**[ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026]**
**Nos. 25-5241(L), 25-5265, 25-5277, 25-5310**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

PERKINS COIE LLP,

*Plaintiff-Appellee,*

*v.*

UNITED STATES DEPARTMENT OF JUSTICE *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia

### BRIEF OF FORMER SENIOR GOVERNMENT OFFICIALS AS
### *AMICI CURIAE* IN SUPPORT OF APPELLEES AND AFFIRMANCE

Harold Hongju Koh
Bruce Swartz
PETER GRUBER RULE OF
LAW CLINIC
YALE LAW SCHOOL
127 Wall Street
P.O. Box 208215
New Haven, CT 06520
(203) 432-4932

Amy Jeffress
Trisha Anderson
Joshua A. Matz
Stephen Prifti
HECKER FINK LLP
1050 K Street NW
Suite 1040
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com

Matthew J. Craig
Mack E. Jenkins
HECKER FINK LLP
1150 S. Olive St.
Suite 10-140
Los Angeles, CA 90015
(212) 763-0883

Sean Hecker
Julie E. Fink
Shawn G. Crowley
Jenna M. Dabbs
Kate L. Doniger
Michael Ferrara
David Gopstein
Damaris Hernández
Marshall L. Miller
David Patton
John C. Quinn
Gabrielle E. Tenzer
HECKER FINK LLP
350 Fifth Avenue
63rd Floor
New York, NY 10118
(212) 763-0883

*Counsel for Amici Curiae Former Senior Government Officials*

## <u>CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES</u>

All parties, intervenors, and amici appearing before the district court and in this Court are listed in Appellants' briefing. References to rulings at issue and related cases also appear in Appellants' briefing.

## TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ...................................................................................1

SUMMARY OF ARGUMENT .......................................................................................2

ARGUMENT ....................................................................................................................4

I.    THE ORDERS UNCONSTITUTIONALLY VIOLATE THE SEPARATION OF POWERS BY USURPING THE POWER OF THE JUDICIARY. ..............................................................................................4

II.    THE ORDERS ALSO VIOLATE THE EXPLICIT CONSTITUTIONAL PROHIBITION OF BILLS OF ATTAINDER. ..............................................6

    A.    The Bill of Attainder Clauses Textually Enshrine the Constitution's Structural Prohibition Against the Usurpation of Judicial Authority. ..6

    B.    The Orders Function as an Unlawful Bill of Attainder by Imposing Punishment. ...............................................................................13

III.    THE NATIONAL SECURITY AND OTHER JUSTIFICATIONS OFFERED FOR THESE EXECUTIVE ORDERS ARE PRETEXTUAL...17

    A.    The President's Blanket Suspension of Security Clearances is Reviewable and Was Pretextual.......................................................17

    B.    The Invocation of Racial Discrimination as a Justification is Equally Pretextual.................................................................................20

    C.    The Settlements with Other Firms Confirm the Pretextual Nature of the Justifications Proffered by the Government.................................21

CONCLUSION ...............................................................................................................26

## Table of Authorities

**CASES**

*Al-Aulaqi v. Panetta*,
    35 F. Supp. 3d 56 (D.D.C. 2014)..................................................................12

*Amiri v. Kelly*,
    No. 17-cv-12188, 2018 WL 623652 (E.D. Mich. Jan. 30, 2018)..................12

*Anthropic PBC v. U.S. Dep't of War,*
    No. 26-cv-1996, 2026 WL 836842 (N.D. Cal. Mar. 26, 2026).....................25

*Coll. v. U.S. Dep't of Health & Hum. Servs.*,
    798 F. Supp. 3d 77 (D. Mass. 2025)............................................................25

*Cooperativa Multiactiva de Empleados de Distribuidores de Drogas v.*
    *Newcomb*,
    No. 98-cv-949, 1999 U.S. Dist. LEXIS 23168 (D.D.C. Mar. 29,
    1999) ............................................................................................................12

*Cummings v. Missouri*,
    71 U.S. 277 (1866)................................................................... 7, 8, 15

*Davies v. Young,*
    No. 12-cv-2794, 2013 WL 5450308 (D. Colo. Sept. 30, 2013)....................12

*Dehainaut v. Pena,*
    32 F.3d 1066 (7th Cir. 1994) .......................................................................12

*Dep't of the Navy v. Egan,*
    484 U.S. 518 (1988)................................................................... 17, 18

*El-Ganayni v. U.S. Dep't of Energy*,
    591 F.3d 176 (3d Cir. 2010) ........................................................................18

*Ex parte Garland,*
    71 U.S. (4 Wall.) 333 (1866)........................................................... 5, 14, 15

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003)................................................................. 13, 14

*Goodyear Tire & Rubber Co. v. Haeger*,
581 U.S. 101 (2017).....................................................................................6

*In re Grand Jury Subpoenas*,
No. 26-mc-12, 2026 WL 710202 (D.D.C. Mar. 11, 2026) ..........................25

*Hettinga v. United States*,
677 F.3d 471 (D.C. Cir. 2012).....................................................................14

*Jamaica Ash & Rubbish Removal Co. v. Ferguson*,
85 F. Supp. 2d 174 (E.D.N.Y. 2000) ..........................................................12

*Jenner & Block LLP v. U.S. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025)............................................. 19, 20, 21, 23

*Joint Anti-Fascist Refugee Committee v. McGrath*,
341 U.S. 123 (1951).............................................................................. 11, 12

*Kadi v. Geithner*,
42 F. Supp. 3d 1 (D.D.C. 2012)...................................................................12

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
909 F.3d 446 (D.C. Cir. 2018).....................................................................16

*Kennedy v. Mendoza-Martinez*,
372 U.S. 144 (1963).....................................................................................16

*Korte v. Off. of Pers. Mgmt.*,
797 F.2d 967 (Fed. Cir. 1986) .....................................................................12

*Kovac v. Wray*,
No. 18-cv-110, 2020 WL 6545913 (N.D. Tex. Nov. 6, 2020).....................12

*Lee v. Garland*,
120 F.4th 880 (D.C. Cir. 2024).....................................................................19

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001)......................................................................5, 6

*Lynce v. Mathis*,
    519 U.S. 433 (1997)........................................................................7

*Marshall v. Sawyer*,
    365 F.2d 105 (9th Cir. 1966) .......................................................12

*Muskrat v. United States*,
    219 U.S. 346 (1911).......................................................................6

*Myers v. United States*,
    272 U.S. 52 (1926).........................................................................4

*Nat'l Fed'n of Fed. Emps. v. Greenberg*,
    983 F.2d 286 (D.C. Cir. 1993).....................................................18

*Nixon v. Administrator of General Services*,
    433 U.S. 425 (1977)........................................................ 7, 14, 16

*Paradissiotis v. Rubin*, 171 F.3d 983 (5th Cir. 1999)............................12

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    783 F. Supp. 3d 105 (D.D.C. 2025).............................. 12, 19, 20, 21, 22, 23

*Peters v. Hobby*,
    349 U.S. 331 (1955)......................................................................11

*Rattigan v. Holder*,
    689 F.3d 764 (D.C. Cir. 2012).....................................................18

*Scheerer v. U.S. Att'y Gen.*, 513 F.3d 1244 (11th Cir. 2008)................12

*SEC v. Jarkesy*,
    603 U.S. 109 (2024).......................................................................4

*Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*,
    468 U.S. 841 (1984)........................................................... 14, 15

*Susman Godfrey LLP v. Exec. Office of the President*,
   789 F. Supp. 3d 15 (D.D.C. 2025)............................................................ 19, 23

*United States v. Brown*,
   381 U.S. 437 (1965)............................................................ 2, 6, 7, 9, 23, 24

*United States v. Lovett*,
   328 U.S. 303 (1946)...................................................................... 15, 16

*Walmer v. U.S. Dep't of Def.*,
   52 F.3d 851 (10th Cir. 1995) .......................................................................12

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
   784 F. Supp. 3d 127 (D.D.C. 2025)........................................................ 20, 23

*Zaid v. Exec. Off. of President,*
   No. 25-cv-01365, 2025 WL 3724884 (D.D.C. Dec. 23, 2025) ....... 11, 12, 20

**U.S. CONSTITUTIONAL PROVISIONS**

Article I § 9 ...........................................................................................2, 7

Article I § 10 ...............................................................................................7

Article III § 1...............................................................................................5

Article III § 3...............................................................................................23

**FEDERAL STATUTES**

50 U.S.C. § 3341 .......................................................................................18

**OTHER AUTHORITIES**

60 Fed. Reg. 40245 (1995) ........................................................................18

Jacob Reynolds, *The Rule of Law and the Origins of the Bill of Attainder
   Clause*, 18 St. Thomas L. Rev. 177 (2005) ......................................................9

Brett Samuels, *Trump Suggests Law Firms 'Want to Make Deals' After Rescinding Paul, Weiss Order*, The Hill (Mar. 21, 2025)..............................16

Duane L. Ostler, *Bills of Attainder and the Formation of the American Takings Clause at the Founding of the Republic*, 32 Campbell L. Rev. 227 (2010) .............................................................................................8

Exec. Order 12968 .........................................................................................18

Exec. Order 14230 ................................................................................... 15, 20

Exec. Order 14246 ................................................................................... 14, 15

Exec. Order 14250 ................................................................................... 14, 15

Exec. Order 14263 ................................................................................... 14, 15

Forrest McDonald, *Novus Ordo Seclorum: The Intellectual Origins of the Constitution* (1985).....................................................................................24

Harold Hongju Koh, Bruce Swartz, Avi Gupta, and Brady Worthington, *The War on Anthropic: Pretextual Designation and Unlawful Punishment*, Just Sec. (Mar. 6, 2026)............................................................25

Harold Hongju Koh, Fred Halbhuber, & Inbar Pe'er, *No, the President Cannot Enforce the Law-Firm Deals*, Just Sec. (Apr. 28, 2025) ..................22

Harold Hongju Koh, Fred Halbhuber, & Inbar Pe'er, *No, the President Cannot Issue Bills of Attainder*, Just Sec. (Apr. 9, 2025)..............................11

Joseph Story, *Commentaries on the Constitution of the United States* § 1338 (1st ed. 1833) ....................................................................................6

Kenneth Pickthorn*, Early Tudor Government: Henry VII* (1934)..........................10

Matthew Steilen, *The Legislature at War: Bandits, Runaways and the Emergence of a Virginia Doctrine of Separation of Powers*, 37 L. & Hist. Rev. 493 (2019) ...............................................................................8

vii

Michael S. Schmidt, Matthew Goldstein, & Maggie Haberman, *Two Big Law Firms Said to Be Doing Free Work for Trump Administration*, N.Y. Times (Aug. 20, 2025) ................................................................22

Nathan Ristuccia, *In Praise of Attainder*, 56 St. Mary's L.J. 621 (2025) ...............24

Stanford Lehmberg, *Parliamentary Attainder in the Reign of Henry VIII*, 18 Historical J. 675  (1975) ............................................................8

*The Federalist No. 44* (James Madison)..................................................3, 9

*The Federalist No. 69* (Alexander Hamilton)..............................................10

*The Federalist No. 78* (Alexander Hamilton)..............................................10

## INTEREST OF AMICI CURIAE

Amici curiae ("Amici") are former public officials who have worked at the most senior levels of the United States government for both Democratic and Republican Administrations.[1] Amici have held the highest security clearances and have devoted decades to combating the national security threats that the United States faces in an increasingly dangerous world. They also have extensive experience with Executive Branch administration, including the issuance of Executive Orders. Collectively, amici have worked in senior leadership positions in the Administrations of seven Presidents from both major political parties.[2]

Amici have devoted their careers across multiple decades to upholding the Constitution and protecting the security of the United States. They write to provide their views regarding the unprecedented nature of the Executive Orders at issue in these proceedings. In particular, amici submit that these Orders violate both the Constitution's separation of powers and the Constitution's specific prohibition of bills of attainder. Further, in amici's view, the Administration's national security and

---

[1] A complete list of amici can be found in the Appendix.

[2] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), amici state that no counsel for a party to this case authored this brief in whole or in part; no party or counsel for a party contributed monetarily to the preparation or submission of any portion of this brief; and no person other than counsel for amici curiae contributed money that was intended to fund preparing or submitting the brief. Appellants and Appellees consent to amici's filing of this brief.

1

other proffered justifications for these Orders are manifestly pretextual and cannot override these fundamental constitutional guarantees.

## SUMMARY OF ARGUMENT

1. Both the Constitution's structure and its plain text forbid Executive Orders like those at issue here. These Orders flout the Constitution's structural separation of powers by unconstitutionally installing the President as prosecutor, judge, and jury for American individuals and institutions that have not been charged with—much less adjudged guilty of—any crime. These Orders exceed any authority entrusted to the President by Article II, were not made pursuant to any power that has been or could be delegated by Congress under Article I, and usurp the powers of the Judiciary under Article III.

2. In addition, these Orders likewise violate the Constitution's absolute textual prohibition against Bills of Attainder, U.S. Const. art. I, § 9, cl. 3, which was intended "as an implementation of the separation of powers." *United States v. Brown,* 381 U.S. 437, 442 (1965). The Framers repudiated the English practice of "attainder," by which English Kings and Parliament acted together to impose extrajudicial punishment without process. From their study of English history and their own experiences during the Revolution, the Framers were intimately familiar with the dangers such bills of attainder posed to both personal liberty and private property. As James Madison argued, because bills of attainder "are contrary to the

first principles of the social compact," the Constitution's prohibition of such bills was a part of a "constitutional bulwark in favor of personal security and private rights." *The Federalist No. 44* (James Madison). The Framers did not intend, and the Bill of Attainder Clause forbids, the President to do alone what he could not do together with Congress. That "constitutional bulwark" thus defends against attainders imposed by the President alone, not just bills of attainder passed by Congress and signed into law by the President.

3. The Constitution's separation of powers, and its prohibition of bills of attainder, cannot be overcome by pretextual claims that the President was acting here to protect national security or fight racial discrimination. As the courts below found, the President's goal was in fact to cripple—if not kill outright—the targeted law firms, while simultaneously extracting nearly a billion dollars in "free" legal services from firms that chose to settle rather than face the same fate. As amici know from their extensive experience in national security and Executive Branch administration, neither access to our nation's most valuable secrets, nor Americans' civil liberties, are a commodity that the Executive Branch may monetize. While security clearances may be revoked and allegations of racial discrimination may be investigated and adjudicated, the Executive must follow an established process to do either. The President may not, as he did here, invoke these powers as pretexts to punish the Appellees or to extract "free" services from others. These Orders were, moreover,

3

only the initial stage of a larger campaign of attainder by the President against a long list of perceived "enemies." The Constitution demands that the Orders be struck down under both the separation of powers and the Bill of Attainder Clause.

## ARGUMENT

## I. THE ORDERS UNCONSTITUTIONALLY VIOLATE THE SEPARATION OF POWERS BY USURPING THE POWER OF THE JUDICIARY.

Other briefs explain why these retaliatory Orders violate the First Amendment. But as the Supreme Court has made clear, "[i]f there is a principle in our Constitution . . . more sacred than another, it is that which separates the legislative, executive and judicial powers." *Myers v. United States*, 272 U.S. 52, 116 (1926) (cleaned up). In constructing the Constitution's separation of powers, the Framers took pains not to "concentrate the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024).

But that is exactly what these Orders do: they unconstitutionally install the President as prosecutor, judge, and jury. By targeting specific American citizens and law firms for retaliatory extrajudicial punishment, these Orders are *ultra vires*: they exceed any authority constitutionally entrusted to the President by Article II or properly delegated to the President by Congress under Article I. The Constitution does not grant the President any explicit or implicit authority to issue punitive Orders against his perceived domestic enemies. And under the structure of our Constitution,

Congress could not pass—and has not sought to pass—any law expressly or impliedly authorizing the President to issue such Orders. Any attempt by Congress to do so would intrude upon the Article III powers of the judiciary.

The President here claims a sweeping authority to levy retaliatory punishment against individuals and institutions that have been neither charged with nor found guilty of any crime. These Orders contravene Article III's core command: that the "judicial Power of the United States" be vested in the federal courts, not the President. U.S. Const. art. III, § 1. To enforce the Order would both intrude executive power into the exclusive zone of a coordinate branch and condone a "severe impairment of the judicial function." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544-46 (2001).

The usurpation of the judicial role by the political branches violates the separation of powers regardless of who is targeted. But that violation is compounded here, where the targets are lawyers and law firms. In amici's experience, the judiciary—*not* the President—possesses the expertise and unique constitutional authority to regulate the conduct of attorneys throughout legal proceedings. As the Supreme Court held more than a century ago, the "admission [of officers of the court] or their exclusion is . . . the exercise of *judicial power*." *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 378-79 (1866) (emphasis added). That power, which "includes the ability to fashion an appropriate sanction for conduct which abuses the

judicial process," *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (citation omitted), falls outside the executive function. The President may not unilaterally decide to seize the judiciary's prerogative to evaluate and discipline the conduct of lawyers engaged in lawful practice. Only the courts have the constitutional power to "decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision." *Muskrat v. United States*, 219 U.S. 346, 356 (1911) (citation omitted).

To permit the Executive to enforce Orders that usurp the role of the judiciary—both generally and with regard to lawyers specifically—would disregard these settled separation-of-powers and due-process norms that our "informed, independent judiciary" ensures. *Velazquez*, 531 U.S. at 545.

## II. THE ORDERS ALSO VIOLATE THE EXPLICIT CONSTITUTIONAL PROHIBITION OF BILLS OF ATTAINDER.

### A. The Bill of Attainder Clauses Textually Enshrine the Constitution's Structural Prohibition Against the Usurpation of Judicial Authority.

The Constitution does more than establish a general principle of separation of powers. Through the Constitution's Bill of Attainder Clauses, the Framers expressed their *particular* concern that the other branches may seek to violate the separation of powers by usurping the judicial function. *See United States v. Brown,* 381 U.S. 437, 442 (1965) (the Bill of Attainder Clause was intended "as an implementation of the separation of powers"); 3 Joseph Story, *Commentaries on the Constitution of the*

*United States* § 1338 (1st ed. 1833) (noting that in bill of attainder cases "the legislature assumes judicial magistracy"). The fact that the Orders here bear the hallmarks of bills of attainder thus further underscores that the President has unlawfully violated the separation of powers by intruding upon the authority of the Judicial Branch.

The prohibition against bills of attainder holds such importance in our constitutional structure that it is enshrined in the Constitution at both the federal and state level. *See* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder . . . shall be passed [by the Congress]"); U.S. Const. art. I, § 10 ("No State shall . . . pass any Bill of Attainder . . . ."). As the Supreme Court has noted, the clauses prohibiting bills of attainder "were adopted by the Constitutional Convention unanimously, and without debate," *Brown*, 381 U.S. at 441, and formed "an important ingredient of the doctrine of 'separation of powers,' one of the organizing principles of our system of government." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 469 (1977).

The Constitution's absolute ban on bills of attainder reflects the Framers' profound concern with preventing the government from "singling out disfavored persons and meting out summary punishment for past conduct." *Lynce v. Mathis*, 519 U.S. 433, 440 n.12 (1997) (citing *Brown*, 381 U.S. at 456-62). The core evil inherent in bills of attainder is that they bypass judicial processes to directly target and punish specific individuals or groups without due process of law. *Cummings v.*

*Missouri*, 71 U.S. 277, 323 (1866) (explaining that bills of attainder violate the separation of powers by allowing Congress to "*exercise[] the powers and office of judge*" and "assume[] . . . judicial magistracy . . . . " (emphasis added)). The Constitution's absolute prohibition against bills of attainder prevents the political branches from "pronounc[ing] upon the guilt of the party without any of the forms or safeguards of trial" to stifle political opponents. *Id.*

The Framers did not adopt the categorical bar on bills of attainder in isolation. They were motivated by an express intent to repudiate a long and notorious English tradition of attainder. English monarchs, operating through pliant Parliaments, wielded bills of attainder as a favored tool to dispatch their perceived enemies without the inconvenient rigors of judicial trial.[3] Prior to the enactment of our Constitution, that practice of attainder migrated to early America, where colonial and early state officials used bills of attainder to punish both rebels and Loyalists.[4]

---

[3] Henry VIII, for instance, together with his Parliament, attainted 130 persons, most of them (96) for treason. Stanford Lehmberg, *Parliamentary Attainder in the Reign of Henry VIII*, 18 Historical J. 675, 701 (1975).

[4] *See* Matthew Steilen, *The Legislature at War: Bandits, Runaways and the Emergence of a Virginia Doctrine of Separation of Powers*, 37 L. & Hist. Rev. 493, 504 (2019) (documenting the attainder of Nathaniel Bacon and his followers by colonial officials after Bacon's Rebellion); Duane L. Ostler, *Bills of Attainder and the Formation of the American Takings Clause at the Founding of the Republic*, 32 Campbell L. Rev. 227, 261 (2010) ("Each of the thirteen colonies enacted attainder legislation, not only to punish British loyalists, but specifically to confiscate and sell their property.").

These troubling historical episodes "were surely on the minds of the delegates at the [Constitutional] [C]onvention," and necessarily informed their decision to banish bills of attainder from the American Republic. Jacob Reynolds, *The Rule of Law and the Origins of the Bill of Attainder Clause*, 18 St. Thomas L. Rev. 177, 202 (2005). It was against this backdrop that James Madison condemned bills of attainder as "contrary to the first principles of the social compact" and celebrated the Constitution's prohibition of such bills as "a constitutional bulwark in favor of personal security and private rights." *The Federalist No. 44*, at 282 (James Madison) (C. Rossiter ed. 1961).

The prohibition of attainder is not limited to Congress. As the Supreme Court has explained, unlike the judiciary, the political branches are "not so well suited . . . to the task of ruling upon the blameworthiness, of, and levying appropriate punishment upon, specific persons." *Brown*, 381 U.S. at 445. The Court in *Brown* noted that the Framers anticipated that, under the system of government they were creating, it would be Congress—not the Executive—that would be "most likely to forget the bounds of its authority," and thus they acted to prevent "trial by legislature." *Id.* at 442-43. But "the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers," *id.* at 442, a principle violated no less by trial by the President than by trial by Congress. Whether it is the Executive or the

9

Legislative Branch that infringes upon judicial authority, the consequence is the same: the judicial role is usurped. As Hamilton cautioned in Federalist No. 78, "[t]here is no liberty if the power of judging be not separated from the legislative *and executive* powers." *The Federalist No. 78*, at 466 (Alexander Hamilton) (C. Rossiter ed. 1961) (emphasis added) (quoting Montesquieu, *The Spirit of the Laws* 152 (Thomas Nugent trans., The Colonial Press 1899) (1748)).

By placing the Bill of Attainder Clauses in Article I, the Framers clearly did not intend to authorize the President to do alone what Congress and the President, acting together, could not. In the three hundred years preceding the American Revolution, the King, acting alone, could not pass a bill of attainder. By the late fifteenth century, it was settled that "the consent of both branches of parliament was requisite" to issue a bill of attainder. Kenneth Pickthorn*, Early Tudor Government: Henry VII* 119 (1934).[5] The Framers would have rebelled at the notion that the President would possess a power denied to the English King. *See, e.g.*, *The Federalist No. 69*, at 417-18 (Alexander Hamilton) (C. Rossiter ed. 1961) (declaring that the President's authority would be "in substance much inferior to" "that of the

---

[5]  The House of Lords had, for example, refused to pass a bill of attainder introduced by Henry VIII until Sir Thomas More was removed from the list of those attainted. *See* Matthew Steilen, *Bills of Attainder*, 53 Hou. L. Rev. 767, 801 (2016). Thereafter, "an Executive Bill of Attainder . . . was hardly, if at all, attempted by the Stuart Kings." F.J. Stimson, *The Constitution and the People's Liberties*, 184 N. Am. L. Rev. 508, 512 (1907).

king of Great Britain"); Harold Hongju Koh, Fred Halbhuber, & Inbar Pe'er, *No, the President Cannot Issue Bills of Attainder*, Just Sec. (Apr. 9, 2025), https://www.justsecurity.org/110109/president-cannot-issue-attainder-bills/.

The Constitution's structure reinforces this understanding. If the President cannot issue a bill of attainder when acting together with Congress, then surely he lacks the power to unilaterally issue the same bill of attainder by Executive Order. Indeed, "other protections lodged in Article I, including the prohibitions on titles of nobility and suspending the writ of habeas corpus, are logically applied to the President as well." *Zaid v. Exec. Off. of President*, No. 25-cv-01365, 2025 WL 3724884, at *16 (D.D.C. Dec. 23, 2025).

Supreme Court Justices have also made this point explicitly. During the McCarthy era, in *Joint Anti-Fascist Refugee Committee v. McGrath*, the Court reviewed challenges to executive actions involving named organizations and individuals designated as Communist by a "Loyalty Review Board." 341 U.S. 123 (1951). Although the *McGrath* Court did not rule on whether the Loyalty Board's determinations constituted unconstitutional bills of attainder, Justice Black's separate opinion condemned the determinations on precisely that basis. *See id.* at 143-44 (Black, J., concurring).[6] It was unfathomable, Justice Black explained, that

---

[6] Similarly, in *Peters v. Hobby*, both Justices Black and Douglas filed separate concurrences arguing that the Court should have held that the Loyalty Board's orders

11

"the authors of the Constitution . . . inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the [legislative] bill [of attainder] such an odious institution." *Id.* at 144 (Black, J., concurring).

Quoting this statement by Justice Black, the court below in *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 173 n.36 (D.D.C. 2025), found that "[i]n many ways, [the Executive Order against Perkins Coie] is indistinguishable from a bill of attainder," and noted that the "assumption" that the Bill of Attainder clause applies only to Congress is "called into question" by constitutional text and history. The *Perkins Coie* court concluded, however, that "consideration of this issue must be left to another day" since the plaintiff had not raised this as a stand-alone claim or pressed it in its papers. *Id.* In *Zaid*, the court went further, finding that the plaintiff had plausibly alleged that President Trump's summary revocation of his security clearance violated the Bill of Attainder Clause. 2025 WL 3724884, at *16-17. As the district court explained, "it is hard to imagine the Framers would have prohibited legislative bills of attainder while leaving the executive branch free to attaint whomever it likes." *Id.* at *16 (citing *McGrath*, 341 U.S. at 144 (Black, J., concurring)).[7]

---

constituted unconstitutional bills of attainder. 349 U.S. 331, 349-50 (1955) (Black, J., concurring); *id.* at 350-52 (Douglas, J., concurring).

[7] The Seventh Circuit has likewise acknowledged that the Bill of Attainder Clause may constrain executive actions. *See Dehainaut v. Pena*, 32 F.3d 1066, 1071 (7th

12

**B. The Orders Function as an Unlawful Bill of Attainder by Imposing Punishment.**

History and precedent make clear that the constitutional bars against bills of attainder equally apply to Executive Orders that purport to operate as law. For a law to be prohibited as an unlawful bill of attainder it must "(1) appl[y] with specificity, and (2) impose[] punishment." *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C.

---

Cir. 1994) (explaining that executive policies functionally equivalent to legislation could be subject to bill of attainder analysis). Other courts have questioned, but left open, whether the constitutional prohibition on bills of attainder extends to the executive. *See, e.g.*, *Paradissiotis v. Rubin*, 171 F.3d 983, 988-89 (5th Cir. 1999); *Scheerer v. U.S. Att'y Gen.*, 513 F.3d 1244, 1253 n.9 (11th Cir. 2008); *Walmer v. U.S. Dep't of Def.*, 52 F.3d 851, 855 (10th Cir. 1995); *Cooperativa Multiactiva de Empleados de Distribuidores de Drogas v. Newcomb,* No. 98-cv-949, 1999 U.S. Dist. LEXIS 23168, at *18-19 (D.D.C. Mar. 29, 1999), *aff'd*, 221 F.3d 195 (D.C. Cir. 2000). Two circuit courts have declined to apply the Bill of Attainder Clause to executive actions, but did not address whether a particular executive action violated the separation of powers. See *Marshall v. Sawyer,* 365 F.2d 105, 111 (9th Cir. 1966) ("[T]he fact that [a state agency's black book and accompanying letter] were not legislative acts deprives them of status as bills of attainder in the constitutional sense."); *cf. Korte v. Off. of Pers. Mgmt.,* 797 F.2d 967, 972 (Fed. Cir. 1986) (although the bill-of-attainder question was not dispositive, the court remarked that "[t]he clause is a limitation on the authority of the legislative branch" and noted that the court was "aware of [no authority] holding that the clause applies to the executive branch"). A handful of district courts have noted, with similarly limited analysis, that the prohibition on bills of attainder is restricted to the legislature. *See Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 82 (D.D.C. 2014); *Kovac v. Wray*, No. 18-cv-110, 2020 WL 6545913, at *3 (N.D. Tex. Nov. 6, 2020); *Davies v. Young*, No. 12-cv-2794, 2013 WL 5450308, at *12 (D. Colo. Sept. 30, 2013); *Amiri v. Kelly,* No. 17-cv-12188, 2018 WL 623652, at *13 (E.D. Mich. Jan. 30, 2018); *Jamaica Ash & Rubbish Removal Co. v. Ferguson*, 85 F. Supp. 2d 174, 184-85 (E.D.N.Y. 2000); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 42-43 (D.D.C. 2012).

13

Cir. 2003) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 678, 683 (D.C. Cir. 1998)). Both prongs are straightforwardly satisfied by the Orders challenged here.

First, the Orders specifically name and impose punishment on Appellees without judicial trial: the Orders all "single[] out a person or class by name" multiple times. *Hettinga v. United States*, 677 F.3d 471, 477 (D.C. Cir. 2012) (citing *Foretich*, 351 F.3d at 1217). Many of the Orders also single out attorneys by name.[8]

Second, the Orders clearly inflict "punishment" under the tests set forth by the Supreme Court in *Nixon v. Administrator of General Services*, 433 U.S. 425, 473-78 (1977). The Orders plainly "fall[] within the historical meaning of legislative punishment." *Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 852 (1984). The Orders "mark . . . with . . . infamy or disloyalty," *Foretich*, 351 F.3d at 1219, when they characterize, for instance, Jenner & Block's activities as "detrimental to critical American interests" and conclude that such conduct should not "be subsidized by Federal taxpayer funds or contracts." Exec. Order 14246 § 1.[9] This type of stigma by public denunciation of loyalty and trustworthiness parallels the loyalty tests that the Supreme Court has consistently invalidated as violating the Bill of Attainder Clause. *See, e.g.*, *Ex parte Garland*, 71 U.S. (4 Wall.) at 380-81

---

[8] *See, e.g.,* Exec. Order 14246 § 1, 90 Fed. Reg. at 13997; Exec. Order 14250 § 1, 90 Fed. Reg. at 14549.

[9] *See also* Exec. Order 14263 § 1, 90 Fed. Reg. at 15615; Exec. Order 14230 § 1, 90 Fed. Reg. at 11781; Exec. Order 14250 § 1.

(invalidating a federal statute requiring attorneys to take a loyalty oath to practice in federal courts); *Cummings*, 71 U.S. at 330-32  (invalidating a state constitutional provision requiring a loyalty oath from clergymen); *United States v. Lovett*, 328 U.S. 303, 315-16 (1946) (invalidating a congressional appropriations act provision prohibiting any future payment of salaries to three named government employees alleged to have been subversive).

In addition, the Orders erect "bars to participation by individuals or groups in specific employments or professions," *Selective Serv. Sys.*, 468 U.S. at 852, by directing agency heads to "take appropriate steps to terminate any contract" with the targeted law firms, thereby directly harming the firms' ability to engage in government legal work.  Exec. Order 14246 § 3(b)(i).[10]  By instructing agency officials to "refrain from hiring employees" of the firms and to provide "guidance limiting official access from Federal Government buildings to employees" of the firms, *id.* § 5,[11] the Orders create substantial barriers to practice in areas involving federal agencies, similar to the attorney exclusions invalidated in *Ex parte Garland*, 71 U.S. at 380-81. And the Orders expressly aim punishment not just at the law firms as corporate entities, but at individuals *within* those firms, specifically calling for

---

[10] *See also* Exec. Order 14263 § 3(b)(i); Exec. Order 14230 § 3(b)(i); Exec. Order 14250 § 3(b)(i).

[11] *See also* Exec. Order 14263 § 5; Exec. Order14230 § 5; Exec. Order 14250 § 5.

barring individual attorneys from federal buildings, prohibiting their communication with federal employees, and limiting their possible future employment by the federal government—affecting their personal professional standing and opportunities. *Cf. Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 463 (D.C. Cir. 2018) ("[W]e do not foreclose the possibility that Congress could impose a brand of infamy or disloyalty upon a corporation that would rise to the level of legislative punishment.").

Far from denying punitive intent, President Trump has openly admitted that these Orders were motivated by a naked official intent to punish. *See Nixon*, 433 U.S. at 478; *Lovett*, 328 U.S. at 308-14 (1946); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 169-70 (1963). When asked about the intent of the Order targeting the Perkins Coie law firm, President Trump stated on March 25, 2025:

> You mean the law firms that we're going after, that went after me for four years ruthlessly, violently, illegally? Are those the law firms you're talking about? They're not babies. They're very sophisticated people. Those law firms did bad things. Bad things. They went after me for years.[12]

---

[12] Brett Samuels, *Trump Suggests Law Firms 'Want to Make Deals' After Rescinding Paul, Weiss Order*, The Hill (Mar. 21, 2025) (internal quotation marks omitted), https://thehill.com/homenews/administration/5207675-trump-paul-weiss-law-firm-deal.

16

The President's own words confirm what the Orders' text makes plain: this is punishment without trial and is forbidden by the Bill of Attainder Clause of the Constitution.

## III. THE NATIONAL SECURITY AND OTHER JUSTIFICATIONS OFFERED FOR THESE EXECUTIVE ORDERS ARE PRETEXTUAL.

Amici have spent their careers protecting bona fide national security interests and protecting civil liberties. Based on their experience at the highest levels of U.S. Government, amici submit that, as the Courts below concluded, these Orders were not designed to, and did not, protect national security or advance nondiscrimination.

### A. The President's Blanket Suspension of Security Clearances is Reviewable and Was Pretextual.

Security clearance revocations are not lawfully used as a weapon of presidential displeasure. In amici's experience, security clearances are granted to protect sensitive information; they can never be revoked as a form of punishment. Instead, revocation must be solely based on a "[p]redictive judgment" that compelling national security interests necessitate a specific revocation for a particular individual, as determined by officials "with the necessary expertise in protecting classified information." *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988). Congress reaffirmed this point by specifically directing the President to select a single entity to "develop[] and implement[] uniform and consistent policies and procedures to ensure the effective, efficient, and timely completion of security

17

clearances and determinations for access to highly sensitive programs." 50 U.S.C. § 3341(b)(2). This settled practice is reflected in prior Executive Order 12968, which requires that any decision to grant or deny access to classified information be "based on judgments by appropriately trained adjudicative personnel." 60 Fed. Reg. 40245, 40250 (1995).

As this Court has recognized, "[i]t is simply not the case that all security-clearance decisions are immune from judicial review." *Nat'l Fed'n of Fed. Emps. v. Greenberg,* 983 F.2d 286, 289 (D.C. Cir. 1993). The deference recognized in *Egan* is not a blank check; it extends only to decisions made by trained personnel exercising "expert, predictive judgment[s]" about whether an individual poses a national security threat that are "categorically unlike" what a court can evaluate. *Rattigan v. Holder*, 689 F.3d 764, 767 (D.C. Cir. 2012).

Thus, courts cannot review the substance of security clearance determinations made through proper channels. *Egan*, 484 U.S. at 527-30. However, courts can review procedural irregularities and actions that fall outside the proper clearance process. *See Rattigan*, 689 F.3d at 767; *see also El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183 (3d Cir. 2010) (noting that "Article III courts have jurisdiction to hear constitutional claims arising from the clearance revocation process, even though the merits of that revocation cannot be reviewed" (citation and internal quotation marks omitted)). The government relies heavily on this Court's decision

18

in *Lee v. Garland*, 120 F. 4th 880 (D.C. Cir. 2024), but *Lee* confirms, rather than undermines, this framework. *Lee* bars review of claims that challenge the substantive basis of an individualized, expert-driven security determination, not claims like those here, where the government substituted a political directive for the reasoned administrative process *Egan* presupposes. *See id.* at 886-87.

Each of the courts below found that the security clearance provisions of these Orders were instruments of retaliation with no genuine national security basis. *See Perkins Coie,* 783 F. Supp. 3d at 131, 157 (finding that agencies were effectively told in advance "what the outcome of their analysis is, because they had been told in Section 1 that working with [Perkins Coie] is not consistent with the national interest" and that "the record demonstrates that retaliation is the only plausible motive" for the security clearance revocations"); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 101, 114 n.18 (D.D.C. 2025) (concluding that "[t]he immediate and blanket suspension involves no 'predictive judgment[s]' about an 'individual['s] threat to national security—indeed it doesn't even permit them'" and finding that the "case implicates no national security concern at all." (citation omitted)); *Susman Godfrey LLP v. Exec. Office of the President*, 789 F. Supp. 3d 15, 46 (D.D.C. 2025) (observing that the government's "departure from the well-trodden path of individualized determination in favor of wholesale revocation—without even an ounce of supporting evidence for the court to evaluate—raises red flags and leads

19

the court to believe that the only plausible motivation for Section 2 is retaliation."); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President ("WilmerHale")*, 784 F. Supp. 3d 127, 150 (D.D.C. 2025) (noting with approval expert testimony that the blanket suspension was "nearly unprecedented" in scope, comparable only "'to the repudiated and discredited'" security clearance revocations of the Red Scare era); *see also Zaid*, 2025 WL 3724884, at *8 (finding that plaintiff's representation of whistleblowers and others adverse to the government "was the sole reason for summarily revoking his security clearance").

## B. The Invocation of Racial Discrimination as a Justification is Equally Pretextual.

The Orders also directed the EEOC and Attorney General to "investigate the practices of large law firms ... for compliance with race-based and sex-based nondiscrimination laws." *See, e.g.,* Exec. Order 14230 § 4. However, the punitive measures in the Orders were not conditioned on any findings of racial discrimination; the investigation was window dressing for predetermined punishment. The structure of the Orders makes this plain: the security clearance suspensions, contract reviews, and building access restrictions all took effect immediately upon issuance, before any investigation had been initiated, let alone completed. *See e.g., Perkins Coie*, 783 F. Supp. 3d at 132 (noting that the day after the EO was issued Perkins Coie attorneys were denied building access); *Jenner & Block*, 784 F. Supp. 3d at 91 (building access restrictions took effect swiftly without

20

investigation). This investigative mandate was an afterthought, appended to sanctions already imposed. During their time in government, amici endeavored to avoid and prevent racial discrimination with respect to any official actions. But as one district court below recognized, the Order's "fact sheet says it all: plaintiff and its clients with government contracts are targeted because of plaintiff's 'partisan lawsuits'"—not because of any finding or even allegation of discrimination directed at the specific firms being punished. *Perkins Coie,* 783 F. Supp. 3d at 159.

## C. The Settlements with Other Firms Confirm the Pretextual Nature of the Justifications Proffered by the Government.

That the stated justifications were pretextual is confirmed by what happened when other firms faced similar Orders. As one lower court found, "[e]ight days after issuing EO 14230 against [Perkins Coie], on March 14, 2025, President Trump issued a similar Executive Order against the law firm Paul, Weiss," which "was revoked only seven days after its issuance when President Trump reached a 'deal' with Paul, Weiss, under which agreement that law firm agreed to," among other things, "dedicate the equivalent of $40 million in pro bono legal services during President Trump's term in office." *Perkins Coie*, 783 F. Supp. 3d at 155 (alterations adopted) (internal quotation marks omitted). Other firms followed suit, but had to pay more in "free" legal services. *See Jenner & Block,* 784 F. Supp. 3d at 91-92 (finding that the price rose to $100 million or more).

21

President Trump himself confirmed the nature of the enterprise in a speech on April 8, 2025:

> Have you noticed that lots of law firms have been signing up with Trump? $100 million, another $100 million, for damages that they've done. But they give you $100 million and then they announce, 'We have done nothing wrong.' *And I agree, they've done nothing wrong.* But what the hell, they've given me a lot of money considering they've done nothing wrong. And we'll use some of those people, some of those great firms, and they are great firms too—they just had a bad moment.

*Perkins Coie*, 783 F. Supp. 3d at 156 (emphasis added) (cleaned up).

The White House assessed that, by these means, almost a billion dollars in legal services have been obtained, *id.* at 156, to be used at the President's discretion—distributed to recipients the government could or would not identify, pursuant to deals it could or would not describe, memorialized in forms it could not or would not produce, *see* Michael S. Schmidt, Matthew Goldstein, & Maggie Haberman*, Two Big Law Firms Said to Be Doing Free Work for Trump Administration*, N.Y. Times (Aug. 20, 2025), https://www.nytimes.com/2025/08/20/us/politics/law-firms-free-work-trump-administration.html?smid=nytcore-ios-share; *see also* Harold Hongju Koh, Fred Halbhuber & Inbar Pe'er, *No, the President Cannot Enforce the Law-Firm Deals*, Just Sec. (Apr. 28, 2025), https://www.justsecurity.org/110996/president-unenforceable-law-firm-deals.

An executive program genuinely concerned with national security or racial discrimination does not operate through undocumented deals, secret beneficiaries, and extortion of services. These Orders were instead transparently designed for punishment and profit. All four courts below drew the same inference from the Paul, Weiss saga. The nearly identical "security clearance" provisions in that Order were abandoned the moment Paul, Weiss agreed to a settlement containing no national security component whatsoever—proof, as the *Jenner & Block* court put it, that what it took to escape the process "had not even a glancing relationship" to national security. *Jenner & Block*, 784 F. Supp. 3d at 102; *see also Susman Godfrey*, 789 F. Supp. 3d at 45-46; *WilmerHale*, 784 F. Supp. 3d at 148; *Perkins Coie*, 783 F. Supp. 3d at 155-56. The same can be said with respect to the proffered explanation of racial discrimination. *Perkins Coie*, 783 F. Supp. 3d at 154-55; *Jenner & Block,* 784 F. Supp. 3d at 95-96; *Susman Godfrey*, 789 F. Supp. 3d at 45-47, *WilmerHale*, 784 F. Supp. 3d at 148.

In this regard as well, these Orders function as bills of attainder, which often combined punishment and profit. "[A]ttainder generally carried with it a 'corruption of blood,'" stripping the condemned party's heirs of their right to inherit. *Brown*, 381 U.S. at 441.[13] Accordingly, as a collateral benefit, the King would take

---

[13] The Constitution independently forbids "Corruption of Blood" as a punishment for treason. U.S. Const. Art. III § 3 cl. 2.

possession of the attainted subject's property; indeed, bills of attainder were even passed against those already dead. [14] The Framers encountered this dynamic themselves, as colonial legislatures wielded bills of attainder not only to condemn Loyalists, but also to transfer their property—by some estimates, as much as 10% of colonial land holdings changed hands by these means during the Revolution. *See* Nathan Ristuccia, *In Praise of Attainder*, 56 St. Mary's L.J. 621, 640 (2025) (citing Forrest McDonald, *Novus Ordo Seclorum: The Intellectual Origins of the Constitution* 91-92 (1985)). Thus, in England and the colonies, the threat of attainder hung like a sword of Damocles over those who would follow the attainted targets' example by rebelling. So too here—the President extracted profit in issuing these Orders, not from the Appellees, but from those firms that feared similar Orders being issued against them, and so "settled" with the President. *See Brown,* 381 U.S. at 442 (noting that some bills of attainder "left the designated parties a way of escaping the penalty").

---

[14] *See* Attainder of the Regicides, etc. Act 1660, 12 Car. 2 c. 30 (Eng.) (act of attainder providing "[t]hat the said Oliver Cromwell deceased [and other enumerated deceased persons] . . . shall by vertue of this Act be adjudged to be convicted and attainted of High Treason to all intents and purposes as if they and every of them respectively had beene attainted in their lives"); Lehmberg, *supra* n.3, at 675-76 (documenting the posthumous attainder of Jack Cade).  Following the attainder of the already-deceased Oliver Cromwell and his allies, their bodies were exhumed and their heads "spiked upon oak poles, and set or fixed upon the top of Westminster Hall"—presumably to deter imitators. Josiah Henry Wilkinson, *A Narrative of the Circumstances Surrounding the Head of Oliver Cromwell*, 68 Archaeological J. 233, 234 (1911).

Finally, the Orders here cannot be seen in isolation: Rather, they were the opening salvos in what has become an unrelenting campaign of executive attainder. Since retaking office, President Trump has already attempted to wield the power of the presidency to punish, among others, his political opponents, law firms that hired or represented them, universities whose administrative decisions he disagreed with, journalistic outlets that refused to use his preferred terminology, companies that refused to fire President Trump's political enemies, and members of Congress of whose speech he disapproved. *See* Harold Hongju Koh, Bruce Swartz, Avi Gupta & Brady Worthington, *The War on Anthropic: Pretextual Designation and Unlawful Punishment*, Just Sec. (Mar. 6, 2026), https://www.justsecurity.org/133247/anthropic-hegseth-unlawful-punishment. Indeed, "[b]eing perceived as the President's adversary has become risky in recent years." *In re Grand Jury Subpoenas,* No. 26-mc-12, 2026 WL 710202, at *3 (D.D.C. Mar. 11, 2026). But courts have repeatedly seen through the pretexts put forward by the Administration and have accordingly struck down the President's unlawful attempts to punish his enemies.[15] The same result should follow here.

---

[15] *See, e.g.*, *Anthropic PBC v. U.S. Dep't of War*, No. 26-cv-1996, 2026 WL 836842, at *2 (N.D. Cal. Mar. 26, 2026) ("Nothing in the governing statute supports the Orwellian notion that an American company may be branded a potential adversary and saboteur of the U.S. for expressing disagreement with the government."); *In re Grand Jury Subpoenas*, 2026 WL 710202, at *13 ("The Government has produced essentially zero evidence to suspect Chair Powell of a crime; indeed, its justifications

## CONCLUSION

Amici took oaths to bear true faith and allegiance to the Constitution and to support and defend the Constitution against all enemies, foreign and domestic. When amici served in the United States government, participation in Executive Orders of this nature would have been viewed as unthinkable violations of their oaths. Keeping faith with those same oaths leads to their view that it is essential that the court hold campaigns of attainder like these Executive Orders unconstitutional.

Accordingly, Amici submit that the judgments below should be affirmed.

Dated: April 3, 2026

Respectfully Submitted,

Harold Hongju Koh[16]
Bruce Swartz
PETER GRUBER RULE OF LAW CLINIC
YALE LAW SCHOOL[17]
127 Wall Street
P.O. Box 208215
New Haven, CT 06520
(203) 432-4932

*/s/ Amy Jeffress*
Amy Jeffress
Trisha Anderson
Joshua A. Matz
Stephen Prifti
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(212) 763-0883
ajeffress@heckerfink.com

---

are so thin and unsubstantiated that the Court can only conclude that they are pretextual."); *President & Fellows of Harv. Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 132 (D. Mass. 2025) (finding that the government's stated motivation of addressing racism and antisemitism "reeks of pretext").

[16] Law student interns Kate Davidson, Avi Gupta, Riler Holcombe, and Brady Worthington contributed to this brief's drafting under supervision by counsel for Amici.

[17] This brief sets forth the position of the signatories, as represented by counsel and law student members of the Peter Gruber Rule of Law Clinic, but does not purport to state the views of Yale Law School or Yale University.

Sean Hecker
Julie E. Fink
Shawn G. Crowley
Jenna M. Dabbs
Kate L. Doniger
Michael Ferrara
David Gopstein
Damaris Hernández
Marshall L. Miller
David Patton
John C. Quinn
Gabrielle E. Tenzer
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883

Matthew J. Craig
Mack E. Jenkins
HECKER FINK LLP
1150 S. Olive St., Suite 10-140
Los Angeles, CA 90015
(212) 763-0883

*Counsel for Amici Curiae Former Senior Government Officials*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief is prepared in Times New Roman 14-point font and that my word processing program, Microsoft Word, counted 6,489 words in the brief – excluding the items exempted by Federal Rule of Appellate Procedure 32(f) – and that this complies with the word limit set forth in Federal Rule of Appellate Procedure 29(a)(5) and Local Rule 29(a)(5).

*/s/ Amy Jeffress*
Amy Jeffress

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2026, I electronically filed the foregoing brief in support of Plaintiff-Appellee with the Clerk of the Court of the U.S. Court of Appeals for the D.C. Circuit by using the Appellate CM/ECF system which will send notice to all counsel who are registered CM/ECF users.

*/s/ Amy Jeffress*
Amy Jeffress

**APPENDIX**

**List of Amici Curiae**

Donald Ayer: Deputy Attorney General (1989-1990); Principal Deputy Solicitor General (1986-1988); U.S. Attorney, Eastern District of California (1982-1986)

John B. Bellinger III: Legal Adviser, U.S. Department of State (2005-2009); Senior Associate Counsel to the President and Legal Adviser, National Security Council (2001-2005)

Gregory Craig: Counsel to the President (2009-2010); Assistant to the President and Special Counsel (1998-1999)

Ambassador Nancy H. Ely-Raphel: Senior Advisor to the Secretary of State (2001-2003); U.S. Ambassador to Slovenia (1998-2001)

Stuart Gerson: Acting Attorney General of the United States (1993); Assistant Attorney General (Civil) (1989-1993)

Secretary Chuck Hagel: Secretary of Defense (2013-2015); Co-Chairman, President's Intelligence Advisory Board (2009-2013); U.S. Senator from Nebraska (1997-2009)

Avril Haines: Director of National Intelligence (2021-2025); Deputy National Security Advisor (2015-2017)

Conrad K. Harper: Legal Adviser, U.S. Department of State (1993-1996)

General Michael Hayden: Director of the Central Intelligence Agency (2006-2009); Principal Deputy Director of National Intelligence (2005-2006); Director of National Security Agency (1999-2005)

Peter Keisler: Acting Attorney General (2007); Assistant Attorney General (Civil) (2003-2007)

Alan Kreczko: Legal Adviser, National Security Council (1992-1997)

John M. Mitnick: General Counsel, U.S. Department of Homeland Security (2018-2019); Associate Counsel to the President (2005-2007)

Ambassador Thomas R. Pickering: U.S. Ambassador to United Nations (1989-1992); U.S. Ambassador to Russia (1993-1996); U.S. Ambassador to India (1993-1996); U.S. Ambassador to Israel (1985-1988); U.S. Ambassador to Jordan (1974-1978); Undersecretary of State for Political Affairs (1997-2000)

Alan Raul: Associate Counsel to President Reagan (1986-1988); General Counsel, Office of Management and Budget (1988-1989); Vice Chairman of the Privacy and Civil Liberties Oversight Board (2006-2008)

Ambassador Susan E. Rice: National Security Advisor (2013-2017); U.S. Ambassador to the United Nations (2009-2013)

Nicholas Rostow: General Counsel and Senior Policy Adviser to the U.S. Permanent Representative to the United Nations (2001-05); Special Assistant to the President for National Security Affairs and Legal Adviser, National Security Council (1987-93)

Wendy Sherman: Deputy Secretary of State (2021-2023); Undersecretary for Political Affairs,
U.S. Department of State (2011-2015)
Judge Abraham D. Sofaer: Legal Adviser, U.S. Department of State (1985-1990); United States District Court, Southern District of New York (1979-1985)
Margaret Taylor: Legal Adviser, U.S. Department of State (2024-2025)
Matthew C. Waxman: Deputy Assistant Secretary of Defense (2004-2005)