**ORAL ARGUMENT SCHEDULED ON MAY 14, 2026**

**Nos. 25-5241, 25-5265, 25-5277, 25-5310**

# In the United States Court of Appeals
# for the District of Columbia Circuit

PERKINS COIE LLP,
*Plaintiff-Appellee*,

v.

U.S. DEPARTMENT OF JUSTICE, et al.,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Columbia

**BRIEF OF THE COLLEGE OF COMMERCIAL ARBITRATORS AS**
***AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND**
**AFFIRMANCE**

Daniel Schimmel*
Nicholas Renzler
Irene Whelan Vita
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
tel: 212.812.0400
fax: 212.812.0399
dschimmel@foleyhoag.com
NRenzler@foleyhoag.com
iwhelanvita@foleyhoag.com

Anthony Mirenda
Aaron Loving
Marilyn Icsman
FOLEY HOAG LLP
155 Seaport Blvd
Boston, MA 02210
tel: 617.832.1000
fax: 617.832.7000
ADM@foleyhoag.com
aloving@foleyhoag.com
micsman@foleyhoag.com

*Counsel for Amicus Curiae*

**Counsel of record*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and District of Columbia Circuit Rule 26.1, *amicus curiae* College of Commercial Arbitrators states that it is a non-stock 501(c)(6) organization and as such has no parent corporation. Nor is there any publicly held company that owns ten percent or more of the College of Commercial Arbitrators.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for the Appellants. References to rulings at issue and related cases also appear in the Brief for the Appellants.

## STATEMENT REGARDING CONSENT TO FILE AND JUSTIFICATION FOR SEPARATE BRIEFING

All parties consented to the timely and rule-compliant filing of this brief. Pursuant to D.C. Circuit Rule 29(d), counsel for the amicus curiae certify that a separate brief is necessary to provide the perspective of commercial arbitrators on the importance of the rule of law to the arbitration process, a critical part of the justice system in the United States, and to describe how the Executive Orders imperil commercial arbitration in the United States.

i

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT .......................................................... i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................. i

STATEMENT REGARDING CONSENT TO FILE AND JUSTIFICATION FOR SEPARATE
        BRIEFING .......................................................................... i

TABLE OF CONTENTS ....................................................................... ii

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF INTEREST OF AMICUS CURIAE ................................................. 1

SUMMARY OF ARGUMENT ..................................................................... 2

ARGUMENT ................................................................................ 4

I.      THE EXECUTIVE ORDERS THREATEN THE RULE OF LAW WHICH IS
        FUNDAMENTAL TO THE ARBITRATION PROCESS. .............................. 4

    A.      Commercial Arbitration Plays an Important Role in the American System
            of Justice. ................................................................ 4

    B.      The Executive Orders Imperil Arbitration in the United States .................. 8

II.     HISTORICAL PRECEDENT SUGGESTS ARBITRATION COULD BE NEXT:
        EXAMPLES FROM TOTALITARIAN REGIMES. ................................ 12

    A.      The Nazis Targeted Arbitrators and Arbitration ........................... 12

    B.      Other Authoritarian Regimes Have Restricted Arbitration to Enhance State
            Control. ................................................................. 15

CONCLUSION ............................................................................. 19

CERTIFICATE OF COMPLIANCE ............................................................. 20

CERTIFICATE OF SERVICE ................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Cos. v. Dobson*,
    513 U.S. 265 (1995)..................................................................................4

*BG Grp. plc v. Republic of Arg.,*
    572 U.S. 25 (2014)...................................................................................4

*Dean Witter Reynolds Inc. v. Byrd*,
    470 U.S. 213 (1985).................................................................................4

*Karaha Bodas Co., L.L.C. v.*
    *Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    364 F.3d 274 (5th Cir. 2004) ..................................................................6

*Lamps Plus, Inc. v. Varela*,
    587 U.S. 176 (2019).................................................................................4

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001).................................................................................8

*Red Cross Line v. Atl. Fruit Co.*,
    264 U.S. 109 (1924).................................................................................4

*Selden v. Airbnb, Inc.*,
    4 F.4th 148 (D.C. Cir. 2021)....................................................................4

*Shearson/Am. Express Inc. v. McMahon*,
    482 U.S. 220 (1987).................................................................................4

*Singleton v. Wulff*,
    428 U.S. 106 (1976).................................................................................8

**Statutes**

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq*......................................4, 8

New York Arbitration Law of 1920, New York Laws of 1920, Ch.
    275, April 9, 1920...................................................................................4

1933 Directives on Arbitration (Germany).................................................................13

Civil Procedure Act, February 3, 1881 (Spain) .......................................................17

1988 Arbitration Act, 36/1988, December 5, 1988 (Spain) .....................................17

Arbitration Act of 1953, December 22, 1953 (Spain) .............................................17

B.O.E 1977, 15727 (Spain) .....................................................................................18

**Other Authorities**

José Carlos Fernández Rozas, *La contaminación del arbitraje por los conceptos e institutos de las leyes procesales estatales*, 13 Anuario de Justicia Alternativa 33 (2015), https://fernandezrozas.com/wp-content/uploads/2019/05/la-contaminacic393n-del-arbitraje-por-los-conceptos-e-institutos-de-las-leyes-procesales-estatales.pdf .......................18

AAA, *2024 ICDR Dispute Resolution Data* (2025), https://go.adr.org/rs/294-SFS-516/images/2024_ICDR_Dispute_Resolution_Infographic.pdf ..........................5

AAA, *AAA-ICDR® Facilitates 755 International B2B Cases in 2022, Worth $4.2B* (2023), https://www.adr.org/press-releases/aaa-icdr-facilitated-arbitration-for-755-international-b2b-cases-filed-in-2022-a-12-year-over-year-increase-comprising-42-billion-in-total-claims/ ................................................................................................................5

AAA, *Mass Arbitration in 2024: Insights from AAA's New Infographic* (2025), https://www.adr.org/news-and-insights/understanding-the-mass-arbitration-landscape-in-2024-insights-from-the-aaa-s-new-infographic/ ..............................................5

AAA, *Proprietary Data from the American Arbitration Association* (2025), https://feature.adr.org/2025-aaa-infographics...........................................5

Antonio Sanchez-Pedreño, *Memento Experto Arbitraje* (2015) .............................18

Bernardo Cremades & Paloma Ureta, *70 Años del Arbitraje en España*, El Confidencial (2023), https://blogs.elconfidencial.com/juridico/tribuna/2023-02-06/70-anos-del-arbitraje-en-espana_3569881.............................................................17

Blake Alderson, *American Interests and Russian Arbitration: Overcoming Confusion and Concern*, 21 S.C. J. Int'l L. & Bus. 172 (2024)............................................................15, 16

Chartered Inst. Of Arbitrators, *CIArb London Centenary Principles* (2015), https://www.ciarb.org/media/ui1fjuf2/london-centenary-principles.pdf ........................................................................................6, 7

Coll. Of Com. Arbitrators, *The College of Commercial Arbitrators Supports the Rule of Law* (Apr. 14, 2025), https://www.ccarbitrators.org/wp-content/uploads/2025/04/CCA-Supports-the-Rule-of-Law.pdf....................................................................1

Daniel Mainguy, *Warbitration: Arbitration in an Atmosphere of War*, 15 Int'l J. Proc. L. 165 (2025) .........................................................13, 14

Ernst Fraenkel, *The Dual State: A Contribution to the Theory of Dictatorship* (E. A. Shils trans., Oxford Univ. Press 1941) ...............................12

Exec. Order No. 14,230, 90 Fed. Reg. 11,781 (Mar. 11, 2025) .......................3, 9, 11

Exec. Order No. 14,246, 90 Fed. Reg. 13,997 (Mar. 25, 2025) ...............................3

Exec. Order No. 14,250, 90 Fed. Reg. 14,549 (Mar. 27, 2025) ...............................3

Exec. Order No. 14,263, 90 Fed. Reg. 15,615 (Apr. 9, 2025)..................................3

Franklin H. Littell, Foreword to *Exile in the Fatherland: Martin Niemöller's Letters from Moabit Prison* (Hubert G. Locke ed., 1986)..............................................................3

Franco Ferrari, *Plures Leges Faciunt Arbitrum*, 37 Arb. Int'l 579 (2024)..............................................................................5

Gary Born, *The 1933 Directives on Arbitration of the German Reich: Echoes of the Past?*, J. Int'l Arb. 38, no. 4 (2021) ...................................12, 13, 14

ICC, *ICC Dispute Resolution 2024 Statistics* (2024), https://iccwbo.org/wp-content/uploads/sites/3/2025/06/2024-Statistics_ICC_Dispute-Resolution_992-1.pdf ...................................................10

v

ICC, *ICC Releases Preliminary 2025 Dispute Resolution Statistics* (Feb. 12, 2026), https://iccwbo.org/news-publications/news/icc-releases-preliminary-2025-dispute-resolution-statistics/ .....................................5

Jana Lamas de Mesa, *Singapore's Recipe for Becoming a Top International Arbitration Hub*, 12 Int'l Arb. Outlook Uría Menéndez (2023), https://www.uria.com/en/publicaciones/8662-singapores-recipe-for-becoming-a-top-international-arbitration-hub ..................7

José Fernando Merino Merchán, *El Arbitraje en España*, El Notario del Siglo XXI (2011), https://www.elnotario.es/revista-37/808-el-arbitraje-en-espana-0-17540448547844262.html.................................18

Karen Halverson, *Resolving Economic Disputes in Russia's Market Economy*, 18 Mich. J. Int'l L. 59 (1996) ...........................................16

London Sch. Of Int'l Arbitration & White & Case LLP, *2021 International Arbitration Survey: Adapting Arbitration to a Changing World* (2021), https://www.qmul.ac.uk/arbitration/media/arbitration/docs/LON03 20037-QMUL-International-Arbitration-Survey-2021_19_WEB.pdf .....................................................................6

Ministère de la Justice, *Paris, Place de Droit* (Mar. 2026), https://parisarbitrationweek.com/wp-content/uploads/2026/03/2026_daei_paris-place-de-droit_a5_v29_web.pdf;.......................................................7

Ministry of Justice & Ministry for Europe and Foreign Affairs, *France's Legal Attractiveness* (2026), https://www.justice.gouv.fr/sites/default/files/2026-01/dacs_france_legal_attractiveness.pdf ...........................7

Patricia Enssle, *A 50 Años del 'Españoles, Franco Ha Muerto', ¿La Transición Fue Un Modelo?*, Diálogo Político (Nov. 20, 2025), https://dialogopolitico.org/agenda/opinion-agenda/50-anos-franco-espana/.................................................................................18

SIAC, *Annual Report 2025* (2025), https://siac.org.sg/wp-content/uploads/2025/09/SIAC-Annual-Report-2025.pdf ..................9

U.K. Ministry of Justice, *Boost for UK Economy as Arbitration Act Receives Royal Assent* (Feb. 24, 2025), https://www.gov.uk/government/news/boost-for-uk-economy-as-arbitration-act-receives-royal-assent; ...................................................................7

Vratislav Pechota, *International Economic Arbitration in the USSR and Eastern Europe*, 8 N.Y.L. Sch. J. Int'l & Comp. L. 367 (1987) .................16

Zoltan M. Mihaly, *The Role and Activity of Arbitration Commissions in a Communist Economy: The Hungarian Experience*, 9 Am. J. Compar. L. 690 (1960).......................................................................16

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

Established in 2001, the College of Commercial Arbitrators ("CCA") is the leading organization of commercial arbitrators in the United States. The CCA promotes the highest standards of arbitrator ethics and practice. It provides meaningful contributions to the profession, the public, and the businesses, individuals and counsel who depend on commercial arbitration as an effective means of dispute resolution.

The CCA has a direct and substantial interest in the outcome of these cases. The Executive Orders at issue in this appeal threaten the rule of law, which is the cornerstone of commercial arbitration. Commercial arbitration does not exist in a vacuum; it is part of an ecosystem of arbitrators, businesses, individuals, lawyers, law firms, and judges, all of whom rely on adherence to the rule of law. In April 2025, the CCA published a Statement on the Rule of Law, which reaffirmed certain of its basic principles and values. Those included the principle that "[s]eeking to destroy law firms by threatening their clients with loss of government contracts undermines the Rule of Law and must be stopped."[2] The legal community's

---

[1] All parties consent to the filing of this brief. No counsel for any party authored this brief in whole or in part. No party, person, or entity made a monetary contribution for the preparation or submission of this brief.

[2] Coll. of Com. Arbitrators, *The College of Commercial Arbitrators Supports the Rule of Law* (Apr. 14, 2025), https://www.ccarbitrators.org/wp-content/uploads/2025/04/CCA-Supports-the-Rule-of-Law.pdf.

1

overwhelmingly positive reception of its Statement demonstrates the importance of the CCA's affirmative stand regarding the impact of the Executive Orders on the rule of law and commercial arbitration.

## SUMMARY OF ARGUMENT

The rule of law is central to the arbitration process; fair arbitration cannot exist without it. Parties rely on the existence of the rule of law when choosing to enter into arbitration agreements as the dispute resolution mechanism for their commercial dealings. Arbitral awards are reviewed and enforced by the judiciary. The integrity of the arbitration process is threatened if judges are afraid to confirm or enforce awards that may be unpopular with government officials. Arbitral proceedings also risk becoming compromised in a world in which law firms and lawyers face the prospect of retaliation for representing clients that are unpopular with the government, since the arbitral process depends on lawyers who zealously advocate for their clients. Furthermore, the arbitral process requires that arbitrators—many of whom practice law at firms—remain free from coercion and without fear that a ruling could bring government retribution against them or their firms.

Today, the rule of law in the United States is threatened by systematic attacks on the independence of the judiciary, law firms, and individual attorneys. Arbitrators are not immune from this assault. To the contrary, historical precedent discussed in this *amicus* brief demonstrates that, while direct subversion of the judiciary and law

2

firms is often the starting point of anti-democratic attacks on the rule of law, assaults on arbitration often promptly follow.[3] Such attacks are not random; rather, commercial arbitration's role as an independent means of resolving disputes threatens the goal of authoritarian and totalitarian regimes of bending legal systems to their will, eliminating independence, and removing a major impediment to the concentration of power in the government. Attacks on arbitration and arbitrators are characteristic of oppressive regimes in which the rule of law is degraded. The CCA submits this brief to explain why Executive Orders 14,230, 14,246, 14,250, and 14,263 (collectively, the "Executive Orders") imperil arbitration—a critical part of the justice system—in the United States. The CCA urges this Court to affirm the judgments below, rejecting the Executive Orders as unconstitutional.

---

[3] The well-known post-war confession of Pastor Martin Niemöller helps explain CCA's interest:

> First they came for the socialists, and I did not speak out—because I was not a socialist. Then they came for the trade unionists, and I did not speak out—because I was not a trade unionist. Then they came for the Jews, and I did not speak out—because I was not a Jew. Then they came for me—and there was no one left to speak for me.

Franklin H. Littell, Foreword to *Exile in the Fatherland: Martin Niemöller's Letters from Moabit Prison*, at viii (Hubert G. Locke ed., 1986) (quoting Pastor Martin Niemöller).

## ARGUMENT

**I.     THE EXECUTIVE ORDERS THREATEN THE RULE OF LAW WHICH IS FUNDAMENTAL TO THE ARBITRATION PROCESS.**

### A.     Commercial Arbitration Plays an Important Role in the American System of Justice.

Commercial arbitration has long been an essential component of the American legal system. The right to arbitration was codified in the United States over a century ago: first through the Arbitration Law of New York of 1920,[4] then nationally in 1925 through the Federal Arbitration Act ("FAA").[5] Federal courts have long recognized that the FAA reflects a "liberal federal policy favoring arbitration agreements,"[6] with uncertainties about the scope of arbitration agreements to be "resolved in favor of arbitration."[7] Consistent with these principles, courts "rigorously enforce agreements to arbitrate."[8]

Due to the federal policy favoring arbitration, and an ecosystem of independent judges, law firms, and lawyers, the number of domestic and international arbitrations commenced in the United States has increased dramatically

---

[4] *See Red Cross Line v. Atl. Fruit Co.*, 264 U.S. 109, 118-19 (1924) (discussing the history of arbitration under New York law and introduction of the Arbitration Law of New York).

[5] *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270-71 (1995) (discussing the history and purpose of the FAA).

[6] *Selden v. Airbnb, Inc.*, 4 F.4th 148, 155 (D.C. Cir. 2021).

[7] *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 189 (2019).

[8] *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

over the past 30 years. According to data publicly reported by the American Arbitration Association ("AAA"), in just the past two years, over 1 million domestic cases have been filed with the AAA – including 11,900 new business to business filings in 2025 – with amounts in dispute exceeding $29 billion.[9] Between 1996 and 2025, over 22,000 international cases were filed with the international division of the AAA ("AAA-ICDR").[10] Similarly, in 2025, at the International Chamber of Commerce ("ICC"), which operates one of the world's leading institutions administering arbitration proceedings across the globe, the United States was the third most frequently selected place of arbitration, *i.e.*, legal "seat" of arbitration.[11]

---

[9] *See* AAA, *Proprietary Data from the American Arbitration Association* (2025), https://feature.adr.org/2025-aaa-infographics (over 580,000 domestic arbitrations in 2025); AAA, *2024 ICDR Dispute Resolution Data*, https://go.adr.org/rs/294-SFS-516/images/2024_ICDR_Dispute_Resolution_Infographic.pdf (over 530,000 domestic arbitrations filed in 2024); AAA, *AAA-ICDR® Facilitates 755 International B2B Cases in 2022, Worth $4.2B* (2023), https://www.adr.org/press-releases/aaa-icdr-facilitated-arbitration-for-755-international-b2b-cases-filed-in-2022-a-12-year-over-year-increase-comprising-42-billion-in-total-claims/ (over 450,000 domestic arbitrations in 2022); *see also* AAA, *Mass Arbitration in 2024: Insights from AAA's New Infographic* (2024), https://www.adr.org/news-and-insights/understanding-the-mass-arbitration-landscape-in-2024-insights-from-the-aaa-s-new-infographic/ (over 280,000 mass arbitration individual filings in 2024).
[10] *See id.*
[11] ICC, *ICC Releases Preliminary 2025 Dispute Resolution Statistics* (Feb. 12, 2026), https://iccwbo.org/news-publications/news/icc-releases-preliminary-2025-dispute-resolution-statistics/. The legal seat of arbitration is "the legal or juridical home (or domicile) of the arbitration." Franco Ferrari, *Plures Leges Faciunt Arbitrum*, 37 Arb. Int'l 579, 580 (2024). It is distinct from the physical location of hearings or deliberations. The legal seat plays a significant role at all stages of an international commercial arbitration proceeding, including because courts at the legal seat of arbitration have jurisdiction to compel arbitration, provide assistance in

Major cities around the world, such as Geneva, London, New York, Paris, Dubai, Hong Kong, and Singapore, compete for arbitration business.[12] When users of arbitration select a legal seat in an arbitration clause, a critical consideration is the neutrality and impartiality of the local legal system.[13] In recognition of the seat's significance, the Chartered Institute of Arbitrators has promulgated principles "necessary for an effective, efficient and 'safe' Seat for the conduct of International Arbitration."[14] At least three of these essential principles underscore the importance of independent judges, law firms, and lawyers: (i) a "clear effective, modern International Arbitration law," (ii) an "independent Judiciary, competent, efficient, with expertise in International Commercial Arbitration and respectful of the parties' choice of arbitration as their method for settlement of their disputes," and (iii) an

---

the course of arbitral proceedings, and decide motions to vacate arbitral awards. *See BG Grp. plc v. Republic of Arg.*, 572 U.S. 25, 37 (2014) ("'[T]he national courts and the law of the legal situs of arbitration control a losing party's attempt to set aside [an] award[.]'") (citation omitted); *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 287 (5th Cir. 2004) ("All other signatory states [to the New York Convention] are secondary jurisdictions, in which parties can only contest whether that state should enforce the arbitral award.") (citation omitted); *see also* Ferrari at 586 (the determination of where to seat an arbitration "is of paramount importance").

[12] Queen Mary Univ. of London Sch. Of Int'l Arbitration & White & Case LLP, *2021 International Arbitration Survey: Adapting Arbitration to a Changing World*, at 6-7 (2021), https://www.qmul.ac.uk/arbitration/media/arbitration/docs/LON0320037-QMUL-International-Arbitration-Survey-2021_19_WEB.pdf.

[13] *Id.* at 8.

[14] Chartered Inst. Of Arbitrators, *CIArb London Centenary Principles*, at 3 (2015), https://www.ciarb.org/media/ui1fjuf2/london-centenary-principles.pdf.

"independent competent legal profession with expertise in International Arbitration and International Dispute Resolution providing significant choice for parties who seek representation in the Courts of the Seat or in the International Arbitration proceedings conducted at the Seat."[15] The continued strength and appeal of the United States as a seat of arbitration depends on the independence of its legal system. A strong arbitral seat also fosters economic activity as it encourages law firms to expand their dispute resolution practices and creates high value professional employment for support services, such as expert witnesses, translators, court reporters, and the hospitality sector. By way of example, the French Ministry of Justice has indicated that revenues attributable to the Paris arbitration ecosystem amount to about 800 million euros per year.[16]

---

[15] *Id.*

[16] *See* Ministry of Justice & Ministry for Europe and Foreign Affairs, *France's Legal Attractiveness*, at 13 (2026), https://www.justice.gouv.fr/sites/default/files/2026-01/dacs_france_legal_attractiveness.pdf ("The arbitration ecosystem in Paris added almost €800 million to the French economy in 2024"); Ministère de la Justice, *Paris, Place de Droit*, at 9 (Mar. 2026) (describing that annual revenues derived from the Paris legal ecosystem is "almost a billion euros" in 2025), https://parisarbitrationweek.com/wp-content/uploads/2026/03/2026_daei_paris-place-de-droit_a5_v29_web.pdf; *cf.* U.K. Ministry of Justice, *Boost for UK Economy as Arbitration Act Receives Royal Assent* (Feb. 24, 2025), https://www.gov.uk/government/news/boost-for-uk-economy-as-arbitration-act-receives-royal-assent; Jana Lamas de Mesa, *Singapore's Recipe for Becoming a Top International Arbitration Hub*, 12 Int'l Arb. Outlook Uría Menéndez (2023), https://www.uria.com/en/publicaciones/8662-singapores-recipe-for-becoming-a-top-international-arbitration-hub.

An effective arbitration process relies on independent counsel. Arbitration cannot perform its essential function unless lawyers appearing before an arbitral tribunal are free to advocate zealously, free from outside influence or intimidation. The U.S. Supreme Court's acknowledgment that "[a]n informed, independent judiciary presumes an informed, independent bar"[17] applies equally to arbitration and arbitrators. Like courts, arbitral tribunals rely upon robust adversarial proceedings to develop a reliable arbitration record.[18] Where these conditions are satisfied, commercial arbitration provides a fair, cost efficient, flexible, prompt and consent-based dispute resolution mechanism focused on party autonomy.

### B.      The Executive Orders Imperil Arbitration in the United States.

Arbitration depends upon the rule of law. It is essential for the commercial order that arbitrated disputes be resolved by a mutually understood and regular process not subject to the coercive influence or whim of whatever government officials happen to be in power. Parties and arbitrators rely on the courts to provide support as contemplated by the FAA, such as ruling on motions to compel arbitration, reviewing arbitral awards on narrow grounds, and enforcing domestic and foreign awards. Arbitration depends on an independent judiciary that performs

---

[17] *Legal Servs. Corp. v. Velazquez,* 531 U.S. 533, 545 (2001).

[18] *Cf. Singleton v. Wulff*, 428 U.S. 106, 114 (1976) ("The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them.").

these statutory responsibilities free from government interference or intimidation and an independent bar to advocate effectively for its clients.

Arbitration also depends on independent arbitrators. The Executive Orders create a threat to the independence of arbitrators. They blacklist law firms by directing federal agencies to terminate contracts based on a nebulous concept of "national interests," suspending security clearances, barring access to federal buildings, and instructing government officials to not "engag[e] with" targeted firms.[19] Many arbitrators practice at law firms and may fear that, if they render an award in favor of a party or reach a result that the government does not like, their law firm will be targeted. The government can become aware of arbitrations as soon as a party to the arbitration files in court a motion to vacate or confirm that award, or through informal channels such as media reporting on arbitration proceedings, or comments and requests from politically active parties who may solicit a government administration for assistance in bending the arbitral process in their favor. The Executive Orders thus interfere with the ability of arbitrators who also practice law at firms to serve independently, free of governmental influence or intimidation.[20]

---

[19] *See, e.g.*, Exec. Order No. 14,230, 90 Fed. Reg. 11,781, 11,782 (Mar. 11, 2025).
[20] Arbitrators from the United States are appointed by every major arbitration organization. For instance, at the Singapore International Arbitration Centre ("SIAC") in 2025, the United States was within the top five countries of origin for arbitrator appointments. SIAC, *Annual Report 2025*, at 33 (2025), https://siac.org.sg/wp-content/uploads/2025/09/SIAC-Annual-Report-2025.pdf.

In addition, many arbitrations involve governmental entities. For example, statistics from the ICC show that approximately 20% of all new ICC arbitrations involve a country or state-owned enterprise as a party.[21] Arbitrators may be concerned that their law firm will be retaliated against through the Executive Orders if an award is issued that is supported by the applicable law and the evidentiary record but either favors a foreign sovereign the government dislikes or finds against a sovereign that the government favors.

Arbitrators are particularly vulnerable to coercion in ways that judges are not. Arbitrators do not have life tenure. They typically practice at law firms that are susceptible to government pressure or in small, independent settings that are also vulnerable to such pressure. Unlike judges, arbitrators depend on their reputations and good names for future work. They are vulnerable to social media and smear campaigns. If an arbitrator is disparaged publicly by the government, that could discourage parties from appointing that arbitrator. Parties might worry that the appointment of a disfavored arbitrator or an arbitrator from a disfavored law firm might bring the government's wrath upon them. As private individuals, arbitrators lack special protections, such as life tenure or a fixed term, that help insulate the judiciary from a government official's improper intimidation and control.

---

[21] ICC, *ICC Dispute Resolution 2024 Statistics*, at 8 (2024), https://iccwbo.org/wp-content/uploads/sites/3/2025/06/2024-Statistics_ICC_Dispute-Resolution_992-1.pdf.

In addition, the Executive Orders pose a threat to the arbitration process by attacking the independence of counsel that appear before arbitrators and by subverting the ability of parties to be represented by counsel of their choosing. The Executive Orders direct all federal contracting agencies to require federal contractors to "disclose any business they do with" a targeted law firm and "take appropriate steps to terminate any contract"[22] in which that firm is engaged—an instruction designed to deter contractors from hiring those firms out of fear of losing government business. The Executive Orders risk chilling counsel from zealously advocating for clients in arbitrations in which the government, or someone connected to it or favored by it, is an adversary. This threat compromises counsel's independence *vis-à-vis* the government, or parties favored by it. Just as it threatens to distort litigation before the judiciary, penalizing lawyers and law firms by effectively restricting clients' ability to retain them will undermine the integrity of the arbitral process by limiting the availability of counsel to those who remain within the administration's favor.

It is, unfortunately, conceivable in the world in which we are living that these dangers may materialize. There is no reason to believe that arbitrators will be immune from the present assault on the independence of the judiciary, lawyers, and law firms if the Executive Orders are upheld.

---

[22] *See, e.g.*, Exec. Order No. 14,230, 90 Fed. Reg. 11,781, 11,782 (Mar. 11, 2025).

## II.    HISTORICAL PRECEDENT SUGGESTS ARBITRATION COULD BE NEXT: EXAMPLES FROM TOTALITARIAN REGIMES.

Examples from the Third Reich, the Union of Soviet Socialist Republics ("U.S.S.R."), and Francoist Spain demonstrate that regimes on either end of the spectrum of totalitarian ideology have sought to control arbitration as part of their efforts to dismantle the rule of law and the independent administration of justice.

### A.    The Nazis Targeted Arbitrators and Arbitration

Totalitarian regimes need to control the administration of justice and the adjudication of disputes to ensure their hold on power.[23] The Nazi regime is perhaps the most notorious example of a fascist regime targeting arbitration. As Gary Born, a leading commentator on international arbitration, has detailed,[24] the Nazi party "saw arbitration as both a threat and a 'disturbance of the trust in the state courts and the state itself.'"[25] Before the Nazis seized power, Germany had a well-established tradition of arbitration. Germany's national arbitration law was more than a half-

---

[23] *Cf.* Ernst Fraenkel, *The Dual State: A Contribution to the Theory of Dictatorship* 40 (E. A. Shils trans., Oxford Univ. Press 1941) ("The difference between a *Rechtsstaat* (Rule of Law state) and the Third Reich may be summed up as follows: in the *Rechtsstaat* the courts control the executive branch of the government in the interest of legality. In the Third Reich the police power controls the courts in the interest of political expediency.").

[24] *See* Gary Born, *The 1933 Directives on Arbitration of the German Reich: Echoes of the Past?*, J. Int'l Arb. 38, no. 4 (2021), at 417-56. This section of the article contains a comprehensive historical description of the multiple governmental attacks on arbitration and arbitrators in Nazi Germany, and this *amicus* brief relies on Born's article for that purpose.

[25] Born, *supra* note 24, at 441.

century old in 1933, and the arbitration of commercial matters had been recognized in German civil procedure codes since the 1860s.[26] Arbitration was widely and effectively used for decades, including as a means of resolving disputes between private parties and German state entities.[27] The first Chancellor of the German Empire, Otto von Bismarck, observed that "the need for arbitral resolution of disputes has existed under every procedural system so far."[28]

The Nazi regime moved swiftly to dismantle that system. On April 12, 1933—just weeks after Hitler used the Reichstag Fire Decree to strip Germans of fundamental civil rights and the Enabling Act to seize sweeping powers—the Reich Minister of Finance issued the 1933 Directives on Arbitration.[29] The Directives were "sent to a number of National Socialist government ministries, with a request to act accordingly within your division and thusly make it known to all subordinated agencies, as well as a request for information on experiences with the Directives in practise."[30] The Directives and subsequent regulations imposed debilitating limits on arbitration, including a blanket prohibition on the use of arbitration to resolve

---

[26] *Id.* at 420-23.

[27] *Id.* The Nazi Directives brought an abrupt end to a vibrant culture of arbitration in Germany. *See* Daniel Mainguy, *Warbitration: Arbitration in an Atmosphere of War*, 15 Int'l J. Proc. L. 165, 225-26 (2025) (citing, *inter alia*, *Deserters of Casablanca (Ger. v. Fr.)*, 11 R.I.A.A. 119 (Perm. Ct. Arb. 1909); *Lehigh Valley R.R. (U.S. v. Ger.)*, 8 R.I.A.A. 84 (Mixed Cl. Comm'n 1930)).

[28] Born, *supra* note 24, at 423.

[29] *Id.* at 418-19.

[30] *Id.* at 419.

"[a]ll disputes arising from contracts between the Reich and private individuals."[31] This prohibition had a few narrow exceptions, but all arbitration agreements involving government entities required "the prior permission by the topmost state authority of the Reich."[32] Further restrictions included (i) mandating that arbitration clauses be drafted as narrowly as possible, (ii) allowing the rejection of arbitrators who were "non-Aryans, mute, deaf, underage, or had lost their civil rights," reflecting the racist and discriminatory views of the National Socialists, and (iii) requiring that arbitral tribunals be appointed by a purportedly "neutral," government controlled, body.[33] The Nazi party rejected arbitration as an independent dispute resolution mechanism, deeming it incompatible with the worldview of the National Socialist State.

The purpose and effect of the Directives bear a startling resemblance to the Executive Orders. Similar to the Directives, the Executive Orders target law firms the administration dislikes, and litigation aimed at achieving results that the administration dislikes. In addition, the Executive Orders require broad and prompt dissemination of these directives throughout government agencies to ensure uniformity and maximize the chilling impact.

---

[31] *Id.* at 429.
[32] *Id.* at 430.
[33] *Id.* at 431-34.

As history shows, respect for the rule of law is antithetical to authoritarian regimes. Targeting arbitration is not a mere possibility, but the logical escalation by a regime that views independent justice as an impediment to acquiring more power.

### B.     Other Authoritarian Regimes Have Restricted Arbitration to Enhance State Control.

**The Soviet Union and other Communist regimes.** The U.S.S.R. similarly restricted arbitration to enhance state control. Despite differences between the regimes of Nazi Germany and the U.S.S.R., their common rejection of the rule of law led to the same result: the effective extinguishment of private commercial arbitration.

Before 1917, Russia maintained a comparatively liberal arbitral regime that respected party autonomy in procedure and substance.[34] Following the Russian Revolution, arbitration was abolished for seven years.[35] Although the Soviet Union technically reintroduced arbitration in the 1920s, such revival was short lived as comprehensive central planning and its attendant dispute resolution mechanisms took hold in the 1930s.[36] In that economic and legal environment—dominated by the

---

[34] *See* Blake Alderson, *American Interests and Russian Arbitration: Overcoming Confusion and Concern*, 21 S.C. J. Int'l L. & Bus. 172, 172 (2024).

[35] *Id.* at 173.

[36] *Id.* (private commercial arbitration was "rendered moot" by the legal and economic reforms of the 1930s).

national government's interests—the space for neutral, consent-based arbitral adjudication almost disappeared. In place of private arbitration, the state provided *arbitrazh,* which "despite its name, ha[d] nothing to do with arbitration … Arbitrazh [was] really a system of economic courts with powers of both a judicial and administrative character."[37] *Arbitrazh* was devised as "an extension of the administrative apparatus" to ensure the subordination of private economic activity to the central plan.[38] Beyond the U.S.S.R., other twentieth-century Communist regimes imposed similar restrictions on private commercial arbitration to achieve the same aims.[39]

---

[37] Harold J. Berman, *Justice in the U.S.S.R.: An Interpretation of Soviet Law* 124 (rev. ed. 1963); *see also* Vratislav Pechota, *International Economic Arbitration in the USSR and Eastern Europe*, 8 N.Y.L. Sch. J. Int'l & Comp. L. 367, 399 (1987) ("[T]he arbitration system in the USSR and Eastern Europe is an institution of public, not private, law. The arbitrator is not an agent of the party that appointed him, nor does he follow its directives."); Karen Halverson, *Resolving Economic Disputes in Russia's Market Economy*, 18 Mich. J. Int'l L. 59, 62 (1996) ("arbitrazh bore little resemblance to arbitration in that its jurisdiction was compulsory and state arbitrators generally were required to apply and adhere to legal rules").

[38] *See id.* at 63.

[39] *See* Pechota, *supra* note 37, at 379 ("State economic arbitration in the Soviet Union and in other countries of the Council for Mutual Economic Assistance (CMEA) is designed to ensure compliance with obligations under the state plan and contracts. The authority of the arbitration agencies is not derived from the consent of the parties but rather flows from the regulatory power of the government. These arbitral agencies have no counterparts in the West, where arbitral systems are based on voluntary agreements to arbitrate. In countries such as Czechoslovakia and Poland, the nationalization of private industries has led to state economic arbitration replacing the commercial courts as a means of settling commercial disputes."); *see also* Zoltan M. Mihaly, *The Role and Activity of Arbitration Commissions in a*

**Francoist Spain.** The fascist regime of Francisco Franco in Spain also restricted the use of arbitration with the implementation of the 1953 Spanish Arbitration Law.[40] In contrast to the earlier 1881 Spanish Civil Procedure Act (which governed arbitration in Spain), the 1953 Spanish Arbitration Law did not recognize arbitration for commercial and international disputes.[41] It also did not provide for the enforcement of foreign arbitral awards or allow third parties, including arbitral institutions, to name arbitrators.[42] These restrictions on party autonomy significantly limited the number of arbitrations held in Spain. The number of arbitrations "during the period of validity of the 1953 Law, which lasted until 1988," could "be counted

---

*Communist Economy: The Hungarian Experience*, 9 Am. J. of Comparative L. 690 (1960) (discussing state arbitration in Communist Hungary).

[40] *See* Spanish Arbitration Law of December 22, 1953.

[41] *Cf.* Spanish Arbitration Law of December 22, 1953, Art. 1; Spanish Civil Procedure Act of 3 February 1881, Art. 487; *see also* Spanish Arbitration Law 36/1988, 5 December 1988, Explanatory Preamble, https://www.boe.es/eli/es/l/1988/12/05/36 ("[T]he 1953 Law was designed for the arbitration of civil law disputes in the strictest sense of the word: practice has shown, however, that this Law is not suitable for resolving disputes arising in commercial transactions through arbitration, and even less so for those arising in international commercial transactions[.]").

[42] Spanish Arbitration Law of December 22, 1953, Art. 22 ("Arbitrators shall be appointed, in all cases, by mutual agreement. Any agreement to defer to one of the parties, or to a third party, the power to appoint any of them shall be invalid") (emphasis added); Bernardo Cremades & Paloma Ureta, *70 Años del Arbitraje en España*, El Confidencial (2023), https://blogs.elconfidencial.com/juridico/tribuna/2023-02-06/70-anos-del-arbitraje-en-espana_3569881.

on one hand."[43] Spain only acceded to the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards in 1977,[44] two years after the end of the Franco regime in 1975,[45] and did not modernize its arbitration laws until 1988.[46]

The elimination of commercial arbitration in the U.S.S.R., other Communist regimes, and Francoist Spain further demonstrates that the rule of law is antithetical to an authoritarian regime on either side of the ideological spectrum.

---

[43] Antonio Sanchez-Pedreño, *Memento Experto Arbitraje* (2015), at ch. 1, p. 3, ¶ 40 ("The LArb/1953 was based on a formalistic conception of arbitration, establishing a structured but very unattractive legal framework that delayed the development and promotion of arbitration as a method of conflict resolution"); José Carlos Fernández Rozas, *La contaminación del arbitraje por los conceptos e institutos de las leyes procesales estatales*, 13 Anuario de Justicia Alternativa 33, 37 (2015), https://fernandezrozas.com/wp-content/uploads/2019/05/la-contaminacic393n-del-arbitraje-por-los-conceptos-e-institutos-de-las-leyes-procesales-estatales.pdf; José Fernando Merino Merchán, *El Arbitraje en España*, El Notario del Siglo XXI (2011), https://www.elnotario.es/revista-37/808-el-arbitraje-en-espana-0-17540448547844262.html.

[44] B.O.E 1977, 15727, Instrumento de Adhesión de España al Convenio sobre reconocimiento y ejecución de sentencias arbitrales extranjeras, hecho en Nueva York el 10 de junio de 1958, Art. XVI(2).

[45] Patricia Enssle, *A 50 Años del 'Españoles, Franco Ha Muerto', ¿La Transición Fue Un Modelo?*, Diálogo Político (Nov. 20, 2025), https://dialogopolitico.org/agenda/opinion-agenda/50-anos-franco-espana/.

[46] Sanchez-Pedreño, *supra* note 43, at ch. 1, p. 3, ¶ 40 ("The LArb/1953 was replaced by Law 36/1988 of December 5 (LArb/1988), which contributed to a positive change in the perception of arbitration, allowing for a modest beginning of the arbitration culture in Spain").

18

## CONCLUSION

Arbitrators and all those who participate in the arbitration process must be free of external intimidation and government coercion to perform their roles and uphold the rule of law. Affirming the judgments below will help protect the rule of law and arbitration process.

Dated: April 3, 2026

Respectfully submitted,

COLLEGE OF COMMERCIAL ARBITRATORS,

By its attorneys,
*/s/ Daniel Schimmel*

Daniel Schimmel*
Nicholas Renzler
Irene Whelan Vita
FOLEY HOAG LLP
1301 6th Ave.
New York, NY 10019
tel: +1.212.812.0400
fax: +1.212.812.0399
dschimmel@foleyhoag.com
NRenzler@foleyhoag.com
iwhelanvita@foleyhoag.com

Anthony Mirenda
Aaron Loving
Marilyn Icsman
FOLEY HOAG LLP
155 Seaport Blvd
Boston, MA 02210
tel: 617.832.1000
fax: 617.832.7000
ADM@foleyhoag.com
aloving@foleyhoag.com
micsman@foleyhoag.com

*Counsel for Amicus Curiae*

*\*Counsel of record*

19

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), this brief complies with the type form and volume requirements of the Federal Rule of Appellate Procedure because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font, and contains 4,557 words, excluding the portions exempted by Rule 32(f).

/s/ *Daniel Schimmel*
Daniel Schimmel
*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2026, I electronically filed the foregoing with the Court using the CM/ECF system. Service will be accomplished electronically through the ECF system to all registered participants.

/s/ *Daniel Schimmel*
Daniel Schimmel
*Counsel for Amicus Curiae*

21