ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026

**Nos. 25-5241(L), 25-5265, 25-5277, 25-5310**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

PERKINS COIE LLP, ET AL.,

*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,

*Defendants-Appellants*.

————————

On Appeal from the United States District Court
for the District of Columbia,
Nos. 25-cv-00716, 25-cv-00916, 25-cv-00917, 25-cv-01107

————————

**Brief of *Amicus Curiae* Campaign Legal Center in Support of Plaintiffs-Appellees and Affirmance**

————————

Tara Malloy
Dana Paikowsky
Rachel Appel
Campaign Legal Center
1101 14 St. NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
tmalloy@campaignlegalcenter.org
dpaikowsky@campaignlegalcenter.org
rappel@campaignlegalcenter.org

*Attorneys for Amicus Curiae*
*Campaign Legal Center*

April 3, 2026

**CORPORATE DISCLOSURE STATEMENT**

Campaign Legal Center is a nonpartisan, nonprofit corporation organized under section 501(c)(3) of the Internal Revenue Code. Campaign Legal Center works to protect and strengthen the U.S. democratic process across all levels of government, including by supporting voting rights, redistricting, campaign finance, and ethics reform through litigation, policy analysis, and public education. No publicly held corporation has any form of ownership interest in Campaign Legal Center, which has no parent corporation and does not issue stock.

**CERTIFICATE REGARDING PARTIES, RULINGS, AND
RELATED CASES**

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for the Appellants. References to rulings at issue and related cases also appear in the Brief for the Appellants.

**CERTIFICATE OF COUNSEL AS TO SEPARATE BRIEF**

Undersigned counsel certifies under D.C. Cir. R. 29(d) that a separate brief is necessary because this brief presents a distinct perspective from amici supporting appellees in these consolidated cases regarding the impact of this decision on elections and voting rights.

*/s/ Tara Malloy*
Tara Malloy

**TABLE OF CONTENTS**

INTERESTS OF AMICUS CURIAE ..........................................................................1

SUMMARY OF ARGUMENT................................................................................2

ARGUMENT ........................................................................................................4

    I.      Appellees' Activities Do Not "Degrade[] American Democracy," These Executive Orders Do. .........................................................................4

    II.     Litigants in Election Law Cases—and the Lawyers Who Represent Them, Such as Appellees—Play a Critical Role in Vindicating Political Rights and Safeguarding Our Democracy. ................................................10

    III.    By Selectively Targeting Legal Resources Used by the President's Opponents, the Orders Seek to Chill Oppositional Election Litigation to Advantage the Administration's Partisan Allies in Future Elections .......19

CONCLUSION .................................................................................................27

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

*Allen v. State Board of Elections*, 393 U.S. 544 (1969) ............................................13

*American Association of University Professors v. Rubio*, 802 F. Supp. 3d 120 (D. Mass. 2025) .............................................................................................................6

*American Bar Association v. Executive Office of the President*, No. 1:25-cv-01888-AHA, 2026 WL 890410 (D.D.C. Mar. 31, 2026) ...........................................6, 18

*Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) ....................4

*Borough of Duryea, Pennsylvania v. Guarnieri*, 564 U.S. 379 (2011).....................4

*CLC v. Iowa Values*, 691 F. Supp. 3d 94 (D.D.C. 2023).........................................11

*CREW v. American Action Network*, 410 F. Supp. 3d 1 (D.D.C. 2019) ..................14

*Democratic Congressional Campaign Committee v. FEC*, 831 F.2d 1131 (D.C. Cir. 1987)..............................................................................14

*Democratic National Committee v. Trump*, No. 25-cv-00587-AHA, 2025 WL 1573181 (D.D.C. June 3, 2025) .........................................................................23

*Department of Commerce v. New York*, 588 U.S. 752 (2019) .................................9

*Dye v. Office of the Racing Commission*, 702 F.3d 286 (6th Cir. 2012)...............5, 7

*Elrod v. Burns*, 427 U.S. 347 (1976).........................................................................7

*Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989)...............................................................................................3

*Federal Election Commission v. Akins*, 524 U.S. 11 (1998)...................................14

*Frederick Douglass Foundation, Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) .....................................................................6, 8

*Gardner v. Henderson*, No. 2:26-cv-00084-RJS-JCB, 2026 WL 496448 (D. Utah Feb. 23, 2026) .................................................................................11

*Garza v. Escobar*, 972 F.3d 721 (5th Cir. 2020) ......................................................7

*Iancu v. Brunetti*, 588 U.S. 388 (2019) ........................................................................6

*King v. O'Bannon*, No. 3:23-CV-408, 2026 WL 172624
   (E.D. Va. Jan. 22, 2026) .........................................................................17

*King v. St. Vincent's Hospital*, 502 U.S. 215 (1991) .....................................7

*League of Women Voters of Ohio, et al. v. Frank LaRose*, No. 2:26-cv-177
   (S.D. Ohio Feb. 13, 2026) .......................................................................11

*League of United Latin American Citizens v. Executive Office of the President*,
   808 F. Supp. 3d 29 (D.D.C. 2025) .........................................................24

*League of United Latin American Citizens v. Executive Office of the President*,
   No. 25-0946 (CKK), 2026 WL 252420 (D.D.C. Jan. 30, 2026) ...........24

*Lozman v. Riviera Beach*, 585 U.S. 87 (2018) ...............................................6

*Masterpiece Cakeshop v. Colorado Civil Rights Commission*,
   584 U.S. 617 (2018) ..................................................................................8

*Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025) ...................11, 15

*Morse v. Frederick*, 551 U.S. 393 (2007) .......................................................3

*Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996) ....................12

*National Association for the Advancement of Colored People v. Button*,
   371 U.S. 415 (1963) ................................................................................15

*National Association for the Advancement of Colored People v. Claiborne
   Hardware Company*, 458 U.S. 886 (1982) ..............................................4

*National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024) ...........8

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ........................................................6

*Petteway v. Galveston County*, 698 F. Supp. 3d 952 (S.D. Tex. 2023) ........15

*PHE, Inc. v. U.S. Department of Justice*, 743 F. Supp. 15 (D.D.C. 1990) .....8

*Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) .......................................8

*Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995)....6

iii

*Shays v. Federal Election Commission*, 414 F.3d 76 (D.C. Cir. 2005)....................11

*Shelby County v. Holder*, 570 U.S. 529 (2013)........................................................15

*Singleton v. Allen*, 782 F. Supp. 3d 1092 (N.D. Ala. 2025) .................................13

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949) ....................................................4

*Texas v. Johnson*, 491 U.S. 397 (1989) .....................................................................4

*Tribe v. Rodriguez*, No. CV-20-00432-TUC-JAS, 2020 WL 6203523
 (D. Ariz. Oct. 22, 2020) .......................................................................................16

*Turtle Mountain Band of Chippewa Indians v. Howe*, No. 3:22-cv-22, 2023 WL
 8004576 (D.N.D. Nov. 17, 2023) .........................................................................11

*Van Hollen, Jr. v. Federal Election Commission*, 811 F.3d 486 (D.C. Cir. 2016) ...11

*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ...........................................................19

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ................................................................4

**Statutes**

52 U.S.C. § 30109(a)(8)(A) ......................................................................................13

52 U.S.C. § 30109(a)(8)(C) ......................................................................................14

**Constitutional Provisions**

U.S. Const. amend. I ....................................................................................................8

**Other Authorities**

*Addressing Risks from Chris Krebs and Government Censorship*, Presidential
 Memoranda (Apr. 9, 2025), https://perma.cc/M2K2-9EGY. .............................22

Alana Abramson, *Marc Elias Fought Trump's 2020 Election Lawsuits. Can He Win
 The Battle Over Voting Rights?*, TIME (Apr. 6, 2021), https://perma.cc/QSG7-
 NVXD ...................................................................................................................17

Andrew Howard, *Trump ousted the top Democratic campaign finance regulator.
 She says it's illegal.*, Politico (Feb. 7, 2025),
 https://www.politico.com/news/2025/02/07/donald-trump-feccommissioner-
 firing-014200 ......................................................................................................23

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012) ..............................................................................................7

Byron Tau, *The sparse indictment of Comey by Trump's Justice Department belies a complicated backstory*, AP News (Sep. 27, 2025), https://apnews.com/article/comey-trump-indictment-russia-investigation-congress-385eb5cfc667412692641fbd32d8c6f4.................................................26

Christina A. Cassidy, *Trump administration halts funding for two cybersecurity efforts, including one for elections*, AP News (Mar. 10, 2025), https://perma.cc/2UYH-5XT4. ......................................................................22

Christine Fernando, *A crush of lawsuits over voting in multiple states is creating a shadow war for the 2024 election*, AP News (Apr. 21, 2024), https://apnews.com/article/rnc-trump-lawsuits-2024-election-voter-rolls-c7d8943dcac776103d948532f62f2a5c ...........................................................20

*Court Cases*, Democracy Docket, https://www.democracydocket.com/cases/ (last visited Apr. 3, 2026)..........................................................................................20

Election Law and Redistricting, Jenner & Block, https://www.jenner.com/en/capabilities/practices/litigation/election-law-and-redistricting (last visited Apr. 3, 2026) .............................................................17

Ellen D. Katz, *Curbing Private Enforcement of the Voting Rights Act: Thoughts on Recent Developments*, 123 Mich. L. Rev. Online 23 (2024)...............................13

Eric Geller, *Top US Election Security Watchdog Forced to Stop Election Security Work*, WIRED (Feb. 14, 2025), https://www.wired.com/story/cisa-election-security-freeze-memo/. ....................................................................................22

Executive Order No. 14215, 90 Fed. Reg. 10447 (Feb. 18, 2025).........................23

Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025) ........................23

Jacob Shamsian, *Trump targeted 20 of the biggest law firms over their diversity programs. A GOP favorite is missing from the list.*, Business Insider (Mar. 21, 2025), https://perma.cc/C4MC-WUSM................................................................9

Jane C. Timm & Charlie Gile, *Election expert testifies FBI's evidence in Fulton County ballot case 'doesn't make sense'*, NBC News (Mar. 27, 2026), https://perma.cc/D69M-SKKP. ...............................................25

Jude Joffe-Block & Miles Parks, *33 million voters have been run through a Trump administration citizenship check*, NPR (Sep. 11, 2025), https://perma.cc/ZKJ3-9LHW ...........................................................................................25

Kate M. Harris, *Judicial Review of Deadlock Votes: Campaign Legal Center & Democracy 21 v. Federal Election Commission (D.C. Cir. 2020)*, U. Chi. L. Rev., https://perma.cc/S6E3-J8AX ...................................................16

Khaleda Rahman & Robert Birsel, *Full List of Donald Trump Pardons of 'Fake Electors'*, Newsweek (Nov. 10, 2025), https://www.newsweek.com/full-list-donald-trump-pardons-fake-electors-rudy-giuliani-mark-meadows-john-eastman-11019555. ......................................................................................26

Madeleine Greenberg, *The Trump Administration's Attempts to Get Sensitive Voter Data Threaten the Rule of Law*, Campaign Legal Center (March 31, 2026), https://perma.cc/MVH9-F43F ........................................................24

NAACP Amicus Brief, *Perkins Coie LLP, et al. v. U.S. Department of Justice, et al.*, No. 1:25-cv-00716-BAH (Apr. 8, 2025), ECF No. 102 ...............................14

Nic Cheeseman & Brian Klaas, How to Rig an Election (2018)............................26

Political Law Litigation, Perkins Coie, https://perma.cc/58N5-DF53 (last visited Apr. 3, 2026) ...............................................................................................16

Rick Hasen, *Election Litigation Database, 1996-2024*, https://electionlawblog.org/wp-content/uploads/Hasen-Election-Litigation-1996-2024.xlsx (last visited Apr. 3, 2026).......................................................21

Rick Hasen, *Election Litigation Hits Record, Increasing More than 14 Percent in the 2024 Election Cycle Compared to the 2020 Election Cycle, Despite End of Covid Pandemic*, Election Law Blog (Mar. 24, 2025), https://perma.cc/K9EH-E4T9......................................................................................................21

Richard L. Hasen, *Record Election Litigation Rates in the 2020 Election: An Aberration or a Sign of Things to Come?*, 21 Election L.J. 150 (2022) ............20

Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, New York Times (Feb. 2, 2026), https://perma.cc/D5S5-LLP6. ...............................................................................21

S. Rep. No. 97-417 (1982) ......................................................................................12

Seung Min Kim, et al., *Trump signs order directing creation of a national voter list, a move already facing lawsuit threats*, AP News (Mar. 31, 2026), https://perma.cc/6N86-3MD2 ................................................................................25

Sherrilyn Ifill, *Trump's Attack on Lawyers and Law Firms Takes a Page Out of the Southern 1950s Playbook*, Sherrilyn's Newsletter (Mar. 24, 2025), https://perma.cc/WS6B-EHJG ...............................................................................14

United States Department of Justice, Justice Manual § 8-1.100 (2023)..................12

United States Department of Justice, Justice Manual § 8-2.270 (2022)..................12

William Cummings, Joey Garrison & Jim Sergent, *By the Numbers: President Donald Trump's Failed Efforts to Overturn the Election*, USA Today (Jan. 6, 2021), https://perma.cc/S8WN-23RY ...............................................................21

**INTERESTS OF AMICUS CURIAE**[1]

Campaign Legal Center ("CLC") is a nonpartisan, nonprofit legal organization dedicated to solving the wide range of challenges facing American democracy. To protect and improve the democratic system, CLC engages in litigation, policy advocacy, and strategic communication in key issue areas, including voting rights, fair redistricting, campaign finance reform, and ethical rules for officeholders.

CLC currently represents clients challenging multiple executive actions that implicate these issues including cases against executive orders affecting our nation's elections, *see League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 1:25-cv-00946 (D.D.C. filed Mar. 31, 2025) ("*LULAC I*"), and *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 1:26-cv-01132 (D.D.C. filed Apr. 2, 2026) ("*LULAC II*"); a federal policy limiting voter registration of naturalized citizens, *League of Women Voters of the United States v. United States Citizen and Immigration Services*, No. 8:25-cv-03777 (D. Md. filed Nov. 18, 2025); and attempts by the Department of Justice (DOJ) to access sensitive state voter data, *see, e.g.*, *United States v. Bellows*, No. 1:25-cv-00468 (D. Me. filed Sep. 16, 2025); *United States v. Copeland Hanzas*, No. 2:25-cv-00903 (D. Vt. filed Dec. 1, 2025);

---

[1] CLC affirms that no counsel for a party authored this brief in whole or in part, and that no person other than CLC or its counsel contributed money that was intended to fund the preparation or submission of this brief.

1

*United States v. Bd. of Elections of the State of N.Y.*, No. 1:25-cv-01338 (N.D.N.Y. filed Sep. 25, 2025).

CLC writes to highlight how the executive orders at issue here retaliate against Appellees for engaging in voting rights and election litigation and for representing President Trump's political and electoral opponents. By taking aim at practitioners of voting and election law—both partisan and nonpartisan—the Trump Administration undermines Americans' ability to vindicate their political rights and puts a thumb on the scale in favor of its own partisan electoral interests. CLC's expertise in democracy work enables it to contribute unique insights to this Court's consideration of the issues in this case.

## SUMMARY OF ARGUMENT

Rights are not real if they cannot be vindicated. Voting rights and election lawyers work to ensure that voters, candidates, and other participants in our democratic system can vindicate their political rights. The four executive orders ("Orders") at issue here take adverse action against four law firms in part because they have undertaken this vital work—from taking on partisan matters representing candidates who oppose President Trump to nonpartisan cases challenging election laws that restrict voting. This work is not only lawful, it plays a critical role in safeguarding the health of our democracy. By attacking firms for their election law work, the Orders undermine our democracy in three primary ways.

First, the Orders represent clear viewpoint discrimination because they expressly rebuke Appellees for their advocacy of certain "partisan ends" and "election law" litigation and expressly fault Appellees for their representation of— or at least association with—the President's electoral and partisan opponents. Campaign speech and electoral advocacy are "at the core of what the First Amendment is designed to protect," *Morse v. Frederick*, 551 U.S. 393, 403 (2007) (citation omitted), and where its protection is at its "fullest and most urgent application," *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989).

Second, the Orders have the pernicious effect of chilling legal advocacy for litigants seeking to expand or protect voting rights or to safeguard the integrity of elections as a whole. Voters need access to legal resources to both protect their individual rights and to ensure electoral processes, such as voter registration, redistricting, and various forms of voting, are fair and open to all.

Finally, the Orders are part of a broader autocratic effort by the Administration to take control of federal elections. The President appears to be deploying the powers of his office to deprive his electoral opponents of legal resources and to tilt the level playing field that is the premise of fair and competitive elections.

The Orders thus pose a threat not only to free speech and association, but also the fundamental integrity of American democracy.

## ARGUMENT

### I.    Appellees' Activities Do Not "Degrade[] American Democracy," These Executive Orders Do.

The Orders infringe on multiple constitutional rights that "are integral to the democratic process." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011) (speech and petition); *see also* WilmerHale Br. 15-25; Jenner Br. 17-34; Susman Br. 13-29; Perkins Br. 14-45. Affected groups and socially conscious lawyers have the right to work together to achieve "a wide variety of political [and] social . . . ends." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quotations omitted). This is especially the case when such association is "designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself," *Nat'l Ass'n for the Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886, 914 (1982), including the fundamental right to vote, *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Rather than forcing "unity," *Texas v. Johnson*, 491 U.S. 397, 401 (1989), our constitutional scheme protects "political and cultural diversity" and "shield[s] dissident expression from suppression by the majority," *Bonta*, 594 U.S. at 606 (citation omitted). Thus, the President cannot silence and seek retribution on his opposition or critics. Indeed, "[t]he right to speak freely and to promote diversity of ideas and programs is [] one of the chief distinctions that sets us apart from totalitarian regimes." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).

4

Here, the Orders take aim at Appellees for representing clients or engaging in activities that were—or were perceived to be—on the opposite side of the political spectrum as President Trump.[2] For instance, one Order alleged Perkins Coie "represent[ed] failed Presidential candidate Hillary Clinton" and "hired Fusion GPS, which then manufactured a false 'dossier' designed to steal an election." Exec. Order No. 14230 §1, JA487. The Order also complained that the firm "worked with activist donors" to challenge certain "election laws," *id.*, and "actions supported by President Trump or his campaign," JA1683.

Executive Order 14250 likewise faulted WilmerHale for "engag[ing] in obvious partisan representations to achieve political ends . . . and further[ing] the degradation of the quality of American elections." Exec. Order No. 14250 § 1, JA2332. Similarly, the President rebuked Jenner for "engage[ing] in obvious partisan representations to achieve political ends," Exec. Order No. 14246 § 1, JA2012, and for "re-hir[ing] the unethical Andrew Weissmann," *id.*, who investigated Russian interference in the 2016 presidential election, Jenner Br. 9. Lastly, the President stated that "Susman spearheads efforts to . . . degrade the quality of American

---

[2] Although the Orders characterize the firms' work as partisan, at least some of the matters the Orders refer to lack any obvious connection to a political party or partisan actor. The firms, too, have stated on the record that their work is nonpartisan in nature. *E.g.*, JA42-43; JA1770-71; JA2286-89; JA3439-40. Regardless, the First Amendment prohibits discrimination based not only on actual but also perceived political affiliation. *See, e.g.*, *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 300 (6th Cir. 2012).

elections," Exec. Order No. 14263 § 1, JA3146, which no party disputes "references Susman's representation of Dominion Voting Systems and state election officials in connection with litigation concerning the 2020 election." JA3485; JA3507.

"Viewpoint discrimination is poison to a free society." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring). When the government targets speakers because of their views, "the violation of the First Amendment is all the more blatant," and such discrimination is presumptively unconstitutional. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). This prohibition applies with equal force to enforcement actions by executive officials. *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1140-41 (D.C. Cir. 2023); *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 184 (D. Mass. 2025) (immigration enforcement based on political speech to chill such speech violated the First Amendment); *see also Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). Especially "when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for" judicial intervention. *Lozman v. Riviera Beach*, 585 U.S. 87, 100 (2018).[3]

---

[3] The American Bar Association has brought a related lawsuit arguing these Orders are part of an official policy to sanction law firms. *See Am. Bar Ass'n v. Exec. Off. of the President*, No. 1:25-cv-01888-AHA, 2026 WL 890410, at *5-8 (D.D.C. Mar. 31, 2026).

The First Amendment has also recognized the unique harms done when state actors try to punish or incentivize partisan affiliation. Even when managing employees—an area in which the executive is entitled to significant deference—the First Amendment generally forbids state actors from conditioning benefits based on actual or perceived partisan affiliation, recognizing that the State will rarely be able to articulate a "vital" state interest sufficient to outweigh the harms done by a system of political patronage. *See, e.g.*, *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 298 (6th Cir. 2012); *Garza v. Escobar*, 972 F.3d 721, 729 (5th Cir. 2020); *Elrod v. Burns*, 427 U.S. 347, 360 (1976).

The government claims Section 1 of each Order is simply President Trump or the government "saying what it wishes" and asks the Court to sever Section 1 if it were to find it unconstitutional. DOJ Br. 63-65. But Section 1 animates and directs the sections that follow and those later sections make little sense without reference to Section 1. "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (quotations omitted); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) (statutes are to be read as a whole). The enforcement sections of the

executive orders cannot be disaggregated from the respective Section 1's that identify the motivations for those enforcement sections.

Even if this Court were to analyze the sections of the Orders separately, the Supreme Court has made clear that facially content neutral laws can be considered viewpoint based when "adopted by the government because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citation modified). Disagreement can be evidenced through statements by government actors. *See Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018) (statements by Colorado Civil Rights Commission belied application of viewpoint neutrality towards religion). Additionally, "selective enforcement of a neutral and facially constitutional law may run afoul of the First Amendment if the government's prosecutorial choices turn on the content or viewpoint of speech." *Frederick Douglass Found., Inc.*, 82 F.4th at 1141. So too when those powers are used "to chill [] First Amendment activities." *PHE, Inc. v. U.S. Dep't of Just.*, 743 F. Supp. 15, 22 (D.D.C. 1990). The government—and President Trump is no exception—may not "use the power of the State to punish or suppress disfavored expression," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024), especially when such expression takes the form of petitioning for redress of constitutional rights. U.S. Const. amend. I.

Here, Section 1 of each of Order, *see supra*, is reinforced by statements by the President attacking Appellees, as detailed in the record below. *E.g.*, JA55; JA1637-41; JA2170; JA2806; JA3442-44. Both the Orders and these statements establish without doubt that the enforcement sections of the Orders (even if stripped of Section 1 to be arguably "facially neutral") were adopted because the government disagrees with the political speech and representation undertaken by Appellees and seeks to chill like speech in the future. Law firms unaffiliated with President Trump's political opposition or that eschewed disfavored electoral advocacy were ignored. For example, Jones Day, which represented President Trump during his 2016 and 2020 election campaigns, and the RNC during the 2024 election, remains unaffected.[4] By contrast, the President described Appellee Perkins Coie as "dishonest and dangerous," Exec. Order No. 14230 §1, JA487, and upon signing the relevant Order, stated that Perkins' litigation against his campaign "should never be allowed to happen again." JA55.

This court should not ignore the Administration's plain statements of intent to discriminate and coerce and should declare the orders unconstitutional. *See Dep't of*

---

[4] Jacob Shamsian, *Trump targeted 20 of the biggest law firms over their diversity programs. A GOP favorite is missing from the list.*, Business Insider (Mar. 21, 2025), https://perma.cc/C4MC-WUSM.

*Com. v. New York*, 588 U.S. 752, 785 (2019) (courts are "not required to exhibit a naiveté from which ordinary citizens are free.").

## II. Litigants in Election Law Cases—and the Lawyers Who Represent Them, Such as Appellees—Play a Critical Role in Vindicating Political Rights and Safeguarding Our Democracy.

It is axiomatic that our political rights—the right to vote, the right to engage in political speech and expression, and the right to associate with others for political ends—must be treated with special solicitude because they are foundational to our democracy. These rights, however, are only existent insofar as they can be vindicated. The private and pro bono bar, including Appellees, play a critical role in making sure that voters and civic engagement groups, or candidates and political parties, can not only exercise these rights, but defend them when they are threatened. By targeting law firms because they have chosen to represent clients in election law cases, the Orders attack and erode this democracy-enabling legal ecosystem.

Election law cases can be costly and doctrinally complicated, often lasting years, requiring testimony from numerous technical experts, and involving thousands of attorney hours. Some cases, too, require emergency litigation on short timelines to resolve election disputes before an election concludes. Legal representation is therefore often necessary for individual voters, especially vulnerable and marginalized voters, to challenge unlawful barriers to voting and

10

confirm that their vote is counted;[5] for candidates and political actors to ensure that campaign finance, election administration and related laws are being interpreted and enforced properly in electoral races;[6] for communities to ensure that maps are drawn fairly to provide every voter an equal opportunity to participate in the political process;[7] and for the electorate as a whole to receive the campaign disclosure necessary for informed voting and to prevent electoral misconduct and fraud.[8]

Constitutional claims vindicating political rights—like right to vote claims—are almost exclusively brought by private litigants represented by private or pro bono

---

[5] *E.g.*, *Mi Familia Vota v. Fontes*, 129 F.4th 691, 701 (9th Cir. 2025) (holding two Arizona laws imposed burdens on the right to vote and violated federal law); *League of Women Voters of Ohio, et al. v. Frank LaRose*, No. 2:26-cv-177 (S.D. Ohio Feb. 13, 2026) (challenge to voter purge program that disproportionately affects naturalized citizens).

[6] *See, e.g.*, *Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) (challenging FEC regulations implementing Bipartisan Campaign Reform Act as insufficiently strong to ensure full campaign finance disclosure and effective contribution limits) (plaintiffs' counsel of record included attorneys from Wilmer Cutler Pickering Hale and Dorr).

[7] *E.g.*, *Turtle Mountain Band of Chippewa Indians v. Howe*, No. 3:22-cv-22, 2023 WL 8004576, at *1 (D.N.D. Nov. 17, 2023), *petition for cert. filed*, *Turtle Mountain Band of Chippewa Indians v. Howe*, No. 25-253 (U.S. Sep. 2, 2025) (North Dakota's legislative map violated the Voting Rights Act by diluting the voting strength of Native American voters); *Gardner v. Henderson*, No. 2:26-cv-00084-RJS-JCB, 2026 WL 496448 (D. Utah Feb. 23, 2026) (Utah's congressional map must comply with citizen initiative prohibiting partisan gerrymandering).

[8] *Van Hollen, Jr. v. FEC*, 811 F.3d 486 (D.C. Cir. 2016) (reviewing challenge by former House Member to FEC rulemaking that weakened federal disclosure) (plaintiffs' counsel of record included attorneys from WilmerHale); *CLC v. Iowa Values*, 691 F. Supp. 3d 94 (D.D.C. 2023) (permitting CLC's private action to require FECA disclosure from Iowa Values to proceed following FEC's inaction).

11

counsel. These cases often fall outside of the DOJ's purview, unless they arise in the context of other statutory enforcement. *See* U.S. Dep't of Just., Just. Manual § 8-1.100 (2023). For example, the Voting Section in the Civil Rights Division "has enforcement responsibility for certain civil provisions of federal laws that protect the right to vote," but it is not granted authority to bring affirmative constitutional cases on its own authority separate from statutory enforcement. U.S. Dep't of Just., Just. Manual § 8-2.270 (2022). Unsurprisingly, the number of private cases raising constitutional right to vote, speak, or associate claims far outpace any brought by state actors.

Further, federal or state enforcement of election statutory law can be hampered by limited government resources and possible political conflicts. Reflecting this reality, many voting and election laws anticipate that private parties will enforce their terms, and more recently drafted statutes make clear that they are intended to be enforced by private litigants.[9] *See* S. Rep. No. 97-417, at 30 (1982) (expressly "reiterat[ing] the existence of the private right of action under Section 2 [of the Voting Rights Act ("VRA")], as has been clearly intended by Congress since 1965"); *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (noting the

---

[9] The National Voter Registration Act (NVRA) explicitly provides a private right of action for any person aggrieved by a violation of the statute. 52 U.S.C. § 20510(b).

12

enforceability of Section 2 by private litigants is supported by Congressional intent and precedent).

Private parties have always brought the vast majority of cases under Section 2. From 1982 through August 2024, "private plaintiffs have been party to 96.4% of Section 2 claims that produced published opinions . . . and the sole litigants in 86.7% of these decisions." *See* Ellen D. Katz, *Curbing Private Enforcement of the Voting Rights Act: Thoughts on Recent Developments*, 123 Mich. L. Rev. Online 23, 34 (2024); *see also Singleton v. Allen*, 782 F. Supp. 3d 1092, 1319 n.68 (N.D. Ala. 2025) (noting that "the Department of Justice has previously observed that private plaintiffs have brought over 400 Section [2] cases resulting in judicial decisions since 1982, while the Department of Justice itself has brought just 44 cases") (citation omitted). Indeed, the Supreme Court has recognized that "[t]he achievement of the [VRA's] laudable goal [would] be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General." *Allen v. State Bd. of Elections*, 393 U.S. 544, 556 (1969).

The Federal Election Campaign Act ("FECA") also relies significantly on private enforcement, providing for judicial review of the FEC's failure to act on, or dismissal of, any administrative complaint alleging campaign finance violations, 52 U.S.C. § 30109(a)(8)(A), and in certain circumstances, permitting the complainant

to bring a private enforcement action in their own name, *id.* § 30109(a)(8)(C).[10] Indeed, given the FEC's evenly-balanced, bipartisan structure, Congress "anticipated that partisan deadlocks were likely to" stymie the agency's capacity to enforce the law. *CREW v. Am. Action Network*, 410 F. Supp. 3d 1, 6 (D.D.C. 2019). It was thus crucial that private parties could pursue claims when the FEC proves "unable or unwilling" to do so. *Democratic Cong. Campaign Comm. ("DCCC") v. FEC*, 831 F.2d 1131, 1135 n.5 (D.C. Cir. 1987).

Access to legal resources has been key to a broad range of other civil rights advocacy too. For example, although the Civil Rights Movement in the 1950-60s is "remembered best for its dramatic, powerful and effective direct actions," "equally important was the litigation that often cleared the paths for those direct actions to take place." Sherrilyn Ifill, *Trump's Attack on Lawyers and Law Firms Takes a Page Out of the Southern 1950s Playbook*, Sherrilyn's Newsletter (Mar. 24, 2025), https://perma.cc/WS6B-EHJG. *See also* NAACP Amicus Br. 6-10, *Perkins Coie LLP, et al. v. U.S. Dep't of Just., et al.*, No. 1:25-cv-00716-BAH (Apr. 8, 2025), ECF No. 102. As a result, legal organizations, like the NAACP, came under fire in this

---

[10] Private suits are most often brought to ensure political actors disclose all statutorily-required information about the financing of their campaign activities, thus ensuring that voters receive the information necessary to "evaluate candidates for public office" and "the role that [a particular committee's] financial assistance might play in a specific election." *FEC v. Akins*, 524 U.S. 11, 21 (1998). *See also supra* n.8.

period from state governments seeking to prevent civil rights reforms, and states attempted to weaponize corporate, tax, and legal ethics and licensing regulations to hinder these groups' capacity to litigate civil rights cases. *Id*. at 7-8. But there—as here—courts stepped in to prevent the State from undermining this right-protecting legal infrastructure. *See, e.g.*, *Nat'l Ass'n for the Advancement of Colored People v. Button*, 371 U.S. 415, 428, 429, 431 (1963) (striking down Virginia's solicitation regulations on grounds that Virginia could not use "its power to regulate the legal profession" to impede civil rights lawyers from "vindicat[ing] the legal rights of members of the [Black] community").

Recent changes in the legal landscape have effectively pushed the enforcement of election laws from government authorities to private litigants, making the work of Appellees all the more crucial. The Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529, 573-74 (2013)—and its invalidation of the Voting Rights Act's Section 5 preclearance regime—has shifted the burden of challenging discriminatory voting practices onto private plaintiffs through litigation under Section 2 of the VRA.[11] Trends in federal campaign finance law enforcement

---

[11] *Mi Familia Vota v. Fontes*, 129 F.4th 691, 701 (9th Cir. 2025); *Tribe v. Rodriguez*, No. CV-20-00432-TUC-JAS, 2020 WL 6203523, at *1 (D. Ariz. Oct. 22, 2020) (Pascua Yaqui Tribe and Pima County Recorder reached a settlement agreement to establish an early voting location on the reservation after suit claiming Section 2 violation); *Petteway v. Galveston Cnty.*, 698 F. Supp. 3d 952 (S.D. Tex. 2023), *aff'd*, *Petteway v. Galveston Cnty.*, 86 F.4th 214 (5th Cir. 2023), *reh'g en banc granted*, *vacated*, 86 F.4th 1146 (5th Cir. 2023), *on reh'g en banc*, *Petteway v. Galveston*

are similar. Over the last decade, the FEC has gradually undertaken fewer and fewer enforcement proceedings, and increasingly, the six Commissioners, balanced in partisan affiliation, have failed to take action due to voting deadlocks and the agency's repeated loss of a voting quorum.[12]

There is no question that, here, the Appellees are being targeted for representing clients who seek to vindicate their political rights and participate in our democracy, even if doing so puts them at odds with the President or his party. Perkins Coie represented former Presidential candidate Hillary Clinton, the Democratic National Committee, and challenged numerous restrictive voting laws "with the objective of removing barriers to voting." Political Law Litigation, Perkins Coie, https://perma.cc/58N5-DF53 (last visited Apr. 3, 2026). They also brought "election-related lawsuits . . . challenging actions supported by [the president] or his campaign." JA1683. Indeed, following the 2020 Presidential election, Perkins Coie represented an opposing party in 65 lawsuits in which President Trump or one of his

---

*Cnty*., 111 F.4th 596 (5th Cir. 2023), *rev'd and remanded*, 111 F.4th 596 (5th Cir. 2024) (challenging county maps for racially discriminating against Black and Latino voters).

[12] From 1975 to 2007, the Commission deadlocked on an average of 4.9 percent of requests per year. But between 2008 and 2019, the deadlock percentage climbed to an average of 24.1 percent of requests per year. Kate M. Harris, *Judicial Review of Deadlock Votes: Campaign Legal Center & Democracy 21 v. Federal Election Commission (D.C. Cir. 2020)*, U. Chi. L. Rev., https://perma.cc/S6E3-J8AX.

associates attempted to overturn the results.[13] WilmerHale has similarly challenged repressive "state voter identification and voter-registration laws," JA2300, most recently helping restore voting rights to hundreds of thousands of formerly incarcerated Virginians. *King v. O'Bannon*, No. 3:23-CV-408, 2026 WL 172624, at *1 (E.D. Va. Jan. 22, 2026). Jenner & Block features an Election Law and Redistricting practice that has "represented clients either on the merits or as *amici* in nearly every major Supreme Court case involving voting rights and election law over the past quarter century" and are committed to "free elections, fair and equitable districting maps, and a government that truly reflects the will of the people."[14] Susman Godfrey represented multiple clients to defend the integrity of the election process including Dominion Voting in its defamation lawsuit against Fox relating to its voting machines in the 2020 election and the Arizona Secretary of State and Governor of Wisconsin in lawsuits accusing them of election interference. JA3485.

Appellees should not suffer retaliation for undertaking this critical democracy-enabling work. At a time when judicial recourse has become increasingly important for voters to protect their right to vote, ensure access to the polls, and

---

[13] Alana Abramson, *Marc Elias Fought Trump's 2020 Election Lawsuits. Can He Win The Battle Over Voting Rights?*, TIME (Apr. 6, 2021), https://perma.cc/QSG7-NVXD.

[14] Election Law and Redistricting, Jenner & Block, https://www.jenner.com/en/capabilities/practices/litigation/election-law-and-redistricting (last visited Apr. 3, 2026).

compel campaign finance transparency, the Orders here attempt to penalize and chill this litigation. Troublingly, the broader chilling effect of these Orders is already apparent. While Appellees decided to challenge the Orders, numerous law firms instead struck deals with the Administration in exchange for escaping similar sanctions.[15] *E.g.*, JA1687-90; 2163; 2169. Many offered millions of dollars' worth of pro-bono services to support the Administration's preferred causes and appeared to abandon their previous disfavored policies and advocacy.[16]

This chilling effect has extended into the election law space in ways less visible to the record, where private law firms are increasingly reticent to partner with our organization or otherwise take on electoral or voting rights work that could be perceived as adverse to the President's electoral interests. *See Am. Bar Ass'n*, 2026 WL 890410, at *4. Reducing the availability of legal resources for political and election-related cases impedes citizens from protecting their access to voting and challenging discriminatory or otherwise unlawful election laws and practices. If citizens are less able to vote, they lose their "voice" in government and are less able to protect or assert other rights and interests—including of course, responding to *this*

---

[15] White House press secretary Karoline Leavitt said, "Big Law continues to bend the knee to President Trump because they know they were wrong, and he looks forward to putting their pro bono legal concessions toward implementing his America First agenda." JA3179.

[16] *Id.*

Administration's actions and polices. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). And while "[o]ther rights, even the most basic, are illusory if the right to vote is undermined," the right to vote itself is illusory if it cannot be vindicated in court. *Id.*

### III. By Selectively Targeting Legal Resources Used by the President's Opponents, the Orders Seek to Chill Oppositional Election Litigation to Advantage the Administration's Partisan Allies in Future Elections.

In addition to targeting Appellees' voting- and election-related legal work, the Orders make clear that they are penalizing Appellees for representing or associating with the President's electoral and partisan opponents. The Orders thus do more than wage a purely ideological war about election law. Instead, President Trump attempts to put a thumb on the scale of federal elections to advantage his own party and political supporters—and to punish his perceived adversaries, especially with respect to their actions relating to President Trump's *own* past campaigns.

Allowing a President to deploy the powers of this office to retaliate against his electoral and partisan opponents poses an acute danger to the rule of law and American democracy. If President Trump can deprive his electoral opponents of the legal resources needed to advise their campaigns and litigate election disputes— resources that the President himself has robustly employed in past elections—this creates an uneven playing field and threatens the integrity of federal elections.

Further, the need for legal resources in today's elections is particularly acute— and growing. Scholars estimate that the rate of election litigation, measured by

19

presidential election cycle, has tripled since 2000, and the 2023-2024 cycle reached an all-time high. Richard L. Hasen, *Record Election Litigation Rates in the 2020 Election: An Aberration or a Sign of Things to Come?*, 21 Election L.J. 150 (2022); *see also infra* n.19. Candidates and party committees now typically litigate almost all the "rules of the game"—from voter registration, to early and mail-in voting options, to Election Day ballot counting and recounts.[17] These lawsuits can be outcome determinative of the elections.

The President is well-aware of the central role litigation plays in the conduct and outcome of modern elections, given the extensive efforts of his own campaigns to challenge the results of the 2020 Presidential election and to cast doubt on states' administration of their election laws. Following the 2020 election, the Trump campaign brought at least sixty-two lawsuits in at least 12 states, seeking to challenge the results in states and counties he lost, as well as alleging fraud in

---

[17] *See, e.g., Court Cases*, Democracy Docket, https://www.democracydocket.com/cases/ (last visited Apr. 3, 2026) (case tracker by Marc Elias-founded group listing current litigation "shaping voting rights, redistricting and elections"); Christine Fernando, *A crush of lawsuits over voting in multiple states is creating a shadow war for the 2024 election*, AP News (Apr. 21, 2024), https://apnews.com/article/rnc-trump-lawsuits-2024-election-voter-rolls-c7d8943dcac776103d948532f62f2a5c (describing how RNC had "filed election-related lawsuits in nearly half the states" before the 2024 elections).

multiple jurisdictions.[18] His campaign's prodigious effort likely contributed to the total election litigation in 2020 reaching an all-time high of 424 cases.[19]

The Orders are also troubling because they are part of a broader coordinated effort of the Administration to reshape the administration of federal elections and to bring them under Presidential control in violation of separation of powers and federalism principles. This effort has featured not only retaliatory action against the President's perceived electoral and political opponents, such as Appellees here, but also actions to dismantle election security infrastructure, exert Presidential control over independent federal election agencies, and direct how states administer federal elections in their jurisdictions. Indeed, President Trump has openly announced his intention to "take over" and "nationalize" voting in the United States.[20]

This effort began with the January 20, 2025 Executive Order titled "Restoring Freedom of Speech and Ending Federal Censorship," which spurred an internal

---

[18] William Cummings, Joey Garrison & Jim Sergent, *By the Numbers: President Donald Trump's Failed Efforts to Overturn the Election*, USA Today (Jan. 6, 2021), https://perma.cc/S8WN-23RY.

[19] Rick Hasen, *Election Litigation Hits Record, Increasing More than 14 Percent in the 2024 Election Cycle Compared to the 2020 Election Cycle, Despite End of Covid Pandemic*, Election Law Blog (Mar. 24, 2025), https://perma.cc/K9EH-E4T9. *See also* Rick Hasen, *Election Litigation Database, 1996-2024*, https://electionlawblog.org/wp-content/uploads/Hasen-Election-Litigation-1996-2024.xlsx (last visited Apr. 3, 2026).

[20] Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. Times (Feb. 2, 2026), https://perma.cc/D5S5-LLP6.

21

investigation at the Cybersecurity and Infrastructure Security Agency (CISA) and an operational freeze of election security activities.[21] Under the direction of the Department of Government Efficiency, hundreds of CISA employees were pushed out and federal funding was terminated for the Election Infrastructure Information Analysis Center and other conduits for sharing threat intelligence with state and local officials.[22] Echoing the claims of the Orders at issue here, President Trump also ordered the DOJ to investigate Christopher Krebs, the former head of CISA, for thwarting his electoral goals, including by "falsely and baselessly den[ying] that the 2020 election was rigged and stolen," and "categorically dismissing widespread election malfeasance and serious vulnerabilities with voting machines."[23]

Shortly thereafter, the Administration sought to consolidate power over federal election agencies like the FEC and Election Assistance Commission (EAC), although Congress carefully designed these agencies to operate in an impartial, nonpartisan manner independent of the President. The President fired a

---

[21] Eric Geller, *Top US Election Security Watchdog Forced to Stop Election Security Work*, WIRED (Feb. 14, 2025), https://www.wired.com/story/cisa-election-security-freeze-memo/.

[22] Christina A. Cassidy, *Trump administration halts funding for two cybersecurity efforts, including one for elections*, AP News (Mar. 10, 2025), https://perma.cc/2UYH-5XT4.

[23] *Addressing Risks from Chris Krebs and Government Censorship*, Presidential Memoranda (Apr. 9, 2025), https://perma.cc/M2K2-9EGY.

commissioner on the FEC without cause,[24] and attempted to control these agencies'

decision-making through executive orders. *See* Exec. Order No. 14215, 90 Fed. Reg.

10447 (Feb. 18, 2025) (providing that the "President and the Attorney General's

opinions on questions of law are controlling on all employees" of the executive

branch, including those of independent agencies); *see also Democratic Nat'l Comm.

v. Trump*, No. 25-cv-00587-AHA, 2025 WL 1573181, at *1 (D.D.C. June 3, 2025)

(considering a challenge by Democratic national party committees to the order as

contrary to FECA and separation of powers principles).

Then, in Executive Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025)

("Elections Order"), the Administration attempted to change various aspects of state

election laws, commanding the EAC to "require, in its national mail voter

registration form," documentary proof of U.S. citizenship, and to decertify all voting

systems machines it previously certified, within 180 days. *Id*. § 2(a). The order also

purported to command the EAC to withhold funds from the 18 states that count

timely cast mail ballots received after Election Day. These mandates faced

---

[24] President Trump fired Democratic FEC Commissioner Ellen Weintraub in February 2025. *See* Andrew Howard, *Trump ousted the top Democratic campaign finance regulator. She says it's illegal.*, Politico (Feb. 7, 2025), https://www.politico.com/news/2025/02/07/donald-trump-feccommissioner-firing-014200.

immediate legal pushback,[25] resulting in several lower court decisions holding that only states and Congress, not the President, are granted constitutional authority to set rules for federal elections. *See, e.g.*, *LULAC I*, 808 F. Supp. 3d 29, 41-42 (D.D.C. 2025) (permanently enjoining part of the Elections Order); *LULAC II*, Nos. 25-0946 (CKK), 25-0952 (CKK), 25-0955 (CKK), 2026 WL 252420, at *1 (D.D.C. Jan. 30, 2026) (same).

But the Elections Order was just one aspect of the Administration's broader attempt to interfere with the states' constitutional authority over elections. In the spring of 2025, the DOJ embarked on a sweeping effort to demand highly sensitive voter information—including partial social security numbers and driver's license numbers—from almost every state, and then escalated this effort by suing over half of the 50 states and Washington, D.C. for access to this data when they did not acquiesce to these demands.[26] In September 2025, the Department of Homeland Security (DHS) confirmed it had used the SAVE program (typically used for immigration status verification for benefits) to conduct citizenship checks with

---

[25] Notably, this pushback, happening amidst the coercion of Big Law, has come primarily from nonprofit groups and states.

[26] Madeleine Greenberg, *The Trump Administration's Attempts to Get Sensitive Voter Data Threaten the Rule of Law*, Campaign Legal Ctr. (March 31, 2026), https://perma.cc/MVH9-F43F.

respect to state voter registration rolls.[27] Just days ago, President Trump issued yet another executive order directing DHS to make a national list of eligible voters and prohibiting the U.S. Postal Service from sending absentee ballots to any person who does not appear on this list.[28] That executive order is now the subject of additional election law litigation. These actions represent a systematic effort to "nationalize" election administration and ensure that the machinery of future contests remains under direct partisan control.[29]

Finally, to return to the actions challenged here, the Administration has utilized executive orders and federal law enforcement as tools for political retaliation—or reward—focusing in particular on those who impacted the President's campaigns in the 2016 and 2020 elections. On his first day, the President issued pardons for approximately 1,500 individuals involved in the January 6 Capitol attack. He later pardoned 77 allies, including Rudy Giuliani and Mark Meadows,

---

[27] Jude Joffe-Block & Miles Parks, *33 million voters have been run through a Trump administration citizenship check*, NPR (Sep. 11, 2025), https://perma.cc/ZKJ3-9LHW.

[28] Seung Min Kim, et al., *Trump signs order directing creation of a national voter list, a move already facing lawsuit threats*, AP News (Mar. 31, 2026), https://perma.cc/6N86-3MD2.

[29] The Administration continues to "investigate" debunked theories of fraud in the 2020 election. For instance, recently, the FBI raided the Fulton County Georgia election board to seize records related to the 2020 election. Jane C. Timm & Charlie Gile, *Election expert testifies FBI's evidence in Fulton County ballot case 'doesn't make sense'*, NBC News (Mar. 27, 2026), https://perma.cc/D69M-SKKP.

25

involved in the "fake electors" scheme, wherein the Trump campaign attempted to submit false certificates in favor of President Trump to the Electoral College from seven states won by President Biden.[30] The President also targeted officials who he perceived as opposing his electoral fortunes, including Krebs,[31] former FBI Director James Comey,[32] and of course, Appellees here.

The Orders targeting Appellees are thus just one aspect of the Administration's broad, multi-pronged effort both to exert Presidential power over the public administration of U.S. elections, and to constrain private actors from litigating or otherwise challenging the President's actions, especially with respect to his past campaigns and current election-related initiatives.[33]

---

[30] Khaleda Rahman & Robert Birsel, *Full List of Donald Trump Pardons of 'Fake Electors'*, Newsweek (Nov. 10, 2025), https://www.newsweek.com/full-list-donald-trump-pardons-fake-electors-rudy-giuliani-mark-meadows-john-eastman-11019555.

[31] *See supra* n.22.

[32] Although Comey was indicted for allegedly making false statements to Congress, observers linked the prosecution to his oversight of the FBI's investigation into possible ties between the 2016 Trump presidential campaign and Russia, *see* Byron Tau, *The sparse indictment of Comey by Trump's Justice Department belies a complicated backstory*, AP News (Sept. 27, 2025), https://apnews.com/article/comey-trump-indictment-russia-investigation-congress-385eb5cfc667412692641fbd32d8c6f4.

[33] Scholars of comparative politics have consistently found that the independence of a country's election authority is "critical to the quality of [its] elections." Nic Cheeseman & Brian Klaas, How to Rig an Election 184 (2018). For example, one study surveying elections worldwide between 2012 and 2016 found that "the likelihood of a credible election is inversely proportional to the degree to which the ruling regime directly controls the election management body." *Id*. at 185.

But the legitimacy of the U.S. democratic system—and the public's confidence in that system—turns on whether federal elections are administered in a fair and impartial manner and whether candidates, political entities, and voters all have access to legal resources to vindicate their rights and responsibilities under law. If the legitimacy of American democracy is to be preserved, the President cannot be seen as exploiting the powers of his office to thwart fair electoral competition. The Orders attempt to arrogate the powers and resources of the Presidency to shield President Trump's past campaigns from accountability—or even investigation—and to entrench President Trump's own political party and political allies in power. These are hallmarks of authoritarianism, not a democracy of, by and for the people.

## CONCLUSION

As our democracy continues to endure attacks—including from within—the work of lawyers and clients who fight to sustain it must be protected. This Court should declare the executive orders unconstitutional.

Dated:        April 3, 2026

Respectfully submitted,

*Tara Malloy*
Tara Malloy (DC Bar No. 988280)
Dana Paikowsky (DC Bar No. 1722349)
Rachel Appel (DC Bar No. 90017750)
CAMPAIGN LEGAL CENTER
1101 14 St. NW, Suite 400
Washington, DC 20005
Tel: (202) 736-2200
tmalloy@campaignlegalcenter.org
dpaikowsky@campaignlegalcenter.org
rappel@campaignlegalcenter.org

*Counsel for Amicus Curiae Campaign Legal Center*

28

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6458 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this response has been prepared using Microsoft Office Word in Times New Roman 14-point font.

*/s/ Tara Malloy*
Tara Malloy

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2026, I electronically filed this Amicus Curiae Brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

I further certify that I caused the required copies of the Amicus Curiae Brief to be filed with the Clerk of the Court.

*/s/ Tara Malloy*
Tara Malloy