SCHEDULED FOR ORAL ARGUMENT MAY 14, 2026

Nos. 25-5241, 25-5265, 25-5277, 25-5310

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| PERKINS COIE LLP,<br>*Plaintiff–Appellee,*<br>v.<br>U.S. DEPARTMENT OF JUSTICE, *et al.*,<br>*Defendants–Appellants.* | | No. 25-5241 |
| JENNER & BLOCK LLP,<br>*Plaintiff–Appellee,*<br>v.<br>U.S. DEPARTMENT OF JUSTICE, *et al.*,<br>*Defendants–Appellants.* | | No. 25-5265 |
| WILMER CUTLER PICKERING HALE AND DORR LLP,<br>*Plaintiff–Appellee,*<br>v.<br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br>*Defendants–Appellants.* | | No. 25-5277 |
| SUSMAN GODFREY LLP,<br>*Plaintiff–Appellee,*<br>v.<br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br>*Defendants–Appellants.* | | No. 25-5310 |

## APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF APPELLEES AND AFFIRMANCE; AMICUS CURIAE BRIEF

The Norton Law Firm PC
George C. Harris
*Counsel of Record*
gharris@nortonlaw.com
Josephine K. Petrick
Gil Walton
Hayley Landman
300 Frank H. Ogawa Plaza, Ste. 450
Oakland, CA 94612
510-906-4900

ATTORNEYS FOR AMICI CURIAE

## CERTIFICATE AS TO PARTES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a), Amici state:

**A. Parties and Amici.**

Except for the following, all parties, intervenors, and amici appearing before the district court and this Court are listed in the Briefs for Appellees filed on March 27, 2026.

Amici 76 Attorneys are listed in Appendix A to this brief.

Amici are aware of the following other amici curiae: 595 Law Professors; Bipartisan Current and Former United States Senators; the State Bar Associations of Washington State, Oregon, and California; Pioneer New England Legal Foundation; Pacific Legal Foundation; National Security Counselors, Inc.; Compass Rose Legal Group, PLLC; Law Office of Daniel L. Ellis; 42 Media Organizations and Press Freedom Advocates; Western Center on Law and Poverty; Members of Congress; 1224 Law Students and 50 Law Student Organizations; Former Presidents of the Energy Bar Association; European Bar Associations; Washington Legal Foundation; the American Bar Association; Former Judges; Lawyers 4 Lawyers; Former and Current General Counsel; the International Bar Association Human Rights

Institute; Lawyers Defending American Democracy; Lawyers' Committee for Civil Rights Under Law; Institute for Justice; Union Internationale des Avocats; Professor Aaron H. Caplan; Law Professors; Leadership Now Project; America's Future; Gun Owners of America, Inc.; Gun Owners Foundation; Judicial Action Group; and Conservative Legal Defense and Education Fund.

### B. Rulings Under Review.

The rulings under review appear in the Defendants-Appellants' brief filed March 6, 2026, at ii.

### C. Related Cases.

The related cases appear in the Defendants-Appellants' brief filed March 6, 2026, at iii.

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure and Circuit Rules 26.1 and 28(a)(1)(A), Amici state they are individuals and have nothing to disclose.

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ................................................2

TABLE OF CONTENTS ......................................................2

TABLE OF AUTHORITIES ..................................................4

APPLICATION FOR LEAVE TO FILE AMICUS CURIAE
     BRIEF IN SUPPORT OF APPELLEES AND
     AFFIRMANCE ...............................................9

BRIEF OF AMICI CURIAE IN SUPPORT OF APPELLEES
     AND AFFIRMANCE ........................................12

INTEREST OF AMICI .......................................................12

INTRODUCTION ..............................................................14

ARGUMENT ...................................................................18

I.    By targeting prominent law firms, the Executive
    Orders seek to prevent lawyers from challenging the
    Administration's policies ...........................................18

II.   The Executive Orders exploited a structural
    vulnerability in law firms, and the effects have been
    devastating. ..........................................................21

    A.   Transactional practices depend on government
       approval in ways litigation does not, making firms
       with large transactional departments uniquely
       vulnerable to coercion. .....................................21

    B.   The Executive Orders have had a widespread chilling
       effect on law firms' advocacy. .............................29

    C.   The coercion worked: settling firms' deal practices
       flourished. ...................................................33

    D.   The specter of future Executive Orders continues to
       chill law firm activity. .......................................34

2

III.   Lawyers and firms face a choice: risk the Administration's ire, inviting harm to their clients, or steer clear. ...............................................................37

 A. The Executive Orders engage in viewpoint discrimination using the attorney-client relationship as a vector for coercion. ............................................. 38

 B. The Executive Orders sabotage transactional attorneys' and clients' rights to free petition and government participation. ......................................... 40

 C. The Executive Orders' pervasive structural coercion should be addressed with comprehensive and unequivocal condemnation. ....................................... 43

CONCLUSION ....................................................................46

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS .......................................................................48

CIRCUIT RULE 29(D) CERTIFICATION ...........................49

**APPENDIX OF AMICI**......................................................51

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963) ..............................................................38

*Borough of Duryea, Pa. v. Guarnieri,*
564 U.S. 379 (2011) ............................................................42

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
404 U.S. 508 (1972) ............................................................41

*Grutter v. Bollinger,*
539 U.S. 306 (2003) ............................................................18

*Hollingsworth v. Perry,*
570 U.S. 693 (2013) ............................................................19

*In re Halkin,*
598 F.2d 176 (D.C. Cir. 1979) ............................................38

*In re Primus,*
436 U.S. 412 (1978) ............................................................38

*Korematsu v. United States,*
323 U.S. 214 (1944) ............................................................18

*Lawrence v. Texas,*
539 U.S. 558 (2003) ............................................................18

*Legal Services Corp. v. Velazquez,*
531 U.S. 533 (2001) ............................................................18

*NRA of Am. v. Vullo,*
602 U.S. 175 (2024) ......................................................38, 39

*Seattle Times Co. v. Rhinehart,*
467 U.S. 20 (1984) ..............................................................38

*Smith v. Ark. State Highway Employees, Loc., 1315*
  441 U.S. 463 (1979) ..................................................................42

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ..................................................................45

*W. Va. State Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ..................................................................20

*Whelan v. Abell,*
  48 F.3d 1247 (D.C. Cir. 1995) ...................................... 41, 42

### Statutes

5 U.S.C. § 553(e) ........................................................................40

15 U.S.C. § 18a ..........................................................................22

15 U.S.C. § 18a(b) ......................................................................23

50 U.S.C. § 4565(b)(2)(A) ..........................................................24

### Rules

D.C. Circuit Rule 29(d) ..............................................................49

Fed. R. App. P. 29(a)(5) .............................................................10

### Other Authorities

ALM/Law.com, *The 2024 Pro Bono Report* ............................30

Amanda O'Brien & Abigail Adcox, *Hindsight Is 20-20: After 3 Firms Beat Trump in Court, Dealmakers Have Second Thoughts* (June 2, 2025) ...............................................25

*Bloomberg Law 2024 League Tables Reveal Top 20 M&A Law Firms, Bloomberg Law* ..............................................26

*Bloomberg Law 2025 League Tables Reveal Top 20 M&A Law Firms, Bloomberg Law* (Jan. 2, 2026) .......................33

*Law Firms Ponder Lobbying DOJ, White House to Get Deals Through, Bloomberg Law* (Nov. 24, 2025)..........................28

Carrie Johnson, *Trump's deals with law firms are like deals 'made with a gun to the head,' lawyers say*, NPR (May 31, 2025) ................................................................................36

*Corporate/M&A: The Elite USA*............................................25

D. Daniel Sokol, *et al.*, *Antitrust Mergers and Regulatory Uncertainty*, 78 Bus. Law. 1099, 1104 (2023) ...................23

David L. Brown, *Law Firm M&A Boom: Will 2026 Keep Up the Pace?*, Best Law Firms (Feb. 13, 2026)........................34

David Thomas, *US Law Firm Paul Weiss Fired by Client Over Trump Executive Order*, Reuters, (March 19, 2025) 16

Debra Cassens Weiss, *Fourth firm reaches pro bono deal with Trump to avoid potential order punishing its government clients*, ABA Journal  (Apr. 3, 2025) ..............28

Latham & Watkins LLP, *Financial Regulatory*...................25

Jake Maher, *In Trump Order Against Perkins Coie, GCs See Harm for Cos.*, Law360 (April 8, 2025) ............................24

John Morley, *Why Law Firms Collapse*, The Practice (March/April 2017)............................................................26

Katelyn Polantz, *The chilling effect of Trump's war against the legal establishment*, CNN (Mar. 11, 2025) .................31

Latham & Watkins LLP, *Merger Clearance & Litigation*, (accessed Feb. 23, 2026)..................................................25

Lauren Hirsch, *Trump Calls on Netflix to Oust Susan Rice From Its Board, The New York Times* (Feb. 22, 2026)......37

Mahira Dayal, *In Trump's $940 Million Deals with Firms, the Jury Is Still Out*, Bloomberg Law (Aug. 15, 2025)......29

Matthew Goldstein & Jessica Silver–Greenberg, *Some Giant Law Firms Shy Away From Pro Bono Immigration Cases*, *N.Y. Times*, May 6, 2025 (updated May 24, 2025) ............32

Matthew Goldstein, et al, *Rivals Pounce on Paul Weiss, a Top Law Firm, After Trump's Order*, The New York Times (March 26, 2025) .............................................................27

Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks*, Wash. Post (Mar. 25, 2025) .......................................................32

Noam Scheiber, *Why Big Law Firms Aren't Standing Together Against Trump's Assault*, The New York Times (Apr. 19, 2025).................................................................28

Patrick Smith & Amanda O'Brien, *Trump Deals Revealed Deep Tensions Between Corporate and Litigation Departments*, Law.com (June 20, 2025) ...........................16

Patterson Belknap, *Firm Ranked in the Top 5 of* The American Lawyer's *2025 Pro Bono Scorecard* (July 8, 2025) ...................................................................................19

*Paul, Weiss Earns 24 Top-Five M&A League Table Rankings in 2025* (Jan. 22, 2026)......................................................33

Ruth Marcus, *The Lede: How Donald Trump Throttled Big Law*, The New Yorker (Mar. 27, 2025) .............................24

Ryan Lucas, *Trump Attacks on Law Firms Begin to Chill Pro Bono Work on Causes He Doesn't Like*, NPR (Apr. 13, 2025) ...................................................................................32

Stephen Gandel & Jeffrey Goldfarb, *Paul Weiss Rewrites the Art of the Deal Under Duress* (Mar. 21, 2025)....................26

THE WHITE HOUSE, *President Trump and the Governor of Louisiana Deliver Remarks*, (YouTube March 24, 2025) ..43

The White House, *Preventing Abuses of the Legal System and the Federal Court* (Mar. 22, 2025) ..............................41

*Truth Social Posts of April 11, 2025*, The American Presidency Project, U.C. Santa Barbara (April 11, 2025).35

Vineet Bhagwat *et al.*, *The Real Effects of Uncertainty on Merger Activity*, 29 Rev. Fin. Stud. 3000 (2016) ...............23

**APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF APPELLEES AND AFFIRMANCE**

The 76 attorneys formerly with prominent law firms whose names are listed in the Appendix respectfully move this Court for leave to file the attached amicus curiae brief in support of Appellees Perkins Coie LLP, Jenner & Block LLP, Wilmer Cutler Pickering Hale and Dorr LLP, and Susman Godfrey LLP. *See* Circuit Rule 29(b).

Amici are uniquely situated to explain the reactions and considerations of large and prominent law firms in response to Executive Orders 14230, 14237, 14246, and 14250. Amici have spent their careers at or working with the nation's most prominent law firms. As former elite law firm attorneys and lifelong officers of the court, they have handled complex litigation, counseled clients through transformative transactions, and devoted thousands of hours to pro bono representations. Amici are familiar with the role large law firms play in the judicial system, large firm dynamics, and the risks posed to them by threats to their ability to represent clients of all types.

The appellees and the district courts have set forth the ways in which the Executive Orders have violated the First Amendment, the separation of powers, due process, and clients' constitutional rights to

9

counsel. Amici write to add the financial and ethical impacts and concerns faced by prominent law firms—particularly those with dominant transactional practices—which help to explain the Executive Orders' far-reaching effects.

The accompanying amicus brief is 6,321 words in length, within the 6,500-word limit imposed by the Federal Rules of Appellate Procedure and the Circuit Rules (i.e., "no more than one-half the maximum length authorized by these rules for a party's principal brief"). Fed. R. App. P. 29(a)(5); *see id.* R. 32(a)(7)(b) (13,000-word limit); Cir. R. 32(e). Considering that the Appellant's and Appellees' principal briefs are limited to 26,000 and 9,000 words, respectively, in an abundance of caution Amici respectfully request leave to file the enclosed 6,321-word brief. *See* Fed. R. App. P. 29(a)(5).

All parties consent to Amici filing this brief.

Dated: April 3, 2026 THE NORTON LAW FIRM PC

*/s/ George C. Harris*

George C. Harris
Attorneys for Amici Curiae

## BRIEF OF AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE

## INTEREST OF AMICI[1]

Amici are 76 attorneys formerly at law firms ranked among the two hundred largest law firms in the United States by gross revenue (the "AmLaw 200") and elite boutiques. They submit this brief in their individual capacities and do not speak on behalf of their firms or former firms. A complete list of amici appears in the Appendix.

Amici have spent their careers at the nation's most prominent law firms. They have handled complex litigation, counseled clients through transformative transactions, and devoted thousands of hours to pro bono representations. Some have continued their careers as general counsel for major companies and turned to AmLaw 200 firms for representation. Amici understand how large law firms operate—how ethical obligations are met, which practices generate the most revenue, what pressures shape firm strategy and governance, and how decisions are made.

---

[1] No party's counsel authored this brief in whole or in part, and other than Amici and their counsel, no person, party, or party's counsel contributed money to fund the preparation or submission of the brief.

Amici have observed with concern the Administration's campaign against large law firms who dare to take up causes and clients adverse to the government or not aligned with the Administration's political priorities. The immediate harms are visible: many firms have withdrawn from pro bono matters, scrubbed their websites, and declined representations they would previously have accepted without hesitation. The Executive Orders strike at the very heart of our legal adversarial system by punishing law firms that take on clients or issues disfavored by the Administration and by depriving clients of their right to employ attorneys of their choice who will zealously advocate on their behalf.

Amici note with concern the  widespread silence of prominent law firms on the damage to the rule of law caused by the Executive Orders. Amici therefore write to add their perspective as former attorneys with large and prominent firms.  Amici include attorneys who practiced primarily transactional work, attorneys who practiced primarily litigation, and attorneys whose practices spanned both areas.  They have observed first-hand the dynamics that the Executive Orders exploit to undermine the independence of the legal profession and

13

access to justice in our country.  They submit this brief in the hope of assisting this Court in its deliberation.

## INTRODUCTION

Beginning in March 2025, President Trump issued a series of executive orders targeting prominent law firms for their pro bono work and perceived political affiliations. Four chose to fight and are appellees here: Perkins Coie, Jenner & Block, WilmerHale, and Susman Godfrey. Each prevailed in the district courts, which unanimously held the Orders unconstitutional.

Nine other firms made a different choice. Rather than litigate, they negotiated deals with the Administration, pledging nearly a billion dollars in free legal services to causes the President supports and committing to change their speech to conform to the Administration's views in hiring and client selection.[2]

---

[2] The firms that settled with the Administration rather than litigate included Paul, Weiss, Rifkind, Wharton & Garrison, which settled after the Administration issued an executive order against it similar to those issued against the appellee firms, and eight firms that settled preemptively with the Administration: Skadden, Arps, Slate, Meagher & Flom; Willkie Farr & Gallagher; Milbank; Kirkland & Ellis; Latham & Watkins; Allen & Overy Shearman Sterling; Simpson Thacher & Bartlett; and Cadwalader, Wickersham & Taft.

14

At least in the short term, the settlements may be understandable from a business perspective. Firms with substantial transactional practices face a particular vulnerability: their clients depend on regulatory approvals the Administration controls. Transactional lawyers thus require unprejudiced access to the federal government to represent their clients effectively. Once litigators are allowed in the door of the federal courthouse, the judiciary and jury system should insulate them and the outcome of their cases from the whims of the Administration; but they, too, undertake litigation with the backdrop that the overwhelming majority of cases settle before trial. Litigators working adversely to the DOJ and government agencies need access to and engagement from government lawyers to achieve settlements and plea bargains or to avoid litigation altogether. Understanding that dynamic reveals how far the chill from these Executive Orders reaches.

The Executive Orders leverage this structural vulnerability to create an unprecedented form of coercion. As one D.C. partner explained, "M&A lawyers need deal approvals, so they're worried about their clients if they were ever to face an executive order. Litigators,

meanwhile, think this is 'another time we have to slug it out.'"[3] The

firms that capitulated did so in no small part because their business

models make them especially vulnerable to coercion.  Their corporate

clients cannot wait years for litigation to resolve; deals must close on

market-driven and regulatory timelines, and agencies controlled by the

Administration hold the keys. Criminal defendant clients need to have

the option to negotiate a plea.[4] This dependency transforms the

Executive Orders from idle threats into a standing compulsion to self-

censor—to decline representations, temper advocacy, and avoid any

conduct that might attract presidential attention.

Judge Howell aptly identified the "chilling effect of blizzard

proportions" the Orders created. Tr. of H'g on TRO at 95:22–24, *Perkins*

---

[3] Patrick Smith & Amanda O'Brien, *Trump Deals Revealed Deep Tensions Between Corporate and Litigation Departments*, Law.com (June 20, 2025), https://www.law.com/americanlawyer/2025/06/20/trump-deals-revealed-deep-tensions-between-corporate-and-litigation-departments/ (hereinafter Smith & O'Brien, *Deep Tensions*).

[4] *See, e.g.*, David Thomas, *US Law Firm Paul Weiss Fired by Client Over Trump Executive Order*, Reuters (March 19, 2025), https://www.reuters.com/world/us/us-law-firm-paul-weiss-fired-by-client-over-trump-executive-order-2025-03-19/ (noting client terminated representation by targeted firm over concern that Justice Department would view case negatively).

*Coie LLP v. DOJ*, No. 1:25-cv-00716-BAH (D.D.C. Mar. 12, 2025). That chill is insidious: the knowledge that a firm's *clients* will suffer if the firm displeases the government inevitably drives a wedge between the client and counsel. The attorney-client relationship itself becomes a vector for coercion. Clients must choose between their preferred counsel and their need for regulatory approval or potential good-faith settlement. Firms must choose between zealous advocacy and their clients' interests. Neither choice should be forced upon them.

Lawyers who fear retaliation are also chilled from taking on representations that would hold the Executive accountable for its actions. In the absence of willing advocates, courts cannot check unlawful action. When the Executive can silence the legal profession by threatening clients' economic interests, it removes the last barrier between executive will and unchecked power. This Court should affirm the district courts' orders holding the Executive Orders unconstitutional and enjoining their enforcement.

## ARGUMENT

I. **By targeting prominent law firms, the Executive Orders seek to prevent lawyers from challenging the Administration's policies.**

The Founders understood that an independent bar is essential to constitutional government. *WilmerHale* Order at 1; *Perkins Coie* Order at 1–2 (citing 3 Diary and Autobiography of John Adams 293 (L.H. Butterfield et al. eds., 1961), and Alexis de Tocqueville, Democracy in America 301 (Henry Reeve trans., 2002) (1835)); *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 545 (2001) ("An informed, independent judiciary presumes an informed, independent bar.").

The AmLaw 200 firms historically recruit top-shelf talent and use their large numbers and resources to tackle complex, high-profile cases. Given their talent base and scale, they are able to respond meaningfully in representations adverse to government agencies. Cognizant of their ethical obligation to provide access to justice, AmLaw 200 attorneys have argued in numerous seminal public-interest cases, including, for example, Charles Horsky of Covington & Burling in *Korematsu v. United States*, 323 U.S. 214 (1944); Maureen Mahoney of Latham & Watkins in *Grutter v. Bollinger*, 539 U.S. 306 (2003); Paul Smith of Jenner & Block in *Lawrence v. Texas*, 539 U.S. 558 (2003); and David

Boies of Boies Schiller & Flexner in *Hollingsworth v. Perry*, 570 U.S. 693 (2013). Expertise and resources matter in these cases: Recently, attorneys from Patterson Belknap obtained a $42 million jury verdict in favor of three victims of torture at Abu Ghraib, but reported nearly 8,000 hours of pro bono work on the case in one year.[5]

As the district courts here found, the Executive Orders have deterred law firms from taking on similar work.  This is intended. The strategic purpose of the Executive Orders is just that—to cripple the opposition to government initiatives that raise serious threats to justice by sidelining preeminent lawyers associated with large firms and the capabilities and resources the firms provide.

The Executive Orders also chill the willingness of law firms to do anything that might invite presidential disfavor. When a firm's clients need M&A antitrust clearance, approval from the Committee on Foreign Investment in the United States (CFIUS), favorable regulatory treatment, or a litigation settlement on acceptable terms, the firm has

---

[5] Patterson Belknap, *Firm Ranked in the Top 5 of* The American Lawyer's *2025 Pro Bono Scorecard* (July 8, 2025), https://www.pbwt.com/news/firm-ranked-in-the-top-5-of-the-american-lawyers-2025-pro-bono-scorecard.

every incentive to stay in the Administration's good graces. That pressure impacts every decision a firm makes about which clients to represent, which positions to advocate, and which causes to support.

The district courts in these cases correctly identified the constitutional stakes. As Judge Howell explained, the Executive Orders are "an overt attempt to suppress and punish certain viewpoints," contrary to the bedrock principle that "'no official, high or petty, can prescribe what shall be orthodox in politics or other matters of opinion.'" *Perkins Coie* Order at 4 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (cleaned up)). Judge Bates warned that the Orders' chilling effect "is uniquely harmful for its focus on pro bono work," threatening to "strongarm firms into redirecting their uncompensated services to work the President prefers." *Jenner* Order at 46. Judge Leon observed that the Orders challenge "fundamental rights" that have stood unchallenged for "nearly 250 years since the Constitution was adopted[.]" *WilmerHale* Order at 1.

As Perkins explains, "The President designed the Order to do more than just damage Perkins; he intended to intimidate the entire bar into submission." Doc. No. 2165998 at 9. The message was received.

20

Major firms that were not subject to an Executive Order lobbied the Administration for a "settlement" of potential future Executive Orders.

## II.    The Executive Orders exploited a structural vulnerability in law firms, and the effects have been devastating.

The parties have documented the Executive Orders' chilling effect on pro bono work and litigation adverse to the Administration, and the district courts correctly found this chill unconstitutional. But these harms represent only part of the damage. The Executive Orders' full reach becomes clear only when one considers how modern large law firms operate—both as businesses and as advocates for all of their clients, including those with transactional, regulatory, and dispute-resolution needs.

### A.    Transactional practices depend on government approval in ways litigation does not, making firms with large transactional departments uniquely vulnerable to coercion.

Transactional practice is the key to understanding why the chill from the Executive Orders extends so far beyond the targeted firms and beyond pro bono. Within settling firms, "the corporate lawyers have been driving the [deals with the Trump Administration], to the great

displeasure of many, if not most or all, of the litigators."[6] Civil litigators do not need regulatory approval to win a case in court. But transactional lawyers need the government's cooperation to serve their clients.

Most large corporate transactions require regulatory approval or at least raise the potential of regulatory review from one government agency or another, including notably, the Department of Justice and the Federal Trade Commission's review of mergers and acquisitions, an important segment of large firms' businesses. *See* 15 U.S.C. § 18a. Many nonlitigation practice areas, such as M&A antitrust clearance, environmental, labor, tax, communications, patent prosecution, and government contracting, require approval by the federal government.

The Executive Orders sabotage these government-facing practices. The orders prohibit "access from Federal Government buildings to employees of [the targeted firms]" and "limit Government employees . . . from engaging with [targeted firm] employees." E.O. Nos. 14230, 14237, 14246, & 14250. The targeted law firms' filings vividly describe

---

[6] Smith & O'Brien, *Deep Tensions, supra* note 3.

cancelled meetings with government officials, revocation of security clearances, and terminated client relationships. Had Amici faced such an order during their years in large-firm practice, they could not have effectively pursued engagements intersecting with the federal government while fulfilling their ethical obligation of zealous representation.

Transactional practices cannot function under the cloud of uncertainty these orders create. In M&A, for example, premerger filings start a thirty-day waiting period, which DOJ and FTC have discretion to terminate early or extend up to sixty days. 15 U.S.C. § 18a(b). Extensions beyond that may lead to protracted litigation between the merging parties and the government, potentially disastrous for a deal. Uncertainty as to timing increases risk and can derail deal financing.[7] When timing is unpredictable, deals fall apart.[8]

---

[7] D. Daniel Sokol, Marissa Ginn, Robert J. Calzaretta, Jr., & Marcello Santana, *Antitrust Mergers and Regulatory Uncertainty*, 78 Bus. Law. 1099, 1104 (2023).

[8] Vineet Bhagwat *et al.*, *The Real Effects of Uncertainty on Merger Activity*, 29 Rev. Fin. Stud. 3000, 3001–05 (2016), https://corpgov.law.harvard.edu/2016/08/21/the-real-effects-of-uncertainty-on-merger-activity/.

Similarly, cross-border deals require approval from the CFIUS, which is charged with identifying national security risk posed by foreign investment. 50 U.S.C. § 4565(b)(2)(A). CFIUS review is confidential; outside parties cannot access CFIUS rationales or internal discussions. *Id.* § 4565(c).

Amici who practiced in house could not reasonably have hired a targeted firm for such a matter when the Orders themselves branded those firms as threats to national security. As one commentator put it, "clients with issues before the government have to think twice before hiring [a firm targeted by the Administration]. Any corporate general counsel would have a difficult time explaining why retaining [that firm] would be in the best interest of shareholders."[9]

---

[9] Ruth Marcus, *The Lede: How Donald Trump Throttled Big Law*, The New Yorker (Mar. 27, 2025), https://www.newyorker.com/news/the-lede/how-donald-trump-throttled-big-law; *see also* Jake Maher, *In Trump Order Against Perkins Coie, GCs See Harm for Cos.*, Law360 (April 8, 2025), https://www.law360.com/articles/2322842.

In the wake of the Executive Orders, firms' relationships with regulators—a key part of their value proposition—have become contingent on political alignment.[10]

In the settling firms, transactional practices are major profit engines.[11] Seven of the settling firms are ranked as "elite" for Corporate/M&A by Chambers.[12] And in Bloomberg Law's 2024 global M&A league tables by deal value, four settling firms, Kirkland & Ellis,

---

[10] Settling law firms tout their abilities to work smoothly and effectively with regulators. *See, e.g.*, Latham & Watkins LLP, *Merger Clearance & Litigation*, https://www.lw.com/en/practices/antitrust-and-competition/merger-clearance-and-litigation (accessed Feb. 23, 2026) ("Our merger clearance team helps clients anticipate, prepare for, and persuasively address questions antitrust enforcers are likely to raise about a deal."); *Financial Regulatory*, https://www.lw.com/en/practices/financial-regulatory ("We leverage strong working relationships with the world's major regulatory bodies to effectively advise clients active across all segments of the financial markets and operating under the full spectrum of domestic and global regulations.").

[11] Amanda O'Brien & Abigail Adcox, *Hindsight Is 20-20: After 3 Firms Beat Trump in Court, Dealmakers Have Second Thoughts* (June 2, 2025), https://www.law.com/americanlawyer/2025/06/02/hindsight-is-20-20-after-3-firms-beat-trump-in-court-dealmakers-have-second-thoughts/.

[12] *Corporate/M&A: The Elite USA*, https://chambers.com/legal-rankings/corporate-ma-the-elite-usa-nationwide-5:1437:12788:1?l=en-GB (listing Kirkland & Ellis, Latham & Watkins, Simpson Thacher & Bartlett, Skadden, Paul Weiss, A&O Shearman, and Willkie Farr among "elite" M&A firms).

25

Latham & Watkins, Skadden, and Paul Weiss ranked in the top five, and another (Simpson Thacher) ranked in the top ten.[13] When the Administration threatened firms' ability to serve transactional clients, it threatened the heart of their business model.

For a targeted firm, disfavored treatment of its transactional practice could be devastating. Although large firms can be quite profitable, they are prone to sudden collapse due to the nature of firm economics.[14] Law firms carry large recurring costs, including associate salaries, real estate leases, and information technology expenses. An adverse event can lead clients to depart, often quickly followed by serial departures of groups of partners or practice groups breaking away to preserve their independent economics. The resulting precipitous

---

[13] Stephen Gandel & Jeffrey Goldfarb, *Paul Weiss Rewrites the Art of the Deal Under Duress* (Mar. 21, 2025), https://www.reuters.com/breakingviews/paul-weiss-rewrites-art-deal-under-duress-2025-03-21; *Bloomberg Law 2024 League Tables Reveal Top 20 M&A Law Firms, Bloomberg Law*, \https://www.prnewswire.com/news-releases/bloomberg-law-2024-league-tables-reveal-top-20-ma-law-firms-302341863.html (hereinafter "Bloomberg, *2024 M&A League Tables*").

[14] John Morley, *Why Law Firms Collapse*, The Practice, (March/April 2017), https://clp.law.harvard.edu/knowledge-hub/magazine/issues/why-law-firms-collapse/why-law-firms-collapse/.

revenue reduction and the calling-in of debt by lenders can work much like a run on a bank. Headhunting by rival firms intensifies and recruiting efforts and pitches for work falter. Amici have witnessed the collapse of several prestigious competitors in just such circumstances.

These concerns motivated the settling firms. The *New York Times* reported that Paul Weiss leadership had "deep concern about how many of the firm's lawyers would be able to keep doing their jobs," and whether a major rainmaker—now-Chairman Scott Barshay—would leave with his large M&A portfolio.[15] Milbank chair Scott Edelman explained: "[A]s a large law firm that does a majority of its work on transactional matters, we are dependent on our ability to navigate client issues in all parts of the Executive Branch. We believed that it was in the best interests of the Firm and its clients to resolve the Trump Administration's concerns in a way that would foster our working relationship and avoid what could have been an unnecessary

---

[15] Matthew Goldstein, et al, *Rivals Pounce on Paul Weiss, a Top Law Firm, After Trump's Order*, *N.Y. Times* (March 26, 2025), https://www.nytimes.com/2025/03/26/business/paul-weiss-trump-deal.html.

confrontation."[16] As a large law firm partner who advises clients on merger reviews commented, the level of confidence that "cultivating a relationship with the White House will pay off in the form of a faster investigation or the avoidance of litigation is 'higher than it has ever been.'"[17]

For the settling firms, contesting the orders was perceived as a no-win proposition. Even if you successfully challenged the Executive Orders, you risked being deemed disfavored. Because corporate partners hold significant governance power in the settling firms, their concerns prevailed.[18]

---

[16] Debra Cassens Weiss, *Fourth firm reaches pro bono deal with Trump to avoid potential order punishing its government clients*, *ABA* Journal  (Apr. 3, 2025), https://www.abajournal.com/news/article/a-fourth-law-firm-reaches-a-pro-bono-deal-with-trump-to-avoid-an-order-punishing-its-government-clients.

[17] BLOOMBERG LAW, *Law Firms Ponder Lobbying DOJ, White House to Get Deals Through* (Nov. 24, 2025), https://news.bloomberglaw.com/antitrust/law-firms-ponder-lobbying-doj-white-house-to-get-deals-through.

[18] Noam Scheiber, *Why Big Law Firms Aren't Standing Together Against Trump's Assault*, The New York Times (Apr. 19, 2025), https://www.nytimes.com/2025/04/19/business/trump-law-firms.html (noting that M&A partners took on increased influence in Paul Weiss's leadership).

## B.    The Executive Orders have had a widespread chilling effect on law firms' advocacy.

The chilling effect is evident in law firms' behavior. Unlike Perkins Coie, Jenner & Block, WilmerHale, and Susman Godfrey, "[o]ther firms skipped straight to negotiations. Without ever receiving an executive order, these firms presumptively bargained with the administration and struck deals sparing them." *Jenner* Order at 8.[19] As Judge Bates observed, "several firms of (presumably) ordinary fitness have folded rather than face similar executive orders. Indeed, it appears to take extraordinary firmness to resist." *Jenner* Order at 13. Still other firms are reportedly operating with anticipatory obedience, tailoring their practices to avoid the administration's ire.[20] But whether a firm

---

[19] As Judge Bates found, "the public interest and balance of equities easily favored relief, as 'the legal profession as a whole [was] watching and wondering' whether the 'federal government [would] turn its unwanted attention to them next.'" *Jenner* Order at 9.

[20] See Mahira Dayal, *In Trump's $940 Million Deals with Firms, the Jury Is Still Out*, Bloomberg Law (Aug. 15, 2025), https://news.bloomberglaw.com/business-and-practice/in-trumps-940-million-deals-with-firms-the-jury-is-still-out (noting that it is "[h]arder to track . . . how the deals have impacted firms' decisions on what cases to take, whether it's pro bono matters that clash with Trump's agenda or lining up directly against the administration in court. Mayer Brown, a large firm that stayed off Trump's target list and did not make a

negotiates a deal or seeks to stay on the sidelines, the specter of an executive order will curb it from accepting engagements the Administration disfavors.

The Executive Orders targeting law firms and accompanying memoranda describe legal work under the Administration's scrutiny, including matters involving elections, political candidates, foreign influence in politics, diversity programs, white collar fraud, immigration, and transgender rights.

If revived, the Orders will also have a severe effect on pro bono work. *See* Jenner Order at 46. Many public-interest organizations depend on large firms' pro bono capacity to pursue their missions, and a massive volume of work is implicated: across 120 responding AmLaw200 firms, pro bono work totaled 5.15 million hours in 2023.[21] Many large and prominent American firms are signatories to the Pro

---

White House deal, has been 'very careful about picking our spots' when it comes to issues that are 'personal to the president,' Jon Van Gorp, the firm's leader[,] said in a July interview.").

[21] ALM/Law.com, *The 2024 Pro Bono Report*, https://www.law.com/americanlawyer/pro-bono-report/.

Bono Institute Law Firm Pro Bono Challenge, committing 3% to 5% of their firm's total billable hours to pro bono.[22]

The work of Amici's own firms involved many cases adverse to the federal government, including cases against the Department of Veterans Affairs to secure disability benefits for veterans, representation of churches providing sanctuary to immigrants, and assisting Central American survivors of political violence seeking asylum. The Executive Orders discourage this work.

The chilling effect has been widely documented. A legal advisory firm told CNN that the Executive Orders have "sent a 'chilling' tone across the legal industry . . . . It's created just an incredible amount of fear."[23] The *Washington Post* reported that Biden-era officials are struggling to find counsel, and that "the well-resourced law firms that once would have backed" nonprofits and volunteers "are now steering

---

[22] The list is available via the Law Firm Pro Bono Project website at http://www.probonoinst.org/projects/lawfirm-pro-bono/law-firm-pro-bono-challenge/ and includes four of the five targeted firms.

[23] Katelyn Polantz, *The chilling effect of Trump's war against the legal establishment*, CNN (Mar. 11, 2025), http://www.cnn.com/2025/03/11/politics/chilling-effect-trump-legal-establishment/index.html.

clear."[24] NPR spoke with attorneys at a half-dozen organizations that partner with large firms on pro bono work; all expressed "deep concerns" about firms pulling back, and "some of them say it is already happening."[25] While Amici can vouch that large firms have a deep and sincere commitment to pro bono work as a solemn duty of the profession, law firms as businesses are unlikely to take on pro bono work that will place the firm at odds with the Administration and jeopardize their paying clients' interests. Press reports show firms are already cutting back their pro bono immigration practices in response to the Executive Orders.[26] The Orders are achieving their intended effect: bring large firms—those with the vast resources required to take on pro bono matters with broad reach and major impact—to heel through

---

[24] Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks*, *Wash. Post* (Mar. 25, 2025) http://www.law360.com/pulse/articles/2323753.

[25] Ryan Lucas, *Trump Attacks on Law Firms Begin to Chill Pro Bono Work on Causes He Doesn't Like*, NPR (Apr. 13, 2025), https://www.npr.org/2025/04/13/g-sl-59497/trump-law-firms-pro-bono.

[26] Matthew Goldstein & Jessica Silver–Greenberg, *Some Giant Law Firms Shy Away From Pro Bono Immigration Cases*, *N.Y. Times*, May 6, 2025 (updated May 24, 2025), https://www.nytimes.com/2025/05/06/business/trump-law-firms-pro-bono-immigration.html.

sanctions, thereby denying representation to those aggrieved by the

Administration's actions and frustrating the constitutional framework

that limits executive power.

### C. The coercion worked: settling firms' deal practices flourished.

In the aftermath of the deals, the settling firms' transactional

practices have thrived. Kirkland, Latham, Skadden, Simpson Thacher,

and Paul Weiss all ranked in the top five of major M&A league tables in

2025.[27] Kirkland, Latham, and Skadden each grew deal value by more

than 150 percent over 2024.[28] In 2025, Kirkland advised on $829 billion

in deals, more than double its 2024 deal value and nearly one-fifth of all

---

[27] *Bloomberg Law 2025 League Tables Reveal Top 20 M&A Law Firms*, Bloomberg Law (Jan. 2, 2026), https://pro.bloomberglaw.com/insights/company-news/bloomberg-law-2025-league-tables-reveal-top-20-ma-law-firms (hereinafter "Bloomberg, *2025 M&A League Tables*"); *Paul, Weiss Earns 24 Top-Five M&A League Table Rankings in 2025* (Jan. 22, 2026), https://www.paulweiss.com/insights/awards/paul-weiss-earns-24-top-five-ma-league-table-rankings-in-2025.

[28] *Compare Bloomberg, 2024 M&A League Tables, supra* note 13, with *Bloomberg, 2025 M&A League Tables, supra* note 27.

deal value in the United States.[29] Latham's deal value increased 85 percent to $720 billion.[30] Skadden advised on upwards of $600 billion in deals.[31] Whatever reputational costs the settlements carried within the profession, they did not translate into diminished deal practice.

The message is clear. Alignment with the Administration protects business; resistance invites risk. Every firm with a significant transactional practice now operates under the same implicit threat.

### D.    The specter of future Executive Orders continues to chill law firm activity.

Because law firms' practices depend on government cooperation and approval, the Executive Orders' coercive pressure reaches virtually every major law firm in the country, extends to every aspect of firm decision-making, and operates as a background constraint on the entire industry, not just the firms named in the Orders.

---

[29] David L. Brown, *Law Firm M&A Boom: Will 2026 Keep Up the Pace?*, Best Law Firms (Feb. 13, 2026), https://www.bestlawfirms.com/articles/law-firm-m-a-boom-will-2026-keep-up-the-pace/7312.

[30] *Id.*

[31] *Id.*

By the time President Trump announced the Willkie and Milbank deals, courts had already granted TROs enjoining the Executive Orders against Perkins, Jenner, and WilmerHale. On April 11, 2025, President Trump announced deals with five more major law firms: Kirkland & Ellis LLP, Allen & Overy Shearman Sterling US LLP, Simpson Thacher & Bartlett LLP, and Latham & Watkins LLP, and Cadwalader, Wickersham & Taft.[32]

Five hundred and four law firms filed an amicus brief in support of Perkins Coie's motion for summary judgment. None of the top twenty-five U.S. law firms by revenue signed, and fewer than ten of the AmLaw 100 signed. By the time Susman moved for summary judgment, four judges had enjoined Executive Orders targeting law firms. Yet the pattern held: fewer than ten of the AmLaw 100 firms—and none of the top twenty-five—signed the *Susman* amicus brief.

---

[32] *Truth Social Posts of April 11, 2025*, The American Presidency Project, U.C. Santa Barbara (April 11, 2025), https://www.presidency.ucsb.edu/documents/truth-social-posts-april-11-2025, citing https://truthsocial.com/@realDonaldTrump/posts/114320236639062571, and https://truthsocial.com/@realDonaldTrump/posts/114320245355397433.

As Judge Howell found, the reaction of "peer law firms that chose to negotiate deals with the Trump White House to avoid being targeted by similar Executive Orders" itself "demonstrates the coercive power of such targeting by the Trump Administration." *Perkins Coie* Order at 61. That coercive power has outlasted the injunctions. Despite invitations from members of Congress, the firms have declined to disavow the settlements.[33] They remain, as observed by the ABA in its district court complaint, "fully incentivized to avoid taking on representations that may draw the Administration's ire." *ABA v. Trump* Compl. ¶ 143. One partner who negotiated a settlement was asked what would prevent the President from "waking up on the wrong side of the bed tomorrow morning and deciding to issue another executive order" against his firm. His answer: "Nothing, you know, nothing protects me."[34]

The implicit threat remains: the Administration can target any firm at any time. Time-sensitive transactions face ongoing risk when

---

[33] Carrie Johnson, *Trump's deals with law firms are like deals 'made with a gun to the head,' lawyers say*, NPR (May 31, 2025) (hereinafter "Johnson, *Gun to the Head*"), https://www.npr.org/2025/05/31/nx-s1-5406173/trump-deals-law-firms.

[34] Johnson, *Gun to the Head, supra* note 33.

adversarial regulators slow-walk review, motivated not by their regulatory mission but by the President's political disagreements with the parties or their counsel. Indeed, the Administration has already demonstrated that criticizing these settlements is grounds for retaliation. President Trump personally intervened in the failed Netflix–Warner Brothers merger to demand Netflix remove Susan Rice from its board or "face the consequences," citing Rice's criticism of firms that had bent "a knee" to the President.[35]

### III.   Lawyers and firms face a choice: risk the Administration's ire, inviting harm to their clients, or steer clear.

As Judge Leon observed, "The Order shouts through a bullhorn: If you take on causes disfavored by President Trump, you will be punished! Other firms facing similar Executive Orders have capitulated to President Trump." *WilmerHale* Order at 33. The Executive Orders exploited large law firms' dependence on federal approvals, producing an unconstitutional chilling effect this Court should forcefully condemn.

---

[35] Lauren Hirsch, *Trump Calls on Netflix to Oust Susan Rice From Its Board*, *The New York Times* (Feb. 22, 2026), https://www.nytimes.com/2026/02/22/business/media/trump-netflix-susan-rice.html.

### A. The Executive Orders engage in viewpoint discrimination using the attorney-client relationship as a vector for coercion.

The First Amendment bars the government from "us[ing] the power of the State to punish or suppress disfavored expression." *NRA of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (*Vullo*). Its protection extends to "litigation as a vehicle for effective political expression and association." *In re Primus*, 436 U.S. 412, 431 (1978); *accord In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979) ("Litigation itself is a form of expression protected by the First Amendment."), *overruled on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31 (1984).

The government violates the First Amendment when it uses regulatory leverage to coerce third parties into suppressing speech, even if the government never directly censors the speech. *Vullo*, 602 U.S. at 197. Informal censorship and coercion—even absent a formal ban—can constitute a First Amendment violation. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Targeting a speaker's business partners or clients—who may be less invested in the speech and more fearful of the regulator—is a potent tool for viewpoint discrimination. *See Vullo*, 602 U.S. at 198. "[T]he First Amendment prohibits

government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries." *Id.*

The district courts correctly found that the Executive Orders constitute viewpoint discrimination because they "target[ ] the firm for its disfavored viewpoints and punish[ ] it for expressing those viewpoints." *WilmerHale* Order at 35–50. Similarly, as Judge Bates found, the Executive Orders "seek[ ] to chill legal representation the administration doesn't like, thereby insulating the Executive Branch from the judicial check fundamental to the separation of powers." *Jenner* Order at 1.

That discrimination operates through an additional mechanism. By threatening firms' ability to obtain regulatory approvals for their clients, the Orders enlist those clients as unwitting enforcers of the government's viewpoint preferences. *See Vullo*, 602 U.S. at 197–98. Clients who depend on federal cooperation for mergers, licensing, settlements, or other approvals cannot afford to be represented by a firm the Administration has targeted, regardless of whether that client's own work has anything to do with the disfavored speech.

39

This concern is not hypothetical. As Judge Howell observed, clients withdrew from Perkins Coie because "the need of the clients to engage with various federal agencies . . . by the nature of their business" made continued association untenable. *Perkins Coie* Order at 100. And the settlements confirm the mechanism: firms agreed to change their speech and client-selection criteria to conform to the Administration's preferences.

The result is viewpoint discrimination that radiates outward from the targeted firm to every client relationship that touches federal regulatory authority.

## B.    The Executive Orders sabotage transactional attorneys' and clients' rights to free petition and government participation.

While the courts below emphasized the right to petition through litigation, First Amendment rights extend beyond the courthouse doors. The transactional and regulatory work firms conduct on behalf of their clients also involves petitioning the government—merger applications, regulatory filings, and agency negotiations, among other things. *See, e.g.*, 5 U.S.C. § 553(e) (Administrative Procedure Act's petition provision); S. Doc. No. 79-248, at 21 (1946) (explaining that APA's

petition provision derives from First Amendment right to petition). That petitioning activity receives the same First Amendment protections as litigation. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("[T]he right to petition extends to all departments of the Government," including "administrative agencies (which are both creatures of the legislature, and arms of the executive) and . . . courts, the third branch of Government."); *Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995) ("[T]he filing of claims in court or before administrative agencies is part of the protected right to petition . . . .").

All American law firms—not only those targeted by the Executive Orders—risk retaliation by the Administration. Just days before it issued the Executive Orders, the Administration published a memorandum titled "Preventing Abuses of the Legal System and the Federal Court."[36] The memorandum is directed to the Attorney General and the Secretary of Homeland Security and seeks to penalize lawyers who are "litigating against the Federal Government" or who, in the

---

[36] The White House, *Preventing Abuses of the Legal System and the Federal Court* (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/.

Administration's view, are "pursuing baseless partisan attacks." *Id.* And it directs the Attorney General "to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States *or in matters before executive departments and agencies of the United States.*" *Id.* (emphasis added). In other words, the Administration aims to retaliate in all departments of government against law firms that have taken disfavored positions for their clients, not just in federal court.

When firms fear that zealous advocacy before executive departments and agencies will invite retaliation, their right to petition is chilled. *See Smith v. Ark. State Highway Employees, Loc. 1315*, 441 U.S. 463, 465 (1979) ("The government is prohibited from infringing upon [First Amendment rights] either by a general prohibition against certain forms of advocacy, or by imposing sanctions for the expression of particular views it opposes.") (cleaned up). The Administration's memorandum and Executive Orders create precisely that fear. And when law firms' representation of clients disfavored by the Administration is chilled, an essential part of the democratic process is lost. *See, e.g., Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011)

("Both speech and petition are integral to the democratic process, although not necessarily in the same way. The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives . . . .").

This chilling effect is not incidental—it is the purpose of the Orders. When asked what his "message" was "for the big corporate clients of the big law firms" targeted by the Executive Orders, and whether those clients should "get new lawyers," President Trump responded "that the law firms have to behave themselves."[37] The First Amendment does not permit the Administration to condition law firms' right to petition on "behaving" to the satisfaction of the Administration.

### C.  The Executive Orders' pervasive structural coercion should be addressed with comprehensive and unequivocal condemnation.

The Executive Orders are a dangerous blueprint. The settlements with other law firms make clear that the intended effects of the Executive Orders were not speculative or temporary.  The regulatory

---

[37] THE WHITE HOUSE, *President Trump and the Governor of Louisiana Deliver Remarks* at 19:07–19:21, (YouTube March 24, 2025), https://www.youtube.com/live/qqgmQUbuGrg?t=1156s.

43

dependencies that made them vulnerable remain. And the implicit threat hangs over every firm whose clients require government approval or cooperation: cross this Administration, and your clients will pay.

In its opening brief, the Government attempts to minimize the impact of the Executive Orders by analogizing them to run-of-the-mill government functions and by breaking down each Executive Order into small enough component parts to make it appear that the Orders are not coercive and punitive when considered as a whole. This mechanical defense ignores the Administration's stated purpose for the Executive Orders, which the Executive Orders in fact accomplished: to prevent the nation's leading law firms from taking positions adverse to the Administration and to mobilize the firms to do legal work for the President instead.

This Court's decision should recognize the broad intent and impact of the intertwined provisions of the Executive Orders. It should not give credence to a piecemeal analysis that would allow some portions of the Executive Orders to survive and thereby potentially give

support to new versions of the Executive Orders the Administration might artfully draft to achieve the originally intended chilling effect.

An independent bar is essential to holding the Executive accountable. A legal profession forced to calibrate its conduct to presidential preference cannot fulfill its constitutional function. That is the shadow the Executive Orders have cast—not only for the four firms whose cases are now before this Court, but over every lawyer who might take a case, represent a client, or advocate a position that draws presidential disapproval. If the Executive can silence lawyers by threatening their clients' interests, judicial review becomes an empty promise. Where, as here, the Executive's disapproval often appears capricious, lawyers may be silenced merely by the lack of clarity and coherence—in other words, by the fear of the unknown.

Although this Court cannot extend injunctive relief beyond the parties, *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), nothing prevents this Court from speaking clearly about what the Administration has done and why it is unconstitutional. A narrow or fact-bound opinion would miss what is at stake. The Administration has discovered a template for capturing the legal profession without direct confrontation:

45

threaten firms' ability to serve their clients and let market forces do the rest. If this Court analyzes the orders provision by provision, allowing some to survive while striking others, it will leave the template intact. The Administration will simply redraft. Only a decision that identifies and repudiates the constitutional violation at the core of these orders— the use of executive power to punish lawyers for their clients and their advocacy—will foreclose that possibility.

The Administration should not be allowed to exploit regulatory leverage to coerce the bar into silence. It should not be allowed to punish law firms for their clients, their advocacy, their pro bono commitments, or for taking positions at odds with the President's political agenda. Amici urge the Court to affirm the district courts' judgments—and to do so in terms that leave no ambiguity so that neither this Administration nor any future administration mistakes judicial restraint for permission.

## CONCLUSION

Amici respectfully urge this Court to affirm the judgments below and to make clear that the Constitution forbids the Executive from silencing those who would hold it accountable.

Dated: April 3, 2026                Respectfully submitted,

                                    THE NORTON LAW FIRM PC


                                    */s/George C. Harris*
                                    George C. Harris
                                    Attorneys for Amici Curiae

47

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS

The text of this petition consists of 6,321 words as counted by

Microsoft Word.


Dated: April 3, 2026                Respectfully submitted,

                                    THE NORTON LAW FIRM PC


                                    */s/George C. Harris*
                                    George C. Harris
                                    Attorneys for Amici Curiae

## CIRCUIT RULE 29(D) CERTIFICATION

Pursuant to D.C. Circuit Rule 29(d), counsel for Amici certify that a separate brief is necessary. Amici are former partners and associates at AmLaw 200 firms who draw on decades of firsthand experience with large-firm governance, business models, and the dynamics the Executive Orders exploit. Their brief addresses a structural vulnerability in prominent law firms—the dependence of large law firm practices on federal approval and cooperation—that is not addressed in the district court opinions and that Amici are uniquely situated to explain. The climate of apprehension the Executive Orders have created within the legal profession has made coordination among potential amici particularly difficult; many prospective filers are weighing institutional and professional considerations that may delay their decisions until shortly before the filing deadline. Because the identities and arguments of other amici supporting Appellees were not known to counsel before filing, coordination to produce a joint brief was not practicable.

49

Dated: April 3, 2026             Respectfully submitted,

                                 THE NORTON LAW FIRM PC


                                 */s/George C. Harris*
                                 George C. Harris
                                 Attorneys for Amici Curiae

## APPENDIX OF AMICI

George Abele is a retired partner at Paul Hastings LLP.

William F. Abrams is a former partner at Orrick, Herrington & Sutcliffe, Pillsbury Winthrop Shaw Pittman, King & Spalding LLP, and Steptoe LLP, and a retired Consulting Professor at Stanford University.

Filiberto Agusti is a retired partner at Steptoe LLP.

Carl Anduri is a former partner at Morrison & Foerster LLP and former president of the law firm network Lex Mundi.

Rudolph F. Aragon is a retired partner at White & Case LLP.

Michael J. Baker is a retired partner at Arnold & Porter.

Al Bedecarre is a retired partner at Quinn Emanuel Urquhart & Sullivan, LLP.

Jim Bennett is a former partner at Morrison & Foerster, LLP and current partner at The Norton Law Firm, PC.

Jeff Bleich is a former partner at Munger, Tolles & Olson LLP and Dentons.

Ruth Borenstein is a retired partner at Morrison & Foerster LLP.

Michael Carlson is a retired partner at Morrison & Foerster LLP and Schnader Harrison Segal & Lewis LLP.

Andrew Chang is a former associate at Gibson Dunn and former general counsel of DreamWorks Animation SKG, Inc.

Esther Chang is a former counsel at Morrison & Foerster LLP and current partner at The Norton Law Firm, PC.

Cedric Chao is a former partner at Morrison & Foerster LLP and DLA Piper LLP.

John W. Crittenden is a retired partner at Cooley LLP.

Mark Danis is a former partner at Morrison & Foerster LLP and former Deputy General Counsel at The Clorox Company.

Scott Edelman is a retired partner at Gibson, Dunn & Crutcher LLP.

Ken Fitzgerald is a former partner at Latham & Watkins LLP.

Paul Flum is a retired partner at Morrison & Foerster LLP.

Steve Friedlander is a former partner at Cooley LLP and current President of SV Employment Law Firm PC.

Angel Garganta is a retired partner at Venable, LLP and former partner of Arnold & Porter and Bingham McCutchen LLP.

Jon Geier is a former partner of Paul Hastings LLP.

Thomas C. Geiser is a former partner at Brobeck Phleger & Harrison LLP and former General Counsel of WellPoint Health Networks Inc.

Patricia K. Gillette is a former partner at Heller Ehrman and Orrick, Herrington & Sutcliffe.

David Gold is a retired partner at Morrison & Foerster LLP.

Karen Hagberg is a retired partner at Morrison & Foerster LLP.

Bree Hann is a former partner at Bingham McCutchen, former Assistant General Counsel at SolarCity Inc., former Associate General Counsel at Tesla Inc., and founding partner of The Norton Law Firm, PC.

Jim Hough is a retired partner at Morrison & Foerster LLP.

Michael Jacobs is a retired partner and former managing partner at Morrison & Foerster LLP.

Paul Jahn is a retired partner at Morrison & Foerster LLP.

A.C. Johnston is a retired partner at Morrison & Foerster LLP.

Michael Kass is a former partner at Pillsbury, Winthrop, Shaw, Pittman LLP and current partner at Rodriguez Wright LLP.

Terry Kee is a retired partner at Pillsbury Winthrop LLP, now known as Pillsbury, Winthrop, Shaw, Pittman LLP.

Robert Kelly is former associate at Gibson, Dunn & Crutcher LLP and former general counsel of Quibi.

Katherine Kendrick is a former associate at Latham & Watkins LLP and former general counsel of DreamWorks Animation SKG.

John Kennedy is a former partner at Dewey & LeBoeuf, Morrison & Foerster LLP, and LeBoeuf, Lamb, Greene & MacRae LLP .

Charles Kerr is a retired partner at Morrison & Foerster LLP.

James Kirkham is a retired partner at Pillsbury, Madison and Sutro, now known as Pillsbury, Winthrop, Shaw, Pittman LLC.

53

Thomas Klein is a former partner at Orrick, Herrington & Sutcliffe.

Nancy J. Koch is a former partner at Farella Braun + Martel LLP.

Serge Kogan is a former associate at Jones Day, Latham & Watkins LLP, and Chadbourne & Parke LLP.

Karl Kramer is a retired partner at Morrison & Foerster LLP and former partner at Brown & Bain PA.

Jack Lahr is a retired partner of Foley & Lardner LLP.

Sandra A. Lambert is a former partner at Farella Braun + Martel LLP.

Scott Lawson is a former partner at Quinn Emanuel Urquhart & Sullivan, LLP and Greenberg Traurig, LLP.

Samuel M. Leaf is a former associate at Willkie Farr & Gallagher LLP and O'Melveny & Meyers LLP, and is currently at The Law Office of Samuel M. Leaf.

Carrie LeRoy is a former partner of Gibson Dunn & Crutcher LLP and White & Case LLP and counsel at Skadden, Arps, Slate, Meagher & Flom LLP.

Steve Lowenthal is a retired partner at Farella Braun + Martel LLP.

Mary McCutcheon is a former partner at Farella Braun + Martel LLP.

Harold McElhinny is a retired partner and former managing partner at Morrison & Foerster LLP.

Andrew Monach is a retired partner at Morrison & Foerster LLP.

Richard V. Normington is a former counsel at King & Spalding LLP.

Fred Norton is a former partner at Boies Schiller & Flexner LLP, former Deputy General Counsel of SolarCity Inc., former Deputy General Counsel of Tesla Inc., and founding partner of The Norton Law Firm, PC.

Matthew Ohlheiser is a former associate at Cozen O'Connor, and a current Counsel at The Norton Law Firm PC.

Mark Petersen is a former partner at Farella Braun + Martel LLP and general counsel of Ophirex.

Matthew Poppe is a former partner at Orrick, Herrington & Sutcliffe LLP and Rimon PC.

Celine Purcell is a former associate at Wilson Sonsini Goodrich & Rosati LLP, and a current Counsel at The Norton Law Firm PC.

Sheldon Quan is a former associate at Wilson Sonsini Goodrich & Rosati LLP.

Mitchell Randall is a former partner at Morrison & Foerster LLP and former General Counsel of Recurrent Energy and Hornblower Group.

Rick Raushenbush is a former partner at Latham & Watkins LLP.

Wendy Ray is a former partner at Morrison & Foerster LLP and current partner at The Norton Law Firm, PC.

55

Thomas Reddy is a former partner at McCutchen Doyle Brown & Enerson LLP and Bingham McCutchen LLP.

Pam Reed is a retired partner and former managing partner at Morrison & Foerster LLP.

Cynthia Remmers is a former partner at Orrick, Herrington & Sutcliffe and former in-house counsel at Intel Corporation.

Jordan Rose is retired counsel at Manatt, Phelps and Phillips and a former partner at Bronson, Bronson & McKinnon.

Michael Rugen is a retired partner at Sidley Austin LLP and former partner at Heller, Ehrman, White & McAuliffe LLP.

Don Rushing is a retired partner at Morrison & Foerster LLP.

Roibin Ryan is a former partner at Kirkland & Ellis and Jenner & Block.

Claude Stern is a former equity partner of Quinn, Emanuel, Urquhart & Sullivan, where he was Managing Partner of the firm's Silicon Valley Office and Co-Chair of the Intellectual Property Litigation practice, and former partner at Fenwick & West.

Robert Townsend is a former partner at Morrison & Foerster LLP, where he was Chair of the Compensation Committee, Business Department, and M&A practice.

Nathan Walker is a former partner at WilmerHale, former associate at Wilson Sonsini Goodrich & Rosati LLP, and a current partner at The Norton Law Firm, PC.

Brad Weirick is a retired partner at Gibson, Dunn & Crutcher LLP.

56

Clarissa Weirick is a former associate at Gibson, Dunn & Crutcher LLP and retired General Counsel of NBCUniversal Filmed Entertainment Group and Warner Bros. Home Entertainment Group.

Edward A. Woods is a retired partner at Akin Gump Strauss Hauer & Feld LLP.

Jonathan Zavin is a retired partner at Loeb & Loeb, LLP.

Mark C. Zebrowski is a retired partner at Morrison & Foerster LLP.