[ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026]
Nos. 25-5241, 25-5265, 25-5277, 25-5310 (Consolidated)

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PERKINS COIE LLP,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF JUSTICE, *et al.,*

Defendants-Appellants.

---

Appeal from the United States District Court
for the District of Columbia
Nos. 1:25-cv-00716 (BAH), 1:25-cv-00916 (JDB),
1:25-cv-00917 (RJL), 1:25-cv-01107 (LLA)

---

**BRIEF OF NEUTRAL PRINCIPLES,
CENTER FOR INDIVIDUAL RIGHTS, AND
PROTECT THE FIRST FOUNDATION AS *AMICI CURIAE*
SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE**

---

DARPANA SHETH
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave. NW, Ste. 625
Washington, DC 20036

JOSHUA J. PRINCE
PROTECT THE FIRST FOUNDATION
1701 Pennsylvania Ave. NW, Ste. 200
Washington, DC 20006

ERIK S. JAFFE
  *Counsel of Record*
GENE C. SCHAERR
JAMES A. HEILPERN
SCHAERR | JAFFE LLP
1717 K Street NW, Ste. 900
Washington, DC 20006
(202) 787-1060
ejaffe@schaerr-jaffe.com

*Counsel for Amici Curiae*

APRIL 3, 2026

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned certifies as follows:

### Parties and *Amici*

Except for the following, all parties, intervenors and *amici curiae* appearing before the district court below and this Court are listed in the briefs for the parties:

Center for Individual Rights, *Amicus Curiae*

Neutral Principles, *Amicus Curiae*

Protect the First Foundation, *Amicus Curiae*

### Rulings Under Review

References to the rulings at issue appear in the Appellants' Brief filed March 6, 2026.

### Related Cases

Counsel adopts and incorporates by reference the parties' statements with respect to related cases.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c) and D.C. Circuit Rules 26.1 and 28(a)(1)(A), *Amici*, through their undersigned counsel, submit the following corporate disclosure statements:

Neutral Principles is a non-stock, nonprofit corporation with no parent company. No corporation owns 10% or greater ownership interest in Neutral Principles.

Protect the First Foundation is a non-stock, nonprofit corporation, with no parent company. No corporation owns 10% or greater ownership interest in Protect the First Foundation.

Center for Individual Rights is a non-stock, nonprofit corporation, with no parent company. No corporation owns 10% or greater ownership interest in Center for Individual Rights.

*/s/ Erik S. Jaffe*
Erik S. Jaffe
*Counsel for Amici Curiae*

## STATEMENTS REGARDING AUTHORITY TO FILE AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amici curiae* Neutral Principles, Center for Individual Rights, and Protect the First Foundation states that counsel for all parties have consented to the filing of this brief.

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *Amici* states that a separate brief is necessary. He certifies that he has conferred with relevant counsel and determined that the contents of this brief are meaningfully different from the briefings submitted by Plaintiffs-Appellees and anticipated from other *amici*. It addresses the original public meaning of the First Amendment and the executive Power relating to the exercise of executive discretion, providing a unique perspective on the jurisprudence central to this case.[1]

/s/ *Erik S. Jaffe*
Erik S. Jaffe
*Counsel for Amici Curiae*

---

[1] Undersigned counsel for *amici* certifies that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *amici* and their counsel have contributed money for this brief.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..........................................................................................i

CORPORATE DISCLOSURE STATEMENT .......................................... iii

STATEMENTS REGARDING AUTHORITY TO FILE AND SEPARATE BRIEFING ...................................................................... iii

TABLE OF AUTHORITIES ................................................................vi

GLOSSARY .....................................................................................xi

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................... 1

SUMMARY OF ARGUMENT ............................................................... 4

ARGUMENT .................................................................................... 7

    I.    Retaliation and Punishment for Disfavored Expression and Association Were Understood to be Abridgements of the Freedoms Protected by the First Amendment's Original Public Meaning. ...................................................... 7

        A.    Licensing Regimes ....................................................... 10

        B.    Viewpoint discriminatory adoption and enforcement of Stamp Acts. ......................................... 16

        C.    Seditious libel ............................................................. 20

    II.    Unchecked Executive Discretion as Asserted in this Case Cannot be Delegated by Congress or Claimed Under the Executive Power and the Duty to Faithfully Execute the Laws. ........................................................... 26

        A.    Critics of the Crown during the Revolutionary Era complained of its unchecked discretion. ............... 27

B.    Proponents of the Constitution argued that the President's authority was far inferior to the King's..................................................................................29

C.    Courts have repeatedly found that unfettered discretion vested in an executive official is unconstitutional. .........................................................31

CONCLUSION ..............................................................................34

CERTIFICATE OF COMPLIANCE.......................................................36

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Chiles v. Salazar,*
607 U.S. --, 2026 WL 872307  (U.S. Mar. 31, 2026) ...........................9

*City of Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993) ..................................................................32

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988) ..................................................................32

*Department of Navy v. Egan,*
484 U.S. 518 (1988) ..................................................................33

\* *Greater New Orleans Broad. Ass'n, Inc. v. United States,*
527 U.S. 173 (1999) ....................................................................5

*Morrison v. Olson,*
487 U.S. 654 (1988) ..................................................................34

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
597 U.S. 1 (2022) ........................................................................9

*Niemotko v. Maryland,*
340 U.S. 268 (1951) ..................................................................32

*Saia v. New York,*
334 U.S. 558 (1948) ..................................................................32

*Talley v. California,*
362 U.S. 60 (1960) ....................................................................13

*Williams-Yulee v. Fla. Bar,*
575 U.S. 433 (2015) ....................................................................4

\*Authorities upon which we principally rely are marked with an asterisk.

**Constitutional Provisions**

U.S. Const. amend. I ....................................................................9, 26, 31

U.S. Const. art. II ..............................................................................26, 29

**Statutes**

Commissioners of Customs Act 1767, 7 Geo. 3 c.41 (Gr. Brit.)..............28

Stamp Act 1712, 10 Ann. c.18 (Gr. Brit.)........................................16, 17

Stamp Act 1765, 5 Geo. 3 c.12 (Gr. Brit.) ...............................................17

The Quebec Act 1774, 14 Geo. 3 c.83 (Gr. Brit.) ....................................28

**Rules**

Fed. R. App. P. 26.1 ...........................................................................ii

Fed. R. App. P. 29 .............................................................................ii

Fed. R. Civ. P. 50 .............................................................................33

D.C. Cir. R. 26.1 ...............................................................................ii

D.C. Cir. R. 28 ........................................................................... i, ii

D.C. Cir. R. 29 ............................................................................. iii

**Other Authorities**

A Democratic Federalist (Oct. 17, 1787),
    in 1 The Founders' Constitution, ch.14, doc. 25
    (Kurland & Lerner eds., 1987)...........................................................23

A Federal Republican: A Review of the Constitution
    (Nov. 28, 1787) ...............................................................................19

John Adams,
    *A Dissertation on the Canon and Feudal Law, No. 4,*
    Bos. Gazette (Oct. 21, 1765) ............................................................18

Samuel Adams,
*The Rights of the Colonists* (Nov. 20, 1772)........................................28

James Alexander,
*A Brief Narrative of the Case and Trial of John Peter*
*Zenger, Printer of the New-York Weekly-Journal*
(N.Y., John Peter Zenger 1736) ........................................................22

*William Blackstone,
*Commentaries* (1769) ...............................................................20, 21

William Bollan,
*The Freedom of Speech and Writing upon Public Affairs,*
*Considered* (S. Baker, 1766) .............................................................22

*Oren Bracha,
*Early American Printing Privileges, in* Privilege and
Property: Essays on the History of Copyright
(online ed. 2010)..............................................................................13

Vincent Buranelli,
*The Trial of Peter Zenger* (1957).......................................................22

Cincinnatus [pseud.],
*Cincinnatus 1* (Nov. 1, 1787) ......................................................14, 23

Cincinnatus [pseud.],
*Cincinnatus 2* (Nov. 8, 1787) ...........................................................24

*Crown v. John Peter Zenger, 1735,*
Hist. Soc'y N.Y. Cts...........................................................................25

Maturin L. Delafield,
*William Smith* (1881) .......................................................................25

The Declaration of Independence (U.S. 1776) ................................27, 28

*Federal Farmer [pseud.],
*No. 16* (Jan. 20, 1788), reprinted in 5 *The Founders'*
*Constitution* (Philip B. Kurland & Ralph Lerner eds., 1987) .............19

The Federalist No. 69 ................................................................... 29

Benjamin Franklin as Silence Dogood,
*Ltr. to Author No. 8*, The New-Eng. Courant (July 9, 1722) ............... 15

H. Rep. Journal (Mass. Jan. 14, 1722) .................................................. 15

H. Rep. Journal (Mass. June 12, 1722) ................................................. 15

\* Philip A. Hamburger,
*The Development of the Law of Seditious Libel and the
Control of the Press*, 37 Stan. L. Rev. 661 (1985) .............. 10, 12, 17, 20

P.B.J. Hyland,
*Liberty & Libel*, 41 Eng. Hist. Rev. 863 (1986) .................................. 17

Douglas E. Lee,
*Seditious Libel*, *First Amendment Encyclopedia*,
Free Speech Ctr., Middle Tenn. State Univ.
(July 2, 2024) ................................................................................ 20

James Madison,
*Letters of Helvidius, Nos. 1-4* (Aug. 24-Sep. 14, 1793) ....................... 30

Jonathan Mayhew,
*A Discourse Concerning Unlimited Submission and
Non-resistance to the Higher Powers* (David Tucker ed., 1750) .......... 29

John Milton,
*Areopagitica* (1644) ....................................................................... 12

*New-Eng. Courant,*
Colonial Soc'y Mass. (1907) ............................................................ 15

Thomas Paine,
*Common Sense* (1776) .................................................................... 28

*Pennsylvania and the Federal Constitution 1787-1788*
(John Bach McMaster & Frederick D. Stone eds., 1888) .................... 14

Roy Robert Ray,
*Truth: A Defense to Libel,* 16 Minn. L. Rev. 43 (1931) ....................... 20

ix

*The Records of the Federal Convention of 1787*
  (Max Farrand ed., 1911) ...................................................................29

\* *The Records of the Federal Convention of 1787*
  (Max Farrand ed., 1937) ...............................................................13

\* Frederick Seaton Siebert,
  *Freedom of the Press in England 1476-1776* (1965)......................11, 12

Speech of James Wilson
  (Alexander J. Dallas ed., Nov. 24, 1787) .............................................31

The Stamp Act Resolves of the New Jersey Assembly
  (Nov. 30, 1765) ...................................................................................18

Jonathan Swift,
  *Journal to Stella, Letter LI* (Aug. 7, 1712),
  *in* 15 The Works of the Rev. Jonathan Swift (1801) ...........................17

John R. Vile,
  *John Peter Zenger*, *First Amendment Encyclopedia,*
  Free Speech Ctr., Middle Tenn. State Univ. (July 2, 2024)................22

# GLOSSARY

CIR        Center for Individual Rights

PT1        Protect the First Foundation

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amicus* Neutral Principles is a nonprofit, nonpartisan organization created to promote the consistent and rigorous application of neutral legal principles emphasizing fidelity to the text and structure of the Constitution and laws regardless of outcome. Our mission is to apply traditionally conservative legal methods in a rigorously nonpartisan way—ensuring that both substantive and procedural constitutional safeguards against government overreach are upheld, regardless of shifting political winds. As jurists and scholars such as Judge Bork, Professor Wechsler, and many others before and since have recognized, the unprincipled exercise of judicial power in pursuit of particular results is unsustainable and illegitimate. Since the 1980s, conservative scholarship and jurisprudence have demonstrated that such neutral principles are best found in a faithful, unbiased adherence to the original public meaning of the text of the Constitution, and, when necessary, relevant history and tradition that may help resolve any ambiguities in that text. Neutral Principles is interested in this case because it involves profound abridgements of multiple First Amendment freedoms within the original public meaning of that Amendment.

*Amicus* Protect the First Foundation (PT1) is a nonprofit, nonpartisan organization that advocates for First Amendment rights in all applicable arenas. PT1 is concerned about all facets of the First Amendment and advocates on behalf of people of all religions and no religion, people across the ideological spectrum, and people who may not even agree with the organization's views.

*Amicus* the Center for Individual Rights (CIR) is a national, public-interest law firm dedicated to defending individual rights essential to a free and flourishing society. Founded in 1989, CIR has a record of victories in the Supreme Court of the United States and many other courts, establishing landmark precedents that protect fundamental rights against government overreach.

CIR's work focuses on three constitutional areas—freedom of speech and association, equal protection of the law, and the structural limits that keep government within its constitutional bounds—and all three converge here. CIR has long defended the First Amendment rights of individuals and organizations to speak, associate, and petition the government without fear of official retaliation, both in direct representation cases and as *amicus*. CIR has also appeared as *amicus* in

cases enforcing the constitutional structure that constrains executive power and has litigated landmark equal protection cases challenging race-conscious government programs. *See* https://cir-usa.org/about/history/.

CIR strongly disagrees with the positions many large law firms have taken in favor of race-based admissions and similar practices, but vigorously opposes the use of executive power to punish such advocacy. CIR knows from experience that a precedent permitting such sanctions could readily be turned against firms taking the opposite positions—firms like CIR itself. As a nonpartisan organization, CIR will naturally agree with some legal positions and policies of every presidential administration and disagree with others.

But it is also the nature of public-interest litigation to continue and initiate litigation challenging executive action. That makes CIR and other public-interest law firms particularly vulnerable to reprisals under every administration if the challenged executive orders are permitted to stand.

3

## SUMMARY OF ARGUMENT

The challenged executive orders at issue in this case, and the sweeping executive discretion claimed to support them, both exceeds the limited executive power the Constitution grants and abridges the freedoms the First Amendment protects. Such broad claimed discretion to suppress or punish speech, press, petitioning, and assembly is precisely the type of abuse the Framers recognized from history, feared for the new republic, and expressed to the public as justification for the First Amendment.

*Amici* agree with the district court that the executive orders here impose viewpoint-discriminatory punishments and exclusions that cannot survive First Amendment scrutiny. JA3505-3518; s*ee also* Pl.-Appellee WilmerHale Br. 14-25; Pl.-Appellee Perkins Coie Br. 14-35. The administration's inconsistent and selective pursuit of its asserted interests provides ample reason to reject their genuineness and legitimacy. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015) (selective burdening of speech raises "doubts about whether the government is in fact pursuing the interest it invokes" (citation omitted)); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173,

190, 194 (1999) (claimed interest suspect where restriction "select[ed] among speakers conveying virtually identical messages"). Even under lesser scrutiny than required here, the executive orders would fail because the "attendant regulatory regime is so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it." *Greater New Orleans*, 527 U.S. at 190.

*Amici* also agree with the district court that the executive orders are properly reviewable and the remedies imposed appropriate. JA3499-3500; WilmerHale Br. 14-15 n.1.

They write separately to offer historical context regarding the original public meaning of both the First Amendment's enumerated freedoms and the limited scope of discretion contained in the Constitution's allocation of the "executive Power." Those original public meanings reflected a broad conception of the freedoms at issue, rejected prior restrictions on such freedoms, and confirm that viewpoint-discriminatory exercises of discretionary powers such as those here that directly and indirectly punish disfavored speech and speakers were precisely the type of abridgements the First Amendment was understood to guard against.

Regarding First Amendment freedoms, the Founding Generation were familiar with, and hostile toward, unchecked discretion to grant or deny privileges, and to mete out punishments, in the service of promoting favored views and suppressing or deterring disfavored views. Examples like the Star Chamber, repressive licensing regimes, viewpoint-selective application of the Stamp Acts, prosecutions for seditious libel, and self-serving government discretion over the appointment of judges and advocacy of lawyers all stood as cautionary tales to the First Amendment's supporters. Those were among the very evils they identified as threats to the freedoms they would later enshrine in the First Amendment. Many of those past abuses find close echoes in the unchecked discretion claimed to permit punishment of the law firms here. The original public meaning of the First Amendment's text encompasses a broad conception of those freedoms, and equally of what constitutes their abridgement. That meaning fully supports the modern jurisprudence on which the district court properly based its decisions below.

Regarding the executive power, the Founding generation was equally familiar with, and publicly critical of, the unchecked discretion

exercised and abused by the Crown. In discussing the proposed Constitution, they took pains to emphasize that executive power under the new government would be far narrower than that exercised by the Crown. Their public hostility towards past unchecked executive discretion, and their assurances that the new executive would not hold the same abusive power, informs the original public meaning of the limits on the executive power granted by the Constitution. The government's current claims of vast discretion to punish and restrict protected First Amendment activity are contrary to that original public meaning.

## ARGUMENT

**I.    Retaliation and Punishment for Disfavored Expression and Association Were Understood to be Abridgements of the Freedoms Protected by the First Amendment's Original Public Meaning.**

This case is fundamentally about the constraints placed by the First Amendment on the executive branch's claimed discretion to execute the laws in an overtly viewpoint-discriminatory manner for the avowed purposed of punishing or suppressing disfavored speech, association, and petitioning. *Amici* agree with the district court that such viewpoint discrimination is unconstitutional under numerous independent and

7

overlapping lines of First Amendment jurisprudence. *See, e.g.*, JA3505-3518.

Rather than retread well-briefed First Amendment ground, *Amici* write to describe how the jurisprudence relied upon by the district court and the law firms is well supported by the original public meaning of the freedoms described in the First Amendment, reflected in the history of abuses against which the Framers vocally complained and sought to guard. Neutral principles applying the text and original public meaning of the Constitution require affirming the judgment below and rejecting expansive claims of unreviewable discretion to restrict the freedoms protected by the First Amendment.

When considering the First Amendment's scope, this Court should look first to the expansive individual words themselves. Doing so requires little deep thought, as the text would plainly encompass the speech, association, and petitioning activities by the law firms that are cited as the basis for the punitive executive orders.

Nor is there sound basis in this case for treating the combined phrases of the First Amendment to have a narrower historic meaning than the sum of the words themselves. While there certainly are some

8

discrete and limited categories of speech that may not have been encompassed by the original public meaning of the *phrase* "the freedom of speech" in the First Amendment—solicitation of a crime, fighting words, etc.—such categories are "few and narrowly drawn" and "share a long and well-recognized historical pedigree." *See Chiles v. Salazar,* 607 U.S. --, 2026 WL 872307, at *7  (U.S. Mar. 31, 2026); *cf. N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1 (2022) (inconsistent or thin historical examples do not overcome text).

As relevant here, no well-established exception exists for the activities of the law firms targeted by the executive orders. Indeed, history compellingly reflects that the Founding Generation understood the abuse of government discretion to favor some viewpoints or speakers and punish others was an "abridge[ment]" of the freedoms protected by the First Amendment's text. Historical examples of abuse by the Crown and colonial governors, and the often-constipated protections afforded by the common law and the courts, were denounced as violations of freedom, not accepted as definitions of its metes and bounds. The proponents and ratifiers of the First Amendment shared and invoked that expansive view of the freedoms they listed, and that is the proper perspective from which

to consider the original public meaning of the text of that Amendment. They *rejected* British abuses of rights in language that was sweeping, protective, and necessarily understood in that context as a bulwark against the despised abuses.

During the Colonial Era, the British government—like the government here—punished speech and speakers in a highly viewpoint discriminatory manner. It did so by direct punishments, such as jailing the speakers, and indirect punishments such as imposing prior restraints and denying various discretionary privileges and licenses. Indeed, the selective grant and denial of such discretionary benefits to supporters and critics formed some of the most well-known examples of abridgement of the freedoms of speech and the press.

### A.    Licensing Regimes

From the early fifteenth century onward, English governments used licensing regimes to suppress disfavored speech: what began as ecclesiastical control over unauthorized manuscripts became, after the Reformation, a secularized system of Crown censorship. *See* Philip A. Hamburger, *The Development of the Law of Seditious Libel and the Control of the Press*, 37 Stan. L. Rev. 661, 671-76 (1985); Frederick Seaton

10

Siebert, *Freedom of the Press in England 1476-1776,* at 48-49, 57, 61-62, 242-43 (1965). In many ways, it was the unfettered discretion exercised by the Crown that was the affront to freedom of speech and the press, almost guaranteeing selective and self-serving discrimination.

Among the most well-known and despised examples of speech suppression recalled by the Founders was the so-called Star Chamber.

Henry VIII's 1538 proclamation was "the first attempt to establish a regular censorship and licensing over all kinds of printing," and it targeted disfavored expression, including heresy and "seditiouse opinions," blurring the line between religious dissent and political criticism. Siebert, *supra,* at 48-49. That system became more explicitly political under Edward VI, whose government issued repeated proclamations between 1547 and 1551 to suppress "news, rumors, or argument favorable to the opposing faction." *Id.* at 52-53. Elizabeth I continued the regime in 1559 by requiring that new works be submitted for approval before publication and that pamphlets, plays, and ballads receive licenses from designated officials. *Id.* at 56-57. In 1586, her government strengthened that existing licensing system by limiting the number of printers and presses, confirming the Stationers' Company's

11

powers of search and seizure, and requiring that nearly all books be licensed by the Archbishop of Canterbury or the Bishop of London before printing. *Id.* at 61-62.

Violators of the licensing regime were prosecuted before the Star Chamber, a prerogative tribunal that lacked common-law protections and juries, and from which acquittals were rare.

After the collapse of the old Star Chamber system, Parliament passed the Printing Ordinance of 1643, which required prepublication licensing and thus revived the central feature of the earlier censorship regime in statutory form. John Milton's *Areopagitica* was written in direct response to that ordinance, condemning "this way of licencing" as a newly revived mechanism of suppression rather than a legitimate protection of learning or religion. John Milton, *Areopagitica* (1644), https://tinyurl.com/3d5jxn7m.

Burdens on the Press expanded under the Regulation of Printing Act of 1662, which "set up a system of censorship" requiring printers to submit copies of publications to various licensers for approval. Hamburger, *supra,* 37 Stan. L. Rev. at 680-81. The Act's "chief aim was to restrict printing critical of the government." *Id.*

These abuses extended to the colonies as well. As the Supreme Court noted in *Talley v. California*, 362 U.S. 60, 64 (1960), "[t]he obnoxious press licensing law of England ... was also enforced [i]n the Colonies." In 1685, the Crown ordered the Royal Governor of New York that "noe person keep any press for printing, nor that any book, pamphlet or other matters whatsoever bee printed without your special leave & license first obtained." Oren Bracha, *Early American Printing Privileges, in* Privilege and Property: Essays on the History of Copyright ¶14 (online ed. 2010), https://books.openedition.org/obp/1068 (quoting original). Similar instructions were given to the governor of Virginia in 1690 and the governor of Maryland in 1694. *Id.* ¶14 n.20. Such discretionary powers to restrict speech and the press "survived in the colonies well into the eighteenth century." *Id.* ¶15.

These licensing regimes—as well as the secret judicial proceedings enforcing them—loomed large in the imagination of the anti-federalists during the ratification debates. During the Constitutional Convention, Elbridge Gerry said he feared that "[t]he Judiciary will be a Star Chamber." 2 *The Records of the Federal Convention of 1787,* at 635 (Max Farrand ed., 1937) (Rufus King notes, Sep. 15, 1787), https://tinyurl.com/

13

bdcrzv3y. Speaking at the Pennsylvania convention, Robert Whitehill argued that "Tho' it is not declared that Congress have a Power to destroy the Liberty of the Press" they "have a Power to secure to Authors the Right of their Writings." *Pennsylvania and the Federal Constitution 1787-1788* (John Bach McMaster & Frederick D. Stone eds., 1888) (Robert Whitehill remarks, Dec. 1, 1787), https://tinyurl.com/56jenv2x. He feared that under "this they may license the Press no Doubt and under licensing the Press they may suppress it." *Id.* And Cincinnatus wrote a writer or printer who attacked government officials could face charges in the newly created federal district and thus be deprived "of his trial by jury" and instead be subject "to something, that will probably very much resemble the Star Chamber of former times." Cincinnatus [pseud.], *Cincinnatus 1* (Nov. 1, 1787), https://tinyurl.com/43s4xnp2. Under such threats, "[t]he freedom of the press, the sacred palladium of public liberty, would be pulled down ... [and] the press would become subservient to the purposes of bad and arbitrary rulers." *Id.*

For many of that generation, such concerns were also born of personal experience. For example, Benjamin Franklin's brother, James Franklin, was the publisher of the *New England Courant,* and a victim

14

of one such regime in Massachusetts. His frequent criticisms of the governor of the Massachusetts Colony, its legislature, and even the clergy eventually landed him in jail and cost him his freedom to publish such viewpoints.[2]

These punitive actions helped shape the worldview of Benjamin Franklin and his own public expression. While James was in prison, Benjamin continued to publish the *Courant* and wrote a letter under the pseudonym Silence Dogood defending freedom of speech. Benjamin Franklin as Silence Dogood, *Ltr. to Author No. 8*, The New-Eng. Courant (July 9, 1722), https://tinyurl.com/55tsw9be.

The licensing regimes and censorship that the Founding Generation and those before them condemned involved the exercise of discretionary authority over speech and the press, with few constraints,

---

[2] *See, e.g.*, *New-Eng. Courant,* Colonial Soc'y Mass. (1907), https://tinyurl.com/4ecws8e6 (legislature finding that the newspaper's criticism of inadequate efforts to combat piracy was "a high Affront to this Government" and ordering "the Sherriff … [to] commit to the Goal in *Boston,* the Body of *James Franklin* Printer, for the gross Affront offered to this Government[.]" (citing H. Rep. Journal (Mass. June 12, 1722)); *id.* (legislature "strictly forbidd[ing]" Franklin from "Print[ing] or Publish[ing] *the New-England Courant,* or any Pamphlet or Paper of the like Nature, except it be first supervised by the Secretary of this Province" (citing H. Rep. Journal (Mass. Jan. 14, 1722)).

not unlike the discretionary authority claimed by the government for the President in this case. He would effectively "license" at his sole pleasure who is allowed to petition the government, enter federal buildings, obtain federal contracts, and obtain security clearances often necessary to represent clients in court or before certain government entities.

The claimed discretion regarding security clearances presumably extends even to judges, allowing the President to effectively forum shop, clear out perceived antagonists at the front end, and make sure that any remaining judge who rules against him once in a case involving classified information would be unreviewably barred from ever hearing such cases again. Such *de facto* "licensing" used to suppress criticism and opposition would have been easily recognized as an abridgement of free speech and the press as those words were understood at the time.

### B.    Viewpoint discriminatory adoption and enforcement of Stamp Acts.

Other examples of indirect suppression of speech and the press through unfettered discretion involve the notorious Stamp Acts. Beginning in 1712, Parliament imposed a stamp tax on newspapers and pamphlets in England. Stamp Act 1712, 10 Ann. c.18 (Gr. Brit.), https://tinyurl.com/2a5c62v8. The tax required printed publications to

16

bear a stamped paper or stamp duty, which increased the cost of printing and selling them. In form, it was a revenue measure. *Id.* In practice, however, contemporaries and later historians understood it as a way to burden the kinds of cheap publications through which political criticism most readily spread. *See* Hamburger, *supra*, 37 Stan. L. Rev. at 681-86. Following the 1712 Act, Jonathan Swift lamented that "Grub Street is dead and gone," listing the opposition papers that had gone out of business. Jonathan Swift, *Journal to Stella*, Letter LI (Aug. 7, 1712), *in* 15 The Works of the Rev. Jonathan Swift 319 (1801), https://tinyurl.com/2vajvcvv.

Meanwhile, government publications were exempt from the tax, empowering the government to "sponsor[], subsidiz[e], and protect[] loyal propagandists and their works." P.B.J. Hyland, *Liberty & Libel*, 41 Eng. Hist. Rev. 863, 864 (1986). This allowed the government to promote "its own policies and interests sometimes to extraordinary effect." *Id.* at 865.

In 1765, Parliament passed a similar law imposing duties on newspapers, pamphlets, legal papers, almanacs, and other printed materials in the colonies. Stamp Act 1765, 5 Geo. 3 c.12 (Gr. Brit.), https://tinyurl.com/524ac8ha. While colonial opposition to the Stamp Act

17

was principally "taxation without representation," many also saw it as an attack on the freedom of the press. John Adams wrote that the act was designed "to strip us in a great measure of the means of knowledge, by loading the Press ... with restraints and duties." John Adams, *A Dissertation on the Canon and Feudal Law, No. 4*, Bos. Gazette (Oct. 21, 1765), https://tinyurl.com/2b8dpu7d. Likewise, the New Jersey Assembly protested that "any Incumbrance, which in Effect restrains the Liberty of the Press in America, is an Infringement upon the Subjects Liberty." The Stamp Act Resolves of the New Jersey Assembly (Nov. 30, 1765), https://tinyurl.com/mrx33zce.

Like the Star Chamber, the abuses of the Stamp Acts remained in public memory after the Revolution. Anti-federalist writers worried that the federal government under the new Constitution would have the power to destroy and control the press through its enumerated powers. As Federal Republican put it, "Congress have power to lay all duties of what-ever kind, and although they could not *perhaps* directly bar the freedom of the Press, yet they can do it in the exercise of the powers that are expressly decreed to them. Remember there are such things as *stamp duties* and that these will as effectually abolish the freedom of the press

18

as any express declaration." A Federal Republican: A Review of the Constitution (Nov. 28, 1787), https://tinyurl.com/knkfx772. Federal Farmer agreed noting that "a power to tax the press at discretion, is a power to destroy or restrain the freedom of it." Federal Farmer [pseud.], *No. 16* (Jan. 20, 1788), reprinted in 5 *The Founders' Constitution* 123 (Philip B. Kurland & Ralph Lerner eds., 1987), https://tinyurl.com/2ycdk9h5. Federal Farmer further recognized that there might "be other powers given [to the federal government], in the exercise of which this freedom may be effected." *Id.*

As with licensing regimes, history informed the Founding Generation's public understanding that the freedom of the press (and other freedoms) could be abridged indirectly through the discriminatory exercise of discretion to promote favored speakers and messages, and to suppress disfavored speakers and messages. That the means of such mischief were the exercises of otherwise lawfully granted discretion in general—such as the power to raise revenue through various taxes—did not negate the conclusion that viewpoint-discriminatory exercise of such discretion abridged the freedoms of speech or the press, it drove that conclusion and the need for additional safeguards.

### C.    Seditious libel

Another instance of viewpoint-discriminatory restrictions on the press, viewed by Americans as a violation of press freedoms, involved seditious libel, or "printed criticism," that brought the King, government, magistrates, or established institutions into disrepute. Hamburger, *supra*, 37 Stan. L. Rev. at 662; *see also* Douglas E. Lee, *Seditious Libel*, *First Amendment Encyclopedia*, Free Speech Ctr., Middle Tenn. State Univ. (July 2, 2024), https://tinyurl.com/bddyubyx.

Unlike the modern tort of libel, truth was not a defense. In fact, an adage of the day often attributed to Lord Mansfield was "the greater the truth, the greater the libel." *See* Roy Robert Ray, *Truth: A Defense to Libel,* 16 Minn. L. Rev. 43, 43 (1931), https://tinyurl.com/3v5dm5bk. As Blackstone explained, "in a *criminal* prosecution [for libel], the tendency which all libels have to create animosities, and to disturb the public peace, is the sole consideration of the law." 4 William Blackstone, *Commentaries* 150 (1769) (emphasis added), https://tinyurl.com/yc4azhjp. Thus, under English law, "blasphemous, immoral, treasonable, schismatical, seditious, or scandalous" material were all punishable. *Id.* at 151.

20

The cramped British view of press freedoms, subordinating speech to government supervision and viewpoint discrimination, was reflected by writers like Blackstone, who claimed that the freedom to express one's sentiments could be narrowed by laws making certain sentiments illegal and by malleable concepts such as whether the material was "improper" or "mischievous." *Id.* at 151-52 ("The liberty of the press is indeed essential to the nature of a free state: but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published."). That often-quoted narrow view of freedom of the press, however, was not what the Framers and ratifiers of the First Amendment understood to be the true scope of the freedom they insisted on protecting.

While the British conception of seditious libel migrated across the Atlantic to the colonies, in the decades leading up to the Revolution it was increasingly criticized. This was perhaps best exemplified by the prosecution of John Peter Zenger in 1734-1735. Zenger was the publisher of the *New-York Weekly Journal*, which published criticisms of the colony's royal governor, William Crosby, leading to Zenger being arrested, jailed, and prosecuted for seditious libel. *See* James Alexander,

*A Brief Narrative of the Case and Trial of John Peter Zenger, Printer of the New-York Weekly-Journal* (N.Y., John Peter Zenger 1736), https://tinyurl.com/5fbxmn8m; John R. Vile, *John Peter Zenger*, *First Amendment Encyclopedia, supra,* https://tinyurl.com/cee5brar. While legally, truth was not a defense, Zenger's attorney Andrew Hamilton, convinced the jury to not punish truthful criticism of public officials, leading to Zenger's acquittal despite the court's instructions.

The Zenger trial was widely publicized. A pamphlet containing a brief narrative of the trial, along with Hamilton's arguments, was printed shortly thereafter and received widespread circulation, going through at least sixteen reprintings over the next century. *See* Alexander, *Brief Narrative, supra.* The Common Council of the City of New York gave Hamilton an award for his "learned and generous defense of the rights of mankind and the liberty of the press." Vincent Buranelli, *The Trial of Peter Zenger* 133 (1957), https://tinyurl.com/5n7xsy9u.

Later colonial writers adopted Hamilton's view that truth should be a defense to libel charges and that truthfulness was a question for the jury. *See, e.g.,* William Bollan, *The Freedom of Speech and Writing upon Public Affairs, Considered* 130 (S. Baker, 1766), https://tinyurl.com/

22

3mdbjmh8 ("I confess it has ever appeared strange to me that the same truth should be lawful when orally delivered, and criminal when reduced into writing.").

The defenders of a broader understanding of the freedom of the press included anti-federalist writers who invoked the Zenger trial in their polemics against the Constitution. A Democratic Federalist warned that under the new Constitution "a thousand means may be devised to destroy effectually the liberty of the press" and warned that the "case of John Peter Zenger of New-York[] ought still to be present to our minds, to convince us how displeasing the liberty of the press is to men in high power." A Democratic Federalist (Oct. 17, 1787), in 1 *The Founders' Constitution,* ch.14, doc. 25 (Kurland & Lerner eds., 1987), https://tinyurl.com/55kdnhkd. Cincinnatus, too, reminded his readers that "what has happened, may happen again: That a patriotic printer, like Peter Zenger, should incur the resentment of our new rulers, by publishing to the world, transactions which they wish to conceal." *Cincinnatus 1, supra.* The anti-federalists feared that without a Bill of Rights, the government would "annihilate the freedom of the press, and convert it from being the palladium of liberty to become an engine of

23

imposition and tyranny." Cincinnatus [pseud.], *Cincinnatus 2* (Nov. 8, 1787), https://tinyurl.com/4hnhkzf2.

In a passage that eerily foreshadows the deals the President cut with law firms seeking to escape his executive orders, Cincinnatus was specifically concerned the government would require the press to "place the worst actions of government in so favorable a light, that we may groan under tyranny and oppression without knowing from whence it comes." *Id.* Skadden, Paul Weiss, and others, under admittedly extraordinary pressure, agreed to become advocates for positions favored by the government. And while many people (and even *Amici* here) could differ on the substantive merits of those favored positions, the original public understanding of those who framed and supported the First Amendment was that coerced pro-government speech (such as "donated" pro-bono hours and money to support favored speech) infringed upon the freedom of speech and the press.

The Zenger trial also has other disturbing echoes in the present case. Royal officials often took punitive action against judges for writing opinions against the government and against lawyers for representing unpopular defendants. Zenger's criticism of Governor Cosby began after

24

Crosby removed Chief Judge Lewis Morris from office for having written a dissenting opinion in a case involving the government. And when seditious libel charges were brought against Zenger, Andrew Hamilton was *not* his first pick as attorney. He was initially represented by James Alexander and William Smith. Because truth was not a defense to seditious libel, Alexander and Smith instead challenged the validity of Chief Judge Morris's removal, the appointment of the new Chief Judge De Lancey, and the appointment of the other judges "at the Governor's pleasure."

The Court was not happy with this argument. Chief Judge De Lancey went as far as to say: "You have brought it to that point that either we must go from the bench or you from the bar." Maturin L. Delafield, *William Smith* 266 (1881). When Alexander and Smith refused to withdraw their plea, they were struck "from the list of attorneys admitted to practice before the Supreme Court of Judicature." *Crown v. John Peter Zenger, 1735*, Hist. Soc'y N.Y. Cts., https://tinyurl.com/9hp7nphy.

To the founding generation, these examples were cautionary tales of the abridgement of core freedoms, not the accepted and permissible

25

limits on those freedoms. Today, the effective removal of swaths of lawyers from practice before the government, or in cases requiring security clearances, for the admitted reason of displeasure with their speech, association, and petitioning activity, should be understood the same way the Framers publicly understood the abuses in the Zenger trial—as abridgements of the freedom of speech, the press, and the ability to petition the government.

## II.    Unchecked Executive Discretion as Asserted in this Case Cannot be Delegated by Congress or Claimed Under the Executive Power and the Duty to Faithfully Execute the Laws.

Even apart from the supervening force of the First Amendment limiting laws that abridge the relevant freedoms either on their face or in their execution, the President's claim of expansive and largely unreviewable discretion in the execution of various laws and powers is contrary to the original public meaning of "the executive Power" as used in Article II of the Constitution. Such vested power was a narrow allocation of authority, often subject to Congressional constraints such as advice and consent, and subject to any other constraints included in or added to the Constitution. The original public meaning of that limited enumeration of power certainly did not embrace the type of freewheeling

26

discretion previously exercised and abused by the King, which was a central cause of the Revolution. However expansively the Crown may have treated its blended sets of powers, such broad claimed authority served as a cautionary tale to the Framers, not an example to be emulated. The Founding Generation that debated and ratified the Constitution understood it to *deny* the President such discretionary latitude.

### A.    Critics of the Crown during the Revolutionary Era complained of its unchecked discretion.

The Revolutionary War was prompted, in part, by colonial frustration with Parliament's grant to the Crown arbitrary and discretionary power over colonial policy. In the Declaration of Independence, Congress complained that, among other things, the King had—on his own accord—"erected a multitude of New Offices" in the colonies and had "establish[ed] ... an Arbitrary government" in Quebec, which the Congress characterized as "absolute rule." The Declaration of Independence (U.S. 1776).

The Commissioners of Customs Act—one of the so-called Townshend Acts—had authorized the King to appoint as many customs commissioners in the colonies as he "shall judge to be most for the

advantage of trade and security of revenue." Commissioners of Customs Act 1767, 7 Geo. 3 c.41 (Gr. Brit.), https://tinyurl.com/ypnmy4ms. Likewise, in The Quebec Act, Parliament authorized the King to unilaterally "constitute and appoint a Council for the Affairs" which was to have "Power and Authority to make Ordinances for the Peace, Welfare, and good Government." The Quebec Act 1774, 14 Geo. 3 c.83 (Gr. Brit.), https://tinyurl.com/4anba429. The Congress likewise complained of the King protecting his whims by making "Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries"—effectively insulating his policies from being challenged. The Declaration of Independence (U.S. 1776).

Indeed, disdain for discretionary authority—whether exercised by the legislature or executive—permeated the writings of the Founding Fathers. *See, e.g.,* Samuel Adams, *The Rights of the Colonists* (Nov. 20, 1772), https://tinyurl.com/39r8z7dz ("The legislative has no right to absolute arbitrary power over the lives and fortunes of the people.... 'The legislative cannot … rule by extempore arbitrary decrees'"); Thomas Paine, *Common Sense* (1776), https://tinyurl.com/pf2pdxex ("[T]he king is not to be trusted ... a thirst for absolute power is the natural disease of

28

monarchy."); Jonathan Mayhew, *A Discourse Concerning Unlimited Submission and Non-resistance to the Higher Powers* (David Tucker ed., 1750), https://tinyurl.com/mure5wfj (condemning "the unnatural and illegal encroachments of arbitrary power").

### B. Proponents of the Constitution argued that the President's authority was far inferior to the King's.

Considering this history, it is unsurprising that proponents of the Constitution held a far narrower view of the executive power than that wielded by the Crown. They explained that "the executive Power" conferred on the President was limited to the responsibility of carrying into effect laws made by Congress, plus a small set of additional powers specifically enumerated in Article II. U.S. Const. art. II; *see also* The Federalist No. 69 (Alexander Hamilton) (contrasting powers of the President with that of a king). Indeed, at the Constitutional Convention James Wilson reportedly went as far as to say that "[t]he only powers he conceived strictly Executive were those of executing the laws, and appointing officers." 1 *The Records of the Federal Convention of 1787*, at 66 (Max Farrand ed., 1911) (per Madison's Notes), https://tinyurl.com/ 4xveuv9p. Likewise, James Madison—writing under the pseudonym Helvidius—stated that "[t]o see the laws faithfully executed constitutes

the essence of the executive authority" and that the executive has "no other discretion than to convene and give information to the legislature on occasions that may demand it." James Madison, *Letters of Helvidius, Nos. 1-4* (Aug. 24-Sep. 14, 1793), https://tinyurl.com/2s3v2zww.

The government's reflexive reliance on executive discretion thus seriously overreads the words and original public meaning of the Constitution. The Constitution was written and understood to deny such unfettered and historically abused discretion—not reinstate the abused power of the Crown. The executive orders in this case do not represent the "faithful execut[ion]" of any valid law or power, particularly when read in light of the First Amendment

Even if one accepts a broader view of executive power, however, either as a result of Congressional delegation of vast discretion or, entertainingly, an *evolution* of the meaning of the executive Power to keep up with the times, that still would not immunize such discretion from constitutional scrutiny under the Bill of Rights or otherwise. As described in the following subsection, a law that allows for its execution in a manner that abridges First Amendment freedoms renders the law itself suspect. If we are to take seriously the First Amendment's

command that "Congress shall make no law … abridging the freedom[s]" of speech, the press, assembly, and petition, U.S. Const. amend. I, then surely a law delegating unreviewable authority to the President to do what Congress may not would be prohibited and an improper delegation of power to boot. In a speech to the Pennsylvania ratifying convention, James Wilson recalled Parliament's decision to "transfer the legislative authority to Henry VIII," allowing him to govern by "proclamations and edicts." Speech of James Wilson (Alexander J. Dallas ed., Nov. 24, 1787), https://tinyurl.com/2z8crvbz. Wilson called that decision "base and treacherous to the rights of the people." *Id.*

The executive discretion the government asserts here is anathema to the separation of powers established by the Constitution and their exercise here cannot plausibly be described as the "faithful" execution of the laws and Constitution. They should be rejected as contrary to the original understanding of the scope of the executive power.

## C. Courts have repeatedly found that unfettered discretion vested in an executive official is unconstitutional.

The Founding Generation's understanding that unfettered discretion over speech and the press inevitably abridge those freedoms is

reflected in subsequent First Amendment jurisprudence. The Supreme Court has routinely struck down laws that "plac[ed] unbridled discretion in the hands of a government official" to limit—or punish—the exercise of First Amendment freedoms. *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 757 (1988) (collecting cases).

For example, in *Saia v. New York*, the Court overturned a conviction for violating a law that required "permission obtained from the Chief of Police" to use radio and loudspeakers to share "news and matters of public concern." 334 U.S. 558, 558 n.1 (1948). Among the ordinance's constitutional flaws was its lack of standards governing the Chief of Police's permitting decision, leaving "[t]he right to be heard … in [his] uncontrolled discretion" and allowing officials to deny permits "because some people find the ideas annoying." *Id.* at 560-61; *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 n.19 (1993) (excessive discretion raises "the potential for invidious discrimination of disfavored subjects."); *Niemotko v. Maryland*, 340 U.S. 268, 271-72 (1951) (permitting process for public meetings violated First Amendment because it turned on "the whims or personal opinions of a local governing

32

body" and lacked "standards" and "narrowly drawn limitations" to "circumscrib[e]" the government's "absolute power" to deny a permit).

The government leans into claims of such suspect discretion by citing *Department of Navy v. Egan*, 484 U.S. 518 (1988), and the deep judicial reluctance to review security-clearance determinations. Appellants' Br. 22-29. But *Egan* never says that judicial deference on such matters is absolute, and its reasoning presumes that discretion is indeed being exercised over particular types of facts and issues beyond the judicial ken. That is not the case here. While judicial scrutiny of executive judgments on actual national security concerns is not to be undertaken lightly, courts should not allow the mere invocation of such concerns to become a pretext to shield constitutional violations. Deference to another decisionmaker's discretion necessarily presumes the decisionmaker has actually *exercised* its discretion over the factors committed to its judgment. Where that is plainly not the case, no substantial deference—much less absolute deference—is required or warranted. *See* Fed. R. Civ. P. 50(b) (even constitutionally delegated jury discretion to find facts subject to backstop judicial review).

33

If it is true that the decisions are unreviewable no matter what reason is given, the President now or in the future could simply declare that Black people, women, Jews, or all members of the opposition party are a risk for security clearances simply because of their race, sex, religion, or political affiliation and the courts would be powerless to act.

Here, the selective imposition and withdrawal of executive orders targeting law firms *de facto* admits that the blanket decisions to pull *all* security clearances were simply punishment for unrelated speech, unrelated to national security factors. That the Paul Weiss executive order was rescinded merely because the firm agreed to do *pro bono* work in support of favored viewpoints confirms that any claimed national security concerns were pretextual. No matter how high the bar for judicial review, it cannot be absolute and still faithful to the Constitution. In this case, any conceivable bar for review has been met, regardless of "exactly where the line falls." *Morrison v. Olson*, 487 U.S. 654, 671 (1988).

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgments of the district court that the executive orders are unconstitutional.

34

Respectfully submitted,

*/s/Erik S. Jaffe*
ERIK S. JAFFE
 *Counsel of Record*
GENE C. SCHAERR
JAMES A. HEILPERN
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
ejaffe@schaerr-jaffe.com

JOSHUA J. PRINCE
PROTECT THE FIRST FOUNDATION
1701 Pennsylvania Ave. NW, Ste. 200
Washington, DC 20006

DARPANA SHETH
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave. NW, Ste 625
Washington, DC 20036

*Counsel for Amici Curiae*

April 3, 2026

35

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief of *Amici Curiae* complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in Century Schoolbook 14-point type. This brief also complies with the word limitation of Fed. R. App. P. 29(a)(5) because it contains 6,421 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). The number of words was determined through the word-count function of Microsoft Word.

*s/ Erik S. Jaffe*
Erik S. Jaffe