**ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026**

**Nos. 25-5241, 25-5265, 25-5277, 25-5310**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

PERKINS COIE LLP,
> *Plaintiff-Appellee,*

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,
> *Defendants-Appellant.*

———————————

JENNER & BLOCK LLP,
> *Plaintiff-Appellee,*

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,
> *Defendants-Appellant.*

———————————

WILMER CUTLER PICKERING HALE & DORR LLP,
> *Plaintiff-Appellee,*

v.

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,
> *Defendants-Appellant.*

———————————

SUSMAN GODFREY LLP, et al.,
> *Plaintiff-Appellee,*

v.

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,
> *Defendants-Appellant.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

## REPLY BRIEF FOR APPELLANTS

———————————

STANLEY E. WOODWARD JR.
*Associate Attorney General*

ABHISHEK S. KAMBLI
*Deputy Associate Attorney
General*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-6993*
*Abhishek.kambli@usdoj.gov*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ...................................................................................... 1

ARGUMENT .............................................................................................. 4

I. Section 2, Suspending Security Clearances,
Is Not Justiciable ............................................................................... 4

II. Section 4, Clarifying Review of Discriminatory
Employment Practices, Is Lawful .................................................... 20

III. Section 3, Concerning Contractors, and Section 5,
Concerning Guidance on Access to Buildings,
Are Lawful .......................................................................................... 26

    A. Plaintiffs' Claims are not Ripe ................................................ 26

    B. Plaintiffs' Claims Fail on the Merits ........................................ 29

        **1.** First Amendment ............................................................... 29

        **2.** Procedural Due Process ...................................................... 38

        **3.** Plaintiffs' Remaining Constitutional Claims ....................... 42

IV. The Executive Orders' Sections Are Severable,
and the District Courts Erred in Enjoining
Future Actions Based on Section 1 of the
Executive Orders ............................................................................... 46

CONCLUSION .......................................................................................... 55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Adams v. Laird,*
420 F.2d 230 (D.C. Cir. 1969), *cert. denied,*
397 U.S. 1039 (1970) ...............................................................................17

*Baker v. Carr,*
369 U.S. 186 (1962) ...................................................................................7

*Bancoult v. McNamara,*
455 F.3d 427 (D.C. Cir. 2006) ...................................................................6

*Barr v. American Ass'n of Pol. Consultants, Inc.,*
591 U.S. 610 (2020) .................................................................................51

*Board of Regents of State Colls. v. Roth,*
408 U.S. 564 ............................................................................................39

*Bill Johnson's Rests., Inc. v. NLRB,*
461 U.S. 731 (1983) .................................................................................32

*Broadrick v. Oklahoma,*
413 U.S. 601 (1973) ...................................................................................2

*Carlucci v. Doe,*
488 U.S. 93 (1988) ...................................................................................17

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) ...................................................................................51

*Cobell v. Jewell,*
802 F.3d 12 (D.C. Cir. 2015) ...................................................................28

*Conn v. Gabbert,*
526 U.S. 286 (1999) ........................................................................... 39, 40

*Contractors Ass'n of E. Pa. v. Secretary of Lab.,*
442 F.2d 159 (3d Cir. 1971) .....................................................................35

*Dent v. West Virginia,*
129 U.S. 114 (1889) ................................................................... 40

*Department of the Navy v. Egan,*
484 U.S. 518 (1988). ....................................................... 5, 6, 15

*FCC v. Fox Television,*
*Studios,* 567 U.S. 239 (2012) ................................................ 41

*Federal Deposit Ins. Corp. v. Mallen,*
486 U.S. 230 (1988) ................................................................. 42

*Garcetti v. Ceballos,*
547 U.S. 410 (2006) ................................................................. 32

*Harmon v. Thornburgh,*
878 F.2d 484 (D.C. Cir. 1989), *cert. denied,*
493 U.S. 1056 (1990) ................................................................. 9

*Hishon v. King & Spalding,*
467 U.S. 69 (1984) ............................................................. 30, 31

*Houston Cmty. Coll. Sys. v. Wilson,*
595 U.S, 468 (2022) ................................................................. 33

*Iowaska Church of Healing v. Werfel,*
105 F.4th 402 (D.C. Cir. 2024) .............................................. 21

*Kartseva v. Department of State,*
37 F.3d 1524 (D.C. Cir. 1994) ............................................... 41

*Lee v. Garland,*
120 F.4th 880 (D.C. Cir. 2024) ............ 1, 4, 5, 6, 7, 9, 10, 11, 18, 53

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ................................................................. 39

*Marbury v. Madison,*
5 U.S. (1 Cranch) 137 (1803) ................................................. 15

*Media Matters for Am. v. Paxton,*
   138 F.4th 563 (D.C. Cir. 2025).......................................................24, 25

*Minnesota State Bd. for Cmty. Colls. v. Knight,*
   465 U.S. 271 (1984).........................................................................37

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
   526 U.S. 172 (1999)....................................................................52, 53

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024)....................................................................29, 33

*National Endowment for Arts v. Finley,*
   524 U.S. 569 (1998).........................................................................48

*National Fed'n of Fed. Emps. v. Greenberg,*
   983 F.2d 286 (D.C. Cir. 1993) .............................................. 8, 9, 10, 11

*National Rifle Assoc. v. Vullo,*
   602 U.S. 175 (2024) ....................................................................49, 50

*Norwood v. Harrison,*
   413 U.S. 455 (1973).........................................................................30

*Ohio Forestry Ass'n v. Sierra Club,*
   523 U.S. 726 (1998).........................................................................26

*Pleasant Grove City v. Summum,*
   555 U.S. 460 (2009).........................................................................48

*Rattigan v. Holder,*
   689 F.3d 764 (D.C. Cir. 2012) ...........................................................14

*Regan v. Time, Inc.,*
   468 U.S. 641 (1984).........................................................................52

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984).........................................................................32

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995).........................................................................48

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ..............................................................48

*Ryan v. Reno*,
  168 F.3d 520 (D.C. Cir. 1999) ......................................... 6, 18

*S & D Maint. Co. v. Goldin*,
  844 F.2d 962 ......................................................................39

*Scahill v. District of Columbia*,
  909 F.3d 1177 (D.C. Cir. 2018) ........................................37

*Seila Law LLP v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020) .......................................... 14, 51, 52, 54

*Shurtleff v. City of Boston*,
  596 U.S. 243 (2022) ...........................................................47

*Simon v. East Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) .............................................................42

*Students for Fair Admissions, Inc. v. President &
  Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) .......................................... 22, 31, 32, 36

*TikTok Inc. v. Garland*,
  604 U.S. 56 (2025) .............................................................34

*Toilet Goods Ass'n v. Gardner*,
  387 U.S. 158 (1967) ...........................................................38

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) .............................................................1

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ...........................................................21

*U.S. Dep't of Lab. v. Triplett*,
  494 U.S. 715 (1990) ...........................................................45

vi

*U.S. Info. Agency v. Krc*,
  905 F.2d 389 (D.C. Cir. 1990) ................................................................9

*UAW-Lab. Emp. & Training Corp. v. Chao*,
  325 F.3d 360 (D.C. Cir. 2003) ..............................................................35

*United States v. Burton*,
  584 F.2d 485 (D.C. Cir. 1978) ..............................................................46

*United States v. Nixon*,
  418 U.S. 683 (1974) ...............................................................................29

*VanderKam v. VanderKam*,
  776 F.3d 883 (D.C. Cir. 2015) ..............................................................28

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
  576 U.S. 200 (2015) ...............................................................................48

*Wheat v. United States*,
  486 U.S. 153 (1988) ...............................................................................46

## U.S. Constitution:

Art. II, § 1, cl. 1 ............................................................................. 14-15

Art. II, § 2 ........................................................................................ 15

Art. II, § 3 ........................................................................................ 15

## Statutes:

42 U.S.C. § 2000e-5(a) ...........................................................................21


D.C. Code § 2-1402.11 ............................................................................33

## Regulatory Materials:

41 C.F.R § 60-1.1 ...................................................................................35

48 C.F.R. § 1.102(a) ......................................................................35

48 C.F.R. § 52.204-10(d)(2).........................................................36

48 C.F.R. § 52.244-2 ....................................................................36

48 C.F.R. § 52.249-2(a) ................................................................35

Exec. Order No. 10,865,
  25 Fed. Reg. 1583 (Feb. 20, 1960)...........................................17

Exec. Order No. 14,147,
  Ending the Weaponization of the Federal Government,
  90 Fed. Reg. 8235 (Jan. 20, 2025)...........................................34

Exec. Order No. 14,151,
  Ending Radical and Wasteful Government DEI Programs
  and Preferencing,
  90 Fed. Reg. 8339 (Jan. 20, 2025)...........................................23

Exec. Order No. 14,168,
  Defending Women From Gender Ideology Extremism
  and Restoring Biological Truth to the Federal Government,
  90 Fed. Reg. 8615 (Jan. 20, 2025)...........................................23

Exec. Order No. 14,173.
  90 Fed. Reg. 8633 (Jan. 21, 2025)...........................................23

# GLOSSARY

| | |
|---|---|
| DOJ | Department of Justice |
| EEOC | Equal Employment Opportunity Commission |
| EO | Executive Order |
| Jenner | Jenner & Block LLP |
| OMB | Office of Management and Budget |
| Perkins | Perkins Coie LLP |
| Susman | Susman Godfrey LLP |
| WilmerHale | Wilmer Cutler Pickering Hale & Dorr LLP |

## INTRODUCTION

Plaintiffs' response briefing "decries an imperial Executive while embracing an imperial judiciary." *Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025). In defending the wholesale, facial, and pre-implementation invalidation of the President's Executive Orders addressing invidious racial discrimination and national security risks relating to certain law firms, plaintiffs relegate "justiciability and remedial doctrines" to afterthoughts. Jenner Br. 34. In fact, all of the Plaintiffs jump straight into the merits and attempt to memory-hole justiciability toward the end of their briefs despite having the burden to establish it in the first place. *See Lee v. Garland*, 120 F.4th 880, 885–86 (D.C. Cir. 2024) ("Lee contends that DOJ violated Title VII, the First Amendment, and the Fifth Amendment in revoking his security clearance. *Before addressing the merits of these claims, we must consider whether they are justiciable.*" (emphasis added)).

And "[o]bserving the limits on judicial authority . . . is required by a judge's oath to follow the law." *CASA*, 606 U.S. at 858. The district courts below exceeded those limits to provide sweeping relief that "has been employed by the Court sparingly and only as a last resort."

1

*Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). The constraints of Article III and the Presidential discretion to set national security and law enforcement priorities apply no less when the suit is brought by a law firm.

Here, those constraints and that discretion compel reversal. Only the President may decide whether "active security clearances" held by plaintiffs' employees "are consistent with the national interest." When the President decides they are not, courts may not interfere, let alone compel the President to continue giving private lawyers access to classified information. Nor may courts enjoin or otherwise interfere with routine directives requiring Executive Branch officials to investigate and enforce existing anti-discrimination laws. The district courts' contrary rulings not only infringe on the Nation's chief law enforcer's unreviewable authority to set priorities, but also defy common sense given that, for years, plaintiffs publicly bragged about their racial hiring practices that were noted in the Executive Orders. Similarly, the district court should not have reached the merits to invalidate contracting and building access instructions that have not been implemented—such that there is nothing concrete to challenge.

2

But even if the court reached the merits of Plaintiffs' arguments, the result should still be reversal. Plaintiffs' arguments are full of constitutional platitudes that fall flat when compared to the actual operative sections of the Executive Orders. For example, the First Amendment is not a shield to prevent the government from exercising its authority to combat the unprotected conduct of racial discrimination in hiring or litigation misconduct by former government attorneys and others. And beyond their First Amendment arguments, all Plaintiffs muster are thin arguments based on scattershot constitutional provisions ranging from due process to separation of powers to right to counsel.

Finally, the Court should reverse the three district courts that enjoined the pure government speech from Section 1, especially to the extent there is now any future conjectural action based on that speech is now permanently enjoined. The Court should also ignore Plaintiffs' invitation to treat the Executive Orders as non-severable simply because of the government speech involved in Section 1.

The Court should reverse the district courts' orders granting Plaintiffs' motions for summary judgment.

3

## ARGUMENT

### I.    Section 2, Suspending Security Clearances, Is Not Justiciable

Section 2 of the Executive Orders reflects the President's determination that access to classified materials by Plaintiffs should be suspended pending further review.  Specifically, Section 2(a) directs agency heads to "take steps consistent with applicable law to suspend any active security clearances held by individuals at" the firms, "pending a review of whether such clearances are consistent with the national interest."  JA487 (Perkins), 2012 (Jenner), 2333 (WilmerHale), 3146 (Susman).

WilmerHale concedes "that courts are ill-equipped 'to make nuanced judgments about' the 'motivation' for a security-clearance determination, or to second-guess 'an assessment of intangible qualities such as "loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment."'"  WilmerHale Br. 36–37 (quoting *Lee*, 120 F.4th at 893–94).  WilmerHale also concedes that "the Executive enjoys 'considerable discretion'" in the security-clearance context.  *Id.* at 35.

Jenner similarly concedes that because "courts are ill-equipped to make sensitive, predictive decisions about a particular individual's trustworthiness, *Egan* and *Lee* insulate such decisions from judicial review," Jenner Br. 43, and that "[u]nder our Constitution, the Executive Branch wields considerable power over whom to entrust with the Nation's secrets," *id.* (citing *Egan*, 484 U.S. at 527–30).

Because Section 2 is a clearance determination, it is not justiciable. *See Lee v. Garland*, 120 at 895. Plaintiffs cannot escape this conclusion by characterizing the President's determination, which involves the suspension of clearances, as a "method" or "policy." Nor can they escape it by arguing that agency experts are entitled to greater deference than the President and that the clearance determinations do not reflect national-security assessments.

Plaintiffs' attempts to bury arguments about security-clearance justiciability toward the end of their briefs (despite having the burden), to strawman the Government's position, or to not talk about the issue at all underscore their tacit recognition that the district courts lacked jurisdiction to hear the security-clearance claims.

1. *Egan* and *Lee* prohibit judicial review of clearance determinations. The Constitution singularly vests the President, as Commander in Chief, with the great responsibility of managing clearances to safeguard this Nation's secrets. *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). Courts may not second-guess the Executive Branch's clearance decisions by reviewing the merits of a clearance determination. *Lee*, 120 F.4th at 886 (quoting *Ryan v. Reno*, 168 F.3d 520, 523 (D.C. Cir. 1999)). This follows from *Egan*'s explanation that the "grant or denial of security clearances" is "an inexact science at best," 484 U.S. at 529 (citation omitted), and that "[i]t should be obvious that no one has a 'right' to a security clearance," *id*. at 528.

Plaintiffs' argument that courts should be permitted to review clearance determinations because "*Lee* expressly recognized that Congress may 'restrict executive discretion in this area'" misstates and selectively quotes this Court's opinion. WilmerHale Br. 34 (quoting *Lee*, 120 F.4th at 891). The full quote speaks for itself:

> These precedents confirm that the issue of national security is a "quintessential source[] of political questions." *Bancoult v. McNamara*, 455 F.3d 427, 433 (D.C. Cir. 2006). Of course, not every case touching on national security lies beyond judicial cognizance. Each question must be considered "in terms of the history of its management by the political

6

branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." [*Baker v. Carr*, 369 U.S. 186, 211–12 (1962)]. But these precedents establish that federal courts generally may not second-guess the political branches' discretionary judgments about matters of national security... As *Egan* makes clear, an Executive Branch decision to deny or revoke a security clearance is just such a judgment. For one thing, the Constitution commits that decision to the Executive. And at least absent congressional action to restrict executive discretion in this area, there are no manageable standards to support judicial review of clearance decisions.

*Lee*, 120 F.4th at 891. So, far from supporting Plaintiff's argument, *Lee* confirms that the Constitution commits clearance determinations to the Executive and that clearance determinations (including suspensions) are not reviewable, especially given that Plaintiffs do not point to any congressional action to restrict the President's decision that is relevant here.

2. Plaintiffs cannot distinguish *Egan* and *Lee* by characterizing their claims as challenging mere "methods" or "policies." *Contra* Jenner Br. 35; WilmerHale Br. 35. While *Lee* and *Egan* left open challenges to methods and policies, the relief sought here is to undo a clearance decision rather than to prevent enforcement of a policy that imposes some independent harm unrelated to the clearance decision. Additionally,

7

there's not even a policy here, because the Executive Orders do not establish generally applicable "methods" or "policies" but rather determines that a group of individuals should have their clearances suspended pending review.

First, Plaintiffs' claims are not challenging the narrow type of "methods" that this Court has held are reviewable. The case upon which Plaintiffs chiefly rely, *Greenberg*, holds merely that claims challenging the methods used in clearance investigations are generally reviewable when the claims and alleged injuries are separate and independent from the denial of the clearance itself. *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993). In that case, the methods at issue were questions on a form that the Department of Defense asked its clearance-holding civilian employees to answer as part of a broad reinvestigation motivated by a series of "highly publicized spy scandals." *Id.* at 287. Employees who failed to answer the questions risked losing their clearances. *Id.* They claimed that the questions, which asked about arrest history, credit history, and mental-health and substance-use history, violated their constitutional right to privacy and against self-incrimination. *Id.* at 288–89.

8

This Court permitted the district court's review of those questions, explaining that the "substantive issues before us relate to the constitutionality of the *methods used to gather information* on which such judgments presumably will be based." *Id.* at 290 (emphasis added). In reaching that conclusion, this Court shared examples of other reviewable methods, including the use of "random searches without warrants in the hope of uncovering information about employees seeking security clearances," *id.* at 290, "random drug testing of Justice Department employees," *id.* (citing *Harmon v. Thornburgh*, 878 F.2d 484, 491–92 (D.C. Cir. 1989), *cert. denied*, 493 U.S. 1056 (1990)), and an agency's termination of an employee for homosexuality, *id.* (citing *U.S. Info. Agency v. Krc*, 905 F.2d 389, 398–99 (D.C. Cir. 1990)). But it did not assess the merits of any security-clearance determination, let alone restore any revoked or suspended clearances.

Instead, *Greenberg* made the uncontroversial point that a dispute does not become nonjusticiable "simply because it tangentially relates to a security clearance." *Lee*, 120 F.4th at 892 (discussing *Greenberg*, 983 F.2d at 286). The key term is "tangentially relates." By contrast, Plaintiffs directly challenged security-clearance determinations as

9

evidenced by the fact that they asked for (and received) relief that included restoring their security clearances. In addition, their claims with respect to Section 2(a) are tied to their clearance suspensions or else they would have neither an injury nor a claim if the clearance decision was favorable. This is unlike *Greenberg*, where violations of self-incrimination or privacy were complete even if they were granted clearances.

And whatever questions *Greenberg* left unanswered, *Lee* answered definitively. There, this Court explained that *Greenberg* was cabined to information-gathering methods that impose harms independent from the denial of clearances. *See id.* at 892 (quoting *Greenberg*, 893 F.2d at 290). Review of such methods was appropriate because the plaintiffs' "alleged injuries—the compelled disclosure of incriminating or private facts—[] existed regardless of how the government might have resolved any particular [clearance] application." *Lee*, 120 F.4th at 892 (citing *Greenberg*, 983 F.2d at 291–95). "[T]he *Greenberg* plaintiffs did not seek review of 'discretionary judgments' regarding the merits of 'any particular employee's security clearance.'" *Id.* (quoting *Greenberg*, 983 F.2d at 290). But the *Lee* plaintiff did "not seek relief against an agency

10

decision discrete from the revocation decision. To the contrary, [he sought] reinstatement, backpay, and compensatory damages from his termination—a decision that all agree[d] flowed inexorably from the revocation decision." *Id.* at 894.

Here, the Plaintiffs went even further as they sought (and the district courts granted) restoration of their clearances and a prohibition of any security-clearance reviews pursuant to Section 1. That is a direct challenge to the President's determination that the clearances should be suspended pending further investigation. Plaintiffs are not challenging any particular method of investigation that impose independent harms, like questionnaires, random searches, or drug tests. And they sought injunctions prohibiting reliance on the determination itself, JA77, 1821, 2329, 3479, unlike the *Greenberg* plaintiffs who only sought prospective relief barring use of the questionnaires without regard for any security clearance determination, *Lee*, 120 F.4th at 892–93 (citing *Greenberg*, 983 F.2d at 287–88). That type of relief is simply foreclosed because it "flow[s] inexorably from the [clearance] decision" and does not target "an agency decision discrete from" it. *Id.* at 894 (citation omitted). Plaintiffs

11

challenge the validity of the clearance determinations themselves, so *Egan*, *Lee*, and *Greenberg* bar review of their claims.

Second, in any event, Section 2 is a specific clearance determination, not a general policy. Although Jenner calls Section 2 a "blanket policy," Jenner Br. 37, and WilmerHale calls it a "blanket action[] and policy change[]," WilmerHale Br. 35, they do not explain why Section 2 is properly characterized as a policy rather than a determination that happens to apply to multiple individuals. The term "policy" (which they do not define) cannot be stretched to include Section 2, which reflects the President's determination to suspend specific clearances pending further investigation in accordance with applicable law. JA487, 2012, 2333, 3146. Indeed, Section 2 does not provide any new standards or rules at all. It pertains only to individuals at those firms and has no effect whatsoever on anyone else.

Accepting Plaintiffs' broad definition of "policy" would allow anyone to challenge a clearance determination by recasting it as a policy if it happens to involve more than one person or a group of people. To this end, WilmerHale also mischaracterizes the Government's position by smuggling in the modifier "only" to claim that "the government concedes

12

that *Egan* and *Lee* hold only that courts may not 'review Executive Branch judgments about *whether specific individuals pose a risk to national security.*'" WilmerHale Br. 35 (inaccurately citing Gov't Br. 21). The Government never argued or conceded that *Egan* and *Lee* were constrained to individuals. In fact, there is no requirement in *Egan* or *Lee* that any review must be "individualized" in order to be nonjusticiable as the political question doctrine is about whether the issue is committed to another branch.[1]

3. Plaintiffs cannot distinguish *Egan* and *Lee* by arguing that the clearance determination is not entitled to deference because it was made by the President instead of an agency expert. *Contra* Jenner Br. 38

---

[1] WilmerHale also argues that in district court, Defendants did not argue the President personally adjudicated the merits of suspending the security clearances. *See* WilmerHale Br. 37–38. But that merits determination is explicitly stated in Section 2(a) of the Executive Orders, where the President states that individuals within these law firms shall have their security clearances suspended pending review. And, in any event, the Government has maintained the position throughout all phases of the litigation that security clearance decisions "are not judicially reviewable." Case No. 25-cv-00917, Dkt. No. 15-1 at 16 (D.D.C. Apr. 8, 2025). To the extent WilmerHale is inviting the Court to try to figure out what the President did or did not consider when he made the decision to suspend security clearances, that only confirms the spurious nature of Plaintiffs' attempt to sidestep *Lee* and *Egan*.

(quoting *Rattigan v. Holder*, 689 F.3d 764, 767 (D.C. Cir. 2012)). Jenner argues that the district court in its case observed that Section 2 "'doesn't even permit' individualized assessments prior to suspension." *Id.* (quoting JA2178). This misses the point. The President already rendered clearance determinations when he suspended the clearances pending review based on his assessment of the national interest (and the President is not beholden to a threshold of whatever Plaintiffs characterize as an "individualized assessment"). JA487, 2012, 2333, 3146. Plaintiffs are challenging *that* determination, not any impending agency determination that could result in either reinstatement or revocation.

In any event, the suggestion that the President is entitled to less deference than his "appropriately trained" unelected subordinates is unpersuasive. Jenner Br. 38 (quoting *Rattigan*, 689 F.3d at 767). Executive Branch agencies cannot exercise discretionary Executive Power beyond what the President has delegated to them. *See Seila Law v. Consumer Fin. Protection Bureau*, 591 U.S. 197, 203–04 (2020) ("[T]he 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. Art. II,

14

§ 1, cl. 1; *id.* § 3)). Under the Constitution, "the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66 (1803). He may "appoint certain officers, who act by his authority and in conformity with his orders," to "aid him in the performance of these duties." *Id.* at 166. But when he does, "their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion." *Id.*

The Constitution singularly vests responsibility over clearance determinations in the President as Commander in Chief. *Egan*, 484 U.S. at 527 (quoting U.S. Const., Art. II, § 2). It does not vest any of this responsibility directly in agencies or unelected experts. Accordingly, Presidents have, by executive order, delegated the responsibility to make clearance determinations to some Executive Branch agencies. *Id.* (citing several executive orders). In turn, those agencies' discretion over clearance determinations can be no greater than the President's itself.

15

This Court should reject Plaintiffs' upside-down theory of executive power.

4. Plaintiffs cannot distinguish *Egan* and *Lee* by arguing that Section 2 does not embody a national-security assessment. In each of the Executive Orders, Section 2 suspends any clearances pending a review based on the "national interest." JA487, 2012, 2333, 3146. Plaintiffs argue that the "national interest" does not count as "national security." Perkins Br. 25; WilmerHale Br. 38–39. They also argue that, despite the plain text of Section 2, the Government was required to offer evidence that "national-security concerns motivated" the President's determination to rebut the claim that the "national-security rationale was merely a pretext." Perkins Br. 23. Both arguments fail.

First, it is undisputable that "national interest" encompasses "national security," especially in the context of a clearance determination. *Contra* Perkins Br. 25; WilmerHale Br. 38–39. Section 2 uses the term "national interest" in the exact same way as countless executive orders that have established security-clearance procedures. For example, President Dwight D. Eisenhower's Executive Order 10,865 provides that the clearance process is necessary "to protect the *national*

16

*interest*," Exec. Ord. 10,865, 25 Fed. Reg. 1583, 1583 (Feb. 20, 1960) (emphasis added), and explains that an applicant should be given access to classified information "only upon a finding that it is clearly consistent with the *national interest* to do so," *id.* (emphasis added).

The Supreme Court and this Court have thus long understood the term "national interest" to include national-security interests in the context of clearance determinations. *E.g.*, *Carlucci v. Doe*, 488 U.S. 93, 95 (1988); *Adams v. Laird*, 420 F.2d 230, 238–39 (D.C. Cir. 1969), *cert. denied*, 397 U.S. 1039 (1970). This Court has even recognized and approved the "standard . . . that classified information is to be made accessible to an applicant 'only upon a finding that it is clearly consistent with the national interest to do so'" and explained that the standard is not "lacking in a particularized enunciation adequate to satisfy due process elements of notice and rationality." *Adams*, 420 F.2d at 236–38. Three of the district courts nevertheless relied on the faulty distinction between national security and the national interest to rule for Plaintiffs. JA1668 (Perkins) (reasoning that "the national interest" is "far broader and more nebulous than threats to national security"); JA2180 (Jenner) (reasoning that "'the national interest'" is "a far broader term than

17

national security); JA2831–32 & n.12 (WilmerHale) (discussing that "Section 2 references the 'national interest,' but nowhere cites 'national security'").

Second, the Government does not have the burden of proving that the President's determination was not pretextual. *Contra, e.g.*, Perkins Br. 24. Going beyond the text of Section 2 to fish for "hidden motives" and pretext is the type of second-guessing that *Egan* and *Lee* forbid in this national-security context. In particular, *Lee* makes clear that "as [this Court] explained in *Ryan*, claims that [the Government] denied a clearance based on an impermissible motive necessarily involve 'reviewing the merits of [the Government's] decision,' which *Egan* prohibits." *Lee*, 120 F.4th at 894 (quoting *Ryan*, 168 F.3d at 524).

Therefore, the extrinsic evidence offered by Plaintiffs and evaluated by the district courts is wholly irrelevant. So are Plaintiffs' arguments that this Court should examine the Government's settlements with other law firms, about whether Section 2 reaches the former employees who were named in the Executive Orders, and about the Government's "urgency in prosecuting this appeal." WilmerHale Br. 39 (citing Gov't Br. 40).

Third,    Perkins argues that "[r]egarding Section 2(b), the government offers no argument and thus forfeits any challenge to the district court's order relating to that section."  Perkins Br. 25.  Jenner argues the same.  Jenner Br. 46 n. 2.  The reason the Government did not raise Section 2(b) in its opening brief is that it is attached to Section 2(a).  As noted in the Jenner opinion, "[b]oth parties, however, agree that Section 2(b) is best read much more narrowly . . . . Section 2(b) revokes Jenner's access to SCIFs and other similar mechanisms and materials of the security state."  JA2182.  In other words, Section 2(b)'s application turns on whether Section 2(a) is operative and need not be addressed separately.

*    *    *

As Plaintiffs observe, "courts 'are not required to exhibit a naiveté from which ordinary citizens are free.'"  WilmerHale Br. 39 (citation omitted).  Plaintiffs are demanding that this Court engage in that type of naiveté by claiming that they are somehow not challenging a Presidential security-clearance determination when they obviously are.  This court should reject that disingenuous framing.

19

## II. Section 4, Clarifying Review of Discriminatory Employment Practices, Is Lawful

Section 4 of the Perkins Executive Order broadly ensures that the Equal Employment Opportunity Commission (EEOC) and Attorney General are appropriately investigating widespread civil rights violations rampant within the legal profession. Specifically, Section 4 clarifies that the EEOC should "review the practices of representative large, influential, or industry leading law firms," while the Attorney General should investigate firms that "do business with Federal entities for compliance with race-based and sex-based non-discrimination laws." Perkins EO § 4. The remaining Executive Orders simply clarify that nothing in those documents should be construed to limit or affect Perkins EO § 4. Plaintiffs, like the district court, mostly treat Section 4 as an afterthought, dedicating a combined six pages across four briefs to address this issue. This demonstrates how weak the arguments were for enjoining that section.

Plaintiffs concede that this section addresses large law firms "broadly." Perkins Br. 28 n.5. They further concede that they are not "exempt from ordinary scrutiny." Jenner Br. 45. But that is all the plain

text of the EO requires. *Compare* Perkins EO § 4, *with* 42 U.S.C. § 2000e-5(a).

Plaintiffs do not meaningfully address that text. Instead, one Plaintiff does not address Section 4 at all except in a portion of a footnote. *Compare* WilmerHale Br. 14 n.1, *with Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 414 (D.C. Cir. 2024) (finding waiver where the argument was raised only in footnote). The other three Plaintiffs focus on non-operative fact sheets. Perkins Br. 33; Jenner Br. 44; Susman Br. 40. But although courts "may consider . . . extrinsic evidence" about the President's orders, they "will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Trump v. Hawaii*, 585 U.S. 667, 705 (2018).

Significantly, Plaintiffs do not deny that they have and continue to consider race and sex when making employment decisions, contrary to federal law. Worse, they turn a blind eye to the public record—memorialized on the face of the Executive Orders—where they boast of such violations. *See, e.g.*, Perkins EO § 1 (Perkins "publicly announced percentage quotas in 2019 for hiring and promotion on the basis of race and other categories prohibited by civil rights law"); *id.* (Perkins "proudly

21

excluded applicants on the basis of race for its fellowships"); Jenner EO § 1 (describing Jenner's use of "race-based 'targets'"); WilmerHale EO § 1 (similar); Susman EO § 1 (describing Susman's program "offer[ing] financial awards and employment opportunities only to 'students of color'"). Plaintiffs cannot argue they are immune from reviews or investigations into the very sort of violations they have flaunted simply because the direction to investigate came from the President—the leader of the entire Executive Branch.

Only one firm even tries to defend its prior conduct, arguing that such practices are "lawful diversity-promoting initiatives." Susman Br. 19. That ignores the Supreme Court's recent precedent rejecting attempts to save racially discriminatory practices through the generic invocation of promoting "diversity." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 221 (2023). The question whether Plaintiffs and other large law firms in fact illegally discriminate should be left to the traditional investigatory and adjudicative process that the Executive Orders contemplate. But here, the district court impermissibly interfered with the President's direction

to an executive agency about an important policy area warranting review and investigation.

Remarkably, one Plaintiff argues that if the Government "genuinely were concerned with employment discrimination, one would expect it to order termination of government contractors who engage in discrimination." Perkins Br. 31.  But as another Plaintiff correctly acknowledges, the Government did just that in EO 14,173, § 3, 90 Fed. Reg. 8633, 8633 (Jan. 21, 2025).  *See* Susman Br. 38 (citing EO 14173). And the Government's commitment to ending racial discrimination in employment can hardly be questioned; the Government has vigorously committed to combatting DEI across numerous sectors, from the legal industry to government contracts and university admissions.  A variety of Executive Orders reflect the same commitment.  *See* EO 14,173; *see also* EO 14,151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," 90 Fed. Reg. 8339 (Jan. 20, 2025); EO 14,168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," 90 Fed. Reg. 8615 (Jan. 20, 2025).

23

Plaintiffs' contrary interpretation would effectively grant them immunity from civil rights investigations if it happens to be because the President asked EEOC to investigate the matter. This is the very opposite of what the Executive Orders command, namely, that nothing in the Executive Orders should be construed to alter the EEOC's and Department of Justice's authority to investigate such large law firms consistent with their statutory schemes and agency processes.[2] This would be an especially perverse outcome given that Plaintiffs have long bragged about flaunting civil rights laws through so-called DEI initiatives as noted in Section 1 of the various Executive Orders.

Plaintiffs' reliance on *Media Matters for America v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) is also misplaced. Contrary to Perkins' claim that the "the government does not dispute that a retaliatory investigation creates a cognizable injury" and that the President "cannot direct a *retaliatory* investigation," Perkins Br. 33–34, or Jenner's claim that the authority to investigate discrimination "does not include the power to

---

[2] Amicus Burrows admits that Commissioners Charges are routinely "trigger[ed]" by information that emerges "from an outside party," DE #2167003 at n.3, which confirms it is permissible for EEOC Commissioners to seek or receive information from outside sources in order to issue a sworn charge.

24

direct investigations for retaliatory aims," Jenner Br. 44, that is not what the Court said in *Media Matters*. In fact, this Court did not even address the issue whether a "retaliatory investigation" was a legally cognizable claim because the argument was "forfeited." *See Media Matters,* 138 F.4th at 584. The President has broad authority to set investigative priorities.

In any event, the defendant in *Media Matters* did not even address the last two prongs of the First Amendment retaliation test. *Id.* Here, Defendants' opening brief addressed precisely why Section 4 of the Executive Order addressed unprotected conduct (namely discrimination) and therefore the causal link required for First Amendment retaliation could not be met. Gov't Br. 46–48. Instead of addressing the arguments directly, Plaintiffs strawman the argument by stating that "the government's generic interest in 'combat[ting] illegal private-sector DEI' . . . does not provide it would have investigated *Perkins* absent unlawful motive." Perkins Br. 34. This ignores the statements in Section 1 that directly connect the Plaintiffs' problems to their unlawful discrimination.

25

III. **Section 3, Concerning Contractors, and Section 5, Concerning Guidance on Access to Buildings, Are Lawful**

Sections 3 and 5 contemplate future agency actions to address contractors and Plaintiffs' access to federal buildings. Plaintiffs jumped the gun by asserting, and district courts jumped the gun by approving, Plaintiffs' unripe challenges to these sections. Those challenges also fail on the merits, given the many lawful motivations behind and applications of Sections 3 and 5. Had the district courts not prematurely enjoined those sections, additional developments could have clearly illustrated their lawful applications.  Regardless, the claims fail on the merits.

### A. Plaintiffs' Claims are not Ripe

1. Plaintiffs' facial claims challenging Sections 3 and 5 of the Executive Orders are "not ripe for court review." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732 (1998).  Section 3 contemplated that agencies would eventually "require Government contractors to disclose any business they do with" Plaintiffs, "review all contracts with" Plaintiffs, and "take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal

26

Acquisition Regulation, for which [Plaintiffs] ha[ve] been hired to perform any service." *E.g.*, Perkins EO § 3. Yet federal agencies never had the chance to conduct such a review, much less determine in the first instance how such a directive interacts with a complex body of federal acquisition law.

Plaintiffs' challenges to Section 5 are equally unripe. That Section directed federal agencies to "provide guidance limiting official access from Federal Buildings" in cases that "would threaten the national security" or "otherwise be inconsistent with the interests of the United States." *E.g.*, Perkins EO § 5. Any such future action by federal agencies would have crystalized the claims at issue. The direction to agencies to evaluate on a case-by-case basis how national security and other interests would be implicated by continued access to federal property is a question best addressed in the first instance by the Executive Branch. Yet the agencies have not issued such guidance or articulated how those interests should be furthered.

Awaiting that process would have allowed agencies to consider the real-world applications at play, rather than having litigants and district courts debate various hypotheticals, as they did below. *See, e.g.*, JA 3039

27

(speculation that order "could mean courthouses, Post Offices, the VA hospital"). "Ensuring that issues presented are ripe for decision protects against the 'premature adjudication of "abstract disagreements"' and 'reserves judicial power for resolution of concrete and 'fully crystalized' disputes." *Cobell v. Jewell*, 802 F.3d 12, 21 (D.C. Cir. 2015) (quoting *VanderKam v. VanderKam*, 776 F.3d 883, 888 (D.C. Cir. 2015)). The district courts' failure to exercise restraint was error.

2. Plaintiffs' contrary arguments miss the mark. They argue that Section 1's findings "preordain" the application of Sections 3 and 5. Perkins Br. 12, 26, 39. But it is impossible to say that any application would be preordained without knowing what that application is. It is certainly impossible to determine if the Executive Orders violated Plaintiffs' procedural due process rights if agencies have not released guidance that could have process built into it or that the Executive Orders violate the right to petition if the building access provision is not akin to Plaintiffs' fears that they would be barred from courthouses (which none of the Executive Orders direct). The Executive Orders' concerns with national security suggest that this calculus could play out differently on different properties and with respect to different

28

individuals. This is especially true given Plaintiffs facially challenge the Executive Orders, and the district courts never "explore[d] the" Executive Orders' "full range of applications." *See Moody v. NetChoice, LLC*, 603 U.S. 707, 726 (2024).

The district court's order enjoining the Government from even developing such guidance also raises separation of powers concerns. Deliberation, as the Supreme Court has recognized, "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974). At the very least, Defendants must be afforded the latitude to deliberate and develop guidance.

### B. Plaintiffs' Claims Fail on the Merits

Even if this Court could hear Plaintiffs' claims, their challenges to Sections 3 and 5 fail because they do not violate the First Amendment, procedural due process, or any other constitutional provision.

#### 1. First Amendment

a. Plaintiffs primarily assert a First Amendment retaliation claim (with a tag-along "viewpoint discrimination" claim that appears to be substantively identical). But those claims fail because much of the

29

conduct at issue is plainly not protected speech or association. The Executive Orders make plain that they are motivated by the (1) law firms' discriminatory employment practices, (2) official conduct by former government officials, and (3) litigation misconduct. Gov't Br. 53-54. And they fail to refute the Government's showing that the President would have issued the Executive Orders on those grounds alone.

Glaringly, Plaintiffs have no response to on-point precedent from the Supreme Court making clear that private law firms enjoy no constitutional protections immunizing them from private discrimination claims. *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984). In *Hishon*, a female associate sued "a large . . . law firm" alleging that she had been discriminated against based on her sex when denied partnership. *Id.* at 71–72. The law firm had "argue[d] that application of Title VII . . . would infringe constitutional rights of expression or association." *Id.* at 78.

But the Supreme Court held that while "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment . . . it has never been accorded affirmative constitutional protections" in the context of commercial employment decisions. *Id.* (quoting *Norwood v. Harrison*, 413

30

U.S. 455, 470 (1973)).  "There is no constitutional right" for law firms to discriminate, any more than "a private school" or "a labor union." *Id.*  As Justice Lewis F. Powell further explained in his concurring opinion, when it comes to law firm employment decisions, "it is now widely recognized— as it should be—that in fact neither race nor sex is relevant" but only "qualities of mind, capacity to reason logically, ability to work under pressure, leadership, and the like," which are wholly "unrelated to race or sex."  *Id.* at 81 (Powell, J., concurring).  Not a single law firm brief engaged with this precedent.

Instead, Plaintiffs rehearse the same tired playbook. They clothe themselves in the First Amendment, claiming a special role in society (and special constitutional protections) to stand up for the oppressed (using race as a proxy).  *E.g.*, Perkins Br. 1 (describing issuance of EO's as "perilous moment for . . . the legal profession, and the rule of law").  But *Hishon* rejected such a specialized view of the First Amendment for law firms.  And "if our history has taught us anything, it has taught us to beware of elites bearing racial theories." *Students for Fair Admissions*, 600 U.S. at 268 (2023) (Thomas, J., concurring) (internal quotation marks omitted).  "Anyone who today thinks that some form of racial

discrimination will prove 'helpful' should . . . tread cautiously, lest racial discriminators succeed (as they once did) in using such language to disguise more invidious motives." *Id.* at 266.

In addition, Jenner's argument that it engaged in First Amendment protected activity when it chose to associate with Mr. Weissmann in pursuit of its clients' ends is incorrect. Jenner Resp. Br. 21 *(citing Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Although *Hishon* applied in the sex discrimination context, its reasoning sweeps more broadly: a law firm is not engaged in expressive conduct when it makes commercial business decisions about who to hire. This is especially true when it comes to law firms who hire former government attorneys who do not enjoy First Amendment protections in the performance of their official duties, s*ee Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), and for attorneys who engage in litigation misconduct that also do not enjoy First Amendment protections, *see Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983). *Hishon's* reasoning means that law firms do not have a First Amendment right to associate with these attorneys in a commercial business enterprise. To hold otherwise would lead to far reaching consequences. For example, if law firm hiring were expressive conduct,

then a law firm could itself discriminate on the basis of political affiliation despite the D.C. Human Rights Act prohibiting it. D.C. Code § 2-1402.11. Likewise, the law firms obviously did not hire these attorneys as part of any expressive association with the work of a particular client—indeed, these attorneys presumably work for a wide array of the firms' clients, lacking any common expressive purpose, and thus are simply employed by a commercial business servicing clients.

Ultimately, First Amendment retaliation has a but-for causation prong. *Houston Community College Sys. v. Wilson*, 595 U.S, 468, 477 (2022).[3] Given that unprotected conduct alone, the but for causation

---

[3] Oddly, WilmerHale argues (at 19) that the Government did not raise this argument below. But the government argued, *e.g.*, "while Section 3 relies on WilmerHale's activities that are not aligned with American interests, including racial discrimination for its authority, *the latter, more specific ground* is sufficient to sustain its provisions." Defs.' Opp. to Mot. for S.J., 2025 WL 1443443 (April 17, 2025). To the extent Plaintiffs complain that Defendants did not discuss the problems with their *facial* First Amendment claims, *see* Perkins Br. 28; WilmerHale Br. 20, the Supreme Court has treated facial invalidity as a threshold issue that Courts should address even if "*no one* has paid much attention to that issue." *Moody*, 603 U.S. at 724 (emphasis added). And Defendants primarily reference the standard for facial challenges to reinforce their arguments that the district court erred by failing to consider but-for causation, jumping the gun when as-applied challenges would be more appropriate, and not severing the lawful aspects of the Executive Orders.

prong cannot be met. That motive is "sufficient to sustain" the Executive Orders regardless of any other justification. *TikTok Inc. v. Garland*, 604 U.S. 56, 79 (2025).

The President's motive to root out racial discrimination and DEI is sincere and widespread, reflected in the multiple executive orders and far-reaching investigations across the legal profession, higher education, and other industries. So too is his desire to address litigation and other misconduct by former government officials and attorneys. *See* Exec. Order 14,147, 90 Fed. Reg. 8235 (Jan. 20, 2025); Memorandum on Preventing Abuses of the Legal System and the Federal Court (Mar. 22, 2025).

Plaintiffs have no basis to refute the Government's showing that the Executive Orders would have issued based on that unprotected conduct alone regardless of any protected activity mentioned in the Executive Orders. Even if the President would have acted on one of those grounds alone, that would be sufficient to sustain the Executive Orders, especially when it comes to discrimination through its procurement power.

34

The Government has long used the procurement power to address racial discrimination. Indeed, the Federal Acquisition Regulations ("FAR") system codifies this longstanding practice to enter into contracts "while maintaining the public trust and fulfilling public policy objectives." 48 C.F.R. 1.102(a). These provisions explicitly provide for the Government exceptionally wide latitude to "terminate performance of work" where "termination is in the Government's interest." 48 C.F.R. § 52.249-2(a). Regulation of federal contracting decisions is fully applicable downstream to a contractor's subcontractors or clients pursuant to 41 C.F.R § 60-1.1. Indeed, subpart 8 of this subsection specifically cites to EO 11246, under which President Lyndon B. Johnson forbade federal contracts to entities debarred for failure to adhere to the equal employment opportunity policies outlined therein. They have therefore long been included in contracts. *See Contractors Ass'n of E. Pa. v. Secretary of Lab.*, 442 F.2d 159, 168–71 (3d Cir. 1971) (describing history). Courts in this Circuit routinely give great deference to Executive Orders addressing the nexus between social policy and the procurement power. *See, e.g., UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366–67 (D.C. Cir. 2003).

35

As the Supreme Court has made clear, "[e]liminating discrimination means eliminating all of it." *Students for Fair Admissions*, 600 U.S. at 230. "[H]owever well intentioned," *id.* at 213, or whatever their "commendable goals," *id.* at 214, law firms must comply with federal law. As must all federal contractors.

All of this demonstrates, the Executive Orders would have issued absent the protected conduct.

b. The Executive Orders do not violate Plaintiffs' associational rights. Defendants have already discussed Plaintiffs' hiring decisions in the section above. And if Plaintiffs' real gripe concerns contracting disclosures, *see* Jenner Br. 31, many contractors across industries are *already* subject to a wide range of disclosure requirements as a condition of doing business with the federal government. *See, e.g.*, 48 C.F.R. § 52.204-10(d)(2) (requiring certain contractors to disclose a laundry list of information about first-tier non-exempt subcontractors, including the products and services being provided under the subcontract); *id.* § 52.244-2 (setting forth circumstances in which a contractor must obtain consent from the Contracting Officer to subcontract and provide detailed information, including the identity of the proposed subcontractor, to

obtain such consent).  As those examples illustrate, "First Amendment concerns are not implicated where the government requires disclosure for its operations." *Scahill v. District of Columbia*, 909 F.3d 1177, 1185 (D.C. Cir. 2018).

c.  Plaintiffs' rights to petition are also not implicated.  Once again, Plaintiffs' prior legal advocacy is not the but-for cause of the orders.  And nothing in the Executive Orders, including Section 5, "threaten[s] [Plaintiffs'] ability to petition federal employees, federal agencies, and federal courts on behalf of its clients."  Susman Br. 25.  Plaintiffs remain free "to advocate ideas" by bringing and pursuing lawsuits.  *Minnesota State Bd. for Cmty. Colls. V. Knight*, 465 U.S. 271, 283 (1984).  To the extent that Plaintiffs take issue with meetings with Federal Government personnel that were cancelled in the wake of the Executive Orders, there is only a right to petition, and no "right to be heard."  *Id.*  There is also nothing preventing them from bringing as-applied challenges if their right to petition were actually infringed.  But for now, it is simply not the case that any "Firm . . . [is] limited from entering federal courthouses." Perkins Br. 39.  The  Executive Orders themselves do not have that effect. And  whether  any  attorneys  could  "potentially"  lose  access  based  on

whatever guidance issues, Susman Br. 19, there is certainly no occasion to prevent the guidance from even issuing in the first place.

## 2. Procedural Due Process

Plaintiffs' due-process claims are similarly meritless.[4]    At the threshold, they are not ripe for judicial resolution because Defendants did not issue guidance implementing the Executive Order. *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163–65 (1967) (legal issue was not ripe where final agency action had not yet concretely affected plaintiff's primary conduct).    And Plaintiffs' claims are speculative in that they assume that Defendants will ignore the Executive Orders' command to implement the order "consistent with applicable law"—as Sections 2, 3, 5, and 6 each explicitly require. *E.g.*, JA3146–48 (Susman Exec. Order).

On the merits, Plaintiffs' argument that the Executive Orders deprive their "attorneys" of their right to a chosen career is specious.[5]

---

[4] Perhaps as a sign of the weakness of these procedural due-process arguments, two Plaintiffs did not even brief the issue and instead incorporated their brethren's arguments by reference.  Jenner Br. 33; WilmerHale Br. 30.  The only two Plaintiffs to brief the argument did so cursorily in just a few paragraphs each.  Perkins Br. 38–40; Susman Br. 25–28.

[5] As Susman's brief recognizes, the employees at issue are still "attorneys."  Susman Br. 25.

Susman Br. 26. The Executive Orders do not prevent them from continuing the practice of law, and the record does not establish that anything of the sort is "actual" or "imminent" rather than "conjectural" and "hypothetical." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). In any event, the "right to a chosen career" entails "some generalized due process right to choose one's field of private employment," *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999), not the right to practice a specific kind of law or have specific clients. The right to a chosen career does not entail any right to future federal employment or government contracts. *See Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."); *see also S & D Maint. Co. v. Goldin*, 844 F.2d 962, 967 (analogizing a "service contract to an employment contract" and explaining that in "the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship *without cause*" (emphasis in original)).

39

And even if the Executive Orders touch upon the right to a chosen career, that right is subject to government regulation. *Conn*, 526 U.S. at 292 (citations omitted). Put another way, "there is no arbitrary deprivation of" the right to pursue one's lawful calling "where its exercise is not permitted because of a failure to comply with conditions imposed by the state for the protection of society." *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). Here, whatever conjectural inconveniences Plaintiffs' attorneys might one day suffer do not come close to the harms to society and the national interest described in the Executive Orders.[6]

Second, Susman's theory of stigmatic or reputational harm based on its "good name" and "reputation" are unpersuasive. Susman Br. 26. For one, much of its argument is based on Section 1's precatory language, which is pure government speech for the reasons described in Section IV.

---

[6] Susman argues that Defendants "forfeited" the argument that it lacks protected interests and that the Executive Orders did not formally exclude anyone from working as an attorney. Susman Br. 27. Defendants did not forfeit this argument. In fact, Defendants explained in the district court proceedings that Susman's "Count VI raises a procedural due process challenge that requires [it] to identify a 'constitutionally protected interest.'" Defs. Mot. to Dismiss 8–9, *Susman Godfrey LLP v. Exec. Off. of President*, No. 1:25-cv-01107, Dkt. No. 58 (D.D.C. Apr. 23, 2025) (citations omitted). In any event, the district court did not rely on any purported forfeiture and clearly passed on the issue. *See* JA3520-22.

40

Furthermore, Susman does not explain how the Executive Order meaningfully alters their status, especially given that it is dependent on future guidance being issued. *See Kartseva v. Department of State*, 37 F.3d 1524, 1527 (D.C. Cir. 1994) (explaining that "a government action that potentially constrains future employment opportunities must involve a tangible change in status to be actionable under the due process clause"). And Susman's reliance on *FCC v. Fox Television Studios* is misplaced. Susman Br. 26 (citing 567 U.S. 239, 255–56 (2012)). That case dealt with an agency licensing action that no doubt had a concrete legal effect. This case deals with a President's order directing agencies to act based on protecting American interests, including combating racial discrimination that is based primarily on future action by agencies. It cannot be the case that the President is required to jump through yet undefined procedural hoops before ordering agencies to address these harms.

Third, the Executive Orders do not interfere any purported "property interest in contracts with clients." *Contra* Susman Br. 27. Whether a client or hypothetical client decides not to retain Susman in light of the Executive Order is an "independent action of some third party

not before the court" and therefore not a basis for standing. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). The one case cited in Susman's three-sentence argument dealt with a plaintiff's "right to continue to serve as president of [a] bank and to participate in the conduct of its affairs," *Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240 (1988), and does not support the broad conclusion Susman draws from it. In that case, the FDIC took the step of suspending the president of the bank from his job. *Id.* at 237. There is no argument that the Government is directly severing the relationship between Plaintiffs and their clients. Plaintiffs cite no additional authority for this claim, and it should be rejected.

Finally, Plaintiff's due process argument based on the right-to-petition argument is flawed for the same reasons described in Section III.3.

### 3. Plaintiffs' Remaining Constitutional Claims

a. Susman and Perkins provide a cursory argument about why the respective Executive Orders are unconstitutionally vague that misses the mark. The Executive Orders (and particularly Sections 3 and 5) do not even proscribe any conduct by Plaintiffs. Susman claims that the fact

that guidance was never issued bolsters its void-for-vagueness argument because it "creates uncertainty about the extent of the disabilities placed on Susman—and it leverages that vagueness to intensify the Order's *in terrorem* effect." Susman Br. 28.  But, if anything, this demonstrates why this case is not ripe for review; to the extent there is any uncertainty, it is because the guidance that was supposed to address the contours of Sections 3 and 5 was never allowed to issue.  It also cannot be the case that a plaintiff can sustain a void for vagueness claim based on uncertainty about such guidance after asking for (and receiving) an injunction before the guidance could even come out.  For now, Plaintiffs are not subject to any "disabilities" at all.  Their void-for-vagueness claims fail.

b.  Only WilmerHale asserts a standalone (and murky) separation of powers argument.  WilmerHale acknowledges that the President has considerable power in the areas addressed in the Executive Orders. WilmerHale Br. 29.  But WilmerHale asserts that only courts can sanction attorneys for litigation conduct. WilmerHale Br. 27.  While it is true that courts have the ability to sanction attorneys in a manner that could result in the loss of their law license, the Executive Orders do not

attempt to do that.  The Executive Orders simply address issues with law firms through authorities that are primarily vested in the Executive.  Just because they happen to involve lawyers at those firms who the judiciary can *also* sanction does not create a separation of powers issue.  To hold otherwise would lead to absurd consequences.  For example, no one would dispute that an attorney accused of having engaged in serial misrepresentations and fraudulent behavior could be denied a government contract on that basis because an agency deems that attorney insufficiently trustworthy.  But by WilmerHale's logic, that too would be barred unless the judiciary punished that attorney first.  The Court should reject that specious argument.

c. On Equal Protection (which only Perkins addresses), any arguments for a class-of-one theory still fail.  As the district court in *WilmerHale* noted, the Plaintiff there "fail[ed] to identify the similarly situated firms [who have been treated differently] while simultaneously admitting that there are multiple large law firms which have received the same treatment as WilmerHale." JA2865.  It is also undisputed that the Executive Orders address big law firms at large and that multiple law firms that were not subject to Executive Orders received letters from

44

the EEOC. There is no requirement that the Government take action against all of "the roughly 360 firms that adopted the Mansfield Rule" or anything close to that. Perkins Br. 45–46. That is dispositive. Regardless, the rational basis for the Executive Orders is spelled out in the First Amendment retaliation section of the Government's briefs that discuss the unprotected conduct that motivated the Executive Orders.

d. Finally, Plaintiff's right-to-counsel claims are meritless. Regarding the Fifth Amendment, Perkins effectively concedes that alternate counsel is available for their clients given that its alleged injury is tied to losing clients to other law firms. This concession is fatal as *U.S. United States Department of Labor v. Triplett* requires a Fifth Amendment right to counsel to show that other attorneys are unavailable to the law firms' clients. 494 U.S. 715, 722 (1990). Perkins misapprehends *Triplett* and attempts to artificially distinguish it. Perkins Br. 44. In doing so, Perkins fails to cite any authority for its proposition that the Fifth Amendment includes a right to counsel of one's choosing. Therefore, Plaintiffs cannot prevail on a Fifth Amendment right to counsel claim.

45

Nor does the Executive Order contravene a Sixth Amendment right to counsel. As explained, that right is "circumscribed." *Wheat v. United States*, 486 U.S. 153, 159 (1988); Gov't Br. 59. It is "not absolute." *United States v. Burton*, 584 F.2d 485, 489 (D.C. Cir. 1978). Plaintiffs' primary argument plays on hypotheticals that agencies would have issued guidance prohibiting their lawyers from accessing courts through "postal service," "PACER," and government websites. Perkins Br. 42. They further suggest that, under their reading, their "attorneys could not negotiate with federal prosecutors, accompany clients to agency meetings, or even proceed past the Executive Branch officials guarding courthouse doors." *Id.* But agencies never promulgated guidance to that effect, and this Court need not engage with those hypotheticals. In addition to ripeness concerns, these arguments fail to acknowledge the plainly lawful sweep of the Executive Order as applied to the vast majority of government buildings and services, which do not implicate the right to counsel. Also, the "public has a strong interest in the prompt, effective, and efficient administration of justice," *Burton*, 584 F.2d at 489, which here includes actions necessary to protect national security.

**IV. The Executive Orders' Sections Are Severable, and the District Courts Erred in Enjoining Future Actions Based on Section 1 of the Executive Orders.**

Section 1 of the Executive Order should not have been enjoined as it was pure government speech, so a permanent injunction against every hypothetical action taken based on it was even more improper. In addition, Section 1 does not, as Plaintiffs claim, make the entire Executive Order inseverable.

1. Three of the district courts erred in enjoining Defendants from taking any actions based on Section 1 of the Executive Orders. One of the district courts correctly recognized that "Section 1 does not direct any action," so it declined to "enjoin future actions taken pursuant to" it. JA2205–06 (Jenner).

Section 1 is government speech. This point should be non-controversial. *But see* Perkins Br. 22 (expecting a "textbook's worth of examples"). Unlike some cases in which the "boundary between government speech and private expression can blur," *Shurtleff v. Boston*, 596 U.S. 243, 252 (2022), there can be little question that the President's statements in an Executive Order reflect his speech—and therefore government speech—rather than private expression, *see id.* (explaining

47

that the standard for government speech is a "holistic inquiry" that in past cases has included looking at "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression" (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–13 (2015)).

Due regard for government speech is essential and compels judicial restraint. After all, "it is not easy to imagine how the government could function if it lacked this freedom." *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009). In fact, "it is the very business of government to favor and disfavor points of view." *Id.* (quoting *National Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment)). Accordingly, the President is "entitled to say what [he] wishes," *id.* at 467–68 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)), and "to select the views that [he] wants to express," *id.* at 468 (quoting *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)).

Plaintiffs' refusal to engage each section of the Executive Orders on their own terms cannot distort Section 1 into anything more than mere government speech. Even Jenner concedes that the "President can speak

48

as he wishes" and that Section 1 is a "statement of Administration policy," Jenner Br. 47–48, yet it still argues that "'retaliatory motive infects the entire order,' including the Order's many statements . . . in Section 1," so it should be reviewable. *Id.* at 47 (quoting JA2171 n.9). The other Plaintiffs' briefs make variations of this argument. Susman Br. 20; Wilmer Br. 31; Perkins Br. 21–22.

But this argument puts the cart before the horse. Standing alone, Section 1 is nothing more than a recitation of findings that, as one district court correctly found, "does not direct any action." JA2205–06 (Jenner). Put differently, even purportedly *retaliatory* government speech is *still speech* that is not subject to judicial review. Indeed, government actors routinely criticize speakers for their speech. A "government official can share [his] views freely and criticize particular beliefs, and [he] can do so forcefully in the hopes of persuading others to follow [his] lead," *National Rifle Assoc. v. Vullo*, 602 U.S. 175, 188 (2024), while permitting judicial scrutiny only when there is an "application of state power" used to "punish or suppress disfavored expression," *id.* (citations omitted). Perkins mistakenly attempts to distinguish the Supreme Court's government speech cases based on the content of the speech in each case.

49

Perkins Br. 22. It argues that those cases are nothing like this case because they are about "a government policy of promoting beef, a city's refusal to erect a particular monument in a park, the National Endowment's decisions to approve or deny art grants, [and] a State's refusal to put a Confederate flag on license plates." *Id.* (citations omitted). But they identify no reason why those factual differences are legally material under the First Amendment. The President has just as much right to criticize certain law firms as to engage in those other forms of speech.

Plaintiffs' reliance on *Vullo* is misplaced. Perkins Br. 23 (quoting *Vullo*, 602 U.S. at 188). That case involved a state official pressuring a third party to unlawfully target Second Amendment advocates on her behalf. *Vullo*, 602 U.S. at 180–81. In any event, as noted, *Vullo* recognizes that government officials can criticize others forcefully without any judicial review absent an exercise of "state power." *Id.* at 188. Because Section 1 does not apply any state power but is rather a mere "statement of Administration policy," Jenner Br. 47–48, *Vullo* is inapposite.

50

Finally, Plaintiffs argue that Section 1 should be enjoined because otherwise, they would be "forced to bring (and federal courts would be forced to review) a new lawsuit every time additional retaliation occurred." WilmerHale Br. 33. Although they correctly suggest that they can sue in the future if they have a valid claim, those "conjectural" and "hypothetical" injuries do not support a permanent injunction. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citing four cases).

In sum, as one district court correctly recognized, the "guesswork entailed in enjoining all future uses of the sentiments expressed in Section 1 would exceed the Court's proper role." JA2207. This Court should reject "such judicial prophylaxis." *Id.*

2. The Executive Orders should be treated as severable. No Plaintiff contests that there is "a strong presumption of severability," Gov't Br. 63 (quoting *Barr v. American Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 625 (2020)), or that the appropriate inquiry to determine severability is whether the "provisions are capable of functioning independently," *id.* at 64 (quoting *Seila Law*, 591 U.S. at 235).

Instead, Plaintiffs generally contend that the Executive Orders are not severable on the basis that the Sections are not discrete, Susman

51

Br. 30; the Sections share a "unifying purpose," *id.*; the Sections form "a single, coherent policy," WilmerHale Br. 32 (citation omitted); and that Plaintiffs would have to file new lawsuits if violations ever occurred, WilmerHale Br. 33.[7]

The arguments that the Sections share a "unifying purpose" and form a "single, coherent policy" are unpersuasive. The Sections do not share a unifying purpose or form one policy. Instead, the Sections have different purposes (*e.g.*, Section 2's focus is national security, while Section 4's purpose is combatting the Plaintiffs' practices of racial discrimination), each of which can be accomplished irrespective of the other Sections. In other words, the Sections "are capable of functioning separately." *Seila Law*, 591 U.S. at 235.

Another way of characterizing the severability inquiry is "essentially an inquiry into legislative intent." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984) (plurality opinion)). In the context

---

[7] Perkins does not meaningfully argue severability. It concludes that the Executive Order is inseverable and cites WilmerHale's and Jenner's briefs. Perkins Br. 21 n.4 (citing WilmerHale Br. 31–33; Jenner Br. 48).

of executive orders, the relevant question is "whether the President would not have revoked" certain provisions if others were invalidated. *Id.* There can be no dispute here that the President wants some of the provisions to take effect even if others are enjoined.

In addition, each Section has its own jurisdictional requirements that the Court must decide before it can consider the merits. For example, in the security-clearance context, *Lee* held, "[b]efore addressing the merits of these claims, we must consider whether they are justiciable." 120 F.4th at 885–86. The Plaintiffs claim that the Executive Orders should be viewed as a whole because they contain a unified purpose centered around First Amendment retaliation. But before the Court can even determine whether there was First Amendment retaliation, it must determine whether it can hear the case at all.

In the security-clearance context, the inquiry would have to end if the court determines it is nonjusticiable. But Plaintiffs ask the Court to skip its duty to determine jurisdiction and jump straight to the merits (and structured their briefs to that effect). The Court must be assured of its jurisdiction before it entertains claims that naturally require a section-by-section analysis.

As noted, Plaintiffs do not dispute that the presumption of severability applies. And Susman's argument that the Executive Order is not severable because it does not have a severability clause is unpersuasive. Susman Br. 30. The Supreme Court has expressly held that the strong presumption in favor of severability does not depend on the existence of a severability clause. *Seila Law*, 591 U.S. at 234 (citations omitted). This holding applies *a fortiori* in the context of an Executive Order, where severability turns on the intent solely of the President, represented here by the Department of Justice. Moreover, the Executive Orders contain the functional equivalent of a severability clause—by providing that they "shall be implemented consistent with applicable law," Section 6(b), they expressly contemplate the possibility of only partial implementation, depending on the constraints imposed by applicable law.

Finally, Plaintiffs' argument that the Executive Orders are not severable because each Orders' preamble states "it is hereby ordered" is of no moment. Jenner Br. 48 (citations omitted). This logic would render any executive order non-severable, no matter how many discrete and independent provisions it has.

54

## CONCLUSION

For the foregoing reasons, the judgments of the district courts should be reversed.

April 10, 2026                    Respectfully submitted,


STANLEY E. WOODWARD, JR.
Associate Attorney General


/s/ *Abhishek Kambli*
ABHISHEK KAMBLI
Deputy Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-9500

*Counsel for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit prescribed by this Court's February 6, 2026, Order (Doc. #2157928) because it contains fewer than 10,653 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font.

*/s/ Abhishek S. Kambli*
ABHISHEK S. KAMBLI

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Abhishek S. Kambli*
ABHISHEK S. KAMBLI