**[ORAL ARGUMENT NOT YET SCHEDULED]**

**Nos. 26-5241, 25-5265, 25-5277, 25-5310**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PERKINS COIE LLP,
                              *Plaintiff-Appellee,*

*v.*

U.S. DEPARTMENT OF JUSTICE, *et al.*,
                              *Defendants-Appellants.*

JENNER & BLOCK LLP,
                              *Plaintiff-Appellee,*

*v.*

U.S. DEPARTMENT OF JUSTICE, *et al.*,
                              *Defendants-Appellants.*

WILMER CUTLER PICKERING HALE AND DORR LLP,
                              *Plaintiff-Appellee,*

*v.*

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,
                              *Defendants-Appellants.*

SUSMAN GODFREY LLP,
                              *Plaintiff-Appellee,*

*v.*

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,
                              *Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of Columbia

Nos. 1:25-cv-00716 (BAH), 1:25-cv-00916 (JDB),
1:25-cv-00917 (RJL), 1:25-cv-01107 (LLA)

———————————

## JOINT APPENDIX

### Volume I of VI (JA1 – JA359)

———————————

DANE H. BUTSWINKAS
   WILLIAMS & CONNOLLY LLP
   680 Maine Avenue SW
   Washington, DC 20024
   (202) 434-5000
   dbutswinkas@wc.com

*Counsel for Plaintiff-Appellee*
   *Perkins Coie LLP*

ELIZABETH B. PRELOGAR
   COOLEY LLP
   1299 Pennsylvania Ave., NW
   Suite 700
   Washington, DC 20004
   (202) 842-7800
   eprelogar@cooley.com

*Counsel for Plaintiff-Appellee*
   *Jenner & Block LLP*

STANLEY E. WOODWARD, JR.
   Associate Attorney General

ABHISHEK KAMBLI
   Deputy Associate Attorney General
   U.S. Department of Justice
   950 Pennsylvania Avenue NW
   Washington, DC 20530
   (202) 514-6993
   abhishek.kambli@usdoj.gov

*Counsel for Defendants-Appellants*

PAUL D. CLEMENT
   CLEMENT & MURPHY, PLLC
   706 Duke Street
   Alexandria, VA 22314
   (202) 742-8893
   paul.clement@clementmurphy.com

*Counsel for Plaintiff-Appellee*
   *Wilmer Cutler Pickering*
   *Hale and Dorr LLP*

DONALD B. VERRILLI, JR.
   MUNGER, TOLLES & OLSON LLP
   601 Massachusetts Avenue NW
   Suite 500E
   Washington, DC 20001
   (202) 220-1100
   donald.verrilli@mto.com

*Counsel for Plaintiff-Appellee*
   *Susman Godfrey LLP*

# TABLE OF CONTENTS

## VOLUME I

**Materials from *Perkins Coie LLP* v. *U.S. Dep't of Just.*,**
**Case No. 25-5241, D. Ct. No. 1:25-cv-00716 (BAH)** ............................ 1

Docket Sheet ................................................................................. 2

Complaint (ECF 1) ....................................................................... 36

Order Granting TRO (ECF 21) ................................................... 79

Transcript of March 12, 2025, TRO Hearing (ECF 22) ......................... 82

Order Extending Injunction (ECF 26) ..................................... 213

DOJ Status Report (Mar. 14, 2025) (ECF 27) ....................................... 214

DOJ Status Report (Mar. 18, 2025) (ECF 29) ....................................... 217

Memorandum from Attorney General Bondi
and Director Vought (Mar. 18, 2025) (ECF 29-1) ................................. 220

Memorandum from General Counsel,
Office of Management and Budget (ECF 29-2) .................................... 222

DOJ Status Report (Mar. 20, 2025) (ECF 31) ....................................... 224

DOJ Supplemental Status Report (Mar. 20, 2025) (ECF 32) .............. 227

Memorandum from Attorney General Bondi
and Director Vought (Mar. 20, 2025) (ECF 32-1) ................................. 229

Memorandum Opinion and Order (ECF 36) ......................................... 231

Statement of Facts in Support of
Motion for Summary Judgment (ECF 39-2) ........................................ 252

Berman Declaration and Exhibits (ECF 39-3) ..................................... 308

## VOLUME II

Manning Declaration and Exhibits (ECF 39-4) .................................... 360

## VOLUME III

Green Expert Report and Exhibits (ECF 39-5) .................................. 1094

Hirshon Expert Report and Exhibits (ECF 39-6) ............................. 1162

Simon Expert Report and Exhibits (ECF 39-7) ................................. 1178

Leonard Expert Report and Exhibits (ECF 39-8)............................. 1211

Scarborough Declaration and Exhibits (ECF 142-1) ......................... 1237

DOJ's Brief in Opposition to
Motion for Summary Judgment (ECF 143) ....................................... 1340

DOJ's Response to Perkins Coie's
Statement of Material Facts (ECF 143-1) ......................................... 1367

Manning Reply Declaration and Exhibits (ECF 148-1) ..................... 1374

Transcript of April 24, 2025, Hearing on the
Motion for Summary Judgment (ECF 169) ....................................... 1384

Order Granting Leave to Amend (ECF 173) ..................................... 1508

Order Granting Consent Motion to
Adopt Streamlined Procedures (ECF 175) ........................................ 1522

Amended Complaint (ECF 176) ......................................................... 1524

Order Granting Motion for Summary Judgment and
Denying Motion to Dismiss (ECF 184) .............................................. 1623

Memorandum Opinion (ECF 185)....................................................... 1628

Notice of Appeal (ECF 188) ................................................................ 1730

**VOLUME IV**

**Materials from *Jenner & Block LLP* v. *U.S. Dep't of Just.* Case No. 5265, D. Ct. No. 1:25-cv-00916 (JDB)** ............................ 1731

Docket Sheet ......................................................................... 1732

Complaint (ECF 1) ................................................................ 1759

Order Granting TRO (ECF 9) ............................................... 1823

Transcript of March 28, 2025, Hearing on
Preliminary Injunction (ECF 10) ......................................... 1825

Email Regarding Compliance with Injunction (ECF 11-1) ............... 1901

Defendants' March 31, 2025, Status Report (ECF 12) ...................... 1903

Plaintiff's Statement of Undisputed Facts (ECF 19-2) ..................... 1905

Truth Social Post (Sept. 5, 2022) (ECF 19-4) ................................... 1930

Transcript of September 6, 2025, Press Conference (ECF 19-5) ........ 1933

Presidential Memorandum Regarding Suspension of Clearances
and Evaluation of Government Contracts (ECF 19-7) ...................... 1949

Fact Sheet Regarding Covington & Burling LLP (ECF 19-8) ............ 1952

Transcript of March 14, 2025, Speech (ECF 19-12) ......................... 1955

Executive Order 14237 (ECF 19-13) ................................................ 1978

Fact Sheet Regarding Paul, Weiss LLP (ECF 19-14) ........................ 1982

Politico Article (Mar. 19, 2025) (ECF 19-15) ................................... 1985

Truth Social Post (Mar. 20, 2025) (ECF 19-17) ................................ 1992

Executive Order 14244 (ECF 19-18) ................................................ 1995

Presidential Memorandum Regarding Preventing Abuses
of the Legal System and the Federal Court (ECF 19-19) ................... 1998

Presidential Memorandum Regarding Rescinding Security
Clearances and Access to Classified Information
from Specified Individuals (ECF 19-20) ............................................... 2002

The Hill Article (Mar. 25, 2025) (ECF 19-21) .................................... 2005

Executive Order 14246 (ECF 19-22) .................................................... 2011

Fact Sheet Regarding Jenner & Block LLP (ECF 19-23) ................... 2015

Truth Social Post (Mar. 28, 2025) (ECF 19-27) ................................ 2018

Truth Social Post (Apr. 1, 2025) (ECF 19-28) .................................... 2021

Truth Social Post (Apr. 2, 2025) (ECF 19-29) .................................... 2024

Perrelli Declaration (ECF 19-30) ........................................................ 2026

Memorandum from Attorney General Bondi
and Director Vought (ECF 21-1) ......................................................... 2057

Defendants' Response to Plaintiff's Statement
of Undisputed Material Facts (ECF 95-1) ......................................... 2059

Transcript of Apr. 28, 2025, Hearing on
Motion for Summary Judgment (ECF 118) ....................................... 2064

Notice of Recent Development (ECF 137) .......................................... 2155

Memorandum Opinion (ECF 138) ....................................................... 2157

Order Granting Summary Judgment and
Denying Motion to Dismiss (ECF 139) .............................................. 2209

Order on Motion for Clarification (ECF 143) .................................... 2214

Defendants' Status Report (ECF 144) ................................................ 2217

Notice of Appeal (ECF 145) ................................................................ 2240

## VOLUME V

***Wilmer Cutler Pickering Hale and Dorr LLP*** v.
***Executive Office of the President,***
**Case No. 25-5277, D. Ct. No. 1:25-cv-00917 (RJL)** ........................**2241**

Docket Sheet ................................................................. 2242

Complaint (ECF 1) ........................................................ 2268

Executive Order 14250 (ECF 1-1) ................................. 2331

Fact Sheet Regarding WilmerHale LLP (ECF 1-2) ........... 2336

Berman Declaration (ECF 3-2) ...................................... 2339

Temporary Restraining Order (ECF 10) .......................... 2373

Transcript of March 28, 2025, Hearing
on Motion for TRO (Mar. 8, 2025) (ECF 11) ................... 2378

Supplemental Berman Declaration (ECF 16-3) ................ 2427

Numbered Exhibits in Support of
WilmerHale's Motion for Summary Judgment (ECF 16-4) .... 2437

Expert Report of J. William Leonard (ECF 16-5) ............. 2734

Transcript of April 23, 2025, Hearing on Motion to Dismiss
and Motion for Summary Judgment (ECF 106) ................ 2759

Letter from Clement & Murphy PLLC
to Hon. Richard Leon (May 13, 2025) (ECF 109) ............ 2803

Opinion on Motion for Summary Judgment (ECF 110) ...... 2804

Order Granting Motion for Summary Judgment and
Denying Motion to Dismiss (ECF 111) ........................... 2877

Order Granting Motion to Clarify
and Motion to Amend (ECF 120) ................................... 2880

Amended Judgment (ECF 121) ....................................... 2886

Defendants' Status Report (ECF 123) ................................................. 2890

Notice of Appeal (ECF 125) ............................................................... 2892

## VOLUME VI

**Materials from *Susman Godfrey LLP* v.
*Executive Office of the President*,
Case No. 25-5310, 1:25-cv-01107 (LLA)** ........................................ **2893**

Docket Sheet ...................................................................................... 2894

Bloomberg Article (Apr. 9, 2025) (ECF 10-3) ................................... 2951

Srinivasan Declaration in Support of
Temporary Restraining Order (ECF 10-14) ....................................... 2955

Order Granting TRO (ECF 15) ........................................................... 2990

Transcript of Apr. 15, 2025, Hearing on TRO (ECF 19) .................... 2993

Order Extending TRO (ECF 30) ......................................................... 3067

Plaintiff's Statement of Undisputed Material Facts (ECF 51-2) ....... 3069

Srinivasan Declaration in Support of
Motion for Summary Judgment (ECF 51-3) ...................................... 3110

Executive Order 14263 (ECF 51-6) .................................................... 3145

Fact Sheet Regarding Susman Godfrey LLP (ECF 51-7) ................... 3149

X Post (Nov. 13, 2020) (ECF 51-10) .................................................. 3152

X Post (Dec. 15, 2020) (ECF 51-11) ................................................... 3154

X Post (Dec. 16, 2020) (ECF 51-12) ................................................... 3156

CNN Article (Apr. 19, 2023) (ECF 51-13) .......................................... 3158

CNN Article (Apr. 18, 2023) (ECF 51-14) .......................................... 3165

Placeholder for Forbes Video (Apr. 10, 2025) (ECF 51-36) ............... 3168

Placeholder for YouTube Video (Apr. 8, 2025) (ECF 51-44)............... 3169

Truth Social Post (Apr. 11, 2025, 09:21 AM) (ECF 51-45) ................ 3171

Truth Social Post (Apr. 11, 2025, 09:19 AM) (ECF 51-46) ................ 3174

Reuters Article (Apr. 11, 2025) (ECF 51-47) .................................... 3177

The Susman Godfrey Prize (ECF 51-52) ........................................... 3180

Email from Richard Lawson (Apr. 16, 2025) (ECF 51-53) ................ 3185

Defendants' Response to Plaintiff's Statement
of Undisputed Material Facts (ECF 159-1) ....................................... 3189

Declaration of Richard Lawson and Exhibits in Support
of Defendants' Opposition to Summary Judgment (ECF 159-2)........ 3198

Order Adopting Streamlined Procedures (ECF 176).......................... 3272

Transcript of May 8, 2025, Hearing on Motion
for Summary Judgment (ECF 177)..................................................... 3274

Amended Complaint (ECF 178) ......................................................... 3362

Memorandum Opinion (ECF 206)...................................................... 3482

Order Denying Motion to Dismiss
and Granting Summary Judgment (ECF 207)................................... 3535

July 29, 2025, Minute Order Granting Defendants'
Unopposed Motion to Clarify (ECF 209)........................................... 3540

Notice of Appeal (ECF 211)............................................................... 3541

# Materials relating to

# Perkins Coie LLP

# v.

# U.S. Department of Justice

# Case No. 25-5241

APPEAL,CLOSED,TYPE−D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25−cv−00716−BAH

PERKINS COIE LLP v. U.S. DEPARTMENT OF JUSTICE et al

Assigned to: Judge Beryl A. Howell

Case in other court:  USCA, 25−05241

Cause: 28:1331 Fed. Question

Date Filed: 03/11/2025
Date Terminated: 05/05/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**PERKINS COIE LLP**                    represented by

**Amy Mason Saharia**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5847
Fax: 202−434−5029
Email: asaharia@wc.com
*ATTORNEY TO BE NOTICED*

**Charles Davant , IV**
WILLIAMS & CONNOLLY
680 Maine Avenue, S.W.
Washington, DC 20024
202−434−5695
Email: cdavant@wc.com
*ATTORNEY TO BE NOTICED*

**Christopher Nicholas Manning**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
202−434−5121
Fax: 202−434−5029
Email: cmanning@wc.com
*ATTORNEY TO BE NOTICED*

**David Simon Kurtzer−Ellenbogen**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5676
Fax: 202−434−5029
Email: dkurtzer@wc.com
*ATTORNEY TO BE NOTICED*

**Eden Schiffmann**
WILLIAMS & CONNOLLY
680 Maine Avenue S.W.
Washington, DC 20024
202−434−5977
Email: eschiffmann@wc.com
*ATTORNEY TO BE NOTICED*

**F. Lane Heard , III**
WILLIAMS & CONNOLLY
680 Maine Avenue, SW
Washington DC, DC 20024
202−434−5114
Fax: 202−434−5029
Email: lheard@wc.com
*ATTORNEY TO BE NOTICED*

JA 2

**Jesse T. Smallwood**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5162
Email: jsmallwood@wc.com
*ATTORNEY TO BE NOTICED*

**Krystal Commons Durham**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5493
Email: kcommons@wc.com
*ATTORNEY TO BE NOTICED*

**Malachi Brown Jones , Jr.**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5445
Email: mjones@wc.com
*ATTORNEY TO BE NOTICED*

**Matthew Brian Nicholson**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5189
Email: mnicholson@wc.com
*ATTORNEY TO BE NOTICED*

**Ryan Thomas Scarborough**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5173
Fax: 202−434−5029
Email: rscarborough@wc.com
*ATTORNEY TO BE NOTICED*

**Dane Hal Butswinkas**
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
202−434−5110
Fax: 202−434−5029
Email: dbutswinkas@wc.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**U.S. DEPARTMENT OF JUSTICE**    represented by    **Douglas C. Dreier**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
601 D Street NW
Washington, DC 20053
(202) 252−2551
Email: douglas.c.dreier@usdoj.gov
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA 3**

**Richard Lawson**
DOJ−USAO
950 Pennsylvania Avenue, NW
Washington, DC 20530−0001
202−445−8042
Email: rlawson@americafirstpolicy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
DOJ−CIV
1100 L Street, NW
Room 7500
Washington, DC 20530
202−514−4107
Email: terry.henry@usdoj.gov
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**FEDERAL COMMUNICATIONS COMMISSION**    represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF MANAGEMENT AND BUDGET**    represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**    represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA 4**

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF PERSONNEL MANAGEMENT**                 represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**GENERAL SERVICES ADMINISTRATION**                 represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE**     represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES OF AMERICA**    represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAMELA J. BONDI**    represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANDREA R. LUCAS**    represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHARLES EZELL**    represented by    **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*

**JA 6**

*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**STEPHEN EHEKIAN**                    represented by  **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**TULSI GABBARD**                    represented by  **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ALL FEDERAL AGENCIES AND**        represented by  **Richard Lawson**
**AGENCY HEADS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BRENDAN T. CARR**                   represented by  **Douglas C. Dreier**
(See above for address)
*TERMINATED: 03/18/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA 7**

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **RUSSELL T. VOUGHT**<br>*in his official capacity as Acting Director* | represented by | **Douglas C. Dreier**<br>(See above for address)<br>*TERMINATED: 03/18/2025*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*TERMINATED: 03/21/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **STATE OF WASHINGTON** | represented by | **Emma Grunberg**<br>WASHINGTON OFFICE OF THE<br>ATTORNEY GENERAL<br>PO Box 40100<br>1125 Washington St. SE<br>Olympia, WA 98504−0100<br>206−521−3222<br>Email: emma.grunberg@atg.wa.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Kelly A. Paradis**
WASHINGTON OFFICE OF THE
ATTORNEY GENERAL
PO Box 40100
1125 Washington St. SE
Olympia, WA 98504−0100
206−389−3105
Email: Kelly.Paradis@atg.wa.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maureen Johnston**
WASHINGTON STATE ATTORNEY
GENERAL
800 Fifth Avenue
Suite 2000
Seattle, WA 98104
206−389−2513
Email: maureen.johnston@atg.wa.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**AMERICAN CIVIL LIBERTIES
UNION**                               represented by   **Cecillia D. Wang**
                                                       ACLU
                                                       425 California St
                                                       Suite 700
                                                       San Francisco, CA 94104
                                                       415−343−0775
                                                       Email: cwang@aclu.org
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

Amicus

**AMERICAN CIVIL LIBERTIES
UNION OF THE DISTRICT OF
COLUMBIA**                            represented by   **Cecillia D. Wang**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

Amicus

**CATO INSTITUTE**                    represented by   **Cecillia D. Wang**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

Amicus

**ELECTRONIC FRONTIER
FOUNDATION**                          represented by   **Cecillia D. Wang**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

Amicus

**FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION**               represented by   **Cecillia D. Wang**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

Amicus

**INSTITUTE FOR JUSTICE**             represented by   **Cecillia D. Wang**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

Amicus

**KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA
UNIVERSITY**                          represented by   **Cecillia D. Wang**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

Amicus

**NATIONAL COALITION AGAINST
CENSORSHIP**                          represented by   **Cecillia D. Wang**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

Amicus

**REPORTERS COMMITTEE FOR
THE FREEDOM OF THE PRESS**            represented by   **Cecillia D. Wang**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**JA 9**

**Amicus**

**RUTHERFORD INSTITUTE**  represented by  **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Amicus**

**SOCIETY FOR THE RULE OF LAW INSTITUTE**  represented by  **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Amicus**

**FORMER DC BAR PRESIDENTS**  represented by  **Andrea C. Ferster**
ANDREA C. FERSTER
68 Beebe Pond Rd
Canaan, NY 12029
202−669−6311
Email: andreaferster@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Amicus**

**363 LAW PROFESSORS**  represented by  **Phillip Robert Malone**
559 Nathan Abbott Way
Stanford, CA 94305−8610
650−725−6369
Email: pmalone@law.stanford.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Amicus**

**LAWYERS DEFENDING AMERICAN DEMOCRACY, INC**  represented by  **Aderson Bellegarde Francois**
GEORGETOWN UNIVERSITY LAW
CENTER
600 New Jersey Avenue, NW
Suite 352
Washington, DC 20001
(202) 661−6721
Fax: 202−662−9634
Email: aderson.francois@georgetown.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Amicus**

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**  represented by  **Edward G. Caspar**
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
202−662−8390
Email: ecaspar@lawyerscommittee.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adria Jasmine Bonillas**
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW
Suite 900

Washington, DC 20005
202−662−8317
Email: abonillas@lawyerscommittee.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**NATIONAL ASSOCIATION OF**          represented by **Kobie Flowers**
**CRIMINAL DEFENSE LAWYERS**                          FLOWERS KELLER LLP
                                                      1601 Connecticut Avenue Northwest
                                                      20009
                                                      Washington, DC 20009
                                                      202−521−8742
                                                      Email: kflowers@flowerskeller.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**NEW YORK COUNCIL OF**              represented by **Noam Biale**
**DEFENSE LAWYERS**                                   SHER TREMONTE LLP
                                                      90 Broad Street
                                                      23rd Floor
                                                      New York, NY 10004
                                                      212−202−2600
                                                      Email: nbiale@shertremonte.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**346 FORMER JUDGES**                represented by **Donald Manwell Falk**
                                                      4416 Harbord Dr
                                                      Oakland, CA 94618
                                                      650−269−2020
                                                      Email: donald.falk@gmail.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                     **Sara E. Kropf**
                                                      KROPF MOSELEY SCHMITT PLLC
                                                      1100 H Street NW
                                                      Suite 1220
                                                      Washington, DC 20005
                                                      202−627−6900
                                                      Email: sara@kmlawfirm.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**KENNETH C. PICKERING**             represented by **KENNETH C. PICKERING**
                                                      Pickering Legal LLC
                                                      100 Grove Street
                                                      Worcester, MA 01605
                                                      PRO SE

<u>Amicus</u>

**504 LAW FIRMS**                    represented by **Donald Beaton Verrilli , Jr**
                                                      MUNGER, TOLLES & OLSON LLP
                                                      1155 F Street, NW
                                                      7th Floor
                                                      Washington, DC 20004
                                                      213−683−9507
                                                      Email: donald.verrilli@mto.com

**JA 11**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan P. Eimer**
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660−7600
Fax: (312) 692−1718
Email: neimer@eimerstahl.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**LITIGATION FIRMS**                    represented by  **Kathryn A. Reilly**
WHEELER TRIGG O'DONNELL LLP
370 17th Street
Suite 4500
Denver, CO 80202−5647
303−244−1800
Email: reilly@wtotrial.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**BAR ASSOCIATIONS**                    represented by  **Eric John Galvez Paredes**
PROTECT DEMOCRACY PROJECT
82 Nassau Street
#601
New York, NY 10038
202−579−4582
Email: jparedes@dirllp.com
*ATTORNEY TO BE NOTICED*

**Hayden Johnson**
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW
Ste 163
Washington, DC 20006
202−870−3210
Email: hayden.johnson@protectdemocracy.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**NAACP LEGAL DEFENSE &**                represented by  **Samuel Spital**
**EDUCATIONAL FUND, INC.**                               NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street
5th Floor
New York, NY 10006
(212) 965−2200
Email: sspital@naacpldf.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**GENERAL COUNSEL AMICI**                represented by  **Andrew George Pappas**
OSBORN MALEDON, P.A.
2929 N. Central Avenue
Suite 2000
Phoenix, AZ 85012
602−640−9398

Fax: 602−640−9050
Email: apappas@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Austin Tyler Marshall**
HERRERA ARELLANO LLP
1001 N Central Ave
Suite 404
Phoenix, AZ 85004
928−446−4410
Email: austin@ha−firm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David B. Rosenbaum**
OSBORN MALEDON, P.A.
2929 N. Central Avenue
Suite 2000
Phoenix, AZ 85012
602−640−9345
Fax: 602−640−9050
Email: drosenbaum@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric M. Fraser**
OSBORN MALEDON P.A.
2929 North Central Avenue
Suite 2000
Phoenix, AZ 85012
602−640−9321
Fax: 602−640−9050
Email: efraser@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph N. Roth**
OSBORN MALEDON, P.A
2929 N. Central Avenue
Suite 2100
Phoenix, AZ 85012
602−640−9320
Fax: 602−640−9050
Email: jroth@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua James Messer**
OSBORN MALEDON, P.A.
2929 N. Central Avenue
Ste 2100
Phoenix, AZ 85012
602−640−9326
Fax: 602−640−9050
Email: jmesser@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Ruth O'Grady**

**JA 13**

OSBORN MALEDON PA
2929 N Central Ave
Suite 2000
Phoenix, AZ 85012
602−640−9000
Fax: 602−640−9050
Email: mogrady@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**INTERNATIONAL ACADEMY OF**          represented by   **Patrick Michael Regan**
**TRIAL LAWYERS**                                      REGAN ZAMBRI & LONG, PLLC
                                                       1919 M Street, NW
                                                       Suite 350
                                                       Washington, DC 20036
                                                       (202) 463−3030
                                                       Fax: (202) 463−0667
                                                       Email: pregan@reganfirm.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**FORMER SENIOR GOVERNMENT**          represented by   **Justin A. Nelson**
**OFFICIALS**                                          SUSMAN GODFREY LLP
                                                       1000 Louisiana Street
                                                       Suite 5100
                                                       Houston, TX 77002
                                                       713−653−7895
                                                       Fax: 713−654−6666
                                                       Email: jnelson@susmangodfrey.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**23 NONGOVERNMENTAL**                 represented by   **William E. Zapf**
**ORGANIZATIONS**                                      KAISER PLLC
                                                       1099 14th Street, NW
                                                       Ste 8th Floor West
                                                       Washington, DC 20005
                                                       202−869−1300
                                                       Email: wzapf@coleschotz.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**MEDIA ORGANIZATIONS AND**           represented by   **Mason Andrew Kortz**
**PRESS FREEDOM ADVOCATES**                            HARVARD LAW SCHOOL
                                                       Cyberlaw Clinic
                                                       Lewis Hall, 4th Floor
                                                       1557 Massachusetts Avenue
                                                       Cambridge, MA 02138
                                                       617−495−2845
                                                       Email: mkortz@law.harvard.edu
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**FRED T. KOREMATSU CENTER**          represented by   **Jim Davy**
**FOR LAW AND EQUALITY**                               JIM DAVY
                                                       P.O. Box 15216

Philadelphia, PA 19125
215−792−3579
Email: jimdavy@allriselaw.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Seungchul Chang**
FRED T. KOREMATSU CENTER FOR
LAW AND EQUALITY
UC Irvine School of Law
401 E. Peltason Dr.
Ste 1000
Irvine, CA 92697
206−390−5676
Email: rchang@law.uci.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremiah Chin**
UNIVERSITY OF WASHINGTON
School of Law
9622 S 221st Pl
Kent, WA 98031
480−334−7703
Email: jerchin@uw.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Levin**
RONALD A. PETERSON LAW CLINIC
Civil Rights Clinic
Seattle University School of Law
901 12th Ave, Sullivan Hall
Ste Sllh 315
Seattle, WA 98115
206−398−4167
Fax: 206−398−4261
Email: levinje@seattleu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Lee**
RONALD A. PETERSON LAW CLINIC
Center for Civil Rights and Critical Justice
1112 E. Columbia St.
Seattle, WA 98122
206−398−4394
Email: leeme@seattleu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan A. McMahon**
FRED T. KOREMATSU CENTER FOR
LAW AND EQUALITY
UC Irvine School of Law
401 E. Peltason Dr.
Ste 1000
Irvine, CA 92697
949−824−0066
Email: smcmahon@law.uci.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **334 SOLO AND SMALL FIRM LAWYERS** | represented by | **Carolyn Elefant**<br>LAW OFFICES OF CAROLYN ELEFANT PLLC<br>1440 G Street, NW<br>8th Floor<br>Washington, DC 20005<br>(202) 297−6100<br>Email: carolyn@carolynelefant.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **AMERICA'S FUTURE** | represented by | **William Jeffrey Olson**<br>WILLIAM J. OLSON, P.C.<br>370 Maple Avenue West<br>Suite 4<br>Vienna, VA 22180<br>(703) 356−5070<br>Fax: (703) 356−5085<br>Email: wjo@mindspring.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **GUN OWNERS OF AMERICA, INC.** | represented by | **William Jeffrey Olson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **GUN OWNERS FOUNDATION** | represented by | **William Jeffrey Olson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **GUN OWNERS OF CALIFORNIA** | represented by | **William Jeffrey Olson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **JUDICIAL ACTION GROUP** | represented by | **William Jeffrey Olson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND** | represented by | **William Jeffrey Olson**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **AARON H. CAPLAN** | represented by | **Stephen Craig Leckar**<br>KALBIAN HAGERTY LLP<br>888 17th Street, NW<br>Suite 1200<br>Washington, DC 20006<br>202−223−5600<br>Email: sleckar@kalbianhagerty.com |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**LEGAL ETHICS PROFESSORS**          represented by  **Kelsi B. Corkran**
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
600 New Jersey Avenue NW
Washington, DC 20001
202−661−6728
Fax: 202−661−6730
Email: kbc74@georgetown.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Wilfred Mead**
GEORGETOWN UNIVERSITY LAW
CENTER
Institute for Constitutional Advocacy and
Protection
600 New Jersey Ave NW
Washington, DC 20001
202−662−9765
Email: jm3468@georgetown.edu
*ATTORNEY TO BE NOTICED*

**Amicus**

**RICH MAY PC**          represented by  **Carolyn Elefant**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Frank N. Gaeta**
RICH MAY, P.C.
Massachusetts
176 Federal Street, 6th Floor
Boston, MA 02110
617−556−3838
Email: fgaeta@richmaylaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/11/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC−11534207) filed by PERKINS COIE LLP. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Summons, # 3 Summons Summons, # 4 Summons Summons, # 5 Summons Summons, # 6 Summons Summons, # 7 Summons Summons, # 8 Summons Summons, # 9 Summons Summons, # 10 Summons Summons, # 11 Summons Summons, # 12 Summons Summons, # 13 Summons Summons, # 14 Summons Summons, # 15 Summons Summons, # 16 Summons Summons, # 17 Summons Summons, # 18 Summons Summons)(Butswinkas, Dane) (Entered: 03/11/2025) |
| 03/11/2025 | 2 | MOTION for Temporary Restraining Order by PERKINS COIE LLP. (Attachments: # 1 Memorandum in Support of the Motion for a Temporary Restraining Order, # 2 Declaration of David J. Burman, # 3 Declaration of Bruce Green, # 4 Declaration of Robert Hirshon, # 5 Declaration of Roy Simon, # 6 Declaration of Chris Manning, # 7 Exhibit Local Rule 65.1 Certification, # 8 Text of Proposed Order Granting TRO)(Butswinkas, Dane) (Entered: 03/11/2025) |

**JA 17**

| 03/11/2025 | | Case Assigned to Judge Beryl A. Howell. (zjd) (Entered: 03/11/2025) |
|---|---|---|
| 03/11/2025 | 3 | NOTICE of Appearance by Christopher Nicholas Manning on behalf of PERKINS COIE LLP (Manning, Christopher) (Entered: 03/11/2025) |
| 03/11/2025 | 4 | NOTICE of Appearance by Amy Mason Saharia on behalf of PERKINS COIE LLP (Saharia, Amy) (Entered: 03/11/2025) |
| 03/11/2025 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint. The following error needs correction: Noncompliance with LCvR 5.1(c). Please file a Notice of Errata stating the error and attach the corrected initiating pleading to include the name & full residence address of each party and file using the event Errata. (zjd) (Entered: 03/11/2025) |
| 03/11/2025 | 5 | SUMMONS (17) Issued Electronically as to All Defendants, U.S. Attorney, and U.S. Attorney General. (Attachments: # 1 Notice and Consent) (zjd) (Entered: 03/11/2025) |
| 03/11/2025 | 6 | NOTICE of Appearance by Eden Schiffmann on behalf of PERKINS COIE LLP (Schiffmann, Eden) (Entered: 03/11/2025) |
| 03/11/2025 | | MINUTE ORDER (paperless) DIRECTING the parties to appear for a hearing on plaintiff's 2 Motion for Temporary Restraining Order on March 12, 2025, at 2:00 PM, in Courtroom 26A− In Person before Judge Beryl A. Howell, and ORDERING plaintiff to serve defendants with a copy of this Order immediately upon receipt to ensure that counsel for defendants has sufficient notice to appear at the hearing. Signed by Judge Beryl A. Howell on March 11, 2025. (lcbah2) (Entered: 03/11/2025) |
| 03/11/2025 | | Set/Reset Hearings: Motion Hearing set for 3/12/2025 at 2:00 PM in Courtroom 26− In Person (Audio Line Available) before Judge Beryl A. Howell. (mac) (Entered: 03/12/2025) |
| 03/12/2025 | | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for March 12, 2025 at 2:00PM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB), available here: **Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (mac) (Entered: 03/12/2025)** |
| 03/12/2025 | 7 | NOTICE of Appearance by Matthew Brian Nicholson on behalf of PERKINS COIE LLP (Nicholson, Matthew) (Entered: 03/12/2025) |
| 03/12/2025 | 8 | NOTICE of Appearance by David Simon Kurtzer−Ellenbogen on behalf of PERKINS COIE LLP (Kurtzer−Ellenbogen, David) (Entered: 03/12/2025) |
| 03/12/2025 | 9 | NOTICE of Appearance by Krystal Commons Durham on behalf of PERKINS COIE LLP (Durham, Krystal) (Entered: 03/12/2025) |
| 03/12/2025 | 10 | NOTICE of Appearance by Douglas C. Dreier on behalf of All Defendants (Dreier, Douglas) (Entered: 03/12/2025) |
| 03/12/2025 | 11 | NOTICE of Appearance by Jesse T. Smallwood on behalf of PERKINS COIE LLP (Smallwood, Jesse) (Entered: 03/12/2025) |
| 03/12/2025 | 12 | NOTICE of Appearance by Kelly A. Paradis on behalf of STATE OF WASHINGTON (Paradis, Kelly) (Entered: 03/12/2025) |
| 03/12/2025 | 13 | NOTICE of Appearance by Maureen Johnston on behalf of STATE OF WASHINGTON (Johnston, Maureen) (Entered: 03/12/2025) |
| 03/12/2025 | 14 | NOTICE of Appearance by Emma Grunberg on behalf of STATE OF WASHINGTON (Grunberg, Emma) (Entered: 03/12/2025) |
| 03/12/2025 | 15 | AMICUS BRIEF *in support of Plaintiff's Motion for Temporary Restraining Order* by STATE OF WASHINGTON. (Grunberg, Emma) (Entered: 03/12/2025) |

| 03/12/2025 | 16 | NOTICE of Appearance by Terry Marcus Henry on behalf of All Defendants (Henry, Terry) (Entered: 03/12/2025) |
| 03/12/2025 | 17 | NOTICE of Appearance by Charles Davant, IV on behalf of PERKINS COIE LLP (Davant, Charles) (Entered: 03/12/2025) |
| 03/12/2025 | 18 | NOTICE of Appearance by Ryan Thomas Scarborough on behalf of PERKINS COIE LLP (Scarborough, Ryan) (Entered: 03/12/2025) |
| 03/12/2025 | 19 | NOTICE of Appearance by F. Lane Heard, III on behalf of PERKINS COIE LLP (Heard, F.) (Entered: 03/12/2025) |
| 03/12/2025 | 20 | ERRATA by PERKINS COIE LLP re 1 Complaint,,. (Attachments: # 1 Exhibit 1. Complaint)(Butswinkas, Dane) (Entered: 03/12/2025) |
| 03/12/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 3/12/2025 in re 2 Motion for Temporary Restraining Order. The Court Heard Oral Arguments From The Parties. For The Reasons Stated On The Record, The Court Will Grant 2 Motion For Temporary Restraining Order. Parties Proposed Briefing Schedule Due No Later Than 4:00PM on 3/13/2025. (Court Reporter ELIZABETH DAVILA.) (mac) (Entered: 03/12/2025) |
| 03/12/2025 | 21 | ORDER GRANTING plaintiff's 2 Motion for a Temporary Restraining Order. See Order for further details. Signed by Judge Beryl A. Howell on March 12, 2025. (lcbah2) (Entered: 03/12/2025) |
| 03/13/2025 | 22 | TRANSCRIPT OF HEARING, before Judge Beryl A. Howell, held on 3−12−2025; Page Numbers: 1 − 131. Date of Issuance: 3−13−2025. Court Reporter: Elizabeth Davila, Telephone number: 202−354−3242, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/3/2025. Redacted Transcript Deadline set for 4/13/2025. Release of Transcript Restriction set for 6/11/2025.(Davila, Elizabeth) (Entered: 03/13/2025) |
| 03/13/2025 | | Set/Reset Deadlines: Parties Joint Status Report due by 3/14/2025. (mac) (Entered: 03/13/2025) |
| 03/13/2025 | 23 | Joint MOTION for Extension of Time to *File Joint Status Report* by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order Granting Motion to Enlarge Time)(Butswinkas, Dane) (Entered: 03/13/2025) |
| 03/13/2025 | | MINUTE ORDER (paperless) GRANTING the parties' 23 Joint Motion for Enlargement of Time to File Joint Status Report and DIRECTING the parties to file jointly, by 3:00 PM on March 14, 2025, a joint status report proposing a schedule to govern further proceedings in this case. Signed by Judge Beryl A. Howell on March 13, 2025. (lcbah2) (Entered: 03/13/2025) |
| 03/14/2025 | 24 | NOTICE of Appearance by Richard Lawson on behalf of All Defendants (Lawson, Richard) (Entered: 03/14/2025) |
| 03/14/2025 | 25 | Joint STATUS REPORT by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order Extending Injunction and Expediting Dispositive Motion Proceedings)(Butswinkas, Dane) (Entered: 03/14/2025) |

| | | |
|---|---|---|
| 03/14/2025 | 26 | ORDER EXTENDING duration of 21 injunction and ISSUING schedule for expedited dispositive motions briefing. See Order for further details. Signed by Judge Beryl A. Howell on March 14, 2025. (lcbah2) (Entered: 03/14/2025) |
| 03/14/2025 | | Set/Reset Deadlines: Parties Dispositive Motions And Opening Briefs In Support due by 4/2/2025. Parties Oppositions due no later than 12:00PM on 4/16/2025. Parties Replies due no later than 4:00PM on 4/18/2025. (mac) (Entered: 03/14/2025) |
| 03/14/2025 | 27 | STATUS REPORT by PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, TULSI GABBARD, U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. (Henry, Terry) (Entered: 03/14/2025) |
| 03/18/2025 | 28 | NOTICE OF WITHDRAWAL OF APPEARANCE as to PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, TULSI GABBARD, U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. Attorney Douglas C. Dreier terminated. (Dreier, Douglas) (Entered: 03/18/2025) |
| 03/18/2025 | 29 | STATUS REPORT by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Status Report Attachment 1, # 2 Status Report Attachment 2)(Lawson, Richard) (Entered: 03/18/2025) |
| 03/18/2025 | 30 | MOTION to Clarify re 21 Order *Motion To Clarify Temporary Restraining Order* by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order Proposed Order)(Manning, Christopher) (Entered: 03/18/2025) |
| 03/19/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiff's 30 Motion to Clarify Temporary Restraining Order, which appropriately raises promptly a difference of interpretation of the Court's 21 Injunction Order for clarification to ensure full compliance with the obligations imposed, ISSUING the following ORDER regarding defendants' obligations under the Court's 21 Injunction Order expressly directing (1) defendants to "communicate to *every* recipient of a request for disclosure of any relationship with Perkins Coie LLP or any person associated with the firm..." that "such request is rescinded," *id.* at 2 (emphasis supplied), regardless of which agency subject to Executive Order 14230 made the request, and (2) four of the named defendants, namely, U.S. Department of Justice; U.S. Attorney General Pamela Bondi; the Office of Management and Budget ("OMB"); and OMB Director Russell Vought, to "immediately issue guidance to all other agencies subject to Executive Order 14230 to suspend and rescind *any implementation or enforcement*" of the enjoined portions of the Executive Order, *id.* (emphasis supplied): <br><br> (1) DIRECTING defendants U.S. Department of Justice; Pamela Bondi, in her official capacity as U.S. Attorney General; the Office of Management and Budget; and Russell Vought, in his official capacity as Director of the Office of Management and Budget, to immediately issue guidance to all other agencies subject to Executive Order 14230 directing them immediately to (a) communicate to every recipient of a request for disclosure of any relationship with Perkins Coie LLP or any person associated with the firm, made pursuant to Section 3(a) of Executive Order 14230, that such request is rescinded until further order of this Court; and (b) cease making such requests for disclosure, pursuant to Section 3(a) of Executive Order 14230, until further order of the Court; and <br><br> (2) FURTHER DIRECTING defendants to file, by 12:00 PM on March 20, 2025, a status report describing the steps taken to ensure compliance with this Order and certifying compliance with its requirements, in light of the fact that "some agencies have requested that contractors respond to disclosure requests as soon as Thursday, March 20, 2025." Plaintiff's 30 Motion ¶ 10. |

**JA 20**

| | | Signed by Judge Beryl A. Howell on March 19, 2025. (lcbah2) (Entered: 03/19/2025) |
|---|---|---|
| 03/19/2025 | | Set/Reset Deadlines: Defendants Status Report due no later than 12:00PM on 3/20/2025. (mac) (Entered: 03/19/2025) |
| 03/20/2025 | 31 | STATUS REPORT by PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, TULSI GABBARD, U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. (Henry, Terry) (Entered: 03/20/2025) |
| 03/20/2025 | 32 | Supplemental STATUS REPORT by PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, TULSI GABBARD, U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. (Attachments: # 1 Attachment)(Henry, Terry) (Entered: 03/20/2025) |
| 03/21/2025 | 33 | NOTICE OF WITHDRAWAL OF APPEARANCE as to PAMELA J. BONDI, BRENDAN CARR, RUSSELL T. VOUGHT, ANDREA R. LUCAS, CHARLES EZELL, STEPHEN EHEKIAN, TULSI GABBARD, U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, OFFICE OF PERSONNEL MANAGEMENT, GENERAL SERVICES ADMINISTRATION, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, UNITED STATES OF AMERICA. Attorney Terry Marcus Henry terminated. (Henry, Terry) (Entered: 03/21/2025) |
| 03/21/2025 | 34 | MOTION to Disqualify Judge by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Text of Proposed Order Proposed Order)(Lawson, Richard) (Entered: 03/21/2025) |
| 03/26/2025 | 35 | NOTICE of Appearance by Malachi Brown Jones, Jr on behalf of PERKINS COIE LLP (Jones, Malachi) (Entered: 03/26/2025) |
| 03/26/2025 | 36 | MEMORANDUM OPINION & ORDER DENYING defendants' 34 Motion to Disqualify Judge. See Memorandum Opinion & Order for further details. Signed by Judge Beryl A. Howell on March 26, 2025. (lcbah2) (Entered: 03/26/2025) |
| 03/28/2025 | 37 | LEAVE TO FILE DENIED− Janice Wolk Grenadier's Motion to Intervene. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to file denied." Signed by Judge Beryl A. Howell on 3/28/2025. (mg) (Entered: 03/31/2025) |
| 03/31/2025 | 38 | LEAVE TO FILE DENIED− Pickering Legal LLC Motion for Leave to File Amicus Brief. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class mail. "Leave to file denied 3/31/25 for failure to state parties' positions on motion, as required by D.D.C. LCvR 7(o)(2)." Signed by Judge Beryl A. Howell on 3/31/2025. (mg) (Entered: 03/31/2025) |
| 04/02/2025 | 39 | MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* by PERKINS COIE LLP. (Attachments: # 1 Memorandum in Support of Plaintiff's Motion for Summary Judgment, # 2 Statement of Facts, # 3 Declaration of David J. Burman, # 4 Declaration of Chris Manning, # 5 Exhibit Expert Report of Bruce A. Green, # 6 Exhibit Expert Report of Robert E. Hirshon, # 7 Exhibit Expert Report of Roy D. Simon, Jr., # 8 Exhibit Expert Report of J. William Leonard, # 9 Text of Proposed Order Granting Plaintiff's Motion)(Butswinkas, Dane). Added MOTION for Declaratory Judgment, MOTION for Permanent Injunction on 4/3/2025 (mg). (Entered: 04/02/2025) |
| 04/02/2025 | 40 | ENTERED IN ERROR.....Unopposed MOTION for Leave to File Amicus Brief by The American Civil Liberties Union, The American Civil Liberties Union of the |

**JA 21**

| | | |
|---|---|---|
| | | District of Columbia, The Cato Institute, The Electronic Frontier Foundation, The Foundation for Individual Rights and Expression, The Institute for Justice, The Knight First Amendment Institute at Columbia University, The National Coalition Against Censorship, The Reporters Committee for the Freedom of the Press, The Rutherford Institute, The Society for the Rule of Law Institute. (Attachments: # 1 Proposed Order)(Wang, Cecillia) Modified on 4/3/2025; entered in error at the request of counsel (zdp). (Entered: 04/02/2025) |
| 04/02/2025 | 41 | ENTERED IN ERROR.....AMICUS BRIEF by The American Civil Liberties Union, The American Civil Liberties Union of the District of Columbia, The Cato Institute, The Electronic Frontier Foundation, The Foundation for Individual Rights and Expression, The Institute for Justice, The Knight First Amendment Institute at Columbia University, The National Coalition Against Censorship, The Reporters Committee for the Freedom of the Press, The Rutherford Institute, The Society for the Rule of Law Institute. (Wang, Cecillia) Modified on 4/3/2025; entered in error at the request of counsel. (zdp). (Entered: 04/02/2025) |
| 04/02/2025 | 42 | Unopposed MOTION for Leave to File Amicus Brief by FORMER DC BAR PRESIDENTS. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(Ferster, Andrea) (Entered: 04/02/2025) |
| 04/02/2025 | 43 | MOTION to Dismiss by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Lawson, Richard) (Entered: 04/02/2025) |
| 04/02/2025 | 44 | MOTION for Reconsideration re 21 by U.S. DEPARTMENT OF JUSTICE. (Lawson, Richard) Modified on 4/7/2025 to add link (mg). (Entered: 04/02/2025) |
| 04/02/2025 | 45 | Unopposed MOTION for Leave to File Amicus Brief by Amici Curiae 363 Law Professors. (Attachments: # 1 Exhibit Amici Brief, # 2 Text of Proposed Order)(Malone, Phillip). Added MOTION for Declaratory Judgment, MOTION for Permanent Injunction on 4/3/2025 (mg). (Entered: 04/02/2025) |
| 04/03/2025 | 46 | Unopposed MOTION for Leave to File Amicus Brief by The American Civil Liberties Union, The American Civil Liberties Union of the District of Columbia, The Cato Institute, The Electronic Frontier Foundation, The Foundation for Individual Rights and Expression, The Institute for Justice, The Knight First Amendment Institute at Columbia University, The National Coalition Against Censorship, The Reporters Committee for the Freedom of the Press, The Rutherford Institute, The Society for the Rule of Law Institute. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(Wang, Cecillia) (Entered: 04/03/2025) |
| 04/03/2025 | | MINUTE ORDER (paperless), in light of the filing of defendants' 44 Motion for Reconsideration after the briefing schedule proposed by the parties had been entered, which motion seeks reconsideration of "the scope of [this Court's] order granting an injunction on March 12, 2025," *id.* at 2, and is thus related to the merits of the briefing already underway, and in order to limit the separate rounds of briefing in which the parties must engage and the Court must review, DIRECTING plaintiff to include any opposition to this motion in its already−scheduled opposition to defendants' dispositive motion, due by April 16, 2025, *see* 26 Order, and FURTHER DIRECTING defendants to include any reply in support of this motion in their already−scheduled reply in support of their dispositive motion, due by April 18, 2025, *see id.*, both of which filings should comply with the normally−applicable page limits, *see* D.D.C. LCvR 7(e). Signed by Judge Beryl A. Howell on April 3, 2025. (lcbah2) (Entered: 04/03/2025) |
| 04/03/2025 | | MINUTE ORDER (paperless) GRANTING 42 Unopposed Motion for Leave to File Amicus Brief, 45 Unopposed Motion for Leave to File Amicus Brief, and 46 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 3, 2025. (lcbah2) (Entered: 04/03/2025) |
| 04/03/2025 | 47 | REQUEST FOR LEAVE TO FILE REVIEW. The attached document requires leave to file: Non−Party Motion for leave to File Amicus Brief, Pickering Legal LLC. Reason(s): Filer is not a party to the case. (Attachments: # 1 Exhibit) (zdp) (Entered: 04/03/2025) |

| 04/03/2025 | 48 | AMICUS BRIEF by FORMER DC BAR PRESIDENTS. (mg) (Entered: 04/03/2025) |
| 04/03/2025 | 49 | AMICUS BRIEF by AMICI CURIAE 363 LAW PROFESSORS. (mg) (Entered: 04/03/2025) |
| 04/03/2025 | 50 | AMICUS BRIEF by AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, CATO INSTITUTE, ELECTRONIC FRONTIER FOUNDATION, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, INSTITUTE FOR JUSTICE, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, NATIONAL COALITION AGAINST CENSORSHIP, REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS, RUTHERFORD INSTITUTE, SOCIETY FOR THE RULE OF LAW INSTITUTE. (mg) (Entered: 04/03/2025) |
| 04/03/2025 | 51 | Unopposed MOTION for Leave to File Amicus Brief by Lawyers Defending American Democracy. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Francois, Aderson) (Entered: 04/03/2025) |
| 04/03/2025 | 52 | NOTICE of Appearance by Aderson Bellegarde Francois on behalf of Lawyers Defending American Democracy (Francois, Aderson) (Main Document 52 replaced on 4/4/2025) (mg). (Entered: 04/03/2025) |
| 04/03/2025 | | MINUTE ORDER (paperless) GRANTING 51 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 3, 2025. (lcbah2) (Entered: 04/03/2025) |
| 04/03/2025 | | MINUTE ORDER (paperless) re 47 Request for Leave to File Review. Leave to file is granted. The Clerk is directed to file the attached document on the public docket. Signed by Judge Beryl A. Howell on April 3, 2025. (lcbah2) (Entered: 04/03/2025) |
| 04/03/2025 | 53 | MOTION for Leave to File Amicus Brief by LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW. (Attachments: # 1 Proposed Order, # 2 Exhibit Amicus Brief of Lawyers' Committee for Civil Rights Under Law)(Caspar, Edward) (Entered: 04/03/2025) |
| 04/03/2025 | 54 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Adria Bonillas, Filing fee $ 100, receipt number ADCDC−11589817. Fee Status: Fee Paid. by LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Proposed Order)(Caspar, Edward) (Entered: 04/03/2025) |
| 04/03/2025 | 61 | AMICUS BRIEF by LAWYERS DEFENDING AMERICAN DEMOCRACY, INC. (mg) (Entered: 04/04/2025) |
| 04/03/2025 | 62 | MOTION for Leave to file Amicus Brief by PICKERING LEGAL LLC. (mg) (Main Document 62 replaced on 4/7/2025) (mg). (Additional attachment(s) added on 4/7/2025: # 1 Amicus Brief) (mg). (Entered: 04/04/2025) |
| 04/04/2025 | 55 | NOTICE of Appearance by Kobie A. Flowers on behalf of NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS (Flowers, Kobie) (Entered: 04/04/2025) |
| 04/04/2025 | 56 | NOTICE of Appearance by Noam Biale on behalf of NEW YORK COUNCIL OF DEFENSE LAWYERS (Biale, Noam) (Entered: 04/04/2025) |
| 04/04/2025 | 57 | NOTICE of Appearance by Sara E. Kropf on behalf of Amici Curiae 346 Former Judges (Kropf, Sara) (Entered: 04/04/2025) |
| 04/04/2025 | 58 | Unopposed MOTION for Leave to File Amicus Brief by NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, NEW YORK COUNCIL OF DEFENSE LAWYERS. (Attachments: # 1 Exhibit Amici Brief for National Association of Criminal Defense Lawyers and New York Council of Defense Lawyers, # 2 Exhibit Proposed Order)(Biale, Noam) (Entered: 04/04/2025) |
| 04/04/2025 | 59 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Donald M. Falk, Filing fee $ 100, receipt number ADCDC−11591258. Fee Status: Fee Paid. by Amici Curiae 346 Former Judges. (Attachments: # 1 Declaration of Donald Falk, # 2 Exhibit Certificate of Good Standing)(Kropf, Sara) (Entered: 04/04/2025) |

| 04/04/2025 | 60 | Consent MOTION for Leave to File Amicus Brief by Amici Curiae 346 Former Judges. (Attachments: # 1 Exhibit Proposed Brief, # 2 Text of Proposed Order)(Kropf, Sara) (Entered: 04/04/2025) |
|---|---|---|
| 04/04/2025 | 63 | Unopposed MOTION for Leave to File Amicus Brief by 504 Law Firms. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order, # 3 Appendix)(Verrilli, Donald) (Entered: 04/04/2025) |
| 04/04/2025 | 64 | NOTICE of Appearance by Donald Beaton Verrilli, Jr on behalf of 504 LAW FIRMS (Verrilli, Donald) (Entered: 04/04/2025) |
| 04/04/2025 | 65 | NOTICE of Appearance by Andrea C. Ferster on behalf of FORMER DC BAR PRESIDENTS (Ferster, Andrea) (Entered: 04/04/2025) |
| 04/04/2025 | 66 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Nathan P. Eimer, Filing fee $ 100, receipt number ADCDC−11592160. Fee Status: Fee Paid. by 504 LAW FIRMS. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/04/2025) |
| 04/04/2025 | 67 | ERRATA *Appendix* by 504 LAW FIRMS re 63 Motion for Leave to File Amicus Brief. (Verrilli, Donald) (Entered: 04/04/2025) |
| 04/04/2025 | 68 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Andrew G. Pappas, Filing fee $ 100, receipt number ADCDC−11591840. Fee Status: Fee Paid. by GENERAL COUNCIL AMICI. (Attachments: # 1 Declaration Declaration of Andrew G. Pappas)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | 69 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− David B. Rosenbaum, Filing fee $ 100, receipt number ADCDC−11592718. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of David B. Rosenbaum)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | 70 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Eric M. Fraser, Filing fee $ 100, receipt number ADCDC−11592744. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of Eric M. Fraser)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | 71 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joseph N. Roth, Filing fee $ 100, receipt number ADCDC−11592858. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of Joseph N. Roth)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | 72 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joshua J. Messer, Filing fee $ 100, receipt number ADCDC−11592877. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of Joshua J. Messer)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | 73 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Mary R. O'Grady, Filing fee $ 100, receipt number ADCDC−11592892. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of Mary R. O'Grady)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | | MINUTE ORDER (paperless) GRANTING 53 Motion for Leave to File Amicus Brief, 58 Unopposed Motion for Leave to File Amicus Brief, 60 Consent Motion for Leave to File Amicus Brief, and 63 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 4, 2025. (lcbah2) (Entered: 04/04/2025) |
| 04/04/2025 | | MINUTE ORDER (paperless) GRANTING 54 , 59 , 66 , 68 , 69 , 70 , 72 , and 73 motions for leave to appear pro hac vice. Each identified attorney may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 4, 2025. (lcbah2) (Entered: 04/04/2025) |

| | | |
|---|---|---|
| 04/04/2025 | 74 | AMICUS BRIEF by LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW. (Caspar, Edward) (Entered: 04/04/2025) |
| 04/04/2025 | 75 | ERRATA re 71 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joseph N. Roth, Filing fee $ 100, receipt number ADCDC−11593281. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of Joseph N. Roth)(Marshall, Austin) Modified to add link on 4/7/2025 (zdp). Modified filer on 4/22/2025 (znmw). (Entered: 04/04/2025) |
| 04/04/2025 | 76 | AMICUS BRIEF by NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, NEW YORK COUNCIL OF DEFENSE LAWYERS. (mg) (Entered: 04/07/2025) |
| 04/04/2025 | 77 | AMICUS BRIEF by 346 FORMER JUDGES. (mg) (Entered: 04/07/2025) |
| 04/04/2025 | 78 | AMICUS BRIEF by 504 LAW FIRMS. (mg) (Entered: 04/07/2025) |
| 04/04/2025 | 100 | ERRATA by KENNETH C. PICKERING re 62 Motion for Leave to File Amicus Brief. (mg) (Entered: 04/08/2025) |
| 04/07/2025 | | NOTICE OF ERROR regarding 71 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joseph N. Roth, Filing fee $ 100, receipt number ADCDC−11592858. Fee Status: Fee Paid.. The following error(s) need correction: Pro Hac Vice motion must be accompanied by a Certificate of Good Standing issued within the last 30 days (LCvR 83.2(c)(2)). Please file certificate as an Errata (mg) (Entered: 04/07/2025) |
| 04/07/2025 | 79 | NOTICE of Appearance by Nathan P. Eimer on behalf of 504 LAW FIRMS (Eimer, Nathan) (Entered: 04/07/2025) |
| 04/07/2025 | 80 | Unopposed MOTION for Leave to File Amicus Brief *in Support of Plaintiff's Motion for Summary Judgment* by AMICI CURIAE LITIGATION FIRMS. (Attachments: # 1 Exhibit − Brief of Amici Curiae Litigation Firms in Support of Plaintiff's Motion for Summary Judgment, # 2 Text of Proposed Order − Granting Litigation Firms' Motion for Leave to File Amici Brief)(Reilly, Kathryn) (Entered: 04/07/2025) |
| 04/07/2025 | 81 | NOTICE of Appearance by Kathryn A. Reilly on behalf of AMICI CURIAE LITIGATION FIRMS (Reilly, Kathryn) (Entered: 04/07/2025) |
| 04/07/2025 | | MINUTE ORDER (paperless) GRANTING 71 Motion for Leave to Appear Pro Hac Vice, in light of 75 Errata, which provides an amended version of the 71 motion that complies with all applicable local rules. Joseph N. Roth may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 7, 2025. (lcbah2) (Entered: 04/07/2025) |
| 04/07/2025 | | MINUTE ORDER (paperless) GRANTING 62 Motion for Leave to File Amicus Brief and 80 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 7, 2025. (lcbah2) (Entered: 04/07/2025) |
| 04/07/2025 | 82 | ERRATA by 504 LAW FIRMS re 78 Amicus Brief. (Attachments: # 1 Appendix A)(Verrilli, Donald) (Entered: 04/07/2025) |
| 04/07/2025 | 83 | Unopposed MOTION for Leave to File Amicus Brief by BAR ASSOCIATIONS. (Attachments: # 1 Exhibit − Amici Curiae Brief, # 2 Text of Proposed Order)(Paredes, Eric John) (Entered: 04/07/2025) |
| 04/07/2025 | 84 | NOTICE of Appearance by Eric John Galvez Paredes on behalf of BAR ASSOCIATIONS (Paredes, Eric John) (Entered: 04/07/2025) |
| 04/07/2025 | 85 | NOTICE of Appearance by Hayden Johnson on behalf of BAR ASSOCIATIONS (Johnson, Hayden) (Entered: 04/07/2025) |
| 04/07/2025 | 86 | Unopposed MOTION for Leave to File Amicus Brief by NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.. (Attachments: # 1 Exhibit Brief of Amicus Curiae, # 2 Text of Proposed Order)(Spital, Samuel) (Entered: 04/07/2025) |
| 04/07/2025 | 93 | AMICUS BRIEF by KENNETH C. PICKERING. (mg) (Entered: 04/08/2025) |

| 04/07/2025 | 94 | AMICUS BRIEF by LITIGATION FIRMS. (mg) (Entered: 04/08/2025) |
|---|---|---|
| 04/08/2025 | 87 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeannie Suk Gersen, Filing fee $ 100, receipt number ADCDC−11597740. Fee Status: Fee Paid. by BAR ASSOCIATIONS. (Attachments: # 1 Declaration of Jeannie Suk Gersen, # 2 Exhibit − Certificate of Good Standing, # 3 Text of Proposed Order)(Paredes, Eric John) (Entered: 04/08/2025) |
| 04/08/2025 | 88 | NOTICE of Appearance by David B. Rosenbaum on behalf of GENERAL COUNSEL AMICI (Rosenbaum, David) (Entered: 04/08/2025) |
| 04/08/2025 | 89 | NOTICE of Appearance by Joseph N. Roth on behalf of GENERAL COUNSEL AMICI (Roth, Joseph) (Entered: 04/08/2025) |
| 04/08/2025 | 90 | NOTICE of Appearance by Joshua James Messer on behalf of GENERAL COUNSEL AMICI (Messer, Joshua) (Entered: 04/08/2025) |
| 04/08/2025 | 91 | NOTICE of Appearance by Eric M. Fraser on behalf of GENERAL COUNSEL AMICI (Fraser, Eric) (Entered: 04/08/2025) |
| 04/08/2025 | 92 | Unopposed MOTION for Leave to File Amicus Brief*in Support of Plaintiff's Motion for Summary Judgment and for Declaratory and Permanent Injunction* by INTERNATIONAL ACADEMY OF TRIAL LAWYERS. (Attachments: # 1 Exhibit Brief of Amicus Curiae, # 2 Text of Proposed Order Proposed Order)(Regan, Patrick) (Entered: 04/08/2025) |
| 04/08/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 86 Unopposed MOTION for Leave to File Amicus Brief by NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.. (Attachments: # 1 Exhibit Brief of Amicus Curiae, # 2 Text of Proposed Order)(Spital, Samuel).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney−renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/15/2025. (zapb) 4/10/2025 (zapb). (Entered: 04/08/2025) |
| 04/08/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 84 NOTICE of Appearance by Eric John Galvez Paredes on behalf of BAR ASSOCIATIONS (Paredes, Eric John).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney−renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/15/2025. (zapb) Modified on 4/9/2025 (zhcn). (Entered: 04/08/2025) |
| 04/08/2025 | 95 | NOTICE of Appearance by Mary Ruth O'Grady on behalf of GENERAL COUNSEL AMICI (O'Grady, Mary) (Entered: 04/08/2025) |
| 04/08/2025 | 96 | MOTION for Leave to File Amicus Brief by GENERAL COUNSEL AMICI. (Attachments: # 1 Exhibit Brief of Amici Curiae, # 2 Text of Proposed Order)(Rosenbaum, David) (Entered: 04/08/2025) |
| 04/08/2025 | 97 | NOTICE of Appearance by Justin A. Nelson on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Nelson, Justin) (Entered: 04/08/2025) |

| 04/08/2025 | 98 | Unopposed MOTION for Leave to File Amicus Brief by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order, # 3 Appendix)(Nelson, Justin) (Entered: 04/08/2025) |
|---|---|---|
| 04/08/2025 | | MINUTE ORDER (paperless) GRANTING 83 Unopposed Motion for Leave to File Amicus Brief, 86 Unopposed Motion for Leave to File Amicus Brief, 92 Unopposed Motion for Leave to File Amicus Brief, 96 Motion for Leave to File Amicus Brief, and 98 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 8, 2025. (lcbah2) (Entered: 04/08/2025) |
| 04/08/2025 | 99 | AMICUS BRIEF *of Former and Current General Counsel Supporting Plaintiff Perkins Coie, LLP* by GENERAL COUNSEL AMICI. (Rosenbaum, David) (Entered: 04/08/2025) |
| 04/08/2025 | 101 | AMICUS BRIEF by BAR ASSOCIATIONS. (mg) (Entered: 04/09/2025) |
| 04/08/2025 | 102 | AMICUS BRIEF by NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.. (mg) (Entered: 04/09/2025) |
| 04/08/2025 | 103 | AMICUS BRIEF by INTERNATIONAL ACADEMY OF TRIAL LAWYERS. (mg) (Entered: 04/09/2025) |
| 04/08/2025 | 104 | AMICUS BRIEF by FORMER SENIOR GOVERNMENT OFFICIALS. (mg) (Entered: 04/09/2025) |
| 04/09/2025 | 105 | NOTICE of Appearance by William E. Zapf on behalf of 23 NONGOVERNMENTAL ORGANIZATIONS (Zapf, William) (Entered: 04/09/2025) |
| 04/09/2025 | 106 | Unopposed MOTION for Leave to File Amicus Brief by MEDIA ORGANIZATIONS AND PRESS FREEDOM ADVOCATES. (Attachments: # 1 Exhibit Proposed Brief, # 2 Appendix A, # 3 Text of Proposed Order)(Kortz, Mason) (Entered: 04/09/2025) |
| 04/09/2025 | 107 | Unopposed MOTION for Leave to File Amicus Brief by 23 NONGOVERNMENTAL ORGANIZATIONS. (Attachments: # 1 Exhibit Exhibit A − Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Zapf, William) (Entered: 04/09/2025) |
| 04/09/2025 | 108 | NOTICE of Appearance by Jim Davy on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Davy, Jim) (Entered: 04/09/2025) |
| 04/09/2025 | 109 | Unopposed MOTION for Leave to File Amicus Brief by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Davy, Jim) (Entered: 04/09/2025) |
| 04/09/2025 | 110 | AMICUS BRIEF by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Davy, Jim) (Entered: 04/09/2025) |
| 04/09/2025 | | MINUTE ORDER (paperless) GRANTING 87 Motion for Leave to Appear Pro Hac Vice. Jeannie Suk Gersen may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 9, 2025. (lcbah2) (Entered: 04/09/2025) |
| 04/09/2025 | | MINUTE ORDER (paperless) GRANTING 106 Unopposed Motion for Leave to File Amicus Brief, 107 Unopposed Motion for Leave to File Amicus Brief, and 109 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 9, 2025. (lcbah2) (Entered: 04/09/2025) |
| 04/09/2025 | 111 | MOTION for Leave to File Amicus Brief by 334 SOLO AND SMALL FIRM LAWYERS. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order Proposed Order)(Elefant, Carolyn) (Entered: 04/09/2025) |
| 04/09/2025 | 112 | NOTICE of Appearance by Carolyn Elefant on behalf of 334 SOLO AND SMALL FIRM LAWYERS (Elefant, Carolyn) (Entered: 04/09/2025) |
| 04/09/2025 | 113 | AMICUS BRIEF *(Corrected)* by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Davy, Jim) (Entered: 04/09/2025) |
| 04/09/2025 | 114 | Consent MOTION for Leave to File Amicus Brief by AMERICA'S FUTURE, ET AL. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Olson, William) (Entered: 04/09/2025) |

| | | |
|---|---|---|
| 04/09/2025 | 115 | AMICUS BRIEF by MEDIA ORGANIZATIONS AND PRESS FREEDOM ADVOCATES. (Attachments: # 1 Appendix A)(Kortz, Mason) (Entered: 04/09/2025) |
| 04/10/2025 | 116 | AMICUS BRIEF by 23 NONGOVERNMENTAL ORGANIZATIONS. (Attachments: # 1 Appendix)(Zapf, William) (Entered: 04/10/2025) |
| 04/10/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 111 MOTION for Leave to File Amicus Brief by 334 SOLO AND SMALL FIRM LAWYERS. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order Proposed Order)(Elefant, Carolyn). <br><br> Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney−renewal. <br><br> Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/17/2025. (zapb) 4/10/2025 (zapb). (Entered: 04/10/2025) |
| 04/10/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 105 NOTICE of Appearance by William E. Zapf on behalf of 23 NONGOVERNMENTAL ORGANIZATIONS (Zapf, William). <br><br> Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney−renewal. <br><br> Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 4/17/2025. (zapb) 4/10/2025 (zapb). (Entered: 04/10/2025) |
| 04/10/2025 | 117 | NOTICE of Appearance by Adria Jasmine Bonillas on behalf of LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW (Bonillas, Adria) (Entered: 04/10/2025) |
| 04/10/2025 | 118 | NOTICE of Appearance by Stephen Craig Leckar on behalf of AARON H. CAPLAN (Leckar, Stephen) (Entered: 04/10/2025) |
| 04/10/2025 | 119 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Robert Chang, Filing fee $ 100, receipt number ADCDC−11606569. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Chang Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/10/2025) |
| 04/10/2025 | 120 | MOTION for Leave to File Amicus Brief*of Professor Aaron H. Caplan Regarding Attainder* by AARON H. CAPLAN. (Attachments: # 1 Exhibit Amicus Brief of Professor Aaron H. Caplan Regarding Attainder, # 2 Text of Proposed Order)(Leckar, Stephen) (Entered: 04/10/2025) |
| 04/10/2025 | | MINUTE ORDER (paperless) GRANTING 111 Motion for Leave to File Amicus Brief, 114 Consent Motion for Leave to File Amicus Brief, and 120 Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 10, 2025. (lcbah2) (Entered: 04/10/2025) |
| 04/10/2025 | 130 | AMICUS BRIEF by 334 SOLO AND SMALL FIRM LAWYERS. (znmw) (Entered: 04/14/2025) |
| 04/10/2025 | 131 | AMICUS BRIEF by AMERICA'S FUTURE, GUN OWNERS OF AMERICA, GUN OWNERS FOUNDATION, GUN OWNERS OF CALIFORNIA, JUDICIAL ACTION GROUP, CONSERVATIVE LEGAL DEFENSE AND EDUCATION FUND. (znmw) Modified to add filers on 4/14/2025 (znmw). (Entered: 04/14/2025) |

**JA 28**

| 04/10/2025 | 132 | AMICUS BRIEF by AARON H. CAPLAN. (znmw) (Entered: 04/14/2025) |
|---|---|---|
| 04/11/2025 | 121 | NOTICE of Appearance by Samuel Spital on behalf of NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC. (Spital, Samuel) (Entered: 04/11/2025) |
| 04/11/2025 | | MINUTE ORDER (paperless) GRANTING 119 Motion for Leave to Appear Pro Hac Vice. Robert Seungchul Chang may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 11, 2025. (lcbah2) (Entered: 04/11/2025) |
| 04/11/2025 | 122 | NOTICE of Appearance by Andrew George Pappas on behalf of GENERAL COUNSEL AMICI (Pappas, Andrew) (Entered: 04/11/2025) |
| 04/11/2025 | 123 | NOTICE of Appearance by Cecillia D. Wang on behalf of AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, CATO INSTITUTE, ELECTRONIC FRONTIER FOUNDATION, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, INSTITUTE FOR JUSTICE, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, NATIONAL COALITION AGAINST CENSORSHIP, REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS, RUTHERFORD INSTITUTE, SOCIETY FOR THE RULE OF LAW INSTITUTE (Wang, Cecillia) (Entered: 04/11/2025) |
| 04/11/2025 | 124 | NOTICE of Appearance by Robert Seungchul Chang on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Chang, Robert) (Entered: 04/11/2025) |
| 04/11/2025 | 125 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jessica Levin, Filing fee $ 100, receipt number ADCDC−11611095. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Levin Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 04/11/2025 | 126 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeremiah Chin, Filing fee $ 100, receipt number ADCDC−11611101. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Chin Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 04/11/2025 | 127 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Melissa Lee, Filing fee $ 100, receipt number ADCDC−11611119. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Lee Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 04/11/2025 | 128 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Susan McMahon, Filing fee $ 100, receipt number ADCDC−11611136. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration McMahon Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 04/11/2025 | 129 | NOTICE of Corrected Exhibit A by 346 FORMER JUDGES re 77 Amicus Brief (Attachments: # 1 Exhibit A (corrected list of judges))(Kropf, Sara) (Entered: 04/11/2025) |
| 04/14/2025 | 133 | Unopposed MOTION for Leave to File Amicus Brief by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Corkran, Kelsi) (Entered: 04/14/2025) |
| 04/14/2025 | 134 | NOTICE of Appearance by Kelsi B. Corkran on behalf of LEGAL ETHICS PROFESSORS (Corkran, Kelsi) (Entered: 04/14/2025) |
| 04/14/2025 | 135 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Ruth Greenwood, Filing fee $ 100, receipt number ADCDC−11613778. Fee Status: Fee Paid. by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit I − Declaration and Certificates of Good Standing, # 2 Text of Proposed Order)(Mead, Joseph) (Entered: 04/14/2025) |

**JA 29**

| 04/14/2025 | 136 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Samuel J. Davis, Filing fee $ 100, receipt number ADCDC−11613867. Fee Status: Fee Paid. by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit I − Declaration and Certificates of Good Standing, # 2 Text of Proposed Order)(Mead, Joseph) (Entered: 04/14/2025) |
| 04/14/2025 | | MINUTE ORDER (paperless) GRANTING 133 Unopposed Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 14, 2025. (lcbah2) (Entered: 04/14/2025) |
| 04/14/2025 | | MINUTE ORDER (paperless) GRANTING 125 , 126 , 127 , 128 , 135 , and 136 motions for leave to appear pro hac vice. Each identified attorney may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 14, 2025. (lcbah2) (Entered: 04/14/2025) |
| 04/14/2025 | 137 | AMICUS BRIEF by LEGAL ETHICS PROFESSORS. (mg) (Entered: 04/15/2025) |
| 04/15/2025 | 138 | NOTICE of Appearance by Jessica Levin on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Levin, Jessica) (Entered: 04/15/2025) |
| 04/15/2025 | 139 | NOTICE of Appearance by Melissa Lee on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Lee, Melissa) (Entered: 04/15/2025) |
| 04/15/2025 | 140 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Charlotte Garden, Filing fee $ 100, receipt number ADCDC−11617929. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Garden Declaration, # 2 Exhibit Certificate of good standing)(Davy, Jim) (Entered: 04/15/2025) |
| 04/15/2025 | 141 | NOTICE of Appearance by Susan A. McMahon on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (McMahon, Susan) (Entered: 04/15/2025) |
| 04/16/2025 | 142 | Memorandum in opposition to re 43 Motion to Dismiss, 44 Motion for Reconsideration filed by PERKINS COIE LLP. (Attachments: # 1 Declaration of Ryan Scarborough, Esquire, in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss and for Expedited Judgment)(Butswinkas, Dane) (Entered: 04/16/2025) |
| 04/16/2025 | 143 | Memorandum in opposition to re 39 Motion for Summary Judgment,,, Motion for Declaratory Judgment,,, Motion for Permanent Injunction,, filed by U.S. DEPARTMENT OF JUSTICE. (Attachments: # 1 Defendant's Response to Plaintiff's Statement, # 2 Declaration)(Lawson, Richard) (Entered: 04/16/2025) |
| 04/16/2025 | | MINUTE ORDER (paperless) GRANTING 140 Motion for Leave to Appear Pro Hac Vice. Charlotte Garden may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 16, 2025. (lcbah2) (Entered: 04/16/2025) |
| 04/17/2025 | | MINUTE ORDER (paperless) DIRECTING the parties to appear for a hearing on plaintiff's 39 Motion for Summary Judgment and defendants' 43 Motion to Dismiss and 44 Motion for Reconsideration on April 23, 2025, at 2:00 PM in Courtroom 26A− In Person before Judge Beryl A. Howell. <br><br> Members of the public or media who wish to listen to live audio of the hearing without physically attending the proceeding may do so by dialing the Toll Free Number: 833−990−9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24−31 (JEB), available here: <https://www.dcd.uscourts.gov/sites/dcd/files/Standing%20Order%20No.% 2024−31_001.pdf >. *Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court.* <br><br> Signed by Judge Beryl A. Howell on April 17, 2025. (lcbah2) (Entered: 04/17/2025) |

| 04/17/2025 | 144 | Unopposed MOTION to Continue *Reschedule Oral Hearing* by U.S. DEPARTMENT OF JUSTICE. (Lawson, Richard) Modified event on 4/18/2025 (znmw). (Entered: 04/17/2025) |
|---|---|---|
| 04/17/2025 | | MINUTE ORDER (paperless), upon consideration of defendants' 144 Unopposed Motion to Reschedule Oral Hearing, RESCHEDULING the hearing currently scheduled for April 23, 2025, at 2:00 PM. It is ORDERED that the hearing shall now take place at 11:00 AM on the same day, April 23, 2025, in Courtroom 26A− In Person before Judge Beryl A. Howell. The public access telephone line credentials previously provided, *see* Min. Order (Apr. 17, 2025) (scheduling the hearing), will remain the same. Signed by Judge Beryl A. Howell on April 17, 2025. (lcbah2) (Entered: 04/17/2025) |
| 04/17/2025 | | Set/Reset Hearings: Motion Hearing set for 4/23/2025 at 11:00 AM in Courtroom 26A− In Person before Judge Beryl A. Howell. (mac) (Entered: 04/17/2025) |
| 04/18/2025 | 145 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Frank N. Gaeta, Filing fee $ 100, receipt number ADCDC−11626362. Fee Status: Fee Paid. by Rich May PC. (Attachments: # 1 Exhibit PHV Declaration, # 2 Exhibit Cert Good Standing, # 3 Exhibit Proposed Order)(Elefant, Carolyn) (Entered: 04/18/2025) |
| 04/18/2025 | 146 | MOTION for Leave to File Amicus Brief by Rich May PC. (Attachments: # 1 Exhibit Amicus Brief, # 2 Exhibit Proposed Order)(Elefant, Carolyn) (Entered: 04/18/2025) |
| 04/18/2025 | 147 | REPLY to opposition to motion re 43 Motion to Dismiss, 44 Motion for Reconsideration filed by PAMELA J. BONDI, BRENDAN CARR, STEPHEN EHEKIAN, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, CHARLES EZELL, FEDERAL COMMUNICATIONS COMMISSION, TULSI GABBARD, GENERAL SERVICES ADMINISTRATION, ANDREA R. LUCAS, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF PERSONNEL MANAGEMENT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, U.S. DEPARTMENT OF JUSTICE, UNITED STATES OF AMERICA, RUSSELL T. VOUGHT. (Lawson, Richard) (Entered: 04/18/2025) |
| 04/18/2025 | 148 | REPLY to opposition to motion re 39 Motion for Summary Judgment,,, Motion for Declaratory Judgment,,,, Motion for Permanent Injunction,, filed by PERKINS COIE LLP. (Attachments: # 1 Declaration of Christopher N. Manning, Esquire, Supporting Plaintiff's Reply Memorandum in Support of Its Motion for Summary Judgment)(Butswinkas, Dane) (Entered: 04/18/2025) |
| 04/18/2025 | | MINUTE ORDER (paperless) GRANTING 145 Motion for Leave to Appear Pro Hac Vice. Frank N. Gaeta may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 18, 2025. (lcbah2) (Entered: 04/18/2025) |
| 04/18/2025 | | MINUTE ORDER (paperless) GRANTING 146 Motion for Leave to File Amicus Brief. Signed by Judge Beryl A. Howell on April 18, 2025. (lcbah2) (Entered: 04/18/2025) |
| 04/22/2025 | 149 | NOTICE of Appearance by Jeremiah Chin on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Chin, Jeremiah) (Entered: 04/22/2025) |
| 04/22/2025 | 150 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/17/2025. Answer due for ALL FEDERAL DEFENDANTS by 5/16/2025. (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 151 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. TULSI GABBARD served on 3/21/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 152 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE served on 3/24/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 153 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. PAMELA J. BONDI served on 3/21/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |

| 04/22/2025 | 154 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. DEPARTMENT OF JUSTICE served on 3/21/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 155 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ANDREA R. LUCAS served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 156 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 157 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. BRENDAN CARR served on 3/21/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 158 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. FEDERAL COMMUNICATIONS COMMISSION served on 3/21/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 159 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. STEPHEN EHEKIAN served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 160 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. GENERAL SERVICES ADMINISTRATION served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 161 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RUSSELL T. VOUGHT served on 3/25/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 162 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. OFFICE OF MANAGEMENT AND BUDGET served on 3/25/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 163 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CHARLES EZELL served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 164 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. OFFICE OF PERSONNEL MANAGEMENT served on 3/20/2025 (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 165 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 3/17/2025. (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/22/2025 | 166 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/21/2025. Answer due for ALL FEDERAL DEFENDANTS by 5/20/2025. (Butswinkas, Dane) (Entered: 04/22/2025) |
| 04/23/2025 | 167 | NOTICE of Proposed Order *Granting Plaintiffs Motion − Amended* by PERKINS COIE LLP re 39 MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* MOTION for Declaratory Judgment MOTION for Permanent Injunction (Attachments: # 1 Text of Proposed Order)(Butswinkas, Dane) (Entered: 04/23/2025) |
| 04/23/2025 | 168 | AMICUS BRIEF by RICH MAY PC. (mg) (Entered: 04/23/2025) |
| 04/23/2025 | | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 4/23/2025 re 43 Motion to Dismiss, 44 Motion for Reconsideration and 39 Motion for Summary Judgment. The Court Heard Arguments From The Parties. Plaintiff's Oral Motion To Amend The Complaint. The Court Will Reserve Judgment. (Court Reporter ELIZABETH DAVILA.) (mac) (Entered: 04/23/2025) |
| 04/24/2025 | 169 | TRANSCRIPT OF PROCEEDINGS, before Judge Beryl A. Howell, held on 4−23−2025; Page Numbers: 1 − 124. Date of Issuance: 4−24−2025. Court Reporter: Elizabeth Davila, Telephone number: 202−354−3242. Transcripts may be ordered by submitting the Transcript Order Form |

|  |  | For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/15/2025. Redacted Transcript Deadline set for 5/25/2025. Release of Transcript Restriction set for 7/23/2025.(Davila, Elizabeth) Modified on 4/25/2025 to correct hearing date (mg). (Entered: 04/24/2025) |
| 04/24/2025 | 170 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joe H. Tucker, Jr., Filing fee $ 100, receipt number ADCDC−11640013. Fee Status: Fee Paid. by INTERNATIONAL ACADEMY OF TRIAL LAWYERS. (Attachments: # 1 Exhibit Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Regan, Patrick) (Entered: 04/24/2025) |
| 04/24/2025 | 171 | RESPONSE *In Opposition to Plaintiffs April 23, 2025 Oral Motion to Amend Complaint* filed by PAMELA J. BONDI, BRENDAN CARR, STEPHEN EHEKIAN, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, CHARLES EZELL, FEDERAL COMMUNICATIONS COMMISSION, TULSI GABBARD, GENERAL SERVICES ADMINISTRATION, ANDREA R. LUCAS, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF PERSONNEL MANAGEMENT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, U.S. DEPARTMENT OF JUSTICE, UNITED STATES OF AMERICA, RUSSELL T. VOUGHT. (Lawson, Richard) Modified event on 4/25/2025 (mg). (Entered: 04/24/2025) |
| 04/24/2025 | 172 | NOTICE of Appearance by Frank N. Gaeta on behalf of RICH MAY PC (Gaeta, Frank) (Entered: 04/24/2025) |
| 04/25/2025 |  | MINUTE ORDER (paperless) GRANTING 170 Motion for Leave to Appear Pro Hac Vice. Joe H. Tucker, Jr., may enter an appearance *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. Signed by Judge Beryl A. Howell on April 25, 2025. (lcbah2) (Entered: 04/25/2025) |
| 04/25/2025 | 173 | MEMORANDUM & ORDER GRANTING plaintiff's Oral Motion for Leave to Amend Complaint, *see* Min. Entry (Apr. 23, 2025), and DENYING AS MOOT the government's 44 Motion for Reconsideration. See Memorandum & Order for further details. Signed by Judge Beryl A. Howell on April 25, 2025. (lcbah2) (Entered: 04/25/2025) |
| 04/28/2025 |  | Set/Reset Deadlines: Plaintiff Amended Complaint due by 4/28/2025. (mac) (Entered: 04/28/2025) |
| 04/28/2025 | 174 | Consent MOTION to Adopt Streamlined Procedures for Amended Complaint and Pending Motions re 173 Memorandum & Opinion, by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order Adopting Streamlined Procedures)(Manning, Christopher) (Entered: 04/28/2025) |
| 04/29/2025 | 175 | ORDER GRANTING plaintiff's 174 Consent Motion to Adopt Streamlined Procedures for Amended Complaint and Pending Motions. Signed by Judge Beryl A. Howell on April 29, 2025. (lcbah2) (Entered: 04/29/2025) |
| 04/29/2025 |  | Set/Reset Deadlines: Plaintiff shall file a new motion for summary judgment and declaratory and permanent injunctive relief, and defendants shall file a new motion to dismiss the Amended Complaint by 4/30/2025. Plaintiff shall file a notice by 4/30/2025. (zalh) (Entered: 04/29/2025) |
| 04/29/2025 | 176 | AMENDED COMPLAINT against ALL FEDERAL AGENCIES AND AGENCY HEADS filed by PERKINS COIE LLP.(Butswinkas, Dane) Modified defendant on |

| | | 4/29/2025 (znmw). (Entered: 04/29/2025) |
|---|---|---|
| 04/29/2025 | 177 | Consent MOTION for Extension of Time to Amend *Status Report and Consent Motion for Enlargement of Time To File Amended Complaint Nunc Pro Tunc* by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order)(Manning, Christopher) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER (paperless) GRANTING plaintiff's 177 Consent Motion for Enlargement of Time to File Amended Complaint and DIRECTING that the deadline for plaintiff to file its amended complaint is extended, *nunc pro tunc*, to April 29, 2025. Signed by Judge Beryl A. Howell on April 29, 2025. (lcbah2) (Entered: 04/29/2025) |
| 04/29/2025 | 178 | REQUEST FOR SUMMONS TO ISSUE *to ALL FEDERAL AGENCIES AND AGENCY HEADS listed in Attachment* filed by PERKINS COIE LLP. Related document: 176 Amended Complaint,,,,,,,,,,,,,,, filed by PERKINS COIE LLP.(Butswinkas, Dane) (Entered: 04/29/2025) |
| 04/29/2025 | 179 | SUMMONS (1) Issued Electronically as to ALL FEDERAL AGENCIES AND AGENCY HEADS. (mg) (Entered: 04/29/2025) |
| 04/29/2025 | 180 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ALL FEDERAL AGENCIES AND AGENCY HEADS served on 4/29/2025 (Manning, Christopher) (Entered: 04/29/2025) |
| 04/30/2025 | 181 | NOTICE of Voluntary Dismissal re Fannie Mae and William J. Pulte, in his official capacity as Chairman of Fannie Mae by PERKINS COIE LLP (Manning, Christopher) (Entered: 04/30/2025) |
| 04/30/2025 | | Set/Reset Deadlines: Plaintiff Amended Complaint due by 4/29/2025,. (mac) (Entered: 04/30/2025) |
| 04/30/2025 | 182 | MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* by PERKINS COIE LLP. (Attachments: # 1 Text of Proposed Order Granting Plaintiff's Motion)(Butswinkas, Dane). Added MOTION for Declaratory Judgment, MOTION for Permanent Injunction on 5/1/2025 (mg). (Entered: 04/30/2025) |
| 04/30/2025 | 183 | MOTION to Dismiss *(Renewed)* by ALL FEDERAL AGENCIES AND AGENCY HEADS. (Attachments: # 1 Text of Proposed Order)(Lawson, Richard). Added MOTION to Expedite on 5/1/2025 (mg). (Entered: 04/30/2025) |
| 05/02/2025 | 184 | ORDER GRANTING plaintiff's 182 Motion for Summary Judgment & Declaratory & Permanent Injunctive Relief and DENYING the government's 183 Renewed Motion to Dismiss & for Expedited Judgment. See Order for further details. The Clerk of the Court is directed to close this case. Signed by Judge Beryl A. Howell on May 2, 2025. (lcbah2) (Entered: 05/02/2025) |
| 05/02/2025 | 185 | MEMORANDUM OPINION regarding plaintiff's 182 Motion for Summary Judgment & Declaratory & Permanent Injunctive Relief and the government's 183 Renewed Motion to Dismiss & for Expedited Judgment. Signed by Judge Beryl A. Howell on May 2, 2025. (lcbah2) (Entered: 05/02/2025) |
| 05/20/2025 | 186 | MOTION to Clarify re 184 Order, by ALL FEDERAL AGENCIES AND AGENCY HEADS, PAMELA J. BONDI, BRENDAN CARR, STEPHEN EHEKIAN, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, CHARLES EZELL, FEDERAL COMMUNICATIONS COMMISSION, TULSI GABBARD, GENERAL SERVICES ADMINISTRATION, ANDREA R. LUCAS, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF PERSONNEL MANAGEMENT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, U.S. DEPARTMENT OF JUSTICE, UNITED STATES OF AMERICA, RUSSELL VOUGHT. (Lawson, Richard) (Entered: 05/20/2025) |
| 05/20/2025 | | MINUTE ORDER (paperless), upon consideration of the government's 186 Motion to Clarify the Court's Order, on which motion plaintiff takes no position, *see id.* at 5, GRANTING the government's 186 motion and CLARIFYING that the injunctive relief granted as to Section 4 of Executive Order 14230, *see* Court's 184 Order, runs only in favor of plaintiff Perkins Coie LLP (including its affiliates, predecessors, successors, assigns, directors, officers, partners, employees, and agents), as |

| | | |
|---|---|---|
| | | specifically described in ¶ 4.H. of the Order. Signed by Judge Beryl A. Howell on May 20, 2025. (lcbah2) (Entered: 05/20/2025) |
| 05/27/2025 | 187 | NOTICE of Appearance by Donald Manwell Falk on behalf of 346 FORMER JUDGES (Falk, Donald) (Main Document 187 replaced on 5/28/2025) (mg). (Entered: 05/27/2025) |
| 06/30/2025 | 188 | NOTICE OF APPEAL TO DC CIRCUIT COURT by ALL FEDERAL AGENCIES AND AGENCY HEADS, GENERAL SERVICES ADMINISTRATION, U.S. DEPARTMENT OF JUSTICE, TULSI GABBARD, CHARLES EZELL, PAMELA J. BONDI, BRENDAN CARR, ANDREA R. LUCAS, OFFICE OF PERSONNEL MANAGEMENT, RUSSELL VOUGHT, FEDERAL COMMUNICATIONS COMMISSION, UNITED STATES OF AMERICA, STEPHEN EHEKIAN, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. Fee Status: No Fee Paid. Parties have been notified. (Lawson, Richard) (Entered: 06/30/2025) |
| 07/01/2025 | 189 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 188 Notice of Appeal to DC Circuit Court,.. (mg) (Entered: 07/01/2025) |
| 07/02/2025 | | USCA Case Number 25−5241 for 188 Notice of Appeal to DC Circuit Court,, filed by OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, UNITED STATES OF AMERICA, CHARLES EZELL, ANDREA R. LUCAS, OFFICE OF PERSONNEL MANAGEMENT, PAMELA J. BONDI, BRENDAN CARR, GENERAL SERVICES ADMINISTRATION, ALL FEDERAL AGENCIES AND AGENCY HEADS, RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, FEDERAL COMMUNICATIONS COMMISSION, STEPHEN EHEKIAN, TULSI GABBARD, OFFICE OF MANAGEMENT AND BUDGET. (mg) (Entered: 07/03/2025) |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

               *Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE, FEDERAL
COMMUNICATIONS COMMISSION,
OFFICE OF MANAGEMENT AND BUDGET,
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, OFFICE OF PERSONNEL
MANAGEMENT, GENERAL SERVICES
ADMINISTRATION, OFFICE OF THE
DIRECTOR OF NATIONAL INTELLIGENCE,
THE UNITED STATES OF AMERICA, and, in
their official capacities, PAMELA J. BONDI,
BRENDAN CARR, RUSSELL T. VOUGHT,
ANDREA R. LUCAS, CHARLES EZELL,
STEPHEN EHEKIAN, and TULSI GABBARD,

               *Defendants*.

Case No. _____

## <u>COMPLAINT</u>

Plaintiff, the law firm of Perkins Coie LLP, brings this case against the U.S. Department

of Justice, the Federal Communications Commission, the Office of Management & Budget, the

Equal Employment Opportunity Commission, the Office of Personnel Management, the General

Services Administration, the Office of the Director of National Intelligence, the United States of

America, and, in their respective official capacities, Pamela J. Bondi, Brendan Carr, Russell T.

Vought, Andrea R. Lucas, Charles Ezell, Stephen Ehekian, and Tulsi Gabbard, and states as

follows:

**WHAT THIS CASE IS ABOUT**

1.      This case concerns an Executive Order issued on March 6, 2025, entitled, "Addressing Risks From Perkins Coie LLP" ("the Order"). The Order is an affront to the Constitution and our adversarial system of justice. Its plain purpose is to bully those who advocate points of view that the President perceives as adverse to the views of his Administration, whether those views are presented on behalf of paying or pro bono clients. Perkins Coie brings this case reluctantly. The firm is comprised of *lawyers* who advocate for *clients*; its attorneys and employees are not activists or partisans. But Perkins Coie's ability to represent the interests of its clients—and its ability to operate as a legal-services business at all—are under direct and imminent threat. Perkins Coie cannot allow its clients to be bullied. The firm is committed to a resolute defense of the rule of law, without regard to party or ideology, and therefore brings this lawsuit to declare the Order unlawful and to enjoin its implementation.

2.      The Order's peculiar title betrays its oddity as an Executive Order, for its purpose is not executive in nature. Rather, the Order reflects a purpose that is judicial—to adjudicate whether a handful of lawyers at Perkins Coie LLP ("Perkins Coie," "the law firm," or "the firm") engaged in misconduct in the course of litigation and then to punish them by: (1) terminating government contracts with firm clients, thereby driving away current and prospective clients; (2) denying *all* members and employees of the firm access to federal buildings and meetings or other engagement with federal employees; and (3) immediately suspending, and possibly revoking, security clearances for all firm employees.

3.      The Order imposes these punishments on the entire law firm even though the attorneys involved in the purported misconduct numbered a mere handful of the more than 1,200

2

**JA 37**

attorneys in the firm, and even though the two attorneys the Order appears to target have not been with the firm for years.

4.    The Order imposes these punishments *ex post facto*—the President having already supposedly adjudicated the matters—determining that Perkins Coie engaged in "dishonest and dangerous activity," "manufactured" evidence in connection with the Clinton 2016 presidential campaign, engaged in "a pattern" of "egregious activity" by challenging (and defending) election laws, and "racially discriminated against" its employees and applicants, all without giving notice to Perkins Coie and without giving Perkins Coie an opportunity to be heard and contest these and other false and disparaging claims made in the Order.

5.    The Order imposes these punishments as retaliation for the firm's association with, and representation of, clients that the President perceives as his political opponents. Many law firms represented candidates, parties, and related political committees and organizations in the 2016 and 2020 campaigns. But the Order targets only one firm—Perkins Coie—because the President views it, more than any other firm, as aligned with the Democratic Party by reason of its representation of the 2016 Clinton presidential campaign and its successful handling of challenges brought by the Trump campaign seeking to overturn the results of the 2020 election, as well as victories the firm won for its clients in a significant number of voting rights cases, including cases where Perkins Coie succeeded in upholding existing laws, in connection with the 2020 election.

6.    During the campaign, the President promised to retaliate against his political opponents, including the attorneys who represented them ("WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law…. Please beware that this legal exposure extends to Lawyers…."). And, in signing the Order, he insisted that Perkins Coie

**JA 38**

engaged in weaponization "against a political opponent" (i.e., himself) and justified the Order for the chilling effect it would have ("it should never be allowed to happen again").

7.     The retaliatory aim of the Order is intentionally obvious to the general public and the press because the very goal is to chill future lawyers from representing particular clients. The Associated Press wrote that "the actions appear designed not only to settle scores from years past but also to deter both government officials and private sector workers from participating in new inquiries into his conduct." And that aim is also obvious to the profession, many of whom will only comment anonymously, as Law.com reported ("most law firm leaders are choosing to stay anonymous when speaking about the administration's orders").

8.     The principal claims made by the Order have already been raised in the proper forum and resolved by the branch of government with constitutional authority to do so. Regarding the claim that the firm engaged in misconduct in connection with its representation of the Clinton campaign, the President filed a federal court lawsuit in March 2022 against Perkins Coie, Hillary Clinton, and others. That lawsuit asserted RICO claims concerning the campaign and allegedly falsified documents. The district court dismissed that lawsuit in September 2022. Regarding the assertion that the firm "pushed" false claims about ties between Russia and the 2016 Trump campaign, a Special Counsel appointed during the first Trump Administration indicted Michael Sussmann, a former partner of the firm, in connection with evidence he brought to the attention of the FBI, allegedly without disclosing his ties to the Clinton campaign. That case went to trial in this Court in May 2022, and the jury quickly and unanimously acquitted him. Regardless, Mr. Sussmann is now at a different firm. And regarding the claim that former members of the firm were not candid with the court, the court concerned—the Court of Appeals for the Fifth Circuit— sanctioned three lawyers in 2021 by requiring them to pay $8,700 in legal fees in connection with

one duplicative motion to supplement the record on appeal.  None of those lawyers work for Perkins Coie today.

9.      The Order also seeks to impermissibly punish Perkins Coie because of its disfavored support of "diversity, equity and inclusion."  Perkins Coie has a longstanding commitment to diversity and inclusion.  Perkins Coie, however, does not discriminate against its attorneys or employees on the basis of race or otherwise.  Rather, fostering an environment where attorneys from diverse backgrounds and experiences can thrive and make meaningful contributions enables Perkins Coie to attract top talent and deliver exceptional legal counsel to its clients. Perkins Coie does not have, and has never had, percentage quotas for hiring or promoting minorities.  The lawsuit referenced in the Order challenging the firm's diversity fellowship was quickly dismissed by the plaintiff after clarification that the program is open to all, regardless of race.  Perkins Coie's commitment to diversity and inclusion is not unlawful and the Order's allegations are a thinly veiled pretext for further punishing the firm for a disfavored viewpoint.

10.      Because the Order in effect adjudicates and punishes alleged misconduct by Perkins Coie, it is an unconstitutional violation of the separation of powers.  Because it does so without notice and an opportunity to be heard, and because it punishes the entire firm for the purported misconduct of a handful of lawyers who are not employees of the firm, it is an unconstitutional violation of procedural due process and of the substantive due process right to practice one's professional livelihood.  Because the Order singles out Perkins Coie, it denies the firm the equal protection of the laws guaranteed by the due process clause of the Fifth Amendment.  Because the Order punishes the firm for the clients with which it has been associated and the legal positions it has taken on matters of election law, the Order constitutes retaliatory viewpoint discrimination and, therefore, violates the First Amendment rights of free expression and association, and the

**JA 40**

right to petition the government for redress.  Because the Order compels disclosure of confidential information revealing the firm's relationships with its clients, it violates the First Amendment. Because the Order retaliates against Perkins Coie for its diversity-related speech, it violates the First Amendment.  Because the Order is vague in proscribing what is prohibited "diversity, equity and inclusion," it violates the Due Process Clause of the Fifth Amendment.  Because the Order works to brand Perkins Coie as *persona non grata* and bar it from federal buildings, deny it the ability to communicate with federal employees, and terminate the government contracts of its clients, the Order violates the right to counsel afforded by the Fifth and Sixth Amendments.

## JURISICTION AND VENUE

11.    The Court has subject matter jurisdiction because the claims arise under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because the individual Defendants are United States officials.  28 U.S.C. § 1346(a)(2).

12.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201-2202, the All Writs Act, and the Court's inherent equitable powers.

13.    Venue lies in this District because Plaintiff has offices here and each Defendant is an agency or officer of the United States sued in his or her official capacity.  28 U.S.C. § 1391(e)(1).

## THE PARTIES

### Plaintiff

14.    Perkins Coie was founded in Seattle by a retiring U.S. District Judge and U.S. Attorney.  Since 1912, Perkins Coie has grown to become the largest law firm in the Pacific

Northwest and has opened offices in Asia and in Europe.  Perkins Coie has approximately 2,500 employees.  Of those, nearly half are attorneys and half are business professionals.  Its employees are deeply woven into the fabric of their communities.  They are Sunday school teachers, Scout leaders, youth sports coaches, and volunteers serving on hundreds of boards of organizations ranging from art museums and food kitchens to major universities, local schools, and foundations.  And they include former members of the armed forces, and current reservists in the U.S. military.

15.    The firm represents a wide range of clients, including Fortune 500 companies, small- and medium-sized businesses, individuals, and charitable and public service-oriented organizations.  Over its 113-year history, the lawyers of Perkins Coie have represented clients in every state, in federal and state courts across the nation, and in tribunals throughout the world (including the Supreme Court of the United States).  Perkins Coie alumni have been and are presently serving as state and federal court judges, law clerks, and high-ranking government officials, as well as founders, CEOs, and General Counsels of some of the nation's largest and most important companies.

16.    Perkins Coie has been named as an "Am Law 50" firm on *The American Lawyer 100* list for over a decade.  It has been named to *Fortune*'s "100 Best Companies to Work For" list for over 20 consecutive years, and its individual offices are often named to similar local lists.  The firm and its lawyers are also regularly recognized for excellence in the legal community by *Best Lawyers*®, *Chambers USA*, and other respected organizations, including national and local bar associations.  And Perkins Coie is often recognized for fostering a work environment in which all lawyers and business professionals are judged on their merit and can reach their potential.

17.    Perkins Coie attorneys are drawn from all sides of the political spectrum, with most not politically active.  There are attorneys who are liberal and attorneys who are conservative.  At

**JA 42**

the time Bob Bauer started the firm's small Political Law practice it was known in Seattle as, if anything, a "Republican firm." Things have become more balanced, and many of the firm's attorneys joined the firm after government service under both Democratic and Republican administrations, or after serving as judges or law clerks to judges appointed by both Democratic and Republican presidents. Reflecting this bipartisan ethos, in recent years, four Perkins Coie partners have been nominated and confirmed to serve as federal judges—two by President Trump in 2019, and two by President Biden in 2021 and 2023.

18.    Perkins Coie is dedicated to serving its clients, its communities, and each other. It has a longstanding, firmwide commitment to pro bono service. In 2024, for example, Perkins Coie lawyers and business professionals spent over 89,000 hours valued at nearly $70 million in pro bono service. Over the past 35 years, the firm has provided approximately 1.45 million hours of pro bono service to innumerable clients, including veterans, indigent families, disabled persons, and community-based organizations of all sizes, including the League of Women Voters and other non-partisan organizations, in matters championing human, civil, and electoral rights, housing, education, food, benefits, and economic justice. Its pro bono service also extends to representing indigent criminal defendants before federal courts by court appointment. Much of its pro bono work involves advocating for military and veterans' rights. The firm has dozens of active veterans-benefits matters on behalf of those who have served this country.

19.    As a full-service law firm that represents clients in all sectors of the economy in transactional, litigation, and regulatory matters, Perkins Coie lawyers necessarily interact with the federal government and its employees on behalf of their clients in innumerable ways. Those interactions are critical to their ability to practice their profession. The firm's lawyers routinely appear in federal court on behalf of their clients in civil and criminal cases, as well as in

administrative proceedings before federal agencies.  They also communicate on behalf of their clients with federal government officials in court proceedings alongside, adverse, or incidental to the federal government in government-owned and -controlled buildings, and as part of daily informal communications through in-person meetings, telephone calls, videoconferences, letters, and the like.

20.    Every single one of the firm's nine main client-facing practice groups intersects with the federal government and each includes clients with business before the federal government. The largest practice groups by headcount are Commercial Litigation, Business, and Intellectual Property, which together account for approximately 75% of the firm's attorneys.  The vast majority of the work in those groups is performed on behalf of clients who have had, or are competing for, business with the government.  The smallest practice group by headcount is Political Law, which includes 8 attorneys (and 19 others affiliated with that practice).  The firm's Political Law practice has historically been much smaller than the firm's other practice groups, and it also substantially shrank in 2021 when Marc Elias and about 50 other attorneys left Perkins Coie to form the Elias Law Group.  It currently accounts for about 0.5% of the firm's revenue.  This practice group historically has handled a mix of paying and pro bono cases.

21.    The firm's nearly 1,000 active matters for its clients require Perkins Coie lawyers to interact with more than 90 different federal agencies.  For example, the firm's Intellectual Property group—among the largest practices at the firm—depends heavily on access to and interaction with the federal government.  The hundreds of attorneys in this group frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board (PTAB).  Perkins Coie lawyers are

**JA 44**

currently representing over five hundred clients in over 5,000 pending patent applications before the USPTO and dozens more in active post-grant proceedings (i.e., administrative trial proceedings) before the PTAB before the International Trade Commission (ITC). Perkins Coie lawyers are also representing clients in trademark and copyright matters before agencies, including over 60 matters before the Trademark Trial and Appeal Board (TTAB), almost 2,000 pending trademark matters before the USPTO, and approximately 145 pending copyright matters before the Copyright Office. Many of those patent and trademark clients also are known to have contracts with the federal government. And many of the firm's practice areas, such as its White Collar & Investigations group, rely almost exclusively on interacting with the federal government.

**<u>Defendants</u>**

22.     The U.S. Department of Justice is a federal agency headquartered in Washington, D.C.

23.     Pamela J. Bondi is the Attorney General of the United States. She is sued in her official capacity.

24.     The Federal Communications Commission is a federal agency headquartered in Washington, D.C.

25.     Brendan Carr is Chairman of the Federal Communications Commission. He is sued in his official capacity.

26.     The U.S. Office of Management & Budget is a federal agency headquartered in Washington, D.C.

27.     Russell T. Vought is Director of the U.S. Office of Management & Budget. He is sued in his official capacity.

**JA 45**

28.    The Equal Employment Opportunity Commission is a federal agency headquartered in Washington, D.C.

29.    Andrea R. Lucas is Acting Chair of the Equal Employment Opportunity Commission.  She is sued in her official capacity.

30.    The Office of Personnel Management is a federal agency headquartered in Washington, D.C.

31.    Charles Ezell is Acting Director of the Office of Personnel Management.  He is sued in his official capacity.

32.    The General Services Administration is a federal agency headquartered in Washington, D.C.

33.    Stephen Ehikian is the Acting Director of the General Services Administration.  He is sued in his official capacity.

34.    The Office of the Director of National Intelligence is a federal agency headquartered in Washington, D.C.

35.    Tulsi Gabbard is U.S. Director of National Intelligence.  She is sued in her official capacity.

36.    The United States of America is responsible for the exercise of executive action by the named Defendants and all other agencies that are directed by the Order to take action respecting Perkins Coie.  In light of the fact that Perkins Coie's attorneys interact with and appear before more than 90 different federal agencies, and the Order at issue is directed generally to "all agencies," the United States of America is included as a defendant to ensure that the relief ordered by the Court will apply on a government-wide basis, including to federal agencies that are not specifically listed as defendants.

## THE FACTS

### Recent Relevant Litigation

37.     In the wake of the 2020 election, Perkins Coie successfully handled numerous challenges brought by the Trump campaign seeking to overturn the results of the 2020 election. These cases came on the heels of many pre-election cases involving voting rights, including cases where Perkins Coie succeeded in upholding existing laws.

38.     On March 24, 2022, Donald Trump sued a number of defendants, including Perkins Coie, Hilary Clinton, the Democratic National Committee, Michael Sussmann, Marc Elias, and Fusion GPS, in the U.S. District Court for the Southern District of Florida, alleging that the defendants "maliciously conspired to weave a false narrative" that Mr. Trump was colluding with Russia and engaged in actionable conduct regarding Fusion GPS and Alfa Bank. *See* Dkt. 1, 2:22-cv-14102 (S.D. Fla.).  Mr. Trump asserted civil RICO claims against Perkins Coie for conspiring with the Clinton campaign and sought to recover damages in excess of $24 million, before trebling, as well as attorney's fees and lost profits.  On September 9, 2022, the District Court dismissed the lawsuit with prejudice, writing:  "As [defendants] view it, 'whatever the utilities of the Amended Complaint as a fundraising tool, a press release, or a list of political grievances, it has no merit as a lawsuit.'  I agree." *Trump v. Clinton*, 626 F. Supp. 3d 1264, 1284 (S.D. Fla. 2022).

39.     On February 6, 2025, Perkins Coie filed a lawsuit, *Shilling v. Trump*, No. 2:25-cv-241 (W.D. Wash.), on behalf of Commander Emily Shilling, Commander Blake Dremann, Lieutenant Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class Jane Doe, Staff Sergeant Videl Leins, Matthew Medina, and the Gender Justice League challenging an Executive Order targeting transgender servicemembers.  Perkins Coie represents the plaintiffs on a pro bono basis as co-counsel, along with Lambda Legal and the Human Rights

Campaign.  Perkins Coie filed a motion for a preliminary injunction on February 19, 2025, asking the court to bar implementation of that Executive Order until it could adjudicate the case, and the court ordered the government, while preliminary injunction briefing is underway, to notify the court immediately before making any changes to the status quo.

<u>**The Executive Order and Accompanying "Fact Sheet"**</u>

40.      The President of the United States on March 6, 2025, issued the Executive Order titled "Addressing Risks From Perkins Coie LLP."  Ex. 1.[1]

41.      Section 1 of the Order falsely declares that Perkins Coie had engaged in "dishonest and dangerous activity" that has affected the country "for decades."  As evidence of such so-called "dishonest and dangerous activity," the Order cites the firm's representation of the 2016 presidential campaign of the Democratic Party candidate, Hillary Clinton, and the firm's hiring of Fusion GPS in the course of that representation, stating that Fusion "manufactured a false 'dossier' designed to steal an election."

42.      As further evidence of such supposed "dishonest and dangerous activity"—activity that the Order brands as "egregious" and "part of a pattern"—the Order asserts that Perkins Coie has worked "to judicially overturn popular, necessary, and democratically enacted election laws" and that it has done so in association with so-called "activist donors."

43.      The Order does not mention the fact that Marc Elias, the lawyer who led the representation of the 2016 Clinton presidential campaign is no longer employed by Perkins Coie.  Nor does the Order mention the fact that the firm's clients prevailed in all but one of the challenges brought by the Trump campaign seeking to overturn the results of the 2020 election, and the firm's

---

[1] The exhibits referenced herein are attached to the declaration of Christopher N. Manning in support of Perkins Coie's motion for a temporary restraining order, filed contemporaneously herewith.

clients also prevailed in a significant number of voting rights cases, including cases where it was

successful in upholding existing laws, relating to the 2020 election.  Also absent from the Order is

any acknowledgment that, before his reelection, a federal court in Florida dismissed with prejudice

the President's personal lawsuit against Perkins Coie alleging that the firm had conspired with the

Clinton campaign and others to weave a false narrative about Mr. Trump colluding with Russia to

interfere with the 2016 election.  The Order also omits that no one involved with the engagement

of Fusion GPS remains at Perkins Coie.

44.    Section 1 of the Order further declares that one court sanctioned Perkins Coie

attorneys "for an unethical lack of candor before the court."  The Order does not mention that the

incident occurred in 2021; that the sanction, collectively, was $8,700; that the three sanctioned

attorneys are no longer members of, or employed by, the firm; that what the court determined to

be a lack of candor was a failure to notify the court of appeals that a motion to supplement the

record on appeal was "nearly identical" to an earlier motion to supplement the record when the

attorneys had sought an emergency stay; and that, upon reconsideration, the court explained that a

violation of the local rules, without any need to find bad faith, supported the sanctions.

45.    Section 1 of the Order also declares that Perkins Coie "racially discriminates

against its own attorneys and staff."  It does not, and did not.  The allegedly discriminatory

practices cited in the Order date back to 2019 and 2023; they did not exist then and they do not

exist now.  And the Order does not purport to identify any current practices that discriminate on

the basis of the race.  It is true that Perkins Coie has a longstanding commitment to diversity and

inclusion and has made, and continues to make, public statements advancing the ideals of diversity,

equity, and inclusion.  But Perkins Coie does not, and did not, have percentage quotas for hiring

or promoting minorities.  Reflecting the firm's core values, Perkins Coie introduced a summer

associate program decades ago (in 1991) geared towards providing diverse first-year law students

with valuable professional experience.  Perkins Coie was one of the first law firms in the country

to offer such an innovative program and expanded it in 2021 to include second-year law students.

Although the program was successful, following the Supreme Court's decision on race-conscious

admissions in *Students for Fair Admissions, Inc. (SFFA) v. President & Fellows of Harvard

College*, 143 S. Ct. 2141 (2023), Perkins Coie reexamined its diversity initiatives to adapt to

changing jurisprudence. While this review was already in progress, the American Alliance for

Equal Rights filed a lawsuit challenging Perkins Coie's fellowship programs.  As a result of the

litigation, the firm's leadership clarified that 1L and 2L diversity fellowships were open to all

applicants.  In fact, Perkins Coie had previously awarded the fellowship to non-diverse applicants.

American Alliance for Equal Rights consequently dismissed its lawsuit.

46.    Section 1 relies on the false premise that, by promoting diversity in the legal

profession, Perkins Coie has engaged in "blatant race-based and sex-based discrimination" and

therefore, violated the public trust.  Section 1 wrongly concludes that diversity, equity, and

inclusion policies "disrespect. . . the bed rock principle of equality" and therefore, represent good

cause to terminate access to national security clearances and federal funds.

47.    Section 4 instructs the Chair of the Equal Employment Opportunity Commission

(EEOC) to target "representative large, influential, or industry leading law firms"—like Perkins

Coie—to determine if large law firms hire and promote individuals; permit client access; or

provide access to events, trainings, or travel "on a discriminatory basis."  Section 4 further instructs

the Attorney General, in coordination with the Chair of the EEOC, to investigate large law firms

who do business with federal entities "for compliance with race-based and sex-based non-

15

**JA 50**

discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered."

48.     On the same day that the White House issued the Order, it also issued a so-called "Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP."  That Fact Sheet, Ex. 2, embellishes the Order's allegations concerning Perkins Coie.  It characterizes the Order as "Stopping Abuses That Undermine the Nation" and states that "President Trump's Administration will not tolerate Perkins Coie LLP's unethical and discriminatory actions that threaten our elections, military strength, and national security."

49.     Unlike the Order, which states that Perkins Coie, in the course of its representation of the Clinton campaign, hired a consultant that "manufactured a false 'dossier' designed to steal an election," the Fact Sheet declares that the law firm hired the consultant for the very purpose of preparing a false document ("In 2016, Perkins Coie LLP hired Fusion GPS to manufacture a false 'dossier' designed to steal an election …..").  The Fact Sheet does not mention that a federal court dismissed President Trump's suit because it was no more than "a fundraising tool, press release, or a list of political grievances," and had no merit as a lawsuit.  *Trump*, 626 F. Supp. 3d at 1284.

50.     The Fact Sheet further explains the Order by stating that the law firm "pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme."  The Fact Sheet does not mention that a jury in this Court quickly and unanimously acquitted Mr. Sussmann, nor the fact that he resigned from the firm in 2021 and is now employed at a different law firm.

51.     The Fact Sheet repeats the same false and disparaging statements about discrimination and lack of candor that the Order does.

**JA 51**

52.    The Fact Sheet also repeats a myth that Perkins Coie "hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump." That rumor was long ago debunked. Like many law firms who represent clients involved in national security issues, the firm was permitted to install, at its own expense, a single-room Secure Work Environment (SWE) when it moved to its current building years ago. The FBI's only involvement was examining and approving the security of the space. Mr. Sussmann—who was not in the firm's Political Law practice and has not been at the firm for years—used that space as his office. Perkins Coie no longer has a SWE.

53.    Although the Order says nothing about "abuses" supposedly affecting military strength and national security, the Fact Sheet purportedly explaining the Order states that "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness." On information and belief, that statement refers to the pending lawsuit brought by servicemembers, represented by Perkins Coie and others, challenging the Executive Order that bans transgender personnel from serving in the United States Armed Forces. The firm represents the plaintiffs on a pro bono basis.

### The Retaliatory Character of the Executive Order and "Fact Sheet"

54.    These many disparaging statements in the Order and Fact Sheet about Perkins Coie were intended to constitute, and in fact do constitute, retaliation for the law firm's representation of the President's Democratic opponent in the 2016 election and of clients who, in 2016 and afterward, challenged and defended cases adverse to the President and his allies.

55.    Only ten days before issuing the Order and Fact Sheet, the White House had issued a memorandum to the Secretaries of State and Defense, the Attorney General, the Director of National Intelligence, and other agency heads directing them to suspend any active security

clearances held by "all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel," falsely referring to Mr. Smith's service as "the weaponization of judicial process." That memorandum also directed the same persons "to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law …."

56.   Observers immediately understood and characterized the Order targeting Perkins Coie, like the earlier memorandum concerning Covington & Burling LLP, as retaliation against the law firm for its association with, and representation of, the President's political opponents.

57.   The Washington Post wrote that, through the Order directed at Perkins Coie, the Administration "targeted another elite law firm that has represented clients the president considers his political enemies." The Associated Press wrote that "the actions appear designed not only to settle scores from years past but also to deter both government officials and private sector workers from participating in new inquiries into his conduct." Politico described the Order as "the latest chapter in the president's campaign to punish his perceived political enemies," noting the earlier termination of security clearances for the lawyers representing Mr. Smith. The Wall Street Journal noted that the president "hasn't shied away from punishing his enemies" and that his moves "have sent a chill through" the legal profession. The New York Times recognized the Order as an "escalation of efforts to punish groups the president sees as aiding his enemies" and called it "a form of payback for [Perkin Coie's] legal work for Democrats during the 2016 presidential campaign." The Financial Times called the Order a "further move against lawyers that worked in opposition to him." And associates of the President have made clear that the Administration is monitoring which lawyers and firms are representing his political opponents. Elon Musk, for example, reposted a story on X about lawsuits challenging the Administration's cuts to funding at

the National Institutes of Health, asking, "Which law firms are pushing these anti-democratic cases to impede the will of the people?"

58.    In seeking comment on the Order, the press also determined that the Order was having an immediate chilling effect.  Law.com reported that "most law firm leaders are choosing to stay anonymous when speaking about the administration's orders[.]"  It quoted one anonymous firm leader as stating that "[n]ow firms need to consider the Trump administration backlash in client intake," and, another, that "'you will see most firms take a more conservative approach to taking on matters that piss off the administration.'"  Similarly, the Wall Street Journal cited "private conversations" with partners at the nation's leading law firms who have declined to object to the Order "in part because of retaliation fears."  The article also stated that "[a]dvocacy groups and smaller law firms say it has been more difficult to recruit larger firms to help with cases against Trump" and quoted a NAACP Legal Defense Fund employee as saying that "Law firms are not as vocal and as zealous" in their representations.

59.    Observers rightly recognized the Order as retaliation for Perkins Coie's association with, and advocacy on behalf of, the President's political opponents because he repeatedly promised during his 2024 presidential campaign to retaliate against his perceived political enemies, including the lawyers who represented them.

60.    In June 2024, in an interview with Sean Hannity, the President said, "Look, when this election is over, based on what they've done, I would have every right to go after them …."  In September 2024, Trump warned on Truth Social that "WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law…. Please beware that this legal exposure extends to Lawyers…."  By October, NPR counted "100 threats to investigate, prosecute, imprison or otherwise punish his perceived opponents."

**JA 54**

61.    In signing the Order, the President confirmed this intention.  His staff secretary handed him the Order, stating it was part of the effort "to hold those who engaged in lawfare accountable," to which the President responded that Perkins Coie engaged in weaponization "against a political opponent" and "it should never be allowed to happen again."

62.    Since issuing the Order, the President has stated that his Administration will continue to retaliate against law firms that have represented persons that he perceives as political enemies.  Interviewed on March 9, 2025, the President said (and repeated), "We have a lot of law firms that we are going to be going after."

### The Irreparable Harm to Perkins Coie

63.    The Order does more than disparage Perkins Coie by declaring that the firm engages in "racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust[.]"  It has caused clients to sever their relationship with the firm, and it incentivizes that in three ways.

64.    First, the Order requires clients that are government contractors to disclose "any business they do with Perkins Coie," regardless of whether that business relates to the client's federal contracting work, where the consequence of such disclosure will be that "the heads of agencies shall … take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law … for which Perkins Coie has been hired to perform any service."  The Fact Sheet is even more explicit that contracts will, in fact, be terminated and that the purpose is punishment.  The Fact Sheet states, "[T]he Federal Government will prohibit funding contractors that use Perkins Coie LLP."  And it states that the Government will do so "[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States[.]"

**JA 55**

65.     Many of Perkins Coie's largest clients (for example, the firm's 15 largest clients, collectively representing over $343 million in revenue in 2024, which represents almost a quarter of the firm's revenue), or their affiliates, are known either to have, or to compete for, contracts or subcontracts with the federal government, and many of those companies are represented by the firm for legal matters completely unrelated to government-contracting matters.  For many of Perkins Coie's clients, the fact that the firm gives them legal advice is not public information. Accordingly, if implemented, the Order will seek to require clients to divulge confidential information regarding consultation of counsel to the federal government, at risk that the Administration will then terminate the clients' government contracts.

66.     Second, the Order directs the heads of "all agencies" to limit the access of Perkins Coie attorneys and employees to federal buildings when access would be "inconsistent with the interests of the United States," to limit Government employees "from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States," and to "refrain from hiring employees of Perkins Coie, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management."

67.     Citing the Order, Government employees have already twice indicated that Perkins Coie attorneys should not, or could not, attend scheduled meetings.  The day after the President signed the Order, an official of a federal agency, informed a client of Perkins Coie that, because of the Order, the client's Perkins Coie lawyers should not attend a scheduled meeting with an office in that agency to discuss a pending matter.

68.     On March 6, an attorney in the Fraud Section of the Criminal Division of the U.S. Department of Justice, informed Perkins Coie that the Criminal Division could not proceed with a scheduled meeting relating to a firm client.  The attorney stated that he was awaiting further

21

**JA 56**

guidance as to whether the Criminal Division could meet at all with the firm's lawyers in light of the Order. This postponement has threatens the ability of that client to achieve a swift resolution of the matter.

69.    Third, the Order directs the Attorney General, the Director of National Intelligence, and the "relevant heads of executive departments" immediately to suspend any security clearances of Perkins Coie attorneys pending a review of whether such clearances "are consistent with the national interest." The Order thus gives clients, like defense contractors, reason to sever ties with lawyers that lack clearances and to retain lawyers who have or can secure the requisite clearances, particularly when those clients can have no assurance that the review of Perkins Coie's clearances will be timely, much less that it will be favorable given the retaliatory character of the Order.

70.    Because of the Order—including the restrictions imposed on Perkins Coie, the obligations imposed on, and risk of contract termination faced by clients with government contracts, the uncertainty, and the Government animus to the firm reflected by the Order—several clients have already terminated, or have communicated that they are considering terminating, their legal engagements with Perkins Coie. This is a rapidly evolving situation, which changes by the hour. Some clients have reported very concerning messages from government officials directing them to report business with Perkins Coie, and others are concerned about that possibility

71.    One client informed Perkins Coie within hours of the Order's release that, due to the Order, Perkins Coie cannot represent that client in any litigation or before the relevant federal agency.

72.    A major government-contractor client for over 35 years withdrew its work from Perkins Coie in light of the Order as of March 7. Shortly before the Order, that client had added

**JA 57**

Perkins Coie to its preferred-provider program, and annual billings to the client have often been in the millions of dollars.

73.    Another government-contractor that has been a firm client since 2018 has also withdrawn all work from the firm as a result of the Order as of March 7.

74.    A group of four clients have withdrawn all work from the firm as of March 7, due to their need to engage with various federal agencies, including the Drug Enforcement Administration, Health and Human Services, and the Department of Justice (DOJ).

75.    Another major government-contractor client for over 10 years informed the firm on March 7 that it is reconsidering its engagements with Perkins Coie unless something changes in terms of the Order's requirements.

76.    Another client indicated on March 7 that it is now considering retention of an alternative firm to represent it in connection with a DOJ investigation.

77.    Because of the uncertainty created by the Order, many clients have begun requesting frequent updates relating to the Order in order to assess whether Perkins Coie can continue to represent them.   The time that Perkins Coie's attorneys spend attending to these inquiries is a present and irreparable cost to Perkins Coie, because its lawyers (like most lawyers) are compensated by clients for their time.  Every hour spent responding to the Order is an hour that an attorney cannot spend serving his or her clients on their cases and other matters.  Both Perkins Coie's clients and its bottom line are harmed every day the Order is left undisturbed. Perkins Coie's largest clients want to keep using the firm, but are reviewing the relationship, their government contracts, and other government interactions, and have indicated that they will need to make decisions shortly.

78.     Perkins Coie has already lost significant revenue due to the loss of clients who terminated their engagements in the few days since the Order was issued.  Like any law firm or business, Perkins Coie has debts, obligations and expenses.  Upon information and belief, Perkins Coie will continue to lose existing and prospective clients if the Order is allowed to stand, and the losses would be such as to jeopardize the firm's long-term health.

79.     The Order also threatens the right of Perkins Coie attorneys to practice their chosen profession.  That threat is not only to revenue-generating practice, but also to the firm's pro bono practice, as Perkins Coie attorneys frequently appear in federal court and before federal agencies in criminal, civil, or administrative matters.  The firm is built around representation of clients who interact with the federal government.

80.     The Order has also adversely affected and will continue to affect the firm's recruiting and, potentially, retention of employees.  Since the issuance of the Order, business-professional candidates to whom offers have been extended have questioned the economic health of the firm and whether there will be layoffs.  At least one interviewee asked questions obviously prompted by the Order.  The firm also has a recruiting event within the next two weeks that is focused on practice before a federal court of appeals, from which the firm historically has hired clerks to practice in areas related to government contracts, international trade, and intellectual property.  The Order will dissuade talented candidates from joining Perkins Coie under fear that they will be foreclosed from later entering service with the federal government

81.     The Order also interferes with Perkins Coie's employer–employee relationships because the restrictions are broadly written to include Perkins Coie employees.

82.     The Order has also harmed and will harm Perkins Coie's reputation in the market through its false and disparaging characterizations of the firm and its attorneys.

**JA 59**

83.     In short: the Order has had its intended effect already—irreparable impact that will only continue to grow.  The disparagement of the firm, which signals to present and prospective clients alike that it is *persona non grata* with the Administration, combined with the threat of termination of clients' government contracts and suspension of security clearances, has caused financial and reputational harm to the firm.  By reason of the Order, the firm has lost clients, lost business (as clients have withdrawn business or given new business to other firms), and received worried inquiries from clients, including its largest clients, which question whether it can adequately represent them in light of the Administration's demonstrated animus.

84.     The Order has had, and will continue to have, a chilling effect on whether and how Perkins Coie will litigate on behalf of certain clients, and is having a chilling effect on attorneys and other persons considering employment with the firm.  These consequences will continue to mount if the Order is allowed to stand.

## CLAIMS FOR RELIEF

## COUNT I

## (Against All Defendants)

### *Ultra Vires Presidential Action – Unconstitutional Exercise of Judicial Authority*

85.     Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

86.     Fundamental to the Constitution is that the separation of powers prevents the "concentrat[ion] [of] the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024).  The separation of powers "protects the liberty of the individual from arbitrary power."  *Bond v. United States*, 564 U.S. 211, 222 (2011).

25

**JA 60**

87.     The President's authority to act must "stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

88.     There is no enumerated or inherent executive authority from the Constitution to regulate and to sanction lawyers for professional misconduct.  That is not part of the President's "core constitutional power[]." *Trump v. United States*, 603 U.S. 593, 606 (2024).  Nor is it one of his "incidental powers, belonging to the executive department, which are necessarily implied from the nature of the functions." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (quoting 3 Joseph Story, Commentaries on the Constitution of the United States § 1563 (1st ed. 1833)).

89.     The Order also identifies no constitutional or statutory source of authority.  The Order is ultra vires because there is "no express constitutional or statutory authorization" empowering the President to retaliate against and punish Plaintiff for representing clients outside of agency proceedings.  *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 331 (1942).

90.     The Judicial Branch, not the President, has the inherent authority to regulate the legal practice.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).  Such authority "includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (cleaned up).  Courts find facts to support punishments limiting private rights of liberty, property, and contract.  *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54–56 (1989).  And they impose punishments only after ensuring due process.  *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 161 (1951) (Frankfurter, J., concurring).

91.     Article III of the Constitution vests the "judicial Power of the United States" in the federal courts.  That power enables courts "to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision." *Muskrat v. United*

*States*, 219 U.S. 346, 356 (1911) (quoting Samuel Freeman Miller, Lectures on the Constitution of the United States 314 (1891)).

92.    Section 1 of the Order purports to find that Perkins Coie has engaged in "dishonest and dangerous activity" and "worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws."  It then falsely asserts that Perkins Coie "undermin[es] democratic elections, the integrity of our courts, and honest law enforcement" and "racially discriminates against its own attorneys and staff, and against applicants."

93.    Section 3 of the Order relies on Section 1 to penalize Perkins Coie for its legal advocacy by instructing "Government contracting agencies … [to] require Government contractors to disclose any business they do with Perkins Coie," "to terminate any contract … for which Perkins Coie has been hired to perform any service," and to report on actions taken with respect to "contracts with Perkins Coie or with entities that do business with Perkins Coie."  It thus strips Perkins Coie's clients and business partners of their government contracts.

94.    Likewise, wielding the purported findings of Section 1, Section 5 of the Order restricts Perkins Coie employees' "access [to] Federal Government buildings" and limits Perkins Coie employees' ability to "engag[e]" with government personnel.

95.    No statute authorizes these actions.  Nor could one exist, because the power to impose penalties for legal advocacy—after an adjudication of the facts accordant with due process—rests with federal and state courts.

96.    The President punishes Perkins Coie with an order that shares all the essential features of a bill of attainder.  The Order thus invades judicial power by adjudicating facts to support a restriction of Plaintiff's private rights in a way the Constitution prohibits the legislature

**JA 62**

from doing.  The Constitution prohibits presidents from arrogating judicial power unto themselves to "pronounce[] upon the guilt of [Plaintiff] … in accordance [solely] with [their] own notions." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866).

97.    The Order is therefore *ultra vires* because it violates the separation of powers by exercising judicial power and because no statute grants such authority.

98.    The *ultra vires* nature of the Order has already harmed, and continues to harm, Plaintiff.

## COUNT II

### (Against All Defendants)

### *Unconstitutional Deprivation of Procedural Due Process*

99.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

100.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."

101.    The Order interferes with and impairs multiple liberty and property interests protected by the Due Process Clause.  Perkins Coie represents clients in federal-court litigation and in matters before federal agencies.  In order to provide legal services, Perkins Coie is required to access federal government buildings and engage with federal government employees.  The Order impairs Perkins Coie's ability to follow its chosen profession by limiting its ability to practice law, including its ability to represent clients in court and before agencies, and to contract with the federal government.  The Order also impairs Perkins Coie's private contracts with its clients.  The Order harms Perkins Coie's constitutionally protected property interests by

prohibiting Perkins Coie from participating in federal contracting and seeking to terminate private contractual relationships between Perkins Coie and its clients.  The Order harms Perkins Coie's cognizable reputation interest by stigmatizing Perkins Coie as dishonest, untrustworthy and racially discriminatory.  The Order also deprives Perkins Coie of its liberty interest in its First Amendment right to petition the government because it restricts access to governmental facilities and governmental personnel.

102.    Perkins Coie did not receive notice prior to being subjected to the Order.  Perkins Coie was not aware, prior to the issuance of the Order, of the conduct that would subject it to punishment or the severity of the potential punishment.

103.    Defendants did not provide Perkins Coie with any opportunity to challenge the purported factual findings or the sanctions in the Order prior to their announcement.  Following the issuance of the Order, Perkins Coie has not been given an opportunity by Defendants to challenge the Executive Order.

104.    No compelling government interest justifies Defendants' violation of Perkins Coie's due process rights.  The decision to adopt the Order was based on improper purposes.  Among other improper purposes, the Order was adopted for retaliatory reasons, and in order to punish Perkins Coie for exercising rights protected by the First Amendment.  The Order is based on false premises, but even assuming that it were not, the sanctions it imposes would be wildly disproportionate.  Indeed, the President's choice to punish an entire law firm—rather than the handful of attorneys allegedly responsible for the misconduct the Order purports to identify—clarifies the retaliatory nature and gross disproportionality of the Order.  So too its focus singling out Perkins Coie from among similarly situated firms.  This improper purpose and absence of any

**JA 64**

legitimate justification demonstrates that the Order is an abusive, irrational abuse of power that shocks the conscience, such that it could not be justified by any level of process.

105.    As a result of Defendants' actions, Perkins Coie's Fifth Amendment right to due process has been violated.  Defendants' violation of due process has caused Perkins Coie to suffer ongoing and irreparable harm.

**COUNT III**

**(Against All Defendants)**

***Unconstitutional Deprivation of Due Process (Void for Vagueness)***

106.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

107.    A federal law is unconstitutionally vague and thus violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see also Johnson v. United States*, 576 U.S. 591, 595 (2015).

108.    The Order is unconstitutionally vague and violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  It does not provide Perkins Coie with a basis to understand what conduct is prohibited or how to avoid further sanctions in the future.  The Order also does not provide any guidance on which interactions and buildings, and in what circumstances, its employees are restricted from.  The Order's vagueness also permits Defendants to engage in arbitrary and discriminatory enforcement against Perkins Coie.

109.    The Order also fails to provide adequate notice as to what are prohibited "diversity, equity, and inclusion" policies.  The Order is unconstitutionally vague because Perkins Coie

30

**JA 65**

cannot know whether it can hire, promote, staff or train employees who are racial minorities or unspecified "other categories prohibited by civil rights laws." Nor can Perkins Coie know how it is deemed untrustworthy to have access to national security information simply because it embraces programs and policies that are deemed by the Order to be discriminatory "diversity, equity, and inclusion" policies. The Order threatens and compels various punishments and investigations against Perkins Coie because of its "diversity, equity, and inclusion" policies. Because the order is vague with respect to prohibited "diversity, equity, and inclusion" policies it is a violation of the firm's constitutional due process rights.

110.    The Order's threatened investigation and enforcement action by the EEOC and the Department of Justice against Perkins Coie because of the firm's vaguely defined "diversity, equity, and inclusion" policies makes it a violation of the firm's constitutional due process rights.

111.    The Order's threatened suspension of active security clearances held by Perkins Coie employees because of the firm's vaguely defined "diversity, equity, and inclusion" policies makes it a violation of the firm's constitutional due process rights.

112.    The Order's threatened termination of contracts or funding with Perkins Coie or entities doing business with Perkins Coie because of the firm's vaguely defined "diversity, equity, and inclusion" policies makes it a violation of the firm's constitutional due process rights.

113.    The Order's threatened limitation of access to Federal property and engaging with government employees because of the firm's vaguely defined "diversity, equity, and inclusion" policies make it a violation of the firm's constitutional due process rights.

114.    The Order's threatened prevention of the hiring of Perkins Coie employees for Federal positions because of the firm's vaguely defined "diversity, equity, and inclusion" policies makes it a violation of the firm's constitutional due process rights.

**JA 66**

115.    No compelling government interest justifies Defendants' violation of Perkins
Coie's due process rights.   The decision to adopt the Order was based on improper purposes.
Among other improper purposes, the Order was adopted for retaliatory reasons, and in order to
punish Perkins Coie for exercising rights protected by the First Amendment.   The Order is based
on false premises, but even assuming that it were not, the sanctions it imposes would be wildly
disproportionate.   Indeed, the President's choice to punish an entire law firm—rather than the
handful of attorneys allegedly responsible for the misconduct the Order purports to identify—
clarifies the retaliatory nature and gross disproportionality of the Order.   So too does its singling
out of Perkins Coie from among similarly situated firms.   This improper purpose and absence of
any legitimate justification demonstrates that the Order is an abusive, irrational abuse of power
that shocks the conscience, such that it could not be justified by any level of process.

116.    As a result of Defendants' actions, Perkins Coie's Fifth Amendment right to due
process has been violated.   Defendants' violation of due process has caused Perkins Coie to suffer
ongoing and irreparable harm.

## COUNT IV

### (Against All Defendants)

### *Unconstitutional Denial of Equal Protection*

117.    Plaintiff repeats and realleges the allegations set forth in each of the preceding
paragraphs as if fully set forth herein.

118.    The Equal Protection Clause as incorporated by the Fifth Amendment to the United
States Constitution prohibits the federal government, its agencies, its officials, and its employees
from denying persons the equal protection of the laws.

32

**JA 67**

119.    The Equal Protection Clause bars the government from disfavoring similarly situated individuals without a constitutionally legitimate basis. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

120.    To justify discriminatory conduct, the government must put forward a "plausible reason" for its differential treatment, *FCC v. Beach Communications*, *Inc.*, 508 U.S. 307, 313-14 (1993), which cannot be "so attenuated" from its conduct "as to render [it] arbitrary or irrational." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446 (1985) (citing, *inter alia*, *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 535 (1973)).  "[A] bare desire to harm a politically unpopular group" is "not [a] legitimate state interest[]." *City of Cleburne*, 473 U.S. at 447.

121.    The purpose of the Order is to discriminate against Perkins Coie.  The Order intentionally targets Perkins Coie with extraordinary sanctions not levied on other, materially similarly situated firms or lawyers.

122.    The improper motive behind the Order is also apparent on its face and through the President's related public statements, as well as the statements of members of his Administration.

123.    The government lacks even a rational justification for the Order.  Among other things, the Order targets a 1,200-lawyer, 21-office international law firm based on almost ten-year-old allegations that courts have rejected and that involve partners whom Perkins Coie has not employed for several years.  The Order expressly seeks to punish Perkins Coie for representing clients in lawsuits that successfully struck down unconstitutional election laws and defeated challenges brought by President Trump or his allies to the results of the 2020 election.  There is not a shred of evidence of any national security threat from Perkins Coie, let alone one sufficient

**JA 68**

to justify barring Perkins Coie from engaging in government contracts, interacting with federal employees, and accessing federal buildings.

124.    The Order is therefore in violation of the Equal Protection Clause.

125.    The Order's violations cause ongoing and irreparable harm to Perkins Coie.

## COUNT V

### (Against All Defendants)

#### *Unconstitutional Denial of First Amendment*
#### *Free Speech and Associational Rights (Political Viewpoint Discrimination)*

126.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

127.    The First Amendment prohibits the regulation or censure of speech based on "'the specific motivating ideology or the opinion or perspective of the speaker.'"  *Reed v. Town of Gilbert*, 576 U.S. 155, 168-69 (2015) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995)).  Such government action is a "'blatant' and 'egregious form of content discrimination'" and is subject to strict scrutiny.  *Reed*, 576 U.S. at 168, 171.

128.    The Order (and Fact Sheet explaining it) constitute viewpoint discrimination because they single out and punish Perkins Coie for its association with, and advocacy on behalf of, the President's political opponents in the 2016 and 2020 elections.

129.    The Order and Fact Sheet do not distinguish between the client's viewpoint and the firm's zealous advocacy of that viewpoint, but attribute the viewpoint to the firm and retaliate against the firm on that basis.

130.    The Order's viewpoint discrimination is all the more egregious because it concerns speech that is at the core of First Amendment protection—i.e., speech concerning the election of candidates to national office and what the law should be governing those elections.

131.    Viewpoint discrimination that is retaliatory cannot be justified by any government interest.  Even if the Order were not retaliatory in purpose and in the public's perception, as it clearly is, no compelling interest can support the Order.  It is the job of the courts to police misconduct by the lawyers who appear before them, and it is the job of state bars to discipline ethical misconduct by members of the bar.  The President has no authority in these areas.  Here, moreover, the President has presented his claims concerning the 2016 election to a federal court, and that court has dismissed his case.  He presented his claims regarding the 2020 election to numerous courts without material success, frequently losing to parties represented by Perkins Coie. Nor can there be any compelling government interest in punishing the entire Perkins Coie firm of over 1,200 lawyers and over 1,200 non-lawyer professionals now, in 2025, when the purportedly offending speech (i) occurred years ago and (ii) involved a mere handful of lawyers (iii) none of whom are members or employees of the firm today.

132.    The First Amendment forbids the government's use of a patronage system whereby it conditions government benefits, such as contracts, access to government facilities or employment, or security clearances on political support or affiliation.  Even where there is no right to a government benefit, the government cannot revoke or condition benefits on grounds that violate the First Amendment's guarantee of free speech and association.  The Order punishes Perkins Coie for the lack of political fealty and conditions the further receipt of government benefits on adherence to the President's political points of view.

133.    The First Amendment protects the right to petition the government for redress of grievances.  Such petition includes seeking relief in courts of law and agencies of government. The Order violates that right by denying the ability of Perkins Coie lawyers to enter public buildings and, even short of entry, communicate and meet with government employees (two of

whom have already refused to meet with Perkins Coie lawyers, as scheduled before issuance of the Order).

134.    Facially overbroad regulation violates the First Amendment because it chills protected speech.  The Order and Fact Sheet are facially overbroad, *inter alia*, because they do not define what constitutes "dishonest and dangerous activity."  The Order, on its face, also encompasses legally protected activity, such as petitioning the government for redress of grievances in the courts.

135.    The Order's violations cause ongoing and irreparable harm to Perkins Coie.

## COUNT VI

### (Against All Defendants)

### *Unconstitutional Denial of First Amendment*
### *Free Speech and Associational Rights (Compelled Disclosures)*

136.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

137.    The First Amendment limits the government's ability to compel individuals to disclose their "affiliation[s] with groups engaged in advocacy."  *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).  Such compelled disclosures must satisfy "exacting scrutiny," a standard that requires the government to show that there is "a substantial relation between the disclosure requirement and a sufficiently important governmental interest."  *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021).

138.    Section 3 of the Order "require[s] [g]overnment contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract."

139. Perkins Coie has third-party standing to assert the First Amendment rights of its clients who are subject to Section 3 because (i) Perkins Coie's right to freedom of association is burdened by the disclosure requirements and the disclosure requirements will cause Perkins Coie to lose clients; (ii) Perkins Coie has a close relationship with its clients; and (iii) Perkins Coie's clients are hindered from challenging the disclosure requirements and protecting their First Amendment rights because the act of challenging the disclosure requirements would require the clients to disclose their relationship with Perkins Coie. *See Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223–24 (D.D.C. 2020).

140. The government's interest—retaliating against Perkins Coie for First-Amendment-protected activity of which the President disapproves—is not "sufficiently important" to withstand exacting scrutiny.

141. Requiring all "[g]overnment contractors to disclose any business they do with Perkins Coie" irrespective of "whether that business is related to the subject of the Government contract," EO § 3, is not the kind of "narrow specificity" required by the First Amendment, *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963).

142. Section 3 of the Order is facially unconstitutional.

143. This constitutional violation causes ongoing and irreparable harm to Perkins Coie.

## COUNT VII

### (Against All Defendants)

***Unconstitutional Denial of First Amendment Free Speech and Associational Rights***
***(Retaliation for Statements in Favor of Diversity and Inclusion)***

144. Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

145.    Perkins Coie has a longstanding commitment to diversity and inclusion and has made, and continues to make, public statements advancing the ideals of diversity, equity, and inclusion.  Such statements of political opinion are core protected speech.

146.    The Order's viewpoint discrimination stems from the threatened investigation and enforcement action against Perkins Coie because it embraces programs and policies that are deemed by the Order to be discriminatory "diversity, equity, and inclusion" policies.

147.    Section 1 of the Order falsely asserts that Perkins Coie, by espousing views supportive of diversity and inclusion, has "disrespect[ed] . . .the bedrock principle of equality" and concludes that good cause therefore exists to terminate Perkins Coie's national security clearances and access to any federal funds.  Such allegations are bad faith, pretextual, and lack any basis in fact.

148.    The Order's threatened investigation and enforcement action by the EEOC and the Department of Justice against Perkins Coie because it embraces programs and policies that espouse a belief in "diversity, equity, and inclusion" makes it a violation of the firm's First Amendment right of free expression.

149.    The Order's threatened suspension of active security clearances held by Perkins Coie employees because the firm embraces programs and policies that espouse a belief in "diversity, equity, and inclusion" makes it a violation of the firm's First Amendment right of free expression.

150.    The Order's threatened termination of contracts or funding with Perkins Coie or entities doing business with Perkins Coie because the firm embraces programs and policies that espouse a belief in "diversity, equity, and inclusion" makes it a violation of the firm's First Amendment right of free expression.

151.    Section 4(a) of the Order unconstitutionally retaliates against Perkins Coie for First Amendment protected speech supporting and promoting diversity, equity, and inclusion in the legal profession and orders the Chair of the Equal Employment Opportunity Commission to investigate "representative large, influential or industry leading law firms"—like Perkins Coie—to determine if discriminatory hiring and promotion practices exist.

152.    Section 4(b) instructs the Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and the State Attorneys General, to conduct compliance investigations of any "large law firms"—like Perkins Coie—who do business with federal entities and to take "additional actions" deemed appropriate by the Attorney General "in light of the evidence uncovered."

153.    The threatened investigations into Perkin Coie's hiring, retention, promotion, and training practices constitute a "retaliatory action sufficient to deter a person of ordinary firmness in [Perkins Coie's] position from speaking again" and would thus be cognizable. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). *See Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001) (Retaliatory actions "that would chill a person of ordinary firmness" include "prosecution, threatened prosecution, bad faith investigation, and legal harassment.").

154.    The threat of an investigation by the Equal Employment Opportunity Commission and/or the Department of Justice imposes costs on Perkins Coie, including the potential costs of litigation and the need to redirect dedicated resources from other purposes to engage with the investigation.  Those harms are in addition to the reputational harms imposed on Perkins Coie by the false allegations in the Order which have resulted or will result in the loss of clients, employees, and prestige.

155.    The Order, thus, violates the First Amendment.

156.    That violation causes ongoing and irreparable harm to Perkins Coie.

## COUNT VIII

### (Against All Defendants)

### *Unconstitutional Denial of Right to Counsel (Sixth Amendment)*

157.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

158.    The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  The Sixth Amendment affords criminal defendants the right to effective assistance provided by the counsel of one's choosing. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Wheat v. United States*, 486 U.S. 153, 159 (1988).  Actions that substantially interfere with, or deprive, the right to counsel constitute a violation of the Sixth Amendment.

159.    Lawyers have prudential, third-party standing to challenge violations of their clients' Sixth Amendment or Due Process rights to counsel that interfere with the lawyers' practice. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989); *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990).  In particular, because an attorney's duty to provide effective counsel "may not be fettered by harassment of government officials," a lawyer has "standing to challenge any act which interferes with his professional obligation to his client and thereby, through the lawyer, invades the client's constitutional right to counsel." *Wounded Knee Legal Def. v. Fed. Bureau of Investigation*, 507 F.2d 1281, 1284 (8th Cir. 1974).  Because the firm represents criminal defendants and others in dealings with the government, it has standing to challenge the Order's attempted interference with its clients' rights to counsel.

40

**JA 75**

160.    The Order violates the firm's clients' Sixth Amendment rights to counsel because it directs "the heads of all agencies" without exception to "limit[] Government employees acting in their official capacity from engaging with Perkins Coie employees" and thus significantly impairs Perkins Coie's ability to advance clients' interests before the government.

161.    The Order violates the firm's clients' Sixth Amendment rights to counsel because it directs "the heads of all agencies" without exception to "limit[] official access from Federal Government buildings to employees of Perkins Coie" and thus significantly impairs Perkins Coie's ability to advance clients' interests before the government.

162.    The Order also violates the firm's clients' Sixth Amendment rights to their preferred counsel because it "require[s] Government contractors to disclose any business they do with Perkins Coie" and thus compels clients to choose between their livelihood and their preferred counsel.

163.    The Order is therefore in violation of the Sixth Amendment.

164.    This violation causes ongoing and irreparable harm to Perkins Coie.

## COUNT IX

### (Against All Defendants)

### *Unconstitutional Denial of Right to Counsel (Fifth Amendment)*

165.    Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

166.    Lawyers and clients have due process interests in their contractual and professional relationships.

167.    The Order's sanctions interfere with and chill all of those representations and relationships.  Like the firm's other due process interests, the Order failed to provide adequate

41

**JA 76**

process before interfering with the firm's and clients' due process rights to counsel.  And because these sanctions—which punish a firm for successful lawsuits and threaten the firm's clients—are not rationally related to a legitimate government interest they cannot stand.

168.    The Order's violations cause ongoing and irreparable harm to Perkins Coie and its clients.

**PRAYER FOR RELIEF**

**WHEREFORE,** Perkins Coie respectfully requests that the Court:

169.    Declare the Executive Order unconstitutional as violative of the Separation of Powers and Article II of and the First, Fifth and Sixth Amendments to the Constitution.

170.    Immediately enjoin implementation of the Order pending consideration of a motion for preliminary injunction.

171.    Preliminarily, then permanently, enjoin implementation of the Order.

172.    Grant such other relief as the Court deems just and proper.

**JA 77**

Dated: March 11, 2025                    Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**

By:  */s/ Dane H. Butswinkas*
                    Dane H. Butswinkas (D.C. Bar #425056)

F. Lane Heard III (D.C. Bar #291724)          Amy M. Saharia (D.C. Bar #981644)
Christopher N. Manning (D.C. Bar #464069)      Matthew B. Nicholson (D.C. Bar #1013418)
Ryan T. Scarborough (D.C. Bar #466956)         Carol J. Pruski (D.C. Bar #1006941)*
Malachi B. Jones (D.C. Bar #455555)            Charles L. McCloud (D.C. Bar #1012047)*
Charles Davant IV (D.C. Bar #484305)           Krystal C. Durham (D.C. Bar # 987768)
David S. Kurtzer-Ellenbogen (D.C. Bar #489559) Eden Schiffmann (D.C. Bar #1035019)
Jesse T. Smallwood (D.C. Bar #495961)

                                               680 Maine Avenue, SW
                                               Washington, DC  20024
                                               (202) 434-5000

                                               *Counsel for Plaintiff Perkins Coie LLP*

                                               *\* DDC bar application pending*

43

**JA 78**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

          Plaintiff,

         v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

         Defendants.

Civil Action No. 25-716 (BAH)

Judge Beryl A. Howell

## <u>ORDER</u>

Upon consideration of plaintiff Perkins Coie LLP's Motion for a Temporary Restraining Order ("TRO"), ECF No. 2; the memoranda, declarations, and exhibits submitted in support; and the arguments in support and in opposition presented at the expedited TRO hearing held on March 12, 2025, for the reasons explained orally at the hearing, it is hereby:

**ORDERED** that plaintiff's Motion for a Temporary Restraining Order, ECF No. 2, is **GRANTED**; it is further

**ORDERED** that defendants are **ENJOINED** from implementing or enforcing Sections 1, 3, and 5 of Executive Order 14230, 90 Fed. Reg. 11781 (Mar. 11, 2025), issued by the President on March 6, 2025, entitled "Addressing Risks from Perkins Coie LLP"; it is further

**ORDERED** that defendants are **ENJOINED** from using the statements laid out in Section 1 of Executive Order 14230 in any interactions with plaintiff or plaintiff's clients, or employee of plaintiff or plaintiff's clients; it is further

**ORDERED** that defendants are **DIRECTED** to suspend and rescind all guidance or other direction provided to their officers, staff, employees, or contractors to communicate, effectuate, implement, or enforce Sections 1, 3, and 5 of Executive Order 14230; it is further

**ORDERED** that defendants are **DIRECTED** immediately to issue guidance to their officers, staff, employees, and contractors to disregard Sections 1, 3, and 5 of Executive Order 14230, and to carry on with their ordinary course of business absent these sections of the Executive Order; it is further

**ORDERED** that defendants are **DIRECTED** immediately to (1) communicate to every recipient of a request for disclosure of any relationship with Perkins Coie LLP or any person associated with the firm, made pursuant to Section 3(a) of Executive Order 14230, that such request is rescinded until further order of the Court; and (2) cease making such requests for disclosure, pursuant to Section 3(a) of Executive Order 14230, until further order of the Court; it is further

**ORDERED** that defendants must, in good faith, take such other steps as are necessary to prevent the implementation or enforcement of Sections 1, 3, and 5 of Executive Order 14230 during the effective period of this Order, until further order of the Court; it is further

**ORDERED** that defendants U.S. Department of Justice; Pamela Bondi, in her official capacity as U.S. Attorney General; the Office of Management and Budget; and Russell Vought, in his official capacity as Director of the Office of Management and Budget, must additionally immediately issue guidance to all other agencies subject to Executive Order 14230 to suspend and rescind any implementation or enforcement of Sections 1, 3, and 5 of the Executive Order, including any reliance on the statements in Section 1 of the Order; it is further

**ORDERED** that the parties shall file, by 4:00 PM on March 13, 2025, a joint status report proposing a schedule to govern further proceedings in this case; it is further

**JA 80**

**ORDERED** that defendants shall file a status report by Friday, March 14, 2025,

describing the steps taken to ensure compliance with this Order and certifying compliance with

its requirements; and it is further

**ORDERED** that this Order shall remain in effect until further order of this Court.

**SO ORDERED.**

Date:  March 12, 2025

_____
**BERYL A. HOWELL**
United States District Judge

3

**JA 81**

```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
PERKINS COIE LLP,                 )
                 Plaintiff,       )  Civil Action
vs.                               )  No. 25-716
                                  )
U.S. DEPARTMENT OF JUSTICE,       )  March 12, 2025
et al.,                          )  2:03 p.m.
                 Defendants.      )  Washington, D.C.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES**</u>:

FOR THE PLAINTIFFS:
                        DANE BUTSWINKAS
                        RYAN SCARBOROUGH
                        CHRIS MANNING
                        LUKE MCCLOUD
                        CAROL PRUSKI
                        MATT NICHOLSON
                        Williams & Connolly
                        680 Main Avenue SW
                        Washington, D.C.  20024
                        (202) 434-5110
                        dbutswinkas@wc.com

FOR THE DEFENSE:
                        CHAD MIZELLE
                        RICHARD LAWSON
                        TERRY HENRY
                        DOUGLAS C. DREIER
                        U.S. Attorney's Office
                        for the District of Columbia
                        601 D Street NW
                        Washington, D.C.  20053


Court Reporter:   Elizabeth Davila, RPR, FCRR
                  Official Court Reporter

              Proceedings reported by machine shorthand.
           Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

1

2          THE COURTROOM DEPUTY:  Your Honor, this is Civil

3    Action 25-716, Perkins Coie LLP v. United States Department

4    of Justice, et al.

5          Would the parties please come forward to the

6    lectern and identify yourselves for the record this

7    afternoon.  We will start with plaintiff's counsel first.

8          MR. BUTSWINKAS:  Good afternoon, Your Honor.

9    I am Dane Butswinkas from Williams & Connolly on behalf of

10   Perkins Coie.

11         THE COURT:  Okay.  Good afternoon.

12         Let me just make sure that I have got --

13   Butswinkas?

14         MR. BUTSWINKAS:  Yes, Your Honor.

15         THE COURT:  Okay.  Did I say that correctly?

16         MR. BUTSWINKAS:  We must be related.

17         THE COURT:  All right.  Welcome to everybody else

18   at your table.  Did you want to introduce everybody just for

19   the record?

20         MR. BUTSWINKAS:  Yes.  Ryan Scarborough.

21         THE COURT:  You have to use the mic.

22         MR. BUTSWINKAS:  Ryan Scarborough, Chris Manning,

23   Luke McCloud, Carol Pruski, and Matt Nicholson.  Thank you.

24         THE COURT:  All right.  Welcome.

25         And for the government?

1            MR. MIZELLE:  Hey, good afternoon, Your Honor.

2    Chad Mizelle on behalf of the United States.  And I am

3    joined at counsel's table by Richard Lawson, Terry Henry,

4    and Doug Dreier.

5            THE COURT:  All right.  And are you all from DOJ

6    or from the U.S. Attorney's Office, or what?

7            MR. MIZELLE:  We're all from Main Justice.

8            THE COURT:  From Main Justice, okay.

9            MR. MIZELLE:  Yes, ma'am.

10           THE COURT:  Federal programs?

11           MR. MIZELLE:  Actually, I think -- I'm sorry.

12   Doug is with the U.S. Attorney's Office.

13           THE COURT:  Doug Dreier?

14           MR. MIZELLE:  Yes, Your Honor.

15           THE COURT:  Okay.  I thought you were the person

16   who was just going to be coming, but you brought a whole

17   crowd with you, Mr. Dreier.

18           MR. MIZELLE:  We're just trying to keep up, Your

19   Honor.

20           THE COURT:  There is no room in the gallery.

21   Thankfully, you have got seats up front.

22           Okay.  You can be seated.

23           Good afternoon, everyone.

24           We're here today for a hearing on Plaintiff

25   Perkins Coie LLP's motion for a temporary restraining order.

**JA 84**

1    This was filed yesterday afternoon.  It challenges Executive

2    Order 14230, which is -- it's already been docketed at 90

3    *Federal Register* 11781.  This was issued by President Trump

4    a week ago, on March 6, 2025.  The executive order is titled

5    "Addressing Risks From Perkins Coie LLP."

6           I have provided the public access line.  If there

7    are people listening, either here in the courthouse or on

8    the public access line who might not be lawyers and,

9    therefore, not really familiar with Perkins Coie, which is

10   the name in the title of the executive order, Perkins Coie

11   is the name of a very well-respected and prominent law firm;

12   it has about 1200 lawyers, 2500 nonlawyers, and 21 separate

13   offices around the world, which I have learned in more

14   detail from the motion papers.

15          As the plaintiff in this lawsuit, Perkins Coie is

16   seeking a temporary injunction to stop three of the five

17   parts of the executive order bearing its name in the title.

18          So with that, I will turn to the plaintiffs, since

19   it's the plaintiff's motion.

20          MR. BUTSWINKAS:  Thank you, Your Honor.

21          Again, Dane Butswinkas on behalf of Perkins Coie.

22          If I may start, Your Honor, by introducing the

23   representatives of my client who are here.  And they are

24   Shannon Bloodworth, who is a representative of the executive

25   committee of the law firm.

**JA 85**

1          THE COURT:  Okay.

2          MR. BUTSWINKAS:  Bill Malley, who is the managing

3    partner of the law firm.

4          THE COURT:  Okay.

5          MR. BUTSWINKAS:  And Bates Larson, who is the

6    general counsel of the law firm.

7          THE COURT:  All right.  Welcome.

8          MR. BUTSWINKAS:  We appreciate you giving us this

9    opportunity so expediently on the docket.  We know the Court

10   is busy.

11         May it please the Court.

12         This executive order takes a wrecking ball to the

13   rule of law, to the principles that promote democracy; and

14   for purposes of this proceeding, to the law firm Perkins

15   Coie.  Its effects have been immediate, substantial,

16   irreparable; and, if not halted, life-threatening for the

17   law firm.

18         THE COURT:  So let me just pause you right there.

19   I will give you time to say everything you want.  I have the

20   luxury of being a district court judge, so I sit by myself.

21   I don't have impatient colleagues sitting on a panel with

22   me, so I can take as much time as I want.

23         I appreciate that the complaint is a challenge to

24   the whole executive order.  You are only seeking a TRO as to

25   Sections 1, 3, and 5.  So you are leaving out Section 2

1    having to do with the lifting of security clearances, and

2    Section 5, which actually applies to all large law firms,

3    whatever that means --

4              MR. BUTSWINKAS:  Section 4.

5              THE COURT:  Section 4, yes -- sorry -- that

6    applies to all large law firms.

7              So why are you holding back on Sections 2 and 4?

8              MR. BUTSWINKAS:  The reason is that we picked the

9    sections where the harm was most immediate and the infirmity

10   most clear and the remedy most clear.

11             The other provisions in our -- if you set a

12   preliminary injunction hearing, we believe we will be able

13   to demonstrate that they are constitutionally invalid as

14   well.

15             THE COURT:  Okay.  Well, we'll get to that at the

16   end because I am going to -- you know, not to keep you on

17   the edges of your seats; but I am going to ask you-all to

18   confer so that we can determine whether we need to go

19   forward with a preliminary injunction hearing or just move

20   to an expedited summary judgment.

21             MR. BUTSWINKAS:  That's what we would prefer, Your

22   Honor.

23             THE COURT:  All right.  Good.  So we'll get to

24   that at the end.

25             MR. BUTSWINKAS:  Yes.

1          THE COURT:  Okay.  Well, that was interesting

2     because there's been a lot of press about the security

3     clearance business because another law firm, Covington, is

4     also -- you know, had security clearance issues pursuant to

5     an executive order.  So I didn't know why you were holding

6     off on looking at that particular section.

7          What I would like to do is go through the

8     executive order section by section, just to make sure I

9     haven't missed anything that I should understand from your

10    briefing papers, which hit my desk after 4 o'clock

11    yesterday.  So this has been my first opportunity to read

12    the actual Executive Order 14230.

13         Section 1 describes the purpose of the order.  It

14    has a number of derogatory accusations against the law firm,

15    all in service of showing, quote:  Good cause to conclude

16    that they -- meaning the law firm -- neither have access to

17    our nation's secrets nor be deemed responsible stewards of

18    any federal funds.

19         Now, I appreciate from your papers and the

20    declaration submitted by Mr. Burman -- Burman?

21         MR. BUTSWINKAS:  Yes.

22         THE COURT:  Yes.

23         -- from the firm that all of those accusations are

24    vigorously disputed.

25         But for purposes of the TRO, what precisely are

1    the government actions you are seeking to have enjoined in

2    Section 1?  Because I don't see -- unlike the other two

3    sections that you are seeking a TRO on, I don't see in

4    Section 1 that the government is being told to do something

5    there.

6              MR. BUTSWINKAS:  The gravamen of Section 1, we

7    believe, are, in essence, factual findings of the

8    administration, which we believe have been a judicial

9    function.  And so we would ask you to invalidate their

10   authority which guide, in theory, agencies and departments

11   in the other paragraphs of what to do if they deliberate

12   about something.

13              For example, several of the other provisions say

14   you have to deliberate about the interests of the

15   United States and whether engaging with this law firm is

16   within those interests.  And it's somewhat of a circular

17   process because paragraph 1, the purpose, essentially makes

18   findings against the law firm that working with them would

19   not be in the interest of the United States.

20              So one answer to your earlier question, Your

21   Honor, is that even Section 2 and Section 4, which we will

22   get to at some point in the process, are driven by

23   Section 1, which we submit to the Court are a series of

24   factual findings.  And you are absolutely correct, not only

25   do we dispute them, the court proceedings about them dispute

 1    them.

 2            THE COURT:  So are you seeking, for example, a

 3    declaration as part of the TRO that Section 1 are findings

 4    that are wrong or improper?

 5            I mean, I can't decide whether they're wrong, I

 6    think, at this stage, but -- just the likelihood of success

 7    that you will establish that they're wrong.

 8            But as I look at your proposed order as to --

 9    precisely, what do you want me to do about that Section 1?

10    You, basically, clump Section 1 with the other two

11    sections -- you know, to disregard it when issuing guidance,

12    prevent enforcement or implementation.

13            So I am a little puzzled --

14            MR. BUTSWINKAS:  Yes.

15            THE COURT:  -- about what the injunctive relief is

16    you are seeking on that.

17            MR. BUTSWINKAS:  On Section 1, we would ask for an

18    instruction to departments, agency, and the administration

19    that they are not to use Section 1's findings as a direction

20    for any interactions with Perkins Coie.

21            THE COURT:  Okay.  That's clearer than what I

22    could see in the proposed order.  Okay.

23            All right.  So then let's turn to Section 3 of the

24    executive order.  That's the one that, by my count, directs

25    four specific federal government actions against Perkins

1  Coie:  One, that government contracting agencies require

2  government contractors to disclose any business they do with

3  Perkins Coie and whether that business is related to the

4  subject of the government contract; two, the heads of all

5  federal agencies must review all contracts with Perkins Coie

6  or with entities that disclose doing business with Perkins

7  Coie; three, that heads of all federal agencies must take

8  appropriate steps to terminate any contract with Perkins

9  Coie and for contracts where Perkins Coie has been hired to

10  perform any service; and then, all federal agencies -- the

11  last one -- have to submit to OMB, within 30 days, an

12  assessment of contracts with Perkins Coie or with entities

13  that do business with Perkins Coie and any actions taken

14  with respect to those contracts in accordance with this

15  order.

16          And so for that last step, do you view that as

17  some kind of enforcement mechanism that agencies are

18  actually going through and terminating all the contracts

19  either directly with Perkins Coie or with clients of Perkins

20  Coie?

21          MR. BUTSWINKAS:  Yes.

22          THE COURT:  Or how do you interpret that?

23          MR. BUTSWINKAS:  Pardon me, Your Honor?

24          THE COURT:  Or how do you interpret that?

25          MR. BUTSWINKAS:  That's how I interpret it.

1          And I interpret, actually, (b)(2), the assessment

2     of contracts with the language that says:  Figure out

3     whether these relationships are in the interest of the

4     citizens of the United States and consistent with the goals

5     and priorities of my administration; that's why this process

6     is -- from a due process and a number of other

7     constitutional standpoints, circular.

8          Because paragraph 1, the purpose, outlines the

9     findings for the agencies and department who are being

10    directed by the administration.  And so it's not much of a

11    process.

12         THE COURT:  And just to make absolutely clear on

13    the record, Perkins Coie had no prior notice of this

14    executive order being issued until it was issued?

15         MR. BUTSWINKAS:  That is correct.

16         THE COURT:  Okay.  And no consultation before it

17    was issued?

18         MR. BUTSWINKAS:  No consultation, no notice, no

19    opportunity to be heard of any kind.  No due process at all.

20         THE COURT:  Okay.  So then plaintiff does contend

21    that directing all federal agencies to review and terminate

22    government contracts where the contractor has used the

23    services of Perkins Coie, deprives plaintiff of the right to

24    practice its profession.

25         So let me just dig into that a little bit because,

1     certainly, Section 3 may drive government contractor clients

2     away from using Perkins Coie, but the order does not disbar

3     the plaintiff, it doesn't seek disbarment or direct agencies

4     to seek disbarment of any Perkins Coie lawyers; it doesn't

5     prohibit Perkins Coie from practicing law at all.

6          So the harm here is simply that -- is what, then,

7     in terms of the plaintiff's practice of law and ability to

8     practice law?

9          MR. BUTSWINKAS:  Well, it's -- the harm arises

10    from having a separate set of procedures that apply only to

11    one law firm; and it is truly the existence of the

12    procedures as much as the potential prospective application

13    of those procedures that is causing the present harm because

14    clients who are government contractors cannot hire a law

15    firm with this executive order in place because they will be

16    in the situation that -- and we are finding this, as you

17    know from our papers already; and we have agencies reaching

18    out to contractors to ask them about their relationships

19    with Perkins Coie, consistent with this instruction in the

20    executive order.

21         A large portion of the practice of Perkins Coie is

22    with federal agencies, federal courts, and in defense

23    contracting.  Every one of the top 15 clients at the law

24    firm has government contracts; and I think that accounts for

25    approximately 25 percent of the revenue of the law firm.

1          THE COURT:  So one of the things that the

2     plaintiff is contending is that Section 3, because of these

3     extra burdens and procedures -- special procedures that

4     would apply to Perkins Coie -- deprives plaintiff of a due

5     process property right to its contractual relationships.

6          So why should interference with a government

7     contract be considered a due process violation?

8          MR. BUTSWINKAS:  Because the courts have

9     consistently said that a contractual relationship is

10    protected by the property interest under the Due Process

11    Clause.

12         THE COURT:  And the contract that's being

13    interfered with is actually Perkins Coie's clients largely.

14         MR. BUTSWINKAS:  Correct.

15         THE COURT:  Perkins Coie's clients contract with

16    the government as opposed to -- although, perhaps, Perkins

17    Coie has some direct contracts with the government, which

18    would also be terminated under this section.  But this is a

19    little -- one step removed, in terms of the due process

20    interference claimed.

21         MR. BUTSWINKAS:  So --

22         THE COURT:  It's not Perkins Coie's own contract

23    with the government that would be terminated, it's sort of

24    an aftereffect.

25         MR. BUTSWINKAS:  That is a correct statement of

1    the facts.  But, respectfully, the contract that's relevant

2    here for due process violations is a contract between

3    Perkins Coie and its clients because given these procedures

4    that have been announced there has been and there will be

5    enormous risk that these contractors will sever or not enter

6    into these contractual relation -- retainer agreements with

7    Perkins Coie; and that is the due process harm.

8         You raise a good point and maybe another argument,

9    and I would have to think about standing on that issue.  But

10   the --

11        THE COURT:  Right.  And that's where I was going

12   because the order doesn't require the private parties to end

13   the relationships with Perkins Coie.  It, basically, is just

14   telling agencies to end the relationship with the clients.

15   And then what the clients do with this risk to their

16   government contracts is different.  And is there third -- so

17   there is a third party in between the order and Perkins

18   Coie.

19        I wonder if there can be a due process violation

20   of private entities that, on their own, decide they would

21   simply rather have another law firm represent them in order

22   to keep their government contracting business, whether that

23   can be a due process violation because of the causation.

24        MR. BUTSWINKAS:  With respect to the contract --

25   with respect to the contracting party, they have a right to

1    counsel of their choice.  And so that is actually -- it may

2    also --

3              THE COURT:  So you are moving from a due process

4    claim to the Sixth Amendment right to counsel --

5              MR. BUTSWINKAS:  I'm saying it's a Sixth Amendment

6    matter, yes.  That issue is -- the standing is solid on

7    that, to assert the claim on behalf of the interference with

8    right to counsel, interference with counsel of choice, and

9    interference with effective counsel, all of which are

10   implicated here.  Because one of the difficulties as -- one

11   of the expert submissions that we submitted is that -- even

12   unfettered, there are so many qualifications under the Rules

13   of Professional Responsibility that the lawyers will have to

14   give to their clients, that sophisticated lawyers know that

15   will not be a relationship.

16             And so while it doesn't -- while the executive

17   order itself -- and I might push back a little bit on the

18   Court.  While the executive order doesn't on its face

19   actually terminate the contract, it is directing the

20   agencies to do that.  And it is that procedure that applies

21   only to this law firm; that different procedure that singles

22   them out, that has due process implications; Sixth Amendment

23   implications; and frankly, equal protection implications in

24   the -- under the class-of-one doctrine.

25             THE COURT:  Well, let's turn to the Sixth

**JA 96**

1   Amendment right-to-counsel issues that you have raised.

2         I mean, when people choose a lawyer, they have got

3   a lot of considerations, from cost, attention, personal

4   chemistry, skill, et cetera.  While Section 3 does set up

5   special conditions for Perkins Coie, by contrast to any

6   other firm, as I understand it, or firms with -- clients

7   with government business, does this really cause an

8   infringement on the client's right to choice of counsel

9   since it's just now one other consideration like cost,

10  skill, location for potential clients to consider?

11        MR. BUTSWINKAS:  Yes.  It's a great question; and,

12  I guess, the heart of Section 3, which essentially says to

13  these contractors:  If you want to have government

14  contracts, you cannot use this law firm.

15        That's the most quintessential abrogation of the

16  contract that is protected by the Due Process Clause and

17  interferes with the contractor's right to counsel of its

18  choice, and effective counsel.  Because if you couple it

19  with Section 5, which I know we are not to yet, and you

20  can't have exchanges with government officials and you can't

21  go into government buildings, it's inconceivable how you

22  could comply with the disciplinary rules effectively and

23  counsel your clients.

24        So while it sets up these forward-looking

25  procedures, it's the existence of the restrictions right now

1    that is incredibly damaging and threatening and has already

2    caused harm to the relationship between Perkins Coie and its

3    clients.  And it has lost clients each day since the order

4    was implemented, as we note in our papers.

5          THE COURT:  Let me just go back to touch on one

6    point I meant to cover with due process and lack of notice.

7          I know this executive order sort of stands on its

8    own, it's not part of any sort of statutory construct or

9    administrative set of rules, meaning that:  If somebody

10   wants to rebut parts of this or challenge parts of it, the

11   only option is to come to court.  You can't just go back to

12   the agency or appeal it or something, like you can with

13   other types of government lists of designated people, like

14   for OFAC lists, or something like that, right?

15         So why doesn't -- my question to you is -- to

16   explain, why doesn't this executive order on its own

17   constitute notice to Perkins Coie, Perkins Coie's clients

18   that contracts may be terminated or that plaintiff's

19   attorneys may be barred from working with federal agencies?

20   And why under the Due Process Clause wouldn't that notice,

21   just by virtue of the executive order, be enough?

22         MR. BUTSWINKAS:  Well, I think that it,

23   technically, would provide prospective notice to the things

24   that haven't happened.  But it does not provide any kind of

25   notice with respect to the factual findings in Section 1,

1    and it doesn't provide any notice at all about the

2    restrictions that are placed only on this law firm because

3    they only learned about them contemporaneous with the

4    release of the executive order.  And --

5        THE COURT:  So this is not the kind of notice

6    that's contemplated by the Due Process Clause?

7        MR. BUTSWINKAS:  Certainly.  And it's certainly --

8    given the idea that you learn about the restriction when it

9    comes out is not sufficient notice to give you the types of

10   things that come with due process, like an opportunity to be

11   heard, an opportunity to dispute the factual findings, an

12   opportunity to say that there is no rational basis or

13   compelling state interest in any of the procedures that are

14   laid out.

15       I think it's especially a difficult problem here

16   given my point that these agencies are already told what the

17   outcome of their analysis is, because they have been told in

18   Section 1 that working with Perkins Coie is not consistent

19   with the national interest and not consistent with the

20   administration and policies of this administration.

21       THE COURT:  So what you are saying is that to the

22   extent that the words -- two words "national security" are

23   thrown around in different parts of Sections 1, 3, and 5, in

24   terms of the guidance, that those two words are then

25   accompanied by -- or, you know, a finding that it would be a

1   threat to national security or inconsistent with the U.S.

2   interests.  And so even if there is zero national security

3   risk, the outcome of the guidance, the outcome of the

4   decisions that heads of agencies are required to make under

5   this executive order is predetermined because of Section 1.

6          MR. BUTSWINKAS:  Right.  Which says that the

7   purpose is, as you reviewed earlier, among other things, to

8   have a finding of serious violations of the public trust.  I

9   mean, it is exactly what these agencies and departments are

10   told to measure, and all they have to do is look back at

11   Section 1 to find out the answer.

12          THE COURT:  Okay.  So I think I understood from

13   your papers that that was going to be your interpretation of

14   this phrase -- the tag line, along with "national security"

15   consistent with U.S. interests; but that's one of the things

16   I am going to want to explore with the government.

17          Like, what does that mean?

18          MR. BUTSWINKAS:  And may I add one more point,

19   Your Honor, about that?

20          THE COURT:  Of course.

21          MR. BUTSWINKAS:  And that is this, "national

22   security" appears to be sprinkled into the executive order

23   for exactly the purpose that you are asking.  But it seems

24   crystal clear, as I will talk about in a minute, that it's a

25   pretext for a retaliatory executive order against this law

**JA 100**

1    firm for viewpoints, association, and speech.

2           And the reason why I say that is because of the

3    things that the President announced before, during the

4    executive order, and afterwards.  He didn't say:  I have

5    this executive order to protect national security.

6           He said:  I am going to take care of these

7    dishonest and dangerous law firms who represent Hillary

8    Clinton, who litigate election laws, who associate

9    themselves with people unpopular with the President.  And

10   those constitute serious violations of the public trust.

11          And interestingly -- and I think tellingly -- if

12   you look at Section 1, which purports to be the purpose of

13   this provision, the words "national security" appear one

14   time, and it's in connection with funding laws.  It's not

15   about a threat to national security.

16          So if you want to know the answer to whether it's

17   a pretext, it's not a circumstantial case from which you

18   have to make some inference.  You wake up in the morning and

19   there is snow, so you conclude it snowed last night.

20          This is, you got to watch the entire snowstorm

21   because you got to hear what the President said before the

22   executive order, about what he promised to do, which was

23   retaliate against the Perkins Coie law firm; number two, you

24   had to hear what he said in the executive order; and in the

25   fact sheet, which said he is going to retaliate against

1    Perkins Coie, and afterwards.

2          So the first point I would make is the "national

3    security" words are a pretext.  And you probably only have

4    to look to the purpose to see -- it doesn't say anywhere in

5    there:  Gee, we need to impose restrictions on this law firm

6    because if we don't that will threaten national security.

7          THE COURT:  Okay.  Let's turn to Section 5, which

8    requires more actions by federal agencies; by my count I

9    have got three that I have teased out of that Section 5.

10   One action is that the heads of all federal agencies must

11   provide guidance limiting official access from federal

12   government buildings to employees of Perkins Coie when such

13   access would threaten the national security or otherwise be

14   inconsistent with the interests of the United States.  That

15   phrase we were just talking about.

16          Two, again:  Heads of all federal agencies have to

17   provide guidance limiting government employees acting in

18   their official capacity from engaging with Perkins Coie

19   employees to ensure consistency with national security and

20   other interests of the United States.

21          And then, not just all heads of federal agencies,

22   but all agency officials across all federal agencies, of

23   which there are -- I mean, hundreds.

24          MR. BUTSWINKAS:  Your Honor, we mentioned over

25   90 --

**JA 102**

1              THE COURT:  90.

2              MR. BUTSWINKAS:  -- in Mr. Burman's declaration.

3              THE COURT:  Okay.  Yes.  So that's a lot of

4     people -- a lot of agency officials are required not to

5     hire -- not to hire employees of Perkins Coie absent a

6     waiver from the head of the agency made in consultation with

7     the director of Office of Personnel Management that such a

8     hire will not threaten the national security of the

9     United States.

10             So any employee from Perkins Coie, as I read that,

11    because it's not limited to lawyers.  That means --

12             MR. BUTSWINKAS:  That is correct.

13             THE COURT:  -- people in the mail office, legal

14    assistants, IT people -- all of those people working at --

15    those 2500 nonlawyer employees at Perkins Coie can't get a

16    federal job without going through a special, more burdensome

17    process with a waiver.

18             Is that how you read it?

19             MR. BUTSWINKAS:  That's right.  Yes, that's

20    exactly how I read it.

21             And it's even a little worse than that, right?

22    The rule is they can't work there unless they get this

23    exception that requires the head of an agency and the head

24    of the OMB.  That's inconceivably overbroad.

25             And you are absolutely right, it applies to the

1    people in the mail room, the IT director, and secretaries.

2              THE COURT:  All right.  Have you seen any

3    guidance -- I have read from your papers and Mr. Burman's

4    declaration that you are feeling real-word consequences with

5    canceled meetings by Criminal Division, Department of

6    Justice prosecutors already -- where they have canceled

7    meetings with no rescheduled meetings to follow up.

8              But have you seen any guidance whatsoever yet that

9    implements Section 5 or any of the other sections?

10             MR. BUTSWINKAS:  We have seen nothing that would

11   in any way limit it or give any guidance to any agency head

12   or departmental authority on what this means, other than

13   what you have just described.

14             THE COURT:  All right.  I am not sure exactly what

15   the government is going to say when they stand up.  But if

16   they stand up and say:  This section doesn't actually bar

17   all the employees from Perkins Coie from entering any

18   federal building in all cases because we don't have guidance

19   yet.  So maybe this is all premature.  And the guidance has

20   to be consistent with the law, so maybe there is no real

21   problem here.

22             What is your response to that, if they make that

23   argument?

24             MR. BUTSWINKAS:  My first response is the point I

25   already made, the language at the end of 5(a).  So it says,

**JA 104**

1    as you read:  Heads of all agency shall provide guidance

2    limiting official access from federal government buildings

3    to employees of Perkins -- and as you know, that's a lot of

4    buildings.  It includes the post office; it includes the

5    V.A. hospital, a lot of veterans work at Perkins Coie; it

6    includes this building.

7           And then it says:  When such access would threaten

8    the national security -- which is sprinkled in there, so you

9    asked the questions that you are asking.  So it's a clever

10   pretext language.  But then it says:  Or otherwise be

11   inconsistent with the interests of the United States, which

12   is explained in the fact sheet that's attached and the

13   purpose in Section 1.  They are hand in glove with one

14   another.

15          And so we have had people canceling meetings, as

16   you have said.  The difficulty is that under the

17   professional rules -- the Rules of Professional

18   Responsibility, you have to advise your client on these

19   potential limitations of your practice.  And the limitation

20   may be that:  I can't go in the courthouse.  I can't go in

21   any of the 90 agencies that they have work in front of.

22          You know, we listed out in Mr. Burman's

23   declaration, as you know, all of the thousands and thousands

24   of matters that this law firm has in front of over

25   90 agencies.  And imagine Mr. Burman, who has been at

1    Perkins Coie for 45 years, has to sit down and write under

2    oath that this is a threat to my law firm.  That is damage

3    that's happening now.

4        THE COURT:  I just want to make sure because we,

5    in the judiciary -- we're the third branch.  We are not the

6    executive branch.  We are not subject to this guidance.  But

7    our landlord, and all of the federal courthouses around the

8    country is GSA --

9        MR. BUTSWINKAS:  GSA.

10        THE COURT:  -- General Services Administration.

11    And the people who do the security at our front doors, all

12    across the country in federal courthouses, are DOJ-component

13    employees from the U.S. Marshals Service or court security

14    officers.  So they are all executive branch employees.

15        MR. BUTSWINKAS:  And they are in charge --

16        THE COURT:  So I want to make sure you had no

17    trouble getting into this building today.  Did you?

18        MR. BUTSWINKAS:  We did not.

19        THE COURT:  Okay.

20        MR. BUTSWINKAS:  But they are -- your point is a

21    really good one.  They are in charge of access to

22    courthouses.  The word "NA" [sic] is access.

23        So, I mean, I hardly have to explain the colossal

24    damage that that rule -- that restriction imposed on one law

25    firm, and no other, is for their ability to practice their

1    profession.

2         THE COURT:  Let's just talk about the harms, which

3    you have provided in -- Mr. Burman's declaration provided

4    great detail about that.

5         But, generally, monetary harms don't qualify as

6    "irreparable," but you have brought them up here.  So could

7    you explain why the monetary harms qualify as "irreparable"

8    here, which is what you would need to show to rely -- if you

9    are relying only on the monetary harms to obtain the

10   extraordinary relief of a temporary injunction?

11        MR. BUTSWINKAS:  There are two reasons.  One is

12   that when the economic damages are not compensable under the

13   law -- and we can't recover those from the administration

14   because of immunity, and that turns the analysis onto

15   whether an injunction is needed.  So that's number one.

16        Number two, in this Circuit the standard is high

17   when measuring economic and potential economic damages, but

18   that's important.  It's existing economic damages and the

19   damages that will be incurred if the TRO is not entered.

20        You and I are from an era where we know law firms

21   can collapse pretty quickly.  And here, they have -- by way

22   of example, they have over a thousand active matters in

23   federal courts.  They have clients who are indicted and

24   federal targets.  They have 69 matters before federal

25   agencies in their government contracts group.  They have 555

1    clients in 5,415 pending patent applications before the

2    USPTO; 20 clients in 56 post-grant proceedings before PTAP;

3    7 clients and 11 proceedings before the ITC; 66 matters in

4    TTAB; 1,960 trademark matters before the Patent and

5    Trademark Office; 145 copyright matters before the Copyright

6    Office; 340 lawyers engaging with the FDIC, the Comptroller

7    of Currency, the Federal Board, the Department of Commerce,

8    the ITC, labor matters; 22 USCIS matters; and an extensive

9    practice before the SEC, the Department of Agriculture, the

10   FDA, the Department of Transportation, the DOJ, Homeland

11   Security, and the State Department.  They have a white

12   collar and investigations group that has 29 lawyers that

13   regularly engage with the FBI, the U.S. Attorney's Office,

14   and the SEC.

15           And as I mentioned earlier, the top 15 clients in

16   the law firm all have contracts with the government.

17           It is an immense, already-existing problem that is

18   like a tsunami waiting to hit the firm.  It truly is

19   life-threatening.  I am not here to exaggerate about it.  It

20   is a -- it will spell the end of the law firm.  And under

21   those circumstances, where the enterprise is truly at

22   economic risk, independent of whether it's compensable or

23   not, that satisfies the standard for TRO.

24           THE COURT:  All right.  You will have an

25   opportunity to come back after I hear from the government.

1          We haven't heard from the government because, on

2     TROs, we have to do this very expeditiously.  And if I had

3     given the government time to respond and, then, you time to

4     reply, we would have been meeting on Friday.  I understood

5     from the papers, you needed more expedition than that, which

6     is why we are meeting today.  I really do want to hear from

7     the government now.

8          MR. BUTSWINKAS:  Thank you, Your Honor.

9          MR. MIZELLE:  Thank you, Your Honor.

10          May it please the Court.  Chad Mizelle on behalf

11     of the United States.

12          Your Honor, if I could pick up right where you

13     left off.  I believe this case, the issues are complex.  The

14     issues related to harms, even in the declaration, are

15     complex.  I think the harm is a lot more speculative and

16     undetermined than my, you know, good friend --

17          THE COURT:  If this is such a complex matter, are

18     you agreeing to entry of a TRO to maintain the status quo

19     until I can get much more complete, fulsome briefing from

20     both sides?  Because that would be great.

21          MR. MIZELLE:  It might -- my argument to you --

22          THE COURT:  It will be my lucky day.

23          MR. MIZELLE:  Yeah.  My argument to you, Your

24     Honor, is that we should have already been given that

25     opportunity.  I do, you know, respectfully request before

1    any injunction is issued that the United States be afforded

2    the opportunity to file a proper response to the TRO to

3    contest some of the allegations, the factual statements, the

4    errors in law, all of those issues.

5         If the Court is not inclined to do that --

6         THE COURT:  That is the purpose of a TRO,

7    Mr. Mizelle -- let's not play games -- to maintain the

8    status quo on a temporary basis until the Court can get more

9    fulsome briefing.

10        So that is not happening.

11        MR. MIZELLE:  Well, I am prepared to --

12        THE COURT:  But we will proceed, and you can just

13   respond to my questions to the extent that you can.

14        MR. MIZELLE:  Yes, Your Honor.

15        THE COURT:  I am just going to do the same thing

16   with you that I did with plaintiff's counsel, just to go

17   through this section by section to make sure I am

18   understanding it all.

19        Section 1 of this executive order -- the whole

20   executive order struck me as different from almost any other

21   executive order I have seen.  Usually, executive orders

22   start, in the first paragraph, with sometimes a very lengthy

23   paragraph saying:  This executive order is being issued

24   under this statute and that statute and this code of federal

25   regulations and that code of federal regulations.

1          This one just starts with "Purpose."  And it just

2    cites the Constitution and the laws of the United States

3    without any specific other citation.

4          You would agree, it's a little bit different from

5    most executive orders?

6          MR. MIZELLE:  You know, I don't know if I would

7    agree with that, having had the privilege of working in the

8    White House Counsel's Office before, seeing a lot of

9    executive orders.  I would say that the form is actually

10   fairly consistent with what I am used to seeing.

11         But I would also add, Your Honor, that with

12   respect to the specific action that's being taken here, this

13   is clear Article II executive authority.

14         The President of the United States is authorized

15   under the Constitution to find that there are certain

16   individuals or certain companies that are not trustworthy

17   with the nation's secrets; that is something that the

18   President is afforded to do under the Constitution.  I don't

19   believe that it is something that Congress could even

20   impinge even if it wanted to, citing the law of the

21   United States.

22         And I think that the only constitutional authority

23   that we really need is the vesting laws.  So it really is --

24         THE COURT:  So you are relying on the whole

25   "national security" phrase that's scattered throughout the

1    executive order as the source -- the constitutional source

2    for his authority to issue this order?

3            MR. MIZELLE:  For the specific provisions that are

4    being challenged today, which is, namely, Sections 1, 3, and

5    5, yes, Your Honor.  That we believe -- and I am happy to

6    walk through, in more detail, the specific statements in

7    Section 1 and why those are a sufficient basis for the

8    President to direct the action that he is doing here.

9            But absolutely.  I mean, even starting from the

10   very first sort of substantive sentence here relating to

11   hiring Fusion GPS, which then maintained --

12           THE COURT:  Right.  He cites the Perkins Coie work

13   with the 2016 campaign of Hillary Clinton; its work with

14   activist donors and litigation over certain election laws,

15   including those requiring voter identification, which is

16   referring to Perkins Coie's fairly extensive work in

17   protecting voting rights that is perceived in this purpose

18   as not protecting voting rights but being counter to

19   protecting voting rights.  So it depends on how you are

20   looking at it.  That's a clear perspective issue.

21           MR. MIZELLE:  Your Honor, if I --

22           THE COURT:  Its work against candidates for

23   office, what he calls in the purpose, "work for election

24   change."

25           I think -- how is this not all viewpoint-related

1      purposes for this order?

2              MR. MIZELLE:  It's a great question, Your Honor,

3      and I would love to address all of those.

4              So in the very first, again, sentence relating to

5      hiring Fusion GPS, which -- they manufactured a false

6      dossier, that is something that the very statement goes to

7      the heart of national security.  At the heart of the dossier

8      were allegations that President Trump's campaign improperly

9      colluded with Russia; those were proven to be false,

10     factually incorrect.  Special Counsel Durham went through

11     and found that every aspect of the dossier -- not a single

12     aspect of it was verifiable --

13             THE COURT:  I have also read the Mueller report.

14     So I wouldn't say that -- I am not going to get into a

15     debate with you about it.  I think that there are very big

16     differences of view about whether -- you cannot be saying

17     that there was nobody involved in the 2016 Trump campaign

18     that had any connection with any Russian; you can't say

19     that.

20             MR. MIZELLE:  Your Honor, I believe --

21             THE COURT:  So let's not get into debate about

22     that.

23             I think what you are establishing is only

24     confirming that there might be a viewpoint perspective

25     difference here.

1          MR. MIZELLE:  I disagree with that, Your Honor.  I

2     would say that, fundamentally, the President -- it's not

3     whether a view is debatable; that is not the relevant

4     question here.

5          The relevant question is:  Is there sufficient

6     basis based on the conduct -- not the speech -- but the

7     conduct of individuals to find that they are not trustworthy

8     with our nation's secrets?  That is the key question.  And

9     it's perfectly based on the facts, as alluded to here, and

10    certainly as they have played out in history --

11         THE COURT:  Okay.  So let's take at face value

12    your perspective and the perspective that's reflected in

13    the --

14         MR. MIZELLE:  The President's perspective.

15         THE COURT:  The President's perspective, yes.  You

16    are right.  Thank you for that clarification.

17         You are competent counsel, and you are

18    representing your client vigorously -- as you must -- and I

19    appreciate that.  Truly, I do.

20         MR. MIZELLE:  Thank you, Your Honor.  Thank you.

21         THE COURT:  The President's perspective here, if

22    we want to dig down a little bit more, is that Perkins Coie,

23    at a certain time, did this thing with Fusion GPS.  Those

24    people who are involved in that are long gone from Perkins

25    Coie.

**JA 114**

1          So how is that helping this executive order's

2     overall purpose in, basically, taking fairly punitive

3     measures against this law firm for acts that happened about

4     a decade ago with people who no longer even work there

5     when -- when sections of this executive order apply not only

6     to the lawyers but the 2500 nonlawyers at the firm?

7          MR. MIZELLE:  Yes, Your Honor.

8          I would direct your attention to a D.C. Circuit

9     case from last year, *Lee v. Garland*.  In that case, the

10    court rejected a Fifth Amendment due process claim, which

11    plaintiffs are bringing here; a First Amendment challenge,

12    which they're bringing here; an equal protection challenge,

13    which I don't believe they're bringing here -- but all

14    related to the revocation of a security clearance on the

15    grounds that this individual was not somebody who could be

16    trusted with the nation's secrets.  There the court said

17    that those are all unreviewable here.  And so we would say

18    that not only is that binding precedent --

19         THE COURT:  That is, perhaps, part of the reason

20    Section 2 is not being challenged here.  That involves the

21    security clearances.

22         MR. MIZELLE:  That's right.

23         But I actually think that -- thinking about this

24    from that provision and the national security, everything

25    flows.  And I know we are going to get to Section 3 and

1   Section 5 -- and I am very much looking forward to doing

2   that -- though, I don't want to leave Section 1 just yet.

3          Because everything is flowing from the

4   President's -- it is fundamentally the President's

5   prerogative, not reviewable by courts, according to *Lee* --

6   according to the D.C. Circuit in *Lee*, not reviewable by

7   courts, whether somebody is trustworthy with the nation's

8   secret.

9          The President has made that finding here.  And

10  everything else in the executive order that is being

11  challenged, Sections 3 and Sections 5, fundamentally flow

12  from that determination.

13         THE COURT:  Well, when I look at the First

14  Amendment claim in the complaint, and under First Amendment

15  analysis, I have to look at how is the government going to

16  satisfy strict scrutiny here by showing a compelling

17  straight interest and also narrow tailoring when -- even if

18  they had a compelling -- assume, for purposes of argument,

19  that's a compelling state interest about national security

20  because of something that happened a decade ago with people

21  who no longer work at Perkins Coie -- how is applying

22  punitive measures to everybody who works for Perkins Coie,

23  putting aside even right now its own -- the law firm's

24  clients, but Perkins Coie itself -- narrowly tailored to

25  show that any infringement on their First Amendment

1    associational rights, petition of government rights, and

2    then their other free speech rights -- how is that narrowly

3    tailored at all?

4            MR. MIZELLE:  Your Honor, I think this actually

5    goes to one of the --

6            THE COURT:  For them not to show not likelihood of

7    success on the merits on those claims.

8            MR. MIZELLE:  Right.  I think this actually goes

9    to one of the foundational defects in plaintiff's case,

10   which is no negative action has been taken against them.

11           This case fundamentally is not ripe because what

12   they're complaining about is a series of boogymen, it's a

13   series of ghosts.  Which -- you know, we can sit here all

14   day and talk about hypos:  What if we can't get on a plane?

15   What if we can't get into a courthouse?  I know that

16   everybody was --

17           THE COURT:  Post office.

18           MR. MIZELLE:  A post office, right?

19           THE COURT:  AUSA won't let us on the plane.

20           MR. MIZELLE:  None of that has happened.

21           THE COURT:  They won't talk to us, they won't look

22   at our paperwork.

23           MR. MIZELLE:  Sure.  Sure.  Right?  It's easy to

24   come up with a thousand hypos, like, what-ifs.  Right?  None

25   of those what-ifs have happened, and that's fundamentally

1    why this is not ripe.

2         THE COURT:  Let me ask you, what is the status of

3    the guidance among the 100 or so or more federal agencies --

4    I have never counted them up.  Have you seen any guidance

5    yourself?

6         MR. MIZELLE:  I have not seen any guidance, Your

7    Honor.

8         THE COURT:  All right.  Are you aware of whether

9    any guidance has been issued?

10        MR. MIZELLE:  I am not aware of any guidance

11   having been issued.  I know, certainly, at the Department of

12   Justice that leadership is working on guidance; I don't have

13   an exact timeline for that.  I know that they are, in light

14   of this case and others, working on it expeditiously; but I

15   can't commit to a timeline.

16        But I have not seen any guidance, Your Honor.

17        THE COURT:  Okay.

18        MR. MIZELLE:  But I do -- again, you know, you

19   asked a question to plaintiff's counsel relating to -- I

20   believe it's more on the due process question, but it was

21   about:  Can't you go back to the agency?

22        And we would say:  That's fundamentally correct.

23   Right?

24        When guidance is issued, when actions are taken,

25   when contracts may or may not be canceled, that is the time

1    that there has actually been a concrete harm,

2    nonspeculative, that the plaintiffs can come in and say:

3    Okay.  Now we have something to complain about.

4         This Court may be the right venue.  It might be

5    the Court of Federal Claims, depending on the specific

6    action that we're taking, but that is the type of concrete

7    actions.  So we're not -- you know, the government --

8    listen, we are happy to carry a big burden.  We're happy to,

9    you know, fight a long way.  But, really, we are being put

10   up with a bunch of what-ifs and boogymen and ghosts that we

11   are having to fight about.  None of those ghosts are real.

12   The boogymen are not real.

13        And so the hard part here is that, like, I am

14   trying to back down --

15        THE COURT:  You have read the declaration about

16   DOJ Criminal Division, at least one prosecutor, declining to

17   meet with the Perkins Coie lawyers in a criminal matter

18   because of the executive order and fear of probably being

19   fired should they meet with Perkins Coie attorneys in

20   violation of whatever -- however this is interpreted by

21   leadership of the Department of Justice.

22        MR. MIZELLE:  Yes, I have.

23        THE COURT:  You have read about the problems that

24   they're having getting federal officials to meet with them

25   in their different -- on their different matters and

1    different agencies.  So do you think this is still just a

2    boogyman and not having real-world effects now?

3                MR. MIZELLE:  100 percent.  And I can explain why.

4                First off, it's paragraph 26, I believe, of the

5    Burman Declaration that discusses an incident in the fraud

6    section of the Criminal Division.

7                And while I have no reason to doubt the veracity

8    of Mr. Burman's declaration here, I have no ability to test

9    it because, unfortunately, for us, Mr. Burman -- unless it's

10   been included somewhere that I have just missed, I don't

11   have an email, I don't know who this attorney is.  And I can

12   say that the action of a single attorney in a department of

13   over 120,000 individuals does not represent the view of the

14   Department of Justice.

15               Actually, it's only the Attorney General or her

16   delegated -- those to whom she has delegated authority who

17   can take that kind of action.

18               And so the fact that they can point to a single

19   instance -- I would say no, that is actually not sufficient.

20   This is a bit of a boogyman here.  There could have been a

21   lot of reasons for this, the attorney could have been

22   mistaken.  If that attorney had talked to their supervisor,

23   their supervisor may have said:  No, no, no.  Don't take

24   this action.

25               So again, without context, without being able to

1    probe, it's not actually clear what exactly happened here.

2         And if I could continue just on the declaration

3    for a little bit, because I think this actually relates to

4    the other question.

5         Really, I take paragraph 30 as really focusing on

6    the harm here to the firm.  And I understand, you know, my

7    friend on the other side's statement, you know:  This is

8    threatening the very existence of a law firm.

9         But if we look even at the second or third

10    sentence here, there is a lot of speculation.

11         If the order were to cause current clients to

12    terminate their agreements and if it were to frighten away

13    new clients, it could put the firm's solvency and existence

14    at risk.  Right away we have an inference built upon an

15    inference that might lead to the firm's solvency being an

16    issue.  But we have no evidence of that.  You know, just

17    simply claiming that 15 clients represents a quarter of the

18    revenue --

19         THE COURT:  And so why don't we just look at

20    paragraph 29 that goes on for one and a half pages listing

21    all of the clients that have raised concerns or left the

22    firm already, which are some of the real-world consequences

23    of what Perkins Coie's clients are facing while awaiting the

24    guidance and experiencing in the Perkins Coie clients' own

25    interactions with government officials.

**JA 121**

1          So I am looking at not just paragraph 30 --

2          MR. MIZELLE:  Sure.

3          THE COURT:  -- as to monetary harm, but also some

4     of the other paragraphs that are a little bit more extensive

5     about how this isn't just an if, if, if situation.

6          MR. MIZELLE:  Right.  Absolutely, Your Honor.  I

7     was going to go back to that, but I am glad you also raised

8     that because I see, in paragraph 29, two major issues.

9          First, I see a traceability issue; second, I see a

10    redressability issue.  I am going to have to talk about both

11    of those.

12         With respect to traceability, clients make

13    decisions for lots of reasons.  In fact, numerous clients

14    make decisions -- and, you know, I have been in a law firm,

15    I have seen this firsthand.  I have also worked at

16    businesses and seen this on the other side, how you decide

17    to pick lawyers.  You pick them for a variety of reasons.

18         What we have is an independent actor, and they're

19    claiming:  Hey, we're not going to work with Perkins Coie

20    because of this order.  Right?

21         We haven't been able to test that.  We are not

22    sure the, you know, actual causation here.

23         THE COURT:  Well, I mean, I did ask that question

24    about the causation, redressability, and so on.

25         MR. MIZELLE:  Yes.

1          THE COURT:  And one of the things that I see in

2    the declaration is the communications that have been ongoing

3    directly with Perkins Coie's current clients, with them

4    raising questions about potentially having to leave if this

5    executive order situation persists --

6          MR. MIZELLE:  But to me, Your Honor, that is

7    actually the crux of the defect --

8          THE COURT:  -- meaning that it's not just lots of

9    other factors.  They already had the client; they have had

10   the client for a long time, some of them.

11         MR. MIZELLE:  Right.

12         THE COURT:  And because of this, the clients are

13   looking -- are considering whether they have to move

14   elsewhere.

15         MR. MIZELLE:  But again, having at least been on

16   the other side of it, I can tell you from personal

17   experience, there are certain law firms with reputations of

18   having -- let's call them political connections to various

19   administrations.  And so there are certain law firms,

20   depending on who the President is and who is staffing the

21   administration, who you might choose to hire because it's

22   perceived that they have more relationships with that

23   particular administration or another administration.

24          So it's not clear, one, that it's actually

25   stemming from the order as opposed to that; and that is

**JA 123**

1    perfectly lawful, and that happens every single day.

2         And then I also think because that is true, we

3    have a redressability problem.  So fundamentally, even if

4    Section 3 and Section 5 get enjoined here, there is no sort

5    of clear -- because I think causation is not clear -- there

6    is no clear evidence that these law firms are going to -- or

7    sorry, these clients are going to say:  You know what, we're

8    going to stay with Perkins Coie.

9         As opposed to saying:  You know what, clearly, the

10   President, at least personally, does not trust you with the

11   nation's secrets.  And so regardless of how Section 2 plays

12   out, this is not really the law firm we want to use if we're

13   trying to get additional business from the federal

14   government.

15        THE COURT:  I want to turn to one other issue that

16   sort of crosses across Sections 1, 3, and 5; and that is a

17   bill of attainder.

18        The plaintiff indicates that the bill of attainder

19   prohibition in Article I, Sections 9 and 10 apply only to

20   Congress and not to the President.

21        Does the government agree with that?

22        MR. MIZELLE:  First off, we would argue that this

23   is not a bill of attainder.  But second off, I mean, I would

24   agree that they --

25        THE COURT:  Well, would you agree that some

1    provisions in this executive order, 14230, are punitive to

2    Perkins Coie?

3            MR. MIZELLE:  Punitive in the sense of -- I don't

4    think I would use the word "punitive."  I would say have an

5    impact and have caused an injury, certainly, to Perkins

6    Coie.

7            THE COURT:  Cause an injury.  Okay.  But just

8    because they cause an injury to Perkins Coie, in your mind,

9    doesn't make them punitive in the meaning of the term "bill

10   of attainder"?

11           MR. MIZELLE:  Right.  When I think bill of

12   attainder, you know, I typically think that you have a

13   legislator who has essentially convicted somebody of a

14   crime.  Without the benefit of counsel, without the benefit

15   of a trial, without the benefit of a jury, they have

16   convicted this person of a crime.  One, nobody has been

17   convicted of a crime.

18           THE COURT:  I don't think a bill of attainder

19   basically has to say:  You are going to go to jail -- you,

20   John Doe.

21           I think a bill of attainder could be:  You, John

22   Doe, in our view, are a bad person for various reasons; and

23   therefore, we are going to penalize you monetarily or in

24   some other way.

25           So I think since we don't have bills of attainder

1      because they are barred under our Constitution -- I mean,

2      the definition of a bill of attainder is, basically, it's a

3      punitive measure taken against an individual without due

4      process by the legislative branch.

5                When an executive order is being issued as if it

6      were a law --

7                MR. MIZELLE:  Right.

8                THE COURT:  -- I am not as quick as the plaintiffs

9      were to say a bill of attainder bar --

10                MR. MIZELLE:  Right.

11                THE COURT:  -- doesn't apply to the executive

12      branch.  But I just was curious whether the government

13      agreed with the plaintiff or thinks it's a more open

14      question.

15                MR. MIZELLE:  I mean, I would say, just as a pure

16      constitutional matter, that the bill of attainder

17      restriction is only on Article I and not on Article II, and

18      so it doesn't apply to the President.

19                THE COURT:  Yes.  But I think, at the time of our

20      founding, they didn't think of Presidents issuing as many

21      executive orders as they do today -- thought of issuing laws

22      like this.

23                MR. MIZELLE:  I disagree.  They certainly thought

24      of Presidents taking action to protect the national security

25      interests of the United States.  And if that meant excluding

1    individuals who are no long trustworthy with the nation's

2    secrets -- that is a bedrock principle of our republic.  I

3    mean, that has existed for a very, very long time.

4         THE COURT:  So can I just explore this a little

5    bit with you, I mean, because this is the second time you

6    have said this, Mr. Mizelle.

7         I would admit to you, it sends little chills down

8    my spine when you say that:  If the President, in his view,

9    takes the position that an individual or an organization or

10   a company is operating in a way that is not in the nation's

11   interests, he can issue an executive order like this and

12   take steps to bar that individual, that entity, that company

13   from doing any business with the government, terminate

14   whatever contracts they have got, bar them from federal

15   buildings -- I mean, that's a pretty extraordinary power for

16   the President to exercise.

17        I am only familiar with OFAC lists, where there is

18   a whole administrative process where people are designated

19   on the lists and there are lots of appeal rights; there are

20   lots of -- there is a lot of due process that's associated

21   with -- whether you are a U.S. citizen or even a foreigner,

22   to challenge being put on a -- designated as a person on

23   that list.

24        Here, the President is basically adopting an

25   OFAC-designation kind of power for Americans as he sees fit.

1    So why shouldn't we be chilled by that?

2            MR. MIZELLE:  I think to adopt any other reading

3    of this -- and to adopt, I think, something -- respectfully,

4    Your Honor, to adopt a ruling that you just articulated

5    would fundamentally upend Article II power as we know it.

6    It would prevent the President from taking all necessary

7    action to suspend security clearances when such action is

8    deemed necessary.  It would prevent the President from --

9            THE COURT:  We are not talking about Section 2

10   here.

11           MR. MIZELLE:  But your reasoning would certainly

12   apply to security clearances, I don't know why it wouldn't.

13   It would prevent the President from issuing sanctions under

14   IEEPA.  It would prevent the President from taking actions,

15   as it's been recognized since 1940 by the U.S. Supreme

16   Court:  The government enjoys the unrestricted power to

17   produce its own supplies, to determine those with whom it

18   will deal, and affix the terms and conditions upon it will

19   need to make those purchases --

20           THE COURT:  So your view is:  Don't be chilled,

21   Judge, we should just trust the President to draw the right

22   lines, and yes, he has that power.

23           That's the government's position here?

24           MR. MIZELLE:  It is 100 percent our position that

25   government -- that the President has that power, and that it

1    is the right and prerogative of the President as the sole

2    individual vested with Article II authority to exercise that

3    prerogative.  Right?

4            It might be a situation where the Court deems it

5    imprudent or unwise.  I am not going to sort of -- you know,

6    sort of bicker with the Court about, you know, your own sort

7    of personal views on it.  But what I will say and vigorously

8    defend is that the President has every right to make that

9    action.  And in taking that action against -- in making a

10   finding that there is a national security risk with respect

11   to a group of individuals, he is allowed to effectuate that.

12           THE COURT:  And so we have Williams & Connolly, a

13   very brave law firm, to take this on.

14           MR. MIZELLE:  Yes, ma'am.  We have hired several

15   of their people to DOJ, so I am familiar with them.

16           THE COURT:  They are very brave to take on the

17   Perkins Coie matter.  And they could be next, with an

18   executive order, because they're representing Perkins

19   Coie -- the President would have that power -- to issue the

20   next executive order that wouldn't be called "Addressing

21   Risk From Perkins Coie LLP," it could be "Addressing Risks

22   From Williams & Connolly" -- LLP LLC, I am not sure -- but

23   that would be within the President's power should he get

24   annoyed by Williams & Connolly's defense of Perkins Coie,

25   which the President believes, as stated in the Section 1

1    purpose of the executive order is a dishonest and dangerous

2    law firm?

3        MR. MIZELLE:  I think that if the President issued

4    a --

5        THE COURT:  Yes or no, the President would have

6    that power?

7        MR. MIZELLE:  If he made a finding that there was

8    a national security risk with a particular law firm, then

9    yes --

10        THE COURT:  Or not in the interest of the

11    United States, in his view.

12        MR. MIZELLE:  I think that this is actually really

13    tied --

14        THE COURT:  Because that's the finding -- that's

15    the finding that he has made here.

16        MR. MIZELLE:  I think this is really tied to

17    national security.  And, again, I think that there is a lot

18    of bases going back to, again, the very first example about

19    Fusion GPS; false information related to Russia; and

20    national security issues, certainly.  I think that it's

21    really tied to that.

22        THE COURT:  I know the President has just -- you

23    know, based on reading these papers, he was upset about that

24    in 2016; he was so upset about this still he filed a lawsuit

25    against Perkins Coie and others in the Southern District of

1    Florida that was dismissed in rapid order.  He keeps

2    bringing it up.  It's like he doesn't want any of us to

3    forget Fusion GPS.  He doesn't want any of us to forget

4    that -- any of this.  He really has a bee in his bonnet

5    about it.

6            So now we have this executive order.  And I

7    already have enormous respect for Williams & Connolly and an

8    enormous respect for them taking this case, when not every

9    law firm in this city or this country would given the

10   substance of this executive order.

11           If I am hearing you correctly, it is your view

12   that another executive order is totally possible and within

13   the President's power to have "Addressing Risks From

14   Williams & Connolly" if the President got angry enough to

15   view this in Williams & Connolly's vigorous representation

16   of Perkins Coie as dishonest and dangerous?

17           MR. MIZELLE:  Your Honor, I would just --

18           THE COURT:  Your answer is yes?

19           MR. MIZELLE:  If the President --

20           THE COURT:  Within the President's power?

21           MR. MIZELLE:  The President has the sole authority

22   to determine if a person poses a national security risk such

23   that certain actions need to be taken, including revocation

24   of security clearances, including walling them off from

25   certain sensitive government buildings that could endanger

1     the national security interest of the United States.  100

2     percent, that is the President's prerogative under the

3     Constitution of the United States.

4           THE COURT:  Okay.

5           MR. MIZELLE:  And I believe -- I would say, going

6     further, that that's a prerogative that, under *Lee v.*

7     *Garland*, this Circuit has said cannot be challenged, at

8     least under a sort of back-door, Fifth Amendment, First

9     Amendment, equal protection-type case, which is exactly what

10    plaintiffs are seeking to do here.

11          THE COURT:  All right.  So let's just look for --

12    move on to Section 3, which you have already told me you

13    haven't seen any guidance yet, but DOJ is working hard on

14    expeditiously issuing guidance about how to, I guess, take

15    steps to terminate contracts, and so on; and Section 5,

16    which also requires guidance to be issued on limiting access

17    to federal government buildings.

18          Is that guidance from each agency, if you know,

19    going to be implemented in a way that, you know, Perkins

20    Coie is going to know which buildings they can go into or is

21    it going to be implemented with enforcement at the door of

22    every federal building or is that too premature to know?

23          MR. MIZELLE:  I believe it's too premature.  I

24    haven't seen any guidance, Your Honor, on that.  I very much

25    doubt it would be a situation where people are, you know,

1    arrested at the door, but --

2              THE COURT:  But it's possible?

3              MR. MIZELLE:  Well, I mean, again, if we're living

4    in a hypo world, sure; I guess anything, as plaintiffs would

5    point out, is theoretically possible.

6              Likely to happen?  I don't think so.

7              Speculative?  Absolutely.

8              Any harm there, under a sort of series of

9    potential hypos, would be necessarily speculative.  I mean,

10   we don't know what is going to happen.

11             I think the fact that neither of us sitting here,

12   and plaintiff's counsel can't --

13             THE COURT:  So let me just ask you because --

14   like, Section 5(a), for example, requires the guidance on

15   limiting Perkins Coie employees -- all of them -- 1200

16   lawyers, plus 2500 nonlawyers -- limiting all of their

17   access to federal government buildings.  That guidance has

18   to address when such access would threaten national security

19   or otherwise be inconsistent with the interests of the

20   United States.

21             So that "inconsistent with the interests of the

22   United States" is far broader than threatening the national

23   security.  And one could say, you know, who needs national

24   security if you can just look to whether it's inconsistent

25   with the interests of the United States?

1          So how do you think "inconsistent with the

2     interests of the United States" should be interpreted?

3          MR. MIZELLE:  To be honest, Your Honor, I am not

4     sure.  And I would -- I am not a head of an agency, so I

5     would not want to speculate as to how the President's

6     cabinet is planning to implement this.

7          But what I would say is the very fact that we're

8     having this conversation --

9          THE COURT:  Well, it's not just the head of the

10    cabinets, it's all federal agencies.  And there are, like,

11    over 90 of them.

12         MR. MIZELLE:  Yes.  Yes, Your Honor.  I mean, you

13    are right.

14         THE COURT:  Some of them, I don't even know what

15    the acronym stands for.

16         MR. MIZELLE:  Right.

17         THE COURT:  So is it possible, then, that the head

18    of every one of these 90-plus agencies could have their own

19    particular view about what's "inconsistent with the

20    interests of the United States" means?

21         And so the people who work at Perkins Coie could

22    have one set of guidance -- a different set of guidance at

23    each different agency.

24         MR. MIZELLE:  Which is not that inconsistent with

25    how access to a lot of these agencies already work, going

**JA 134**

1    through various security.  The security of the Department of

2    Justice is very different than security at the Department of

3    Education, for example, right?

4            THE COURT:  But that applies to everybody coming

5    in, not one particular firm and employees of a firm, right?

6            MR. MIZELLE:  That is true.

7            But again, this is an instance where:  Once

8    guidance is issued, if there is an issue with that, if they

9    believe that it's objectionable in some way, I would say

10   that is the proper time to bring a lawsuit and say:  There

11   is now specific issues with guidance issues by this specific

12   agency head.

13           THE COURT:  Let me ask you this.  I know that DOJ,

14   based on your representation, is working hard to implement

15   guidance for this executive order.

16           MR. MIZELLE:  Yes, Your Honor.

17           THE COURT:  Has this order been circulated to the

18   employees at the Department of Justice?

19           MR. MIZELLE:  I am not sure whether the executive

20   order has.  It's not something we would typically just send

21   around to everybody.

22           THE COURT:  Okay.  How about at the U.S.

23   Attorney's Office; do you know?

24           MR. MIZELLE:  I am not sure, Your Honor.

25           THE COURT:  Mr. Dreier, has it been sent to

1    everybody at the U.S. Attorney's Office?

2              MR. DREIER:  I don't believe it has.

3              THE COURT:  Okay.

4              Would you agree that if the guidance that is

5    issued, with the full spirit of the purposes of the

6    executive order, tells Department of Justice people with

7    whom you are most familiar or U.S. Attorney's Office people

8    here in D.C.:  Don't meet or engage -- to use the word from

9    the executive order -- with anybody from Perkins Coie --

10   that that would put quite the damper on Perkins Coie

11   attorneys' ability to represent clients?

12             MR. MIZELLE:  I don't read it, first off --

13             THE COURT:  When the Department of Justice is on

14   one side of the view or the other?

15             MR. MIZELLE:  Sure.  Yeah.  First, I don't read it

16   as going, necessarily, as far as you suggested, to not even

17   talk to or speak with individuals.

18             And I would also remind -- you know, respectfully

19   remind the Court that during COVID nobody was entering

20   federal buildings; nobody was meeting; all access and all

21   communications were handled via letter, email, phone

22   calls --

23             THE COURT:  Well, you tell me, Mr. Mizelle.

24             The specific words are:  Heads of all agencies

25   shall provide guidance limiting government employees acting

1      in their official capacity from engaging with Perkins Coie

2      employees.

3             So "engaging" is not -- they could have said:

4      Don't meet in person.

5             That would say -- he can have a Zoom call.

6             MR. MIZELLE:  Sure.

7             THE COURT:  But this is broader than that.  It

8      says "engaging."

9             So do you think "engaging" just means hiring or

10     entering into a contract with Perkins Coie?  Or do you think

11     "engaging" means, in the context of this overall executive

12     order, something broader than that, and it means more akin

13     to interacting with them?

14            MR. MIZELLE:  I would say, first off, it says:

15     Engaging to ensure consistency with the national security

16     and other interests of the United States.

17            So I believe it all has to be read together.  It's

18     not just "engaging," full stop, right there.  There is a

19     qualifier there that the agency should consider when

20     directing it.

21            Now, how each head of the agency --

22            THE COURT:  But limiting -- limiting those

23     engagements.  It uses the word "limiting."

24            MR. MIZELLE:  Limiting those engagements to the

25     extent to ensure consistency with the national security,

```
1          yes, Your Honor.

2                    THE COURT:  And other interests of the United

3     States.

4                    MR. MIZELLE:  That's exactly right.

5                    THE COURT:  So you read that in total; and

6     plaintiff certainly reads that to say:  Government officials

7     are not willing to take meetings with us -- that's happened

8     already.  And we're afraid the guidance is going to also say

9     that because that's how it reads.

10                   How do you read it?

11                   MR. MIZELLE:  Me personally, Your Honor, I think

12    my reading of it is somewhat irrelevant.

13                   THE COURT:  Well, you are representing the

14    government here.  So... right?

15                   MR. MIZELLE:  And I read it as giving agencies

16    discretion and to determine what level of engagement would

17    be appropriate in light of the interests in national

18    security of the United States.

19                   So it's not even clear that it's --

20                   THE COURT:  In a situation where a Perkins Coie

21    lawyer is representing a criminal defendant --

22                   MR. MIZELLE:  Sure.

23                   THE COURT:  -- say, or a potential target --

24                   MR. MIZELLE:  Right.

25                   THE COURT:  -- in a criminal investigation, and
```

1    they want to have a negotiation about what charges or what

2    disposition, or no charges --

3              MR. MIZELLE:  Right.

4              THE COURT:  -- or deferred prosecution --

5              MR. MIZELLE:  Right.

6              THE COURT:  -- all of the things that go on in

7    those incredibly important plea negotiations, or

8    negotiations between government counsel and defense counsel.

9    Would that be engagement that would be consistent with the

10    national security or other interests of the United States?

11              MR. MIZELLE:  I am not sure it would.  And in the

12    same way as the Court alluded to right at the very

13    beginning, if you were to order a meet-and-confer, I would

14    not go over to, you know, my counterpart and say:  Listen, I

15    can't talk to you, have a nice day; and openly defy the

16    Court's order there.  That is not how I read this, nor do I

17    think that that would be required.

18              And the very fact -- and I really would like to

19    hammer this point home.  The very fact that we don't know --

20    plaintiffs have put forward a world, and it looks a certain

21    way.  And I have put forward a world, and it looks a very

22    different way.  And the fact that you are even trying to

23    decide which world is accurate just shows how speculative

24    the harm is.  That is not the role of a court to determine.

25              THE COURT:  And isn't the speculativeness of this

**JA 139**

1    harm and how far it will go and the risk that the next

2    executive order is going to be saying not "Addressing Risks

3    From Perkins Coie" but "Addressing Risks From Williams &

4    Connolly"? -- isn't that enough of a concern about

5    associational risks, rights of association, rights of being

6    able to practice law and accept clients that you want, and

7    for clients to be able to choose the lawyers they want for

8    us not to have to wait on the guidance?

9            MR. MIZELLE:  Regardless of whether a matter --

10   you might feel that there is a certain harm being done --

11   fundamentally, this is something going to the Article III

12   jurisdiction of the Court.  Right?

13           If there is a speculative harm here, which is

14   exactly what they're pointing to, we may not be able to go

15   to airports; we may not be able to go to the post office.

16   If an order is entered by a postal master saying:  Perkins

17   Coie's employees may not enter the post office, then --

18           THE COURT:  We're going to have to use FedEx.

19           MR. MIZELLE:  Right.  Or someone else, right?

20   UPS, right?  But that would be now a challenge that is ripe

21   for this Court to adjudicate.  At this point, the fact that

22   we're all speculating and guessing just shows that it's not

23   ripe for adjudication by this Court.

24           THE COURT:  Thank you, Mr. Mizelle.

25           MR. MIZELLE:  If I may, Your Honor, there's just a

**JA 140**

1       couple more points that you brought up that I would like to

2       address.

3                    THE COURT:  Sure.  Go ahead.

4                    MR. MIZELLE:  Your Honor, you mentioned the First

5       Amendment and, certainly, viewpoint discrimination.  I

6       believe there it's more of a nuanced approach when we talk

7       about national security.

8                    And so whenever I say, you know, First Amendment

9       rights, you think it's typically someone's First Amendment

10      rights.  There's a lot of things that people -- a lot of

11      speech that people are allowed to engage in that we might

12      even find abhorrent but, nonetheless, it's protected by the

13      First Amendment.  People can be pro-terrorist, pro-ISIS

14      terrorist.  They can engage -- they could even call for the

15      overthrow of the federal government.  However, those are

16      activities that would be categorically disqualifying for

17      national security experiences.

18                   THE COURT:  Perhaps unless you are a green card

19      holder at Colombia University.

20                   MR. MIZELLE:  Perhaps, Your Honor.  Right?  If

21      that individual is calling for the violent overthrow of the

22      United States --

23                   THE COURT:  I don't think he was doing that --

24                   MR. MIZELLE:  That is something while --

25                   THE COURT:  -- based on what my reading is.

1          MR. MIZELLE:  Yeah.  There is a lot of facts in

2     that case that are, you know, tricky and not all public.

3          But with respect to viewpoint discrimination, it

4     is fundamentally the prerogative of the federal government

5     to find -- in fact, when I got my own security clearance,

6     one of the key questions was:  Have you ever advocated for

7     the overthrow of the United States?

8          If I had answered that question yes, the

9     government would be well within its rights to say:  You know

10    what, we are not going to trust you, Mr. Mizelle, with a

11    security clearance.  And so this notion that any speech

12    whatsoever --

13          THE COURT:  You are not -- you are not even

14    suggesting that anybody at Perkins Coie did that to justify

15    this executive order, are you?

16          MR. MIZELLE:  What I am suggesting -- no, Your

17    Honor.

18          THE COURT:  To be clear, you are not; are you?

19          MR. MIZELLE:  No, Your Honor.

20          But what I am suggesting is that throwing around

21    terms like "viewpoint discrimination" and "strict scrutiny,"

22    when you look at it in the national security context, it

23    fundamentally needs to be viewed differently.  And that

24    fundamental difference is, the government is allowed to

25    discriminate on the basis of viewpoint.  We are not required

1    to trust our nation's secrets to somebody who advocates for

2    the overthrow of the federal government or for someone who

3    is engaged in other sort of dangerous actions that are

4    contrary to the national security of the United States.

5            And that is fundamentally, I think, what is at

6    heart here because we're not talking about, you know,

7    generic principles of First Amendment law.  What we're

8    talking about is a finding by the President of the United

9    States which is eminently defensible, both in law and fact,

10   that Perkins Coie poses a national security risk to the

11   United States.  And he is directing all of those to whom --

12   he is directing everybody who reports to him, all of the

13   heads of the agencies, to take actions in light of that,

14   right?

15           And so that does mean a security clearance review,

16   which is not under challenge today; but also means taking

17   actions with respect to federal buildings and personnel that

18   need to be consistent with our nation's most treasured, most

19   private secrets.  And I believe that's exactly what the

20   President did here, Your Honor.

21           THE COURT:  Thank you.

22           MR. MIZELLE:  Thank you, Your Honor.

23           THE COURT:  Yes.  Mr. Butswinkas.

24           MR. BUTSWINKAS:  Thank you, Your Honor.

25           I appreciate the time the Court has devoted to

1    this, and I will try to be as brief as possible; but there

2    are a few things that I just am compelled to respond to.

3            That is a different Constitution from the one I am

4    familiar with.

5            The words "if the President in his view" jump out

6    of the courtroom.  That's not the way the Constitution

7    works.

8            The President can issue executive orders from a

9    delegated act of Congress or from inherent authority in the

10   vesting clause of the Constitution.

11           THE COURT:  And he has a very broad view of the

12   vesting clause of the Constitution.

13           MR. BUTSWINKAS:  Indeed.  But it's not one

14   consistent with the law.  And --

15           THE COURT:  Well, the Supreme Court might have to

16   decide that.

17           MR. BUTSWINKAS:  This case -- *Youngstown Sheet &*

18   *Tube Company*, which I know you are familiar with because you

19   have cited it, where Justice Jackson, the concurring

20   opinion, is kind of the cornerstone of this analysis.  And

21   when she --

22           THE COURT:  We see in some ways -- I mean, I just

23   issued an opinion on the unitary President theory, I didn't

24   know it was actually going to come up again in this case --

25           MR. BUTSWINKAS:  When the government --

**JA 144**

1          THE COURT:  But there you go.

2          MR. BUTSWINKAS:  I'm sorry.

3          When the government says:  "The President in his

4     view," this passage from Justice Jackson jumps off the page:

5     The essence of our free Government is "leave to live by no

6     man's leave, underneath the law," -- to be governed by those

7     impersonal forces which we call law.  Our government is

8     fashioned to fulfill this concept so far as humanly

9     possible.  The Executive, except for recommendation and

10    veto, has no legislative power.  The executive action we

11    have here originates in the individual will of the President

12    and represents an exercise of authority without law.

13          That's exactly what we have here.  And that

14    concurring opinion, as you know, has been the foundation of

15    executive order analysis for, now, 75 years.

16          I want to touch upon the case that they cite to

17    Your Honor showing that this is inherent authority from the

18    vesting clause.  And by the way, I am not one here to argue

19    that the vesting clause is any model of clarity; but the

20    cases have court meaning into it that would not allow an

21    executive order that targets a law firm to retaliate because

22    of lawsuits they have been involved in.

23          You mentioned the bill of attainder.  And I have

24    always thought that was curious, too, because the law does

25    say the bill of attainder applies to Congress, not to the

```
 1    President --

 2              THE COURT:  Well, it's in Article I.

 3              MR. BUTSWINKAS:  Yes.

 4              THE COURT:  But it doesn't say only Congress.

 5              MR. BUTSWINKAS:  Well, that's right.  And I don't

 6    know --

 7              THE COURT:  So, I mean, I don't --

 8              MR. BUTSWINKAS:  I think, Judge, that's right.

 9              THE COURT:  I think you can't have a law that is a

10    bill of attainder, period, short stop.  That is in the

11    Constitution -- two sections they thought it was so

12    important, the founders.  I don't think they thought about

13    things like executive orders.

14              I know the government has a different view, thinks

15    that it's perfectly common.  But executive orders that sort

16    of stand in for law, I think, could be subject to a bill of

17    attainder constitutional bar.

18              MR. BUTSWINKAS:  We had open and robust debate

19    about how to characterize the bill of attainder, but I will

20    say this, we agreed on one thing:  Whether you call it "bill

21    of attainder" or not, the same principles apply to the

22    executive.  Those aren't my words, those are Justice Black

23    in Joint Anti-Fascist Refugee Comm v. McGrath -- the

24    McCarthy cases which, by the way, not as bad as this

25    executive order.
```

**JA 146**

1        Here is what Justice Black said:  Moreover,

2   officially prepared and proclaimed governmental blacklists

3   possess almost every quality of bills of attainder, the use

4   of which was, from the beginning, forbidden to both national

5   and state governments.  It is true that the classic bill of

6   attainder was a condemnation by the legislature following

7   investigation by that body while, in the present case, the

8   Attorney General performed the official task.

9        Justice Black goes on:  But I cannot believe that

10  the authors of the Constitution who outlawed the bill of

11  attainder inadvertently endowed the executive with power to

12  engage in the same tyrannical practices that had made the

13  bill such an odious institution.

14        Your point is exactly right, and that's what

15  happened here.

16        I want to touch upon the First Amendment.  It is

17  virtually indisputable that this executive order is a

18  retaliation for many First Amendment rights:  Association,

19  petition, speech -- and you only have to read the order or

20  read the statements we submitted from the President before,

21  during, and after.  And the language of the order jumps out.

22  It says:  Partisans -- partisans, activists, election

23  lawsuits -- it's all quintessential viewpoint

24  discrimination.

25        And I want to make that point clear because when

1    you get to -- like, in the McCarthy situation, putting

2    together an enemies list which is targeting viewpoints, the

3    cases are clear.  And Justice Black said that smacks of the

4    most evil type of censorship in our society; it cannot be

5    reconciled with the First Amendment.

6           And the retaliation for a favored viewpoint -- and

7    this is, I think, critical to our First Amendment

8    analysis -- if that is the motive, as is confessed in

9    Section 1 of the executive order, that ends the inquiry.

10   It's over.  You don't have to worry about compelling state

11   interests, rational -- you don't have to do anything

12   because, first of all, you couldn't pass those tests because

13   you have already established that the actual motive was not

14   some legitimate interest but one that is in violation of the

15   First Amendment.  And that's the *Perry* case that we cite

16   from the Supreme Court in 1972, and the *National Association*

17   *of Diversity Officers v. Trump* in 2025.  A unanimous Supreme

18   Court echoed the same principle in *National Rifle*

19   *Association v. Vullo*, when Justice Sotomayor -- as I said,

20   writing for the whole Court:  At the heart of the First

21   Amendment free speech clause is the recognition that

22   viewpoint discrimination is uniquely harmful to a free and

23   democratic society.  The First Amendment prohibits

24   government officials from relying on the threat of invoking

25   legal sanctions and other means of coercion to achieve the

1        suppression of disfavored speech.

2                I wanted to talk about, briefly -- and I will try

3        not to take up too much more time, boogymen, ghosts, and

4        causation.  One legal concept, one not so much.  Same point.

5                We listed out exactly what has happened.  Despite

6        the claim of speculative causation, they all happened on

7        March 6, March 7, March 8, March 9, March 10, March 11th.

8        And I don't know what that fallacy is *post hoc ergo propter*

9        *hoc* -- whatever it is.  All of these people said:  We love

10       you as our lawyers.  We want you as our lawyers, but we

11       can't.

12               The Justice Department person from the Criminal

13       Division said:  Can't meet with you.

14               Only, I think, yesterday agencies started to

15       contact contractors and ask them to tell us:  Do we have a

16       relationship with Perkins Coie?

17               They are required by March 20th to give an answer

18       to that.

19               These are not ghosts, these are real things that

20       are threatening the vitality of that law firm.

21               Clients terminating their relationships because

22       administrations change, so maybe they are trying to cozy up

23       to a new administration.  The clients we mentioned were

24       35-year clients; that's a lot of different administrations.

25       20-year clients; that's a lot of different administrations.

1              That argument does not hold water here.

2              The other thing I will say is there has been a big

3    debate about economic harm.  And I think the economic harm

4    is massive.  First of all, since it's noncompensable, it

5    doesn't have to be massive.  But second of all, it is a

6    massive threat to the law firm.

7              But also, the government didn't talk about the

8    other irreparable constitutional harms.  Those are *per se*

9    irreparable injury if we prove to you that there is a

10   violation of First Amendment rights, petition, association,

11   speech; Fifth Amendment rights, due process; Sixth Amendment

12   rights, the right to counsel, if you agree on the standing

13   point we talked about; and equal protection about a group

14   being singled out like no other group.  That one we only

15   spent a page on in our 45 pages, and it is a slam dunk on

16   the law.

17             There is also irreparable reputational harm by all

18   of the aspersions that are cast in Section 1, and in the

19   fact sheet.  And all of those are injuries that establish,

20   as we point out in our papers, irreparable on many, many

21   different levels.

22             I think the government admitted to you that this

23   was punitive.  That makes a big difference, too, because in

24   the separation of powers analysis, one thing you will look

25   at -- we submitted to you -- that what they have done is

1    just a mulligan from the things that happened in the

2    judicial system.

3            Sussmann was indicted and acquitted.  President

4    Trump, as a private citizen, sued the law firm; and he lost.

5            The punitive portion, courts mete out punishment,

6    not the Presidents; and courts adjudicate, not Presidents.

7            THE COURT:  I know.  This is the first claim in

8    your complaint, the ultra vires claim.

9            MR. BUTSWINKAS:  So I guess I will conclude by

10   saying that we believe that we meet the criteria for a TRO,

11   and we don't come here lightly to ask.

12           I will tell you that this is the first time I have

13   ever advised a client in 36 years to seek a TRO because it's

14   a tough thing to get.  You have to have emergent

15   circumstances.  Those are present here in spades.

16           It's not political.  It's not a Republican or

17   Democratic issue.  It's not a liberal or conservative issue.

18           Not supporting a -- not being able to associate

19   yourself with an unpopular client or an unpopular viewpoint

20   cannot be the way we do business in Washington.

21           When John Adams represented British soldiers after

22   the Boston Massacre, that was a watershed event for our

23   legal profession.  It's one that not only encourages us but

24   requires us to represent the people who are unpopular in

25   viewpoint or otherwise; and every single code of

1    professional responsibility compels us to do that.  The

2    President is punishing this law firm for exactly that.

3         My father and mother are buried in Arlington

4    National Cemetery.  My dad spent almost a quarter of a

5    century in the Navy.  He didn't agree with the opinions of

6    anyone, but he would fight to the death for your right to

7    say them.  This executive order eviscerates that concept;

8    and if left unchecked, we will be in a country we barely

9    recognize.

10        Thank you, Your Honor.

11        THE COURT:  Thank you.

12        All right.  I see why, Mr. Butswinkas, you are

13   such a popular attorney and so well respected.  I am going

14   to follow on your eloquent words by issuing my ruling.

15        Plaintiff Perkins Coie LLP, moves for a temporary

16   restraining order to enjoin enforcement of Sections 1, 3,

17   and 5 of President Trump's Executive Order dated March 6,

18   2025, Numbered 14230, titled "Addressing Risks For Perkins

19   Coie LLP."

20        An application for a TRO is analyzed using the

21   same factors that apply to a request for a preliminary

22   injunction; see *Gordon v. Holder*, 632 F.3d 722, jump cite

23   723, D.C. Circuit 2011.

24        The purpose of a TRO is not to decide which side

25   wins the case; that will come later in the case when the

1    parties and this Court have more time to consider all facets

2    of the law and how the law appropriately applies to the

3    facts.

4            The purpose of a TRO is to preserve the status quo

5    while the Court considers the merits of the case and gets in

6    all of that necessary briefing.  See *National Council of*

7    *Nonprofits v. OMB*, Civil Action No. 25-239, 2025 WL 314433

8    at *2, D.D.C. January 28, 2025; citing *MGU v. Nielsen*, 316

9    F.Supp.3d 518, jump cite 520, D.D.C. 2018, which involves a

10    TRO; and *Chaplaincy of Full Gospel Churches v. England,* 454

11    F.3d 290, jump cite 297, D.C. Circuit from 2006, involving a

12    preliminary injunction.

13            For all of you who are listening, sorry I have to

14    give all of these citations.  The administration has --

15    while TROs are normally not appealable, the administration

16    has taken appeals from TROs.  I want to make sure my record

17    is full and complete in case this is appealed, and the

18    Circuit has the benefit of all of my citations.

19            So the status quo is the last uncontested status

20    which preceded the pending controversy.  See *Huisha-Huisha*

21    *v. Mayorkas*, 27 F.4th 718, jump cite 733, D.C. Circuit 2022;

22    citing *District 50 United Mine Workers of America v.*

23    *International Union, United Mine Workers of America,* 412

24    F.2d 165, 168 -- jump cite 168, D.C. Circuit 1969.

25            For a TRO to be granted, the plaintiff must show

1   that:  One, the plaintiff is likely to succeed on the merits

2   of its claims; two, the plaintiff is likely to suffer

3   irreparable harm without the TRO; three, the balance of the

4   equities favors issuance of the TRO; and four, the issuance

5   of the TRO is in the public interest.  See *Ramirez v.*

6   *Collier, 595 U.S.* 411, jump cite 421, from 2022; quoting

7   *Winter v. NRDC,* 555 U.S. 7, jump cite 20, from 2008.

8           When the government is the opposing party, the

9   final two factors, namely, the balance of the equities and

10   the public interests, merge into one.  See *Karem v. Trump,*

11   960 F.3d 656, jump cite 668, D.C. Circuit from 2020.

12           Here, the plaintiff has met its burden to satisfy

13   all of these factors and, therefore, is entitled to a

14   temporary restraining order enjoining enforcement of

15   Sections 1, 3, and 5 of Executive Order 14230.

16           To be clear, I have not been asked and, therefore,

17   have not considered for purposes of today's TRO hearing the

18   other two sections of Executive Order 14230.

19           I am going to start with the first factor, the

20   likelihood that plaintiff will succeed on the merits.  This

21   factor is one of the most important, and absent the showing

22   of likelihood of success on the merits, the injunctive

23   relief should be denied.  See, for example, *Greater New*

24   *Orleans Action Center v. U.S. Department of Housing and*

25   *Urban Development,* 639 F.3d 1078, jump cite 1088,

1    D.C. Circuit 2011, stating:  When a plaintiff has not shown

2    the likelihood of success on the merits, there is no need to

3    consider the remaining factors.  See also, *Kiyemba v. Obama*,

4    561 F.3d 509, jump cite 513, D.C. Circuit 2009; and *Hanson*

5    *v. District of Columbia*, 120 F.4th 223, jump cite 242,

6    D.C. Circuit 2024, with the same holdings.

7         Plaintiffs have shown that Plaintiff Perkins Coie

8    is likely to succeed on the merits on at least three of its

9    constitutional claims against the executive order, each of

10   which are sufficient to satisfy the first factor of the

11   standard for issuance of a TRO.

12        Given the time constraints under which the Court

13   is considering the nine claims plaintiff asserts in the

14   complaint filed only yesterday afternoon, this focus on only

15   three of the claims does not mean that the other claims have

16   any less or even more likelihood of success, but only that

17   deeper review of all the claims must await further briefing

18   by the parties and consideration by the Court.

19        I am going to start with the plaintiff's First

20   Amendment claims before turning to plaintiff's due process

21   and Sixth Amendment claims.

22        Plaintiff has shown a likelihood of success on the

23   merits of its First Amendment claim on two fronts:  One,

24   that Executive Order 14230 unlawfully retaliates against

25   plaintiff for protected speech; and two, that the executive

1    order constitutes unlawful viewpoint discrimination.

2            As a general matter, the First Amendment prohibits

3    government officials from subjecting individuals to

4    retaliatory actions after the fact for having engaged in

5    protected speech.  See *Houston Community College System v.*

6    *Wilson*, 595 U.S. 468, jump cite 472, from 2022.  This

7    prohibition extends to retaliatory actions based on

8    perceived viewpoint.  See *Turner v. U.S. Agency for Global*

9    *Media*, 502 F.Supp.3d 333, jump cite 381, D.D.C. from 2020;

10    and *Heffernan v. City of Paterson*, 578 U.S. 266, jump cite

11    270 through 273, from 2016.

12            The retaliatory nature of Executive Order 14230 is

13    clear from its face.

14            In Section 1, the executive order cites as one

15    basis for the order that Perkins Coie worked with activist

16    donors, including George Soros, to judicially overturn

17    popular necessary and democratically enacted election laws,

18    including those requiring voter identification, along with

19    Perkins Coie's work for Hillary Clinton in the 2016

20    election.

21            The executive order goes on, in Section 3, to

22    allude, in slightly more general terms, to Perkins Coie's

23    work for Hillary Clinton and election litigation as the

24    explicit basis for the punitive nature of the steps that

25    federal agency heads and officials are ordered to take

1    against Perkins Coie and its clients under that section.

2         Executive Order 14230 was accompanied by a fact

3    sheet to explain the order.  Both were issued the same day.

4         The fact sheet is even more explicit about the

5    retaliatory animus for issuance of the order.  This fact

6    sheet cites, "Partisan lawsuits" filed by Perkins Coie as

7    the justification for the federal contracting restrictions

8    in Section 3 of the order and cites:  "Lawsuits against the

9    Trump Administration" in effort to, "protect the nation from

10   partisan actors, as another justification for issuing the

11   executive order."

12        This language makes clear the executive order is a

13   means of retaliating against Perkins Coie for representing

14   individual clients who are the President's political

15   opponents whom the President does not like; for representing

16   clients in litigation seeking results the President does not

17   like; and representing clients in litigation challenging

18   some of the President's actions, which he also does not

19   like.

20        The firm's political work on behalf of a political

21   opponent of the President and to protect voting rights in

22   the 2020 presidential election and the viewpoint or

23   perceived viewpoint of the law firm's clients and even

24   former or current partners and employees of the firm all

25   fall squarely within the protections of the First Amendment.

1           Regardless of whether the President dislikes the

2     firm's clients, dislikes the litigation positions the law

3     firm takes and vigorous representation of those clients, or

4     dislikes the results Perkins Coie achieves for its clients,

5     issuing an executive order targeting the firm based on the

6     President's dislike of these political positions of the

7     firm's clients or the firm's litigation positions is

8     retaliatory and runs head-on into the wall of First

9     Amendment protections.

10          As the Supreme Court has previously articulated in

11    a case involving the firing of a government employee based

12    on his perceived viewpoint, quote:  The discharge of one

13    tells the others that they engage in protected activity at

14    their peril.  *Heffernan v. City of Paterson*, 578 U.S. 266,

15    jump cite 273, from 2016.

16          That chilling of speech, the Supreme Court has

17    said, causes constitutional harm because:  When an employer

18    announces a policy of demoting those who, say, help a

19    particular candidate in a mayoral race, all employees

20    fearful of demotion may refrain from providing any such

21    help.  See *Heffernan* at 274.

22          That is exactly what the executive order at issue

23    in the instant case does, by punishing Perkins Coie for

24    accepting work from political candidates and from clients

25    who want or need to challenge government actions, oftentimes

1    on a pro bono basis, this order, quote:  Tells others that

2    they engage in this kind of protected activity at their

3    peril.

4              Exactly the concern expressed in *Heffernan*.

5              The order here tells other law firms and lawyers

6    that they engage in political work for certain candidates

7    and for clients with causes unpopular with the political

8    powers at their own peril with the costs likely to include

9    their livelihoods.  This kind of clear retaliation chills

10   First Amendment-protected activity, both for those

11   retaliated against and others watching on the sidelines.

12   And I am sure that many of the legal profession are watching

13   in horror at what Perkins Coie is going through here.

14             Plaintiff has clearly shown it is likely to

15   succeed on the merits of its claim in Count 7 of the

16   complaint, and the executive order unlawfully retaliates on

17   the basis of First Amendment-protected activity.

18             Plaintiff has also shown it is likely to succeed

19   on the merits of its claim in Count 5 of the complaint that

20   the executive order constitutes unlawful viewpoint

21   discrimination.  When the government targets particular

22   views taken by speakers on a subject, the violation of the

23   First Amendment is all the more blatant.  See *Rosenberger v.*

24   *Rector & Visitors of the University of Virginia*, 515 U.S.

25   819, jump cite 829, from 1995.  Viewpoint discrimination is

1    thus, an egregious form of content discrimination.

2         The government must abstain from regulating speech

3    when the specific motivating ideology or the opinion or

4    perspective of the speaker is the rationale for the

5    restriction.  See *Rosenberger.*

6         The Supreme Court has spoken clearly that, quote:

7    The state may not burden the speech of others in order to

8    tilt public debate in a preferred direction.  See *Sorrell v.*

9    *IMS Health, Inc.*, 564 U.S. 552, jump cite 578, from 2011.

10   That is why, as the Supreme Court reaffirmed just last year,

11   quote:  Government officials cannot attempt to coerce

12   private parties in order to punish or suppress views that

13   the government disfavors.  See *National Rifle Association v.*

14   *Vullo*, 602 U.S. 175, jump cite 180, from 2024.

15        In this case, the plain language of Executive

16   Order 14230 confirms that this is exactly what government

17   officials are attempting to do; coerce plaintiff with

18   punitive actions against all federal agencies to punish and

19   suppress views that the government, or at least the current

20   administration, disfavors.

21        As already noted, the plain text of the executive

22   order states that the executive order is being issued due to

23   Perkins Coie work with the 2016 campaign of Hillary Clinton;

24   its work with activist donors and litigation over certain

25   election laws, including those requiring voter

1    identification; its work against candidates for office; and

2    its work for election changes as justification for the

3    order.

4           The fact sheet issued by the White House to

5    explain the order is even more explicit, citing Perkins Coie

6    partisan lawsuits against the United States, representation

7    of Hillary Clinton, filing of lawsuits against the Trump

8    Administration, and perceived status as a partisan actor as

9    rationale for the executive order.

10          All of this language makes perfectly clear that

11   Perkins Coie and its employees were targeted for the firm

12   accepting clients with perceived viewpoints that are

13   unpopular with those in current political power.  This

14   targeting is a clear violation of long-established Supreme

15   Court precedent that government actors may not punish or

16   suppress views that the government disfavors.  See *Vullo*;

17   also, see *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, jump

18   cite 67, 1963, finding that the threat of invoking legal

19   sanctions and other means of coercion, persuasion, and

20   intimidation in order to achieve suppression of First

21   Amendment-protected activity warranted injunctive relief.

22          Nor is the government likely to be able to prove

23   that the executive order is narrowly tailored to achieve a

24   compelling state interest.  First, the order is not narrowly

25   tailored but sweeps breathtakingly broadly.

1          As plaintiff notes at page 23 of its memorandum,

2     the order punishes the entire law firm, all its lawyers and

3     supporting personnel, from the firm's mail room, IT staff,

4     and docketing clerks, with the reputational taint and harm

5     by being described as dishonest and dangerous in Section 1

6     of the order; but also in Section 5, every person working at

7     Perkins Coie faces the embarrassment and risk of being

8     barred from federal buildings and barred from meeting with

9     government employees acting in their official capacity.

10    They face extra hurdles if they should seek a job at the

11    federal government, even if they aspire to public service,

12    even if they want to help the President in achieving his

13    political agenda.

14         This order directs all federal officials to

15    refrain from hiring employees of Perkins Coie unless the

16    official goes through a lot of extra hoops to get a waiver

17    from the head of the agency and that the director of office

18    of personnel management approves that the hire will not

19    threaten the national security of the United States.

20         The order goes even further to punish every client

21    of the firm that holds any government contract with a

22    reporting requirement about any business the client does

23    with Plaintiff Perkins Coie and the threat of termination of

24    the government contract.

25         Then you get to Section 5 of the order, which

**JA 162**

1    requires limiting official access from federal government

2    buildings to employees of Perkins Coie and limiting the

3    government employees acting in their official capacity from

4    engaging with Perkins Coie employees.

5           In short, the scope of the order sweeps widely to

6    hurt everyone working at Perkins Coie and every client at

7    the firm with a government contract.  The firm and other

8    clients with other matters that may have -- require

9    engagement with a government official.

10          The firm is already suffering adverse impacts of

11   the order.  The Burman Declaration describes two instances

12   where the government officials refused to meet with Perkins

13   Coie employees on issues related to pending cases; totally

14   unrelated to any of those cited by the executive order.

15          Also, while the order mentions the words "national

16   security," this simply cannot mask the fact laid out in the

17   opening -- in the order and its accompanying fact sheet that

18   this order is intended to punish Perkins Coie for its work

19   on behalf of its clients.  And this is viewpoint

20   discrimination, plain and simple.

21          The government has no compelling interest in

22   punishing a President's political opponents or preventing

23   certain viewpoints of being heard in the public forum or in

24   the courts, as the Supreme Court's viewpoint discrimination

25   makes clear.  For all of these reasons, plaintiff has shown

1    it is likely to succeed on the merits of its First Amendment

2    claims of retaliation based on First Amendment-protected

3    activities and impermissible viewpoint discrimination.

4         Plaintiff has also shown that the law firm is

5    likely to succeed on the merits on its due process claims in

6    Counts 2 and 3.

7         The inquiry for a due process violation is:  One,

8    whether plaintiff was deprived of a protected interest; and

9    two, what process was due.  See *Logan v. Zimmerman Brush*

10   *Company,* 455 U.S. 422, jump cite 428, from 1982.

11        Plaintiff has identified multiple protected

12   interests that are infringed by the executive order.

13        First, there is the constitutionally protected

14   right of the firm and its attorneys to follow their chosen

15   profession.  See *Campbell v. District of Columbia,* 894 F.3d

16   281, jump cite 288, D.C. Circuit from 2018.  One may be

17   foreclosed from their profession in two ways:  Either via a

18   formal exclusion from some category of work or via some act

19   that has the, quote:  Broad effect of largely precluding the

20   plaintiff from pursuing a chosen career.  See *O'Donnell v.*

21   *Barry,* 148 F.3d 1126, jump cite 1141, D.C. Circuit from

22   1998.

23        Executive Order 14230 places an enormous burden on

24   the law firm's ability to practice law as it has in the past

25   and as it is entitled to do.  This order directs that

1    guidance be developed to restrict plaintiff's attorneys from

2    entering federal buildings and from interacting or

3    engaging -- to use the words used in the order -- with

4    federal employees, preventing employees from practicing law

5    before agency adjudicators, meeting with federal regulators,

6    negotiating with federal prosecutors, and so forth.

7            For a deprivation of the ability to pursue one's

8    profession to be constitutionally cognizable, it may not

9    absolutely bar its practice; rather, seriously affecting, if

10   not destroying plaintiff's ability or substantially reducing

11   the value of its human capital is enough.  See *Campbell v.*

12   *District of Columbia*, a D.C. Circuit case from 2018.

13           Plaintiff's anticipated and real harm that it has

14   already suffered clearly meets that standard.  Plaintiff has

15   a robust practice in specialization of working with federal

16   agencies and federal contractors as well as litigating

17   against such entities.  That practice can no longer operate

18   as it has until issuance of this executive order.

19           The ability of plaintiff to pursue other kinds of

20   legal work, transactional work between private parties, for

21   instance, does not make up for this loss of huge portions of

22   plaintiff's practice and the sole purpose of the work of

23   many of plaintiff's attorneys.  Moreover, plaintiff's

24   attorneys will find it hard to do any kind of legal work

25   going forward, assuming they could avoid interactions or

1    engagement with the federal government entirely in their

2    work, given the harm to their reputations, as I will discuss

3    next, and clients' fear of reprisal from this

4    administration, which has put a target on Perkins Coie.

5            Plaintiff also has a constitutional right to its

6    good name, reputation, honor, and integrity.  See *Wisconsin

7    v. Constantineau*, 400 U.S. 433, jump cite 437, from 1971,

8    holding that it is unconstitutional to attach to someone a

9    badge of infamy without due process.

10           The order describes plaintiff as a threat to

11   national security and the interests of the country, accusing

12   the firm of acting unethically, dishonestly, and

13   discriminatorily, based solely on the President's say-so

14   with clear adverse effects on the firm's reputation.

15           Plaintiff is further deprived of its liberty

16   interests in the First Amendment right to petition the

17   government.  See *Trentadue v. Integrity Commission,* 501 F.3d

18   1215, jump cite 1237, Tenth Circuit 2007, noting a First

19   Amendment right to petition the government.

20           While the First Amendment bars any law abridging

21   the freedom of speech or of the press, the very last clause

22   of the First Amendment also protects the right to petition

23   the government for a redress of grievances.  Plaintiff is

24   unable to seek recourse via federal agents on behalf of its

25   clients because the order restricts the firm's ability to

1    enter federal property and engage with federal officials.

2         Finally, EO 14230 deprives plaintiff of its

3    property interest in the form of contractual relationships

4    with the firm's clients.  As an initial matter, Section

5    3(b)(i) of the order instructs agencies to terminate

6    contracts directly with plaintiff.  In addition, property

7    interests can derive from the private contractual agreements

8    that the plaintiff has with its clients.  See *International*

9    *Union United Auto, Aerospace & Agriculture Implement Workers*

10   *of America v. Auto Glass Empires Credit Union*, 72 F.3d,

11   1243, jump cite 1250, Sixth Circuit 1996; and *Brock v.*

12   *Roadway Express,* 481 U.S. 252, jump cite 260, describing a

13   property interest in a collective bargaining agreement.

14        The order deprives plaintiff of these private

15   relationships as well by requiring disclosure, review, and

16   termination of government contracts with clients of Perkins

17   Coie.  This, obviously, impairs the firm's ability to work

18   with and across from the federal government and even enter

19   federal buildings.

20        As to the second prong for finding a due process

21   violation, this Court need not determine precisely what

22   process was due plaintiff before issuance of Executive Order

23   14230 because no process was given.

24        As the Supreme Court has explained, the

25   fundamental requirement of due process is the opportunity to

1   be heard at a meaningful time and in a meaningful manner.

2   See *Mathews v. Eldridge,* 424 U.S. 319, jump cite 333, 1976;

3   quoting *Armstrong v. Manzo*, 380 U.S. 545, jump cite 552,

4   from 1965.  See also *Joint Anti-Fascist Refugee Committee v.*

5   *McGrath*, 341 U.S. 123, jump cite 160, 1951, with Justice

6   Frankfurter concurring and condemning the designation by the

7   U.S. Attorney General of certain organizations as communist

8   without notice, without opportunity to meet the evidence or

9   suspicion on which designation may have been based, and

10  without opportunity to establish affirmatively that the aims

11  and acts of the organization are innocent and, instead, on

12  the mere say-so of the Attorney General, and describing it

13  as:  So devoid of fundamental fairness as to offend the due

14  process clause of the Fifth Amendment.

15          Plaintiff apparently only learned of the order

16  when it took effect, so plaintiff had no opportunity to be

17  heard prior to the deprivation of its rights.  Even where

18  national security interests are legitimately involved,

19  plaintiffs generally have a right to some due process.  See

20  *Ralls Corp v. Committee on Foreign Investment in U.S.*, 758

21  F.3d 296, jump cite 318, D.C. Circuit from 2014, finding a

22  due process violation where a foreign-owned corporation was

23  subject to an order from the Committee on Foreign Investment

24  in the United States, sometimes called CFIUS, preventing a

25  merger without an opportunity to rebut the findings.

1          Plaintiff was clearly deprived of due process when

2     it was not even given the most basic protection of advance

3     notice and opportunity to challenge the decision reflected

4     in Executive Order 14230.

5          Plaintiff has demonstrated an additional separate

6     due process problem.  The order is so vague that government

7     officials in different agencies may apply all of the

8     different provisions where, specifically, Section 3 and

9     Section 5, to Perkins Coie, its employees, and its clients

10    in ways that are inconsistent and overbroad; so the firm,

11    its employees, and its clients will have little idea what to

12    expect in any professional encounter with any government

13    official.  An enactment is void for vagueness if its

14    prohibitions are not clearly defined.  See *Grayned v. City*

15    *of Rockford,* 408 U.S. 104, jump cite 108, 1972.

16          Plaintiff explains, for example, that the

17    "Personnel" in Section 5 provision is so broad that Perkins

18    Coie and its clients do not know the full set of

19    circumstances under which the firm will be barred from

20    engaging with government employees.

21          The government concedes that we don't know exactly

22    what that means even or what "engaging" means, and what the

23    impact of that is going to be.  Section 5 of the order

24    refers to limiting official access from federal government

25    buildings to employees of Perkins Coie when such access

1    would threaten the national security of or otherwise be

2    inconsistent with the interests of the United States.  What

3    exactly that means is far from clear, as our discussion here

4    of today has evinced.

5           At a minimum, even where an agency finds zero

6    national security threat, Perkins Coie employees can still

7    be barred from federal government buildings if an agency

8    head finds that to be in the U.S. interests, whatever that

9    may mean.

10          In short, Executive Order 14230 is like a bill of

11   attainder, a punishment for a singled-out entity deemed to

12   be disloyal, without any formal investigation, trial, or

13   even informal process.  This may be amusing in *Alice in*

14   *Wonderland*, where the Queen of Hearts yells "Off with their

15   heads," at annoying subjects, and when the Queen of Hearts

16   wants to impose a sentence before a verdict; but this cannot

17   be the reality we are living under.

18          Our Constitution bars bills of attainder by either

19   the federal government or the states.  See Article I,

20   Sections 9 and 10.  And the Fifth Amendment's due process

21   clause does not permit such arbitrary assaults on

22   constitutional rights.

23          Finally, plaintiff has shown it is likely to

24   succeed on its Sixth Amendment right to counsel claim in

25   Count 8.  The Sixth Amendment right to counsel protects a

**JA 170**

1  criminal defendant's right to the effective assistance of

2  counsel.  See *Strickland v. Washington,* 466 U.S. 668, jump

3  cite 686, from 1984.  And a defendant's right to choose

4  one's own counsel subject to some restrictions -- see *Wheat*

5  *v. U.S.,* 486 U.S. 153, jump cite 159, from 1988.

6        Executive Order 14230 likely impermissibly

7  threatens both of those counsel rights.

8        As an initial matter, Perkins Coie has standing to

9  challenge the violations of the Sixth Amendment right to

10  counsel on behalf of the firm's clients and criminal matters

11  in this case.  When an entity seeks standing to advance the

12  constitutional rights of others, the Court asks two

13  questions:  First, has the litigant suffered some

14  injury-in-fact adequate to satisfy Article III's

15  case-or-controversy requirement; and second, do prudential

16  considerations -- which the Supreme Court has identified in

17  its prior cases -- point to permitting litigants to advance

18  the claim.  See *Caplin & Drysdale, Chartered v. U.S.,* 491

19  U.S. 617, 624 n.3, from 1989; citing *Singleton v. Wulff*, 428

20  U.S. 106, jump cite 112, from 1976.

21        Here, plaintiff has clearly alleged that the law

22  firm has suffered and will continue to suffer concrete,

23  cognizable injuries-in-fact from the executive order, such

24  as lost fees and reputational harm.  See the Burman

25  Declaration, paragraphs 25, 29, 30, and 33.

1          Prudential considerations also weigh in favor of

2     allowing plaintiff to challenge alleged Sixth Amendment

3     violations on behalf of its clients.  The Supreme Court has

4     outlined several factors to consider here, including:  One,

5     the relationship of the litigant to the person whose rights

6     are being asserted; two, the ability of the person to

7     advance his own rights; and three, the impact of the

8     litigation on third-party interests.  See *Caplin & Drysdale*.

9          Both the first and third prudential considerations

10    clearly weigh in favor of standing for Perkins Coie here to

11    protect the Sixth Amendment rights of its clients since the

12    attorney-client relationship is one of special consequence

13    and since it has credibly alleged that the Executive Order

14    14230 may materially impair the ability of third persons

15    represented by Perkins Coie to exercise their constitutional

16    rights.

17          Turning first to the Sixth Amendment right to

18    effective counsel, the instruction in Section 5(a) of the

19    executive order for all agencies, quote:  To limit

20    government employees acting in their official capacity from

21    engaging with Perkins Coie employees, threatens to undermine

22    plaintiff's ability to provide effective assistance of

23    counsel to its clients in criminal cases.

24          As the Supreme Court has recognized, negotiations

25    between a criminal defendant's counsel and the government

1    are critical to the operation of the criminal justice

2    system.  See *Missouri v. Frye*, 566 U.S. 134, jump cite 143,

3    from 2012; and *Lafler v. Cooper*, 566 U.S. 156, jump cite

4    170, also from 2012.

5          Here, the plain language of the executive order

6    threatens Perkins Coie's ability to engage in such

7    negotiations because it limits government employees acting

8    in their official capacity from engaging with Perkins Coie

9    employees, and further limits Perkins Coie employees from

10   accessing federal government buildings.  This has already

11   led to a DOJ Criminal Division attorney canceling a meeting

12   with Perkins Coie attorneys in an ongoing case, with no

13   clarity as to whether that meeting will ever be rescheduled.

14   See Burman Declaration, paragraph 26.

15         Given the centrality of plea bargaining and other

16   related and required communications between criminal defense

17   lawyers and the government to the operation of the criminal

18   justice system -- see *Frye*, 566 U.S. at 143 -- preventing

19   lawyers representing criminal defendants from meeting with

20   or working with or engaging with government lawyers likely

21   threatens their ability to provide effective assistance of

22   counsel to their clients, implicating their clients' Sixth

23   Amendment rights.

24         This threat also necessarily implicates the right

25   of a defendant who does not require appointed counsel to

1    choose who will represent him.  See *U.S. v. Gonzalez-Lopez*,

2    548 U.S. 140, jump cite 144, 2006.  This is called the right

3    to counsel of choice.

4         Executive Order 14230 singles out Perkins Coie and

5    prevents the firm's attorneys from performing duties central

6    to the representation of criminal defendants and, as a

7    consequence, those firm's clients who engage at the firm in

8    criminal matters are likely to lose their ability to choose

9    Perkins Coie as their counsel of choice, either because

10   doing so would prevent them from receiving effective

11   assistance of counsel because of the government's actions

12   or, as pointed out in one of the plaintiff's declarations,

13   because legal ethics rules would require Perkins Coie

14   attorneys to withdraw from representations where they could

15   not provide effective counsel due to the restrictions

16   imposed by the executive order.  See declaration of

17   Professor Roy Simon from Hofstra Law School.

18        Although plaintiff acknowledges that Executive

19   Order 14230 does not expressly bar clients from hiring the

20   firm, the order clearly intends to prevent clients from

21   hiring the firm, both by impugning the firm's reputation and

22   integrity and by preventing it from doing the work needed

23   and necessary to represent its clients effectively.

24        The right to select counsel of one's choice is the

25   root meaning of the constitutional guarantee to counsel in

1    the Sixth Amendment.  See *Gonzalez-Lopez* at 147.  The

2    government may not interfere with this right directly, and a

3    government official cannot do indirectly what she is barred

4    from doing directly.  See *Vullo,* from 2024.

5          Here, that principle demonstrates that plaintiff

6    is likely to succeed on the merits of its Sixth Amendment

7    claims.

8          I am now going to turn to the second factor for a

9    TRO, irreparable harm.

10         Plaintiff has shown it is likely to suffer

11   irreparable harm without the issuance of a TRO.  To obtain a

12   TRO, the movant must establish that the alleged injury is

13   certain and great, actual and not theoretical, beyond

14   remediation, and of such imminence that there is clear and

15   present need for equitable relief.  See *Mexican Specialty*

16   *Resins, Inc. v. EPA*, 787 F.3d 544, jump cite 555,

17   D.C. Circuit 2015.

18         Here, plaintiff has made a clear showing that it

19   will likely suffer irreparable harm on multiple fronts in

20   the absence of emergency injunctive relief.  *Singh v.*

21   *Berger*, 56 F.4th 88, jump cite 95, D.C. Circuit 2022.

22         As already discussed, plaintiff has shown a

23   likelihood of success on the merits that Executive Order

24   14230 likely violates plaintiff's First, Fifth, and Sixth

25   Amendment rights, and those are the only claims examined for

1    purposes of this expeditious TRO hearing.

2              Violations of plaintiff's constitutional rights in

3    and of themselves leads to irreparable harm.

4              As to the First Amendment, the Supreme Court has

5    stated that the loss of First Amendment freedoms for even

6    minimal periods of time unquestionably constitutes

7    irreparable injury.  See *Roman Catholic Diocese of Brooklyn*

8    *v. Cuomo*, 592 U.S. 14, jump cite 19, 2020; see also *Cigar*

9    *Association of America v. U.S. Food and Drug Administration,*

10   317 F.Supp.3d 555, jump cite 562, D.D.C. from 2018; and

11   *Elrod v. Burns*, 427 U.S. 347, jump cite 373, from 1976,

12   stating that the loss of First Amendment freedoms for even

13   minimal periods of time constitute irreparable injury.

14             Here, plaintiff has done more than merely allege

15   harm and has showed irreparable harm that has flowed from

16   violations of its First Amendment rights.  For example, as

17   of the time of this hearing, and supported by declarations,

18   the order has resulted in a growing number of government

19   agencies refusing to interact with plaintiff's lawyers, and

20   clients have distanced themselves from association with

21   Perkins Coie.

22             Compounding this harm, the order casts a chilling

23   harm of a blizzard -- of blizzard proportions across the

24   entire legal profession.  If not enjoined or restrained, the

25   executive order will be understood by lawyers and law firms

**JA 176**

1   as an extreme dangerous and unprecedented effort to

2   intimidate them and prevent them from representing clients

3   whom the President does not wish to have access to legal

4   counsel or to the courts or whose advocacy the President

5   wishes to punish.

6          I am quoting from the declaration of Robert

7   Hirshon, the former President of the American Bar

8   Association and the former professor for practice and

9   special counsel on developments in the legal profession at

10  the University of Michigan Law School.

11         Indeed, the executive order is already chilling

12  lawyers' advocacy on behalf of clients as law firms are now

13  fearful of taking on a President who hasn't shied away from

14  punishing his enemies.  See the Hirshon Declaration at

15  paragraph 9.

16         The executive order consequently, if permitted to

17  remain in effect, will -- as Mr. Hirshon states, will force

18  lawyers to choose between performing their assigned role in

19  our democracy or pleasing the President, all to the

20  detriment of clients and the fair administration of justice.

21         Thus, the First Amendment violations are certain,

22  as they have already occurred and are ongoing.  See *Simms v.*

23  *District of Columbia*, 872 F.Supp.2d 90, jump cite 105,

24  D.D.C. from 2012.

25         All of this irreparably harms the plaintiff's

1    activity of petitioning the government, First Amendment

2    right to speech, and the right to associate.

3         As to the Fifth Amendment due process rights, a

4    violation of Fifth Amendment due process rights suffices for

5    a finding of irreparable harm.  See *Karem v. Trump*, a D.C.

6    Circuit case from 2020, stating:  A violation of Fifth

7    Amendment due process rights supports injunctive relief.

8         As already discussed, the executive order

9    interferes with plaintiff's liberty interests and property

10   interests, and does so without prior notice and opportunity

11   to be heard, a fair and impartial factfinder, or any other

12   semblance of fair process.

13        Numerous clients have already withdrawn work from

14   the plaintiff in light of the order, and the order has

15   chilled plaintiff's attorneys, who must now reconsider how

16   they approach certain matters that require them to appear in

17   federal buildings, and it threatens their right to practice

18   their profession.

19        At this juncture, plaintiff has shown irreparable

20   harm based on the order's violation of plaintiff's Fifth

21   Amendment due process rights.

22        As to the Sixth Amendment, the order, which bars

23   plaintiff and its lawyers from federal buildings and bars

24   federal employees from engaging with them, and requires all

25   federal contractor clients to disclose any business they do

1    at the firm has resulted in irreparable harm.  A significant

2    portion of plaintiff's clients have matters that require its

3    lawyers to interact with federal agencies.  See the Burman

4    Declaration at paragraph 13.

5         For example, plaintiff represents a number of

6    clients with a number of patent applications pending before

7    the U.S. Patent and Trademark Office, the firm's white

8    collar and investigation practice almost exclusively relies

9    on interacting and engaging with the federal government and

10   has civil and criminal matters requiring its lawyers to

11   interact with or appear before government officials in at

12   least 90 different federal agencies.

13        The government employees have already canceled

14   meetings where the individual or entity is represented by

15   the plaintiff.  Clients of Perkins Coie have cited the order

16   and its accompanying uncertainty as reasons to terminate

17   their relationship with Perkins Coie.

18        At this juncture, plaintiff has been irreparably

19   harmed because, as a practical matter, the order deprives

20   clients of their right to be represented by their chosen

21   lawyers.  Furthermore, many of plaintiff's representations

22   are not public, whether or not related to government

23   contracting.  And despite the confidentiality that generally

24   cloaks attorney-client communications, the order requires

25   clients to disclose the fact that they are consulting with

1     Perkins Coie.  Once such disclosure occurs, it is, by its

2     very nature, irreparable.  See *Robert Half International,*

3     *Inc. v. Billingham,* 315 F.Supp.3d 419, jump cite 433, D.D.C.

4     2018.

5          While ordinary -- with respect to the monetary

6     harms, while ordinary economic injuries are usually

7     insufficient, financial harm can constitute irreparable harm

8     where the loss threatens the very existence of the movant's

9     business.  See *Wisconsin Gas Company v. FERC*, 758 F.2d 669,

10    at 674, D.C. Circuit from 1985.

11         Executive Order 14230 poses a risk of such

12    irreparable harm to Perkins Coie.

13         First, all of plaintiff's practice groups interact

14    with the federal government in some way.  See Burman

15    Declaration at paragraph 12.  And because the vast bulk of

16    the firm's practice requires plaintiff's lawyers to engage

17    with the federal government, the order poses an existential

18    risk to plaintiff's solvency, as it would be unable to

19    perform its duties and generate income for the firm under

20    the terms of this executive order and, notwithstanding, that

21    guidance hasn't been issued yet.  The direction is clear in

22    both the purpose of this and the other framing terms of what

23    the guidance is supposed to look like.

24         Certain clients who are government contractors or

25    involved in government-related litigation already have

1    terminated their attorney-client relationships with

2    plaintiff.  This has caused losses of anticipated revenue in

3    the millions of dollars within days.  All of which is

4    unrecoverable because sovereign immunity limits the firm to

5    nonmonetary equitable relief.  See *Xiaomi Corp v.*

6    *Department of Defense*, 2021 WL 950144, D.D.C. from March 12,

7    2021; explaining that:  When plaintiff's alleged damages are

8    unrecoverable, such as here, due to sovereign immunity

9    enjoined by defendants, courts have recognized that

10   unrecoverable economic loss can, indeed, constitute

11   irreparable harm.

12          At this juncture, plaintiff has established

13   irreparable financial harm stemming from the order.  But

14   because injury to reputation or goodwill is not easily

15   measurable in monetary terms, it is also typically viewed as

16   irreparable.  See *Xiaomi Corp v. Department of Defense*

17   at *9.  Here, if the executive order brands the plaintiff as

18   dishonest and dangerous, and threatens severe restrictions

19   on the firm's ability to do work, which has already resulted

20   in large and long-standing clients to take their business

21   elsewhere.

22          Accordingly, the order has damaged plaintiff's

23   corporate goodwill and reputation and its competitive

24   position, which is sufficient to find irreparable harm.  See

25   *Honeywell, Inc. v. Consumer Product Safety Commission*, 582

1    F.Supp. 1072, jump cite 1078, D.D.C. from 1984.

2        The final factor combines an analysis of whether

3    the balance of the equities and the public interest favor

4    issuance of a TRO.  Here, they do.

5        As already addressed, the injuries to plaintiff

6    have been and will continue to be severe.  Plaintiff's

7    clients have also suffered significant injuries to their

8    rights to counsel, as previously analyzed.  The government,

9    meanwhile, would suffer no cognizable injuries from the

10    issuance of a TRO.

11        To the extent Executive Order 14230 is based on

12    the actions of two former Perkins Coie partners during the

13    2016 presidential election, neither individual works for the

14    firm anymore, and neither has for many years.  Furthermore,

15    this ground is a personal grievance that President Trump has

16    already attempted to pursue in a personal lawsuit that was

17    dismissed in its entirety by a court in the Southern

18    District of New York.  See *Trump v. Clinton*, 626 F.Supp.3d,

19    1264, Southern District of Florida from 2022.

20        To the extent this executive order appears to be

21    an instance of President Trump using taxpayer dollars and

22    government resources with four attorneys from the Department

23    of Justice and the D.C. U.S. Attorney's Office sitting at

24    counsel table to pursue what is a wholly personal vendetta,

25    advancing such political payback is not something in which

1    the government has a cognizable interest.  Moreover, the

2    other concerns mentioned by the government in the executive

3    order also would suffer no harm by a TRO.

4         The isolated Fifth Circuit ethics issue involving

5    three Perkins Coie attorneys alluded to in Section 1 of the

6    order was adjudicated and already resolved by a court.  This

7    is old news.  Nor can the claims about Perkins Coie hiring

8    practices be tied to any significant governmental interest,

9    even if they were able to be substantiated.

10        Finally, the public interest also favors the

11   issuance of a TRO.  While Sections 1, 3, and 5 of the

12   executive order subjects only Perkins Coie to punitive

13   federal government actions, its potential adverse impact

14   cannot be understated.  Without issuance of a TRO, lawyers

15   around the country may be in fear of retribution for

16   litigating against or advancing cases for clients with

17   viewpoints disfavored by the Trump Administration.  Such a

18   circumstance threatens the very foundations of our legal

19   system, which operates on a basis that an informed,

20   independent judiciary presumes an informed, independent bar.

21   See *Legal Services Corp v. Velazquez*, 531 U.S. 533, jump

22   cite 545, from 2001.

23        Our justice system is based on the fundamental

24   belief that justice works best when all parties have zealous

25   advocates, when all sides have vigorous representation and

1    can present for the Court to hear powerful statements on

2    both sides of the question.  See *Penson v. Ohio*, 488 U.S.

3    75, jump cite 84, 1988.

4          That fundamental promise extends to all parties,

5    even those with unpopular ideas or beliefs or those with

6    causes disliked by President Trump.  That promise, however,

7    cannot be fulfilled when lawyers' livelihoods are threatened

8    with retribution for representing clients and interests

9    deemed unpopular by those wielding political power.

10         The chilling effect of this executive order,

11   14230, threatens to significantly undermine the integrity of

12   our entire legal system and the ability of all people and

13   groups to access justice in the American judicial system.

14   The public interest, therefore, demands that a TRO be issued

15   to protect the integrity of the judicial system and the

16   lawyers who practice under professional obligations to

17   represent their clients zealously within the bounds of the

18   law.

19         The President is certainly entitled to his own

20   beliefs, entitled to his preferred causes, and he is

21   entitled to hold tight to his own dislikes.

22         The Constitution protects all of us, however, from

23   the exercise of his targeted power based on those dislikes,

24   to bring the force of the federal government down on the

25   lawyers representing his political opponents and challengers

1        to his political actions, as he has done here.

2                The Court will, therefore, issue a TRO enjoining

3        the President's subordinates from enforcing unlawful

4        sections of 1, 3, and 5 of the executive order.

5                I am going to post a TRO order shortly.

6                As to the next steps, if the parties will confer,

7        I can order you to do so, and then you will have no problem

8        under the executive order.  Confer, submit jointly by -- I

9        would say 4 p.m. tomorrow, unless you need more time -- you

10       will let me know -- a proposal on scheduling.

11               As I opened with plaintiff's counsel, we could go

12       to a preliminary injunction hearing, but unless you see a

13       reason not to, I don't know why we just can't have a

14       schedule for expedited summary judgment briefing.  And then

15       I don't need to see you-all again once I have issued that

16       judgment until it goes up and the case is remanded.  But

17       anyway, it's just cleaner with an expedited summary

18       judgment, if I can encourage you-all to work on that.

19               So I will wait to hear from you tomorrow, and then

20       I will enter a scheduling order.  I like to let parties

21       control their own destinies.  If you-all can reach an

22       agreement on that, that will be the scheduling order I

23       enter.

24               Yes.

25               MR. BUTSWINKAS:  Thank you, Judge.  I had one

1    question about the order.

2              One concern that we have, obviously, is some of

3    these agencies have reached out to contractors to require

4    them to report by March 20th.  We just want to make sure

5    that the order goes to all of the agencies, and any actions

6    that have been taken pursuant to those sections of the

7    executive order -- they're told to rescind them.

8              THE COURT:  Okay.  This is what I am going to ask

9    you to do -- you have a whole team, much larger than mine.

10   Why don't you submit to me any changes you want to make with

11   respect to Section 1 from your proposed order, as we

12   discussed at the beginning of this hearing, and other

13   suggestions that you have that I can consider before I issue

14   the order.  If you do that in the next hour and a half --

15             MR. BUTSWINKAS:  Yes.

16             THE COURT:  -- I will wait for that, not much

17   longer than that.

18             MR. BUTSWINKAS:  Okay.  Thank you.

19             THE COURT:  Thank you.

20             Anything else from the government?

21             MR. MIZELLE:  Yes, Your Honor, if I may.

22             I would just ask that counsel share that with us

23   too, just to have the opportunity to talk about it --

24             MR. BUTSWINKAS:  Of course.

25             MR. MIZELLE:  -- and present at least an argument

1    to the extent that what they would propose is an expansion

2    of even what they have already offered up to the Court, just

3    so that we have an opportunity to do that.

4              MR. BUTSWINKAS:  Of course we will, Your Honor.

5              THE COURT:  Okay.  Well, depending on how long

6    that conferral process takes -- I was planning on issuing

7    the order today, but I can wait until tomorrow if the

8    conferral goes a little longer.  You should get papers in

9    today.

10             MR. BUTSWINKAS:  Yes, Your Honor.  We'll provide

11   it to them in the next half hour.

12             THE COURT:  Well, let me see if I can cut through

13   this a little bit.  You have seen the proposed order?

14             MR. MIZELLE:  I have, Your Honor.

15             THE COURT:  And based on that proposed order,

16   other than what plaintiff's counsel just suggested, about

17   making sure that the order was circulated to all federal

18   agencies who may have received the executive order, what --

19   I think it is within the scope of what has been determined

20   here, it's limited to Sections 1, 3, and 5, which pretty

21   much covers --

22             MR. MIZELLE:  Your Honor, I would take issue

23   with -- so I am looking at the proposed order now.

24             The plaintiff chose who to sue, who to make a

25   defendant in this case, so to the extent that the order is

**JA 187**

1    directed towards "defendants," that is okay.  To the extent

2    that they want to expand it beyond defendants in this case,

3    I think that's wholly inappropriate, wholly improper.  They

4    would need to fundamentally amend their complaint.

5            MR. BUTSWINKAS:  May I respond briefly, Your

6    Honor?

7            THE COURT:  Well, one of the defendants is the

8    United States America.

9            MR. BUTSWINKAS:  You took my response.

10           THE COURT:  Well, I got that.  So you-all can

11   confer.  It would have been easy for me to just deal with

12   that in, like, two seconds once I got the submission from

13   the government; but I have dealt with that now.

14           MR. BUTSWINKAS:  Your Honor, if I may.  I don't

15   want to keep you.

16           There are only two things we would like to add to

17   the order, and I could tell you what they are right now.

18           Order that defendants are directed to immediately

19   instruct all agencies of the federal government to

20   immediately cease all communications or directions to any

21   contractor or other person or entity instructing or asking

22   them to disclose a relationship with Perkins Coie LLP or any

23   person associated with the firm.

24           THE COURT:  Okay.  I am going to ask you to repeat

25   that very slowly because I am not going to try and keep up

```
 1    with you.

 2              MR.  BUTSWINKAS:  Okay.

 3              THE COURT:  My court reporter is looking at me,

 4    which is her signal to me that you need to go more slowly;

 5    and my law clerk is not as fast as she is.

 6              MR. BUTSWINKAS:  Here it is.

 7              Order that defendants are directed to immediately

 8    instruct all agencies of the federal government to

 9    immediately cease all communications or directions to any

10    contractor or other person or entity instructing or asking

11    them to disclose a relationship with Perkins Coie LLP or any

12    person associated with the firm.  That's number one.

13              THE COURT:  Do you want to have time to think

14    about that, or do you have a view on that now?

15              MR. MIZELLE:  Just these two new paragraphs?

16              MR. BUTSWINKAS:  Yes.

17              MR. MIZELLE:  Your Honor, if I could just get two

18    minutes to read these and confer with my --

19              THE COURT:  Go ahead.

20              MR. BUTSWINKAS:  Your Honor, if I may approach, I

21    can give you an order that includes that.  Thank you.

22              The new paragraphs are paragraphs 2 and 3, on page

23    2.  I hope that's right.

24              (Whereupon, the proceeding pauses while government

25    counsel confer.)
```

1          THE COURT:  Yes, Mr. Mizelle.

2          MR. MIZELLE:  Thank you for your indulgence, Your

3    Honor.

4          So there are two new paragraphs.  With respect to

5    the second one:  Defendants are directed to immediately

6    instruct all agencies of the federal government to

7    immediately communicate to every recipient of a request for

8    such disclosure, the request is immediately rescinded until

9    further order of the Court.

10          That one we have no objection to.

11          The first one, Your Honor, instructs the

12    defendants to immediately instruct all agencies of the

13    federal government to immediately cease all communications

14    or directions to any contractor or other person or entity

15    instructing them to disclose a relationship with Perkins

16    Coie or any other person associated with their firm.

17          That, Your Honor, is untied to anything related to

18    the executive order, at least in terms of, like, directly

19    tying it to.  So there could be other legitimate bases that

20    the government would have for asking these types of

21    questions.  So we would ask that --

22          THE COURT:  Okay.  What would you suggest?

23          MR. MIZELLE:  I actually think that it's already

24    covered by the immediately preceding paragraph that says:

25    The defendants are directed to immediately issue guidance to

```
 1     their officers, staff, employees, and contractors to

 2     disregard Sections 1, 3, and 5 of the executive order and

 3     carry on their ordinary business absent such sections of the

 4     executive order.

 5            I believe that the paragraph that we are flagging

 6     as objectionable is completely redundant --

 7            THE COURT:  Why don't we just -- I don't think it

 8     is.  Why don't we just add the -- ask them to disclose a

 9     relationship pursuant to Executive Order --

10            MR. MIZELLE:  I think that would solve our

11     concern, Your Honor.

12            THE COURT:  -- 40230.

13            MR. MIZELLE:  I think that would solve our

14     concern.  Thank you.

15            THE COURT:  Any objection to that?

16            MR. BUTSWINKAS:  No, Your Honor.

17            THE COURT:  All right.

18            MR. MIZELLE:  Thank you, Your Honor.

19            THE COURT:  All right.  I think we have our order

20     then, and I will look forward to getting your proposed

21     schedule tomorrow.

22            Thank you.

23            (Whereupon, the proceeding concludes, 4:34 p.m.)

24

25
```

## CERTIFICATE

I, ELIZABETH DAVILA, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 13th day of March, 2025.

/s/ Elizabeth Davila, RPR, FCRR
Official Court Reporter

**/**

**/s** [1] - 111:14

**1**

**1** [37] - 5:25, 7:13, 8:2, 8:4, 8:6, 8:17, 8:23, 9:3, 9:9, 9:10, 9:17, 11:8; 17:25, 18:18, 18:23, 19:5, 19:11, 20:12, 24:13, 29:19, 31:4, 31:7, 35:2, 43:16, 48:25, 67:9, 69:18, 71:16, 73:15, 75:14, 81:5, 102:5, 102:11, 104:4, 105:11, 106:20, 110:2
**1's** [1] - 9:19
**1,960** [1] - 27:4
**10** [3] - 43:19, 68:7, 89:20
**100** [4] - 37:3, 39:3, 47:24, 51:1
**104** [1] - 88:15
**105** [1] - 96:23
**106** [1] - 90:20
**1072** [1] - 101:1
**1078** [2] - 73:25, 101:1
**108** [1] - 88:15
**1088** [1] - 73:25
**11** [1] - 27:3
**112** [1] - 90:20
**1126** [1] - 83:21
**1141** [1] - 83:21
**11781** [1] - 4:3
**11th** [1] - 68:7
**12** [3] - 1:5, 99:15, 100:6
**120** [1] - 74:5
**120,000** [1] - 39:13
**1200** [2] - 4:12, 52:15
**1215** [1] - 85:18
**123** [1] - 87:5
**1237** [1] - 85:18
**1243** [1] - 86:11
**1250** [1] - 86:11
**1264** [1] - 101:19
**13** [1] - 98:4
**134** [1] - 92:2
**13th** [1] - 111:13
**14** [1] - 95:8
**140** [1] - 93:2
**14230** [23] - 4:2, 7:12, 44:1, 71:18, 73:15, 73:18, 74:24, 75:12, 76:2, 79:16, 83:23, 86:2, 86:23, 88:4, 89:10, 90:6, 91:14,

93:4, 93:19, 94:24, 99:11, 101:11, 103:11
**143** [2] - 92:2, 92:18
**144** [1] - 93:2
**145** [1] - 27:5
**147** [1] - 94:1
**148** [1] - 83:21
**15** [3] - 12:23, 27:15, 40:17
**153** [1] - 90:5
**156** [1] - 92:3
**159** [1] - 90:5
**160** [1] - 87:5
**165** [1] - 72:24
**168** [2] - 72:24
**170** [1] - 92:4
**175** [1] - 79:14
**180** [1] - 79:14
**19** [1] - 95:8
**1940** [1] - 47:15
**1951** [1] - 87:5
**1963** [1] - 80:18
**1965** [1] - 87:4
**1969** [1] - 72:24
**1971** [1] - 85:7
**1972** [2] - 67:16, 88:15
**1976** [3] - 87:2, 90:20, 95:11
**1982** [1] - 83:10
**1984** [2] - 90:3, 101:1
**1985** [1] - 99:10
**1988** [2] - 90:5, 103:3
**1989** [1] - 90:19
**1995** [1] - 78:25
**1996** [1] - 86:11
**1998** [1] - 83:22

**2**

**2** [10] - 5:25, 6:7, 8:21, 34:20, 43:11, 47:9, 72:8, 83:6, 108:22, 108:23
**20** [2] - 27:2, 73:7
**20-year** [1] - 68:25
**2001** [1] - 102:22
**20024** [1] - 1:15
**20053** [1] - 1:21
**2006** [2] - 72:11, 93:2
**2007** [1] - 85:18
**2008** [1] - 73:7
**2009** [1] - 74:4
**2011** [3] - 71:23, 74:1, 79:9
**2012** [3] - 92:3, 92:4, 96:24
**2014** [1] - 87:21
**2015** [1] - 94:17

**2016** [8] - 31:13, 32:17, 49:24, 75:11, 75:19, 77:15, 79:23, 101:13
**2018** [5] - 72:9, 83:16, 84:12, 95:10, 99:4
**202** [1] - 1:15
**2020** [5] - 73:11, 75:9, 76:22, 95:8, 97:6
**2021** [2] - 100:6, 100:7
**2022** [5] - 72:21, 73:6, 75:6, 94:21, 101:19
**2024** [3] - 74:6, 79:14, 94:4
**2025** [7] - 1:5, 4:4, 67:17, 71:18, 72:7, 72:8, 111:13
**20th** [2] - 68:17, 105:4
**21** [1] - 4:12
**22** [1] - 27:8
**223** [1] - 74:5
**23** [1] - 81:1
**242** [1] - 74:5
**25** [2] - 12:25, 90:25
**25-239** [1] - 72:7
**25-716** [2] - 1:4, 2:3
**2500** [4] - 4:12, 22:15, 34:6, 52:16
**252** [1] - 86:12
**26** [2] - 39:4, 92:14
**260** [1] - 86:12
**266** [2] - 75:10, 77:14
**27** [1] - 72:21
**270** [1] - 75:11
**273** [2] - 75:11, 77:15
**274** [1] - 77:21
**28** [1] - 72:8
**281** [1] - 83:16
**288** [1] - 83:16
**29** [4] - 27:12, 40:20, 41:8, 90:25
**290** [1] - 72:11
**296** [1] - 87:21
**297** [1] - 72:11
**2:03** [1] - 1:5

**3**

**3** [24] - 5:25, 9:23, 12:1, 13:2, 16:4, 16:12, 18:23, 31:4, 34:25, 35:11, 43:4, 43:16, 51:12, 71:16, 73:15, 75:21, 76:8, 83:6, 88:8, 102:11, 104:4, 106:20, 108:22, 110:2
**3(b)(i** [1] - 86:5
**30** [4] - 10:11, 40:5, 41:1, 90:25

**314433** [1] - 72:7
**315** [1] - 99:3
**316** [1] - 72:8
**317** [1] - 95:10
**318** [1] - 87:21
**319** [1] - 87:2
**33** [1] - 90:25
**333** [2] - 75:9, 87:2
**340** [1] - 27:6
**341** [1] - 87:5
**347** [1] - 95:11
**35-year** [1] - 68:24
**36** [1] - 70:13
**372** [1] - 80:17
**373** [1] - 95:11
**380** [1] - 87:3
**381** [1] - 75:9

**4**

**4** [6] - 6:4, 6:5, 6:7, 7:10, 8:21, 104:9
**400** [1] - 85:7
**40230** [1] - 110:12
**408** [1] - 88:15
**411** [1] - 73:6
**412** [1] - 72:23
**419** [1] - 99:3
**421** [1] - 73:6
**422** [1] - 83:10
**424** [1] - 87:2
**427** [1] - 95:11
**428** [2] - 83:10, 90:19
**433** [2] - 85:7, 99:3
**434-5110** [1] - 1:15
**437** [1] - 85:7
**45** [2] - 25:1, 69:15
**454** [1] - 72:10
**455** [1] - 83:10
**466** [1] - 90:2
**468** [1] - 75:6
**472** [1] - 75:6
**481** [1] - 86:12
**486** [1] - 90:5
**488** [1] - 103:2
**491** [1] - 90:18
**4:34** [1] - 110:23

**5**

**5** [25] - 5:25, 6:2, 16:19, 18:23, 21:7, 21:9, 23:9, 31:5, 35:1, 35:11, 43:4, 43:16, 51:15, 71:17, 73:15, 78:19, 81:6, 81:25, 88:9, 88:17, 88:23, 102:11, 104:4, 106:20, 110:2
**5(a** [2] - 52:14, 91:18

**5(a)** [1] - 23:25
**5,415** [1] - 27:1
**50** [1] - 72:22
**501** [1] - 85:17
**502** [1] - 75:9
**509** [1] - 74:4
**513** [1] - 74:4
**515** [1] - 78:24
**518** [1] - 72:9
**520** [1] - 72:9
**531** [1] - 102:21
**533** [1] - 102:21
**544** [1] - 94:16
**545** [2] - 87:3, 102:22
**548** [1] - 93:2
**552** [2] - 79:9, 87:3
**555** [4] - 26:25, 73:7, 94:16, 95:10
**56** [2] - 27:2, 94:21
**561** [1] - 74:4
**562** [1] - 95:10
**564** [1] - 79:9
**566** [3] - 92:2, 92:3, 92:18
**578** [3] - 75:10, 77:14, 79:9
**58** [1] - 80:17
**582** [1] - 100:25
**592** [1] - 95:8
**595** [2] - 73:6, 75:6

**6**

**6** [3] - 4:4, 68:7, 71:17
**601** [1] - 1:20
**602** [1] - 79:14
**617** [1] - 90:19
**624** [1] - 90:19
**626** [1] - 101:18
**632** [1] - 71:22
**639** [1] - 73:25
**656** [1] - 73:11
**66** [1] - 27:3
**668** [2] - 73:11, 90:2
**669** [1] - 99:9
**67** [1] - 80:18
**674** [1] - 99:10
**680** [1] - 1:14
**686** [1] - 90:3
**69** [1] - 26:24

**7**

**7** [4] - 27:3, 68:7, 73:7, 78:15
**718** [1] - 72:21
**72** [1] - 86:10
**722** [1] - 71:22
**723** [1] - 71:23

**733** [1] - 72:21
**75** [2] - 64:15, 103:3
**758** [2] - 87:20, 99:9
**787** [1] - 94:16

## 8

**8** [2] - 68:7, 89:25
**819** [1] - 78:25
**829** [1] - 78:25
**84** [1] - 103:3
**872** [1] - 96:23
**88** [1] - 94:21
**894** [1] - 83:15

## 9

**9** [5] - 43:19, 68:7, 89:20, 96:15, 100:17
**90** [8] - 4:2, 21:25, 22:1, 24:21, 24:25, 53:11, 96:23, 98:12
**90-plus** [1] - 53:18
**95** [1] - 94:21
**950144** [1] - 100:6
**960** [1] - 73:11

## A

**abhorrent** [1] - 60:12
**ability** [19] - 12:7, 25:25, 39:8, 55:11, 83:24, 84:7, 84:10, 84:19, 85:25, 86:17, 91:6, 91:14, 91:22, 92:6, 92:21, 93:8, 100:19, 103:12, 111:7
**able** [10] - 6:12, 39:25, 41:21, 59:6, 59:7, 59:14, 59:15, 70:18, 80:22, 102:9
**abridging** [1] - 85:20
**abrogation** [1] - 16:15
**absence** [1] - 94:20
**absent** [3] - 22:5, 73:21, 110:3
**absolutely** [7] - 8:24, 11:12, 22:25, 31:9, 41:6, 52:7, 84:9
**abstain** [1] - 79:2
**accept** [1] - 59:6
**accepting** [2] - 77:24, 80:12
**access** [10] - 4:6, 4:8, 7:16, 21:11, 21:13, 24:2, 24:7, 25:21, 25:22, 51:16, 52:17, 52:18, 53:25, 55:20, 82:1, 88:24, 88:25,

96:3, 103:13
**accessing** [1] - 92:10
**accompanied** [2] - 18:25, 76:2
**accompanying** [2] - 82:17, 98:16
**accordance** [1] - 10:14
**according** [2] - 35:5, 35:6
**accordingly** [1] - 100:22
**accounts** [1] - 12:24
**accurate** [2] - 58:23, 111:4
**accusations** [2] - 7:14, 7:23
**accusing** [1] - 85:11
**achieve** [3] - 67:25, 80:20, 80:23
**achieves** [1] - 77:4
**achieving** [1] - 81:12
**acknowledges** [1] - 93:18
**acquitted** [1] - 70:3
**acronym** [1] - 53:15
**act** [2] - 63:9, 83:18
**acting** [7] - 21:17, 55:25, 81:9, 82:3, 85:12, 91:20, 92:7
**Action** [4] - 1:3, 2:3, 72:7, 73:24
**action** [14] - 21:10, 30:12, 31:8, 36:10, 38:6, 39:12, 39:17, 39:24, 45:24, 47:7, 48:9, 64:10
**actions** [21] - 8:1, 9:25, 10:13, 21:8, 37:24, 38:7, 47:14, 50:23, 62:3, 62:13, 62:17, 75:4, 75:7, 76:18, 77:25, 79:18, 93:11, 101:12, 102:13, 104:1, 105:5
**active** [1] - 26:22
**activist** [3] - 31:14, 75:15, 79:24
**activists** [1] - 66:22
**activities** [2] - 60:16, 83:3
**activity** [6] - 77:13, 78:2, 78:10, 78:17, 80:21, 97:1
**actor** [2] - 41:18, 80:8
**actors** [2] - 76:10, 80:15
**acts** [2] - 34:3, 87:11
**actual** [4] - 7:12, 41:22, 67:13, 94:13

**Adams** [1] - 70:21
**add** [4] - 19:18, 30:11, 107:16, 110:8
**addition** [1] - 86:6
**additional** [2] - 43:13, 88:5
**address** [3] - 32:3, 52:18, 60:2
**addressed** [1] - 101:5
**Addressing** [7] - 4:5, 48:20, 48:21, 50:13, 59:2, 59:3, 71:18
**adequate** [1] - 90:14
**adjudicate** [2] - 59:21, 70:6
**adjudicated** [1] - 102:6
**adjudication** [1] - 59:23
**adjudicators** [1] - 84:5
**administration** [16] - 8:8, 9:18, 11:5, 11:10, 18:20, 26:13, 42:21, 42:23, 68:23, 72:14, 72:15, 79:20, 85:4, 96:20
**Administration** [5] - 25:10, 76:9, 80:8, 95:9, 102:17
**administrations** [4] - 42:19, 68:22, 68:24, 68:25
**administrative** [2] - 17:9, 46:18
**admit** [1] - 46:7
**admitted** [1] - 69:22
**adopt** [3] - 47:2, 47:3, 47:4
**adopting** [1] - 46:24
**advance** [4] - 88:2, 90:11, 90:17, 91:7
**advancing** [2] - 101:25, 102:16
**adverse** [3] - 82:10, 85:14, 102:13
**advise** [1] - 24:18
**advised** [1] - 70:13
**advocacy** [2] - 96:4, 96:12
**advocated** [1] - 61:6
**advocates** [2] - 62:1, 102:25
**Aerospace** [1] - 86:9
**affecting** [1] - 84:9
**affirmatively** [1] - 87:10
**affix** [1] - 47:18
**afforded** [2] - 29:1, 30:18
**afraid** [1] - 57:8

**aftereffect** [1] - 13:24
**afternoon** [7] - 2:7, 2:8, 2:11, 3:1, 3:23, 4:1, 74:14
**afterwards** [2] - 20:4, 21:1
**agencies** [49] - 8:10, 10:1, 10:5, 10:7, 10:10, 10:17, 11:9, 11:21, 12:3, 12:17, 12:22, 14:14, 15:20, 17:19, 18:16, 19:4, 19:9, 21:8, 21:10, 21:16, 21:21, 21:22, 24:21, 24:25, 26:25, 37:3, 39:1, 53:10, 53:18, 53:25, 55:24, 57:15, 62:13, 68:14, 79:18, 84:16, 86:5, 88:7, 91:19, 95:19, 98:3, 98:12, 105:3, 105:5, 106:18, 107:19, 108:8, 109:6, 109:12
**Agency** [1] - 75:8
**agency** [20] - 9:18, 17:12, 21:22, 22:4, 22:6, 22:23, 23:11, 24:1, 37:21, 51:18, 53:4, 53:23, 54:12, 56:19, 56:21, 75:25, 81:17, 84:5, 89:5, 89:7
**agenda** [1] - 81:13
**agents** [1] - 85:24
**ago** [3] - 4:4, 34:4, 35:20
**agree** [8] - 30:4, 30:7, 43:21, 43:24, 43:25, 55:4, 69:12, 71:5
**agreed** [2] - 45:13, 65:20
**agreeing** [1] - 28:18
**agreement** [2] - 86:13, 104:22
**agreements** [3] - 14:6, 40:12, 86:7
**Agriculture** [2] - 27:9, 86:9
**ahead** [2] - 60:3, 108:19
**aided** [1] - 1:25
**aims** [1] - 87:10
**airports** [1] - 59:15
**akin** [1] - 56:12
**al** [2] - 1:5, 2:4
**Alice** [1] - 89:13
**allegations** [2] - 29:3, 32:8
**allege** [1] - 95:14

**alleged** [5] - 90:21, 91:2, 91:13, 94:12, 100:7
**allow** [1] - 64:20
**allowed** [3] - 48:11, 60:11, 61:24
**allowing** [1] - 91:2
**allude** [1] - 75:22
**alluded** [3] - 33:9, 58:12, 102:5
**almost** [4] - 29:20, 66:3, 71:4, 98:8
**already-existing** [1] - 27:17
**amend** [1] - 107:4
**Amendment** [64] - 15:4, 15:5, 15:22, 16:1, 34:10, 34:11, 35:14, 35:25, 51:8, 51:9, 60:5, 60:8, 60:9, 60:13, 62:7, 66:16, 66:18, 67:5, 67:7, 67:15, 67:21, 67:23, 69:10, 69:11, 74:20, 74:21, 74:23, 75:2, 76:25, 77:9, 78:10, 78:17, 78:23, 80:21, 83:1, 83:2, 85:16, 85:19, 85:20, 85:22, 87:14, 89:24, 89:25, 90:9, 91:2, 91:11, 91:17, 92:23, 94:1, 94:6, 94:25, 95:4, 95:5, 95:12, 95:16, 96:21, 97:1, 97:3, 97:4, 97:7, 97:21, 97:22
**Amendment's** [1] - 89:20
**Amendment-protected** [4] - 78:10, 78:17, 80:21, 83:2
**America** [5] - 72:22, 72:23, 86:10, 95:9, 107:8
**American** [2] - 96:7, 103:13
**Americans** [1] - 46:25
**amusing** [1] - 89:13
**analysis** [8] - 18:17, 26:14, 35:15, 63:20, 64:15, 67:8, 69:24, 101:2
**analyzed** [2] - 71:20, 101:8
**angry** [1] - 50:14
**animus** [1] - 76:5
**announced** [2] - 14:4, 20:3

announces [1] - 77:18
annoyed [1] - 48:24
annoying [1] - 89:15
answer [5] - 8:20,
19:11, 20:16, 50:18,
68:17
answered [1] - 61:8
Anti [2] - 65:23, 87:4
Anti-Fascist [2] -
65:23, 87:4
anticipated [2] -
84:13, 100:2
anyway [1] - 104:17
appeal [2] - 17:12,
46:19
appealable [1] - 72:15
appealed [1] - 72:17
appeals [1] - 72:16
appear [3] - 20:13,
97:16, 98:11
APPEARANCES [1] -
1:9
application [2] -
12:12, 71:20
applications [2] -
27:1, 98:6
applies [7] - 6:2, 6:6,
15:20, 22:25, 54:4,
64:25, 72:2
apply [10] - 12:10,
13:4, 34:5, 43:19,
45:11, 45:18, 47:12,
65:21, 71:21, 88:7
applying [1] - 35:21
appointed [1] - 92:25
appreciate [5] - 5:8,
5:23, 7:19, 33:19,
62:25
approach [3] - 60:6,
97:16, 108:20
appropriate [2] - 10:8,
57:17
appropriately [1] -
72:2
approves [1] - 81:18
arbitrary [1] - 89:21
argue [2] - 43:22,
64:18
argument [7] - 14:8,
23:23, 28:21, 28:23,
35:18, 69:1, 105:25
arises [1] - 12:9
Arlington [1] - 71:3
Armstrong [1] - 87:3
arrested [1] - 52:1
Article [10] - 30:13,
43:19, 45:17, 47:5,
48:2, 59:11, 65:2,
89:19, 90:14
articulated [2] - 47:4,

77:10
aside [1] - 35:23
aspect [2] - 32:11,
32:12
aspersions [1] - 69:18
aspire [1] - 81:11
assaults [1] - 89:21
assert [1] - 15:7
asserted [1] - 91:6
asserts [1] - 74:13
assessment [2] -
10:12, 11:1
assigned [1] - 96:18
assistance [4] - 90:1,
91:22, 92:21, 93:11
assistants [1] - 22:14
associate [3] - 20:8,
70:18, 97:2
associated [4] -
46:20, 107:23,
108:12, 109:16
Association [5] -
67:16, 67:19, 79:13,
95:9, 96:8
association [5] - 20:1,
59:5, 66:18, 69:10,
95:20
associational [2] -
36:1, 59:5
assume [1] - 35:18
assuming [1] - 84:25
attach [1] - 85:8
attached [1] - 24:12
attainder [22] - 43:17,
43:18, 43:23, 44:10,
44:12, 44:18, 44:21,
44:25, 45:2, 45:9,
45:16, 64:23, 64:25,
65:10, 65:17, 65:19,
65:21, 66:3, 66:6,
66:11, 89:11, 89:18
attempt [1] - 79:11
attempted [1] - 101:16
attempting [1] - 79:17
attention [2] - 16:3,
34:8
attorney [9] - 39:11,
39:12, 39:21, 39:22,
71:13, 91:12, 92:11,
98:24, 100:1
Attorney [4] - 39:15,
66:8, 87:7, 87:12
Attorney's [8] - 1:19,
3:6, 3:12, 27:13,
54:23, 55:1, 55:7,
101:23
attorney-client [3] -
91:12, 98:24, 100:1
attorneys [2] - 17:19,
38:19, 83:14, 84:1,

84:23, 84:24, 92:12,
93:5, 93:14, 97:15,
101:22, 102:5
attorneys' [1] - 55:11
AUSA [1] - 36:19
authority [11] - 8:10,
23:12, 30:13, 30:22,
31:2, 39:16, 48:2,
50:21, 63:9, 64:12,
64:17
authorization [1] -
111:10
authorized [1] - 30:14
authors [1] - 66:10
Auto [2] - 86:9, 86:10
Avenue [1] - 1:14
avoid [1] - 84:25
await [1] - 74:17
awaiting [1] - 40:23
aware [2] - 37:8, 37:10

## B

b)(2 [1] - 11:1
back-door [1] - 51:8
bad [2] - 44:22, 65:24
badge [1] - 85:9
balance [3] - 73:3,
73:9, 101:3
ball [1] - 5:12
Bantam [1] - 80:17
bar [8] - 23:16, 45:9,
46:12, 46:14, 65:17,
84:9, 93:19, 102:20
Bar [1] - 96:7
barely [1] - 71:8
bargaining [2] - 86:13,
92:15
barred [7] - 17:19,
45:1, 81:8, 88:19,
89:7, 94:3
Barry [1] - 83:21
bars [4] - 85:20,
89:18, 97:22, 97:23
based [16] - 33:6,
33:9, 49:23, 54:14,
60:25, 75:7, 77:5,
77:11, 83:2, 85:13,
87:9, 97:20, 101:11,
102:23, 103:23,
106:15
bases [2] - 49:18,
109:19
basic [1] - 88:2
basis [10] - 18:12,
29:8, 31:7, 33:6,
61:25, 75:15, 75:24,
78:1, 78:17, 102:19
Bates [1] - 5:5
bearing [1] - 4:17

bedrock [1] - 46:2
bee [1] - 50:4
BEFORE [1] - 1:8
beginning [3] - 58:13,
66:4, 105:12
behalf [11] - 2:9, 3:2,
4:21, 15:7, 28:10,
76:20, 82:19, 85:24,
90:10, 91:3, 96:12
belief [1] - 102:24
beliefs [2] - 103:5,
103:20
believes [1] - 48:25
below [1] - 111:11
benefit [4] - 44:14,
44:15, 72:18
Berger [1] - 94:21
BERYL [1] - 1:8
best [2] - 102:24,
111:6
between [8] - 14:2,
14:17, 17:2, 58:8,
84:20, 91:25, 92:16,
96:18
beyond [2] - 94:13,
107:2
bicker [1] - 48:6
big [4] - 32:15, 38:8,
69:2, 69:23
bill [20] - 43:17, 43:18,
43:23, 44:9, 44:11,
44:18, 44:21, 45:2,
45:9, 45:16, 64:23,
64:25, 65:10, 65:16,
65:19, 65:20, 66:5,
66:10, 66:13, 89:10
Bill [1] - 5:2
billingham [1] - 99:3
bills [3] - 44:25, 66:3,
89:18
binding [1] - 34:18
bit [9] - 11:25, 15:17,
30:4, 33:22, 39:20,
40:3, 41:4, 46:5,
106:13
Black [4] - 65:22,
66:1, 66:9, 67:3
blacklists [1] - 66:2
blatant [1] - 78:23
blizzard [1] - 95:23
Bloodworth [1] - 4:24
Board [1] - 27:7
body [1] - 66:7
bonnet [1] - 50:4
bono [1] - 78:1
boogyman [2] - 39:2,
39:20
boogymen [4] - 36:12,
38:10, 38:12, 68:3
Books [1] - 80:17

Boston [1] - 70:22
bounds [1] - 103:17
branch [5] - 25:5,
25:6, 25:14, 45:4,
45:12
brands [1] - 100:17
brave [2] - 48:13,
48:16
breathtakingly [1] -
80:25
brief [1] - 63:1
briefing [6] - 7:10,
28:19, 29:9, 72:6,
74:17, 104:14
briefly [2] - 68:2,
107:5
bring [2] - 54:10,
103:24
bringing [4] - 34:11,
34:12, 34:13, 50:2
British [1] - 70:21
broad [3] - 63:11,
83:19, 88:17
broader [3] - 52:22,
56:7, 56:12
broadly [1] - 80:25
Brock [1] - 86:11
Brooklyn [1] - 95:7
brought [3] - 3:16,
26:6, 60:1
Brush [1] - 83:9
building [4] - 23:18,
24:6, 25:17, 51:22
buildings [20] - 16:21,
21:12, 24:2, 24:4,
46:15, 50:25, 51:17,
51:20, 52:17, 55:20,
62:17, 81:8, 82:2,
84:2, 86:19, 88:25,
89:7, 92:10, 97:17,
97:23
built [1] - 40:14
bulk [1] - 99:15
bunch [1] - 38:10
burden [4] - 38:8,
73:12, 79:7, 83:23
burdens [1] - 13:3
burdensome [1] -
22:16
buried [1] - 71:3
burman [2] - 7:20,
24:25
Burman [7] - 7:20,
39:5, 39:9, 82:11,
90:24, 92:14, 98:3,
99:14
burman's [5] - 22:2,
23:3, 24:22, 26:3,
39:8
Burns [1] - 95:11

**business** [15] - 7:3, 10:2, 10:3, 10:6, 10:13, 14:22, 16:7, 43:13, 46:13, 70:20, 81:22, 97:25, 99:9, 100:20, 110:3
**businesses** [1] - 41:16
**busy** [1] - 5:10
**Butswinkas** [5] - 2:9, 2:13, 4:21, 62:23, 71:12
**BUTSWINKAS** [72] - 1:11, 2:8, 2:14, 2:16, 2:20, 2:22, 4:20, 5:2, 5:5, 5:8, 6:4, 6:8, 6:21, 6:25, 7:21, 8:6, 9:14, 9:17, 10:21, 10:23, 10:25, 11:15, 11:18, 12:9, 13:8, 13:14, 13:21, 13:25, 14:24, 15:5, 16:11, 17:22, 18:7, 19:6, 19:18, 19:21, 21:24, 22:2, 22:12, 22:19, 23:10, 23:24, 25:9, 25:15, 25:18, 25:20, 26:11, 28:8, 62:24, 63:13, 63:17, 63:25, 64:2, 65:3, 65:5, 65:8, 65:18, 70:9, 104:25, 105:15, 105:18, 105:24, 106:4, 106:10, 107:5, 107:9, 107:14, 108:2, 108:6, 108:16, 108:20, 110:16

**C**

**cabinet** [1] - 53:6
**cabinets** [1] - 53:10
**campaign** [4] - 31:13, 32:8, 32:17, 79:23
**Campbell** [2] - 83:15, 84:11
**canceled** [4] - 23:5, 23:6, 37:25, 98:13
**canceling** [2] - 24:15, 92:11
**candidate** [1] - 77:19
**candidates** [4] - 31:22, 77:24, 78:6, 80:1
**cannot** [13] - 12:14, 16:14, 32:16, 51:7, 66:9, 67:4, 70:20, 79:11, 82:16, 89:16, 94:3, 102:14, 103:7

**capacity** [6] - 21:18, 56:1, 81:9, 82:3, 91:20, 92:8
**capital** [1] - 84:11
**Caplin** [2] - 90:18, 91:8
**card** [1] - 60:18
**care** [1] - 20:6
**career** [1] - 83:20
**CAROL** [1] - 1:13
**Carol** [1] - 2:23
**carry** [2] - 38:8, 110:3
**case** [30] - 20:17, 28:13, 34:9, 36:9, 36:11, 37:14, 50:8, 51:9, 61:2, 63:17, 63:24, 64:16, 66:7, 67:15, 71:25, 72:5, 72:17, 77:11, 77:23, 79:15, 84:12, 90:11, 90:15, 92:12, 97:6, 104:16, 106:25, 107:2
**case-or-controversy** [1] - 90:15
**cases** [8] - 23:18, 64:20, 65:24, 67:3, 82:13, 90:17, 91:23, 102:16
**cast** [1] - 69:18
**casts** [1] - 95:22
**categorically** [1] - 60:16
**category** [1] - 83:18
**Catholic** [1] - 95:7
**causation** [6] - 14:23, 41:22, 41:24, 43:5, 68:4, 68:6
**caused** [3] - 17:2, 44:5, 100:2
**causes** [4] - 77:17, 78:7, 103:6, 103:20
**causing** [1] - 12:13
**cease** [3] - 107:20, 108:9, 109:13
**Cemetery** [1] - 71:4
**censorship** [1] - 67:4
**Center** [1] - 73:24
**central** [1] - 93:5
**centrality** [1] - 92:15
**century** [1] - 71:5
**certain** [18] - 30:15, 30:16, 31:14, 33:23, 42:17, 42:19, 50:23, 50:25, 58:20, 59:10, 78:6, 79:24, 82:23, 87:7, 94:13, 96:21, 97:16, 99:24
**certainly** [12] - 12:1, 18:7, 33:10, 37:11,

44:5, 45:23, 47:11, 49:20, 57:6, 60:5, 103:19
**CERTIFICATE** [1] - 111:1
**certificate** [1] - 111:8
**certify** [1] - 111:3
**cetera** [1] - 16:4
**CFIUS** [1] - 87:24
**Chad** [2] - 3:2, 28:10
**CHAD** [1] - 1:17
**challenge** [11] - 5:23, 17:10, 34:11, 34:12, 46:22, 59:20, 62:16, 77:25, 88:3, 90:9, 91:2
**challenged** [4] - 31:4, 34:20, 35:11, 51:7
**challengers** [1] - 103:25
**challenges** [1] - 4:1
**challenging** [1] - 76:17
**change** [2] - 31:24, 68:22
**changes** [2] - 80:2, 105:10
**Chaplaincy** [1] - 72:10
**characterize** [1] - 65:19
**charge** [2] - 25:15, 25:21
**charges** [2] - 58:1, 58:2
**Chartered** [1] - 90:18
**chemistry** [1] - 16:4
**chilled** [3] - 47:1, 47:20, 97:15
**chilling** [4] - 77:16, 95:22, 96:11, 103:10
**chills** [2] - 46:7, 78:9
**choice** [7] - 15:1, 15:8, 16:8, 16:18, 93:3, 93:9, 93:24
**choose** [7] - 16:2, 42:21, 59:7, 90:3, 93:1, 93:8, 96:18
**chose** [1] - 106:24
**chosen** [3] - 83:14, 83:20, 98:20
**CHRIS** [1] - 1:12
**Chris** [1] - 2:22
**Churches** [1] - 72:10
**Cigar** [1] - 95:8
**Circuit** [24] - 26:16, 34:8, 35:6, 57:1, 71:23, 72:11, 72:18, 72:21, 72:24, 73:11, 74:1, 74:4, 74:6, 83:16, 83:21, 84:12,

85:18, 86:11, 87:21, 94:17, 94:21, 97:6, 99:10, 102:4
**circular** [2] - 8:16, 11:7
**circulated** [2] - 54:17, 106:17
**circumstance** [1] - 102:18
**circumstances** [3] - 27:21, 70:15, 88:19
**circumstantial** [1] - 20:17
**citation** [1] - 30:3
**citations** [2] - 72:14, 72:18
**cite** [49] - 64:16, 67:15, 71:22, 72:9, 72:11, 72:21, 72:24, 73:6, 73:7, 73:11, 73:25, 74:4, 74:5, 75:6, 75:9, 75:10, 77:15, 78:25, 79:9, 79:14, 80:18, 83:10, 83:16, 83:21, 85:7, 85:18, 86:11, 86:12, 87:2, 87:3, 87:5, 87:21, 88:15, 90:3, 90:5, 90:20, 92:2, 92:3, 93:2, 94:16, 94:21, 95:8, 95:10, 95:11, 96:23, 99:3, 101:1, 102:22, 102:3
**cited** [3] - 63:19, 82:14, 98:15
**cites** [5] - 30:2, 31:12, 75:14, 76:6, 76:8
**citing** [5] - 30:20, 72:8, 72:22, 80:5, 90:19
**citizen** [2] - 46:21, 70:4
**citizens** [1] - 11:4
**city** [2] - 50:9, 77:14
**City** [2] - 75:10, 88:14
**Civil** [3] - 1:3, 2:2, 72:7
**civil** [1] - 98:10
**claim** [12] - 15:4, 15:7, 34:10, 35:14, 68:6, 70:7, 70:8, 74:23, 78:15, 78:19, 89:24, 90:18
**claimed** [1] - 13:20
**claiming** [2] - 40:17, 41:19
**claims** [14] - 36:7, 73:2, 74:9, 74:13, 74:15, 74:17, 74:20, 74:21, 83:2, 83:5,

94:7, 94:25, 102:7
**Claims** [1] - 38:5
**clarification** [1] - 33:16
**clarity** [2] - 64:19, 92:13
**class** [1] - 15:24
**class-of-one** [1] - 15:24
**classic** [1] - 66:5
**clause** [8] - 63:10, 63:12, 64:18, 64:19, 67:21, 85:21, 87:14, 89:21
**Clause** [4] - 13:11, 16:16, 17:20, 18:6
**cleaner** [1] - 104:17
**clear** [27] - 6:10, 11:12, 19:24, 30:13, 31:20, 40:1, 42:24, 43:5, 43:6, 57:19, 61:18, 66:25, 67:3, 73:16, 75:13, 76:12, 78:9, 80:10, 80:14, 82:25, 85:14, 89:3, 94:14, 94:18, 99:21
**clearance** [6] - 7:3, 7:4, 34:14, 61:5, 61:11, 62:15
**clearances** [5] - 6:1, 34:21, 47:7, 47:12, 50:24
**clearer** [1] - 9:21
**clearly** [9] - 43:9, 78:14, 79:6, 84:14, 88:1, 88:14, 90:21, 91:10, 93:20
**clerk** [1] - 108:5
**clerks** [1] - 81:4
**clever** [1] - 24:9
**client** [13] - 4:23, 24:18, 33:18, 42:9, 42:10, 70:13, 70:19, 81:20, 81:22, 82:6, 91:12, 98:24, 100:1
**client's** [1] - 16:8
**clients** [86] - 10:19, 12:1, 12:14, 12:23, 13:13, 13:15, 14:3, 14:14, 14:15, 15:14, 16:6, 16:10, 16:23, 17:3, 17:17, 26:23, 27:1, 27:2, 27:3, 27:15, 35:24, 40:11, 40:13, 40:17, 40:21, 40:23, 41:12, 41:13, 42:3, 42:12, 43:7, 55:11, 59:6, 59:7, 68:21, 68:23, 68:24, 68:25, 76:1, 76:14,

76:16, 76:17, 76:23, 77:2, 77:3, 77:4, 77:7, 77:24, 78:7, 80:12, 82:8, 82:19, 85:25, 86:4, 86:8, 86:16, 88:9, 88:11, 88:18, 90:10, 91:3, 91:11, 91:23, 92:22, 93:7, 93:19, 93:20, 93:23, 95:20, 96:2, 96:12, 96:20, 97:13, 97:25, 98:2, 98:6, 98:15, 98:20, 98:25, 99:24, 100:20, 101:7, 102:16, 103:8, 103:17

**clients'** [3] - 40:24, 85:3, 92:22
**Clinton** [7] - 20:8, 31:13, 75:19, 75:23, 79:23, 80:7, 101:18
**cloaks** [1] - 98:24
**clump** [1] - 9:10
**code** [3] - 29:24, 29:25, 70:25
**coerce** [2] - 79:11, 79:17
**coercion** [2] - 67:25, 80:19
**cognizable** [4] - 84:8, 90:23, 101:9, 102:1
**Coie** [128] - 2:3, 2:10, 3:25, 4:5, 4:9, 4:10, 4:15, 4:21, 5:15, 9:20, 10:1, 10:3, 10:5, 10:7, 10:9, 10:12, 10:13, 10:19, 10:20, 11:13, 11:23, 12:2, 12:4, 12:5, 12:19, 12:21, 13:4, 13:17, 14:3, 14:7, 14:13, 14:18, 16:5, 17:2, 17:17, 18:18, 20:23, 21:1, 21:12, 21:18, 22:5, 22:10, 22:15, 23:17, 24:5, 25:1, 31:12, 33:22, 33:25, 35:21, 35:22, 35:24, 38:17, 38:19, 40:24, 41:19, 43:8, 44:2, 44:6, 44:8, 48:17, 48:19, 48:21, 48:24, 49:25, 50:16, 51:20, 52:15, 53:21, 55:9, 55:10, 56:1, 56:10, 57:20, 59:3, 61:14, 62:10, 68:16, 71:15, 71:19, 74:7, 75:15, 76:1, 76:6, 76:13, 77:4, 77:23,

78:13, 79:23, 80:5, 80:11, 81:7, 81:15, 81:23, 82:2, 82:4, 82:6, 82:13, 82:18, 85:4, 86:17, 88:9, 88:18, 88:25, 89:6, 90:8, 91:10, 91:15, 91:21, 92:8, 92:9, 92:12, 93:4, 93:9, 93:13, 95:21, 98:15, 98:17, 99:1, 99:12, 101:12, 102:5, 102:7, 102:12, 107:22, 108:11, 109:16
**COIE** [1] - 1:3
**Coie's** [11] - 13:13, 13:15, 13:22, 17:17, 31:16, 40:23, 42:3, 59:17, 75:19, 75:22, 92:6
**collapse** [1] - 26:21
**collar** [2] - 27:12, 98:8
**colleagues** [1] - 5:21
**collective** [1] - 86:13
**College** [1] - 75:5
**Collier** [1] - 73:6
**colluded** [1] - 32:9
**Colombia** [1] - 60:19
**colossal** [1] - 25:23
**COLUMBIA** [1] - 1:1
**Columbia** [5] - 1:20, 74:5, 83:15, 84:12, 96:23
**combines** [1] - 101:2
**coming** [2] - 3:16, 54:4
**Comm** [1] - 65:23
**Commerce** [1] - 27:7
**Commission** [2] - 85:17, 100:25
**commit** [1] - 37:15
**committee** [2] - 4:25, 87:20
**Committee** [2] - 87:4, 87:23
**common** [1] - 65:15
**communicate** [1] - 109:7
**communications** [7] - 42:2, 55:21, 92:16, 98:24, 107:20, 108:9, 109:13
**communist** [1] - 87:7
**Community** [1] - 75:5
**companies** [1] - 30:16
**company** [2] - 46:10, 46:12
**Company** [3] - 63:18, 83:10, 99:9

**compelled** [1] - 63:2
**compelling** [7] - 18:13, 35:16, 35:18, 35:19, 67:10, 80:24, 82:21
**compels** [1] - 71:1
**compensable** [2] - 26:12, 27:22
**competent** [1] - 33:17
**competitive** [1] - 100:23
**complain** [1] - 38:3
**complaining** [1] - 36:12
**complaint** [7] - 5:23, 35:14, 70:8, 74:14, 78:16, 78:19, 107:4
**complete** [3] - 28:19, 72:17, 111:6
**completely** [1] - 110:6
**complex** [3] - 28:13, 28:15, 28:17
**comply** [1] - 16:22
**component** [1] - 25:12
**compounding** [1] - 95:22
**Comptroller** [1] - 27:6
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concedes** [1] - 88:21
**concept** [3] - 64:8, 68:4, 71:7
**concern** [5] - 59:4, 78:4, 105:2, 110:11, 110:14
**concerns** [2] - 40:21, 102:2
**conclude** [3] - 7:15, 20:19, 70:9
**concludes** [1] - 110:23
**concrete** [3] - 38:1, 38:6, 90:22
**concurring** [3] - 63:19, 64:14, 87:6
**condemnation** [1] - 66:6
**condemning** [1] - 87:6
**conditions** [2] - 16:5, 47:18
**conduct** [2] - 33:6, 33:7
**confer** [7] - 6:18, 58:13, 104:6, 104:8, 107:11, 108:18, 108:25
**conferral** [2] - 106:6, 106:8
**confessed** [1] - 67:8

**confidentiality** [1] - 98:23
**confirming** [1] - 32:24
**confirms** [1] - 79:16
**Congress** [5] - 30:19, 43:20, 63:9, 64:25, 65:4
**connection** [2] - 20:14, 32:18
**connections** [1] - 42:18
**Connolly** [7] - 1:14, 2:9, 48:12, 48:22, 50:7, 50:14, 59:4
**Connolly's** [2] - 48:24, 50:15
**consequence** [2] - 91:12, 93:7
**consequences** [2] - 23:4, 40:22
**consequently** [1] - 96:16
**conservative** [1] - 70:17
**consider** [6] - 16:10, 56:19, 72:1, 74:3, 91:4, 105:13
**consideration** [2] - 16:9, 74:18
**considerations** [4] - 16:3, 90:16, 91:1, 91:9
**considered** [3] - 13:7, 73:17, 111:8
**considering** [2] - 42:13, 74:13
**considers** [1] - 72:5
**consistency** [3] - 21:19, 56:15, 56:25
**consistent** [10] - 11:4, 12:19, 18:18, 18:19, 19:15, 23:20, 30:10, 58:9, 62:18, 63:14
**consistently** [1] - 13:9
**Constantineau** [1] - 85:7
**constitute** [5] - 17:17, 20:10, 95:13, 99:7, 100:10
**constitutes** [4] - 75:1, 78:20, 95:6, 111:4
**Constitution** [13] - 30:2, 30:15, 30:18, 45:1, 51:3, 63:3, 63:6, 63:10, 63:12, 65:11, 66:10, 89:18, 103:22
**constitutional** [14] - 11:7, 30:22, 31:1, 45:16, 65:17, 69:8,

74:9, 77:17, 85:5, 89:22, 90:12, 91:15, 93:25, 95:2
**constitutionally** [3] - 6:13, 83:13, 84:8
**constraints** [1] - 74:12
**construct** [1] - 17:8
**consultation** [3] - 11:16, 11:18, 22:6
**consulting** [1] - 98:25
**Consumer** [1] - 100:25
**contact** [1] - 68:15
**contemplated** [1] - 18:6
**contemporaneous** [1] - 18:3
**contend** [1] - 11:20
**contending** [1] - 13:2
**content** [1] - 79:1
**contest** [1] - 29:3
**context** [3] - 39:25, 56:11, 61:22
**continue** [3] - 40:2, 90:22, 101:6
**contract** [15] - 10:4, 10:8, 13:7, 13:12, 13:15, 13:22, 14:1, 14:2, 14:24, 15:19, 16:16, 56:10, 81:21, 81:24, 82:7
**contracting** [6] - 10:1, 12:23, 14:22, 14:25, 76:7, 98:23
**contractor** [6] - 11:22, 12:1, 97:25, 107:21, 108:10, 109:14
**contractor's** [1] - 16:17
**contractors** [10] - 10:2, 12:14, 12:18, 14:5, 16:13, 68:15, 84:16, 99:24, 105:3, 110:1
**contracts** [19] - 10:5, 10:9, 10:12, 10:14, 10:18, 11:2, 11:22, 12:24, 13:17, 14:16, 16:14, 17:18, 26:25, 27:16, 37:25, 46:14, 51:15, 86:6, 86:16
**contractual** [5] - 13:5, 13:9, 14:6, 86:3, 86:7
**contrary** [1] - 62:4
**contrast** [1] - 16:5
**control** [1] - 104:21
**controversy** [2] - 72:20, 90:15
**conversation** [1] -

53:8
**convicted** [3] - 44:13, 44:16, 44:17
**Cooper** [1] - 92:3
**copyright** [1] - 27:5
**Copyright** [1] - 27:5
**cornerstone** [1] - 63:20
**Corp** [4] - 87:20, 100:5, 100:16, 102:21
**corporate** [1] - 100:23
**corporation** [1] - 87:22
**correct** [6] - 8:24, 11:15, 13:14, 13:25, 22:12, 37:22
**correctly** [2] - 2:15, 50:11
**cost** [2] - 16:3, 16:9
**costs** [1] - 78:8
**Council** [1] - 72:6
**counsel** [45] - 2:7, 5:6, 15:1, 15:4, 15:8, 15:9, 16:1, 16:8, 16:17, 16:18, 16:23, 29:16, 33:17, 37:19, 44:14, 52:12, 58:8, 69:12, 89:24, 89:25, 90:2, 90:4, 90:7, 90:10, 91:18, 91:23, 91:25, 92:22, 92:25, 93:3, 93:9, 93:11, 93:15, 93:24, 93:25, 96:4, 96:9, 101:8, 101:24, 104:11, 105:22, 106:16, 108:25
**Counsel** [1] - 32:10
**Counsel's** [1] - 30:8
**counsel's** [1] - 3:3
**Count** [3] - 78:15, 78:19, 89:25
**count** [2] - 9:24, 21:8
**counted** [1] - 37:4
**counter** [1] - 31:18
**counterpart** [1] - 58:14
**country** [6] - 25:8, 25:12, 50:9, 71:8, 85:11, 102:15
**Counts** [1] - 83:6
**couple** [2] - 16:18, 60:1
**course** [3] - 19:20, 105:24, 106:4
**COURT** [167] - 1:1, 1:8, 2:11, 2:15, 2:17, 2:21, 2:24, 3:5, 3:8, 3:10, 3:13, 3:15,

3:20, 5:1, 5:4, 5:7, 5:18, 6:5, 6:15, 6:23, 7:1, 7:22, 9:2, 9:15, 9:21, 10:22, 10:24, 11:12, 11:16, 11:20, 13:1, 13:12, 13:15, 13:22, 14:11, 15:3, 15:25, 17:5, 18:5, 18:21, 19:12, 19:20, 21:7, 22:1, 22:3, 22:13, 23:2, 23:14, 25:4, 25:10, 25:16, 25:19, 26:2, 27:24, 28:17, 28:22, 29:6, 29:12, 29:15, 30:24, 31:12, 31:22, 32:13, 32:21, 33:11, 33:15, 33:21, 34:19, 35:13, 36:6, 36:17, 36:19, 36:21, 37:2, 37:8, 37:17, 38:15, 38:23, 40:19, 41:3, 41:23, 42:1, 42:8, 42:12, 43:15, 43:25, 44:7, 44:18, 45:8, 45:11, 45:19, 46:4, 47:9, 47:20, 48:12, 48:16, 49:5, 49:10, 49:14, 49:22, 50:18, 50:20, 51:4, 51:11, 52:2, 52:13, 53:9, 53:14, 53:17, 54:4, 54:13, 54:17, 54:22, 54:25, 55:3, 55:13, 55:23, 56:7, 56:22, 57:2, 57:5, 57:13, 57:20, 57:23, 57:25, 58:4, 58:6, 58:25, 59:18, 59:24, 60:3, 60:18, 60:23, 60:25, 61:13, 61:18, 62:21, 62:23, 63:11, 63:15, 63:22, 64:1, 65:2, 65:4, 65:7, 65:9, 70:7, 71:11, 105:8, 105:16, 105:19, 106:5, 106:12, 106:15, 107:7, 107:10, 107:24, 108:3, 108:13, 108:19, 109:1, 109:22, 110:7, 110:12, 110:15, 110:17, 110:19
**court** [11] - 5:20, 8:25, 17:11, 25:13, 34:10, 34:16, 58:24, 64:20, 101:17, 102:6, 108:3
**Court** [45] - 1:23, 1:23, 5:9, 5:11, 8:23, 15:18, 28:10, 29:5,

29:8, 38:4, 38:5, 47:16, 48:4, 48:6, 55:19, 58:12, 59:12, 59:21, 59:23, 62:25, 63:15, 67:16, 67:18, 67:20, 72:1, 72:5, 74:12, 74:18, 77:10, 77:16, 79:6, 79:10, 80:15, 86:21, 86:24, 90:12, 90:16, 91:3, 91:24, 95:4, 103:1, 104:2, 106:2, 109:9, 111:14
**Court's** [2] - 58:16, 82:24
**courthouse** [3] - 4:7, 4:20, 36:15
**courthouses** [3] - 25:7, 25:12, 25:22
**courtroom** [1] - 63:6
**COURTROOM** [1] - 2:2
**courts** [10] - 12:22, 13:8, 26:23, 35:5, 35:7, 70:5, 70:6, 82:24, 96:4, 100:9
**cover** [1] - 17:6
**covered** [1] - 109:24
**covers** [1] - 106:21
**COVID** [1] - 55:19
**Covington** [1] - 7:3
**cozy** [1] - 68:22
**credibly** [1] - 91:13
**Credit** [1] - 86:10
**crime** [3] - 44:14, 44:16, 44:17
**Criminal** [5] - 23:5, 38:16, 39:6, 68:12, 92:11
**criminal** [14] - 38:17, 57:21, 57:25, 90:1, 90:10, 91:23, 91:25, 92:1, 92:16, 92:17, 92:19, 93:6, 93:8, 98:10
**criteria** [1] - 70:10
**critical** [2] - 67:7, 92:1
**crosses** [1] - 43:16
**crowd** [1] - 3:17
**crux** [1] - 42:7
**crystal** [1] - 19:24
**Cuomo** [1] - 95:8
**curious** [2] - 45:12, 64:24
**Currency** [1] - 27:7
**current** [5] - 40:11, 42:3, 76:24, 79:19, 80:13
**cut** [1] - 106:12

**D**

**D.C** [23] - 1:6, 1:15, 1:21, 34:8, 35:6, 55:8, 71:23, 72:11, 72:21, 72:24, 73:11, 74:1, 74:4, 74:6, 83:16, 83:21, 84:12, 87:21, 94:17, 94:21, 97:5, 99:10, 101:23
**D.D.C** [8] - 72:8, 72:9, 75:9, 95:10, 96:24, 99:3, 100:6, 101:1
**dad** [1] - 71:4
**damage** [2] - 25:2, 25:24
**damaged** [1] - 100:22
**damages** [5] - 26:12, 26:17, 26:18, 26:19, 100:7
**damaging** [1] - 17:1
**damper** [1] - 55:10
**Dane** [2] - 2:9, 4:21
**DANE** [1] - 1:11
**dangerous** [7] - 20:7, 49:1, 50:16, 62:3, 81:5, 96:1, 100:18
**dated** [1] - 71:17
**Dated** [1] - 111:13
**Davila** [2] - 1:23, 111:14
**DAVILA** [1] - 111:3
**days** [2] - 10:11, 100:3
**dbutswinkas@wc. com** [1] - 1:16
**deal** [2] - 47:18, 107:11
**dealt** [1] - 107:13
**death** [1] - 71:6
**debatable** [1] - 33:3
**debate** [5] - 32:15, 32:21, 65:18, 69:3, 79:8
**decade** [2] - 34:4, 35:20
**decide** [6] - 9:5, 14:20, 41:16, 58:23, 63:16, 71:24
**decision** [1] - 88:3
**decisions** [3] - 19:4, 41:13, 41:14
**declaration** [13] - 7:20, 9:3, 22:2, 23:4, 24:23, 26:3, 28:14, 38:15, 39:8, 40:2, 42:2, 93:16, 96:6
**Declaration** [7] - 39:5, 82:11, 90:25, 92:14, 96:14, 98:4, 99:15
**declarations** [2] -

93:12, 95:17
**declining** [1] - 38:16
**deemed** [4] - 7:17, 47:8, 89:11, 103:9
**deems** [1] - 48:4
**deeper** [1] - 74:17
**defect** [1] - 42:7
**defects** [1] - 36:9
**defend** [1] - 48:8
**defendant** [3] - 57:21, 92:25, 106:25
**defendant's** [3] - 90:1, 90:3, 91:25
**defendants** [11] - 92:19, 93:6, 100:9, 107:1, 107:2, 107:7, 107:18, 108:7, 109:5, 109:12, 109:25
**Defendants** [1] - 1:6
**defense** [4] - 12:22, 48:24, 58:8, 92:16
**DEFENSE** [1] - 1:17
**Defense** [2] - 100:6, 100:16
**defensible** [1] - 62:9
**deferred** [1] - 58:4
**defined** [1] - 88:14
**definition** [1] - 45:2
**defy** [1] - 58:15
**delegated** [3] - 39:16, 63:9
**deliberate** [2] - 8:11, 8:14
**demands** [1] - 103:14
**democracy** [2] - 5:13, 96:19
**Democratic** [1] - 70:17
**democratic** [1] - 67:23
**democratically** [1] - 75:17
**demonstrate** [1] - 6:13
**demonstrated** [1] - 88:5
**demonstrates** [1] - 94:5
**demoting** [1] - 77:18
**demotion** [1] - 77:20
**denied** [1] - 73:23
**department** [2] - 11:9, 39:12
**Department** [19] - 2:3, 23:5, 27:7, 27:9, 27:10, 27:11, 37:11, 38:21, 39:14, 54:1, 54:2, 54:18, 55:6, 55:13, 68:12, 73:24, 100:6, 100:16, 101:22
**DEPARTMENT** [1] -

1:5
**departmental** [1] - 23:12
**departments** [3] - 8:10, 9:18, 19:9
**deprivation** [2] - 84:7, 87:17
**deprived** [3] - 83:8, 85:15, 88:1
**deprives** [5] - 11:23, 13:4, 86:2, 86:14, 98:19
**DEPUTY** [1] - 2:2
**derive** [1] - 86:7
**derogatory** [1] - 7:14
**described** [2] - 23:13, 81:5
**describes** [2] - 7:13, 82:11, 85:10
**describing** [2] - 86:12, 87:12
**designated** [3] - 17:13, 46:18, 46:22
**designation** [3] - 46:25, 87:6, 87:9
**desk** [1] - 7:10
**despite** [2] - 68:5, 98:23
**destinies** [1] - 104:21
**destroying** [1] - 84:10
**detail** [3] - 4:14, 26:4, 31:6
**determination** [1] - 35:12
**determine** [6] - 6:18, 47:17, 50:22, 57:16, 58:24, 86:21
**determined** [1] - 106:19
**detriment** [1] - 96:20
**developed** [1] - 84:1
**Development** [1] - 73:25
**developments** [1] - 96:9
**devoid** [1] - 87:13
**devoted** [1] - 62:25
**difference** [3] - 32:25, 61:24, 69:23
**differences** [1] - 32:16
**different** [20] - 14:16, 15:21, 18:23, 29:20, 30:4, 38:25, 39:1, 53:22, 53:23, 54:2, 58:22, 63:3, 65:14, 68:24, 68:25, 69:21, 88:7, 88:8, 98:12
**differently** [1] - 61:23
**difficult** [1] - 18:15
**difficulties** [1] - 15:10

**difficulty** [1] - 24:16
**dig** [2] - 11:25, 33:22
**Diocese** [1] - 95:7
**direct** [4] - 12:3, 13:17, 31:8, 34:8
**directed** [6] - 11:10, 107:1, 107:18, 108:7, 109:5, 109:25
**directing** [5] - 11:21, 15:19, 56:20, 62:11, 62:12
**direction** [3] - 9:19, 79:8, 99:21
**directions** [3] - 107:20, 108:9, 109:14
**directly** [6] - 10:19, 42:3, 86:6, 94:2, 94:4, 109:18
**director** [3] - 22:7, 23:1, 81:17
**directs** [3] - 9:24, 11:24, 83:25
**disagree** [2] - 33:1, 45:23
**disassembled** [1] - 111:9
**disbar** [1] - 12:2
**disbarment** [2] - 12:3, 12:4
**discharge** [1] - 77:12
**disciplinary** [1] - 16:22
**disclose** [8] - 10:2, 10:6, 97:25, 98:25, 107:22, 108:11, 109:15, 110:8
**disclosure** [3] - 86:15, 99:1, 109:8
**discretion** [1] - 57:16
**discriminate** [1] - 61:25
**discrimination** [12] - 60:5, 61:3, 61:21, 66:24, 67:22, 75:1, 78:21, 78:25, 79:1, 82:20, 82:24, 83:3
**discriminatorily** [1] - 85:13
**discuss** [1] - 85:2
**discussed** [3] - 94:22, 97:8, 105:12
**discusses** [1] - 39:5
**discussion** [1] - 89:3
**disfavored** [2] - 68:1, 102:17
**disfavors** [3] - 79:13, 79:20, 80:16
**dishonest** [5] - 20:7, 49:1, 50:16, 81:5,

100:18
**dishonestly** [1] - 85:12
**dislike** [1] - 77:6
**disliked** [1] - 103:6
**dislikes** [5] - 77:1, 77:2, 77:4, 103:21, 103:23
**disloyal** [1] - 89:12
**dismissed** [2] - 50:1, 101:17
**disposition** [1] - 58:2
**dispute** [3] - 8:25, 18:11
**disputed** [1] - 7:24
**disqualifying** [1] - 60:16
**disregard** [2] - 9:11, 110:2
**distanced** [1] - 95:20
**DISTRICT** [3] - 1:1, 1:1, 1:8
**district** [1] - 5:20
**District** [9] - 1:20, 49:25, 72:22, 74:5, 83:15, 84:12, 96:23, 101:18, 101:19
**Diversity** [1] - 67:17
**Division** [5] - 23:5, 38:16, 39:6, 68:13, 92:11
**docket** [1] - 5:9
**docketed** [1] - 4:2
**docketing** [1] - 81:4
**doctrine** [1] - 15:24
**Doe** [8] - 44:20, 44:22
**DOJ** [8] - 3:5, 25:12, 27:10, 38:16, 48:15, 51:13, 54:13, 92:11
**DOJ-component** [1] - 25:12
**dollars** [2] - 100:3, 101:21
**done** [4] - 59:10, 69:25, 95:14, 104:1
**donors** [3] - 31:14, 75:16, 79:24
**door** [2] - 51:8, 51:21, 52:1
**doors** [1] - 25:11
**dossier** [3] - 32:6, 32:7, 32:11
**doubt** [2] - 39:7, 51:25
**Doug** [3] - 3:4, 3:12, 3:13
**DOUGLAS** [1] - 1:19
**down** [5] - 25:1, 33:22, 38:14, 46:7, 103:24
**draw** [1] - 47:21
**Dreier** [4] - 3:4, 3:13,

3:17, 54:25
**DREIER** [2] - 1:19, 55:2
**drive** [1] - 12:1
**driven** [1] - 8:22
**Drug** [1] - 95:9
**Drysdale** [2] - 90:18, 91:8
**due** [39] - 11:6, 11:19, 13:4, 13:7, 13:19, 14:2, 14:7, 14:19, 14:23, 15:3, 15:22, 17:6, 18:10, 34:10, 37:20, 45:3, 46:20, 69:11, 74:20, 79:22, 83:5, 83:7, 83:9, 85:9, 86:20, 86:22, 86:25, 87:13, 87:19, 87:22, 88:1, 88:6, 89:20, 93:15, 97:3, 97:4, 97:7, 97:21, 100:8
**Due** [4] - 13:10, 16:16, 17:20, 18:6
**dunk** [1] - 69:15
**Durham** [1] - 32:10
**during** [4] - 20:3, 55:19, 66:21, 101:12
**duties** [2] - 93:5, 99:19

## E

**easily** [1] - 100:14
**easy** [2] - 36:23, 107:11
**echoed** [1] - 67:18
**economic** [9] - 26:12, 26:17, 26:18, 27:22, 69:3, 99:6, 100:10
**edges** [1] - 6:17
**Education** [1] - 54:3
**effect** [4] - 83:19, 87:16, 96:17, 103:10
**effective** [8] - 15:9, 16:18, 90:1, 91:18, 91:22, 92:21, 93:10, 93:15
**effectively** [2] - 16:22, 93:23
**effects** [3] - 5:15, 39:2, 85:14
**effectuate** [1] - 48:11
**effort** [2] - 76:9, 96:1
**egregious** [1] - 79:1
**either** [5] - 4:7, 10:19, 83:17, 89:18, 93:9
**Eldridge** [1] - 87:2
**election** [1] - 20:8, 31:14, 31:23, 66:22,

75:17, 75:20, 75:23, 76:22, 79:25, 80:2, 101:13
**Elizabeth** [2] - 1:23, 111:14
**ELIZABETH** [1] - 111:3
**eloquent** [1] - 71:14
**Elrod** [1] - 95:11
**elsewhere** [2] - 42:14, 100:21
**email** [2] - 39:11, 55:21
**embarrassment** [1] - 81:7
**emergency** [1] - 94:20
**emergent** [1] - 70:14
**eminently** [1] - 62:9
**Empires** [1] - 86:10
**employee** [2] - 22:10, 77:11
**employees** [39] - 21:12, 21:17, 21:19, 22:5, 22:15, 23:17, 24:3, 25:13, 25:14, 52:15, 54:5, 54:18, 55:25, 56:2, 59:17, 76:24, 77:19, 80:11, 81:9, 81:15, 82:2, 82:3, 82:4, 82:13, 84:4, 88:9, 88:11, 88:20, 88:25, 89:6, 91:20, 91:21, 92:7, 92:9, 97:24, 98:13, 110:1
**employer** [1] - 77:17
**enacted** [1] - 75:17
**enactment** [1] - 88:13
**encounter** [1] - 88:12
**encourage** [1] - 104:18
**encourages** [1] - 70:23
**end** [6] - 6:16, 6:24, 14:12, 14:14, 23:25, 27:20
**endanger** [1] - 50:25
**endowed** [1] - 66:11
**ends** [1] - 67:9
**enemies** [2] - 67:2, 96:14
**enforcement** [5] - 9:12, 10:17, 51:21, 71:16, 73:14
**enforcing** [1] - 104:3
**engage** [12] - 27:13, 55:8, 60:11, 60:14, 66:12, 77:13, 78:2, 78:6, 86:1, 92:6, 93:7, 99:16

engaged [2] - 62:3, 75:4
engagement [4] - 57:16, 58:9, 82:9, 85:1
engagements [2] - 56:23, 56:24
engaging [19] - 8:15, 21:18, 27:6, 56:1, 56:3, 56:8, 56:9, 56:11, 56:15, 56:18, 82:4, 84:3, 88:20, 88:22, 91:21, 92:8, 92:20, 97:24, 98:9
England [1] - 72:10
enjoin [1] - 71:16
enjoined [4] - 8:1, 43:4, 95:24, 100:9
enjoining [2] - 73:14, 104:2
enjoys [1] - 47:16
enormous [4] - 14:5, 50:7, 50:8, 83:23
ensure [3] - 21:19, 56:15, 56:25
enter [6] - 14:5, 59:17, 86:1, 86:18, 104:20, 104:23
entered [2] - 26:19, 59:16
entering [4] - 23:17, 55:19, 56:10, 84:2
enterprise [1] - 27:21
entire [4] - 20:20, 81:2, 95:24, 103:12
entirely [1] - 85:1
entirety [1] - 101:17
entities [4] - 10:6, 10:12, 14:20, 84:17
entitled [5] - 73:13, 83:25, 103:19, 103:20, 103:21
entity [7] - 46:12, 89:11, 90:11, 98:14, 107:21, 108:10, 109:14
entry [1] - 28:18
EO [1] - 86:2
EPA [1] - 94:16
equal [4] - 15:23, 34:12, 51:9, 69:13
equitable [2] - 94:15, 100:5
equities [3] - 73:4, 73:9, 101:3
era [1] - 26:20
ergo [1] - 68:8
errors [1] - 29:4
especially [1] - 18:15
essence [2] - 8:7, 64:5

essentially [3] - 8:17, 16:12, 44:13
establish [4] - 9:7, 69:19, 87:10, 94:12
established [3] - 67:13, 80:14, 100:12
establishing [1] - 32:23
et [3] - 1:5, 2:4, 16:4
ethics [2] - 93:13, 102:1
event [1] - 70:22
evidence [3] - 40:16, 43:6, 87:8
evil [1] - 67:4
evinced [1] - 89:4
eviscerates [1] - 71:7
exact [1] - 37:13
exactly [18] - 19:9, 19:23, 22:20, 23:14, 40:1, 51:9, 57:4, 59:14, 62:19, 64:13, 66:14, 68:5, 71:2, 77:22, 78:4, 79:16, 88:21, 89:3
exaggerate [1] - 27:19
examined [1] - 94:25
example [8] - 8:13, 9:2, 26:22, 49:18, 52:14, 54:3, 73:23, 88:16, 95:16, 98:5
except [1] - 64:9
exception [1] - 22:23
exchanges [1] - 16:20
excluding [1] - 45:25
exclusion [1] - 83:18
exclusively [1] - 98:8
Executive [22] - 4:1, 7:12, 64:9, 71:17, 73:15, 73:18, 74:24, 75:12, 76:2, 79:15, 83:23, 86:22, 88:4, 89:10, 90:6, 91:13, 93:4, 93:18, 94:23, 99:11, 101:11, 110:9
executive [109] - 4:4, 4:10, 4:17, 4:24, 5:12, 5:24, 7:5, 7:8, 9:24, 11:14, 12:15, 12:20, 15:16, 15:18, 17:7, 17:16, 17:21, 18:4, 19:5, 19:22, 19:25, 20:4, 20:5, 20:22, 20:24, 25:6, 25:14, 29:19, 29:20, 29:21, 29:23, 30:5, 30:9, 30:13, 31:1, 34:1, 34:5, 35:10, 38:18, 42:5, 44:1, 45:5, 45:11, 45:21,

46:11, 48:18, 48:20, 49:1, 50:6, 50:10, 50:12, 54:15, 54:19, 55:6, 55:9, 56:11, 59:2, 61:15, 63:8, 64:10, 64:15, 64:21, 65:13, 65:15, 65:22, 65:25, 66:11, 66:17, 67:9, 71:7, 74:9, 74:25, 75:14, 75:21, 76:11, 76:12, 77:5, 77:22, 78:16, 78:20, 79:21, 79:22, 80:9, 80:23, 82:14, 83:12, 84:18, 90:23, 91:19, 92:5, 93:16, 95:25, 96:11, 96:16, 97:8, 99:20, 100:17, 101:20, 102:2, 102:12, 103:10, 104:4, 104:8, 105:7, 106:18, 109:18, 110:2, 110:4
exercise [5] - 46:16, 48:2, 64:12, 91:15, 103:23
existed [1] - 46:3
existence [5] - 12:11, 16:25, 40:8, 40:13, 99:8
existential [1] - 99:17
existing [2] - 26:18, 27:17
expand [1] - 107:2
expansion [1] - 106:1
expect [1] - 88:12
expediently [1] - 5:9
expedited [3] - 6:20, 104:14, 104:17
expedition [1] - 28:5
expeditious [1] - 95:1
expeditiously [3] - 28:2, 37:14, 51:14
experience [1] - 42:17
experiences [1] - 60:17
experiencing [1] - 40:24
expert [1] - 15:11
explain [6] - 17:16, 25:23, 26:7, 39:3, 76:3, 80:5
explained [2] - 24:12, 86:24
explaining [1] - 100:7
explains [1] - 88:16
explicit [3] - 75:24, 76:4, 80:5
explore [2] - 19:16, 46:4

Express [1] - 86:12
expressed [1] - 78:4
expressly [1] - 93:19
extends [2] - 75:7, 103:4
extensive [3] - 27:8, 31:16, 41:4
extent [8] - 18:22, 29:13, 56:25, 101:11, 101:20, 106:1, 106:25, 107:1
extra [3] - 13:3, 81:10, 81:16
extraordinary [2] - 26:10, 46:15
extreme [1] - 96:1

**F**

F.2d [2] - 72:24, 99:9
F.3d [11] - 71:22, 72:11, 73:11, 73:25, 74:4, 83:15, 83:21, 85:17, 86:10, 87:21, 94:16
F.4th [3] - 72:21, 74:5, 94:21
F.Supp [1] - 101:1
F.Supp.2d [1] - 96:23
F.Supp.3d [5] - 72:9, 75:9, 95:10, 99:3, 101:18
face [4] - 15:18, 33:11, 75:13, 81:10
faces [1] - 81:7
facets [1] - 72:1
facing [1] - 40:23
fact [23] - 20:25, 24:12, 39:18, 41:13, 52:11, 53:7, 58:18, 58:19, 58:22, 59:21, 61:5, 62:9, 69:19, 75:4, 76:2, 76:4, 76:5, 80:4, 82:16, 82:17, 90:14, 90:23, 98:25
factfinder [1] - 97:11
factor [5] - 73:19, 73:21, 74:10, 94:8, 101:2
factors [6] - 42:9, 71:21, 73:9, 73:13, 74:3, 91:4
facts [4] - 14:1, 33:9, 61:1, 72:3
factual [5] - 8:7, 8:24, 17:25, 18:11, 29:3
factually [1] - 32:10
fair [3] - 96:20, 97:11, 97:12

fairly [3] - 30:10, 31:16, 34:2
fairness [1] - 87:13
fall [1] - 76:25
fallacy [1] - 68:8
false [2] - 32:5, 32:9, 49:19
familiar [4] - 4:9, 46:17, 48:15, 55:7, 63:4, 63:18
far [5] - 52:22, 55:16, 59:1, 64:8, 89:3
Fascist [2] - 65:23, 87:4
fashioned [1] - 64:8
fast [1] - 108:5
father [1] - 71:3
favor [3] - 91:1, 91:10, 101:3
favored [1] - 67:6
favors [2] - 73:4, 102:10
FBI [1] - 27:13
FCRR [3] - 1:23, 111:3, 111:14
FDA [1] - 27:10
FDIC [1] - 27:6
fear [3] - 38:18, 85:3, 102:15
fearful [2] - 77:20, 96:13
federal [78] - 3:10, 7:18, 9:25, 10:5, 10:7, 10:10, 11:21, 12:22, 17:19, 21:8, 21:10, 21:11, 21:16, 21:21, 21:22, 22:16, 23:18, 24:2, 25:7, 25:12, 26:23, 26:24, 29:24, 29:25, 37:3, 38:24, 43:13, 46:14, 51:17, 51:22, 52:17, 53:10, 55:20, 60:15, 61:4, 62:2, 62:17, 75:25, 76:7, 79:18, 81:8, 81:11, 81:14, 82:1, 84:2, 84:4, 84:5, 84:6, 84:15, 84:16, 85:1, 85:24, 86:1, 86:18, 86:19, 88:24, 89:7, 89:19, 92:10, 97:17, 97:23, 97:24, 97:25, 98:3, 98:9, 98:12, 99:14, 99:17, 102:13, 103:24, 106:17, 107:19, 108:8, 109:6, 109:13
Federal [4] - 4:3, 27:7, 38:5

**FedEx** [1] - 59:18
**fees** [1] - 90:24
**FERC** [1] - 99:9
**few** [1] - 63:2
**Fifth** [11] - 34:10, 51:8, 69:11, 87:14, 89:20, 94:24, 97:3, 97:4, 97:6, 97:20, 102:4
**fight** [3] - 38:9, 38:11, 71:6
**figure** [1] - 11:2
**file** [1] - 29:2
**filed** [4] - 4:1, 49:24, 74:14, 76:6
**filing** [1] - 80:7
**final** [2] - 73:9, 101:2
**finally** [3] - 86:2, 89:23, 102:10
**financial** [2] - 99:7, 100:13
**findings** [9] - 8:7, 8:18, 8:24, 9:3, 9:19, 11:9, 17:25, 18:11, 87:25
**fired** [1] - 38:19
**firing** [1] - 77:11
**firm** [73] - 4:11, 4:25, 5:3, 5:6, 5:14, 5:17, 7:3, 7:14, 7:16, 7:23, 8:15, 8:18, 12:11, 12:15, 12:24, 12:25, 14:21, 15:21, 16:6, 16:14, 18:2, 20:1, 20:23, 21:5, 24:24, 25:2, 25:25, 27:16, 27:18, 27:20, 34:3, 34:6, 40:6, 40:8, 40:22, 41:14, 43:12, 48:13, 49:2, 49:8, 50:9, 54:5, 64:21, 68:20, 69:6, 70:4, 71:2, 76:24, 77:3, 77:5, 80:11, 81:2, 81:21, 82:7, 82:10, 83:4, 83:14, 85:12, 88:10, 88:19, 90:22, 93:7, 93:20, 93:21, 98:1, 99:19, 100:4, 101:14, 107:23, 108:12, 109:16
**firm's** [21] - 35:23, 40:13, 40:15, 76:20, 76:23, 77:2, 77:7, 81:3, 83:24, 85:14, 85:25, 86:4, 86:17, 90:10, 93:5, 93:7, 93:21, 98:7, 99:16, 100:19
**firms** [11] - 6:2, 6:6, 16:6, 20:7, 26:20,

42:17, 42:19, 43:6, 78:5, 95:25, 96:12
**First** [40] - 34:11, 35:13, 35:14, 35:25, 51:8, 60:4, 60:8, 60:9, 60:13, 62:7, 66:16, 66:18, 67:5, 67:7, 67:15, 67:20, 67:23, 69:10, 74:19, 74:23, 75:2, 76:25, 77:8, 78:10, 78:17, 78:23, 80:20, 83:1, 83:2, 85:16, 85:18, 85:20, 85:22, 94:24, 95:4, 95:5, 95:12, 95:16, 96:21, 97:1
**first** [27] - 2:7, 7:11, 21:2, 23:24, 29:22, 31:10, 32:4, 39:4, 41:9, 43:22, 49:18, 55:12, 55:15, 56:14, 67:12, 69:4, 70:7, 70:12, 73:19, 74:10, 80:24, 83:13, 90:13, 91:9, 91:17, 99:13, 109:11
**firsthand** [1] - 41:15
**fit** [1] - 46:25
**five** [1] - 4:16
**flagging** [1] - 110:5
**Florida** [2] - 50:1, 101:19
**flow** [1] - 35:11
**flowed** [1] - 95:15
**flowing** [1] - 35:3
**flows** [1] - 34:25
**focus** [1] - 74:14
**focusing** [1] - 40:5
**follow** [3] - 23:7, 71:14, 83:14
**following** [1] - 66:6
**Food** [1] - 95:9
**FOR** [3] - 1:1, 1:10, 1:17
**forbidden** [1] - 66:4
**force** [2] - 96:17, 103:24
**forces** [1] - 64:7
**foreclosed** [1] - 83:17
**foregoing** [1] - 111:4
**Foreign** [2] - 87:20, 87:23
**foreign** [1] - 87:22
**foreign-owned** [1] - 87:22
**foreigner** [1] - 46:21
**forget** [2] - 50:3
**form** [3] - 30:9, 79:1, 86:3
**formal** [2] - 83:18,

89:12
**former** [4] - 76:24, 96:7, 96:8, 101:12
**forth** [1] - 84:6
**forum** [1] - 82:23
**forward** [8] - 2:5, 6:19, 16:24, 35:1, 58:20, 58:21, 84:25, 110:20
**forward-looking** [1] - 16:24
**foundation** [1] - 64:14
**foundational** [1] - 36:9
**foundations** [1] - 102:18
**founders** [1] - 65:12
**founding** [1] - 45:20
**four** [3] - 9:25, 73:4, 101:22
**framing** [1] - 99:22
**Frankfurter** [1] - 87:6
**frankly** [1] - 15:23
**fraud** [1] - 39:5
**free** [4] - 36:2, 64:5, 67:21, 67:22
**freedom** [1] - 85:21
**freedoms** [1] - 95:5, 95:12
**Friday** [1] - 28:4
**friend** [2] - 28:16, 40:7
**frighten** [1] - 40:12
**front** [4] - 3:21, 24:21, 24:24, 25:11
**fronts** [2] - 74:23, 94:19
**Frye** [2] - 92:2, 92:18
**fulfill** [1] - 64:8
**fulfilled** [1] - 103:7
**Full** [1] - 72:10
**full** [5] - 55:5, 56:18, 72:17, 88:18, 111:5
**fulsome** [2] - 28:19, 29:9
**function** [1] - 8:9
**fundamental** [5] - 61:24, 86:25, 87:13, 102:23, 103:4
**fundamentally** [13] - 33:2, 35:4, 35:11, 36:11, 36:25, 37:22, 43:3, 47:5, 59:11, 61:4, 61:23, 62:5, 107:4
**funding** [1] - 20:14
**funds** [1] - 7:18
**furthermore** [2] - 98:21, 101:14
**Fusion** [5] - 31:11, 32:5, 33:23, 49:19, 50:3

## G

**gallery** [1] - 3:20
**games** [1] - 29:7
**Garland** [2] - 34:9, 51:7
**Gas** [1] - 99:9
**gee** [1] - 21:5
**general** [3] - 5:6, 75:2, 75:22
**General** [5] - 25:10, 39:15, 66:8, 87:7, 87:12
**generally** [3] - 26:5, 87:19, 98:23
**generate** [1] - 99:19
**generic** [1] - 62:7
**George** [1] - 75:16
**ghosts** [5] - 36:13, 38:10, 38:11, 68:3, 68:19
**given** [11] - 14:3, 18:8, 18:16, 28:3, 28:24, 50:9, 74:12, 85:2, 86:23, 88:2, 92:15
**glad** [1] - 41:7
**Glass** [1] - 86:10
**Global** [1] - 75:8
**glove** [1] - 24:13
**goals** [1] - 11:4
**Gonzalez** [2] - 93:1, 94:1
**Gonzalez-Lopez** [2] - 93:1, 94:1
**goodwill** [2] - 100:14, 100:23
**Gordon** [1] - 71:22
**Gospel** [1] - 72:10
**governed** [1] - 64:6
**Government** [1] - 64:5
**government** [130] - 2:25, 8:1, 8:4, 9:25, 10:1, 10:2, 10:4, 11:22, 12:1, 12:14, 12:24, 13:6, 13:16, 13:17, 13:23, 14:16, 14:22, 16:7, 16:13, 16:20, 16:21, 17:13, 19:16, 21:12, 21:17, 23:15, 24:2, 26:25, 27:16, 27:25, 28:1, 28:3, 28:7, 35:15, 36:1, 38:7, 40:25, 43:14, 43:21, 45:12, 46:13, 47:16, 47:25, 50:25, 51:17, 52:17, 55:25, 57:6, 57:14, 58:8, 60:15, 61:4, 61:9, 61:24, 62:2, 63:25, 64:3, 64:7,

65:14, 67:24, 69:7, 69:22, 73:8, 75:3, 77:11, 77:25, 78:21, 79:2, 79:11, 79:13, 79:16, 79:19, 80:15, 80:16, 80:22, 81:9, 81:11, 81:21, 81:24, 82:1, 82:3, 82:7, 82:9, 82:12, 82:21, 85:1, 85:17, 85:19, 85:23, 86:16, 86:18, 88:6, 88:12, 88:20, 88:21, 88:24, 89:7, 89:19, 91:20, 91:25, 92:7, 92:10, 92:17, 92:20, 94:2, 94:3, 95:18, 97:1, 98:9, 98:11, 98:13, 98:22, 99:14, 99:17, 99:24, 99:25, 101:8, 101:22, 102:1, 102:2, 102:13, 103:24, 105:20, 107:13, 107:19, 108:8, 108:24, 109:6, 109:13, 109:20
**government's** [2] - 47:23, 93:11
**government-related** [1] - 99:25
**governmental** [2] - 66:2, 102:8
**governments** [1] - 66:5
**GPS** [5] - 31:11, 32:5, 33:23, 49:19, 50:3
**grant** [1] - 27:2
**granted** [1] - 72:25
**gravamen** [1] - 8:6
**Grayned** [1] - 88:14
**great** [5] - 16:11, 26:4, 28:20, 32:2, 94:13
**Greater** [1] - 73:23
**green** [1] - 60:18
**grievance** [1] - 101:15
**grievances** [1] - 85:23
**ground** [1] - 101:15
**grounds** [1] - 34:15
**group** [5] - 26:25, 27:12, 48:11, 69:13, 69:14
**groups** [2] - 99:13, 103:13
**growing** [1] - 95:18
**GSA** [2] - 25:8, 25:9
**guarantee** [1] - 93:25
**guess** [4] - 16:12, 51:14, 52:4, 70:9
**guessing** [1] - 59:22

guidance [41] - 9:11, 18:24, 19:3, 21:11, 21:17, 23:3, 23:8, 23:11, 23:18, 23:19, 24:1, 25:6, 37:3, 37:4, 37:6, 37:9, 37:10, 37:12, 37:16, 37:24, 40:24, 51:13, 51:14, 51:16, 51:18, 51:24, 52:14, 52:17, 53:22, 54:8, 54:11, 54:15, 55:4, 55:25, 57:8, 59:8, 84:1, 99:21, 99:23, 109:25
guide [1] - 8:10

**H**

half [3] - 40:20, 105:14, 106:11
Half [1] - 99:2
halted [1] - 5:16
hammer [1] - 58:19
hand [1] - 24:13
handled [1] - 55:21
Hanson [1] - 74:4
happy [3] - 31:5, 38:8
hard [4] - 38:13, 51:13, 54:14, 84:24
hardly [1] - 25:23
harm [42] - 6:9, 12:6, 12:9, 12:13, 14:7, 17:2, 28:15, 38:1, 40:6, 41:3, 52:8, 58:24, 59:1, 59:10, 59:13, 69:3, 69:17, 73:3, 77:17, 81:4, 84:13, 85:2, 90:24, 94:9, 94:11, 94:19, 95:3, 95:15, 95:22, 95:23, 97:5, 97:20, 98:1, 99:7, 99:12, 100:11, 100:13, 100:24, 102:3
harmed [1] - 98:19
harmful [1] - 67:22
harms [8] - 26:2, 26:5, 26:7, 26:9, 28:14, 69:8, 96:25, 99:6
head [12] - 22:6, 22:23, 23:11, 53:4, 53:9, 53:17, 54:12, 56:21, 77:8, 81:17, 89:8
head-on [1] - 77:8
heads [11] - 10:4, 10:7, 19:4, 21:10, 21:16, 21:21, 24:1, 55:24, 62:13, 75:25, 89:15

Health [1] - 79:9
hear [6] - 20:21, 20:24, 27:25, 28:6, 103:1, 104:19
heard [7] - 11:19, 18:11, 28:1, 82:23, 87:1, 87:17, 97:11
HEARING [1] - 1:7
hearing [9] - 3:24, 6:12, 6:19, 50:11, 73:17, 95:1, 95:17, 104:12, 105:12
heart [5] - 16:12, 32:7, 62:6, 67:20
Hearts [2] - 89:14, 89:15
Heffernan [4] - 75:10, 77:14, 77:21, 78:4
help [3] - 77:18, 77:21, 81:12
helping [1] - 34:1
Henry [1] - 3:3
HENRY [1] - 1:18
hereby [1] - 111:3
high [1] - 26:16
Hillary [6] - 20:7, 31:13, 75:19, 75:23, 79:23, 80:7
hire [6] - 12:14, 22:5, 22:8, 42:21, 81:18
hired [2] - 10:9, 48:14
hiring [3] - 31:11, 32:5, 56:9, 81:15, 93:19, 93:21, 102:7
Hirshon [3] - 96:7, 96:14, 96:17
history [1] - 33:10
hit [2] - 7:10, 27:18
hoc [2] - 68:8, 68:9
Hofstra [1] - 93:17
hold [2] - 69:1, 103:21
Holder [1] - 71:22
holder [1] - 60:19
holding [3] - 6:7, 7:5, 85:8
holdings [1] - 74:6
holds [1] - 81:21
home [1] - 58:19
Homeland [1] - 27:10
honest [1] - 53:3
Honeywell [1] - 100:25
honor [1] - 85:6
Honor [65] - 2:2, 2:8, 2:14, 3:1, 3:14, 3:19, 4:20, 4:22, 6:22, 8:21, 10:23, 19:19, 21:24, 28:8, 28:9, 28:12, 28:24, 29:14, 30:11, 31:5, 31:21,

32:1, 32:20, 33:1, 33:20, 34:7, 36:4, 37:7, 37:16, 41:6, 42:6, 47:4, 50:17, 51:24, 53:3, 53:12, 54:16, 54:24, 57:1, 57:11, 59:25, 60:4, 60:20, 61:17, 61:19, 62:20, 62:22, 62:24, 64:17, 71:10, 105:21, 106:4, 106:10, 106:14, 106:22, 107:6, 107:14, 108:17, 108:20, 109:3, 109:11, 109:17, 110:11, 110:16, 110:18
HONORABLE [1] - 1:8
hoops [1] - 81:16
hope [1] - 108:23
horror [1] - 78:13
hospital [1] - 24:5
hour [2] - 105:14, 106:11
House [2] - 30:8, 80:4
Housing [1] - 73:24
Houston [1] - 75:5
HOWELL [1] - 1:8
huge [1] - 84:21
Huisha [2] - 72:20
Huisha-Huisha [1] - 72:20
human [1] - 84:11
humanly [1] - 64:8
hundreds [1] - 21:23
hurdles [1] - 81:10
hurt [1] - 82:6
hypo [1] - 52:4
hypos [3] - 36:14, 36:24, 52:9

**I**

idea [2] - 18:8, 88:11
ideas [1] - 103:5
identification [3] - 31:15, 75:18, 80:1
identified [2] - 83:11, 90:16
identify [1] - 2:6
ideology [1] - 79:3
IEEPA [1] - 47:14
ifs [3] - 36:24, 36:25, 38:10
II [4] - 30:13, 45:17, 47:5, 48:2
III [1] - 59:11
III's [1] - 90:14
imagine [1] - 24:25

immediate [2] - 5:15, 6:9
immediately [11] - 107:18, 107:20, 108:7, 108:9, 109:5, 109:7, 109:8, 109:12, 109:13, 109:24, 109:25
immense [1] - 27:17
imminence [1] - 94:14
immunity [3] - 26:14, 100:4, 100:8
impact [4] - 44:5, 88:23, 91:7, 102:13
impacts [1] - 82:10
impair [1] - 91:14
impairs [1] - 86:17
impartial [1] - 97:11
impatient [1] - 5:21
impermissible [1] - 83:3
impermissibly [1] - 90:6
impersonal [1] - 64:7
impinge [1] - 30:20
implement [2] - 53:6, 54:14
Implement [1] - 86:9
implementation [1] - 9:12
implemented [3] - 17:4, 51:19, 51:21
implements [1] - 23:9
implicated [1] - 15:10
implicates [1] - 92:24
implicating [1] - 92:22
implications [3] - 15:22, 15:23
important [4] - 26:18, 58:7, 65:12, 73:21
impose [2] - 21:5, 89:16
imposed [2] - 25:24, 93:16
improper [2] - 9:4, 107:3
improperly [1] - 32:8
imprudent [1] - 48:5
impugning [1] - 93:21
IMS [1] - 79:9
inadvertently [1] - 66:11
inappropriate [1] - 107:3
Inc [5] - 79:9, 80:17, 94:16, 99:3, 100:25
incident [1] - 39:5
inclined [1] - 29:5
include [1] - 78:8
included [1] - 39:10

includes [4] - 24:4, 24:6, 108:21
including [7] - 31:15, 50:23, 50:24, 75:16, 75:18, 79:25, 91:4
income [1] - 99:19
inconceivable [1] - 16:21
inconceivably [1] - 22:24
inconsistent [11] - 19:1, 21:14, 24:11, 52:19, 52:21, 52:24, 53:1, 53:19, 53:24, 88:10, 89:2
incorrect [1] - 32:10
incredibly [2] - 17:1, 58:7
incurred [1] - 26:19
indeed [3] - 63:13, 96:11, 100:10
independent [4] - 27:22, 41:18, 102:20
indicates [1] - 43:18
indicted [2] - 26:23, 70:3
indirectly [1] - 94:3
indisputable [1] - 66:17
individual [10] - 34:15, 45:3, 46:9, 46:12, 48:2, 60:21, 64:11, 76:14, 98:14, 101:13
individuals [7] - 30:16, 33:7, 39:13, 46:1, 48:11, 55:17, 75:3
indulgence [1] - 109:2
infamy [1] - 85:9
inference [3] - 20:18, 40:14, 40:15
infirmity [1] - 6:9
informal [1] - 89:13
information [1] - 49:19
informed [2] - 102:19, 102:20
infringed [1] - 83:12
infringement [2] - 16:8, 35:25
inherent [2] - 63:9, 64:17
initial [2] - 86:4, 90:8
injunction [9] - 4:16, 6:12, 6:19, 26:10, 26:15, 29:1, 71:22, 72:12, 104:12
injunctive [5] - 9:15, 73:22, 80:21, 94:20, 97:7

**injuries** [6] - 69:19, 90:23, 99:6, 101:5, 101:7, 101:9
**injuries-in-fact** [1] - 90:23
**injury** [9] - 44:5, 44:7, 44:8, 69:9, 90:14, 94:12, 95:7, 95:13, 100:14
**injury-in-fact** [1] - 90:14
**innocent** [1] - 87:11
**inquiry** [2] - 67:9, 83:7
**instance** [4] - 39:19, 54:7, 84:21, 101:21
**instances** [1] - 82:11
**instant** [1] - 77:23
**instead** [1] - 95:11
**institution** [1] - 66:13
**instruct** [4] - 107:19, 108:8, 109:6, 109:12
**instructing** [3] - 107:21, 108:10, 109:15
**instruction** [3] - 9:18, 12:19, 91:18
**instructs** [2] - 86:5, 109:11
**insufficient** [1] - 99:7
**integrity** [4] - 85:6, 93:22, 103:11, 103:15
**Integrity** [1] - 85:17
**intended** [1] - 82:18
**intends** [1] - 93:20
**interact** [4] - 95:19, 98:3, 98:11, 99:13
**interacting** [3] - 56:13, 84:2, 98:9
**interactions** [3] - 9:20, 40:25, 84:25
**interest** [21] - 8:19, 11:3, 13:10, 18:13, 18:19, 35:17, 35:19, 49:10, 51:1, 67:14, 73:5, 80:24, 82:21, 83:8, 86:3, 86:13, 101:3, 102:1, 102:8, 102:10, 103:14
**interesting** [1] - 7:1
**interestingly** [1] - 20:11
**interests** [31] - 8:14, 8:16, 19:2, 19:15, 21:14, 21:20, 24:11, 45:25, 46:11, 52:19, 52:21, 52:25, 53:2, 53:20, 56:16, 57:2, 57:17, 58:10, 67:11, 73:10, 83:12, 85:11,

85:16, 86:7, 87:18, 89:2, 89:8, 91:8, 97:9, 97:10, 103:8
**interfere** [1] - 94:2
**interfered** [1] - 13:13
**interference** [5] - 13:6, 13:20, 15:7, 15:8, 15:9
**interferes** [2] - 16:17, 97:9
**International** [3] - 72:23, 86:8, 99:2
**interpret** [4] - 10:22, 10:24, 10:25, 11:1
**interpretation** [1] - 19:13
**interpreted** [2] - 38:20, 53:2
**intimidate** [1] - 96:2
**intimidation** [1] - 80:20
**introduce** [1] - 2:18
**introducing** [1] - 4:22
**invalid** [1] - 6:13
**invalidate** [1] - 8:9
**investigation** [4] - 57:25, 66:7, 89:12, 98:8
**investigations** [1] - 27:12
**Investment** [2] - 87:20, 87:23
**invoking** [2] - 67:24, 80:18
**involved** [5] - 32:17, 33:24, 64:22, 87:18, 99:25
**involves** [2] - 34:20, 72:9
**involving** [3] - 72:11, 77:11, 102:4
**irrelevant** [1] - 57:12
**irreparable** [25] - 5:16, 26:6, 26:7, 69:8, 69:9, 69:17, 69:20, 73:3, 94:9, 94:11, 94:19, 95:3, 95:7, 95:13, 95:15, 97:5, 97:19, 98:1, 99:2, 99:7, 99:12, 100:11, 100:13, 100:16, 100:24
**irreparably** [2] - 96:25, 98:18
**ISIS** [1] - 60:13
**isolated** [1] - 102:4
**issuance** [11] - 73:4, 74:11, 76:5, 84:18, 86:22, 94:11, 101:4, 101:10, 102:11,

102:14
**issue** [20] - 14:9, 15:6, 31:2, 31:20, 40:16, 41:9, 41:10, 43:15, 46:11, 48:19, 54:8, 63:8, 70:17, 77:22, 102:4, 104:2, 105:13, 106:22, 109:25
**issued** [21] - 4:3, 11:14, 11:17, 29:1, 29:23, 37:9, 37:11, 37:24, 45:5, 49:3, 51:16, 54:8, 55:5, 63:23, 76:3, 79:22, 80:4, 99:21, 103:14, 104:15
**issues** [10] - 7:4, 16:1, 28:13, 28:14, 29:4, 41:8, 49:20, 54:11, 82:13
**issuing** [9] - 9:11, 45:20, 45:21, 47:13, 51:14, 71:14, 76:10, 77:5, 106:6
**IT** [3] - 22:14, 23:1, 81:3
**ITC** [2] - 27:3, 27:8
**itself** [2] - 15:17, 35:24

**J**

**Jackson** [2] - 63:19, 64:4
**jail** [1] - 44:19
**January** [1] - 72:8
**job** [2] - 22:16, 81:10
**John** [3] - 44:20, 44:21, 70:21
**joined** [1] - 3:3
**Joint** [2] - 65:23, 87:4
**jointly** [1] - 104:8
**judge** [1] - 5:20
**JUDGE** [1] - 1:8
**Judge** [3] - 47:21, 65:8, 104:25
**judgment** [4] - 6:20, 104:14, 104:16, 104:18
**judicial** [4] - 8:8, 70:2, 103:13, 103:15
**judicially** [1] - 75:16
**judiciary** [2] - 25:5, 102:20
**jump** [48] - 63:5, 71:22, 72:9, 72:11, 72:21, 72:24, 73:6, 73:7, 73:11, 73:25, 74:4, 74:5, 75:6, 75:9, 75:10, 77:15,

78:25, 79:9, 79:14, 80:17, 83:10, 83:16, 83:21, 85:7, 85:18, 86:11, 86:12, 87:2, 87:3, 87:5, 87:21, 88:15, 90:2, 90:5, 90:20, 92:2, 92:3, 93:2, 94:16, 94:21, 95:8, 95:10, 95:11, 96:23, 99:3, 101:1, 102:21, 103:3
**jumps** [2] - 64:4, 66:21
**juncture** [1] - 97:19, 98:18, 100:12
**jurisdiction** [1] - 59:12
**jury** [1] - 44:15
**Justice** [21] - 2:4, 3:7, 3:8, 23:6, 37:12, 38:21, 39:14, 54:2, 54:18, 55:6, 55:13, 63:19, 64:4, 65:22, 66:1, 66:9, 67:3, 67:19, 68:12, 87:5, 101:23
**justice** [6] - 92:1, 92:18, 96:20, 102:23, 102:24, 103:13
**JUSTICE** [1] - 1:5
**justification** [3] - 76:7, 76:10, 80:2
**justify** [1] - 61:14

**K**

**Karem** [2] - 73:10, 97:5
**keep** [5] - 3:18, 6:16, 14:22, 107:15, 107:25
**keeps** [1] - 50:1
**key** [2] - 33:8, 61:6
**kind** [10] - 10:17, 11:19, 17:24, 18:5, 39:17, 46:25, 63:20, 78:2, 78:9, 84:24
**kinds** [1] - 84:19
**Kiyemba** [1] - 74:3

**L**

**labor** [1] - 27:8
**lack** [1] - 17:6
**Lafler** [1] - 92:3
**laid** [2] - 18:14, 82:16
**landlord** [1] - 25:7
**language** [8] - 11:2, 23:25, 24:10, 66:21, 76:12, 79:15, 80:10,

92:5
**large** [4] - 6:2, 6:6, 12:21, 100:20
**largely** [2] - 13:13, 83:19
**larger** [1] - 105:9
**Larson** [1] - 5:5
**last** [7] - 10:11, 10:16, 20:19, 34:9, 72:19, 79:10, 85:21
**Law** [2] - 93:17, 96:10
**law** [84] - 4:11, 4:25, 5:3, 5:6, 5:13, 5:14, 5:17, 6:2, 6:6, 7:3, 7:14, 7:16, 8:15, 8:18, 12:5, 12:7, 12:8, 12:11, 12:14, 12:23, 12:25, 14:21, 15:21, 16:14, 18:2, 19:25, 20:7, 20:23, 21:5, 23:20, 24:24, 25:2, 25:24, 26:13, 26:20, 27:16, 27:20, 29:4, 30:20, 34:3, 35:23, 40:8, 41:14, 42:17, 42:19, 43:6, 43:12, 45:6, 48:13, 49:2, 49:8, 50:9, 59:6, 62:7, 62:9, 63:14, 64:6, 64:7, 64:12, 64:21, 64:24, 65:9, 65:16, 68:20, 69:6, 69:16, 70:4, 71:2, 72:2, 76:23, 77:2, 78:5, 81:2, 83:4, 83:24, 84:4, 85:20, 90:21, 95:25, 96:12, 103:18, 108:5
**lawful** [1] - 43:1
**laws** [8] - 20:8, 20:14, 30:2, 30:23, 31:14, 45:21, 75:17, 79:25
**Lawson** [1] - 3:3
**LAWSON** [1] - 1:18
**lawsuit** [4] - 4:15, 49:24, 54:10, 101:16
**lawsuits** [6] - 64:22, 66:23, 76:6, 76:8, 80:6, 80:7
**lawyer** [2] - 16:2, 57:21
**lawyers** [31] - 4:8, 4:12, 12:4, 15:13, 15:14, 22:11, 27:6, 27:12, 34:6, 38:17, 41:17, 52:16, 59:7, 68:10, 78:5, 81:2, 92:17, 92:19, 92:20, 95:19, 95:25, 96:18, 97:23, 98:3, 98:10,

98:21, 99:16,
102:14, 103:16,
103:25
**lawyers'** [2] - 96:12,
103:7
**lead** [1] - 40:15
**leadership** [2] - 37:12,
38:21
**leads** [1] - 95:3
**learn** [1] - 18:8
**learned** [3] - 4:13,
18:3, 87:15
**least** [9] - 38:16,
42:15, 43:10, 51:8,
74:8, 79:19, 98:12,
105:25, 109:18
**leave** [4] - 35:2, 42:4,
64:5, 64:6
**leaving** [1] - 5:25
**lectern** [1] - 2:6
**led** [1] - 92:11
**Lee** [4] - 34:9, 35:5,
35:6, 51:6
**left** [3] - 28:13, 40:21,
71:8
**Legal** [1] - 102:21
**legal** [14] - 22:13,
67:25, 68:4, 70:23,
78:12, 80:18, 84:20,
84:24, 93:13, 95:24,
96:3, 96:9, 102:18,
103:12
**legislative** [2] - 45:4,
64:10
**legislator** [1] - 44:13
**legislature** [1] - 66:6
**legitimate** [2] - 67:14,
109:19
**legitimately** [1] -
87:18
**lengthy** [1] - 29:22
**less** [1] - 74:16
**letter** [1] - 55:21
**level** [1] - 57:16
**levels** [1] - 69:21
**liberal** [1] - 70:17
**liberty** [2] - 85:15,
97:9
**life** [2] - 5:16, 27:19
**life-threatening** [2] -
5:16, 27:19
**lifting** [1] - 6:1
**light** [4] - 37:13,
57:17, 62:13, 97:14
**lightly** [1] - 70:11
**likelihood** [8] - 9:6,
36:6, 73:20, 73:22,
74:2, 74:16, 74:22,
94:23
**likely** [18] - 52:6, 73:1,

73:2, 74:8, 78:8,
78:14, 78:18, 80:22,
83:1, 83:5, 89:23,
90:6, 92:20, 93:8,
94:6, 94:10, 94:19,
94:24
**limit** [2] - 23:11, 91:19
**limitation** [1] - 24:19
**limitations** [1] - 24:19
**limited** [2] - 22:11,
106:20
**limiting** [14] - 21:11,
21:17, 24:2, 51:16,
52:15, 52:16, 55:25,
56:22, 56:23, 56:24,
82:1, 82:2, 88:24
**limits** [3] - 92:7, 92:9,
100:4
**line** [3] - 4:6, 4:8,
19:14
**lines** [1] - 47:22
**list** [2] - 46:23, 67:2
**listed** [2] - 24:22, 68:5
**listen** [2] - 38:8, 58:14
**listening** [2] - 4:7,
72:13
**listing** [1] - 40:20
**lists** [4] - 17:13, 17:14,
46:17, 46:19
**litigant** [2] - 90:13,
91:5
**litigants** [1] - 90:17
**litigate** [1] - 20:8
**litigating** [2] - 84:16,
102:16
**litigation** [3] - 31:14,
75:23, 76:16, 76:17,
77:2, 77:7, 79:24,
91:8, 99:25
**live** [1] - 64:5
**livelihoods** [2] - 78:9,
103:7
**living** [2] - 52:3, 89:17
**LLC** [1] - 48:22
**LLP** [9] - 1:3, 2:3, 4:5,
48:21, 48:22, 71:15,
71:19, 107:22,
108:11
**LLP's** [1] - 3:25
**location** [1] - 16:10
**Logan** [1] - 83:9
**long-established** [1] -
80:14
**long-standing** [1] -
100:20
**look** [15] - 9:8, 19:10,
20:12, 21:4, 35:13,
35:15, 36:21, 40:9,
40:19, 51:11, 52:24,
61:22, 69:24, 99:23,

110:20
**looking** [8] - 7:6,
16:24, 31:20, 35:1,
41:1, 42:13, 106:23,
108:3
**looks** [2] - 58:20,
58:21
**Lopez** [2] - 93:1, 94:1
**lose** [1] - 93:8
**loss** [5] - 84:21, 95:5,
95:12, 99:8, 100:10
**losses** [1] - 100:2
**lost** [3] - 17:3, 70:4,
90:24
**love** [2] - 32:3, 68:9
**lucky** [1] - 28:22
**Luke** [1] - 2:3
**LUKE** [1] - 1:12
**luxury** [1] - 5:20

**M**

**ma'am** [2] - 3:9, 48:14
**machine** [1] - 1:24
**mail** [3] - 22:13, 23:1,
81:3
**Main** [3] - 1:14, 3:7,
3:8
**maintain** [2] - 28:18,
29:7
**maintained** [1] - 31:11
**major** [1] - 41:8
**Malley** [1] - 5:2
**man's** [1] - 64:6
**management** [1] -
81:18
**Management** [1] -
22:7
**managing** [1] - 5:2
**manner** [2] - 87:1,
111:10
**MANNING** [1] - 1:12
**Manning** [1] - 2:22
**manufactured** [1] -
32:5
**Manzo** [1] - 87:3
**March** [13] - 1:5, 4:4,
68:7, 68:17, 71:17,
100:6, 105:4, 111:13
**Marshals** [1] - 25:13
**mask** [1] - 82:16
**Massacre** [1] - 70:22
**massive** [3] - 69:4,
69:5, 69:6
**master** [1] - 59:16
**materially** [1] - 91:14
**Mathews** [1] - 87:2
**MATT** [1] - 1:13
**Matt** [1] - 2:23
**matter** [10] - 15:6,

28:17, 38:17, 45:16,
48:17, 59:9, 75:2,
86:4, 90:8, 98:19
**matters** [15] - 24:24,
26:22, 26:24, 27:3,
27:4, 27:5, 27:8,
38:25, 82:8, 90:10,
93:8, 97:16, 98:2,
98:10
**mayoral** [1] - 77:19
**Mayorkas** [1] - 72:21
**McCarthy** [2] - 65:24,
67:1
**McCloud** [1] - 2:23
**MCCLOUD** [1] - 1:12
**McGrath** [1] - 65:23,
87:5
**mean** [22] - 9:5, 16:2,
19:9, 19:17, 21:23,
25:23, 31:9, 41:23,
43:23, 45:1, 45:15,
46:3, 46:5, 46:15,
52:3, 52:9, 53:12,
62:15, 63:22, 65:7,
74:15, 89:9
**meaning** [6] - 7:16,
17:9, 42:8, 44:9,
64:20, 93:25
**meaningful** [1] - 87:1
**means** [14] - 6:3,
22:11, 23:12, 53:20,
56:9, 56:11, 56:12,
62:16, 67:25, 76:13,
80:19, 88:22, 89:3
**meant** [2] - 17:6,
45:25
**meanwhile** [1] - 101:9
**measurable** [1] -
100:15
**measure** [2] - 19:10,
45:3
**measures** [1] - 34:3,
35:22
**measuring** [1] - 26:17
**mechanism** [1] -
10:17
**Media** [1] - 75:9
**meet** [10] - 38:17,
38:19, 38:24, 55:8,
56:4, 58:13, 68:13,
70:10, 82:12, 87:8
**meet-and-confer** [1] -
58:13
**meeting** [8] - 28:4,
28:6, 55:20, 81:8,
84:5, 92:11, 92:13,
92:19
**meetings** [6] - 23:5,
23:7, 24:15, 57:7,
98:14

**meets** [1] - 84:14
**memorandum** [1] -
81:1
**mentioned** [6] - 21:24,
27:15, 60:4, 64:23,
68:23, 102:2
**mentions** [1] - 82:15
**mere** [1] - 87:12
**merely** [1] - 95:14
**merge** [1] - 73:10
**merger** [1] - 87:25
**merits** [14] - 36:7,
72:5, 73:1, 73:20,
73:22, 74:2, 74:8,
74:23, 78:15, 78:19,
83:1, 83:5, 94:6,
94:23
**met** [1] - 73:12
**mete** [1] - 70:5
**Mexican** [1] - 94:15
**MGU** [1] - 72:8
**mic** [1] - 2:21
**Michigan** [1] - 96:10
**might** [11] - 4:8, 15:17,
28:21, 32:24, 38:4,
40:15, 42:21, 48:4,
59:10, 60:11, 63:15
**millions** [1] - 100:3
**mind** [1] - 44:8
**mine** [1] - 105:9
**Mine** [2] - 72:22, 72:23
**minimal** [2] - 95:6,
95:13
**minimum** [1] - 89:5
**minute** [1] - 19:24
**minutes** [1] - 108:18
**missed** [2] - 7:9, 39:10
**Missouri** [1] - 92:2
**mistaken** [1] - 39:22
**MIZELLE** [101] - 1:17,
3:1, 3:7, 3:9, 3:11,
3:14, 3:18, 28:9,
28:21, 28:23, 29:11,
29:14, 30:6, 31:3,
31:21, 32:2, 32:20,
33:1, 33:14, 33:20,
34:7, 34:22, 36:4,
36:8, 36:18, 36:20,
36:23, 37:6, 37:10,
37:18, 38:22, 39:3,
41:2, 41:6, 41:25,
42:6, 42:11, 42:15,
43:22, 44:3, 44:11,
45:7, 45:10, 45:15,
45:23, 47:2, 47:11,
47:24, 48:14, 49:3,
49:7, 49:12, 49:16,
50:17, 50:19, 50:21,
51:5, 51:23, 52:3,
53:3, 53:12, 53:16,

53:24, 54:6, 54:16, 54:19, 54:24, 55:12, 55:15, 56:6, 56:14, 56:24, 57:4, 57:11, 57:15, 57:22, 57:24, 58:3, 58:5, 58:11, 59:9, 59:19, 59:25, 60:4, 60:20, 60:24, 61:1, 61:16, 61:19, 62:22, 105:21, 105:25, 106:14, 106:22, 108:15, 108:17, 109:2, 109:23, 110:10, 110:13, 110:18
**Mizelle** [8] - 3:2, 28:10, 29:7, 46:6, 55:23, 59:24, 61:10, 109:1
**model** [1] - 64:19
**monetarily** [1] - 44:23
**monetary** [6] - 26:5, 26:7, 26:9, 41:3, 99:5, 100:15
**moreover** [3] - 66:1, 84:23, 102:1
**morning** [1] - 20:18
**most** [11] - 6:9, 6:10, 16:15, 30:5, 55:7, 62:18, 67:4, 73:21, 88:2
**mother** [1] - 71:3
**motion** [3] - 3:25, 4:14, 4:19
**motivating** [1] - 79:3
**motive** [2] - 67:8, 67:13
**movant** [1] - 94:12
**movant's** [1] - 99:8
**move** [3] - 6:19, 42:13, 51:12
**moves** [1] - 71:15
**moving** [1] - 15:3
**MR** [172] - 2:8, 2:14, 2:16, 2:20, 2:22, 3:1, 3:7, 3:9, 3:11, 3:14, 3:18, 4:20, 5:2, 5:5, 5:8, 6:4, 6:8, 6:21, 6:25, 7:21, 8:6, 9:14, 9:17, 10:21, 10:23, 10:25, 11:15, 11:18, 12:9, 13:8, 13:14, 13:21, 13:25, 14:24, 15:5, 16:11, 17:22, 18:7, 19:6, 19:18, 19:21, 21:24, 22:2, 22:12, 22:19, 23:10, 23:24, 25:9, 25:15, 25:18, 25:20, 26:11, 28:8, 28:9, 28:21,

28:23, 29:11, 29:14, 30:6, 31:3, 31:21, 32:2, 32:20, 33:1, 33:14, 33:20, 34:7, 34:22, 36:4, 36:8, 36:18, 36:20, 36:23, 37:6, 37:10, 37:18, 38:22, 39:3, 41:2, 41:6, 41:25, 42:6, 42:11, 42:15, 43:22, 44:3, 44:11, 45:7, 45:10, 45:15, 45:23, 47:2, 47:11, 47:24, 48:14, 49:3, 49:7, 49:12, 49:16, 50:17, 50:19, 50:21, 51:5, 51:23, 52:3, 53:3, 53:12, 53:16, 53:24, 54:6, 54:16, 54:19, 54:24, 55:2, 55:12, 55:15, 56:6, 56:14, 56:24, 57:4, 57:11, 57:15, 57:22, 57:24, 58:3, 58:5, 58:11, 59:9, 59:19, 59:25, 60:4, 60:20, 60:24, 61:1, 61:16, 61:19, 62:22, 62:24, 63:13, 63:17, 63:25, 64:2, 65:3, 65:5, 65:8, 65:18, 70:9, 104:25, 105:15, 105:18, 105:21, 105:24, 105:25, 106:4, 106:10, 106:14, 106:22, 107:5, 107:9, 107:14, 108:2, 108:6, 108:15, 108:16, 108:17, 108:20, 109:2, 109:23, 110:10, 110:13, 110:16, 110:18
**Mueller** [1] - 32:13
**mulligan** [1] - 70:1
**multiple** [2] - 83:11, 94:19
**must** [10] - 2:16, 10:5, 10:7, 21:10, 33:18, 72:25, 74:17, 79:2, 94:12, 97:15

**N**

**n.3** [1] - 90:19
**NA** [1] - 25:22
**name** [4] - 4:10, 4:11, 4:17, 85:6
**namely** [2] - 31:4, 73:9
**narrow** [1] - 35:17

**narrowly** [4] - 35:24, 36:2, 80:23, 80:24
**nation** [1] - 76:9
**nation's** [10] - 7:17, 30:17, 33:8, 34:16, 35:7, 43:11, 46:1, 46:10, 62:1, 62:18
**national** [45] - 18:19, 18:22, 19:1, 19:2, 19:14, 19:21, 20:5, 20:13, 20:15, 21:2, 21:6, 21:13, 21:19, 22:8, 24:8, 30:25, 32:7, 34:24, 35:19, 45:24, 48:10, 49:8, 49:17, 49:20, 50:22, 51:1, 52:18, 52:22, 52:23, 56:15, 56:25, 57:17, 58:10, 60:7, 60:17, 61:22, 62:4, 62:10, 66:4, 81:19, 82:15, 85:11, 87:18, 89:1, 89:6
**National** [5] - 67:16, 67:18, 71:4, 72:6, 79:13
**nature** [3] - 75:12, 75:24, 99:2
**Navy** [1] - 71:5
**necessarily** [3] - 52:9, 55:16, 92:24
**necessary** [5] - 47:6, 47:8, 72:6, 75:17, 93:23
**need** [15] - 6:18, 21:5, 26:8, 30:23, 47:19, 50:23, 62:18, 74:2, 77:25, 86:21, 94:15, 104:9, 104:15, 107:4, 108:4
**needed** [3] - 26:15, 28:5, 93:22
**needs** [2] - 52:23, 61:23
**negative** [1] - 36:10
**negotiating** [1] - 84:6
**negotiation** [1] - 58:1
**negotiations** [4] - 58:7, 58:8, 91:24, 92:7
**never** [1] - 37:4
**New** [2] - 73:23, 101:18
**new** [5] - 40:13, 68:23, 108:15, 108:22, 109:4
**news** [1] - 102:7
**next** [7] - 48:17, 48:20, 59:1, 85:3, 104:6, 105:14, 106:11

**nice** [1] - 58:15
**NICHOLSON** [1] - 1:13
**Nicholson** [1] - 2:23
**Nielsen** [1] - 72:8
**night** [1] - 20:19
**nine** [1] - 74:13
**nobody** [4] - 32:17, 44:16, 55:19, 55:20
**noncompensable** [1] - 69:4
**none** [3] - 36:20, 36:24, 38:11
**nonetheless** [1] - 60:12
**nonlawyer** [1] - 22:15
**nonlawyers** [3] - 4:12, 34:6, 52:16
**nonmonetary** [1] - 100:5
**Nonprofits** [1] - 72:7
**nonspeculative** [1] - 38:2
**normally** [1] - 72:15
**note** [1] - 17:4
**noted** [1] - 79:21
**notes** [2] - 81:1, 111:5
**nothing** [1] - 23:10
**notice** [13] - 11:13, 11:18, 17:6, 17:17, 17:20, 17:23, 17:25, 18:1, 18:5, 18:9, 87:8, 88:3, 97:10
**noting** [1] - 85:18
**notion** [1] - 61:11
**notwithstanding** [1] - 99:20
**NRDC** [1] - 73:7
**nuanced** [1] - 60:6
**null** [1] - 111:8
**number** [9] - 7:14, 11:6, 20:23, 26:15, 26:16, 95:18, 98:5, 98:6, 108:12
**Numbered** [1] - 71:18
**numerous** [2] - 41:13, 97:13
**NW** [1] - 1:20

**O**

**o'clock** [1] - 7:10
**O'Donnell** [1] - 83:20
**oath** [1] - 25:2
**Obama** [1] - 74:3
**objection** [2] - 109:10, 110:15
**objectionable** [2] - 54:9, 110:6
**obligations** [1] -

103:16
**obtain** [2] - 26:9, 94:11
**obviously** [2] - 86:17, 105:2
**occurred** [1] - 96:22
**occurs** [1] - 99:1
**odious** [1] - 66:13
**OF** [3] - 1:1, 1:5, 1:7
**OFAC** [3] - 17:14, 46:17, 46:25
**OFAC-designation** [1] - 46:25
**offend** [1] - 87:13
**offered** [1] - 106:2
**office** [9] - 22:13, 24:4, 31:23, 36:17, 36:18, 59:15, 59:17, 80:1, 81:17
**Office** [13] - 1:19, 3:6, 3:12, 22:7, 27:5, 27:6, 27:13, 30:8, 54:23, 55:1, 55:7, 98:7, 101:23
**Officers** [1] - 67:17
**officers** [2] - 25:14, 110:1
**offices** [1] - 4:13
**Official** [1] - 1:23
**official** [16] - 21:11, 21:18, 24:2, 56:1, 66:8, 81:9, 81:16, 82:1, 82:3, 82:9, 88:13, 88:24, 91:20, 92:8, 94:3, 111:14
**officially** [1] - 66:2
**officials** [16] - 16:20, 21:22, 22:4, 38:24, 40:25, 57:6, 67:24, 75:3, 75:25, 79:11, 79:17, 81:14, 82:12, 86:1, 88:7, 98:11
**oftentimes** [1] - 77:25
**Ohio** [1] - 103:2
**old** [1] - 102:7
**OMB** [3] - 10:11, 22:24, 72:7
**once** [4] - 54:7, 99:1, 104:15, 107:12
**one** [65] - 8:20, 9:24, 10:1, 10:11, 12:11, 12:23, 13:1, 13:19, 15:10, 15:24, 16:9, 17:5, 19:15, 19:18, 20:13, 21:10, 24:13, 25:21, 25:24, 26:11, 26:15, 30:1, 36:5, 36:9, 38:16, 40:20, 42:1, 42:24, 43:15, 44:16, 52:23, 53:18,

53:22, 54:5, 55:14, 61:6, 63:3, 63:13, 64:18, 65:20, 67:14, 68:4, 69:14, 69:24, 70:23, 73:1, 73:10, 73:21, 74:23, 75:14, 77:12, 83:7, 83:16, 91:4, 91:12, 93:12, 104:25, 105:2, 107:7, 108:12, 109:5, 109:10, 109:11

one's [3] - 84:7, 90:4, 93:24

ongoing [3] - 42:2, 92:12, 96:22

open [2] - 45:13, 65:18

opened [1] - 104:11

opening [1] - 82:17

openly [1] - 58:15

operate [1] - 84:17

operates [1] - 102:19

operating [1] - 46:10

operation [2] - 92:1, 92:17

opinion [4] - 63:20, 63:23, 64:14, 79:3

opinions [1] - 71:5

opponent [1] - 76:21

opponents [2] - 76:15, 82:22, 103:25

opportunity [18] - 5:9, 7:11, 11:19, 18:10, 18:11, 18:12, 27:25, 28:25, 29:2, 86:25, 87:8, 87:10, 87:16, 87:25, 88:3, 97:10, 105:23, 106:3

opposed [3] - 13:16, 42:25, 43:9

opposing [1] - 73:8

option [1] - 17:11

order [182] - 3:25, 4:4, 4:10, 4:17, 5:12, 5:24, 7:5, 7:8, 7:13, 9:8, 9:22, 9:24, 10:15, 11:14, 12:2, 12:15, 12:20, 14:12, 14:17, 14:21, 15:17, 15:18, 17:3, 17:7, 17:16, 17:21, 18:4, 19:5, 19:22, 19:25, 20:4, 20:5, 20:22, 20:24, 29:19, 29:20, 29:21, 29:23, 31:1, 31:2, 32:1, 34:5, 35:10, 38:18, 40:11, 41:20, 42:5, 42:25, 44:1, 45:5, 46:11,

48:18, 48:20, 49:1, 50:1, 50:6, 50:10, 50:12, 54:15, 54:17, 54:20, 55:6, 55:9, 56:12, 58:13, 58:16, 59:2, 59:16, 61:15, 64:15, 64:21, 65:25, 66:17, 66:19, 66:21, 67:9, 71:7, 71:16, 73:14, 74:9, 75:1, 75:14, 75:15, 75:21, 76:3, 76:5, 76:8, 76:11, 76:12, 77:5, 77:22, 78:1, 78:5, 78:16, 78:20, 79:7, 79:12, 79:22, 80:3, 80:5, 80:9, 80:20, 80:23, 80:24, 81:2, 81:6, 81:14, 81:20, 81:25, 82:5, 82:11, 82:14, 82:15, 82:17, 82:18, 83:12, 83:25, 84:3, 84:18, 85:10, 85:25, 86:5, 86:14, 87:15, 87:23, 88:6, 88:23, 90:23, 91:19, 92:5, 93:16, 93:20, 95:18, 95:22, 95:25, 96:11, 96:16, 97:8, 97:14, 97:22, 98:15, 98:19, 98:24, 99:17, 99:20, 100:13, 100:17, 100:22, 101:20, 102:3, 102:6, 102:12, 103:10, 104:4, 104:5, 104:7, 104:8, 104:20, 104:22, 105:1, 105:5, 105:7, 105:11, 105:14, 106:7, 106:13, 106:15, 106:17, 106:18, 106:23, 106:25, 107:17, 107:18, 108:7, 108:21, 109:9, 109:18, 110:2, 110:4, 110:19

Order [21] - 4:2, 7:12, 71:17, 73:15, 73:18, 74:24, 75:12, 76:2, 79:16, 83:23, 86:22, 88:4, 89:10, 90:6, 91:13, 93:4, 93:19, 94:23, 99:11, 101:11, 110:9

order's [2] - 34:1, 97:20

ordered [1] - 75:25

orders [7] - 29:21, 30:5, 30:9, 45:21,

63:8, 65:13, 65:15

ordinary [3] - 99:5, 99:6, 110:3

organization [2] - 46:9, 87:11

organizations [1] - 87:7

originates [1] - 64:11

Orleans [1] - 73:24

otherwise [5] - 21:13, 24:10, 52:19, 70:25, 89:1

outcome [2] - 18:17, 19:3

outlawed [1] - 66:10

outlined [1] - 91:4

outlines [1] - 11:8

overall [2] - 34:2, 56:11

overbroad [2] - 22:24, 88:10

overthrow [4] - 60:15, 60:21, 61:7, 62:2

overturn [1] - 75:16

own [16] - 13:22, 14:20, 17:8, 17:16, 35:23, 40:24, 47:17, 48:6, 53:18, 61:5, 78:8, 90:4, 91:7, 103:19, 103:21, 104:21

owned [1] - 87:22

## P

p.m [3] - 1:5, 104:9, 110:23

page [4] - 64:4, 69:15, 81:1, 108:22

pages [2] - 40:20, 69:15

panel [1] - 5:21

papers [11] - 4:14, 7:10, 7:19, 12:17, 17:4, 19:13, 23:3, 28:5, 49:23, 69:20, 106:8

paperwork [1] - 36:22

paragraph [15] - 8:17, 11:8, 29:22, 29:23, 39:4, 40:5, 40:20, 41:1, 41:8, 92:14, 96:15, 98:4, 99:15, 109:24, 110:5

paragraphs [7] - 8:11, 41:4, 90:25, 108:15, 108:22, 109:4

pardon [1] - 10:23

part [4] - 9:3, 17:8, 34:19, 38:13

particular [7] - 7:6, 42:23, 49:8, 53:19, 54:5, 77:19, 78:21

parties [10] - 2:5, 14:12, 72:1, 74:18, 79:12, 84:20, 102:24, 103:4, 104:6, 104:20

Partisan [1] - 76:6

partisan [3] - 76:10, 80:6, 80:8

partisans [2] - 66:22

partner [1] - 5:3

partners [2] - 76:24, 101:12

parts [4] - 4:17, 17:10, 18:23

party [5] - 14:17, 14:25, 73:8, 91:8, 111:10

pass [1] - 67:12

passage [1] - 64:4

past [1] - 83:24

patent [2] - 27:1, 98:6

Patent [2] - 27:4, 98:7

Paterson [2] - 75:10, 77:14

pause [1] - 5:18

pauses [1] - 108:24

payback [1] - 101:25

penalize [1] - 44:23

pending [4] - 27:1, 72:20, 82:13, 98:6

Penson [1] - 103:2

people [26] - 4:7, 16:2, 17:13, 20:9, 22:4, 22:13, 22:14, 23:1, 24:15, 25:11, 33:24, 34:4, 35:20, 46:18, 48:15, 51:25, 53:21, 55:6, 55:7, 60:10, 60:11, 60:13, 68:9, 70:24, 103:12

per [1] - 69:8

perceived [7] - 31:17, 42:22, 75:8, 76:23, 77:12, 80:8, 80:12

percent [4] - 12:25, 39:3, 47:24, 51:2

perfectly [4] - 33:9, 43:1, 65:15, 80:10

perform [2] - 10:10, 99:19

performed [1] - 66:8

performing [2] - 93:5, 96:18

perhaps [4] - 13:16, 34:19, 60:18, 60:20

peril [3] - 77:14, 78:3, 78:8

period [1] - 65:10

periods [2] - 95:6, 95:13

PERKINS [1] - 1:3

Perkins [140] - 2:3, 2:10, 3:25, 4:5, 4:9, 4:10, 4:15, 4:21, 5:14, 9:20, 9:25, 10:3, 10:5, 10:6, 10:8, 10:9, 10:12, 10:13, 10:19, 11:13, 11:23, 12:2, 12:4, 12:5, 12:19, 12:21, 13:4, 13:13, 13:15, 13:16, 13:22, 14:3, 14:7, 14:13, 14:17, 16:5, 17:2, 17:17, 18:18, 20:23, 21:1, 21:12, 21:18, 22:5, 22:10, 22:15, 23:17, 24:3, 24:5, 25:1, 31:12, 31:16, 33:22, 33:24, 35:21, 35:22, 35:24, 38:17, 38:19, 40:23, 40:24, 41:19, 42:3, 43:8, 44:2, 44:5, 44:8, 48:17, 48:18, 48:21, 48:24, 49:25, 50:16, 51:19, 52:15, 53:21, 55:9, 55:10, 56:1, 56:10, 57:20, 59:3, 59:16, 61:14, 62:10, 68:16, 71:15, 71:18, 74:7, 75:15, 75:19, 75:22, 76:1, 76:6, 76:13, 77:4, 77:23, 78:13, 79:23, 80:5, 80:11, 81:7, 81:15, 81:23, 82:2, 82:4, 82:6, 82:12, 82:18, 85:4, 86:16, 88:9, 88:17, 88:25, 89:6, 90:8, 91:10, 91:15, 91:21, 92:6, 92:8, 92:9, 92:12, 93:4, 93:9, 93:13, 95:21, 98:15, 98:17, 99:1, 99:12, 101:12, 102:5, 102:7, 102:12, 107:22, 108:11, 109:15

permit [1] - 89:21

permitted [1] - 96:16

permitting [1] - 90:17

Perry [1] - 67:15

persists [1] - 42:5

person [16] - 3:15, 44:16, 44:22, 46:22, 50:22, 56:4, 68:12,

81:6, 91:5, 91:6,
107:21, 107:23,
108:10, 108:12,
109:14, 109:16
**personal** [6] - 16:3,
42:16, 48:7, 101:15,
101:16, 101:24
**personally** [2] - 43:10,
57:11
**personnel** [3] - 62:17,
81:3, 81:18
**Personnel** [2] - 22:7,
88:17
**persons** [1] - 91:14
**perspective** [8] -
31:20, 32:24, 33:12,
33:14, 33:15, 33:21,
79:4
**persuasion** [1] - 80:19
**petition** [6] - 36:1,
66:19, 69:10, 85:16,
85:19, 85:22
**petitioning** [1] - 97:1
**phone** [1] - 55:21
**photocopied** [1] -
111:9
**phrase** [3] - 19:14,
21:15, 30:25
**pick** [3] - 28:12, 41:17
**picked** [1] - 6:8
**place** [1] - 12:15
**placed** [1] - 18:2
**places** [1] - 83:23
**plain** [4] - 79:15,
79:21, 82:20, 92:5
**plaintiff** [64] - 4:15,
11:20, 11:23, 12:3,
13:2, 13:4, 43:18,
45:13, 57:6, 71:15,
72:25, 73:1, 73:2,
73:12, 73:20, 74:1,
74:13, 74:22, 74:25,
78:14, 78:18, 79:17,
81:1, 82:25, 83:4,
83:8, 83:11, 83:20,
84:14, 84:19, 85:5,
85:10, 85:15, 85:23,
86:2, 86:6, 86:8,
86:14, 86:22, 87:15,
87:16, 88:1, 88:5,
88:16, 89:23, 90:21,
91:2, 93:18, 94:5,
94:10, 94:18, 94:22,
95:14, 97:14, 97:19,
97:23, 98:5, 98:15,
98:18, 100:2,
100:12, 100:17,
101:5, 106:24
**Plaintiff** [4] - 1:3, 3:24,
74:7, 81:23

**plaintiff's** [35] - 2:7,
4:19, 12:7, 17:18,
29:16, 36:9, 37:19,
52:12, 74:19, 74:20,
84:1, 84:10, 84:13,
84:22, 84:23, 91:22,
93:12, 94:24, 95:2,
95:19, 96:25, 97:9,
97:15, 97:20, 98:2,
98:21, 99:13, 99:16,
99:18, 100:7,
100:22, 101:6,
104:11, 106:16
**plaintiffs** [9] - 4:18,
34:11, 38:2, 45:8,
51:10, 52:4, 58:20,
74:7, 87:19
**PLAINTIFFS** [1] - 1:10
**plane** [2] - 36:14,
36:19
**planning** [2] - 53:6,
106:6
**play** [1] - 29:7
**played** [1] - 33:10
**plays** [1] - 43:11
**plea** [2] - 58:7, 92:15
**pleasing** [1] - 96:19
**plus** [1] - 52:11
**point** [18] - 8:22, 14:8,
17:6, 18:16, 19:18,
21:2, 23:24, 25:20,
39:18, 52:5, 58:19,
59:21, 66:14, 66:25,
68:4, 69:13, 69:20,
90:17
**pointed** [1] - 93:12
**pointing** [1] - 59:14
**points** [1] - 60:1
**policies** [1] - 18:20
**policy** [1] - 77:18
**political** [16] - 42:18,
70:16, 76:14, 76:20,
77:6, 77:24, 78:6,
78:7, 80:13, 81:13,
82:22, 101:25,
103:9, 103:25, 104:1
**popular** [2] - 71:13,
75:17
**portion** [3] - 12:21,
70:5, 98:2
**portions** [1] - 84:21
**poses** [4] - 50:22,
62:10, 99:11, 99:17
**position** [4] - 46:9,
47:23, 47:24, 100:24
**positions** [3] - 77:2,
77:6, 77:7
**possess** [1] - 16:3
**possible** [6] - 50:12,
52:2, 52:5, 53:17,

63:1, 64:9
**post** [8] - 24:4, 27:2,
36:17, 36:18, 59:15,
59:17, 68:8, 104:5
**post-grant** [1] - 27:2
**postal** [1] - 59:16
**potential** [7] - 12:12,
16:10, 24:19, 26:17,
52:9, 57:23, 102:13
**potentially** [1] - 42:4
**power** [16] - 46:15,
46:25, 47:5, 47:16,
47:22, 47:25, 48:19,
48:23, 49:6, 50:13,
50:20, 64:10, 66:11,
80:13, 103:9, 103:23
**powerful** [1] - 103:1
**powers** [2] - 69:24,
78:8
**practical** [1] - 98:19
**practice** [19] - 11:24,
12:7, 12:8, 12:21,
24:19, 25:25, 27:9,
59:6, 83:24, 84:9,
84:15, 84:17, 84:22,
96:8, 97:17, 98:8,
99:13, 99:16, 103:16
**practices** [2] - 66:12,
102:8
**practicing** [2] - 12:5,
84:4
**preceded** [1] - 72:20
**precedent** [2] - 34:18,
80:15
**preceding** [1] - 109:24
**precisely** [3] - 7:25,
9:9, 86:21
**precluding** [1] - 83:19
**predetermined** [1] -
19:5
**prefer** [1] - 6:21
**preferred** [2] - 79:8,
103:20
**preliminary** [5] - 6:12,
6:19, 71:21, 72:12,
104:12
**premature** [3] - 23:19,
51:22, 51:23
**prepared** [2] - 29:11,
66:2
**prerogative** [6] - 35:5,
48:1, 48:3, 51:2,
51:6, 61:4
**present** [6] - 12:13,
66:7, 70:15, 94:15,
103:1, 105:25
**preserve** [1] - 72:4
**President** [59] - 4:3,
20:3, 20:9, 20:21,
30:14, 30:18, 31:8,

32:8, 33:2, 35:9,
42:20, 43:10, 43:20,
45:18, 46:8, 46:16,
46:24, 47:6, 47:8,
47:13, 47:14, 47:21,
47:25, 48:1, 48:8,
48:19, 48:25, 49:3,
49:5, 49:22, 50:14,
50:19, 50:21, 62:8,
62:20, 63:5, 63:8,
63:23, 64:3, 64:11,
65:1, 66:20, 70:3,
71:2, 71:17, 76:15,
76:16, 76:21, 77:1,
81:12, 96:3, 96:4,
96:7, 96:13, 96:19,
101:15, 101:21,
103:6, 103:19
**President's** [16] -
33:14, 33:15, 33:21,
35:4, 48:23, 50:13,
50:20, 51:2, 53:5,
76:14, 76:18, 77:6,
82:22, 85:13, 104:3
**presidential** [2] -
76:22, 101:13
**Presidents** [4] - 45:20,
45:24, 70:6
**press** [2] - 7:2, 85:21
**presumes** [1] - 102:20
**pretext** [7] - 19:25,
20:17, 21:3, 24:10
**pretty** [3] - 26:21,
46:15, 106:20
**prevent** [8] - 9:12,
47:6, 47:8, 47:13,
47:14, 93:10, 93:20,
96:2
**preventing** [5] - 82:22,
84:4, 87:24, 92:18,
93:22
**prevents** [1] - 93:5
**previously** [2] - 77:10,
101:8
**principle** [4] - 46:2,
67:18, 94:5
**principles** [3] - 5:13,
62:7, 65:21
**priorities** [1] - 11:5
**private** [7] - 14:12,
14:20, 62:19, 70:4,
79:12, 84:20, 86:7,
86:14
**privilege** [1] - 30:7
**pro** [3] - 60:13, 78:1
**pro-ISIS** [1] - 60:13
**pro-terrorist** [1] -
60:13
**probe** [1] - 40:1
**problem** [6] - 18:15,

23:21, 27:17, 43:3,
88:6, 104:7
**problems** [1] - 38:23
**procedure** [2] - 15:20,
15:21
**procedures** [8] -
12:10, 12:12, 12:13,
13:3, 14:3, 16:25,
18:13
**proceed** [1] - 29:12
**proceeding** [3] - 5:14,
108:24, 110:23
**proceedings** [4] -
8:25, 27:2, 27:3,
111:6
**Proceedings** [1] -
1:24
**Process** [4] - 13:10,
16:16, 17:20, 18:6
**process** [46] - 8:17,
8:22, 11:5, 11:6,
11:11, 11:19, 13:5,
13:7, 13:19, 14:2,
14:7, 14:19, 14:23,
15:3, 15:22, 17:6,
18:10, 22:17, 34:10,
37:20, 45:4, 46:18,
46:20, 69:11, 74:20,
83:5, 83:7, 83:9,
85:9, 86:20, 86:22,
86:23, 86:25, 87:14,
87:19, 87:22, 88:1,
88:6, 89:13, 89:20,
97:3, 97:4, 97:7,
97:12, 97:21, 106:6
**proclaimed** [1] - 66:2
**produce** [1] - 47:17
**produced** [1] - 1:25
**Product** [1] - 100:25
**profession** [10] -
11:24, 26:1, 70:23,
78:12, 83:15, 83:17,
84:8, 95:24, 96:9,
97:18
**professional** [4] -
24:17, 71:1, 88:12,
103:16
**Professional** [2] -
15:13, 24:17
**Professor** [1] - 93:17
**professor** [1] - 96:8
**programs** [1] - 3:10
**prohibit** [1] - 12:5
**prohibition** [2] -
43:19, 75:7
**prohibitions** [1] -
88:14
**prohibits** [2] - 67:23,
75:2
**prominent** [1] - 4:11

**promise** [2] - 103:4, 103:6
**promised** [1] - 20:22
**promote** [1] - 5:13
**prong** [1] - 86:20
**proper** [2] - 29:2, 54:10
**property** [7] - 13:5, 13:10, 86:1, 86:3, 86:6, 86:13, 97:9
**proportions** [1] - 95:23
**proposal** [1] - 104:10
**propose** [1] - 106:1
**proposed** [7] - 9:8, 9:22, 105:11, 106:13, 106:15, 106:23, 110:20
**propter** [1] - 68:8
**prosecution** [1] - 58:4
**prosecutor** [1] - 38:16
**prosecutors** [2] - 23:6, 84:6
**prospective** [2] - 12:12, 17:23
**protect** [6] - 20:5, 45:24, 76:9, 76:21, 91:11, 103:15
**protected** [14] - 13:10, 16:16, 60:12, 74:25, 75:5, 77:13, 78:2, 78:10, 78:17, 80:21, 83:2, 83:8, 83:11, 83:13
**protecting** [3] - 31:17, 31:18, 31:19
**protection** [5] - 15:23, 34:12, 51:9, 69:13, 88:2
**protection-type** [1] - 51:9
**protections** [2] - 76:25, 77:9
**protects** [3] - 85:22, 89:25, 103:22
**prove** [2] - 69:9, 80:22
**proven** [1] - 32:9
**provide** [11] - 17:23, 17:24, 18:1, 21:11, 21:17, 24:1, 55:25, 91:22, 92:21, 93:15, 106:10
**provided** [3] - 4:6, 26:3
**providing** [1] - 77:20
**provision** [3] - 20:13, 34:24, 88:17
**provisions** [5] - 6:11, 8:13, 31:3, 44:1, 88:8

**prudential** [3] - 90:15, 91:1, 91:9
**PRUSKI** [1] - 1:13
**Pruski** [1] - 2:23
**PTAP** [1] - 27:2
**public** [14] - 4:6, 4:8, 19:8, 20:10, 61:2, 73:5, 73:10, 79:8, 81:11, 82:23, 98:22, 101:3, 102:10, 103:14
**punish** [6] - 79:12, 79:18, 80:15, 81:20, 82:18, 96:5
**punishes** [1] - 81:2
**punishing** [4] - 71:2, 77:23, 82:22, 96:14
**punishment** [2] - 70:5, 89:11
**punitive** [12] - 34:2, 35:22, 44:1, 44:3, 44:4, 44:9, 45:3, 69:23, 70:5, 75:24, 79:18, 102:12
**purchases** [1] - 47:19
**pure** [1] - 45:15
**purports** [1] - 20:12
**purpose** [7] - 7:13, 8:17, 11:8, 19:7, 19:23, 20:12, 21:4, 24:13, 29:6, 31:17, 31:23, 34:2, 49:1, 71:24, 72:4, 84:22, 99:22
**Purpose** [1] - 30:1
**purposes** [7] - 5:14, 7:25, 32:1, 35:18, 55:5, 73:17, 95:1
**pursuant** [3] - 7:4, 105:6, 110:9
**pursue** [4] - 84:7, 84:19, 101:16, 101:24
**pursuing** [1] - 83:20
**push** [1] - 15:17
**put** [7] - 38:9, 40:13, 46:22, 55:10, 58:20, 58:21, 85:4
**putting** [2] - 35:23, 67:1
**puzzled** [1] - 9:13

**Q**

**qualifications** [1] - 15:12
**qualifier** [1] - 56:19
**qualify** [2] - 26:5, 26:7
**quality** [1] - 66:3
**quarter** [2] - 40:17,

71:4
**Queen** [2] - 89:14, 89:15
**questions** [6] - 24:9, 29:13, 42:4, 61:6, 90:13, 109:21
**quick** [1] - 45:8
**quickly** [1] - 26:21
**quintessential** [2] - 16:15, 66:23
**quite** [1] - 55:10
**quo** [4] - 28:18, 29:8, 72:4, 72:19
**quote** [7] - 7:15, 77:12, 78:1, 79:6, 79:11, 83:19, 91:19
**quoting** [3] - 73:6, 87:3, 96:6

**R**

**race** [1] - 77:19
**raise** [1] - 14:8
**raised** [3] - 16:1, 40:21, 41:7
**raising** [1] - 42:4
**Ralls** [1] - 87:20
**Ramirez** [1] - 73:5
**rapid** [1] - 50:1
**rather** [2] - 14:21, 84:9
**rational** [2] - 18:12, 67:11
**rationale** [2] - 79:4, 80:9
**reach** [1] - 104:21
**reached** [1] - 105:3
**reaching** [1] - 12:17
**read** [19] - 7:11, 22:10, 22:18, 22:20, 23:3, 24:1, 32:13, 38:15, 38:23, 55:12, 55:15, 56:17, 57:5, 57:10, 57:15, 58:16, 66:19, 66:20, 108:18
**reading** [4] - 47:2, 49:23, 57:12, 60:25
**reads** [2] - 57:6, 57:9
**reaffirmed** [1] - 79:10
**real** [8] - 23:4, 23:20, 38:11, 38:12, 39:2, 40:22, 68:19, 84:13
**real-word** [1] - 23:4
**real-world** [2] - 39:2, 40:22
**reality** [1] - 89:17
**really** [15] - 4:9, 16:7, 25:21, 28:6, 30:23, 38:9, 40:5, 43:12, 49:12, 49:16, 49:21, 50:4, 58:18

**reason** [5] - 6:8, 20:2, 34:19, 39:7, 104:13
**reasoning** [1] - 47:11
**reasons** [7] - 26:11, 39:21, 41:13, 41:17, 44:22, 82:25, 98:16
**rebut** [2] - 17:10, 87:25
**received** [1] - 106:18
**receiving** [1] - 93:10
**recipient** [1] - 109:7
**recognition** [1] - 67:21
**recognize** [1] - 71:9
**recognized** [3] - 47:15, 91:24, 100:9
**recommendation** [1] - 64:9
**reconciled** [1] - 67:5
**reconsider** [1] - 97:15
**record** [4] - 2:6, 2:19, 11:13, 72:16
**recourse** [1] - 85:24
**recover** [1] - 26:13
**Rector** [1] - 78:24
**redress** [1] - 85:23
**redressability** [3] - 41:10, 41:24, 43:3
**reducing** [1] - 84:10
**redundant** [1] - 110:6
**referring** [1] - 31:16
**refers** [1] - 88:24
**reflected** [2] - 33:12, 88:3
**refrain** [2] - 77:20, 81:15
**Refugee** [2] - 65:23, 87:4
**refused** [1] - 82:12
**refusing** [1] - 95:19
**regardless** [3] - 43:11, 59:9, 77:1
**Register** [1] - 4:3
**regularly** [1] - 27:13
**regulating** [1] - 79:2
**regulations** [2] - 29:25
**regulators** [1] - 84:5
**rejected** [1] - 34:10
**related** [11] - 2:16, 10:3, 28:14, 31:25, 34:14, 49:19, 82:13, 92:16, 98:22, 99:25, 109:17
**relates** [1] - 40:3
**relating** [3] - 31:10, 32:4, 37:19
**relation** [1] - 14:6
**relationship** [12] - 13:9, 14:14, 15:15, 17:2, 68:16, 91:5,

91:12, 98:17, 107:22, 108:11, 109:15, 110:9
**relationships** [9] - 11:3, 12:18, 13:5, 14:13, 42:22, 68:21, 86:3, 86:15, 100:1
**release** [1] - 18:4
**relevant** [3] - 14:1, 33:3, 33:5
**relief** [8] - 9:15, 26:10, 73:23, 80:21, 94:15, 94:20, 97:7, 100:5
**relies** [1] - 98:8
**rely** [1] - 26:8
**relying** [3] - 26:9, 30:24, 67:24
**remain** [1] - 96:17
**remaining** [1] - 74:3
**remanded** [1] - 104:16
**remediation** [1] - 94:14
**remedy** [1] - 6:10
**remind** [2] - 55:18, 55:19
**removed** [1] - 13:19
**repeat** [1] - 107:24
**reply** [2] - 28:4
**report** [2] - 32:13, 105:4
**reported** [1] - 1:24
**reporter** [1] - 108:3
**Reporter** [3] - 1:23, 1:23, 111:14
**reporting** [1] - 81:22
**reports** [1] - 62:12
**represent** [8] - 14:21, 20:7, 39:13, 55:11, 70:24, 93:1, 93:23, 103:17
**representation** [6] - 50:15, 54:14, 77:3, 80:6, 93:6, 102:25
**representations** [2] - 93:14, 98:21
**representative** [1] - 4:24
**representatives** [1] - 4:23
**represented** [4] - 70:21, 91:15, 98:14, 98:20
**representing** [11] - 33:18, 48:18, 57:13, 57:21, 76:13, 76:15, 76:17, 92:19, 96:2, 103:8, 103:25
**represents** [2] - 40:17, 64:12, 98:5
**reprisal** [1] - 85:3

republic [1] - 46:2
Republican [1] - 70:16
reputation [5] - 85:6,
85:14, 93:21,
100:14, 100:23
reputational [3] -
69:17, 81:4, 90:24
reputations [2] -
42:17, 85:2
request [4] - 28:25,
71:21, 109:7, 109:8
require [8] - 10:1,
14:12, 82:8, 92:25,
93:13, 97:16, 98:2,
105:3
required [6] - 19:4,
22:4, 58:17, 61:25,
68:17, 92:16
requirement [3] -
81:22, 86:25, 90:15
requires [9] - 21:8,
22:23, 51:16, 52:14,
70:24, 82:1, 97:24,
98:24, 99:16
requiring [5] - 31:15,
75:18, 79:25, 86:15,
98:10
rescheduled [2] -
23:7, 92:13
rescind [1] - 105:7
rescinded [1] - 109:8
Resins [1] - 94:16
resolved [1] - 102:6
resources [1] - 101:22
respect [14] - 10:14,
14:24, 14:25, 17:25,
30:12, 41:12, 48:10,
50:7, 50:8, 61:3,
62:17, 99:5, 105:11,
109:4
respected [2] - 4:11,
71:13
respectfully [4] - 14:1,
28:25, 47:3, 55:18
respond [4] - 28:3,
29:13, 63:2, 107:5
response [4] - 23:22,
23:24, 29:2, 107:9
Responsibility [2] -
15:13, 24:18
responsibility [1] -
71:1
responsible [1] - 7:17
restrained [1] - 95:24
restraining [3] - 3:25,
71:16, 73:14
restrict [1] - 84:1
restriction [4] - 18:8,
25:24, 45:17, 79:5
restrictions [7] -

16:25, 18:2, 21:5,
76:7, 90:4, 93:15,
100:18
restricts [1] - 85:25
resulted [3] - 95:18,
98:1, 100:19
results [2] - 76:16,
77:4
retainer [1] - 14:6
retaliate [3] - 20:23,
20:25, 64:21
retaliated [1] - 78:11
retaliates [2] - 74:24,
78:16
retaliating [1] - 76:13
retaliation [4] - 66:18,
67:6, 78:9, 83:2
retaliatory [6] - 19:25,
75:4, 75:7, 75:12,
76:5, 77:8
retribution [2] -
102:15, 103:8
revenue [2] - 12:25,
40:18, 100:2
review [5] - 10:5,
11:21, 62:15, 74:17,
86:15
reviewable [2] - 35:5,
35:6
reviewed [1] - 19:7
revocation [2] - 34:14,
50:23
Richard [1] - 3:3
RICHARD [1] - 1:18
Rifle [2] - 67:18, 79:13
right-to-counsel [1] -
16:1
rights [34] - 31:17,
31:18, 31:19, 36:1,
36:2, 46:19, 59:5,
60:9, 60:10, 61:9,
66:18, 69:10, 69:11,
69:12, 76:21, 87:17,
89:22, 90:7, 90:12,
91:5, 91:7, 91:11,
91:16, 92:23, 94:25,
95:2, 95:16, 97:3,
97:4, 97:7, 97:21,
101:8
ripe [4] - 36:11, 37:1,
59:20, 59:23
risk [13] - 14:5, 14:15,
19:3, 27:22, 40:14,
48:10, 49:8, 50:22,
59:1, 62:10, 81:7,
99:11, 99:18
Risk [1] - 48:21
Risks [6] - 4:5, 48:21,
50:13, 59:2, 59:3,
71:18

risks [1] - 59:5
Roadway [1] - 86:12
Robert [2] - 96:6, 99:2
robust [2] - 65:18,
84:15
Rockford [1] - 88:15
role [2] - 58:24, 96:18
Roman [1] - 95:7
room [3] - 3:20, 23:1,
81:3
root [1] - 93:25
Rosenberger [2] -
78:23, 79:5
Roy [1] - 93:17
RPR [3] - 1:23, 111:3,
111:14
rule [2] - 5:13, 22:22,
25:24
Rules [2] - 15:12,
24:17
rules [4] - 16:22, 17:9,
24:17, 93:13
ruling [2] - 47:4, 71:14
runs [1] - 77:8
Russia [2] - 32:9,
49:19
Russian [1] - 32:18
RYAN [1] - 1:11
Ryan [2] - 2:20, 2:22

                 S

Safety [1] - 100:25
sanctions [3] - 47:13,
67:25, 80:19
satisfies [1] - 27:23
satisfy [4] - 35:16,
73:12, 74:10, 90:14
say-so [2] - 85:13,
87:12
Scarborough [2] -
2:20, 2:22
SCARBOROUGH [1] -
1:11
scattered [1] - 30:25
schedule [2] - 104:14,
110:21
scheduling [3] -
104:10, 104:20,
104:22
School [2] - 93:17,
96:10
scope [2] - 82:5,
106:19
scrutiny [2] - 35:16,
61:21
se [1] - 69:8
seated [1] - 3:22
seats [2] - 3:21, 6:17
SEC [2] - 27:9, 27:14

second [9] - 40:9,
41:9, 43:23, 46:5,
69:5, 86:20, 90:15,
94:8, 109:5
seconds [1] - 107:12
secret [1] - 35:8
secretaries [1] - 23:1
secrets [8] - 7:17,
30:17, 33:8, 34:16,
43:11, 46:2, 62:1,
62:19
Section [59] - 5:25,
6:2, 6:5, 7:13, 8:2,
8:4, 8:6, 8:21, 8:23,
9:3, 9:9, 9:10, 9:17,
9:19, 9:23, 12:1,
13:2, 16:4, 16:12,
16:19, 17:25, 18:18,
19:5, 19:11, 20:12,
21:7, 21:9, 23:9,
24:13, 31:7, 34:20,
34:25, 35:1, 35:2,
43:4, 43:11, 47:9,
48:25, 51:12, 51:15,
52:14, 67:9, 69:18,
75:14, 75:21, 76:8,
81:5, 81:6, 81:25,
86:4, 88:8, 88:9,
88:17, 88:23, 91:18,
102:5, 105:11
section [16] - 6:4, 7:6,
7:8, 13:18, 23:16,
29:17, 29:19, 39:6,
76:1
Sections [14] - 5:25,
6:7, 18:23, 31:4,
35:11, 43:16, 43:19,
71:16, 73:15, 89:20,
102:11, 106:20,
110:2
sections [10] - 6:9,
8:3, 9:11, 23:9, 34:5,
65:11, 73:18, 104:4,
105:6, 110:3
Security [1] - 27:11
security [59] - 6:1, 7:2,
7:4, 18:22, 19:1,
19:2, 19:14, 19:22,
20:5, 20:13, 20:15,
21:3, 21:6, 21:13,
21:19, 22:8, 24:8,
25:11, 25:13, 30:25,
32:7, 34:14, 34:21,
34:24, 35:19, 45:24,
47:7, 47:12, 48:10,
49:8, 49:17, 49:20,
50:22, 50:24, 51:1,
52:18, 52:23, 52:24,
54:1, 54:2, 56:15,
56:25, 57:18, 58:10,

60:7, 60:17, 61:5,
61:11, 61:22, 62:4,
62:10, 62:15, 81:19,
82:16, 85:11, 87:18,
89:1, 89:6
see [69] - 8:2, 8:3,
9:22, 21:4, 41:8,
41:9, 42:1, 63:22,
71:12, 71:22, 72:6,
72:20, 73:5, 73:10,
73:23, 74:3, 75:5,
75:8, 77:21, 78:23,
79:5, 79:8, 79:13,
80:16, 80:17, 83:9,
83:15, 83:20, 84:11,
85:6, 85:17, 86:8,
87:2, 87:4, 87:19,
88:14, 89:19, 90:2,
90:4, 90:18, 90:24,
91:8, 92:2, 92:14,
92:18, 93:1, 93:16,
94:1, 94:4, 94:15,
95:7, 95:8, 96:14,
96:22, 97:5, 98:3,
99:2, 99:9, 99:14,
100:5, 100:16,
100:24, 101:18,
102:21, 103:2,
104:12, 104:15,
106:12
seeing [2] - 30:8,
30:10
seek [5] - 12:3, 12:4,
70:13, 81:10, 85:24
seeking [8] - 4:16,
5:24, 8:1, 8:3, 9:2,
9:16, 51:10, 76:16
seeks [1] - 90:11
sees [1] - 46:25
select [1] - 93:24
semblance [1] - 97:12
send [1] - 54:20
sends [1] - 46:7
SENIOR [1] - 1:8
sense [1] - 44:3
sensitive [1] - 50:25
sent [1] - 54:25
sentence [4] - 31:10,
32:4, 40:10, 89:16
separate [3] - 4:12,
12:10, 88:5
separation [1] - 69:24
series [4] - 8:23,
36:12, 36:13, 52:8
serious [2] - 19:8,
20:10
seriously [1] - 84:9
Service [1] - 25:13
service [3] - 7:15,
10:10, 81:11

**JA 209**

**Services** [2] - 25:10, 102:21
**services** [1] - 11:23
**set** [7] - 6:11, 12:10, 16:4, 17:9, 53:22, 88:18
**sets** [1] - 16:24
**sever** [1] - 14:5
**several** [3] - 8:13, 48:14, 91:4
**severe** [2] - 100:18, 101:6
**shall** [3] - 24:1, 55:25, 111:8
**Shannon** [1] - 4:24
**share** [1] - 105:22
**sheet** [8] - 20:25, 24:12, 69:19, 76:3, 76:4, 76:6, 80:4, 82:17
**Sheet** [1] - 63:17
**shied** [1] - 96:13
**short** [3] - 65:10, 82:5, 89:10
**shorthand** [1] - 1:24
**shortly** [1] - 104:5
**show** [4] - 26:8, 35:25, 36:6, 72:25
**showed** [1] - 95:15
**showing** [5] - 7:15, 35:16, 64:17, 73:21, 94:18
**shown** [11] - 74:1, 74:7, 74:22, 78:14, 78:18, 82:25, 83:4, 89:23, 94:10, 94:22, 97:19
**shows** [2] - 58:23, 59:22
**sic** [1] - 25:22
**side** [4] - 41:16, 42:16, 55:14, 71:24
**side's** [1] - 40:7
**sidelines** [1] - 78:11
**sides** [3] - 28:20, 102:25, 103:2
**signal** [1] - 108:4
**signatory** [1] - 111:10
**significant** [3] - 98:1, 101:7, 102:8
**significantly** [1] - 103:11
**Simms** [1] - 96:22
**Simon** [1] - 93:17
**simple** [1] - 82:20
**simply** [4] - 12:6, 14:21, 40:17, 82:16
**Singh** [1] - 94:20
**single** [5] - 32:11, 39:12, 39:18, 43:1,

70:25
**singled** [2] - 69:14, 89:11
**singled-out** [1] - 89:11
**singles** [2] - 15:21, 93:4
**Singleton** [1] - 90:19
**sit** [3] - 5:20, 25:1, 36:13
**sitting** [3] - 5:21, 52:11, 101:23
**situation** [7] - 12:16, 41:5, 42:5, 48:4, 51:25, 57:20, 67:1
**Sixth** [18] - 15:4, 15:5, 15:22, 15:25, 69:11, 74:21, 86:11, 89:24, 89:25, 90:9, 91:2, 91:11, 91:17, 92:22, 94:1, 94:6, 94:24, 97:22
**skill** [2] - 16:4, 16:10
**slam** [1] - 69:15
**slightly** [1] - 75:22
**slowly** [2] - 107:25, 108:4
**smacks** [1] - 67:3
**snow** [1] - 20:19
**snowed** [1] - 20:19
**snowstorm** [1] - 20:20
**so..** [1] - 57:14
**society** [2] - 67:4, 67:23
**soldiers** [1] - 70:21
**sole** [3] - 48:1, 50:21, 84:22
**solely** [1] - 85:13
**solid** [1] - 15:6
**solve** [2] - 110:10, 110:13
**solvency** [3] - 40:13, 40:15, 99:18
**someone** [3] - 59:19, 62:2, 85:8
**sometimes** [2] - 29:22, 87:24
**somewhat** [2] - 8:16, 57:12
**somewhere** [1] - 39:10
**sophisticated** [1] - 15:14
**Soros** [1] - 75:16
**Sorrell** [1] - 79:8
**sorry** [5] - 3:11, 6:5, 43:7, 64:2, 72:13
**sort** [13] - 13:23, 17:7, 17:8, 31:10, 43:4, 43:16, 48:5, 48:6, 51:8, 52:8, 62:3,

65:15
**Sotomayor** [1] - 67:19
**source** [2] - 31:1
**Southern** [3] - 49:25, 101:17, 101:19
**sovereign** [2] - 100:4, 100:8
**spades** [1] - 70:15
**speaker** [1] - 79:4
**speakers** [1] - 78:22
**special** [5] - 13:3, 16:5, 22:16, 91:12, 96:9
**Special** [1] - 32:10
**specialization** [1] - 84:15
**Specialty** [1] - 94:15
**specific** [10] - 9:25, 30:3, 30:12, 31:3, 31:6, 38:5, 54:11, 55:24, 79:3
**specifically** [1] - 88:8
**speculate** [1] - 53:5
**speculating** [1] - 59:22
**speculation** [1] - 40:10
**speculative** [6] - 28:15, 52:7, 52:9, 58:23, 59:13, 68:6
**speculativeness** [1] - 58:25
**speech** [16] - 20:1, 33:6, 36:2, 60:11, 61:11, 66:19, 67:21, 68:1, 69:11, 74:25, 75:5, 77:16, 79:2, 79:7, 85:21, 97:2
**spell** [1] - 27:20
**spent** [2] - 69:15, 71:4
**spine** [1] - 46:8
**spirit** [1] - 55:5
**spoken** [1] - 79:6
**sprinkled** [2] - 19:22, 24:8
**squarely** [1] - 76:25
**staff** [2] - 81:3, 110:1
**staffing** [1] - 42:20
**stage** [1] - 9:6
**stand** [3] - 23:15, 23:16, 65:16
**standard** [4] - 26:16, 27:23, 74:11, 84:14
**standing** [7] - 14:9, 15:6, 69:12, 90:8, 90:11, 91:10, 100:20
**standpoints** [1] - 11:7
**stands** [2] - 17:7, 53:15
**start** [5] - 2:7, 4:22,

29:22, 73:19, 74:19
**started** [1] - 68:14
**starting** [1] - 31:9
**starts** [1] - 30:1
**state** [6] - 18:13, 35:19, 66:5, 67:10, 79:7, 80:24
**State** [1] - 27:11
**statement** [3] - 13:25, 32:6, 40:7
**statements** [4] - 29:3, 31:6, 66:20, 103:1
**States** [37] - 2:3, 3:2, 8:15, 8:19, 11:4, 21:14, 21:20, 22:9, 24:11, 28:11, 29:1, 30:2, 30:14, 30:21, 45:25, 49:11, 51:1, 51:3, 52:20, 52:22, 52:25, 53:2, 53:20, 56:16, 57:3, 57:18, 58:10, 60:22, 61:7, 62:4, 62:9, 62:11, 80:6, 81:19, 87:24, 89:2, 107:8
**states** [3] - 79:22, 89:19, 96:17
**STATES** [2] - 1:1, 1:8
**stating** [3] - 74:1, 95:12, 97:6
**status** [7] - 28:18, 29:8, 37:2, 72:4, 72:19, 80:8
**statute** [2] - 29:24
**statutory** [1] - 17:8
**stay** [1] - 43:8
**stemming** [2] - 42:25, 100:13
**stenographic** [1] - 111:5
**step** [2] - 10:16, 13:19
**steps** [5] - 10:8, 46:12, 51:15, 75:24, 104:6
**stewards** [1] - 7:17
**still** [3] - 39:1, 49:24, 89:6
**stop** [3] - 4:16, 56:18, 65:10
**straight** [1] - 35:17
**Street** [1] - 1:20
**Strickland** [1] - 90:2
**strict** [2] - 35:16, 61:21
**struck** [1] - 29:20
**subject** [6] - 10:4, 25:6, 65:16, 78:22, 87:23, 90:4
**subjecting** [1] - 75:3
**subjects** [2] - 89:15, 102:12

**submission** [1] - 107:12
**submissions** [1] - 15:11
**submit** [4] - 8:23, 10:11, 104:8, 105:10
**submitted** [4] - 7:20, 15:11, 66:20, 69:25
**subordinates** [1] - 104:3
**substance** [1] - 50:10
**substantial** [1] - 5:15
**substantially** [1] - 84:10
**substantiated** [1] - 102:9
**substantive** [1] - 31:10
**succeed** [9] - 73:1, 73:20, 74:8, 78:15, 78:18, 83:1, 83:5, 89:24, 94:6
**success** [7] - 9:6, 36:7, 73:22, 74:2, 74:16, 74:22, 94:23
**sue** [1] - 106:24
**sued** [1] - 70:4
**suffer** [6] - 73:2, 90:22, 94:10, 94:19, 101:9, 102:3
**suffered** [4] - 84:14, 90:13, 90:22, 101:7
**suffering** [1] - 82:10
**suffices** [1] - 97:4
**sufficient** [6] - 18:9, 31:7, 33:5, 39:19, 74:10, 100:24
**suggest** [1] - 109:22
**suggested** [2] - 55:16, 106:16
**suggesting** [3] - 61:14, 61:16, 61:20
**suggestions** [1] - 105:13
**Sullivan** [1] - 80:17
**summary** [3] - 6:20, 104:14, 104:17
**supervisor** [2] - 39:22, 39:23
**supplies** [1] - 47:17
**supported** [1] - 95:17
**supporting** [2] - 70:18, 81:3
**supports** [1] - 97:7
**supposed** [1] - 99:23
**suppress** [3] - 79:12, 79:19, 80:16
**suppression** [2] - 68:1, 80:20
**Supreme** [15] - 47:15,

63:15, 67:16, 67:17,
77:10, 77:16, 79:6,
79:10, 80:14, 82:24,
86:24, 90:16, 91:3,
91:24, 95:4
**suspend** [1] - 47:7
**suspicion** [1] - 87:9
**Sussmann** [1] - 70:3
**SW** [1] - 1:14
**sweeps** [2] - 80:25,
82:5
**System** [1] - 75:5
**system** [8] - 70:2,
92:2, 92:18, 102:19,
102:23, 103:12,
103:13, 103:15

## T

**table** [3] - 2:18, 3:3,
101:24
**tag** [1] - 19:14
**tailored** [4] - 35:24,
36:3, 80:23, 80:25
**tailoring** [1] - 35:17
**taint** [1] - 81:4
**target** [2] - 57:23, 85:4
**targeted** [2] - 80:11,
103:23
**targeting** [3] - 67:2,
77:5, 80:14
**targets** [3] - 26:24,
64:21, 78:21
**task** [1] - 66:8
**taxpayer** [1] - 101:21
**team** [1] - 105:9
**teased** [1] - 21:9
**technically** [1] - 17:23
**tellingly** [1] - 20:11
**temporary** [6] - 3:25,
4:16, 26:10, 29:8,
71:15, 73:14
**Tenth** [1] - 85:18
**term** [1] - 44:9
**terminate** [8] - 10:8,
11:21, 15:19, 40:12,
46:13, 51:15, 86:5,
98:16
**terminated** [4] - 13:18,
13:23, 17:18, 100:1
**terminating** [2] -
10:18, 68:21
**termination** [2] -
81:23, 86:16
**terms** [10] - 12:7,
13:19, 18:24, 47:18,
61:21, 75:22, 99:20,
99:22, 100:15,
109:18
**terrorist** [2] - 60:13,

60:14
**TERRY** [1] - 1:18
**Terry** [1] - 3:3
**test** [2] - 39:8, 41:21
**tests** [1] - 67:12
**text** [1] - 79:21
**thankfully** [1] - 3:21
**THE** [170] - 1:1, 1:8,
1:10, 1:17, 2:2, 2:11,
2:15, 2:17, 2:21,
2:24, 3:5, 3:8, 3:10,
3:13, 3:15, 3:20, 5:1,
5:4, 5:7, 5:18, 6:5,
6:15, 6:23, 7:1, 7:22,
9:2, 9:15, 9:21,
10:22, 10:24, 11:12,
11:16, 11:20, 13:1,
13:12, 13:15, 13:22,
14:11, 15:3, 15:25,
17:5, 18:5, 18:21,
19:12, 19:20, 21:7,
22:1, 22:3, 22:13,
23:2, 23:14, 25:4,
25:10, 25:16, 25:19,
26:2, 27:24, 28:17,
28:22, 29:6, 29:12,
29:15, 30:24, 31:12,
31:22, 32:13, 32:21,
33:11, 33:15, 33:21,
34:19, 35:13, 36:6,
36:17, 36:19, 36:21,
37:2, 37:8, 37:17,
38:15, 38:23, 40:19,
41:3, 41:23, 42:1,
42:8, 42:12, 43:15,
43:25, 44:7, 44:18,
45:8, 45:11, 45:19,
46:4, 47:9, 47:20,
48:12, 48:16, 49:5,
49:10, 49:14, 49:22,
50:18, 50:20, 51:4,
51:11, 52:2, 52:13,
53:9, 53:14, 53:17,
54:4, 54:13, 54:17,
54:22, 54:25, 55:3,
55:13, 55:23, 56:7,
56:22, 57:2, 57:5,
57:13, 57:20, 57:23,
57:25, 58:4, 58:6,
58:25, 59:18, 59:24,
60:3, 60:18, 60:23,
60:25, 61:13, 61:18,
62:21, 62:23, 63:11,
63:15, 63:22, 64:1,
65:2, 65:4, 65:7,
65:9, 70:7, 71:11,
105:8, 105:16,
105:19, 106:5,
106:12, 106:15,
107:7, 107:10,

107:24, 108:3,
108:13, 108:19,
109:1, 109:22,
110:7, 110:12,
110:15, 110:17,
110:19
**themselves** [3] - 20:9,
95:3, 95:20
**theoretical** [1] - 94:13
**theoretically** [1] - 52:5
**theory** [2] - 8:10,
63:23
**therefore** [4] - 4:9,
44:23, 73:13, 73:16,
103:14, 104:2
**thinking** [1] - 34:23
**thinks** [2] - 45:13,
65:14
**third** [7] - 14:16,
14:17, 25:5, 40:9,
91:8, 91:9, 91:14
**third-party** [1] - 91:8
**thousand** [2] - 26:22,
36:24
**thousands** [1] - 24:23
**threat** [10] - 19:1,
20:15, 25:2, 67:24,
69:6, 80:18, 81:23,
85:10, 89:6, 92:24
**threaten** [7] - 21:6,
21:13, 22:8, 24:7,
52:18, 81:19, 89:1
**threatened** [1] - 103:7
**threatening** [6] - 5:16,
17:1, 27:19, 40:8,
52:22, 68:20
**threatens** [5] - 90:7,
91:21, 92:6, 92:21,
97:17, 99:8, 100:18,
102:18, 103:11
**three** [8] - 4:16, 10:7,
21:9, 73:3, 74:8,
74:15, 91:7, 102:5
**throughout** [1] - 30:25
**throwing** [1] - 61:20
**thrown** [1] - 18:23
**tied** [4] - 49:13, 49:16,
49:21, 102:8
**tight** [1] - 103:21
**tilt** [1] - 79:8
**timeline** [2] - 37:13,
37:15
**title** [2] - 4:10, 4:17
**titled** [2] - 4:4, 71:18
**today** [9] - 3:24, 25:17,
28:6, 31:4, 45:21,
62:16, 89:4, 106:7,
106:9
**today's** [1] - 73:17
**together** [2] - 56:17,

67:2
**tomorrow** [4] - 104:9,
104:19, 106:7,
110:21
**took** [2] - 87:16, 107:9
**top** [2] - 12:23, 27:15
**total** [1] - 57:5
**totally** [2] - 50:12,
82:13
**touch** [2] - 17:5,
64:16, 66:16
**tough** [1] - 70:14
**towards** [1] - 107:1
**traceability** [2] - 41:9,
41:12
**trademark** [1] - 27:4
**Trademark** [2] - 27:5,
98:7
**transactional** [1] -
84:20
**TRANSCRIPT** [1] - 1:7
**Transcript** [1] - 1:25
**transcript** [3] - 111:5,
111:6, 111:9
**transcription** [1] -
1:25
**Transportation** [1] -
27:10
**treasured** [1] - 62:18
**Trentadue** [1] - 85:17
**trial** [2] - 44:15, 89:12
**tricky** [1] - 61:2
**TRO** [33] - 5:24, 7:25,
8:3, 9:3, 26:19,
27:23, 28:18, 29:2,
29:6, 70:10, 70:13,
71:20, 71:24, 72:4,
72:10, 72:25, 73:3,
73:4, 73:5, 73:17,
74:11, 94:9, 94:11,
94:12, 95:1, 101:4,
101:10, 102:3,
102:11, 102:14,
103:14, 104:2, 104:5
**TROs** [3] - 28:2,
72:15, 72:16
**trouble** [1] - 25:17
**true** [5] - 43:2, 54:6,
66:5, 111:4, 111:5
**truly** [4] - 12:11,
27:18, 27:21, 33:19
**trump** [1] - 97:5
**Trump** [12] - 4:3,
32:17, 67:17, 70:4,
73:10, 76:9, 80:7,
101:15, 101:18,
101:21, 102:17,
103:6
**Trump's** [2] - 32:8,
71:17

**trust** [6] - 19:8, 20:10,
43:10, 47:21, 61:10,
62:1
**trusted** [1] - 34:16
**trustworthy** [4] -
30:16, 33:7, 35:7,
46:1
**try** [3] - 63:1, 68:2,
107:25
**trying** [5] - 3:18,
38:14, 43:13, 58:22,
68:22
**tsunami** [1] - 27:18
**TTAB** [1] - 27:4
**Tube** [1] - 63:18
**turn** [6] - 4:18, 9:23,
15:25, 21:7, 43:15,
94:8
**Turner** [1] - 75:8
**turning** [2] - 74:20,
91:17
**turns** [1] - 26:14
**two** [27] - 8:2, 9:10,
10:4, 18:22, 18:24,
20:23, 21:16, 26:11,
26:16, 41:8, 65:11,
73:2, 73:9, 73:18,
74:23, 74:25, 82:11,
83:9, 83:17, 90:12,
91:6, 101:12,
107:12, 107:16,
108:15, 108:17,
109:4
**tying** [1] - 109:19
**type** [3] - 38:6, 51:9,
67:4
**types** [3] - 17:13, 18:9,
109:20
**typically** [4] - 44:12,
54:20, 60:9, 100:15
**tyrannical** [1] - 66:12

## U

**U.S** [51] - 1:5, 3:6,
3:12, 19:1, 19:15,
25:13, 27:13, 46:21,
47:15, 54:22, 55:1,
55:7, 73:6, 73:7,
73:24, 75:6, 75:8,
75:10, 77:14, 78:24,
79:9, 79:14, 80:17,
83:10, 85:7, 86:12,
87:2, 87:3, 87:5,
87:7, 87:20, 88:15,
89:8, 90:2, 90:5,
90:18, 90:19, 90:20,
92:2, 92:3, 92:18,
93:1, 93:2, 95:8,
95:9, 95:11, 98:7,

101:23, 102:21, 103:2
**u.S** [1] - 1:19
**ultra** [1] - 70:8
**unable** [2] - 85:24, 99:18
**unanimous** [1] - 67:17
**uncertainty** [1] - 98:16
**unchecked** [1] - 71:8
**unconstitutional** [1] - 85:8
**uncontested** [1] - 72:19
**under** [28] - 13:10, 13:18, 15:12, 15:24, 17:20, 19:4, 24:16, 25:1, 26:12, 27:20, 29:24, 30:15, 30:18, 35:14, 45:1, 47:13, 51:2, 51:6, 51:8, 52:8, 62:16, 74:12, 76:1, 88:19, 89:17, 99:19, 103:16, 104:8
**undermine** [2] - 91:21, 103:11
**underneath** [1] - 64:6
**understated** [1] - 102:14
**understood** [3] - 19:12, 28:4, 95:25
**undetermined** [1] - 28:16
**unethically** [1] - 85:12
**unfettered** [1] - 15:12
**unfortunately** [1] - 39:9
**Union** [3] - 72:23, 86:9, 86:10
**uniquely** [1] - 67:22
**unitary** [1] - 63:23
**United** [40] - 2:3, 3:2, 8:15, 8:19, 11:4, 21:14, 21:20, 22:9, 24:11, 28:11, 29:1, 30:2, 30:14, 30:21, 45:25, 49:11, 51:1, 51:3, 52:20, 52:22, 52:25, 53:2, 53:20, 56:16, 57:2, 57:18, 58:10, 60:22, 61:7, 62:4, 62:8, 62:11, 72:22, 72:23, 80:6, 81:19, 86:9, 87:24, 89:2, 107:8
**UNITED** [2] - 1:1, 1:8
**University** [3] - 60:19, 78:24, 96:10
**unlawful** [3] - 75:1, 78:20, 104:3
**unlawfully** [2] - 74:24,

78:16
**unless** [6] - 22:22, 39:9, 60:18, 81:15, 104:9, 104:12
**unlike** [1] - 8:2
**unpopular** [8] - 20:9, 70:19, 70:24, 78:7, 80:13, 103:5, 103:9
**unprecedented** [1] - 96:1
**unquestionably** [1] - 95:6
**unrecoverable** [3] - 100:4, 100:8, 100:10
**unrelated** [1] - 82:14
**unrestricted** [1] - 47:16
**unreviewable** [1] - 34:17
**untied** [1] - 109:17
**unwise** [1] - 48:5
**up** [22] - 3:18, 3:21, 16:4, 16:24, 20:18, 23:7, 23:15, 23:16, 26:6, 28:12, 36:24, 37:4, 38:10, 50:2, 60:1, 63:24, 68:3, 68:22, 84:21, 104:16, 106:2, 107:25
**upend** [1] - 47:5
**UPS** [1] - 59:20
**upset** [2] - 49:23, 49:24
**Urban** [1] - 73:25
**USCIS** [1] - 27:8
**uses** [1] - 56:23
**USPTO** [1] - 27:2

**V**

**V.A** [1] - 24:5
**vague** [1] - 88:6
**vagueness** [1] - 88:13
**value** [2] - 33:11, 84:11
**variety** [1] - 41:17
**various** [3] - 42:18, 44:22, 54:1
**vast** [1] - 99:15
**Velazquez** [1] - 102:21
**vendetta** [1] - 101:24
**venue** [1] - 38:4
**veracity** [1] - 39:7
**verdict** [1] - 89:16
**verifiable** [1] - 32:12
**vested** [1] - 48:2
**vesting** [5] - 30:23, 63:10, 63:12, 64:18, 64:19

**veterans** [1] - 24:5
**veto** [1] - 64:10
**via** [4] - 55:21, 83:17, 83:18, 85:24
**view** [17] - 10:16, 32:16, 33:3, 39:13, 44:22, 46:8, 47:20, 49:11, 50:11, 50:15, 53:19, 55:14, 63:5, 63:11, 64:4, 65:14, 108:14
**viewed** [2] - 61:23, 100:15
**viewpoint** [21] - 31:25, 32:24, 60:5, 61:3, 61:21, 61:25, 66:23, 67:6, 67:22, 70:19, 70:25, 75:1, 75:8, 76:22, 76:23, 77:12, 78:20, 78:25, 82:19, 82:24, 83:3
**viewpoint-related** [1] - 31:25
**viewpoints** [5] - 20:1, 67:2, 80:12, 82:23, 102:17
**views** [5] - 48:7, 78:22, 79:12, 79:19, 80:16
**vigorous** [3] - 50:15, 77:3, 102:25
**vigorously** [3] - 7:24, 33:18, 48:7
**violates** [1] - 94:24
**violation** [14] - 13:7, 14:19, 14:23, 38:20, 67:14, 69:10, 78:22, 80:14, 83:7, 86:21, 87:22, 97:4, 97:6, 97:20
**violations** [8] - 14:2, 19:8, 20:10, 90:9, 91:3, 95:2, 95:16, 96:21
**violent** [1] - 60:21
**vires** [1] - 70:8
**Virginia** [1] - 78:24
**virtually** [1] - 66:17
**virtue** [1] - 17:21
**Visitors** [1] - 78:24
**vitality** [1] - 68:20
**void** [2] - 88:13, 111:8
**voter** [3] - 31:15, 75:18, 79:25
**voting** [4] - 31:17, 31:18, 31:19, 76:21
**vs** [1] - 1:4
**Vullo** [2] - 67:19, 79:14, 80:16, 94:4

**W**

**wait** [4] - 59:8, 104:19, 105:16, 106:7
**waiting** [1] - 27:18
**waiver** [3] - 22:6, 22:17, 81:16
**wake** [1] - 20:18
**walk** [1] - 31:6
**wall** [1] - 77:8
**walling** [1] - 50:24
**wants** [2] - 17:10, 89:16
**warranted** [1] - 80:21
**Washington** [4] - 1:6, 1:15, 70:20, 90:2
**washington** [1] - 1:21
**watch** [1] - 20:20
**watching** [2] - 78:11, 78:12
**water** [1] - 69:1
**watershed** [1] - 70:22
**ways** [3] - 63:22, 83:17, 88:10
**week** [1] - 4:4
**weigh** [2] - 91:1, 91:10
**welcome** [3] - 2:17, 2:24, 5:7
**well-respected** [1] - 4:11
**what-ifs** [3] - 36:24, 36:25, 38:10
**whatsoever** [2] - 23:8, 61:12
**Wheat** [1] - 90:4
**White** [2] - 30:8, 80:4
**white** [2] - 27:11, 98:7
**whole** [7] - 3:16, 5:24, 29:19, 30:24, 46:18, 67:20, 105:9
**wholly** [3] - 101:24, 107:3
**widely** [1] - 82:5
**wielding** [1] - 103:9
**Williams** [9] - 1:14, 2:9, 48:12, 48:22, 48:24, 50:7, 50:14, 50:15, 59:3
**willing** [1] - 57:7
**Wilson** [1] - 75:6
**wins** [1] - 71:25
**Winter** [1] - 73:7
**Wisconsin** [2] - 85:6, 99:9
**wish** [1] - 96:3
**wishes** [1] - 96:5
**withdraw** [1] - 93:14
**withdrawn** [1] - 97:13
**WL** [2] - 72:7, 100:6

**wonder** [1] - 14:19
**Wonderland** [1] - 89:14
**word** [5] - 23:4, 25:22, 44:4, 55:8, 56:23
**words** [11] - 18:22, 18:24, 20:13, 21:3, 55:24, 63:5, 65:22, 71:14, 82:15, 84:3
**Workers** [3] - 72:22, 72:23, 86:9
**works** [4] - 35:22, 63:7, 101:13, 102:24
**world** [7] - 4:13, 39:2, 40:22, 52:4, 58:20, 58:21, 58:23
**worry** [1] - 67:10
**worse** [1] - 22:21
**wrecking** [1] - 5:12
**write** [1] - 25:1
**writing** [1] - 67:20
**Wulff** [1] - 90:19

**X**

**Xiaomi** [2] - 100:5, 100:16

**Y**

**year** [2] - 34:9, 79:10
**years** [4] - 25:1, 64:15, 70:13, 101:14
**yells** [1] - 89:14
**yesterday** [4] - 4:1, 7:11, 68:14, 74:14
**York** [1] - 101:18
**you-all** [5] - 6:17, 104:15, 104:18, 104:21, 107:10
**Youngstown** [1] - 63:17
**yourself** [2] - 37:5, 70:19
**yourselves** [1] - 2:6

**Z**

**zealous** [1] - 102:24
**zealously** [1] - 103:17
**zero** [2] - 19:2, 89:5
**Zimmerman** [1] - 83:9
**Zoom** [1] - 56:5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

PERKINS COIE LLP,

        Plaintiff,

        v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

        Defendants.

Civil Action No. 25-716 (BAH)

Judge Beryl A. Howell

---

**ORDER**

Upon consideration of the parties' Joint Status Report ("JSR"), ECF No. 25, it is hereby:

**ORDERED** that the injunction, ECF No. 21, issued by this Court on March 12, 2025, and all

restrictions and obligations imposed therein, shall be **EXTENDED** by agreement of all parties, *see* JSR ¶

5, until final judgment is entered in this matter; it is further

**ORDERED**, in accordance with the parties' joint proposal for expedited dispositive motions

briefing, reached after their meeting and conferral, that the parties shall file all dispositive motions

according to the following schedule:

(1)   By April 2, 2025, the parties shall file any dispositive motions and opening briefs in support;

(2)   By April 16, 2025, at noon, the parties shall file any oppositions;

(3)   By April 18, 2025, at 4:00 PM, the parties shall file any replies; and

(4)   Any motions hearing, if necessary, will be scheduled for the week of April 21, 2025; and it is

     further

**ORDERED** that discovery shall be **STAYED** pending further order of the Court, given the

parties' agreement that no discovery is required or will be requested, *see* JSR ¶ 4.

**SO ORDERED.**

Date:  March 14, 2025

                                      *Beryl A. Howell*

                      _____

                      **BERYL A. HOWELL**
                      United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PERKINS COIE LLP, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, *et al.*, <br><br> Defendants. | Civil Action No. 25-0716 (BAH) |

<u>**STATUS REPORT**</u>

On March 12, 2025, the Court entered an Order (ECF 21) requiring, among other things, that Defendants file a status report by March 14, 2025 "describing steps taken to ensure compliance with th[e] Order and certifying compliance with its requirements."  Counsel for Defendants, accordingly, submit this Status Report.

1. On March 14, 2025, the Office of the Associate Attorney General sent by e-mail to office of general counsel contacts for the named defendant agencies a copy of the Court's Order and directions and guidance to ensure compliance with the Order.  The e-mail provided background on the litigation, informed the recipients of the specific provisions of the Court's Order, requested that steps to comply with the Order's requirements be taken immediately, and explained that implementation of Sections 1, 3, and 5 of Executive Order 14230 ("EO") is prohibited and that any prior steps taken, or guidance or directions issued, to implement those sections of the EO must be walked back or rescinded.  Further, the e-mail requested that agencies inform Department of Justice counsel of steps being taken to comply with the Order and expected completion of those steps.

**JA 214**

2.  As of the time of this filing, Department of Justice counsel have received information in response to the e-mail described above from the seven named Defendant agencies regarding the various steps those agencies have taken to ensure compliance with the Court's Order, tailored to the agencies' respective situations.  These steps have included: rescinding or overriding prior instructions or data calls with respect to disclosure by contractors of any business they do with Perkins Coie LLP related to Government contracts; issuing directives or instructions that agency staff should disregard Sections 1, 3, and 5 of the EO and carry on with their ordinary course of business absent those sections, or confirmation of intent to issue such instructions expeditiously; issuing directives to agency employees and contractors that implementation of Sections 1, 3, and 5 of the EO is prohibited and any prior steps taken, or guidance or directions issued, to implement those sections must be walked back or rescinded; as well as confirmation that no prior instructions regarding Sections 1, 3, or 5 were issued that need to be rescinded.

3.  Defendants' counsel continue to engage with relevant officials at OMB and DOJ regarding issuance of guidance to all other agencies subject to the EO to suspend and rescind any implementation or enforcement of Sections 1, 3, and 5 of the Executive Order, including any reliance on the statements in Section 1.

4.  Defendant's counsel also continue to engage with Defendant agencies regarding compliance with the Court's Order to confirm that Defendants have taken or are taking necessary and appropriate steps to comply with the Order.

2

**JA 215**

5. Defendant's counsel intend to provide additional information regarding completion of
   steps to ensure compliance with the Court's order when such information becomes
   available.

Dated: March 14, 2025
       Washington, DC

Respectfully submitted,

CHAD MIZELLE
Acting Associate Attorney General

/s/ Richard Lawson
RICHARD LAWSON
Deputy Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 445-8042

/s/ Terry M. Henry
TERRY M. HENRY
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, NW, Room 7500
Washington, D.C. 20530
Telephone: (202) 514-4107
Email:  Terry.Henry@usdoj.gov

*Counsel for Defendants*

**JA 216**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PERKINS COIE LLP,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF JUSTICE, *et al*.,<br><br>    Defendants. | Civil Action No. 25-0716 (BAH) |

**STATUS REPORT**

On March 12, 2025, the Court entered an Order (ECF 21) requiring, among other things,

that Defendants file a status report by March 14, 2025 "describing steps taken to ensure

compliance with th[e] Order and certifying compliance with its requirements," and on March 14,

2025, Defendants filed such an initial Status Report (ECF 27).  Defendants respectfully file this

follow-on Status Report and state as follows:

1.  Defendants' March 14, 2025 Status Report explained that,

> Defendants' counsel continue to engage with relevant officials at
> OMB and DOJ regarding issuance of guidance to all other agencies
> subject to the EO to suspend and rescind any implementation or
> enforcement of Sections 1, 3, and 5 of the Executive Order, including
> any reliance on the statements in Section 1.

ECF 27 ¶ 3.

2.  As noted in the Status Report, such engagement by Defendants' counsel continued,

    and all-agency guidance, as ordered in the Court's March 12, 2025 Order, has been

    issued.  Specifically, on March 18, 2025, joint OMB-DOJ guidance was distributed to

    all agencies via the OMB process for providing such all-agency issuances.  A

    "Memorandum For All Agencies Subject To Executive Order 14230," along with a

copy of the Court's March 12, 2025 Order and a copy of Executive Order 14230, was

transmitted by e-mail from OMB to appropriate agency contacts, under a cover e-mail

noting that agencies should "see attached court order and joint guidance from the

Department of Justice and the Office of Management regarding the order," and noting

a DOJ contact for questions.  The "Memorandum For All Agencies Subject To

Executive Order 14230" states, in accordance with the specific requirements of the

Court's Order, "Pursuant to this order, all agencies subject to Executive Order 14230

must suspend and rescind any implementation or enforcement of Sections 1, 3, and 5

of Executive Order 14230, including any reliance on the statements in Section 1 of

the Executive Order."  *See* Attachment 1.

3.  In addition, also on March 18, 2025, and consistent with the Court's Order, OMB

issued OMB Memorandum M-25-18, directed to all Executive Departments and

Agencies.  *See* Attachment 2.  This all-agency Memorandum M-25-18 notes that

"OMB Memorandum M-25-17 is rescinded;" OMB Memorandum M-25-17

(available at https://www.whitehouse.gov/omb/information-

resources/guidance/memoranda/) was a March 7, 2025 OMB issuance to agencies

requiring implementation of Sections 2(b) and 3 of Executive Order 14230.

4.  Accordingly, all agencies subject to Executive Order 14230 have been informed that

previously mandated implementation of Section 3 of the EO has been specifically

rescinded, and the agencies have been further instructed to suspend and rescind *any*

implementation or enforcement of Sections 1, 3, and 5 of the EO, in accordance with

the Court's Order.  Further, to assist with carrying out such suspension and rescission,

agencies have been supplied with a copy of the Court's March 12, 2025 Order.


Dated: March 18, 2025                    Respectfully submitted,
      Washington, DC

                                                      CHAD MIZELLE
                                                      Acting Associate Attorney General

                                                      */s/ Richard Lawson*
                                                      RICHARD LAWSON
                                                      Deputy Associate Attorney General
                                                      950 Pennsylvania Avenue, NW
                                                      Washington, DC 20530
                                                      Telephone: (202) 445-8042

                                                      *Counsel for Defendants*

3

**JA 219**

# Attachment 1

     

March 18, 2025

MEMORANDUM FOR All AGENCIES SUBJECT TO EXECUTIVE ORDER 14230

FROM:                    PAMELA BONDI
                         ATTORNEY GENERAL

                         RUSSELL T. VOUGHT
                         DIRECTOR
                         OFFICE OF MANAGEMENT AND BUDGET

SUBJECT:                 COURT ORDER REGARDING EXECUTIVE ORDER 14230


         On March 12, 2025, a district judge in the District of Columbia entered an order in the
case of *Perkins Coie v. U.S. Department of Justice, et al.*, No. 25cv0716 (D.D.C.), ECF No. 21.
The case involves a challenge to Executive Order 14230 of March 6, 2025, 90 Fed. Reg. 11781
(Mar. 11, 2025), entitled, "Addressing Risks from Perkins Coie LLP." Pursuant to this order, all
agencies subject to Executive Order 14230 must suspend and rescind any implementation or
enforcement of Sections 1, 3, and 5 of Executive Order 14230, including any reliance on the
statements in Section 1 of the Executive Order.

# Attachment 2



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**GENERAL COUNSEL**

March 18, 2025

M-25-18

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:            Mark Paoletta
                 General Counsel

SUBJECT:         Rescission of M-25-17

    On behalf of Director Vought, and in accordance with instructions provided by the Department of Justice regarding a recent court order, OMB Memorandum M-25-17 is rescinded.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PERKINS COIE LLP,<br><br>       Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF JUSTICE, *et al*.,<br><br>       Defendants. | Civil Action No. 25-0716 (BAH) |

## STATUS REPORT

On March 19, 2025, the Court entered a Minute Order directing that "defendants U.S. Department of Justice; Pamela Bondi, in her official capacity as U.S. Attorney General; the Office of Management and Budget; and Russell Vought, in his official capacity as Director of the Office of Management and Budget . . . immediately issue guidance to all other agencies subject to Executive Order 14230 directing them immediately to (a) communicate to every recipient of a request for disclosure of any relationship with Perkins Coie LLP or any person associated with the firm, made pursuant to Section 3(a) of Executive Order 14230, that such request is rescinded until further order of this Court; and (b) cease making such requests for disclosure, pursuant to Section 3(a) of Executive Order 14230, until further order of the Court." The Court's Minute Order also required defendants to file a status report by 12:00 noon today regarding the same.

Defendants respectfully file this Status Report and state as follows:

1. The Court's Minute Order issued at 9:43 a.m. in response to Plaintiff's Motion to Clarify Temporary Restraining Order (ECF 30), which was filed at 6:39 p.m. on March 18, 2025. Thus, the Minute Order issued without the benefit of a response by

**JA 224**

Defendants to Plaintiff's Motion to Clarify, including Defendants' position that the additional issuance requested by Plaintiffs was neither necessary nor appropriate.

2. Defendants have worked diligently to implement the Court's Minute Order, despite the significant logistical difficulties of coordinating joint Department of Justice and Office of Management and Budget guidance, issued by the Attorney General and the Director of OMB, between both agencies, their principals or representatives, as well as then distributing such guidance through the appropriate administrative process involved to ensure the guidance is issued to all agencies as directed by the Court's Minute Order.

3. The joint OMB-DOJ guidance required by the Court's Minute Order, using the specific language called for in the Court's Minute Order, was distributed to all agencies via the OMB process for providing such all-agency issuances a short time ago.

4. Defendants recognize that this Status Report is filed several minutes beyond Noon and request the Court's indulgence in the matter. Counsel for Defendant were able to confirm with OMB that the guidance required by the Court's Minute Order was distributed through the OMB process by approximately Noon today, with this Status Report filed as soon as possible following that confirmation.

Dated: March 20, 2025                    Respectfully submitted,
       Washington, DC

                                         CHAD MIZELLE
                                         Acting Associate Attorney General

2

**JA 225**

/s/ *Richard Lawson*
RICHARD LAWSON
Deputy Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 445-8042


/s/ *Terry M. Henry*
TERRY M. HENRY
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, NW, Room 7500
Washington, D.C. 20530
Telephone: (202) 514-4107
Email:  Terry.Henry@usdoj.gov


*Counsel for Defendants*

3

**JA 226**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PERKINS COIE LLP, <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, *et al*., <br><br> Defendants. | Civil Action No. 25-0716 (BAH) |

**SUPPLEMENTAL STATUS REPORT**

As a follow-up to Defendants' March 20, 2025 Status Report (ECF 31), counsel for

Defendants submit this supplemental status report, and state as follows:

On March 20, 2025, Defendants filed a Status Report (ECF 31) explaining that joint

OMB-DOJ guidance directed by the Court's March 19, 2025 Minute Order had been distributed

to all agencies subject to Executive Order 14230.  Due to the timing of the distribution as

explained in the Status Report, the final guidance, as distributed, was not available to counsel for

Defendants prior to the filing of Status Report.  A copy of the distributed guidance

memorandum, a "Memorandum For All Agencies Subject To Executive Order 14230," is now

attached hereto.   The Memorandum was transmitted by e-mail from OMB to appropriate agency

contacts, under a cover e-mail noting that agencies should "see attached a joint guidance from

//

//

**JA 227**

the Department of Justice and the Office of Management and Budget regarding a court order,"

and noting a DOJ contact for questions.

Dated: March 20, 2025                        Respectfully submitted,
          Washington, DC

                                 CHAD MIZELLE
                                 Acting Associate Attorney General

                                 /s/ *Richard Lawson*
                                 RICHARD LAWSON
                                 Deputy Associate Attorney General
                                 950 Pennsylvania Avenue, NW
                                 Washington, DC 20530
                                 Telephone: (202) 445-8042

                                 /s/ *Terry M. Henry*
                                 TERRY M. HENRY
                                 United States Department of Justice
                                 Civil Division
                                 Federal Programs Branch
                                 1100 L Street, NW, Room 7500
                                 Washington, D.C. 20530
                                 Telephone: (202) 514-4107
                                 Email:  Terry.Henry@usdoj.gov

                                 *Counsel for Defendants*

JA 228

# Attachment

 

March 20, 2025


MEMORANDUM FOR All AGENCIES SUBJECT TO EXECUTIVE ORDER 14230

FROM:            PAMELA BONDI
                 ATTORNEY GENERAL

                 RUSSELL T. VOUGHT
                 DIRECTOR
                 OFFICE OF MANAGEMENT AND BUDGET

SUBJECT:         COURT ORDER REGARDING EXECUTIVE ORDER 14230


On March 19, 2025, a district judge in the District of Columbia entered an order in the case of *Perkins Coie v. U.S. Department of Justice, et al.*, No. 25cv0716 (D.D.C.). The case involves a challenge to Executive Order 14230 of March 6, 2025, 90 Fed. Reg. 11781 (Mar. 11, 2025), entitled, "Addressing Risks from Perkins Coie LLP." Pursuant to this March 19, 2025 order, all agencies subject to Executive Order 14230 must (a) communicate to every recipient of a request for disclosure of any relationship with Perkins Coie LLP or any person associated with the firm, made pursuant to Section 3(a) of Executive Order 14230, that such request is rescinded until further order of the Court; and (b) cease making such requests for disclosure, pursuant to Section 3(a) of Executive Order 14230, until further order of the Court.

The Executive Branch's position is that Executive Order 14230 is permissible, and that the Court's order was erroneous. The government reserves the right to take all necessary and legal actions in response to the "dishonest and dangerous" conduct of Perkins Coie LLP, as set forth in Executive Order 14230.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

        Plaintiff,

        v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

        Defendants.

Civil Action No. 25-716 (BAH)

Judge Beryl A. Howell

### MEMORANDUM OPINION AND ORDER

Though this adage is commonplace, and the tactic overused, it is called to mind by defendants' pending motion to disqualify this Court: "When you can't attack the message, attack the messenger."  Defendants filed this motion less than two weeks after this Court issued a temporary restraining order barring defendants from enforcing against plaintiff Perkins Coie LLP three of the five sections of Executive Order 14230 ("EO 14230"), issued by President Donald J. Trump on March 6, 2025, 90 Fed. Reg. 11781 (Mar. 11, 2025), targeting the law firm with punitive measures due to the law firm's representation of clients whom the President dislikes or who sought relief through litigation that the President opposes.  When the U.S. Department of Justice engages in this rhetorical strategy of *ad hominem* attack, the stakes become much larger than only the reputation of the targeted federal judge.  This strategy is designed to impugn the integrity of the federal judicial system and blame any loss on the decision-maker rather than fallacies in the substantive legal arguments presented.

The opportunity presented by the defendants' motion, which invokes 28 U.S.C. § 455(a) to disqualify this Court, is welcomed to set the record straight, because facts matter.  To begin, this Court agrees wholeheartedly with defendants that "[f]air proceedings free from any suggestion of impartiality are essential to the integrity of our country's judiciary."  Defendants' Mot. to

1

Disqualify Judge Beryl Howell ("Defs.' Mot.") at 1, ECF No. 34. No judicial ruling exists in a vacuum but rests on the facts presented in "Cases" or "Controversies" necessary for the exercise of a federal court's jurisdiction, U.S. Const. art. III, § 2, and every litigating party deserves a fair and impartial hearing to determine both what the material facts are and how the law best applies to those facts. That fundamental promise, however, does not entitle *any* party—not even those with the power and prestige of the President of the United States or a federal agency—to demand adherence to their own version of the facts and preferred legal outcome. "Factfinding," after all, "is the basic responsibility of district courts," *Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982) (citation omitted, alteration accepted), and "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

This reminder about the role of the federal courts seems necessary given the opening line in defendants' pending motion, expressing "the need to curtail ongoing improper encroachments of President Trump's Executive Power playing out around the country." Defs.' Mot. at 1. This line, which sounds like a talking point from a member of Congress rather than a legal brief from the United States Department of Justice, has no citation to any legal authority for the simple reason that the notion expressed reflects a grave misapprehension of our constitutional order. Adjudicating whether an Executive Branch exercise of power is legal, or not, is actually the job of the federal courts, and not of the President or the Department of Justice, though vigorous and rigorous defense of executive actions is both expected and helpful to the courts in resolving legal issues. Defendants then proceed, in the second line of their pending motion, to describe as "meritless" every lawsuit challenging the President's "agenda that the American people elected him to carry out." *Id*. This blanket denigration of the merits of all the lawsuits filed across the

2

**JA 232**

country certainly reflects palpable frustration with court rulings issued to pause, temper, or reverse Trump Administration actions, but this is a testament to the fact that this country has an independent judiciary that adheres to an impartial adjudication process, without being swayed merely because the federal government appears on one side of a case and the President wishes a particular result.

While obviously not able to speak to the merits of all the cases "around the country" provoking defendants' frustration, a quick survey of the cases over which this Court is presiding challenging the current Administration's actions show that, contrary to the defendants' posturing, the outcomes have followed the facts and the law. When the facts and applicable law appear likely to favor the actions taken by the current administration, for example, this Court has ruled in the government's favor. *See, e.g.*, Min. Order, *U.S. Inst. of Peace v. Jackson*, No. 25-cv-804-BAH (D.D.C. Mar. 19, 2025) (denying motion for a temporary restraining order filed by plaintiffs in a case against President Trump and ten other Executive Branch defendants for terminating ten board members and the acting president of the U.S. Institute of Peace). In another case, even the government conceded that binding Supreme Court precedent required the legal result reached by this Court if the facts were found to be sufficiently similar to that precedent, which the Court found they were. *See Wilcox v. Trump*, -- F. Supp. 3d --, 2025 WL 720914, at *10 (D.D.C. Mar. 6, 2025); *id.* at *1 ("*Humphrey's Executor* remains binding on this Court, as defendants rightly acknowledge." (citing Defs.' Opp'n at 8 n.2)); Defs.' Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ. J. at 8 n.2, *Wilcox v. Trump*, No. 25-cv-334, ECF No. 23 (D.D.C.) (filed Feb. 21, 2025) ("[T]he government acknowledges that whatever little remains of *Humphrey's Executor* is binding on this Court until overturned by the Supreme Court."). Thus, in the latter case, the action

3

**JA 233**

taken by the President was declared null and void, since the facts and applicable law entitled the plaintiff to a favorable judgment.  The neutral administration of justice required no less.

The D.C. Circuit has warned that consideration of a motion for disqualification "is never taken lightly," since "[i]n the wrong hands, a disqualification motion is a procedural weapon" that, "[i]f supported only by rumor, speculation, or innuendo," might be used, among other nefarious purposes, as "a means to tarnish the reputation of a federal judge," *United States v. Microsoft Corp.*, 253 F.3d 34, 108 (D.C. Cir. 2001) (en banc) (per curiam), or to "reduce[] the judicial process to little more than a skirmish in a partisan battle," *In re Flynn*, 973 F.3d 74, 85 (D.C. Cir. 2020) (en banc) (per curiam) (Griffith, J., concurring).  This larger concern about the overall damage to the rule of law and the federal judicial system from the feckless impugning of the decision-making process of individual federal judges has prompted Chief Justice John G. Roberts, Jr., to criticize "regrettabl[e] . . . attempts" by "[p]ublic officials . . . to intimidate judges," including by "suggesting political bias in the judge's adverse rulings without a credible basis for such allegations."  John G. Roberts, Jr., 2024 Year End Rep. on the Fed. Judiciary 7 (Dec. 31, 2024), https://perma.cc/QU5A-r9YB.

Here, defendants rely only on "speculation[ and] innuendo" in seeking to get another Judge assigned to preside over this case.  The clear absence of any legitimate basis for disqualification requires denial of the pending motion.  *See, e.g., United States v. Haldeman*, 559 F.2d 31, 139 n.360 (D.C. Cir. 1976) ("[I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. . . . Nothing in [§455] should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial."); *Garrett v. Ohio State*

4

**JA 234**

*Univ.*, 60 F.4th 359, 371 (6th Cir. 2023) (warning of the "significant toll" "exact[ed]" on the judiciary by "needless recusals," including "facilitat[ing] judge-shopping" (quoting *In re U.S.*, 572 F.3d 301, 308 (7th Cir. 2009))).

## I.    LEGAL STANDARD

A judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or "[w]here he has a personal bias or prejudice concerning a party," *id.* § (b)(1).  This statute sets a high bar under which "recusal must be limited to truly extraordinary cases." *Cobell v. Kempthorne*, 455 F.3d 317, 332 (D.C. Cir. 2006); *see also, e.g.*, *United States v. Pollard*, 959 F.2d 1011, 1023 (D.C. Cir. 1992) ("[D]isqualification of a judge is not lightly granted," since "that relief" is "extraordinary.").  As a result, the party moving for disqualification carries a "heavy burden" of proof to succeed.  *Cobell*, 455 F.3d at 332.  A court's "judicial rulings alone almost never" satisfy this standard.  *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)); *see also SEC v. Loving Spirit Found. Inc.*, 392 F.3d 486, 493 (D.C. Cir. 2004) ("[R]ulings resting on record evidence 'almost never constitute a valid basis for a bias or partiality motion.'" (quoting *Liteky*, 510 U.S. at 555)).  Instead, as the Supreme Court has explained, adverse rulings are "[a]lmost invariably . . . proper grounds for appeal, not for recusal." *Liteky*, 510 U.S. at 555.  Moreover, judicial recusal is required "'if a reasonable person, *knowing all the circumstances*, would expect that the judge would have actual knowledge' of his interest or bias in the case." *Sao Paulo State of Federative Republic of Braz. v. Am. Tobacco Co.*, 535 U.S. 229, 232-33 (2002) (emphasis in original) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 861 (1988)); *see also Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (Statement of Chief Justice Rehnquist on decision not to recuse) (noting that, under § 455(a), the "inquiry is an objective one,

made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances"); *United States v. Hite*, 769 F.3d 1154, 1172 (D.C. Cir. 2014) (reiterating that rulings alone are almost never a basis for recusal).

Similarly, when a motion for disqualification relies on other grounds, recusal is improper unless the moving party can show that the judge has "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." *Liteky*, 510 U.S. at 556; *id.* at 558 (Kennedy, J., concurring in judgment) ("[U]nder [28 U.S.C.] § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute."). This standard is not satisfied merely because a judge "has expressed an opinion" on a legal issue "while on the bench," something the Supreme Court has long recognized is "common," and, in fact, "encourage[d]," by various codes governing judicial conduct. *Republican Party of Minn. v. White*, 536 U.S. 765, 779 (2002).

## II.    DISCUSSION

Defendants base their disqualification motion on the claim that this Court has demonstrated "[s]ystematic" "disdain for President Trump," Defs.' Mot. at 3, in three referenced prior rulings, *see id.* at 1, 4-5, and in "comments in this proceeding, other judicial proceedings, and in the public," *id.* at 6.[1]  Although defendants' motion is rife with innuendo, none of the claims put forward come close to meeting the standard for disqualification.

---

[1]    Defendants' requested relief is not just to have this case reassigned but, more specifically, "transferred to another district court judge who was neither involved with [the] Mueller Report nor the investigation of Special Counsel John Durham ("Durham Investigation") and who has not demonstrated a pattern of hostility towards Defendants." Defs.' Mot. at 2; *see also id.* at 7 (asking for reassignment "before a judge free from any appearance of hostility toward this Administration and is otherwise unconnected with any matter related to the Mueller Report or Durham Investigation"). Though this odd request might leave available for any reassignment those judges who handled matters related to investigations by Special Counsels Jack Smith and Robert Hur, by defendants' measure of purported bias, recusal would apply to most of the judges on this Court. Other judges have overseen grand jury matters involving the President, tried cases brought by the Mueller and Durham Special Counsel Offices, granted

## A. Defendants' Reliance On This Court's Three Prior Rulings

Despite the law being clear that prior rulings "[a]lmost invariably" do not provide a basis for disqualification, *Liteky*, 510 U.S. at 555, defendants point to three prior decisions of this Court as suggesting bias. *See* Defs.' Mot. at 4-5. Notably, defendants "offer[] no evidence" of actual bias but instead "merely *infer[]* bias from unfavorable judicial rulings." *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 848 (D.C. Cir. 1995) (emphasis in original). These prior rulings are addressed in reverse chronological order.

### 1.    Dismissal of Cases Charging Defendants with Criminal Conduct at the U.S. Capitol on January 6, 2021

Defendants claim that this Court's dismissal of pending charges against defendants charged with criminal conduct at the U.S. Capitol on January 6, 2021, showed "hostility toward President Trump" through "disdain for his supporters," Defs.' Mot. at 4 (citing only *United States v. Jovanovic*, No. 25-cr-15 (BAH), 2025 WL 266551, at *2 (D.D.C. Jan. 22, 2025)).[2] These

---

dismissal without prejudice in January 6 prosecutions, and granted temporary restraining orders against the Trump administration. The regularity of these judicial decisions only highlights how unfounded the government's request is for recusal.

[2]    The *Jovanovic* decision relied upon by defendants was only one of many issued by this Court to resolve the government's motions to dismiss, with prejudice, ongoing criminal cases against defendants for offense conduct during the January 6, 2021, attack at the U.S. Capitol. In a number of these cases, the defendants were charged with felonies for assaulting and/or physically resisting law enforcement officers, which charges were supported by the defendants' own admissions, photographic and video evidence, and extensive law enforcement investigations. For instance, in *Jovanovic*, the government alleged, based on photographic and video evidence, that the defendant assaulted law enforcement officers in a "prolonged scuffle" where he "rushed a line of police officers," and grabbed an officer's baton to drag that officer into a "mob" of rioters. 2025 WL 266551, at *1. In *United States v. DeCarlo*, No. 21-cr-73 (BAH), 2025 WL 266308, at *1 (D.D.C. Jan. 22, 2025), the two defendants, one of whom was a former senior leader of the Proud Boys, "by their own admission, engaged in criminal assault against law enforcement officers . . ., as well as property damage and theft" while at the Capitol. In *United States v. Amos*, -- F. Supp. 3d --, 2025 WL 275639, at *1 (D.D.C. Jan. 23, 2025), the defendant faced criminal charges for, among other conduct, attempting to break past a police line outside the Capitol, charging law enforcement officers while wielding a flagpole, and assaulting law enforcement officers by deploying pepper spray against them. In *United States v. Mangia*, No. 23-cr-288-2 (BAH), 2025 WL 266493, at *1 (D.D.C. Jan. 22, 2025), evidence showed, and the co-defendant in the case admitted, that the defendant physically assaulted law enforcement officers, breached the Capitol two separate times, and entered the Speaker of the House's personal office and the Senate floor. In *United States v. Dahlquist*, No. 24-cr-443 (BAH), 2025 WL 270608, at *1 (D.D.C. Jan. 22, 2025), the defendant was charged with nine counts, including the direct assault of two law enforcement officers, based on photographic and video evidence of defendant spraying officers with a chemical agent and throwing a four-by-four piece of lumber at officers responding to the scene. In *United States v. Gonzalez*, No. 24-cr-462 (BAH), 2025 WL 275605, at *1

defendants were not identified, investigated, and prosecuted for their political beliefs or support

for President Trump but because they engaged in offense conduct during the January 6, 2021,

attack on the U.S. Capitol that allegedly violated federal criminal laws.  The offense conduct of

these dismissed defendants, similarly to the many pardoned defendants, who already had been

convicted of offense conduct at the Capitol attack, ran the gamut of breaching police lines, illegally

entering restricted grounds, and assaulting and impeding police officers.  Their conduct—not their

beliefs and not their political views—was the reason for their criminal charges.

Defendants further accuse this Court of "grandstand[ing]," *id*., because the decisions in

each such dismissed case explained the legal and factual reasons for dismissing the cases "without

prejudice," rather than simply granting the request of the U.S. Attorney's Office for the District of

Columbia for dismissal "with prejudice," *see, e.g.*, *Jovanovic*, 2025 WL 266551, at *2-3.  As a

matter of law, the requested dismissals of charges in these cases were predicated on a criminal

procedural rule requiring the exercise of judicial discretion, albeit narrow, and thus an explanation

for the decision reached, in the form of a written decision, is appropriate and even warranted.  *See*

FED. R. CRIM. P. 48(a) ("The government may, *with leave of court*, dismiss an indictment,

information, or complaint." (emphasis supplied)).

The crux of defendants' critique appears to be the fact that, in explaining the decision to

dismiss the pending criminal cases without prejudice, this Court did not adopt in full the

President's reasons for his issuance of the pardons to convicted defendants and his direction to the

D.C. U.S. Attorney's Office to seek dismissal of the pending cases arising from the January 6,

---

(D.D.C. Jan. 23, 2025), the defendant was charged with felonies for directly assaulting two law enforcement officers and destroying government property, resulting in damages of more than $1,000.  In *United States v. Williams*, No. 21-cr-377 (BAH), 2025 WL 266565, at *1 (D.D.C. Jan. 22, 2025), the defendant faced charges for, in his own words, "storm[ing] the stairs of the Capitol, push[ing] the cops back, . . . and hit[ting] everybody." (alterations in original) (citation, internal quotation marks omitted).  In *United States v. Giusini*, No. 24-cr-318 (BAH), 2025 WL 275683, at *1 (D.D.C. Jan. 23, 2025), the defendant admitted to using physical force to help resist the police line attempting to clear and secure the Capitol building.

8

**JA 238**

2021, attack on the U.S. Capitol.  *See* Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025).

As defendants highlight, this Court, in "[d]irectly rejecting the president's determination"

justifying the "dismissal of pending indictments," instead "curtly stated that no 'national injustice'

occurred here."  Defs. Mot. at 4 (quoting *Jovanovic*, 2025 WL 266551, at *2).  In essence,

defendants are affronted that the President's version of the facts was not simply adopted as reality

by this Court.

Whatever reasons the President gives for the exercise of his pardon power are unreviewable

by the courts.  *See, e.g.*, *United States v. Klein*, 80 U.S. 128, 147 (1871) ("To the executive alone

is intrusted the power of pardon; and it is granted without limit."); *The Laura*, 114 U.S. 411, 413

(1885) (recognizing that the President has "the general, unqualified grant of power to pardon

offenses against the United States"); *United States v. Flynn*, 507 F. Supp. 3d 116, 135-37 (D.D.C.

2020) (collecting and reviewing cases on the scope of the President's pardon power).  While the

President may want a judicial imprimatur to bolster his reasons for a pardon, no court is required

to grant this wish, though courts should explain the reasons for any judicial decision.  That is the

responsibility this Court fulfilled.  *See, e.g.*, *Jovanovic*, 2025 WL 266551, at *1-3 (reviewing the

factual allegations supporting criminal charges against defendant and noting that "the

government's cursory motion provides *no* factual basis for dismissal," acknowledging that "the

government's view of the public interest" does not clearly fall within the types of reasons found

to warrant denial of a government Rule 48(a) motion to dismiss charges, but finding that "[n]othing

about the government's reasoning for dismissal warrants entry of dismissal with prejudice"

(emphasis in original)).[3]

---

[3]    Contrary to the reason given by the President for pardoning defendants charged with criminal conduct at the U.S. Capitol on January 6, 2021—*i.e.*, asserting that these defendants were the subjects of a "national injustice," Proclamation No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025)—the same careful review of the facts and law relevant to each individual case this Court applied to the government's dismissal motions was also given to January 6

**JA 239**

Moreover, the specific statements by this Court in these decisions granting the government's motion to dismissing pending charges against January 6 defendants that are objected to by defendants—*i.e.*, "[n]o 'national injustice' occurred here," *id.* at *2 (quoting Proclamation No. 10887), and that statements to the contrary represented a "revisionist myth," *id.*—provide no basis for finding "recusable . . . bias or prejudice," since these statements were "properly and necessarily acquired in the course of the proceedings," *Liteky*, 510 U.S. at 551, against the specific dismissed defendant and "scores" of other January 6 cases, through review of "extensive videotapes and photographs, admissions by defendants in the course of plea hearings and in testimony at trials, and the testimony of law enforcement officers and congressional staff present at the Capitol" on January 6, 2021, *Jovanovic*, 2025 WL 266551, at *2.  Since these comments properly "reflect[] what [the Court] learned . . . during the proceedings," *Microsoft Corp.*, 253 F.3d at 115, they provide no basis for disqualification.

Decisions from the D.C. Circuit finding that recusal was not warranted in cases involving far more critical comments made about criminal defendants reinforce this determination, *see, e.g.*, *Haldeman*, 559 F.2d at 131-32, 131 n.293 (holding, in a case involving Watergate defendants, that recusal was not warranted despite comments from a previous case "express[ing] a belief that criminal liability extended beyond the seven persons there charged" and "suggest[ing] persons whom the prosecutors might consider calling before the grand jury investigating 'Watergate'"); *In re Flynn*, 973 F.3d at 83 (finding no recusal warranted where the district judge told the defendant,

---

defendants' motions filed during the pendency of their cases, resulting in some rulings by this Court favoring the positions asserted vigorously by their defense counsel, often over the strenuous objection of the government.  *See, e.g.*, *United States v. DeCarlo*, No. 21-cr-73 (BAH), 2024 WL 4650993 (D.D.C. Nov. 1, 2024); *United States v. Lyons*, No. 21-cr-79 (BAH), 2024 WL 3898550 (D.D.C. Aug. 22, 2024) (granting release pending resolution of a motion to vacate January 6 defendant's convictions, despite defendant's failure to appeal, over the government's objection); *United States v. Bledsoe*, No. 21-cr-204 (BAH), 2024 WL 341159 (D.D.C. Jan. 30, 2024) (granting release pending appeal to January 6 defendant over the government's objection); *United States v. Roche*, No. 22-cr-86 (BAH), 2024 WL 1328459 (D.D.C. Mar. 28, 2024) (same).

"[a]rguably, you sold your country out. . . . I'm not hiding my disgust, my disdain for this criminal

offense."), as do similar decisions from other circuits, *see, e.g.*, *United States v. Allen*, 587 F.3d

246, 252 (5th Cir. 2009) (per curiam) (finding no recusal required for a criminal contempt trial

where the district judge previously stated the defendants were "now in criminal contempt as far as

[he was] concerned" (alteration in original)); *United States v. Young*, 45 F.3d 1405, 1414-15 (10th

Cir. 1995) (finding no recusal required where a district judge had previously opined it was

"obvious" that a defendant was "going to get convicted").

### 2.    Two Rulings in Grand Jury Related Matters

Defendants also rely on two decisions issued in grand jury matters, claiming that this Court

"utilized the judicial power against President Trump himself."  Defs.' Mem. at 4 (citing *In re*

*Sealed Case*, 77 F.4th 815, 822 n.2 (D.C. Cir. 2023)); *id*. at 5 (citing decision on crime-fraud

exception to attorney-client privilege as applied to "President Trump's personal attorney").[4]  As

an initial matter, to the extent that defendants' characterization of "utiliz[ing] the judicial power"

means deciding cases brought before the Court by determining the facts and applying the relevant

legal principles, this phrase merely describes the job of a judge.  For that reason, the Supreme

Court's caution that "judicial rulings alone" are "[a]lmost invariably[] . . . proper grounds for

appeal, *not for recusal*," *Liteky*, 510 U.S. at 555 (emphasis supplied), bears repeating, particularly

where, as here, appeals were unsuccessfully pursued in both referenced cases, and President Trump

ultimately voluntarily dismissed the appeal in one of those matters.

The first grand jury related decision defendants cite as an example of purported bias

involved enforcement of a search warrant issued to the company formerly known as Twitter.  *In*

---

[4]    Pursuant to D.D.C. Local Civil Rule 40.7, this Court was tasked, during her service as Chief Judge of the Court from March 2016 until March 2023, with resolving legal issues arising from grand jury investigations taking place in this district court, including such investigations conducted generally by the U.S. Department of Justice, the D.C. U.S. Attorney's Office and by special counsels Robert Mueller, John Durham, Jack Smith, and Robert Hur.

### JA 241

*re Sealed Case*, 77 F.4th at 821. While the company "ultimately complied with the warrant," compliance only occurred "three days after a court-ordered deadline," with which the company had agreed it could and would comply, resulting in a finding of civil contempt and the imposition of a previously-noticed sanction for the delay. *Id.*; *see also* Mem. Op., *In the Matter of the Search of: Information That is Stored at Premises Controlled by Twitter Inc.*, No. 23-sc-31 (BAH) (D.D.C. Mar. 3, 2023) [hereinafter *Twitter Contempt Decision*], Ex. 1 to Notice of Filing of Redacted Mem. Op., *In the Matter of the Search of: Information That is Stored at Premises Controlled by Twitter Inc.*, No. 23-sc-31, ECF No. 32 (D.D.C.) (filed Mar. 3, 2023) (filing a redacted version of the Court's Mem. Op. as an attachment to the notice). On appeal, this Court's decision was unanimously "affirm[ed] . . . in all respects" by the D.C. Circuit. *Id.*[5] To the extent defendants allege bias due to the suggestion that a flight risk may have existed were the investigation publicly revealed, they refer only to standard statutory language included in an order and omit that the D.C. Circuit specifically found that the "ultimate analysis" in this Court's decision "did not rely on risk of flight." *Id.* at 822 n.2.

Defendants also note this Court's questioning of Twitter's counsel in a February 7, 2023, hearing on Twitter's failure to comply with the search warrant, Defs.' Mot. at 5, though how this is supposed to show purported bias is not entirely clear. In context, defendants' cherry-picked quotations were part of close questioning by the Court about the legal justifications put forward by Twitter for its highly unusual positions to challenge the search warrant based on theoretical claims of privilege on behalf of a third-party user of the account at issue and the non-disclosure order based on First Amendment grounds. These were challenges Twitter had apparently never

---

[5] Twitter's petition to the D.C. Circuit for rehearing en banc was denied, No. 23-5044, 2024 WL 158766 (D.C. Cir. Jan. 16, 2024), as was the company's petition to the Supreme Court for certiorari, 145 S. Ct. 159 (2024).

before brought in a case involving a covert search warrant, *see Twitter Contempt Decision* at 1, and in testing whether the privilege and First Amendment grounds were merely masking more obvious business interests to lure then-former President Trump back to using the Twitter platform, the Court posed pointed questions about this business interest to Twitter's counsel. Defendants mischaracterize this line of questions as "editorializing," Defs.' Mot. at 5, but actually this line of questioning was effective in clarifying the issue since, in response, Twitter's counsel conceded that the company "had no standing to assert any privilege by any of its users, including the Target Account's User" and "had no confirmation that the Target Account's User wanted or would seize on any opportunity to assert any privilege if such opportunity were provided," *Twitter Contempt Decision* at 10 (citing Feb. 7, 2023, Hr'g Tr. at 66:3-4, 54:11-25).

The second grand jury related decision cited as an example of purported bias by defendants involved grand jury subpoenas for testimony from two personal attorneys for President Trump, "as part of an investigation into whether the former president orchestrated a scheme unlawfully to retain and hide from the government documents bearing classification markings." Mem. Op. at 1, *In re Grand Jury Subpoena*, No. 23-gj-10 (BAH) (D.D.C. Mar. 17, 2023) [hereinafter *Crime Fraud Decision*], Ex. 12 to President Trump's Mot. to Dismiss the Indictment Based on Prosecutorial Misconduct & Due Process Violations ("Trump MTD"), *United States v. Trump*, No. 9:23-cr-80101-AMC, ECF No. 561 (S.D. Fla.) (filed May 21, 2024) (filing the Court's Mem. Op. as an attachment to this motion). In their strained effort to find some purported bias in this decision, defendants conveniently ignore several notable points. First, the government's motion to enforce these subpoenas and compel testimony was granted only in part and denied in part based on an extensive review of the facts and applicable legal principles, explained in an 85-page opinion. *See generally Crime Fraud Decision*. For example, the government's request to compel the production

13

**JA 243**

of documents from both attorneys was partially denied, *id*. at 74-79, and the government's request

to compel testimony on enumerated topics from one of the attorneys was also partially denied, *id*.

at 78-79.

Second, as a grand jury matter, this decision could have remained under seal, literally

forever, but for the fact that President Trump himself asked for the decision to be unsealed for his

use in support of his motion to dismiss the criminal indictment pending against him in the Southern

District of Florida.  Trump MTD at 20 (citing *Crime Fraud Decision* at 47 n.13).  Specifically, he

relied on a portion of this Court's *Crime Fraud Decision* agreeing with his position presented to

the Florida court that certain aspects of the prosecutor's questioning before the grand jury were

improper.  *Id*.

Finally, defendants do not take issue here with any of the substantive factual or legal

findings in the *Crime Fraud Decision*, *see* Defs.' Mot. at 5, claiming only that the decision suffered

from a "readily apparent lack of venue in this District," *id*. at 1.  In fact, President Trump initially

pursued, and lost on appeal, an effort to stay this Court's decision, Alan Feuer, Ben Protess &

Maggie Haberman, *Appeals Court Orders Trump Lawyer to Hand Over Records in Documents

Inquiry*, N.Y. Times (Mar. 22, 2023), https://www.nytimes.com/2023/03/22/us/politics/trump-

lawyer-classified-documents-investigation.html, before later voluntarily dismissing his appeal, *see*

Order, *In re Sealed Case*, No. 23-3035 (D.C. Cir. May 1, 2023); Order, *In re Sealed Case*, No. 23-

3036 (D.C. Cir. Oct. 4, 2023).

Defendants make a somewhat oblique complaint that this Court, in supervising the grand

jury investigation into then-former President's retention of documents with classified markings,

should have been aware that venue to conduct that investigation in Washington, D.C. was

somehow improper, Defs.' Mot. at 1, 5, when, to the contrary, the documents at issue had been

removed from this district and were being requested by the National Archives located in this district to be returned to this district as records belonging to the American people, not to the former President personally. Notably, a venue challenge was never raised in the hotly litigated motion to compel the testimony of the two personal attorneys—not by the attorneys themselves nor by then-former President Trump—for good reasons. While the grand jury is obtaining and reviewing relevant evidence to assess whether probable cause exists to find that a crime was committed and by whom, determining where venue for a criminal charge properly lies may not become clear until the investigation has sufficiently progressed to assess who is involved in the criminal conduct, where relevant conduct occurred, and the precise charges to be brought. To be sure, by the time the grand jury returns an indictment, "the government must show that 'venue is proper with respect to each count charged.'" *United States v. Slatten*, 865 F.3d 767, 788 (D.C. Cir. 2017) (quoting *United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991)). Here, the *Crime Fraud Decision* was issued several months before any indictment was filed in the Southern District of Florida arising from this aspect of the grand jury's work.

In sum, mere disagreements with the prior legal rulings of this Court do not "constitute a valid basis" for disqualification. *Liteky*, 510 U.S. at 555.

### B.  November 2023 Speech

Defendants also point to a single line in a speech delivered by this Court in November 2023, upon acceptance of an award from the Women's White Collar Defense Association ("WWCDA"), Defs.' Mot. at 3, a non-partisan, non-profit organization that promotes diversity in white-collar and other defense and compliance legal work, *see Membership and Mission*, Women's White Collar Defense Ass'n, https://www.wwcda.org/who-we-are/mission-goals-and-membership-criteria (last visited Mar. 25, 2025). The apolitical, nonpartisan theme of the remarks

15

**JA 245**

defendants cite for purported bias was the importance of facts in the legal profession, the body politic, and American democracy. *See 2023 WWCDA Awards Gala Full Video* ("WWCDA Video") at 1:45:11–1:53:15 (Nov. 30, 2023), YouTube, https://www.youtube.com/watch?v=sNDnJWh1gzE. To support these points, the speech drew on examples from history, including an anecdote about President Abraham Lincoln, *see id.* at 1:47:25–1:48:10, and quoted from a recent bestselling book by a Boston College professor of American history warning about one of the keys to the rise of authoritarianism being the dismissal of facts and reliance on "big lies," *see id.* at 1:48:28–1:49:40. In further emphasis of this point, a single line of the speech reflected on then-recent experiences at the sentencings of individuals involved in the attack on the U.S. Capitol on January 6, 2021, stating that judges on this Court "regularly see the impact of 'big lies' at the sentencing of hundreds, hundreds of individuals who have been convicted for offense conduct on January 6, 2021, when they disrupted the certification of the 2020 presidential election at the U.S. Capitol." *Id.* at 1:49:41–1:50:04. This remark drew on observations of, and comments made by, defendants and their counsel about the motivations for many defendants to engage in this criminal conduct as stemming from their belief in a stolen election, despite the lack of any evidence showing any outcome dispositive election fraud in the 2020 presidential election.

Importantly, and contrary to defendants' assertions, *see* Defs.' Mot. at 3, this speech never mentioned President Trump or took any political positions, nor named any of the media outlets, pundits or politicians cited by January 6 defendants and their counsel in court proceedings as the source for their mistaken belief in a stolen 2020 presidential election. *See generally* WWCDA Video at 1:45:11–1:53:15. To the extent defendants suggest otherwise and even point an accusatory finger at President Trump as the person who must have been the source, that is their

16

**JA 246**

finger and not that of this Court.  Their motion twists and mischaracterizes the words actually

spoken, seemingly adopting the partisan framing by a Republican member of Congress who filed

the ethics complaint referenced by defendants against this Court.  Defs.' Mot. at 3-4; *see also* April

Rubin, *Stefanik Urges Ethics Investigation into Judge Linked to Trump, Jan. 6 Cases*, Axios (Dec.

15, 2023), https://www.axios.com/2023/12/15/stefanik-complaint-ethics-judge-trump.[6]    This

same Republican member of Congress has filed a series of ethics complaints against other judges

who issued rulings perceived to be adverse to President Trump.  *See, e.g.*, Jose Pagliery, *New York*

*Tosses Stefanik's Trump Court Complaint in Bank Fraud Civil Suit*, The Daily Beast (June 3, 2024,

8:01 PM), https://www.thedailybeast.com/new-york-tosses-rep-stefaniks-trump-court-complaint-

in-bank-fraud-civil-suit/ (reporting that an ethics complaint filed by the same Republican member

of Congress against a New York state court judge overseeing a civil trial against President Trump

was dismissed as "having . . . no basis on the facts presented to commence an investigation");

Sophia Cai, *Scoop: Stefanik Files Ethics Complaint Against Judge Merchan*, Axios (May 21,

2024), https://www.axios.com/2024/05/21/stefanik-ethics-complaint-judge-merchan-trump.  Two

independent legal ethics experts characterized the ethics complaint filed against this Court as

failing to "rais[e] any viable ethics issues."  Peter A. Joy & Kevin C. McMunigal, *Ethics Complaint*

*Against    Judge    Howell*,    Crim.    Just.    Magazine    (Summer    2024),

https://www.americanbar.org/groups/criminal_justice/resources/magazine/2024-summer/ethics-

complaint-against-judge-howell/.

---

[6]    Other obvious sources for misinformation about a "stolen" 2020 presidential election were certainly
available.  Indeed, the ethics complaint from the Republican House member was dated the same day a jury in a civil
lawsuit presided over by this Court returned a verdict of $148,169,000.00, in compensatory and punitive damages
for defamation and intentional infliction of emotional distress in favor of two Georgia election workers against
Rudolph W. Giuliani for his false public statements that the plaintiffs had engaged in election fraud when doing their
job of counting ballots for the 2020 presidential election.  *See* Verdict Form, *Freeman v. Giuliani*, No. 21-cv-3354-
BAH, ECF No. 135 (D.D.C. Dec. 15, 2023).

The Supreme Court has long recognized that judges are "not only permit[ted] but encourage[d]" to "state their views on disputed legal issues outside the context of adjudication," including "in classes that they conduct, and in books and speeches." *Republican Party of Minn.*, 536 U.S. at 779. It is "common" for judges to later "confront[] a legal issue on which [they have] expressed an opinion while on the bench," including "in . . . speeches." *Id.* This reality does not undermine a judge's impartiality. In the words of the D.C. Circuit, disqualification "would be extraordinary" for remarks that "reflected what [a judge] learned, or what [the judge] thought [s]he learned, during . . . proceedings" in a case. *Microsoft Corp.*, 253 F.3d at 115. "[C]andid reflections" about a "judge's assessment of a defendant's conduct" offered "on the basis of facts presented during the proceedings . . . simply do not establish bias or prejudice." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 751 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *In re Barry*, 946 F.2d 913, 914 (D.C. Cir. 1991)).

"Candid reflections" are exactly what the remarks at issue here offered, drawing on knowledge and experience from observing and presiding over many cases and trials arising out of the attack on the Capitol on January 6, 2021, and becoming intimately familiar with the facts of that day. *See, e.g.*, *United States v. Warnagiris*, No. 21-cr-382 (PLF), 2025 WL 341990, at *5 (D.D.C. Jan. 30, 2025) (explaining the extensive investigations of the facts of January 6 cases and voluminous evidence presented in each case to support the prosecutions). These cases were used to emphasize the importance of a generally applicable legal theme about the critical importance of accurate fact-finding to the legal process and to the broader health of our democracy. As explained in the speech, a focus on "authentic, reliable, and tested facts" *promotes* confidence that all parties will receive fair processes and just outcomes in federal district courts and federal courts more

18

**JA 248**

broadly.   WWCDA Video at 1:50:04–1:51:05.   Put simply, the nonpartisan discussion of the importance of facts provides no basis for disqualification in this case.

### C.  The Instant Case

Finally, as is clearly laid out in the "Purpose" section of EO 14230, "issues of the Durham investigation, the Fusion GPS report, and the Mueller Report are central to the EO."  Defs.' Mot. at 6; *see also* EO 14230, § 1, 90 Fed. Reg. at 11781.  Defendants take issue with what they call the Court's "concerning and dismissive approach to the entire Durham Investigation" and "[t]he entire Fusion GPS fiasco."  Defs.' Mot. at 6.  While styling this as an accusation about purported bias in the Court's "[c]onduct," *id.*, at its core, this objection appears to be that the Court has not given sufficient deference to how President Trump views these and other events as "dishonest and dangerous activity of the law firm," EO 14230, § 1, 90 Fed. Reg. at 11781, and "actions that threaten our elections, military strength, and national security," *Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-adresses-risks-from-perkins-coie-llp/.   While the President and his administration are promoting an expansive view of presidential authority and claimed that any decisions purportedly made in the name of national security are judicially nonreviewable, *see, e.g.*, Tr. of Mar. 12, 2025, Temporary Restraining Order Hr'g ("TRO Hr'g Tr.") at 30:6–35:12, ECF No. 22; *see also id.* at 45:23–48:11 (defense counsel explaining defendants' position that "the President has that power, and that it is the right and prerogative of the President as the sole individual vested with Article II authority to exercise that prerogative"), that legally debatable claim is at the heart of the challenge in this case, *see, e.g.*, *id.* at 18:7–21:6 (plaintiff's counsel articulating position that the President's conduct violated fundamental constitutional rights and that the use of "the 'national security' words are a

pretext"); *id.* at 62:24–64:22 (plaintiff's counsel further articulating plaintiff's position that the President's actions exceeded his constitutional authority). The mere fact that the Court, in an emergency hearing on a temporary restraining order held less than 24 hours after the filing of the motion, did not immediately adopt defendants' legal arguments about the level of deference owed to the President, even when a national security justification is asserted, does not mean bias exists when foundational constitutional principles and norms are also at stake.

Moreover, defendants' motion mischaracterizes the discussion of Fusion GPS and the Mueller investigation. While noting possible "big differences of view" on these topics, the Court took "at face value" "[t]he President's perspective" on the issue and used this viewpoint to evaluate the likely legality of EO 14230. TRO Hr'g Tr. at 32:15–33:16; *see also id.* at 33:21–43:14 (questioning defendants' counsel about aspects of the legality of the order). The Court recognized that President Trump is "certainly entitled to his own beliefs, entitled to his preferred causes, and he is entitled to hold tight to his own dislikes." *Id.* at 103:19-21. As a legal matter, however, the Court found at this stage that "[t]he Constitution protects all [Americans] . . . from the exercise of [the President's] targeted power based on those dislikes, to bring the force of the federal government down on the lawyers representing his political opponents and challengers to his political actions, as he has done here." *Id.* at 103:22–104:1.

As this case continues, pursuant to the briefing schedule jointly proposed by the parties, Joint Status Report ¶ 3, ECF No. 25, and adopted by the Court, Order, ECF No. 26, the parties will have the opportunity to present relevant evidence and legal arguments, which will receive full, fair, and impartial consideration, as does every case before this Court. To the extent the parties disagree with the final judgment entered, the normal judicial process of appeal applies. *See* FED.

R. APP. P. 4.  Defendants' disagreements, no matter how strong, with this Court's preliminary legal determinations simply provide no basis for disqualification.  *Liteky*, 510 U.S. at 555.

## III.    CONCLUSION AND ORDER

For the reasons addressed above, defendants' motion to disqualify this Court pursuant to 28 U.S.C. § 455, ECF No. 34, which relies only on speculation, innuendo, and basic legal disagreements that provide no basis for disqualification of a judge, must be denied.  Therefore, it is hereby—

**ORDERED** that defendants' Motion to Disqualify Judge Beryl Howell, ECF No. 34, is **DENIED.**

**SO ORDERED.**

Date:  March 26, 2025

_____
**BERYL A. HOWELL**
United States District Judge

**JA 251**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

            *Plaintiff*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

            *Defendants*.

Case No. 1:25-cv-00716 (BAH)

Judge Beryl A. Howell

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to Local Civil Rule 7(h), Plaintiff Perkins Coie LLP submits the following Statement of Material Facts as to Which There Is No Genuine Dispute in support of its Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief.

## I.    Perkins Coie LLP Is an Established, Reputable Law Firm

### A.    Perkins Coie has Represented Clients for More than 100 Years

1.    Perkins Coie is an international law firm that conducts its U.S. operations and activities through a limited liability partnership, Perkins Coie LLP.  Burman Decl. ¶ 1.

2.    Perkins Coie was founded in 1912 in Seattle by a retiring U.S. District Judge and U.S. Attorney.  Burman Decl. ¶ 4.

3.    Since 1912, Perkins Coie has grown to become the largest law firm in the Pacific Northwest, has opened offices throughout the United States and in Asia and in Europe, and has more than 1,200 lawyers.  Burman Decl. ¶ 4.

4.    The firm's lawyers are members of national, state, and local bar associations around the country.  Among other esteemed professional organizations, its lawyers are members of the American Bar Association, state bar associations for nearly every state in the country, and local

1

## JA 252

bar associations in such cities and counties as Chicago, King County, Los Angeles County, Maricopa County, New York City, San Francisco, and Washington, D.C. Burman Decl. ¶ 6.

5.      The firm represents a wide range of clients, including Fortune 500 companies, small- and medium-sized businesses, families, individuals, and charitable and public service-oriented organizations. Burman Decl. ¶ 5.

6.      Perkins Coie alumni have been and are presently serving as state and federal court judges, judicial law clerks, prosecutors, public defenders, and high-ranking government officials, as well as founders, CEOs, and General Counsels of some of the nation's largest and most important companies. Burman Decl. ¶ 5.

7.      Perkins Coie and its lawyers have represented clients in most, if not every, state, in federal and state courts across the nation, and in tribunals throughout the world (including the Supreme Court of the United States), and they have helped to establish major precedent in state and federal law. Burman Decl. ¶ 6.

8.      Perkins Coie has been named as an "Am Law 50" firm on *The American Lawyer 100* list for over a decade. The firm and its lawyers are regularly recognized for excellence in the legal community by *Best Lawyers*®, *Chambers USA*, and other respected organizations, including national and local bar associations. Burman Decl. ¶ 7.

9.      Perkins Coie has been named to *Fortune*'s "100 Best Companies to Work For" list for over 20 consecutive years, and its individual offices are often named to similar local lists. Burman Decl. ¶ 12.

10.     Perkins Coie has approximately 2,500 lawyers and business professionals. Of those, nearly half are attorneys—including equity partners, non-equity partners, and associates,

among others—and half are business professionals—including paralegals, patent agents, legal assistants, and other professionals.  Burman Decl. ¶ 8.

11.    Perkins Coie's personnel include former members of the armed forces and current reservists in the U.S. military.  Many of the firm's partners and business professionals also serve as Sunday school teachers, Scouts leaders, youth sports coaches, and volunteers serving on hundreds of boards of organizations ranging from art museums and food kitchens to major universities, local schools, and foundations.  Burman Decl. ¶ 8.

12.    Perkins Coie's attorneys are drawn from all sides of the political spectrum, and most of its attorneys are not politically active.  Burman Decl. ¶ 9.

13.    Many Perkins Coie attorneys joined the firm after government service under both Democratic and Republican administrations, or after serving as judges or judicial law clerks to judges appointed by both Democratic and Republican presidents.  Burman Decl. ¶ 9.

14.    In the past six years, four current or former Perkins Coie lawyers have been nominated and confirmed to serve as federal judges—two by President Trump in 2019, and two by President Biden in 2021 and 2023.  One former partner ran for Congress as a Republican, won, and returned to the firm for a time after he lost re-election. Another former partner was elected Washington Attorney General as a Republican.  Burman Decl. ¶ 9.

15.    The firm has a longstanding, firmwide commitment to pro bono service.  Since 1989, the firm has provided approximately 1.45 million hours of pro bono service by attorneys, paralegals, and other business professionals to numerous clients, including veterans, indigent families, disabled persons, and community-based organizations of all sizes, including the League of Women Voters and other non-partisan organizations, in matters championing human, civil, and electoral rights, housing, education, food, benefits, and economic justice.  Perkins Coie's pro bono

**JA 254**

service also extends to representing indigent criminal defendants before federal courts by court appointment and clients on death row in states with limited pro bono resources. Burman Decl. ¶ 10.

16.    In 2024, Perkins Coie lawyers, paralegals, and other business professionals spent over 89,000 hours, valued at nearly $70 million, in pro bono service. Burman Decl. ¶ 10.

17.    Perkins Coie has received numerous awards from a wide range of organizations for its pro bono representation, including state and local bar associations, the U.S. Patent and Trademark Office 2023 Patent Pro Bono Achievement Certificate, the U.S. District Court for the District of Arizona 2022 Outstanding Pro Bono Attorney of the Year Award (awarded in 2023), and the 2023 Veteran Heroes Law Firm Award by the Attorney General of Washington's Office of Military and Veteran Legal Assistance. Burman Decl. ¶ 11.

**B.    Perkins Coie Is Committed to Advancing Diversity and Inclusion Within the Firm and the Legal Industry**

18.    In addition to its representation of clients in this area, Perkins Coie has a longstanding and demonstrable commitment to fostering diversity and inclusion (D&I) within the firm, the legal profession and its community. This commitment is reflected on the Perkins Coie website, which states:

- "We are intentional and consistent in our efforts to increase the diversity of our workforce and to advance the values of diversity and inclusion in the legal profession. Diversity and inclusion are key to our culture, our values, and our business strategy. They are fundamental to the way we connect with and serve our clients.";

**JA 255**

- "Perkins Coie is committed to advancing diversity and inclusion both within the firm and throughout our collective communities.  We will continue to support and participate in efforts to make the legal profession more diverse and inclusive."

Burman Decl. ¶ 13; Ex. 1, p. 2 (Perkins Coie Website).

19.    Like the federal government, Perkins Coie formally recognizes Martin Luther King Jr. Day and Juneteenth as firmwide holidays, reinforcing the firm's commitment to racial equity through institutionalized reflection, education, and service.  The firm encourages attorneys and staff to engage in volunteer activities on these days, supporting local community organizations dedicated to advancing racial justice.  Burman Decl. ¶ 14.

20.    Perkins Coie observes many heritage months, including several that have been recognized by Congress, by conducting programming aimed at fostering awareness and appreciation of diverse cultural narratives.  These include, but are not limited to, Black History Month, Asian American and Pacific Islander Heritage Month, Women's History Month, Pride Month, and Hispanic Heritage Month.  These initiatives are complemented by firm-wide speakers, panel discussions, and presentations open to all Perkins Coie personnel designed to encourage meaningful dialogue on diversity-related topics.  These programs benefit all the firm's personnel and the firm believes that they make for a more cohesive and effective working environment. Burman Decl. ¶ 14.

21.    Perkins Coie's hiring and promotion decisions are merit-based: all candidates are evaluated based on qualifications, competencies, personality, and demonstrated excellence.  The firm's hiring committee and interviewers undergo training on best practices for inclusive hiring, mitigating implicit biases, and fostering fair opportunities.  Burman Decl. ¶ 15.  Perkins Coie does not have "percentage quotas" as part of its hiring practices.  Burman Decl. ¶ 15.

5

**JA 256**

22.    Perkins Coie has a Diversity & Inclusion Fellowship program that is expressly open to all first-year law students.  Burman Decl. ¶ 16; Ex. 2, p. 3 (Perkins Coie Website).

23.    Following litigation initiated by the American Alliance for Equal Rights in 2023, the firm explicitly affirmed the inclusive nature of the fellowship to ensure continued adherence to principles of fairness and legal compliance.  After the firm's confirmation that the law student fellowships were open to all, the American Alliance for Equal Rights voluntarily dismissed its lawsuit.  Burman Decl. ¶ 17.

**C.    Many of Perkins Coie's Practices Require Interaction with the Federal Government**

24.    As a full-service law firm that represents clients across all sectors of the economy in transactional, litigation, and regulatory matters, Perkins Coie lawyers necessarily interact with the federal government on behalf of their clients.  Those interactions are crucial to their ability to practice their profession.  Burman Decl. ¶ 19.

25.    Most of the firm's litigation practice occurs in federal court on behalf of its clients in civil and criminal cases, as well as in federal agencies' in-house administrative proceedings.  Burman Decl. ¶ 19.

26.    The firm has nearly one thousand cases currently pending before federal district, bankruptcy, and appellate courts, including the Supreme Court of the United States.  Burman Decl. ¶ 19.

27.    Perkins Coie attorneys have upcoming appearances scheduled before agencies and in courtrooms, including an argument before the Supreme Court.  Burman Decl. ¶ 19.

28.    Perkins Coie represents clients who have been criminally charged or are the targets of pending federal criminal investigations.  Over the past five years, the firm has represented more than 80 individuals and companies who have been criminally investigated, charged, or prosecuted

6

**JA 257**

by federal authorities at the Department of Justice. This list does not include the firm's work in federal criminal-adjacent areas, such as clemency petitions or other post-conviction relief beyond direct appeals, such as pardons or compassionate release. Burman Decl. ¶¶ 20.

29.    The firm has nine practice groups, and all of them intersect with the federal government in some way and include clients with business before the federal government. Burman Decl. ¶ 21.

30.    The largest practice groups by headcount are Commercial Litigation, Business, and Intellectual Property, which together account for approximately 75% of the firm's attorneys. Burman Decl. ¶ 21.

31.    The smallest practice group by headcount is Political Law, which includes 8 attorneys, plus 19 attorneys who are members of other practice groups and also affiliated with the practice. Burman Decl. ¶ 21.

32.    In the course of their representations, Perkins Coie lawyers frequently meet with federal officials from many federal agencies. Burman Decl. ¶ 22.

33.    The significant majority of the firm's clients have matters that require Perkins Coie lawyers to interact with federal agencies. Burman Decl. ¶ 22.

34.    A significant number of Perkins Coie clients are, or have affiliates who are, government contractors and subcontractors—including 100% of its top 15 clients by revenue. Burman Decl. ¶ 23. The firm is frequently sought out by leading technology and communications companies who are innovating in areas as varied as artificial intelligence, telecommunications, and the Internet of Things. Burman Decl. ¶ 6.

35.    Perkins Coie is constrained by Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, and thus cannot disclose client engagements without authorization.

No client has authorized Perkins Coie to disclose its engagement of the firm in connection with this litigation.  Burman Decl. ¶ 18.

36.    The firm's Government Contracts group handles clients' bid protests and disputes surrounding contract claims, including transactional work and litigation.  Perkins Coie represents some of these clients in connection with government contract matters.  Burman Decl. ¶ 24.

37.    The approximately nine attorneys in the Government Contracts group currently are handling approximately 70 government contracting matters involving various federal agencies.  Burman Decl. ¶ 24.

38.    Many other firm clients that have government contracts have engaged Perkins Coie to represent them in matters unrelated to their government contracts.  Burman Decl. ¶ 24.

39.    Perkins Coie's Intellectual Property group and its clients also depend heavily on access to the federal government.  The approximately 236 attorneys in this group frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board.  Burman Decl. ¶ 25.

40.    Perkins Coie is currently representing clients in approximately 5,415 pending patent applications before the USPTO.  Burman Decl. ¶ 25.

41.    Perkins Coie is also representing clients in approximately 56 active post-grant proceedings (i.e., administrative trial proceedings) before the Patent Trial and Appeal Board (PTAB), and approximately 11 active proceedings before the International Trade Commission (ITC).  Burman Decl. ¶ 25.

42.    Perkins Coie is also representing clients in trademark and copyright matters before agencies, including approximately 66 matters before the Trademark Trial and Appeal Board

8

**JA 259**

(TTAB), approximately 1,960 pending trademark matters before the USPTO, and approximately 145 pending copyright matters before the Copyright Office.  Burman Decl. ¶ 25.

43.     Many of Perkins Coie's patent and trademark clients have contracts with the federal government.  Burman Decl. ¶ 25.

44.     Perkins Coie has approximately 340 attorneys in its Business group.  Burman Decl. ¶ 26.

45.     The Business group includes subgroups directed to financial regulation, which requires them to engage with federal financial regulatory agencies and instrumentalities (such as the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency); international trade, which involves interaction with and practice before the Department of Commerce and the International Trade Commission; and tax, which involves interaction with the Internal Revenue Service.  Burman Decl. ¶ 26.

46.     The international trade group also has approximately 17 pending matters before the Department of Labor and approximately 22 pending matters before U.S. Citizenship and Immigration Services.  Burman Decl. ¶ 26.

47.     The group's corporate and securities practice regularly represents clients before and in connection with the Securities and Exchange Commission (SEC), including No Action Request Letters, Securities Act registration statements subject to SEC review, and Exchange Act filings. Burman Decl. ¶ 26.

48.     The Business group also represents clients before or in connection with the Department of Agriculture, the Food and Drug Administration, Department of Transportation, Department of Labor, Department of Justice, Department of Homeland Security, and Department of State.  Burman Decl. ¶ 26.

**JA 260**

49.    Perkins Coie's White Collar & Investigations practice (a subgroup of the Commercial Litigation group) includes approximately 29 attorneys and is almost exclusively reliant on interacting with the federal government. Burman Decl. ¶ 27.  The White Collar & Investigations practice involves representing clients in investigations and after indictments in numerous proceedings involving many agencies of the federal government, including the Department of Justice, Federal Bureau of Investigation (FBI), U.S. Attorney's Offices, and SEC, among others.  Burman Decl. ¶ 27.

50.    There are many other practice groups and subgroups at Perkins Coie that interact, by necessity, with the federal government on behalf of their clients.  These groups include, but are not limited to, Commercial Litigation (with subgroups including Appeals, Issues & Strategy; Construction; and Antitrust); Environment, Energy & Resources; Labor & Employment; Private Client Services; Product Liability; and Real Estate & Land Use.  Burman Decl. ¶ 28.

51.    Much of Perkins Coie's work on behalf of its clients requires access to federal government buildings, which house both courthouses and agencies.  Burman Decl. ¶ 28.

52.    Every practice group at the firm has work on behalf of its clients that requires access to federal government buildings.  Burman Decl. ¶ 28.

53.     Certain of the firm's practice areas, such as White Collar & Investigations, are almost exclusively reliant on interacting with the federal government.  Burman Decl. ¶ 28.

54.    Each of Perkins Coie's nine major practice groups relies on clients who have done business with the federal government.  Burman Decl. ¶ 28.

55.    Clients who have done business with the federal government or their corporate affiliates account for a significant fraction of revenue in each practice group, as evidenced by the top 15 clients in each practice group (84% of revenue from top 15 clients in Business from those

that have or whose corporate affiliates have government contracts; 90% for Commercial Litigation; 88% for Intellectual Property; 51% for Environment, Energy & Resources; 75% for Labor & Employment; 44% for Political Law; 51% for Private Client Services; 94% for Product Liability; 32% for Real Estate & Land Use).  Burman Decl. ¶ 28.

56.    Perkins Coie has active civil and criminal matters on behalf of its clients involving at least the following federal agencies, instrumentalities, or other bodies which require them either to interact with or appear before federal government officials:

- Administration for Strategic Preparedness and Response
- Advisory Council on Historic Preservation
- Biomedical Advanced Research and Development Authority
- Bonneville Power Administration
- Bureau of the Census
- Bureau of Economic Analysis
- Bureau of Indian Affairs
- Bureau of Industry and Security
- Bureau of Land Management
- Bureau of Ocean Energy Management
- Bureau of Reclamation
- Bureau of Safety and Environmental Enforcement
- CHIPS Program Office
- Committee on Foreign Investment in the United States
- Commodity Futures Trading Commission
- Consumer Financial Protection Bureau
- Defense Contract Audit Agency
- Defense Contract Management Agency
- Defense Logistics Agency
- Department of Agriculture
- Department of the Army
- Department of Commerce
- Department of Defense
- Department of Energy (including Oak Ridge National Laboratory)
- Department of Health & Human Services
- Department of Homeland Security
- Department of the Interior
- Department of Justice (including Antitrust, CCIPS, Civil, Fraud)
- Department of Labor
- Department of State
- Department of Transportation

11

**JA 262**

- Department of Toxic Substance Controls
- Department of the Treasury
- Department of Veterans Affairs
- Directorate of Defense Trade Controls
- Drug Enforcement Administration
- Environmental Protection Agency
- Equal Employment Opportunity Commission
- Executive Office of the President (including CEQ, OMB, and OSTP)
- Fannie Mae and Freddie Mac
- Federal Aviation Administration
- Federal Bureau of Investigation
- Federal Bureau of Prisons
- Federal Communications Commission
- Federal Deposit Insurance Corporation
- Food & Drug Administration
- Federal Election Commission
- Federal Emergency Management Agency
- Federal Energy Regulatory Commission
- Federal Highway Administration
- Federal Permitting Improvement Steering Council
- Federal Transit Administration
- Financial Crimes Enforcement Network
- Financial Industry Regulatory Affairs
- Government Accountability Office
- Grid Deployments Office
- Housing and Urban Development
- Internal Revenue Service
- International Trade Administration
- Loan Programs Office
- National Institutes of Health
- National Labor Relations Board
- National Marine Fisheries Service
- National Oceanic and Atmospheric Administration
- National Park Service
- National Renewable Energy Lab
- Office of Clean Energy Demonstrations
- Office of Federal Contract Compliance Programs
- Office of Foreign Assets Control
- Office of the Comptroller of the Currency
- Office of the U.S. Trade Representative
- Pacific States Marine Fisheries Commission
- Patent Trial & Appeal Board
- Rural Utilities Service
- Securities & Exchange Commission

12

**JA 263**

- Small Business Administration
- Trademark Trial & Appeal Board
- U.S. Army Corps of Engineers
- U.S. Attorney's Offices
- U.S. Copyright Office
- U.S. Citizenship and Immigration Services
- U.S. Customs and Border Protection
- U.S. Fish & Wildlife Service
- U.S. Forest Service
- U.S. Immigration and Customs Enforcement
- U.S. International Trade Commission
- U.S. Patent & Trademark Office
- U.S. Postal Inspection Service
- U.S. Secret Service

Burman Decl. ¶ 29.

57.     Perkins Coie's pro bono work is frequently before federal agencies or involves interacting with federal government officials.  Burman Decl. ¶ 30.

58.     Perkins Coie attorneys represent individual veterans pro bono in obtaining benefits before the Department of Veterans Affairs and the Department of Defense.  Perkins Coie has approximately 41 open pro bono matters for individual veterans, the majority of which relate to seeking higher levels of benefits for veterans in connection with their service to this country, such as application for combat-related special compensation (before the Combat-Related Special Compensation Board); discharge upgrade petitions; and appeals to the U.S. Court of Appeals for Veterans Claims.  Burman Decl. ¶ 30.

59.     In the past five years, Perkins Coie has handled 90 matters for individual servicemembers related to veterans' rights.  Burman Decl. ¶ 30.

60.     Perkins Coie received the 2023 Veterans Heroes Law Firm Award by the Attorney General of Washington's Office of Military and Veteran Legal Assistance (OMVLA).  That award recognizes the law firm that provided the greatest contribution to OMVLA in any given year. Burman Decl. ¶ 30.

**JA 264**

61.    The National Veterans Legal Services Program (NVLSP) also selected a Perkins Coie attorney to receive the 2020 NVLSP Lawyers Serving Warriors Excellence Award.  Burman Decl. ¶ 30.

62.    The entire veterans-rights practice requires access to federal officials and buildings. Burman Decl. ¶ 30.

63.    Perkins Coie attorneys also represent disaster victims on a pro bono basis in FEMA applications and appeals.  Burman Decl. ¶ 30.

64.    Perkins Coie attorneys represent pro bono clients in social-security matters, including Social Security Income (SSI) and Social Security Disability Insurance (SSDI) cases. Burman Decl. ¶ 30.

65.    Perkins Coie represents several nonprofits pro bono for a range of matters, including obtaining federal tax exemptions, formation, and counseling.  Burman Decl. ¶ 30.

66.    Perkins Coie represents pro bono low-income inventors with patent applications before the USPTO, and assists organizations and small businesses in registering trademarks. Burman Decl. ¶ 30.

67.    Perkins Coie attorneys also provide pro bono representation to religious organizations.  Burman Decl. ¶ 30.

68.    Much of Perkins Coie's pro bono work is not political.  Only about 20% of the pro bono matters, and 35% of the pro bono time spent over the past year, were attributable to cases that might be viewed as "political" – i.e., cases involving transgender service members, homelessness, immigration, reproductive rights, the First or Second Amendments, elections, discrimination, or right to die.  By contrast, 80% of Perkins Coie's pro bono matters, and nearly two-thirds of its pro bono hours over the past year, were devoted to non-political matters such as

veterans, domestic abuse, Criminal Justice Act appointments to represent indigent defendants, Social Security disability payments, patents and trademarks, business and non-profit tax counseling.  Burman Decl. ¶ 31.

69.    Examples of the type of pro bono work that might be considered "political" include: (1) a challenge to a state law that prevented pregnant individuals from using midwives that employ traditional healing practices for prenatal, maternal, and infant care; (2) assisting a faith-based "crisis" pregnancy resources center in a lease dispute; and (3) assisting a deported veteran—who had lived in the United States as a lawful permanent resident since the age of five—in returning to the United States through humanitarian parole.  Burman Decl. ¶ 32.

   **D.    Some Former Perkins Coie Lawyers Represented Clients Aligned with the Democratic Party**

70.    Perkins Coie's Political Law Group has historically been much smaller than the firm's other practice groups.  Burman Decl. ¶ 21.

71.    In 2021, the Political Law Group shrank further when Marc Elias and about 50 other attorneys left Perkins Coie to form the Elias Law Group.  Burman Decl. ¶ 21.

72.    The Elias Law Group describes itself as "a mission-driven firm committed to helping Democrats win, citizens vote, and progressives make change."  Marc Elias and other former Perkins Coie lawyers founded the firm to "focus[] on representing the Democratic Party, Democratic campaigns, nonprofit organizations, and individuals committed to securing a progressive future."  Manning Decl. ¶ 2, Ex. 1.

73.    Today, Perkins Coie's Political Law Group includes 8 attorneys (and 19 other attorneys who are members of other practice groups and also affiliated with the practice).  Burman Decl. ¶ 21.

74.     The Political Law Group accounts for about 0.5% of the firm's revenue.   It historically has handled a mix of paying and some pro bono cases, and is often called on to advise clients (typically corporations and business organizations) on political finance issues.   Burman Decl. ¶ 21.

75.     In 2016, Marc Elias and others at Perkins Coie represented Hillary Clinton in connection with her presidential campaign, including the engagement of Fusion GPS.   Burman Decl. ¶ 60.   No attorney employed by Perkins Coie during the last three years was involved with the engagement of Fusion GPS.   Burman Decl. ¶ 60.

76.     On May 31, 2022, a former Perkins Coie attorney who was not in the Political Law group, Michael Sussmann, was acquitted of lying to the FBI about links between the Trump organization and Russia.   Manning Decl. ¶ 61, Ex. 60; *United States v. Sussmann*, 21-CR-582 (CRC), ECF No. 156 (May 31, 2022) (Judgment of Acquittal).   Mr. Sussmann, who had considerable experience as a cybersecurity lawyer, had been engaged by the Clinton campaign after its emails were hacked.   Mr. Sussmann left Perkins Coie in 2021.   Burman Decl. ¶¶ 60-61.

77.     In 2020, Perkins Coie represented a number of clients opposing then-candidate Trump's challenges to the results of the 2020 Presidential Election.   Perkins Coie's clients prevailed in all but one of the challenges brought by the Trump campaign.   The case where Perkins Coie's client did not prevail involved a challenge to the deadline—November 9 versus November 12—to confirm the identities of first-time voters who voted by mail in Pennsylvania.   Burman Decl. ¶ 33.

78.     In 2020, the firm's clients also prevailed in a significant number of voting rights cases, including cases where its clients were successful in defending existing laws against various legal challenges.   Burman Decl. ¶ 33.

79.     Perkins Coie has represented both party-affiliated and non-partisan clients in litigation over election laws.  None of Perkins Coie's election-related litigation was frivolous. More than half of the litigation was successful after both sides had full due process.  And much of the litigation was defending state election procedures and actions taken by state officials.  Burman Decl. ¶ 61.

**E.    President Trump's 2022 Lawsuit Against Perkins Coie, Hillary Clinton, Michael Sussmann, and Others**

80.     On March 24, 2022, Donald Trump sued 31 individuals and entities, including Perkins Coie, Hillary Clinton, the Democratic National Committee, Fusion GPS, and former Perkins Coie partners Michael Sussmann and Marc Elias in the U.S. District Court for the Southern District of Florida alleging that the defendants "maliciously conspired to weave a false narrative" that Mr. Trump was colluding with Russia, including by "falsifying evidence, deceiving law enforcement, and exploiting access to highly-sensitive data sources."  The complaint also alleged that "Perkins Coie was tasked with spearheading the scheme to find—or fabricate—proof of a sinister link between Donald J. Trump and Russia."  Mr. Trump asserted civil RICO claims against certain defendants, including Perkins Coie, for conspiring with the Clinton campaign and sought to recover damages in excess of $24 million, before trebling, as well as attorney's fees and lost profits. *Trump v. Clinton et al.,* 2:22-cv-14102, Dkt. 1, (S.D. Fla. 2022).

81.     On September 8, 2022, the court dismissed the lawsuit with prejudice.  *Trump v. Clinton et al.,* 626 F. Supp. 3d 1264 (S.D. Fla. 2022).  The court decision stated "[w]hatever the utilities of [the Amended Complaint] as a fundraising tool, a press release, or a list of political grievances, it has no merit as a lawsuit."  *Id.* at 1264.

82.     Some of those defendants, but not Perkins Coie, sought sanctions.  The court sanctioned Mr. Trump, and his attorneys Alina Habba and Habba Madaio & Associates,

$937,989.39 for, among other things, bringing a frivolous case "in order to dishonestly advance a political narrative." *See Trump v. Clinton et al.,* 2:22-cv-14102, Dkt. 302 (S.D. Fla.). The court stated that the case was part of "[a] continuing pattern of misuse of the courts by Mr. Trump and his lawyers" which "undermines the rule of law, portrays judges as partisans, and diverts resources from those who have suffered actual legal harm." *Id.*

83.    In 2021, three former Perkins Coie attorneys were sanctioned, collectively, $8,700 in connection with a single duplicative motion to supplement the record in a Fifth Circuit appeal in a voting-rights case. None of the three sanctioned attorneys remains at Perkins Coie. *See Tex. All. for Retired Ams. v. Hughs*, No. 20-40643, Dkt. No. 127-1 (5th Cir. Jun. 30, 2021).

### F.    Perkins Coie's Current Litigation Against the Trump Administration

84.    On February 6, 2025, Perkins Coie filed a lawsuit, *Shilling v. Trump*, No. 2:25-cv-241 (W.D. Wash.), on behalf of Commander Emily Shilling, Commander Blake Dremann, Lieutenant Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class Jane Doe, Staff Sergeant Videl Leins, Matthew Medina, and the Gender Justice League challenging Executive Order 14185 entitled "Restoring America's Fighting Force," which purports to address risks posed by transgender military servicemembers. *Shilling v. Trump*, No. 2:25-cv-241, Dkt. 1 (W.D. Wash.).

85.    Perkins Coie represents the plaintiffs in *Shilling* on a pro bono basis as co-counsel, along with Lambda Legal and the Human Rights Campaign. On February 19, 2025, Perkins Coie, on behalf of its clients, filed a motion for a preliminary injunction asking the court to bar implementation of the executive order until it could adjudicate the case. *Shilling*, No. 2:25-cv-241, Dkt. No. 23 (W.D. Wash.).

86.     Perkins Coie's clients in *Shilling* argue that the Order violates their First Amendment, due process, and equal protection rights. The court entered a preliminary injunction on March 27, 2025. *Shilling*, No. 2:25-cv-241, Dkt. No. 103 (W.D. Wash.).

87.     On January 28, 2025, a group of plaintiffs filed an earlier parallel lawsuit challenging Executive Order 14185. *Talbott v. Trump*, No. 25-cv-240, Dkt. 1 (D.D.C.). Perkins Coie does not represent those individuals and is not otherwise involved in that litigation. Burman Decl. ¶ 35.

88.     On March 18, 2025, the court granted the *Talbott* plaintiffs' motion for a preliminary injunction, holding that Executive Order 14185 violated the *Talbott* plaintiffs' equal protection rights. *Talbott v. Trump*, No. 25-cv-240, Dkt. 89 (D.D.C.).

### G.     Perkins Coie Personnel Maintain Security Clearances for Matters Unrelated to the Executive Order

89.     At the time Executive Order 14230 was issued, *see infra* ¶ 123, approximately twenty-four Perkins Coie lawyers and business professionals held security clearances. These individuals include a dozen persons with former military or other public service backgrounds, granted access to sensitive information by virtue of their commitment to public service. These individuals also include and overlap with persons whose access to sensitive information has been granted in the context of their fulfilling their obligations as lawyers to represent their clients. Burman Decl. ¶ 36.

90.     Of the twenty-four security clearance holders, twenty-one received clearance from the Department of Defense and the other three received clearance from the Department of Justice and Federal Bureau of Investigation. Burman Decl. ¶ 37.

91.     One partner received a security clearance on February 12, 2025, after President Trump's inauguration and approximately three weeks before the Executive Order issued. The

"Adjudication History" in the Defense Information System for Security (DISS) for the partner reflected "**Top Secret adjudication completed** with a **determination of Favorable by DoD CAS on 2025/02/12**." (emphasis in original.)  All of the factual conclusions recited in Section 1 of the Executive Order occurred before that partner received a security clearance.  Burman Decl. ¶ 39.

92.    None of the security clearance holders is a primary member of the Political Law Group.  Burman Decl. ¶ 41.

93.    Ten of the security clearance holders were hired at Perkins Coie after the 2016 election.  Burman Decl. ¶ 40.

94.    Nineteen of the security clearance holders had no involvement in any of the matters referenced in the Order or the Fact Sheet.  Of the five that did, the security clearances they held were unrelated to their work on those matters.  Burman Decl. ¶ 41.

95.    No security clearance holder had any involvement in the Fusion GPS matter.  Burman Decl. ¶ 41.

96.    No security clearance holder has any involvement with the *Shilling* matter.  Burman Decl. ¶ 41.

97.    Nine of the security clearance holders received their clearance prior to being hired by Perkins Coie.  Burman Decl. ¶ 38.  Two of those individuals hold clearances in connection with their duties as military reservists, and wholly unrelated to their work at Perkins Coie.  Burman Decl. ¶ 38.

98.    Four of the twenty-four individuals with security clearances are non-attorneys.  Burman Decl. ¶ 38.

99.    Perkins Coie previously (but does not now) maintained a secure area with a low classification level, namely a secure working environment, but that secure area was closed prior

to the issuance of the Order.  Perkins Coie has never maintained a Sensitive Compartmented Information Facility (SCIF).  Burman Decl. ¶ 42.

## II. For Almost a Decade, President Trump Has Routinely Attacked and Vowed to Retaliate Against Perkins Coie and Lawyers Previously Associated with the Firm (Marc Elias and Michael Sussmann)

100.   Since the 2016 Presidential Election, President Trump has made numerous statements directed at Perkins Coie and its lawyers, particularly former partners Marc Elias and Michael Sussmann.  Manning Decl. ¶¶ 3-23, Exs. 2-22.  Both as a candidate and as President, Mr. Trump has threatened retribution against them.  Manning Decl. ¶¶ 3-23, Exs. 2-22.  Some non-exhaustive examples include the following:

101.   On October 19, 2017, then-President Trump posted on "X," formerly Twitter: "Workers of firm involved with the discredited and Fake Dossier take the 5th. Who paid for it, Russia, the FBI or the Dems (or all)?"  Manning Decl. ¶ 3, Ex. 2.

102.   On August 6, 2018, then-President Trump posted on X: "Collusion with Russia was very real.  Hillary Clinton and her team 100% colluded with the Russians, and so did Adam Schiff who is on tape trying to collude with what he thought was Russians to obtain compromising material on DJT.  We also know that Hillary Clinton paid through....a law firm, eventually Kremlin connected sources, to gather info on Donald Trump. Collusion is very real with Russia, but only with Hillary and the Democrats, and we should demand a full investigation."  Dan Bongino on @foxandfriends Looking forward to the new IG Report!"  Manning Decl. ¶ 4, Ex. 3.

103.   On November 9, 2018, then-President Trump took questions from reporters on the South Lawn, which the White House later posted under "Remarks by President Trump Before Marine One Departure."  When asked by a reporter about whether there was any evidence of voter fraud in Broward County, Florida, then-President Trump stated, "[a]ll of a sudden, they're finding

votes? . . . And you have this guy, Elias, who represented Hillary Clinton and a lot of shady things."
Manning Decl. ¶ 5, Ex. 4.

104.    On November 9, 2018, then-President Trump posted on X:  "As soon as Democrats
sent their best Election stealing lawyer, Marc Elias, to Broward County they miraculously started
finding Democrat votes.  Don't worry, Florida – I am sending much better lawyers to expose the
FRAUD!"  Manning Decl. ¶ 6, Ex. 5.  Then-President Trump posted the same on Facebook.
Manning Decl. ¶ 7, Ex. 6.

105.    On January 22, 2019, then-President Trump posted on X:  "Former FBI top lawyer
James Baker just admitted involvement in FISA Warrant and further admitted there were
IRREGULARITIES in the way the Russia probe was handled.  They relied heavily on the
unverified Trump 'Dossier' paid for by the DNC & Clinton Campaign, & funded through a…"
"…big Crooked Hillary law firm, represented by her lawyer Michael Sussmann (do you believe
this?) who worked Baker hard & gave him Oppo Research for 'a Russia probe.' This meeting, now
exposed, is the subject of Senate inquiries and much more.   An Unconstitutional Hoax.
@FoxNews."  Manning Decl. ¶ 8, Ex. 7.

106.    This paragraph is intentionally omitted.

107.    On December 5, 2021, then-former President Trump claimed the following in an
interview with Fox News's Mark Levin:

> LEVIN: Let's talk a little bit more about this Russia collusion issue. Durham has indicted
> this guy, Michael Sussman who lied to the F.B.I., brought them fake information. He was
> working with Perkins Coie. That law firm used to have a guy by the name of Mark Elias.
> They went all through the states from 2016 to 2020 trying to change the rules and so
> forth, all kinds of dark money behind them from billionaires –
>
> TRUMP: And got fired from Perkins Coie.
>
> LEVIN: Well, he certainly left.

TRUMP: Because it's hot.

LEVIN: It's hot. Hillary Clinton was behind most of it.

TRUMP: Yes.

LEVIN: What do you want to say to Hillary Clinton?

TRUMP: Well, I think it's disgraceful. I think that I always knew it was a hoax and I tell the story. During the campaign, people would come up to me -- different people, young people, old people, people that were working on my campaign. So, what do you know about Russia? I said nothing. What do you know about Russia? Nothing. Two months later, what do you know about -- sir, do you know anything about Russia? After about five times, I'd said, what the hell is going on with Russia? They've created a false -- it was a totally fabricated story. They made it up in either her kitchen or a law office. She spent millions of dollars. Crooked Hillary did this -- millions and millions of dollars, gave it to Steele, who is a nut job and he did the whole F.B.I.

Manning Decl. ¶ 10, Ex. 9

108.     On May 31, 2022, the day Michael Sussmann was acquitted of lying to the FBI about links between the Trump organization and Russia, the then-former President Trump posted on Truth Social:  "Our Legal System is CORRUPT, our Judges (and Justices!) are highly partisan, compromised or just plain scared, our Borders are OPEN, our Elections are Rigged, Inflation is RAMPANT, gas prices and food costs are 'through the roof,' our Military 'Leadership' is Woke, our Country is going to HELL, and Michael Sussmann is not guilty.  How's everything else doing? Enjoy your day!!!"  Manning Decl. ¶ 11, Ex. 10.

109.     On November 15, 2022, then-former President Trump announced his candidacy for the 2024 Presidential Election.  Manning Decl. ¶ 12, Ex. 13.

110.     On December 11, 2022, then-candidate Trump posted a link on Truth Social to a Breitbart article entitled "Elon Musk Calls out Sussmann, Perkins Coie for 'Attempt to Corrupt a Presidential Election.'"  Manning Decl. ¶ 13, Ex. 12.

111.    On May 16, 2023, then-candidate Trump posted on Truth Social his interview with Dan Bongino, in which he included Marc Elias in a list of "bad people" and stated that their actions "really effected 2020 more than it effected 2016."  Manning Decl. ¶ 14, Ex. 13.

112.    During the 2023 Conservative Political Action Conference, then-candidate Trump stated "I am your warrior.  I am your justice.  And for those who have been wronged and betrayed: I am your retribution."  Manning Decl. ¶ 15, Ex. 14.

113.    On June 21, 2023, then-candidate Trump reposted on Truth Social an infographic associating Perkins Coie with "collusion" with Russia in relation to Fusion GPS and the Steele Dossier.   Manning Decl. ¶ 16, Ex. 15.

114.    On March 31, 2024, then-candidate Trump posted on Truth Social an article from Vigilant News entitled "Marc Elias Is Scared…And He Should Be[:] The lawfare being used to try to stop President Trump is failing."  Manning Decl. ¶ 17, Ex. 16.

115.    On April 23, 2024, then-candidate Trump posted on Truth Social:  "I am being accused of Election Interference in a trial being presided over by a Corrupt D.A. and a ridiculously Conflicted Judge, representing people who Rigged and stole the 2020 Presidential Election, and paid millions of dollars for the Fake and Fully Discredited Russia Dossier…..And they're after me because a bookkeeper marked down 'Legal Expense' in a Ledger when describing Legal Fees paid to a lawyer.  What else would you call it?  The Biden Thugs call it Falsifying Business Records. THIS FAKE CASE SHOULD BE DROPPED, IMMEDIATELY!"  Manning Decl. ¶ 18, Ex. 17.

116.    On May 5, 2024, then-candidate Trump posted on Truth Social:  "Andrew McCarthy: 'HILLARY CLINTON, RECIDIVIST ELECTION-THEFT CONSPIRATOR . . . book[ed] as legal fees what might euphemistically be called 'research'—was the blueprint for the 2016 Hillary Clinton campaign, in cahoots with the Democratic National Committee. They paid

24

**JA 275**

their law firm, Perkins Coie, which retained the research firm Fusion GPS and its contractor,

former British spy Christopher Steele, to generate the farcical Steele dossier that was shared with

the FBI, the State Department, and the media to smear Trump as a clandestine agent of the

Kremlin…"  Manning Decl. ¶ 19, Ex. 18.

117.    On August 29, 2024, Monica Crowley, a former Trump administration official and

media figure, hosted then-candidate Trump on her podcast and asked whether he believed the July

13, 2024 assassination attempt near Butler, Pennsylvania at one of President Trump's campaign

events was an "inside job."  In response, President Trump acknowledged that the circumstances

were "strange," and questioned whether Marc Elias was involved in paying for the lawyer hired to

represent the family of the individual who attempted to carry out the assassination—Matthew

Crooks.  Manning Decl. ¶ 20, Ex. 19.

118.    On September 7, 2024, then-candidate Trump posted the following on Truth Social:

> CEASE & DESIST: I, together with many Attorneys and Legal
> Scholars, am watching the Sanctity of the 2024 Presidential Election
> very closely because I know, better than most, the rampant Cheating
> and Skullduggery that has taken place by the Democrats in the 2020
> Presidential Election.  It was a Disgrace to our Nation!  Therefore,
> the 2024 Election, where Votes have just started being cast, will be
> under the closest professional scrutiny and, WHEN I WIN, those
> people that CHEATED will be prosecuted to the fullest extent of the
> Law, which will include long term prison sentences so that this
> Depravity of Justice does not happen again.  We cannot let our
> Country further devolve into a Third World Nation, AND WE
> WON'T!  Please beware that this legal exposure extends to
> Lawyers, Political Operatives, Donors, Illegal Voters, & Corrupt
> Election Officials.  Those involved in unscrupulous behavior will be
> sought out, caught, and prosecuted at levels, unfortunately, never
> seen before in our Country.

Manning Decl. ¶ 21, Ex. 20.  He posted substantially the same post on Truth Social ten days later

on September 17, 2024 and again on October 25, 2024. Manning Decl. ¶¶ 22-23, Exs. 21-22.

### III.   President Trump Also Has Targeted Efforts Supporting Diversity & Inclusion

119.    The President and his Administration have demonstrated their opposition to viewpoints supporting Diversity & Inclusion efforts, often characterizing such policies as illegal, radical, immoral, woke, or politically motivated.

120.    The President has signed multiple Executive Orders targeting such viewpoints.  For example, an Executive Order titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" focused specifically on targeted "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)," and described such programs as "public waste and shameful discrimination."  Manning Decl. ¶ 24, Ex. 23, Executive Order 14151 (Jan. 20, 2025).

121.    A White House Fact Sheet called "Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI," states DEI's "foundational rhetoric and ideas foster intergroup hostility and authoritarianism" and "creates and then amplifies prejudicial hostility and exacerbates interpersonal conflict."  Manning Decl. ¶ 25, Ex. 24, White House Fact Sheet (Jan. 22, 2025).

122.    On March 4, 2025, During President Trump's Joint Address to Congress, he stated "We've ended the tyranny of so-called diversity, equity, and inclusion policies all across the entire federal government and, indeed, the private sector and our military.  [] And our country will be woke no longer."  He also claimed "[W]e're getting wokeness out of our schools and out of our military, and it's already out, and it's out of our society.  We don't want it.  Wokeness is trouble.

26

**JA 277**

Wokeness is bad.  It's gone.  It's gone."  Manning Decl. ¶ 27, Ex. 26.

**IV.   President Trump Issues Executive Order 14230 to Make Good on His Promise of Retribution against Perkins Coie**

123.    On March 6, 2025, less than two months after taking office, President Trump issued Executive Order 14230, entitled "Addressing Risks from Perkins Coie LLP" ("the Order"), and an accompanying document titled "Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP."  Manning Decl. ¶¶ 28-29, Exs. 27-28; Burman Decl. ¶ 24.

124.    President Trump signed the Order in the Oval Office during a filmed signing ceremony.  At the beginning of the signing ceremony, President Trump's staff secretary handed him the Order, saying, "Sir, your administration has made it a priority both to end lawfare and the weaponization of government and also to hold those who have engaged in lawfare accountable.  Uh, one of those, uh one of the law firms that uh has been involved in that is called Perkins Coie.  That's also a law firm uh that has engaged in unlawful DEI practices.  This Executive Order will security clearances…"  President Trump interrupted his staff secretary saying, "And I've watched it take place."  President Trump's staff secretary continued, "This executive order will suspend security clearances and access to certain federal resources for that law firm, and also launch a holistic review of unlawful DEI practices at some of the Nation's largest law firms."  Manning Decl. ¶ 30, Ex. 29.

125.    After his staff secretary finished, President Trump said, "This is an absolute honor to sign.  What they've done is… it's just terrible.  It's weaponization, uh you could say weaponization against a political opponent and it should never be allowed to happen again."  At that point, President Trump began signing the Order. Manning Decl. ¶ 30, Ex. 29.

126.    Each section of the Order retaliates against Perkins Coie, consistent with President

Trump's prior statements.

127.    Section 1 of the Order is titled "Purpose."  Section 1 of the Executive Order purports

to make a series of factual findings, including:

    a.    "The dishonest and dangerous activity of the law firm Perkins Coie LLP ("Perkins

        Coie") has affected this country for decades."

    b.    "Notably, in 2016 while representing failed Presidential candidate Hillary Clinton,

        Perkins Coie hired Fusion GPS, which then manufactured a false "dossier"

        designed to steal an election."

    c.    "This egregious activity is part of a pattern.  Perkins Coie has worked with activist

        donors including George Soros to judicially overturn popular, necessary, and

        democratically enacted election laws, including those requiring voter identification.

        In one such case, a court was forced to sanction Perkins Coie attorneys for an

        unethical lack of candor before the court."

    d.    "In addition to undermining democratic elections, the integrity of our courts, and

        honest law enforcement, Perkins Coie racially discriminates against its own

        attorneys and staff, and against applicants.  Perkins Coie publicly announced

        percentage quotas in 2019 for hiring and promotion on the basis of race and other

        categories prohibited by civil rights laws.  It proudly excluded applicants on the

        basis of race for its fellowships, and it maintained these discriminatory practices

        until applicants harmed by them finally sued to enforce change."

    e.    "Those who engage in blatant race-based and sex-based discrimination, including

        quotas, but purposefully hide the nature of such discrimination through deceiving

        language, have engaged in a serious violation of the public trust.  Their disrespect

28

**JA 279**

for the bedrock principle of equality represents good cause to conclude that they

neither have access to our Nation's secrets nor be deemed responsible stewards of

any Federal funds."

Manning Decl. ¶ 28, Ex. 27.

128.    Section 2 of the Executive Order is titled "Security Clearance Review."  Section

2(a) directs "The Attorney General, the Director of National Intelligence, and all other relevant

heads of executive departments and agencies" to "immediately take steps consistent with

applicable law to suspend any active security clearances held by individuals at Perkins Coie,

pending a review of whether such clearances are consistent with the national interest."  Section

2(b) directs "[t]he Office of Management and Budget" to "identify all Government goods,

property, material, and services, including Sensitive Compartmented Information Facilities,

provided for the benefit of Perkins Coie," and "[t]he heads of all agencies providing such material

or services shall, to the extent permitted by law, expeditiously cease such provision."  Manning

Decl. ¶ 28, Ex. 27.

129.    Section 3 of the Executive Order is titled "Contracting."  Section 3 includes

provisions that mandate federal agencies to require government contractors to disclose any

relationship they have with Perkins Coie, and to terminate government contracts for clients as to

which Perkins Coie has been hired to perform any service, even if unrelated to the particular matter

for which the client engaged Perkins Coie.  Manning Decl. ¶¶ 28, 32, Exs. 27, 31.

130.    Section 4 of the Executive Order is titled "Racial Discrimination."  Executive Order

14230.  Section 4 contains a directive to the Acting Chair of the Equal Employment Opportunity

Commission (EEOC) and the Attorney General to investigate the hiring and promotion practices

of "leading" and "large" law firms, including Perkins Coie.  Manning Decl. ¶ 28, Ex. 27.

131.    Section 5 of the Order is titled "Personnel."  Section 5 broadly restricts access to federal buildings, limits engagement with federal personnel, and presumptively bars all Firm employees from federal employment.  Manning Decl. ¶ 28, Ex. 27.

132.    The Order's accompanying Fact Sheet states that "President Trump's Administration will not tolerate Perkins Coie LLP's unethical and discriminatory actions that threaten our elections, military strength, and national security."  Manning Decl. ¶ 29, Ex. 28.

133.    The Fact Sheet purports to make a series of factual findings, including:

a.    "In 2016, Perkins Coie LLP hired Fusion GPS to manufacture a false 'dossier' designed to steal an election while representing failed presidential candidate Hillary Clinton."

b.    "Perkins Coie LLP pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussman indicted for lying to the FBI about this scheme."

c.    "Perkins Coie LLP has worked with activist donors, including George Soros, to judicially overturn enacted election laws, such as those requiring voter identification."

d.    "Perkins Coie has been accused of racially discriminating against its own attorneys, staff, and applicants."

e.    "Perkins Coie has publicly announced Perkins Coe LLP hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump."

f.    "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness."

Manning Decl. ¶ 29, Ex. 28.

134.    Perkins Coie was given no notice of, nor an opportunity to respond to, the Order or Fact Sheet or to explain their impact on the firm before they were issued.  Burman Decl. ¶ 34.

135.    Immediately following the issuance of the Order, federal agencies began to implement the Order's directives.

136.    After President Trump signed the Order, a senior administration official told The Washington Post that the "President doesn't believe they should have the privileges afforded to companies of their stature to work and operate with the federal government, since they have made it very clear that are vehemently against the president of the United States, and their work proves that."  The Washington Post stated that the senior official spoke "on the condition of anonymity to talk frankly about the sensitive decision-making behind the order."  Manning Decl. ¶ 31, Ex. 30.

137.    On March 7, 2025, Russell Vought, Director of the Office of Management and Budget, sent a memorandum to the heads of all executive branch departments and agencies that directed:

> Agencies must review all Government contracts and subcontracts with Perkins and Coie LLP, as well as provision to Perkins and Coie LLP of goods, property, material, and services, including any Sensitive Compartmented Information Facilities.  Agencies shall complete the review, perform all duties required by the . . . Executive Order, and report back to the Office of Management of [sic] Budget . . . no later than April 5, 2025, which should include contract type, scope, period of performance, and value, along with any action taken.

Manning Decl. ¶ 32, Ex. 31.

138.    On March 9, 2025, during an interview with Fox News Channel's Maria Bartiromo that was given on March 6, 2025, Ms. Bartiromo noted that President Trump signed executive orders regarding law firms, and that one of the law firms was Perkins Coie.  Ms. Bartiromo stated, regarding Perkins Coie, that "that was the law firm that had the Steele dossier."  President Trump

responded, "Yeah.  They had the Steele dossier; they had a lot of other things, and we have a lot

of law firms that we're going to be going after because they were very dishonest people.  They

were very, very dishonest.  I could go point after point after point… and were so bad for our

country, and we have a lot of law firms that we're going after."  Manning Decl. ¶¶ 33-34, Ex. 32-

33.

140.    On March 10, 2025, Stephen Miller, President Trump's deputy chief of staff for

policy, appeared on Fox News and described the Executive Order "as part of President Trump's

plan to shut down weaponized law enforcement.  Perkins Coie, as has been well documented and

established, was at the center of the Russian collusion hoax that was a multi-year war on American

democracy—a giant PSYOP attempted on the American people that formed the justification for

the incarceration, harassment, and spying on of countless American citizens, and of course the

attempt to infiltrate President Trump's campaign and ultimately to try to launch a coup to throw

him out of office."  Manning Decl. ¶ 34, Ex. 33.

140.    On March 17, 2025, following the directives in Section 4 of the Order, Acting Chair

Andrea Lucas of the Equal Employment Opportunity Commission (EEOC) sent nearly identical

letters to Perkins Coie and 19 other law firms requesting extensive information about each firm's

employment practices "[b]ased on [their] public statements."  Manning Decl. ¶ 35, Ex. 34.

Nothing about Perkins Coie's commitment to Diversity & Inclusion was considered illegal before

President Trump's inauguration.

141.    The investigative letters are publicly available on the Equal Employment

Opportunity Commission's website.  Manning, Decl. ¶ 36, Ex. 35.

142.   The 11-page letter to Perkins Coie contained 37 "initial" requests for information, including four requests which seek ten years of information about Perkins Coie's hiring practices. Manning Decl. ¶ 35, Ex. 34.

143.   At the same time, Acting Chair Lucas issued a press release identifying Perkins Coie by name and stating, "The EEOC is prepared to root out discrimination anywhere it may rear its head, including in our nation's elite law firms.  No one is above the law—and certainly not the private bar."  Manning, Decl. ¶ 36, Ex. 35.

144.   The EEOC may only initiate a Title VII investigation after a valid charge has been filed.  Yet the investigative letters do not cite any such charges, and no such charge has been filed.  *E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 64 (1984); *see also* Manning, Decl. ¶ 35, Ex. 34.

## V.   Executive Order 14230 Punishes and Irreparably Harms Perkins Coie

145.   Since the issuance of the Order and Fact Sheet, Perkins Coie has incurred irreparable economic, constitutional, and reputational harms as a result of each Section of the Order.

### A.   Perkins Coie Has Suffered and Will Suffer Irreparable Economic Harm

#### 1.   The Firm Has Lost Clients as a Result of the Order and Will Lose Clients Without a Permanent Injunction

146.   Perkins Coie is constrained by Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, but can report general facts and facts known to the government. Burman Decl. ¶ 25.

147.   Many of Perkins Coie's largest clients (for instance, the top 15 clients, collectively representing over $343 million in revenue in 2024, which represents almost a quarter of the firm's revenue) or their affiliates have contracts or subcontracts with the federal government, or compete

33

**JA 284**

for such contracts, and many of those companies are represented by the firm for legal matters completely unrelated to government-contracting matters. Burman Decl. ¶ 47.

148.    For many of the firm's clients, the fact that the firm gives them legal advice is not public information. Burman Decl. ¶ 47.

149.    Enforcement of the Order would require many of these clients to divulge confidential information regarding their legal representations to the federal government, in addition to risking the termination of those clients' contracts due solely to their engagement with Perkins Coie. Burman Decl. ¶ 47.

150.    In the less than four business days between the issuance of the Order and the Court's entry of a temporary restraining order, multiple clients terminated their legal engagements with Perkins Coie or began reviewing their relationship with the firm, their government contracts, and other government interactions to determine if the relationship could continue. Burman Decl. ¶ 48.

151.    On March 6, 2025, within hours of the Order's release, a seven-year client with seven open matters ended Perkins Coie's representation of that client in any litigation before the relevant federal agency. Burman Decl. ¶ 48.

152.    The day after the Executive Order, an official of a federal agency refused to allow the client's Perkins Coie lawyers to attend a scheduled meeting with an office in that agency to discuss a pending matter. The client had engaged Perkins Coie to defend that client in that enforcement action, and Perkins Coie performed substantial work on the matter, totaling over $1 million in fees, and interacted with the agency on this matter in the interim. The client hired another law firm to represent it before the federal government and in related litigation. Burman Decl. ¶ 44.

**JA 285**

153.    A major government contractor that has been a firm client for over 35 years reassigned two matters to other law firms on March 7.  Burman Decl. ¶ 48.

154.    A government contractor that was a firm client since 2018 withdrew all work from Perkins Coie as of March 7.  Burman Decl. ¶ 48.

155.    After the Order was issued, a coalition of four clients whose matters required engagement with various federal agencies—including the DEA, DOJ, and HHS—withdrew all coalition work from Perkins Coie.  Burman Decl. ¶ 48.

156.    On March 7, 2025, a major government contractor that was a firm client since 2021 with fifteen open matters started reconsidering its engagements with Perkins Coie.  Burman Decl. ¶ 48.

157.    On March 7, 2025, another client abruptly started considering other firms to represent it in connection with a DOJ investigation.  Burman Decl. ¶ 48.

158.    Many clients began requesting frequent updates relating to the Order to assess whether Perkins Coie can continue to represent them.  Burman Decl. ¶ 48.

159.    On March 11, 2025, a longtime client of the firm that had increased its work five-fold over the past three years and had 30 open matters started to reconsider whether to terminate every engagement with Perkins Coie.  Burman Decl. ¶ 48.

160.    The abrupt loss of so many longstanding and significant clients across a variety of business types and practice disciplines in a one-week period is exceptional and abnormal.  The common denominator is that each client terminated or began reconsidering its engagements in the immediate aftermath of the Order's issuance.   While the TRO stemmed some of those consequences, a permanent injunction is necessary to prevent them from resuming and intensifying.  Burman Decl. ¶ 49.

**JA 286**

161.    Since March 6, 2025, Perkins Coie has lost significant revenue due to the loss of clients who terminated their engagements after the Order was issued.  Perkins Coie also lost out on new work from clients who were considering engaging the firm, but chose not to move forward with Perkins Coie after issuance of the Executive Order.  Burman Decl. ¶ 50.

### 2.    The Order Affects Perkins Coie's Ability to Practice Law on Behalf of its Clients

162.    On March 6, 2025, the day the Order was issued, an attorney in the Fraud Section of the Criminal Division of the U.S. Department of Justice cancelled a previously set meeting relating to another Perkins Coie client, pending further guidance on whether that meeting could even occur in light of the Order.  Burman Decl. ¶ 45.  Because the Order may be interpreted to ban Perkins Coie's access to federal courthouses, the firm incurred additional costs in securing additional backup personnel to attend impending hearings before it was enjoined.  Burman Decl. ¶ 46.

163.    Perkins Coie attorneys have numerous upcoming appearances before federal courts and agencies that will be affected by the Order, were the injunction to be lifted.  Burman Decl. ¶ 46.

164.    Perkins Coie has nearly one thousand active matters before federal courts, and has thousands of matters before agencies that require access to federal government buildings and officials.  Burman Decl. ¶ 46.

165.    Continued refusals by federal officials to meet with Perkins Coie lawyers, or to permit Perkins Coie lawyers to access federal agencies and buildings, would be devastating to both Perkins Coie's legal practice and its clients' interests.  Burman Decl. ¶ 46.

166.    The firm would not be able to operate without interacting with federal agencies or entering federal buildings on behalf of its clients.  Burman Decl. ¶ 46.

**JA 287**

### 3.    The Order Affects Perkins Coie's Business Relationships and Hiring Practices

167.    The Order threatens Perkins Coie attorneys' right to practice their chosen profession, which frequently requires them to appear in federal court or before federal agencies in criminal, civil, or administrative matters.  Burman Decl. ¶ 52.

168.    The Order has also impacted Perkins Coie's recruiting and retention of its personnel.  Since the issuance of the Order, the firm has had business professional candidates who have been extended offers question the economic health of the firm and ask if there will be layoffs.  Burman Decl. ¶ 53.

169.    The Order also interferes with Perkins Coie's diversity and inclusion programs, including its ability to offer fellowships to potential new hires.  Burman Decl. ¶ 58.

170.    The Order increases the potential that Perkins Coie lawyers will leave the Firm for other opportunities in order to preserve their relationships with clients that have government contracts.  Burman Decl. ¶ 54.

171.    The Order interferes with Perkins Coie's employer–employee relationships because the restrictions include Perkins Coie employees.  Burman Decl. ¶ 55.

172.    The Firm's ability to grow its business hinges on its ability to draw and retain top talent.  Burman Decl. ¶ 53.

### B.    Perkins Coie Has Suffered and Will Suffer Irreparable Constitutional Harm from the Order

173.    The Order exceeds the President's constitutional authority and violates the separation of powers.

174.    The Order violates Perkins Coie's and its clients' constitutional rights under the First, Fifth, and Sixth Amendments.

175.    The Order's purpose is retaliatory.  *See supra* ¶¶ 100-144.

176.    The Order has also caused an immediate chilling effect.  Immediately after the Order's enactment, some government agencies refused to interact with Perkins Coie and some clients disengaged from the firm altogether.  *See supra* ¶¶ 145-166.  Perkins Coie attorneys have been forced to reconsider how they approach certain matters that require them to appear in federal buildings or interact with federal officials.  Burman Decl. ¶ 51.

177.    The firm currently faces considerable uncertainty regarding which aspects of its D&I activities and advocacy will result in adverse consequences, including injunctive relief, but the message appears to be to get rid of everything.  This risk and uncertainty given the vagueness of the Executive Order and the need to protect the firm from extralegal pressure has resulted in pausing or pulling back on certain programs and some statements in support of D&I and the implementation of D&I initiatives even where likely lawful and consistent with EEOC guidance at the time those actions were taken.  Burman Decl. ¶¶ 56, 58.

178.    Perkins Coie is reassessing statements and references to its D&I advocacy on its website.  In an abundance of caution, all press releases and stories touting the firm's prior advocacy more than six months old were removed from the firm's website (but have been preserved).  Burman Decl. ¶ 57.

179.    Perkins Coie has postponed a showing of a movie regarding Lilly Ledbetter, sex discrimination and the Fair Pay Act.  Burman Decl. ¶ 58.

180.    Perkins Coie has reassessed and is reassessing statements and references to its D&I advocacy in various advertisements and program brochures, including considering removal of the following:

    a.    The phrase "Diversity is Excellence" in an advertisement;

38

**JA 289**

    b.  The statement that Perkins Coie is "proud to support" an organization's "commitment to inclusivity and empowerment of diverse communities," in a program brochure for an event the firm is sponsoring.

    c.  The phrase "Investing in diversity and inclusion is smart business and helps drive our pursuit of excellence," in a program brochure.

Burman Decl. ¶ 57.

181.    The firm is considering whether and how it can or should respond to questions from clients and prospective clients regarding the demographics of the firm or its lawyers.  Burman Decl. ¶ 58.

182.    Although the firm decided to proceed with the event, the Perkins Coie Women's Forum was concerned that an internal event for first-time attendees to the firm's partner planning conference could be targeted as impermissible, even though it was open to all conference attendees, because a resource group was hosting the event.  Burman Decl. ¶ 58.

183.    Firm personnel were unsure whether they can have a reference to "DE&I" in their email signature block.  Burman Decl. ¶ 58.

184.    The EEOC letter and accompanying press release have further chilled Perkins Coie's exercise of its First Amendment right to advocate for D&I at the firm, in the legal profession and in the community.  Burman Decl. ¶ 58.

**C.    Perkins Coie Has Suffered and Will Suffer Irreparable Reputational Harms from the Order**

185.    The Order has branded Perkins Coie as "dishonest and dangerous," which irreparably threatens Perkins Coie's reputation, and thus, its ability to do its work.  Burman Decl. ¶ 59.

**JA 290**

186.    The Order and the Fact Sheet have harmed Perkins Coie's reputation in the market for clients, lawyers, and staff through its false and disparaging characterizations of the firm and its attorneys.  Burman Decl. ¶ 59.

187.    The Order likewise defames Perkins Coie by falsely stating Perkins Coie worked to "steal an election," "undermining democratic elections, the integrity of our courts, and honest law enforcement."  Burman Decl. ¶ 60.

188.    Similarly, the Order defames Perkins Coie by falsely stating Perkins Coie "racially discriminates against its own attorneys and staff, and against applicants," including through "percentage quotas" and "proudly exclud[ing] applicants on the basis of race."  Burman Decl. ¶ 60.

189.    The Order also defames Perkins Coie by falsely stating Perkins Coie has "earnings" that "subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust."  Burman Decl. ¶ 60.

190.    The Fact Sheet disparages Perkins Coie by falsely stating "Perkins Coie LLP pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme."  A jury unanimously acquitted Mr. Sussmann on May 31, 2022.  Manning Decl. ¶ 61, Ex. 60.

191.    These false and disparaging statements have stigmatized Perkins Coie.  Burman Decl. ¶ 59.

192.    Perkins Coie's reputation hinges on its ability to draw and retain top talent.  Burman Decl. ¶ 53.

193.    Perkins Coie's reputation also is critically affected by its ability to draw and retain clients.  Burman Decl. ¶ 59.

40

**JA 291**

**D.    Punishing Perkins Coie for Its Advocacy Irreparably Harms the Administration of Justice**

194.    Several reputable experts—Robert Hirshon, Bruce Green, and Roy Simon—submitted reports in this case opining on the Executive Order's legal infirmities, including its constitutional flaws and its interference with lawyers discharging their ethical obligations under applicable rules of professional conduct.  Numerous bar groups, law schools, law firms, and lawyers have also spoken out against the Executive Order.

195.    Professor Hirshon opined that the Order presents a clear and present danger to the administration of justice in the United States.  Hirshon Rpt. ¶¶ 8-21; Simon Rpt. ¶ 16.

196.    Professor Hirshon also opined that the quality of justice in the United States depends in large measure on lawyers' diligent advocacy of their clients' respective positions, especially for people whose cause is controversial or the subject of popular disapproval.  Hirshon Rpt. ¶¶ 14-15 (quoting D.C. R. Prof'l C. r. 1.3, Comment [2]).

197.    Professor Green opined that the Rules of Professional Conduct underscore "the importance of affording legal assistance to unpopular clients."  Green Rpt. ¶ 42.

198.    Professors Green and Hirshon opined that reasonable lawyers will understand the Executive Order to mean not only that lawyers may suffer government retribution for representing clients in matters of which the President disapproves for personal or political reasons, but also that they may be punished for representing clients who challenge the legality of government policies.  Hirshon Rpt. ¶ 17; *see also* Green Rpt. ¶ 48 (opining that the Order "will discourage not only Perkins Coie but also other law firms from representing future clients and pursuing future actions, and particularly actions against the Government and other advocacy that the President might disfavor").

**JA 292**

199.    They also opined that the threat of presidential sanctions will chill lawyers from representing clients whom the President views as political opponents, or from advocating legal positions that the President dislikes.  Hirshon Rpt. ¶¶ 15-18 ; Green Rpt. ¶¶ 51-52; *see also* Simon Rpt. ¶¶ 43-55.

200.    Professor Hirshon opined "the Executive Orders will have the effect of forcing lawyers to choose between performing their assigned role in our democracy or pleasing the President, all to the detriment of clients and the fair administration of justice."  Hirshon Rpt. ¶ 24.

201.    Professor Green opined that the Order also deters clients from exercising their Constitutional right to select the counsel of their choosing.  Green Rpt. ¶ 45.

202.    Professor Green opined that the Order threatens to block the firm's attorneys from engaging in such discussions, infringing their clients' Sixth Amendment rights and the Firm's ability to effectively and zealously represent those clients.  Green Rpt. ¶¶ 49-53.

203.    Professor Hirshon opined that the Order drastically limits the ability of Perkins Coie lawyers to represent their many clients, including "barring [them] from federal buildings." Hirshon Rpt. ¶ 19.

204.    Professor Simon opined that interfering with counsel's effectiveness can itself violate choice of counsel: a lawyer who could not effectively represent a client because of limitations on his practice could be forced by the Rules of Professional Conduct to withdraw. Simon Rpt. ¶ 48.

205.    Professors Hirshon and Simon concluded that "as a practical matter," the Order "deprive[s] clients of their right to be represented by their chosen lawyers."  Hirshon Rpt. ¶ 19; *see also* Simon Rpt. ¶ 48.

206.    Professor Simon explained that the Order thus "chill[s] the rights of clients to petition government for redress of grievances and to peaceably assemble, as guaranteed by the First Amendment." Simon Rpt. ¶ 55.

207.    Professor Green also opined that the Order "distort[s] the legal system" and infringes on "the freedom of [the Firm's] clients to choose a lawyer," which is protected by the Constitution. Green Rpt. ¶¶ 44-45 (quoting *Velazquez*, 531 U.S. at 544; D.C. Rules of Prof. Conduct, Rule 5.6, cmt. [1]).

208.    Professor Hirshon opined that the Order's hiring restrictions will "impair Perkins Coie's hiring of lawyer and non-lawyer professionals because of the risk that joining a law firm disfavored by the President would destroy any possible future in federal government service (e.g., as a federal prosecutor or SEC lawyer)." Hirshon Rpt. ¶ 20.

209.    Professor Hirshon further opined that the Order would deter law school graduates from choosing employment at law firms that represent clients the President dislikes. Hirshon Rpt. ¶ 20.

210.    Professor Green opined that the Order is also inconsistent with, and interferes with, settled understandings of the separation of powers and, in particular, judicial regulation of the legal profession. Green Rpt. ¶ 54.

211.    Professor Green also opined that the Order's "form of regulation by presidential whim … threatens to undermine the judicial regulation that requires lawyers to represent clients zealously and not to subordinate clients' interests to lawyers' own self-interest." Green Rpt. ¶ 53.

212.    Professor Green opined that the Executive Branch could not "be expected to regulate fairly the very lawyers against whom it litigates." Green Rpt. ¶ 34.

213.    Professor Green also opined that the Order "finds wrongdoing and imposes punishment without prior notice, an opportunity to be heard, a fair and impartial factfinder, or any other semblance of fair process."  Green Rpt. ¶ 38.

214.    Professor Hirshon opined that under Executive Order 14230, Perkins Coie can "reasonably fear a tsunami of adverse consequences that would threaten its ability to continue to effectively operate," including the departure of clients, partners, and practice groups.  Hirshon Rpt. ¶ 21.

## VI.    The Order Is Inconsistent With Governing Security Clearance Policy, Is Facially Unrelated to National Security, and Has No Bona Fide Relationship to National Security

215.    A reputable expert—J. William Leonard, who served in various senior positions with responsibility for security clearances and classification of national security information—submitted a pro bono report in this case opining on governmental policy and guidance related to security clearances.

216.    Mr. Leonard opined that the Order's blanket approach is inconsistent with governing policy requiring "fair and equitable treatment" of security clearance holders, and violates bedrock principles of the security-clearance review process, because it provides no individualized assessment of personal conduct in the suspension of clearances.    Leonard Rpt. ¶¶ 44-47.

217.    Mr. Leonard explained that the individualized review of security clearances "is one of the fundamental hallmarks of the security-clearance review process; Person A is never held accountable for the conduct of Person B, let alone are Persons 1 through 2,500 held accountable for the conduct of formerly-associated Person 2,501."  Leonard Rpt. ¶ 44.

218.   Mr. Leonard further opined that the Order is unprecedented in that it relies on facially stale information and conduct unrelated to national security as the justification for a directive to immediately suspend security clearances.  Leonard Rpt. ¶¶ 48-53.

219.   Mr. Leonard noted that Section 2 of the Order never uses the term "national security interest," but rather mentions "national interest," which is "markedly broader than the 'national security interest' that serves as the touchstone of a security-clearance review."  Leonard Rpt. ¶ 49.

220.   Mr. Leonard further noted that most of the claimed factual findings purporting to justify the Order's directive to immediately suspend security clearances are facially unrelated to national security (such as participation in election-related litigation), and the only reference that might be considered remotely related to "national security" (a reference to Perkins Coie's retention of Fusion GPS in 2016) was public knowledge between 2017 and 2021, throughout the duration of President Trump's first administration, and therefore cannot be an emergency necessitating an immediate suspension of security clearances now, in 2025.  Leonard Rpt. ¶ 50.

221.   Mr. Leonard further noted that after a similar Executive Order was published directing the immediate suspensions of security clearances for all personnel at another firm, that Executive Order was promptly rescinded on the basis of a commitment by that firm to provide pro bono services and undertake certain other conduct unrelated to national security, demonstrating that there cannot have been a national security emergency justifying the immediate suspension of security clearances that could have been remedied by that firm's promise to provide pro bono services.  Leonard Rpt. ¶ 53.

222.   Mr. Leonard further noted that as a Perkins Coie attorney was issued a security clearance only a few weeks before the Perkins Coie Executive Order was published in March 2025, there cannot have been any national security emergency grounded in stale facts such as Perkins

45

**JA 296**

Coie's 2016 engagement of Fusion GPS that could be a bona fide justification for the immediate suspension of a security clearance granted without controversy and in accordance with ordinary procedures only weeks earlier.  Leonard Rpt. ¶ 52.

223.    Mr. Leonard also opined that the Order amounts to preordained revocation of security clearances held by the firm's employees without the required due process protections associated with such revocation, such that the Order "functionally plays the role of judge, jury, and executioner."  Leonard Rpt. ¶¶ 54-56.

224.    Mr. Leonard explained that although the Order directs a review to follow the immediate suspension of security clearances held by all Perkins Coie employees, the express findings of Section 1 of the Order functionally predetermine the outcome of any such review, precluding a good-faith and impartial investigation.  Leonard Rpt. ¶ 55.

## VII.    Perkins Coie Challenges the Order as the White House Continues Its Retaliation Against the Firm

225.    Because of the irreparable harm caused by the Order, Perkins Coie moved for a Temporary Restraining Order on March 11, 2025.  P*erkins Coie LLP v. U.S. Department of Justice et al.*, 1:25-cv-00716-BAH, Dkt. 2 (D.D.C.).

226.    The Court granted Perkins Coie's motion on March 12, 2025.  *Perkins Coie LLP v. U.S. Department of Justice et al.*, 1:25-cv-00716-BAH, Dkt. 21 (D.D.C.)

227.    On March 12, 2025, White House Deputy Chief of Staff for Policy and Homeland Security Advisor Stephen Miller linked to a post on X announcing this Court's Order awarding Perkins Coie a temporary restraining order and denounced the Court's Order as "Lawless judicial tyranny.  Judges have no authority to force the executive branch to provide classified secrets to Democrat activist law firms."  Manning Decl. ¶ 37, Ex. 36.

228.    On March 13, 2025, after this Court granted Perkins Coie's motion for a temporary

restraining order, the White House made a statement to Fox News stating that "[t]he Trump Administration is working efficiently to eliminate waste, fraud and abuse in the federal government." The White House spokesperson, Harrison Fields, continued, "It is absurd that a billion-dollar law firm is suing to retain its access to government perks and handouts." The White House did not mention national security in its statement. Manning Decl. ¶ 38, Ex. 37.

229.    On March 14, 2025, President Trump delivered a speech in the Great Hall of the Department of Justice. In that approximately hour-long speech, President Trump stated that "a corrupt group of hacks and radicals within the ranks of the American government [who] obliterated the trust and goodwill built up over generations. They weaponized the vast powers of our intelligence and law enforcement agencies to try and thwart the will of the American people." Among those individuals, President Trump singled out "radicals like Marc Elias, Mark Pomerantz" and "scum" "like Andrew Weissmann and Jack Smith." President Trump stated, "We revoked the clearances of deranged Jack Smith, Alvin Bragg, Letitia James, and the crooked law firms that aided their partisan persecutions." He also stated "these are people that nobody's ever seen anything like it. So many others, but these are people that are bad people, really bad people. They tried to turn America into a corrupt, communist and Third World country. But in the end, the thugs failed and the truth won. Freedom won. Justice won. Democracy won. And above all, the American people won. There could be no more heinous betrayal of American values than to use the law to terrorize the innocent and reward the wicked." Manning Decl. ¶ 39, Ex. 38.

230.    On March 20, 2025, Defendant Department of Justice and Defendant Attorney General Pamela Bondi issued a memorandum to all agencies subject to the Order. It directed all agencies to comply with the Court's temporary restraining order on Executive Order 14230, and stated "The Executive Branch's position is that Executive Order 14230 is permissible, and that the

Court's order was erroneous.  The government reserves the right to take all necessary and legal actions in response to the 'dishonest and dangerous' conduct of Perkins Coie LLP, as set forth in Executive Order 14230."  *Perkins Coie LLP v. U.S. Department of Justice et al*., 1:25-cv-00716-BAH, Dkt. 032-01 (D.D.C.).

231.    On March 22, 2025, President Trump issued a Presidential Memoranda addressed to the Attorney General and the Secretary of Homeland Security entitled, "Preventing Abuses of the Legal System and the Federal Court."  The subject of the memo was "Preventing Abuses of the Legal System and the Federal Court."  Manning Decl. ¶ 40, Ex. 39.

232.    Among other things, the Presidential Memoranda recited, "Recent examples of grossly unethical [lawyer] misconduct are far too common.  For instance, in 2016, Marc Elias, founder and chair of Elias Law Group LLP, was deeply involved in the creation of a false 'dossier' by a foreign national designed to provide a fraudulent basis for Federal law enforcement to investigate a Presidential candidate in order to alter the outcome of the Presidential election.  Elias also intentionally sought to conceal the role of his client — failed Presidential candidate Hillary Clinton — in the dossier."  The President directed the Attorney General and Secretary of Homeland Security to "seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive departments and agencies of the United States," and to reassess "security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services."  Manning Decl. ¶ 40, Ex. 39.

233.    On March 25, 2025, counsel for the government in this case, the Attorney General's Chief of Staff, Chad Mizelle, criticized former federal judge J. Michael Luttig, who had publicly criticized the Perkins Coie Executive Order, stating "Mike Luttig is the Perkins Coie of judges."

Manning Decl. ¶ 41, Ex. 40.

234.    On March 26, 2025, at an event commemorating Women's History Month, President Trump stated "You see what we're doing with the colleges, and they're all bending and saying, 'Sir, thank you very much.  We appreciate it.' … Nobody can believe it, including law firms that have been so horrible, law firms that, nobody would believe this, just saying, 'Where do I sign? Where do I sign?' … And there's more coming, but we really are in the 'Golden age of America.'"  Manning Decl. ¶ 42, Ex. 41.

## VIII.  The Retaliatory Intent of Executive Order 14230 Is Demonstrated by Similar Executive Orders Targeting Law Firms Associated with President Trump's Legal Adversaries

235.    President Trump's attacks on law firms and lawyers are not limited to Perkins Coie. In October 2024, NPR counted "100 threats to investigate, prosecute, imprison or otherwise punish [the President's] perceived opponents."  Manning Decl. ¶ 43, Ex. 42.

236.    The White House has focused on six other law firms in addition to Perkins Coie, out of the significant number of firms that have engaged in election litigation, have ties to investigations of former-President Trump, or that have diversity and inclusion programs.

### A.    Covington & Burling LLP

237.    President Trump and his Administration have taken action against Covington & Burling LLP for some Covington attorneys' affiliation with Special Prosecutor Jack Smith, who prosecuted President Trump in two separate cases for his "efforts to unlawfully retain power after losing the 2020 election and his unlawful retention of classified documents after leaving office." Manning Decl. ¶ 44, Ex. 43.

238.    For example, on June 30, 2023, then-candidate Trump posted on Truth Social: "The Crooked Election Interference 'Thugs' from the DOJ, headed by the worst Thug of them all, Deranged Jack Smith, are now admitting that the Mar-a-Lago Security Tapes were NOT

DELETED. That's not what they were illegally leaking to the press. These guys should be prosecuted for MISCONDUCT. Also, whatever happened to Crooked Joe's Documents? Where are the ones he sent and stored in Chinatown? Is Deranged Jack going to Indict him for this and, at the same time, receiving BRIBES FROM CHINA?"  Manning Decl. ¶ 45, Ex. 44.

239.    After President Trump was reelected, both cases were dismissed due to the Department of Justice's longstanding position "that the Constitution forbids the federal indictment and prosecution of a sitting President."  Manning Decl. ¶ 44, Ex. 43.

240.    On February 25, 2025, the White House issued a memorandum to the Secretaries of State and Defense, the Attorney General, the Director of National Intelligence, and other agency heads, directing them to suspend any active security clearances held by "all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel."  Manning Decl. ¶ 46, Ex. 45.

241.    That memorandum also directed the same persons "to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law …."  Manning Decl. ¶ 46, Ex. 45.

242.    During his March 14, 2025 speech at the Justice Department, President Trump bragged that his "administration stripped the security clearances of the disgraced intelligence agents who lied about Hunter Biden's laptop from hell. We revoked the clearances of deranged Jack Smith, Alvin Bragg, Letitia James, and the crooked law firms that aided their partisan persecutions, and I went through it. These are state and city courts and the corruption is unbelievable."  Manning Decl. ¶ 39, Ex. 38.

**B.    Paul, Weiss, Rifkind Wharton & Garrison LLP**

243.    The President also issued an executive order regarding Paul, Weiss, Rifkind Wharton & Garrison LLP for Mark Pomerantz's, a former partner, political speech.  Manning Decl. ¶ 50, Ex. 49.

244.    Mark Pomerantz investigated President Trump as a special prosecutor in the Manhattan District Attorney's Office who believed that President Trump had committed fraud. Manning Decl. ¶ 50, Ex. 49.

245.    On January 26, 2023, referring to Paul Weiss lawyer Mike Pomerantz, then-candidate Trump posted on Truth Social:  "So Crooked HILLARY Clinton's lawyer, from the biggest of all Democrat law firms, and which is headed up by Chuck Schumer's brother, is put into the Manhattan District Attorneys Office in order to dredge up bull…. to PROSECUTE 'TRUMP." A TOTALLY CORRUPT WEAPONIZATION OF LAW ENFORCEMENT BY THE DEMOCRATS, RUN DIRECTLY BY THE DEPARTMENT OF INJUSTICE (D.C.), WHO HAVE IMPLANTED THEIR OWN PEOPLE INTO THAT OFFICE.  In the meantime, record breaking murders and violent crime are not even being looked at!"  Manning Decl. ¶ 47, Ex. 46.

246.    On February 9, 2023, then-candidate Trump posted on Truth Social:  "This Crazy Pomerantz guy, Hillary Clinton's lawyer, who left his Democrat only Law Firm to join (get this!) the Manhattan D.A.'s Office in order to prosecute 'Trump,' while at the same time writing a book about his exploits, including everything that happened in a secret Grand Jury.  This guy is deranged and should be charged approximately.  Nothing like this has ever happened before.  As prosecutor he actually wrote a book in the midst of an ongoing case.   It's stone cold prosecutorial misconduct!"  Manning Decl. ¶ 48, Ex. 47.

247.    On April 23, 2024, then-candidate Trump posted on Truth Social:  "Every single Legal Scholar and Expert said that Soros backed prosecutor, Alvin Bragg, has 'no case.' This list

51

**JA 302**

includes Jonathan Turley, Gregg Jarrett, Byron York, Andrew McCarthy, Mark Levin, Alan

Dershowitz, Mike Davis, David Rivkin, Kristin Shapiro, Brad Smith, Andrew Cherkasky, and

many more. SO WHY WON'T THEY DROP THIS CASE? Alvin Bragg never wanted to bring

it – thought it was a joke. Was furious at lawyer MARK POMERANTZ (will he be prosecuted?)

for what he did!" Manning Decl. ¶ 49, Ex. 48.

248.    On March 14, 2025, two days after the Court granted Perkins Coie's Motion for a

Temporary Restraining Order, President Trump issued an Executive Order titled "Addressing

Risks from Paul[,] Weiss" (the "Paul, Weiss Executive Order"). Manning Decl. ¶ 50, Ex. 49.

Other than Section 1, which was customized to Paul, Weiss, the other sections of the Paul, Weiss

Executive Order largely mirrored the Perkins Coie Executive Order. *Compare* Manning Decl. ¶

28, Ex. 27 *with* Manning Decl. ¶ 50, Ex. 49.

249.    On March 20, 2024, President Trump posted on Truth Social that he had entered

into an agreement with Paul, Weiss "following a meeting with Paul, Weiss Chairman, Brad Karp,

during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark

Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of

Justice." According to President Trump, Paul, Weiss agreed (i) affirm certain principles such as

not using the justice system "to achieve political ends," (ii) not to "pursue any DEI policies" and

to engage "mutually agreed" experts to audit the firm's employment practices, and (iii) to dedicate

"$40 million in pro bono legal services" to "support the Administration's initiatives." Manning

Decl. ¶ 62, Ex. 61.

250.    The President later withdrew the Paul, Weiss Executive Order following the

settlement. Manning Decl. ¶ 51, Ex. 50.

251.   On March 21, 2025, in response to a reporter's questions about the President's decision to revoke the Executive Order he issued regarding Paul, Weiss, President Trump responded, "Well, the law firms all want to make deals.  You mean the law firms that we're going after, that went after me for four years ruthlessly, violently, illegally?  Are those the law firms you're talking about?"  He continued that those firms are "not babies.  They're very sophisticated people.  Those law firms did bad things.  Bad things.  They went after me for years."  Manning Decl. ¶ 52, Ex. 51.

### C.   Jenner & Block LLP

252.   The President also issued an executive order regarding Jenner and Block LLP for its former partner Andrew Weissmann's political speech.  Manning Decl. ¶ 53, Ex. 52.

253.   Weissmann was a prosecutor working with Robert Mueller in what the Executive Order refers to as an "entirely unjustified investigation." Manning Decl. ¶ 53, Ex. 52.

254.   On March 25, 2025, President Trump issued an Executive Order titled "Addressing Risks from Jenner & Block LLP."  While signing the Order, President Trump stated that Andrew Weissmann was a "bad man."  Manning Decl. ¶ 64, Ex. 63.

255.   Other than Section 1, which was customized to Jenner & Block, the other sections of the Executive Order mirror the Perkins Coie Executive Order.  *Compare* Manning Decl. ¶ 28, Ex. 27, *with* Manning Decl. ¶ 53, Ex. 52.

### D.   Wilmer Cutler Pickering Hale and Dorr LLP

256.   The President also targeted Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) for the political speech of former partner Robert Mueller, current partner, Aaron Zebley, and James Quarles, who is retired.  Manning Decl. ¶ 55, Ex. 54.

257.   On September 6, 2023, then-candidate Trump tweeted "They spied on my Campaign, Impeached me twice, had the Russia, Russia Hoax, the Fake Dossier Hoax, FISA

Fraud, Election Fraud, the "No Collusion" Mueller Hoax, and so much more. I was innocent on all counts. If I am elected, they will be brought to JUSTICE, something that Republicans have always been afraid to do." Manning Decl. ¶ 54, Ex. 53.

258.    On March 27, 2025, President Trump issued an Executive Order titled "Addressing Risks from WilmerHale." Manning Decl. ¶ 55, Ex. 54.

259.    The Order states "WilmerHale rewarded Robert Mueller and his colleagues — Aaron Zebley, Mueller's 'top aide' and 'closest associate,' and James Quarles — by welcoming them to the firm after they wielded the power of the Federal Government to lead one of the most partisan investigations in American history." Manning Decl. ¶ 55, Ex. 54.

260.    The Order states "Mueller's 'investigation' upended the lives of public servants in my Administration who were summoned before 'prosecutors' with the effect of interfering in their ability to fulfill the mandates of my first term agenda." Manning Decl. ¶ 55, Ex. 54.

261.    Other than Section 1, which was customized to WilmerHale, the other sections of the Executive Order mirror the Perkins Coie Executive Order. *Compare* Manning Decl. ¶ 28, Ex. 27 *with* Manning Decl. ¶ 55, Ex. 54.

### E.    Skadden, Arps, Slate, Meagher & Flom LLP

262.    On March 23, 2025, conservative filmmaker Dinesh D'Souza posted on X that Skadden, Arps, Slate, Meagher & Flom LLP was engaged in "systematic lawfare" and had an "army of 17 attorneys working pro bono" against him in connection with his film "2000 Mules," which alleges widespread voter fraud in the 2020 election. Elon Musk re-published D'Souza's post, stating "Skadden, this needs to stop now." Manning Decl. ¶ 63, Ex. 62.

263.    Five days later, on March 28, 2025, Skadden preemptively entered into an agreement with the Trump Administration where it agreed to provide $100 million dollars in pro bono legal services to causes that "the President and Skadden both support;" agreed to commit at

54

**JA 305**

least five Skadden Fellows to projects including "Assisting Veterans; ensuring fairness in our Justice System; combatting Antisemitism" and that Skadden Fellows will include people who "represent . . . conservative ideals;" agreed to "not engage in illegal DEI discrimination and preferences," and agreed to "not deny representation to clients, such as members of politically disenfranchised groups, who have not historically received legal representation from major National Law Firms." Manning Decl. ¶ 65, Ex. 64.

### F.    Willkie Farr & Gallagher LLP

264.    On April 1, 2025, after "proactively reach[ing] out to President Trump," Wilkie Farr & Gallagher LLP (Willkie) entered into an agreement with the Trump Administration in which it agreed to provide "a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration, and beyond, to causes that President Trump and Willkie both support" and that "pro bono activities represent the full political spectrum, including Conservative ideals;" agreed to "not engage in illegal DEI discrimination and preferences," that Willkie would give "consideration to Job Candidates irrespective of their political beliefs, including Candidates who have served in the Trump Administration, and any other Republican or Democrat Administration," and that Willkie "will not deny representation to clients, such as members of politically disenfranchised groups and Government Officials, employees, and advisors, who have not historically received Legal representation from major National Law Firms," and to avoid action against it by the Trump Administration. Manning Decl. ¶ 60, Ex. 59.

**JA 306**

Dated:  April 2, 2025                          Respectfully submitted,

                                               **WILLIAMS & CONNOLLY LLP**

                               By:    */s/ Dane H. Butswinkas*
                                      Dane H. Butswinkas (D.C. Bar #425056)

F. Lane Heard III (D.C. Bar #291724)          Amy M. Saharia (D.C. Bar #981644)
Christopher N. Manning (D.C. Bar #464069)     Matthew B. Nicholson (D.C. Bar #1013418)
Ryan T. Scarborough (D.C. Bar #466956)        Carol J. Pruski (D.C. Bar #1006941)*
Malachi B. Jones (D.C. Bar #455555)           Charles L. McCloud (D.C. Bar #1012047)*
Charles Davant IV (D.C. Bar #484305)          Krystal C. Durham (D.C. Bar # 987768)
David S. Kurtzer-Ellenbogen (D.C. Bar #489559)  Eden Schiffmann (D.C. Bar #1035019)
Jesse T. Smallwood (D.C. Bar #495961)

                                               680 Maine Avenue, SW
                                               Washington, DC  20024
                                               (202) 434-5000

                                               *Counsel for Plaintiff Perkins Coie LLP*

                                               * *DDC bar application pending*

**JA 307**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

*Plaintiff,*

v.

U.S. DEPARTMENT OF JUSTICE, *et al.,*

*Defendants.*

Case No. 1:25-cv-00716 (BAH)

Judge Beryl A. Howell

## DECLARATION OF DAVID J. BURMAN IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

I, David J. Burman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:[1]

1.      I am a partner at Perkins Coie LLP ("Perkins Coie").  Perkins Coie is an international law firm that conducts its U.S. operations and activities through a limited liability partnership, Perkins Coie LLP, with seventeen offices around the country.  I have been an attorney at Perkins Coie for over 45 years, following two years clerking.  I am a member in good standing of the D.C. and Washington bars and have been admitted in many state and federal courts, and I serve on the Advisory Committee on the Federal Rules of Civil Procedure.  I am very familiar with the firm's business and operations and was asked as a result to take a lead role in attempting to assess and contain the damage from the March 6 Executive Order.  I either have personal knowledge of the facts set forth in this declaration or I know them from business records and my knowledge of the firm's history and operations, and the statements herein are consistent with the

---

[1] This declaration includes the substance of my prior March 12, 2025 declaration in support of Perkins Coie's motion for temporary restraining order (with minor changes where appropriate), along with additional information relevant for summary judgment.

knowledge formed while I was even more directly involved in various aspects of firm management.

2.     I currently chair the firm's governance task force, and have long and intense involvement in firm management.  I led the commercial litigation practice and first served on the firm's executive committee by the early 1990s.  I then served for six years on the four-partner management committee.   Over the years, I have chaired or served on the firm's hiring, compensation, pro bono, technology, and strategic conflicts committees as well as two strategic planning efforts and task forces on practice group structure, total quality management, and role of non-lawyer professionals.  I spearheaded the creation of our Intellectual Property Department and the opening of our Chicago office, both of which have become among our most successful initiatives.  I have acted as co-lead relationship partner for three of our large institutional clients.

3.     I submit this Declaration in Support of the Statement of Material Facts As To Which There Is No Genuine Dispute and Motion for Summary Judgment filed by Perkins Coie.  I am of the age of majority, and I am competent to make this declaration.

A.     **Perkins Coie LLP**

4.     Perkins Coie was founded in Seattle by a retiring U.S. District Judge and U.S. Attorney.  Since 1912, Perkins Coie has grown to become the largest law firm in the Pacific Northwest, has opened offices throughout the United States and in Asia and in Europe, and has more than 1,200 lawyers.

5.     The firm represents a wide range of clients, including Fortune 500 companies, small- and medium-sized businesses, families, individuals, and charitable and public service-oriented organizations.  Perkins Coie alumni have been and are presently serving as state and federal court judges, judicial law clerks, prosecutors, public defenders, and high-ranking

government officials, as well as founders, CEOs, and General Counsels of some of the nation's largest and most important companies. Perkins Coie is widely recognized as one of the leading law firms for technology and other innovative companies, and since our founding, Perkins Coie has proudly represented a wide range of industry leaders throughout the world.

6.     Over our 113-year history, Perkins Coie and its lawyers have represented clients in most if not every state, in federal and state courts across the nation, and in tribunals throughout the world (including the Supreme Court of the United States), and they have helped to establish major precedent in state and federal law. The firm is frequently sought out by leading technology and communications companies who are innovating in areas as varied as artificial intelligence, telecommunications, and the Internet of Things. The firm's lawyers are leaders and members of national, state, and local bar associations around the country. Among other esteemed professional organizations, its lawyers are members of the American Bar Association, state bar associations for nearly every state in the country, and local bar associations in such cities and counties as Chicago, King County, Los Angeles County, Maricopa County, New York City, San Francisco, and Washington, D.C.

7.     Perkins Coie has been named as an "Am Law 50" firm on *The American Lawyer 100* list for over a decade. The firm and its lawyers are regularly recognized for excellence in the legal community by *Best Lawyers*®, *Chambers USA*, and other respected organizations, including national and local bar associations.

8.     Perkins Coie has approximately 2,500 lawyers and business professionals. Of those, nearly half are attorneys—including equity partners, non-equity partners, and associates—and half are business professionals, including paralegals, patent agents, legal assistants, and other professionals. Our employees are deeply woven into the fabric of their communities. They are

Sunday school teachers, Scout leaders, youth sports coaches, and volunteers serving on hundreds of boards of organizations ranging from art museums and food kitchens to major universities, local schools, and foundations. They include former members of the armed forces, and current reservists in the U.S. military.

9.     Perkins Coie's attorneys are drawn from all sides of the political spectrum, and most of our attorneys are not politically active. There are attorneys who are liberal and attorneys who are conservative. When Bob Bauer started our small Political Law practice, we were known in Seattle as, if anything, a "Republican firm." His practice was viewed as an interesting business opportunity, not a cause. While partner politics have become more balanced, it was always important that the political practice be respectful of the firm's diversity. Further, many of our attorneys joined the firm after government service under both Democratic and Republican administrations, or after serving as judges or judicial law clerks to judges appointed by both Democratic and Republican presidents. Reflecting this bipartisan ethos, in the past six years, four current or former Perkins Coie lawyers have been nominated and confirmed to serve as federal judges—two by President Trump in 2019, and two by President Biden in 2021 and 2023. One former partner ran for Congress as a Republican, won, and returned to the firm for a time after he lost re-election. Another partner was elected Washington Attorney General as a Republican.

10.     Perkins Coie is dedicated to our clients, our communities, and each other. The firm has a longstanding, firmwide commitment to pro bono service. Since 1989, the firm has provided approximately 1.45 million hours of pro bono service by attorneys, paralegals, and other business professionals to innumerable clients, including veterans, indigent families, disabled persons, and community-based organizations of all sizes, including the League of Women Voters and other non-partisan organizations, in matters championing human, civil, and electoral rights, housing,

JA 311

education, food, benefits, and economic justice.  We have frequently been honored for our efforts.  Our pro bono service also extends to representing indigent criminal defendants before federal courts by court appointment and clients on death row in states with limited pro bono resources.  In 2024, for example, Perkins Coie lawyers, paralegals, and other business professionals spent over 89,000 hours, valued at nearly $70 million, in pro bono service.  Much of our pro bono work involves advocating for military and veterans' rights.

11.    Perkins Coie has received numerous awards from a wide range of organizations for its pro bono representation, including state and local bar associations, the U.S. Patent and Trademark Office 2023 Patent Pro Bono Achievement Certificate, the U.S. District Court for the District of Arizona 2022 Outstanding Pro Bono Attorney of the Year Award (awarded in 2023), and the 2023 Veteran Heroes Law Firm Award by the Attorney General of Washington's Office of Military and Veteran Legal Assistance.

12.    Perkins Coie is often recognized for fostering a work environment in which all lawyers and business professionals are judged on their merit and can reach their potential.  Perkins Coie has been named to *Fortune*'s "100 Best Companies to Work For" list for over 20 consecutive years, and our individual offices are often named to similar local lists.

**B.    The Firm's Diversity and Inclusion Efforts**

13.    In addition to our representation of clients in this area, Perkins Coie itself has a longstanding and demonstrable commitment to fostering diversity and inclusion (D&I) within the firm, the legal profession and community.  The firm's commitment is summarized plainly on our website:

- "We are intentional and consistent in our efforts to increase the diversity of our workforce and to advance the values of diversity and inclusion in the legal

**JA 312**

profession.  Diversity and inclusion are key to our culture, our values, and our

business strategy.  They are fundamental to the way we connect with and serve our

clients.";

- "Perkins Coie is committed to advancing diversity and inclusion both within the

  firm and throughout our collective communities.  We will continue to support and

  participate in efforts to make the legal profession more diverse and inclusive."

*See* Ex. 1, p. 1, 2.

14.     Like the federal government, Perkins Coie formally recognizes Martin Luther King

Jr. Day and Juneteenth as firmwide holidays, reinforcing the Firm's commitment to racial equity

through institutionalized reflection, education, and service.  The firm encourages attorneys and

staff to engage in volunteer activities on these days, supporting local community organizations

dedicated to advancing racial justice.  Perkins Coie also observes many heritage months, including

several that have been recognized by Congress, by conducting programming aimed at fostering

awareness and appreciation of diverse cultural narratives.  These include, but are not limited to,

Black History Month, Asian American and Pacific Islander Heritage Month, Women's History

Month, Pride Month, and Hispanic Heritage Month.  These initiatives are complemented by firm-

wide speakers, panel discussions, and presentations open and available to all Perkins Coie

personnel designed to encourage meaningful dialogue on diversity-related topics.  These programs

benefit all of the firm's personnel, and we believe they make for a more cohesive and effective

working environment.

15.     Perkins Coie's hiring and promotion decisions are merit-based, meaning all

candidates are evaluated equally based on the same metrics: qualifications, competencies,

personality, and demonstrated excellence.  The firm's hiring committee and interviewers undergo

training on best practices for inclusive hiring, mitigating implicit biases, and fostering fair opportunities. Perkins Coie does not have "percentage quotas" as part of its hiring practices.

16.    Perkins Coie has a Diversity & Inclusion Fellowship program that is expressly open to all first-year law students. *See* Ex. 2, p. 3.

17.    Following litigation initiated by the American Alliance for Equal Rights in 2023, the firm explicitly affirmed the inclusive nature of the fellowship to ensure continued adherence to principles of fairness and legal compliance. After the firm's confirmation that the law student fellowships were open to all, the American Alliance for Equal Rights voluntarily dismissed its lawsuit.

**C.    Interaction with the Federal Government**

18.    Perkins Coie is constrained by Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, and thus cannot disclose client engagements without authorization. No client has authorized Perkins Coie to disclose its engagement of the firm in connection with this litigation, and this section therefore contains information about the Firm's practice without revealing confidential details.

19.    As a full-service law firm that represents clients in all sectors of the economy in transactional, litigation, and regulatory matters, Perkins Coie lawyers necessarily interact with the federal government on behalf of their clients in innumerable ways. Those interactions are critical to their ability to practice their profession; they are the waters the Perkins Coie attorneys swim in, the air they breathe. If allowed to go into effect, the Order's restrictions would be devastating and irreparable. Most of the firm's litigation practice is in federal court on behalf of their clients in civil and criminal cases, as well as in federal agencies' in-house administrative proceedings. As of March 11, 2025, the firm had nearly a thousand cases currently pending before federal district,

bankruptcy, and appellate courts, including the Supreme Court of the United States. Its attorneys have upcoming appearances scheduled before agencies and in courtrooms, including an upcoming argument before the Supreme Court (another one has occurred since March 11).

20.    Perkins Coie represents clients who have been indicted or are the targets of pending federal criminal investigations. Over the past five years, the firm has represented more than 80 individuals and companies who have been criminally investigated, charged, and/or prosecuted by federal authorities at the Department of Justice. This list does not include the firm's work in federal criminal-adjacent areas, such as clemency petitions or other post-conviction relief beyond direct appeals, such as pardons or compassionate release.

21.    The firm has nine main practice groups, and all of them intersect with the federal government in some way and include clients with business before the federal government. The largest practice groups by headcount are Commercial Litigation, Business, and Intellectual Property, which together account for approximately 75% of the firm's attorneys. The smallest practice group by headcount is Political Law. Today, Perkins Coie's Political Law Group includes approximately 8 attorneys, plus approximately 19 attorneys who are members of other practice groups and also affiliated with the practice. I understand the March 6, 2025 Executive Order and Fact Sheet at issue in this proceeding to refer to former members of the Political Law Group, albeit not by name. Although the firm's Political Law practice has historically been much smaller than our other practice groups, it also substantially shrank in 2021 when Marc Elias and about 50 other attorneys left Perkins Coie to form the Elias Law Group. This practice group historically has handled a mix of paying and some pro bono cases, and it is often called on to advise clients (typically corporations and business organizations) on political finance issues. It accounts for

about 0.5% of the firm's revenue.  Perkins Coie attorneys work on these matters because they involve important legal rights and issues affecting our clients.

22.    In the course of their representations, Perkins Coie lawyers frequently meet with federal officials from countless agencies.  Although it is difficult to quantify precisely, based on a review of our current client matter list, the vast bulk of our clients have matters that require Perkins Coie lawyers to interact with federal agencies.

23.    For instance, a significant number of Perkins Coie clients are, or have affiliates who are, government contractors and subcontractors—including 100% of its top 15 clients by revenue. *See* Ex. 3 (identifying revenue from top 15 clients).  I have also reviewed records from the Federal Procurement Data System (FDPS) to confirm that each of these clients, or their affiliates, are government contractors.

24.    The firm's Government Contracts group handles clients' bid protests and disputes surrounding contract claims, including transactional work and litigation.  Perkins Coie represents some of these clients in connection with government contract matters.  As of March 11, 2025, the approximately nine attorneys in this group were handling approximately 70 government contracting matters involving various federal agencies.  But there are many other firm clients that have government contracts and who have engaged Perkins Coie to represent them in matters unrelated to their government contracts.

25.    The firm's Intellectual Property group and its clients also depend heavily on access to and interaction with the federal government.  The approximately 236 attorneys in this group frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board.  As of March 11, 2025, Perkins

Coie was representing clients in approximately 5,415 pending patent applications before the USPTO. Perkins Coie was also representing clients in approximately 56 active post-grant proceedings (i.e., administrative trial proceedings) before the Patent Trial and Appeal Board (PTAB), and clients in approximately 11 active proceedings before the International Trade Commission (ITC). Perkins Coie was also representing clients in trademark and copyright matters before agencies, including approximately 66 matters before the Trademark Trial and Appeal Board (TTAB), approximately 1,960 pending trademark matters before the USPTO, and approximately 145 pending copyright matters before the Copyright Office. Many of those patent and trademark clients also are known to have contracts with the federal government.

26.    Perkins Coie has approximately 340 attorneys in its Business group. That practice group includes subgroups directed to financial regulation, which requires them to engage with federal financial regulatory agencies and instrumentalities (such as the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency); international trade, which involves interaction with and practice before the Department of Commerce and the International Trade Commission; and tax, which involves interaction with the Internal Revenue Service. As of March 11, 2025, the international trade group also had approximately 17 pending matters before the Department of Labor and approximately 22 pending matters before U.S. Citizenship and Immigration Services. The group's corporate and securities practice regularly represents clients before and in connection with the Securities and Exchange Commission (SEC), including No Action Request Letters, Securities Act registration statements subject to SEC review, and Exchange Act filings. The Business Group also represents clients before or in connection with the Department of Agriculture, the Food and Drug Administration, Department of Transportation, Department of Justice, Department of Homeland Security, and Department of State.

JA 317

27.    The firm's White Collar & Investigations practice (a subgroup of the Commercial Litigation group) includes approximately 29 attorneys and is almost exclusively reliant on interacting with the federal government.  That practice involves representing clients in investigations and after indictments in numerous proceedings involving many agencies of the federal government, including the Department of Justice, Federal Bureau of Investigation (FBI), U.S. Attorney's Offices, and SEC, among others.

28.    There are many other practice groups and subgroups at Perkins Coie that interact, by necessity, with the federal government on behalf of our clients.  These groups include, but are not limited to, Commercial Litigation (with subgroups including Appeals, Issues & Strategy; Construction; and Antitrust); Environment, Energy & Resources; Labor & Employment; Private Client Services; Product Liability; and Real Estate & Land Use.  In summary, much of our work on behalf of our clients requires access to federal government buildings, which house both courthouses and agencies.  This is true of every practice group at the firm.  And certain of these practice areas, such as White Collar & Investigations, are almost exclusively reliant on interacting with the federal government.  Each of our nine major practice groups relies on clients who have done business with the federal government.  Such clients or their corporate affiliates account for a significant fraction of revenue in each practice group, as evidenced by the top 15 clients in each practice group (84% of revenue from top 15 clients in Business from those that have or whose corporate affiliates have government contracts; 90% for Commercial Litigation; 88% for Intellectual Property; 51% for Environment, Energy & Resources; 75% for Labor & Employment; 44% for Political Law; 51% for Private Client Services; 94% for Product Liability; 32% for Real Estate & Land Use).  *See* Ex. 4 (listing revenue from top 15 clients in each practice group).  I have

also reviewed records from the FDPS that confirm the percentage of these clients, or their affiliates, that are government contractors.

29.    As of March 11, 2025, by way of non-exhaustive example, our records show that Perkins Coie has active civil and criminal matters on behalf of its clients involving at least the following federal agencies, which require them either to interact with or appear before federal government officials:

- Administration for Strategic Preparedness and Response
- Advisory Council on Historic Preservation
- Biomedical Advanced Research and Development Authority
- Bonneville Power Administration
- Bureau of the Census
- Bureau of Economic Analysis
- Bureau of Indian Affairs
- Bureau of Industry and Security
- Bureau of Land Management
- Bureau of Ocean Energy Management
- Bureau of Reclamation
- Bureau of Safety and Environmental Enforcement
- CHIPS Program Office
- Committee on Foreign Investment in the United States
- Commodity Futures Trading Commission
- Consumer Financial Protection Bureau
- Defense Contract Audit Agency
- Defense Contract Management Agency
- Defense Logistics Agency
- Department of Agriculture
- Department of the Army
- Department of Commerce
- Department of Defense
- Department of Energy (including Oak Ridge National Laboratory)
- Department of Health & Human Services
- Department of Homeland Security
- Department of the Interior
- Department of Justice (including Antitrust, CCIPS, Civil, Fraud)
- Department of Labor
- Department of State
- Department of Transportation
- Department of Toxic Substance Controls

**JA 319**

- Department of the Treasury
- Department of Veterans Affairs
- Directorate of Defense Trade Controls
- Drug Enforcement Administration
- Environmental Protection Agency
- Equal Employment Opportunity Commission
- Executive Office of the President (including CEQ, OMB, and OSTP)
- Fannie Mae and Freddie Mac
- Federal Aviation Administration
- Federal Bureau of Investigation
- Federal Bureau of Prisons
- Federal Communications Commission
- Federal Deposit Insurance Corporation
- Food & Drug Administration
- Federal Election Commission
- Federal Emergency Management Agency
- Federal Energy Regulatory Commission
- Federal Highway Administration
- Federal Permitting Improvement Steering Council
- Federal Transit Administration
- Financial Crimes Enforcement Network
- Financial Industry Regulatory Affairs (FINRA)
- Government Accountability Office
- Grid Deployments Office
- Housing and Urban Development
- Internal Revenue Service
- International Trade Administration
- Loan Programs Office
- National Institutes of Health
- National Labor Relations Board
- National Marine Fisheries Service
- National Oceanic and Atmospheric Administration
- National Park Service
- National Renewable Energy Lab
- Office of Clean Energy Demonstrations
- Office of Federal Contract Compliance Programs
- Office of Foreign Assets Control
- Office of the Comptroller of the Currency
- Office of the U.S. Trade Representative
- Pacific States Marine Fisheries Commission
- Patent Trial & Appeal Board
- Rural Utilities Service
- Securities & Exchange Commission
- Small Business Administration

**JA 320**

- Trademark Trial & Appeal Board
- U.S. Army Corps of Engineers
- U.S. Attorney's Offices
- U.S. Copyright Office
- U.S. Citizenship and Immigration Services
- U.S. Customs and Border Protection
- U.S. Fish & Wildlife Service
- U.S. Forest Service
- U.S. Immigration and Customs Enforcement
- U.S. International Trade Commission
- U.S. Patent & Trademark Office
- U.S. Postal Inspection Service
- U.S. Secret Service

30.     The firm's pro bono work is frequently before federal agencies or involves interacting with federal government officials.  For instance, Perkins Coie attorneys represent individual veterans pro bono in obtaining benefits before the Department of Veterans Affairs and the Department of Defense.  As of March 11, 2025, Perkins Coie had approximately 41 open pro bono matters for individual veterans matters, the majority of which are related to seeking higher levels of benefits for veterans in connection with their service to this country, such as application for combat-related special compensation (before the Combat-Related Special Compensation Board); discharge upgrade petitions; and appeals to the U.S. Court of Appeals for Veterans Claims. In the past five years, Perkins Coie has handled 90 matters for individual service members.  Perkins Coie was honored with the 2023 Veterans Heroes Law Firm Award by the Attorney General of Washington's Office of Military and Veteran Legal Assistance (OMVLA).  That award recognizes the law firm that provided the greatest contribution to OMVLA in any given year.  The National Veterans Legal Services Program (NVLSP) also selected a Perkins Coie attorney to receive the 2020 NVLSP Lawyers Serving Warriors Excellence Award.  The entire veterans-rights practice requires access to federal officials and buildings.  Perkins Coie attorneys also represent disaster victims on a pro bono basis in FEMA applications and appeals.  Perkins Coie attorneys represent

pro bono clients in social-security matters, including SSI and SSDI. Perkins Coie represents several nonprofits pro bono for a range of matters, including obtaining federal tax exemptions, formation, and counseling. And Perkins Coie represents pro bono low-income inventors with patent applications before the USPTO, and assists organizations and small businesses in registering trademarks. Further, Perkins Coie attorneys have represented pro bono religious organizations, including Jewish and Catholic organizations.

31.    Much of this pro bono work is not "political." Our analysis indicates that only about 20% of the pro bono matters, and 35% of the pro bono time spent over the past year, were attributable to cases that might be viewed as "political" – *i.e.*, cases involving transgender service members, homelessness, immigration, reproductive rights, the First or Second Amendments, elections, discrimination, or right to die. By contrast, 80% of Perkins Coie's pro bono matters, and nearly two-thirds of its pro bono hours over the past year, were devoted to non-political matters such as veterans, domestic abuse, Criminal Justice Act appointments to represent indigent defendants, Social Security disability payments, patents and trademarks, business and non-profit tax counseling.

32.    Examples of the type of pro bono work that might be considered "political" include: 1) a challenge to a state law that prevented pregnant individuals from using midwives that employ traditional healing practices for prenatal, maternal, and infant care; 2) assisting a faith-based "crisis" pregnancy resources center in a lease dispute; and 3) assisting a deported veteran—who had lived in the United States as a lawful permanent resident since the age of five—in returning to the United States through humanitarian parole.

**D.     Recent Relevant Litigation**

33.     In 2020, Perkins Coie represented a number of clients opposing then-candidate Trump's challenges to the results of the 2020 Presidential Election.  The firm's clients prevailed in all but one of the challenges brought by the Trump campaign seeking to overturn the results of the 2020 election,[2] and the firm's clients also prevailed in a significant number of voting rights cases, including cases where our clients were successful in upholding existing laws against challenges by lawyers for the other party.  The profession's ethics rules would generally not allow us to represent candidate Trump's interests once we had been retained adverse to those interests.

34.     On March 24, 2022, Donald Trump sued a host of defendants, including Perkins Coie, Hillary Clinton, the Democratic National Committee, Fusion GPS, and former Perkins Coie partners Michael Sussmann and Marc Elias in the U.S. District Court for the Southern District of Florida alleging that the defendants "maliciously conspired to weave a false narrative" that Mr. Trump was colluding with Russia.  *See* 2:22-cv-14102 (S.D. Fla.).  Mr. Trump asserted civil RICO claims against Perkins Coie for conspiring with the Clinton campaign and sought to recover damages in excess of $24 million, before trebling, as well as attorney's fees and lost profits.  On September 9, 2022, the court dismissed the lawsuit with prejudice.  *Trump v. Clinton,* 626 F. Supp. 3d 1264 (S.D. Fla. 2022).

35.     On February 6, 2025, Perkins Coie filed a lawsuit, *Shilling v. Trump*, No. 2:25-cv-241 (W.D. Wash.), on behalf of Commander Emily Shilling, Commander Blake Dremann, Lieutenant Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class Jane Doe, Staff Sergeant Videl Leins, Matthew Medina, and the Gender Justice League

---

[2] The case where Perkins Coie's client did not prevail involved a challenge to the deadline—November 9 versus November 12—to confirm the identities of first-time voters who voted by mail in Pennsylvania.

challenging an executive order by President Trump targeting transgender servicemembers. The lawsuit challenges the Executive Order as a violation of Plaintiffs' First Amendment, due process, and equal protection rights. Perkins Coie represents the plaintiffs on a pro bono basis as co-counsel, along with Lambda Legal and the Human Rights Campaign. On February 19, 2025, Perkins Coie, on behalf of its clients, filed a motion for a preliminary injunction asking the court to bar implementation of the executive order until it could adjudicate the case. The court entered a preliminary injunction on March 27, 2025. *Shilling*, No. 2:25-cv-241, ECF Dkt. No. 103 (W.D. Wash.). On January 28, 2025, a group of plaintiffs filed an earlier parallel lawsuit challenging Executive Order 14185. *Talbott v. Trump*, No. 25-cv-240, Dkt. 1 (D.D.C.). Perkins Coie does not represent those individuals and, beyond monitoring, is not otherwise involved in that litigation.

**E.    Security Clearances Held by Perkins Coie Personnel**

36.    At the time of the March 6 Order, our records showed that approximately twenty-four Perkins Coie lawyers and business professionals held security clearances. These individuals include a dozen persons with former military or other public service backgrounds, granted access to sensitive information by virtue of their commitment to public service. These individuals also include and overlap with persons whose access to sensitive information has been granted in the context of their fulfilling their obligations as lawyers to represent their clients.

37.    Of the twenty-four security clearance holders, twenty-one received clearance from the Department of Defense and the other three received clearance from the Department of Justice and Federal Bureau of Investigation.

38.    Nine of the security clearance holders received their clearance prior to being hired by Perkins Coie. Two of those individuals hold clearances in connection with their duties as

military reservists, and wholly unrelated to their work at Perkins Coie. Four of the twenty-four individuals with security clearances are non-attorneys.

39.    One partner received a security clearance on February 12, 2025, after President Trump's inauguration and approximately three weeks before the Executive Order issued. The "Adjudication History" in the Defense Information System for Security (DISS) for the partner reflected "**Top Secret adjudication completed** with a **determination of Favorable by DoD CAS on 2025/02/12**." (emphasis in original). *See* Ex. 5. All of the factual conclusions recited in Section 1 of the Executive Order occurred before that partner received this security clearance.

40.    Ten of the security clearance holders were hired at Perkins Coie after the 2016 election.

41.    Nineteen of the security clearance holders had no involvement in any of the matters referenced in the Order or the Fact Sheet. Of the five that did, the security clearances they held were unrelated to their work on those matters. No security clearance holder had any involvement in the Fusion GPS matter. No security clearance holder has any involvement with the *Shilling* matter. None of the security clearance holders is a primary member of the Political Law Group.

42.    Perkins Coie previously (but no longer) maintained a secure area with a low classification level, namely a secure working environment, but that secure area was closed prior to the issuance of the Order. As described below, Perkins Coie has never maintained a Sensitive Compartmented Information Facility (SCIF) and has no record of FBI agents working out of its offices.

**F.    Irreparable Harm Caused by the Order and Its Enforcement**

43.    On March 6, 2025, President Donald J. Trump signed the Executive Order 14230 titled "Addressing Risks from Perkins Coie LLP." *See* https://www.whitehouse.gov/presidential-

actions/2025/03/addressing-risks-from-perkins-coie-llp/ (90 Fed. Reg. 11,781) (the "Order"). The Order was accompanied by a "Fact Sheet" issued the same day that purports to explain and support the Order. Perkins Coie was given no notice of, nor an opportunity to respond to, the false charges in the Order and Fact Sheet or to explain their inevitable impact on the firm before they were issued, and no effort was made to alter the Order or Fact Sheet after our TRO pleadings pointed out many fundamental (and still unrebutted) errors. Numerous bar groups, law schools, law firms, and lawyers have spoken out against the Executive Order's plain unconstitutionality.

44.     We of course are constrained under Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, but we can report general facts and facts known to the government. The day after the Executive Order, an official of a federal agency informed a client of Perkins Coie that, because of the Order, the client's Perkins Coie lawyers should not attend a scheduled meeting with an office in that agency to discuss a pending matter. The client had engaged Perkins Coie to defend that client in that enforcement action, and Perkins Coie performed substantial work on the matter, totaling over $1 million in fees, and interacted with the agency on this matter in the interim. The client, after expressing great reluctance and regret, said it was forced to hire other law firms to represent it before the federal government and in related litigation.

45.     On March 6, 2025, an attorney in the Fraud Section of the Criminal Division of the U.S. Department of Justice, informed Perkins Coie that the Fraud Section of the Criminal Division could not proceed with a previously set meeting relating to another Perkins Coie client, citing the need to wait for further guidance on whether that meeting could even occur in light of the Order. *See* Ex. 6.

46.     It is inconceivable that the Order could constitutionally ban Perkins Coie's access to federal courthouses, but because it might be interpreted to do so, the firm has already been

forced to incur additional costs in securing backup personnel to attend impending hearings. Perkins Coie will continue incurring such harm if the Order's enforcement is not permanently enjoined because Perkins Coie attorneys have numerous upcoming appearances before federal courts and agencies. Indeed, Perkins Coie has nearly a thousand active matters before federal courts, and has thousands of matters before agencies that require access to federal government buildings and officials. Refusals by federal officials to meet with Perkins Coie lawyers, or to permit Perkins Coie lawyers to access federal agencies and buildings, would be devastating to both Perkins Coie's legal practice and its clients' interests. Even the threat of such lack of access is surely deterring potential new clients and existing clients from retaining the firm for new matters.

47.     Similarly, the Order also includes provisions that would require federal agencies to require government contractors to disclose any relationship they have with Perkins Coie, and to terminate government contracts for clients as to which Perkins Coie has been hired to perform any service. Many of Perkins Coie's largest clients (for instance, the top 15 clients, collectively representing over $343 million in revenue in 2024, which represents almost a quarter of the firm's revenue) or their affiliates have contracts or subcontracts with the federal government, or compete for such contracts, and many of those companies are represented by the firm for legal matters completely unrelated to government-contracting matters. *See supra* ¶ 23. For many of the firm's clients, the fact that the firm gives them legal advice is not public information, and the importance of confidentiality is a reason for attorney-client privilege and Rule 1.6. Accordingly, if enforced, the Order would seek to require many of these clients to divulge confidential information regarding their legal representations to the federal government, in addition to risking the termination of those clients' contracts if Perkins Coie has been hired to perform any service related to the contract.

48.     Due to the restrictions that the Order imposes on Perkins Coie, and the provisions directed to the firm's federal contractor clients, several clients have already terminated, or have communicated that they are considering terminating, their legal engagements with Perkins Coie. We are in frequent contact with many of our clients, and since the Order, have been in contact with at least our larger clients every day.  The common message is that they want to keep using us but are reviewing the relationship, their government contracts and other government interactions, and will need to make decisions shortly.  This is a rapidly evolving situation, which changes by the hour.  Prior to the TRO, for example, some clients have reported very concerning messages from government officials directing them to report business with Perkins Coie, and others are concerned about that possibility, including:

a.   A seven-year client with seven open matters informed Perkins Coie on March 6, 2025, within hours of the Order's release, that due to the Order, Perkins Coie cannot represent that client in any litigation or before the relevant federal agency.

b.   A major government contractor that has been a firm client for over 35 years reassigned two matters to other law firms on March 7, 2025.

c.   A government contractor that has been a firm client since 2018 withdrew all work from Perkins Coie as a result of the Order as of March 7, 2025.

d.   A coalition of four clients had also withdrawn all coalition work from Perkins Coie as of March 7, 2025 due to the need of the clients to engage with various federal agencies—including the DEA, DOJ, and HHS—by the nature of their business.

e.   A major government contractor that has been a firm client since 2021 with fifteen open matters informed the firm on March 7, 2025 that it is reconsidering its

engagements with Perkins Coie unless something changes in terms of the Order's requirements.

    f.    Another client indicated on March 7, 2025 that it is now, in view of the Order, considering other firms instead to represent it in connection with a DOJ investigation.

    g.    On March 11, 2025, a longtime client of the firm that had increased its work five-fold over the past three years and had 30 open matters started to reconsider whether to terminate every engagement with Perkins Coie.

    h.    Because of the uncertainty created by the Order, and even after the entry of the TRO, many clients have begun requesting frequent updates relating to the Order in order to assess whether Perkins Coie can continue to represent them.

49.    The abrupt loss of so many longstanding and significant clients across a variety of business types and practice disciplines in a one-week period is exceptional and abnormal. The common denominator among these clients is that each one terminated or began reconsidering its engagements in the immediate aftermath of the Order's issuance. While the TRO stemmed some of those consequences, a permanent injunction is necessary to prevent them from resuming and intensifying.

50.    Perkins Coie has already lost significant revenue due to the loss of clients who terminated their engagements in the few days since the Order was issued. And the firm has lost out on new work from clients who were considering engaging the firm, but chose not to move forward with Perkins Coie after issuance of the Executive Order. Like any law firm or business, Perkins Coie has debts, obligations and expenses. If the Order were to continue and thus cause current clients to terminate their engagements, and frighten away prospective new clients, it would

put the firm's solvency and very existence at risk. For instance, if we lost our top 15 clients—each of whom is a government contractor or a corporate affiliate of one, each of whom we believe is at risk accordingly—the revenue loss would be devastating because this group alone represented about a quarter of our revenue in 2024. If the Order is allowed to prevent Perkins Coie from interacting with federal agencies or entering federal buildings on behalf of its clients, it would pose an existential risk. The firm is built around representation of clients who interact with the federal government. We take pride in the loyalty of our partners and associates, but lawyers of their quality have other opportunities, including the easy one of following their clients to other firms. Exceptional lawyers are the basis for our reputation and our success.

51.    The Order has also had a chilling effect on Perkins Coie attorneys, who are now reconsidering how they approach certain matters that require them to appear in federal buildings.

52.    The Order also threatens Perkins Coie attorneys' right to practice their chosen profession. That threat is not only to revenue-generating practice, but also to the firm's pro bono practice, which frequently requires us to appear in federal court or before federal agencies in criminal, civil, or administrative matters. It is not even clear if TSA officers can process us at airports.

53.    The Order has also impacted Perkins Coie's recruiting and, potentially, retention of our personnel. Since the issuance of the Order, we have had business professional candidates who have been extended offers question the economic health of the firm and ask if there will be layoffs. One interviewee asked one of the firm's recruiters questions that the recruiter understood to be precipitated by the Order. The threat to the Firm's recruitment efforts poses severe consequences for the health of the firm. Its potential for growth as a business depends on its ability to draw and retain top talent.

54.    The Order increases the potential that Perkins Coie lawyers will leave the firm for other opportunities in order to preserve their relationships with clients that have government contracts.

55.    The Order also interferes with Perkins Coie's employer–employee relationships because the restrictions are broadly written to include Perkins Coie business personnel.

56.    The firm currently faces considerable uncertainty regarding which aspects of its D&I activities and advocacy will result in adverse consequences, even in the face of injunctive relief.  The Executive Order appears to be a command to purge all references to or support of diversity and inclusion in the workplace.  The risks and uncertainty stemming from this Order have resulted in pausing or pulling back on certain programs and some statements in support of D&I and the implementation of D&I initiatives.  The affected conduct is lawful and consistent with EEOC guidance at the time those actions were taken.

57.    For example, press releases and stories more than six months old, including those touting the firm's D&I advocacy, were already removed from the firm's website (but have been preserved).  Perkins Coie has reassessed and is reassessing other statements and references to its pro bono and D&I advocacy on its website.  The firm similarly has reassessed and is reassessing statements and references to its D&I advocacy in various advertisements and program brochures, including considering removal of the following: (1) the phrase "Diversity is Excellence" in an advertisement; (2) the statement that Perkins Coie is "proud to support" an organization's "commitment to inclusivity and empowerment of diverse communities," in a program brochure for an event the firm is sponsoring; and (3) the phrase "Investing in diversity and inclusion is smart business and helps drive our pursuit of excellence," in a program brochure.

58.     The Order has done more than impact the firm's messaging on D&I.  It has chilled Perkins Coie's diversity-related programs, not because certain measures are required by law, but because of the need to protect the firm from extralegal pressure.  For instance, the Order has interfered with Perkins Coie's ability to offer fellowships to potential new hires, even though those fellowships are open to all applicants.  Perkins Coie has postponed a showing of a movie regarding Lilly Ledbetter, sex discrimination and the Fair Pay Act.  The firm is considering whether and how it can or should respond to questions from clients and prospective clients regarding the demographics of the firm or its lawyers.  The Perkins Coie Women's Forum was concerned that an internal event for first-time attendees to the firm's partner planning conference could be targeted as impermissible, even though it was open to all conference attendees, because a resource group was hosting the event, but decided to proceed with the event notwithstanding the uncertainty.  And firm personnel were even unsure whether they can have a reference to "DE&I" in their email signature block.  In short, Perkins Coie is committed to complying with the law as it evolves over time.  But Section 4 of the Executive Order is both unclear and overbroad, far broader than any change in the law to date.  Consequently, it interferes with speech, and tries to intimidate and distort the firm's advice to clients.

**G.     False and Disparaging Statements in the Order**

59.     The Order has also harmed Perkins Coie's reputation in the markets for clients, lawyers, and staff through its false and disparaging characterizations of the firm and its attorneys, such as its statement that Perkins Coie is "dishonest and dangerous."  Such stigma threatens grave, mutually-reinforcing consequences, as the Firm's reputation affects its ability to attract clients, and its ability to attract clients in turn supports its reputation as a top law firm.

60.    The Order says many things that are not only inflammatory but also blatantly false. Most of the allegations were known during the President's first term, and have been (and in many cases were) adjudicated and dismissed long ago.  For example, the Order accuses Perkins Coie of working to "steal an election," of "undermining democratic elections, the integrity of our courts, and honest law enforcement," and of "racially discriminat[ing] against its own attorneys and staff, and against applicants," including through "percentage quotas" and "proudly exclud[ing] applicants on the basis of race."  And it accuses Perkins Coie of "earnings" that "subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust." Those accusations are just plain false and most have already been rebutted through the results of prior cases.  The Order also references "Fusion GPS" in connection with representation of Hillary Clinton.  Though Marc Elias and others at Perkins Coie represented Hillary Clinton in connection with her presidential campaign, no attorney employed at Perkins Coie for at least the last three years had anything to do with the engagement of Fusion GPS.

61.    The Fact Sheet also lists accusations against Perkins Coie.  Those descriptions are inflammatory and baseless.  Among other false statements, the Fact Sheet wrongly states:

   a.    "Perkins  Coie  LLP  pushed  debunked  claims  of  secret  Trump-Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme."  A jury unanimously acquitted Mr. Sussmann.  The Fact Sheet also omits that no one else was involved and that Mr. Sussmann left the firm in 2021.

   b.    "Perkins Coie LLP has worked with activist donors, including George Soros, to judicially  overturn  enacted  election  laws,  such  as  those  requiring  voter

identification." Perkins Coie has historically represented both party-affiliated and non-partisan clients in litigation over election laws. Many law firms have done the same. None of Perkins Coie's election-related litigation was frivolous. Indeed, more than half of the litigation was successful after both sides had full due process. And much of it was *defending* state election procedures and actions taken by state officials.

c. "A court was forced to sanction Perkins Coie attorneys for unethical lack of candor before the court." The Fact Sheet alludes to one minor sanction, collectively, $8,700, connected with a single duplicative motion to supplement the record in a Fifth Circuit appeal in a 2021 voting-rights case in violation of a local rule. *See Tex. All. for Retired Ams. v. Hughs*, No. 20-40643 (5th Cir. Jun. 30, 2021), Dkt. No. 127-1. None of the three sanctioned attorneys remains at Perkins Coie. It is extremely rare for any of our lawyers to be sanctioned, and we take such matters very seriously. This was not a lack of candor.

d. "Perkins Coie LLP hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump." The "FBI workspace" rumor was long ago debunked. Perkins Coie did not host an "FBI workspace." Rather, like many law firms who represent clients involved in national-security issues, the firm wanted to protect national security and thus was permitted to install, at its own expense, a single-room Secure Work Environment (SWE) when it moved to new offices. The FBI's only involvement was examining and approving the security of the space. Perkins Coie no longer has a SWE, and the SWE was never an "FBI workspace."

e.  "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness."  This statement impugns Perkins Coie for the political and legal positions taken by some of its clients in lawful litigation. Specifically, this statement refers to *Shilling v. Trump*, the pro bono lawsuit described earlier representing plaintiffs challenging an executive order by President Trump affecting transgender servicemembers despite their love of country and equal ability to contribute to military readiness.

\* \* \*

62.  I declare under penalty of perjury, on this 2nd day of April, 2025, that the foregoing is true and correct to the best of my knowledge, information and belief.

DAVID J. BURMAN

# EXHIBIT 1

4/1/25, 1:47 PM                    Diversity & Inclusion | Perkins Coie

Case 1:25-cv-00716-BAH    Document 30-3    Filed 04/02/25    Page 30 of 52
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 347 of 369

← IMPACT

# Diversity & Inclusion

Embracing diversity and inclusion allows us to draw from varied perspectives and communities, enabling us to attract the very best talent to our ranks, and in turn provide excellent service to our clients.

**Overview**          Recruitment & Retention          Our Commitment to Racial Equality

# Our Continuing Commitment to Diversity & Inclusion

Perkins Coie is committed to advancing diversity and inclusion both within the firm and throughout our collective communities. We will continue to support and participate in efforts to make the legal profession more diverse and inclusive.

JA 337



We are intentional and consistent in our efforts to increase the diversity of our workforce and to advance the values of diversity and inclusion in the legal profession. Diversity and inclusion are key to our culture, our values, and our business strategy. They are fundamental to the way we connect with and serve our clients.

As we consider the Supreme Court decision limiting the consideration of race in university admissions, we re-affirm our commitment to building a more diverse and inclusive workplace and legal profession. Our methods for fulfilling that commitment may evolve over time as the legal landscape changes; our commitment will remain steadfast.

## Objectives

– Engaging firm leadership in proactive diversity and inclusion

– Investing in the diversity pipeline

– Developing programs to address internal and external priorities

**JA 338**

– Measuring and monitoring our progress and success

## Strategic Diversity & Inclusion Committee

Established in 2006, the **Strategic Diversity & Inclusion Committee** (SDC) develops firmwide diversity strategies and policies which are used to guide the implementation of existing programs and the creation of new strategic diversity initiatives, with a strong focus on recruitment, retention, promotion and community

## Local Diversity Committees

We have also established **Local Diversity Committees** in each office that work to develop programming and initiatives designed to address the unique needs of their office and communities.

## Resource groups

**Resource groups** are a key to the success of diversity and inclusion at the firm. Our resource groups develop educational programming, assist with business and professional development opportunities, maintain relationships with national minority bar associations and foster community. The resource groups are important sources of support, development and networking for our diverse lawyers. Below is a list of our resource groups.

# Our Structure

Our commitment to diversity and inclusion is a goal shared collectively throughout the firm, which is why we have created a committee structure that allows all stakeholders to participate.



# Resource Groups

African American/Black Lawyers       +

Asian Pacific Islander Lawyers       +

Latinx Lawyers       +

Lawyers with Disabilities       +

**JA 340**

Lesbian, Gay, Bisexual and Transgender (LGBTQ+) Lawyers    +

Native American Lawyers    +

Parents and Caregivers    +

South Asian/Middle Eastern Lawyers    +

Veterans    +

Women's Forum    +

Women of Color    +

# Awards

– Awarded Mansfield 7.0 Certification Plus for Diversity Leadership from Diversity Lab, 2022-2024

– Named among the "Best Law Firms for Women" by *Working Mother*/*Flex-Time Lawyers,* 2008, 2009, 2011-2022

– Received a score of 100% in the *Corporate Equality Index* and designation as one of the "Best Places to Work" from the Human Rights Campaign Foundation (the educational arm of the nation's largest advocacy group for LGBT Americans), 2009-2025

– Ranked among ChIPs Honor Roll Firms for gender diversity in Intellectual Property practices in the 2021 Inclusion Blueprint Survey a joint initiative between ChIPs and Diversity Lab

## Partnerships and Sponsorships

**JA 341**

4/1/25, 1:47 PM                    Diversity & Inclusion | Perkins Coie

Case 1:25-cv-00716-BAH    Document 30-3    Filed 04/02/25    Page 35 of 52
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 352 of 369

– Leadership Council on Legal Diversity

– Corporate Counsel Women of Color

– Charting Your Own Course

– Diversity & Flexibility Alliance

– Hispanic National Bar Association

– Just the Beginning Foundation's Summer Legal Institute

– LAMBDA Legal National Sponsorships

– Minority Corporate Counsel Association

– National Asian Pacific American Bar Association

– National Bar Association

– National Black Law Students Association

– LGBTQ+ Bar Association Lavender Law Conference & Career Fair

– National Native American Law Students Association

– North American South Asian Bar Association

– Out and Equal Workplace Summit

– Practicing Attorneys for Law Students Program, Inc.

**For questions, please contact** Diversity&Inclusion@perkinscoie.com.

People

Industries

Services

Locations

Impact

Careers

Job Openings ↗

**JA 342**

Case 1:25-cv-00716-BAH    Document 30-3    Filed 04/02/25    Page 36 of 52
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 353 of 369

| | |
|---|---|
| Perkins Coie Trust Company↗ | The Public Company Handbook |
| Client Advantage | Subscribe to Mailing Lists↗ |
| 中文网站 | AI & Machine Learning |
| Alumni ↗ | Corporate Law |
| Blogs | Energy Infrastructure & Clean Technology |
| Client Updates | Environment, Energy & Resources Law |
| Podcasts | Intellectual Property Law |
| Publications | Labor & Employment Law |
| News Room | Litigation |
| California Land Use & Development Law Report | Privacy & Security Law |
| Security Breach Notification Chart | Private Client Services |
| Perkins on Privacy | Real Estate & Land Use |
| Public Chatter | Technology Transactions & Privacy Law |
| | Pay Invoice ↗ |

| | |
|---|---|
| Terms of Use | Transparency in Coverage |
| Privacy Policy | UK Legal Notice |
| Legal Disclaimer | Lawyer Advertising |

**JA 343**

USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 354 of 369
© 2025 Perkins Coie LLP

**JA 344**

# EXHIBIT 2

← IMPACT

# Diversity & Inclusion

Embracing diversity and inclusion allows us to draw from varied perspectives and communities, enabling us to attract the very best talent to our ranks, and in turn provide excellent service to our clients.

Overview          **Recruitment & Retention**          Our Commitment to Racial Equality

# Recruitment & Retention

We believe in developing relationships and investing in people. At Perkins Coie, we strive to create a diverse and inclusive community where opportunities to succeed are available to all.

**JA 346**



Our firm culture is built on collaboration and mutual respect. Once an attorney becomes part of our community, we want them to feel welcome and prepared to participate at every level of engagement necessary for success. This is why the firm supports inclusive resource groups for women, lesbian, gay bisexual and transgender attorneys, lawyers with disabilities, veterans, parents, caregivers, and lawyers of color (African American/Black, Latinx, Asian American/Pacific Islander and South Asian/Middle Eastern). In order to increase the diversity of backgrounds, experiences and perspectives within the firm, these resource groups offer opportunities for fellowship, support and networking. In addition, local office diversity committees offer programs and events that respond to the specific and unique needs of their communities, while the firm as a whole also hosts national programs and retreats aimed at providing all attorneys with the information and tools they need to succeed.

## Recruitment Activities & Programs

Our recruitment efforts include building supportive relationships with organizations, hosting job fairs, and offering programs designed to educate and expose students to the legal profession.

**JA 347**

# Diversity & Inclusion Fellowship Program

## Overview                                                                              ✕

At Perkins Coie, we foster a diverse and inclusive community where opportunities to succeed are available to all. Embracing diversity allows us to draw from different backgrounds and experiences, enabling us to attract the best talent to our ranks, and in turn build strong teams that provide excellent service to our clients. We are committed to creating an environment in which all our people thrive because they feel a sense of belonging.

We are proud to offer our **Diversity & Inclusion Fellowship Program** as part of our comprehensive, firmwide commitment to advancing diversity, equity, and inclusion.

Our Diversity & Inclusion Fellows are full participants in our summer associate program and must spend the first 10 weeks of their summer(s) with Perkins Coie. In addition to receiving a summer associate salary, Fellows will also receive a $15,000 stipend at the conclusion of their first-year summer. Fellows who return as 2Ls will receive a $15,000 stipend at the

## Application Process and Criteria                                                      ✕

All students who are in good standing in their first year at an ABA-accredited law school are eligible to apply for the Diversity & Inclusion Fellowship Program. Perkins Coie is an Equal Opportunity Employer and welcomes applications for the Diversity & Inclusion Fellowship Program from all eligible applicants regardless of race, color, religion, sex, age, national origin, veteran status, sexual orientation, gender identity / gender expression, disability status, or any other identity.

A complete application must include:

– Current resume.

– Cover letter.

– Undergraduate and law school transcripts (unofficial versions are acceptable).

– A legal writing sample (10-page maximum).

– A personal statement (one-page, single-spaced). The personal statement should be a narrative describing your academic, professional, and life experiences and, where relevant, identifying connections between those experiences and the broader goal of advancing diversity, equity, and inclusion in the legal profession.

We evaluate all applications for the fellowship and consider the following factors:

**JA 348**

Case 1:25-cv-00716-BAH      Document 39-3      Filed 04/02/25      Page 42 of 52

USCA Case #25-5241      Document #2162586      Filed: 03/06/2026      Page 359 of 369

- **Academic Achievement** – A demonstrated record of academic achievement and excellent writing and interpersonal skills, as well as experience that will contribute to a successful career in the legal field.

- **DEI Leadership** – Engagement in efforts to advance diversity, equity, and inclusion within the community and/or legal profession, including during college or law school.

# Retention Programs and Activities

Perkins Coie recognizes the importance of retention in advancing diversity and inclusion, and we work diligently to invest in the success of our lawyers across the firm. Our retreats are an important retention tool that provide our attorneys opportunities to strengthen relationships with one another and our clients in a professional development setting.



**JA 349**

## All Women Lawyers Retreat

The retreat serves as an opportunity for participants to network with other attorneys from all levels, offices and practice groups within the firm, and to share best practices on navigating the law firm culture. The presentations and events offered at this two-day retreat provide the participants with various tools to help advance their career

## Lawyers of Color/LGBTQ+/Lawyers with Disabilities and Veterans Retreats

These retreats bring together many of the firm's attorneys to discuss, embrace, and celebrate diversity and allyship in an inviting environment. Many of the retreat's sessions and presentations are open to attorneys of all levels, with tracks specific to the programming that coincides with where the attorney currently is in their career. This distinction allows for time focused on professional and business development skills particular to the career stage of the attorneys. In addition to the networking opportunities provided at different presentations and mixers, attendees also have the opportunity to meet other lawyers in their specific practice groups and create new and build upon existing relationships.

People

Industries

Services

Locations

Impact

Careers

Job Openings↗

Perkins Coie Trust Company↗

Client Advantage

中文网站

Alumni↗

Blogs

Client Updates

Podcasts

Publications

News Room

California Land Use & Development Law Report

**JA 350**

Security Breach Notification Chart

Perkins on Privacy

Public Chatter

The Public Company Handbook

Subscribe to Mailing Lists↗

AI & Machine Learning

Corporate Law

Energy Infrastructure & Clean Technology

Environment, Energy & Resources Law

Intellectual Property Law

Labor & Employment Law

Litigation

Privacy & Security Law

Private Client Services

Real Estate & Land Use

Technology Transactions & Privacy Law

Pay Invoice↗

Terms of Use

Privacy Policy

Legal Disclaimer

Transparency in Coverage

UK Legal Notice

Lawyer Advertising

© 2025 Perkins Coie LLP

**JA 351**

# EXHIBIT 3

### Total Fees Attributable to Top 15 Firm Clients

| | Fees Collected (collect) |
|---|---|
| Grand Total | $349,859,769 |

# EXHIBIT 4

**Total Fees Attributable to Top 15 Practice Group Clients**

| Practice Group | Fees Collected |
|---|---|
| Commercial Litigation Total | $145,647,380 |
| Intellectual Property Total | $118,496,457 |
| Business Total | $56,227,281 |
| Product Liability Total | $51,279,833 |
| Environment, Energy & Resources Total | $22,752,554 |
| Real Estate & Land Use Total | $17,096,769 |
| Labor & Employment Total | $15,292,812 |
| Private Client Services Total | $14,767,312 |
| Political Law Total | $2,558,821 |

# EXHIBIT 5



# EXHIBIT 6

| | |
|---|---|
| **From:** |  (CRM) Redacted @usdoj.gov> |
| **Sent:** | Thursday, March 6, 2025 10:15 PM |
| **To:** | Redacted (Perkins Coie) |
| **Cc:** | Redacted (Perkins Coie); Redacted (CRM); Redacted (USAVAE) |
| **Subject:** | Tomorrow |

,

Good evening. We are just seeing the newly issued Executive Order relating to your firm, linked here
https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-llp/. Consequently, we
need to postpone tomorrow's meeting to get further guidance from our management about how to proceed. We will
reach out once we have this additional clarity. We appreciate your patience.


Best,
Redacted


Redacted
**Trial Attorney**
**U.S. Department of Justice | Criminal Division**
**Fraud Section | Market Integrity & Major Frauds Unit**
Redacted (o) | Redacted (c)
Redacted @usdoj.gov