**[ORAL ARGUMENT NOT YET SCHEDULED]**

**Nos. 26-5241, 25-5265, 25-5277, 25-5310**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

PERKINS COIE LLP,

Plaintiff-Appellee,

*v.*

U.S. DEPARTMENT OF JUSTICE, *et al.*,

Defendants-Appellants.

JENNER & BLOCK LLP,

Plaintiff-Appellee,

*v.*

U.S. DEPARTMENT OF JUSTICE, *et al.*,

Defendants-Appellants.

WILMER CUTLER PICKERING HALE AND DORR LLP,

Plaintiff-Appellee,

*v.*

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,

Defendants-Appellants.

SUSMAN GODFREY LLP,

Plaintiff-Appellee,

*v.*

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

Nos. 1:25-cv-00716 (BAH), 1:25-cv-00916 (JDB),
1:25-cv-00917 (RJL), 1:25-cv-01107 (LLA)

## JOINT APPENDIX

### Volume V of VI (JA2241 – JA2892)

DANE H. BUTSWINKAS
   WILLIAMS & CONNOLLY LLP
   680 Maine Avenue SW
   Washington, DC 20024
   (202) 434-5000
   dbutswinkas@wc.com

*Counsel for Plaintiff-Appellee*
   *Perkins Coie LLP*

ELIZABETH B. PRELOGAR
   COOLEY LLP
   1299 Pennsylvania Ave., NW
   Suite 700
   Washington, DC 20004
   (202) 842-7800
   eprelogar@cooley.com

*Counsel for Plaintiff-Appellee*
   *Jenner & Block LLP*

STANLEY E. WOODWARD, JR.
   Associate Attorney General

ABHISHEK KAMBLI
   Deputy Associate Attorney General
   U.S. Department of Justice
   950 Pennsylvania Avenue NW
   Washington, DC 20530
   (202) 514-6993
   abhishek.kambli@usdoj.gov

*Counsel for Defendants-Appellants*

PAUL D. CLEMENT
   CLEMENT & MURPHY, PLLC
   706 Duke Street
   Alexandria, VA 22314
   (202) 742-8893
   paul.clement@clementmurphy.com

*Counsel for Plaintiff-Appellee*
   *Wilmer Cutler Pickering*
   *Hale and Dorr LLP*

DONALD B. VERRILLI, JR.
   MUNGER, TOLLES & OLSON LLP
   601 Massachusetts Avenue NW
   Suite 500E
   Washington, DC 20001
   (202) 220-1100
   donald.verrilli@mto.com

*Counsel for Plaintiff-Appellee*
   *Susman Godfrey LLP*

# TABLE OF CONTENTS

**VOLUME I**

**Materials from *Perkins Coie LLP* v. *U.S. Dep't of Just.*, Case No. 25-5241, D. Ct. No. 1:25-cv-00716 (BAH)** ............................1

Docket Sheet ...........................................................................................2

Complaint (ECF 1) ...............................................................................36

Order Granting TRO (ECF 21) ............................................................79

Transcript of March 12, 2025, TRO Hearing (ECF 22) ........................82

Order Extending Injunction (ECF 26) ...............................................213

DOJ Status Report (Mar. 14, 2025) (ECF 27) .....................................214

DOJ Status Report (Mar. 18, 2025) (ECF 29) .....................................217

Memorandum from Attorney General Bondi
and Director Vought (Mar. 18, 2025) (ECF 29-1) ................................220

Memorandum from General Counsel,
Office of Management and Budget (ECF 29-2) .....................................222

DOJ Status Report (Mar. 20, 2025) (ECF 31) .....................................224

DOJ Supplemental Status Report (Mar. 20, 2025) (ECF 32) ..............227

Memorandum from Attorney General Bondi
and Director Vought (Mar. 20, 2025) (ECF 32-1) ................................229

Memorandum Opinion and Order (ECF 36) ........................................231

Statement of Facts in Support of
Motion for Summary Judgment (ECF 39-2) ........................................252

Berman Declaration and Exhibits (ECF 39-3) ....................................308

**VOLUME II**

Manning Declaration and Exhibits (ECF 39-4)...................................360

**VOLUME III**

Green Expert Report and Exhibits (ECF 39-5) ..................................1094

Hirshon Expert Report and Exhibits (ECF 39-6)..............................1162

Simon Expert Report and Exhibits (ECF 39-7)..................................1178

Leonard Expert Report and Exhibits (ECF 39-8)..............................1211

Scarborough Declaration and Exhibits (ECF 142-1).........................1237

DOJ's Brief in Opposition to
Motion for Summary Judgment (ECF 143) .......................................1340

DOJ's Response to Perkins Coie's
Statement of Material Facts (ECF 143-1) .........................................1367

Manning Reply Declaration and Exhibits (ECF 148-1) .....................1374

Transcript of April 24, 2025, Hearing on the
Motion for Summary Judgment (ECF 169) .......................................1384

Order Granting Leave to Amend (ECF 173) .....................................1508

Order Granting Consent Motion to
Adopt Streamlined Procedures (ECF 175) .......................................1522

Amended Complaint (ECF 176)........................................................1524

Order Granting Motion for Summary Judgment and
Denying Motion to Dismiss (ECF 184) .............................................1623

Memorandum Opinion (ECF 185)....................................................1628

Notice of Appeal (ECF 188)..............................................................1730

**VOLUME IV**

**Materials from *Jenner & Block LLP* v. *U.S. Dep't of Just.*
Case No. 5265, D. Ct. No. 1:25-cv-00916 (JDB)**............................**1731**

Docket Sheet.................................................................... 1732

Complaint (ECF 1) ........................................................... 1759

Order Granting TRO (ECF 9) ........................................... 1823

Transcript of March 28, 2025, Hearing on
Preliminary Injunction (ECF 10)...................................... 1825

Email Regarding Compliance with Injunction (ECF 11-1) ................ 1901

Defendants' March 31, 2025, Status Report (ECF 12) ...................... 1903

Plaintiff's Statement of Undisputed Facts (ECF 19-2) ...................... 1905

Truth Social Post (Sept. 5, 2022) (ECF 19-4) .................................... 1930

Transcript of September 6, 2025, Press Conference (ECF 19-5)........ 1933

Presidential Memorandum Regarding Suspension of Clearances
and Evaluation of Government Contracts (ECF 19-7) ....................... 1949

Fact Sheet Regarding Covington & Burling LLP (ECF 19-8)............ 1952

Transcript of March 14, 2025, Speech (ECF 19-12) .......................... 1955

Executive Order 14237 (ECF 19-13)................................................ 1978

Fact Sheet Regarding Paul, Weiss LLP (ECF 19-14)......................... 1982

Politico Article (Mar. 19, 2025) (ECF 19-15) .................................... 1985

Truth Social Post (Mar. 20, 2025) (ECF 19-17) ................................ 1992

Executive Order 14244 (ECF 19-18)................................................ 1995

Presidential Memorandum Regarding Preventing Abuses
of the Legal System and the Federal Court (ECF 19-19)................... 1998

Presidential Memorandum Regarding Rescinding Security
Clearances and Access to Classified Information
from Specified Individuals (ECF 19-20) ............................................ 2002

The Hill Article (Mar. 25, 2025) (ECF 19-21) ..................................... 2005

Executive Order 14246 (ECF 19-22) ................................................... 2011

Fact Sheet Regarding Jenner & Block LLP (ECF 19-23) ................... 2015

Truth Social Post (Mar. 28, 2025) (ECF 19-27) ................................. 2018

Truth Social Post (Apr. 1, 2025) (ECF 19-28) ................................... 2021

Truth Social Post (Apr. 2, 2025) (ECF 19-29) ................................... 2024

Perrelli Declaration (ECF 19-30) ....................................................... 2026

Memorandum from Attorney General Bondi
and Director Vought (ECF 21-1) ........................................................ 2057

Defendants' Response to Plaintiff's Statement
of Undisputed Material Facts (ECF 95-1) ......................................... 2059

Transcript of Apr. 28, 2025, Hearing on
Motion for Summary Judgment (ECF 118) ........................................ 2064

Notice of Recent Development (ECF 137)........................................... 2155

Memorandum Opinion (ECF 138)....................................................... 2157

Order Granting Summary Judgment and
Denying Motion to Dismiss (ECF 139) ............................................. 2209

Order on Motion for Clarification (ECF 143) .................................... 2214

Defendants' Status Report (ECF 144) ............................................... 2217

Notice of Appeal (ECF 145)................................................................ 2240

## VOLUME V

*Wilmer Cutler Pickering Hale and Dorr LLP* v.
*Executive Office of the President,*
**Case No. 25-5277, D. Ct. No. 1:25-cv-00917 (RJL)........................2241**

Docket Sheet.......................................................................2242

Complaint (ECF 1) ...........................................................2268

Executive Order 14250 (ECF 1-1)..................................2331

Fact Sheet Regarding WilmerHale LLP (ECF 1-2)............................2336

Berman Declaration (ECF 3-2) .......................................2339

Temporary Restraining Order (ECF 10).........................2373

Transcript of March 28, 2025, Hearing
on Motion for TRO (Mar. 8, 2025) (ECF 11) .....................................2378

Supplemental Berman Declaration (ECF 16-3) ...............2427

Numbered Exhibits in Support of
WilmerHale's Motion for Summary Judgment (ECF 16-4)...............2437

Expert Report of J. William Leonard (ECF 16-5)..............................2734

Transcript of April 23, 2025, Hearing on Motion to Dismiss
and Motion for Summary Judgment (ECF 106)................................2759

Letter from Clement & Murphy PLLC
to Hon. Richard Leon (May 13, 2025) (ECF 109) ..............................2803

Opinion on Motion for Summary Judgment (ECF 110) .....................2804

Order Granting Motion for Summary Judgment and
Denying Motion to Dismiss (ECF 111) .............................................2877

Order Granting Motion to Clarify
and Motion to Amend (ECF 120) ......................................................2880

Amended Judgment (ECF 121)........................................2886

Defendants' Status Report (ECF 123) ............................................... 2890

Notice of Appeal (ECF 125)............................................................ 2892

## VOLUME VI

**Materials from *Susman Godfrey LLP* v.
*Executive Office of the President*,
Case No. 25-5310, 1:25-cv-01107 (LLA)........................................2893**

Docket Sheet....................................................................................2894

Bloomberg Article (Apr. 9, 2025) (ECF 10-3)..................................2951

Srinivasan Declaration in Support of
Temporary Restraining Order (ECF 10-14) .....................................2955

Order Granting TRO (ECF 15) .........................................................2990

Transcript of Apr. 15, 2025, Hearing on TRO (ECF 19).....................2993

Order Extending TRO (ECF 30) .......................................................3067

Plaintiff's Statement of Undisputed Material Facts (ECF 51-2) .......3069

Srinivasan Declaration in Support of
Motion for Summary Judgment (ECF 51-3).....................................3110

Executive Order 14263 (ECF 51-6)...................................................3145

Fact Sheet Regarding Susman Godfrey LLP (ECF 51-7)...................3149

X Post (Nov. 13, 2020) (ECF 51-10) .................................................3152

X Post (Dec. 15, 2020) (ECF 51-11)..................................................3154

X Post (Dec. 16, 2020) (ECF 51-12)..................................................3156

CNN Article (Apr. 19, 2023) (ECF 51-13).........................................3158

CNN Article (Apr. 18, 2023) (ECF 51-14).........................................3165

Placeholder for Forbes Video (Apr. 10, 2025) (ECF 51-36) ...............3168

Placeholder for YouTube Video (Apr. 8, 2025) (ECF 51-44)............... 3169

Truth Social Post (Apr. 11, 2025, 09:21 AM) (ECF 51-45) ................. 3171

Truth Social Post (Apr. 11, 2025, 09:19 AM) (ECF 51-46) ................. 3174

Reuters Article (Apr. 11, 2025) (ECF 51-47) ...................................... 3177

The Susman Godfrey Prize (ECF 51-52) ........................................... 3180

Email from Richard Lawson (Apr. 16, 2025) (ECF 51-53) ................. 3185

Defendants' Response to Plaintiff's Statement
of Undisputed Material Facts (ECF 159-1) ....................................... 3189

Declaration of Richard Lawson and Exhibits in Support
of Defendants' Opposition to Summary Judgment (ECF 159-2)........ 3198

Order Adopting Streamlined Procedures (ECF 176)......................... 3272

Transcript of May 8, 2025, Hearing on Motion
for Summary Judgment (ECF 177)..................................................... 3274

Amended Complaint (ECF 178)......................................................... 3362

Memorandum Opinion (ECF 206)...................................................... 3482

Order Denying Motion to Dismiss
and Granting Summary Judgment (ECF 207)................................... 3535

July 29, 2025, Minute Order Granting Defendants'
Unopposed Motion to Clarify (ECF 209)............................................ 3540

Notice of Appeal (ECF 211).............................................................. 3541

# Materials relating to

# Wilmer Cutler Pickering Hale and Dorr LLP

## v.

# Executive Office of the President

# Case No. 25-5277

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25−cv−00917−RJL

WILMER CUTLER PICKERING HALE AND DORR LLP v. EXECUTIVE OFFICE OF THE PRESIDENT et al
Assigned to: Judge Richard J. Leon
Case in other court:  USCA, 25−05277
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 03/28/2025
Date Terminated: 05/27/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**WILMER CUTLER PICKERING HALE AND DORR LLP**

represented by **Erin Elizabeth Murphy**
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
202−742−8900
Email: erin.murphy@clementmurphy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph John DeMott**
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
202−742−8893
Email: joseph.demott@clementmurphy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Rowen**
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
202−742−8900
Email: matthew.rowen@clementmurphy.com
*ATTORNEY TO BE NOTICED*

**Paul Clement**
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 20004
202−742−8900
Email: paul.clement@clementmurphy.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**EXECUTIVE OFFICE OF THE PRESIDENT**

represented by **Richard Lawson**
DOJ−USAO
950 Pennsylvania Avenue, NW
Washington, DC 20530−0001
202−445−8042
Email: rlawson@americafirstpolicy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF JUSTICE**

represented by **Richard Lawson**
(See above for address)

JA 2242

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF DEFENSE**    represented by   **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF HEALTH**    represented by   **Richard Lawson**
**AND HUMAN SERVICES**                              (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF**    represented by   **Richard Lawson**
**EDUCATION**                              (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF VETERANS**    represented by   **Richard Lawson**
**AFFAIRS**                              (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF MANAGEMENT AND**    represented by   **Richard Lawson**
**BUDGET**                              (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF THE DIRECTOR OF**    represented by   **Richard Lawson**
**NATIONAL INTELLIGENCE**                              (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CENTRAL INTELLIGENCE**    represented by   **Richard Lawson**
**AGENCY**                              (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ENVIRONMENTAL PROTECTION**    represented by   **Richard Lawson**
**AGENCY**                              (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF HOMELAND**    represented by   **Richard Lawson**
**SECURITY**                              (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF STATE**    represented by

**JA 2243**

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF ENERGY**          represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF THE TREASURY**     represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF LABOR**           represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF AGRICULTURE**     represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF COMMERCE**        represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT**               represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SMALL BUSINESS
ADMINISTRATION**                  represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF THE UNITED STATES
TRADE REPRESENTATIVE**            represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF THE INTERIOR**    represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **DEPARTMENT OF TRANSPORTATION** | represented by | **Richard Lawson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION** | represented by | **Richard Lawson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION** | represented by | **Richard Lawson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES PATENT AND TRADEMARK OFFICE** | represented by | **Richard Lawson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION** | represented by | **Richard Lawson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | represented by | **Richard Lawson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **PAMELA J. BONDI** *in her official capacity as Attorney General of the United States* | represented by | **Richard Lawson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **PETER B. HEGSETH** *in his official capacity as the Secretary of Defense* | represented by | **Richard Lawson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **ROBERT F. KENNEDY, JR.** | represented by | **Richard Lawson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **LINDA MCMAHON** *in her official capacity as Secretary of Education* | represented by | **Richard Lawson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Defendant**

**DOUG COLLINS**
*in his official capacity as Secretary of*
*Veterans Affairs*

represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Defendant**

**RUSSELL T. VOUGHT**
*in his official capacity as Director of The*
*U.S. Office of Management and Budget*

represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Defendant**

**TULSI GABBARD**
*in her official capacity as U.S. Director of*
*National Intelligence*

represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Defendant**

**JOHN L. RATCLIFFE**
*in his official capacity as Director of the*
*Central Intelligence Agency*

represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Defendant**

**LEE M. ZELDIN**
*Administrator of the Environmental*
*Protection Agency*

represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Defendant**

**KRISTI L. NOEM**
*in her official capacity as Secretary of*
*Homeland Security*

represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Defendant**

**MARCO A. RUBIO**
*in his official capacity as Secretary of*
*State*

represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Defendant**

**CHRIS WRIGHT**
*in his official capacity as Secretary of*
*Energy*

represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Defendant**

**SCOTT BESSENT**
*in his official capacity as Secretary of the*
*Treasury*

represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*


**Defendant**

**LORI CHAVEZ−DEREMER**
*in her official capacity as Secretary of*
*Labor*

represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*

ATTORNEY TO BE NOTICED

**Defendant**

**BROOKE L. ROLLINS**
*in her official capacity as Secretary of Agriculture*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**HOWARD W. LUTNICK**
*in his official capacity as Secretary of Commerce*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SCOTT TURNER**
*in his official capacity as Secretary of Housing and Urban Development*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**KELLY LOEFFLER**
*in her official capacity as Administrator of the U.S. Small Business Administration*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMIESON GREER**
*in his official capacity as United States Trade Representative*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DOUGLAS J. BURGUM**
*in his official capacity as Secretary of the Interior*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SEAN P. DUFFY**
*in his official capacity as Secretary of Transportation*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK T. UYEDA**
*in his official capacity as Acting Chairman of the Securities and Exchange Commission*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANDREW N. FERGUSON**
*in his official capacity as Chairman of the Federal Trade Commission*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**COKE MORGAN STEWART**
*in her official capacity as Acting Under*

represented by **Richard Lawson**
(See above for address)

**JA 2247**

*Secretary of Commerce for Intellectual Property and Acting Director of the United States Patent and Trademark Office*

<u>**Defendant**</u>

**ANDREA R. LUCAS**
*in her official capacity as Acting Chair of the Equal Employment Opportunity Commission*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

represented by  **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**KENNETH C. PICKERING**

represented by  **KENNETH C. PICKERING**
Pickering Legal LLC
100 Grove Street
Worcester, MA 01605
PRO SE

<u>**Amicus**</u>

**FORMER SENIOR GOVERNMENT OFFICIALS**

represented by  **Justin A. Nelson**
SUSMAN GODFREY LLP
1000 Louisiana Street
Suite 5100
Houston, TX 77002
713−653−7895
Fax: 713−654−6666
Email: jnelson@susmangodfrey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY**

represented by  **Jim Davy**
JIM DAVY
P.O. Box 15216
Philadelphia, PA 19125
215−792−3579
Email: jimdavy@allriselaw.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Seungchul Chang**
FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY
UC Irvine School of Law
401 E. Peltason Dr.
Ste 1000
Irvine, CA 92697
206−390−5676
Email: rchang@law.uci.edu
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeremiah Chin**
UNIVERSITY OF WASHINGTON
School of Law
9622 S 221st Pl
Kent, WA 98031
480−334−7703
Email: jerchin@uw.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Levin**
RONALD A. PETERSON LAW CLINIC
Civil Rights Clinic
Seattle University School of Law
901 12th Ave, Sullivan Hall
Ste Sllh 315
Seattle, WA 98115
206−398−4167
Fax: 206−398−4261
Email: levinje@seattleu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Lee**
RONALD A. PETERSON LAW CLINIC
Center for Civil Rights and Critical Justice
1112 E. Columbia St.
Seattle, WA 98122
206−398−4394
Email: leeme@seattleu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan A. McMahon**
FRED T. KOREMATSU CENTER FOR
LAW AND EQUALITY
UC Irvine School of Law
401 E. Peltason Dr.
Ste 1000
Irvine, CA 92697
949−824−0066
Email: smcmahon@law.uci.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

GENERAL COUNSEL AMICI     represented by

**Andrew George Pappas**
OSBORN MALEDON, P.A.
2929 N. Central Avenue
Suite 2000
Phoenix, AZ 85012
602−640−9398
Fax: 602−640−9050
Email: apappas@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Austin Tyler Marshall**
HERRERA ARELLANO LLP
1001 N Central Ave
Suite 404
Phoenix, AZ 85004
928−446−4410
Email: austin@ha−firm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David B. Rosenbaum**
OSBORN MALEDON, P.A.
2929 N. Central Avenue
Suite 2000
Phoenix, AZ 85012

**JA 2249**

602−640−9345
Fax: 602−640−9050
Email: drosenbaum@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric M. Fraser**
OSBORN MALEDON P.A.
2929 North Central Avenue
Suite 2000
Phoenix, AZ 85012
602−640−9321
Fax: 602−640−9050
Email: efraser@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph N. Roth**
OSBORN MALEDON, P.A
2929 N. Central Avenue
Suite 2100
Phoenix, AZ 85012
602−640−9320
Fax: 602−640−9050
Email: jroth@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua James Messer**
OSBORN MALEDON, P.A.
2929 N. Central Avenue
Ste 2100
Phoenix, AZ 85012
602−640−9326
Fax: 602−640−9050
Email: jmesser@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Ruth O'Grady**
OSBORN MALEDON PA
2929 N Central Ave
Suite 2000
Phoenix, AZ 85012
602−640−9000
Fax: 602−640−9050
Email: mogrady@omlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**PAST PRESIDENTS OF THE DC BAR**    represented by **Andrea C. Ferster**
ANDREA C. FERSTER
68 Beebe Pond Rd
Canaan, NY 12029
202−669−6311
Email: andreaferster@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**676 LAW PROFESSORS**  represented by **Phillip Robert Malone**
559 Nathan Abbott Way
Stanford, CA 94305−8610
650−725−6369
Email: pmalone@law.stanford.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**24 NONGOVERNMENTAL**
**ORGANIZATIONS**  represented by **William E. Zapf**
KAISER PLLC
1099 14th Street, NW
Ste 8th Floor West
Washington, DC 20005
202−869−1300
Email: wzapf@coleschotz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**808 LAW FIRMS**  represented by **Donald Beaton Verrilli , Jr**
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW
7th Floor
Washington, DC 20004
213−683−9507
Email: donald.verrilli@mto.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan P. Eimer**
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660−7600
Fax: (312) 692−1718
Email: neimer@eimerstahl.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Amicus

**LAWYERS' COMMITTEE FOR**
**CIVIL RIGHTS UNDER LAW AND**
**LOCAL AFFILIATES**  represented by **Edward G. Caspar**
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
202−662−8390
Email: ecaspar@lawyerscommittee.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adria Jasmine Bonillas**
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
202−662−8317
Email: abonillas@lawyerscommittee.org

**JA 2251**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**INTERNATIONAL ACADEMY OF TRIAL LAWYERS**

represented by **Patrick Michael Regan**
REGAN ZAMBRI & LONG, PLLC
1919 M Street, NW
Suite 350
Washington, DC 20036
(202) 463−3030
Fax: (202) 463−0667
Email: pregan@reganfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**MEDIA ORGANIZATIONS AND PRESS FREEDOM ADVOCATES**

represented by **Mason Andrew Kortz**
HARVARD LAW SCHOOL
Cyberlaw Clinic
Lewis Hall, 4th Floor
1557 Massachusetts Avenue
Cambridge, MA 02138
617−495−2845
Email: mkortz@law.harvard.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.**

represented by **Samuel Spital**
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street
5th Floor
New York, NY 10006
(212) 965−2200
Email: sspital@naacpldf.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF NEW JERSEY**

represented by **Sundeep Iyer**
OFFICE OF THE ATTORNEY GENERAL
State of New Jersey
25 Market Street
Trenton, NJ 08611
609−273−2823
Email: sundeep.iyer@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMICI CURIAE LITIGATION FIRMS**

represented by **Kathryn A. Reilly**
WHEELER TRIGG O'DONNELL LLP
370 17th Street
Suite 4500
Denver, CO 80202−5647
303−244−1800
Email: reilly@wtotrial.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN CIVIL LIBERTIES UNION**

represented by **Cecillia D. Wang**
ACLU
Center for Democracy
425 California St
Suite 700
San Francisco, CA 94104
415−343−0775
Email: cwang@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CATO INSTITUTE**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ELECTRONIC FRONTIER FOUNDATION**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**INSTITUTE FOR JUSTICE**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**NATIONAL COALITION AGAINST CENSORSHIP**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA 2253**

**Amicus**

**RUTHERFORD INSTITUTE**            represented by **Cecillia D. Wang**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**SOCIETY FOR THE RULE OF LAW**     represented by **Cecillia D. Wang**
**INSTITUTE**                                       (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**LEGAL ETHICS PROFESSORS**         represented by **Kelsi B. Corkran**
                                                    INSTITUTE FOR CONSTITUTIONAL
                                                    ADVOCACY AND PROTECTION
                                                    600 New Jersey Avenue NW
                                                    Washington, DC 20001
                                                    202−661−6728
                                                    Fax: 202−661−6730
                                                    Email: kbc74@georgetown.edu
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**BAR ASSOCIATIONS**                represented by **Eric John Galvez Paredes**
                                                    PROTECT DEMOCRACY PROJECT
                                                    82 Nassau Street
                                                    #601
                                                    New York, NY 10038
                                                    202−579−4582
                                                    Email: jparedes@dirllp.com
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Hayden Johnson**
                                                    PROTECT DEMOCRACY PROJECT
                                                    2020 Pennsylvania Ave. NW
                                                    Ste 163
                                                    Washington, DC 20006
                                                    202−870−3210
                                                    Email: hayden.johnson@protectdemocracy.org
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**NEW YORK COUNCIL OF**             represented by **Noam Biale**
**DEFENSE LAWYERS**                                 SHER TREMONTE LLP
                                                    90 Broad Street
                                                    23rd Floor
                                                    New York, NY 10004
                                                    212−202−2600
                                                    Email: nbiale@shertremonte.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**NATIONAL ASSOCIATION OF**         represented by **Kobie Flowers**
**CRIMINAL DEFENSE LAWYERS**                        FLOWERS KELLER LLP
                                                    1601 Connecticut Avenue Northwest
                                                    20009
                                                    Washington, DC 20009
                                                    202−521−8742

**JA 2254**

Email: kflowers@flowerskeller.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**342 FORMER JUDGES**                    represented by  **Donald Manwell Falk**
4416 Harbord Dr
Oakland, CA 94618
650−269−2020
Email: donald.falk@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
KROPF MOSELEY SCHMITT PLLC
1100 H Street NW
Suite 1220
Washington, DC 20005
202−627−6900
Email: sara@kmlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AARON H. CAPLAN**                    represented by  **Stephen Craig Leckar**
KALBIAN HAGERTY LLP
888 17th Street, NW
Suite 1200
Washington, DC 20006
202−223−5600
Email: sleckar@kalbianhagerty.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| e Filed | # | Docket Text |
|---|---|---|
| 28/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC−11573634) filed by WILMER CUTL PICKERING HALE AND DORR LLP. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Civil Cover Sheet, # 4 Summon Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, Summons, # 14 Summons, # 15 Summons, # 16 Summons, # 17 Summons, # 18 Summons, # 19 Summons, # 20 Summ Summons, # 22 Summons, # 23 Summons, # 24 Summons, # 25 Summons, # 26 Summons, # 27 Summons, # 28 Summ Summons, # 30 Summons, # 31 Summons, # 32 Summons, # 33 Summons, # 34 Summons, # 35 Summons, # 36 Summ Summons, # 38 Summons, # 39 Summons, # 40 Summons, # 41 Summons, # 42 Summons, # 43 Summons, # 44 Summ Summons, # 46 Summons, # 47 Summons, # 48 Summons, # 49 Summons, # 50 Summons, # 51 Summons, # 52 Summ Summons, # 54 Summons, # 55 Summons)(Clement, Paul) (Entered: 03/28/2025) |
| 28/2025 | 2 | NOTICE OF RELATED CASE by WILMER CUTLER PICKERING HALE AND DORR LLP. Case related to Case N 1:25−cv−716, 1:25−cv−916. (Clement, Paul) (Entered: 03/28/2025) |
| 28/2025 | 3 | MOTION for Preliminary Injunction , MOTION for Temporary Restraining Order by WILMER CUTLER PICKERING AND DORR LLP. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Bruce M. Berman, # 3 Exhibit Local Certification, # 4 Text of Proposed Order)(Clement, Paul). Added MOTION for Hearing on 3/31/2025 (mg). (Entered: ( |
| 28/2025 | 4 | NOTICE of Appearance by Erin Elizabeth Murphy on behalf of WILMER CUTLER PICKERING HALE AND DORR (Murphy, Erin) (Entered: 03/28/2025) |
| 28/2025 | 5 | NOTICE of Appearance by Joseph John DeMott on behalf of WILMER CUTLER PICKERING HALE AND DORR LI (DeMott, Joseph) (Entered: 03/28/2025) |
| 28/2025 | | Case Assigned to Judge Beryl A. Howell. (zmtm) (Entered: 03/28/2025) |
| 28/2025 | | NOTICE OF NEW CASE ERROR regarding 1 Complaint,,,,. The following error(s) need correction: Noncompliance w 5.1(c). Please file a Notice of Errata stating the error and attach the corrected initiating pleading to include the name & f residence address of each party and file using the event Errata. **COMPLIANCE DEADLINE is by close of business t** |

| | | |
|---|---|---|
| | | **case will not proceed any further until all errors are satisfied.** (zmtm) (Entered: 03/28/2025) |
| 28/2025 | 6 | ERRATA by WILMER CUTLER PICKERING HALE AND DORR LLP re 1 Complaint,,,,. (Attachments: # 1 Exhibit Complaint)(Clement, Paul) (Entered: 03/28/2025) |
| 28/2025 | 7 | NOTICE of Appearance by Richard Lawson on behalf of All Defendants (Lawson, Richard) (Entered: 03/28/2025) |
| 28/2025 | | MINUTE ORDER (paperless), upon consideration of plaintiff's 1 Complaint in this case, which was directly, rather than assigned to the undersigned Judge, this Court concludes that plaintiff's 2 Notice of Related Case ("Notice"), indicating th case is "related" to two other cases brought by different plaintiffs against similar federal government defendants, *Perkin v. U.S. Dep't of Justice et al.*, 25−cv−716 (BAH), and *Jenner & Block v. U.S. Dep't of Justice*, 25−cv−916, which case v filed today and also directed to be reassigned, *see* Min. Order, 25−cv−916 (Mar. 28, 2025), is erroneous, since these cas related in a manner contemplated by D.D.C. LCvR 40.5(a)(3) (defining related civil cases) and 40.5(c)(1) (allowing dire assignment of "new case to the judge to whom the oldest related case is assigned"). The legal issues involved in all three appear to be substantially similar, making the instinct to keep and decide the cases together understandable and even ten preservation of judicial resources by allowing a single judge to become familiar with applicable legal principles in these Nonetheless, the cases involve different issues of fact and arise from different events, and thus strict adherence to the ru assignment through the normal random assignment procedures of this District. *See* D.D.C. LCvR 40.5(a)(3).

LCvR 40.5(a)(3) provides that cases may properly be deemed related when, as pertinent here, they "(ii) involve commor fact, or (iii) grow out of the same event or transaction..." This case and *Perkins Coie* do not involve common issues of fa out of the same event or transaction. Executive Order ("E.O.") No. 14230, at issue in *Perkins Coie*, cites, as justification punitive measures applied to all employees of the targeted firm, the President's dislike of Perkins Coie's representation c political opponent (*i.e.*, "Hillary Clinton"), Exec. Order No. 14230 § 1, 90 Fed. Reg. 11781 (Mar. 11, 2025), and Perkins representation, sometimes *pro bono*, of clients seeking enforcement of voting rights (*i.e.*, "Perkins Coie has worked with donors... to judicially overturn popular, necessary, and democratically enacted election laws"; referring to work for what calls "anti−democratic election changes"), *id.* §§ 1, 3, and rights to continue service as transgender individuals in the U.S (*i.e.*, "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness"), *see* Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP (Mar. 6, 2025), https://www.whitehouse.gov/fact−sheets/2025/03/fact−sheet−president−donald−j−trump−adresses−risks−from−perkins

In contrast to the focus on Perkins Coie's provision of legal services to clients disliked by the President as the sole reaso No. 14230, the E.O. at issue in this newly assigned case, *see* Addressing Risks from WilmerHale ("WilmerHale E.O.") ( 2025), https://www.whitehouse.gov/presidential−actions/2025/03/addressing−risks−from−wilmerhale/ (not yet publishe Federal Register), cites as justification for the punitive measures on all employees of Wilmer Cutler Pickering Hale and ("WilmerHale"), both (1) the firm's representation of clients and issues disfavored by the President, including immigrati voting rights, *see id.* § 1, and (2) the professional tasks undertaken by current employees of WilmerHale−−including Aa and James Quarles−−during a time when they were not employed by the firm and worked on the Special Counsel invest by former Federal Bureau of Investigation Director Robert Mueller, *id.* Although both law firms are being targeted in si in these separate Executive Orders, the facts of each case differ: the punitive measures imposed on Perkins Coie arise sc the firm's representation of clients disliked by the President, while the punitive measures imposed on WilmerHale in this arise, in part, from the firm's representation of clients disliked by the President but also, in part, from professional work by current WilmerHale employees while employed by the U.S. Department of Justice and not affiliated with the firm.

While, as noted, the reasons for relating the new case brought by WilmerHale with the case brought by Perkins Coie are understandable, since both challenge Executive Orders carrying similar punitive measures and thereby raise similar que: law, strict adherence to the normal process of random case assignment is crucial to ensure "fair and equal distribution of all judges, avoid[] public perception or appearance of favoritism in assignments, and reduce[] opportunities for judge−sl *Tripp v. Exec. Off. of President*, 196 F.R.D. 201, 202 (D.D.C. 2000), and the reasons given to justify these orders do not the same underlying events or facts in the way contemplated by LCvR 40.5(a)(3). Accordingly, the Clerk of the Court is reassign this case randomly, pursuant to D.D.C. LCvR 40.3, since the exception provided for "related case" assignment LCvR 40.5 does not apply.

Signed by Judge Beryl A. Howell on March 28, 2025. (lcbah2) (Entered: 03/28/2025) |
| 28/2025 | | Case Randomly Reassigned to Judge Richard J. Leon. Judge Beryl A. Howell is no longer assigned to the case. (zjd) (E1 03/28/2025) |
| 28/2025 | 8 | SUMMONS (52) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # and Consent)(zmtm) (Entered: 03/28/2025) |
| 28/2025 | | NOTICE of Hearing: Motion Hearing, re: 3 MOTION for Temporary Restraining Order set for 3/28/2025 at 4:30 PM in Courtroom 18 (In Person) before Judge Richard J. Leon. (smc) (Entered: 03/28/2025) |
| 28/2025 | 9 | REQUEST FOR SUMMONS TO ISSUE *Re: U.S. Attorney & U.S. Attorney General* filed by WILMER CUTLER PICk HALE AND DORR LLP. (Attachments: # 1 Summons U.S. Attorney General)(Clement, Paul) (Entered: 03/28/2025) |

| Date | # | Description |
|---|---|---|
| 28/2025 | | Minute Entry for Motion Hearing held on 3/28/2025 before Judge Richard J. Leon: re 3 MOTION for Temporary Restra... Order. Oral arguments heard and TAKEN UNDER ADVISEMENT. Proposed Briefing Schedule due by 3/31/2025. Co... Reporter: William Zaremba. (smc) (Entered: 03/28/2025) |
| 28/2025 | 10 | MEMORANDUM ORDER granting in part and denying in part 3 Plaintiff's Motion for Temporary Restraining Order. S... attached Memorandum Order for details. Consistent with the attached Memorandum Order, the parties must file a joint s... report proposing an expedited briefing schedule by 4:00 PM on March 31, 2025. Signed by Judge Richard J. Leon on 0... (lcrjl3) (Entered: 03/28/2025) |
| 28/2025 | 11 | TRANSCRIPT OF MOTION HEARING ON TRO PROCEEDINGS before Judge Richard J. Leon held on March 28, 2... Numbers: 1−49. Court Reporter/Transcriber: William Zaremba; Email: William_Zaremba@dcd.uscourts.gov. Transcrip... ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchase... court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (mu... condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the co... any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made av... the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifica... covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/18/2025. Redacted Transcript Deadline set for 4/28/2025. Release of Transcript Restriction se... 6/26/2025.(Zaremba, William) (Entered: 03/28/2025) |
| 31/2025 | 12 | SUMMONS (2) Reissued Electronically as to U.S. Attorney and U.S. Attorney General (mg) Modified event on 3/31/2... (Entered: 03/31/2025) |
| 31/2025 | 13 | Joint STATUS REPORT by ENVIRONMENTAL PROTECTION AGENCY, DEPARTMENT OF HOMELAND SEC... DEPARTMENT OF STATE, DEPARTMENT OF ENERGY, DEPARTMENT OF THE TREASURY, DEPARTMEN... LABOR, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF HOUSING... URBAN DEVELOPMENT, SMALL BUSINESS ADMINISTRATION, EXECUTIVE OFFICE OF THE PRESIDENT... OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF THE INTERIOR, DEPARTMENT O... TRANSPORTATION, SECURITIES AND EXCHANGE COMMISSION, FEDERAL TRADE COMMISSION, UNIT... STATES PATENT AND TRADEMARK OFFICE, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, UNIT... STATES OF AMERICA, PAMELA J. BONDI, PETER B. HEGSETH, U.S. DEPARTMENT OF JUSTICE, ROBERT... KENNEDY, JR, LINDA M. MCMAHON, DOUGLAS A. COLLINS, RUSSELL T. VOUGHT, TULSI GABBARD, J... RATCLIFFE, LEE M. ZELDIN, KRISTI NOEM, MARCO A. RUBIO, CHRIS WRIGHT, U.S. DEPARTMENT OF D... SCOTT BESSENT, LORI CHAVEZ−DEREMER, BROOKE L. ROLLINS, HOWARD W. LUTNICK, SCOTT TURN... KELLY LOEFFLER, JAMIESON GREER, DOUGLAS J. BURGUM, SEAN DUFFY, MARK T. UYEDA, U.S. DEPA... OF HEALTH AND HUMAN SERVICES, ANDREW N. FERGUSON, COKE MORGAN STEWART, ANDREA R. L... WILMER CUTLER PICKERING HALE AND DORR LLP, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTM... VETERANS AFFAIRS, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATION... INTELLIGENCE, CENTRAL INTELLIGENCE AGENCY. (Clement, Paul) (Entered: 03/31/2025) |
| 01/2025 | | MINUTE ORDER. Upon consideration of the 13 Joint Status Report, it is hereby ORDERED that the Court sets the foll... briefing schedule for dispositive motions: dispositive motions and opening briefs are due April 8, 2025; amicus briefs i... either side are due April 11, 2025; and opposition briefs are due April 17, 2025. It is further ORDERED that the Court s... oral argument on April 23, 2025 at 3:00 PM in Courtroom 18 (In Person) before Judge Richard J. Leon. SO ORDERED... Judge Richard J. Leon on 4/1/2025. (lcrjl1) (Entered: 04/01/2025) |
| 01/2025 | | MINUTE ORDER. On March 31, 2025, the parties filed a 13 Joint Status Report stating that "[a]ll parties have [] agree... the injunctive relief issued by this Court on March 28, 2025, until final judgment." *See* Joint Status Report [Dkt. #13]. W... parties' consent and having found good cause to do so, the Court hereby ORDERS that the temporary restraining order i... March 28, 2025, Mem. Order [Dkt. #10], is EXTENDED until final judgment. This will allow time for the parties to bri... for the Court to rule on−−the forthcoming dispositive motions. The 13 Joint Status Report also states that "[t]he parties l... that they do not anticipate needing discovery in this case and that no party will request discovery in connection with the... dispositive motions." *See* Joint Status Report. Therefore, and at the parties' request, the Court ORDERS that discovery s... STAYED pending further order of the Court. SO ORDERED. Signed by Judge Richard J. Leon on 4/1/2025. (lcrjl1) (E... 04/01/2025) |
| 07/2025 | 17 | Unopposed MOTION for Leave to File Amicus Brief by KENNETH C. PICKERING. (Attachments: # 1 Amicus Brief,... of Proposed Order)(mg) (Entered: 04/08/2025) |
| 08/2025 | 14 | NOTICE of Appearance by Matthew Rowen on behalf of WILMER CUTLER PICKERING HALE AND DORR LLP (... Matthew) (Entered: 04/08/2025) |

| | | |
|---|---|---|
| 08/2025 | 15 | MOTION to Dismiss by SCOTT BESSENT, PAMELA J. BONDI, DOUGLAS J. BURGUM, CENTRAL INTELLIGE AGENCY, LORI CHAVEZ−DEREMER, DOUGLAS A. COLLINS, DEPARTMENT OF AGRICULTURE, DEPART COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF F AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPARTMENT OF STATE, DEPARTMENT OF TH INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECU OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION, ANDREW N. FERGUSON, TULSI GABBARD JAMIESON GREER, PETER B. HEGSETH, ROBERT F. KENNEDY, JR, KELLY LOEFFLER, ANDREA R. LUCA HOWARD W. LUTNICK, LINDA M. MCMAHON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENT JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO A. RUBIO, SECURITIES AND EXCHANGE COMMISSIO SMALL BUSINESS ADMINISTRATION, COKE MORGAN STEWART, SCOTT TURNER, U.S. DEPARTMENT C DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES OF AMERICA, STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL T. VOUGHT, CHRIS WRIGHT, L ZELDIN. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Lawson, Richard) (Entered: 04/08/2 |
| 08/2025 | 16 | MOTION for Summary Judgment by WILMER CUTLER PICKERING HALE AND DORR LLP. (Attachments: # 1 Memorandum in Support of Plaintiff's Motion for Summary Judgment, # 2 Statement of Facts, # 3 Declaration of Bruce Berman (supplemental), # 4 Declaration of Joseph J. DeMott, # 5 Exhibit Expert Report of J. William Leonard, # 6 Text Proposed Order)(Clement, Paul) (Entered: 04/08/2025) |
| 09/2025 | 18 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Andrew G. Pappas, Filing fee $ 100, receipt number ADCDC−11603087. Fee Status: Fee Paid. by AUSTIN TYLER MARSHALL. (Attachments: # 1 Declaration Declaratio Andrew G. Pappas)(Marshall, Austin) (Entered: 04/09/2025) |
| 09/2025 | 19 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− David B. Rosenbaum, Filing fee $ 100, receipt number ADCDC−11603095. Fee Status: Fee Paid. by AUSTIN TYLER MARSHALL. (Attachments: # 1 Declaration Declaratio B. Rosenbaum)(Marshall, Austin) (Entered: 04/09/2025) |
| 09/2025 | 20 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joshua J. Messer, Filing fee $ 100, receipt number ADCDC−11603097. Fee Status: Fee Paid. by AUSTIN TYLER MARSHALL. (Attachments: # 1 Declaration Declaratio Joshua J. Messer)(Marshall, Austin) (Entered: 04/09/2025) |
| 09/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Mary R. O'Grady, Filing fee $ 100, receipt number ADCDC−11603099. Fee Status: Fee Paid. by AUSTIN TYLER MARSHALL. (Attachments: # 1 Declaration Declaratio R. O'Grady)(Marshall, Austin) (Entered: 04/09/2025) |
| 09/2025 | 22 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Eric M. Fraser, Filing fee $ 100, receipt number ADCDC−11603110. Fee Status: Fee Paid. by AUSTIN TYLER MARSHALL. (Attachments: # 1 Declaration Declaratio M. Fraser)(Marshall, Austin) (Entered: 04/09/2025) |
| 09/2025 | 23 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joseph N. Roth, Filing fee $ 100, receipt number ADCDC−11603137. Fee Status: Fee Paid. by AUSTIN TYLER MARSHALL. (Attachments: # 1 Declaration Declaratio Joseph N. Roth)(Marshall, Austin) (Entered: 04/09/2025) |
| 10/2025 | 24 | Unopposed MOTION to Modify *Scheduling Order* by WILMER CUTLER PICKERING HALE AND DORR LLP. (Cl Paul) (Entered: 04/10/2025) |
| 10/2025 | 25 | NOTICE of Appearance by Justin A. Nelson on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Nelson, J (Entered: 04/10/2025) |
| 10/2025 | 26 | Unopposed MOTION for Leave to File Amicus Brief by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachme Exhibit Amicus Brief, # 2 Text of Proposed Order, # 3 Appendix)(Nelson, Justin) (Entered: 04/10/2025) |
| 10/2025 | 27 | NOTICE of Appearance by Jim Davy on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Attachments: # 1 Exhibit Full list of Amici represented by Jim Davy)(Davy, Jim) (Entered: 04/10/2025) |
| 10/2025 | 28 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Robert Chang, Filing fee $ 100, receipt number ADCDC−11606916. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attac 1 Declaration Chang Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/10/2025) |
| 10/2025 | | MINUTE ORDER granting 17 Unopposed Motion for Leave to File Amicus Brief. No parties opposing such motion, th hereby GRANTS the Motion for Leave to File the Amicus Curiae Brief of Pickering Legal LLC in Support of Plaintiff' for a Permanent Injunction. SO ORDERED. Signed by Judge Richard J. Leon on 4/10/2025. (lcrjl1) (Entered: 04/10/202 |
| 10/2025 | | MINUTE ORDER granting 18 Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GR and that Andrew G. Pappas be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e−filing v and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Ri |

| | | |
|---|---|---|
| | | Leon on 4/10/2025. (lcrjl1) (Entered: 04/10/2025) |
| 10/2025 | | MINUTE ORDER granting <u>19</u> Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GR and that David B. Rosenbaum be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e−filin PACER and file a notice of appearance pursuant to LCvR 83.6(a)** <u>Click for instructions</u>. SO ORDERED. Signed by Richard J. Leon on 4/10/2025. (lcrjl1) (Entered: 04/10/2025) |
| 10/2025 | | MINUTE ORDER granting <u>20</u> Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GR and that Joshua J. Messer be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e−filing via and file a notice of appearance pursuant to LCvR 83.6(a)** <u>Click for instructions</u>. SO ORDERED. Signed by Judge Ri Leon on 4/10/2025. (lcrjl1) (Entered: 04/10/2025) |
| 10/2025 | | MINUTE ORDER granting <u>21</u> Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GR and that Mary R. O'Grady be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e−filing vi and file a notice of appearance pursuant to LCvR 83.6(a)** <u>Click for instructions</u>. SO ORDERED. Signed by Judge Ri Leon on 4/10/2025. (lcrjl1) (Entered: 04/10/2025) |
| 10/2025 | | MINUTE ORDER granting <u>22</u> Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GR and that Eric M. Fraser be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e−filing via P and file a notice of appearance pursuant to LCvR 83.6(a)** <u>Click for instructions</u>. SO ORDERED. Signed by Judge Ri Leon on 4/10/2025. (lcrjl1) (Entered: 04/10/2025) |
| 10/2025 | | MINUTE ORDER granting <u>23</u> Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GR and that Joseph N. Roth be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e−filing via and file a notice of appearance pursuant to LCvR 83.6(a)** <u>Click for instructions</u>. SO ORDERED. Signed by Judge Ri Leon on 4/10/2025. (lcrjl1) (Entered: 04/10/2025) |
| 10/2025 | <u>29</u> | NOTICE of Appearance by David B. Rosenbaum on behalf of GENERAL COUNSEL AMICI (Rosenbaum, David) (En 04/10/2025) |
| 10/2025 | <u>30</u> | NOTICE of Appearance by Joseph N. Roth on behalf of GENERAL COUNSEL AMICI (Roth, Joseph) (Entered: 04/10 |
| 10/2025 | <u>31</u> | Unopposed MOTION for Leave to File Amicus Brief by PAST PRESIDENTS OF THE DC BAR. (Attachments: # <u>1</u> Ex amicus brief, # <u>2</u> Appendix list of amici, # <u>3</u> Text of Proposed Order)(Ferster, Andrea) (Entered: 04/10/2025) |
| 10/2025 | <u>32</u> | Unopposed MOTION for Leave to File Amicus Brief by AMICI CURIAE 676 LAW PROFESSORS. (Attachments: # <u>1</u> Amici Brief, # <u>2</u> Text of Proposed Order)(Malone, Phillip) (Entered: 04/10/2025) |
| 10/2025 | <u>74</u> | AMICUS BRIEF by KENNETH C. PICKERING. (znmw) (Entered: 04/14/2025) |
| 11/2025 | <u>33</u> | NOTICE of Appearance by Eric M. Fraser on behalf of GENERAL COUNSEL AMICI (Fraser, Eric) (Entered: 04/11/2 |
| 11/2025 | <u>34</u> | NOTICE of Appearance by Mary Ruth O'Grady on behalf of GENERAL COUNSEL AMICI (O'Grady, Mary) (Entered 04/11/2025) |
| 11/2025 | <u>35</u> | NOTICE of Appearance by Joshua James Messer on behalf of GENERAL COUNSEL AMICI (Messer, Joshua) (Entere 04/11/2025) |
| 11/2025 | <u>36</u> | NOTICE of Appearance by William E. Zapf on behalf of 24 NONGOVERNMENTAL ORGANIZATIONS (Zapf, Will (Entered: 04/11/2025) |
| 11/2025 | <u>37</u> | Unopposed MOTION for Leave to File Amicus Brief by 24 NONGOVERNMENTAL ORGANIZATIONS. (Attachmer Exhibit A − Proposed Brief, # <u>2</u> Text of Proposed Order)(Zapf, William) (Entered: 04/11/2025) |
| 11/2025 | <u>38</u> | Unopposed MOTION for Leave to File Amicus Brief by FRED T. KOREMATSU CENTER FOR LAW AND EQUAL (Attachments: # <u>1</u> Exhibit Proposed amicus brief)(Davy, Jim) (Entered: 04/11/2025) |
| 11/2025 | <u>39</u> | Unopposed MOTION for Leave to File Amicus Brief by 808 LAW FIRMS. (Attachments: # <u>1</u> Exhibit, # <u>2</u> Appendix, # Proposed Order)(Verrilli, Donald) (Entered: 04/11/2025) |
| 11/2025 | <u>40</u> | Unopposed MOTION for Leave to File Amicus Brief by LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER L LOCAL AFFILIATES. (Attachments: # <u>1</u> Exhibit Brief of Lawyers' Committee and affiliates, # <u>2</u> Exhibit Proposed Order)(Caspar, Edward) (Entered: 04/11/2025) |
| 11/2025 | <u>41</u> | Consent MOTION for Leave to File Amicus Brief *in Support of Plaintiff* by INTERNATIONAL ACADEMY OF TRIA LAWYERS. (Attachments: # <u>1</u> Exhibit Brief of Amicus Curiae, # <u>2</u> Text of Proposed Order Proposed Order)(Regan, Pa (Entered: 04/11/2025) |
| 11/2025 | | MINUTE ORDER. Upon consideration of the <u>26</u> Unopposed Motion for Leave to File Amicus Brief of Former Senior Government Officials as Amici Curiae, it is hereby ORDERED that the motion is GRANTED and that the Amici Curiae |

| | | |
|---|---|---|
| | | attached as Exhibit 1 to the 26 Motion is deemed filed with this Court upon entry of this Minute Order. SO ORDERED. Judge Richard J. Leon on 4/11/2025. (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | | MINUTE ORDER granting 28 Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GF and that Robert Seungchul Chang be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e−f PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Richard J. Leon on 4/11/2025. (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | | MINUTE ORDER. Upon consideration of the 31 Unopposed Motion of Former Presidents of the District of Columbia F Past Presidents of Voluntary Bar Associations for Leave to File Amici Curiae Brief, it is hereby ORDERED that the mo GRANTED and that the Amici Curiae brief attached as Exhibit 1 to the 31 Motion is deemed filed with this Court upon this Minute Order. SO ORDERED. Signed by Judge Richard J. Leon on 4/11/2025. (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | 42 | NOTICE of Appearance by Donald Beaton Verrilli, Jr on behalf of 808 LAW FIRMS (Verrilli, Donald) (Entered: 04/11 |
| 11/2025 | 43 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Nathan P. Eimer, Filing fee $ 100, receipt number ADCDC−11610134. Fee Status: Fee Paid. by 808 LAW FIRMS. (Attachments: # 1 Declaration of Nathan P. Eimer, # 2 Proposed Order)(Verrilli, Donald) (Entered: 04/11/2025) |
| 11/2025 | | MINUTE ORDER. Upon consideration of the 32 Unopposed Motion for Leave to File Brief of Amici Curiae 676 Law F it is hereby ORDERED that the motion is GRANTED and that the Amici Curiae brief attached as Exhibit 1 to the 32 Mc deemed filed with this Court upon entry of this Minute Order. SO ORDERED. Signed by Judge Richard J. Leon on 4/11 (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | | MINUTE ORDER. Upon consideration of the 37 Unopposed Motion by 24 Nongovernmental Organizations for Leave t Amici Curiae Brief, it is hereby ORDERED that the motion is GRANTED and that the Amici Curiae brief attached as E the 37 Motion is deemed filed with this Court upon entry of this Minute Order. SO ORDERED. Signed by Judge Richar on 4/11/2025. (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | 44 | Unopposed MOTION for Leave to File Amicus Brief by MEDIA ORGANIZATIONS AND PRESS FREEDOM ADVC (Attachments: # 1 Exhibit Proposed Brief, # 2 Appendix A, # 3 Text of Proposed Order)(Kortz, Mason) (Entered: 04/11 |
| 11/2025 | | MINUTE ORDER. Upon consideration of the 38 Unopposed Motion for Leave to File Brief of Amici Curiae Fred T. Kc Center for Law and Equality, Service Employees International Union, American Federation of Teachers, American Asso University Professors, Center for Civil Rights and Critical Justice, Race and Law Centers, and Civil Rights and Advoca Organizations, it is hereby ORDERED that the motion is GRANTED and that the Amici Curiae brief attached as Exhibi 38 Motion is deemed filed with this Court upon entry of this Minute Order. SO ORDERED. Signed by Judge Richard J. 4/11/2025. (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | | MINUTE ORDER. Upon consideration of the 39 Unopposed Motion of 808 Law Firms for Leave to File a Brief Amicu is hereby ORDERED that the motion is GRANTED and that the Amici Curiae brief attached as Exhibit 1 to the 39 Moti deemed filed with this Court upon entry of this Minute Order. SO ORDERED. Signed by Judge Richard J. Leon on 4/11 (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | | MINUTE ORDER. Upon consideration of the 40 Unopposed Motion of the Lawyers' Committee for Civil Rights Under Public Counsel, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Public Interest Law Center, Chica Lawyers' Committee for Civil Rights Under Law, Mississippi Center for Justice, and Lawyers' Committee for Civil Rigl San Francisco Bay Area for Leave to File Brief of Amici Curiae, it is hereby ORDERED that the motion is GRANTED the Amici Curiae brief attached as Exhibit 1 to the 40 Motion is deemed filed with this Court upon entry of this Minute ORDERED. Signed by Judge Richard J. Leon on 4/11/2025. (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | | MINUTE ORDER. Upon consideration of the 41 Consent Motion for Leave to File Brief of Amicus Curiae Internationa of Trial Lawyers, it is hereby ORDERED that the motion is GRANTED and that the Amicus Curiae brief attached as Ex the 41 Motion is deemed filed with this Court upon entry of this Minute Order. SO ORDERED. Signed by Judge Richar on 4/11/2025. (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | 45 | Unopposed MOTION for Leave to File Amicus Brief by NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC (Attachments: # 1 Exhibit Brief of Amicus Curiae, # 2 Text of Proposed Order)(Spital, Samuel) (Entered: 04/11/2025) |
| 11/2025 | | MINUTE ORDER granting 43 Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GF and that Nathan P. Eimer be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e−filing via and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Ri Leon on 4/11/2025. (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | 46 | NOTICE of Appearance by Robert Seungchul Chang on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Chang, Robert) (Entered: 04/11/2025) |

| 11/2025 | 47 | AMICUS BRIEF *in Support of Plaintiff's Summary Judgment Motion* by STATE OF NEW JERSEY. (Iyer, Sundeep) (E 04/11/2025) |
|---|---|---|
| 11/2025 | 48 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Adria Bonillas, Filing fee $ 100, receipt number ADCDC−11610707. Fee Status: Fee Paid. by LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AND L AFFILIATES. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Proposed Order)(Caspar, Edward) ( 04/11/2025) |
| 11/2025 | 49 | MOTION for Leave to File Amicus Brief*of Amici Curiae Former and Current General Counsel Supporting Plaintiff W Cutler Pickering Hale and Dorr LLP* by GENERAL COUNSEL AMICI. (Attachments: # 1 Exhibit Brief of Amici Curi Text of Proposed Order)(Rosenbaum, David) (Entered: 04/11/2025) |
| 11/2025 | 50 | NOTICE of Appearance by Andrew George Pappas on behalf of GENERAL COUNSEL AMICI (Pappas, Andrew) (En 04/11/2025) |
| 11/2025 | | MINUTE ORDER. Upon consideration of the 44 Unopposed Motion for Leave to File Amicus Brief by Media Organiza Press Freedom Advocates, it is hereby ORDERED that the motion is GRANTED and that the Amici Curiae brief attach Exhibit 1 to the 44 Motion is deemed filed with this Court upon entry of this Minute Order. SO ORDERED. Signed by . Richard J. Leon on 4/11/2025. (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | | MINUTE ORDER. Upon consideration of the 45 Unopposed Motion for Leave to File Amicus Brief by NAACP Legal and Education Fund, Inc., it is hereby ORDERED that the motion is GRANTED and that the Amicus Curiae brief attach Exhibit 1 to the 45 Motion is deemed filed with this Court upon entry of this Minute Order. SO ORDERED. Signed by . Richard J. Leon on 4/11/2025. (lcrjl1) (Entered: 04/11/2025) |
| 11/2025 | 51 | Unopposed MOTION for Leave to File Amicus Brief *in Support of Plaintiff's Motion for Summary Judgment* by AMICI LITIGATION FIRMS. (Attachments: # 1 Exhibit − Brief of Amici Curiae Litigation Firms in Support of Plaintiff's Mot Summary Judgment, # 2 Text of Proposed Order)(Reilly, Kathryn) (Entered: 04/11/2025) |
| 11/2025 | 52 | NOTICE of Appearance by Kathryn A. Reilly on behalf of AMICI CURIAE LITIGATION FIRMS (Reilly, Kathryn) (E 04/11/2025) |
| 11/2025 | 53 | Unopposed MOTION for Leave to File Amicus Brief by AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVI LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, CATO INSTITUTE, ELECTRONIC FRONTIER FOUND FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, INSTITUTE FOR JUSTICE, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, NATIONAL COALITION AGAINST CENSORSHIP, REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS, RUTHERFORD INSTITUTE, SOCIETY FOR ' RULE OF LAW INSTITUTE. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(Wang, Cecillia) (E 04/11/2025) |
| 11/2025 | 54 | NOTICE of Appearance by Cecillia D. Wang on behalf of AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIV LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, CATO INSTITUTE, ELECTRONIC FRONTIER FOUND FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, INSTITUTE FOR JUSTICE, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, NATIONAL COALITION AGAINST CENSORSHIP, REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS, RUTHERFORD INSTITUTE, SOCIETY FOR ' RULE OF LAW INSTITUTE (Wang, Cecillia) (Entered: 04/11/2025) |
| 11/2025 | 55 | Unopposed MOTION for Leave to File Amicus Brief by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit, # Proposed Order)(Corkran, Kelsi) (Entered: 04/11/2025) |
| 11/2025 | 56 | NOTICE of Appearance by Kelsi B. Corkran on behalf of LEGAL ETHICS PROFESSORS (Corkran, Kelsi) (Entered: 04/11/2025) |
| 11/2025 | 57 | NOTICE of Appearance by Nathan P. Eimer on behalf of 808 LAW FIRMS (Eimer, Nathan) (Entered: 04/11/2025) |
| 11/2025 | 58 | NOTICE of Appearance by Hayden Johnson on behalf of BAR ASSOCIATIONS (Johnson, Hayden) (Main Document on 4/14/2025) (znmw). (Entered: 04/11/2025) |
| 11/2025 | 59 | NOTICE of Appearance by Eric John Galvez Paredes on behalf of BAR ASSOCIATIONS (Paredes, Eric John) (Entere 04/11/2025) |
| 11/2025 | 60 | Unopposed MOTION for Leave to File Amicus Brief by BAR ASSOCIATIONS. (Attachments: # 1 Exhibit − Amici Cu # 2 Text of Proposed Order)(Paredes, Eric John) (Entered: 04/11/2025) |
| 11/2025 | 61 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Samuel Davis, Filing fee $ 100, receipt number ADCDC−11611164. Fee Status: Fee Paid. by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit, # 2 Text of Order)(Corkran, Kelsi) (Entered: 04/11/2025) |

**JA 2261**

| | | |
|---|---|---|
| 11/2025 | 62 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeremiah Chin, Filing fee $ 100, receipt number ADCDC−11611188. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attac 1 Declaration Chin Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 11/2025 | 63 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Melissa Lee, Filing fee $ 100, receipt number ADCDC− Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declarat Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 11/2025 | 64 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jessica Levin, Filing fee $ 100, receipt number ADCDC−11611210. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attac 1 Declaration Levin Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 11/2025 | 65 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Susan McMahon, Filing fee $ 100, receipt number ADCDC−11611213. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attac 1 Declaration McMahon Declaration, # 2 Exhibit Certificate of Good Standing)(Davy, Jim) (Entered: 04/11/2025) |
| 11/2025 | 66 | NOTICE of Appearance by Noam Biale on behalf of NEW YORK COUNCIL OF DEFENSE LAWYERS (Biale, Noan (Entered: 04/11/2025) |
| 11/2025 | 67 | NOTICE of Appearance by Kobie A. Flowers on behalf of NATIONAL ASSOCIATION OF CRIMINAL DEFENSE L (Flowers, Kobie) (Entered: 04/11/2025) |
| 11/2025 | 68 | NOTICE of Appearance by Sara E. Kropf on behalf of AMICI CURIAE 342 FORMER JUDGES (Kropf, Sara) (Entere 04/11/2025) |
| 11/2025 | 69 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Donald Falk, Filing fee $ 100, receipt number ADCDC− Fee Status: Fee Paid. by AMICI CURIAE 342 FORMER JUDGES. (Attachments: # 1 Declaration By Donald Falk)(Kr (Entered: 04/11/2025) |
| 11/2025 | 70 | Consent MOTION for Leave to File Amicus Brief by AMICI CURIAE 342 FORMER JUDGES. (Attachments: # 1 Exh of amici), # 2 Exhibit B (brief), # 3 Text of Proposed Order)(Kropf, Sara) (Entered: 04/11/2025) |
| 11/2025 | 71 | Unopposed MOTION for Leave to File Amicus Brief by NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LA NEW YORK COUNCIL OF DEFENSE LAWYERS. (Attachments: # 1 Exhibit 1: Brief, # 2 Exhibit 2: Proposed Order Noam) (Entered: 04/11/2025) |
| 11/2025 | 75 | AMICUS BRIEF by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Appendix)(znmw) (Entered 04/14/2025) |
| 11/2025 | 76 | AMICUS BRIEF by PAST PRESIDENTS OF THE DC BAR. (Attachments: # 1 Appendix)(znmw) (Entered: 04/14/20: |
| 11/2025 | 77 | AMICUS BRIEF by 676 LAW PROFESSORS. (znmw) (Entered: 04/14/2025) |
| 11/2025 | 78 | AMICUS BRIEF by 24 NONGOVERNMENTAL ORGANIZATIONS. (znmw) (Entered: 04/14/2025) |
| 11/2025 | 79 | AMICUS BRIEF by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (znmw) (Entered: 04/14/2025) |
| 11/2025 | 80 | AMICUS BRIEF by 808 LAW FIRMS. (Attachments: # 1 Appendix)(znmw) (Entered: 04/14/2025) |
| 11/2025 | 81 | AMICUS BRIEF by LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AND LOCAL AFFILIATES. (z (Entered: 04/14/2025) |
| 11/2025 | 82 | AMICUS BRIEF by INTERNATIONAL ACADEMY OF TRIAL LAWYERS. (znmw) (Entered: 04/14/2025) |
| 11/2025 | 83 | AMICUS BRIEF by MEDIA ORGANIZATIONS AND PRESS FREEDOM ADVOCATES. (znmw) (Entered: 04/14/2 |
| 11/2025 | 84 | AMICUS BRIEF by NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.. (znmw) (Entered: 04/14/2025) |
| 11/2025 | 94 | AMICUS BRIEF by GENERAL COUNSEL AMICI. (mg) (Entered: 04/16/2025) |
| 11/2025 | 95 | AMICUS BRIEF by AMICI CURIAE LITIGATION FIRMS. (mg) (Entered: 04/16/2025) |
| 11/2025 | 96 | AMICUS BRIEF by AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DI OF COLUMBIA, CATO INSTITUTE, ELECTRONIC FRONTIER FOUNDATION, FOUNDATION FOR INDIVIDU RIGHTS AND EXPRESSION, INSTITUTE FOR JUSTICE, KNIGHT FIRST AMENDMENT INSTITUTE AT COLU UNIVERSITY, NATIONAL COALITION AGAINST CENSORSHIP, REPORTERS COMMITTEE FOR THE FREEI THE PRESS, RUTHERFORD INSTITUTE, SOCIETY FOR THE RULE OF LAW INSTITUTE. (mg) (Entered: 04/16 |
| 11/2025 | 97 | AMICUS BRIEF by LEGAL ETHICS PROFESSORS. (mg) (Entered: 04/16/2025) |

| | | |
|---|---|---|
| 11/2025 | 98 | AMICUS BRIEF by BAR ASSOCIATIONS. (mg) (Entered: 04/16/2025) |
| 11/2025 | 99 | AMICUS BRIEF by 342 FORMER JUDGES. (mg) (Entered: 04/16/2025) |
| 11/2025 | 100 | AMICUS BRIEF by NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, NEW YORK COUNCIL C DEFENSE LAWYERS. (mg) (Entered: 04/16/2025) |
| 11/2025 | 101 | AMICUS BRIEF by AARON H. CAPLAN. (mg) (Entered: 04/16/2025) |
| 14/2025 | 72 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Ruth Greenwood, Filing fee $ 100, receipt number ADCDC−11611705. Fee Status: Fee Paid. by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit, # 2 Exhibit, Proposed Order)(Corkran, Kelsi) (Entered: 04/14/2025) |
| 14/2025 | 73 | ERRATA by LEGAL ETHICS PROFESSORS re 61 Motion for Leave to Appear Pro Hac Vice,. (Attachments: # 1 Exhibit)(Corkran, Kelsi) (Entered: 04/14/2025) |
| 14/2025 | | NOTICE OF ERROR regarding 69 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Donald Falk, Filing receipt number ADCDC−11611291. Fee Status: Fee Paid.. The following error(s) need correction: Pro Hac Vice motion accompanied by a Certificate of Good Standing issued within the last 30 days (LCvR 83.2(c)(2)). Please file certificate a (znmw) (Entered: 04/14/2025) |
| 14/2025 | 85 | NOTICE of Appearance by Sundeep Iyer on behalf of STATE OF NEW JERSEY (Iyer, Sundeep) (Entered: 04/14/2025 |
| 14/2025 | 86 | NOTICE of Appearance by Stephen Craig Leckar on behalf of AARON H. CAPLAN (Leckar, Stephen) (Entered: 04/14 |
| 14/2025 | 87 | Unopposed MOTION for Leave to File Amicus Brief*Nunc Pro Tunc* by AARON H. CAPLAN. (Attachments: # 1 Exhil Brief of Professor Aaron H. Caplan Regarding Attainder, # 2 Text of Proposed Order)(Leckar, Stephen) (Entered: 04/14 |
| 14/2025 | | MINUTE ORDER. It is hereby ORDERED that the 49 , 51 , 53 , 55 , 60 , 70 , 71 , and 87 Motions for Leave to File Am are GRANTED. The Amicus Briefs attached as Exhibit 1 to 49 , 51 , 53 , 55 , 60 , 71 , and 87 are deemed filed with the April 11, 2025. The Amicus Brief attached as Exhibit 2 to 70 is deemed filed with the Court as of April 11, 2025. SO O Signed by Judge Richard J. Leon on 4/14/2025. (lcrjl1) (Entered: 04/14/2025) |
| 14/2025 | | MINUTE ORDER granting 48 , 61 , 62 , 63 , 64 , 65 , and 72 Motions for Leave to Appear Pro Hac Vice. It is hereby O that Motions are GRANTED and that Adria Bonillas, Samuel Davis, Jeremiah Chin, Melissa Lee, Jessica Levin, Susan and Ruth Greenwood be, and hereby are, admitted pro hac vice in this case. **Counsel should register for e−filing via P. file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Richar on 4/14/2025. (lcrjl1) (Entered: 04/14/2025) |
| 14/2025 | | ENTERED IN ERROR.....MINUTE ORDER. Upon consideration of the parties' 6 Joint Status Report, it is hereby ORD a hearing on plaintiff's 2 Motion for a Temporary Restraining Order is scheduled for April 17, 2025 at 3:30 PM in Court (In Person) before Judge Richard J. Leon. It is further ORDERED that, consistent with the Joint Status Report, the gove shall submit its opposition to the motion by April 15, 2025. SO ORDERED. Signed by Judge Richard J. Leon on 4/14/2 (lcrjl1) Modified on 4/14/2025 (zsmc). (Entered: 04/14/2025) |
| 15/2025 | | MINUTE ORDER. The Court has received inquiries about the Minute Order marked "ENTERED IN ERROR," dated A 2025. For clarity, the Minute Order was inadvertently entered on this docket and does not apply to this case. There is no scheduled for April 17, 2025 at 3:30 PM in this matter. SO ORDERED. Signed by Judge Richard J. Leon on 4/15/2025. (Entered: 04/15/2025) |
| 15/2025 | 88 | NOTICE of Appearance by Jessica Levin on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALIT Jessica) (Entered: 04/15/2025) |
| 15/2025 | 89 | ERRATA *Certificate of Good Standing (Donald Falk)* by 342 FORMER JUDGES re 69 Motion for Leave to Appear Pi Vice,. (Kropf, Sara) (Entered: 04/15/2025) |
| 15/2025 | | MINUTE ORDER. It is hereby ORDERED that plaintiff's 24 Unopposed Motion to Reschedule Oral Hearing is GRAN PART and DENIED IN PART. Plaintiff asks the Court to advance the time of the April 23, 2025 hearing by two hours, from 3:00 PM to 1:00 PM. The Court will advance the time of the hearing, but only by one hour. It is therefore ORDER hearing scheduled for April 23, 2025 at 3:00 PM is RESCHEDULED to April 23, 2025 at 2:00 PM (same day, just one earlier) in Courtroom 18 (In Person) before Judge Richard J. Leon. SO ORDERED. Signed by Judge Richard J. Leon o 4/15/2025. (lcrjl1) (Entered: 04/15/2025) |
| 15/2025 | 90 | NOTICE of Appearance by Melissa Lee on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY Melissa) (Entered: 04/15/2025) |
| 15/2025 | 91 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Charlotte Garden, Filing fee $ 100, receipt number ADCDC−11618024. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attac 1 Declaration Garden declaration, # 2 Exhibit Certificate of good standing)(Davy, Jim) (Entered: 04/15/2025) |

| | | |
|---|---|---|
| 15/2025 | | MINUTE ORDER granting 69 Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GF and that Donald Falk be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e−filing via PA file a notice of appearance pursuant to LCvR 83.6(a)** <u>Click for instructions</u>. SO ORDERED. Signed by Judge Richar on 4/15/2025. (lcrjl1) (Entered: 04/15/2025) |
| 15/2025 | 92 | NOTICE of Appearance by Susan A. McMahon on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQU (McMahon, Susan) (Entered: 04/15/2025) |
| 15/2025 | 93 | NOTICE of Appearance by Andrea C. Ferster on behalf of PAST PRESIDENTS OF THE DC BAR (Ferster, Andrea) (I Document 93 replaced on 4/16/2025) (mg). (Entered: 04/15/2025) |
| 16/2025 | | MINUTE ORDER granting 91 Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is GF and that Charlotte Garden be, and hereby is, admitted pro hac vice in this matter. **Counsel should register for e−filing PACER and file a notice of appearance pursuant to LCvR 83.6(a)** <u>Click for instructions</u>. SO ORDERED. Signed by Richard J. Leon on 4/16/2025. (lcrjl1) (Entered: 04/16/2025) |
| 16/2025 | 102 | NOTICE of Appearance by Adria Jasmine Bonillas on behalf of LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNI AND LOCAL AFFILIATES (Bonillas, Adria) (Main Document 102 replaced on 4/17/2025) (mg). (Entered: 04/16/202! |
| 17/2025 | 103 | Memorandum in opposition to re 16 Motion for Summary Judgment, filed by SCOTT BESSENT, PAMELA J. BONDI, DOUGLAS J. BURGUM, CENTRAL INTELLIGENCE AGENCY, LORI CHAVEZ−DEREMER, DOUGLAS A. COL DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF ENERGY, DEPARTI HOMELAND SECURITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT OF L/ DEPARTMENT OF STATE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE TREASURY, DEPART OF TRANSPORTATION, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECUTIVE OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION ANDREW N. FERGUSON, TULSI GABBARD, JAMIESON GREER, PETER B. HEGSETH, ROBERT F. KENNED KELLY LOEFFLER, ANDREA R. LUCAS, HOWARD W. LUTNICK, LINDA M. MCMAHON, KRISTI NOEM, OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF TH UNITED STATES TRADE REPRESENTATIVE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO A. RUBI SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STE SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMEN HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF VETERANS AF UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, I T. VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Statement of Facts Response to Plaintiff's Staten Facts, # 2 Declaration of Richard Lawson)(Lawson, Richard) (Entered: 04/17/2025) |
| 17/2025 | 104 | Memorandum in opposition to re 15 Motion to Dismiss,,,,, filed by WILMER CUTLER PICKERING HALE AND DOF (Clement, Paul) (Entered: 04/17/2025) |
| 22/2025 | 105 | NOTICE of Appearance by Jeremiah Chin on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALI? Jeremiah) (Entered: 04/22/2025) |
| 23/2025 | | Minute Entry for Motion Hearing held on 4/23/2025 before Judge Richard J. Leon: re 16 MOTION for Summary Judgm arguments heard and TAKEN UNDER ADVISEMENT. Court Reporter: Lisa Edwards. (smc) Modified on 4/24/2025 (a (Entered: 04/24/2025) |
| 24/2025 | 106 | TRANSCRIPT OF PRELIMINARY INJUNCTION before Judge Richard J. Leon held on April 23, 2025; Page Number Date of Issuance: April 24, 2025. Court Reporter/Transcriber Lisa Edwards. Telephone number (202) 354−3269. Transc be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchase court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (mt condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the co any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made av the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifica covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/15/2025. Redacted Transcript Deadline set for 5/25/2025. Release of Transcript Restriction set 7/23/2025.(Edwards, Lisa) (Entered: 04/24/2025) |
| 24/2025 | 107 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeannie Suk Gersen, Filing fee $ 100, receipt number ADCDC−11642732. Fee Status: Fee Paid. by BAR ASSOCIATIONS. (Attachments: # 1 Declaration of Jeannie Suk Ge Exhibit − Certificate of Good Standing, # 3 Text of Proposed Order)(Paredes, Eric John) (Entered: 04/24/2025) |

| | | |
|---|---|---|
| 28/2025 | | MINUTE ORDER granting 107 Motion for Leave to Appear Pro Hac Vice. It is hereby ORDERED that the motion is G and that Jeannie Suk Gersen be, and hereby is, admitted pro hac vice in this case. **Counsel should register for e−filing PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Richard J. Leon on 4/28/2025. (lcrjl1) (Entered: 04/28/2025) |
| 12/2025 | 108 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. All Defendants, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upo States Attorney General 4/3/2025., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to th States Attorney. Date of Service Upon United States Attorney on 4/3/2025. ( Answer due for ALL FEDERAL DEFENI 6/2/2025.) (Attachments: # 1 Exhibit)(Clement, Paul) (Entered: 05/12/2025) |
| 13/2025 | 109 | NOTICE *of Recent Development* by WILMER CUTLER PICKERING HALE AND DORR LLP (Clement, Paul) (Enter 05/13/2025) |
| 27/2025 | 110 | MEMORANDUM OPINION. Signed by Judge Richard J. Leon on 5/27/2025. (lcrjl1) (Entered: 05/27/2025) |
| 27/2025 | 111 | ORDER. Consistent with the attached Order, defendants' 15 Motion to Dismiss is GRANTED IN PART and DENIED I plaintiff's 16 Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART; and plaintiff's 3 Motion Preliminary Injunction is DENIED AS MOOT. See attached Order for details. Signed by Judge Richard J. Leon on 5/27 (lcrjl1) (Entered: 05/27/2025) |
| 27/2025 | 112 | NOTICE of Appearance by Donald Manwell Falk on behalf of 342 FORMER JUDGES (Falk, Donald) (Main Documer replaced on 5/28/2025) (mg). (Entered: 05/27/2025) |
| 03/2025 | 113 | STATUS REPORT by SCOTT BESSENT, PAMELA J. BONDI, DOUGLAS J. BURGUM, CENTRAL INTELLIGEN AGENCY, LORI CHAVEZ−DEREMER, DOUG COLLINS, DEPARTMENT OF AGRICULTURE, DEPARTMENT COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF F AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPARTMENT OF STATE, DEPARTMENT OF TH INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECU OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION, ANDREW N. FERGUSON, TULSI GABBARE JAMIESON GREER, PETER B. HEGSETH, ROBERT F. KENNEDY, JR, KELLY LOEFFLER, ANDREA R. LUCA HOWARD W. LUTNICK, LINDA MCMAHON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENTAT L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMAI BUSINESS ADMINISTRATION, COKE MORGAN STEWART, SCOTT TURNER, U.S. DEPARTMENT OF DEFE DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTM JUSTICE, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES OF AMERICA, UNITED STATES P AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Law Richard) (Entered: 06/03/2025) |
| 06/2025 | 114 | Unopposed MOTION to Clarify re 111 Order on Motion to Dismiss,, Order on Motion for Summary Judgment,, Order ( for Preliminary Injunction,, Set/Reset Deadlines, by SCOTT BESSENT, PAMELA J. BONDI, DOUGLAS J. BURGUM CENTRAL INTELLIGENCE AGENCY, LORI CHAVEZ−DEREMER, DOUG COLLINS, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELA SECURITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPAF OF STATE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECUTIVE OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION ANDREW N. FERGUSON, TULSI GABBARD, JAMIESON GREER, PETER B. HEGSETH, ROBERT F. KENNEL KELLY LOEFFLER, ANDREA R. LUCAS, HOWARD W. LUTNICK, LINDA MCMAHON, KRISTI NOEM, OFFIC MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF TH UNITED STATES TRADE REPRESENTATIVE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STE SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMEN HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF VETERANS AF UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, F VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Lawson, Richard) (Entered: 06/06/2025) |
| 06/2025 | 115 | MOTION to Amend/Correct 111 Order on Motion to Dismiss,, Order on Motion for Summary Judgment,, Order on Mo Preliminary Injunction,, Set/Reset Deadlines, by WILMER CUTLER PICKERING HALE AND DORR LLP. (Attachm Declaration of Joseph J. DeMott, # 2 Text of Proposed Order)(Murphy, Erin) (Entered: 06/06/2025) |
| 11/2025 | | MINUTE ORDER. The Court is aware of defendants' 114 Unopposed Motion to Clarify and WilmerHale's 115 Motion the Judgment. It is hereby ORDERED that no later than June 17, 2025, defendants shall respond to WilmerHale's 115 M Amend the Judgment. WilmerHale may file a reply in support of that motion no later than June 20, 2025. SO ORDERE by Judge Richard J. Leon on 6/11/2025. (lcrjl1) (Entered: 06/11/2025) |

| Date | # | Description |
|---|---|---|
| 17/2025 | 116 | RESPONSE re 115 MOTION to Amend/Correct 111 Order on Motion to Dismiss,, Order on Motion for Summary Judg Order on Motion for Preliminary Injunction,, Set/Reset Deadlines, filed by SCOTT BESSENT, PAMELA J. BONDI, D J. BURGUM, CENTRAL INTELLIGENCE AGENCY, LORI CHAVEZ−DEREMER, DOUG COLLINS, DEPARTMI AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELA SECURITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPAF OF STATE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECUTIVE OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION ANDREW N. FERGUSON, TULSI GABBARD, JAMIESON GREER, PETER B. HEGSETH, ROBERT F. KENNED KELLY LOEFFLER, ANDREA R. LUCAS, HOWARD W. LUTNICK, LINDA MCMAHON, KRISTI NOEM, OFFIC MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF TF UNITED STATES TRADE REPRESENTATIVE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STE SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMEN HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF VETERANS AF UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, I VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Lawson, Richard) (Entered: 06/17/2025) |
| 20/2025 | 117 | REPLY to opposition to motion re 115 Motion to Amend/Correct, filed by WILMER CUTLER PICKERING HALE AI LLP. (Murphy, Erin) (Entered: 06/20/2025) |
| 20/2025 | 118 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: ANDREW DELANEY'! to INTERVENE. Reason(s): Case is closed.Filer is not a party to the case. (mg) (Entered: 06/23/2025) |
| 20/2025 | 119 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: ANDREW DELANEY'! to VACATE. Reason(s): Case is closed.Filer is not a party to the case. (mg) (Entered: 06/23/2025) |
| 23/2025 | 122 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: ANDREW DELANEY'! for Leave to File. Reason(s): Case is closed.Filer is not a party to the case. (mg) (Entered: 06/26/2025) |
| 26/2025 | 120 | MEMORANDUM ORDER granting defendants' 114 Motion to Clarify and granting WilmerHale's 115 Motion to Amen Judgment. Signed by Judge Richard J. Leon on 6/26/2025. (lcrjl1) (Entered: 06/26/2025) |
| 26/2025 | 121 | AMENDED ORDER amending 111 Order. Consistent with the attached, defendants shall file a status report by July 3, 2 Signed by Judge Richard J. Leon on 6/26/2025. (Attachments: # 1 Appendix A) (lcrjl1) (Entered: 06/26/2025) |
| 27/2025 | | MINUTE ORDER  re **122 Request for Leave to File Review, 119 Request for Leave to File Review, 118 Request fo File Review.** Leave to file is denied. The filer is not a party to this case and this case is closed. SO ORDERED. Signed I Richard J. Leon on 6/27/2025. (lcrjl1) (Entered: 06/27/2025) |
| 30/2025 | 124 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: ANDREW DELANEY'! for Leave to File. Reason(s): Case is closed.Filer is not a party to the case. (mg) (Entered: 07/09/2025) |
| 03/2025 | 123 | STATUS REPORT by SCOTT BESSENT, PAMELA J. BONDI, DOUGLAS J. BURGUM, CENTRAL INTELLIGEN AGENCY, LORI CHAVEZ−DEREMER, DOUG COLLINS, DEPARTMENT OF AGRICULTURE, DEPARTMENT COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF F AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPARTMENT OF STATE, DEPARTMENT OF TF INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECU OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION, ANDREW N. FERGUSON, TULSI GABBARE JAMIESON GREER, PETER B. HEGSETH, ROBERT F. KENNEDY, JR, KELLY LOEFFLER, ANDREA R. LUCA HOWARD W. LUTNICK, LINDA MCMAHON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENTAT L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMAI BUSINESS ADMINISTRATION, COKE MORGAN STEWART, SCOTT TURNER, U.S. DEPARTMENT OF DEFE DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTM JUSTICE, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES OF AMERICA, UNITED STATES P AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Atta 1 Exhibit Notice)(Lawson, Richard) (Entered: 07/03/2025) |
| 15/2025 | | MINUTE ORDER  re **124 Request for Leave to File Review.** Leave to file is denied. The filer is not a party to this cas case is closed. SO ORDERED. Signed by Judge Richard J. Leon on 7/15/2025. (lcrjl1) (Entered: 07/15/2025) |
| 25/2025 | 125 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 121 Order, Set Deadlines, 120 Order on Motion to Clarify, Ord Motion to Amend/Correct, 111 Order on Motion to Dismiss,, Order on Motion for Summary Judgment,, Order on Motic Preliminary Injunction,, Set/Reset Deadlines, 110 Memorandum & Opinion by RUSSELL VOUGHT, DOUG COLLIN DEPARTMENT OF THE INTERIOR, OFFICE OF MANAGEMENT AND BUDGET, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT |

AGRICULTURE, SCOTT TURNER, UNITED STATES OF AMERICA, OFFICE OF THE UNITED STATES TRAD[...]
REPRESENTATIVE, ENVIRONMENTAL PROTECTION AGENCY, LINDA MCMAHON, JOHN L. RATCLIFFE, [...]
DEPARTMENT OF HOMELAND SECURITY, SEAN DUFFY, PETER B. HEGSETH, ANDREW N. FERGUSON, [...]
WRIGHT, LORI CHAVEZ−DEREMER, DEPARTMENT OF STATE, DEPARTMENT OF LABOR, ANDREA R. LU[...]
KELLY LOEFFLER, SMALL BUSINESS ADMINISTRATION, DEPARTMENT OF COMMERCE, U.S. DEPARTM[...]
JUSTICE, EXECUTIVE OFFICE OF THE PRESIDENT, ROBERT F. KENNEDY, JR, UNITED STATES PATENT A[...]
TRADEMARK OFFICE, PAMELA J. BONDI, SCOTT BESSENT, DEPARTMENT OF THE TREASURY, MARK T[...]
FEDERAL TRADE COMMISSION, DEPARTMENT OF TRANSPORTATION, BROOKE L. ROLLINS, JAMIESON[...]
SECURITIES AND EXCHANGE COMMISSION, DEPARTMENT OF ENERGY, U.S. DEPARTMENT OF VETER[...]
AFFAIRS, LEE M. ZELDIN, U.S. DEPARTMENT OF DEFENSE, COKE MORGAN STEWART, CENTRAL INTE[...]
AGENCY, DOUGLAS J. BURGUM, MARCO RUBIO, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGE[...]
DEPARTMENT OF HEALTH AND HUMAN SERVICES, TULSI GABBARD, KRISTI NOEM, HOWARD W. LUT[...]
U.S. DEPARTMENT OF EDUCATION. Fee Status: No Fee Paid. Parties have been notified. (Lawson, Richard) (Enter[...]
07/25/2025)

| | | |
|---|---|---|
| 28/2025 | 126 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appe[...] Court of Appeals docketing fee was not paid because the appeal was filed by the government re 125 Notice of Appeal to [...] Circuit Court. (znmw) (Entered: 07/28/2025) |
| 28/2025 | | USCA Case Number 25−5277 for 125 Notice of Appeal to DC Circuit Court filed by All Defendants.(znmw) (Entered: 07/28/2025) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

WILMER CUTLER PICKERING HALE AND
DORR LLP,

                     *Plaintiff*,

      v.

EXECUTIVE OFFICE OF THE PRESIDENT
1600 Pennsylvania Avenue NW
Washington, DC 20500

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Avenue NW
Washington, DC 20530

U.S. DEPARTMENT OF DEFENSE,
1000 Defense Pentagon
Washington, DC 20301

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
200 Independence Avenue SW
Washington, DC 20201

U.S. DEPARTMENT OF EDUCATION
400 Maryland Avenue SW
Washington, DC 20202

U.S. DEPARTMENT OF VETERANS AFFAIRS
810 Vermont Avenue NW
Washington, DC 20420

OFFICE OF MANAGEMENT AND BUDGET,
725 17th Street NW
Washington, DC 20503

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE,
Office of General Counsel
Washington, DC 20511

CENTRAL INTELLIGENCE AGENCY
Litigation Division, Office of General Counsel
Central Intelligence Agency
Washington, DC 20505

Civil Case No. _____

**JA 2268**

ENVIRONMENTAL PROTECTION AGENCY
1200 Pennsylvania Avenue NW
Washington, DC 20460

DEPARTMENT OF HOMELAND SECURITY
2707 Martin Luther King Jr Avenue SW
Mail Stop 0485
Washington, DC 20528

DEPARTMENT OF STATE
Suite 5.600, 600 19th Street NW
Washington DC 20522

DEPARTMENT OF ENERGY
1000 Independence Avenue SW
Washington, DC 20585

DEPARTMENT OF THE TREASURY
1500 Pennsylvania Avenue NW
Washington, DC 20220

DEPARTMENT OF LABOR
200 Constitution Avenue NW
Washington, DC 20210

DEPARTMENT OF AGRICULTURE
1400 Independence Avenue SW
Washington, DC 20250

DEPARTMENT OF COMMERCE
1401 Constitution Avenue NW
Washington, DC 20230

DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT
451 Seventh Street SW
Washington, DC 20410

SMALL BUSINESS ADMINISTRATION
409 Third Street SW
Washington, DC 20416

OFFICE OF THE UNITED STATES
TRADE REPRESENTATIVE
600 17th Street NW
Washington, DC 20508

DEPARTMENT OF THE INTERIOR
1849 C Street NW
Washington, DC 20240

**JA 2269**

DEPARTMENT OF TRANSPORTATION
1200 New Jersey Avenue SE
Washington, DC 20590

SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue NW
Washington, DC 20580

UNITED STATES PATENT AND TRADEMARK
OFFICE
600 Dulany Street
Alexandria, VA 22314

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
131 M Street NE
Washington, DC 20507

THE UNITED STATES OF AMERICA,
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, DC 20530

PAMELA J. BONDI, in her official capacity as
Attorney General of the United States
950 Pennsylvania Avenue NW
Washington, DC 20530

PETER B. HEGSETH, in his official capacity as
the Secretary of Defense
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services
U.S. Department of Health and Human Services
200 Independence Avenue SW
Washington, DC 20201

LINDA M. MCMAHON, in her official capacity
as Secretary of Education
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

DOUGLAS A. COLLINS, in his official capacity
as Secretary of Veterans Affairs
Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420

RUSSELL T. VOUGHT, in his official capacity
as Director of The U.S. Office of
Management and Budget
725 17th Street NW
Washington, DC 20503

TULSI GABBARD, in her official capacity as
U.S. Director of National Intelligence
1500 Tysons McLean Drive
McLean, VA 22102

JOHN L. RATCLIFFE, in his official capacity as
Director of the Central Intelligence Agency
Office of Public Affairs, Central Intelligence
Agency
Washington, DC 20505

LEE M. ZELDIN, in his official capacity as
Administrator of the Environmental
Protection Agency
1200 Pennsylvania Avenue NW
Washington, DC 20460

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security
2707 Martin Luther King Jr Avenue SW
Mail Stop 0485
Washington, DC 20528

MARCO RUBIO, in his official capacity as
Secretary of State
Suite 5.600, 600 19th Street NW
Washington DC 20522

CHRIS WRIGHT, in his official capacity as
Secretary of Energy
1000 Independence Avenue SW
Washington, DC 20585

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury
1500 Pennsylvania Avenue NW
Washington, DC 20220

JA 2271

LORI CHAVEZ-DEREMER, in her official capacity as Secretary of Labor
200 Constitution Avenue NW
Washington, DC 20210

BROOKE L. ROLLINS, in her official capacity as Secretary of Agriculture
1400 Independence Avenue SW
Washington, DC 20250

HOWARD LUTNICK, in his official capacity as Secretary of Commerce
1401 Constitution Avenue NW
Washington, DC 20230

SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development
451 Seventh Street SW
Washington, DC 20410

KELLY LOEFFLER, in her official capacity as Administrator of the U.S. Small
Business Administration
409 Third Street SW
Washington, DC 20416

JAMIESON GREER, in his official capacity as United States Trade Representative
600 17th Street NW
Washington, DC 20508

DOUG BURGUM, in his official capacity as Secretary of the Interior
1849 C Street NW
Washington, DC 20240

SEAN DUFFY, in his official capacity as Secretary of Transportation
1200 New Jersey Avenue SE
Washington, DC 20590

MARK T. UYEDA, in his official capacity as Acting Chairman of the Securities and Exchange
Commission
100 F Street NE
Washington, DC 20549

ANDREW N. FERGUSON, in his official capacity as Chairman of the Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580

COKE MORGAN STEWART, in her official capacity as Acting Under Secretary of Commerce for Intellectual Property and Acting Director of the United States Patent and Trademark Office
600 Dulany Street
Alexandria, VA 22314

ANDREA R. LUCAS, in her official capacity as Acting Chair of the Equal Employment Opportunity Commission
131 M Street NE
Washington, DC 20507I

<em>Defendants.</em>

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.     "[T]he right to counsel is the foundation for our adversary system," *Martinez v. Ryan*, 566 U.S. 1, 12 (2012), and the "courage" of attorneys who take on unpopular clients has long "made lawyerdom proud," *Sacher v. United States*, 343 U.S. 1, 4 (1952).  John Adams famously embodied these principles by defending eight British soldiers in the "Boston Massacre" trial, an effort he described as "one of the best pieces of service I ever rendered my country."[1]  And British monarchs' practice of punishing attorneys "whose greatest crime was to dare to defend unpopular causes"—which threatened to reduce lawyers to "parrots of the views of whatever group wields governmental power at the moment"—helped inspire the Bill of Rights.  *Cohen v. Hurley*, 366 U.S. 117, 138-40 (1961) (Black, J., dissenting).  It is thus a core principle of our legal system that "one should not be penalized for merely defending or prosecuting a lawsuit."  *F. D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974).

2.     In an unprecedented assault on that bedrock principle, the President has issued multiple executive orders in recent weeks targeting law firms and their employees as an undisguised form of retaliation for representing clients and causes he disfavors or employing lawyers he dislikes.[2]  These "personal vendetta[s]" are so facially improper that the first court to address the merits of one of these orders concluded that it likely violates multiple foundational

---

[1] David McCullough, *John Adams* 68 (2001).

[2] *See Addressing Risks from Jenner & Block*, The White House (Mar. 25, 2025) ("Jenner Order"), https://tinyurl.com/u7ts9x49; *Addressing Risks from Paul Weiss*, The White House (Mar. 14, 2025) ("Paul Weiss Order"), https://tinyurl.com/5w4j69fv; *Addressing Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025) ("Perkins Order"), https://tinyurl.com/547rwhna; *Suspension of Security Clearances and Evaluation of Government Contracts*, The White House (Feb. 25, 2025) ("Covington Mem."), https://tinyurl.com/4xtrb52x.

**JA 2274**

safeguards enshrined in the Bill of Rights.  Tr. of TRO Hearing at 74:7-21, 101:24, *Perkins Coie*

*LLP v. U.S. Dep't of Just.*, No. 1:25-cv-716 (D.D.C. Mar. 12, 2025), Dkt.22 ("*Perkins* Tr.").

3.      The latest such directive ("Order"), dated March 27, 2025, targets Wilmer Cutler

Pickering Hale and Dorr LLP ("WilmerHale" or the "Firm").[3]  Titled "Addressing Risks From

WilmerHale LLP," the Order avowedly punishes WilmerHale for various matters the Firm has

handled, including some it has taken on pro bono, and for its employment of certain attorneys who

participated in the Department of Justice's investigation of the 2016 presidential election.  In

particular, WilmerHale has been a professional home for public servants like Robert Mueller and

represented (among many others) President Trump's political opponents, including in litigation on

behalf of the Democratic National Committee and the Biden and Harris campaigns in the two most

recent presidential elections.  This past month, WilmerHale also filed a lawsuit challenging the

President's sudden dismissal of eight inspectors general at major federal agencies.

4.      The Order's declared purpose is to retaliate against WilmerHale—and certain of its

clients—for WilmerHale attorneys' constitutionally protected advocacy in matters that President

Trump perceives to be adverse to his personal and/or political interests.  Among other things, the

Order accuses WilmerHale of "abus[ing] its pro bono practice," specifically referencing the Firm's

election- and immigration-related litigation and its defense of race-based college admission

policies.  Order §1.  The Order also singles out retired WilmerHale partners Robert Mueller and

James Quarles and current partner Aaron Zebley because of their involvement in the Department

of Justice's investigation into allegations of Russian interference in the 2016 presidential election,

in which Mr. Mueller served as Special Counsel.  *Id.*

---

[3] For the Court's convenience, a copy of the Order is attached to this complaint as Exhibit A.  The order is available at https://tinyurl.com/4m8a79jn.

5.      While most litigation requires discovery to unearth retaliatory motive, the Order makes no secret of its intent to punish WilmerHale for its past and current representations of clients before the Nation's courts and for its perceived connection to the views that Mr. Mueller expressed as Special Counsel.

6.      Section One of the Order vigorously criticizes WilmerHale for advocating in favor of clients and causes that the President disfavors.  The Order accuses WilmerHale of "earmarking hundreds of millions of [its] clients' dollars for destructive causes" and "engag[ing] in activities that undermine justice and the interests of the United States."  *Id.*  It also accuses the Firm of "abus[ing] its pro bono practice" to "engage[] in obvious partisan representations to achieve political ends, support[] efforts to discriminate on the basis of race, back[] the obstruction of [immigration-enforcement] efforts," and "further[] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote."  *Id.*  The Order makes clear that these allegations are based on actions WilmerHale has taken in certain client representations before this Nation's courts, many of which have been successful and drawn plaudits—and certainly not sanctions—from the courts that directly oversaw the litigation.

7.      Section One further criticizes WilmerHale for "employing" certain "lawyers" whom President Trump dislikes.  *Id.*  Specifically, the Order criticizes WilmerHale for "welcoming" Robert Mueller, James Quarles, and Aaron Zebley back to the Firm after the conclusion of the Special Counsel investigation into the 2016 election.  *Id.*  The Order accuses these attorneys—all of whom were involved in a Justice Department investigation conducted under an appointment by the Acting Attorney General of the United States—of having "weaponize[d] the prosecutorial power to upend the democratic process and distort justice" during "[Mr.] Mueller's investigation" and states that this alleged "weaponization of the justice system must not

be rewarded, let alone condoned." *Id.* The Order specifically criticizes WilmerHale for claiming that Mr. Mueller "embodies the highest value of our firm and profession," when, in the President's view, he "l[ed] one of the most partisan investigations in American history." *Id.*

8.      Section Two directs "[t]he Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies" to immediately "suspend any active security clearances held by individuals at WilmerHale" and to review whether to revoke them permanently. *Id.* §2. This direction bypasses the existing procedures for granting and revoking security clearances and addresses individuals at the Firm without regard to when they joined the Firm and whether they had any personal connection to any of the representations criticized in the Order.

9.      Section Three takes aim at WilmerHale's finances by pressuring its current clients to leave the Firm and prospective clients to stay away. The Order accomplishes this by directing federal agencies to (1) "require Government contractors to disclose any business they do with WilmerHale"; (2) seek to "terminate any contract … for which WilmerHale has been hired to perform any service"; and (3) reassess all "contracts with WilmerHale or with entities that do business with WilmerHale," suggesting that such relationships may not "align[] with American interests." *Id.* §3.

10.     Section Four references a portion of the Perkins Order (*see supra* n.2) that instructs federal officials to "investigate" diversity, equity, and inclusion policies at "large, influential, or industry leading law firms."

11.     Lastly, Section 5 of the Order directs federal agencies to "limit[]" WilmerHale employees' "access" to "Federal Government buildings" and stop "engaging with WilmerHale employees" whenever it would "be inconsistent with the interests of the United States." *Id.* §5. It

also instructs agency officials to "refrain from hiring employees of WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management." *Id.*

12.     The President's sweeping attack on WilmerHale (and other firms) is unprecedented and unconstitutional.  The First Amendment protects the rights of WilmerHale, its employees, and its clients to speak freely, petition the courts and other government institutions, and associate with the counsel of their choice without facing retaliation and discrimination by federal officials. Indeed, the Supreme Court recently reaffirmed the bedrock law that the government may neither "use the power of the State to punish or suppress disfavored expression" nor "attempt to coerce private parties in order to" accomplish those forbidden ends.  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180, 188 (2024).

13.     The Order also violates the separation of powers twice over.  The President's role is to enforce the law—not to create new law or adjudicate litigation conduct before the courts— and no statute or constitutional provision empowers him to unilaterally sanction WilmerHale in this manner.  That is unsurprising; any legislative effort to restrict lawyers' access to government buildings, services, and materials just for representing disfavored clients or causes would be patently unconstitutional.   And any executive-branch effort to deter private attorneys from representing particular clients or advancing particular arguments "threatens severe impairment of the judicial function," as courts depend on attorneys to "present all … reasonable and well-grounded arguments" on their clients' behalf.  *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545-46 (2001).

14.     On top of that, the Order flagrantly violates due process.  It imposes severe consequences without notice or any opportunity to be heard; it uses vague, expansive language

that does not adequately inform WilmerHale (or its clients) of what conduct triggered these extraordinary sanctions; and it unfairly singles out WilmerHale based on its perceived connections to disfavored individuals and causes.

15.     Finally, the Order violates the right to counsel protected by the Fifth and Sixth Amendments and imposes unconstitutional conditions on federal contracts and expenditures.

16.     For any and all these reasons, the Order cannot stand.

## **PARTIES**

17.     WilmerHale is a limited liability partnership established in Delaware and formed from a 2004 merger of the Boston-headquartered firm Hale and Dorr LLP and the Washington D.C.-headquartered firm Wilmer Cutler & Pickering LLP.

18.     WilmerHale is led by a Management Committee, comprising 17 partners, which is responsible for the day-to-day management of the Firm and which implements the decisions of the broader partnership.

19.     Most of the named defendants are (1) federal agencies that are directed to implement the Order and (2) the heads of those agencies.  The Order expressly directs some of these agencies to obstruct the ability of WilmerHale employees to practice law and serve the Firm's clients.  Other named agencies have significant contracts with WilmerHale clients and are at least implicitly directed by the Order to encourage WilmerHale's clients to terminate their relationships with the Firm (e.g., through the threat of cancelling government contracts).[4]

---

[4] As detailed in the accompanying declaration, WilmerHale's global practice requires attorneys and employees to interact with dozens of federal agencies.  Because the Order generally directs all federal agencies to take specified actions, WilmerHale has named 26 agencies (as well as the heads of those agencies) as defendants out of an abundance of caution.

20.    The Executive Office of the President is a federal agency headquartered in Washington, D.C.

21.    The U.S. Department of Justice is a federal agency headquartered in Washington, D.C.

22.    The U.S. Department of Defense is a federal agency headquartered in Washington, D.C.

23.    The U.S. Department of Health and Human Services is a federal agency headquartered in Washington, D.C.

24.    The U.S. Department of Education is a federal agency headquartered in Washington, D.C.

25.    The U.S. Department of Veterans Affairs is a federal agency headquartered in Washington, D.C.

26.    The Office of Management and Budget ("OMB") is a federal agency headquartered in Washington, D.C.

27.    The Office of the Director of National Intelligence is a federal agency headquartered in McLean, Virginia.

28.    The Central Intelligence Agency is a federal agency headquartered in McLean, Virginia.

29.    The Environmental Protection Agency is a federal agency headquartered in Washington, D.C.

30.    The Department of Homeland Security is a federal agency headquartered in Washington, D.C.

31.    The Department of State is a federal agency headquartered in Washington, D.C.

**JA 2280**

32.    The Department of Energy is a federal agency headquartered in Washington, D.C.

33.    The Department of the Treasury is a federal agency headquartered in Washington, D.C.

34.    The Department of Labor is a federal agency headquartered in Washington, D.C.

35.    The Department of Agriculture is a federal agency headquartered in Washington, D.C.

36.    The Department of Commerce is a federal agency headquartered in Washington, D.C.

37.    The Department of Housing and Urban Development is a federal agency headquartered in Washington, D.C.

38.    The Small Business Administration is a federal agency headquartered in Washington, D.C.

39.    The Office of the United States Trade Representative is a federal agency headquartered in Washington, D.C.

40.    The Department of the Interior is a federal agency headquartered in Washington, D.C.

41.    The Department of Transportation is a federal agency headquartered in Washington, D.C.

42.    The Securities and Exchange Commission is a federal agency headquartered in Washington, D.C.

43.    The Federal Trade Commission is a federal agency headquartered in Washington, D.C.

**JA 2281**

44.     The United States Patent and Trademark Office is a federal agency headquartered in Alexandria, Virginia.

45.     The Equal Employment Opportunity Commission ("EEOC") is a federal agency headquartered in Washington, D.C.

46.     Pamela J. Bondi is the Attorney General of the United States and the head of Defendant U.S. Department of Justice.  She is sued in her official capacity.

47.     Peter B. Hegseth is the Secretary of Defense and the head of Defendant U.S. Department of Defense**.**  He is sued in his official capacity.

48.     Robert F. Kennedy, Jr. is the Secretary of Health and Human Services and the head of Defendant U.S. Department of Health and Human Services.  He is sued in his official capacity.

49.     Linda M. McMahon is the Secretary of Education and the head of Defendant U.S. Department of Education.  She is sued in her official capacity.

50.     Douglas A. Collins is the Secretary of Veterans Affairs and the head of Defendant U.S. Department of Veterans Affairs.  He is sued in his official capacity.

51.     Russell T. Vought is the Director of Defendant OMB.  He is sued in his official capacity.

52.     Tulsi Gabbard is the Director of National Intelligence and the head of Defendant Office of the Director of National Intelligence.  She is sued in her official capacity.

53.     John L. Ratcliffe is the Director of the Central Intelligence Agency and the head of Defendant Central Intelligence Agency.  He is sued in his official capacity.

54.     Lee M. Zeldin is the Administrator of the Environmental Protection Agency and the head of Defendant Environmental Protection Agency.  He is sued in his official capacity.

55. Kristi Noem is the Secretary of Homeland Security and the head of Defendant Department of Homeland Security. She is sued in her official capacity.

56. Marco Rubio is the Secretary of State and the head of Defendant Department of State. He is sued in his official capacity.

57. Chris Wright is the Secretary of Energy and the head of Defendant Department of Energy. He is sued in his official capacity.

58. Scott Bessent is the Secretary of the Treasury and the head of Defendant Department of the Treasury. He is sued in his official capacity.

59. Lori Chavez-DeRemer is the Secretary of Labor and the head of Defendant Department of Labor. She is sued in her official capacity.

60. Brooke L. Rollins is the Secretary of Agriculture and the head of Defendant Department of Agriculture. She is sued in her official capacity.

61. Howard Lutnick is the Secretary of Commerce and the head of Defendant Department of Commerce. He is sued in his official capacity.

62. Scott Turner is the Secretary of Housing and Urban Development and the head of Defendant Department of Housing and Urban Development. He is sued in his official capacity.

63. Kelly Loeffler is the Administrator of the Small Business Administration and head of Defendant U.S. Small Business Administration. She is sued in her official capacity.

64. Jamieson Greer is the United States Trade Representative and head of Defendant Office of the United States Trade Representative. He is sued in his official capacity.

65. Doug Burgum is Secretary of the Interior and head of Defendant Department of the Interior. He is sued in his official capacity.

66.    Sean Duffy is Secretary of Transportation and head of Defendant Department of Transportation.  He is sued in his official capacity.

67.    Mark T. Uyeda is the Acting Chairman of Defendant Securities and Exchange Commission.  He is sued in his official capacity.

68.    Andrew N. Ferguson is the Chairman of Defendant Federal Trade Commission. He is sued in his official capacity.

69.    Coke Morgan Stewart is the Acting Under Secretary of Commerce for Intellectual Property and the Acting Director of Defendant United States Patent and Trademark Office.  She is sued in her official capacity.

70.    Andrea R. Lucas is Acting Chair of Defendant EEOC.  She is sued in her official capacity.

71.    The United States of America is responsible for the exercise of executive action by the named Defendants and all other agencies that are directed by the Order to take action with respect to WilmerHale and its clients.  Given that WilmerHale's employees interact with—and their attorneys appear before—dozens of different federal agencies, and the Order at issue generally directs all federal agencies to take specified action, the United States of America is included as a defendant to ensure that the relief ordered by the Court will apply government-wide.

## JURISDICTION & VENUE

72.    This Court has subject matter jurisdiction under 28 U.S.C. §1331 because WilmerHale's causes of action arise under the Constitution and laws of the United States.  This Court also has jurisdiction under 28 U.S.C. §1346(a)(2) because the defendants are United States officials.

73.    Venue is appropriate under 28 U.S.C. §1391(1)(A) because at least one defendant resides in this district.

11
**JA 2284**

74.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§2201-02; the All Writs Act, 28 U.S.C. §1651; and the Court's inherent equitable powers.

75.    WilmerHale has a non-statutory right of action to enjoin unlawful official action that is *ultra vires*. *See, e.g.*, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996). This Court has inherent equitable power to enjoin executive conduct that violates the Constitution. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Therefore, "the President's actions may … be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

76.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

## FACTUAL ALLEGATIONS

### *WilmerHale Represents a Wide Array of Clients on a Wide Range of Matters, Including Matters Adverse to President Trump.*

77.    WilmerHale is a large law firm with clients located throughout the United States and around the world. Today, WilmerHale has more than 2,000 employees, approximately 1,200 of whom are lawyers based in 12 offices throughout the world. Many of WilmerHale's lawyers work at the intersection of government and business to support clients across a range of industries, from finance to life sciences to technology to education, while others represent and advise clients

in a range of areas that have no immediate connection to the federal government or other governments.

78.     WilmerHale's employees come from all walks of life and hold diverse political views.  Before or after working at the Firm, WilmerHale attorneys have served as federal judges, cabinet secretaries, governors, ambassadors, business executives, and academic leaders—in many cases on both sides of the aisle.  For instance, among several former WilmerHale lawyers currently serving in the federal judiciary, two were appointed by President Trump.

79.     WilmerHale represents a wide array of clients, ranging from large corporations, colleges and universities, and Native American tribes to nimble start-ups and individuals accused of criminal and civil wrongs.  The work required to represent such a broad clientele necessarily involves entering federal buildings and communicating with federal agencies and employees on a daily basis.  To give just a few examples:  WilmerHale attorneys representing criminal defendants often meet with prosecutors in U.S. Attorneys' offices in-person to advocate for their clients.  Members of the Firm's Intellectual Property department represent patent applicants, patent holders, and patent challengers before U.S. Patent and Trademark Office in patent prosecution and post-grant proceedings.  Attorneys in the Firm's Securities and Financial Services Department regularly participate in enforcement proceedings and compliance matters before federal agencies such as the Securities and Exchange Commission, the Commodity Futures Trading Commission, the Office of the Comptroller of the Currency, the Treasury Department, and the Federal Reserve.  And so on.  Indeed, an entire WilmerHale department (Regulatory and Government Affairs) is devoted to addressing matters involving regulatory and administrative disputes, and another practice group (Government and Regulatory Litigation) is devoted to handling government-facing litigation.

80.    Ever since predecessor firm Hale and Dorr LLP was founded in 1918, WilmerHale's attorneys have played important roles in legal matters that have shaped history.  For instance, Wilmer Cutler & Pickering co-founder Lloyd Cutler successfully defended the NAACP before the U.S. Supreme Court in *NAACP v. Claiborne Hardware Co.*, which reversed the Mississippi Supreme Court in holding that the First Amendment protects "a nonviolent, politically motivated boycott designed to force governmental and economic change."  458 U.S. 886, 914 (1982).  During the Army-McCarthy hearings, Hale and Dorr's Joseph Welch took on pro bono representation of the United States Army in a time when anti-communist sentiment was at its height.  Welch's advocacy—and his famous "Have you no decency, sir" rejoinder—began the process that ended Senator McCarthy's career.  More recently, WilmerHale's attorneys represented Harvard University at the trial, appellate, and Supreme Court levels in *Students for Fair Admissions v. President and Fellows of Harvard College*, a case challenging the university's use of race in its admission practices, 600 U.S. 181 (2023), and persuaded the Supreme Court that a man who had been on death row for decades was there because of prosecutorial misconduct and thus constitutionally entitled to a new trial, *Glossip v. Oklahoma*, 145 S.Ct. 612 (2025).  In short, WilmerHale attorneys have not shied away from controversial matters.  And, win or lose, their zealous advocacy has helped shape the law and enabled courts to resolve cases based on undaunted and skilled adversarial presentations.

81.    WilmerHale's litigation practice has long advocated for clients and causes across the ideological spectrum.  In recent years, for example, the Firm has challenged laws that prohibited congregants from attending in-person religious services during the COVID-19 pandemic and defended the right of churches to make ecclesiastical hiring and firing decisions free from unconstitutional government interference.  WilmerHale has challenged laws restricting

14
**JA 2287**

access to abortion in the aftermath of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022).  And the Firm has represented advocates for stricter gun laws.  The Firm's decisions to take on clients and matters that some may find controversial or disagree with are themselves a reflection of the Firm's values.  In some cases, the Firm's representations reflect a deliberate choice to avoid representing one side of a controversy, such as generally declining to represent tobacco companies in health-related matters, while in others it represents a commitment to ensuring that both sides of a controversial issue are well represented.

82.     The Firm has not shied away from taking on the federal government.  To the contrary, WilmerHale has frequently represented clients in litigation against the federal government, during both Republican and Democratic administrations.  *See, e.g.*, *Career Coll. Ass'n v. Duncan*, No. 1:11-cv-138 (D.D.C. Jan. 21, 2011) (Obama administration); *FERC v. Barclays Bank PLC*, No. 2:13-cv-02093 (E.D. Cal. Oct. 9, 2013) (Obama administration); *Chamber of Com. of U.S. v. DOL*, No. 3:16-cv-1476 (N.D. Tex. June 1, 2016) (Obama administration); *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) (Trump administration); *United Farm Workers v. DOL*, No. 1:20-cv-1690 (E.D. Cal. Nov. 30, 2020) (Trump administration); *Express Scripts, Inc. v. FTC,* No. 4:24-cv-1549 (E.D. Mo. Nov. 19, 2024) (Biden administration); *Intuit, Inc. v. FTC*, No. 24-60040 (5th Cir. Jan. 24, 2024) (Biden administration); *Am. Council of Life Insurers v. DOL*, No. 4:24-cv-482 (N.D. Tex. May 24, 2024) (Biden administration).

83.     Continuing this longstanding part of its government-litigation practice and commitment to pro bono representations, WilmerHale filed a lawsuit in February on behalf of the inspectors general of eight federal agencies—the Departments of Defense, State, Veterans Affairs, Education, Health and Human Services, Agriculture, and Labor, and the Small Business

Administration—alleging that President Trump improperly fired them in violation of the removal procedures set forth in the Inspectors General Act. *See Storch v. Hegseth*, No. 1:25-cv-415 (D.D.C. Feb. 12, 2025).

84.    In addition to litigating against the government during both of his terms (and during the terms of virtually every President of either party going back decades), WilmerHale has represented clients in matters directly adverse to President Trump's personal and political interests. For example, WilmerHale represented the House of Representatives Committee on Ways and Means in its litigation against the Department of the Treasury and President Trump, in his personal capacity. As a result of this litigation, the President's personal tax returns were ultimately disclosed to Congress and entered the public record. *See* Mem. Op., *Comm. on Ways & Means v. U.S. Dep't of Treasury*, No. 1:19-cv-1974 (D.D.C. Dec. 14, 2021), Dkt.148 (granting Committee's motion to dismiss the President's counterclaim and permitting public disclosure of his personal tax records).

85.    WilmerHale has also represented several of President Trump's political opponents—including the Joe Biden campaign in 2020 and 2024, and the Kamala Harris campaign in 2024—in litigation concerning ballot access, voting rights, and election certification.

86.    In November and December 2020, WilmerHale represented the Biden for President campaign, the Democratic National Committee, and state-level Democratic Party organizations in numerous lawsuits brought by the Trump campaign and/or its allies challenging the results of the 2020 presidential elections. *See, e.g.*, *Donald J. Trump for President, Inc. v. Secretary of Pennsylvania*, 830 F.App'x 377 (3d Cir. 2020); *Trump v. Wis. Elections Comm'n*, 983 F.3d 919 (7th Cir. 2020).

87.    In the leadup to the 2024 general election, WilmerHale once again represented Democratic Party entities in numerous cases in which they were adverse to President Trump's

16
**JA 2289**

campaign, the Republican National Committee, or others aligned with then-candidate Trump.  In Georgia, for example, WilmerHale represented the Democratic National Committee ("DNC") in multiple state-court cases concerning the vote counting and election certification rules enacted by Georgia's State Election Board.  *See Cobb Cnty. Bd. of Elections & Registration v. State Election Bd.*, No. 24CV012491 (Ga. Super. Ct. Oct. 2, 2024); *Democratic Party of Ga., Inc. v. State Election Bd.*, No. 24CV012349 (Ga. Super. Ct. Sept. 30, 2024); *Abhiraman v. State Bd. of Elections*, No. 24CV010786 (Ga. Super. Ct. Aug. 26, 2024).  And WilmerHale represented (or is still representing) the DNC and/or state Democratic parties in numerous state and federal cases in Pennsylvania regarding the rules for counting mail, absentee, and provisional ballots.  *See, e.g.*, *Republican Nat'l Comm. v. Genser*, No. 24-786 (U.S. Jan. 21, 2025); *Pa. State Conf. of NAACP Branches v. Secretary of Pennsylvania*, 97 F.4th 120 (3d Cir. 2024); *Reschenthaler v. Schmidt*, No 1:24-cv-1671 (M.D. Pa. Sept. 30, 2024); *Baxter v. Phila. Cnty. Bd. of Elections*, Nos. 1 EAP 2025, 2 EAP 2025 (Pa. Jan. 17, 2025); *Black Pol. Empowerment Project v. Schmidt*, No. 68 MAP 2024 (Pa. Sept. 2, 2024); *In re Canvass of Provisional Ballots in the 2024 Primary Election*, No. 55 MAP 2024 (Pa. July 24, 2024); *Republican Nat'l Comm. v. Schmidt*, 108 MM 2024 (Pa. Sept. 18, 2024); *Ctr. for Coalfield Just. v. Wash. Cnty. Bd. of Elections*, No. 1172 C.D. 2024 (Pa. Commw. Ct. Sept. 24, 2024).

## *WilmerHale's Tradition of Public Service.*

88.    WilmerHale has long encouraged its attorneys to answer the call of public service, and the Firm has frequently invited those attorneys to return to the Firm when their service is complete.  Many of its attorneys have held positions in the federal government, including in the White House (under Presidents of both parties), in the military (in both civilian and uniformed capacities), in the Department of Justice, and in numerous other federal agencies.  Other attorneys continue to serve in reserve units of the United States military.

89.     Among the WilmerHale attorneys who have answered the call to public service is Robert S. Mueller III.  Mr. Mueller is a graduate of Princeton University and University of Virginia Law School who served in the Marine Corps during the Vietnam War and received a Bronze Star for heroism and a Purple Heart, among many other honors for combat-related valor.  He served with distinction in numerous government posts before becoming a partner at the Firm in 1993.  He remained at the Firm until 1995, when he left to serve in a variety of roles in the Department of Justice, including Director of the Federal Bureau of Investigation from 2001 through 2013.  In 2014, Mr. Mueller rejoined WilmerHale.  On May 17, 2017, he again left WilmerHale for the Justice Department upon being appointed by Rod Rosenstein, in his capacity as Acting Attorney General, to serve as Special Counsel charged with investigating allegations of Russian interference in the 2016 presidential election.[5]  While serving in this position, Mr. Mueller had no ties, financial or otherwise, with the Firm.

90.     In the years following Mr. Mueller's appointment as Special Counsel, President Trump repeatedly railed against the work of the Special Counsel's Office, calling it a "hoax" and Mr. Mueller's investigation a "witch hunt."[6]  The President also engaged in inflammatory personal attacks against Mr. Mueller's team, calling them "thugs,"[7] members of a "hit squad,"[8] and a

---

[5] *See* Press Release, *Appointment of Special Counsel*, U.S. Dep't of Just. (May 17, 2017), https://tinyurl.com/yc59yed4.

[6] *See, e.g.*, Meredith McGraw, *Trump Attacks Mueller After He Agrees to Testify to Congress*, ABC News (June 26, 2019), https://tinyurl.com/59s56ffh.

[7] John Wagner, *Trump Calls Mueller Lawyers 'Thugs' and 'A National Disgrace!'*, Wash. Post (Aug. 20, 2018), https://tinyurl.com/74z89vjc.

[8] Martin Pengelly, *Trump Attacks Robert Mueller's 'Hit Squad' in Row over 'Wiped' Phones*, The Guardian (Sept. 12, 2020), https://tinyurl.com/zxfrdxxe.

"National Disgrace!"[9]  At other times, he described them as "very sick and dangerous people"[10] whose investigation—initiated and overseen by President Trump's Department of Justice— amounted to an "attack on our country"[11] and potentially made them guilty of "very serious crimes,"[12] including "Treason."[13]

91.    Mr. Mueller personally became a target of President Trump's ire.  The President has accused Mr. Mueller of committing unspecified "illegal acts"[14] and engaging in unethical conduct, calling him a "totally conflicted"[15] person whose actions "will certainly be looked at."[16]  He also insinuated that Mr. Mueller initiated his investigation for purely personal reasons related to alleged business dealings between Mr. Mueller and President Trump—albeit without providing any evidence for his claims.[17]

---

[9] Wagner, *supra* n.7.

[10] Brett Samuels, *Trump: Some Statements About Him in Mueller Report Are 'Total Bulls—'*, The Hill (Apr. 19, 2019), https://tinyurl.com/yftm6bpe.

[11] Jeremy Diamond, *Trump Claims Victory in the Wake of Mueller Testimony*, CNN (July 24, 2019), https://tinyurl.com/58u87krx.

[12] Samuels, *supra* n.10.

[13] *Id.*

[14] John Parkinson & Jordyn Phelps, *Trump Calls Mueller Investigation 'Attempted Coup,' Barr Says 'Spying' Needs to Be Investigated*, ABC News (Apr. 10, 2019), https://tinyurl.com/4pyvj73m.

[15] John Wagner, *Trump Attacks Mueller, Says He Would Have Brought Charges if He Had Evidence of a Crime*, Wash. Post (May 30, 2019), https://tinyurl.com/yc8cayht.

[16] *See* Associated Press, *Trump Claims Launching Russia Probe 'Treasonous'*, PBS News (Mar. 25, 2019), https://tinyurl.com/5n6ka843.

[17] Wagner, *supra* n.15.

92.     In 2019, the Special Counsel's Office issued its Report on the Investigation into Russian Interference in the 2016 Presidential Election.  The Report, which was delivered to then-Attorney General William Barr, did not find that members of the Trump campaign conspired or coordinated with the Russian government.  Nor did it determine whether President Trump had obstructed justice.  The Report also concluded, consistent with longstanding Department of Justice policy, that a sitting President could not be indicted.

93.     After the Special Counsel's Office completed its 2019 report, Mr. Mueller rejoined the Firm.  As noted, WilmerHale itself had no role in the report or Mr. Mueller's work as Special Counsel, and indeed represented a number of clients adverse to the Special Counsel's office during that time.  Mr. Mueller retired from the Firm more than three years ago.

### *President Trump Takes Aim at Law Firms That Have Represented His Political Opponents.*

94.     In recent months, the President has unambiguously stated his intention to retaliate against his political adversaries and attorneys who represent them.  During the 2024 presidential campaign, for example, the President threatened to "go after" his political opponents[18] and warned that "WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law."  He further warned:  "Please beware that this legal exposure extends to Lawyers."[19]  After winning the election, the President reaffirmed his intent to punish the law firms that he believed

---

[18] Amy B Wang, *Trump Says He'd Have 'Every Right' to Seek Prosecutions of Political Foes*, Wash. Post (June 6, 2024), https://tinyurl.com/5n78w9w8.

[19] Michael Goldberg et al., *Trump Threatens Prison Sentences for Those Who 'Cheat' in the Election if He Wins*, PBS News (Sept. 8, 2024), https://tinyurl.com/2j35xdn5.

had wronged him, telling Fox News that "[w]e have a lot of law firms that we're going to be going after, because they were very dishonest people."[20]

95.     On February 25, 2025, the President issued a memorandum to various intelligence-community agency heads directing them "to suspend any active security clearances held by Peter Koski and all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel" pending a review to "terminate any engagement of Covington." As Special Counsel, Jack Smith brought criminal charges against then-former President Trump in two cases involving his challenges to the 2020 election results and his retention of sensitive government documents after leaving office in 2021. The President referred to the February 25 directive as "the deranged Jack Smith signing or bill," and said afterward of the pen used to sign the memorandum, "Why don't you give it to Jack Smith?"[21]

96.     On March 6, 2025, the President signed a substantially more expansive executive order entitled "Addressing Risks from Perkins Coie LLP," and issued an accompanying fact sheet.[22] The Perkins Order imposed firm-wide penalties on Perkins Coie for "representing failed Presidential candidate Hillary Clinton." The Perkins Order directed agency heads to terminate contracts with Perkins Coie, to require all government contractors to disclose any business with Perkins Coie and then review all contracts with Perkins Coie's clients, to limit official access of

---

[20] Alex Woodward, *Trump Confirms Retribution Campaign Against Law Firms That Clash with His Agenda*, The Independent (Mar. 9, 2025), https://tinyurl.com/45knwmeb.

[21] Janna Brancolini, *Trump Hits Jack Smith's Lawyers with Bombshell Executive Order*, The Daily Beast (Feb. 26, 2025), https://tinyurl.com/z6mmybxj.

[22] *Fact Sheet: President Donald Trump Addresses Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025) ("Perkins Coie Fact Sheet"), https://tinyurl.com/8trncswm.

Perkins Coie to federal government buildings, and to limit government officials from engaging in their official capacity with Perkins Coie employees.

97.     The fact sheet accompanying the Perkins Order explained that the President was taking action against Perkins Coie "[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States."  The fact sheet cited as an example of Perkins Coie's supposedly "unethical and discriminatory actions that threaten our elections, military strength, and national security" the fact that the firm had "filed lawsuits against the Trump Administration."  It also cited Perkins Coie's purported attempt to help "steal an election while representing failed presidential candidate Hillary Clinton"; alleged "push[ing of] debunked claims of secret Trump-Russia communications"; "work[] with activist donors, including George Soros, to judicially overturn enacted election laws"; and purportedly "partisan" "host[ing of] an FBI workspace."  The fact sheet further explained that "President Trump signed [the Perkins] Order to end" what the President perceived to be "the weaponization of Federal Government … 'and the abuse of law enforcement against political opponents.'"[23]

98.     The President declared at the signing ceremony that it was "an absolute honor to sign" the Perkins Order because Perkins Coie had engaged in "weaponization against a political opponent," which "should never be allowed to happen again."[24]  A senior White House official later elaborated on "the sensitive decision-making behind the order," explaining that "[t]he president doesn't believe [Perkins Coie] should have the privileges afforded to companies of their

---

[23] *Id.*

[24] Woodward, *supra* n.20.

stature to work and operate with the federal government, since they have made it very clear they are vehemently against the president of the United States, and their work proves that."[25]

99.     On March 12, 2025, a court in this District issued a temporary restraining order against the Perkins Order, holding that Perkins Coie is likely to prevail in establishing that the order violates "at least" the First, Fifth, and Sixth Amendments.  *See Perkins* Tr. at 74:7-21.

100.     Undeterred, the President issued a similar executive order two days later concerning the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP.  That order accused former Paul Weiss partner Mark Pomerantz of leaving the firm "to join the Manhattan District Attorney's office solely to manufacture a prosecution against" the President; of "unethically le[ading] witnesses in ways designed to implicate" the President; and of "engag[ing] in a media campaign to gin up support for this unwarranted prosecution."  Paul Weiss Order §1.  The Paul Weiss Order imposed the same basic punishments as the Perkins Order, including stripping all Paul Weiss employees of their security clearances, requiring government contractors to disclose their attorney-client relationships with Paul Weiss, and restricting the ability of Paul Weiss employees to enter federal buildings, engage with federal employees, and obtain federal employment.  In the wake of that Order, Paul Weiss filed a motion to withdraw as counsel based on a client decision to drop the firm in light of the Executive Order.  Mem. in Support of Motion to Withdraw as Counsel at 2, *United States v. Coburn*, No. 2:19-cr-120 (D.N.J. Mar. 19, 2025) ("*Coburn* Withdrawal Mem.").

101.     Although the Paul Weiss Order punished only one firm, its "Background" provision was more expansive.  It states that "[g]lobal law firms have for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles."  Paul

---

[25] Perry Stein & Michael Birnbaum, *Trump Expands Retribution Campaign Against Law Firms That Aided His Foes*, Wash. Post (Mar. 6, 2025), https://tinyurl.com/bdh8mad6.

Weiss Order §1.  The provision singled out representations taken "pro bono, or ostensibly 'for the public good,'" and declares that "[m]y Administration will no longer support taxpayer funds sponsoring such harm."  *Id.*

102.    On March 20, 2025, President Trump announced that he had "agreed to withdraw his March 14, 2025 Executive Order" regarding Paul Weiss "in light of a meeting with [the firm's] Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice."[26]  According to the President's announcement, Paul Weiss agreed that "[l]aw firms should not favor any political party when it comes to choosing their clients," and that it "will not deny representation to clients, including in pro bono matters and in support of non-profits, because of the personal political views of individual lawyers."[27]

103.    The President further stated that Paul Weiss has agreed to undertake "pro bono matters that represent the full spectrum of political viewpoints of our society, whether 'conservative' or 'liberal'"; "dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives"; "not adopt, use, or pursue any DEI policies"; and submit "to … a comprehensive audit of all of its employment

---

[26] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 20, 2025, 6:10 p.m.), https://tinyurl.com/3bj68n4r ("Paul Weiss Agreement").

[27] *Id.*

practices."[28]  On March 21, 2025, the President formally rescinded the Paul Weiss Order, citing the firm's "remarkable change of course."[29]

104.    On March 22, 2025, the President issued yet another directive aimed at law firms and lawyers he disfavors, accompanied by another "fact sheet."[30]  This time, the President asserted that "far too many attorneys and law firms have long ignored" the ethical requirements of Federal Rule of Civil Procedure 11 "when litigating against the Federal Government or in pursuing baseless partisan attacks."  Sanctions Mem.  In particular, the President accused "Marc Elias, founder and chair of Elias Law Group LLP"—which describes itself as "a mission-driven firm committed to helping Democrats win," whose "attorneys have collectively represented hundreds of Democratic campaigns, organizations, and PACs … and over a dozen presidential campaigns"[31]—of "grossly unethical misconduct" in connection with Mr. Elias' 2016 representation of "failed Presidential candidate Hillary Clinton."  *Id.*

105.    In light of these purported "concerns," the President "direct[ed] the Attorney General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against" the federal government; "to review conduct by attorneys or their law firms in litigation against the Federal Government over the last 8 years" for potential

---

[28] *Id.*; *see also* Lauren Edmonds, *Read the Email Paul Weiss Chairman Brad Karp Sent to Staff After Striking a Deal with Trump: 'Clients Perceived Our Firm as Being Persona Non Grata'*, Bus. Insider (Mar. 23, 2025), https://tinyurl.com/54t8yy5m.

[29] *See Addressing Remedial Action by Paul Weiss*, The White House (Mar. 21, 2025), https://tinyurl.com/35xs2bhs ("Rescission EO").

[30] *See Preventing Abuses of the Legal System and the Federal Court*, The White House (Mar. 22, 2025), https://tinyurl.com/t7c88y86 ("Sanctions Mem."); *Fact Sheet: President Donald J. Trump Prevents Abuses of the Legal System and the Federal Courts*, The White House (Mar. 21, 2025), https://tinyurl.com/48zbufb8.

[31] Elias Law Group, *About*, https://tinyurl.com/yyutr6h8 (last visited Mar. 28, 2025).

"misconduct"; and to consider whether allegedly improper attorney conduct warrants "reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services." *Id.*

106.    On March 25, 2025, the President issued yet another executive order, this time concerning the law firm of Jenner & Block LLP.  That order lambastes former Jenner partner Andrew Weissman for supposedly "engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation" of the President, which the order calls an "overt demand that the Federal Government pursue a political agenda against me." Jenner Order §1.  The Jenner Order imposes the same punishments as the Perkins and Paul Weiss Orders, including immediately stripping all Jenner employees of their security clearances, requiring government contractors to disclose their attorney-client relationships with Jenner, and restricting the ability of Jenner employees to enter federal buildings, engage with federal employees, and obtain federal employment.

### *President Trump Issues the Order and "Fact Sheet" Regarding WilmerHale.*

107.    On March 27, 2025, the President issued the Order at issue in this case, which takes aim at WilmerHale.  The Order begins by announcing the Administration's "commit[ment] to addressing the significant risks associated with law firms, particularly so-called 'Big Law' firms, that engage in conduct detrimental to critical American interests." Order §1.  It asserts that "[m]any firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles." *Id.*  And it criticizes "law firms" for "regularly conduct[ing] this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes." *Id.*

108.    The Order next turns to WilmerHale, describing it as "yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." *Id.* As one "example," the Order asserts that WilmerHale "engages in obvious partisan representations to achieve political ends," an apparent reference to WilmerHale's representation of President Trump's political opponents—namely, the Democratic National Committee, state-level Democratic Party organizations, and the presidential campaigns of Joe Biden and Kamala Harris.

109.    The Order's second "example" of WilmerHale's supposedly "egregious conduct" is "support[ing] efforts to discriminate on the basis of race," an apparent reference to WilmerHale's representation of Harvard in the *Students for Fair Admissions* litigation.

110.    The Order next accuses WilmerHale of "back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders," *id.*, an apparent reference to the Firm's litigation-related pro bono practice and successful challenges to immigration-related policies.

111.    The Order also accuses WilmerHale of "further[ing] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote," *id.*, an apparent reference to WilmerHale's involvement in challenges to state voter-identification and voter-registration laws.

112.    Like the Perkins, Paul Weiss, and Jenner Orders, the WilmerHale Order singles out certain current and former WilmerHale partners, including Robert Mueller, for special criticism. In particular, it asserts that Mr. "Mueller's investigation epitomizes the weaponization of government," describing it as "one of the most partisan investigations in American history." *Id.*

The Order further accuses Mr. Mueller, Mr. Zebley, and Mr. Quarles of "weaponiz[ing] the prosecutorial power to upend the democratic process and distort justice." *Id.*

113. The Order directs the Attorney General, Director of National Intelligence, and all other relevant agency heads to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest." *Id.* §2(a).

114. The Order further provides that agency heads "shall," to the extent permissible by law, "require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract." *Id.* §3(a). "The heads of agencies shall review all contracts with WilmerHale or with entities that disclose doing business with WilmerHale …." *Id.* §3(b). The Order then directs agency heads "to terminate any contract" with WilmerHale "to the maximum extent permitted by applicable law." *Id.* §3(b)(i). Finally, "[w]ithin 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." *Id.* §3(b)(ii).

115. The Order directs agencies to issue guidance "limiting official access" to federal government buildings "to employees of WilmerHale when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." *Id.* §5(a).

116. The Order also directs that "heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States." *Id.* §5(a). And the Order directs agency officials to "refrain from hiring employees of

WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States." *Id.* §5(b).

117.    The Order does not cite any statute as purported authority for any of the directives, and the President has not asserted in any other context that he acted under authority of any specific statute in issuing the Order or any of the others.

118.    Like the Perkins, Paul Weiss, and Jenner Orders, the WilmerHale Order was issued with an accompanying "Fact Sheet."[32]  The Fact Sheet brands WilmerHale as a "rogue law firm[]," summarizes the various retaliatory actions being taken against WilmerHale, and asserts that the Order will "ensure accountability for past misconduct" and help "to end the weaponization of the Federal government."

### *The Order Has Harmed and Will Continue to Irreparably Harm WilmerHale and Its Clients.*

119.    WilmerHale has suffered irreparable harm in the 16 hours since the Order issued, and it will continue to suffer irreparable harm unless and until it obtains judicial relief.

120.    First, as explained further below, the Order violates WilmerHale's and its clients' constitutional rights under the First, Fifth, and Sixth Amendments.  It is well-established that a loss of constitutional freedoms even for a brief interval constitutes irreparable harm, particularly when it comes to First Amendment rights.

121.    Second, the Order irreparably damages WilmerHale's reputation and its goodwill with clients.  WilmerHale has been vilified by the most powerful person in the country as a "rogue law firm[]" that "engage[s] in conduct detrimental to critical American interests."  That will

---

[32] For the Court's convenience, a copy of the Fact Sheet is attached to this complaint as Exhibit B.  The order is available at https://tinyurl.com/49cp8zrb.

immediately and irreparably impede the Firm's ability to attract and retain clients. Indeed, the Order directly interferes with the attorney-client relationship between WilmerHale and its existing clients, by forcing clients to disclose their representation by WilmerHale to the government even when that representation is not public.

122. Proving the point, on March 19, 2025, Paul Weiss attorneys moved to withdraw from a major criminal case, explaining that the defendant "terminated [the firm]'s representation of him" "[i]n response to the March 14 Executive Order," out of "concern[] that Paul, Weiss's ongoing involvement in the matter could in and of itself prejudice the review of his case." *Coburn Withdrawal Mem.* at 2-3.

123. The harm to WilmerHale's reputation will negatively affect its ability to recruit and retain employees, especially given the Order's restrictions on the Firm's lawyers from engaging in Executive Branch employment, including in traditionally non-partisan roles, such as Assistant United States Attorneys. Left standing, the Order will impose severe limitations on WilmerHale's ability to hire and keep the best and brightest—be they attorneys, paralegals, IT professionals, secretaries, or the many others who make WilmerHale the law firm it is today.

124. Third, WilmerHale will suffer substantial economic injuries from the Order, as its draconian restrictions threaten the very viability of the Firm's business model. These economic injuries are irreparable because sovereign immunity prevents WilmerHale from suing the government for monetary damages in the absence of an express waiver of this immunity by Congress.

125. Given the serious constraints it places on WilmerHale's employees' ability to do their jobs, the Order creates significant uncertainty for WilmerHale's existing clients about whether WilmerHale can continue to represent them effectively. Every day the Order remains in force, the

Firm will inevitably receive more inquiries from clients who are contemplating terminating their engagements with the Firm due to the Order. And the Order's terms and odious language will invariably dissuade potential clients from retaining WilmerHale for new or expanded legal matters. Indeed, that is the Order's point.

126. The Order also creates uncertainty for WilmerHale's existing clients about whether a continued representation will come at the cost of lucrative governmental contracts. Many of WilmerHale's most important clients have contracts with the U.S. Government, and are thus required by the Order to "disclose any business they do with WilmerHale." That appears to include even instances where the client's engagement with WilmerHale is otherwise confidential and/or has no relationship with the government contract at issue. And the Fact Sheet that accompanied the Order makes plain that their government contracts may be at risk if they continue their relationship with WilmerHale.

127. In sum, the Order will inevitably cause extensive, lasting damage to WilmerHale's current and future business prospects. It will severely hinder the Firm's ability to effectively serve its clients—the lifeblood of any law firm. And, by design, it discourages clients from retaining or maintaining WilmerHale as their counsel. The harm to the Firm's financial health, professional reputation, free expression, and its clients' right to counsel and freedom of association will be immediate and profound—unless this Court promptly issues relief.

128. That the Order directs agencies to issue guidance or take other action does not make the harm it inflicts any less imminent. Only one day after President Trump signed the Perkins Order, OMB issued guidance implementing it.[33] And not even two weeks after the Perkins Order

---

[33] Russell T. Vought, *Implementation of the Executive Order on "Addressing Risks from Perkins Coie LLP"*, OMB (Mar. 7, 2025), https://tinyurl.com/5bvxkuay.

issued, the EEOC began to implement the Perkins Order's directive to conduct investigations of various law firms, including WilmerHale.[34]  Notably, the "Fact Sheet" states unequivocally that "the Federal Government will terminate contracts that involve WilmerHale," "[t]he Federal Government will … restrict [WilmerHale] employees' access to government buildings," and "Federal Agencies will also refrain from hiring WilmerHale employees unless specifically authorized."

## CLAIMS FOR RELIEF

### Count I
(Against All Defendants)
### Violation Of The First Amendment - Retaliation for Protected Expression

129.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

130.    The Supreme Court has repeatedly held that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *see, e.g.*, *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022); *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  The Order blatantly defies this bedrock principle of constitutional law.

131.    As discussed, WilmerHale engages in written and oral advocacy on behalf of a wide array of clients, including some of President Trump's political opponents, in a wide array of matters, including some adverse to President Trump's interests.  *See supra* ¶¶77-87.  For example, WilmerHale attorneys have represented both the Democratic National Committee and the presidential campaigns of Joe Biden and Kamala Harris in voting-related litigation in the two most recent presidential elections.  WilmerHale attorneys also represented the House of Representatives

---

[34] Andrea R. Lucas, *Review of Perkins Coie LLP's Compliance with Title VII of the Civil Rights Act of 1964*, EEOC (Mar. 17, 2025), https://tinyurl.com/3zddk5bb.

Committee on Ways and Means in its attempt to obtain, and ultimately to disclose, President Trump's personal tax returns. And WilmerHale attorneys currently represent eight inspectors general who have sued the President and several members of his cabinet to challenge their recent purported terminations. Some of these representations have been paid, while others have been pro bono; all have been in service of the Firm's clients.

132. WilmerHale's advocacy on behalf of these clients is unquestionably protected speech and petitioning activity. *See, e.g.*, *Velazquez*, 531 U.S. at 542-49 ("advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection); *Lehnert v. Ferris Fac. Ass'n*, 500 U.S. 507, 528 (1991) (plurality) ("We long have recognized the important political and expressive nature of litigation."); *Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990) ("[The First Amendment] is violated if the Government affirmatively interferes with constitutionally protected litigation[.]"); *In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979) ("[A]ttorneys and parties retain their First Amendment rights even as participants in the judicial process."), *overruled in part on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31-32, 37 (1984). The Supreme Court has likewise held that "filing a complaint in court is a form of petitioning activity" protected by the First Amendment. *McDonald v. Smith*, 472 U.S. 479, 484 (1985); *see Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (collecting cases).

133. It is plain as day that President Trump issued the Order to retaliate against WilmerHale for that protected First Amendment activity. Indeed, unlike a typical case where discovery is needed to root out a forbidden retaliatory motive, the Order openly proclaims its retaliatory intent. The Order admits on its face that it is animated by WilmerHale's alleged "engage[ment] in obvious partisan representations to achieve political ends," its defense of race-

based college admission policies, its advocacy on behalf of "illegal aliens," and its involvement in litigation related to "American elections." Order §1.

134.    The accompanying Fact Sheet also expressly acknowledges that the Order is designed to punish WilmerHale for representing clients in litigation—in other words, for engaging in First Amendment activity.

135.    Other statements by the President reinforce that naked retaliatory motive. As discussed, then-candidate Trump stated during the 2024 presidential campaign that he intended to "go after" not only his political opponents but also "Lawyers" associated with them. *Supra* ¶94. And, after winning the election, he reiterated his intent to "go[] after" "a lot of law firms," based on his belief that they employ "dishonest people." *Supra* ¶94. The Order's timing—issuing just a month after WilmerHale filed a high-profile pro bono suit against the Administration on behalf of eight inspectors general, and hours after a public hearing during which the trial court lauded WilmerHale for bringing that litigation and doing so pro bono—also corroborates its retaliatory motivation. The President singled out WilmerHale because he views some of the lawsuits it has handled as "harmful," Order §1, and he wishes to discourage other law firms from taking on similar lawsuits in the future.

136.    The President's withdrawal of the Paul Weiss Order also underscores the retaliatory motive of his orders targeting law firms. The President removed the retaliatory sanctions against Paul Weiss only after the firm (1) "acknowledged the [purported] wrongdoing of its former partner Mark Pomerantz," who participated in a successful criminal prosecution of President Trump; (2) jettisoned certain "'diversity, equity, and inclusion' policies" that the President disfavors; and (3) committed to taking on pro bono clients and causes that support the Administration's initiatives. Rescission EO §1; *see* Paul Weiss Agreement ¶¶2-5. The rescission order thus confirms that the

Paul Weiss Order was intended to punish Paul Weiss for previous exercises of First Amendment rights with a compelled mea culpa (itself a First Amendment violation) the only available route to recission.  The Order targeting WilmerHale shares the same structure and retaliatory purpose.

137.    It is equally plain that the Order "constitutes a sufficiently adverse action" against WilmerHale "to give rise to an actionable First Amendment claim," *Wilson*, 595 U.S. at 477.  Each of the Order's directives impedes the ability of WilmerHale's lawyers to practice their professions, disrupts the Firm's relations with clients, and damages the Firm's business prospects.

138.    For example, restricting WilmerHale attorneys' access to federal buildings (such as courthouses) and ability to engage with government officials (such as advocacy on behalf of clients in investigations and regulatory matters) profoundly undercuts their ability to provide effective advocacy.  Order §5(a).

139.    Moreover, multiple WilmerHale attorneys hold security clearances that permit them to access classified information.  The suspension and threatened revocation of security clearances held by individuals at WilmerHale in retaliation for protected speech, *id.* §2(a), impedes WilmerHale's ability to serve clients in cases involving sensitive government information.

140.    Threatening targeted investigations by the EEOC and Attorney General, with potential prosecution, *id.* §4; Fact Sheet, damages WilmerHale's reputation, with follow-on harm to client relationships and the Firm's business prospects.

141.    Forcing government contractors to disclose their business with WilmerHale and threatening to reassess those clients' government contracts, even if unrelated to business with WilmerHale, Order §3, damages WilmerHale's relations with existing clients and its ability to attract future ones.  Those provisions are calculated to try to force those clients to stop doing business with the Firm.  And as the Supreme Court unanimously held last year, "a government

entity's 'threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment." *Vullo*, 602 U.S. at 180).

142.    These draconian punishments easily meet the standard for "adverse action" because they "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," *Connelly v. County of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023)—i.e., they would deter lawyers from representing the President's political opponents or advancing positions that are adverse to his interests.  Indeed, that is their whole point.

143.    Neither a general statement purporting to require nominal adherence to the law nor a directive to an agency official to exercise judgment or make some factual finding is sufficient to avoid judicial review or to undermine the Order's clear purpose and effect.

144.    Defendants' First Amendment violations have caused WilmerHale ongoing and irreparable harm.

### Count II
(Against All Defendants)
### Violation Of The First Amendment - Viewpoint Discrimination

145.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

146.    The Order violates another core First Amendment principle: the prohibition on viewpoint discrimination.  The Supreme Court has long held that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995).  While "[a] government official can share her views freely and criticize particular beliefs," the First Amendment forbids "us[ing] the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188.  Viewpoint-based sanctions constitute a "blatant and egregious form of content discrimination" that is anathema to the First Amendment. *Reed v.*

*Town of Gilbert*, 576 U.S. 155, 168-71 (2015) (quotation marks omitted) (quoting *Rosenberger*, 515 U.S. at 829).

147.    The Order attributes to WilmerHale certain viewpoints and then punishes the Firm and all its employees and clients because the President disagrees with those viewpoints.  For example, the Order targets WilmerHale for using "its pro bono practice to engage in activities that"—in the President's view—"undermine justice and the interests of the United States."  Order §1.  The Order criticizes WilmerHale's pro bono work as "partisan" and "political," specifically criticizing its defense of race-based college admission policies ("efforts to discriminate on the basis of race"), its alleged "obstruction" of the Administration's immigration-enforcement policies, and its involvement in litigation regarding "American elections," which the Order derides— inaccurately—as "efforts designed to enable noncitizens to vote."  *Id.*  The Order characterizes all these representations as "harmful" and asserts that they "undermine justice and the interests of the United States."  *Id.*  In short, the Order punishes the Firm for advancing arguments with which the President disagrees.  This viewpoint discrimination is particularly evident with respect to the Order's direction that WilmerHale be prioritized for investigation of recruiting and advancement policies that the Perkins Order itself describes as widely shared among large law firms.  *See id.* §1; Perkins Order §4.  The only basis for prioritizing investigation of WilmerHale vis-à-vis other firms with materially analogous policies is the viewpoint that the Order attributes to WilmerHale's representations.

148.    The Order also targets WilmerHale based on the speech and viewpoints of a former partner, Robert Mueller, and on WilmerHale's own characterization of Mr. Mueller's public service.  President Trump has repeatedly expressed the view that Mr. Mueller's investigation into whether the 2016 Trump campaign colluded with Russia was a "witch hunt"—arguing that the

Special Counsel "should never have been appointed and there should be no Mueller Report."[35] The Order likewise asserts that "[Mr.] Mueller's investigation epitomizes the weaponization of government," and specifically criticizes WilmerHale for "welcoming" Mr. Mueller, Mr. Zebley, and Mr. Quarles "to the [F]irm" while "claim[ing]" that Mr. Mueller "'embodies the highest value of our firm and profession.'"  Order §1.  While the President is free to disagree with that assessment, pointing to it as the basis for multiple adverse government actions is undisguised viewpoint discrimination.

149.    The President's decision to rescind the Paul Weiss Order after Paul Weiss agreed to criticize Mark Pomerantz, eliminate its DEI policies, and undertake pro bono representations that support the Administration's initiatives underscores that the President is using the power of his office to suppress law firms' and lawyers' protected expression and induce them to align with his political views.  The First Amendment prohibits such coercion.

150.    While the President may disagree with some of the viewpoints that he attributes to WilmerHale and/or its clients, the First Amendment does not allow him to punish the Firm based on those viewpoints.  Similarly, while the President may disagree with Mr. Mueller's decision to serve in the Justice Department as Special Counsel—at the request of the Deputy Attorney General President Trump himself appointed—and the viewpoints expressed in his report and related public statements, and with the Firm's decision to welcome him back after his service, the President may not penalize Mr. Mueller's former law firm based on a perceived association with those viewpoints.

151.    Nor can the President constitutionally punish WilmerHale attorneys' expressive decisions to represent certain clients or causes and not others, *see infra* ¶¶168-69—even if he

---

[35] *See, e.g.*, Rebecca Morin, *Trump Says 'There Should Be No Mueller Report'*, Politico (Mar. 15, 2019), https://tinyurl.com/yc77yfkc.

deems certain lawsuits to be "harmful" or "detrimental to critical American interests."  Order §1. Government action "cannot be aimed at the suppression of ideas thought inimical to the Government's own interest," whether those ideas are expressed in the town square or propounded by "litigants and their attorneys."  *Velazquez*, 531 U.S. at 548-49.

152.    Defendants' First Amendment violations have caused WilmerHale ongoing and irreparable harm.

**Count III**
(Against All Defendants)
**Violation Of The First Amendment - Right To Petition The Government**

153.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

154.    The Order violates the First Amendment right "to petition the Government for a redress of grievances," U.S. Const. amend. I.  The Supreme Court has held that "the right to petition extends to all departments of the Government," including "administrative agencies" and "courts." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  Accordingly, the Court has treated "a lawsuit" as a form of "petition" within the meaning of the Petition Clause.  *Borough of Duryea*, 564 U.S. at 390; *see id.* at 387 (collecting "precedents confirm[ing] that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes").

155.    The Order violates the Petition Clause in multiple ways.  First, the Supreme Court has long accepted "the proposition that when a person petitions the government for redress"—e.g., by filing a lawsuit—"the First Amendment prohibits any sanction on that action … so long as the petition was in good faith."  *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009) (discussing the *Noerr-Pennington* doctrine).  The Order violates this doctrine by sanctioning WilmerHale attorneys for bringing good-faith—and in many cases, successful—claims on behalf

39
**JA 2312**

of their clients.  Simply put, the Petition Clause does not allow the President to punish WilmerHale or its clients for "filing lawsuits against the Trump Administration."  *Cf.* Perkins Coie Fact Sheet.

156.    Second, the Order's directive to federal agencies to prohibit their employees from engaging with WilmerHale precludes the Firm from petitioning the government on its or its clients' behalf.  The Order prohibits WilmerHale's employees from—in many cases—meeting or even speaking with the very government officials who could hear such a petition (e.g., administrative law judges, prosecutors, and regulators).

157.    Third, the directive to exclude WilmerHale from all federal government buildings prevents the Firm's employees from accessing buildings that house federal judicial and administrative proceedings.  The Order also arbitrarily withdraws WilmerHale attorneys' access to the sensitive information they need to represent existing clients in ongoing proceedings involving classified subject matter.

158.    WilmerHale has standing to assert this First Amendment claim both on its own behalf and on behalf of its existing clients based on attorney-client relationships.  *See Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004).

159.    Defendants' First Amendment violations have caused WilmerHale and its clients ongoing and irreparable harm.

### Count IV
(Against All Defendants)
### Violation Of The First Amendment - Free Association

160.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

161.    The Order's requirement that government contractors "disclose any business they do with WilmerHale" violates WilmerHale's clients' freedom of association under the First Amendment.  "[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as other forms of governmental action."

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (alterations omitted) (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)).

162.    The Order subjects WilmerHale clients who have government contracts to risks of economic reprisal and other forms of governmental hostility simply because they have chosen to retain and associate with WilmerHale.  The Order is a thinly veiled threat to government contractors who have associated themselves with WilmerHale that they are at risk of losing those contracts as a result of that association.  The Order provides that "[w]ithin 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order."  This is a naked secondary boycott of government contractors who do business with WilmerHale.  On any reasonable understanding of the Order, any government contractor who has associated with WilmerHale can expect economic consequences and other repercussions in short order.

163.    Indeed, the Fact Sheet admits as much.  It expressly states that "the Federal Government will terminate contracts that involve WilmerHale" in a purported effort to "ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests."  The unambiguous goal of the disclosure demand is thus to chill clients' First Amendment choice to retain and associate with WilmerHale.

164.    The lone governmental interest underlying the Order—trying to impede the ability of law firms to represent clients in matters that the President does not like—is not even legitimate, let alone a "sufficiently important" interest to satisfy exacting scrutiny.  *See Ams. for Prosperity*, 594 U.S. at 607.

165.   Nor is the Order narrowly tailored to that (illegitimate) interest.  "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'because First Amendment freedoms need breathing space to survive.'"  *Id*. at 609 (alterations omitted) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).  Forced disclosure of "any business [clients] do with WilmerHale," Order §3(a), even if unrelated to any government contract or any litigation with which the President takes issue, is not narrowly tailored to any professed interest in avoiding subsidizing particular litigation.  *See also USAID v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013).  Nor is forced disclosure of "whether that business is related to *the subject of* the Government contract."  Order §3(a) (emphasis added).  Those disclosures are simply designed to leverage the government's control over federal funding to punish WilmerHale.  But "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors."  *Vullo*, 602 U.S. at 180.

166.   A facial challenge to the Order is appropriate because a substantial number of its applications are unconstitutional.  Indeed, all of them are.  The Order's lack of tailoring to any government interest is categorical—that is, present in every case—as is the illegitimacy of the government interest.  Every forced disclosure that might chill association therefore fails exacting scrutiny.

167.   WilmerHale has both direct standing to challenge a secondary boycott targeted at it and third-party standing to bring this First Amendment claim on behalf of its existing clients based on attorney-client relationships.  *See Kowalski*, 543 U.S. at 130-31.  Clients are hindered from bringing claims themselves because, to do so, they would have to disclose their business with WilmerHale—the precise First Amendment harm that WilmerHale seeks to prevent.  Moreover,

the existence of that attorney-client relationship is protected by attorney-client privilege.  The Order cites no authority that would justify requiring such sweeping disclosures.

168.   Furthermore, the First Amendment protects WilmerHale attorneys' expressive choices about which clients and causes they choose to represent.  The Supreme Court has held that "the First Amendment offers protection when an entity engag[es] in expressive activity, including compiling and curating others' speech."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). That principle applies not only to newspapers, bookstores, and social media companies, but also to attorneys' decisions about which clients to associate with—particularly when it comes to pro bono matters.  WilmerHale attorneys have a First Amendment right to take on pro bono clients such as the eight inspectors general challenging to their recent termination by the President, the jurisdictions (i.e., "sanctuary cities") that challenged the Administration's immigration-related policies during the President's first term, and the United Farm Workers that resisted a Department of Labor rule that would have depressed migrant farmworkers' wages.

169.   To be sure, WilmerHale attorneys have diverse views—political and otherwise— that inform their decisions about what matters to pursue.  "But a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech."  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569-70 (1995).  Simply put, the Order restricts WilmerHale attorneys' constitutionally protected "'discretion in the selection and presentation' of content"—i.e., the cases on which they choose to work, and particularly those they agree to handle pro bono—which itself is a form of "'speech activity.'"  *NetChoice*, 603 U.S. at 731.  The government cannot punish WilmerHale for its attorneys' expressive choices about which clients to represent.

170.    Neither a general statement purporting to require nominal adherence to the law nor a directive to an agency official to exercise judgment is sufficient to avoid judicial review.

171.    Defendants' First Amendment violations have caused WilmerHale and its clients ongoing and irreparable harm.

### Count V
(Against All Defendants)
*Ultra Vires* **Presidential Action - Separation Of Powers**

172.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

173.    In addition to violating the First Amendment in myriad ways, the Order exceeds the President's authority and interferes with federal courts' exercise of "[t]he judicial Power," U.S. Const. art. III, §1.

174.    It is "black letter law" that the President's power to issue an executive order "'must stem either from an act of Congress or from the Constitution itself.'"  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999); *accord Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

175.    The Order identifies no statutory authority that empowers the President to sanction a law firm for representing his political opponents or handling lawsuits that he perceives to be contrary to his interests or those of the United States.[36]  That is unsurprising; no statute confers such authority, and any statute that purported to do so would raise grave constitutional concerns. *See Youngstown*, 343 U.S. at 588 ("The President's order does not direct that a congressional policy

---

[36] To the contrary, the Order's restrictions on hiring WilmerHale employees squarely conflict with a statutory prohibition on "discriminat[ing] for or against" any "applicant for [federal] employment" based on factors—including "political affiliation"—that are not related to the applicant's ability to do the job.  5 U.S.C. §2302(b)(1)(E), (2), (3), (10), (12).

be executed in a manner prescribed by Congress—it [improperly] directs that a *presidential policy* be executed in a manner prescribed by the President." (emphasis added)).

176.    The Order finds no support in the President's inherent Article II powers either. There is no "executive practice, long pursued to the knowledge of the Congress and never before questioned," of Presidents using the office to punish law firms for taking on representations or to try to deter law firms from doing so. *See Youngstown*, 343 U.S. at 610 (Frankfurter, J., concurring); *accord United States v. Midwest Oil Co.*, 236 U.S. 459, 473-74 (1915).  No other President has even tried to claim such a power.

177.    Nor could Article II reserve any such power to the President, as to do so would empower the President to interfere with "the proper exercise of the judicial power." *Velazquez*, 531 U.S. at 545.  In our adversarial system of litigation, "courts must depend" on attorneys to "present all the reasonable and well-grounded arguments necessary for proper resolution of [a] case."  *Id.*  The separation of powers thus precludes either Congress or the Executive from attempting to "exclude from litigation those arguments and theories [it] finds unacceptable but which by their nature are within the province of the courts to consider." *Id.* at 546.  And while the legislature has authority to create or eliminate causes of action and to enact rules of professional conduct, courts have "inherent power[]" to determine whether an attorney (or a litigant) has "abuse[d] the judicial process" and "to fashion an appropriate sanction." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)).

178.    The Order flouts these "accepted separation-of-powers principles," "threaten[ing] severe impairment of the judicial function." *Velazquez*, 531 U.S. at 544-46.  The imposition of draconian consequences on law firms that challenge Executive action cannot help but make other

law firms think twice about doing so. That prospect undermines the rule of law, and its victims include the courts that will receive less zealous advocacy from lawyers who pull their punches for fear of retribution. The Order thus threatens the "informed, independent" adversarial presentation on which an "informed, independent judiciary" depends. *Id.* at 545.

179. To make matters worse, the Order attempts to sanction WilmerHale for its legal advocacy without providing the notice, opportunity to be heard, or proper adjudicative fact-finding that is a prerequisite to such sanctions. *See infra* ¶¶192-97.

180. To the extent the Executive Branch believes that a private law firm has engaged in improper legal advocacy in a particular case, it may appeal to the judiciary to make appropriate findings and fashion an appropriate sanction. *See Goodyear*, 581 U.S. at 107. Even as to matters already fully litigated, Rule 60 and courts' inherent powers allow aggrieved parties to alert a court to fraud and other serious misconduct. But the Executive Branch cannot simply take it upon itself to declare filings directed toward a coordinate branch of government to be so far beyond the pale as to warrant sanction. As the Supreme Court recently reiterated, the Constitution forbids "concentrat[ion] [of] the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024); *see also* Antonin Scalia, *The Essential Scalia: On the Constitution, the Courts, and the Rule of Law* 41 (J. Sutton & E. Whelan, eds., 2020) (when a constitution does "not prevent the centralization of power in one person…, the game is over"). Yet that is precisely what the Order endeavors to accomplish.

181. On top of that, the Order—which effectively functions as a "prepared and proclaimed governmental blacklist[]"—"possess[es] almost every quality of [an unlawful] bill[] of attainder." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring). It punishes WilmerHale—and only WilmerHale—"without any formal

investigation, trial, or even informal process." *See Perkins* Tr. at 89:10-22. From the Founding, such measures have been "forbidden to both national and state governments." *McGrath*, 341 U.S. at 144 (Black, J., concurring). It cannot be "that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution." *Id.*

182. The *ultra vires* nature of the Order has already harmed and continues to irreparably harm WilmerHale.

### Count VI
(Against All Defendants)
### Violation Of The Fifth Amendment - Due Process Clause (Procedural Due Process)

183. The paragraphs above are incorporated and reasserted as if fully set forth herein.

184. The Fifth Amendment's Due Process Clause guarantees that "[n]o person shall … be deprived of life, liberty, or property, without due process of law." And the Supreme Court has held that when courts impose civil sanctions for "'abuse[ of] the judicial process,'" they "must be compensatory rather than punitive in nature." *Goodyear*, 581 U.S. at 107-08. Before a court may impose a "punishment for [a] sanctioned party's misbehavior," it must "provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof" and a jury trial. *Id.* at 108. The Order flouts these established constitutional principles by imposing draconian punishments on WilmerHale without *any* meaningful process.

185. The Order deprives WilmerHale and its employees of protected liberty and property interests. Specifically, the Order interferes with the rights of WilmerHale and its attorneys to follow their chosen profession by interfering with its attorneys' ability to practice law, including representing clients in court and before government agencies.

186. WilmerHale represents clients in litigation in federal courts and in regulatory and other matters before federal agencies. WilmerHale lawyers must be able to enter federal

47
**JA 2320**

government buildings and engage with federal government employees to be able to represent those clients effectively.

187.   The Order similarly deprives WilmerHale non-lawyer employees of their protected liberty interests.  The Order targets all WilmerHale "employees," meaning that all WilmerHale support professionals—paralegals, mailroom staff, information technology specialists, paralegals, human resources workers, and janitorial staff—are now suffering the reputational and practical consequences of being barred from government buildings and government employment (potentially even for matters unrelated to the employment at WilmerHale).  As the district court explained in enjoining the Perkins Order, "every person working at [this firm] … face[s] extra hurdles if they should seek a job at the federal government, even if they aspire to public service, even if they want to help the President in achieving his political agenda." *Perkins* Tr. at 81:6-13.

188.   The Order also harms WilmerHale's constitutionally protected property interests by seeking to terminate private contractual relationships between WilmerHale and its clients.  The Order further impairs WilmerHale's constitutionally protected property interests by prohibiting the Firm from participating in federal contracting.  And the Order harms WilmerHale's cognizable interest in its reputation because it stigmatizes the Firm as a "rogue law firm[]" that "engage[s] in conduct detrimental to critical American interests."  Order §1; Fact Sheet.  Finally, the Order deprives WilmerHale of its protected liberty interest in its First Amendment right to petition the government because it restricts access to government buildings and government personnel.

189.   WilmerHale received no notice whatsoever before the Order issued.  Among other things, Defendants did not provide WilmerHale with the purported factual findings or sanctions, much less provide an opportunity to challenge them, before the Order issued.  And since the Order issued, WilmerHale has not been given any opportunity to be heard or to otherwise challenge it.

190.    No compelling interest justifies this violation of WilmerHale's due process rights. The Order was adopted for illegitimate and retaliatory reasons that could not justify the deprivation of *any aspect* of due process, let alone justify the deprivation of any due process *at all*.

191.    Defendants' violations of due process have caused WilmerHale ongoing and irreparable harm.

**<u>Count VII</u>**
(Against All Defendants)
**<u>Violation Of The Fifth Amendment - Due Process Clause (Void For Vagueness)</u>**

192.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

193.    A government enactment, including an executive order, is unconstitutionally vague, and thus violates the Due Process Clause, if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

194.    The Order is unconstitutionally vague because it does not give WilmerHale fair notice of what is prohibited and how the Firm can avoid sanctions in the future. To the contrary, the Order appears deliberately crafted to deter future speech and legal advocacy by forcing both WilmerHale and its clients "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

195.    While the Order leaves no doubt that WilmerHale is being punished because it has represented some of the President's political opponents and advanced positions with which he disagrees, the Order does not specify what aspect of WilmerHale's conduct triggered its massive sanctions. It instead vaguely accuses the Firm of "tak[ing] actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, [and] undermine bedrock American principles"; "earmarking hundreds of millions of their clients'

dollars for destructive causes"; and "abus[ing] its pro bono practice to engage in activities that undermine justice and the interests of the United States."  Order §1.

196.    Moreover, the Order is so standardless that it authorizes and encourages discriminatory enforcement.  For example, it does not articulate any clear standard by which agencies are to limit WilmerHale's official access to federal government buildings and federal employees.  The Order states only that access to buildings should be limited when it "would threaten the national security of or otherwise be inconsistent with the interests of the United States," and that government employees acting in their official capacity should not "engag[e]" with WilmerHale employees when doing so would be inconsistent with the national security "and other interests of the United States."  *Id.* §5(a).  These standards are unclear to such a degree that they authorize and encourage discriminatory enforcement between and within agencies.  And they leave WilmerHale employees with no notice of what conduct would prevent their access to federal government buildings and what, if anything, they could do to ensure access.  Similarly, the order provides no clear notice about what kind of "engag[ement]" with federal employees is prohibited and what, if anything, they could do to enable such engagement.

197.    Defendants' violations of due process have caused WilmerHale to suffer ongoing and irreparable harm.

**Count VIII**
(Against All Defendants)
**Violation Of The Fifth Amendment - Equal Protection**

198.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

199.    The Equal Protection Clause of the Fourteenth Amendment, as incorporated against the federal government through the Fifth Amendment, protects all individuals and entities from unjust discrimination by the federal government.  Though the Fifth Amendment "does not contain an equal protection clause," it is well established that discrimination by the federal government

50
**JA 2323**

that would run afoul of the Equal Protection Clause if undertaken by a State is "violative of due process." *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

200.    The government violates equal protection when, as here, it singles out similarly situated entities for adverse treatment without a constitutionally legitimate justification. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

201.    In cases where it does treat similarly situated individuals or entities differently, therefore, the government must articulate a legitimate interest for doing so.  Such justification cannot be arbitrary, irrational, or pretextual—that is, it cannot serve only to mask the government's true, illegitimate motive for singling out the entity.  A desire to single out that group will not suffice. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985).

202.    The Order cannot be squared with those equal-protection principles.  The Order's very purpose is to discriminate against WilmerHale and WilmerHale alone.  It imposes on the Firm extraordinary and punitive measures that it does not apply to many similarly situated firms or lawyers, even when the Order itself complains that certain practices are widespread among large law firms.  This singling out alone demonstrates that the Order was motivated by a bare intent to punish WilmerHale.

203.    Although the Order's discriminatory intent is evident on its face, it is reinforced by public statements made by President Trump that reflect his deep-seated animus toward WilmerHale and his desire to seek retribution against its lawyers for their constitutionally protected advocacy.

204.    No credible or rational justification exists for singling out WilmerHale.  The Order's stated reasons are arbitrary, irrational, and do not even try to conceal its true motive:

punishing WilmerHale for engaging in constitutionally protected speech and legal advocacy that President Trump does not like.

205. Defendants' violations of equal protection have caused WilmerHale to suffer ongoing and irreparable harm.

## Count IX
### (Against All Defendants)
### Violation Of The Fifth Amendment - Right To Counsel

206. Plaintiff repeats and realleges the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

207. The Fifth Amendment protects both lawyers' and clients' due-process rights in establishing and maintaining attorney-client relationships, including the client's right to choose counsel and the lawyer's corresponding right to maintain that representation free from arbitrary or unjustified governmental interference. *See DOL v. Triplett*, 494 U.S. 715, 721 (1990).

208. The Order's stated reasons for interfering with these relationships—to punish the Firm for its First Amendment activity—are not rationally related to any legitimate government interest. Its restrictions therefore infringe the rights of lawyers and clients under the Fifth Amendment.

209. Defendants' violations of the right to counsel have caused WilmerHale and its clients ongoing and irreparable harm.

## Count X
### (Against All Defendants)
### Violation Of The Sixth Amendment - Right To Counsel

210. The paragraphs above are incorporated and reasserted as if fully set forth herein.

211. The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Actions that interfere with "the right to select and be

represented by one's preferred attorney," *Wheat v. United States*, 486 U.S. 153, 159 (1988), violate the Sixth Amendment by denying defendants "a fair opportunity to secure counsel of his own choice," *Luis v. United States*, 578 U.S. 5, 11 (2016) (plurality).

212.    In light of the "special" relationship between an attorney and his or her client, attorneys have third-party standing to contest government actions that impair their clients' abilities to exercise their constitutional rights, *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989), including the "right to obtain legal representation" of one's choice, *Triplett*, 494 U.S. at 720. WilmerHale thus has standing to challenge the Order's unconstitutional interference with the right to counsel of the criminal defendants it represents in proceedings against the government.

213.    The Order directly infringes the Sixth Amendment right to counsel of those clients by instructing all federal-agency leaders to limit government employees from engaging with WilmerHale personnel. This prohibition eviscerates the Firm's ability to provide effective representation and advocacy for its clients in proceedings against the government.

214.    The Order further violates these clients' Sixth Amendment right to counsel by mandating that agency leaders restrict WilmerHale lawyers' access to all government buildings. This limitation severely impedes the Firm's ability to effectively advocate for its clients in government forums, hearings, and proceedings.

215.    The Order contravenes these clients' Sixth Amendment right to counsel by compelling government contractors to publicly disclose their business relationships with WilmerHale. This command coerces clients to choose between retaining their government contracts—and, in many cases, their economic survival—and exercising their constitutional right to select counsel of their choice.

216.    The restrictions collectively represent unlawful governmental interference with the attorney-client relationship, constituting clear and substantial violations of the Sixth Amendment.

217.    Defendants' violations of the right to counsel have caused WilmerHale and its clients ongoing and irreparable harm.

**Count XI**
(Against All Defendants)
**Violation Of The Spending Power (U.S. Const. Art. I, §8) -
Unconstitutional Conditions On Government Contracts**

218.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

219.    When the government funds an activity pursuant to the spending power (art. I, §8), it is not permitted "to leverage funding to regulate speech outside the contours of the federal program itself." *USAID*, 570 U.S. at 214-15.  And while the government may require certain restrictions on the freedom of government contractors as part of the deal, the government may not terminate contracts because of the contractor's protected expression "on matters of public concern," *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996), or deny or terminate a government contract on a basis that infringes the contractor's constitutional rights, *id.* at 674.

220.    In light of the "special" relationship between an attorney and his or her client, attorneys have third-party standing to contest government actions that impair their clients' abilities to exercise their constitutional rights—including the "right to obtain legal representation" of ones' choice. *Triplett*, 494 U.S. at 720; *see Caplin & Drysdale*, 491 U.S. at 623 n.3.  WilmerHale thus has standing to challenge the Order's unconstitutional interference with its clients' rights not to be subject to unconstitutional conditions on federal government contracts.

221.    The attorney-client relationship between WilmerHale and its clients is not relevant to any of those clients' suitability as a federal contractor.  This is particularly true when WilmerHale's representation of the client is substantively unrelated to any federal contract.

54
**JA 2327**

222.    Aside from the leverage provided by the federal contracting process, neither Congress nor the President is authorized by the Constitution to require any person to disclose its retention of WilmerHale attorneys or to prohibit any person or entity from engaging WilmerHale lawyers to provide legal representation.

223.    The Order's directive that federal agencies require contractors to disclose whether they have any attorney-client relationship with WilmerHale is irrelevant to the merits of any federal contracting decision and violates the First Amendment right to freedom of association of any WilmerHale client subject to that compelled disclosure requirement.   And by attempting to withhold or terminate federal contracts to try to force clients to abandon WilmerHale, and thus limit the Firm's financial resources to represent clients in supposedly "harmful" litigation, including through its "pro bono practice[]," Order §1, the directive violates the Firm's First Amendment rights as well.

224.    By threatening to terminate any federal government contract held by any WilmerHale client who refuses to end its attorney-client relationship with WilmerHale, the Order has the effect of making it a *de facto* condition of all federal government contracts that the contractor is prohibited from retaining any WilmerHale lawyer to represent it for any purpose. This *de facto* condition is an unlawful governmental interference with the attorney-client relationship, constituting clear and substantial violations of the First, Fifth and Sixth Amendments.

225.    The Order thus imposes unconstitutional conditions on federal contracts.

226.    Defendants' attempts to impose unconstitutional conditions on federal contracts have caused and will continue to cause ongoing and irreparable harm to WilmerHale and its clients.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court declare that the Order is unconstitutional and award any other relief the Court deems necessary and just, including using its equitable powers to enter interim, preliminary, and permanent orders providing that:

A.    Defendants are enjoined from implementing or giving effect to the Order in any way, including by relying on any of the statements in §1;

B.    Defendants are directed to rescind any and all guidance or direction that has already issued that relates to implementing or enforcing the Order;

C.    Defendants are directed to immediately issue guidance to their officers, staff, employees, and contractors to disregard the Order and carry on with their ordinary course of business as if the Order had never issued;

D.    Defendants U.S. Department of Justice; Pamela Bondi, in her official capacity as U.S. Attorney General; the Office of Management and Budget; and Russell Vought, in his official capacity as Director of the Office of Management and Budget, are directed to immediately issue guidance to all other agencies subject to the Order to suspend and rescind any implementation or enforcement; and

E.    Defendants are directed to take, in good faith, any other steps that are necessary to prevent the implementation or enforcement of the Order.

**JA 2329**

March 28, 2025

Respectfully submitted,

s/Paul D. Clement
_____
PAUL D. CLEMENT (D.C. Bar. No. 433215)
ERIN E. MURPHY (D.C. Bar No. 995953)
JOSEPH J. DEMOTT (Virginia Bar No. 93981,
    D.D.C. Bar ID #D00561)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Attorneys for Plaintiff Wilmer Cutler
Pickering Hale and Dorr LLP*

# EXHIBIT A

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

ADDRESSING RISKS FROM WILMERHALE

Executive Orders

March 27, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Background.  My Administration is committed to addressing the significant risks associated with law firms, particularly so-called "Big Law" firms, that engage in conduct detrimental to critical American interests.  Many firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles.  Moreover, law firms regularly conduct this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients.  Lawyers and law firms that engage in such egregious conduct should not have access to our Nation's secrets, nor should such conduct be subsidized by Federal taxpayer funds or contracts.

Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) is yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States.  For example, WilmerHale engages in obvious partisan representations to achieve political ends, supports efforts to discriminate on the basis of race, backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and furthers the degradation of the quality of American elections, including

JA 2332

by supporting efforts designed to enable noncitizens to vote.  Moreover, WilmerHale itself discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based "targets." WilmerHale is also bent on employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice.  For example, WilmerHale rewarded Robert Mueller and his colleagues — Aaron Zebley, Mueller's "top aide" and "closest associate," and James Quarles — by welcoming them to the firm after they wielded the power of the Federal Government to lead one of the most partisan investigations in American history.  Mueller's investigation epitomizes the weaponization of government, yet WilmerHale claimed he "embodies the highest value of our firm and profession." Mueller's "investigation" upended the lives of public servants in my Administration who were summoned before "prosecutors" with the effect of interfering in their ability to fulfill the mandates of my first term agenda.  This weaponization of the justice system must not be rewarded, let alone condoned.

Sec. 2.  Security Clearance Review.  (a)  The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest.
(b)  The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of WilmerHale.  The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3.  Contracting.  (a)  To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract.
(b)  The heads of agencies shall review all contracts with WilmerHale or with entities that disclose doing business with WilmerHale under subsection (a) of this section.  To the

JA 2333

extent permitted by law, the heads of agencies shall:

(i)  take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which WilmerHale has been hired to perform any service; and

(ii)  otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate.  Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4.  Racial Discrimination.  Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. 5.  Personnel.  (a)  The heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of WilmerHale when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States.  In addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States.

(b)  Agency officials shall, to the extent permitted by law, refrain from hiring employees of WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

 Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

JA 2334

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
   March 27, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP

JA 2335

# EXHIBIT B

JA 2336

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale

The White House

March 27, 2025

**SUSPENDING SECURITY CLEARANCES TO PROTECT THE NATIONAL INTEREST:**
Today, President Donald J. Trump signed an Executive Order to suspend security clearances held by individuals at Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) pending a review of whether such clearances are consistent with the national interest.

- Security clearances held by WilmerHale employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest.
  - The Federal Government will halt all material and services, including sensitive compartmented information facility (SCIF) access provided to WilmerHale and restrict its employees' access to government buildings.
  - Federal Agencies will also refrain from hiring WilmerHale employees unless specifically authorized.

- To ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests, the Federal Government will terminate contracts that involve WilmerHale.

- The practices of WilmerHale will be reviewed under Title VII to ensure compliance with civil rights laws against racial bias.

**ADDRESSING ROGUE LAW FIRMS:** President Trump believes that lawyers and law firms that engage in conduct detrimental to critical American interests should not be subsidized by American taxpayers or have access to our Nation's secrets.

- WilmerHale has abandoned the legal profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of

JA 2337

the United States.

- WilmerHale pursues partisan goals, supports efforts to discriminate on the basis of race, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders.

- WilmerHale has furthered the degradation of the quality of American elections by supporting efforts designed to enable noncitizens to vote.

- WilmerHale has been accused of discriminating against its own employees on the basis of race and other categories prohibited by civil rights laws, including through the use of race-based "targets."

- WilmerHale rewarded Robert Mueller and two of his colleagues by welcoming them to the firm after they wielded the power of the Federal government to lead a partisan "investigation" against the President and others.   Mueller's investigation epitomizes the weaponization of government.

**A RETURN TO ACCOUNTABILITY:** President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence.

- In addition to WilmerHale, President Trump has also taken action to hold other major law firms accountable.

- This Executive Order aligns with President Trump's priority on refocusing government operations to serve the citizens of the United States.

- It builds on President Trump's previous actions, such as signing an Executive Order on his first day in office to end the weaponization of the Federal government and ensure accountability for past misconduct.

- It follows his revocation of security clearances held by intelligence officials who falsely claimed Hunter Biden's laptop was Russian disinformation during the 2020 election.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP,<br><br>*Plaintiff,*<br><br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF VETERANS AFFAIRS, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, CENTRAL INTELLIGENCE AGENCY, ENVIRONMENTAL PROTECTION AGENCY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF STATE, DEPARTMENT OF ENERGY, DEPARTMENT OF THE TREASURY, DEPARTMENT OF LABOR, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, SMALL BUSINESS ADMINISTRATION, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF TRANSPORTATION, SECURITIES AND EXCHANGE COMMISSION, FEDERAL TRADE COMMISSION, UNITED STATES PATENT AND TRADEMARK OFFICE, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE UNITED STATES OF AMERICA, *and, in their official capacities*, PAMELA J. BONDI, PETE HEGSETH, ROBERT F. KENNEDY, JR., LINDA M. MCMAHON, DOUGLAS A. COLLINS, RUSSELL T. VOUGHT, TULSI GABBARD, JOHN L. RATCLIFFE, LEE M. ZELDIN, KRISTI NOEM, MARCO RUBIO, CHRIS WRIGHT, SCOTT BESSENT, LORI CHAVEZ-DEREMER, BROOKE L. ROLLINS, HOWARD LUTNICK, SCOTT TURNER, KELLY LOEFFLER, JAMIESON GREER, DOUG BURGUM, SEAN DUFFY, MARK T. UYEDA, ANDREW N. FERGUSON, COKE MORGAN STEWART, ANDREA R. LUCAS,<br><br>*Defendants.* | Civil Case No. _____ |

**DECLARATION OF BRUCE M. BERMAN IN SUPPORT OF
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

I, Bruce M. Berman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am one of two General Counsel of Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale" or "the Firm"). I submit this Declaration in support of the Motion to which this Declaration is attached. I am of the age of majority and competent to make this declaration.

2.      I joined one of the Firm's predecessors, Wilmer Cutler & Pickering LLP, as an associate in 1980 and have worked at Wilmer Cutler & Pickering (which later became Wilmer Cutler Pickering LLP) and WilmerHale ever since, nearly 45 years. I became a partner on January 1, 1987, and have served as General Counsel since 2009. During my time at WilmerHale, I have served on numerous firm committees, including the Compensation Committee and the Nominating Committee (which nominates candidates to serve on the Management Committee and as Managing Partner). I also headed the Firm's Higher Education practice for more than a decade. I am a member in good standing of the District of Columbia bar and a registered foreign lawyer in England and Wales. I previously served on the American Bar Association Litigation Section's Federal Practice Task Force.

3.      As General Counsel, I am familiar with the Firm's business and operations and have been involved in the Firm's efforts to prepare for, assess, and address the March 27, 2025 Executive Order targeting WilmerHale. The facts set forth in this declaration are based on my personal knowledge of the Firm's history and operations or business records with which I am familiar.

4.      As General Counsel, I provide advice and counsel to WilmerHale management, partners, counsel, and associates, and I represent the Firm in professional responsibility and legal ethics matters and in other legal matters. I am also involved in decisions about the Firm's client

2

**JA 2340**

relationships and the matters it takes on. And I help assess potential conflicts and reputational or policy concerns raised by the matters the Firm takes on. Finally, as a member of WilmerHale's New Business Intake Committee, I review every new matter that the Firm agrees to handle.

I.    **WILMERHALE IS A LARGE GLOBAL LAW FIRM WITH A STRONG TRADITION OF PUBLIC SERVICE**

5.    WilmerHale is a large international law firm that employs approximately 2,061 people—roughly 1,194 of whom are lawyers—and serves clients located throughout the United States and the world.[1]

6.    Formed after a 2004 merger of Hale and Dorr LLP and Wilmer Cutler Pickering LLP, the Firm now has twelve offices across the United States and Europe.

7.    WilmerHale is currently led by a single Managing Partner and a Management Committee—comprising 17 partners—that is responsible for the day-to-day management of the Firm and which implements the decisions of the broader partnership.

8.    WilmerHale lawyers represent a range of clients—including large multinational corporations, family businesses, individuals, government entities and sovereign nations, and non-profit organizations—across a range of industries and endeavors. While many of WilmerHale's lawyers work at the intersection of government, technology, and business, others represent and advise clients in areas that have no immediate connection to the federal government or any other government—for example, on transactions or disputes between private entities or individuals. WilmerHale attorneys practice across a broad span of industries, ranging from work in education, to energy and national resources, to national security, to media and entertainment, to artificial intelligence and cryptocurrency, to healthcare and financial services, to civil and criminal defense.

---

[1] Except where noted, all statistics regarding WilmerHale's employees, clients, and open matters were calculated as of March 27, 2025, using Firm records that are maintained in the normal course of business.

3

9.    The approximately 867 non-lawyers at WilmerHale include paralegals, information technology specialists, mailroom staff, and other professionals who support the Firm's work.

10.    WilmerHale's attorneys and employees cover the full political and ideological spectrum and come from a variety of backgrounds. Lloyd Cutler, for example, was White House Counsel to Presidents Carter and Clinton, and C. Boyden Gray was White House Counsel to President George H.W. Bush. In keeping with this tradition, the Firm has recruited lawyers from every administration over the last forty years and has bipartisan leadership of the practices that involve legal and public policy. WilmerHale lawyers have represented people and causes across the political and ideological spectrum. Its lawyers, on their own time, have worked for the campaigns of both parties in each of the presidential elections over at least the last twenty years.

11.    Many of WilmerHale's former employees and partners have served in the federal government, across all three branches. Current and past WilmerHale alumni serve or have served as judicial law clerks, state and federal court judges, White House officials under presidents of both parties, high-ranking Department of Justice officials and officials of other departments, as well as military service members.

12.    WilmerHale's attorneys and employees include parents, teachers, scientists, members and leaders of religious communities, members of the military and other public servants, pro bono board members, and volunteers.

13.    Chief among WilmerHale's defining features is its commitment to securing equal access to justice. Ever since its predecessor firm Hale and Dorr LLP was founded in 1918, WilmerHale's attorneys have played important roles that have shaped the history of legal services in the United States. Hale and Dorr partner Reginald Heber Smith—considered the father of legal aid in the United States—authored the seminal book *Justice and the Poor*, which galvanized the

organized bar nationally to secure equal justice for those unable to afford counsel. More than seven decades later, in 1992, Wilmer Cutler & Pickering partner John Pickering led the effort to establish the Pro Bono Institute's Law Firm Pro Bono Challenge—which encourages law firms to commit a minimum of 3-5% of annual total billable hours to legal pro bono services—and ensured that the firm was its charter signatory.

14. WilmerHale is consistently and widely recognized as one of the leading law firms, and one of the best law firm employers, in the nation. The year 2025 marks WilmerHale's twenty-first year in a row on *The American Lawyer*'s annual A-List and WilmerHale's ninth consecutive year in the A-List top 10. WilmerHale routinely ranks at the top of other prestigious legal rankings, including Chambers USA, Benchmark Litigation, the National Law Journal, and Vault Law. Moreover, WilmerHale has for many years been named a top employer by publications such as *The Washington Post*, *Forbes*, and *The Boston Globe*, which rank employers on such metrics as supportiveness and responsiveness to employee needs. More than 50% of WilmerHale's non-lawyer business professionals have been employed with the Firm for over 10 years.

15. WilmerHale's pro bono work—across a wide variety of perspectives and causes—is a central pillar of the Firm's identity. In 2024, 96.4% of active U.S. lawyers spent 20 or more hours on over 1,400 pro bono matters, for a total of 148,551 pro bono hours firm wide and an average of 123 hours per active U.S. lawyer. In total, WilmerHale contributed attorney time equivalent to roughly $120 million on pro bono matters in 2024. These matters range from high-profile, high-impact matters to direct representation of hundreds of low-income individuals, including veterans, survivors of sex trafficking, and criminal defendants. The Firm's pro bono work reflects the diversity of its lawyers' political and social views: it has defended the free

exercise of religion—including the right to attend church during the COVID-19 shutdowns—and it has represented clients committed to protecting reproductive rights.

16.    As a result of these efforts, WilmerHale has been consistently ranked among the very top law firms in the country for its pro bono efforts. In 2024 alone, WilmerHale placed second in *Law360 Pulse*'s Pro Bono ranking and third in *The American Lawyer*'s 2024 Pro Bono Scorecard. And in the opening months of 2025, WilmerHale has been recognized by the New York State Bar Association and the Lawyers' Committee for Civil Rights of the San Franciso Bay Area for its pro bono efforts.

**II.    WILMERHALE'S INTERACTION WITH THE FEDERAL GOVERNMENT**

    **A.    WilmerHale Routinely Interacts With The Federal Government On Behalf Of Its Clients**

17.    As a full-service law firm, WilmerHale represents a wide range of clients—including large corporations, colleges and universities, Native American tribes, start-ups, and individuals accused of criminal and civil wrongs—in litigation, transactional, and regulatory matters. The Firm's employees interact with the federal government on behalf of the Firm's clients on a daily basis and in innumerable ways. For example, the Firm's attorneys appeared in federal court over 340 times since March 1, 2024, and the Firm has more than 380 cases pending before federal district and bankruptcy courts and more than 160 cases pending before federal appellate courts. Its attorneys have upcoming appearances scheduled before agencies and in courtrooms, including before the Supreme Court of the United States. And they interact with a variety of government agencies on behalf of the Firm's clients, including, among others, the Departments of Justice, Treasury, Veterans Affairs, Labor, Defense, Interior, Health and Human Services, Housing and Urban Development, Agriculture, and Education, the Patent and Trademark Office, the Office of the Director of National Intelligence, the Federal Bureau of Investigation, the Central

**JA 2344**

Intelligence Agency, the Federal Communications Commission, the Environmental Protection Agency, the Federal Energy Regulatory Commission, the Federal Reserve Board, the Securities and Exchange Commission, and the Federal Trade Commission.

18.     WilmerHale has five departments (with some attorneys who are cross-listed in two or more departments): Litigation and Controversy, Regulatory and Government Affairs, Securities and Financial Services, Transactional, and Intellectual Property. All of these groups intersect with the federal government in some way and include clients with business before the federal government.

19.     In the course of representing the Firm's clients, WilmerHale lawyers frequently meet with federal officials from numerous agencies. Although it is difficult to quantify precisely, based on a review of the Firm's client-matter list, a large number of WilmerHale clients have matters that require the Firm's lawyers to interact with the federal government. Such work requires entering government buildings and interacting with federal agencies' employees.

20.     The Firm's Litigation and Controversy Department includes approximately 563 attorneys. A large proportion of the litigation matters handled by this department are pending in federal court and require WilmerHale attorneys to enter federal buildings and engage with federal employees in order to represent Firm clients. Within that department, the Investigations and Criminal Litigation practice group includes approximately 81 attorneys. This practice focuses on representing clients in criminal prosecutions and investigations in proceedings involving many agencies of the federal government, including the Department of Justice, Federal Bureau of Investigation, Comptroller of the Currency, Department of Defense, Department of Health and Human Services, Department of Education, Federal Communications Commission, Environmental Protection Agency, Federal Trade Commission, U.S. Attorneys' Offices, the

7

Commodity Futures Trading Commission, and the Securities and Exchange Commission, among others. Also within the Litigation and Controversy Department, the Government and Regulatory Litigation practice group includes approximately 60 attorneys. This practice involves representing clients in investigations and litigation involving myriad federal agencies, including the Environmental Protection Agency, the Department of Labor, and the Department of Health and Human Services. WilmerHale Litigation and Controversy Department lawyers also routinely take on pro bono matters that require interaction with, and litigation before, the Department of Veterans' Affairs and the Social Security Administration.

21.    WilmerHale Litigation and Controversy Department lawyers must interact with federal employees and enter federal buildings in order to fulfill their duties to clients, for example, to make presentations to prosecutors and federal agency employees on WilmerHale clients' behalf.

22.    The Firm's Regulatory and Government Affairs Department includes approximately 127 attorneys. This practice involves navigating the intersection of law, public policy, and business, which in turn relies on WilmerHale's expertise in the complex policies and regulations governing its clients' industries—including leveraging the experience and insight of WilmerHale attorneys who have worked in the executive branch or on Capitol Hill. Needless to say, a legal practice involving regulation and legislation requires interaction with federal officials.

23.    Within the Regulatory and Government Affairs Department are practices involving national security, trade, the energy and environment sectors, antitrust, congressional investigations, education, and more. The Defense, National Security, and Government Contracts Practice requires interaction with the Department of Defense, the Office of the Director of National Intelligence, the National Security Agency, the Federal Bureau of Investigation, and the Central Intelligence

8

**JA 2346**

Agency, among others. The Firm has multiple attorneys with active security clearances; such clearances are vital to serving clients operating in the national security space.

24. Also within the Firm's Regulatory and Government Affairs Department is the Higher Education practice group, which includes approximately 48 attorneys and requires interaction with many federal departments and agencies. The Regulatory and Government Affairs Department also encompasses the Firm's Energy, Environment and Natural Resources Practice, which represents oil and gas companies, alternative energy companies, and those involved in mining and in critical minerals industries. WilmerHale attorneys in this practice area routinely engage with the Department of the Interior, the Environmental Protection Agency, and other agencies.

25. The Firm's Securities and Financial Services Department includes approximately 155 attorneys. It represents securities firms and banking entities in the full range of regulatory and enforcement matters before federal agencies such as the Securities and Exchange Commission, the Commodity Futures Trading Commission, the Office of the Comptroller of the Currency, the Treasury Department, and the Federal Reserve. Additionally, WilmerHale lawyers routinely engage with regulators on their clients' behalf.

26. The Firm's Transactional Department includes approximately 200 attorneys. The department's matters often involve financings, mergers and acquisitions, collaborations, and other transactions between private entities or persons. In connection with many of these matters, WilmerHale lawyers often interact with federal employees, including staff from the Securities and Exchange Commission, Federal Trade Commission, Food and Drug Administration, and other federal agencies. The Transactional Department also represents private entities in transactions that have no nexus to the federal government and do not involve any interaction with federal agency

9

**JA 2347**

staff. However, many of these private company clients have contracts with federal agencies, and Transactional attorneys often refer litigation work that arises from transactions to other Firm departments.

27. The Firm's Intellectual Property Department, which includes roughly 52 attorneys, and the Firm's Intellectual Property Litigation practice group, which includes roughly 111 attorneys, depend heavily on access to and interaction with the federal government to represent WilmerHale clients. As a representative example, attorneys in these departments frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board (PTAB). WilmerHale is currently representing over 3750 clients in over 1,150 live trademarks or trademark applications and over 200 clients in over approximately 2,450 live patents or patent applications before the USPTO (including International Applications filed with the U.S. Receiving Office), as well as representing clients in over 25 active post-grant proceedings before the PTAB.

28. As of March 26, 2025, WilmerHale attorneys are working on hundreds of matters before or involving at least the following federal agencies, which together implicate approximately 1,110 matters:

- The Securities and Exchange Commission;
- The Department of Justice (including approximately 25 U.S. Attorney's Offices);
- The Federal Trade Commission;
- The Consumer Financial Protection Bureau;
- The Department of Health and Human Services;
- The Environmental Protection Agency;
- The Department of Defense;
- The Department of Homeland Security;
- The Federal Bureau of Investigation;
- The Department of Navy;
- The Commodity Futures Trading Commission;
- The Department of State;

**JA 2348**

- The Department of Energy;
- The Department of the Treasury;
- The Department of Labor;
- The Department of Agriculture;
- The Department of Veterans Affairs;
- The Air Force;
- The Department of Education;
- The Office of the Comptroller of the Currency;
- The Internal Revenue Service;
- The Central Intelligence Agency;
- The Office of Management and Budget;
- The Department of Commerce;
- The Agency for International Development;
- The Federal Reserve;
- The Department of Housing and Urban Development;
- The Farm Credit Administration;
- The Occupational Health and Safety Administration;
- The Patent and Trademark Office;
- The Pension Benefit Guaranty Corporation; and
- The International Trade Commission.

29. WilmerHale lawyers have cooperated with government agencies and lawyers in both Republican and Democratic administrations, including in cases where the United States has filed an amicus curiae brief in support of WilmerHale clients. *See, e.g.*, Brief for the United States as Amicus Curiae, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 20-1199 (U.S. Dec. 8, 2021); Brief of the United States as Amicus Curiae, *Hardeman v. Monsanto*, No. 19-16636 (9th Cir. Dec. 20, 2019), ECF No. 32.

**B.    Many Of WilmerHale's Clients Are Government Contractors**

30. Many of the Firm's clients—both traditional government contractors and commercial enterprises that contract with the federal government—are government contractors or otherwise have a funding relationship with the federal government. At least 21 of the Firm's 25 largest clients in 2024 have contracts with federal agencies. These 21 clients accounted for more

11

**JA 2349**

than 30% of the Firm's revenue in 2024—nearly $500 million. The Firm also has numerous other clients that have federal contracts.

31.    WilmerHale often represents clients in connection with disputes regarding government contracts, including handling clients' bid protests and disputes surrounding contract claims. The Firm's attorneys are currently handling over 100 open government contracting matters involving various federal agencies. And there are many more Firm clients with government contracts that have engaged WilmerHale to represent them in matters unrelated to those contracts.

**C.    WilmerHale's Attorneys Often Serve In The Federal Government**

32.    WilmerHale is committed to public service, and many attorneys and staff choose to work at the Firm because of its commitment to public service.

33.    Many WilmerHale attorneys work, will work, or have worked in the federal government at some point in their professional career.

34.    The U.S. Senate, for example, recently confirmed a President Trump-nominated former WilmerHale partner to serve as Under Secretary for Industry and Security at the U.S. Department of Commerce. The current Deputy Attorney General under President Trump and the current Acting Head of the Criminal Division in President Trump's Department of Justice are also both alumni of WilmerHale.

35.    At least 130 current WilmerHale employees have served as public servants in offices across the federal government, in the federal judiciary, or in agencies ranging from the Federal Reserve Board to the Central Intelligence Agency. WilmerHale also proudly counts numerous public servants among its alumni, including two federal judges appointed by President Trump and two federal judges appointed by President Biden.

36.    One notable example is Robert S. Mueller III, a longtime Republican who was appointed Director of the Federal Bureau of Investigation by President George W. Bush and was

12

**JA 2350**

JA 2351

later appointed by the Department of Justice in the first Trump administration as special counsel to investigate allegations of foreign interference in the 2016 presidential election. WilmerHale had no role in his appointment.

37. Mr. Mueller has had a long and distinguished public service career. He graduated from Princeton University and volunteered for the United States Marine Corps during the Vietnam War, earning a Bronze Star with Valor and Purple Heart. After returning from Vietnam, he attended the University of Virginia School of Law and went on to serve for decades in both the Department of Justice and various United States Attorney's offices under Presidents Ronald Reagan, George H. W. Bush, Bill Clinton, and George W. Bush. Between his stints in public service, Mr. Mueller became a partner at Hale and Dorr, specializing in white-collar criminal defense.

38. Mr. Mueller was appointed to serve as special counsel by Acting Attorney General Rod Rosenstein on May 17, 2017 during the first administration of President Trump. He was tasked specifically with investigating Russian government efforts to interfere in the 2016 U.S. presidential election. The appointment required him to investigate and prosecute actions that interfered with that work, including potential obstruction of justice by President Trump or any of his associates that could be charged with obstruction of justice. The special counsel's office included roughly 20 attorneys. Mr. Mueller and those attorneys were employed by the United States government.

39. As required by Department of Justice regulations that govern a special counsel, Mr. Mueller and other lawyers employed by the U.S. government delivered a confidential report on the investigation to then-Attorney General William Barr. The report did not conclude that members of the Trump campaign conspired or coordinated with the Russian government. Nor did

13

JA 2352

the report determine whether President Trump had obstructed justice. The report also concluded, consistent with longstanding Department of Justice policy, that a sitting president could not be indicted.

40.    WilmerHale had no role in the Report or Mr. Mueller's work as special counsel, and indeed represented clients adverse to the special counsel's office. Mr. Mueller rejoined the Firm in 2019 following the conclusion of the special counsel investigation and retired from the Firm over three years ago. Approximately 54% of WilmerHale's current attorneys joined the Firm after Mr. Mueller's retirement.

41.    Among the attorneys who worked in the special counsel's office under Mr. Mueller are James L. Quarles III and Aaron M. Zebley. Mr. Quarles and Mr. Zebley returned to the Firm as partners around the same time as Mr. Mueller, in 2019. Both Mr. Quarles and Mr. Zebley had distinguished careers in public service before joining WilmerHale. Mr. Quarles served as an assistant special prosecutor on the Watergate Special Prosecution Force from 1973 to 1975 before joining Hale and Dorr in 1975. Mr. Quarles retired from WilmerHale in 2021. Mr. Zebley first joined WilmerHale as a partner in 2014. Before that time, he had served in multiple roles in federal law enforcement, including as an FBI special agent, an assistant United States Attorney, senior counselor in DOJ's National Security Division, and as FBI chief of staff. Mr. Zebley remains a partner in WilmerHale's Washington D.C. office.

III.    WILMERHALE'S RELEVANT LITIGATION

42.    WilmerHale has represented clients in dozens of federal and state courts, and in tribunals across the world. WilmerHale's litigation practice has long included cases against the federal government (across both Democratic and Republican presidential administrations), as well as cases that span the ideological spectrum.

**JA 2352**

43.    The Firm has an established process for assessing whether to take on new business, including both new clients and new matters for existing clients. I play an important role in that process by reviewing every new matter. The Firm's decisions about whether (or not) to represent certain clients or to advocate on behalf of clients in favor of particular policies—including some that are controversial or unpopular—are one way in which the Firm expresses its values.

44.    For example, WilmerHale has long declined to represent tobacco companies in health-related matters. WilmerHale also successfully defended the Truth Campaign—the most successful public health campaign in recent memory, dedicated to persuading young people not to take up smoking—against efforts by the tobacco industry to shut it down. *See Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728 (Del. 2006). And WilmerHale has represented advocates for gun control pro bono, such as Everytown for Gun Safety, in litigation concerning the constitutionality of gun control laws. *See, e.g., California Rifle & Pistol Ass'n v. Los Angeles County Sheriff's Dep't*, No. 23-cv-10169 (C.D. Cal.) (counsel for defendant); Brief for Everytown for Gun Safety as Amicus Curiae In Support of Petitioner, *United States v. Rahimi*, No. 22-915 (U.S.).

45.    WilmerHale has also participated in lawsuits that advanced civil rights in a wide range of contexts—often pro bono. The Firm has, for example, defended the religious liberties of its clients by challenging laws that prohibited congregants from attending in-person religious services during the COVID-19 pandemic and, more recently, defending the right of churches to make ecclesiastical hiring and firing decisions free from unconstitutional government interference. *See, e.g., King James Bible Baptist Church v. Simmons*, No. 20-cv-65 (N.D. Miss.); *Capitol Hill Baptist Church v. Bowser*, No. 20-cv-2710 (D.D.C.); *McRaney v. North American Mission Bd. of Southern Baptist Convention*, No. 19-60293 (5th Cir.). WilmerHale has also represented clients

15

**JA 2353**

in defending reproductive rights following the Supreme Court's decision in *Dobbs v. Whole Women's Health*. *See, e.g., Planned Parenthood of Montana v. State of Montana*, No. DA 23-288 (S. Ct. Mont.). WilmerHale also represented clients in challenging the constitutionality of the Defense of Marriage Act. *See Massachusetts v. U.S. Dep't of Health and Human Servs.*, 682 F.3d 1 (1st Cir. 2012). And WilmerHale has filed lawsuits on behalf of clients with disabilities, securing, for example, a favorable settlement ensuring that hearing-impaired prisoners in Massachusetts received essential accommodations such as hearing aids and interpreters. *See Briggs v. Dep't of Corrections*, 15-cv-40162 (D. Mass.). The Firm also represents Wisconsin voting rights and disability groups in ongoing litigation seeking to ensure that voters who have a disability preventing them from reading or marking paper ballots receive accessible electronic absentee ballots by email. *Disability Rights Wisconsin v. Wisconsin Elections Comm'n*, No. 24-CV-1141 (Wis. Cir. Ct.).

46.    WilmerHale also has stood up for the rights of criminal defendants and low-income families via pro bono representation. For example, WilmerHale secured the release of Dewey Bozella, who was imprisoned for 26 years for a murder he did not commit, and obtained a $7.5 million settlement for Mr. Bozella based on his wrongful conviction. *See Bozella v. Cnty. of Dutchess, N.Y.*, No. 10-cv-04917, ECF No. 285 (S.D.N.Y Jan. 12, 2015); *People v. Bozella*, 901 N.Y.S.2d 908 (Cnty. Ct.). Through its support for the Family Justice Clinic at the WilmerHale Legal Services Center of Harvard Law School, moreover, the Firm provides pro bono representation to parents facing Department of Children and Families investigations, addressing critical gaps in legal support for low-income families.

A.    **WilmerHale's Litigation Against The Government**

47.    The Firm has been involved in suits against the federal government for decades, regardless of who was in the White House at the time. The Firm sued the Clinton Administration

16

**JA 2354**

on behalf of clients at least 28 times. For example, it represented telecommunications companies in their challenge of a Federal Communications Commission rule that restricted the areas in which they could provide cable television programming. *U.S. West, Inc. v. United States*, No. 93-cv-1523 (W.D. Wa.). The Firm also brought a lawsuit on behalf of the *Washington Post* under the Freedom of Information Act, seeking to require the Department of Agriculture to release basic identifying details about the recipients of funds under a certain department program. *Wash. Post v. U.S. Dep't of Agriculture*, No. 95-cv-656 (D.D.C.).

48.    WilmerHale also was involved in at least 125 lawsuits against the Obama Administration. For example, the Firm represented several life insurance and financial services trade associations in successfully challenging the Obama Administration's retirement security rule ("the fiduciary rule"), which the Fifth Circuit held exceeded the Department of Labor's authority. *Chamber of Commerce v. Dep't of Labor*, No. 17-10238 (5th Cir.). The Firm also represents insurers challenging a Department of Housing and Urban Development rule issued by the Obama Administration that imposed Fair Housing Act liability for neutral underwriting practices. *Property Casualty Insurers Ass'n v. Dep't of Housing and Urban Dev.*, No. 13-cv-8564 (N.D. Ill.). And the Firm represented mining companies challenging an Obama-era opinion that terminated their rights under longstanding mineral leases and later defended them as intervenors supporting the Trump Administration's reinstatement of those leases. *Franconia Minerals (US) LLC v. United States*, No. 16-cv-3042 (D. Minn. 2016); *Voyageur Outward Bound School v. United States*, No. 18-cv-1463 (D.D.C.); *Wilderness Society v. Bernhardt*, No. 20-cv-1176 (D.D.C.).

49.    The Firm also represented clients in at least 97 cases against the Biden Administration. Among the lawsuits the Firm brought against the Biden Administration was a suit to vacate a revised version of the fiduciary rule that was promulgated by the Department of Labor.

**JA 2355**

*American Council of Life Insurers v. Dep't of Labor*, No. 24-cv-482 (N.D. Tex.).  WilmerHale also brought a lawsuit alongside the State of Louisiana contesting President Biden's purported withdrawal of more half a billion acres of offshore waters from oil and natural gas leasing.  *See Louisiana v. Biden*, No. 25-cv-71 (W.D. La.).  The case built on the Firm's prior representation in a suit seeking to obtain information about the Biden Administration's meetings with third parties in connection with an Interior Department rule regarding oil reserves in Alaska.  *Alaska Oil & Gas Association v. Dep't of the Interior*, No. 24-cv-2653 (D.D.C.).

50.    Also during the Biden Administration, WilmerHale filed several lawsuits on behalf of clients raising constitutional challenges to the structure of administrative proceedings at such agencies as the Federal Trade Commission and the Federal Energy Regulatory Commission.  *See, e.g.*, *Intuit Inc. v. Federal Trade Comm'n*, No. 24-60040 (5th Cir.) (Article II, Article III, due process, and non-delegation challenges); *Express Scripts v. Federal Trade Comm'n*, No. 24-cv-1549 (E.D. Mo.) (Article II, Article III, and due process challenges).

51.    WilmerHale has also brought suits on behalf of clients against Republican administrations.  For example, WilmerHale provided pro bono representation to a number of individuals detained as enemy-combatants at the Guantanamo Bay Naval Base in litigation against the government, resulting in a landmark decision by the Supreme Court of the United States expanding the availability of judicial relief to prisoners detained without process in military facilities overseas.  *Boumediene v. Bush*, 553 U.S. 723 (2008).

52.    WilmerHale was also involved in at least 45 lawsuits against the first Trump Administration on behalf of clients, including in several notable cases involving immigration policy.  For example, the Firm served as pro bono co-counsel with Farmworker Justice to represent the United Farm Workers in their successful challenge of a Department of Labor rule that would

**JA 2356**

have frozen wages for thousands of farmers. *See United Farm Workers v. Department of Labor*, No. 20-cv-1690 (E.D. Cal.); *United Farm Workers v. Perdue*, No. 20-cv-1452 (E.D. Cal.). WilmerHale also represented the City of Chicago pro bono when the City sued the first Trump Administration for imposing funding conditions on "sanctuary cities" that had adopted immigration policies contrary to those favored by the Administration. *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018). And the Firm brought a lawsuit on behalf of Harvard University and the Massachusetts Institute of Technology challenging Immigration and Customs Enforcement regulations that would have exposed students on F-1 visas to deportation as schools moved to online learning in the wake of the COVID-19 pandemic. *President & Fellows of Harvard College, et al. v. U.S. Dep't of Homeland Security*, No. 20-cv-11283 (D. Mass.).

53.     WilmerHale lawyers followed this long tradition of representing clients in bringing suit against the federal government when, on February 12, 2025, WilmerHale filed suit on behalf of the nonpartisan inspectors general of eight federal agencies—the Departments of Defense, State, Veterans Affairs, Education, Health and Human Services, Agriculture, Labor, and the Small Business Administration—who were fired in violation of the removal procedures set forth in the Inspectors General Act. *See Storch v. Hegseth*, No. 25-cv-415 (D.D.C.). At the conclusion of a public hearing yesterday in the matter, the Court applauded WilmerHale for pursuing the litigation on behalf of its estimable public servant clients, and for doing so pro bono.

B.     **WilmerHale's Election-Related Representations**

54.     WilmerHale also has a long tradition of litigating in defense of the United States' democratic electoral system generally and for clients who span the political spectrum, often pro bono. For instance, in 2003, the Firm successfully represented Republican Senator John McCain and Democratic Senator Russ Feingold in defense of the landmark Bipartisan Campaign Reform Act they co-sponsored. *See McConnell v. Federal Election Commission*, 540 U.S. 93 (2003).

19

**JA 2357**

Later, in 2015, the Firm successfully defended the constitutionality of Arizona's non-partisan redistricting commission. *See Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015). And in 2021, WilmerHale filed suit on behalf of voters and community organizations to challenge Georgia's legislative redistricting plans as diluting Black voters' voting strength, in violation of Section 2 of the Voting Rights Act. *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 21-cv-5337 (N.D. Ga.).

55.    One of WilmerHale's many clients is the Democratic National Committee. The Firm has long represented the DNC in matters relating to the rule of law, ballot access, and election integrity. The Firm also represented the Joe Biden campaign in 2020 and 2024, and the Kamala Harris campaign in 2024. In 2020, for example, the Biden campaign and the Democratic National Committee retained the Firm to provide representation in potential litigation regarding the integrity and certification of the presidential election. The Firm went on to represent the Biden for President campaign, the Democratic National Committee, and state-level Democratic Party organizations in numerous lawsuits regarding the 2020 election in at least six states: Arizona, Georgia, Michigan, New Hampshire, North Carolina, and Pennsylvania. This included representing the Democratic National Committee in opposition to lawsuits that sought to change election results or prevent certification of elections. *See, e.g., Donald J. Trump for President, Inc. v. Secretary of the Commonwealth of Pennsylvania*, 830 F.App'x 377 (3d Cir. Nov. 27, 2020); *Trump v. Wisconsin Elections Commission*, 983 F.3d 919 (7th Cir. 2020); *see also Feehan v. Wisconsin Elections Commission*, 506 F.Supp.3d 596 (E.D. Wis.) (amicus curiae brief). And in the leadup to the 2024 general election, WilmerHale represented Democratic Party entities in numerous cases. *See, e.g., Cobb Cnty. Bd. of Elections & Registration v. State Election Bd.*, No. 24CV012491 (Ga. Super.

**JA 2358**

Ct. 2024); *Pennsylvania State Conference of NAACP v. Schmidt*, 97 F.4th 120 (3d Cir. 2024); *Republican National Committee v. N. Carolina State Bd. Of Elections*, No. 24-2044 (4th Cir. 2024).

56.    As with the Firm's other longstanding client relationships, the Democratic Party's continued retention of WilmerHale speaks not to the Firm's own political ideology, but to its excellence in representing and advocating for its clients. The Firm is proud of its advocacy for all of its clients, including those that may not be politically or ideologically favorable to any particular presidential administration. For instance, the Firm has advised many people nominated by President Trump to positions in both of his administrations.

IV.    **THE EXECUTIVE ORDERS TARGETING OTHER LAW FIRMS HAVE ALREADY INFLICTED SIGNIFICANT HARM ON THOSE FIRMS AND ON THE INDUSTRY, INCLUDING ON WILMERHALE**

57.    On February 25, 2025, President Trump signed a memorandum directed to the heads of various federal agencies in the intelligence community, titled "Suspension of Security Clearances and Evaluation of Government Contracts," that targets the law firm Covington & Burling LLP ("Covington Memo"). The Covington Memo singles out a specific partner of Covington & Burling "who assisted former Special Counsel Jack Smith" (a former Department of Justice prosecutor who criminally investigated President Trump). The Covington Memo directs the agency heads to "suspend any active security clearances held by" that specific partner and "all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel," and "to terminate any engagement of Covington & Burling LLP by any agency."

58.    On March 6, 2025, President Trump signed Executive Order 14237, titled "Addressing Risks From Perkins Coie LLP" ("Perkins Order"). Perkins Coie is another large, global law firm. The Perkins Order described what it called the "dishonest and dangerous activity of the law firm Perkins Coie LLP," including that firm's "representing failed Presidential candidate

21

**JA 2359**

Hillary Clinton," which the Perkins Order asserted was "part of a pattern" of "egregious activity." Perkins Order § 1. For instance, the Perkins Order asserted that "Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification"—apparently referring to Perkins Coie's well-known representation of Democratic Party organizations in voting rights and election law litigation. *Id.* The Perkins Order directed federal agencies to, among other things, "suspend security clearances held by individuals at Perkins Coie" until further notice, require government contractors to disclose any business they do with Perkins Coie, "terminate any contract" with Perkins Coie "to the maximum extent permitted by applicable law," issue guidance "limiting [the] official access" of Perkins Coie employees to federal government buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States," issue guidance "limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States," and "refrain from hiring employees of Perkins Coie" absent special conditions. *Id.* §§ 2-5. The Perkins Order also directed the Chair of the Equal Employment Opportunity Commission to investigate "the practices of representative large, influential, or industry leading law firms" for practices it describes as "discrimination under 'diversity, equity, and inclusion' policies." *Id.* §§ 1, 4.

59.    On March 11, 2025, Perkins Coie sued to enjoin the Perkins Order, arguing that it began experiencing harm from the Order "[t]he day after" its issuance, when a federal agency official informed a Perkins Coie client that Perkins Coie lawyers "should not attend a scheduled meeting with an office in that agency." *Perkins Coie LLP v. Department of Justice*, No. 25-cv-716, ECF No. 2-2 ¶ 25 (D.D.C. Mar. 11, 2025). Because of the Perkins Coie Order, that client

22

**JA 2360**

said it would be "forced to hire other law firms" in connection with federal litigation. *Id.* Perkins Coie described other immediate and ongoing harms as a result of the Perkins Order, including: numerous clients terminating legal engagements with Perkins Coie, communicating that they did not feel comfortable proceeding with Perkins Coie in the future, or otherwise halting or withdrawing work; Perkins Coie incurring additional costs to secure backup personnel to attend impending hearings; clients requesting "frequent updates relating to the Order in order to assess whether Perkins Coie can continue to represent them"; candidates for Perkins Coie employment communicating that they needed to reevaluate "the economic health of the firm"; and a Department of Justice attorney informing Perkins Coie that DOJ "could not proceed with a previously set meeting relating to another Perkins Coie client" without further guidance in light of the Perkins Order, *id.* at ¶¶ 26-27, 29, 33.

60.    Based on the limited publicly available information regarding how the Perkins Order was implemented before its enforcement was enjoined—i.e., the information provided in the Perkins Coie declaration—I understand Perkins Coie has suffered substantial harm from the promulgation of the Perkins Order. I understand that harm poses an existential threat to Perkins Coie, given that it derives approximately one-fourth of its total revenue from its largest 15 clients, all of which hold contracts with the federal government that are subject to termination under the terms of the Order. *Id.* at ¶ 30. As discussed below, it seems very likely that—unless the relief sought in the accompanying motion is granted—WilmerHale too will be barred from meeting with federal officials and will lose current and/or potential future clients based on fear of reprisal from the federal government.

61.    On March 12, 2025, Judge Beryl A. Howell of the U.S. District Court for the District of Columbia issued a temporary restraining order enjoining enforcement of several aspects

**JA 2361**

of the Perkins Order. *See Perkins Coie LLP v. Department of Justice*, No. 25-cv-716, ECF No. 21 (D.D.C. Mar. 12, 2025).

62.    On March 14, 2025, President Trump signed Executive Order 14237, titled "Addressing Risks From Paul Weiss" ("Paul Weiss Order").[2] The Paul Weiss Order generally attacked "[g]lobal law firms," asserting that they "engaged in activities that make our communities less safe, increase burdens on local businesses, limit constitutional freedoms, and degrade the quality of American elections." Paul Weiss Order § 1. The Paul Weiss Order also emphasized that the supposedly improper litigation brought by "[g]lobal law firms" includes not only work done on behalf of paying clients, but also work done "pro bono" or "'for the public good.'" *Id.*

63.    In addition to the broad statements about law firms in general, the Paul Weiss Order targeted specific Paul Weiss partners who had played key roles in criminal investigations of President Trump, referring to one Paul Weiss partner as a "leading prosecutor in the office of Special Counsel Robert Mueller." Paul Weiss Order § 1. The Paul Weiss Order directed government officials to impose substantially the same sanctions against Paul Weiss and its employees as the Perkins Order purported to impose on Perkins Coie. *Id.* §§ 2-5.

64.    At least one of Paul Weiss's clients cited the Executive Order as the reason for terminating his representation by Paul Weiss attorneys. The client is set to begin trial on federal bribery charges and told the district court that Paul Weiss's involvement could prejudice the Department of Justice's review of his case (even if prosecutors were permitted to engage with Paul

---

[2] *Addressing Risks From Paul Weiss*, The White House (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/.

**JA 2362**

JA 2363

Weiss attorneys). *See* Mem. in Support of Motion to Withdraw as Counsel for Defendant Steven Schwartz at 2, *United States v. Coburn*, No. 19-cr-120, ECF No. 1012 (D.N.J. Mar. 19, 2025).[3]

65.     On March 20, 2025, President Trump posted on social media that he had "agreed to withdraw his March 14, 2025 Executive Order regarding [Paul Weiss], which has entered into [an] agreement with the President."[4]  According to the social media post, Paul Weiss agreed to undertake "pro bono matters that represent the full spectrum of political viewpoints of our society, whether 'conservative' or 'liberal'"; "dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives"; "not adopt, use, or pursue any DEI policies"; and submit "to … a comprehensive audit of all of its employment practices."[5]  Finally, President Trump's post stated that he had "'met[] with Paul, Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice.'"[6]

66.     President Trump formalized this deal the following day, when he issued Executive Order 14244 officially revoking the Paul Weiss Order.  Though President Trump continued to assert that Paul Weiss was "one of many law firms" that have "for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles," he justified the reversal by citing what he characterized as the firm's "remarkable change of course."[7]

---

[3] M. Tribe & J. Wise, *Paul Weiss Fired by Cognizant Executive Over Trump Order*, Bloomberg (Mar. 19, 2025), https://news.bloomberglaw.com/business-and-practice/paul-weiss-fired-by-cognizant-executive-over-trump-order.

[4] D. Trump, Truth Social (Mar. 20, 2025), https://truthsocial.com/@realDonaldTrump/posts/114197044617921519.

[5] *Id.*

[6] *Id.*

[7] *Addressing Remedial Action by Paul Weiss*, The White House (Mar. 21, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-remedial-action-by-paul-weiss.

Specifically, he claimed that Paul Weiss "acknowledged the wrongdoing of its former partner Mark Pomerantz" and agreed to implement policy changes, including "adopting a policy of political neutrality with respect to client selection and attorney hiring"; prioritizing "merit-based hiring, promotion, and retention" rather than "diversity, equity, and inclusion" policies; and dedicating "$40 million in pro bono legal services" for causes such as "assisting our Nation's veterans, fairness in the justice system, and combating anti-Semitism."[8]

67.    Beyond the sweeping statements made in the original March 14 Paul Weiss Order, President Trump has made several broad assertions suggesting he intends to target law firms that have represented clients he fears or dislikes.  When he signed the Perkins Order, President Trump stated that his team "was looking at about 15 different firms" as potential targets for similar sanctions.[9]  A few days after he issued the Perkins Order, President Trump said in an interview that "[w]e have a lot of law firms that we're going to be going after because they were very dishonest people."[10]  And the same day that President Trump issued the March 14 Paul Weiss Order, he delivered a speech at the Department of Justice denouncing "crooked law firms," "violent, vicious lawyers," and "fake lawyers."[11]

---

[8] *Id.*

[9] I. Schwartz, "Trump Signs Executive Order To Revoke Security Clearances From Perkins Coie: "This Is An Absolute Honor," *RealClear Politics* (Mar. 6, 2025),  https://www.realclearpolitics .com/video/2025/03/06/trump_signs_executive_order_to_revoke_security_clearances_from_per kins_coie_this_is_an_absolute_honor.html.

[10] E. Mulvany & C.R. Barber, *Fear of Trump Has Elite Law Firms in Retreat*, Wall St. J. (Mar. 9, 2025) https://www.wsj.com/us-news/law/fear-of-trump-has-elite-law-firms-in-retreat-6f251dec.

[11] *See Donald Trump Addresses the Staff At the Department of Justice* (March 14, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-department-of-justice-march-14-2025.

**JA 2364**

68.    In a Presidential Memorandum dated March 22, 2025, President Trump further directed the Attorney General to assess whether attorneys and law firms currently litigating against the federal government have engaged in "misconduct" and to "seek sanctions" or recommend other disciplinary actions—including "reassess[ing]" security clearances held by the firms' lawyers and "terminat[ing] … any federal contract" under which they provide services—whenever the Attorney General feels their conduct warrants such measures.[12] He also instructed the Attorney General to review attorney conduct in litigation against the federal government over the past eight years and to recommend the same range of disciplinary actions if the Attorney General "identifies misconduct that may warrant additional action, such as filing frivolous litigation or engaging in fraudulent practices."[13]

69.    In the same March 22 memorandum, President Trump asserted that these measures are necessary to combat what he described as "grossly unethical misconduct" by attorneys and law firms, which, he claimed, "threatens our national security, homeland security, public safety, or election integrity."[14]

70.    On March 25, 2025, President Trump signed an executive order titled "Addressing Risks from Jenner & Block" ("Jenner Order").[15] The Jenner Order continued the Administration's practice of targeting "so-called 'Big Law' firms," alleging that such firms "regularly conduct … harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own

---

[12] *Preventing Abuses of the Legal System and the Federal Court*, The White House (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court.

[13] *Id.*
[14] *Id.*
[15] *Addressing Risks from Jenner & Block*, The White House (Mar. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/.

27

**JA 2365**

clients."[16] The Jenner Order singled out Jenner for purportedly "abus[ing] its pro bono practice" by "engag[ing] in obvious partisan representations to achieve political ends, support[ing] attacks against women and children based on a refusal to accept the biological reality of sex, and back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders."[17] Like the Paul Weiss Order, the Jenner Order also singled out a specific Jenner partner based on his role in what the Order described as "Robert Mueller's entirely unjustified investigation."[18] The Jenner Order directed government officials to impose substantially the same sanctions against Jenner and its employees as the Perkins Order purported to impose on Perkins Coie and as the now-withdrawn Paul Weiss Order purported to impose on Paul Weiss.[19]

71.    The media has in the past speculated whether WilmerHale would be among the targets of a future executive order because it once counted Mr. Mueller as a partner and is among the "big-name firms involved in litigation against the administration," including its lawsuit on behalf of eight inspectors general who were purportedly terminated by President Trump.[20] Indeed, WilmerHale is among the relatively small set of firms whose employment practices the administration is investigating—a step some in the media interpreted as signaling to WilmerHale

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] E. Mulvany & C.R. Barber, *Fear of Trump Has Elite Law Firms in Retreat*, Wall Street Journal (Mar. 9, 2025) https://www.wsj.com/us-news/law/fear-of-trump-has-elite-law-firms-in-retreat-6f251dec; J. Henry &T. Monnay, *Trump's Big Law Fury Shows Additional Firms Are Target Risks*, Bloomberg (Mar. 19, 2025), https://news.bloomberglaw.com/business-and-practice/trumps-big-law-fury-shows-additional-firms-are-target-risks.

**JA 2366**

and the other listed firms that they are likely to face further investigation or punishment by the Administration.[21]

72.    WilmerHale has also been forced to expend significant resources to address the risk that it would be targeted by an executive order. For instance, since early March 2025, WilmerHale attorneys have devoted hundreds of hours to analyzing the Covington Memo, Perkins Order, Paul Weiss Order, and Jenner Order, and to preparing WilmerHale's strategy for responding should the Firm be targeted by President Trump. WilmerHale also retained outside counsel at Clement & Murphy to assess the risk to WilmerHale and to be prepared to protect the Firm through litigation, if necessary.

**V.    WILMERHALE HAS SUFFERED—AND IS SUFFERING—IRREPARABLE AND ENDURING HARM FROM THE EXECUTIVE ORDER TARGETING WILMERHALE**

73.    On March 27, 2025, President Trump signed an Executive Order entitled "Addressing Risks from WilmerHale" (the "Order" or "WilmerHale Order").[22] President Trump also issued an accompanying "fact sheet" that purported to further support the Order.[23] The Order directs government officials to, among other things, (A) "suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest," (B) require "[g]overnment contractors to disclose any business they do with WilmerHale," (C) "terminate any contract" with WilmerHale "to the maximum extent

---

[21] P. Hodkinson, *Big Law at War*, Am. Lawyer (Mar. 23, 2025), https://www.law.com/americanlawyer/2025/03/23/big-law-at-war/.
[22] *Addressing Risks from WilmerHale*, White House (Mar. 27, 2025),https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-wilmerhale.

[23] *Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale*, White House (Mar. 27, 2025) ("WilmerHale Fact Sheet" or "Fact Sheet"), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-wilmerhale.

**JA 2367**

permitted by applicable law," (D) issue guidance "limiting [the] official access" of WilmerHale employees to "Federal Government buildings" "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States," (E) issue guidance "limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States," and (F) "refrain from hiring employees of WilmerHale" absent special conditions. WilmerHale Order §§ 2-5.

74.     The accompanying Fact Sheet accuses WilmerHale of engaging in "activities not aligned with American interests" and calls for WilmerHale to be reviewed for non-compliance "with civil rights laws against racial bias." WilmerHale Fact Sheet. Describing WilmerHale as a "Rogue Law Firm[]" and a "partisan and bad faith actor[]," the Fact Sheet asserts that WilmerHale should "not … have access to our Nation's secrets." *Id.* The Fact Sheet further accuses WilmerHale of having "abused its pro bono practice" to "undermine justice and the interests of the United States," "pursue[d] partisan goals, support[ed] efforts to discriminate on the basis of race," "back[ed] the obstruction of efforts" to stem illegal immigration, drug trafficking, and the commission of "horrific crimes," and "support[ed] efforts designed to enable noncitizens to vote." *Id.* And it specifically targets retired WilmerHale partner "Robert Mueller and two of his colleagues," accusing all three of "lead[ing] a partisan 'investigation' against the President and others," for which it claims "WilmerHale rewarded" them by "welcoming them to the firm." *Id.*

75.     WilmerHale was given no notice that the Order or Fact Sheet were forthcoming. Nor was WilmerHale given the opportunity to respond to the false allegations in the Order or fact sheet or to explain the immediate, ongoing, and wide-ranging harm that the Order and fact sheet would have on WilmerHale, its employees, and its clients. WilmerHale also was not given an

30

**JA 2368**

opportunity to contest the claims and punishments detailed in the Order, because the Order establishes no means (and WilmerHale was provided none outside of the Order) for either contesting its directives or for challenging its assertions.

76. The Order and accompanying Fact Sheet have damaged and will damage WilmerHale's business prospects, have disrupted and will disrupt its relations with current and future clients, and have impeded and will impede its lawyers' ability to zealously advocate as counsel.

77. First, forcing government contractors to disclose "any business" with WilmerHale and threatening action with respect to those clients' government contracts (even if unrelated to their relationships with WilmerHale) discourages clients from working with WilmerHale. *See* WilmerHale Order § 3. WilmerHale represents many contractors who do business with the federal government, and the fact that WilmerHale provides legal advice to certain clients is often confidential. By creating administrative hurdles for clients seeking to work with both the federal government and with WilmerHale—and by sending the message that this Administration disfavors contractors who are represented by WilmerHale, even in matters having nothing to do with contracting—the Order and Fact Sheet directly discourage current and future clients from working with WilmerHale.

78. Second, the suspension and threatened revocation of security clearances held by individuals at WilmerHale harms the ability of WilmerHale lawyers to represent clients in cases involving sensitive government information, for example, matters involving national security, cybersecurity, defense contracting, criminal investigations, or practice before the Committee on Foreign Investment in the United States. *See* WilmerHale Order § 2. The withdrawal of

**JA 2369**

WilmerHale security clearances impairs WilmerHale's relations with clients, its reputation as a zealous and effective advocate, and the Firm's overall business prospects.

79.    Third, limiting the official access of WilmerHale attorneys to federal buildings (such as agencies and courthouses) and restricting engagement by government officials with WilmerHale attorneys (such as advocacy on behalf of clients in investigations and regulatory matters) damages the ability of WilmerHale lawyers to perform basic functions necessary to represent firm clients, including WilmerHale's ability to petition the government on its clients' behalf. *See* WilmerHale Order § 5.

80.    For example, WilmerHale attorneys are scheduled to attend meetings on behalf of clients at the Department of Justice on March 31, 2025 and the SEC on April 1, 2025. The Order makes it uncertain whether the attorneys will be denied access to the Department of Justice, SEC, and other federal buildings or whether the federal employees will refuse to meet with them. Similarly, WilmerHale attorneys are scheduled to meet over videoconference with Department of Justice attorneys on March 28, April 2, April 4, and April 9. The Order makes it uncertain whether the Department of Justice attorneys will refuse to meet with the WilmerHale attorneys.

81.    These specific impacts of the Order are particularly notable in the context of criminal cases. WilmerHale cannot provide effective representation and advocacy for its clients in proceedings against the government or in government fora if it is obstructed from engaging with federal prosecutors and accessing federal buildings.

82.    The Order also impairs WilmerHale personnel's ability to perform their civic duties, including WilmerHale employees who proudly serve our nation in the military Reserves and must access government facilities and interact with government employees when called to serve. Indeed, several WilmerHale attorneys who are employed as reservists (with security clearances)

32

**JA 2370**

are scheduled to report for duty in the upcoming days. The Order may prevent these patriots from performing their duties and serving their country. *See* WilmerHale Order §§ 2, 5.

83.    Fourth, by damaging WilmerHale's business prospects, the Order has and will continue to create significant economic loss such that WilmerHale may need to reduce its staff or refrain from hiring new staff, further impairing the operation of the Firm and harming its employees and clients.

84.    Fifth, the Order and Fact Sheet violate WilmerHale's constitutional rights. It is clear on the face of the documents that they were issued because of, and in retaliation for, WilmerHale's advocacy for clients or causes that President Trump dislikes and association with individuals or causes the President perceives as opposed to his Administration. Both the Order and the accompanying Fact Sheet cite WilmerHale's pro bono advocacy on behalf of noncitizens, its defense of voting rights, and its efforts to ensure fair elections as reasons for issuing the Order. *E.g.*, WilmerHale Order § 1; Fact Sheet. The Order also expressly links this punishment to the Firm's decision to "welcome[e]" Mr. Mueller, Mr. Quarles, and Mr. Zebley back "to the firm" after serving in the special counsel's office. WilmerHale Order § 1. If allowed to stand, the Order will likely deter WilmerHale—and its clients and personnel—from exercising their fundamental rights to free speech and association. And by limiting WilmerHale's ability to engage with the federal government—by restricting federal employees from engaging with WilmerHale and by limiting WilmerHale's access to federal buildings—the Order impairs WilmerHale and its personnel's ability to petition the government. WilmerHale Order § 5.

85.    Finally, the Order and accompanying Fact Sheet harm WilmerHale's reputation in the legal market and among its current and prospective clients and employees through false and disparaging characterizations of the Firm and its attorneys. The Order and fact sheet lodge baseless

33

**JA 2371**

JA 2372

accusations and create the false impression that WilmerHale and its attorneys have *inter alia* (1) "engage[d] in activities that undermine justice and the interests of the United States," (2) "furthered the degradation of the quality of American elections," and (3) "rewarded" individuals who encouraged the "weaponization of the government." WilmerHale Order § 1; Fact Sheet.

86.    In sum, unless the WilmerHale Order is immediately enjoined, WilmerHale faces exceptional, ongoing, and irreparable harm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on March 28, 2025

_____
Bruce M. Berman

34

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WILMER CUTLER PICKERING HALE    )
AND DORR LLP,    )
                )
        Plaintiff,    )
                )
        v.    )    Civil Case No. 25-cv-917 (RJL)
                )
EXECUTIVE OFFICE OF THE    )
PRESIDENT, *et al.*,    )
                )
        Defendant.    )

<u>MEMORANDUM ORDER</u>

March 28, 2025 [Dkt. #3]

This matter comes before the Court on plaintiff's Motion for a Temporary Restraining Order [Dkt. #3]. For the reasons set forth below, I will **GRANT IN PART** and **DENY IN PART** plaintiff's motion and issue a temporary restraining order ("TRO") as to Sections 3 and 5 of the Executive Order issued on March 27, 2025, entitled "Addressing Risks from WilmerHale."

Plaintiff has shown "'(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [TRO] were not granted, (3) that [the TRO] would not substantially injure other interested parties, and (4) that the public interest would be furthered' by the TRO." *Am. Foreign Serv. Ass'n v. Trump*, --- F. Supp. 3d ---, 2025 WL435415, at *1 (D.D.C. Feb. 7, 2025) (Nichols, J.) (quoting *Chaplaincy of Full Gospel*

1

**JA 2373**

*Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  Here, because plaintiff seeks to enjoin the Government, the third and fourth factors merge.  *Id.*

As to the first factor, plaintiff has shown a likelihood of success on the merits of its First Amendment claims as to Sections 3 and 5 of the Executive Order.  Undisputably, "the First Amendment prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech."  *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)).  This prohibition includes retaliatory actions based on perceived viewpoint.  The retaliatory nature of the Executive Order at issue here is clear from its face—not only from Section 1, but also from the Fact Sheet published the same day.  Indeed, the Executive Order requires government contracting agencies to disclose, review, and terminate all contracts with plaintiff—that is Section 3—and restricts WilmerHale employees from access to federal officials, buildings, and employment—that is Section 5.  There is no doubt this retaliatory action chills speech and legal advocacy, or that it qualifies as a constitutional harm.

Regarding Section 2, however, plaintiff has not met its burden in showing a likelihood of success on the merits.  Our Circuit has held that security clearance decisions are within the purview of the Executive Branch, *see Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024), and plaintiff has not pointed to persuasive authority that would support extraordinary injunctive relief at this early stage.

As to the second factor, the Court finds that plaintiff would suffer irreparable injury should the Court deny a TRO as to Sections 3 and 5 of the Executive Order.  As an initial matter, violations of plaintiff's constitutional rights constitute irreparable harm, even if the

2

**JA 2374**

violations occur only for short periods of time. Moreover, implementation of Sections 3 and 5 would cause specific, irreparable, and non-remediable economic and reputational harm to plaintiff. While economic loss does not always warrant a TRO, this is not a typical situation because plaintiff faces more than economic harm—it faces crippling losses and its very survival is at stake.

Indeed, enforcing Section 3—the government contracts provision—would threaten almost one-third of plaintiff's revenues. The declaration of Bruce Berman states that "[a]t least 21 of the firm's 25 largest clients in 2024 have contracts with federal agencies. These 21 clients accounted for more than 30% of the Firm's revenue in 2024—nearly $500 million." Berman Decl. ¶ 30 [Dkt. #3-2]. Plaintiff is also "currently handling over 100 open government contracting matters involving various federal agencies." *Id.* ¶ 31. Losing these clients as a result of Section 3 would be a devastating blow to plaintiff—threatening plaintiff's very existence. This says nothing of the potential clients who may not even consider hiring plaintiff because of their concerns about losing government contracts.

Regarding Section 5—the personnel provision—it is clear that plaintiff's business is inextricably intertwined with interactions with the federal government. The Berman Declaration states that WilmerHale attorneys are working on approximately 1,110 matters before or involving federal agencies. *Id.* ¶ 28. WilmerHale attorneys are scheduled to attend meetings on behalf of clients at the Department of Justice ("DOJ") on March 31, 2025 and the Securities and Exchange Commission ("SEC") on April 1, 2025. *Id.* ¶ 80. According to the Berman Declaration, plaintiff does not know either if its attorneys will be denied access to DOJ or the SEC, or if the federal employees will refuse to meet with them.

3

**JA 2375**

*Id.* Plaintiff's counsel stated during the TRO hearing that since the Executive Order issued, the federal government has already cancelled two meetings with plaintiff's attorneys, at the last minute and without explanation. Should Section 5 be enforced, plaintiff would be thoroughly hamstrung from representing clients because its attorneys could not enter federal courthouses or other buildings, or meet with federal employees regarding cases. The impact on plaintiff's business and reputation cannot be overstated. Thus, I find that the second factor, irreparable injury, favors granting a TRO regarding Sections 3 and 5.

Finally, the third factor, the balance of the equities and public interest, also favor issuing a TRO preventing enforcement of Sections 3 and 5. The injuries to plaintiff here would be severe and would spill over to its clients and the justice system at large. The public interest demands protecting against harms of this magnitude.

Therefore, it is hereby

**ORDERED** that plaintiff's Motion for a Temporary Restraining Order [Dkt. #3] is **GRANTED** as to Sections 3 and 5 of the Executive Order entitled "Addressing Risks from WilmerHale," issued by the President and published on March 27, 2025, and **DENIED** as to the remaining Sections of the Executive Order; it is further

**ORDERED** that defendants are **ENJOINED** from implementing or enforcing Sections 3 and 5 of the Executive Order; it is further

**ORDERED** that defendants must suspend and rescind any implementation or enforcement of Sections 3 and 5 of the Executive Order; and it is further

4

**JA 2376**

**ORDERED** that the parties shall file, by 4:00 PM on March 31, 2025, a joint status report proposing an expedited schedule to govern further proceedings in this case.

**SO ORDERED**.

_____
RICHARD J. LEON
United States District Judge

5

**JA 2377**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


WILMER CUTLER LLP,                    )
                                      )
         Plaintiff,                   )
                                      )     CA No. 25-917
                                      )     Washington, D.C.
      vs.                             )     March 28, 2025
                                      )     4:30 p.m.
EXECUTIVE OFFICE                      )
OF THE PRESIDENT, ET AL.,             )
                                      )
         Defendants.                  )
_____)


TRANSCRIPT OF MOTION HEARING ON TRO PROCEEDINGS
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:            Paul Clement
                              Erin Murphy
                              CLEMENT & MURPHY, PLLC
                              706 Duke Street
                              Alexandria, VA 20004
                              (202) 742-8900
                              Email:
                              paul.clement@clementmurphy.com



For the Defendants:           Richard Lawson
                              DOJ-USAO
                              950 Pennsylvania Avenue, NW
                              Washington, D.C. 20530-0001
                              202-445-8042
                              Email:
                              richard.lawson3@usdoj.gov

**JA 2378**

```
APPEARANCES CONTINUED:

Court Reporter:                 William P. Zaremba
                                Registered Merit Reporter
                                Certified Realtime Reporter
                                Official Court Reporter
                                E. Barrett Prettyman CH
                                333 Constitution Avenue, NW
                                Washington, D.C. 20001
                                (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription
```

P R O C E E D I N G S

COURTROOM DEPUTY:  All rise.  The United States District Court for the District of Columbia is now in session, the Honorable Richard J. Leon presiding.  God save the United States and this Honorable Court.  Please be seated and come to order.

We're on the record in Civil Action 25-917, Wilmer Cutler, Pickering, Hall and Dorr, LLP, versus Executive Office of the President, et al.

Starting with plaintiff's counsel, please approach the podium and state your appearance for the record.

MR. CLEMENT:  Good afternoon, Your Honor.

Paul Clement from Clement & Murphy.

THE COURT:  Welcome.

MR. CLEMENT:  Thank you.

Would you like to me introduce my co-counsel or have her --

THE COURT:  Sure.  She's well-known.

MR. CLEMENT:  Okay.

Well, I'll introduce my co-counsel, Erin Murphy, of Clement & Murphy as well.

THE COURT:  Okay.  Welcome.

MR. LAWSON:  Good afternoon, Your Honor.

Richard Lawson with the Department of Justice.

THE COURT:  Whereabouts in the Department of Justice?

MR. LAWSON:  Deputy Associate Attorney General.

Deputy Associate Attorney General's Office.

THE COURT:  Okay.

Well, Mr. Clement, TRO world, moving party goes first.  You have 15 minutes, five minutes for rebuttal, all right?

You have a baby in the room?

AUDIENCE MEMBER:  Yes, I can move her out.

THE COURT:  We're not going to have interference from a baby.

Go ahead, sir.

MR. CLEMENT:  Thank you, Your Honor, and may it please the Court.

As I mentioned, accompanied with my co-counsel, Erin Murphy, and a number of the members of my client firm.

As Your Honor stated, we're here on a TRO, and because of that, I want to sort of get to the various TRO factors.

I'll just start with the idea, though, that I think this case and the case that'll be argued in front of Judge Bates in a few minutes and the case that was argued earlier in front of Judge Howell are some of the most important cases for the First Amendment and the rule of law.

And this is a TRO.

We'll eventually get to the stage of a PI or some other point where I will look forward to arguing all of the various issues in depth.

But at this stage, the questions are obviously, is there a likelihood of success, is there irreparable injury, and then the balance of the equities.

THE COURT:  Well, let's start with irreparable harm.

MR. CLEMENT:  Sure.

THE COURT:  It's too speculative at this point because of all the clauses that are stuck in this Executive Order of, consistent with the law, consistent with national interest, that shall do this, thus-and-thus, as long as it's consistent with the law, consistent with the national interest, all of those qualifiers, which, of course, the hurdles haven't been jumped yet, this has just been issued, right?

MR. CLEMENT:  It's just been issued, but it was issued by the President with the intention that it would have immediate effect.

Security clearances are being suspended, and there'll be a process later to see if we've suspended the right security clearances.  So this was decidedly by the President intended to have immediate effect.

6

And, of course, in the First Amendment context, the chilling effect has been immediate.

And the effect on my clients, the effects on them in dealing with their own clients, the effects in dealing with the government.

For example, my clients have already had two meetings with agencies that were supposed to take place today; were canceled at the last minute. So there's no -- well, we'll cancel it if it's consistent with law, because if they had done that check, they wouldn't have canceled the meeting, because it's not consistent with the law.

THE COURT: Right.

MR. CLEMENT: I think in thinking about the irreparable injury and this issue in particular, I think you obviously have to approach it with an ounce of common sense.

And, you know, if, in fact -- because if it's consistent with law clauses, this Executive Order had no actual effect because it's all inconsistent with the First Amendment and it's all inconsistent with the separation of powers, et cetera, et cetera, there would be nobody more disappointed to learn that than the President of the United States.

When the President of the United States signed that Executive Order, he thought it was having immediate effect and he wanted it to have immediate effect and it has

had an immediate effect.

Then you can look at -- I mean, obviously, Judge Howell considered irreparable injury and found irreparable injury.

Since she's issued her orders, we've seen the effects that it's had on our firm.

But, frankly, we've also seen the effects that it had on Paul, Weiss.  And I think we can take notice of the fact that Paul, Weiss did not, essentially, comply and make a deal with the President because they wanted to or they thought it was consistent with the First Amendment.  They did it, as they told their own partnership, we had to do this to save the business.

This has such a dramatic -- even with those clauses, these orders have had such a dramatic effect on these law firms that some of them are standing tall and some of them are making deals, but it's not because it's not having an immediate effect on their businesses.

So if I could return then just for a minute to the separation of -- to the merits questions, rather, and the likelihood of success on the merits.

As I said, there will be plenty of time to talk about that in depth, but I would just like to talk about a couple of the constitutional issues that I think are the most straightforward.

**JA 2384**

8

And I'll start -- it's always a good place to start:  The First Amendment.

And, of course, it prohibits retaliation, and it prohibits government action, including Executive Branch action, in retaliation for protected speech, protected activity, protected petitioning activity.

Now, in most cases, at least that I'm aware of and I've been involved in, you know, the question is, boy, we're going to need discovery or something to see if there's actually a retaliatory intent.

Here, the President has given us that in Section 1 of this Executive Order.  It is avowedly retaliatory.  And I think that's important in the sense that this entire Executive Order flows from Section 1.

So before I sit down, I want to talk about the security clearance issues, which is probably the hardest issue under Circuit law.

But it's not like in the way this Executive Order is constructed, that you can really say, oh, well, you know, we're going to look at each of these clauses completely independently because they all flow from those findings in that first section and they are avowedly -- all of the consequences that follow are avowedly based on retaliation for core protected activity.  And so I think that's a clear violation of the First Amendment Free Speech Clause.

I think it is an equally clear violation of the petition clause.  It's a little bit of the weak sibling in the First Amendment; we don't think about it as much.  That's because you don't have Presidential action like this much.

THE COURT:  No.

MR. CLEMENT:  But if there's one thing that seems to me to be within the core of the constitutional right to petition for the redress of grievances, it is the ability of lawyers to come into court on behalf of their client and plead for relief in front of the courts, and that's exactly what the retaliation is targeted at.

And that brings me to the separation of powers, because, if you think about what's happening here, it is a clear violation of the separation of powers, in two respects.

One is, there is no legislative authority for what the President has done here.

But, second, and I think, frankly, more important, the retaliation here is for representations that have taken place largely in the Article III courts.  And every one of those representations was overseen by an Article III Judge, who's in a position to evaluate the quality of the lawyering before them.  If there are any misrepresentations, if there was any weaponization of the judiciary or the judicial

system, the judges were there to witness it firsthand.

Now, they didn't say, Wilmer and Cutler, WilmerHale has behaved in some sort of awful way.

In many of these cases, the clients that WilmerHale was representing won.

In many of the cases, the judges lauded the performance of the WilmerHale attorneys, particularly when they took some of these cases on on a pro bono basis, but yet all of that activity that's taking place in front of the Article III courts is being sanctioned by the Article I branch.

And we simply can't go forward like that. I mean, that is as palpable a threat to the separation of powers as I've seen, because you can't essentially let the Article III branch to its job if lawyers appearing before you are looking over their shoulder to see what is the consequence of me taking on this case in the first instance; or, worse yet, okay, I took it on, now how am I going to argue it? Am I going to argue it on eggshells because I'm afraid that I might offend somebody in the Executive Branch, or am I going to give zealous representation to my client?

And the clients require that zealous representation, but so too do the Article III courts. So the threat here is absolutely palpable.

To paraphrase Justice Scalia, this wolf comes as a

wolf.  There's nothing subtle about the separation of powers violation here.  There's nothing subtle about the retaliatory intent here.  It's right there on full display in Article I.

That brings me to the security clearances.

And we're certainly aware of *Lee against Garland* and other cases in this Circuit that say, generally speaking, most challenges to security clearance revocations are non-justiciable.

THE COURT:  Yeah, the primacy of the President in that arena is pretty darn clear.

MR. CLEMENT:  Pretty darn, but not absolute.

And I'm here to tell you that, unless it is absolute like the pardon, then you cannot withdraw security clearances or, even more precisely, because I think it's the issue, you can't deny people the usual procedures for the revocation of security clearances based on a purely retaliatory intent.

And there's no other case like this on the books.  Certainly *Lee against Garland* was not this kind of case.

And I think what many courts have done in looking at these issues, including the Third Circuit in the *El-Ganayni* case that we cite.  But I think this is consistent with footnote 7 of *Webster against Doe*.  And I think it's, frankly, consistent with the *Ralls* case,

12

is you distinguish between the substantive decision to withdraw or revoke the security clearance and the procedures that are available for that.

And if your claim is not, like, look, I want to second-guess, I want to -- they've denied me my security clearance, I have gone through my appeals, my agency appeals, I want to second-guess it.

THE COURT:  Have any been withdrawn yet?

MR. CLEMENT:  Well, on the basis of the order, they are basically suspended.

And if you want to just give -- if I can, for a second, tie this to -- because if you look at the relevant provision, it basically says the security clearances are gone and then subject to restoration through the agency processes.

THE COURT:  It says, "take steps immediately" -- excuse me.

"Immediately, take steps consistent with applicable law to suspend" -- to suspend -- "any active security clearances held by individuals at WilmerHale pending a review whether such clearances are consistent with a national interest."

MR. CLEMENT:  Right.

THE COURT:  So that's future.

MR. CLEMENT:  No, no, it's the process afterwards.

The way I read that, in all events, is that, take action to suspend those security clearances, and then you have the agency review to make sure we actually got the right people.

And just to put this in concrete terms, there are WilmerHale attorneys who are reservists.  They have security clearances not because of any legal work they're doing at WilmerHale, they have security clearances because they are serving their country in the reserves.

Two of those lawyers have to report for their reserve duty next week.  Now, I can't tell you for sure that they're going to show up and they're not going to be able to do their job because their security clearance has been suspended.

I can also tell you, though, that they have no idea whether they can, you know --

THE COURT:  They haven't been notified?

MR. CLEMENT:  Nobody's been notified of anything.

I mean, you know, I went through what I thought was the top three hits.

But due process, I mean, you know, whatever happened to due process?

In every other situation -- I mean, absolutely, the President has got the final say on security clearances.

**JA 2390**

But it's a big deal.  There's a process for it.  If you look at the *Lee against Garland* case, it talks about how that went through the agency's administrative appeals process. None of that's been given here.

And I don't think for a minute the government lawyer is going to come up here and tell you that they actually intended to suspend the reservists' security clearances.  But they're painting with such a broad brush with this thing, they aren't distinguishing sheep from goats at all.  If you're affiliated with WilmerHale, your security clearance is gone.

We know from the way this has been interpreted, with respect to canceling meetings and the like, this is not something where this might take effect next week.  This is something that's going into immediate effect.  It's having an immediate effect on our clients.  It's having an immediate effect on WilmerHale's ability to provide legal services for its clients.

THE COURT:  You say there's only one way to read this section.

MR. CLEMENT:  I think there's only -- I do.

And I think there's only one way to read it consistent with the President's intent.

Again, you know -- and we have the same principle in the congressional context, right.

Look at *Plaut v. Spendthrift Farm* or *FAIR against Rumsfeld* [sic].  You have somebody come into court and they say, oh, this is constitutional, because, actually, if you read the words the right way, it does nothing.

And the Supreme Court gives that the back of the hand; say, no, we're not going to interpret this to be a blank -- you know, blank piece of paper in order to avoid a constitutional question.

And as I say, nobody would be more disappointed to learn that this Executive Order had zero effect than President Trump.

That is not why he signed it.  He signed it because he wanted to have immediate consequences on lawyers and a law firm that he thought were weaponizing the judicial system.  And whatever might be true in some other area of the law, the chilling effect of this is immediate and enormous and fully intended.

I mean, again, this is not some case where we're going to do this for some other purpose and it might have some incidental chilling effect.  This is designed to chill law firms from representing certain kinds of clients, and that is chilling in every meaning of the word.

I'll just say a minute, before I sit down, about the balance of equities.

The balance of equities here are not close;

**JA 2392**

the public-interest factors are not close.

We've been doing it in this republic for 230 years, whatever exactly it's been; we've never had Executive Orders like this.

This is not the tradition of our country. Our country is based on the tradition that you can represent clients, you can represent unpopular clients, you can represent clients that are adverse to the interests of the people in the White House right now, and, if you do a good job for your client, you're applauded for doing it and you're certainly not sanctioned by the government power, the highest official in the land, you're not sanctioned for your choices and who you represented, especially when you're successfully representing them in courts that respect the way you've represented them.

Last thing I'll just say, as I said before, we're here on a TRO, and so we think the issues at this stage are pretty straightforward.

We look forward to briefing the PI issues, but I would respectfully ask that, from our standpoint, we'd like this whole litigation to move promptly, because one of the things we've seen with Perkins Coie is even getting a TRO doesn't seem to deter the President from issuing additional Executive Orders, and it doesn't fully stop the bleeding in terms of the intended effects on the law firm

17

and its relationships with its clients and its ability to bring in additional business.

THE COURT:  Well, what would you think for your PI pleadings, three weeks?

MR. CLEMENT:  Well, what we've suggested is -- my understanding is that in the Perkins Coie's case, briefing on the PI is supposed to be completed by April 18th.

We are perfectly happy to brief it on that schedule or on a more expeditious schedule if Your Honor would prefer.  But we would really like -- because we've seen that a TRO just isn't good enough in this particular context.

THE COURT:  I certainly agree with you on the expeditious part, absolutely, no question about that.

And we've had a little experience in this courtroom with expeditious proceedings, so we know how to deal with that.

MR. CLEMENT:  I thank you, Your Honor, and I would look forward to that.

But as we are expeditedly briefing this, we very much would want the TRO in place, we think that's absolutely vital to the rule of law and absolutely vital to protecting my clients from irreparable injury.

THE COURT:  You can get five minutes in rebuttal when the government is done.

MR. CLEMENT:  Thank you, Your Honor.

THE COURT:  I'll hear from the government.

MR. LAWSON:  Good afternoon.  Richard Lawson again for the Department of Justice.

THE COURT:  Welcome, sir.

MR. LAWSON:  Your Honor, perhaps the best way to approach this, if we could, is to take the matter section by section of the order.

I would submit that Section 1 has no operative effect.  There's no command.  It simply is laying out --

THE COURT:  It's background.

MR. LAWSON:  Correct, yes.

So --

THE COURT:  Although it is insightful with regard to the President's thinking.

MR. LAWSON:  Well --

THE COURT:  What the President was seeking to accomplish.

MR. LAWSON:  I won't deny that it's providing background as to the purpose of the order, absolutely.

I would say that it falls, perhaps, within the realm of government speech as far as, you know, this is what he is -- the President thinks on this issue and why he's

wishing to carry it out.

But I don't think it has any specific commandments to any of the Executive Branches to do X or Y. I think you'll find those in the remaining 2, 3, 4, and 5 sections.

THE COURT: Would you say it informs the agency heads and the other people of what the objective is, what the objectives are the President is seeking to achieve?

So, in a sense, by virtue of being first and setting the stage, so to speak, for what comes later, it's informing the thinking that the President is seeking to accomplish?

MR. LAWSON: I don't think there's any denial that that is laying some groundwork for the agencies; that the agencies would understand, okay, we have Section 2 on the clearances, okay, what should guide decisions on there.

You, the Court, caught the "pending review" if this is appropriate. We would read that together, that the "pending" is part of the process. And so to determine what is relevant, I think there would be some reference to Section 1 for sure.

And so, for example, the reservist, who had nothing to do with anything that was -- Section 1 was addressing, might very well likely fall outside Section 1's -- or Section 2's ambit, if that makes sense.

So if we -- but, again, going from section to

section, Section 1 clearly giving the background.

Section 2, I think the Court probably is far more well-versed than I am as to the deference on national security issues.

One point I would urge is that, to the degree counsel, Mr. Clement, has brought up points regarding the issues of where there may be some gray area on the deference, I would submit that right now at a TRO level, that that would be inappropriate at this point, given the sensitivities going on in this case and other cases, where there could be national security issues, caution should be exerted, particularly at the TRO stage, allow at least fuller briefing.  As the Court knows, we've not had a chance to submit written responses.

THE COURT:  Not yet.

MR. LAWSON:  We understand it's a TRO, not complaining on that.  But I would just urge --

THE COURT:  It's not appealable either.

MR. LAWSON:  Well, I would just urge that Section 2 -- that no TRO be granted as to Section 2, because it just -- given the particularities at this temporary emergency stage, that the deference that the Executive needs to have on security issues would be impaired on that point.

THE COURT:  What about the chilling effect?

It's hard to argue that would have a chilling effect.

You wouldn't take that position, would you?

Common sense.

MR. LAWSON:  Well, let me actually go to -- if you'll indulge that if I could address that as it relates to Section 3, if I could move on to that.

THE COURT:  Okay.

MR. LAWSON:  So Section 3 deals with the contracting issues.

There is -- I've read a number of pleadings from various counsel today, so apologies if I'm mixing up cases.

THE COURT:  Of course.

MR. LAWSON:  But there have been some citations on some of the pleadings on these issues relating to cases like the recent Supreme Court *Vullo* case and the very old *Bantam Books* case.

There is something very remarkably and importantly and vitally different in this matter than in *Vullo* or in *Bantam Books*.

In *Bantam Books* and in *Vullo*, the government was acting as a sovereign.

As it relates to Section 3, the government is acting as a patron.

And when it comes to issuing contracts, the deference due to executive action is much stronger.

For example, although it was recently rescinded by President Trump, President Johnson issued an Executive Order urging affirmative action in government contracts.  There was substantial litigation on this point over the decades, and it was constantly affirmed that the use of soc -- of the procurement power on social policy is a valid use of the procurement power.

And I would cite *Contractors Association of Eastern Pennsylvania*, 442 F.2d 159.  This is a Third Circuit case from 1971, very early dealing with this, and there's a quote in there:  "No less than in the case of defense procurement, it is in the interest of the United States and all procurement to see that its suppliers are not over the long run increasing its costs and delaying its programs by excluding from the labor pool available minority workmen."

And here's the key part:  In the area of government procurement, executive authority to impose non-discrimination contract provisions, falls within Justice Jackson's, in *Youngstown Shee*t, first category:  Actions pursuant to the expressed or implied authorization of Congress.

What I would urge, the reason I wanted to flag the chilling effect is to -- where it comes in in this order.

Section 3 is a contract provision.

The next operative provision in the order is Section 5:  Contact with agencies.

There's a lot of talk in these pleadings regarding penalties, a lot of talk regarding punishment.

This is nothing like *Vullo*.  This is nothing like *Bantam*.  This is interactions within the government.

And so we -- as far as the chilling effect, what is at stake?  What is the punishment?

This is a contract provision.

And I would urge that as it relates to the foundation in Section 1 and as it relates into Section 3, one of the points that's being discussed is racial discrimination, which is a reference to diversity programs within the law.

There is a program called the Mansfield Certification Program.  WilmerHale is a participant in that program.  We -- I think it's a valid social policy of combating diversity, which, after the *Harvard* decision in December of 2023, I think I have the right -- or '24 -- that diversity is suspect at the very least and to use the procurement power in furtherance of addressing that issue, I think, is firmly supported and within the strongest realm, as noted in that contractor's case, using the executive power to advance social policy is very strongly supported.

So as to the chilling effect, who's not being able to do what?  There's no penalty, there's no punishment.

THE COURT:  Well, Section 5 then, being prohibited from having access to government buildings?

MR. LAWSON:  So let me address Section 5.

THE COURT:  I mean --

MR. LAWSON:  Exactly.

THE COURT:  -- what possible threat do they pose to having access to government buildings?

This is a government building we're in. Supreme Court's a government building.

MR. LAWSON:  All right.

So as it relates to Section 5, I think this is critical as to all the sections of Section 5.  It's calling for guidance to be issued addressing how government buildings, government personnel will interact with the firm.

And one point that I would urge regarding the framing of any TRO that the Court -- we would urge the Court to deny -- if the Court were to grant a TRO, some care should be given as to what in Section 5 is being prohibited.

If Section 5 is, as I'm reading the proposed order, a blanket order quashing any implementation of Section 5, that kills the ability to develop the guidance.

Now, the reason we think this is important is because, without that guidance, we don't think this issue is

ripe.  We don't know exactly what limitations there will be on interaction with staff.

The counsel has raised issues about Sixth Amendment and Fifth Amendment right-to-counsel issues.

We will not deny that the Sixth Amendment talks about right-to-counsel issues, and the Fifth and Sixth both address it.  We won't deny that at all.

We don't see -- we don't know what the guidance is and how it will interact with that.

And obviously we've heard these concerns, we'll be mindful of those as they're being drafted.

But if the order bans even the creation of the guidance, I don't know how this issue ever becomes ripe. We need to see what the guidance says.

So there is an endless parade of horribles that could come from implementation of Section 5, but we don't know what that is.

So, again, I would go back to the issue of, when the Court talks about the chilling effect, what is at jeopardy here?

Contracts where there's very firm discretion for the executive and to-be-determined access to staff and government buildings not qualified, not defined, and security clearances upon which there's extraordinary deference, particularly in this type of set.

THE COURT:  What about litigation?

How are they going to -- how can a law firm of the magnitude of WilmerHale, who does litigation all over the nation, not be able to have access to federal buildings that are courthouses?

MR. LAWSON:  I will submit the order as drafted does not block that.  Right now, it doesn't block it.  The guidance has not been issued that would address access to those buildings.

The Court has raised a legitimate concern about a law firm having access to a courtroom.  As drafted, this has not defined what that access is.

Once drafted, and if the order prohibits the drafting of it -- you see, there's an interesting Catch-22 here as to the ripeness of bringing this case forward.

If we can get the guidance, then there can be a full challenge as to whether or not it is blocking access to points that the Court would have concerns about, as far as the regular duties of an attorney on that point.

But it's that ripeness issue that I think is -- it's just premature at this point to -- we would submit that there isn't a basis to bring the claim, it's too premature at this point, certainly to issue a TRO that prohibits the guidance being driven, which would form the very basis of a real claim, to the degree the guidance impinges on something

that WilmerHale finds objectionable.

THE COURT:  Wouldn't that uncertainty or doubt have a chilling effect on a client retaining the firm to do litigation for it, not knowing whether, after expending resources to hire the firm and meet with the firm and make available its time, it learns that the rules, so to speak, or the guidelines are, indeed, prohibitive of their being available to go into the courthouse and all that money is lost and wasted?

Why would a firm that's a possible client take that risk?

MR. LAWSON:  Well, I would -- I can't speak to the prospective client's perspective.

THE COURT:  Are you in the practice of law?

MR. LAWSON:  Yes, Your Honor.

THE COURT:  Do you have clients?

MR. LAWSON:  I've had clients.

I understand the Court's question.

THE COURT:  Use your common sense.

You know how clients are worried about downside risk, and they don't want to expend money needlessly or wastefully.

They are going to go to a different firm.  They'll go down the street to a different firm that doesn't have a Presidential Executive Order hanging over -- like a Sword of

Damocles hanging over its head.

MR. LAWSON:  So to the degree the Court thinks this is a concern that should be addressed on the TRO in an order the Court enters, I would urge that the order be allowed for the process to go forward on the drafting of the guidance at least so that we can have a concrete issue here.

I can understand the Court's concern.  I'm not going to discount --

THE COURT:  Well, the President could have done it a different way, couldn't he?

I mean, the President could have given a directive to his agency heads, start coming up with some guidance on this, before he issued the Executive Order.

He did it the other way around.  He did the Executive Order first before he came up with the guidance.

MR. LAWSON:  I think that might invite a question as to the difference between mentioning it to his team in a cabinet meeting versus issuing an Executive Order.  They're practically, I would think, somewhat the same.

There is an order, there has been instruction from the White House, whether it came in the form of an Executive Order, whether it came in the form of a memo passed at a cabinet meeting, draft some guidance about interaction and access to buildings.

Once the guidance is issued, we have a ripe issue,

**JA 2405**

we have a ripe matter at that point, presuming that they find it objectionable.

But I just urge great care in not curtailing the creation of the thing that would actually bring this into matter. Hopefully, the Court understands the concern I have about the breadth of the order as proposed by counsel.

I think that --

THE COURT: You have a couple more minutes.

MR. LAWSON: I think I've addressed the key points.

As to Section 4, Section 4 is -- I believe it simply engrafts the language that was in the Perkins Coie order.

This is guidance to industry writ large to the EEOC.

This is -- we would urge great care with that, that this is typical type of instruction.

I think what the Court was referring to as far as, I would like my Executive Branch agencies to be doing X, Y, and Z. It is moving the ball forward once they have produced a result. Then there would be something concrete that is challengeable.

One of the last points -- and I beg the Court's indulgence on this --

THE COURT: Sure, go ahead.

**JA 2406**

MR. LAWSON:  I have not had as much chance to study this as I would care for.

I see that one of the defendants is listed as the Executive Office of the President.

I would urge great caution about issuing a TRO as it relates to the Executive Office of the President. I think they have been very comprehensive in the various agencies that they would like this order to retain.

THE COURT:  Where is that one located?

MR. LAWSON:  I'm looking -- hopefully I've got -- yes, I'm looking at the complaint.

The first defendant listed is the Executive Office of the President.

I think there is some grave concerns about the judiciary issuing things to the President itself.  The concerns are less severe, of course, when it comes to the executive agencies.

But I think the Court understands, hopefully, the government's position.  I think there would be great help if the Court approaches as suggested, we go section by section and look at exactly what is being challenged and what, if anything, is concrete in each section.

THE COURT:  Will you be able to handle an accelerated briefing schedule for the PI?

MR. LAWSON:  Yes, I think we can probably -- that's probably a matter we can work out very easily with counsel.  We are moving very quickly.

I will point out its dispositive motions on the Perkins Coie case are due Wednesday.  There's some motions for summary judgment, motions to dismiss dispute, but they're due Wednesday, briefing should be completed by the 18th, with a hearing set for the 21st.

I think the arguments here very closely track to there.  I don't think it would be hard to meet that schedule, assuming I haven't missed some other very complicated issue, but I think we can hit that schedule.

It might be good if we could have briefs due late next week, rather than Wednesday, give me a few days to get Perkins dealt with.  Okay.

THE COURT:  Well, I would suggest that by Monday, we have a joint proposed accelerated briefing schedule --

MR. LAWSON:  That should not be a problem.

THE COURT:  -- that you file with the Court so I can take a look at that on Monday.

MR. LAWSON:  Thank you, Your Honor.

THE COURT:  Thank you.

Do you have anything that jumped out at you?

MR. CLEMENT:  A couple of things, Your Honor, so I have a couple of quick points in rebuttal.

I mean, first of all, if somebody's shooting randomly and you come in and say, you gotta stop that guy shooting randomly, and then their best response is, well, no, no, if you do that, then I won't have time to aim. I mean, come on, there was plenty of opportunity for the President, as you suggested, to make the guidance first. He didn't do that, and he didn't do it for a reason.

And there's also a reason that he didn't do it in a cabinet meeting.  If he'd done this in a cabinet meeting, our clients wouldn't be concerned about this, Perkins Coie's clients wouldn't be concerned about this, and Paul, Weiss wouldn't have come in and offered to do $40 million in pro bono work.

He needed to make this public, he needed to make a point, he needed to have the chilling effect.  And it's all done on the basis of a retaliatory motive that is plain as day for all to see and a retaliation against litigation in the Article III courts.

So let me also talk about the security clearance.

I think the TRO aspect of this cuts both ways. I mean, there is immediate injury on the security clearance's clause.

And in order to ultimately rule for the government on this, given how clear paragraph 1 of the Executive Order is, you are going to have to hold effectively that security

clearances are like pardons; that even if the President swears on a bible that I'm giving this pardon for a purely retaliatory motive for what somebody did in an Article III court that the Article III court thought was great, maybe you can do that with a pardon power.

I do not think you can do that with security clearances. That would be a grave abuse of all the residual authority of the President. All the reasons why we give deference to those judgments when the procedures are followed, all that goes out the window if you can say, I'm going to revoke your security clearance just to get even, and that's essentially what this case looks like.

Happy to brief it. But in the interim, the TRO should be complete, especially because, as we said in the briefing, there's nothing severable about this Executive Order.

This is not like, oh, well, the security clearances stand alone. It all fits together and it's all driven by those statements in Section 1 that Your Honor yourself pointed to.

Let me then go to this idea that somehow because this is government procurement or government contracting or government spending, somehow it's different. Not when it comes to retaliation, not when it comes to viewpoint distribution. That's true as a matter of constitutional

law, and it's also true as a matter of statutory law.

If you look at footnote 25 in our TRO papers, we cite a congressional statute where Congress says that, we don't want any contracting decisions to be done on a discriminatory basis, partisan basis, and all the rest. So the Constitution itself doesn't say you have free rein when it comes to spending your contracting, and Congress has made the same point, which is just one of the many separation-of-powers problems here.

Last thing I'll say is just on the chilling effect, I mean, Your Honor, I think, captured this point well. But, in terms of telling your clients, hey, you know, in a couple of weeks, we might know whether we can get into that government building. That is not something any client wants to hear from their lawyer. They expect their lawyers to get into government buildings on a regular basis.

And it's not just the courts. I mean, WilmerHale has a thriving state-of-the-art intellectual property practice. They have to go in front of the PTAB, which is part of the Executive Branch, looks a lot like a court in some of its proceedings, but they have to go into the PTAB virtually every single day. If they can't get into the PTAB, or, frankly, if there's any doubt whether they can get into the PTAB on behalf of their clients, that is a complete chilling effect, a complete irreparable injury.

And then if the reason they can't get into the PTAB is because of the way that some of their lawyers, their partners at the firm, have litigated cases in court, succeeded for their clients in many cases, sometimes they've lost as well.  But we have an adversarial system of justice. We need both sides in there making the best arguments for the Court.

They've done that in the highest tradition of the law, and what do they get?  They get barred from federal buildings, they lose their security clearances, some of their lawyers are told that they might not be able to get a job into the Executive branch, including an AUSA job that has traditionally been completely nonpartisan and is a plum job that somebody, whether they're at the firm now or they're in law school thinking about which firm to go to, if going it WilmerHale means you can't go to the U.S. Attorney's Office and be an AUSA, all of that has chilling effects that are happening right now.

And we have a declaration that supports all of that.  But you also have common sense and you can look at what's happened at Perkins Coie, you can look at what Paul, Weiss has done.

I think the irreparable injury here is as clear as the constitutional violations, and they are clear as day, and all we have to show is a likelihood of success at this

**JA 2412**

stage.

So we'd ask you to have a TRO that applies across the board to the whole Executive Order.

Thank you, Your Honor.

THE COURT:  Well, thank you, Counsel.

I promised my dear colleague, Judge Bates, that I'd get done so that he could start his hearing for his case in the next five minutes, ten minutes.

I'm going to digest a little bit more the arguments that I've heard today, which were insightful, helpful.

Kind of historically coincidental that it was in this very courtroom that WilmerHale represented *Boumediene* and represented the *Boumediene* five right in this courtroom years ago.  So the Court's quite familiar with that firm's litigation practice and the service that it provided to the community, to the Bar, and to the nation.

So I will tell the government counsel that I'm inclined to grant the TRO.  The only question is, how broadly.

So I'll issue an order probably within the next few hours, and, like I say, I'm inclined to grant it.

So that's where we stand at the moment.  We'll see where this goes.  It will be an interesting ride for the next few months.

37

MR. LAWSON:  Your Honor, if I could talk about one point regarding a proposed grant?

THE COURT:  You don't have any experience in this courtroom.

Once I've finished my remarks, I'm done.

Stand adjourned.

COURTROOM DEPUTY:  All rise.

This Honorable Court stands adjourned.

(Proceedings concluded at 5:32 p.m.)

**JA 2414**

38

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date:__March 28, 2025_____    _____

William P. Zaremba, RMR, CRR

**AUDIENCE MEMBER: [1]** 4/10

**COURTROOM DEPUTY: [2]** 3/2 37/7

**MR. CLEMENT: [18]** 3/12 3/15 3/19 4/14 5/10 5/19 6/13 9/7 11/12 12/9 12/23 12/25 13/19 14/21 17/5 17/19 18/3 31/24

**MR. LAWSON: [29]** 3/23 4/3 18/5 18/8 18/14 18/18 18/21 19/12 20/16 20/19 21/6 21/10 21/15 24/5 24/7 24/12 26/6 27/12 27/15 27/17 28/2 28/16 29/9 30/1 30/10 30/25 31/18 31/21 37/1

**THE COURT: [48]**

**$**

**$40 [1]** 32/12

**'**

**'24 [1]** 23/20

**0**

**0001 [1]** 1/19

**1**

**1's [1]** 19/24
**15 [1]** 4/7
**159 [1]** 22/11
**18th [2]** 17/8 31/8
**1971 [1]** 22/12

**2**

**2's [1]** 19/24
**20001 [1]** 2/5
**20004 [1]** 1/15
**202 [2]** 1/15 2/5
**202-445-8042 [1]** 1/20
**2023 [1]** 23/20
**2025 [2]** 1/5 38/7
**20530-0001 [1]** 1/19
**21st [1]** 31/8
**22 [1]** 26/14
**230 years [1]** 16/3
**25 [1]** 34/2
**25-917 [2]** 1/4 3/7
**28 [2]** 1/5 38/7

**3**

**3249 [1]** 2/5
**333 [1]** 2/4
**354-3249 [1]** 2/5

**4**

**442 [1]** 22/11
**4:30 [1]** 1/6

**5**

**5:32 [1]** 37/9

**7**

**706 [1]** 1/14
**742-8900 [1]** 1/15

**8**

**8042 [1]** 1/20
**8900 [1]** 1/15

**9**

**917 [2]** 1/4 3/7
**950 [1]** 1/19

**A**

**ability [4]** 9/9 14/17 17/1 24/23
**able [5]** 13/13 24/1 26/4 30/23 35/11
**about [29]** 6/13 7/23 7/23 8/15 9/3 9/14 11/1 11/2 14/2 15/23 17/15 21/1 25/3 25/6 25/19 26/1 26/10 26/18 27/20 28/23 29/6 30/5 30/14 32/10 32/11 32/19 33/15 35/15 37/1
**above [1]** 38/4
**above-titled [1]** 38/4
**absolute [2]** 11/12 11/14
**absolutely [6]** 10/24 13/24 17/15 17/22 17/23 18/22
**abuse [1]** 33/7
**accelerated [2]** 30/24 31/17
**access [9]** 24/4 24/9 25/22 26/4 26/8 26/11 26/12 26/17 28/24
**accompanied [1]** 4/16
**accomplish [2]** 18/20 19/11
**achieve [1]** 19/7
**across [1]** 36/2
**acting [2]** 21/23 21/25
**action [7]** 3/7 8/4 8/5 9/4 13/3 22/2 22/5
**Actions [1]** 22/21
**active [1]** 12/19
**activity [4]** 8/6 8/6 8/24 10/9
**actual [1]** 6/18
**actually [6]** 8/10 13/4 14/7 15/3 21/6 29/4
**additional [2]** 16/24 17/2
**address [4]** 21/7

24/5 25/7 26/8
**addressed [2]** 28/3 29/9
**addressing [3]** 19/23 23/22 24/15
**adjourned [2]** 37/6 37/8
**administrative [1]** 14/3
**advance [1]** 23/25
**adversarial [1]** 35/5
**adverse [1]** 16/8
**affiliated [1]** 14/10
**affirmative [1]** 22/5
**affirmed [1]** 22/7
**afraid [1]** 10/19
**after [2]** 23/19 27/4
**afternoon [3]** 3/12 3/23 18/5
**afterwards [1]** 13/1
**again [5]** 14/24 15/18 18/5 19/25 25/18
**against [6]** 11/6 11/20 11/24 14/2 15/1 32/17
**agencies [7]** 6/7 19/13 19/14 23/3 29/19 30/8 30/17
**agency [5]** 12/6 12/14 13/4 19/5 28/12
**agency's [1]** 14/3
**ago [1]** 36/15
**agree [1]** 17/14
**ahead [2]** 4/13 29/25
**aided [1]** 2/7
**aim [1]** 32/4
**al [2]** 1/7 3/9
**Alexandria [1]** 1/15
**all [31]** 3/2 4/8 5/3 5/12 5/16 6/18 6/19 8/21 8/22 10/9 13/2 14/10 22/15 24/12 24/14 25/7 26/3 27/8 32/1 32/15 32/17 33/7 33/8 33/10 33/18 33/18 34/5 35/17 35/19 35/25 37/7
**all right [1]** 4/8
**allow [1]** 20/12
**allowed [1]** 28/5
**alone [1]** 33/18
**already [1]** 6/6
**also [6]** 7/7 13/16 32/8 32/19 34/1 35/20
**although [2]** 18/16 22/3
**always [1]** 8/1
**am [4]** 10/18 10/19 10/20 20/3
**Am I [1]** 10/19
**ambit [1]** 19/24

**Amendment [10]** 4/25 6/1 6/19 7/11 8/2 8/25 9/3 25/4 25/4 25/5
**any [14]** 9/24 9/25 12/8 12/19 13/8 19/2 19/3 19/12 24/18 24/22 34/4 34/14 34/23 37/3
**anything [4]** 13/19 19/22 30/22 31/23
**apologies [1]** 21/13
**appealable [1]** 20/18
**appeals [3]** 12/6 12/7 14/3
**appearance [1]** 3/11
**APPEARANCES [2]** 1/12 1/21
**appearing [1]** 10/15
**applauded [1]** 16/10
**applicable [1]** 12/19
**applies [1]** 36/2
**approach [3]** 3/10 6/15 18/9
**approaches [1]** 30/20
**appropriate [1]** 19/17
**April [1]** 17/8
**April 18th [1]** 17/8
**are [42]**
**area [3]** 15/15 20/7 22/18
**aren't [1]** 14/9
**arena [1]** 11/11
**argue [3]** 10/18 10/19 21/2
**argued [2]** 4/22 4/23
**arguing [1]** 5/3
**arguments [3]** 31/9 35/6 36/10
**around [1]** 28/14
**art [1]** 34/18
**Article [10]** 9/21 9/22 10/10 10/10 10/14 10/23 11/4 32/18 33/3 33/4
**Article I [2]** 10/10 11/4
**Article III [7]** 9/21 10/10 10/14 10/23 32/18 33/3 33/4
**as [60]**
**ask [2]** 16/20 36/2
**aspect [1]** 32/20
**Associate [2]** 4/3 4/4
**Association [1]** 22/10
**assuming [1]** 31/11
**attorney [3]** 4/3 4/4 26/19
**Attorney General [1]** 4/3
**Attorney's [1]** 35/17
**attorneys [2]** 10/7

**JA 2416**

**A**

**attorneys... [1]** 13/7
**AUSA [2]** 35/12 35/17
**authority [3]** 9/17 22/19 33/8
**authorization [1]** 22/22
**available [4]** 12/3 22/17 27/6 27/8
**Avenue [2]** 1/19 2/4
**avoid [1]** 15/7
**avowedly [3]** 8/12 8/22 8/23
**aware [2]** 8/7 11/6
**awful [1]** 10/3

**B**

**baby [2]** 4/9 4/12
**back [2]** 15/5 25/18
**background [3]** 18/13 18/22 20/1
**balance [3]** 5/7 15/24 15/25
**ball [1]** 29/20
**bans [1]** 25/12
**Bantam [4]** 21/17 21/21 21/22 23/7
**Bar [1]** 36/17
**barred [1]** 35/9
**Barrett [1]** 2/4
**based [3]** 8/23 11/17 16/6
**basically [2]** 12/10 12/13
**basis [8]** 10/8 12/9 26/22 26/24 32/16 34/5 34/5 34/16
**Bates [2]** 4/23 36/6
**be [43]**
**because [27]** 4/19 5/12 6/9 6/11 6/16 6/18 7/10 7/17 8/21 9/4 9/14 10/14 10/19 11/15 12/12 13/8 13/9 13/14 15/3 15/13 16/21 17/11 20/21 24/25 33/14 33/21 35/2
**because it [1]** 20/21
**becomes [1]** 25/13
**been [18]** 5/17 5/17 5/19 6/2 8/8 12/8 13/14 13/18 13/19 14/4 14/12 16/2 16/3 21/15 26/8 28/20 30/7 35/13
**before [8]** 1/10 8/15 9/24 10/15 15/23 16/16 28/13 28/15
**beg [1]** 29/23
**behalf [2]** 9/10 34/24
**behaved [1]** 10/3
**being [11]** 5/22

10/10 19/8 23/13 24/1 24/3 24/20 25/11 26/24 27/7 30/21
**believe [1]** 29/11
**best [3]** 18/8 32/3 35/6
**between [2]** 12/1 28/17
**bible [1]** 33/2
**big [1]** 14/1
**bit [2]** 9/2 36/9
**blank [2]** 15/7 15/7
**blanket [1]** 24/22
**bleeding [1]** 16/25
**block [2]** 26/7 26/7
**blocking [1]** 26/17
**board [1]** 36/3
**bono [2]** 10/8 32/13
**books [4]** 11/19 21/18 21/21 21/22
**both [3]** 25/6 32/20 35/6
**Boumediene [2]** 36/13 36/14
**boy [1]** 8/8
**branch [7]** 8/4 10/11 10/15 10/20 29/19 34/20 35/12
**Branches [1]** 19/3
**breadth [1]** 29/6
**brief [2]** 17/9 33/13
**briefing [8]** 16/19 17/7 17/21 20/13 30/24 31/7 31/17 33/15
**briefs [1]** 31/13
**bring [3]** 17/2 26/22 29/4
**bringing [1]** 26/15
**brings [2]** 9/13 11/5
**broad [1]** 14/8
**broadly [1]** 36/20
**brought [1]** 20/6
**brush [1]** 14/8
**building [3]** 24/10 24/11 34/14
**buildings [9]** 24/4 24/9 24/16 25/23 26/4 26/9 28/24 34/16 35/10
**business [2]** 7/13 17/2
**businesses [1]** 7/18

**C**

**CA [1]** 1/4
**cabinet [4]** 28/18 28/23 32/9 32/9
**called [1]** 23/16
**calling [1]** 24/14
**came [3]** 28/15 28/21 28/22
**can [27]** 4/10 7/2 7/8 8/19 12/11 13/16

13/17 16/6 16/7 16/9 18/1 26/2 26/16 26/16 28/6 28/7 31/1 31/2 31/12 31/20 33/5 33/6 33/10 34/13 34/23 35/20 35/21
**can't [8]** 10/12 10/14 11/16 13/12 27/12 34/22 35/1 35/16
**cancel [1]** 6/9
**canceled [2]** 6/8 6/10
**canceling [1]** 14/13
**cannot [1]** 11/14
**captured [1]** 34/11
**care [4]** 24/19 29/3 29/16 30/2
**carry [1]** 19/1
**case [21]** 4/22 4/22 4/23 10/17 11/19 11/20 11/23 11/25 14/2 15/18 17/6 20/10 21/17 21/18 22/12 22/13 23/24 26/15 31/5 33/12 36/7
**cases [11]** 4/25 8/7 10/4 10/6 10/8 11/7 20/10 21/13 21/16 35/3 35/4
**Catch [1]** 26/14
**Catch-22 [1]** 26/14
**category [1]** 22/21
**caught [1]** 19/16
**caution [2]** 20/11 30/5
**certain [1]** 15/21
**certainly [5]** 11/6 11/20 16/11 17/14 26/23
**Certification [1]** 23/17
**Certified [1]** 2/3
**certify [1]** 38/2
**cetera [2]** 6/20 6/20
**CH [1]** 2/4
**challenge [1]** 26/17
**challengeable [1]** 29/22
**challenged [1]** 30/21
**challenges [1]** 11/8
**chance [2]** 20/13 30/1
**check [1]** 6/10
**chill [1]** 15/20
**chilling [15]** 6/2 15/16 15/20 15/22 21/1 21/2 22/25 23/8 24/1 25/19 27/3 32/15 34/10 34/25 35/17
**choices [1]** 16/13
**Circuit [4]** 8/17

11/7 11/22 22/11
**citations [1]** 21/15
**cite [3]** 11/23 22/10 34/3
**Civil [1]** 3/7
**claim [3]** 12/4 26/22 26/25
**clause [3]** 8/25 9/2 32/22
**clauses [4]** 5/12 6/17 7/15 8/20
**clear [7]** 8/24 9/1 9/15 11/11 32/24 35/23 35/24
**clearance [8]** 8/16 11/8 12/2 12/6 13/14 14/11 32/19 33/11
**clearance's [1]** 32/22
**clearances [19]** 5/22 5/24 11/5 11/15 11/17 12/13 12/20 12/21 13/3 13/8 13/9 13/25 14/8 19/15 25/24 33/1 33/7 33/18 35/10
**clearly [1]** 20/1
**Clement [7]** 1/13 1/14 3/13 3/13 3/21 4/6 20/6
**clementmurphy.com [1]** 1/16
**client [7]** 4/17 9/10 10/21 16/10 27/3 27/10 34/14
**client's [1]** 27/13
**clients [21]** 6/3 6/4 6/6 10/4 10/22 14/16 14/18 15/21 16/7 16/7 16/8 17/1 17/24 27/16 27/17 27/20 32/10 32/11 34/12 34/24 35/4
**close [2]** 15/25 16/1
**closely [1]** 31/9
**co [3]** 3/16 3/20 4/16
**co-counsel [3]** 3/16 3/20 4/16
**Coie [4]** 16/22 29/12 31/5 35/21
**Coie's [2]** 17/6 32/10
**coincidental [1]** 36/12
**colleague [1]** 36/6
**COLUMBIA [2]** 1/1 3/3
**combating [1]** 23/19
**come [8]** 3/6 9/10 14/6 15/2 25/16 32/2 32/5 32/12
**comes [8]** 10/25 19/9 22/1 22/25 30/16 33/24 33/24 34/7
**coming [1]** 28/12

**C**

command [1] 18/12
commandments [1] 19/2
common [4] 6/15 21/5 27/19 35/20
community [1] 36/17
complaining [1] 20/17
complaint [1] 30/11
complete [3] 33/14 34/24 34/25
completed [2] 17/7 31/7
completely [2] 8/20 35/13
complicated [1] 31/12
comply [1] 7/9
comprehensive [1] 30/7
computer [1] 2/7
computer-aided [1] 2/7
concern [4] 26/10 28/3 28/7 29/5
concerned [2] 32/10 32/11
concerns [4] 25/10 26/18 30/14 30/16
concluded [1] 37/9
concrete [4] 13/6 28/6 29/21 30/22
Congress [3] 22/23 34/3 34/7
congressional [2] 14/25 34/3
consequence [1] 10/16
consequences [2] 8/23 15/13
considered [1] 7/3
consistent [13] 5/13 5/13 5/15 5/15 6/9 6/11 6/17 7/11 11/24 11/25 12/18 12/21 14/23
constantly [1] 22/7
Constitution [2] 2/4 34/6
constitutional [6] 7/24 9/8 15/3 15/8 33/25 35/24
constructed [1] 8/19
Contact [1] 23/3
context [3] 6/1 14/25 17/13
CONTINUED [1] 2/1
contract [3] 22/20 23/1 23/10
contracting [4] 21/11 33/22 34/4 34/7
contractor's [1] 23/24

contractors [1] 22/10
contracts [3] 22/1 22/5 25/21
core [2] 8/24 9/8
correct [2] 18/14 38/3
costs [1] 22/16
could [11] 7/19 18/9 20/11 21/7 21/8 25/16 28/9 28/11 31/13 36/7 37/1
couldn't [1] 28/10
counsel [13] 3/10 3/16 3/20 4/16 20/6 21/13 25/3 25/4 25/6 29/6 31/3 36/5 36/18
country [3] 13/10 16/5 16/6
couple [5] 7/24 29/8 31/24 31/25 34/13
course [5] 5/16 6/1 8/3 21/14 30/16
court [32] 1/1 2/2 2/3 3/3 3/5 4/15 9/10 15/2 15/5 19/16 20/2 20/13 21/17 24/18 24/18 24/19 25/19 26/10 26/18 28/2 28/4 29/5 29/18 30/18 30/20 31/19 33/4 33/4 34/20 35/3 35/7 37/8
Court's [5] 24/11 27/18 28/7 29/23 36/15
courthouse [1] 27/8
courthouses [1] 26/5
courtroom [5] 17/17 26/11 36/13 36/14 37/4
courts [8] 9/11 9/21 10/10 10/23 11/21 16/14 32/18 34/17
creation [2] 25/12 29/4
critical [1] 24/14
CRR [2] 38/2 38/8
curtailing [1] 29/3
CUTLER [3] 1/3 3/8 10/2
cuts [1] 32/20

**D**

D.C [3] 1/5 1/19 2/5
Damocles [1] 28/1
darn [2] 11/11 11/12
Date [1] 38/7
day [3] 32/17 34/22 35/24
days [1] 31/14
deal [3] 7/10 14/1 17/18
dealing [3] 6/4 6/4 22/12

deals [2] 7/17 21/16
dealt [1] 31/15
dear [1] 36/6
decades [1] 22/6
December [1] 23/20
decidedly [1] 5/24
decision [2] 12/1 23/19
decisions [2] 19/15 34/4
declaration [1] 35/19
defendant [1] 30/12
defendants [3] 1/8 1/18 30/3
defense [1] 22/13
deference [6] 20/3 20/8 20/22 22/2 25/25 33/9
defined [2] 25/23 26/12
degree [3] 20/5 26/25 28/2
delaying [1] 22/16
denial [1] 19/12
denied [1] 12/5
deny [5] 11/16 18/21 24/19 25/5 25/7
Department [3] 3/24 4/1 18/6
depth [2] 5/4 7/23
Deputy [2] 4/3 4/4
designed [1] 15/20
deter [1] 16/23
determine [1] 19/18
determined [1] 25/22
develop [1] 24/23
did [5] 7/9 7/12 28/14 28/14 33/3
didn't [4] 10/2 32/7 32/7 32/8
difference [1] 28/17
different [5] 21/20 27/23 27/24 28/10 33/23
digest [1] 36/9
directive [1] 28/11
disappointed [2] 6/21 15/9
discount [1] 28/8
discovery [1] 8/9
discretion [1] 25/21
discrimination [2] 22/20 23/14
discriminatory [1] 34/5
discussed [1] 23/13
dismiss [1] 31/6
display [1] 11/3
dispositive [1] 31/4
dispute [1] 31/6
distinguish [1] 12/1
distinguishing [1] 14/9
distribution [1]

DISTRICT [5] 1/1 1/1 1/11 3/3 3/3
diversity [3] 23/14 23/19 23/21
do [23] 5/14 7/12 10/23 13/14 14/21 15/19 16/9 19/3 19/22 24/2 24/8 27/3 27/16 31/23 32/4 32/7 32/7 32/8 32/12 33/5 33/6 33/6 35/9
Do you have [1] 27/16
Doe [1] 11/24
does [3] 15/4 26/3 26/7
doesn't [5] 16/23 16/24 26/7 27/24 34/6
doing [4] 13/8 16/2 16/10 29/19
DOJ [1] 1/18
DOJ-USAO [1] 1/18
don't [15] 9/3 9/4 14/5 19/2 19/12 24/25 25/1 25/8 25/8 25/13 25/16 27/21 31/10 34/4 37/3
done [12] 6/10 9/18 11/21 18/2 28/9 32/9 32/16 34/4 35/8 35/22 36/7 37/5
Dorr [1] 3/8
doubt [2] 27/2 34/23
down [3] 8/15 15/23 27/24
downside [1] 27/20
draft [1] 28/23
drafted [4] 25/11 26/6 26/11 26/13
drafting [2] 26/14 28/5
dramatic [2] 7/14 7/15
driven [2] 26/24 33/19
due [6] 13/22 13/23 22/2 31/5 31/7 31/13
Duke [1] 1/14
duties [1] 26/19
duty [1] 13/12

**E**

each [2] 8/20 30/22
earlier [1] 4/24
early [1] 22/12
easily [1] 31/2
Eastern [1] 22/11
EEOC [1] 29/15
effect [28] 5/21 5/25 6/2 6/3 6/18 6/25 6/25 7/1 7/15 7/18 14/14 14/15 14/16 14/17 15/10

| E | | F | | forward [7] | got |
|---|---|---|---|---|---|
| effect... [13] 15/16 15/20 18/12 21/1 21/3 22/25 23/8 24/1 25/19 27/3 32/15 34/11 34/25 | | F.2d [1] 22/11 | | forward [7] 5/3 10/12 16/19 17/20 26/15 28/5 29/20 | got -- yes [1] 30/11 gotta [1] 32/2 government [26] 6/5 8/4 14/5 16/11 18/2 18/4 18/24 21/22 21/24 22/5 22/19 23/7 24/4 24/9 24/10 24/11 24/15 24/16 25/23 32/23 33/22 33/22 33/23 34/14 34/16 36/18 |

effect... [13]   15/16
  15/20 18/12 21/1
  21/3 22/25 23/8 24/1
  25/19 27/3 32/15
  34/11 34/25
effectively [1]
  32/25
effects [6]   6/3 6/4
  7/6 7/7 16/25 35/18
eggshells [1]   10/19
either [1]   20/18
El [1]   11/23
El-Ganayni [1]   11/23
Email [2]   1/16 1/20
emergency [1]   20/22
endless [1]   25/15
engrafts [1]   29/12
enormous [1]   15/17
enough [1]   17/12
enters [1]   28/4
entire [1]   8/13
equally [1]   9/1
equities [3]   5/7
  15/24 15/25
Erin [3]   1/13 3/20
  4/17
especially [2]   16/13
  33/14
essentially [3]   7/9
  10/14 33/12
et [4]   1/7 3/9 6/20
  6/20
et cetera [1]   6/20
evaluate [1]   9/23
even [6]   7/14 11/15
  16/22 25/12 33/1
  33/11
events [1]   13/2
eventually [1]   5/2
ever [1]   25/13
every [4]   9/21 13/24
  15/22 34/22
exactly [5]   9/11
  16/3 24/7 25/1 30/21
example [3]   6/6
  19/21 22/3
excluding [1]   22/17
excuse [1]   12/17
executive [35]   1/6
  3/9 5/12 6/17 6/24
  8/4 8/12 8/14 8/18
  10/20 15/10 16/4
  16/24 19/3 20/23
  22/2 22/4 22/19
  23/24 25/22 27/25
  28/13 28/15 28/18
  28/21 29/19 30/4
  30/6 30/12 30/17
  32/24 33/15 34/20
  35/12 36/3
exerted [1]   20/12
expect [1]   34/15
expeditedly [1]
  17/21

expeditious [3]
  17/10 17/15 17/17
expend [1]   27/21
expending [1]   27/4
experience [2]   17/16
  37/3
expressed [1]   22/22
extraordinary [1]
  25/24

**F**

F.2d [1]   22/11
fact [2]   6/16 7/9
factors [2]   4/20
  16/1
FAIR [1]   15/1
fall [1]   19/23
falls [2]   18/23
  22/20
familiar [1]   36/15
far [5]   18/24 20/2
  23/8 26/18 29/18
Farm [1]   15/1
federal [2]   26/4
  35/9
few [4]   4/23 31/14
  36/22 36/25
Fifth [2]   25/4 25/6
file [1]   31/19
final [1]   13/25
find [2]   19/4 29/2
findings [1]   8/21
finds [1]   27/1
finished [1]   37/5
firm [17]   4/17 7/6
  15/14 16/25 24/16
  25/21 26/2 26/11
  27/3 27/5 27/5 27/10
  27/23 27/24 35/3
  35/14 35/15
firm's [1]   36/15
firmly [1]   23/23
firms [2]   7/16 15/21
first [16]   4/7 4/25
  6/1 6/18 7/11 8/2
  8/22 8/25 9/3 10/17
  19/8 22/21 28/15
  30/12 32/1 32/6
First Amendment [6]
  4/25 6/1 7/11 8/2
  8/25 9/3
firsthand [1]   10/1
fits [1]   33/18
five [4]   4/7 18/1
  36/8 36/14
flag [1]   22/24
flow [1]   8/21
flows [1]   8/14
follow [1]   8/23
followed [1]   33/10
footnote [2]   11/24
  34/2
foregoing [1]   38/3
form [3]   26/24 28/21
  28/22

forward [7]   5/3
  10/12 16/19 17/20
  26/15 28/5 29/20
found [1]   7/3
foundation [1]   23/12
framing [1]   24/18
frankly [4]   7/7 9/19
  11/25 34/23
free [2]   8/25 34/6
front [5]   4/22 4/24
  9/11 10/9 34/19
full [2]   11/3 26/17
fuller [1]   20/13
fully [2]   15/17
  16/24
furtherance [1]
  23/22
future [1]   12/24

**G**

Ganayni [1]   11/23
Garland [3]   11/6
  11/20 14/2
General [1]   4/3
General's [1]   4/4
generally [1]   11/7
get [15]   4/19 5/2
  18/1 26/16 31/14
  33/11 34/13 34/16
  34/22 34/23 35/1
  35/9 35/9 35/11 36/7
getting [1]   16/22
give [4]   10/21 12/11
  31/14 33/8
given [7]   8/11 14/4
  20/9 20/21 24/20
  28/11 32/24
gives [1]   15/5
giving [2]   20/1 33/2
go [15]   4/13 10/12
  21/6 25/18 27/8
  27/23 27/24 28/5
  29/25 30/20 33/21
  34/19 34/21 35/15
  35/16
go ahead [2]   4/13
  29/25
goats [1]   14/9
God [1]   3/4
goes [3]   4/6 33/10
  36/24
going [21]   4/11 8/9
  8/20 10/18 10/19
  10/21 13/13 13/13
  14/6 14/15 15/6
  15/19 19/25 20/10
  26/2 27/23 28/8
  32/25 33/11 35/16
  36/9
gone [3]   12/6 12/14
  14/11
good [7]   3/12 3/23
  8/1 16/9 17/12 18/5
  31/13
got [3]   13/4 13/25

got -- yes [1]   30/11
gotta [1]   32/2
government [26]   6/5
  8/4 14/5 16/11 18/2
  18/4 18/24 21/22
  21/24 22/5 22/19
  23/7 24/4 24/9 24/10
  24/11 24/15 24/16
  25/23 32/23 33/22
  33/22 33/23 34/14
  34/16 36/18
government's [1]
  30/19
grant [4]   24/19
  36/19 36/22 37/2
granted [1]   20/20
grave [2]   30/14 33/7
gray [1]   20/7
great [5]   29/3 29/16
  30/5 30/19 33/4
grievances [1]   9/9
groundwork [1]   19/13
guess [2]   12/5 12/7
guidance [17]   24/15
  24/23 24/25 25/8
  25/13 25/14 26/8
  26/16 26/24 26/25
  28/6 28/12 28/15
  28/23 28/25 29/14
  32/6
guide [1]   19/15
guidelines [1]   27/7
guy [1]   32/2

**H**

had [15]   6/6 6/10
  6/17 7/1 7/6 7/8
  7/12 7/15 15/10 16/3
  17/16 19/21 20/13
  27/17 30/1
Hall [1]   3/8
hand [1]   15/6
handle [1]   30/23
hanging [2]   27/25
  28/1
happened [2]   13/23
  35/21
happening [2]   9/14
  35/18
happy [2]   17/9 33/13
hard [2]   21/2 31/10
hardest [1]   8/16
harm [1]   5/9
Harvard [1]   23/19
has [23]   5/17 6/2
  6/25 7/14 8/11 9/18
  10/3 13/14 13/25
  14/12 18/11 19/2
  20/6 25/3 26/8 26/10
  26/11 28/20 34/7
  34/18 35/13 35/17
  35/22
have [63]
haven't [3]   5/17

**H**

haven't... **[2]**  13/18 31/11
having **[7]**  6/24 7/18 14/15 14/16 24/4 24/9 26/11
he **[19]**  6/24 6/25 15/12 15/12 15/13 15/14 18/25 28/10 28/13 28/14 28/14 28/15 32/7 32/7 32/8 32/14 32/14 32/15 36/7
he didn't **[2]**  32/7 32/7
he'd **[1]**  32/9
he's **[1]**  18/25
head **[1]**  28/1
heads **[2]**  19/6 28/12
hear **[2]**  18/4 34/15
heard **[2]**  25/10 36/10
hearing **[3]**  1/10 31/8 36/7
held **[1]**  12/20
help **[1]**  30/19
helpful **[1]**  36/11
her **[3]**  3/17 4/10 7/5
here **[19]**  4/18 8/11 9/14 9/18 9/20 10/24 11/2 11/3 11/13 14/4 14/6 15/25 16/17 25/20 26/15 28/6 31/9 34/9 35/23
here's **[1]**  22/18
hey **[1]**  34/12
highest **[2]**  16/12 35/8
hire **[1]**  27/5
his **[4]**  28/12 28/17 36/7 36/7
historically **[1]** 36/12
hit **[1]**  31/12
hits **[1]**  13/21
hold **[1]**  32/25
Honor **[15]**  3/12 3/23 4/14 4/18 17/10 17/19 18/3 18/8 27/15 31/21 31/24 33/19 34/11 36/4 37/1
HONORABLE **[4]**  1/10 3/4 3/5 37/8
hopefully **[3]**  29/5 30/10 30/18
horribles **[1]**  25/15
hours **[1]**  36/22
House **[2]**  16/9 28/21
how **[11]**  10/18 14/2 17/17 24/15 25/9 25/13 26/2 26/2 27/20 32/24 36/20
how broadly **[1]**

36/20
Howell **[2]**  4/24 7/3
hurdles **[1]**  5/17

**I**

I am **[1]**  20/3
I believe **[1]**  29/11
I can **[2]**  13/16 31/20
I can't **[2]**  13/12 27/12
I don't **[4]**  19/2 19/12 25/13 31/10
I have **[3]**  23/20 29/5 30/1
I haven't **[1]**  31/11
I just **[1]**  29/3
I mean **[11]**  7/2 10/12 13/22 15/18 24/6 28/11 32/1 32/5 32/21 34/11 34/17
I might **[1]**  10/20
I say **[2]**  15/9 36/22
I think **[35]**  4/22 6/13 6/14 7/8 7/24 8/13 9/1 9/19 11/15 11/21 11/23 11/25 14/21 14/22 19/3 19/19 20/2 23/18 23/20 23/23 24/13 26/20 28/16 29/7 29/9 29/18 30/7 30/14 30/18 30/19 31/1 31/9 31/12 32/20 34/11
I thought **[1]**  13/20
I understand **[1]** 27/18
I want **[2]**  4/19 12/4
I wanted **[1]**  22/24
I went **[1]**  13/20
I will **[3]**  26/6 31/4 36/18
I would **[18]**  7/23 16/20 17/19 18/11 20/5 20/8 20/17 20/19 22/10 22/24 23/11 24/17 27/12 28/4 28/19 29/19 30/5 31/16
I'd **[1]**  36/7
I'll **[8]**  3/20 4/21 8/1 15/23 16/16 18/4 34/10 36/21
I'm **[14]**  8/7 10/19 11/13 21/13 24/21 28/7 30/10 30/11 33/2 33/10 36/9 36/18 36/22 37/5
I'm not **[1]**  28/7
I've **[8]**  8/8 10/14 21/12 27/17 29/9 30/10 36/10 37/5
idea **[3]**  4/21 13/17 33/21

Ill **[8]**  9/21 9/22 10/10 10/14 10/23 32/18 33/3 33/4
immediate **[13]**  5/21 5/25 6/2 6/24 6/25 7/1 7/18 14/15 14/16 14/17 15/13 15/16 32/21
immediately **[2]** 12/16 12/18
impaired **[1]**  20/23
impinges **[1]**  26/25
implementation **[2]** 24/22 25/16
implied **[1]**  22/22
important **[4]**  4/25 8/13 9/19 24/24
importantly **[1]** 21/19
impose **[1]**  22/19
inappropriate **[1]** 20/9
incidental **[1]**  15/20
inclined **[2]**  36/19 36/22
including **[3]**  8/4 11/22 35/12
inconsistent **[2]** 6/18 6/19
increasing **[1]**  22/16
indeed **[1]**  27/7
independently **[1]** 8/21
individuals **[1]** 12/20
indulge **[1]**  21/7
indulgence **[1]**  29/24
industry **[1]**  29/14
informing **[1]**  19/10
informs **[1]**  19/5
injury **[8]**  5/7 6/14 7/3 7/4 17/24 32/21 34/25 35/23
insightful **[2]**  18/16 36/10
instance **[1]**  10/17
instruction **[2]** 28/20 29/17
intellectual **[1]** 34/18
intended **[4]**  5/25 14/7 15/17 16/25
intent **[4]**  8/10 11/3 11/18 14/23
intention **[1]**  5/20
interact **[2]**  24/16 25/9
interaction **[2]**  25/2 28/23
interactions **[1]** 23/7
interest **[5]**  5/14 5/16 12/22 16/1 22/14
interesting **[2]**

26/14 36/24
interests **[1]**  16/8
interference **[1]** 4/11
interim **[1]**  33/13
interpret **[1]**  15/6
interpreted **[1]** 14/12
introduce **[2]**  3/16 3/20
invite **[1]**  28/16
involved **[1]**  8/8
irreparable **[8]**  5/6 5/8 6/14 7/3 7/4 17/24 34/25 35/23
is **[126]**
is there **[2]**  5/6 5/6
is you **[1]**  12/1
isn't **[2]**  17/12 26/22
issue **[14]**  6/14 8/17 11/16 18/25 23/22 24/25 25/13 25/18 26/20 26/23 28/6 28/25 31/12 36/21
issued **[9]**  5/17 5/19 5/20 7/5 22/4 24/15 26/8 28/13 28/25
issues **[15]**  5/4 7/24 8/16 11/22 16/17 16/19 20/4 20/7 20/11 20/23 21/11 21/16 25/3 25/4 25/6
issuing **[5]**  16/23 22/1 28/18 30/5 30/15
it **[86]**
it would be **[1]** 31/10
it's **[38]**  5/11 5/14 5/19 6/9 6/11 6/16 6/18 6/19 7/6 7/17 7/17 8/1 8/18 9/2 11/3 11/15 11/25 13/1 14/1 14/15 14/16 16/3 18/13 18/21 19/9 20/16 20/18 21/2 23/18 24/14 26/20 26/21 26/22 32/15 33/18 33/23 34/1 34/17
its **[12]**  10/15 14/18 17/1 17/1 17/1 22/15 22/16 22/16 27/6 28/1 31/4 34/21
itself **[2]**  30/15 34/6

**J**

Jackson's **[1]**  22/21
jeopardy **[1]**  25/20
job **[6]**  10/15 13/14 16/10 35/12 35/12 35/14
Johnson **[1]**  22/4

**JA 2420**

Case 1:25-cv-00917-RJL   Document 11   Filed 03/28/25   Page 44 of 49

**J**

**joint [1]**   31/17
**JUDGE [6]**   1/11 4/23 4/24 7/3 9/22 36/6
**Judge Bates [2]**   4/23 36/6
**Judge Howell [2]**   4/24 7/3
**judges [2]**   10/1 10/6
**judgment [1]**   31/6
**judgments [1]**   33/9
**judicial [2]**   9/25 15/14
**judiciary [2]**   9/25 30/15
**jumped [2]**   5/17 31/23
**just [19]**   4/21 5/17 5/19 7/19 7/23 12/11 13/6 15/23 16/16 17/12 20/17 20/19 20/21 26/21 29/3 33/11 34/8 34/10 34/17
**justice [6]**   3/24 4/2 10/25 18/6 22/20 35/5
**justiciable [1]**   11/9

**K**

**key [2]**   22/18 29/9
**kills [1]**   24/23
**kind [2]**   11/20 36/12
**kinds [1]**   15/21
**know [18]**   6/16 8/8 8/19 13/17 13/20 13/22 14/12 14/24 15/7 17/17 18/24 25/1 25/8 25/13 25/17 27/20 34/12 34/13
**knowing [1]**   27/4
**known [1]**   3/18
**knows [1]**   20/13

**L**

**labor [1]**   22/17
**land [1]**   16/12
**language [1]**   29/12
**large [1]**   29/14
**largely [1]**   9/21
**last [4]**   6/8 16/16 29/23 34/10
**late [1]**   31/13
**later [2]**   5/23 19/9
**lauded [1]**   10/6
**law [22]**   4/25 5/13 5/15 6/9 6/11 6/17 7/16 8/17 12/19 15/14 15/16 15/21 16/25 17/23 23/15 26/2 26/11 27/14 34/1 34/1 35/9 35/15
**Lawson [3]**   1/18 3/24 18/5

**lawyer [2]**   14/6 34/15
**lawyering [1]**   9/23
**lawyers [7]**   9/10 10/15 13/11 15/13 34/15 35/2 35/11
**laying [2]**   18/12 19/13
**learn [2]**   6/21 15/10
**learns [1]**   27/6
**least [4]**   8/7 20/12 23/21 28/6
**Lee [3]**   11/6 11/20 14/2
**legal [2]**   13/8 14/17
**legislative [1]**   9/17
**legitimate [1]**   26/10
**LEON [2]**   1/10 3/4
**less [2]**   22/13 30/16
**let [5]**   10/14 21/6 24/5 32/19 33/21
**let's [1]**   5/8
**level [1]**   20/8
**like [23]**   3/16 7/23 8/18 9/4 10/12 11/14 11/19 12/4 14/13 16/4 16/21 17/11 21/16 23/6 23/6 27/25 29/19 30/8 33/1 33/12 33/17 34/20 36/22
**likelihood [3]**   5/6 7/21 35/25
**likely [1]**   19/23
**limitations [1]**   25/1
**listed [2]**   30/3 30/12
**litigated [1]**   35/3
**litigation [7]**   16/21 22/6 26/1 26/3 27/4 32/17 36/16
**little [3]**   9/2 17/16 36/9
**LLP [2]**   1/3 3/8
**located [1]**   30/9
**long [2]**   5/14 22/16
**look [14]**   5/3 7/2 8/20 12/4 12/12 14/1 15/1 16/19 17/20 30/21 31/20 34/2 35/20 35/21
**looking [4]**   10/16 11/21 30/10 30/11
**looks [2]**   33/12 34/20
**lose [1]**   35/10
**lost [2]**   27/9 35/5
**lot [3]**   23/4 23/5 34/20

**M**

**made [1]**   34/7
**magnitude [1]**   26/3
**make [6]**   7/9 13/4 27/5 32/6 32/14

32/14
**makes [1]**   19/24
**making [2]**   7/17 35/6
**Mansfield [1]**   23/16
**many [5]**   10/4 10/6 11/21 34/8 35/4
**March [2]**   1/5 38/7
**matter [8]**   18/9 21/20 29/1 29/5 31/2 33/25 34/1 38/4
**may [2]**   4/14 20/7
**maybe [1]**   33/4
**me [12]**   3/16 9/8 9/13 10/17 11/5 12/5 12/17 21/6 24/5 31/14 32/19 33/21
**mean [13]**   7/2 10/12 13/20 13/22 13/24 15/18 24/6 28/11 32/1 32/5 32/21 34/11 34/17
**meaning [1]**   15/22
**means [1]**   35/16
**mechanical [1]**   2/7
**meet [2]**   27/5 31/10
**meeting [5]**   6/11 28/18 28/23 32/9 32/9
**meetings [2]**   6/7 14/13
**members [1]**   4/17
**memo [1]**   28/22
**mentioned [1]**   4/16
**mentioning [1]**   28/17
**Merit [1]**   2/2
**merits [2]**   7/20 7/21
**might [9]**   10/20 14/14 15/15 15/19 19/23 28/16 31/13 34/13 35/11
**million [1]**   32/12
**mindful [1]**   25/11
**minority [1]**   22/17
**minute [4]**   6/8 7/19 14/5 15/23
**minutes [7]**   4/7 4/7 4/23 18/1 29/8 36/8 36/8
**misrepresentations [1]**   9/24
**missed [1]**   31/11
**mixing [1]**   21/13
**moment [1]**   36/23
**Monday [2]**   31/16 31/20
**money [2]**   27/8 27/21
**months [1]**   36/25
**more [8]**   6/20 9/19 11/15 15/9 17/10 20/2 29/8 36/9
**most [4]**   4/24 7/25 8/7 11/8
**MOTION [1]**   1/10
**motions [3]**   31/4 31/5 31/6

**motive [2]**   32/16 33/3
**move [3]**   4/10 16/21 21/8
**moving [3]**   4/6 29/20 31/3
**Mr. [2]**   4/6 20/6
**Mr. Clement [2]**   4/6 20/6
**much [5]**   9/3 9/5 17/22 22/2 30/1
**Murphy [6]**   1/13 1/14 3/13 3/20 3/21 4/17
**my [15]**   3/16 3/20 4/16 4/17 6/3 6/6 10/21 12/5 12/6 12/6 17/6 17/24 29/19 36/6 37/5
**my understanding [1]**   17/6

**N**

**nation [2]**   26/4 36/17
**national [5]**   5/13 5/15 12/22 20/3 20/11
**need [3]**   8/9 25/14 35/6
**needed [3]**   32/14 32/14 32/15
**needlessly [1]**   27/21
**needs [1]**   20/23
**never [1]**   16/3
**next [7]**   13/12 14/14 23/2 31/14 36/8 36/21 36/25
**no [19]**   1/4 6/8 6/17 9/6 9/17 11/19 12/25 13/1 13/16 15/6 17/15 18/11 18/12 20/20 22/13 24/2 24/2 32/4 32/4
**nobody [2]**   6/20 15/9
**Nobody's [1]**   13/19
**non [2]**   11/9 22/20
**non-discrimination [1]**   22/20
**non-justiciable [1]**   11/9
**None [1]**   14/4
**nonpartisan [1]**   35/13
**not [46]**
**noted [1]**   23/24
**nothing [7]**   11/1 11/2 15/4 19/22 23/6 23/6 33/15
**notice [1]**   7/8
**notified [2]**   13/18 13/19
**now [11]**   3/3 8/7 10/2 10/18 13/12 16/9 20/8 24/24 26/7 35/14 35/18

**JA 2421**

Case 1:25-cv-00917-RJL   Document 11   Filed 03/28/25   Page 45 of 49

**N**

number [2]   4/17
  21/12
NW [2]   1/19  2/4

**O**

objectionable [2]
  27/1  29/2
objective [1]   19/6
objectives [1]   19/7
obviously [4]   5/5
  6/15  7/2  25/10
offend [1]   10/20
offered [1]   32/12
OFFICE [7]   1/6  3/9
  4/4  30/4  30/6  30/12
  35/17
official [2]   2/3
  16/12
oh [3]   8/19  15/3
  33/17
okay [8]   3/19  3/22
  4/5  10/18  19/14
  19/15  21/9  31/15
old [1]   21/17
once [4]   26/13  28/25
  29/20  37/5
one [14]   9/7  9/17
  9/21  14/19  14/22
  16/21  20/5  23/13
  24/17  29/23  30/3
  30/9  34/8  37/1
only [4]   14/19  14/21
  14/22  36/19
operative [2]   18/11
  23/2
opportunity [1]   32/5
order [36]   3/6  5/13
  6/17  6/24  8/12  8/14
  8/18  12/9  15/7  15/10
  18/10  18/22  22/4
  22/25  23/2  24/22
  24/22  25/12  26/6
  26/13  27/25  28/4
  28/4  28/13  28/15
  28/18  28/20  28/22
  29/6  29/13  30/8
  32/23  32/24  33/16
  36/3  36/21
orders [4]   7/5  7/15
  16/4  16/24
other [10]   5/3  11/7
  11/19  13/24  15/15
  15/19  19/6  20/10
  28/14  31/11
ounce [1]   6/15
our [7]   7/6  14/16
  16/5  16/6  16/20
  32/10  34/2
Our country [1]   16/6
out [7]   4/10  18/12
  19/1  31/2  31/4  31/23
  33/10
outside [1]   19/23
over [6]   10/16  22/6

22/15  26/3  27/25
  28/1
overseen [1]   9/22
own [2]   6/4  7/12

**P**

p.m [2]   1/6  37/9
painting [1]   14/8
palpable [2]   10/13
  10/24
paper [1]   15/7
papers [1]   34/2
parade [1]   25/15
paragraph [1]   32/24
paraphrase [1]   10/25
pardon [3]   11/14
  33/2  33/5
pardons [1]   33/1
part [4]   17/15  19/18
  22/18  34/20
participant [1]
  23/17
particular [2]   6/14
  17/12
particularities [1]
  20/21
particularly [3]
  10/7  20/12  25/25
partisan [1]   34/5
partners [1]   35/3
partnership [1]   7/12
party [1]   4/6
passed [1]   28/22
patron [1]   21/25
Paul [6]   1/13  3/13
  7/8  7/9  32/11  35/21
paul.clement [1]
  1/16
penalties [1]   23/5
penalty [1]   24/2
pending [3]   12/21
  19/16  19/18
Pennsylvania [2]
  1/19  22/11
people [4]   11/16
  13/5  16/9  19/6
perfectly [1]   17/9
performance [1]   10/7
perhaps [2]   18/8
  18/23
Perkins [7]   16/22
  17/6  29/12  31/5
  31/15  32/10  35/21
personnel [1]   24/16
perspective [1]
  27/13
petition [2]   9/2  9/9
petitioning [1]   8/6
PI [5]   5/2  16/19
  17/3  17/7  30/24
Pickering [1]   3/8
piece [1]   15/7
place [5]   6/7  8/1
  9/21  10/9  17/22
plain [1]   32/16

plaintiff [2]   1/4
  1/13
plaintiff's [1]   3/10
Plaut [1]   15/1
plead [1]   9/11
pleadings [4]   17/4
  21/12  21/16  23/4
please [3]   3/5  3/10
  4/15
plenty [2]   7/22  32/5
PLLC [1]   1/14
plum [1]   35/13
podium [1]   3/11
point [16]   5/3  5/11
  20/5  20/9  20/24  22/6
  24/17  26/19  26/21
  26/23  29/1  31/4
  32/15  34/8  34/11
  37/2
pointed [1]   33/20
points [6]   20/6
  23/13  26/18  29/10
  29/23  31/25
policy [3]   22/8
  23/18  23/25
pool [1]   22/17
pose [1]   24/8
position [3]   9/23
  21/4  30/19
possible [2]   24/8
  27/10
power [6]   16/11  22/8
  22/9  23/22  23/25
  33/5
powers [6]   6/20  9/13
  9/15  10/13  11/1  34/9
practically [1]
  28/19
practice [3]   27/14
  34/19  36/16
precisely [1]   11/15
prefer [1]   17/11
premature [2]   26/21
  26/22
PRESIDENT [28]   1/7
  3/9  5/20  5/25  6/21
  6/23  7/10  8/11  9/18
  11/10  13/25  15/11
  16/23  18/19  18/25
  19/7  19/10  22/4  22/4
  28/9  28/11  30/4  30/6
  30/13  30/15  32/6
  33/1  33/8
President has [1]
  9/18
President Trump [2]
  15/11  22/4
President's [2]
  14/23  18/17
Presidential [2]   9/4
  27/25
presiding [1]   3/4
presuming [1]   29/1
pretty [3]   11/11
  11/12  16/18

Prettyman [1]   2/4
primacy [1]   11/10
principle [1]   14/24
pro [2]   10/8  32/12
probably [5]   8/16
  20/2  31/1  31/2  36/21
problem [1]   31/18
problems [1]   34/9
procedures [3]   11/16
  12/2  33/9
proceedings [6]   1/10
  2/7  17/17  34/21  37/9
  38/4
process [8]   5/23
  13/1  13/22  13/23
  14/1  14/3  19/18  28/5
processes [1]   12/15
procurement [7]   22/8
  22/9  22/14  22/15
  22/19  23/22  33/22
produced [2]   2/7
  29/21
program [3]   23/16
  23/17  23/18
programs [2]   22/16
  23/14
prohibited [2]   24/3
  24/20
prohibitive [1]   27/7
prohibits [4]   8/3
  8/4  26/13  26/23
promised [1]   36/6
promptly [1]   16/21
property [1]   34/18
proposed [4]   24/21
  29/6  31/17  37/2
prospective [1]
  27/13
protected [4]   8/5
  8/5  8/6  8/24
protecting [1]   17/23
provide [1]   14/17
provided [1]   36/16
providing [1]   18/21
provision [4]   12/13
  23/1  23/2  23/10
provisions [1]   22/20
PTAB [5]   34/19  34/21
  34/23  34/24  35/2
public [2]   16/1
  32/14
punishment [3]   23/5
  23/9  24/2
purely [2]   11/17
  33/2
purpose [2]   15/19
  18/22
pursuant [1]   22/22
put [1]   13/6

**Q**

qualified [1]   25/23
qualifiers [1]   5/16
quality [1]   9/23
quashing [1]   24/22

**Q**

**question [6]** 8/8 15/8 17/15 27/18 28/16 36/19
**questions [2]** 5/5 7/20
**quick [1]** 31/25
**quickly [1]** 31/3
**quite [1]** 36/15
**quote [1]** 22/13

**R**

**racial [1]** 23/13
**raised [2]** 25/3 26/10
**Ralls [1]** 11/25
**randomly [2]** 32/2 32/3
**rather [2]** 7/20 31/14
**read [6]** 13/2 14/19 14/22 15/4 19/17 21/12
**reading [1]** 24/21
**real [1]** 26/25
**really [2]** 8/19 17/11
**realm [2]** 18/24 23/23
**Realtime [1]** 2/3
**reason [5]** 22/24 24/24 32/7 32/8 35/1
**reasons [1]** 33/8
**rebuttal [3]** 4/7 18/1 31/25
**recent [1]** 21/17
**recently [1]** 22/3
**record [3]** 3/7 3/11 38/3
**recorded [1]** 2/7
**redress [1]** 9/9
**reference [2]** 19/19 23/14
**referring [1]** 29/18
**regard [1]** 18/16
**regarding [5]** 20/6 23/4 23/5 24/17 37/2
**Registered [1]** 2/2
**regular [2]** 26/19 34/16
**rein [1]** 34/6
**relates [6]** 21/7 21/24 23/11 23/12 24/13 30/6
**relating [1]** 21/16
**relationships [1]** 17/1
**relevant [2]** 12/12 19/19
**relief [1]** 9/11
**remaining [1]** 19/4
**remarkably [1]** 21/19
**remarks [1]** 37/5
**report [1]** 13/11
**Reporter [4]** 2/2 2/2

**represent [3]** 16/6 16/7 16/8
**representation [2]** 10/21 10/23
**representations [2]** 9/20 9/22
**represented [4]** 16/13 16/15 36/13 36/14
**representing [3]** 10/5 15/21 16/14
**republic [1]** 16/2
**require [1]** 10/22
**rescinded [1]** 22/3
**reserve [1]** 13/12
**reserves [1]** 13/10
**reservist [1]** 19/21
**reservists [1]** 13/7
**reservists' [1]** 14/7
**residual [1]** 33/7
**resources [1]** 27/5
**respect [2]** 14/13 16/14
**respectfully [1]** 16/20
**respects [1]** 9/16
**response [1]** 32/3
**responses [1]** 20/14
**rest [1]** 34/5
**restoration [1]** 12/14
**result [1]** 29/21
**retain [1]** 30/8
**retaining [1]** 27/3
**retaliation [7]** 8/3 8/5 8/23 9/12 9/20 32/17 33/24
**retaliatory [6]** 8/10 8/12 11/3 11/18 32/16 33/3
**return [1]** 7/19
**review [3]** 12/21 13/4 19/16
**revocation [1]** 11/17
**revocations [1]** 11/8
**revoke [2]** 12/2 33/11
**RICHARD [5]** 1/10 1/18 3/4 3/24 18/5
**richard.lawson3 [1]** 1/21
**ride [1]** 36/24
**right [19]** 4/8 5/18 5/24 6/12 9/8 11/3 12/23 13/5 14/25 15/4 16/9 20/8 23/20 24/12 25/4 25/6 26/7 35/18 36/14
**ripe [4]** 25/1 25/13 28/25 29/1
**ripeness [2]** 26/15 26/20
**rise [2]** 3/2 37/7
**risk [2]** 27/11 27/21

**RMR [2]** 38/2 38/8
**room [1]** 4/9
**rule [3]** 4/25 17/23 32/23
**rules [1]** 27/6
**Rumsfeld [1]** 15/2
**run [1]** 22/16

**S**

**said [3]** 7/22 16/16 33/14
**same [3]** 14/24 28/19 34/8
**sanctioned [3]** 10/10 16/11 16/12
**save [2]** 3/4 7/13
**say [17]** 8/19 10/2 11/7 13/25 14/19 15/3 15/6 15/9 15/23 16/16 18/23 19/5 32/2 33/10 34/6 34/10 36/22
**says [4]** 12/13 12/16 25/14 34/3
**Scalia [1]** 10/25
**schedule [6]** 17/10 17/10 30/24 31/11 31/12 31/17
**school [1]** 35/15
**seated [1]** 3/6
**second [4]** 9/19 12/5 12/7 12/12
**second-guess [2]** 12/5 12/7
**section [39]**
**Section 1 [6]** 8/11 8/14 19/20 20/1 23/12 33/19
**Section 1's [1]** 19/24
**Section 2 [1]** 20/20
**Section 3 [5]** 21/8 21/10 21/24 23/1 23/12
**Section 4 [2]** 29/11 29/11
**sections [2]** 19/4 24/14
**security [29]** 5/22 5/24 8/16 11/5 11/8 11/14 11/17 12/2 12/5 12/13 12/20 13/3 13/7 13/9 13/14 13/25 14/7 14/10 20/4 20/11 20/23 25/24 32/19 32/21 32/25 33/6 33/11 33/17 35/10
**see [10]** 5/23 8/9 10/16 22/15 25/8 25/14 26/14 30/3 32/17 36/23
**seeking [3]** 18/19 19/7 19/10
**seem [1]** 16/23

**seems [1]** 9/7
**seen [5]** 7/5 7/7 10/14 16/22 17/12
**SENIOR [1]** 1/11
**sense [7]** 6/15 8/13 19/8 19/24 21/5 27/19 35/20
**sensitivities [1]** 20/10
**separation [7]** 6/19 7/20 9/13 9/15 10/13 11/1 34/9
**service [1]** 36/16
**services [1]** 14/18
**serving [1]** 13/10
**session [1]** 3/4
**set [2]** 25/25 31/8
**setting [1]** 19/9
**severable [1]** 33/15
**severe [1]** 30/16
**shall [1]** 5/14
**she's [2]** 3/18 7/5
**sheep [1]** 14/9
**Sheet [1]** 22/21
**shooting [2]** 32/1 32/3
**should [7]** 19/15 20/11 24/20 28/3 31/7 31/18 33/14
**shoulder [1]** 10/16
**show [2]** 13/13 35/25
**sibling [1]** 9/2
**sic [1]** 15/2
**sides [1]** 35/6
**signed [3]** 6/23 15/12 15/12
**simply [3]** 10/12 18/12 29/12
**Since [1]** 7/5
**single [1]** 34/22
**sir [2]** 4/13 18/7
**sit [2]** 8/15 15/23
**situation [1]** 13/24
**Sixth [3]** 25/4 25/5 25/6
**Sixth Amendment [1]** 25/4
**so [37]** 5/24 6/8 7/19 8/15 8/24 10/23 10/24 12/24 16/17 17/17 18/15 19/8 19/9 19/18 19/21 19/25 21/10 21/13 23/8 24/1 24/5 24/13 25/15 25/18 27/6 28/2 28/6 31/19 31/25 32/19 34/5 36/2 36/7 36/15 36/18 36/21 36/23
**so I have [1]** 31/25
**so I think [1]** 8/24
**So the [1]** 10/24
**soc [1]** 22/7
**social [3]** 22/8 23/18 23/25

**JA 2423**

Case 1:25-cv-00917-RJL    Document 11    Filed 03/28/25    Page 47 of 49

**S**

**some [24]**  4/24 5/2 7/16 7/16 10/3 10/8 15/15 15/18 15/19 15/20 19/13 19/19 20/7 21/15 21/16 24/19 28/12 28/23 30/14 31/5 31/11 34/21 35/2 35/10

**somebody [4]**  10/20 15/2 33/3 35/14

**somebody's [1]**  32/1

**somehow [2]**  33/21 33/23

**something [7]**  8/9 14/14 14/15 21/19 26/25 29/21 34/14

**sometimes [1]**  35/4

**somewhat [1]**  28/19

**sort [2]**  4/19 10/3

**sovereign [1]**  21/23

**speak [3]**  19/9 27/6 27/12

**speaking [1]**  11/8

**specific [1]**  19/2

**speculative [1]**  5/11

**speech [3]**  8/5 8/25 18/24

**spending [2]**  33/23 34/7

**Spendthrift [1]**  15/1

**staff [2]**  25/2 25/22

**stage [7]**  5/2 5/5 16/17 19/9 20/12 20/22 36/1

**stake [1]**  23/9

**stand [3]**  33/18 36/23 37/6

**standing [1]**  7/16

**standpoint [1]**  16/20

**stands [1]**  37/8

**start [6]**  4/21 5/8 8/1 8/2 28/12 36/7

**Starting [1]**  3/10

**state [2]**  3/11 34/18

**stated [1]**  4/18

**statements [1]**  33/19

**STATES [7]**  1/1 1/11 3/2 3/5 6/22 6/23 22/14

**statute [1]**  34/3

**statutory [1]**  34/1

**stenography [1]**  2/7

**steps [2]**  12/16 12/18

**stop [2]**  16/24 32/2

**straightforward [2]**  7/25 16/18

**street [2]**  1/14 27/24

**stronger [1]**  22/2

**strongest [1]**  23/23

**strongly [1]**  23/25

**stuck [1]**  5/12

**study [1]**  30/2

**subject [1]**  12/14

**submit [5]**  18/11 20/8 20/14 26/6 26/21

**substantial [1]**  22/6

**substantive [1]**  12/1

**subtle [2]**  11/1 11/2

**succeeded [1]**  35/4

**success [3]**  5/6 7/21 35/25

**successfully [1]**  16/14

**such [4]**  7/14 7/15 12/21 14/8

**suggest [1]**  31/16

**suggested [3]**  17/5 30/20 32/6

**summary [1]**  31/6

**suppliers [1]**  22/15

**supported [2]**  23/23 23/25

**supports [1]**  35/19

**supposed [2]**  6/7 17/7

**Supreme [3]**  15/5 21/17 24/11

**Supreme Court [1]**  21/17

**Supreme Court's [1]**  24/11

**sure [6]**  3/18 5/10 13/4 13/12 19/20 29/25

**suspect [1]**  23/21

**suspend [4]**  12/19 12/19 13/3 14/7

**suspended [4]**  5/22 5/23 12/10 13/15

**swears [1]**  33/2

**Sword [1]**  27/25

**system [3]**  10/1 15/15 35/5

**T**

**take [10]**  6/7 7/8 12/16 12/18 13/3 14/14 18/9 21/4 27/10 31/20

**take action [1]**  13/3

**taken [1]**  9/20

**taking [2]**  10/9 10/17

**talk [7]**  7/22 7/23 8/15 23/4 23/5 32/19 37/1

**talks [3]**  14/2 25/5 25/19

**tall [1]**  7/16

**targeted [1]**  9/12

**team [1]**  28/17

**tell [5]**  11/13 13/12 13/16 14/6 36/18

**telling [1]**  34/12

**temporary [1]**  20/22

**ten [1]**  36/8

**terms [3]**  13/6 16/25 34/12

**than [6]**  6/21 15/10 20/3 21/20 22/13 31/14

**thank [8]**  3/15 4/14 17/19 18/3 31/21 31/22 36/4 36/5

**thank you [6]**  3/15 4/14 17/19 31/21 31/22 36/4

**that [177]**

**that'll [1]**  4/22

**that's [15]**  8/13 8/24 9/4 9/11 10/9 12/24 14/4 14/15 17/22 23/13 27/10 31/2 33/12 33/25 36/23

**their [19]**  6/4 7/12 7/18 9/10 10/16 13/10 13/11 13/14 13/14 27/7 32/3 34/15 34/15 34/24 35/2 35/2 35/4 35/10 35/11

**them [6]**  6/3 7/16 7/17 9/24 16/14 16/15

**then [13]**  5/7 7/2 7/19 11/14 12/14 13/3 24/3 26/16 29/21 32/3 32/4 33/21 35/1

**there [33]**  5/6 5/6 6/20 7/22 9/17 9/24 9/24 10/1 11/3 13/6 19/15 19/19 20/7 20/11 21/12 21/15 21/19 22/5 22/13 23/16 25/1 25/15 26/16 26/22 28/20 28/20 29/21 30/14 30/19 31/10 32/5 32/21 35/6

**there'll [1]**  5/23

**there's [23]**  6/8 8/9 9/7 11/1 11/2 11/19 14/1 14/19 14/21 14/22 18/12 19/12 22/12 23/4 24/2 24/2 25/21 25/24 26/14 31/5 32/8 33/15 34/23

**these [9]**  7/15 7/16 8/20 10/4 10/8 11/22 21/16 23/4 25/10

**they [39]**

**They'll [1]**  27/23

**they're [9]**  13/8 13/13 13/13 14/8 25/11 28/18 31/7 35/14 35/15

**they've [3]**  12/5 35/4 35/8

**thing [5]**  9/7 14/9 16/16 29/4 34/10

**things [3]**  16/22 30/15 31/24

**think [50]**

**thinking [4]**  6/13 18/17 19/10 35/15

**thinks [2]**  18/25 28/2

**Third [2]**  11/22 22/11

**Third Circuit [1]**  22/11

**this [100]**

**those [11]**  5/16 7/14 8/21 9/22 13/3 13/11 19/4 25/11 26/9 33/9 33/19

**though [2]**  4/21 13/16

**thought [5]**  6/24 7/11 13/20 15/14 33/4

**threat [3]**  10/13 10/24 24/8

**three [2]**  13/21 17/4

**thriving [1]**  34/18

**through [4]**  12/6 12/14 13/20 14/3

**thus [2]**  5/14 5/14

**tie [1]**  12/12

**time [3]**  7/22 27/6 32/4

**titled [1]**  38/4

**today [3]**  6/8 21/13 36/10

**together [2]**  19/17 33/18

**told [2]**  7/12 35/11

**too [3]**  5/11 10/23 26/22

**took [2]**  10/8 10/18

**top [1]**  13/21

**track [1]**  31/9

**tradition [3]**  16/5 16/6 35/8

**traditionally [1]**  35/13

**transcript [3]**  1/10 2/7 38/3

**transcription [1]**  2/7

**TRO [23]**  1/10 4/6 4/18 4/19 5/1 16/17 16/23 17/12 17/22 20/8 20/12 20/16 20/20 24/18 24/19 26/23 28/3 30/5 32/20 33/13 34/2 36/2 36/19

**true [3]**  15/15 33/25 34/1

**Trump [2]**  15/11 22/4

**two [3]**  6/6 9/15 13/11

**JA 2424**

**T**

**type [2]**   25/25 29/17
**typical [1]**   29/17

**U**

**U.S [1]**   35/16
**ultimately [1]**   32/23
**uncertainty [1]**   27/2
**under [1]**   8/17
**understand [4]**   19/14
  20/16 27/18 28/7
**understanding [1]**
  17/6
**understands [2]**   29/5
  30/18
**UNITED [7]**   1/1 1/11
  3/2 3/5 6/22 6/23
  22/14
**United States [2]**
  6/22 6/23
**unless [1]**   11/13
**unpopular [1]**   16/7
**up [6]**   13/13 14/6
  20/6 21/13 28/12
  28/15
**upon [1]**   25/24
**urge [11]**   20/5 20/17
  20/19 22/24 23/11
  24/17 24/18 28/4
  29/3 29/16 30/5
**urging [1]**   22/5
**us [1]**   8/11
**USAO [1]**   1/18
**usdoj.gov [1]**   1/21
**use [4]**   22/7 22/8
  23/21 27/19
**using [1]**   23/24
**usual [1]**   11/16

**V**

**VA [1]**   1/15
**valid [2]**   22/8 23/18
**various [4]**   4/19 5/4
  21/13 30/7
**versed [1]**   20/3
**versus [2]**   3/8 28/18
**very [15]**   17/21
  19/23 21/17 21/19
  22/12 23/21 23/25
  25/21 26/24 30/7
  31/2 31/3 31/9 31/11
  36/13
**viewpoint [1]**   33/24
**violation [4]**   8/25
  9/1 9/15 11/2
**violations [1]**   35/24
**virtually [1]**   34/22
**virtue [1]**   19/8
**vital [2]**   17/23
  17/23
**vitally [1]**   21/20
**vs [1]**   1/5
**Vullo [4]**   21/17
  21/20 21/22 23/6

**W**

**want [9]**   4/19 8/15
  12/4 12/5 12/7 12/11
  17/22 27/21 34/4
**wanted [4]**   6/25 7/10
  15/13 22/24
**wants [1]**   34/15
**was [22]**   4/23 5/19
  5/24 6/24 7/11 9/22
  9/25 10/5 11/20
  13/21 18/19 19/22
  19/22 21/22 22/3
  22/6 22/7 29/12
  29/18 32/5 33/4
  36/12
**Washington [3]**   1/5
  1/19 2/5
**wasted [1]**   27/9
**wastefully [1]**   27/22
**way [12]**   8/18 10/3
  13/2 14/12 14/19
  14/22 15/4 16/15
  18/8 28/10 28/14
  35/2
**ways [1]**   32/20
**we [57]**
**we cite [1]**   34/3
**we don't [1]**   34/4
**We need [1]**   25/14
**we'd [2]**   16/20 36/2
**we'll [4]**   5/2 6/9
  25/10 36/23
**we're [10]**   3/7 4/11
  4/18 8/8 8/20 11/6
  15/6 15/18 16/16
  24/10
**we've [11]**   5/23 7/5
  7/7 16/2 16/3 16/22
  17/5 17/11 17/16
  20/13 25/10
**weak [1]**   9/2
**weaponization [1]**
  9/25
**weaponizing [1]**
  15/14
**Webster [1]**   11/24
**Wednesday [3]**   31/5
  31/7 31/14
**week [3]**   13/12 14/14
  31/14
**weeks [2]**   17/4 34/13
**Weiss [4]**   7/8 7/9
  32/11 35/22
**Welcome [3]**   3/14
  3/22 18/7
**well [24]**   3/18 3/20
  3/21 4/6 5/8 6/9
  8/19 12/9 17/3 17/5
  18/18 19/23 20/3
  20/19 21/6 24/3
  27/12 28/9 31/16
  32/3 33/17 34/12
  35/5 36/5
**well-known [1]**   3/18
**well-versed [1]**   20/3

**went [2]**   13/20 14/9
**were [6]**   6/7 6/8
  10/1 15/14 24/19
  36/10
**what [35]**   9/12 9/17
  10/16 11/21 13/20
  17/3 17/5 18/19
  18/24 19/6 19/6 19/9
  19/15 19/18 20/25
  22/24 23/8 23/9 24/2
  24/8 24/20 25/1 25/8
  25/14 25/17 25/19
  26/1 26/12 29/18
  30/21 30/21 33/3
  33/12 35/9 35/21
**what's [2]**   9/14
  35/21
**whatever [3]**   13/22
  15/15 16/3
**when [11]**   6/23 10/7
  16/13 18/2 22/1
  25/19 30/16 33/9
  33/23 33/24 34/6
**when the [1]**   25/19
**where [11]**   5/3 14/14
  15/18 20/7 20/10
  22/25 25/21 30/9
  34/3 36/23 36/24
**Whereabouts [1]**   3/25
**whether [9]**   12/21
  13/17 26/17 27/4
  28/21 28/22 34/13
  34/23 35/14
**which [10]**   5/16 8/16
  23/14 23/19 25/24
  26/24 34/8 34/19
  35/15 36/10
**White [2]**   16/9 28/21
**White House [2]**   16/9
  28/21
**who [4]**   13/7 16/13
  19/21 26/3
**who's [2]**   9/23 24/1
**whole [2]**   16/21 36/3
**why [4]**   15/12 18/25
  27/10 33/8
**will [11]**   5/3 7/22
  24/16 25/1 25/5 25/9
  26/6 30/23 31/4
  36/18 36/24
**William [3]**   2/2 38/2
  38/8
**WILMER [3]**   1/3 3/8
  10/2
**Wilmer Cutler [1]**
  3/8
**WilmerHale [13]**   10/3
  10/5 10/7 12/20 13/7
  13/9 14/10 23/17
  26/3 27/1 34/17
  35/16 36/13
**WilmerHale's [1]**
  14/17
**window [1]**   33/10
**wishing [1]**   19/1

**withdraw [2]**   11/14
  12/2
**withdrawn [1]**   12/8
**within [7]**   9/8 18/23
  22/20 23/7 23/15
  23/23 36/21
**without [1]**   24/25
**witness [1]**   10/1
**wolf [2]**   10/25 11/1
**won [1]**   10/5
**won't [3]**   18/21 25/7
  32/4
**word [1]**   15/22
**words [1]**   15/4
**work [3]**   13/8 31/2
  32/13
**workmen [1]**   22/17
**world [1]**   4/6
**worried [1]**   27/20
**worse [1]**   10/17
**would [50]**
**wouldn't [6]**   6/10
  21/4 27/2 32/10
  32/11 32/12
**writ [1]**   29/14
**written [1]**   20/14

**Y**

**Yeah [1]**   11/10
**years [2]**   16/3 36/15
**yes [5]**   4/10 18/14
  27/15 30/11 30/25
**yet [5]**   5/17 10/9
  10/18 12/8 20/15
**you [79]**
**you know [10]**   6/16
  8/19 13/17 13/20
  13/22 14/24 15/7
  18/24 27/20 34/12
**you'll [2]**   19/4 21/7
**you're [5]**   14/10
  16/10 16/11 16/12
  16/13
**you've [1]**   16/15
**Youngstown [1]**   22/21
**your [25]**   3/11 3/12
  3/23 4/14 4/18 12/4
  14/10 16/10 16/13
  17/3 17/10 17/19
  18/3 18/8 27/15
  27/19 31/21 31/24
  33/11 33/19 34/7
  34/11 34/12 36/4
  37/1
**Your Honor [13]**   3/12
  3/23 4/14 4/18 17/10
  17/19 18/8 27/15
  31/21 33/19 34/11
  36/4 37/1
**yourself [1]**   33/20

**Z**

**Zaremba [3]**   2/2 38/2
  38/8
**zealous [2]**   10/21

**Z**

zealous... **[1]**   10/22
**zero [1]**   15/10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

WILMER CUTLER PICKERING HALE
AND DORR LLP,

          *Plaintiff*,

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

          *Defendants*.

Case No. 1:25-cv-917

Judge Richard J. Leon

**SUPPLEMENTAL DECLARATION OF BRUCE M. BERMAN IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND DECLARATORY AND PERMANENT INJUNCTIVE RELIEF**

I, Bruce M. Berman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am one of two General Counsel of Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale" or "the Firm"). I submit this Supplemental Declaration in support of WilmerHale's Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief ("the Motion"), filed April 8, 2025. I am of the age of majority and competent to make this declaration.

2.      This declaration is intended to supplement my March 28, 2025, declaration, including by advising the Court of events that have occurred since that declaration and by providing additional information regarding the ongoing irreparable harm that WilmerHale and its

**JA 2427**

employees and clients will face unless the March 27, 2025, executive order ("the Order" or "WilmerHale Order") remains enjoined.[1]

## I.     ADDITIONAL INFORMATION REGARDING WILMERHALE'S HARM

3.     On March 28, 2025, mere hours after my original declaration was finalized but before this Court entered its temporary restraining order (the "TRO"), WilmerHale was already beginning to feel the effects of the Order.

4.     For example, two previously-scheduled meetings with an agency that were supposed to take place on March 28, 2025, involving two unrelated matters, were abruptly postponed on March 28, 2025.  Both of those meetings were rescheduled after the TRO issued and after the Department of Justice issued notice to federal agencies of the TRO, and they have since taken place.

5.     In addition, although the Order was in effect for just over 24 hours before the Court entered the TRO, I am aware that at least one government contractor received an email on March 28, 2025, from a federal agency contracting officer requesting that it disclose whether it has any business relationship with WilmerHale.  I further understand that this request was not rescinded until April 2 (several days after the TRO issued).

6.     The Order continues to harm WilmerHale notwithstanding the Court's TRO.  For example, one client, which had retained the Firm for a new matter prior to the issuance of the Order, terminated its retention of the Firm for that matter following the Order, citing the Order's issuance as the reason for terminating the engagement.

---

[1] I also write to correct the reference in Paragraph 28 of my March 28, 2025, declaration to the "Occupational Health and Safety Administration."  The relevant agency is the Occupational Safety and Health Administration.

7.      As another example, on April 1, federal officials at a component of the Department of Defense indefinitely postponed a planned meeting with WilmerHale attorneys in light of the Order.  While government counsel has represented that the Department of Justice has notified affected agencies via email of the TRO, it is impossible for WilmerHale to confirm that all agencies have received the message.

8.      As another example, several existing clients have paused WilmerHale's engagements in government-facing matters—or declined to engage WilmerHale for new work— citing the Order.  Another has directed that formal correspondence with government representatives be placed on its own letterhead rather than WilmerHale's, and that any direct communications with government representatives be handled by non-WilmerHale individuals. And yet another has directed that WilmerHale cannot represent it publicly in light of the Order.

9.      Other existing clients have indicated to WilmerHale partners that they are considering whether to replace WilmerHale—or engage an additional firm on ongoing matters— out of concern that agencies, federal courts, and other actors in the justice system are hostile to the Firm.

10.     While the TRO has stemmed some of the harms of the Order, a permanent injunction is necessary to prevent the harms from resuming and intensifying.  For instance, a number of existing clients have expressed concerns about continuing to work with WilmerHale if the TRO is lifted and the Order fully takes effect, even though they would otherwise wish to continue working with the Firm.  Moreover, if the Order fully takes effect, WilmerHale partners may leave the firm for another firm not subject to the same restrictions on their practice.  Clients who need attorneys who can interact with federal government personnel, access federal buildings, and access classified information may well take existing or new business to other firms.  And

clients with government contracts may decide to terminate matters and/or not engage WilmerHale

for new matters to avoid the Order's reporting requirements.

11.     At least one incoming employee has expressed concern about, and is considering

revoking an acceptance of an offer of employment due to, the Order's implications for the

employee's security clearance.

12.     The Order also implicates the ability of WilmerHale's military reservists—all of

whom have security clearances—to serve their country.  While, to the best of my knowledge, no

military reservist has yet been stripped of a clearance or barred from reporting for duty, there is no

guarantee that this will remain true unless the entire Order is permanently enjoined.

13.     In addition, WilmerHale attorneys have numerous upcoming appearances before

federal courts and agencies that would be affected by the Order, if it is not permanently enjoined.

As just a few examples:

    a.  WilmerHale attorneys are scheduled to meet with the Securities and Exchange
Commission in a federal building on April 29;

    b.  WilmerHale attorneys are scheduled to meet over videoconference or telephone
with the Department of Justice on April 9 and May 8 and with the Securities and
Exchange Commission on April 16, 17, and 24;

    c.  WilmerHale attorneys are scheduled to participate in in-person hearings in front of
the Patent Trial and Appeal Board on April 23 and April 29; and

    d.  WilmerHale attorneys are currently scheduled to participate in numerous upcoming
hearings, trials, and appellate proceedings in the coming days, weeks, and months.

14.     Finally, if a permanent injunction is not entered, virtually all of WilmerHale's

practice groups will be harmed—either directly or indirectly—in their ability to effectively

represent their clients.  My first declaration highlighted some of those harms, but there are many others.

15.    For example, in addition to other impacts on the Firm's Transactional Department attorneys discussed in my first declaration, Section 5 of the Order, if enforced, would also prevent those attorneys from interacting with employees of the Internal Revenue Service.  WilmerHale attorneys represent clients in audits, in connection with requests for guidance and rulings, and in the creation of corporations, LLCs, and other entities.  All of these activities require WilmerHale attorneys to interact with IRS personnel.

## II.    ADDITIONAL INFORMATION REGARDING PRESIDENT TRUMP'S ACTIONS AGAINST LAW FIRMS

16.    Since my prior declaration, three firms have preemptively entered into agreements with President Trump to avoid the issuance of a targeted executive order.

17.    On March 28, President Trump announced on Truth Social that he had reached an agreement with Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), under which Skadden committed to provide "at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration and beyond," in areas both parties mutually support, including "Assisting Veterans and other Public Servants," ensuring "fairness in our Justice System," and "Combatting Antisemitism."[2]  According to this announcement, Skadden committed to conduct pro bono activities "in the Firm name," establish a committee to make sure its pro bono activities represent "the full political spectrum," and fund "no fewer than five Skadden Fellows each year" for law school graduates who will work specifically on the causes identified in the agreement and who hold a wide range of political viewpoints, including "conservative ideals."[3]  Additionally,

---

[2]  President Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 28, 2025), https://truthsocial.com/@realDonaldTrump/posts/114241348699704594.
[3] *Id.*

President Trump stated that Skadden had committed to "merit-based hiring, promotion, and retention," promised not to engage in "illegal DEI discrimination and preferences," and pledged not to deny representation to "members of politically disenfranchised groups" due to attorneys' "personal political views."[4]  The Truth Social post also states that Skadden agreed to hire independent outside counsel to ensure that its employment practices fully comply with anti-discrimination laws.[5]

18.    In a message sent to Skadden employees the same day, the firm's executive partner Jeremy London stated that the decision to negotiate a deal was made after firm leadership "learn[ed] that the Trump Administration intended to issue an executive order directed at Skadden."[6]    According to London, the firm's leadership ultimately determined "that [the agreement] was the best path to protect our clients, our people and our Firm."[7]

19.    Referring to the Skadden agreement, President Trump reportedly stated: "This was essentially a settlement."[8]

20.    On April 1, President Trump announced that he had reached an agreement with Willkie Farr & Gallagher LLP ("Willkie") that largely mirrors his agreement with Skadden.[9]

21.    According to President Trump's Truth Social post, Willkie committed to providing "at least $100 Million Dollars in pro bono Legal Services" aligned with the same causes identified in the Skadden agreement, as well as to "Gold Star Families."[10]  The President stated that Willkie

---

[4] *Id.*
[5] *Id.*
[6] Daniel Barnes, *Major law firm strikes preemptive deal with White House*, Politico (March 28, 2025), https://www.politico.com/news/2025/03/28/skadden-arps-trump-law-deal-028324.
[7] *Id.*
[8] *Id.*
[9] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 1, 2025), https://truthsocial.com/@realDonaldTrump/posts/114264667777137553.
[10] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 1, 2025).

pledged that its pro bono committee would oversee these matters to ensure that they represent "the full political spectrum, including Conservative ideals.[11]  Additionally, Willkie allegedly promised "Fair and Equal consideration" for job candidates regardless of political beliefs or prior administration service and undertook to retain independent counsel to confirm its compliance with anti-discrimination laws.[12]  Finally, President Trump stated that Willkie agreed not to deny representation to politically disenfranchised groups or government officials based on the "personal political views" of individual attorneys.[13]

22.    Willkie's executive committee communicated to its employees via email that a deal was made after the firm "learned that the President intended to issue an Executive Order similar to the orders issued against multiple firms in the past weeks" that would "threat[en] to imperil [their] clients' rights and those of [the] Firm."[14]  The committee further explained that the firm was "invited to contact the Administration," at which point the Administration "outlined a proposed alternative to receiving an Executive Order."[15]  The email concluded by acknowledging, "[n]eedless to say, this was an incredibly difficult decision for Firm leadership."[16]

23.    On April 2, President Trump announced another agreement, this one with Milbank LLP ("Milbank"), in which Milbank made concessions similar to those made by Skadden and Willkie to avoid punishment by the President.[17]

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Willkie Leadership's Address to Firm Following Trump Agreement*, Law.com (Apr. 1, 2025), https://www.law.com/international-edition/2025/04/01/willkie-leaderships-address-to-firm-following-trump-agreement/?slreturn=20250406-44037.
[15] *Id.*
[16] *Id.*
[17] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 2, 2025), https://truthsocial.com/@realDonaldTrump/posts/114269692330126501.

24.     Like the previous agreements, President Trump's announcement indicated that Milbank pledged at least "$100 Million Dollars in pro bono legal services" toward the same shared causes, and specifically committed to expanding its existing partnership with the "Milbank Exoneration and Resentencing Review Unit at the Perlmutter Center for Legal Justice at Cardozo Law School." [18]    Additionally, Milbank promised to include partners with diverse political ideologies on its pro bono committee to ensure that the committee represents "the full political spectrum, including Conservative ideals."[19]   Milbank also guaranteed that representation would not be denied based on a client's "political affiliation" or due to opposition from any government official.[20]   And it committed to considering candidates from both Republican and Democratic administrations—including the Trump Administration—for employment, and agreed to retain independent outside counsel to ensure compliance with anti-discrimination laws. [21]    The announcement included a "Statement from the White House" stating that through these agreements, "The President continues to build an unrivaled network of Lawyers, who will put a stop to Partisan Lawfare in America."[22]

25.     In an email to staff, Milbank chairman Scott Edelman stated that the firm was "contacted by representatives of the Trump administration with questions and concerns about [the firm's] approach to pro bono and diversity initiatives," and that "[t]he Trump Administration suggested … that [the firm] enter into an agreement similar to the one recently agreed to by Skadden." [23]   He further explained that the firm had determined it was "in [Milbank's] best interest

---

[18] President Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 2, 2025).
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] Abigail Adcox, *Milbank Becomes Next Big Law Firm to Reach Deal with Trump*, Law.com (Apr. 2, 2025), https://www.law.com/americanlawyer/2025/04/02/milbank-becomes-next-big-law-firm-to-reach-deal-with-trump.

**JA 2434**

to agree with the administration's suggestion."[24]  Edelman also noted that "the Administration's expressed concerns about big law firms, and in some cases its entry of Executive Orders against particular firms, have created uncertainty for law firms like ours," adding that Milbank believes the agreement significantly contributes to "putting these issues behind us."[25]

## III.    ADDITIONAL INFORMATION REGARDING WILMERHALE

26.    In addition to the relevant litigation I identified in my March 28, 2025, declaration, WilmerHale also successfully represented a pro bono client in challenging a Massachusetts law restricting speech on sidewalks outside reproductive health care clinics that perform abortions. This advocacy resulted in a Supreme Court opinion holding that the Massachusetts law was unconstitutional. *McCullen v. Coakley*, 573 U.S. 464 (2014).

27.    In addition to the suits against the federal government I identified in my March 28, 2025, declaration, the Firm was involved in at least 68 lawsuits against the George W. Bush Administration on behalf of clients, including *Boumediene v. Bush*, 553 U.S. 723 (2008).

28.    Our records show that at the time the Order issued on March 27, 2025, more than 20 WilmerHale employees held security clearances, and at least 5 of those employees held active security clearances in connection with their service as military reservists.

29.    Most of these employees are military veterans or reservists, or are former public civil servants, who were initially entrusted with access to sensitive information by virtue of their prior public service employment.

30.    Many security clearance holders received their clearance before being hired by WilmerHale.

31.    The clearances of WilmerHale personnel were issued by the Department of Defense,

---

[24] *Id.*
[25] *Id.*

Department of Justice, Department of State, Central Intelligence Agency, National Security Agency, and other entities of the Intelligence Community.

32.     The majority of WilmerHale personnel holding active security clearances had no involvement in any of the matters referenced in the WilmerHale Order or the Fact Sheet.

33.     WilmerHale does not now maintain a Sensitive Compartmented Information Facility (SCIF).

34.     Between early March and April 8, 2025, the Firm devoted more than 1,200 hours to analyzing the Covington Memo, Perkins Order, Paul Weiss Order, and Jenner Order; to preparing WilmerHale's strategy for responding should the Firm be targeted by President Trump; and to working on this litigation after President Trump issued the WilmerHale Order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on April 8, 2025

_____
Bruce M. Berman

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP, <br><br> *Plaintiff*, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> *Defendants*. | Case No. 1:25-cv-917 <br><br> Judge Richard J. Leon |

**DECLARATION OF JOSEPH J. DEMOTT
IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

1.      I am an attorney in the law firm of Clement & Murphy, PLLC and a member of the Bar of this Court.  I am one of the counsel of record in the above-captioned action representing Plaintiff, Wilmer Cutler Pickering Hale and Dorr LLP.  I submit this declaration in support of Plaintiff's Motion for Summary Judgment.

2.      I am over the age of 18 and competent to make this declaration.  I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

3.      All exhibits to this Declaration were obtained by visiting the URLs listed below within the past four business days.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of a May 17, 2017 Press Release by the U.S. Department of Justice titled "Appointment of Special Counsel," as downloaded from the Department of Justice's website at https://tinyurl.com/2um33wv9.

**JA 2437**

5.      Attached hereto as **Exhibit 2** is a true and correct copy of an April 19, 2019 post on X by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from X's website at https://tinyurl.com/2fp9wua7.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of a July 29, 2018 post on X by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from X's website at https://tinyurl.com/yjst9zsw.

7.      Attached hereto as **Exhibit 4** is a true and correct copy of an August 20, 2018 post on X by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from X's website at https://tinyurl.com/5n6d5atp.

8.      Attached hereto as **Exhibit 5** is a true and correct copy of a March 25, 2019 article by the Associated Press titled "Trump claims launching Russia probe 'treasonous'" and published by PBS News, as downloaded from PBS News's website at https://tinyurl.com/5b5ej795.

9.      Attached hereto as **Exhibit 6** is a true and correct copy of a September 6, 2023 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/yneuk8me.

10.     Attached hereto as **Exhibit 7** is a true and correct copy of a September 7, 2024 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/3ujuyh36.

11.     Attached hereto as **Exhibit 8** is a true and copy of a March 19, 2025 article by Daniel Barnes titled "How Major Law Firms Are Responding To Trump's Attacks" and published by Politico, as downloaded from Politico's website at https://tinyurl.com/e4nzahke.

12.     Attached hereto as **Exhibit 9** is a true and correct copy of a February 25, 2025 Presidential Memorandum issued by President Donald J. Trump titled "Suspension of Security Clearances and Evaluation of Government Contracts," as downloaded from the White House's website at https://tinyurl.com/y83rccby.

13.     Attached hereto as **Exhibit 10** is a true and correct copy of a July 30, 2023, post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/534unn9k.

14.     Attached hereto as **Exhibit 11** is a true and correct copy of a February 25, 2025 article by Joshua Gerstein and Kyle Cheney titled "Trump Targets Washington Law Firm that Aided Smith" and published by Politico, as downloaded from Politico's website at https://tinyurl.com/3yj86d6a.

15.     Attached hereto as **Exhibit 12** is a true and correct copy of a February 25, 2025 article by Kelsey Walsh titled "Trump signs executive action targeting law firm representing former special counsel Jack Smith," and published by ABC News, as downloaded from ABC News's website at https://tinyurl.com/25bxpb58.

16.     Attached hereto as **Exhibit 13** is a true and correct copy of a March 14, 2025 video by the White House titled "President Trump Delivers Remarks at the Department of Justice," as downloaded from YouTube's website at https://tinyurl.com/mwcwxwj9.

17.     Attached hereto as **Exhibit 14** is a true and correct copy of a March 6, 2025 Executive Order Number 14230 issued by President Donald J. Trump titled "Addressing Risks from Perkins Coie LLP," as downloaded from the White House's website at https://tinyurl.com/3fd4mnse.

18.     Attached hereto as **Exhibit 15** is a true and correct copy of a March 6, 2025 White House Fact Sheet titled "Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP," as downloaded from the White House's website at https://tinyurl.com/nyfnhuj.

19.     Attached hereto as **Exhibit 16** is a true and correct copy of a May 5, 2024 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/yc4xv5j6.

20.     Attached hereto as **Exhibit 17** is a true and correct copy of a March 6, 2025 article by Devlin Barrett titled "Trump Ramps Up Attacks on Law Firms with Order Targeting Perkins Coie" and published by the New York Times, as downloaded from the New York Times's website at https://tinyurl.com/mry4aup3.

21.     Attached hereto as **Exhibit 18** is a true and correct copy of a March 6, 2025 by Perry Stein and Michael Birnbaum titled "Trump Expands Retribution Campaign Against Law Firms that Aided His Foes" and published by the Washington Post, as downloaded from the Washington Post's website at https://tinyurl.com/bdh8mad6.

22.     Attached hereto as **Exhibit 19** is a true and correct copy of a March 11, 2025 document filed by Perkins Coie titled "Declaration of David J. Burman in Support of Motion for Temporary Restraining Order" as downloaded from the docket for *Perkins Coie LLP v. U.S. Department of Justice*, No. 25-cv-716, ECF No. 2-2 (D.D.C.).

23.     Attached hereto as **Exhibit 20** is a true and correct copy of an April 2, 2025 document filed by Perkins Coie titled "Declaration of David J. Burman in Support of Motion for Summary Judgment," as downloaded from the docket for *Perkins Coie LLP v. U.S. Department of Justice*, No. 25-cv-716, ECF No. 39-3 (D.D.C.).

24.    Attached hereto as **Exhibit 21** is a true and correct copy of a March 14, 2025 Executive Order Number 14237 issued by President Donald J. Trump titled "Addressing Risks from Paul Weiss," as downloaded from the White House's website at https://tinyurl.com/4kbua5u7.

25.    Attached hereto as **Exhibit 22** is a true and correct copy of a February 9, 2023 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/5abmyp2s.

26.    Attached hereto as **Exhibit 23** is a true and correct copy of a March 19, 2025 filing by Roberto Finzi and titled "Memorandum in Support of Motion to Withdraw as Counsel for Defendant Steven Schwartz" as downloaded from the docket for *United States v. Coburn*, No. 19-120, ECF No. 1012-1 (D.N.J.).

27.    Attached hereto as **Exhibit 24** is a true and correct copy of a March 20, 2025 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/3y3edyh9.

28.    Attached hereto as **Exhibit 25** is a true and correct copy of a March 21, 2025 Executive Order 14244 issued by President Donald J. Trump titled "Addressing Remedial Action by Paul Weiss" as downloaded from the White House's website at https://tinyurl.com/2ta2b3tz.

29.    Attached hereto as **Exhibit 26** is a true and correct copy of a March 23, 2025 article by Lauren Edmonds titled "Read the email Paul Weiss Chairman Brad Karp sent to staff after striking a deal with Trump: 'Clients perceived our firm as being persona non grata'" and published by Business Insider, as downloaded from Business Insider's website at https://tinyurl.com/3k3w8phu.

30.     Attached hereto as **Exhibit 27** is a true and correct copy of a March 21, 2025 article by Brett Samuels titled "Trump suggest law firms 'want to make deals' after rescinding Paul, Weiss order" and published by The Hill, as downloaded from the Hill's website at https://tinyurl.com/5mcv9zxh.

31.     Attached hereto as **Exhibit 28** is a true and correct copy of a March 22, 2025 Presidential Memorandum issued by President Donald J. Trump titled "Preventing Abuses of the Legal System and the Federal Court," as downloaded from the White House's website at https://tinyurl.com/2xffvr6c.

32.     Attached hereto as **Exhibit 29** is a true and correct copy of a March 21, 2025 White House Fact Sheet titled "Fact Sheet: President Donald J. Trump Prevents Abuses of the Legal System and the Federal Courts," as downloaded from the White House's website at https://tinyurl.com/48zbufb8.

33.     Attached hereto as **Exhibit 30** is a true and correct copy of a March 25, 2025 Executive Order 14246 issued by President Donald J. Trump titled "Addressing Risks from Jenner & Block," as downloaded from the White House's website at https://tinyurl.com/53v3xcam.

34.     Attached hereto as **Exhibit 31** is a true and correct copy of a March 25, 2025 video titled "Trump Signs Executive Order Taking Aim At Law Firm Jenner & Block, Slams Attorney Andrew Weissmann" and published by Forbes, as downloaded from YouTube's website at https://tinyurl.com/4pr9c2za.

35.     Attached hereto as **Exhibit 32** is a true and correct copy of a September 1, 2018 post on X by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from X's website at https://tinyurl.com/m2rtfp6y.

**JA 2442**

36.     Attached hereto as **Exhibit 33** is a true and correct copy of a March 28, 2025 declaration by Thomas J. Perrelli titled "Declaration Of Thomas J. Perrelli In Support Of Motion For Temporary Restraining Order," as downloaded from the docket for *Jenner & Block LLP v. U.S. Department of Justice*, No. 1:25-cv-916, ECF No. 2-16 (D.D.C.).

37.     Attached hereto as **Exhibit 34** is a true and correct copy of a March 28, 2025 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/tsfbcbwu.

38.     Attached hereto as **Exhibit 35** is a true and correct copy of a March 28, 2025 article by Daniel Barnes titled "Major law firm strikes preemptive deal with White House" and published in Politico, as downloaded from Politico's website at https://tinyurl.com/mvv9ubmz.

39.     Attached hereto as **Exhibit 36** is a true and correct copy of an April 1, 2025 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/tuddku4n.

40.     Attached hereto as **Exhibit 37** is a true and correct copy of an April 1, 2025 article by Patrick Smith and Abigail Adcox titled "Willkie Believes It's the Next Target of Trump Executive Order" and published in Law.com, as downloaded from Law.com's website at https://tinyurl.com/3pywbjx8.

41.     Attached hereto as **Exhibit 38** is a true and correct copy of an April 1, 2025 article by ALM Staff titled "Willkie Firm Leadership Addresses the Firm Following Trump Agreement" and published by The American Lawyer, as downloaded from the American Lawyer's website at https://tinyurl.com/mtnwrdya.

**JA 2443**

42.     Attached hereto as **Exhibit 39** is a true and correct copy of an April 2, 2025 post on Truth Social by user @realDonaldTrump, which upon information and belief is an account owned by President Donald J. Trump, as downloaded from Truth Social's website at https://tinyurl.com/mr3cves4.

43.     Attached hereto as **Exhibit 40** is a true and correct copy of an April 2, 2025 article by ALM Staff titled "Milbank 'Comfortable With All These Provisions,' Chairman Says in Message to Firm" and published in the American Lawyer, as downloaded from the American Lawyer's website at https://tinyurl.com/3k6kk7v7.

44.     Attached hereto as **Exhibit 41** is a true and correct copy of a March 11, 2025 article by Michael Birnbaum titled "Law Firms Refuse To Represent Trump Opponents In The Wake Of His Attacks" and published in the Washington Post, as downloaded from the Washington Post's website at https://tinyurl.com/yn563p6x.

45.     Attached hereto as **Exhibit 42** is a true and correct copy of a March 27, 2025 article by Katelyn Polantz titled "Law Firms Are Scared To Speak Out Amid Trump's Attacks On Their Livelihood" and published by CNN, as downloaded from CNN's website at https://tinyurl.com/2rd8dwem.

46.     Attached hereto as **Exhibit 43** is a true and correct copy of an April 4, 2025 article by Justin Henry titled "Big Law Mostly Sits Out Industry Response To Trump Orders" and published in Bloomberg Law, as downloaded from Bloomberg Law's website at https://tinyurl.com/ycypte4h.

47.     Attached hereto as **Exhibit 44** is a true and correct copy of a March 27, 2025 Executive Order 14250 issued by President Donald J. Trump titled "Addressing Risks from WilmerHale," as downloaded from the White House's website at https://tinyurl.com/mv3kjzmz.

48.     Attached hereto as **Exhibit 45** is a true and correct copy of a March 27, 2025 White House Fact Sheet titled "Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale," as downloaded from the White House's website at https://tinyurl.com/3t33z9zk.

49.     On March 31, 2025, Deputy Associate Attorney General Richard P. Lawson informed me that at approximately 2:00pm ET that day, he sent an email to all named agency defendants regarding the temporary restraining order issued by this Court three days earlier.  Mr. Lawson forwarded me a copy of that email, which is attached hereto as **Exhibit 46**.

50.     On April 1, 2025, Mr. Lawson sent me a list of federal agencies that he said were notified at approximately 4:20pm ET that day, "in addition to the named defendants who were notified yesterday."  A copy of that list is attached as **Exhibit 47**.

51.     On April 2, 2025, at approximately 10:02am ET, I informed Mr. Lawson that there were still several agencies and sub-agencies subject to the Executive Order that did not appear to have been notified, including the Department of the Navy, the Air Force, the Commodity Futures Trading Commission, the Office of the Comptroller of the Currency, the Farm Credit Administration, the Federal Reserve, the Occupational Safety and Health Administration, the Pension Benefit Guaranty Corporation, and the International Trade Commission.

52.     On April 3, 2025, at approximately 12:11pm ET, Mr. Lawson informed me that he had sent additional emails to federal agencies and provided what he said was "a complete list" of all "agencies that have received notice" of the Court's temporary restraining order.  A copy of that list is attached as **Exhibit 48**.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April 8, 2025, in Columbia, South Carolina.

_____

JOSEPH J. DEMOTT
Virginia Bar No. 93981
D.D.C. Bar ID #D00561

# EXHIBIT 1



**PRESS RELEASE**

# Appointment of Special Counsel

Wednesday, May 17, 2017

**For Immediate Release**

Office of Public Affairs

Deputy Attorney General Rod J. Rosenstein today announced the appointment of former Department of Justice official and FBI Director Robert S. Mueller III to serve as Special Counsel to oversee the previously-confirmed FBI investigation of Russian government efforts to influence the 2016 presidential election and related matters.

"In my capacity as acting Attorney General, I determined that it is in the public interest for me to exercise my authority and appoint a Special Counsel to assume responsibility for this matter," said Deputy Attorney General Rosenstein. "My decision is not a finding that crimes have been committed or that any prosecution is warranted. I have made no such determination. What I have determined is that based upon the unique circumstances, the public interest requires me to place this investigation under the authority of a person who exercises a degree of independence from the normal chain of command."

Deputy Attorney General Rosenstein added, "Each year, the career professionals of the U.S. Department of Justice conduct tens of thousands of criminal investigations and handle countless other matters without regard to partisan political considerations. I have great confidence in the independence and integrity of our people and our processes. Considering the unique circumstances of this matter, however, I determined that a Special Counsel is necessary in order for the American people to have full confidence in the outcome. Our nation is grounded on the rule of law, and the public must be assured that government officials administer the law fairly. Special Counsel Mueller will have all appropriate resources to conduct a thorough and

complete investigation, and I am confident that he will follow the facts, apply the law and reach a just result."

Special Counsel Mueller has agreed to resign from his private law firm in order to avoid any conflicts of interest with firm clients or attorneys.

A copy of the order is attached.

*Updated February 6, 2025*

**Attachment**

Order 3915-2017 (Special Counsel) [PDF, 265 KB]

**Topic**

**VOTING AND ELECTIONS**

**Component**

Office of the Deputy Attorney General

Press Release Number: 17-541

**Office of Public Affairs**

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington DC 20530

Office of Public Affairs Direct Line
202-514-2007

Department of Justice Main Switchboard
202-514-2000

**JA 2449**

# EXHIBIT 2

JA 2451



# EXHIBIT 3

JA 2453



# EXHIBIT 4

JA 2455



# EXHIBIT 5



# Trump claims launching Russia probe 'treasonous'

Politics    Mar 25, 2019 1:27 PM EDT

WASHINGTON — President Donald Trump is accusing those responsible for launching the special counsel investigation of "treason" and says they "will certainly be looked at."

Trump did not specify who he's referring to, but told reporters Monday, that "There are a lot of people out there that have done some very, very evil things, very bad things. I would say treasonous things against our country."

Trump adds that, "Those people will certainly be looked at" and says: "I've been looking at them for a long time."

READ MORE: How Trump's allies are seizing on the Mueller report for his 2020 campaign

The comments come a day after the attorney general told Congress that special counsel Robert Mueller found no evidence Trump or his associates conspired with Russia to influence the 2016 election.

Asked about the possibility of **issuing pardons**, Trump also says: I "haven't thought about it."

READ MORE: 4 things we learned from Barr's summary of the Mueller report

# Insightful, trustworthy journalism, for everyone.

Your tax-deductible donation directly supports our mission. Support *PBS News Hour* today.

**Donate** →

*By* — **Associated Press**

JA 2457

# EXHIBIT 6



← **Truth Details**
1415 replies

**Donald J. Trump** ✓
@realDonaldTrump

They spied on my Campaign, Impeached me twice, had the Russia, Russia Hoax, the Fake Dossier Hoax, FISA Fraud, Election Fraud, the "No Collusion" Mueller Hoax, and so much more. I was innocent on all counts. If I am elected, they will be brought to JUSTICE, something that Republicans have always been afraid to do.

**7.45k** ReTruths   **25.5k** Likes                    Sep 06, 2023, 3:06 PM

# EXHIBIT 7





**Donald J. Trump** ✔
@realDonaldTrump

CEASE & DESIST: I, together with many Attorneys and Legal Scholars, am watching the Sanctity of the 2024 Presidential Election very closely because I know, better than most, the rampant Cheating and Skullduggery that has taken place by the Democrats in the 2020 Presidential Election. It was a Disgrace to our Nation! Therefore, the 2024 Election, where Votes have just started being cast, will be under the closest professional scrutiny and, WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law, which will include long term prison sentences so that this Depravity of Justice does not happen again. We cannot let our Country further devolve into a Third World Nation, AND WE WON'T! Please beware that this legal exposure extends to Lawyers, Political Operatives, Donors, Illegal Voters, & Corrupt Election Officials. Those involved in unscrupulous behavior will be sought out, caught, and prosecuted at levels, unfortunately, never seen before in our Country.

**17.5k** ReTruths  **46.8k** Likes                      Sep 07, 2024, 7:01 PM



# EXHIBIT 8



Advertisement

# How major law firms are responding to Trump's attacks

Law firms are torn on how to handle the new Trump administration as the president targets some of their own.



U.S. President Donald Trump speaks after signing executive orders in the Oval Office of the White House on March 06, 2025 in Washington, DC. | Alex Wong/Getty Images

By **DANIEL BARNES**
03/19/2025 05:55 AM EDT

f  X  🔗  •••

Lawyers at some of the nation's largest law firms are afraid of President Donald Trump. Not just afraid of what his policies might mean for their clients, but now for their own livelihoods, as his attacks on individual firms have left a shocked industry struggling to respond.

When Trump first took office in 2017, attorneys at Big Law firms lent thousands of pro-bono hours to legal efforts to stymie the administration's most controversial policies, including the travel ban that restricted entry to the U.S. from certain Muslim-majority countries.

Advertisement



After his efforts to overturn the results of the 2020 election and the Capitol riot on Jan. 6, 2021, Trump became even more anathema to major firms; several of his criminal defense lawyers had to leave their firms in order to take him on as a client.

Now, as he returns triumphant from the political wilderness, Trump finds a Washington legal community facing a dilemma — keep their heads down and avoid cases that may pit them against the administration, or continue representing clients that might anger a president increasingly willing to use his power to seek vengeance.

**JA 2463**

"Back then nobody believed that there would be retaliation against the institution or them personally for taking these actions," said a former partner at a major firm granted anonymity to speak candidly. "Nobody was thinking, I've got to worry whether it could really hurt my law firm if I took this on. And that's the huge change we're in now."

POLITICO talked to more than five lawyers for this story and most were granted anonymity in order to speak candidly without fear of Trump's retribution. Much of the trepidation inside big firms comes from Trump's new strategy of signing executive orders seemingly aimed at destroying firms in retaliation for perceived wrongs dating back a decade.

On Friday, Trump signed an order sanctioning the firm Paul Weiss for the work of their former employee Mark Pomerantz, who later investigated Trump's finances and payments to porn star Stormy Daniels for the Manhattan District Attorney's office. Pomerantz resigned from the DA's office in 2022 before Trump was indicted. The order cuts the firm off from government contracts and even restricts their lawyers from entering certain government buildings.

And earlier this month, Trump signed an executive order sanctioning Perkins Coie, punishing the firm for earlier work on behalf of Hillary Clinton.

Trump's grudge against Perkins dates back to the 2016 presidential campaign when now-former Perkins Coie lawyers working for Clinton's campaign hired Fusion GPS, resulting in the infamous Steele dossier that alleged collusion between Trump's campaign and Russia. While the executive order ostensibly targets the firm for national security reasons and racially discriminatory hiring practices, the entire first paragraph is dedicated to Clinton, the dossier and MAGA bogeyman George Soros.

Advertisement

"We have a lot of law firms that we're going to be going after because they were very dishonest people," Trump said in a Fox News interview after signing the Perkins order. "They were very, very dishonest. I could go point after point after point, and it was so bad for our country."

A February order stripped security clearance from an employee at Covington & Burling who provided legal services to former special counsel Jack Smith, who criminally prosecuted Trump for his attempts to overturn the 2020 election and refusal to return classified materials stored at Mar-a-Lago. (Those cases have been dropped.) And on Monday, the acting chair of the U.S. Equal Employment Opportunity Commission sent letters to 20 major firms, suggesting their diversity and inclusion practices may violate civil rights laws and requesting extensive data on their use of race and sex in hiring. Trump has vowed to eliminate the use of DEI practices and previously directed the Justice Department to identify potential targets for civil and criminal investigation.

"Law firms in America shouldn't be fearful of President Trump, they should be fearful of the lawfare being perpetuated by federal judges hellbent on upending the Executive Branch," White House Deputy Press Secretary Harrison Fields said in a statement. "Our justice system and Constitution are under attack and lawyers across the nation should unite behind President Trump in defense of Law and Order."

Perkins, Paul Weiss, and other firms named in this piece did not respond to requests for comment.

Leaders at major firms have so far not made formal statements on these attacks. Discussions between firms on issuing a joint statement criticizing the orders have been ongoing but many firms are loath to speak out first, according to three people.

O  MOST READ



1  Trump Tells Inner Circle That
   Musk Will Leave Soon

2  'This Could Get Much Uglier': The
   Fatal Flaw in Trump's Trade War

3  Trump's second-term honeymoon
   might be over

4  'I hope he's right': Markets
   tumble on tariffs — but Trump
   isn't flinching

JA 2464

"Firms are afraid that if you're out there and perceived as being anti-administration, that could hurt your firm," a senior lawyer at a large firm said. "The administration is viewed as very punitive and retributive."

"They're just scared of retribution," a senior lawyer at another firm said. "There's a lot of fear in Big Law right now."

The administration hasn't provided any visibility into which additional firms they might target, and going after entire firms for the actions of one or two former partners certainly makes it harder for firm leaders to determine what actions could land them on the blacklist. But perhaps that's the point.

"If you want to put a head on a spike in the city square in order to deter people from crossing the ruler, it really doesn't matter if the person's head is of someone innocent or guilty," the former major firm partner said.

Advertisement

Frustrated by the lack of outcry from leadership, associates at dozens of major firms have begun circulating an open letter criticizing the administration for attempting to "bully corporate law firms out of engaging in any representation that challenges the administration's aims" and calling on their employers to do the same. More than 300 associates have anonymously signed the letter since it went live about a week ago.

Rachel Cohen, an associate at Skadden Arps who helped organize the letter and spoke to POLITICO in her personal capacity, said she wants to see a "critical mass" of large firms in the country put out a statement expressing their commitment to continuing to represent "all sides of the coin" even when one side is opposed to the interests of the administration.

"It is imperative for rule of law in this country that lawyers not be associated with the interests that they represent or not have those imputed to them," she said. "Because if we don't have that and we have a vindictive government at the federal level targeting attorneys for providing representation, then we don't have checks and balances. We don't have the judiciary or the court system in the way that it's intended to function."

Big Law has not been completely absent in fighting Trump since January. Several firms are involved in ongoing litigation against the administration representing a variety of clients. WilmerHale represents a group of fired inspectors general challenging their removal; Hogan Lovells and Jenner & Block are seeking to block executive orders restricting federal funds from hospitals that provide gender-affirming care; Arnold & Porter is working with civil rights groups to challenge potential restrictions on birthright citizenship. But whether there will be a chilling effect as a result of the Perkins and Paul Weiss orders remains to be seen.

Other firms are willing to work with the president directly. New York firm Sullivan and Cromwell accepted Trump as a client earlier this year and will manage the appeal of his criminal hush money conviction after several members of Trump's defense team found new employment within his administration.

There's also the acknowledgement in some corners of the legal community that what's bad for Perkins, Covington or Paul Weiss might be good for their competitors. An exodus of clients from firms in the administration's crosshairs means more business up for grabs, especially if you're a firm who can advertise closer ties to the White House, one lawyer said.

And the business of law is, at the end of the day, a business. Firm leaders have a fiduciary duty to their employees and no one wants to be the one holding the reins when a firm goes under.

Cohen, the Skadden associate who helped organize the open letter, disputes

5   New chaos in White House as top NSC officials sacked

Advertisement

**JA 2465**

that premise.

"What's crucial for everyone in this industry to remember is that silence is not going to protect you," she said. "And it is a much, much better business decision if the industry as a whole rejects this type of targeting than it is to be silent and hope that the president doesn't pull your name out of the hat next."

*Daniel Lippman contributed*

# EXHIBIT 9

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Suspension of Security Clearances and Evaluation of Government Contracts

The White House

February 25, 2025

MEMORANDUM FOR THE SECRETARY OF STATE

      THE SECRETARY OF DEFENSE

      THE ATTORNEY GENERAL

      THE SECRETARY OF ENERGY

      THE DIRECTOR OF THE OFFICE OF MANAGEMENT AND
        BUDGET

      THE DIRECTOR OF NATIONAL INTELLIGENCE

      THE DIRECTOR OF THE CENTRAL INTELLIGENCE AGENCY

      THE DIRECTOR OF THE OFFICE OF PERSONNEL
      MANAGEMENT

SUBJECT:    Suspension of Security Clearances and Evaluation
of Government Contracts

I hereby direct the Attorney General and all other relevant heads of executive departments and agencies (agencies) to immediately take steps consistent with applicable law to suspend any active security clearances held by Peter Koski and all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel, pending a review and determination of their roles and responsibilities, if any, in the weaponization of the judicial process.  I also direct the Attorney General and heads of agencies to take such

**JA 2468**

actions as are necessary to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law and consistent with the memorandum that shall be issued by the Director of the Office of Management and Budget.

Additionally, if any of the covered Covington & Burling LLP members, partners, and employees referenced in this memorandum obtained a security clearance from an agency not included as an addressee of this memorandum, the Director of the Office of Personnel Management shall provide this memorandum to the appropriate clearance-granting agency to ensure compliance.

I further direct the Director of the Office of Management and Budget to issue a memorandum to all agencies to review all Government contracts with Covington & Burling LLP.  To the extent permitted by applicable law, heads of agencies shall align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

NEWS

ADMINISTRATION

ISSUES

CONTACT

JA 2469

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 10



**TRUTH.**

← **Truth Details**
1839 replies

**Donald J. Trump** ✓
@realDonaldTrump

The Crooked Election Interference "Thugs" from the DOJ, headed by the worst Thug of them all, Deranged Jack Smith, are now admitting that the Mar-a-Lago Security Tapes were NOT DELETED. That's not what they were illegally leaking to the press. These guys should be prosecuted for MISCONDUCT. Also, whatever happened to Crooked Joe's Documents? Where are the ones he sent and stored in Chinatown? Is Deranged Jack going to Indict him for this and, at the same time, receiving BRIBES FROM CHINA?

**8.65k** ReTruths   **29.1k** Likes                    Jul 30, 2023, 11:50 AM



# EXHIBIT 11



# POLITICO

EUROPE   PRO   E&E NEWS

LEGAL

## Trump targets Washington law firm that aided Jack Smith

The president suspended security clearances of lawyers at Covington & Burling over their pro bono work for special counsel Jack Smith.



President Donald Trump holds a signed memorandum regarding revoking security clearances in the Oval Office at the White House in Washington, Tuesday, Feb. 25, 2025. (Pool via AP) | AP

By JOSH GERSTEIN and KYLE CHENEY
02/25/2025 07:27 PM EST

President Donald Trump retaliated Tuesday against a Washington law firm that provided free legal services to special counsel Jack Smith, the federal prosecutor who brought two criminal cases against Trump that were dropped after he won last November's election.

During an Oval Office photo opportunity devoted to a series of executive actions, Trump signed a memorandum suspending the security clearances of lawyers and other personnel at Covington & Burling involved in representing Smith before he resigned from the Justice Department last month.

Advertisement

Trump's directive also calls for ending all contracts Covington has with the federal government, although a federal spending database doesn't show any government contracts with the firm.

The president's move followed a report in POLITICO earlier this month that Smith declared in a financial disclosure that he received a gift of $140,000-worth of legal services from the firm while in government service. Government rules allow federal employees to take pro bono legal services related to their work as long as they get approval from their agency and disclose the gift.

JA 2474

Trump's directive mentioned by name only one Covington lawyer representing Smith, Peter Koski, but says it applies equally to others at the firm "who assisted former Special Counsel Jack Smith during his time as Special Counsel, pending a review and determination of their roles and responsibilities, if any, in the weaponization of the judicial process."

Trump frequently targeted Smith and his team during the special counsel's investigations and threatened to fire him.

In a statement, Covington said the firm "recently agreed" to represent Smith when it "became apparent that he would become the subject of a government investigation" and suggested the relationship began around the time of the 2024 election.

"For more than 100 years, Covington has represented clients facing government investigations, consistent with the best traditions of the legal profession," the firm's statement said. "Covington serves as defense counsel to Jack Smith in his personal, individual capacity. We look forward to defending Mr. Smith's interests and appreciate the trust he has placed in us to do so."

A Covington spokesperson declined to comment on whether Koski or other lawyers there currently have security clearances.

The directive Trump signed Tuesday is just his latest attempt to use his return to the power of the presidency to punish his perceived enemies. He has rescinded security clearances for former intelligence community officials who signed a letter raising concerns — that ultimately turned out to be false — that Hunter Biden's hard drive bore the hallmarks of a foreign influence operation. Trump also pulled the clearance for attorney Mark Zaid, a prominent whistleblower attorney who represented the intelligence official who helped trigger Trump's 2020 impeachment. Trump has also pulled security details for figures who have criticized and publicly opposed him.

Advertisement

Attorney General Pam Bondi has also launched a "Weaponization Working Group" that is assigned to examine the conduct of Smith's team, among other things.

Trump during the Oval appearance Tuesday mocked Smith and tossed the pen used to sign the memo to someone with instructions to deliver it to the former special counsel.

"We're going to call it the deranged Jack Smith signing, or bill," Trump told reporters. "The weaponization of our system by law firms, even pro bono work they're doing in order to clog up government, stop government. And nobody knows about it better than me and, hopefully, that will never happen again."

As a reporter began to ask Trump about the wisdom of the directive, Trump interrupted. "Excuse me, I've been targeted for four years, longer than that," the president said. "You don't tell me about targeting. I was the target of corrupt politicians for four years and then four years after that, so don't tell me about targeting."

Covington counts several prominent Democrats in its ranks including former Attorney General Eric Holder, now a senior counsel at the firm, and former DOJ Criminal Division chief and Clinton White House lawyer Lanny Breuer, who is a partner there. The firm also served as counsel to President Joe Biden's 2020 presidential bid.

FILED UNDER: JUSTICE DEPARTMENT, DONALD TRUMP, PAM BONDI, LEGAL, JACK SMITH

Advertisement

○ MOST READ



Trump Tells Inner Circle That Musk Will Leave Soon

'This Could Get Much Uglier': The Fatal Flaw in Trump's Trade War

Trump's second-term honeymoon might be over

'I hope he's right': Markets tumble on tariffs — but Trump isn't flinching

New chaos in White House as top NSC officials sacked

JA 2475

# EXHIBIT 12

# Trump signs executive action targeting law firm representing former special counsel Jack Smith

The law firm says it's representing Smith in his personal capacity.

By **Kelsey Walsh**
February 25, 2025, 10:05 PM

   



**Trump says Musk email is 'somewhat' voluntary, but people could get fired**   During a signing of executive orders, President Donald Trump was asked about the email requests sent out to federal employees and whether or not it's mandatory

President Donald Trump signed an executive action Tuesday targeting a prominent law firm that represents former special counsel Jack Smith. The memo strips Smith's attorney of his security clearance as well as any other attorneys at the firm who assisted Smith while he was investigating Trump.

JA 2477

Covington and Burling LLP said it is representing Smith in a personal capacity, and a person familiar with the matter said there is no evidence the law firm played any part in Smith's criminal investigations of Trump.

The memo Trump signed Tuesday -- a major escalation in Trump's targeting of those he believes to be his political enemies -- also directs the Office of Management and Budget to review any government contracts held by the law firm.



President Donald Trump speaks to the press in the Oval Office, at the White House in Washington, Feb. 25, 2025.

Evelyn Hockstein/Reuters

---

**MORE: House Republicans narrowly pass measure to fund Trump's agenda after last-minute drama** →

---

"One law firm that provided pro-bono legal services to the special counsel's office under Jack Smith's leadership was Covington and Burling," White House Staff Secretary Will Scharf said about the memo as Trump moved to sign it during a ceremony on Tuesday. "As a result of those actions, we're now going to be suspending and putting under review the security clearances for the attorneys and employees at that firm who worked with

Jack Smith's team. And we're going to continue holding the people who were responsible for the weaponization of government, who supported it, accountable for what they did."

Trump asked Scharf about the plans to do this to other law firms and Scharf said that the administration was looking at a range of options to take against other law firms. Trump tossed the pen to an attendee and joked "Why don't you give it to Jack Smith?" and called him a "deranged" individual.

A reporter asked Trump whether the action to strip the attorneys' security clearances amounted to political targeting, but Trump cut the reporter off and said that he was the target.

"I've been targeted for four years longer than that. So, you don't tell me about targeting?" Trump said. "I was the target of corrupt politicians for four years, and then four years after that. So don't talk to me about targeting."

JA 2479



U.S. Special Counsel Jack Smith makes a statement to reporters about the 37 federal charges returned by a grand jury in an indictment of former U.S. President Donald Trump on charges of unauthorized retention of classified documents and conspiracy to obstruct justice, in Washington, June 9, 2023.

Leah Millis/Reuters, FILE

---

**MORE: Trump 2nd term live updates: Trump floats selling 'gold card' for $5 million for pathway to citizenship** →

---

A person familiar with Covington's representation of Jack Smith responded to Trump's action saying, "There is no evidence the firm itself played any role in Special Counsel Smith's investigation of Trump -- and no evidence their representation of Smith had anything to do with his official duties. Separately, Covington is not a contractor to the federal government."

A spokesperson for the firm added that they recently agreed to represent Smith in an individual capacity and look forward to defending him.

"For more than 100 years, Covington has represented clients facing government investigations, consistent with the best traditions of the legal profession. We recently agreed to represent Jack Smith when it became apparent that he would become a subject of a government investigation. Covington serves as defense counsel to Jack Smith in his

personal, individual capacity. We look forward to defending Mr. Smith's interests and appreciate the trust he has placed in us to do so."

---

**MORE: Federal judge rules Trump administration has to pay millions in foreign aid to nonprofits** →

---

As special counsel, Smith led probes into both Trump's handling of classified material and his efforts to overturn the results of the 2020 election.

Both cases were dropped following Trump's reelection in November due to a longstanding Justice Department policy prohibiting the prosecution of a sitting president.

Under Trump's continual personal attacks, Smith defended his conduct as fully lawful, free of partisan influence and vital to the justice system.

In a letter before he stepped down, Smith personally denounced Trump for levying "laughable" and baseless attacks on the federal prosecutors who brought two criminal cases against him.

When Trump was charged with allegedly mishandling the nation's most sensitive secrets, his lawyers and lawyers for Trump's co-defendants were granted security clearances by the Biden administration so they could adequately defend their clients. Those lawyers now work at the top of the Trump administration -- Todd Blanche is the incoming deputy attorney general, and Emil Bove is the acting deputy attorney general.

JA 2481

A third attorney, Stanley Woodward, is now a senior adviser to Trump and was present in the Oval Office on Tuesday to witness Trump signing the executive order.

*ABC News' Katherine Faulders contributed to this report.*

## Related Topics

**President Trump**



## Sponsored Content by Taboola

Texas measles outbreak includes multiple cases at a day care in Lubbock

Discover

# EXHIBIT 13

Exhibit 13


March 14, 2025 remarks by President Donald J. Trump
at the Department of Justice


The video is available here:
https://www.youtube.com/watch?v=6i41Av4eYO8


Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this
exhibit is being maintained by plaintiff's counsel and will be
provided to the Court and defendants' counsel.

# EXHIBIT 14

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Addressing Risks from Perkins Coie LLP

The White House

March 6, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Purpose. The dishonest and dangerous activity of the law firm Perkins Coie LLP ("Perkins Coie") has affected this country for decades. Notably, in 2016 while representing failed Presidential candidate Hillary Clinton, Perkins Coie hired Fusion GPS, which then manufactured a false "dossier" designed to steal an election. This egregious activity is part of a pattern. Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification. In one such case, a court was forced to sanction Perkins Coie attorneys for an unethical lack of candor before the court.

In addition to undermining democratic elections, the integrity of our courts, and honest law enforcement, Perkins Coie racially discriminates against its own attorneys and staff, and against applicants. Perkins Coie publicly announced percentage quotas in 2019 for hiring and promotion on the basis of race and other categories prohibited by civil rights laws. It proudly excluded applicants on the basis of race for its fellowships, and it maintained these discriminatory practices until applicants harmed by them finally sued to enforce change.

**JA 2486**

My Administration is committed to ending discrimination under "diversity, equity, and inclusion" policies and ensuring that Federal benefits support the laws and policies of the United States, including those laws and policies promoting our national security and respecting the democratic process. Those who engage in blatant race-based and sex-based discrimination, including quotas, but purposefully hide the nature of such discrimination through deceiving language, have engaged in a serious violation of the public trust. Their disrespect for the bedrock principle of equality represents good cause to conclude that they neither have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds.

Sec. 2. Security Clearance Review. (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Perkins Coie. The heads of all agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3. Contracting. (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract.

(b) The heads of all agencies shall review all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

JA 2487

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Perkins Coie has been hired to perform any service;

(ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Perkins Coie or with entities that do business with Perkins Coie effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4. Racial Discrimination. (a) The Chair of the Equal Employment Opportunity Commission shall review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964, including whether large law firms: reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis.

(b) The Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and in consultation with State Attorneys General as appropriate, shall investigate the practices of large law firms as described in subsection (a) of this section who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered.

Sec. 5. Personnel. (a) The heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their

official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of Perkins Coie, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. 6. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
March 6, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

JA 2490

Copyright

Privacy

Style Guide

JA 2491

# EXHIBIT 15

*The* WHITE HOUSE

**FACT SHEETS**

Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP

The White House

March 6, 2025

**STOPPING ABUSES THAT UNDERMINE THE NATION:** Today, President Donald J. Trump signed an Executive Order to suspend security clearances held by individuals at Perkins Coie LLP, pending a review of whether their access to sensitive information is consistent with the national interest.

- Security clearances held by Perkins Coie LLP employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest.
    - The Federal Government will halt all material and services, including sensitive compartmented information facility (SCIF) access provided to Perkins Coie LLP and restrict its employees' access to government buildings.
    - Federal Agencies will also refrain from hiring Perkins Coie LLP employees unless specifically authorized.

- To ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States, the Federal Government will prohibit funding contractors that use Perkins Coie LLP.
    - All Federal Government contracts with Perkins Coie LLP will undergo rigorous scrutiny, with agency heads directed to terminate engagements to the maximum extent permitted by law.

- The practices of Perkins Coie LLP will be reviewed under Title VII to ensure compliance with civil rights laws against racial bias.

**ENSURING GOVERNMENT SERVES THE AMERICAN PEOPLE:** President Trump's Administration will not tolerate Perkins Coie LLP's unethical and discriminatory actions that threaten our elections, military strength, and national security.

**JA 2493**

- In 2016, Perkins Coie LLP hired Fusion GPS to manufacture a false "dossier" designed to steal an election while representing failed presidential candidate Hillary Clinton.

- Perkins Coie LLP pushed debunked claims of secret Trump–Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme.

- Perkins Coie LLP has worked with activist donors, including George Soros, to judicially overturn enacted election laws, such as those requiring voter identification.
  - A court was forced to sanction Perkins Coie attorneys for unethical lack of candor before the court.

- Perkins Coie LLP has been accused of racially discriminating against its own attorneys, staff, and applicants.
  - Perkins Coie has publicly announced racial percentage quotas for hiring and promotions, violating civil rights laws, and excluded applicants from fellowships based on race until lawsuits forced change.

- Perkins Coie LLP hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump.

- Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness.

**A RETURN TO ACCOUNTABILITY:** President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan actors who exploit their influence.

- President Trump is refocusing government operations to their core mission— serving the citizens of the United States.

- President Trump signed an Executive Order to end the weaponization of the Federal Government on his first day in office after promising to "end forever the weaponization of government and the abuse of law enforcement against political opponents."

- President Trump revoked security clearances held by dozens of intelligence officials who falsely claimed in a 2020 letter, during the height of the U.S.

JA 2494

presidential election season, that Hunter Biden's laptop was tantamount to Russian disinformation.

JA 2495

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

VIDEO LIBRARY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

**JA 2496**

Copyright

Privacy

Style Guide

# EXHIBIT 16





← **Truth Details**
159 replies                                                              •••

**Donald J. Trump** ✓
@realDonaldTrump

Andrew McCarthy: "HILLARY CLINTON, RECIDIVIST ELECTION-THEFT
CONSPIRATOR...Regarding 1992, the Clinton campaign used a law firm as the
intermediary for tens of thousands of dollars in payments to a private investigator
(Jack Palladino) whose task was to obtain the silence of women who claimed to
have had affairs with Bill Clinton...it turns out that this 1992 tactic — booking as
legal fees what might euphemistically be called 'research' — was the blueprint for
the 2016 Hillary Clinton campaign, in cahoots with the Democratic National
Committee. They paid their law firm, Perkins Coie, which retained the research firm
Fusion GPS and its contractor, former British spy Christopher Steele, to generate
the farcical Steele dossier that was shared with the FBI, the State Department, and
the media to smear Trump as a clandestine agent of the Kremlin...

**2.2k** ReTruths  **7.67k** Likes                          May 05, 2024, 3:01 PM



# EXHIBIT 17

# Trump Ramps Up Attacks on Law Firms With Order Targeting Perkins Coie

The order against the firm, which did work for Democrats during the 2016 campaign, represents an escalation of efforts to punish groups the president sees as aiding his enemies.

 **By Devlin Barrett**
Reporting from Washington

March 6, 2025

President Trump signed an executive order on Thursday seeking to severely punish the law firm Perkins Coie by stripping its lawyers of security clearances and access to government buildings and officials — a form of payback for its legal work for Democrats during the 2016 presidential campaign.

With the order, Perkins Coie becomes the second such firm to be targeted by the president. Late last month, he signed a similar memorandum attacking Covington & Burling, which has done pro bono legal work for Jack Smith, who as special counsel pursued two separate indictments of Mr. Trump.

While the Covington memorandum sought to strip clearances and contracts from that firm, the Perkins Coie order goes much further, seeking to also limit its lawyers' access to federal buildings, officials and jobs in a way that could cast a chilling effect over the entire legal profession.

The president's animosity toward Perkins Coie dates back eight years, to when two lawyers at the firm, Marc Elias and Michael Sussmann, played roles in what eventually became an F.B.I. investigation to determine if anyone on the 2016 Trump presidential campaign conspired with Russian agents to influence the outcome of that election. Both lawyers left that firm years ago.

**JA 2501**

The executive order denounces what it calls "dishonest and dangerous activity" at Perkins Coie, singling out its hiring of a research firm that led to the compilation of a dossier of unsubstantiated allegations against Mr. Trump related to possible ties between his campaign and Russia. The executive order accused the firm of "undermining democratic elections, the integrity of our courts and honest law enforcement."

The order instructs federal agencies to suspend any security clearances that Perkins Coie lawyers may have. It also orders government agencies to determine if they have any contracts with the law firm, and then cancel them.

Additionally, the order instructs the heads of all federal agencies to limit Perkins Coie lawyers' access to federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." It also instructs federal officials to limit their interactions with employees of the firm and seeks to prevent Perkins Coie lawyers from being hired by the federal government.

It is not clear what immediate effect the presidential decree will have on the firm. The president and his supporters have railed against what they call the "weaponization" of the legal system against him, arguing that he was unfairly targeted by prosecutors, judges and private practice lawyers for political purposes, rather than any wrongdoing on his part.

"This is an absolute honor to sign," Mr. Trump said at the White House. "What they've done is just terrible. It's weaponization, you could say weaponization against a political opponent, and it should never be allowed to happen again."

The same executive order also accuses the firm of unfair hiring practices, and calls for a far-reaching review of top law firms to see if they promote diversity, equity or inclusion in a way that the Trump administration dislikes.

The federal review ordered by Mr. Trump will seek to determine "whether large law firms reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis;

permit client access on a discriminatory basis; or provide access to events, trainings or travel on a discriminatory basis."

In a written statement, the law firm said the executive order "is patently unlawful, and we intend to challenge it." It was not immediately clear how many lawyers at the firm have security clearances.

Mr. Trump filed a lawsuit against Perkins Coie in 2022, accusing the firm, along with his former rival Hillary Clinton and others, of participating in a left-wing conspiracy to derail his presidential campaign. That lawsuit was quickly tossed by a judge who said it lacked substance and legal support.

Earlier this week, the president of the American Bar Association, William R. Bay, warned that Mr. Trump might take additional punitive measures against law firms he does not like, and said such behavior undermines the nation's legal system.

"Lawyers must be free to represent clients and perform their ethical duty without fear of retribution," Mr. Bay said in a written statement. He added: "We reject the notion that the government can punish lawyers who represent certain clients or punish judges who rule certain ways. We cannot accept government actions that seek to tip the scales of justice in this manner."

Luke Broadwater contributed reporting.

**Devlin Barrett** covers the Justice Department and the F.B.I. for The Times. More about Devlin Barrett

JA 2503

# EXHIBIT 18

JA 2504

*Democracy Dies in Darkness*

# Trump expands retribution campaign against law firms that aided his foes

Trump hit another major law firm that worked for his political rivals with an executive order seeking to limit its ability to work for the U.S. government.

Updated March 6, 2025

By Perry Stein and Michael Birnbaum

President Donald Trump on Thursday targeted another elite law firm that has represented clients he considers his political enemies, sending a forceful message that he is willing to punish firms who work for people or groups that oppose his administration's agenda.

In an Oval Office ceremony, the president signed an executive order hitting the large international law firm Perkins Coie with a sweeping directive that bans the federal government from hiring it, or from using contractors who work with it, except in limited circumstances. The order also bars Perkins Coie employees from entering federal buildings and suspends their security clearances.

The firm represented Hillary Clinton's campaign and the Democratic National Committee during the 2016 presidential race, and it also contracted with the research firm that produced the now-discredited opposition dossier that alleged extensive contacts between Trump and Russia.

The move could have a chilling effect on law firms' willingness to take on clients and cases that run counter to the Trump administration, challenging a fundamental tenet of the rule of law in the United States that everyone should have access to legal representation, experts said.

"This is an absolute honor to sign," Trump said from his Oval Office desk.

A spokesman for Perkins Coie said in a statement that the executive order is "patently unlawful, and we intend to challenge it."

A White House official said the move targeted Perkins Coie because of its track record on Trump.

"The president doesn't believe they should have the privileges afforded to companies of their stature to work and operate with the federal government, since they have made it very clear they are vehemently against the president of the United States, and their work proves that," a senior administration official said, speaking on the condition of anonymity to talk frankly about the sensitive decision-making behind the order.

**JA 2505**

"If this case was retribution or anti-Democrat, anti-liberal, then we would basically pull the security clearance clearances of every law firm on K Street, because they all hate the president," the official said. "This law firm in particular has shown a level of bias in which their coordination with the federal government was done so in an illegal fashion that was purposely intended on undermining the president of the United States and really locking him up."

Perkins Coie is the second law firm Trump has taken action against or decried as engaging "in the weaponization of the judicial process."

Last week, he ordered the suspension of security clearances of some attorneys at Covington & Burling, which has represented special counsel Jack Smith pro bono. Smith led the federal investigations of Trump for allegedly mishandling classified materials and trying to block the 2020 election results.

Trump's orders targeting the law firms called for limiting their access to federal resources and could have the effect of dissuading other private law firms from battling the Trump administration in court.

The American legal system relies on attorneys representing all sorts of clients, including violent criminals, and the president's appearing to punish firms for their choice of clients could do grave damage to that system, said Mark Zaid, a national security lawyer who often represents whistleblowers.

"By taking these actions against these major law firms, it is effectively sending a message to all the lawyers that you best not challenge this administration, or you, your lawyers and your clients will suffer," Zaid said. "It is the most un-American thing I've ever heard."

Other experts said the order was part of Trump's broader campaign against the legal system.

"He doesn't like judges who rule against him. He doesn't like prosecutors who prosecuted against him. He doesn't like lawyers who've undertaken measures against him," said Thomas Carothers, the director of the Democracy, Conflict, and Governance Program at the Carnegie Endowment for International Peace. "This is part of a broader questioning, and in many cases, an attack on the core institutions of the rule of law."

But Carothers said that he did not think Trump's order would bring the U.S. legal system to a halt.

"I don't think a peer law firm will think, 'Oh, we shouldn't bring this enforcement action against this government entity, because we can no longer challenge the U.S. government.' I think that would be overreading it."

Perkins Coie became embroiled in what Trump and his allies have repeatedly described as the "Russia hoax" when it contracted with a firm that conducted research about Trump's connections to Russia during the 2016 presidential campaign. That contract resulted in the now-famous Steele dossier, a document full of unverified allegations assembled by former British intelligence officer Christopher Steele.

But the two main attorneys involved in that work — Marc E. Elias and Michael Sussmann — are no longer employed by Perkins Coie. Both attorneys are named in a fact sheet explaining Trump's executive order.

Elias retained Fusion GPS, the Washington firm that ultimately produced the Steele dossier.

**JA 2506**

Years later, special counsel John Durham — who was assigned to look into possible wrongdoing among federal agents who investigated Trump's 2016 campaign — underline charged Sussmann with lying to a senior FBI official during that investigation.

Sussmann was accused of bringing allegations to the FBI of a secret computer communications channel between the Trump organization and Russia-based Alfa Bank. FBI agents investigated the data but concluded that there was nothing suspicious about it.

In 2022, a jury found Sussmann not guilty.

Perkins Coie is one of eight big law firms involved in lawsuits against Trump, according to an American Bar Association Journal article published last week that cited the law firm's representation of transgender service members who are challenging the administration's ban on joining the military.

Trump also signed a separate order that could make it harder for opponents to seek injunctions against his administration's actions by holding them accountable for legal costs if they lose. The Justice Department will ask judges to require plaintiffs who are seeking injunctions and restraining orders against the Trump administration to post a bond to cover court costs should they fail, raising the bar for legal challenges.

When presenting the Perkins Coie executive order to Trump to sign, White House staff secretary Will Scharf said the firm has engaged in "unlawful DEI practices," referring to diversity, equity and inclusion programs, and accused it of using racial quotas for hiring and promotions.

Scharf said the executive order calls for a "holistic review of unlawful DEI in some of the nation's largest law firms."

Although the Supreme Court has banned affirmative action in college admissions, and federal law prohibits workplace discrimination on the basis of race, sex and certain other criteria, no law bans diversity and equity efforts within private companies.

Scharf did not explain what the government's review would entail, which law firms would be examined and what criteria the federal government would use to determine whether a law firm engaged in wrongdoing.

The Trump administration's move to penalize law firms for their DEI practices when no court has said such programs are illegal "is extraordinary," said Walter Olson, a senior fellow at the Cato Institute, a libertarian think tank.

"There is no legal definition of excessive DEI. The law itself is so unsettled," Olson said. "The administration can take positions, but it's not as if the courts have taken a position and given them a green light and said, 'Yes, you are right.'"

**CORRECTION**

An earlier version of this article misspelled the last name of a former Perkins Coie attorney. He is Michael Sussmann. This article has been corrected.

**What readers are saying**

The comments overwhelmingly criticize the Trump administration's decision to target Perkins Coie, viewing it as an abuse of power and a threat to the rule of law. Many commenters express concern that this action represents authoritarian behavior, likening it to tactics used by...  Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

JA 2508

# EXHIBIT 19

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

    *Plaintiff,*

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,

    *Defendants.*

## DECLARATION OF DAVID J. BURMAN IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

I, David J. Burman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a partner at Perkins Coie LLP ("Perkins Coie"). Perkins Coie is an international law firm that conducts its U.S. operations and activities through a limited liability partnership, Perkins Coie LLP, with seventeen offices around the country. I have been an attorney at Perkins Coie for over 45 years, following two years clerking. I am a member in good standing of the D.C. and Washington bars and have been admitted in many state and federal courts, and I serve on the Advisory Committee on the Federal Rules of Civil Procedure. I am very familiar with the firm's business and operations and was asked as a result to take a lead role in attempting to assess and contain the damage from the March 6 Executive Order. I either have personal knowledge of the facts set forth in this declaration or I know them from business records and my knowledge of the firm's history and operations.

2. I currently chair the firm's governance task force, and have long and intense involvement in firm management. I led the commercial litigation practice and first served on the firm's executive committee by the early 1990s. I then served for six years on the four-partner

JA 2510

management committee. Over the years, I have chaired or served on the firm's hiring, compensation, pro bono, technology, and strategic conflicts committees as well as two strategic planning efforts and task forces on practice group structure, total quality management, and role of non-lawyer professionals. I spearheaded the creation of our Intellectual Property Department and the opening of our Chicago office, both of which have become among our most successful initiatives. I have acted as co-lead relationship partner for three of our large institutional clients.

3. I submit this Declaration in Support of the Complaint and Motion for Temporary Restraining Order filed by Perkins Coie. I am of the age of majority, and I am competent to make this declaration.

I. **Perkins Coie LLP**

4. Perkins Coie was founded in Seattle by a retiring U.S. District Judge and U.S. Attorney. Since 1912, Perkins Coie has grown to become the largest law firm in the Pacific Northwest, has opened offices throughout the United States and in Asia and in Europe, and has more than 1,200 lawyers. The firm represents a wide range of clients, including Fortune 500 companies, small- and medium-sized businesses, families, individuals, and charitable and public service-oriented organizations. Perkins Coie alumni have been and are presently serving as state and federal court judges, judicial law clerks, and high-ranking government officials, as well as founders, CEOs, and General Counsels of some of the nation's largest and most important companies. Perkins Coie is widely recognized as one of the leading law firms for technology and other innovative companies, and since our founding, Perkins Coie has proudly represented a wide range of industry leaders throughout the world.

5. Over our 113-year history, Perkins Coie and its lawyers have represented clients in every state, in federal and state courts across the nation, and in tribunals throughout the world

(including the Supreme Court of the United States), and they have helped to establish major precedent in state and federal law. We are committed to providing excellent service to our clients, helping them achieve their goals and standing by them in good and bad times alike.

6. Perkins Coie has been named as an "Am Law 50" firm on *The American Lawyer 100* list for over a decade. The firm and its lawyers are regularly recognized for excellence in the legal community by *Best Lawyers®*, *Chambers USA*, and other respected organizations, including national and local bar associations.

7. Perkins Coie has approximately 2,500 employees. Of those, nearly half are attorneys and half are business professionals, including paralegals, patent agents, legal assistants, and other professionals. Our employees are deeply woven into the fabric of their communities. They are Sunday school teachers, Scouts leaders, youth sports coaches, and volunteers serving on hundreds of boards of organizations ranging from art museums and food kitchens to major universities, local schools, and foundations. And they include former members of the armed forces, and current reservists in the U.S. military.

8. Perkins Coie's attorneys are drawn from all sides of the political spectrum, and most of our attorneys are not politically active. There are attorneys who are liberal and attorneys who are conservative. When Bob Bauer started our small Political Law practice, we were known in Seattle as, if anything, a "Republican firm." Things have become more balanced, but many of our attorneys joined the firm after government service under both Democratic and Republican administrations, or after serving as judges or judicial law clerks to judges appointed by both Democratic and Republican presidents. Reflecting this bipartisan ethos, in recent years, four Perkins Coie partners have been nominated and confirmed to serve as federal judges—two by President Trump in 2019, and two by President Biden in 2021 and 2023.

9. Perkins Coie is dedicated to our clients, our communities, and each other. The firm has a longstanding, firmwide commitment to pro bono service. Since 1989, the firm has provided approximately 1.45 million hours of pro bono service to innumerable clients, including veterans, indigent families, disabled persons, and community-based organizations of all sizes, including the League of Women Voters and other non-partisan organizations, in matters championing human, civil, and electoral rights, housing, education, food, benefits, and economic justice. We have frequently been honored for our efforts. Our pro bono service also extends to representing indigent criminal defendants before federal courts by court appointment and clients on death row in states with limited pro bono resources. In 2024, for example, Perkins Coie lawyers and business professionals spent over 89,000 hours, valued at nearly $70 million, in pro bono service. Much of our pro bono work involves advocating for military and veterans' rights.

10. Perkins Coie is often recognized for fostering a work environment in which all lawyers and business professionals are judged on their merit and can reach their potential. Perkins Coie has been named to *Fortune*'s "100 Best Companies to Work For" list for over 20 consecutive years, and our individual offices are often named to similar local lists.

## II. Interaction with the Federal Government

11. As a full-service law firm that represents clients in all sectors of the economy in transactional, litigation, and regulatory matters, Perkins Coie lawyers necessarily interact with the federal government on behalf of their clients in innumerable ways. Those interactions are critical to their ability to practice their profession; they are the waters the Perkins Coie attorneys swim in, the air they breathe. If allowed to go into effect, the Order's restrictions would be devastating and irreparable. Most of the firm's litigation practice is in federal court on behalf of their clients in civil and criminal cases, as well as in federal agencies' in-house administrative proceedings. The

firm has nearly a thousand cases currently pending before federal district, bankruptcy, and appellate courts, including the Supreme Court of the United States. Its attorneys have upcoming appearances scheduled before agencies and in courtrooms, including two upcoming arguments before the Supreme Court. Perkins Coie represents clients who have been indicted or are the targets of pending federal criminal investigations.

12. The firm has nine practice groups, and all of them intersect with the federal government in some way and include clients with business before the federal government. The largest practice groups by headcount are Commercial Litigation, Business, and Intellectual Property, which together account for approximately 75% of the firm's attorneys. The smallest practice group by headcount is Political Law, which includes 8 attorneys (and 19 others affiliated with that practice). I understand the March 6, 2025 Executive Order and Fact Sheet at issue in this proceeding to refer to former members of the Political Law group, albeit not by name. Although the firm's Political Law practice has historically been much smaller than our other practice groups, it also substantially shrank in 2021 when Marc Elias and about 50 other attorneys left Perkins Coie to form the Elias Law Group. This practice group historically has handled a mix of paying and some pro bono cases. It accounts for about 0.5% of the firm's revenue. Perkins Coie attorneys work on these matters because they involve important legal rights and issues affecting our clients.

13. In the course of their representations, Perkins Coie lawyers frequently meet with federal officials from countless agencies. Although it is difficult to quantify precisely, based on a review of our current client matter list, the vast bulk of our clients have matters that require Perkins Coie lawyers to interact with federal agencies.

14. For instance, a significant number of Perkins Coie clients are, or have affiliates who are, government contractors and subcontractors—including 100% of its top 15 clients by revenue.

The firm's Government Contracts group handles clients' bid protests and disputes surrounding contract claims, including transactional work and litigation. Perkins Coie represents some of these clients in connection with government contract matters. The approximately 13 attorneys in this group currently are handling approximately 69 government contracting matters involving various federal agencies. But there are many other firm clients that have government contracts and who have engaged Perkins Coie to represent them in matters unrelated to their government contracts.

15.     The firm's Intellectual Property group and its clients also depend heavily on access to and interaction with the federal government. The approximately 236 attorneys in this group frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board. Perkins Coie is currently representing approximately 555 clients in approximately 5,415 pending patent applications before the USPTO. Perkins Coie is also representing approximately 20 clients in approximately 56 active post-grant proceedings (i.e., administrative trial proceedings) before the Patent Trial and Appeal Board (PTAB), and approximately 7 clients in approximately 11 active proceedings before the International Trade Commission (ITC). Perkins Coie is also representing clients in trademark and copyright matters before agencies, including approximately 66 matters before the Trademark Trial and Appeal Board (TTAB), approximately 1,960 pending trademark matters before the USPTO, and approximately 145 pending copyright matters before the Copyright Office. Many of those patent and trademark clients also are known to have contracts with the federal government.

16.     Perkins Coie has approximately 343 attorneys in its Business group. That practice group includes subgroups directed to financial regulation, which requires them to engage with federal financial regulatory agencies (such as the Federal Deposit Insurance Corporation, Office

of the Comptroller of the Currency, and the Board of Governors of the Federal Reserve System); international trade, which involves interaction with and practice before the Department of Commerce and the International Trade Commission; and tax, which involves interaction with the Internal Revenue Service. The international trade group also has approximately 17 pending matters before the Department of Labor and approximately 22 pending matters before U.S. Citizenship and Immigration Services. The group's corporate and securities practice regularly represents clients before and in connection with the Securities and Exchange Commission (SEC), including No Action Request Letters, Securities Act registration statements subject to SEC review, and Exchange Act filings. The Business Group also represents clients before or in connection with the Department of Agriculture, the Food and Drug Administration, Department of Transportation, Department of Labor, Department of Justice, Department of Homeland Security, and Department of State.

17. The firm's White Collar & Investigations practice includes approximately 29 attorneys and is almost exclusively reliant on interacting with the federal government. That practice involves representing clients in investigations and after indictments in numerous proceedings involving many agencies of the federal government, including the Department of Justice, Federal Bureau of Investigation (FBI), U.S. Attorney's Offices, and SEC, among others.

18. There are many other practice groups and subgroups at Perkins Coie that interact, by necessity, with the federal government on behalf of our clients. These groups include, but are not limited to, Commercial Litigation (with subgroups including Appeals, Issues & Strategy; Construction; and Antitrust); Environment, Energy & Resources; Labor & Employment; Private Client Services; Product Liability; and Real Estate & Land Use. In summary, much of our work on behalf of our clients requires access to federal government buildings, which house both

courthouses and agencies. This is true of every practice group at the firm. And many of these practice areas, such as White Collar & Investigations, are almost exclusively reliant on interacting with the federal government. Each of our nine major practice groups relies on clients who have done business with the federal government. Such clients or their corporate affiliates account for a significant fraction of revenue in each practice group, as evidenced by the top 15 clients in each practice group (84% of revenue from top 15 clients in Business from those that have or whose corporate affiliates have government contracts; 90% for Commercial Litigation; 51% for Environment, Energy & Resources; 88% for Intellectual Property; 75% for Labor & Employment; 44% for Political Law; 51% for Private Client Services; 94% for Product Liability; 32% for Real Estate & Land Use).

19. At present, by way of non-exhaustive example, Perkins Coie has active civil and criminal matters on behalf of its clients involving at least the following federal agencies, which require them either to interact with or appear before federal government officials:

- Administration for Strategic Preparedness and Response
- Advisory Council on Historic Preservation
- Biomedical Advanced Research and Development Authority
- Board of Governors of the Federal Reserve System
- Bonneville Power Administration
- Bureau of the Census
- Bureau of Economic Analysis
- Bureau of Indian Affairs
- Bureau of Industry and Security
- Bureau of Land Management
- Bureau of Ocean Energy Management
- Bureau of Reclamation
- Bureau of Safety and Environmental Enforcement
- CHIPS Program Office
- Committee on Foreign Investment in the United States
- Commodity Futures Trading Commission
- Consumer Financial Protection Bureau
- Defense Contract Audit Agency
- Defense Contract Management Agency

- Defense Logistics Agency
- Department of Agriculture
- Department of the Army
- Department of Commerce
- Department of Defense
- Department of Defense Cyber Crime Center
- Department of Energy (including Oak Ridge National Laboratory)
- Department of Health & Human Services
- Department of Homeland Security
- Department of the Interior
- Department of Justice (including Antitrust, CCIPS, Civil, Fraud)
- Department of Labor
- Department of State
- Department of Transportation
- Department of the Treasury
- Department of Veterans Affairs
- Directorate of Defense Trade Controls
- Drug Enforcement Administration
- Environmental Protection Agency
- Equal Employment Opportunity Commission
- Executive Office of the President (including CEQ, OMB, and OSTP)
- Fannie Mae and Freddie Mac
- Federal Aviation Administration
- Federal Bureau of Investigation
- Federal Bureau of Prisons
- Federal Communications Commission
- Federal Deposit Insurance Corporation
- Food & Drug Administration
- Federal Election Commission
- Federal Emergency Management Agency
- Federal Energy Regulatory Commission
- Federal Highway Administration
- Federal Permitting Improvement Steering Council
- Federal Reserve Bank of San Francisco
- Federal Transit Administration
- Financial Crimes Enforcement Network
- Government Accountability Office
- Grid Deployments Office
- Housing and Urban Development
- Internal Revenue Service
- International Trade Administration
- Loan Programs Office
- National Institutes of Health
- National Labor Relations Board

- National Marine Fisheries Service
- National Oceanic and Atmospheric Administration
- National Park Service
- National Renewable Energy Lab
- Office of Clean Energy Demonstrations
- Office of Federal Contract Compliance Programs
- Office of Foreign Assets Control
- Office of the Comptroller of the Currency
- Office of the U.S. Trade Representative
- Pacific States Marine Fisheries Commission
- Patent Trial & Appeal Board
- Rural Utilities Service
- Securities & Exchange Commission
- Small Business Administration
- Trademark Trial & Appeal Board
- U.S. Army Corps of Engineers
- U.S. Attorney's Offices
- U.S. Copyright Office
- U.S. Citizenship and Immigration Services
- U.S. Customs and Border Protection
- U.S. Fish & Wildlife Service
- U.S. Forest Service
- U.S. Immigration and Customs Enforcement
- U.S. International Trade Commission
- U.S. Patent & Trademark Office
- U.S. Postal Inspection Service
- U.S. Secret Service

20. The firm's pro bono work is frequently before federal agencies or involves interacting with federal government officials. For instance, Perkins Coie attorneys represent veterans in obtaining benefits before the Department of Veterans Affairs and the Department of Defense. Perkins Coie has approximately 41 open veterans matters, the majority of which are related to seeking higher levels of benefits for veterans in connection with their service to this country, such as application for combat-related special compensation (before the Combat-Related Special Compensation Board); discharge upgrade petitions; and appeals to the U.S. Court of Appeals for Veterans Claims. In the past five years, Perkins Coie has handled 90 matters related to veterans' rights. Perkins Coie was honored with the 2023 Veterans Heroes Law Firm Award

by the Attorney General of Washington's Office of Military and Veteran Legal Assistance (OMVLA). That award recognizes the law firm that provided the greatest contribution to OMVLA in any given year. The National Veterans Legal Services Program (NVLSP) also selected a Perkins Coie attorney to receive the 2020 NVLSP Lawyers Serving Warriors Excellence Award. The entire veterans-rights practice requires access to federal officials and buildings. Perkins Coie attorneys also represent disaster victims in FEMA applications and appeals. Perkins Coie attorneys represent pro bono clients in social-security matters, including SSI and SSD. Perkins Coie represents some nonprofits pro bono in obtaining federal tax exemptions. And Perkins Coie represents pro bono low-income inventors with patent applications before the USPTO, and assists organizations and small businesses in registering trademarks. Further, Perkins Coie attorneys have represented pro bono religious organizations, including Jewish and Catholic organizations.

## III. Recent Relevant Litigation

21. The firm's clients prevailed in all but one of the challenges brought by the Trump campaign seeking to overturn the results of the 2020 election,[1] and the firm's clients also prevailed in a significant number of voting rights cases, including cases where our clients were successful in upholding existing laws against attacks by lawyers for the other party.

22. On March 24, 2022, Donald Trump sued a host of defendants, including Perkins Coie, Hillary Clinton, the Democratic National Committee, Fusion GPS, and former Perkins Coie partners Michael Sussmann and Marc Elias in the U.S. District Court for the Southern District of Florida alleging that the defendants "maliciously conspired to weave a false narrative" that Mr. Trump was colluding with Russia. *See* 2:22-cv-14102 (S.D. Fla.). Mr. Trump asserted civil RICO

---

[1] The case where Perkins Coie's client did not prevail involved a challenge to the deadline—November 9 versus November 12—to confirm the identities of first-time voters who voted by mail in Pennsylvania.

JA 2520

claims against Perkins Coie for conspiring with the Clinton campaign and sought to recover damages in excess of $24 million, before trebling, as well as attorney's fees and lost profits. On September 9, 2022, the court dismissed the lawsuit with prejudice. *Trump v. Clinton*, 626 F. Supp. 3d 1264 (S.D. Fla. 2022).

23.    On February 6, 2025, Perkins Coie filed a lawsuit, *Shilling v. Trump*, No. 2:25-cv-421 (W.D. Wash.), on behalf of Commander Emily Shilling, Commander Blake Dremann, Lieutenant Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class Jane Doe, Staff Sergeant Videl Leins, Matthew Medina, and the Gender Justice League challenging an executive order by President Trump targeting transgender servicemembers. Perkins Coie represents the plaintiffs on a pro bono basis as co-counsel, along with Lambda Legal and the Human Rights Campaign. Perkins Coie, on behalf of its clients, filed a motion for a preliminary injunction on February 19, 2025, asking the court to bar implementation of the executive order until it could adjudicate the case, and the court ordered the government to immediately notify the court before any changes were made to the status quo while the preliminary injunction motion was being briefed.

## IV.    Irreparable Harm Caused by the Order and Its Enforcement

24.    On March 6, 2025, President Donald J. Trump signed the Executive Order 14230 titled "Addressing Risks from Perkins Coie LLP." *See* https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-llp/ (90 Fed. Reg. 11,781) (the "Order"). The Order was accompanied by a "Fact Sheet" issued the same day that purports to explain and support the Order. Perkins Coie was given no opportunity to respond to the false charges in the Order and Fact Sheet or to explain the inevitable impact.

25.    We of course are constrained under Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, but we can report general facts and facts known to the government. The day after the Executive Order, an official of a federal agency informed a client of Perkins Coie that, because of the Order, the client's Perkins Coie lawyers should not attend a scheduled meeting with an office in that agency to discuss a pending matter. The client had engaged Perkins Coie to defend that client in that enforcement action, and Perkins Coie performed substantial work on the matter, totaling over $1 million in fees, and interacted with the agency on this matter in the interim. The client, after expressing great reluctance and regret, said it was forced to hire other law firms to represent it before the federal government and in related litigation.

26.    On March 6, 2025, an attorney in the Fraud Section of the Criminal Division of the U.S. Department of Justice, informed Perkins Coie that the Fraud Section of the Criminal Division could not proceed with a previously set meeting relating to another Perkins Coie client, citing the need to wait for further guidance on whether that meeting could even occur in light of the Order. This postponement threatens the ability of that client to achieve a swift resolution of the matter.

27.    It is inconceivable that the Order could constitutionally ban Perkins Coie's access to federal courthouses, but because it might be interpreted to do so, the firm has already been forced in incur additional costs in securing additional backup personnel to attend impending hearings. Perkins Coie will continue incurring such harm if the Order's enforcement is not enjoined because Perkins Coie attorneys have numerous upcoming appearances before federal courts and agencies. Indeed, Perkins Coie has nearly a thousand active matters before federal courts, and has thousands of matters before agencies that require access to federal government buildings and officials. Continued refusals by federal officials to meet with Perkins Coie lawyers,

or to permit Perkins Coie lawyers to access federal agencies and buildings, would be devastating to both Perkins Coie's legal practice and its clients' interests.

28. The Order also includes provisions that would require federal agencies to require government contractors to disclose any relationship they have with Perkins Coie, and to terminate government contracts for clients as to which Perkins Coie has been hired to perform any service. Many of Perkins Coie's largest clients (for instance, the top 15 clients, collectively representing over $343 million in revenue in 2024, which represents almost a quarter of the firm's revenue) or their affiliates have contracts or subcontracts with the federal government, or compete for such contracts, and many of those companies are represented by the firm for legal matters completely unrelated to government-contracting matters. For many of the firm's clients, the fact that the firm gives them legal advice is not public information. Accordingly, if enforced, the Order would seek to require many of these clients to divulge confidential information regarding their legal representations to the federal government, in addition to risking the termination of those clients' contracts if Perkins Coie has been hired to perform any service related to the contract.

29. Due to the restrictions that the Order imposes on Perkins Coie, and the provisions directed to the firm's federal contractor clients, several clients have already terminated, or have communicated that they are considering terminating, their legal engagements with Perkins Coie. We are in frequent contact with many of our clients, and since the Order, have been in contact with at least our larger clients every day. The common message is that they want to keep using us but are reviewing the relationship, their government contracts and other government interactions, and will need to make decisions shortly. This is a rapidly evolving situation, which changes by the hour. Some clients have reported very concerning messages from government officials directing them to report business with Perkins Coie, and others are concerned about that possibility.

a. A client informed Perkins Coie on March 6, within hours of the Order's release, that due to the Order, Perkins Coie cannot represent that client in any litigation or before the relevant federal agency.

b. A major government contractor that has been a firm client for over 35 years withdrew its work from Perkins Coie in light of the Order as of March 7. Shortly before the Order, the client had added Perkins Coie to its preferred-provider program, and annual billings to the client have often been in the millions of dollars.

c. A government contractor that has been a firm client since 2018 has also withdrawn all work from Perkins Coie as a result of the Order as of March 7.

d. A group of four clients has also withdrawn all work from Perkins Coie as of March 7 due to the need of the clients to engage with various federal agencies—including the DEA, DOJ, and HHS—by the nature of their business.

e. A major government contractor that has been a firm client for over ten years informed the firm on March 7 that it is reconsidering its engagements with Perkins Coie unless something changes in terms of the Order's requirements.

f. Another client indicated on March 7 that it is now, in view of the Order, considering other firms instead to represent it in connection with a DOJ investigation.

g. Because of the uncertainty created by the Order, many clients have begun requesting frequent updates relating to the Order in order to assess whether Perkins Coie can continue to represent them.

h. Earlier today, March 11, a longtime client of the firm that increased its work five-fold over the past three years told us that its CEO intends to disengage from Perkins Coie due to the Order.

JA 2524

30. Perkins Coie has already lost significant revenue due to the loss of clients who terminated their engagements in the few days since the Order was issued. Like any law firm or business, Perkins Coie has debts, obligations and expenses. If the Order were to continue and thus cause current clients to terminate their engagements, and frighten away prospective new clients, it would put the firm's solvency and very existence at risk. For instance, if we lost our top 15 clients—each of whom is a government contractor or a corporate affiliate of one, each of whom be believe is at risk accordingly—the revenue loss would be devastating because this group alone represented about a quarter of our revenue in 2024. If the Order is allowed to prevent Perkins Coie from interacting with federal agencies or entering federal buildings on behalf of its clients, it would pose an existential risk. The firm is built around representation of clients who interact with the federal government. We take pride in the loyalty of our partners and associates, but lawyers of their quality have other opportunities, including the easy one of following their clients to other firms. Exceptional lawyers are the basis for our reputation and our success. Every passing day increases our risk.

31. The Order has also had a chilling effect on Perkins Coie attorneys, who are now reconsidering how they approach certain matters that require them to appear in federal buildings.

32. The Order also threatens Perkins Coie attorneys' right to practice their chosen profession. That threat is not only to revenue-generating practice, but also to the firm's pro bono practice, which frequently requires us to appear in federal court or before federal agencies in criminal, civil, or administrative matters. It is not even clear if TSA officers can process us at airports.

33. The Order has also impacted Perkins Coie's recruiting and, potentially, retention of our employees. Since the issuance of the Order, we have had business professional candidates

who have been extended offers question the economic health of the firm and if there will be layoffs. One interviewee asked one of the firm's recruiters questions that the recruiter understood to be precipitated by the Order. And the firm has a recruiting event within the next two weeks that is focused on practice before a federal court of appeals, from which the firm historically has hired clerks to practice in areas related to government contracts, international trade, and intellectual property.

34. The Order also interferes with Perkins Coie's employer–employee relationships because the restrictions are broadly written to include Perkins Coie employees.

## V. False and Disparaging Statements in the Order

35. The Order has also harmed Perkins Coie's reputation in the markets for clients, lawyers, and staff through its false and disparaging characterizations of the firm and its attorneys.

36. The Order says many things that are not only inflammatory but also blatantly false. Most of the allegations were known during the President's first term, and have been (and in many cases were) adjudicated and dismissed long ago. For example, the Order accuses Perkins Coie of working to "steal an election," of "undermining democratic elections, the integrity of our courts, and honest law enforcement," and of "racially discriminat[ing] against its own attorneys and staff, and against applicants," including through "percentage quotas" and "proudly exclud[ing] applicants on the basis of race." And it accuses Perkins Coie of "earnings" that "subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust." Those accusations are just plain false and most have already been rebutted through the results of prior cases. The Order also references "Fusion GPS" in connection with representation of Hillary

Clinton. No attorney at Perkins Coie for at least the last three years had anything to do with the engagement of Fusion GPS.

37.     The Fact Sheet also lists accusations against Perkins Coie. Those descriptions are inflammatory and baseless. Among other false statements, the Fact Sheet wrongly states:

a. "Perkins Coie LLP pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme." A jury quickly and unanimously acquitted Mr. Sussmann. The Fact Sheet also omits that no one else was involved and that Mr. Sussmann left the firm in 2021.

b. "Perkins Coie LLP has worked with activist donors, including George Soros, to judicially overturn enacted election laws, such as those requiring voter identification." Perkins Coie has historically represented both party-affiliated and non-partisan clients in litigation over election laws. Many law firms have done the same. None of Perkins Coie's election-related litigation was frivolous. Indeed, more than half of the litigation was successful after both sides had full due process. And much of it was *defending* state election procedures and actions taken by state officials.

c. "A court was forced to sanction Perkins Coie attorneys for unethical lack of candor before the court." The Fact Sheet alludes to one minor sanction, collectively, $8,700, connected with a single duplicative motion to supplement the record in a Fifth Circuit appeal in a 2021 voting-rights case. None of the three sanctioned attorneys remains at Perkins Coie. It is extremely rare for any of our lawyers to be sanctioned, and we take such matters very seriously.

d. "Perkins Coie LLP has been accused of racially discriminating against its own attorneys, staff, and applicants." Perkins Coie does have a program to encourage minority and other diverse students to become lawyers in technology practices, but it is not limited to such students and Perkins Coie has previously awarded the fellowship to non-diverse applicants. As the law changed, we adjusted the program accordingly, although an action (later voluntarily dismissed) was filed before we could do so. We remain proud of our efforts, which did not harm any existing employee, and which did not affect our regular program for hiring associates in our technology practices. The American Alliance for Equal Rights brought the lawsuit alluded to in the Order (and similar lawsuits against other law firms). The firm responded by making clear that all were welcome to apply to its fellowship, not just those from historically underrepresented groups, and the American Alliance for Equal Rights then dropped the suit.

e. The Fact Sheet is also wrong that "Perkins Coie has publicly announced racial percentage quotas for hiring and promotions, violating civil rights laws." The Fact Sheet's reference to 2019 suggests that it is talking about our pledge, based on the National Football League's Rooney Rule, to always consider minority candidates for firm leadership positions. That is not a quota, and it does not favor such candidates over more qualified candidates.

f. "Perkins Coie LLP hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump." The "FBI workspace" rumor was long ago debunked. Perkins Coie did not host an "FBI workspace." Rather, like many law firms who represent clients involved in

national-security issues, the firm wanted to protect national security and thus was permitted to install, at its own expense, a single-room Secure Work Environment (SWE) when it moved to new offices. The FBI's only involvement was examining and approving the security of the space. Mr. Sussmann used that as his office. Perkins Coie no longer has a SWE, and the SWE was never an "FBI workspace."

g. "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness." This statement impugns Perkins Coie for the political and legal positions taken by some of its clients in lawful litigation. Specifically, this statement refers to *Shilling v. Trump*, a pro bono lawsuit representing plaintiffs challenging an executive order by President Trump affecting transgender servicemembers despite their love of country and equal ability to contribute to military readiness.

\* \* \*

38. I declare under penalty of perjury, on this 11th day of March, 2025, that the foregoing is true and correct to the best of my knowledge, information and belief.

DAVID J. BURMAN

# EXHIBIT 20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PERKINS COIE LLP,

*Plaintiff,*

v.

U.S. DEPARTMENT OF JUSTICE, *et al.,*

*Defendants.*

Case No. 1:25-cv-00716 (BAH)

Judge Beryl A. Howell

**DECLARATION OF DAVID J. BURMAN IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

I, David J. Burman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:[1]

1.      I am a partner at Perkins Coie LLP ("Perkins Coie").  Perkins Coie is an international law firm that conducts its U.S. operations and activities through a limited liability partnership, Perkins Coie LLP, with seventeen offices around the country.  I have been an attorney at Perkins Coie for over 45 years, following two years clerking.  I am a member in good standing of the D.C. and Washington bars and have been admitted in many state and federal courts, and I serve on the Advisory Committee on the Federal Rules of Civil Procedure.  I am very familiar with the firm's business and operations and was asked as a result to take a lead role in attempting to assess and contain the damage from the March 6 Executive Order.  I either have personal knowledge of the facts set forth in this declaration or I know them from business records and my knowledge of the firm's history and operations, and the statements herein are consistent with the

---

[1] This declaration includes the substance of my prior March 12, 2025 declaration in support of Perkins Coie's motion for temporary restraining order (with minor changes where appropriate), along with additional information relevant for summary judgment.

**JA 2531**

knowledge formed while I was even more directly involved in various aspects of firm management.

2.  I currently chair the firm's governance task force, and have long and intense involvement in firm management.  I led the commercial litigation practice and first served on the firm's executive committee by the early 1990s.  I then served for six years on the four-partner management committee.  Over the years, I have chaired or served on the firm's hiring, compensation, pro bono, technology, and strategic conflicts committees as well as two strategic planning efforts and task forces on practice group structure, total quality management, and role of non-lawyer professionals.  I spearheaded the creation of our Intellectual Property Department and the opening of our Chicago office, both of which have become among our most successful initiatives.  I have acted as co-lead relationship partner for three of our large institutional clients.

3.  I submit this Declaration in Support of the Statement of Material Facts As To Which There Is No Genuine Dispute and Motion for Summary Judgment filed by Perkins Coie.  I am of the age of majority, and I am competent to make this declaration.

A.  **Perkins Coie LLP**

4.  Perkins Coie was founded in Seattle by a retiring U.S. District Judge and U.S. Attorney.  Since 1912, Perkins Coie has grown to become the largest law firm in the Pacific Northwest, has opened offices throughout the United States and in Asia and in Europe, and has more than 1,200 lawyers.

5.  The firm represents a wide range of clients, including Fortune 500 companies, small- and medium-sized businesses, families, individuals, and charitable and public service-oriented organizations.  Perkins Coie alumni have been and are presently serving as state and federal court judges, judicial law clerks, prosecutors, public defenders, and high-ranking

**JA 2532**

government officials, as well as founders, CEOs, and General Counsels of some of the nation's largest and most important companies. Perkins Coie is widely recognized as one of the leading law firms for technology and other innovative companies, and since our founding, Perkins Coie has proudly represented a wide range of industry leaders throughout the world.

6. Over our 113-year history, Perkins Coie and its lawyers have represented clients in most if not every state, in federal and state courts across the nation, and in tribunals throughout the world (including the Supreme Court of the United States), and they have helped to establish major precedent in state and federal law. The firm is frequently sought out by leading technology and communications companies who are innovating in areas as varied as artificial intelligence, telecommunications, and the Internet of Things. The firm's lawyers are leaders and members of national, state, and local bar associations around the country. Among other esteemed professional organizations, its lawyers are members of the American Bar Association, state bar associations for nearly every state in the country, and local bar associations in such cities and counties as Chicago, King County, Los Angeles County, Maricopa County, New York City, San Francisco, and Washington, D.C.

7. Perkins Coie has been named as an "Am Law 50" firm on *The American Lawyer 100* list for over a decade. The firm and its lawyers are regularly recognized for excellence in the legal community by *Best Lawyers®*, *Chambers USA*, and other respected organizations, including national and local bar associations.

8. Perkins Coie has approximately 2,500 lawyers and business professionals. Of those, nearly half are attorneys—including equity partners, non-equity partners, and associates— and half are business professionals, including paralegals, patent agents, legal assistants, and other professionals. Our employees are deeply woven into the fabric of their communities. They are

**JA 2533**

Sunday school teachers, Scout leaders, youth sports coaches, and volunteers serving on hundreds of boards of organizations ranging from art museums and food kitchens to major universities, local schools, and foundations. They include former members of the armed forces, and current reservists in the U.S. military.

9. Perkins Coie's attorneys are drawn from all sides of the political spectrum, and most of our attorneys are not politically active. There are attorneys who are liberal and attorneys who are conservative. When Bob Bauer started our small Political Law practice, we were known in Seattle as, if anything, a "Republican firm." His practice was viewed as an interesting business opportunity, not a cause. While partner politics have become more balanced, it was always important that the political practice be respectful of the firm's diversity. Further, many of our attorneys joined the firm after government service under both Democratic and Republican administrations, or after serving as judges or judicial law clerks to judges appointed by both Democratic and Republican presidents. Reflecting this bipartisan ethos, in the past six years, four current or former Perkins Coie lawyers have been nominated and confirmed to serve as federal judges—two by President Trump in 2019, and two by President Biden in 2021 and 2023. One former partner ran for Congress as a Republican, won, and returned to the firm for a time after he lost re-election. Another partner was elected Washington Attorney General as a Republican.

10. Perkins Coie is dedicated to our clients, our communities, and each other. The firm has a longstanding, firmwide commitment to pro bono service. Since 1989, the firm has provided approximately 1.45 million hours of pro bono service by attorneys, paralegals, and other business professionals to innumerable clients, including veterans, indigent families, disabled persons, and community-based organizations of all sizes, including the League of Women Voters and other non-partisan organizations, in matters championing human, civil, and electoral rights, housing,

JA 2534

education, food, benefits, and economic justice. We have frequently been honored for our efforts. Our pro bono service also extends to representing indigent criminal defendants before federal courts by court appointment and clients on death row in states with limited pro bono resources. In 2024, for example, Perkins Coie lawyers, paralegals, and other business professionals spent over 89,000 hours, valued at nearly $70 million, in pro bono service. Much of our pro bono work involves advocating for military and veterans' rights.

11. Perkins Coie has received numerous awards from a wide range of organizations for its pro bono representation, including state and local bar associations, the U.S. Patent and Trademark Office 2023 Patent Pro Bono Achievement Certificate, the U.S. District Court for the District of Arizona 2022 Outstanding Pro Bono Attorney of the Year Award (awarded in 2023), and the 2023 Veteran Heroes Law Firm Award by the Attorney General of Washington's Office of Military and Veteran Legal Assistance.

12. Perkins Coie is often recognized for fostering a work environment in which all lawyers and business professionals are judged on their merit and can reach their potential. Perkins Coie has been named to *Fortune*'s "100 Best Companies to Work For" list for over 20 consecutive years, and our individual offices are often named to similar local lists.

**B.      The Firm's Diversity and Inclusion Efforts**

13. In addition to our representation of clients in this area, Perkins Coie itself has a longstanding and demonstrable commitment to fostering diversity and inclusion (D&I) within the firm, the legal profession and community. The firm's commitment is summarized plainly on our website:

- "We are intentional and consistent in our efforts to increase the diversity of our workforce and to advance the values of diversity and inclusion in the legal

JA 2535

profession. Diversity and inclusion are key to our culture, our values, and our business strategy. They are fundamental to the way we connect with and serve our clients.";

- "Perkins Coie is committed to advancing diversity and inclusion both within the firm and throughout our collective communities. We will continue to support and participate in efforts to make the legal profession more diverse and inclusive."

*See* Ex. 1, p. 1, 2.

14. Like the federal government, Perkins Coie formally recognizes Martin Luther King Jr. Day and Juneteenth as firmwide holidays, reinforcing the Firm's commitment to racial equity through institutionalized reflection, education, and service. The firm encourages attorneys and staff to engage in volunteer activities on these days, supporting local community organizations dedicated to advancing racial justice. Perkins Coie also observes many heritage months, including several that have been recognized by Congress, by conducting programming aimed at fostering awareness and appreciation of diverse cultural narratives. These include, but are not limited to, Black History Month, Asian American and Pacific Islander Heritage Month, Women's History Month, Pride Month, and Hispanic Heritage Month. These initiatives are complemented by firm-wide speakers, panel discussions, and presentations open and available to all Perkins Coie personnel designed to encourage meaningful dialogue on diversity-related topics. These programs benefit all of the firm's personnel, and we believe they make for a more cohesive and effective working environment.

15. Perkins Coie's hiring and promotion decisions are merit-based, meaning all candidates are evaluated equally based on the same metrics: qualifications, competencies, personality, and demonstrated excellence. The firm's hiring committee and interviewers undergo

training on best practices for inclusive hiring, mitigating implicit biases, and fostering fair opportunities. Perkins Coie does not have "percentage quotas" as part of its hiring practices.

16. Perkins Coie has a Diversity & Inclusion Fellowship program that is expressly open to all first-year law students. *See* Ex. 2, p. 3.

17. Following litigation initiated by the American Alliance for Equal Rights in 2023, the firm explicitly affirmed the inclusive nature of the fellowship to ensure continued adherence to principles of fairness and legal compliance. After the firm's confirmation that the law student fellowships were open to all, the American Alliance for Equal Rights voluntarily dismissed its lawsuit.

## C. Interaction with the Federal Government

18. Perkins Coie is constrained by Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, and thus cannot disclose client engagements without authorization. No client has authorized Perkins Coie to disclose its engagement of the firm in connection with this litigation, and this section therefore contains information about the Firm's practice without revealing confidential details.

19. As a full-service law firm that represents clients in all sectors of the economy in transactional, litigation, and regulatory matters, Perkins Coie lawyers necessarily interact with the federal government on behalf of their clients in innumerable ways. Those interactions are critical to their ability to practice their profession; they are the waters the Perkins Coie attorneys swim in, the air they breathe. If allowed to go into effect, the Order's restrictions would be devastating and irreparable. Most of the firm's litigation practice is in federal court on behalf of their clients in civil and criminal cases, as well as in federal agencies' in-house administrative proceedings. As of March 11, 2025, the firm had nearly a thousand cases currently pending before federal district,

**JA 2537**

bankruptcy, and appellate courts, including the Supreme Court of the United States. Its attorneys have upcoming appearances scheduled before agencies and in courtrooms, including an upcoming argument before the Supreme Court (another one has occurred since March 11).

20. Perkins Coie represents clients who have been indicted or are the targets of pending federal criminal investigations. Over the past five years, the firm has represented more than 80 individuals and companies who have been criminally investigated, charged, and/or prosecuted by federal authorities at the Department of Justice. This list does not include the firm's work in federal criminal-adjacent areas, such as clemency petitions or other post-conviction relief beyond direct appeals, such as pardons or compassionate release.

21. The firm has nine main practice groups, and all of them intersect with the federal government in some way and include clients with business before the federal government. The largest practice groups by headcount are Commercial Litigation, Business, and Intellectual Property, which together account for approximately 75% of the firm's attorneys. The smallest practice group by headcount is Political Law. Today, Perkins Coie's Political Law Group includes approximately 8 attorneys, plus approximately 19 attorneys who are members of other practice groups and also affiliated with the practice. I understand the March 6, 2025 Executive Order and Fact Sheet at issue in this proceeding to refer to former members of the Political Law Group, albeit not by name. Although the firm's Political Law practice has historically been much smaller than our other practice groups, it also substantially shrank in 2021 when Marc Elias and about 50 other attorneys left Perkins Coie to form the Elias Law Group. This practice group historically has handled a mix of paying and some pro bono cases, and it is often called on to advise clients (typically corporations and business organizations) on political finance issues. It accounts for

**JA 2538**

about 0.5% of the firm's revenue. Perkins Coie attorneys work on these matters because they involve important legal rights and issues affecting our clients.

22. In the course of their representations, Perkins Coie lawyers frequently meet with federal officials from countless agencies. Although it is difficult to quantify precisely, based on a review of our current client matter list, the vast bulk of our clients have matters that require Perkins Coie lawyers to interact with federal agencies.

23. For instance, a significant number of Perkins Coie clients are, or have affiliates who are, government contractors and subcontractors—including 100% of its top 15 clients by revenue. *See* Ex. 3 (identifying revenue from top 15 clients). I have also reviewed records from the Federal Procurement Data System (FDPS) to confirm that each of these clients, or their affiliates, are government contractors.

24. The firm's Government Contracts group handles clients' bid protests and disputes surrounding contract claims, including transactional work and litigation. Perkins Coie represents some of these clients in connection with government contract matters. As of March 11, 2025, the approximately nine attorneys in this group were handling approximately 70 government contracting matters involving various federal agencies. But there are many other firm clients that have government contracts and who have engaged Perkins Coie to represent them in matters unrelated to their government contracts.

25. The firm's Intellectual Property group and its clients also depend heavily on access to and interaction with the federal government. The approximately 236 attorneys in this group frequently represent patent applicants, patent owners, and patent challengers before the U.S. Patent and Trademark Office (USPTO) in patent prosecution and post-grant proceedings, including in administrative trials before the Patent Trial and Appeal Board. As of March 11, 2025, Perkins

**JA 2539**

Coie was representing clients in approximately 5,415 pending patent applications before the USPTO. Perkins Coie was also representing clients in approximately 56 active post-grant proceedings (i.e., administrative trial proceedings) before the Patent Trial and Appeal Board (PTAB), and clients in approximately 11 active proceedings before the International Trade Commission (ITC). Perkins Coie was also representing clients in trademark and copyright matters before agencies, including approximately 66 matters before the Trademark Trial and Appeal Board (TTAB), approximately 1,960 pending trademark matters before the USPTO, and approximately 145 pending copyright matters before the Copyright Office. Many of those patent and trademark clients also are known to have contracts with the federal government.

26. Perkins Coie has approximately 340 attorneys in its Business group. That practice group includes subgroups directed to financial regulation, which requires them to engage with federal financial regulatory agencies and instrumentalities (such as the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency); international trade, which involves interaction with and practice before the Department of Commerce and the International Trade Commission; and tax, which involves interaction with the Internal Revenue Service. As of March 11, 2025, the international trade group also had approximately 17 pending matters before the Department of Labor and approximately 22 pending matters before U.S. Citizenship and Immigration Services. The group's corporate and securities practice regularly represents clients before and in connection with the Securities and Exchange Commission (SEC), including No Action Request Letters, Securities Act registration statements subject to SEC review, and Exchange Act filings. The Business Group also represents clients before or in connection with the Department of Agriculture, the Food and Drug Administration, Department of Transportation, Department of Justice, Department of Homeland Security, and Department of State.

**JA 2540**

27. The firm's White Collar & Investigations practice (a subgroup of the Commercial Litigation group) includes approximately 29 attorneys and is almost exclusively reliant on interacting with the federal government. That practice involves representing clients in investigations and after indictments in numerous proceedings involving many agencies of the federal government, including the Department of Justice, Federal Bureau of Investigation (FBI), U.S. Attorney's Offices, and SEC, among others.

28. There are many other practice groups and subgroups at Perkins Coie that interact, by necessity, with the federal government on behalf of our clients. These groups include, but are not limited to, Commercial Litigation (with subgroups including Appeals, Issues & Strategy; Construction; and Antitrust); Environment, Energy & Resources; Labor & Employment; Private Client Services; Product Liability; and Real Estate & Land Use. In summary, much of our work on behalf of our clients requires access to federal government buildings, which house both courthouses and agencies. This is true of every practice group at the firm. And certain of these practice areas, such as White Collar & Investigations, are almost exclusively reliant on interacting with the federal government. Each of our nine major practice groups relies on clients who have done business with the federal government. Such clients or their corporate affiliates account for a significant fraction of revenue in each practice group, as evidenced by the top 15 clients in each practice group (84% of revenue from top 15 clients in Business from those that have or whose corporate affiliates have government contracts; 90% for Commercial Litigation; 88% for Intellectual Property; 51% for Environment, Energy & Resources; 75% for Labor & Employment; 44% for Political Law; 51% for Private Client Services; 94% for Product Liability; 32% for Real Estate & Land Use). *See* Ex. 4 (listing revenue from top 15 clients in each practice group). I have

**JA 2541**

also reviewed records from the FDPS that confirm the percentage of these clients, or their affiliates, that are government contractors.

29.     As of March 11, 2025, by way of non-exhaustive example, our records show that Perkins Coie has active civil and criminal matters on behalf of its clients involving at least the following federal agencies, which require them either to interact with or appear before federal government officials:

- Administration for Strategic Preparedness and Response
- Advisory Council on Historic Preservation
- Biomedical Advanced Research and Development Authority
- Bonneville Power Administration
- Bureau of the Census
- Bureau of Economic Analysis
- Bureau of Indian Affairs
- Bureau of Industry and Security
- Bureau of Land Management
- Bureau of Ocean Energy Management
- Bureau of Reclamation
- Bureau of Safety and Environmental Enforcement
- CHIPS Program Office
- Committee on Foreign Investment in the United States
- Commodity Futures Trading Commission
- Consumer Financial Protection Bureau
- Defense Contract Audit Agency
- Defense Contract Management Agency
- Defense Logistics Agency
- Department of Agriculture
- Department of the Army
- Department of Commerce
- Department of Defense
- Department of Energy (including Oak Ridge National Laboratory)
- Department of Health & Human Services
- Department of Homeland Security
- Department of the Interior
- Department of Justice (including Antitrust, CCIPS, Civil, Fraud)
- Department of Labor
- Department of State
- Department of Transportation
- Department of Toxic Substance Controls

**JA 2542**

- Department of the Treasury
- Department of Veterans Affairs
- Directorate of Defense Trade Controls
- Drug Enforcement Administration
- Environmental Protection Agency
- Equal Employment Opportunity Commission
- Executive Office of the President (including CEQ, OMB, and OSTP)
- Fannie Mae and Freddie Mac
- Federal Aviation Administration
- Federal Bureau of Investigation
- Federal Bureau of Prisons
- Federal Communications Commission
- Federal Deposit Insurance Corporation
- Food & Drug Administration
- Federal Election Commission
- Federal Emergency Management Agency
- Federal Energy Regulatory Commission
- Federal Highway Administration
- Federal Permitting Improvement Steering Council
- Federal Transit Administration
- Financial Crimes Enforcement Network
- Financial Industry Regulatory Affairs (FINRA)
- Government Accountability Office
- Grid Deployments Office
- Housing and Urban Development
- Internal Revenue Service
- International Trade Administration
- Loan Programs Office
- National Institutes of Health
- National Labor Relations Board
- National Marine Fisheries Service
- National Oceanic and Atmospheric Administration
- National Park Service
- National Renewable Energy Lab
- Office of Clean Energy Demonstrations
- Office of Federal Contract Compliance Programs
- Office of Foreign Assets Control
- Office of the Comptroller of the Currency
- Office of the U.S. Trade Representative
- Pacific States Marine Fisheries Commission
- Patent Trial & Appeal Board
- Rural Utilities Service
- Securities & Exchange Commission
- Small Business Administration

**JA 2543**

- Trademark Trial & Appeal Board
- U.S. Army Corps of Engineers
- U.S. Attorney's Offices
- U.S. Copyright Office
- U.S. Citizenship and Immigration Services
- U.S. Customs and Border Protection
- U.S. Fish & Wildlife Service
- U.S. Forest Service
- U.S. Immigration and Customs Enforcement
- U.S. International Trade Commission
- U.S. Patent & Trademark Office
- U.S. Postal Inspection Service
- U.S. Secret Service

30.     The firm's pro bono work is frequently before federal agencies or involves interacting with federal government officials.  For instance, Perkins Coie attorneys represent individual veterans pro bono in obtaining benefits before the Department of Veterans Affairs and the Department of Defense.  As of March 11, 2025, Perkins Coie had approximately 41 open pro bono matters for individual veterans matters, the majority of which are related to seeking higher levels of benefits for veterans in connection with their service to this country, such as application for combat-related special compensation (before the Combat-Related Special Compensation Board); discharge upgrade petitions; and appeals to the U.S. Court of Appeals for Veterans Claims. In the past five years, Perkins Coie has handled 90 matters for individual service members.  Perkins Coie was honored with the 2023 Veterans Heroes Law Firm Award by the Attorney General of Washington's Office of Military and Veteran Legal Assistance (OMVLA).  That award recognizes the law firm that provided the greatest contribution to OMVLA in any given year.  The National Veterans Legal Services Program (NVLSP) also selected a Perkins Coie attorney to receive the 2020 NVLSP Lawyers Serving Warriors Excellence Award.  The entire veterans-rights practice requires access to federal officials and buildings.  Perkins Coie attorneys also represent disaster victims on a pro bono basis in FEMA applications and appeals.  Perkins Coie attorneys represent

pro bono clients in social-security matters, including SSI and SSDI.  Perkins Coie represents several nonprofits pro bono for a range of matters, including obtaining federal tax exemptions, formation, and counseling.  And Perkins Coie represents pro bono low-income inventors with patent applications before the USPTO, and assists organizations and small businesses in registering trademarks.  Further, Perkins Coie attorneys have represented pro bono religious organizations, including Jewish and Catholic organizations.

31.     Much of this pro bono work is not "political."  Our analysis indicates that only about 20% of the pro bono matters, and 35% of the pro bono time spent over the past year, were attributable to cases that might be viewed as "political" – *i.e.*, cases involving transgender service members, homelessness, immigration, reproductive rights, the First or Second Amendments, elections, discrimination, or right to die.  By contrast, 80% of Perkins Coie's pro bono matters, and nearly two-thirds of its pro bono hours over the past year, were devoted to non-political matters such as veterans, domestic abuse, Criminal Justice Act appointments to represent indigent defendants, Social Security disability payments, patents and trademarks, business and non-profit tax counseling.

32.     Examples of the type of pro bono work that might be considered "political" include: 1) a challenge to a state law that prevented pregnant individuals from using midwives that employ traditional healing practices for prenatal, maternal, and infant care; 2) assisting a faith-based "crisis" pregnancy resources center in a lease dispute; and 3) assisting a deported veteran—who had lived in the United States as a lawful permanent resident since the age of five—in returning to the United States through humanitarian parole.

**D.     Recent Relevant Litigation**

33.     In 2020, Perkins Coie represented a number of clients opposing then-candidate Trump's challenges to the results of the 2020 Presidential Election. The firm's clients prevailed in all but one of the challenges brought by the Trump campaign seeking to overturn the results of the 2020 election,[2] and the firm's clients also prevailed in a significant number of voting rights cases, including cases where our clients were successful in upholding existing laws against challenges by lawyers for the other party. The profession's ethics rules would generally not allow us to represent candidate Trump's interests once we had been retained adverse to those interests.

34.     On March 24, 2022, Donald Trump sued a host of defendants, including Perkins Coie, Hillary Clinton, the Democratic National Committee, Fusion GPS, and former Perkins Coie partners Michael Sussmann and Marc Elias in the U.S. District Court for the Southern District of Florida alleging that the defendants "maliciously conspired to weave a false narrative" that Mr. Trump was colluding with Russia. *See* 2:22-cv-14102 (S.D. Fla.). Mr. Trump asserted civil RICO claims against Perkins Coie for conspiring with the Clinton campaign and sought to recover damages in excess of $24 million, before trebling, as well as attorney's fees and lost profits. On September 9, 2022, the court dismissed the lawsuit with prejudice. *Trump v. Clinton,* 626 F. Supp. 3d 1264 (S.D. Fla. 2022).

35.     On February 6, 2025, Perkins Coie filed a lawsuit, *Shilling v. Trump*, No. 2:25-cv-241 (W.D. Wash.), on behalf of Commander Emily Shilling, Commander Blake Dremann, Lieutenant Commander Geirid Morgan, Sergeant First Class Cathrine Schmid, Sergeant First Class Jane Doe, Staff Sergeant Videl Leins, Matthew Medina, and the Gender Justice League

---

[2] The case where Perkins Coie's client did not prevail involved a challenge to the deadline—November 9 versus November 12—to confirm the identities of first-time voters who voted by mail in Pennsylvania.

challenging an executive order by President Trump targeting transgender servicemembers. The lawsuit challenges the Executive Order as a violation of Plaintiffs' First Amendment, due process, and equal protection rights. Perkins Coie represents the plaintiffs on a pro bono basis as co-counsel, along with Lambda Legal and the Human Rights Campaign. On February 19, 2025, Perkins Coie, on behalf of its clients, filed a motion for a preliminary injunction asking the court to bar implementation of the executive order until it could adjudicate the case. The court entered a preliminary injunction on March 27, 2025. *Shilling*, No. 2:25-cv-241, ECF Dkt. No. 103 (W.D. Wash.). On January 28, 2025, a group of plaintiffs filed an earlier parallel lawsuit challenging Executive Order 14185. *Talbott v. Trump*, No. 25-cv-240, Dkt. 1 (D.D.C.). Perkins Coie does not represent those individuals and, beyond monitoring, is not otherwise involved in that litigation.

**E.     Security Clearances Held by Perkins Coie Personnel**

36.     At the time of the March 6 Order, our records showed that approximately twenty-four Perkins Coie lawyers and business professionals held security clearances. These individuals include a dozen persons with former military or other public service backgrounds, granted access to sensitive information by virtue of their commitment to public service. These individuals also include and overlap with persons whose access to sensitive information has been granted in the context of their fulfilling their obligations as lawyers to represent their clients.

37.     Of the twenty-four security clearance holders, twenty-one received clearance from the Department of Defense and the other three received clearance from the Department of Justice and Federal Bureau of Investigation.

38.     Nine of the security clearance holders received their clearance prior to being hired by Perkins Coie. Two of those individuals hold clearances in connection with their duties as

**JA 2547**

military reservists, and wholly unrelated to their work at Perkins Coie. Four of the twenty-four individuals with security clearances are non-attorneys.

39. One partner received a security clearance on February 12, 2025, after President Trump's inauguration and approximately three weeks before the Executive Order issued. The "Adjudication History" in the Defense Information System for Security (DISS) for the partner reflected "**Top Secret adjudication completed** with a **determination of Favorable by DoD CAS on 2025/02/12**." (emphasis in original). *See* Ex. 5. All of the factual conclusions recited in Section 1 of the Executive Order occurred before that partner received this security clearance.

40. Ten of the security clearance holders were hired at Perkins Coie after the 2016 election.

41. Nineteen of the security clearance holders had no involvement in any of the matters referenced in the Order or the Fact Sheet. Of the five that did, the security clearances they held were unrelated to their work on those matters. No security clearance holder had any involvement in the Fusion GPS matter. No security clearance holder has any involvement with the *Shilling* matter. None of the security clearance holders is a primary member of the Political Law Group.

42. Perkins Coie previously (but no longer) maintained a secure area with a low classification level, namely a secure working environment, but that secure area was closed prior to the issuance of the Order. As described below, Perkins Coie has never maintained a Sensitive Compartmented Information Facility (SCIF) and has no record of FBI agents working out of its offices.

**F.     Irreparable Harm Caused by the Order and Its Enforcement**

43. On March 6, 2025, President Donald J. Trump signed the Executive Order 14230 titled "Addressing Risks from Perkins Coie LLP." *See* https://www.whitehouse.gov/presidential-

actions/2025/03/addressing-risks-from-perkins-coie-llp/ (90 Fed. Reg. 11,781) (the "Order").  The Order was accompanied by a "Fact Sheet" issued the same day that purports to explain and support the Order.  Perkins Coie was given no notice of, nor an opportunity to respond to, the false charges in the Order and Fact Sheet or to explain their inevitable impact on the firm before they were issued, and no effort was made to alter the Order or Fact Sheet after our TRO pleadings pointed out many fundamental (and still unrebutted) errors.  Numerous bar groups, law schools, law firms, and lawyers have spoken out against the Executive Order's plain unconstitutionality.

44.     We of course are constrained under Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, but we can report general facts and facts known to the government.  The day after the Executive Order, an official of a federal agency informed a client of Perkins Coie that, because of the Order, the client's Perkins Coie lawyers should not attend a scheduled meeting with an office in that agency to discuss a pending matter.  The client had engaged Perkins Coie to defend that client in that enforcement action, and Perkins Coie performed substantial work on the matter, totaling over $1 million in fees, and interacted with the agency on this matter in the interim.  The client, after expressing great reluctance and regret, said it was forced to hire other law firms to represent it before the federal government and in related litigation.

45.     On March 6, 2025, an attorney in the Fraud Section of the Criminal Division of the U.S. Department of Justice, informed Perkins Coie that the Fraud Section of the Criminal Division could not proceed with a previously set meeting relating to another Perkins Coie client, citing the need to wait for further guidance on whether that meeting could even occur in light of the Order. *See* Ex. 6.

46.     It is inconceivable that the Order could constitutionally ban Perkins Coie's access to federal courthouses, but because it might be interpreted to do so, the firm has already been

**JA 2549**

forced to incur additional costs in securing backup personnel to attend impending hearings. Perkins Coie will continue incurring such harm if the Order's enforcement is not permanently enjoined because Perkins Coie attorneys have numerous upcoming appearances before federal courts and agencies. Indeed, Perkins Coie has nearly a thousand active matters before federal courts, and has thousands of matters before agencies that require access to federal government buildings and officials. Refusals by federal officials to meet with Perkins Coie lawyers, or to permit Perkins Coie lawyers to access federal agencies and buildings, would be devastating to both Perkins Coie's legal practice and its clients' interests. Even the threat of such lack of access is surely deterring potential new clients and existing clients from retaining the firm for new matters.

47. Similarly, the Order also includes provisions that would require federal agencies to require government contractors to disclose any relationship they have with Perkins Coie, and to terminate government contracts for clients as to which Perkins Coie has been hired to perform any service. Many of Perkins Coie's largest clients (for instance, the top 15 clients, collectively representing over $343 million in revenue in 2024, which represents almost a quarter of the firm's revenue) or their affiliates have contracts or subcontracts with the federal government, or compete for such contracts, and many of those companies are represented by the firm for legal matters completely unrelated to government-contracting matters. *See supra* ¶ 23. For many of the firm's clients, the fact that the firm gives them legal advice is not public information, and the importance of confidentiality is a reason for attorney-client privilege and Rule 1.6. Accordingly, if enforced, the Order would seek to require many of these clients to divulge confidential information regarding their legal representations to the federal government, in addition to risking the termination of those clients' contracts if Perkins Coie has been hired to perform any service related to the contract.

48. Due to the restrictions that the Order imposes on Perkins Coie, and the provisions directed to the firm's federal contractor clients, several clients have already terminated, or have communicated that they are considering terminating, their legal engagements with Perkins Coie. We are in frequent contact with many of our clients, and since the Order, have been in contact with at least our larger clients every day. The common message is that they want to keep using us but are reviewing the relationship, their government contracts and other government interactions, and will need to make decisions shortly. This is a rapidly evolving situation, which changes by the hour. Prior to the TRO, for example, some clients have reported very concerning messages from government officials directing them to report business with Perkins Coie, and others are concerned about that possibility, including:

a. A seven-year client with seven open matters informed Perkins Coie on March 6, 2025, within hours of the Order's release, that due to the Order, Perkins Coie cannot represent that client in any litigation or before the relevant federal agency.

b. A major government contractor that has been a firm client for over 35 years reassigned two matters to other law firms on March 7, 2025.

c. A government contractor that has been a firm client since 2018 withdrew all work from Perkins Coie as a result of the Order as of March 7, 2025.

d. A coalition of four clients had also withdrawn all coalition work from Perkins Coie as of March 7, 2025 due to the need of the clients to engage with various federal agencies—including the DEA, DOJ, and HHS—by the nature of their business.

e. A major government contractor that has been a firm client since 2021 with fifteen open matters informed the firm on March 7, 2025 that it is reconsidering its

**JA 2551**

engagements with Perkins Coie unless something changes in terms of the Order's requirements.

f.  Another client indicated on March 7, 2025 that it is now, in view of the Order, considering other firms instead to represent it in connection with a DOJ investigation.

g.  On March 11, 2025, a longtime client of the firm that had increased its work five-fold over the past three years and had 30 open matters started to reconsider whether to terminate every engagement with Perkins Coie.

h.  Because of the uncertainty created by the Order, and even after the entry of the TRO, many clients have begun requesting frequent updates relating to the Order in order to assess whether Perkins Coie can continue to represent them.

49.  The abrupt loss of so many longstanding and significant clients across a variety of business types and practice disciplines in a one-week period is exceptional and abnormal. The common denominator among these clients is that each one terminated or began reconsidering its engagements in the immediate aftermath of the Order's issuance. While the TRO stemmed some of those consequences, a permanent injunction is necessary to prevent them from resuming and intensifying.

50.  Perkins Coie has already lost significant revenue due to the loss of clients who terminated their engagements in the few days since the Order was issued. And the firm has lost out on new work from clients who were considering engaging the firm, but chose not to move forward with Perkins Coie after issuance of the Executive Order. Like any law firm or business, Perkins Coie has debts, obligations and expenses. If the Order were to continue and thus cause current clients to terminate their engagements, and frighten away prospective new clients, it would

put the firm's solvency and very existence at risk. For instance, if we lost our top 15 clients—each of whom is a government contractor or a corporate affiliate of one, each of whom we believe is at risk accordingly—the revenue loss would be devastating because this group alone represented about a quarter of our revenue in 2024. If the Order is allowed to prevent Perkins Coie from interacting with federal agencies or entering federal buildings on behalf of its clients, it would pose an existential risk. The firm is built around representation of clients who interact with the federal government. We take pride in the loyalty of our partners and associates, but lawyers of their quality have other opportunities, including the easy one of following their clients to other firms. Exceptional lawyers are the basis for our reputation and our success.

51.     The Order has also had a chilling effect on Perkins Coie attorneys, who are now reconsidering how they approach certain matters that require them to appear in federal buildings.

52.     The Order also threatens Perkins Coie attorneys' right to practice their chosen profession. That threat is not only to revenue-generating practice, but also to the firm's pro bono practice, which frequently requires us to appear in federal court or before federal agencies in criminal, civil, or administrative matters. It is not even clear if TSA officers can process us at airports.

53.     The Order has also impacted Perkins Coie's recruiting and, potentially, retention of our personnel. Since the issuance of the Order, we have had business professional candidates who have been extended offers question the economic health of the firm and ask if there will be layoffs. One interviewee asked one of the firm's recruiters questions that the recruiter understood to be precipitated by the Order. The threat to the Firm's recruitment efforts poses severe consequences for the health of the firm. Its potential for growth as a business depends on its ability to draw and retain top talent.

**JA 2553**

54.     The Order increases the potential that Perkins Coie lawyers will leave the firm for other opportunities in order to preserve their relationships with clients that have government contracts.

55.     The Order also interferes with Perkins Coie's employer–employee relationships because the restrictions are broadly written to include Perkins Coie business personnel.

56.     The firm currently faces considerable uncertainty regarding which aspects of its D&I activities and advocacy will result in adverse consequences, even in the face of injunctive relief.  The Executive Order appears to be a command to purge all references to or support of diversity and inclusion in the workplace.  The risks and uncertainty stemming from this Order have resulted in pausing or pulling back on certain programs and some statements in support of D&I and the implementation of D&I initiatives.  The affected conduct is lawful and consistent with EEOC guidance at the time those actions were taken.

57.     For example, press releases and stories more than six months old, including those touting the firm's D&I advocacy, were already removed from the firm's website (but have been preserved).  Perkins Coie has reassessed and is reassessing other statements and references to its pro bono and D&I advocacy on its website.  The firm similarly has reassessed and is reassessing statements and references to its D&I advocacy in various advertisements and program brochures, including considering removal of the following: (1) the phrase "Diversity is Excellence" in an advertisement; (2) the statement that Perkins Coie is "proud to support" an organization's "commitment to inclusivity and empowerment of diverse communities," in a program brochure for an event the firm is sponsoring; and (3) the phrase "Investing in diversity and inclusion is smart business and helps drive our pursuit of excellence," in a program brochure.

**JA 2554**

58.     The Order has done more than impact the firm's messaging on D&I.  It has chilled Perkins Coie's diversity-related programs, not because certain measures are required by law, but because of the need to protect the firm from extralegal pressure.  For instance, the Order has interfered with Perkins Coie's ability to offer fellowships to potential new hires, even though those fellowships are open to all applicants.  Perkins Coie has postponed a showing of a movie regarding Lilly Ledbetter, sex discrimination and the Fair Pay Act.  The firm is considering whether and how it can or should respond to questions from clients and prospective clients regarding the demographics of the firm or its lawyers.  The Perkins Coie Women's Forum was concerned that an internal event for first-time attendees to the firm's partner planning conference could be targeted as impermissible, even though it was open to all conference attendees, because a resource group was hosting the event, but decided to proceed with the event notwithstanding the uncertainty.  And firm personnel were even unsure whether they can have a reference to "DE&I" in their email signature block.  In short, Perkins Coie is committed to complying with the law as it evolves over time.  But Section 4 of the Executive Order is both unclear and overbroad, far broader than any change in the law to date.  Consequently, it interferes with speech, and tries to intimidate and distort the firm's advice to clients.

G.     **False and Disparaging Statements in the Order**

59.     The Order has also harmed Perkins Coie's reputation in the markets for clients, lawyers, and staff through its false and disparaging characterizations of the firm and its attorneys, such as its statement that Perkins Coie is "dishonest and dangerous."  Such stigma threatens grave, mutually-reinforcing consequences, as the Firm's reputation affects its ability to attract clients, and its ability to attract clients in turn supports its reputation as a top law firm.

60.     The Order says many things that are not only inflammatory but also blatantly false. Most of the allegations were known during the President's first term, and have been (and in many cases were) adjudicated and dismissed long ago.  For example, the Order accuses Perkins Coie of working to "steal an election," of "undermining democratic elections, the integrity of our courts, and honest law enforcement," and of "racially discriminat[ing] against its own attorneys and staff, and against applicants," including through "percentage quotas" and "proudly exclud[ing] applicants on the basis of race."  And it accuses Perkins Coie of "earnings" that "subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust." Those accusations are just plain false and most have already been rebutted through the results of prior cases.  The Order also references "Fusion GPS" in connection with representation of Hillary Clinton.  Though Marc Elias and others at Perkins Coie represented Hillary Clinton in connection with her presidential campaign, no attorney employed at Perkins Coie for at least the last three years had anything to do with the engagement of Fusion GPS.

61.     The Fact Sheet also lists accusations against Perkins Coie.  Those descriptions are inflammatory and baseless.  Among other false statements, the Fact Sheet wrongly states:

    a. "Perkins Coie LLP pushed debunked claims of secret Trump-Russia communications via Alfa Bank, with attorney Michael Sussmann indicted for lying to the FBI about this scheme."  A jury unanimously acquitted Mr. Sussmann.  The Fact Sheet also omits that no one else was involved and that Mr. Sussmann left the firm in 2021.

    b. "Perkins Coie LLP has worked with activist donors, including George Soros, to judicially overturn enacted election laws, such as those requiring voter

**JA 2556**

identification." Perkins Coie has historically represented both party-affiliated and non-partisan clients in litigation over election laws. Many law firms have done the same. None of Perkins Coie's election-related litigation was frivolous. Indeed, more than half of the litigation was successful after both sides had full due process. And much of it was *defending* state election procedures and actions taken by state officials.

c. "A court was forced to sanction Perkins Coie attorneys for unethical lack of candor before the court." The Fact Sheet alludes to one minor sanction, collectively, $8,700, connected with a single duplicative motion to supplement the record in a Fifth Circuit appeal in a 2021 voting-rights case in violation of a local rule. *See Tex. All. for Retired Ams. v. Hughs*, No. 20-40643 (5th Cir. Jun. 30, 2021), Dkt. No. 127-1. None of the three sanctioned attorneys remains at Perkins Coie. It is extremely rare for any of our lawyers to be sanctioned, and we take such matters very seriously. This was not a lack of candor.

d. "Perkins Coie LLP hosted an FBI workspace, raising concerns about partisan misuse of sensitive data during investigations targeting President Trump." The "FBI workspace" rumor was long ago debunked. Perkins Coie did not host an "FBI workspace." Rather, like many law firms who represent clients involved in national-security issues, the firm wanted to protect national security and thus was permitted to install, at its own expense, a single-room Secure Work Environment (SWE) when it moved to new offices. The FBI's only involvement was examining and approving the security of the space. Perkins Coie no longer has a SWE, and the SWE was never an "FBI workspace."

e. "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness." This statement impugns Perkins Coie for the political and legal positions taken by some of its clients in lawful litigation. Specifically, this statement refers to *Shilling v. Trump*, the pro bono lawsuit described earlier representing plaintiffs challenging an executive order by President Trump affecting transgender servicemembers despite their love of country and equal ability to contribute to military readiness.

* * *

62. I declare under penalty of perjury, on this 2nd day of April, 2025, that the foregoing is true and correct to the best of my knowledge, information and belief.

DAVID J. BURMAN

# EXHIBIT 1

JA 2559

Case 1:25-cv-00716-BAH    Document 163-3    Filed 04/08/25    Page 124 of 327

← IMPACT

# Diversity & Inclusion

Embracing diversity and inclusion allows us to draw from varied perspectives and communities, enabling us to attract the very best talent to our ranks, and in turn provide excellent service to our clients.

**Overview**          Recruitment & Retention          Our Commitment to Racial Equality

# Our Continuing Commitment to Diversity & Inclusion

Perkins Coie is committed to advancing diversity and inclusion both within the firm and throughout our collective communities. We will continue to support and participate in efforts to make the legal profession more diverse and inclusive.

**JA 2560**



We are intentional and consistent in our efforts to increase the diversity of our workforce and to advance the values of diversity and inclusion in the legal profession. Diversity and inclusion are key to our culture, our values, and our business strategy. They are fundamental to the way we connect with and serve our clients.

As we consider the Supreme Court decision limiting the consideration of race in university admissions, we re-affirm our commitment to building a more diverse and inclusive workplace and legal profession. Our methods for fulfilling that commitment may evolve over time as the legal landscape changes; our commitment will remain steadfast.

## Objectives

− Engaging firm leadership in proactive diversity and inclusion

− Investing in the diversity pipeline

− Developing programs to address internal and external priorities

**JA 2561**

— Measuring and monitoring our progress and success

---

## Strategic Diversity & Inclusion Committee

Established in 2006, the **Strategic Diversity & Inclusion Committee** (SDC) develops firmwide diversity strategies and policies which are used to guide the implementation of existing programs and the creation of new strategic diversity initiatives, with a strong focus on recruitment, retention, promotion and community

---

## Local Diversity Committees

We have also established **Local Diversity Committees** in each office that work to develop programming and initiatives designed to address the unique needs of their office and communities.

---

## Resource groups

**Resource groups** are a key to the success of diversity and inclusion at the firm. Our resource groups develop educational programming, assist with business and professional development opportunities, maintain relationships with national minority bar associations and foster community. The resource groups are important sources of support, development and networking for our diverse lawyers. Below is a list of our resource groups.

---

# Our Structure

Our commitment to diversity and inclusion is a goal shared collectively throughout the firm, which is why we have created a committee structure that allows all stakeholders to participate.

**JA 2562**



# Resource Groups

African American/Black Lawyers                                    +

Asian Pacific Islander Lawyers                                    +

Latinx Lawyers                                                    +

Lawyers with Disabilities                                         +

**JA 2563**

Lesbian, Gay, Bisexual and Transgender (LGBTQ+) Lawyers  +

Native American Lawyers  +

Parents and Caregivers  +

South Asian/Middle Eastern Lawyers  +

Veterans  +

Women's Forum  +

Women of Color  +

# Awards

— Awarded Mansfield 7.0 Certification Plus for Diversity Leadership from Diversity Lab, 2022-2024

— Named among the "Best Law Firms for Women" by *Working Mother/Flex-Time Lawyers,* 2008, 2009, 2011-2022

— Received a score of 100% in the *Corporate Equality Index* and designation as one of the "Best Places to Work" from the Human Rights Campaign Foundation (the educational arm of the nation's largest advocacy group for LGBT Americans), 2009-2025

— Ranked among ChIPs Honor Roll Firms for gender diversity in Intellectual Property practices in the 2021 Inclusion Blueprint Survey, a joint initiative between ChIPs and Diversity Lab

Partnerships and Sponsorships

**JA 2564**

— Leadership Council on Legal Diversity

— Corporate Counsel Women of Color

— Charting Your Own Course

— Diversity & Flexibility Alliance

— Hispanic National Bar Association

— Just the Beginning Foundation's Summer Legal Institute

— LAMBDA Legal National Sponsorships

— Minority Corporate Counsel Association

— National Asian Pacific American Bar Association

— National Bar Association

— National Black Law Students Association

— LGBTQ+ Bar Association Lavender Law Conference & Career Fair

— National Native American Law Students Association

— North American South Asian Bar Association

— Out and Equal Workplace Summit

— Practicing Attorneys for Law Students Program, Inc.

For questions, please contact Diversity&Inclusion@perkinscoie.com.

People

Industries

Services

Locations

Impact

Careers

Job Openings ↗

**JA 2565**

Perkins Coie Trust Company↗

Client Advantage

中文网站

Alumni↗

Blogs

Client Updates

Podcasts

Publications

News Room

California Land Use & Development Law Report

Security Breach Notification Chart

Perkins on Privacy

Public Chatter

The Public Company Handbook

Subscribe to Mailing Lists↗

AI & Machine Learning

Corporate Law

Energy Infrastructure & Clean Technology

Environment, Energy & Resources Law

Intellectual Property Law

Labor & Employment Law

Litigation

Privacy & Security Law

Private Client Services

Real Estate & Land Use

Technology Transactions & Privacy Law

Pay Invoice↗

Terms of Use

Privacy Policy

Legal Disclaimer

Transparency in Coverage

UK Legal Notice

Lawyer Advertising

**JA 2566**

© 2025 Perkins Coie LLP

# EXHIBIT 2

Case 1:25-cv-00716-BAH   Document 103   Filed 04/08/25   Page 139 of 327

← IMPACT

# Diversity & Inclusion

Embracing diversity and inclusion allows us to draw from varied perspectives and communities, enabling us to attract the very best talent to our ranks, and in turn provide excellent service to our clients.

Overview      **Recruitment & Retention**      Our Commitment to Racial Equality

# Recruitment & Retention

We believe in developing relationships and investing in people. At Perkins Coie, we strive to create a diverse and inclusive community where opportunities to succeed are available to all.

**JA 2569**



Our firm culture is built on collaboration and mutual respect. Once an attorney becomes part of our community, we want them to feel welcome and prepared to participate at every level of engagement necessary for success. This is why the firm supports inclusive resource groups for women, lesbian, gay, bisexual and transgender attorneys, lawyers with disabilities, veterans, parents, caregivers, and lawyers of color (African American/Black, Latinx, Asian American/Pacific Islander and South Asian/Middle Eastern). In order to increase the diversity of backgrounds, experiences and perspectives within the firm, these resource groups offer opportunities for fellowship, support and networking. In addition, local office diversity committees offer programs and events that respond to the specific and unique needs of their communities, while the firm as a whole also hosts national programs and retreats aimed at providing all attorneys with the information and tools they need to succeed.

## Recruitment Activities & Programs

Our recruitment efforts include building supportive relationships with organizations, hosting job fairs, and offering programs designed to educate and expose students to the legal profession.

**JA 2570**

# Diversity & Inclusion Fellowship Program

## Overview                                                                  ✕

At Perkins Coie, we foster a diverse and inclusive community where opportunities to succeed are available to all. Embracing diversity allows us to draw from different backgrounds and experiences, enabling us to attract the best talent to our ranks, and in turn build strong teams that provide excellent service to our clients. We are committed to creating an environment in which all our people thrive because they feel a sense of belonging.

We are proud to offer our **Diversity & Inclusion Fellowship Program** as part of our comprehensive, firmwide commitment to advancing diversity, equity, and inclusion.

Our Diversity & Inclusion Fellows are full participants in our summer associate program and must spend the first 10 weeks of their summer(s) with Perkins Coie. In addition to receiving a summer associate salary, Fellows will also receive a $15,000 stipend at the conclusion of their first-year summer. Fellows who return as 2Ls will receive a $15,000 stipend at the

## Application Process and Criteria                                          ✕

All students who are in good standing in their first year at an ABA-accredited law school are eligible to apply for the Diversity & Inclusion Fellowship Program. Perkins Coie is an Equal Opportunity Employer and welcomes applications for the Diversity & Inclusion Fellowship Program from all eligible applicants regardless of race, color, religion, sex, age, national origin, veteran status, sexual orientation, gender identity / gender expression, disability status, or any other identity.

A complete application must include:

— Current resume.

— Cover letter.

— Undergraduate and law school transcripts (unofficial versions are acceptable).

— A legal writing sample (10-page maximum).

— A personal statement (one-page, single-spaced). The personal statement should be a narrative describing your academic, professional, and life experiences and, where relevant, identifying connections between those experiences and the broader goal of advancing diversity, equity, and inclusion in the legal profession.

We evaluate all applications for the fellowship and consider the following factors:

## JA 2571

- **Academic Achievement** – A demonstrated record of academic achievement and excellent writing and interpersonal skills, as well as experience that will contribute to a successful career in the legal field.

- **DEI Leadership** – Engagement in efforts to advance diversity, equity, and inclusion within the community and/or legal profession, including during college or law school.

# Retention Programs and Activities

Perkins Coie recognizes the importance of retention in advancing diversity and inclusion, and we work diligently to invest in the success of our lawyers across the firm. Our retreats are an important retention tool that provide our attorneys opportunities to strengthen relationships with one another and our clients in a professional development setting.



**JA 2572**

## All Women Lawyers Retreat

The retreat serves as an opportunity for participants to network with other attorneys from all levels, offices and practice groups within the firm, and to share best practices on navigating the law firm culture. The presentations and events offered at this two-day retreat provide the participants with various tools to help advance their career

---

## Lawyers of Color/LGBTQ+/Lawyers with Disabilities and Veterans Retreats

These retreats bring together many of the firm's attorneys to discuss, embrace, and celebrate diversity and allyship in an inviting environment. Many of the retreat's sessions and presentations are open to attorneys of all levels, with tracks specific to the programming that coincides with where the attorney currently is in their career. This distinction allows for time focused on professional and business development skills particular to the career stage of the attorneys. In addition to the networking opportunities provided at different presentations and mixers, attendees also have the opportunity to meet other lawyers in their specific practice groups and create new and build upon existing relationships.

---

People

Industries

Services

Locations

Impact

Careers

Job Openings↗

Perkins Coie Trust Company↗

Client Advantage

中文网站

Alumni↗

Blogs

Client Updates

Podcasts

Publications

News Room

California Land Use & Development Law Report

**JA 2573**

Security Breach Notification Chart

Intellectual Property Law

Perkins on Privacy

Labor & Employment Law

Public Chatter

Litigation

The Public Company Handbook

Privacy & Security Law

Subscribe to Mailing Lists↗

Private Client Services

AI & Machine Learning

Real Estate & Land Use

Corporate Law

Technology Transactions & Privacy Law

Energy Infrastructure & Clean Technology

Pay Invoice↗

Environment, Energy & Resources Law

Terms of Use

Transparency in Coverage

Privacy Policy

UK Legal Notice

Legal Disclaimer

Lawyer Advertising

© 2025 Perkins Coie LLP

**JA 2574**

# EXHIBIT 3

JA 2575

**Total Fees Attributable to Top 15 Firm Clients**

| | Fees Collected (collect) |
|---|---|
| Grand Total | $349,859,769 |

# EXHIBIT 4

JA 2577

## Total Fees Attributable to Top 15 Practice Group Clients

| Practice Group | Fees Collected |
| --- | --- |
| Commercial Litigation Total | $145,647,380 |
| Intellectual Property Total | $118,496,457 |
| Business Total | $56,227,281 |
| Product Liability Total | $51,279,833 |
| Environment, Energy & Resources Total | $22,752,554 |
| Real Estate & Land Use Total | $17,096,769 |
| Labor & Employment Total | $15,292,812 |
| Private Client Services Total | $14,767,312 |
| Political Law Total | $2,558,821 |

# EXHIBIT 5

JA 2579

JA 2580



# EXHIBIT 6

| From: |  Redacted (CRM) Redacted @usdoj.gov> |
|---|---|
| Sent: | Thursday, March 6, 2025 10:15 PM |
| To: | Redacted (Perkins Coie) |
| Cc: | Redacted (Perkins Coie); Redacted (CRM); Redacted (USAVAE) |
| Subject: | Tomorrow |

 Redacted ,

Good evening. We are just seeing the newly issued Executive Order relating to your firm, linked here https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-llp/. Consequently, we need to postpone tomorrow's meeting to get further guidance from our management about how to proceed. We will reach out once we have this additional clarity. We appreciate your patience.

Best,

Redacted



Redacted
**Trial Attorney**
U.S. Department of Justice | Criminal Division
Fraud Section | Market Integrity & Major Frauds Unit
Redacted (o) | Redacted (c)
Redacted @usdoj.gov

# EXHIBIT 21

JA 2583

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

ADDRESSING RISKS FROM PAUL WEISS

The White House

March 14, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Background.  Global law firms have for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles. Many have engaged in activities that make our communities less safe, increase burdens on local businesses, limit constitutional freedoms, and degrade the quality of American elections.  Additionally, they have sometimes done so on behalf of clients, pro bono, or ostensibly "for the public good" — potentially depriving those who cannot otherwise afford the benefit of top legal talent the access to justice deserved by all.
 My Administration will no longer support taxpayer funds sponsoring such harm.
My Administration has already taken action to address some of the significant risks and egregious conduct associated with law firms, and I have determined that similar action is necessary to end Government sponsorship of harmful activity by an additional law firm: Paul, Weiss, Rifkind, Wharton & Garrison LLP (Paul Weiss).  In 2021, a Paul Weiss partner and former leading prosecutor in the office of Special Counsel Robert Mueller brought a pro bono suit against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021, on behalf of the District of Columbia Attorney General.
In 2022, Paul Weiss hired unethical attorney Mark Pomerantz, who had previously left Paul Weiss to join the Manhattan District Attorney's office solely to manufacture a

JA 2584

prosecution against me and who, according to his co-workers, unethically led witnesses in ways designed to implicate me.  After being unable to convince even Manhattan District Attorney Alvin Bragg that a fraud case was feasible, Pomerantz engaged in a media campaign to gin up support for this unwarranted prosecution.

Additionally, Paul Weiss discriminates against its own employees on the basis of race and other categories prohibited by civil rights laws.  Paul Weiss, along with nearly every other large, influential, or industry leading law firm, makes decisions around "targets" based on race and sex.  My Administration is committed to ending such unlawful discrimination perpetrated in the name of "diversity, equity, and inclusion" policies and ensuring that Federal benefits support the laws and policies of the United States, including those laws and policies promoting our national security and respecting the democratic process.  Those who engage in blatant discrimination and other activities inconsistent with the interests of the United States should not have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds.

Sec. 2.  Security Clearance Review.  (a)  The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Paul Weiss and Mark Pomerantz, pending a review of whether such clearances are consistent with the national interest.

(b)  The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Paul Weiss.  The heads of all agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3.  Contracting.  (a)  To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Paul Weiss and whether that business is related to the subject of the Government contract.

(b)  The heads of all agencies shall review all contracts with Paul Weiss or with entities that disclose doing business with Paul Weiss under subsection (a) of this section.  To the extent permitted by law, the heads of agencies shall:

(i)  take appropriate steps to terminate any contract, to the maximum extent permitted

by applicable law, including the Federal Acquisition Regulation, for which Paul Weiss has been hired to perform any service;

(ii)  otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate.  Within 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Paul Weiss or with entities that do business with Paul Weiss effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4.  Racial Discrimination.  Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. 5.  Personnel.  (a)  The heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Paul Weiss when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States.  In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Paul Weiss employees to ensure consistency with the national security and other interests of the United States.

   (b)  Agency officials shall, to the extent permitted by law, refrain from hiring employees of Paul Weiss, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive

or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
   March 14, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



JA 2587

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

# EXHIBIT 22



← **Truth Details**
288 replies

**Donald J. Trump** ✓
@realDonaldTrump

This Crazy Pomerantz guy, Hillary Clinton's lawyer, who left his Democrat only Law Firm to join (get this!) the Manhattan D.A.'s Office in order to prosecute "Trump," while at the same time writing a book about his exploits, including everything that happened in a secret Grand Jury. This guy is deranged and should be charged approximately. Nothing like this has ever happened before. As prosecutor he actually wrote a book in the midst of an ongoing case. It's stone cold prosecutorial misconduct!

**3.55k** ReTruths  **13.8k** Likes                              Feb 09, 2023, 5:04 PM



# EXHIBIT 23

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>GORDON J. COBURN and<br>STEVEN SCHWARTZ,<br>　　　　　　　　　Defendants. | Crim. No. 19-120 (MEF)<br><br>**MEMORANDUM IN SUPPORT OF<br>MOTION TO WITHDRAW AS<br>COUNSEL FOR DEFENDANT<br>STEVEN SCHWARTZ** |

Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") respectfully submits this motion to withdraw as counsel for Defendant Steven Schwartz. This motion is based on Mr. Schwartz's decision to terminate Paul, Weiss as his counsel, which is in turn based on President Donald J. Trump's issuance of his March 14, 2025 Executive Order titled "Addressing Risks from Paul Weiss." For reasons set forth below, the motion should be granted.

**FACTUAL BACKGROUND**

Mr. Schwartz retained Paul, Weiss to represent him in this matter on July 3, 2018. The government filed the Indictment against him in this action approximately seven months later, on February 14, 2019. ECF No. 1. For the last six years, Paul, Weiss has served as lead counsel of record for Mr. Schwartz. ECF No. 9. Bohrer PLLC and Gibbons P.C. entered appearances for Mr. Schwartz on April 22, 2019 and October 8, 2019, respectively. ECF Nos. 25, 51. Throughout, and particularly with respect to the forthcoming trial, Paul, Weiss has acted as lead trial counsel.

On February 10, 2025, the President of the United States issued an Executive Order titled "Pausing Foreign Corrupt Practices Act Enforcement to Further American Economic and National Security." Exec. Order No. 14209, 90 Fed. Reg. 9587 (Feb. 10, 2025) (the "February 10 Executive Order"). The February 10 Executive Order, among other things, directs the Attorney General to "review in detail all existing FCPA investigations or enforcement actions and take

**JA 2592**

appropriate action with respect to such matters to restore proper bounds on FCPA enforcement." *Id*. § 2(a)(ii). The February 10 Executive Order also directs the Attorney General to "determine whether additional actions, including remedial measures with respect to inappropriate past FCPA investigations and enforcement actions, are warranted and [to] take any such appropriate actions." *Id*. § 2(d). The review directed by the Executive Order is currently underway, and counsel for the defendants expect to participate in that process.

On March 14, 2025, the President of the United States issued an Executive Order titled "Addressing Risks from Paul Weiss." Exec. Order No. __, 90 Fed. Reg. __ (Mar. 14, 2025) (the "March 14 Executive Order"). The March 14 Executive Order provides, among other things, that "[t]he heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Paul Weiss when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Paul Weiss employees to ensure consistency with the national security and other interests of the United States." *Id*. § 5(a).

## REQUEST TO WITHDRAW

In response to the March 14 Executive Order, Mr. Schwartz terminated Paul, Weiss's representation of him and instructed Paul, Weiss to file this motion.

The New Jersey Rules of Professional Conduct provide that a lawyer "shall withdraw from the representation of a client if . . . the lawyer is discharged." N.J. R.P.C. 1.16(a)(3); *see also* U.S. Dist. Ct. for the Dist. of N.J. L. Civ. R. 103.1(a) (providing that federal practitioners in the District of New Jersey are subject to the New Jersey Rules of Professional Conduct), L. Cr. R. 1.1 (applying L. Civ. R. 103.1 to criminal cases). A lawyer may also withdraw for "other good cause." N.J. R.P.C. 1.16(b)(7).

2

**JA 2593**

Mr. Schwartz's discharge of Paul, Weiss as his counsel requires that Paul, Weiss withdraw pursuant to the New Jersey Rules of Professional Conduct. N.J. R.P.C. 1.16(a)(3). In addition, Mr. Schwartz's belief that he may be prejudiced by Paul, Weiss's continued representation of him in this case constitutes "other good cause" for Paul, Weiss's motion to withdraw.

The Court has adjourned this trial until April 7, 2025 in order to allow the Department of Justice to complete its review of this FCPA enforcement action pursuant to the February 10 Executive Order. ECF Nos. 1003, 1011. Mr. Schwartz understands that his counsel will have an opportunity to engage in advocacy on his behalf as that process is unfolding, and believes that the March 14 Executive Order affects those efforts.

In particular, Mr. Schwartz is concerned that the firm's continued representation of him may negatively affect his ability to obtain a favorable review of his case, or, due to the Executive Order, otherwise create potential conflicts of interest as between Mr. Schwartz and Paul, Weiss, that Mr. Schwartz is not prepared to waive. *See* March 14 Executive Order § 5(a) (providing that government attorneys acting in their official capacity may be prevented from engaging with Paul, Weiss attorneys). Regardless of whether or not the government is permitted to engage with Paul, Weiss in the ongoing review, Mr. Schwartz is concerned that Paul, Weiss's ongoing involvement in the matter could in and of itself prejudice the review of his case.

Mr. Schwartz is actively seeking replacement trial counsel.

## CONCLUSION

For the foregoing reasons, Paul, Weiss respectfully requests that the Court grant

this motion to withdraw as counsel for Defendant Steven Schwartz.

Dated: New York, New York
    March 19, 2025

Respectfully submitted,

/s/ Roberto Finzi

Roberto Finzi
**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
rfinzi@paulweiss.com

# EXHIBIT 24

JA 2596

 **Truth Details**
1165 replies

 **Donald J. Trump** ✓
@realDonaldTrump

Today, President Donald J. Trump agreed to withdraw his March 14, 2025 Executive Order regarding the Paul, Weiss, Rifkind, Wharton & Garrison LLP law firm ("Paul, Weiss"), which has entered into the following agreement with the President:

1. Paul, Weiss agrees that the bedrock principle of American Justice is that it must be fair and nonpartisan for all. Our Justice System is betrayed when it is misused to achieve political ends.

Lawyers and law firms play a vital role in ensuring that we live up to that standard as a Nation. Law firms should not favor any political party when it comes to choosing their clients. Firms also should not make decisions on whom to hire based on a person's political affiliation. To do otherwise is to deny some Americans an equal opportunity for our services while favoring others.

Lawyers abandon the profession's highest ideals when they engage in partisan decision-making, and betray the ethical obligation to represent those who are unpopular or disfavored in a particular environment.

**JA 2597**

2. Paul, Weiss affirms its unwavering commitment to these core ideals and principles, and will not deny representation to clients, including in pro bono matters and in support of non-profits, because of the personal political views of individual lawyers.

3. Paul, Weiss will take on a wide range of pro bono matters that represent the full spectrum of political viewpoints of our society, whether "conservative" or "liberal."

4. Paul, Weiss affirms its commitment to merit-based hiring, promotion, and retention, and will not adopt, use, or pursue any DEI policies. As part of its commitment, it will engage experts, to be mutually agreed upon within 14 days, to conduct a comprehensive audit of all of its employment practices.

5. Paul, Weiss will dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives, including: assisting our Nation's veterans, fairness in the Justice System, the President's Task Force to Combat Antisemitism, and other mutually agreed projects.

Statement from the White House: "The President is agreeing to this action in light of a meeting with Paul, Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice."

In response to the President's announcement, Paul, Weiss's Chairman Brad Karp said: "We are gratified that the President has agreed to withdraw the Executive Order concerning Paul, Weiss. We look forward to an engaged and constructive relationship with the President and his Administration."

**4.77k** ReTruths  **19k** Likes                    Mar 20, 2025, 6:10 PM



# EXHIBIT 25

JA 2600

*The* WHITE HOUSE

EXECUTIVE ORDER

Addressing Remedial Action by Paul Weiss

Executive Orders

March 21, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Background.  On March 14, 2025, I signed Executive Order 14237 (Addressing Risks from Paul Weiss) to address certain issues related to Paul, Weiss, Rifkind, Wharton & Garrison LLP (Paul Weiss).  I noted that "[g]lobal law firms have for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles."  Paul Weiss is one of many law firms that have participated in this harmful activity.

 Earlier this week, though, Paul Weiss indicated that it will engage in a remarkable change of course.  Specifically, Paul Weiss has acknowledged the wrongdoing of its former partner Mark Pomerantz, and it has agreed to a number of policy changes to promote equality, justice, and the principles that keep our Nation strong, including:  adopting a policy of political neutrality with respect to client selection and attorney hiring; taking on a wide range of pro bono matters representing the full political spectrum; committing to merit-based hiring, promotion, and retention, instead of "diversity, equity, and inclusion" policies; dedicating the equivalent of $40 million in pro bono legal services during my term in office to support causes including assisting our Nation's veterans, fairness in the justice system, and combating anti-Semitism; and

JA 2601

other similar initiatives.

This development should give Americans hope.  If the legal profession dedicates a fraction of its energy to bringing justice to local communities, unleashing hard-working businesses, strengthening the American family, and unifying our Nation, all Americans will benefit.

Sec. 2.  Revocation.  I hereby revoke Executive Order 14237 of March 14, 2025 (Addressing Risks from Paul Weiss).

Sec. 3.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:
(i)  the authority granted by law to an executive department or agency, or the head thereof; or
(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.
(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.
(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
   March 21, 2025.

NEWS

ADMINISTRATION

JA 2602

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

JA 2603

# EXHIBIT 26

JA 2604

Case 1:25-cv-00917-RJL    Document 16-4    Filed 04/08/25    Page 169 of 297

AD

# BUSINESS INSIDER

⬈ Subscribe

MSFT ⬂ -3.26%    AMZN ⬂ -3.03%    META ⬂ -4.14%    TSLA ⬂ -9.5%    DOW JONES ⬂ -5.5%    NASDAQ ⬂ -6.07%    S&P 500

POLITICS

## Read the email Paul Weiss Chairman Brad Karp sent to staff after striking a deal with Trump: 'Clients perceived our firm as being persona non grata'

By **Lauren Edmonds**



y Images

Mar 23, 2025, 7:44 PM ET

↗ **Share**    🔖 **Save**

Jump to

Main content
Search
Account

Paul Weiss' chairman, Brad Karp, sent an email to employees on Sunday.

**JA 2605**

**The email addressed the firm's deal with President Donald Trump after an executive order targeted it.**

**Karp acknowledged that "many" employees were "uncomfortable" over the resolution.**

Paul Weiss' chairman, Brad Karp, knows some employees feel uneasy about the law firm's deal with the Trump administration.

AD

So he sent an email.

Paul Weiss is among several major firms that <u>President Donald Trump</u> has targeted this month with executive orders over their diversity, equity, and inclusion policies and political affiliations. The orders revoked the security clearance of lawyers at Paul Weiss and called for the review of the firm's government contracts. The firm is associated with Trump's political rivals, including the lawyer Mark Pomerantz, who left the firm to join the Manhattan district attorney's investigation into Trump's finances.

AD

Jump to

Main content
Search
Account

After the order, uncertainty gripped the law firm, and it began <u>losing clients</u>. Then, Trump announced on Thursday that he'd

**JA 2606**

Case 1:25-cv-00917-RJL   Document 16-4   Filed 04/08/25   Page 171 of 297

reached a resolution with Paul Weiss and withdrew the executive order. The resolution included specific stipulations, including providing $40 million in pro bono services to the administration.

The deal shocked some in the legal community, which was alarmed by what some saw as a capitulation by the powerful firm. Karp attempted to address those concerns in an email to staffers on Sunday. The email was first reported by the legal publication Original Jurisdiction. A Paul Weiss representative confirmed the contents of the email to Business Insider.

Here is a copy of the full email:

AD

Jump to

Main content
Search
Account

*Subject: Statement to the PW Community*
*Dear Members of the Paul, Weiss Community,*
*I wanted to take this opportunity to speak with all of you more fully about the events of recent days. I know that this has been a profoundly unsettling time for all of you. Information gaps have been filled with speculation, concern, and misinformation, and I wanted to take this opportunity to address your concerns directly. Thank you for taking the time to listen.*
*Late in the evening of Friday, March 14, the President issued an executive order targeting our firm. Since then, we have been facing an unprecedented threat to our firm unlike anything since Samuel Weiss first hung out a shingle in downtown Manhattan on April 1, 1875—almost exactly 150 years ago. Only several days ago, our firm faced an existential crisis. The executive order could easily have destroyed our firm. It brought the full weight of the government down on our firm, our people, and our clients. In particular, it threatened our clients with the loss of their government contracts, and the loss of access to the government, if they continued to use the firm as their lawyers. And in an obvious effort to target all of you as*

**JA 2607**

Case 1:25-cv-00917-RJL    Document 16-4    Filed 04/08/25    Page 172 of 297

*well as the firm, it raised the specter that the government would not hire our employees.*

*We were hopeful that the legal industry would rally to our side, even though it had not done so in response to executive orders targeting other firms. We had tried to persuade other firms to come out in public support of Covington and Perkins Coie. And we waited for firms to support us in the wake of the President's executive order targeting Paul, Weiss. Disappointingly, far from support, we learned that certain other firms were seeking to exploit our vulnerabilities by aggressively soliciting our clients and recruiting our attorneys.*

*We initially prepared to challenge the executive order in court, and a team of Paul, Weiss attorneys prepared a lawsuit in the finest traditions of the firm. But it became clear that, even if we were successful in initially enjoining the executive order in litigation, it would not solve the fundamental problem, which was that clients perceived our firm as being persona non grata with the Administration. We could prevent the executive order from taking effect, but we couldn't erase it. Clients had told us that they were not going to be able to stay with us, even though they wanted to. It was very likely that our firm would not be able to survive a protracted dispute with the Administration.*

*At the same time, we learned that the Administration might be willing to reach a resolution with us. So, working with our outside counsel, we did exactly what we advise our clients to do in "bet the company" litigation every day: we talked with the Administration to see if we could achieve a lasting settlement that would not require us to compromise our core values and fundamental principles.*

*In a matter of days, we were able to negotiate such a resolution. That resolution, the terms of which I shared with all of you on Thursday evening, had three primary components. First, we reiterated our commitment to viewpoint diversity, including in recruiting and in the intake of new matters. Second, while retaining our longstanding commitment to diversity in all of its forms, we agreed that we would follow the law with respect to our employment practices. And third, we agreed to commit $10 million per year over the next four years in pro bono time in three areas in which we are already doing significant work: assisting our Nation's veterans, countering anti-Semitism, and promoting the fairness of the justice system.*

*To be clear, and to clarify misinformation perpetuated from various media sources, the Administration is not dictating what matters we take on, approving our matters, or anything like that. We obviously would not, and could not ethically, have agreed to that. Instead, we have agreed to commit substantial pro bono resources, in addition to the $130+ million we already commit annually, in areas of shared*

**JA 2608**

Jump to

Main content
Search
Account

Case 1:25-cv-00917-RJL     Document 16-4     Filed 04/08/25     Page 173 of 297

*interest. We will continue all of the existing pro bono work we already do and will continue in our longstanding role as a leader of the private bar in the pro bono and public interest sphere.*

*This existential crisis required the leadership of our law firm to make incredibly difficult decisions under extraordinary time pressure. In making those decisions, we were guided by two fundamental principles. First and foremost, we were guided by our obligation to protect our clients' interests. As I mentioned earlier, we concluded that even a victory in litigation would not be sufficient to do so, because our firm would still be perceived as persona non grata with the Administration. We simply could not practice law in the Paul, Weiss way if we were still subject to the executive order. This resolution was unambiguously in our clients' best interests.*

*Equally important, we were guided by our fiduciary duty to all of you—by our obligation, as stewards of the firm, to protect the livelihoods of the 2,500 lawyers and non-legal professionals who work at Paul, Weiss. That consideration—the need to ensure, above all, that our firm would survive—weighed extremely heavily on all of us, and especially on me, as the leader of the firm.*

*In today's political environment, it is unsurprising that the announcement that we have negotiated a resolution with the Administration, rather than fighting it in court, has generated intense feelings across the firm and indeed across the entire legal and broader community. As is often the case in situations like this, the extensive media coverage and social media commentary surrounding recent events has taken on a life of its own, with its own factual narrative and its own momentum. The coverage has been decidedly unhelpful, piecemeal, and incorrect in many fundamental respects. But it is not particularly constructive for any of us involved to debate factual discrepancies. Instead, what is most important is to look to the future. In this regard, I want to provide some clarity and perspective as we move forward.*

*First, and most important, we have quickly solved a seemingly intractable problem and removed a cloud of uncertainty that was hanging over our law firm. Our clients have been overwhelmingly supportive, expressing relief at the resolution of this situation and the fact that, as the President publicly has acknowledged, our firm now has an engaged and constructive relationship with this Administration. Thousands of clients have reached out directly to express their continued confidence in Paul, Weiss and their appreciation for our unwavering dedication to their matters throughout this period and our ability to quickly secure a resolution that will redound to their benefit. Even those who have expressed personal*

JA 2609

Jump to

Main content
Search
Account

*disappointment that we didn't fight the Administration have said they fully appreciate what was at stake for our law firm and respect our decision.*

*Second, the resolution we reached with the Administration will have no effect on our work and our shared culture and values. The core of who we are and what we stand for is and will remain unchanged. To that end, we will continue our proud, century-long legacy of courageously standing up for fundamental rights and liberties, for fairness in the justice system, and for our society's most vulnerable individuals. That commitment is woven into our DNA; it was and will never be subject to negotiation or compromise.*

*Third, we will continue to support each of you in your career journey, providing you with the world's best training and opportunities to advance and thrive in your field. Above all, we will continue to be a place where we enjoy working together; where we respect each other; where we can practice law at the highest levels of excellence.*

*I know many of you are uncomfortable that we entered into any sort of resolution at all. That is completely understandable. There was no right answer to the predicament in which we found ourselves. All of us have opinions about what is going on right now in America. This is an incredibly consequential moment for our country. It is very easy for commentators to judge our actions from the sidelines. But no one in the wider world can appreciate how stressful it is to confront an executive order like this until one is directed at you.*

*I want to close by expressing my profound gratitude to each of you. Since March 14, we have seen Paul, Weiss at its very best, supporting each other in the face of an unprecedented threat. You have demonstrated, once again, the extraordinary caliber of our Paul, Weiss community. Your professionalism, your dedication to our clients, your support for one another, and your commitment to our firm have been nothing short of remarkable under these impossibly challenging circumstances. I am confident that, just as we have in past crises, we will get through this together and become even stronger and more resilient as a community.*

*To that end, my door is open to you as we navigate next steps, as are the doors of firm leadership. This has been a deeply painful experience for me and for the other leaders of the firm. I know it has been a profoundly difficult period for many of you. Since March 14, we have been weathering a terrible storm. But I know that we will get through this storm, and that we will continue to uphold the proud traditions that have defined Paul, Weiss for the last 150 years. I am so thankful for each and every one of you, and for all that you do every day for this very special place and for our broader communities.*

**JA 2610**

Jump to

Main content
Search
Account

*Brad*

*Brad S. Karp | Chairman*

*Paul, Weiss, Rifkind, Wharton & Garrison LLP*

*Correction: March 24, 2025 — An earlier version of this story misstated when President Donald Trump announced that he'd reached a resolution with Paul Weiss and withdrew the executive order. It was Thursday, not Friday.*

**President Trump**

**Read next**

AD



## Legal & Privacy

Terms of Service    Terms of Sale    Privacy Policy    Accessibility    Code of Ethics Policy    Reprints & Permissions    Disclaimer

Advertising Policies    Conflict of Interest Policy    Commerce Policy    Coupons Privacy Policy    Coupons Terms    Your Privacy Choices

**Company**

Advertise With Us    Contact Us    Company News    Masthead

**Jump to**

Main content
Search
Account

...es by finanzen.net

**JA 2611**

Read the Email Paul Weiss Chairman Sent Staffers After Trump Deal - Business Insider

Case 1:25-cv-00917-RJL    Document 16-4    Filed 04/08/25    Page 176 of 297

**International Editions**

AT        DE        ES        JP        NL        PL

Copyright © 2025 Insider Inc. All rights reserved. Registration on or use of this site constitutes acceptance of our Terms of Service and Privacy Policy.

JA 2612

# EXHIBIT 27

JA 2613



**JUST IN**

**Trump to give TikTok another 75-day extension**
TECHNOLOGY | 8 MINUTES AGO

**OPINION** Booker's record-breaking speech proves Democrats are stuck in the past
OPINION | 10 MINUTES AGO

**Trump to send Hegseth to Dover ceremony for remains of US soldiers**
DEFENSE | 10 MINUTES AGO

**Thune faces GOP divisions on critical budget resolution**
SENATE | 40 MINUTES AGO

**OPINION** Don't be misled about what's driving our budget deficit
FINANCE | 40 MINUTES AGO

**Trump spares drugmakers from tariffs; costs could still go up**
HEALTH CARE | 45 MINUTES AGO

**Here's what to know about Saturday's 'Hands Off!' anti-Trump protests**
ADMINISTRATION | 1 HOUR AGO

**Judge finds FEMA withholding grants in violation of court order**
COURT BATTLES | 1 HOUR AGO

VIEW ALL

ADMINISTRATION

# Trump suggests law firms 'want to make deals' after rescinding Paul, Weiss order

BY BRETT SAMUELS - 03/21/25 1:17 PM ET

  



Trump suggests law firms 'want to make deals' after rescinding Paul, Weiss order

F-47

‖ 🔇                                    0:00 / 1:21   CC  ⚙ < ⛶

 Listen to this Article     Stay in the know with The Hill's newsletters   ✉ Sign Up

President Trump on Friday defended a series of executive actions he's taken to target major law firms associated with individuals he holds grudges against, one day after one of those law firms struck a deal with the administration to avoid any penalties.

Trump was asked in the Oval Office how he would respond to critics who argue his actions amount to coercion.

"Well, the law firms all want to make deals. You mean the law firms that we're going after, that went after me for four years ruthlessly, violently, illegally? Are those the law firms you're talking about?" Trump said.

"They're not babies. They're very sophisticated people. Those law firms did bad things. Bad things. They went after me for years," Trump added.

The president has signed orders in recent weeks that review security clearances and government contracts for three law firms.

One order Trump targeted Covington & Burling, which is providing pro bono services to represent former special counsel Jack Smith in his personal capacity. Smith oversaw two federal criminal cases against Trump involving the alleged mishandling of classified documents and his involvement in the Jan. 6, 2021, riot.

ADVERTISEMENT



Another targeted Perkins Coie, which worked for the Hillary Clinton campaign in 2016 and worked for a political opposition research company that dug into Trump during his first run for president.

### Sign up for the Morning Report

The latest in politics and policy. Direct to your inbox.

| Email address | SUBSCRIBE |

By signing up, I agree to the Terms of Use, have reviewed the Privacy Policy, and to receive personalized offers and communications via email, on-site notifications, and targeted advertising using my email address from The Hill, Nexstar Media Inc. and its affiliates.

And a third targeted Paul, Weiss, Rifkind, Wharton & Garrison LLP law firm, called Paul, Weiss for short. That firm employs attorney Mark Pomerantz, who was involved in the Manhattan District Attorney's Office investigation into Trump's finances. After Pomerantz resigned from the DA's office, it brought charges against Trump over a hush money payment he made over

**Most Popular**

**1** GOP senators express alarm over scale of Trump tariffs

**2** House Republicans bash Senate's Trump agenda blueprint: 'Thi...

**3** House cancels rest of votes for week after GOP floor rebellion

**4** Here's what to know about Saturday's 'Hands Off!' anti-Trum...

**5** Trump approval slips to lowest point in second term: Survey

**6** Thune faces GOP divisions on critical budget resolution

Load more







the course of his 2016 campaign.

Trump was ultimately convicted on 34 charges related to falsifying business records to conceal an alleged affair that he denies.

A federal judge temporarily blocked the portion of Trump's order denying Perkins Coie attorneys entry to federal buildings.

Trump announced on Thursday night that he was rescinding the order targeting Paul, Weiss after the firm agreed to a series of stipulations that align it closely with the administration, including by providing the equivalent of $40 million in pro bono legal services to support the Trump administration's initiatives.

TAGS   JACK SMITH

Copyright 2025 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

  

SPONSORED CONTENT

Privacy Policy



**Amazon's Worst Nightmare: Shoppers Canceling Prime for Th...**
Online Shopping Tools | Sponsored



**Amazon is Losing Money As Shoppers Canceling Prime for Th...**
Online Shopping Tools | Sponsored



**Actress Leaks Hollywood Trick For Slim Body: "We all do it"**
Your Healthy News | Sponsored    Learn More



**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**
WalletJump | Sponsored    Learn More



**Neurologists Amazed: These Barefoot Shoes Help Seniors Lose Weight and Live a Life with Less Pain**
Barefoot Vitality | Sponsored    Learn More



**This cute and realistic bunny robot toy is perfect for Easter.**
miracle box | Sponsored



**3 Toxic Foods for Dogs: The One Meat You Should Never Feed You...**
Pet Health Gurus | Sponsored



**Japanese Endocrinologists Warns Reason Behind Glucose Levels in...**
switchhomehub | Sponsored    Learn More



**Hollywood Actress Leaks Weight Loss Trick, Gets Fired!**
Your Healthy News | Sponsored    Learn More



**Sore Knees After 60 Comes Down To 1 Thing (Stop Doing This)**
Arthrozene | Sponsored    Learn More





# EXHIBIT 28

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

Preventing Abuses of the Legal System and the Federal Court

Presidential Memoranda

March 22, 2025

MEMORANDUM FOR THE ATTORNEY GENERAL
THE SECRETARY OF HOMELAND SECURITY

SUBJECT:    Preventing Abuses of the Legal System and the Federal Court

Lawyers and law firms that engage in actions that violate the laws of the United States or rules governing attorney conduct must be efficiently and effectively held accountable. Accountability is especially important when misconduct by lawyers and law firms threatens our national security, homeland security, public safety, or election integrity.

Recent examples of grossly unethical misconduct are far too common. For instance, in 2016, Marc Elias, founder and chair of Elias Law Group LLP, was deeply involved in the creation of a false "dossier" by a foreign national designed to provide a fraudulent basis for Federal law enforcement to investigate a Presidential candidate in order to alter the outcome of the Presidential election. Elias also intentionally sought to conceal the role of his client — failed Presidential candidate Hillary Clinton — in the dossier.

The immigration system — where rampant fraud and meritless claims have supplanted the constitutional and lawful bases upon which the President exercises core powers under Article II of the United States Constitution — is likewise replete with examples of

JA 2617

unscrupulous behavior by attorneys and law firms.  For instance, the immigration bar, and powerful Big Law pro bono practices, frequently coach clients to conceal their past or lie about their circumstances when asserting their asylum claims, all in an attempt to circumvent immigration policies enacted to protect our national security and deceive the immigration authorities and courts into granting them undeserved relief.  Gathering the necessary information to refute these fraudulent claims imposes an enormous burden on the Federal Government.  And this fraud in turn undermines the integrity of our immigration laws and the legal profession more broadly — to say nothing of the undeniable, tragic consequences of the resulting mass illegal immigration, whether in terms of heinous crimes against innocent victims like Laken Riley, Jocelyn Nungaray, or Rachel Morin, or the enormous drain on taxpayer resources intended for Americans.

Federal Rule of Civil Procedure 11 prohibits attorneys from engaging in certain unethical conduct in Federal courts.  Attorneys must not present legal filings "for improper purpose[s]," including "to harass, cause unnecessary delay, or needlessly increase the cost of litigation."  FRCP 11(b)(1).  Attorneys must ensure that legal arguments are "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  FRCP 11(b)(2).  And attorneys must ensure that their statements about facts are "reasonably based" on evidentiary support, or a belief that such evidence actually exists.  FRCP 11(b)(3)–(b)(4).  When these commands are violated, opposing parties are authorized to file a motion for sanctions.  FRCP 11(c).  The text of the rule specifically addresses and provides for sanctions for attorneys and their firms as well as for recalcitrant parties given the solemn obligation that attorneys have to respect the rule of law and uphold our Nation's legal system with integrity.  Furthermore, Rule 3.1 of the Model Rules of Professional Conduct provides that, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."

Unfortunately, far too many attorneys and law firms have long ignored these requirements when litigating against the Federal Government or in pursuing baseless partisan attacks.  To address these concerns, I hereby direct the Attorney General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive

departments and agencies of the United States.

I further direct the Attorney General and the Secretary of Homeland Security to prioritize enforcement of their respective regulations governing attorney conduct and discipline. *See, e.g.*, 8 C.F.R. 292.1 *et seq.*; 8 C.F.R. 1003.101 *et seq.*; 8 C.F.R. 1292.19.

I further direct the Attorney General to take all appropriate action to refer for disciplinary action any attorney whose conduct in Federal court or before any component of the Federal Government appears to violate professional conduct rules, including rules governing meritorious claims and contentions, and particularly in cases that implicate national security, homeland security, public safety, or election integrity. In complying with this directive, the Attorney General shall consider the ethical duties that law partners have when supervising junior attorneys, including imputing the ethical misconduct of junior attorneys to partners or the law firm when appropriate.

I further direct that, when the Attorney General determines that conduct by an attorney or law firm in litigation against the Federal Government warrants seeking sanctions or other disciplinary action, the Attorney General shall, in consultation with any relevant senior executive official, recommend to the President, through the Assistant to the President for Domestic Policy, additional steps that may be taken, including reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services.

I further direct the Attorney General, in consultation with any relevant senior executive official, to review conduct by attorneys or their law firms in litigation against the Federal Government over the last 8 years. If the Attorney General identifies misconduct that may warrant additional action, such as filing frivolous litigation or engaging in fraudulent practices, the Attorney General is directed to recommend to the President, through the Assistant to the President for Domestic Policy, additional steps that may be taken, including reassessment of security clearances held by the attorney, termination of any contract for which the relevant attorney or law firm has been hired to perform services, or any other appropriate actions.

Law firms and individual attorneys have a great power, and obligation, to serve the rule of

law, justice, and order.  The Attorney General, alongside the Counsel to the President, shall report to the President periodically on improvements by firms to capture this hopeful vision.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

JA 2621

# EXHIBIT 29

JA 2622

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Prevents Abuses of the Legal System and the Federal Courts

The White House

March 21, 2025

**ADDRESSING ATTORNEY MISCONDUCT:** Today, President Donald J. Trump signed a memorandum to hold attorneys and law firms accountable for unethical conduct when litigating against the Federal government or pursuing baseless partisan attacks. The memorandum instructs the Attorney General to:

- Prioritize seeking sanctions against attorneys and law firms that engage in frivolous, unreasonable, or vexatious litigation against the United States.

- Prioritize enforcement of regulations governing attorney conduct and discipline. This directive also applies to the Secretary of Homeland Security.

- Refer attorneys and law firms for disciplinary action when their conduct in Federal court or before any component of the Federal government appears to violate professional conduct rules.

- Recommend additional consequences, including reassessing security clearances or terminating federal contracts, for attorneys and law firms that engage in conduct deserving of sanctions or other disciplinary action.

- Review attorney and law firm conduct over the last eight years in litigation against the Federal government and recommend further actions if misconduct is identified.

**PREVENTING ABUSES OF THE LEGAL SYSTEM AND FEDERAL COURTS:** President Trump believes that lawyers and law firms must be held accountable when they engage in illegal or unethical conduct, especially when their misconduct threatens our national security, homeland security, public safety, or election integrity.

- Examples of egregious unethical conduct, such as Marc Elias' direct involvement in creating a false "dossier" to interfere with the 2016 presidential election, are too

JA 2623

common in the legal profession.

- The immigration system is likewise replete with examples of unscrupulous behavior by attorneys and law firms that undermine immigration enforcement.
  - The immigration bar, and powerful Big Law pro bono practices, frequently coach clients to conceal their past or lie about their circumstances when seeking asylum.
  - Fact-checking these fraudulent claims imposes an enormous burden on the Federal government, and in turn undermines the integrity of our immigration laws.

- Federal Rule of Civil Procedure 11 prohibits attorneys from engaging in certain unethical conduct, such as filing frivolous claims, presenting arguments not grounded in law, or making factual assertions without evidentiary support. Federal regulations establish similar attorney conduct standards, particularly in connection with immigration proceedings.

- Frivolous lawsuits, bad-faith legal arguments, and blatant misrepresentations of fact burden the courts and waste taxpayer resources.

- Lawyers and law firms that engage in unethical conduct often face little to no accountability—this memorandum delivers overdue enforcement.

**A RETURN TO ACCOUNTABILITY:** President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence.

- This memorandum aligns with President Trump's priority on refocusing government operations to serve the citizens of the United States.

- It builds on President Trump's previous actions, such as signing an Executive Order on his first day in office to end the weaponization of the Federal government and ensure accountability for past misconduct.

- It follows his revocation of security clearances held by intelligence officials who falsely claimed Hunter Biden's laptop was Russian disinformation during the 2020 election.

- President Trump has also taken action to hold major law firms accountable, including Covington & Burling, Paul Weiss, and Perkins Coie.

JA 2624

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

**JA 2625**

Privacy

Style Guide

JA 2626

# EXHIBIT 30

*The* WHITE HOUSE

Addressing Risks from Jenner & Block

Executive Orders

March 25, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Background. My Administration is committed to addressing the significant risks associated with law firms, particularly so-called "Big Law" firms, that engage in conduct detrimental to critical American interests. Many firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles. Moreover, law firms regularly conduct this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients. Lawyers and law firms that engage in such egregious conduct should not have access to our Nation's secrets, nor should such conduct be subsidized by Federal taxpayer funds or contracts.

Jenner & Block LLP (Jenner) is yet another law firm that has abandoned the profession's highest ideals, condoned partisan "lawfare," and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States. For example, Jenner engages in obvious partisan representations to achieve political ends, supports attacks against women and children based on a refusal to accept the biological reality of sex, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders. Moreover, Jenner

**JA 2628**

discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based "targets."

In addition, Jenner was "thrilled" to re-hire the unethical Andrew Weissmann after his time engaging in partisan prosecution as part of Robert Mueller's entirely unjustified investigation.  Andrew Weissmann's career has been rooted in weaponized government and abuse of power, including devastating tens of thousands of American families who worked for the now defunct Arthur Andersen LLP, only to have his unlawfully aggressive prosecution overturned by the Supreme Court.  The numerous reports of Weissmann's dishonesty, including pursuit of nonexistent crimes, bribery to foreign nationals, and overt demand that the Federal Government pursue a political agenda against me, is a concerning indictment of Jenner's values and priorities.

Sec. 2.  Security Clearance Review.  (a)  The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Jenner pending a review of whether such clearances are consistent with the national interest.

(b)  The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Jenner.  The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3.  Contracting.  (a)  To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Jenner and whether that business is related to the subject of the Government contract.

(b)  The heads of agencies shall review all contracts with Jenner or with entities that disclose doing business with Jenner under subsection (a) of this section.  To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Jenner has been hired to perform any service; and

(ii)  otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate.  Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Jenner or with entities that do business with Jenner effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4.  Racial Discrimination.  Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. 5.  Personnel.  (a)  The heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Jenner when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States.  In addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Jenner employees, including but not limited to Andrew Weissmann, to ensure consistency with the national security and other interests of the United States.

(b)  Agency officials shall, to the extent permitted by law, refrain from hiring employees of Jenner, including but not limited to Andrew Weissmann, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States,

JA 2630

its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

　March 25, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

**JA 2632**

Privacy

Style Guide

JA 2633

# EXHIBIT 31

<u>Exhibit 31</u>

March 26, 2025 remarks by President Donald J. Trump
upon signing an executive order titled
"Addressing Risks from Jenner & Block"

The video is available here:
https://www.youtube.com/watch?v=7LsV-l0xWh4

Pursuant to Local Civil Rule 5.4(e)(1), a digital file copy of this
exhibit is being maintained by plaintiff's counsel and will be
provided to the Court and defendants' counsel.

**JA 2635**

# EXHIBIT 32



# EXHIBIT 33

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JENNER & BLOCK LLP,

        *Plaintiff*,

v.                                   Case No. 1:25-cv-00916

U.S. DEPARTMENT OF JUSTICE, et al.,

        *Defendants*.

---

## DECLARATION OF THOMAS J. PERRELLI IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

I, Thomas J. Perrelli, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am Firm Chair and a partner at Jenner & Block LLP ("Jenner"). Jenner is an international law firm that conducts its U.S. operations and activities through a limited liability partnership, Jenner & Block LLP, with six offices in the United States and one in the United Kingdom. I have been an attorney at Jenner for more than 25 years. I am a member in good standing of the District of Columbia bar and have been admitted in many federal courts, including the U.S. Supreme Court, and the Supreme Court of Virginia. I am very familiar with the firm's business and operations and provide this declaration in response to the March 25, 2025 Executive Order entitled "Addressing Risks From Jenner & Block." *See* Executive Order, "Addressing Risks From Jenner & Block" (March 25, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/ (the "Order"). I either have personal knowledge of the facts set forth in this declaration or I know them from business records and my knowledge of the firm's history and operations.

2. I initially began to work at Jenner as a summer associate in 1990. After graduating

1

**JA 2639**

from law school and beginning my legal career as a judicial law clerk, I worked as an associate at Jenner from 1992 to 1997. I thereafter served as a partner at the firm from 2001 through 2009. During that time period, I was the managing partner of the Washington D.C. office and co-chair of the firm's Creative Content practice (now known as Content, Media, and Entertainment).

3. I left the firm in 2009 to serve as Associate Attorney General of the United States, supervising the Department's Civil, Antitrust, Civil Rights, Environment and Natural Resources, and Tax Divisions. The U.S. Senate confirmed my nomination to serve as Associate Attorney General by a vote of 72 to 20. In that role, I served as lead federal negotiator on some of the largest settlements in history and oversaw the United States' civil litigation.

4. I returned to the firm in 2012. That year, I founded the firm's Government Controversies and Public Policy Litigation Practice to build a multi-disciplinary approach to our clients' most complex problems. I continue to serve as co-chair of that practice. The practice helps businesses and large organizations navigate and resolve highly complex crises that require a mix of litigation, regulatory, public policy, legislative and communications skills. I have also served on the firm's Policy Committee since 2013, and as Firm Chair since early 2020.

5. I submit this declaration in Support of the Motion for Temporary Restraining Order filed by Jenner. I am of the age of majority, and I am competent to make this declaration.

## I. Jenner & Block LLP

6. Jenner was founded in Chicago in 1914. Jenner currently has six offices in the United States—Chicago, Washington, D.C., New York, Los Angeles, Century City, San Francisco—and an office in London. The firm has over 500 lawyers and more than 900 total personnel.

7. Jenner is known for its prominent and successful litigation practice, global investigations practice, regulatory and government controversies work, and experience handling

2

**JA 2640**

sophisticated, high-profile corporate transactions. Its clients include Fortune 100 companies, technology companies, large privately held corporations, colleges and universities, emerging companies, Native American tribes, and venture capital and private equity investors. Jenner serves clients across a variety of industries, including aerospace and defense, energy, food and beverage, telecommunications, technology, hospitality and real estate, finance, transportation, education, and media and entertainment, among others. Jenner alumni have been and are serving as state and federal court judges, judicial law clerks, and high-ranking government officials, as well as founders, CEOs, and general counsels of some of the nation's largest and most important companies. We serve clients across a variety of industries, with particular expertise representing clients in highly-regulated industries, including aerospace and defense, agriculture, education, energy, food and beverage, healthcare and life sciences, hospitality, telecommunications, technology, transportation, and media and entertainment, among others.

8.      Over our 111-year history, Jenner and its lawyers have represented clients in federal and state courts across the nation, and in tribunals throughout the world. We have presented dozens of arguments in the Supreme Court of the United States, helping to establish major precedent in federal and constitutional law. We are committed to providing excellent service to our clients, helping them achieve their goals and standing by them in good times and bad.

9.      Jenner has been named as an "Am Law 100" firm on The American Lawyer 100 list in every year since that list began in 1987. The firm and its lawyers are regularly recognized for excellence in the legal community by Chambers USA and other respected organizations, including national and local bar associations. 76 Jenner partners have been recognized as "America's Leading Lawyers" in more than 35 practice areas ranked by Chambers USA 2024. Consistent with our litigation prowess, Jenner boasts nine Fellows of the prestigious American College of Trial Lawyers ("ACTL"), one of the highest percentages of partners in the ACTL

3

**JA 2641**

among AmLaw 100 firms. Six Jenner lawyers are members of the American Law Institute, a leading independent organization producing scholarly work designed to clarify, modernize, and improve the law.

10. Jenner has more than 900 personnel. Of those, approximately 500 are attorneys and 400 are business professionals, including paralegals, legal assistants, and other professionals. Our employees participate in the communities in which they live. Our partners have included two former Presidents of the Chicago Bar Association and a former President of the New York City Bar Association. They serve on countless boards of legal services, community, and arts organizations. They include former members of the armed forces and a current reservist in the U.S. military.

11. Jenner's attorneys are drawn from all sides of the political spectrum. Many of our attorneys joined the firm after service in Democratic or Republican administrations. Our Chair Emeritus Anton Valukas, who served as Chairman of the firm for a decade until 2017, has been a leading Jenner partner for more than three decades, returning to the firm after being appointed by President Reagan to serve as United States Attorney for the Northern District of Illinois. Other current attorneys include:

- A senior adviser for Congressional Republicans with 14 years of experience at key investigative committees in U.S. Congress;

- the leader of the Office of the Special Inspector General for the Troubled Asset Relief Program (SIGTARP), appointed by President George W. Bush to head a law enforcement agency that helped protect taxpayers from fraud-related losses;

- the Acting Solicitor General of the United States during the Obama administration;

- a Commissioner of the Federal Energy Regulatory Commission appointed by President George W. Bush;

- a Deputy Associate Director of Cabinet Affairs at the White House during the administration of President George W. Bush;

4

**JA 2642**

- the U.S. Ambassador to Hungary during the Biden administration;

- the U.S. Ambassador and Permanent Representative to the United Nations Human Rights Council during the Obama administration;

- A Special Counsel to the Judiciary Committee of the U.S. House of Representatives in connection with the impeachment proceedings of federal district judge Harry Claiborne, leading to the conviction and ultimately the removal of a President Carter appointee; and

- Fifteen former Assistant United States Attorneys with experience in eight U.S. Attorney's Offices around the country, who were appointed by the Attorney General in both Republican and Democratic administrations.

12. In addition, our attorneys have served in federal government agencies as varied as the Department of Justice, Securities and Exchange Commission, Federal Communications Commission, Federal Trade Commission, Department of the Treasury, Department of State, National Security Council, Environmental Protection Agency, Secret Service, U.S. Air Force, U.S. Navy, the Internal Revenue Service, Department of Health and Human Services, and numerous Committees of the U.S. Senate and U.S. House of Representatives. Some of our attorneys served in these federal government agencies during the first Trump administration.

13. Many of our attorneys joined the firm after serving as judicial law clerks to judges appointed by both Democratic and Republican Presidents. Thirteen of our attorneys served as law clerks for Justices of the Supreme Court, including Justice Scalia, Justice Kennedy, Justice Souter, and Justice Kagan. In recent years, five Jenner partners or alumni have been nominated to serve as Article III federal judges—two by President Trump, and three by President Biden. Former U.S. Supreme Court Justice John Paul Stevens, appointed by President Gerald Ford, was a Jenner alumnus. President Nixon appointed Jenner partner Philip Tone first to the U.S. District Court for the Northern District of Illinois and thereafter to the Seventh Circuit Court of Appeals; Judge Tone was a partner at Jenner both before and after his service to the federal judiciary. President Nixon also appointed Jenner partner Prentice Marshall to the U.S. District Court for the Northern District

5

JA 2643

of Illinois, where he served for more than two decades. Former Governor Rick Snyder (R-Mich.) appointed a Jenner alumnus to the Michigan Supreme Court.

14. Jenner has a longstanding, industry-leading commitment to pro bono service. Jenner was one of the first law firms nationwide to create a pro bono program, establishing it in the 1950's to represent indigent criminal defendants in Chicago. Those origins launched a culture of public service that has only grown stronger over seven decades. The American Lawyer has ranked the firm its number one pro bono firm 12 times in the past 15 years. In January 2021, the firm launched a five-year pro bono pledge, setting a goal of contributing $250 million in free legal services. The firm exceeded that commitment more than one year early, contributing the equivalent of $305 million in pro bono legal services by the end of 2024. In 2024 alone, the firm dedicated 90,993 hours of attorney time to pro bono work, valued at $103 million. Among other things, this includes defending individuals in our criminal justice system, governments and society; assisting individuals denied social security benefits; advocating for veterans; protecting constitutional rights; assisting victims of domestic violence and sex trafficking; pursuing religious liberty while fighting religious discrimination; and counseling community organizations on issues such as governance, real estate, and intellectual property.

15. We were early champions for sometimes-controversial issues like prisoners' rights, criminal defense, and LGBTQ equality, and we continue forging the path, year after year, to provide legal representation to those who cannot afford it. We pursue impact litigation on important constitutional issues such as voting rights and reproductive rights. We pursue pro bono litigation on behalf of Medicaid recipients, challenging onerous policies that threaten their health care. We also do significant pro bono work advocating for military and veterans' rights. In partnership with the Veterans Legal Services Clinic at Yale Law School, we represent military veterans seeking veterans benefits and honorable status. We currently represent Black veterans

6

**JA 2644**

who served in the Vietnam War and who were improperly denied veterans benefits for more than fifty years, as acknowledged by the Department of Veterans Affairs. We also represent Navy and Marine Corps veterans who received less-than-honorable discharges while suffering from post-traumatic stress disorder (PTSD) after service in Iraq and Afghanistan. We also represent adults who were brought to the United States as children, helping them to apply for deferred action status and obtain work authorization.

16.    Jenner attorneys pursue matters of public importance, from a variety of perspectives. We represent our clients on their most significant matters, and we fight for them even in the face of intense public pressure. Named partner Albert Jenner challenged the constitutionality of the House Committee on Un-American Activities ("HUAC"), on behalf of his client, a prominent scientist who had received a subpoena from HUAC. He also served as counsel for Republicans on the House Judiciary Committee during the impeachment proceedings against President Richard Nixon. Later, the firm represented Theodore B. Olson—then President Reagan's Assistant Attorney General for the Office of Legal Counsel—in his challenge to the Independent Counsel statute.

17.    The firm represented MCI in the historic case that led to the break-up of AT&T. The firm represented the examiner in the bankruptcy proceedings of Lehman Brothers Holdings, Inc., the largest bankruptcy in U.S. history. More recently, Jenner represents American victims of terrorist attacks, including 9/11 and October 7 victims, in civil actions against Iran, the Taliban, Russian banks, and other malign foreign actors. Jenner represented a major corporation, a university, and a Deferred Action for Childhood Arrivals ("DACA") recipient in successfully challenging the rescission of DACA. A Jenner partner served last year as Special Counsel to Chairman Mike Kelly (R-PA) and House Republicans on the Task Force on the Attempted Assassination of Donald J. Trump.

**JA 2645**

18.     In short, we are lawyers, and we serve our clients. We are driven by our clients' needs and the firm's values.

19.     Beyond the legal matters we pursue, the firm is often recognized for fostering a work environment in which all lawyers and business professionals can flourish. A 2024 Vault survey ranked Jenner as the #18 Best Law Firm in America to Work For and #14 in Firm Culture. American Lawyer surveys of associate satisfaction consistently rank Jenner among the top firms nationwide.

## II.     The March 25, 2025 Executive Order

20.     On March 25, 2025, the President signed the Executive Order titled "Addressing Risks From Jenner & Block." The Order was accompanied by a "Fact Sheet" issued the same day that purports to explain and support the Order. *See* White House, "Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block" (March 25, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-jenner-block/ ("Fact Sheet"). Jenner was given no opportunity to respond to the false charges in the Order or to explain the inevitable impact. Jenner learned of the Order only after it was issued.

21.     The Order directs the heads of all agencies to (1) "limit[]" Jenner's employees' "official access" to federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States" and "engage[ment]" between government employees acting in their official capacity and Jenner employees to "ensure consistency with the national security and other interests of the United States," , Order § 5; (2) require government contractors to "disclose any business they do with Jenner and whether that business is related to the subject of the Government contract" and to "take appropriate steps to terminate any contract[] … for which Jenner has been hired to perform any service," *id.* § 3; and

8

**JA 2646**

(3) create a new security-clearance review procedure, applicable only to Jenner and other law firms whose activities are deemed disfavored, "suspend[ing] any active security clearances held by individuals at Jenner" and threatening arbitrary revocation, *id.* § 2.

### III.    Jenner's Interaction with the Federal Government

22.    As a full-service law firm that represents clients in all sectors of the economy in transactional, litigation, and regulatory matters, Jenner lawyers necessarily interact with the federal government on behalf of their clients in countless ways. Those interactions are critical to our ability to practice our profession, and our clients retain us and rely on us in their most sensitive matters to be able to interact with the federal government.

23.    If allowed to go into effect, the Order's restrictions on Jenner's interactions with the federal government would be devastating and irreparable. Our litigators carry forward more than a century of principled and effective advocacy that continues to serve as the hallmark of our firm. Driven by a commitment to integrity and professionalism, our credibility is our currency, and clients trust Jenner to skillfully defend and pursue their interests in their most contentious matters. Described by The National Law Journal as "the Army's Special Forces: highly trained and ready to deploy anywhere at any time," Jenner has been widely recognized for our prowess in high-profile trials and reputation as a "go-to" litigation firm for major corporate clients facing bet-the-company stakes. These trials and litigations require access to the federal courts. Unlike many other large law firms, the vast majority (nearly 90%) of the firm's attorneys focus on litigation, white collar/investigations, and regulatory practices, and the bulk of the firm's revenue derives from those practices. Many of these lawyers practice in federal court on behalf of our clients in civil and criminal cases, as well as in federal agencies' in-house administrative proceedings.

24.    We estimate that the firm has 540 cases pending before federal district, appellate, and bankruptcy courts, including the Supreme Court of the United States and the Court of Federal

9

**JA 2647**

Claims. This includes three cases pending before the Supreme Court, and approximately 140 cases pending before federal appellate courts, 340 cases pending before federal district courts, 40 matters in bankruptcy court, and 15 matters in the Court of Federal Claims. These matters require regular appearances in federal court. For example, the firm has at least 28 scheduled in-person appearances in federal court in April and May 2025 alone, including trials and pre-trial conferences, oral arguments, and motion hearings.

25. We estimate that the firm has more than 500 active matters pending before or adverse to federal administrative agencies, including (using approximate numbers) 100 matters involving the Department of Justice; 40 matters involving the Federal Communications Commission; 35 matters involving U.S. Citizenship and Immigration Services; 30 matters involving the Navy; 25 matters involving each of Immigration and Customs Enforcement and the Securities and Exchange Commission; 20 matters involving each of the Department of State and the Department of Homeland Security; 15 matters involving each of the Army, Department of Defense, Department of Health and Human Services, Environmental Protection Agency, Federal Bureau of Investigation, and Federal Energy Regulatory Commission; and 10 matters involving each of the Air Force, Consumer Financial Protection Bureau, Federal Bureau of Prisons, Federal Trade Commission, and Internal Revenue Service.

26. Jenner also represents many clients who are the targets of pending federal criminal investigations or have been indicted. Many of these clients retain us to interact with the Department of Justice, the Securities and Exchange Commission, or other federal agencies. For example, the firm currently is engaging with the Department of Justice as to at least five antitrust investigations.

27. The firm has 17 practice groups, and all of them intersect with the federal government in some way and include clients with business before the federal government. The largest practice groups by headcount are Investigations, Compliance, and Defense (67 attorneys);

10

**JA 2648**

Corporate (52 attorneys); Funds, Investment, and Financial Litigation (44 attorneys); Business Litigation (32 attorneys); and Government Controversies and Public Policy Litigation (28 attorneys).

28.     In the course of their representations, Jenner lawyers frequently meet with federal officials from a range of federal government agencies. Based on a review of our current client list, hundreds of our clients have matters that require Jenner lawyers to interact with federal agencies.

29.     Jenner boasts one of the best Appellate & Supreme Court practices in the country. It has been regularly recognized on *The National Law Journal*'s Appellate Hot List and rated a top practice by *Chambers USA*. Six different Jenner lawyers have argued before the Supreme Court of the United States in the last four Terms alone, addressing issues of criminal law, tribal sovereignty, social security, and the tax code. Jenner has won important Supreme Court precedents in cases such as *Haaland v. Brackeen*, 599 U.S. 255 (2023) (upholding the constitutionality of the Indian Child Welfare Act); *Kokesh v. SEC*, 581 U.S. 455 (2017) (holding that a five-year statute of limitations applies to the SEC's disgorgement penalty); *Puerto Rico v. Sanchez Valle*, 579 U.S. 59 (2016) (holding that the federal government and Puerto Rican government are the same sovereign for the purpose of the Double Jeopardy Clause); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) (holding that companies that distribute and promote software to infringe copyrights are liable for the resulting acts of infringement); *Lawrence v. Texas*, 539 U.S. 558 (2003) (holding unconstitutional a Texas law criminalizing consensual, sexual conduct between individuals of the same sex); *Wiggins v. Smith*, 539 U.S. 510 (2003) (holding that defense counsel's failure to conduct a reasonable investigation of mitigating facts violated a defendant's Sixth Amendment right to effective assistance of counsel); and *Witherspoon v. Illinois*, 391 U.S. 510 (1968) (holding death sentence unconstitutional where jurors who opposed the death penalty were dismissed in violation of the Sixth and Fourteenth Amendments). Its clients have included (on the

11

one hand) major corporations, state governments, and Indian tribes, and (on the other) targets of government enforcement actions, criminal defendants, and civil rights plaintiffs, among many others. In the Court's current term, Jenner has already argued and won *Williams v. Reed*, 145 S. Ct. 465 (2025), wherein the Court held in an opinion by Justice Kavanaugh that Alabama may not enforce a state exhaustion requirement that would effectively immunize state officials from federal Section 1983 claims.

30. Representing clients before the Supreme Court requires Jenner lawyers to access federal buildings not only on the day of the argument itself but also for meetings with the Office of the Solicitor General in the Department of Justice, a critical strategic moment in many Supreme Court cases where the parties have an opportunity to discuss the matter with key stakeholders in the federal government and attempt to persuade the United States to take particular positions in the case.

31. Jenner also features a strong Government Controversies and Public Policy Litigation practice, which I founded and co-chair. We guide businesses and other large organizations through highly complex crises presenting a mix of litigation, regulatory, public policy, legislative and communications challenges. These challenges can include Congressional hearings, federal law enforcement investigations, and management of regulatory scrutiny. Examples of the types of matters handled by these lawyers include representing major companies in congressional investigations, preparing senior executives for their testimony in Congress, and representing companies in litigation brought by federal agencies including the Department of Justice, Consumer Financial Protection Bureau and the Federal Trade Commission. I also serve as mediator and settlement master in cases, including having been asked by the Department of Justice to mediate cases on multiple occasions. I am currently serving as a court-appointed Settlement Master in complex litigation involving veterans exposed to contaminated water at Camp LeJeune.

**JA 2650**

32.     Matters handled by the Government Controversies and Public Policy Litigation group frequently require regular interaction with the federal government and entrance into federal buildings for important meetings, interviews, and negotiations. Many of these meetings are only offered in person where parties can speak candidly with federal officials about sensitive matters.

33.     Jenner also offers clients one of the top Investigations, Compliance, and Defense ("ICD") practices in the country. Featuring 16 former federal prosecutors, this team helps clients navigate highly sensitive investigative and compliance challenges. When appropriate, they can quickly facilitate productive, dispositive interactions with authorities including the Department of Justice, Securities and Exchange Commission, the Commodity Futures Trading Commission, the Consumer Financial Protection Bureau, and the Financial Crimes Enforcement Network, among other government agencies. Jenner's ICD team have led hundreds of jury and bench trials, drawing on decades of first-chair experience to fight for their clients.

34.     Jenner's ICD team is currently representing large corporate clients and former employees in, among others, criminal and civil investigations carried out by the Department of Justice; ongoing dialogue with the Securities & Exchange Commission; and investigations conducted by the U.S. Postal Service Inspector General. The ICD team also partners with Jenner's Antitrust and Competition law team, which is currently representing clients in five separate antitrust investigations pursued by the Department of Justice.

35.     Matters handled by the ICD team require regular interaction with the federal government and entrance into federal buildings for important meetings, interviews, and negotiations. Many of these meetings are only offered in person where parties can speak candidly with federal officials about sensitive matters. Some of these matters also involve classified information that can only be viewed, discussed, or electronically processed in a Sensitive Compartmented Information Facility ("SCIF").

13

**JA 2651**

36.     Jenner includes a Government Contracts and Grants practice featuring Chambers-rated lawyers. Many of the nation's leading government contractors turn to Jenner for sophisticated legal advice as they navigate the complex government contracting landscape. Jenner lawyers draw on a wealth of industry, government, and litigation experience to help companies successfully avoid or resolve contract disputes with the U.S. Government. They also leverage the leadership and unique experience of former government officials, representing the Air Force General Counsel's Office and Government Accountability Office, to help develop effective solutions for clients as they face potential or proactive investigations, seek an experienced approach to combat bid protests, or navigate subcontractor issues.

37.     By definition, nearly every matter handled by Jenner's Government Contracts and Grants practice involves work with government contractors. These matters likewise involve frequent interaction with the federal government, entrance into federal buildings, litigation in the Court of Federal Claims, and handling of classified information—all of which is threatened by the Executive Order.

38.     Jenner has a nationally recognized Litigation Department. The firm litigates on behalf of clients in their most important matters, regularly appearing in federal courts. Thus far in every week of 2025, Jenner lawyers have appeared for hearings or oral argument in federal court at least once, and often multiple times each week. Jenner lawyers appear in federal court for all kinds of matters for all kinds of clients. Some prominent examples from the last few years include: a trial win in the Northern District of Illinois holding the nation's largest egg producers and industry groups liable for conspiring to inflate egg prices; a groundbreaking win in the Second Circuit Court of Appeals on behalf of the family of an American citizen killed when Malaysia Airlines Flight 17 was shot down over eastern Ukraine in 2014; a trial win in a trademark infringement suit against a European company that unlawfully pirated the products of its former

14

**JA 2652**

business partner; and a successful interlocutory appeal in the Fourth Circuit reversing a class certification order on behalf of a major hospitality company.

39.     Jenner features a number of high-caliber regulatory practices, with particularly strong practices in Energy, Communications, and Native American law. Jenner's Energy practice brings creative and collaborative thinking to cutting-edge issues in which the law is still developing, as the electric and natural gas industries face transformative opportunities as well as daunting challenges. The Energy group litigates cases at trial and appeal for energy companies at every level of the federal and state court systems, including before the U.S. Supreme Court. They handle cases at the Federal Energy Regulatory Commission ("FERC") and at state commissions, and represent clients in regulatory enforcement matters. They also represent and counsel clients engaged in energy transactions and many of the nation's largest electric and gas utilities, which service tens of millions of Americans, and the nation's largest nuclear power generator.

40.     Jenner's Communications, Internet and Technology ("CIT") practice represents cable/broadband, wireless, Internet, satellite, and technology companies, as well as private equity investors. The CIT group has negotiated industry-leading transactions and prevailed in wide-ranging litigation, regulatory proceedings, and agency enforcement actions, helping their clients pursue large mergers and other transactions, enter new industries, navigate new regulations and government enforcement, and create new products and services. Jenner's CIT group is known for tackling particularly difficult problems and bet-the-company matters that require a unique combination of top legal skills, hands-on Federal Communications Commission ("FCC") experience, and commitment to work wherever and whenever needed to achieve clients' goals. As a result, the team has achieved major successes for clients on some of the most significant communications matters before the FCC, Department of Justice, other agencies, and courts. Jenner's CIT practice is currently representing numerous clients in enforcement, regulatory, and

15

**JA 2653**

transactional matters before the FCC. Each matter requires the ability to interact with FCC lawyers and professional staff.

41.     Jenner's nationally recognized Native American Law practice, led by and primarily composed of enrolled members and descendants of federally recognized tribes, is consistently at the forefront of the most significant issues facing Indian Country. The team draws on its deep legal and government experience to provide unparalleled service to Native American tribes navigating the complex government-to-government relationship that Indian Country holds with the United States.

42.     Each of these regulatory practices—Energy, CIT, and Native American Law— requires near-constant communication with federal regulators about clients' most important matters. Jenner's electrical utility clients own or operate facilities used in transmission or wholesale of electric energy in interstate commerce, making them subject to FERC's exclusive jurisdiction. Jenner's CIT clients in telecommunications and media call on Jenner lawyers to secure regulatory approval for their transactions, to advocate for their interests in rulemaking and policymaking, to handle spectrum allocation, assignment, auctions, licensing, and relocation, and to defend against FCC enforcement actions. Jenner's Native American law clients value Jenner for its ability to advocate for tribal interests before a variety of federal regulators, including the Department of the Interior, FERC, and the FCC, among others. The Executive Order threatens clients' ability to select Jenner for all of these types of matters and many others as well.

43.     At present, by way of non-exhaustive example, Jenner has active civil and criminal matters on behalf of its clients involving at least the following federal agencies, which often require them either to interact with or appear before federal government officials:

- Air Force
- Army

16

**JA 2654**

- Commodity Futures Trading Commission

- Consumer Financial Protection Bureau

- Consumer Product Safety Commission

- Department of Agriculture

- Department of Commerce

- Department of Defense

- Department of Education

- Department of Energy

- Department of Health and Human Services

- Department of Homeland Security

- Department of the Interior

- Department of Justice

- Department of Labor

- Department of State

- Department of Treasury

- Drug Enforcement Administration

- Environmental Protection Agency

- Equal Employment Opportunity Commission

- Federal Aviation Administration

- Federal Bureau of Investigation

- Federal Bureau of Prisons

- Federal Communications Commission

- Federal Deposit Insurance Corporation

17

**JA 2655**

- Federal Energy Regulatory Commission

- Federal Railroad Administration

- Federal Trade Commission

- Internal Revenue Service

- John F. Kennedy Center for the Performing Arts

- Marine Corps

- Marshals Service

- National Aeronautics and Space Administration

- National Highway Traffic Safety Administration

- National Labor Relations Board

- Navy

- Office of Management and Budget

- Office of the U.S. Trade Representative

- Postal Service

- Securities and Exchange Commission

- Social Security Administration

- Special Operations Command

44. The firm's pro bono service frequently involves work in federal court, before federal agencies, or interacting with federal government officials. For example, our pro bono work for current clients frequently requires interaction with the Department of Veterans Affairs, U.S. Citizenship and Immigration Services, the Department of Justice, the Federal Bureau of Prisons, and the Internal Revenue Service, among many others.

## IV. Recent Relevant Litigation

**JA 2656**

45. Attorneys at the firm frequently file litigation on behalf of their clients challenging federal government action.

46. Just as it has done during previous Democratic and Republican administrations, Jenner has continued to file litigation challenging federal government action subsequent to the January 20, 2025 inauguration of the President.

47. Working with co-counsel, the Firm is representing a large number of associations and colleges and universities in litigation against the National Institutes of Health ("NIH") challenging guidance that attempted to impose a cap on payments for indirect costs necessary for research conducted pursuant to NIH grants. *See Ass'n of Am. Univs. v. Dep't of Health & Human Servs.*, No. 25-cv-10346 (D. Mass. filed Feb. 10, 2025). The lawsuit challenged this guidance as contrary to a statute expressly prohibiting this result; as contrary to the governing regulations; and as arbitrary and capricious pursuant to the Administrative Procedure Act. On March 5, 2025, the district court issued a preliminary injunction enjoining NIH from implementing the guidance.

48. On February 11, 2025, in response to a post on X about an injunction issued by a judge in the NIH litigation handled by Jenner, Special Government Employee Elon Musk posted on X: "Which law firms are pushing these anti-democratic cases to impede the will of the people?"[1]

49. Jenner also represents Climate United Fund in a suit against Citibank and the Environmental Protection Agency ("EPA"), seeking to enjoin the termination of its $7 billion grant as part of the Greenhouse Gas Reduction Fund. *Climate United Fund v. Citibank et al.*, No. 25-cv-00698 (D.D.C. filed Mar. 8, 2025). On March 18, 2025, the district court granted, in part, a temporary restraining order and held that the plaintiffs had shown a substantial likelihood of success on the merits of their Administrative Procedure Act and due process claims.

---

[1] Elon Musk (@elonmusk), X.COM (Feb. 11, 2025, 10:24 AM), https://perma.cc/EB6G-UUUP.

19

**JA 2657**

50.     The firm has represented several nonprofits and individual noncitizens challenging the Executive Order entitled *Guaranteeing the States Protection Against Invasion*, which invokes Section 212(f) of the Immigration and Nationality Act ("INA") and the President's constitutional powers to abrogate the protections from removal that Congress created by statute, including the asylum statute. Proclamation 10888, 90 Fed. Reg. 8333 (Jan. 20, 2025); *see Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-cv-306 (D.D.C. filed Feb. 3, 2025). In 1984, then-Assistant Attorney General for the Office of Legal Counsel, Theodore B. Olson, rejected the argument that Section 212(f) permitted the President to "eliminate the asylum rights of noncitizens" in the United States. 89 Fed. Reg. 81156, 81163 n.53 (Oct. 7, 2024). In 2018, during the President's first term, his Administration recognized that a proclamation under Section 212(f) did not affect asylum rights. 83 Fed. Reg. 55934, 55940 (Nov. 9, 2018). Jenner's representation of clients challenging this Executive Order is part a long tradition of advocacy for noncitizens' asylum rights. Representing several of the same clients, Jenner also challenged an Executive Order and rulemaking by the Biden-Harris Administration that sought to impose lesser restrictions on asylum and other forms of protection. *Las Americas Immigrant Advocacy Center v. U.S. Dep't of Homeland Security*, 1:24-cv-01702 (D.D.C.).

51.     Working with co-counsel, the Firm has represented two advocacy groups, six transgender people under nineteen, and four parents of minor Plaintiffs, who brought suit on February 4, 2025 against the President, the Secretary of the Department of Health and Human Services ("HHS"), HHS, and various HHS subagencies to enjoin enforcement of a January 28, 2025 Executive Order, "*Protecting Children from Chemical and Surgical Mutilation*." That Executive Order directs all federal agencies to "immediately" withhold federal funds from healthcare institutions and entities that provide gender-affirming care to people under age nineteen. Exec. Order No. 14,187, 90 Fed. Reg. 8771. *See PFLAG, Inc. v. Trump*, 8:25-cv-00337-BAH (D.

20

**JA 2658**

Md.). After expedited briefing, the district court issued a temporary restraining order restraining Defendants "from conditioning or withholding federal funding based on the fact that a healthcare entity or health professional provides gender affirming medical care to a patient under the age of nineteen." *See PFLAG*, 2025 WL 510050, at *1 (D. Md. Feb. 14, 2025) (opinion memorializing TRO). Plaintiffs then moved for a nationwide preliminary injunction on February 18, 2025, which the district court granted on March 4, 2025. *See PFLAG*, 2025 WL 685124, at *2 (D. Md. Mar. 4, 2025).

## V.     Former Jenner Partner Andrew Weissmann

52.     Andrew Weissmann served as a Partner at Jenner from March 27, 2006 to October 24, 2011 and again from June 7, 2020 to July 16, 2021. Mr. Weissmann worked in the Firm's investigations and financial services practices.

53.     Prior to coming to Jenner in 2006, Mr. Weissmann had significant experience as a federal prosecutor. He had successfully tried more than 25 cases, including many against notorious New York organized crime families. During the administration of President George W. Bush, he was appointed to serve as Deputy Director and then Director of the Department of Justice's Enron Task Force.

54.     After completing his first stint at Jenner, Mr. Weissmann served as the General Counsel at the Federal Bureau of Investigation, the chief of the Criminal Fraud Section of the U.S. Department of Justice, and as a member of the team led by Special Counsel Robert S. Mueller, III, who was appointed by Rod Rosenstein, the President's Deputy Attorney General, to investigate Russian interference in the 2016 election.

55.     Following his work with Special Counsel Mueller, Mr. Weissmann authored a non-fiction book, *Where Law Ends: Inside the Mueller Investigation*, published by Random House on

September 29, 2020. The book was highly critical of the President.

56.     Mr. Weissmann also became a legal analyst for MSNBC after his work for Special Counsel Mueller.

57.     As a result of Mr. Weissmann's participation in the Special Counsel team, the publication of his book, and his political commentary, Mr. Weissmann has become a frequent political target of the President.

58.     In a Truth Social Post in 2022, the President reposted a comment describing Mr. Weissmann as "the Scum of the Earth!!!"[2]

59.     On March 14, 2025, during a speech at the Department of Justice, the President accused Mr. Weissmann and others, including Jack Smith, of participating in a "coordinated … campaign" against him, referring to Mr. Weissmann and others as "horrible people" and "scum."  He also accused "crooked law firms," referring to "violent, vicious lawyers that we have all over."[3]

60.     Mr. Weissmann has likewise been a frequent target of the President's senior advisers. For example, on March 17, 2025, Stephen Miller called Mr. Weissmann "an absolute moron… a fool and a degenerate."

61.     On March 21, 2025, the President issued a memorandum revoking any active security clearances held by Mr. Weissmann and other individuals.

62.     Although the Order and Fact Sheet falsely imply that Mr. Weissmann is a "Jenner employee[]," Order § 5(a), Mr. Weissmann has not worked at and has not performed legal work

---

[2]  Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 5, 2022, 6:07 PM), https://truthsocial.com/@realDonaldTrump/posts/108948071458149558.

[3] *Id.*; *Speech: Donald Trump Addresses the Staff at the Department of Justice—March 14, 2025*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-department-of-justice-march-14-2025 (last visited Mar. 28, 2025)

22

**JA 2660**

for Jenner since his departure on July 16, 2021. All payments associated with his time at Jenner have been completed. The firm has no current financial obligations to Mr. Weissmann.

## VI.   Irreparable Harm Caused by the Order and its Enforcement

63.   Federal government agencies and personnel have already changed their approach to Jenner, causing irreparable harm to Jenner and its clients. Although we are constrained by the attorney-client privilege and Rule 1.6 of the Model Rules of Professional Conduct, we can report general facts and facts known to the federal government. For example, one client has informed us that the Department of Justice notified the client on March 26, 2025 that the client may not bring their counsel from Jenner & Block to a meeting with the Department of Justice that is scheduled for April 3. That client therefore will either need to attend the meeting without outside counsel or would need to retain new outside counsel before April 3.

64.   Because the Order could be interpreted to ban Jenner's access to federal courthouses and other buildings, some of our clients are concerned that we cannot represent them in federal court or enter federal buildings to engage with regulatory agencies or senior government officials. For example, within 24 hours of the issuance of the Order, several clients expressed concerns about our representation because they did not know whether we would be permitted to enter federal buildings and federal courthouses, negotiate with federal government officials, or participate in meetings with the Department of Justice. One of these clients has engaged us to represent them in a trial scheduled in June and expressed concern that we would be prohibited from appearing on their behalf. Jenner will continue incurring such harm if the Order's enforcement is not enjoined because Jenner attorneys have numerous upcoming appearances. Indeed, Jenner has around 540 active matters pending before federal courts, and numerous matters before agencies that require access to federal government buildings and officials. Continued refusals by federal officials to meet with Jenner lawyers, or denying Jenner lawyers access to

23

federal agencies and buildings, would harm Jenner's legal practice and its clients.

65.     Because of our flourishing ICD, regulatory, and Government Controversies practices, clients rely on us to engage with federal government agencies and officials, a previously routine activity of the firm's attorneys that is now at risk. Clients have expressed concern about whether the Order could impair the firm's ability to attend upcoming meetings with government agencies.

66.     The Order also required Jenner attorneys to expend significant time to discuss the impacts with our clients and develop a plan to work together to mitigate and address any impacts in the days and weeks ahead, an evolving situation requiring frequent communications that burdens both the firm and our clients.  Many of our partners with responsibility for client relationships have spent a significant amount of time since the Order was issued communicating with clients about the Order and its impacts and developing plans for the path ahead.

67.     The Order also includes provisions that would require federal agencies to require government contractors to disclose any relationship they have with Jenner, and to terminate government contracts for clients as to which Jenner has been hired to perform any service. Eight of Jenner's top 15 clients by revenue in 2024—and 23 of Jenner's top 50 clients by revenue in 2024—have contracts or subcontracts with the federal government, either directly or through an affiliate. Many of those companies are represented by the firm for legal matters completely unrelated to government-contracting matters. For many of the firm's clients, the fact that the firm gives them legal advice is not public information. If enforced, the Order would seek to require many of these clients to divulge confidential information regarding their legal representations to the federal government, with whom they may be adverse on the very same matter. In addition, the Order threatens the termination of those clients' contracts if Jenner has been hired to perform any service related to the contract.

24

**JA 2662**

68. Due to the restrictions that the Order imposes on Jenner, and the disclosure and termination provisions directed to the firm's federal contractor clients, numerous government contractor clients of the firm have expressed concerns to us about government-mandated disclosure of their relationship with us to federal agencies and the impact that may have on the contractor's own relationships with the federal government. In general, we would describe our government contractor clients as nervous about their relationship with us and closely monitoring the evolving situation.

69. The Order targets our clients with government contracts. In 2024, we estimate that more than 40% of the firm's revenue came from clients who are government contractors or subcontractors. We estimate the same percentage is true over the last five years. If we lost that business, or even a portion of it, it would be a serious threat to the firm's financial health.

70. The Order also threatens Jenner attorneys' right to practice their chosen profession. That threat is not only to revenue-generating practice, but also to the firm's pro bono practice, which frequently requires us to appear in federal court or before federal agencies in criminal, civil or administrative matters. Our pro bono work for current clients frequently requires interaction with the Department of Veterans Affairs, U.S. Citizenship and Immigration Services, the Department of Justice, the Federal Bureau of Prisons, and the Internal Revenue Service, among many others. Many of our pro bono clients are also government contractors and fear that a continued relationship with us could jeopardize their own organization. One day after the Order was issued, a non-profit organization that has been enthusiastic about the quality of our work terminated our engagement because of concerns that its own government contracts could be placed at risk.

71. The Order also interferes with Jenner's employer-employee relationships because the restrictions are broadly written to include Jenner employees.

25

**JA 2663**

## VII.    False and Disparaging Statements in the Order

72.    The Order has also harmed Jenner's reputation in the market for clients, lawyers, and staff through its false and disparaging characterization of the firm and its attorneys.

73.    The Order and Fact Sheet contain numerous false and inflammatory statements about Jenner, its clients, and its work. For example, the Order implies that Jenner has "earmark[ed] hundreds of millions of [its] clients' dollars" for pro bono work, but the Firm does not spend its clients' money on pro bono matters. Instead, it has committed its own resources and its own attorney time to assisting clients in a wide range of legal areas.

74.    The Order characterizes former partner Andrew Weissmann as a current employee of Jenner. *See* Order §§ 5(a), 5(b). But as discussed above, Mr. Weissmann has not worked at nor performed legal work for Jenner since 2021.

75.    The Order and Fact Sheet further distort Jenner's work on behalf of its clients. For example, the Order and Fact Sheet asserts that "Jenner engages in obvious partisan representations to achieve political ends," Order § 1, and "pursues partisan goals," *see* Fact Sheet. Rather, Jenner represents its clients, whatever their interests, and has challenged unlawful or unconstitutional governmental actions on behalf of its clients regardless of which major political party is in the White House. *See supra* ¶¶ 16-18.

76.    The Order and Fact Sheet baselessly claim that the firm "supports attacks against women and children based on a refusal to accept the biological reality of sex." Order § 1; *see also* Fact Sheet. This statement grossly misrepresents Jenner's long and proud history of protecting the rights of LGBTQ+ communities, from winning the landmark *Lawrence v. Texas* case more than 20 years ago to more recent litigation to protect transgender individuals. In 2023, Jenner filed a lawsuit challenging an Oklahoma law that bans gender-affirming medical care to transgender adolescents and threatens providers who violate the law with a felony conviction. And this year,

26

**JA 2664**

the firm helped obtain a preliminary injunction preventing the administration from conditioning or withholding federal funding based on the provision of gender-affirming medical care to a patient under the age of nineteen.

77. The Order and Fact Sheet also distort Jenner's advocacy for noncitizens' rights, falsely asserting that the firm "backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." Order § 1. This, too, baselessly distorts the firm's longstanding pro bono work to help those eager to contribute to our country. The firm has a long tradition of representing individuals seeking immigration relief, both in individual representations and impact litigation. We regularly partner with organizations such as Kids in Need of Defense and the National Immigrant Justice Center to protect and preserve American values, such as ensuring that visas are not awarded based on impermissible religious criteria, uncovering the abuses of solitary confinement in immigrant detention centers, and representing families torn apart by broken border policies, in addition to innumerable asylum cases for individuals fleeing human rights abuses abroad. As noted above, Jenner also currently represents clients in a challenge to the President's executive order invoking Section 212(f) of the INA to abrogate protections from removal that Congress created by statute; our clients' position in that litigation is consistent with the positions taken by the Reagan and first Trump administrations. *See supra* ¶ 50.

\* \* \*

I declare under penalty of perjury, on this 28th day of March, 2025, that the foregoing is true and correct, to the best of my knowledge, information and belief.

Thomas J. Perrelli

27

**JA 2665**

# EXHIBIT 34



← **Truth Details**
1694 replies

 **Donald J. Trump** ✓
@realDonaldTrump

Today, President Donald J. Trump and Skadden, Arps, Slate, Meagher & Flom LLP announce the following agreement regarding a series of actions to be taken by Skadden:

1. Skadden will provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration and beyond, to causes that the President and Skadden both support, in relation to the following areas: Assisting Veterans and other Public Servants, including members of the Military, Law Enforcement, First Responders, and Federal, State, and Local Government Officials; ensuring fairness in our Justice System; and combatting Antisemitism. Skadden will change its pro bono policy so that all pro bono moving forward will be done in the Firm name. A pro bono Committee will be constituted to ensure that pro bono matters are consistent with the objectives of the program, and that pro bono activities represent the full political spectrum.

2. The Skadden Foundation will commit to the mission of providing pro bono Legal Services to a wide variety of deserving organizations and individuals. Skadden is committed to funding no fewer than five Skadden Fellows each year dedicated to the following projects: Assisting Veterans; ensuring fairness in our Justice System; combatting Antisemitism, and other similar types of projects. Law Graduates that receive Skadden Fellowships will represent a wide range of political views, including conservative ideals.

3. Skadden affirms its commitment to merit-based hiring, promotion, and retention. Accordingly, the Firm will not engage in illegal DEI discrimination and preferences. Skadden will engage independent outside counsel to advise the Firm to ensure employment practices are fully compliant with Law, including, but not limited to, anti-discrimination Laws.

**JA 2667**



4. Skadden will not deny representation to clients, such as members of politically disenfranchised groups, who have not historically received legal representation from major National Law Firms, including in pro bono matters, and in support of non-profits, because of the personal political views of individual lawyers.

Statement From the White House: "Skadden, Arps, Slate, Meagher & Flom LLP approached President Trump and his Administration, and declared the Firm's strong commitment to ending the Weaponization of the Justice System and the Legal Profession. The President will never stop fighting to deliver on his promises of eradicating partisan Lawfare in America, and restoring Liberty & Justice for ALL."

Statement From Skadden Executive Partner, Jeremy London: "Skadden is pleased to have achieved a successful agreement with President Trump and his Administration. We engaged proactively with the President and his team in working together constructively to reach this agreement. The Firm looks forward to continuing our productive relationship with President Trump and his Admin. We firmly believe that this outcome is in the best interests of our clients, our people, and our Firm."

**7.96k** ReTruths  **33.4k** Likes                                    Mar 28, 2025, 1:57 PM

JA 2668

# EXHIBIT 35



# Major law firm strikes preemptive deal with White House

Skadden Arps, one of the largest law firms in the world, reached an agreement with Trump despite not being targeted by the White House like other firms.

President Donald Trump announced that his administration has reached a deal with an elite law firm during a swearing-in ceremony in the Oval Office at the White House on March 28, 2025, in Washington, D.C. | Andrew Harnik/Getty Images

By **DANIEL BARNES**
03/28/2025 02:47 PM EDT
Updated: 03/28/2025 04:33 PM EDT

   

**JA 2670**

The White House has reached a deal with one of the largest law firms in the world to provide the equivalent of $100 million in free legal work to causes supported by the administration, President Donald Trump announced Friday afternoon.

The law firm, Skadden, Arps, Slate, Meagher & Flom LLP, will also fund fellowships for law school graduates to work on causes in line with the administration's priorities. The fellows "will represent a wide range of political views, including conservative ideals," the president said in a statement.

Advertisement

AD

Skadden will also commit to "merit based hiring, promotion and retention," and will not deny representation to "politically disenfranchised groups," the president said during a swearing in event for Alina Habba, one of his personal attorneys and his pick to be the acting U.S. Attorney for New Jersey.

"This was essentially a settlement," Trump said of the deal.

The president has signed a number of executive orders in recent weeks targeting individual law firms for their prior associations with his political enemies. No such order had been signed targeting Skadden, however, the fifth-highest grossing law firm in the world according to Law.com, making this the first time a law firm has preemptively gone to the White House to negotiate with the administration.

**JA 2671**

Skadden's executive partner Jeremy London shared details of the negotiation in a firm-wide email sent Friday and obtained by POLITICO.

"Over the past few days, we learned that the Trump Administration intended to issue an executive order directed at Skadden," London wrote. "We believed it would focus on DEI initiatives and our pro bono activities."

"With that in mind, we chose to engage proactively and constructively with the Administration to align on a productive path forward without the issuance of an executive order," he wrote. "We entered into the agreement the President announced today because, when faced with the alternatives, it became clear that it was the best path to protect our clients, our people and our Firm."

"Not everyone will agree with the decision we made today, and I have great respect for the different views that make us stronger as a Firm," he wrote. "But I firmly believe that an agreement centered around our pro bono work and complying with the law was an acceptable outcome to ensure Skadden will continue to thrive long into the future. This agreement does not change who we are."

Advertisement

The deal echoes an earlier agreement between the administration and the law firm Paul, Weiss, which agreed to donate $40 million in pro bono work towards causes supported by the administration. Paul, Weiss similarly committed to reviewing their hiring practices and ending use of diversity, equity and inclusion policies.

That settlement was reached after the president signed an executive order punishing Paul, Weiss for the work of a former partner by revoking security clearances for certain attorneys and restricting the firm's ability to represent clients that interface with the government.

"We appreciate Skadden's coming to the table," Trump said Friday. "As you know other law firms have likewise settled the case. It's a shame, you know,

JA 2672

what's gone on is a shame but we very much appreciate their coming to the table."

Though Skadden had not yet been targeted by an executive order, it recently drew negative attention from Elon Musk, who posted about the firm on X.

"Skadden, this needs to stop now," Musk posted in response to a post from 2020 election denier Dinesh D'Souza who said the firm was engaged in "systematic lawfare" against his film 2000 Mules.

Earlier Friday, major law firms Jenner & Block and WilmerHale filed two lawsuits challenging Trump's executive orders cutting those firms off from government contracts, suspending security clearances held by lawyers at the firm and restricting firm employees from entering government buildings.

A federal judge previously ruled that a similar executive order targeting the firm Perkins Coie is likely unconstitutional.

FILED UNDER: WHITE HOUSE, DONALD TRUMP, LAW, LEGAL

## West Wing Playbook: Remaking Government

Your guide to Donald Trump's unprecedented overhaul of the federal government.

EMAIL

Your Email

EMPLOYER

Employer

JOB TITLE

Job Title

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SIGN UP

SPONSORED CONTENT

JA 2673







**Donald Trump has begun a…**

But the new rules do not suit...

The Economist

**The Worst Thing You…**

Use this LLLT device daily for 1...

Okita Nail Fungus…

**The Super Rich Read A…**

Thousands swear by this Apple-...

The Super Rich R…

**Why you should neve…**

Pleasure cruises, golf and tracing...

The Economist

**New Retirement…**

TopSearchesNow …

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

JA 2674

© 2025 POLITICO LLC

# EXHIBIT 36



← **Truth Details**
614 replies

 **Donald J. Trump** ✅
@realDonaldTrump

Today, President Donald J. Trump and Willkie Farr & Gallagher LLP ("Willkie") announce the following agreement regarding a series of actions to be taken by Willkie:

1. Willkie will provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration, and beyond, to causes that President Trump and Willkie both support, in relation to the following areas: Assisting Veterans and other Public Servants including, among others, members of the Military, Gold Star families, Law Enforcement, and First Responders; Ensuring fairness in our Justice System; and Combatting Antisemitism. Willkie's pro bono Committee will ensure that new pro bono matters are consistent with these objectives, and that pro bono activities represent the full political spectrum, including Conservative ideals.

2. Willkie affirms its commitment to Merit-Based Hiring, Promotion, and Retention. Accordingly, the Firm will not engage in illegal DEI discrimination and preferences. Willkie affirms that it is Willkie's policy to give Fair and Equal consideration to Job Candidates, irrespective of their political beliefs, including Candidates who have served in the Trump Administration, and any other Republican or Democrat Administration. Willkie will engage independent outside counsel to advise the Firm in confirming that employment practices are fully compliant with Law, including, but not limited to, anti-discrimination Laws.

3. Willkie affirms that it will not deny representation to clients, such as members of politically disenfranchised groups and Government Officials, employees, and advisors, who have not historically received Legal representation from major National Law Firms, including in pro bono matters and in support of non-profits, because of the personal political views of individual lawyers.

**JA 2677**

Statement from the White House: "Willkie Farr & Gallagher LLP proactively reached out to President Trump and his Administration, offering their decisive commitment to ending the Weaponization of the Justice System and the Legal Profession. The President is delivering on his promises of eradicating Partisan Lawfare in America, and restoring Liberty and Justice FOR ALL."

Statement from Thomas M. Cerabino, Chairman of Willkie Farr & Gallagher LLP: "We reached an agreement with President Trump and his Administration on matters of great importance to our Firm. The substance of that agreement is consistent with our Firm's views on access to Legal representation by clients, including pro bono clients, our commitment to complying with the Law as it relates to our employment practices, and our history of working with clients across a wide spectrum of political viewpoints. The Firm looks forward to having a constructive relationship with the Trump Administration, and remains committed to serving the needs of our clients, our employees, and the communities of which we are a part."

**4.24k** ReTruths   **18.3k** Likes                                    Apr 01, 2025, 4:47 PM

JA 2678

# EXHIBIT 37

# THE AMERICAN LAWYER



Willkie Farr & Gallagher offices in Washington, D.C. Photo: Diego M. Radzinschi/ALM

NEWS

# Willkie Believes It's the Next Target of Trump Executive Order

The New York law firm has "started to make preparations" and take necessary steps, said one of the sources, declining to elaborate on those steps.

April 01, 2025 at 09:15 AM

🕐 3 minute read

Government

 By Patrick Smith

 By Abigail Adcox

---

*After this article published, President Trump on Tuesday afternoon announced a deal with Willkie, allowing the firm to avoid an executive order. Read about* <u>*the deal here.*</u>

As law firms brace for more executive orders targeting them, another New York law firm, Willkie, Farr & Gallagher, is preparing to get hit.

Sources close to the firm say Willkie believes it is one of the next likely targets of the Trump administration's executive order blitz on Big Law. A firm representative did not reply to multiple requests for comment regarding the matter.

The New York firm has "started to make preparations" and take necessary steps, said one of the sources, declining to elaborate on those steps.

The firm hired former Second Gentleman Douglas Emhoff in January. Emhoff's wife, former Vice President Kamala Harris, lost the last U.S. presidential election to President Donald Trump.

The firm also employs two former investigators for the congressional committee that investigated Trump's role in the Jan. 6, 2021, attack on the U.S. Capitol. Tim Heaphy, who served as the chief investigative

JA 2681

counsel for the House select committee, and Soumya Dayananda, who was a senior investigative counsel for the committee, both joined the firm as partners in 2023.

Willkie also represented two former Georgia poll workers, Ruby Freeman and Wandrea "Shaye" Moss, pro bono in a lawsuit accusing former New York City Mayor Rudy Giuliani of defaming by falsely stating that they had engaged in fraud while counting ballots at State Farm Arena in Atlanta during the 2020 election.

Giuliani reached a settlement agreement with Freeman and Moss earlier this year, owing almost $150 million to the two after he failed to appear in federal court in New York in January.

Several webpages detailing the firm's work on the defamation case appeared to be down from the firm's website on Tuesday.

So far, the legal industry has diverged on its approach to Trump's executive orders.

Two other New York law firms, Paul, Weiss, Rifkind, Wharton & Garrison and Skadden, Arps, Slate, Meagher & Flom, made a deal with Trump to stop executive orders, with Skadden appearing to preempt one. Both deals included the promise of millions of dollars in pro bono efforts to support causes important to the Trump administration, as well as capitulations that the firms will not engage in DEI "discrimination and preferences" and will hire an independent outside counsel to examine its employment practices.

Sources previously indicated to Law.com that other firms were in talks with the administration as well in hopes of avoiding executive orders targeting their businesses.

Meanwhile, three other law firms are suing the administration to block Trump's executive orders against them, including Perkins Coie; Jenner & Block; and Wilmer Cutler Pickering Hale and Dorr. Each of the three has obtained a temporary restraining order to block parts of Trump's orders.

JA 2682

These firms have been scrutinized and punished by Trump for former matters involving Democratic politics or civil rights, investigations of Trump himself, DEI, and "racial discrimination" on the part of firms that favor minority groups.

---

NOT FOR REPRINT

© 2025 ALM Global, LLC, All Rights Reserved. Request academic re-use from www.copyright.com. All other uses, submit a request to asset-and-logo-licensing@alm.com. For more information visit Asset & Logo Licensing.

## You Might Like



# EXHIBIT 38

# THE AMERICAN LAWYER



Willkie Farr & Gallagher offices in Washington, D.C. March 30, 2017.

NEWS

# Willkie Firm Leadership Addresses the Firm Following Trump Agreement

JA 2685

This communication, obtained by Law.com, was transmitted from Willkie's executive committee Tuesday afternoon shortly after the firm's deal with the Trump administration.

April 01, 2025 at 04:36 PM

🕐 3 minute read

Government

**By ALM Staff**

The below communication, obtained by law.com, was transmitted from Willkie Farr & Gallagher's executive committee Tuesday afternoon shortly after the firm's <u>agreement with the Trump administration</u>, to avoid an executive action against the firm, was announced. President Donald Trump announced the deal Tuesday, with the firm "proactively reaching out" to the administration in a manner similar to Skadden to avoid an executive order.

*Dear All Colleagues,*

*We learned that the President intended to issue an Executive Order targeting Willkie similar to the orders issued against multiple firms in the past weeks, threatening to imperil our clients' rights and those of our Firm.*

*We were invited to contact the Administration on Sunday, and they outlined a proposed alternative to receiving an Executive Order. After determining that the three principles on which an agreement would be based are consistent with our Firm's longstanding practices, we engaged in discussions to see if an acceptable resolution could be reached.*

*While the agreement ultimately reached with the Administration focuses on activities that are already in place at our Firm, similar agreements at peer firms have been publicly criticized, and there is heightened*

*conversation across our industry as law firms grapple with the consequences of potential Executive Orders and the impact for their clients, their employees and their businesses. In making this difficult decision, we concluded, after due consideration of the implications of each possible course of action, that accepting the Administration's final proposal was the path that best serves our clients' needs and protects the Firm's various stakeholders, avoiding potentially grave consequences.*

*As mentioned above, the agreement has three principles. First, we will continue to follow the law related to our employment practices. Second, we will continue to represent clients on both sides of the aisle and with a wide range of ideological views. Third, we will continue to represent underrepresented individuals and groups that are not only important to the Administration, but to Willkie—this includes veterans, Gold Star families and victims of religious discrimination. These are all longstanding practices at Willkie, so the agreement does not require us to change course.*

*We know this news is not welcomed by some of you and you would have urged a different course of action. Needless to say, this was an incredibly difficult decision for Firm leadership.*

*If you receive questions from clients, please direct them to the appropriate relationship partner. Should you receive an inquiry from the media or another third party, please do not respond and send the information to* [the firm's chief marketing officer].

*Thank you for your continued hard work and dedication to the Firm and our clients.*

*The Executive Committee*

NOT FOR REPRINT

© 2025 ALM Global, LLC, All Rights Reserved. Request academic re-use from www.copyright.com. All other uses, submit a request to asset-and-logo-licensing@alm.com.

# EXHIBIT 39

← **Truth Details**
710 replies



**Donald J. Trump** ✔
@realDonaldTrump

Today, President Donald J. Trump and Milbank LLP ("Milbank") announce the following commitments regarding a series of actions to be taken by Milbank:

1. Milbank will perform a total of at least $100 Million Dollars in pro bono legal services during the Trump Administration, and beyond, on initiatives supported by both the President and Milbank, such as: Assisting Veterans and other Public Servants, including members of the Military, Law Enforcement, and First Responders; Ensuring fairness in our Justice System; and Combatting Antisemitism. In furtherance of, and as part of, these activities, Milbank will continue to grow its work with the Milbank Exoneration and Resentencing Review Unit at the Perlmutter Center for Legal Justice at Cardozo Law School.

2. Our pro bono Committee will include Partners at the Firm with diverse political ideologies to ensure that pro bono matters are consistent with the objectives of the Firm, and that our pro bono practices represent the full political spectrum, including Conservative ideals.

3. Milbank will not deny representation to clients, such as members of politically disenfranchised groups and Government Officials, employees, and advisors, who have not historically received Legal representation from major National Law Firms, including in pro bono matters, and in support of non-profits, because of the personal political views of individual lawyers. Milbank shall not deny representation to any clients on the basis of the political affiliation of the prospective client, or because of the opposition of any Government Official.

4. Milbank acknowledges and affirms its commitment to Merit-Based Hiring, Promotion, and Retention. Accordingly, the Firm will not engage in illegal DEI discrimination and preferences. Milbank will continue to give Fair and Equal consideration to Job Candidates who have served in both Republican and Democrat Administrations, including the Trump Administration. Milbank will continue to work with independent outside counsel to advise the Firm to ensure employment practices are fully compliant with Law, including, but not limited to, anti-discrimination laws.

Statement from the White House: "Milbank LLP approached President Donald J. Trump and his Administration, stating their resolve to help end the Weaponization of the Justice System and the Legal Profession. The President continues to build an unrivaled network of Lawyers, who will put a stop to Partisan Lawfare in America, and restore Liberty and Justice FOR ALL."

Statement from Scott A. Edelman, Chairman of Milbank LLP: "After a constructive dialogue with President Trump's Administration, Milbank is pleased that we were so quickly able to find common ground. Our agreement is consistent with Milbank's core values. We are pleased to affirm a commitment to continue to engage in significant pro bono services in areas that are mutually supported by Milbank and the President. Milbank looks forward to continuing its working relationship with President Trump and his Administration."

**4.18k** ReTruths    **16.6k** Likes                    Apr 02, 2025, 2:05 PM

**JA 2689**

# EXHIBIT 40

# THE AMERICAN LAWYER



Milbank

NEWS

# Milbank 'Comfortable With All These Provisions,' Chairman Says in Message to Firm

JA 2691

Leadership "concluded that it was in the Firm's best interest to agree with the Administration's suggestion and enter into our own Skadden-type agreement," chairman Scott Edelman wrote.

April 02, 2025 at 01:56 PM

🕐 7 minute read

Government

**By ALM Staff**

---

The below communication from Milbank chairman Scott Edelman, obtained by Law.com, was distributed to firm employees Wednesday after the firm's <u>agreement with the Trump administration</u>, to avoid an executive action against the firm, was announced.

*To the Milbank Community:*

*As many of you know, in recent weeks, the President has raised a number of issues about the practices of big law firms. In some cases, the President has issued executive orders against particular firms.*

*And many of you surely read that, on March 17, 2025, the Acting Chair of the EEOC sent letters requesting information about DEI in employment practices to twenty of the country's largest law firms, including Milbank.*

*Late last week, we were contacted by representatives of the Trump Administration with questions and concerns about our approach to pro bono and diversity initiatives. The Trump Administration suggested to us that we enter into an agreement similar to one recently agreed to by Skadden. Having reviewed the Skadden agreement, we concluded that it was in the Firm's best interest to agree with the Administration's suggestion and enter into our own Skadden-type agreement. We did so for the following reasons:*

JA 2692

*First, our review of Skadden's agreement convinced us that the terms agreed to by Skadden were not unreasonable. In reviewing the Skadden agreement, it became apparent that our present practices are consistent with the agreements that the Administration had required of Skadden. We therefore concluded that an agreement would not entail any significant changes to our current practices, and the new commitments are things that we are happy to do anyway.*

*Second, as a large law firm that does a majority of its work on transactional matters, we are dependent on our ability to navigate client issues in all parts of the Executive Branch. We believed that it was in the best interests of the Firm and its clients to resolve the Trump Administration's concerns in a way that would foster our working relationship and avoid what could have been an unnecessary confrontation.*

*Third, the only commitments that we have made to the Government are those that we are happy to make. We are extremely comfortable providing the requested levels of pro bono activities to clients facing challenges that fall within the wide range of the agreed-upon initiatives.*

*The only commitment that I consider to be "new" is something that we were actively considering anyway, and that is to agree that we would ensure that we have lawyers with diverse political ideologies on our existing pro bono committee to ensure that pro bono matters are both consistent with the objectives of the Firm and represent the full political spectrum. Again, we think this is the right thing to do.*

*Milbank is a Firm that has always attracted lawyers with a diversity of viewpoints. Two of our partners served in the Executive Branch during the first Trump Administration. We believe that those differences of views and opinions are a strength that makes Milbank a better and more successful institution. This change to our committee will formalize our consideration of those different viewpoints in making decisions about pro bono.*

*With that background, we made the decision to provide the Administration with the following commitments that the President announced today:*

*1. Milbank will perform a total of at least $100 million in pro bono legal services during the Trump Administration and beyond on initiatives supported by both the President and Milbank, such as: assisting veterans and other public servants, including members of the military, law enforcement, and first responders; ensuring fairness in our justice system; and combatting antisemitism. In furtherance and as part of these activities, Milbank will continue to grow its work with the Milbank Exoneration and Resentencing Review Unit at the Perlmutter Center for Legal Justice at Cardozo Law School.*

*2. Our pro bono committee will include partners at the Firm with diverse political ideologies to ensure that pro bono matters are consistent with the objectives of the Firm, and that our pro bono practices represent the full political spectrum, including conservative ideals.*

*3. Milbank will not deny representation to clients, such as members of politically disenfranchised groups and government officials, employees, and advisors, who have not historically received legal representation from major national law firms, including in pro bono matters, and in support of non-profits, because of the personal political views of individual lawyers. Milbank shall not deny representation to any clients on the basis of the political affiliation of the prospective client or because of the opposition of any government official.*

*4. Milbank acknowledges and affirms its commitment to merit-based hiring, promotion, and retention. Accordingly, the Firm will not engage in illegal DEI discrimination and preferences. Milbank will continue to give fair and equal consideration to job candidates who have served in both Republican and Democrat Administrations, including the Trump Administration. Milbank will continue to work with independent outside*

**JA 2694**

*counsel to advise the Firm to ensure employment practices are fully compliant with law, including, but not limited to, anti-discrimination laws. We are comfortable with all of these provisions. By reaffirming our commitments on a number of these issues, we set a path for the Firm to continue its working relationship with the Executive Branch while at the same time zealously representing our clients.*

*Our pro bono activities have always represented a broad spectrum of clients and causes.*

*Of note, in 2024, we proudly announced our new partnership with the Perlmutter Center for Legal Justice at Cardozo Law, championed and sponsored by Laurie and Ike Perlmutter, to combat historical wrongs in the US criminal justice system with a focus on wrongful conviction, excessive sentencing and clemency. We established the Milbank Exoneration and Resentencing Review Unit at the Perlmutter Center, which has enabled the Center to grow its staff and expand its ability to review the high volume of requests it receives. As part of this commitment, we also pledged to provide pro bono legal services as a close partner with the Perlmutter Center at every stage of its work, from screening clients and writing case recommendation memos to litigating cases. The agreement we entered into with the Administration specifies that our work at the Perlmutter Center is one example of work that we are committing to do as part of our overall pro bono commitment.*

*There is nothing in our agreement that gives the Administration the right to dictate or approve the matters we take on. Nor have we restricted our pro bono activities or limited positions we could take on behalf of our clients. And, of course, no Milbank lawyer will be required to work on any pro bono matter that they do not support. That goes for more conservative lawyers and liberal causes, just as it goes for more liberal lawyers and conservative causes.*

*We believe that our agreement is very much in Milbank's interest. The Administration's expressed concerns about big law firms, and in some*

JA 2695

*cases its entry of Executive Orders against particular firms, have created uncertainty for law firms like ours. With this agreement, we believe we have gone a long way to putting these issues behind us. But we have done so in a way that allows us to continue to focus on the Firm's values and missions, including with respect to pro bono and our hope to foster an inclusive, non-discriminatory community where all of our members have an equal opportunity to succeed. Having now reached an agreement with the Administration, we can continue to do what we do best—focus on providing the best possible advice, counseling and service to our clients.*

*As I often end my talks to you, I want to end by expressing my gratitude to all of you. Milbank continues to accomplish so much as a Firm and for its clients. All of those accomplishments are a reflection of you, our people. I want to thank all of you for everything that you do for the Firm. And I also want to thank you for what I am sure will be our shared commitment to fostering an environment that continues to allow and encourage inclusion of diverse viewpoints among all the members of our community.*

*Respectfully,*

*Scott*

**NOT FOR REPRINT**

© 2025 ALM Global, LLC, All Rights Reserved. Request academic re-use from www.copyright.com. All other uses, submit a request to asset-and-logo-licensing@alm.com. For more information visit Asset & Logo Licensing.

## You Might Like

# EXHIBIT 41

*Democracy Dies in Darkness*

# Law firms refuse to represent Trump opponents in the wake of his attacks

The president issued a new order Tuesday sanctioning yet another law firm, Jenner & Block. The result overall has been called an extraordinary threat to the constitutional rights of due process and legal representation, as well as a far weaker effort to challenge Trump's actions in court than during his first term.

Updated March 25, 2025

 By [Michael Birnbaum](#)

President Donald Trump's crackdown on lawyers is having a chilling effect on his opponents' ability to defend themselves or challenge his actions in court, according to people who say they are struggling to find legal representation as a result of his challenges.

Biden-era officials said they're having trouble finding lawyers willing to defend them. The volunteers and small nonprofits forming the ground troops of the legal resistance to Trump administration actions say that the well-resourced law firms that once would have backed them are now steering clear. The result is an extraordinary threat to the fundamental constitutional rights of due process and legal representation, they said — and a far weaker effort to challenge Trump's actions in court than during his first term.

Legal scholars say no previous U.S. administration has taken such concerted action against the legal establishment, with Trump's predecessors in both parties typically respecting the constitutionally enshrined tenet that everyone deserves effective representation in court and that lawyers cannot be targeted simply for the cases and clients they take on.

Trump has used executive orders to target powerful law firms that have challenged him. The latest came Tuesday against Jenner & Block, which employed attorney Andrew Weissmann after he worked as a prosecutor in Robert S. Mueller III's special counsel investigation of Trump in his first term.

The firm "has participated in the weaponization of the legal system against American principles and values. And we believe that the measures in this executive order will help correct that," White House staff secretary Will Scharf said as he handed Trump the order to sign, calling out Weissmann by name.

The orders have sought to strip law firms of their business by banning their lawyers from government buildings and barring companies that have federal contracts from employing the firms.

In a statement, Jenner & Block noted the similarity to an order that "has already been declared unconstitutional by a federal court" and that they "will pursue all appropriate remedies."

Trump on Friday ordered Attorney General Pam Bondi to [expand the campaign](#) beyond individual law firms by sanctioning lawyers who "engage in frivolous, unreasonable, and vexatious litigation" against his administration.

Legal scholars say there is little precedent in modern U.S. history for Trump's actions. But the president is following a playbook from other countries whose leaders have sought to undermine democratic systems and the rule of law, including Russia, Turkey and Hungary. Leaders in those countries have similarly attacked lawyers with the effect of hollowing out a pillar of justice systems to expand their power without violating existing laws. They have successfully used the strategy to blast away their political opposition and any effort to counter their actions through courts.

"The law firms have to behave themselves," Trump said at a Cabinet meeting Monday. "They behave very badly, very wrongly."

Trump's targets say they are feeling the heat.

"It's scary," said a former official in the administration of Joe Biden who has been pulled into Trump-era litigation and needed a lawyer as a result. The former official had lined up a pro bono lawyer from a major law firm that, the day after an executive order this month against the heavyweight law firm Perkins Coie, said that it had discovered a conflict of interest and dropped the person as a client.

Five other firms said they had conflicts, the former official said, including one where "the partner called me livid, furious, saying that he's not sure how much longer he's going to stay there," the former official said, "because the leadership didn't want to take the risk."

The person spoke on the condition of anonymity to avoid further difficulties obtaining a lawyer.

"I don't know how many people are going to end up having to pay a significant amount of money out of pocket to defend themselves for faithfully and ethically executing their public service jobs," the person said. "It's really a wild situation to be in."

The sweeping campaign is targeting the livelihoods of the people best qualified to contest the legality of Trump's agenda. Lawyers must now contend with the possibility they could face lawsuits, fines and other punishment aimed at them and even their other clients should they contest Trump administration efforts in court.

"You need the legitimacy of law on your side at some level," said Scott Cummings, a law professor at the UCLA School of Law who has studied challenges to the legal establishment. "This is the autocratic legal idea of claiming a democratic mandate to attack the rule of law by using law to really erode institutional pillars that are supposed to check executive power."

Trump's actions toward lawyers, Cummings said, have been "about disabling effective representation of anyone that Trump doesn't like, and that is the beginning of the end of the adversarial system," in which both sides of a legal case have equal access to present their views in front of a judge.

The first White House action against lawyers came late last month, when Trump stripped the security clearances of lawyers at a prominent firm, Covington & Burling, who represented former special counsel Jack Smith after he investigated the president's role in the Jan. 6, 2021, attack on the U.S. Capitol.

The following week, he took far harsher action against Perkins Coie, a law firm that had ties to a dossier of opposition research against Trump that circulated during the 2016 campaign. The executive order barred the firm's lawyers from federal buildings and directed the federal government to halt any financial relationship with the firm and its clients. That effectively forced Perkins Coie's clients to pick between their lawyers or any federal government business they might have.

The move could cost Perkins 25 percent of its revenue, the firm said in a court filing contesting the executive order. It said that several clients have already departed the firm, others have said they are thinking about it, and federal agencies were excluding it from key meetings with its clients.

**JA 2699**

"It sends little chills down my spine," U.S. District Judge Beryl A. Howell said in court as she granted Perkins Coie a temporary restraining order this month and suggested the executive order might have been unconstitutional. Another major law firm, Williams & Connolly, one of the most skillful and aggressive federal litigators, agreed to take the Perkins Coie case.

Howell said she had "enormous respect for them taking this case when not every law firm would."

In a filing last week, the Justice Department sought to remove Howell from the case, accusing her and her court of being "insufficiently impartial."

And even after Howell's ruling, Trump's campaign against lawyers broadened when he issued a nearly identical executive order targeting Paul Weiss, a law firm that employed lawyer Mark Pomerantz for two decades before he joined the Manhattan district attorney's office to help prosecute Trump for hush money payments to a porn star.

Rather than fighting, Paul Weiss cut a deal with the president, even though it had a long track record of aggressive legal action against Trump's agenda during his first term. Paul Weiss Chairman Brad Karp met for three hours with Trump at the White House, then agreed to devote $40 million worth of pro bono work "to support the administration's initiatives," Trump said in a post on Truth Social, including work for veterans and combating antisemitism.

The president rescinded the order against the firm Thursday.

Paul Weiss has faced significant blowback for its decision to back down, including from some lawyers who said that its settlement emboldened Trump to proceed Friday with the directive for Bondi to pursue the far vaster campaign against all lawyers who might challenge him in federal court.

"Paul Weiss's deal emboldened him to ratchet up his attack on one of the strongest checks on his power: lawyers and the rule of law," Perkins Coie partner David Perez wrote on LinkedIn.

The chilling effect has been quick. Some nonprofits say that major law firms that in Trump's first term would have been quick to assist them with pro bono work now say that they can't risk the cost if Trump goes after them as a result. Many of those same groups are worried that the administration will soon go after their nonprofit tax status — and that they won't be able to find high-powered lawyers to contest it.

Although not every lawyer is likely to be cowed by Trump's actions, the major corporate law firms that the president has targeted have a core role in the U.S. legal system. Complex litigation can require vast resources: experienced lawyers versed in the arcana of case law, platoons of paralegals doing research across thousands of pages of evidence, and the stamina to go toe-to-toe with the unparalleled legal resources of the federal government.

Big law firms, best known for deep-pocketed corporate clients, often lend their assistance free to small nonprofits shepherding public interest cases through the courts. They have also been willing, historically, to take on clients who are facing prosecution that they charge is politically motivated. Much of the litigation against Trump's actions in the first term was driven by the big law firms that he is now targeting.

"If somebody's been deported to Guantánamo, it used to be law firms would support us and work on it," said the director of one nonprofit organization that works on different legal challenges to Trump's agenda. "And now it's a slower process of getting those approvals, versus just doing what would be done before, which is, 'This is wrong, and we're going to represent it.'"

That person and others spoke on the condition of anonymity for fear of retaliation from the administration.

**JA 2700**

Trump's campaign against the law firms could deprive his opponents of top legal talent, weakening their ability to push back on him, analysts say. And individuals and groups that are taking risks by working against the administration's agenda may also be deeply vulnerable, forcing them to make difficult choices about when to take a stand against him and when to stay silent.

"We're telling [small nongovernmental organizations] with three people on the border to stand strong, and they are standing strong, and then these law firms are folding," said one lawyer at a nonprofit who works on immigration cases.

Trump on Friday said in a memorandum that lawyers aren't supposed to file lawsuits or engage in court action unless there is "a basis in law" that is not "frivolous," suggesting that he and Bondi, not courts, would be in charge of determining what that is.

"Far too many attorneys and law firms have long ignored these requirements when litigating against the Federal Government or in pursuing baseless partisan attacks," Trump said. "To address these concerns, I hereby direct the Attorney General to seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive departments and agencies of the United States."

Trump's allies have continued to challenge law firms by name: "Skadden, this needs to stop now," Elon Musk posted over the weekend, taking aim at the law firm Skadden, Arps in response to right-wing commentator Dinesh D'Souza's complaint that lawyers with the firm had worked pro bono to target him.

Skadden lawyers worked pro bono on behalf of plaintiffs who said D'Souza defamed them in a documentary that falsely accused them of ballot fraud in the 2020 election. D'Souza has previously admitted that the movie was "flawed" and apologized to one of the plaintiffs.

Legal experts said Trump's actions amounted to a broad-based assault on the profession.

"This is the livelihood of these lawyers, and the Trump administration is basically saying we're going to dictate the terms under which you are going to be able to practice your profession," said Claire Finkelstein, a law professor and the director of the Center for Ethics and the Rule of Law at the University of Pennsylvania.

*Beth Reinhard contributed to this report.*

**CORRECTION**

An earlier version of this story incorrectly described the law firm Covington & Burling's relationship with former special counsel Jack Smith. The firm represented Smith in the wake of his investigations of Donald Trump. The article has been corrected.

**What readers are saying**

The comments express deep concern over Donald Trump's actions against law firms, viewing them as a significant threat to the rule of law and democracy. Many commenters liken Trump's tactics to those of authoritarian regimes, suggesting that his intimidation of legal professionals... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT 42

# Law firms are scared to speak out amid Trump's attacks on their livelihood

By <u>Katelyn Polantz</u>, CNN

🕐 6 minute read · Published 5:00 AM EDT, Thu March 27, 2025

 Politics     Subscribe     **Sign in**



President Donald Trump looks on as he holds a pen in the Oval Office at the White House in Washington, DC on February 4. Elizabeth Frantz/Reuters

**(CNN)** — The fear and loathing among lawyers in Washington, DC, has never been greater.

After a series of White House executive orders threatening their business and hiring practices, several powerful Washington law firms face a defining choice: push back publicly in defense of their industry or quietly hope to avoid President Donald Trump's wrath.

Many firms are afraid that if they are targeted by Trump, it could devastate their business if both clients and partners flee, reconfiguring <u>the centers of power</u> in Washington's most influential private industry.

 **RELATED ARTICLE**
Trump's assault on elites encompasses almost every aspect of American life

JA 2703



"We could see a shakeup like we've never seen before," Ivan Adler, a headhunter for lobbyists who regularly works with Washington's law firms. "This is the talk of the town. Firms are just waiting for the other shoe to drop."

Interviews with nearly a dozen lawyers and legal industry professionals shed light on the quiet fear gripping many law firms with decades of history doing business in Washington.

A number of major firms are strategizing behind the scenes on how to react without attracting attention in wider political conversations, according to several people in Washington's legal community. Firm leaders, sources tell CNN, want to quell fears among their lawyers, especially younger associates who may be more likely to want the firms to take a stand politically against Trump.

So far, Trump's executive orders have targeted four large law firms – Perkins Coie; Jenner & Block; Covington & Burling; and Paul, Weiss, Wharton, Rifkin & Garrison. Among other things, lawyers at those firms have had their national security clearances suspended – a core piece of some legal defense work.

Several lawyers who spoke to CNN expressed disappointment with the general lack of response from the legal industry and in Paul Weiss' situation, the capitulation to Trump's targeting with the firm leader's choice to cut a deal.

Trump suggested Wednesday that universities and law firms are "bending" to his administration's will as he's targeted top legal firms that have represented his perceived political enemies.

"You see what we're doing with the colleges, and they're all bending and saying, 'Sir, thank you very much. We appreciate it,'" Trump said at a White House event marking Women's History Month. "Nobody can believe it, including law firms that have been so horrible, law firms that, nobody would believe this, just saying, 'Where do I sign? Where do I sign?' ... And there's more coming, but we really are in the 'Golden age of America.'"

Rather than fight an executive order, the New York dealmaking powerhouse law firm Paul Weiss agreed to provide $40 million in legal work to causes backed by the White House, including veterans' assistance and countering antisemitism, according to an email chairman Brad Karp sent firmwide on Sunday that was obtained by CNN.

JA 2704

Several lawyers in Washington privately griped about Karp backing down from a fight against Trump. Several dozen alumni of Paul Weiss this week also published an open letter "to protest the firm's recent decision to surrender to the Trump administration," the letter said.

But some legal industry insiders weren't surprised nor were they outraged by Paul Weiss' move.

It's not unusual for lawyers to "look at all of your options," Cari Brunelle, a legal industry consultant, told CNN. "Sometimes you choose to litigate, and sometimes you choose to settle. It's what you do for your clients every day."

**Anderson Cooper on 'chilling message' Trump is sending to law firms**
03:09

For instance, an amicus brief being drafted in support of Perkins Coie has gotten few signatures from leaders at other firms, several people familiar with it say.

The White House is drafting more executive orders that would target more firms, according to two people familiar with what is in the works.

At the same time, the federal Equal Employment Opportunity Commission has sent letters to another handful of law firms announcing a "review" of their diversity, equity and inclusion practices. Retaliation for DEI initiatives has been part of the White House executive orders against law firms, making those firms contacted by the EEOC especially concerned.

If law firms don't stand together, the president would be able to "wipe out any potential legal opposition," Elliot Peters of the West Coast-centric litigation firm Keker, Van Nest & Peters.

Peters said he believed Trump's actions so far add to a reality where Congress no longer

JA 2705

pushes back against the president, and as Trump also tries to silence the press.

"We're well on our road to an authoritarian government here," he said.

Keker has been one of the few major US law firms willing to make a public statement criticizing the executive orders against law firms.

## Perkins Coie faces major challenges

Though a number of firms are potentially at risk, the situation is particularly dire for Perkins Coie, according to a number of people familiar with the matter, who agreed to speak on condition of anonymity.

The White House announced it was blacklisting a number of its lawyers from federal buildings and potentially punishing its clients if they contract with the government, sending an immediate chill across the firm's everyday operations, sources said and according to a court case the firm has brought against the administration.

Agencies have pulled back from working with the law firm, and one recent meeting was canceled for the firm at the Justice Department related to an ongoing client matter, sources and the firm's lawyer have said.

Dane Butswinkas, an attorney representing Perkins Coie in its challenge to the executive order, told a judge recently that the White House's approach would "spell the end of the law firm."

District Judge Beryl Howell this month ordered the administration to stop many of the ways agencies could restrict Perkins Coie lawyers, deeming much of that executive order unconstitutional.

The American Bar Association along with dozens of other voluntary lawyer groups across the country have pushed back against the reticence across the profession to speak out.

"We will not stay silent in the face of efforts to remake the legal profession into something that rewards those who agree with the government and punishes those who do not," a statement on Wednesday said. "We call upon the entire profession, including lawyers in private practice from Main Street to Wall Street, as well as those in corporations and who serve in elected positions, to speak out against intimidation."



**RELATED ARTICLE**
It's still Antonin Scalia's Supreme Court

Even so, the White House continued its campaign against law firms on Tuesday, announcing more restrictions.

Jenner & Block was targeted with another executive order partly because one of its former well-known partners, Andrew Weissmann, had been a top prosecutor on the Russia investigation around Trump's 2016 presidential campaign, according to the White House. Jenner & Block is also working on several lawsuits challenging Trump's policies.

A Jenner & Block spokesman, in a statement, acknowledged the firm had been named in Tuesday's executive order but didn't indicate how the firm would respond.

"We remain focused on serving and safeguarding our clients' interests with the dedication, integrity, and expertise that has defined our firm for more than one hundred years and will pursue all appropriate remedies," the statement said.

*CNN's Kit Maher and Evan Perez contributed to this report.*

# Up next

Doug Emhoff publicly criticizes his law firm for coming to agreement with Trump administration

2 minute read



Judge rips DOJ for attempting to remove her from case challenging Trump's executive order on law firm

3 minute read



Lawyer for Trump co-defendant and alleged US Capitol rioters picked for major role at DOJ

1 minute read



The extremely flawed logic behind Trump's chaotic trade war

4 minute read



Trump's crackdown on university protests is casting a long shadow. Activists hope he's also providing a spark

9 minute read



# Most read

**1**    Rally in US stocks wavers as White House doubles down on tariffs on China

**2**    Scientists say they have resurrected the dire wolf

**3**    China lashes out at JD Vance for comments about 'Chinese peasants'

**4**    Trump's refusal to blink on tariffs raises the risks of an ugly endgame

**5**    'Amazing' reduction in Alzheimer's risk verified by blood markers, study says

**6**    'I want to reclaim my skin': Why these people are removing their tattoos

**7**    Billionaires are turning on Trump

**8**    Supreme Court allows Trump to enforce Alien Enemies Act for rapid deportations for now

**9**    The markets just gave Trump an off-ramp. Your move, Mr. President

**10**    China calls Trump's new tariff threat 'a mistake upon a mistake' and looks for opportunity in global trade war

## ▎MORE FROM CNN

 Doug Emhoff publicly criticizes his law firm for coming to agreement with ...

 Judge rips DOJ for attempting to remove her from case challenging Trump's ...

 Lawyer for Trump co-defendant and alleged US Capitol rioters picked for

JA 2708

# EXHIBIT 43

JA 2709

Business & Practice
April 4, 2025, 2:28 PM EDT; Updated: April 4, 2025, 2:48 PM EDT
**Big Law Mostly Sits Out Industry Response to Trump Orders (2)**

- **Some 500 firms back Munger Tolles effort on brief**
- **None of the country's largest 25 law firms join**

Few large law firms joined an amicus brief backing Perkins Coie in its lawsuit against President Donald Trump over an executive order targeting the firm.

None of country's 25 largest firms signed the friend-of-the-court brief, filed in federal court Friday. A total of eight of the 100 largest players joined the more than 500 firms on the brief, which was organized by Munger Tolles & Olson.

The brief had been billed as a response to Trump's series of directives targeting firms for their ties to the president's perceived enemies and work on causes he opposes. Big Law firms have largely remained on the sideline, with a few striking deals with the White House to stay out of the bull's eye.

"No one wants to put a target on their backs to be the next firm subject to an executive order, and that's exactly what the office of the president is counting on," said David Neff, a retired Perkins Coie partner. "If you saw many firms, particularly in the major markets, rise up against these types of orders and give great pushback, I think that would go a long way toward stopping the madness."



Chart by Phil Kuntz/Bloomberg

Arnold & Porter, Freshfields, Fenwick & West, Susman Godfrey, Crowell & Moring, and Davis Wright Tremaine were among the large firms signing the brief.

"Davis Wright Tremaine believes in the constitutional right of clients to choose their counsel and the independence of the legal profession," the firm said on its LinkedIn page.

Most of the big firms wouldn't sign unless a critical mass of peers did so as well.

**'Grave Threat'**

The brief, authored by Munger Tolles partner and former solicitor general Donald Verrilli, was filed Friday in US District Court for the District of Columbia.

Trump's orders "pose a grave threat to our system of constitutional governance and to the rule of law itself," the firms said. The judiciary should "act with resolve" to stop the president's overreach of executive authority, they said.

Law firms that signed onto the brief include others that are suing over Trump orders against them—WilmerHale and Jenner & Block. Covington & Burling, whose partner Peter Koski was the subject of a Trump memorandum for his representation of former special counsel Jack Smith, also signed.

"Any controversial representation challenging actions of the current administration (or even causes it disfavors) now brings with it the risk of devastating retaliation," the firms' said. "Whatever short term advantage an administration may gain from exercising power in this way, the rule of law cannot long endure in the climate of fear that such actions create."

The executive order against Perkins Coie was the second in a string of five actions aimed at punishing law firms with ties to past cases against Trump that the president has referred to as "weaponization" of the legal system. The orders that restrict security clearances, limit access to federal buildings and cut federal contracts for firm clients have also hit firms including Paul Weiss, Jenner & Block and WilmerHale.

Perkins Coie sued in response to the Trump order on March 11, represented by a team at Williams & Connolly. Perkins won a temporary restraining order that halted parts of the order.

Some firms—Paul Weiss, Skadden, Willkie and Milbank—hatched deals with Trump to evade the impacts of his orders in exchange for $340 million in pro bono legal services to Trump-supported causes.

California's Hanson Bridgett also signed the brief. Managing partner Kristina Lawson said signing the brief was the "right thing to do."

"It's really very simple," Lawson said in a statement. "Our oath as attorneys demands we defend the rule of law, protect judicial independence, and ensure all lawyers can fulfill their duties without interference or intimidation."

In a statement Friday, Munger Tolles said, "The executive orders recently issued against prominent law firms raise important issues for our courts to decide. We are honored to participate together with so many of our colleagues in the legal profession in the submission of this brief."

The case is: Perkins Coie v. U.S. Department of Justice, D.D.C., 1:25-cv-00716, 4/4/25

(Adds number of firms, other details starting in first paragraph.)

To contact the reporter on this story: Justin Henry in Washington DC at jhenry@bloombergindustry.com

To contact the editors responsible for this story: John Hughes at jhughes@bloombergindustry.com

© 2025 Bloomberg Industry Group, Inc.   All Rights Reserved

JA 2711

# EXHIBIT 44

*The* WHITE HOUSE

PRESIDENTIAL ACTIONS

ADDRESSING RISKS FROM WILMERHALE

Executive Orders

March 27, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Background.  My Administration is committed to addressing the significant risks associated with law firms, particularly so-called "Big Law" firms, that engage in conduct detrimental to critical American interests.  Many firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles.  Moreover, law firms regularly conduct this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients.  Lawyers and law firms that engage in such egregious conduct should not have access to our Nation's secrets, nor should such conduct be subsidized by Federal taxpayer funds or contracts.

Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) is yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States.  For example, WilmerHale engages in obvious partisan representations to achieve political ends, supports efforts to discriminate on the basis of race, backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and furthers the degradation of the quality of American elections, including

JA 2713

by supporting efforts designed to enable noncitizens to vote.  Moreover, WilmerHale itself discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based "targets." WilmerHale is also bent on employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice.  For example, WilmerHale rewarded Robert Mueller and his colleagues — Aaron Zebley, Mueller's "top aide" and "closest associate," and James Quarles — by welcoming them to the firm after they wielded the power of the Federal Government to lead one of the most partisan investigations in American history.  Mueller's investigation epitomizes the weaponization of government, yet WilmerHale claimed he "embodies the highest value of our firm and profession." Mueller's "investigation" upended the lives of public servants in my Administration who were summoned before "prosecutors" with the effect of interfering in their ability to fulfill the mandates of my first term agenda.  This weaponization of the justice system must not be rewarded, let alone condoned.

Sec. 2.  Security Clearance Review.  (a)  The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest.

(b)  The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of WilmerHale.  The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

Sec. 3.  Contracting.  (a)  To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract.

(b)  The heads of agencies shall review all contracts with WilmerHale or with entities that disclose doing business with WilmerHale under subsection (a) of this section.  To the

extent permitted by law, the heads of agencies shall:

(i)  take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which WilmerHale has been hired to perform any service; and

(ii)  otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate.  Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. 4.  Racial Discrimination.  Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. 5.  Personnel.  (a)  The heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of WilmerHale when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States.  In addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States.

(b)  Agency officials shall, to the extent permitted by law, refrain from hiring employees of WilmerHale, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

 Sec. 6.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

JA 2715

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
   March 27, 2025.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP

**JA 2716**



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

Style Guide

JA 2717

# EXHIBIT 45

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale

The White House

March 27, 2025

**SUSPENDING SECURITY CLEARANCES TO PROTECT THE NATIONAL INTEREST:**
Today, President Donald J. Trump signed an Executive Order to suspend security clearances held by individuals at Wilmer Cutler Pickering Hale and Dorr LLP (WilmerHale) pending a review of whether such clearances are consistent with the national interest.

- Security clearances held by WilmerHale employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest.
    - The Federal Government will halt all material and services, including sensitive compartmented information facility (SCIF) access provided to WilmerHale and restrict its employees' access to government buildings.
    - Federal Agencies will also refrain from hiring WilmerHale employees unless specifically authorized.

- To ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests, the Federal Government will terminate contracts that involve WilmerHale.

- The practices of WilmerHale will be reviewed under Title VII to ensure compliance with civil rights laws against racial bias.

**ADDRESSING ROGUE LAW FIRMS:** President Trump believes that lawyers and law firms that engage in conduct detrimental to critical American interests should not be subsidized by American taxpayers or have access to our Nation's secrets.

- WilmerHale has abandoned the legal profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of

**JA 2719**

the United States.

- WilmerHale pursues partisan goals, supports efforts to discriminate on the basis of race, and backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders.

- WilmerHale has furthered the degradation of the quality of American elections by supporting efforts designed to enable noncitizens to vote.

- WilmerHale has been accused of discriminating against its own employees on the basis of race and other categories prohibited by civil rights laws, including through the use of race-based "targets."

- WilmerHale rewarded Robert Mueller and two of his colleagues by welcoming them to the firm after they wielded the power of the Federal government to lead a partisan "investigation" against the President and others.   Mueller's investigation epitomizes the weaponization of government.

**A RETURN TO ACCOUNTABILITY:** President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence.

- In addition to WilmerHale, President Trump has also taken action to hold other major law firms accountable.

- This Executive Order aligns with President Trump's priority on refocusing government operations to serve the citizens of the United States.

- It builds on President Trump's previous actions, such as signing an Executive Order on his first day in office to end the weaponization of the Federal government and ensure accountability for past misconduct.

- It follows his revocation of security clearances held by intelligence officials who falsely claimed Hunter Biden's laptop was Russian disinformation during the 2020 election.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

GALLERY

EOP



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

**JA 2721**

Privacy

Style Guide

# EXHIBIT 46

JA 2723

To: Agencies Subject to the Executive Order "Addressing Risks from Wilmer Hale" as addressed in *Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of the President, et al.*, No. 25-cv-917, Dist. of Columbia District Court

From: Deputy Associate Attorney General Richard P. Lawson

Date: 3/31/25

Subject: Temporary Restraining Order / Notification Requirement

I am writing to inform you of an Order entered on Friday, March 28, 2025, by the federal District Court for the District of Columbia which requires government agencies, as explained further below, to cease implementation and, if necessary, rescind all guidance or other direction or action, if any, to implement or enforce Sections 3 and 5 of the Executive Order of March 25, 2025, entitled, "Addressing Risks from WilmerHale" (EO). **Your immediate attention to this matter is necessary.** Copies of the court Order and the EO are attached.

In the EO, the President undertook efforts to protect the interests of the United States. The EO made certain findings regarding the activity of the law firm Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale"), *see* EO § 1, and, among other things, required Government contracting agencies to "require Government contractors to disclose any business that they do with WilmerHale and whether that business is related to the subject of the Government contract," *id.* § 3(a). The EO also imposes certain requirements related to limiting access of employees of WilmerHale to Federal buildings and engaging with or hiring WilmerHale employees, *id.* § 5. After a hearing in a lawsuit brought by WilmerHale, the Court entered a temporary restraining order. Pursuant to that Order, defendants, including your agency, are:

- Enjoined from implementing or enforcing Sections 3 and 5 of the EO;

- Directed to suspend and rescind any implementation or enforcement of Sections 3 and 5 of the EO; and

- Directed to take any additional steps necessary to prevent implementation or enforcement of Sections 3 and 5 of the EO.

Bottom line, implementation of Sections 3 and 5 of the EO is prohibited and any prior steps taken, or guidance or directions issued, to implement or enforce those sections of the EO must be walked back or rescinded. To be clear, however, actions or activity your agency may be involved

in with respect to WilmerHale or agency contractors that are not based or founded on reliance on the EO or on implementation of the EO are not affected by the Court's Order.

Please take **immediate** steps to carry out the injunctions and directions of the Court Order.

As it remains the Executive Branch's position that the EO was lawfully issued and that the grant of the temporary restraining order was in error, the government will pursue a fuller review of the Executive Order before the Court and reserves the right to take all necessary and legal actions regarding "lawfare," national security concerns, and discriminatory practices involving WilmerHale.

Do not hesitate to contact me at 202-445-8042 or via email at Richard.lawson3@usdoj.gov with any questions regarding carrying out and complying with the Court Order.  Your cooperation is appreciated.

JA 2725

# EXHIBIT 47

JA 2726

Administration for Children and Families

American Red Cross

AmeriCorps

Centers for Disease Control and Prevention

Centers for Medicare and Medicaid Services

Consumer Financial Protection Bureau

Defense intelligence Agency

Equal Employment Opportunity Commission

Export-Import Bank of the United States

Federal Deposit Insurance Corporation

Federal Emergency Management Agency

Federal Energy Regulatory Commission

Federal Railroad Administration

Federal Trade Commission

Food and Drug Administration

General Services Administration

Health Resources and Services Administration

Housing and Urban Development

Internal Revenue Services

Joint Chiefs of Staff

Millennium Challenge Corporation

National Aeronautics and Space Administration

National Archives and Records Administration

National Counterterrorism Center

National Institutes of Health

National Nuclear Security Administration

National Oceanic and Atmospheric Administration

National Science Foundation

National Security Agency

National Security Council

National Transportation Safety Board

Nuclear Regulatory Commission

Occupational Safety and Health Review Commission

Office of Homeland Security Situational Awareness

Office of Inspector General

Office of Personnel Management

Office of the Director of National Intelligence

Peace Corps

Science and Technology Directorate

Securities and Exchange Commission

Social Security Administration

U. S. Department of State

U.S. Agency for International Development

U.S. Citizenship and Immigration Services

U.S. Department of Commerce

U.S. Department of Defense

U.S. Department of Education

U.S. Department of Energy

U.S. Department of Health and Human Services

U.S. Department of Homeland Security

U.S. Department of Labor

U.S. Department of the Interior

JA 2728

U. S. Department of State

U.S. Department of Transportation

U.S. Department of Veterans Affairs

U.S. Environmental Protection Agency

U.S. Small Business Administration

# EXHIBIT 48

JA 2730

Administration for Children and Families

American Red Cross

AmeriCorps

Centers for Disease Control and Prevention

Centers for Medicare and Medicaid Services

Central Intelligence Agency

Commodity Future Trading Commission

Consumer Financial Protection Bureau

Defense Intelligence Agency

Equal Employment Opportunity Commission

Export-Import Bank of the United States

Executive Office of the President

Federal Deposit Insurance Corporation

Federal Emergency Management Agency

Federal Energy Regulatory Commission

Federal Railroad Administration

Federal Reserve

Federal Trade Commission

Food and Drug Administration

General Services Administration

Health Resources and Services Administration

Housing and Urban Development

Internal Revenue Service

International Trade Commission

Joint Chiefs of Staff

Millennium Challenge Corporation

National Aeronautics and Space Administration

National Archives and Records Administration

National Counterterrorism Center

JA 2731

National Institutes of Health

National Nuclear Security Administration

National Oceanic and Atmospheric Administration

National Science Foundation

National Security Agency

National Security Council

National Transportation Safety Board

Nuclear Regulatory Commission

Occupational Safety and Health Review Commission

Office of the Comptroller of the Currency

Office of the Director of National Intelligence

Office of Homeland Security Situational Awareness

Office of Management and Budget

Office of National Drug Control Policy

Office of Personnel Management

Office of the Director of National Intelligence

Office of the Inspector General

Peace Corps

Pension Benefit Guaranty Corporation

Science and Technology Directorate

Securities and Exchange

Social Security Administration

U.S. Agency for International Development

U.S. Citizenship and Immigration Services

U.S. Department of Agriculture

U.S. Department of Commerce

U.S. Department of Defense

U.S. Department of Education

U.S. Department of Energy

U.S. Department of Health and Human Services

U.S. Department of Homeland Security

U.S. Department of Housing and Urban Development

U.S. Department of Interior

U.S. Department of Labor

U.S. Department of State

U.S. Department of Transportation

U.S. Department of Treasury

U.S. Department of Veteran Affairs

U.S. Environmental Protection Agency

U.S. Patent and Trademark Office

U.S. Small Business Administration

U.S. Trade Representative

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

WILMER CUTLER PICKING HALE AND
DORR LLP,

      *Plaintiff*,

v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

      *Defendants*.

Case No. 1:25-cv-917-RJL

<u>**EXPERT REPORT OF J. WILLIAM LEONARD**</u>

I, J. WILLIAM LEONARD, declare as follows:

1.      I have agreed to testify *pro bono* as an expert witness in the above matter based upon the expertise I developed during the course of a 34-year career as a Federal public servant in the national security arena and more than 50 continuous years of experience as a cleared individual.

**I.      BACKGROUND AND CREDENTIALS**

2.      I was employed by the Department of Defense ("DoD") from 1973 to 2002.  My entire tenure involved the area of Personnel Security.  For the first 23 years of my career, I served in various roles of increasing responsibility at the Defense Investigative Service, which was the precursor to today's Defense Counterintelligence and Security Agency.  *See* https://www.dcsa.mil/. In these roles I had operational responsibilities in the DoD's program providing oversight to private sector entities, to include defense contractors and law firms, and their employees who required access to classified national security information.  From 1992 to 1996, I served as the Assistant Deputy Director at the Defense Investigative Service, where I was responsible for a wide range of policy and operational matters pertaining to the DoD's administration of the National Industrial Security Program ("NISP").  *See* https://www.dcsa.mil/Industrial-Security/National-Industrial-

1

**JA 2734**

Security-Program-Oversight. The NISP is the federal program that manages the access of private industry to classified information. Among other things, I was responsible in that role for the Field Services Division, the Counterintelligence Office, and all overseas operations of the Defense Investigative Service in Europe, the Middle East, Central and South America, and the Far East. My responsibilities included reviewing submittals to the Office of the Secretary of Defense recommending the suspension of personnel security clearances of private sector individuals when appropriate.

3.    From 1996 to 1998, I served as the Director of Security Programs for the DoD, and from 1999 to 2002, I served at times as the Deputy Assistant Secretary of Defense ("DASD") responsible for security and information operations, and at other times as the Principal Director in that office.    As the DASD, I was the most senior official in the DoD responsible for all security, counterintelligence, computer security, infrastructure protection, and information operations programs within the DoD.    Part of my responsibility at the Pentagon was to develop and oversee policies to ensure the proper protection of classified information within the entirety of the DoD as well as within private sector entities that did business with the DoD.    These policies included the granting, revocation, and suspension of personnel security clearances for military and civilian members of the DoD and for employees of DoD-affiliated private sector entities, to include law firms, that required access to classified national security information.    As DASD, I was the final authority resolving matters relating to security clearance issues.    In 2002, I was a recipient of the Presidential Meritorious Rank, an award that recognizes a select group of career members of the Senior Executive Service ("SES") for exceptional performance over an extended period of time.

4.    From 2002 to January 2008, I served as the Director of the Information Security Oversight Office ("ISOO") during the Administration of President George W. Bush.    ISOO

receives its policy and program guidance from the National Security Council and is an administrative component of the National Archives and Records Administration. *See* https://www.archives.gov/isoo. The Director of ISOO is known colloquially as the "Classification Czar" because the Director is responsible for oversight of the government-wide classification system and aspects of the security clearance process. I was appointed to this position with the approval of President Bush, and in this role I oversaw the entire Executive Branch's classification and handling of classified national security information.

5.    The Director of ISOO has authority to access more classified information than anyone in the government other than the President and Vice President. As the Director of ISOO, I was the primary official charged with the responsibility to ensure that all Executive Branch agencies properly classified and declassified national security information and appropriately granted and restricted access to classified national security information in accordance with established policy. To that end, I had a primary role in the drafting, editing, and issuance by President George W. Bush of Executive Order 13292 (2003), which amended Executive Order 12958 (1995), and established the Federal government's policies with respect to classifying, safeguarding, and declassifying national security information.

6.    As the Director of ISOO, I was also the primary official charged with the responsibility to ensure that Executive Branch agencies appropriately implemented the NISP. The NISP policies that I oversaw included policies around the granting, revocation, and suspension of personnel security clearances for employees of private sector firms that required access to classified national security information in support of Executive Branch agencies or in working with other cleared private sector entities.

3

7.    In my various capacities with the Federal government, it was my responsibility on a regular basis to recommend and/or determine whether security clearances should be granted, suspended, or revoked, and whether information which an agency sought to classify or keep classified met the appropriate classification criteria.

8.    Between 2008 and 2010, I served as the principal of my own consulting firm advising on security issues related to national defense, homeland security, and counterintelligence. My area of expertise included the investigation and adjudication of personnel security clearances; assessments of the foreign ownership, control, and influence of cleared U.S. defense industry; and the protection of critical infrastructures. I also served as an adjunct professor of political science at St. Mary's College of Maryland.

9.    Between 2010 and 2019, I served as the Chief Operating Officer of the National Endowment for Democracy, a nongovernmental, nonprofit foundation dedicated to the growth and strengthening of democratic institutions around the world.

10.    While I am retired from full-time employment, I currently serve as a member of the board of directors for a company cleared by the DoD under the terms of a special security agreement. In this capacity, I am required to retain a personnel security clearance, and my responsibilities include ensuring that the cleared firm and its personnel properly safeguard classified information as well as ensuring that the firm's foreign-owned parent is precluded from accessing classified and other sensitive U.S. Government information. As such, I have remained abreast of all official policy and requirements for the protection of classified national security information, as well as the standards for approving, suspending, denying, or revoking security clearances. I have been continuously cleared (i.e., have held an active security clearance) at all times between 1973 and the present.

11.     I hold a Master of Arts degree in International Relations from Boston University and a Bachelor of Arts degree in History from Saint John's University.

## II.     RETENTION IN THIS MATTER AND RELATED DISCLOSURES

12.     In April 2025, I was approached by counsel to Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") to discuss this case, which relates to Executive Order 14250 entitled "Addressing Risks from WilmerHale," 90 Fed. Reg. 14549 (March 27, 2025) ("WilmerHale Executive Order"). More specifically, I was asked to address the portions of the WilmerHale Executive Order that purport to direct the immediate suspension and review of any security clearances held by any WilmerHale partner or employee, and the portions of the WilmerHale Executive Order that address "national security." After reviewing the WilmerHale Executive Order, I agreed to offer the opinions in this report in the capacity of an expert witness based on my experience and credentials above. I am doing so without compensation, as my sole motivation for involvement in this present matter is my concern for the integrity of the processes around security clearances, a key tool intended to safeguard the security of our nation and the American people. I have devoted the great majority of my professional career to the protection of our national security through rigorous application of fair criteria determining (1) what information should be classified and (2) which individuals are entitled to access to such information, and on what terms.

13.     In the years since my retirement from public service, I have served as a *pro bono* expert in several prior court proceedings, including in the parallel litigation against Executive Order 14230, entitled "Addressing Risks from Perkins Coie LLP," 90 Fed. Reg. 11781. *See Perkins Coie LLP v. U.S. Department of Justice*, Dkt. 39-8, No. 1:25-716 (D.D.C.). In all such instances, as in this case, I have made it clear to the counsel that I would become involved in their case not as an advocate for a party but rather as an advocate for the integrity of the national security classification and clearance systems.

14.     A list of publications that I have authored in the last ten years is attached as Exhibit 1. I have not testified in any case as an expert at trial or by deposition in the last four years.    The facts or data I have considered in forming my opinions are set forth in Section III below.

## III.     SUMMARY OF RELEVANT FACTS

### A.     Executive Order 14250 And The Related Fact Sheet

15.     On March 27, 2025, President Donald Trump issued Executive Order 14250, entitled "Addressing Risks from WilmerHale."  90 Fed. Reg. 14549.  The WilmerHale Executive Order was accompanied by a "Fact Sheet."  *Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale*, The White House (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-wilmerhale.     The following points in the WilmerHale Executive Order and Fact Sheet are relevant to this report.

16.     ***Section 1 ("Background").***     Section 1 sets out the "Background" of the WilmerHale Executive Order.  The first paragraph of Section 1 does not name WilmerHale, but describes the Trump Administration's general "commit[ment] to addressing the significant risks associated with law firms."  It states that "[m]any firms take actions that threaten public safety and national security," concluding that these law firms "should not have access to our Nation's secrets."

17.     The second paragraph of Section 1 characterizes certain work undertaken by WilmerHale as "engag[ing] in obvious partisan representations to achieve political ends, support[ing] efforts to discriminate on the basis of race, back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and further[ing] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote."  This paragraph also states that WilmerHale "discriminates against its employees based on race and other categories prohibited by

civil rights laws," and uses "race-based 'targets.'"  This paragraph does not mention specific cases or clients of WilmerHale's, nor does it refer to "national security."

18.     The third paragraph of Section 1 singles out Robert Mueller, James Quarles, and Aaron Zebley for their Federal government work investigating Russian interference in the 2016 election.  I understand that Messrs. Mueller and Quarles are retired WilmerHale partners, and Mr. Zebley is a current WilmerHale partner.  I understand that their work in the Special Counsel's Office was entirely distinct from and unrelated to WilmerHale.  Robert Mueller was appointed to serve as Special Counsel during President Trump's first term by Acting Attorney General Rod J. Rosenstein.  *See* Order No. 3915-2017, Office of the Deputy Attorney General (May 17, 2017), https://www.justice.gov/archives/opa/press-release/file/967231/dl.  As Special Counsel, Mr. Mueller worked under the appointment, direction, funding, and supervision of the Acting Attorney General and later Attorney General Bill Barr.  Messrs. Quarles and Zebley worked in Special Counsel Mueller's office.  Section 1's third paragraph characterizes the special counsel investigation into Russian interference as "one of the most partisan investigations in American history" that "epitomizes the weaponization of government," specifically the use of "prosecutorial power to upend the democratic process and distort justice."  This paragraph does not mention "national security."

19.     ***Section 2 ("Security Clearance Review").***  Section 2(a) of the WilmerHale Executive Order directs the Attorney General, the Director of National Intelligence, and "all other relevant heads of executive departments and agencies" to "immediately … suspend any active security clearances held by individuals at WilmerHale," to be followed by a "review of whether such clearances are consistent with the national interest."  This last phrase is notable, in that there is no reference in Section 2(a) to "national security," only to "the national interest" (a phrase that

7
**JA 2740**

appears in Section 2(a) but nowhere else in the WilmerHale Executive Order).    Also notable in Section 2(a) is the blanket directive to suspend all active security clearances held by any person working at WilmerHale, a firm that I understand employs over 2,000 people, almost 1,200 of whom are attorneys.  I discuss both of these noteworthy features of Section 2(a) below.

20.    Section 2(b), which also falls under the header of "Security Clearance Review," directs the Office of Management and Budget to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of WilmerHale," and to cease such provision.

21.    ***Sections 3 and 4.***  I do not address Section 3 ("Contracting") or Section 4 ("Racial Discrimination") of the WilmerHale Executive Order in this report, as neither of those sections addresses security clearances nor do they contain any reference to or discussion of "national security" in any respect.

22.    ***Section 5 ("Personnel").***  Section 5 ("Personnel") contains two subsections.  First Section 5(a) directs all Federal agency heads to limit the access of WilmerHale employees to Federal buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States."  Section 5(a) also directs Federal agency heads to limit Federal employees in their official capacity "from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States."

23.    Second, Section 5(b) directs Federal Officials to refrain from hiring any WilmerHale employee into Federal service unless a waiver is obtained establishing "that such hire will not threaten the national security of the United States."

24.    Section 5 ("Personnel") thus contains three references to "national security," while Section 2 ("Security Clearance Review") contains none.

25.   ***Section 6.***   Lastly, Section 6 of the WilmerHale Executive Order contains various general provisions common in such orders, such as directing that the order be implemented consistent with the law.

26.   ***The Fact Sheet.***   By and large, the Fact Sheet is consistent with the WilmerHale Executive Order.  It begins with a section entitled "Suspending Security Clearances To Protect The National Interest," which restates that "[s]ecurity clearances held by WilmerHale employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest."  It includes the notable phrase "the national interest" and the absence of reference to national security, and also addresses aspects of the WilmerHale Executive Order relating to government contracting.

27.   The Fact Sheet's section entitled "Addressing Rogue Law Firms" restates the allegations in Section 1 ("Background") of the WilmerHale Executive Order.  The Fact Sheet's final section, entitled "A Return To Accountability," broadly describes President Trump's "promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence."

**B.   Security Clearances Held By WilmerHale Personnel**

28.   Based on representations by counsel, I understand the following to be undisputed facts related to the security clearances currently held by WilmerHale personnel.

    a.   At the time the WilmerHale Order was issued, more than 20 WilmerHale personnel held security clearances, and at least 5 of those WilmerHale personnel held active security clearances in connection with their service as military reservists.

    b.   Most of these personnel are military veterans or reservists, or are former public civil servants, in either case initially entrusted with access to

sensitive information by virtue of their prior public service employment, as opposed to their work at WilmerHale.

c. The clearances of WilmerHale personnel were issued by the Department of Defense, Department of Justice, Department of State, Central Intelligence Agency, National Security Agency, and other elements of the Intelligence Community.

d. The majority of WilmerHale personnel holding active security clearances had no involvement in any of the matters referenced in the WilmerHale Executive Order or the Fact Sheet.

e. Many security clearance holders received their clearance before being hired by WilmerHale.

f. WilmerHale does not now maintain a Sensitive Compartmented Information Facility (SCIF).

## IV.    BACKGROUND PRINCIPLES ON SECURITY CLEARANCES

### A.    The Rules And Principles Governing The Security Clearance Review Process

29. Executive Order 12968, which established the protocols governing access to classified information to include provisions for due process, has remained in effect since it was issued nearly thirty years ago by President Bill Clinton.  *Access to Classified Information*, 60 Fed. Reg. 40245 (Aug. 2, 1995).  The protocols in Executive Order 12968 have been subject to minor amendments since then, the most substantive ones being the designation of the Director of National Intelligence as the "Security Executive Agent" by virtue of Executive Order 13467, *Reforming Processes Related to Suitability for Government Employment, Fitness for Contractor Employees, and Eligibility for Access to Classified National Security Information*, which was issued by President George W. Bush on June 30, 2008, and the initiation of continuous vetting procedures

through Executive Order 13764 that President Barack Obama signed on January 17, 2017.   None

of the subsequent amendments or policy modifications have impacted the core principles of due

process that were created in Executive Order 12968.

30.    The protocols established by Executive Order 12968 are aimed at ensuring that the

protection of the nation's classified information is consistent with "providing fair and equitable

treatment to those Americans upon whom we rely to guard our national security."   60 Fed. Reg. at

40245.   A hallmark of the process, therefore, is that it is an *individualized* one.   The touchstone of

that individualized review is whether clearance is consistent with the "national security interest"

of the United States.   "National security," meanwhile, is defined both in the United States Code

and in Executive Order 13526, *Classified National Security Information* (Dec. 29, 2009), as "the

national defense and foreign relations of the United States."   10 U.S.C. §801(16); 75 Fed. Reg.

707, 729 (Jan. 5, 2010) (identical definition in Executive Order 13526, except using the disjunctive

"or").[1]

31.    Pursuant to Executive Order 12968, an individual may not access classified

information unless (1) that individual has been "determined to be eligible" for access, (2) that

individual has signed a nondisclosure agreement, and (3) that individual has a "demonstrated need-

to-know" for the information at issue.   60 Fed. Reg. at 40246.   Access to classified information

is generally granted (with limited and defined exceptions) only to individuals "who are United

---

[1] For most of the WilmerHale personnel holding security clearances, particularly those whose clearances are held through their military status or their former civilian public service, their due process rights are derived from Executive Order 12968.   There are other executive orders and subordinate directives and regulations that touch upon personnel vetting that are not discussed here.   While some of these may reference "national interest" instead of "national security interest," the governing executive order (12968) and the national adjudicative guidelines for security clearances, which are discussed in more detail below, explicitly rely upon the term "national security interests."

States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information." *Id.* at 40250. The determination of eligibility for access to such information is to be "based on judgments by appropriately trained adjudicative personnel." *Id.*

32.     The security clearance process is a critical tool in keeping our nation and its citizens safe. For it to be effective, it is to be implemented in a "fair and equitable" manner and through a "uniform … program." *Id.* at 40245.

33.     To ensure that this national security tool (i.e., the individualized security clearance process) is implemented in a fair and equitable manner and through a uniform program, the Director of National Intelligence ("DNI"), under the authority of Executive Order 13467 referenced above and in furtherance of Executive Order 12968, issued DNI Security Executive Agent Directive 4 ("SEAD-4"), *National Security Adjudicative Guidelines*, on June 8, 2017, during the prior Administration of President Donald Trump. This Directive establishes the criteria to be used by all Federal government agencies authorized to render a determination for initial or continued eligibility of an individual to access classified information. Off. of the Dir. of Nat'l Intel., *Security Executive Agent Directive 4: National Security Adjudicative Guidelines* (2017), https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf.

34.     Pursuant to SEAD-4, an individual's eligibility for a security clearance turns on whether that individual's access to classified information is "clearly consistent with the national

security interests" of the United States.  *Id.* at 5.   The adjudicative process is intended to be an examination of the "whole person," meaning an examination of "a sufficient period and careful weighing of a number of variables of an individual's life," in order to make an affirmative determination that the individual is an acceptable security risk.  *Id.* at 6 ("the whole-person concept").   The adjudicative policy states unambiguously that for every individual seeking a security clearance, each such individual "case must be judged on its own merits."  *Id.*   To perform that adjudication, an individual's personal conduct in the following thirteen areas are taken into account:  allegiance to the United States (Guideline A), foreign influence (Guideline B), foreign preference (Guideline C), sexual behavior (Guideline D), personal conduct (Guideline E), financial considerations (Guideline F), alcohol consumption (Guideline G), drug involvement and substance misuse (Guideline H), psychological conditions (Guideline I), criminal conduct (Guideline J), handling protected information (Guideline K), outside activities (Guideline L), and use of information technology (Guideline M).  *Id.*   The guidelines also state that in evaluating the relevance of an individual's conduct with respect to any of the above guidelines, the recency of that conduct is a key element to be taken into account.  *Id.*

35.     In light of the above, the granting, suspending, and revoking of security clearances is a highly individualized process that involves a close and detailed factual analysis of the individual in question and provides any individual subject to this analysis with significant due process protections.  Before any security clearance is granted, denied, or revoked, the appropriate investigative agency must conduct an investigation of the individual to the required scope.  This investigation addresses the factors outlined in the above adjudicative guidelines outlined in Directive 4, pursuant to Executive Order 12968.

36.     Following the appropriate investigation, should an applicant be denied a clearance or should a cleared individual's clearance be revoked, that individual is entitled to the due process considerations set forth in Executive Order 12968.   The standard due process provisions that are followed within the Executive Branch whenever an individual's security clearance is denied or revoked include the following: (1) a comprehensive and detailed written explanation for the denial or revocation; (2) appropriate access to documents, records, and reports upon which the denial or revocation is based; (3) the right to be represented by counsel; (4) the opportunity to respond in writing; (5) a written notice of and the reasons for the results of the review, the identity of the deciding authority, and written notice of the appeal; and (5) the opportunity to appeal in writing and in some instances in person to a higher level of review.   *See* 60 Fed. Reg. at 40252-53 (Part 5—Review of Access Determinations).

**B.      Relevant History Regarding The Security Clearance Review Process**

37.     The above-described security-clearance processes set out by Executive Order 12968 and expanded through SEAD-4, and the due process protections afforded individuals as part of the same, are an outgrowth of an earlier period of our nation's history when such rights were not present and the security clearance process was abused.   As illustrated by the well-known case of Robert Oppenheimer, it was not unusual in the immediate aftermath of World War II for groups of persons to have their security clearances denied, revoked or suspended solely based upon their membership in disfavored organizations or upon their association with other known members of such organizations.

38.     In 1947, then-Attorney General Tom Clark released the "Attorney General's List of Subversive Organizations."   As its name implies, this list was intended to compile organizations deemed to be subversive by the U.S. government.   The list included 50 organizations ranging from Communist Party USA and the Ku Klux Klan to organizations such as the National Negro

Congress and the Washington Book Shop Association.   Many Americans had signed petitions or become members of such groups, often not understanding their true nature or the consequences of affiliation.   The Attorney General's List was eventually incorporated by then-President Harry Truman into Executive Order 9835, which established the first federal employee loyalty program. *See* 12 Fed. Reg. 1935 (Mar. 25, 1947).   Executive Order 9835 was in turn superseded by President Dwight Eisenhower's Executive Order 10450 in 1953, which updated the Attorney General's List and expanded the criteria for determining trustworthiness and reliability for purposes of a security clearance.   Security Requirements for Government Employment, 18 Fed. Reg. 2489 (Apr. 27, 1953).   In 1959, the Supreme Court decided the landmark case *Greene v. McElroy*, holding in relevant part that the revocation of the plaintiff's security clearance as a defense contractor on the grounds of alleged Communist associations and sympathies was unlawful in that the plaintiff "was not afforded the safeguards of confrontation and cross-examination."   360 U.S. 474, 508 (1959).[2]

39.    It was the Supreme Court's decision in *Greene* that led to the establishment of due process provisions for the individualized granting, denial, or revocation of security clearances for contractors, which due process provisions continue to this day.   Due process provisions were first adopted for defense contractors through President Eisenhower's Executive Order 10865 in 1960, and similar due process provisions were codified in 1995 by President Clinton in Executive Order 12968 ("Access to Classified Information") to cover civil servants and military personnel.   These protections have remained unchanged through five successive administrations, including President Trump's prior Administration between 2017 and 2021.   Executive Orders 10865 and 12968 as well

---

[2] *Greene* stands for the proposition that due process applies to security clearances.   360 U.S. 474. There, neither Congress nor the President authorized the constitutionally deficient procedures.   *Id.* at 508.   The Court declined to opine on the constitutionality of those procedures had they been set out in legislation or an executive order.   *Id.*

as SEAD-4 remain the current governing policy for granting, denying, and revoking personnel security clearances.[3]   There is no language within the WilmerHale Executive Order that indicates it is superseding, revoking or modifying the protections set forth in any of the prior Executive Orders or governing due process requirements.

### C.    The Process For Suspending Or Revoking A Security Clearance

40.    Existing policy recognizes that emergency situations may arise where an individual security clearance must be suspended before the completion of all of the due process provisions outlined above.  60 Fed. Reg. at 40252-53 (Part 5—Review of Access Determinations); *see also* SEAD-4 at 7.   Specifically, an individual's security clearance can be suspended for cause when information relative to any of the adjudicative guidelines exists and raises a serious question as to the *individual's* ability or intent to protect national security information.

41.    Throughout my career I have frequently either recommended or approved the suspension of an individual's clearance.   In every case, as well as every other suspension I am aware of (whether or not personally involved in the related recommendation or approval), any such suspension was based upon the individual's conduct.   I am not aware of any instance when an individual's security clearance has been suspended for reasons *other* than the individual's own conduct.   Furthermore, in every case in which I was personally involved or am otherwise aware of, there existed a reasonable basis for concluding that the individual's continued access to classified information posed an imminent threat.   For example, if a person with a security clearance

---

[3] Executive Order 12968 allows for narrow instances when due process may be limited because the required procedure cannot occur "without damaging the national security interests of the United States by revealing classified information."  60 Fed. Reg. at 40252.   This provision might be invoked, for example, when a government employee or contractor is charged with espionage for a foreign power.   But this limited due process section is inapplicable here, including because the required certification has not been made and because there has been no determination that full due process would itself compromise national security by revealing classified information.

is arrested for a serious crime that calls into question the individual's honesty or trustworthiness, such that a new investigation is needed, an emergency suspension of a security clearance may be issued pending final result of the new investigation.    In the vast majority of cleared defense contractor cases where the government is seeking to revoke an individual's security clearance for conduct issues, that individual maintains their access and eligibility throughout the process, which could take years.

42.    Importantly, whenever an individual's security clearance is suspended, the government entity that granted the clearance is obligated to notify the individual in writing and to provide that individual with a statement of reasons as to why access to classified information has been suspended.

43.    The suspension process is followed, as appropriate, either with reinstatement of access to classified information or with a revocation process that affords the established processes and due process protections outlined above.

## V.    OPINIONS

### A.    Opinion 1: The Blanket Approach Of The WilmerHale Executive Order Is Inconsistent With Governing Policy Requiring Individualized Assessments.

44.    As described above in Section IV, in order to ensure that clearance procedures "provid[e] fair and equitable treatment to those Americans upon whom we rely to guard our national security," 60 Fed. Reg. at 40245,  the process is always based upon the personal conduct of the relevant individual.    That is one of the fundamental hallmarks of the security-clearance review process; Person A is never held accountable for the conduct of Person B, let alone are Persons 1 through 2,000 held accountable for the conduct of formerly-associated Person 2,001.

45.    The WilmerHale Executive Order violates these bedrock principles of the security-clearance review process because it provides no individualized assessment of personal conduct in

the suspension of clearances. The WilmerHale Executive Order contains no mention of, let alone any individualized assessment of the WilmerHale personnel who currently hold security clearances. The only common feature as to those individuals is that they all currently work at WilmerHale, yet the WilmerHale Executive Order directs the immediate suspension of all clearances regardless of whether that clearance derived from work related to WilmerHale, regardless of whether that clearance had anything to do with any factual finding in the WilmerHale Executive Order, and regardless of when that individual was hired at WilmerHale.

46.    Simply put, a blanket suspension of all security clearances at a law firm of over 2,000 employees, including approximately 1,200 attorneys, was—prior to March 2025—unprecedented in its scope and fundamentally inconsistent with existing authority addressing the processing, granting, and revocation of security clearances.    The *ad hoc* directive in this case harkens back to the repudiated and discredited programs that existed before *Greene v. McElroy*, including during the Red Scare.    The arbitrary directive of immediate suspension of security clearances not for any personal conduct by any clearance holder but rather simply for that individual's association with a law firm is no different analytically than if a directive were issued to immediately suspend the security clearances of all Jews or Muslims, all members of the LGBTQ+ community, all women, or all registered Democrats or Republicans.

47.    These types of non-individualized, mass suspensions of security clearances targeted at groups of individuals threaten to harm our national security efforts.    Should individuals who otherwise meet the standards be summarily denied or stripped of their security clearance through these types of sweeping, blanket decrees addressed at entire classes of thousands of persons or more at once, the resulting uncertainty that would spread throughout the system may severely

impact the effectiveness of our military, intelligence and diplomatic capabilities to deter or otherwise respond to our nation's adversaries.

**B.    Opinion 2: The WilmerHale Executive Order Is Unprecedented In Its Invocation of Facially Stale Information And Conduct Unrelated To National Security.**

48.    The WilmerHale Executive Order is also contrary to the foundational principles surrounding the granting, suspension, denial, or revocation of security clearances, as set forth in existing and operative policy documentation that have existed for decades, in that the stated reasons for the suspension of the security clearances do not have any apparent nexus to national security concerns.    As I explained in Section IV, the touchstone of the individualized security-clearance review is whether clearance is consistent with the "national security interest" of the United States, which is defined as "the national defense and foreign relations of the United States."

49.    Here, however, the WilmerHale Executive Order—and in particular Section 2 of the WilmerHale Executive Order related to security clearances—makes clear it has nothing to do with national security.  For example, the WilmerHale Executive Order faults WilmerHale for its "degradation of the quality of American elections."  By this characterization, I understand the WilmerHale Executive Order to refer to the fact that WilmerHale represented a number of clients opposing then-candidate Trump's challenges to the result of the 2020 Presidential Election (in almost all instances, I am told, with successful outcomes).  In my more than three decades of service culminating as the most senior public servant focused professionally on the protection of United States classified information, I have never seen any security clearance determination that was based on the fact that an attorney represented clients in election-related litigation (or other litigation challenging the policies of an administration), and I can see no reasonable construction of such activity as being a matter of "national security" as that term is defined and understood.  As another example, the WilmerHale Executive Order states that WilmerHale "supports efforts to

discriminate on the basis of race," in what I am told is an apparent reference to WilmerHale's representation of Harvard University in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 20-1199 (U.S.). Again, in my decades of experience I have never seen a security clearance determination based on an attorney representing clients in litigation, and I can see no reasonable construction of "national security" that would encompass such activity. Tellingly, Section 2 of the WilmerHale Executive Order never uses the term "national security," and instead only mentions the "national interest," a term that is markedly broader than the "national security interest" that serves as the touchstone of a security-clearance review. On the face of the WilmerHale Executive Order, it therefore appears apparent and acknowledged that the directive in Section 2 to suspend security clearances is *not* based on "national security." I am aware of no practice, examples, or guidance that permits the suspension, revocation, or denial of a security clearance on any grounds other than national security grounds.

50.    Neither is the WilmerHale Executive Order's reference to Robert Mueller, James Quarles, and Aaron Zebley remotely related to any "national security" risk supposedly posed by WilmerHale. I understand that Mr. Mueller was appointed by the Department of Justice in the first Trump Administration as special counsel to investigate allegations of foreign interference in the 2016 presidential election, and that WilmerHale had no role in his appointment or work as Special Counsel. I understand that Mr. Zebley and Mr. Quarles worked with Mr. Mueller on this investigation. I further understand that Messrs. Mueller, Quarles, and Zebley had no WilmerHale affiliation whatsoever when they served in the Office of Special Counsel. There was no effort of which I am aware to suspend, revoke, or deny any security clearance held by any WilmerHale personnel for reasons related to Mr. Mueller's work and report at the time that Messrs. Mueller, Quarles, and Zebley were employed by the special counsel's office, nor does the WilmerHale Order

identify any newly discovered basis for doing so. If Mr. Mueller's and his colleagues' work was not viewed as detrimental to "national security" during President Trump's first term in office, it is impossible to understand how that same activity could now serve as a "national security" justification for immediate suspension of security clearances. In my experience, immediate suspensions of security clearances based on a "national security" justification were based on newly identified imminent threats that required delaying due process, as described above.

51.     More fundamentally, the behavior that the WilmerHale Executive Order deems problematic—attorneys representing clients in court—is not of the type that has ever in my experience been deemed conduct relating to a "national security" interest.

52.     It is further apparent that the WilmerHale Executive Order is not grounded in a "national security" determination because Jeffrey Kessler, a recently departed WilmerHale partner, was appointed and confirmed to serve as U.S. Commerce Under Secretary for Industry and Security on March 13, 2025. *See WilmerHale Congratulates Partner Jeffrey Kessler on His Senate Confirmation as US Commerce Under Secretary for Industry and Security*, WilmerHale (Mar. 14, 2025), https://www.wilmerhale.com/en/insights/news/20250314-wilmerhale-congratulates-partner-jeffrey-kessler-on-his-senate-confirmation-as-us-commerce-under-secretary-for-industry-and-security. There cannot reasonably have been a national security emergency that justified the immediate suspension of WilmerHale security clearances when a recently departed firm partner was just entrusted to serve in the highest levels of government.

53.     The lack of any national-security concerns here is still further underscored by the fact that, as I understand from public reports, an Executive Order was issued on March 14, 2025 against another law firm (Paul Weiss) that similarly directed the immediate suspension of all security clearances held by any firm employee, *see Addressing Risks from Paul Weiss*, The White

House (Mar. 14 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss, only to be withdrawn within days following an agreement that provides for the provision of *pro bono* services by Paul Weiss and certain other steps by that firm with no mention of national security or national interest. There cannot reasonably have been a national security emergency that justified the immediate suspension of security clearances but that was remedied by Paul Weiss's agreement to provide *pro bono* services.

      **C.**      **Opinion 3: The WilmerHale Executive Order's Directive Amounts To A Preordained Revocation Of Security Clearances Without Due Process.**

54.      While the WilmerHale Executive Order purports only to suspend clearances pending review, the WilmerHale Executive Order and Fact Sheet together amount to a preordained blanket revocation of security clearances without any of the required due process protections associated with such revocation. That is, the WilmerHale Executive Order functionally plays the role of judge, jury, and executioner.

55.      In Section 2, the WilmerHale Executive Order directs all Federal agency heads to "immediately … suspend any active security clearances held by individuals at WilmerHale" and to "review … whether such clearances are consistent with the national interest." It might therefore seem, at first blush, that the WilmerHale Executive Order merely calls for an emergency suspension, to be followed by appropriate due process, although there is no indication of what that might look like, when it would occur, or when it must be concluded. In any event, Section 1 of the WilmerHale Executive Order contains express findings that any reviewing agency necessarily must take as fact in conducting that review. Those findings include a statement that WilmerHale has "abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States" and "employ[s] lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice." The

findings in Section 1 functionally predetermine the outcome, meaning that no good-faith and impartial investigation could ever take place.

56.    In light of the above directives in the WilmerHale Executive Order, the outcome of any security clearance review is preordained.    For these suspensions to be reversed and the affected individuals' access to classified national security information to be reinstated would require a professional adjudicator to make findings expressly contradictory to the findings in Section 1 of the WilmerHale Executive Order.    The approach of the WilmerHale Executive Order is unprecedented and inconsistent with governing guidance and policy documentation.

I declare under penalty of perjury that the foregoing is true and correct.


Date: April 7, 2025

_____
J. William Leonard

# EXHIBIT 1

Authored Publications in Past Ten Years

J. William Leonard, *Congress Must Stop the Weaponization of Personnel Security Clearances*, Just Sec. (Mar. 11, 2025), https://www.justsecurity.org/108657/congress-stop-weaponization- security-clearances/.

J. William Leonard, *Vice Presidents and Rules Governing Classified National Security Information*, Just Sec. (Jan. 17, 2023), https://www.justsecurity.org/84774/vice-presidents-and- rules-governing-classified-national-security-information/.

J. William Leonard, *Myths and Misunderstandings Relating to Mar-a-Lago Documents Investigation*, Just Sec. (Mar. 16, 2022), https://www.justsecurity.org/82706/myths-misunderstandings-relating-to-mar-a-lago-documents-investigation/.

J. William Leonard, *Why Joe Biden Should Pardon Reality Winner*, Wash. Post (Dec. 20, 2019), https://www.washingtonpost.com/opinions/why-joe-biden-should-pardon-reality-winner/2020/12/21/9e6f4094-4162-11eb-8db8-395dedaaa036_story.html.

J. William Leonard, *Barr's Personal Ad Hoc Declassification Authority and the Role of Congress*, Just Sec. (Dec. 9, 2019), https://www.justsecurity.org/67663/barrs-personal-ad-hoc- declassification-authority-and-the-role-of-congress/.

J. William Leonard, *Trump Repudiates a Century of U.S. Policy*, Just Sec. (Nov. 15, 2019), https://www.justsecurity.org/67255/trump-repudiates-a-century-of-u-s-policy/.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *      )
WILMER CUTLER PICKERING HALE          )      Civil Action
AND DORR, LLP                         )      No. 25-00917
                                      )
              Plaintiff,              )
                                      )
   vs.                                )
                                      )
EXECUTIVE OFFICE OF THE               )      Washington, D.C.
PRESIDENT, et al.,                    )      April 23, 2025
                                      )      2:11 p.m.
              Defendants.             )
                                      )
* * * * * * * * * * * * * * * *      )


TRANSCRIPT OF PRELIMINARY INJUNCTION
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:        PAUL CLEMENT, ESQ.
                          ERIN E. MURPHY, ESQ.
                          JOSEPH J. DeMOTT, ESQ.
                          MATTHEW ROWEN, ESQ.
                          CLEMENT & MURPHY, PLLC
                          706 Duke Street
                          Alexandria, Virginia 22314

FOR THE DEFENDANTS:       RICHARD LAWSON, ESQ.
                          U.S. DEPARTMENT OF JUSTICE
                          950 Pennsylvania Avenue, Northwest
                          Washington, D.C. 20530

REPORTED BY:              LISA EDWARDS, RDR, CRR
                          Official Court Reporter
                          United States District Court for the
                            District of Columbia
                          333 Constitution Avenue, Northwest
                          Room 6706
                          Washington, D.C. 20001
                          (202) 354-3269

**JA 2759**

THE COURTROOM DEPUTY:  We're on the record in Civil Action 25-917, *Wilmer Cutler Pickering Hale and Dorr, LLP, versus the Executive Office of the President, et al.*

Starting with Plaintiff's counsel, please approach the podium and state your appearance for the record.

MR. CLEMENT:  Good afternoon, your Honor.  Paul Clement for the Plaintiffs.  And I'm joined at counsel table by Erin Murphy, Matthew Rowen and Joseph DeMott.

THE COURT:  Welcome.

MR. CLEMENT:  Thank you.

MR. LAWSON:  Good afternoon, your Honor.  Richard Lawson, deputy associate attorney general, for the Department of Justice and the Defendants.

THE COURT:  Welcome.

All right, counsel.  We're here for arguments on the various motions.  I'll hear from the Plaintiffs first.  You can have 20 minutes and ten minutes for rebuttal.  And then we'll have 20 minutes and ten minutes for rebuttal for the Defendants.

MR. CLEMENT:  Thank you, your Honor.  And may it please the Court.

As I said, Paul Clement here for the Plaintiffs.  And I should note for the record that a good chunk of the law firm that I represent is here as well on the other side of the bar there.

**JA 2760**

THE COURT:  They're more than welcome.

MR. CLEMENT:  Your Honor, as this Court recognized in granting a TRO, the retaliatory nature of the executive order directed at WilmerHale is clear from its face; and it threatens both the firm's, quote, "very survival," end quote, and, quote, "the justice system at large," end quote.

Now, to be sure, since the TRO was entered, the government has filed two briefs attempting to defend it. But nothing in those briefs undermines the twin conclusions that the order is retaliatory in nature and inflicts irreparable harm on WilmerHale and the adversarial system of justice more broadly.

That suffices to underscore the need for permanent relief.  That permanent relief should run to the order as a whole, as the order itself and the president's actions in revoking a similar order against Paul, Weiss underscore that it was intended to stand or fall as a whole.

Indeed, Section 1 makes the connection express by complaining about representations and *pro bono* activities and proclaiming that, quote, "engaging in such egregious actions should not have -- law firms that engage in such egregious actions should not have access to our nation's secrets."

THE COURT:  So it's your position that the Court should analyze the order as a whole, not on a

**JA 2761**

section-by-section basis?

MR. CLEMENT:  That's right, your Honor.  I mean, obviously, we don't -- we're happy to go section by section if you would like.  But this order was designed as a whole.  I don't think you can really understand the operative provisions of the order independent of Section 1.

And I think -- it's not just that Section 1 is a complete preamble.  It really explains exactly what has motivated the president's actions, and then it ties those actions directly to the actions later in the order.  As I say, it says that it's these egregious actions in representing people *pro bono* and taking certain positions that makes WilmerHale attorneys and associates ineligible to have access to the nation's secrets, to have access to government contracts, to have access to government buildings.

THE COURT:  So by doing it this way, as you suggest the Court should do, what effect or impact would that have on the doctrine of severability, depending upon how the Court analyzes certain sections?

MR. CLEMENT:  Sure.  So the way I would think about it is that, you know, severability is usually a question of legislative intent.

Here, I think it is a question of the president's intent.  There's no nonseverability clause in the order or

anything else that would sort of influence your judgment other than to look at the order, the structure of the order, and make a judgment about whether it was intended to operate as an operative whole or as sort of section by section, as if those were independent things.

And I think it's crystal clear that the whole order is tied together.  Section 1 explains how all the various provisions are supposed to work and what motivated all of those provisions.

And then I do think it's fair, based on the record that you have before you, to take a look at what happened with Paul, Weiss, because Paul, Weiss, like WilmerHale, was subject to an order that essentially had the same operative provisions in a comparable Section 1 that explained it, and then when -- that was on March 14th.  And then on March 21st, when there was a subsequent executive order, it repealed the whole thing.  It didn't say, Well, we're going to keep the security clearances issues or We're going to keep the restrictions on the access to the government buildings.

And I think that's particularly telling with respect to the security clearances, because when you look to the agreement that Paul, Weiss made with the president, there wasn't anything specific there as to national security or the national interest or anything else.  There were some

agreements, mostly about providing $40 million in *pro bono* services that were more to the president's liking.

And so this is a situation where, if the question is sort of the president's intent as to how these orders are supposed to operate, I think we have not just the order itself, which is structured in a way that suggests it stands or falls together, but we have the Paul, Weiss experience, where the order was issued and then revoked *in toto*.

THE COURT:  Why don't you proceed on treating the order as a whole.

MR. CLEMENT:  Sure.  So if we look at the order as a whole, then the first question we confront is -- I think is the question of the retaliatory intent that is reflected in Section 1 and permeates the entire order.

And I don't want to belabor the point about retaliatory intent because, as this Court indicated in the TRO order, the retaliatory intent here is evident on the face of the order.

As I've mentioned before, I'm used to situations where you need to have discovery to sort of suss out a forbidden intent.  But here, the president has made it easy on all of us.  He's made his intent crystal clear in Section 1 of the order, and that retaliatory intent permeates the whole order and requires the invalidation of the whole order.

**JA 2764**

Now, I want to move on, though, because it's not just the retaliatory intent that's problematic; it's the viewpoint discrimination that is reflected there.  And that is another place where I think the Paul, Weiss experience and the experience of the law firms that have made agreements even without an executive order are particularly informative, because if you had any doubt about the viewpoint discrimination in the order itself -- and I think it would be hard to have doubts, because it is clear that the president is exercised by particular kinds of litigation on behalf of particular clients -- and, of course, the president was also motivated by WilmerHale's own words and its own press release welcoming Bob Mueller and some of his colleagues back to the firm and applauding Bob Mueller for his career of public service.

So we have viewpoint discrimination right there.  But then the actions of these other firms really reinforces that because, in order to get these orders lifted or obviated in the case of the firms other than Paul, Weiss, what they've done is they've agreed to provide legal services for some of the president's favored causes, favored viewpoints.

So both in the order itself, we know which viewpoints the president disfavors; and with respect to the other deals that have been made with other law firms, we

**JA 2765**

know what viewpoints that the president favors.  So the viewpoint discrimination is utterly obvious here.

So I think that the First Amendment problems with the order as a whole are probably the most glaring flaws in the executive order.

But in the long run, I actually think the most pernicious flaws actually go to the separation of powers because, in this case -- and there's really two elements to the separation-of-powers problem here.  First and foremost, this is essentially legislative in nature.  There is no legislation that supports this authority.  This executive order doesn't invoke legislation that would somehow give the president the authority to do this.

This is essentially -- if Congress passed this provision or authorized this provision, it would be about as plain a bill of attainder as we've seen in this country for decades and decades.  So for the president to do it himself is actually a double violation, because he's essentially usurping legislative authority to do it and then he's doing something through executive fiat that all of the framers would recognize as a bill of attainder.

And indeed, in preparing for the argument today, there's one case I read that is not in the briefs, but I think is telling, a case called *Ex parte Garland* from the Supreme Court in 1866.  And it underscores that a bill of

**JA 2766**

attainder doesn't need to inflict criminal punishment.  The punishment at issue in *Ex parte Garland* was being barred from practicing law in the courts.

And Congress passed a law after the Civil War and said, basically, if you were involved with the Confederacy, you can't practice law in the courts in the United States. And the Supreme Court invalidated that as a bill of attainder and, in the process, laid the groundwork for the second separation-of-powers problem here, which is they said who gets to appear in the courts and make arguments in front of the courts is an issue for the Article III courts.  It's not an issue for Congress; it's not an issue for the executive branch.

And that is to me what's particularly pernicious here, because the things that are the basis for the retaliation in Section 1 are almost exclusively representations before the Article III courts.

And as it turns out, as best we can tell, if we try to associate the complaints in Section 1 with actual cases, those are cases where on almost every occasion WilmerHale prevailed on behalf of its clients.  And the two exceptions I've been able to identify, WilmerHale prevailed in the district court for its clients and, on appeal, had at least one dissenting jurist side with their position.

So we are not talking about a law firm that has

**JA 2767**

weaponized the judicial system in the way that any of us would recognize in the Article III courts.  The lawsuits that have formed the basis for this executive branch action in the main were overwhelmingly successful.

And in that regard -- and none of them were the basis of the Article III courts sanctioning the lawyers in front of them for misbehavior, misconduct, misleading the Court.

So under those circumstances, for the executive branch to take it onto itself and impose punishment, impose sanctions on the lawyers for those representations, is a grave threat to the rule of law, Article III and the separation of powers.

And of course, the problem, as I alluded to in the earlier hearing, goes even deeper, because the signal this sends to the whole bar is:  Watch out.  We're watching.  If you're litigating against the government or you're not litigating against the government, your behavior can be punished.  And there's just no way to practice law under those circumstances.

If I have to stand up here and argue in front of the Court today with one eye on how this is going to be perceived by the executive branch and how that's going to influence the interest of my other clients, well, I might as well go sit down.  That's not how you can practice law.

The Supreme Court in the *Velazquez* case said that an independent judiciary depends on an independent bar.  And this -- these orders are a direct and lethal threat to the independent bar.

And so I think the separation-of-powers issues here are incredibly important.

Now, let me just address, if I can, a couple of things that I think we are -- that the government has indicated in its briefs, and I think ultimately get them nowhere.  Obviously, I'll have a chance for rebuttal, so I'll address some of that then as well.

But I think a couple of points.  We've heard over and over again this idea that, Well, all Section 5 does is ask for guidance.

But that gets the government nowhere, because there's no guidance that can be consistent with our constitutional system to implement this order because this idea that, like, you need guidance -- the executive branch already has lots of guidance for who can get into government buildings.  Some government buildings everybody can come in.  The post office, pretty much anybody can come in.  The Justice Department, you have to have an appointment.  And then you get a red badge or you get a green badge.

So the only guidance that's even needed here is guidance that would say, how is WilmerHale and their lawyers

disfavored vis-à-vis all the other lawyers in town who get access based on neutral principles?

So there's no guidance here that can fix the fundamental problem here, which is that a handful of law firms are being singled out based on their representations for disfavorable treatment.

The other problem about guidance -- and your Honor already alluded to this in the earlier TRO hearing -- is clients don't have time or the patience to wait and figure out, well, I wonder how the guidance is going to turn out.

I mean, right now, today, WilmerHale is making pitches for business with other -- against other law firms that are not constrained by this kind of executive order. When those clients are making their decisions as to who to hire, they've got a choice between law firms that don't have to wait for guidance and law firms that may be useless to them or substantially hamstrung if the guidance comes out and reflects the president's intent that they should have restricted access to these buildings.

So waiting for guidance is absolutely no answer in this context.

The same is true with the provisions in the executive order that say "to the extent consistent with law."

I mean, "to the extent consistent with law" with

this executive order is not at all.  It needs to be enjoined.  It needs to be enjoined *in toto*.  And it is not --

THE COURT:  One might say that's window dressing.

MR. CLEMENT:  One would say that's window dressing at best.  And as -- you know, in the context of legislation, it's quite common for somebody to come into court and say, Well, I have an interpretation of this statute that avoids the constitutional problem because it does nothing.

And the courts time and time again reject those arguments.  And I think that applies *a fortiori* here, because if this executive order accomplished nothing because it only takes effect to the extent consistent with law, and that extent is nothing, there would be nobody more disappointed than the president himself.  And you can see that from the fact sheet that accompanied the order.

The fact sheet doesn't talk about sort of, you know, vague what-ifs or compliance.  It says:  We're going to immediately suspend the security clearances of everybody associated with WilmerHale.  Immediately suspend.

And it similarly talks in terms that the president understood that this order was supposed to have effect -- it was supposed to have immediate effect.  It has had an immediate chilling effect on my clients.  And all of that, I think we're at the point where it would be appropriate and

**JA 2771**

important to have permanent relief.

Before I sit down -- I don't have a clock right in front of me, but if --

THE COURT:  You have five minutes left.

MR. CLEMENT:  If I have five minutes left -- I mean, obviously, I'm here to answer any questions that your Honor has.

But I would talk about some of the other provisions -- the other constitutional provisions.  I mean --

THE COURT:  Well, why don't you talk a little bit about the expert report which you submitted by Mr. Leonard and how he stresses, based on his 30 years of experience in the security world -- at the highest levels, I might add, at the end -- he stresses the individualized nature of gaining security and having it withdrawn and how this order flies in the face of the experience that he's accumulated, again, at the very highest levels during the Bush Administration and before then.

MR. CLEMENT:  So your Honor has already well summarized the Leonard declaration.  But let me bring your attention to one particular aspect of that that's important, which is the individualized nature of this goes not just to the decision to grant the security clearance or to revoke it formally.  It also goes to suspension.

**JA 2772**

I mean, this idea of suspending security clearances, that is something that happens in the real world; but again, it's an individualized basis.

I mean, if somebody with a security clearance is arrested tonight under very suspicious circumstances, the national security community doesn't have to wait to suspend a security clearance until they go through a very individualized formal process. They can suspend it, but they suspend it based on the fact that that individual has been arrested under very suspicious circumstances.

You also sort of see this in the reporting requirements. If you have a security clearance, you're under obligations to report foreign travel, a bequest from some relative, all of that stuff. And of course, if you don't do your individualized reporting, that can lead to a suspension. But it's all individualized.

And as the Leonard declaration makes clear, what there isn't any room for in the traditional way of proceeding with security clearances -- and equally important, what is not off limits under *Lee v. Garland* is this idea that we're going to not do this individualized; we're going to have a suspension that's across the board of everyone who's associated with WilmerHale.

And what I think makes that particularly pernicious is because these are people -- these are roughly

**JA 2773**

20 people, 20 lawyers, who were granted the security clearances only on the basis of those individualized investigations that Mr. Leonard details.  And again, he details -- there's 13 different factors that are taken into account.  And all of these 20 individuals were flyspecked on those 13 factors and granted security clearances, some of whom have had security clearances for years and have complied with the reporting requirements and are in good standing.

And so to take something that is only granted on an individualized basis and then suspend it across the board based on a nonindividualized basis, I think, is really unprecedented.

And it fits much more in the model of --

THE COURT:  I think he goes further and says -- as I recall it, I think he says that that leads to danger to national security if you start granting, suspending or revoking based upon classification as opposed to an individualized assessment.

MR. CLEMENT:  That's exactly right.  And he also goes so far as to suggest it's also inconsistent with all of the regulations and even the statutory directions from Congress.

And I would only add, as the cherry to that particular sundae, is I think that maps onto the D.C.

**JA 2774**

Circuit case law very well.  I know your Honor is familiar with *Lee v. Garland*.  But *Lee v. Garland* expressly distinguished an earlier case of the D.C. Circuit, the *Federated Federal Employees v. Greenberg*.

And that was a decision written by Judge Randolph, who is not somebody who takes national security issues lightly.

THE COURT:  No.

MR. CLEMENT:  Judge Randolph, for a panel that included Judge Edwards and Judge Sentelle, said that when you have these kind of across-the-board issues -- and there it was, What kind of questions are we going to ask in the security clearance? -- that's not off limits under *Egan* and political question cases.

So I think the distinction you see in the case law is a distinction between these kind of across-the-board generalized things, which can be challenged in court and are justiciable, and the individualized determination that this particular person poses this threat to national security.  I think that makes perfect sense.  It would almost have to be the rule because, otherwise, you could use these security clearances to get around all sorts of constitutional provisions.  The Republican president could come in and say, Everybody associated with a Democrat, everybody who has ever voted Democrat, is immediately suspended with their security

**JA 2775**

clearance.

Well, of course you can't have that as a matter of the protections that you have against that kind of partisanship and the fact that we don't have a spoils system in our civil service.  But you can get around it if you could make these kind of generalizations.

So I think that that aspect and the declaration that your Honor has pointed to I think not only shows why Section 2, even if you were going to go section by section, is fundamentally infirm, but also I think shows that there's a path here that does not implicate the *Lee v. Garland* decision.

So I'll be back with you in rebuttal.  But I appreciate your Honor's attention.  Thank you.

THE COURT:  Very good.  Thank you.

Mr. Lawson.

MR. LAWSON:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. LAWSON:  I think at a high level, the Court asked the question about reviewing in whole or by section.  Obviously the Court has seen our pleadings.  We have attacked this issue section by section.  There is a --

THE COURT:  I thought I'd tee it up for you.

MR. LAWSON:  Thank you.

There is -- at a very high level, I think the

**JA 2776**

biggest point of difference between the parties, and I suspect will be driving the Court's decision and guide most of its ruling, is whether or not these provisions, the main operative sections, 2, 3, 4 and 5, are acts of executive discretion or if they are punishment.

And that, I think, really is going to drive all of this analysis, particularly as it relates to the claims about viewpoint retaliation and a First Amendment issue.  As I read those cases, the retaliation does have to involve some level of punishment.

We are viewing these sections, 2, 3, 4 and 5, as not punishment, just the -- the effort of the executive --

THE COURT:  Isn't the threat to the ongoing business of a major law firm punishment?  Just the threat alone.

MR. LAWSON:  I would submit that these --

THE COURT:  How can that not be punishment?

MR. LAWSON:  Well, if we can take the sections individually and figure out -- I would -- I guess I'm disputing the point that this order and these sections, separately or together, really aren't an absolute threat, an absolute punishment.  These are discretionary points.

Section 2, which you were just having a discussion with Mr. Clement about, there is great deference given to the executive on security clearances.

**JA 2777**

Section 3 regarding contracting:  extraordinary deference by Congress to the executive on how to fill that out.

Section 4, the direction to the EEOC:  This is, on a broad level -- obviously, the section is important from the Perkins executive order.

And Section 5, again, it's regarding the guidance.

Is it possible in Section 5, regarding access to staff, access to offices -- could guidance be issued that is so horrific that it prevents a Wilmer attorney going to the Bureau of Prisons to meet a client and prep for trial?

Yes, it could be that way.  But no guidance has been issued that is posing that level of threat.  It's not ripe on that point.  And there are ways of access to buildings, access to staff, that would be consistent.  Just by way of example --

THE COURT:  How do you think clients would take that?

MR. LAWSON:  I'm sorry?

THE COURT:  How do you think clients would take the admonition from a Wilmer attorney that this issue is not ripe yet, so don't worry about it?  Do you see, in the practical real world, that would be an answer that would be acceptable to a prospective client if you need to tell him the guidance hasn't been issued?

**JA 2778**

MR. LAWSON:  No.  I can -- I can see the Court's concern.  I can see the question and the issue there.

But whether or not that's actionable, I don't think we can say it's actionable until we see what it says.

I think we just -- we have to -- we have to have the ripe issue of, what is it prohibiting?  Is it prohibiting Department of Justice staff from appearing at a WilmerHale CLE on diversity?  That's one thing.

Is it barring access to the courthouse?  Something else.

We don't know what it is.  It hasn't been -- it hasn't been defined.  It's been frozen because of the Court's order in this and the other cases.

THE COURT:  You'd have to add a lot of judges to this court to deal with all the motions that would have to be litigated to deal with that kind of potential unraveling.

MR. LAWSON:  Well, I mean, as it relates to this particular case, one way, if the Court denies the motion for summary judgment and also denies the motion to dismiss and we proceed, the Court could easily amend the temporary restraining order to allow for the development of the guidance.  Maybe not even -- not allow it to be implemented, but at least it will be ripe; it will be concise, concrete and reviewable.

We don't have that here.  We're playing a guessing

**JA 2779**

game.

And so that's the issue there.

Counsel for the Plaintiffs has raised concerns about the breadth of what Section 5 could be. The Court has obviously understood some of the concerns about that.

But we just -- it's not concrete. That's our issue there. We can have no end of parade of horribles, but we need to have that definiteness to have it be justiciable. That's our main point on that point.

But again, to go back to the example I gave a moment ago about, you know, perhaps it's a bar on attending CLEs on diversity issues or something along these lines, that's within the prerogative of the executive to decide, where will staff go? Obviously, going in an official capacity. You know, if someone wants to pay their own way and attend, that's one thing. But someone who is appearing as XYZ official from ABC agency, that would be something that I would submit is within the prerogative of the executive.

So there's a way that Section 5 can fit within executive discretion.

Section 4 -- I'll just go in reverse order here -- Section 4 with the EEOC direction, this is a classic example of the executive having a concern on a legal issue; you know, improper use of race, sex and ethnicity stereotypes

in -- in private practice of sending a direction to the EEOC:  Take a look; see what you've got there.  That's really all Section 4 is dealing with.

Section 3 I think we discussed at some length at the prior hearing.  And just to recap, there is a very large body of case law supporting the use of executive order -- or the use of executive orders to further public policy and social policy through the procurement power.

So again, these contractual issues with subcontractors:  well supported as a use of executive power.

And again, the concerns as laid out in this executive order are on racial discrimination.  And that's the -- there's the strongest body of case law that's very well supportive of the use of executive order through the procurement power to further that end.

And then, of course, returning now to Section 2, the case law that the Court knows better than I, I'm sure, is very supportive of the merits being given over to the executive.

And as it relates to Section 2 and the Court's concerns and issues addressed with Plaintiff's counsel, I would just call out that the immediate steps are to be taken consistent with applicable law.

Now, I understand the Court's concerns about, is this just general surplusage or is it meaningful?

**JA 2781**

I read the key cases, *Egan* and *Lee*, as holding that following proper protocols and procedures on enforcing -- as it relates to the grant, revocation, suspension of security clearances, is justiciable, is reviewable.  The merits, maybe not.  But at least that process.

So to the degree there are processes involved, the -- what is being painted as sort of a blanket or wholesale immediate suspension is subject to the applicable law, which would involve following the protocols and procedures; and then the order specifically calls for pending a review of whether the clearances are merited.  So there is that individual review.

I understand the Court's consideration of the expert opinion.  His statements are what his statements are on that point.

But I would submit that what's driving Section 2 is the inherent authority of the executive.  And to give an example on this, if the Court were to adopt some of the language -- or the statements from the expert into an order, there is this risk that now, all of a sudden, an immediate urgency -- emergency pops up.  The executive is having to deal with this --

THE COURT:  Isn't that what suspension is for?

MR. LAWSON:  Yes.  But if it's -- if it's, like, a

**JA 2782**

larger group, if it's more than, like, a group of two or three people or five people or 100 people that he has a concern with, this or future presidents might have a concern with people who are a member of a certain group, it's like: Wait a minute. We've got to stop, pause and then we're going to dive into each of these people. This Court's order on this point is going to drive how that future issue is dealt with.

And I don't mean to belittle the concerns from the Court on this point, but I would just draw the Court's attention to the section that it is not eliminating the individual review. That is, as I read the issues counsel mentioned -- Mr. Clement mentioned the bill of attainder issues. Obviously, the expert is talking about the large group, that blacklisting and so forth.

This is not that. This allows for the individualized review to take place.

So I think, again, going back to where I was driving from, on the 30,000-foot level, are these punishments or are these valid -- a valid exercise of executive discretion?

And I think for all of them, they are and they suffice.

And obviously, as to Section 1, I know they're seeking to enjoin it, but the Court declined on the TRO

level.  And I would submit that these are protected government speech issues at that point.

I can't remember if it was this or another court, but it was almost along the lines of a press conference.

THE COURT:  Speaking of speech, why don't you spend a few minutes addressing the First Amendment concerns that Mr. Clement outlined in great detail in his pleading.

MR. LAWSON:  So as to the First Amendment concern, the issue that I see with how that applies here is, again, downstream of the idea of:  Is this retaliation or not?  Is this punishment or not?

THE COURT:  It's pretty clear it's retaliation --

MR. LAWSON:  Well, I would submit --

THE COURT:  -- on the face of it.  At least to this Court.

MR. LAWSON:  I think --

THE COURT:  Maybe not some other court.  But I have already staked that position out in my TRO.

MR. LAWSON:  I'm sorry?

THE COURT:  I already staked that position out in my TRO.

MR. LAWSON:  Well, I would submit that these concerns are properly within the president's realm to have an opinion on as far as his concerns about --

THE COURT:  No one is concerned about his

opinions; they're concerned about his actions.

MR. LAWSON:  Well, that's where I -- again, to go back to the section-by-section analysis I just gave as to, are these actions within the discretion given to the executive?  I would say yes.

And so to the degree that there's a First Amendment concern, none of these -- let's talk about the bill of attainder for a minute.  The big concern with those bill-of-attainder cases was that it was a bar from the ability to practice, a bar on the ability to do your chosen profession.

That's not accomplished here.  Now, I know there's a parade of horribles that could be referenced if the Section 5 guidance ever comes out and it's as bad as it's thought.  But it doesn't have to be.  So even removing that, there's nothing here that's a bar.

There is no right to government contracts. There's no --

THE COURT:  What do you mean, it doesn't have to be?  What does that mean?

MR. LAWSON:  The guidance in Section 5 can be consistent with any constitutional concerns, whether on the First Amendment, due process, right to counsel, any of that. There is a way of drafting that guidance so that it can be consistent with this, with all of the concerns that have

been raised.

And so that's where I would say that to the degree that there is, you know, a concern about this being punishment, I think if you look at those cases where the punishment was found, you're seeing a theme of this person is being deprived of an ability to engage in their vocation.

That's not being done here.  There's no right to national security secret clearances under 2.  There's no right to government contracts under 3.  Certainly no right to violate Title VII, which is what Section 4 deals with.  And as to Section 5, access to buildings, access to government staff, access to government employment:  Soundly within the discretion of the executive to set boundaries consistent with the constitutional concerns that have been raised.

So we can -- there is a way for all of these provisions to fall within executive discretion that's been granted by Congress, granted by the Constitution.

And so there will be -- to the degree the Court is inclined to grant any of the provisions being sought by Plaintiff, extraordinary care needs to be written that isn't so broad that it is tying the hands of the executive.

Obviously, for decades, the procurement power was used to advance social policy in fighting discrimination.

To the degree the Court grants anything for

**JA 2786**

Section 3, I urge caution that it's not written so broadly it interrupts that power.

Obviously, there are many, many cases that have dealt with national security on this. This Court's order as to Section 2 will be similar on that point.

Section 4, interestingly, is actually one of the more -- the points that we are most concerned with because it's at such a high level as far as we would like you to --

THE COURT: What if the Court disagrees with you and decides to treat it as a whole?

MR. LAWSON: As a whole?

THE COURT: Yes. Not on a section-by-section basis.

MR. LAWSON: Well, I would submit --

THE COURT: Which is the direction the Court is leaning in. I'll give you a little heads-up there.

MR. LAWSON: I appreciate that.

THE COURT: That's the direction I'm leaning in.

MR. LAWSON: And from that, I'm assuming the Court is concerned that, as a whole, this is an attack on First Amendment rights of representing certain --

THE COURT: It kind of looks that way.

MR. LAWSON: I would submit, your Honor, if you take the granular approach that we urge of looking at those sections, looking at the portions of the executive order in

**JA 2787**

Section 1 that lend support to each section, Section 1 is broadly written.  Not all of Section 1 supports each of those provisions equally.

There are very big concerns with -- on Section 4 as far as, what could possibly be improper with the executive urging an agency to investigate an area of concern?  And that's really all Section 4 is asking for. That's a very hard order to state, Oh, no, that's retaliatory.  That's going to call -- the consequences of executive action for how investigatory agencies prioritize what they look at, tying the hands of the executive going that way has tremendous consequences that I don't think this Court has to reach on that point.

So I don't know if that quite answers the Court's question or -- on that point.

THE COURT:  Not particularly.

MR. LAWSON:  Well --

THE COURT:  You can try -- keep trying, if you wish.

MR. LAWSON:  Well, I wish.

The --

THE COURT:  You've got about three minutes.

MR. LAWSON:  I understand.

Again, I would just drive back to, at that high level, you know, the executive has the ability to engage in

**JA 2788**

these discretionary acts.  There are no rights to all of these points that --

THE COURT:  There are First Amendment rights.

MR. LAWSON:  There are First Amendment rights. I --

THE COURT:  But you're not even prepared to concede that.

MR. LAWSON:  No.  I don't think I can concede --

THE COURT:  Or the chilling effect on their First Amendment rights --

MR. LAWSON:  I don't think I can --

THE COURT:  -- a combination of all these ingredients.

MR. LAWSON:  I don't think I can concede that.

The -- I don't view this as -- if it could be viewed -- if any one of these sections were overstepping discretionary bounds, then maybe.

But these, I submit --

THE COURT:  Mr. Clement says that these combination of components pose a challenge to the checks and balances between the various branches of the government.

MR. LAWSON:  Well, I understood the checks and balance.  And I guess we have two rebuttals here, so we can clarify that.  But I understood the checks and balance angle is the constitutional prohibition on the -- Congress not

**JA 2789**

being able to issue bills of attainder, with bills of attainder being an issue of, hey, Congress sets the law; the judiciary determines the punishment.

Again, you see the issue I'm driving at. If this isn't punishment, there is no separation-of-powers issue because there's no bill-of-attainder issue. It has to be the punishment -- for it to be punishment. And the classic examples of all those blacklists, total ban: There is no total ban here.

I understand -- noting the caveat about Section 5, because we don't have the guidance, there is no total ban. So if there were a total ban, then some of those concerns would be firmer.

THE COURT: Well, save up your swings for your rebuttal.

MR. LAWSON: Thank you, your Honor.

THE COURT: I think there's a different case he's working on. How about you?

MR. CLEMENT: I agree with you, your Honor. And I'm going to take a couple of swings myself. So let me start with this idea that there's no punishment here.

Now, the first point to make about that is, punishment isn't actually the test for most of the constitutional claims we're bringing.

THE COURT: Okay.

MR. CLEMENT:  The prohibition on viewpoint discrimination, just to pick one, is not limited to viewpoint discrimination in punishment.

Now, nobody thinks getting into a public forum or not has to be punishment in order for the government not to be able to prohibit access on the basis of viewpoint.

So on a lot of these things, punishment is actually beside the point.

Same with retaliation.  The question on retaliation is whether the action would influence somebody of ordinary firmness.  We can talk about these other law firms in a second, which I think demonstrate beyond a shadow of a doubt that, whether this is punishment or not, it would influence the judgments of law firms of ordinary firmness. And it takes, frankly, a law firm of extraordinary firmness to be in court challenging these things.

But even as to those constitutional claims where punishment is the test -- and I will grant you that, for the bill of attainder, for example, that punishment is the test -- I think we have punishment in spades here, and I actually find the idea that this isn't punitive to be somewhat bewildering.

THE COURT:  It's retaliatory.  There's no question in my mind.

MR. CLEMENT:  Exactly.  Exactly.

But as to whether it's punishment, just for a moment on that, I mean, in the context of a law firm to say that you are not going to have access to -- unfettered access that your peer firms are going to have to government buildings, that you're not going to have the same kind of security clearances, especially if you're trying to have a national security practice -- and WilmerHale has one of the finest national security practices in the country -- and then, if you tell that law firm that its clients are going to have to make disclosures to the government about who's representing them and about what, if they're a government contractor that are different from their peer firms, all of that, it seems to me, would qualify as punishment.

THE COURT:  What would you consider a peer firm? Firms of over a thousand lawyers?  How would you describe it?

MR. CLEMENT:  Well, there's so many different ways to come at that.  But maybe I'll talk about for a second the nine firms that have made a deal with the government rather than suffer these kind of executive orders.

THE COURT:  Skadden.

MR. CLEMENT:  The Skaddens, the Kirklands, the Lathams.

THE COURT:  Paul, Weiss.

MR. CLEMENT:  Paul, Weiss.

**JA 2792**

And I think even my friend from the government would agree that a $125 million fine is punishment.  And from the perspective of most of these law firms, the last ones to settle, the Lathams, the Kirklands, they were willing to pony up $125 million in *pro bono* services in order to avoid this kind of executive order.

So those peer firms' actions speak louder than words, and they say that being subject to one of these executive orders is worse than a $125 million fine.

So the punishment here, I think, is clear beyond cavil.

So the second thing I want to address in rebuttal is my friend from the government says, Well, really you should understand Section 1 is government speech.

That is the precise argument that was rejected unanimously in the *Vullo* case, the *NRA v. Vullo* case in the Supreme Court.

And this would not be a difficult case before *Vullo*.  But *Vullo* is, it seems like, the Supreme Court trying to say, You can't do what the executive order purports to do here.

And what *Vullo* focused on in particular that was -- arose in the context of the DFS regulator in New York and putting pressure on people in order to not provide services to the NRA.

And what the Court focused in on -- and I think it's important, and I think it's related to an observation that you made in the TRO hearing -- is that if the government wants to go after somebody and their speech, it's particularly effective to try to go after third parties who they provide services to, or vice versa, because the insurance Lloyd's of London, they don't have much of an incentive to stand up for gun rights. So if the pressure is imposed on them, they'll fold easily, whereas the NRA would have stood tall and resisted.

And in the same way, the reason that this executive order is so pernicious is it put pressure -- it puts pressure on the clients. The executive branch understands that, as this Court underscored at the TRO hearing, clients are skittish. Clients are nervous. They want to make sure, if they're going to hire a lawyer, that that lawyer is going to be there throughout the representation, able to defend them, able to have a fair hearing in a government office building, able to get into the door of the government office building. That's what clients need, and that's what this executive order goes after, I think entirely consciously, and makes it particularly pernicious.

Now, my friend on the other side also talks a lot about discretion and the discretion of the executive.

**JA 2794**

But with all due respect, the discretion of the executive branch does not extend to retaliation.  It does not extend to viewpoint discrimination.  It does not extend to providing punishment without any due process, any notice.

Again, I have barely talked about due process because the First Amendment and separation-of-powers violations here are so glaring.  But all of this came on to WilmerHale.  There was no notice.  There was no opportunity for a hearing.  There was no predeprivation process or anything like it in this case.

So I'm a big believer, frankly, in executive discretion, but executive discretion is always limited by the Constitution.  And our complaint shows you about 11 different ways in which the executive discretion that's trying to be exercised here violates the Constitution.

The fourth point I'd just like to make in rebuttal, but also to potentially forecast to the remedy here:  I think that to the extent this Court is inclined to look at this order as a whole, that's exactly the right way to look at it.  And I think it lends itself to the kind of relief this Court could order.  Obviously, that's within the discretion of the Court.

But I think it would be quite straightforward to say that this executive order is unconstitutional *in toto* as a matter of declaratory relief and then simply enjoin any

and all action based on this executive order.

I think that gets to the gist of this order being unconstitutional, root and branch, and no action should take place on the basis of this order.

And then I think in terms of framing who's subject to that order, it needs to be very, very broad. I mean, the government, in their compliance efforts, doesn't even seem to understand every agency that is subject to the president's discretion to retaliate against WilmerHale. And so we need relief here that is comprehensive.

And if your Honor took a look at the compliance memo that was provided with respect to Judge Bates's order that's in a footnote in our last brief, they need a real compliance memo, not "An unelected federal judge has told us we have to do something, but we don't think he or she is right."

That's not compliance. That's not the way the Justice Department typically ensures that there is compliance with a federal judge's order.

The point I'll sit down on, your Honor, is one that we've talked about a fair amount already. But again, my friend from the government, about the best thing he can tell you is, Well, this looks really bad, but we're going to give some guidance, and maybe the guidance is going to make it look a little bit better.

There is no guidance in the world that can fix this problem, because the gist of this order is to single out WilmerHale and figure out how we're going to treat it worse than other law firms and how we're going to disadvantage WilmerHale.  The order of this executive order itself -- the title of this executive order tells you what this is on about:  addressing the risks posed by WilmerHale.

Now, the way you do that is you have guidance eventually that tells you exactly how to deny access, how to deny security clearances, how to interfere with government contracting and client relationships and all of the rest.

No -- there are certain things in government that no guidance can fix.  There's an executive order that says, Go discriminate on the basis of race and issue some guidance on how to do it.  You don't have to wait for the guidance.  It's unconstitutional, root and branch.

And my friend also talks a lot about tying the executive's hands.

THE COURT:  They talk about national interests, sometimes distinguishing it from national security.  They don't define what national interests are in that situation.  Presumably, it's broader.

MR. CLEMENT:  It has to be broader and --

THE COURT:  It has to be.

MR. CLEMENT:  -- presumably, it's in the eye of

the beholder.  And that's both problematic, but it also underscores that no decision of the D.C. Circuit or the Supreme Court has ever said -- that I'm aware of says you have to defer to the president's view of the national interest.

National security, sure, especially based on an individualized determination.

But in a sense, they give away the game when they talk about the national interest rather than national security.  Even they can't quite bring themselves to say that WilmerHale lawyers, all 20 of whom have gone through this exhaustive individualized process and been determined fit to have a security clearance, they can't really bring themselves to say that those lawyers pose a national security risk.

So they fudge a little bit, talk about the national interest.

With respect, that doesn't get it done.  And, in a way, ultimately, it's kind of offensive to those that are really concerned about the national security.  And it dilutes, frankly -- I mean, courts should defer to the executive when it's truly about the national security interests of the United States.  But if we're going to fudge, no deference is appropriate.

And let me finish on this note, your Honor:  My

friend also talks about tying the hands of the executive, and you don't want to tie the hands of the executive.

Well, with all respect, there are some subjects where the executive's hands should be tied.  And that gets to retaliation.  That gets to viewpoint discrimination.  That gets to interference with the separation of powers and representations before the Article III courts.  If the executive is inclined to interfere with the traditions that are essentially necessary to have the rule of law in the adversarial system of justice, the president's hands should be tied.

Thank you, your Honor.

MR. LAWSON:  So Mr. Clement referenced the *Vullo* case.  I think that's a good point to kind of finish where I was starting as to whether or not this is punishment.

And in that case, the regulatory body up there was threatening to use its powers as the sovereign to coerce other parties, on threat of further investigation, to cease doing business with another entity.  That qualified as punishment in that case.

We don't have that here.  All of these sections involve not the use of the executive power as sovereign to go and exact punishment.  This is the executive determining who should be trusted with secrets.  Section 2.  Who should we contract with?  Section 3.  What should be the priorities

for policing antidiscrimination laws?  Section 4.  What should we be doing as far as interaction with our staff on these issues?  Section 5.

None of them involve those same issues in *Vullo*.

So I understand the Court's concerns.  I have certainly heard the Court's questions and comments and statements regarding its view of the nature of this order.

So I'm not -- you know, while I respectfully disagree that it's purely retaliatory or anything like that, to the degree the Court is inclined to grant any portion of this, I hope I can impart at least that one concern, that the traditional -- or the easy analogy to the *Vullo* line of cases doesn't really hold here.  This involves discretion.

And to the degree the Court is granting any portion of this order, it's going to be -- I say again -- tying the hands of the executive with consequences that could be unpleasant and only visible in the long term.

So that is the biggest point that I would leave the Court with here, is to be mindful that this point deals with discretion and not with punishment.

Beyond that, I don't have any other specific points to raise in rebuttal.

THE COURT:  Thank you.

MR. LAWSON:  Thank you.

THE COURT:  Well, I appreciate, of course, that

**JA 2800**

the parties would like a ruling in short order, as quick as possible.

There are so many issues of truly unusual and major importance here.  It's not like the opinion will be turned out in a matter of days.  It will be more like weeks.  But it will get the highest priority among my cases, I can promise you that.

And hopefully, it will not be too late.  I'll try to avoid that as well.

Thank you for your assistance, counsel.  We stand in recess.

(Proceedings concluded.)

**CERTIFICATE**

I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.

Dated this 23rd day of April, 2025.

/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

**JA 2802**

Clement & Murphy
PLLC

May 13, 2025

**VIA ECF**

The Honorable Richard J. Leon
U.S. District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

      Re:    *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*, No. 1:25-cv-917-RJL (D.D.C.)

Dear Judge Leon:

      I write to inform the Court of a recent development that pertains to the above-referenced matter. On May 9, 2025, two WilmerHale attorneys received letters from a government agency informing them that their security clearances have been suspended "pursuant to Executive Order 14250, *Addressing Risks from WilmerHale*" (the "Executive Order").[1]

      This development underscores that the Executive Branch stands ready and willing to implement the Executive Order absent judicial intervention. It also underscores the need for any permanent relief this Court may grant not only to restrain future implementation of the Executive Order, but also to redress actions already taken pursuant to it. Accordingly, WilmerHale respectfully requests that, if the Court enjoins enforcement of the Executive Order, the Court specifically direct Defendants to (1) nullify and reverse any and all suspensions or revocations of WilmerHale personnel's security clearances that have been made pursuant to the Executive Order; (2) cease any and all reviews of WilmerHale personnel's security clearances initiated pursuant to the Executive Order; and (3) nullify, reverse, and/or cease any other actions that may have been taken pursuant to the Executive Order.

                  Respectfully,

                  s/Paul D. Clement
                  Paul D. Clement

                  *Counsel for Plaintiff*

Cc:  All Counsel of Record

---

[1] WilmerHale stands ready to lodge the letters under seal if the Court so orders.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Case No. 25-917 (RJL) |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OPINION**
May **27**, 2025 [Dkt. #15; Dkt. #16]

The cornerstone of the American system of justice is an independent judiciary and an independent bar willing to tackle unpopular cases, however daunting. The Founding Fathers knew this! Accordingly, they took pains to enshrine in the Constitution certain rights that would serve as the foundation for that independence. Little wonder that in the nearly 250 years since the Constitution was adopted no Executive Order has been issued challenging these fundamental rights. Now, however, several Executive Orders have been issued directly challenging these rights and that independence. One of these Orders is the subject of this case. For the reasons set forth below, I have concluded that this Order must be struck down in its entirety as unconstitutional. Indeed, to rule otherwise would be unfaithful to the judgment and vision of the Founding Fathers!

1

**JA 2804**

**BACKGROUND**

I.    **Factual Background**

A.    *WilmerHale*

Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale" or "the firm") is a law firm with over 2,000 employees, approximately 1,200 of whom are lawyers.  Compl. [Dkt. #1] ¶ 77.  The firm has 12 offices around the world.  *Id.*  Its attorneys work in a variety of different sectors, including criminal defense, patent prosecution, securities law, and regulatory and government affairs, to name just a few.  *See id.* ¶ 79.

The firm takes on "a wide array of clients, ranging from large corporations, colleges and universities, and Native American tribes to nimble start-ups and individuals accused of criminal and civil wrongs."  *Id.*  Its "litigation practice has long advocated for clients and causes across the ideological spectrum."  *Id.* ¶ 81.  Keeping with that practice, WilmerHale has represented clients in litigation against the federal Government during both Republican and Democratic administrations.  *Id.* ¶ 82.[1]

Certain of WilmerHale's cases and clients have drawn the ire of President Trump. The Complaint highlights a few, including the firm's representation of: inspectors general alleging that President Trump improperly fired them, *id.* ¶ 83; the House of Representatives Committee on Ways and Means in litigation resulting in President Trump's disclosure of his personal tax returns, *id.* ¶ 84; the Joe Biden and Kamala Harris campaigns in election

---

[1] WilmerHale "sued the Clinton Administration at least 28 times, the Bush Administration at least 68 times, the Obama Administration at least 125 times, the first Trump Administration at least 45 times, and the Biden administration at least 97 times."  *See* Pl.'s Statement of Undisputed Material Facts ("Pl.'s SUMF") [Dkt. #16-2] ¶ 42.  Throughout this Memorandum Opinion, the cited paragraphs of WilmerHale's statement of material facts are undisputed unless otherwise noted.

litigation, *id.* ¶ 85; and the Democratic National Committee and state-level Democratic Party organizations in lawsuits brought by the Donald Trump campaign challenging the results of the 2020 presidential election, *id.* ¶ 86.

The firm's affiliation with Robert S. Mueller III ("Mueller") has also attracted the President's displeasure. After a long and distinguished career in the Government, Mueller joined WilmerHale as a partner in 1993, and he remained there until he re-joined the Department of Justice ("DOJ") in 1995, where he ultimately served as the Director of the Federal Bureau of Investigation from 2001 to 2013. *Id.* ¶ 89. Thereafter, Mueller again returned to the firm for a few years before then-Acting Attorney General Rod Rosenstein appointed him to serve as Special Counsel charged with investigating allegations of Russian interference in the 2016 presidential election. *Id.* The Complaint alleges that, because of his role as Special Counsel, "Mueller personally became a target of President's Trump ire." *Id.* ¶ 91. The Complaint is replete with President Trump's statements on the investigation and Mueller's involvement. *See id.* ¶¶ 90–91 (collecting quotes from President Trump: "thugs"; "hit squad"; "National Disgrace!"; "hoax"; "witch hunt"; "very sick and dangerous people"). After the Special Counsel's Office issued its Report on the Investigation into Russian Interference in the 2016 President Election, Mueller rejoined WilmerHale. *Id.* ¶¶ 92–93. He has since retired from the firm. *Id.* ¶ 93.

**B.    *Executive Orders***

During the 2024 presidential campaign, then-former President Trump "threatened to 'go after' his political opponents and warned that 'WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law,'" adding "'[p]lease beware

3

that this legal exposure extends to Lawyers.'" *Id.* ¶ 94 (footnotes omitted).  After he won the 2024 election, President Trump renewed these warnings, stating that "[w]e have a lot of law firms that we're going to be going after, because they were very dishonest people." *Id.* (footnote omitted).

President Trump followed through on these threats.  On February 25, 2025, he issued a memorandum to the heads of intelligence agencies instructing them "to suspend any active security clearances held by Peter Koski and all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel[.]"  *Id.* ¶ 95.  Jack Smith, as Special Counsel, had brought criminal charges against then-former President Trump in two cases.  *Id.*

Covington & Burling and Jack Smith were not President Trump's only targets.  Next up:  Perkins Coie LLP.  On March 6, 2025, President Trump issued an Executive Order entitled "Addressing Risks from Perkins Coie LLP," which instructed agencies "to terminate contracts with Perkins Coie, to require all federal contractors to disclose any business with Perkins Coie and then review all contracts with Perkins Coie's clients, to limit official access of Perkins Coie to federal Government buildings, and to limit Government officials from engaging in their official capacity with Perkins Coie employees."  *Id.* ¶ 96; *see also* Exec. Order No. 14230, 90 Fed. Reg. 11781 (Mar. 11, 2025) ("Perkins Coie Order") (cited in Compl. ¶ 2 n.2).

The "Purpose" section of the Perkins Coie Order outlines its motivation.  *See* Perkins Coie Order § 1.  It accuses Perkins Coie of "dishonest and dangerous activity," including its representation of "failed Presidential candidate Hillary Clinton" in 2016 and

its involvement in election law litigation. *See id.*; Compl. ¶¶ 96–98. Perkins Coie sued to block enforcement of the Perkins Coie Order. *See generally* Compl., *Perkins Coie LLP v. DOJ, et al.*, No. 1:25-cv-716 (D.D.C. filed Mar. 11, 2025), ECF No. 1.

Next came a March 14, 2025 Executive Order targeting Paul, Weiss, Rifkind, Wharton & Garrison LLP. Compl. ¶ 100; Exec. Order No. 14237, 90 Fed. Reg. 13039 (Mar. 20, 2025) ("Paul Weiss Order") (cited in Compl. ¶ 2 n.2). The Paul Weiss Order substantially mirrors the Perkins Coie Order. *Compare* Perkins Coie Order *with* Paul Weiss Order. The "Background" section of the Paul Weiss Order explains that it is, in part, a response to Paul Weiss partner Mark Pomerantz leaving the firm "to join the Manhattan District Attorney's office solely to manufacture a prosecution against [President Trump]." Paul Weiss Order § 1; Compl. ¶ 100.

A few days later, President Trump announced that he had agreed to withdraw the Paul Weiss Order following a meeting with Paul Weiss's Chairman, Brad Karp. Compl. ¶ 102. The President then rescinded the Paul Weiss Order in toto. *Id.* ¶ 103; Exec. Order No. 14244, 90 Fed. Reg. 13685 (Mar. 26, 2025) ("Paul Weiss Recission Order") (cited in Compl. ¶ 103 n.29). The Paul Weiss Recission Order states that the firm had, among other conditions, "acknowledged the wrongdoing of its former partner Mark Pomerantz" and agreed to "dedicate[] the equivalent of $40 million in pro bono legal services during [President Trump's] term in office to support causes including assisting our Nation's veterans, fairness in the justice system, and combating anti-Semitism; and other similar initiatives." Paul Weiss Recission Order § 1.

On March 25, 2025, President Trump issued another similar Executive Order, this time targeting Jenner & Block LLP. *See* Compl. ¶ 106; Exec. Order No. 14246, 90 Fed. Reg. 13997 (Mar. 28, 2025) ("Jenner & Block Order") (cited in Compl. ¶ 2 n.2). Like Perkins Coie, Jenner & Block sued to enjoin enforcement of the Executive Order. *See generally* Compl., *Jenner & Block LLP v. DOJ, et al.*, No. 1:25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 1.

### C.   *The WilmerHale Order*

On March 27, 2025, only two days later after issuing the Jenner & Block Order, President Trump issued the Executive Order at issue in this case—the WilmerHale Order. Compl. ¶ 107; Exec. Order No. 14250, 90 Fed. Reg. 14549 (Apr. 3, 2025) ("WilmerHale Order" or "the Order"). The Order is entitled "Addressing Risks from WilmerHale" and largely tracks the Executive Orders issued against other large law firms. *See generally* WilmerHale Order. It contains six sections and is accompanied by a "Fact Sheet." Compl. Ex. B, Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale, The White House (Mar. 27, 2025) ("WilmerHale Fact Sheet" or "Fact Sheet") [Dkt. #1-2].

*Section 1 – Background.* The Background section of the Order outlines the risks supposedly posed by WilmerHale. It states, among other insinuations, that the firm has "abused its pro bono practice to engage in activities that undermine justice and the interests of the United States"; "supports efforts to discriminate on the basis of race"; "backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs"; and "furthers the degradation of the quality of American elections." WilmerHale Order § 1.

**JA 2809**

It further accuses WilmerHale of "employing lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice." *Id.* Here, President Trump cites to WilmerHale "welcoming" Mueller and his colleagues to the firm despite their involvement in "one of the most partisan investigations in American history." *Id.* The Background section culminates in a declaration that this type of "weaponization of the justice system" must not be condoned. *Id.*

*Section 2 – Security Clearance Review.* This section contains two provisions. Section 2(a) instructs the heads of relevant agencies to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest." *Id.* § 2(a).[2] Section 2(b) orders the Office of Management and Budget ("OMB") to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of WilmerHale." *Id.* § 2(b). The heads of relevant agencies are then to cease providing such materials and services to the firm, "to the extent permitted by law." *Id.*

*Section 3 – Contracting.* Section 3 has multiple parts. First, "Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract." *Id.* § 3(a). Second, agency heads "shall review all contracts with WilmerHale or with entities that disclose doing business with

---

[2] Multiple WilmerHale attorneys hold security clearances. Compl. ¶ 139; Suppl. Decl. of Bruce M. Berman in Supp. of Pl.'s MSJ ("Suppl. Berman Decl.") [Dkt. #16-3] ¶ 28.

WilmerHale" and then:  (1) "take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law . . . for which WilmerHale has been hired to perform any service"; (2) "otherwise align their agency funding decisions with the interests of the citizens of the United States [and] with the goals and priorities of [President Trump's] Administration as expressed in executive actions"; and (3) within 30 days of the Order, submit to OMB "an assessment of contracts with WilmerHale or with entities that do business with WilmerHale effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order."  *Id.* § 3(b).

*Section 4 – Racial Discrimination*.  Section 4 states that "[n]othing in this order shall be construed to limit the action authorized by section 4 of [the Perkins Coie Order]."  *Id.* § 4.  The relevant section of the Perkins Coie Order, in turn, instructs the Chair of the Equal Employment Opportunity Commission ("EEOC") to "review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964."  Perkins Coie Order § 4(a).  The provision also instructs the Attorney General to investigate large law firms "who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws."  *Id.* § 4(b).

*Section 5 – Personnel*.  Section 5 contains two provisions.  First, it instructs agency heads to provide guidance on "limiting official access from Federal Government buildings to employees of WilmerHale" and "limiting Government employees acting in their official capacity from engaging with WilmerHale employees," with the cited goal of "ensur[ing] consistency with the national security and other interests of the United States."

**JA 2811**

WilmerHale Order § 5(a).  Second, it states that agency officials shall refrain from hiring WilmerHale employees, absent a waiver from the relevant agency head.  *Id.* § 5(b).

*Section 6 – General Provisions*.  This section contains limiting provisions.  It states that nothing in the WilmerHale Order shall be construed to impair (1) "the authority granted by law to an executive department or agency, or the head thereof"; or (2) OMB's functions "relating to budgetary, administrative, or legislative proposals."  *Id.* § 6(a).  It also mandates that the Order be implemented consistent with applicable law.  *Id.* § 6(b).

*Fact Sheet*.  The Fact Sheet accompanies the Order.  It largely reiterates the allegations in the Background section of the Order, but further characterizes WilmerHale as a "rogue law firm."  *See* WilmerHale Fact Sheet.

## II.    Procedural Background

One day after President Trump issued the Order, WilmerHale filed suit in this Court. *See generally* Compl.  The Complaint's 11 counts allege that the Order violates the First, Fifth, and Sixth Amendments, the separation of powers, and the Spending Clause.  *See id.* ¶¶ 129–226 (Counts I–XI).  The Complaint seeks declaratory and injunctive relief.

Along with the Complaint, WilmerHale filed a motion for a temporary restraining order ("TRO") and a preliminary injunction ("PI").  *See* Pl.'s Mot. for TRO and PI [Dkt. #3].  This Court held a hearing on the TRO motion that same day, after which the Court granted a TRO enjoining enforcement of §§ 3 and 5 of the Order.  *See* Min. Entry (Mar. 28, 2025); Mem. Order ("TRO Order") [Dkt. #10].

The parties subsequently submitted a proposed briefing schedule for dispositive motions and consented to the Court extending the TRO until final judgment.  Joint Status

**JA 2812**

Report [Dkt. #13]. The Court adopted the briefing schedule, set oral argument for April 23, 2025, and extended the TRO pending resolution of the case. Min. Order (Apr. 1, 2025).

Defendants filed a motion to dismiss, and WilmerHale filed a motion for summary judgment. *See* Defs.' Mot. to Dismiss [Dkt. #15]; Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' MTD") [Dkt. #15-1]; Pl.'s Mot. for Summ. J. [Dkt. #16]; Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s MSJ") [Dkt. #16-1]. The issues therein evidently piqued the interests of many third parties, as the Court has received over 30 amicus briefs, which are filed on the docket. With the parties' briefs and amici's insights in hand, the Court held oral argument on April 23, 2025. The matter is now ripe for decision. *See* Pl.'s Opp'n to Defs.' MTD [Dkt. #104]; Defs.' Opp'n to Pl.'s MSJ [Dkt. #103].

## LEGAL STANDARDS

Defendants move to dismiss the Complaint under Federal Rules of Civil Procedure 8(a), 12(b)(1), and 12(b)(6).

Rule 8(a) requires that a claim for relief include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(1)(2). The Court may dismiss the Complaint under this Rule if it is "so excessively long as to be unmanageable, or so poorly conceived and drafted that it is difficult to decipher a coherent, viable cause of action." *T.M. v. District of Columbia*, 961 F. Supp. 2d 169, 175 (D.D.C. 2013).

A Rule 12(b)(6) motion to dismiss for failure to state a claim tests the legal sufficiency of the Complaint. *See* Fed. R. Civ. P. 12(b)(6); *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017). To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

10

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Complaint must include "factual content" sufficient to allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A Rule 12(b)(1) motion, on the other hand, tests the Court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by the Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). WilmerHale bears the burden of demonstrating the Court's subject-matter jurisdiction over the claims at issue. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

In deciding a motion under Rule 12(b), the Court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). If "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (quoting Fed. R. Civ. P. 12(b)).

WilmerHale moves for summary judgment on each of its claims. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "must assume the truth of all statements proffered by the non-movant

11

**JA 2814**

except for conclusory allegations lacking any factual basis in the record." *Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999). "'The mere existence of *some* alleged factual dispute between the parties' will not defeat summary judgment; 'the requirement is that there be no *genuine* issue of *material* fact.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law . . . . An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 F.3d at 248).

<u>**ANALYSIS**</u>

**I.     Framing**

Before addressing the parties' arguments, the Court must resolve a threshold dispute: whether to analyze the Order as a whole or on a section-by-section basis. WilmerHale urges the Court to take the former approach, while defendants press for the latter.

The Complaint asserts 11 claims, each of which attacks the entire Order as unconstitutional. *See generally* Compl. Defendants, in moving to dismiss and opposing summary judgment, organize their arguments by section of the Order. *See* Defs.' MTD at 4 ("To provide some structure regarding this overbroad shotgun Complaint, Defendants have organized this motion to dismiss by addressing what appear to be Plaintiff's challenges to each section of the Executive Order.").

**JA 2815**

It is beyond dispute, however, that "[t]he plaintiff is 'the master of the complaint' and therefore controls much about [the] suit." *Royal Canin USA, Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987)). The plaintiff "gets to determine which substantive claims to bring against which defendants." *Id.* The defendant may then assert a "defense to a claim." Fed. R. Civ. P. 12(b).

Defendants here resist WilmerHale's framing of the Complaint because it "complicates Defendants' task in moving for dismissal." Defs.' MTD at 4. Defendants believe a section-by-section approach favors their defense because each section of the Order is an "act[] of executive discretion." Tr. of Apr. 23, 2025 Hearing ("Dispositive Mots. Hearing Tr.") [Dkt. #106] at 18:19–19:22. Unfortunately for defendants, the Court declines to follow their approach. WilmerHale, the master of its Complaint, chose to bring claims challenging the Order as a whole. Defendants attempt to infer which of WilmerHale's claims apply to which sections of the Order, *see* Defs.' MTD at 4, but this approach would require the Court to reconstrue—and likely misconstrue—the Complaint. Defendants themselves concede that in following this approach, their motion to dismiss can only address "what *appear* to be [WilmerHale]'s challenges to each section of the Executive Order." *See id.* (emphasis added).

The language of the Order and the record before the Court also support analyzing the Order as a whole. First, the Background section informs and is inextricably interwoven with each operative section of the Order. *See* WilmerHale Order § 1. It provides the President's justification for the Order and serves as a guide to federal agencies in

13

**JA 2816**

implementing the operative sections.[3]   Defendants admit that "portions" of § 1 "lend support to each section," albeit not equally.   Dispositive Mots. Hearing Tr. 29:23–30:3. The Order's operative provisions can thus only be understood in the context of § 1.[4]

The President's treatment of the Paul Weiss Order underscores the unified nature of the Order.  The Paul Weiss Order largely tracks the WilmerHale Order, with a Background section and similar operative provisions.  *See generally* Paul Weiss Order.  When Paul Weiss struck a deal with the President, he rescinded the Paul Weiss Order *in full*, citing the firm's "remarkable change of course."  Compl. ¶¶ 102–03; Paul Weiss Rescission Order. The President's treatment of the Paul Weiss Order shows that he "intended" these Executive Orders "to stand or fall as a whole."  *See Minn. v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 173 (1999) (finding that an Executive Order was designed "to stand or fall as a whole" because it "embodied a single, coherent policy").

Given the structure of the Order and WilmerHale's decision to challenge it as a whole, I will analyze WilmerHale's claims as it has pleaded them in the Complaint.

---

[3] For example, § 1 explains that law firms like WilmerHale "should not have access to our Nation's secrets, nor should such conduct be subsidized by Federal taxpayer funds or contracts."  WilmerHale Order § 1. Sections 2 and 3, in turn, instruct agencies and federal officials to suspend WilmerHale employees' security clearances and terminate any federal contracts for which WilmerHale provides services.

[4] The Order is akin to a gumbo.  Sections 2 through 5 are the meaty ingredients—*e.g.*, the Andouille, the okra, the tomatoes, the crab, the oysters.  But it is the roux—here, § 1—which holds everything together. A gumbo is served and eaten with all the ingredients together, and so too must the sections of the Order be addressed together.  As explained in this Memorandum Opinion, this gumbo gives the Court heartburn.

14

**JA 2817**

## II.    Justiciability

Throughout their motion to dismiss, defendants raise multiple justiciability issues, including standing, ripeness, and the political question doctrine.  I find that none bar this Court's review of WilmerHale's claims.  How so?

### A.    *Standing*

Defendants argue that WilmerHale and its clients do not have standing to challenge the Order.  *See* Defs.' MTD at 17–19, 23, 29.  "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance." *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004).  "This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Id.* at 128–29 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  One such prudential limitation implicated in this case is WilmerHale's ability to bring claims on behalf of its third-party clients.  *See LaRoque v. Holder*, 650 F.3d 777, 781–82 (D.C. Cir. 2011) (explaining the "prudential limitation" that a plaintiff "generally must assert his own legal rights and interest, and cannot rest his claim to relief on the legal rights or interests of third parties" (internal quotation marks omitted)); Compl. ¶¶ 158, 167, 207–08, 212, 220 (asserting third-party standing as to WilmerHale's freedom of association, right to petition, right to counsel, and spending power claims).

The Court may look to materials outside the Complaint in assessing standing, including sworn declarations.  *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 70 (D.D.C. 2022); *Garnett v. Zeilinger*, 323 F. Supp. 3d 58, 65 (D.D.C. 2018).  WilmerHale has the burden of establishing standing, and that burden "grows heavier at each stage of the litigation." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063

15

JA 2818

(D.C. Cir. 2015). Unfortunately for defendants, WilmerHale has met its burden to show standing on its own behalf and on behalf of its clients.

### 1.    Article III Standing

To satisfy the "irreducible constitutional minimum of standing" under Article III, WilmerHale must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of [defendants], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). As an organization, WilmerHale "can assert standing on its own behalf, on behalf of its members or both." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). WilmerHale asserts this organizational standing, which requires the firm, like an individual, to satisfy the standing elements. *Id.*

There can be no serious dispute over whether WilmerHale has standing to challenge the Order. "The Supreme Court has stated that 'there is ordinarily little question' that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (Kavanaugh, J.) (quoting *Lujan*, 504 U.S. at 561–62). While neither a statute nor a rule, the Order makes clear that WilmerHale is its target. It is entitled "Addressing Risks from WilmerHale" and includes multiple directives targeting the firm, its employees, and its clients. *See generally* WilmerHale Order.

As to the first standing factor, WilmerHale has an injury in fact. WilmerHale plausibly alleges violations of its First Amendment rights. *See infra* Analysis III.A. The Order points to WilmerHale's "pro bono practices," "partisan representations," and

16

**JA 2819**

involvement in election and immigration litigation as among its motivations.  WilmerHale Order § 1; *see* Compl. ¶¶ 131–35.  The Court assumes that this advocacy on behalf of its clients is protected speech and petitioning activity.  *See Tanner-Brown v. Haaland*, 105 F.4th 437, 444 (D.C. Cir. 2024).  In response to this protected conduct, the Order suspends WilmerHale employees' security clearances and seeks to restrict these employees' access to federal buildings, engagement with federal employees, and use of Government goods and services, all of which are necessary for the firm to represent its clients.  *See* WilmerHale Order §§ 1–3, 5; Compl. ¶¶ 137–42.  Thus, WilmerHale has alleged cognizable injuries to its First Amendment rights.  *See* Compl. ¶ 120; *cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (stating, in the context of injunctive relief, that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

WilmerHale has also alleged that the Order causes the firm economic injury.  *See* Compl. ¶¶ 124–28; Decl. of Bruce M. Berman in Supp. of Pl.'s Mot. for TRO and PI ("Berman Decl.") [Dkt. #3-2] ¶¶ 76, 83; Suppl. Decl. of Bruce M. Berman in Supp. of Pl.'s MSJ ("Suppl. Berman Decl.") [Dkt. #16-3] ¶¶ 6–11.  WilmerHale alleges that the Order places "serious constraints . . . on WilmerHale's employees' ability to do their jobs," thus creating "significant uncertainty for WilmerHale's existing clients."  Compl. ¶¶ 124–25.  When WilmerHale filed the Complaint, it alleged that it would "inevitably receive more inquiries from clients who are contemplating terminating their engagements with the Firm due to the Order."  *Id.* ¶ 125.  Indeed, that prediction has already materialized.  At least one

17

**JA 2820**

new client has terminated its retention of the firm due to the Order, and "several existing clients have paused WilmerHale's engagements in government-facing matters—or declined to engage WilmerHale for new work—citing the Order."  Suppl. Berman Decl. ¶¶ 6, 8–10.

Moreover, the Order creates uncertainty for the firm's existing federal contractor "clients about whether a continued representation will come at the cost of lucrative government contracts."  Compl. ¶ 126; *see* WilmerHale Order § 3.  As of 2024, at least 21 of the firm's 25 largest clients in 2024 had contracts with federal agencies, and those clients accounted for more than 30% of the firm's total revenue that year.  Berman Decl. ¶ 30.  The Order pressures these clients to abandon WilmerHale or face loss of their contracts.  Compl. ¶¶ 126–27, 162.  The nature of these injuries suffices to satisfy the first prong of Article III standing.  *See Lepelletier v. FDIC*, 164 F.3d 37, 42 (D.C. Cir. 1999) ("[T]he denial of a business opportunity satisfies the injury requirement.").

Defendants argue that WilmerHale's alleged injuries are speculative.  Defs.' MTD at 18–19.  Focusing only on § 3 of the Order, they assert that since the firm has not alleged that it is a federal contractor or that it intends to bid for a contract, its injury is conjecture. *Id.*  Please—that dog won't hunt!  The firm alleges that § 3 "discourages clients from retaining or maintaining WilmerHale as their counsel" by threatening to cancel the contracts of any entity which associates with WilmerHale.  Compl. ¶ 126–27.  This, in turn, causes "extensive, lasting damage to WilmerHale's current and future business prospects." *Id.* ¶ 127.  Thus, the economic injury that WilmerHale alleges does *not* depend on WilmerHale itself serving as a federal contractor.

18

**JA 2821**

This case is far afield from *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), which defendants invoke to argue that WilmerHale's risk of harm is too speculative because it relies upon the decisions of third parties not before the Court. *See* Defs.' MTD at 17–19. "*Clapper* does not require certainty; instead, it understandably holds a plaintiff's risk of harm cannot be based upon a 'highly attenuated chain of possibilities.'" *New York Republican State Comm. v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019) (quoting *Clapper*, 568 U.S. at 410). "Unlike in *Clapper*, where the chain comprised several links," the four corners of the Order are causing damage to WilmerHale's business relationships. *See id.* at 504–05; Compl. ¶ 126. The causal chain contains at most two links, and it is certainly not highly attenuated!

As to the second and third factors, traceability and redressability pose no issue for WilmerHale. These two elements typically overlap in cases against Government actors because "if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017). Such is the case here. WilmerHale has alleged the Order is the sole cause of the firm's constitutional and economic injuries. *See* Compl. ¶¶ 120–27. While defendants dispute the causal relationship between the Order and any client's decision to terminate its relationship with WilmerHale, this argument is absurd! Defs.' MTD at 18–19, 23. The Order imposes various restrictions on the firm's ability to serve its clients—"the lifeblood of any law firm"—and therefore "threatens the very viability of [its] business model." Compl. ¶¶ 124, 127. It also threatens to terminate federal contracts for any entity which does business with WilmerHale. *Id.* ¶ 126. Indeed, several of WilmerHale's clients have

explicitly cited the Order as the reason for either curtailing or terminating their relationships with the firm. Suppl. Berman Decl. ¶¶ 6–10.[5] WilmerHale has thus established Article III standing in its own right.

### 2. Third-Party Standing

WilmerHale also brings its right to petition, freedom of association, right to counsel, and Spending Clause claims on behalf of its clients. *See* Compl. ¶¶ 158, 167, 209, 212, 220–24. "[A] party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Kowalski*, 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 499). This rule, however, is not "absolute." *Id.* at 129–30. There are "circumstances where it is necessary to grant a third party standing to assert the rights of another." *Id.*

In assessing third-party standing, the Court weighs three "prudential considerations": "(1) '[t]he litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute,' (2) 'the litigant must have a close relation to the third party,' and (3) 'there must exist some hindrance to the third party's ability to protect his or her own interests.'" *Lepelletier*, 164 F.3d at 43 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). To satisfy the third prong—the hindrance requirement—a plaintiff must show that "there is some impediment to the

---

[5] Defendants also claim that WilmerHale lacks standing to pursue its due process claims because it cannot point to any injury traceable to § 5. *See* Defs.' MTD at 29. Section 5 directs heads of agencies to provide guidance limiting WilmerHale employees' access to federal building and prohibits agencies from hiring WilmerHale employees absent a waiver. WilmerHale Order § 5. WilmerHale has alleged and shown a protected liberty interest, *see infra* Analysis III.C.1, and, as discussed above, WilmerHale has proffered clear allegations of harm.

20

JA 2823

real party in interest's ability to assert his own legal rights." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 31 (D.D.C. 2010) (citing *Singleton v. Wulff*, 428 U.S. 106, 118 (1976)).

WilmerHale satisfies all three requirements. As to the first requirement, and as discussed above, WilmerHale's constitutional and economic injuries are sufficient to show injury in fact. As to the second requirement, its attorney-client relationships are "sufficient to confer third-party standing" for "existing client[s]." *See Kowalski*, 543 U.S. at 130. Indeed, the firm has proffered that most of its largest clients in 2024 had contracts with federal agencies. Berman Decl. ¶ 30. WilmerHale has also proffered that it represents clients in "government-facing" matters. *Id.*[6]

The final hurdle is the third "hinderance" requirement. For its First Amendment and Spending Clause claims, WilmerHale has shown that its federal contractor clients are hindered from bringing claims themselves because doing so would require them to disclose their attorney-client relationships, which is the same First Amendment harm that WilmerHale is trying to enjoin. *See* Compl. ¶¶ 161–62. "[T]he First Amendment offers protection when an entity engag[es] in expressive activity, including compiling and curating others' speech." *Moody*, 603 U.S. at 731. That is why the hinderance requirement is relaxed for First Amendment claims. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 957 (1984) (finding it non-dispositive "that there is no showing that [the third-party] charity cannot bring its own lawsuit" because "[a]lthough such an argument

---

[6] This case is unlike those in which the Supreme Court has rejected attorneys' standing to bring claims on behalf of hypothetical clients, as WilmerHale has alleged the violation of existing clients' rights. *Cf. Kowalski*, 543 U.S. at 130 ("The attorneys before us do not have a 'close relationship' with their alleged 'clients'; indeed, they have no relationship at all.").

21

**JA 2824**

might defeat a party's standing outside the First Amendment context, this Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech"); *cf. Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Litigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.").

WilmerHale may also bring its right to counsel claims on behalf of its clients. These claims "fall[] within that class of cases where" the Supreme Court has "'allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.'" *See Kowalski*, 543 U.S. at 130 (quoting *Warth*, 422 U.S. at 510). As the Supreme Court explained in *U.S. Department of Labor v. Triplett*, when "enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third-party standing has been held to exist." 494 U.S. 715, 720 (1990); *see Warth*, 422 U.S. at 510 (finding "standing to litigate the rights of third parties when enforc[ing] the challenged restriction against the litigant would result indirectly in the violation of third parties' rights"). Assuming the merits of WilmerHale's claims, the Order's restrictions against WilmerHale, the litigant, violate its third-party clients' constitutional right to counsel. *See* Compl. ¶¶ 206–17. These clients, according to

22

**JA 2825**

WilmerHale, are hindered from bringing claims themselves because the Order prevents the clients from retaining their counsel of choice, WilmerHale.  Compl. ¶¶ 207–08, 213–16.

Having met all three prudential requirements, WilmerHale has comfortably established third-party standing to bring claims on behalf of its clients.

### 3. Ripeness

Defendants also challenge the ripeness of WilmerHale's claims.[7]  The Court rejects these arguments and finds that WilmerHale's claims are indeed ripe for review.

"The ripeness doctrine requires that the federal courts 'reserve[] judicial power for resolution of concrete and fully crystallized disputes.'"  *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (quoting *Cobell v. Jewell*, 802 F.3d 12, 21 (D.C. Cir. 2015)).  In determining ripeness, the Court considers "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Id.* (quoting *Cobell*, 802 F.3d at 21).

*First*, the issues are clearly fit for judicial decision.  WilmerHale's claims do not require further factual development for the Court to address the legal issues presented; indeed, the parties informed the Court that they "do not anticipate needing discovery in this case and that no party will request discovery in connection with . . . dispositive motions."

---

[7] Given that defendants advance their arguments section-by-section, it is not entirely clear how their ripeness arguments map onto WilmerHale's 11 claims for relief.  Defendants appear to challenge the ripeness of the firm's attacks on § 2, *see* Defs.' MTD at 14–15, § 3, *see* Defs.' Opp'n to Pl.'s MSJ at 15–16, and § 5, *see* Defs.' MTD at 28–29.  The Court will address ripeness as to all claims and as to the entire Order, as it is the Court's obligation to ensure the ripeness of all claims.  *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (explaining that "the question of ripeness may be considered on a court's own motion").

**JA 2826**

*See* Joint Status Report [Dkt. #13] ¶ 3. Thus, the Court may adjudicate WilmerHale's claims based on the text of the Order and the factual record currently before the Court.

Defendants argue that the claims are not factually ripe because various sections of the Order instruct agency heads to take some action in the future. For example, § 2 suspends security clearances "pending further review of whether such clearances are consistent with the national interest," and § 5 instructs agency heads to "provide guidance" about limiting access to federal buildings and employees. *See* Defs.' MTD at 14–15, 28–29. Defendants thus urge the Court to wait and see how this guidance comes out before ruling on WilmerHale's claims. Please!

The Court need not wait. WilmerHale's claims turn on the constitutionality of the Order *as issued*—not on any guidance agency heads eventually release to implement the Order. The Complaint alleges, for example, that the Order has a chilling effect on speech and creates significant uncertainty for the firm's clients even before agency officials issue guidance or make factual findings. *See* Compl. ¶¶ 125–28, 142–43. Accordingly, the issues have already "crystallized into a concrete legal dispute" ready for this Court's decision. *See Al-Nashiri*, 47 F.4th at 826.

*Second*, "the hardship to the parties of withholding court consideration" is severe. *See id.* (quoting *Cobell*, 802 F.3d at 21). WilmerHale began feeling the effects of the Order when it was issued—one day before the firm filed its Complaint—and has since been losing clients despite this Court temporarily enjoining the Order. *See* Pl.'s Statement of

24

Undisputed Material Facts ("Pl.'s SUMF") [Dkt. #16-2] ¶¶ 135, 138,[8] 141; Suppl. Berman Decl. ¶ 6, 8–10; *see also* Compl. ¶¶ 121, 124–27.  WilmerHale's clients have been left wondering if their attorneys will be able to, for example, enter federal courthouses for hearings, attend plea negotiations at U.S. Attorneys' offices, or engage with federal employees on regulatory matters.  This uncertainty—and the attendant harm—escalates while the parties wait for the Court's decision.

As this Court stated during the TRO hearing, the Order is akin to a sword of Damocles hanging over WilmerHale's head.  Tr. of Mar. 28, 2025 Hearing ("TRO Hearing Tr.") [Dkt. #11] at 27:2–28:1.  The Court need not wait for the sword to fall before ruling on the case.

### 4.    Political Question Doctrine

Defendants argue that WilmerHale's challenges to § 2 of the Order are not judicially reviewable under our Circuit's decision in *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024).  Defs.' MTD at 13–14.  According to defendants, *Lee* requires this Court to dismiss the firm's claims to the extent they apply to § 2 because "courts may not review a decision to deny or revoke a security clearance even when the denial or revocation is challenged on statutory or even constitutional grounds." *Id.* (citing *Lee*, 120 F.4th at 883, 891).  I find that *Lee*'s holding is not so broad as to shield § 2 from judicial review.

*Lee* holds that courts may not hear statutory and constitutional challenges to the merits of the revocation of an individual's security clearance.  *See* 120 F.4th at 883.  Our

---

[8] Defendants dispute this fact but provide no basis for that dispute.  *See* Defs.' Resp. to Pl.'s SUMF [Dkt. #103-1].  The Court finds that there is no genuine dispute of material fact here.

Circuit reasoned that, under the political question doctrine, "federal courts generally may not second-guess the political branches' discretionary judgments about matters of national security," and "an Executive Branch decision to deny or revoke a security clearance is just such a judgment." *See id.* at 891.

However, our Circuit recognized that, "[o]f course, not every case touching on national security lies beyond judicial cognizance." *Id.*; *see also Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993) ("It is simply not the case that all security-clearance decisions are immune from judicial review."). Instead, "[e]ach question must be considered 'in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.'" *Lee*, 120 F.4th at 891.

Here, the Court finds that § 2 is not "beyond judicial cognizance" for multiple reasons. *First*, the "nature and posture in [this] specific case" differ from those in *Lee*. *See id. Lee* bars judicial review of the *merits* of an *individual's* security clearance revocation. The WilmerHale Order, in contrast, demands immediate, blanket suspension of security clearances with no individualized review. WilmerHale Order § 2(a) (instructing agency heads to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at WilmerHale"). At issue here is not the merits of any individual's suspension, but the process involved in the blanket suspension. Pl.'s Expert Report of J. William Leonard ("Leonard Report") [Dkt. #16-5] at 17–18 ("The WilmerHale Executive Order violates the[] bedrock principles of the security-clearance review process because it provides no individualized assessment of personal conduct in the

26

JA 2829

suspension of clearances.  The WilmerHale Executive Order contains no mention of, let alone any individualized assessment of the WilmerHale personnel who currently hold security clearances.").

Thus this case falls outside the ambit of *Lee*[9] and instead I look to our Circuit's reasoning in *Greenberg*.  *See generally Greenberg*, 983 F.2d 286.  That case, in relevant part, analyzed whether courts could hear constitutional challenges to certain questions asked during security clearance investigations.[10]  Our Circuit found that it could hear these challenges, since the issue was "the constitutionality of the methods used to gather information on which such judgments presumably will be based," not the "discretionary judgments regarding a particular employee's security clearance."  *Id.* at 290.  In doing so, the *Greenberg* court carefully distinguished between the "ends" of security clearance decisions—which are entrusted to the President—and the "means"—which the judiciary may properly scrutinize.  *Id.*[11]

---

[9] The Supreme Court precedent on which *Lee* relies—*Department of the Navy v. Egan*, 484 U.S. 518 (1988)—itself bars judicial review only of the substance of security clearance decisions.  *See Egan*, 484 U.S. at 526 (examining whether "the [Merit Systems Protection] Board may examine *the merits* of [a] security-clearance denial" (emphasis added)); *id.* at 529 ("[It] is not reasonably possible for an outside nonexpert body to review *the substance* of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." (emphasis added)).

[10] For example, one question "solicit[ed] a complete mental health and drug and alcohol use history." *Greenberg*, 983 F.2d at 287.

[11] *Greenberg* emphasizes our Circuit's concern with a wholesale ban on judicial review of security clearance-related decisions:

> Suppose the President has unlimited and judicially-unreviewable constitutional power to determine which Executive Branch employees will be given access to the nation's secrets. No one would suggest the government therefore could, despite the Fourth Amendment, conduct random searches without warrants in the hope of uncovering information about employees seeking security clearances.  Still less would anyone consider such unconstitutional searches and seizures to be immune from judicial review.

983 F.2d at 290.

27

**JA 2830**

WilmerHale challenges the President's process—or lack thereof—in suspending the firm's employees' security clearances.  For example, the alleged constitutional injuries include the lack of individualized review (in violation of the Due Process Clause), and the targeting of WilmerHale employees for suspension as a form of retaliation for protected speech (in violation of the First Amendment).  WilmerHale's expert opined that, based on his 30 years of experience in the national security arena, "the granting, suspending, and revoking of security clearances is a highly individualized process that involves a close and detailed factual analysis of the individual in question and provides any individual subject to this analysis with significant due process protections."  Leonard Report ¶ 35.  WilmerHale claims that § 2 fails to meet these requirements, and it is this process failure which the firm asks the Court to review.  As such, the alleged harm exists regardless of whether the Government eventually determines there is merit to revoking an individual's security clearance.  *See Lee*, 120 F.4th at 893 (explaining that *Greenberg* permits review where the "alleged injuries . . . exist regardless of how the government might have resolved any particular application").  *Greenberg* thus allows the Court to hear WilmerHale's challenges.

*Second*, § 2 of the Order does not invoke the national security concerns which barred judicial review of the security clearance revocation in *Lee*.  *Cf. id.* at 891 ("[F]ederal courts generally may not second-guess the political branches' discretionary judgments about matters of *national security*." (emphasis added)); *id.* at 889 ("The political question doctrine applies perhaps most vigorously to issues bearing on *national security*." (emphasis added)).  Section 2 references the "national interest," but nowhere cites "national security."

28

**JA 2831**

*See* WilmerHale Order § 2(a). *Lee* does not require the Court to give unlimited deference to the broad concept of national interest.[12]  *See* Leonard Report ¶ 49 ("Tellingly, Section 2 of the WilmerHale Executive Order never uses the term 'national security,' and instead only mentions the 'national interest,' a term that is markedly broader than the 'national security interest' that serves as the touchstone of a security-clearance review. . . .'"). *Lee* is grounded in the Executive Branch's discretion on issues related to national security, which apparently is not the basis for § 2 of the Order.

　　*Third*, the history of the issues at play here supports judicial review.  *See Lee*, 120 F.4th at 891 ("Historical practice is important in determining the scope of executive power." ).  Plaintiff's expert opined that, based on his decades of experience, § 2 is nearly unprecedented.  *See* Leonard Report ¶ 46 ("Simply put, a blanket suspension of all security clearances at a law firm of over 2,000 employees, including approximately 1,200 attorneys, was—prior to March 2025—unprecedented in scope . . . ."); *id.* at ¶ 49.  In fact, the closest analogy WilmerHale's expert could draw is "to the repudiated and discredited" revocation of security clearances from individuals with alleged Communist sympathies during the Red Scare.  *Id.* ¶¶ 38, 46.  As such, the extraordinary nature of this case easily distinguishes it from *Lee* and supports judicial review.

　　For all these reasons, I find that WilmerHale's challenges to § 2 are indeed judicially reviewable.  The merits of those challenges are discussed *infra*.

---

[12] In fact, *Lee* references "national security" 27 times.  It references "national interest" zero times.

**JA 2832**

### III.    Merits

I will now proceed to the merits of WilmerHale's claims. At the outset, I reject defendants' argument that the Complaint is a "shotgun pleading" in violation of Federal Rule of Civil Procedure 8. *See* Defs.' MTD at 4. The Complaint is a far cry from a "handicap" to defendants and the Court. *See id.* To the contrary, its 56 pages and 11 counts are concise and well-organized, and it provides fair notice of the claims WilmerHale is pursing against defendants. *Cf. Jiggetts v. District of Columbia*, 319 F.R.D. 408, 414–15 (D.D.C. 2017).

Defendants' Rule 12(b)(6) motion and WilmerHale's motion for summary judgment require more discussion. As explained above, I will address the Order as a whole. *See supra* Analysis I.

#### A.    *First Amendment Claims*

The Complaint includes four counts alleging that the WilmerHale Order violates the First Amendment. *See* Compl. ¶¶ 129–44 (Count I), 145–52 (Count II), 153–59 (Count III), 160–71 (Count IV). All survive defendants' motion to dismiss. All warrant summary judgment for WilmerHale!

##### 1.    <u>Count I – First Amendment – Retaliation for Protected Expression</u>

"[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). WilmerHale alleges that "[t]he Order blatantly defies this bedrock principle of constitutional law." Compl. ¶ 130. I agree!

30

**JA 2833**

To establish First Amendment retaliation, WilmerHale must plausibly allege and then prove: "(1) [WilmerHale] engaged in conduct protected under the First Amendment; (2) [defendants] took some retaliatory action sufficient to deter a person of ordinary firmness in [WilmerHale's] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against [WilmerHale]." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)).

WilmerHale represents a range of clients in litigation.  *See* Compl. ¶¶ 79–87, 131; Pl.'s SUMF ¶¶ 37–40, 42–49.  This advocacy is unquestionably protected conduct under the First Amendment.  *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001) (treating "the analysis of certain legal issues" and their "presentation to the courts" as "speech and expression"); *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 528 (1991) ("We long have recognized the important political and expressive nature of litigation."); *McDonald v. Smith*, 472 U.S. 479, 484 (1985) ("[F]iling a complaint in court is a form of petitioning activity . . . ."); *see also Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990) ("[T]he first amendment guarantees the[] right to be free of governmental restraints on 'political expression' and that right is violated if the Government affirmatively interferes with constitutionally protected litigation as a form of political expression.").  This is true even to the extent WilmerHale's clients are unpopular, controversial, or disfavored.  *See NAACP v. Button*, 371 U.S. 415, 444–45 (1963) ("[T]he Constitution protects expression and association without regard . . . to the truth, popularity, or social utility of the ideas and beliefs which are offered.").

31

**JA 2834**

The WilmerHale Order is, on its face, retaliation for the firm's protected speech. Indeed, § 1 outlines the motivations of the Order, including WilmerHale's pro bono practice, "obvious partisan representations to achieve political ends," and involvement in immigration and election litigation. *See* WilmerHale Order § 1; WilmerHale Fact Sheet; *see also* Compl. ¶¶ 133–34.

The Order goes on to impose a kitchen sink of *severe* sanctions on WilmerHale for this protected conduct!  In addition to vilifying the firm in § 1, it suspends WilmerHale employees' security clearances, with a looming threat of full revocation of those clearances, WilmerHale Order § 2(a); coerces the firm's federal contractor clients to end their engagements with the firm or face cancellation of their contracts, *id.* § 3; targets the firm for investigation into supposed racial discrimination, *id.* § 4; threatens to bar its employees from entering federal buildings or engaging with federal employees, *id.* § 5(a); and prohibits agencies from hiring firm employees absent a waiver from the relevant agency heads, *id.* § 5(b).

Any one of those sanctions would cause clients to strongly reconsider their engagements with WilmerHale.  Taken together, the provisions constitute a staggering punishment for the firm's protected speech!  The Order is intended to, and does in fact, impede the firm's ability to effectively represent its clients!  For example, WilmerHale attorneys may not be able to enter federal courthouses for trial, meet with federal regulators, or access classified materials necessary for working on national security matters.  *See* Compl. ¶¶ 79, 137–39.  The Order also pressures the firm's federal contractor clients to

32

**JA 2835**

either end their relationships with WilmerHale or face possible cancellation of their contracts. *Id.* ¶ 141.

This, in turn, has severe economic consequences for the firm. *Id.* ¶¶ 124–27. The ability to effectively serve clients is the heart of the firm's business model. *Id.* Clients have already begun ending or curtailing their relationships with WilmerHale. Pl.'s SUMF ¶¶ 138–41. The impact of losing federal contractor clients would be staggering, as "[a]t least 21 of WilmerHale's 25 largest clients in 2024 have contracts with federal agencies. These 21 clients accounted for more than 30% of the Firm's revenue in 2024—nearly $500 million." *Id.* ¶ 32.

This "retaliatory action" is more than "sufficient to deter a person of ordinary firmness in [WilmerHale's] position from speaking again." *See Aref*, 833 F.3d at 258 (internal quotation marks omitted). The Order shouts through a bullhorn: If you take on causes disfavored by President Trump, you will be punished! Other firms facing similar Executive Orders have capitulated to President Trump. *See, e.g.*, Pl.'s SUMF ¶¶ 87–91 (explaining that Paul Weiss reached an agreement with President Trump to revoke the Paul Weiss Order because it was "an unprecedented threat to the firm" (citing Pl.'s MSJ Ex. 26 [Dkt. #16-4] at 168–76));[13] *id.* ¶¶ 102–09 (explaining that Skadden, Arps, Slate, Meagher

---

[13] Defendants dispute these facts as "[c]haracterization that is immaterial as the cited material speaks for itself." Defs.' Resp. to Pl.'s SUMF. The relevant paragraphs of WilmerHale's statement of material facts are largely direct quotes from the cited sources, with no characterization. *See* Pl.'s SUMF ¶¶ 87–91. The Court thus finds that there is no genuine dispute as to these facts.

& Flom LLP, Willkie Farr & Gallagher LLP, and Milbank LLP reached agreements with President Trump to proactively avoid Executive Orders);[14] *see also* Compl. ¶¶ 102–03.

Finally, § 1 makes clear the causal link between the protected speech and the retaliatory conduct. This Background section characterizes WilmerHale's representation of certain causes as "harmful," "egregious," and "partisan," and states that the purpose of the Order is to "address the significant risks associated with law firms" like WilmerHale. WilmerHale Order § 1. The sanctions laid out in §§ 2 through 5 follow this Background section and are plainly the result of those findings.

Defendants argue that the Order is not retaliation or punishment, as each section is a valid exercise of Executive discretion. *See* Defs.' MTD at 19–21; Dispositive Mots. Hearing Tr. at 19:18–20:16 ("MR. LAWSON: . . . I'm disputing the point that this order and these sections, separately or together, really aren't an absolute threat, an absolute punishment. These are discretionary points."). The plain language of § 1—which defendants concede "lend[s] support to each section," Dispositive Mots. Hearing Tr. at 29:23–30:3—and the context of the Order prove otherwise. Each of the provisions is crafted to cripple the firm by, for example, threatening to restrict WilmerHale employees' access to federal courthouses—a sanction devastating to a law firm which appeared in federal court over 340 times in the last year. *See* Pl.'s SUMF ¶ 29. Together or individually, the Order's sections constitute "sufficiently adverse action to give rise to an actionable First Amendment claim." *See Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022).

---

[14] For the same reasons as those set out in note 13, *supra*, the Court finds that there is no genuine dispute as to the facts in these paragraphs.

In sum, WilmerHale has both alleged and shown that the Order is retaliation for protected speech in violation of the First Amendment.  I will therefore **DENY** defendants' motion to dismiss to the extent it seeks to dismiss Count I of WilmerHale's Complaint and **GRANT** WilmerHale's motion for summary judgment as to Count I.

### 2.    Count II – First Amendment – Viewpoint Discrimination

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society."  *NRA of Am. v. Vullo*, 602 U.S. 175, 187 (2024); *see also Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.").  As such, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rational for the restriction."  *Rosenberger*, 515 U.S. at 829.  Such viewpoint discrimination is "an egregious" violation of the First Amendment.  *Id.*

Here, WilmerHale claims that the Order targets the firm for its disfavored viewpoints and punishes it for expressing those viewpoints.  Compl. ¶¶ 145–52.  The Court finds that WilmerHale has both alleged and shown this First Amendment violation!

As explained in Analysis III.A.1, *supra*, WilmerHale's representation of clients in litigation is speech.  The Order attacks the viewpoints WilmerHale expressed over the course of these representations, describing WilmerHale's work as "partisan" and "political," and maligning WilmerHale's advocacy on behalf of causes disfavored by President Trump.  *See* WilmerHale Order § 1; WilmerHale Fact Sheet ("WilmerHale pursues partisan goals, supports efforts to discriminate on the basis of race, and backs the

obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders."); Compl. ¶¶ 146–47; Pl.'s SUMF ¶¶ 116, 129–30.[15] The Order is also motivated by WilmerHale's decision to "welcom[e]" Mueller to the firm and its statements that Mueller "embodies the highest value of our firm and profession." WilmerHale Order § 1; Compl. ¶ 148; Pl.'s SUMF ¶ 117.[16]

President Trump can "share [his] views freely and criticize particular beliefs, and [he] can do so forcefully in the hopes of persuading others to follow [his] lead." *Vullo*, 602 U.S. at 188. He cannot, however, "use the power of the State to punish or suppress disfavored expression." *Id.* The First Amendment bars the Government "from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." *Id.* at 189 (alteration in original) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

Yet that is exactly what the Order here does: It both threatens and imposes sanctions and uses other means of coercion to suppress WilmerHale's representation of disfavored causes and clients. For example, § 4 targets WilmerHale for investigation by the EEOC and the Attorney General. WilmerHale Order § 4 (incorporating Perkins Coie Order § 4). This is the President, in essence, wielding the investigative and prosecutorial powers of the State to punish and suppress WilmerHale's advocacy. *See Vullo*, 602 U.S. at 187 ("[Vullo] could not wield her power, however, to threaten enforcement actions . . . ."). Sections 2

---

[15] For the same reasons as those set out in note 13, *supra*, the Court finds that there is no genuine dispute as to the facts in these paragraphs.

[16] For the same reasons as those set out in note 13, *supra*, the Court finds that there is no genuine dispute as to the fact in this paragraph.

**JA 2839**

and 5 also directly punish the firm for its disfavored speech by suspending security clearances, threatening to revoke access to federal buildings and bar engagement with federal employees, and prohibiting federal agencies from hiring WilmerHale employees absent a waiver. *See* WilmerHale Order §§ 2, 5.

Additionally, § 3 attempts to suppress WilmerHale's speech indirectly by pressuring the firm's federal contractor clients to terminate their relationships with the firm or face cancellation of their contracts. As the Supreme Court stated in *Vullo*, "a government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." 602 U.S. at 190 (citing *Bantam Books*, 372 U.S. at 67–69). Here, § 3 instructs federal contractors "to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract." WilmerHale Order § 3(a). It then instructs agency heads to review their contracts with entities who do business with the firm and (1) "terminate any contract . . . for which WilmerHale has been hired to perform any service"; and, much more broadly, (2) "align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of [the] Administration . . . ; and as heads of agencies deem appropriate." *Id.* § 3(b).

WilmerHale has shown that § 3 "could be reasonably understood to convey a threat of adverse government action in order to punish or suppress [the firm's] speech." *See Vullo*, 602 U.S. at 191; *see* Compl. ¶¶ 9, 141. It presents a federal contractor with a Hobson's choice: End its relationships with WilmerHale, or face review and possible termination of all of its federal contracts. As the Supreme Court noted in *Vullo*, the power of the

37

**JA 2840**

Government official taking action is relevant, and "the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official."  602 U.S. at 191–92.  There is no Executive official with "greater" or "more direct" authority than the President of the United States!  It is thus hard to imagine federal contractors would feel free to disregard the implicit directive in § 3 to terminate their engagements with WilmerHale.  *See id.* at 193 (explaining that the "threat need not be explicit").  Given that "[a]t least 21 of WilmerHale's 25 largest clients in 2024 have contracts with federal agencies" and that "[t]hese 21 clients accounted for more than 30% of [WilmerHale's] revenue in 2024," the impact of losing these clients on WilmerHale's business would be ruinous.  *See* Pl.'s SUMF ¶ 32.

Defendants maintain that "the fact that a funding program supports one point of view does not establish viewpoint discrimination against disfavored alternatives."  Defs.' MTD at 20–21.  Defendants cite to the Supreme Court's decision in *Rust v. Sullivan* for the proposition that "'the Government has not discriminated on the basis of viewpoint' merely by 'fund[ing] one activity to the exclusion of the other.'"  *Id.* (quoting 500 U.S. 173, 193 (1991)).  *Rust* is inapposite, though.  That case addressed the constitutionality of regulations implementing Title X of the Public Health Service Act, which provided federal funding for family-planning services but mandated that "none of the funds appropriated . . . shall be used in programs where abortion is a method of family planning."  *Rust*, 500 U.S. at 178.  The implementing regulations barred funding of projects which "encourage, promote, or advocate abortion as a method of family planning."  *Id.* at 180.

**JA 2841**

The Supreme Court upheld the implementing regulations' restrictions, explaining that the Government does not "unconstitutionally discriminate[] on the basis of viewpoint when it chooses to fund a program dedicated to advancing certain permissible goals[] because the program in advancing those goals necessarily discourages alternative goals." *Id.* at 194. This is where the WilmerHale Order is critically different from the regulations in *Rust*. Section 3 of the Order does not create or address a federally-funded program designed to advance a certain Government viewpoint, as was at issue in *Rust*. Instead, § 3 applies to federal contracting writ large, and there can be no claim that all federal contracts together constitute a program designed to promote a specific Government message. *Cf. id.* at 194–95 (describing *Rust* as "a case of the Government refusing to fund activities, including speech, which are specifically excluded from the scope of the project funded").

*Rust* distinguished "situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* at 197. The Supreme Court emphasized that the *Rust* regulations governed the scope of a Title X project's activities, but that a grantee could continue to perform abortions and provide related services through programs separate from Title X-funded programs. *Id.* at 196. The WilmerHale Order, on the other hand, requires federal contractors to disclose *any* affiliation with the firm, regardless of whether WilmerHale is involved in their federal contracts. *See* WilmerHale Order § 3(a). The Order is thus keyed to the *recipient* of federal funds, not to the particular contract funded.

39

**JA 2842**

*Cf. Rust*, 500 U.S. at 197.[17]  The WilmerHale Order does not seek to preserve a program designed to promote a specific Government message, and instead effectively bars federal contractors' association with WilmerHale even outside the scope of their federal contracts.

In sum, the Order and Fact Sheet make clear that President Trump disfavors WilmerHale's representation of certain causes and the firm's statements regarding Mueller. The Order suppresses that disfavored speech by imposing severe sanctions on WilmerHale both directly and indirectly.  This viewpoint discrimination is "an egregious" violation of the First Amendment!  *See Rosenberger*, 515 U.S. at 829.  As such, I will **DENY** defendants' motion to dismiss to the extent it seeks dismissal of Count II and **GRANT** summary judgment for WilmerHale as to Count II.

### 3.      Count III – First Amendment – Right to Petition the Government

The First Amendment protects the right "to petition the Government for a redress of grievances."  U.S. Const. amend. I.  Filing and pursuing lawsuits are forms of protected petitioning.  *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) ("This Court's precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes.");

---

[17] *Rust* itself distinguishes a Supreme Court case which more closely aligns with the facts currently before the Court.  *See Rust*, 500 U.S. at 197.  In *FCC v. League of Women Voters of California*, the Supreme Court invalidated a law which barred noncommercial television and radio stations that received federal grants from "engag[ing] in editorializing," even in programs unrelated to federal grants.  *See generally* 468 U.S. 364 (1984).  The Supreme Court found that, under the law, "a noncommercial educational station that receives only 1% of its overall income from [federal] grants is barred absolutely from all editorializing." *Id.* at 400.  The WilmerHale Order is similar:  If an entity "receives only 1% of its overall income from" federal contracts, it is effectively "barred absolutely from" association with WilmerHale.  *See id.  Rust* explained that these types of prohibitions, unlike the restrictions upheld in *Rust*, are invalid because they "effectively prohibit[] the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Rust*, 500 U.S. at 197.

40

**JA 2843**

*Am. Bus Ass'n v. Rogoff*, 649 F.3d 734, 738 (D.C. Cir. 2011) ("The right 'extends to [petitioning] all departments of the Government,' including administrative agencies and courts." (alteration in original) (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972))); *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009) ("[T]he Supreme Court has treated lawsuits as petitions."). This right to petition is "integral to the democratic process." *Borough of Duryea*, 564 U.S. at 388; *see also BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524–25 (2002) ("We have recognized this right to petition as one of 'the most precious of the liberties safeguarded by the Bill of Rights,' and have explained that the right is implied by 'the very idea of a government, republican in form[.]'" (citations omitted)).

WilmerHale has both alleged and shown that the Order violates the Petition Clause by (1) punishing the firm for its past representation of clients in litigation and (2) undermining the firm's ability to pursue litigation in the future. Compl. ¶¶ 153–71. The Order explicitly targets WilmerHale at least in part for the litigation it has pursued, including election and immigration lawsuits. *See* WilmerHale Order § 1;[18] Compl. ¶¶ 82–87 (identifying specific lawsuits); Pl.'s SUMF ¶¶ 43, 47–49. After identifying these

---

[18] Section 1 alleges that WilmerHale "is yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." WilmerHale Order § 1. It contends that the firm "engages in obvious partisan representations to achieve political ends, supports efforts to discriminate on the basis of race, backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and furthers the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote." *Id.*

41

**JA 2844**

purportedly harmful lawsuits,[19] the Order then sanctions the firm for pursuing these cases. *See* WilmerHale Order §§ 2–5; Compl. ¶¶ 113–16, 155.

The Order, however, goes further than punishing WilmerHale for past petitioning. It also creates hurdles to prevent the firm from pursuing future lawsuits. For example, § 5 directs agencies to limit the firm's employees' access to federal buildings and ability to engage with federal employees. WilmerHale Order § 5(a). The Order also suspends their security clearances, which restricts their access to the classified information they need to pursue cases involving national security. *Id.* § 2; Compl. ¶ 157. These limitations would severely hinder WilmerHale's ability to effectively bring cases.[20] *See* Compl. ¶¶ 79, 138–39; Pl.'s SUMF ¶ 28 ("At any given moment, WilmerHale attorneys may be working on over 1,000 matters before or involving dozens of federal agencies.").

Since the Order significantly impairs WilmerHale's First Amendment right to petition, it is subject to "exacting scrutiny." *See Elrod*, 427 U.S. at 362 ("It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny."). Under this standard, defendants must show "a substantial relation between the [impairment] and a sufficiently important government interest." *See Ams. for Prosperity*

---

[19] The Petition Clause protects only lawsuits brought "in good faith." *See Nader*, 567 F.3d at 696 ("[W]hen a person petitions the government for redress, the First Amendment prohibits any sanction on that action . . . so long as the petition was in good faith."). There can be no serious claim that WilmerHale's lawsuits were not brought in good faith; in fact, many of the lawsuits were successful. *See* Compl. ¶ 155.

[20] Defendants counter that WilmerHale will still be able to petition "by written communication with government officials." Defs.' MTD at 29. To the extent the firm would be able to engage with federal employees in writing—which is not clear on the face of the Order—this would still significantly hamper the firm's ability to advocate on behalf of its clients. Defendants conveniently ignore that investigations or litigation might require in-person attendance in federal buildings and face-to-face engagement with federal employees for depositions, in-court hearings, advocacy presentations, and more.

42

**JA 2845**

*Found. v. Bonta*, 594 U.S. 595, 607 (2021) (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)).  The impairment must also "be narrowly tailored to the government's asserted interest."  *Id.* at 608.

Defendants have shown neither a substantial relation to a sufficiently important government interest nor that the Order is narrowly tailored to that interest.  Defendants invoke national security as the Government interest supporting the restrictions on WilmerHale's ability to petition outlined in § 5.  Defs.' MTD at 29–30; *see* WilmerHale Order § 5 (stating that the guidance implementing the restrictions should be written to "ensure consistency with the national security and other interests of the United States").  WilmerHale concedes that "national security is of course an important government interest[.]"  Pl.'s Opp'n to Defs.' MTD at 34.  Yet the firm maintains—and the Court agrees—that the Order is not substantially related to that interest.

Other than a passing reference to WilmerHale's involvement in election and immigration litigation, the Order does not explain how WilmerHale's conduct has threatened national security or how restricting its access to federal buildings or federal employees would remedy those threats.  *See* Leonard Report ¶ 51 ("[T]he behavior that the WilmerHale Executive Order deems problematic—attorneys representing clients in court—is not of the type that has ever in my experience been deemed conduct relating to a 'national security' interest.").  Instead, and as I have already found, the Order is plainly motivated by the President's desire to retaliate against WilmerHale for its protected activity, *see supra* Analysis III.A.1.  This is not a legitimate Government interest, and the Order's unsupported assertion of national security will not save it!

43

**JA 2846**

Finally, even if I agreed that the Order's restrictions on WilmerHale's right to petition are substantially related to national security, those restrictions are not narrowly tailored. The provisions sweep broadly to implicate all WilmerHale employees and clients, regardless of their involvement in certain cases or their affiliation with Mueller. As such, the Order fails exacting scrutiny and is unconstitutional under the Petition Clause. I will therefore **DENY** defendants' motion to dismiss to the extent it seeks to dismiss Count III and **GRANT** WilmerHale's motion for summary judgment as to Count III.

### 4.    Count IV – First Amendment – Free Association

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Bonta*, 594 U.S. at 605–06 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). Compelled disclosure of affiliation with groups engaged in advocacy can violate this First Amendment right. *See id.* at 607. WilmerHale alleges that the Order compels the firm's federal contractor clients to disclose their affiliation with WilmerHale, which engages in advocacy on their behalf and on behalf of other clients. Compl. ¶¶ 161–63. I find that this disclosure violates the First Amendment freedom of association.

The Order compels "Government contractors to disclose any business they do with WilmerHale." WilmerHale Order § 3(a). It then instructs agencies to terminate any contracts for which WilmerHale has been hired to perform services and to "otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of [President Trump's] Administration . . . ; and as heads of agencies deem appropriate." *Id.* § 3(b). This is plainly a compelled disclosure of federal contractors'

44

**JA 2847**

association with WilmerHale and an accompanying threat of reprisal—cancellation of federal contracts—for that association.  *See* Compl. ¶¶ 162–63.[21]

The Order's compelled disclosure is subject to—and fails—exacting scrutiny.  *See Bonta*, 594 U.S. at 607.[22]  Defendants assert that the Government has an interest in (1) "managing its contracts, with an eye towards an undisputed federal interest" of preventing racial discrimination, *see* Defs.' Opp'n to Pl.'s MSJ at 9–15; and (2) monitoring WilmerHale as a subcontractor, *see* Defs.' MTD at 21.  Even if these interests are important, defendants cannot show a substantial relation between the Order and these goals, or that the Order is narrowly tailored to achieve those goals.  *See Bonta*, 594 U.S. at 607–08.

The Order "require[s] Government contractors to disclose *any* business they do with WilmerHale," regardless of whether that business is related to a federal contract.  *See* WilmerHale Order § 3(a) (emphasis added).  Defendants have not explained how a federal contractor's affiliation with WilmerHale on "any business"—even business unrelated to the contract[23]—is substantially related to defendants' proffered interests in "ensur[ing] that there is no transfer of taxpayer dollars to entities that engage in racial discrimination" or

---

[21] At least one federal contractor received an email from a federal agency on March 28, 2025 requesting that the contractor disclose whether it has any business relationship with WilmerHale.  Pl.'s SUMF ¶ 134.
[22] Defendants assert that the disclosure at issue here should be subject to relaxed scrutiny, as it involves only "factual" disclosure.  *See* Defs.' MTD at 21–22.  Defendants' cited case, *American Meat Institute v. U.S. Department of Agriculture*, 760 F.3d 18 (D.C. Cir. 2014), is inapposite.  *American Meat Institute* involved commercial speech and disclosure of "'purely factual and uncontroversial information' about attributes of the product or service being offered."  *See id.* at 26.  The WilmerHale Order has made association with the firm controversial by branding it as a "rogue" law firm, *see* WilmerHale Fact Sheet, and publicly accusing it of "weaponization of the justice system," *see* WilmerHale Order § 1.  Thus, the relaxed standard applied in *American Meat Institute* is inapplicable here.
[23] WilmerHale has federal contractor clients who have engaged the firm to work on matters unrelated to those federal contracts.  Berman Decl. ¶ 31.

45

managing contracts on which WilmerHale is a subcontractor. *See* Defs.' MTD at 2, 21. It is certainly not clear to this Court!

The Order is also not narrowly tailored. *See Bonta*, 594 U.S. at 607–08. "The 'government may regulate in the [First Amendment] area only with narrow specificity[.]'" *Id.* at 610 (first alteration in original) (quoting *Button*, 371 U.S. at 433). The Supreme Court has warned that "[w]hen it comes to 'a person's beliefs and associations,' '[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Id.* (alterations in original) (quoting *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion)). That is exactly what § 3 does here. The sweeping inquiry into "any business" federal contractors do with WilmerHale—and the threatened reprisals for that affiliation—discourages those contractors from exercising their protected right to associate with WilmerHale. The Order thus does not operate with the required narrow specificity.

Accordingly, the Order is an unconstitutional impairment on the firm's and federal contractors' freedom of association. As such, I will **DENY** defendants' motion to dismiss to the extent that it seeks to dismiss Count IV and **GRANT** WilmerHale's motion for summary judgment as to Count IV.

### B.    *Separation of Powers and Spending Clause Claims*

WilmerHale asserts two claims related to the separation of powers and the Spending Clause. Compl. ¶¶ 172–82 (Count V), 218–26 (Count XI). Analyzing each in turn, the Court finds for WilmerHale on the separation of powers claim, but for defendants on the Spending Clause claim.

**JA 2849**

### 1.    Count V – *Ultra Vires* Presidential Action – Separation of Powers

"[T]he President's power, if any, to issue [an Executive Order] must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *accord Mille Lacs Band*, 526 U.S. at 188–89. President Trump purportedly issued the WilmerHale Order pursuant to "the authority vested in [him] as President by the Constitution and the laws of the United States of America." WilmerHale Order. WilmerHale argues that neither the Constitution nor any statutory authority empowers the President to issue the Order, and in fact the Order violates the separation of powers by usurping judicial authority to identify and sanction abuses of the judicial process.[24]  Pl.'s MSJ at 26–27. At the very least, the latter is certainly true!

This claim epitomizes a key dispute between the parties. WilmerHale urges the Court to view the Order as a single, retaliatory action and conclude that no authority "empowers the President to sanction a law firm for representing his political opponents or handling lawsuits that he perceives to be contrary to his interests or those of the United

---

[24] WilmerHale frames this count as a challenge to the Order as *ultra vires*. Compl. ¶ 75. Defendants, citing to *Federal Express Corp. v. U.S. Department of Commerce* ("*FedEx*"), argue that *ultra vires* claims must meet a very high bar and are unavailable when there is an alternative procedure for review of the alleged violation. Defs.' MTD at 6 (citing 39 F.4th 756, 765 (D.C. Cir. 2022)). *FedEx*'s limitations on *ultra vires* review are inapplicable to this case. FedEx was challenging the Department of Commerce's interpretation of the 2018 Export Controls Act, but it was unable to bring an Administrative Procedure Act ("APA") claim because Congress had barred APA review of Commerce's functioning under the Act. *Id.* at 762–63. Our Circuit found that a "demanding standard [was] necessary" in reviewing FedEx's *ultra vires* claim because FedEx sought "the intervention of an equity court where Congress ha[d] not authorized statutory judicial review." *Id.* at 765. Here, WilmerHale is not advancing an *ultra vires* claim to avoid an explicit determination by Congress that statutory judicial review should not be available. Instead, the firm's arguments are grounded in the separation of powers, an area which is firmly within the Court's province. *See generally Youngstown*, 343 U.S. 579; *see also Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority.").

**JA 2850**

States."  *See* Pl.'s MSJ at 26; *see also* Compl. ¶ 175.  Defendants, on the other hand, insist that viewing the Order section-by-section reveals that each section is a proper exercise of Executive discretion.  *See, e.g.*, Defs.' MTD at 29 ("Start with Plaintiff's *ultra vires* claim, which remarkably suggests that Federal agencies lack any authority to control over [sic] who can enter their buildings or interact with their employees on official business.").

Even if the Court found that each section *could* be grounded in Executive power, the directives set out in each section clearly *exceed* that power!  The President, by issuing the Order, is wielding his authority to punish a law firm for engaging in litigation conduct the President personally disfavors.  Thus, to the extent the President does have the power to limit access to federal buildings, suspend and revoke security clearances, dictate federal hiring, and manage federal contracts, the Order surpasses that authority and in fact usurps the Judiciary's authority to resolve cases and sanction parties that come before the courts!

The Constitution vests "[t]he judicial Power of the United States" in the Supreme Court and such inferior courts established by Congress.  U.S. Const. art. III, § 1.  "Article III is 'an inseparable element of the constitutional system of checks and balances' that 'both defines the power and protects the independence of the Judicial Branch.'"  *Stern v. Marshall*, 564 U.S. 462, 482–83 (2011) (quoting *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982) (plurality opinion)).  "Under 'the basic concept of separation of powers . . . the "judicial Power of the United States" . . . can no more be shared' with another branch than 'the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto.'"  *Id.* at 483 (quoting *United States v. Nixon*, 418 U.S. 683, 704 (1974)).

48

**JA 2851**

This judicial power includes the inherent authority to sanction attorneys for their conduct in Article III courts. "Federal courts possess certain 'inherent powers,' . . . 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). The Supreme Court has "outlined the scope of the inherent power of the federal courts." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). A federal court's inherent powers include, but are not limited to, the authority to "discipline attorneys who appear before it," "punish for contempt," "vacate its own judgment upon proof that a fraud has been perpetrated upon the court," and "conduct an independent investigation in order to determine whether [the court] has been the victim of fraud." *Id.* at 43–44. Accordingly, judicial "authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Goodyear*, 581 U.S. at 107 (quoting *Chambers*, 501 U.S. at 44–45).

It necessarily follows that this judicial power is exclusive of the other two branches. *See Stern*, 564 U.S. at 483 ("In establishing the system of divided power in the Constitution, the Framers considered it essential that 'the judiciary remain[] truly distinct from both the legislature and the executive.'" (quoting The Federalist No. 78, at 466 (C. Rossiter ed. 1961) (A. Hamilton))); *N. Pipeline Constr. Co.*, 458 U.S. at 59 ("[O]ur Constitution unambiguously enunciates a fundamental principle – that the 'judicial Power of the United States' must be reposed in an independent Judiciary. It commands that the independence of the Judiciary be jealously guarded . . . ."); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) ("Congress cannot vest review of the decisions of Article III courts in officials

49

**JA 2852**

of the Executive Branch."); The Federalist No. 78, at 466 (C. Rossiter ed. 1961) (A. Hamilton) ("The complete independence of the courts of justice is peculiarly essential . . . .").

The Order sanctions WilmerHale and its attorneys for their conduct before Article III courts. *See* WilmerHale Order § 1; *supra* Analysis III.A.1 (finding that the Order constitutes punishment). This encroaches on the Judiciary's exclusive power to sanction attorneys. *See Goodyear*, 581 U.S. at 107. If the President believed that the firm "engaged in improper legal advocacy," he should have "appeal[ed] to the judiciary to make appropriate findings and fashion an appropriate sanction." Compl. ¶¶ 94, 108–11, 180; Pl.'s MSJ at 28.[25] The Executive was not empowered to take it upon itself to sanction this purportedly improper conduct!

This attempted usurpation "threatens severe impairment of the judicial function" by "sift[ing] out" certain challenges and cases. *See Velazquez*, 531 U.S. at 546. "An informed, independent judiciary presumes an informed, independent bar." *See id.* at 545. The Order leaves attorneys wary of making certain arguments and representing certain clients for fear of retribution from the Executive Branch. *See* Amicus Br. of 342 Former Judges in Supp. of Pl.'s MSJ ("Former Judges Amicus Br.") [Dkt. #99] at 5 ("A court cannot be confident that the facts and law relevant to a matter have been fully presented if a firm must look over its shoulder in fear of becoming the target of punitive action such as the Order."). This

---

[25] The Order's attempts to punish WilmerHale's litigation conduct is particularly concerning because the President and the Executive Branch were among the parties in the relevant litigation. *See, e.g.*, Compl. ¶ 83 ("WilmerHale filed a lawsuit in February on behalf of the inspector general of eight federal agencies . . . alleging that President Trump improperly fired them . . . ."); *id.* ¶ 84 ("WilmerHale has represented clients in matters directly adverse to President Trump's personal and political interests.").

contravenes the long-standing adversarial nature of our legal system, and "[t]he Constitution does not permit the Government to confine litigants and their attorneys in this manner." *See Velazquez*, 531 U.S. at 548; *see also* Former Judges Amicus Br. at 6 ("Efforts to use governmental power to bend lawyers to the political interests or views of an administration may impair the candor on which judges rely and usurp judges' role in regulating the conduct of lawyers who appear before them. The adversarial system cannot function properly with such an incursion into the judicial role.").

In short, the WilmerHale Order violates the separation of powers by attempting to usurp the Judiciary's authority to resolve cases and sanction abuses of the judicial process. "A scheme so inconsistent with accepted separation-of-powers principles" must fall. *See Velazquez*, 531 U.S. at 546. I will therefore **DENY** defendants' motion to dismiss to the extent it seeks to dismiss Count V and **GRANT** WilmerHale's motion for summary judgment as to Count V.[26]

### 2. Count XI – Spending Power (U.S. Const. Art. I, § 8) – Unconstitutional Conditions on Government Contracts

The Constitution's Spending Clause grants Congress the federal spending power. *See* U.S. Const., art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *S.D. v. Dole*, 483 U.S. 203,

---

[26] WilmerHale also alleges that the Order "effectively functions" as an unlawful bill of attainder. Compl. ¶ 181. While it is not clear to what extent, if any, the Constitution's prohibition on bills of attainder applies to the Executive Branch, the Court need not reach this issue.

206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)); *see Rust*, 500 U.S. at 195 n.4 ("Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use.").

WilmerHale alleges that the Order violates the Spending Clause by imposing unconstitutional conditions on federal contracts. Compl. ¶¶ 219, 222–25. The firm claims that § 3 of the Order "make[s] it a *de facto* condition of all federal government contracts that the contractor is prohibited from retaining any WilmerHale lawyer to represent it for any purpose," which violates the First, Fifth, and Sixth Amendments. *Id.* ¶ 224. The Court finds that the firm has failed to state a Spending Clause claim.

The Spending Clause is implicated when Congress imposes a spending or funding condition. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 208, 213–21 (2013) (holding that the spending conditions Congress placed on funding in the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 violated the Spending Clause); *Dole*, 483 U.S. at 206 (holding that Congress did not violate the Spending Clause by requiring states to raise the minimum drinking age to receive federal funds); *N.Y. v. United States*, 505 U.S. 144, 167, 174–75 (1992) (holding that "the conditions attached to [] funds by Congress" violated the Spending Clause).

WilmerHale has not, however, alleged a connection between § 3 and a mandate from Congress, which is fatal to its Spending Clause claim.[27] The President issued the Order,

---

[27] WilmerHale's reliance on *Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996) to state a claim under the Spending Clause is misplaced. *Umbehr* analyzes the unconstitutional conditions doctrine under the First Amendment—not the Spending Clause. *See* 518 U.S. at 673–74. In *Umbehr*, the Supreme Court held that that First Amendment protects independent contractors from termination in retaliation for

**JA 2855**

which directs executive agency heads to take various actions to impose allegedly unconstitutional conditions on federal contracts. Compl. ¶¶ 114, 223–26. Tellingly, the Complaint points to "*[d]efendants'* attempts to impose unconstitutional conditions on federal contracts." *See id.* ¶ 226 (emphasis added). The defendants are largely agencies and agency heads; none belong to the Legislative Branch. WilmerHale nowhere alleges Congressional action and in fact concedes that "Congress has not even purported to authorize the President to impose such sanctions on law firms that take on disfavored representations." Pl.'s MSJ at 29.

WilmerHale has not and cannot state a claim under the Spending Clause.[28] As such, I will **GRANT** defendants' motion to dismiss to the extent it seeks to dismiss Count XI and **DENY AS MOOT** WilmerHale's motion for summary judgment as to Count XI. Count XI will be **DISMISSED WITH PREJUDICE**.

### C.    *Due Process and Equal Protection*

WilmerHale alleges that the Order violates the Due Process Clause and the Equal Protection Clause of the Fifth Amendment. Compl. ¶¶ 183–205. WilmerHale brings two Due Process claims alleging that: (1) the Order deprives WilmerHale and its employees of protected liberty and property interests without due process of law, *id.* ¶¶ 183–91 (Count

---

their exercise of freedom of speech. *Id.* at 686. While WilmerHale's Spending Clause claim does allege that § 3 "violates the First Amendment right to freedom of association," *see* Compl. ¶ 223, the firm chose to bring this as a Spending Clause claim and was thus required to plead some action by Congress.

[28] WilmerHale's summary judgment briefing attempts to reframe the Spending Clause claim as a separation of powers claim. *See* Pl.'s MSJ at 28–29 ("To be sure, Congress can authorize the President to impose conditions on the receipt of federal funds. . . . Congress has not even purported to authorize the President to impose such sanctions on law firms that take on disfavored representations, and they are every bit as forbidden to the Executive Branch as they are to the Legislature."). The Court need not evaluate this alternative ground for its Spending Clause claim, as WilmerHale did not allege it in the Complaint.

VI); and (2) the Order is unconstitutionally vague, *id.* ¶¶ 192–97 (Count VII). WilmerHale's Equal Protection claim asserts that the Order singles the firm out for punishment because of President Trump's "deep-seated animus" against the firm. *Id.* ¶¶ 198–205 (Count VIII). The Court finds for WilmerHale on the Due Process claims, but for defendants on the Equal Protection claim.

### 1. Count VI – Fifth Amendment – Due Process Clause (Procedural Due Process)

The Due Process Clause of the Fifth Amendment guarantees that the Government will provide due process of law before depriving an individual "of life, liberty, or property." U.S. Const. amend. V. WilmerHale alleges that "[t]he Order deprives the firm and its employees of protected liberty and property interests" "without *any* meaningful process." Compl. ¶¶ 184. To establish a due process violation, WilmerHale must prove: "(i) deprivation of a protected liberty or property interest; (ii) by the government; (iii) without the process that is 'due' under the Fifth Amendment." *N.B. ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (citations omitted); *see Reed v. Goertz*, 598 U.S. 230, 236 (2023). I find that WilmerHale's claim meets this standard.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.' Only after finding the deprivation of a protected interest do[es the Court] look to see if the [Government's] procedures comport with due process." *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)). The Supreme Court recently reiterated that "'the Due Process Clause specially protects' only 'those

54

fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition.'" *Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)).

WilmerHale pleads a protected liberty interest in its right to petition the Government under the First Amendment. Compl. ¶ 188 ("[T]he Order deprives WilmerHale of its protected liberty interest in its First Amendment right to petition the government because it restricts access to government buildings and government personnel."). The Supreme Court has recognized that the right to petition is "integral to the democratic process," *Borough of Duryea*, 564 U.S. at 388, and "one of 'the most precious of the liberties safeguarded by the Bill of Rights," *BE&K Constr. Co.*, 536 U.S. at 524 (quoting *United Mine Workers*, 389 U.S. at 222). This is because "[t]he very idea of government, republican in form, implies a right on the part of its citizens to . . . petition for a redress of grievances." *De Jonge v. Or.*, 299 U.S. 353, 364 (1937) (quoting *United States v. Cruikshank*, 92 U.S. 542, 552 (1875)). Accordingly, the Court finds that the right to petition is "deeply rooted in this Nation's history and tradition." *See Munoz*, 602 U.S. at 910; *see also Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236–37 (10th Cir. 2007) (finding that the plaintiff "has a liberty interest in his First Amendment right to petition the government").

WilmerHale has shown that the Government deprived the firm of this protected liberty interest. "[T]he right to petition extends to all departments of the Government[.]" *BE&K Constr. Co.*, 536 U.S. at 525 (quoting *Cal. Motor Transp. Co.*, 404 U.S. at 510). As discussed in Analysis III.A.3, the Order violates WilmerHale's First Amendment right to petition by obstructing the firm's ability to bring and pursue lawsuits. For example, the

55

JA 2858

Order seeks to restrict WilmerHale attorneys' access to federal buildings and ability to engage with Government counsel in civil and criminal cases. *See* Compl. ¶¶ 153–59. These restrictions infringe on WilmerHale's protected liberty interest in its right to petition the Government for redress.

Finally, President Trump issued the Order without any due process. At its core, due process requires "notice of the proposed official action and 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Ralls Corp. v. CFIUS*, 758 F.3d 296, 318 (D.C. Cir. 2014) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Defendants concede that "WilmerHale was given no notice that the Order or Fact Sheet was forthcoming" and that "WilmerHale was not given the opportunity to respond to the allegations in the Order or Fact Sheet." Pl.'s SUMF ¶ 131; Defs.' Resp. to Pl.'s SUMF [Dkt. #103-1] at 4 (stating that paragraph 131 is "[u]ndisputed"). That does not comport with due process. *See Ralls Corp.*, 758 F.3d at 318 ("Both the Supreme Court and this Court have recognized that the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action are essential components of due process.").[29]

The Order deprives the firm of its protected liberty interest in petitioning the Government without notice or an opportunity to respond. Accordingly, it violates procedural due process. I will therefore **DENY** defendants' motion to dismiss to the extent

---

[29] Even assuming *arguendo* that national security concerns justify certain provisions of the Order, such as §§ 2 and 5, WilmerHale was still owed due process. *See Ralls Corp.*, 758 F.3d at 318–20 (finding that the "lack of process constitute[d] a clear constitutional violation, notwithstanding the Appellees' substantial interest in national security").

56

**JA 2859**

it seeks to dismiss Count VI and **GRANT** WilmerHale's motion for summary judgment as to Count VI.

### 2.    Count VII – Fifth Amendment – Due Process Clause (Void for Vagueness)

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The Due Process Clause thus "requires the invalidation of laws that are impermissibly vague"—specifically, a law is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). This void for vagueness doctrine "addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

WilmerHale alleges that "[t]he Order is unconstitutionally vague because it does not give WilmerHale fair notice of what is prohibited and how the Firm can avoid sanctions in the future." Compl. ¶ 194. I agree!

As a threshold matter, the doctrine of void for vagueness applies to the Order. Courts have applied the doctrine to civil actions, as well as criminal actions. *See Fox*, 567 U.S. at 258 (setting aside Federal Communications Commission regulations under the void for vagueness doctrine); *Boutilier v. INS*, 387 U.S. 118, 123 (1967) ("It is true that this

57

**JA 2860**

Court has held the 'void for vagueness' doctrine applicable to civil as well as criminal actions."). Defendants nonetheless argue that the doctrine is inapplicable because the Order "is not proscriptive in nature." Defs.' MTD at 11. Not so. The Order directs the suspension of WilmerHale employees' security clearances; orders federal contractors to disclose their relationships with WilmerHale; and seeks to restrict firm employees' ability to access federal buildings, engage with federal employees, and obtain federal employment. WilmerHale Order §§ 2, 3, 5. These directives instruct federal agencies to take punitive, adverse action against WilmerHale and its employees.

The Order does not provide WilmerHale with notice of how it should act in the future to avoid these sanctions. *See Fox*, 567 U.S. at 253. President Trump allegedly issued the Order because WilmerHale has "abandoned the profession's highest ideals" and "abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." WilmerHale Order § 1. He points to WilmerHale's "obvious partisan representations," "efforts to discriminate on the basis of race," "obstruction of efforts to prevent illegal aliens from committing horrific crimes," and "efforts . . . to enable noncitizens to vote." *Id.* The Court agrees that the Order "leaves no doubt that WilmerHale is being punished because it has represented some of the President's political opponents and advanced positions with which he disagrees," but it "does not specify what aspect of WilmerHale's conduct triggered its massive sanctions." Compl. ¶ 195. Moreover, the Order's invocation of concepts such as "bedrock American principles" and "the interests of the United States" leave WilmerHale and its employees guessing about how to modify their conduct to avoid the Order's sanctions.

58

**JA 2861**

Under the most generous reading of the Order, it condemns WilmerHale's involvement in immigration and election litigation. It does not, however, otherwise explain what conduct the President considers to be undermining the interests of the United States. The Order essentially leaves it to WilmerHale to predict which causes and which attorneys the President personally dislikes and then steer clear of those causes and attorneys. This chilling effect triggers serious vagueness concerns. *See Fox*, 567 U.S. at 253–54 ("When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."); *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) ("The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech.").

The Order also fails to provide the "precision and guidance [] necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *See Fox*, 567 U.S. at 253. The Order directs agency officials to take action against WilmerHale to ensure "consistency" with the "national interest," "the goals and priorities of [the] Administration," and "the interests of the United States." WilmerHale Order §§ 2, 3, 5. Read in the context of the Order, these phrases are most narrowly construed to mean those interests which the President condones or, in their broadest construction, whatever an agency head thinks is in the interest of the American people. To say the least, the Order is fraught with the risk of arbitrary or discriminatory enforcement! *See Fox*, 567 U.S. at 253.

As such, I find that the Order fails to provide "fair notice of conduct that is forbidden or required," *see id.*, and is therefore void for vagueness. I therefore will **DENY**

59

**JA 2862**

defendants' motion to dismiss to the extent it seeks to dismiss Count VII and **GRANT** WilmerHale's motion for summary judgment as to Count VII.

### 3.      Count VIII – Fifth Amendment – Equal Protection

The Fifth Amendment's guarantee of equal protection commands that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954). WilmerHale advances a "class of one" equal protection claim, which requires the firm to show that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). These two elements are "essential." *3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003).

WilmerHale alleges that the "very purpose" of the Order "is to discriminate against WilmerHale and WilmerHale alone," imposing punitive measures on the firm which do "not apply to many similarly situated firms or lawyers, even when the Order itself complains that certain practices are widespread among large law firms." Compl. ¶ 202. The Order, according to WilmerHale, singles the firm out "for engaging in constitutionally protected speech and legal advocacy that President Trump does not like." *Id.* ¶ 204.

At the outset, the Court rejects defendants' argument for dismissing WilmerHale's equal protection claim. These arguments are grounded in assessing the treatment of WilmerHale as a federal contractor. *See* Defs.' MTD at 22 ("To begin, the class-of-one theory of equal protection is inapplicable in the government employment context."); *id.* at 23 ("[WilmerHale] is not 'similarly situated' to other potential government contractors who

60

**JA 2863**

do not engage in unlawful DEI practices."). Defendants ignore the plain text of the Complaint and the Order. WilmerHale posits that it has been treated differently from "similarly situated firms," Compl. ¶ 202, and the Order was purportedly issued to address the risks associated with "'Big Law' firms," WilmerHale Order § 1. The appropriate class for WilmerHale is not federal contractors, but instead some set of large law firms. The Court therefore rejects defendants' argument.

Nevertheless, WilmerHale has failed to plausibly allege a group of "similarly situated" firms. The Complaint references "large law firms," and implies that some of those law firms may engage in the same practices of which WilmerHale is accused. *See* Compl. ¶ 202. Nowhere in the Complaint does WilmerHale concretely identify the similarly situated firms, and instead leaves the Court to guess who they are. In fact, when the Court asked WilmerHale's counsel who are WilmerHale's "peer firms," counsel conceded that "there's so many different ways to come at that" and otherwise did not provide guidance on how to draw the circle around similarly situated firms. Dispositive Mots. Hearing Tr. 34:14–20 ("THE COURT: What would you consider a peer firm? Firms of over a thousand lawyers? How would you describe it? MR CLEMENT: Well, there's so many different ways to come at that. But maybe I'll talk about for a second the nine firms that have made a deal with the government rather than suffer these kinds of executive orders.").

WilmerHale also does not address how the firm could have been "singled out" when it acknowledges that multiple other firms either received or were threatened with Executive Orders. *See* Compl. ¶¶ 96–98 (Perkins Coie), ¶¶ 100–03 (Paul Weiss), ¶ 106 (Jenner &

Block); Pl.'s SUMF ¶¶ 102–03 (Skadden), ¶¶ 104–06 (Wilkie Farr & Gallagher), ¶¶ 107–09 (Milbank);[30] Dispositive Mots. Hearing Tr. 34:17-20 (stating that "nine firms [] have made a deal with the government rather than suffer these kinds of executive orders"); *see also* Compl. ¶ 12 ("The President's sweeping attack on WilmerHale (*and other firms*) is unprecedented and unconstitutional" (emphasis added)); *id.* ¶¶ 104–05 (alleging that President Trump issued a directive aimed generally "at law firms and lawyers he disfavors" and directing the Attorney General "to consider whether allegedly improper attorney conduct warrants 'reassessment of security clearances held by the attorney or termination of any Federal contract for which the relevant attorney or law firm has been hired to perform services'"). The WilmerHale Order itself states that the President "is committed to addressing the significant risks associated with law firms, particularly so-called 'Big Law' firms," not just WilmerHale. WilmerHale Order § 1.

The Complaint fails to identify the similarly situated firms while simultaneously admitting that there are multiple large law firms which have received the same treatment as WilmerHale. Thus, the firm cannot establish a "class of one" equal protection claim. I will **GRANT** defendants' motion to dismiss to the extent it seeks to dismiss Count VIII and **DENY AS MOOT** WilmerHale's motion for summary judgment as to Count VIII. Count VIII will be **DISMISSED WITH PREJUDICE**.

---

[30] For the same reasons as those set out in note 13, *supra*, the Court finds that there is no genuine dispute as to the facts in these paragraphs.

62

JA 2865

**D.    *Right to Counsel Claims***

WilmerHale alleges that the Order violates its clients' right to counsel of their choice under both the Fifth Amendment and Sixth Amendment.  Compl. ¶¶ 206–09 (Count IX), 210–17 (Count X).  The Sixth Amendment guarantees the right to counsel in criminal matters, *see* U.S. Const. amend. VI, while the Fifth Amendment's Due Process Clause provides for the right to counsel in civil matters, *see American Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 (D.C. Cir. 1984) (citing *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932)).  The Court finds that WilmerHale succeeds as to its Sixth Amendment claim, but not as to its Fifth Amendment claim.

### 1.    Count IX – Fifth Amendment – Right to Counsel

WilmerHale asserts that "[t]he Fifth Amendment protects both lawyers' and clients' due-process rights in establishing and maintaining attorney-client relationships, including the client's right to choose counsel and the lawyer's corresponding right to maintain that representation free from arbitrary or unjustified government interference."  Compl. ¶ 207. The Court finds that WilmerHale has not sufficiently alleged a violation of the Fifth Amendment right to counsel.

Under *Triplett*, the primary case on which WilmerHale relies, the firm is required to show that the alleged violation of the Fifth Amendment right to counsel "made attorneys unavailable to [the] clients."  *See* 494 U.S. at 722.  *Triplett* "call[ed] into question the constitutionality of the Department of Labor's administration of [a] provision of the Black Lung Benefits Act of 1972 which prohibits the acceptance of attorney's fees for the representation of claimants, except such fees as are approved by the Department."  *Id.* at

63

**JA 2866**

717. An attorney argued that this restriction on fees "violate[d] the Due Process Clause of the Fifth Amendment because it render[ed] qualified attorneys unavailable and thereby deprive[d] claimants of legal assistance in the prosecution of their claims." *Id.*

The Supreme Court rejected the attorney's claim, as he failed to show "that the regime made attorneys unavailable to his prospective clients." *Id.* at 722. It was not enough to provide "anecdotal evidence" from three lawyers that the regime produced too few lawyers. *Id.* at 723–24. In fact, the Supreme Court found this evidence "blatantly insufficient to meet [the attorney's] burden of proof." *Id.*

WilmerHale's allegations are even more deficient. WilmerHale nowhere alleges that its clients are unable to obtain alternative qualified counsel. In fact, the Complaint acknowledges that there are "many similarly situated firms" who have not been targeted by Executive Orders. Compl. ¶ 202; *see also* Suppl. Berman Decl. ¶ 9 ("Other existing clients have indicated to WilmerHale partners that they are considering whether to replace WilmerHale—or engage an additional firm on ongoing matters . . . ."); *id.* ¶ 10 ("Clients who need attorneys who can interact with federal government personnel, access federal buildings, and access classified information may well take existing or new business to other firms."). Thus, WilmerHale has not met and cannot meet its burden to show that the alleged violation of the Fifth Amendment right to counsel deprived its clients of qualified attorneys. *See Triplett*, 494 U.S. at 722.

The Court will **GRANT** defendants' motion to dismiss to the extent it seeks to dismiss Count IX and **DENY AS MOOT** WilmerHale's motion for summary judgment on Count IX. Count IX will be **DISMISSED WITH PREJUDICE**.

64

JA 2867

### 2.    Count X – Sixth Amendment – Right to Counsel

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  This guarantee requires providing a criminal defendant with "a fair opportunity to secure counsel of his own choice."  *Luis v. United States*, 578 U.S. 5, 11 (2016) (quoting *Powell*, 287 U.S. at 53).  "The right to select counsel of one's choice" is "the root meaning of the constitutional guarantee" to counsel protected by the Sixth Amendment.  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147–48 (2006).

The Supreme Court and our Circuit Court have recognized the right to counsel of one's choice as "fundamental," *see Luis*, 578 U.S. at 12, but "not absolute," *United States v. Friedman*, 849 F.2d 1488, 1490 (D.C. Cir. 1988); *see also Wheat v. United States*, 486 U.S. 153, 166 (1988).  For example, "a defendant may not insist on representation by an attorney he cannot afford or . . . insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party."  *Wheat*, 486 U.S. at 159.

Absent an exception, a defendant is entitled to "the counsel he believes to be best."  *Gonzalez-Lopez*, 548 U.S. at 146.  The "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the [alternative] representation he received."  *Id.* at 148.  A defendant alleging a violation of this Sixth Amendment right need not show that alternative counsel was ineffective or prejudiced his case.  *See id.*  "To argue otherwise is to confuse the right to counsel of choice—which is the right to a particular lawyer regardless of comparative effectiveness—with the right to effective counsel—which imposes a baseline

65

**JA 2868**

requirement of competence on whatever lawyer is chosen or appointed." *Id.*;[31] *see also id.* at 150 ("A choice-of-counsel violation occurs *whenever* the defendant's choice is wrongfully denied.").

Here, WilmerHale has alleged and shown that the Order "infringes the Sixth Amendment right to counsel of [its] clients" by "eviscerat[ing] the Firm's ability to provide effective representation and advocacy for its clients." Compl. ¶¶ 213–16. The firm represents "individuals accused of criminal . . . wrongs." *Id.* ¶ 79; *see* Berman Decl. ¶¶ 8, 15, 17, 20. This work requires entering federal buildings and engaging with federal employees. For example, "WilmerHale attorneys representing criminal defendants often meet with prosecutors in U.S. Attorneys' offices in-person to advocate for their clients." Compl. ¶ 79; *see also* Berman Decl. ¶¶ 20–21 ("WilmerHale Litigation and Controversy Department lawyers must interact with federal employees . . . to make presentations to prosecutors."). It can also require active security clearances, depending on the matter. Pl.'s SUMF ¶ 24 ("The Firm has multiple attorneys with active security clearances, which are necessary to represent clients in cases involving sensitive government information, including in . . . criminal investigations."); Berman Decl. ¶ 78.

---

[31] In reaching this conclusion, the Supreme Court took care to distinguish the Sixth Amendment right to counsel from the Fifth Amendment Due Process right to counsel. *See Gonzalez-Lopez*, 548 U.S. at 146–48. The Due Process protections are grounded in the right to a fair trial, while the Sixth Amendment protection is a distinct right to counsel of choice. *See id.* at 147 ("The earliest case generally cited for the proposition that 'the right to counsel is the right to the effective assistance of counsel,' was based on the Due Process Clause rather than on the Sixth Amendment." (citation omitted)). Accordingly, while WilmerHale was required to show its clients could not obtain effective assistance of counsel for its Fifth Amendment right to counsel claim, it need not make such a showing with respect to its Sixth Amendment claim.

By barring WilmerHale attorneys from federal buildings, prohibiting their engagement with federal employees, and suspending their security clearances, the Order effectively prevents the firm's attorneys from representing their clients in criminal matters. *See* WilmerHale Order §§ 2, 5; Compl. ¶¶ 79, 125, 213–14; Pl.'s SUMF ¶ 24; Berman Decl. ¶¶ 20–21, 78, 81.  The Order also coerces WilmerHale's federal contractor clients to choose between their contracts and their engagements—including engagements on criminal matters—with WilmerHale.  *See* WilmerHale Order § 3; Compl. ¶¶ 126, 215.  These directives may thus cause the firm's criminal defendant clients to abandon the firm and seek alternate counsel;[32] some clients have already begun to do so.  *See* Pl.'s SUMF ¶¶ 135, 138,[33] 141; Suppl. Berman Decl. ¶¶ 5–10.

Though the Order does not *directly* prohibit criminal defendants from hiring WilmerHale as their counsel, it certainly has that effect!  The Supreme Court has indicated that indirect infringements on the right to counsel of choice can violate the Sixth Amendment.  *See Luis*, 578 U.S. at 10 ("[T]he pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment.").  This is a logical conclusion, as the Government "cannot do indirectly what [it] is barred from doing directly."  *See Vullo*, 602 U.S. at 190 (citing *Bantam Books*, 372 U.S. at 67–69); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 230 (2023) ("[W]hat cannot be done directly cannot be done indirectly. The Constitution deals

---

[32] As explained above, the existence of alternative qualified counsel for these clients is irrelevant.  The violation of WilmerHale's clients' Sixth Amendment right was "complete" when President Trump issued the Order.  *See Gonzalez-Lopez*, 548 U.S. at 148.

[33] Defendants dispute paragraph 138 but provide no basis for that dispute.  *See* Defs.' Resp. to Pl.'s SUMF. The Court thus finds that there is no genuine dispute here.

with substance, not shadows[.]" (quoting *Cummings v. Missouri*, 71 U.S. 277, 4 Wall. 277, 325 (1867))).

The indirect infringement on the right to counsel here is severe, as explained above. I see no reason to ignore this violation simply because it is not a direct, explicit prohibition on representation of criminal clients. The intended and actual effect of the Order's sanctions is to drive clients away from WilmerHale! Taking into consideration the source of these directives—the President of the United States—along with the breadth of the sanctions, the Court finds that the Order materially "undermine[s] the value of" the firm's clients' right to counsel of choice. *See Luis*, 578 U.S. at 12. Accordingly, I will **DENY** defendants' motion to dismiss to the extent it seeks to dismiss Count X and **GRANT** WilmerHale's motion for summary judgment as to Count X.

<u>**REMEDIES**</u>

WilmerHale has shown that it is entitled to summary judgment on Counts I–VII and X, which allege that the Order violates the First, Fifth, and Sixth Amendments and the separation of powers. The Court next considers the appropriate remedies. WilmerHale asks for a declaratory judgment and permanent injunction relief. Compl. at 56 (Prayer for Relief); Pl.'s MSJ at 36–45. The Court has found that the Order is unconstitutional and will issue a declaratory judgment to that effect.[34] The Court will also issue injunctive relief, but only as to some of the defendants. *See infra* note 35.

---

[34] While the Order includes a provision that "[t]his order shall be implemented consistent with applicable law," *see* WilmerHale Order § 6(b), the Court has found that the Order *as issued* is unconstitutional.

The Court can properly enjoin enforcement of the Order. "[I]t is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Com. of the United States v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin v. Mass.*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring in part and concurring in the judgment)). Accordingly, "courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Id.* (quoting *Soucie v. David*, 448 F.2d 1067, 1072 n.12 (D.C. Cir. 1971)). Thus, when the President issues an unlawful Executive Order, "the proper course is to seek to enjoin a member of the executive branch from carrying out the executive order at issue." *McCray v. Biden*, 574 F. Supp. 3d 1, 11 (D.D.C. 2021). That is what WilmerHale has done here.[35]

---

[35] Defendants move to dismiss two defendants, the Executive Office of the President ("EOP") and the United States. Defs.' MTD at 31–35. Addressing each in turn, the Court finds both are proper defendants. *First*, "EOP is an entity comprising a number of other entities, offices and establishments" with a variety of responsibilities. *Id.* at 31. Defendants complain that naming EOP without specifying whether the Complaint seeks relief as to any particular EOP entity is "puzzling and improper." *Id.* at 31–32. Defendants fail to provide any legal authority for dismissing EOP on that basis. *Second*, defendants seek dismissal of the United States because WilmerHale "cannot sue for injunctive relief against the entire Government *qua* Government." *Id.* at 32. Here the Court looks to the waiver of sovereign immunity in 5 U.S.C. § 702. *See Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) (holding that "§ 702's waiver of sovereign immunity permits not only [plaintiff's] APA cause of action, but his nonstatutory and First Amendment actions as well," because the "APA's waiver of sovereign immunity applies to any suit whether under the APA or not" (quoting *Reich*, 74 F.3d at 1328)). Section 702 states that "[t]he United States may be named as a defendant in any [] action, and a judgment or decree may be entered against the United States," if the action (1) is in a court of the United States; (2) seeks relief other than money damages; and (3) "stat[es] a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." WilmerHale has met these requirements, and thus the United States is a proper defendant. Defendants argue that the Court may not issue injunctive relief against the United States because § 702 requires "[t]hat any mandatory or injunctive decree shall specify the Federal officer or officers (by name or title), and their successors in office, personally responsible for compliance." This is true, but it speaks only to the scope of the injunctive relief the Court issues. WilmerHale also seeks declaratory relief, and § 702 does not bar declaratory relief against the United States. As such, I need not and will not dismiss the United States from the case!

To obtain permanent injunctive relief, WilmerHale must establish "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between [WilmerHale] and [defendants], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *eBay Inc. v. MercExchange*, 547 U.S. 388, 391 (2006)). The last two factors merge when the Government is the opposing party. *Id.*

WilmerHale has shown that it will suffer irreparable injury absent an injunction. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod*, 427 U.S. at 373) (discussing a motion for a preliminary injunction); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998))). Here, WilmerHale has shown that the Order violates the firm's First, Fifth, and Sixth Amendment rights, as well as its clients' First and Sixth Amendment rights.

WilmerHale has also shown that the Order will cause economic injury sufficient to warrant injunctive relief. While "economic loss does not, in and of itself, constitute irreparable harm," there is an exception when "the loss threatens the very existence of the

70

**JA 2873**

movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Such is the case here. "A large proportion" of WilmerHale's litigation matters are in federal court, and its litigation group frequently represents clients in investigations involving federal agencies. Pl.'s SUMF ¶¶ 18–19. Even outside of federal litigation and investigations, WilmerHale's matters involve significant engagement with federal agencies and employees. *See, e.g.*, *id.* ¶¶ 21–23, 26–28. Moreover, federal contractors constitute 21 of WilmerHale's 25 largest clients and account for more than 30% of the firm's revenue. *Id.* ¶ 32. WilmerHale has thus shown that the Order "threaten[s] the very viability of the Firm's business model." Compl. ¶ 124.

Despite the issuance of a TRO one day after President Trump announced the Order, existing clients have been curtailing their relationships with WilmerHale and new clients are taking their business elsewhere. Pl.'s SUMF ¶¶ 138–41. The monetary value of these current and future client relationships is difficult to calculate. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("We have found, for example, that injunctive relief is appropriate where it would be 'very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.'" (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999))).

Absent an injunction, WilmerHale's injuries will likely continue. *See* Suppl. Berman Decl. ¶¶ 10–15. WilmerHale attorneys are currently scheduled to appear in hearings, trials, and appellate proceedings in the upcoming months; the Order, unless enjoined, creates significant uncertainty about whether the firm's attorneys would be able

71

**JA 2874**

to appear for these proceedings.  *See id.* ¶ 13(d).  Additionally, "a number of existing clients have expressed concerns about continuing to work with WilmerHale if . . . the Order fully takes effect, even though they would otherwise wish to continue working with the Firm." *Id.* ¶ 10.

The Court also finds that the balance of the equities and public interest support issuing a permanent injunction.  The Order is unconstitutional, and thus defendants do not have a legitimate interest in enforcing the Order.  In fact, it is "obvious" that the "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653.  Enjoining the Order serves the public interest by, for example, eliminating an obstacle to free speech and preserving the independent and adversarial nature of our judicial system.  The balance of the equities and public interest thus strongly favor injunctive relief.

The final question is whether the Court could or should sever any sections of the Order.[36]  The Order does not contain a severability clause.  *See generally* WilmerHale Order; *cf. League of United Latin Am. Citizens v. EOP*, 2025 WL 1187730, at *58 (D.D.C. Apr. 24, 2025) (finding an Executive Order severable where "[t]he Executive Order itself contains a severability clause").  Additionally, as explained in Analysis I, the operative provisions of the Order are intertwined with § 1, and the President's treatment of the Paul Weiss Order underscores the unified nature of the WilmerHale Order too.  The language of

---

[36] While the Supreme Court has "never addressed whether *Executive Orders* can be severed into valid and invalid parts, and if so, what standard should govern the inquiry," it has "assume[d], arguendo, that the severability standard for statutes also applies to Executive Orders." *Mille Lacs Band*, 526 U.S. at 191.

**JA 2875**

the WilmerHale Order and the record before the Court thus indicate that the President intended for the Order to "embod[y] a single, coherent policy," designed "to stand or fall as a whole." *See Mille Lacs Band*, 526 U.S. at 173. The Court will therefore enjoin the *entire* WilmerHale Order.

## CONCLUSION

For the reasons set forth above, I find the Order is unconstitutional. The Court will **GRANT IN PART** and **DENY IN PART** each parties' dispositive motion. Defendants' motion to dismiss will be **DENIED** except to the extent it seeks to dismiss Counts VIII, IX, and XI, which will be **DISMISSED WITH PREJUDICE**. WilmerHale's motion for summary judgment will be **GRANTED** as to Counts I–VII and X, and **DENIED AS MOOT** as to Counts VIII, IX, and XI. The Court will issue both declaratory and permanent injunctive relief.[37] An Order consistent with the above accompanies this Memorandum Opinion.

_____
RICHARD J. LEON
United States District Judge

---

[37] Given that the Court will issue a permanent injunction barring enforcement of the Order, the Court will also **DENY AS MOOT** WilmerHale's Motion for a Preliminary Injunction [Dkt. #3].

73

**JA 2876**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Case No. 25-917 (RJL) |
| v. | ) ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**ORDER**

May **27**, 2025 [Dkt. #15; Dkt. #16]

For the reasons set forth in the accompanying Memorandum Opinion, defendants'
Motion to Dismiss [Dkt. #15] and Wilmer Cutler Pickering Hale and Dorr LLP's
("WilmerHale") Motion for Summary Judgment [Dkt. #16] are each **GRANTED IN
PART** and **DENIED IN PART**.  Accordingly, it is hereby

**ORDERED** that defendants' Motion to Dismiss [Dkt. #15] is **GRANTED** to the
extent it seeks to dismiss Counts VIII, IX, and XI and **DENIED** to the extent it seeks to
dismiss Counts I–VII and X; it is further

**ORDERED** that Counts VIII, IX, and XI are **DISMISSED WITH PREJUDICE**;
it is further

**ORDERED** that WilmerHale's Motion for Summary Judgment is **GRANTED** as
to Counts I–VII and X and **DENIED AS MOOT** as to Counts VIII, IX, and XI; it is further

1

**JA 2877**

**DECLARED** that Executive Order 14250, 90 Fed. Reg. 14549 (Apr. 3, 2025), issued by the President on March 27, 2025 and entitled "Addressing Risks from WilmerHale," is unconstitutional because it violates the First, Fifth, and Sixth Amendments to the U.S. Constitution and is *ultra vires*, and is therefore null and void; it is further

**ORDERED** that all defendants other than defendant United States (together, the "agency defendants") are **PERMANENTLY ENJOINED** from implementing or giving effect to Executive Order 14250, including by relying on or considering any of the statements in § 1 of Executive Order 14250; it is further

**ORDERED** that the agency defendants shall immediately take any and all steps necessary to nullify and reverse any implementation or enforcement of Executive Order 14250 that has occurred or is occurring; it is further

**ORDERED** that the agency defendants shall immediately issue guidance to their officers, staff, employees, and contractors, instructing them to disregard Executive Order 14250; it is further

**ORDERED** that counsel for defendants shall provide counsel for WilmerHale with copies of such guidance within seven (7) days of issuance; it is further

**ORDERED** that counsel for defendants shall, within seven (7) days of this Order, file with the Court a status report describing the steps taken to ensure compliance with this Order and certifying compliance with its requirements; it is further

**ORDERED** that WilmerHale's Motion for a Preliminary Injunction [Dkt. #3] is **DENIED AS MOOT**; and it is further

2

**JA 2878**

3

**ORDERED** that this Court shall retain jurisdiction to enforce or modify this Order.

This Order shall serve as the judgment of the Court.

**SO ORDERED**.

RICHARD J. LEON
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Case No. 25-917 (RJL) |
| EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) ) | |

**MEMORANDUM ORDER**

June 26 , 2025 [Dkt. #114; Dkt. #115]

On May 27, 2025, this Court issued an Order striking down Executive Order 14250,

entitled "Addressing Risks from WilmerHale" (the "WilmerHale Order"), as

unconstitutional. *See* Mem. Op. [Dkt. #110]; Order [Dkt. #111].  The parties now ask the

Court to clarify or amend that judgment in two ways.  First, defendants filed an unopposed

motion to clarify the scope of the Court's injunction barring enforcement of Section 4 of

the WilmerHale Order.  Defs.' Mot. to Clarify [Dkt. #114] at 2.  Second, WilmerHale

"move[d] the Court to amend its Order so that the relief applies to all agencies and officials

subject to Executive Order 14250."  Pl.'s Mot. to Amend the J. ("Pl.'s Mot. to Amend")

[Dkt. #115].  Defendants oppose WilmerHale's motion.  Defs.' Opp'n to Pl.'s Mot. to

Amend the J. ("Defs.' Opp'n to Pl.'s Mot.") [Dkt. #116]; Pl.'s Reply in Supp. of Mot. to

1

**JA 2880**

Amend the J. ("Pl.'s Reply ISO Mot. to Amend") [Dkt. #117].  For the reasons set forth below, I will **GRANT** both motions.

*Defendants' Motion to Clarify.*  Defendants ask the Court to clarify "the scope of the Court's declaratory and injunctive relief as applied to Section 4 of [the WilmerHale Order]."  Defs.' Mot. to Clarify at 1.  Section 4 is labeled "Racial Discrimination" and states that "[n]othing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP) [the 'Perkins Coie Order']."  WilmerHale Order § 4.  Section 4 of the Perkins Coie Order, which is also labeled "Racial Discrimination," instructs the Equal Employment Opportunity Commission ("EEOC") to "review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964 . . . ."  Perkins Coie Order § 4(a).  It also directs the Attorney General to investigate large law firms "who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered."  *Id.* § 4(b).

Defendants, "in an abundance of caution," moved the Court for a clarification that this Court's Order enjoins enforcement of Section 4 of the Perkins Coie Order only as applied to WilmerHale, not as to any other large law firms or other entities.  Defs.' Mot. to Clarify at 2.  WilmerHale does not oppose the motion.  *Id.* at 3.  Defendants are correct that

this Court's injunction barring enforcement of Section 4 of the WilmerHale Order runs only

as to WilmerHale; therefore, the Court will grant defendants' motion to clarify.[1]

*WilmerHale's Motion to Amend.* WilmerHale filed a motion to amend the Court's

Order pursuant to Rule 59(e). Pl.'s Mot. to Amend. I will grant this motion as well.

WilmerHale's Complaint named 52 defendants: 26 federal agencies, 25 federal

officers in their official capacities, and the United States. Compl. [Dkt. #1]. In striking

down the WilmerHale Order as unconstitutional, the Court issued declaratory relief as to

all of the defendants but issued injunctive relief only as to the federal agency and officer

defendants. *See* Order at 2; Mem. Op. at 69 n.35. The Court found that the United States

is a proper defendant which could be subject to the Court's declaratory relief. Mem. Op.

at 69 n.35. However, the Court did not issue injunctive relief against the United States as

a whole "because [5 U.S.C.] § 702 requires '[t]hat any mandatory or injunctive decree shall

specify the Federal officer or officers (by name or title) and their successors in office,

personally responsible for compliance.'" *Id.* (quoting 5 U.S.C. § 702). WilmerHale named

only 51 federal agencies and officers in its Complaint, and the Court thus issued injunctive

relief only as to those agencies and officers.

WilmerHale now "asks the Court to amend its judgment so that the permanent

injunction applies to every agency and officer subject to Executive Order 14250, not just

the 51 named in the complaint." Pl.'s Mot. to Amend at 3. To that end, WilmerHale

---

[1] Defendants propose the Court issue the clarification via minute order. Defs.' Mot. to Clarify at 2. However, as explained below, the Court will grant WilmerHale's motion to amend and will issue an amended order. For the sake of efficiency, the Court will include defendants' requested clarification in the forthcoming amended order.

3

**JA 2882**

attached to its motion a list of additional federal agencies and officers it seeks to enjoin (hereinafter, the "additional agencies and officers").

WilmerHale brought this motion under Federal Rule of Civil Procedure 59(e), which provides that the Court may amend its judgment because of an "intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam) (quoting *Nat'l Trust v. Dep't of State*, 834 F. Supp. 453, 455 (D.D.C. 1993)). Courts have "considerable discretion" in deciding these motions. *Piper v. Dep't of Justice*, 312 F. Supp. 3d 17, 20 (D.D.C. 2004)

The Court finds that amending its Order is necessary to prevent manifest injustice. WilmerHale is concerned that even though the Court declared the WilmerHale Order unconstitutional, it "will nevertheless be enforced against it by agencies and officers who may not be aware (or could potentially claim unawareness) of either this Court's declaratory judgment or their obligation to comply with that declaration." Pl.'s Mot. to Amend at 3. The Court struck down the WilmerHale Order in its entirety and declared it null and void. This declaratory relief runs as to the United States as a whole, yet according to WilmerHale, defense counsel has refused to notify all United States agencies and officers of this judgment. *Id.* at 2–3; Decl. of Joseph J. DeMott [Dkt. #115-1] ¶¶ 4–6. Thus the Court must amend its Order to ensure that no federal agencies or officers are misguidedly enforcing the null and void WilmerHale Order.

Furthermore, this amendment is necessary to fully effectuate WilmerHale's inclusion of the United States as a defendant. WilmerHale included the United States "to

**JA 2883**

ensure that the relief ordered by the Court will apply government-wide." Compl. ¶. 71. The Court can issue injunctive relief against the United States so long as the injunction names the federal officers responsible for compliance instead of simply enjoining the "United States." *See* 5 U.S.C. § 702. While the Court initially included in the injunction only the agencies and officers named as defendants, nothing in § 702 requires WilmerHale to list every agency and officer it seeks to enjoin in the Complaint. *See Jenner & Block LLP v. Dep't of Justice*, 2025 U.S. Dist. LEXIS 99015, at *72–73 (D.D.C. May 23, 2025) (Bates, J.) ("Section 702 does require Jenner eventually to list the individual federal officers it seeks to enjoin; it just need not do so in the caption of the complaint."). WilmerHale named the United States as a defendant and has now provided the required list of agencies and officers it would like the Court to enjoin.[2] If I decline to enjoin these

---

[2] While defendants complain that WilmerHale could have raised this issue before judgment was issued, *see* Defs.' Opp'n to Pl.'s Mot. at 2–3, this argument is unavailing for two reasons. First, WilmerHale's Complaint states that the United States "is included as a defendant to ensure that the relief ordered by the Court will apply government-wide." Compl. ¶ 71. WilmerHale's proposed summary judgment order urged the Court to order "[d]efendant United States Department of Justice . . . to immediately issue guidance to all other agencies subject to the Order, instructing them to disregard the Order and carry on with their ordinary course of business as if the Order had never issued." Pl.'s Proposed Order [Dkt. #16-6] Thus defendants cannot claim any unfair surprise that WilmerHale has moved to make sure that the relief applies Government-wide. Second, WilmerHale asserts that it reasonably believed defense counsel would notify the additional agencies and officers of the Court's Order because defense counsel indicated it would do so:

> WilmerHale's counsel has remained in frequent communication with the government's counsel about compliance with this Court's orders, including by other covered agencies. From those communications, WilmerHale understood that the government was willing to notify all covered agencies of any final judgment declaring the [WilmerHale Order] unconstitutional, regardless of whether they were specifically named in the action or instead captured by "the United States of America," thus obviating the need to burden this Court with an amended complaint adding scores of additional parties. . . . It is only the government's unexpected (and unjustified) refusal to even *notify* all covered agencies about the Court's order that has necessitated this request to amend the judgment . . . .

Pl.'s Reply ISO Mot. to Amend at 3–4. This is not a situation in which a party should have raised issues or arguments earlier. Instead, WilmerHale is asking the Court to amend its judgment in response to what it believes to be warning signs of defendants' potential non-compliance with said judgment.

additional agencies and officers, my Order will not reflect the relief sought—and granted—in this case.[3]

None of the defendants can claim prejudice from this amendment and defendants point to no such prejudice. The Court has already declared the WilmerHale Order unconstitutional, and "thus defendants do not have a legitimate interest in enforcing [it]." Mem. Op. at 72. In fact, since the Court issued declaratory relief as to the United States as a whole, none of the federal agencies and officers should be enforcing the WilmerHale Order anyway.

Accordingly, it is hereby

**ORDERED** that defendants' Motion to Clarify [Dkt. #114] is **GRANTED**; it is further

**ORDERED** that WilmerHale's Motion to Amend [Dkt. #115] is **GRANTED**; and it is further

**ORDERED** that the Court will issue an amended version of its May 27, 2025 Order [Dkt. #111] consistent with the above.

**SO ORDERED**.

RICHARD J. LEON
United States District Judge

---

[3] The Court has already concluded that WilmerHale has standing to sue the United States and the named agency and officer defendants. *See* Mem. Op. at 16–19, 69 n.35. WilmerHale has standing as to the additional agencies and officers for the same reasons and to the same extent.

6

**JA 2885**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILMER CUTLER PICKERING HALE AND DORR LLP,<br><br>     Plaintiff,<br><br>     v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Case No. 25-917 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

th
**AMENDED ORDER**
June  26 , 2025 [Dkt. #15; Dkt. #16]

This Court's May 27, 2025 Order [Dkt. #111] is **VACATED**.

For the reasons set forth in the Court's May 27, 2025 Memorandum Opinion [Dkt. #110], defendants' Motion to Dismiss [Dkt. #15] and Wilmer Cutler Pickering Hale and Dorr LLP's ("WilmerHale") Motion for Summary Judgment [Dkt. #16] are each **GRANTED IN PART** and **DENIED IN PART**.  Accordingly, it is hereby

**ORDERED** that defendants' Motion to Dismiss [Dkt. #15] is **GRANTED** to the extent it seeks to dismiss Counts VIII, IX, and XI and **DENIED** to the extent it seeks to dismiss Counts I–VII and X; it is further

**ORDERED** that Counts VIII, IX, and XI are **DISMISSED WITH PREJUDICE**; it is further

1

**JA 2886**

**ORDERED** that WilmerHale's Motion for Summary Judgment is **GRANTED** as to Counts I–VII and X and **DENIED AS MOOT** as to Counts VIII, IX, and XI; it is further

**DECLARED** that Executive Order 14250, 90 Fed. Reg. 14549 (Apr. 3, 2025), issued by the President on March 27, 2025 and entitled "Addressing Risks from WilmerHale," is unconstitutional because it violates the First, Fifth, and Sixth Amendments to the U.S. Constitution and is *ultra vires*, and is therefore null and void; it is further

**ORDERED** that (i) all defendants; (ii) the departments, agencies, and other entities listed in Appendix A hereto, including the responsible officials and their successors at each entity, also listed in Appendix A; and (iii) any officers, staff, employees, and contractors of any of the foregoing who were provided with Executive Order 14250 or guidance related to Executive Order 14250, are **PERMANENTLY ENJOINED** from implementing or giving effect to Executive Order 14250, including by relying on or considering any of the statements in § 1 of Executive Order 14250; it is further

**ORDERED** that (i) all defendants; (ii) the departments, agencies, and other entities listed in Appendix A hereto, including the responsible officials and their successors at each entity, also listed in Appendix A; and (iii) any officers, staff, employees, and contractors of any of the foregoing who were provided with Executive Order 14250 or guidance related to Executive Order 14250, shall immediately take any and all steps necessary to nullify and reverse any implementation or enforcement of Executive Order 14250 that has occurred or is occurring; it is further

2

**JA 2887**

**ORDERED** that this Order's injunctive relief as to Section 4 of Executive Order 14250 runs only in favor of WilmerHale (including its affiliates, predecessors, successors, assigns, directors, officers, partners, employees, and agents); it is further

**ORDERED** that defendants other than the United States shall immediately issue notice to their officers, staff, employees, and contractors, instructing them to disregard Executive Order 14250; it is further

**ORDERED** that defendant United States Department of Justice shall immediately issue guidance, which shall include a copy of this Order, to (i) all defendants; (ii) the departments, agencies, and other entities listed in Appendix A hereto, including the responsible officials and their successors at each entity, also listed in Appendix A; and (iii) any officers, staff, employees, and contractors of any of the foregoing who were provided with Executive Order 14250 or guidance related to Executive Order 14250, notifying each recipient that:

    a)    Executive Order 14250 has been declared unconstitutional and *ultra vires* and is therefore null and void;

    b)    The recipient is permanently enjoined from implementing or giving effect to Executive Order 14250, including by relying on or considering any of the statements in § 1 of Executive Order 14250; and

    c)    The recipient shall immediately take any and all steps necessary to nullify and reverse any implementation or enforcement of Executive Order 14250 that has occurred or is occurring; it is further

3

**JA 2888**

**ORDERED** that counsel for defendants shall provide counsel for WilmerHale with copies of such guidance within seven (7) days of issuance; it is further

**ORDERED** that counsel for defendants shall, within seven (7) days of this Order, file with the Court a status report describing the steps taken to ensure compliance with this Order and certifying compliance with its requirements; it is further

**ORDERED** that WilmerHale's Motion for a Preliminary Injunction [Dkt. #3] is **DENIED AS MOOT**; and it is further

**ORDERED** that this Court shall retain jurisdiction to enforce or modify this Order.

This Order shall serve as the judgment of the Court.

**SO ORDERED**.

RICHARD J. LEON
United States District Judge

4

**JA 2889**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

WILMER CUTLER PICKERING
HALE & DORR LLP,

       Plaintiff,

   v.

EXECUTIVE OFFICE OF THE PRESIDENT,
*et al.*,

       Defendants.

Civil Action No. 25-917 (RJL)

**DEFENDANTS' STATUS REPORT**

On June 26, 2025, this Court entered an Amended Order ECF No. 121. In relevant part, the Order directed "defendant United States Department of Justice" to "immediately issue guidance," including "a copy of this Order," to "(i) all defendants; (ii) the departments, agencies, and other entities listed in Appendix A hereto … and (iii) any officers, staff, employees, and contractors of any of the foregoing who were provided with Executive Order 14250 or guidance related to Executive Order." ECF No. 121 at 3. The Order further directed "counsel for defendants" to "provide counsel for WilmerHale with copies of such guidance within seven (7) days of issuance" and "within seven (7) days of this Order, file with the Court a status report describing the steps taken to ensure compliance with this Order and certifying compliance with its requirements." ECF No. 121 at 4.

To that end, counsel for Defendants hereby files a status update and certifies compliance with the Court's Amended Order. Specifically, counsel for Defendants has distributed the attached notice (Exhibit A) describing the Court's order, explaining that the Court declared Executive Order 14250 unconstitutional, informing recipients that the agencies have been

**JA 2890**

permanently enjoined from implementing the Executive Order, and that the recipient must

immediately take steps to nullify or reverse any implementation of the Executive Order. This

notice also includes a copy of the Court's Order as an attachment.[1]

Dated:  July 3, 2025                                    Respectfully submitted,
             Washington, D.C.

                                                        /s/ *Richard Lawson*
                                                        RICHARD LAWSON
                                                        Deputy Associate Attorney General
                                                        950 Pennsylvania Avenue, NW
                                                        Washington, DC 20530
                                                        Telephone: (202) 445-8042

                                                        *Counsel for Defendants*

---

[1] Undersigned counsel is coordinating with counsel for Plaintiff on the distribution of notice to these entities: American Red Cross; Court Services and Offender Supervision Agency for the District of Columbia (CSOSA); Department of Toxic Substance Control (DTSC); Federal National Mortgage Association (Fannie Mae); National Board of Respiratory Care; Pretrial Services Agency for the District of Columbia (PDS); U.S. Court of Appeals for Veterans Claims.

**JA 2891**

**UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF COLUMBIA**

333 Constitution Avenue, NW
Washington, DC 20001-2866
Phone: 202-216-7000 | Facsimile: 202-219-8530

Plaintiff: **WILMER CUTLER PICKERING HALE** ⊞

vs.                                              Civil Action No. **1:25-cv-917**

Defendant: **EXECUTIVE OFFICE OF THE PRE** ⊞

## CIVIL NOTICE OF APPEAL

Notice is hereby given this __25__ day of ___July___ 20__25__, that

Defendants _____

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from the

judgment of this court entered on the __27__ day of ___May___, 20__25__, in

favor of _Plaintiff_____

against said _Defendants_____

Attorney/Pro Se Party Signature: _____

Name: __RICHARD LAWSON_____

Address: __US DEPARTMENT OF JUSTICE_____

__PO BOX 878_____

__WASHINGTON DC 20044_____

Telephone: (__202__) __445-8042___

(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil action must be filed within 30 days after the date of entry of judgment or 60 days if the United States or officer or agency is a party)

USCA Form 13
Rev. June 2017

**JA 2892**