**[ORAL ARGUMENT NOT YET SCHEDULED]**

**Nos. 26-5241, 25-5265, 25-5277, 25-5310**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

PERKINS COIE LLP,
　　　　　　　　　　*Plaintiff-Appellee*,

*v.*

U.S. DEPARTMENT OF JUSTICE, *et al.*,
　　　　　　　　　　*Defendants-Appellants*.

JENNER & BLOCK LLP,
　　　　　　　　　　*Plaintiff-Appellee*,

*v.*

U.S. DEPARTMENT OF JUSTICE, *et al.*,
　　　　　　　　　　*Defendants-Appellants*.

WILMER CUTLER PICKERING HALE AND DORR LLP,
　　　　　　　　　　*Plaintiff-Appellee*,

*v.*

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,
　　　　　　　　　　*Defendants-Appellants*.

SUSMAN GODFREY LLP,
　　　　　　　　　　*Plaintiff-Appellee*,

*v.*

EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*,
　　　　　　　　　　*Defendants-Appellants*.

———————————

On Appeal from the United States District Court
for the District of Columbia

Nos. 1:25-cv-00716 (BAH), 1:25-cv-00916 (JDB),
1:25-cv-00917 (RJL), 1:25-cv-01107 (LLA)

———————————

## JOINT APPENDIX

### Volume VI of VI (JA2893 – JA3541)

———————————

DANE H. BUTSWINKAS
　WILLIAMS & CONNOLLY LLP
　680 Maine Avenue SW
　Washington, DC 20024
　(202) 434-5000
　dbutswinkas@wc.com

*Counsel for Plaintiff-Appellee*
　*Perkins Coie LLP*

ELIZABETH B. PRELOGAR
　COOLEY LLP
　1299 Pennsylvania Ave., NW
　Suite 700
　Washington, DC 20004
　(202) 842-7800
　eprelogar@cooley.com

*Counsel for Plaintiff-Appellee*
　*Jenner & Block LLP*

STANLEY E. WOODWARD, JR.
　Associate Attorney General

ABHISHEK KAMBLI
　Deputy Associate Attorney General
　U.S. Department of Justice
　950 Pennsylvania Avenue NW
　Washington, DC 20530
　(202) 514-6993
　abhishek.kambli@usdoj.gov

*Counsel for Defendants-Appellants*

PAUL D. CLEMENT
  CLEMENT & MURPHY, PLLC
  706 Duke Street
  Alexandria, VA 22314
  (202) 742-8893
  paul.clement@clementmurphy.com

*Counsel for Plaintiff-Appellee*
  *Wilmer Cutler Pickering*
  *Hale and Dorr LLP*

DONALD B. VERRILLI, JR.
  MUNGER, TOLLES & OLSON LLP
  601 Massachusetts Avenue NW
  Suite 500E
  Washington, DC 20001
  (202) 220-1100
  donald.verrilli@mto.com

*Counsel for Plaintiff-Appellee*
  *Susman Godfrey LLP*

# TABLE OF CONTENTS

**VOLUME I**

**Materials from *Perkins Coie LLP* v. *U.S. Dep't of Just.*,
Case No. 25-5241, D. Ct. No. 1:25-cv-00716 (BAH)** ........................... 1

Docket Sheet ................................................................................. 2

Complaint (ECF 1) ...................................................................... 36

Order Granting TRO (ECF 21) ................................................... 79

Transcript of March 12, 2025, TRO Hearing (ECF 22) .......................... 82

Order Extending Injunction (ECF 26) .................................................. 213

DOJ Status Report (Mar. 14, 2025) (ECF 27) ..................................... 214

DOJ Status Report (Mar. 18, 2025) (ECF 29) ..................................... 217

Memorandum from Attorney General Bondi
and Director Vought (Mar. 18, 2025) (ECF 29-1) ................................ 220

Memorandum from General Counsel,
Office of Management and Budget (ECF 29-2)..................................... 222

DOJ Status Report (Mar. 20, 2025) (ECF 31) ..................................... 224

DOJ Supplemental Status Report (Mar. 20, 2025) (ECF 32).............. 227

Memorandum from Attorney General Bondi
and Director Vought (Mar. 20, 2025) (ECF 32-1) ................................ 229

Memorandum Opinion and Order (ECF 36)........................................ 231

Statement of Facts in Support of
Motion for Summary Judgment (ECF 39-2)........................................ 252

Berman Declaration and Exhibits (ECF 39-3) .................................... 308

i

## VOLUME II

Manning Declaration and Exhibits (ECF 39-4).....................................360

## VOLUME III

Green Expert Report and Exhibits (ECF 39-5) ...................................1094

Hirshon Expert Report and Exhibits (ECF 39-6) .............................1162

Simon Expert Report and Exhibits (ECF 39-7) .................................1178

Leonard Expert Report and Exhibits (ECF 39-8).............................1211

Scarborough Declaration and Exhibits (ECF 142-1).........................1237

DOJ's Brief in Opposition to
Motion for Summary Judgment (ECF 143) ......................................1340

DOJ's Response to Perkins Coie's
Statement of Material Facts (ECF 143-1) .........................................1367

Manning Reply Declaration and Exhibits (ECF 148-1) ....................1374

Transcript of April 24, 2025, Hearing on the
Motion for Summary Judgment (ECF 169) ......................................1384

Order Granting Leave to Amend (ECF 173) .....................................1508

Order Granting Consent Motion to
Adopt Streamlined Procedures (ECF 175) ........................................1522

Amended Complaint (ECF 176) .........................................................1524

Order Granting Motion for Summary Judgment and
Denying Motion to Dismiss (ECF 184) .............................................1623

Memorandum Opinion (ECF 185)......................................................1628

Notice of Appeal (ECF 188).................................................................1730

## VOLUME IV

**Materials from *Jenner & Block LLP* v. *U.S. Dep't of Just.*
Case No. 5265, D. Ct. No. 1:25-cv-00916 (JDB)............................1731**

Docket Sheet...................................................................... 1732

Complaint (ECF 1) ........................................................... 1759

Order Granting TRO (ECF 9) ........................................... 1823

Transcript of March 28, 2025, Hearing on
Preliminary Injunction (ECF 10) ...................................... 1825

Email Regarding Compliance with Injunction (ECF 11-1) ............... 1901

Defendants' March 31, 2025, Status Report (ECF 12) ...................... 1903

Plaintiff's Statement of Undisputed Facts (ECF 19-2) ..................... 1905

Truth Social Post (Sept. 5, 2022) (ECF 19-4) .................................... 1930

Transcript of September 6, 2025, Press Conference (ECF 19-5)........ 1933

Presidential Memorandum Regarding Suspension of Clearances
and Evaluation of Government Contracts (ECF 19-7) ...................... 1949

Fact Sheet Regarding Covington & Burling LLP (ECF 19-8)............ 1952

Transcript of March 14, 2025, Speech (ECF 19-12) .......................... 1955

Executive Order 14237 (ECF 19-13)................................................. 1978

Fact Sheet Regarding Paul, Weiss LLP (ECF 19-14)......................... 1982

Politico Article (Mar. 19, 2025) (ECF 19-15) ..................................... 1985

Truth Social Post (Mar. 20, 2025) (ECF 19-17) .................................. 1992

Executive Order 14244 (ECF 19-18)................................................... 1995

Presidential Memorandum Regarding Preventing Abuses
of the Legal System and the Federal Court (ECF 19-19)................... 1998

(Page 6 of Total)

Presidential Memorandum Regarding Rescinding Security
Clearances and Access to Classified Information
from Specified Individuals (ECF 19-20) ............................................... 2002

The Hill Article (Mar. 25, 2025) (ECF 19-21) ..................................... 2005

Executive Order 14246 (ECF 19-22) .................................................... 2011

Fact Sheet Regarding Jenner & Block LLP (ECF 19-23).................. 2015

Truth Social Post (Mar. 28, 2025) (ECF 19-27) ................................. 2018

Truth Social Post (Apr. 1, 2025) (ECF 19-28)..................................... 2021

Truth Social Post (Apr. 2, 2025) (ECF 19-29)..................................... 2024

Perrelli Declaration (ECF 19-30) ......................................................... 2026

Memorandum from Attorney General Bondi
and Director Vought (ECF 21-1) .......................................................... 2057

Defendants' Response to Plaintiff's Statement
of Undisputed Material Facts (ECF 95-1) .......................................... 2059

Transcript of Apr. 28, 2025, Hearing on
Motion for Summary Judgment (ECF 118) ........................................ 2064

Notice of Recent Development (ECF 137).......................................... 2155

Memorandum Opinion (ECF 138)........................................................ 2157

Order Granting Summary Judgment and
Denying Motion to Dismiss (ECF 139) ............................................... 2209

Order on Motion for Clarification (ECF 143) .................................... 2214

Defendants' Status Report (ECF 144) ................................................. 2217

Notice of Appeal (ECF 145)................................................................. 2240

iv

**VOLUME V**

*Wilmer Cutler Pickering Hale and Dorr LLP* v.
*Executive Office of the President,*
**Case No. 25-5277, D. Ct. No. 1:25-cv-00917 (RJL)........................2241**

Docket Sheet..................................................................................2242

Complaint (ECF 1) .........................................................................2268

Executive Order 14250 (ECF 1-1)...................................................2331

Fact Sheet Regarding WilmerHale LLP (ECF 1-2)...........................2336

Berman Declaration (ECF 3-2) .......................................................2339

Temporary Restraining Order (ECF 10)...........................................2373

Transcript of March 28, 2025, Hearing
on Motion for TRO (Mar. 8, 2025) (ECF 11) ...................................2378

Supplemental Berman Declaration (ECF 16-3) ................................2427

Numbered Exhibits in Support of
WilmerHale's Motion for Summary Judgment (ECF 16-4)................2437

Expert Report of J. William Leonard (ECF 16-5).............................2734

Transcript of April 23, 2025, Hearing on Motion to Dismiss
and Motion for Summary Judgment (ECF 106)................................2759

Letter from Clement & Murphy PLLC
to Hon. Richard Leon (May 13, 2025) (ECF 109) ............................2803

Opinion on Motion for Summary Judgment (ECF 110).....................2804

Order Granting Motion for Summary Judgment and
Denying Motion to Dismiss (ECF 111) ............................................2877

Order Granting Motion to Clarify
and Motion to Amend (ECF 120) .....................................................2880

Amended Judgment (ECF 121).........................................................2886

v

Defendants' Status Report (ECF 123) ...................................................2890

Notice of Appeal (ECF 125)...................................................2892

## VOLUME VI

**Materials from *Susman Godfrey LLP* v.
*Executive Office of the President*,
Case No. 25-5310, 1:25-cv-01107 (LLA) ...........................................2893**

Docket Sheet...................................................2894

Bloomberg Article (Apr. 9, 2025) (ECF 10-3)...................................................2951

Srinivasan Declaration in Support of
Temporary Restraining Order (ECF 10-14) ...................................................2955

Order Granting TRO (ECF 15) ...................................................2990

Transcript of Apr. 15, 2025, Hearing on TRO (ECF 19)...................................................2993

Order Extending TRO (ECF 30) ...................................................3067

Plaintiff's Statement of Undisputed Material Facts (ECF 51-2) .......3069

Srinivasan Declaration in Support of
Motion for Summary Judgment (ECF 51-3)...................................................3110

Executive Order 14263 (ECF 51-6)...................................................3145

Fact Sheet Regarding Susman Godfrey LLP (ECF 51-7)...................................................3149

X Post (Nov. 13, 2020) (ECF 51-10) ...................................................3152

X Post (Dec. 15, 2020) (ECF 51-11)...................................................3154

X Post (Dec. 16, 2020) (ECF 51-12)...................................................3156

CNN Article (Apr. 19, 2023) (ECF 51-13) ...................................................3158

CNN Article (Apr. 18, 2023) (ECF 51-14) ...................................................3165

Placeholder for Forbes Video (Apr. 10, 2025) (ECF 51-36) ...................................................3168

vi

Placeholder for YouTube Video (Apr. 8, 2025) (ECF 51-44)............... 3169

Truth Social Post (Apr. 11, 2025, 09:21 AM) (ECF 51-45) ................ 3171

Truth Social Post (Apr. 11, 2025, 09:19 AM) (ECF 51-46) ................ 3174

Reuters Article (Apr. 11, 2025) (ECF 51-47) ..................................... 3177

The Susman Godfrey Prize (ECF 51-52) ........................................... 3180

Email from Richard Lawson (Apr. 16, 2025) (ECF 51-53) ................ 3185

Defendants' Response to Plaintiff's Statement
of Undisputed Material Facts (ECF 159-1) ........................................ 3189

Declaration of Richard Lawson and Exhibits in Support
of Defendants' Opposition to Summary Judgment (ECF 159-2)........ 3198

Order Adopting Streamlined Procedures (ECF 176)......................... 3272

Transcript of May 8, 2025, Hearing on Motion
for Summary Judgment (ECF 177)..................................................... 3274

Amended Complaint (ECF 178) ........................................................ 3362

Memorandum Opinion (ECF 206)...................................................... 3482

Order Denying Motion to Dismiss
and Granting Summary Judgment (ECF 207)................................... 3535

July 29, 2025, Minute Order Granting Defendants'
Unopposed Motion to Clarify (ECF 209)........................................... 3540

Notice of Appeal (ECF 211)............................................................... 3541

vii

# Materials relating to

# Susman Godfrey LLP

# v.

# Executive Office of the President

# Case No. 25-5310

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25−cv−01107−LLA

| | |
|---|---|
| SUSMAN GODFREY LLP v. EXECUTIVE OFFICE OF THE PRESIDENT et al | Date Filed: 04/11/2025 |
| Assigned to: Judge Loren L. AliKhan | Date Terminated: 06/27/2025 |
| Case in other court:  USCA, 25−05310 | Jury Demand: None |
| Cause: 28:1331 Federal Question: Other Civil Rights | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**SUSMAN GODFREY LLP**                represented by   **Bethany Woodard Kristovich**
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue
Ste 50th Floor
Los Angeles, CA 90071
213−683−9292
Email: bethany.kristovich@mto.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brad Dennis Brian**
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071−3426
213−683−9280
Email: brad.brian@mto.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hailyn Jennifer Chen**
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071−3426
213−683−9548
Fax: 213−687−3702
Email: hailyn.chen@mto.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael R. Doyen**
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071
213−683−9195
Fax: 213−687−3702
Email: michael.doyen@mto.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam Weiss**
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071−3426

213−683−9273
Email: adam.weiss@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elaine J. Goldenberg**
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW
Suite 500e
Washington, DC 20001−5369
202−220−1100
Email: elaine.goldenberg@mto.com
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, DC 20001
202−220−1100
Email: esthena.barlow@mto.com
*ATTORNEY TO BE NOTICED*

**Ginger Dawn Anders**
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW
Suite 500e
Washington, DC 20001−5369
202−220−1107
Fax: 213−683−5112
Email: ginger.anders@mto.com
*ATTORNEY TO BE NOTICED*

**Jennifer Bryant**
MUNGER TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071
213−683−9100
Fax: 213−687−3702
Email: jennifer.bryant@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeremy Kreisberg**
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW
Suite 500e
Washington, DC 20001−5369
202−220−1120
Email: jeremy.kreisberg@mto.com
*ATTORNEY TO BE NOTICED*

**Juliana Yee**
MUNGER, TOLLES & OLSON LLP
560 Mission Street
27th Floor
San Francisco, CA 94105
415−512−4028
Fax: 415−512−4077
Email: juliana.yee@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kyle Schneider**

JA 2895

MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW
Suite 500e
Washington, DC 20001−5369
202−220−1229
Email: kyle.schneider@mto.com
*ATTORNEY TO BE NOTICED*

**Miranda E. Rehaut**
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071−3426
213−683−9100
Fax: 213−687−3702
Email: miranda.rehaut@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel G. Miller−Ziegler**
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW
Suite 500e
Washington, DC 20001−5369
202−220−1115
Email: Rachel.Miller−Ziegler@mto.com
*ATTORNEY TO BE NOTICED*

**Shannon Galvin Aminirad**
MUNGER, TOLLES & OLSON LLP
560 Mission Street
27th Floor
San Francisco, CA 94105
415−512−4000
Email: shannon.aminirad@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Orr**
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071−3426
213−683−9284
Email: william.orr@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr**
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW
7th Floor
Washington, DC 20004
213−683−9507
Email: donald.verrilli@mto.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**EXECUTIVE OFFICE OF THE
PRESIDENT**                         represented by    **Richard Lawson**
DOJ−USAO
950 Pennsylvania Avenue, NW
Washington, DC 20530−0001

202−445−8042
Email: rlawson@americafirstpolicy.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF JUSTICE**       represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF MANAGEMENT AND**       represented by **Richard Lawson**
**BUDGET**       (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SECURITIES AND EXCHANGE**       represented by **Richard Lawson**
**COMMISSION**       (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES INTERNATIONAL**       represented by **Richard Lawson**
**TRADE COMMISSION**       (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**FEDERAL TRADE COMMISSION**       represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES PATENT AND**       represented by **Richard Lawson**
**TRADEMARK OFFICE**       (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**EQUAL EMPLOYMENT**       represented by **Richard Lawson**
**OPPORTUNITY COMMISSION**       (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF THE TREASURY**       represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF DEFENSE**       represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF
EDUCATION**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF VETERANS
AFFAIRS**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CENTRAL INTELLIGENCE
AGENCY**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ENVIRONMENTAL PROTECTION
AGENCY**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF HOMELAND
SECURITY**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF STATE**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF ENERGY**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF LABOR**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA 2898**

**Defendant**

**DEPARTMENT OF AGRICULTURE**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF COMMERCE**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SMALL BUSINESS ADMINISTRATION**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF THE INTERIOR**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF TRANSPORTATION**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES OF AMERICA**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAMELA J. BONDI**
*in her official capacity as Attorney General of the United States*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**RUSSELL T. VOUGHT**
*in his official capacity as Director of the U.S. Office of Management and Budget*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*

JA 2899

ATTORNEY TO BE NOTICED

**Defendant**

**MARK T. UYEDA**
*in his official capacity as Acting
Chairman of the Securities and Exchange
Commission*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**AMY A. KARPEL**
*in her official capacity as Chair of the
U.S. International Trade Commission*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANDREW N. FERGUSON**
*in his official capacity as Chairman of the
Federal Trade Commission*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**COKE MORGAN STEWART**
*in her official capacity as Acting Under
Secretary of Commerce for Intellectual
Property and Acting Director of the
United States Patent and Trademark
Office*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANDREA R. LUCAS**
*in her official capacity as Acting Chair of
the Equal Employment Opportunity
Commission*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SCOTT BESSENT**
*in his official capacity as Secretary of the
Treasury*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER B. HEGSETH**
*in his official capacity as the Secretary of
Defense U.S. Department of Defense*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROBERT F. KENNEDY, JR.**
*in his official capacity as Secretary of
Health and Human Services*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**LINDA MCMAHON**
*in her official capacity as Secretary of
Veterans Affairs Department of Veterans
Affairs*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DOUG COLLINS**
*in his official capacity*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**TULSI GABBARD**
*in her official capacity as U.S. Director of*
*National Intelligence*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN L. RATCLIFFE**
*in his official capacity as Director of the*
*Central Intelligence Agency*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**LEE M. ZELDIN**
*in his official capacity as Administrator*
*of the Environmental Protection Agency*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**KRISTI L. NOEM**
*in her official capacity capacity as*
*Secretary of State*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARCO A. RUBIO**
*in his official capacity*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHRIS WRIGHT**
*in his official capacity as Secretary of*
*Energy*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**LORI CHAVEZ−DEREMER**
*in her official capacity as Secretary of*
*Labor*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BROOKE L. ROLLINS**
*in her official capacity as Secretary of*
*Agriculture*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**HOWARD W. LUTNICK**
*in his official capacity as Secretary of*
*Commerce*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SCOTT TURNER**
*in his official capacity as Secretary of Housing and Urban Development*

represented by   **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**KELLY LOEFFLER**
*in her official capacity as Administrator of the U.S. Small Business Administration*

represented by   **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMIESON GREER**
*in his official capacity as United States Trade Representative*

represented by   **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DOUGLAS J. BURGUM**
*in his official capacity as Secretary of the Interior*

represented by   **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SEAN P. DUFFY**
*in his official capacity as Secretary of Transportation*

represented by   **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAUL S. ATKINS**
*in his official capacity as Acting Chairman of the Securities and Exchange Commission*

represented by   **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Hestor PIERCE**
*in her official capacity as Commissioner of the Securities and Exchange Commission*

represented by   **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CAROLINE A. CRENSHAW**
*in her official capacity as Commissioner of the Securities and Exchange Commission*

represented by   **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DAVID JOHNSON**
*in his official capacity as Commissioner of the U.S. International Trade Commission*

represented by   **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JASON KEARNS**
*in his official capacity as Commissioner of the U.S. International Trade Commission*

represented by   **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA 2902

**Defendant**

**MELISSA ANN HOLYOAK**
*in her official capacity as Commissioner*
*of the Federal Trade Commission*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARK M. MEADOR**
*in his official capacity as Commissioner*
*of the Federal Trade Commission*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF THE AIR
FORCE**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**GARY A. ASHWORTH**
*in his official capacity as Acting*
*Secretary of the Air Force*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF THE ARMY**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DANIEL P. DRISCOLL**
*in his official capacity as Acting*
*Secretary of the Army*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF THE NAVY**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN C. PHELAN**
*in his official capacity as Acting*
*Secretary of the Navy*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ADMINISTRATION FOR
CHILDREN AND FAMILIES**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANDREW GRADISON**
*in his official capacity as Acting Assistant*
*Secretary for the Administration for*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*

JA 2903

*Children and Families*                                                    *ATTORNEY TO BE NOTICED*

**Defendant**

**ADMINISTRATION FOR**              represented by   **Richard Lawson**
**STRATEGIC PREPAREDNESS AND**                       (See above for address)
**RESPONSE**                                         *LEAD ATTORNEY*
200 Independence Avenue SW                           *ATTORNEY TO BE NOTICED*
Washington, DC 20201
United Sta

**Defendant**

**JOHN KNOX**                        represented by   **Richard Lawson**
*in his official capacity as Principal*              (See above for address)
*Deputy Assistant Secretary for*                     *LEAD ATTORNEY*
*Preparedness and Response*                          *ATTORNEY TO BE NOTICED*

**Defendant**

**ADVISORY COUNCIL ON**              represented by   **Richard Lawson**
**HISTORIC PRESERVATION**                            (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**REID NELSON**                      represented by   **Richard Lawson**
*in his official capacity as Chairman of the*        (See above for address)
*Advisory Council on Historic*                       *LEAD ATTORNEY*
*Preservation*                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**AMERICORPS**                       represented by   **Richard Lawson**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**JENNIFER BASTRESS TAHMASEBI**      represented by   **Richard Lawson**
*in her official capacity as Interim Agency*         (See above for address)
*Head of AmeriCorps*                                 *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**APPALACHIAN REGIONAL**             represented by   **Richard Lawson**
**COMMISSION**                                       (See above for address)
1666 Connecticut Ave NW                              *LEAD ATTORNEY*
Suite 700                                            *ATTORNEY TO BE NOTICED*
Washington, DC 20009
United Sta

**Defendant**

**GAYLE CONELLY MANCHIN**            represented by   **Richard Lawson**
*in her official capacity as Co−Chair of*            (See above for address)
*the Appalachian Regional Commission*                *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**BIOMEDICAL ADVANCED**              represented by   **Richard Lawson**
**RESEARCH AND DEVELOPMENT**                         (See above for address)
**AUTHORITY**                                        *LEAD ATTORNEY*
200 C STREET, SW                                     *ATTORNEY TO BE NOTICED*

Washington, DC 20201

**Defendant**

**GARY DISBROW**
*in his official capacity as Director of the*
*Biomedical Advanced Research and*
*Development Authority*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BONNEVILLE POWER**
**ADMINISTRATION**
P.O. Box 3621
Portalnd, OR 97208
United Sta

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOHN HAIRSTON**
*in his official capacity as Administrator*
*and Chief Executive Officer of the*
*Bonneville Power Administration*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BUREAU OF ECONOMIC**
**ANALYSIS**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**VIPIN ARORA**
*in his official capacity as Director of the*
*Bureau of Economic Analysis*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BUREAU OF INDIAN AFFAIRS**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BRYAN MERCIER**
*in his official capacity as Director of the*
*Bureau of Indian Affairs*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BUREAU OF INDUSTRY AND**
**SECURITY**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JEFFREY KESSLER**
*in his official capacity as Under*
*Secretary for Industry and Security*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BUREAU OF LAND MANAGEMENT**

represented by

JA 2905

**Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL D. NEDD**
*in his official capacity as Director of the*
*Bureau of Land Management*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BUREAU OF OCEAN ENERGY**
**MANAGEMENT**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**WALTER CRUICKSHANK**
*in his official capacity as Director of the*
*Bureau of Ocean Energy Management*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BUREAU OF RECLAMATION**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DAVID PALUMBO**
*in his official capacity as Acting*
*Commissioner of the Bureau of*
*Reclamation*

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BUREAU OF SAFETY AND**
**ENVIRONMENTAL**
**ENFORCEMENT**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ALL FEDERAL AGENCIES AND**
**DEPARTMENTS AND HEADS OF**
**FEDERAL AGENCIES AND**
**DEPARTMENTS**

represented by **Richard Lawson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**SERVICE EMPLOYEES**
**INTERNATIONAL UNION**

represented by **Jim Davy**
JIM DAVY
P.O. Box 15216
Philadelphia, PA 19125
215−792−3579
Email: jimdavy@allriselaw.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**GENERAL COUNSEL AMICI**

represented by

**JA 2906**

**Andrew George Pappas**
OSBORN MALEDON, P.A.
2929 N. Central Avenue
Suite 2000
Phoenix, AZ 85012
602−640−9398
Fax: 602−640−9050
Email: apappas@omlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Austin Tyler Marshall**
HERRERA ARELLANO LLP
1001 N Central Ave
Suite 404
Phoenix, AZ 85004
928−446−4410
Email: austin@ha−firm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David B. Rosenbaum**
OSBORN MALEDON, P.A.
2929 N. Central Avenue
Suite 2000
Phoenix, AZ 85012
602−640−9345
Fax: 602−640−9050
Email: drosenbaum@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric M. Fraser**
OSBORN MALEDON P.A.
2929 North Central Avenue
Suite 2000
Phoenix, AZ 85012
602−640−9321
Fax: 602−640−9050
Email: efraser@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua James Messer**
OSBORN MALEDON, P.A.
2929 N. Central Avenue
Ste 2100
Phoenix, AZ 85012
602−640−9326
Fax: 602−640−9050
Email: jmesser@omlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mary Ruth O'Grady**
OSBORN MALEDON PA
2929 N Central Ave
Suite 2000
Phoenix, AZ 85012
602−640−9000
Fax: 602−640−9050
Email: mogrady@omlaw.com

**JA 2907**

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph N. Roth**
OSBORN MALEDON, P.A
2929 N. Central Avenue
Suite 2100
Phoenix, AZ 85012
602−640−9320
Fax: 602−640−9050
Email: jroth@omlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**LAWYERS DEFENDING AMERICAN DEMOCRACY, INC**　　represented by　**Aderson Bellegarde Francois**
GEORGETOWN UNIVERSITY LAW CENTER
Civil Rights Clinic
600 New Jersey Avenue, NW
Suite 352
Washington, DC 20001
(202) 661−6721
Fax: 202−662−9634
Email: aderson.francois@georgetown.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**LAW FIRM PARTNERS UNITED**　　represented by　**Abigail Moss Hinchcliff**
OLSON GRIMSLEY KAWANABE HINCHCLIFF & MURRAY LLC
700 17th Street, Suite 1600
80202
Denver, CO 80203
303−535−9154
Email: ahinchcliff@olsongrimsley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bianca Miyata**
OLSON GRIMSLEY KAWANABE HINCHCLIFF & MURRAY LLC
700 17th Street, Suite 1600
80202
Denver, CO 80203
970−535−3226
Email: bmiyata@olsongrimsley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Zimmer**
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
617−676−9421
Email: david@zimmercitronclarke.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA 2908**

**Eric F. Citron**
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, DC 02139
617−821−6006
Email: eric@zimmercitronclarke.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric R. Olson**
OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY LLC
700 17th Street, Suite 1600
Denver, CO 80202
303−535−9151
Email: eolson@olsongrimsley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason C. Murray**
OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY
700 17th St.
Suite 1600
80202
Denver, CO 80202
303−535−9151
Fax: 303−592−3140
Email: jmurray@olsongrimsley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kenzo Kawanabe**
OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY LLC
700 Seventeenth Street
Suite 1600
Denver, CO 80202
303−535−9151
Email: kkawanabe@olsongrimsley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sean C. Grimsley**
OLSON GRIMSLEY KAWANABE
HINCHCLIFF & MURRAY LLC
700 17th Street, Suite 1600
80202
Denver, CO 80203
303−535−5191
Email: sgrimsley@olsongrimsley.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**775 LAW PROFESSORS**          represented by   **Phillip Robert Malone**
559 Nathan Abbott Way
Stanford, CA 94305−8610
650−725−6369
Email: pmalone@law.stanford.edu

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AARON H. CAPLAN**
*Prof.*

represented by **Stephen Craig Leckar**
KALBIAN HAGERTY LLP
888 17th Street, NW
Suite 1200
Washington, DC 20006
202−223−5600
Email: sleckar@kalbianhagerty.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF WASHINGTON**

represented by **Cristina Sepe**
WASHINGTON STATE OFFICE OF
THE ATTORNEY GENERA
Solicitor General's Office
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504−0100
360−753−7085
Email: cristina.sepe@atg.wa.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**884 LAW FIRMS**

represented by **Nathan P. Eimer**
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660−7600
Fax: (312) 692−1718
Email: neimer@eimerstahl.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Waldin**
EIMER STAHL LLP
224 S. Michigan Ave.
Ste 1100
Chicago, IL 60604
312−660−7600
Fax: 312−692−1718
Email: bwaldin@eimerstahl.com
*ATTORNEY TO BE NOTICED*

**Daniel D. Birk**
EIMER STAHL LLP
224 S. Michigan Ave.
Ste 1100
Chicago, IL 60604
312−660−7620
Fax: 312−692−1718
Email: dbirk@eimerstahl.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

JA 2910

**INSTITUTE FOR THE RULE OF**
**LAW OF THE UNION**
**INTERNATIONALE DES AVOCATS**

represented by **Jacqueline Scott**
FORTNEY AND SCOTT, LLC
1909 K Street NW
Suite 330
Washington, DC 20006
202−689−1200
Fax: 202−689−1209
Email: jscott@fortneyscott.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah Mugmon**
FORTNEY AND SCOTT, LLC
1909 K Street NW
Suite 330
Washington, DC 20006
202−689−1200
Email: smugmon@fortneyscott.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jerry Roth**
ROTH GLOBAL LAW
990 Green Street
San Francisco, CA 94133
415−860−0909
Email: jerryrotharb@gmail.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**FRED T. KOREMATSU CENTER**
**FOR LAW AND EQUALITY**

represented by **Jim Davy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert Seungchul Chang**
FRED T. KOREMATSU CENTER FOR
LAW AND EQUALITY
UC Irvine School of Law
401 E. Peltason Dr.
Ste 1000
Irvine, CA 92697
206−390−5676
Email: rchang@law.uci.edu
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jeremiah Chin**
UNIVERSITY OF WASHINGTON
School of Law
9622 S 221st Pl
Kent, WA 98031
480−334−7703
Email: jerchin@uw.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica Levin**
RONALD A. PETERSON LAW CLINIC
Civil Rights Clinic
Seattle University School of Law
901 12th Ave, Sullivan Hall

JA 2911

Ste Sllh 315
Seattle, WA 98115
206−398−4167
Fax: 206−398−4261
Email: levinje@seattleu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Melissa Lee**
RONALD A. PETERSON LAW CLINIC
Center for Civil Rights and Critical Justice
1112 E. Columbia St.
Seattle, WA 98122
206−398−4394
Email: leeme@seattleu.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Susan A. McMahon**
FRED T. KOREMATSU CENTER FOR
LAW AND EQUALITY
UC Irvine School of Law
401 E. Peltason Dr.
Ste 1000
Irvine, CA 92697
949−824−0066
Email: smcmahon@law.uci.edu
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF ILLINOIS**

**Amicus**

**STATE OF MASSACHUSETTS**

**Amicus**

**STATE OF NEW JERSEY**

**Amicus**

**STATE OF ARIZONA**

**Amicus**

**CALIFORNIA**

**Amicus**

**STATE OF COLORADO**

**Amicus**

**STATE OF CONNECTICUT**

**Amicus**

**STATE OF DELAWARE**

**Amicus**

**DISTRICT OF COLUMBIA**

**Amicus**

**STATE OF HAWAII**

<u>**Amicus**</u>

**STATE OF MAINE**

<u>**Amicus**</u>

**STATE OF MARYLAND**

<u>**Amicus**</u>

**STATE OF MICHIGAN**

<u>**Amicus**</u>

**STATE OF MINNESOTA**

<u>**Amicus**</u>

**STATE OF NEVADA**

<u>**Amicus**</u>

**STATE OF NEW MEXICO**

<u>**Amicus**</u>

**STATE OF NEW YORK**

<u>**Amicus**</u>

**STATE OF OREGON**

<u>**Amicus**</u>

**STATE OF RHODE ISLAND**

<u>**Amicus**</u>

**STATE OF VERMONT**

<u>**Amicus**</u>

| | | |
|---|---|---|
| **AMERICAN FEDERATION OF TEACHERS** | represented by | **Jim Davy**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

<u>**Amicus**</u>

| | | |
|---|---|---|
| **AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS** | represented by | **Jim Davy**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

<u>**Amicus**</u>

| | | |
|---|---|---|
| **CENTER FOR CIVIL RIGHTS AND CRITICAL JUSTICE** | represented by | **Jim Davy**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

<u>**Amicus**</u>

| | | |
|---|---|---|
| **CIVIL RIGHTS AND ADVOCACY ORGANIZATONS** | represented by | **Jim Davy**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

<u>**Amicus**</u>

**JA 2913**

**RACE AND LAW CENTERS**

represented by **Jim Davy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**366 FORMER JUDGES**

represented by **Donald Manwell Falk**
4416 Harbord Dr
Oakland, CA 94618
650−269−2020
Email: donald.falk@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sara E. Kropf**
KROPF MOSELEY SCHMITT PLLC
1100 H Street NW
Suite 1220
Washington, DC 20005
202−627−6900
Email: sara@kmlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AND LOCAL AFFILIATES**

represented by **Edward G. Caspar**
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
202−662−8390
Email: ecaspar@lawyerscommittee.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adria Jasmine Bonillas**
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
202−662−8317
Email: abonillas@lawyerscommittee.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**PAST PRESIDENTS OF THE DC BAR**

represented by **Andrea C. Ferster**
ANDREA C. FERSTER
68 Beebe Pond Rd
Canaan, NY 12029
202−669−6311
Email: andreaferster@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.**

represented by **Samuel Spital**
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street

JA 2914

5th Floor
New York, NY 10006
(212) 965−2200
Email: sspital@naacpldf.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**23 NONGOVERNMENTAL
ORGANIZATIONS**

represented by **William E. Zapf**
KAISER PLLC
1099 14th Street, NW
Ste 8th Floor West
Washington, DC 20005
202−869−1300
Email: wzapf@coleschotz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**777 SOLO & SMALL FIRM
LAWYERS**

represented by **Carolyn Elefant**
LAW OFFICES OF CAROLYN
ELEFANT PLLC
1440 G Street, NW
8th Floor
Washington, DC 20005
(202) 297−6100
Email: carolyn@carolynelefant.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**PUBLIC COUNSEL**

represented by **Edward G. Caspar**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**WASHINGTON LAWYERS
COMMITTEE FOR CIVIL RIGHTS
AND URBAN AFFAIRS**

represented by **Edward G. Caspar**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**PUBLIC INTEREST LAW CENTER**

represented by **Edward G. Caspar**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CHICAGO LAWYERS COMMITTEE
FOR CIVIL RIGHTS UNDER LAW**

represented by **Edward G. Caspar**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**MISSISSIPPI CENTER FOR
JUSTICE**

represented by **Edward G. Caspar**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA 2915

**Amicus**

**LAWYERS COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA**

represented by **Edward G. Caspar**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**BAR ASSOCIATIONS**

represented by **Eric John Galvez Paredes**
PROTECT DEMOCRACY PROJECT
82 Nassau Street
#601
New York, NY 10038
202−579−4582
Email: jparedes@dirllp.com
*ATTORNEY TO BE NOTICED*

**Hayden Johnson**
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW
Ste 163
Washington, DC 20006
202−870−3210
Email: hayden.johnson@protectdemocracy.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN CIVIL LIBERTIES UNION**

represented by **Cecillia D. Wang**
ACLU
Center for Democracy
425 California St
Suite 700
San Francisco, CA 94104
415−343−0775
Email: cwang@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CATO INSTITUTE**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CENTER FOR INDIVIDUAL RIGHTS**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ELECTRONIC FRONTIER FOUNDATION**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**INSTITUTE FOR JUSTICE**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**NATIONAL COALITION AGAINST CENSORSHIP**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**RUTHERFORD INSTITUTE**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**SOCIETY FOR THE RULE OF LAW INSTITUTE**

represented by **Cecillia D. Wang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**LEGAL ETHICS PROFESSORS**

represented by **Kelsi B. Corkran**
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION
600 New Jersey Avenue NW
Washington, DC 20001
202−661−6728
Fax: 202−661−6730
Email: kbc74@georgetown.edu
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Wilfred Mead**
GEORGETOWN UNIVERSITY LAW CENTER
Institute for Constitutional Advocacy and Protection

600 New Jersey Ave NW
Washington, DC 20001
202−662−9765
Email: jm3468@georgetown.edu
*ATTORNEY TO BE NOTICED*

**Amicus**

**FORMER SENIOR GOVERNMENT OFFICIALS**

represented by **Amy Jeffress**
HECKER FINK LLP
1050 K St NW
Suite 1040
Washington, DC 20001
202−742−2655
Email: ajeffress@heckerfink.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carmen Iguina Gonzalez**
HECKER FINK LLP
1050 K St NW
Suite 1040
Washington, DC 20001
212−763−0883
Email: ciguinagonzalez@aclu.org
*TERMINATED: 08/01/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Gopstein**
HECKER & FINK LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
Email: dgopstein@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Patton**
HECKER FINK LLP
350 5th Ave
Ste 63rd Floor
New York, NY 10118
212−763−0883
Email: dpatton@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gabrielle Tenzer**
HECKER FINK LLP
350 5th Ave
Ste 63rd Floor
New York, NY 10118
212−763−0883
Fax: 212−564−0883
Email: gtenzer@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jenna M. Dabbs**
HECKER FINK LLP
350 5th Ave

JA 2918

Ste 63rd Floor
New York, NY 10118
212−763−0883
Email: jdabbs@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Charles Quinn**
HECKER & FINK LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212−763−0886
Email: jquinn@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joshua Adam Matz**
HECKER FINK LLP
1050 K St NW
Suite 1040
Washington, DC 20001
929−294−2537
Fax: 212−564−0883
Email: jmatz@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Julie E. Fink**
HECKER FINK LLP
350 5th Ave
Ste 63rd Floor
New York, NY 10118
212−763−0883
Fax: 212−564−0883
Email: jfink@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kate Doniger**
HECKER FINK LLP
350 5th Ave
Ste 63rd Floor
New York, NY 10118
212−763−0883
Email: kdoniger@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mack Jenkins**
HECKER FINK LLP
350 5th Ave
Ste 63rd Floor
New York, NY 10118
213−459−2997
Email: mjenkins@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA 2919**

**Marshall Miller**
HECKER FINK LLP
350 5th Ave
Ste 63rd Floor
New York, NY 10118
212−404−8656
Email: mmiller@heckerfink.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew J. Craig**
HECKER & FINK LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
929−294−2542
Email: mcraig@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Ferrara**
HECKER FINK LLP
350 5th Ave
Ste 63rd Floor
New York, NY 10118
929−294−2529
Email: mferrara@heckerfink.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Hecker**
HECKER & FINK LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212−763−0883
Fax: 212−546−6836
Email: shecker@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shawn Geovjian Crowley**
HECKER & FINK LLP
350 Fifth Avenue
Ste 63rd Floor
New York, NY 10118
212−763−0883
Email: scrowley@heckerfink.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**LITIGATION FIRMS**                     represented by **Kathryn A. Reilly**
WHEELER TRIGG O'DONNELL LLP
370 17th Street
Suite 4500
Denver, CO 80202−5647
303−244−1800
Email: reilly@wtotrial.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**LAWYER MEMBERSHIP
ASSOCIATIONS**

represented by **Hayden Johnson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**1129 LAW STUDENTS**

represented by **Jordan Koel Merson**
MERSON LAW, PLLC
950 Third Avenue, 18th Floor
New York, NY 10022
212−603−9100
Email: jmerson@mersonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**51 LAW STUDENT
ORGANIZATIONS**

represented by **Jordan Koel Merson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/11/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC−11611137) filed by SUSMAN GODFREY LLP. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Civil Cover Sheet, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons, # 16 Summons, # 17 Summons, # 18 Summons, # 19 Summons, # 20 Summons, # 21 Summons, # 22 Summons, # 23 Summons, # 24 Summons, # 25 Summons, # 26 Summons, # 27 Summons, # 28 Summons, # 29 Summons, # 30 Summons, # 31 Summons, # 32 Summons, # 33 Summons, # 34 Summons, # 35 Summons, # 36 Summons, # 37 Summons, # 38 Summons, # 39 Summons, # 40 Summons, # 41 Summons, # 42 Summons, # 43 Summons, # 44 Summons, # 45 Summons, # 46 Summons, # 47 Summons, # 48 Summons, # 49 Summons, # 50 Summons, # 51 Summons, # 52 Summons, # 53 Summons, # 54 Summons, # 55 Summons, # 56 Summons, # 57 Summons, # 58 Summons)(Verrilli, Donald) (Entered: 04/11/2025) |
| 04/11/2025 | 2 | NOTICE of Appearance by Donald Beaton Verrilli, Jr on behalf of SUSMAN GODFREY LLP (Verrilli, Donald) (Entered: 04/11/2025) |
| 04/11/2025 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by SUSMAN GODFREY LLP (Verrilli, Donald) (Entered: 04/11/2025) |
| 04/11/2025 | 4 | NOTICE of Appearance by Elaine J. Goldenberg on behalf of SUSMAN GODFREY LLP (Goldenberg, Elaine) (Entered: 04/11/2025) |
| 04/11/2025 | 5 | NOTICE of Appearance by Ginger Dawn Anders on behalf of SUSMAN GODFREY LLP (Anders, Ginger) (Entered: 04/11/2025) |
| 04/11/2025 | 6 | NOTICE of Appearance by Rachel G. Miller−Ziegler on behalf of SUSMAN GODFREY LLP (Miller−Ziegler, Rachel) (Entered: 04/11/2025) |
| 04/11/2025 | 7 | NOTICE of Appearance by Jeremy Kreisberg on behalf of SUSMAN GODFREY LLP (Kreisberg, Jeremy) (Entered: 04/11/2025) |
| 04/11/2025 | 8 | NOTICE of Appearance by Esthena Barlow on behalf of SUSMAN GODFREY LLP (Barlow, Esthena) (Entered: 04/11/2025) |
| 04/14/2025 | | Case Assigned to Judge Loren L. AliKhan. (zmtm) (Entered: 04/14/2025) |
| 04/14/2025 | 9 | SUMMONS (55) Issued as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 04/14/2025) |

| | | |
|---|---|---|
| 04/14/2025 | 10 | MOTION for Temporary Restraining Order by SUSMAN GODFREY LLP. (Attachments: # 1 Memorandum in Support, # 2 Declaration Anders, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Declaration Hirshon, # 14 Declaration Srinivasan, # 15 Exhibit 65.1 Certificate, # 16 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/14/2025) |
| 04/14/2025 | | MINUTE ORDER: In light of Plaintiff's Motion for a Temporary Restraining Order 10 , it is hereby ORDERED that the parties shall appear for a hearing on the motion on April 15, 2025 at 2:00 p.m. in Courtroom 21. It is further ORDERED that Plaintiff shall serve Defendants with a copy of this Order immediately upon receipt to ensure that counsel for Defendants has sufficient notice to appear at the hearing.<br><br>The court will provide access for the public to telephonically attend the hearing. The hearing can be accessed by dialing the Toll Free Number: 833−990−9400 (Meeting ID: 715234770). It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the following: persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge. Signed by Judge Loren L. AliKhan on 04/14/2025. (lclla2) (Entered: 04/14/2025) |
| 04/14/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Brad D. Brian, Filing fee $ 100, receipt number ADCDC−11615045. Fee Status: Fee Paid. by SUSMAN GODFREY LLP. (Attachments: # 1 Declaration of Brad D. Brian, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/14/2025) |
| 04/14/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Michael R. Doyen, Filing fee $ 100, receipt number ADCDC−11615053. Fee Status: Fee Paid. by SUSMAN GODFREY LLP. (Attachments: # 1 Declaration of Michael R. Doyen, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/14/2025) |
| 04/14/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Hailyn Chen, Filing fee $ 100, receipt number ADCDC−11615058. Fee Status: Fee Paid. by SUSMAN GODFREY LLP. (Attachments: # 1 Declaration of Hailyn Chen, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/14/2025) |
| 04/14/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Admission Pro Hac Vice 11 , it is hereby ORDERED that the motion is GRANTED and BRAD D. BRIAN is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 4/14/2025. (lclla2) (Entered: 04/14/2025) |
| 04/14/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Admission Pro Hac Vice 12 , it is hereby ORDERED that the motion is GRANTED and MICHAEL R. DOYEN is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/14/2025. (lclla2) (Entered: 04/14/2025) |
| 04/14/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Admission Pro Hac Vice 13 , it is hereby ORDERED that the motion is GRANTED and HAILYN CHEN is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/14/2025. (lclla2) (Entered: 04/14/2025) |
| 04/15/2025 | 14 | NOTICE of Appearance by Richard Lawson on behalf of All Defendants (Lawson, Richard) (Entered: 04/15/2025) |
| 04/15/2025 | | Minute Entry for MOTION HEARING held on 4/15/2025 before Judge Loren L. AliKhan: The matter comes before the court for a Motion Hearing on Plaintiff's Motion 10 for a Temporary Restraining Order ("TRO"). Donald B. Verrilli, Jr., Brad |

**JA 2922**

| | | |
|---|---|---|
| | | D. Brian, Ginger D. Anders, and Jeremy Kreisberg present on behalf of Plaintiff. Richard Lawson present on behalf of Defendants. Oral arguments heard. For the reasons stated from the bench, the court grants Plaintiff's motion for a TRO and Defendants are enjoined from implementing sections one, three, and five of the Executive Order of April 9, 2025 entitled Addressing Risks from Susman Godfrey. Defendants shall file a status report by 5:00 p.m. on April 16, 2025 describing the steps taken to ensure compliance with the court's order, and the parties shall file a joint status report by 5:00 p.m. on April 16, 2025 setting forth a briefing schedule. The court declined to impose a bond under Fed. R. Civ. Proc Rule 65(c). Order to follow. (Court Reporter Jeffrey Hook)(mhp) (Entered: 04/15/2025) |
| 04/15/2025 | 15 | ORDER granting Plaintiff's Motion for Temporary Restraining Order 10 . See order for details. Signed by Judge Loren L. AliKhan on 04/15/2025. (lclla2) (Entered: 04/15/2025) |
| 04/15/2025 | 16 | NOTICE of Appearance by Brad Dennis Brian on behalf of SUSMAN GODFREY LLP (Brian, Brad) (Entered: 04/15/2025) |
| 04/15/2025 | 17 | NOTICE of Appearance by Michael R. Doyen on behalf of SUSMAN GODFREY LLP (Doyen, Michael) (Entered: 04/15/2025) |
| 04/15/2025 | 18 | NOTICE of Appearance by Hailyn Jennifer Chen on behalf of SUSMAN GODFREY LLP (Chen, Hailyn) (Entered: 04/15/2025) |
| 04/16/2025 | 19 | TRANSCRIPT OF MOTION HEARING before Judge Loren L. AliKhan held on April 15, 2025. Page Numbers: 1 − 74. Date of Issuance: April 16, 2025. Court Reporter: Jeff Hook. Telephone number: 202−354−3373. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/7/2025. Redacted Transcript Deadline set for 5/17/2025. Release of Transcript Restriction set for 7/15/2025.(Hook, Jeff) (Entered: 04/16/2025) |
| 04/16/2025 | 20 | ENTERED IN ERROR.....MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Bethany W. Kristovich, Filing fee $ 100, receipt number ADCDC−11620474. Fee Status: Fee Paid. by SUSMAN GODFREY LLP. (Attachments: # 1 Declaration of Bethany W. Kristovich, # 2 Text of Proposed Order)(Kristovich, Bethany) Modified on 4/16/2025 (znmw). (Entered: 04/16/2025) |
| 04/16/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Adam Benjamin Weiss, Filing fee $ 100, receipt number ADCDC−11620732. Fee Status: Fee Paid. by SUSMAN GODFREY LLP. (Attachments: # 1 Declaration of Adam B. Weiss, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/16/2025) |
| 04/16/2025 | 22 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jennifer L. Bryant, Filing fee $ 100, receipt number ADCDC−11620754. Fee Status: Fee Paid. by SUSMAN GODFREY LLP. (Attachments: # 1 Declaration of Jennifer L. Bryant, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/16/2025) |
| 04/16/2025 | 23 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− William McLeese Orr, Filing fee $ 100, receipt number ADCDC−11620804. Fee Status: Fee Paid. by SUSMAN GODFREY LLP. (Attachments: # 1 Declaration of William McLeese Orr, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/16/2025) |
| 04/16/2025 | 24 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Miranda Elizabeth Rehaut, Filing fee $ 100, receipt number ADCDC−11620822. Fee Status: Fee Paid. by |

| | | |
|---|---|---|
| | | SUSMAN GODFREY LLP. (Attachments: # 1 Declaration of Miranda Elizabeth Rehaut, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/16/2025) |
| 04/16/2025 | 25 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Juliana M. Yee, Filing fee $ 100, receipt number ADCDC−11620841. Fee Status: Fee Paid. by SUSMAN GODFREY LLP. (Attachments: # 1 Declaration of Juliana M. Yee, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/16/2025) |
| 04/16/2025 | 26 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Shannon Colleen Galvin Aminirad, Filing fee $ 100, receipt number ADCDC−11620848. Fee Status: Fee Paid. by SUSMAN GODFREY LLP. (Attachments: # 1 Declaration of Shannon Colleen Galvin Aminirad, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/16/2025) |
| 04/16/2025 | | NOTICE OF ERROR regarding 20 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Bethany W. Kristovich. The following error(s) need correction: Invalid attorney signature− signature on document must match PACER login. Please refile. (znmw) (Entered: 04/16/2025) |
| 04/16/2025 | 27 | Joint STATUS REPORT by SUSMAN GODFREY LLP. (Attachments: # 1 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/16/2025) |
| 04/16/2025 | 28 | STATUS REPORT by SCOTT BESSENT, PAMELA J. BONDI, DOUG BURGUM, CENTRAL INTELLIGENCE AGENCY, LORI CHAVEZ−DEREMER, DOUGLAS A. COLLINS, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPARTMENT OF STATE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECUTIVE OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION, ANDREW N. FERGUSON, TULSI GABBARD, JAMIESON GREER, PETER B. HEGSETH, AMY A. KARPEL, ROBERT F. KENNEDY, JR, KELLY LOEFFLER, ANDREA R. LUCAS, HOWARD LUTNICK, LINDA M. MCMAHON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STEWART, SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES INTERNATIONAL TRADE COMMISSION, UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL T. VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Attachment)(Lawson, Richard) (Entered: 04/16/2025) |
| 04/16/2025 | 29 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Bethany W. Kristovich, Filing fee $ 100, receipt number ADCDC−11621737. Fee Status: Fee Paid. by SUSMAN GODFREY LLP. (Attachments: # 1 Declaration of Bethany W. Kristovich, # 2 Text of Proposed Order)(Verrilli, Donald) (Entered: 04/16/2025) |
| 04/16/2025 | 30 | ORDER extending duration of temporary restraining order 15 and setting briefing schedule. See order for details. Signed by Judge Loren L. AliKhan on 04/16/2025. (lclla2) (Entered: 04/16/2025) |
| 04/17/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Admission Pro Hac Vice 21 , it is hereby ORDERED that the motion is GRANTED and BENJAMIN WEISS is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions.** Signed by Judge Loren L. AliKhan on 04/17/2025. (lclla2) (Entered: 04/17/2025) |
| 04/17/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Admission Pro Hac Vice 22 , it is hereby ORDERED that the motion is GRANTED and JENNIFER L. BRYANT is granted leave to appear pro hac vice in this case. **Counsel should** |

| | | |
|---|---|---|
| | | register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). **Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/17/2025. (lclla2) (Entered: 04/17/2025) |
| 04/17/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Admission Pro Hac Vice <u>23</u> , it is hereby ORDERED that the motion is GRANTED and WILLIAM MCLEESE ORR is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/17/2025. (lclla2) (Entered: 04/17/2025) |
| 04/17/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Admission Pro Hac Vice <u>24</u> , it is hereby ORDERED that the motion is GRANTED and MIRANDA ELIZABETH REHAUT is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/17/2025. (lclla2) (Entered: 04/17/2025) |
| 04/17/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Admission Pro Hac Vice <u>25</u> , it is hereby ORDERED that the motion is GRANTED and JULIANA M. YEE is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/17/2025. (lclla2) (Entered: 04/17/2025) |
| 04/17/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Admission Pro Hac Vice <u>26</u> , it is hereby ORDERED that the motion is GRANTED and SHANNON COLLEEN GALVIN AMINIRAD is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/17/2025. (lclla2) (Entered: 04/17/2025) |
| 04/17/2025 | | MINUTE ORDER: Upon consideration of Plaintiff's Motion for Admission Pro Hac Vice <u>29</u> , it is hereby ORDERED that the motion is GRANTED and BETHANY W. KRISTOVICH is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/17/2025. (lclla2) (Entered: 04/17/2025) |
| 04/18/2025 | <u>31</u> | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Andrew G. Pappas, Filing fee $ 100, receipt number ADCDC−11628455. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # <u>1</u> Declaration Declaration of Andrew G. Pappas)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/18/2025) |
| 04/18/2025 | <u>32</u> | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− David B. Rosenbaum, Filing fee $ 100, receipt number ADCDC−11628585. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # <u>1</u> Declaration Declaration of David B. Rosenbaum)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/18/2025) |
| 04/18/2025 | <u>33</u> | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Eric M. Fraser, Filing fee $ 100, receipt number ADCDC−11628592. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # <u>1</u> Declaration Declaration of Eric M. Fraser)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/18/2025) |
| 04/18/2025 | <u>34</u> | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joshua J. Messer, Filing fee $ 100, receipt number ADCDC−11628608. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # <u>1</u> Declaration Declaration of Joshua J. Messer)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/18/2025) |
| 04/21/2025 | <u>35</u> | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Joseph N. Roth, Filing fee $ 100, receipt number ADCDC−11632265. Fee Status: Fee Paid. by GENERAL COUNSEL AMICI. (Attachments: # <u>1</u> Declaration Declaration of Joseph N. Roth)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/21/2025) |

**JA 2925**

| | | |
|---|---|---|
| 04/21/2025 | 36 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Mary R. O'Grady, Filing fee $ 100, receipt number ADCDC−11632290. Fee Status: Fee Paid. GENERAL COUNSEL AMICI. (Attachments: # 1 Declaration Declaration of Mary R. O'Grady)(Marshall, Austin) Modified filer on 4/22/2025 (znmw). (Entered: 04/21/2025) |
| 04/21/2025 | | MINUTE ORDER: Upon consideration of General Counsel Amici's Motion for Admission Pro Hac Vice 31 , it is hereby ORDERED that the motion is GRANTED and ANDREW G. PAPPAS is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).** **Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/21/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/21/2025) |
| 04/21/2025 | | MINUTE ORDER: Upon consideration of General Counsel Amici's Motion for Admission Pro Hac Vice 32 , it is hereby ORDERED that the motion is GRANTED and DAVID B. ROSENBAUM is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).** **Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/21/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/21/2025) |
| 04/21/2025 | | MINUTE ORDER: Upon consideration of General Counsel Amici's Motion for Admission Pro Hac Vice 33 , it is hereby ORDERED that the motion is GRANTED and ERIC M. FRASER is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).** **Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/21/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/21/2025) |
| 04/21/2025 | | MINUTE ORDER: Upon consideration of General Counsel Amici's Motion for Admission Pro Hac Vice 34 , it is hereby ORDERED that the motion is GRANTED and JOSHUA J. MESSER is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).** **Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/21/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/21/2025) |
| 04/21/2025 | | MINUTE ORDER: Upon consideration of General Counsel Amici's Motion for Admission Pro Hac Vice 35 , it is hereby ORDERED that the motion is GRANTED and JOSEPH N. ROTH is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).** **Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/21/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/21/2025) |
| 04/21/2025 | | MINUTE ORDER: Upon consideration of General Counsel Amici's Motion for Admission Pro Hac Vice 36 , it is hereby ORDERED that the motion is GRANTED and MARY R. O'GRADY is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).** **Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/21/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/21/2025) |
| 04/21/2025 | 37 | NOTICE of Appearance by David B. Rosenbaum on behalf of GENERAL COUNSEL AMICI (Rosenbaum, David) (Entered: 04/21/2025) |
| 04/21/2025 | 38 | NOTICE of Appearance by Joseph N. Roth on behalf of GENERAL COUNSEL AMICI (Roth, Joseph) (Entered: 04/21/2025) |
| 04/21/2025 | 39 | NOTICE of Appearance by Joshua James Messer on behalf of GENERAL COUNSEL AMICI (Messer, Joshua) (Entered: 04/21/2025) |
| 04/21/2025 | 40 | NOTICE of Appearance by Eric M. Fraser on behalf of GENERAL COUNSEL AMICI (Fraser, Eric) (Entered: 04/21/2025) |
| 04/21/2025 | 41 | NOTICE of Appearance by Mary Ruth O'Grady on behalf of GENERAL COUNSEL AMICI (O'Grady, Mary) (Entered: 04/21/2025) |
| 04/21/2025 | 42 | NOTICE of Appearance by Bethany Woodard Kristovich on behalf of SUSMAN GODFREY LLP (Kristovich, Bethany) (Entered: 04/21/2025) |
| 04/21/2025 | 43 | NOTICE of Appearance by Adam Weiss on behalf of SUSMAN GODFREY LLP (Weiss, Adam) (Entered: 04/21/2025) |

| | | |
|---|---|---|
| 04/21/2025 | 44 | NOTICE of Appearance by Jennifer Bryant on behalf of SUSMAN GODFREY LLP (Bryant, Jennifer) (Entered: 04/21/2025) |
| 04/21/2025 | 45 | NOTICE of Appearance by Juliana Yee on behalf of SUSMAN GODFREY LLP (Yee, Juliana) (Entered: 04/21/2025) |
| 04/21/2025 | 46 | NOTICE of Appearance by Shannon Galvin Aminirad on behalf of SUSMAN GODFREY LLP (Aminirad, Shannon) (Entered: 04/21/2025) |
| 04/21/2025 | 47 | NOTICE of Appearance by William Orr on behalf of SUSMAN GODFREY LLP (Orr, William) (Entered: 04/21/2025) |
| 04/21/2025 | 48 | NOTICE of Appearance by Miranda E. Rehaut on behalf of SUSMAN GODFREY LLP (Rehaut, Miranda) (Entered: 04/21/2025) |
| 04/22/2025 | 49 | NOTICE of Appearance by Andrew George Pappas on behalf of GENERAL COUNSEL AMICI (Pappas, Andrew) (Entered: 04/22/2025) |
| 04/23/2025 | 50 | NOTICE of Appearance by Aderson Bellegarde Francois on behalf of LAWYERS DEFENDING AMERICAN DEMOCRACY, INC (Francois, Aderson) (Main Document 50 replaced on 4/24/2025) (znmw). (Entered: 04/23/2025) |
| 04/23/2025 | 51 | MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* by SUSMAN GODFREY LLP. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Declaration Srinivasan, # 4 Declaration Hirshon, # 5 Declaration Anders, # 6 Exhibit 1, # 7 Exhibit 2, # 8 Exhibit 3, # 9 Exhibit 4, # 10 Exhibit 5, # 11 Exhibit 6, # 12 Exhibit 7, # 13 Exhibit 8, # 14 Exhibit 9, # 15 Exhibit 10, # 16 Exhibit 11, # 17 Exhibit 12, # 18 Exhibit 13, # 19 Exhibit 14, # 20 Exhibit 15, # 21 Exhibit 16, # 22 Exhibit 17, # 23 Exhibit 18, # 24 Exhibit 19, # 25 Exhibit 20, # 26 Exhibit 21, # 27 Exhibit 22, # 28 Exhibit 23, # 29 Exhibit 24, # 30 Exhibit 25, # 31 Exhibit 26, # 32 Exhibit 27, # 33 Exhibit 28, # 34 Exhibit 29, # 35 Exhibit 30, # 36 Exhibit 31, # 37 Exhibit 32, # 38 Exhibit 33, # 39 Exhibit 34, # 40 Exhibit 35, # 41 Exhibit 36, # 42 Exhibit 37, # 43 Exhibit 38, # 44 Exhibit 39, # 45 Exhibit 40, # 46 Exhibit 41, # 47 Exhibit 42, # 48 Exhibit 43, # 49 Exhibit 44, # 50 Exhibit 45, # 51 Exhibit 46, # 52 Exhibit 47, # 53 Exhibit 48, # 54 Exhibit 49, # 55 Exhibit 50, # 56 Exhibit 51, # 57 Exhibit 52, # 58 Exhibit 53, # 59 Exhibit 54, # 60 Exhibit 55, # 61 Exhibit 56, # 62 Exhibit 57, # 63 Exhibit 58, # 64 Exhibit 59, # 65 Exhibit 60, # 66 Exhibit 61, # 67 Exhibit 62, # 68 Exhibit 63, # 69 Exhibit 64, # 70 Exhibit 65, # 71 Text of Proposed Order)(Verrilli, Donald). Added MOTION for Declaratory Judgment, MOTION for Permanent Injunction on 4/24/2025 (znmw). (Entered: 04/23/2025) |
| 04/23/2025 | 52 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Eric R. Olson, Filing fee $ 100, receipt number ADCDC−11639595. Fee Status: Fee Paid. by Law Firm Partners United. (Attachments: # 1 Declaration)(Citron, Eric) (Entered: 04/23/2025) |
| 04/23/2025 | 53 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Sean C. Grimsley, Filing fee $ 100, receipt number ADCDC−11639597. Fee Status: Fee Paid. by Law Firm Partners United. (Attachments: # 1 Declaration)(Citron, Eric) (Entered: 04/23/2025) |
| 04/23/2025 | 54 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Kenzo Kawanabe, Filing fee $ 100, receipt number ADCDC−11639603. Fee Status: Fee Paid. by Law Firm Partners United. (Attachments: # 1 Declaration)(Citron, Eric) (Entered: 04/23/2025) |
| 04/23/2025 | 55 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Abigail Hinchcliff, Filing fee $ 100, receipt number ADCDC−11639620. Fee Status: Fee Paid. by Law Firm Partners United. (Attachments: # 1 Declaration)(Citron, Eric) (Entered: 04/23/2025) |
| 04/23/2025 | 56 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jason Murray, Filing fee $ 100, receipt number ADCDC−11639623. Fee Status: Fee Paid. by Law Firm Partners United. (Attachments: # 1 Declaration)(Citron, Eric) (Entered: 04/23/2025) |
| 04/23/2025 | 57 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Bianca Miyata, Filing fee $ 100, receipt number ADCDC−11639627. Fee Status: Fee Paid. by Law Firm Partners United. (Attachments: # 1 Declaration)(Citron, Eric) (Entered: 04/23/2025) |

| 04/23/2025 | 58 | MOTION to Dismiss by SCOTT BESSENT, PAMELA J. BONDI, DOUG BURGUM, CENTRAL INTELLIGENCE AGENCY, LORI CHAVEZ−DEREMER, DOUGLAS A. COLLINS, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPARTMENT OF STATE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECUTIVE OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION, ANDREW N. FERGUSON, TULSI GABBARD, JAMIESON GREER, PETER B. HEGSETH, AMY A. KARPEL, ROBERT F. KENNEDY, JR, KELLY LOEFFLER, ANDREA R. LUCAS, HOWARD LUTNICK, LINDA M. MCMAHON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STEWART, SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES INTERNATIONAL TRADE COMMISSION, UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL T. VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Lawson, Richard) (Entered: 04/23/2025) |
| 04/23/2025 | 59 | Unopposed MOTION for Leave to File Amicus Brief by AMICI CURIAE 775 LAW PROFESSORS. (Attachments: # 1 Exhibit Amici Brief, # 2 Text of Proposed Order)(Malone, Phillip) (Entered: 04/23/2025) |
| 04/23/2025 | 60 | NOTICE of Appearance by Phillip Robert Malone on behalf of AMICI CURIAE 775 LAW PROFESSORS (Malone, Phillip) (Entered: 04/23/2025) |
| 04/24/2025 | 61 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− David Zimmer, Filing fee $ 100, receipt number ADCDC−11640005. Fee Status: Fee Paid. by Law Firm Partners United. (Citron, Eric) (Entered: 04/24/2025) |
| 04/24/2025 | 62 | Unopposed MOTION for Leave to File Amicus Brief by LAWYERS DEFENDING AMERICAN DEMOCRACY, INC. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Francois, Aderson) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of Law Firm Partners United's Motion for Admission Pro Hac Vice 52 , it is hereby ORDERED that the motion is GRANTED and ERIC R. OLSON is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).** **Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of Law Firm Partners United's Motion for Admission Pro Hac Vice 53 , it is hereby ORDERED that the motion is GRANTED and SEAN C. GRIMSLEY is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of Law Firm Partners United's Motion for Admission Pro Hac Vice 54 , it is hereby ORDERED that the motion is GRANTED and KENZO KAWANABE is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of Law Firm Partners United's Motion for Admission Pro Hac Vice 55 , it is hereby ORDERED that the motion is GRANTED and ABIGAIL HINCHCLIFF is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance** |

**JA 2928**

| | | |
|---|---|---|
| | | pursuant to Local Civ. R. 83.6(a). **Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of Law Firm Partners United's Motion for Admission Pro Hac Vice <u>56</u> , it is hereby ORDERED that the motion is GRANTED and JASON MURRAY is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). <u>Click for Instructions</u>**. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of Law Firm Partners United's Motion for Admission Pro Hac Vice <u>57</u> , it is hereby ORDERED that the motion is GRANTED and BIANCA MIYATA is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). <u>Click for Instructions</u>**. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of Law Firm Partners United's Motion for Admission Pro Hac Vice <u>61</u> , it is hereby ORDERED that the motion is GRANTED and DAVID ZIMMER is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). <u>Click for Instructions</u>**. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) Modified on 4/25/2025 (mhp) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of 775 Law Professors' Unopposed Motion for Leave to File an Amicus Brief <u>59</u> , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [59−1] as 775 Law Professors' amicus brief. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of Lawyers Defending American Democracy, Inc.'s Unopposed Motion for Leave to File an Amicus Brief <u>62</u> , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [62−1] as Lawyers Defending American Democracy, Inc.'s amicus brief. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) (Entered: 04/24/2025) |
| 04/24/2025 | <u>63</u> | NOTICE of Appearance by Stephen Craig Leckar on behalf of AARON H. CAPLAN (Leckar, Stephen) (Entered: 04/24/2025) |
| 04/24/2025 | <u>64</u> | MOTION for Leave to File Amicus Brief*Uncontested Motion for Leave to File Amicus Brief* by AARON H. CAPLAN. (Attachments: # <u>1</u> Exhibit Amicus Brief of Professor Aaron H. Caplan Regarding Attainder, # <u>2</u> Text of Proposed Order)(Leckar, Stephen) (Entered: 04/24/2025) |
| 04/24/2025 | <u>65</u> | AMICUS BRIEF by 775 LAW PROFESSORS. (mg) (Entered: 04/24/2025) |
| 04/24/2025 | <u>66</u> | AMICUS BRIEF by LAWYERS DEFENDING AMERICAN DEMOCRACY, INC. (mg) (Entered: 04/24/2025) |
| 04/24/2025 | <u>67</u> | NOTICE of Appearance by Eric R. Olson on behalf of LAW FIRM PARTNERS UNITED (Olson, Eric) (Entered: 04/24/2025) |
| 04/24/2025 | <u>68</u> | NOTICE of Appearance by Sean C. Grimsley on behalf of LAW FIRM PARTNERS UNITED (Grimsley, Sean) (Entered: 04/24/2025) |
| 04/24/2025 | <u>69</u> | NOTICE of Appearance by Abigail Moss Hinchcliff on behalf of LAW FIRM PARTNERS UNITED (Hinchcliff, Abigail) (Entered: 04/24/2025) |
| 04/24/2025 | <u>70</u> | NOTICE of Appearance by Jason C. Murray on behalf of LAW FIRM PARTNERS UNITED (Murray, Jason) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of Professor Aaron H. Caplan's Uncontested Motion for Leave to File an Amicus Brief <u>64</u> , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [64−1] as Professor Aaron H. Caplan's amicus brief. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) (Entered: 04/24/2025) |

| 04/24/2025 | 71 | NOTICE of Appearance by Cristina Sepe on behalf of STATE OF WASHINGTON (Sepe, Cristina) (Entered: 04/24/2025) |
|---|---|---|
| 04/24/2025 | 72 | AMICUS BRIEF *(Multi State)* by STATE OF WASHINGTON. (Sepe, Cristina) (Entered: 04/24/2025) |
| 04/24/2025 | 73 | AMICUS BRIEF by AARON H. CAPLAN. (mg) (Entered: 04/24/2025) |
| 04/24/2025 | 74 | NOTICE of Appearance by Benjamin Waldin on behalf of AMICUS LAW FIRMS (Waldin, Benjamin) (Entered: 04/24/2025) |
| 04/24/2025 | 75 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Nathan P. Eimer, Filing fee $ 100, receipt number ADCDC−11642516. Fee Status: Fee Paid. by AMICUS LAW FIRMS. (Attachments: # 1 Exhibit A (Declaration), # 2 Text of Proposed Order)(Waldin, Benjamin) (Entered: 04/24/2025) |
| 04/24/2025 | 76 | Unopposed MOTION for Leave to File Amicus Brief *in Support of Plaintiff Susman Godfrey LLP's Motion for Summary Judgment* by GENERAL COUNSEL AMICI. (Attachments: # 1 Exhibit Brief of Amici Curiae, # 2 Text of Proposed Order)(Rosenbaum, David) (Entered: 04/24/2025) |
| 04/24/2025 | 77 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− JACQUELINE R. SCOTT, Filing fee $ 100, receipt number ADCDC−11642538. Fee Status: Fee Paid. by INSTITUTE FOR THE RULE OF LAW OF THE UNION INTERNATIONALE DES AVOCATS. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Mugmon, Sarah) (Entered: 04/24/2025) |
| 04/24/2025 | 78 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− JEROME C. ROTH, Filing fee $ 100, receipt number ADCDC−11642641. Fee Status: Fee Paid. by INSTITUTE FOR THE RULE OF LAW OF THE UNION INTERNATIONALE DES AVOCATS. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Mugmon, Sarah) (Entered: 04/24/2025) |
| 04/24/2025 | 79 | NOTICE of Appearance by Kenzo Kawanabe on behalf of LAW FIRM PARTNERS UNITED (Kawanabe, Kenzo) (Entered: 04/24/2025) |
| 04/24/2025 | 80 | NOTICE of Appearance by Bianca Miyata on behalf of LAW FIRM PARTNERS UNITED (Miyata, Bianca) (Entered: 04/24/2025) |
| 04/24/2025 | 81 | NOTICE of Appearance by Jim Davy on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Attachments: # 1 Supplement full list of amici represented by Jim Davy)(Davy, Jim) (Entered: 04/24/2025) |
| 04/24/2025 | 82 | Unopposed MOTION for Leave to File Amicus Brief by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Exhibit Proposed Amicus Brief)(Davy, Jim) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of Amicus Law Firms' Motion for Admission Pro Hac Vice 75 , it is hereby ORDERED that the motion is GRANTED and NATHAN P. EIMER is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of the General Counsel Amici's Unopposed Motion for Leave to File an Amicus Brief 76 , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [76−1] as the General Counsel Amici's amicus brief. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of the Institute for the Rule of Law of the Union Internationale des Avocats' Motion for Admission Pro Hac Vice 77 , it is hereby ORDERED that the motion is DENIED because it seeks the admission of Jerome C. Roth, not Jacqueline R. Scott. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of the Institute for the Rule of Law of the Union Internationale des Avocats' Motion for Admission Pro Hac Vice 78 , it is hereby ORDERED that the motion is GRANTED and JEROME C. ROTH is granted leave to |

**JA 2930**

| | | |
|---|---|---|
| | | appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) (Entered: 04/24/2025) |
| 04/24/2025 | | MINUTE ORDER: Upon consideration of Fred T. Korematsu Center for Law and Equality's Unopposed Motion for Leave to File an Amicus Brief 82 , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [82−1] as Fred T. Korematsu Center for Law and Equality's amicus brief. Signed by Judge Loren L. AliKhan on 04/24/2025. (lclla2) (Entered: 04/24/2025) |
| 04/24/2025 | 113 | AMICUS BRIEF by GENERAL COUNSEL AMICI. (mg) (Entered: 04/28/2025) |
| 04/24/2025 | 114 | AMICUS BRIEF by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (mg) (Entered: 04/28/2025) |
| 04/25/2025 | 83 | NOTICE of Appearance by David Zimmer on behalf of LAW FIRM PARTNERS UNITED (Zimmer, David) (Entered: 04/25/2025) |
| 04/25/2025 | 84 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− JACQUELINE R. SCOTT, Filing fee $ 100, receipt number ADCDC−11643749. Fee Status: Fee Paid. by INSTITUTE FOR THE RULE OF LAW OF THE UNION INTERNATIONALE DES AVOCATS. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Mugmon, Sarah) (Entered: 04/25/2025) |
| 04/25/2025 | 85 | NOTICE of Appearance by Sara E. Kropf on behalf of 366 FORMER JUDGES (Kropf, Sara) (Entered: 04/25/2025) |
| 04/25/2025 | 86 | Consent MOTION for Leave to File Amicus Brief by 366 FORMER JUDGES. (Attachments: # 1 Exhibit A (list of former judges), # 2 Exhibit B (amicus brief), # 3 Text of Proposed Order)(Kropf, Sara) (Entered: 04/25/2025) |
| 04/25/2025 | 87 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Donald Falk, Filing fee $ 100, receipt number ADCDC−11643799. Fee Status: Fee Paid. by 366 FORMER JUDGES. (Attachments: # 1 Declaration (by Donald Falk))(Kropf, Sara) (Entered: 04/25/2025) |
| 04/25/2025 | | MINUTE ORDER: Upon consideration of the Institute for the Rule of Law of the Union Internationale des Avocats' Motion for Admission Pro Hac Vice 84 , it is hereby ORDERED that the motion is GRANTED and JACQUELINE R. SCOTT is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/25/2025. (lclla1) (Entered: 04/25/2025) |
| 04/25/2025 | 88 | Unopposed MOTION for Leave to File Amicus Brief by LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AND LOCAL AFFILIATES. (Attachments: # 1 Exhibit Proposed Order, # 2 Exhibit Amicus Brief of Lawyers' Committee for Civil Rights Under Law and Local Affiliates)(Caspar, Edward) (Entered: 04/25/2025) |
| 04/25/2025 | 89 | NOTICE of Appearance by Nathan P. Eimer on behalf of AMICUS LAW FIRMS (Eimer, Nathan) (Entered: 04/25/2025) |
| 04/25/2025 | 90 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Adria Bonillas, Filing fee $ 100, receipt number ADCDC−11644608. Fee Status: Fee Paid. by LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AND LOCAL AFFILIATES. (Attachments: # 1 Exhibit Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Exhibit Proposed Order)(Caspar, Edward) (Entered: 04/25/2025) |
| 04/25/2025 | 91 | Unopposed MOTION for Leave to File Amicus Brief by PAST PRESIDENTS OF THE DC BAR. (Attachments: # 1 Exhibit Amici Brief, # 2 Appendix List of Amici, # 3 Text of Proposed Order)(Ferster, Andrea) (Entered: 04/25/2025) |
| 04/25/2025 | 92 | Unopposed MOTION for Leave to File Amicus Brief by LAW FIRM PARTNERS UNITED. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(Olson, Eric) (Entered: 04/25/2025) |

| 04/25/2025 | 93 | Unopposed MOTION for Leave to File Amicus Brief by NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.. (Attachments: # 1 Exhibit Brief of Amicus Curiae, # 2 Text of Proposed Order)(Spital, Samuel) (Entered: 04/25/2025) |
|---|---|---|
| 04/25/2025 | 94 | NOTICE of Appearance by William E. Zapf on behalf of 23 NONGOVERNMENTAL ORGANIZATIONS (Zapf, William) (Entered: 04/25/2025) |
| 04/25/2025 | 95 | MOTION for Leave to File Amicus Brief by 777 Solos & Smalls. (Attachments: # 1 Exhibit Amicus Brief)(Elefant, Carolyn) (Entered: 04/25/2025) |
| 04/25/2025 | 96 | NOTICE of Appearance by Carolyn Elefant on behalf of 777 Solos & Smalls (Elefant, Carolyn) (Entered: 04/25/2025) |
| 04/25/2025 | 97 | Unopposed MOTION for Leave to File Amicus Brief *in Support of Plaintiff's Motion for Summary Judgment and for Declaratory and Permanent Injunctive Relief* by 23 NONGOVERNMENTAL ORGANIZATIONS. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(Zapf, William) (Entered: 04/25/2025) |
| 04/25/2025 | 98 | NOTICE of Appearance by Eric John Galvez Paredes on behalf of BAR ASSOCIATIONS (Paredes, Eric John) (Entered: 04/25/2025) |
| 04/25/2025 | 99 | NOTICE of Appearance by Hayden Johnson on behalf of BAR ASSOCIATIONS (Johnson, Hayden) (Entered: 04/25/2025) |
| 04/25/2025 | 100 | Unopposed MOTION for Leave to File Amicus Brief by AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, CATO INSTITUTE, CENTER FOR INDIVIDUAL RIGHTS, ELECTRONIC FRONTIER FOUNDATION, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, INSTITUTE FOR JUSTICE, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, NATIONAL COALITION AGAINST CENSORSHIP, REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS, RUTHERFORD INSTITUTE, SOCIETY FOR THE RULE OF LAW INSTITUTE. (Attachments: # 1 Exhibit Amicus Brief, # 2 Text of Proposed Order)(Wang, Cecilia) (Entered: 04/25/2025) |
| 04/25/2025 | 101 | NOTICE of Appearance by Cecillia D. Wang on behalf of AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, CATO INSTITUTE, CENTER FOR INDIVIDUAL RIGHTS, ELECTRONIC FRONTIER FOUNDATION, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, INSTITUTE FOR JUSTICE, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, NATIONAL COALITION AGAINST CENSORSHIP, REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS, RUTHERFORD INSTITUTE, SOCIETY FOR THE RULE OF LAW INSTITUTE (Wang, Cecilia) (Entered: 04/25/2025) |
| 04/25/2025 | 102 | Unopposed MOTION for Leave to File Amicus Brief by BAR ASSOCIATIONS. (Attachments: # 1 Exhibit − Amici Curiae Brief, # 2 Text of Proposed Order)(Johnson, Hayden) (Entered: 04/25/2025) |
| 04/25/2025 | 103 | Unopposed MOTION for Leave to File Amicus Brief by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Corkran, Kelsi) (Entered: 04/25/2025) |
| 04/25/2025 | 104 | NOTICE of Appearance by Kelsi B. Corkran on behalf of LEGAL ETHICS PROFESSORS (Corkran, Kelsi) (Entered: 04/25/2025) |
| 04/25/2025 | 105 | Unopposed MOTION for Leave to File Amicus Brief *of 884 Law Firms* by AMICUS LAW FIRMS. (Attachments: # 1 Exhibit 1 (Proposed Brief of Amicus Law Firms), # 2 Appendix A (List of Amicus Law Firms), # 3 Text of Proposed Order)(Eimer, Nathan) (Entered: 04/25/2025) |
| 04/25/2025 | 106 | Unopposed MOTION for Leave to File Amicus Brief by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Exhibit − Proposed Brief of Former Senior Government Officials as Amici Curiae in Support of Plaintiff's Motion for Summary Judgment, # 2 Appendix − List of Amici Curiae, # 3 Text of Proposed Order)(Jeffress, Amy) (Entered: 04/25/2025) |

JA 2932

| 04/25/2025 | <u>107</u> | NOTICE of Appearance by Amy Jeffress on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Jeffress, Amy) (Entered: 04/25/2025) |
|---|---|---|
| 04/25/2025 | <u>108</u> | NOTICE of Appearance by Joshua Adam Matz on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Matz, Joshua) (Entered: 04/25/2025) |
| 04/25/2025 | <u>109</u> | NOTICE of Appearance by Carmen Iguina Gonzalez on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Iguina Gonzalez, Carmen) (Entered: 04/25/2025) |
| 04/25/2025 | <u>110</u> | NOTICE of Appearance by Michael Ferrara on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Ferrara, Michael) (Entered: 04/25/2025) |
| 04/25/2025 | <u>111</u> | Unopposed MOTION for Leave to File Amicus Brief by LITIGATION FIRMS. (Attachments: # <u>1</u> Exhibit − Brief of Amici Curiae Litigation Firms in Support of Plaintiff's Motion for Summary Judgment & Declaratory & Permanent Injunctive Relief, # <u>2</u> Text of Proposed Order Granting Litigation Firms' Unopposed Motion for Leave to File Amici Brief)(Reilly, Kathryn) (Entered: 04/25/2025) |
| 04/25/2025 | <u>112</u> | NOTICE of Appearance by Kathryn A. Reilly on behalf of LITIGATION FIRMS (Reilly, Kathryn) (Entered: 04/25/2025) |
| 04/28/2025 | <u>115</u> | NOTICE of Appearance by Andrea C. Ferster on behalf of PAST PRESIDENTS OF THE DC BAR (Ferster, Andrea) (Main Document 115 replaced on 4/29/2025) (znmw). (Entered: 04/28/2025) |
| 04/28/2025 | <u>116</u> | NOTICE of Appearance by Jerry Roth on behalf of INSTITUTE FOR THE RULE OF LAW OF THE UNION INTERNATIONALE DES AVOCATS (Roth, Jerry) (Main Document 116 replaced on 4/29/2025) (znmw). (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of 366 Former Judges' Consent Motion for Leave to File an Amicus Brief <u>86</u> , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [86−2] as the 366 Former Judges' amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the 366 Former Judges' Motion for Admission Pro Hac Vice <u>87</u> , it is hereby ORDERED that the motion is GRANTED and DONALD FALK is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the Lawyers' Committee for Civil Rights Under Law's Unopposed Motion for Leave to File an Amicus Brief <u>88</u> , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [88−2] as the Lawyers' Committee for Civil Rights Under Law's amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | <u>117</u> | NOTICE of Appearance by Marshall Miller on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Miller, Marshall) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the Lawyers' Committee for Civil Rights Under Law's Motion for Admission Pro Hac Vice <u>90</u> , it is hereby ORDERED that the motion is GRANTED and ADRIA BONILLAS is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the Past Presidents of the D.C. Bar's Unopposed Motion for Leave to File an Amicus Brief <u>91</u> , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [91−1] as the Past Presidents of the D.C. Bar's amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of Law Firm Partners United's Unopposed Motion for Leave to File an Amicus Brief <u>92</u> , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [92−1] as Law Firm Partners United's amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |

| | | |
|---|---|---|
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the NAACP Legal Defense & Educational Fund, Inc.'s Unopposed Motion for Leave to File an Amicus Brief 93 , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [93−1] as the NAACP Legal Defense & Educational Fund, Inc.'s amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of 777 Solos & Smalls' Unopposed Motion for Leave to File an Amicus Brief 95 , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [95−1] as the 777 Solos & Smalls' amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the 23 Nongovernmental Organizations' Unopposed Motion for Leave to File an Amicus Brief 97 , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [97−1] as the 23 Nongovernmental Organizations' amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the American Civil Liberties Union, American Civil Liberties Union of the District of Columbia, Cato Institute, Center For Individual Rights, Electronic Frontier Foundation, Foundation for Individual Rights and Expression, Institute for Justice, Knight First Amendment Institute at Columbia University, National Coalition Against Censorship, Reporters Committee for the Freedom of the Press, Rutherford Institute, and Society for the Rule of Law Institute's Unopposed Motion for Leave to File an Amicus Brief 100 , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [100−1] as the American Civil Liberties Union, American Civil Liberties Union of the District of Columbia, Cato Institute, Center For Individual Rights, Electronic Frontier Foundation, Foundation for Individual Rights and Expression, Institute for Justice, Knight First Amendment Institute at Columbia University, National Coalition Against Censorship, Reporters Committee for the Freedom of the Press, Rutherford Institute, and Society for the Rule of Law Institute's amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the Bar Associations' Unopposed Motion for Leave to File an Amicus Brief 102 , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [102−1] as the Bar Associations' amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the Legal Ethics Professors' Unopposed Motion for Leave to File an Amicus Brief 103 , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [103−1] as the Legal Ethics Professors' amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the 884 Law Firms' Unopposed Motion for Leave to File an Amicus Brief 105 , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [105−1] as the Amicus Law Firms' amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) Modified on 4/30/2025 (mhp) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Unopposed Motion for Leave to File an Amicus Brief 106 , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [106−1] as the Former Senior Government Officials' amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | | MINUTE ORDER: Upon consideration of the Litigation Firms' Unopposed Motion for Leave to File an Amicus Brief 111 , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [111−1] as the Litigation Firms' amicus brief. Signed by Judge Loren L. AliKhan on 04/28/2025. (lclla1) (Entered: 04/28/2025) |
| 04/28/2025 | 118 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Sean Hecker, Filing fee $ 100, receipt number ADCDC−11650292. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of Sean |

**JA 2934**

| | | |
|---|---|---|
| | | Hecker, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/28/2025) |
| 04/28/2025 | 119 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Julie E. Fink, Filing fee $ 100, receipt number ADCDC−11650296. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of Julie E. Fink, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/28/2025) |
| 04/28/2025 | 120 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Shawn G. Crowley, Filing fee $ 100, receipt number ADCDC−11650297. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of Shawn G. Crowley, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/28/2025) |
| 04/28/2025 | 121 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Kate L. Doniger, Filing fee $ 100, receipt number ADCDC−11650300. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of Kate L. Doniger, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/28/2025) |
| 04/28/2025 | 122 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− David Gopstein, Filing fee $ 100, receipt number ADCDC−11650308. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of David Gopstein, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/28/2025) |
| 04/28/2025 | 123 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− David Patton, Filing fee $ 100, receipt number ADCDC−11650309. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of David Patton, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/28/2025) |
| 04/28/2025 | 124 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− John C. Quinn, Filing fee $ 100, receipt number ADCDC−11650313. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of John C. Quinn, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/28/2025) |
| 04/28/2025 | 125 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Trisha Anderson, Filing fee $ 100, receipt number ADCDC−11650315. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of Trisha Anderson, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/28/2025) |
| 04/28/2025 | 126 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Matthew J. Craig, Filing fee $ 100, receipt number ADCDC−11650319. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of Matthew J. Craig, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/28/2025) |
| 04/28/2025 | 127 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Mack Jenkins, Filing fee $ 100, receipt number ADCDC−11650324. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of Mack Jenkins, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/28/2025) |
| 04/28/2025 | 128 | Unopposed MOTION for Leave to File Amicus Brief by INSTITUTE FOR THE RULE OF LAW OF THE UNION INTERNATIONALE DES AVOCATS. (Attachments: # 1 Exhibit Amicus Curiae Brief, # 2 Text of Proposed Order)(Roth, Jerry) (Entered: 04/28/2025) |
| 04/28/2025 | 141 | AMICUS BRIEF by 366 FORMER JUDGES. (mg) (Additional attachment(s) added on 4/30/2025: # 1 Exhibit A (list of former judges)) (mg). (Entered: 04/29/2025) |
| 04/28/2025 | 142 | AMICUS BRIEF by CHICAGO LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW, LAWYERS COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA, LAWYERS' COMMITTEE FOR CIVIL RIGHTS |

| | | |
|---|---|---|
| | | UNDER LAW AND LOCAL AFFILIATES, MISSISSIPPI CENTER FOR JUSTICE, PUBLIC INTEREST LAW CENTER, WASHINGTON LAWYERS COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS. (mg) (Entered: 04/29/2025) |
| 04/28/2025 | 143 | AMICUS BRIEF by PAST PRESIDENTS OF THE DC BAR. (mg) (Additional attachment(s) added on 4/30/2025: # 1 Appendix List of Amici) (mg). (Entered: 04/29/2025) |
| 04/28/2025 | 144 | AMICUS BRIEF by LAW FIRM PARTNERS UNITED. (mg) (Entered: 04/29/2025) |
| 04/28/2025 | 145 | AMICUS BRIEF by NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.. (mg) (Entered: 04/29/2025) |
| 04/28/2025 | 146 | AMICUS BRIEF by 777 SOLO & SMALL FIRM LAWYERS. (mg) (Entered: 04/29/2025) |
| 04/28/2025 | 147 | AMICUS BRIEF by 23 NONGOVERNMENTAL ORGANIZATIONS. (mg) (Entered: 04/30/2025) |
| 04/28/2025 | 148 | AMICUS BRIEF by AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, CATO INSTITUTE, CENTER FOR INDIVIDUAL RIGHTS, ELECTRONIC FRONTIER FOUNDATION, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, INSTITUTE FOR JUSTICE, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, NATIONAL COALITION AGAINST CENSORSHIP, REPORTERS COMMITTEE FOR THE FREEDOM OF THE PRESS, RUTHERFORD INSTITUTE, SOCIETY FOR THE RULE OF LAW INSTITUTE. (mg) (Entered: 04/30/2025) |
| 04/28/2025 | 149 | AMICUS BRIEF by BAR ASSOCIATIONS, LAWYER MEMBERSHIP ASSOCIATIONS. (mg) (Entered: 04/30/2025) |
| 04/28/2025 | 150 | AMICUS BRIEF by LEGAL ETHICS PROFESSORS. (mg) (Entered: 04/30/2025) |
| 04/28/2025 | 151 | AMICUS BRIEF by 884 LAW FIRMS. (mg) (Additional attachment(s) added on 4/30/2025: # 1 Appendix A (List of Amicus Law Firms)) (mg). (Entered: 04/30/2025) |
| 04/28/2025 | 152 | AMICUS BRIEF by FORMER SENIOR GOVERNMENT OFFICIALS. (mg) (Additional attachment(s) added on 4/30/2025: # 1 Appendix − List of Amici Curiae) (mg). (Entered: 04/30/2025) |
| 04/28/2025 | 153 | AMICUS BRIEF by LITIGATION FIRMS. (mg) (Entered: 04/30/2025) |
| 04/29/2025 | 129 | NOTICE of Appearance by Jacqueline Scott on behalf of INSTITUTE FOR THE RULE OF LAW OF THE UNION INTERNATIONALE DES AVOCATS (Scott, Jacqueline) (Entered: 04/29/2025) |
| 04/29/2025 | 130 | Unopposed MOTION for Leave to File Amicus Brief *In Support of Plaintiff's Motion for Summary Judgment* by 1129 LAW STUDENTS AND 51 LAW STUDENT ORGANIZATIONS. (Attachments: # 1 Exhibit Proposed Brief, # 2 Text of Proposed Order)(Merson, Jordan) (Entered: 04/29/2025) |
| 04/29/2025 | 131 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeannie Suk Gersen, Filing fee $ 100, receipt number ADCDC−11651987. Fee Status: Fee Paid. by BAR ASSOCIATIONS. (Attachments: # 1 Declaration of Jeannie Suk Gersen, # 2 Exhibit − Certificate of Good Standing, # 3 Text of Proposed Order)(Paredes, Eric John) (Entered: 04/29/2025) |
| 04/29/2025 | 132 | NOTICE of Appearance by Joseph Wilfred Mead on behalf of LEGAL ETHICS PROFESSORS (Mead, Joseph) (Entered: 04/29/2025) |
| 04/29/2025 | 133 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Charles L. Becker, Filing fee $ 100, receipt number ADCDC−11651975. Fee Status: Fee Paid. by 1129 LAW STUDENTS AND 51 LAW STUDENT ORGANIZATIONS. (Attachments: # 1 Text of Proposed Order)(Merson, Jordan) (Entered: 04/29/2025) |
| 04/29/2025 | 134 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Corrie Woods, Filing fee $ 100, receipt number ADCDC−11652089. Fee Status: Fee Paid. by 1129 LAW STUDENTS AND 51 LAW STUDENT ORGANIZATIONS. (Attachments: # 1 Text |

**JA 2936**

of Proposed Order)(Merson, Jordan) (Entered: 04/29/2025)

| 04/29/2025 | 135 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Gabrielle E. Tenzer, Filing fee $ 100, receipt number ADCDC−11652167. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of Gabrielle E. Tenzer, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/29/2025) |
|---|---|---|
| 04/29/2025 | 136 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jenna M. Dabbs, Filing fee $ 100, receipt number ADCDC−11652173. Fee Status: Fee Paid. by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Declaration of Jenna M. Dabbs, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 04/29/2025) |
| 04/29/2025 | 137 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Spencer Pahlke, Filing fee $ 100, receipt number ADCDC−11652184. Fee Status: Fee Paid. by 1129 LAW STUDENTS AND 51 LAW STUDENT ORGANIZATIONS. (Attachments: # 1 Text of Proposed Order)(Merson, Jordan) (Entered: 04/29/2025) |
| 04/29/2025 | 138 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Ruth Greenwood, Filing fee $ 100, receipt number ADCDC−11652182. Fee Status: Fee Paid. by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit I − Declaration and Certificates of Good Standing, # 2 Text of Proposed Order)(Mead, Joseph) (Entered: 04/29/2025) |
| 04/29/2025 | 139 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Samuel J. Davis, Filing fee $ 100, receipt number ADCDC−11652190. Fee Status: Fee Paid. by LEGAL ETHICS PROFESSORS. (Attachments: # 1 Exhibit I − Declaration and Certificates of Good Standing, # 2 Text of Proposed Order)(Mead, Joseph) (Entered: 04/29/2025) |
| 04/29/2025 | 140 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Shanin Specter, Filing fee $ 100, receipt number ADCDC−11652431. Fee Status: Fee Paid. by 1129 LAW STUDENTS AND 51 LAW STUDENT ORGANIZATIONS. (Attachments: # 1 Text of Proposed Order)(Merson, Jordan) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice 118 , it is hereby ORDERED that the motion is GRANTED and SEAN HECKER is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions.** Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) Modified on 4/29/2025 (mhp) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice 119 , it is hereby ORDERED that the motion is GRANTED and JULIE E. FINK is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions.** Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) Modified on 4/29/2025 (mhp) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice 120 , it is hereby ORDERED that the motion is GRANTED and SHAWN G. CROWLEY is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions.** Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) Modified on 4/29/2025 (mhp) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice 121 , it is hereby ORDERED that the motion is GRANTED and KATE L. DONIGER is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions.** Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) Modified on 4/29/2025 (mhp) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice 122 , it is hereby ORDERED that the motion is GRANTED and DAVID GOPSTEIN is granted leave to appear pro hac vice in this |

JA 2937

| | | |
|---|---|---|
| | | case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) Modified on 4/29/2025 (mhp) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice <u>123</u> , it is hereby ORDERED that the motion is GRANTED and DAVID PATTON is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) Modified on 4/29/2025 (mhp) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice <u>124</u> , it is hereby ORDERED that the motion is GRANTED and JOHN C. QUINN is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) Modified on 4/29/2025 (mhp) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice <u>125</u> , it is hereby ORDERED that the motion is GRANTED and TRISHA ANDERSON is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) Modified on 4/29/2025 (mhp) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice <u>126</u> , it is hereby ORDERED that the motion is GRANTED and MATTHEW J. CRAIG is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) Modified on 4/29/2025 (mhp) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice <u>127</u> , it is hereby ORDERED that the motion is GRANTED and MACK JENKINS is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) Modified on 4/29/2025 (mhp) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Institute for the Rule of Law of the Union Internationale des Avocats' Unopposed Motion for Leave to File an Amicus Brief <u>128</u> , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [128−1] as the Institute for the Rule of Law of the Union Internationale des Avocats' amicus brief. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the 1129 Law Students and 51 Law Student Organizations' Unopposed Motion for Leave to File an Amicus Brief <u>130</u> , it is hereby ORDERED that the motion is GRANTED. The Clerk of Court shall docket [130−1] as the 1129 Law Students and 51 Law Student Organizations' amicus brief. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Bar Associations' Motion for Admission Pro Hac Vice <u>131</u> , it is hereby ORDERED that the motion is GRANTED and JEANNIE SUK GERSEN is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the 1129 Law Students and 51 Law Student Organizations' Motion for Admission Pro Hac Vice <u>133</u> , it is hereby ORDERED that the motion is GRANTED and CHARLES L. BECKER is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. |

| | | Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) (Entered: 04/29/2025) |
|---|---|---|
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the 1129 Law Students and 51 Law Student Organizations' Motion for Admission Pro Hac Vice 134 , it is hereby ORDERED that the motion is GRANTED and CORRIE WOODS is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice 135 , it is hereby ORDERED that the motion is GRANTED and GABRIELLE E. TENZER is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Former Senior Government Officials' Motion for Admission Pro Hac Vice 136 , it is hereby ORDERED that the motion is GRANTED and JENNA M. DABBS is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the 1129 Law Students and 51 Law Student Organizations' Motion for Admission Pro Hac Vice 137 , it is hereby ORDERED that the motion is GRANTED and SPENCER PAHLKE is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Legal Ethics Professors' Motion for Admission Pro Hac Vice 138 , it is hereby ORDERED that the motion is GRANTED and RUTH GREENWOOD is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the Legal Ethics Professors' Motion for Admission Pro Hac Vice 139 , it is hereby ORDERED that the motion is GRANTED and SAMUEL J. DAVIS is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER: Upon consideration of the 1129 Law Students and 51 Law Student Organizations' Motion for Admission Pro Hac Vice 140 , it is hereby ORDERED that the motion is GRANTED and SHANIN SPECTER is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a). Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/29/2025. (lclla1) (Entered: 04/29/2025) |
| 04/29/2025 | 154 | AMICUS BRIEF by INSTITUTE FOR THE RULE OF LAW OF THE UNION INTERNATIONALE DES AVOCATS. (mg) (Entered: 04/30/2025) |
| 04/29/2025 | 155 | AMICUS BRIEF by 1129 LAW STUDENTS and 51 LAW STUDENT ORGANIZATIONS. (mg) Modified docket text on 4/30/2025 (mg). (Entered: 04/30/2025) |
| 04/30/2025 | 156 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Daniel D. Birk, Filing fee $ 100, receipt number ADCDC−11654738. Fee Status: Fee Paid. by 884 LAW FIRMS. (Attachments: # 1 Exhibit A (Declaration), # 2 Text of Proposed Order)(Waldin, Benjamin) (Entered: 04/30/2025) |
| 04/30/2025 | | MINUTE ORDER: Upon consideration of the 884 Law Firms' Motion for Admission Pro Hac Vice 156 , it is hereby ORDERED that the motion is GRANTED and DANIEL D. BIRK is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R.** |

| | | |
|---|---|---|
| | | 83.6(a). **Click for Instructions**. Signed by Judge Loren L. AliKhan on 04/30/2025. (lclla2) (Entered: 04/30/2025) |
| 04/30/2025 | 157 | NOTICE of Appearance by Daniel D. Birk on behalf of 884 LAW FIRMS (Birk, Daniel) (Entered: 04/30/2025) |
| 04/30/2025 | 158 | Memorandum in opposition to re 58 MOTION to Dismiss filed by SUSMAN GODFREY LLP. (Verrilli, Donald) (Entered: 04/30/2025) |
| 04/30/2025 | 159 | Memorandum in opposition to re 51 MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* MOTION for Declaratory Judgment MOTION for Permanent Injunction filed by SCOTT BESSENT, PAMELA J. BONDI, DOUG BURGUM, CENTRAL INTELLIGENCE AGENCY, LORI CHAVEZ−DEREMER, DOUGLAS A. COLLINS, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPARTMENT OF STATE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECUTIVE OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION, ANDREW N. FERGUSON, TULSI GABBARD, JAMIESON GREER, PETER B. HEGSETH, AMY A. KARPEL, ROBERT F. KENNEDY, JR, KELLY LOEFFLER, ANDREA R. LUCAS, HOWARD LUTNICK, LINDA M. MCMAHON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STEWART, SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES INTERNATIONAL TRADE COMMISSION, UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL T. VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Statement of Facts Response to Plaintiff's Statement of Facts, # 2 Declaration of Richard Lawson with 10 exhibits)(Lawson, Richard) (Entered: 04/30/2025) |
| 05/01/2025 | 160 | NOTICE of Appearance by Adria Jasmine Bonillas on behalf of LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AND LOCAL AFFILIATES (Bonillas, Adria) (Entered: 05/01/2025) |
| 05/05/2025 | 161 | NOTICE of Appearance by Sean Hecker on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Hecker, Sean) (Entered: 05/05/2025) |
| 05/05/2025 | 162 | NOTICE of Appearance by Julie E. Fink on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Fink, Julie) (Entered: 05/05/2025) |
| 05/05/2025 | 163 | NOTICE of Appearance by Shawn Geovjian Crowley on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Crowley, Shawn) (Entered: 05/05/2025) |
| 05/05/2025 | 164 | REPLY to opposition to motion re 51 Motion for Summary Judgment,,,,,,, Motion for Declaratory Judgment,,,,,,, Motion for Permanent Injunction,,,,,, filed by SUSMAN GODFREY LLP. (Verrilli, Donald) (Entered: 05/05/2025) |
| 05/05/2025 | 165 | NOTICE of Appearance by Kate Doniger on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Doniger, Kate) (Entered: 05/05/2025) |
| 05/05/2025 | 166 | NOTICE of Appearance by Jenna M. Dabbs on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Dabbs, Jenna) (Entered: 05/05/2025) |
| 05/05/2025 | 167 | NOTICE of Appearance by David Gopstein on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Gopstein, David) (Entered: 05/05/2025) |
| 05/05/2025 | 168 | NOTICE of Appearance by Kyle Schneider on behalf of SUSMAN GODFREY LLP (Schneider, Kyle) (Entered: 05/05/2025) |

JA 2940

| 05/05/2025 | [169](#) | NOTICE of Appearance by David Patton on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Patton, David) (Entered: 05/05/2025) |
| 05/05/2025 | [170](#) | NOTICE of Appearance by John Charles Quinn on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Quinn, John) (Entered: 05/05/2025) |
| 05/05/2025 | [171](#) | NOTICE of Appearance by Gabrielle Tenzer on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Tenzer, Gabrielle) (Entered: 05/05/2025) |
| 05/05/2025 | [172](#) | NOTICE of Appearance by Matthew J. Craig on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Craig, Matthew) (Entered: 05/05/2025) |
| 05/05/2025 | [173](#) | NOTICE of Appearance by Mack Jenkins on behalf of FORMER SENIOR GOVERNMENT OFFICIALS (Jenkins, Mack) (Entered: 05/05/2025) |
| 05/05/2025 | [174](#) | REPLY to opposition to motion re [58](#) Motion to Dismiss,,,,, filed by SCOTT BESSENT, PAMELA J. BONDI, DOUG BURGUM, CENTRAL INTELLIGENCE AGENCY, LORI CHAVEZ−DEREMER, DOUGLAS A. COLLINS, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPARTMENT OF STATE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECUTIVE OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION, ANDREW N. FERGUSON, TULSI GABBARD, JAMIESON GREER, PETER B. HEGSETH, AMY A. KARPEL, ROBERT F. KENNEDY, JR, KELLY LOEFFLER, ANDREA R. LUCAS, HOWARD LUTNICK, LINDA M. MCMAHON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STEWART, SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES INTERNATIONAL TRADE COMMISSION, UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL T. VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Lawson, Richard) (Entered: 05/05/2025) |
| 05/08/2025 | | ENTERED IN ERROR.....MINUTE ORDER: Upon consideration of the parties' Joint Status Report [13](#) , it is hereby ORDERED that the parties shall file another joint status report on or before August 4, 2025, updating the court on the status of Plaintiff's FOIA request. Signed by Judge Loren L. AliKhan on 05/08/2025. (lclla1) Modified on 5/8/2025, filed under the incorrect case number. (mhp) (Entered: 05/08/2025) |
| 05/08/2025 | | MINUTE ORDER: The court will provide access for the public to telephonically attend the motions hearing scheduled for May 8, 2025 at 2:00 p.m. The hearing can be accessed by dialing the Toll Free Number: 833−990−9400 (Meeting ID: 715234770). It is hereby ORDERED that the attendees using the public access telephone line shall adhere to the following: persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the presiding Judge. Signed by Judge Loren L. AliKhan on 5/8/2025. (mhp) (Entered: 05/08/2025) |
| 05/08/2025 | [175](#) | Consent MOTION to Adopt Streamlined Procedures *in the Event of an Amended Complaint* by SUSMAN GODFREY LLP. (Attachments: # [1](#) Text of Proposed Order)(Verrilli, Donald) (Entered: 05/08/2025) |
| 05/08/2025 | [176](#) | ORDER granting Consent Motion to Adopt Streamlined Procedures in the Event of an Amended Complaint [175](#) . See order for details. Signed by Judge Loren L. AliKhan on 05/08/2025. (lclla1) (Entered: 05/08/2025) |

| 05/08/2025 | | Set/Reset Deadlines: Amended Pleadings due by 5/9/2025; Dispositive Motions due by 5/12/2025. (mhp) (Entered: 05/08/2025) |
|---|---|---|
| 05/08/2025 | | Minute Entry for MOTIONS HEARING held on 5/8/2025 before Judge Loren L. AliKhan: The matter comes before the court on Plaintiff's Motion 51 for Summary Judgment and Declaratory and Permanent Injunctive Relief and Defendants' Motion 58 to Dismiss. Donald B. Verrilli, Jr., Brad D. Brian, Ginger D. Anders, Jeremy Kreisberg, and Elaine J. Goldenberg present on behalf of Plaintiff. Richard Lawson present on behalf of Defendants. The matters were fully briefed, argued, and taken under advisement. The Temporary Restraining Order remains in place until the court enters its ultimate merits ruling. (Court Reporter Sherry Lindsay)(mhp) (Entered: 05/08/2025) |
| 05/09/2025 | 177 | TRANSCRIPT OF PROCEEDINGS before Judge Loren L. AliKhan held on 5/8/25; Page Numbers: 1−88. Date of Issuance:5/9/25. Court Reporter: Sherry Lindsay, Email: Sherry_Lindsay@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/30/2025. Redacted Transcript Deadline set for 6/9/2025. Release of Transcript Restriction set for 8/7/2025.(stl) (Entered: 05/09/2025) |
| 05/09/2025 | 178 | AMENDED COMPLAINT *FOR DECLARATORY AND INJUNCTIVE RELIEF* against All Defendants filed by SUSMAN GODFREY LLP.(Verrilli, Donald) (Entered: 05/09/2025) |
| 05/09/2025 | 179 | REQUEST FOR SUMMONS TO ISSUE filed by SUSMAN GODFREY LLP. Related document: 178 Amended Complaint filed by SUSMAN GODFREY LLP.(Verrilli, Donald) (Entered: 05/09/2025) |
| 05/12/2025 | 180 | MOTION to Dismiss *Plaintiff's Amended Complaint* by ADMINISTRATION FOR CHILDREN AND FAMILIES, ADMINISTRATION FOR STRATEGIC PREPAREDNESS AND RESPONSE, ADVISORY COUNCIL ON HISTORIC PRESERVATION, AMERICORPS, APPALACHIAN REGIONAL COMMISSION, VIPIN ARORA, GARY A. ASHWORTH, PAUL S. ATKINS, SCOTT BESSENT, BIOMEDICAL ADVANCED RESEARCH AND DEVELOPMENT AUTHORITY, PAMELA J. BONDI, BONNEVILLE POWER ADMINISTRATION, BUREAU OF ECONOMIC ANALYSIS, BUREAU OF INDIAN AFFAIRS, BUREAU OF INDUSTRY AND SECURITY, BUREAU OF LAND MANAGEMENT, BUREAU OF OCEAN ENERGY MANAGEMENT, BUREAU OF RECLAMATION, BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, DOUG BURGUM, CENTRAL INTELLIGENCE AGENCY, LORI CHAVEZ−DEREMER, DOUGLAS A. COLLINS, CAROLINE A. CRENSHAW, WALTER CRUICKSHANK, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPARTMENT OF STATE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, GARY DISBROW, DANIEL P. DRISCOLL, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECUTIVE OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION, ANDREW N. FERGUSON, TULSI GABBARD, ANDREW GRADISON, JAMIESON GREER, JOHN HAIRSTON, PETER B. HEGSETH, MELISSA HOLYOAK, DAVID JOHNSON, AMY A. KARPEL, JASON KEARNS, ROBERT F. KENNEDY, JR, JEFFREY KESSLER, |

| | | |
|---|---|---|
| | | JOHN KNOX, KELLY LOEFFLER, ANDREA R. LUCAS, HOWARD LUTNICK, GAYLE CONELLY MANCHIN, LINDA M. MCMAHON, MARK MEADOR, BRYAN MERCIER, MICHAEL D. NEDD, REID NELSON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DAVID PALUMBO, JOHN PHELAN, Hestor PIERCE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STEWART, JENNIFER BASTRESS TAHMASEBI, SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF THE AIR FORCE, U.S. DEPARTMENT OF THE ARMY, U.S. DEPARTMENT OF THE NAVY, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES INTERNATIONAL TRADE COMMISSION, UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL T. VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Text of Proposed Order)(Lawson, Richard) (Entered: 05/12/2025) |
| 05/12/2025 | 181 | MOTION for Summary Judgment *and Declaratory and Permanent Injunctive Relief* by SUSMAN GODFREY LLP. (Attachments: # 1 Text of Proposed Order)(Verrilli, Donald). Added MOTION for Declaratory Judgment, MOTION for Permanent Injunction on 5/12/2025 (znmw). (Entered: 05/12/2025) |
| 05/13/2025 | 182 | SUMMONS (1) Issued Electronically as to FEDERAL AGENCIES AND DEPARTMENTS AND HEADS OF FEDERAL AGENCIES AND DEPARTMENTS, U.S. Attorney General. (znmw) (Entered: 05/13/2025) |
| 05/16/2025 | 183 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Robert Chang, Filing fee $ 100, receipt number ADCDC−11697450. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Chang declaration, # 2 Exhibit certificate of good standing)(Davy, Jim) (Entered: 05/16/2025) |
| 05/16/2025 | 184 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeremiah Chin, Filing fee $ 100, receipt number ADCDC−11697455. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Chin declaration, # 2 Exhibit certificate of good standing)(Davy, Jim) (Entered: 05/16/2025) |
| 05/16/2025 | 185 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Melissa Lee, Filing fee $ 100, receipt number ADCDC−11697461. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Lee declaration, # 2 Exhibit certificate of good standing)(Davy, Jim) (Entered: 05/16/2025) |
| 05/16/2025 | 186 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jessica Levin, Filing fee $ 100, receipt number ADCDC−11697463. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Levin declaration, # 2 Exhibit certificate of good standing)(Davy, Jim) (Entered: 05/16/2025) |
| 05/16/2025 | 187 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Susan McMahon, Filing fee $ 100, receipt number ADCDC−11697465. Fee Status: Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration McMahon declaration, # 2 Exhibit certificate of good standing)(Davy, Jim) (Entered: 05/16/2025) |
| 05/16/2025 | 188 | NOTICE of Appearance by Jeremiah Chin on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Chin, Jeremiah) (Entered: 05/16/2025) |
| 05/19/2025 | | MINUTE ORDER: Upon consideration of Fred T. Korematsu Center for Law and Equality's Motion for Leave to Appear Pro Hac Vice 183 , it is hereby ORDERED that the motion is DENIED without prejudice. Pursuant to Local Civil Rule 44.1(c)(2), an attorney seeking to appear pro hac vice in this court must, *inter alia*, submit a certificate of good standing that has been issued within thirty days of the filing of the motion. Signed by Judge Loren L. AliKhan on 05/19/2025. (lclla2) (Entered: |

JA 2943

| | | |
|---|---|---|
| | | 05/19/2025) |
| 05/19/2025 | | MINUTE ORDER: Upon consideration of Fred T. Korematsu Center for Law and Equality's Motion for Leave to Appear Pro Hac Vice 184 , it is hereby ORDERED that the motion is DENIED without prejudice. Pursuant to Local Civil Rule 44.1(c)(2), an attorney seeking to appear pro hac vice in this court must, *inter alia*, submit a certificate of good standing that has been issued within thirty days of the filing of the motion. Signed by Judge Loren L. AliKhan on 05/19/2025. (lclla2) (Entered: 05/19/2025) |
| 05/19/2025 | | MINUTE ORDER: Upon consideration of Fred T. Korematsu Center for Law and Equality's Motion for Leave to Appear Pro Hac Vice 185 , it is hereby ORDERED that the motion is DENIED without prejudice. Pursuant to Local Civil Rule 44.1(c)(2), an attorney seeking to appear pro hac vice in this court must, *inter alia*, submit a certificate of good standing that has been issued within thirty days of the filing of the motion. Signed by Judge Loren L. AliKhan on 05/19/2025. (lclla2) (Entered: 05/19/2025) |
| 05/19/2025 | | MINUTE ORDER: Upon consideration of Fred T. Korematsu Center for Law and Equality's Motion for Leave to Appear Pro Hac Vice 186 , it is hereby ORDERED that the motion is DENIED without prejudice. Pursuant to Local Civil Rule 44.1(c)(2), an attorney seeking to appear pro hac vice in this court must, *inter alia*, submit a certificate of good standing that has been issued within thirty days of the filing of the motion. Signed by Judge Loren L. AliKhan on 05/19/2025. (lclla2) (Entered: 05/19/2025) |
| 05/19/2025 | | MINUTE ORDER: Upon consideration of Fred T. Korematsu Center for Law and Equality's Motion for Leave to Appear Pro Hac Vice 187 , it is hereby ORDERED that the motion is DENIED without prejudice. Pursuant to Local Civil Rule 44.1(c)(2), an attorney seeking to appear pro hac vice in this court must, *inter alia*, submit a certificate of good standing that has been issued within thirty days of the filing of the motion. Signed by Judge Loren L. AliKhan on 05/19/2025. (lclla2) (Entered: 05/19/2025) |
| 05/19/2025 | 189 | ERRATA *updated certificate of good standing* by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY re 183 Motion for Leave to Appear Pro Hac Vice,. (Davy, Jim) (Entered: 05/19/2025) |
| 05/19/2025 | 190 | ERRATA *updated certificate of good standing* by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY re 187 Motion for Leave to Appear Pro Hac Vice,. (Davy, Jim) (Entered: 05/19/2025) |
| 05/21/2025 | | MINUTE ORDER: On May 19, 2025, the court denied Fred T. Korematsu Center for Law and Equality's motions for leave to appear pro hac vice 183 184 185 186 187 for failure to comply with Local Civil Rule 44.1(c)(2). If Fred T. Korematsu Center for Law and Equality still wishes to move for leave to appear pro hac vice, it shall file compliant motions for pro hac vice on or before May 23, 2025. Signed by Judge Loren L. AliKhan on 05/21/2025. (lclla2) (Entered: 05/21/2025) |
| 05/21/2025 | 191 | Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Robert Chang, Fee Status: No Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Chang declaration, # 2 Exhibit certificate of good standing)(Davy, Jim) (Entered: 05/21/2025) |
| 05/21/2025 | 192 | Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeremiah Chin, Fee Status: No Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration Chin declaration, # 2 Exhibit certificate of good standing)(Davy, Jim) (Entered: 05/21/2025) |
| 05/21/2025 | 193 | Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Susan McMahon, Fee Status: No Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # 1 Declaration McMahon declaration, # 2 Exhibit certificate of good standing)(Davy, Jim) (Attachment 1 replaced on 5/21/2025) (mg). (Entered: 05/21/2025) |
| 05/21/2025 | 194 | Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jessica Levin, Fee Status: No Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW |

JA 2944

| | | |
|---|---|---|
| | | AND EQUALITY. (Attachments: # <u>1</u> Declaration Levin declaration, # <u>2</u> Exhibit certificate of good standing)(Davy, Jim) (Entered: 05/21/2025) |
| 05/21/2025 | <u>195</u> | Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Melissa Lee, Fee Status: No Fee Paid. by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY. (Attachments: # <u>1</u> Declaration Lee Declaration, # <u>2</u> Exhibit certificate of good standing)(Davy, Jim) (Entered: 05/21/2025) |
| 05/21/2025 | | NOTICE OF ERROR regarding <u>194</u> Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jessica Levin, Fee Status: No Fee Paid., <u>192</u> Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeremiah Chin, Fee Status: No Fee Paid., <u>191</u> Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Robert Chang, Fee Status: No Fee Paid., <u>195</u> Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Melissa Lee, Fee Status: No Fee Paid., <u>193</u> Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Susan McMahon, Fee Status: No Fee Paid.. The following error(s) need correction: Other− Pro Hac Vice Motions must be accompanied by a payment of $100 for each Motion (LCvR 83.2(c)(2)). Please submit payment using event: Payment of Fee− Pro Hac Vice Motion. Please refile. (mg) (Entered: 05/21/2025) |
| 05/21/2025 | | Payment for <u>191</u> Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Robert Chang, Fee Status: No Fee Paid.. ($100; Receipt number ADCDC−11706993). (Davy, Jim) (Entered: 05/21/2025) |
| 05/21/2025 | | Payment for <u>192</u> Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jeremiah Chin, Fee Status: No Fee Paid.. ($100; Receipt number ADCDC−11706995). (Davy, Jim) (Entered: 05/21/2025) |
| 05/21/2025 | | Payment for <u>193</u> Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Susan McMahon, Fee Status: No Fee Paid.. ($100; Receipt number ADCDC−11706997). (Davy, Jim) (Entered: 05/21/2025) |
| 05/21/2025 | | Payment for <u>194</u> Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Jessica Levin, Fee Status: No Fee Paid.. ($100; Receipt number ADCDC−11706998). (Davy, Jim) (Entered: 05/21/2025) |
| 05/21/2025 | | Payment for <u>195</u> Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Melissa Lee, Fee Status: No Fee Paid.. ($100; Receipt number ADCDC−11707001). (Davy, Jim) (Entered: 05/21/2025) |
| 05/22/2025 | | MINUTE ORDER: Upon consideration of Fred T. Korematsu Center for Law and Equality's Amended Motion for Admission Pro Hac Vice <u>192</u> , it is hereby ORDERED that the motion is GRANTED and JEREMIAH AUGUSTUS CHIN is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).** <u>**Click for Instructions**</u>. Signed by Judge Loren L. AliKhan on 05/22/2025. (lclla2) (Entered: 05/22/2025) |
| 05/22/2025 | | MINUTE ORDER: Upon consideration of Fred T. Korematsu Center for Law and Equality's Amended Motion for Admission Pro Hac Vice <u>193</u> , it is hereby ORDERED that the motion is GRANTED and SUSAN ANNE MCMAHON is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).** <u>**Click for Instructions**</u>. Signed by Judge Loren L. AliKhan on 05/22/2025. (lclla2) (Entered: 05/22/2025) |
| 05/22/2025 | | MINUTE ORDER: Upon consideration of Fred T. Korematsu Center for Law and Equality's Amended Motion for Admission Pro Hac Vice <u>194</u> , it is hereby ORDERED that the motion is GRANTED and JESSICA LEVIN is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).** <u>**Click for Instructions**</u>. Signed by Judge Loren L. AliKhan on 05/22/2025. (lclla2) (Entered: 05/22/2025) |
| 05/22/2025 | | MINUTE ORDER: Upon consideration of Fred T. Korematsu Center for Law and Equality's Amended Motion for Admission Pro Hac Vice <u>195</u> , it is hereby ORDERED that the motion is GRANTED and MELISSA R. LEE is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a** |

JA 2945

| | | |
|---|---|---|
| | | **notice of appearance pursuant to Local Civ. R. 83.6(a).** <u>Click for Instructions</u>. Signed by Judge Loren L. AliKhan on 05/22/2025. (lclla2) (Entered: 05/22/2025) |
| 05/22/2025 | | NOTICE OF ERROR regarding <u>191</u> . The following error(s) need correction: Document incomplete; missing telephone number on Declaration. Please refile using the event Declaration. (mg) Modified on 5/22/2025 to add link (mg). (Entered: 05/22/2025) |
| 05/22/2025 | <u>196</u> | DECLARATION *of Robert Chang* by FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY re <u>191</u> Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Robert Chang, Fee Status: No Fee Paid.. (Davy, Jim) (Entered: 05/22/2025) |
| 05/22/2025 | <u>197</u> | NOTICE of Appearance by Jessica Levin on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Levin, Jessica) (Entered: 05/22/2025) |
| 05/22/2025 | <u>198</u> | NOTICE of Appearance by Melissa Lee on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Lee, Melissa) (Entered: 05/22/2025) |
| 05/23/2025 | | MINUTE ORDER: Upon consideration of Fred T. Korematsu Center for Law and Equality's Amended Motion for Admission Pro Hac Vice <u>191</u> and Declaration for Pro Hac Admission <u>196</u> , it is hereby ORDERED that the motion is GRANTED and ROBERT SEUNGCHUL CHANG is granted leave to appear pro hac vice in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to Local Civ. R. 83.6(a).** <u>Click for Instructions</u>. Signed by Judge Loren L. AliKhan on 05/23/2025. (lclla2) (Entered: 05/23/2025) |
| 05/23/2025 | <u>199</u> | NOTICE of Appearance by Robert Seungchul Chang on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (Chang, Robert) (Entered: 05/23/2025) |
| 05/27/2025 | <u>200</u> | NOTICE of Appearance by Susan A. McMahon on behalf of FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY (McMahon, Susan) (Entered: 05/27/2025) |
| 05/27/2025 | <u>201</u> | NOTICE of Appearance by Donald Manwell Falk on behalf of 366 FORMER JUDGES (Falk, Donald) (Main Document 201 replaced on 5/28/2025) (znmw). (Entered: 05/27/2025) |
| 06/06/2025 | <u>202</u> | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 5/5/2025. Answer due for ALL FEDERAL DEFENDANTS by 7/4/2025. (Kreisberg, Jeremy) (Entered: 06/06/2025) |
| 06/06/2025 | <u>203</u> | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 4/21/2025. (Kreisberg, Jeremy) (Entered: 06/06/2025) |
| 06/06/2025 | <u>204</u> | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SCOTT BESSENT served on 4/21/2025; PAMELA J. BONDI served on 4/21/2025; DOUGLAS J. BURGUM served on 4/21/2025; CENTRAL INTELLIGENCE AGENCY served on 4/21/2025; LORI CHAVEZ−DEREMER served on 4/21/2025; DOUG COLLINS served on 4/21/2025; DEPARTMENT OF AGRICULTURE served on 4/23/2025; DEPARTMENT OF COMMERCE served on 4/21/2025; DEPARTMENT OF ENERGY served on 4/21/2025; DEPARTMENT OF HOMELAND SECURITY served on 4/21/2025; DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT served on 4/21/2025; DEPARTMENT OF LABOR served on 4/21/2025; DEPARTMENT OF STATE served on 4/21/2025; DEPARTMENT OF THE INTERIOR served on 4/21/2025; DEPARTMENT OF THE TREASURY served on 4/21/2025; DEPARTMENT OF TRANSPORTATION served on 4/22/2025; SEAN DUFFY served on 4/22/2025; ENVIRONMENTAL PROTECTION AGENCY served on 5/27/2025; EQUAL EMPLOYMENT OPPORTUNITY COMMISSION served on 4/21/2025; EXECUTIVE OFFICE OF THE PRESIDENT served on 4/21/2025; FEDERAL TRADE COMMISSION served on 4/21/2025; ANDREW N. FERGUSON served on 4/21/2025; TULSI GABBARD served on 4/21/2025; JAMIESON GREER served on 4/24/2025; PETER B. HEGSETH served on 4/22/2025; AMY A. KARPEL served on 4/21/2025; ROBERT F. KENNEDY, JR served on 4/21/2025; KELLY LOEFFLER served on 4/23/2025; |

ANDREA R. LUCAS served on 4/21/2025; HOWARD W. LUTNICK served on 4/21/2025; LINDA MCMAHON served on 4/21/2025; KRISTI NOEM served on 4/21/2025; OFFICE OF MANAGEMENT AND BUDGET served on 4/24/2025; OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE served on 4/21/2025; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE served on 4/24/2025; JOHN L. RATCLIFFE served on 4/23/2025; BROOKE L. ROLLINS served on 4/21/2025; MARCO RUBIO served on 4/22/2025; SECURITIES AND EXCHANGE COMMISSION served on 4/21/2025; SMALL BUSINESS ADMINISTRATION served on 4/22/2025; COKE MORGAN STEWART served on 4/17/2025; SCOTT TURNER served on 4/21/2025; U.S. DEPARTMENT OF DEFENSE served on 4/22/2025; U.S. DEPARTMENT OF EDUCATION served on 4/21/2025; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES served on 4/23/2025; U.S. DEPARTMENT OF JUSTICE served on 4/21/2025; U.S. DEPARTMENT OF VETERANS AFFAIRS served on 4/21/2025; UNITED STATES INTERNATIONAL TRADE COMMISSION served on 4/21/2025; UNITED STATES PATENT AND TRADEMARK OFFICE served on 4/17/2025; MARK T. UYEDA served on 4/21/2025; RUSSELL VOUGHT served on 4/24/2025; CHRIS WRIGHT served on 4/21/2025; LEE M. ZELDIN served on 4/21/2025 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Kreisberg, Jeremy) (Entered: 06/06/2025)

| 06/10/2025 | 205 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ALL FEDERAL AGENCIES AND DEPARTMENTS AND HEADS OF FEDERAL AGENCIES AND DEPARTMENTS served on 5/14/2025 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Kreisberg, Jeremy) (Entered: 06/10/2025) |
| 06/27/2025 | 206 | MEMORANDUM OPINION regarding Defendants' Motion to Dismiss 180 and Plaintiff's Motion for Summary Judgment 181 . See document for details. Signed by Judge Loren L. AliKhan on 06/27/2025. (lclla2) (Entered: 06/27/2025) |
| 06/27/2025 | 207 | ORDER denying Defendants' Motion to Dismiss 180 , granting Plaintiff's Motion for Summary Judgment 181 , entering judgment for Plaintiff on Counts I through IV and VI through IX of the Amended Complaint 178 , and granting Plaintiff declaratory and permanent injunctive relief. See order for details. This Order constitutes a final judgment of the court within the meaning of Rule 58(a) of the Federal Rules of Civil Procedure. The Clerk of Court is directed to terminate the case. Signed by Judge Loren L. AliKhan on 06/27/2025. (lclla2) (Entered: 06/27/2025) |
| 07/01/2025 | 208 | STATUS REPORT by ADMINISTRATION FOR CHILDREN AND FAMILIES, ADMINISTRATION FOR STRATEGIC PREPAREDNESS AND RESPONSE, ADVISORY COUNCIL ON HISTORIC PRESERVATION, ALL FEDERAL AGENCIES AND DEPARTMENTS AND HEADS OF FEDERAL AGENCIES AND DEPARTMENTS, AMERICORPS, APPALACHIAN REGIONAL COMMISSION, VIPIN ARORA, GARY A. ASHWORTH, PAUL S. ATKINS, SCOTT BESSENT, BIOMEDICAL ADVANCED RESEARCH AND DEVELOPMENT AUTHORITY, PAMELA J. BONDI, BONNEVILLE POWER ADMINISTRATION, BUREAU OF ECONOMIC ANALYSIS, BUREAU OF INDIAN AFFAIRS, BUREAU OF INDUSTRY AND SECURITY, BUREAU OF LAND MANAGEMENT, BUREAU OF OCEAN ENERGY MANAGEMENT, BUREAU OF RECLAMATION, BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, DOUGLAS J. BURGUM, CENTRAL INTELLIGENCE AGENCY, LORI CHAVEZ−DEREMER, DOUG COLLINS, CAROLINE A. CRENSHAW, WALTER CRUICKSHANK, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPARTMENT OF STATE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, GARY DISBROW, DANIEL P. DRISCOLL, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECUTIVE OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION, ANDREW N. FERGUSON, TULSI GABBARD, ANDREW GRADISON, JAMIESON GREER, JOHN HAIRSTON, PETER B. HEGSETH, MELISSA ANN HOLYOAK, DAVID JOHNSON, AMY A. KARPEL, JASON KEARNS, ROBERT F. KENNEDY, JR, JEFFREY KESSLER, JOHN KNOX, KELLY LOEFFLER, ANDREA R. LUCAS, HOWARD W. LUTNICK, GAYLE |

CONELLY MANCHIN, LINDA MCMAHON, MARK M. MEADOR, BRYAN MERCIER, MICHAEL D. NEDD, REID NELSON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DAVID PALUMBO, JOHN PHELAN, Hestor PIERCE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STEWART, JENNIFER BASTRESS TAHMASEBI, SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF THE AIR FORCE, U.S. DEPARTMENT OF THE ARMY, U.S. DEPARTMENT OF THE NAVY, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES INTERNATIONAL TRADE COMMISSION, UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Exhibit Notice)(Lawson, Richard) (Entered: 07/01/2025)

| | | |
|---|---|---|
| 07/29/2025 | 209 | Unopposed MOTION to Clarify re 207 Order on Motion for Summary Judgment,,, Order on Motion to Dismiss,,, Order on Motion for Declaratory Judgment,,, Order on Motion for Permanent Injunction,,,,,,,,,,,,,, 206 Memorandum & Opinion by ADMINISTRATION FOR CHILDREN AND FAMILIES, ADMINISTRATION FOR STRATEGIC PREPAREDNESS AND RESPONSE, ADVISORY COUNCIL ON HISTORIC PRESERVATION, ALL FEDERAL AGENCIES AND DEPARTMENTS AND HEADS OF FEDERAL AGENCIES AND DEPARTMENTS, AMERICORPS, APPALACHIAN REGIONAL COMMISSION, VIPIN ARORA, GARY A. ASHWORTH, PAUL S. ATKINS, SCOTT BESSENT, BIOMEDICAL ADVANCED RESEARCH AND DEVELOPMENT AUTHORITY, PAMELA J. BONDI, BONNEVILLE POWER ADMINISTRATION, BUREAU OF ECONOMIC ANALYSIS, BUREAU OF INDIAN AFFAIRS, BUREAU OF INDUSTRY AND SECURITY, BUREAU OF LAND MANAGEMENT, BUREAU OF OCEAN ENERGY MANAGEMENT, BUREAU OF RECLAMATION, BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, DOUGLAS J. BURGUM, CENTRAL INTELLIGENCE AGENCY, LORI CHAVEZ−DEREMER, DOUG COLLINS, CAROLINE A. CRENSHAW, WALTER CRUICKSHANK, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPARTMENT OF STATE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, GARY DISBROW, DANIEL P. DRISCOLL, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECUTIVE OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION, ANDREW N. FERGUSON, TULSI GABBARD, ANDREW GRADISON, JAMIESON GREER, JOHN HAIRSTON, PETER B. HEGSETH, MELISSA ANN HOLYOAK, DAVID JOHNSON, AMY A. KARPEL, JASON KEARNS, ROBERT F. KENNEDY, JR, JEFFREY KESSLER, JOHN KNOX, KELLY LOEFFLER, ANDREA R. LUCAS, HOWARD W. LUTNICK, GAYLE CONELLY MANCHIN, LINDA MCMAHON, MARK M. MEADOR, BRYAN MERCIER, MICHAEL D. NEDD, REID NELSON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DAVID PALUMBO, JOHN PHELAN, Hestor PIERCE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STEWART, JENNIFER BASTRESS TAHMASEBI, SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF THE AIR FORCE, U.S. DEPARTMENT OF THE ARMY, U.S. DEPARTMENT OF THE NAVY, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES INTERNATIONAL TRADE COMMISSION, UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Lawson, Richard) (Entered: 07/29/2025) |

| | | |
|---|---|---|
| 07/29/2025 | | MINUTE ORDER: Upon consideration of Defendants' Unopposed Motion to Clarify 209 , it is hereby ORDERED that the motion is GRANTED. The court clarifies that the injunctive relief granted as to Section 4 of Executive Order 14,263, ECF No. 207 , at 4, runs only in favor of Plaintiff Susman Godfrey LLP (including its affiliates, predecessors, successors, assigns, directors, officers, partners, employees, and agents). Signed by Judge Loren L. AliKhan on 07/29/2025. (lclla2) (Entered: 07/29/2025) |
| 08/01/2025 | 210 | MOTION to Withdraw as Attorney by FORMER SENIOR GOVERNMENT OFFICIALS. (Attachments: # 1 Text of Proposed Order)(Iguina Gonzalez, Carmen) (Entered: 08/01/2025) |
| 08/01/2025 | | MINUTE ORDER: Upon consideration of Former Senior Government Officials' Motion to Withdraw as Attorney 210 , it is hereby ORDERED that the motion is GRANTED and Carmen Iguina Gonz&aacutelez shall be withdrawn as counsel. Signed by Judge Loren L. AliKhan on 08/1/2025. (lclla2) (Entered: 08/01/2025) |
| 08/22/2025 | 211 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 207 Order on Motion for Summary Judgment,,, Order on Motion to Dismiss,,, Order on Motion for Declaratory Judgment,,, Order on Motion for Permanent Injunction,,,,,,,,,,,,,, 206 Memorandum & Opinion by GAYLE CONELLY MANCHIN, ANDREW GRADISON, MARK T. UYEDA, WALTER CRUICKSHANK, DEPARTMENT OF HOMELAND SECURITY, BRYAN MERCIER, CENTRAL INTELLIGENCE AGENCY, LEE M. ZELDIN, SEAN DUFFY, DEPARTMENT OF THE INTERIOR, GARY A. ASHWORTH, DEPARTMENT OF ENERGY, JEFFREY KESSLER, RUSSELL VOUGHT, BUREAU OF OCEAN ENERGY MANAGEMENT, COKE MORGAN STEWART, U.S. DEPARTMENT OF DEFENSE, VIPIN ARORA, UNITED STATES OF AMERICA, BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, U.S. DEPARTMENT OF THE ARMY, AMERICORPS, U.S. DEPARTMENT OF THE NAVY, ENVIRONMENTAL PROTECTION AGENCY, EXECUTIVE OFFICE OF THE PRESIDENT, PAUL S. ATKINS, BUREAU OF INDUSTRY AND SECURITY, ADMINISTRATION FOR STRATEGIC PREPAREDNESS AND RESPONSE, U.S. DEPARTMENT OF VETERANS AFFAIRS, MELISSA ANN HOLYOAK, BROOKE L. ROLLINS, JENNIFER BASTRESS TAHMASEBI, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, JOHN KNOX, DEPARTMENT OF COMMERCE, BUREAU OF LAND MANAGEMENT, CHRIS WRIGHT, UNITED STATES PATENT AND TRADEMARK OFFICE, SCOTT BESSENT, JOHN L. RATCLIFFE, DAVID PALUMBO, SECURITIES AND EXCHANGE COMMISSION, AMY A. KARPEL, DEPARTMENT OF LABOR, FEDERAL TRADE COMMISSION, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, ADVISORY COUNCIL ON HISTORIC PRESERVATION, U.S. DEPARTMENT OF THE AIR FORCE, APPALACHIAN REGIONAL COMMISSION, BUREAU OF ECONOMIC ANALYSIS, DEPARTMENT OF THE TREASURY, Hestor PIERCE, BUREAU OF INDIAN AFFAIRS, ADMINISTRATION FOR CHILDREN AND FAMILIES, LORI CHAVEZ−DEREMER, MARK M. MEADOR, BIOMEDICAL ADVANCED RESEARCH AND DEVELOPMENT AUTHORITY, HOWARD W. LUTNICK, DAVID JOHNSON, ALL FEDERAL AGENCIES AND DEPARTMENTS AND HEADS OF FEDERAL AGENCIES AND DEPARTMENTS, ROBERT F. KENNEDY, JR, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, DOUG COLLINS, KELLY LOEFFLER, KRISTI NOEM, DEPARTMENT OF STATE, DOUGLAS J. BURGUM, BONNEVILLE POWER ADMINISTRATION, PAMELA J. BONDI, GARY DISBROW, DANIEL P. DRISCOLL, SMALL BUSINESS ADMINISTRATION, DEPARTMENT OF TRANSPORTATION, LINDA MCMAHON, MICHAEL D. NEDD, JASON KEARNS, JAMIESON GREER, TULSI GABBARD, DEPARTMENT OF AGRICULTURE, JOHN PHELAN, MARCO A. RUBIO, BUREAU OF RECLAMATION, U.S. DEPARTMENT OF EDUCATION, UNITED STATES INTERNATIONAL TRADE COMMISSION, JOHN HAIRSTON, ANDREA R. LUCAS, U.S. DEPARTMENT OF JUSTICE, CAROLINE A. CRENSHAW, SCOTT TURNER, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, PETER B. HEGSETH, OFFICE OF MANAGEMENT AND BUDGET, ANDREW N. FERGUSON, REID NELSON. Fee Status: No Fee Paid. Parties have been notified. (Lawson, Richard) (Entered: 08/22/2025) |

JA 2949

| 08/25/2025 | 212 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 211 Notice of Appeal to DC Circuit Court.(znmw) (Entered: 08/25/2025) |
|---|---|---|
| 08/27/2025 | | USCA Case Number 25−5310 for 211 Notice of Appeal to DC Circuit Court, filed by MELISSA ANN HOLYOAK, DEPARTMENT OF ENERGY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, SECURITIES AND EXCHANGE COMMISSION, HOWARD W. LUTNICK, DEPARTMENT OF THE INTERIOR, SCOTT TURNER, BIOMEDICAL ADVANCED RESEARCH AND DEVELOPMENT AUTHORITY, ROBERT F. KENNEDY, JR., KELLY LOEFFLER, ANDREA R. LUCAS, U.S. DEPARTMENT OF JUSTICE, ANDREW GRADISON, ALL FEDERAL AGENCIES AND DEPARTMENTS AND HEADS OF FEDERAL AGENCIES AND DEPARTMENTS, BUREAU OF OCEAN ENERGY MANAGEMENT, DANIEL P. DRISCOLL, VIPIN ARORA, ADMINISTRATION FOR CHILDREN AND FAMILIES, DEPARTMENT OF LABOR, APPALACHIAN REGIONAL COMMISSION, JASON KEARNS, GAYLE CONELLY MANCHIN, PETER B. HEGSETH, CHRIS WRIGHT, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, ANDREW N. FERGUSON, Hestor PIERCE, COKE MORGAN STEWART, BONNEVILLE POWER ADMINISTRATION, U.S. DEPARTMENT OF THE ARMY, GARY DISBROW, DAVID JOHNSON, RUSSELL VOUGHT, CAROLINE A. CRENSHAW, ENVIRONMENTAL PROTECTION AGENCY, EXECUTIVE OFFICE OF THE PRESIDENT, U.S. DEPARTMENT OF EDUCATION, DOUGLAS J. BURGUM, LINDA MCMAHON, CENTRAL INTELLIGENCE AGENCY, MICHAEL D. NEDD, JENNIFER BASTRESS TAHMASEBI, LEE M. ZELDIN, UNITED STATES OF AMERICA, DEPARTMENT OF THE TREASURY, BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, JEFFREY KESSLER, LORI CHAVEZ−DEREMER, U.S. DEPARTMENT OF THE AIR FORCE, BRYAN MERCIER, JOHN HAIRSTON, MARK M. MEADOR, UNITED STATES PATENT AND TRADEMARK OFFICE, KRISTI NOEM, MARK T. UYEDA, PAMELA J. BONDI, REID NELSON, U.S. DEPARTMENT OF VETERANS AFFAIRS, DEPARTMENT OF STATE, DEPARTMENT OF TRANSPORTATION, DEPARTMENT OF COMMERCE, BUREAU OF LAND MANAGEMENT, BUREAU OF RECLAMATION, UNITED STATES INTERNATIONAL TRADE COMMISSION, ADMINISTRATION FOR STRATEGIC PREPAREDNESS AND RESPONSE, JOHN L. RATCLIFFE, BUREAU OF ECONOMIC ANALYSIS, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, BUREAU OF INDUSTRY AND SECURITY, TULSI GABBARD, DEPARTMENT OF AGRICULTURE, PAUL S. ATKINS, JOHN PHELAN, DEPARTMENT OF HOMELAND SECURITY, SEAN DUFFY, U.S. DEPARTMENT OF DEFENSE, AMY A. KARPEL, ADVISORY COUNCIL ON HISTORIC PRESERVATION, U.S. DEPARTMENT OF THE NAVY, DOUG COLLINS, MARCO A. RUBIO, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, BUREAU OF INDIAN AFFAIRS, JAMIESON GREER, SCOTT BESSENT, WALTER CRUICKSHANK, FEDERAL TRADE COMMISSION, AMERICORPS, JOHN KNOX, DAVID PALUMBO, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, SMALL BUSINESS ADMINISTRATION, GARY A. ASHWORTH, OFFICE OF MANAGEMENT AND BUDGET, BROOKE L. ROLLINS. (mg) (Entered: 08/29/2025) |

JA 2950

# EXHIBIT A

Business & Practice
April 9, 2025, 4:16 PM EDT; Updated: April 10, 2025, 6:47 AM EDT

# Trump Targets Law Firm Behind $787.5 Million Fox News Suit (4)

- **Susman Godfrey lawyers are also suing MyPillow's Lindell for defamation**
- **Trump is nearing $700 million in pro bono deals with other law firms**

President Donald Trump on Wednesday targeted Susman Godfrey with an executive order as an aide said the administration was close to $1 billion in deals with law firms.

Susman represented Dominion Voting Systems Inc. in a blockbuster defamation lawsuit against Fox Corp. in which the media company agreed to pay a $787.5 million settlement. The firm is also pursuing a defamation case against Mike Lindell, a well-known Trump advocate and chief executive officer of MyPillow, on behalf of Dominion.

"We signed with many law firms, the ones that we thought were inappropriate, and they've all agreed to pay," Trump said in the Oval Office. "We have another five to go."

While Trump has publicized four agreements with law firms that have promised $340 million in pro bono services for causes the president supports, aide Stephen Miller said the administration was getting close to $600 to $700 million in deals now, including those that haven't been announced.

"The numbers are adding up," Miller said in the Oval Office. "We're going to be close to a billion soon."

4/13/25, 3:35 PM     Trump Targets Law Firm Behind $787.5 Million Fox News Settle...

Case 1:25-cv-01107-LLA    Document 103    Filed 04/14/25    Page 3 of 4

USCA Case #25-5241     Document #2162586     Filed: 03/06/2026     Page 71 of 660

Susman will fight "this unconstitutional order," the firm said in a statement on its website. "We believe in the rule of law, and we take seriously our duty to uphold it."

Other litigation firms so far have also been choosing to fight Trump's orders rather than settle with the president. Perkins Coie, WilmerHale, and Jenner & Block secured court orders temporarily blocking large parts of the orders against them. Susman was one of more than 500 law firms that signed on to an amicus brief filed April 4 that backed Perkins Coie.

Trump also leveled an executive order against Paul Weiss, which reached a deal to get the order withdrawn by pledging to commit $40 million in pro bono legal services to administration-aligned causes. Three other firms—Skadden, Milbank LLP, and Willkie Farr—pledged another $300 million in preemptive deals with the White House.

Trump also signed a memo that was directed at Covington & Burling, and that firm so far has neither filed suit or settled in response.

The orders, including the one against Susman, instruct agency heads to strip lawyers' security clearances, restrict firm personnel from accessing federal buildings, and slash federal contracts held by firm clients. Trump also called for an investigation of Susman's employment practice for possible violations of federal employment discrimination law, according to a White House fact sheet. The Equal Employment Opportunity Commission is already probing 20 top law firms for potential discrimination in their diversity, equity, and inclusion programs.

Susman is home to some of the country's top trial lawyers and is well-known for taking major contingency fee cases, meaning it only gets paid when it wins. Picking winners has made the firm's lawyers some of the highest paid in the country. Profits of nearly $7 million per partner in fiscal 2023 ranked the firm fourth among the 100 largest law operations by revenue, according to American Lawyer data.

The Dominion case stemmed from the network's reporting tying the company's voting machines to conspiracy theories about a stolen 2020 election. "This firm is very involved in the election misconduct," Miller said, without elaborating as to whether he was talking about the Dominion case.

In the Lindell case, a judge ordered the MyPillow founder to pay sanctions for claims he brought against election technology company Smartmatic International Holding. Lawyers for that company said last month Lindell has yet to pay the sanctions.

**(Adds law firm comment in sixth paragraph.)**

---

To contact the editor on this story: John Hughes in Washington at jhughes@bloombergindustry.com

To contact the editors responsible for this story: Chris Opfer at copfer@bloombergindustry.com; Alessandra Rafferty at

arafferty@bloombergindustry.com

© 2025 Bloomberg Industry Group, Inc.   All Rights Reserved

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SUSMAN GODFREY LLP,

     *Plaintiff,*

v.

EXECUTIVE OFFICE OF THE PRESIDENT,
*et al.,*

     *Defendants.*

Civil Case No. 1:25-cv-01107

**DECLARATION OF KALPANA SRINIVASAN IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Kalpana Srinivasan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

  1.  I am one of two Managing Partners and a partner at Susman Godfrey LLP ("Susman Godfrey" or the "Firm"). I submit this Declaration in support of Susman Godfrey's Motion for a Temporary Restraining Order. I am of the age of majority and I am competent to submit this declaration.

  2.  I have been an attorney at Susman Godfrey for nearly 20 years, following a clerkship with the Honorable Raymond Fisher on the United States Court of Appeals for the Ninth Circuit. I joined the Firm as an associate in 2005, became a partner in 2009, and was elected co-Managing Parter in 2020. During my time at Susman Godfrey, I have served on the Firm's executive committee and have chaired the Firm's practice development, employment, and training committees. I have served as lead trial counsel for numerous clients and in courtrooms across the country. I am a member in good standing of the California bar and have been admitted in many state and federal courts nationwide.

1

3.      Susman Godfrey is a firm that is run by its lawyers. Every partner and associate gets an equal vote on whether to hire a partnership-track associate at the Firm. The same is true for any case requiring an investment of Firm time or resources. Management decisions are made by the equity-only partnership. Those decisions are guided and led by the Firm's Managing Partners and its Executive Committee, which convenes weekly.

4.      As a Managing Partner, I am very familiar with the Firm's business and operations and have been involved in Susman Godfrey's efforts to prepare for, assess, and address the April 9, 2025 Executive Order targeting the Firm (the "Order"). As a Managing Partner, I co-chair the Firm's Executive Committee. I help assess potential business, policy, or conflicts concerns raised by the matters the Firm takes on.

5.      The facts set forth in this declaration are based on my personal knowledge of the Firm's history and operations or business records and information with which I am familiar.

**I.      Susman Godfrey is a firm of civil trial lawyers.**

6.      Susman Godfrey is a trial firm that represents both plaintiffs and defendants in a variety of complex, commercial litigation. Trials are our specialty, and we excel at trying all kinds of cases.

7.      **History.** The Firm was founded on a simple vision: Hire the best, reward success, and handle every case with a relentless focus on winning at trial. The Firm's origins date back to 1976, when Stephen Susman—then an attorney at a small Houston-based personal-injury and admiralty law firm—was approached by a small-business owner seeking representation against more powerful adversaries. The potential client owned a small business that sold cardboard boxes, and he alerted Susman to the existence of a potential price-fixing conspiracy by manufacturers of corrugated boxes. That conversation planted the seeds of the *Corrugated Container Antitrust Litigation* (S.D. Tex.), a class action brought by Susman on behalf of cardboard-box purchasers

2

**JA 2956**

against the manufacturers that made them. Susman and fellow attorney Gary McGowan founded the eight-lawyer firm, Susman & McGowan, in 1980 to pursue the *Corrugated* case, from which the firm recovered $550 million on behalf of plaintiffs through settlements and obtaining the then-largest verdict in antitrust history after a three-month jury trial. Lee Godfrey joined the Firm in 1983 and the Firm became Susman Godfrey & McGowan. After Gary McGowan left the Firm in 1989, it became Susman Godfrey LLP, which it has been ever since.

8.      What began as a one-office firm with a small handful of lawyers has grown to a litigation powerhouse made up of 235 of the country's best trial attorneys spread across four offices in Houston, Los Angeles, New York, and Seattle. Over its 45-year history, Susman Godfrey and its lawyers have represented clients in most if not every state, in federal and state courts across the nation, before myriad federal agencies and regulatory bodies, and in tribunals throughout the world (including the Supreme Court of the United States), and they have helped to establish major precedent in state and federal law. Susman Godfrey is widely recognized as one of the leading litigation firms for bet-the-company cases by companies, and since our founding, Susman Godfrey has proudly represented a wide range of industry leaders throughout the world.

9.      **Recognitions.** Susman Godfrey is one of the top-performing firms in the country. The Firm was named as an "Am Law 100" firm on *The American Lawyer 100* list in 2024. Out of those 100 top revenue-generating firms, Susman Godfrey is one of only a few firms that is a litigation law firm and that does not practice transactional law. The Firm's success is also notable because we pioneered success-based fee agreements, for both plaintiffs and defendants, that reward the results we achieve and not the hours we bill. In other words, the Firm's financial success directly corresponds to the success we have achieved for our clients in court.

10.    The Firm and its lawyers are regularly recognized for excellence in the legal community by *Chambers USA*, *Law360*, *Lawdragon*, *National Law Journal*, *Super Lawyers*, *American Lawyer*, *Benchmark Litigation*, and other respected publications and organizations, including national and local bar associations. As just a few examples:

- For the past 14 consecutive years, Susman Godfrey has been named as the #1 Litigation Boutique in the nation by the Vault survey—a distinction the Firm has held since the survey's inception.

- For the past 10 consecutive years, Susman Godfrey has had the largest number of lawyers named to *Lawdragon*'s annual list of 500 Leading Lawyers in the nation.

- In 2024, Susman Godfrey was named Class Action Firm of the Year and Media & Entertainment Firm of the Year by *Law360*, was a finalist for the *National Law Journal*'s Plaintiffs Firm of the Year and Antitrust Firm of the Year awards, was a finalist for *Texas Lawyer*'s Firm of the Year and Litigation Department of the Year in General Commercial Litigation awards, and had 32 of its lawyers recognized as *Super Lawyers* in their respective states.

- In 2023, the Firm received the award for Specialty/Boutique Litigation Department of the Year from *The American Lawyer*, and was named the General Commercial Litigation Firm of the Year by *Benchmark Litigation*.

- In 2022, the Firm was named Trial Firm of the Year by *Benchmark Litigation*.

11.    **Clients and notable representations.** The Firm represents a wide range of clients across a variety of industries, from small- and medium-sized businesses, families, individuals, and charitable and public service-oriented organizations to Fortune 500 companies. Notably, the Firm

4

has represented individuals and small companies in disputes against some of the largest and most powerful companies in the world. To offer just a few examples:

- In 2024, Susman Godfrey won a $266 million verdict on behalf of the City of Baltimore against McKesson and AmerisourceBergen in the city's nearly seven-year lawsuit against the opioid distributors and manufacturers that fueled the worst opioid epidemic in the nation.

- Susman Godfrey also led class-action efforts on behalf of residents of Flint, Michigan, who pursued claims for personal injuries and property damage arising from widespread lead contamination in the city's water supply, securing court-approved settlements valued at $626 million on behalf of the class.

- In 2024, Susman Godfrey achieved a groundbreaking $418 million joint settlement on behalf of a nationwide class of home sellers with the National Association of Realtors (NAR), resolving antitrust claims that NAR and several of the nation's largest residential real estate brokerage companies implemented anticompetitive rules requiring real estate agents for home sellers to offer to pay buyer broker fees in addition to their own brokers' commissions.

12.    **Our colleagues.** Susman Godfrey has approximately 382 lawyers and staff members. Of those, 235 are attorneys—including equity partners, of counsel, associates, and staff attorneys—and the remainder are support staff, including paralegals, legal assistants, and information technology specialists.

13.    Our employees create community, enrich civic engagement, and serve their country. Susman Godfrey attorneys have served in the Army, Navy, Air Force, and Marines, both in active combat and as members of the JAG corps, and some continue to serve as active or ready

5

reserves; the Army recognized one current attorney's heroism with the award of a Bronze Star. The Firm's lawyers are leaders and members of national, state, and local bar associations around the country. Susman Godfrey lawyers are members of the American Bar Association, the Federal Bar Council, state bar associations in Texas, New York, California, and Washington, and local bar associations in such cities and counties as Los Angeles County, Harris County, and New York City—among other esteemed professional organizations.

14.     Susman Godfrey's lawyers come from all backgrounds and hold diverse political views. Attorneys have joined the Firm after government service under both Democratic and Republican administrations. The Firm requires associates it hires to have completed at least one clerkship for a federal Article III judge; many clerked for two judges and some even three. Susman Godfrey lawyers have joined the Firm after clerking for judges nominated by both Republican and Democratic presidents. Current Susman Godfrey attorneys have clerked for federal appeals court judges in each of the 13 federal circuit courts of appeals, and 10 current and recent Susman Godfrey attorneys have clerked on the United States Supreme Court, for justices appointed by presidents of both parties: Justice Sandra Day O'Connor, Justice Anthony Kennedy, Justice Ruth Bader Ginsburg, Justice Steven Breyer, Justice Elena Kagan, Justice Samuel Alito, and Chief Justice John Roberts.

15.     **Alumni.** Susman Godfrey alumni have served or are now serving as federal and state judges, judicial clerks, high-ranking government officials, federal prosecutors, and adjunct professors of law. Republican governors have appointed four former Susman Godfrey lawyers to state court judgeships. Two former Susman Godfrey lawyers currently serve as federal judges: one nominated by President Trump and one by President Biden.

6

16.    **Pro bono.** Susman Godfrey is dedicated to its pro bono practice, even if it means taking on unpopular clients and controversial causes. The Firm is committed to representing those who cannot afford to pay for legal services. We encourage our attorneys to participate in pro bono opportunities and make Firm resources available to ensure our pro bono efforts are meaningful and effective. Since its founding, the Firm has provided thousands of hours of pro bono service by attorneys, paralegals, and other professionals to innumerable clients, including indigent criminal defendants and community-based organizations of all sizes, in matters championing human, civil, electoral, housing, immigration, and reproductive rights. Since 2020, Susman Godfrey lawyers, paralegals, and other professionals have spent over 22,000 hours, valued at nearly $15 million, on pro bono service. Susman Godfrey has received numerous awards from a wide range of organizations for its pro bono representation, including recognition on the *National Law Journal*'s "Pro Bono Hot List." The Firm's decision whether to take on any particular pro bono representation is driven by the varying interests and passions of its lawyers—not by any ideological or political agenda established by the Firm.

17.    Susman Godfrey fosters a work environment in which all lawyers and business professionals are judged on their merit, and has been recognized for its culture of excellence and transparency. For example, in the 2025 *Vault* Rankings, Susman Godfrey was named #1 Best Midsize Law Firm for Career Outlook, Selectivity, and Transparency and #3 Best Midsize Law Firm for Satisfaction and Quality of Work.

18.    I am proud to have spent nearly 20 years of my career at the Firm.

## II.    Susman Godfrey attorneys frequently interact with the federal government on behalf of the Firm's clients.

19.    As a commercial litigation firm that represents a wide array of clients across numerous industries, Susman Godfrey lawyers necessarily interact with the federal government on

7

behalf of their clients regularly in innumerable ways. Those interactions are critical to their ability to practice their profession, develop their careers, and serve their clients. Susman Godfrey is constrained by Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege, and thus cannot disclose the specifics of client engagements without authorization. No client has authorized Susman Godfrey to disclose its engagement of the Firm (to the extent that engagement is not a matter of public record) in connection with this litigation, and this section therefore contains information about the Firm's practice without revealing confidential details or disclosing client confidences.

20.    **Active federal cases.** Our attorneys are all litigators who regularly appear in federal courts across the country, as well as in federal agencies' in-house administrative proceedings, on behalf of their clients. The Firm's lawyers are in federal court and interacting with federal officials every week and nearly every day. Indeed, a team of Susman Godfrey lawyers was in federal court in Northern California at the time the April 9, 2025 Order was issued. As of April 10, 2025, the Firm has scores of active matters before the federal courts and federal agencies, which represent more than a third of all active matters at the Firm. Susman Godfrey attorneys have already made dozens of in-person appearances in federal court in 2025, and the Firm's attorneys have several in-person appearances in federal court and before federal agencies during the week of April 14, 2025, including an in-person hearing before the Executive Office of Immigration Review. Susman Godfrey attorneys currently have at least seven trials scheduled to go forward in federal court in the next six months. The Firm has many more federal court actions presently awaiting trial dates for 2025.

21.    **Practice areas interacting with the federal government.** The Firm has no formal practice groups and engages in all forms of commercial litigation, but many of our matters require

frequent interactions with the federal government. While representing their clients, Susman Godfrey lawyers frequently meet with officials from many different federal agencies. Susman Godfrey partners have numerous upcoming meetings scheduled with federal government personnel in the next 90 days, including with officials from the Main Branch and Antitrust Division of the Department of Justice, multiple United States Attorneys' Offices, United States Customs and Border Protection, and the Department of Health and Human Services. At any given time, and consistent with the nature of the Firm's matters as of the date of this declaration, I estimate that no fewer than one third of our active matters require Susman Godfrey lawyers to appear before federal courts or interact with federal agencies in some capacity.

22.     Our attorneys also practice in a variety of areas that require extensive interaction with the federal government in order to represent our clients:

23.     *Qui tam and False Claims Act.* Susman Godfrey dedicates itself to a significant number of False Claims Act cases in which the firm represents whistleblowers ("relators") in cases brought under the federal False Claims Act and comparable state laws. These laws permit private citizens to file suits on behalf of the government (called "*qui tam*" suits) against those who have defrauded the government. *Qui tam* cases provide a significant benefit to the United States government. In 2022 and 2023, the federal government obtained almost $5 billion in False Claims Act recoveries on behalf of United States taxpayers.

24.     These matters frequently require regular interaction with federal government employees on behalf of the relator-client and often involve in-person contact with the government in federal buildings for important meetings, interviews, and negotiations. Most False Claims Act *qui tam* cases begin with an identification of a responsible attorney in one of the United States Attorneys' Offices. Our practice is to make an initial disclosure to the United States Government

9

disclosing all material evidence and information in the relator's possession relating to the claim, since this initial disclosure is required by statute in order for the relator to claim "original source" status. This process necessitates engagement with a federal employee—typically an Assistant United States Attorney. Susman Godfrey attorneys who are currently representing clients in pending *qui tam* cases have made contact with dozens of United States Attorneys' Offices across the country as part of the initial disclosure process. Susman Godfrey attorneys and the Assistant United States Attorneys typically engage in further communications via emails and/or phone calls after the initial disclosure.

25.     Following the initial disclosure, a *qui tam* case is filed under seal in United States District Court. It is often standard, post-filing, for the Assistant United States Attorney to set up an interview between the government and the relator; Susman Godfrey attorneys participate as the relator's counsel. For smaller cases, the post-filing interviews may be held remotely by phone or videoconference. For larger cases, relator interviews are more likely to be held in-person in federal buildings. The interviews will always include at least one Assistant United States Attorney, and, for larger cases, may include attorneys or investigators from other responsible federal agencies that have an interest in the false claim, including, for instance, individuals from a responsible agency's Office of Inspector General. Susman Godfrey currently has at least one such interview scheduled, and anticipates several more will be scheduled in the near future.

26.     After the initial relator interview, the case proceeds to the investigatory phase, during which time the matter remains under seal. During this stage, there are typically three types of routine engagements with government employees:

a.     *First*, the Assistant United States Attorney may make contact with Susman Godfrey because the Assistant United States Attorney wishes to enlist Susman Godfrey's

assistance in the investigation. In previous matters, Susman Godfrey attorneys have entered into common-interest agreements with the Department of Justice that allow Susman Godfrey to participate in reviewing documents produced by the defendant(s) during the investigatory stage. Pursuant to that common-interest agreement, Susman Godfrey may help Assistant United States Attorneys with reviewing documents and preparing memoranda to assist the Department of Justice in the investigation. Many of these engagements occur by telephone or videoconference.

b. *Second*, government employees may seek direct assistance from the client-relator him- or herself to assist with the investigation. This may include asking for assistance in deciphering an internal document or record, or providing information or other details about the defendant's internal operations or knowledge. These engagements may occur by telephone or videoconference but have also been held in person.

c. *Third*, the government may wish to engage with Susman Godfrey and the client-relator to facilitate settlement with the defendant. The settlement process frequently involves in-person meetings between the government and the defendant involving detailed presentations of evidence. Although the relator-client is not part of those meetings, Susman Godfrey attorneys may be involved in assisting the government in its presentation and helping the government prepare responses to the defendant's settlement positions.

27. If the government decides to intervene in a *qui tam* case, as it has in current cases handled by the Firm, Susman Godfrey's interactions with the government are frequent and involved, similar to a co-counsel relationship. Susman Godfrey often holds at least weekly phone calls with the government, and may be in contact with government lawyers daily during discovery, for purposes of motions practice, and during trial if the case does not settle. Susman Godfrey and the government typically share extensive amounts of joint work-product necessary for the effective

11

prosecution of the case. Following a settlement or judgment, the government also engages with Susman Godfrey to reach resolution on the relator-client's share of the recovery. The process for determining what share the relator receives requires additional engagement between Susman Godfrey lawyers and the government, including sharing of information, memoranda, and presentations.

28.    *Intellectual property.* Susman Godfrey also handles a large volume of patent-infringement litigation, which often necessitates representing clients before federal agencies with responsibilities over patent validity and patent infringement disputes. For example, Susman Godfrey represents patent owners in the United States International Trade Commission in unfair import proceedings, which involve hearings before administrative law judges and frequent interaction between Susman Godfrey attorneys and investigative staff attorneys for the United States International Trade Commission's Office of Unfair Import Investigations, as well as semi-regular interactions with attorneys from the United States International Trade Commission's Office of the General Counsel. Susman Godfrey attorneys also at times represent patent owners and patent challengers before the U.S. Patent and Trademark Office in administrative post-grant proceedings, including before the Patent Trial and Appeal Board. Susman Godfrey attorneys also interact with attorneys working at the Exclusion Order Enforcement Branch of U.S. Customs and Border Protection to assist them in implementing and enforcing the exclusion orders issued by the United States International Trade Commission.

29.    *Environmental.* Susman Godfrey also represents both plaintiffs and defendants in litigation concerning the discharge of hazardous substances into the environment. These actions have included toxic tort actions for personal injuries and property damage, natural resource damages actions, and Superfund remediation. These matters can involve interaction with United

States Attorneys' Offices, the Environmental Protection Agency, and state and local governments that partner with federal agencies in implementing federal environmental programs and statutory mandates.

30.    *Pro bono.* In carrying out pro bono work, Susman Godfrey lawyers are frequently before federal agencies and regularly interact with federal government officials. Lawyers at Susman Godfrey are often tapped by trial and appellate courts across the country to assist on precedent-setting pro bono matters. These matters include human rights and anti-discrimination issues, constitutional challenges, and death penalty appeals; much of this litigation is in federal court. For example, Susman Godfrey successfully challenged in federal court Harris County, Texas's practice of holding in jail tens of thousands of people who were arrested for misdemeanors but were financially unable to post bail. The United States Court of Appeals for the Fifth Circuit upheld the ruling on appeal. *See ODonnell v. Harris County*, 892 F.3d 147 (5th Cir. 2018).

31.    **Federal agencies.** In representative matters for clients, the Firm has interacted with, and anticipates future interactions with, at least the following federal departments, agencies, and officials:

      a.    Attorney General of the United States

      b.    Department of Commerce

      c.    Department of Defense

      d.    Department of Health and Human Services

      e.    Department of Homeland Security

      f.    Department of Justice

      g.    Department of Treasury

      h.    Executive Office of Immigration Review

13

      i.       Federal Trade Commission

      j.       International Trade Commission

      k.      Securities and Exchange Commission

      l.       United States Attorneys' Offices

      m.    United States Customs and Border Protection

      n.     United States Citizenship and Immigration Services

      o.     United States Patent and Trademark Office

32.     **Government contractor clients.** Among Susman Godfrey's clients, including several of the Firm's biggest clients, are nearly twenty persons and entities that contract with or otherwise do business with the federal government, or have affiliates who are government contractors and subcontractors.

33.     In short, the Firm's civil litigation practice—whether at the trial court or appellate level—frequently requires us to interact with the federal government, regularly and repeatedly, on behalf of our clients. This means that much of our work on behalf of our clients requires access to federal government buildings, which house both courthouses and agencies. This is true of every matter pending in federal court or a federal agency at the Firm. Certain practice areas, such as False Claims Act cases, are also heavily reliant on interacting with the federal government. And many of the Firm's clients do, or have done, business with the federal government.

### III.   Susman Godfrey has recently pursued litigation against the federal government, in federal court, and related to federal elections.

34.     Susman Godfrey is no stranger to suing the United States Government, in cases against both Democratic and Republican presidential administrations, and in cases that span the ideological spectrum. For example, Susman Godfrey attorneys currently are litigating several Tucker Act cases in the Court of Federal Claims, involving frequent interactions with attorneys at

14

the Department of Justice. Those cases include a Fifth Amendment takings claims against the United States Navy on behalf of dozens of property owners whose property values and quality of life have decreased on account of a vast expansion of the Navy's flight-training program; a case against a federal agency for inverse condemnation on behalf of property owners; and a suit against a federal agency for user fees that it collected in violation of the agency's statutory and regulatory mandates.

35.    Susman Godfrey also has litigated in defense of the United States' democratic electoral system generally and for clients who span the political spectrum. After the November 2020 election, Susman Godfrey represented various State officers in their official capacities defending the results of the 2020 election against unfounded conspiracy theories that the election had been rigged. Among other officials, Susman Godfrey represented the Governor of Wisconsin and the Secretary of State of Arizona. *Feehan v. Wis. Elections Comm'n*, No. 2:20-cv-01771-PP (E.D. Wis. filed Dec. 1, 2020) (counsel for Defendant Tony Evers in his official capacity as Wisconsin Governor); *Bowyer v. Ducey*, No. 2:20-cv-02321-DJH (D. Ariz. filed Dec. 2, 2020) (counsel for Defendant Katie Hobbs in her official capacity as the Arizona Secretary of State). Federal courts rejected the arguments put forth by the Trump campaign and related individuals. *Feehan*, ECF No. 83 (granting defendants' motions to dismiss) *vacated on other grounds by Feehan v. Wis. Elections Commission*, No. 20-3448 (7th Cir. Feb. 1, 2021); *Bowyer*, ECF No. 84 (granting defendants' motions to dismiss). In Arizona, Susman Godfrey presented at a hearing on behalf of all state-official Defendants (including the Democratic Secretary of State and Republican Governor) that had been sued by voters and GOP chairs for various Arizona counties. *Bowyer*, ECF No. 83 (transcript).

15

36.    In recent years, Susman Godfrey represented Dominion Voting Systems in defamation actions against Fox News and Fox News Corporation for false claims relating to the 2020 election. *US Dominion Inc. v. Fox News Network LLC*, No. N21C-03-257 (Del. Super. Ct.); *US Dominion Inc. v. Fox Corp.*, No. N21-C11-082 (Del. Super. Ct.). In legal filings in the months leading up to trial, the team exposed the truth of what went on at Fox in the weeks and months after the 2020 election, when Fox was publicly broadcasting falsehoods about Dominion while privately disparaging those same statements and the individuals promoting them. At summary judgment, the trial court ruled that not a single one of Fox News' disputed statements about Dominion was true, vindicating the claims advanced by Susman Godfrey and paving the way for a trial focused on whether Fox News acted with actual malice. *US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1039 (Del. Super. Ct. 2023) ("The evidence developed in this civil proceeding demonstrates that is [sic] **CRYSTAL** clear that none of the Statements relating to Dominion about the 2020 election are true." (emphasis in original)). Only shortly before trial did the case settle. This case received widespread media attention and resulted in a historic $787.5 million settlement—believed to be the largest defamation settlement in United States history.

37.    At the end of April 2025, Susman Godfrey is trying a case on behalf of Dominion Voting Systems against Newsmax Media for false and defamatory statements that the network broadcast accusing Dominion of voter fraud and rigging the 2020 election to flip votes from President Trump to then-candidate Joe Biden. Siding with arguments made by Susman Godfrey, the court denied the defendant's motion for summary judgment and partially granted Susman Godfrey's cross-motion for summary judgment. The court ruled that Newsmax had made false and defamatory statements. *US Dominion, Inc. v. Newsmax Media, Inc.*, No. N21C-08-063, 2025 WL

16

1092289 (Del. Super. Ct. Apr. 9, 2025). Notably, the Court made this ruling on April 9, 2025, just

hours before the Administration announced the Executive Order targeting the Firm.

      38.      Susman Godfrey continues to serve as counsel for Dominion in related defamation

lawsuits against Rudy Giuliani, Sidney Powell, Mike Lindell and MyPillow, Patrick Byrne, and

One America News Network (OAN).

**IV.    The executive orders targeting other law firms have already inflicted significant
harm on those firms and on the industry, including on Susman Godfrey.**

      39.      On February 25, 2025, President Trump signed a memorandum directed to the

heads of various agencies in the intelligence community, titled "Suspension of Security Clearances

and Evaluation of Government Contracts," that targets the law firm Covington & Burling LLP (the

"Covington Memo").[1] The Covington Memo singles out Peter Koski, a partner of Covington &

Burling "who assisted former Special Counsel Jack Smith." The Covington Memo directs the

agency heads to "suspend any active security clearances held by" Mr. Koski and "all members,

partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack

Smith during his time as Special Counsel" and "to terminate any engagement of Covington &

Burling LLP by any agency."

      40.      On March 6, 2025, President Trump signed Executive Order 14237, titled

"Addressing Risks from Perkins Coie LLP" (the "Perkins Order").[2] The Perkins Order describes

what it calls the "dishonest and dangerous activity of the law firm Perkins Coie LLP," including

---

[1] *Suspension of Security Clearances and Evaluation of Government Contracts*, The White House
(Feb. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/suspension-of-
security-clearances-and-evaluation-of-government-contracts/.

[2] *Addressing Risks from Perkins Coie LLP*, The White House (Mar. 6, 2025),
https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-
llp/.

that firm's "representing failed Presidential candidate Hillary Clinton," which the Perkins Order

asserts was "part of a pattern" of "egregious activity." Perkins Order § 1. The Perkins Order also

asserts that "Perkins Coie has worked with activist donors including George Soros to judicially

overturn popular, necessary, and democratically enacted election laws, including those requiring

voter identification." *Id.* The Perkins Order directs federal agencies to "suspend . . . security

clearances held by individuals at Perkins Coie" until further notice; require government contractors

to disclose any business they do with Perkins Coie; "terminate any contract" with Perkins Coie "to

the maximum extent permitted by applicable law"; issue guidance "limiting [the] official access"

of Perkins Coie employees to federal government buildings "when such access would threaten the

national security of or otherwise be inconsistent with the interests of the United States"; issue

guidance "limiting Government employees acting in their official capacity from engaging with

Perkins Coie employees to ensure consistency with the national security and other interests of the

United States"; and "refrain from hiring employees of Perkins Coie, absent a waiver." *Id.* §§ 2-5.

The Perkins Order also directs the Chair of the Equal Employment Opportunity Commission to

investigate "the practices of representative large, influential, or industry leading law firms" for

what that order describes as "discrimination under 'diversity, equity, and inclusion' policies." *Id.*

§§ 1, 4.

41.    On March 12, 2025, Judge Beryl A. Howell of the U.S. District Court for the

District of Columbia issued a temporary restraining order enjoining enforcement of several aspects

of the Perkins Order. *See Perkins Coie LLP v. Department of Justice*, No. 25-cv-716 (D.D.C. Mar.

12, 2025), ECF No. 21.

42.    On March 14, 2025, President Trump signed Executive Order 14237, titled "Addressing Risks from Paul Weiss" (the "Paul Weiss Order")[3]—an order that the President subsequently rescinded. That order directed government officials to impose against Paul Weiss and its employees sanctions nearly identical to those imposed under the already-enjoined Perkins Order. *Id.* §§ 2-5. The Paul Weiss Order attacked "[g]lobal law firms," asserting that they are "engaged in activities that make our communities less safe, increase burdens on local businesses, limit constitutional freedoms, and degrade the quality of American elections." Paul Weiss Order § 1. The Paul Weiss Order asserted that the supposedly improper litigation brought by "[g]lobal law firms" includes not only work done on behalf of paying clients, but also work done "pro bono" or "for the public good." *Id.* And the Paul Weiss Order targeted specific Paul Weiss partners, including a partner and "former leading prosecutor in the office of Special Counsel Robert Mueller" who "brought a pro bono suit" "on behalf of the District of Columbia Attorney General" "against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021." *Id.*

43.    On March 20, 2025, on Truth Social, the President announced that, as part of an "agreement" with Paul Weiss, he would withdraw the Paul Weiss Order.[4] The President stated that "Paul, Weiss will dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives."[5]  He also stated that he was "agreeing to this action in light of a meeting with Paul, Weiss Chairman, Brad Karp, during which

---

[3] *Addressing Risks from Paul Weiss*, The White House (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/.

[4] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 20, 2025, 3:10 PM), https://truthsocial.com/@realDonaldTrump/posts/114197044617921519.

[5] *Id.*

Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz."[6] Mr. Karp, Paul, Weiss's Chairman, stated:  "We are gratified that the President has agreed to withdraw the Executive Order concerning Paul, Weiss. We look forward to an engaged and constructive relationship with the President and his Administration."[7]

44.    In a Presidential Memorandum dated March 22, 2025, President Trump directed the Attorney General to assess whether attorneys and law firms currently litigating against the federal government have engaged in "misconduct" and to "seek sanctions" or recommend other disciplinary actions—including "reassess[ing]" security clearances held by the firms' lawyers and "terminat[ing] . . . any federal contract" under which they provide services—whenever the Attorney General concludes that their conduct warrants such measures.[8] President Trump also instructed the Attorney General to review attorney conduct in litigation against the federal government over the past eight years and to recommend the same range of disciplinary actions "[i]f the Attorney General identifies misconduct that may warrant additional action, such as filing frivolous litigation or engaging in fraudulent practices."[9]

45.    On March 25, 2025, President Trump issued an executive order titled "Addressing Risks from Jenner & Block" (the "Jenner Order").[10] The Jenner Order directs government officials

---

[6] *Id.*

[7] *Id.*

[8] *Preventing Abuses of the Legal System and the Federal Court*, The White House (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/.

[9] *Id.*

[10] *Addressing Risks from Jenner & Block*, The White House (Mar. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/.

**JA 2974**

to impose nearly identical sanctions against Jenner and its employees as sanctions set forth in the enjoined Perkins Order and the now-withdrawn Paul Weiss Order. The Jenner Order continues the Administration's practice of criticizing "so-called 'Big Law' firms," alleging that such firms "regularly conduct . . . harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients." Jenner Order § 1. The Jenner Order specifically criticizes Jenner for purportedly "abus[ing] its pro bono practice" by "engag[ing] in obvious partisan representations to achieve political ends, support[ing] attacks against women and children based on a refusal to accept the biological reality of sex, and back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." *Id.* In addition, the Jenner Order singles out the firm's re-hiring of Andrew Weissmann after he served as part of Special Counsel Robert Mueller's team to investigate Russian interference in the 2016 election.

46.    On March 27, 2025, President Trump issued an executive order titled "Addressing Risks from WilmerHale" (the "WilmerHale Order").[11] President Trump again described this order as part of his campaign against "so-called 'Big Law' firms," and he again imposed sanctions similar to those set forth in prior orders against other law firms. WilmerHale Order § 1. He stated that he singled out WilmerHale on the ground that the firm "engages in obvious partisan representations to achieve political ends," including by allegedly "support[ing] efforts to discriminate on the basis of race, back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and further[ing] the degradation of the quality of American elections, including by supporting efforts designed to

---

[11] *Addressing Risks from WilmerHale*, The White House (Mar. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-wilmerhale/.

21

enable noncitizens to vote." *Id.* President Trump also claimed that WilmerHale demonstrated that it was "bent on employing lawyers who weaponize the prosecutorial power" by hiring Robert Mueller and two of his colleagues from the Mueller investigation, Aaron Zebley and James Quarles. *Id.*

47.    On March 28, 2025, Jenner & Block and WilmerHale separately sued to enjoin their respective executive orders. *Jenner & Block LLP v. Department of Justice*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 1; *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 1.

48.    The same day that those suits were filed, Judge John D. Bates and Judge Richard J. Leon of the United States District Court for the District of Columbia issued temporary restraining orders against the Jenner and WilmerHale Orders, respectively. Those orders rested on the conclusion that each law firm had established a likelihood of success on the merits and made a showing of irreparable harm. *Jenner & Block LLP v. Department of Justice*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 9; *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10.

49.    From publicly available information, I understand that the law firms subject to the executive orders described above began to experience irreparable harm as a result of those executive orders. In support of Perkins Coie's motion for a temporary restraining order, a Perkins Coie attorney stated that the government had informed firm attorneys that they could not attend upcoming scheduled meetings and that numerous clients had terminated engagements with the firm. *Perkins Coie LLP v. Department of Justice*, No. 25-cv-716 (D.D.C. Mar. 11, 2025), ECF No. 2-2 ¶¶ 25–26; *id.*, ECF No. 39-3 ¶¶ 44–45 (D.D.C. Apr. 2, 2025). According to a declaration filed by Jenner & Block, the government informed a firm client that Jenner & Block attorneys could not

22

attend an upcoming meeting with the Department of Justice, and several clients expressed concern

about Jenner & Block's ongoing representation of them. *Jenner & Block LLP v. Department of

Justice*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 2-16 ¶¶ 63–64, 68; *id.*, ECF No. 19-30

¶¶ 70–72 (D.D.C. Apr. 8, 2025). At least one of Paul Weiss's clients cited the Paul Weiss Order

as the reason for terminating his representation by Paul Weiss attorneys. *See* Mem. in Supp. of

Mot. to Withdraw as Counsel for Def. Steven Schwartz at 2, *United States v. Coburn*, No. 19-cr-

120 (D.N.J. Mar. 19, 2025), ECF No. 1012.[12] And within 24 hours of the issuance of the

WilmerHale Order, at least one of WilmerHale's government-contractor clients was contacted by

a federal agency requesting that the client disclose whether it had any business relationship with

WilmerHale, and two meetings between WilmerHale attorneys and a federal agency were abruptly

postponed. *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*, No.

25-cv-917 (D.D.C. Apr. 8, 2025), ECF No. 16-3 ¶¶ 4–5. I expect Susman Godfrey to suffer similar

irreparable harm, absent emergency relief.

50.    In addition to the existing executive orders, President Trump has threatened to

target additional law firms. When he signed the Perkins Order, President Trump referenced how

his team "was looking at about 15 different law firms" as potential targets for similar sanctions.[13]

A few days after he issued the Perkins Order, President Trump said in an interview that "[w]e have

---

[12] *See also* Richard Vanderford, *Law Firm in Trump's Crosshairs Fired by White-Collar Client*, Wall St. J. (Mar. 19, 2025), https://www.wsj.com/articles/law-firm-in-trumps-crosshairs-fired-by-white-collar-client-082bf6da?st=hRnQCK&reflink=desktopwebshare_permalink.

[13] Ian Schwartz, *Trump Signs Executive Order to Revoke Security Clearances from Perkins Coie: "This Is an Absolute Honor,"* Real Clear Politics (Mar. 6, 2025), https://www.realclearpolitics.com/video/2025/03/06/trump_signs_executive_order_to_revoke_security_clearances_from_perkins_coie_this_is_an_absolute_honor.html.

a lot of law firms that we're going to be going after because they were very dishonest people."[14]
The same day that President Trump issued the March 14 Paul Weiss Order, he delivered a speech
at the Department of Justice denouncing "crooked law firms," "violent, vicious lawyers," and
"fake lawyers."[15] And upon signing the Order targeting Susman Godfrey, the President told the
gathered press that he had five more law firms in his sights.[16]

    51.    Those closely associated with President Trump have made similar comments
concerning the intent behind these executive orders targeting law firms. Steve Bannon has stated
that President Trump is "going after" law firms "to cut them off."[17] According to Mr. Bannon,
"what we are trying to do is put you [law firms] out of business and bankrupt you."[18]

    52.    These threats by the President and his allies have been effective, as law firms have
chosen to make costly concessions to the White House rather than face the existential threat that
an executive order would pose. First, on March 28, 2025, the President announced another
"agreement" similar to the one reached with Paul Weiss—this time with the law firm Skadden,

---

[14] Erin Mulvaney & C. Ryan Barber, *Fear of Trump Has Elite Law Firms in Retreat*, Wall St. J. (Mar. 9, 2025), https://www.wsj.com/us-news/law/fear-of-trump-has-elite-law-firms-in-retreat-6f251dec.

[15] *See Donald Trump Addresses the Staff at the Department of Justice*, Roll Call (Mar. 14, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-department-of-justice-march-14-2025/.

[16] *President Trump Discusses Tariff Reversal and Signs Executive Order in the Oval Office – 4/9/25*, CNBC Television, at 12:14-12:36, https://www.youtube.com/watch?v=mYm7kmOC37s&t=646s.

[17] *Steve Bannon: "There's Major Law Firms in Washington, D.C." and "What We Are Trying to Do Is Put You Out of Business and Bankrupt You,"* Media Matters (Mar. 13, 2025), https://www.mediamatters.org/steve-bannon/steve-bannon-theres-major-law-firms-washington-dc-and-what-we-are-trying-do-put-you.

[18] *Id.*

Arps, Slate, Meagher & Flom LLP ("Skadden"). That new "agreement" was reached without the President having to issue any executive order against the firm in the first place; the mere threat of such an order was enough. It was publicly reported that, before negotiating this "agreement," Skadden had learned that the President intended to issue an executive order targeting the firm over its pro bono work and diversity, equity, and inclusion initiatives.[19] In a post on Truth Social, the President announced that Skadden had agreed to "provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration and beyond, to causes that the President and Skadden both support."[20] The President asserted that he would "never stop fighting to deliver on his promises of eradicating partisan Lawfare in America, and restoring Liberty & Justice for ALL."[21]

    53.    On April 1, 2025, the President announced a substantially identical "agreement" to the ones reached with Paul Weiss and Skadden—this time with the law firm Willkie Farr & Gallagher LLP ("Willkie"). Like the Skadden "agreement," this "agreement" was reached without the President having issued an Executive Order. It was publicly reported that, before negotiating this "agreement," Willkie learned that the President intended to issue an executive order against the firm.[22] In return for escaping the threat of an order, Willkie committed "at least $100 Million

---

[19] Erik Tucker, *Major Law Firm Reaches Deal With Trump to Avoid White House Order Even as Two Other Firms Sue*, Associated Press (Mar. 28, 2025), https://apnews.com/article/trump-law-firm-mueller-fc64fcda098b52756294c3d6a3b3d998.

[20] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 28, 2025, 10:57 AM), https://truthsocial.com/@realDonaldTrump/posts/114241348699704594.

[21] *Id.*

[22] Erik Tucker, *Major International Law Firm Reaches Deal With White House, Becoming The Latest To Do So*, Associated Press (Apr. 1, 2025), https://apnews.com/article/trump-law-firms-retribution-emhoff-89db97e7f76dd4cbf74d571a648baedb.

Dollars in pro bono Legal Services, during the Trump Administration, and beyond, to causes that President Trump and Willkie both support."[23]

54.    On April 2, 2025, yet another law firm, Milbank LLP, preemptively reached an "agreement" with the President prior to receiving an executive order targeting the firm. Public reporting based on an internal firm memorandum stated that, before negotiating this "agreement," President Trump's administration contacted Milbank with concerns about Milbank's approach to pro bono and diversity initiatives and suggested that Milbank reach an agreement similar to Skadden's.[24] The Milbank "agreement," like the others, committed to provide $100 million in pro bono services to causes favored by the President.[25]

55.    On April 11, 2025, the President announced that he had reached deals with five more law firms. Those deals are similar to the ones that came before, except that several of the latest deals promise not only to provide certain pro bono work but also "other free Legal services." Four of those firms—Kirkland & Ellis LLP, Allen Overy Shearman Sterling US LLP, Simpson Thacher & Bartlett LLP, and Latham & Watkins LLP—jointly agreed to provide an "aggregate total of at least $500 Million Dollars in pro bono and other free Legal services . . . to causes that President Trump and the Law Firms both support and agree to work on."[26] The firms also affirmed

---

[23] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 1, 2025, 1:47 PM), https://truthsocial.com/@realDonaldTrump/posts/114264667777137553.

[24] ALM Staff, *Milbank 'Comfortable With All These Provisions,' Chairman Says in Message to Firm*, The American Lawyer (Apr. 2, 2025), https://www.law.com/americanlawyer/2025/04/02/milbank-comfortable-with-all-these-provisions-chairman-says-in-message-to-firm.

[25] Matthew Goldstein, *Another Big Law Firm Reaches Agreement With Trump*, N.Y. Times (Apr. 2, 2025), https://www.nytimes.com/2025/04/02/business/trump-law-firms-milbank-deal.html.

[26] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 11, 2025, 9:21 AM), https://truthsocial.com/@realDonaldTrump/posts/114320245355397433.

26

that they would not "engage in illegal DEI discrimination and preferences."[27] In return, the President announced, the Equal Employment and Opportunity Commission had "withdrawn" letters seeking information about the firms' employment practices and would "not pursue any claims related to those issues."[28] The President also announced "commitments" made by a fifth firm, Cadwalader Wickersham & Taft LLP.[29] Cadwalader agreed to provide "at least $100 Million Dollars in pro bono Legal Services . . . to causes that President Trump and Cadwalader both support."[30] Faced with the threat of irreparable harm that an executive order would pose, each of these firms decided to pay the steep price of avoiding one.

56.    Susman Godfrey was forced to expend significant resources to address the risk that it would be targeted by an executive order and would suffer similar types of irreparable harm. Susman Godfrey attorneys have devoted hundreds of hours to monitoring and analyzing the Administration's actions targeting other law firms, preparing Susman Godfrey's strategy for responding should the Firm be targeted by President Trump, and, now, responding to the Order targeted at Susman Godfrey. Susman Godfrey also engaged outside counsel to represent the Firm in a challenge to the April 9, 2025 Order.

57.    Susman Godfrey has also spoken out against the executive orders targeting other law firms. On April 4, 2025, Susman Godfrey was one of more than 500 law firms that filed an amicus brief in support of Perkins Coie in *Perkins Coie LLP v. United States Department of*

---

[27] *Id.*

[28] *Id.*

[29] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 11, 2025, 12:19 PM), https://truthsocial.com/@realDonaldTrump/posts/114320237164839938.

[30] *Id.*

27

*Justice.* No. 25-cv-716 (D.D.C. Apr. 4, 2025), ECF No. 63-1. Susman Godfrey was one of only eight firms in the AmLaw 100 (the top 100 firms by revenue in the United States) that signed the brief. Susman Godfrey was the fifth-largest firm to sign the brief, and two of the larger firms were targets of separate Executive Orders directed against them.

58.    On April 8, 2025, Susman Godfrey filed an amicus brief in support of Perkins Coie in *Perkins Coie LLP v. United States Department of Justice*, on behalf of 27 former national security, foreign policy, intelligence, and other public officials who have worked on security matters at the most senior levels of the United States government for both Democratic and Republican administrations. No. 25-cv-716 (D.D.C. Apr. 8, 2025), ECF No. 104. Susman Godfrey informed the Department of Justice that it intended to seek leave to file this amicus brief on April 5. On April 9, 2025—the day after Susman Godfrey filed the amicus brief—President Trump issued the Order targeting Susman Godfrey.

## V.    President Trump signs the executive order targeting Susman Godfrey.

59.    On April 9, 2025, President Donald J. Trump signed the Executive Order titled "Addressing Risks from Susman Godfrey." *See* https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-susman-godfrey/. The Order was accompanied by a "Fact Sheet" issued the same day that purports to explain and support the Order. *See* https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-addresses-risks-from-susman-godfrey/ (the "Fact Sheet").

60.    Susman Godfrey was given no notice of, nor an opportunity to respond to, the false charges in the Order and Fact Sheet or to explain their inevitable impact on the Firm before they were issued.

61.    **Litigation to defend businesses and public officials from false accusations about the conduct of the 2020 election.** The Order attacks Susman Godfrey because it

"spearheads efforts to weaponize the American legal system and degrade the quality of American elections." The Order and the Fact Sheet make no attempt to identify any specific actions or representations by the Firm that could conceivably fit that description. Consistent with its history of zealous advocacy for its clients, and as described above, Susman Godfrey represented Dominion, the Arizona Secretary of State, and the Governor of Wisconsin (among others) to defend the American election system against false and unsupported attacks on its legitimacy, accuracy, and reliability. Indeed, Susman Godfrey's handling of the Dominion case earned the Court's praise for the quality of its lawyering.[31]

62.     **Unspecified efforts to "undermine" military effectiveness.** The Order attacks Susman Godfrey based on the assertion that the Firm "also funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology." The Order and Fact Sheet make no attempt to identify any specific actions or representations by the Firm that could conceivably fit that description. Susman Godfrey is aware of none.

63.     **The Firm's diversity and inclusion efforts.** The Order attacks Susman Godfrey on the ground that the Firm "supports efforts to discriminate on the basis of race" and that the Firm "itself engages in unlawful discrimination, including discrimination on the basis of race." The sole example cited is an unnamed program alleged to "offer[] financial awards and employment opportunities only to 'students of color.'" To the extent this refers to the Susman Godfrey Prize, then it is not accurate on multiple levels. The Firm does not have any program that offers employment opportunities only to people of color. The Susman Godfrey Prize is a cash prize that

---

[31] *See* Catherine Thorbecke et al., *Settlement Reached in Dominion Defamation Lawsuit Against Fox News*, CNN Business (Apr. 18, 2023), https://www.cnn.com/business/live-news/fox-news-dominion-trial-04-18-23/index.html.

is awarded to up to 20 students of color who are finishing their first or second year at certain law schools. The Susman Godfrey Prize program does not offer any "employment opportunities."[32] Nor does it constitute unlawful discrimination. Neither the Order nor the Fact Sheet attempts to articulate how such a program constitutes unlawful discrimination.

## VI. Susman Godfrey is suffering ongoing and irreparable harm from the Executive Order.

64.    The Order disrupts existing attorney-client relationships and representations and does so immediately, to the detriment of the Firm, its attorneys, and its clients, without notice or opportunity to be heard. Refusals by federal officials to meet with Susman Godfrey lawyers, or to permit Susman Godfrey lawyers to access federal agencies and buildings, immediately and irreparably harm Susman Godfrey's legal practice, its clients' interests, and the careers of its attorneys.

65.    **Impact on active matters in federal forums.** The Order broadly limits Susman Godfrey's access to the federal government. The Order's prohibition against (or limitations on) Susman Godfrey attorneys or personnel interacting with the federal government has severe effects on the Firm's practice. As noted, Susman Godfrey has scores of active matters before federal courts and federal agencies that require access to federal government buildings and officials. And Susman Godfrey lawyers have numerous upcoming meetings scheduled with federal government personnel across various matters in the next 90 days, including with officials from the Main Branch and Antitrust Division of the Department of Justice, United States Attorneys' Offices, United States Customs and Border Protection, and the Department of Health and Human Services. Even mere uncertainty about whether Susman Godfrey attorneys may or may not be allowed to access federal

---

[32] *See The Susman Godfrey Prize*, Susman Godfrey, https://www.susmangodfrey.com/the-susman-godfrey-prize/.

buildings and interact with federal personnel has wide-ranging negative impacts on the Firm's ability to practice law and on its business.

66.    **Interference with attorney-client relationships.** The purpose and only business of the Firm is representing clients—and hiring, retaining, and supporting lawyers representing those clients. These client relationships are the lifeblood of Susman Godfrey's business. The Firm has cultivated these relationships over years by being constantly available to handle its clients' immediate and pressing problems, and providing excellent service to resolve those problems promptly. By limiting Susman Godfrey's access to the federal government and forcing clients to disclose their relationship with the Firm, the Order directly interferes with Susman Godfrey's relationships with its clients, attempting to intimidate and coerce Susman Godfrey's clients to resort to another firm.

67.    **Forced disclosure of attorney-client relationships.** The Order mandates that federal agencies (a) require government contractors to disclose any relationship they have with Susman Godfrey, and (b) terminate government contracts for clients as to which Susman Godfrey has been hired to perform any service. A significant number of Susman Godfrey's clients contract with or otherwise do business with the federal government, or have affiliates who are government contractors or subcontractors. Many other Susman Godfrey clients have significant interactions with the federal government. And many of those clients are represented by the Firm for legal matters completely unrelated to government-contracting matters.

68.    For many of the Firm's clients, the fact that the Firm gives them legal advice is not public information. Accordingly, the Order seeks to require many of these clients to divulge confidential information regarding their legal representations to the federal government, in addition to risking the termination of those clients' contracts.

31

69.     **Disruption to relationships with current clients.** Firm clients have already begun to inquire about the effects of the Order, and whether it affects Susman's ability to access the federal courts or could negatively affect Susman's continued representation. If the Order is not enjoined, other clients of the Firm will likely experience or express similar reservations or concerns, and some may choose to move their business to other firms as a result of those concerns.

70.     **Interference with clients' right to counsel.** In addition to interfering with Susman Godfrey's relationships with its clients, the Order interferes with Susman Godfrey's clients' right to and choice of counsel. Without cause, the Order bars Susman Godfrey attorneys from interacting with federal officials, preventing Susman Godfrey from carrying out key aspects of its representation of certain of its clients, and forcing those clients to obtain other counsel, in wholly unjustified violation of their Fifth Amendment rights.

71.     **Financial impact to the Firm.** By interfering with Susman Godfrey's attorney-client relationships and by limiting Susman Godfrey's ability to advocate on behalf of its clients before the federal government, the Order also threatens to cause significant economic harm to the Firm. As discussed above, a substantial portion of the Firm's active matters—no less than one third—are in federal court or require interaction with the federal government in some way. And a significant number of Susman Godfrey clients have contracts or subcontracts with the federal government. The very purpose of the Order is to force clients with government contracts to terminate their relationships with Susman Godfrey and not to hire Susman Godfrey for future work.

72.     **Financial harm regarding future opportunities.** We are proud of the trust that clients place in us and value their loyalty, but the Order disrupts both existing client relationships and potential future client relationships. Now that the Firm has been targeted by the federal

32

government in this Order and restricted from providing the full breadth and depth of professional services within our capabilities, potential future clients have an incentive to retain other law firms, not targeted by the federal government, that do not face those restrictions. Likewise, existing clients deciding which firm to retain for new matters now have incentives to choose competitor firms that are not saddled with the restrictions imposed by the Order and have not suffered the reputational harm that the Order inflicts on Susman Godfrey. The legal industry is competitive, and the existence of competitors able to offer a broader suite of professional services (including unfettered interactions with the federal government) adversely affects our ability to attract new clients and new matters.

73.    **Attorneys' ability to practice chosen profession.** The Order targets Susman Godfrey attorneys' right to practice their chosen profession: providing lawful representation to clients in need of legal services. That poses a threat not only to the Firm's revenue-generating practice, but also to its attorneys' professional development and careers. It also threatens the Firm's pro bono practice, which frequently requires us to appear in federal court or before federal agencies on behalf of clients.

74.    **Immediate chilling effect and effect on exercise of profession.** The Order has had an immediate chilling effect on Susman Godfrey attorneys, the exercise of their chosen profession, and the expression of their own viewpoints. The Order retaliates against the Firm on the stated basis of causes and clients that the President dislikes or finds to be in opposition to the Administration's priorities. The Firm's attorneys must immediately reconsider how they approach current matters requiring appearances in federal forums or requiring interactions with federal officials, counsel, and personnel. The Firm's lawyers also already have felt a chilling effect as they

decide whether to take on future representations that may lead to further baseless ire and punitive action from the federal government due to potentially disfavored viewpoints or identities.

75.    **Harm to Susman Godfrey's reputation.** The Order has harmed Susman Godfrey's reputation in the markets for clients, lawyers, and staff through its false and disparaging characterizations of the Firm and its attorneys. The Order says many things that are not only inflammatory—for instance, branding the Firm as "detrimental to critical American interests" and accusing it of "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military"—but also false, as described above.

76.    **Harm to recruitment and retention of attorneys interested in future federal service.** The Order directs federal agencies to refrain from hiring any "employees" of the Firm, absent a pre-hire waiver from an agency head made in consultation with the Director of the Office of Personnel Management following determination that such a hire will not "threaten the national security of the United States." The Firm prides itself on a commitment to public service that is often reflected in lawyers leaving the firm for federal service. In my experience, many law students and currently practicing attorneys are drawn to our firm and stay at our firm due to the significant substantive responsibility we give to associates, which helps make them more compelling candidates for federal employment. Moreover, it is increasingly common for lawyers to begin their careers at private law firms such as ours before then departing for clerkships for federal judges or employment at United States Attorneys' Offices. Directing federal agencies to refrain from hiring our employees—including non-lawyers—notwithstanding the potential for a waiver through an opaque and undisclosed process, impairs our ability to recruit and retain lawyers and employees who are interested in future federal employment.

34

77.    **Employees' ability to perform their civic duties.** The Order also impairs Susman Godfrey employees' ability to perform their civic duties, including Susman Godfrey employees who have been called for federal jury duty and Susman Godfrey employees who proudly serve our nation in the military reserves and must access government facilities and interact with government employees when called to serve.

78.    The Order is designed to disrupt and injure Susman Godfrey's representation of its clients, is doing so now, and will continue to do so unless and until it is properly stayed by a court of law.

79.    I declare under penalty of perjury, on this 14th day of April, 2025, that the foregoing is true and correct to the best of my knowledge, information and belief.

Kalpana Srinivasan

35

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

SUSMAN GODFREY LLP,

       *Plaintiff*,

   v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

       *Defendants*.

Civil Action No. 25 - 1107 (LLA)

---

### <u>ORDER</u>

Upon consideration of Plaintiff Susman Godfrey LLP's Motion for a Temporary Restraining Order ("TRO"), ECF No. 10; the memoranda, declarations, and exhibits submitted in support thereof, ECF Nos. 10-1 to 10-15; and the arguments presented at the motion hearing held on April 15, 2025, and for the reasons explained orally at the hearing, it is hereby

**ORDERED** that Plaintiff's Motion for a Temporary Restraining Order, ECF No. 10, is **GRANTED**; it is further

**ORDERED** that Defendants are **ENJOINED** from implementing or giving effect to Sections 1, 3, and 5 of Executive Order 14,263, 90 Fed. Reg. 15615 (Apr. 15, 2025), issued by the President on April 9, 2025, entitled "Addressing Risks from Susman Godfrey," including by relying on any of the statements in Section 1; it is further

**ORDERED** that Defendants are **DIRECTED** to rescind any and all guidance or direction that has already issued that relates to implementing or enforcing Sections 1, 3, and 5 of Executive Order 14,236; it is further

**JA 2990**

**ORDERED** that Defendants are **DIRECTED** to immediately issue guidance to their officers, staff, employees, and contractors to disregard Sections 1, 3, and 5 of Executive Order 14,236, and to carry on as if those sections of the Executive Order 14,236 had never issued; it is further

**ORDERED** that Defendants U.S. Department of Justice; Pamela Bondi, in her official capacity as U.S. Attorney General; the Office of Management and Budget; and Russell Vought, in his official capacity as Director of the Office of Management and Budget, are **DIRECTED** to immediately issue guidance to all other agencies subject to Executive Order 14,236 to suspend and rescind any implementation or enforcement of Sections 1, 3, and 5 of Executive Order 14,236; it is further

**ORDERED** that Defendants are **DIRECTED** immediately to (1) communicate to every recipient of a request for disclosure of any relationship with Susman Godfrey LLP or any person associated with the firm, made pursuant to Section 3(a) of Executive Order 14,236, that such request is rescinded until further order of the court; and (2) cease making such requests for disclosure, pursuant to Section 3(a) of Executive Order 14,236, until further order of the court; it is further

**ORDERED** that Defendants are **DIRECTED** to take, in good faith, any other steps that are necessary to prevent the implementation or enforcement of Sections 1, 3, and 5 of Executive Order 14,236 during the effective period of this order, until further order of the court; it is further

**ORDERED** that Defendants shall file a status report on or before 5:00 p.m. on Wednesday, April 16, 2025, describing the steps taken to ensure compliance with this order and certifying compliance with its requirements; and it is further

2

ORDERED that the parties shall file a joint status report on or before 5:00 p.m. on Wednesday, April 16, 2025, proposing a schedule to govern further proceedings in this case; and it is further

ORDERED that this order shall remain in effect until further order of the court.

SO ORDERED.

_____
LOREN L. ALIKHAN
United States District Judge

Date:   April 15, 2025

1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
2

3      SUSMAN GODFREY LLP,
                                            Civil Action No.
4                 Plaintiff,                1:25-cv-1107

5           vs.                             Washington, DC
                                            April 15, 2025
6      EXECUTIVE OFFICE OF THE
       PRESIDENT, et al.,
7                                           2:04 p.m.
                  Defendants.
8      _____/

9

10                   TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE LOREN L. ALIKHAN
11                  UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES:
       For the Plaintiff:      DONALD VERRILLI, JR.
13                             GINGER ANDERS
                               JEREMY KREISBERG
14                               Munger, Tolles & Olson LLP
                                 1155 F Street, NW, 7th Floor
15                               Washington, DC 20004

16                             BRAD BRIAN
                                 Munger, Tolles & Olson LLP
17                               350 South Grand Ave, 50th Floor
                                 Los Angeles, CA 90071
18

19     For the Defendants:      RICHARD LAWSON
                                 DOJ-USAO
20                               950 Pennsylvania Ave, NW
                                 Washington, DC 20530
21

22

23     Court Reporter:          JEFF HOOK
                                 Official Court Reporter
24                               U.S. District & Bankruptcy Courts
                                 333 Constitution Avenue, NW
25                               Washington, DC 20001

<u>**P R O C E E D I N G S**</u>

1

2      **DEPUTY CLERK:**  Your Honor, we're now on the record

3  for Susman Godfrey LLP vs. Executive Office of the

4  President, et al., civil action 25-cv-1107.

5      Counsel, please come forward and note your

6  appearance for the record, beginning with the plaintiff.

7      **MR. VERRILLI:**  Good morning, Your Honor.  I'm Don

8  Verrilli from Munger, Tolles & Olson for Susman Godfrey.

9  Permit me first to introduce two of the leaders of the

10  Susman Godfrey firm who are here, and they are sitting just

11  behind me:  Kalpana Srinivasan and Vineet Bhatia.  Thank

12  you.  And if I can introduce my colleagues.

13      **THE COURT:**  Sure, please do.

14      **MR. VERRILLI:**  So I want to introduce Brad Brian,

15  who is the chairman of Munger, Tolles & Olson, and our

16  partner Ginger Anders, and our senior counsel Jeremy

17  Kreisberg.  Thank you.

18      **THE COURT:**  Good afternoon, and welcome to you

19  all.

20      You're a bit outmanned here.

21      **MR. LAWSON:**  Good afternoon, Your Honor.  Richard

22  Lawson, Deputy Associate Attorney General for the Department

23  of Justice.

24      **THE COURT:**  All right, thank you very much.  I

25  appreciate everybody appearing on such short notice.  Susman

1    Godfrey filed this suit yesterday and sought a temporary

2    restraining order yesterday afternoon.  We have opened the

3    public line for this hearing, and I will just note for

4    anybody listening that any broadcasting or recording is

5    strictly forbidden and will result in contempt sanctions.

6        So because this is Susman's motion, I will hear

7    first from counsel for the plaintiffs.

8        **MR. VERRILLI:**  Thank you, and may it please the

9    Court.  We are here this afternoon seeking a TRO against --

10   to block the key provisions of an executive order that is

11   one of the most brazenly unconstitutional exercises of

12   executive power in the history of this nation.  And that is,

13   unfortunately, just the latest in a string of brazenly

14   unconstitutional attacks on law firms in retaliation for the

15   work they have done representing their clients.  We're

16   specifically seeking a TRO against Sections 1, 3 and 5 of

17   the order.

18       Now, the first thing we need to show is likelihood

19   of success on the merits, and with the Court's permission, I

20   will turn to that first.

21       **THE COURT:**  Before we get into that, you had

22   mentioned -- and I know this relates to your due process

23   argument, that you had no -- or your client had no prior

24   knowledge of this.  I know that the administration has been

25   negotiating with some other firms.

1    And so there was no outreach, this is the first

2    you heard of this was when it dropped?

3    **MR. VERRILLI:**  None whatsoever, total bolt from

4    the blue.  No notice, no outreach, no indication whatsoever.

5    **THE COURT:**  All right, thank you.

6    **MR. VERRILLI:**  With respect to likelihood of

7    success on the merits, the Susman order is unconstitutional

8    for all of the reasons that the three courts that have

9    reviewed comparable orders -- the Jenner order, the

10    WilmerHale order, the Perkins Coie order -- and found them

11    likely unconstitutional, and for additional reasons as well.

12    It violates the First Amendment by retaliating against

13    Susman for its advocacy on behalf of clients, by

14    perpetrating odious viewpoint discrimination against that

15    advocacy, by trying to cut off our right to petition the

16    courts, and by seeking to disrupt Susman's right to

17    associate with clients in ways that are sadly similar to the

18    ones that the states of the old segregationist south used to

19    disrupt the relationships between civil rights lawyers and

20    their clients.

21    And there's no need to infer retaliatory intent in

22    this case, it is right there in unapologetic black and white

23    on the face of the executive order.  This order also denies

24    due process by tarring Susman's reputation, disrupting its

25    client relationships and impairing its lawyers' ability to

1  practice their profession without, as Your Honor's question

2  made clear, any notice or any opportunity to be heard

3  whatsoever.  And it does so on the basis of impermissibly

4  vague and totally unsubstantiated smears.

5      It denies Susman equal protection of the laws by

6  singling the firm out without even a plausible rational

7  basis for doing so.  It denies Susman's clients their rights

8  to be represented by the lawyers of their choice, and it

9  runs roughshod over the separation of powers.  It's every

10  bit as bad as the Steel Seizure case.  The President has

11  ordered actions and imposed punishments without any

12  statutory authority or any constitutional authority.  In

13  fact, it's worse than the Steel Seizure case because it's

14  also a direct assault on the authority of Article III courts

15  and the independence of the judiciary.  And, if that weren't

16  enough, it also bears all the hallmarks of an

17  unconstitutional bill of attainder.  We don't think, based

18  on that, and based on that read together with the rulings in

19  the other three cases, that there's any serious question

20  that we have a likelihood of success on the merits.

21      But before I turn to irreparable harm, let me

22  pause there if Your Honor has any questions with respect to

23  the merits.

24      **THE COURT:**  So just a housekeeping matter.  I

25  think there was a Sixth Amendment argument in some of the

1    other cases.  There's not one here because you're purely a

2    civil firm?

3        **MR. VERRILLI:**  Well, based on the fact that the

4    work of the firm is, with very few exceptions,

5    overwhelmingly civil in nature, that's correct.

6        **THE COURT:**  And if we could turn to the order.  I

7    was hoping we could go through it and you could help me get

8    some clarity, or not, as it goes to your vagueness argument.

9    So my understanding is that the allegation that Susman

10   spearheads efforts to weaponize the American legal system

11   and degrade the quality of American elections is in

12   reference to your client's representation of Dominion

13   Voting; is that how you read this?

14       **MR. VERRILLI:**  We assume that that's one of the

15   bases, along with the firm's reputation of the Secretary of

16   State of Arizona in the 2020 election aftermath and the

17   Governor of Wisconsin in the 2020 election aftermath.  Those

18   are the election-related representations of the firm that

19   we're aware of.  You know, maybe there's something else that

20   the government has in mind with respect to this vague

21   language, but those are the ones we think must be at issue.

22       **THE COURT:**  And then I think you confessed some

23   confusion as to what the next sentence was, but that:  "The

24   firm funds groups that engage in dangerous efforts to

25   undermine the effectiveness of the United States military

1    through the injection of political and radical ideology."

2         Do you have a sense as to what that might be

3    about?

4         **MR. VERRILLI:**  We are completely mystified by

5    that.  Perhaps the government can clear it up today, but we

6    are completely mystified.  You know, it's particularly

7    unfortunate, we think -- and as the Srinivasan declaration

8    identifies, this firm has reservists, it has numerous

9    veterans, it has a long and proud tradition of recognizing

10   the importance of military service.  And so we're completely

11   mystified as to what that's about.

12        **THE COURT:**  And then efforts to discriminate on

13   the basis of race, you know, you pointed to a fellowship

14   that your client has that I think they go on to speak of in

15   the next paragraph.  But are you aware of any other hooks on

16   which the government is hanging that hat?

17        **MR. VERRILLI:**  We are not; we are not.

18        **THE COURT:**  And at this stage, since we're looking

19   at a temporary restraining order, I think you would agree

20   with me that I don't need to address every potential

21   argument in terms of your likelihood of success on the

22   merits.

23        Which do you think are your strongest, if you had

24   to pick a favorite child or two?

25        **MR. VERRILLI:**  Well, I never like having to pick a

1    favorite child, but I would say that the Court can look to

2    the three decisions that have already been rendered on

3    virtually identical executive orders, and those courts

4    relied on the First Amendment retaliation argument.  That

5    seems to us to be rock solid.  And with respect to that

6    argument, of course, if there is retaliation for the

7    exercise of protected speech -- and we know from Velazquez

8    that advocacy in court is protected speech, that's just a

9    flat out violation.  You don't go through the compelling

10   interests, narrowly tailored means analysis, it's just a

11   flat out violation.  You have the unanimous decision of the

12   Supreme Court in Vullo from last term saying exactly that.

13   That seems to us to be just an ironclad, obvious First

14   Amendment violation.

15         The viewpoint discrimination, which the other

16   courts have also relied on, seems to us to be equally strong

17   in that it says it right on the face of the order that these

18   punishments are being imposed because of the positions that

19   the firm took.  And, of course, it's standard First

20   Amendment law that viewpoint discrimination is the most

21   consequential, the most serious violation of the First

22   Amendment.  Viewpoint discrimination, you have it here, they

23   admit it in the executive order.  Those two seem just

24   totally rock solid.

25         We think the other ones are also very, very

1    strong.  And we do think the due process argument, you know,

2    as Your Honor's question kind of reflected -- and, I mean,

3    out of the blue, we got an order imposing these punishments

4    and disabilities on us with no notice and no opportunity to

5    be heard and in this incredibly vague way so that we don't

6    even know in some instances what they're talking about.

7    That also seems completely rock solid.

8        **THE COURT:**  Have there been any efforts from you

9    or your client to reach out to the administration to try and

10   clarify what the catalyst was for this and to clarify some

11   of the statements that are being made?

12       **MR. VERRILLI:**  No, not to my knowledge.  I'm quite

13   certain there haven't been, Your Honor.  And this, of

14   course, has all happened very fast.  You know, this order

15   just issued a few days ago, again, out of the blue.  So

16   we've been focused on defending ourselves, defending -- our

17   firm's been focused on defending Susman, and Susman's been

18   focused on defending itself.

19       **THE COURT:**  Do you want to move on to harm?

20       **MR. VERRILLI:**  Yeah, I'd be happy to, Your Honor.

21   Again, as with the merits, we don't think there's any

22   serious question here that Susman is suffering and will

23   continue to suffer irreparable harm.  Our papers have

24   detailed the harms.  There's the harm -- irreparable harm as

25   a matter of law based on the chilling of our free

1    expression, a First Amendment harm.  There's irreparable

2    harm to Susman's reputation by these unfounded smears

3    hanging out there in an executive order by the President of

4    the United States.  That kind of reputational harm is well

5    established irreparable harm.  And there's economic harm as

6    well, and that's detailed in the Srinivasan declaration at

7    pages 30 to 35 in numerous respects.  So if we just apply

8    standard law, we easily establish irreparable harm.

9            But I think it's important to take a step back

10   here and just think about what's actually going on.  The

11   point of this order is to harm Susman Godfrey.  The harms

12   aren't incidental, they are the point.  The Executive is

13   wielding an axe here, and we don't know exactly when that

14   axe is going to fall, but they're ready to bring it down.

15   And when they bring it down, Susman isn't going to be able

16   to represent its clients.  It's not going to be able to meet

17   with government officials.  It's not going to be able to --

18   which they need to do to pursue their qui tam actions --

19   which, by the way, net ironically hundreds of millions of

20   dollars for the government.  They're not going to be able to

21   pursue their antitrust representations where they need to

22   meet with government officials.  They're not going to be

23   able to pursue their environmental representations where

24   they need to meet with government officials.  They're not

25   going to be -- they're not going to be able to pursue their

1   intellectual property cases where they've got to be in front

2   of the PTAB.  And as I said, they may not even be able to

3   enter federal courthouses under this order.

4        **THE COURT:**  I think under your reading of the

5   order, they couldn't even go to jury duty.

6        **MR. VERRILLI:**  Yeah, jury duty.  Frankly, they

7   couldn't even go to the Post Office to mail a letter.  So we

8   think that there really is no doubt that this is irreparable

9   harm.  And they may say, well, it's not ripe yet because you

10  don't have guidance, but that's just a question of when this

11  axe is going to fall.

12        And in that regard, Your Honor, I do think it's

13  quite valuable to look at the memoranda that the Department

14  of Justice circulated in the other cases.  The Jenner one is

15  particularly illuminating, I think, in this regard.  It went

16  to the heads of all executive departments and agencies.  And

17  the court required that this notification go out to instruct

18  the agencies that the temporary restraining order was in

19  place.  But, you know, what it says is:  "A local district

20  judge has mandated that the Attorney General and OMB

21  director personally send the below notification about Jenner

22  & Block LLP, a law firm committed to the weaponization of

23  justice, discrimination on the basis of race, radical gender

24  ideology and other anti-American pursuits."

25        **THE COURT:**  That was in their notice informing the

1    individuals of the court's TRO?

2           **MR. VERRILLI:**  Yes, yes, to the agency heads of

3    the court's TRO.  Anti-American pursuits.

4           **THE COURT:**  In, I believe, the Jenner and the

5    Perkins Coie cases, there were indications that meetings

6    with government officials had been canceled.  I think -- as

7    far as I can tell, you didn't allege anything like that in

8    your papers.

9           Do you have reason to believe that that has

10   happened since you filed or --

11          **MR. VERRILLI:**  It hasn't happened yet, Your Honor.

12   But as the declarations do explain, the representations that

13   Susman undertakes requires meetings on a weekly basis with

14   government officials on all kinds of cases, appearances in

15   court on a weekly basis on all kinds of cases.  And so it

16   seems to me it's not an answer to the irreparable harm -- or

17   even putting aside the constitutional harm and the

18   reputational harm, which may be indisputably out there, and

19   the harm that could come from the investigation into

20   government contractors who are represented by -- who Susman

21   represents.  You know, this only goes to the Section Five

22   disabilities being imposed.

23          But of course -- it's just common sense, of course

24   clients thinking about hiring Susman Godfrey, thinking about

25   staying with Susman Godfrey are going to be asking

1    themselves, well, what's going to happen when the axe falls

2    here; are you going to be able to represent me.  And I just

3    think it's self-evident.  You know, and it does -- it brings

4    to mind a quotation from Judge Friendly that Chief Justice

5    Roberts put into the Census case -- I think it's really

6    quite apt here, which is that courts are not required to

7    exhibit a naivety from which ordinary citizens are free.

8            Everyone knows what this is about; it is plain on

9    the face of it: it is an attack on this law firm.  It is a

10   attack on this law firm based on its representations, and

11   its design is to inflict harm in the here and now and harm

12   in the future.  There's just not any doubt about that.

13       **THE COURT:**  In a few of the other cases, the

14   complained of actions in the executive order had been

15   undertaken by individuals who are no longer associated with

16   the firm.  I understand that your client still represents

17   Dominion Voting.

18           But as to some prior representations, are we

19   talking about -- and in looking at sort of a fish, actions

20   that go to people who are actually at the firm or folks that

21   have since departed?

22       **MR. VERRILLI:**  Well, because the allegations are

23   so vague that we don't know what they're about, it's a

24   little bit hard to answer your -- I don't mean to flip about

25   it.  I mean, genuinely it's a little bit hard to answer Your

1    Honor's question.  But with respect to Dominion Voting, I do

2    think there's a significant point here.  Maybe it's a

3    coincidence, maybe it's a coincidence that this executive

4    order dropped right on the eve of when Susman Godfrey was

5    about to go to trial on behalf of Dominion Voting against

6    Newsmax based on the defamatory allegations -- the

7    defamatory statements from the 2020 election aftermath.

8    Maybe it's a coincidence, but that's what happened.

9         And I do think Your Honor raised a point about

10   other firms.  I think it is useful to look at the experience

11   of other firms.  Of course, you did see what happened with

12   other firms and their clients and their clients' reactions,

13   it's all documented, the basis of judicial findings now.  I

14   think it's equally important to look at the conduct of the

15   firms that settled with the Trump administration and to look

16   at their explanations.  You know, those explanations are a

17   matter of public record; they're out there, the Paul Weiss

18   chairman's message, the Skadden chairman's message.  One can

19   read those.

20        They didn't say, you know, we're really sorry, the

21   President is right; we've been behaving badly and so we're

22   doing this because it's the right thing.  They said these

23   executive orders are an existential threat to the continued

24   existence of our firm, and we had no choice but to settle.

25   I don't think there's any clearer proof of the irreparable

1    harm potential of these orders than those statements and the

2    actions that those prominent, powerful firms took in

3    response.

4            **THE COURT:**  And I suppose it might be even worse

5    for your client as one of the smaller firms in the --

6            **MR. VERRILLI:**  Susman Godfrey is a mighty firm,

7    and it's hugely successful and it's full of courageous

8    lawyers who are standing up here.  And if I may just say

9    this now, they're standing up for themselves certainly, but

10   they're doing more than that.  They're standing up for the

11   profession.  They're standing up for the rule of law.

12   They're standing up for the Constitution.  They're standing

13   up for this country.  And they've had the courage to do

14   that, but it's a risk.  They understand it, everyone

15   understands it.  And the reason is because everyone

16   understands what the point of this order is.  The point of

17   this order is to inflict grievous harm on these firms, on

18   this firm and the others.  That's its point.  And I just

19   think on any reasonable understanding of what irreparable

20   injury consists of, this qualifies.

21            Now, if I may, just the last couple of factors,

22   the balance of hardships and public interest, cases like

23   this involving the government that effuse together of

24   course.  And I won't spend any considerable time on it

25   unless Your Honor has questions about it, it just seems

1    obvious where the public interest lies here.  It just seems

2    obvious.  There is no injury whatsoever to the government

3    from the entry of a temporary restraining order.  And in

4    that regard, if the Court does choose to enter one, we'll of

5    course abide by any expedited schedule necessary to achieve

6    final resolution.  So there's really no harm to the

7    government here at all.

8          And it is just obvious where the public interest

9    lies.  It cannot be that the executive branch can exercise

10   power that it does not have by statute, that it does not

11   have under the Constitution to retaliate against a law firm

12   like Susman Godfrey going into court, representing its

13   clients zealously to the best of their ability.  That is the

14   core of what happened here.  It is the definition of the

15   public interest for Susman Godfrey to do the work that it

16   does.

17         **THE COURT:**  And it encroaches upon this court who

18   relies on your lawyers to negotiate with the federal

19   government in cases that you bring before us and bring

20   before other judges --

21         **MR. VERRILLI:**  Of course.

22         **THE COURT:**  -- or resolve cases before they come

23   to court.

24         **MR. VERRILLI:**  And that's why I said earlier, Your

25   Honor, this is not -- in a way it's worse than the Steel

1    Seizure case, because it's not just a presidential assertion

2    of power that the President doesn't have under our

3    Constitution, it's a direct assault on the Article III

4    courts, on the independence of the judicial branch.

5            You know, and there's language in Velazquez that I

6    think is quite relevant here where the court said that an

7    independent judiciary relies on an independent bar.  And the

8    point in that case was, of course, that it is

9    unconstitutional -- in that instance it was Congress through

10   legislation, but it's unconstitutional, it's a grave First

11   Amendment violation for the government to wield its power

12   against lawyers who come to court so that they cannot make

13   and they are deterred from making the full throated, zealous

14   defense of their clients' interests that the norms of the

15   profession and the rule of law require for the judiciary to

16   be able to do its job under our Constitution.

17           **THE COURT:**  All right, thank you very much.

18           **MR. VERRILLI:**  Thank you.

19           **THE COURT:**  I'll give you some time on rebuttal.

20   Mr. Lawson.

21           **MR. LAWSON:**  Good afternoon.

22           **THE COURT:**  Good afternoon.

23           **MR. LAWSON:**  Your Honor, at sort of a 30,000-foot

24   level, I would ask the Court to examine the issue of what

25   these sections really focus on.  And I'd like to focus on

1    Sections 3 and 5 at this high level.

2        **THE COURT:**  Well, could you start with Section 1

3    and tell me what you think are the allegations behind each

4    of the statements.

5        **MR. LAWSON:**  Your Honor, I heard the Court's

6    questions of counsel.  Regrettably, I don't have any further

7    information beyond what is contained in here aside from the

8    discrimination issue.  And for that, all I have is a web

9    page from the Susman website discussing some of the

10   diversity initiatives, which we think would speak to the

11   sort of gray zone under the Students for Fair Admissions

12   case and diversity and quotas and so forth.

13       **THE COURT:**  But you don't have any understanding

14   of what the funding groups that undermine the effectiveness

15   of the military is?

16       **MR. LAWSON:**  Regrettably, Your Honor, I have no

17   further information than what's contained in the order.  I

18   apologize, I just wasn't able to procure that before we got

19   here.

20       **THE COURT:**  All right, thank you.

21       **MR. LAWSON:**  But if I could, there is a theme that

22   will run through as this case progresses -- because

23   obviously I'm handling the other ones as well.

24       **THE COURT:**  Lucky you.

25       **MR. LAWSON:**  One way to put it.  Is the power --

1   how is the government acting here.  And then for that, we

2   have approached it from the idea of the government acting as

3   sovereign.  And is the government acting here in Section 3

4   as a contractor and in Section 5 as a landlord and an office

5   supervisor, not as the sovereign.

6        A key point, counsel for plaintiff referenced the

7   Vullo case earlier -- the Court is nodding, I'm sure the

8   Court is generally familiar, involving the issue of the

9   improper use of the power of the sovereign to sanction and

10  punish entities that did business with disfavored actors.

11  There's no sanction or punishment here, not when it's coming

12  to contracting, not when it's coming to office access, not

13  when it's coming to hiring.  This is not a fine.  This is

14  not jail time.  Classic case of Bantam Books where there

15  were books being sold at a bookstore, a concerned citizens

16  committee with the power to refer cases for criminal

17  prosecution sends a letter please remove these books.  There

18  was the threat of sanction and punishment.  This is --

19  Section 3 is, again, contracting.  Section 5 is landlord

20  employment, that type of thing.

21        **THE COURT:**  So walk me through how it's not a

22  sanction.  Because, I mean, I don't know if Susman has

23  itself government contracts, but if it does and it's

24  competed for and won those, why would unrelated actions

25  relating to cases that it brings, or whatever it might be

1    doing with groups that have something to do with the

2    military, have any -- be any permissible basis on which to

3    terminate such a contract?

4         **MR. LAWSON:**  So if we look at Section 3, there is

5    a reference in there to the racial discrimination angle.

6    And so for that point, the analogy would be to the LBJ

7    order, Executive Order 11246, regarding contractors and

8    their requirements to diversify their workforce.  Fifty

9    something -- 60 something years ago, an extraordinary body

10   of case law supporting that.

11        Also codified in the Code of Federal Regulations,

12   I would draw the Court's attention to 41 C.F.R. -- and

13   hopefully I've written this down correctly, 60-1.4(b)(8).

14   Don't we love federal regulations.  So I'll repeat, 41

15   C.F.R. 60-1.4(b)(8).  And this prevents contractors from

16   working with entities that have themselves, the third-party

17   entity, been debarred for failing to comply with the LBJ

18   executive order.  Now, I'm referencing this from the point

19   of view of this sort of downstream inquiry on the larger --

20   in compliance with the larger executive order has been on

21   the books for decades.  And so this idea of reaching out to

22   contractors saying who are you doing business with, that's

23   been a part of federal government contracting for decades.

24   And so there's some body of law that would support that.

25        And again, so to -- I could see the Court's

1    concern, and obviously the initial question was, okay, how

2    does this relate to the national security issue.  And this

3    is why I draw the Court's attention to Section 3 does

4    specifically references the racial discrimination angle.

5    Furthermore, under 40 -- we'll go to the statutes here, 40

6    U.S.C. 121(a), the President, as far as the acquisition

7    practice, is able to set -- to use the procurement power to

8    advance policies and public policies.  So there is a large

9    body of case law supporting the idea of the use of the

10   procurement power to advance social policy.

11           One of the leading cases, a very old case,

12   Contractors Association of Eastern Pennsylvania vs.

13   Secretary of Labor, 442 F.2d 159, and the spot cite running

14   from 168 to 171 talks about the use of -- it traces in that

15   section decades prior -- and this is from '71.  I apologize,

16   I didn't finish, the Third Circuit, 1971.  Going back

17   decades to the use of procurement power to advance social

18   policy initially in the defense era under FDR.  And it

19   goes -- the court at that point said:  "In the area of

20   government procurement, executive authority to impose

21   nondiscrimination contract provisions falls in Justice

22   Jackson's first category" -- this is the steel case,

23   Youngstown Sheet & Tube vs. Sawyer, 343 U.S. 579,

24   discussing -- well, various levels of that.  So falls in

25   Justice Jackson's first category, action pursuant to the

1    express or implied authorization of Congress.

2        And I'll further note in Chrysler Corporation vs.

3    Brown, 441 U.S. 281, spot cite 305 to 306, 1979, the court

4    was examining the origins of this LBJ order, 11246.  And the

5    court said at that point:  "The origins of congressional

6    authority for Executive Order 11246 are somewhat obscure and

7    have been roundly debated by commentators and courts."  And

8    then the court goes on to reference it draws equally from --

9    or it can draw equally from the Administrative Services Act,

10   Titles VI and VII of the Civil Rights Act and Equal

11   Opportunity Act.  So I'm referencing this from the point of

12   view that to the degree the Court -- and I suspect the Court

13   has noticed the various statutes that are and are not

14   referenced in this order, that that in and of itself is not

15   fatal.

16       Here we have a 1979 U.S. Supreme Court case

17   examining the LBJ order and noting it doesn't really say

18   what statutes are doing it.  But because the use of social

19   policy -- use of procurement power to advance social policy

20   has been so established, that I would submit that that's

21   permissible here.  And furthermore, it doesn't fall within

22   the world of sanctions and punishment, that it is discretion

23   on the purchasing entity, the contractor.

24       **THE COURT:**  So obviously this is the first time

25   you've been able to present your arguments in this Court, so

1    I appreciate all of the citations.  I've not had the chance

2    to review them.  But my sense of a lot of these are the

3    government can incentivize particularly policy aims in

4    engaging with who to contract with.  This seems to be quite

5    different because you're terminating existing contracts.

6         And so is there any support for that not being a

7    sanction?  I could understand that you might in the future

8    not want to engage in contractual relationships with

9    individuals or companies that don't support your

10   administration's policies, but is there grounds for this

11   kind of midstream termination?

12        **MR. LAWSON:**  So very excellent question.  I do not

13   read the order as necessarily calling for an immediate

14   termination that would violate any existing authority.

15   Obviously there are -- what is it, the Mount Healthy and

16   Umbehr line of cases.  Umbehr itself -- and I apologize for

17   Court and counsel, I don't have the cite handy, but it does

18   reference that its analysis does not apply to -- or it

19   specifically points that the case does not address future

20   contracts.

21        But to the Court's question as to is this -- the

22   cases that I rely on and just referenced, does it bless an

23   immediate termination.  To my knowledge, no immediate

24   termination of the contract has happened.  And obviously the

25   provisions of the EO would require that it would be

1   consistent with that body of case law, that line of First

2   Amendment retaliation of terminating an existing

3   relationship, whether it's the school teacher fired by the

4   board or the contractor who has it terminated ab initio, but

5   it would have to be consistent with that.

6        But the larger point I'm trying to make is that,

7   on its face, it's not necessarily a sanction, it's not

8   necessarily punishment.  So I would urge the Court to have

9   great caution as it examines these arguments under that

10  Vullo type of analysis.  That is the largest point I'd like

11  to leave the Court with as to Section 3.

12       As to Section 5, again, I would make the same

13  general arguments about we're acting here as landlord, as

14  employer.  But there is an issue that I would just indulge

15  the Court with, that while we would urge the Court to deny

16  the temporary restraining order, to the degree the Court

17  does grant it, there is a problem I've been dealing with in

18  the other cases which is the ripeness issue.  And there was

19  great foresight on plaintiff's counsel to note that I would

20  be referencing that.

21       And if the Court issues the order as I understand

22  it to have been drafted, not only is the issue -- in my

23  opinion would it not be ripe now, it can't be ripe because

24  the order as issued would prohibit agencies from developing

25  the guidance.  I would urge the Court to consider some sort

1    of opportunity to allow these guidances to be promulgated so

2    we can have something concrete here.  There is -- we've

3    already heard here, and the Court can imagine -- and we are

4    not immune to the parade of horribles that can come as far

5    as right to counsel, right to petition, but that's not

6    called for in this order here; it doesn't say that.  We need

7    the guidance to know if any of that parade of horribles

8    might be queuing up, much less beginning the parade.

9         And then just the last --

10        **THE COURT:**  Can I ask, has there been any guidance

11   being prepared?

12        **MR. LAWSON:**  I don't know, I cannot speak to that.

13   And to my knowledge, there's been no guidance on any of the

14   other cases at all that were developed prior to the TROs

15   being entered.  The one last point, to kind of go out of

16   order here -- we talked about 3, 5 and I'd like to jump back

17   to 1, which is --

18        **THE COURT:**  Well, actually, before you go there, I

19   take your point that you're trying to separate the

20   government as sovereign from the government as contractor or

21   landlord, but what interest does the landlord have in

22   barring individuals that the sovereign has problems with

23   from coming into a courthouse or a federal building?

24        **MR. LAWSON:**  Well, let me kind of go towards --

25   give an example that I think might apply, if I can, from

1    recent events.  I believe both the chair of the FTC and I

2    believe the Deputy Attorney General have issued guidance to

3    staff regarding engagement with the American Bar

4    Association.  I haven't studied them in great depth, I hope

5    everybody will forgive if I get some of this analogy off

6    point.  But at a high level, I think direction that would be

7    minimizing interactions with agencies -- like one of the

8    concerns with the ABA is is it nonpartisan or is it

9    partisan.

10             To the degree it's partisan, I think there's an

11   interest by these actors to distance engagement with the --

12   between agency staff.  So I'm coming at it from that angle

13   on the idea of within the power of an employer to state I

14   don't want you interacting with a certain entity in your

15   official capacity.  And to the degree that is consistent

16   otherwise with employment law -- obviously, people can pay

17   their own way and go to these meetings, that is fine.  But

18   to go speak on a panel would be something.  So I think that

19   might be an area where some of the guidance would develop

20   and flow from.

21             To speak to the issue of guidance that came out

22   and said that marshals are to keep counsel from the firm

23   from entering the court, I would hesitate to speculate that

24   that would be anything like what was coming up.  If the

25   guidance did come up, I'm quite confident that motions would

1    be filed and orders would be rendered by this Court before

2    we had an argument to hear whether you liked that position

3    or not.  So again, I just -- yes.

4         **THE COURT:**  What is the interest in keeping them

5    out of federal buildings, if not to retaliate against them?

6         **MR. LAWSON:**  Well, I would -- again, just to kind

7    of develop a bit of an analogy.  To the degree there was an

8    ability in a federal space to hold some sort of CLE on

9    diversity or so forth, maybe something along those lines

10   could apply.  But again, I think the Court's -- if I can

11   take the Court's question and highlight a position, this is

12   why we need the guidance.  Even if the Court issues like --

13   you know, to the degree any guidance is issued, it is to be

14   stayed pending review.  I don't want to propose that

15   necessarily, but I just want to highlight the great

16   challenge we have in getting this into a concrete position

17   for a full ruling from the Court on the matter.

18         And just to conclude very briefly, on Section 1,

19   this is -- the government, as much as anyone, has its own

20   right to speak.  I would view that these contents -- the

21   statements in Section 1 are classic government speech.  The

22   difference between the statements in Section 1 and a press

23   conference are very, very minimal, maybe more well thought

24   out and greater punctuation and so forth.  But --

25         **THE COURT:**  You say it's more well thought out,

28

1    but you don't actually know what the second sentence about

2    funding military groups means.

3        **MR. LAWSON:**  Well, correct.  As far as the detail,

4    the detail speaks for itself.  What I -- all I was really

5    meaning by well thought out is just, you know, coherent

6    phrases and so forth.  The -- but the larger point of

7    Section 1 is -- that we've been wrestling with is how do we

8    speak.  And the government has a right to speak.  And I

9    think -- and I would urge great caution from the Court on

10   the judiciary policing the executive branch's speech.  That

11   is just a very tricky area that is just extremely difficult

12   to try to implement.  And also, I don't think Section 1 has

13   any real operative effect.  Clearly Sections 3 and 5 are

14   giving instruction.  So I think an injunction on Section 1

15   just courts more trouble than it might solve.

16       **THE COURT:**  In other cases, my understanding is

17   that -- I think at least in the Wilmer case, that it's --

18   not that there's anything to enjoin in Section 1 because

19   it's not taking any action, but the TRO was to prevent the

20   government from discriminating against the firm on the basis

21   of that language.

22       **MR. LAWSON:**  Well, I think -- I believe Wilmer,

23   before Judge Leon, there was no injunction as to Section 1.

24       **THE COURT:**  Then it may be the Jenner case before

25   Judge Bates.

1          MR. LAWSON:  Jenner and Howell -- and plaintiff's

2    counsel will speak better to this.  I think their motion --

3    their proposed order tracks very closely, at least at a high

4    level, to what was entered before by Judges Bates and

5    Howell.  But that -- as I understand it, that is -- the

6    purpose of the injunction of Section 1 is the use with the

7    clients and whatnot.  But it becomes so difficult to know

8    what can or can't be said, what is -- what will be coming

9    before this Court to be explained as far as what we said or

10   not when it's all really, we would submit, protected by the

11   First Amendment.  The issues come in -- working on Section 3

12   and working on Section 5, spot that.  But Section 1, it's

13   just extraordinarily difficult to practically implement an

14   injunction as to that.

15         THE COURT:  Do you know why the administration has

16   been reaching out to certain firms ahead of these orders

17   versus why you just drop this on Susman without opportunity?

18         MR. LAWSON:  I cannot speak to that, I don't know,

19   and anything I would say would be rank speculation.

20         THE COURT:  Another concern that I have is, as

21   your friend on the other side points out, a lot of the

22   relationships between companies that may be federal

23   contractors and the firm are -- is non public information,

24   you know, potentially you're hiring the firm to investigate

25   whether you should merge with somebody, what some

1    consequences would be if you bring an IP suit against

2    somebody else.  And so it seems quite stark to make

3    contractors disclose that information to the federal

4    government.

5        **MR. LAWSON:**  Again, I would just -- I would draw

6    back to the comments I made earlier about the idea of if

7    this is an entity that it would otherwise not be compliant

8    with the old LBJ order, that contractors need to make sure

9    that they're not working with someone who would otherwise be

10   debarred.  So I do think that those -- that the line of

11   inquiry is permissible.  There are issues about whether or

12   not the representation of an individual by an attorney is

13   privileged.

14        My general understanding is that is privileged if

15   the acknowledgement would be material, someone consulting a

16   criminal defense lawyer 30 minutes after a presumed murder,

17   something along those lines, whereas like, okay, what is

18   this indicating.  But I believe, absent that, I'm not sure

19   there really is quite that same level of privilege.  I

20   certainly understand the Court's question and concern, but

21   I -- you know, and with more time to brief, I could probably

22   answer a little more fully the true parameters of doing that

23   downstream inquiry.  I'd just draw the Court's attention to

24   my earlier comments about that.

25        **THE COURT:**  And a lot of your argument today

1   focuses on maybe the government's actions as a landlord or

2   as a contractor.  Do those apply when we're talking about

3   the First Amendment analysis or is that just a question of

4   where the authority to enter such an order comes from?

5        **MR. LAWSON:**  Well, I think that tracks to our

6   conversation earlier regarding the Mount Healthy and Umbehr.

7   That's where First Amendment issues about retaliation and

8   viewpoint discrimination come in.  I don't see anything in

9   the order that is necessarily in conflict with that line of

10  cases, and so certainly the First Amendment applies.  But

11  there is another line of cases on this -- well, anyway,

12  sorry, that was a -- I was going the wrong direction on that

13  one.

14       I guess the answer to your question of how does

15  the First Amendment apply on that, I think that falls within

16  the Mount Healthy-Umbehr line, and I don't see anything that

17  these orders necessarily conflict with that.

18       **THE COURT:**  And do you agree that if we're looking

19  at viewpoint discrimination, strict scrutiny is the

20  appropriate standard?

21       **MR. LAWSON:**  I believe it is.  I haven't --

22       **THE COURT:**  And so under that, give me your best

23  on your compelling interest, and then we can talk about

24  whether it's narrowly tailored.

25       **MR. LAWSON:**  Sure.  Well, I think the critical

1    inquiry for viewpoint discrimination has to be that there's

2    punishment or sanction.  We start there.  This is why I went

3    to that at the beginning.  To the degree the Court finds

4    that this is a punishment, this is sanction, that this is in

5    the Vullo category, the Bantam Books category, well, that's

6    going to be a certain line of inquiry that I think I know

7    where the Court may go on that.

8         This is why I've been driving the issue towards

9    what is fundamentally going on here.  If this is use of the

10   procurement power to advance social policy, very well

11   supported.  And under the Northeastern Contractors -- I

12   think I've got that right, I cited it earlier, extremely

13   well supported under that first category from Youngstown

14   Sheet.  And even the court later, in the Brown vs. Kisor

15   case, is talking about this use of social -- of procurement

16   power to advance social policy is -- has many statutory

17   sources on that.

18        **THE COURT:**  And maybe you'll just repeat that

19   argument, but what about it being narrowly tailored?  So

20   this applies to every one of, I think it's, 328 or 329

21   people that work at the firm.  So the IT guy might not be

22   able to go get a job in government IT or the paralegal who's

23   also a vet may not be able to go to the VA.

24        **MR. LAWSON:**  So the narrowly tailored due

25   process -- I'll put those together, if the Court will

1    indulge, from the perspective that those are inquiries far

2    more appropriate for a legislative setting.  This is an

3    executive order within the ability to arrange contracting

4    provisions and within the ability to act as a landlord.

5    It's just a different -- it's just a different setting.

6    Again, this -- the Court also predicted, this is a

7    rephrasing of my earlier argument.  If it's not punishment,

8    if it's not sanction, if it is acting as landlord, then I

9    would submit that the strict scrutiny, narrowly tailored

10   analysis is just the wrong way to approach, that it's

11   something else.

12        **THE COURT:**  But I think, taking you at your word

13   that we're talking about the government as landlord, the

14   government as landlord doesn't have the right to engage in

15   viewpoint discrimination unless it can satisfy strict

16   scrutiny.

17        **MR. LAWSON:**  Well, let's just assume that for a

18   moment, yes.  We don't know what --

19        **THE COURT:**  Do we need to assume that?  I mean, do

20   you not agree with that?

21        **MR. LAWSON:**  Well, here's -- sure, I agree with

22   that, but the guidance, we don't know what the access is.

23   We can't say it's viewpoint discrimination, we don't know

24   what it says.  And if the Court issues the order as

25   requested, we won't know what it says.

1      **THE COURT:**  All right, I think I'm losing you,

2   because it strikes me that we can read the viewpoint

3   discrimination from Section 1 of the executive order.  You

4   do not like the views that this firm has taken on behalf of

5   its clients, and something to do with someone that's from

6   the military, and as a result you're then taking actions.

7   The degree of those actions, to be sure, we won't know until

8   we see the guidance, but the genesis is the disagreement

9   with the viewpoint.

10      **MR. LAWSON:**  Well, on that point, Your Honor, if

11   you're talking about the motivation -- now, this is where

12   I -- recall where I lost -- went down the wrong path

13   earlier, but I want to return to that.  If the Court is

14   talking about the motivation, there is a long body of case

15   law that when it comes to analyzing statutes where the state

16   is acting as sovereign -- McGowan vs. Maryland, criminal

17   prosecutions for violating Sunday closure laws; in U.S. v.

18   O'Brien, criminal prosecutions for the destruction of draft

19   cards, the courts -- the Supreme Court in both cases said if

20   there is a logical basis to support this decision, we will

21   not inquire any further into the discriminatory nature of

22   it, in any aspect of it.

23      So let us return on the landlord angle to the

24   example I was giving about -- say, for example, the ABA.

25   I'm not sure it would be out of place for the government, if

1    it could, if it had an access to a space and had the proper

2    discretion, otherwise compliant with the law, to deny access

3    to the ABA to use a federal facility and have -- place

4    prohibitions on official representatives representing these

5    agencies to speak at said conference.  But again, this goes

6    to we need the guidance.  We need to know how -- if it's

7    part of the parade of horribles or if it's within

8    established areas of discretion.

9        **THE COURT:**  You know, I confess I don't know that

10    much about the ABA other than it's a nonprofit that likes

11    the rule of law, but it strikes me that the ABA doesn't have

12    the same -- there's not the same societal interest in having

13    individuals being able to choose the lawyers that represent

14    them and in encouraging lawyers to take positions that might

15    be unpopular or indeed adverse to the current federal

16    government.

17        **MR. LAWSON:**  Well, on that point, as it relates,

18    again, to Section 5, access to buildings, employment, et

19    cetera, I will be the broken record and just say we need the

20    guidance, it's not ripe.  The Court's concern is not

21    ill-founded, we just don't know if it holds.  And if the

22    Court issues the order as requested, we won't know.  As it

23    relates to Section 3 and contracting, I would just repeat

24    the arguments I made earlier.

25        **THE COURT:**  All right, thank you very much.

1          **MR. LAWSON:**  Thank you, Your Honor.

2          **THE COURT:**  Mr. Verrilli.

3          **MR. VERRILLI:**  Thank you, Your Honor.  I'm going

4     to try to address some specific things that we heard from

5     the United States.  First, this point about the guidance.

6     You know, I'd call that argument a red herring, but that

7     would be unfair to red herrings.  These executive orders are

8     law firm-specific.  They can issue general guidance

9     tomorrow, tomorrow.  That's all they would need to do to

10    solve the whole problem, but they don't.

11         **THE COURT:**  Well, and they can develop guidance

12    even if there's an injunction in place.

13         **MR. VERRILLI:**  Of course they can.  I mean, you

14    know -- I'll try to control myself here, but it is a

15    completely insubstantial argument.  Now with respect to the

16    government as contractor and landlord, Your Honor's

17    questions, I think, I have elucidated the problem with that

18    argument, is that you can't violate the Constitution as a

19    contractor.  You can't violate the Constitution as a

20    landlord.  The Justice Department could not constitutionally

21    adopt a rule that said anyone who is a registered Democrat

22    may not enter the Department of Justice for a meeting.  It

23    could not constitutionally adopt a rule that said no black

24    person may enter the Department of Justice.  They can't act

25    unconstitutionally.

1              And as Your Honor's question made clear, this kind

2      of viewpoint discrimination and this kind of retaliation is

3      unconstitutional.  They can't do it as a contractor; they

4      can't do it as a landlord; they can't do it as a sovereign;

5      they can't do it, period.  Now --

6              **THE COURT:**  And what about your friend's point

7      that the LBJ order and other authorities support the notion

8      that the government can steer policy preferences through

9      contracting?

10             **MR. VERRILLI:**  So my friend, Mr. Lawson, made a

11     reference to the allegation of racial discrimination.  I

12     assume what he's referring to is the Susman Prize.  Of

13     course, the Susman Prize is lawful.  It's described in the

14     Srinivasan declaration.  Your Honor can look at it, it's

15     lawful, there's nothing unlawful about it.  And the other

16     thing is it certainly hasn't been adjudicated as unlawful by

17     anybody because we haven't had any process of any kind.  And

18     so the idea that you can invoke this notion that government

19     can pursue social policy to justify this kind of vindictive,

20     retaliatory order I think is just, again, completely

21     insubstantial argument.

22             Now, if I could, with respect to Section 1, my

23     friend says, well, that's just government speech.  A couple

24     of points about that.  I would urge on the Court the Vullo

25     case's discussion about that very issue.  That was exactly

1   the argument that the state made in Vullo: well, yeah, you

2   need to separate out the fact that we were criticizing the

3   NRA from these other actions we took for unlawful conduct by

4   the NRA.  And what the court held is no, no, no, you have to

5   consider them together.  You have to look at it as a whole,

6   as a pattern, and what the pattern shows you is that this

7   was in retaliation for their exercise of First Amendment

8   freedoms.

9        And I do think that goes back to the contractor

10   point we were just discussing.  You know, that logic in

11   Vullo seems to me to apply fully, that even -- as I said,

12   the prize is lawful, and it's certainly never been

13   adjudicated unlawful.  But even if it were, they can't do

14   this.  They can't do this because of that.  They can't

15   engage in this kind of retaliation.  And that was the case

16   in Vullo, you know, the NRA had violated the insurance

17   regulations, there wasn't any doubt about that.  So again,

18   nothing to that argument.

19        **THE COURT:**  And would that argument be the same if

20   the entirety of the executive order was Section 1 and there

21   weren't these Sections 3 and 5, which are tying action to

22   that statement?

23        **MR. VERRILLI:**  Yeah, that was the next point I

24   wanted to make actually, Your Honor.  The idea that Section

25   1 is just some standalone exercise in government speech,

1    again, seems -- I'll restrain myself here, let's call it

2    completely insubstantial.  Section 1 says that Susman

3    Godfrey is engaging in activities inconsistent with the

4    interests of the United States, and that the firm should not

5    have access to the nation's secrets nor be deemed

6    responsible stewards of any federal funds.

7         And then if one drops down to Section 3,

8    subsection two -- and this is the contracting section, it

9    instructs federal agencies, in addition to dropping the

10   specific contracts, to otherwise align their agency funding

11   decisions with the interests of the citizens of the United

12   States.  Paragraph one in Section 1 specifically said that

13   Susman Godfrey, in the view of the President, is acting in a

14   manner inimical to the interests of the United States.  So

15   the idea that this is just speech is, it seems to me, again,

16   completely insubstantial.

17        My friend's invocation of O'Brien, et cetera, what

18   that law is is that when there's a facially neutral statute

19   or a facially neutral government action, that only in rare

20   circumstances will a court look behind a facially neutral

21   action to see whether there's unconstitutional motive.  Now,

22   sometimes courts do, and there is First Amendment law saying

23   that you do.  But there's no need to do that here.  Beyond

24   constitutional motivation is right there in black and white

25   in the executive order.  It says it's being done in

1    retaliation for advocacy and speech, it says it.

2         And then if you had any doubts, if the Court had

3    any doubts about that, there's some publicly available

4    statements that we have referred to and quoted in our

5    complaint.  I'd direct the Court's attention to paragraph

6    101 of the complaint where we quote the President telling a

7    news outlet:  "We have lots of law firms that we're going to

8    be going after because they were very dishonest people.

9    They're a crooked law firm.  They're violent, vicious

10   lawyers.  They're fake lawyers."  That's the same president

11   who signed this executive order.

12        Then paragraph 105, this was not the President but

13   someone else in the White House telling the Washington Post:

14   "The President doesn't believe they," these firms, "should

15   have the privileges afforded to companies of their stature

16   to work and operate with the federal government since they

17   have made it very clear they are vehemently against the

18   President of the United States and their work proves that."

19   That's a White House official.  There isn't any doubt about

20   what this is.

21        If the Court has no further questions, I'd just

22   like to leave the Court with one additional thought, which I

23   think is important.  Think about what actually the

24   Department of Justice is asking you to bless here in this

25   case.  In the world that they're trying to bring about, when

1    Mr. Lawson or anybody in the chain of command above him, all

2    the way up to the Attorney General, four years from now,

3    they're done with their government service, there's a new

4    president, they're out there looking for a job, the new

5    president would be, on their view, entirely within his

6    rights or her rights to say, you know, the position that the

7    Department of Justice took in court today defending this

8    executive order was, to use the language that they used

9    against Jenner & Block, anti-American.  And the next

10   president could issue an executive order that says any law

11   firm that hires anybody who did that in court, who made that

12   representation of their client in that way in court, will

13   suffer exactly the same sanctions and disabilities that this

14   order imposes on Susman Godfrey.

15        And as we said in our complaint, today it's Susman

16   Godfrey, but if they're right, this could be anyone for any

17   reason at any time.  And make no mistake, they have made a

18   lot of progress already.  Some very prominent law firms have

19   bent the knee -- to use the words of the White House press

20   secretary, bent the knee by offering up hundreds of millions

21   of dollars in tribute to stay on the President's good side.

22   We're sliding very fast into an abyss here.  There's only

23   one way to stop that slide, and it's for the courts to act

24   decisively, and to act decisively now.

25        I respectfully submit, Your Honor, that, above

1    all, is what the Article III judicial power is for.  So we

2    respectfully ask this Court to grant a TRO, as we've

3    requested, and to move this case swiftly to a final

4    determination repudiating this unconstitutional executive

5    order.

6          **THE COURT:**  All right, thank you very much.

7          **MR. VERRILLI:**  Thank you.

8          **THE COURT:**  It's 3:05 now.  The Court will take a

9    brief recess until 3:15 and then we'll return with a ruling.

10        (Off the record at 3:05 p.m.)

11        (Back on the record at 3:16 p.m.)

12         **THE COURT:**  So thank you to the parties for their

13   arguments today.  I'm now going to issue an oral ruling,

14   which I will follow up with a written order shortly.  So

15   Plaintiff Susman Godfrey LLP moves for a temporary

16   restraining order to enjoin enforcement of Sections 1, 3 and

17   5 of President Trump's Executive Order 14263 dated

18   April 9th, 2025, entitled, quote, Addressing Risks from

19   Susman Godfrey, end quote.

20         After hearing from the parties, I am inclined to

21   grant the temporary restraining order, and I will set forth

22   in brief my reasons why.  First the legal standard.  A

23   temporary restraining order is an extraordinary remedy meant

24   to prevent serious and imminent harm in dire circumstances.

25   To obtain one, a court -- a party must, quote, show a

1   substantial likelihood of success on the merits; that it

2   would suffer irreparable injury if the injunction were not

3   granted; that an injunction would not substantially injure

4   other interested parties; and that the public interest would

5   be furthered by the injunction, end quote.  That comes from

6   Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290,

7   297; that's D.C. Circuit, 2006.

8          These four considerations are factors, not

9   elements, and a district court must balance the strength of

10   the requesting party's arguments in each of the four

11   required areas.  When the government is the opposing party,

12   the third and fourth factors merge.  That comes from a

13   variety of cases, but for purposes of the court record, I'll

14   cite Pursuing America's Greatness vs. Federal Election

15   Commission, 831 F.3d 500, jump cite 511, D.C. Circuit, 2016.

16   Here, Susman Godfrey has met its burden to satisfy each of

17   the factors, and therefore it is entitled to a temporary

18   restraining order enjoining the enforcement of Sections 1, 3

19   and 5 of the executive order.

20          Starting with the first factor, the likelihood of

21   success on the merits, the Court determines that Susman is

22   likely to succeed on the merits of their claims.  The Court

23   need not address each, but will focus on the First and Fifth

24   Amendment harms in brief.  As to the First Amendment, the

25   executive order is likely to violate the First Amendment for

1   several of the reasons outlined by Susman Godfrey in their

2   motion.  The order retaliates against the firm and its

3   clients for their actual and perceived exercise of speech

4   and associational rights.  The Court and the parties

5   discussed the NRA vs. Vullo case a lot today, and that

6   stands for the notion that, quote, use of the power of the

7   state to punish or suppress disfavored expression, end

8   quote, is prohibited.

9        In order to demonstrate First Amendment

10  retaliation, Susman must show that it, one, engaged in

11  conduct protected by the First Amendment; two, that a causal

12  link exists between the exercise of a constitutional right

13  and the adverse action; and three, that the government took

14  adverse action sufficient to deter a person of ordinary

15  firmness from speaking again.  That test comes from Aref vs.

16  Lynch, 833 F.3d 242, jump cite 258, D.C. Circuit, 2016.

17       Susman is likely to show a likelihood of success

18  on all three elements.  First, the firm's advocacy on behalf

19  of its clients, advice to its clients and petitioning of the

20  courts on behalf of its clients constitute constitutionally

21  protected expression that implicates central First Amendment

22  concerns.  That comes from Legal Services Corp. vs.

23  Velazquez, 531 U.S. at 547 and 548.  Second, the retaliatory

24  nature of the executive order is plain from the language of

25  the EO; namely, Section 1.  Further, the Court agrees the

1    context is important here.  The order against Susman is not

2    the first of its kind, it follows orders against Paul Weiss,

3    WilmerHale, Perkins Coie and others.  Notably, every firm to

4    have challenged the executive order has received a temporary

5    restraining order against its enforcement.

6         Third, the executive order constitutes a

7    sufficiently adverse action against the firm, quote, to give

8    rise to an actionable First Amendment claim, end quote.

9    That's Houston Community vs. Wilson, 595 U.S. 468, jump cite

10   477, 2022.  The order threatens the firm's clients with

11   disfavored contracting treatment and restricts attorneys

12   from engaging with federal employees, which is a routine

13   activity that is necessary for a wide range of the firm's

14   representations.  The order additionally threatens to deny

15   Susman's personnel access to government buildings, including

16   federal courthouses.  Any one of these actions alone meets

17   the standard for adverse action.

18        The executive order also discriminates against the

19   firm on the basis of viewpoint.  The order refers to the

20   firm's participation in the, quote, legal system in the

21   context of elections.  And it is highly likely that Susman

22   will be able to demonstrate that these references are veiled

23   illusions to the firm's reputation of Dominion Voting, state

24   government entities and other clients in connection with the

25   2020 election.

1       Again, quoting Vullo:  "At the heart of the First

2   Amendment's free speech clause is the recognition that

3   viewpoint discrimination is uniquely harmful to a free and

4   democratic society."  Viewpoint discrimination is subject to

5   strict scrutiny, which means that the government's action

6   must be sustained or will be sustained only if the

7   government proves that the order is narrowly tailored to

8   serve compelling governmental interests.  As the firm

9   argues, viewpoint discrimination, in the context of legal

10  representation, is especially pernicious.  In the context of

11  strict scrutiny, such viewpoint discrimination is all but

12  dispositive of the strict scrutiny test.

13      The Court agrees with Susman that nothing in the

14  order shows a compelling interest.  The order's unexplained

15  reference to national security and the supposed funding of

16  groups that, quote, engage in dangerous efforts to undermine

17  the effectiveness of the United States military through the

18  injection of political and radical ideology, end quote, is

19  quite vague; so much so that no party here today actually

20  knows what it is referencing.  Additionally, the firm --

21  sorry, the executive order's reliance on a purported award

22  that -- as to students of color and to representation of

23  individuals involved with voting litigation bears no

24  connection to the national security concerns that the

25  executive order is trying to promote.

1    In a similar vein, the order lacks the narrow

2    tailoring that would be required because it threatens the

3    termination of all government contracts held by any clients

4    of the firm but does not justify this far-reaching

5    punishment.  Further, it allows for barring all Susman

6    attorneys and staff from federal buildings, which could mean

7    courthouses, Post Offices, the VA hospital and beyond.

8    The Court will also find that Susman is likely to

9    prevail on its Fifth Amendment claim that the order violates

10    its right to due process.  The Due Process Clause is

11    violated when the plaintiff faces a deprivation of a

12    protected liberty or property interest and has not received

13    the process that is due.  Here, the firm was deprived of

14    protected liberty and property interests that include the

15    right of its attorneys to pursue their chosen profession,

16    the firm's good name, reputation, honor and integrity, and

17    the constitutionally protected interest in its contracts

18    with its own clients.  The firm has shown that the order was

19    issued with no process whatever, and it also raises viable

20    concerns that the order is impermissibly vague, and that

21    vagueness is its own independent due process flaw.

22    A federal law is unconstitutionally vague and thus

23    violates due process if it, quote, fails to provide a person

24    of ordinary intelligence fair notice of what is prohibited

25    or is so standardless that it authorizes or encourages

1    seriously discriminatory enforcement, end quote.  That is

2    from United States v. Williams, 553 U.S. 285, jump cite 304,

3    2008.

4         The government further finds that the firm has

5    made a showing that it is likely to succeed on other aspects

6    of its Fifth Amendment claims, including its right to equal

7    protection and its client's due process right to counsel.

8    However, given the compelling nature of the First Amendment

9    harms and the due process claim, the Court need not go into

10   those at length.

11        Next I want to turn to irreparable injury.  It's

12   well established that irreparable injury is a high standard

13   and the injury must be both certain and great, actual and

14   not theoretical, and of such imminence that there is a clear

15   and present need for equitable relief.  Additionally, the

16   injury must be beyond remediation, meaning that the

17   possibility of adequate compensatory or other corrective

18   relief at a later date could show against irreparable harm.

19   The Court concludes that Susman has carried its burden here.

20        Susman has described several harms to its firm.

21   First, it has argued that the order has impaired its First

22   and Fifth Amendment constitutional rights.  With regard to

23   the First Amendment, the loss of First Amendment freedoms,

24   even for minimal periods of time, alone constitutes

25   irreparable injury.  The Court agrees that if it does not

1    grant a TRO, Susman will suffer certain and imminent injury

2    because the order chills the firm's speech and advocacy.

3           Next, with regard to the Fifth Amendment, a

4    violation of Fifth Amendment due process rights, which

5    includes unlawful interference with the right to counsel,

6    can give rise to irreparable harm.  That is also true of

7    other Fifth Amendment harms the Court finds that the firm is

8    likely to establish, including equal protection.  Second,

9    the firm explains that it will suffer severe and irreparable

10   reputational harm as a result of the executive order because

11   statements in the order could damage the firm's corporate

12   good will and reputation.  Relying on the Srinivasan

13   declaration, Susman points to the order's description of the

14   firm's work as, quote, dangerous and, quote, detrimental to

15   critical American interests, end quote, and its accusation

16   that the firm is, quote, spearheading efforts to weaponize

17   the American legal system and degrade the quality of

18   American elections, end quote.  The Court agrees that this

19   characterization indeed threatens reputational harm and

20   justifies emergency relief.

21           Third, the firm argues that it is already

22   suffering irreparable economic injuries explaining that,

23   quote, without relief from the Court, the executive order

24   will subject Susman to unrecoverable losses, end quote.  By

25   not being able to meet with federal officials when one-third

1    of its business includes federal cases and where it has

2    cases not just in federal court, but also before various

3    federal agencies, including U.S. Attorney's Offices, the

4    Patent Review Board, the Coast Guard, and I believe other

5    agencies, will stymie a critical aspect of its business.

6          That is especially so when the firm engages in the

7    types of litigation that are particularly adjacent to the

8    government, including qui tam litigation and patent

9    litigation, as the firm has supported through its

10   declarations.  And while Susman admits that it has not yet

11   had any meetings canceled and has not yet been barred from

12   any federal building, it has pointed out there's every

13   reason to believe that the refusals are imminent.  And the

14   firm has already been fielding requests from clients about

15   how to handle such a situation.

16         Additionally, the order is discouraging current

17   clients from continuing their relationships with the firm

18   and prospective clients from beginning new relationships.

19   In particular, because the executive order directs agencies

20   to terminate contracts with contractors who have hired the

21   firm to perform services.  So the Court finds that for

22   purposes of a TRO, the firm has sufficiently demonstrated

23   that the possible loss resulting from the order threatens

24   the very existence of its business and warrants emergency

25   relief.

1    Turning to the balance of the equities and the

2    public interest, as noted, when the government is the

3    opposing party in the case, the third factor -- which is

4    harm to other parties, and the fourth factor -- which is the

5    public interest, merge.  Here, the balance of equities

6    overwhelmingly favors granting a TRO in this case.  The

7    government has sought to use its immense power to dictate

8    the positions that law firms may and may not take.  The

9    executive order seeks to control who law firms are allowed

10   to represent.  And this immensely oppressive power threatens

11   the very foundation of legal representation in our country.

12   The adversarial process lies at the heart of our

13   judicial system and maintains that all individuals,

14   regardless of beliefs, are entitled to representation.  As

15   the court wrote in Velazquez:  "An independent judiciary

16   requires an independent bar."  Here, the executive order

17   specifically targets lawyers because of the clients that

18   they represented.  The executive order is based on a

19   personal vendetta against a particular firm.  And frankly, I

20   think the framers of our Constitution would see this as a

21   shocking abuse of power.

22   We've already seen the effects of similar

23   executive orders against other law firms.  Law firms across

24   the country are entering into agreements with the government

25   out of fear that they will be targeted next, and that

1    coercion is plain and simple.  And while I wish other firms

2    were not capitulating as readily, I admire firms like Susman

3    for standing up and challenging it when does threaten the

4    very existence of their business.

5         But even for the many firms that have entered into

6    agreements with the administration, there is nothing

7    stopping the government from returning to target them in the

8    future.  But at base, the government cannot hold lawyers

9    hostage to force them to agree with it.  Allowing the

10   lawyers to coerce private -- sorry, allowing the government

11   to coerce private businesses, law firms and lawyers solely

12   on the basis of their views is antithetical to our

13   constitutional republic and hampers this Court and every

14   court's ability to adjudicate its cases.  Because this

15   executive order attacks a core principle of client

16   representation and threatens to punish both Susman and the

17   legal industry as a whole, the Court finds that the public

18   interest weighs in favor of granting a TRO.

19        On the flip side, granting a TRO would not inflict

20   harm to the government.  The government has no legal

21   interest in breaking the law.  And furthermore, as I've

22   already said, the government is purely trying to control

23   what private lawyers may do, which I do not think will

24   withstand constitutional scrutiny.

25        So for all of those reasons, today I will impose a

1    temporary restraining order.  I will put this in writing,

2    but it is ordered that plaintiff's motion for a temporary

3    restraining order is granted.

4            It is further ordered that defendants are enjoined

5    from implementing or giving effect to Sections 1, 3 and 5 of

6    the executive order of April 9th, 2025 entitled Addressing

7    Risks from Susman Godfrey, including by relying on any of

8    the statements in Section 1.

9            It is further ordered that defendants are directed

10   to rescind any and all guidance or direction that has

11   already issued that relates to implementing or enforcing

12   Sections 1, 3 and 5 of the executive order.

13           It is further ordered the defendants are directed

14   to immediately issue guidance to their officers, staff,

15   employees and contractors to disregard Sections 1, 3 and 5

16   of the executive order and carry on as if those sections of

17   the executive order were never issued.

18           It is further ordered that the defendants are

19   directed to immediately issue guidance to other agencies

20   subject to the executive order to suspend and rescind any

21   implementation or enforcement of Sections 1, 3 and 5.

22           It is further ordered the defendants are directed

23   to immediately, A, communicate to every recipient of a

24   request for a disclosure of any relationship with Susman

25   Godfrey or any person associated with the firm made pursuant

1    to Section 33(a) of the executive order, that such request

2    is rescinded until further order of the Court; and B, cease

3    making such requests for disclosure pursuant to Section

4    33(a) of the executive order until further order of the

5    Court.

6              It is further ordered the defendants are directed

7    to take in good faith any other steps that are necessary to

8    prevent the implementation or enforcement of Sections 1, 3

9    and 5 of the executive order.

10             And finally, it is ordered that defendants shall

11   file a joint -- file a status report by 5:00 p.m. tomorrow,

12   April 16th indicating the steps they've taken to comply with

13   the Court's TRO.

14             I do want to turn to scheduling, but before I do,

15   I do want to note that I am declining to impose a bond under

16   Federal Rule of Civil Procedure 65(c).  Under Rule 65(c),

17   the Court has broad discretion to determine the appropriate

18   amount of an injunction bond, including the discretion to

19   award no bond at all.  And here, requiring a bond would

20   potentially preclude Susman Godfrey's right to judicial

21   review.

22             So I will get a written order out later today.  I

23   would like to hear from the parties on whether there is a

24   need to proceed to preliminary injunction briefing or

25   whether we can move just to summary judgment.  And I'll hear

1    first from the plaintiffs.

2            MR. VERRILLI:  Thank you, Your Honor.  I believe

3    that the course here ought to parallel the course in the

4    other cases; in other words, move directly to summary

5    judgment.  With respect to the schedule, we do want

6    resolution expeditiously, as I said before.  With the

7    Court's indulgence, it may be that we can work out a

8    schedule jointly with the United States for prompt

9    submission of dispositive motions and then a hearing at Your

10   Honor's discretion.

11           It might make sense if we could schedule a brief

12   telephonic status conference in the next day or two so that

13   we can just nail that down and make sure that we've got

14   agreement upon that.  And we haven't discussed specific

15   dates yet, but I suspect we'll be able to work out a plan

16   that's amenable to both sides.  And if it's amenable to the

17   Court, then we can move forward that way.

18           THE COURT:  All right, thank you.  Anything to

19   add?

20           MR. LAWSON:  No, Your Honor, we're happy to move

21   quickly.

22           THE COURT:  All right.  I'll ask the parties to

23   file a joint status report by 5:00 p.m. tomorrow setting

24   forth the briefing schedule for summary judgment briefing

25   mindful of the fact that the TRO will be in effect for 14

1    days, so until April 29th.  If the parties agree to extend

2    it by another two weeks, that gives you a bit more time to

3    have your summary judgment briefing.  I would just ask that

4    you leave me at least a day or two to go through the

5    briefing before we have our hearing and before I need to

6    render any ruling before any TRO might expire.

7              All right.  Is there anything else you wish to

8    address today, Mr. Verrilli?

9              **MR. VERRILLI:**  Nothing.  Thank you, Your Honor.

10             **THE COURT:**  Anything else from you, Mr. Lawson?

11             **MR. LAWSON:**  No, Your Honor.

12             **THE COURT:**  All right, thank you very much.  I

13   appreciate everyone's availability today.  I'm grateful for

14   the arguments, and I will look out for the order on

15   compliance and the joint briefing schedule.  This matter is

16   adjourned.

17             (Proceedings adjourned at 3:36 p.m.)

18

19

20

21

22

23

24

25

1                **C E R T I F I C A T E**

2

3              I, **Jeff M. Hook, Official Court Reporter,**

4       certify that the foregoing is a true and correct transcript

5       of the record of proceedings in the above-entitled matter.

6

7

8

9       _April 16, 2025_                  _____

10              **DATE**                          **Jeff M. Hook**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DEPUTY CLERK:**
**[1]**   2/2
**MR. LAWSON:**
**[28]**   2/21
17/21 17/23
18/5 18/16
18/21 18/25
20/4 23/12
25/12 25/24
27/6 28/3
28/22 29/1
29/18 30/5
31/5 31/21
31/25 32/24
33/17 33/21
34/10 35/17
36/1 55/20
56/11
**MR. VERRILLI:**
**[27]**   2/7 2/14
3/8 4/3 4/6
6/3 6/14 7/4
7/17 7/25 9/12
9/20 11/6 12/2
12/11 13/22
15/6 16/21
16/24 17/18
36/3 36/13
37/10 38/23
42/7 55/2 56/9
**THE COURT:**
**[56]**   2/13
2/18 2/24 3/21
4/5 5/24 6/6
6/22 7/12 7/18
9/8 9/19 11/4
11/25 12/4
13/13 15/4
16/17 16/22
17/17 17/19
17/22 18/2
18/13 18/20
18/24 19/21
22/24 25/10
25/18 27/4
27/25 28/16
28/24 29/15
29/20 30/25
31/18 31/22
32/18 33/12
33/19 34/1
35/9 35/25
36/2 36/11
37/6 38/19
42/6 42/8
42/12 55/18

'
**'71 [1]**   21/15

**1**
**1.4 [2]**   20/13
20/15
**101 [1]**   40/6
**105 [1]**   40/12
**1107 [2]**   1/4
2/4
**11246 [3]**   20/7
22/4 22/6
**1155 [1]**   1/14
**121 [1]**   21/6
**14 [1]**   55/25
**14263 [1]**
42/17
**15 [1]**   1/5
**159 [1]**   21/13
**168 [1]**   21/14
**16th [1]**   54/12
**171 [1]**   21/14
**1971 [1]**   21/16
**1979 [2]**   22/3
22/16
**1:25-cv-1107**
**[1]**   1/4

**2**
**20001 [1]**   1/25
**20004 [1]**   1/15
**2006 [1]**   43/7
**2008 [1]**   48/3
**2016 [2]**   43/15
44/16
**2020 [4]**   6/16
6/17 14/7
45/25
**2022 [1]**   45/10
**2025 [3]**   1/5
42/18 53/6
**20530 [1]**   1/20
**242 [1]**   44/16
**25-cv-1107 [1]**
2/4
**258 [1]**   44/16
**281 [1]**   22/3
**285 [1]**   48/2
**290 [1]**   43/6
**297 [1]**   43/7
**29th [1]**   56/1
**2:04 [1]**   1/7

**3**
**30 [2]**   10/7

30/16
**30,000-foot [1]**
17/23
**304 [1]**   48/2
**305 [1]**   22/3
**306 [1]**   22/3
**328 [1]**   32/20
**329 [1]**   32/20
**33 [2]**   54/1
54/4
**333 [1]**   1/24
**343 [1]**   21/23
**35 [1]**   10/7
**350 [1]**   1/17
**3:05 [1]**   42/8
**3:05 p.m [1]**
42/10
**3:15 and [1]**
42/9
**3:16 p.m [1]**
42/11
**3:36 p.m [1]**
56/17

**4**
**40 [2]**   21/5
21/5
**41 [2]**   20/12
20/14
**441 [1]**   22/3
**442 [1]**   21/13
**454 [1]**   43/6
**468 [1]**   45/9
**477 [1]**   45/10

**5**
**500 [1]**   43/15
**50th [1]**   1/17
**511 [1]**   43/15
**531 [1]**   44/23
**547 [1]**   44/23
**548 [1]**   44/23
**553 [1]**   48/2
**579 [1]**   21/23
**595 [1]**   45/9
**5:00 p.m [2]**
54/11 55/23

**6**
**60 [1]**   20/9
**60-1.4 [2]**
20/13 20/15
**65 [2]**   54/16
54/16

**7**
**7th [1]**   1/14

**8**
**831 [1]**   43/15
**833 [1]**   44/16

**9**
**90071 [1]**   1/17
**950 [1]**   1/20
**9th [2]**   42/18
53/6

**A**
**ab [1]**   24/4
**ABA [5]**   26/8
34/24 35/3
35/10 35/11
**abide [1]**   16/5
**ability [6]**
4/25 16/13
27/8 33/3 33/4
52/14
**able [18]**
10/15 10/16
10/17 10/20
10/23 10/25
11/2 13/2
17/16 18/18
21/7 22/25
32/22 32/23
35/13 45/22
49/25 55/15
**above [3]**   41/1
41/25 57/5
**above-entitled**
**[1]**   57/5
**absent [1]**
30/18
**abuse [1]**
51/21
**abyss [1]**
41/22
**access [7]**
19/12 33/22
35/1 35/2
35/18 39/5
45/15
**accusation [1]**
49/15
**achieve [1]**
16/5
**acknowledgement**
**[1]**   30/15
**acquisition [1]**
21/6
**across [1]**
51/23
**act [7]**   22/9
22/10 22/11
33/4 36/24

**41/23 41/24**
**acting [7]**
19/1 19/2 19/3
24/13 33/8
34/16 39/13
**action [12]**
1/3 2/4 21/25
28/19 38/21
39/19 39/21
44/13 44/14
45/7 45/17
46/5
**actionable [1]**
45/8
**actions [11]**
5/11 10/18
13/14 13/19
15/2 19/24
34/1 34/6 34/7
38/3 45/16
**activities [1]**
39/3
**activity [1]**
45/13
**actors [2]**
19/10 26/11
**actual [2]**
44/3 48/13
**actually [7]**
10/10 13/20
25/18 28/1
38/24 40/23
46/19
**add [1]**   55/19
**addition [1]**
39/9
**additional [2]**
4/11 40/22
**additionally**
**[4]**   45/14
46/20 48/15
50/16
**address [5]**
7/20 23/19
36/4 43/23
56/8
**Addressing [2]**
42/18 53/6
**adequate [1]**
48/17
**adjacent [1]**
50/7
**adjourned [2]**
56/16 56/17
**adjudicate [1]**
52/14
**adjudicated [2]**
37/16 38/13

**A**

**administration [5]**  3/24 9/9 14/15 29/15 52/6

**administration's [1]**  23/10

**Administrative [1]**  22/9

**admire [1]**  52/2

**Admissions [1]**  18/11

**admit [1]**  8/23

**admits [1]**  50/10

**adopt [2]**  36/21 36/23

**advance [6]**  21/8 21/10 21/17 22/19 32/10 32/16

**adversarial [1]**  51/12

**adverse [5]**  35/15 44/13 44/14 45/7 45/17

**advice [1]**  44/19

**advocacy [6]**  4/13 4/15 8/8 40/1 44/18 49/2

**afforded [1]**  40/15

**aftermath [3]**  6/16 6/17 14/7

**afternoon [6]**  2/18 2/21 3/2 3/9 17/21 17/22

**again [18]**  9/15 9/21 19/19 20/25 24/12 27/3 27/6 27/10 30/5 33/6 35/5 35/18 37/20 38/17 39/1 39/15 44/15 46/1

**against [21]**  3/9 3/16 4/12 4/14 14/5 16/11 17/12 27/5 28/20

30/1 40/17 41/9 44/2 45/1 45/2 45/5 45/7 45/18 48/18 51/19 51/23

**agencies [10]**  11/16 11/18 24/24 26/7 35/5 39/9 50/3 50/5 50/19 53/19

**agency [3]**  12/2 26/12 39/10

**ago [2]**  9/15 20/9

**agree [6]**  7/19 31/18 33/20 33/21 52/9 56/1

**agreement [1]**  55/14

**agreements [2]**  51/24 52/6

**agrees [4]**  44/25 46/13 48/25 49/18

**ahead [1]**  29/16

**aims [1]**  23/3

**al [2]**  1/6 2/4

**align [1]**  39/10

**ALIKHAN [1]**  1/10

**allegation [2]**  6/9 37/11

**allegations [3]**  13/22 14/6 18/3

**allege [1]**  12/7

**allow [1]**  25/1

**allowed [1]**  51/9

**allowing [2]**  52/9 52/10

**allows [1]**  47/5

**alone [2]**  45/16 48/24

**along [3]**  6/15 27/9 30/17

**amenable [2]**  55/16 55/16

**Amendment [32]**  4/12 5/25 8/4 8/14 8/20 8/22

10/1 17/11 24/2 29/11 31/3 31/7 31/10 31/15 38/7 39/22 43/24 43/24 43/25 44/9 44/11 44/21 45/8 47/9 48/6 48/8 48/22 48/23 48/23 49/3 49/4 49/7

**Amendment's [1]**  46/2

**America's [1]**  43/14

**American [9]**  6/10 6/11 11/24 12/3 26/3 41/9 49/15 49/17 49/18

**amount [1]**  54/18

**analogy [3]**  20/6 26/5 27/7

**analysis [5]**  8/10 23/18 24/10 31/3 33/10

**analyzing [1]**  34/15

**ANDERS [2]**  1/13 2/16

**Angeles [1]**  1/17

**angle [4]**  20/5 21/4 26/12 34/23

**answer your [1]**  13/24

**anti [3]**  11/24 12/3 41/9

**anti-American [3]**  11/24 12/3 41/9

**antithetical [1]**  52/12

**antitrust [1]**  10/21

**apologize [3]**  18/18 21/15 23/16

**appearance [1]**  2/6

**appearances [2]**  1/12 12/14

**appearing [1]**

2/25

**applies [2]**  31/10 32/20

**apply [7]**  10/7 23/18 25/25 27/10 31/2 31/15 38/11

**appreciate [3]**  2/25 23/1 56/13

**approach [1]**  33/10

**approached [1]**  19/2

**appropriate [3]**  31/20 33/2 54/17

**April [5]**  1/5 42/18 53/6 54/12 56/1

**April 16th [1]**  54/12

**April 29th [1]**  56/1

**April 9th [2]**  42/18 53/6

**apt [1]**  13/6

**area [3]**  21/19 26/19 28/11

**areas [2]**  35/8 43/11

**Aref [1]**  44/15

**argued [1]**  48/21

**argues [2]**  46/9 49/21

**argument [18]**  3/23 5/25 6/8 7/21 8/4 8/6 9/1 27/2 30/25 32/19 33/7 36/6 36/15 36/18 37/21 38/1 38/18 38/19

**arguments [7]**  22/25 24/9 24/13 35/24 42/13 43/10 56/14

**Arizona [1]**  6/16

**arrange [1]**  33/3

**Article [3]**  5/14 17/3 42/1

**aside [2]**  12/17 18/7

**aspect [2]**  34/22 50/5

**aspects [1]**  48/5

**assault [2]**  5/14 17/3

**assertion [1]**  17/1

**associate [2]**  2/22 4/17

**associated [2]**  13/15 53/25

**Association [2]**  21/12 26/4

**associational [1]**  44/4

**assume [4]**  6/14 33/17 33/19 37/12

**attack [2]**  13/9 13/10

**attacks [2]**  3/14 52/15

**attainder [1]**  5/17

**attention [4]**  20/12 21/3 30/23 40/5

**attorney [5]**  2/22 11/20 26/2 30/12 41/2

**Attorney's [1]**  50/3

**attorneys [3]**  45/11 47/6 47/15

**authorities [1]**  37/7

**authority [7]**  5/12 5/12 5/14 21/20 22/6 23/14 31/4

**authorization [1]**  22/1

**authorizes [1]**  47/25

**availability [1]**  56/13

**available [1]**  40/3

**Ave [2]**  1/17 1/20

**Avenue [1]**  1/24

**award [2]**  46/21 54/19

**aware [2]**  6/19

**A**

aware... [1]
7/15
axe [4]   10/13
10/14 11/11
13/1

**B**

back [6]   10/9
21/16 25/16
30/6 38/9
42/11
bad [1]   5/10
badly [1]
14/21
balance [4]
15/22 43/9
51/1 51/5
Bankruptcy [1]
1/24
Bantam [2]
19/14 32/5
bar [3]   17/7
26/3 51/16
barred [1]
50/11
barring [2]
25/22 47/5
base [1]   52/8
based [7]   5/17
5/18 6/3 9/25
13/10 14/6
51/18
bases [1]   6/15
basis [12]   5/3
5/7 7/13 11/23
12/13 12/15
14/13 20/2
28/20 34/20
45/19 52/12
Bates [2]
28/25 29/4
bears [2]   5/16
46/23
becomes [1]
29/7
been focused
[1]   9/17
beginning [4]
2/6 25/8 32/3
50/18
behalf [5]
4/13 14/5 34/4
44/18 44/20
behaving [1]
14/21
behind [3]
2/11 18/3

39/20
beliefs [1]
51/14
below [1]
11/21
bent [2]   41/19
41/20
best [2]   16/13
31/22
better [1]
29/2
beyond [4]
18/7 39/23
47/7 48/16
Bhatia [1]
2/11
bill [1]   5/17
bit [6]   2/20
5/10 13/24
13/25 27/7
56/2
black [3]   4/22
36/23 39/24
bless [2]
23/22 40/24
block [3]   3/10
11/22 41/9
blue [3]   4/4
9/3 9/15
board [2]   24/4
50/4
body [5]   20/9
20/24 21/9
24/1 34/14
bolt [1]   4/3
bond [4]   54/15
54/18 54/19
54/19
books [5]
19/14 19/15
19/17 20/21
32/5
bookstore [1]
19/15
both [5]   26/1
34/19 48/13
52/16 55/16
BRAD [2]   1/16
2/14
branch [2]
16/9 17/4
branch's [1]
28/10
brazenly [2]
3/11 3/13
breaking [1]
52/21
BRIAN [2]   1/16

2/14
brief [5]
30/21 42/9
42/22 43/24
briefing [6]
54/24 55/24
55/24 56/3
56/5 56/15
briefly [1]
27/18
bring [6]
10/14 10/15
16/19 16/19
30/1 40/25
brings [2]
13/3 19/25
broad [1]
54/17
broadcasting
[1]   3/4
broken [1]
35/19
Brown [2]   22/3
32/14
building [2]
25/23 50/12
buildings [4]
27/5 35/18
45/15 47/6
burden [2]
43/16 48/19
business [6]
19/10 20/22
50/1 50/5
50/24 52/4
businesses [1]
52/11

**C**

C.F.R [2]
20/12 20/15
CA [1]   1/17
call [2]   36/6
39/1
called [1]
25/6
calling [1]
23/13
came [1]   26/21
can [31]   2/12
7/5 8/1 12/7
14/18 16/9
22/9 23/3 25/2
25/3 25/4
25/10 25/25
26/16 27/10
29/8 31/23

33/15 34/2
36/8 36/11
36/13 37/8
37/14 37/18
37/19 49/6
54/25 55/7
55/13 55/17
canceled [2]
12/6 50/11
capacity [1]
26/15
capitulating
[1]   52/2
cards [1]
34/19
carried [1]
48/19
carry [1]
53/16
case [27]   4/22
5/10 5/13 13/5
17/1 17/8
18/12 18/22
19/7 19/14
20/10 21/9
21/11 21/22
22/16 23/19
24/1 28/17
28/24 32/15
34/14 38/15
40/25 42/3
44/5 51/3 51/6
case's [1]
37/25
cases [27]
5/19 6/1 11/1
11/14 12/5
12/14 12/15
13/13 15/22
16/19 16/22
19/16 19/25
21/11 23/16
23/22 24/18
25/14 28/16
31/10 31/11
34/19 43/13
50/1 50/2
52/14 55/4
catalyst [1]
9/10
category [5]
21/22 21/25
32/5 32/5
32/13
causal [1]
44/11
caution [2]
24/9 28/9

cease [1]   54/2
Census [1]
13/5
central [1]
44/21
certain [6]
9/13 26/14
29/16 32/6
48/13 49/1
certainly [5]
15/9 30/20
31/10 37/16
38/12
certify [1]
57/4
cetera [2]
35/19 39/17
chain [1]   41/1
chair [1]   26/1
chairman [1]
2/15
chairman's [2]
14/18 14/18
challenge [1]
27/16
challenged [1]
45/4
challenging [1]
52/3
chance [1]
23/1
Chaplaincy [1]
43/6
characterizatio
n [1]   49/19
Chief [1]   13/4
child [2]   7/24
8/1
chilling [1]
9/25
chills [1]
49/2
choice [2]   5/8
14/24
choose [2]
16/4 35/13
chosen [1]
47/15
Chrysler [1]
22/2
Churches [1]
43/6
Circuit [4]
21/16 43/7
43/15 44/16
circulated [1]
11/14
circumstances
[2]   39/20

**C**

circumstances... [1]   42/24
citations [1]   23/1
cite [8]   21/13 22/3 23/17 43/14 43/15 44/16 45/9 48/2
cited [1]   32/12
citizens [3]   13/7 19/15 39/11
civil [7]   1/3 2/4 4/19 6/2 6/5 22/10 54/16
claim [3]   45/8 47/9 48/9
claims [2]   43/22 48/6
clarify [2]   9/10 9/10
clarity [1]   6/8
classic [2]   19/14 27/21
clause [2]   46/2 47/10
CLE [1]   27/8
clear [5]   5/2 7/5 37/1 40/17 48/14
clearer [1]   14/25
Clearly [1]   28/13
client [8]   3/23 4/25 7/14 9/9 13/16 15/5 41/12 52/15
client's [2]   6/12 48/7
clients [23]   3/15 4/13 4/17 4/20 5/7 10/16 12/24 14/12 16/13 29/7 34/5 44/3 44/19 44/19 44/20 45/10 45/24 47/3 47/18 50/14 50/17 50/18 51/17

clients' [2]   14/12 17/14
closely [1]   29/3
closure [1]   34/17
Coast [1]   50/4
Code [1]   20/11
codified [1]   20/11
coerce [2]   52/10 52/11
coerce private [1]   52/10
coercion [1]   52/1
coherent [1]   28/5
Coie [3]   4/10 12/5 45/3
coincidence [3]   14/3 14/3 14/8
colleagues [1]   2/12
color [1]   46/22
COLUMBIA [1]   1/1
coming [7]   19/11 19/12 19/13 25/23 26/12 26/24 29/8
command [1]   41/1
commentators [1]   22/7
comments [2]   30/6 30/24
Commission [1]   43/15
committed [1]   11/22
committee [1]   19/16
common [1]   12/23
communicate [1]   53/23
Community [1]   45/9
companies [3]   23/9 29/22 40/15
comparable [1]   4/9
compelling [5]

8/9 31/23 46/8 46/14 48/8
compensatory [1]   48/17
competed [1]   19/24
complained [1]   13/14
complaint [3]   40/5 40/6 41/15
completely [8]   7/4 7/6 7/10 9/7 36/15 37/20 39/2 39/16
compliance [2]   20/20 56/15
compliant [2]   30/7 35/2
comply [2]   20/17 54/12
concern [4]   21/1 29/20 30/20 35/20
concerned [1]   19/15
concerns [4]   26/8 44/22 46/24 47/20
conclude [1]   27/18
concludes [1]   48/19
concrete [2]   25/2 27/16
conduct [3]   14/14 38/3 44/11
conference [3]   27/23 35/5 55/12
confess [1]   35/9
confessed [1]   6/22
confident [1]   26/25
conflict [2]   31/9 31/17
confusion [1]   6/23
Congress [2]   17/9 22/1
congressional [1]   22/5
connection [2]   45/24 46/24

consequences [1]   30/1
consequential [1]   8/21
consider [2]   24/25 38/5
considerable [1]   15/24
considerations [1]   43/8
consistent [3]   24/1 24/5 26/15
consists [1]   15/20
constitute [1]   44/20
constitutes [2]   45/6 48/24
Constitution [8]   1/24 15/12 16/11 17/3 17/16 36/18 36/19 51/20
constitutional [7]   5/12 12/17 39/24 44/12 48/22 52/13 52/24
constitutionally [4]   36/20 36/23 44/20 47/17
consulting [1]   30/15
contained [2]   18/7 18/17
contempt [1]   3/5
contents [1]   27/20
context [4]   45/1 45/21 46/9 46/10
continue [1]   9/23
continued [1]   14/23
continuing [1]   50/17
contract [4]   20/3 21/21 23/4 23/24
contracting [8]   19/12 19/19 20/23 33/3 35/23 37/9

39/8 45/11
contractor [9]   19/4 22/23 24/4 25/20 31/2 36/16 36/19 37/3 38/9
contractors [11]   12/20 20/7 20/15 20/22 21/12 29/23 30/3 30/8 32/11 50/20 53/15
contracts [7]   19/23 23/5 23/20 39/10 47/3 47/17 50/20
contractual [1]   23/8
control [3]   36/14 51/9 52/22
conversation [1]   31/6
core [2]   16/14 52/15
Corp [1]   44/22
corporate [1]   49/11
Corporation [1]   22/2
corrective [1]   48/17
correctly [1]   20/13
counsel [12]   2/5 2/16 3/7 18/6 19/6 23/17 24/19 25/5 26/22 29/2 48/7 49/5
country [3]   15/13 51/11 51/24
couple [2]   15/21 37/23
courage [1]   15/13
courageous [1]   15/7
course [14]   8/6 8/19 9/14 12/23 12/23 14/11 15/24 16/5 16/21 17/8 36/13

**C**

**course... [3]**
37/13 55/3
55/3
**court [86]**
**court's [17]**
3/19 12/1 12/3
18/5 20/12
20/25 21/3
23/21 27/10
27/11 30/20
30/23 35/20
40/5 52/14
54/13 55/7
**courthouse [1]**
25/23
**courthouses [3]**
11/3 45/16
47/7
**courts [14]**
1/24 4/8 4/16
5/14 8/3 8/16
13/6 17/4 22/7
28/15 34/19
39/22 41/23
44/20
**criminal [4]**
19/16 30/16
34/16 34/18
**critical [3]**
31/25 49/15
50/5
**criticizing [1]**
38/2
**crooked [1]**
40/9
**current [2]**
35/15 50/16
**cut [1]** 4/15
**cv [2]** 1/4 2/4

**D**

**D.C [3]** 43/7
43/15 44/16
**damage [1]**
49/11
**dangerous [3]**
6/24 46/16
49/14
**date [2]** 48/18
57/10
**dated [1]**
42/17
**dates [1]**
55/15
**day [2]** 55/12
56/4
**days [2]** 9/15

56/1
**DC [4]** 1/5
1/15 1/20 1/25
**dealing [1]**
24/17
**debarred [2]**
20/17 30/10
**debated [1]**
22/7
**decades [4]**
20/21 20/23
21/15 21/17
**decision [2]**
8/11 34/20
**decisions [2]**
8/2 39/11
**decisively [2]**
41/24 41/24
**declaration [4]**
7/7 10/6
37/14 49/13
**declarations
[2]** 12/12
50/10
**declining [1]**
54/15
**deemed [1]**
39/5
**defamatory [2]**
14/6 14/7
**defendants [9]**
1/7 1/19 53/4
53/9 53/13
53/18 53/22
54/6 54/10
**defending [5]**
9/16 9/16 9/17
9/18 41/7
**defense [3]**
17/14 21/18
30/16
**definition [1]**
16/14
**degrade [2]**
6/11 49/17
**degree [8]**
22/12 24/16
26/10 26/15
27/7 27/13
32/3 34/7
**Democrat [1]**
36/21
**democratic [1]**
46/4
**demonstrate [2]**
44/9 45/22
**demonstrated
[1]** 50/22

**denies [3]**
4/23 5/5 5/7
**deny [3]** 24/15
35/2 45/14
**departed [1]**
13/21
**Department [7]**
2/22 11/13
36/20 36/22
36/24 40/24
41/7
**departments [1]**
11/16
**deprivation [1]**
47/11
**deprived [1]**
47/13
**depth [1]** 26/4
**Deputy [2]**
2/22 26/2
**described [2]**
37/13 48/20
**description [1]**
49/13
**design [1]**
13/11
**destruction [1]**
34/18
**detail [2]**
28/3 28/4
**detailed [2]**
9/24 10/6
**deter [1]**
44/14
**determination
[1]** 42/4
**determine [1]**
54/17
**determines [1]**
43/21
**deterred [1]**
17/13
**detrimental [1]**
49/14
**develop [3]**
26/19 27/7
36/11
**developed [1]**
25/14
**developing [1]**
24/24
**dictate [1]**
51/7
**difference [1]**
27/22
**different [3]**
23/5 33/5 33/5
**difficult [3]**

28/11 29/7
29/13
**dire [1]** 42/24
**direct [3]**
5/14 17/3 40/5
**directed [5]**
53/9 53/13
53/19 53/22
54/6
**direction [3]**
26/6 31/12
53/10
**directly [1]**
55/4
**director [1]**
11/21
**directs [1]**
50/19
**disabilities
[3]** 9/4 12/22
41/13
**disagreement
[1]** 34/8
**disclose [1]**
30/3
**disclosure [2]**
53/24 54/3
**discouraging
[1]** 50/16
**discretion [6]**
22/22 35/2
35/8 54/17
54/18 55/10
**discriminate
[1]** 7/12
**discriminates
[1]** 45/18
**discriminating
[1]** 28/20
**discrimination
[20]** 4/14
8/15 8/20 8/22
11/23 18/8
20/5 21/4 31/8
31/19 32/1
33/15 33/23
34/3 37/2
37/11 46/3
46/4 46/9
46/11
**discriminatory
[2]** 34/21
48/1
**discussed [2]**
44/5 55/14
**discussing [3]**
18/9 21/24
38/10

**discussion [1]**
37/25
**disfavored [3]**
19/10 44/7
45/11
**dishonest [1]**
40/8
**dispositive [2]**
46/12 55/9
**disregard [1]**
53/15
**disrupt [2]**
4/16 4/19
**disrupting [1]**
4/24
**distance [1]**
26/11
**district [6]**
1/1 1/1 1/10
1/24 11/19
43/9
**diversify [1]**
20/8
**diversity [3]**
18/10 18/12
27/9
**documented [1]**
14/13
**DOJ [1]** 1/19
**DOJ-USAO [1]**
1/19
**dollars [2]**
10/20 41/21
**Dominion [5]**
6/12 13/17
14/1 14/5
45/23
**Don [1]** 2/7
**DONALD [1]**
1/12
**done [3]** 3/15
39/25 41/3
**doubt [4]** 11/8
13/12 38/17
40/19
**doubts [2]**
40/2 40/3
**down [6]** 10/14
10/15 20/13
34/12 39/7
55/13
**downstream [2]**
20/19 30/23
**draft [1]**
34/18
**drafted [1]**
24/22
**draw [5]** 20/12

**D**

**draw... [4]**
21/3 22/9 30/5
30/23
**draws [1]** 22/8
**driving [1]**
32/8
**drop [1]** 29/17
**dropped [2]**
4/2 14/4
**dropping [1]**
39/9
**drops [1]** 39/7
**due [12]** 3/22
4/24 9/1 32/24
47/10 47/10
47/13 47/21
47/23 48/7
48/9 49/4
**duty [2]** 11/5
11/6

**E**

**earlier [9]**
16/24 19/7
30/6 30/24
31/6 32/12
33/7 34/13
35/24
**easily [1]**
10/8
**Eastern [1]**
21/12
**economic [2]**
10/5 49/22
**effect [3]**
28/13 53/5
55/25
**effectiveness**
**[3]** 6/25
18/14 46/17
**effects [1]**
51/22
**efforts [6]**
6/10 6/24 7/12
9/8 46/16
49/16
**effuse [1]**
15/23
**election [6]**
6/16 6/17 6/18
14/7 43/14
45/25
**election-relate**
**d [1]** 6/18
**elections [3]**
6/11 45/21
49/18

**elements [2]**
43/9 44/18
**else [6]** 6/19
30/2 33/11
40/13 56/7
56/10
**elucidated [1]**
36/17
**emergency [2]**
49/20 50/24
**employees [2]**
45/12 53/15
**employer [2]**
24/14 26/13
**employment [3]**
19/20 26/16
35/18
**encourages [1]**
47/25
**encouraging [1]**
35/14
**encroaches [1]**
16/17
**end [9]** 42/19
43/5 44/7 45/8
46/18 48/1
49/15 49/18
49/24
**enforcement [6]**
42/16 43/18
45/5 48/1
53/21 54/8
**enforcing [1]**
53/11
**engage [5]**
6/24 23/8
33/14 38/15
46/16
**engaged [1]**
44/10
**engagement [2]**
26/3 26/11
**engages [1]**
50/6
**engaging [3]**
23/4 39/3
45/12
**England [1]**
43/6
**enjoin [2]**
28/18 42/16
**enjoined [1]**
53/4
**enjoining [1]**
43/18
**enough [1]**
5/16
**enter [5]** 11/3

16/4 31/4
36/22 36/24
**entered [3]**
25/15 29/4
52/5
**entering [2]**
26/23 51/24
**entirely [1]**
41/5
**entirety [1]**
38/20
**entities [3]**
19/10 20/16
45/24
**entitled [5]**
42/18 43/17
51/14 53/6
57/5
**entity [4]**
20/17 22/23
26/14 30/7
**entry [1]** 16/3
**environmental**
**[1]** 10/23
**EO [2]** 23/25
44/25
**equal [4]** 5/5
22/10 48/6
49/8
**equally [4]**
8/16 14/14
22/8 22/9
**equitable [1]**
48/15
**equities [2]**
51/1 51/5
**era [1]** 21/18
**especially [2]**
46/10 50/6
**establish [2]**
10/8 49/8
**established [4]**
10/5 22/20
35/8 48/12
**et [4]** 1/6 2/4
35/18 39/17
**eve [1]** 14/4
**even [14]** 5/6
9/6 11/2 11/5
11/7 12/17
15/4 27/12
32/14 36/12
38/11 38/13
48/24 52/5
**events [1]**
26/1
**everybody [2]**
2/25 26/5

**everyone [3]**
13/8 15/14
15/15
**everyone's [1]**
56/13
**evident [1]**
13/3
**exactly [4]**
8/12 10/13
37/25 41/13
**examine [1]**
17/24
**examines [1]**
24/9
**examining [2]**
22/4 22/17
**example [3]**
25/25 34/24
34/24
**excellent [1]**
23/12
**exceptions [1]**
6/4
**executive [54]**
1/6 2/3 3/10
3/12 4/23 8/3
8/23 10/3
10/12 11/16
13/14 14/3
14/23 16/9
20/7 20/18
20/20 21/20
22/6 28/10
33/3 34/3 36/7
38/20 39/25
40/11 41/8
41/10 42/4
42/17 43/19
43/25 44/24
45/4 45/6
45/18 46/21
46/25 49/10
49/23 50/19
51/9 51/16
51/18 51/23
52/15 53/6
53/12 53/16
53/17 53/20
54/1 54/4 54/9
**exercise [6]**
8/7 16/9 38/7
38/25 44/3
44/12
**exercises [1]**
3/11
**exhibit [1]**
13/7
**existence [3]**

14/24 50/24
52/4
**existential [1]**
14/23
**existing [3]**
23/5 23/14
24/2
**exists [1]**
44/12
**expedited [1]**
16/5
**expeditiously**
**[1]** 55/6
**experience [1]**
14/10
**expire [1]**
56/6
**explain [1]**
12/12
**explained [1]**
29/9
**explaining [1]**
49/22
**explains [1]**
49/9
**explanations**
**[2]** 14/16
14/16
**express [1]**
22/1
**expression [3]**
10/1 44/7
44/21
**extend [1]**
56/1
**extraordinarily**
**[1]** 29/13
**extraordinary**
**[2]** 20/9
42/23
**extremely [2]**
28/11 32/12

**F**

**F.2d [1]** 21/13
**F.3d [3]** 43/6
43/15 44/16
**face [4]** 4/23
8/17 13/9 24/7
**faces [1]**
47/11
**facially [3]**
39/18 39/19
39/20
**facility [1]**
35/3
**fact [4]** 5/13
6/3 38/2 55/25

**F**

**factor [3]**
43/20 51/3
51/4
**factors [4]**
15/21 43/8
43/12 43/17
**failing [1]**
20/17
**fails [1]**
47/23
**fair [2]** 18/11
47/24
**faith [1]** 54/7
**fake [1]** 40/10
**fall [3]** 10/14
11/11 22/21
**falls [4]** 13/1
21/21 21/24
31/15
**familiar [1]**
19/8
**far [7]** 12/7
21/6 25/4 28/3
29/9 33/1 47/4
**far-reaching
[1]** 47/4
**fast [2]** 9/14
41/22
**fatal [1]**
22/15
**favor [1]**
52/18
**favorite [2]**
7/24 8/1
**favors [1]**
51/6
**FDR [1]** 21/18
**fear [1]** 51/25
**federal [26]**
11/3 16/18
20/11 20/14
20/23 25/23
27/5 27/8
29/22 30/3
35/3 35/15
39/6 39/9
40/16 43/14
45/12 45/16
47/6 47/22
49/25 50/1
50/2 50/3
50/12 54/16
**fellowship [1]**
7/13
**few [3]** 6/4
9/15 13/13

**fielding [1]**
50/14
**Fifth [7]**
43/23 47/9
48/6 48/22
49/3 49/4 49/7
**Fifty [1]** 20/8
**file [3]** 54/11
54/11 55/23
**filed [3]** 3/1
12/10 27/1
**final [2]** 16/6
42/3
**finally [1]**
54/10
**find [1]** 47/8
**findings [1]**
14/13
**finds [5]** 32/3
48/4 49/7
50/21 52/17
**fine [2]** 19/13
26/17
**finish [1]**
21/16
**fired [1]** 24/3
**firm [50]** 2/10
5/6 6/2 6/4
6/18 6/24 7/8
8/19 11/22
13/9 13/10
13/16 13/20
14/24 15/6
15/18 16/11
26/22 28/20
29/23 29/24
32/21 34/4
36/8 39/4 40/9
41/11 44/2
45/3 45/7
45/19 46/8
46/20 47/4
47/13 47/18
48/4 48/20
49/7 49/9
49/16 49/21
50/6 50/9
50/14 50/17
50/21 50/22
51/19 53/25
**firm's [11]**
6/15 9/17
44/18 45/10
45/13 45/20
45/23 47/16
49/2 49/11
49/14
**firm-specific
[1]** 36/8

**firmness [1]**
44/15
**firms [21]**
3/14 3/25
14/10 14/11
14/12 14/15
15/2 15/5
15/17 29/16
40/7 40/14
41/18 51/8
51/9 51/23
51/23 52/1
52/2 52/5
52/11
**first [43]** 2/9
3/7 3/18 3/20
4/1 4/12 8/4
8/13 8/19 8/21
10/1 17/10
21/22 21/25
22/24 24/1
29/11 31/3
31/7 31/10
31/15 32/13
36/5 38/7
39/22 42/22
43/20 43/23
43/24 43/25
44/9 44/11
44/18 44/21
45/2 45/8 46/1
48/8 48/21
48/21 48/23
48/23 55/1
**fish [1]** 13/19
**Five [1]** 12/21
**flat [2]** 8/9
8/11
**flaw [1]** 47/21
**flip [2]** 13/24
52/19
**Floor [2]** 1/14
1/17
**flow [1]** 26/20
**focus [3]**
17/25 17/25
43/23
**focused [3]**
9/16 9/17 9/18
**focuses [1]**
31/1
**folks [1]**
13/20
**follow [1]**
42/14
**follows [1]**
45/2
**foot [1]** 17/23

**forbidden [1]**
3/5
**force [1]** 52/9
**foregoing [1]**
57/4
**foresight [1]**
24/19
**forgive [1]**
26/5
**forth [6]**
18/12 27/9
27/24 28/6
42/21 55/24
**forward [2]**
2/5 55/17
**found [1]** 4/10
**foundation [1]**
51/11
**founded [1]**
35/21
**four [3]** 41/2
43/8 43/10
**fourth [2]**
43/12 51/4
**framers [1]**
51/20
**frankly [2]**
11/6 51/19
**free [4]** 9/25
13/7 46/2 46/3
**freedoms [2]**
38/8 48/23
**friend [3]**
29/21 37/10
37/23
**friend's [2]**
37/6 39/17
**Friendly [1]**
13/4
**front [1]** 11/1
**FTC [1]** 26/1
**full [4]** 15/7
17/13 27/17
43/6
**fully [2]**
30/22 38/11
**fundamentally
[1]** 32/9
**funding [4]**
18/14 28/2
39/10 46/15
**funds [2]** 6/24
39/6
**further [16]**
18/6 18/17
22/2 34/21
40/21 44/25
47/5 48/4 53/4

53/9 53/13
53/18 53/22
54/2 54/4 54/6
**furthered [1]**
43/5
**furthermore [3]**
21/5 22/21
52/21
**future [4]**
13/12 23/7
23/19 52/8

**G**

**gender [1]**
11/23
**general [7]**
2/22 11/20
24/13 26/2
30/14 36/8
41/2
**generally [1]**
19/8
**genesis [1]**
34/8
**genuinely [1]**
13/25
**GINGER [2]**
1/13 2/16
**given [1]** 48/8
**gives [1]** 56/2
**giving [3]**
28/14 34/24
53/5
**GODFREY [22]**
1/3 2/3 2/8
2/10 3/1 10/11
12/24 12/25
14/4 15/6
16/12 16/15
39/3 39/13
41/14 41/16
42/15 42/19
43/16 44/1
53/7 53/25
**Godfrey's [1]**
54/20
**goes [6]** 6/8
12/21 21/19
22/8 35/5 38/9
**good [9]** 2/7
2/18 2/21
17/21 17/22
41/21 47/16
49/12 54/7
**Gospel [1]**
43/6
**government [59]**

**G**

government's
**[2]**    31/1 46/5
governmental
**[1]**    46/8
Governor [1]
6/17
Grand [1]    1/17
grant [4]
24/17 42/2
42/21 49/1
granted [2]
43/3 53/3
granting [3]
51/6 52/18
52/19
grateful [1]
56/13
grave [1]
17/10
gray [1]    18/11
great [6]    24/9
24/19 26/4
27/15 28/9
48/13
greater [1]
27/24
Greatness [1]
43/14
grievous [1]
15/17
grounds [1]
23/10
groups [5]
6/24 18/14
20/1 28/2
46/16
Guard [1]    50/4
guess [1]
31/14
guidance [21]
11/10 24/25
25/7 25/10
25/13 26/2
26/19 26/21
26/25 27/12
27/13 33/22
34/8 35/6
35/20 36/5
36/8 36/11
53/10 53/14
53/19
guidances [1]
25/1
guy [1]    32/21

**H**

hallmarks [1]

5/16
hampers [1]
52/13
handle [1]
50/15
handling [1]
18/23
handy [1]
23/17
hanging [2]
7/16 10/3
happen [1]
13/1
happened [7]
9/14 12/10
12/11 14/8
14/11 16/14
23/24
happy [2]    9/20
55/20
hard [2]    13/24
13/25
hardships [1]
15/22
harm [29]    5/21
9/19 9/23 9/24
9/24 10/1 10/2
10/4 10/5 10/5
10/8 10/11
11/9 12/16
12/17 12/18
12/19 13/11
13/11 15/1
15/17 16/6
42/24 48/18
49/6 49/10
49/19 51/4
52/20
harmful [1]
46/3
harms [6]    9/24
10/11 43/24
48/9 48/20
49/7
hat [1]    7/16
heads [2]
11/16 12/2
Healthy [3]
23/15 31/6
31/16
Healthy-Umbehr
**[1]**    31/16
hear [4]    3/6
27/2 54/23
54/25
heard [6]    4/2
5/2 9/5 18/5
25/3 36/4

hearing [5]
1/9 3/3 42/20
55/9 56/5
heart [2]    46/1
51/12
held [2]    38/4
47/3
help [1]    6/7
here's [1]
33/21
herring [1]
36/6
herrings [1]
36/7
hesitate [1]
26/23
high [4]    18/1
26/6 29/3
48/12
highlight [2]
27/11 27/15
highly [1]
45/21
hired [1]
50/20
hires [1]
41/11
hiring [3]
12/24 19/13
29/24
history [1]
3/12
hold [2]    27/8
52/8
holds [1]
35/21
honor [25]    2/2
2/7 2/21 5/22
9/13 9/20
11/12 12/11
14/9 15/25
16/25 17/23
18/5 18/16
34/10 36/1
36/3 37/14
38/24 41/25
47/16 55/2
55/20 56/9
56/11
Honor's [6]
5/1 9/2 14/1
36/16 37/1
55/10
HONORABLE [1]
1/10
HOOK [3]    1/23
57/3 57/10
hooks [1]    7/15

hope [1]    26/4
hopefully [1]
20/13
hoping [1]    6/7
horribles [3]
25/4 25/7 35/7
hospital [1]
47/7
hostage [1]
52/9
House [3]
40/13 40/19
41/19
housekeeping
**[1]**    5/24
Houston [1]
45/9
Howell [3]
29/1 29/5
hugely [1]
15/7
hundreds [2]
10/19 41/20

**I**

idea [8]    19/2
20/21 21/9
26/13 30/6
37/18 38/24
39/15
identical [1]
8/3
identifies [1]
7/8
ideology [3]
7/1 11/24
46/18
III [3]    5/14
17/3 42/1
ill [1]    35/21
ill-founded [1]
35/21
illuminating
**[1]**    11/15
illusions [1]
45/23
imagine [1]
25/3
immediate [3]
23/13 23/23
23/23
immediately [3]
53/14 53/19
53/23
immense [1]
51/7
immensely [1]
51/10

imminence [1]
48/14
imminent [3]
42/24 49/1
50/13
immune [1]
25/4
impaired [1]
48/21
impairing [1]
4/25
impermissibly
**[2]**    5/3 47/20
implement [2]
28/12 29/13
implementation
**[2]**    53/21
54/8
implementing
**[2]**    53/5
53/11
implicates [1]
44/21
implied [1]
22/1
importance [1]
7/10
important [4]
10/9 14/14
40/23 45/1
impose [3]
21/20 52/25
54/15
imposed [3]
5/11 8/18
12/22
imposes [1]
41/14
imposing [1]
9/3
improper [1]
19/9
in the [1]
15/5
incentivize [1]
23/3
incidental [1]
10/12
inclined [1]
42/20
include [1]
47/14
includes [2]
49/5 50/1
including [7]
45/15 48/6
49/8 50/3 50/8
53/7 54/18

**I**

inconsistent
[1]   39/3
incredibly [1]
9/5
indeed [2]
35/15 49/19
independence
[2]   5/15 17/4
independent [5]
17/7 17/7
47/21 51/15
51/16
indicating [2]
30/18 54/12
indication [1]
4/4
indications [1]
12/5
indisputably
[1]   12/18
individual [1]
30/12
individuals [7]
12/1 13/15
23/9 25/22
35/13 46/23
51/13
indulge [2]
24/14 33/1
indulgence [1]
55/7
industry [1]
52/17
infer [1]   4/21
inflict [3]
13/11 15/17
52/19
information [4]
18/7 18/17
29/23 30/3
informing [1]
11/25
inimical [1]
39/14
initial [1]
21/1
initially [1]
21/18
initiatives [1]
18/10
initio [1]
24/4
injection [2]
7/1 46/18
injunction [10]
28/14 28/23

29/6 29/14
36/12 43/2
43/3 43/5
54/18 54/24
injure [1]
43/3
injuries [1]
49/22
injury [9]
15/20 16/2
43/2 48/11
48/12 48/13
48/16 48/25
49/1
inquire [1]
34/21
inquiries [1]
33/1
inquiry [5]
20/19 30/11
30/23 32/1
32/6
instance [1]
17/9
instances [1]
9/6
instruct [1]
11/17
instruction [1]
28/14
instructs [1]
39/9
insubstantial
[4]   36/15
37/21 39/2
39/16
insurance [1]
38/16
integrity [1]
47/16
intellectual
[1]   11/1
intelligence
[1]   47/24
intent [1]
4/21
interacting [1]
26/14
interactions
[1]   26/7
interest [17]
15/22 16/1
16/8 16/15
25/21 26/11
27/4 31/23
35/12 43/4
46/14 47/12
47/17 51/2

51/5 52/18
52/21
interested [1]
43/4
interests [8]
8/10 17/14
39/4 39/11
39/14 46/8
47/14 49/15
interference
[1]   49/5
into [11]   3/21
12/19 13/5
16/12 25/23
27/16 34/21
41/22 48/9
51/24 52/5
introduce [3]
2/9 2/12 2/14
investigate [1]
29/24
investigation
[1]   12/19
invocation [1]
39/17
invoke [1]
37/18
involved [1]
46/23
involving [2]
15/23 19/8
IP [1]   30/1
ironclad [1]
8/13
ironically [1]
10/19
irreparable
[18]   5/21
9/23 9/24 10/1
10/5 10/8 11/8
12/16 14/25
15/19 43/2
48/11 48/12
48/18 48/25
49/6 49/9
49/22
is hanging [1]
7/16
issue [16]
6/21 17/24
18/8 19/8 21/2
24/14 24/18
24/22 26/21
32/8 36/8
37/25 41/10
42/13 53/14
53/19
issued [7]

9/15 24/24
26/2 27/13
47/19 53/11
53/17
issues [7]
24/21 27/12
29/11 30/11
31/7 33/24
35/22

**J**

Jackson's [2]
21/22 21/25
jail [1]   19/14
JEFF [3]   1/23
57/3 57/10
Jenner [7]   4/9
11/14 11/21
12/4 28/24
29/1 41/9
JEREMY [2]
1/13 2/16
job [3]   17/16
32/22 41/4
joint [3]
54/11 55/23
56/15
jointly [1]
55/8
JR [1]   1/12
judge [5]   1/10
11/20 13/4
28/23 28/25
judges [2]
16/20 29/4
judgment [4]
54/25 55/5
55/24 56/3
judicial [5]
14/13 17/4
42/1 51/13
54/20
judiciary [5]
5/15 17/7
17/15 28/10
51/15
jump [5]   25/16
43/15 44/16
45/9 48/2
jury [2]   11/5
11/6
justice [11]
2/23 11/14
11/23 13/4
21/21 21/25
36/20 36/22
36/24 40/24
41/7

justifies [1]
49/20
justify [2]
37/19 47/4

**K**

Kalpana [1]
2/11
keep [1]   26/22
keeping [1]
27/4
key [2]   3/10
19/6
kind [12]   9/2
10/4 23/11
25/15 25/24
27/6 37/1 37/2
37/17 37/19
38/15 45/2
kinds [2]
12/14 12/15
Kisor [1]
32/14
knee [2]   41/19
41/20
knowledge [4]
3/24 9/12
23/23 25/13
knows [2]   13/8
46/20
KREISBERG [2]
1/13 2/17

**L**

Labor [1]
21/13
lacks [1]   47/1
landlord [14]
19/4 19/19
24/13 25/21
25/21 31/1
33/4 33/8
33/13 33/14
34/23 36/16
36/20 37/4
language [5]
6/21 17/5
28/21 41/8
44/24
large [1]   21/8
larger [4]
20/19 20/20
24/6 28/6
largest [1]
24/10
last [4]   8/12
15/21 25/9
25/15

## L

**later [3]**
32/14 48/18
54/22
**latest [1]**
3/13
**law [32]**   3/14
8/20 9/25 10/8
11/22 13/9
13/10 15/11
16/11 17/15
20/10 20/24
21/9 24/1
26/16 34/15
35/2 35/11
36/8 39/18
39/22 40/7
40/9 41/10
41/18 47/22
51/8 51/9
51/23 51/23
52/11 52/21
**lawful [3]**
37/13 37/15
38/12
**laws [2]**   5/5
34/17
**LAWSON [6]**
1/19 2/22
17/20 37/10
41/1 56/10
**lawyer [1]**
30/16
**lawyers [14]**
4/19 5/8 15/8
16/18 17/12
35/13 35/14
40/10 40/10
51/17 52/8
52/10 52/11
52/23
**lawyers' [1]**
4/25
**LBJ [6]**   20/6
20/17 22/4
22/17 30/8
37/7
**leaders [1]**
2/9
**leading [1]**
21/11
**least [3]**
28/17 29/3
56/4
**leave [3]**
24/11 40/22
56/4

**legal [9]**   6/10
42/22 44/22
45/20 46/9
49/17 51/11
52/17 52/20
**legislation [1]**
17/10
**legislative [1]**
33/2
**length [1]**
48/10
**Leon [1]**   28/23
**less [1]**   25/8
**letter [2]**
11/7 19/17
**level [5]**
17/24 18/1
26/6 29/4
30/19
**levels [1]**
21/24
**liberty [2]**
47/12 47/14
**lies [3]**   16/1
16/9 51/12
**liked [1]**   27/2
**likelihood [7]**
3/18 4/6 5/20
7/21 43/1
43/20 44/17
**likely [8]**
4/11 43/22
43/25 44/17
45/21 47/8
48/5 49/8
**likes [1]**
35/10
**line [8]**   3/3
23/16 24/1
30/10 31/9
31/11 31/16
32/6
**lines [2]**   27/9
30/17
**link [1]**   44/12
**listening [1]**
3/4
**litigation [4]**
46/23 50/7
50/8 50/9
**little [3]**
13/24 13/25
30/22
**LLP [6]**   1/3
1/14 1/16 2/3
11/22 42/15
**local [1]**
11/19

**logic [1]**
38/10
**logical [1]**
34/20
**long [2]**   7/9
34/14
**longer [1]**
13/15
**look [10]**   8/1
11/13 14/10
14/14 14/15
20/4 37/14
38/5 39/20
56/14
**looking [4]**
7/18 13/19
31/18 41/4
**LOREN [1]**   1/10
**Los [1]**   1/17
**losing [1]**
34/1
**loss [2]**   48/23
50/23
**losses [1]**
49/24
**lost [1]**   34/12
**lot [5]**   23/2
29/21 30/25
41/18 44/5
**lots [1]**   40/7
**love [1]**   20/14
**Lucky [1]**
18/24
**Lynch [1]**
44/16

## M

**mail [1]**   11/7
**maintains [1]**
51/13
**making [2]**
17/13 54/3
**mandated [1]**
11/20
**manner [1]**
39/14
**many [2]**   32/16
52/5
**marshals [1]**
26/22
**Maryland [1]**
34/16
**material [1]**
30/15
**matter [6]**
5/24 9/25
14/17 27/17
56/15 57/5

**may [16]**   3/8
11/2 11/9
12/18 15/8
15/21 28/24
29/22 32/7
32/23 36/22
36/24 51/8
51/8 52/23
55/7
**maybe [8]**   6/19
14/2 14/3 14/8
27/9 27/23
31/1 32/18
**McGowan [1]**
34/16
**mean [7]**   9/2
13/24 13/25
19/22 33/19
36/13 47/6
**meaning [2]**
28/5 48/16
**means [3]**   8/10
28/2 46/5
**meant [1]**
42/23
**meet [4]**   10/16
10/22 10/24
49/25
**meeting [1]**
36/22
**meetings [4]**
12/5 12/13
26/17 50/11
**meets [1]**
45/16
**memoranda [1]**
11/13
**mentioned [1]**
3/22
**merge [3]**
29/25 43/12
51/5
**merits [9]**
3/19 4/7 5/20
5/23 7/22 9/21
43/1 43/21
43/22
**message [2]**
14/18 14/18
**met [1]**   43/16
**midstream [1]**
23/11
**might [12]**   7/2
15/4 19/25
23/7 25/8
25/25 26/19
28/15 32/21
35/14 55/11

**56/6**
**mighty [1]**
15/6
**military [7]**
6/25 7/10
18/15 20/2
28/2 34/6
46/17
**millions [2]**
10/19 41/20
**mind [2]**   6/20
13/4
**mindful [1]**
55/25
**minimal [2]**
27/23 48/24
**minimizing [1]**
26/7
**minutes [1]**
30/16
**mistake [1]**
41/17
**moment [1]**
33/18
**more [8]**   15/10
27/23 27/25
28/15 30/21
30/22 33/2
56/2
**morning [1]**
2/7
**most [3]**   3/11
8/20 8/21
**motion [5]**   1/9
3/6 29/2 44/2
53/2
**motions [2]**
26/25 55/9
**motivation [3]**
34/11 34/14
39/24
**motive [1]**
39/21
**Mount [3]**
23/15 31/6
31/16
**move [6]**   9/19
42/3 54/25
55/4 55/17
55/20
**moves [1]**
42/15
**Mr. [5]**   17/20
36/2 37/10
41/1 56/8
**Mr. Lawson [3]**
17/20 37/10
41/1

**JA 3059**

**M**

**Mr. Verrilli**
**[2]**   36/2 56/8
**much [9]**   2/24
17/17 25/8
27/19 35/10
35/25 42/6
46/19 56/12
**Munger [4]**
1/14 1/16 2/8
2/15
**murder [1]**
30/16
**must [7]**   6/21
42/25 43/9
44/10 46/6
48/13 48/16
**myself [2]**
36/14 39/1
**mystified [3]**
7/4 7/6 7/11

**N**

**nail [1]**   55/13
**naivety [1]**
13/7
**name [1]**   47/16
**namely [1]**
44/25
**narrow [1]**
47/1
**narrowly [6]**
8/10 31/24
32/19 32/24
33/9 46/7
**nation [1]**
3/12
**nation's [1]**
39/5
**national [3]**
21/2 46/15
46/24
**nature [4]**   6/5
34/21 44/24
48/8
**necessarily [6]**
23/13 24/7
24/8 27/15
31/9 31/17
**necessary [3]**
16/5 45/13
54/7
**need [21]**   3/18
4/21 7/20
10/18 10/21
10/24 25/6
27/12 30/8
33/19 35/6

35/6 35/19
36/9 38/2
39/23 43/23
48/9 48/15
54/24 56/5
**negotiate [1]**
16/18
**negotiating [1]**
3/25
**net [1]**   10/19
**neutral [3]**
39/18 39/19
39/20
**new [3]**   41/3
41/4 50/18
**news [1]**   40/7
**Newsmax [1]**
14/6
**next [8]**   6/23
7/15 38/23
41/9 48/11
49/3 51/25
55/12
**nodding [1]**
19/7
**non [1]**   29/23
**nondiscriminati
on [1]**   21/21
**None [1]**   4/3
**nonpartisan [1]**
26/8
**nonprofit [1]**
35/10
**nor [1]**   39/5
**norms [1]**
17/14
**Northeastern
[1]**   32/11
**not one [1]**
6/1
**Notably [1]**
45/3
**note [5]**   2/5
3/3 22/2 24/19
54/15
**noted [1]**   51/2
**notice [6]**
2/25 4/4 5/2
9/4 11/25
47/24
**noticed [1]**
22/13
**notification
[2]**   11/17
11/21
**noting [1]**
22/17
**notion [3]**

37/7 37/18
44/6
**NRA [4]**   38/3
38/4 38/16
44/5
**numerous [2]**
7/8 10/7
**NW [3]**   1/14
1/20 1/24

**O**

**O'Brien [2]**
34/18 39/17
**obscure [1]**
22/6
**obtain [1]**
42/25
**obvious [4]**
8/13 16/1 16/2
16/8
**obviously [6]**
18/23 21/1
22/24 23/15
23/24 26/16
**odious [1]**
4/14
**off [3]**   4/15
26/5 42/10
**offering [1]**
41/20
**office [5]**   1/6
2/3 11/7 19/4
19/12
**officers [1]**
53/14
**Offices [2]**
47/7 50/3
**official [5]**
1/23 26/15
35/4 40/19
57/3
**officials [6]**
10/17 10/22
10/24 12/6
12/14 49/25
**old [3]**   4/18
21/11 30/8
**Olson [4]**   1/14
1/16 2/8 2/15
**OMB [1]**   11/20
**one [21]**   3/11
6/1 6/14 11/14
14/18 15/5
16/4 18/25
21/11 25/15
26/7 31/13
32/20 39/7
39/12 40/22

41/23 42/25
44/10 45/16
49/25
**one-third [1]**
49/25
**ones [4]**   4/18
6/21 8/25
18/23
**only [5]**   12/21
24/22 39/19
41/22 46/6
**opened [1]**   3/2
**operate [1]**
40/16
**operative [1]**
28/13
**opinion [1]**
24/23
**opportunity [5]**
5/2 9/4 22/11
25/1 29/17
**opposing [2]**
43/11 51/3
**oppressive [1]**
51/10
**oral [1]**   42/13
**order [109]**
**order's [3]**
46/14 46/21
49/13
**ordered [9]**
5/11 53/2 53/4
53/9 53/13
53/18 53/22
54/6 54/10
**orders [10]**
4/9 8/3 14/23
15/1 27/1
29/16 31/17
36/7 45/2
51/23
**ordinary [3]**
13/7 44/14
47/24
**origins [2]**
22/4 22/5
**others [2]**
15/18 45/3
**otherwise [5]**
26/16 30/7
30/9 35/2
39/10
**ought [1]**   55/3
**ourselves [1]**
9/16
**out [28]**   5/6
8/9 8/11 9/3
9/9 9/15 10/3

11/17 12/18
14/17 20/21
25/15 26/21
27/5 27/24
27/25 28/5
29/16 29/21
34/25 38/2
41/4 50/12
51/25 54/22
55/7 55/15
56/14
**outlet [1]**
40/7
**outlined [1]**
44/1
**outmanned [1]**
2/20
**outreach [2]**
4/1 4/4
**over [1]**   5/9
**overwhelmingly
[2]**   6/5 51/6
**own [4]**   26/17
27/19 47/18
47/21

**P**

**p.m [6]**   1/7
42/10 42/11
54/11 55/23
56/17
**page [1]**   18/9
**pages [1]**   10/7
**panel [1]**
26/18
**papers [2]**
9/23 12/8
**parade [4]**
25/4 25/7 25/8
35/7
**paragraph [4]**
7/15 39/12
40/5 40/12
**paralegal [1]**
32/22
**parallel [1]**
55/3
**parameters [1]**
30/22
**part [2]**   20/23
35/7
**participation
[1]**   45/20
**particular [2]**
50/19 51/19
**particularly
[4]**   7/6 11/15
23/3 50/7

**P**

**parties [8]**
42/12 42/20
43/4 44/4 51/4
54/23 55/22
56/1

**partisan [2]**
26/9 26/10

**partner [1]**
2/16

**party [5]**
20/16 42/25
43/11 46/19
51/3

**party's [1]**
43/10

**patent [2]**
50/4 50/8

**path [1]**  34/12

**pattern [2]**
38/6 38/6

**Paul [2]**  14/17
45/2

**pause [1]**  5/22

**pay [1]**  26/16

**pending [1]**
27/14

**Pennsylvania
[2]**  1/20
21/12

**people [4]**
13/20 26/16
32/21 40/8

**perceived [1]**
44/3

**perform [1]**
50/21

**Perhaps [1]**
7/5

**period [1]**
37/5

**periods [1]**
48/24

**Perkins [3]**
4/10 12/5 45/3

**permissible [3]**
20/2 22/21
30/11

**permission [1]**
3/19

**Permit [1]**  2/9

**pernicious [1]**
46/10

**perpetrating
[1]**  4/14

**person [4]**
36/24 44/14

**personal [1]**
51/19

**personally [1]**
11/21

**personnel [1]**
45/15

**perspective [1]**
33/1

**petition [2]**
4/15 25/5

**petitioning [1]**
44/19

**phrases [1]**
28/6

**pick [2]**  7/24
7/25

**place [4]**
11/19 34/25
35/3 36/12

**plain [3]**  13/8
44/24 52/1

**plaintiff [6]**
1/4 1/12 2/6
19/6 42/15
47/11

**plaintiff's [3]**
24/19 29/1
53/2

**plaintiffs [2]**
3/7 55/1

**plan [1]**  55/15

**plausible [1]**
5/6

**please [4]**  2/5
2/13 3/8 19/17

**point [26]**
10/11 10/12
14/2 14/9
15/16 15/16
15/18 17/8
19/6 20/6
20/18 21/19
22/5 22/11
24/6 24/10
25/15 25/19
26/6 28/6
34/10 35/17
36/5 37/6
38/10 38/23

**pointed [2]**
7/13 50/12

**points [4]**
23/19 29/21
37/24 49/13

**policies [3]**
21/8 21/8
23/10

**policing [1]**
28/10

**policy [9]**
21/10 21/18
22/19 22/19
23/3 32/10
32/16 37/8
37/19

**political [2]**
7/1 46/18

**position [4]**
27/2 27/11
27/16 41/6

**positions [3]**
8/18 35/14
51/8

**possibility [1]**
48/17

**possible [1]**
50/23

**Post [3]**  11/7
40/13 47/7

**potential [2]**
7/20 15/1

**potentially [2]**
29/24 54/20

**power [19]**
3/12 16/10
17/2 17/11
18/25 19/9
19/16 21/7
21/10 21/17
22/19 26/13
32/10 32/16
42/1 44/6 51/7
51/10 51/21

**powerful [1]**
15/2

**powers [1]**  5/9

**practically [1]**
29/13

**practice [2]**
5/1 21/7

**preclude [1]**
54/20

**predicted [1]**
33/6

**preferences [1]**
37/8

**preliminary [1]**
54/24

**prepared [1]**
25/11

**present [2]**
22/25 48/15

**president [17]**
1/6 2/4 5/10
10/3 14/21

17/2 21/6
39/13 40/6
40/10 40/12
40/14 40/18
41/4 41/5
41/10 42/17

**President's [1]**
41/21

**presidential
[1]**  17/1

**press [2]**
27/22 41/19

**presumed [1]**
30/16

**prevail [1]**
47/9

**prevent [3]**
28/19 42/24
54/8

**prevents [1]**
20/15

**principle [1]**
52/15

**prior [4]**  3/23
13/18 21/15
25/14

**private [3]**
52/10 52/11
52/23

**privilege [1]**
30/19

**privileged [2]**
30/13 30/14

**privileges [1]**
40/15

**prize [3]**
37/12 37/13
38/12

**probably [1]**
30/21

**problem [3]**
24/17 36/10
36/17

**problems [1]**
25/22

**Procedure [1]**
54/16

**proceed [1]**
54/24

**proceedings [2]**
56/17 57/5

**process [15]**
3/22 4/24 9/1
32/25 37/17
47/10 47/10
47/13 47/19
47/21 47/23
48/7 48/9 49/4

51/12

**procure [1]**
18/18

**procurement [7]**
21/7 21/10
21/17 21/20
22/19 32/10
32/15

**profession [4]**
5/1 15/11
17/15 47/15

**progress [1]**
41/18

**progresses [1]**
18/22

**prohibit [1]**
24/24

**prohibited [2]**
44/8 47/24

**prohibitions
[1]**  35/4

**prominent [2]**
15/2 41/18

**promote [1]**
46/25

**prompt [1]**
55/8

**promulgated [1]**
25/1

**proof [1]**
14/25

**proper [1]**
35/1

**property [3]**
11/1 47/12
47/14

**propose [1]**
27/14

**proposed [1]**
29/3

**prosecution [1]**
19/17

**prosecutions
[2]**  34/17
34/18

**prospective [1]**
50/18

**protected [8]**
8/7 8/8 29/10
44/11 44/21
47/12 47/14
47/17

**protection [3]**
5/5 48/7 49/8

**proud [1]**  7/9

**proves [1]**
40/18 46/7

**provide [1]**

**P**

**provide... [1]**
47/23
**provisions [4]**
3/10 21/21
23/25 33/4
**PTAB [1]** 11/2
**public [12]**
3/3 14/17
15/22 16/1
16/8 16/15
21/8 29/23
43/4 51/2 51/5
52/17
**publicly [1]**
40/3
**punctuation [1]**
27/24
**punish [3]**
19/10 44/7
52/16
**punishment [8]**
19/11 19/18
22/22 24/8
32/2 32/4 33/7
47/5
**punishments [3]**
5/11 8/18 9/3
**purchasing [1]**
22/23
**purely [2]** 6/1
52/22
**purported [1]**
46/21
**purpose [1]**
29/6
**purposes [2]**
43/13 50/22
**pursuant [3]**
21/25 53/25
54/3
**pursue [6]**
10/18 10/21
10/23 10/25
37/19 47/15
**Pursuing [1]**
43/14
**pursuits [2]**
11/24 12/3
**put [4]** 13/5
18/25 32/25
53/1
**putting [1]**
12/17

**Q**

**qualifies [1]**
15/20

**quality [2]**
6/11 49/17
**queuing [1]**
25/8
**qui [2]** 10/18
50/8
**quickly [1]**
55/21
**quite [9]** 9/12
11/13 13/6
17/6 23/4
26/25 30/2
30/19 46/19
**quotas [1]**
18/12
**quotation [1]**
13/4
**quote [21]**
40/6 42/18
42/19 42/25
43/5 44/6 44/8
45/7 45/8
45/20 46/16
46/18 47/23
48/1 49/14
49/14 49/15
49/16 49/18
49/23 49/24
**quoted [1]**
40/4
**quoting [1]**
46/1

**R**

**race [2]** 7/13
11/23
**racial [3]**
20/5 21/4
37/11
**radical [3]**
7/1 11/23
46/18
**raised [1]**
14/9
**raises [1]**
47/19
**range [1]**
45/13
**rank [1]** 29/19
**rare [1]** 39/19
**rational [1]**
5/6
**reach [1]** 9/9
**reaching [3]**
20/21 29/16
47/4
**reactions [1]**
14/12

**read [5]** 5/18
6/13 14/19
23/13 34/2
**readily [1]**
52/2
**reading [1]**
11/4
**ready [1]**
10/14
**real [1]** 28/13
**really [9]**
11/8 13/5
14/20 16/6
17/25 22/17
28/4 29/10
30/19
**reason [4]**
12/9 15/15
41/17 50/13
**reasonable [1]**
15/19
**reasons [5]**
4/8 4/11 42/22
44/1 52/25
**rebuttal [1]**
17/19
**recall [1]**
34/12
**received [2]**
45/4 47/12
**recent [1]**
26/1
**recess [1]**
42/9
**recipient [1]**
53/23
**recognition [1]**
46/2
**recognizing [1]**
7/9
**record [8]** 2/2
2/6 14/17
35/19 42/10
42/11 43/13
57/5
**recording [1]**
3/4
**red [2]** 36/6
36/7
**refer [1]**
19/16
**reference [6]**
6/12 20/5 22/8
23/18 37/11
46/15
**referenced [3]**
19/6 22/14
23/22

**references [2]**
21/4 45/22
**referencing [4]**
20/18 22/11
24/20 46/20
**referred [1]**
40/4
**referring [1]**
37/12
**refers [1]**
45/19
**reflected [1]**
9/2
**refusals [1]**
50/13
**regard [5]**
11/12 11/15
16/4 48/22
49/3
**regarding [3]**
20/7 26/3 31/6
**regardless [1]**
51/14
**registered [1]**
36/21
**Regrettably [2]**
18/6 18/16
**regulations [3]**
20/11 20/14
38/17
**relate [1]**
21/2
**related [1]**
6/18
**relates [4]**
3/22 35/17
35/23 53/11
**relating [1]**
19/25
**relationship**
**[2]** 24/3
53/24
**relationships**
**[6]** 4/19 4/25
23/8 29/22
50/17 50/18
**relevant [1]**
17/6
**reliance [1]**
46/21
**relied [2]** 8/4
8/16
**relief [5]**
48/15 48/18
49/20 49/23
50/25
**relies [2]**
16/18 17/7

**rely [1]** 23/22
**relying [2]**
49/12 53/7
**remediation [1]**
48/16
**remedy [1]**
42/23
**remove [1]**
19/17
**render [1]**
56/6
**rendered [2]**
8/2 27/1
**repeat [3]**
20/14 32/18
35/23
**rephrasing [1]**
33/7
**report [2]**
54/11 55/23
**Reporter [3]**
1/23 1/23 57/3
**represent [4]**
10/16 13/2
35/13 51/10
**representation**
**[8]** 6/12
30/12 41/12
46/10 46/22
51/11 51/14
52/16
**representations**
**[7]** 6/18
10/21 10/23
12/12 13/10
13/18 45/14
**representatives**
**[1]** 35/4
**represented [3]**
5/8 12/20
51/18
**representing**
**[3]** 3/15
16/12 35/4
**represents [2]**
12/21 13/16
**republic [1]**
52/13
**repudiating [1]**
42/4
**reputation [6]**
4/24 6/15 10/2
45/23 47/16
49/12
**reputational**
**[4]** 10/4
12/18 49/10
49/19

**JA 3062**

**R**

**request [2]**
53/24 54/1

**requested [3]**
33/25 35/22
42/3

**requesting [1]**
43/10

**requests [2]**
50/14 54/3

**require [2]**
17/15 23/25

**required [4]**
11/17 13/6
43/11 47/2

**requirements
[1]**  20/8

**requires [2]**
12/13 51/16

**requiring [1]**
54/19

**rescind [2]**
53/10 53/20

**rescinded [1]**
54/2

**reservists [1]**
7/8

**resolution [2]**
16/6 55/6

**resolve [1]**
16/22

**respect [8]**
4/6 5/22 6/20
8/5 14/1 36/15
37/22 55/5

**respectfully
[2]**  41/25
42/2

**respects [1]**
10/7

**response [1]**
15/3

**responsible [1]**
39/6

**restrain [1]**
39/1

**restraining
[12]**  3/2 7/19
11/18 16/3
24/16 42/16
42/21 42/23
43/18 45/5
53/1 53/3

**restricts [1]**
45/11

**result [3]**  3/5
34/6 49/10

**resulting [1]**
50/23

**retaliate [2]**
16/11 27/5

**retaliates [1]**
44/2

**retaliating [1]**
4/12

**retaliation
[10]**  3/14 8/4
8/6 24/2 31/7
37/2 38/7
38/15 40/1
44/10

**retaliatory [3]**
4/21 37/20
44/23

**return [3]**
34/13 34/23
42/9

**returning [1]**
52/7

**review [4]**
23/2 27/14
50/4 54/21

**reviewed [1]**
4/9

**RICHARD [2]**
1/19 2/21

**right [33]**
2/24 4/5 4/15
4/16 4/22 8/17
14/4 14/21
14/22 17/17
18/20 25/5
25/5 27/20
28/8 32/12
33/14 34/1
35/25 39/24
41/16 42/6
44/12 47/10
47/15 48/6
48/7 49/5
54/20 55/18
55/22 56/7
56/12

**rights [8]**
4/19 5/7 22/10
41/6 41/6 44/4
48/22 49/4

**ripe [4]**  11/9
24/23 24/23
35/20

**ripeness [1]**
24/18

**rise [2]**  45/8
49/6

**risk [1]**  15/14

**Risks [2]**
42/18 53/7

**Roberts [1]**
13/5

**rock [3]**  8/5
8/24 9/7

**roughshod [1]**
5/9

**roundly [1]**
22/7

**routine [1]**
45/12

**rule [7]**  15/11
17/15 35/11
36/21 36/23
54/16 54/16

**ruling [4]**
27/17 42/9
42/13 56/6

**rulings [1]**
5/18

**run [1]**  18/22

**running [1]**
21/13

**runs [1]**  5/9

**S**

**sadly [1]**  4/17

**same [7]**  24/12
30/19 35/12
35/12 38/19
40/10 41/13

**sanction [9]**
19/9 19/11
19/18 19/22
23/7 24/7 32/2
32/4 33/8

**sanctions [3]**
3/5 22/22
41/13

**satisfy [2]**
33/15 43/16

**Sawyer [1]**
21/23

**saying [3]**
8/12 20/22
39/22

**schedule [6]**
16/5 55/5 55/8
55/11 55/24
56/15

**scheduling [1]**
54/14

**school [1]**
24/3

**scrutiny [7]**
31/19 33/9
33/16 46/5

**46/11 46/12
52/24**

**second [3]**
28/1 44/23
49/8

**secretary [3]**
6/15 21/13
41/20

**secrets [1]**
39/5

**section [37]**
12/21 18/2
19/3 19/4
19/19 19/19
20/4 21/3
21/15 24/11
24/12 27/18
27/21 27/22
28/7 28/12
28/14 28/18
28/23 29/6
29/11 29/12
29/12 34/3
35/18 35/23
37/22 38/20
38/24 39/2
39/7 39/8
39/12 44/25
53/8 54/1 54/3

**sections [13]**
3/16 17/25
18/1 28/13
38/21 42/16
43/18 53/5
53/12 53/15
53/16 53/21
54/8

**security [3]**
21/2 46/15
46/24

**seeking [3]**
3/9 3/16 4/16

**seeks [1]**  51/9

**seem [1]**  8/23

**seems [12]**  8/5
8/13 8/16 9/7
12/16 15/25
16/1 23/4 30/2
38/11 39/1
39/15

**segregationist
[1]**  4/18

**Seizure [3]**
5/10 5/13 17/1

**self [1]**  13/3

**self-evident
[1]**  13/3

**send [1]**  11/21

**sends [1]**
19/17

**senior [1]**
2/16

**sense [4]**  7/2
12/23 23/2
55/11

**sentence [2]**
6/23 28/1

**separate [2]**
25/19 38/2

**separation [1]**
5/9

**serious [4]**
5/19 8/21 9/22
42/24

**seriously [1]**
48/1

**serve [1]**  46/8

**service [2]**
7/10 41/3

**services [3]**
22/9 44/22
50/21

**set [2]**  21/7
42/21

**setting [3]**
33/2 33/5
55/23

**settle [1]**
14/24

**settled [1]**
14/15

**several [2]**
44/1 48/20

**severe [1]**
49/9

**shall [1]**
54/10

**Sheet [2]**
21/23 32/14

**shocking [1]**
51/21

**short [1]**  2/25

**shortly [1]**
42/14

**show [5]**  3/18
42/25 44/10
44/17 48/18

**showing [1]**
48/5

**shown [1]**
47/18

**shows [2]**  38/6
46/14

**side [3]**  29/21
41/21 52/19

**sides [1]**

**S**

sides... [1]
55/16

signed [1]
40/11

significant [1]
14/2

similar [3]
4/17 47/1
51/22

simple [1]
52/1

singling [1]
5/6

sitting [1]
2/10

situation [1]
50/15

Sixth [1]  5/25

Skadden [1]
14/18

slide [1]
41/23

sliding [1]
41/22

smaller [1]
15/5

smears [2]  5/4
10/2

so to [1]
20/25

social [8]
21/10 21/17
22/18 22/19
32/10 32/15
32/16 37/19

societal [1]
35/12

society [1]
46/4

sold [1]  19/15

solely [1]
52/11

solid [3]  8/5
8/24 9/7

solve [2]
28/15 36/10

somebody [2]
29/25 30/2

someone [4]
30/9 30/15
34/5 40/13

sometimes [1]
39/22

somewhat [1]
22/6

sorry [4]

14/20 31/12
46/21 52/10
sort [6]  13/19
17/23 18/11
20/19 24/25
27/8
sought [2]  3/1
51/7
sources [1]
32/17
south [2]  1/17
4/18
sovereign [7]
19/3 19/5 19/9
25/20 25/22
34/16 37/4
space [2]  27/8
35/1
speak [11]
7/14 18/10
25/12 26/18
26/21 27/20
28/8 28/8 29/2
29/18 35/5
speaking [1]
44/15
speaks [1]
28/4
spearheading
[1]  49/16
spearheads [1]
6/10
specific [4]
36/4 36/8
39/10 55/14
specifically
[5]  3/16 21/4
23/19 39/12
51/17
speculate [1]
26/23
speculation [1]
29/19
speech [11]
8/7 8/8 27/21
28/10 37/23
38/25 39/15
40/1 44/3 46/2
49/2
spend [1]
15/24
spot [3]  21/13
22/3 29/12
Srinivasan [5]
2/11 7/7 10/6
37/14 49/12
staff [4]  26/3
26/12 47/6

53/14
stage [1]  7/18
standalone [1]
38/25
standard [6]
8/19 10/8
31/20 42/22
45/17 48/12
standardless
[1]  47/25
standing [7]
15/8 15/9
15/10 15/11
15/12 15/12
52/3
stands [1]
44/6
stark [1]  30/2
start [2]  18/2
32/2
Starting [1]
43/20
state [6]  6/16
26/13 34/15
38/1 44/7
45/23
statement [1]
38/22
statements [9]
9/11 14/7 15/1
18/4 27/21
27/22 40/4
49/11 53/8
states [13]
1/1 1/10 4/18
6/25 10/4 36/5
39/4 39/12
39/14 40/18
46/17 48/2
55/8
stature [1]
40/15
status [3]
54/11 55/12
55/23
statute [2]
16/10 39/18
statutes [4]
21/5 22/13
22/18 34/15
statutory [2]
5/12 32/16
stay [1]  41/21
stayed [1]
27/14
staying [1]
12/25
steel [4]  5/10

5/13 16/25
21/22
steer [1]  37/8
step [1]  10/9
steps [2]  54/7
54/12
stewards [1]
39/6
still [1]
13/16
stop [1]  41/23
stopping [1]
52/7
Street [1]
1/14
strength [1]
43/9
strict [6]
31/19 33/9
33/15 46/5
46/11 46/12
strictly [1]
3/5
strikes [2]
34/2 35/11
string [1]
3/13
strong [2]
8/16 9/1
strongest [1]
7/23
students [2]
18/11 46/22
studied [1]
26/4
stymie [1]
50/5
subject [3]
46/4 49/24
53/20
submission [1]
55/9
submit [4]
22/20 29/10
33/9 41/25
subsection [1]
39/8
substantial [1]
43/1
substantially
[1]  43/3
succeed [2]
43/22 48/5
success [7]
3/19 4/7 5/20
7/21 43/1
43/21 44/17
successful [1]

15/7
suffer [5]
9/23 41/13
43/2 49/1 49/9
suffering [2]
9/22 49/22
sufficient [1]
44/14
sufficiently
[2]  45/7
50/22
suit [2]  3/1
30/1
summary [4]
54/25 55/4
55/24 56/3
Sunday [1]
34/17
supervisor [1]
19/5
support [5]
20/24 23/6
23/9 34/20
37/7
supported [3]
32/11 32/13
50/9
supporting [2]
20/10 21/9
suppose [1]
15/4
supposed [1]
46/15
suppress [1]
44/7
Supreme [3]
8/12 22/16
34/19
sure [9]  2/13
19/7 30/8
30/18 31/25
33/21 34/7
34/25 55/13
SUSMAN [53]
1/3 2/3 2/8
2/10 2/25 4/7
4/13 5/5 6/9
9/17 9/22
10/11 10/15
12/13 12/20
12/24 12/25
14/4 15/6
16/12 16/15
18/9 19/22
29/17 37/12
37/13 39/2
39/13 41/14
41/15 42/15

**S**

**SUSMAN... [22]**
42/19 43/16
43/21 44/1
44/10 44/17
45/1 45/21
46/13 47/5
47/8 48/19
48/20 49/1
49/13 49/24
50/10 52/2
52/16 53/7
53/24 54/20
**Susman's [7]**
3/6 4/16 4/24
5/7 9/17 10/2
45/15
**suspect [2]**
22/12 55/15
**suspend [1]**
53/20
**sustained [2]**
46/6 46/6
**swiftly [1]**
42/3
**system [4]**
6/10 45/20
49/17 51/13

**T**

**tailored [6]**
8/10 31/24
32/19 32/24
33/9 46/7
**tailoring [1]**
47/2
**talk [1]**  31/23
**talked [1]**
25/16
**talking [7]**
9/6 13/19 31/2
32/15 33/13
34/11 34/14
**talks [1]**
21/14
**tam [2]**  10/18
50/8
**target [1]**
52/7
**targeted [1]**
51/25
**targets [1]**
51/17
**tarring [1]**
4/24
**teacher [1]**
24/3
**telephonic [1]**

55/12
**telling [2]**
40/6 40/13
**temporary [12]**
3/1 7/19 11/18
16/3 24/16
42/15 42/21
42/23 43/17
45/4 53/1 53/2
**term [1]**  8/12
**terminate [2]**
20/3 50/20
**terminated [1]**
24/4
**terminating [2]**
23/5 24/2
**termination [5]**
23/11 23/14
23/23 23/24
47/3
**terms [1]**  7/21
**test [2]**  44/15
46/12
**theme [1]**
18/21
**theoretical [1]**
48/14
**therefore [1]**
43/17
**thinking [2]**
12/24 12/24
**third [7]**
20/16 21/16
43/12 45/6
49/21 49/25
51/3
**third-party [1]**
20/16
**thought [4]**
27/23 27/25
28/5 40/22
**threat [2]**
14/23 19/18
**threaten [1]**
52/3
**threatens [7]**
45/10 45/14
47/2 49/19
50/23 51/10
52/16
**three [5]**  4/8
5/19 8/2 44/13
44/18
**throated [1]**
17/13
**thus [1]**  47/22
**Titles [1]**
22/10

**today [11]**  7/5
30/25 41/7
41/15 42/13
44/5 46/19
52/25 54/22
56/8 56/13
**together [4]**
5/18 15/23
32/25 38/5
**Tolles [4]**
1/14 1/16 2/8
2/15
**tomorrow [4]**
36/9 36/9
54/11 55/23
**took [5]**  8/19
15/2 38/3 41/7
44/13
**total [1]**  4/3
**totally [2]**
5/4 8/24
**towards [2]**
25/24 32/8
**traces [1]**
21/14
**tracks [2]**
29/3 31/5
**tradition [1]**
7/9
**transcript [2]**
1/9 57/4
**treatment [1]**
45/11
**trial [1]**  14/5
**tribute [1]**
41/21
**tricky [1]**
28/11
**TRO [14]**  3/9
3/16 12/1 12/3
28/19 42/2
49/1 50/22
51/6 52/18
52/19 54/13
55/25 56/6
**TROs [1]**  25/14
**trouble [1]**
28/15
**true [3]**  30/22
49/6 57/4
**Trump [1]**
14/15
**Trump's [1]**
42/17
**try [4]**  9/9
28/12 36/4
36/14
**trying [6]**

4/15 24/6
25/19 40/25
46/25 52/22
**Tube [1]**  21/23
**turn [5]**  3/20
5/21 6/6 48/11
54/14
**Turning [1]**
51/1
**two [8]**  2/9
7/24 8/23 39/8
44/11 55/12
56/2 56/4
**tying [1]**
38/21
**type [2]**  19/20
24/10
**types [1]**  50/7

**U**

**U.S [9]**  1/24
21/23 22/3
22/16 34/17
44/23 45/9
48/2 50/3
**U.S.C [1]**  21/6
**Umbehr [4]**
23/16 23/16
31/6 31/16
**unanimous [1]**
8/11
**unapologetic
[1]**  4/22
**unconstitutiona
l [10]**  3/11
3/14 4/7 4/11
5/17 17/9
17/10 37/3
39/21 42/4
**unconstitutiona
lly [2]**  36/25
47/22
**under [14]**
11/3 11/4
16/11 17/2
17/16 18/11
21/5 21/18
24/9 31/22
32/11 32/13
54/15 54/16
**under 40 [1]**
21/5
**undermine [3]**
6/25 18/14
46/16
**understands [2]**
15/15 15/16
**undertaken [1]**

13/15
**undertakes [1]**
12/13
**unexplained [1]**
46/14
**unfair [1]**
36/7
**unfortunate [1]**
7/7
**unfortunately
[1]**  3/13
**unfounded [1]**
10/2
**uniquely [1]**
46/3
**UNITED [12]**
1/1 1/10 6/25
10/4 36/5 39/4
39/11 39/14
40/18 46/17
48/2 55/8
**unlawful [5]**
37/15 37/16
38/3 38/13
49/5
**unless [2]**
15/25 33/15
**unpopular [1]**
35/15
**unrecoverable
[1]**  49/24
**unrelated [1]**
19/24
**unsubstantiated
[1]**  5/4
**up [14]**  7/5
15/8 15/9
15/10 15/11
15/12 15/13
25/8 26/24
26/25 41/2
41/20 42/14
52/3
**upon [2]**  16/17
55/14
**urge [5]**  24/8
24/15 24/25
28/9 37/24
**USAO [1]**  1/19
**use [15]**  19/9
21/7 21/9
21/14 21/17
22/18 22/19
29/6 32/9
32/15 35/3
41/8 41/19
44/6 51/7
**used [2]**  4/18

**U**

**used... [1]**
41/8
**useful [1]**
14/10

**V**

**VA [2]**    32/23
47/7
**vague [7]**    5/4
6/20 9/5 13/23
46/19 47/20
47/22
**vagueness [2]**
6/8 47/21
**valuable [1]**
11/13
**variety [1]**
43/13
**various [3]**
21/24 22/13
50/2
**vehemently [1]**
40/17
**veiled [1]**
45/22
**vein [1]**    47/1
**Velazquez [4]**
8/7 17/5 44/23
51/15
**vendetta [1]**
51/19
**VERRILLI [4]**
1/12 2/8 36/2
56/8
**versus [1]**
29/17
**vet [1]**    32/23
**veterans [1]**
7/9
**VI [1]**    22/10
**viable [1]**
47/19
**vicious [1]**
40/9
**view [5]**    20/19
22/12 27/20
39/13 41/5
**viewpoint [17]**
4/14 8/15 8/20
8/22 31/8
31/19 32/1
33/15 33/23
34/2 34/9 37/2
45/19 46/3
46/4 46/9
46/11
**views [2]**    34/4

52/12
**VII [1]**    22/10
**vindictive [1]**
37/19
**Vineet [1]**
2/11
**violate [4]**
23/14 36/18
36/19 43/25
**violated [2]**
38/16 47/11
**violates [3]**
4/12 47/9
47/23
**violating [1]**
34/17
**violation [6]**
8/9 8/11 8/14
8/21 17/11
49/4
**violent [1]**
40/9
**virtually [1]**
8/3
**voting [6]**
6/13 13/17
14/1 14/5
45/23 46/23
**Vullo [10]**
8/12 19/7
24/10 32/5
37/24 38/1
38/11 38/16
44/5 46/1

**W**

**walk [1]**    19/21
**warrants [1]**
50/24
**Washington [5]**
1/5 1/15 1/20
1/25 40/13
**way [10]**    9/5
10/19 16/25
18/25 26/17
33/10 41/2
41/12 41/23
55/17
**ways [1]**    4/17
**weaponization
[1]**    11/22
**weaponize [2]**
6/10 49/16
**web [1]**    18/8
**website [1]**
18/9
**weekly [2]**
12/13 12/15

**weeks [1]**    56/2
**weighs [1]**
52/18
**Weiss [2]**
14/17 45/2
**welcome [1]**
2/18
**weren't [2]**
5/15 38/21
**what's [3]**
10/10 13/1
18/17
**whatnot [1]**
29/7
**whatsoever [4]**
4/3 4/4 5/3
16/2
**whereas [1]**
30/17
**white [5]**    4/22
39/24 40/13
40/19 41/19
**who's [1]**
32/22
**whole [3]**
36/10 38/5
52/17
**wide [1]**    45/13
**wield [1]**
17/11
**wielding [1]**
10/13
**Williams [1]**
48/2
**Wilmer [2]**
28/17 28/22
**WilmerHale [2]**
4/10 45/3
**Wilson [1]**
45/9
**Wisconsin [1]**
6/17
**wish [2]**    52/1
56/7
**within [7]**
22/21 26/13
31/15 33/3
33/4 35/7 41/5
**without [5]**
5/1 5/6 5/11
29/17 49/23
**withstand [1]**
52/24
**won [1]**    19/24
**word [1]**    33/12
**words [2]**
41/19 55/4
**work [9]**    3/15

6/4 16/15
32/21 40/16
40/18 49/14
55/7 55/15
**workforce [1]**
20/8
**working [4]**
20/16 29/11
29/12 30/9
**world [2]**
22/22 40/25
**worse [3]**    5/13
15/4 16/25
**wrestling [1]**
28/7
**writing [1]**
53/1
**written [3]**
20/13 42/14
54/22
**wrong [3]**
31/12 33/10
34/12
**wrote [1]**
51/15

**Y**

**years [2]**    20/9
41/2
**yesterday [2]**
3/1 3/2
**Youngstown [2]**
21/23 32/13

**Z**

**zealous [1]**
17/13
**zealously [1]**
16/13
**zone [1]**    18/11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

SUSMAN GODFREY LLP,

       *Plaintiff*,

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

       *Defendants*.

Civil Action No. 25 - 1107 (LLA)

---

### <u>ORDER</u>

Upon consideration of the parties' Joint Status Report, ECF No. 27, it is hereby

**ORDERED** that the injunction, ECF No. 15, issued by this court on April 15, 2025, and all

restrictions and obligations imposed therein, shall be **EXTENDED** by agreement of all parties,

*see* ECF No. 27, at 2; Fed. R. Civ. P. 65(b)(2), until final judgment is entered in this matter; it is

further

**ORDERED** that, in accordance with the parties' joint proposal for an expedited briefing

schedule on dispositive motions, the parties shall file dispositive motions according to the

following schedule:

(1) On or before April 23, 2025, the parties shall file any dispositive motions and opening

    briefs in support;

(2) On or before April 30, 2025, the parties shall file any oppositions;

(3) On or before May 5, 2025, the parties shall file any replies; and

(4) A motions hearing, if necessary, will be scheduled for May 8, 2025 at 2:00 p.m. in

    Courtroom 21.

**JA 3067**

**SO ORDERED.**

_____

LOREN L. ALIKHAN
United States District Judge

Date:   April 16, 2025

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

       *Plaintiff*,

  v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

       *Defendants*.

Civil Case No.: 1:25-cv-01107
Judge Loren L. AliKhan

### STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h), Plaintiff Susman Godfrey LLP ("Susman Godfrey" or the "Firm") submits the following statement of undisputed material facts in support of its motion for summary judgment seeking declaratory and permanent injunctive relief with respect to Executive Order 14263, titled "Addressing Risks from Susman Godfrey" (hereinafter, the "Order" or "Executive Order").

**I.  Susman Godfrey is a Premier Litigation Law Firm.**

1.  Susman Godfrey is a trial firm that represents both plaintiffs and defendants in a variety of complex, commercial litigation.  Declaration of Kalpana Srinivasan in Support of Plaintiff's Motion for Summary Judgment ("Srinivasan Decl.") ¶ 6.

2.  Since its founding by Stephen Susman and Gary McGowan as an eight-lawyer firm in 1980, the Firm has grown to over 230 trial attorneys, located in offices in Houston, Los Angeles, New York, and Seattle.  Srinivasan Decl. ¶¶ 7–8.  Trial attorneys making their careers at the firm include equity partners, associates, of counsel, and staff attorneys.  Srinivasan Decl. ¶ 12.

1

3.      The Firm has represented clients in federal and state courts across the country (including the Supreme Court of the United States), before many federal agencies and regulatory bodies, and in tribunals throughout the world.  Srinivasan Decl. ¶ 8.

4.      Susman Godfrey has been named as an "Am Law 100" firm on *The American Lawyer 100* list in 2024 and 2025.  Out of the Am Law 100 top revenue-generating firms, it is one of only a handful that practices solely litigation.  Srinivasan Decl. ¶ 9.

5.      Susman Godfrey and its attorneys are regularly recognized for their standing in the legal community by *Chambers USA*, *Law360*, *Lawdragon*, *National Law Journal*, *Super Lawyers*, *American Lawyer*, *Benchmark Litigation*, national and local bar associations, and other publications and organizations.  Srinivasan Decl. ¶ 10.

6.      Susman Godfrey represents a range of clients, including small- and medium-sized businesses, families, individuals, charitable and public service-oriented organizations, and Fortune 500 companies.  Srinivasan Decl. ¶ 11.

7.      Susman Godfrey often represents plaintiffs—in many cases, individuals or smaller companies—in disputes against some of the largest organizations in the world, recovering billions of dollars and obtaining injunctive and declaratory relief for its clients.  Srinivasan Decl. ¶ 11.

8.      Susman Godfrey has over 350 attorneys and staff members.  Its professional support staff includes paralegals, legal assistants, and information technology specialists. Srinivasan Decl. ¶ 12.

9.      Susman Godfrey's attorneys come from diverse backgrounds, hold diverse political views, and bring diverse experiences to work.  Srinivasan Decl. ¶¶ 13–14.

10.      The Firm has been recognized for its culture of excellence and transparency by the legal publication *Vault*, including being named as #1 Best Midsize Law Firm for Career Outlook,

2

Selectivity, and Transparency and #3 Best Midsize Law Firm for Satisfaction and Quality of Work. Srinivasan Decl. ¶ 17.

11.    Many of Susman Godfrey's attorneys joined the Firm after government service.  Its attorneys have served in Democratic and Republican administrations.  Srinivasan Decl. ¶ 14.

12.    The Firm requires every associate it hires to have completed at least one clerkship for a federal Article III judge.  Srinivasan Decl. ¶ 14.

13.    Susman Godfrey attorneys have joined the Firm after clerking for judges nominated by Republican presidents and judges nominated by Democratic presidents, including Justices of the United States Supreme Court appointed by presidents of both parties.  Srinivasan Decl. ¶ 14.

14.    About half of Susman Godfrey attorneys clerked for judges nominated by Republican presidents, and about half clerked for judges nominated by Democratic presidents. Srinivasan Decl. ¶ 14.

15.    Former Susman Godfrey attorneys have served, or are now serving, as federal and state judges, judicial clerks, high-ranking government officials, federal prosecutors, and adjunct professors of law.  Srinivasan Decl. ¶ 15.

16.     Republican governors have appointed four former Susman Godfrey attorneys to state court judgeships.  Srinivasan Decl. ¶ 15.

17.    Two former Susman Godfrey attorneys currently serve as Article III federal judges: one nominated by President Trump and one by President Biden.  Srinivasan Decl. ¶ 15.

18.    Since its founding, the Firm has provided thousands of hours of pro bono legal services through its attorneys, paralegals, and other professionals to numerous clients, including indigent criminal defendants and community-based organizations, in matters concerning human

3

and civil rights, as well as electoral, housing, immigration, and reproductive issues.  Srinivasan Decl. ¶ 16.

19.    Since 2020, Susman Godfrey attorneys, paralegals, and other business professionals have spent over 22,000 hours, valued at nearly $15 million, on pro bono legal services.  Srinivasan Decl. ¶ 16.

## II.    Susman Godfrey Interacts Routinely with Federal Departments, Agencies, and Attorneys and Appears Regularly in Federal Forums.

20.    Susman Godfrey's attorneys interact regularly, on a near-daily basis, with the federal government.  Srinivasan Decl. ¶¶ 19–34.

21.    The Firm's attorneys' interactions with the federal government and access to federal buildings are critical to their service to their clients, the practice of their profession, and the development of their careers.  Srinivasan Decl. ¶¶ 19–34.

22.    Susman Godfrey's attorneys regularly appear in federal courts and federal administrative proceedings.  Srinivasan Decl. ¶ 20.

23.    More than a third of all active matters at the Firm are before federal courts and agencies.  Srinivasan Decl. ¶ 20.

24.    The Firm's attorneys already have made dozens of in-person federal court appearances in 2025, and they have numerous in-person appearances scheduled in federal courts and federal agencies in the coming months.  Firm attorneys currently have at least seven trials scheduled to proceed in federal court within the next six months—in addition to more federal cases awaiting trial dates.  Srinivasan Decl. ¶ 20.

25.    Susman Godfrey attorneys frequently meet with officials and attorneys from many different federal agencies and departments.  Susman Godfrey attorneys have upcoming scheduled

4

meetings with federal government personnel from the Main Branch of the U.S. Department of Justice and from United States Attorneys' Offices.  Srinivasan Decl. ¶ 21.

26.    In representative matters for clients, the Firm has interacted with, and anticipates future interactions with, at least the following federal departments, agencies, and officials (Srinivasan Decl. ¶ 32):

      a.    Attorney General of the United States

      b.    Department of Commerce

      c.    Department of Defense

      d.    Department of Health and Human Services

      e.    Department of Homeland Security

      f.    Department of Justice

      g.    Department of Treasury

      h.    Executive Office of Immigration Review

      i.    Federal Trade Commission

      j.    International Trade Commission

      k.    Securities and Exchange Commission

      l.    United States Attorneys' Offices

      m.    United States Customs and Border Protection

      n.    United States Citizenship and Immigration Services

      o.    United States Patent and Trademark Office

27.    Many of the Firm's clients do, or have done, business with the federal government directly or through an affiliate.  Srinivasan Decl. ¶¶ 33–34.

5

28.     Susman Godfrey has nearly twenty clients that contract or otherwise do business with the federal government, or have affiliates who are government contractors and subcontractors. Srinivasan Decl. ¶ 33.

29.     Some of Susman Godfrey's largest clients contract or otherwise do business with the federal government, or have affiliates who are government contractors and subcontractors. Srinivasan Decl. ¶ 33.

### A.     Many of Susman Godfrey's Representations and Practice Areas Rely on Frequent and Substantive Interactions with Federal Government Employees.

30.     Many of Susman Godfrey's current matters—and recurring types of matters—require frequent interactions with the federal government.  Those matters include, but are not limited to, (a) *qui tam* and False Claims Act matters, (b) intellectual property matters, (c) antitrust matters, (d) environmental matters, and (e) pro bono matters.  Srinivasan Decl. ¶¶ 21–31.

### Qui Tam *and False Claims Act Matters*

31.     Susman Godfrey frequently represents whistleblowers ("relators") in cases brought under the federal False Claims Act, involving private citizens who file suit on behalf of the government against those who have defrauded the government.  Srinivasan Decl. ¶ 23.

32.     *Qui tam* cases provide a significant financial benefit to the United States government.  Between 2022 and 2024, the federal government obtained almost $7 billion in False Claims Act recoveries on behalf of U.S. taxpayers.  Srinivasan Decl. ¶ 23; Declaration of Ginger D. Anders in Support of Plaintiff's Motion for Summary Judgment ("Anders Decl.") Ex. 3.

33.     The Firm's *qui tam* matters require frequent, substantive interaction with federal government employees on behalf of the relator-client and often require in-person contact with the government in federal buildings for meetings, interviews, and negotiations.  Srinivasan Decl. ¶¶ 24–27.

6

34.    Susman Godfrey's *qui tam* representations typically require ongoing and frequent interactions with responsible attorneys in United States Attorneys' Offices at various stages in the process, including (a) at the initial disclosure stage, in facilitating and conducting interviews between the relator and the federal government, (b) at the investigatory stage, and (c), should the federal government choose to intervene in the action brought by Susman Godfrey, at the discovery and trial stages of the action.  Srinivasan Decl. ¶¶ 24–27.

35.    Susman Godfrey attorneys who are currently representing clients in pending *qui tam* cases have made contact with dozens of United States Attorneys' Offices across the country in these pending cases.  Srinivasan Decl. ¶ 24.

36.    Susman Godfrey currently has at least one interview scheduled between a relator in a *qui tam* action in which it is involved and the federal government, and the Firm anticipates several more interviews to be scheduled in the near future, all of which will involve interaction with the federal government.  Srinivasan Decl. ¶ 25.

37.    In past *qui tam* matters, Susman Godfrey attorneys have entered into common-interest agreements with the Department of Justice that allow Susman Godfrey to review documents produced by the defendant(s) during the investigatory stage; Susman Godfrey attorneys may help Assistant United States Attorneys with reviewing documents and preparing memoranda to assist the Department of Justice in its investigation.  Srinivasan Decl. ¶ 26.

38.    If the federal government decides to intervene in a *qui tam* case involving a Susman Godfrey relator-client, as the government has in current cases handled by Susman Godfrey, then Susman Godfrey attorneys interact frequently with the government attorneys throughout the course of the action, including through telephone calls, videoconferences, and in-person meetings; these interactions involve sharing of information, memoranda, and presentations and, following a

7

settlement or judgment, resolution of the relator-client's share of the recovery.  Srinivasan Decl. ¶ 27.

### *Intellectual Property Matters*

39.    Susman Godfrey also handles a significant volume of patent-infringement litigation.  Srinivasan Decl. ¶ 28.

40.    Such patent-infringement matters include representing clients before federal agencies with responsibilities over patent validity and patent infringement disputes.  Srinivasan Decl. ¶ 28.

41.    Susman Godfrey attorneys also represent patent owners in the United States International Trade Commission in unfair import proceedings before administrative law judges and in frequent interactions with investigative staff attorneys for the United States International Trade Commission's Office of Unfair Import Investigations, as well as semi-regular interactions with attorneys from the United States International Trade Commission's Office of the General Counsel.  Srinivasan Decl. ¶ 28.

42.    Susman Godfrey attorneys also interact with attorneys working at the Exclusion Order Enforcement Branch of United States Customs and Border Protection to assist them in implementing and enforcing the exclusion orders issued by the United States International Trade Commission.  Srinivasan Decl. ¶ 28.

43.    Susman Godfrey attorneys represent patent owners and patent challengers before the United States Patent and Trademark Office in administrative post-grant proceedings, including before the Patent Trial and Appeal Board.  Srinivasan Decl. ¶ 28.

### *Antitrust Matters*

44.    Susman Godfrey represents plaintiffs with price-fixing, market allocation, refusal-to-deal, no-poach, and monopolization claims in numerous industries, including consumer products, healthcare, real estate, technology, telecommunications, and transportation.  Srinivasan Decl. ¶ 29.

45.    Susman Godfrey's antitrust matters frequently require interaction and coordination with the federal government, including the Antitrust Division of the Department of Justice and the Federal Trade Commission.  Srinivasan Decl. ¶ 29.  Susman Godfrey has had cases related to actions brought by the government, calling for close coordination with the DOJ or FTC in litigation.  *Id.*

### *Environmental Matters*

46.    Susman Godfrey represents plaintiffs and defendants in litigation concerning the discharge of hazardous substances into the environment, including toxic tort actions for personal injuries and property damage, natural resource damages actions, and Superfund remediation actions.  Srinivasan Decl. ¶ 30.

47.    Such representations frequently require interaction with United States Attorneys' Offices, the Environmental Protection Agency, and state and local governments that partner with federal agencies in implementing federal environmental programs and statutory mandates.  Srinivasan Decl. ¶ 30.

### *Pro Bono Matters*

48.    Susman Godfrey's pro bono practice involves frequent and regular interactions with federal agencies and federal government employees, including in representations involving

9

human rights, anti-discrimination issues, constitutional challenges, and death penalty appeals. Srinivasan Decl. ¶ 31.

49.    Much of this pro bono litigation proceeds in federal courts.  Srinivasan Decl. ¶ 31.

**III.    Susman Godfrey has Represented Clients in Litigation Against the Federal Government and Relating to Federal Elections Involving President Trump.**

50.    On behalf of its clients, Susman Godfrey has brought litigation against the federal government in cases adverse to Democratic and Republican presidential administrations. Srinivasan Decl. ¶ 35.

51.    Susman Godfrey attorneys currently are litigating several Tucker Act cases in the Court of Federal Claims, which require frequent interactions with attorneys at the Department of Justice.  Those cases include (a) a Fifth Amendment takings claims against the United States Navy relating to an expansion of the Navy's flight-training program; (b) a case against a federal agency for inverse condemnation on behalf of property owners; and (c) a suit against a federal agency relating to user fees that it collected.  Srinivasan Decl. ¶ 35.

52.    In cases relating to federal elections, Susman Godfrey has represented clients who span the political spectrum.  Srinivasan Decl. ¶ 36.

53.    After then-former Vice President Biden defeated President Trump in the November 2020 presidential election, Anders Decl. Ex. 4, and after several media outlets began falsely claiming that Dominion Voting Systems had "rigged" the 2020 election, President Trump posted on the social media site Twitter on November 13, 2020:  "Now it is learned that the horrendous Dominion Voting System was used in Arizona (and big in Nevada).  No wonder the result was a very close loss!"  Anders Decl. Ex. 5.

54.    On December 15, 2020, President Trump posted on the social media site Twitter: "'Study:  Dominion Machines shifted 2-3% of Trump Votes to Biden.  Far more votes than needed

10

to sway election.'  Florida, Ohio, Texas and many other states were won by even greater margins than projected.  Did just as well with Swing States, but bad things happened."  Anders Decl. Ex. 6.

55.    On December 16, 2020, MyPillow CEO and Trump campaign donor Mike Lindell reposted the December 15, 2020 Twitter post by President Trump and added:  "This is how the massive fraud was done!  The media should quit hiding the truth!  Everyone should get to see the evidence and then all will know @realDonaldTrump is our president for 4 more years!  We can't let our country be taken by China!  They are behind this!"  Anders Decl. Ex. 7.

56.    Susman Godfrey has represented Dominion Voting Systems in defamation actions against various individuals and entities alleging that it knowingly perpetuated false claims relating to the November 2020 presidential election.  Srinivasan Decl. ¶¶ 37–39.

57.    For example, Susman Godfrey has represented Dominion Voting Systems against Fox News and Fox News Corporation based on their false claims relating to the 2020 election (the "Fox Litigation").  Srinivasan Decl. ¶ 37.

58.    The trial court in the Fox Litigation ruled that none of Fox's disputed statements about Dominion Voting Systems and the 2020 election were true.  Srinivasan Decl. ¶ 37; *see US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1039 (Del. Super. Ct. 2023).

59.    The Fox Litigation settled shortly before trial for $787.5 million, which has been reported to be the largest publicly known defamation settlement involving a media company in United States history.  Srinivasan Decl. ¶ 37; Anders Decl. Ex. 8

60.    Delaware Superior Court Judge Eric Davis praised the attorneys in the Fox Litigation—including Susman Godfrey attorneys—for "the best lawyering [he has] had, ever" and stated that he "would be proud to be [their] judge in the future."  Anders Decl. Ex. 9.

11

**JA 3079**

61. Susman Godfrey also represents Dominion Voting Systems with respect to claims against Newsmax Media for allegedly false and defamatory statements that the network broadcasted accusing Dominion of voter fraud and rigging the 2020 election to flip votes from President Trump to then-former Vice President Joseph R. Biden, Jr. (the "Newsmax Litigation"). Srinivasan Decl. ¶ 38.

62. In April 2025, the trial court in the Newsmax Litigation ruled at summary judgment that Newsmax had made false and defamatory statements about Dominion Voting Systems and the 2020 election. Srinivasan Decl. ¶ 38; *see US Dominion, Inc. v. Newsmax Media, Inc.*, No. N21C-08-063, 2025 WL 1092289, at *17 (Del. Super. Ct. Apr. 9, 2025).

63. The trial court in the Newsmax Litigation issued its ruling on April 9, 2025, hours before President Trump signed the Executive Order targeting Susman Godfrey. Srinivasan Decl. ¶ 38.

64. At the time the Order issued against Susman Godfrey, the Firm was scheduled to proceed to trial in the Newsmax Litigation less than three weeks later. Srinivasan Decl. ¶ 38.

65. Susman Godfrey continues to represent Dominion Voting Systems in similar defamation lawsuits arising out of allegedly false statements related to the 2020 presidential election, including actions against Rudy Giuliani, Sidney Powell, Mike Lindell and MyPillow, Patrick Byrne, and One America News Network (OAN). Srinivasan Decl. ¶ 39; *see, e.g.*, *US Dominion, Inc. v. Giuliani*, No. 1:21-cv-213-CJN (D.D.C. filed Jan. 25, 2021); *US Dominion, Inc. v. Powell*, No. 1:21-cv-40-CJN (D.D.C. filed Jan. 8, 2021); *US Dominion, Inc. v. My Pillow, Inc.*, No. 1:21-cv-445-CJN (D.D.C. filed Feb. 22, 2021); *US Dominion, Inc. v. Herring Networks, Inc.*, No. 1:21-cv-2130-CJN (D.D.C. filed Aug. 10, 2021).

66.     In addition, following the November 2020 presidential election, Susman Godfrey represented various state officers in their official capacities, including the Governor of Wisconsin and the Secretary of State of Arizona, against assertions that the election had been rigged. Srinivasan Decl. ¶ 36; *Feehan v. Wis. Elections Comm'n*, No. 2:20-cv-01771-PP (E.D. Wis. filed Dec. 1, 2020); *Bowyer v. Ducey*, No. 2:20-cv-02321-DJH (D. Ariz. filed Dec. 2, 2020).

67.     In the cases in which Susman Godfrey represented the Governor of Wisconsin and the Secretary of State of Arizona in connection with the 2020 presidential election, federal courts rejected the claims advanced by the Trump presidential campaign and individuals supporting President Trump that sought to decertify the election results based on allegations of voter fraud, improper vote dilution, and compromised voting machine security.  Srinivasan Decl. ¶ 36; *Feehan v. Wis. Elections Comm'n*, No. 2:20-cv-01771-PP (E.D. Wis. Dec. 9, 2020), ECF No. 83, *vacated on other grounds by Feehan v. Wis. Elections Comm'n*, No. 20-3448 (7th Cir. Feb. 1, 2021); *Bowyer v. Ducey*, No. 2:20-cv-02321-DJH (D. Ariz. Dec. 9, 2020), ECF No. 84.

68.     In election litigation in federal court in Arizona, Susman Godfrey presented at a hearing on behalf of all state-official defendants (including the Democratic Secretary of State and Republican Governor) that had been sued by voters and Republican party chairs for various Arizona counties.  Srinivasan Decl. ¶ 36; *Bowyer v. Ducey*, No. 2:20-cv-02321-DJH (D. Ariz. Dec. 8, 2020), ECF Nos. 69, 83.

**IV.   The President Has Engaged in a Campaign of Retribution and Intimidation Against Law Firms Representing Causes or Clients that he Disfavors.**

69.     Since February 2025, President Trump has signed executive orders and memoranda targeting law firms that (i) employ or have employed individuals he disfavors or (ii) represent or have represented causes or clients he disfavors.  Srinivasan Decl. ¶¶ 40–64.

13

### A.    Covington & Burling LLP

70.    On February 25, 2025, President Trump signed a memorandum directed to the heads of various agencies in the intelligence community, titled "Suspension of Security Clearances and Evaluation of Government Contracts."  Anders Decl. Ex. 10.

71.    President Trump's memorandum specifically calls out Peter Koski, a partner at Covington & Burling LLP "who assisted former Special Counsel Jack Smith," who brought criminal charges against President Trump in the wake of President Trump's efforts to challenge the 2020 election results.  Anders Decl. Exs. 10, 11.

72.    President Trump's memorandum directs agency heads to "suspend any active security clearances held by" Mr. Koski and "all members, partners, and employees of Covington and Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel," and directs those agency heads "to terminate any engagement of Covington & Burling LLP by any agency to the maximum extent permitted by law."  Anders Decl. Ex. 10.

### B.    Perkins Coie LLP

73.    On March 6, 2025, President Trump issued Executive Order 14230, titled "Addressing Risks from Perkins Coie LLP" (the "Perkins Order").  Anders Decl. Ex. 12.

74.    The stated "Purpose" of the Perkins Order was to address the "dishonest and dangerous activity of the law firm Perkins Coie LLP," including "representing failed Presidential candidate Hillary Clinton," which it characterized as "part of a pattern" of "egregious activity." Anders Decl. Ex. 12 § 1.

75.    The Perkins Order stated that "Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification."  Anders Decl. Ex. 12 § 1.

14

76.     The Perkins Order directed federal agencies to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie." Anders Decl. Ex. 12 § 2.

77.     The Perkins Order directed "Government contracting agencies . . . , to the extent permissible by law, [to] require Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract." Anders Decl. Ex. 12 § 3.

78.     The Perkins Order directed the heads of all federal agencies to "review all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie" and to "take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, . . . for which Perkins Coie has been hired to perform any service."  Anders Decl. Ex. 12 § 3.

79.     The Perkins Order directed the heads of all federal agencies, "to the extent permitted by law, [to] provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States."  Anders Decl. Ex. 12 § 5.

80.     The Perkins Order directed the heads of all federal agencies to "provide guidance limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States."  Anders Decl. Ex. 12 § 5.

81.     The Perkins Order directed "[a]gency officials . . . , to the extent permitted by law, [to] refrain from hiring employees of Perkins Coie, absent a waiver . . . that such hire will not threaten the national security of the United States."  Anders Decl. Ex. 12 § 5.

82.    The Perkins Order directed the Chair of the Equal Employment Opportunity Commission to "review the practices of representative large, influential, or industry leading law firms" for what that order describes as "discrimination under 'diversity, equity, and inclusion' policies." Anders Decl. Ex. 12 §§ 1, 4.

83.    On March 11, 2025, Perkins Coie sued to enjoin the Perkins Order. Anders Decl. Ex. 13; *Perkins Coie LLP v. Dep't of Just.*, No. 25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 1.

84.    On March 12, 2025, Judge Beryl A. Howell of the United States District Court for the District of Columbia issued a temporary restraining order enjoining implementation or enforcement of Sections 1, 3, and 5 of the Perkins Order. Anders Decl. Ex. 14; *Perkins Coie LLP v. Dep't of Just.*, No. 25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 21.

85.    The same day, President Trump's Deputy Chief of Staff for Policy Stephen Miller posted an article about Judge Howell's ruling on the social media site X and commented: "Lawless judicial tyranny. Judges have no authority to force the executive branch to provide classified secrets to Democrat activist law firms." Anders Decl. Ex. 15.

86.    Judge Howell's order said nothing about the security clearance issues raised by the Perkins Order. Anders Decl. Ex. 14.

**C.    Paul, Weiss, Rifkind, Wharton & Garrison LLP**

87.    After the district court temporarily enjoined the Perkins Order, President Trump issued Executive Order 14237, titled "Addressing Risks from Paul Weiss" (the "Paul Weiss Order"). Anders Decl. Ex. 16.

88.    The Paul Weiss Order directed government officials to apply measures with respect to Paul Weiss and its employees similar to those applied to Perkins Coie under the enjoined Perkins Order. Anders Decl. Ex. 16.

16

89.    The Paul Weiss Order stated that "[g]lobal law firms" have "played an outsized role in undermining the judicial process and in the destruction of bedrock American principles," and "engaged in activities that make our communities less safe, increase burdens on local businesses, limit constitutional freedoms, and degrade the quality of American elections."  Anders Decl. Ex. 16 § 1.

90.    The Paul Weiss Order stated that, in addition to work done on behalf of paying clients, the allegedly improper litigation brought by "[g]lobal law firms" includes work done "pro bono" or "for the public good."  Anders Decl. Ex. 16 § 1.

91.    The Paul Weiss Order identified specific Paul Weiss partners, including a "former leading prosecutor in the office of Special Counsel Robert Mueller" whom the Order describes as having "brought a pro bono suit" "on behalf of the District of Columbia Attorney General" "against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021."  Anders Decl. Ex. 16 § 1.

92.    On March 20, 2025, on Truth Social, the President announced that, as part of an agreement with Paul Weiss, he would withdraw the Paul Weiss Order.  Anders Decl. Ex. 17.

93.    The President stated that "Paul, Weiss will dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives."  Anders Decl. Ex. 17.

94.    The President stated that he was "agreeing to this action in light of a meeting with Paul, Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz, the grave dangers of Weaponization, and the vital need to restore our System of Justice."  Anders Decl. Ex. 17.

17

95. On March 21, 2025, President Trump issued Executive Order 14244, "Addressing Remedial Action by Paul Weiss," which rescinded the Paul Weiss Order. Anders Decl. Ex. 18 .

96. Mr. Karp, Paul Weiss's Chairman, stated: "We are gratified that the President has agreed to withdraw the Executive Order concerning Paul, Weiss. We look forward to an engaged and constructive relationship with the President and his Administration." Anders Decl. Ex. 17.

97. Neither the President's March 20, 2025 Truth Social post regarding the agreement with Paul Weiss nor Executive Order 14244 referenced any national security concerns regarding Paul Weiss nor any resolution of such concerns. Anders Decl. Exs. 17, 18.

**D. Alleged Abuses of the Legal System**

98. Two days after the agreement with Paul Weiss, President Trump issued a memorandum dated March 22, 2025, titled "Preventing Abuses of the Legal System and the Federal Court" (the "Legal System Memorandum"). Anders Decl. Ex. 20.

99. The Legal System Memorandum directed the Attorney General to "seek sanctions against attorneys and law firms who engage in frivolous, unreasonable, and vexatious litigation against the United States or in matters before executive departments and agencies of the United States." Anders Decl. Ex. 20. Such sanctions include "reassess[ing]" attorney security clearances and "terminat[ing] . . . any Federal contract" under which they provide services—whenever the Attorney General concludes that their conduct warrants such measures. Anders Decl. Ex. 20.

100. The Legal System Memorandum further instructed the Attorney General to review attorney conduct in litigation against the federal government over the past eight years and to recommend the same range of disciplinary actions if the Attorney General "identifies misconduct that may warrant additional action, such as filing frivolous litigation or engaging in fraudulent practices." Anders Decl. Ex. 20.

E.    **Jenner & Block LLP**

101.    On March 25, 2025, President Trump issued Executive Order 14246, titled "Addressing Risks from Jenner & Block" (the "Jenner Order").  Anders Decl. Ex. 21.

102.    The Jenner Order directed government officials to apply measures with respect to Jenner & Block and its employees similar to those set forth in the enjoined Perkins Order and the withdrawn Paul Weiss Order.  Anders Decl. Ex. 21.

103.    The Jenner Order stated that "so-called 'Big Law' firms . . . regularly conduct . . . harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients." Anders Decl. Ex. 21 § 1.

104.    The Jenner Order stated that Jenner & Block is "abus[ing] its pro bono practice" by "engag[ing] in obvious partisan representations to achieve political ends, support[ing] attacks against women and children based on a refusal to accept the biological reality of sex, and back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders."  Anders Decl. Ex. 21 § 1.

105.    The Jenner Order singled out Jenner & Block for re-hiring Andrew Weissmann after he served as part of Special Counsel Robert Mueller's "entirely unjustified investigation." Anders Decl. Ex. 21 § 1.

106.    On March 28, 2025, Jenner & Block sued to enjoin the Jenner Order.  Anders Decl. Ex. 22; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 1.

107.    On that same date, Judge John D. Bates of the United States District Court for the District of Columbia issued a temporary restraining order enjoining implementation or enforcement of Sections 1, 3, and 5 of the Jenner Order.  Anders Decl. Ex. 23; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 9.

19

108.    In a memorandum informing federal agency heads of that temporary restraining order (the "Jenner Notice"), Attorney General Pamela Bondi and Office of Management and Budget Director Russell Vought described Jenner & Block as "committed to the weaponization of justice, discrimination on the basis of race, radical gender ideology, and other anti-American pursuits." Anders Decl. Ex. 24; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 21-1.

109.    The Jenner Notice also stated that, by issuing the temporary restraining order, the district court had "invaded the policy-making and free speech prerogatives of the executive branch," and that the order was a "blatant overstepping of the judicial power." Anders Decl. Ex. 24; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 21-1.

**F.    Wilmer Cutler Pickering Hale and Dorr LLP**

110.    On March 27, 2025, President Trump issued Executive Order 14250, titled "Addressing Risks from WilmerHale" (the "WilmerHale Order"). Anders Decl. Ex. 25.

111.    The WilmerHale Order applied measures with respect to WilmerHale and its employees similar to those set forth in the prior orders concerning other law firms. Anders Decl. Ex. 25 § 1.

112.    The WilmerHale Order stated that WilmerHale "engages in obvious partisan representations to achieve political ends," including by "support[ing] efforts to discriminate on the basis of race, back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders, and further[ing] the degradation of the quality of American elections, including by supporting efforts designed to enable noncitizens to vote." Anders Decl. Ex. 25 § 1.

113.    The WilmerHale Order stated that WilmerHale is "bent on employing lawyers who weaponize the prosecutorial power," as reflected in its hiring of Robert Mueller and two of his

20

colleagues from the Mueller investigation, Aaron Zebley and James Quarles.  Anders Decl. Ex. 25 § 1.

114.    On March 28, 2025, WilmerHale sued to enjoin the WilmerHale Order.  Anders Decl. Ex. 26; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 1.

115.    On that same date, Judge Richard J. Leon of the United States District Court for the District of Columbia issued a temporary restraining order enjoining implementation or enforcement of Sections 3 and 5 of the WilmerHale Order.  Anders Decl. Ex. 27; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10.

### G.    The Trump Administration's Threatened Action Against Other Large Law Firms

116.    President Trump has threatened government action against additional law firms. Srinivasan Decl. ¶ 51.

117.    The Trump Administration has stated as among its "priorit[ies] both to end lawfare and the weaponization of government and also to hold those who have engaged in lawfare accountable."  Anders Decl. Ex. 28 at 4:44–4:53.

118.    When he signed the Perkins Order, President Trump stated that his administration was "looking at about 15 different firms" as potential targets for similar measures.  Anders Decl. Ex. 28 at 5:45–5:50.  President Trump's aide added, "That, or more, sir."  *Id.*

119.    Days after he issued the Perkins Order, President Trump stated in an interview that "[w]e have a lot of law firms that we're going to be going after because they were very dishonest people."  Anders Decl. Ex. 29.

120.    The same day that President Trump issued the Paul Weiss Order, he delivered a speech at the Department of Justice referencing "crooked law firms," "violent, vicious lawyers," and "fake lawyers."  Anders Decl. Ex. 30.

121.    Upon signing the Order targeting Susman Godfrey, the President told the gathered press that "we've signed with many law firms, the ones that we thought were inappropriate" and "we have another five to go."  Anders Decl. Ex. 31 at 0:38–1:32.

122.    Steve Bannon, a senior counselor and strategist for President Trump during the first Trump Administration, has stated that President Trump is "going after" law firms "to cut them off," explaining that "what we are trying to do is put [law firms] out of business and bankrupt [them]."  Anders Decl. Ex. 32.

**H.    President Trump Reaches Agreements with Additional Law Firms**

123.    Following the Paul Weiss agreement, additional law firms have chosen to reach agreements with the White House.  Srinivasan Decl. ¶ 53.

124.    On March 28, 2025, in a post on Truth Social, the President announced an agreement with the law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  Anders Decl. Ex. 33.

125.    The agreement with Skadden occurred without the President issuing an executive order against the firm.  Anders Decl. Ex. 33.

126.    Public reporting has stated that the President intended to issue an executive order with respect to Skadden on account of its pro bono work and diversity, equity, and inclusion initiatives.  Anders Decl. Ex. 34

127.    Skadden agreed to "provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration and beyond, to causes that the President and Skadden both support," including causes that "represent the full political spectrum," and to award

pro bono fellowships to "Law Graduates that . . . represent a wide range of political views, including conservative ideals."  Anders Decl. Ex. 33.

128.    In the March 28, 2025 Truth Social post announcing the agreement with Skadden, the President announced that Skadden had "declared the Firm's strong commitment to ending the Weaponization of the Justice System and the Legal Profession," and stated that he would "never stop fighting to deliver on his promises of eradicating partisan Lawfare in America, and restoring Liberty & Justice for ALL."  Anders Decl. Ex. 33.

129.    On April 1, 2025, in a post on Truth Social, the President announced a similar agreement with the law firm Willkie Farr & Gallagher LLP ("Willkie").  Anders Decl. Ex. 35.

130.    The agreement with Willkie occurred without the President issuing an executive order against the firm.  Anders Decl. Ex. 35.

131.    Public reporting has stated that, prior to reaching this agreement, Willkie had learned that the President intended to issue an executive order against the firm.  Anders Decl. Ex. 36.

132.    Willkie committed "at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration, and beyond, to causes that President Trump and Willkie both support," including causes that "represent the full political spectrum, including Conservative ideals." Anders Decl. Ex. 35.

133.    In the April 1, 2025 Truth Social post announcing the agreement with Willkie, the President announced that Willkie had "offer[ed] their decisive commitment to ending the Weaponization of the Justice System and the Legal Profession," and stated that he "is delivering on his promises of eradicating Partisan Lawfare in America, and restoring Liberty and Justice FOR ALL."  Anders Decl. Ex. 35.

23

134.    On April 2, 2025, in a post on Truth Social, the President announced an agreement with the law firm Milbank LLP.  Anders Decl. Ex. 37.

135.    The agreement with Milbank occurred without the President issuing an executive order against the firm.  Anders Decl. Ex. 37.

136.    Public reporting has stated that, prior to reaching this agreement, President Trump's administration contacted Milbank with concerns about Milbank's approach to pro bono and diversity initiatives and suggested that Milbank reach an agreement similar to Skadden's.  Anders Decl. Ex. 38.

137.    Milbank committed to "perform a total of at least $100 Million Dollars in pro bono legal services during the Trump Administration, and beyond, on initiatives supported by both the President and Milbank," including causes that "represent the full political spectrum, including Conservative ideals"  Anders Decl. Ex. 37.

138.    In the April 2, 2025 Truth Social post announcing the agreement with Milbank, the President announced that Milbank had "stat[ed] their resolve to help end the Weaponization of the Justice System and the Legal Profession," and stated that he "continues to build an unrivaled network of Lawyers, who will put a stop to Partisan Lawfare in America, and restore Liberty and Justice FOR ALL."  Anders Decl. Ex. 37.

139.    On April 8, 2025, during a White House event relating to the coal industry, President Trump remarked:  "Have you noticed that lots of law firms have been signing up with Trump?  A hundred million dollars, another hundred million, for damages that they've done.  But they give you $100 million, and then they announce that, 'But we have done nothing wrong.  And I agree, they've done nothing wrong, but what the hell, they give me a lot of money considering they've done nothing wrong."  He continued:  "And we'll use some of those people, some of those

24

great firms.  They are great firms too, they just had a bad moment."  Gesturing to the gathered members of the coal industry, he added:  "But we're going to use some of those firms to work with you on you leasing and your other things, and they'll do a great job.  I think they're going to do a fantastic job."  Anders Decl. Ex. 39 at 25:56–26:39.

140.    On April 11, 2025, in a post on Truth Social, the President announced that he had reached agreements with five additional law firms.  Anders Decl. Ex. 40.

141.    Four of those firms—Kirkland & Ellis LLP, Allen Overy Shearman Sterling US LLP, Simpson Thacher & Bartlett LLP, and Latham & Watkins LLP—agreed to "provide an aggregate total of at least $500 Million Dollars in pro bono and other free Legal services, during the Trump Administration and beyond, . . . to causes that President Trump and the Law Firms both support and agree to work on," including causes that "represent the full political spectrum,  including Conservative ideals."  Anders Decl. Ex. 40.  The firms also affirmed that they would not "engage in illegal DEI discrimination and preferences."  *Id.*

142.    The President stated that, concurrently, the Equal Employment Opportunity Commission had "withdrawn" letters seeking information about the firms' employment practices and would "not pursue any claims related to those issues."  Anders Decl. Ex. 40.

143.    The President also announced "commitments" made by a fifth firm, Cadwalader, Wickersham & Taft LLP.  Anders Decl. Ex. 41.

144.    Cadwalader agreed to provide "at least $100 Million Dollars in pro bono Legal Services . . . to causes that President Trump and Cadwalader both support."  Anders Decl. Ex. 41.

145.    President Trump has stated that the law firms the Administration has reached agreements with "went for some pretty big numbers," "millions of dollars an hour," but "they don't admit guilt, remember that, they don't admit guilt."  Anders Decl. Ex. 31 at 0:55–1:28.

25

146.    White House Press Secretary Karoline Leavitt said in a statement:  "Big Law continues to bend the knee to President Trump because they know they were wrong."  Anders Decl. Ex. 42.

147.    President Trump has since stated that law firms that have reached agreements with the Administration might help him negotiate trade deals, revive the coal industry, or represent President Trump and his allies if they are investigated.  Anders Decl. Exs. 43, 60.

## V.    Susman Godfrey is the Latest Target of the President's Campaign of Retribution.

148.    On April 4, 2025, Susman Godfrey was one of more than 500 law firms that signed an amicus brief in support of Perkins Coie in *Perkins Coie LLP v. United States Department of Justice*. No. 25-cv-716 (D.D.C. Apr. 4, 2025), ECF No. 63-1 (Anders Decl. Ex. 44).  Srinivasan Decl. ¶ 58.  Susman Godfrey also signed the amicus briefs filed on behalf of more than 800 law firms in the *Jenner* and *WilmerHale* cases. *Id.*; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Apr. 11, 2025), ECF No. 45-1; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Apr. 11, 2025), ECF No. 80.

149.    The amicus brief that Susman Godfrey signed argued that the President's Executive Orders against Perkins Coie and other leading law firms "pose a grave threat to our system of constitutional governance and to the rule of law itself" and warned that "any controversial representation challenging actions of the current administration (or even causes it disfavors) now brings with it the risk of devastating retaliation."  Anders Decl. Ex. 44 at 1–2; *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716 (D.D.C. Apr. 4, 2025), ECF No. 63-1.

150.    Susman Godfrey was one of only eight firms in the Am Law 100 (the top 100 firms by revenue in the United States) that signed the amicus brief.  Srinivasan Decl. ¶ 58.

151.    At the time of signing the amicus brief, Susman Godfrey was the fifth-largest Am Law 100 firm to sign the brief, and two of the larger firms already had been subjects of Executive Orders (WilmerHale and Perkins Coie).  Srinivasan Decl. ¶ 58.

152.    On April 8, 2025, Susman Godfrey filed an amicus brief in support of Perkins Coie in *Perkins Coie LLP v. United States Department of Justice* on behalf of 27 former national security, foreign policy, intelligence, and other public officials who have worked in Democratic and Republican administrations.  Srinivasan Decl. ¶ 59; Anders Decl. Ex. 45; *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716 (D.D.C. Apr. 8, 2025), ECF No. 104.

153.    The amicus brief filed by Susman Godfrey argued, among other things, that "[t]he Constitution did not make the President a king empowered to punish subjects arbitrarily based on animus or whim."  Anders Decl. Ex. 45 at 2.  It further stated:  "When Amici served in the United States government, executive orders of this nature would have been viewed as unthinkable violations of their constitutional oath.  Yet the repeated issuance in recent weeks of punitive executive orders against specific lawyers and law firms, with perhaps more to come, makes clear that this Administration will continue to levy such sanctions unless enjoined by the courts."  *Id.* at 25.

154.    Susman Godfrey informed the Department of Justice that it intended to seek leave to file the above-described amicus brief of former senior government officials on April 5, 2025. The Firm filed the amicus brief on April 8, 2025.  Srinivasan Decl. ¶ 59.

155.    The day after Susman Godfrey filed the amicus brief, on April 9, 2025, President Trump signed the Order targeting Susman Godfrey.  Anders Decl. Ex. 1; Srinivasan Decl. ¶ 59.

156.    The Order was accompanied by a "Fact Sheet."  Anders Decl. Ex. 2.

157.    Susman Godfrey received no contact or other outreach from the Trump Administration prior to issuance of the Order and Fact Sheet, and was provided no notice that the Order and Fact Sheet were forthcoming.  Srinivasan Decl. ¶ 61.

158.    Susman Godfrey was not given an opportunity to respond to the allegations in the Order and Fact Sheet prior to their issuance.  Srinivasan Decl. ¶ 61.

159.    As of the date hereof, the Administration has not contacted Susman Godfrey regarding the assertions in the Order.  Srinivasan Decl. ¶ 61.

160.    When handing the Order to President Trump to sign, White House Staff Secretary Will Scharf said to the President:  "This is an executive order that takes certain measures against Susman Godfrey to ensure that they can't access government resources, government buildings— scrutinizing certain aspects of their practices as a law firm given their previous activities."  Anders Decl. Ex. 31 at 0:18–0:33.

161.    During the signing ceremony for the Order, President Trump stated:  "We're just starting a process with this [firm], because there were some very bad things that happened with these law firms."  Deputy White House Chief of Staff for Policy Stephen Miller added:  "This firm was very involved in the election misconduct."  Anders Decl. Ex. 31 at 1:30–1:44.

162.    The Order and Fact Sheet state that Susman Godfrey "spearheads efforts to weaponize the American legal system and degrade the quality of American elections."  Anders Decl. Ex. 1 § 1; Anders Decl. Ex. 2 § 1.

163.    The Order and Fact Sheet state that Susman Godfrey "also funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology."  Anders Decl. Ex. 1 § 1; Anders Decl. Ex. 2 § 1.

28

164.     At oral argument on Susman Godfrey's motion for a temporary restraining order in this action, the Court asked: "But you don't have any understanding of what the funding groups that undermine the effectiveness of the military is?" The Government answered: "Regrettably, Your Honor, I have no further information than what's contained in the order." Anders Decl. Ex. 46 at 18:13–17.

165.     The Order states that Susman Godfrey "supports efforts to discriminate on the basis of race" and that the Firm "itself engages in unlawful discrimination, including discrimination on the basis of race." Anders Decl. Ex. 1 § 1.

166.     The Order cites as the sole support for this statement a Susman Godfrey program that the Order states "offers financial awards and employment opportunities only to 'students of color.'" Anders Decl. Ex. 1 § 1.

167.     The Firm does not operate any program that offers employment opportunities only to people of color. Srinivasan Decl. ¶ 64.

168.     To the extent the Order intends to reference the Susman Godfrey Prize, that is a cash prize that is awarded to up to 20 students of color who are finishing their first or second year at certain law schools. Srinivasan Decl. ¶ 64; Anders Decl. Ex. 47.

169.     The Susman Godfrey Prize program does not offer any "employment opportunities." Students receiving the Susman Godfrey Prize are not, in connection with or as a condition of receipt of that prize, offered employment at Susman Godfrey. Srinivasan Decl. ¶ 64; Anders Decl. Ex. 47.

170.     At oral argument on Susman Godfrey's motion for a temporary restraining order in this action, when the Court asked counsel for the United States to "start with Section 1 and tell me what you think are the allegations behind each of the statements," counsel for the United States

29

stated: "Regrettably, I don't have any further information beyond what is contained in here aside from the discrimination issue. And for that, all I have is a web page from the Susman website discussing some of the diversity initiatives, which we think would speak to the sort of gray zone under the Students for Fair Admissions case and diversity and quotas and so forth." Anders Decl. Ex. 46 at 18:2–12.

## VI.    The Executive Order has Harmed, is Currently Harming, and will Continue to Harm Susman Godfrey.

### A.    Limits on Access to Federal Courts and Federal Officials

171.    Section 5 of the Order directs that "heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Susman when such access would threaten the national security of or otherwise would be inconsistent with the interests of the United States." Anders Decl. Ex. 1 § 5(a).

172.    Section 5 also directs that "the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Susman employees to ensure consistency with the national security and other interests of the United States." Anders Decl. Ex. 1 § 5(a).

173.    The memorandum that the Department of Justice sent affected agencies notifying them of the Court's Temporary Restraining Order stated that the Order "imposes certain requirements related to limiting the access of employees of [Susman] Godfrey to Federal buildings and engaging with or hiring [Susman] Godfrey employees." Anders Decl. Ex. 48.

174.    Federal courthouses are "Federal Government buildings," as referenced in the Order. *See* Anders Decl. Ex. 1 § 5(a); Anders Decl. Ex. 46 at 45:14–16.

175.    Susman Godfrey attorneys frequently access federal courthouses to advocate on behalf of their clients in federal court. Srinivasan Decl. ¶¶ 19–34.

176.    Susman Godfrey attorneys frequently engage with federal government employees in their official capacities in order to petition the federal government on behalf of the Firm's clients.  Srinivasan Decl. ¶¶ 19–34.

177.    Susman Godfrey attorneys are in federal court and interacting with federal officials every week and nearly every day.  Srinivasan Decl. ¶ 20.

178.    Susman Godfrey has hundreds of active matters before federal courts and federal agencies that require access to federal government buildings and officials.  Srinivasan Decl. ¶ 66.

179.    Limitations on Susman Godfrey attorneys accessing federal buildings or interacting with federal personnel, or even uncertainty about whether Susman Godfrey attorneys may or may not be allowed to access federal buildings and interact with federal personnel, negatively impacts the Firm's ability to practice law in federal courts and on federal issues.  Srinivasan Decl. ¶ 66.

**B.    Harm to Recruitment and Retention of Employees**

180.    The Order directs that federal agency officials, "to the extent permitted by law, refrain from hiring employees of Susman, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States."  Anders Decl. Ex. 1 § 5(a).

181.    Susman Godfrey attorneys and professional staff frequently leave the firm for federal service.  Srinivasan Decl. ¶ 77.  Many law students and currently practicing attorneys are drawn to the Firm and stay at the Firm due to the significant substantive responsibility that the Firm gives to associates, which helps make those attorneys more compelling candidates for federal employment.  Srinivasan Decl. ¶ 77.

182.    It is common for attorneys to begin their careers at private law firms such as Susman Godfrey before departing for clerkships for federal judges or employment in United States

31

Attorneys' Offices, other parts of the United States Department of Justice, or federal agencies. Srinivasan Decl. ¶ 77.

183.    Unless the Order is permanently enjoined, the Order's direction to federal agencies to refrain from hiring Susman Godfrey employees, absent a waiver, will impair the Firm's ability to recruit and retain employees who are interested in future federal employment.  Srinivasan Decl. ¶ 77; Declaration of Robert E. Hirshon in Support of Plaintiff's Motion for Summary Judgment ("Hirshon Decl.") ¶ 22.

184.    Law firms compete for legal talent, and attorneys regularly move to different law firms to seek expanded opportunities or pay.  Anders Decl. Ex. 61.

185.    Unless the Order is permanently enjoined, attorneys may leave Susman Godfrey to seek employment at other law firms that are not subject to the restrictions the Order imposes on Susman Godfrey.  Anders Decl. Ex. 62.

###    C.    Forced Disclosure of Attorney-Client Relationships

186.    Section 3 of the Order directs that "Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract."  Anders Decl. Ex. 1 § 3(a).

187.    Section 3 further directs that agency heads "shall review all contracts with Susman and with entities that disclose doing business with Susman."  Anders Decl. Ex. 1 § 3(b).

188.    Section 3 further directs that agency heads shall "take appropriate steps to terminate any contract, to the maximum extent permitted by law . . . for which Susman has been hired to perform any service" and "otherwise align their agency funding decisions with the interests of the citizens of the United States . . . and as heads of agencies deem appropriate."  Anders Decl. Ex. 1 § 3(b).

189.    Nearly twenty of Susman Godfrey's clients, including several of the Firm's largest clients, contract with or otherwise do business with the federal government or have affiliates who are government contractors and subcontractors.  Srinivasan Decl. ¶ 33.

190.    For many of Susman Godfrey's clients, the fact that the Firm provides them legal advice is not public information.  Srinivasan Decl. ¶ 69.

191.    Susman Godfrey vets numerous cases to consider whether or not to pursue them long before they are filed.  Srinivasan Decl. ¶ 69.

192.    If not permanently enjoined, the Order will require certain of the Firm's clients to divulge confidential information regarding their legal representations to the federal government. Srinivasan Decl. ¶ 69.

193.    By terminating government contracts and compelling disclosure of attorney-client relationships, the Order, if not permanently enjoined, will adversely impact clients who contract or otherwise do business with the federal government and who seek legal advice or legal services from Susman Godfrey.  Hirshon Decl. ¶ 21.

### D.    Revocation of Security Clearances

194.    In Section 2, titled "Security Clearance Review," the Order directs that the Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies "shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest."  Anders Decl. Ex. 1 § 2(a).

195.    The Fact Sheet accompanying the Order states that the Order is "suspending security clearances to protect the national interest."  Anders Decl. Ex. 2.

196.    Susman Godfrey personnel currently possess active security clearances.  Srinivasan Decl. ¶ 79.

197.    One attorney at Susman Godfrey possesses a Top Secret/Sensitive Compartmented Information clearance in connection with that attorney's service in the military.  Srinivasan Decl. ¶ 79.

198.    Active security clearances are necessary for the effective representation of clients in certain cases involving sensitive government information, such as in matters involving national security or defense and certain *qui tam* and False Claims Act matters.  Srinivasan Decl. ¶ 79.

199.    Susman Godfrey has in the past had matters that require active security clearances. Srinivasan Decl. ¶ 79.

200.    Susman Godfrey expects to have matters requiring security clearances in the future. Srinivasan Decl. ¶ 79.

201.    Unless permanently enjoined, the Order's creation of a Susman Godfrey-specific "Security Clearance Review" process will restrict the Firm's ability to represent clients in matters involving classified information, including, for instance, matters in the Firm's *qui tam* and False Claims Act practice.  Srinivasan Decl. ¶ 79.

202.    Section 2 also directs the Office of Management and Budget to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman" and to "expeditiously cease such provision," to the extent permitted by law.  Anders Decl. Ex. 1 § 2(b).

203.    The federal government does not currently provide Sensitive Compartmented Information Facilities access to Susman or its employees.  Srinivasan Decl. ¶ 80.

**E.     Effect on Exercise of Profession**

204.    Before the Order was enjoined, the Order was intended to impose and did impose chilling effects on Susman Godfrey attorneys deciding whether to take on future representations

34

that may lead to further executive action due to potentially disfavored viewpoints or identities. Srinivasan Decl. ¶ 75.

205.    Unless the Order is permanently enjoined, Susman Godfrey attorneys will have to reconsider how they approach current matters requiring appearances in federal forums or requiring interactions with federal officials, attorneys, and personnel.  Srinivasan Decl. ¶ 75.

206.    The stated intent of the Order is to chill the prosecution in court of claims the administration does not favor.  Anders Decl. Ex. 1.

207.    The executive orders targeting law firms have chilled speech at other affected law firms:

> a.    Perkins Coie reported that the Perkins Order "had a chilling effect on Perkins Coie attorneys, who are now reconsidering how they approach certain matters that require them to appear in federal buildings."  Anders Decl. Ex. 49 ¶ 51.

> b.    WilmerHale reported that the WilmerHale Order "impeded and will impede its lawyers' ability to zealously advocate as counsel."  Anders Decl. Ex. 50 ¶ 76.

> c.    Jenner & Block reported that the Jenner Order "threatens Jenner attorneys' right to practice their chosen profession," including in what types of pro bono work the firm chooses to pursue.  Anders Decl. Ex 51 ¶ 70.

208.    Public reporting also has described a chilling effect on law firms' representations. Anders Decl. Exs. 52–54.

209.    The *Washington Post* reported on March 25, 2025 that "law firms [were] refus[ing] to represent Trump opponents in the wake of his attacks."  Anders Decl. Ex. 52 ("The volunteers

and small nonprofits forming the ground troops of the legal resistance to Trump administration actions say that the well-resourced law firms that once would have backed them are now steering clear.").

210.    *CNN* reported on March 27, 2025 that "law firms [were] scared to speak out amid Trump's attacks on their livelihood." Anders Decl. Ex. 53.

211.    *NPR* reported on April 13, 2025 that "Trump attacks on law firms [were] begin[ning] to chill pro bono work on causes [the President] doesn't like."  Anders Decl. Ex. 54.

212.    Organizations that regularly partner with law firms to provide pro bono assistance to challenge government actions or policies have recently found law firms to be less willing to partner with them on pro bono work.  Anders Decl. Ex. 54.

213.    Legal ethics expert Professor Robert Hirshon has opined that if attorneys are fearful of advocating for causes adverse to the federal government or adverse to the President's personal and political interests, it will be difficult for clients with such interests to find attorneys to represent them.  Hirshon Decl. ¶ 21.

**F.    Reputational Harm to the Firm**

214.    By characterizing the Firm's work as "dangerous" and "detrimental to critical American interests," Anders Decl. Ex. 1 § 1, among other things, the Order has harmed Susman Godfrey's reputation in the markets for clients, attorneys, and staff.  Srinivasan Decl. ¶ 76.

215.    The Order suggests that Susman Godfrey is so "dangerous" that it cannot be permitted to represent clients in interactions with the federal government, at federal agencies, or in federal courtrooms.  Anders Decl. Ex. 1.

216.    Public reporting has suggested that orders like the Executive Order implicating Susman Godfrey render it more difficult for law firms to perform work on behalf of their clients effectively.  *See, e.g.*, Anders Decl. Exs. 52–55, 61.

36

### G.    Financial Harm to the Firm

217.    Susman Godfrey attorneys already have devoted hundreds of hours to monitoring and analyzing the Administration's actions targeting other law firms, preparing Susman Godfrey's response should the Firm be targeted by President Trump, and, now, responding to the Order targeted at Susman Godfrey.  Srinivasan Decl. ¶ 57.

218.    Susman Godfrey also has been required to engage outside counsel to represent the Firm in this challenge to the April 9, 2025 Order.  Srinivasan Decl. ¶ 57.

219.    Unless the Order is permanently enjoined, the Order will cause further financial harm to Susman Godfrey.  Srinivasan Decl. ¶ 72.

220.    If the Order is not permanently enjoined, limitations on Susman Godfrey attorneys accessing federal buildings or interacting with federal personnel, or even uncertainty about whether Susman Godfrey attorneys may or may not be allowed to access federal buildings and interact with federal personnel, will negatively impact the Firm's business.  Srinivasan Decl. ¶ 66.

221.    Unless the Order is permanently enjoined, existing and potential government-contractor clients will in some instances choose competitor firms because those firms are not subject to the Order's Section 3 restrictions.  Srinivasan Decl. ¶¶ 69, 72–73; *see* Hirshon Decl. ¶ 17.

222.    Unless the Order is permanently enjoined, existing and potential clients will in some instances choose competitor firms because those firms are not restricted in their ability to access federal government buildings and engage with federal employees.  Srinivasan Decl. ¶¶ 66, 72–73.

223.    Since the signing of the Order, clients contacted Susman Godfrey partners to inquire about the effects of the Order, and whether it affected Susman Godfrey's ability to access

the federal courts or could negatively affect Susman Godfrey's continued representation of those clients.  Srinivasan Decl. ¶ 70.

224.    Other law firms subject to similar executive orders reported that they lost clients and had meetings with the federal government cancelled before temporary restraining orders issued against the executive orders affecting them:

a.    Before the Perkins Order was temporarily enjoined, the federal government informed a Perkins Coie client that Perkins Coie attorneys could not attend upcoming scheduled meetings with the federal government.  Perkins Coie also reported that numerous clients had terminated engagements with the firm.  Anders Decl. Ex. 56 ¶¶ 25–26, 29; Anders Decl. Ex. 49 ¶¶ 44–45.

b.    Before the Paul Weiss Order was rescinded, at least one Paul Weiss client terminated his representation by Paul Weiss as a result of the Paul Weiss Order.  Anders Decl. Ex. 57 at 2–3.

c.    Before the Jenner Order was temporarily enjoined, the federal government informed Jenner & Block attorneys that they could not attend an upcoming meeting with the Department of Justice, and several clients expressed concern about Jenner & Block's ongoing representation of them.  Anders Decl. Ex. 51 ¶¶ 63–64, 68; Anders Decl. Ex. 58 ¶¶ 70–72.

d.    Before the WilmerHale Order was temporarily enjoined, a federal agency contacted a WilmerHale government contractor client requesting that the WilmerHale client disclose whether it had any business relationship with WilmerHale.  Two meetings between WilmerHale attorneys and a federal agency were also abruptly postponed.  Anders Decl. Ex. 59 ¶¶ 4–5.

38

225.    Absent a permanent injunction, Susman Godfrey expects to have the government cancel meetings with its attorneys, to have its employees' access to government buildings restricted, and to lose clients, similar to the other affected law firms.  Srinivasan Decl. ¶¶ 50, 65–73.

### H.    Effect on Employees' Ability to Perform Their Civic Duties

226.    If a Susman Godfrey employee reports for federal jury duty, the employee must access federal government buildings and interact with federal government employees.  Srinivasan Decl. ¶ 78.

227.    If a Susman Godfrey employee reports for duty in the military reserves, the employee must access federal government buildings and interact with federal government employees.  Srinivasan Decl. ¶ 78.

228.    Unless the Order is permanently enjoined, the Order will impair Susman Godfrey employees' ability to perform their civic duties, such as serve on a federal jury or in the military reserves.  Srinivasan Decl. ¶ 78.

39

Dated: April 23, 2025                    Respectfully submitted,

                                         /s/ Donald B. Verrilli, Jr.
                                         Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
                                         Elaine J. Goldenberg (D.C. Bar No. 478383)
                                         Ginger D. Anders (D.C. Bar. No. 494471)
                                         MUNGER, TOLLES & OLSON LLP
                                         601 Massachusetts Avenue, NW, Suite 500E
                                         Washington, D.C. 20001
                                         (202) 220-1100
                                         Donald.Verrilli@mto.com
                                         Elaine.Goldenberg@mto.com
                                         Ginger.Anders@mto.com

                                         Brad D. Brian (*pro hac vice*)
                                         Michael R. Doyen (*pro hac vice*)
                                         Hailyn J. Chen (*pro hac vice*)
                                         MUNGER, TOLLES & OLSON LLP
                                         350 S. Grand Avenue, Fiftieth Floor
                                         Los Angeles, California 90071
                                         (213) 683-9100
                                         Brad.Brian@mto.com
                                         Michael.Doyen@mto.com
                                         Hailyn.Chen@mto.com

                                         *Attorneys for Susman Godfrey LLP*

                                         (*Additional counsel listed on following page*)

40

**JA 3108**

Bethany W. Kristovich (*pro hac vice*)
Adam B. Weiss (*pro hac vice*)
Jennifer L. Bryant (*pro hac vice*)
William M. Orr (*pro hac vice*)
Miranda E. Rehaut (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Bethany.Kristovich@mto.com
Adam.Weiss@mto.com
Jennifer.Bryant@mto.com
William.Orr@mto.com
Miranda.Rehaut@mto.com

Rachel G. Miller-Ziegler (D.C. Bar No. 229956)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Kyle A. Schneider (D.C. Bar No. 90024468)*
Esthena L. Barlow (D.C. Bar No. 90000252)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Rachel.Miller-Ziegler@mto.com
Jeremy.Kreisberg@mto.com
Kyle.Schneider@mto.com
Esthena.Barlow@mto.com

Juliana Yee (*pro hac vice*)
Shannon C. Galvin Aminirad (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Juliana.Yee@mto.com
Shannon.Aminirad@mto.com

* Admission pending

*Attorneys for Susman Godfrey LLP*

**JA 3109**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

        *Plaintiff*,

   v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

        *Defendants*.

Civil Case No.: 1:25-cv-01107
Judge Loren L. AliKhan

## DECLARATION OF KALPANA SRINIVASAN IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Kalpana Srinivasan, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a partner at Susman Godfrey LLP ("Susman Godfrey" or the "Firm") and one of its two Managing Partners. I submit this Declaration in support of Susman Godfrey's Motion for Summary Judgment. I am of the age of majority and I am competent to submit this declaration.

2. I have been an attorney at Susman Godfrey for nearly 20 years, following a clerkship with the Honorable Raymond C. Fisher on the United States Court of Appeals for the Ninth Circuit. I joined the Firm as an associate in 2005, became a partner in 2009, and was elected co-Managing Partner in 2020. During my time at Susman Godfrey, I have served on the Firm's Executive Committee and have chaired the Firm's practice development, employment, and training committees. I have served as lead trial counsel for numerous clients and in courtrooms across the country. I am a member in good standing of the California bar and have been admitted in many state and federal courts nationwide.

1

3.     Susman Godfrey is a firm that is run by its lawyers. Every partner and associate has an equal vote on whether to hire a partnership-track associate at the Firm. The same is true for any case requiring an investment of Firm time or resources. Management decisions are made by the equity-only partnership. Those decisions are guided and led by the Firm's Managing Partners and its Executive Committee, which convenes weekly.

4.     As a Managing Partner, I am very familiar with the Firm's business and operations and have been involved in Susman Godfrey's efforts to prepare for, assess, address, and respond to the April 9, 2025 Executive Order targeting the Firm (the "Order"). As a Managing Partner, I co-chair the Firm's Executive Committee. I help assess potential business, policy, or conflicts concerns raised by the matters the Firm takes on.

5.     The facts set forth in this declaration are based on my personal knowledge of the Firm's history and operations or business records and information with which I am familiar.

## I.     Susman Godfrey is a firm of civil trial lawyers.

6.     Susman Godfrey is a trial firm that represents both plaintiffs and defendants in a variety of complex, commercial litigation. Trials are our specialty, and we excel at trying all kinds of cases.

7.     **History.** The Firm was founded on a simple vision: Hire the best, reward success, and handle every case with a relentless focus on winning at trial. The Firm's origins date back to 1976, when Stephen Susman—then an attorney at a small Houston-based personal-injury and admiralty law firm—was approached by a small-business owner seeking representation against more powerful adversaries. The potential client owned a small business that sold cardboard boxes, and he alerted Susman to the existence of a potential price-fixing conspiracy by manufacturers of corrugated boxes. That conversation planted the seeds of the *Corrugated Container Antitrust Litigation* (S.D. Tex.), a class action brought by Susman on behalf of cardboard-box purchasers

2

against the manufacturers that made them. Susman and fellow attorney Gary McGowan founded the eight-lawyer firm, Susman & McGowan, in 1980 to pursue the *Corrugated* case, from which the firm recovered $550 million on behalf of plaintiffs through settlements and obtaining the then-largest verdict in antitrust history after a three-month jury trial. Lee Godfrey joined the firm in 1983 and the firm became Susman Godfrey & McGowan. After Gary McGowan left the firm in 1989, it became Susman Godfrey LLP, which it has been ever since.

8.    What began as a one-office firm with a small handful of lawyers has grown to a litigation powerhouse made up of more than 230 of the country's best trial attorneys spread across four offices in Houston, Los Angeles, New York, and Seattle. Over its 45-year history, Susman Godfrey and its lawyers have represented clients in most if not every state, in federal and state courts across the nation, before myriad federal agencies and regulatory bodies, and in tribunals throughout the world (including the Supreme Court of the United States), and they have helped to establish major precedent in state and federal law. Susman Godfrey is widely recognized as one of the leading litigation firms for bet-the-company cases by companies, and since our founding, we have proudly represented a wide range of industry leaders throughout the world.

9.    **Recognitions.** Susman Godfrey is one of the top-performing firms in the country. The Firm has been recognized as an "Am Law 100" firm on *The American Lawyer* 100 list in 2024 and 2025. Out of those 100 top revenue-generating firms, Susman Godfrey is one of only a few firms that solely practices litigation and not transactional law. The Firm's success is also notable because we pioneered success-based fee agreements, for both plaintiffs and defendants, that reward the results we achieve and not the hours we bill. In other words, the Firm's financial success directly corresponds to the success we achieve for our clients in court.

3

10.    The Firm and its lawyers are regularly recognized for excellence in the legal community by *Chambers USA*, *Law360*, *Lawdragon*, *National Law Journal*, *Super Lawyers*, *American Lawyer*, *Benchmark Litigation*, national and local bar associations, and other respected publications and organizations. As just a few examples:

- For the past 14 consecutive years, Susman Godfrey has been named as the #1 Litigation Boutique in the nation by the *Vault* survey—a distinction the Firm has held since the survey's inception.

- For the past 10 consecutive years, Susman Godfrey has had the largest number of lawyers of any firm named to *Lawdragon*'s annual list of 500 Leading Lawyers in the nation.

- In 2024, Susman Godfrey was named Class Action Firm of the Year and Media & Entertainment Firm of the Year by *Law360*, was a finalist for the *National Law Journal*'s Plaintiff Firm of the Year and Antitrust Firm of the Year awards, was a finalist for *Texas Lawyer*'s Firm of the Year and Litigation Department of the Year in General Commercial Litigation awards, and had 32 of its lawyers recognized as *Super Lawyers* in their respective states.

-  In 2023, the Firm received the award for Specialty/Boutique Litigation Department of the Year from *The American Lawyer* and was named the General Commercial Litigation Firm of the Year by *Benchmark Litigation*.

- In 2022, the Firm was named Trial Firm of the Year by *Benchmark Litigation*.

11.    **Clients and notable representations.** The Firm represents a wide range of clients across a variety of industries, from small- and medium-sized businesses, families, individuals, and charitable and public service-oriented organizations to Fortune 500 companies. Courts across the country have appointed the Firm to serve as lead or co-lead counsel in many cases in recognition

4

of the Firm's ability, skill, and expertise in prosecuting and managing complex litigation. Notably, the Firm has represented individuals and smaller companies in disputes against some of the largest and most powerful companies in the world. To offer just a few examples:

- In 2024, Susman Godfrey won a $266 million verdict on behalf of the City of Baltimore against McKesson and AmerisourceBergen in the city's nearly seven-year lawsuit against the opioid distributors and manufacturers that fueled the worst opioid epidemic in the nation's history.

- Susman Godfrey also led class-action efforts on behalf of residents of Flint, Michigan, who pursued claims for personal injuries and property damage arising from widespread lead contamination in the city's water supply, securing court-approved settlements valued at $626 million on behalf of the class.

- In 2024, Susman Godfrey achieved a groundbreaking $418 million joint settlement on behalf of a nationwide class of home sellers with the National Association of Realtors, resolving antitrust claims asserting that the National Association of Realtors and several of the nation's largest residential real estate brokerage companies implemented anticompetitive rules requiring real estate agents for home sellers to offer to pay buyer broker fees in addition to their own brokers' commissions.

12.    **Our colleagues.** Susman Godfrey has over 350 lawyers and staff members. Of those, over 230 are attorneys—including equity partners, associates, of counsel, and staff attorneys—and the remainder are professional support staff, including paralegals, legal assistants, and information technology specialists.

13.    Our employees create community, enrich civic engagement, and serve their country. Susman Godfrey attorneys have served in the Army, Navy, Air Force, and Marines, both

5

JA 3114

in active combat and as members of the JAG corps, and some continue to serve as military reserves. The Army recognized one current attorney's heroism with the award of a Bronze Star. The Firm's lawyers are leaders and members of national, state, and local bar associations around the country. Susman Godfrey lawyers are members of the American Bar Association, the Federal Bar Council, state bar associations in Texas, New York, California, and Washington, and local bar associations in such cities and counties as Los Angeles County, Harris County, and New York City—among other esteemed professional organizations.

14.     Susman Godfrey's lawyers come from all backgrounds and hold diverse political views. Attorneys have joined the Firm after government service in both Democratic and Republican administrations. The Firm requires associates it hires to have completed at least one clerkship for a federal Article III judge; many clerked for two judges and some even three. Susman Godfrey lawyers have joined the Firm after clerking for judges nominated by both Republican and Democratic presidents. Current Susman Godfrey attorneys have clerked for federal appeals court judges in each of the 13 federal circuit courts of appeals. Following in the footsteps of firm founder Stephen Susman, who clerked for United States Supreme Court Justice Hugo Black, more than 10 current and recent Susman Godfrey attorneys have clerked on the United States Supreme Court for justices appointed by presidents of both parties: Chief Justice William Rehnquist, Justice Sandra Day O'Connor, Justice Anthony Kennedy, Justice Ruth Bader Ginsburg, Justice Steven Breyer, Justice Elena Kagan, Justice Samuel Alito, and Chief Justice John Roberts. Of our current lawyers, the breakdown is roughly evenly split: about half clerked for judges nominated by Republican presidents and about half for judges nominated by Democratic presidents.

15.     **Alumni.** Susman Godfrey alumni have served or are now serving as federal and state judges, judicial clerks, high-ranking government officials, federal prosecutors, and adjunct

6

professors of law. Republican governors have appointed four former Susman Godfrey lawyers to state court judgeships. Two former Susman Godfrey lawyers currently serve as Article III federal judges: one nominated by President Trump and one by President Biden.

16.    **Pro bono.** Susman Godfrey is dedicated to its pro bono practice, even if it means taking on unpopular clients and controversial causes. The Firm is committed to representing those who cannot afford to pay for legal services. We encourage our attorneys to participate in pro bono opportunities and make Firm resources available to ensure our pro bono efforts are meaningful and effective. Since its founding, the Firm has provided thousands of hours of pro bono services by attorneys, paralegals, and other professionals to innumerable clients, including indigent criminal defendants and community-based organizations of all sizes, in matters championing human and civil rights, as well as electoral, housing, immigration, and reproductive issues. Since 2020, Susman Godfrey lawyers, paralegals, and other professionals have spent over 22,000 hours, valued at nearly $15 million, on pro bono service. Susman Godfrey has received numerous awards from a wide range of organizations for its pro bono representations, including recognition on the *National Law Journal*'s "Pro Bono Hot List." The Firm's decision whether to take on any particular pro bono representation is driven by the varying interests and passions of its lawyers— not by any ideological or political agenda established by the Firm.

17.    Susman Godfrey fosters a work environment in which all lawyers and business professionals are judged on their merit, and the Firm has been recognized for its culture of excellence and transparency. For example, in the 2025 *Vault* Rankings, Susman Godfrey was named #1 Best Midsize Law Firm for Career Outlook, Selectivity, and Transparency and #3 Best Midsize Law Firm for Satisfaction and Quality of Work.

18.    I am proud to have spent nearly 20 years of my career at the Firm.

II.    **Susman Godfrey attorneys frequently interact with the federal government on behalf of the Firm's clients.**

19.    As a commercial litigation firm that represents a wide array of clients across numerous industries, Susman Godfrey lawyers necessarily and regularly interact with the federal government on behalf of their clients in innumerable ways. Those interactions are critical to their ability to practice their profession, develop their careers, and serve their clients. Susman Godfrey is constrained by Rule 1.6 of the Model Rules of Professional Conduct and attorney-client privilege and thus cannot disclose the specifics of client engagements without authorization. No client has authorized Susman Godfrey to disclose its engagement of the Firm (to the extent that engagement is not a matter of public record) in connection with this litigation, and this section therefore contains information about the Firm's practice without revealing confidential details or disclosing client confidences.

20.    **Active federal cases.** Our attorneys are litigators who regularly appear in federal courts or administrative proceedings across the country on behalf of their clients. The Firm's lawyers are in federal court and interact with federal officials every week and nearly every day. Indeed, a team of Susman Godfrey lawyers was in federal court in Northern California at the time the April 9, 2025 Order was issued. The Firm has hundreds of active matters before federal courts and federal agencies, which represent more than a third of all active matters at the Firm. Susman Godfrey attorneys already have made dozens of in-person appearances in federal court in 2025, and the Firm's attorneys have several in-person appearances in federal court this week and next, including in the Southern District of New York, Northern District of Illinois, Southern District of Iowa, Western District of Texas, and Eastern District of Texas, with numerous in-person appearances in federal court and before federal agencies scheduled in the coming months. Susman Godfrey attorneys currently have at least seven trials scheduled to go forward in federal court in

8

the next six months. The Firm has many more federal court actions presently awaiting trial dates for 2025.

21.    **Practice areas interacting with the federal government.** The Firm has no formal practice groups and engages in all forms of commercial litigation, but many of our matters require frequent interactions with the federal government. While representing their clients, Susman Godfrey lawyers frequently meet with officials from many different federal agencies. Susman Godfrey partners have numerous upcoming meetings scheduled with federal government personnel in the next 90 days, including with officials from the Main Branch of the Department of Justice and multiple United States Attorneys' Offices. At any given time, and consistent with the nature of the Firm's matters, I estimate that no fewer than one third of our active matters require Susman Godfrey lawyers to appear before federal courts or interact with federal agencies in some capacity.

22.    Our attorneys also practice in a variety of areas that require extensive interaction with the federal government in order to represent our clients:

23.    Qui tam *and False Claims Act.* Susman Godfrey dedicates itself to a significant number of False Claims Act cases in which the firm represents whistleblowers ("relators") in cases brought under the federal False Claims Act and comparable state laws. These laws permit private citizens to file suits on behalf of the government (called "*qui tam*" suits) against those who have defrauded the government. *Qui tam* cases provide significant monetary and other benefits to the United States Government.

24.    These matters frequently require regular interaction with federal government employees on behalf of the relator-client and often involve in-person contact with the government in federal buildings for important meetings, interviews, and negotiations. Most False Claims Act

9

*qui tam* cases begin with the identification of a responsible attorney in one of the United States Attorneys' Offices. Our practice is to make an initial disclosure to the United States Government disclosing all material evidence and information in the relator's possession relating to the claim. This process necessitates engagement with a federal employee—typically an Assistant United States Attorney. Susman Godfrey attorneys who are currently representing clients in pending *qui tam* cases have made contact with dozens of United States Attorneys' Offices across the country. Susman Godfrey attorneys and the Assistant United States Attorneys typically engage in further communications via emails and/or phone calls after the initial disclosure.

25.    Following the initial disclosure, a *qui tam* case is filed under seal in United States District Court. It is often standard, post-filing, for the Assistant United States Attorney to set up an interview between the government and the relator; Susman Godfrey attorneys participate as the relator's counsel. For smaller cases, the post-filing interviews may be held remotely by phone or videoconference. For larger cases, relator interviews are more likely to be held in-person in federal buildings. The interviews will always include at least one Assistant United States Attorney, and, for larger cases, may include attorneys or investigators from other responsible federal agencies that have an interest in the false claim, including, for instance, individuals from a responsible agency's Office of Inspector General. Susman Godfrey currently has at least one such interview scheduled and anticipates that several more will be scheduled in the near future.

26.    After the initial relator interview, the case proceeds to the investigatory phase, during which time the matter remains under seal. During this stage, there are typically three types of routine engagements with government employees:

a.    *First*, the Assistant United States Attorney may make contact with Susman Godfrey because he or she wishes to enlist Susman Godfrey's assistance in the investigation. In

10

previous matters, Susman Godfrey attorneys have entered into common-interest agreements with the Department of Justice that allow Susman Godfrey to participate in reviewing documents produced by the defendant(s) during the investigatory stage. Pursuant to that common-interest agreement, Susman Godfrey may help Assistant United States Attorneys with reviewing documents and preparing memoranda to assist the Department of Justice in the investigation. Many of these engagements occur by telephone or videoconference.

b.      *Second*, government employees may seek direct assistance from the relator-client him- or herself to assist with the investigation. This may include asking for assistance in deciphering an internal document or record, or providing information or other details about the defendant's internal operations or knowledge. These engagements may occur by telephone or videoconference but have also been held in person.

c.      *Third*, the government may wish to engage with Susman Godfrey and the relator-client to facilitate settlement with the defendant. The settlement process frequently involves in-person meetings between the government and the defendant involving detailed presentations of evidence. Although the relator-client is not part of those meetings, Susman Godfrey attorneys may be involved in assisting the government in its presentation and helping the government prepare responses to the defendant's settlement positions.

27.     If the government decides to intervene in a *qui tam* case, as it has in current cases handled by the Firm, Susman Godfrey's interactions with the government are frequent and involved, similar to a co-counsel relationship. Susman Godfrey often holds at least weekly phone calls with the government, and may be in contact with government lawyers daily during discovery, for purposes of motions practice, and during trial if the case does not settle. Susman Godfrey and the government typically share extensive amounts of joint work-product necessary for the effective

11

JA 3120

prosecution of the case. Following a settlement or judgment, the government also engages with Susman Godfrey to reach resolution on the relator-client's share of the recovery, which can include the sharing of information, memoranda, and presentations.

28.    *Intellectual property.* Susman Godfrey also handles a large volume of patent-infringement litigation, often representing clients before federal agencies with responsibilities over patent validity and patent infringement disputes. For example, Susman Godfrey represents patent owners in the United States International Trade Commission in unfair import proceedings before administrative law judges and in frequent interactions with investigative staff attorneys for the United States International Trade Commission's Office of Unfair Import Investigations, as well as semi-regular interactions with attorneys from the United States International Trade Commission's Office of the General Counsel. Susman Godfrey attorneys also represent patent owners and patent challengers before the United States Patent and Trademark Office in administrative post-grant proceedings, including before the Patent Trial and Appeal Board. Susman Godfrey attorneys also frequently interact with attorneys working at the Exclusion Order Enforcement Branch of United States Customs and Border Protection to assist them in implementing and enforcing the exclusion orders issued by the United States International Trade Commission.

29.    *Antitrust.* Ever since the landmark *Corrugated Container* price-fixing case in 1980, in which Susman Godfrey recovered $550 million on behalf of plaintiffs as a result of settlements and a verdict after a 3-month jury trial, the Firm has been at the forefront of antitrust litigation. The Firm has successfully represented and is currently representing plaintiffs bringing price-fixing, market allocation, refusal to deal, no-poach, and monopolization claims in numerous industries: consumer products, healthcare, real estate, technology, telecommunications, and transportation. Such cases frequently require interaction and coordination with the federal

12

government, including the Antitrust Division of the Department of Justice and the Federal Trade
Commission. For example, in the *In re Qualcomm Antitrust Litigation*, the Firm served as co-lead
counsel in a consumer class action that was coordinated with a parallel action brought by the
Federal Trade Commission, and that required close and regular coordination with agency staff.

30.    *Environmental.* Susman Godfrey also represents both plaintiffs and defendants in
litigation concerning the discharge of hazardous substances into the environment. These actions
have included toxic tort actions for personal injuries and property damage, natural resource
damages actions, and Superfund remediation matters. These matters can involve interaction with
United States Attorneys' Offices, the Environmental Protection Agency, and state and local
governments that partner with federal agencies in implementing federal environmental programs
and statutory mandates.

31.    *Pro bono.* In carrying out pro bono work, Susman Godfrey lawyers are frequently
before federal agencies and regularly interact with federal government officials. Lawyers at
Susman Godfrey are often tapped by trial and appellate courts across the country to assist on
precedent-setting pro bono matters. These matters include human rights, anti-discrimination
issues, constitutional challenges, and death penalty appeals; much of this litigation is in federal
court. For example, Susman Godfrey successfully challenged in federal court Harris County,
Texas's practice of holding in jail tens of thousands of people who were arrested for misdemeanors
but were financially unable to post bail. The United States Court of Appeals for the Fifth Circuit
upheld the ruling on appeal. *See ODonnell v. Harris County*, 892 F.3d 147 (5th Cir. 2018).

32.    **Federal agencies.** In representative matters for clients, the Firm has interacted
with, and anticipates future interactions with, at least the following federal departments,
agencies, and officials:

a.    Attorney General of the United States

b.    Department of Commerce

c.    Department of Defense

d.    Department of Health and Human Services

e.    Department of Homeland Security

f.    Department of Justice

g.    Department of the Treasury

h.    Executive Office of Immigration Review

i.    Federal Trade Commission

j.    International Trade Commission

k.    Securities and Exchange Commission

l.    United States Attorneys' Offices

m.    United States Customs and Border Protection

n.    United States Citizenship and Immigration Services

o.    United States Patent and Trademark Office

33.    **Government contractor clients.** Among Susman Godfrey's clients, including several of the Firm's largest clients, are nearly twenty persons and entities that contract with or otherwise do business with the federal government, or have affiliates who are government contractors and subcontractors.

34.    In short, the Firm's civil litigation practice—at the trial court and appellate levels—frequently requires us to interact with the federal government, regularly and repeatedly, on behalf of our clients. This means that much of our work on behalf of our clients requires access to federal government buildings housing courthouses and agencies. This is true of every matter pending in

14

federal court or a federal agency at the Firm. Certain practice areas, such as False Claims Act cases, rely heavily on interacting with the federal government. And many of the Firm's clients do, or have done, business with the federal government.

**III.    Susman Godfrey recently has pursued litigation against the federal government, in federal court, and related to federal elections.**

35.    Susman Godfrey is no stranger to suing the United States Government. It has sued the federal government in cases against both Democratic and Republican presidential administrations, and in cases that span the ideological spectrum. For example, Susman Godfrey attorneys currently are litigating several Tucker Act cases in the Court of Federal Claims, involving frequent interactions with attorneys at the Department of Justice. Those cases include a Fifth Amendment takings claim against the United States Navy on behalf of dozens of property owners whose property values and quality of life have decreased on account of a vast expansion of the Navy's flight-training program; a case against a federal agency for inverse condemnation on behalf of property owners; and a suit against a federal agency for user fees that it collected in violation of the agency's statutory and regulatory mandates.

36.    Susman Godfrey also has defended the United States' democratic electoral system generally and for clients who span the political spectrum. After the November 2020 election, Susman Godfrey represented various state officers in their official capacities defending the results of the 2020 election against unfounded conspiracy theories that the election had been rigged. Susman Godfrey represented, among other officials, the Governor of Wisconsin and the Secretary of State of Arizona. *Feehan v. Wis. Elections Comm'n*, No. 2:20-cv-01771-PP (E.D. Wis. filed Dec. 1, 2020) (counsel for Defendant Tony Evers in his official capacity as Wisconsin Governor); *Bowyer v. Ducey*, No. 2:20-cv-02321-DJH (D. Ariz. filed Dec. 2, 2020) (counsel for Defendant Katie Hobbs in her official capacity as the Arizona Secretary of State). Federal courts rejected the

arguments put forth by the Trump campaign and related individuals in those cases. *Feehan*, ECF No. 83 (granting defendants' motions to dismiss), *vacated on other grounds by Feehan v. Wis. Elections Comm'n*, No. 20-3448 (7th Cir. Feb. 1, 2021); *Bowyer*, ECF No. 84 (granting defendants' motions to dismiss). In Arizona, Susman Godfrey presented at a hearing on behalf of all state-official defendants (including the Democratic Secretary of State and Republican Governor) who had been sued by voters and GOP chairs for various Arizona counties. *Bowyer*, ECF No. 83 (transcript).

37.    In recent years, Susman Godfrey represented Dominion Voting Systems in defamation actions against Fox News and Fox News Corporation for false claims relating to the 2020 election. *US Dominion Inc. v. Fox News Network LLC*, No. N21C-03-257 (Del. Super. Ct. filed Mar. 26, 2021); *US Dominion Inc. v. Fox Corp.*, No. N21-C11-082 (Del. Super. Ct. filed Nov. 8, 2021). In legal filings in the months leading up to trial, the Susman Godfrey team exposed what had gone on at Fox in the weeks and months after the 2020 election, when Fox was publicly broadcasting falsehoods about Dominion while privately disparaging those same statements and the individuals promoting them. At summary judgment, the trial court ruled that none of Fox News' disputed statements about Dominion were true, vindicating the claims advanced by Susman Godfrey and paving the way for a trial focused on whether Fox News acted with actual malice. *US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1039 (Del. Super. Ct. 2023) ("The evidence developed in this civil proceeding demonstrates that is [sic] **CRYSTAL** clear that none of the Statements relating to Dominion about the 2020 election are true." (emphasis in original)). Only shortly before trial did the case settle. This case received widespread media attention and resulted in a historic $787.5 million settlement—reported to be

16

the largest publicly known defamation settlement involving a media company in United States history.

38.    At the time the Order issued, Susman Godfrey was scheduled to try a case less than three weeks later on behalf of Dominion Voting Systems against Newsmax Media. The lawsuit concerns false and defamatory statements broadcasted by Newsmax accusing Dominion of voter fraud and rigging the 2020 election to flip votes from President Trump to then-former Vice President Joseph R. Biden, Jr. Siding with arguments made by Susman Godfrey, the court recently denied the defendant's motion for summary judgment and partially granted Susman Godfrey's cross-motion for summary judgment, ruling that Newsmax made false and defamatory statements. *US Dominion, Inc. v. Newsmax Media, Inc.*, No. N21C-08-063, 2025 WL 1092289, at *12-17 (Del. Super. Ct. Apr. 9, 2025). The court's ruling issued just hours before the Administration announced the Executive Order targeting the Firm on April 9, 2025.

39.    Susman Godfrey continues to serve as counsel for Dominion in defamation lawsuits arising out of allegedly false statements related to the 2020 presidential election against Rudy Giuliani, Sidney Powell, Mike Lindell and MyPillow, Patrick Byrne, and One America News Network (OAN).

## IV.    The executive orders targeting other law firms have inflicted significant harm on those firms and on the industry, including on Susman Godfrey.

40.    On February 25, 2025, President Trump signed a memorandum directed to the heads of various agencies in the intelligence community, titled "Suspension of Security Clearances and Evaluation of Government Contracts," that targeted the law firm Covington & Burling LLP (the "Covington Memo"). Declaration of Ginger D. Anders in Supp. of Mot. for Summ. J. (hereinafter "Anders Decl.") Ex. 10. The Covington Memo singled out Peter Koski, a partner of Covington & Burling "who assisted former Special Counsel Jack Smith." *Id.* The Covington

17

Memo directed the agency heads to "suspend any active security clearances held by" Mr. Koski and "all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel" and "to terminate any engagement of Covington & Burling LLP by any agency." *Id.*

41.    On March 6, 2025, President Trump issued Executive Order 14230, titled "Addressing Risks from Perkins Coie LLP" (the "Perkins Order"). Anders Decl. Ex. 12. The Perkins Order described what it calls the "dishonest and dangerous activity of the law firm Perkins Coie LLP," including "representing failed Presidential candidate Hillary Clinton," which the Perkins Order asserted was "part of a pattern" of "egregious activity." *Id.* § 1. The Perkins Order also asserted that "Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification." *Id.* The Perkins Order directed federal agencies to "suspend any active security clearances held by individuals at Perkins Coie" until further notice; require government contractors to disclose any business they do with Perkins Coie; "terminate any contract" with Perkins Coie "to the maximum extent permitted by applicable law"; issue guidance "limiting [the] official access" of Perkins Coie employees to federal government buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States"; issue guidance "limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States"; and "refrain from hiring employees of Perkins Coie, absent a waiver." *Id.* §§ 2-5. The Perkins Order also directed the Chair of the Equal Employment Opportunity Commission to investigate "the practices of representative large,

18

**JA 3127**

influential, or industry leading law firms" for what that order describes as "discrimination under 'diversity, equity, and inclusion' policies." *Id.* §§ 1, 4.

42.     On March 12, 2025, Judge Beryl A. Howell of the United States District Court for the District of Columbia issued a temporary restraining order enjoining implementation or enforcement of Sections 1, 3, and 5 of the Perkins Order. Anders Decl. Ex. 14; *see Perkins Coie LLP v. Dep't of Just.* No. 25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 21.

43.     On March 14, 2025, President Trump issued Executive Order 14237, titled "Addressing Risks from Paul Weiss" (the "Paul Weiss Order")—an order that the President subsequently rescinded. Anders Decl. Ex. 16. That order directed government officials to impose against Paul Weiss and its employees sanctions nearly identical to those imposed under the already-enjoined Perkins Order. *Id.* §§ 2-5. The Paul Weiss Order attacked "[g]lobal law firms," asserting that they are "engaged in activities that make our communities less safe, increase burdens on local businesses, limit constitutional freedoms, and degrade the quality of American elections." *Id.* § 1. The Paul Weiss Order asserted that the supposedly improper litigation brought by "[g]lobal law firms" includes not only work done on behalf of paying clients, but also work done "pro bono" or "for the public good." *Id.* And the Paul Weiss Order targeted specific Paul Weiss partners, including a partner and "former leading prosecutor in the office of Special Counsel Robert Mueller" who "brought a pro bono suit" "on behalf of the District of Columbia Attorney General" "against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021." *Id.*

44.     On March 20, 2025, the President announced on Truth Social that he would withdraw the Paul Weiss Order as part of an "agreement" with Paul Weiss. Anders Decl. Ex. 17. The President stated that "Paul, Weiss will dedicate the equivalent of $40 million in pro bono legal

services over the course of President Trump's term to support the Administration's initiatives." *Id.*
He also stated that he was "agreeing to this action in light of a meeting with Paul, Weiss Chairman,
Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner,
Mark Pomerantz." *Id.* Mr. Karp, Paul Weiss's Chairman, stated: "We are gratified that the
President has agreed to withdraw the Executive Order concerning Paul, Weiss. We look forward
to an engaged and constructive relationship with the President and his Administration." *Id.*

45.    In a Presidential Memorandum dated March 22, 2025, President Trump directed
the Attorney General to assess whether attorneys and law firms currently litigating against the
federal government have engaged in "misconduct" and to "seek sanctions" or recommend other
disciplinary actions—including "reassess[ing]" security clearances held by the firms' lawyers and
"terminat[ing] . . . any federal contract" under which they provide services—whenever the
Attorney General concludes that their conduct warrants such measures. Anders Decl. Ex. 20.
President Trump also instructed the Attorney General to review attorney conduct in litigation
against the federal government over the past eight years and to recommend the same range of
disciplinary actions "[i]f the Attorney General identifies misconduct that may warrant additional
action, such as filing frivolous litigation or engaging in fraudulent practices." *Id.*

46.    On March 25, 2025, President Trump issued Executive Order 14246, titled
"Addressing Risks from Jenner & Block" (the "Jenner Order"). Anders Decl. Ex. 21. The Jenner
Order directed government officials to impose sanctions against Jenner and its employees nearly
identical to those set forth in the enjoined Perkins Order and the since-withdrawn Paul Weiss
Order. The Jenner Order criticized "so-called 'Big Law' firms," alleging that such firms "regularly
conduct . . . harmful activity through their powerful pro bono practices, earmarking hundreds of
millions of their clients' dollars for destructive causes, that often directly or indirectly harm their

20

own clients." *Id.* § 1. The Jenner Order specifically criticized Jenner for purportedly "abus[ing] its

pro bono practice" by "engag[ing] in obvious partisan representations to achieve political ends,

support[ing] attacks against women and children based on a refusal to accept the biological reality

of sex, and back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific

crimes and trafficking deadly drugs within our borders." *Id.* In addition, the Jenner Order singled

out the firm's re-hiring of Andrew Weissmann after he served as part of Special Counsel Robert

Mueller's team to investigate Russian interference in the 2016 election.

47.    On March 27, 2025, President Trump issued Executive Order 14250, titled

"Addressing Risks from WilmerHale" (the "WilmerHale Order"). Anders Decl. Ex. 25. The

WilmerHale Order again referenced the Administration's campaign against "so-called 'Big Law'

firms," and again imposed sanctions similar to those set forth in the prior orders against other law

firms. *Id.* § 1. The WilmerHale Order singled out WilmerHale on the ground that the firm "engages

in obvious partisan representations to achieve political ends," including by allegedly "support[ing]

efforts to discriminate on the basis of race, back[ing] the obstruction of efforts to prevent illegal

aliens from committing horrific crimes and trafficking deadly drugs within our borders, and

further[ing] the degradation of the quality of American elections, including by supporting efforts

designed to enable noncitizens to vote." *Id.* The WilmerHale Order also claimed that WilmerHale

demonstrated that it was "bent on employing lawyers who weaponize the prosecutorial power" by

hiring Robert Mueller and two of his colleagues from the Mueller investigation, Aaron Zebley and

James Quarles. *Id.*

48.    On March 28, 2025, Jenner and WilmerHale separately sued to enjoin their

respective executive orders. Anders Decl. Exs. 22, 26; *Jenner & Block LLP v. Dep't of Just.*, No.

25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 1; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 1.

49.    The same day that those suits were filed, Judge John D. Bates and Judge Richard J. Leon of the United States District Court for the District of Columbia issued temporary restraining orders against the Jenner and WilmerHale Orders, respectively. Those temporary restraining orders concluded that each law firm had established a likelihood of success on the merits and made a showing of irreparable harm; Judge Bates enjoined implementation and enforcement of Sections 1, 3, and 5 of the Jenner Order, and Judge Leon enjoined implementation and enforcement of Sections 3 and 5 of the WilmerHale Order. Anders Decl. Exs. 23, 27; *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 9; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10.

50.    From publicly available information, I understand that the law firms subject to the executive orders described above immediately began to experience irreparable harm as a result of those executive orders. In support of Perkins Coie's motion for a temporary restraining order, a Perkins Coie attorney stated that the government had informed a Perkins Coie client that Perkins Coie attorneys could not attend upcoming scheduled meetings and that numerous clients had terminated engagements with the firm. Anders Decl. Ex. 56 ¶¶ 25-26, 29; *see* Anders Decl. Ex. 49 ¶¶ 44-45. According to a declaration filed by Jenner, the government informed a firm client that Jenner attorneys could not attend an upcoming meeting with the Department of Justice, and several clients expressed concern about Jenner's ongoing representation of them. Anders Decl. Ex. 51 ¶¶ 63-64, 68; Anders Decl. Ex. 58 ¶¶ 70-72. At least one of Paul Weiss's clients cited the Paul Weiss Order as the reason for terminating his representation by Paul Weiss attorneys. *See* Anders Decl. Ex 57 at 2-3. And within 24 hours of the issuance of the WilmerHale Order, at least one of

WilmerHale's government-contractor clients was contacted by a federal agency requesting that the client disclose whether it had any business relationship with WilmerHale, and two meetings between WilmerHale attorneys and a federal agency were abruptly postponed. Anders Decl. Ex. 59 ¶¶ 4-5. Unless, the Order is permanently enjoined, I expect Susman Godfrey to suffer similar irreparable harm.

51.     In addition to the existing executive orders, President Trump has threatened to target additional law firms. When he signed the Perkins Order, President Trump referenced how his team "was looking at about 15 different law firms" as potential targets for similar sanctions. Anders Decl. Ex 28 at 5:45-5:50. A few days after he issued the Perkins Order, President Trump said in an interview that "[w]e have a lot of law firms that we're going to be going after because they were very dishonest people." Anders Decl. Ex. 29. The same day that President Trump issued the March 14 Paul Weiss Order, he delivered a speech at the Department of Justice denouncing "crooked law firms," "violent, vicious lawyers," and "fake lawyers." Anders Decl. Ex. 30. And upon signing the Order targeting Susman Godfrey, the President told the gathered press that he had five more law firms in his sights. Anders Decl. Ex. 31 at 1:28-1:32.

52.     Those closely associated with President Trump have made similar comments concerning the intent behind these executive orders targeting law firms. Steve Bannon has stated that President Trump is "going after" law firms "to cut them off." Anders Decl. Ex. 32. According to Mr. Bannon, "what we are trying to do is put you [law firms] out of business and bankrupt you." *Id.*

53.     These threats by the President and his allies have been effective, as law firms have chosen to make concessions to the White House rather than face the existential threat that an executive order would pose. First, on March 28, 2025, the President announced another

"agreement" similar to the one reached with Paul Weiss—this time with the law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"). Anders Decl. Ex. 33. That new "agreement" was reached without the President having to issue any executive order against the firm in the first place; the mere threat of such an order was enough. This "agreement" followed public reports that the President intended to issue an executive order targeting Skadden over its pro bono work and diversity, equity, and inclusion initiatives. Anders Decl. Ex. 34. In a post on Truth Social, the President announced that Skadden had agreed to "provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration and beyond, to causes that the President and Skadden both support." Anders Decl. Ex. 33. The President asserted that he would "never stop fighting to deliver on his promises of eradicating partisan Lawfare in America, and restoring Liberty & Justice for ALL." *Id.*

54.    On April 1, 2025, the President announced a substantially identical "agreement" to the ones reached with Paul Weiss and Skadden—this time with the law firm Willkie Farr & Gallagher LLP ("Willkie"). Anders Decl. Ex. 35. Like the Skadden "agreement," this "agreement" was reached without the President having issued an executive order. It was publicly reported that, before negotiating this "agreement," Willkie had learned that the President intended to issue an executive order against the firm. Anders Decl. Ex. 36. Willkie committed "at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration, and beyond, to causes that President Trump and Willkie both support." *Id.*

55.    On April 2, 2025, another law firm, Milbank LLP, preemptively reached an "agreement" with the President prior to receiving an executive order targeting the firm. Anders Decl. Ex. 37. Public reporting stated that, before negotiating this "agreement," President Trump's administration had contacted Milbank with concerns about Milbank's approach to pro bono and

diversity initiatives and suggested that Milbank reach an agreement similar to Skadden's. Anders

Decl. Ex. 38. The Milbank "agreement," like the others, committed to provide $100 million in pro

bono services to causes favored by the President. Anders Decl. Ex. 37.

56.    On April 11, 2025, the President announced that he had reached deals with five

more law firms. Anders Decl. Ex. 40. Those deals were similar to the ones that came before, except

that several of the latest deals committed not only to provide certain pro bono work but also "other

free Legal services." *Id.* Four of the firms involved in those deals—Kirkland & Ellis LLP, Allen

Overy Shearman Sterling US LLP, Simpson Thacher & Bartlett LLP, and Latham & Watkins

LLP—jointly agreed to provide an "aggregate total of at least $500 Million Dollars in pro bono

and other free Legal services . . . to causes that President Trump and the Law Firms both support

and agree to work on." *Id*. The firms also affirmed that they would not "engage in illegal DEI

discrimination and preferences." *Id.* The President announced that the Equal Employment

Opportunity Commission had concurrently "withdrawn" letters seeking information about the

firms' employment practices and would "not pursue any claims related to those issues." *Id.* The

President also announced "commitments" made by a fifth firm, Cadwalader Wickersham & Taft

LLP. Anders Decl. Ex. 41. Cadwalader agreed to provide "at least $100 Million Dollars in pro

bono Legal Services . . . to causes that President Trump and Cadwalader both support." *Id.*

President Trump has since suggested that he intends to direct free legal work promised by law

firms towards, among other things, negotiating trade deals with foreign nations, reviving the coal

industry, and representing President Trump and his allies if they are investigated. Anders Decl.

Exs. 43, 60. Faced with the threat of irreparable harm that an executive order would pose, each of

these firms decided to pay the steep price of avoiding one.

57.    Susman Godfrey was forced to expend significant resources to address the risk that it would be targeted by an executive order and would suffer similar types of irreparable harm, and now has expended significant resources in responding to the Order. Susman Godfrey attorneys have devoted hundreds of hours to monitoring and analyzing the Administration's actions targeting other law firms, preparing Susman Godfrey's strategy for responding should the Firm be targeted by President Trump, and, now, responding to the Order targeted at Susman Godfrey. Susman Godfrey also engaged outside counsel to represent the Firm in a challenge to the April 9, 2025 Order, which has now come to pass.

58.    Susman Godfrey also has spoken out against the executive orders targeting other law firms. On April 4, 2025, Susman Godfrey was one of more than 500 law firms that filed an amicus brief in support of Perkins Coie in *Perkins Coie LLP v. United States Department of Justice.* No. 25-cv-716 (D.D.C. Apr. 4, 2025), ECF No. 63-1. Anders Decl. Ex. 44. Susman Godfrey was one of only eight firms in the Am Law 100 (the top 100 firms by revenue in the United States) that signed the brief. At the time of signing, Susman Godfrey was the fifth-largest firm by revenue to sign the brief, and two of the larger firms (WilmerHale and Perkins Coie) previously had been targets of separate executive orders directed against them. Susman Godfrey also signed the amicus briefs filed on behalf of more than 800 law firms in the *Jenner* and *WilmerHale* cases. *Jenner & Block LLP v. Dep't of Just.*, No. 25-cv-916 (D.D.C. Apr. 11, 2025), ECF No. 45-1; *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of the President*, No. 25-cv-917 (D.D.C. Apr. 11, 2025), ECF No. 80.

59.    In addition, on April 8, 2025, Susman Godfrey filed an amicus brief in support of Perkins Coie in *Perkins Coie LLP v. Department of Justice*, on behalf of 27 former national security, foreign policy, intelligence, and other public officials who have worked on security

26

matters at the most senior levels of the federal government for both Democratic and Republican administrations. No. 25-cv-716 (D.D.C. Apr. 8, 2025), ECF No. 104; Anders Decl. Ex. 45. Susman Godfrey informed the Department of Justice that it intended to seek leave to file this amicus brief on April 5. On April 9, 2025—the day after Susman Godfrey filed the amicus brief—President Trump issued the Order targeting Susman Godfrey.

**V.    President Trump signs the executive order targeting Susman Godfrey.**

60.    On April 9, 2025, President Donald J. Trump signed the Order (No. 14263), titled "Addressing Risks from Susman Godfrey." *See* Anders Decl. Ex. 1. The Order was accompanied by a "Fact Sheet" issued the same day that purports to explain and support the Order. *See* Anders Decl. Ex. 2 (the "Fact Sheet").

61.    Susman Godfrey was not contacted by the Administration regarding the Order at any time prior to the public signing of the Order. Susman Godfrey was given no notice of, nor an opportunity to respond to, the false charges in the Order and Fact Sheet or to explain their inevitable impact on the Firm before they were issued. To this day, the Administration has not contacted Susman Godfrey concerning the claims in the Order and Fact Sheet.

62.    **Litigation to defend businesses and public officials from false accusations about the conduct of the 2020 election.** The Order attacks Susman Godfrey because it purportedly "spearheads efforts to weaponize the American legal system and degrade the quality of American elections." Anders Decl. Ex. 1 § 1. The Order and Fact Sheet make no attempt to identify any specific actions or representations by the Firm that could conceivably fit that description. Anders Decl. Exs. 1, 2. Consistent with its history of zealous advocacy for its clients, and as described above, Susman Godfrey represented Dominion, the Arizona Secretary of State, and the Governor of Wisconsin (among others) to defend the American election system against false and unsupported attacks on its legitimacy, accuracy, and reliability. Indeed, Susman

27

Godfrey's handling of the Dominion case earned the Court's praise for the quality of its lawyering. Anders Decl. Ex. 9.

63.    **Unspecified efforts to "undermine" military effectiveness.** The Order attacks Susman Godfrey based on the assertion that the Firm "also funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology." Anders Decl. Ex. 1 § 1. The Order and Fact Sheet make no attempt to identify any specific actions or representations by the Firm that could conceivably fit that description. Anders Decl. Exs. 1, 2. Susman Godfrey is aware of none. I attended the oral argument on Susman Godfrey's motion for a temporary restraining order in this action on April 15, 2025, during which the Court asked counsel for the Government about the basis for this assertion; the Government replied that it did not have any further information beyond what is contained in the Order. Anders Decl. Ex. 46 at 18:13-17.

64.    **The Firm's diversity and inclusion efforts.** The Order attacks Susman Godfrey on the ground that the Firm "supports efforts to discriminate on the basis of race" and that the Firm "itself engages in unlawful discrimination, including discrimination on the basis of race." Anders Decl. Ex. 1 § 1. The sole example cited is an unnamed program alleged to "offer[] financial awards and employment opportunities only to 'students of color.'" *Id.* To the extent this refers to the Susman Godfrey Prize, then it is inaccurate on multiple levels. The Firm does not have any program that offers employment opportunities only to people of color. The Susman Godfrey Prize is a cash prize that is awarded to up to 20 students of color who are finishing their first or second years at certain law schools. The Susman Godfrey Prize program does not offer any "employment opportunities." Anders Decl. Ex. 47; Anders Decl. Ex. 1 § 1. Nor does it constitute unlawful

28

discrimination. Anders Decl. Ex. 47. Neither the Order nor the Fact Sheet attempts to articulate how such a program constitutes unlawful discrimination.

**VI.    If the Executive Order is not permanently enjoined, Susman Godfrey will suffer irreparable harm.**

65.    Unless permanently enjoined, the Order will disrupt existing attorney-client relationships and representations to the detriment of the Firm, its attorneys, and its clients, without notice or opportunity to be heard. Refusals by federal officials to meet with Susman Godfrey lawyers, or to permit Susman Godfrey lawyers to access federal agencies and buildings, will immediately and irreparably harm Susman Godfrey's legal practice, its clients' interests, and the careers of its attorneys.

66.    **Impact on active matters in federal forums.** The Order broadly limits Susman Godfrey's access to the federal government. The Order's prohibition against (or limitations on) Susman Godfrey attorneys or personnel interacting with the federal government will have severe effects on the Firm's practice. As noted, Susman Godfrey has scores of active matters before federal courts and federal agencies that require access to federal government buildings and officials. And Susman Godfrey lawyers have numerous upcoming meetings scheduled with federal government personnel across various matters in the next 90 days, including with officials from the Main Branch of the Department of Justice and United States Attorneys' Offices. Even mere uncertainty about whether Susman Godfrey attorneys may or may not be allowed to access federal buildings and interact with federal personnel has wide-ranging negative impacts on the Firm's ability to practice law and on its business.

67.    **Interference with attorney-client relationships.** The purpose and only business of the Firm is representing clients—and hiring, retaining, and supporting lawyers representing those clients. These client relationships are the lifeblood of Susman Godfrey's business. The Firm

has cultivated these relationships over years by being constantly available to handle its clients' immediate and pressing problems, and providing excellent service to resolve those problems promptly. By limiting Susman Godfrey's access to the federal government and forcing clients to disclose their relationship with the Firm, the Order, if not permanently enjoined, will directly interfere with Susman Godfrey's relationships with its clients, attempting to intimidate and coerce Susman Godfrey's clients to resort to another firm.

68. **Forced disclosure of attorney-client relationships.** The Order mandates that federal agencies (a) require government contractors to disclose any relationship they have with Susman Godfrey, and (b) terminate government contracts for clients for which Susman Godfrey has been hired to perform any service. A significant number of Susman Godfrey's clients contract with or otherwise do business with the federal government, or have affiliates who are government contractors or subcontractors. Many other Susman Godfrey clients have significant interactions with the federal government. And many of those clients are represented by the Firm in legal matters completely unrelated to government contracting.

69. For many of the Firm's clients, the fact that the Firm gives them legal advice is not public information. In particular, our firm vets countless cases to consider whether or not to pursue them long before they are filed. Accordingly, if not permanently enjoined, the Order will require many of these clients to divulge confidential information regarding their legal representations to the federal government, in addition to risking the termination of those clients' contracts.

70. **Disruption to relationships with current clients.** Since the signing of the Order, Firm clients have contacted partners of the Firm to inquire about the effects of the Order, whether it impacts Susman Godfrey's ability to access the federal courts, whether it could negatively affect Susman Godfrey's continued representation of those clients, and whether it might influence juries

30

who will be empaneled for their cases. If the Order is not permanently enjoined, other clients of the Firm will likely consider, and some will experience similar reservations or concerns about, the impact of the Order and its potential impact on Susman Godfrey's ability to represent them. Indeed, the Order appears expressly designed for that purpose.

71.    **Interference with clients' right to counsel.** In addition to interfering with Susman Godfrey's relationships with its clients, the Order will interfere with Susman Godfrey's clients' right to, and choice of, counsel. Without cause, the Order will bar Susman Godfrey attorneys from interacting with federal officials, preventing Susman Godfrey from carrying out key aspects of its representation of certain of its clients and forcing those clients to obtain other counsel, in wholly unjustified violation of their Fifth Amendment rights.

72.    **Financial impact to the Firm.** As noted above, by interfering with Susman Godfrey's attorney-client relationships and by limiting Susman Godfrey's ability to advocate on behalf of its clients before the federal government, the Order will cause significant economic harm to the Firm if not permanently enjoined. As discussed above, a substantial portion of the Firm's active matters—no fewer than one third—are in federal court or require interaction with the federal government in some way. And a significant number of Susman Godfrey clients have contracts or subcontracts with the federal government. The very purpose of the Order is to force clients with government contracts to terminate their relationships with Susman Godfrey and not to hire Susman Godfrey for future work.

73.    **Financial harm regarding future opportunities.** We are proud of the trust that clients place in us and value their loyalty, but the Order seeks to disrupt both existing client relationships and potential future client relationships. Unless the Order is permanently enjoined, potential future clients will have an incentive to retain other law firms, not targeted by the federal

government, that do not face the restrictions the Order imposes on our ability to provide the full breadth and depth of professional service on which we pride ourselves. Likewise, existing clients deciding which firm to retain for new matters will have incentives to choose competitor firms that are not saddled with the restrictions imposed by the Order and have not suffered the reputational harm that the Order inflicts on Susman Godfrey. The legal industry is competitive, and the existence of competitors not subject to such an executive order and able to offer a broader suite of professional services (including unfettered interactions with the federal government) will adversely affect our ability to attract new clients and new matters.

74.    **Attorneys' ability to practice chosen profession.** The Order targets Susman Godfrey attorneys' right to practice their chosen profession: providing lawful representation to clients in need of legal services. If not permanently enjoined, the Order will pose a threat not only to the Firm's revenue-generating practice, but also to its attorneys' professional development and careers. It also will threaten the Firm's pro bono practice, which frequently requires us to appear in federal court or before federal agencies on behalf of clients.

75.    **Immediate chilling effect and effect on exercise of profession.** If not permanently enjoined, the Order will have an immediate chilling effect on Susman Godfrey attorneys, the exercise of their chosen profession, and the expression of their own viewpoints. The Order retaliates against the Firm on the stated basis of causes and clients that the President dislikes or finds to be in opposition to the Administration's priorities. If not permanently enjoined, the Firm's attorneys will have to reconsider how they approach current matters requiring appearances in federal forums or requiring interactions with federal officials, attorneys, and personnel. The Firm's lawyers already have felt a chilling effect in deciding whether to take on future representations

32

that may lead to further baseless ire and punitive action from the federal government due to potentially disfavored viewpoints or identities.

76. **Harm to Susman Godfrey's reputation.** The Order has harmed Susman Godfrey's reputation in the markets for clients, lawyers, and staff through its false and disparaging characterizations of the Firm and its attorneys. It also threatens Susman Godfrey's reputation among prospective jruors in trials for Susman Godfrey clients. The Order says many things that are not only inflammatory—for instance, branding the Firm as "detrimental to critical American interests" and accusing it of "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military," Anders Decl. Ex. 1 § 1—but also false, as described above.

77. **Harm to recruitment and retention of attorneys interested in future federal service.** The Order directs federal agencies to refrain from hiring any "employees" of the Firm, absent a pre-hire waiver from an agency head made in consultation with the Director of the Office of Personnel Management following determination that such a hire will not "threaten the national security of the United States." Anders Decl. Ex. 1 § 1. The Firm prides itself on a commitment to public service that is often reflected in lawyers leaving the firm for federal service. In my experience, many law students and currently practicing attorneys are drawn to our firm and stay at our firm due to the significant substantive responsibility we give to associates, which helps make them more compelling candidates for federal employment. Moreover, it is increasingly common for lawyers to begin their careers at private law firms such as ours before then departing for clerkships for federal judges or employment at United States Attorneys' Offices. Unless the Order is permanently enjoined, its direction to federal agencies to refrain from hiring our employees—including non-lawyers—notwithstanding the potential for a waiver through an opaque and

undisclosed process, will impair our ability to recruit and retain lawyers and employees who are interested in future federal employment.

78.     **Employees' ability to perform their civic duties.** Unless permanently enjoined, the Order also will impair Susman Godfrey employees' ability to perform their civic duties, including Susman Godfrey employees who have been called for federal jury duty and those who proudly serve our nation in the military reserves and must access government facilities and interact with government employees when called to serve.

79.     **Revocation of security clearances.** The Order requires the immediate suspension of all active security clearances held by Susman Godfrey employees and purports to create a "Security Clearance Review" process applicable to all such personnel. Anders Decl. Ex. 1 § 2(a). It directs the Attorney General, the Director of National Intelligence, and the "relevant heads of executive departments and agencies" to "immediately take steps to suspend any active security clearances held by individuals at Susman [Godfrey] pending a review of whether such clearances are consistent with the national interest." *Id.* Susman Godfrey personnel currently possess active security clearances, including one attorney who possesses a Top Secret/Sensitive Compartmented Information clearance in connection with service in the military. The Firm does not currently have any active matters requiring security clearances, but has had such matters in the past and expects to have future matters requiring security clearances. Active security clearances are necessary for the effective representation of clients in certain cases involving sensitive government information, such as in matters involving national security or defense and certain *qui tam* and False Claims Act matters. The Order identifies no "national security interest" that it purportedly serves and no basis for the claim that the Firm's conduct is inconsistent with the "national interest" other than litigation the Firm has engaged in relation to elections and for unidentified groups said to "inject[] . . . radical

34

ideology" into the military. The Order's creation of a Susman Godfrey-specific "Security Clearance Review" process, in addition to the federal government's existing security clearance adjudication procedures, could undermine the Firm's efforts to bring in matters involving classified information, including, for instance, matters in the Firm's *qui tam* and False Claims Act practice.

80.    **Revocation of Sensitive Compartmented Information Facilities.** Section 2 of the Order directs the Office of Management and Budget to "identify all Government goods, property, materials, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman [Godfrey]" and to "expeditiously cease such provision," to the extent permitted by law. Anders Decl. Ex. 1 § 2(b). The federal government does not provide Sensitive Compartmented Information Facilities access to Susman Godfrey or its employees.

81.    The Order is designed to disrupt and injure Susman Godfrey's representation of its clients, has done so, and will continue to do so unless it is permanently enjoined by this Court.

82.    I declare under penalty of perjury, on this 23rd day of April, 2025, that the foregoing is true and correct to the best of my knowledge, information and belief.



Kalpana Srinivasan

35

# EXHIBIT 1

Case 1:25-cv-01107-LLA    Document 51-6    Filed 04/23/25    Page 2 of 4
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 264 of 660

15615

Federal Register

Vol. 90, No. 71

Tuesday, April 15, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14263 of April 9, 2025

## Addressing Risks From Susman Godfrey

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Background.* Lawyers and law firms that engage in activities detrimental to critical American interests should not have access to our Nation's secrets, nor should their conduct be subsidized by Federal taxpayer funds or contracts. My Administration must also take appropriate and necessary measures to guard against the actual, potential, or perceived conflicts of interest that arise when the Government funds, engages with, or otherwise devotes resources to law firms and their clients that engage in conduct undermining critical American interests and priorities.

I have determined that action is necessary to address the significant risks, egregious conduct, and conflicts of interest associated with Susman Godfrey LLP (Susman). Susman spearheads efforts to weaponize the American legal system and degrade the quality of American elections. Susman also funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology, and it supports efforts to discriminate on the basis of race.

Susman itself engages in unlawful discrimination, including discrimination on the basis of race. For example, Susman administers a program where it offers financial awards and employment opportunities only to "students of color." My Administration is committed to ending such unlawful discrimination perpetrated in the name of "diversity, equity, and inclusion" policies and ensuring that Federal benefits support the laws and policies of the United States, including those laws and policies promoting our national security and respecting the democratic process. Those who engage in blatant discrimination and other activities inconsistent with the interests of the United States should not have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds.

**Sec. 2.** *Security Clearance Review.* (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman. The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

**Sec. 3.** *Contracting.* (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract.

(b) The heads of agencies shall review all contracts with Susman or with entities that disclose doing business with Susman under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Susman has been hired to perform any service; and

(ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Susman or with entities that do business with Susman effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

Sec. **4**. *Racial Discrimination*. Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP).

Sec. **5**. *Personnel*. (a) The heads of agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Susman when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Susman employees to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of Susman, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

Sec. **6**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**Federal Register** / Vol. 90, No. 71 / Tuesday, April 15, 2025 / Presidential Documents **15617**

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*April 9, 2025.*

[FR Doc. 2025–06458
Filed 4–14–25; 8:45 am]
Billing code 3395–F4–P

# EXHIBIT 2

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Addresses Risks from Susman Godfrey

The White House

April 9, 2025

## SUSPENDING SECURITY CLEARANCES TO PROTECT THE NATIONAL INTEREST:

Today, President Donald J. Trump signed an Executive Order to suspend security clearances held by individuals at Susman Godfrey LLP (Susman) pending a review of whether such clearances are consistent with the national interest.

- Security clearances held by Susman employees will be immediately suspended, pending a review of whether their access to sensitive information is consistent with the national interest.
  - The Federal Government will halt all material and services, including sensitive compartmented information facility (SCIF) access provided to Susman and restrict its employees' access to government buildings.
  - Federal Agencies will also refrain from hiring Susman employees unless specifically authorized.

- To ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests, the Federal Government will terminate contracts that involve Susman.

- The practices of Susman will be reviewed under Title VII to ensure compliance with civil rights laws against racial bias.

## ADDRESSING ROGUE LAW FIRMS: President Trump believes that lawyers and law firms that engage in conduct detrimental to critical American interests should not be subsidized by American taxpayers or have access to our Nation's secrets.

- Susman spearheads efforts to weaponize the American legal system and degrade the quality of American elections.

- Susman funds groups that engage in dangerous efforts to undermine the effectiveness of the U.S. military through the injection of political and radical ideology, and it supports efforts to discriminate on the basis of race.

- Susman has been accused of engaging in unlawful discrimination, including on the basis of race.
  - Susman administers a program where it offers financial awards and employment opportunities only to "students of color."

**A RETURN TO ACCOUNTABILITY:** President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence.

- In addition to Susman, President Trump has also taken action to hold other major law firms accountable.

- This Executive Order aligns with President Trump's priority on refocusing government operations to serve the citizens of the United States.

- It builds on President Trump's previous actions, such as signing an Executive Order on his first day in office to end the weaponization of the Federal government and ensure accountability for past misconduct.

- It follows his revocation of security clearances held by intelligence officials who falsely claimed Hunter Biden's laptop was Russian disinformation during the 2020 election.

NEWS

ADMINISTRATION

ISSUES

CONTACT

VISIT

# EXHIBIT

Case 1:25-cv-01107-LLA    Document 51-10    Filed 04/23/25    Page 2 of 2



← Post

**Donald J. Trump** ✔
@realDonaldTrump

Now it is learned that the horrendous Dominion Voting System was used in Arizona (and big in Nevada). No wonder the result was a very close loss!

12:38 PM · Nov 13, 2020

32K    42K    211K    353

Read 32.7K replies

**JA 3153**

# EXHIBIT

Case 1:25-cv-01107-LLA    Document 51-11    Filed 04/23/25    Page 2 of 2



← **Post**

**Donald J. Trump** ✓
@realDonaldTrump

"Study: Dominion Machines shifted 2-3% of Trump Votes to Biden. Far more votes than needed to sway election." Florida, Ohio, Texas and many other states were won by even greater margins than projected. Did just as well with Swing States, but bad things happened. @OANN

10:09 PM · Dec 15, 2020

♡ 19K          ⇄ 31K          ♡ 146K          ⊓ 268

◯ **Read 19.4K replies**

**JA 3155**

# EXHIBIT

Case 1:25-cv-01107-LLA    Document 51-12    Filed 04/23/25    Page 2 of 2



← Post

**Mike Lindell** ✔
@realMikeLindell

This is how the massive fraud was done! The media should quit hiding the truth! Everyone should get to see the evidence and then all will know @realDonaldTrump is our president for 4 more years! We can't let our country be taken by China! They are behind this!

**Donald J. Trump** ✔ @realDonaldTrump · Dec 15, 2020

"Study: Dominion Machines shifted 2-3% of Trump Votes to Biden. Far more votes than needed to sway election." Florida, Ohio, Texas and many other states were won by even greater margins than projected. Did just as well with Swing States, but bad things happened. @OANN

12:37 PM · Dec 16, 2020

💬 63        �recycle 469        ♡ 1.9K        ⬜        ↵

◯ Read 63 replies

**JA 3157**

 

☰  **Business**   **Markets**   **Tech**   **Media**   **Calculators**   **Videos**   ⊙ Watch   🎧 Listen

# Fox News settles with Dominion at the last second, pays more than $787 million to avert defamation trial over its 2020 election lies

 By Marshall Cohen and Oliver Darcy, CNN

⊙ 4 minute read · Updated 4:28 AM EDT, Wed April 19, 2023

f  X  ✉  🔗



▶ 'Difficult to say with a straight face': Tapper reacts to Fox News' statement on settlement
03:11

**Wilmington, Delaware (CNN) —** Fox News reached a last-second settlement with Dominion Voting Systems on Tuesday as the case raced toward opening statements, paying more than $787 million to end a colossal two-year legal battle that publicly shredded the right-wing network's credibility.

Fox News' $787.5 million settlement with Dominion Voting Systems is the largest publicly known defamation settlement in US history involving a media company.

The deal was announced hours after the jury was sworn in at the Delaware Superior Court. Rumors of a settlement swirled in the courthouse when, after a lunch break, the proceedings dramatically ground to a halt for nearly three hours with no explanation, while the parties apparently hammered out an accord.



Attorneys representing Dominion Voting Systems, leave the New Castle County Courthouse in Wilmington, Del., after the defamation lawsuit by Dominion Voting Systems against Fox News was settled just as the jury trial was set to begin, Tuesday, April 18, 2023. Julio Cortez/AP

"The parties have resolved their case," Judge Eric Davis said, before dismissing the 12-member jury, crediting them with giving the parties an impetus to reach a settlement, effusively praising the lawyers from both sides, and gaveling out the so-called media "trial of the century" before it could even begin.

The groundbreaking settlement "represents vindication and accountability," Dominion

lawyer Justin Nelson said. "For our democracy to endure for another 250 years, and hopefully much longer, we must share a commitment to facts... Today represents a ringing endorsement for truth and for democracy."

The right-wing network said in a statement that it "acknowledge[s] the Court's rulings finding certain claims about Dominion to be false," referring to Davis' recent ruling that 20 Fox News broadcasts from late 2020 contained blatantly untrue assertions that Dominion rigged the presidential election. But Fox won't have to admit on-air that it spread lies about Dominion, a Dominion representative told CNN.

The $787.5 million payout is roughly half of the $1.6 billion that Dominion initially sought, though it is nearly 10 times the company's valuation from 2018, and roughly eight times its annual revenue in 2021, according to court filings.

## Fox avoids painful six-week trial

The last-minute agreement means the closely watched case is over and won't proceed to trial. By settling with Dominion, influential Fox News executives and prominent on-air personalities will be spared from testifying about their 2020 election coverage, which was filled with lies about voter fraud.



Fox lawyers leave the courthouse after Dominion Voting Systems and Fox settled a defamation lawsuit for $787.5 million, avoiding trial, over Fox's coverage of debunked election-rigging claims, in Delaware Superior Court, in Wilmington, Delaware, U.S. April 18, 2023. Eduardo Munoz/Reuters

**JA 3162**

The witness list included Fox Corporation chairman Rupert Murdoch, his CEO son Lachlan Murdoch, and top Fox hosts like Sean Hannity and Tucker Carlson. Damning emails, texts, and deposition testimony made public during the case revealed that these figures, and many others at Fox, privately said in 2020 that the vote-rigging claims against Dominion were asinine. But the lies were spread on-air anyway.

Rupert Murdoch thought the election denialism was "really crazy," even as Fox personalities peddled those same claims to millions of viewers. Carlson said he "passionately" hates Donald Trump, whose presidency was a "disaster." Fox hosts, producers, fact-checkers, and senior executives privately said in the on-air claims of a stolen election were "kooky," "dangerously reckless" and "mind-blowingly nuts."

These revelations generated months of blistering headlines for Fox as the case moved toward trial. By settling now, Fox deprived Dominion a chance to further expose its dishonesty with a weeks-long trial.

"This settlement reflects Fox's continued commitment to the highest journalistic standards," Fox said in a statement Tuesday. "We are hopeful that our decision to resolve this dispute with Dominion amicably, instead of the acrimony of a divisive trial, allows the country to move forward from these issues."

Fox News and Fox Corporation – its parent company, which was also a defendant – maintain they never defamed Dominion, and say the case was a meritless assault on First Amendment press freedoms.

# Dramatic days in Delaware

Speculation of a settlement reached a fever pitch in recent days, especially after the court on Sunday announced a one-day delay to the start of the trial, which was originally set to begin on Monday.

The jury selection process wrapped up as planned Tuesday morning, and both sides prepped for opening statements. They even briefly tangled over objections to specific slides in their presentations. But when the proceedings didn't promptly resume after lunch, the chances of a deal seemed to rise by the minute, even though the top lawyers from both sides sat in the courtroom, looking at their phones, and waiting.

The racially diverse jury of six men and six women was brought back into the court, ready for their front-row seat to a historic trial. But Davis, the judge, instead told the panel they helped spur a settlement.

"Your presence here, short compared to what you thought, and uneventful in a certain sense, was extremely important," Davis said. "Without you, the parties would not have been able to resolve their situation."

Many on the Dominion side cast the settlement as a victory for democracy and for truth itself.

"Fox has admitted to telling lies about Dominion that caused enormous damage to my company, our employees, and the customers that we serve," Dominion CEO John Poulos said Tuesday outside court.



**RELATED ARTICLE**
Tucker Carlson 'passionately' hates Trump, and eight more key revelations about Fox News from new Dominion filings

While the Dominion case is now over, Fox News is still facing a second major defamation lawsuit from Smartmatic, another voting technology company that was similarly smeared on Fox News' shows after the 2020 election. That case is still in the discovery process, and a trial isn't expected anytime soon.

For its part, Dominion still has pending lawsuits against right-wing TV networks Newsmax and OAN, as well as against Trump allies Rudy Giuliani, Sidney Powell and Mike Lindell. They all deny wrongdoing.

*CNN's Liam Reilly and Danny Freeman contributed to this story.*

# EXHIBIT 9

1:11 p.m. PDT, April 18, 2023

# Judge praises lawyers from both sides as Fox-Dominion case ends

From CNN's Marshall Cohen



Judge Eric Davis (center) depicted earlier today in an artist sketch before finishing jury selection in the Delaware Superior Court. (Elizabeth Williams/AP)

Delaware Superior Court Judge Eric Davis praised both sides after they abruptly settled the defamation case between Fox News and Dominion Voting Systems at the last second.

He said, "I have been on the bench since 2010... I think this is the best lawyering I've had, ever."

"I would be proud to be your judge in the future," Davis said, his final words before leaving the bench.

The hearing is now over. The case is now over.



# EXHIBIT   1

Exhibit 31

April 10, 2025 remarks by President Donald J. Trump at
the Oval Office

The video is available here
(Relevant timestamp: 0:18-1:45):
https://tinyurl.com/4cj3ccr6

A digital copy of this exhibit has been preserved and can be provided to
the Court and/or Defendants' counsel upon request.

# EXHIBIT

<u>Exhibit 3</u>


April 8, 2025 remarks by President Donald J. Trump at
the    hite    ouse


The video is available here
(Relevant timestamp: 25:26-26:3 ):
https://tinyurl.com/mr_vmnfh


A digital copy of this exhibit has been preserved and can be provided to
the Court and/or Defendants' counsel upon request.

# EXHIBIT



← **Truth Details**
885 replies

**Donald J. Trump** ✓
@realDonaldTrump

Today, President Donald J. Trump and Kirkland & Ellis LLP, Allen Overy Shearman Sterling US LLP, Simpson Thacher & Bartlett LLP, and Latham & Watkins LLP (the "Law Firms") announce the following agreement regarding a series of actions to be taken by the Law Firms:

1. The Law Firms will provide an aggregate total of at least $500 Million Dollars in pro bono and other free Legal services, during the Trump Administration and beyond, in the respective amounts set forth below, to causes that President Trump and the Law Firms both support and agree to work on, including in the following areas: Assisting Veterans and other Public Servants, including, among others, members of the Military, Gold Star families, Law Enforcement, and First Responders; ensuring fairness in our Justice System; and combatting Antisemitism. The Law Firms will take on a wide range of pro bono matters that represent the full political spectrum, including Conservative ideals.

The Law Firms and their commitments are: Kirkland & Ellis LLP, Allen Overy Shearman Sterling US LLP, Simpson Thacher & Bartlett LLP, and Latham & Watkins LLP: $125 Million Dollars each.

2. The Law Firms affirm their commitment to Merit-Based Hiring, Promotion, and Retention. Accordingly, the Law Firms will not engage in illegal DEI discrimination and preferences. The Law Firms affirm that it is their policy to give Fair and Equal consideration to Job Candidates, irrespective of their political beliefs, including Candidates who have served in the Trump Administration, and any other Republican or Democrat Administration. The Law Firms will engage outside counsel to advise the Law Firms in confirming their employment practices are fully compliant with Law, including, but not limited to, Anti-Discrimination Laws.

3. The Law Firms affirm that they will not deny representation to clients, such as members of politically disenfranchised groups and Government Officials, employees, and advisors, who have not historically received Legal representation from major National Law Firms, including in pro bono matters, and in support of non-profits, because of the personal political views of individual lawyers.

4. Concurrent with these agreements, the EEOC has withdrawn the March 17, 2025 letters to the Law Firms, and will not pursue any claims related to those issues....

**4.48k** ReTruths   **19k** Likes                                      Apr 11, 2025, 9:21 AM

# EXHIBIT   1

258 replies

 **Donald J. Trump** ✔
@realDonaldTrump

Today, President Donald J. Trump and Cadwalader, Wickersham &
Taft, LLP ("Cadwalader") announce the following commitments
regarding a series of actions to be taken by Cadwalader:

1. Cadwalader will provide a total of at least $100 Million Dollars in
pro bono Legal Services, during the Trump Administration, and
beyond, to causes that President Trump and Cadwalader both
support, such as: Assisting Veterans and other Public Servants
including, among others, members of the Military, Gold Star
families, Law Enforcement, and First Responders; Ensuring fairness
in our Justice System; and Combatting Antisemitism. Cadwalader's
pro bono Committee will ensure that pro bono matters are
consistent with these objectives, and that pro bono activities
represent the full political spectrum, including Conservative ideals.

2. Cadwalader affirms its commitment to Merit-Based Hiring,
Promotion, and Retention. Accordingly, the Firm will not engage in
illegal DEI discrimination and preferences. Cadwalader affirms that
it is Cadwalader's policy to give Fair and Equal consideration to Job
Candidates, irrespective of their political beliefs, including
Candidates who have served in the Trump Administration, and any
other Republican or Democrat Administration. Cadwalader will
engage independent outside counsel to advise the Firm in
confirming that employment practices are fully compliant with Law,
including, but not limited to, Anti-Discrimination Laws.

3. Cadwalader affirms that it will not deny representation to clients, such as members of politically disenfranchised groups and Government Officials, employees, and advisors, who have not historically received Legal representation from major National Law Firms, including in pro bono matters and in support of non-profits, because of the personal political views of individual lawyers, consistent with our intake and conflicts procedures and capabilities....

**3.41k** ReTruths   **15.1k** Likes                         Apr 11, 2025, 9:19 AM

# EXHIBIT

Learn more about **LSEG**

 Reuters

My News

# Law firm targeted by Trump sues as five other top firms make deals

By **Mike Scarcella**, **Sara Merken** and **David Thomas**

April 11, 2025 4:45 PM PDT · Updated a day ago



[1/3] Signage is seen outside of the law firm Kirkland & Ellis LLP in Washington, D.C., U.S., August 30, 2020. REUTERS/Andrew Kelly/File Photo Purchase Licensing Rights 

## Summary

- Susman Godfrey is latest firm to sue over executive orders
- Nine other law firms so far have pledged $940 million to Trump's approved causes
- Trump has issued executive orders against firms he says 'weaponized' the legal system

WASHINGTON, April 11 (Reuters) - U.S. President Donald Trump's administration was hit with another lawsuit on Friday over his executive orders sanctioning prominent law firms, even as five other firms offered costly concessions to avoid the president's crackdowns.

Susman Godfrey filed the lawsuit in Washington to challenge an executive order that it said violated its rights under the U.S. Constitution, becoming the fourth firm targeted by Trump to sue the administration in response.

Jumpstart your morning with the latest legal news delivered straight to your inbox from The Daily Docket newsletter. Sign up here.

"If President Trump's Executive Orders are allowed to stand, future presidents will face no constraint when they seek to retaliate against a different set of perceived foes," the lawsuit said.

Susman Godfrey accused Trump of trying to "exact revenge" on the firm, which has represented Dominion Voting Systems in defamation cases related to the president's false claims that the 2020 U.S. election was rigged.

The White House did not immediately respond to a request for comment on the lawsuit.

Trump's executive orders against the firms restricted their lawyers from accessing government buildings and officials and threatened their clients' federal contracts, citing their connections to his perceived enemies or cases he opposes.

Trump earlier on Friday said five other firms facing pressure from the administration had reached deals to devote a at least $600 million in free legal work to causes he supports, bringing the total pledges he has received to $940 million since last month.

The agreements mostly mirror others struck with four firms in recent weeks, requiring them to shun diversity-based employment practices the administration deems illegal and work on pro bono projects approved by the president.

Kirkland & Ellis, A&O Shearman, Simpson Thacher and Latham & Watkins are set to provide $125 million in pro bono work each. Cadwalader, Wickersham & Taft would provide at least $100 million, Trump said in posts on his Truth Social account.

Trump said at a cabinet meeting on Thursday that firms that settled with him "have paid me a lot of money in the form of legal fees" and that he may press them into service negotiating trade deals amid the White House's aggressive tariff rollouts.

The president on Friday also said the U.S. Equal Employment Opportunity Commission has withdrawn a probe into employment practices at Kirkland, A&O Shearman, Simpson Thacher and Latham as part of the agreements.

Spokespeople for the five firms declined to comment or did not immediately respond to requests for comment.

Kirkland's executive committee and Simpson Thacher chairman Alden Millard said in internal memos obtained by Reuters on Friday that their agreements would not force them to relinquish control over the pro bono cases they handle.

Millard wrote that the firm had made a "strategic decision" to remove the threat of an executive order.

Kirkland and Simpson Thacher and at least two of the other settling firms were involved in litigation challenging Trump's policies in his first term, related to issues such as voting and transgender rights or immigration.

"Big Law continues to bend the knee to President Trump because they know they were wrong, and he looks forward to putting their pro bono legal concessions toward implementing his America First agenda," White House spokeswoman Karoline Leavitt said in a statement.

**DIVIDED RESPONSE**

The Trump administration already faced lawsuits by Perkins Coie, WilmerHale and Jenner & Block over executive orders against them, and each quickly won rulings that said the orders likely violated constitutional protections for speech and due process.

Trump agreed to rescind an executive order against Paul Weiss after it became the first to settle with the White House, agreeing to donate $40 million in pro bono work.

Skadden Arps, Milbank and Willkie Farr reached similar deals without an executive order being issued against them, each agreeing to earmark $100 million in pro bono services for mutually agreed projects with the administration.

More than 800 law firms and lawyers signed onto a court brief on Friday supporting the legal challenges to Trump's executive orders, calling them "undisguised retaliation" that threatened to put the firms out of business.

The attorneys general of 20 Democratic-led states and the District of Columbia also filed briefs in two of the firms' cases, warning that Trump's actions could make it harder for vulnerable groups to secure legal representation.

Reporting by Mike Scarcella, Sara Merken, David Thomas, Brendan O'Brien and Sarah Morland; Writing by David Bario; Editing by Katharine Jackson, Alistair Bell and Deepa Babington

Our Standards: **The Thomson Reuters Trust Principles.** [↗]

# EXHIBIT

Case 1:25-cv-01107-LLA    Document 51-52    Filed 04/26/25    Page 2 of 5

USCA Case #25-5241     Document #2162586     Filed: 03/06/2026     Page 299 of 660



# SUSMAN GODFREY

SHARE   BOOKMARK   PRINT

# The Susman Godfrey Prize

Susman Godfrey is accepting nominations for the 2025 Susman Godfrey Prize, an honor awarded annually to up to 20 students of color who are finishing their first or second year at an eligible law school. The Prize is part of the firm's ongoing commitment to celebrate and promote diversity among civil trial lawyers.

---

## 2025 SUSMAN GODFREY PRIZE RECIPIENTS WILL RECEIVE:

**(1) a $4,000 cash award; and**

**(2) ongoing mentoring from Susman Godfrey attorneys**.

---

Recipients will be recognized at a virtual reception held in their honor by Susman Godfrey.

Susman Godfrey will select Prize recipients from the following law schools, recognizing the alumni presence these schools have at the firm: UC Berkeley, UCLA, University of Chicago, Columbia, Harvard, University of Houston, Northwestern, NYU, Stanford, University of Texas, Yale, Penn, and University of Washington.

4/13/25, 3:02 PM                    The Susman Godfrey Prize | Susman Godfrey L.L.P.

Case 1:25-cv-01107-LLA          Document 51-52     Filed 04/28/25    Page 3 of 5

USCA Case #25-5241          Document #2162586          Filed: 03/06/2026          Page 300 of 660

Law school faculty members and administrators are eligible to nominate for the Prize students of color who have excelled academically in law school and have impressive overall achievement. There is no cap on the number of nominations from a law school.

---

# NOMINATIONS SHOULD INCLUDE:

**(1) a completed <u>Nomination Form</u>, and**

**(2) a letter of recommendation detailing the basis for the nomination and describing the nominee's academic excellence and overall achievement.**

---

Upon receipt of these materials, a representative of Susman Godfrey will contact the nominee for a copy of their law school transcript and resume. Please notify your nominee that we will be doing so.

Susman Godfrey will evaluate the nominations and make award decisions based on a review of each nomination form, the accompanying recommendation letter, the nominee's law school transcript and resume, and a virtual interview with each finalist.

(Page 300 of Total)

JA 3182

4/13/25, 3:02 PM

Case 1:25-cv-01107-LLA   Document 51-52   Filed 04/28/25   Page 4 of 5
The Susman Godfrey Prize - Susman Godfrey L.L.P.

USCA Case #25-5241     Document #2162586     Filed: 03/06/2026     Page 301 of 660

Downloaded and saved nomination forms and recommendation letters should be sent by email to sgprize@susmangodfrey.com or mailed to:

**SUSMAN GODFREY**

ATTN: Susman Godfrey Prize
1000 Louisiana Street, Suite 5100
Houston, TX 77002

Nominators who submit via email will receive confirmation of receipt within 48 hours of submission. Nominators who submit via mail should allow up to two weeks after submission to receive a call or email confirming receipt. If you do not receive confirmation within 14 days of submission or have any questions about the Prize or nomination process, please contact either of our co-managing partners:

## **KALPANA SRINIVASAN**

(310) 789-3106

ksrinivasan@susmangodfrey.com

## **VINEET BHATIA**

Case 1:25-cv-01107-LLA    Document 51-52    Filed 04/26/25    Page 5 of 5
The Susman Godfrey Prize - Susman Godfrey L.L.P.

USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 302 of 660

(713) 653-7855

vbhatia@susmangodfrey.com

# EXHIBIT

# Attachment

To: General Counsels and Related Contacts for Agencies Subject to *Sussman Godfrey LLP v. Executive Office of the President*, *et al.*, No. 25-cv-1107, Dist. of Columbia District Court

From: Deputy Associate Attorney General Richard P. Lawson

Date: 4/16/25

Subject: Temporary Restraining Order / Notification Requirement

---

I am writing to inform you of an Order entered on Tuesday, April 15, 2025, by the federal District Court for the District of Columbia which requires government agencies, as explained further below, to cease implementation and, if necessary, rescind all guidance or other direction or action, if any, to implement or enforce Sections 1, 3, and 5 of Executive Order 14263 of April 9, 2025, 90 Fed. Reg. 15615 (Apr. 15, 2025), entitled, "Addressing Risks from Susman Godfrey." **The Order also requires the Government to certify compliance with the requirements of the Order on Wednesday, April 16, 2025; thus, your immediate attention to this matter is necessary.** Copies of the court Order and EO 14263 are attached.

In EO 14263, the President undertook efforts to protect the interests of the United States. EO 14263 made certain findings regarding the activity of the law firm Sussman Godfrey, *see* EO 14263 § 1, and, among other things, required Government contracting agencies to "require Government contractors to disclose any business that they do with Sussman [Godfrey] and whether that business is related to the subject of the Government contract," *id.* § 3(a). The EO also imposes certain requirements related to limiting access of employees of Sussman Godfrey to Federal buildings and engaging with or hiring Sussman Godfrey employees, *id.* § 5. After a hearing in a lawsuit brought by Sussman Godfrey, the Court entered a temporary restraining order. Pursuant to that Order, your agency, including your agency, are:

- Enjoined from implementing or giving effect to Sections 1, 3, and 5 of the EO, including by relying on any of the statements in Section 1 of the EO;

- Directed to rescind any and all guidance or direction that has already issued that relates to implementing or enforcing Sections 1, 3, and 5 of the EO;

- Directed to immediately issue guidance to officers, staff, employees, and contractors to disregard Sections 1, 3, and 5 of the EO and to "carry on as if those sections [of the EO] had never issued;"

- Directed immediately to communicate to every recipient of a prior request for disclosure of any relationship with Sussman Godfrey or with any person associated with the firm, made pursuant to Section 3 of the EO, that such request is rescinded;

JA 3187

- Directed to cease making requests for disclosure of any relationship with Sussman Godfrey or with any person associated with the firm made pursuant to Section 3 of the EO; and

- Directed to take any additional steps necessary to prevent implementation or enforcement of Sections 1, 3, and 5 of the EO.

Implementation of Sections 1, 3, and 5 of the EO is therefore prohibited and any prior steps taken, or guidance or directions issued, to implement those sections of the EO must be walked back or rescinded.  To be clear, however, actions or activity the Department may be involved in with respect to Sussman Godfrey or agency contractors that are not based or founded on reliance on EO 14263 or on implementation of the EO are not affected by the Court's Order and agencies may carry on as if those sections had never been issued.

Please take **immediate** steps to carry out the injunctions and directions of the Court Order and ensure that your agency has instituted a plan to distribute notice of this injunction to appropriate staff.  Please provide an update to my office by Monday, 12:00 pm ET as to your efforts to implement a distribution plan.

It remains the Executive Branch's position that Executive Order 14263 was lawfully issued and, while we are pursuing a fuller review of the Executive Order before the Court on an expedited briefing schedule, it is important that your agency remain in compliance with the TRO.

Do not hesitate to contact me at 202-445-8042 or via email at Richard.lawson3@usdoj.gov with any questions regarding carrying out and complying with the Court Order.  Your cooperation is appreciated.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

        Plaintiff,

   v.

EXECUTIVE OFFICE OF THE PRESIDENT,
U.S. DEPARTMENT OF JUSTICE, OFFICE
OF MANAGEMENT AND BUDGET,
SECURITIES AND EXCHANGE
COMMISSION, UNITED STATES
INTERNATIONAL TRADE COMMISION,
FEDERAL TRADE COMMISION, UNITED
STATES PATENT AND TRADEMARK
OFFICE, EQUAL EMPLOYMENT
OPPORTUNITY COMMISION, U.S.
DEPARTMENT OF THE TREASURY, U.S.
DEPARTMENT OF DEFENSE, U.S.
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, U.S. DEPARTMENT OF
EDUCATION, U.S. DEPARTMENT OF
VETERANS AFFAIRS, OFFICE OF THE
DIRECTOR OF NATIONAL
INTELLIGENCE, CENTRAL
INTELLIGENCE AGENCY,
ENVIRONMENTAL PROTECTION
AGENCY, DEPARTMENT OF HOMELAND
SECURITY, DEPARTMENT OF STATE,
DEPARTMENT OF ENERGY,
DEPARTMENT OF LABOR,
DEPARTEMNT OF AGRICULTURE,
DEPARTMENT OF COMMERCE,
DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, SMALL
BUSINESS ADMINISTRATION, OFFICE
OF THE TRADE REPRESENTATIVE,
DEPARTEMNT OF THE INTERIOR,
DEPARTMENT OF TRANSPORTION, THE
UNITED STATES OF AMERICA, and, in
their official capacities, PAMELA J. BONDI,
RUSSELL T. VOUGHT, MARK T. UYEDA,
AMY A. KARPEL, ANDREW N.
FERGUSON, COKE MORGAN STEWART,
ANDREA R. LUCAS, SCOTT BESSENT,

Civil Action No. 25-1107 (LLA)

JA 3189

PETER B. HEGSETH, ROBERT F.
KENNEDY, JR., LINDA M. MCMAHON,
DOUGLAS A. COLLINS, TULSI
GABBARD, JOHN L. RATCLIFFE, LEE M.
ZELDIN, KRISTI NOEM, MARCO RUBIO,
CHRIS WRIGHT, LORI CHAVEZ-
DEREMER, BROOKE L. ROLLINS,
HOWARD LUTNICK, SCOTT TURNER,
KELLY LOEFFLER, JAMIESON GREER,
DOUG BURGUM, and SEAN DUFFY,
Defendants.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT
## OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7(h)(1), Defendants hereby respectfully submit the following response to Plaintiff's Statement of Undisputed Material Facts (ECF 51-2).

Preliminarily, Defendants note that this Response identifies which of the factual grounds asserted in Plaintiff's statement of material facts are disputed. In light of Defendants' separate dispositive motion, the term, "disputed," or similar references herein should not be construed to mean necessarily that Defendants believe that there are genuine issues of material fact that would necessitate a trial. Rather, such language simply means that Defendants dispute Plaintiff's statement regarding that matter. Defendants maintain their position that grounds exist entitling Defendants to dismissal and judgment as to Plaintiff's claims. Further, to the extent that matters stated in Plaintiff's statement of material facts are not disputed herein, they are not disputed at this time only for purposes of resolution of the pending dispositive cross-motions. Also, Defendants' position is that such matters are not necessarily material to resolution of the pending dispositive motions.

| Plaintiff's Statement of Undisputed Material Fact (by ¶ number) | Defendants' Response |
|---|---|
| **1.-9.** | Undisputed. |

1

| Plaintiff's Statement of Undisputed Material Fact (by ¶ number) | Defendants' Response |
|---|---|
| 10. | First clause is characterization of publication, which speaks for itself; recognition by *Vault* as asserted in remainder of paragraph is undisputed. |
| 11.-17. | Undisputed. |
| 18. | Undisputed. |
| 19. | Undisputed. |
| 20. | Undisputed. |
| 21. | Disputed that entrance into federal buildings is required for stated purposes. |
| 22.-23. | Undisputed. |
| 24. | Undisputed. |
| 25. | Undisputed, except disputed that "Main Branch of U.S. Department of Justice" is an office or section of the U.S. Department of Justice and disputed that entrance to federal buildings is required for stated interactions. |
| 26.-32. | Undisputed. |
| 33. | Undisputed, but disputed that entrance to federal buildings is required for stated interactions. |
| 34.-37. | Undisputed. |
| 38. | Undisputed, but disputed that entrance to federal buildings is required for stated interactions. |
| 39.-49. | Undisputed. |
| 50.-52. | Undisputed. |
| 53. | First two clauses disputed to extent inconsistent with EO 14250 § 1; remainder of paragraph is characterization that is immaterial as the cited material speaks for itself. |
| 54.-55. | Characterization that is immaterial as the cited material speaks for itself. |
| 56. | Undisputed. |
| 57.-58. | To extent statements are characterization of court proceedings, then they are immaterial as the cited court opinion speaks for itself. |

2

| Plaintiff's Statement of Undisputed Material Fact (by ¶ number) | Defendants' Response |
|---|---|
| 59. | Undisputed. |
| 60. | Characterization that is immaterial as the cited material speaks for itself. |
| 61. | Undisputed. |
| 62. | Characterization that is immaterial as the cited material speaks for itself. |
| 63.-64. | Immaterial. |
| 65.-66. | Undisputed. |
| 67. | Characterization that is immaterial as the cited material speaks for itself. |
| 68. | Undisputed. |
| 69. | Characterization that is immaterial as the referenced executive orders speak for themselves. |
| 70. | Undisputed. |
| 71.-72. | Characterization that is immaterial as the cited memorandum speaks for itself. |
| 73. | Undisputed. |
| 74.-82. | Characterization that is immaterial as the cited executive order speaks for itself. |
| 83.-86. | Characterization that is immaterial as the cited materials speak for themselves. |
| 87. | Undisputed. |
| 88.-91. | Characterization that is immaterial as the cited executive order speaks for itself. |
| 92.-94. | Characterization that is immaterial as the cited material speaks for itself. |
| 95. | Undisputed. |
| 96.-97. | Characterization that is immaterial as the cited material speaks for itself. |
| 98. | Undisputed. |
| 99.-100. | Characterization that is immaterial as the cited memorandum speaks for itself. |

3

| Plaintiff's Statement of Undisputed Material Fact (by ¶ number) | Defendants' Response |
|---|---|
| 101. | Undisputed. |
| 102.–105. | Characterization that is immaterial as the cited executive order speaks for itself. |
| 106. | Undisputed. |
| 107. | Characterization that is immaterial as the cited material speaks for itself. |
| 108.–109. | Characterization that is immaterial as the cited material speaks for itself. |
| 110. | Undisputed. |
| 111.–113. | Characterization that is immaterial as the cited executive order speaks for itself. |
| 114. | Undisputed. |
| 115. | Characterization that is immaterial as the cited material speaks for itself. |
| 116. | Disputed as vague. |
| 117.–122. | Characterization that is immaterial as the cited material speaks for itself. |
| 123. | Undisputed. |
| 124.–147. | Characterization that is immaterial as the cited material speaks for itself. |
| 148. | Undisputed. |
| 149. | Characterization that is immaterial as the cited brief speaks for itself. |
| 150. | Undisputed. |
| 151. | Undisputed; immaterial. |
| 152. | Undisputed. |
| 153. | Characterization that is immaterial as the cited brief speaks for itself. |
| 154. | Undisputed. |
| 155. | Undisputed, but dispute the implied linkage between the two events. |

4

| Plaintiff's Statement of Undisputed Material Fact (by ¶ number) | Defendants' Response |
|---|---|
| **156.** | Undisputed. |
| **157.-158.** | Undisputed. |
| **159.** | Disputed given ongoing communications since the filing of this case between the Department of Justice and counsel for Plaintiff concerning litigation over the Executive Order. |
| **160.-164.** | Characterization that is immaterial as the cited material speaks for itself. |
| **165.-166.** | Characterization that is immaterial as the cited executive order speaks for itself. |
| **167.** | Disputed. *See* Exhibits 1, 2, 3, 4, 5, 7[1]  (discussed in Defs' Mem. in Support of Mot. to Dismiss § I (ECF 58-1); Defs' Opp. to Pls' Mot. for Summ. Judmt. § III (filed Apr. 30, 2025)). |
| **168.** | Undisputed. |
| **169.** | First sentence disputed.  Second sentence undisputed. |
| **170.** | Characterization that is immaterial as the cited material speaks for itself. |
| **171.-173.** | Characterization that is immaterial as the cited material speaks for itself. |
| **174.** | Undisputed. |
| **175.** | Undisputed. |
| **176.-177.** | Undisputed. |
| **178.** | Disputed that entrance to federal buildings is required for all such stated interactions. |
| **179.** | Disputed, including as legal conclusion. |
| **180.** | Characterization that is immaterial as the cited executive order speaks for itself. |
| **181.** | First sentence undisputed.  Second sentence disputed as conclusory or speculative. |
| **182.** | Undisputed. |

---

[1] The numbered exhibits referenced in this Response are attached to the Declaration of Richard Lawson, submitted herewith.

5

| Plaintiff's Statement of Undisputed Material Fact (by ¶ number) | Defendants' Response |
|---|---|
| **183.** | Disputed as legal argument or conclusion. |
| **184.** | Undisputed. |
| **185.** | Disputed as legal argument or conclusion. |
| **186.-188.** | Characterization that is immaterial as the cited executive order speaks for itself. |
| **189.-191.** | Undisputed. |
| **192.** | Disputed. |
| **193.** | Disputed as legal argument or conclusion. |
| **194.** | Characterization that is immaterial as the cited executive order speaks for itself. |
| **195.** | Characterization that is immaterial as the cited material speaks for itself. |
| **196.** | Undisputed. |
| **197.** | Undisputed. |
| **198.** | Undisputed that active security clearance can be necessary for such matters, but Plaintiff "does not currently have any active matters requiring security clearances."  Srinivasan Decl. ¶ 79. |
| **199.** | Undisputed. |
| **200.** | Disputed as speculative. |
| **201.** | Disputed as speculative; Plaintiff "does not currently have any active matters requiring security clearances." Srinivasan Decl. ¶ 79. |
| **202.** | Characterization that is immaterial as the cited executive order speaks for itself. |
| **203.** | Undisputed. |
| **204.** | Disputed as legal argument or conclusion. |
| **205.** | Disputed as legal argument or conclusion. |
| **206.** | Characterization that is immaterial as the cited executive order speaks for itself. |

6

JA 3195

| Plaintiff's Statement of Undisputed Material Fact (by ¶ number) | Defendants' Response |
|---|---|
| **207.** | Disputed as legal argument or conclusion. With regard to statements in 207.a., b., c., undisputed that the statements are asserted in the cited filings, but otherwise disputed as legal argument or conclusion. |
| **208.** | Disputed as legal conclusion or argument. |
| **209.-212.** | Characterization that is immaterial as the cited material speaks for itself. |
| **213.** | Undisputed that Plaintiff submitted an expert report from Robert Hirshon in connection with its motion for summary judgment. The remainder of the paragraph is characterization that is immaterial as the referenced report speaks for itself. |
| **214.** | Disputed as characterizations comprising factual inferences, legal argument, and legal conclusions. |
| **215.** | Characterization that is immaterial as the cited material speaks for itself. |
| **216.** | Characterization that is immaterial as the cited materials speak for themselves; disputed as factual inference or conclusion or legal conclusion.. |
| **217.** | Undisputed; dispute the unstated causation inference. |
| **218.** | Undisputed that Plaintiff has engaged outside counsel to represent it in this case. |
| **219.-222.** | Disputed as characterization comprising factual inferences, speculation, legal argument, and legal conclusions. |
| **223.** | Undisputed. |
| **224.** | Disputed as characterization of referenced materials, which speak for themselves; also dispute causation inference. As to statements in 224.a.-d., disputed as characterization of referenced materials, which speak for themselves. *See also* Defs' Response to Pl's Statement, *Perkins Coie LLP v. USDOJ*, No. 25cv0716 (DDC) (ECF 143-1,¶¶ 152, 162); Defs' Response to Pl's Statement, *Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of the President*, No. 25cv917 (DDC) (ECF 103-1, ¶¶ 87, 133-34); Defs' Response to Pl's Statement, *Jenner & Block LLP v. USDOJ*, No. 25cv916 (DDC) (ECF 95-1,  ¶¶ 76-78). |
| **225.** | Disputed as immaterial and speculative |

7

| Plaintiff's Statement of Undisputed Material Fact (by ¶ number) | Defendants' Response |
|---|---|
| **226.** | Undisputed. |
| **227.** | Undisputed. |
| **228.** | Disputed as comprising unwarranted factual inferences, speculation, legal argument, and legal conclusions. |

Dated:  April 30, 2025  
      Washington, D.C.

Respectfully submitted,

CHAD MIZELLE  
Acting Associate Attorney General

/s/ *Richard Lawson*  
RICHARD LAWSON  
Deputy Associate Attorney General  
950 Pennsylvania Avenue, NW  
Washington, DC 20530  
Telephone: (202) 445-8042

*Counsel for Defendants*

8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SUSMAN GODFREY LLP,<br><br>               Plaintiff,<br><br>    v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT,<br>*et* al.,<br>               Defendants. | Civil Action No. 25-1107 (LLA) |

**<u>DECLARATION OF RICHARD LAWSON</u>**

1.  I serve as Deputy Associate Attorney General in the United States Department of Justice and am counsel of record for Defendants in the above-captioned case.  The facts provided herein are based on my personal knowledge or on information provided to me in my official capacity.

2.  All exhibits attached to this Declaration were obtained by visiting the URLs or other cites noted below within the last ten days.

3.  Attached as Exhibit 1 is a true and correct copy of a Susman Godfrey website entry, *The Susman Godfrey Prize* (available at  https://www.susmangodfrey.com/the-susman-godfrey-prize/).

4.  Attached as Exhibit 2 is a true and correct copy of a Susman Godfrey website entry, *Diversity* (available at https://www.susmangodfrey.com/diversity/ ).

5.  Attached as Exhibit 3 is a true and correct copy of the Houston Bar Association 2018 "Gender Fairness Commitment Statement" referenced in Exhibit 2 under the

"Gender Fairness Commitment Statement" topic and available by clicking the URL link contained in that topic.

6.    Attached as Exhibit 4 is a true and correct copy of a March 19, 2025 joint Department of Justice and Equal Employment Opportunity Commission (EEOC) press release, *EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination* (available at https://www.justice.gov/opa/pr/eeoc-and-justice-department-warn-against-unlawful-dei-related-discrimination ).

7.    Attached as Exhibit 5 is a true and correct copy of a January 21, 2025 EEOC press release, *President Appoints Andrea R. Lucas EEOC Acting Chair* (available at https://www.eeoc.gov/newsroom/president-appoints-andrea-r-lucas-eeoc-acting-chair).

8.    Attached as Exhibit 6 is a true and correct copy of a March 17, 2025 EEOC press release, *EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices*, (available at https://www.eeoc.gov/newsroom/eeoc-acting-chair-andrea-lucas-sends-letters-20-law-firms-requesting-information-about-dei ).

9.    Attached as Exhibit 7 is a true and correct copy of a February 5, 2025 Memorandum from the Attorney General to Department of Justice employees, *Subject: Ending Illegal DEI and DEIA Discrimination and Preferences* (available at https://www.justice.gov/ag/media/1388501/dl?inline).

10. Attached as Exhibit 8 is a true and correct copy of a White House website entry, *The White House: Executive Office of the President* (available at https://www.whitehouse.gov/eop/).

2

11. Attached as Exhibit 9 is a true and correct copy of the complaint filed in

*Stockman v. Trump*, Civil Action No. 5:17cv1799 (C.D. Cal.) (ECF 1).

12. Attached as Exhibit 10 is a true and correct copy of "GLAD Briefs" (Winter

2018) (available at https://glad-org-wpom.nyc3.cdn.digitaloceanspaces.com/wp-

content/uploads/2018/02/glad-winter-briefs-2018.pdf ).


I hereby declare under penalty of perjury that the foregoing is true and correct to the

best of my knowledge, information, and belief.

Executed this 30th day of April, 2025.

RICHARD LAWSON
Deputy Associate Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530

3

# Exhibit 1

Case 1:25-cv-01107-LLA          Document 159-2          Filed 04/30/25          Page 5 of 74

USCA Case #25-5241          Document #2162586          Filed: 03/06/2026          Page 320 of 660



# SUSMAN GODFREY

# The Susman Godfrey Prize

SHARE    BOOKMARK    PRINT

Susman Godfrey is accepting nominations for the 2025 Susman Godfrey Prize, an honor awarded annually to up to 20 students of color who are finishing their first or second year at an eligible law school. The Prize is part of the firm's ongoing commitment to celebrate and promote diversity among civil trial lawyers.

## 2025 SUSMAN GODFREY PRIZE RECIPIENTS WILL RECEIVE:

**(1) a $4,000 cash award; and**

**(2) ongoing mentoring from Susman Godfrey attorneys**.

Recipients will be recognized at a virtual reception held in their honor by Susman Godfrey.

Susman Godfrey will select Prize recipients from the following law schools, recognizing the alumni presence these schools have at the firm: UC Berkeley, UCLA, University of Chicago, Columbia, Harvard, University of Houston, Northwestern, NYU, Stanford, University of Texas, Yale, Penn, and University of Washington.

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept" you consent to the use of ALL the cookies.
Do not sell my personal information.

Cookie Settings    Accept

Law school faculty members and administrators are eligible to nominate for the Prize students of color who have excelled academically in law school and have impressive overall achievement. There is no cap on the number of nominations from a law school.

---

# NOMINATIONS SHOULD INCLUDE:

**(1) a completed <u>Nomination Form</u>, and**

**(2) a letter of recommendation detailing the basis for the nomination and describing the nominee's academic excellence and overall achievement.**

---

Upon receipt of these materials, a representative of Susman Godfrey will contact the nominee for a copy of their law school transcript and resume. Please notify your nominee that we will be doing so.

## The deadline to submit nominations is February 17, 2025.

Susman Godfrey will evaluate the nominations and make award decisions based on a review of each nomination form, the accompanying recommendation letter, the nominee's law school transcript and resume, and a virtual interview with each finalist.

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept", you consent to the use of ALL the cookies.

<u>Do not sell my personal information</u>.

Cookie Settings      Accept

4/29/25, 6:18 PM          Case 1:25-cv-01107-LLA     Document 159-2   Filed 04/30/25   Page 7 of 74
The Susman Godfrey Prize | Susman Godfrey L.L.P.

USCA Case #25-5241          Document #2162586          Filed: 03/06/2026          Page 322 of 660

Susman Godfrey will meet virtually with finalists by April 1, 2025.

Susman Godfrey Prize recipients will be notified by May 1, 2025.

Downloaded and saved nomination forms and recommendation letters should be sent by email to sgprize@susmangodfrey.com or mailed to:

**SUSMAN GODFREY**

ATTN: Susman Godfrey Prize

1000 Louisiana Street, Suite 5100

Houston, TX 77002

Nominators who submit via email will receive confirmation of receipt within 48 hours of submission. Nominators who submit via mail should allow up to two weeks after submission to receive a call or email confirming receipt. If you do not receive confirmation within 14 days of submission or have any questions about the Prize or nomination process, please contact either of our co-managing partners:

### KALPANA SRINIVASAN

(310) 789-3106

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept", you consent to the use of ALL the cookies.
ksrinivasan@susmangodfrey.com
Do not sell my personal information.

Cookie Settings          Accept

### VINEET BHATIA

(713) 653-7855

vbhatia@susmangodfrey.com

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept", you consent to the use of ALL the cookies.

Do not sell my personal information.

Cookie Settings      Accept

# Exhibit 2

Case 1:25-cv-01107-LLA     Document 159-2     Filed 04/30/25     Page 10 of 74
USCA Case #25-5241     Document #2162586     Filed: 03/06/2026     Page 325 of 660



# SUSMAN GODFREY



Diversity

SHARE   BOOKMARK   PRINT

Susman Godfrey is committed to growing diversity among its trial lawyers and in the legal profession. This commitment is one of the firm's core values and is essential to maintaining our position as the nation's premier litigation firm. Diversity enriches the experience and ability of all our lawyers, and it is critical to achieving winning results for our clients.

## Leadership                                                                                              —

In 2020, the firm elected <u>Kalpana Srinivasan</u> to serve as the fourth co-Managing Partner in the firm's 40-year history. She is the first person of color to serve as managing partner, the first female managing partner, and the first leader of the firm to have risen through the associate ranks. With the 2021 election of <u>Vineet Bhatia</u> to serve as co-Managing Partner alongside Ms. Srinivasan, both of Susman Godfrey's managing partners identify with groups that are underrepresented in the profession, a testament to the firm's belief that diverse leadership is a critical factor to our success.

## Talent                                                                                                   —

Susman Godfrey seeks to attract the brightest legal minds from diverse talent pools and understands that promoting diversity is an ongoing mandate. The firm strongly encourages members of all grounds underrepresented in the profession to apply to join us. Susman Godfrey does not discriminate based on race, creed, religion, color, national origin, ancestry, sex, age, marital status, disability, sexual orientation, or gender identity.

4/29/25, 6:20 PM          Case 1:25-cv-01107-LLA          Document 159-2          Filed 04/30/25          Page 11 of 74
Diversity | Susman Godfrey L.L.P.

USCA Case #25-5241          Document #2162586          Filed: 03/06/2026          Page 326 of 660

## Diversity Committee                                                    −

The Susman Godfrey Diversity Committee regularly meets to discuss and execute diversity-related initiatives. The Diversity Committee is comprised of partners and associates who are dedicated to improving diversity within the firm, including by recruiting and supporting lawyers who identify as members of groups underrepresented in today's legal profession. The Committee also continues work first initiated by the Racial Justice Working Group, which was created in the wake of the wanton killing of George Floyd.

## Gender Fairness Commitment Statement                                  −

Susman Godfrey has signed a Gender Fairness Commitment Statement as part of the Houston Bar Association's Gender Fairness Initiative.

## Unlimited, Gender–Neutral Parental Leave                               −

Susman Godfrey offers unlimited paid parental leave to new parents, regardless of gender or caregiver status..

## Diversity Fellowship For 1L Students                                   −

Susman Godfrey offers a two-week fellowship to first-year law students who have overcome personal or systemic hardships or disadvantages, including experiences of those who self-identify as members of groups underrepresented in today's legal profession. The firm seeks diverse applicants who have excelled in their first semester of law school and want to learn firsthand about trial work at Susman Godfrey. Fellows receive $5,000 upon acceptance of the fellowship. Click here to apply.

## The Susman Godfrey Prize for 1L and 2L Students                        −

In 2020, the firm developed and announced the Susman Godfrey Prize, an honor awarded annually to students of color who are finishing their first or second year at an eligible law school. Recipients of the SG Prize receive $3,500 and ongoing mentoring from partners and associates at the firm. Learn about our past winners here: 2024, 2023, 2022, 2021..

# Exhibit 3



## 2018 GENDER FAIRNESS COMMITMENT STATEMENT

WHEREAS the Houston Bar Association ("HBA") announced its Gender Fairness Initiative in 2003 patterned after similar programs of other bar associations; and

WHEREAS the HBA established a Gender Fairness Task Force to develop programs and policies to promote equality for women in law offices and corporate law departments; and

WHEREAS during the 2006-2007 bar year, the Task Force became a standing committee of the HBA and is now known as the Gender Fairness Committee; and

WHEREAS studies of the legal industry indicate that women remain underrepresented in law firms and among general counsel, law school deans, and the judiciary;

NOW THEREFORE on behalf of my law firm/law department, I commit to taking concrete action to achieve the following objectives:

1. To achieve a material increase in the number of women at the partnership level and/or in leadership positions in law firms and corporate/public sector law departments by 2020;

2. To develop and implement objective and unbiased criteria and procedures for the evaluation and promotion of women attorneys to partner and/or into leadership positions;

3. To promote policies, practices, sponsorship opportunities, and transparency to retain and advance women attorneys and to achieve gender parity;

4. To support processes to obtain feedback from employees regarding the advancement of women attorneys;

5. To offer formal and/or informal networking opportunities, client development activities, and mentoring programs to women attorneys at all levels to help women enhance their professional skills and develop their professional networks and client relationships;

6. To identify and promote opportunities for women attorneys at all levels to participate in career-advancing projects, leadership committees, practice groups, and management training to help enable women to assume significant management roles within their organizations; and

7. To allow for appropriate flexible work arrangements that present an equitable and viable option for all attorneys.

_____          _____
Signature                            Name of Organization

Date executed: _____

*Please return this signed form via regular mail, e-mail or fax to: Tara Shockley, Houston Bar Association, 1111 Bagby Street, FLB 200, Houston, TX 77002; Phone: 713-759-1133; Fax: 713-759-1710; taras@hba.org*

**JA 3210**

# Exhibit 4

4/29/25, 6:23 PM                    Office of Public Affairs | EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination | United States Departm…

USCA Case #25-5241          Document #2162586          Filed: 03/06/2026          Page 330 of 660



**PRESS RELEASE**

# EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination

Wednesday, March 19, 2025

**For Immediate Release**

Office of Public Affairs

## Employers' DEI Policies, Programs, and Practices Can Violate Title VII of the Civil Rights Act of 1964

Today, the U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Justice (DOJ) released two technical assistance documents focused on educating the public about unlawful discrimination related to "diversity, equity, and inclusion" (DEI) in the workplace.

DEI is a broad term that is not defined in Title VII of the Civil Rights Act of 1964. Title VII prohibits employment discrimination based on protected characteristics such as race and sex. Under Title VII, DEI initiatives, policies, programs, or practices may be unlawful if they involve an employer or other covered entity taking an employment action motivated — in whole or in part — by an employee's or applicant's race, sex, or another protected characteristic.

In the past five years, DEI policies, programs, and practices have become increasingly prevalent in many of our nation's largest and most prominent businesses, universities, and cultural institutions. The widespread adoption of DEI, however, does not change longstanding legal prohibitions against the use of race, sex, and other protected characteristics in employment.

To help educate the public about how well-established civil rights rules apply to employment policies, programs, and practices — including those labeled or framed as "DEI" — the EEOC and the DOJ today released a joint one-page technical assistance document, "[What To Do If You Experience Discrimination Related to DEI at Work](#)." The EEOC also released a longer question-and-answer technical assistance document, "[What You Should Know About DEI-Related Discrimination at Work](#)." Both documents are based on Title VII, existing EEOC policy guidance and technical assistance documents and Supreme Court precedent.

"Far too many employers defend certain types of race or sex preferences as good, provided they are motivated by business interests in 'diversity, equity, or inclusion.' But no matter an employer's motive, there is no 'good,' or even acceptable, race or sex discrimination," said EEOC Acting Chair Andrea Lucas. "In the words of Justice Clarence Thomas in his concurrence in *Students for Fair Admissions*, 'two discriminatory wrongs cannot make a right.'"

Lucas emphasized, "While the public may be confused about what rules apply to DEI, the law itself is clear. And there are some serious implications for some very popular types of DEI programs. These technical assistance documents will help employees know their rights and help employers take action to avoid unlawful DEI-related discrimination."

"The Department of Justice is committed to ending illegal DEI initiatives, policies, and programs," said Deputy Attorney General Todd Blanche. "The technical assistance document provides clear information for employees on how to act should they experience unlawful discrimination based on DEI practices."

*Updated April 25, 2025*

**Topic**

**CIVIL RIGHTS**

**Component**

[Office of the Attorney General](#)

Press Release Number: 25-277

# Related Content

---

**PRESS RELEASE**

### Attorney General Pamela Bondi Hosts First Task Force Meeting to Eradicate Anti-Christian Bias in the Federal Government

Today, Attorney General Pamela Bondi hosted members of the President's Cabinet at the U.S. Department of Justice for the inaugural meeting of the Task Force to Eradicate Anti-Christian Bias in...

April 22, 2025

---

**PRESS RELEASE**

### Unlawful Illinois DEI Scholarship Program Suspended After Justice Department Threatened Lawsuit

Today, the Justice Department announced that it has acted to end the state of Illinois' unlawful minority-only scholarship program. After the Justice Department threatened to file suit, the state and...

April 11, 2025

---

**PRESS RELEASE**

### Attorney General Pamela Bondi Statement Regarding Creation of a 2nd Amendment Task Force

Attorney General Pamela Bondi released the following statement regarding her creation of a 2nd Amendment Task Force at the Department of Justice:

4/29/25, 6:23 PM    Case 1:25-cv-01107-LLA   EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination | United States Departm…

USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 333 of 660

April 9, 2025

✉ **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

📞 Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

# Exhibit 5

Case 1:25-cv-01107-A  Document 159-2  Filed 04/30/25  Page 20 of 74
USCA Case #25-5241     Document #2162586     Filed: 03/06/2026     Page 335 of 660

 **U.S. Equal Employment Opportunity Commission**

**Press Release**

01-21-2025

# President Appoints Andrea R. Lucas EEOC Acting Chair

WASHINGTON – The U.S. Equal Employment Opportunity Commission (EEOC) today announced that President Donald J. Trump has named Commissioner Andrea R. Lucas Acting Chair of the EEOC. Lucas has served as an EEOC Commissioner since 2020, having been nominated by President Trump during his first term.

"I am honored to be chosen by President Trump to lead the EEOC, our nation's premier civil rights agency enforcing federal employment antidiscrimination laws," Lucas said. "I look forward to restoring evenhanded enforcement of employment civil rights laws for all Americans. In recent years, this agency has remained silent in the face of multiple forms of widespread, overt discrimination. Consistent with the President's Executive Orders and priorities, my priorities will include rooting out unlawful DEI-motivated race and sex discrimination; protecting American workers from anti-American national origin discrimination; defending the biological and binary reality of sex and related rights, including women's rights to single-sex spaces at work; protecting workers from religious bias and harassment, including antisemitism; and remedying other areas of recent under-enforcement."

During her tenure on the Commission, Lucas has **written and spoken (https://www.eeoc.gov/andrea-r-lucas-acting-chair#section1)** frequently about challenging and emerging issues in employment and civil rights law to educate workers about their rights, help employers comply with their responsibilities, and correct common misunderstandings about the law.

"Our employment civil rights laws are a matter of individual rights. We must reject the twin lies of identity politics: that justice is measured by group outcomes and that civil rights exist solely to remedy harms against certain groups," Lucas said. "I intend to dispel the notion that only the 'right sort of' charging party is welcome through our doors and to reinforce instead the fundamental belief enshrined in the Declaration of Independence and our civil rights laws—that all people are 'created equal.' I am committed to ensuring equal justice under the law and to focusing on equal opportunity, merit, and colorblind equality."

Before her appointment to the EEOC, Lucas practiced labor and employment law for an international law firm in Washington, D.C. Earlier in her career, she clerked on the United States District Court for the Eastern District of Virginia. More information about Lucas is available at **https://www.eeoc.gov/andrea-r-lucas-acting-chair (https://www.eeoc.gov/andrea-r-lucas-acting-chair)** .

The EEOC is the sole federal agency authorized to investigate and litigate against private companies and other private employers for violations of federal laws prohibiting employment discrimination. For public employers, the EEOC shares jurisdiction with the Department of Justice's Civil Rights Division; the EEOC is responsible for investigating public sector charges before referring them to DOJ for potential litigation. The EEOC also is responsible for coordinating the federal government's employment antidiscrimination effort. More information about the EEOC is available at **www.eeoc.gov (http://www.eeoc.gov)** . Stay connected with the latest EEOC news by subscribing to our **email updates (https://public.govdelivery.com/accounts/USEEOC/subscriber/new)** .

# Exhibit 6

JA 3219

**U.S. Equal Employment Opportunity Commission**

**Press Release**

03-17-2025

# EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices

WASHINGTON – Today, U.S. Equal Employment Opportunity Commission (EEOC) Acting Chair Andrea Lucas sent letters to 20 law firms requesting information about their diversity, equity and inclusion (DEI) related employment practices.

Based on publicly available information, the letters note concerns that some firms' employment practices, including those labeled or framed as DEI, may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based on race, sex, or other protected characteristics, in violation of **Title VII of the Civil Rights Act of 1964 (Title VII) (https://www.eeoc.gov/statutes/title-vii-civil-rights-act-1964)** .

"The EEOC is prepared to root out discrimination anywhere it may rear its head, including in our nation's elite law firms," Lucas said. "No one is above the law—and certainly not the private bar."

**JA 3220**

4/29/25, 6:26 PM    EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices…

USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 339 of 660

Title VII prohibits an employer from discriminating against an individual because of race, color, religion, sex, or national origin. Under Title VII, an employer initiative, policy, program, or practice may be unlawful if it involves an employer taking an employment action motivated—in whole or in part—by race, sex, or another protected characteristic.

Title VII also bars employers from limiting, segregating, or classifying employees based on race, sex, or other protected characteristics in a way that affects their status or deprives them of employment opportunities, including in voluntary employee groups and activities which are employer sponsored. There is no "diversity" exception to these prohibitions. It is the responsibility of the EEOC to enforce the provisions of Title VII with respect to businesses and other private sector employers.

The law firms that received letters from Acting Chair Lucas include:

1. A & O Shearman

2. Debevoise & Plimpton LLP

3. Cooley LLP

4. Freshfields Bruckhaus Deringer LLP

5. Goodwin Procter LLP

6. Hogan Lovells LLP

7. Kirkland & Ellis LLP

8. Latham & Watkins LLP

9. McDermott Will & Emery

10. Milbank LLP

11. Morgan, Lewis & Bockius LLP

12. Morrison & Foerster LLP

13. Perkins Coie

14. Reed Smith

15. Ropes & Gray LLP

4/29/25, 6:26 PM    EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law firms Requesting Information About DEI-Related Employment Practices…

Case 1:25-cv-01107-LLA    Document 150-3    Filed 04/30/25    Page 25 of 74

USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 340 of 660

16. Sidley Austin LLP

17. Simpson Thacher & Bartlett LLP

18. Skadden, Arps, Slate, Meagher & Flom LLP

19. White & Case LLP

20. WilmerHale

You can read the letters here: **https://www.eeoc.gov/sites/default/files/2025-03/Law_Firm_Letters_-_03.17.2025.pdf (https://www.eeoc.gov/sites/default/files/2025-03/Law_Firm_Letters_-_03.17.2025.pdf)**

The EEOC has established an email where whistleblowers can submit information to the EEOC about potentially unlawful DEI practices at law firms: lawfirmDEI@eeoc.gov. Whistleblowers should be aware that emailing allegations of unlawful discrimination, harassment, or retaliation to the lawfirmDEI@eeoc.gov email address, **does not constitute filing a charge of discrimination**. If you suspect you have experienced or witnessed DEI-related discrimination at a law firm, and you wish to file a charge of discrimination, contact the EEOC promptly because there are strict time limits for filing a charge—you can learn more about the process to file a charge at **https://www.eeoc.gov/filing-charge-discrimination (https://www.eeoc.gov/filing-charge-discrimination)** .

Information obtained from individuals who contact the EEOC is **confidential (https://www.eeoc.gov/confidentiality)** and will not be revealed to the employer until the individual files a charge of discrimination. Your employer may not fire, demote, harass, or otherwise retaliate against you for filing a charge or cooperating with the EEOC. The laws the EEOC enforces make it illegal for an employer to **retaliate (https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues)** against someone who files a charge or someone who takes part in an EEOC process, investigation, or lawsuit.

The EEOC is the federal agency authorized to investigate and litigate against private companies and other private employers for violations of Title VII and other federal laws prohibiting employment discrimination. For public employers, the EEOC shares jurisdiction with the Department of Justice's Civil Rights Division; the EEOC is responsible for investigating public sector charges before referring them to DOJ for potential litigation. The EEOC also is responsible for coordinating the federal

government's employment antidiscrimination effort. More information about the
EEOC is available at **www.eeoc.gov (http://www.eeoc.gov/)** . Stay connected with
the latest EEOC news by subscribing to our **email updates
(https://public.govdelivery.com/accounts/USEEOC/subscriber/new)** .

JA 3223

# Exhibit 7



**Office of the Attorney General**

**Washington, D. C. 20530**

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:                    THE ATTORNEY GENERAL

SUBJECT:            ENDING ILLEGAL DEI AND DEIA DISCRIMINATION
                             AND PREFERENCES

The Department of Justice is committed to enforcing all federal civil rights laws and ensuring equal protection under the law. As the United States Supreme Court recently stated, "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). On January 21, 2025, President Trump issued Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), making clear that policies relating to "diversity, equity, and inclusion" ("DEI") and "diversity, equity, inclusion, and accessibility" ("DEIA") "violate the text and spirit of our longstanding Federal civil-rights laws" and "undermine our national unity." *Id.* at 8633.

To fulfill the Nation's promise of equality for all Americans, the Department of Justice's Civil Rights Division will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds.[1]

**I.        Ending Illegal DEI And DEIA Discrimination and Preferences**

By March 1, 2025, consistent with Executive Order 14173, the Civil Rights Division and the Office of Legal Policy shall jointly submit a report to the Associate Attorney General containing recommendations for enforcing federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including policies relating to DEI and DEIA. The report should address:

- Key sectors of concern within the Department's jurisdiction;

---

[1] This memorandum is intended to encompass programs, initiatives, or policies that discriminate, exclude, or divide individuals based on race or sex. It does not prohibit educational, cultural, or historical observances—such as Black History Month, International Holocaust Remembrance Day, or similar events—that celebrate diversity, recognize historical contributions, and promote awareness without engaging in exclusion or discrimination.

Memorandum for all Department Employees                                                           Page 2
Subject:  Ending Illegal DEI And DEIA Discrimination and Preferences

- The most egregious and discriminatory DEI and DEIA practitioners in each sector of concern;

- A plan including specific steps or measures to deter the use of DEI and DEIA programs or principles that constitute illegal discrimination or preferences, including proposals for criminal investigations and for up to nine potential civil compliance investigations of entities that meet the criteria outlined in section 4(b)(iii) of Executive Order 14173;

- Additional potential litigation activities (including interventions in pending cases, statement of interest submissions, and amicus brief submissions), regulatory actions, and sub-regulatory guidance; and

- Other strategies to end illegal DEI and DEIA discrimination and preferences and to comply with all federal civil-rights laws.

## II.    Guidance to Institutions Receiving Federal Funds

Educational agencies, colleges, and universities that receive federal funds may not "treat some students worse than others in part because of race." *Students for Fair Admissions*, 600 U.S. at 304 (Gorsuch, J., concurring).  Consistent with the January 21, 2025, Executive Order, the Department of Justice will work with the Department of Education to issue directions, and the Civil Rights Division will pursue actions, regarding the measures and practices required to comply with *Students for Fair Admissions*.

# Exhibit 8

Case 1:25-cv-01107-LLA     Document 159-2     Filed 04/30/25     Page 31 of 74
USCA Case #25-5241     Document #2162586     Filed: 03/06/2026     Page 346 of 660

*The* WHITE HOUSE

Executive Office of the President

Office of
Management and
Budget

Office of Science and
Technology Policy

Council of Economic
Advisors

Office of the National
Cyber Director

Office of National
Drug Control Policy

Council on
Environmental
Quality

N E W S

A D M I N I S T R A T I O N

I S S U E S

C O N T A C T

E O P

(Page 346 of Total)

JA 3228

4/29/25, 6:24 PM                    Executive Office of the President – The White House

Case 1:25-cv-01107-LLA    Document 159-8    Filed 04/30/25    Page 32 of 74
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 347 of 660

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS



THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

# Exhibit 9

Case 2:25-cv-01107-LA    Document 159-2    Filed 04/30/25    Page 34 of 76
Case 8:17-cv-01799-JGB-KK    Document 1    Filed 09/05/17    Page 1 of 20    Page ID #:1
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 349 of 660

LATHAM & WATKINS LLP
   Amy C. Quartarolo (SBN 222144)
    *amy.quartarolo@lw.com*
   Adam S. Sieff (SBN 302030)
    *adam.sieff@lw.com*
   Harrison J. White (SBN 307790)
    *harrison.white@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: +1.213.485.1234
Facsimile: +1.213.891.8763

*Attorneys for Plaintiffs*
*Aiden Stockman, Nicolas Talbott,*
*Tamasyn Reeves, Jaquice Tate,*
*John Does 1-2, Jane Doe, and*
*Equality California*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIDEN STOCKMAN; NICOLAS TALBOTT; TAMASYN REEVES; JAQUICE TATE; JOHN DOES 1-2; JANE DOE; and EQUALITY CALIFORNIA,<br><br>        Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; JAMES N. MATTIS, in his official capacity as Secretary of Defense; JOSEPH F. DUNFORD, JR., in his official capacity as Chairman of the Joint Chiefs of Staff; RICHARD V. SPENCER, in his official capacity as Secretary of the Navy; RYAN D. MCCARTHY, in his official capacity as Acting Secretary of the Army; HEATHER A. WILSON, in her official capacity as Secretary of the Air Force; and ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security,<br><br>        Defendants. | CASE NO. 17-CV-6516<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 349 of Total)

COMPLAINT

JA 3231

## NATURE OF THE ACTION

1.     This action, brought on behalf of transgender individuals, seeks to ensure that all qualified Americans have an equal opportunity to serve in the United States military, that transgender individuals are free from arbitrary and invidious discrimination, and that the constitutional rights of transgender individuals to autonomy, privacy, and freedom of expression are respected and protected.

2.     In June 2016, following an exhaustive multi-year review supported by reams of data, interviews, and analysis, the Department of Defense ("DOD") announced that it would reverse its prior unconstitutional policy barring openly transgender people from serving in the military, and would implement a policy expressly allowing transgender people to serve openly in the United States armed forces ("June 2016 Policy"). Since that announcement, and in reliance thereon, hundreds of American servicemembers followed protocol and informed their chain of command that they are transgender. These transgender servicemembers have continued to serve without incident. In addition, as a consequence of the DOD's announced policy, after years of unlawful exclusion, openly transgender persons have believed for the first time that it is possible for them to serve their country in the Armed Forces.

3.     However, in a burst of Twitter statements on July 26, 2017, Defendant President Donald J. Trump abruptly announced that the United States military would return to discriminating unlawfully against transgender people solely because of their transgender status. By proclaiming that "the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military," President Trump signaled that transgender troops would be barred altogether from serving openly in our Armed Forces.

4.     On August 25, 2017, Defendant President Trump formalized the government's policy, directing his co-Defendants as leaders of the DOD and

USCA Case #25-5241      Document #2162586      Filed: 03/06/2026      Page 351 of 660

Department of Homeland Security ("DHS," and together with the DOD, the "Departments") to reinstate the ban "on military service by transgender individuals that was in place prior to June 2016" (the "August 25 Directive"). Specifically, President Trump directed the Departments (i) to ban the "accession of transgender individuals into military service," (ii) to "halt all use of DOD or DHS resources to fund sex reassignment surgical procedures for military personnel" except in limited instances, and (iii) to implement a plan to return to the prohibition on military service for transgender people, including those current servicemembers who, in reliance on the June 2016 Policy, came out to their command. *See Memorandum Regarding Military Service by Transgender Individuals,* -- Fed. Reg. -------- (entered Aug. 25, 2017) (publication forthcoming). President Trump's August 25 Directive, which carries the force of law, does not reference any evidence, facts or analysis to support the imposition of this categorical ban.

5.     Plaintiffs here are (i) Aiden Stockman, Nicolas Talbott, and Tamasyn Reeves, transgender individuals who have taken steps to enlist in the military, (ii) Jaquice Tate and several other openly transgender active servicemembers, proceeding as anonymous plaintiffs, who will be impacted by President Trump's August 25 Directive, and (iii) Equality California, the nation's largest statewide lesbian, gay, bisexual, transgender, and queer ("LGBTQ") civil rights organization.

6.     The August 25 Directive inflicts serious injuries upon Plaintiffs and Plaintiff EQCA's members. First, the August 25 Directive expressly forecloses transgender people from acceding into military service. Second, the August 25 Directive causes immediate and concrete injury to the current servicemember Plaintiffs, each of whom came out as transgender to their chain of command in reliance on the June 2016 Policy lifting the prior ban. Specifically, the current servicemember Plaintiffs will be subject to involuntary separation beginning March 23, 2018, suspending their reasonable expectation of continued service. Third, the August 25 Directive denies the current servicemember Plaintiffs equal

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 351 of Total)

2

COMPLAINT

JA 3233

Case 2:25-cv-01107-LKA   Document 159-2   Filed 04/30/25   Page 37 of 76
Case 7:25-cv-01799-JCB-KK   Document 1-15   Filed 09/08/19   Page 4 of 290   Page ID #:4
USCA Case #25-5241      Document #2162586      Filed: 03/06/2026      Page 352 of 660

access to full medical care.  Fourth, the August 25 Directive chills the speech and expression of each of the Plaintiffs and Plaintiff EQCA's members.

7.      Fundamentally, without any rational basis, the August 25 Directive denies Plaintiffs and their members the equal protection of the laws, their right to freedom of expression, and their right to liberty and privacy, in violation of the First and Fifth Amendments to the United States Constitution.  Accordingly, Plaintiffs seek a declaration that the August 25 Directive is unconstitutional, and an injunction preventing Defendants from implementing and enforcing it.

## JURISDICTION AND VENUE

8.      This court has jurisdiction over the claims pursuant to 28 U.S.C. Sections 1331 and 1343.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et seq*.

9.      Venue is proper in the Central District of California under 28 U.S.C. Section 1391(e) because Plaintiffs reside in this judicial district and a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

10.      Plaintiff Aiden Stockman is a transgender man who wants to serve his country through military service, and has taken steps to do so.  Mr. Stockman, 20, was raised and currently resides in California.  Mr. Stockman has long been interested in serving his country and intended to join the Air Force.  As a young man, Mr. Stockman spoke with friends and neighbors who were stationed at nearby Twenty-Nine Palms Air Force Base to discuss what it is like to serve in the Air Force.  Mr. Stockman came out to his family as transgender in the eighth grade.  At or about that time, he began seeking medical advice related to gender transition.  In June 2014, when he was in the eleventh grade, Mr. Stockman began hormone replacement therapy ("HRT").  Later that year, Mr. Stockman took the Armed Services Vocational Aptitude Battery ("ASVAB") test consistent with his intention of acceding into the military.  He hoped to join the Air Force following

1    his graduation from high school, but wanted to complete a double-mastectomy
2    (i.e., "top surgery") first.  After finding a doctor, Mr. Stockman ultimately made
3    plans to undergo top surgery, planning to enlist thereafter.  The June 2016 Policy
4    permitting open service by transgender people gave Mr. Stockman comfort that he
5    would be able to pursue a career of military service.  However, upon learning of
6    the August 25 Directive, Mr. Stockman felt crushed, as he will no longer be able to
7    pursue his dream of serving his country in the Air Force.

8         11.    Plaintiff Nicolas Talbott, 23, is a transgender man currently residing
9    in Ohio.   After graduating from college with a degree in sociology and
10   criminology, he planned to enlist in the military in pursuit of a career in counter-
11   terrorism.  Prior to issuance of the June 2016 Policy, Mr. Talbott contacted military
12   recruiters on several occasions to express his interest in serving his country, but
13   each time he was informed that regulations prohibited his service because he is
14   transgender.  After the June 2016 Policy was announced, Mr. Talbott found a
15   recruiter for the Air Force National Guard who advised that he would help him
16   enlist.  Mr. Talbott met with the recruiter in December 2016 and filled out
17   paperwork confirming his interest in acceding into the military.  The recruiter
18   asked Mr. Talbott to obtain a letter from his doctor confirming that being
19   transgender did not have any adverse effects on his life or his ability to perform
20   military-related duties.  The recruiter advised that the next step in the process
21   would be to meet with the regional Military Entrance Processing Station ("MEPS")
22   for a physical exam and to take the ASVAB test, but later advised that MEPS
23   would not begin processing for transgender enlistees until mid-2017.  Mr. Talbott
24   scheduled his appointment with his doctor, began studying practice ASVAB
25   exams, and was training regularly for the physical exam, all in anticipation of
26   enlisting in 2017.   However, when President Trump tweeted about the re-
27   enactment of the ban on transgender military service and then issued the August 25
28   / / /

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 353 of Total)

4

COMPLAINT

JA 3235

Case 1:25-cv-01107-LLA   Document 159-2   Filed 04/30/25   Page 39 of 76
Case 8:17-cv-01799-JGB-KK   Document 1   Filed 09/05/17   Page 6 of 30   Page ID #:6
USCA Case #25-5241   Document #2162586   Filed: 03/06/2026   Page 354 of 660

1  Directive, Mr. Talbott was devastated and knew that he would no longer be able to
2  pursue a military career.

3      12.    Plaintiff Tamasyn Reeves is a transgender woman currently residing
4  in California.  Ms. Reeves, 29, has wanted to join the Navy since she was 17.  Her
5  family has a tradition of service in the military: her grandfather served in the Navy
6  during the Korean War, two of her uncles served in the Air Force, and two of her
7  cousins served in the Navy.  Ms. Reeves first spoke to a recruiter at age 21.  The
8  recruiter told Ms. Reeves that she was not eligible to enlist because of the
9  military's then-policy banning LGBTQ individuals from military service.  At age
10  23, Ms. Reeves began HRT, but continued to be barred from enlistment.
11  Following issuance of the June 2016 Policy, Ms. Reeves decided to enlist as soon
12  as the final procedures for accession of transgender individuals were
13  solidified.  The abrupt reversal in the August 25 Directive prevents her accession
14  into the military, despite her longstanding desire to do so.

15      13.    Plaintiff Jaquice Tate is a transgender man currently serving in the
16  Army.  He enlisted in 2008 because he wanted a career in which he could take
17  pride.  He hopes to serve a twenty year term.  Mr. Tate has served domestically and
18  internationally, including a deployment to Iraq.  Currently, he is a Military Police
19  Officer and he has served on drug suppression teams.  Each of his command
20  leaders awarded him a Colonel Coin of Excellence and he has received numerous
21  Army Achievement Medals.  The Army has approved his application to become a
22  Drill Sergeant.  In reliance on the June 2016 Policy, Mr. Tate informed his chain of
23  command of his true gender.  His chain of command has supported him throughout
24  his process of medical transition.  However, since issuance of the August 25
25  Directive, Mr. Tate fears that he will lose his job and retirement opportunities after
26  his nearly ten years of dedicated service.  Mr. Tate and his wife had planned to
27  begin the process of having children next year, but the financial uncertainty caused
28  / / /

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 354 of Total)

5

COMPLAINT

Case 1:25-cv-01107-LLA   Document 159-2   Filed 04/30/25   Page 40 of 76
Case 1:25-cv-01798-JCB-LKA   Document 11   Filed 09/05/19   Page 7 of 20   Page ID #:7
USCA Case #25-5241   Document #2162586   Filed: 03/06/2026   Page 355 of 660

by the August 25 Directive is forcing them to place their future family on hold indefinitely.

14.    Plaintiffs John Doe 1-2 and Jane Doe are active duty servicemembers who serve openly as transgender persons.  They proceed under pseudonyms for fear of retribution.

15.    Plaintiff John Doe 1 is a transgender man who has served in the United States Air Force since 2012.  John Doe 1 comes from a military family; his father served in the military for 30 years.  John Doe 1 has plans make a career out of military service as well.  John Doe 1 currently is stationed and resides in California.  In reliance on the June 2016 Policy permitting open service by transgender servicemembers, John Doe 1 felt that the military had become an "open space" to come out.  In April 2017, John Doe 1 came out to his chain of command.  John Doe 1 subsequently met with Air Force medical doctors and psychologists to discuss gender transition, and received a diagnosis of gender dysphoria.  John Doe 1 is awaiting a meeting with his medical team and commander to discuss his transition plan.  John Doe 1 recently was awarded Academic Achievement and Distinguished Graduate distinctions from the Airmen Leadership School, and received a "Must Promote" performance report.  Although his colleagues and chain of command have been supportive of John Doe 1 since he came out, John Doe 1 believes that the August 25 Directive will preclude him from obtaining promotions and further advancing his career in the Air Force.

16.    Plaintiff John Doe 2 is a transgender man currently serving in the Army.  John Doe 2 voluntarily enlisted with the Army to serve his country, to achieve financial security, and to honor his family's tradition of service.  His technical expertise pertains to the operations, diagnostics, and maintenance of the multichannel communications systems necessary for the Army to make real-time strategic and tactical decisions.  His position requires Secret-level Security Clearance.  John Doe 2 earned an early promotion wavier to become an Army

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

(Page 355 of Total)

6

COMPLAINT

JA 3237

Case 1:25-cv-01107-LLA   Document 159-2   Filed 04/30/25   Page 41 of 76
Case 8:17-cv-01799-JGB-KK   Document 1   Filed 09/05/17   Page 8 of 290   Page ID #:8
USCA Case #25-5241      Document #2162586         Filed: 03/06/2026      Page 356 of 660

Specialist and was awarded two Colonel Coins of Excellence.  In reliance on the June 2016 Policy, he came out as transgender to his unit, his chain of command, and his medical providers.  John Doe 2 has begun medical transition to his true gender, and has received the support of his chain of command and his unit.  John Doe 2's current term of enlistment ends in 2020.  He had hoped to become a twenty-year veteran, but under the shadow of the August 25 Directive, John Doe 2 fears that his future in the military, and his ability to support his family, is in jeopardy.

17.     Plaintiff Jane Doe is a transgender woman currently serving in the Air Force.  In the seven years since she enlisted, Jane Doe has been deployed twice.  She currently is stationed abroad as a Staff Sergeant.  Jane Doe joined the military in hopes of serving her country, achieving financial stability and garnering personal skills such as discipline, self-respect and service of others.  After the ban on transgender service was lifted by the June 2016 Policy, Jane Doe came out to her chain of command.  She found her military colleagues to be supportive.  Jane Doe carefully reviewed the guidance and policies issued by the DOD, and after meeting with her doctors, made the decision to pursue transition-related medical care.  While she has received early promotions, two achievement medals and one commendation medal, she now fears that the August 25 Directive compromises her ability to achieve promotion, jeopardizes her medical benefits and ultimately forecloses her ability to continue her career in the military.

18.     Plaintiff Equality California ("EQCA") is an I.R.S. 501(c)(4) organization dedicated to LGBTQ civil rights.  Specifically, EQCA is dedicated to combatting discrimination and injustice on the basis of sexual orientation and gender identity, and to protecting the fundamental rights of those within the LGBTQ community and the vulnerable communities of which they are a part.  Its more than 500,000 members include transgender individuals in active military service, transgender military veterans, and transgender individuals who have taken

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 356 of Total)

7

COMPLAINT

JA 3238

Case 1:25-cv-01107-LLA   Document 159-2   Filed 04/30/25   Page 9 of 76
Case 2:17-cv-01799-JCB-KA   Document 11   Filed 09/05/17   Page 9 of 20   Page ID #:9
USCA Case #25-5241     Document #2162586        Filed: 03/06/2026     Page 357 of 660

1   steps to serve and ultimately intend to pursue long-term careers in the United

2   States Armed Forces.  EQCA's membership also includes family members and

3   dependents of openly transgender individuals, each of whom share an interest in

4   ensuring that all qualified individuals wishing to serve their country through

5   military service are permitted to do so regardless of their gender identity.

6   19.   Defendant Donald J. Trump is President of the United States and

7   Commander in Chief of the Armed Forces of the United States.  On July 26, 2017,

8   President Trump announced via Twitter that transgender people would not be

9   permitted to serve "in any capacity in the U.S. military."  On August 25, 2017, he

10  delivered an official executive directive to the Departments concerning "Military

11  Service by Transgender Individuals."  The August 25 Directive, which is to be

12  formally published in the Federal Register, unlawfully bans transgender persons

13  from enlisting or serving openly in the military and prohibits the military from

14  paying for certain forms of healthcare related to gender transition.

15  20.   Defendant James N. Mattis is the United States Secretary Defense.

16  Secretary Mattis directs the Department of Defense, which has been charged with

17  execution and implementation of the President's unlawful August 25 Directive.

18  21.   Defendant Joseph F. Dunford, Jr. is a United States Marine Corps

19  General and serves as the current Chairman of the Joint Chiefs of Staff.   In

20  conjunction with co-defendants, General Dunford, Jr. has been charged with

21  execution and implementation of the President's unlawful August 25 Directive.

22  22.   Defendant Richard V. Spencer is the United States Secretary of the

23  Navy.  Secretary Spencer directs the Department of the Navy and the United States

24  Marine Corps, which have been charged with execution and implementation of the

25  President's unlawful August 25 Directive.

26  23.   Defendant Ryan D. McCarthy is the Acting United States Secretary of

27  the Army.  Secretary McCarthy directs the Department of the Army, which has

28  / / /

8                                           COMPLAINT

JA 3239

Case 1:25-cv-01107-kkA Document 159-2 09/04/25 04/30/25 Page 43 of 76
Case 1:1F-cv-91799-JCB-kkA Document 1 Filed 09/05/17 Page 10 of 30 Page ID #:10
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 358 of 660

been charged with execution and implementation of the President's unlawful August 25 Directive.

24. Defendant Heather A. Wilson is the United States Secretary of the Air Force. She directs the Department of the Air Force, which has been charged with execution and implementation of the President's unlawful August 25 Directive.

25. Defendant Elaine C. Duke is the Acting United States Secretary of Homeland Security. She directs the DHS, which is responsible for the administration and operation of the United States Coast Guard, and which has been charged with execution and implementation of the President's unlawful August 25 Directive.

## FACTUAL BACKGROUND

**A. Following an Exhaustive Review in 2015-2016, the DOD Concluded that Open Service by Transgender People Best Served the Interests of U.S. Armed Forces**

26. In May 2014, then-Secretary of Defense Chuck Hagel directed the DOD to review whether transgender people should be permitted to serve openly in the U.S. armed forces.

27. In August 2014, the DOD amended its physical disability policy to remove references to mandatory exclusion based on "sexual gender and identity disorders," and issued a new regulation instructing each branch of the armed forces to assess whether there was any justification to maintain a ban on service by openly transgender persons.

28. In issuing this regulation, Secretary Hagel stated that "every qualified American who wants to serve our country should have an opportunity to do so if they fit the qualifications and can do it."

29. Secretary Hagel was succeeded as Secretary of Defense by Secretary Ashton B. Carter. In July 2015, Secretary Carter announced that the military would comprehensively analyze whether there was any justification to maintain the ban on service by openly transgender persons. Accordingly, Secretary Carter

Case 1:25-cv-01107-kkA  Document 159-2  Filed 04/30/25  Page 44 of 76
Case 1:25-cv-01799-JGB-kkA  Document 1  Filed 09/05/21  Page 11 of 290  Page ID #:11
USCA Case #25-5241      Document #2162586          Filed: 03/06/2026      Page 359 of 660

1   created a working group to address this issue including the Armed Services, the

2   Joint Chiefs of Staff, the service secretaries, and personnel, training, readiness, and

3   medical specialists from across the DOD.  The lengthy and comprehensive review

4   process that followed included an examination of all available data, including but

5   not limited to existing studies and research and input from transgender service

6   members, commanding officers who supervised transgender service members,

7   military readiness and personnel experts, outside expert groups, and medical

8   professionals.  The review process also included a careful analysis of the eighteen

9   other countries that permit military service by openly transgender people.  Doctors,

10  employers, and insurance companies were consulted regarding the provision of

11  medical care to transgender people.

12      30.    The DOD also commissioned the RAND Corporation—a defense

13  consultancy formed after World War II to connect military planning with research

14  and development decisions, and which now operates as an independent think tank

15  financed by the U.S. government—to determine the impact of permitting

16  transgender servicemembers to serve openly.  The study titled *Assessing the*

17  *Implications of Allowing Transgender Personnel to Serve Openly* (the "<u>RAND</u>

18  <u>Study</u>") ultimately concluded that allowing transgender people to serve openly

19  would cost little and have no significant impact on unit readiness.  As for the

20  potential impact on healthcare costs, the RAND Study concluded that health care

21  costs for transgender servicemembers, including costs related to gender transition-

22  related treatment, would "have little impact on and represents an exceedingly small

23  proportion of [DOD's] overall health care expenditures."

24      31.    Based on the results of this comprehensive review process, on June

25  30, 2016, the DOD announced its conclusion that open transgender service would

26  best serve the military's interests in recruiting and retaining the most highly

27  qualified personnel.  In issuing the June 2016 Policy, Secretary Carter explained

28  that this conclusion was based on a number of considerations, including *inter alia*:

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 359 of Total)

10
COMPLAINT

JA 3241

Case 1:25-cv-01107-kkA Document 159-2 Filed 04/30/25 Page 45 of 76
Case 3:25-cv-01599-RGB-kkA Document 1 Filed 09/05/21 Page 12 of 20 Page ID #:12
USCA Case #25-5241     Document #2162586     Filed: 03/06/2026     Page 360 of 660

(a) the fact that thousands of transgender people already serve, and that the military has already invested hundreds of millions of dollars to train them collectively; (b) that the military benefits by retaining individuals who are already trained and who have already proven themselves; (c) the need to provide both transgender servicemembers and their commanders with clear guidance on questions such as deployment and medical treatment; and (d) the principle that "*Americans who want to serve and can meet our standards should be afforded the opportunity to compete to do so*."

32.    Secretary Carter announced that "[e]ffective immediately, transgender Americans may serve openly.  They can no longer be discharged or otherwise separated from the military just for being transgender."   This unequivocal statement was accompanied by the formal issuance of Directive-Type Memorandum 16-005, *Military Service of Transgender Service Members*, which lifted the ban on military service and accession by openly transgender people. Directive-Type Memorandum 16-005 sets forth the DOD's conclusion, based on thorough review and analysis, that:

> The defense of the Nation requires a well-trained, all-volunteer force comprised of Active and Reserve Component Service members ready to deploy worldwide on combat and operational missions.  The policy of the Department of Defense is that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness. Consistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the military.  These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity.

In accordance with Directive-Type Memorandum 16-005, transgender people were to be permitted to enlist in the U.S. military and openly serve beginning on July 1, 2017.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 360 of Total)
11
COMPLAINT
JA 3242

33.    In furtherance of its conclusions and in an effort to consistently and effectively implement this change in policy, the DOD took the following actions:

- In September 2016, the DOD issued an implementation handbook entitled *Transgender Service in the United States Military* setting forth guidance and instructions to both military servicemembers and commanders regarding how to understand and implement the new policies enabling open service of transgender servicemembers.

- On October 1, 2016, the Office of the Undersecretary of Defense for Personnel and Readiness issued DOD Instruction 1300.28 entitled *In-Service Transition for Transgender Service Members*.  The instruction set forth further guidance to ensure open service by transgender servicemembers, including details regarding revisions to medical treatment provisions.

- The Acting Assistant Secretary of Defense for Health Affairs issued a memorandum entitled *Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members*.

- On November 29, 2016, the DOD revised Directive 1020.02E, *Diversity Management and Equal Opportunity in the DOD*, expressly to prohibit discrimination and harassment on the basis of gender identity.

34.    In line with the guidance issued by the DOD, the United States Coast Guard adopted similar policies and procedures for service by transgender servicemembers.

**B.    Defendants Institute an Arbitrary Ban on Transgender Servicemembers**

35.    In a series of statements released via Twitter on July 26, 2017, Defendant President Donald J. Trump abruptly announced that the United States military would return to banning military service by transgender people.

36.    He tweeted: "After consultation with my Generals and military experts, please be advised that the United States Government will not accept or

Case 1:25-cv-01107-kkA Document 159-2 09/05/17 Filed 04/30/25 Page 47 of 76 #:14
Case 1:17-cv-01799-JGB-kkA Document 1 Filed 09/05/17 Page 14 of 76 Page ID #:14
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 362 of 660

1   allow Transgender individuals to serve in any capacity in the U.S. Military. Our

2   military must be focused on decisive and overwhelming victory and cannot be

3   burdened with the tremendous medical costs and disruption that transgender in the

4   military would entail. Thank you."

5       37.   This July 26, 2017 announcement was rendered without any

6   significant study or analysis and lacks a rational basis.

7       38.   Shortly after the Twitter announcement, members of both major

8   political parties criticized this abrupt change in policy, and fifty six former generals

9   and admirals issued a public statement denouncing the new policy.

10      39.   Less than one month following his initial Twitter statement,

11  Defendant President Trump issued the August 25 Directive formalizing the

12  administration's policy. The August 25 Directive orders co-Defendants (i) to ban

13  the "accession of transgender individuals into military service," (ii) to "halt all use

14  of DOD or DHS resources to fund sex reassignment surgical procedures for

15  military personnel" except in limited instances, and (iii) to implement a plan to

16  return to the prohibition on military service for transgender people, including those

17  current servicemembers who, in reliance on the June 2016 Policy, came out to their

18  command.

19      40.   Similar to the July 26, 2017 Twitter announcement, the August 25

20  Directive was rendered without any significant study or analysis and lacks a

21  rational basis.

22      41.   The stated bases offered in support of Defendants' August 25

23  Directive are pretextual, arbitrary, capricious, and unsupported by facts, evidence,

24  or analysis.  Indeed, the DOD previously concluded in Directive Type

25  Memorandum 16-005, after more than a year of exhaustive analysis, that "open

26  service by transgender Service members . . . is consistent with military readiness,"

27  as well as the "defense of the Nation" generally. Since issuance of Directive Type

28  Memorandum 16-005, transgender people have been serving openly without

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 362 of Total)

13

COMPLAINT

JA 3244

Case 1:25-cv-01107-kkA Document 159-2 Filed 04/30/25 Page 48 of 76
Case 2:25-cv-01279-JCB-kkA Document 1 Filed 09/08/21 Page 15 of 290 Page ID #:15
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 363 of 660

1    incident or any negative impact upon military readiness, lethality, unit cohesion, or
2    the national defense generally.

3        42.   The government-commissioned RAND Report concluded that the
4    "costs of gender transition related healthcare treatment are relatively low," and
5    amount to possible increases of only between "$2.4 million and $8.4 million
6    annually, representing a 0.04% to 0.13% increase in active-component healthcare
7    expenditures."

8        43.   In contrast, separating and replacing currently serving transgender
9    service members would be costly and cause disruption, and also would undermine
10   unit cohesion, respect for military authority, and morale.  Research from the Naval
11   Postgraduate School published by the Palm Center in August 2017 (the "Palm
12   Center Report") concludes that the "financial cost of fully implementing President
13   Trump's ban on transgender servicemembers would be $960 million," assuming
14   the military acted to expel the estimated 12,800 transgender servicemembers and
15   needed to replace them.  Even assuming the military acted to expel and replace
16   only 1,320 transgender servicemembers, which was the RAND Report's lowest
17   estimate of the total number of active transgender servicemembers, the Palm
18   Center Report indicates the financial cost of fully implementing President Trump's
19   ban would still be at least $99 million.

20       44.   The August 25 Directive applies to currently serving open transgender
21   servicemembers, including Plaintiffs, who have not yet undergone gender
22   reassignment surgery, but have openly expressed their gender identity, as well as to
23   currently serving transgender servicemembers who have not yet come out to their
24   chain of command, but wish to do so.

25       45.   The August 25 Directive bars currently serving transgender
26   servicemembers, including Plaintiffs, from re-enlisting.

27       46.   The August 25 Directive bars currently serving transgender
28   servicemembers, including Plaintiffs, from earning and obtaining promotions in

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 363 of Total)

14

COMPLAINT

JA 3245

Case 1:25-cv-01107-kkA Document 159-2 Filed 04/30/26 Page 49 of 76
Case 1:25-cv-01799-JGB-kkA Document 1 Filed 09/05/11 Page 16 of 100 Page ID #:16
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 364 of 660

1   rank, or from attaining the service record required to qualify for military retirement

2   benefits.

3        47.    The August 25 Directive bars currently serving transgender

4   servicemembers, including Plaintiffs, from receiving equal access to full medical

5   care.

6        48.    The August 25 Directive bars transgender people who wish to pursue

7   careers in the Armed Forces and are able to meet the standards for military service,

8   including Plaintiffs, from acceding into the military.

9                          **FIRST CLAIM FOR RELIEF**

10                    **Fifth Amendment – Equal Protection**

11                          **(against all Defendants)**

12       49.    Plaintiffs re-allege and incorporate by reference the preceding

13   allegations in this Complaint as if fully set forth herein.

14       50.    The Due Process Clause of the Fifth Amendment prohibits the federal

15   government from denying persons the equal protection of the laws.

16   51.    Defendants' August 25 Directive excluding transgender persons from

17   eligible military service discriminates against Plaintiffs and Plaintiff's members

18   based on their sex and transgender status, without lawful justification, in violation

19   of the Equal Protection component of the Due Process Clause of the Fifth

20   Amendment.

21       52.    Defendants' exclusion of transgender persons from military service

22   lacks a rational basis, is arbitrary, and cannot be justified by any government

23   interest.

24       53.    Defendants' August 25 Directive denying equal health benefits to

25   transgender persons also discriminates against Plaintiffs and Plaintiff's members

26   based on their sex and transgender status, without lawful justification, in violation

27   of the Equal Protection component of the Due Process Clause of the Fifth

28   Amendment.

Case 1:25-cv-01107-kkA Document 159-2 Filed 04/30/25 Page 50 of 76
Case 3:17-cv-01799-JCB-kkA Document 1 Filed 09/05/17 Page 17 of 290 PageID #:17
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 365 of 660

54.    Defendants' action to deny transgender persons equal health benefits lacks a rational basis, is arbitrary, and cannot be justified by any government interest.

55.    Defendants' above-described discrimination against transgender persons—a discrete and insular group that lacks the power to protect its rights through the legislative process, and one that has suffered a history of targeted discrimination and exclusion—is not narrowly tailored to advance any important or compelling government interest.

56.    As a result of Defendants' implementation and enforcement of the August 25 Directive, Plaintiffs and Plaintiff's members have suffered injuries and will suffer further irreparable harm to their constitutional rights under the Fifth Amendment if the directive is not declared unconstitutional and enjoined.

57.    Plaintiffs have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Fifth Amendment – Due Process

### (against all Defendants)

58.    Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

59.    The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals of their property or other interests without due process of law.

60.    The Due Process Clause of the Fifth Amendment requires, at a minimum, that government action have some rational basis before depriving any person of his or her property or liberty interests.

61.    Defendants' June 2016 Policy permitting transgender persons to serve openly in the military, together with reliance by Plaintiffs and Plaintiff's members on that policy, created a protected interest in their ability to continue serving in the military as openly transgender persons.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 365 of Total)

16

COMPLAINT

JA 3247

Case 1:25-cv-01107-kkA Document 159-2 Filed 04/30/25 Page 51 of 76
Case 1:25-cv-01799-JGB-kkA Document 1 Filed 09/05/21 Page 18 of 120 Page ID #:18
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 366 of 660

62.    Defendants' August 25 Directive will deprive Plaintiffs and Plaintiff's members of their protected interests in continued military service as openly transgender persons.

63.    Defendants' deprivation of Plaintiffs' and Plaintiff's members' protected interests in continued military service as openly transgender persons is arbitrary and without any rational basis.

64.    As a result of Defendants' implementation and enforcement of the August 25 Directive, Plaintiffs and Plaintiff's members have suffered injuries and will suffer further irreparable harm to their constitutional rights under the Fifth Amendment if the directive is not declared unconstitutional and enjoined.

65.    Plaintiffs have no adequate remedy at law.

**THIRD CLAIM FOR RELIEF**

**Fifth Amendment – Right to Privacy**

**(against all Defendants)**

66.    Plaintiffs re-allege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

67.    The Due Process Clause of the Fifth Amendment grants Plaintiffs and Plaintiff's members constitutional liberties and a fundamental right to privacy that encompasses and protects Plaintiffs' and Plaintiff's members' right to self-identification and self-determination as transgender individuals who live, form intimate relationships, work, and pursue happiness and meaning as the gender, or non-gender, with which they identify.

68.    The Due Process Clause of the Fifth Amendment requires, at a minimum, that government action have some rational basis before depriving any person of their liberty interests.

69.    Defendants' August 25 Directive impermissibly burdens Plaintiffs' and Plaintiff's members' fundamental liberty to live consistently with their gender

/ / /

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 366 of Total)

17

COMPLAINT

JA 3248

Case 1:25-cv-01107-kkA Document 159-2 Filed 09/09/21 Page 52 of 76
Case 3:17-cv-01799-JCB-kkA Document 1 Filed 09/08/17 Page 519 of 200 Page ID #:19
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 367 of 660

1  identity, and unlawfully impinges upon Plaintiffs' privacy by penalizing and
2  stigmatizing them for expressing a fundamental aspect of their personal identity.

3      70.   Defendants' August 25 Directive to exclude transgender persons from
4  service in and accession into the military is arbitrary and lacks any rational basis.

5      71.   As a result of Defendants' implementation and enforcement of the
6  August 25 Directive, Plaintiffs and Plaintiff EQCA's members have suffered
7  injuries and will suffer further irreparable harm to their constitutional rights under
8  the Fifth Amendment if the directive is not declared unconstitutional and enjoined.

9      72.   Plaintiffs have no adequate remedy at law.

10  **FOURTH CLAIM FOR RELIEF**
11  **First Amendment – Retaliation for Free Speech & Expression**
12  **(against all Defendants)**

13      73.   Plaintiffs re-allege and incorporate by reference the preceding
14  allegations in this Complaint as if fully set forth herein.

15      74.   The First Amendment grants Plaintiffs the constitutional right to
16  freedom of speech and expression.

17      75.   By banning military service by transgender people, Defendants'
18  August 25 Directive violates Plaintiffs' and Plaintiff's members' rights of free
19  speech and expression under the First Amendment by impermissibly restricting,
20  punishing, and chilling all public and private speech that would tend to identify
21  Plaintiffs and Plaintiff's members as transgender people.  The August 25 Directive
22  impermissibly burdens such speech on the basis of the content and viewpoint of
23  such speech.

24      76.   As a result of Defendants' implementation and enforcement of the
25  August 25 Directive, Plaintiffs and Plaintiff's members have suffered injuries and
26  will suffer further irreparable harm to their constitutional rights under the First
27  Amendment if the directive is not declared unconstitutional and enjoined.

28      77.   Plaintiffs have no adequate remedy at law.

Case 1:25-cv-01107-kkA Document 159-2 09/05/17 Page 53 of 76 #:20
Case 2:17-cv-01799-JGB-kkA Document 1 Filed 09/05/17 Page 20 of 20 Page ID #:20
USCA Case #25-5241    Document #2162586    Filed: 03/06/2026    Page 368 of 660

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for judgment on their Complaint as follows:

1.     That this Court find and declare that Defendants' August 25 Directive to exclude transgender people from federal military service, ban the accession of transgender people into the U.S. military, and prohibit the funding of sex reassignment surgical procedures as part of health care for transgender servicemembers is unconstitutional;

2.     That Defendants, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, preliminarily and permanently be enjoined from enforcing the August 25 Directive to exclude transgender people from serving or enlisting in the military or to preclude transgender servicemembers from access to full medical care, including gender reassignment treatment;

3.     That Plaintiffs be awarded their costs and reasonable attorneys' fees; and

4.     For such other relief as the Court may deem just and proper.

Dated:  September 5, 2017            Respectfully submitted,

           LATHAM & WATKINS LLP
             Amy C. Quartarolo
             Adam S. Sieff
             Harrison J. White

           By   /s/ Amy C. Quartarolo
             Amy C. Quartarolo

           *Attorneys for Plaintiffs Aiden Stockman,*
           *Nicolas Talbott, Tamasyn Reeves, Jaquice*
           *Tate, John Does 1-2, Jane Doe, and*
           *Equality California*

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
(Page 368 of Total)
19
COMPLAINT
JA 3250

# Exhibit 10



GLAD**Briefs**  WINTER '18

Regan Kibby and Nicolas Talbott (right), two courageous plaintiffs challenging Trump's transgender military ban

**INSIDE**

Putting Children First: More Courts Recognize Today's Families...............3

Advocating for LGBTQ Youth in the Juvenile Justice System.....................5

Fighting for the Dignity and Humanity of Transgender People Within the Correction System............7

Announcing the GLAD One Justice Fund...............................9

Thank You...........................................10

Legal Update.....................................16



**GLAD**

**LEGAL ADVOCATES & DEFENDERS**

*for the LGBTQ Community*

## Fighting Trump's Transgender Military Ban

**Transgender Americans Became Eligible to Enlist January 1, But the Fight to End Trump's Discriminatory Ban for Good Goes On**

In the midst of challenging times for many in our nation, this new year began with one truly historic and promising moment. As of January 1, for the first time, transgender Americans became eligible to enlist in our nation's military.

This should be an incredibly proud step for our country. It follows a series of profound and positive changes in the history of our military—from racial desegregation, to welcoming service members from a multitude of faiths, from expanding roles for women, to ending the ban on service by lesbian, gay and bisexual people—all stemming from an understanding that our military is made stronger when it is reflective of the diverse American population it protects, and when all those who are both qualified and willing have an opportunity to serve.

On January 2, our plaintiff Nicolas Talbott contacted the Air Force recruiter he has been working with for more than a year, thrilled to finally take the next step toward his dream. "Service to me means coming together to take care of one another," says Nicolas, who studied national security issues in college, about what motivates his long-standing desire to join the military. "I just want to offer the skills and talents I have, to do what I can to make our country and our world a safer, better place. I'm excited and hopeful to finally move closer to that possibility."

But whether we would get to this moment—whether patriotic and talented transgender Americans like Nicolas would be able to pursue their dreams of service—was in question up until the very end of December. And the fight to ensure that capable, courageous transgender Americans are able to serve, and that our military is able to benefit from that service, still goes on, as we continue battling Trump's transgender military ban in court.

The June 2016 announcement that transgender people would be able to serve openly in the military followed over a year and a half of rigorous study by military experts, which concluded that open service would have no adverse impact and in fact would strengthen military readiness and national security. Transgender Americans who were already

continued on page 8

JA 3252

# From the Executive Director



*Photo: Infinity Portrait Designs.com*

**"Courage is the most important of all the virtues because without courage, you can't practice any other virtue consistently."**

This quote, by the incomparable Maya Angelou, has been on my mind as I reflect on the past year—a year in which we have witnessed a resurgence of hate groups, continued assaults on voting rights, a rise in anti-Semitism, the scapegoating of immigrants, and attacks from the highest levels of our government on the civil rights of so many of our communities.

It is easy in these times to wonder whether our nation's strongest virtues— justice, equality, freedom, compassion—will hold. For me, I need only look to the incredible courage of those individuals, families, and communities who are speaking out and resisting attempts to drag us back, to know that they will.

Here at GLAD I get to witness so much courage.

The brave plaintiffs who are at the heart of GLAD's cases against Trump's discriminatory transgender military ban show a determination to fulfill their dreams of serving their country that is nothing short of exemplary. *(see page 1)*

Also tremendously resilient are the LGBTQ youth we are working with in Long Creek Youth Development Center, Maine's juvenile prison, who are strong advocates for juvenile justice reform, determined to create a better future for themselves in spite of the systemic and social barriers they face. *(see page 5)*

And I am so incredibly moved by our client B.'s fight to be reunited with her partner of 30 years, D., so that she can care for D. in the community they both love *(see page 16)*. In these times especially, we must be fiercely protective of our relationships with one another.

The events of this past year have led us to a crossroads. We must decide what kind of society we envision for ourselves. Will we be a nation where LGBTQ people, people of color, immigrants, women, and so many vulnerable communities are cast as second-class citizens? Or will we continue moving forward and protect and defend the humanity and dignity of all Americans?

Maya Angelou's words deeply resonate now, not only because of the courage of those impacted by GLAD's work, whose stories you'll read more about in these pages, but because of the courage we'll all need to sustain our movement for justice in the year ahead.

Thank you for your ongoing support, and for your courage in staying with us in the fight for equality.

Toward Justice,

Janson Wu
Executive Director

## BOARD OF DIRECTORS

Richard J. Yurko, *President*
Joyce Kauffman, *Vice President*
David Hayter, *Treasurer*
Darian Butcher, *Clerk*
Leila Bailey-Stewart
Mark Brown
Edward Byrne
Francisco Cabas
Andre L. Campagna
Fred Csibi
Shane Dunn
Benjamin Franklin
Meghan E. Freed
Joseph Garland
George Hastie
Deborah Heller
Chuck Latovich
Dianne R. Phillips
Marlene Seltzer
David Wilson

## GLAD STAFF

Janson Wu, *Executive Director*

James Barden,
*Public Affairs Assistant*

Brianna Boggs,
*Director of Development*

Hayley Bohn,
*Development Co-op*

Mary Bonauto,
*Civil Rights Project Director*

Eva Boyce, *Chief Financial Officer*

Gary Buseck, *Legal Director*

Khari Charles,
*Community Engagement Manager*

Patience Crozier,
*Senior Staff Attorney*

Kathy Eow,
*Communications Manager*

Beth Grierson,
*Senior Manager of Operations
and Administration*

Tessa Holtzman,
*Legal Assistant*

Rianna Johnson-Levy,
*Legal Assistant*

Amanda Johnston,
*Director of Public Affairs and Education*

Kenyon King, *Web Developer*

Bennett Klein, *AIDS Law Project Director
and Senior Staff Attorney*

Jennifer Levi,
*Transgender Rights Project Director*

Stephanie Lowitt,
*Assistant Director of Development*

Carol Marton, *Business Manager*

Elaine McGrath, *Operations Assistant*

Aria Pierce,
*Major Gifts & Foundations Associate*

Chris Rainville, *Events Manager*

Chloe Sanders, *Development Co-op*

Erin Semagin Damio,
*Database Manager*

Bob Tumposky, *IT Manager*

Alex Weinstein, *Legal Assistant*

Daniel Weiss,
*Public Information Manager*

Michelle Wiener,
*Senior Legal Assistant &
GLAD Answers Assistant*

Allison Wright, *Staff Attorney*

2

# Putting Children First: More Courts Recognize Today's Families

Ensuring that all children are secure and all families are recognized —no matter how they are formed—is a top priority at GLAD. That more and more states are recognizing the diversity of our families and ensuring protections for all children means we are making incredible progress in catching up the courts and the law to today's families.

This past December, we celebrated a huge victory for children and families in Vermont, where the state's highest court recognized that families are formed not only through biology, adoption or marriage but through intention, love and caring.

In *Sinnott v. Peck*, the Vermont Supreme Court issued a groundbreaking ruling in favor of our plaintiff Sarah Sinnott, whose former partner sought to block her relationship with the daughter they jointly brought into their family through adoption.

Sarah and her former partner were in a committed relationship for seven years. During that time, the couple jointly planned for, adopted and raised their daughter, though for legal and logistical reasons, Sarah's former partner was the sole adoptive parent. After their relationship ended, the couple continued to jointly parent for three years before Sarah's former partner stopped allowing their daughter to see and be cared for by Sarah.

Sarah filed a Petition to Establish Parentage with the Vermont Superior Court, Family Division. The court declined to accept her filing, holding that Vermont law did not recognize parentage other than by married parents or those with a genetic or adoptive relationship to their child.

With co-counsel Sarah Star, GLAD Transgender Rights Project Director Jennifer Levi argued that Sarah meets the legal definition of a parent, and is entitled to seek custody under Vermont's Parentage Act. And the Court agreed.

"This decision is child-centered, as it should be," says Levi. "It protects parent-child relationships based on the loving bonds that create them, not based on legal formalities. The reality is that children in Vermont, as elsewhere, are being raised in many different types of families. This decision recognizes that, as more and more courts across the country are beginning to do."

"I'm grateful my case could open the door to protections for so many families," says Sinnott.

The ruling in *Sinnott v. Peck* is part of a growing trend of courts adopting modern approaches to recognizing our families. For instance, in October 2016 the Massachusetts Supreme Judicial Court ruled in our case *Partanen v. Gallagher*, that non-married, non-biological parents can be recognized as their children's full, legal parent.

As we continue to fight for these important court victories, GLAD is also advocating for other critical means of family recognition, from ensuring state policies follow such court rulings to advocating for parentage statues that reflect modern families. And GLAD also works with parents directly to help them navigate what can be complex legal terrain to understand their rights, and to find accessible resources to protect their families.

For example, although *Partanen* paved the way for unmarried, non-biological parents in Massachusetts to be recognized as full, legal parents, vital records such as Voluntary Acknowledgment of Parentage (VAP), which same-sex parents should be able to use to establish parentage, still reflect an antiquated view of families formed by same-sex couples. GLAD is currently advocating alongside a female couple to spur the state to update its records to be more inclusive.

K. and P. have been in a committed, unmarried relationship for four years. They planned for and conceived their daughter through alternative insemination. P. gave birth in December 2016, after the *Partanen* ruling, with K. supporting her the entire way. They tried to fill out the birth certificate worksheet listing them both as parents, but the hospital said they couldn't. GLAD Senior Staff Attorney Patience Crozier is working with K. and P. to get access to the VAP form to establish K.'s parentage simply and efficiently through this administrative procedure easily accessed by different-sex couples.

The courageous families and individuals pushing for the legal protection of their children are driving change, and we are proud to partner with them to ensure all children have the security, stability and love they need and deserve. ■

## GLAD Forward Is GLAD to Help

GLAD Forward, GLAD's young adult group, volunteered at the Greater Boston Food Bank this winter to help sort and package food for community members struggling with hunger. Visit www.glad.org/forward to learn more about GLAD Forward.

3

*Photos: Matt Kurkowski, xocialight.com*



Case 1:25-cv-01107-LLA    Document 159-2    Filed 04/30/25    Page 373 of 660



A visual art piece made by incarcerated LGBTQ youth as part of Maine Inside Out's "Love Is: Alternatives to Incarceration," a showcase of theater, film, and visual art.

## We Need Each Other

Below is a poem by Sexuality and gender Awareness for Everyone (SAFE) Group Member J.O., DOC No. 115950, and performed by Maine Inside Out.

**We Need Each Other.**
Nobody knows what young people need more
    than young people themselves.
What they think we need and what we really need is different.
What will it take for our society and this country
    to realize that youth incarceration harms not
    only our youth, but also our communities?

Youth are locked up and told they can change,
    but how many kids who get locked up actually
    get the support they need to make change?

Do our communities really want us locked up?
Do they think we deserve what happens to us?
Do they know what happens to us?
Do they think we deserve the things we need to survive?

Take the time to work with us, don't just send us away.

What would our communities be willing to do to make a change?
**We need to be heard.**

The system says they listen to us, but do they really listen to us?

We are all human beings.
We make mistakes. But all of us have the power to make change.
Even if it's hard,
We have the power to make change.
The difference between change
& transformation
Is that transformation is something you can do on your own
But for change, you need help.
No one and no community can change alone.
**We need each other.**

For queer and trans folks:
We know it's difficult coming out, to be different, to be who you are
Especially for those of us in facilities or locked away
We are fortunate to have each other though
Without the chosen families we build in these places
We'd just be part of the zoo
We wouldn't make it through
All the harassment and discrimination we face
Without each other

Unless we push and try
We won't get what we deserve
To survive, to thrive, to build the world we know is possible
We need each other.

For young people out there,
Who may be struggling
Feeling isolated
Locked up or navigating the hardness of the world outside
Seek help and support
Know that millions of people in this world are
    fighting for you
And that some people (some closer than
    you think)
Are experiencing the same thing
We need each other

We need each other.
We should be heard.
We need to be heard.

We need each other.
We need each other.
We need each other.

## Advocating for LGBTQ Youth in the Juvenile Justice System

GLAD is engaged in advocacy work across New England to help create safe and affirming communities for LGBTQ young people, and that includes the juvenile justice system. Together with our local partners, we are working hard to reform a system that disproportionately harms LGBTQ youth.

LGBTQ youth, particularly LGBTQ youth of color, are overrepresented in the juvenile justice system due to stereotypes, pervasive stigma, bias, and structural factors. Family rejection, unsupportive schools and discriminatory policing practices contribute to increased interactions between LGBTQ youth and the juvenile and criminal justice systems.

Recent research by the Movement Advancement Project (MAP) reveals that 20 percent of the youth in seven juvenile detention centers and correctional facilities across the U.S. identify as LGBTQ or gender non-conforming, which is almost three times their estimated number in the general population. And LGBTQ youth of color are disproportionately more likely to be targeted by the juvenile justice system, with Black youth four times as likely as white youth to be incarcerated, and Latinx youth nearly twice as likely as white youth to be incarcerated.

MAP's research on the experience of LGBTQ youth once they are in the system found that many are placed in prisons without respect for their gender identity or expression. Additionally, youth prisons are often ill equipped to meet the needs of LGBTQ youth and ensure their safety. This puts LGBTQ youth at increased risk for harassment, violence, and sexual assault by other youth and staff.

GLAD is seeing these nationwide trends in focus at Long Creek, a juvenile detention center and prison in Maine, and is deeply engaged in a critical intervention there to support the youth inside. We became involved with Long Creek when we learned that a detained transgender youth died by suicide last November, demanding a thorough and transparent investigation of the youth's tragic death.

Through our work, we have uncovered that the facility's conditions do not comply with federal standards. And we have learned that 30 percent of youth in its custody identify as LGBTQ and are at increased risk of harm, facing daily harassment and abuse by staff and other inmates due to their perceived or actual sexual orientation.

GLAD Civil Rights Project Director Mary L. Bonauto and GLAD Senior Staff Attorney Patience Crozier have been deeply involved with the youth in Long Creek and are now representing two young people who are LGBTQ or perceived to be, advocating alongside them for their safety and ultimately their release from Long Creek. Bonauto has been personally visiting Long Creek virtually every week since last November, checking on the facility's conditions and on our clients.

Our clients have become courageous advocates for themselves and other LGBTQ youth in Long Creek. Speaking honestly about the realities of living in a place like Long Creek is part of their advocacy. For example, it is important to them to be referred to as inmates, not residents, an unambiguous message for us all that Long Creek is a prison, cell blocks and all.

continued on page 18

## Letter for GLAD, From Long Creek Inmate, DOC No. 121309

Life in Long Creek Youth Development Center (LCYDC) depends very much on where you fall in the pecking order. Those at the bottom—LGBTQ youth, youth judged to be weak, youth unwilling to fight other youth, mentally disabled youth, or youth with sex crime related charges—endure boundless torment. They are relentlessly harassed, assaulted, threatened, and demoralized. Sometimes this means having their chairs kicked out from under them, food thrown at them, vulgar images drawn on their cells or clothing. Sometimes it means brutal assaults, being told they don't deserve to be alive, being forced to hand over meals and hygiene supplies. Sometimes it means being too afraid to leave their cell for days at a time.

Most of these offensive actions come from other inmates who have been shown by peers and staff that it is okay and even commendable to torture these youth. The staff often ignore or even actively encourage this behavior.

All inmates at LCYDC endure hours each day spent in an 8 x 12 cell, poor quality (sometimes expired) food, persistent untreated skin rashes and infection lasting years, and excessive, unnecessary use of force from the staff. Doors don't open and close here. They are locked, unlocked, and can only slam shut.

A punishment-based "rehabilitation" system is inherently flawed. It demoralizes impressionable youth, reinforcing the belief that the crime path is the only one available to them. It increases trauma and abuse, which is typically a huge factor in the underlying conditions which brought youth to LCYDC in the first place and a factor in recidivism.

In order for youth to learn how to function in society, they need to be told that they have a place in society. Their positive behavior needs focus, not neglect. Groups of at-risk youth need to be kept small enough to meet these demands for success.

Adequate mental health care must be provided to help youth deal with past abuse and trauma.

Sexuality and gender Awareness For Everyone (SAFE) group, an Incarcerated LGBTQ youth and allies group that is an off-shoot of Portland Outright, is one of the only places in LCYDC where this culture is actively being developed. It provides a space with leadership instead of authority, acceptance instead of judgement, tenderness instead of hate, encouragement and empathy instead of indifference, and a safe place where the burden of incarceration is eased and youth are allowed to grow.

SAFE Group, along with Maine Inside Out and GLAD, have shown that they truly care about the children of our communities, and that they are willing to do the work needed to repair the damages we have sustained while free and incarcerated in order to give us a healthier, happier, and prosperous future. ◼

5

# The Most Anti-Gay Corporate Policy in America Today

By Ben Klein and Alex Weinstein

Perhaps we have become a little too accustomed to Fortune 500 companies that tout their LGBTQ employee affinity groups, advertise to our community with the rainbow flag, march in our parades, and even donate to our organizations and sign briefs in the U.S. Supreme Court showing considerable business support for our rights. Those corporate acts make a big difference and reflect tangible positive change in the world we live in.

But what about actual business practices? Here's our vote for the most unrecognized anti-gay and AIDS-phobic corporate policy in America today: the largest insurance companies in America that are blatantly discriminating against gay men who take steps to prevent HIV transmission by using PrEP (or HIV pre-exposure prophylaxis), a once-a-day dosage of the medication Truvada.

Fortunately, most health insurers and state Medicaid agencies are covering the cost of the medication so people can have access to this extraordinary breakthrough in prevention. But when people take PrEP and then individually apply for life insurance, long-term care insurance, and disability insurance, they are automatically denied coverage solely because they use PrEP.

Some of the largest insurance companies in the nation are engaging in this categorical exclusion of PrEP users. GLAD has learned about denials of insurance coverage by State Farm, Aetna, Metropolitan Life, John Hancock, Protective Life, Lincoln Financial, and many more. We have sued Mutual of Omaha Insurance Company for denying long-term care insurance to a qualified HIV-negative gay man because he uses PrEP. This is an industry-wide policy and practice. Gay men can either get insurance or they can take the best biomedical HIV prevention method in the history of an epidemic that has claimed so many lives.

So, what are all these corporate giants saying about PrEP users? Life, disability, and long-term care insurers underwrite the risk that an applicant will claim benefits and when. They get your medical records and exclude you if you have a disqualifying health condition, or charge you higher premiums if you have certain health conditions. But people who are excluded solely because they take PrEP do not have any disqualifying health condition. They are excluded because these corporations believe they are engaging in "high-risk sexual behavior" and deem them at high risk for HIV. Let's be frank: they are talking about anal intercourse. In other words, you are fully eligible for insurance, but you are turned away because of the sex you are having.

In an industry that is based on rationality, and is supposed to make decisions based on actual data, how does this make sense? Research demonstrates that PrEP is close to 100% effective at reducing the risk of HIV transmission, far more effective than condoms. Let us say that again: *Close to 100% effective* in stopping HIV. And yet the insurers ignore the efficacy of PrEP and instead use it as a proxy for "high risk sexual behavior" in their underwriting. That is not science; it's a moral judgment about the people who use PrEP. By the way, 80% of PrEP users are gay men.

These insurers argue that not everybody takes PrEP as directed (once daily) which reduces its effectiveness, or that the long-term effects of Truvada usage are unknown (PrEP has been demonstrated to be well tolerated with no significant side effects). These same insurers offer insurance to people with a range of conditions, such as diabetes and bipolar disorder, as long as the applicant demonstrates adherence to medications that control those conditions. Yet they don't allow PrEP users to demonstrate adherence. And insurers obviously don't exclude every new drug approved as safe by the FDA simply because there is not long-term data for new drugs.

This "no PrEP users need apply" policy belongs on the long list of just plain stupid beliefs about HIV transmission that have been proffered over the course of the epidemic. This corporate policy does nothing to achieve its stated goal of reducing the overall prevalence of HIV in an insurer's pool of beneficiaries. Take two people with identical sex lives: The PrEP user is denied insurance; the person who doesn't use PrEP is covered. That make zero sense. And worse, it actually risks discouraging use of a powerful tool that could help end the HIV epidemic.

And the fact is that most people at risk for HIV in the United States are not yet on PrEP. The Centers for Disease Control and Prevention estimates that 1.2 million people could benefit from PrEP. Yet, since PrEP was approved by the FDA in 2012 there have only been about 145,000 total PrEP users. Before the advent of PrEP, life, disability, and long-term care insurers did not assess for HIV risk. They did not ask applicants about sexual practices or condom use and make underwriting decisions on that basis. But with the advent of PrEP, they are carving out and excluding just a small percentage of the whole group of people who have some risk for HIV—those who use the most effective prevention tool. This is discrimination, not a rational policy.

From the earliest days of HIV, we have often said: We're not going to end this epidemic if myths, fear and discrimination interfere with our best public health policies. We need to be doing everything we can to end the stigma associated with PrEP so that people can make decisions based on what's best for their own health, not based on barriers to access or fear of discrimination. The corporate practices of these insurance companies reflect and reinforce stigma. They put the public health at risk by creating an incentive to avoid or delay PrEP.

Many of the companies perpetuating this policy and practice are Fortune 500 companies and some, like Aetna, John Hancock, State Farm, and Mutual of Omaha have a 100% approval rating from Human Rights Campaign (HRC). These corporations can't wave the rainbow flag with one hand and the other turn us away because of our sex lives. It's time to end the PrEP exclusion in America's insurance industry. ■



Photo: Cara Soulia

GLAD's Senior Manager of Operations and Administration Beth Grierson (right) with Trish Settles and Julia Slee at the Boston Women's March 2018.

6

# Fighting for the Dignity and Humanity of
## Transgender People Within the Correction System

This fall, GLAD filed a groundbreaking case, *Jane Doe v. MA Department of Correction* (DOC), on behalf of a transgender woman currently incarcerated at Massachusetts Correctional Institution-Norfolk (MCI), a state facility that houses male inmates. The suit, filed in coordination with Prisoner Legal Services and Goodwin Procter LLP, seeks for our client to be appropriately transferred to DOC's female corrections facility, MCI-Framingham.

Our client, Jane Doe, is a transgender woman who transitioned 40 years ago. Despite having lived as a woman for the near entirety of her life, she is housed in an all-male facility where she faces the traumatizing experience of being a woman locked up in a men's prison, including daily sexual harassment and mistreatment from other inmates and guards. We are fighting for our plaintiff to be treated with dignity and humanity in a case that could set a precedent for other correction systems nationwide.

According to federal data, transgender inmates report being targeted for sexual assault and harassment by guards and other inmates at a rate 10 times that of the general incarcerated population. Guidelines for federal prisons recognize the need to assess placement for transgender people on a case-by-case basis, and to take into consideration where the person will be safest. Massachusetts, like most states, currently fails to meet this federal standard in making placement decisions.

"Massachusetts is a state with strong policy recognizing the humanity of transgender people," says Jennifer Levi, GLAD Transgender Rights Project Director. "That humanity must also be recognized in our correction system. Transgender people who are serving time for an underlying offense should not be punished for being transgender."

The results of housing a woman in a male facility are predictably disturbing. Our client is regularly subjected to strip searches by male correctional officers, who routinely grope her breasts in the process. She is forced to shower in view of male prisoners who inappropriately comment on her body and otherwise harass her. She fears for her safety daily.

The impact of this daily discriminatory and traumatizing treatment is scarring, humiliating, and both physically and emotionally harmful.

"The level of harassment, fear, and trauma our client experiences at MCI-Norfolk is horrifying—anyone who hears her story can plainly see that," says GLAD Senior Attorney Ben Klein. "By housing her in a men's facility the Department of Corrections is putting her safety and her health at risk on a daily basis."

The suit filed in U.S. District Court for the District of Massachusetts asserts that DOC is violating our client's constitutional right to equal protection, as well as her rights under the Americans with Disabilities Act. We are seeking for Ms. Doe to be appropriately transferred to MCI-Framingham, and that DOC take certain immediate steps in the interim to reduce threats to her safety, including that she be searched only by female correctional officers; that she be provided with a separate shower time without the presence of men; and that she be referred to by the correct name and female pronouns.

Our laws, our Constitution, and our values say that people should not be stripped of their basic humanity when they are incarcerated, and our state prisons have a responsibility to ensure the safety of all inmates—including that of our client. State correctional systems in Massachusetts and across the country must adopt safer and more humane policies for assessing placements for transgender inmates. ■

## 18th Annual Spirit of Justice Award Dinner

Honoring Eric H. Holder Jr., the 82nd Attorney General of the United States  •  October 22, 2017



*Photos: InfinityPortraitDesign.com*

7

GLAD Civil Rights Project Director Mary Bonauto with GE Vice President Mo Cowan and State Street Vice President Paul Francisco

Honorable Eric H. Holder Jr.

Darla Pires DeGrace and Shelle Mendes

# Fighting Trump's Transgender Military Ban

continued from page 1

serving—some for decades, all with dignity and courage—began to come out to their commanding officers. At the same time, it was announced that openly transgender Americans would be able to enlist beginning the following year.

But that thoroughly vetted and thoughtful policy was suddenly threatened when, last July, President Trump tweeted an announcement that transgender people would be prohibited from serving in any capacity in the U.S. military.

GLAD and our partners at the National Center for Lesbian Rights (NCLR) immediately saw this announcement for what it was—a serious attack on our community. We knew we needed to act quickly to ensure the rights and dignity of transgender Americans, preserve the stability of our military, and protect our nation's core values of equality and fairness.

We filed the first challenge to Trump's discriminatory and harmful transgender military ban, *Doe v. Trump*, on August 9, on behalf of five (since joined by a sixth) service members and two individuals seeking to serve. A few weeks later, we joined a second case, *Stockman v. Trump*, representing additional current and aspiring service members.

On October 30, D.C. District Court Judge Colleen Kollar-Kotelly issued a nationwide preliminary injunction halting the ban in *Doe v. Trump*. Judge Kollar-Kotelly agreed our plaintiffs were likely to prevail on their claim that Trump's ban violates their constitutional right to equal protection, and recognized the serious harm the ban was already causing to transgender service members—who under it face discharge and the loss of their livelihoods, health care, and post-military retirement they have worked hard to earn—as well as to transgender Americans who the ban blocked from ever being able to serve, regardless of their individual qualifications.

Since then, each of the other three federal district courts to consider Trump's transgender military ban, including in GLAD's second case *Stockman v. Trump*, has issued a similar injunction halting its enforcement while the cases proceed.

The Trump administration challenged those rulings on appeal—and, as we got closer to the January 1, 2018 start date for open enlistment,

began to ask for "emergency stays" of those rulings, seeking to delay that date. But neither the district courts nor the courts of appeal were persuaded by the administration's argument that the military was not prepared for open enlistment to begin. The district courts denied the government's request for an emergency stay, and the courts of appeal followed suit.

In ruling against a stay, the D.C. Court of Appeals described the central question with these profound words: "[I]t must be remembered that all Plaintiffs seek during this litigation is to serve their Nation with honor and dignity, volunteering to face extreme hardships, to endure lengthy deployments and separation from family and friends, and to willingly make the ultimate sacrifice of their lives if necessary to protect the Nation, the people of the United States, and the Constitution against all who would attack them."

Late in the evening on December 29, we got incredible and welcome news: the Pentagon confirmed that the government was withdrawing its appeals of the temporary orders prohibiting enforcement of the ban, and would not seek a last minute "emergency" stay from the United States Supreme Court to delay the January 1 enlistment date. Transgender people throughout the country, whose future educational and career dreams rest on their being able to enlist, would finally be able to move forward.

But this fight is far from over. While enforcement of the ban is currently blocked by court order, it remains official policy to deny

continued service and enlistment by transgender people. The government is continuing to defend Trump's ban in federal district court, where we are currently engaged in the discovery process. The government has also said that it will soon conclude a study of transgender people serving in the military, and we expect that it may use the outcome of that study as a further attempt to defend Trump's discriminatory policies.

"The beginning of open transgender enlistment is truly historic and something to celebrate," says GLAD Transgender Rights Project Director Jennifer Levi, who with NCLR's Shannon Minter is one of two transgender attorneys leading the fight against the ban. "But we can't let down our guard. Beyond its devastating discriminatory impact on individual service members and on our military itself, allowing a ban on transgender service members to stand would have wide ranging implications. If transgender people are deemed categorically unfit to serve in the military, that exclusion will be used to justify discrimination in housing, employment, social services, family law, healthcare, public benefits, insurance, and beyond. This is a critical fight, for our community and for our nation's values."

GLAD, with our partners at NCLR and the other organizations who are challenging Trump's ban in court, will not stop fighting until it is gone for good. ◼

To follow case developments, visit www.glad.org/cases/doe-v-trump and www.glad.org/cases/stockman-v-trump

8



*Photo: The History Project, Matt Karkowski, xocialight.com*

GLAD Staff Attorney Allison Wright (right) was awarded the distinguished Lavender Rhino Award last October by The History Project for her contribution to the LGBTQ community.

USCA Case #25-5091    Document #2102585    Filed: 05/07/2025    Page 378 of 660

## Announcing the GLAD One Justice Fund



*Lawyers are a key bulwark in the ongoing fight against discrimination and oppression—not just for the LGBTQ community but for all our communities that are fighting for liberation and justice. And GLAD's lawyers do us proud—every single time. That's why we need to support GLAD—now more than ever!*

*—Elyse Cherry, Co-Chair, GLAD One Justice Fund*

We are facing unprecedented, hateful attacks by an administration determined to strip away our rights and freedoms. The president has reversed sound military policy with his reckless ban barring transgender Americans from serving their country. He has appointed anti-LGBTQ officials to the highest levels of government and the federal bench. His actions threaten to roll back



rights for transgender students, while opening the door to religious discrimination against LGBTQ people and people seeking birth control. Deportations and unconstitutional travel bans are separating families and demonizing immigrants. Meanwhile, the health and insurance needs of our loved ones are under assault, and federal agencies are stripping away metrics to track the needs and wellbeing of LGBTQ communities, especially elders. In courts and state legislatures across the country, similar attacks are happening every day.

While the president and his advisors are hell-bent on dividing our communities—LGBTQ, immigrant, Muslim, communities of color, women—GLAD is proud to show that we are one justice movement. GLAD is responding to these injustices with strategic and unwavering resistance—by defending against attacks in the courts and advancing justice for all.

**That's why we are announcing the creation of the GLAD One Justice Fund, a $1.7 million investment that will launch the next generation of GLAD's litigation and advocacy work to defend and advance LGBTQ rights for years to come.**

At a critical time for the LGBTQ community, the One Justice Fund will build on GLAD's winning track record and expertise in litigation, policy and education to:

• Leverage the courts to resist attacks on marriage and parenting rights, and advance transgender protections, employment non-discrimination and more

• Expand legal staff to advance groundbreaking litigation and legal work nationwide—to stop bigotry before it spreads

• Increase rapid-response services of our GLAD Answers infoline to field the surge in daily emergency legal inquiries

• Launch new education and advocacy initiatives to advance strategic, movement-building priorities for equality in law, racial and economic justice

The three-year fund will ensure that GLAD's growth will be sustained—expanding our Legal team now and growing our Development team to meet new demands by 2020.

We are proud to announce that generous donors have already made gifts and pledges of nearly $1M, or 58% of our $1.7M goal.

Our deepest thanks go to our One Justice Fund Co-chairs for



their leadership: Elyse Cherry and Scott Pomfret. And our One Justice Fund Committee Members: Gary Daffin, Catherine D'Amato, Kristen Elechko, Deborah Heller Oz Mondejar, Rick McCarthy, Richard Moore, Bryan-Eric Simmons Ian Tzeng, and Rich Yurko.

Become an influential part of the movement toward justice for all by investing in the GLAD One Justice Fund today. Your one-time or multi-year support will ensure a staunch, smart, swift opposition to these outrageous attempts to curtail the rights and dignity of LGBTQ people, women, people of color, immigrants, religious minorities and every one of our allies. ■

*For more information about the GLAD One Justice Fund, contact GLAD Director of Development Brianna Boggs at bboggs@glad.org or 617-426-1350*

9

# Thank You

GLAD thrives due to the support of volunteers, donors and in-kind contributors. We extend our thanks to the following individuals and organizations who worked with us in the past year toward achieving a more just world. We apologize if we have omitted anyone.

**ATTORNEYS**

Sally Abrahamson (DC)
Daniel Ball (MA)
Richard D.
   Batchelder, Jr. (MA)
Courtney Beer (ME)
Inga Bernstein (MA)
Christopher Berry (ME)
Judith Berry (ME)
Karen Blum (MA)
Robert C. Boyd (DC)
Kathleen M. Brill (MA)
C. Thomas Brown (MA)
Vanessa M. Brown (MA)
Hays Burchfeld (MS)
Adam M. Cambier (MA)
Tiffany F. Carney (DC)
Phil Catanzano (MA)
Arcangelo S. Cella (MA)
Denny Chan (CA)
Katrina Chapman (MA)
Teresa Cloutier (ME)
Catherine R. Connors (ME)
Susan Crockin (DC)
Andrew Davis (ME)
Stuart F. Delery (DC)
Kathleen DeLisle (MA)
Walter Dellinger (DC)
Adriel Cepeda Derieux (NY)
Andrew DeVoogd (MA)
Christine Dinan (DC)
Catherine J. Djang (NY)
Christopher D. Dodge (MA)
J. Anthony Downs (MA)
Douglas C. Dreier (DC)
Dianne Ellis (MS)
Carolyn N. Famiglietta (MA)
John Freedman (DC)
Peter Grossi (DC)
Bruce Hale (MA)
Matthew Handley (DC)
Cathy Harris (DC)
Lindsay C. Harrison (DC)
Lisa Hays (MA)
Jordan D. Hershman (MA)
John Brent Hill (DC)
Harriet Hoder (MA)
Brook Hopkins (MA)
Rachel Hutchinson (MA)
Richard Iandoli (MA)
Robert Intile (MA)
Kristi L. Jobson (MA)
Richard Jones (MA)
Courtney G. Joslin (CA)
Joyce Kauffman (MA)
Jennifer A. Kirby (MA)
Nicole Kinsley (MA)
Tiffany Knapp (MA)
Katherine Knox (ME)
Andrea Kramer (MA)
Kevin Lamb (MA)

Paul Lannon (MA)
Michelle LaPointe (MA)
Claire Laporte (MA)
Ronald M. LaRocca (ME)
David M. Lehn (DC)
Michael J. Licker (MA)
Ariel Linet (MA)
Sharen Litwin (MA)
Louis Lobel (MA)
Christopher Looney (MA)
Sandra Lundy (MA)
Lizz Matos (MA)
Maureen McBrien (MA)
John N. McClain, III (NY)
Daniel McFadden (MA)
Gerald McIntyre (CA)
Anton Metlitsky (DC)
Matthew E. Miller (MA)
Margaret Minister (DC)
Shannon Minter (DC)
Ashley E. Moore (MA)
Tiffany Moore (MA)
Andrew Musgrave (MA)
Susan Murray (VT)
David Nagle (MA)
Kim Nemirow (IL)
Juliette Niehuss (DC)
Andrew O'Connor (MA)
Zack Paakkonen (ME)
Patricia A. Peard (ME)
Amy L. Pierce (CA)
Nancy Polikoff (DC)
Amy Christine
   Quartarolo (CA)
Marco J. Quina (MA)
Pauline Quirion (MA)
Vivek J. Rao (MA)
Nolan L. Reichl (ME)
Carolyn Reyes (CA)
Anna Rich (CA)
Elizabeth Roberts (MA)
Cynthia C. Robertson (MA)
G. David Rojas (IL)
Peter Romer-Friedman (DC)
Alexandra Roth (NY)
Cathy Sakimura (CA)
Hema Sarang-
   Sieminski (MA)
Margo Schlanger (MI)
Mary Schmidt (MA)
Matthew D. Schnall (MA)
Joseph Schneiderman (CT)
Alan Schoenfeld (NY)
Richard M. Segal (CA)
Leah Segal (MA)
Giovanna Shay (CT)
John Shope (MA)
Emily R. Shulman (MA)
Adam Sieff (CA)
Steven Silver (ME)
Andrew Silvia (MA)
Stephanie Simon (NY)

Joseph W. Singer (MA)
Deirdre Smith (ME)
Nathaniel R. Smith (CA)
Andrew Sokol (NY)
David Soutter (MA)
Kate Stewart (MA)
Joel Thompson (MA)
Joshua Tom (MS)
Juno Turner (NY)
Jill Ward (ME)
John Ward (CA)
Sarah Warlick (DC)
Daniel Wathen (ME)
Ryan N. Watzel (DC)
Harrison J. White (CA)
Shannan Wilber (CA)
Emma S. Winer (MA)
Paul R.Q. Wolfson (DC)
Jennifer Wriggins (ME)
Paloma Wu (MS)
Gina Yamartino (ME)
Mary Zou (NY)

**LAW FIRMS**

Bernstein, Shur, Sawyer &
   Nelson, PA
Cadwalader, Wickersham
   & Taft LLP
Foley Hoag LLP
Gibson, Dunn &
   Crutcher LLP
Greater Hartford Legal Aid
Goodwin Procter LLP
Jenner & Block
Justice in Aging
Kator, Parks &
   Wesler, PLLC
Kauffman Crozier LLP
Latham & Watkins LLP
Morgan, Lewis &
   Bockius LLP
O'Melveny & Myers LLP
Outten & Golden LLP
Paul, Weiss, Rifkind,
   Wharton & Garrison LLP
Pierce Atwood LLP
Ropes & Gray
Schmidt & Federico, PC
Sullivan & Worcester LLP
Wilmer Cutler Pickering
   Hale and Dorr LLP

**GLAD ANSWERS
VOLUNTEERS**

William Albinger
Bruce Bell
Sam Bock
Marjorie Charney
Alexa Cho
Caitlin Delehanty

Michael Dicaprio
Anthony Fleenor
Pat Freedman
Laura Frye
Myra Hindus
Roger Hooper
Nicole Kesner
Carol Kirchick
Patsy Leibensperger
Malavika Lobo
Debbie London
Jessie Lowell
Bob Mack
Aarthi Madadi
Juliana Mieles
Howard Muise
Han Park
Justin Pelletier
Sharon Pritchett
Julia Remotti
Cara Rotschafer
Michaela Santos
Karen Silver
Caitlin Simens
Charles Studen
Shen Tang
Henry Thomas
Sofia Tort
Jessi Whitby
Michael Wilson
Lorraine Wong
Ryan Wood
Sydney Wright
David Zhang
Joelle Zhu
Cris Zubizarreta

**INTERNS**

Hana Al-Henaid
Grace Arredondo
AJ Bolan
Portia Caruso
Eric Cheng
Ryley Copans
Courtney Copp
Kelcey Duggan
Grizel Flores
Andrew Hellman
Charlie Hunsinger
Clarice Johnson
Erik Laats
Cory Lamz
Emily Leen
Rachael Littlehale
Olivia Milne
Moriah Rodriguez
Michaela Santos
Lila Selle
Lindiwe Sibande
Marie Stephens

**VOLUNTEERS**

Michael Andrzejewski
Grace Arredondo
Michele Arroyo
Karina Berçan
Jen Brown
Robert Bryant
Bob Bryant
Gayara Bulathsinhalage
Emily Calbick
Mikayla Carignan
Jessica Carignan
Lindsay Child
Alexandra Cipolla
Alejandro Clark
Elsbeth Colson
Sherryl Drasin
Cara Durgin
Constance Fontanet
Joey Francoeur-Krzyzek
Alexa Frongillo
Ava Gallo
Ellen Goodman
David Gorin
Alice Gottesman
Taylor Grenga
Barbara Grindell
Tom Hay
Sarah Horn
Zach Honer
Sydney Hubbell
Julia Huesa
Kristen Hunsinger
Reva Kasman
Vanessa Larrieux
Aki Lin
Deborah London
Caroline Lucas
Shirley Márquez Dúlcey
Claire McDonell
Mark McNally
Cherai Mills
Melissa Munoz
Frances Murphy
Brody Nagy
Ina Neugebauer
Amy Nishman
Elizabeth O'Neill
Van Pham
Mary Potts
Julia Ratzlaff
Paulina Ruiz
Julia Ruiz Borys
Elijah Rumbaut
Karl Sanchez
Emily Saunders
Althea Smith
Eliza Sparkes
PJ Strachan
Jesse Strachman
Madison Summers

Kyle Thomas
Mike Thomas
Marisa Thomassie
Emmalee Todd
Jo Trigilio
Susan Trotz
Bobby Valentine
Ke Wang
Mason Weintraub
Marina Weisz
Randi Whitcomb
Amy Wong



GLAD thanks our generous major donors who transform the law through their leadership giving.

**$250,000–500,000**
Anonymous

**$100,000–249,999**
Anonymous
Gill Foundation
Evelyn & Walter Haas,
   Jr. Fund
H. van Ameringen
   Foundation

**$50,000–99,999**
The Aldrich Family
Arcus Foundation
Barr Foundation
Elton John AIDS
   Foundation
Gilead Sciences, Inc
Klarman Family
   Foundation
Krupp Family Foundation
Frank E. Payne and
   Seba B. Payne
   Foundation

**$25,000–49,999**
Anonymous
The Boston Foundation
Elyse Cherry
The Corners Fund
Cummings Foundation
The Herrman Family
Richard Moore &
   Matt Lafond
Partners Healthcare
   System, Inc.
Dianne R. Phillips &
   Evelyn C. Kaupp
Scott Penfrett &
   Scott Whittier

JA 3261

# Thank You

Alix Ritchie &
   Marty Davis
SheGives Inc.

**$10,000–24,999**
Anonymous (2)
Akamai
   Technologies, Inc.
Ronald M. Ansin &
   Jim Stork
Cameron Baird
   Foundation
Bruce W. Bastian
Adam Berger &
   Stephen Frank
BNY Mellon
Mr. Matt Damon
Dell EMC
Eastern Bank
Fidelity Investments
Douglas P. Fielderkorn &
   Andrew Hall
GE
Eric Green
Anne Guenzel &
   Frances Pieters
Esmond Harmsworth &
   Jerome Buet
David Hayter
Holland & Knight LLP
Ambassador
   James C. Hormel &
   Michael P. Nguyen
Jack Hornor & Ron Skrin
James E. Humphreys
Richard Iandoli, Esq.
Ralph & Janice James
Rev. David S. King
Charles &
   Rebecca Ledley
Jeanne Leszczynski &
   Diane DiCarlo
Jeffrey Levin &
   Andrew J. Goffe
Diane K. Lincoln
Macy's
Amy Mandel &
   Katina Rodis
Jeffrey H. Munger &
   Robert T. Whitman
Andrew S. &
   Samuel C. Pang, MD
Rhode Island Foundation
Daniel L. Romanow &
   B. A. Zelermyer
Ropes & Gray LLP
Samantha Rosman &
   David Rosman
Timothy Sabol &
   Judd Flesch
Evan Schwartz &
   Robert K. Fitterman
Lynnae Schwartz &
   Leslie K. Serchuck
Ted Snowdon &
   Duffy Violante

Anne Stanback &
   Charlotte Kinlock
State Street Bank &
   Trust Co.
Stickk.com, LLC
Cecilia Stone
TD Bank
Ian Tzeng
Scott Webster &
   Peter Black
Trina Soske &
   Sarah Yedinsky
Richard J. Yurko

**$5,000–9,999**
Anonymous (3)
5 Star Travel
American Heart
   Association
Sandy Anderson &
   Meg Wallace
Atwater Wealth
   Management
Ashley Banfield &
   Emily Drahzal
Beacon Hill Legal
Adrienne Benton
Biogen
Edward S.W. Boesel
Mary L. Bonauto &
   Jennifer Wriggins
Kraig V. Kissinger &
   Mark S. Brown
Gary Buseck
André L. Campagna &
   Gary H. Sherr
Steven Carlin &
   Michael Cormier
Amelia M. Charamba &
   Maralyn Wheeler
Choate Hall &
   Stewart LLP
Circle Surrogacy
A.M. Clark
Christine Coakley &
   Michelle O'Connell
Mark A. Cohen &
   Jerrold E. Hyman
Collora LLP
Rob Compton &
   David Wilson
Cooley LLP
Fred Csibi & Daniel Levin
Phyllis Dixon &
   Diana Rubin
DLA Piper
Lisa J. Drapkin &
   Debbie Lewis
Nannette Dumas
Foley Hoag LLP
David P. Gagne &
   Devan F. Dewey
Joseph Garland &
   Phillip Haines
Gonzalez & Associates PC
Goodwin Procter LLP

John D. Hancock &
   Jay Wood
Lindsay Harrison &
   Jonna Hamilton
Julia Fitz-Randolph
   Lesbian Innovations
   Fund at The Women's
   Foundation of CO
Deborah Heller &
   Ann Sanders
Highfields Capital
   Management LP
Philippe Hills
Jane A. Hiscock &
   Marijean Lauzier
Dean Hodge &
   Stavros Kissonerghis
Hogan Lovells
Nancy Horwitz
IBM
Jenner & Block, LLP
John Hancock
   Financial Services
Jones Day
Justice Resource Institute
Joyce Kauffman &
   Annie Weatherwax
Kauffman Law &
   Mediation
Kronos
Lesbian Equity
   Foundation
Karen Lichtenstein
Sharen Litwin
Locke Lord LLP
Matt Maguire
Harvey J. Makadon MD
Michael & Benjamin
   Manthei
Gwen Marcus &
   Nancy Alpert
Mintz Levin Cohn Ferris
   Glovsky & Popeo PC
Paul Moreno
Morgan, Lewis &
   Bockius LLP
Betty J. Morningstar &
   Jeanette Kruger
Nathaniel & Elizabeth P.
   Stevens Foundation
John B. Nay, Jr.
Nutter McClennen &
   Fish LLP
Patricia Peard &
   Alice Brock
Kirk Pessner & Russ Miller
James M. Pierce &
   Richard Cresswell
Carole & Richard Rifkind
Rockland Trust
Molly & Rebecca
   Shangraw
Sidley Austin LLP
Skadden Arps Slate
   Meagher & Flom LLP

Joseph Smith &
   Scott Popkowski
Mark D. Smith &
   John T. O'Keefe
Timothy D. Stein
Sullivan & Worcester LLP
Sun Life Financial
Tracy Vasile &
   Lori Nikolic-Vasile
Vertex Pharmaceuticals
David Weidner &
   William Gannon
Lisa B. Weissmann, MD &
   Debra Shapiro, MD
Wellington Management
   Company LLP
WilmerHale LLP
Wilson, Marino &
   Bonnevie PC
Sherry Wittenritz &
   Jean Frazier
Wolf Greenfield &
   Sacks PC
Janson Wu &
   Adam Levine

**$3,000–4,999**
Anonymous (2)
ADP, LLC
Mark Allen
Susan A. &
   Donald P. Babson
   Charitable Foundation
Mariterese Balthrop
Jane Barber &
   Linda Rohler
Kenneth Barr &
   Michael Fenter
The Baupost Group LLC
Baystate Financial
Beth Israel Deaconess
   Medical Center
Janis Bettencourt
Kathleen Biro &
   Julie Nave
Blue Cross Blue Shield
   of Massachusetts
Brianna Boggs &
   Sean D. Best
Boston Private Bank
Broadway Cares/Equity
   Fights AIDS
Edward Byrne &
   David Jiles, Jr
Joanne Cancro, DC &
   Charlene P. Allen
Bonnie Catena
Rich Coffman
Kimberly Cohen &
   Susanna Benn
Community Works
Laurie A. Costa &
   Kathy Schulman
DangerLaw, LLC
Liz Doherty &
   Elizabeth Roberts

Marc Elovitz
Willis Emmons &
   Zach Durant-Emmons
Peter J. Epstein Esq.
Heidi Erlacher &
   Christine Donahue
Nima & Kate Eshghi
Finnegan, Henderson,
   Farabow, Garrett &
   Dunner LLP
Fish & Richardson
Foley & Lardner LLP
Ralph Freidin
Virginia Gassel &
   Belen Trevino
Julie Goodridge
Goulston & Storrs
David Halstead &
   Jay Santos
Dean T. Hara
Harvard Law School
   Lambda
Harvard Pilgrim
   Health Care
   Foundation
Joanne Herman &
   Terry Fallon
Tracy & Matt Heverly
Hinckley Allen
Hirsch Roberts
   Weinstein LLP
Carolyn Hotchkiss &
   Katherine M. Cole
Hilary Jaffe
Kathy & John Kaufmann
Susan E. Kennedy &
   William Buffett
J.B. Kittredge, Jr. &
   Winand Van Eeghen
Barry Kostinsky &
   Charles Kelly
Lawson & Weitzen LLP
Mary K. Loeffelholz &
   Laura Green
LPL Financial
Kristin Marcus
Massachusetts
   General Hospital
Anita McLauchlan &
   Sarah Kaplan
Hirschel D. McGinnis, MD &
   David G. O'Dowd
Mead, Talerman &
   Costa, LLC
Rolando Medina
Kendra Moore
Kathy Mulvey &
   Patricia Lambert
Nixon Peabody LLP
Gregory Noonan
Northeastern University
   School of Law
Ranesh &
   Erik Ramanathan
Fred Ramos &
   Bob Starmer

The Residences at
   Seashore Point
Roberts & Sauer LLP
Sanofi Genzyme
Jack Sansolo &
   Dean Waller
Marlene Seltzer &
   Janice Ambrose
Paul Smith &
   Michael Dennis
Charles Steenburg
Caleb P. Stewart
Charles Richard Studen
Susman Godfrey, LLP
Linda Z. Swartz &
   Jessica W. Seaton
Lee Swislow &
   Denise McWilliams
Douglas Talhelm &
   Ashley Eaton
Steven & Rebecca Taylor
John & Kristine
   Van Amsterdam
Nancy Vogele
Edmund & Jane Walsh
Richard & Sally Weitzen
Wells Fargo
Gene Yoon &
   Amil Shah

**$1,500–2,999**
Anonymous (8)
Catherine M. Adler &
   Ellen Dehm
John Affuso
Gavin Alexander
Muath Alwari
Jonathan &
   Erin Anderman
John Argos &
   Robert G. Ross
David Aronstein &
   Steven Tamasy
Sydney Atkins
Jens Audenaert &
   Amol Shah
Paul & Edith Babson
   Foundation
Joseph P. Barri, Esq. &
   Randal A. Farrar
Paul Beaulieu
Robert D. Beck &
   Greg Van Boven
Bruce Bell &
   George Smart
James Bennette &
   David Cowan
Rhonda L. Berchuck &
   Kat Katrouzas
Robert Biddleman &
   Daniel Sullivan
Kristen Bokhan
Kelly M. Bonnevie, Esq. &
   Karen Kaufman
Mohan Boodram &
   Robert Morris

11

**JA 3262**

## Thank You

continued from page 11

Boston Marriott
  Copley Place
Boston University
  School of Law
Eva N. Boyce
Peter Brady &
  Alan Davis
Susan F. Brand, Esq. &
  Gail E. Horowitz, Esq.
Seth Brennan
David W. Briggs &
  John Benton
Jean-Phillip Brignol &
  Rohan Barrett
Peter Brox
Alex Bucci &
  Julia Wagner Bucci
Herbert Burtis
Darian M. Butcher
Greg Butler
Richard Carey
Dr. Paula G. Carmichael &
  Rev. Richelle Russell
J.W. Carney & Joy Rosen
Paul G. Cellupica &
  Jesse Liu
Chandler Center for
  the Arts, Inc
David P. Chicoine
Lindsey Cimochowski &
  Bradley Rufleth
Jennifer Collins &
  Gretchen Randall
David Colton &
  Hsein M. Khoo
Deanne Colwell &
  Denise Serrecchia
Elizabeth J. Coolidge &
  Elisabeth Sackton
Margaret J. Covert &
  Brian S. Eberman
Patience Crozier &
  Jessica R. Keimowitz
Stanley Cushing &
  Daniel Lyons
Pam Cyr & Joyce Holupka
Pamela Daniels &
  Belden Daniels
Jo Davis, MSW
Day Pitney LLP
Thomas De Young
Robert J. DeBenedictis &
  Donald Picard
Laura E. DeNardis &
  Deborah R. Smith
Andrew Devoogd &
  Nancy Griffiths
Kerry L. Dietz &
  Eva Schocken
Nancy Douttiel &
  Diane Willcox
Shane Dunn &
  Elizabeth Bernardi
Athena & Penn Edmonds
Betsy Ehrenberg &
  Beth Eisenberg

Meryl Epstein &
  Patricia Nuzzola
Will Evans, Esq
Kyle Faget &
  Tracy Brown
Diane M. Felicio PhD &
  Jan L. Donley
Marcy Feller &
  Gabby Hanna
Michael F. Fernon
First Parish Church
  of Brewster
Dwight Foley
Polly Franchot &
  Julie Smith
Benjamin Franklin &
  John Donnelly
Irene Gage & Susan Pierce
gc2b
Christiana N. Gianopulos
  & Paul Butler
Sterling Giles
Daniel A. Ginsburg &
  Laura A. Lechner
Laurie Glassman &
  Carla Bettano
Gail E. Goodearl
Richard Gosselin &
  Robb Johnson
Gordon Gottlieb &
  Rob Krikorian
Robert-Jay Green &
  Holden Lee
Dr. Lawrence L.
  Greenawal
Stanley N. Griffith &
  Ann E. Schauffler
Maria Grigoriadis
  Household
Paul Groipen &
  Todd Satterlee
Grossman
  Marketing Group
Holly Gunner &
  Anne Chalmers
Katherine Haffner
Robert H. Hale &
  William G. Church
Harry & John Harkins
Jonas Harrington
Ann Hartstein &
  Dr. Cathy Stern
Timothy Harwood
George Hastie &
  Quinn Kian
Dr. Catherine A. Hay &
  Kristine Clerkin
Eliza Hewat &
  Susan Weinberg
Kathryn Livelli &
  Wendy Hinden
Kenneth Hirschkind
Sarah Hodges
Terry & Todd Holzman
John Hopper
Matthew Horan

Horizons Foundation
G. Lee &
  Diana Humphrey
Frances Hutchins &
  Laura Kalba
Michael J. Izdepski &
  James Couchon
Elizabeth C. Janeway &
  Sen. Harold Janeway
Suriya Jeyadalan, MD &
  Cora Jeyadame
Arthur Kaplan &
  Duane Perry
Peter Kassel &
  Thomas Tostengard
Wendy Kirchick
Brad & Flint
  Kleinerman-Gehre
Martin Koski &
  James Fitzgerald
Kotin, Crabtree & Strong
G. Paul Kowal
Michael Kramer
Karen Kruskal &
  Sheera Strick
Stewart J. Landers, Esq.
Jacqueline Lapidus
Claire Laporte
Chuck Latovich
Joan A. Lenane &
  Sally A. Rose
Michele Lenke &
  Rachel Goldman
Shari & Robert Levitan
Mike Lew &
  Thomas Harrigan
Marie A. Longo &
  Allison F. Bauer
Maria Lopez &
  Stephen Mindich
Loughlin FitzGerald, PC
Chelsea Loughran
Kenneth Lowry &
  John Lynah
Paul E. Lynch, MD &
  John Pitfield
Keith J. MacDonald &
  Thomas P. Webber
Tony Maida &
  Anthony Volpe
Sara Malconian &
  Katherine Truscott
Seth Marnin
James Mattus &
  Trevor Fulmer
Marc Maxwell
Kenneth H. Mayer, MD
Richard D. McCarthy &
  Franc Castro
Anne McClintock
Siobhan McMahon &
  Philip Holland
Matthew McTygue &
  Todd Rivers
Judith Miles, Esq. &
  Renata Sos

David Mills
Jessica Mink
Frank C. Mockler &
  Stephen J. Griffin
Elizabeth &
  William Monnin-Browder
Marianne Monte &
  Lisa Carcieri
John Morrel
John Morrill
Christine Nickerson &
  Inga Bernstein
Jodi Nofsinger
Mark E. Ojakian &
  Jason Veretto
Deborah Olszewski
Open Society
  Foundations
Patricia Opsoyan &
  Tamar Hosansky
Rosemary Palladino &
  Marianne Brennick
Patterson Belknap Webb
  & Tyler LLP
Larry Petrovich &
  Robert Fogel
W. Glen Pierson &
  Charles P. Reed
Luke Platzer
David J. &
  Nancy Poorvu
Jose F. Portuondo &
  Maria L. Wilson-
  Portuondo
Ellen M. Poss, MD
Stephen R. Powell &
  Ronald McClelland
Provincetown Bears
Oliver Radford &
  Stephen C. Perry
Caroline Raisler
Brian Ramos
Catherine Reuben
Brian P. Rice &
  Jason D. Kelliher
Sharon L. Rich &
  Nancy L. Reed
Matthew Riemer &
  Leighton Brown
Craig Robbins &
  Eric Huang
Carol Rosensweig, Esq. &
  Charlene D. Grant
Richard Rubinstein
Jess & Robbie Samuels
Jane L. Scarborough, Esq.
  & Louise Wylan
Timothy Schofield &
  Stephen Chan
Johanna Schulman &
  Moira S. Barrett
Jocelyn M. Sedney &
  Holly A. Williams
Bradley Seeman
Linda Serafini &
  Cathy Welsh

Mark Serchuck
Robert Sessions
Mark Sexton &
  Kirk Wallace Fund of
  Stonewall Community
  Foundation
Matthew Shakespeare &
  Fritz Backus
Sherin and Lodgen LLP
John A. Shope &
  Stephen Sampang
Robin Shore &
  Laura Moskowitz
Bryan-Eric Simmons &
  Ralph Vetters
Joseph W. Singer &
  Martha Minow
SKDKnickerbocker
Julia Slee &
  Beth Grierson
Clifford Sloan &
  Mary Lou Hartman
Mary Grace Smith
Marc Solomon &
  Daniel Barrett
Andrew Sorbo
Scott Squillace, Esq.
John F. Stafstrom, Jr. &
  Dennis C. Murphy
Randall Steere
Stonewall Community
  Foundation
Sullivan Bille, PC
Ed Suplee &
  Matt Barrett
Suzanne Sylvester
Susan Symonds &
  Annie Landry
Tracy Talbot
Kevin A. Tedeschi
Mark R. Thall, MD &
  Tom Slavin
Martha J. Thurber &
  Dena G. Willmore
Karen Tirozzi &
  Danielle Pease
Christopher Transue &
  Adrienne Shapiro
Jonathan "Dutch" Treat
Mark & Wellner Tremallo
Thomas G. J.
  Trykowski, AIA
  & Joseph Cacciola
Geoffrey W. Tuba
United Parish of
  Auburndale
United Way of
  Rhode Island
Christopher Valente
Rich Van Loan
Anthony Viola &
  Michael Hershey
Ellen Wade, Esq. &
  Maureen Brodoff, Esq.
Wade Horowitz
  LaPointe LLC

O'Hanlan-Walker LGBT
  Equality Fund
Francis C. Ward
John P. Ward, Esq. &
  Alain Balseiro
Shana Weaver
Jeffrey Webb &
  Mark Schuster
Geoffrey Weber
Arthur E. Webster, Esq.
Don Cornuet &
  Steve Weiner
Katherine &
  Kimberly Weir
Nicholas Whalen
Mary White
Jo Ann Whitehead &
  Bette Jo Green
Susan Wilson, Esq. &
  Laura Kanter
Evan Wolfson & Cheng He
Rodney L. Yoder &
  Michael J. Piore
Mark R. Young &
  Gary Sullivan
Elizabeth A. Zeldin, Esq.
  & Polly Grant
Dana Zircher

*as of 11/27/17*

**Legacy Society**

Anonymous (3)
Carol Alms
Amy Aulwes &
  Warren Zola
Michael Baeder &
  David Wimberly
Sharyn Bahn
Gloria & Linda
  Bailey-Davies
Dawn Baumer &
  Rosie Hartzler
Bruce Bell &
  George Smart
Linda Betzer
Dr. Stephen Boswell &
  John Neale
Eva N. Boyce
Peter Brady & Alan Davis
Shelley Brauer &
  Jean Hey
Ann M. Briley, MD
Bill Brindamour &
  Peter Tognalli
David Brown
The Estate of Larry Brown
Dr. Paula G. Carmichael &
  Rev. Richelle Russell
The Estate of
  Leslie H. Carter
The Estate of Esther Carty
David Cash
Patience Crozier &
  Jessica R. Keimowitz

12

## Thank You

The Estate of Pam Dennis
Laura Diamond &
  Carolyn McDonald
Abby & Mary
  Diamond-Kissiday
Lisa J. Drapkin &
  Debbie Lewis
Nannette Dumas
Peter J. Epstein Esq.
In memory of Eli J.,
  Ada R. & Linda
  M. Ersken
Suzanne Estler
Adam Feinberg
Robert Flavell &
  Ronald Baker
David F. Freedman
John Giso
Gail E. Goodearl &
  Sarah Jane Guy
Holly Gunner &
  Anne Chalmers
Dean T. Hara
Harry Harkins
Christopher Hartley &
  Micah Buis
J. Bourge Hathaway &
  Julia Fitz-Randolph
Warren Hathaway
Deborah Heller &
  Ann Sanders
Joanne Herman
Gavin Hilgemeier
Joan Hilty
Kenneth Hirschkind
Leslie Horst
Claire E. Humphrey
James E. Humphreys
Rabbi Devorah Jacobson
  & Ms. Margaret Mastrangelo
Barbara Jordan
Susan Judge
John Kane
Terence Keane &
  Douglas Hughes
Rudy Kikel & Sterling Giles
Robert King & Gary Jordan
G. Paul Kowal
R.P. André LaCroix
Karen Lichtenstein
Arthur Lipkin &
  Robert Ellsworth
The Estate of
  Kay Longcope
Marie A. Longo
Tony Maida &
  Anthony Volpe
David Martin &
  The Rev. Steve Godbey
Daniel Mauk &
  Mitchell Sendrowitz
Marc Maxwell
Richard D. McCarthy
Laura McMurry
Brian McNaught &
  Raymond Struble

The Estate of
  Russell Miller
Robert Minnocci
Paul Moreno &
  Stephen Barlow
Jeffrey H. Munger &
  Robert T. Whitman
The Estate of
  Vincent Nardone
Andrew S. &
  Samuel C. Pang, MD
Trevor Paulson
Patricia Peard &
  Alice Brock
Janet F. Peck &
  Carol A. Conklin
Estate of Jalna Perry, MD
Mark Philibert &
  David Rooks
Scott Pomfret &
  Scott Whittier
Brian Quint
Nick & Sian Robertson
Richard Rubinstein
Takoma Sampson &
  Leah Whaley-Holmes
Jess & Robbie Samuels
Arnold Sapenter &
  Joseph Reed
Mary & Jean B. Sevarese
The Estate of Joan Schneider
Robert Seletsky & Michael Miller
Joanne Shapiro
The Estate of Cameron Smith
Diane Smith
Tony Smith
Andrew Sorbo
Trina Soske & Sarah Yedinsky
Scott Squillace, Esq.
Anne Stanback &
  Charlotte Kinlock
Kenneth Stilwell
Donald Stone
Mark Strickland
The Estate of Raymond Sullivan
Amalie Tuffin & Laura Lewis
Anthony Volponi
Herbert Walcoe
Karen &
  Marilyn Watson-Etsell
Kendall Watts
Lisa B. Weissmann, MD &
  Debra Shapiro, MD
Tim Wernette
Jo Ann Whitehead &
  Bette Jo Green
The Roy Glenn Wood Trust
David Yalen
Peter Zupcofska &
  Robert Wilson

## The Pop-Up Transgender ID Project

*A project of GLAD, Ropes & Gray LLP and MTPC, the Pop-Up Transgender ID Project supports transgender people across New England in acquiring accurate identity documentation.*

Immediately following the 2016 presidential election, GLAD partnered with law firm Ropes & Gray LLP and the Massachusetts Transgender Political Coalition to launch the Pop-Up Transgender ID Project, a rapid response clinic that provides legal support to transgender people in New England needing to update their legal name or gender marker on documentation like Social Security cards and birth certificates.

Thanks to Ropes & Gray's steadfast support of this project, we've assisted over 450 people throughout New England. The recruitment of hundreds of attorneys and staff, and the ongoing training and information sharing Ropes & Gray provides them not only sustains the Pop-Up Transgender ID Project but ensures clients have a positive experience every step of the way.

**Thank you, Ropes & Gray, for your commitment to New England's transgender community!**

*I sought the help of the Pop-Up Transgender ID clinic when I needed to update my name on my Social Security card. The attorneys at Ropes & Gray were so supportive and respectful. It was comforting to know that they were there for me, from start to finish. – LB, Boston*

If you'd like to contact the Pop-Up Transgender ID Project, visit www.glad.org/id



13

**JA 3264**

## A Message From the CFO

GLAD's financial health is strong. We have about seven months of reserves, or net assets, as of March 31, 2017 including board designated funds. There is minimal debt and sufficient cash to meet our obligations.

In the first half of FY17, we were pleasantly surprised that event revenue exceeded expectations, with our most successful Summer Party and Spirit of Justice events ever. We also welcomed new foundation funding. By the end of October 2016, we were ahead of year-to-date revenue expectations.

And then, the November 8 election changed all our assumptions. We experienced a swell of new and increased contributions. For example, we raised almost $700,000 in December, which was well above our average of $400,000. The number of gifts in December also increased from an average of 800, to almost 1,200. We saw many significant first-time gifts from both individual donors and foundations. While the election was the trigger, none of this support would have been possible without the strong reputation that GLAD enjoys as a strategic leader in the LGBTQ legal movement.

We ended FY17 in March 2017 with a surplus of $367,526 *(see table below)*. With this extra revenue, and the expectation that new fundraising opportunities will continue, the approved budget for FY18 grows GLAD as an organization in both staff and non-staff resources, to help us meet the increased demands of this new Administration. It does so through a combination of reserve spending and a focused fundraising campaign. Read more about the One Justice Fund—a campaign to grow GLAD's legal capacity—*on page 9*.

| | Operating Fund | Board Designated | Total Unrestricted | Temporarily Restricted | Total |
|---|---|---|---|---|---|
| **Net Assets: March 31, 2016** | $  945,628 | $  574,838 | $  1,520,466 | $  418,379 | $  **1,938,845** |
| FY17: Change in Net Assets | 423,766 | (50,717) | 373,049 | (5,523) | **367,526** |
| FY: Board Approved Transfer | (425,000) | 425,000 | – | – | – |
| **Net Assets: March 31, 2017** | $  944,394 | $  949,121 | $  1,893,515 | $  412,856 | $  **2,306,371** |

**Based on the table above, a couple of things to note:**
• Temporarily restricted funds are cash gifts and pledges restricted by the donor for a particular purpose or timeframe. The net reduction of $5,523 means we are spending down our backlog of restricted money and complying with the donors' intent. These funds are available to GLAD in FY18 and subsequent years.
• The board voted to move all of the FY17 surplus into the board designated fund. The FY18 budget includes expenditures for strategic initiatives totaling $253,000 and for subsequent years we anticipate spending an additional $295,000 to increase our legal staff, strengthen development capacity, and pay for increased operating costs, including a March 2018 office relocation.

**Other highlights and trends:**
• During fiscal year 2017, GLAD received donated legal services of $4,008,303. These were unusually high, as a result of the new challenges presented by the new Presidential Administration and a reinvigorated religious opposition. Almost 75% of the donated services supported the Transgender Rights Project I.D. clinic and related impact litigation including in schools and prisons. The remaining 25% assisted GLAD in thwarting attempts to undermine non-discrimination protections and marriage equality. Please refer to the audit footnotes available at www.glad.org/financial-information/ for more details.
• At March 31, 2017, the market value of the investment portfolio was $1.3m. The Finance & Audit Committee monitors investment results, risk tolerance and asset mix in accordance with our cash & investment policy. There has been a recent trend to slowly and responsibly raise the cash and short term bond positions.

We remain committed to excellence and will carefully monitor our financial results with an eye to the future.

Thank you for investing in GLAD. ◼

Eva N. Boyce
Chief Financial Officer
December 2017

14

# Summarized Financial Data
## for Annual Report

## Statement of Activities*

For the 12 month period ended March 31, 2017 — **FY17**

**Support and Revenue**

| | | |
|---|---|---:|
| Contributions & Grants | $ | 2,399,981 |
| Special events revenue, net | | 783,005 |
| Fees & program revenue | | 280,501 |
| Other income | | 42,565 |
| **Operating Income** | | **3,506,052** |
| Donated Services (In-kind Legal Fees) | | 4,008,303 |
| **Total Support & Revenue** | | **7,514,355** |

**Expenses**

| | |
|---|---:|
| Transgender Rights Project | 3,410,510 |
| Civil Rights Project | 2,100,261 |
| AIDS Law Project | 293,496 |
| Public Affairs & Education | 580,541 |
| Development & Fundraising | 423,974 |
| General & Administrative | 330,492 |
| **Total Expenses** | **7,139,274** |
| **Change in Net Assets from Operations** | **375,081** |

**Other Revenue (Expenses)**

| | |
|---|---:|
| Investment income | 9,468 |
| Net realized & unrealized gain (losses) | 16,710 |
| Spending policy transfer | (33,733) |
| **Total Change in Net Assets** | **367,526** |
| **Net Assets, beginning of year** | 1,938,845 |
| **Net Assets, end of year** | **$ 2,306,371** |

## Statement of Financial Position*

March 31, 2017 — **FY17**

**Assets**

| | |
|---|---:|
| Cash & cash equivalents | $660,006 |
| Accounts receivable & pledges | 444,388 |
| Investments | 1,333,641 |
| Equipment, deposits & prepaid expenses | 206,754 |
| **Total Assets** | **$ 2,644,789** |

**Liabilities**

| | |
|---|---:|
| Accounts payable & accrued expenses | $ 292,411 |
| Deferred rent | 46,007 |
| **Total Liabilities** | **338,418** |

**Net Assets**

| | |
|---|---:|
| Operating | 944,394 |
| Board Designated | 949,121 |
| Temporarily Restricted | 412,856 |
| **Total Net Assets** | **2,306,371** |
| **Total Liabilities & Net Assets** | **$ 2,644,789** |

## Program Spending: FY17



Transgender Rights Project 53%
Civil Rights Project 33%
AIDS Law Project 5%
Public Affairs & Education 9%

## Cost Categories: FY17



Non Personnel 14%
Personnel 30%
In-Kind Legal Fees 56%

15

\* Full audit available at www.glad.org/financial-information/

JA 3266

# Legal Update



**Keeping Families Together: In Re D.**
LGBTQ elders, particularly LGBTQ elders of color, face distinct barriers to resources that impact their health and wellbeing, economic security, and social connections. GLAD is representing B, a 73 year old Massachusetts woman, in her effort to be reunited with her spouse, D, 89, after guardianship of D was incorrectly assigned to D's nephew in Mississippi. B and D have been together for nearly thirty years and legally married in March 2017. After D was diagnosed with dementia-like symptoms, her nephew took D to Mississippi, where he lives, and secured guardianship and conservatorship of her—without telling the court about her marriage and her spouse in Massachusetts. GLAD is working to obtain access to critical medical information, assess D's current needs, and transfer guardianship to Massachusetts.

GLAD is hopeful that D will be able to return to Massachusetts, where she will once again be surrounded by the family and friends she knows and loves. We are grateful to co-counsel Mary Schmidt in Massachusetts and Dianne Ellis in Mississippi for their support in helping reunite B and D.

**Pelletier v. Executive Office of Health and Human Services, et al., Massachusetts Superior Court**
GLAD and Health Law Advocates are challenging a denial of medically necessary facial feminization surgery for a transgender woman by MassHealth, the state Medicaid agency. Following a diagnosis of severe gender dysphoria, our client's doctors prescribed a course of medical treatment to allow her to live in her affirmed gender, including facial feminization surgery. Our client's insurer, MassHealth, refused to provide coverage for the surgery, claiming that facial feminization is categorically excluded in every instance. We filed suit in Suffolk Superior Court in September 2017, arguing that this is an improper interpretation of MassHealth regulations on health care for transgender people, which require a case-by-case determination—based on presented medical evidence and physician assessments—of whether facial feminization surgery is medically necessary to treat a particular individual's gender dysphoria.

**Rivera v. Springfield Rescue Mission**
In January 2017, GLAD filed a complaint with the Massachusetts Commission Against Discrimination on behalf of our client, Lynn Rivera, who was discriminated against by a religiously affiliated place of business based on their gender identity, sex, and race in violation of Massachusetts Public Accommodation Laws. In the fall of 2016, Lynn, who is of Puerto Rican descent and identifies as transgender, tried to shop at the Give-Away Center, a distribution center in Springfield open to the public that provides items like clothing and toiletries to those in need. Because Lynn exclusively wears men's clothing, Lynn intended to shop only for men's clothing items at the Give-Away Center. But when Lynn began shopping for clothing, an employee loudly told Lynn

that "only men were allowed in the men's section" and "only women were allowed in the women's section." This employee later said that because Lynn's identification said female, Lynn could not take any clothing from the men's section. The business, Springfield Rescue Mission, moved to dismiss the case by arguing their religious character exempted them from coverage under the Massachusetts Public Accommodation Law. GLAD has since submitted an opposition to their motion to dismiss and a rebuttal to Springfield Rescue Mission's position statement.

**Commonwealth v. a Juvenile "LN"**
GLAD, along with the ACLU of Massachusetts, filed an amicus brief in this case at the Supreme Judicial Court exploring the question of whether the Massachusetts statutory rape law can properly be applied to consensual conduct between two individuals under the age of sixteen. Beyond legal arguments that the statute should not apply to children under sixteen as perpetrators, we submit that criminalizing consensual sexual activity between two individuals under the age of sixteen hinders honest communication between young people and parents, health care providers, school personnel, and other sources of support about their sexual feelings and conduct, and interferes with a positive identity and regard for one's sexuality that experts agree is critical to avoiding risky behavior. We also argue that criminalization of consensual activity between young people under the age of sixteen is particularly harmful to LGBTQ youth who already experience a range of harmful outcomes due to the societal stigma associated with LGBTQ identity and sexual behavior. The message of deviance conveyed by the criminal law reflects, reinforces and amplifies this stigma, which results in higher rates of suicidality, depression, drug use and sexually transmitted infections among LGBTQ youth. We argue that the statute should not be interpreted to apply to two young people under sixteen because the Legislature could not have intended to harm the youth the statute intended to protect.

**Title VII and The Courts: Zarda v. Altitude Express**
GLAD submitted an amicus brief in this case before the U.S. Court of Appeals for the Second Circuit in which a plaintiff brought a discrimination claim under Title VII, charging that he was fired for being gay. The Second Circuit granted en banc review and, in so doing, specifically invited amicus briefs addressing the question of whether Title VII—our federal law that protects against discrimination in employment—prohibits sexual orientation discrimination. GLAD and others have long made the clear, common sense case that both gender identity and sexual orientation are protected under the law's prohibition of discrimination "because of sex." Last year the US Court of Appeals for the Seventh Circuit issued a watershed ruling that Title VII does prohibit sexual orientation discrimination, and we hope to see the Second Circuit Court of Appeals do the same.

**Masterpiece Cakeshop v. Colorado Civil Rights Commission**
On December 5, the U.S. Supreme Court heard oral arguments in this case involving a gay couple who were refused service by a public business based on religious objections to their marriage. David and

16

Charlie filed a complaint with the Colorado Civil Rights Commission, which found that the bakery had violated Colorado nondiscrimination law requiring businesses to provide the same services to LGBTQ people that they provide to others. The outcome of this case could either preserve hard won protections in local, state and federal antidiscrimination laws, or allow them to be overridden by religious and moral objections. In October, GLAD and NCLR, assisted by Pierce Atwood, LLP, filed one of about forty friend-of-the-court briefs in support of David and Charlie, arguing that a constitutionally-compelled exception to antidiscrimination laws would impose serious harms on LGBT people, other historically marginalized groups, and our broader society.

### *Pidgeon v. Turner*
The U.S. Supreme Court denied a petition for review of *Pidgeon v. Turner*, a case moving through the Texas courts concerning the question of whether the *Obergefell* marriage decision requires the equal provision of benefits to same-sex spouses of municipal employees (in this case, the City of Houston) as to different-sex spouses. GLAD and NCLR submitted an amicus brief supporting the request for Supreme Court review following a June Texas State Supreme Court ruling that sent the case back to the trial court rather than settle the matter directly. This case is not over, and we hope and expect the Texas trial court, on remand, will uphold spousal benefits for employees married to a person of the same sex, as *Obergefell* and common sense require.

### Transgender Youth: School Bullying and Harassment

### Rhode Island
GLAD filed a complaint with the Office of Civil Rights on behalf of a nine-year-old Rhode Island transgender girl, H.H., who experienced pervasive physical and sexual harassment by her peers at her elementary school—including a sexual assault on the school bus— because of her gender expression. The student's family reported the harassment to the principal and H.H.'s teachers when the bullying and abuse began, but the school failed to take reasonable measures to end the harassment, even assigning H.H. a seat in her classroom next to a student who was her primary harasser and sexually assaulted her on the bus. Our complaint on behalf of the family states that the school violated Title IX through their deliberate indifference to the pervasive harassment and by failing to create a safe and welcoming environment for H.H.

### Massachusetts
• We are working with a school district in Massachusetts to develop an inclusive and affirming athletics policy to make athletic spaces safer for transgender students. We became involved after we learned that a talented high school athlete experienced pervasive discrimination by his lacrosse team based on his gender identity. Despite being informed that the student had transitioned over the summer, the athletics director, coach and team captains hadn't proactively taken steps to ensure he would be welcomed when he joined his teammates in the fall. The team environment deteriorated into an unsafe place for him and the environment became so hostile, the student was forced to leave the team and stop playing sports at his school.

• *Cormier v. City of Lynn*
GLAD submitted an amicus letter to the Massachusetts Supreme Judicial Court in this bullying case involving very serious injury to a fourth-grade student while on school property. The student had been bullied for years because of his physical appearance, and sustained the injury after being pushed down a flight of stairs at school by a known bully.

The issue in the case is when the school district and the city should be immune from liability and, conversely, what should trigger the possibility of liability.

Our letter discusses bullying as a pervasive problem in schools, particularly for vulnerable populations such as LGBTQ youth, and cites Massachusetts' bullying law that was enacted to protect students. The law notes that certain students are likely to be more vulnerable to bullying based upon actual or perceived characteristics including sexual orientation, gender identity or expression, and physical appearance. GLAD argues that a decision in this case in favor of the school district would undermine efforts to protect young people from bullying.

### Comprehensive Criminal Justice Reform in Massachusetts
LGBTQ youth, particularly LGBTQ youth of color, are overrepresented in the juvenile justice system due to stereotypes, pervasive stigma, bias, and other structural factors. Family rejection, unsupportive schools and discriminatory policing practices contribute to increased interactions between LGBTQ youth and the juvenile and criminal justice systems. LGBTQ adults, too, are disproportionately vulnerable to discrimination when interacting with the criminal justice system.

GLAD is working in several coalitions to push legislative action for criminal justice reform. Through legislative action, GLAD hopes the Massachusetts Legislature will make major reforms to the criminal justice system that will, for example, reduce the involvement of youth and adults in the criminal justice system, lower the threshold for expungement of juvenile records so that such records do not follow youth for the rest of their lives, and reform the inhumane practice of solitary confinement on both youth and adults who are incarcerated. Our efforts gained momentum last session, with the House and Senate passing major criminal justice reform bills and including some of the coalitions' key amendments, such as expungement of some juvenile records and restrictions on the use of solitary confinement.

### Transgender Equality Across New England
GLAD is leading two critical movements to advance and protect transgender equality in state law. GLAD and our partners in Freedom for All New Hampshire are working hard to pass House Bill 1319, which would add gender identity to the state's non-discrimination law. New Hampshire is the last state in New England to have no explicit protections for transgender people, and this bipartisan effort will be a model for the nation.

In Massachusetts, opponents of equality have put repealing our hard-won transgender public accommodations protections on the 2018 ballot. This November, Massachusetts voters will have the chance to show the nation that they support transgender equality. GLAD is a leading member of Freedom for All Massachusetts, the bipartisan coalition working to ensure Massachusetts upholds fairness and equality for all.

17

JA 3268

## Advocating for LGBTQ Youth in the Juvenile Justice System
continued from page 5

Our clients and their peers are remarkably resilient in spite of Long Creek's harmful environment, thanks in notable part to the support of local organization Portland Outright and its Executive Director Osgood.

Operating in Portland since the 1990s, Portland Outright is a youth-driven program that supports underserved LGBTQ+ youth through ongoing mentorship, social events and trainings, as well as intentional support to youth navigating systems, such as the foster care system, homelessness, mental health services, and the juvenile justice system, including Long Creek.

"At the core of Portland Outright has always been young people mobilizing other young people to be at the table about decisions being made in their own lives, supported by a network of adult mentors," says Osgood.

About five years ago, the organization started focusing on mobilizing low-income LGBTQ young people around gender and racial and economic justice, which drove their work in homeless shelters, residential treatment centers, and eventually Long Creek.

"We'd been working a lot with low-income folks and folks experiencing homelessness," Osgood says. "One of the things we were hearing was that a lot of them were coming into contact with the juvenile justice system, either going in and out of Long Creek or leaving Long Creek and going straight into homelessness or into residential treatment that was creating further harm."

> **"[The assesment on Long Creek] confirms what we already know: prisons do not work for youth."**
>
> – GLAD Civil Rights Project Director Mary L. Bonauto

To support the LGBTQ youth incarcerated in Long Creek, Portland Outright (www.portlandoutright.com) created Sexuality and Gender Awareness For Everyone (SAFE) Group, a space inside Long Creek where "young people can talk to each other and organize or create the kinds of connections that help them survive the day-to-day while also creating a vision for a more just system for community-based alternatives to incarceration," Osgood says. "They talk about the conditions of incarceration but also the systems that are funneling LGBTQ young people into incarceration—the school to prison pipeline, the mental health system, lack of healthcare, homelessness."

Portland Outright has also collaborated with Maine Inside Out (www.maineinsideout.org), an organization that uses original theater inside and outside correctional facilities to initiate dialogue and build community across boundaries. A new collaboration between the two organizations involves opportunities to create visual art pieces made by incarcerated LGBTQ youth. An installation of that visual work is part of "Love Is: Alternatives to Incarceration," a showcase of theater, film, and visual art. The body of work is a catalyst for young people and the outside community "to have conversations about their vision of justice and of the communities they want to live in," says Osgood.

We are proud to collaborate with Portland Outright and Maine Inside Out to empower and advocate for and with youth and to find solutions for systemic change.

"Getting to know our youth clients over the past year has been a privilege," says Crozier. "Their strength and resilience in the face of inhumane conditions is inspiring. And, witnessing how community organizations like Portland Outright and Maine Inside Out have supported their voices and empowerment reminds me of how important it is to fight to keep hope, and that we can change the systems that care for our youth."

"Partnering with GLAD has been like coming home to our community in lots of ways," says Osgood. "To have folks with a legal lens, who show up consistently for our members and are willing to do the community building, as well as the advocacy work, has really been a gift for the movement that we're building."

And we are making progress. Earlier this year, one of our clients was released early to after-care. Another of our clients still inside has become a resident leader and has a treatment program that better meets his needs. Our clients contributed their stories and voices in a federal audit process that led to the facility failing to meet federal standards and having to undergo policy and training changes. Maine's Department of Corrections is in the process of updating their transgender and intersex policy based on our recommendations and continued advocacy.

Last December, an expert assessment on Long Creek authorized by the Maine Juvenile Justice Advisory Group was released, highlighting problems at Long Creek and providing a roadmap of recommendations for addressing concerns GLAD has raised over the past year. We are working with Portland Outright, Maine Inside Out, and others on the ground in Long Creek, to push for immediate and dramatic changes, such as:

- Releasing the 25-50% of youth currently at Long Creek who, according to the assessment, should not be there.
- Correcting the serious safety concerns of the youth in Long Creek.
- Developing policy and training about LGBTQ youth.
- Increasing resources and accountability from the State for funding community-based alternatives to incarceration, such as residential facilities and family and community support services.

"This report confirms what we already know: prisons do not work for youth," says Bonauto. "We expect the committed leadership of Long Creek and staff and supervisors to seize this opportunity to take a hard and urgent look at rebuilding the medical and mental health services youth need based on research and experiences that work well elsewhere."

There is much work to be done, in and outside of Long Creek. But the courageous youth determined to change their futures give us hope. GLAD will keep fighting for them, will keep supporting their self-advocacy to send the message that LGBTQ youth, like all youth, deserve to be safe, welcomed, and loved for who they are. ■

18

# Welcome New Staff

**Khari Charles, Community Engagement Manager**
Khari joined GLAD in January 2018, bringing to the organization deep community connections and experience in local and national organizing, including with the National LGBTQ/HIV Criminal Justice Working Group, The MA Against Solitary Confinement Coalition (MASC), and Black & Pink. Khari is Chairperson on the National Black Leadership Coalition, and the founder of Queeri, an organization aimed at bridging the gaps between intersections of race, class, gender, sexual identity and orientation.

**Tessa Holtzman, Legal Assistant**
Tessa joined GLAD in June 2017 after graduating from Bates College with a B.A. in Institutional Politics and a minor in Spanish. While at Bates, Tessa interned with the ACLU where she researched the barriers experienced by survivors of domestic violence who were applying for U.S. visas. She also interned with U.S. Senator Martin Heinrich where she worked to help draft information-technology legislation to serve Native American communities. Tessa is excited to be starting her career in public policy and legal advocacy at GLAD.

**Rianna Johnson-Levy, Legal Assistant**
Rianna joined GLAD in October 2017 after graduating from Yale University with a B.A. in African American Studies and Women's, Gender, and Sexuality Studies. Rianna previously interned with the ACLU's LGBT & HIV Project. She also interned with Lambda Legal, working with their Youth in Out-of-Home Care Project, researching the disproportionate contact LGBTQ youth of color have with the juvenile justice system.

**Chris Rainville, Events Manager**
Prior to joining GLAD in November 2017, Chris was the Manager of Production for Special Events and Communications at Columbia University Medical Center in the Office of Development in New York City. His previous work includes staffing the Children's Museum of the Arts as a Teaching Artist, and freelancing as a film producer in the New York City area. Chris earned a B.A. in Film & TV Production as well as a Certificate of Meeting and Conference Management from New York University.

# 36th Annual Summer Party

Honoring Jeanne Leszczynski & Diane DiCarlo for their dedication and work on behalf of LGBTQ justice    July 29, 2017



David Wilson, Sally Deane and Anderson Clark

Board members Fred Csibi and Francisco Cabas with TJ Rivetti

Morgan Wentworth and Corri Hale

19



Honorees Jeanne Leszczynski and Diane DiCarlo

Joanna Hamilton and Lindsay Harrison

GLAD Executive Director Janson Wu with Leila Eshghi and Kate Clinton

Photos: InfinityPortraitDesign.com



POSTAGE
INFO

30 Winter Street, STE 800, Boston, MA 02108

**Save** the Date



37th ANNUAL
**SUMMER PARTY**

**Saturday | July 28**
**Pilgrim Monument &**
**Provincetown Museum**

www.glad.org/events



19th Annual
**Spirit of Justice Award**
**Dinner**

**Friday | October 12**
**Boston Marriott**
**Copley Place**

www.glad.org/events

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

     *Plaintiff*,

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

     *Defendants*.

Civil Case No.: 1:25-cv-01107
Judge Loren L. AliKhan

## ORDER

Upon consideration of Plaintiff's Consent Motion to Adopt Streamlined Procedures in the Event of an Amended Complaint, ECF No. 175, it is hereby

**ORDERED** that Plaintiff's Consent Motion to Adopt Streamlined Procedures in the Event of an Amended Complaint, ECF No. 175, is **GRANTED**; it is further

**ORDERED** that, if Plaintiff files by May 9, 2025, an amended complaint adding as named defendants additional federal entities subject to Executive Order 14263, *Addressing Risks From Susman Godfrey*, as well as the head officers of those entities (the "Amended Complaint"), Plaintiff shall file a new motion for summary judgment and declaratory and permanent injunctive relief, and Defendants shall file a new motion to dismiss the amended complaint (the "New Motions") by 5:00 p.m. on Monday, May 12, 2025. Plaintiff shall also file a new proposed order to reflect the addition of the new defendants in the Amended Complaint. It is further

**ORDERED** that the parties shall not submit new briefing in support of, in opposition to, or in reply to the New Motions. Instead, the parties' prior briefing (including accompanying declarations and exhibits) directed to Plaintiff's Motion for Summary Judgment and Declaratory and Permanent Injunctive Relief, ECF No. 51, and Defendants' Motion to Dismiss, ECF No. 58,

1

(the "Existing Briefs") shall apply to the New Motions without the need for renewed briefing.  The parties' arguments (including accompanying declarations and exhibits) set forth in their respective Existing Briefs and at the May 8, 2025 oral argument shall apply to the New Motions as if they had been directed to the New Motions in the first instance, and all parties to the Amended Complaint shall be bound by the Court's ruling on the New Motions.  It is further

ORDERED that, in lieu of physically serving each new defendant in the Amended Complaint, Plaintiff will serve counsel for Defendants, Mr. Lawson, who will accept service by email for each new defendant subject to each agency's approval of substitute service.  Counsel for Defendants shall promptly, and within no more than ten (10) days of service, notify Plaintiff if any new defendant requests individual service.

SO ORDERED.

Dated: May 8, 2025

_____
LOREN L. ALIKHAN
United States District Judge

2

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3   SUSMAN GODFREY, LLP,
                                          Civil Action
 4              Plaintiff,                No. 1: 25-1107

 5         vs.                            Washington, DC
                                          May 8, 2025
 6   EXECUTIVE OFFICE OF THE
     PRESIDENT, et al,
 7
                Defendants.
 8   _____/

 9
                   TRANSCRIPT OF MOTION HEARING
10          BEFORE THE HONORABLE LOREN L. ALIKHAN
                 UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:      Donald Verrilli, Jr.
                             Ginger Anders
14                           Jeremy Kreisberg
                             Munger, Tolles & Olson LLP
15                           1155 F Street, NW, 7th Floor
                             Washington, DC 20004
16
                             Brad Brian
17                           Munger, Tolles & Olson LLP
                             350 South Grand Ave, 50th Floor
18                           Los Angeles, CA 90071

19   For the Defendant:      Richard Lawson
                             DOJ-USAO
20                           950 Pennsylvania Ave, NW
                             Washington, DC 20530
21

22   Court Reporter:         Sherry Lindsay
                             Official Court Reporter
23                           U.S. District & Bankruptcy Courts
                             333 Constitution Avenue, NW
24                           Room 6710
                             Washington, DC 20001
25
```

P R O C E E D I N G S

1

2          THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

3    We are now the record for Susman Godfrey, LLP, versus Executive

4    Office of the President, et al, civil action 25-1107.

5          Could counsel please come forward and note their

6    appearance for the record beginning with the plaintiff.

7          MR. VERRILLI:  Good afternoon, Your Honor.  And may

8    it please the Court, I am Don Verrilli for Susman Godfrey.

9    With me at counsel table is firm chair, Brad Brian, Ginger

10   Anders, Elaine Goldenberg and Jerry Kreisberg.  Also

11   representing Susman Godfrey here this afternoon we have Kalpana

12   Srinivasan and Vineet Bhatia.  In addition in the audience we

13   have our comanaging partner at Munger, Tolles; Hailyn Chen, and

14   several other lawyers and employees of the firm.

15         THE COURT:  Good afternoon.

16         MR. LAWSON:  Good afternoon, Your Honor.  Richard

17   Lawson with the Department of Justice.

18         THE COURT:  Good afternoon.

19         So we are here today for a hearing on the motions for

20   summary judgment and motions to dismiss.

21         Oh, forgive me.  Before me begin, Ms. Pham reminds me

22   that we have activated the public line for this hearing.  Any

23   unauthorized broadcast will be subject to sanctions including

24   contempt.

25         So with that, we are here for a hearing on the motion

1    to dismiss, a motion for summary judgment.

2            I do want to hear just briefly from the parties

3    before we begin about the import of the order I issued earlier

4    today about the schedule for an amended complaint and

5    subsequent briefing.

6            So I will hear first from you, Mr. Verrilli, because

7    it was your motion.

8            MR. VERRILLI:  Thank you, Your Honor.

9            May it please the Court, we made that motion in the

10    aftermath of discussion of this very issue in the *Perkins Coie*

11    case in which the United States made an issue regarding any

12    order that the Court might issue to the United States as a

13    whole, or to the Executive Office of the President, would run

14    by its own terms against every Executive Branch agency or

15    whether all of the Executive Branch agencies needed to be

16    named.  In the *Perkins* case, the plaintiff amended the

17    complaint to name every executive agency to avoid that problem.

18    And we are just taking the same step here to avoid that

19    potential ambiguity.

20            THE COURT:  All right.  Thank you.  Are you intending

21    to drop any parties like the Executive Office of the President

22    or the United States?

23            MR. VERRILLI:  No.

24            THE COURT:  All right.  Thank you.

25            Do you have anything to add, Mr. Lawson?

1          MR. LAWSON:  No, Your Honor.  I think that is a fair

2    summary.

3          THE COURT:  All right.  Thank you very much.  So I

4    know you have dueling motions, so I suppose we could flip a

5    coin to decide who goes first.  But I am inclined to hear first

6    from counsel for the plaintiff.  I will note that we have

7    already had an extensive hearing on the temporary restraining

8    order, which focused on Sections 1, 3 and 5 of the executive

9    order.  So if you could give me any developments or additional

10   arguments you have as to those sections, but also walk me

11   through Sections 2 and 4 since we haven't yet had the

12   opportunity to discuss those.

13         MR. VERRILLI:  I would be happy to.

14         May it please the Court, in Your Honor's provisional

15   ruling granting the temporary restraining order, the Court

16   observed that the framers would have found that executive order

17   to be a shocking abuse of power.  The summary judgment

18   submissions vividly confirm the accuracy of that observation.

19   We now have undisputed facts that establish that the order

20   retaliates against the firm for its advocacy on behalf of

21   Dominion Voting Systems and state election officials.  And

22   remarkably now we know that it also retaliates against Susman

23   Godfrey for a charitable contribution to an organization that

24   advocates for gay and lesbian equality.  Now, that violates the

25   First Amendment for all of the reasons that Your Honor found

1    provisionally and that we discussed previously.  It is

2    retaliatory.  It is odious viewpoint discrimination.  It

3    burdens the right to petition and it disrupts our association

4    with our clients.

5            THE COURT:  If I could press you on that.  So this

6    charitable contribution, do you have a sense of how it is

7    related to the -- what the order calls interference with

8    military operations?  I am looking for the precise quote, but I

9    think you know which phrasing --

10            MR. VERRILLI:  I certainly do, Your Honor.  And I am

11    speculating here.  Of course, it is something that is

12    presumably within the knowledge of the United States.  My

13    speculation goes something like this:  The organization GLAAD,

14    to which the contribution was made, is an advocacy

15    organization.  One of the things it advocates for is equal

16    treatment for gay and lesbian service members.  And I believe

17    also it takes positions with respect to equal treatment for

18    transgender service members.  And I presume that they have

19    brought litigation to try to advance those interests, although

20    I don't know specifically what litigation the government has in

21    mind, if it does have in mind that litigation.  And that

22    litigation, I assume, is what the government suggests is

23    interference with military operations.  That is the best I can

24    do, but I think it must be something like that.

25            THE COURT:  And the Susman firm, they were not

1    involved in bringing any of this litigation?

2            MR. VERRILLI:  Correct.  It was a charitable

3    contribution to an organization.

4            THE COURT:  Do you have a sense of when the

5    charitable contribution was made?

6            MR. VERRILLI:  I don't have it at my fingerprints.  I

7    apologize, Your Honor.  I should know that.  I can try to

8    figure it out, but I don't have it at my fingerprints.

9            THE COURT:  But in your view, it was made not in

10   connection with any type of litigation?

11           MR. VERRILLI:  That is my understanding, right.  Even

12   if it were, of course, it would be completely and thoroughly

13   protected under the Supreme Court's *Bonta* decision. But I don't

14   believe that there was any specific connection of that kind.

15           THE COURT:  All right.  And while we are it, why

16   don't you also tell me a bit about the Susman Godfrey Prize.

17           MR. VERRILLI:  Yeah.  This goes, I guess, to the

18   order as a whole and to Section 3 and to Section 5 and maybe

19   Section 4.  The undisputed facts, which we have submitted in

20   the form of declaration establish that the Susman Godfrey Prize

21   is a prize that includes a cash award and mentoring.  It does

22   not include an offer of employment.  And as a result of it not

23   including an offer of employment, it is not within Title VII

24   because it is not a term or condition of employment.  It cannot

25   be a violation of 42 U.S.C Section 1981 because it is a grant,

1    a gift, and not a contract.  So there is nothing unlawful about

2    it, nothing.

3              THE COURT:  All right.  Thank you very much.

4              MR. VERRILLI:  Now, with -- what I would like to

5    do -- you know, I will work through the specifics and focus on

6    the issues we haven't talked about as much.  But if Your Honor

7    would permit me, I would like to make two overarching points at

8    the outset here.  I want to make sure they don't get lost as we

9    work through the specifics on the merits.  I want to make sure

10   we don't miss the forest for the trees.  What James Madison

11   said in the early days of the republic by way of explanation,

12   was, "We guarantee free speech principally and primarily to

13   ensure that citizens can check and constrain their government,"

14   that they can do that when the government is wrong including in

15   court.

16              And since the time of the Magna Carta, the guarantee

17   of due process has existed principally to check and constrain

18   the arbitrary use of executive power to threaten life, liberty

19   or property.  And the framers put those guarantees in our

20   constitution precisely for moments like this one.

21              And, second, again, I don't want to have us miss the

22   forest for the trees when we are talking about the equities and

23   the public interest.  The whole point of the Susman Godfrey

24   executive order and the others like it is to intimidate law

25   firms into abandoning advocacy on a behalf of their clients.

1              Now Susman Godfrey is fighting that effort and

2    intimidation.  But as our statement of material facts and our

3    supporting declaration show, other firms are already

4    acquiescing to that intimidation.  And that is

5    unconstitutional, full stop, no matter what the motivation is.

6    But the specific goal of this intimidation is what makes it so

7    pernicious.  The issue specific point of these orders is to

8    prevent courts from hearing the best arguments from the best

9    lawyers challenging executive actions.

10             It is to silence the challenges to the myth that the

11   2020 election was somehow rigged.  It is really to silence any

12   argument that the President finds threatening to the image he

13   wants to project to the world and the policies he wants to

14   pursue.  That is why it is such an extensional -- particular

15   extensional threat to the independence of the Bar, to the

16   independence of the judiciary, to our constitution and to our

17   basic commitment to the rule of law.  That is why every section

18   of this order needs to be enjoined, respectfully.

19             With respect to Section 1, I do think we did discuss

20   it.  There are, I think, a couple of points that would be

21   helpful to make before moving to Section 2.  The government's

22   pitch at TRO stage and the pitch now is this is just good

23   old-fashioned government speech, Section 1, and you should just

24   treat it as a standalone basis of good old-fashioned government

25   speech.  To point out the irony of this first -- what the

1    President of the -- they are describing what we are doing here
2    as an effort to muzzle the speech of the President, when what
3    is at issue is one of the most brazen efforts by a President
4    ever to muzzle private speech.  And it can't be defended as
5    government speech and *Vullo* is really controlling here.  The
6    President can speak all he wants.  What the President can't do
7    is retaliate against us for protected speech.
8          And just as Judge Howell found in the *Perkins Coie*
9    case, Section 1 is government action.  It is not just some
10   disembodied opinion.  It is findings.  And those findings are
11   that operative basis for all of the specific commands that
12   follow.
13         THE COURT:  So in your view, if the entirety of the
14   executive order was Section 1, you still would have an argument
15   that this is not purely government speech?
16         MR. VERRILLI:  Absolutely, we absolutely would.  And
17   there are a couple of reasons for that.  The first one is --
18   and I think the first of the two can be illustrated by the
19   Jenner & Block experience that we talked about at the TRO
20   hearing.  Those findings are findings that operationalize
21   Sections 2 through 5.  But they are also findings that
22   government agencies in the Executive Branch could rely on more
23   broadly to take action against Susman Godfrey.  And, of course,
24   that is exactly what the attorney general and the Director of
25   the Office of Management and Budget in a memorandum in the wake

1    of the TRO issued in the Jenner & Block case urged government

2    agencies to do.  This is the -- after the TRO was in place and

3    the order was enjoined, this memo went around.  I am just going

4    to reiterate what I said last time because it so astounding

5    that "Jenner & Block is a law firm committed to the

6    weaponization of justice, discrimination on the basis of race,

7    radical gender idealogy" --

8            THE COURT REPORTER:  Sir, you need to slow down.

9            MR. VERRILLI:  I'm sorry.

10           -- "radical gender idealogy and other anti-American

11   pursuits."

12           And then the key for present purposes as this note

13   says, "Of course, as noted in the Court order agencies are

14   permitted to carry on their ordinary course of business, which

15   carries with it the authority to decide with whom to work" --

16   so that consequence right there going beyond Sections 2 through

17   5.

18           And then, of course, the important part of our due

19   process claim is that our reputation -- and through it our

20   ability to attract and retain clients has been seriously

21   damaged by the -- what our -- what we believe to be the

22   completely baseless findings in Section 1.

23           So our due process claim also goes directly to

24   Section 1.  So if it were alone, we would still I think would

25   have very, very powerful arguments that ought to be enjoined.

1    But, of course, it is not alone.

2          THE COURT:  And so again just taking it on its own,

3    is it the findings itself?  I am just trying to determine where

4    is the line between government speech and government action?

5          MR. VERRILLI:  So I think the key thing, Your Honor,

6    if I may is to point the Court to the -- our proposed order and

7    the relief that we seek.  And this is on page 2 in particular

8    of our proposed order.

9          THE COURT:  Give me a minute to get there.

10          MR. VERRILLI:  Of course, paragraph 2 on page 2.

11          THE COURT:  I'm sorry.  There is a lot of pages here.

12          All right.

13          MR. VERRILLI:  What we are seeking the Court to do --

14    asking the Court to enjoin is any Executive Branch employee,

15    et cetera, from relying on or using in any way or for any

16    purpose or otherwise taking any action based upon the

17    statements laid out in Section 1 of the executive order.

18          We are not asking -- we are asking that it -- that

19    those statements not be operationalized within the four corners

20    of this executive order or more broadly as attempted with

21    respect to *Jenner & Block*.  So we are not asking that any

22    speech be enjoined.  What we are asking is that the operative

23    effect of that speech be comprehensively enjoined.

24          THE COURT:  And how does that work with regard to

25    Section 1?  Because I understand your argument to be Section 1

1    states why Sections 2 through 5 are necessary in the

2    government's view.  So if I enjoin Sections 2 through 5, can

3    Section 1 stand or is it part and parcel of the action?

4            MR. VERRILLI:  No.  I think it has to be part and

5    parcel, in part because enjoining Sections 2 through 5 would

6    not cure all of the constitution harm and practical harm to us

7    for the sort of *Jenner & Block* circumvention kind of reasons I

8    was talking about.

9            THE COURT:  And it wouldn't prevent the Executive

10   Branch from issuing a *Jenner & Block* like memorandum.

11           MR. VERRILLI:  Correct.  Precisely.  It also would

12   not address our due process objection to the defamatory and

13   baseless statements about our reputation.  And there is also

14   this direct connection between Section 1 and Section 3 where

15   Section 1, baselessly says that Susman Godfrey is acting

16   against the national interest.  And then Section 3 tells every

17   federal government agency supervising government contracts that

18   it should take the fact that -- it should take the national

19   interest into account in deciding which contracts to terminate.

20   So it just seems to me -- that is, I think, helpful in

21   illustrating that it is just interwoven with the whole

22   document.  There is no way I think it could be allowed to stand

23   for all of those reasons.

24           If Your Honor has no more questions about Section 1,

25   I can move to Section 2.

1          THE COURT:  Yes.

2          MR. VERRILLI:  I think the key question here about

3     Section 2 is the security clearances issue.

4          THE COURT:  Do you know if any Susman Godfrey

5     employees have had their security clearances revoked?  I know

6     you weren't seeking a temporary restraining order about that.

7          MR. VERRILLI:  I am not aware that they have, Your

8     Honor.  I am not aware that they have.

9          THE COURT:  Thank you.

10          MR. VERRILLI:  But the question here I think is

11     whether our constitution claims are justiciable.  And both *Egan*

12     in the Supreme Court and *Lee* in the D.C. Circuit are

13     justiciability cases.  And I think it is quite important to

14     look at what *Egan* talks about and to contrast it with what we

15     have in this executive order.  *Egan* describes the

16     determinations that are insulated from judicial review that

17     aren't justiciable as protective judgments about an

18     individual's future actions, specifically attempts to assess

19     whether under compulsion of circumstances or for other reasons,

20     the individual might compromise sensitive information and

21     threaten national security.  That is at pages 528 and 529.  So

22     in other words, individualized decisions about the

23     trustworthiness of particular applicants or holders of security

24     clearances, that is not this.

25          And I think maybe to illustrate that the fundamental

1  difference if a President were to issue an executive order that

2  no woman could receive a security clearance or that no

3  republican could receive a security clearance, there is not a

4  chance in the world that the Supreme Court or the D.C. Circuit

5  would find that executive order to be nonjusticiable.  And that

6  is because it differs fundamentally from what *Egan* and *Lee* were

7  talking about.

8         And this EO is a version of the same thing.  This is

9  a categorical suspension of security clearances to a class

10  defined by its exercise of First Amendment rights.  That is

11  what it is.  There is no individualized consideration that

12  preceded the suspension.  There is a suspension and then they

13  claim there will be individualized consideration to follow

14  about whether to restore that which has been suspended.  But

15  the suspension occurred on the basis of retaliation for the

16  collective exercise of First Amendment freedoms by the firm and

17  not based on any individualized determination about anyone.

18         THE COURT:  And what do you make of your friend on

19  the other side's argument that a post deprivation process like

20  this review about whether the clearance should be reinstated is

21  sufficient for purposes of due process?

22         MR. VERRILLI:  Well, the first observation I would

23  make about that, Your Honor, is it doesn't address the First

24  Amendment problem.  This was imposed in retaliation for

25  exercise of First Amendment rights and has suffered the same

1   defect that an order saying no woman or no republican can hold

2   a security clearance would have.  It is based on a categorical

3   judgment and an impermissible criterion defending that

4   categorical judgment.  That is the first problem with it.

5        The second problem with it is that the suspension has

6   adverse effects in the here and now.  And because it will

7   prevent those who do have security clearances from being able

8   to use them to -- in the event that the firm is retained to

9   carry out work that requires the security clearances.  And as

10  we have demonstrated in our factual submissions, the firm

11  routinely does that kind of work.  Of course, we have got

12  somebody in the reserves who needs a security clearance

13  unrelated to firm work.  And that person's security clearance

14  has been suspended.  There is also a defamatory element to the

15  suspension of the security clearances that happens in the here

16  and now.  The argument is that no one in Susman Godfrey is

17  trustworthy enough to have a security clearance.  It is just

18  pure defamation that occurred with no process.

19        THE COURT:  And is not connected at all to the

20  specific problems that Section 1 is trying to address?

21        MR. VERRILLI:  None whatsoever.

22        Your Honor, I will point -- it is a little bit

23  surprising.  Section 2 doesn't even have the words national

24  security in the Section.

25        And so, you know, a couple more points if I could

1    make about this.  You know, this exact same suspension of

2    security clearances, was in the Paul Weiss executive order and

3    exact same justification that Paul Weiss had undertaken

4    representation that were against national interest that is what

5    justified the suspension of the Paul Weiss security clearances.

6    And then whenever it was, a few days later, the President

7    rescinded the Paul Weiss order.  There was no change in

8    circumstances with respect to the trustworthiness of Paul Weiss

9    lawyers between the imposition of that executive order and its

10   recision a few days later, I think in some ways that tells you

11   all you need to know about whether there is anything legitimate

12   about the suspension.

13         THE COURT:  Is the Paul Weiss the only order that was

14   issued and rescinded?  Am I correct in thinking the other

15   agreements, as least to public knowledge didn't --

16         MR. VERRILLI:  I believe that is correct, Your Honor,

17   yes.

18         THE COURT:  Thank you.

19         MR. VERRILLI:  And then, you know, the other one more

20   point I would make about Section 2, if I could -- and in

21   particular I would commend to Your Honor's attention the D.C.

22   Circuit's *Rattigan* decision, which we cite in our briefs.  And

23   the -- what the Court said in that decision I think is exactly

24   what we are talking about here.  It said that the Court has

25   dual responsibilities in a security clearance situation.  Its

 1    duty is to follow *Egan*, but it is also -- and I am quoting

 2    here, "To preserve to the maximum extent possible" legal

 3    protections for individuals.  That is at page 770 of 689 F.3d.

 4             Judge Howell said something very much along the same

 5    lines at page 41 of her opinion enjoining the equivalent

 6    provisions of the Perkins Coie order.

 7             If the Court has nothing further on Section 2, I will

 8    move to Section 3.

 9             THE COURT:  You argue in the alternative that *Lee* is

10    bad law.  But I don't need to reach that --

11             MR. VERRILLI:  No.  We are preserving that in case we

12    need it.  We don't think we need it for all of the reasons.  We

13    have identified this is, as we have said is -- this is upstream

14    of the kind of decision that is at issue in *Lee*.  But we are

15    just preserving that issue.  We are not asking Your Honor to

16    rule on it.

17             With respect to Section 3, I think there is a pretty

18    clear way to just cut through it all.  And it is this:  If one

19    looks at page 16 of the government's motion to dismiss, there

20    is a sentence there --

21             THE COURT:  If you will give me a moment to get

22    there.

23             MR. VERRILLI:  Sure.

24             THE COURT:  I am with you.

25             MR. VERRILLI:  Just in the very middle of the page,

1    it is the sentence penultimate -- it is the last sentence of

2    the carryover paragraph that starts with the word furthermore.

3    The key language I think for the moment here is that it says,

4    "While Section 3 relies equally on plaintiff's racial

5    discrimination and its malfeasance in election litigation for

6    its authority."  So the government has conceded that Section 3,

7    the disabilities imposed and burdens imposed by Section 3 rest

8    equally on our election litigation and their baseless

9    allegations of racial discrimination.  One of those two things

10   is a blatant First Amendment violation.  It is retaliation,

11   viewpoint discrimination, et cetera.  So once one recognizes

12   that there is viewpoint discrimination and retaliation going on

13   here in violation of the First Amendment, then what we have is,

14   in the best case scenario for the government, you have got an

15   order that is justified equally by the unconstitutional First

16   Amendment violation and their concern -- purported concern with

17   race discrimination.

18        Well, there is a well associated constitutional

19   methodology for dealing with a situation like that.  It is the

20   *Mount Healthy* methodology.  The Supreme Court applied it just

21   earlier this year in the TikTok case.  You have to ask the

22   question, whether the government would have gone forward with

23   the action based solely on the -- on the rationale that doesn't

24   violate the constitution.  And the government bears the burden

25   of making that proof.  They didn't even try to make that

1   argument.  So I just think it is game over on that.  They have

2   conceded retaliation.  And they haven't tried to defend on the

3   *Mount Healthy*.  I would point out that this case that -- about

4   which they make a great deal, the *Umbehr* case by the Supreme

5   Court -- the holding of that case, the holding of that case was

6   that government contracts may not be terminated based on

7   government officials' retaliation or viewpoint discrimination

8   against the speech of the contract.  And then it goes on to

9   apply the *Mount Healthy* kind of analysis that I just described.

10  It instructed the lower courts to do so, because it hadn't been

11  done yet.  But the case they cite establishes the principle

12  that defeats their position on that issue.  It is just plain as

13  could be.

14          THE COURT:  Which case are you relying on there?

15          MR. VERRILLI:  It is the *Umbehr* case.

16          THE COURT:  Okay.  Because they cite *McGowan* for the

17  notion that you can support it under both an unconstitutional

18  and a constitutional justification and just evaluate on the

19  basis --

20          MR. VERRILLI:  Right.  *But McGowan* is a very old

21  case.  And the Supreme Court law has evolved a very great deal

22  since then to the *Mount Healthy*, *TikTok* approach.  As I said,

23  the best proof for it is the *Umbehr* case, which they cite which

24  says exactly what I am saying now about how to go about it.

25  And they haven't attempted that.  And, you know, I think there

 1   is probably a good reason why they haven't attempted it,

 2   because they couldn't possibly justify what they have done here

 3   on the basis of the spurious allegations of racial

 4   discrimination that they have made in the executive order that

 5   they have sought to defend in the summary judgment proceedings.

 6           There are really two elements to it.  The first is

 7   the Susman Prize, which they point to.  Your Honor has asked

 8   appropriately about that.  I have explained, it is 100 percent

 9   lawful.  That can't possibly justify this.  And the only

10   thing -- the only other evidence that they support to are some

11   statements that they pulled off of the website basically that

12   says that Susman is committed to diversity and that they have

13   signed a pledge that commits them to gender parity.  I mean,

14   God forbid that Susman Godfrey would pledge itself to equal

15   treatment for men and woman.  That is what they are saying

16   constitutes the unlawful discrimination.

17           And I do think it is important too if I could ask

18   Your Honor to take a look at page 13 of the defendant's

19   opposition to our summary judgment motion.

20           THE COURT:  You said page 13?

21           MR. VERRILLI:  Thirteen, yes.

22           THE COURT:  I am ready when you are.

23           MR. VERRILLI:  Yes.  This is the first full

24   paragraph.  So they have pointed to these statements on the

25   website "And our commitment to gender equality" and they say --

1    and I just -- I am going read to it out loud because it is just

2    astounding.  They say, "This is precisely the sort of racial

3    and gender considerations prohibited by civil rights laws.  And

4    Susman appears to have fallen short of these principles.  Such

5    explicit race-based criterion goes well beyond the hidden

6    consideration of race that the Supreme Court condemned in

7    *SSFA*."  They are saying these website statements go

8    considerably beyond what was at issue in *SSFA*.  What was at

9    issue in *SSFA* was express race conscious decision making that

10   granted benefits on the basis of race.  They are saying those

11   website statements go beyond what was at issue.  They don't

12   remotely approach what was at issue in *SSFA*.  And the idea the

13   United States would say something like this in a brief, I mean,

14   I just -- I -- I am speechless, frankly.  So there is no

15   possible way that this race discrimination justification, even

16   if they had tried to prove what they have to prove on *Mount*

17   *Healthy*, even if they had tried, and they haven't, there is no

18   way it could uphold any part of this order.

19            THE COURT:  This is a better question for your friend

20   on the other side so I will ask him.  But what law do you

21   perceive then to believe the statements on the website to be

22   violating certainly?  Title VII is out of the picture, because

23   the Susman Godfrey Prize and some mere statements I think

24   wouldn't rise to the level of a Title VII claim.  Do you have

25   any other guesses?

1          MR. VERRILLI:  I don't know.  We are not subject to

2     the equal protection clause because we are a private entity.

3     And maybe they have got some Title VI theory in mind.  I don't

4     know.  I think what their theory is basically, we don't like

5     what they are doing.  And because we don't like what they are

6     doing, we are going to impose this Draconian set of

7     punishments.  This language I read tries to gesture at some

8     thought that maybe this is unlawful in some way, but it just

9     isn't.  It just isn't.

10          With respect to -- I can move on to Sections 4 and 5

11     and I think I can move pretty quickly through them, Your Honor.

12     With respect to Section 4, I think the point, again, is very

13     straightforward.  We are not seeking an injunction that the

14     EEOC may never investigate Susman Godfrey.  We are seeking an

15     injunction that the EEOC and every other government agency

16     can't open an investigation or otherwise come after us on the

17     basis of this executive order, because this executive order is

18     impermissibly retaliatory in violation of the First Amendment.

19     An EEOC investigation prompted by this executive order would be

20     a form of retaliation.  We are not asking for an immunity from

21     EEOC proceedings.  And so I just think this is very

22     straightforward.  This goes back to the language that Your

23     Honor and I discussed in page 2 of the proposed order.  It

24     could prohibit the EEOC from acting on the basis of the

25     findings in Section 1 or anything else in the EO.  But it

1    doesn't ask for immunity, so I think that is pretty

2    straightforward.

3              THE COURT:  Now, I confess I have some concerns about

4    Section 4.  It would be one thing I think were Section 4 to put

5    you at the head of the line of any EEOC investigation.  All

6    this seems to be saying is that nothing in the order is

7    constraining the prior order which had directed these type of

8    EEOC investigations.  So is Section 4 actually doing something

9    affirmative as opposed to just limiting its potential to be

10   construed as undermining an earlier order?

11             MR. VERRILLI:  Yes.  And it is because of the

12   connection between Section 1 and Section 4.  Section 1 contains

13   as I hope I have demonstrated absolutely spurious allegations

14   that we have engaged in race discrimination.  And Section 4 is

15   connected to Section 1 in the same executive order.  And our --

16   and the remedy we propose in that language that we were

17   discussing earlier, Your Honor, is that you can't act on the

18   basis of this executive order.  So the EEOC can't open an

19   investigation based on the findings in Section 1.  I think that

20   is quite important.  And so it is not shutting down an EEOC

21   permanently, but they can't do that.  Just like every other

22   agency in the Executive Branch can't act on the basis of those

23   findings.

24             THE COURT:  And Section 4 of the *Perkins Coie* order

25   has been enjoined?

```
 1                 MR. VERRILLI:  It has.

 2                 THE COURT:  I think there are more steps in that

 3      litigation to come.  Isn't there also an even earlier order,

 4      the EO on DEI, does that affect you or is it really just the

 5      Perkins Coie order from which these EEOC investigations are

 6      stemming?

 7                 MR. VERRILLI:  So it doesn't effect the firm directly

 8      in the sense that we haven't been -- Susman hasn't subjected

 9      to -- it wasn't on the list of firms subjected to the EEOC

10      investigations.  And, you know, I think given that it wasn't on

11      the list, there would be lot of reasons to be suspect of being

12      put on the list now in light of what is happening.  Again, all

13      we are asking for is that the Court enter that the -- the

14      language that we propose on page 2 in paragraph 2 of our

15      proposed order, which would prohibit what we think would be the

16      unconstitutional action while leaving the EEOC with the

17      authority to proceed in regular order in a proper way without

18      any unconstitutional taint.

19                 THE COURT:  Thank you.

20                 MR. VERRILLI:  With respect to Section 5, two points.

21      The first, it has the exact same problems as Section 3.  I

22      mean, on the merits what the government is trying to do with

23      respect to Section 5 is argue, well, you know, we are a

24      contractor.  We have rights.  We have broader latitude than we

25      have as a sovereign.  And when we are landlord or proprietor we
```

1    have broader rights than we have as a sovereign.  You don't

2    have the right as -- just as you don't have the right as a

3    contractor to engage in blatant viewpoint discrimination, you

4    don't have the right as a proprietor or landlord or anything

5    else to engage in blatant viewpoint discrimination.  You don't

6    have the right, period, if you are the government.  You don't

7    have the right to deny due process as a landlord or proprietor,

8    just like you don't have a right to deny due process as a

9    contractor.

10             So it really just -- exactly the same arguments apply

11    that they -- you know, in order to have any chance of

12    prevailing on this, they would have to come in and say, there

13    is some neutral, non -- some neutral constitutional ground that

14    we are invoking to justify the exclusion from government

15    buildings and facilities, et cetera, and that the President

16    would have adopted this executive order with this exact same

17    restriction, even absent the retaliatory First Amendment

18    motive.  They haven't tried to make that argument.  So, again,

19    on the *Mount Healthy* analysis there is -- they just -- it is

20    game over.  They haven't made the -- even begun to make the

21    case they would have to make to make the relief.  And they

22    couldn't, of course, because of the reasons we talked about

23    with respect to Section 3.

24             THE COURT:  Do you perceive this dichotomy between

25    the government as sovereign and the government as contractor or

26

1    landlord?

2         MR. VERRILLI:  So the government -- there is some

3    difference.  There is some latitude that the government has as

4    employer or as contractor or as landlord.  But it is not that

5    the constitution applies to the government as sovereign and the

6    constitution doesn't apply to the government as landlord and

7    contractor, et cetera.  Again, the *Umbehr* case on which they

8    rely, that is exactly what it says.  So that is a case about --

9    that was a case about retaliation against a contractor for the

10   contractor's criticism of local government officials.  And what

11   the court held in that case was that the government can't

12   retaliate, can't terminate a contract in retaliation for that.

13        And so while there might be some additional latitude,

14   it doesn't extend so far as to the types of things the

15   government is trying to do here.  So I really think that is the

16   fundamental problem.

17        THE COURT:  Your friend on the other side relies on

18   *Rust v. Sullivan* and that line of cases to say the government

19   is allowed to favor particular types of speech.  Is your view

20   that, be that as it may, that does not apply when you are

21   cutting off a contract or retaliating or how do you sort of

22   square those lines of cases?

23        MR. VERRILLI:  So I will address contracting in a

24   minute.  It can't possibly justify keeping us out of government

25   buildings.  That has no bearing on that whatsoever.  And then

1    with respect to the -- with respect to government contracts,

2    what it says is that, you know, the government can decide that

3    the government's money will be, you know, put to the uses that

4    the government directs that it be put to.  But, of course, all

5    of that is happening with respect to the contracts that would

6    be at issue here.  And what they are trying to do is impose an

7    extraneous set of constraints.  I mean, you couldn't possibly,

8    I think, justify a rule that said, no women-owned businesses

9    shall receive government contracts based on the fact that

10   government wants only men, only male-owned businesses to

11   receive government contracts.  You couldn't possibly do that on

12   the theory that government can spend its own money any way it

13   wants.  It can't do that.

14          And then the *Umbehr* case specifically holds that you

15   can't -- that whatever *Rust v. Sullivan* might have said, it

16   doesn't mean that the government can terminate a contract based

17   on its disagreement with the -- or in retaliation for the

18   particular political viewpoints that the speaker -- that the

19   speaker manifests.  And so I just think that that argument

20   is -- you know, *Rust v. Sullivan* stands for a limited

21   proposition, an important one, but it is a limited one and it

22   doesn't come close to justifying what they have done here.

23          And with that, Your Honor, I do have one more point

24   to make about Section 5, but of course, I want to answer any

25   questions Your Honor has.

```
 1                THE COURT:  No.  Give me your point and then I have a
 2     few questions.
 3                MR. VERRILLI:  Okay.  So with respect to the other
 4     argument they make with respect to Section 5 is the ripeness
 5     argument.  I think that was thoroughly vetted at the TRO
 6     hearing.  And it was just obviously ripe.  And one thing I
 7     think is worth pointing to is -- and this is in our statement
 8     of facts 160.  When the President was signing the executive
 9     order, the official who handed him the document to sign said,
10     this is an executive order that takes certain measures against
11     Susman Godfrey to ensure they cannot access government
12     resources, government buildings, et cetera -- to ensure that
13     they cannot access.  Okay.  And so I just think the idea that
14     it isn't ripe is just an insubstantial argument.
15                THE COURT:  Can I turn you to your vagueness
16     argument?
17                MR. VERRILLI:  Sure.
18                THE COURT:  So your friend on the other side
19     maintains that your due process vagueness argument doesn't hold
20     water because this is neither criminal nor regulatory.  So what
21     is your response to that?
22                MR. VERRILLI:  Well, fortunately, it is not criminal.
23     It is obviously regulatory.  It is instructing government
24     agencies to take regulatory action against us.  I don't see how
25     you could think of it any other way.  And the idea that -- and
```

1    then, just stepping back again, you know, let's not lose the

2    forest for the trees here.  Look at what they are doing.  They

3    are saying, you can't bring a First Amendment challenge --

4    excuse me -- a due process vagueness challenge against an order

5    like this, because in some technical sense it is not

6    challenging the application of the regulation.  I mean, how

7    could that be?  How could it be that a private citizen, a

8    private entity subject to Draconian punishment like this can't

9    object to the fact that it was done without any notice, without

10   any opportunity to be heard?  How could that be?

11            THE COURT:  And the last question I have for you is,

12   obviously, we have the benefit of the *Perkins Coie* opinion from

13   Judge Howell.  Does that affect how you wish this proceeding to

14   proceed?

15            MR. VERRILLI:  So, you know, I think the -- what we

16   are hoping to have happen in this proceeding is final judgment,

17   entry of permanent injunction enjoining the order as a whole in

18   the manner that we have described in our proposed order.  And

19   we think Judge -- we think Judge Howell's opinion is supportive

20   in every particular, that result.  And so I think in that

21   respect, the -- we endorse Judge Howell's reasoning.  And we

22   think it -- we think it provides a quite useful road map.  And

23   we think that the -- we hope that the Court is able to move

24   expeditiously to a final judgment here.

25            THE COURT:  And is there any portion of the Judge

```
 1    Howell opinion with which you take issue?
 2         MR. VERRILLI:  I don't think there is any portion
 3    with which we take issue.  We might emphasize, you know, the
 4    arguments that we have made today in some places are maybe a
 5    little bit different in emphasis than Judge Howell's, but there
 6    are no real fundamental diversions I don't think.
 7         THE COURT:  Thank you very much.
 8         MR. VERRILLI:  Okay.  Thank you, Your Honor.
 9         THE COURT:  Mr. Lawson.
10         MR. LAWSON:  Good afternoon, Your Honor.
11         I believe as I mentioned at the TRO hearing, we
12    think -- and counsel for plaintiffs approached it this way as
13    far as section by section.  And I think, as I believe I
14    referenced at the TRO hearing, at sort of a 30,000-foot level,
15    I think the biggest point of difference is whether or not these
16    are punishments in the traditional sense that the court -- the
17    Supreme Court has looked at and in cases like *Vullo* and *Bantam*
18    *Books* or if this is more discretionary.  Our position, of
19    course, is that this is executive discretion.  One of the
20    reasons, I am -- I'm sorry I have already forgotten the example
21    that Mr. Verrilli was referencing a moment ago in the due
22    process section.  We would point -- our general overarching
23    position is that due process would apply certainly in a
24    criminal type of prosecution, certainly would apply in a
25    licensing type of issue where there is an inherent right of
```

1    access and so forth.

2        Our position is that on these points, the -- there is

3    no inherent right of access, that the -- it is discretionary as

4    to who has and is able to maintain security clearances,

5    discretion as to who can be a contractor with the government,

6    discretion as to the guidance given to Executive Branches to

7    inquire into areas.

8        And if I can just flag on Section 4, an EEOC

9    investigation is a bit of a term of art as I have been

10   learning.  And this is more of a review.

11       But then also to kind of round out, discretion, no

12   inherent right on the Section 5, the last point, that, you

13   know, access to buildings, access to staff, hiring, again

14   discretionary.

15       THE COURT:  Isn't there --

16       MR. VERRILLI:  It is conceivable --

17       I'm sorry, Your Honor.

18       THE COURT:  Isn't there an inherent right of access

19   to federal courthouses for purposes of the petition clause?

20       MR. LAWSON:  Of course.  I don't want to go down the

21   hypothetical of saying this guidance regarding access to

22   buildings would necessarily violate, because between the time I

23   gave the hypothetical and the guidance came out, maybe I could

24   come up with some reason on it.  I have to concede that it

25   could be possible for some guidance limiting access to a

1   building to at the very least affect the right of petition, but

2   that it is conceivable that is done.  But that drives home the

3   point that I have been making throughout this proceeding that

4   it is not ripe.  We don't have that.  Obviously, we have

5   submitted that that is a grounds to dismiss.  If the Court

6   denies the dismissal and denies the motion for summary

7   judgment, then perhaps the Court could revisit the issue on the

8   TRO aspect and at least allow the guidance to be developed to

9   see if we are coming across an issue that raises constitutional

10  implications.  Right now, we have hypothetical parades of

11  horribles.  I would submit that we need something granular and

12  specific on that point.

13          So that is the sort of 30,000-foot variation and

14  approach.  And I think however the Court decides on that point,

15  much will flow for the rest of the order and the decision.

16  Certainly, I can go section by section as to how we view it.

17  Unfortunately, this may be a bit of a repeat for the Court from

18  some of the prior hearings.

19          THE COURT:  Before we get there, can I just ask --

20          MR. LAWSON:  Yes.

21          THE COURT:  -- some factual questions?

22          MR. LAWSON:  Please.

23          THE COURT:  I think you had said at the TRO stage

24  that no one reached out to the firm before issuing the order,

25  which is different than what happened with a lot of other law

```
1    firms.

2              MR. LAWSON:  I don't -- I can't speak to that.  And I

3    apologize if I said that that was the case.  I don't think I

4    have ever known one way or the other on that.

5              THE COURT:  All right.  Maybe your friend on the

6    other side said it and you didn't contradict it.

7              MR. LAWSON:  Yes.  I have no evidence either way that

8    I can give.  If his representation is no contact was made, I

9    have nothing to refute that, certainly.

10             THE COURT:  Do you have any explanation for why

11   certain firms were entitled to dialogue and Susman was not?

12             MR. LAWSON:  No, I don't have any information on the

13   nature of those conversations with the White House.  I have

14   been purely handling the litigation.

15             THE COURT:  Do you know if the agreements with the

16   firms that entered into agreements are written agreements?

17             MR. LAWSON:  I know of nothing beyond I think the

18   generally publicly available information.  I think there have

19   been some press releases that have some details.  I cannot

20   remember if plaintiffs -- any of those releases were attached

21   in the declarations from plaintiff.  I don't think we included

22   them.  But to my knowledge that I know of, no other documents

23   than that.  That is not saying there isn't any, but I know of

24   no others.

25             THE COURT:  Do you know if any security clearances
```

1    have been revoked that belong to Susman employees?

2            MR. LAWSON:  No, I do not know of that.

3            THE COURT:  No, they haven't; or, no, you do not

4    know?

5            MR. LAWSON:  I do not have any information on that

6    point.  If Mr. Verrilli is saying that none have done -- I have

7    nothing to contradict that.

8            THE COURT:  All right.  Thank you.  You can return to

9    your previously scheduled remarks.

10           MR. LAWSON:  I appreciate the Court's enthusiasm on

11   the point.

12           So, again, as to Section 1 I think the Court's

13   questions as to the fundamental issue in Sections 2, 3, 4 and 5

14   are not present, is there anything worth enjoining in Section

15   1?  I would submit, no, that Section 1 really is just

16   commentary.  We have made the argument in the other cases or

17   made the notation in the other cases that it is informative as

18   to how the sections, the operative sections, would be viewed.

19   I can't dispute that.  It is certainly in the order.  And if

20   someone is going to be looking at how to deal with Section 3,

21   they would probably look at Section 1 for some information on

22   that.  But I don't think that makes Section 1 operative.  I

23   don't think in a vacuum -- if you are an agency and you see

24   Section 1, I don't think there is any direction to take.  It is

25   a little more than reading a press conference.  That would be

1    our position.

2          THE COURT:  But you agree that Section 1 informs what

3    actions may be taken under Sections --

4          MR. LAWSON:  Absolutely.  It is part of the order.  I

5    can't deny there is information there.

6          THE COURT:  So given that, why doesn't Section 1

7    confirm that what we are looking at here are punishments as

8    opposed to discretionary decisions, because the language is in,

9    I think even you would concede, quite punitive terms.

10          MR. LAWSON:  That is a great question.  And I would

11    submit that the punishment has to be looked at at the act being

12    taken.  And so therefore, this is why in all of these cases and

13    in all of these points -- or all of these motions, we have gone

14    granular in Sections 2, 3, 4 and 5.  Is whatever may be

15    informed in Section 1, whatever intent someone may want to read

16    into Section 1, the rubber hits the road on whether this is

17    punishment or discretion by the terms of the operative

18    sections.  And on each one of those, I make the point as the

19    Court is now painfully aware on it being a form of discretion,

20    that this is how it is determined.

21          So the punishment in some of the other cases and

22    maybe even in some of the amicus briefs and there has been the

23    issue of bills of attainder and that type of issue.  So the

24    punishment -- is it barring somebody from something they have

25    an absolute right to?  The practice of law versus, you know,

1    being able to act as a contractor.  One is eliminating

2    somebody's ability to get a bar license is considerably

3    different than the ability to work as a government contractor.

4    The ability to, again -- you can just apply that to all of the

5    other sections.

6          So that is where -- and, again, we -- obviously in

7    that context, we are outside of a criminal section.  And this

8    is where -- I am mixing and jumping ahead to the *McGowan* and

9    the *O'Brien* issues, those were the Court giving some deference

10   to intent reading in favor of congressional intent on criminal

11   punishment.  And so here we have an executive order where the

12   consequences are not jail time on any of these, far from.  It

13   is not barring anybody from anything they would like to do or

14   have a right to do.  It is -- strike that.  It is not something

15   they have a right to do.  It is something that they may want to

16   do, but there is a counter-party who has discretion and that is

17   the government in this case.

18          THE COURT:  So there are a lot of circumstances in

19   which the Executive Branch or the Judicial Branch has

20   discretion.  So if I were to instruct my law clerk in applying

21   an abuse of discretion standard to do so with a retaliatory

22   intent, is the mere fact that we are exercising discretion

23   enough to immunize that retaliatory intent?

24          MR. LAWSON:  No.  And I think we concede that point

25   when we cite the cases discussed earlier with -- well, I can't

1    remember if we cite *Mount Healthy*, but we certainly channel it

2    when we cite the *Umbehr* line of cases.  And even in *Umbehr*

3    there is the -- forgive me if I am mispronouncing it.  There is

4    the point at the case in the -- this is around page 685 of the

5    point where if a plaintiff is able to establish that speech

6    issues had some role in a termination -- this is, of course, a

7    contract termination -- the government would then have a valid

8    defense if it can show by a preponderance of the evidence that

9    in light of their knowledge and policies at the time, they

10   would have terminated regardless of the speech.  So there is

11   still that -- there is still that inquiry.  Is there something

12   else?  Is there the valid choice?  If the Court's instruction

13   to the clerk was irredeemably ill-motivated that would be one

14   issue.  But I think this is a case -- and again it is the

15   *Umbehr*, *Mount Healthy* line is far more on point than the *Vullo*

16   line.  Because *Vullo* is, of course, involving real sanctions.

17   I don't think crime, criminal sanctions were at play, they were

18   more regulatory, but sanctions nonetheless.  And that is the

19   state acting as a sovereign.  Here is not a sovereign, here is

20   a balancing factor.  So there is that inquiry.

21          THE COURT:  So this is where you are relying on

22   *McGowan*, which there is a --

23          MR. LAWSON:  To a degree, yes.

24          THE COURT:  -- permissible and impermissible, the

25   Court should look at the permissible.  So how does that work in

1    practice?  Because you are talking about unlawful racial

2    discrimination.  And it doesn't seem like anything that you

3    have alleged in Section 1 actually constitutes unlawful racial

4    discrimination.

5         MR. LAWSON:  So what I would put to is obviously

6    Section 1 is as detailed and it states what it states.  I --

7    the verbiage there is what it is.  What we have referenced in

8    some of our summary judgment pleadings -- I think it is in the

9    declaration.  One of the points that -- and this just may be a

10   fundamental legal philosophical difference here.  Our view of

11   the *SSFA* decision is that -- and I want to get this right.  It

12   is sort of upper case diversity.  Diversity as it was

13   formulated in the *Bakke* decision and then evolved.  That

14   necessarily deals with -- and it is interested in the academic

15   setting on race-based balancing, representation.  And one of

16   the points that you will see in our exhibit regarding the

17   Susman Godfrey website on diversity is the phrase or the word,

18   underrepresented.

19         The concern that is present with that approach is

20   that it is presuming there is inadequate representation based

21   on race, ethnicity, gender.  And that is what *SSFA* has

22   completely undermined.  There are five Justices in that case,

23   three in dissent, two in concurrence who have acknowledged that

24   the *Bakke* line is over.  The majority, of course, is coming at

25   it from the *Grutter* 25-year extension is not done.  But

1    logically what it is speaking to there is that the balancing,

2    which was limited exclusively in the academic setting for

3    student body and representation based on these categories are

4    not applicable.  So the Court had a question.  Hopefully I will

5    get to the --

6        THE COURT:  But before we get there, I guess I don't

7    understand how much weight you are putting on underrepresented.

8    So, for example, let me give you the hypothetical, which is

9    somewhat grounded in reality.  My understanding is that women

10   make up a majority of law school graduates but are a

11   significant minority of law firm partners.  Given that, would

12   it be an objective factual statement to say that women lawyers

13   are underrepresented in the partner ranks?

14       MR. LAWSON:  No, because I think you are just talking

15   about what the statistics show.  But if you start to make

16   hiring decisions based on -- not on individual merit, but from

17   an idea of, hey, we need to get this group up to a certain

18   level, then is that person being hired on merits and individual

19   quality or they almost like some identity ambassador to fill

20   that represented category that is deemed to need to be hired?

21       THE COURT:  So you're essentially getting that Susman

22   has a quota system -- I believe this ECF 159-2 at page 10 ECF

23   page.  It is the statement, "The firm strongly encourages

24   members of all grounds underrepresented in the profession to

25   apply to join us."

1          MR. LAWSON:  That is one example.  There are multiple

2    throughout that page.

3          THE COURT:  It goes on to say, Susman Godfrey does

4    not discriminate based race, creed, religion, color, national

5    origin, ancestry, sex, age, marital status, disability, sexual

6    orientation or gender identity.  So why are we not reading that

7    earlier statement in context?  Which it is to say as in my

8    hypothetical, women who want to be law firm partners, we

9    encourage you to apply because we know that you are objectively

10    underrepresented in this pool.  That said, we abide by Title

11    VII -- I assume the DCHRA or whatever other -- I guess they

12    don't have a DC office -- what other state antidiscrimination

13    statutes there are to say, we encourage everyone to apply,

14    especially those in underrepresented groups but in making a

15    decision of whether to hire you, we are going to abide by the

16    letter of the anti-discrimination laws.

17          MR. LAWSON:  The next section, the diversity

18    committee is -- and this is the second sentence, but the

19    first --

20          THE COURT:  Before we get to that, could you answer

21    my question as it gets to the talent section.  I mean, they

22    say, we encourage people from underrepresented backgrounds, but

23    we will follow the law; correct?

24          MR. LAWSON:  That is correct, but in the next

25    paragraph they talk about dedicating to improving diversity in

1    the firm by recruiting and supporting lawyers.  So we are

2    talking there about what I think is not an unreasonable

3    interpretation of hiring decisions based on trying to address

4    an underrepresented issue, which is quite suspect after the

5    *SSFA* decision.

6              THE COURT:  By virtue of a recruiting, which I take

7    to be sort of encouraging lawyers to apply and supporting those

8    lawyers?

9              MR. LAWSON:  I would also think that recruiting and

10   hiring are synonymous there.

11             THE COURT:  So you think that recruiting means hiring

12   a quota of underrepresented --

13             MR. LAWSON:  I am not asking the Court to make an

14   inquiry into whether or not -- or a ruling into whether or not

15   setting up interviews are the issue.  This -- the concern would

16   be true hiring -- you know, I am not necessarily saying there

17   is no issue with the hiring -- or strike that -- no issue with

18   the interviewing process.  I am not looking at that.  That is

19   not the concern.  The concern would be actual hiring decisions

20   based on trying to hit a representative, however determined

21   level that is deemed appropriate.  That is what I think is

22   quite suspect in light of the *SSFA* decision.

23             THE COURT:  Okay.  So I am just trying to assess if

24   we are in the *McGowan* world and we are putting your retaliatory

25   motive to one side --

1          MR. LAWSON:  Okay.

2          THE COURT:  -- whether this can stand on your

3     presumption they are engaging in unlawful race discrimination.

4     I think we are agreeing today it would actually have to be

5     hiring some number of underrepresented individuals that might

6     not otherwise be hired in a diversity blind procedure.

7          So you then go on to say in Section 1, "Susman itself

8     engages in unlawful discrimination, including discrimination on

9     the basis of race."  What is your support for that statement?

10          MR. LAWSON:  I would -- I would really just draw to

11     the -- the exhibit we were talking about a moment ago, the

12     information off of the website.  I don't have the hard data on

13     hiring.  We move on an expedited basis for various reasons,

14     the Court is familiar with.  I don't have the --

15          THE COURT:  So your evidence of unlawful

16     discrimination including discrimination on the basis of race

17     is, this award they have, which doesn't go to hiring, which I

18     think we all agree.

19          MR. LAWSON:  Yes.

20          THE COURT:  So really it is just the word recruiting

21     and supporting lawyers who identify as members of

22     underrepresented groups?

23          MR. LAWSON:  Underrepresented, yes, that is the key

24     concern.

25          THE COURT:  Okay.  So if you are factually incorrect

43

1    or if I am unable to determine whether or not you are factually

2    correct or incorrect, how can I sustain the order on the basis

3    of their alleged racial discrimination?

4         MR. LAWSON:  I think that you could -- there is still

5    the element of discretion.  We are talking in the world of

6    Section 3, the contracting world.  You have the -- you have

7    that -- the government acting as a contractor, not as the

8    sovereign with discretion.  If it is concerned about these

9    hiring practices, what does this really mean?  I don't -- I

10   have not read the case that says that it has to grant the

11   contract without a preponderance of the evidence conclusively

12   issuing that these hiring patterns are or are not existent.  If

13   it is concerned about this generally, that is one thing.  And,

14   again, I would track back to the decades of law supporting the

15   old LBJ order.  That if the social policy -- I think really

16   where this comes to -- and hopefully I am getting close to

17   answering the Court's key question here.  If the social

18   policy -- I think the Court's question is really what is the

19   quantum of evidence that must be present either in the order or

20   supportable through litigation that could support the validity

21   of the social policy?  I think in this context, given the

22   extraordinary -- we cite the *Chao* case, I think it is, in this

23   circuit in particular the great deference that is given to

24   executive order, determining efficiencies and obviously that

25   was the -- there is no end of law regarding diversity and

1    affirmative action, et cetera, as a social policy that

2    increases efficiency.  I would think that absent the hard data

3    of who has applied, who has been hired, who has not been hired,

4    which we do not have, I still think there is some discretion

5    that the executive would have if they look at this and they are

6    like, I think I know what this means, I am not sure I want to

7    jump into business with that person.  I think there has to be

8    some level of discretion given to the executive on that.

9         THE COURT:  I do agree that you have some discretion.

10   But you rely very heavily on efforts to combat racial

11   discrimination dating back to 1940 as it pertains to government

12   contracting.

13        MR. LAWSON:  Yes.

14        THE COURT:  There I believe there was a documented,

15   objective understanding that these contracts were not being

16   awarded on a race-neutral basis.  And here you make this

17   allegation -- one that your friend on the other side says is

18   potentially defamatory that Susman engages in unlawful

19   discrimination, including discrimination on the basis of race.

20   And other than one sentence about trying to recruit individuals

21   from underrepresented backgrounds, you don't have any evidence

22   of that.  So it strikes me that if you are engaging in a

23   discretionary decision to which you might be entitled to

24   deference on the basis of incorrect data, that is sort of

25   necessarily an abuse of your discretion.

1                Right?  If I commit a legal error, I have necessarily

2        abused my discretion.

3                MR. LAWSON:  Yes.

4                THE COURT:  So I don't know how if you are relying on

5        a legally erroneous statement you are entitled to exercise that

6        discretion.

7                MR. LAWSON:  Well, I think it -- would be in the

8        realm for the executive to kind of look at the context of what

9        is meant by diversity.  We cite a few other points that the --

10       increasing parity from the -- it is the *Houston Bar*

11       *Association.*

12               THE COURT:  So increasing parity, that we should pay

13       people that do the same work, similar salaries.

14               MR. LAWSON:  That wouldn't be objectionable.  What is

15       objectionable is saying, hey, we need this number of people to

16       make sure this underrepresented group is properly represented.

17       At what level?  Why?

18               THE COURT:  And I think if we saw that on the Susman

19       website, I might follow your argument, right?  If it said only

20       members of underrepresented minorities should apply or we have

21       a specific pipeline or we have a quota.  I just don't see any

22       evidence of that.

23               MR. LAWSON:  I would submit that, again, it goes back

24       to the point we were just chatting about that.  That is going

25       towards an issue of what is the quantum of proof that must

 1   exist for the executive to determine a social policy and try to

 2   use the procurement power to further that.  And the -- *Kahn* I

 3   think is the underlying case where the circuit -- the Court is

 4   nodding -- it was dealing with an inflation issue.  And the

 5   Circuit Court here in DC said, look, it is an economic issue,

 6   it is a procurement issue.  There is plenty of good reasons on

 7   one side versus the other as to whether or not this is going to

 8   work.  We are deferring.  And I think that was a play again at

 9   *Chao*, which I am remembering a little better, which involved

10   the presence of posters being required to alert workers that

11   they didn't have to join a union.  And I believe the Court made

12   a passing reference, you know, putting that sign in there may

13   boost union membership as much as deflate it.

14          So, again, I think if the Court -- if I am

15   understanding the Court's question, I think it is going towards

16   what is the quantum of proof that is required I would submit

17   under the circuit precedence is low when it comes to this

18   issue.

19          THE COURT:  And assuming that it is low, I think that

20   is -- there is some room for debate.  I think it is hard in

21   looking at this part of Section 1 to say Susman itself engages

22   in unlawful discrimination, including discrimination on the

23   basis of race.  For example, and then you go on to discuss the

24   Susman Prize, which I think is not, I think you agree, unlawful

25   discrimination on the basis of race.

1          So if I say, Judge AliKhan's chambers engages in

2     unlawful discrimination, including discrimination on the basis

3     of race and then I say, for example, she has hired all women.

4     That obviously would not be an example of unlawful

5     discrimination on the basis of race, because the two don't jibe

6     together.  I think that is exactly what you have here.  So when

7     we are talking about the quantum of proof, I think if you had

8     come in and your second sentence had said, here is our evidence

9     of unlawful discrimination, then you might be entitled to some

10    deference in this space.  I just don't know how you square the

11    circle of the first sentence and the only quantum of proof you

12    are offering is the second sentence, which I think you agree --

13    and please tell me if I am wrong, you agree is not evidence of

14    racial discrimination.

15          MR. LAWSON:  I think if I am understanding the point

16    that counsel has made regarding the prize is that that is an

17    award.  That is not Title VII employment decisions.

18          THE COURT:  Do you agree with that?

19          MR. LAWSON:  Yes, this is just a prize.  Now, I am

20    going to put that most of the concern I think that is in the

21    order regarding racial discrimination is regarding to Title VII

22    employment.  And an academic prize, as I sit here now, I don't

23    particularly view as relating to employment.  Is there some

24    subset of Title VII law that I am overlooking?  I -- so I can't

25    sit here and say, look, it is -- that it is not.  But I don't

```
 1    see it offhand.  And it certainly is not the key issue of the
 2    hiring decisions that are the real concern with hiring towards
 3    these goals of an ideal level of representation based off of
 4    quite sensitive categories.
 5              THE COURT:  That is not the example that you
 6    included, even crediting that would be evidence of
 7    discrimination.
 8              MR. LAWSON:  Well, the order is what it is.  I
 9    can't -- I can't say, no, Your Honor, we cited something else.
10              THE COURT:  So you agree that the only example of
11    this purported unlawful discrimination is not itself unlawful
12    discrimination?  Yes or no?
13              Yes or no, sir?
14              MR. LAWSON:  I would like to think about that, Your
15    Honor.
16              THE COURT:  I would like an answer before you leave
17    my courtroom.
18              MR. LAWSON:  I understand.  And I think the Court
19    knows the concern I have got is -- I just haven't examined if
20    there is a Title VII application to scholarships.  That is the
21    fundamental issue on that point.  To the degree Title VII --
22    the Court pointed to Title VII as employment.  This is not
23    employment, I can give you that answer, yes.
24              THE COURT:  So this is not --
25              MR. LAWSON:  It is not employment, but is there a
```

1    Title VII application towards scholarships?  I am not in a

2    position to give an affirmative answer or negative.

3         THE COURT:  Last I checked, Title VII was concerned

4    with employment in terms of --

5         MR. LAWSON:  But there are subsections, of course,

6    that deal with training and education and there may be some

7    angle in there that I am overlooking.

8         THE COURT:  All right.  Just to make sure that we are

9    on the same page here, assuming that we think of -- reading the

10   first sentence of Susman engages in unlawful discrimination,

11   including discrimination on the basis of race, if you and I

12   agree that Title VII goes to the terms and conditions of

13   employment, do you agree the Susman Prize is not an example of

14   unlawful racial discrimination?

15        MR. LAWSON:  I think that is a correct reading.

16        THE COURT:  So given that we are on the same page

17   about that, doesn't your only quantum of evidence fall out of

18   the equation?

19        MR. LAWSON:  If it is in the order.  But the

20   deference that is given -- that is required to be given to

21   courts -- or by courts to executive orders is quite broad.

22   That was the --

23        THE COURT:  I understand that.  I guess, I -- I am

24   just trying to understand, why I am supposed to defer to

25   something I can't read.  Right?  The President wrote these

1    words.  I assume that his example was the best example, because

2    if there was some other one out there, it would have been good

3    to include it.  And we don't see that here.  And so I don't

4    know how as someone who is reading this and trying to decide

5    how to implement this, I can accord you any deference or

6    determine that you are exercising discretion, as opposed to

7    putative action based on something I can't read.

8        MR. LAWSON:  Well, I guess I can only kind of repeat

9    what I have said earlier regarding the -- under *Kahn* and *Chao*

10   cases with the deference due on procurement power that there is

11   a very low burden of proof.  Perhaps the Court is not satisfied

12   that that low burden of proof has been met, but that is -- I

13   believe it is a low burden.

14       THE COURT:  And you are not, as you stand here today,

15   trying to defend the election interference or the malfeasances

16   in election litigation as an appropriate reason to discriminate

17   or penalize the firm?

18       MR. LAWSON:  I think as far -- certainly, no.  I can

19   give a very simple answer on that, no.  Because we don't view

20   this as a penalty, as the Court knows already.

21       As it relates to Section 3, I think obviously a core

22   portion of the defense of Section 3 is under the diversity

23   issue, et cetera.  I am not prepared to just wipe out the --

24   the election issues, because, again, not viewing this as

25   viewpoint retaliation, not viewing this as punishment, not

 1    viewing it as falling under the First Amendment, we would view

 2    that as just part of the factors that an executive not acting

 3    as sovereign would have as discretion.  But, again, this goes

 4    back to that 30,000-foot level if you go down the path of

 5    punishment, that is one answer.  We would submit it is not.

 6            THE COURT:  All right.  And so getting into this

 7    world of election malfeasance.  So explain to me your best

 8    argument for why that would be an appropriate basis on which to

 9    exercise any deference or discretion as opposed to a penalty?

10            MR. LAWSON:  Okay.  Well, for the election issue that

11    I think was referenced in the order, I would view -- I have

12    viewed that as mainly going towards Section 2, regarding the

13    security clearances.

14            THE COURT:  Well, in your brief citing, you know,

15    *McGowan*, you say that Section 3 can stand because it relies

16    equally either on racial discrimination or malfeasance in

17    election litigation.

18            MR. LAWSON:  Correct.  So as to Section 3, we would

19    view it as just -- some of the concerns that the executive

20    voiced regarding some of the work that had been done on this

21    issue.  I don't have anything more specific that I can give on

22    that point.  The majority, of course, is, as we referenced on

23    the discrimination issue, thus the bifurcation.  I mean, we

24    obviously wanted to put that in there in case the Court

25    disregarded it.  But --

```
 1                     Yes.
 2          THE COURT:  What is election malfeasance if not
 3   discrimination on the viewpoint of the clients that the firm is
 4   retaining?
 5          MR. LAWSON:  I would -- I viewed -- and I would like
 6   to shift over if I could to Section 2.
 7          THE COURT:  I want to stay on Section 3 --
 8          MR. LAWSON:  Section 3?
 9          THE COURT:  -- because I am looking at your brief and
10   we are talking about Section 3.
11          MR. LAWSON:  I understand.  I would view that as some
12   of the concerns of the executive as to the firm as a
13   counter-party to the government and does it want to work with
14   that entity?  I think there is some discretion given to the
15   executive on that.
16          THE COURT:  Ostensibly the firm has clients.  Those
17   clients have positions that are adverse to the federal
18   government.  So your view is that the President can say, I
19   don't want any firm that has ever been adverse to me in any
20   type of litigation to receive government contracts?
21          MR. LAWSON:  I don't think it would have to be that
22   broad.  I think it could be -- if I have a particular concern
23   about certain issues, I think it could be more narrow than
24   that.
25          THE COURT:  And am I correct in thinking that in most
```

1   if not all of these cases where Susman was representing

2   individuals affiliated with election interference, they

3   prevailed in court?

4           MR. LAWSON:  I don't -- I -- that would certainly be

5   the reading I have taken from pleadings from plaintiff.  And I

6   have no evidence to counteract that.

7           THE COURT:  Do you dispute that the monies they got

8   for Dominion Voting were I think the highest defamation award?

9           MR. LAWSON:  I have no dispute on that.

10          THE COURT:  Okay.  And so I guess I am just trying to

11  figure out where your line is between presidential preferences

12  and viewpoint discrimination.

13          MR. LAWSON:  The -- I think a large part of it is

14  driven by the nature of the act taken.  If this was real

15  punishment, if this was a direction to try to sanction, you

16  know, prevent them from practicing, exact fines, threatened

17  criminal prosecution, yeah, that is an issue.  If it is an

18  inherently discretionary act, contracting, there -- there is no

19  right to have full access if they just don't want to be a

20  counter-party.

21          THE COURT:  So there is no legal limit?  So if I

22  said, I as the President don't want government contracts going

23  to anyone who defends criminal defendants.  I don't think they

24  are entitled to a defense.  I think that any firm that takes

25  that on is not a firm I want as a counter-party.  Is that

1    appropriate?

2              MR. LAWSON:  I think a variation on that is --

3              THE COURT:  No.  Answer my hypothetical, please.

4              MR. LAWSON:  Well, I think the -- the concern I see

5    is that who gets to challenge what?  Is every denial of a

6    contract now going to be a justiciable issue where everyone is

7    coming in, saying, hey, I wanted this contract, I didn't get

8    it, you know, he looked at me crosswise, he knew I gave money

9    to the other opponent a few years ago, I ran against him.  I

10   mean, we could have candidates going against candidates and

11   litigating over denial of contracts.

12             THE COURT:  That strikes me as a far cry from the

13   situation that we are in where we have an executive order.

14   This isn't like a nudge and wink where I am seeing ghosts where

15   I shouldn't.  This is, I don't like the things that you did, so

16   I am going to bar you from this space.  You are saying because

17   that is not putative in your view, there is no constitutional

18   test.

19             MR. LAWSON:  I think if there is not punishment, no.

20   Now, the Court may dispute whether or not it is punishment or

21   not.  But if there is not punishment, all of those cases,

22   whether *Vullo* and *Bantam* or whether it is *Umbehr* and *Mount*

23   *Healthy*, all of them involve some punitive aspect.

24             THE COURT:  So an executive order that says, I only

25   like women, I only want my contracts to go to women.

```
 1              MR. LAWSON:  That would have problems.

 2              THE COURT:  And what are the problems?  Because in

 3    your view, that is not punitive; right?  It is giving contracts

 4    to people that you want to have as counter-parties.

 5              MR. LAWSON:  Well, what plausible basis could there

 6    be for --

 7              THE COURT:  I really like women.  My clerks are

 8    women.  I think they are good lawyers.  I want them to be on my

 9    legal team.

10              MR. LAWSON:  You would have certainly some equal

11    protection issues I think at play in a situation like that.

12              THE COURT:  All right.  What if we take it a step

13    further and it is any gender, but I only want people who have

14    represented women, because I think women are entitled to a good

15    defense?  So I only want to engage with firms that have

16    represented women?

17              MR. LAWSON:  I -- I --

18              THE COURT:  I am not asking these questions to

19    browbeat you.  I am trying to figure out where the lines are.

20    Because it seems like you are saying that when we get to the

21    outer bounds of what we think would be problematic, it doesn't

22    matter that it is punishment versus discretion.  And I just

23    don't know why this is where your line is and why Susman falls

24    on one side and my hypotheticals fall on the other.  Right.  If

25    I rule for you, I need to write an opinion.
```

1           MR. LAWSON:  Yes.

2           THE COURT:  What would that opinion say?

3           MR. LAWSON:  Well, I think it would say that a --

4    there needs to be a denial of the contract that could be -- a

5    denied access, a canceled contract that meets with *Umbehr*

6    before it could be reviewable.  If it doesn't -- again, this

7    goes back to some issues that we have raised in our motion to

8    dismiss regarding what is at play here.  There is concern from

9    plaintiff as to the way the order is written.  Where is the

10   injury?  If this -- you know, an order would -- needs to be

11   mindful of opening the door to just every single denial of a

12   federal contract being subject to inquiry.

13          THE COURT:  What if it were limited to EOs that say

14   don't contract?

15          MR. LAWSON:  Well, the -- I think that still opens

16   the door considerably to massive amounts of litigation over

17   what was in somebody's mind at the time they decided to deny a

18   contract when that just will massively impede the functioning

19   of the government.

20          THE COURT:  I know you have been wanting to talk

21   about Section 2, so I will let you go there.

22          MR. LAWSON:  Okay.  Well, Section 2, I think the --

23   obviously there is inherent discretion on security clearances

24   that are deferred to by the courts.  And obviously the Court

25   knows the -- there is *Egan* and *Lee* cases.  And so we would view

1  this as falling within that category of the --

2      THE COURT:  So you argue that Section 2, the

3  challenge is both nonjusticiable, but is it also not ripe.

4  Which is it in your view?  My sense is if it is nonjusticiable,

5  it would never become ripe for me.

6      MR. LAWSON:  I think as written, it is not

7  justiciable.  As I understand the justiciability issue when it

8  comes to security clearances, it is -- what is justiciable is a

9  process-based analysis.  I would submit -- I will just jump

10  right into this issue that has come up elsewhere and I suspect

11  will come up in a few minutes, so I will try to anticipate it.

12  That the direction is to take steps consistent with applicable

13  law.  And I would submit that before the suspensions -- if you

14  have a pool of Susman attorneys and Susman staff who have

15  clearances, if you have that pool -- and under this term, I

16  would view it as under applicable law, those clearances have to

17  be suspended, applicable with law, which would require as under

18  the rules, each clearance holder's clearance to be individually

19  analyzed to make sure that the initial suspension was correct.

20      And then there is, of course, the second provision

21  that is requiring -- you know, what is the phrase?  Pending

22  review of whether the clearance -- so that is a very specific,

23  individualized review.

24      The reason I am jumping straight to this is I think

25  that really harps on it.  If the clearance issue is

1    individually focused, I think there is extraordinary deference,

2    to the degree it is a group approach I think that is where some

3    of the concern has come from plaintiff's counsel and some of

4    the other courts on the issue.  And that has been our approach

5    here is that the suspension has to be done consistent with the

6    applicable law rather than just a wholesale approach.

7         THE COURT:  You think consistent with applicable law

8    necessarily means on an individualized basis?

9         MR. LAWSON:  Yes.  Before you could -- before you

10    could take it -- you know, there are going to be various rules

11    and regulations -- forgive me, I don't have them at the ready

12    and recall as far as what they would be.  But whatever the

13    agency procedures are regarding the granting suspension of

14    clearances, those would have to be followed.  And you could

15    take the individual and run that through that process for the

16    suspension.  And then you could conduct the more fulsome,

17    individual review.

18         THE COURT:  And so you had said in your brief that

19    this was a situation where post-deprivation process was

20    appropriate.  So are you walking that back now and saying --

21         MR. LAWSON:  I'm sorry.

22         THE COURT:  You said in your brief that vis-a-vis

23    Section 2, post deprivation process, the subsequent review that

24    was supposed to happen was an adequate substitute for

25    pre-deprivation process.  But now it seems like you are saying

1    there is pre-deprivation process.

2         MR. LAWSON:  Well, certainly as it states in the

3    order that there is the applicable law provision.  The order

4    also is calling for a much more fulsome post-suspension review,

5    individual.  But I think that that -- the big concern that I

6    have seen is this group being singled out without any sort of

7    merits-based analysis.  And I think that it -- you know, any

8    agency trying to implement this would have to take that first

9    step as it states in the order, consistent with applicable law.

10        THE COURT:  All right.  Talking about

11   post-deprivation process, my understanding is that

12   post-deprivation process is appropriate where there is some

13   extraordinary situation where there is a government interest at

14   stake in acting before you can give pre-deprivation process.

15   What is that circumstance here?

16        Or I am misunderstanding the test?

17        MR. LAWSON:  I don't -- I am not in a position to say

18   the Court is misunderstanding the process.  As to --

19        THE COURT:  So I am quoting your motion to dismiss at

20   page 15.  You cite *Smith versus District of Columbia*, "In

21   extraordinary situations where some valid governmental interest

22   is at stake that justifies postponing the hearing until after

23   the deprivation, a post-deprivation opportunity to be heard

24   suffices."

25        And you cite that in support of your argument that

1   there will be appropriate process with regard to maintaining or

2   restoring the security clearance.

3          MR. LAWSON:  Yes.  I think we are -- the point we are

4   trying to make there is that post deprivation, I guess is the

5   phrase, revocation can be undertaken.  And that would be an

6   example.  I don't -- I don't have anything particular beyond

7   what is in the order as far as the extraordinary circumstances

8   provision.  I think that is the Court's question.  I don't have

9   anything beyond what is actually included in Section 1 to

10   expand on that.

11          THE COURT:  All right.  So in the absence of that,

12   don't you necessarily lose?

13          MR. LAWSON:  I would submit that the -- we don't have

14   to lose, no.  Because there is the provision in there that the

15   first suspension is done consistent with applicable law.

16          THE COURT:  And what also do you make of the fact

17   that Section 2 speaks of being consistent with the national

18   interest, as opposed to national security?  And I am wondering

19   in particular to what extent does that undermine your *Lee* and

20   *Egan* argument.  Because I absolutely agree with you that the

21   executive has the authority to determine who, for purposes of

22   national security, is entitled or not entitled to a security

23   clearance.  But here the national interest seems to be not

24   related to national security but purely the types of clients

25   they represent -- not even they represent.  Anyone in the firm

1    seems to be tarred and feathered with this, even if they have

2    nothing to do with the voting litigation or any sort of

3    purported unlawful discrimination.

4         MR. LAWSON:  Well, I think, you know, Section 2 is

5    labeled security clearance review.  I think national interest

6    is going to definitely be defined and cabined, if you will,

7    within that interest.  You know, one of the points in the

8    deference is, you know, is the custodian -- the executive as

9    custodian for national secrets, is he able to -- does he have

10   confidence in the people who have security clearances?  And I

11   think that, you know, it could be a broad individualized

12   inquiry as to whether or not people should be able to retain

13   and hold on to their clearances.

14        So, you know -- I guess to the Court's question as to

15   what is the national interest, I think it is something that is

16   definitely driven by national security, even if it didn't use

17   that phrase.  I cannot sit here and tell you, well, they chose

18   national interest or that word was used or national security

19   for X, Y, Z reasons.  I am not in a position to be able to do

20   that, but I think it is certainly informed by it within the

21   framing of the section.

22        THE COURT:  Did you want to move to Section 4?

23        MR. LAWSON:  I am happy to help the Court.

24        So Section 4 is actually a very interesting one.  The

25   *Perkins* order directed a review by the chair of the EEOC of

 1   large law firms' diversity practices.  I don't believe to this

 2   date Susman has received any inquiry, whether investigation as

 3   a term of art or review is a term of art, from EEOC.  So I

 4   think there is a significant issue as to their ability to

 5   challenge that.  It is almost like there is some agency over

 6   there that is doing something in my industry and I want to go

 7   stop it.  I don't think there has been any direct impact there.

 8   I think that there -- I would urge great care in the Court's

 9   order as to Section 4 as to the impact of any order impairing

10   the ability of the executive to give some direction as to

11   prioritization of efforts by cabinet agencies and other

12   government entities like the EEOC.

13          That has been something that we have wrestled with

14   significantly on Section 4 as to how does this -- what does

15   this do?  Is this inadvertently immunizing an entire industry

16   from any Title VII review?  And that is a bit of the art of the

17   drafting, so I would urge care from the Court on that point.

18   But I think the larger point is, what is Susman's interest in

19   Section 4 of the *Perkins'* order?  I am not quite sure I see

20   that.

21          THE COURT:  Do you take issue with how your friend on

22   the other side framed it, which is just any injunction would be

23   against using the order -- this order as a basis for --

24          MR. LAWSON:  The only issue I would have, as I

25   understood his argument, is that viewing again -- returning to

```
 1   the 30,000-foot level, is this discretion?  Is this punitive?
 2   As I heard it, he is, of course, taking the view that it is
 3   punishment, it is punitive -- that I understood him to be
 4   stating that the relief he would be seeking from this Court is
 5   that no inquiry pursuant to this order be used, not any sort of
 6   blanket Title VII immunity.  I am sure he will be able to clean
 7   up anything I have mistaken about.
 8              THE COURT:  That is how I understand Mr. Verrilli as
 9   well.  So if that is the world we are in, what is your
10   objection to that?
11              MR. LAWSON:  Well, at the 30,000-foot level, I am
12   objecting to the punishment.  But I certainly see where that is
13   coming from.  An order that is simply stating that Section 4 --
14   I mean, I would urge the Court to not issue an -- or deny the
15   relief on Section 4, because I don't think it -- I think it is
16   too complicated given the fact that it is not in this case or
17   it is not in the order of Susman.  And it is -- there has been
18   no outreach by the EEOC.  But that being said, an order that is
19   simply saying that no retaliatory efforts pursuant to this
20   order can be engaged in is -- I think is workable.
21              Noting, of course, hopefully that I am not suggesting
22   that there is a retaliatory angle.  I am just trying to work
23   out, how does an order get written that is not overbroad?  So
24   that is really the biggest point and maybe the only point to
25   talk about on 4.
```

 1          A related theme on Section 5, I think we talked about

 2     that very early as far as we just need the granularity of the

 3     guidance, as to access to buildings, access to staff.  We don't

 4     have that.  I will, as I mentioned earlier, concede that it is

 5     possible that something could be drawn that could impact -- I

 6     think the clearest, easiest one is the petition process that --

 7     but that -- there is -- I don't think there is a reason to

 8     believe it would be written that broadly.  And we haven't seen

 9     it, we don't know what exactly we are enjoining.

10          THE COURT:  Your friend on the other side argues that

11     clients are getting sheepish.  They point to other firms that

12     have had clients withdraw, because they are worried about

13     whatever this guidance might say.  So how is it that the harm

14     now can't be remedied until we have the guidance?  Because the

15     guidance may or may not prove to be uniquely harmful.

16          MR. LAWSON:  Yeah.  It is -- well, let me put it this

17     way:  That might be sufficient harm to grant a TRO.  But for a

18     summary judgment, what is the relief?  What is the problem that

19     is being enjoined?  We don't know.  We haven't seen it.  And so

20     that just may be one to -- I mean, formally that we don't think

21     a TRO would be appropriate.  But just practically speaking, we

22     need the granularity to know what is being enjoined, even if it

23     is simply, you know, the government shall have 30 days to

24     propose something and submit to the Court or something along

25     those lines.  That would be a much better decision than we are

1    in right now.

2            THE COURT:  What is to prevent you from thinking up

3    that guidance now?

4            MR. LAWSON:  As I read the Court's order, I think it

5    is --

6            THE COURT:  You can't act on it, if you thought there

7    was --

8            MR. LAWSON:  Implement and develop and enforce, I

9    have -- we viewed it quite broadly and we have wanted to steer

10    clear on that.

11            THE COURT:  All right.

12            MR. LAWSON:  Obviously, we have been moving at a

13    lightning pace on these things.  So the core issue, if it moves

14    beyond, if you issue a final judgment, we have that to deal

15    with.  If you deny both motions, then we can address it then.

16    So --

17            THE COURT:  All right.  Fair point.

18            Did you have anything else that you would like to

19    address?

20            MR. LAWSON:  I think I am going to end on the Court

21    stating fair point.

22            THE COURT:  I do have one more question.

23            MR. LAWSON:  I thought I made it out.

24            THE COURT:  Do you think that the *Perkins Coie*

25    opinion effects this Court's proceedings in any way?

1    MR. LAWSON:  I can't think offhand -- has driving

2    things in one fashion or another.  I don't know if the Court

3    has a specific issue.  No, I --

4         THE COURT:  I am wondering if you thought -- wanted

5    to stay this proceeding something else, whether you had views

6    about how these cases should travel.

7         MR. LAWSON:  No, I don't -- there is nothing in there

8    that I -- obviously, we take issue with the finding, but I

9    don't think there is anything urgent I need to bring to the

10   Court's attention.

11        THE COURT:  My final question for you, given that

12   these are cross-motions, would you like some time for rebuttal

13   on your motion to dismiss or have you said everything you would

14   like to say?

15        MR. LAWSON:  I have essentially said everything I

16   would like to say, but maybe if I have one material question or

17   point to make, I would keep it very limited.

18        THE COURT:  I will give you that opportunity.

19        MR. LAWSON:  Thank you.

20        THE COURT:  Thank you, Mr. Lawson.

21        Mr. Verrilli.

22        MR. VERRILLI:  Thank you, Your Honor.  I might want

23   to start at the granular level and then ascend to 30,000 feet.

24        With respect to discrimination, I think as a result

25   of Your Honor's questioning, what we have established now is

1  that the support for the President's finding in an executive

2  order that Susman Godfrey has engaged in unlawful

3  discrimination on the basis of race consists of a website

4  statement that uses the word underrepresented and the fact that

5  the firm has agreed to a pledge that focuses on gender parity.

6  That is it.  That is the sum total.

7         Now what my friend, Mr. Lawson, said was that, you

8  know, these are exactly the kinds of things that go to what was

9  at the heart of what was concerning in the majority of the

10  Supreme Court in the *SSFA* decision -- well, I commend Your

11  Honor's attention at page 2166 of 143, Supreme Court where

12  Chief Justice Roberts said in the *SSFA* decision that, "The

13  goals of improving diversity and dealing with

14  underrepresentation are commendable."  What he said was that

15  those goals don't provide a sufficiently compelling

16  justification for specific racial preferences because they are

17  too amorphous.  He didn't say that they were dangerous.  He

18  didn't say that they were negative.  He said, they were

19  commendable.  So the very things that my friend on the other

20  side is saying are the reason why Susman Godfrey should be

21  suspect, are things that the Chief Justice said in *SSFA* were

22  commendable.

23         Now, I can't help but point out that my friend on the

24  other side also referenced President Johnson's executive order.

25  Of course, that executive order was rescinded by this

1    President.

2         THE COURT:  I guess I am surprised you are starting

3    with the *SSFA* and not the fact that none of those concerns

4    actually made it into the executive order.

5         MR. VERRILLI:  So the -- well, what I heard my friend

6    on the other side saying is that is the factual support for the

7    finding that this is unlawful.  And I guess what I am trying to

8    suggest is not only is it not unlawful, but it is quite a

9    substantial distance from anything that was concerning the

10   Supreme Court in *SSFA*.  Because I quoted from their papers

11   earlier to Your Honor that they said these are exactly the

12   kinds of concerns that animated *SSFA*.  And I guess I am just

13   trying to suggest that that really is not correct.

14        Now, I want to reiterate a point I made earlier.  I

15   just want to make sure it is clear that, you know, the weakness

16   of this discrimination rationale I think is apparent from the

17   discussion today.  But even if it had any substance -- it

18   doesn't, but even if it did, the burden would still be on the

19   government here under *Mount Healthy* and *TikTok* to prove that

20   this executive order with all of its terms would have been

21   adopted based solely on that rationale putting aside the

22   retaliation for Susman's constitutionally protected speech.

23   They haven't tried to do that.  And so they just -- so they

24   just lose for that reason alone.

25        Now, my friend raised this issue about the risk of

1    speculation here with respect to government motives.  There is
2    some hard cases maybe with respect to that.  This is not one of
3    them.  There is no need to speculate.  We are not asking the
4    Court to speculate.  All we are asking the Court to do is read
5    the executive order.  It is right there what the President's
6    reasons were.

7              The point about Section 4 -- I think, you know -- I
8    think Your Honor's questioning accurately represented what we
9    are asking for.  But the idea that we don't -- that we
10   shouldn't have any concern about Section 4.  In Section 1, the
11   President of the United States determined that we have engaged
12   in unlawful racial discrimination.

13             And then Section 4 is a direction to the EEOC.  And
14   so, you know, if the EEOC were to issue a notice saying they
15   are launching an investigation against Susman Godfrey because
16   the President of the United States has found that Susman
17   Godfrey engaged in unlawful racial discrimination, that would
18   be unconstitutional.  So, of course, we have a concern over
19   that.

20             With respect to the Section 5, again, my friend has
21   raised this issue, well, we don't know what the guidance would
22   say.  I think here is the fundamental problem with that.  There
23   is nothing that the government could do, nothing, in Section 5
24   in terms of restricting Susman's lawyers from access to federal
25   buildings, talking to federal officials, et cetera, nothing

1    that they could constitutionally do in retaliation for Susman

2    exercising its constitutionally protected First Amendment

3    rights to advocate on behalf of its clients.  There is not a

4    single thing that they could constitutionally do.  No guidance

5    is necessary for the Court to reach that conclusion.

6         THE COURT:  What if we are looking at not the

7    retaliatory election litigation, but the allegation of racial

8    discrimination?

9         MR. VERRILLI:  Same problem under *Mount Healthy*.

10   They would have to prove they would take that step irrespective

11   of their retaliatory motive.  They haven't tried, so they lose

12   on that ground.  Beyond that, I don't know.  I don't -- I am

13   trying to be careful here.  It seems ridiculous to me to say

14   that because Susman Godfrey said on its website that it had

15   used the word underrepresented groups and it supports gender

16   equality that one could justify any restriction, any

17   restriction at all on access to government facilities or

18   buildings or the ability to meet with government personnel.  I

19   don't see how anyone could possibly think that is okay.

20        Now, the -- my friend has stressed this idea that

21   there is a big difference between punishment and discretion

22   and, of course, the government can't do these things as

23   punishment.  It can do these things if it has discretion.  I

24   just want to spend a minute with that.  The -- because it is

25   wrong.  The government may have some additional latitude, as we

1   discussed earlier, Your Honor, with respect to contractor, et

2   cetera.  But they don't have the discretion to blatantly

3   violate the constitution.  And a good example came up in Your

4   Honor's questioning.  You know, the government doesn't have the

5   discretion to afford preferences on government contracting

6   based on race.  Right?  That is discretion whether to award a

7   contract.  But they don't have that.  That is the *Adarand*

8   decision.  That is 30-plus years old now.  That is contracting.

9   That is discretion.  But the constitution limits the

10  discretion.

11          And the *Umbehr* decision that we were discussing

12  earlier, again the case that the government relies on and that

13  Mr. Lawson discussed today, I think it is helpful.  I am going

14  to read something from page 674 of the decision, because I

15  think it is complete refutation of the core premise of the

16  government's argument here.  The opinion is discussing the

17  Court's precedence on page 674 and says, "Those precedents have

18  long since rejected Justice Holmes' famous dictum that a

19  policeman may have a constitutional right to talk politics, but

20  he has no constitutional right to be a policeman.  Recognizing

21  that the constitutional violations may arise from the deterrent

22  or chilling effect of government efforts that fall short of

23  direct prohibition against the exercise of First Amendment

24  rights, our modern 'unconstitutional conditions' doctrine holds

25  that the government may not deny a benefit to a person on the

1  basis that infringes his constitutionally protected freedom of

2  speech even if he has no entitlement to that benefit."  In

3  other words, even if the government is exercising discretion.

4  So that whole premise is just misconceived.

5          And then, you know, to ascend to 30,000 feet here, if

6  I could.  I would like to take a step back and think about what

7  this executive order says.  In Section 1 it says -- this is a

8  President of the United States in an operative legal document

9  directing federal agencies to take action against Susman.  It

10  says, in the second paragraph of Section 1, "Susman spearheads

11  efforts to weaponize the American legal system and to degrade

12  the quality of American elections."

13          Now what does that amount to?  Susman's

14  constitutionally protected right to advocate on behalf of

15  Dominion Voting Systems and on behalf of the Secretaries of

16  State of Wisconsin and Arizona in defense of the integrity of

17  Dominion's voting machines and the integrity of the electoral

18  results in those states.  That is what this refers to.

19          And then the next sentence, "Susman also funds groups

20  that engage in dangerous efforts to undermine the effectiveness

21  of the United States military through injection of political

22  and radical ideology."

23          Now, what does that amount to?  A charitable

24  contribution to the GLAAD organization.  Again, something that

25  the Supreme Court has said as recently as *Bonta* is fully

1    constitutionally protected.

2          And then, third, it supports efforts to discriminate

3    on the basis of race.  And Susman itself engages in unlawful

4    discrimination.  So we discussed that.  It is completely

5    baseless.

6          And the government is trying very hard here to make

7    it seem like this executive order is no big deal.  But as this

8    Court has already observed in the TRO ruling and as everyone in

9    this country knows, these executive orders are designed to

10   intimidate law firms so that they will not advocate on the

11   basis -- for the interests of their clients if the President of

12   the United States doesn't like what they are advocating for.

13   And we know that while Susman is fighting and several other

14   firms are fighting that several of the nation's largest and

15   most powerful law firms have agreed to acquiesce to this

16   intimidation.  We know that clients aren't getting

17   representation that they need because of that intimidation.

18   This is as serious as it gets.  This is as serious an abuse of

19   executive power as has happened in the history of this country.

20   And I would urge the Court as promptly as the Court can

21   reasonably do so to issue a judgment definitively and

22   permanently enjoining it.  Thank you.

23          THE COURT:  All right.  Thank you very much.

24          Mr. Lawson.

25          MR. LAWSON:  I have no specific points unless the

1    Court has any.

2         THE COURT:  All right.  Thank you very much.  I will

3    take the motions under advisement.  I will endeavor to get

4    something out in due course.  I believe the parties have agreed

5    to keep the TRO in place until my ultimate merits ruling.  The

6    parties are still in agreement on that?

7         MR. VERRILLI:  Yes, Your Honor.

8         MR. LAWSON:  Yes, Your Honor.

9         THE COURT:  Thank you.  I thank the parties and the

10   amici for their briefing.  You have given me and my clerks a

11   lot to think about and I very much appreciate it.

12         So this matter is adjourned.

13         (Proceedings concluded at 3:55 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

**JA 3347**

1                    C E R T I F I C A T E

2

3          I, SHERRY LINDSAY, Official Court Reporter, certify

4    that the foregoing constitutes a true and correct transcript of

5    the record of proceedings in the above-entitled matter.

6

7

8

9

10                   Dated this 9th day of May, 2025.

11

12                   _____
                     Sherry Lindsay, RPR
13                   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

MR. LAWSON: [88]   1/5 2/7 3/16
MR. WELLS: [75]   1/25 2/2 2/4
4/13 5/10 6/2 6/6 6/11 6/17 7/4
9/16 10/9 11/5 11/10 11/13 12/4
12/11 13/2 13/7 13/10 14/22 15/21
16/16 16/19 17/11 17/23 17/25
19/15 19/20 20/21 20/23 22/1
23/11 24/1 24/7 24/20 26/2 26/23
28/3 28/17 28/22 29/15 30/2 30/8
31/16 66/22 68/5 70/9 74/7
**THE COURT REPORTER: [1]**   10/8
**THE COURT: [135]**
**THE COURTROOM DEPUTY: [1]**   2/2

**'**

'unconstitutional [1]   71/24

**1**

10 [1]   39/22
100 percent [1]   20/8
1107 [2]   1/4 2/4
1155 [1]   1/15
13 [2]   20/18 20/20
143 [1]   67/11
15 [1]   59/20
159-2 [1]   39/22
16 [1]   17/19
160 [1]   28/8
1940 [1]   44/11
1981 [1]   6/25

**2**

20001 [1]   1/24
20004 [1]   1/15
2020 [1]   8/11
2025 [1]   1/5 75/10
20530 [1]   1/20
2166 [1]   67/11
25-1107 [2]   1/4 2/4
25-year [1]   38/25

**3**

30 [1]   64/23
30,000 feet [2]   66/23 72/5
30,000-foot [5]   30/14 32/13 51/4
63/1 63/11
30-plus [1]   71/8
333 [1]   1/23
350 [1]   1/17
3:55 [1]   74/13

**4**

41 [1]   17/5
42 [1]   6/25

**5**

50th [1]   1/17
528 [1]   13/21
529 [1]   13/21

**6**

6710 [1]   1/24
674 [2]   71/14 71/17
685 [1]   37/4
689 [1]   17/3

**7**

770 [1]   17/3
7th [1]   1/15

**9**

90071 [1]   1/18
950 [1]   1/20
9th [1]   75/10

**A**

abandoning [1]   7/25
abide [2]   40/10 40/15
ability [7]   10/20 36/2 36/3 36/4
62/4 62/10 70/18

able [9]   15/7 29/23 31/4 36/1
42/11 61/11 62/7 68/2 68/8
above [1]   75/5
above-entitled [1]   75/5
absence [1]   60/11
absent [2]   25/17 44/2
absolute [1]   35/25
absolutely [5]   9/16 9/16 23/13
53/4 60/20
abuse [4]   4/17 36/21 44/25 73/18
abused [1]   45/2
academic [3]   38/14 39/2 47/22
access [15]   28/11 28/13 31/1 31/3
31/13 31/13 31/18 31/21 31/25
53/19 56/5 64/3 64/3 69/24 70/17
accord [1]   50/5
account [1]   12/19
accuracy [1]   4/18
accurately [1]   69/8
acknowledged [1]   38/23
acquiesce [1]   73/15
acquiescing [1]   8/4
across [1]   32/9
act [7]   23/17 23/22 35/11 36/1
53/14 53/18 65/6
acting [6]   12/15 22/24 37/19 43/7
51/2 59/14
action [13]   1/3 2/4 9/9 9/23 11/4
11/16 12/3 18/23 24/16 28/24 44/1
50/7 72/9
actions [3]   8/9 13/18 35/3
activated [1]   2/22
actual [1]   41/19
actually [6]   23/8 38/3 42/4 60/9
61/24 68/4
Adarand [1]   71/7
add [1]   3/25
addition [1]   2/12
additional [3]   4/9 26/13 70/25
address [7]   12/12 14/23 15/20
26/23 41/3 65/15 65/19
adequate [1]   58/24
adjourned [1]   74/12
adopted [2]   25/16 68/21
advance [1]   5/19
adverse [3]   15/6 52/17 52/19
advisement [1]   74/3
advocacy [3]   4/20 5/14 7/25
advocate [3]   70/3 72/14 73/10
advocates [2]   4/24 5/15
advocating [1]   73/12
affect [3]   24/4 29/13 32/1
affiliated [1]   53/2
affirmative [3]   23/9 44/1 49/2
afford [1]   71/5
after [4]   10/2 22/16 41/4 59/22
aftermath [1]   3/10
afternoon [7]   2/2 2/7 2/11 2/15
2/16 2/18 30/10
again [23]   7/21 11/2 22/12 24/12
25/18 26/7 29/11 31/13 34/12 36/4
36/6 37/14 43/14 45/23 46/8 46/14
50/24 51/3 56/6 62/25 69/20 71/12
72/24
against [18]   3/14 4/20 4/22 9/7
9/23 12/16 16/4 19/8 26/9 28/10
28/24 29/4 54/9 54/10 62/23 69/15
71/23 72/9
age [1]   40/5
agencies [7]   3/15 9/22 10/2 10/13
28/24 62/11 72/9

agency [9]   3/14 3/17 12/17 22/15
30/25 35/5 35/6 48/8 62/5
agree [11]   35/2 42/18 44/9 46/24
47/12 47/13 47/18 48/10 49/12
49/13 60/20
agreed [3]   67/5 73/15 74/4
agreeing [1]   42/4
agreement [1]   74/6
agreements [4]   16/15 33/15 33/16
33/16
ahead [1]   36/8
al [2]   1/6 2/4
alert [1]   46/10
ALIKHAN [1]   1/10
AliKhan's [1]   47/1
all [43]   3/15 3/20 3/24 4/3 4/25
6/15 7/3 9/9 9/11 11/12 12/6
12/23 15/19 16/11 17/12 17/18
23/5 24/12 27/4 33/5 34/8 35/12
35/13 35/13 36/4 39/24 42/18 47/3
49/8 51/6 53/1 54/21 54/23 55/12
59/10 60/11 65/11 65/17 68/20
69/4 70/17 73/23 74/2
allegation [2]   44/17 70/7
allegations [3]   18/9 20/3 23/13
alleged [2]   38/3 43/3
allow [1]   32/8
allowed [2]   12/22 26/19
almost [2]   39/19 62/5
alone [3]   10/24 11/1 68/24
along [2]   17/4 64/24
already [5]   4/7 8/3 30/20 50/20
73/8
also [19]   2/10 4/10 4/22 5/17
6/16 9/21 10/23 12/11 12/13 15/14
17/1 24/3 31/11 41/9 57/3 59/4
60/16 67/24 72/19
alternative [1]   17/9
although [1]   5/19
am [62]   2/8 4/5 5/8 5/10 10/3
11/3 13/7 13/8 16/14 17/1 17/24
19/24 20/22 21/1 21/14 30/20 36/8
37/3 41/13 41/16 41/18 41/23 43/1
43/16 44/6 46/9 46/14 47/13 47/15
47/19 47/24 49/1 49/7 49/23 49/24
50/23 52/9 52/25 53/10 54/14
54/16 55/18 55/19 57/24 59/16
59/17 59/19 60/18 61/19 61/23
62/19 63/6 63/11 63/21 63/22 70/22
65/20 66/4 68/2 68/7 68/12 70/12
71/13
ambassador [1]   39/19
ambiguity [1]   3/19
amended [2]   3/4 3/16
Amendment [14]   4/25 14/10 14/16
14/24 14/25 18/10 18/13 18/16
22/18 25/17 29/3 51/1 70/2 71/23
American [3]   10/10 72/11 72/12
amici [1]   74/10
amicus [1]   35/22
amorphous [1]   67/17
amount [2]   72/12 72/23
amounts [1]   56/16
analysis [4]   19/9 25/19 57/9 59/7
analyzed [1]   57/19
ancestry [1]   40/5
Anders [2]   1/13 2/10
Angeles [1]   1/18
angle [2]   49/7 63/22
animated [1]   68/12
another [1]   66/2
answer [8]   27/24 40/20 48/16
48/23 49/2 50/19 51/5 54/3
answering [1]   43/17
anti [2]   10/10 40/16
anti-American [1]   10/10
anti-discrimination [1]   40/16
anticipate [1]   57/11
antidiscrimination [1]   40/12
any [58]   2/22 3/11 3/21 4/9 6/1
6/10 6/14 8/11 11/14 11/15 11/15

**JA 3349**

**A**

**any [47]**   25/11 27/12 27/24 28/25 29/9
29/10 29/25 30/2 33/10 33/12
33/20 33/23 33/25 34/5 34/24
36/12 44/21 45/21 50/5 51/9 52/19
52/19 53/24 55/13 59/6 59/7 61/2
62/2 62/7 62/9 62/16 62/22 63/5
65/25 68/17 69/10 70/16 70/16
74/1
**anybody [1]**   36/13
**anyone [4]**   14/17 53/23 60/25 70/19
**anything [14]**   3/25 16/11 22/25 25/4 34/14 36/13 38/2 51/21 60/6 60/9 63/7 65/18 66/9 68/9
**apologize [2]**   6/7 33/3
**apparent [1]**   68/16
**appearance [1]**   2/6
**APPEARANCES [1]**   1/12
**appears [1]**   21/4
**applicable [9]**   39/4 57/12 57/16 57/17 58/6 58/7 59/3 59/9 60/15
**applicants [1]**   13/23
**application [3]**   29/6 48/20 49/1
**applied [2]**   18/20 44/3
**applies [1]**   26/5
**apply [12]**   19/9 25/10 26/6 62/20 30/23 30/24 36/4 39/25 40/9 40/13 41/7 45/20
**applying [1]**   36/20
**appreciate [1]**   34/10 74/11
**approach [7]**   19/22 21/12 32/14 38/19 58/2 58/4 58/6
**approached [1]**   30/12
**appropriate [8]**   41/21 50/16 51/8 54/1 58/20 59/12 60/1 64/21
**appropriately [1]**   20/8
**arbitrary [1]**   7/18
**are [147]**
**areas [1]**   31/7
**aren't [2]**   13/17 73/16
**argue [3]**   17/9 24/23 57/2
**argues [1]**   64/10
**argument [20]**   8/12 9/14 11/25 14/19 15/16 19/1 25/18 27/19 28/4 28/5 28/14 28/16 28/19 34/16 45/19 51/8 59/25 60/20 62/25 71/16
**arguments [5]**   4/10 8/8 10/25 25/10 30/4
**arise [1]**   71/21
**Arizona [1]**   72/16
**around [1]**   10/3 37/4
**art [4]**   31/9 62/3 62/3 62/16
**as [145]**
**ascend [2]**   66/23 72/5
**aside [1]**   68/21
**ask [5]**   18/21 20/17 21/20 23/1 32/19
**asked [1]**   20/7
**asking [13]**   11/14 11/18 11/18 11/21 11/22 17/15 22/20 24/13 41/13 55/18 69/3 69/4 69/9
**aspect [2]**   32/8 54/23
**assess [2]**   13/18 41/23
**associated [1]**   18/18
**association [2]**   5/3 45/11
**assume [5]**   5/22 40/11 50/1
**assuming [2]**   46/19 49/9
**astounding [2]**   10/4 21/2
**attached [1]**   33/20
**attainder [1]**   35/23
**attempted [3]**   11/20 19/25 20/1
**attempts [1]**   13/18
**attention [3]**   16/21 66/10 67/11
**attorney [1]**   9/24
**attorneys [1]**   57/14
**attract [1]**   10/20
**audience [1]**   2/12

**authority [4]**   10/15 18/6 24/17 31/18
**authorize [1]**   33/18
**Ave [2]**   1/17 1/20
**Avenue [1]**   1/23
**avoid [3]**   3/17 3/18
**award [5]**   6/21 42/17 47/17 53/8 71/6
**awarded [1]**   44/16
**aware [3]**   13/7 13/8 35/19

**B**

**back [9]**   22/22 29/1 43/14 44/11 45/23 51/4 56/7 58/20 72/6
**backgrounds [2]**   40/22 44/21
**bad [1]**   55/21
**Bakke [2]**   38/13 38/24
**balancing [1]**   37/20 38/15 39/1
**Bankruptcy [1]**   1/23
**Bantam [2]**   30/17 54/22
**bar [4]**   8/15 36/2 45/10 54/16
**barring [2]**   35/24 36/13
**based [22]**   11/16 14/17 15/2 18/23 19/6 21/5 23/19 27/9 27/16 38/15 38/20 39/3 39/16 40/4 41/3 41/20 48/3 50/7 57/9 59/7 68/21 71/6
**baseless [4]**   10/22 12/13 13/18 73/5
**baselessly [1]**   12/15
**basic [1]**   8/17
**basically [2]**   20/11 22/4
**basis [31]**   8/24 9/11 10/6 14/15 19/19 20/3 21/10 22/17 22/24 23/18 23/22 24/9 42/13 42/16 43/2 44/16 44/19 44/24 46/23 46/25 47/2 47/5 49/11 51/8 55/5 58/8 62/23 67/3 72/1 73/3 73/11
**be [120]**
**bearing [1]**   26/25
**bears [1]**   18/24
**because [48]**   3/6 6/24 6/25 10/4 11/25 12/5 14/6 15/6 19/10 19/16 20/2 21/1 21/22 22/2 22/5 22/17 23/11 25/22 28/20 29/5 31/22 35/8 37/16 38/1 39/14 40/9 47/5 50/1 50/19 50/24 51/15 52/9 54/16 55/2 55/14 55/20 60/14 60/20 63/15 64/12 64/14 67/16 68/10 69/15 70/14 70/24 71/14 73/17
**become [1]**   57/5
**been [25]**   10/20 14/14 15/14 19/10 23/25 24/8 31/9 32/3 33/14 33/19 34/1 35/22 44/3 44/3 50/2 50/12 51/20 52/19 56/20 58/4 62/7 62/13 63/17 65/12 68/20
**before [14]**   1/10 2/21 3/3 8/21 32/19 32/24 39/6 40/20 48/16 56/6 57/13 58/9 58/9 59/14
**begin [2]**   2/21 3/3
**beginning [1]**   2/6
**begun [1]**   25/20
**behalf [5]**   4/20 7/25 70/3 72/14 72/15
**being [14]**   15/7 24/11 35/11 35/19 36/1 39/18 44/15 46/10 56/12 59/6 60/17 63/18 64/19 64/22
**believe [14]**   5/16 6/14 10/21 16/16 21/21 30/11 30/13 39/22 44/14 46/11 50/13 62/1 64/8 74/4
**belong [1]**   34/1
**benefit [3]**   29/12 71/25 72/2
**benefits [1]**   21/10
**best [7]**   5/23 8/8 8/8 18/14 19/23 50/1 51/7
**better [3]**   21/19 46/9 64/25
**between [8]**   11/4 12/14 16/9 23/12 25/24 31/22 53/11 70/21
**beyond [9]**   10/16 21/5 21/8 21/11 33/17 60/6 60/9 65/14 70/12
**Bhatia [1]**   2/12
**bifurcation [1]**   51/23
**big [3]**   59/5 70/21 73/7

**biggest [2]**   30/15 63/24
**bills [2]**   71/9 71/10
**bit [2]**   32/17 62/16
**blanket [1]**   63/6
**blatant [3]**   18/10 25/3 25/5
**blatantly [1]**   71/2
**blind [1]**   42/6
**Block [6]**   9/19 10/1 10/5 11/21 12/7 12/10
**body [1]**   39/3
**Bonta [2]**   6/13 72/25
**Books [1]**   30/18
**boost [1]**   46/13
**both [4]**   13/11 19/17 57/3 65/15
**bounds [1]**   55/21
**Brad [2]**   1/16 2/9
**Branch [8]**   3/14 3/15 9/22 11/14 12/10 23/22 36/19 36/19
**Branches [1]**   31/6
**brazen [1]**   9/3
**Brian [2]**   1/16 2/9
**brief [5]**   21/13 51/14 52/9 58/18 58/22
**briefing [2]**   3/5 74/10
**briefly [1]**   3/2
**briefs [2]**   16/22 35/22
**bring [2]**   29/3 66/9
**bringing [1]**   6/1
**broad [3]**   49/21 52/22 61/11
**broadcast [1]**   2/23
**broader [2]**   24/24 25/1
**broadly [4]**   9/23 11/20 64/8 65/9
**brought [1]**   5/19
**browbeat [1]**   55/19
**Budget [1]**   9/25
**building [1]**   32/1
**buildings [8]**   25/15 26/25 28/12 31/13 31/22 64/3 69/25 70/18
**burden [5]**   18/24 50/11 50/12 50/13 68/18
**burdens [2]**   3/13 18/7
**business [2]**   10/14 44/7
**businesses [2]**   27/8 27/10

**C**

**CA [1]**   1/18
**cabined [1]**   61/6
**cabinet [1]**   62/11
**calling [1]**   59/4
**calls [1]**   5/7
**came [2]**   31/23 71/3
**can [39]**   5/23 6/7 7/13 7/14 9/6 9/18 12/2 12/25 15/1 19/17 22/10 22/11 27/2 27/12 27/16 28/15 31/5 31/8 32/16 32/19 33/8 34/8 36/4 37/8 42/2 43/2 48/23 50/5 50/8 50/18 51/15 51/21 52/18 59/14 60/5 63/20 65/15 70/23 73/20
**can't [29]**   9/4 9/6 20/9 22/16 23/17 23/18 23/21 23/22 26/11 26/12 26/24 27/13 27/15 29/3 29/8 33/2 34/19 35/5 36/25 47/24 48/9 48/9 49/25 50/7 64/14 65/6 66/1 67/23 70/22
**canceled [1]**   56/5
**candidates [2]**   54/10 54/10
**cannot [5]**   6/24 28/11 28/13 33/19 61/17
**care [2]**   62/8 62/17
**careful [1]**   70/13
**carries [1]**   10/15
**carry [2]**   10/14 15/9
**carryover [1]**   18/2
**Carta [1]**   7/16
**case [34]**   3/11 3/16 9/9 10/1 17/11 18/14 18/21 19/3 19/4 19/5 19/5 19/11 19/14 19/7 19/12 19/23 25/21 26/7 26/8 26/9 26/11 27/14 33/3 36/17 37/4 37/14 38/12 38/22 43/10 43/22 46/3 51/24 63/16 71/12

**C**

**cases [16]** 12/3 12/6 13/6 28/22
29/3 29/21 29/22 30/19 34/3
36/14 36/21 37/12 38/3 42/22
36/16 37/2 50/10 53/1 54/21 56/25
66/6 69/2
**cash [1]** 6/21
**categorical [3]** 14/9 15/2 15/4
**categories [2]** 39/3 48/4
**category [2]** 39/20 57/1
**certain [4]** 28/10 33/11 39/17
52/23
**certainly [15]** 5/10 21/22 30/23
30/24 32/16 33/9 34/19 37/1 48/1
50/18 53/4 55/10 59/2 61/20 63/12
**certify [1]** 75/3
**cetera [9]** 11/15 18/11 25/15 26/7
28/12 44/1 50/23 69/25 71/2
**chair [2]** 2/9 61/25
**challenge [5]** 29/3 29/4 54/5 57/3
62/5
**challenges [1]** 8/10
**challenging [2]** 8/9 29/6
**chambers [1]** 47/1
**chance [2]** 14/4 25/11
**change [1]** 16/7
**channel [1]** 37/1
**Chao [3]** 43/22 46/9 50/9
**charitable [5]** 4/23 5/6 6/2 6/5
72/23
**chatting [1]** 45/24
**check [2]** 7/13 7/17
**checked [1]** 49/3
**Chen [1]** 2/13
**Chief [2]** 67/12 67/21
**chilling [1]** 71/22
**choice [1]** 37/12
**chose [1]** 61/17
**circle [1]** 47/11
**circuit [6]** 13/12 14/4 43/23 46/3
46/5 46/17
**Circuit's [1]** 16/22
**circumstance [1]** 59/15
**circumstances [4]** 13/19 16/8
36/18 60/7
**circumvention [1]** 12/7
**cite [11]** 16/22 19/11 19/16 19/23
36/25 37/1 37/2 43/22 45/9 59/20
59/25
**cited [1]** 48/9
**citing [1]** 51/14
**citizen [1]** 29/7
**citizens [1]** 7/19
**civil [3]** 1/3 2/4 21/3
**claim [4]** 10/19 10/23 14/13 21/24
**claims [1]** 13/11
**class [1]** 14/9
**clause [2]** 22/2 31/19
**clean [1]** 63/6
**clear [3]** 17/18 65/10 68/15
**clearance [15]** 14/2 14/3 14/20
15/2 15/12 15/13 15/17 16/25
57/18 57/18 57/22 57/25 60/2
60/23 61/5
**clearances [19]** 13/3 13/5 13/24
14/9 15/7 15/9 15/15 16/2 16/5
31/4 33/25 51/13 56/23 57/8 57/15
57/16 58/14 61/10 61/13
**clearest [1]** 64/6
**clerk [2]** 36/20 37/13
**clerks [2]** 55/7 74/10
**clients [12]** 5/4 7/25 10/20 52/3
52/16 52/17 60/20 64/11 64/12
70/3 73/11 73/16
**close [2]** 27/22 43/16
**Coie [7]** 3/10 9/8 17/6 23/24 24/5
29/12 65/24
**coin [1]** 4/5
**collective [1]** 14/16
**color [1]** 40/4
**COLUMBIA [2]** 1/1 59/20
**comanaging [1]** 2/13

**combat [1]** 44/10
**combined [1]** 12/17
**come [6]** 20/18 21/5 25/7 44/11
47/10 49/8 57/10 57/16 58/5 59/25
**comes [3]** 43/16 46/17 57/8
**coming [4]** 32/9 38/24 54/7 63/13
**commands [1]** 9/11
**commend [2]** 16/21 67/10
**commendable [5]** 67/14 67/19 67/22
**commentary [1]** 34/16
**commit [1]** 45/1
**commitment [2]** 8/17 20/25
**commits [1]** 20/13
**committed [2]** 10/5 20/12
**committee [1]** 40/18
**compelling [1]** 67/15
**complaint [2]** 3/4 3/17
**complete [1]** 71/15
**completely [6]** 6/12 10/22 38/22
73/4
**complicated [1]** 63/16
**comprehensively [1]** 11/23
**compromise [1]** 13/20
**compulsion [1]** 13/19
**concede [4]** 31/24 35/9 36/24 64/4
**conceded [2]** 18/6 19/2
**conceivable [2]** 31/16 32/2
**concern [17]** 18/16 18/16 38/19
41/15 41/19 41/19 42/24 47/20
48/2 48/19 52/22 54/4 56/8 58/3
59/5 69/10 69/18
**concerned [3]** 43/8 43/13 49/3
**concerning [2]** 67/9 68/9
**concerns [5]** 23/3 51/19 52/12
68/3 68/12
**concluded [1]** 74/13
**conclusion [1]** 70/5
**conclusively [1]** 43/11
**concurrence [1]** 38/23
**condemned [1]** 21/6
**condition [1]** 6/24
**conditions [1]** 49/12
**conditions' [1]** 71/24
**conduct [1]** 58/16
**conference [1]** 34/25
**confess [1]** 23/3
**confidence [1]** 61/10
**confirm [2]** 4/18 35/7
**congressional [1]** 36/10
**connected [2]** 15/19 23/15
**connection [4]** 6/10 6/14 12/14
23/12
**conscious [1]** 21/9
**consequence [1]** 10/16
**consequences [1]** 36/12
**considerably [3]** 21/8 36/2 56/16
**consideration [3]** 14/11 14/13
21/6
**considerations [1]** 21/3
**consistent [6]** 57/12 58/5 58/7
59/9 60/15 60/17
**consists [1]** 67/3
**constitutes [3]** 20/16 38/3 75/4
**constitution [10]** 1/23 7/20 8/16
12/6 13/11 18/24 26/5 26/6 71/3
71/9
**constitutional [8]** 18/18 19/18
25/13 32/9 54/17 71/19 71/20
71/21
**constitutionally [7]** 68/22 70/1
70/2 70/4 72/1 72/14 73/1
**constrain [1]** 7/13 7/17
**constraining [1]** 23/7
**constraints [1]** 27/7
**construed [1]** 23/10
**contact [1]** 33/8
**contains [1]** 23/12
**contempt [1]** 2/24
**context [4]** 36/7 40/7 43/21 45/8
**contract [15]** 7/1 19/8 26/12
26/21 27/16 37/7 43/11 54/6 54/7
56/4 56/5 56/12 56/14 56/18 71/7
**contracting [6]** 26/23 43/6 44/12

53/18 71/5 71/8
**contractor [9]** 24/10 25/1 25/3 25/9
25/18 25/21 25/24 25/25 26/4
26/10 26/14 26/24 28/9 36/2 43/1
36/3 43/7 71/1
**contractor's [1]** 26/10
**contracts [13]** 12/17 12/19 19/6
27/1 27/5 27/9 27/11 44/15 52/20
53/22 54/11 54/25 55/3
**contradict [2]** 33/6 34/7
**contrast [1]** 13/14
**contribution [6]** 4/23 5/6 5/14
6/3 6/5 72/24
**controlling [1]** 9/5
**conversations [1]** 33/13
**core [3]** 50/21 65/13 71/15
**corners [1]** 11/19
**correct [13]** 6/2 12/11 16/14
16/16 40/23 40/24 43/2 49/15
51/18 52/25 57/19 68/13 75/4
**could [44]** 2/5 4/4 4/9 5/5 9/22
12/22 14/2 14/3 15/25 16/20 19/13
20/17 21/18 22/24 28/25 29/7 29/7
29/10 31/23 31/25 32/7 40/20 43/4
43/20 52/6 52/22 52/23 54/10 55/5
56/4 56/6 58/9 58/10 58/14 58/16
61/11 64/5 64/5 69/23 70/1 70/4
70/16 70/19 72/6
**couldn't [4]** 20/2 25/22 27/7
27/11
**counsel [6]** 2/5 2/9 4/6 30/12
47/16 58/3
**counter [6]** 36/16 52/13 53/20
53/25 55/4
**counter-parties [1]** 55/4
**counter-party [4]** 36/16 52/13
53/20 53/25
**counteract [1]** 53/6
**country [2]** 73/9 73/19
**couple [3]** 8/20 9/17 15/25
**course [26]** 5/11 6/12 9/23 10/13
10/14 10/18 11/1 11/10 15/11
25/22 27/4 27/24 30/19 31/20 37/6
37/16 38/24 49/5 51/22 57/20 63/2
63/21 67/25 69/18 70/22 74/4
**court [70]** 1/1 1/22 1/22 2/8 3/9
3/12 4/14 4/15 7/15 10/13 11/6
11/13 11/14 13/12 14/4 16/23
16/24 17/7 18/20 19/5 19/21 21/6
24/13 26/11 29/23 30/16 30/17
32/5 32/7 32/14 32/17 35/19 36/9
37/25 39/4 41/13 42/14 46/3 46/5
46/11 46/14 48/18 48/22 50/11
50/20 51/24 53/3 54/20 56/24
59/18 61/23 62/17 63/4 63/14
64/24 65/20 66/2 67/10 67/11
68/10 69/4 69/4 70/5 72/25 73/8
73/20 73/20 74/1 75/3 75/13
**Court's [14]** 6/13 34/10 34/12
37/12 43/17 43/18 46/15 60/8
61/14 62/8 65/4 65/25 66/10 71/17
**courthouses [1]** 31/19
**courtroom [1]** 48/17
**courts [7]** 1/23 8/18 19/10 49/21
49/21 56/24 58/4
**crediting [1]** 48/6
**creed [1]** 40/4
**crime [1]** 37/17
**criminal [8]** 28/20 28/22 30/24
36/7 36/10 37/17 53/17 53/23
**criterion [2]** 15/3 21/5
**criticism [2]** 26/10
**cross [1]** 66/12
**cross-motions [1]** 66/12
**crosswise [1]** 54/8
**cry [1]** 54/12
**cure [1]** 12/6
**custodian [2]** 61/8 61/9
**cut [1]** 17/18
**cutting [1]** 26/21

**D**

**D.C [3]** 13/12 14/4 16/21

**D**

**damaged [1]**   42/12 44/2 44/24
**damages [1]**   72/20
**data [3]**   42/12 44/2 44/24
**date [1]**   62/2
**Dated [1]**   75/10
**dating [1]**   44/11
**day [1]**   75/10
**days [4]**   7/11 16/6 16/10 64/23
**DC [6]**   1/5 1/15 1/20 1/24 40/12
46/5
**DCHRA [1]**   40/11
**deal [6]**   19/4 19/21 34/20 49/6
65/14 73/7
**dealing [3]**   18/19 46/4 67/13
**deals [1]**   38/14
**debate [1]**   46/20
**decades [1]**   43/14
**decide [4]**   4/5 10/15 27/2 50/4
**decided [1]**   56/17
**decides [1]**   32/14
**deciding [1]**   12/19
**decision [18]**   6/13 16/22 16/23
17/14 21/9 32/15 38/11 38/13
40/15 41/5 41/22 44/23 64/25
67/10 67/12 71/8 71/11 71/14
**decisions [7]**   13/22 35/8 39/16
41/3 41/19 47/17 48/2
**declaration [3]**   6/20 8/3 38/9
**declarations [1]**   33/21
**dedicating [1]**   40/25
**deemed [2]**   39/20 41/21
**defamation [2]**   15/18 53/8
**defamatory [2]**   12/12 15/14 44/18
**defeats [1]**   19/12
**defect [1]**   15/1
**defend [3]**   19/2 20/5 50/15
**Defendant [1]**   1/19
**defendant's [1]**   20/18
**defendants [2]**   1/7 53/23
**defended [1]**   9/4
**defending [1]**   15/3
**defends [1]**   53/23
**defense [5]**   37/8 50/22 53/24
55/15 72/16
**defer [1]**   49/24
**deference [10]**   36/9 43/23 44/24
47/10 49/20 50/5 50/10 51/9 58/1
61/8
**deferred [1]**   56/24
**deferring [1]**   46/8
**defined [2]**   14/10 61/6
**definitely [1]**   61/6 61/16
**definitively [1]**   73/21
**deflate [1]**   46/13
**degrade [1]**   72/11
**degree [3]**   37/23 48/21 58/2
**DEI [1]**   24/4
**demonstrated [2]**   15/10 23/13
**denial [4]**   54/5 54/11 56/4 56/11
**denied [1]**   56/5
**denies [2]**   32/6 32/6
**deny [7]**   25/7 25/8 35/5 56/17
63/14 65/15 71/25
**Department [1]**   2/17
**deprivation [11]**   14/19 58/19
58/23 58/25 59/1 59/11 59/12
59/14 59/23 59/23 60/4
**described [2]**   19/9 29/18
**describes [1]**   13/15
**describing [1]**   9/11
**designed [1]**   73/9
**detailed [1]**   38/6
**details [1]**   33/19
**determination [1]**   14/17
**determinations [1]**   13/16
**determine [5]**   11/3 43/1 46/1 50/6
60/21
**determined [3]**   35/20 41/20 69/11
**determining [1]**   43/24
**deterrent [1]**   71/21

**develop [1]**   65/8
**development [1]**   1/7
**developments [1]**   4/9
**dialogue [1]**   33/11
**dichotomy [1]**   25/24
**dictum [1]**   71/18
**did [5]**   8/19 54/15 61/22 65/18
**didn't [8]**   16/15 18/25 33/6 46/11
54/7 61/16 67/17 67/18
**didn't contradict [1]**   33/6
**difference [5]**   14/1 26/3 30/15
38/10 70/21
**different [3]**   30/1 32/25 36/3
**differs [1]**   14/6
**direct [3]**   12/14 62/7 71/23
**directed [2]**   23/7 61/25
**directing [1]**   72/9
**direction [5]**   34/24 53/15 57/12
62/10 69/13
**directly [2]**   10/23 24/7
**Director [1]**   9/24
**directs [1]**   27/4
**disabilities [1]**   18/7
**disability [1]**   40/5
**disagreement [1]**   27/17
**discretion [33]**   30/19 31/5 31/6
31/11 35/17 35/19 36/16 36/20
36/21 36/22 43/5 43/8 44/4 44/8
44/9 44/25 45/2 45/6 50/6 51/3
51/9 52/14 55/22 56/23 63/1 70/21
70/23 71/2 71/5 71/6 71/9 71/10
72/3
**discretionary [6]**   30/18 31/3
31/14 35/8 44/23 53/18
**discriminate [3]**   40/4 50/16 73/2
**discrimination [53]**   5/2 10/6 18/5
18/9 18/11 18/12 18/17 19/7 20/4
20/16 21/15 23/14 25/3 25/5 38/2
38/4 40/16 42/3 42/8 42/8 42/16
42/16 43/3 44/11 44/19 44/19
46/22 46/22 46/25 47/2 47/2 47/5
47/9 47/14 47/21 48/7 48/11 48/12
47/9 49/11 49/14 51/16 51/23
52/3 53/12 61/3 66/24 67/3 68/16
69/12 69/17 70/8 73/4
**discuss [3]**   4/12 8/19 46/23
**discussed [6]**   5/1 22/23 36/25
71/1 71/13 73/4
**discussing [3]**   23/17 71/11 71/16
**discussion [2]**   3/10 68/17
**disembodied [1]**   9/10
**dismiss [7]**   2/20 3/1 17/19 32/5
56/8 59/19 66/13
**dismissal [1]**   32/6
**dispute [4]**   34/19 53/7 53/9 54/20
**disregarded [1]**   51/25
**disrupts [1]**   5/3
**dissent [1]**   38/23
**distance [1]**   54/8
**DISTRICT [5]**   1/1 1/1 1/10 1/23
59/20
**diversions [1]**   30/6
**diversity [12]**   20/12 38/12 38/12
38/17 40/17 40/25 42/6 43/25 45/9
50/22 62/1 67/13
**do [60]**   3/2 3/25 5/6 5/10 5/24
6/4 7/5 7/14 8/19 9/6 10/2 11/3
13/4 14/18 15/7 19/10 20/17 21/20
21/24 23/21 24/22 25/24 26/15
26/21 27/6 27/11 27/13 27/23
33/10 33/15 33/25 34/2 34/3 34/5
36/13 36/14 36/15 36/16 36/21
44/4 44/9 45/13 47/18 49/13 53/7
60/16 61/2 61/19 62/15 62/21
65/22 65/24 68/23 69/4 69/23 70/1
70/4 70/22 70/23 73/21
**doctrine [1]**   71/24
**document [3]**   12/22 28/9 72/8
**documented [1]**   44/14
**documents [1]**   33/22
**does [18]**   5/21 6/21 11/24 15/11

24/4 26/20 29/13 37/25 40/3 43/9
43/11 43/13 43/14 62/14
**doesn't [19]**   14/23 15/23 18/23
23/1 24/7 26/6 26/14 27/16 27/22
28/19 35/6 38/22 42/17 49/17 55/21
56/6 68/18 71/4 73/12
**doing [6]**   9/1 22/5 22/6 23/8 29/2
62/6
**DOJ [1]**   1/19
**DOJ-USAO [1]**   1/19
**Dominion [3]**   4/21 53/8 72/15
**Dominion's [1]**   72/17
**Don [1]**   2/8
**don't [85]**
**Donald [1]**   1/13
**done [10]**   19/11 20/2 27/22 29/9
32/2 34/6 38/25 51/20 58/5 60/15
**door [2]**   56/11 56/16
**down [4]**   10/8 23/20 31/20 51/4
**Draconian [2]**   22/6 29/8
**drafting [1]**   62/17
**draw [1]**   42/10
**drawn [1]**   64/5
**driven [2]**   53/14 61/16
**drives [1]**   32/2
**driving [1]**   66/1
**drop [1]**   3/21
**dual [1]**   16/25
**due [13]**   7/17 10/18 10/23 12/12
14/21 25/7 25/8 28/19 29/4 30/21
30/23 50/10 74/4
**dueling [1]**   4/4
**duty [1]**   17/1

**E**

**each [2]**   35/18 57/18
**earlier [13]**   3/3 18/21 23/10
23/17 24/3 36/25 40/7 50/9 64/4
68/11 68/14 71/1 71/12
**early [2]**   7/11 64/2
**easiest [1]**   64/6
**economic [1]**   46/5
**education [1]**   49/6
**EEOC [19]**   22/14 22/15 22/19 22/21
22/24 23/5 23/8 23/18 23/20 24/5
24/9 24/16 31/8 61/25 62/3 62/12
63/18 69/13 69/14
**effect [3]**   11/23 24/7 71/22
**effectiveness [1]**   72/20
**effects [2]**   15/6 65/25
**efficiencies [1]**   43/24
**efficiency [1]**   44/2
**effort [2]**   8/1 9/2
**efforts [8]**   9/3 44/10 62/11 63/19
71/22 72/11 72/20 73/2
**Egan [2]**   13/11 13/14 13/15 14/6
17/1 56/25 60/20
**either [3]**   33/7 43/19 51/16
**Elaine [1]**   2/10
**election [13]**   4/21 8/11 18/5 18/8
50/15 50/16 50/24 51/7 51/10
51/17 52/2 53/2 70/7
**elections [1]**   72/12
**electoral [1]**   72/17
**element [2]**   15/14 43/5
**elements [1]**   20/6
**eliminating [1]**   36/1
**else [6]**   22/25 25/5 37/12 48/9
65/18 66/5
**elsewhere [1]**   57/10
**emphasis [1]**   30/5
**emphasize [1]**   30/3
**employee [1]**   11/14
**employees [2]**   2/14 13/5 34/1
**employer [1]**   26/4
**employment [11]**   6/22 6/23 6/24
47/17 47/22 47/23 48/22 48/23
48/25 49/4 49/13
**encourage [2]**   40/9 40/13 40/22
**encourages [1]**   39/23

**E**

encouraging [1]  4/7
endeavor [1]  74/3
endorse [1]  29/21
enforce [1]  65/8
engage [4]  25/3 25/5 55/15 72/20
engaged [5]  23/14 63/20 67/2 69/11 69/17
engages [6]  42/8 44/18 46/21 47/1 49/10 73/3
engaging [2]  42/3 44/22
enjoin [2]  11/14 12/2
enjoined [8]  8/18 10/3 10/25 11/22 11/23 23/25 64/19 64/22
enjoining [6]  12/5 17/5 29/17 34/14 64/9 73/22
enough [2]  15/17 36/23
ensure [3]  7/13 28/11 28/12
enter [1]  24/13
entered [1]  33/16
enthusiasm [1]  34/10
entire [1]  62/15
entirety [1]  9/13
entities [1]  62/12
entitled [9]  33/11 44/23 45/5 47/9 53/24 55/14 60/22 60/22 75/5
entitlement [1]  72/2
entity [3]  22/2 29/8 52/14
entry [1]  29/17
EO [3]  14/8 22/25 24/4
EOs [1]  56/13
equal [5]  5/15 5/17 20/14 22/2 55/10
equality [3]  4/24 20/25 70/16
equally [4]  18/4 18/8 18/15 51/16
equation [1]  49/18
equities [1]  17/2
equivalent [1]  17/5
erroneous [1]  45/5
error [1]  45/1
especially [1]  40/14
essentially [2]  39/21 66/15
establish [3]  4/19 6/20 37/5
established [1]  66/25
establishes [1]  19/11
et [11]  1/6 2/4 11/15 18/11 25/15 26/7 28/12 44/1 50/23 69/25 71/1
et cetera [4]  11/15 28/12 44/1 69/25
ethnicity [1]  38/21
evaluate [1]  19/18
even [20]  6/11 15/23 18/25 21/15 21/17 24/3 25/17 25/20 35/9 35/22 37/2 48/6 60/25 61/1 61/16 64/22 68/17 68/18 72/2 72/3
event [1]  15/8
ever [3]  9/4 33/4 52/19
every [9]  3/14 3/17 8/17 12/16 22/15 23/21 29/20 54/5 56/11
everyone [3]  40/13 54/6 73/8
everything [2]  66/13 66/15
evidence [13]  20/10 33/7 37/8 42/15 43/11 43/19 44/21 45/22 47/8 47/13 48/6 49/17 53/6
evolved [1]  19/21 38/13
exact [5]  16/1 16/3 24/21 25/16 53/16
exactly [9]  9/24 16/23 19/24 25/10 26/8 47/6 64/9 67/8 68/11
examined [1]  48/19
example [13]  30/20 39/8 40/1 46/23 47/3 47/4 48/5 48/10 49/13 50/1 50/1 60/6 71/3
exclusion [1]  25/14
exclusively [1]  39/2
excuse [1]  29/4
executive [62]  1/6 2/3 3/13 3/14 3/15 3/17 3/21 4/8 4/16 7/18 7/24 8/9 9/14 9/22 11/14 11/17 11/20 12/9 13/15 14/1 14/5 16/2 16/9

**F**

F.3d [1]  17/3
facilities [2]  25/15 70/17
fact [8]  12/18 27/9 29/9 36/22 60/16 63/16 67/4 68/3
factor [1]  37/20
factors [1]  51/2
facts [4]  4/19 6/19 8/2 28/8
factual [1]  15/10 32/21 39/12 68/6
factually [2]  42/25 43/1
fair [3]  4/1 65/17 65/21
fall [3]  49/17 55/24 71/22
fallen [1]  21/4
falling [2]  51/1 57/1
falls [1]  55/23
familiar [1]  42/14
famous [1]  71/18
far [9]  26/14 30/13 36/12 37/15 50/18 54/12 58/12 60/7 64/2
fashion [1]  66/2
fashioned [2]  8/23 8/24
favor [2]  26/19 36/10
feathered [1]  61/1
federal [5]  12/17 31/19 52/17 56/12 69/24 69/25 72/9
feet [2]  66/23 72/5
few [6]  16/6 16/10 28/2 45/9 54/9 57/11
fighting [3]  8/1 73/13 73/14
figure [3]  6/8 53/11 55/19
fill [1]  39/19
final [4]  29/16 29/24 65/14 66/11
find [1]  14/5
finding [3]  66/8 67/1 68/7
findings [10]  9/10 9/10 9/20 9/20 9/21 10/22 11/3 22/25 23/19 23/23
finds [1]  8/12
fines [1]  53/16
fingerprints [2]  6/6 6/8
firm [24]  2/9 2/14 4/20 5/25 10/5 14/16 15/8 15/10 15/13 24/7 32/24 39/11 39/23 40/8 41/1 50/17 52/3 52/12 52/16 52/19 53/24 53/25 60/25 67/5
firms [11]  7/25 8/3 24/9 33/1 33/11 33/16 55/15 64/11 73/10 73/14 73/15
firms' [1]  62/1

20/4 22/17 22/17 22/19 23/15
23/11 23/17 23/22 24/17 24/23
24/25 31/17 36/15 36/18 40/1
44/8 45/8 46/1 49/21 51/2 51/19
52/12 52/15 54/13 54/24 60/21
61/8 62/10 67/1 67/14 67/25 68/4
68/20 69/5 72/7 73/7 73/9 73/19
exercise [6]  14/10 14/16 14/25 45/5 51/9 71/23
exercising [4]  36/22 50/6 70/2 72/3
exhibit [2]  38/16 42/11
exist [1]  46/1
existed [1]  7/17
existent [1]  43/12
expand [1]  60/10
expedited [1]  42/13
expeditiously [1]  29/24
experience [1]  9/19
explain [1]  51/7
explained [1]  20/8
explanation [2]  7/11 33/10
explicit [1]  21/5
express [1]  21/9
extend [1]  26/14
extension [1]  38/25
extensional [2]  8/14 8/15
extensive [1]  4/7
extent [2]  17/2 60/19
extraneous [1]  27/7
extraordinary [5]  43/22 58/1 59/13 59/21 60/7

**first** [30]  3/6 4/5 4/5 4/25 8/25 9/17 10/6 10/6 13/16 14/22 14/23 15/15 15/18 15/20 15/22 20/6 20/23 22/18 24/21 25/17 29/3 40/19 47/11 49/10 51/1 59/8 60/15 70/2 71/23
five [1]  38/22
flag [1]  31/8
flip [1]  4/4
Floor [2]  1/15 1/17
flow [1]  32/15
focus [1]  7/5
focused [2]  4/8 58/1
focuses [1]  67/5
follow [5]  9/12 14/13 17/1 40/23 45/19
followed [1]  58/14
foot [5]  30/14 32/13 51/4 63/1 63/11
forbid [1]  20/14
foregoing [1]  75/4
forest [3]  7/10 7/22 29/2
forgive [3]  2/21 37/3 58/11
forgotten [1]  30/20
form [3]  6/20 22/20 35/19
formally [1]  64/20
formulated [1]  38/13
forth [1]  31/1
fortunately [1]  28/22
forward [2]  2/5 18/22
found [4]  4/16 4/25 9/8 69/16
four [1]  11/19
framed [1]  62/22
framers [2]  4/16 7/19
framing [1]  61/21
frankly [1]  21/14
free [1]  7/12
freedom [1]  72/1
freedoms [1]  14/16
friend [15]  14/18 21/19 26/17 28/18 33/5 44/17 62/21 64/10 67/7 67/19 67/23 68/5 68/25 69/20 70/20
full [3]  8/5 20/23 53/19
fully [1]  72/25
fulsome [3]  58/16 59/4
functioning [1]  56/18
fundamental [7]  13/25 26/16 30/6 34/13 38/10 48/21 69/22
fundamentally [1]  14/6
funds [1]  72/19
further [3]  17/7 46/2 55/13
furthermore [1]  18/2
future [1]  13/18

**G**

game [2]  19/1 25/20
gave [2]  31/23 54/8
gay [2]  4/24 5/16
gender [10]  10/7 10/10 20/13 20/25 21/3 38/21 40/6 55/13 67/5 70/15
general [2]  9/24 30/22
generally [2]  33/18 43/13
gesture [1]  22/7
get [14]  7/8 11/9 17/21 32/19 36/2 38/11 39/5 39/6 39/17 40/20 54/7 55/20 63/23 74/3
gets [3]  40/21 54/5 73/18
getting [5]  39/21 43/16 51/6 64/11 73/16
ghosts [1]  54/14
gift [1]  7/1
Ginger [2]  1/13 2/9
give [13]  4/9 11/9 17/21 28/1 33/8 39/8 48/23 49/2 50/19 51/21 59/14 62/10 66/18
given [14]  24/10 31/6 35/6 39/11 43/21 43/23 44/8 49/16 49/20 49/20 52/14 63/16 64/11 74/10
giving [2]  36/9 55/3
GLAAD [2]  5/13 72/24

**G**

**ge [1]**   21/23

**gives [13]**   5/13 23/11 27/11 31/20
56/21 62/6 67/8

**goal [1]**   8/6

**goals [3]**   48/3 67/13 67/15

**God [1]**   20/14

**GODFREY [24]**   1/3 2/3 2/8 2/11
4/23 6/16 6/20 7/23 8/1 9/23
12/15 13/4 15/16 20/14 21/23
22/14 28/11 38/17 40/3 67/2 67/20
69/15 69/17 70/14

**goes [12]**   4/5 5/13 6/17 10/23
19/8 21/5 22/22 40/3 45/23 49/12
51/3 56/7

**going [20]**   10/3 10/16 18/12 21/1
22/6 34/20 40/15 45/24 46/7 46/15
47/20 51/12 53/22 54/6 54/10
54/16 58/10 61/6 65/20 71/13

**Goldenberg [1]**   2/10

**gone [2]**   18/22 35/13

**good [14]**   2/2 2/7 2/15 2/16 2/18
8/22 8/24 20/1 30/10 46/6 50/2
55/8 55/14 71/3

**got [5]**   15/11 18/14 22/3 48/19
53/7

**government [75]**   5/20 5/22 7/13
7/14 8/23 8/24 9/5 9/9 9/15 9/22
10/1 11/4 11/4 12/17 12/17 18/6
18/14 18/22 18/24 19/6 19/7 22/15
24/22 25/6 25/14 25/25 25/25 26/2
26/3 26/5 26/6 26/10 26/11 26/15
26/18 26/24 27/1 27/2 27/4 27/9
27/10 27/11 27/16 27/16 28/11
28/12 28/23 31/5 36/3 36/17 37/7
43/7 44/11 52/13 52/18 52/20
53/22 56/19 59/13 62/12 64/23
68/19 69/1 69/23 70/17 70/18
70/22 70/25 71/4 71/5 71/12 71/22
71/25 72/3 73/6

**government's [5]**   8/21 12/2 17/19
27/3 71/16

**governmental [1]**   59/21

**graduates [1]**   39/10

**Grand [1]**   1/17

**grant [3]**   6/25 43/10 64/17

**granted [1]**   21/10

**granting [2]**   4/15 58/13

**granular [3]**   32/11 35/14 66/23

**granularity [2]**   64/2 64/22

**great [5]**   19/4 19/21 35/10 43/23
62/8

**ground [2]**   25/13 70/12

**grounded [1]**   39/9

**grounds [2]**   32/5 39/24

**group [4]**   39/17 45/16 58/2 59/6

**groups [4]**   40/14 42/22 70/15
72/19

**Grutter [1]**   38/25

**guarantee [2]**   7/12 7/16

**guarantees [1]**   7/19

**guess [11]**   6/17 39/6 40/11 49/23
50/8 53/10 60/4 61/14 68/2 68/7
68/12

**guesses [1]**   21/25

**guidance [12]**   31/6 31/21 31/23
31/25 32/8 64/3 64/13 64/14 64/15
65/3 69/21 70/4

**H**

**had [18]**   4/7 4/11 13/5 16/3 21/16
21/17 23/7 32/23 37/6 39/4 47/7
47/8 51/20 58/18 64/12 66/5 68/17
70/14

**hadn't [1]**   19/10

**Hailyn [1]**   2/13

**handed [1]**   28/9

**handling [1]**   33/14

**happen [1]**   29/16 58/24

**happened [2]**   32/25 73/19

**happening [2]**   24/12 27/5

**happens [1]**   15/15

**happy [1]**   71/21

**harbor [1]**   44/2

**harm [4]**   12/6 12/6 64/13 64/17

**harmful [1]**   64/15

**harps [1]**   57/25

**has [61]**   5/20 7/17 10/20 12/4
12/24 14/14 14/25 15/5 15/14
16/24 17/7 18/6 19/21 20/7 23/25
24/1 24/21 26/3 26/25 27/25 30/17
31/4 35/11 35/22 36/16 36/19
38/21 39/22 43/10 44/3 44/3 44/3
44/7 47/3 47/16 50/12 52/16 52/19
57/10 58/3 58/4 58/5 60/21 62/2
62/7 62/13 63/17 66/1 66/3 67/2
67/5 69/16 69/20 70/20 70/23
71/20 72/2 72/25 73/8 73/19 74/1

**hasn't [1]**   24/8

**have [188]**

**haven't [15]**   4/11 7/6 19/2 19/25
20/1 21/17 24/8 25/18 25/20 34/3
48/19 64/8 64/19 68/23 70/11

**he [16]**   8/12 8/13 9/6 54/8 54/8
9/9 61/9 61/9 63/2 63/4 63/6 63/6 54/14
67/17 67/17 67/18 71/20 72/2

**head [1]**   23/5

**Healthy [11]**   18/20 19/3 19/9
19/22 21/17 25/19 37/1 37/15
54/23 68/19 70/9

**hear [3]**   3/2 3/6 4/5

**heard [4]**   29/10 59/23 63/2 68/5

**hearing [11]**   1/9 2/19 2/22 2/25
4/7 8/8 9/20 28/6 30/11 30/14
59/22

**hearings [1]**   32/18

**heart [1]**   67/9

**heavily [1]**   44/10

**held [1]**   26/11

**help [2]**   61/23 67/23

**helpful [3]**   8/21 12/20 71/13

**her [1]**   17/5

**here [50]**   2/11 2/19 2/25 3/18
5/11 7/8 9/1 9/5 11/1 13/2 13/10
15/6 15/18 16/24 17/2 18/3 18/13
20/2 26/15 26/7 27/22 29/2 29/24
35/7 36/11 37/19 37/19 38/10
43/17 44/16 46/5 47/6 47/8 47/22
47/25 49/9 50/3 50/14 56/8 58/5
59/15 60/23 61/17 68/19 69/1
69/22 70/13 71/16 72/5 73/6

**hey [3]**   39/17 45/15 54/7

**hidden [1]**   21/5

**highest [1]**   53/8

**him [4]**   21/20 28/9 54/9 63/3

**hire [1]**   40/15

**hired [6]**   39/18 39/20 42/6 44/3
44/3 47/3

**hiring [15]**   31/13 39/16 41/3
41/10 41/11 41/16 41/17 41/19
42/5 42/13 42/17 43/9 43/12 48/2
48/3

**his [4]**   33/8 50/1 62/25 72/1

**history [1]**   73/19

**hit [1]**   41/20

**hits [1]**   35/16

**hold [3]**   15/1 28/19 61/13

**holder's [1]**   57/18

**holders [1]**   13/23

**holding [2]**   15/9 19/5

**holds [2]**   27/14 71/24

**Holmes' [1]**   71/18

**home [1]**   32/2

**Honor [33]**   2/2 2/7 2/16 3/8 4/1
4/25 5/10 6/7 7/6 11/5 12/24 13/8
14/23 15/22 16/16 17/15 20/7
20/18 22/11 22/23 23/17 27/23
27/25 30/8 30/10 31/17 48/9 48/15
66/22 68/11 71/1 74/7 74/8

**Honor's [6]**   4/14 16/21 66/25
67/11 69/8 71/4

**HONORABLE [1]**   1/10

**hope [2]**   23/13 29/23

**hopefully [1]**   73/11

**horrible [2]**   53/16 63/21

**horribles [1]**   52/11

**House [1]**   33/13

**Houston [1]**   45/10

**how [27]**   5/6 11/24 19/24 26/21
28/24 29/9 29/17 29/10 29/13 32/16
34/18 34/20 35/20 37/25 39/7 43/2
45/4 47/10 50/4 50/5 62/14 62/21
63/8 63/23 64/13 66/6 70/19

**Howell [4]**   9/8 17/4 29/13 30/1

**Howell's [3]**   29/19 29/21 30/5

**however [2]**   32/14 41/20

**hypothetical [6]**   31/21 31/23
32/10 39/8 40/8 54/3

**hypotheticals [1]**   55/24

**I**

**I don't [1]**   28/24

**I'm [5]**   10/9 11/11 30/20 31/17
58/21

**idea [6]**   21/12 28/13 28/25 39/17
69/9 70/20

**ideal [1]**   48/3

**idealogy [2]**   10/7 10/10

**identified [1]**   17/13

**identify [1]**   42/21

**identity [2]**   39/19 40/6

**ideology [1]**   72/22

**ill [1]**   37/13

**ill-motivated [1]**   37/13

**illustrate [1]**   13/25

**illustrated [1]**   9/18

**illustrating [1]**   12/21

**image [1]**   8/12

**immunity [3]**   22/20 23/1 63/6

**immunize [1]**   36/23

**immunizing [1]**   62/15

**impact [3]**   62/7 62/9 64/5

**impairing [1]**   62/9

**impede [1]**   56/18

**impermissible [2]**   15/3 37/24

**impermissibly [1]**   22/18

**implement [3]**   50/5 59/8 65/8

**implications [1]**   32/10

**import [1]**   3/3

**important [6]**   10/18 13/13 20/17
23/20 27/21

**impose [2]**   22/6 27/6

**imposed [3]**   14/24 18/7 18/7

**imposition [1]**   16/9

**improving [2]**   40/25 67/13

**inadequate [1]**   38/20

**inadvertently [1]**   62/15

**inclined [1]**   4/5

**include [2]**   6/22 50/3

**included [3]**   33/21 48/6 60/9

**includes [1]**   6/21

**including [9]**   2/23 6/23 7/14 42/8
42/16 44/19 46/22 47/2 49/11

**incorrect [3]**   42/25 43/2 44/24

**increases [1]**   44/2

**increasing [2]**   45/10 45/12

**independence [2]**   8/15 8/16

**individual [6]**   13/20 39/16 39/18
58/15 58/17 59/5

**individual's [1]**   13/18

**individualized [7]**   13/22 14/11
14/13 14/17 57/23 58/8 61/11

**individually [1]**   57/18 58/1

**individuals [4]**   17/3 42/5 44/20
53/2

**industry [1]**   62/6 62/15

**inflation [1]**   46/4

**information [7]**   13/20 33/12 33/18
34/5 34/21 35/5 42/12

**informative [1]**   34/17

**informed [2]**   35/15 61/20

**informs [1]**   35/2

**infringes [1]**   72/1

**inherent [5]**   30/25 31/3 31/12

**JA 3354**

## I

inherent... [2] 32/18 56/23
inherently [1] 56/23
initial [1] 57/19
injection [1] 72/21
injunction [4] 22/13 22/15 29/17 62/22
injury [1] 56/10
inquire [1] 31/7
inquiry [7] 37/11 37/20 41/14 56/12 61/12 62/2 63/5
instruct [1] 36/20
instructed [1] 19/10
instructing [1] 28/23
instruction [1] 37/12
insubstantial [1] 28/14
insulated [1] 13/16
integrity [2] 72/16 72/17
intending [1] 3/20
intent [5] 35/15 36/10 36/10 36/22 36/23
interest [13] 7/23 12/16 12/19 16/4 59/13 59/21 60/18 60/23 61/5 61/7 61/15 61/18 62/18
interested [1] 38/14
interesting [1] 61/24
interests [2] 5/19 73/11
interference [4] 5/7 5/23 50/15 53/2
interpretation [1] 41/3
interviewing [1] 41/18
interviews [1] 41/15
interwoven [1] 12/21
intimidate [2] 7/24 73/10
intimidation [5] 8/2 8/4 8/6 73/16 73/17
investigate [1] 22/14
investigation [7] 22/16 22/19 23/5 23/19 31/9 62/2 69/15
investigations [3] 23/8 24/5 24/10
invoking [1] 25/14
involve [1] 54/23
involved [2] 6/1 46/9
involving [1] 37/16
irony [1] 8/25
irredeemably [1] 37/13
irrespective [1] 70/10
is [545]
isn't [8] 22/9 22/9 24/3 28/14 31/15 31/18 33/23 54/14
issue [57] 3/10 3/11 3/12 8/7 9/3 13/3 14/1 17/14 17/15 19/12 21/8 21/9 21/11 21/12 27/6 30/1 30/3 30/25 32/7 32/9 34/13 35/23 35/23 37/14 41/4 41/15 41/17 41/17 45/25 46/4 46/5 46/6 46/18 48/1 48/21 50/23 51/10 51/21 51/23 53/17 54/6 57/7 57/10 57/25 58/4 62/4 62/21 62/24 63/14 65/13 65/14 66/3 66/8 68/25 69/14 69/21 73/21
issued [3] 3/3 10/1 16/14
issues [7] 7/6 36/9 37/6 50/24 52/23 55/11 56/7
issuing [3] 12/10 32/24 43/12
it [304]
its [15] 3/14 4/20 11/2 14/10 16/9 16/25 18/5 18/6 23/9 27/12 27/17 68/20 70/2 70/3 70/14
itself [6] 11/3 20/14 42/7 46/21 48/11 73/3

## J

jail [1] 36/12
James [1] 7/10
Jenner [6] 9/19 10/1 10/5 11/21 12/7 12/10
Jeremy [1] 1/14
Jerry [1] 2/10
jibe [1] 47/5

## Johnson's / J

Johnson's [1] 67/24
judgment... [2] 11/6 11/11
JUDGE [10] 1/10 9/8 17/4 29/13 29/19 29/19 29/21 29/25 30/5 47/1
judgment [14] 2/20 3/1 4/17 15/3 15/4 20/5 20/9 29/16 29/24 32/7 38/8 64/18 65/14 73/21
judgments [1] 13/17
judicial [2] 13/16 36/19
judiciary [1] 8/16
jump [2] 44/7 57/9
jumping [2] 36/8 57/24
just [75] 3/2 3/18 8/22 8/23 9/8 9/9 10/3 11/2 11/3 12/20 12/21 15/17 17/15 17/18 17/25 18/20 19/1 19/9 19/12 19/18 21/1 21/1 21/4 21/22 22/9 22/21 23/9 23/21 24/4 25/2 25/8 25/10 25/19 27/19 28/6 28/13 28/14 29/1 31/8 32/19 34/15 36/4 38/9 39/14 41/23 42/10 42/20 45/21 45/24 47/10 47/19 48/19 49/8 49/24 50/23 51/2 51/19 53/10 53/19 55/22 56/11 56/18 57/9 58/6 62/22 63/22 64/2 64/20 64/21 68/12 68/15 68/23 68/24 70/24 72/4
justice [5] 2/17 10/6 67/12 67/21 71/18
Justices [1] 38/22
justiciability [2] 13/13 57/7
justiciable [5] 13/11 13/17 54/6 57/7 57/8
justification [4] 16/3 19/18 21/15 67/16
justified [2] 16/5 18/15
justifies [1] 59/22
justify [6] 20/2 20/9 25/14 26/24 27/8 70/16
justifying [1] 27/22

## K

Kahn [2] 46/2 50/9
Kalpana [1] 2/11
keep [2] 66/17 74/5
keeping [1] 26/24
key [7] 10/12 11/5 13/2 18/3 42/23 43/17 48/1
kind [8] 6/14 12/7 15/11 17/14 19/9 31/11 45/8 50/8
kinds [2] 67/8 68/12
knew [1] 54/8
know [69] 4/4 22/5 9/9 5/20 6/7 7/5 13/4 13/5 15/25 16/1 16/11 16/19 19/25 22/1 22/4 24/10 24/23 25/11 27/2 27/3 27/20 29/1 29/15 30/3 31/13 33/15 33/17 33/22 33/23 33/25 34/2 34/4 35/25 40/9 41/16 44/6 45/4 46/12 47/10 50/4 51/14 53/16 54/8 55/23 56/10 56/20 57/21 58/10 59/7 61/4 61/7 61/8 61/11 61/14 64/9 64/19 64/22 64/23 66/2 67/8 68/15 69/7 69/14 69/21 70/12 71/4 72/5 73/13 73/16
knowledge [4] 5/12 16/15 33/22 37/9
known [1] 33/4
knows [4] 48/19 50/20 56/25 73/9
Kreisberg [2] 1/14 2/10

## L

labeled [1] 61/5
laid [1] 11/17
landlord [6] 24/25 25/4 25/7 26/1 26/4 26/6
language [5] 22/7 22/22 23/16 24/14 35/8
large [2] 53/13 62/1
larger [1] 62/18
largest [1] 73/14
last [5] 10/4 18/1 29/11 31/12 49/3

## later / L

later [2] 16/6 16/10
latitude [2] 16/3 26/13
launching [1] 69/15
law [27] 7/24 8/17 10/5 17/10 19/21 21/20 32/25 35/25 36/20 39/10 39/11 40/8 40/23 43/14 43/25 47/24 57/13 57/16 57/17 58/6 58/7 59/3 59/9 60/15 62/1 73/10 73/15
lawful [1] 20/9
laws [2] 21/3 40/16
Lawson [8] 1/19 2/17 3/25 30/9 66/20 67/7 71/13 73/24
lawyers [10] 2/14 8/9 16/9 39/12 41/1 41/7 41/8 42/21 55/8 69/24
LBJ [1] 43/15
learning [1] 31/10
least [3] 16/15 32/1 32/8
leave [1] 48/16
leaving [1] 24/16
Lee [6] 13/12 14/6 17/9 17/14 56/25 60/19
legal [7] 17/2 38/10 45/1 53/21 55/9 72/8 72/11
legally [1] 45/5
legitimate [1] 16/11
lesbian [2] 4/24 5/16
let [3] 39/8 56/21 64/16
let's [1] 29/1
letter [1] 40/16
level [11] 21/24 30/14 39/18 41/21 44/8 45/17 48/3 51/4 63/1 63/11 66/23
liberty [1] 7/18
license [1] 36/2
licensing [1] 30/25
life [1] 7/18
light [3] 24/12 37/9 41/22
lightning [1] 65/13
like [41] 3/21 5/13 5/24 7/4 7/7 7/20 7/24 12/10 14/19 18/19 21/13 22/4 22/5 23/21 25/8 29/5 29/8 30/17 36/13 38/2 39/19 44/6 48/14 48/16 52/5 54/14 54/15 54/25 55/7 55/11 55/20 58/25 62/5 62/12 65/18 66/12 66/14 66/16 72/6 73/7 73/12
limit [1] 53/21
limited [5] 27/20 27/21 39/2 56/13 66/17
limiting [2] 23/9 31/25
limits [1] 71/9
Lindsay [3] 1/22 75/3 75/12
line [10] 2/22 11/4 23/5 26/18 37/2 37/15 37/16 38/24 53/11 55/23
lines [4] 17/5 26/22 55/19 64/25
list [3] 24/9 24/11 24/12
litigating [1] 54/11
litigation [17] 5/19 5/20 5/21 5/22 6/1 6/10 18/5 18/8 24/3 33/14 43/20 50/16 51/17 52/20 56/16 61/2 70/7
little [4] 15/22 30/5 34/25 46/9
LLP [4] 1/3 1/14 1/17 2/3
local [1] 26/10
logically [1] 39/1
long [1] 71/18
look [9] 13/14 20/18 29/2 34/21 37/25 44/5 45/8 46/5 47/25
looked [3] 30/17 35/11 54/8
looking [7] 5/8 34/20 35/7 41/18 46/21 52/9 70/6
looks [1] 17/19
LOREN [1] 1/10
Los [1] 1/18
lose [5] 29/1 60/12 60/14 68/24 70/11
lost [1] 7/8
lot [5] 11/11 24/11 32/25 36/18 74/11

**L**

**loud [1]** 71/10
**Louisiana [2]** 50/11 50/14
50/13
**lower [1]** 19/10

**M**

**machines [1]** 72/17
**made [16]** 3/9 3/11 5/14 6/5 6/9
20/4 25/20 30/4 33/8 34/16 34/17
46/11 47/16 65/23 68/4 68/14
**Madison [1]** 7/10
**Magna [1]** 7/16
**mainly [1]** 51/12
**maintain [1]** 31/4
**maintaining [1]** 60/1
**maintains [1]** 28/19
**majority [4]** 38/24 39/10 51/22
67/9
**make [29]** 7/7 7/8 7/9 8/21 14/18
14/23 16/1 16/20 18/25 19/4 25/18
25/20 25/21 27/24 27/24 28/4
35/18 39/10 39/15 41/13 44/16
45/16 49/8 57/19 60/4 60/16 66/17
68/15 73/6
**makes [2]** 8/6 34/22
**making [4]** 18/25 21/9 32/3 40/14
**male [1]** 27/10
**male-owned [1]** 27/10
**malfeasance [4]** 18/5 51/7 51/16
52/2
**malfeasances [1]** 50/15
**Management [1]** 9/25
**manifests [1]** 27/19
**manner [1]** 29/18
**map [1]** 29/22
**marital [1]** 40/5
**massive [1]** 56/16
**massively [1]** 56/18
**material [2]** 8/2 66/16
**matter [4]** 8/5 55/22 74/12 75/5
**maximum [1]** 17/2
**may [25]** 1/5 2/7 3/9 4/14 11/6
19/6 22/14 26/20 32/17 35/3 35/14
35/15 36/15 38/9 46/12 49/6 54/20
64/15 64/15 64/20 70/25 71/19
71/21 71/25 75/10
**maybe [11]** 6/18 13/25 22/3 22/8
30/4 31/23 33/5 35/22 63/24 66/16
69/2
**McGowan [6]** 19/16 19/20 36/8
37/22 41/24 75/5
**me [26]** 2/9 2/21 2/21 2/21 4/9
4/10 6/16 7/7 11/9 12/20 17/21
28/1 29/4 37/3 39/8 44/22 47/13
51/7 52/19 54/8 54/12 57/5 58/11
64/16 70/13 74/10
**mean [12]** 20/13 21/13 24/22 27/7
27/16 29/6 40/21 43/9 51/23 66/10
63/14 64/20
**means [3]** 41/11 44/6 58/8
**meant [1]** 11/9
**measures [1]** 28/10
**meet [1]** 70/18
**meets [1]** 56/5
**members [5]** 5/16 5/18 39/24 42/21
45/20
**membership [1]** 46/13
**memo [1]** 10/3
**memorandum [2]** 9/25 12/10
**men [2]** 20/15 27/10
**mentioned [1]** 30/11 64/4
**mentoring [1]** 6/21
**mere [2]** 21/23 36/22
**merit [1]** 39/16
**merits [5]** 7/9 24/22 39/18 59/7
74/5
**merits-based [1]** 59/7
**met [1]** 50/12
**methodology [2]** 18/19 18/20
**middle [1]** 17/25

**might [12]** 3/12 13/20 26/13 27/15
31/2 35/20 42/8 43/11 47/25 56/11
57/21 72/16
**military [3]** 5/8 5/23 72/21
**mind [4]** 5/21 5/21 22/3 56/17
**mindful [1]** 56/11
**minorities [1]** 45/20
**minority [1]** 39/11
**minute [3]** 11/9 26/24 70/24
**minutes [1]** 57/11
**misconceived [1]** 72/4
**mispronouncing [1]** 37/3
**miss [2]** 7/10 7/21
**mistaken [1]** 63/7
**misunderstanding [2]** 59/16 59/18
**mixing [1]** 36/8
**modern [1]** 71/24
**moment [4]** 17/21 18/3 30/21 42/11
**moments [1]** 7/20
**money [3]** 27/3 27/12 54/8
**monies [1]** 53/7
**more [15]** 9/22 11/20 12/24 15/25
16/19 24/2 27/23 30/18 31/10
34/25 37/15 37/18 51/21 52/23
58/16 59/4 65/22
**most [4]** 9/3 47/20 52/25 73/15
**motion [11]** 1/9 2/25 3/1 3/7 3/9
17/19 20/19 32/6 56/7 59/19 66/13
**motions [7]** 2/19 2/20 4/4 35/13
65/15 66/12 74/3
**motivated [1]** 37/13
**motivation [1]** 8/5
**motive [3]** 25/18 41/25 70/11
**motives [1]** 69/1
**Mount [11]** 18/20 19/3 19/9 19/22
21/16 25/19 37/17 37/15 54/22
68/19 70/9
**move [12]** 12/25 17/8 22/10 22/11
29/23 42/13 61/22
**moves [1]** 65/13
**moving [2]** 8/21 65/12
**Mr [10]** 3/25 30/9 30/21 34/6 63/8
66/20 66/21 67/7 71/13 73/24
**Mr. [1]** 3/6
**Mr. Verrilli [1]** 3/6
**Ms. [1]** 2/21
**Ms. Pham [1]** 2/21
**much [11]** 4/3 7/3 7/6 17/4 30/7
32/15 39/7 46/13 59/4 64/25 73/23
74/2 74/11
**multiple [1]** 40/1
**Munger [3]** 1/14 1/17 2/13
**must [3]** 5/24 43/19 45/25
**muzzle [2]** 9/2 9/4
**my [29]** 5/12 6/6 6/8 6/11 33/22
36/20 39/9 40/7 40/21 45/2 48/17
54/3 54/25 55/7 55/8 55/24 57/4
59/11 62/6 66/11 67/7 67/19 67/23
68/5 68/25 69/20 70/20 74/5 74/10
**myth [1]** 8/10

**N**

**name [1]** 3/17
**named [1]** 3/16
**narrow [1]** 52/23
**nation's [1]** 73/14
**national [17]** 12/16 12/18 13/21
15/23 16/4 40/4 60/17 60/18 60/22
60/23 60/24 61/5 61/9 61/15 61/16
61/18 61/18
**nature [2]** 33/13 53/14
**necessarily [7]** 31/22 38/14 41/16
44/25 45/1 58/8 60/12
**necessary [2]** 12/1 70/5
**need [15]** 10/8 16/11 17/10 17/12
17/12 32/11 39/17 39/20 45/15
55/25 64/2 64/22 66/9 69/3 73/17
**needed [1]** 3/15
**needs [4]** 8/18 15/12 56/4 56/10
**negative [2]** 49/2 67/18
**neither [1]** 28/20
**neutral [3]** 25/13 25/13 44/16

**never [2]** 22/14 57/5
**next [2]** 17/17 72/19
**no [42]** 2/7 11/5 12/14 15/11
15/1 15/15 16/18 16/7 17/11 21/14
21/17 26/25 27/8 28/11 30/6 31/3
31/11 32/24 33/7 33/8 33/12 33/22
33/24 34/2 34/3 34/3 34/15 36/24
39/14 41/17 41/17 43/25 48/9
48/12 48/15 50/18 50/19 53/6 53/9
53/18 53/21 54/3 54/17 54/19
60/14 63/5 63/18 63/19 66/3 66/7
69/3 70/4 71/20 72/2 73/7 73/25
**nodding [1]** 46/4
**non [1]** 25/13
**none [3]** 15/21 34/6 68/3
**nonetheless [1]** 37/18
**nonjusticiable [3]** 14/5 57/3 57/4
**not [123]**
**notation [1]** 34/17
**note [3]** 2/5 4/6 10/12
**noted [1]** 10/13
**nothing [12]** 7/1 7/2 17/7 23/6
33/9 33/17 34/7 61/2 66/7 69/23
69/23 69/25
**notice [2]** 29/9 69/14
**Noting [1]** 63/21
**notion [1]** 19/17
**now [32]** 2/3 4/19 4/22 4/24 7/4
8/1 8/22 15/6 15/16 19/24 23/3
24/12 32/10 35/19 47/19 47/22
54/6 54/20 58/20 58/25 64/14 65/1
65/3 66/25 67/7 67/23 68/14 68/25
70/20 71/8 72/13 72/23
**nudge [1]** 54/14
**number [2]** 42/5 45/15
**NW [3]** 1/15 1/20 1/23

**O**

**O'Brien [1]** 36/9
**object [1]** 29/9
**objecting [1]** 63/12
**objection [2]** 12/12 63/10
**objectionable [2]** 45/14 45/15
**objective [2]** 39/12 44/15
**objectively [1]** 40/9
**observation [2]** 4/18 14/22
**observed [2]** 4/16 73/8
**obviously [14]** 28/6 28/23 29/12
32/4 36/6 38/5 43/24 47/4 50/21
51/24 56/23 56/24 65/12 66/8
**occurred [2]** 14/15 15/18
**odious [1]** 5/2
**off [4]** 20/11 26/21 42/12 48/3
**offer [2]** 6/22 6/23
**offering [1]** 47/12
**offhand [2]** 48/1 66/1
**office [6]** 1/6 2/4 3/13 3/21 9/25
40/12
**official [1]** 1/22 28/9 75/3 75/13
**officials [3]** 4/21 26/10 69/25
**officials' [1]** 19/7
**Oh [1]** 2/21
**okay [11]** 19/16 28/3 28/13 30/8
41/23 42/1 42/25 51/10 53/10
56/22 70/19
**old [5]** 8/23 8/24 19/20 43/15
71/8
**old-fashioned [2]** 8/23 8/24
**Olson [2]** 1/14 1/17
**once [1]** 18/11
**one [40]** 5/15 7/20 9/3 9/17 15/16
16/19 17/18 18/9 18/11 23/4 27/21
27/21 27/23 28/6 30/19 32/24 33/4
35/18 36/1 37/13 38/9 38/15 40/1
41/25 43/13 44/17 44/20 46/7 50/2
51/5 55/24 61/7 61/24 64/6 64/20
65/22 66/2 66/16 67/6 67/8 68/8
**only [17]** 16/13 20/9 20/10 27/10
27/10 45/19 47/11 48/20 49/17
50/8 54/24 54/25 55/13 55/15
62/24 63/24 68/8

O

opem [2]   25/16 32/18
opening [1]   10/24
opens [1]   56/15
operationalize [1]   9/20
operationalized [1]   11/19
operations [2]   5/8 5/23
operative [6]   9/11 11/22 34/18
 34/22 35/17 72/8
opinion [9]   9/10 17/5 29/12 29/19
 30/1 55/25 56/2 65/25 71/16
opponent [1]   54/9
opportunity [4]   4/12 29/10 59/23
 66/18
opposed [5]   23/9 35/8 50/6 51/9
 60/18
opposition [1]   20/19
order [94]
orders [3]   8/7 49/21 73/9
ordinary [1]   10/14
organization [5]   4/23 5/13 5/15
 6/3 72/24
orientation [1]   40/6
origin [1]   40/5
Ostensibly [1]   52/16
other [44]   2/14 8/3 10/10 13/19
 13/22 14/19 16/14 16/19 20/10
 21/20 21/25 22/15 23/21 26/17
 28/3 28/18 28/25 32/25 33/4 33/6
 33/22 34/16 34/17 35/21 36/5
 40/11 40/12 44/17 44/20 45/9 46/7
 50/2 54/9 55/24 58/4 62/11 62/22
 64/10 64/11 67/19 67/24 68/6 72/3
 73/13
others [2]   7/24 33/24
otherwise [3]   11/16 22/16 42/6
ought [1]   10/25
our [38]   2/13 5/3 5/4 7/19 8/2
 8/2 8/16 8/16 10/18 10/19 10/19
 10/21 10/23 11/6 11/8 12/12 12/13
 13/11 15/10 16/22 18/8 20/19
 20/25 23/15 24/14 28/7 29/18
 30/18 30/22 31/2 35/1 38/8 38/10
 38/16 47/8 56/7 58/4 71/24
out [21]   6/8 8/25 11/17 15/9 19/3
 21/1 21/22 26/24 31/11 31/23
 32/24 49/17 50/2 50/23 53/11
 55/19 59/6 63/23 65/23 67/23 74/4
outer [1]   55/21
outreach [1]   63/18
outset [1]   7/8
outside [1]   36/7
over [8]   19/1 25/20 38/24 52/6
 54/11 56/16 62/5 69/18
overarching [2]   7/7 30/22
overbroad [1]   63/23
overlooking [2]   47/24 49/7
own [3]   3/14 11/2 27/12
owned [2]   27/8 27/10

P

p.m [1]   74/13
pace [1]   65/13
page [20]   11/7 11/10 17/3 17/5
 17/19 17/25 20/18 20/20 22/23
 24/14 37/4 39/22 39/23 40/2 49/9
 49/16 59/20 67/11 71/14 71/17
pages [2]   11/11 13/21
painfully [1]   35/19
papers [1]   68/10
parades [1]   32/10
paragraph [6]   11/10 18/2 20/24
 24/14 40/25 72/2
parcel [2]   12/3 12/5
parity [4]   20/13 45/10 45/12 67/5
part [9]   10/18 12/3 12/4 12/5
 21/18 35/4 46/21 51/2 53/13
particular [11]   8/14 11/7 13/23
 16/21 26/19 27/18 29/20 43/23
 52/22 60/6 60/19
particularly [1]   47/23

parties [6]   3/2 3/21 55/4 74/4
 74/9 74/11
partners [3]   39/13 39/13 39/14
partners [2]   39/11 40/8
party [4]   36/16 52/13 53/20 53/25
passing [1]   46/12
path [1]   51/4
patterns [1]   43/12
Paul [6]   16/2 16/3 16/5 16/7 16/8
 16/13
pay [1]   45/12
penalize [1]   50/17
penalty [2]   50/20 51/9
Pending [1]   57/21
Pennsylvania [1]   1/20
penultimate [1]   18/1
people [7]   40/22 43/13 45/15 55/4
 55/13 61/10 61/12
perceive [2]   21/21 25/24
percent [1]   20/8
perhaps [2]   32/7 50/11
period [1]   25/6
Perkins [9]   3/10 3/16 9/8 17/6
 23/24 24/5 29/12 61/25 65/24
Perkins' [1]   62/19
permanent [1]   29/17
permanently [2]   23/21 73/22
permissible [2]   37/24 37/25
permit [1]   7/7
permitted [1]   10/14
pernicious [1]   8/7
person [3]   39/18 44/7 71/25
person's [1]   15/13
personnel [1]   70/18
pertains [1]   44/11
petition [4]   5/3 31/19 32/1 64/6
Pham [1]   2/21
philosophical [1]   38/10
phrase [4]   38/17 57/21 60/5 61/17
phrasing [1]   5/9
picture [1]   21/22
pipeline [1]   45/21
pitch [2]   8/22 8/22
place [2]   10/2 74/5
places [1]   30/4
plain [1]   19/12
plaintiff [9]   1/4 1/13 2/6 3/16
 4/6 33/21 37/5 53/5 56/8
plaintiff's [2]   18/4 58/3
plaintiffs [2]   30/12 33/20
plausible [1]   55/5
play [4]   37/17 46/8 55/11 56/8
pleadings [2]   38/8 53/5
please [7]   2/5 2/8 3/9 4/14 32/22
 47/13 54/3
pledge [3]   20/13 20/14 67/5
plenty [1]   46/6
plus [1]   71/8
point [40]   7/23 8/7 8/25 11/6
 15/22 16/20 19/3 20/7 22/12 27/23
 28/1 30/15 30/22 31/12 32/3 32/12
 32/14 34/6 34/11 35/18 36/24 37/4
 37/5 37/15 45/24 47/15 48/21
 51/22 60/3 62/17 62/18 63/24
 63/24 64/11 65/17 65/21 66/17
 67/23 68/14 69/7
pointed [2]   20/24 48/22
pointing [1]   28/7
points [11]   7/7 8/20 15/25 24/20
 31/2 35/13 38/9 38/16 45/9 61/7
 73/25
policeman [2]   71/19 71/20
policies [2]   8/13 37/9
policy [5]   43/15 43/18 43/21 44/1
 46/1
political [2]   27/18 72/21
politics [1]   71/19
pool [3]   40/10 57/14 57/15
portion [1]   29/25 30/2 50/22
position [2]   19/12 30/18 30/23
 31/2 35/1 49/2 59/17 61/19
positions [2]   5/17 52/17

possible [4]   17/2 21/15 31/25
 39/18
poster [2]   47/7 47/25 27/7
 27/11 70/19
post [8]   14/19 58/19 58/23 59/4
 59/11 59/12 59/23 60/4
post-deprivation [4]   58/19 59/11
 59/12 59/23
post-suspension [1]   59/4
posters [1]   46/10
postponing [1]   59/22
potential [2]   3/19 23/9
potentially [1]   44/18
power [5]   4/17 7/18 46/2 50/10
 73/19
powerful [2]   10/25 73/15
practical [1]   12/6
practically [1]   64/21
practice [2]   35/25 38/1
practices [2]   43/9 62/1
practicing [1]   53/16
pre [2]   58/25 59/1 59/14
pre-deprivation [3]   58/25 59/1
 59/14
preceded [1]   14/12
precedence [2]   46/17 71/17
precedents [1]   71/17
precise [1]   5/8
precisely [3]   7/20 12/11 21/2
preferences [3]   53/11 67/16 71/5
premise [2]   71/15 72/4
prepared [1]   50/23
preponderance [2]   37/8 43/11
presence [1]   46/10
present [4]   10/12 34/14 38/19
 43/19
preserve [1]   17/2
preserving [2]   17/11 17/15
PRESIDENT [23]   1/6 2/4 3/13 3/21
 8/12 9/1 9/2 9/3 9/6 9/6 14/1
 16/6 25/15 28/8 49/25 52/18 53/22
 67/24 68/7 69/15 69/16 72/8 73/11
President's [2]   67/1 69/5
presidential [1]   53/11
press [3]   5/5 33/19 34/25
presumably [1]   5/12
presume [1]   5/18
presuming [1]   38/20
presumption [1]   42/3
pretty [3]   17/17 22/11 23/1
prevailed [1]   53/3
prevailing [1]   25/12
prevent [5]   8/8 12/9 15/7 53/16
 65/2
previously [2]   5/1 34/9
primarily [1]   7/12
principally [2]   7/12 7/17
principle [1]   19/11
principles [1]   21/4
prior [2]   23/7 32/18
prioritization [1]   62/11
private [4]   9/4 22/2 29/7 29/8
prize [10]   6/16 6/20 6/21 20/7
 21/23 46/24 47/16 47/19 47/22
 49/13
probably [2]   20/1 34/21
problem [8]   3/17 14/24 15/4 15/5
 26/16 64/18 69/22 70/9
problematic [1]   55/21
problems [4]   15/20 24/21 55/1
 55/2
procedure [1]   42/6
procedures [1]   58/13
proceed [2]   24/17 29/14
proceeding [4]   29/13 29/16 32/3
 66/5
proceedings [5]   20/5 22/21 65/25
 74/13 75/5
process [26]   7/17 10/19 10/23
 12/12 14/19 14/21 15/18 25/7 25/8
 28/19 29/4 30/22 30/23 41/18 57/9
 58/15 58/19 58/23 58/25 59/1

**P**

process... **[6]** ...
process-based **[1]** 57/9
procurement **[3]** 46/2 46/6 50/10
profession **[1]** 39/24
prohibit **[2]** 22/24 24/15
prohibited **[1]** 21/3
prohibition **[1]** 71/23
project **[1]** 8/13
prompted **[1]** 22/19
promptly **[1]** 73/20
proof **[8]** 18/25 19/23 45/25 46/16 47/7 47/11 50/11 50/12
proper **[1]** 24/17
properly **[1]** 45/16
property **[1]** 7/19
propose **[3]** 23/16 24/14 64/24
proposed **[5]** 11/6 11/8 22/23 24/15 29/18
proposition **[1]** 27/21
proprietor **[3]** 24/25 25/4 25/7
prosecution **[2]** 30/24 53/17
protected **[7]** 6/13 9/7 68/22 70/2 72/1 72/14 73/1
protection **[2]** 22/2 55/11
protections **[1]** 17/3
protective **[1]** 13/17
prove **[5]** 21/16 21/16 64/15 68/19 70/10
provide **[1]** 67/15
provides **[1]** 29/22
provision **[4]** 57/20 59/3 60/8 60/14
provisional **[1]** 4/14
provisionally **[1]** 5/1
provisions **[1]** 17/6
public **[3]** 2/22 7/23 16/15
publicly **[1]** 33/18
pulled **[1]** 20/11
punishment **[17]** 29/8 35/11 35/17 35/21 35/24 36/11 50/25 51/5 53/15 54/19 54/20 54/21 55/22 63/3 63/12 70/21 70/23
punishments **[3]** 22/7 30/16 35/7
punitive **[5]** 35/9 54/23 55/3 63/1 63/3
pure **[1]** 15/18
purely **[3]** 9/15 33/14 60/24
purported **[3]** 18/16 48/11 61/3
purpose **[1]** 11/16
purposes **[4]** 10/12 14/21 31/19 60/21
pursuant **[2]** 63/5 63/19
pursue **[1]** 8/14
pursuits **[1]** 10/11
put **[9]** 7/19 23/4 24/12 27/3 27/4 38/5 47/20 51/24 64/16
putative **[2]** 50/7 54/17
putting **[4]** 39/7 41/24 46/12 68/21

**Q**

quality **[2]** 39/19 72/12
quantum **[6]** 43/19 45/25 46/16 47/7 47/11 49/17
question **[16]** 13/2 13/10 18/22 21/19 29/11 35/10 39/4 40/21 43/17 43/18 46/15 60/8 61/14 65/22 66/11 66/16
questioning **[3]** 66/25 69/8 71/4
questions **[6]** 12/24 27/25 28/2 32/21 34/13 55/18
quickly **[1]** 22/11
quite **[11]** 13/13 23/20 29/22 35/9 41/4 41/22 48/4 49/21 62/19 65/9 68/8
quota **[3]** 39/22 41/12 45/21
quote **[1]** 5/8
quoted **[1]** 68/10
quoting **[2]** 17/1 59/1

**R**

race **[24]** 14/8 17/17 18/1 18/25 22/15 23/14 23/18 36/25 38/21 40/4 42/3 42/9 42/16 44/16 44/19 46/23 46/25 47/3 47/5 49/11 67/3 71/6 73/3
race-based **[2]** 21/5 38/15
race-neutral **[1]** 44/16
racial **[16]** 18/4 18/9 20/3 21/2 38/1 38/3 43/3 44/10 47/14 47/21 49/14 51/16 67/16 69/12 69/17 70/7
radical **[3]** 10/7 10/10 72/22
raised **[3]** 56/7 68/25 69/21
raises **[1]** 32/9
ran **[1]** 54/9
ranks **[1]** 39/13
rather **[1]** 58/6
rationale **[3]** 18/23 68/16 68/21
Rattigan **[1]** 16/22
reach **[2]** 17/10 70/5
reached **[1]** 32/24
read **[9]** 21/1 22/7 35/15 43/10 49/25 50/7 65/4 69/4 71/14
reading **[7]** 34/25 36/10 40/6 49/9 49/15 50/4 53/5
ready **[2]** 20/22 58/11
real **[4]** 30/6 37/16 48/2 53/14
reality **[1]** 39/9
really **[16]** 8/11 9/5 20/6 24/4 25/10 26/15 34/15 42/10 42/20 43/9 43/15 43/18 55/7 57/25 63/24 68/13
realm **[1]** 45/8
reason **[7]** 20/1 31/24 50/16 57/24 64/7 67/20 68/24
reasonably **[1]** 73/21
reasoning **[1]** 24/2
reasons **[13]** 4/25 9/17 12/7 12/23 13/19 17/12 24/11 25/22 30/20 42/13 46/6 61/19 69/6
rebuttal **[1]** 66/12
recall **[1]** 58/12
receive **[5]** 14/2 14/3 27/9 27/11 52/20
received **[1]** 62/2
recently **[1]** 72/25
recision **[1]** 16/10
recognizes **[1]** 18/11
Recognizing **[1]** 71/20
record **[3]** 2/3 2/6 75/5
recruit **[1]** 44/20
recruiting **[5]** 41/1 41/6 41/9 41/11 42/20
reference **[1]** 46/12
referenced **[5]** 30/14 38/7 51/11 51/22 67/24
referencing **[1]** 30/21
refers **[1]** 72/18
refutation **[1]** 71/15
refute **[1]** 33/9
regard **[2]** 11/24 60/1
regarding **[12]** 3/11 31/21 38/16 43/25 47/16 47/21 47/21 50/9 51/12 51/20 56/8 58/13
regardless **[1]** 37/10
regular **[1]** 24/17
regulation **[1]** 29/6
regulations **[1]** 58/11
regulatory **[4]** 28/20 28/23 28/24 37/18
reinstated **[1]** 14/20
reiterate **[2]** 10/4 68/14
rejected **[1]** 71/18
related **[3]** 5/7 60/24 64/1
relates **[1]** 50/21
relating **[1]** 47/23
releases **[2]** 13/19 33/20
relief **[5]** 11/7 25/21 63/4 63/15 64/18
relies **[1]** 18/4 26/17 51/15 71/12

**religion [1]** 40/4
**rely [4]** 38/13 88
... 44/10 ...
... 45/4
remarkably **[1]** 4/22
remarks **[1]** 34/9
remedied **[1]** 64/14
remedy **[1]** 23/16
remember **[2]** 33/20 37/1
remembering **[1]** 46/9
reminds **[1]** 2/21
remotely **[1]** 21/12
repeat **[2]** 32/17 50/8
Reporter **[4]** 1/22 1/22 75/3 75/13
represent **[2]** 60/25 60/25
representation **[7]** 16/4 33/8 38/15 38/20 39/3 48/3 73/17
representative **[1]** 41/20
represented **[5]** 39/20 45/16 55/14 55/16 69/8
representing **[2]** 2/11 53/1
republic **[1]** 7/11
republican **[2]** 14/3 15/1
reputation **[2]** 10/19 12/13
require **[1]** 57/17
required **[5]** 46/10 46/16 49/20
requires **[1]** 15/9
requiring **[1]** 57/21
rescinded **[3]** 16/7 16/14 67/25
reserves **[1]** 15/12
resources **[1]** 28/12
respect **[21]** 5/17 8/19 11/21 16/8 17/17 22/10 22/12 24/20 24/23 25/23 27/1 27/1 27/5 28/3 28/4 29/21 66/24 69/1 69/2 69/20 71/1
respectfully **[1]** 8/18
response **[1]** 28/21
responsibilities **[1]** 16/25
rest **[2]** 18/7 32/15
restore **[1]** 14/14
restoring **[1]** 60/2
restraining **[3]** 4/7 4/15 13/6
restricting **[1]** 69/24
restriction **[3]** 25/17 70/16 70/17
result **[3]** 6/22 29/20 66/24
results **[1]** 72/18
retain **[2]** 10/20 61/12
retained **[1]** 15/8
retaining **[1]** 52/4
retaliate **[2]** 9/7 26/12
retaliates **[2]** 4/20 4/22
retaliating **[1]** 26/21
retaliation **[13]** 14/15 14/24 18/10 18/12 19/2 19/7 22/20 26/9 26/12 27/17 50/25 68/22 70/1
retaliatory **[10]** 5/2 22/18 25/17 36/21 36/23 41/24 63/19 63/22 70/7 70/11
return **[1]** 34/8
returning **[1]** 62/25
review **[12]** 13/16 14/20 31/10 57/22 57/23 58/17 58/23 59/4 61/5 61/25 62/3 62/16
reviewable **[1]** 56/6
revisit **[1]** 32/7
revocation **[1]** 60/5
revoked **[2]** 13/5 34/1
Richard **[2]** 1/19 2/16
ridiculous **[1]** 70/13
rigged **[1]** 8/11
right **[50]** 3/20 3/24 4/3 5/3 6/11 6/15 7/3 10/16 11/12 19/20 25/2 25/2 25/4 25/6 25/7 25/8 30/25 31/3 31/12 31/18 32/1 32/10 33/5 34/8 35/25 36/14 36/15 38/11 45/1 45/19 49/8 49/25 51/6 53/19 55/3 55/12 55/24 57/10 59/10 60/11 65/1 65/11 65/17 69/5 71/6 71/19 71/20 72/14 73/23 74/2
rights **[7]** 14/10 14/25 21/3 24/24 25/1 70/3 71/24
ripe **[5]** 28/6 28/14 32/4 57/3

**JA 3358**

**R**

**ripe [1]**  12/25
**expenses [1]**  2/23
**rise [1]**  21/24
**risk [1]**  68/25
**road [2]**  29/22 35/16
**Roberts [1]**  67/12
**role [1]**  37/6
**room [2]**  1/24 46/20
**round [1]**  31/11
**routinely [1]**  15/11
**RPR [1]**  75/12
**rubber [1]**  35/16
**rule [4]**  8/17 17/16 27/8 55/25
**rules [2]**  57/18 58/10
**ruling [4]**  4/15 41/14 73/8 74/5
**run [2]**  3/13 58/15
**Rust [3]**  26/18 27/15 27/20

**S**

**said [33]**  7/11 10/4 16/23 16/24
17/4 17/13 19/22 20/20 27/8 27/15
28/9 32/23 33/3 33/6 40/10 45/19
46/5 47/8 50/9 53/22 58/18 58/22
63/18 66/13 66/15 67/7 67/12
67/14 67/18 67/21 68/11 70/14
72/25
**salaries [1]**  45/13
**same [14]**  3/18 14/8 14/25 16/1
16/3 17/4 23/15 24/21 25/10 25/16
45/13 49/9 49/16 70/9
**sanction [1]**  53/15
**sanctions [4]**  2/23 37/16 37/17
37/18
**satisfied [1]**  50/11
**saw [1]**  45/18
**say [29]**  20/25 21/2 21/13 25/12
26/18 39/12 40/3 40/7 40/13 40/22
42/7 46/21 47/1 47/3 47/25 48/9
51/15 52/18 56/2 56/3 56/13 59/17
64/13 66/14 66/16 67/17 67/18
69/22 70/13
**saying [21]**  15/1 19/24 20/15 21/7
21/10 23/6 29/3 31/21 33/23 34/6
41/16 45/15 54/7 54/16 55/20
58/20 58/25 63/19 67/20 68/6
69/14
**says [14]**  10/13 12/15 18/3 19/24
20/12 26/8 27/2 43/10 44/17 54/24
71/17 72/7 72/7 72/10
**scenario [1]**  18/14
**schedule [1]**  3/4
**scheduled [1]**  34/9
**scholarships [2]**  48/20 49/1
**school [1]**  39/10
**second [7]**  7/21 15/5 40/18 47/8
47/12 57/20 72/10
**Secretaries [1]**  72/15
**secrets [1]**  61/9
**section [110]**
**sections [16]**  4/8 4/10 4/11 9/21
10/16 12/1 12/2 12/5 22/10 34/13
34/18 34/18 35/3 35/14 35/18 36/5
**security [32]**  13/3 13/5 13/21
13/23 14/2 14/3 14/9 15/2 15/7
15/9 15/12 15/13 15/15 15/17
15/24 16/2 16/5 16/25 31/4 33/25
51/13 56/23 57/8 60/2 60/18 60/22
60/22 60/24 61/5 61/10 61/16
61/18
**see [11]**  28/24 32/9 34/23 38/16
45/21 48/1 50/3 54/4 62/19 63/12
70/19
**seeing [1]**  54/14
**seek [1]**  11/7
**seeking [5]**  11/13 13/6 22/13
22/14 63/4
**seem [2]**  38/2 73/7
**seems [7]**  12/20 23/6 55/20 58/25
60/23 61/1 70/13
**seen [3]**  59/6 64/8 64/19

**sense [6]**  5/6 6/4 24/8 29/5 30/16
30/16 37/23 62/24
**sensible [1]**  45/6
**sent [1]**  35/5
**sentence [10]**  27/10 18/1 18/1
40/18 44/20 47/8 47/11 47/12
49/10 72/19
**serious [2]**  73/18 73/18
**seriously [1]**  10/20
**service [2]**  5/16 5/18
**set [2]**  22/6 27/7
**setting [3]**  38/15 39/2 41/15
**several [2]**  2/14 73/13 73/14
**sex [1]**  40/5
**sexual [1]**  40/5
**shall [2]**  27/9 64/23
**she [1]**  47/3
**sheepish [1]**  64/11
**Sherry [3]**  1/22 75/3 75/12
**shift [1]**  52/6
**shocking [1]**  4/17
**short [2]**  21/4 71/22
**should [6]**  6/7 8/23 12/18 12/18
14/20 37/25 42/15 45/20 61/12
66/6 67/20
**shouldn't [2]**  54/15 69/10
**show [3]**  8/3 37/8 39/15
**shutting [1]**  23/20
**side [13]**  21/20 26/17 28/18 33/6
41/25 44/17 46/7 55/24 62/22
64/10 67/20 67/24 68/6
**side's [1]**  14/19
**sign [1]**  28/9 46/12
**signed [1]**  20/13
**significant [2]**  39/11 62/4
**significantly [1]**  62/14
**signing [1]**  28/8
**silence [2]**  8/10 8/11
**similar [1]**  45/13
**simple [1]**  50/19
**simply [3]**  63/13 63/19 64/23
**since [4]**  4/11 7/16 19/22 71/18
**single [2]**  56/11 70/4
**singled [1]**  59/6
**sir [2]**  10/8 48/13
**sit [3]**  47/22 47/25 61/17
**situation [6]**  16/25 18/19 54/13
55/11 58/19 59/13
**situations [1]**  59/21
**slow [1]**  10/8
**Smith [1]**  59/20
**so [129]**
**social [5]**  43/15 43/17 43/21 44/1
46/1
**solely [2]**  18/23 68/21
**some [53]**  9/9 16/10 20/10 21/23
22/3 22/7 22/8 23/3 25/13 25/13
26/2 26/3 26/13 29/5 30/4 31/24
31/25 32/12 32/21 33/19 33/19
34/21 35/21 35/22 36/9 37/6 38/8
39/19 42/5 44/5 44/8 44/9 46/20
47/9 47/23 49/6 50/2 51/19 51/20
52/11 52/14 54/23 55/10 56/7 58/2
58/3 59/12 59/21 62/5 62/10 66/12
69/2 70/25
**somebody [2]**  15/12 35/24
**somebody's [2]**  36/2 56/17
**somehow [1]**  8/11
**someone [3]**  34/20 35/15 50/4
**something [24]**  5/11 5/13 5/24
17/4 21/13 23/8 32/11 35/24 36/14
36/15 37/11 48/9 49/25 50/7 61/15
62/6 62/13 64/5 64/24 64/24 66/5
71/14 72/24 74/4
**somewhat [1]**  39/9
**sorry [5]**  10/9 11/11 30/20 31/17
58/21
**sort [11]**  12/7 21/2 26/21 30/14
32/13 38/12 41/7 44/24 59/6 61/2
63/5
**sought [1]**  20/5
**South [1]**  1/17
**sovereign [8]**  24/25 25/1 25/25

26/5 37/19 37/19 43/8 51/3
56/6
**space [1]**  46/6
**speak [4]**  20/18 21/17 41/6 41/6
**speaker [2]**  27/18 27/19
**speaking [2]**  39/1 64/21
**speaks [1]**  60/17
**spearheads [1]**  72/10
**specific [12]**  6/14 8/6 8/7 9/11
15/20 32/12 45/21 51/21 57/22
66/3 67/16 73/25
**specifically [3]**  5/20 13/18 27/14
**specifics [2]**  7/5 7/9
**speculate [2]**  69/3 69/4
**speculating [1]**  5/11
**speculation [2]**  5/13 69/1
**speech [17]**  7/12 8/23 8/25 9/2
9/4 9/5 9/7 9/15 11/4 11/22 11/23
11/24 26/19 37/5 37/10 68/22 72/2
**speechless [1]**  21/14
**spend [2]**  27/12 70/24
**spurious [2]**  20/3 23/13
**square [2]**  26/22 47/10
**Srinivasan [1]**  2/12
**SSFA [14]**  21/7 21/8 21/9 21/12
38/11 38/21 41/5 41/22 67/10
67/12 67/21 68/3 68/10 68/12
**staff [3]**  31/13 57/14 64/3
**stage [2]**  8/22 32/23
**stake [2]**  59/14 59/22
**stand [5]**  12/3 12/22 42/2 50/14
51/15
**standalone [1]**  8/24
**standard [1]**  36/21
**stands [1]**  27/20
**start [2]**  39/15 66/23
**starting [1]**  58/2
**starts [1]**  18/2
**state [4]**  4/21 37/19 40/12 72/16
**statement [8]**  8/2 28/7 39/12
39/23 40/7 42/9 45/5 67/4
**statements [9]**  11/17 11/19 12/13
20/11 20/24 21/7 21/11 21/21
21/23
**states [18]**  1/1 1/10 3/11 3/12
3/22 5/12 12/1 21/13 38/6 38/6
59/2 59/9 69/11 69/16 72/8 72/18
72/21 73/12
**stating [3]**  63/4 63/13 65/21
**statistics [1]**  39/15
**status [1]**  40/5
**statutes [1]**  40/13
**stay [2]**  52/7 66/5
**steer [1]**  65/9
**stemming [1]**  24/6
**step [5]**  3/18 55/12 59/9 70/10
72/6
**stepping [1]**  29/1
**steps [2]**  24/2 57/12
**still [9]**  9/14 10/24 37/11 37/11
43/4 44/4 56/15 68/18 74/6
**stop [2]**  8/5 62/7
**straight [1]**  57/24
**straightforward [3]**  22/13 22/22
23/2
**Street [1]**  1/15
**stressed [1]**  70/20
**strike [2]**  36/14 41/17
**strikes [2]**  44/22 54/12
**strongly [1]**  39/23
**student [1]**  39/3
**subject [4]**  2/23 22/1 29/8 56/12
**subjected [2]**  24/8 24/9
**submissions [2]**  4/18 15/10
**submit [10]**  32/11 34/15 35/11
45/23 46/16 51/5 57/9 57/13 60/13
64/24
**submitted [2]**  6/19 32/5
**subsections [1]**  49/5
**subsequent [2]**  3/5 58/23
**subset [1]**  47/24
**substance [1]**  68/17
**substantial [1]**  68/9

**S**

substitute [1]   58/24
substituted [1]   50/12
suffered [1]   14/25
suffices [1]   59/24
sufficient [2]   14/21 64/17
sufficiently [1]   67/15
suggest [2]   68/8 68/13
suggesting [1]   63/21
suggests [1]   5/22
Sullivan [3]   26/18 27/15 27/20
sum [1]   67/6
summary [9]   2/20 3/1 4/2 4/17
   20/5 20/19 32/6 38/8 64/18
supervising [1]   12/17
support [7]   19/17 20/10 42/9
   43/20 59/25 67/1 68/6
supportable [1]   43/20
supporting [5]   8/3 41/1 41/7
   42/21 43/14
supportive [1]   29/19
supports [2]   70/15 73/2
suppose [1]   4/4
supposed [2]   49/24 58/24
Supreme [12]   6/13 13/12 14/4
   18/20 19/4 19/21 21/6 30/17 67/10
   67/11 68/10 72/25
sure [11]   7/8 7/9 17/23 28/17
   44/6 45/16 49/8 57/19 62/9 63/6
   68/15
surprised [1]   68/2
surprising [1]   15/23
SUSMAN [51]   1/3 2/3 2/8 2/11 4/22
   5/25 6/16 6/20 7/23 8/1 9/23
   12/15 13/4 16/25 16/20 17/20 22/10 20/14
   21/4 21/23 22/14 24/8 28/11 33/11
   34/1 38/17 39/21 40/3 42/7 44/18
   45/18 46/21 46/24 49/10 49/13
   53/1 53/23 57/14 57/14 62/2 63/17
   67/2 67/20 69/15 69/16 70/1 70/14
   72/9 72/10 72/19 73/3 73/13
Susman hasn't [1]   24/8
Susman's [4]   62/18 68/22 69/24
   72/13
suspect [5]   24/11 41/4 41/22
   57/10 67/21
suspended [3]   14/14 15/14 57/17
suspension [15]   14/9 14/12 14/12
   14/15 15/5 15/15 16/1 16/5 16/12
   57/19 58/5 58/13 58/16 59/4 60/15
suspensions [1]   57/13
sustain [1]   43/2
synonymous [1]   41/10
system [2]   39/22 72/11
Systems [2]   4/21 72/15

**T**

table [1]   2/9
taint [1]   24/18
take [20]   9/23 12/18 12/18 20/18
   28/24 30/1 30/3 34/24 41/6 55/12
   57/12 58/10 58/15 59/8 62/21 66/8
   70/10 72/6 72/9 74/3
taken [4]   35/3 35/12 53/5 53/14
takes [3]   5/17 28/10 53/24
taking [4]   31/18 11/2 11/16 63/2
talent [1]   40/21
talk [4]   40/25 56/20 63/25 71/19
talked [4]   7/6 9/19 25/22 64/1
talking [13]   7/22 12/8 14/7 16/24
   38/1 39/14 41/2 42/11 43/5 47/7
   52/10 59/10 69/25
talks [1]   13/14
tarred [1]   61/1
team [1]   55/9
technical [1]   29/5
tell [3]   6/16 47/13 61/17
tells [2]   12/16 16/10
temporary [3]   4/7 4/15 13/6
term [5]   6/24 31/9 57/15 62/3
   62/3

terminate [3]   12/19 26/12 27/16
terminated [1]   7/6
termination [3]   37/6 37/8
terms [7]   3/14 35/9 35/17 49/4
   49/12 68/20 69/24
test [2]   54/18 59/16
than [12]   24/24 25/1 30/5 32/25
   33/23 34/25 36/3 37/15 44/20
   52/23 58/6 64/25
thank [19]   3/8 3/20 3/24 4/3 7/3
   13/9 16/18 24/19 30/7 30/8 34/8
   66/19 66/20 66/22 73/22 73/23
   74/2 74/9 74/9
that [639]
their [17]   2/5 7/13 7/25 10/14
   13/5 18/8 18/16 19/12 22/4 37/9
   43/3 61/13 62/4 68/10 70/11 73/11
   74/10
them [9]   15/8 20/13 22/11 33/22
   53/16 54/23 55/8 58/11 69/3
theme [1]   64/1
then [32]   10/12 10/18 12/16 14/12
   16/6 16/19 18/13 19/8 19/22 21/21
   26/25 27/14 28/21 29/1 31/11 32/7
   37/7 38/13 39/18 42/7 46/23 47/3
   47/9 57/20 58/16 65/15 65/15
   66/23 69/13 72/5 72/19 73/2
theory [3]   22/3 22/4 27/12
there [133]
therefore [1]   35/12
these [28]   8/7 20/24 21/4 21/7
   23/7 24/5 30/15 31/2 35/12 35/13
   35/13 36/12 39/3 43/8 43/12 44/15
   48/3 49/25 53/1 55/18 65/13 66/6
   66/12 67/8 68/11 70/22 70/23 73/9
they [106]
thing [7]   11/5 14/8 20/10 23/4
   28/6 43/13 70/4
things [5]   5/15 18/9 26/14 54/15
   65/13 66/2 67/8 67/19 67/21 70/22
   70/23
think [164]
thinking [3]   16/14 52/25 65/2
third [1]   73/2
this [163]
thoroughly [2]   6/12 28/5
those [28]   4/10 4/12 5/19 7/19
   9/10 9/20 11/19 12/23 15/7 18/9
   21/10 23/22 26/22 33/13 33/20
   35/18 36/9 40/14 41/7 52/16 54/21
   57/16 58/14 64/25 67/15 68/3
   71/17 72/18
thought [4]   22/8 65/6 65/23 66/4
threat [1]   8/15
threaten [2]   7/18 13/21
threatened [1]   53/16
threatening [1]   8/12
three [1]   38/23
through [14]   4/11 7/5 7/9 9/21
   10/16 10/19 12/12 12/5 17/18
   22/11 43/20 58/15 72/21
throughout [2]   32/3 40/2
thus [1]   51/23
TikTok [3]   18/21 19/22 68/19
time [7]   7/16 10/4 31/22 36/12
   37/9 56/17 66/12
Title [16]   6/23 21/22 21/24 22/3
   40/10 47/17 47/21 47/24 48/20
   48/21 48/22 49/1 49/3 49/12 62/16
   63/6
today [7]   2/19 3/4 30/4 42/4
   50/14 68/17 71/13
together [1]   47/6
Tolles [3]   1/14 1/17 2/13
too [3]   20/17 63/16 67/17
total [1]   67/6
towards [5]   45/25 46/15 48/2 49/1
   51/12
track [1]   43/14
traditional [1]   30/16
training [1]   49/6

transcript [2]   1/9 75/4
transgender [1]   57/5
treat [1]   8/24
treatment [2]   5/16 5/17 20/15
trees [3]   7/10 7/22 29/2
tried [6]   19/2 21/16 21/17 25/18
   68/23 70/11
tries [1]   22/7
TRO [13]   8/22 9/19 10/1 10/2 28/5
   30/11 30/14 32/8 32/23 64/17
   64/21 73/8 74/5
true [2]   41/16 75/4
trustworthiness [2]   13/23 16/8
trustworthy [1]   15/17
try [6]   5/19 6/7 18/25 46/1 53/15
   57/11
trying [21]   11/3 15/20 24/22
   26/15 27/6 41/3 41/20 41/23 44/20
   49/24 50/4 50/15 53/10 55/19 59/8
   60/4 63/22 68/7 68/13 70/13 73/6
turn [1]   28/15
two [7]   7/7 9/18 18/9 20/6 24/20
   38/23 47/5
type [6]   6/10 23/7 30/24 30/25
   35/23 52/20
types [3]   26/14 26/19 60/24

**U**

U.S [1]   1/23
U.S.C [1]   6/25
ultimate [1]   74/5
Umbehr [11]   19/4 19/15 19/23 26/7
   27/14 37/2 37/2 37/15 54/22 56/5
   71/11
unable [1]   43/1
unauthorized [1]   2/23
unconstitutional [6]   8/5 18/15
   19/17 24/16 24/18 69/18
under [14]   6/13 13/19 19/17 35/3
   46/17 50/9 50/22 51/1 57/15 57/16
   57/17 68/19 70/9 70/9 74/3
underlying [1]   46/3
undermine [2]   60/19 72/20
undermined [1]   38/22
undermining [1]   23/10
underrepresentation [1]   67/14
underrepresented [17]   38/18 39/7
   39/13 39/24 40/10 40/14 40/22
   41/4 41/12 42/5 42/22 42/23 44/21
   45/16 45/20 67/4 70/15
understand [8]   11/25 39/7 48/18
   49/23 49/24 52/11 57/7 63/8
understanding [6]   6/11 39/9 44/15
   46/15 47/15 59/11
understood [2]   62/25 63/3
undertaken [2]   16/3 60/5
undisputed [2]   4/19 6/19
Unfortunately [1]   32/17
union [2]   46/11 46/13
uniquely [1]   64/15
UNITED [12]   1/1 1/10 3/11 3/12
   3/22 5/12 21/13 69/11 69/16 72/8
   72/21 73/12
unlawful [25]   7/1 20/16 22/8 38/1
   38/3 42/3 42/8 42/15 44/18 46/22
   46/24 47/2 47/4 47/9 48/11 48/11
   49/10 49/14 61/3 67/2 68/7 68/8
   69/12 69/17 73/3
unless [1]   73/25
unreasonable [1]   41/2
unrelated [1]   15/13
until [3]   59/22 64/14 74/5
up [9]   31/24 39/10 39/17 41/15
   57/10 57/11 63/7 65/2 71/3
uphold [1]   21/18
upon [1]   11/16
upper [1]   38/12
upstream [1]   17/13
urge [4]   62/8 62/17 63/14 73/20
urged [1]   10/1
urgent [1]   66/9

**U**

**us** [7]    4/3 5/12 12/5 25/15 26/24
25/25

**USAO** [1]    1/19

**use** [4]    7/18 15/8 46/2 61/16

**used** [3]    61/18 63/5 70/15

**useful** [1]    29/22

**uses** [2]    7/3 67/4

**using** [2]    11/15 62/23

**V**

**vacuum** [1]    34/23

**vagueness** [3]    28/15 28/19 29/4

**valid** [3]    37/7 37/12 59/21

**validity** [1]    43/20

**variation** [2]    32/13 54/2

**various** [2]    42/13 58/10

**verbiage** [1]    38/7

**Verrilli** [7]    1/13 2/8 3/6 30/21
34/6 63/8 66/21

**version** [1]    14/8

**versus** [5]    2/3 35/25 46/7 55/22
59/20

**very** [25]    3/10 4/3 7/3 10/25
10/25 17/4 17/25 19/20 19/21
22/12 22/21 30/7 32/1 44/10 50/11
50/19 57/22 61/24 64/2 66/17
67/19 73/6 73/23 74/2 74/11

**vetted** [1]    28/5

**VI** [1]    22/3

**view** [19]    6/9 9/13 12/2 26/19
32/16 38/10 47/23 50/19 51/1
51/11 51/19 52/11 52/18 54/17
55/3 56/25 57/4 57/16 63/2

**viewed** [4]    34/18 51/12 52/5 65/9

**viewing** [4]    50/24 50/25 51/1
62/25

**viewpoint** [9]    5/2 18/11 18/12
19/7 25/3 25/5 50/25 52/3 53/12

**viewpoints** [1]    27/18

**views** [1]    66/5

**VII** [15]    6/23 21/22 21/24 40/11
47/17 47/21 47/24 48/20 48/21
48/22 49/1 49/3 49/12 62/16 63/6

**Vineet** [1]    2/12

**violate** [3]    18/24 31/22 71/3

**violates** [1]    4/24

**violating** [1]    21/22

**violation** [5]    6/25 18/10 18/13
18/16 22/18

**violations** [1]    71/21

**virtue** [1]    41/6

**vis** [2]    58/22 58/22

**vividly** [1]    4/18

**voiced** [1]    51/20

**voting** [5]    4/21 53/8 61/2 72/15
72/17

**vs** [1]    1/5

**Vullo** [5]    9/5 30/17 37/15 37/16
54/22

**W**

**wake** [1]    9/25

**walk** [1]    4/10

**walking** [1]    58/20

**want** [28]    3/2 7/8 7/9 7/21 27/24
31/20 35/15 36/15 38/11 40/8 44/6
52/7 52/13 52/19 53/19 53/22
53/25 54/25 55/4 55/8 55/13 55/15
61/22 62/6 66/22 68/14 68/15
70/24

**wanted** [4]    51/24 54/7 65/9 66/4

**wanting** [1]    56/20

**wants** [5]    8/13 8/13 9/6 27/10
27/13

**was** [62]    3/7 5/14 6/2 6/5 6/9
6/14 7/12 8/11 9/14 10/2 10/3
12/8 14/24 16/2 16/6 16/7 16/13
19/5 21/8 21/8 21/9 21/11 21/12
26/9 26/11 28/5 28/6 28/8 29/9
30/21 33/3 33/8 33/11 37/13 38/12

39/2 43/25 44/14 46/4 46/8 49/3
49/8 49/13 49/17 51/1 53/24 56/5
58/24 58/24 61/18 65/7 67/7 67/8
67/9 67/14 67/25 68/9

**Washington** [4]    1/5 1/15 1/20 1/24

**wasn't** [2]    24/9 24/10

**water** [1]    28/20

**way** [16]    7/11 11/15 12/22 17/18
21/15 21/18 22/8 24/17 27/12
28/25 30/12 33/4 43/7 56/9 64/17
63/25

**ways** [1]    16/10

**we** [196]

**weakness** [1]    68/15

**weaponization** [1]    10/6

**weaponize** [1]    72/11

**website** [10]    20/11 20/25 21/7
21/11 21/21 38/17 42/12 45/19
67/3 70/14

**weight** [1]    39/7

**Weiss** [6]    16/2 16/3 16/5 16/7
16/8 16/13

**well** [14]    14/22 18/18 18/18 21/5
24/23 28/22 36/25 45/7 48/8 50/8
51/10 51/14 54/4 55/5 56/3 56/15
56/22 59/2 61/4 61/17 63/9 63/11
64/16 67/10 68/5 69/21

**went** [1]    10/3

**were** [26]    5/25 6/12 10/24 14/1
14/6 16/4 23/4 23/16 33/11 33/20
36/9 36/20 37/7 37/17 42/11
44/15 45/24 53/8 56/13 67/17
67/18 67/18 67/21 69/6 69/14
71/11

**weren't** [1]    13/6

**what** [117]

**whatever** [6]    27/15 35/14 35/15
40/11 58/12 64/13

**whatever other** [1]    40/11

**whatsoever** [2]    15/21 26/25

**when** [15]    6/4 7/14 7/22 9/2 20/22
24/25 26/20 28/8 36/25 37/2 46/17
47/6 55/20 56/18 57/7

**whenever** [1]    16/6

**where** [26]    11/3 12/14 30/25 36/6
36/8 36/11 37/5 37/21 43/16 46/3
53/1 53/11 54/6 54/13 54/14 54/14
55/19 55/23 56/9 58/2 58/19 59/12
59/13 59/21 63/12 67/11

**whether** [23]    3/15 13/11 13/19
14/14 14/20 16/11 18/22 30/15
35/16 40/15 41/14 41/14 42/2 43/1
46/7 54/9 55/2 55/22 57/22 57/22
61/12 62/2 66/5 71/6

**which** [40]    3/11 4/8 5/9 5/14 6/19
10/14 12/19 14/14 16/22 19/4
19/14 19/23 19/23 20/7 23/7 24/5
24/15 26/7 30/1 30/3 32/25 36/19
37/22 39/2 39/8 40/7 41/4 41/6
42/17 42/17 44/4 44/23 46/9 46/9
46/24 47/12 51/8 57/4 57/17 62/22

**while** [5]    6/15 18/4 24/16 26/13
73/13

**White** [1]    33/13

**who** [20]    4/5 15/7 15/12 28/9 31/4
31/5 36/16 38/23 40/8 42/21 44/3
44/3 44/3 50/4 53/23 54/5 55/13
57/14 60/21 61/10

**whole** [6]    3/13 6/18 7/23 12/21
29/17 72/4

**wholesale** [1]    58/6

**whom** [1]    10/15

**why** [15]    6/15 8/14 8/17 12/1 20/1
33/10 35/6 35/12 40/6 45/17 49/24
51/8 55/23 55/23 67/20

**will** [29]    2/23 3/6 4/6 7/5 14/13
15/6 15/22 17/7 17/21 21/20 26/23
27/3 32/15 38/16 39/4 40/23 56/18
56/21 57/9 57/11 57/11 60/1 61/6
63/6 64/4 66/18 73/10 74/2 74/3

**wink** [1]    54/14

**wipe** [1]    50/23

**Wisconsin** [1]    1/21

**withdraw** [1]    64/12

**within** [6]    5/12 6/23 11/19 57/1
61/7 61/20

**without** [5]    24/17 29/9 29/9 43/11
59/6

**woman** [3]    14/2 15/1 20/15

**women** [12]    27/8 39/9 39/12 40/8
47/3 54/25 54/25 55/7 55/8 55/14
55/14 55/16

**women-owned** [1]    27/8

**wondering** [2]    60/18 66/4

**word** [6]    18/2 38/17 42/20 61/18
67/4 70/15

**words** [4]    13/22 15/23 50/1 72/3

**work** [14]    7/5 7/9 10/15 11/24
15/9 15/11 15/13 36/3 37/25 45/13
52/19 52/20 52/13 63/22

**workable** [1]    63/20

**workers** [1]    46/10

**world** [7]    8/13 14/4 41/24 43/5
43/6 51/7 63/9

**worried** [1]    64/12

**worth** [2]    28/7 34/14

**would** [116]

**wouldn't** [3]    12/9 21/24 45/14

**wrestled** [1]    62/13

**write** [1]    55/25

**written** [5]    33/16 56/9 57/6 63/23
64/8

**wrong** [3]    7/14 47/13 70/25

**wrote** [1]    49/25

**Y**

**yeah** [3]    6/17 53/17 64/16

**year** [2]    18/21 38/25

**years** [2]    54/9 71/8

**yes** [22]    13/1 16/17 20/21 20/23
23/11 32/20 33/7 37/23 42/19
42/23 44/13 45/3 47/19 48/12
48/13 48/23 52/1 56/1 58/9 60/3
74/7 74/8

**yet** [2]    4/11 19/11

**you** [218]

**you're** [1]    39/21

**your** [81]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002

    *Plaintiff*,

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT
1600 Pennsylvania Avenue NW
Washington, DC 20500

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530

OFFICE OF MANAGEMENT AND
BUDGET
725 17th Street NW
Washington, DC 20503

SECURITIES AND EXCHANGE
COMMISSION
100 F Street NE
Washington, DC 20549

U.S. INTERNATIONAL TRADE
COMMISSION
500 E St SW
Washington, DC 20436

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue NW
Washington, DC 20580

U.S. PATENT AND TRADEMARK
OFFICE
600 Dulany Street
Alexandria, VA 22314

Civil Case No.: 1:25-cv-01107
Judge Loren L. AliKhan

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
131 M Street NE
Washington, DC 20507

DEPARTMENT OF THE TREASURY
1500 Pennsylvania Avenue NW
Washington, DC 20220

U.S. DEPARTMENT OF DEFENSE
1000 Defense Pentagon
Washington, DC 20301

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES
200 Independence Avenue SW
Washington, DC 20201

U.S. DEPARTMENT OF EDUCATION
400 Maryland Avenue SW
Washington, DC 20202

U.S. DEPARTMENT OF VETERANS
AFFAIRS
810 Vermont Avenue NW
Washington, DC 20420

OFFICE OF THE DIRECTOR OF
NATIONAL INTELLIGENCE
Office of General Counsel
Washington, DC 20511

CENTRAL INTELLIGENCE AGENCY
Litigation Division, Office of General
Counsel
Washington, DC 20505

ENVIRONMENTAL PROTECTION
AGENCY
1200 Pennsylvania Avenue NW
Washington, DC 20460

DEPARTMENT OF HOMELAND
SECURITY
2707 Martin Luther King Jr. Avenue SW
Mail Stop 0485
Washington, DC 20528

DEPARTMENT OF STATE
Suite 5.600, 600 19th Street NW
Washington, DC 20522

DEPARTMENT OF ENERGY
1000 Independence Avenue SW
Washington, DC 20585

DEPARTMENT OF LABOR
200 Constitution Avenue NW
Washington, DC 20210

DEPARTMENT OF AGRICULTURE
1400 Independence Avenue SW
Washington, DC 20250

DEPARTMENT OF COMMERCE
1401 Constitution Avenue NW
Washington, DC 20230

DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT
451 Seventh Street NW
Washington, DC 20410

SMALL BUSINESS ADMINISTRATION
409 Third Street SW
Washington, DC 20416

OFFICE OF THE U.S. TRADE
REPRESENTATIVE
600 17th Street NW
Washington, DC 20508

DEPARTMENT OF THE INTERIOR
1849 C Street NW
Washington, DC 20240

3

DEPARTMENT OF TRANSPORTATION
1200 New Jersey Avenue SE
Washington, DC 20590

THE UNITED STATES OF AMERICA
U.S. Attorney's Office for the District of
Columbia
601 D Street NW
Washington, DC 20530

PAMELA J. BONDI, in her official capacity
as Attorney General of the United States
950 Pennsylvania Avenue NW
Washington, DC 20530

RUSSELL T. VOUGHT, in his official
capacity as Director of the U.S. Office of
Management and Budget
725 17th Street NW
Washington, DC 20503

PAUL S. ATKINS, in his official capacity as
Acting Chairman of the Securities and
Exchange Commission
100 F Street NE
Washington, DC 20549

HESTER M. PIERCE, in her official capacity
as Commissioner of the Securities and
Exchange Commission
100 F Street NE
Washington, DC 20549

CAROLINE A. CRENSHAW, in her official
capacity as Commissioner of the Securities and
Exchange Commission
100 F Street NE
Washington, DC 20549

MARK T. UYEDA, in his official capacity as
Commissioner of the Securities and Exchange
Commission
100 F Street NE
Washington, DC 20549

4

AMY A. KARPEL, in her official capacity as
Chair of the U.S. International Trade
Commission
500 E Street SW
Washington, DC 20436

DAVID S. JOHNSON, in his official capacity
as Commissioner of the U.S. International
Trade Commission
500 E Street SW
Washington, DC 20436

JASON E. KEARNS, in his official capacity as
Commissioner of the U.S. International Trade
Commission
500 E Street SW
Washington, DC 20436

ANDREW N. FERGUSON, in his official
capacity as Chairman of the Federal Trade
Commission
600 Pennsylvania Avenue NW
Washington, DC 20580

MELISSA HOLYOAK, in her official capacity
as Commissioner of the Federal Trade
Commission
600 Pennsylvania Avenue NW
Washington, DC 20580

MARK M. MEADOR, in his official capacity
as Commissioner of the Federal Trade
Commission
600 Pennsylvania Avenue NW
Washington, DC 20580

COKE MORGAN STEWART, in her official
capacity as Acting Under Secretary of
Commerce for Intellectual Property and
Acting Director of the U.S. Patent and
Trademark Office
600 Dulany Street
Alexandria, VA 22314

5

ANDREA R. LUCAS, in her official
capacity as Acting Chair of the Equal
Employment Opportunity Commission
131 M Street NE
Washington, DC 20507

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury
1500 Pennsylvania Avenue NW
Washington, DC 20220

PETER B. HEGSETH, in his official
capacity as the Secretary of Defense
U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services
U.S. Department of Health and Human
Services
200 Independence Avenue SW
Washington, DC 20201

LINDA M. MCMAHON, in her official
capacity as Secretary of Education
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

DOUGLAS A. COLLINS, in his official
capacity as Secretary of Veterans Affairs
Department of Veterans Affairs
810 Vermont Avenue NW
Washington, DC 20420

TULSI GABBARD, in her official capacity as
U.S. Director of National Intelligence
Office of the Director of National Intelligence
Office of General Counsel
Washington, DC 20511

JOHN L. RATCLIFFE, in his official capacity
as Director of the Central Intelligence Agency
Litigation Division, Office of General Counsel
Central Intelligence Agency
Washington, DC 20505

LEE M. ZELDIN, in his official capacity as
Administrator of the Environmental Protection
Agency
1200 Pennsylvania Avenue NW
Washington, DC 20460

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security
2707 Martin Luther King Jr. Avenue SW
Mail Stop 0485
Washington, DC 20528

MARCO RUBIO, in his official capacity as
Secretary of State
Suite 5.600, 600 19th Street NW
Washington DC 20522

CHRIS WRIGHT, in his official capacity as
Secretary of Energy
1000 Independence Avenue SW
Washington, DC 20585

LORI CHAVEZ-DEREMER, in her official
capacity as Secretary of Labor
200 Constitution Avenue NW
Washington, DC 20210

BROOKE L. ROLLINS, in her official
capacity as Secretary of Agriculture
1400 Independence Avenue SW
Washington, DC 20250

HOWARD LUTNICK, in his official capacity
as Secretary of Commerce
1401 Constitution Avenue NW
Washington, DC 20230

SCOTT TURNER, in his official capacity as
Secretary of Housing and Urban Development
451 Seventh Street SW
Washington, DC 20410

KELLY LOEFFLER, in her official capacity
as Administrator of the U.S. Small Business
Administration
409 Third Street SW
Washington, DC 20416

JAMIESON GREER, in his official capacity as
U.S. Trade Representative
600 17th Street NW
Washington, DC 20508

DOUG BURGUM, in his official capacity as
Secretary of the Interior
1849 C Street NW
Washington, DC 20240

SEAN DUFFY, in his official capacity as
Secretary of Transportation
1200 New Jersey Avenue SE
Washington, DC 20590

U.S. DEPARTMENT OF THE AIR FORCE
1670 Air Force Pentagon
Washington, DC 20330

GARY A. ASHWORTH, in his official
capacity as Acting Secretary of the Air Force
1670 Air Force Pentagon
Washington, DC 20330

U.S. DEPARTMENT OF THE ARMY
1500 Army Pentagon
Washington, DC 20310

DANIEL P. DRISCOLL, in his official
capacity as Acting Secretary of the Army
1500 Army Pentagon
Washington, DC 20310

8

U.S. DEPARTMENT OF THE NAVY
1000 Navy Pentagon
Washington, DC 20350

JOHN PHELAN, in his official capacity as
Acting Secretary of the Navy
1000 Navy Pentagon
Washington, DC 20350

ADMINISTRATION FOR CHILDREN AND
FAMILIES
330 C Street SW
Washington, DC 20201

ANDREW GRADISON, in his official
capacity as Acting Assistant Secretary for the
Administration for Children and Families
330 C Street SW
Washington, DC 20201

ADMINISTRATION FOR STRATEGIC
PREPAREDNESS AND RESPONSE
200 Independence Avenue SW
Washington, DC 20201

JOHN KNOX, in his official capacity as
Principal Deputy Assistant Secretary for
Preparedness and Response
200 Independence Avenue SW
Washington, DC 20201

ADVISORY COUNCIL ON HISTORIC
PRESERVATION
401 F Street NW, Suite 308
Washington, DC 20001

REID NELSON, in his official capacity as
Chairman of the Advisory Council on Historic
Preservation
401 F Street NW, Suite 308
Washington, DC 20001

AMERICORPS
250 E Street SW
Washington, DC 20525

9

JENNIFER BASTRESS TAHMASEBI, in her
official capacity as Interim Agency Head of
AmeriCorps
250 E Street SW
Washington, DC 20525

APPALACHIAN REGIONAL
COMMISSION
1666 Connecticut Avenue NW, Suite 700
Washington, DC 20009

GAYLE CONELLY MANCHIN, in her
official capacity as Co-Chair of the
Appalachian Regional Commission
1666 Connecticut Ave NW, Suite 700
Washington, DC 20009

BIOMEDICAL ADVANCED RESEARCH
AND DEVELOPMENT AUTHORITY
200 Independence Avenue SW
Washington, DC 20201

GARY DISBROW, in his official capacity as
Director of the Biomedical Advanced Research
and Development Authority
200 Independence Avenue SW
Washington, DC 20201

BONNEVILLE POWER ADMINISTRATION
905 NE 11th Avenue
Portland, OR 97232

JOHN HAIRSTON, in his official capacity as
Administrator and Chief Executive Officer of
the Bonneville Power Administration
905 NE 11th Avenue
Portland, OR 97232

BUREAU OF ECONOMIC ANALYSIS
4600 Silver Hill Road
Suitland, MD 20746

VIPIN ARORA, in his official capacity as
Director of the Bureau of Economic Analysis
4600 Silver Hill Road
Suitland, MD 20746

(Page 489 of Total)     JA 3371

BUREAU OF INDIAN AFFAIRS
1849 C Street NW
Washington, DC 20240

BRYAN MERCIER, in his official capacity as
Director of the Bureau of Indian Affairs
1849 C Street NW
Washington, DC 20240

BUREAU OF INDUSTRY AND SECURITY
1401 Constitution Avenue NW
Washington, DC 20230

JEFFREY KESSLER, in his official capacity
as Under Secretary for Industry and Security
1401 Constitution Avenue NW, Room H-3839
Washington, DC 20230

BUREAU OF LAND MANAGEMENT
1849 C Street NW
Washington, DC 20240

MICHAEL D. NED, in his official capacity as
Director of the Bureau of Land Management
1849 C Street NW
Washington, DC 20240

BUREAU OF OCEAN ENERGY
MANAGEMENT
1849 C Street NW
Washington, DC 20240

WALTER CRUICKSHANK, in his
official capacity as Director of the Bureau of
Ocean Energy Management
1849 C Street NW
Washington, DC 20240

BUREAU OF RECLAMATION
1849 C Street NW
Washington, DC 20240

11

DAVID PALUMBO, in his official capacity as
Acting Commissioner of the Bureau of
Reclamation
1849 C Street NW
Washington, DC 20240

BUREAU OF SAFETY AND
ENVIRONMENTAL ENFORCEMENT
1849 C Street NW
Washington, DC 20240

PAUL HUANG, in his official capacity as
Acting Director of the Bureau of Safety and
Environmental Enforcement
1849 C Street NW
Washington, DC 20240

BUREAU OF THE CENSUS
4600 Silver Hill Road
Suitland, MD 20746

RON S. JARMIN, in his official capacity as
Acting Director of the Bureau of the Census
4600 Silver Hill Road
Suitland, MD 20746

CENTERS FOR DISEASE CONTROL AND
PREVENTION
1600 Clifton Road
Atlanta, GA 30329

SUSAN MONAREZ, in her official capacity
as Acting Director of the Centers for Disease
Control and Prevention
1600 Clifton Road, NW
Atlanta, GA 30333

CENTERS FOR MEDICARE AND
MEDICAID SERVICES
200 Independence Avenue SW
Washington, DC 20201

12

DR. MEHMET OZ, in his official capacity as
Administrator of the Centers for Medicare and
Medicaid Services
200 Independence Avenue SW
Washington, DC 20201

CHEMICAL SAFETY BOARD
1750 Pennsylvania Avenue NW, Suite 910
Washington, DC 20006

STEVE OWENS, in his official capacity as
Chairperson of the Chemical Safety Board
1750 Pennsylvania Avenue NW, Suite 910
Washington, DC 20006

NATIONAL INSTITUTE FOR STANDARDS
AND TECHNOLOGY
100 Bureau Drive
Gaithersburg, MD 20899

CRAIG BURKHARDT, in his official capacity
as Acting Director of the National Institute for
Standards and Technology
100 Bureau Drive
Gaithersburg, MD 20899

COMMISSION OF FINE ARTS
401 F Street NW, Suite 312
Washington, DC 20001

BILLIE TSIEN, in her official capacity as
Chairperson of the Commission of Fine Arts
401 F Street NW, Suite 312
Washington, DC 20001

COMMITTEE ON FOREIGN INVESTMENT
IN THE UNITED STATES
1500 Pennsylvania Avenue NW
Washington, DC 20220

SCOTT BESSENT, in his official capacity as
Chairperson of the Committee on Foreign
Investment in the United States
1500 Pennsylvania Avenue NW
Washington, DC 20220

13

JA 3374

COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street NW
Washington, DC 20581

CAROLINE D. PHAM, in her official capacity
as Acting Chairman of the Commodity Futures
Trading Commission
1155 21st Street NW
Washington, DC 20581

KRISTIN N. JOHNSON, in her official
capacity as Commissioner of the Commodity
Futures Trading Commission
1155 21st Street NW
Washington, DC 20581

CHRISTY GOLDSMITH ROMERO, in her
official capacity as Commissioner of the
Commodity Futures Trading Commission
1155 21st Street NW
Washington, DC 20581

SUMMER K. MERSINGER, in her official
capacity as Commissioner of the Commodity
Futures Trading Commission
1155 21st Street NW
Washington, DC 20581

CONSUMER FINANCIAL PROTECTION
BUREAU
1700 G Street NW
Washington, DC 20552

SCOTT BESSENT, in his official capacity as
Acting Director of the Consumer Financial
Protection Bureau
1500 Pennsylvania Avenue NW
Washington, DC 20220

COUNCIL OF INSPECTORS GENERAL ON
INTEGRITY AND EFFICIENCY
1717 H Street NW, Suite 825
Washington, DC 20006

14

DEIDRE HARRISON, in her official capacity
as Executive Chair of the Council of Inspectors
General on Integrity and Efficiency
1717 H Street NW, Suite 825
Washington, DC 20006

COUNCIL ON ENVIRONMENTAL
QUALITY
730 Jackson Place NW
Washington, DC 20503

KATHERINE SCARLETT, in her official
capacity as Acting Chair of the Council on
Environmental Quality
730 Jackson Place NW
Washington, DC 20503

DEFENSE CONTRACT AUDIT AGENCY
8725 John J. Kingman Road
Fort Belvoir, VA 22060

JENNIFER DESAUTEL, in her official
capacity as Director of the Defense Contract
Audit Agency
8725 John J. Kingman Road
Fort Belvoir, VA 22060

DEFENSE CONTRACT MANAGEMENT
AGENCY
3901 Adams Avenue
Fort Gregg-Adams, VA 23801

LIEUTENANT GENERAL GREGORY L.
MASIELLO, in his official capacity as
Director of the Defense Contract Management
Agency
3901 Adams Avenue
Fort Gregg-Adams, VA 23801

DEFENSE INTELLIGENCE AGENCY
7400 Pentagon
Washington, DC 20301

15

LIEUTENANT GENERAL JEFFREY A.
KRUSE, in his official capacity as Director of
the Defense Intelligence Agency
7400 Pentagon
Washington, DC 20301

DEFENSE LOGISTICS AGENCY
8725 John J. Kingman Road
Fort Belvoir, VA 22060

LIEUTENANT GENERAL MARK T.
SIMERLY, in his official capacity as Director
of the Defense Logistics Agency
8725 John J. Kingman Road
Fort Belvoir, VA 22060

DENALI COMMISSION
550 W 7th Avenue, Suite 1230
Anchorage, AK 99501

JULIE E. KITKA, in her official capacity as
Federal Co-Chair of the Denali Commission
550 W 7th Avenue, Suite 1230
Anchorage, AK 99501

DIRECTORATE OF DEFENSE TRADE
CONTROLS
2401 E Street NW
Washington, DC 20522

MICHAEL J. VACCARO, in his official
capacity as Deputy Assistant Secretary of State
for Defense Trade Controls
2401 E Street NW
Washington, DC 20522

DRUG ENFORCEMENT
ADMINISTRATION
8701 Morrisette Drive
Springfield, VA 22152

DEREK S. MALTZ, in his official capacity as
Acting Administrator of the Drug Enforcement
Administration
8701 Morrisette Drive
Springfield, VA 22152

16

EXPORT-IMPORT BANK OF THE UNITED
STATES
811 Vermont Avenue NW
Washington, DC 20571

JAMES C. CRUSE, in his official capacity as
Acting President and Chairman of the Export-
Import Bank of the United States
811 Vermont Avenue NW
Washington, DC 20571

FARM CREDIT SYSTEM INSURANCE
CORPORATION
1501 Farm Credit Drive
McLean, VA 22102

GLEN R. SMITH, in his official capacity as
Chairman of the Farm Credit System Insurance
Corporation
1501 Farm Credit Drive
McLean, VA 22102

FEDERAL AVIATION ADMINISTRATION
800 Independence Avenue SW
Washington, DC 20591

CHRIS ROCHELEAU, in his official capacity
as Acting Administrator of the Federal
Aviation Administration
800 Independence Avenue SW
Washington, DC 20591

FEDERAL BUREAU OF INVESTIGATION
935 Pennsylvania Avenue NW
Washington, DC 20535

KASH PATEL, in his official capacity as
Director of the Federal Bureau of Investigation
935 Pennsylvania Avenue NW
Washington, DC 20535

FEDERAL BUREAU OF PRISONS
320 First Street NW
Washington, DC 20534

WILLIAM K. MARSHALL III, in his official
capacity as Director of the Federal Bureau of
Prisons
320 First Street NW
Washington, DC 20534

FEDERAL COMMUNICATIONS
COMMISSION
45 L Street NE
Washington, DC 20554

BRENDAN CARR, in his official capacity as
Chairman of the Federal Communications
Commission
45 L Street NE
Washington, DC 20554

GEOFFREY STARKS, in his official capacity
as Commissioner of the Federal
Communications Commission
45 L Street NE
Washington, DC 20554

NATHAN SIMINGTON, in his official
capacity as Commissioner of the Federal
Communications Commission
45 L Street NE
Washington, DC 20554

ANNA M. GOMEZ, in her official capacity as
Commissioner of the Federal Communications
Commission
45 L Street NE
Washington, DC 20554

FEDERAL DEPOSIT INSURANCE
CORPORATION
550 17th Street NW
Washington, DC 20429

TRAVIS HILL, in his official capacity as
Acting Chairman of the Federal Deposit
Insurance Corporation
550 17th Street NW
Washington, DC 20429

JA 3379

FEDERAL ELECTION COMMISSION
1050 First Street NE
Washington, DC 20463

JAMES E. TRAINOR III, in his official
capacity as Vice Chairman and Acting
Chairman of the Federal Election Commission
1050 First Street NE
Washington, DC 20463

SHANA M. BROUSSARD, in her official
capacity as Commissioner of the Federal
Election Commission
1050 First Street NE
Washington, DC 20463

DARA LINDENBAUM, in her official
capacity as Commissioner of the Federal
Election Commission
1050 First Street NE
Washington, DC 20463

FEDERAL EMERGENCY MANAGEMENT
AGENCY
500 C Street SW
Washington, DC 20472

CAMERON HAMILTON, in his official
capacity as Administrator of the Federal
Emergency Management Agency
500 C Street SW
Washington, DC 20472

FEDERAL ENERGY REGULATORY
COMMISSION
888 First Street NE
Washington, DC 20426

MARK C. CHRISTIE, in his official capacity
as Chairman of the Federal Energy Regulatory
Commission
888 First Street NE
Washington, DC 20426

JA 3380

DAVID ROSNER, in his official capacity as
Commissioner of the Federal Energy
Regulatory Commission
888 First Street NE
Washington, DC 20426

LINSAY S. SEE, in her official capacity as
Commissioner of the Federal Energy
Regulatory Commission
888 First Street NE
Washington, DC 20426

JUDY W. CHANG, in her official capacity as
Commissioner of the Federal Energy
Regulatory Commission
888 First Street NE
Washington, DC 20426

FEDERAL HIGHWAY ADMINISTRATION
1200 New Jersey Avenue SE
Washington, DC 20590

GLORIA M. SHEPHERD, in her official
capacity as Executive Director and Acting
Administrator of the Federal Highway
Administration
1200 New Jersey Avenue SE
Washington, DC 20590

FEDERAL HOUSING FINANCE AGENCY
400 7th Street SW
Washington, DC 20219

WILLIAM J. PULTE, in his official capacity
as Director of the Federal Housing Finance
Agency
400 Seventh Street SW
Washington, DC 20219

FEDERAL LABOR RELATIONS
AUTHORITY
1400 K Street NW
Washington, DC 20424

20

JA 3381

COLLEEN DUFFY KIKO, in her official
capacity as Chairman of the Federal Labor
Relations Authority
1400 K Street NW
Washington, DC 20424

SUSAN TSUI GRUNDMANN, in her official
capacity as Member of the Federal Labor
Relations Authority
1400 K Street NW
Washington, DC 20424

ANNE M. WAGNER, in her official capacity
as Member of the Federal Labor Relations
Authority
1400 K Street NW
Washington, DC 20424

FEDERAL MARITIME COMMISSION
800 North Capitol Street NW
Washington, DC 20573

LOUIS E. SOLA, in his official capacity as
Chairman of the Federal Maritime
Commission
800 North Capitol Street NW
Washington, DC 20573

REBECCA F. DYE, in her official capacity as
Commissioner of the Federal Maritime
Commission
800 North Capitol Street NW
Washington, DC 20573

DANIEL B. MAFFEI, in his official capacity
as Commissioner of the Federal Maritime
Commission
800 North Capitol Street NW
Washington, DC 20573

MAX VEKICH, in his official capacity as
Commissioner of the Federal Maritime
Commission
800 North Capitol Street NW
Washington, DC 20573

(Page 500 of Total)
JA 3382

FEDERAL MEDIATION AND
CONCILIATION SERVICE
250 E Street SW
Washington, DC 20427

GREGORY GOLDSTEIN, in his official
capacity as Acting Director of the Federal
Mediation and Conciliation Service
250 E Street SW
Washington, DC 20427

FEDERAL MINE SAFETY AND HEALTH
REVIEW COMMISSION
1331 Pennsylvania Avenue NW, Suite 520N
Washington, DC 20004

MARY LU JORDAN, in her official capacity
as Chair of the Federal Mine Safety and Health
Review Commission
1331 Pennsylvania Avenue NW, Suite 520N
Washington, DC 20004

TIMOTHY J. BAKER, in her official capacity
as Commissioner of the Federal Mine Safety
and Health Review Commission
1331 Pennsylvania Avenue NW, Suite 520N
Washington, DC 20004

MOSHE Z. MARVIT, in her official capacity
as Commissioner of the Federal Mine Safety
and Health Review Commission
1331 Pennsylvania Avenue NW, Suite 520N
Washington, DC 20004

FEDERAL PERMITTING IMPROVEMENT
STEERING COUNCIL
1800 M Street NW, Suite 6006
Washington, DC 20036

MANISHA PATEL, in her official capacity as
Executive Director of the Federal Permitting
Improvement Steering Council
1800 M Street NW, Suite 6006
Washington, DC 20036

JA 3383

FEDERAL RAILROAD ADMINISTRATION
1200 New Jersey Avenue SE
Washington, DC 20590

MICHAEL LESTINGI, in his official capacity
as Executive Director of the Federal Railroad
Administration
1200 New Jersey Avenue SE
Washington, DC 20590

THOMAS R. JAYNE, in his official capacity
as a Management Member of the Federal
Railroad Administration
1200 New Jersey Avenue SE
Washington, DC 20590

JOHN BRAGG, in his official capacity as a
Labor Member of the Federal Railroad
Administration
1200 New Jersey Avenue SE
Washington, DC 20590

FEDERAL RETIREMENT THRIFT
INVESTMENT BOARD
77 K Street NE, Suite 1000
Washington, DC 20002

DANA BILYEU, in her official capacity as
Acting Chair of the Federal Retirement Thrift
Investment Board
77 K Street NE, Suite 1000
Washington, DC 20002

FEDERAL TRANSIT ADMINISTRATION
1200 New Jersey Avenue SE
Washington, DC 20590

MATTHEW WELBES, in his official capacity
as Executive Director of the Federal Transit
Administration
1200 New Jersey Avenue SE
Washington, DC 20590

(Page 502 of Total)

JA 3384

FINANCIAL CRIMES ENFORCEMENT
NETWORK
P.O. Box 39
Vienna, VA 22183

ANDREA GACKI, in her official capacity as
Director of the Financial Crimes Enforcement
Network
P.O. Box 39
Vienna, VA 22183

FOOD & DRUG ADMINISTRATION
10903 New Hampshire Avenue
Silver Spring, MD 20993

MARTIN A. MAKARY, in his official
capacity as Commissioner of Food and Drugs
10903 New Hampshire Avenue
Silver Spring, MD 20993

GENERAL SERVICES ADMINISTRATION
1800 F Street NW
Washington, DC 20405

STEPHEN EHEKIAN, in his official capacity
as Acting Administrator of the General
Services Administration
1800 F Street NW
Washington, D.C. 20405

GRID DEPLOYMENT OFFICE
1000 Independence Avenue SW
Washington, DC 20585

NICK ELLIOT, in his official capacity as
Director of the Grid Deployment Office
1000 Independence Avenue SW
Washington, DC 20585

GULF COAST ECOSYSTEM
RESTORATION COUNCIL (RESTORE THE
GULF)
500 Poydras Street, Suite 1117
New Orleans, LA 70130

(Page 503 of Total)    **JA 3385**

LEE M. ZELDIN, in his official capacity as
Member of the RESTORE Council
1200 Pennsylvania Avenue NW
Washington, DC 20460

HEALTH RESOURCES AND SERVICES
ADMINISTRATION
5600 Fishers Lane
Rockville, MD 20857

THOMAS J. ENGELS, in his official capacity
as Administrator of the Health Resources and
Services Administration
5600 Fishers Lane
Rockville, MD 20857

INSTITUTE OF MUSEUM AND LIBRARY
SERVICES
955 L'Enfant Plaza North SW, Suite 4000
Washington, DC 20024

KEITH SONDERLING, in his official
capacity as Chairperson of the Institute of
Museum and Library Services
955 L'Enfant Plaza North SW, Suite 4000
Washington, DC 20024

INTERNAL REVENUE SERVICE
1111 Constitution Avenue NW
Washington, DC 20224

MICHAEL FAULKENDER, in his official
capacity as Acting Commissioner of the
Internal Revenue Service
1111 Constitution Avenue NW
Washington, DC 20224

INTERNATIONAL TRADE
ADMINISTRATION
1401 Constitution Ave NW
Washington, DC 20230

25

DIANE FARRELL, in her official capacity as
Deputy Under Secretary for International
Trade and Acting Chair of the International
Trade Administration
1401 Constitution Avenue NW
Washington, DC 20230

JOINT CHIEFS OF STAFF
9999 Joint Staff Pentagon
Washington, DC 20318

GENERAL DAN CAINE, in his official
capacity as Chairman of the Joint Chiefs of
Staff
9999 Joint Staff Pentagon
Washington, DC 20318

KENNEDY CENTER
2700 F Street NW
Washington, DC 20566

RICHARD GRENELL, in his official capacity
as President of the Kennedy Center
2700 F Street NW
Washington, DC 20566

LOAN PROGRAMS OFFICE
1000 Independence Avenue SW
Washington, DC 20585

LANE GENATOWSKI, in his official capacity
as Director of the Loan Programs Office
1000 Independence Avenue SW
Washington, DC 20585

NATIONAL AERONAUTICS AND SPACE
ADMINISTRATION
300 E Street SW, Suite 5R30
Washington, DC 20546

JANET PETRO, in her official capacity as
Administrator of the National Aeronautics and
Space Administration
300 E Street SW, Suite 5R30
Washington, DC 20546

(Page 505 of Total)

NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION
700 Pennsylvania Avenue NW
Washington, DC 20408

MARCO RUBIO, in his official capacity as
Acting Archivist of the National Archives and
Records Administration
700 Pennsylvania Avenue NW
Washington, DC 20408

NATIONAL COUNTERTERRORISM
CENTER
1500 Tysons McLean Drive
McLean, VA 22102

DON M. HOLSTEAD, in his official capacity
as Acting Director of the National
Counterterrorism Center
1500 Tysons McLean Drive
McLean, VA 22102

NATIONAL ENDOWMENT FOR THE
ARTS
400 7th Street SW
Washington, DC 20506

MARY ANNE CARTER, in her official
capacity as Acting Chair of the National
Endowment for the Arts
400 7th Street SW
Washington, DC 20506

NATIONAL ENDOWMENT FOR THE
HUMANITIES
400 7th Street SW
Washington, DC 20506

MICHAEL MCDONALD, in his official
capacity as Acting Chairman of the National
Endowment for the Humanities
400 7th Street SW
Washington, DC 20506

27

NATIONAL GEOSPATIAL-
INTELLIGENCE AGENCY
MS N73
7500 GEOINT Drive
Springfield, VA 22150

FRANK WHITWORTH, in his official
capacity as Director of the National
Geospatial-Intelligence Agency
MS N73
7500 GEOINT Drive
Springfield, VA 22150

NATIONAL INDIAN GAMING
COMMISSION
1849 C Street NW
Mail Stop #1621
Washington, DC 20240

SHARON AVERY, in her official capacity as
Acting Chairwoman of the National Indian
Gaming Commission
1849 C Street NW
Mail Stop #1621
Washington, DC 20240

NATIONAL INSTITUTES OF HEALTH
9000 Rockville Pike
Bethesda, MD 20892

JAY BHATTACHARYA, in his official
capacity as Director of the National Institutes
of Health
9000 Rockville Pike
Bethesda, MD 20892

NATIONAL LABOR RELATIONS BOARD
1015 Half Street SE
Washington, DC 20570

MARVIN E. KAPLAN, in his official capacity
as Chairman of the National Labor Relations
Board
1015 Half Street SE
Washington, DC 20570

DAVID M. PROUTY, in his official capacity
as Member of the National Labor Relations
Board
1015 Half Street SE
Washington, DC 20570

NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, MD 20910

EUGENIO PIÑEIRO SOLER, in his official
capacity as Director of the National Marine
Fisheries Service
1315 East-West Highway
Silver Spring, MD 20910

NATIONAL MEDIATION BOARD
1301 K Street NW, Suite 250 East
Washington, DC 20005

LOREN E. SWEATT, in her official capacity
as Chair of the National Mediation Board
1301 K Street NW, Suite 250 East
Washington, DC 20005

LINDA A. PUCHALA, in her official capacity
as Member of the National Mediation Board
1301 K Street NW, Suite 250 East
Washington, DC 20005

DEIRDRE HAMILTON, in her official
capacity as Member of the National Mediation
Board
1301 K Street NW, Suite 250 East
Washington, DC 20005

NATIONAL NUCLEAR SECURITY
ADMINISTRATION
1000 Independence Avenue SW
Washington, DC 20585

TERESA M. ROBBINS, in her official
capacity as Acting Administrator of the
National Nuclear Security Administration
1000 Independence Avenue SW
Washington, DC 20585

29

NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION
1401 Constitution Avenue NW
Washington, DC 20230

LAURA GRIMM, in her official capacity as
Administrator of the National Oceanic and
Atmospheric Administration
1401 Constitution Avenue NW
Washington, DC 20230

NATIONAL PARK SERVICE
1849 C Street NW
Washington, DC 20240

JESSICA BOWRON, in her official capacity
as Acting Director of the National Park Service
1849 C Street NW
Washington, DC 20240

NATIONAL RENEWABLE ENERGY
LABORATORY
901 D Street SW, Suite 930
Washington, DC 20024

MARTIN KELLER, in his official capacity as
Laboratory Director of the National Renewable
Energy Laboratory
901 D Street SW, Suite 930
Washington, DC 20024

NATIONAL SCIENCE FOUNDATION
2415 Eisenhower Avenue
Alexandria, VA 22314

VICTOR MCCRARY, in his official capacity
as Acting Director of the National Science
Foundation
2415 Eisenhower Avenue
Alexandria, VA 22314

NATIONAL SECURITY AGENCY
9800 Savage Road, Suite 6272
Fort Meade, MD 20755

LIEUTENANT GENERAL WILLIAM J.
HARTMAN, in his official capacity as Acting
Director of the National Security Agency
9800 Savage Road, Suite 6272
Fort Meade, MD 20755

NATIONAL SECURITY COUNCIL
1600 Pennsylvania Avenue NW
Washington, DC 20500

MARCO RUBIO, in his official capacity as
Acting National Security Advisor
1600 Pennsylvania Avenue NW
Washington, DC 20500

NATIONAL TRANSPORTATION SAFETY
BOARD
490 L'Enfant Plaza SW
Washington, DC 20594

JENNIFER HOMENDY, in her official
capacity as Chair of the National
Transportation Safety Board
490 L'Enfant Plaza East SW
Washington, DC 20594

ALVIN BROWN, in his official capacity as
Vice Chairman of the National Transportation
Safety Board
490 L'Enfant Plaza East SW
Washington, DC 20594

MICHAEL E. GRAHAM, in his official
capacity as Member of the National
Transportation Safety Board
490 L'Enfant Plaza East SW
Washington, DC 20594

THOMAS B. CHAPMAN, in his official
capacity as Member of the National
Transportation Safety Board
490 L'Enfant Plaza East SW
Washington, DC 20594

J. TODD IMAN, in his official capacity as
Member of the National Transportation Safety
Board
490 L'Enfant Plaza East SW
Washington, DC 20594

OCCUPATIONAL SAFETY AND HEALTH
ADMINISTRATION
200 Constitution Avenue NW
Washington, DC 20210

AMANDA WOOD LAIHOW, in her official
capacity as Acting Assistant Secretary of
Labor for Occupational Safety and Health
200 Constitution Avenue NW
Washington, DC 20210

OCCUPATIONAL SAFETY AND HEALTH
REVIEW COMMISSION
1120 20th Street NW, 9th Floor
Washington, DC 20036

CHAIR of the Occupational Safety and Health
Review Commission, in his or her official
capacity
1120 20th Street NW, 9th Floor
Washington, DC 20036

OFFICE OF CLEAN ENERGY
DEMONSTRATIONS
1000 Independence Avenue SW
Washington, DC 20585

CATHY TRIPODI, in her official capacity as
Executive Director of the Office of Clean
Energy Demonstrations
1000 Independence Avenue SW
Washington, DC 20585

OFFICE OF FEDERAL CONTRACT
COMPLIANCE PROGRAMS
200 Constitution Avenue NW
Washington, DC 20210

CATHERINE ESCHBACH, in her official
capacity as Director of the Office of Federal
Contract Compliance Programs
200 Constitution Avenue NW
Washington, DC 20210

OFFICE OF FOREIGN ASSETS CONTROL
1500 Pennsylvania Avenue NW
Washington, DC 20220

BRADLEY T. SMITH, in his official capacity
as Director of the Office of Foreign Assets
Control
1500 Pennsylvania Avenue NW
Washington, DC 20220

OFFICE OF GOVERNMENT ETHICS
250 E Street SW, Suite 750
Washington, DC 20024

JAMIESON GREER, in his official capacity as
Acting Director of the Office of Government
Ethics
250 E Street SW, Suite 750
Washington, DC 20024

OFFICE OF HOMELAND SECURITY
SITUATIONAL AWARENESS
300 7th Street SW
Washington, DC 20024

CHRISTOPHER TOMNEY, in his official
capacity as Director of the Office of Homeland
Security Situational Awareness
300 7th Street SW
Washington, DC 20024

OFFICE OF NATIONAL DRUG CONTROL
POLICY
1600 Pennsylvania Avenue NW
Washington, DC 20500

33

JON RICE, in his official capacity as Acting
Director of the Office of National Drug
Control Policy
1600 Pennsylvania Avenue NW
Washington, DC 20500

OFFICE OF PERSONNEL MANAGEMENT
1900 E Street NW
Washington, DC 20415

CHARLES EZELL, in his official capacity as
Acting Director of the Office of Personnel
Management
1900 E Street NW
Washington, DC 20415

OFFICE OF SCIENCE AND TECHNOLOGY
POLICY
1650 Pennsylvania Avenue NW
Washington, DC 20504

MICHAEL KRATSIOS, in his official
capacity as Director of the Office of Science
and Technology Policy
1650 Pennsylvania Avenue NW
Washington, DC 20504

OFFICE OF SPECIAL COUNSEL
1730 M Street NW, Suite 218
Washington, DC 20036

DOUGLAS A. COLLINS, in his official
capacity as Acting Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036

OFFICE OF THE COMPTROLLER OF THE
CURRENCY
400 7th Street SW
Washington, DC 20219

RODNEY E. HOOD, in his official capacity as
Acting Comptroller of the Currency
400 7th Street SW
Washington, DC 20219

(Page 513 of Total)          **JA 3395**

OFFICE OF THE INSPECTOR GENERAL
950 Pennsylvania Avenue NW
Washington, DC 20530

MICHAEL E. HOROWITZ, in his official
capacity as Inspector General
950 Pennsylvania Avenue NW
Washington, DC 20530

PATENT TRIAL & APPEAL BOARD
600 Dulany Street
Alexandria, VA 22314

COKE MORGAN STEWART, in her official
capacity as Acting Director of the Patent Trial
& Appeal Board
600 Dulany Street
Alexandria, VA 22314

PEACE CORPS
1275 First Street NE
Washington, DC 20526

ALLISON GREEN, in her official capacity as
Chief Executive Officer of the Peace Corps
1275 First Street NE
Washington, DC 20526

PENSION BENEFIT GUARANTY
CORPORATION
445 12th Street SW
Washington, DC 20024

ALICE MARONI, in her official capacity as
Acting Director of the Pension Benefit
Guaranty Corporation
445 12th Street SW
Washington, DC 20024

PRESIDIO TRUST
1750 Lincoln Boulevard
San Francisco, CA 94129

MARK W. BUELL, in his official capacity as
Chair of the Presidio Trust
1750 Lincoln Boulevard
San Francisco, CA 94129

RURAL UTILITIES SERVICE
1400 Independence Avenue SW
Stop 1560, Room 4121-S
Washington, DC 20250

CHRISTOPHER A. MCLEAN, in his official
capacity as Acting Administrator of the Rural
Utilities Service
1400 Independence Avenue SW
Stop 1560, Room 4121-S
Washington, DC 20250

SELECTIVE SERVICE SYSTEM
1515 Wilson Boulevard, Suite 600
Arlington, VA 22209

CRAIG T. BROWN, in his official capacity as
Acting Director of the Selective Service
System
1515 Wilson Boulevard, Suite 600
Arlington, VA 22209

SMITHSONIAN INSTITUTION
P.O. Box 37012, MRC 012
Washington, DC 20013

LONNIE G. BUNCH III, in his official
capacity as Secretary of the Smithsonian
Institution
P.O. Box 37012, MRC 012
Washington, DC 20013

SURFACE TRANSPORTATION BOARD
395 E Street SW
Washington, DC 20423

PATRICK J. FUCHS, in his official capacity
as Chairman of the Surface Transportation
Board
395 E Street SW
Washington, DC 20423

ROBERT E. PRIMUS, in his official capacity
as a Member of the Surface Transportation
Board
395 E Street SW
Washington, DC 20423

MICHELLE A. SCHULTZ, in her official
capacity as Member of the Surface
Transportation Board
395 E Street SW
Washington, DC 20423

KAREN J. HEDLUND, in her official capacity
as Member of the Surface Transportation
Board
395 E Street SW
Washington, DC 20423

TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, TN 37902

BILL RENICK, in his official capacity as
Chair of the Tennessee Valley Authority
400 West Summit Hill Drive
Knoxville, TN 37902

TRADEMARK TRIAL AND APPEAL
BOARD
Madison East, Concourse Level Room C 55
600 Dulany Street
Alexandria, VA 22314

COKE MORGAN STEWART, in her official
capacity as Acting Director of the Trademark
Trial and Appeal Board
Madison East, Concourse Level Room C 55
600 Dulany Street
Alexandria, VA 22314

U.S. AGENCY FOR GLOBAL MEDIA
330 Independence Avenue SW
Washington, DC 20237

37

JA 3398

VICTOR MORALES, in his official capacity
as Acting Chief Executive Officer of the U.S.
Agency for Global Media
330 Independence Avenue SW
Washington, DC 20237

U.S. AGENCY FOR INTERNATIONAL
DEVELOPMENT
1300 Pennsylvania Avenue NW
Washington, DC 20523

MARCO RUBIO, in his official capacity as
Acting Administrator of the U.S. Agency for
International Development
1300 Pennsylvania Avenue NW
Washington, DC 20523

U.S. ARMY CORPS OF ENGINEERS
441 G Street NW
Washington, DC 20314

LIEUTENANT GENERAL WILLIAM H.
GRAHAM, JR., in his official capacity as
Commanding General of the U.S. Army Corps
of Engineers
441 G Street NW
Washington, DC 20314

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES
20 Massachusetts Avenue NW
Washington, DC 20529

KIKA SCOTT, in her official capacity as
Senior Official Performing the Duties of the
Director of U.S. Citizenship and Immigration
Services
20 Massachusetts Avenue NW
Washington, DC 20529

U.S. COAST GUARD
Commandant CG–LCL
US Coast Guard HQ
2703 Martin Luther King Jr. Avenue SE
Stop 7213
Washington, DC 20593

KEVIN E. LUNDAY, in his official capacity
as Commandant of the U.S. Coast Guard
Commandant CG–LCL
US Coast Guard HQ
2703 Martin Luther King Jr. Avenue SE
Stop 7213
Washington, DC 20593

U.S. COMMISSION ON CIVIL RIGHTS
1331 Pennsylvania Avenue NW, Suite 1150
Washington, DC 20425

ROCHELLE GARZA, in her official capacity
as Chair of the U.S. Commission on Civil
Rights
1331 Pennsylvania Avenue NW, Suite 1150
Washington, DC 20425

U.S. CONSUMER PRODUCT SAFETY
COMMISSION
4330 East West Highway
Bethesda, MD 20814

PETER A. FELDMAN, in his official capacity
as Acting Chairman of the U.S. Consumer
Product Safety Commission
4330 East-West Highway
Bethesda, MD 20814

U.S. CUSTOMS AND BORDER
PROTECTION
1300 Pennsylvania Avenue NW, Suite 4.4-B
Washington, DC 20229

PETE R. FLORES, in his official capacity as
Acting Commissioner of U.S. Customs and
Border Protection
1300 Pennsylvania Avenue NW, Suite 4.4-B
Washington, DC 20229

U.S. ELECTION ASSISTANCE
COMMISSION
633 3rd Street NW, Suite 200
Washington, DC 20001

JA 3400

DONALD L. PALMER, in his official
capacity as Chairman of the U.S. Election
Assistance Commission
633 3rd Street NW, Suite 200
Washington, DC 20001

U.S. FISH & WILDLIFE SERVICE
1849 C Street NW
Washington, DC 20240

PAUL SOUZA, in his official capacity as
Regional Director, Pacific Southwest Region,
exercising the delegated authority of the
Director of the U.S. Fish and Wildlife Service
1849 C Street NW
Washington, DC 20240

U.S. FOREST SERVICE
1400 Independence Avenue SW
Washington, DC 20250

TOM SCHULTZ, in his official capacity as
Chief of the U.S. Forest Service
1400 Independence Avenue SW
Washington, D.C. 20250

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT
500 12th Street SW
Washington, DC 20536

TODD M. LYONS, in his official capacity as
Acting Director of U.S. Immigration and
Customs Enforcement
500 12th Street SW
Washington, DC 20536

U.S. MERIT SYSTEMS PROTECTION
BOARD
1615 M Street NW
Washington, DC 20419

40

HENRY KERNER, in his official capacity as
Acting Chairman of the U.S. Merit Systems
Protection Board
1615 M Street NW
Washington, DC 20419

U.S. NUCLEAR WASTE TECHNICAL
REVIEW BOARD
2300 Clarendon Boulevard, Suite 1300
Arlington, VA 22201

PETER SWIFT, in his official capacity as
Chair of the U.S. Nuclear Waste Technical
Review Board
2300 Clarendon Boulevard, Suite 1300
Arlington, VA 22201

U.S. POST OFFICE
475 L'Enfant Plaza SW, Room 4012
Washington, DC 20260

DOUG TULINO, in his official capacity as
Acting Postmaster General
475 L'Enfant Plaza SW, Room 4012
Washington, DC 20260

U.S. POSTAL INSPECTION SERVICE
475 L'Enfant Plaza SW
Washington, DC 20260

GARY R. BARKSDALE, in his official
capacity as Chief Postal Inspector
475 L'Enfant Plaza SW
Washington, DC 20260

U.S. PRIVACY AND CIVIL LIBERTIES
OVERSIGHT BOARD
800 N. Capitol Street NW
Washington, DC 20002

BETH ANN WILLIAMS, in her official
capacity as Chair of the U.S. Privacy and Civil
Liberties Oversight Board
800 N. Capitol Street NW
Washington, DC 20002

41

U.S. RAILROAD RETIREMENT BOARD
844 North Rush Street
Chicago, IL 60611

ERHARD R. CHORLÉ, in his official capacity
as Chairman of the U.S. Railroad Retirement
Board
844 North Rush Street
Chicago, IL 60611

THOMAS R. JAYNE, in his official capacity
as Management Member of the U.S. Railroad
Retirement Board
844 North Rush Street
Chicago, IL 60611

JOHN BRAGG, in his official capacity as
Labor Member of the U.S. Railroad Retirement
Board
844 North Rush Street
Chicago, IL 60611

U.S. SECRET SERVICE
245 Murray Lane SW
Building T5
Washington, DC 20223

SEAN M. CURRAN, in his official capacity as
Director of the U.S. Secret Service
245 Murray Lane SW
Building T5
Washington, DC 20223

U.S. SOCIAL SECURITY
ADMINISTRATION
6401 Security Boulevard
Baltimore, MD 21235

LELAND C. DUDEK, in his official capacity
as Acting Commissioner of the U.S. Social
Security Administration
6401 Security Boulevard
Baltimore, MD 21235

U.S. SPACE FORCE
2020 U.S. Space Force Pentagon, Suite 4E858
Washington, DC 20330

B. CHANCE SALTZMAN, in his official
capacity as Chief of Space Operations
2020 U.S. Space Force Pentagon, Suite 4E858
Washington, DC 20330

U.S. TRADE AND DEVELOPMENT
AGENCY
1101 Wilson Boulevard, Suite 1100
Arlington, VA 22209

THOMAS R. HARDY, in his official capacity
as Director of Policy and Program
Management for the U.S. Trade and
Development Agency
1101 Wilson Boulevard, Suite 1100
Arlington, VA 22209

U.S. TRANSPORTATION SECURITY
ADMINISTRATION
601 South 12th Street
Arlington, VA 20598

HA NGUYEN MCNEILL, in his official
capacity as Acting Administrator of the U.S.
Transportation Security Administration
601 South 12th Street
Arlington, VA 20598

     *Defendants*.

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     In America we have, in the words of John Adams, a government of laws and not men.  President Trump's campaign of Executive Orders against law firms and others, including the Executive Order he signed on April 9, 2025 against Susman Godfrey, is a grave threat to this foundational premise of our Republic.  The President is abusing the powers of his office to wield the might of the Executive Branch in retaliation against organizations and people that he dislikes. Nothing in our Constitution or laws grants a President such power; to the contrary, the specific provisions and overall design of our Constitution were adopted in large measure to ensure that presidents cannot exercise arbitrary, absolute power in the way that the President seeks to do in these Executive Orders.

2.     Unless the Judiciary acts with resolve—now—to repudiate this blatantly unconstitutional Executive Order and the others like it, a dangerous and perhaps irreversible precedent will be set.  Whatever opinions one may hold about President Trump, or about Susman Godfrey's litigation on behalf of its clients, someday a different president with an entirely different set of policy priorities and personal grievances will sit behind the Resolute Desk.  That future president may genuinely believe that an entirely different set of organizations or people have "engage[d] in activities detrimental to critical American interests," to quote the accusation President Trump has leveled at Susman Godfrey.  If President Trump's Executive Orders are allowed to stand, future presidents will face no constraint when they seek to retaliate against a different set of perceived foes.  What for two centuries has been beyond the pale will become the new normal.

3.     Put simply, this could be any of us.

4.     The Executive Order makes no secret of its unconstitutional retaliatory and discriminatory intent to punish Susman Godfrey for its work defending the integrity of the 2020

44

presidential election.  Susman Godfrey lawyers, standing shoulder-to-shoulder with other lawyers, law firms, and legal organizations and representing a group of public officials in their official capacities, worked in court to ensure that every vote legally cast in that election was counted, turning back numerous efforts to overturn the legitimate results of that election.  Susman Godfrey lawyers have continued to defend in court the legitimacy of that election in civil cases—standing up for a company that was subjected to a flood of falsehoods wrongly accusing it of having stolen that election.  Similarly, the Executive Order targets Susman Godfrey because of its commitment to equal opportunity in the legal profession.

5.      Susman Godfrey lawyers recognize that the highest calling of a lawyer is our duty to our Constitution and to the rule of law.  We cannot do something on behalf of our clients that imperils the rule of law.  That is why Susman Godfrey stands firm against this plainly unconstitutional order:  because it is so dangerous to the rule of law.  Though no president has the power to unilaterally impose these kinds of punishments directly on any organization or person, it is particularly significant that, in this case, President Trump is trying to exact revenge on a law firm.  Because we are a government of laws, and not men, lawyers hold a special place in protecting our constitutional order.  We lawyers, just like the President, swear an oath to support and protect the Constitution.  If a president can with impunity seek to destroy a law firm because of the clients it represents, then the rule of law itself is in grave danger.

6.      An independent private bar is fundamental to the rule of law in this Nation and to the proper functioning of the independent Judiciary.  Since before the Nation's founding, private attorneys have represented clients disfavored by the government, whether because they are accused of a crime, because they assert civil or other rights that the government would rather not recognize, or because they are simply unpopular.  Those representations are vital to our constitutional

system. They ensure that the Executive and Legislative branches do not overstep their constitutional and legal bounds, thereby reining in official abuses of power. They fortify the separation of powers by enabling Article III judicial review of the political branches. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 546 (2001). They effectuate the bedrock right to counsel enjoyed by all persons, and more broadly ensure that the protections of the Bill of Rights are upheld in all cases and in all aspects of private parties' interactions with the government. *See Martinez v. Ryan*, 566 U.S. 1, 12 (2012). They ensure that the promise that all are equal under the law is a foundational truth undergirding every aspect of our legal system, rather than merely an empty motto.

7.      In undertaking those critically important representations, attorneys themselves enjoy the protections of the Bill of Rights—most obviously the First Amendment rights to engage in protected speech, associate with persons of one's choosing, and petition the courts, but also the rights to due process and equal protection of the law. *See Velazquez*, 531 U.S. at 546. It is thus a bedrock constitutional principle that lawyers must "not be penalized for merely defending or prosecuting a lawsuit." *F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974).

8.      The President is engaged in an unprecedented and unconstitutional assault on those bedrock principles and on the independent bar. In recent weeks, the President has issued multiple executive orders targeting law firms and their employees in an express campaign of retaliation for representing clients and causes he disfavors or employing lawyers he dislikes.[1] Those orders are

---

[1]  *See* Addressing Risks from WilmerHale, The White House (Mar. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-wilmerhale/ ("WilmerHale Order"); Addressing Risks from Jenner & Block, The White House (Mar. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/

so obviously unconstitutional that the firms that have challenged them have immediately and uniformly received judicial orders acknowledging their probable unconstitutionality and barring their enforcement.[2]

9.      Susman Godfrey is the Nation's foremost trial firm—a firm that specializes in shepherding the country's highest-stakes cases through trial.  What began as a one-office, seven-attorney firm has now grown into a powerhouse of 235 trial attorneys based in Houston, Los Angeles, New York, and Seattle.  Susman Godfrey is consistently recognized by leading legal publications as the Nation's premier trial firm.  Nearly every partner and associate at the Firm has completed at least one clerkship for federal Article III judges, including for Justices of the United States Supreme Court—and those Article III judges were appointed by both Republican and Democratic presidents.  The Firm represents clients of all stripes and sizes:  individuals and classes of individuals; small businesses and gigantic corporations; plaintiffs and defendants; the powerful and the powerless; and people of all political persuasions.

10.     Susman Godfrey is the latest target of the President's retaliatory campaign.  On April 9, 2025, the President of the United States issued an Executive Order titled *Addressing Risks from Susman Godfrey* (the "Order") (attached as Exhibit A), which is unsparing in its attempt to

---

("Jenner Order"); Addressing Risks from Paul Weiss, The White House (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/ ("Paul Weiss Order"); Addressing Risks from Perkins Coie LLP, The White House (Mar. 6, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-llp/ ("Perkins Order"); Suspension of Security Clearances and Evaluation of Government Contracts, The White House (Feb. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/suspension-of-security-clearances-and-evaluation-of-government-contracts/ ("Covington Mem.").

[2] *See Perkins Coie LLP v. U.S. Department of Justice*, No. 25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 21; *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 10; *Jenner & Block LLP v. U.S. Department of Justice*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 9.

punish Susman Godfrey and its attorneys simply for doing their jobs as lawyers and officers of the court. That Order, like the ones before it, is unconstitutional. It immediately, irreparably harms Susman Godfrey and the Firm's partners, employees, and clients. And it gravely threatens the independence of the bar and the rule of law.

11.    The Order's retaliatory intent is unmistakable. Its stated purpose is to punish Susman Godfrey and its clients for Susman Godfrey lawyers' constitutionally protected advocacy in matters that President Trump claims are adverse to his personal or political interests—even though *none* of those representations has ever given rise to any suggestion whatsoever that the Firm's conduct was anything other than entirely ethical and reflective of the highest standards of the profession.

12.    Section 1 of the Order purports to have determined that "action is necessary to address the significant risks, egregious conduct, and conflicts of interest associated with Susman Godfrey LLP," and it accuses Susman Godfrey of "subsidiz[ing] . . . activities that are not aligned with American interests"; "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections"; "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology"; and "support[ing] efforts to discriminate on the basis of race," such as by "administer[ing] a program where it offers financial awards and employment opportunities only to 'students of color.'" Order § 1.

13.    The Order's subsequent provisions take a wide range of punitive steps against Susman Godfrey that are self-evidently designed to severely harm its ability to practice law and its business. Section 2 of the Order directs "[t]he Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies" to immediately

"suspend any active security clearances held by individuals at Susman" and to review whether to revoke them permanently.  *Id.* § 2.  It also directs the Office of Management and Budget to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman," and "expeditiously cease such provision."  *Id.*

14.    Section 3 of the Order directs federal agencies to (1) "require Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract"; (2) take steps to "terminate any contract . . . for which Susman has been hired to perform any service"; (3) reassess all "contracts with Susman or with entities that do business with Susman"; and (4) more generally "align" any "agency funding decisions" with those other directives.  *Id.* § 3.  The Order suggests that government-contractor relationships with Susman do not "align[] with American interests."  *Id.* §§ 1, 3.

15.    Section 4 of the Order references a portion of the Perkins Order (*see supra* n.1) that instructs federal officials to "investigate" diversity, equity, and inclusion policies at "large, influential, or industry leading law firms."  Order § 4.

16.    Section 5 of the Order directs federal agencies to "provide guidance limiting official access from Federal Government buildings to employees of Susman when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States," while also barring "Government employees acting in their official capacity from engaging with Susman employees."  *Id.* § 5; *see id.* § 1 (asserting that Susman "engage[s] in activities detrimental to critical American interests").  Section 5 also instructs agency officials to "refrain from hiring employees of Susman, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management."  *Id.*

49

JA 3410

17.    Together and separately, these provisions aim to vitiate Susman Godfrey's ability to represent a wide range of clients, including those with government contracts or other business before the government, and to prevent the Firm from advocating in front of—or against—the government in a broad swath of matters.  And through its defamatory allegations against the Firm, the Order seeks to warn or drive clients away from engaging the Firm's services.  Simply put, the Order endeavors to foreclose the Firm from practicing law—for the perceived transgression of undertaking representations with which the President disagrees.

18.    The Order is unconstitutional many times over—and obviously so.  "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.  One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).  The Order runs roughshod over those fundamental rights.

19.    The Order violates the First Amendment by retaliating against Susman Godfrey for its speech; by discriminating against Susman Godfrey for views or perspectives it or its clients have expressed; by interfering with the right to petition the government; by interfering with the Firm's associations with its clients; and by placing unconstitutional conditions on the Firm's exercise of its First Amendment rights.  The Executive cannot "use the power of the State to punish or suppress disfavored expression" or "attempt to coerce private parties in order to" accomplish those forbidden ends.  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180, 188 (2024).

20.    The Order violates the Due Process Clause of the Fifth Amendment by depriving Susman Godfrey of protected liberty and property interests without any procedural protections at

all; by purporting to prohibit the Firm from taking actions that may violate a set of rules with boundaries that are, at best, vague and undefined; by purporting to deprive the Firm's clients of their right to counsel (a right that the Firm has standing to assert); and by discriminating against the Firm in violation of its right to equal protection.

21.     The Order violates the Constitution's foundational structure—its separation of powers—by taking action for which the Executive Branch has no constitutional or statutory authority whatsoever.  In doing so, the Order intrudes on the judicial branch's sanctioning authority and the legislature's power of the purse.  The President cannot take *ultra vires* action by purporting to exercise power he has not been granted by statute or the Constitution.  *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999); *accord Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  And the President cannot usurp congressional spending power by terminating contracts of Susman Godfrey's clients in retaliation for Susman Godfrey's exercise of its constitutionally protected rights.  *See USAID v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013).

22.     Each one of those constitutional violations warrants immediate action to declare the Order unconstitutional, enjoin its implementation, and take all actions necessary to halt and remedy its effects.  The Order represents a clear and harmful attempt to discourage law firms and their clients from challenging abuses of government power.  "When the Constitution was adopted, it was well known that courts could not properly discharge their functions without the aid of counsel; and it was equally well known that such a class of men, in a free government, was absolutely necessary to the protection of the citizen and the defence of constitutional liberty."  *Ex parte Garland*, 71 U.S. 333, 370 (1866).  "Lawyers [thus] . . . occupy professional positions of

responsibility and influence that impose on them duties correlative with their vital right of access to the courts." *Application of Griffiths*, 413 U.S. 717, 729 (1973).

23.    That lawyers are "engaged in a private profession" makes them no less "important . . . to our system of justice." *Cammer v. United States*, 350 U.S. 399, 405 (1956). Through their advocacy, lawyers have shaped and defined the Constitution's central guarantees. And because every Susman Godfrey attorney is an "'officer of the court,'" it is the duty of each "to further the interests of [their] clients by all lawful means, even when those interests are in conflict with the interests of the United States or of a State." *Griffiths*, 413 U.S. at 724 n.14. The Order retaliates against and restricts the proper and honorable exercise of that duty and, in doing so, not only irreparably harms Susman itself but also casts a chilling pall over lawyers and law firms across the country.

## PARTIES

24.    Plaintiff Susman Godfrey LLP is a Texas limited liability partnership, founded in Houston, Texas in 1980.[3]  It has offices in Houston, Los Angeles, New York, and Seattle.

25.    The named defendants include the United States as well as (1) federal departments and agencies that are directed to implement the Order, took steps to implement the Order, and/or were contacted by the Department of Justice when the Department of Justice took steps to ensure that all Executive Branch entities complied with the Court's temporary restraining order; and (2) the heads of those departments and agencies.  The Order expressly directs certain defendants to obstruct the ability of Susman Godfrey lawyers to practice law and serve the Firm's clients.  Other named defendants have contracts with Susman Godfrey clients and are directed by the Order to

---

[3] This complaint will refer to Plaintiff Susman Godfrey LLP as "Susman Godfrey," "Susman," or "the Firm."

take actions (*e.g.*, canceling or threatening cancellation of those contracts) that are aimed at harming those clients' relationships with the Firm.

26.     The Executive Office of the President is a federal agency or department headquartered in Washington, D.C.

27.     The U.S. Department of Justice is a federal agency or department headquartered in Washington, D.C.

28.     The Office of Management and Budget is a federal agency or department headquartered in Washington, D.C.

29.     The Securities and Exchange Commission is a federal agency or department headquartered in Washington, D.C.

30.     The U.S. International Trade Commission is a federal agency or department headquartered in Washington, D.C.

31.     The Federal Trade Commission is a federal agency or department headquartered in Washington, D.C.

32.     The U.S. Patent and Trademark Office is a federal agency or department headquartered in Alexandria, Virginia.

33.     The Equal Employment Opportunity Commission is a federal agency or department headquartered in Washington, D.C.

34.     The Department of the Treasury is a federal agency or department headquartered in Washington, D.C.

35.     The Department of Defense is a federal agency or department headquartered in Washington, D.C.

36.     The Department of Health and Human Services is a federal agency or department headquartered in Washington, D.C.

37.     The Department of Education is a federal agency or department headquartered in Washington, D.C.

38.     The Department of Veterans Affairs is a federal agency or department headquartered in Washington, D.C.

39.     The Office of the Director of National Intelligence is a federal agency or department headquartered in McLean, Virginia.

40.     The Central Intelligence Agency is a federal agency or department headquartered in McLean, Virginia.

41.     The Environmental Protection Agency is a federal agency or department headquartered in Washington, D.C.

42.     The Department of Homeland Security is a federal agency or department headquartered in Washington, D.C.

43.     The Department of State is a federal agency or department headquartered in Washington, D.C.

44.     The Department of Energy is a federal agency or department headquartered in Washington, D.C.

45.     The Department of Labor is a federal agency or department headquartered in Washington, D.C.

46.     The Department of Agriculture is a federal agency or department headquartered in Washington, D.C.

47.    The Department of Commerce is a federal agency or department headquartered in Washington, D.C.

48.    The Department of Housing and Urban Development is a federal agency or department headquartered in Washington, D.C.

49.    The Small Business Administration is a federal agency or department headquartered in Washington, D.C.

50.    The Office of the U.S. Trade Representative is a federal agency or department headquartered in Washington, D.C.

51.    The Department of the Interior is a federal agency or department headquartered in Washington, D.C.

52.    The Department of Transportation is a federal agency or department headquartered in Washington, D.C.

53.    Pamela J. Bondi is the Attorney General of the United States and the head of Defendant U.S. Department of Justice. She is sued in her official capacity.

54.    Russell T. Vought is the Director of Defendant the Office of Management and Budget. He is sued in his official capacity.

55.    Paul S. Atkins is the Acting Chairman of Defendant Securities and Exchange Commission. He is sued in his official capacity. Commissioners Hester M. Pierce, Caroline A. Crenshaw, and Mark T. Uyeda are sued in their official capacities.

56.    Andrew N. Ferguson is the Chairman of Defendant Federal Trade Commission. He is sued in his official capacity. Commissioners Melissa Holyoak and Mark M. Meador are sued in their official capacities.

55

57.    Coke Morgan Stewart is the Acting Under Secretary of Commerce for Intellectual Property and the Acting Director of Defendant U.S. Patent and Trademark Office.  She is sued in her official capacity.

58.    Scott Bessent is the Secretary of the Treasury and the head of Defendant Department of the Treasury.   He is sued in his official capacity.

59.    Amy A. Karpel is Chair of Defendant U.S. International Trade Commission.  She is sued in her official capacity.  Commissioners David S. Johnson and Jason E. Kearns are sued in their official capacities.

60.    Andrea R. Lucas is Acting Chair of Defendant Equal Employment Opportunity Commission.  She is sued in her official capacity.

61.    Peter B. Hegseth is the Secretary of Defense and the head of Defendant U.S. Department of Defense.  He is sued in his official capacity.

62.    Robert F. Kennedy, Jr. is the Secretary of Health and Human Services and the head of Defendant U.S. Department of Health and Human Services.  He is sued in his official capacity.

63.    Linda M. McMahon is the Secretary of Education and the head of Defendant U.S. Department of Education.  She is sued in her official capacity.

64.    Douglas A. Collins is the Secretary of Veterans Affairs and the head of Defendant U.S. Department of Veterans Affairs.  He is sued in his official capacity.

65.    Tulsi Gabbard is the Director of National Intelligence and the head of Defendant Office of the Director of National Intelligence.  She is sued in her official capacity.

66.    John L. Ratcliffe is the Director of the Central Intelligence Agency and the head of Defendant Central Intelligence Agency.  He is sued in his official capacity.

67.     Lee M. Zeldin is the Administrator of the Environmental Protection Agency and the head of Defendant Environmental Protection Agency.  He is sued in his official capacity.

68.     Kristi Noem is the Secretary of Homeland Security and the head of Defendant Department of Homeland Security.  She is sued in her official capacity.

69.     Marco Rubio is the Secretary of State and the head of Defendant Department of State.  He is sued in his official capacity.

70.     Chris Wright is the Secretary of Energy and the head of Defendant Department of Energy.  He is sued in his official capacity.

71.     Lori Chavez-DeRemer is the Secretary of Labor and the head of Defendant Department of Labor.  She is sued in her official capacity.

72.     Brooke L. Rollins is the Secretary of Agriculture and the head of Defendant Department of Agriculture.  She is sued in her official capacity.

73.     Howard Lutnick is the Secretary of Commerce and the head of Defendant Department of Commerce.  He is sued in his official capacity.

74.     Scott Turner is the Secretary of Housing and Urban Development and the head of Defendant Department of Housing and Urban Development.  He is sued in his official capacity.

75.     Kelly Loeffler is the Administrator of the Small Business Administration and head of Defendant U.S. Small Business Administration.  She is sued in her official capacity.

76.     Jamieson Greer is the U.S. Trade Representative and head of Defendant Office of the U.S. Trade Representative.  He is sued in his official capacity.

77.     Doug Burgum is Secretary of the Interior and head of Defendant Department of the Interior.  He is sued in his official capacity.

78.     Sean Duffy is Secretary of Transportation and head of Defendant Department of Transportation.  He is sued in his official capacity.

78.1.    The U.S. Department of the Air Force is a federal agency or department headquartered in Washington, D.C.  Gary A. Ashworth is Acting Secretary of the Air Force and head of Defendant U.S. Department of the Air Force.  He is sued in his official capacity.

78.2.    The U.S. Department of the Army is a federal agency or department headquartered in Washington, D.C.  Daniel P. Driscoll is Acting Secretary of the Army and head of Defendant U.S. Department of the Army.  He is sued in his official capacity.

78.3.    The U.S. Department of the Navy is a federal agency or department headquartered in Washington, D.C.  John Phelan is Acting Secretary of the Navy and head of Defendant U.S. Department of the Navy.  He is sued in his official capacity.

78.4.    The Administration for Children and Families is a federal agency or department headquartered in Washington, D.C.  Andrew Gradison is its Acting Assistant Secretary and is sued in his official capacity.

78.5.    The Administration for Strategic Preparedness and Response is a federal agency or department headquartered in Washington, D.C.  John Knox is its Principal Deputy Assistant Secretary for Preparedness and Response and is sued in his official capacity.

78.6.    The Advisory Council on Historic Preservation is a federal agency or department headquartered in Washington, D.C.  Reid Nelson is its Chairman and is sued in his official capacity.

78.7.    AmeriCorps is a federal agency or department headquartered in Washington, D.C. Jennifer Bastress Tahmasebi is its Interim Agency Head and is sued in her official capacity.

78.8.    The Appalachian Regional Commission is a federal agency or department headquartered in Washington, D.C.  Gayle Conelly Manchin is its Co-Chair and is sued in her official capacity.

78.9.    The Biomedical Advanced Research and Development Authority is a federal agency or department headquartered in Washington, D.C.  Gary Disbrow is its Director and is sued in his official capacity.

78.10.    The Bonneville Power Administration is a federal agency or department headquartered in Portland, Oregon.  John Hairston is its Administrator and Chief Executive Officer and is sued in his official capacity.

78.11.    The Bureau of Economic Analysis is a federal agency or department headquartered in Suitland, Maryland.  Vipin Arora is its Director and is sued in his official capacity.

78.12.    The Bureau of Indian Affairs is a federal agency or department headquartered in Washington, D.C.  Bryan Mercier is its Director and is sued in his official capacity.

78.13.    The Bureau of Industry and Security is a federal agency or department headquartered in Washington, D.C.  Jeffrey Kessler is its Under Secretary for Industry and Security and is sued in his official capacity.

78.14.    The Bureau of Land Management is a federal agency or department headquartered in Washington, D.C.  Michael D. Nedd is its Director and is sued in his official capacity.

78.15.    The Bureau of Ocean Energy Management is a federal agency or department headquartered in Washington, D.C.  Walter Cruickshank is its Director and is sued in his official capacity.

59

JA 3420

78.16.   The Bureau of Reclamation is a federal agency or department headquartered in Washington, D.C.  David Palumbo is its Acting Commissioner and is sued in his official capacity.

78.17.   The Bureau of Safety and Environmental Enforcement is a federal agency or department headquartered in Washington, D.C.  Paul Huang is its Acting Director and is sued in his official capacity.

78.18.   The Bureau of the Census is a federal agency or department headquartered in Washington, D.C.  Ron S. Jarmin is its Acting Director and sued in his official capacity.

78.19.   The Centers for Disease Control and Prevention is a federal agency or department headquartered in Atlanta, Georgia.  Susan Monarez is its Acting Director, First Assistant to the Director, and Principal Deputy Director and is sued in her official capacity.

78.20.   The Centers for Medicare and Medicaid Services is a federal agency or department headquartered in Washington, D.C.  Dr. Mehmet Oz is its Administrator and is sued in his official capacity.

78.21.   The Chemical Safety Board is a federal agency or department headquartered in Washington, D.C.  Steve Owens is its Chairperson and is sued in his official capacity.

78.22.   The Commission of Fine Arts is a federal agency or department headquartered in Washington, D.C.  Billie Tsien is its Chairperson and is sued in her official capacity.

78.23.   The Committee on Foreign Investment in the United States is a federal agency or department headquartered in Washington, D.C.  Scott Bessent is its Chairperson and is sued in his official capacity.

78.24.   The Commodity Futures Trading Commission is a federal agency or department headquartered in Washington, D.C.  Caroline D. Pham is its Acting Chairman and is sued in her

official capacity.  Commissioners Kristin N. Johnson, Christy Goldsmith Romero, and Summer K. Mersinger are sued in their official capacities.

78.25.    The Consumer Financial Protection Bureau is a federal agency or department headquartered in Washington, D.C.  Scott Bessent is its Acting Director and is sued in his official capacity.

78.26.    The Council of Inspectors General on Integrity and Efficiency is a federal agency or department headquartered in Washington, D.C.  Deidre Harrison is its Acting Deputy Director for Management and sued in her official capacity.

78.27.    The Council on Environmental Quality is a federal agency or department headquartered in Washington, D.C.  Katherine Scarlett is its Acting Chair and is sued in her official capacity.

78.28.    The Defense Contract Audit Agency is a federal agency or department headquartered in Fort Belvoir, Virginia.  Jennifer Desautel is its Director and is sued in her official capacity.

78.29.    The Defense Contract Management Agency is a federal agency or department headquartered in Fort Lee, Virginia.  Lieutenant General Gregory L. Masiello is its Director and is sued in his official capacity.

78.30.    The Defense Intelligence Agency is a federal agency or department headquartered in Washington, D.C.  Lieutenant General Jeffrey A. Kruse is its Director and is sued in his official capacity.

78.31.    The Defense Logistics Agency is a federal agency or department headquartered in Fort Belvoir, Virginia.  Lieutenant General Mark T. Simerly is its Director and is sued in his official capacity.

78.32.    The Denali Commission is a federal agency or department headquartered in Anchorage, Alaska.  Julie E. Kitka is its Federal Co-Chair and is sued in her official capacity.

78.33.    The Directorate of Defense Trade Controls is a federal agency or department headquartered in Washington, D.C.  Michael J. Vaccaro is the Deputy Assistant Secretary of State for Defense Trade Controls and is sued in his official capacity.

78.34.    The Drug Enforcement Administration is a federal agency or department headquartered in Springfield, Virginia.  Derek S. Maltz is its Acting Administrator and is sued in his official capacity.

78.35.    The Export-Import Bank of the United States is a federal agency or department headquartered in Washington, D.C.  James C. Cruse is its Acting President and Chairman and is sued in his official capacity.

78.36.    The Farm Credit System Insurance Corporation is a federal agency or department headquartered in McLean, Virginia.  Glen R. Smith is its Chairman and is sued in his official capacity.

78.37.    The Federal Aviation Administration is a federal agency or department headquartered in Washington, D.C.  Chris Rocheleau is its Acting Administrator and is sued in his official capacity.

78.38.    The Federal Bureau of Investigation is a federal agency or department headquartered in Washington, D.C.  Kash Patel is its Director and is sued in his official capacity.

78.39.    The Federal Bureau of Prisons is a federal agency or department headquartered in Washington, D.C.  William K. Marshall III is its Director and is sued in his official capacity.

78.40.    The Federal Communications Commission is a federal agency or department headquartered in Washington, D.C.  Brendan Carr is its Chairman and is sued in his official

capacity.  Commissioners Geoffrey Starks, Nathan Simington, and Anna M. Gomez are sued in their official capacities.

78.41.    The Federal Deposit Insurance Corporation is a federal agency or department headquartered in Washington, D.C.  Travis Hill is its Acting Chairman and is sued in his official capacity.

78.42.    The Federal Election Commission is a federal agency or department headquartered in Washington, D.C.  James E. Trainor III is its Vice Chairman and Acting Chairman and is sued in his official capacity.  Commissioners Shana M. Broussard and Dara Lindenbaum are sued in their official capacity.

78.43.    The Federal Emergency Management Agency is a federal agency or department headquartered in Washington, D.C.  Cameron Hamilton is its Administrator and is sued in his official capacity.

78.44.    The Federal Energy Regulatory Commission is a federal agency or department headquartered in Washington, D.C. Mark C. Christie is its Chairman and is sued in his official capacity.  Commissioners David Rosner, Lindsay S. See, and Judy W. Chang are sued in their official capacities.

78.45.    The Federal Highway Administration is a federal agency or department headquartered in Washington, D.C.  Gloria M. Shepherd is its Executive Director and Acting Administrator and is sued in her official capacity.

78.46.    The Federal Housing Finance Agency is a federal agency or department headquartered in Washington D.C.  William J. Pulte is its Director and is sued in his official capacity.

78.47.    The Federal Labor Relations Authority is a federal agency or department headquartered in Washington D.C.  Colleen Duffy Kiko is its Chairman and is sued in her official capacity.  Members Susan Tsui Grundmann and Anne M. Wagner are sued in their official capacities.

78.48.    The Federal Maritime Commission is a federal agency or department headquartered in Washington D.C. Louis E. Sola is its Chairman and is sued in his official capacity.  Commissioners Rebecca F. Dye, Daniel B. Maffei, and Max Vekich are sued in their official capacity.

78.49.    The Federal Mediation and Conciliation Service is a federal agency or department headquartered in Washington D.C.  Gregory Goldstein is its acting Director and is sued in his official capacity.

78.50.    The Federal Mine Safety and Health Review Commission is a federal agency or department headquartered in Washington D.C. Mary Lu Jordan is its Chair and is sued in her official capacity.  Commissioners Timothy J. Baker and Moshe Z. Marvit are sued in their official capacities.

78.51.    The Federal Permitting Improvement Steering Council is a federal agency or department headquartered in Washington D.C.  Manisha Patel is its Executive Director and is sued in her official capacity.

78.52.    The Federal Railroad Administration is a federal agency or department headquartered in Washington D.C.  Michael Lestingi is its Executive Director and is sued in his official capacity.  Members Thomas R. Jayne and John Bragg are sued in their official capacities.

64

JA 3425

78.53.    The Federal Retirement Thrift Investment Board is a federal agency or department headquartered in Washington D.C.  Dana Bilyeu is its acting Chair and is sued in her official capacity.

78.54.    The Federal Transit Administration is a federal agency or department headquartered in Washington D.C.  Matthew Welbes is its Executive Director and is sued in his official capacity.

78.55.    The Financial Crimes Enforcement Network is a federal agency or department headquartered in Vienna, Virginia.  Andrea Gacki is its Director and is sued in her official capacity.

78.56.    The Food and Drug Administration is a federal agency or department headquartered in Rockville, Maryland.  Martin A. Makary, Ph.D. is its Commissioner of Food and Drugs and is sued in his official capacity.

78.57.    The General Services Administration is a federal agency or department headquartered in Washington, D.C.  Stephen Ehekian is its Acting Administrator and is sued in his official capacity.

78.58.    The Grid Deployment Office is a federal agency or department headquartered in Washington, D.C.  Nick Elliot is its Director and is sued in his official capacity.

78.59.    The Gulf Coast Ecosystem Restoration Council (RESTORE the Gulf) is a federal agency or department headquartered in New Orleans, Louisiana.  Lee M. Zeldin is one of the Members of the RESTORE Council and is sued in his official capacity.

78.60.    The Health Resources and Services Department is a federal agency or department headquartered in Rockville, Maryland.  Thomas J. Engels is Administrator of the Health Resources and Services Administration and is sued in his official capacity.

78.61.    The Institute of Museum and Library Services is a federal agency or department headquartered in Washington, D.C. Keith Sonderling is its Chairperson and is sued in his official capacity.

78.62.    The Internal Revenue Service is a federal agency or department headquartered in Washington, D.C.  Michael Faulkender is its Acting Commissioner and is sued in his official capacity.

78.63.    The International Trade Administration is a federal agency or department headquartered in Washington, D.C.  Diane Farrell is its Deputy Under Secretary for International Trade and Acting Chair and is sued in her official capacity.

78.64.    The Joint Chiefs of Staff is a  federal agency or department headquartered in Washington, D.C. General Dan Caine is its Chairman and is sued in his official capacity.

78.65.    The Kennedy Center is a federal agency or department headquartered in Washington, D.C. Richard Grenell is its President and is sued in his official capacity.

78.66.    The Loan Programs Office is a federal agency or department headquartered in Washington, D.C. Lane Genatowski is its Director and is sued in his official capacity.

78.67.    The National Aeronautics and Space Administration is a federal agency or department headquartered in Washington, D.C. Janet Petro is its Administrator and is sued in her official capacity.

78.68.    The National Archives and Records Administration is a federal agency or department headquartered in Washington, D.C. Marco Rubio is its Acting Archivist and is sued in his official capacity.

78.69.    The National Counterterrorism Center is a federal agency or department headquartered in McLean, Virginia.  Don M. Holstead is its Acting Director and is sued in his official capacity.

78.70.    The National Endowment for the Arts is a federal agency or department headquartered in Washington, D.C.  Mary Anne Carter is its Acting Chair and is sued in her official capacity.

78.71.    The National Endowment for the Humanities is a federal agency or department headquartered in Washington, D.C. Michael McDonald is its Acting Chairman and is sued in his official capacity.

78.72.    The National Geospatial-Intelligence Agency is a federal agency or department headquartered in Springfield, Virginia.  Frank Whitworth is its Director and is sued in his official capacity.

78.73.    The National Indian Gaming Commission is a federal agency or department headquartered in Washington, D.C.  Sharon Avery is its Acting Chairwoman and is sued in her official capacity.

78.74.    The National Institute for Standards and Technology is a federal agency or department headquartered in Gaithersburg, Maryland.  Craig Burkhardt is its Acting Director and is sued in his official capacity.

78.75.    The National Institutes of Health is a federal agency or department headquartered in Bethesda, Maryland.  Jay Bhattacharya is its Director and is sued in his official capacity.

78.76.    The National Labor Relations Board is a federal agency or department headquartered in Washington, D.C.  Marvin E. Kaplan is its Chairman and is sued in his official capacity.  Member David M. Prouty is sued in his official capacity.

78.77.    The National Marine Fisheries Service is a federal agency or department headquartered in Silver Spring, Maryland.  Eugenio Piñeiro Soler is its Director and is sued in his official capacity.

78.78.    The National Mediation Board is a federal agency or department headquartered in Washington, D.C.  Loren E. Sweatt is its Chair and is sued in her official capacity.  Members Linda A. Puchala and Deirdre Hamilton are sued in their official capacities.

78.79.    The National Nuclear Security Administration is a federal agency or department headquartered in Washington, D.C. Teresa M. Robbins is its Acting Administrator and is sued in her official capacity.

78.80.    The National Oceanic and Atmospheric Administration is a federal agency or department headquartered in Washington, D.C.  Laura Grimm is its Administrator and is sued in her official capacity.

78.81.    The National Park Service is a federal agency or department headquartered in Washington, D.C.  Jessica Bowron is its Acting Director and is sued in her official capacity.

78.82.    The National Renewable Energy Laboratory is a federal agency or department headquartered in Washington, D.C. Martin Keller is its Laboratory Director and is sued in his official capacity.

78.83.    The National Science Foundation is a federal agency or department headquartered in Fort Meade, Maryland.  Victor McCrary is its Acting Director is sued in his official capacity.

78.84.    The National Security Agency is a federal agency or department headquartered in Fort Meade, Maryland.  Lieutenant General William J. Hartman is its Acting Director and is sued in his official capacity.

68

78.85.    The National Security Council is a federal agency or department headquartered in Washington, D.C.  Marco Rubio is the Acting National Security Advisor, and he is sued in his official capacity.

78.86.    The National Transportation Safety Board is a federal agency or department headquartered in Washington, D.C.  Jennifer Homendy is its Chair and is sued in her official capacity.  Vice Chairman Alvin Brown and Members Michael E. Graham, Thomas B. Chapman, and J. Todd Iman are sued in their official capacities.

78.87.    The Occupational Safety and Health Administration is a federal agency or department headquartered in Washington, D.C.  Amanda Wood Laihow is Acting Assistant Secretary of Labor for Occupational Safety and Health and is sued in her official capacity.

78.88.    The Occupational Safety and Health Review Commission is a federal agency or department headquartered in Washington, D.C.  Its Chair is sued in his or her official capacity.

78.89.    The Office of Clean Energy Demonstrations is a federal agency or department headquartered in Washington, D.C.  Cathy Tripodi is its Executive Director and is sued in her official capacity.

78.90.    The Office of Federal Contract Compliance Programs is a federal agency or department headquartered in Washington, D.C.  Catherine Eschbach is its Director and is sued in her official capacity.

78.91.    The Office of Foreign Assets Control is a federal agency or department headquartered in Washington, D.C.  Bradley T. Smith is its Director and is sued in his official capacity.

**JA 3430**

78.92.   The Office of Government Ethics is a federal agency or department headquartered in Washington, D.C.  Jamieson Greer is its Acting Director and is sued in his official capacity.

78.93.   The Office of Homeland Security Situational Awareness is a federal agency or department headquartered in Washington, D.C.  Christopher Tomney is its Director and is sued in his official capacity.

78.94.   The Office of National Drug Control Policy is a federal agency or department headquartered in Washington, D.C.  Jon Rice is its Acting Director and is sued in his official capacity.

78.95.   The Office of Personnel Management is a federal agency or department headquartered in Washington, D.C.  Charles Ezell is its Acting Director and is sued in his official capacity.

78.96.   The Office of Science and Technology Policy is a federal agency or department headquartered in Washington, D.C.  Michael Kratsios is its Director and is sued in his official capacity.

78.97.   The Office of Special Counsel is a federal agency or department headquartered in Washington, D.C.  Douglas A. Collins is its Acting Special Counsel and is sued in his official capacity.

78.98.   The Office of the Comptroller of the Currency is a federal agency or department headquartered in Washington, D.C.  Rodney E. Hood is its acting Comptroller of the Currency and is sued in his official capacity.

70

78.99.    The Office of the Inspector General is a federal agency or department headquartered in Washington, D.C.  Michael E. Horowitz is its Inspector General and is sued in his official capacity.

78.100.    The Patent Trial and Appeal Board is a federal agency or department headquartered in Alexandria, Virginia.  Coke Morgan Stewart is its Acting Director and is sued in her official capacity.

78.101.    The Peace Corps is a federal agency or department headquartered in Washington, D.C.  Allison Greene is its Chief Executive Officer and is sued in her official capacity.

78.102.    The Pension Benefit Guaranty Corporation is a federal agency or department headquartered in Washington, D.C. Alice Maroni is its Acting Director and is sued in her official capacity.

78.103.    The Presidio Trust is a federal agency or department headquartered in San Francisco, California.  Mark W. Buell is its chair and is sued in his official capacity.

78.104.    The Rural Utilities Service is a federal agency or department headquartered in Washington, D.C. Christopher A. McLean is its Acting Administrator and is sued in his official capacity.

78.105.    The Selective Service System is a federal agency or department headquartered in Arlington, Virginia.  Craig T. Brown is its Acting Director and is sued in his official capacity.

78.106.    The Smithsonian Institution is a federal agency or department headquartered in Washington, D.C.  Lonnie G. Bunch III is its Secretary and is sued in his official capacity.

78.107.    The Surface Transportation Board is a federal agency or department headquartered in Washington, D.C.  Patrick J. Fuchs is its Chairman and is sued in his official

capacity.  Members Robert E. Primus, Michelle A. Schultz, and Karen J. Hedlund are sued in their official capacities.

78.108.    The Tennessee Valley Authority is a federal agency or department headquartered in Knoxville, Tennessee.  Bill Renick is its Chair and is sued in his official capacity.

78.109.    The Trademark Trial and Appeal Board is a federal agency or department headquartered in Alexandria, Virginia.  Coke Morgan Stewart is its Acting Director and is sued in her official capacity.

78.110.    The U.S. Agency for Global Media, formerly known as the Broadcasting Board of Governors, is a federal agency or department headquartered in Washington, D.C. Victor Morales is its Acting Chief Executive Officer and is sued in his official capacity.

78.111.    The U.S. Agency for International Development is a federal agency or department headquartered in Washington, D.C.  Marco Rubio is its Acting Administrator and is sued in his official capacity.

78.112.    The U.S. Army Corps of Engineers is a federal agency or department headquartered in Washington, D.C.  Lieutenant General William H. Graham, Jr. is its Commanding General and is sued in his official capacity.

78.113.    U.S. Citizenship and Immigration Services is a federal agency or department headquartered in Washington, D.C.  Kika Scott is its Senior Official Performing the Duties of the Director and is sued in her official capacity.

78.114.    The U.S. Coast Guard is a federal agency or department headquartered in Washington, D.C.  Kevin E. Lunday is its Commandant and is sued in his official capacity.

78.115.    The U.S. Commission on Civil Rights is a federal agency or department headquartered in Washington, D.C.  Rochelle Garza is its Commission Chair and is sued in her official capacity.

78.116.    The U.S. Consumer Product Safety Commission is a federal agency or department headquartered in Bethesda, Maryland.  Peter A. Feldman is its Acting Chairman and is sued in his official capacity.

78.117.    U.S. Customs and Border Protection is a federal agency or department headquartered in Washington, D.C. Pete R. Flores is its Acting Commissioner and is sued in his official capacity.

78.118.    The U.S. Election Assistance Commission is a federal agency or department headquartered in Washington, D.C.  Donald L. Palmer is its Chairman and is sued in his official capacity.

78.119.    The U.S. Fish and Wildlife Service is a federal agency or department headquartered in Washington, D.C.  Paul Souza is its Regional Director, Pacific Southwest Region, exercising the delegated authority of the Director, U.S. Fish and Wildlife Service and is sued in his official capacity.

78.120.    The U.S. Forest Service is a federal agency or department headquartered in Washington, D.C.  Tom Schultz is its Chief and is sued in his official capacity.

78.121.    U.S. Immigration and Customs Enforcement is a federal agency or department headquartered in Washington, D.C. Todd M. Lyons is its Acting Director and is sued in his official capacity.

78.122.    The U.S. Merit Systems Protection Board is a federal agency or department headquartered in Washington, D.C.  Henry Kerner is its Acting Chairman and is sued in his official capacity.

78.123.    The U.S. Nuclear Waste Technical Review Board is a federal agency or department headquartered in Arlington, VA.  Peter Swift is its Chair and is sued in his official capacity.

78.124.    The U.S. Patent and Trademark Office is a federal agency or department headquartered in Alexandria, Virginia.  Coke Morgan Stewart is its acting Director and is sued in her official capacity.

78.125.    The U.S. Post Office is a federal agency or department headquartered in Washington, D.C.  Doug Tulino is Acting Postmaster General and is sued in his official capacity.

78.126.    The U.S. Postal Inspection Service is a federal agency or department headquartered in Washington, D.C.  Gary R. Barksdale is Chief Postal Inspector and is sued in his official capacity.

78.127.    The U.S. Privacy and Civil Liberties Oversight Board is a federal agency or department headquartered in Washington, D.C.  Beth Ann Williams is its Chair and is sued in her official capacity.

78.128.    The U.S. Railroad Retirement Board is a federal agency or department headquartered in Chicago, IL.  Erhard R. Chorlé is its Chairman and is sued in his official capacity.  Members Thomas R. Jayne and John Bragg are sued in their official capacities.

78.129.    The U.S. Secret Service is a federal agency or department headquartered in Washington, D.C.  Sean M. Curran is its Director and is sued in his official capacity.

74

**JA 3435**

78.130.    The U.S. Social Security Administration is a federal agency or department headquartered in Baltimore, Maryland.  Leland C. Dudek is its Acting Commissioner and is sued in his official capacity.

78.131.    The U.S. Space Force is a federal agency or department headquartered in Washington, D.C.  B. Chance Saltzman is its Chief of Space Operations and is sued in his official capacity.

78.132.    The U.S. Trade and Development Agency is a federal agency or department headquartered in Arlington, Virginia.  Thomas R. Hardy is its Director of Policy and Program Management and is sued in his official capacity.

78.133.    The U.S. Transportation Security Administration is a federal agency or department headquartered in Arlington, Virginia.  Ha Nguyen McNeill is its Acting Administrator and is sued in her official capacity.

79.    The United States of America is responsible for the exercise of executive action by the named defendants and any other departments and agencies that are directed by the Order to take action respecting Susman Godfrey.  Because Susman Godfrey attorneys and employees interact with and appear before numerous federal departments, agencies, and officials, and the Order at issue is directed generally to "heads of executive departments and agencies," Order §§ 2-5, the United States of America is included as a Defendant to ensure that the relief ordered by the Court will apply on a government-wide basis, including to any federal agencies that are not specifically listed as defendants.

## JURISDICTION AND VENUE

80.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Susman Godfrey's causes of action arise under the Constitution and laws of the United States.  This Court

75

also has jurisdiction under 28 U.S.C. § 1346(a)(2) because the defendants are United States officials.

81.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

82.    Susman Godfrey also has a right to non-statutory review of *ultra vires* executive action. *See, e.g.*, *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996). Among other powers, this Court has inherent equitable power to enjoin executive conduct that violates the Constitution, *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010), and "the President's actions" therefore "may . . . be reviewed for constitutionality," *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

83.    This Court also possesses the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). The Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

84.    Venue lies in this District under 28 U.S.C. § 1391(e)(1) because at least one defendant is an agency of the United States or is an officer or employee of the United States or an agency thereof sued in his or her official capacity and resides in this District.

## FACTUAL ALLEGATIONS

**I.    Susman Godfrey represents an array of clients on a wide range of matters.**

85.    In 1976, Susman Godfrey's founding partner Stephen Susman—then an attorney at a small Houston-based personal-injury and admiralty law firm—was approached by a small-

76

business owner seeking representation against more powerful adversaries. Mr. Susman and his fellow attorney Gary McGowan took on that representation and, in 1980, founded their own seven-lawyer firm—now Susman Godfrey. That first representation resulted in Susman Godfrey recovering $550 million on behalf of plaintiffs through settlements and after a successful verdict in a three-month jury trial.

86.    What began as a one-office, seven-attorney firm is now made up of 235 trial attorneys spread across four offices in Houston, Los Angeles, New York, and Seattle. For the past ten consecutive years, Susman Godfrey has had the largest number of lawyers of any firm in the Nation named to *Lawdragon's* annual list of 500 Leading Lawyers. For the past fourteen consecutive years, Susman Godfrey has been named as the #1 Litigation Boutique in the Nation by the Vault survey—a distinction Susman Godfrey has held since the survey's inception in 2011. And in 2023, the Firm received the award for Specialty/Boutique Litigation Department of the Year from *The American Lawyer*.

87.    The Firm's lawyers routinely appear in federal courts across the country. Susman Godfrey attorneys have already made in-person appearances in federal court dozens of times in 2025, and they have numerous additional appearances in federal court scheduled. Susman Godfrey attorneys currently have seven trials in federal court scheduled for the next six months. And the Firm has many more federal-court matters presently awaiting trial dates. Representation of clients in federal court is thus critical to the work of the Firm's litigators.

88.    The Firm's lawyers also represent clients in matters pending before federal agencies and their adjudicatory bodies. Attorneys representing whistleblowers often meet with—and work closely in conjunction with—prosecutors in U.S. Attorneys' Offices in pursuing and litigating False Claims Act *qui tam* cases seeking recovery of money by the federal government. The Firm's

large patent-litigation portfolio often necessitates attorneys' participation in post-grant patent adjudications at the Patent Trial and Appeal Board of the U.S. Patent and Trademark Office. The Firm's lawyers pursue unfair import proceedings before the U.S. International Trade Commission. The Firm's lawyers also represent small-business owners in litigation involving the Internal Revenue Service, a bureau of the Treasury Department, and frequently meet with lawyers and officials at the U.S. Department of Justice and the Internal Revenue Service in conjunction with that litigation. And the Firm's lawyers represent both plaintiffs and defendants in litigation concerning the discharge of hazardous substances and interact in those matters with lawyers and officials at the Environmental Protection Agency and the U.S. Department of Justice.

89.    Susman Godfrey lawyers have several matters currently pending before federal agencies and numerous upcoming meetings scheduled with federal-government personnel across various cases in the next 90 days, including with officials from U.S. Customs and Border Protection, the Department of Health and Human Services, and the U.S. Department of Justice. That work before federal agencies, too, is critical to the Firm's lawyers, practices, and client representations.

90.    All told, at least a third of the Firm's current active matters require Susman Godfrey lawyers to appear before federal courts or interact with federal agencies in some capacity.

91.    Susman Godfrey's lawyers come from all backgrounds and hold diverse political views. Nearly every partner and associate at the firm has completed at least one clerkship for a federal Article III judge—and the judges for which those lawyers have clerked have been appointed by both Republican and Democratic presidents. For example, of the ten current Susman Godfrey lawyers who have clerked for the Supreme Court, five clerked for Justices appointed by Republican presidents, and five clerked for Justices appointed by Democratic presidents. Two

former Susman Godfrey lawyers have been nominated and confirmed to serve as federal judges: one was nominated by President Trump and one by President Biden. And Republican governors have appointed four former Susman Godfrey lawyers to state-court judgeships.

92.    Many of Susman Godfrey's successful representations have arisen from the Firm's willingness to represent individuals and small companies in disputes against some of the largest and most powerful companies in the world. In 2024, Susman Godfrey won a $266 million verdict on behalf of the City of Baltimore against McKesson and AmerisourceBergen in the City's nearly seven-year lawsuit against the opioid distributors and manufacturers that fueled the worst opioid epidemic in the Nation.

93.    In 2023, the Firm secured a $787 million settlement with Fox News for its client Dominion Voting Systems, to resolve Dominion's claim that Fox defamed Dominion by falsely broadcasting to its viewers that Dominion's voting machines were at the center of a vast conspiracy in the 2020 election to steal votes from President Donald Trump and swing them to his Democratic challenger Joe Biden. Susman Godfrey also will shortly be trying a case on behalf of Dominion against Newsmax Media on the same topic. On April 9, 2025, mere hours before the President's Order targeting Susman Godfrey issued, the court in that case ruled on summary judgment that Newsmax had made false and defamatory statements. *See US Dominion, Inc. et al. v. Newsmax Media, Inc. et al.*, No. N21C-08-063 (Del. Super. Ct. Apr. 9, 2025). Susman Godfrey also continues to serve as counsel for Dominion in related defamation lawsuits against Rudy Giuliani, Sidney Powell, Mike Lindell and MyPillow, Patrick Byrne, and One America News Network.

94.    Susman Godfrey has at times taken on unpopular clients and controversial causes in pro bono representations. It successfully challenged as unconstitutional Harris County, Texas's practice of holding in jail tens of thousands of people who were arrested for misdemeanors but

79

were financially unable to post bail.  It secured the release of a man wrongfully convicted for the abduction and rape of a 14-year-old girl.  And it defended Harris County, Texas Judge Lina Hidalgo and other county officials in election contests in 2023.

95.    The Firm also is no stranger to suing the U.S. government.  The Firm is suing a federal agency for user fees that it collected in violation of the agency's statutory and regulatory mandates.  The Firm also is suing a federal agency on behalf of property owners for an inverse condemnation action.  And the Firm is currently pursuing Fifth Amendment takings claims against the U.S. Navy on behalf of dozens of property owners whose property values and quality of life have decreased on account of a vast expansion of the Navy's flight-training program.

96.    In addition to litigating against the government, Susman Godfrey represents clients in matters directly adverse to President Trump's personal and political interests.  The day before the Order issued, Susman Godfrey filed an *amicus* brief on behalf of former government officials in support of Perkins Coie LLP in its litigation against the government for a materially similar (and similarly unconstitutional) executive order.  *See Perkins Coie LLP v. U.S. Dep't of Justice*, *et al.*, No. 1:25-cv-00716 (D.D.C. Apr. 8, 2025), ECF No. 98.  And during the 2020 presidential election, Susman Godfrey represented state officials in litigation defending the integrity of that election.

97.    Among Susman Godfrey's clients, including several of the Firm's biggest clients, are nearly twenty persons and entities that contract with or otherwise do business with the federal government, or have affiliates who are government contractors and subcontractors.

## II.    <u>The President targets his political opponents and so-called "lawfare."</u>

98.    Less than two weeks before the 2024 election, then-candidate Trump was unequivocal in his stated plan to retaliate against his political opponents.  In an October 25, 2024 post on Truth Social, then-candidate Trump wrote:

CEASE & DESIST: I, together with many Attorneys and Legal Scholars, am

watching the Sanctity of the 2024 Presidential Election very closely because I know, better than most, the rampant Cheating and Skullduggery that has taken place by the Democrats in the 2020 Presidential Election. It was a Disgrace to our Nation! Therefore, the 2024 Election, where Votes have just started being cast, will be under the closest professional scrutiny and, WHEN I WIN, those people that CHEATED will be prosecuted to the fullest extent of the Law, which will include long term prison sentences so that this Depravity of Justice does not happen again. We cannot let our Country further devolve into a Third World Nation, AND WE WON'T! Please beware that this legal exposure extends to Lawyers, Political Operatives, Donors, Illegal Voters, & Corrupt Election Officials. Those involved in unscrupulous behavior will be sought out, caught, and prosecuted at levels, unfortunately, never seen before in our Country.[4]

99.    Once elected, President Trump reaffirmed his commitment "to end the Lawfare once and for all,"[5] which he defined as the "Weaponization of our Justice System against a Political Opponent."[6]

100.    On January 27, 2025—one week after swearing to preserve, protect, and defend the Constitution of the United States—President Trump posted on his Truth Social account a link to an article written by Victoria Toensing and John Yoo entitled *Prosecute The Architects Of Trump Lawfare For Election Interference* that advocated targeting the President's political opponents by, among other things, "[o]btaining phone records and emails, reviewing White House logs, and putting witnesses under oath before Congress or a grand jury" to decide whether there was a criminal "conspiracy" to inhibit President Trump's run for office.[7]

---

[4] Donald J. Trump (@realDonaldTrump), Truth Social (Oct. 25, 2024, 10:32 AM), https://truthsocial.com/@realDonaldTrump/posts/113369255491639591.

[5] Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 17, 2024, 7:44 AM), https://truthsocial.com/@realDonaldTrump/posts/113668931527088240.

[6] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 9, 2025, 5:02 PM), https://truthsocial.com/@realDonaldTrump/posts/113801361784208511.

[7] Victoria Toensing & John Yoo, *Prosecute The Architects Of Trump Lawfare For Election Interference*, The Federalist (Jan. 27, 2025), https://thefederalist.com/2025/01/27/prosecute-the-architects-of-trump-lawfare-for-election-interference/; *see* Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 27, 2025, 6:46 PM), https://truthsocial.com/@realDonaldTrump/posts/113903692672828515.

81

JA 3442

101.    Since his election, President Trump has told Fox News that "[w]e have a lot of law firms that we're going to be going after, because they were very dishonest people."[8]  On March 14, 2025, he delivered a speech at the Department of Justice denouncing "crooked law firms," "violent, vicious lawyers," and "fake lawyers."[9]  When asked in the Oval Office how he would respond to critics who argue that recently issued executive orders against law firms amount to coercion, the President responded:  "You mean the law firms that we're going after, that went after me for four years ruthlessly, violently, illegally?  Are those the law firms you're talking about?"[10]  And at a March 24, 2025, meeting of the Cabinet, the President explained that executive orders targeting law firms were necessary in his view because "[t]he law firms have to behave themselves," and "[t]hey behave very badly, very wrongly."[11]

102.    Those closely associated with President Trump have made similar comments concerning the intent behind the President's executive orders targeting law firms.  Steve Bannon

---

[8] Alex Woodward, *Trump Confirms Retribution Campaign Against Law Firms that Clash with his Agenda*, The Independent (Mar. 9, 2025), https://www.the-independent.com/news/world/americas/us-politics/trump-law-firms-executive-order-interview-b2711843.html.

[9] *See Donald Trump Addresses the Staff at the Department of Justice*, Roll Call (Mar. 14, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-speech-department-of-justice-march-14-2025/.

[10] *Trump Suggests Law Firms 'Want to Make Deals' After Rescinding Paul, Weiss Order*, The Hill (Mar. 21, 2025), https://thehill.com/video/trump-suggests-law-firms-'want-to-make-deals'-after-rescinding-paul-weiss-order/10560109/.

[11] Michael Birnbaum, *Law firms refuse to represent Trump opponents in the wake of his attack*, Wash. Post (Mar. 25, 2025), https://www.washingtonpost.com/politics/2025/03/25/trump-law-firms/.

has stated that President Trump is "going after" law firms "to cut them off."[12]   According to Mr.

Bannon, "what we are trying to do is put you [law firms] out of business and bankrupt you."[13]

103.    Consistent with those statements, the President has taken a variety of retaliatory actions over the last several months.   On February 25, 2025, the President took actions to revoke security clearances held by his political enemies.   He issued a memorandum to intelligence community agency heads directing them "to suspend any active security clearances held by Peter Koski and all members, partners, and employees of Covington & Burling LLP who assisted former Special Counsel Jack Smith during his time as Special Counsel" pending a review and to "terminate any engagement of Covington."[14]   As Special Counsel, Jack Smith brought criminal charges against then-former President Trump in two cases involving challenges to the 2020 election results and retention of sensitive government documents after leaving office.   When signing the memorandum, President Trump told reporters:   "We're going to call it the deranged Jack Smith signing, or bill," adding that "[t]he weaponization of our system by law firms, even pro bono work they're doing in order to clog up government, stop government.   And nobody knows about it better than me and, hopefully, that will never happen again."[15]

---

[12] *Steve Bannon: "There's Major Law Firms in Washington, D.C." and "What We Are Trying to Do Is Put You Out of Business and Bankrupt You,"* Media Matters (Mar. 13, 2025), https://www.mediamatters.org/steve-bannon/steve-bannon-theres-major-law-firms-washington-dc-and-what-we-are-trying-do-put-you.

[13] *Id.*

[14] Presidential Memorandum, *Suspension of Security Clearances and Evaluation of Government Contracts* (Feb. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/suspension-of-security-clearances-and-evaluation-of-government-contracts/.

[15] Josh Gerstein & Kyle Cheney, *Trump Targets Washington Law Firm That Aided Jack Smith*, Politico (Feb. 25, 2025), https://www.politico.com/news/2025/02/25/donald-trump-jack-smith-covington-lawyers-022770.

JA 3444

104.    On March 6, 2025, the President signed an Executive Order titled "Addressing Risks from Perkins Coie LLP" ("Perkins Order")[16] and issued an accompanying "Fact Sheet."[17] The stated premise of the Perkins Order was to impose punishment on that law firm for "representing failed Presidential candidate Hillary Clinton" and "work[ing] with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification."  Perkins Order § 1.  The Perkins Order directed agency heads to terminate contracts with Perkins Coie; require all government contractors to disclose any business with Perkins Coie; review all contracts with Perkins Coie's clients; limit Perkins Coie personnel's access to federal government buildings; and limit government officials from engaging in their official capacity with Perkins Coie employees.  *Id.* §§ 3-5.

105.    President Trump and his leadership also explained the motivations for the Perkins Order.  The accompanying Fact Sheet stated that "Perkins Coie LLP has filed lawsuits against the Trump Administration, including one designed to reduce military readiness."  Perkins Fact Sheet. At the signing ceremony for the Perkins Order, President Trump declared that it was "an absolute honor to sign" and that "the weaponization against a political opponent . . .  should never be allowed to happen again."[18]  A White House official later "speaking on the condition of anonymity to talk frankly about the sensitive decision-making behind the order" told the Washington Post that

---

[16]  Executive Order, *Addressing Risks from Perkins Coie LLP* (Mar. 6, 2025), https://www. whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-perkins-coie-llp/.

[17]  *Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP* (Mar. 6, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-adresses-risks-from-perkins-coie-llp/.

[18]  Megan Messerly, *Trump Targets Prominent Democratic-Linked Law Firm*, Politico (Mar. 6, 2025),    https://www.politico.com/news/2025/03/06/trump-security-clearance-steele-dossier-025203.

84

"[t]he president doesn't believe they should have the privileges afforded to companies of their stature to work and operate with the federal government, since they have made it very clear they are vehemently against the president of the United States, and their work proves that."[19]

106.   On March 12, 2025, a court in this District issued a temporary restraining order against the Perkins Order, holding that Perkins Coie is likely to prevail in establishing that the order violates "at least" the First, Fifth, and Sixth Amendments.  The court required the defendants to rescind any guidance implementing the order and to communicate with entities who had been asked to disclose any relationships with Perkins Coie that any such request was rescinded pending further order of the Court.  *See* Tr. of TRO Hrg. at 107:16-110:21, *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 1:25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 22 ("*Perkins Coie* Tr.").  At the hearing on the motion to restrain the Perkins Order, the judge described the order as an "effort to intimidate" attorneys that "casts a chilling harm . . . of blizzard proportions across the entire legal profession."  Tr. at 95:22-96:2, *Perkins Coie LLP v. Department of Justice*, No. 25-cv-716 (D.D.C. Mar. 12, 2025), ECF No. 22.

107.   Two days later, on March 14, 2025, the President issued an Executive Order targeting Paul, Weiss, Rifkind, Wharton & Garrison LLP (the "Paul Weiss Order").[20]  The Paul Weiss Order sought retribution for the firm's association with a former Paul Weiss lawyer who later worked as a prosecutor for the Special Counsel and with former Paul Weiss partner Mark Pomerantz.  The Order accused Mr. Pomerantz of leaving the firm "to join the Manhattan District Attorney's office solely to manufacture a prosecution against" the President."  Paul Weiss Order

---

[19] Perry Stein & Michael Birnbaum, *Trump Expands Retribution Campaign Against Law Firms That Aided His Foes*, Wash. Post (Mar. 6, 2025), https://www.washingtonpost.com/national-security/2025/03/06/trump-perkins-coie-hillary-clinton-steele-dossier/.

[20] Executive Order, *Addressing Risks from Paul Weiss* (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-paul-weiss/.

§ 1. The Paul Weiss Order imposed similar punishments as the Perkins Order: stripping all Paul Weiss employees of security clearances; requiring government contractors to disclose their attorney-client relationships with Paul Weiss; and restricting the ability of Paul Weiss personnel to enter federal buildings, engage with federal employees, and obtain federal employment. The Paul Weiss Order stated that restricting access to federal buildings was necessary because the firm's "access would threaten the national security of or otherwise be inconsistent with the interests of the United States." *Id.* § 5.

108.    The Paul Weiss Order also articulated a broader grievance with the legal profession, stating:

> Global law firms have for years played an outsized role in undermining the judicial process and in the destruction of bedrock American principles . . . . [T]hey have sometimes done so on behalf of clients, pro bono, or ostensibly "for the public good"—potentially depriving those who cannot otherwise afford the benefit of top legal talent the access to justice deserved by all. My Administration will no longer support taxpayer funds sponsoring such harm.

Paul Weiss Order § 1.

109.    On March 20, 2025, on Truth Social, the President announced that, as part of an "agreement" with Paul Weiss, he would withdraw the Paul Weiss Order. The President stated that "Paul Weiss will dedicate the equivalent of $40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives."[21] He also stated that he was "agreeing to this action in light of a meeting with Paul, Weiss Chairman, Brad Karp, during which Mr. Karp acknowledged the wrongdoing of former Paul, Weiss partner, Mark Pomerantz."[22] Mr. Karp, Paul Weiss's Chairman, stated: "We are gratified that the President has agreed to

---

[21] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 20, 2025, 3:10 PM), https://truthsocial.com/@realDonaldTrump/posts/114197044617921519.

[22] *Id.*

withdraw the Executive Order concerning Paul, Weiss. We look forward to an engaged and constructive relationship with the President and his Administration."[23]

110.    On March 21, 2025, the President formally rescinded the Paul Weiss Order by way of another Executive Order titled "Addressing Remedial Action by Paul Weiss."[24]  The stated basis for the revocation was Paul Weiss's "indicat[ion] that it will engage in a remarkable change of course."[25]

111.    On March 22, 2025, the President issued yet another directive aimed at law firms and lawyers he disfavors.  In a Presidential Memorandum entitled "Preventing Abuses of the Legal System and the Federal Court,"[26] issued with an accompanying "Fact Sheet,"[27] the President directed the Attorney General and Secretary of Homeland Security to, among other things, "review conduct by attorneys or their law firms in litigation against the Federal Government over the last 8 years," "prioritize enforcement of [agency] regulations governing attorney conduct and discipline," and "recommend to the President . . . additional steps . . . , including reassessment of security clearances held by the attorney, termination of any contract for which the relevant attorney or law firm has been hired to perform services, or any other appropriate actions."[28]

---

[23] *Id.*

[24] Executive Order: *Addressing Remedial Action by Paul Weiss* (Mar. 21, 2025), https://www. whitehouse.gov/presidential-actions/2025/03/addressing-remedial-action-by-paul-weiss/.

[25] *Id.*

[26] Presidential Memorandum: *Preventing Abuses of the Legal System and the Federal Court* (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/.

[27] Fact Sheet: *President Donald J. Trump Prevents Abuses of the Legal System and the Federal Courts* (Mar. 21, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-prevents-abuses-of-the-legal-system-and-the-federal-courts/.

[28] *Id.*

112.    As support for those requirements, the Fact Sheet identifies purported "unethical conduct" to "interfere with the 2016 presidential election" by attorney Marc Elias.[29]    The Fact Sheet also identifies purported "unscrupulous behavior by attorneys and law firms that undermine immigration enforcement," including actions purportedly taken "frequently" by "powerful Big Law pro bono practices" like "coach[ing] clients to conceal their past or lie about their circumstances when seeking asylum."[30]

113.    On March 25, 2025, the President issued another executive order targeting the law firm Jenner & Block LLP ("Jenner Order").[31]    That order continues the Administration's practice of targeting "so-called 'Big Law' firms," alleging that such firms "regularly conduct . . . harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes, that often directly or indirectly harm their own clients." Jenner Order § 1.    The Jenner Order asserts that former Jenner partner Andrew Weissman supposedly "engag[ed] in partisan prosecution as part of Robert Mueller's entirely unjustified investigation" of the President, which the Order calls an "overt demand that the Federal Government pursue a political agenda against [the President]." *Id.*  The Jenner Order imposes the same punishments as the Perkins and Paul Weiss Orders:  stripping all Jenner employees of their security clearances, requiring government contractors to disclose their attorney-client relationships with Jenner, and restricting the ability of Jenner employees to enter federal buildings, engage with federal employees, and obtain federal employment. *Id.* §§ 2-5.

---

[29]  *Id.*

[30]  *Id.*

[31]   Executive Order: *Addressing Risks from Jenner & Block* (Mar. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-jenner-block/.

114.    Two days after the Jenner Order, on March 27, 2025, the President issued his fifth Executive Order targeting a law firm—this time, Wilmer Cutler Pickering Hale and Dorr LLP (the "WilmerHale Order").  Described by President Trump as part of his campaign against "so-called 'Big Law' firms,"[32] the WilmerHale Order states that "yet another law firm . . . has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States."  WilmerHale Order § 1.  The WilmerHale Order attacks WilmerHale for its pro bono representations, asserts that WilmerHale's employment practices are racially discriminatory, and focuses on WilmerHale's association with Former Special Counsel Mueller and two other attorneys who were part of the Mueller investigation.  *Id.* Like the orders that came before it, the WilmerHale Order directs agencies to take immediate action to suspend the security clearances of all WilmerHale employees, require government contractors to disclose their attorney-client relationships with WilmerHale, restrict WilmerHale employees from government buildings, and bar executive agencies from hiring WilmerHale employees.  *Id.* §§ 2-5.

115.    Like the Perkins, Paul Weiss, and Jenner Orders, the WilmerHale Order was issued with an accompanying "Fact Sheet."[33]  The "Fact Sheet" labels WilmerHale a "rogue law firm[]," summarizes the various retaliatory actions being taken against WilmerHale, and asserts that the Order will "ensure accountability for past misconduct" and help "to end the weaponization of the Federal government."[34]

---

[32]   Executive Order: *Addressing Risks from WilmerHale* (Mar. 27, 2025), https://www. whitehouse.gov/presidential-actions/2025/03/addressing-risks-from-wilmerhale/.

[33]   *Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale* (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-wilmerhale/.

[34]   *Id.*

116.    On March 28, 2025, the President announced another "agreement" similar to the one reached with Paul Weiss—this time with Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").    That new "agreement" was reached without the President having to issue any executive order against the firm; the mere threat of such an order was enough.    In a post on Truth Social, the President announced that Skadden had agreed to "provide a total of at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration and beyond, to causes that the President and Skadden both support."[35]    The President asserted that he would "never stop fighting to deliver on his promises of eradicating partisan Lawfare in America."[36]

117.    On March 28, 2025, Jenner & Block and WilmerHale separately sued to enjoin their respective executive orders.    *See Jenner & Block LLP v. Department of Justice*, No. 25-cv-916 (D.D.C. Mar. 28, 2025), ECF No. 1; *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*, No. 25-cv-917 (D.D.C. Mar. 28, 2025), ECF No. 1.

118.    Later that day, two different courts in this District issued temporary restraining orders, one against the Jenner Order and another against the WilmerHale Order.    *See Jenner & Block LLP v. U.S. Dep't of Justice, et al.*, No. 1:25-cv-00916 (D.D.C. Mar. 28, 2025), ECF No. 9 (enjoining implementation or enforcement of Sections 3 and 5 of the Jenner Order); *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President, et al.*, No. 1:25-cv-00917 (D.D.C. Mar. 28, 2025), ECF No. 10 (enjoining implementation or enforcement of Sections 3 and 5 of the WilmerHale Order).

119.    On April 1, 2025, the President announced an "agreement" with Willkie Farr & Gallagher LLP that is substantially identical to the ones reached with Paul Weiss and Skadden

---

[35]    Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 28, 2025, 10:57 AM), https://truthsocial.com/@realDonaldTrump/posts/114241348699704594.
[36]    *Id.*

Arps.  Like the Skadden Arps "agreement," this "agreement" was reached without the President having issued an executive order.  Willkie promised "at least $100 Million Dollars in pro bono Legal Services, during the Trump Administration, and beyond, to causes that President Trump and Willkie both support."[37]

120.    On April 2, 2025, yet another law firm, Milbank LLP, preemptively reached an "agreement" with the President without having received an executive order targeting it.  The Milbank "agreement," like the others, committed to provide $100 Million in pro bono services to causes favored by the President.[38]

121.    On April 4, 2025, Susman Godfrey joined over 500 other law firms as *amici curiae* in support of Perkins Coie (and in opposition to the U.S. Government) in the pending litigation over the constitutionality of the Perkins Order.  *See Perkins Coie LLP*, No. 1:25-cv-00716 (D.D.C. Apr. 4, 2025), ECF No. 63.  The *amicus* brief asks that the Perkins Order "be permanently enjoined as a violation of core First, Fifth, and Sixth Amendment guarantees, as well as bedrock separation-of-powers principles."  *Id.*, ECF No. 63-1 at 1.

122.    On April 8, 2025, Susman Godfrey filed an *amicus* brief in support of Perkins Coie (and in opposition to the government) in the same litigation on behalf of a bipartisan group of former national security, foreign policy, intelligence, legal, and other public officials who have worked on security matters at the most senior levels of the government.  *See Perkins Coie LLP*, No. 1:25-cv-00716 (D.D.C. Apr. 8, 2025), ECF No. 98.  The *amici* represented by Susman Godfrey include former policymakers and lawyers from both major political parties whose governmental

---

[37]  Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 1, 2025, 1:47 PM), https://truthsocial.com/@realDonaldTrump/posts/114264667777137553.

[38]  Matthew Goldstein, *Another Big Law Firm Reaches Agreement With Trump*, N.Y. Times (Apr. 2, 2025), https://www.nytimes.com/2025/04/02/business/trump-law-firms-milbank-deal.html.

service spans seven decades, including federal judges, senators, ambassadors, national security advisors, White House counsels and general counsels of federal agencies, and a secretary of defense.  All *amici* "express[ed] their shared view that the president's unprecedented executive orders against Perkins Coie and other law firms were *ultra vires*, because they were based on no valid national security concern, issued without any colorable legal authority, and unconstitutionally interfere with the separation of powers."  *Id.*, ECF No. 98-1 at 1.  Susman Godfrey had asked the Department of Justice on April 5, 2025, whether it would object to *amici*'s request for leave to file an *amicus* brief.  The Department of Justice confirmed it had no objection.

123.   On April 11, 2025, the President announced that he had reached deals with five more law firms.  Those deals are similar to the ones that came before, except that several include not only promises of certain pro bono work but also promises of "other free Legal services."  Four of those firms—Kirkland & Ellis LLP, Allen Overy Shearman Sterling US LLP, Simpson Thacher & Bartlett LLP, and Latham & Watkins LLP—jointly agreed to provide an "aggregate total of at least $500 Million Dollars in pro bono and other free Legal services . . . to causes that President Trump and the Law Firms both support and agree to work on."[39]  The firms also affirmed that they would not "engage in illegal DEI discrimination and preferences."[40]  In return, the President announced, the Equal Employment and Opportunity Commission had "withdrawn" letters seeking information about the firms' employment practices and would "not pursue any claims related to those issues."[41]  The President also announced "commitments" made by a fifth firm, Cadwalader,

---

[39]  Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 11, 2025, 12:21 PM), https://truthsocial.com/@realDonaldTrump/posts/114320245355397433.

[40]  *Id.*

[41]  *Id.*

Wickersham & Taft LLP.[42]  Cadwalader agreed to provide "at least $100 Million Dollars in pro bono Legal Services . . . to causes that President Trump and Cadwalader both support."[43]

### III.    The President targets Susman Godfrey with the retaliatory Order and Fact Sheet.

124.    On April 9, 2025, the President issued the Order that is the focus of this Complaint, which names Susman Godfrey and Susman Godfrey alone as its target.

125.    Section 1 of the Order proclaims that "[l]awyers and law firms that engage in activities detrimental to critical American interests should not have access to our Nation's secrets, nor should their conduct be subsidized by Federal taxpayer funds or contracts."  Order § 1.  It asserts the purported necessity of "tak[ing] appropriate and necessary measures to guard against the actual, potential, or perceived conflicts of interest that arise when the Government funds, engages with, or otherwise devotes resources to law firms and their clients that engage in conduct undermining critical American interests and priorities."  *Id.*  And it asserts "that action is necessary to address the significant risks, egregious conduct, and conflicts of interest associated with Susman Godfrey LLP (Susman)."  *Id.*

126.    As supposed confirmation of such "risks," Section 1 accuses Susman Godfrey of "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections"; "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology"; "support[ing] efforts to discriminate on the basis of race"; and "engag[ing] in unlawful discrimination,    including    discrimination    on    the    basis    of    race,"    by,    "[f]or

---

[42] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 11, 2025, 12:19 PM), https:// truthsocial.com/@realDonaldTrump/posts/114320237164839938.

[43] *Id.*

example, . . . administer[ing] a program where it offers financial awards and employment opportunities only to 'students of color.'" *Id.* § 1.

127.    Section 2 of the Order addresses security clearances.  In that section, the Order directs "[t]he Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies)" to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest." *Id.* § 2(a).  The Order also states that "[t]he Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman.  The heads of agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision." *Id.* § 2(b).

128.    Section 3 addresses government contracting.  In that section, the Order states that "agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract" and "shall review all contracts with Susman or with entities that disclose doing business with Susman." *Id.* § 3(a)-(b).  The Order then directs agency heads "to terminate any contract" with Susman "to the maximum extent permitted by applicable law." *Id.* § 3(b)(i).  And the Order mandates that, "[w]ithin 30 days," agencies "shall submit to the Director of the Office of Management and Budget an assessment of contracts with Susman or with entities that do business with Susman effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order." *Id.* § 3(b)(ii).

129.    Section 5 is directed at barring Susman Godfrey personnel from federal buildings, interactions with federal officials, and federal employment.  The Order states that "heads of

94

agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Susman when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States," *id.* § 5(a)— having already asserted in Section 1 that the Firm engages in "activities inconsistent with the interests of the United States," *id.* § 1. The Order also provides that "heads of agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Susman employees to ensure consistency with the national security and other interests of the United States." *Id.* § 5(a). And it directs that "[a]gency officials shall, to the extent permitted by law, refrain from hiring employees of Susman, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States." *Id.* § 5(b).

130.    The Order does not cite any statute as providing authority for its directives, and the President has not, in the context of any other similar executive order issued against law firms, asserted that he acted under authority of any statute when doing so.

131.    The President also issued a "Fact Sheet" to accompany the Order.[44] The Fact Sheet brands Susman Godfrey a "rogue law firm[]" and states that the President's action against Susman Godfrey demonstrates that the President is "delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence" by "hold[ing] . . . law firms" like Susman Godfrey "accountable" and "ensur[ing] accountability for past misconduct."[45] It also restates the Order's directives in definitive terms—for instance,

---

[44] *Fact Sheet: President Donald J. Trump Addresses Risks from Susman Godfrey* (Apr. 9, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-addresses-risks-from-susman-godfrey/ (attached as Exhibit B).

[45] *Id.*

stating that "the Federal Government will terminate contracts that involve Susman" to "ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests."[46]

## IV.   **The Order has harmed and will continue to irreparably harm Susman Godfrey and its clients.**

132.    Susman Godfrey has suffered irreparable harm since the Order issued, and it will continue to suffer irreparable harm unless and until it obtains judicial relief.

133.    As explained further below, the Order violates the First and Fifth Amendments of the Constitution as well as separation-of-powers principles.  It is well established that a loss of constitutional freedoms even for a brief interval constitutes irreparable harm, particularly when it comes to First Amendment rights.

134.    The Order irreparably damages Susman Godfrey's reputation and its goodwill with clients.  The Firm has been accused by the Commander in Chief of, among other things, "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military" and  "weaponiz[ing] the American legal system and degrad[ing] the quality of American elections." Order § 1.  Such unfounded accusations will immediately and irreparably impede the Firm's ability to attract and retain clients, including by impeding clients from asking the Firm to take on new matters for them.

135.    So long as the Order remains in force, the Firm faces a serious risk that clients will terminate or contemplate terminating their engagements with the Firm due to the Order, or that the Firm will be turned down—or never contacted at all—by potential clients.

---

[46] *Id.*

96

136.    The Order also causes severe economic harm to Susman Godfrey by immediately drawing into question the Firm's ability to perform the primary work that it is hired by clients to perform:  represent them in court.  Susman Godfrey is a trial-law firm.  Its attorneys are in federal courthouses on a regular, and sometimes daily, basis.  The day that the Order issued, numerous Susman Godfrey attorneys were in a hearing in a U.S. District Court in northern California.  But the Order purports to restrict Susman Godfrey employees' access to all "Federal Government buildings."  Order § 5.  Because those terms of the Order on their face would include federal courthouses, the Order immediately impairs Susman Godfrey's ability to do the work that it has been retained to do on behalf of its clients, which will irreparably injure Susman Godfrey's ability to attract and retain clients.

137.    For similar reasons, the Order immediately impairs Susman Godfrey's ability to undertake work that involves or necessitates engagement with the government on behalf of Susman Godfrey's clients.  The Order "limit[s] Government employees acting in their official capacity from engaging with Susman employees."  Order § 5.  Susman Godfrey routinely and regularly meets with federal employees with and on behalf of clients in civil fraud and *qui tam* cases, cases pending before the U.S. Patent and Trademark Office and the U.S. International Trade Commission, and cases undertaken in consultation with the Securities and Exchange Commission and Federal Trade Commission.  For example, in *qui tam* cases handled by the Firm in which the government has decided to intervene, the Firm's interactions with the government are frequent and involved, similar to a co-counsel relationship.  Firm lawyers often hold at least weekly phone calls with government attorneys in those cases; may be in contact with them daily during discovery, for purposes of motions practice, and during trial if the case does not settle; and hold in-person meetings with them.  But under the Order, agencies are directed to restrict Susman's access to

97

federal buildings, imperiling Susman's ability to attend scheduled meetings, if those meetings even remain on schedule. And the cessation of official government "engage[ment]" with Susman Godfrey, whether in an in-person meeting or otherwise, will immediately and irreparably impair Susman Godfrey's ability to represent its clients in those matters and will economically harm the firm. Even mere uncertainty about whether Susman Godfrey attorneys may or may not be allowed to access federal buildings and interact with federal personnel has wide-ranging negative impacts on the Firm's ability to practice law and on its business.

138. The Order also imposes severe economic harm on Susman Godfrey by directly interfering with the attorney-client relationship between the Firm and its existing clients who have government contracts. The Order grievously impairs the Firm's relationship with those clients. The Order forces them to disclose their representation by Susman Godfrey to the government, whether or not the representation is public. That appears to include even instances where the client's engagement with Susman Godfrey is otherwise confidential and/or has no relationship with the government contract at issue. The Order also indicates to Susman Godfrey's existing clients that continued representation by Susman Godfrey will mean that those clients can no longer be party to any government contracts.

139. All told, Susman Godfrey will suffer substantial and irreparable reputational and economic injuries from the Order, which threaten the Firm's business model. Any economic injury to Susman Godfrey is irreparable because sovereign immunity prevents Susman Godfrey from suing the government for monetary damages in the absence of an express waiver of this immunity by Congress.

140. That the Order directs agencies to issue guidance or take other similar action does not make the harm it inflicts any less imminent. Only one day after President Trump signed the

Perkins Order, the Office of Management and Budget issued guidance implementing it.[47]  And

less than two weeks after the Perkins Order issued, the Equal Employment Opportunity

Commission began to implement the Perkins Order's directive to conduct investigations of various

law firms.[48]  Indeed, as to the Order's government-contracts directives, the Order itself requires

agencies to submit a report to the Director of the Office of Management and Budget regarding

actions undertaken pursuant to the Order within 30 days of its issuance.  *See* Order § 3.

## CLAIMS FOR RELIEF

## COUNT I

### (Against All Defendants)

### *Violation of the First Amendment - Retaliation for Protected Expression*

141.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

142.    The First Amendment to the U.S. Constitution states:  "Congress shall make no law

respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the

freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition

the Government for a redress of grievances."  U.S. Const. amend. I.

143.    The Order violates the First Amendment prohibition on government retaliation for

engaging in speech that the government disfavors.  "[T]he First Amendment prohibits government

officials from retaliating against individuals for engaging in protected speech."  *Lozman v. City of

Riviera Beach*, 585 U.S. 87, 90 (2018).  "[R]eprisal for protected speech offends the Constitution

---

[47] Russell T. Vought, *Implementation of the Executive Order on "Addressing Risks from Perkins Coie LLP,"* OMB (Mar. 7, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/M-25-17-OMB-Perkins-Coie-Draft-Memo-v4-Signed.pdf.

[48] Andrea R. Lucas, *Review of Perkins Coie LLP's Compliance with Title VII of the Civil Rights Act of 1964*, EEOC (Mar. 17, 2025), https://www.eeoc.gov/sites/default/files/2025-03/Law_Firm_Letters_-_03.17.2025.pdf.

because it threatens to inhibit exercise of the protected right." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (cleaned up). "[T]he law is settled" on this issue. *Gonzalez v. Trevino*, 602 U.S. 653, 662 (2024) (Alito, J., concurring) (quoting *Hartman*, 547 U.S. at 256).

144.    On its face, the Order (along with its accompanying Fact Sheet) retaliates based on protected First Amendment speech. As discussed above, Susman Godfrey's work almost always involves written and oral advocacy on behalf of clients, including some of President Trump's political opponents, and that advocacy takes place in some matters that are adverse to President Trump's interests. The Firm's advocacy is core protected speech. *See Velazquez*, 531 U.S. at 542 ("advocacy by the attorney to the courts" is speech protected by the First Amendment); *McDonald v. Smith*, 472 U.S. 479, 484 (1985) ("filing a complaint in court is a form of petitioning activity" protected by the First Amendment).

145.    President Trump issued the Order to retaliate against Susman Godfrey for that protected First Amendment activity. The Order says so directly, seeking to penalize Susman Godfrey for its purported "efforts to weaponize the American legal system and degrade the quality of American elections" and the President's belief that Susman Godfrey "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology." Order § 1.

146.    The President's withdrawal of the Paul Weiss Order further confirms the retaliatory motive that is both express and implicit in the President's orders targeting law firms, including the Order in this case. The President removed the retaliatory sanctions against Paul Weiss only after the firm (1) "acknowledged the [purported] wrongdoing of its former partner Mark Pomerantz," who participated in a successful criminal prosecution of President Trump; (2) jettisoned certain "'diversity, equity, and inclusion' policies" that the President disfavors; and (3) committed to

taking on pro bono clients and causes that support the Administration's initiatives. Rescission Executive Order § 1; *see* Paul Weiss Agreement ¶¶ 2-5. The rescission confirms that the Paul Weiss Order was intended to punish Paul Weiss for previous exercises of First Amendment rights, with a compelled apology (also violative of the First Amendment) as the only available route to relief from that punishment. The Order targeting Susman Godfrey has the same structure and retaliatory purpose as the Paul Weiss Order.

147.    The Order also "constitutes a sufficiently adverse action" against Susman Godfrey "to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). The Order's dictates to federal agencies impede Susman Godfrey attorneys' ability to practice law, disrupt the Firm's relationships with clients, and harm the Firm's business prospects. Restricting Susman Godfrey attorneys' access to federal buildings (such as federal agency buildings and federal courthouses) and ability to engage with government officials (including in *qui tam* and other matters involving communication, coordination, or partnership with federal departments or agencies) profoundly undercuts those attorneys' ability to provide effective advocacy. *See* Order § 5(a).

148.    Threatening targeted investigations by the Equal Employment Opportunity Commission and Attorney General, with the prospect of potential prosecution, *id.* § 4 ("Nothing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP)."), damages Susman Godfrey's reputation, with attendant harm to client relationships and Firm business prospects.

149.    Forcing Firm clients who contract with the government to disclose to the government their representation by Susman Godfrey, and threatening to reassess and cancel those clients' government contracts, even if unrelated to business with Susman Godfrey, Order § 3,

damages Susman Godfrey's relations with existing clients and its ability to attract future ones. These provisions are designed to leverage Susman Godfrey clients' existing government business to force them to stop doing business with the Firm. "[A] government entity's 'threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment." *Vullo*, 602 U.S. at 180.

150.    Making Susman Godfrey employees presumptively ineligible for federal employment, Order § 5(b), also is a severe sanction for the Firm's protected First Amendment activity. That sanction is not limited to particular attorneys, but instead applies to all lawyers and other employees of the Firm.

151.    Each of those punishments is a materially adverse action that deters Susman Godfrey "from exercising [its] own right to speak." *Wilson*, 595 U.S. at 479.

152.    Defendants' First Amendment violations are severely affecting Susman Godfrey—including by causing immediate and ongoing irreparable harm—and will continue to do so absent relief from this Court.

## COUNT II

### (Against All Defendants)

#### *Violation of the First Amendment – Viewpoint Discrimination*

153.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

154.    "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187. "The government" therefore "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 706 (2010) (Alito,

102

J., dissenting) (cleaned up) ("The proudest boast of our free speech jurisprudence is that we protect the freedom to express [even] the thought that we hate."). Viewpoint-based punishments are particularly pernicious in the context of legal advocacy because they "threaten[] severe impairment of the judicial function," which depends on an "informed, independent bar." *Velazquez*, 531 U.S. at 545-46.

155.    The Order violates the First Amendment's prohibition on viewpoint discrimination. The Order attributes to Susman Godfrey certain viewpoints and then punishes the Firm and all its employees and clients because the President disagrees with those viewpoints. The Order openly targets "law firms and their clients" that allegedly "engage in conduct undermining critical American interests and priorities." Order § 1. It specifically targets Susman Godfrey's purported "efforts to weaponize the American legal system and degrade the quality of American elections" and its alleged "fund[ing]" of "groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology." *Id.* And the Order attacks Susman Godfrey's purported "efforts to discriminate on the basis of race," as exemplified by Susman Godfrey's supposed "administ[ration of] a program where it offers financial awards and employment opportunities only to 'students of color.'" *Id.* The Firm, however, does not administer any program that violates any applicable law; Susman does not have any program that offers employment opportunities only to people of color. The Order on its face thus punishes the Firm for advancing arguments, or using "funding" to support "efforts," with which the President disagrees.

156.    That viewpoint discrimination is particularly evident with respect to the Order's direction that Susman Godfrey be prioritized for investigation of advancement policies that the Perkins Order describes as widely shared among large law firms. *See* Order § 4; Perkins Order

§ 4. The only basis for prioritizing investigation of Susman Godfrey instead of other (or all) law firms with similar policies is the viewpoint that the Order attributes to Susman Godfrey.

157.    The President's order rescinding the Paul Weiss Order after Paul Weiss agreed to criticize Mark Pomerantz, eliminate DEI policies, and undertake pro bono representations that support the Administration's initiatives underscores that the President is using the power of his office to suppress particular viewpoints expressed by law firms, in an effort to induce them to align with his own political views.

158.    Because the Order constitutes viewpoint discrimination, strict scrutiny applies. *See Reed v. Town of Gilbert*, 576 U.S. 155, 168-71 (2015).  The Order may be sustained "only if the government proves" that the Order is "narrowly tailored to serve compelling state interests." *Id.* at 163.

159.    The Order does not come close to meeting that demanding test.  There is no compelling interest in punishing lawyers for, or chilling them from, advocating for clients whose interests are adverse to the government.  To the contrary, there is a compelling interest in *permitting* lawyers to challenge the government.  *See Velazquez*, 531 U.S. at 545-48.  Zealous representation of those disfavored by the government has long been part of our constitutional tradition and is recognized as essential to reining in abuses of government power.  *See NAACP v. Button*, 371 U.S. 415, 440 (1963).  Moreover, nothing in the Order articulates a compelling interest.  The government has no compelling interest in broadly punishing law firms for alleged attorney misconduct.  And the Order's bare invocation of "national security" does not suffice, as that reference is unexplained and is not supported by any particularized findings.

160.    Even if there were a compelling interest at stake, the Order is not narrowly tailored to serve it.  Rather, the Order is vastly overbroad.  It punishes Susman Godfrey attorneys and staff

104

who have nothing to do with the allegedly improper conduct mentioned in the Order. It imposes punishments on those personnel that are in no way targeted at addressing attorney misconduct. And even if the withdrawal of security clearances were relevant to the President's "national security" concerns, the Order's punishments go far beyond security clearances—even reaching the Firm's clients and their important government contracts.

161.    Defendants' First Amendment violations are causing and will continue to cause ongoing, irreparable harm to Susman Godfrey.

## COUNT III

### (Against All Defendants)

### *Violation of the First Amendment – Right to Petition the Government*

162.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

163.    The Order violates the First Amendment right "to petition the Government for a redress of grievances." U.S. Const. amend. I. The Petition Clause of the First Amendment "protects the right of individuals to appeal to courts and other forums established by the government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). "Petitions to the courts and similar bodies can . . . address matters of great public import" and "may facilitate the informed public participation that is a cornerstone of democratic society." *Id.* at 397. "[T]he right to petition extends to all departments of the Government," including "administrative agencies" and "courts." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

164.    The Order's directive to federal agencies to prohibit their employees from engaging with Susman Godfrey restricts the Firm from petitioning the government on its or its clients' behalf. The Order interferes with Susman Godfrey employees' ability to "engag[e]" with the very government lawyers and officials who could hear such a petition (*e.g.*, administrative law judges, enforcement attorneys, investigative attorneys, prosecutors, and the like).

165.    Excluding Susman Godfrey from federal government buildings likewise constitutes a severe restriction on the Firm's ability to petition the government, as it restricts the Firm and its employees from accessing buildings that house agency proceedings and even federal courthouses. If Susman Godfrey lawyers are refused entry into those buildings, they will not be able to attend key hearings or meetings and will not be able to represent their clients in federal trials.

166.    Susman Godfrey has standing to assert this First Amendment claim both on its own behalf and on behalf of its existing clients based on attorney-client relationships. *See Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004).

167.    Defendants' First Amendment violations are causing and will continue to cause ongoing, irreparable harm to Susman Godfrey.

## COUNT IV

### (Against All Defendants)

### *Violation of the First Amendment – Free Association and Compelled Disclosure*

168.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

169.    The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (citation omitted). The government may not impose punishments based on protected association. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72 (1990).

170.    The Order violates the right to freedom of association under the First Amendment. The Order requires that any Firm clients who are government contractors "disclose any business they do with Susman." Order § 3. "[C]ompelled disclosure of affiliation" with a law firm targeted by the President may chill those clients' willingness to continue to retain the Firm, thus burdening

106

its freedom of association.  *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (alterations omitted) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958)).

171.    The Order also forces Susman Godfrey clients with government contracts to endure economic reprisal (or other forms of hostility) from the government based on the mere fact of having retained and associated with Susman Godfrey, which discourages them from continuing to do so.  Indeed, government-contractor clients of Susman Godfrey risk termination of their government contracts because of that association, regardless of whether Susman Godfrey is doing any work for those clients related to such contracts.  On any reasonable reading of the Order, any government-contractor client who has associated with Susman Godfrey can expect economic consequences and other repercussions as a result of their chosen counsel.

172.    Those features of the Order affect the Firm:  they mean that, even if Susman Godfrey wishes to keep associating with such clients, its ability to do so has been severely impaired.  In addition, Susman Godfrey has standing to assert interference with the First Amendment right to free association on behalf of its clients.  *See Kowalski*, 543 U.S. at 130-31.

173.    "Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest."  *Clingman v. Beaver*, 544 U.S. 581, 586 (2005).  And compelled disclosures, in particular, must satisfy "exacting scrutiny," which requires the government to show that there is a "substantial relation between the disclosure requirement and a sufficiently important governmental interest."  *Ams. for Prosperity Found.*, 594 U.S. at 607 (citations omitted).  For the reasons explained above, the Order cannot meet those demanding standards.

174.    Defendants' First Amendment violations are causing and will continue to cause ongoing, irreparable harm to Susman Godfrey.

## COUNT V

### (Against All Defendants)

### *Violation of the First Amendment and Spending Power (U.S. Const. Art. I, § 8) – Unconstitutional Conditions on Government Contracts*

175.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

176.    When the government funds an activity pursuant to the legislative branch's spending power, *see* U.S. Const. art. I, § 8, the government cannot "leverage funding to regulate speech outside the contours of the federal program itself," *USAID*, 570 U.S. at 214-15.   The government also may not deny or terminate contracts on a basis that infringes the contractor's constitutional rights.   *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674-75 (1996).

177.    Section 3 of the Order violates those rules.   It directs agencies to "require Government contractors to disclose any business they do with Susman Godfrey and whether that business is related to the subject of the Government contract," Order § 3(a), and to "terminate any contract" for which "Susman has been hired to perform any service," Order § 3(b)(i).   But Susman Godfrey's relationship with government contractors is wholly irrelevant to its clients' ability to effectively provide services under government contracts.   The Order, in fact, does not even limit itself to contracts on which Susman Godfrey provides legal services, but instead requires disclosure of Susman's attorney-client relationship in the case of all contractors.   *See* Order § 3(a).

178.    The attorney-client relationship between Susman Godfrey and its clients is not material to any clients' suitability as a federal contractor.   There is no statutory or constitutional authority for the President to require an existing federal contractor to disclose its retention of Susman Godfrey attorneys or to prohibit any person from engaging Susman Godfrey.

179.    The Order effectively seeks to create a new condition of government contracting—that contractors not work with Susman Godfrey.   That is an unconstitutional condition that burdens

the right to association, as explained above, interferes with the right to counsel, as explained below, and is wholly unrelated to the government's legitimate procurement purposes.

180.    Because of the "special" relationship between an attorney and his or her client, attorneys have third-party standing to contest government actions that impair their clients' "right to obtain legal representation" of their choice.  *DOL v. Triplett*, 494 U.S. 715, 720 (1990); *see Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989).  Susman Godfrey thus has standing to challenge the Order's unconstitutional interference with its clients' rights not to be subject to unconstitutional conditions on federal government contracts.

181.    Defendants' unconstitutional conditions on federal contracts are causing and will continue to cause Susman Godfrey and its clients ongoing, irreparable harm.

## COUNT VI

### (Against All Defendants)

### *Violation of the Fifth Amendment – Due Process Clause (Procedural Due Process)*

182.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

183.    The Order violates the Due Process Clause of the Fifth Amendment, which guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."  The Due Process Clause is violated when the plaintiff (1) faces a deprivation of a protected liberty or property interest, and (2) has not received the process that is due.  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).  The safeguards of the Due Process Clause are "'implicated' whenever the government imposes 'civil penalties.'"  *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 n.22 (1996)).  And before a court may impose a "punishment for [a] sanctioned party's misbehavior," it must "provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof" and a jury trial.  *Id.* at 108.  The Order flouts those established constitutional

109

principles by imposing draconian punishments on Susman Godfrey's liberty and property interests without any process at all.

184.    The Order deprives Susman Godfrey of protected liberty and property interests in multiple ways:  it denies the Firm and its attorneys the right to follow their chosen profession; harms the Firm's reputation; abrogates the Firm's right to petition the government; and interferes with the Firm's protected contractual relationships with clients.

185.    In particular, the Order interferes with the right of Susman Godfrey and its attorneys to pursue their chosen profession by interfering with the ability to practice law, including representing clients in court and before federal agencies.  Susman Godfrey lawyers must be able to enter federal government buildings and engage with federal government employees to be able to represent those clients effectively.  And the Order also subjects Susman Godfrey's non-lawyer professional staff—including paralegals, office managers, legal assistants, information-technology specialists, recruiters, human resources staff, mailroom staff, and others—to the many reputational, practical, and economic consequences associated with restricting all Susman Godfrey personnel from government buildings and barring them from government employment.

186.    The Order also impairs Susman Godfrey's constitutionally protected property interests by seeking to impair and terminate private contractual relationships between Susman Godfrey and its clients, by prohibiting the Firm from participating in federal contracting, and by stigmatizing the Firm as a "rogue law firm[]" that, among other things, allegedly "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military." Order §§ 1, 3.

187.    Susman Godfrey did not receive any notice prior to being subjected to the Order. Susman Godfrey was not informed, prior to the issuance of the Order, of the conduct that would subject the Firm to punishment or the severity of the potential punishment.

188.    Susman Godfrey was not given any opportunity to challenge the purported factual findings or the sanctions in the Order prior to their announcement.  And after issuance of the Order, Susman Godfrey also has not been given an opportunity to challenge the Order.

189.    No compelling interest justifies that violation of Susman Godfrey's due process rights.  The Order was adopted for illegitimate and retaliatory reasons that could not justify the deprivation of any aspect of due process, let alone justify the deprivation of any due process.  The Order's cursory invocations of "national security" do not cure the due-process issue.  Moreover, any invocations of national security cannot ignore the weighty interests that militate against the Order's harsh punishments.

190.    Defendants' violations of due process are causing and will continue to cause ongoing, irreparable harm to Susman Godfrey.

## COUNT VII

### (Against All Defendants)

### *Violation of the Fifth Amendment – Due Process Clause (Void for Vagueness)*

191.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

192.    The Order separately violates the Due Process Clause because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).

193.    The Order is unconstitutionally vague because it does not give Susman Godfrey fair notice of what is prohibited and how the Firm can avoid sanctions in the future.  The Order

111

instead appears deliberately crafted to deter protected speech and legal advocacy by forcing both Susman Godfrey and its clients "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

194.    The Order makes clear what its penalties are, but does not specify in any way what triggered the punishment.  Without any specificity at all, the Order states that Susman Godfrey has, among other things, engaged in "egregious conduct, and conflicts of interest," "subsidiz[ing] . . . activities that are not aligned with American interests," "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections," and "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology." Order § 1.

195.    The Order's lack of standards invites discriminatory enforcement.  The Order "impermissibly delegates" to defendants, "for resolution on an ad hoc and subjective basis," basic policy matters such as when, and to what extent, Susman's employees may access federal buildings or engage with federal employees—"with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).  The Order also does not state with specificity what standard by which federal personnel are to limit Susman Godfrey's access to federal government buildings and federal employees, instead referring only vaguely to undefined "threat[s]" to "the national security of" or "the interests of the United States."  Order §§ 3, 5(a).  That leaves Susman Godfrey employees without any understanding or notice of what conduct would prevent (or allow) their access to federal government buildings or prohibit (or allow) their attorneys' "engag[ement]" with federal employees.

196.    That vagueness is especially impermissible because where, as here, "speech is involved," the vagueness test must be applied with special "rigor[]." *FCC v. Fox Television Stations*, 567 U.S. 239, 253-54 (2012).

197.    Defendants' violations of due process are causing and will continue to cause ongoing, irreparable harm to Susman Godfrey.

<u>**COUNT VIII**</u>

**(Against All Defendants)**

*Violation of the Fifth Amendment – Right to Counsel*

198.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

199.    The Order violates the Fifth Amendment right to counsel of Susman Godfrey's clients, which the Firm has standing to assert because those violations interfere with the Firm's practice.   The Fifth Amendment protects clients' due-process rights in establishing and maintaining attorney-client relationships, including the client's right to choose counsel, free from arbitrary or unjustified governmental interference. *See Triplett*, 494 U.S. at 721.

200.    The Order's sanctions interfere with and chill that right.  Those sanctions deny Firm attorneys the ability to freely "engag[e] with" Government officials or "access[] . . . Federal Government buildings." Order § 5(a).  As a result of the Order, the Firm's clients will have to go without their chosen counsel in upcoming meetings and hearings.

201.    The Order's stated reasons for that interference—to punish the Firm for its First Amendment activity—are not rationally related to any legitimate government interest.   The Order's restrictions therefore infringe the rights of the Firm's clients under the Fifth Amendment.

202.    Defendants' violations of the right to counsel are causing and will continue to cause ongoing, irreparable harm.

## COUNT IX

### (Against All Defendants)

### *Violation of the Fifth Amendment – Equal Protection*

203.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

204.    The Order violates the Equal Protection Clause as incorporated by the Fifth Amendment, which prohibits the federal government, its agencies, its officials, and its employees from denying persons the equal protection of the laws.  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

205.    The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,'" regardless of whether that class actually has a single member or consists of a group of disfavored parties.  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (citations omitted).  Such a claim requires the plaintiff to allege that it "has [a] been intentionally treated differently from others similarly situated and [b] that there is no rational basis for the difference in treatment."  *Id*.  Further, when the differential treatment burdens a plaintiff's First Amendment activity, a standard "appreciably more stringent than 'minimum rationality'" governs. *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 802 (D.C. Cir. 1988).

206.    To justify discriminatory conduct, the government must put forward a "plausible reason" for its differential treatment, *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993), which cannot be "so attenuated" from its conduct "as to render [it] arbitrary or irrational."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985) (citing, *e.g.*, *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 535 (1973)).  "[A] bare desire to harm a politically unpopular group" is "not [a] legitimate state interest[]."  *City of Cleburne*, 473 U.S. at 447.

207.    The Order violates those equal-protection principles because its purpose is to discriminate against Susman Godfrey.  The targeted nature of the treatment inheres in the Order

114

itself, which singles out the Firm by name, airs the President's particular grievances with the Firm, and assigns specific sanctions to the Firm. Countless other similarly situated law firms and lawyers have not been subjected to the same—or remotely similar—sanctions. That different treatment alone demonstrates that the Order was motivated by a bare intent to punish Susman Godfrey.

208.    Although the Order's discriminatory intent is evident on its face, it is reinforced by public statements made by President Trump and his associates that reflect his animus toward Susman Godfrey and his desire to seek retribution against its lawyers for their constitutionally protected advocacy. For instance, during the signing ceremony for the Order, President Trump stated, "We're just starting a process with this [firm], because there were some very bad things that happened with these law firms." An aide added, "[t]his firm was very involved in the election misconduct."[49]

209.    It is immaterial that several other law firms have previously been subjected to analogous orders. The fact remains that the number of similarly situated firms targeted by the President is dwarfed by the number who have been unaffected.

210.    No credible, rational justification exists for treating Susman Godfrey differently than similarly situated firms. The Order's stated reasons are arbitrary, irrational, and do not even try to conceal the Executive's true motive: punishing Susman Godfrey for engaging in constitutionally protected speech, association, and legal advocacy that President Trump disfavors.

211.    Defendants' violations of equal protection are causing and will continue to cause ongoing, irreparable harm to Susman Godfrey.

---

[49] *President Trump discusses tariff reversal and signs Executive Order in the Oval Office – 4/9/25*, CNBC Television, at 12:15-12:36, https://www.youtube.com/watch?v=mYm7kmOC37s&t=735s.

## COUNT X

### (Against All Defendants)

### *Ultra Vires* Presidential Action – Separation of Powers

212.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

213.    The Order violates the Constitution's separation of powers, which prevents the "concentrat[ion] [of] the roles of prosecutor, judge, and jury in the hands of the Executive Branch." *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024).  The separation of powers "protects the liberty of the individual from arbitrary power."  *Bond v. United States*, 564 U.S. 211, 222 (2011).

214.    "The President's power, if any, to issue" an executive order "must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  No act of Congress supports the Executive Order.  Congress has not authorized the President to make findings about law firm conduct, *see* Order § 1, or to impose punishments on law firms for the personnel they hire or the work they do.  There is no statutory authority for the contracting directives in Section 3 of the Order or for the significant restrictions imposed in Section 5 of the Order.  The President does not cite any statutory authority for the actions taken in the Executive Order.

215.    Section 3 of the Order also fails for an additional reason:  it violates the terms of the Federal Property and Administrative Services Act.  At a minimum, that law requires that a presidential contracting directive advance economy and efficiency in government contracting.  *See UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003).  Section 3 of the Order wholly lacks an economy-and-efficiency finding, and the Order is expressly not directed at that purpose—but is instead directed at stopping "taxpayer dollars" from "subsidizing" Susman Godfrey.  Order § 3.  An economy-and-efficiency finding would be impossible in any event.  The Order undermines efficiency by discouraging federal contractors from working with their law firm

116

of choice and by requiring agencies to terminate existing contractors, regardless of their effectiveness. Courts recently have taken a narrow view of the President's contracting authority which would clearly bar Section 3 of the Order as well. *See, e.g.*, *Nebraska v. Su*, 121 F.4th 1, 7 (9th Cir. 2024) (rejecting presidential directive to require contractors to have a $15 minimum wage); *Kentucky v. Biden*, 57 F.4th 545, 552 (6th Cir. 2023) (rejecting presidential directive to require contractors to have a COVID-19 vaccination requirement).

216.    The Constitution does not independently authorize the Order. Article II does not authorize the President to punish disfavored law firms. "[O]fficially prepared and proclaimed governmental blacklists possess almost every quality of bills of attainder, the use of which was from the beginning forbidden to both national and state governments." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-44 (1951) (Black, J., concurring). There is no history supporting a constitutional authority to issue the Order.

217.    Instead, the historical power to sanction attorneys for alleged professional misconduct rests with the Article III judiciary. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). The Order intrudes on that judicial role by imposing sanctions on Susman Godfrey based not on a judicial finding of professional wrongdoing, but rather on the President's own view of what is right and wrong. It further intrudes on Article III powers by undermining the independence of the bar. The Order targets Susman Godfrey for representing clients and pursuing cases that the President does not favor. But under the Constitution, the President may not prevent the Nation's courts from having independent and zealous attorneys appear before them. Such action improperly "truncate[s] presentation to the courts" and interferes with the advocacy "upon which courts must depend for the proper exercise of the judicial power." *Velazquez*, 531 U.S. at 545.

218.    Indeed, the Order punishes Susman Godfrey in the manner of an unconstitutional bill of attainder.  The Order invades judicial power by adjudicating facts to support a restriction of Plaintiff's private rights in a way the Constitution prohibits even the legislature from doing.  But under the Constitution, Presidents cannot seize judicial power unto themselves to "pronounce[] upon the guilt of [Plaintiff] . . . in accordance [solely] with [their] own notions."  *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866).

219.    The Order is *ultra vires* because it violates the separation of powers by exercising judicial power and because no statute grants such authority.

220.    The *ultra vires* nature of the Order has already irreparably harmed and continues to irreparably harm Susman Godfrey.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court declare that the Order is unconstitutional and award any other relief the Court deems necessary and just, including as appropriate using its equitable powers to enter orders providing that:

A. Defendants are enjoined from implementing or giving effect to the Order in any way, including by relying on any of the statements in Section 1;

B. Defendants are directed to rescind any and all guidance or direction that has already issued that relates to implementing or enforcing the Order;

C. Defendants are directed to issue guidance to their officers, staff, employees, and contractors to disregard the Order and carry on with their ordinary course of business as if the Order had never issued;

D. Defendants U.S. Department of Justice; Pamela Bondi, in her official capacity as U.S. Attorney General; the Office of Management and Budget; and Russell Vought, in his official capacity as Director of the Office of Management and Budget, are directed to

118

immediately issue guidance to all other agencies subject to the Order to suspend and rescind any implementation or enforcement; and

E. Defendants are directed to take, in good faith, any other steps that are necessary to prevent the implementation or enforcement of the Order.

May 9, 2025            Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr. (D.C. Bar. No. 420434)
Elaine J. Goldenberg (D.C. Bar. No. 478383)
Ginger D. Anders (D.C. Bar. No. 494471)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com
Ginger.Anders@mto.com

Brad D. Brian (*pro hac vice*)
Michael R. Doyen (*pro hac vice*)
Hailyn J. Chen (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Brad.Brian@mto.com
Michael.Doyen@mto.com
Hailyn.Chen@mto.com

*Attorneys for Susman Godfrey LLP*

(*Additional counsel listed on following page*)

119

**JA 3480**

Bethany W. Kristovich (*pro hac vice*)
Adam B. Weiss (*pro hac vice*)
Jennifer L. Bryant (*pro hac vice*)
Miranda E. Rehaut (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
Bethany.Kristovich@mto.com
Adam.Weiss@mto.com
Jennifer.Bryant@mto.com
Miranda.Rehaut@mto.com

Rachel G. Miller-Ziegler (D.C. Bar No. 229956)
Jeremy S. Kreisberg (D.C. Bar No. 1048346)
Kyle A. Schneider (D.C. Bar No. 90024468)
Esthena L. Barlow (D.C. Bar No. 90000252)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue, NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Rachel.Miller-Ziegler@mto.com
Jeremy.Kreisberg@mto.com
Kyle.Schneider@mto.com
Esthena.Barlow@mto.com

Juliana Yee (*pro hac vice*)
Shannon C. Galvin Aminirad (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
(415) 512-4000
Juliana.Yee@mto.com
Shannon.Aminirad@mto.com

*Attorneys for Susman Godfrey LLP*

**JA 3481**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUSMAN GODFREY LLP,

    *Plaintiff*,

    v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

    *Defendants*.

Civil Action No. 25 - 1107 (LLA)

## <u>MEMORANDUM OPINION</u>

In April 2025, President Donald J. Trump issued an Executive Order targeting the law firm Susman Godfrey LLP ("Susman") based on the clients it represents and the causes it supports. The order was one in a series attacking firms that had taken positions with which President Trump disagreed. In the ensuing months, every court to have considered a challenge to one of these orders has found grave constitutional violations and permanently enjoined enforcement of the order in full. *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-CV-716, 2025 WL 1276857, at *49 (D.D.C. May 2, 2025); *Jenner & Block LLP v. U.S. Dep't of Just.*, No. 25-CV-916, 2025 WL 1482021, at *26 (D.D.C. May 23, 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, No. 25-CV-917, 2025 WL 1502329, at *33-34 (D.D.C. May 27, 2025). Today, this court follows suit, concluding that the order targeting Susman violates the U.S. Constitution and must be permanently enjoined.

# I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

## A.    Susman Godfrey LLP

Founded in 1980, Susman is a well-known trial firm with offices in Houston, Los Angeles, New York, and Seattle.  ECF No. 51-2 ¶¶ 1-2, 8; ECF No. 159-1 ¶¶ 1-2, 8.  While Susman has just over 230 attorneys, it is one of the top 100 revenue-generating law firms in the United States.  ECF No. 51-2 ¶¶ 2, 4; ECF No. 159-1 ¶¶ 2, 4.

Susman works on a wide variety of cases, and approximately one-third of its active matters take place before federal courts and agencies.  ECF No. 51-2 ¶¶ 3, 23; ECF No. 159-1 ¶¶ 3, 23.  In representing its clients, Susman has interacted with, and anticipates further interactions with, at least fifteen federal departments, agencies, and officials.  ECF No. 51-2 ¶ 26; ECF No. 159-1 ¶ 26.  Additionally, Susman has nearly twenty clients that either contract or do business with the federal government or have affiliates that are government contractors and subcontractors.  ECF No. 51-2 ¶ 28; ECF No. 159-1 ¶ 28.

Many of the practice areas in which Susman specializes require frequent interaction with the federal government.  ECF No. 51-2 ¶ 30; ECF No. 159-1 ¶ 30.  For example, Susman frequently handles cases involving the False Claims Act; patent infringement; antitrust matters including price-fixing, market allocation, refusal-to-deal, no-poach, and monopolization claims; and statutes regulating the environment.  ECF No. 51-2 ¶¶ 30-31, 39, 44, 46; ECF No. 159-1 ¶¶ 30-31, 39, 44, 46.  The same is true of Susman's pro bono activities, which include matters related to human rights violations, anti-discrimination issues, constitutional challenges, and death penalty appeals, and also involve interacting with the federal government and appearing in federal court.  ECF No. 51-2 ¶¶ 48-49; ECF No. 159-1 ¶¶ 48-49.

### B.    Executive Order 14,263

On April 9, 2025, President Trump signed and issued Executive Order 14,263 (the "Order"), titled "Addressing Risks from Susman Godfrey," along with an accompanying "fact sheet."  *See* Exec. Order No. 14,263, 90 Fed. Reg. 15615 (Apr. 15, 2025); ECF No. 51-7.  The Order followed on the heels of similar executive orders targeting several other law firms, including Perkins Coie LLP, Jenner & Block LLP, Wilmer Cutler Pickering Hale and Dorr LLP, and Paul, Weiss, Rifkind, Wharton & Garrison LLP, as well as a memorandum targeting Covington & Burling LLP.  ECF No. 51-2 ¶¶ 70-115; ECF No. 159-1 ¶¶ 70-115.[1]  The Order proceeds in six sections.

*Section 1.*  The first section, titled "Background," provides the factual basis for the Order. It begins by stating President Trump's belief that "[l]awyers and law firms that engage in activities detrimental to critical American interests should not have access to our Nation's secrets, nor should their conduct be subsidized by Federal taxpayer funds or contracts" and explains that the federal government must take steps to "guard against the actual, potential, or perceived conflicts of interest that arise when the Government funds, engages with, or otherwise devotes resources to law firms and their clients that engage in conduct undermining critical American interests and priorities." Order § 1.

The Order then zeroes in on Susman, offering three reasons that the President "ha[s] determined that action is necessary to address the significant risks, egregious conduct, and conflicts

---

[1] *See* Addressing Risks from WilmerHale, Exec. Order No. 14,250, 90 Fed. Reg. 14549 (Apr. 3, 2025); Addressing Risks from Jenner & Block, Exec. Order No. 14,246, 90 Fed. Reg. 13997 (Mar. 28, 2025); Addressing Risks from Perkins Coie LLP, Exec. Order No. 14,230, 90 Fed. Reg. 11781 (Mar. 11, 2025); Addressing Risks from Paul Weiss, Exec. Order No. 14,237, 90 Fed. Reg. 13039 (Mar. 20, 2025) (revoked by Addressing Remedial Action by Paul Weiss, Exec. Order No. 14,244 § 1, 90 Fed. Reg. 13685 (Mar. 26, 2025)); Suspension of Security Clearances and Evaluation of Government Contracts, The White House (Feb. 25, 2025), https://perma.cc/66W7-9WM3.

of interest" posed by the firm.  *Id.*  First, it accuses Susman of "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections."  *Id.*  Neither this section nor the rest of the Order explains what exactly this refers to, but Susman proffers—and the government does not dispute—that it references Susman's representation of Dominion Voting Systems and state election officials in connection with litigation concerning the 2020 election.[2] ECF No. 164, at 3; Hr'g Tr. at 4:19-21, 72:13-18.  Next, the Order asserts that Susman "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology."  Order § 1.  Again, the Order offers no explanation of what is meant by this, but Defendants suggest that it refers to Susman's decision to donate funds to "GLBTQ Legal Advocates and Defenders (GLAD), which previously sued the Federal Government to enjoin [a] Department of Defense policy."  ECF No. 159, at 13 n.2. Finally, the Order claims that Susman "supports efforts to discriminate on the basis of race" and "itself engages in unlawful discrimination, including . . . on the basis of race."  Order § 1.  To substantiate this claim, the Order explains that "Susman administers a program where it offers financial awards and employment opportunities only to 'students of color' . . . [which is] unlawful discrimination perpetrated in the name of 'diversity, equity, and inclusion' policies."  *Id.* Throughout Section 1, the Order repeatedly asserts that Susman's activities are "inconsistent with the interests of the United States" and "undermin[e] critical American interests and priorities."  *Id.*

---

[2] Following the 2020 election, various news outlets falsely claimed that voting machines supplied by Dominion Voting Systems had been rigged, causing President Trump to fail in his bid for reelection.  ECF No. 51-2 ¶ 53; ECF No. 159-1 ¶ 53 (Defendants dispute portions of the statement "to [the] extent inconsistent with EO 14250 § 1," which is not at issue in this case).  President Trump echoed these aspersions on social media.  ECF No. 51-2 ¶¶ 53-55; ECF No. 159-1 ¶¶ 53-55.  Susman represents Dominion Voting Systems in various defamation lawsuits related to these accusations.  ECF No. 51-2 ¶¶ 56, 65; ECF No. 159-1 ¶¶ 56, 65.  Susman also defended the Secretary of the State of Arizona and the Governor of Wisconsin in lawsuits accusing them of election interference.  ECF No. 51-2 ¶¶ 66-67; ECF No. 159-1 ¶¶ 66-67.

*Section 2*.  The second section, titled "Security Clearance Review," instructs the Attorney General, the Director of National Intelligence, and other agency heads to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest." Order § 2(a).  It further commands the Office of Management and Budget to "identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Susman" so that agency heads can "expeditiously cease such provision." *Id.* § 2(b)  The section does not provide any further detail, nor does it explain what the review of Susman clearances to ensure "consisten[cy] with the national interest" might entail.  *Id.*

*Section 3*.  The third section, titled "Contracting," sets several limitations on the ability of Susman and parties that do business with Susman to contract with the federal government, purportedly so that the government does not subsidize "activities that are not aligned with American interests."  Order § 3(a).  The section first "require[s] Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract."  *Id.*  Informed by these disclosures, agency heads must review all contracts with Susman and parties that do business with Susman and "take appropriate steps to terminate any contract . . . for which Susman has been hired to perform any service" and "otherwise align their agency funding decisions . . . with the goals and priorities of [the Trump] Administration." *Id.* § 3(b).  To ensure compliance with the Order, agencies are required to submit to the Office of Management and Budget an assessment of any relevant contracts, and actions taken with respect to those contracts, within thirty days. *Id.* § 3(b)(ii).

5

**JA 3486**

*Section 4*.  The fourth section, titled "Racial Discrimination," states only that "[n]othing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP)."  Order § 4.  Section 4 of Executive Order 14,230 instructs the Chair of the Equal Employment Opportunity Commission to review the practices of "large, influential, or industry[-]leading law firms for consistency with Title VII of the Civil Rights Act of 1964," with a focus on whether these firms "reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis."  Exec. Order No. 14,230 § 4, 90 Fed. Reg. at 11782.  That order also directs the Attorney General to spearhead investigations into law firms that "do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered." *Id.*

*Section 5*.  The fifth section of the Susman Order, titled "Personnel," instructs agency heads to "provide guidance limiting official access from Federal Government buildings to employees of Susman when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States" and to provide further guidance "limiting Government employees acting in their official capacity from engaging with Susman employees."  Order § 5(a).  It also creates a presumption against hiring Susman employees into the federal government, directing agency officials to "refrain from hiring employees of Susman, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States."  *Id.* § 5(b).

*Section 6.* The last section of the Order, titled "General Provisions," explains that the Order must be implemented "consistent with applicable law" and clarifies that nothing in the Order should be "construed to impair or otherwise affect" the "authority granted by law to an executive department or agency, or the head thereof" or "the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals." Order § 6.

Alongside the Order, the White House issued a "fact sheet" that largely regurgitates the language of the Order, refers to Susman as a "rogue law firm[,]" and explains that "President Trump is delivering on his promise to end the weaponization of government and protect the nation from partisan and bad faith actors who exploit their influence." ECF No. 51-7.

The Trump Administration did not contact Susman in advance of issuing the Order and accompanying fact sheet. ECF No. 51-2 ¶¶ 157-58; ECF No. 159-1 ¶¶ 157-58. It also has not provided the firm an opportunity to respond to the allegations contained in the Order and fact sheet. ECF No. 51-2 ¶ 159; ECF No. 51-3 ¶ 61.

### C.    Procedural History

On April 11, 2025, Susman filed suit to challenge the constitutionality of the Order. ECF No. 1.[3] A few days later, the firm sought a temporary restraining order ("TRO") to prevent implementation of Sections 1, 3, and 5 of the Order. ECF No. 10. On April 15, the court heard oral arguments from both parties and granted Susman's request for a TRO. *See* Apr. 15, 2025 Minute Entry; ECF No. 15. Specifically, the court temporarily enjoined Defendants "from

---

[3] Susman brings this suit against various agencies and officers in their official capacity. To the extent that any officer who is a party to the case is replaced, "[t]he officer's successor is automatically substituted as a party" pursuant to Federal Rule of Civil Procedure 25(d).

implementing or giving effect to Sections 1, 3, and 5" of the Order and directed Defendants "to rescind any and all guidance or direction" relating to the implementation or enforcement of those sections of the Order. ECF No. 15, at 1. The court further ordered Defendants to file a status report "describing the steps taken to ensure compliance with [the court's] order and certifying compliance with its requirements." *Id.* at 2. Accordingly, Defendants reported that the Department of Justice had distributed the court's order with directions to ensure compliance. ECF No. 28, at 1. By the agreement of the parties, ECF No. 27, at 2; Fed. R. Civ. P. 65(b)(2), the court extended its TRO "until final judgment is entered in this matter" and set a dispositive briefing schedule, ECF No. 30, at 1.

Susman then moved for summary judgment, requesting that the court declare the Order "unlawful because it violates the First and Fifth Amendments to the U.S. Constitution, exceeds the President's constitutional authority under Article II, and violates the separation of powers." ECF No. 51, at 1. The firm seeks to permanently enjoin Defendants from implementing or enforcing the Order. *Id.* Defendants separately moved to dismiss Susman's claims. ECF No. 58. The court held a hearing on both motions on May 8. *See* May 8, 2025 Minute Entry.

Following the hearing, Susman amended its complaint to add additional federal defendants subject to the Order. ECF No. 178. Given the limited nature of the amendment, the parties agreed to not submit new briefing and, instead, incorporate the parties' prior briefing into their new motions. ECF No. 175. The renewed motions are both fully briefed. ECF Nos. 51, 159, 164, 181 (motion for summary judgment); ECF Nos. 58, 158, 174, 180 (motion to dismiss). The court is

also in receipt of twenty-one amicus briefs filed in support of Susman's motion for summary

judgment.[4]

### D.    Related Orders and Litigation

Before and after the issuance of the Susman Order, several other law firms, including

Skadden, Arps, Slate, Meagher & Flom LLP; Willkie Farr & Gallagher LLP; Milbank LLP;

Kirkland & Ellis LLP; Allen Overy Shearman Sterling US, LLP; Simpson Thacher & Bartlett LLP;

Latham & Watkins LLP; and Cadwalader, Wickersham & Taft LLP negotiated agreements with

the Trump Administration to avoid being the target of similar orders.[5]  These firms committed to

providing hundreds of millions of dollars in pro bono work on initiatives supported by President

---

[4] *See* ECF Nos. 65 (775 Law Professors); 66 (Lawyers Defending American Democracy, Inc.); 72 (Washington, Illinois, Massachusetts, New Jersey, Arizona, California, Colorado, Connecticut, Delaware, District of Columbia, Hawai'i, Maine, Maryland, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, and Vermont); 73 (Professor Aaron H. Caplan); 113 (Former and Current General Counsel); 114 (Fred T. Korematsu Center for Law and Equality); 141 (366 Former Judges); 142 (Lawyers' Committee for Civil Rights Under Law, Public Counsel, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Public Interest Law Center, Chicago Lawyers' Committee for Civil Rights Under Law, Mississippi Center for Justice, and Lawyers' Committee for Civil Rights of the San Francisco Bay Area); 143 (Former Presidents of the District of Columbia Bar, Past Presidents of Voluntary Bar Associations, and Voluntary Bar Associations in the District of Columbia); 144 (Law Firm Partners United Inc.); 145 (NAACP Legal Defense & Educational Fund, Inc.); 146 (777 Solo and Small Firm Lawyers); 147 (23 Nongovernmental Organizations); 148 (American Civil Liberties Union, American Civil Liberties Union of the District of Columbia, Cato Institute, Center for Individual Rights, Electronic Frontier Foundation, Foundation for Individual Rights and Expression, Institute for Justice, Knight First Amendment Institute at Columbia University, National Coalition Against Censorship, Reporters Committee for the Freedom of the Press, Rutherford Institute, and Society for the Rule of Law Institute); 149 (Bar Associations and Lawyer Membership Associations); 150 (Legal Ethics Professors); 151 (884 Law Firms); 152 (Former Senior Government Officials); 153 (Litigation Firms); 154 (Institute for the Rule of Law of the Union Internationale des Avocats); 155 (1129 Law Students and 51 Law Student Organizations).

[5] One firm, Paul, Weiss, Rifkind, Wharton & Garrison LLP, negotiated a deal after executive action had already been taken against it.  In exchange for millions of dollars in promised pro bono legal services, President Trump rescinded the executive order targeting the firm.  ECF No. 51-2 ¶¶ 87-97; ECF No. 159-1 ¶¶ 87-97.

9

Trump, including ones that "represent the full political spectrum, including [c]onservative ideals,"
ECF No. 51-2 ¶¶ 127, 132, 137, 141; ECF No. 159-1 ¶¶ 127, 132, 137, 141, and further affirmed
that they would not "engage in illegal DEI discrimination and preferences," ECF No. 51-2 ¶ 141;
ECF No. 159-1 ¶ 141; *see generally* ECF No. 51-2 ¶¶ 123-47; ECF No. 159-1 ¶¶ 123-47.

Three other law firms were subject to executive orders like the one targeting Susman, and
each filed suit.  On March 6, 2025, President Trump issued Executive Order 14,230, "Addressing
Risks from Perkins Coie LLP."  90 Fed. Reg. 11781 (Mar. 11, 2025).  In Section 1, that order
contends that Perkins Coie "represent[ed] failed Presidential candidate Hillary Clinton," "hired
Fusion GPS, which then manufactured a false 'dossier' designed to steal an election," and "worked
with activist donors including George Soros to judicially overturn . . . election laws," and in
Sections 2 through 6, it imposes restrictions on Perkins Coie akin to those placed on Susman.  *Id.*
Perkins Coie quickly moved for a temporary restraining order as to Sections 1, 3, and 5 of
Executive Order 14,230, which the court granted.  Order, *Perkins Coie LLP*, No. 25-CV-716, 2025
WL 782889 (D.D.C. Mar. 12, 2025), ECF No. 21.  On May 2, 2025, the court granted summary
judgment to Perkins Coie, concluding that Executive Order 14,230 violates the First, Fifth, and
Sixth Amendments to the U.S. Constitution.  *Perkins Coie LLP*, No. 25-CV-716, 2025 WL
1276857, at *49 (D.D.C. May 2, 2025).  The court permanently enjoined the order in its entirety.
*Id.*

On March 25, 2025, President Trump issued Executive Order 14,246, "Addressing Risks
from Jenner & Block."  90 Fed. Reg. 13997 (Mar. 28, 2025).  That order accuses Jenner of
"support[ing] attacks against women and children based on a refusal to accept the biological reality
of sex, and back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific
crimes and trafficking deadly drugs within our borders."  *Id.*  Jenner sought a temporary restraining

order against Sections 1, 3, and 5 of Executive Order 14,246, which the court largely granted. Order, *Jenner & Block LLP*, No. 25-CV-916, 2025 WL 942426 (D.D.C. Mar. 28, 2025), ECF No. 9. On May 23, 2025, the court granted summary judgment to Jenner, concluding that Executive Order 14,246 violates the First Amendment. *Jenner & Block LLP*, No. 25-CV-916, 2025 WL 1482021, at *26 (D.D.C. May 23, 2025). The court permanently enjoined the order in full. *Id.*

On March 27, 2025, President Trump issued Executive Order 14,250, "Addressing Risks from WilmerHale." 90 Fed. Reg. 14549 (Apr. 3, 2025). That order contends that WilmerHale "employ[s] lawyers who weaponize the prosecutorial power to upend the democratic process and distort justice." *Id.* WilmerHale sought a temporary restraining order enjoining enforcement of the order, which the court granted as to Sections 3 and 5. Order, *Wilmer Cutler Pickering Hale & Dorr LLP*, No. 25-CV-917, 2025 WL 946979 (D.D.C. Mar. 28, 2025), ECF No. 10. On May 27, 2025, the court granted summary judgment to WilmerHale, concluding that Executive Order 14,250 violates the First, Fifth, and Sixth Amendments and is *ultra vires*. *Wilmer Cutler Pickering Hale & Dorr LLP*, No. 25-CV-917, 2025 WL 1502329, at *33-34 (D.D.C. May 27, 2025). As with the courts considering the Perkins Coie and Jenner orders, the court permanently enjoined the WilmerHale order in its entirety. *Id.*

In anticipation of additional executive orders targeting law firms, the American Bar Association ("ABA") filed suit to challenge the "Law Firm Intimidation Policy"—"a series of materially identical executive orders designed to severely damage . . . and intimidate . . . firms and lawyers" to "abandon clients, causes, and policy positions the President does not like." Compl., *Am. Bar Ass'n v. Exec. Off. of President*, No. 25-CV-1888, ECF No. 1 ¶ 4 (D.D.C. June 16, 2025). The ABA has asked the court to declare the policy unconstitutional and enjoin the federal

government from implementing and enforcing the policy against the ABA or its members.  *Id.*

¶¶ 269-78.

## II.    LEGAL STANDARDS

### A.    Rule 8

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint include: (1) "a

short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain

statement of the claim showing that the pleader is entitled to relief"; and (3) "a demand for the

relief sought."   Fed. R. Civ. P. 8(a)   The rule ensures that defendants have "notice of what

the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

545 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).   A

complaint that is "excessively long, rambling, disjointed, incoherent, or full of irrelevant and

confusing material" or that "contains an untidy assortment of claims that are neither plainly nor

concisely stated, nor meaningfully distinguished from bold conclusions, sharp harangues[,] and

personal comments" will fail to meet Rule 8's pleading standard.  *Jiggetts v. District of Columbia*,

319 F.R.D. 408, 413 (D.D.C. 2017) (quoting *T.M. v. District of Columbia*, 961 F. Supp. 2d 169,

174 (D.D.C. 2013)), *aff'd sub nom.*, *Cooper v. District of Columbia*, No. 17-7021, 2017 WL

5664737 (D.C. Cir. Nov. 1, 2017).

### B.    Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction," and it is generally presumed that "a cause

lies outside [of] this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S.

375, 377 (1994).  Under Federal Rule of Civil Procedure 12(b)(1), the court must dismiss an action

unless the plaintiff can establish, by a preponderance of the evidence, that the court possesses

subject-matter jurisdiction.  *Green v. Stuyvesant*, 505 F. Supp. 2d 176, 177 (D.D.C. 2007).  In

reviewing such a motion, the court "is not limited to the allegations set forth in the complaint" and "may consider materials outside the pleadings." *Morrow v. United States*, 723 F. Supp. 2d 71, 76 (D.D.C. 2010) (quoting *Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)). Additionally, when reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court is required to "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

### C.      Rule 12(b)(6)

Under Rule 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a motion under Rule 12(b)(6), a court accepts all well-pleaded factual allegations in the complaint as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). Although the plausibility standard does not require "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor will "'naked assertion[s]' devoid of 'further factual enhancement'" suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

In determining whether a complaint states a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint

and matters of which [the court] may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alteration in original) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)).

### D.    Rule 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Where the parties do not dispute any material facts, as is the case here, the case is "particularly amenable to resolution on summary judgment" because all that remains is the application of law. *W & T Travel Servs., LLC v. Priority One Servs., Inc.*, 69 F. Supp. 3d 158, 164 (D.D.C. 2014).

### III.    DISCUSSION

In its ten-count complaint, Susman alleges that the Order violates the First Amendment because it retaliates against the firm for protected expression (Count I), ECF No. 178 ¶¶ 141-52; constitutes impermissible viewpoint discrimination (Count II), *id.* ¶¶ 153-61; interferes with the firm's right to petition the government (Count III), *id.* ¶¶ 162-67; interferes with the firm's right of free association (Count IV), *id.* ¶¶ 168-74; and places unconstitutional conditions on government contracts in violation of both the First Amendment and the Spending Clause (Count V), *id.* ¶¶ 175-81.  Susman further contends that the Order violates the Fifth Amendment's guarantees of procedural due process (Count VI), *id.* ¶¶ 182-90; fair notice (Count VII), *id.* ¶¶ 191-97; the right to counsel (Count VIII), *id.* ¶¶ 198-202; and equal protection (Count IX), *id.* ¶¶ 203-11; and that it violates the Constitution's separation of powers and is *ultra vires* (Count X), *id.* ¶¶ 212-20.

Defendants seek dismissal of the complaint, raising threshold standing and procedural arguments concerning some of Susman's claims and challenging the sufficiency of the firm's allegations in support of others. ECF No. 180. While Federal Rule of Civil Procedure 12(b) directs a defendant to assert "[e]very defense to a *claim* for relief" in its motion to dismiss, Fed. R. Civ. P. 12(b) (emphasis added), Defendants curiously do not organize their motion to address Susman's complaint count-by-count but instead defend the Order section-by-section, *see generally* ECF No. 180. Susman opposes Defendants' motion to dismiss and argues that it is entitled to summary judgment and a permanent injunction against the Order in its entirety. ECF No. 181. To avoid potential redundancies created by Defendants' peculiar approach to their motion to dismiss, the court will proceed by first considering Defendants' threshold standing and procedural arguments on a section-by-section basis, next addressing—jointly—Defendants' disputes with the sufficiency of Susman's allegations and Susman's arguments in support of summary judgment, and finally determining whether Susman is entitled to a permanent injunction on any of its claims.

### A.     None of Defendants' Threshold Arguments Precludes Relief

#### 1.     Section 1

As noted, Section 1 states that Susman "engage[s] in activities detrimental to critical American interests," "spearheads efforts to weaponize the American legal system and degrade the quality of American elections[,] . . . funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology, and . . . supports efforts to discriminate on the basis of race." Order § 1. On this basis, President Trump has "determined that action is necessary to address the significant risks, egregious conduct, and conflicts of interest associated with Susman." *Id.*

Defendants move to dismiss Susman's claims concerning Section 1, arguing that the language contained therein "is simply government speech" and "is exempt from First Amendment scrutiny." ECF No. 174, at 1, 3 (quoting *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005)); *see* ECF No. 58-1, at 12. Susman responds that, while "a President is 'entitled to say what [he] wishes,'" the statements in Section 1 go beyond "mere presidential musing." ECF No. 158, at 34 (alteration in original) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009)). Susman identifies two ways in which Section 1 gives rise to actionable claims. First, Susman argues that the official findings in Section 1 "imbue every substantive provision of the Order with its operative effect" and "lay[] the predicate—and set[] the government policy— that will justify (even *require*) agencies' decisions to terminate contracts involving Susman or its clients." *Id.* Second, Susman contends that even if Section 1 were the entirety of the Order, it would still be actionable because federal agencies may rely on the official factual findings contained therein to take adverse action against the firm and because it has inflicted reputational harm that has damaged the firm's ability to attract and retain clients. *See* Hr'g Tr. at 9:13-11:8.

The court agrees with Susman. As the Supreme Court made clear in *National Rifle Ass'n of America v. Vullo*, 602 U.S. 175 (2024), "[a] government official can share h[is] views freely and criticize particular beliefs, and []he can do so forcefully in the hopes of persuading others to follow h[is] lead. What []he cannot do, however, is use the power of the State to punish or suppress disfavored expression." *Id.* at 188. In instances where a plaintiff alleges the latter, the court is called "to scrutinize" the "application of state power" in question. *Id.* (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958)).

While Defendants describe Susman as attempting to "silence the Government's . . . opinions" because it "does not like what the current Administration thinks about [it]," this

mischaracterizes the relief that the firm is seeking.  ECF No. 58, at 12.  Susman is not asking the

court to "muzzl[e] the Executive" by enjoining the President's speech.  *Id.* at 1.  Instead, it asks

the court to enjoin Defendants "from implementing or giving effect to the Order in any way,

including by relying on any of the statements in Section 1."  ECF No. 178, at 118.  In this way,

Susman is asking the court to "scrutinize" the "application of state power" for evidence of an

unconstitutional attempt to coerce.  *NAACP*, 357 U.S. at 463.  This aligns perfectly with the kind

of claim contemplated in *Vullo*, and Susman may therefore proceed with its claims related to

Section 1.

### 2.   Section 2

Section 2(a) of the Order directs the Attorney General, the Director of National

Intelligence, and "all other relevant heads of executive departments and agencies" to "immediately

take steps consistent with applicable law to suspend any active security clearances held by

individuals at Susman, pending a review of whether such clearances are consistent with the

national interest."  Order § 2(a).  The mandate applies to all Susman personnel, whether attorneys

or staff, and it does not differentiate between individuals who hold security clearances in

connection with their work at the firm or in another context—such as one attorney's security

clearance in connection with his military service.  ECF No. 51-3 ¶ 79.  Section 2(b) of the Order

directs the Office of Management and Budget to "identify all Government goods, property,

material, and services, including Sensitive Compartmented Information Facilities, provided for the

benefit of Susman," and instructs any agency heads providing such goods to, "to the extent

permitted by law, expeditiously cease such provision."  Order § 2(b).

Defendants raise two threshold arguments for dismissing the counts concerning Section 2.

First, they assert that the blanket suspension of security clearances under Section 2 is "not

judicially reviewable" in light of "governing D.C. Circuit precedent"—specifically *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024), in which the D.C. Circuit concluded that "an Executive Branch decision to deny or revoke a security clearance" was not reviewable in court, *id.* at 891.  ECF No. 58-1, at 12-13.  Susman responds that *Lee* does not extend so broadly as to foreclose its constitutional challenges to Defendants' blanket revocation of its employees' security clearances divorced from national security concerns.  ECF No. 158, at 35-37.

The court agrees that *Lee* does not bar its review of Susman's claims regarding Section 2 of the Order.  *Lee* concerned an individual employee's challenge to the denial of his security clearance, which the D.C. Circuit held was nonjusticiable because "the decision whether to grant an employee a security clearance [is] 'a sensitive and inherently discretionary judgment call [that] is committed by law to the appropriate agency of the Executive Branch.'"  120 F.4th at 886 (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988)).  In so holding, the D.C. Circuit did not foreclose any challenge "simply because it tangentially relates to a security clearance," *id.* at 892, which is in keeping with other D.C. Circuit precedent explaining that "[i]t is simply not the case that all security-clearance decisions are immune from judicial review," *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993).  In *Greenberg*, the D.C. Circuit determined that it could consider the constitutionality of asking applicants for a security clearance about their history of drug use and mental health because (1) the plaintiffs' "alleged injuries—the compelled disclosure of incriminating or private facts—[] existed regardless of how the government might have resolved any particular application," and (2) the plaintiffs "did not seek review of 'discretionary judgments' regarding the merits of any 'particular employee's security clearance.'"  *Lee*, 120 F.4th at 893 (quoting *Greenberg*, 983 F.2d at 290).  That is precisely the situation here.  Susman's alleged constitutional injuries exist independent of any final decision on

18

whether to reinstate any individual employee's security clearance. Susman is not seeking to review any discretionary judgment about an individual security clearance but is instead raising a constitutional challenge to President Trump's blanket policy of revoking all its employees' clearances.

Second, Defendants argue that Susman's challenges to Section 2 are not ripe yet because the revocation of its employees' security clearances is "pending a review whether such clearances are consistent with the national interest." ECF No. 58-1, at 14 (quoting Order § 2(a)). Defendants maintain that "[u]ntil any clearance suspension is accomplished consistent with applicable law[] and then reviewed consistent with applicable law and a further security clearance determination made, any dispute is premature for judicial consideration." ECF No. 58-1, at 15. Again, the court is not convinced. Section 2 of the Order directs the revocation of Susman employees' security clearances "immediately," Order § 2(a), which creates a here-and-now injury independent of the outcome of any individualized post-deprivation process. *See Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989) (holding that due process entitled the plaintiff to a "meaningful opportunity to contest" allegations before revocation of a security clearance).

### 3.    Section 3

Section 3 of the Order requires government contractors to "disclose any business they do with Susman and whether that business is related to the subject of the Government contract." Order § 3(a). It further instructs agency heads to "review all contracts with Susman or with entities that disclose doing business with Susman" and "[t]o the extent permitted by law . . . take appropriate steps to terminate any contract . . . for which Susman has been hired to perform any service." *Id.* § 3(b).

19

**JA 3500**

Defendants argue that Susman does not have standing to bring claims related to Section 3 because the firm has not alleged an injury-in-fact that is "concrete and particularized," "actual or imminent," or traceable to Defendants' actions. ECF No. 58, at 18 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Specifically, Defendants discount as "speculative," ECF No. 58-1, at 20, Susman's arguments that Section 3 pressures the firm's existing clients to "sever or cut back on their relationship with Susman by requiring them to reveal any business they do with the Firm," "threaten[s] them with loss of government contracts that are almost certainly important to their businesses if they maintain their relationships with Susman," ECF No. 158, at 5, and discourages prospective clients from retaining the firm "for fear that doing so would risk unacceptable restrictions on their contracting work," *id.* at 6. To be sure, Susman has not identified a current client that has severed ties with the firm or a prospective client that has declined to engage the firm on the basis of Section 3, but that is hardly surprising given the court's issuance of a temporary restraining order less than a week after the Order's publication. The relevant question for standing purposes is whether such harms are "actual or imminent," *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)), and, here, Susman has sufficiently alleged both. Susman alleges that Section 3 is chilling its current and prospective attorney-client relationships in the here-and-now, ECF No. 178 ¶¶ 171-72, and that clients are inquiring about how the Order will affect the firm's ability to represent them, ECF No. 51-3 ¶ 70. These harms are directly tied to Section 3, thereby establishing traceability. Accordingly, Susman has standing to challenge Section 3 of the Order.[6]

---

[6] Defendants further argue that Susman "has not demonstrated standing to challenge Section 3 insofar as it regulates its clients." ECF No. 58-1, at 17. If Defendants are arguing that *Susman* is not likely to suffer harm as a result of Section 3, that argument fails for the reasons described. If Defendants are instead suggesting that Susman does not have third-party standing to challenge the restrictions on its clients' access to counsel, that argument is foreclosed by well-established

### 4.    Section 4

Section 4 states, in its entirety, that "[n]othing in this order shall be construed to limit the action authorized by section 4 of Executive Order 14230 of March 6, 2025 (Addressing Risks from Perkins Coie LLP)." Order § 4.  The relevant portion of Executive Order 14,230 instructs that:

> (a) The Chair of the Equal Employment Opportunity Commission shall review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964, including whether large law firms: reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis.

> (b) The Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and in consultation with State Attorneys General as appropriate, shall investigate the practices of large law firms as described in subsection (a) of this section who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered.

Exec. Order No. 14,230 § 4.  Defendants argue that Susman has failed to sufficiently allege an injury that is traceable to Section 4 and redressable by the court.  ECF No. 58, at 24-27.  They contend that the Order "merely cross-references" Executive Order 14,230, which in turn only instructs the Equal Employment Opportunity Commission to carry out tasks that it is "already . . . supposed to be doing."  *Id.* at 25 (emphasis omitted).  In Defendants' view, because the Commission has not yet taken any action against Susman pursuant to the Order—and because any action would, in any case, be a part of the Commission's statutory duties—Susman has not suffered an injury that the court may remedy.  *Id.* at 24-25.

---

precedent.  *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989) (granting a law firm third-party standing to challenge a drug-forfeiture statute on behalf of an existing client); *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720-21 (1990) (allowing an attorney to invoke the rights of clients to challenge a fee-restriction statute).

The court disagrees.  Susman alleges that the "threat[] [of] targeted investigations by the Equal Employment Opportunity Commission and Attorney General, with the prospect of potential prosecution," is retaliation for First Amendment activity that "damages Susman Godfrey's reputation, with attendant harm to client relationships and Firm business prospects."  ECF No. 178 ¶ 148.  The firm also explains that it is only being targeted because of "the viewpoint that the Order attributes to [it]" in Section 1.  *Id.* ¶ 156.  These are allegations of actual harm that are traceable to Section 4, plain and simple.  The court, of course, cannot redress these injuries by enjoining any otherwise-legitimate investigation into Susman.  But, as the parties agreed at the May 8 hearing, should the court find that there have been violations of the First Amendment, it may enjoin the Commission and the Attorney General from commencing an investigation on the basis of the Order.  Thus, because Susman has alleged injuries that are traceable to Section 4 and can be remedied by the court, it may proceed on its claims concerning Section 4.

### 5.    Section 5

Section 5(a) of the Order directs agency heads to "provide guidance limiting official access from Federal Government buildings to employees of Susman" and "limiting Government employees acting in their official capacity from engaging" with the firm's employees "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States."  Order § 5(a).  Section 5(b) further directs that agency officials shall "refrain from hiring employees of Susman, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management."  Order § 5(b).

Defendants raise a ripeness argument concerning Section 5, contending that Susman's claims will not be actionable until the agency heads provide the relevant guidance.  ECF No. 58-1, at 27-28.  This argument plainly fails with regard to Section 5(b), which does not instruct agency

heads to issue guidance but instead directs agency heads to "refrain from hiring [Susman] employees." Order § 5(b). That mandate could not be clearer: do not hire Susman employees. Accordingly, Section 5(b) presents a ripe matter for adjudication.

Defendants' argument fares no better with regard to Section 5(a). While the guidance contemplated by Section 5(a) has yet to issue, the Order provides a clear preview of what it will do: "limit[]" Susman's employees from entering federal buildings or engaging with federal employees to "ensure consistency" with the "interests of the United States," Order § 5(a), because Susman is engaging in "activities inconsistent with the interests of the United States," *id.* § 1. While the precise contours of those limitations have not been set, *any* limitation on Susman's ability to enter federal buildings and interact with federal officials necessarily threatens the firm given that nearly one-third of its matters involve federal courts and agencies. ECF No. 178 ¶ 90. This is precisely the type of imminent injury that confers Susman standing to challenge Section 5(a).

### 6.    Shotgun Pleading

Finally, Defendants criticize the entirety of Susman's amended complaint as a "shotgun pleading." ECF No. 58-1, at 3-4. It is not clear whether they are seeking dismissal on this basis; however, any such argument would fail because Susman's amended complaint complies with the Federal Rules of Civil Procedure. Susman's pleading begins with an organized series of facts that provides the necessary background to its claims for relief. ECF No. 178 ¶¶ 1-140. The amended complaint then sets forth ten counts, each of which references specific facts pertaining to the claim. *Id.* ¶¶ 141-220. Accordingly, Susman's amended complaint provides "sufficient notice of the nature and grounds of [the plaintiff's] legal claims." *Jiggetts*, 319 F.R.D. at 417 (distinguishing a "shotgun pleading" as "one in which 'it is virtually impossible to know which allegations of fact

are intended to support which claim(s) for relief'" (quoting *Kabbaj v. Obama*, 568 F. App'x 875, 879 (11th Cir. 2014))).

### B.    Susman is Entitled to Summary Judgment

Having dispensed with Defendants' threshold arguments, the court turns to Defendants' challenges to the sufficiency of Susman's claims and Susman's arguments in support of its motion for summary judgment.  As noted, the parties do not genuinely dispute any material facts, so the court is left to determine which party has the better legal argument for each count of the complaint. *See* ECF Nos. 51-2 & 159-1; Fed. R. Civ. P. 56(a).  For the reasons that follow, the court concludes that Susman is entitled to summary judgment on Counts I-IV and VI-X of its complaint.[7]

### 1.    First Amendment - Retaliation and Viewpoint Discrimination (Counts I and II)

"'[I]f there is any fixed star in our constitutional constellation,'" it is that the First Amendment's Free Speech Clause "protect[s] the 'freedom to think as you will and to speak as you think.'"  *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (first quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U. S. 624, 642 (1943), then quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660-61 (2000)).  This protection applies "regardless of whether the government considers [a person's] speech sensible and well intentioned or deeply 'misguided.'"  *Id.* at 587 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995)).  That is because "[a]t the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society."  *Vullo*, 602 U.S. at 187.  Thus, the First Amendment prohibits the government from both "impos[ing] prior restraints on speech"

---

[7] In Count V, Susman argues that Section 3 of the Order violates the First Amendment and the Spending Clause because it imposes unconstitutional conditions on government contracts.  ECF No. 178 ¶¶ 175-81.  Susman does not address this count in its motion for summary judgment, so the court need not reach it.

and "from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech" that the government does not favor. *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022).

Counts I and II of Susman's complaint allege that the firm was subjected to unfavorable treatment in retaliation for and on the basis of its protected speech.  ECF No. 178 ¶¶ 141-61.  To succeed on these claims, Susman must establish (1) that it "engaged in conduct protected under the First Amendment"; (2) that Defendants "took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"; and (3) that there is "a causal link between the exercise of a constitutional right and the adverse action taken against [the firm]."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)).  The court concludes that Susman has carried its burden and is entitled to summary judgment on Counts I and II.

### a.    Protected Activity

It is clear from the face of the Order and the record in this case that the Order was issued in response to Susman's First-Amendment-protected activities.  The Order explains that it was motivated by President Trump's concerns that Susman (1) "spearheads efforts to weaponize the American legal system and degrade the quality of American elections"; (2) "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology"; and (3) "supports efforts to discriminate on the basis of race."  Order § 1.  The court finds that each of these bases is tied to activity that is protected by the First Amendment.

While the Order does not identify which of Susman's activities purportedly "weaponize[s] the American legal system and degrade[s] the quality of American elections," the parties and the

court agree that this refers to Susman's representation of Dominion Voting Systems and government officials in Arizona and Wisconsin in connection with litigation regarding the 2020 election. *See* Hr'g Tr. at 50:14-56:19; 72:13-22; ECF No. 51-1, at 18-19. It is well established that "advice from [an] attorney to [a] client and . . . advocacy by the attorney to the courts" is private speech that is protected by the First Amendment. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-43 (2001). Specifically, "[t]he [F]irst [A]mendment guarantees the[] right to be free of governmental restraints on 'political expression' and that right is violated if the Government affirmatively interferes with constitutionally protected litigation as a form of political expression." *Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990). Susman's representation of particular clients is therefore protected First Amendment activity.

The Order similarly does not explain what it means by its assertion that Susman "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology." Order § 1. Susman understands this provision to refer to a donation that it made to GLBTQ Legal Advocates and Defenders ("GLAD"), an organization that advocates for—among other things—the equal treatment of gay, lesbian, and transgender service members. *See* Hr'g Tr. at 4:14-6:14. Defendants appear to agree with this interpretation, stating in their briefing that Susman "has provided funds to [GLAD], which previously sued the Federal Government to enjoin Department of Defense policy, based on a radical theory of gender ideology," as support for their contention that Susman "engage[s] in dangerous efforts to undermine the effectiveness of the United States military." ECF No. 159, at 13 n.2. It is settled law that the political speech of corporations, including donations, is protected by the First Amendment. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342-43 (2010)

(collecting cases).  Accordingly, Susman's donation to GLAD is also protected First Amendment activity.

The Order provides some—although scant—support for the accusation that Susman "engages in unlawful discrimination, including discrimination on the basis of race."  Order § 1.  Specifically, the Order asserts that "Susman administers a program where it offers financial awards and employment opportunities only to 'students of color,'" which contravenes the Trump Administration's "commit[ment] to ending . . . unlawful discrimination perpetrated in the name of 'diversity, equity, and inclusion' policies."  *Id.*  Defendants identify the "program" in question as the "Susman Godfrey Prize, which provides a cash award and ongoing mentorship from Susman attorneys to selected 'students of color.'"  ECF No. 159, at 12.  The trouble with this argument is that the parties agree that the Susman Godfrey Prize is a cash prize, which does not include an offer of employment, and it is thus not covered by Title VII.  ECF No. 51-2 ¶¶ 165-66, 168-70; ECF No. 159-1 ¶¶ 165-66, 168-70.  Indeed, at the hearing, Defendants' counsel agreed that "the Susman Prize is not an example of unlawful racial discrimination."  Hr'g Tr. at 47:15-49:15.

Apart from the Susman Godfrey Prize—the only discriminatory practice alleged in the Order—Defendants also appear to take issue with (1) a "statement on [Susman's] website describing diversity as 'one of the firm's core values'"; (2) the fact that Susman "operates a 'Diversity Committee' that 'regularly meets to discuss and execute diversity-related initiatives,' focuses on 'recruiting and supporting lawyers who identify as members of groups underrepresented in today's legal profession,' and advances 'work first initiated by the Racial Justice Working Group'"; and (3) the fact that Susman is a signatory to "a Gender Fairness Commitment statement, which includes the explicit goal 'to achieve gender parity'" in law firm wages.  ECF No. 159, at 12-13; *see* ECF No. 159-2, at 4-11.  In their briefing, Defendants maintain

that these are "precisely the sort of racial and gender considerations prohibited by civil rights laws," ECF No. 159, at 13, but at the motions hearing, Defendants conceded that "increasing parity . . . [and] pay[ing] people that do the same work[] similar salaries" "wouldn't be objectionable" unless an unlawful quota for underrepresented groups was enforced, Hr'g Tr. at 45:12-17. Defendants point to no evidence of any such practice, and statements on the Susman website that merely evince a general commitment to diversity and gender parity do not suggest that one exists. In the absence of any plausible allegations of unlawful discrimination, Susman's statements on its website are speech plainly protected by the First Amendment.

### b.    Retaliatory Action

Susman has amply demonstrated that Defendants' actions were "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833 F.3d at 258. Indeed, this court previously granted Susman's motion for a temporary restraining order because of the irreparable harm that it anticipated would befall the firm in the absence of relief. *See Susman Godfrey LLP v. Exec. Off. of President*, No. 25-CV-1107, 2025 WL 1113408, at *1 (D.D.C. Apr. 15, 2025). That preliminary finding is further validated by the efforts of several other peer law firms to avoid precisely the consequences that have befallen Susman here. For example, Paul Weiss was targeted by an Executive Order virtually identical to the one in the instant case. *See* 90 Fed. Reg. 13039. Instead of suffering the financial and reputational consequences of that order, Paul Weiss negotiated a deal with the Trump Administration that involves

> adopting a policy of political neutrality with respect to client selection and attorney hiring; taking on a wide range of pro bono matters representing the full political spectrum; committing to merit-based hiring, promotion, and retention, instead of "diversity, equity, and inclusion" policies; dedicating the equivalent of $40 million in pro bono legal services during [President Trump's] term in office to support causes including assisting our Nation's veterans,

28

fairness in the justice system, and combating anti-Semitism; and
other similar initiatives.

Addressing Remedial Action by Paul Weiss, Exec. Order No. 14,244 § 1, 90 Fed. Reg. 13685

(Mar. 26, 2025).  And rather than risk being targeted by President Trump, several other reputable

firms negotiated agreements with the White House regarding their pro bono work and diversity,

equity, and inclusion practices.  ECF No. 178 ¶¶ 123-47; *see supra* Part I.D.

Defendants do not seriously contend that the Order is not intended to adversely affect

Susman.  Instead, they argue that their actions cannot be understood as retaliatory because the

government is acting as a contractor "with an eye toward[] an undisputed federal interest," rather

than as a sovereign with an intent to punish.  ECF No. 159, at 9.[8]  They maintain that the federal

government may "choose with whom it will do business . . . [based on] the fulfillment of its public

policy goals, including those involving national security and civil rights."  *Id.* at 10.

As support, Defendants invoke *Board of County Commissioners v. Umbehr*, 518 U.S. 668,

671 (1996), which, in their view, instructs that "that courts should refrain from striking otherwise

constitutional acts due to allegations of improper motivations," ECF No. 159, at 9.  But that is not

an accurate description of *Umbehr*'s holding.  In *Umbehr*, a waste disposal contractor brought a

retaliation claim against his county employer when his contract was terminated after he criticized

the county and its board of commissioners.  518 U.S. at 671-72.  The Supreme Court determined

---

[8] For this reason, Defendants believe that *Vullo* is inapposite.  In their view, "*Vullo* addressed a
potential First Amendment violation where the state used its *sovereign* regulatory powers to
threaten private actors with enforcement actions in an attempt to discourage disfavored
speech . . . [but] [t]his Executive Order carries with it none of the force of the powers exhibited in
*Vullo*."  ECF No. 159, at 9.  But *Vullo* makes no distinction as to which capacity—sovereign,
contractor, or otherwise—in which the government operates.  Its holding is the same regardless:
while "[a] government official can share h[is] views freely and criticize particular beliefs, . . . []he
cannot . . . use the power of the State to punish or suppress disfavored expression."  *Vullo*, 602
U.S. at 188.

that while "independent contractors do enjoy some First Amendment protection," a court must evaluate whether the government's "legitimate interests as contractor, deferentially viewed, outweigh the free speech interests at stake." *Id.* at 685. The case is not analogous because Susman is not a government contractor—instead, it *represents* several entities "that contract or otherwise do business with the federal government, or have affiliates who are government contractors and subcontractors." ECF No. 51-2 ¶ 28; ECF No. 159-1 ¶ 28. For this reason, the balancing test laid out in *Umbehr* is not applicable at all, and the regular standard for First Amendment retaliation applies.[9]

Thus, while it may be true that the government has a greater degree of discretion when it operates as a contractor, that is beside the point. Whether the executive is operating as a sovereign, contractor, landlord, or employer, it must comply with the Constitution. And as Defendants' counsel conceded at argument, the mere fact that the government has the right to exercise discretion does not immunize retaliatory intent. *See* Hr'g Tr. at 36:18-37:2.

### c.    Causal Link

Finally, the record offers sufficient evidence to conclude that there is "a causal link between the exercise of a constitutional right and the adverse action taken against [Susman]." *Aref*, 833 F.3d at 258 (quoting *Banks*, 515 F. Supp. 2d at 111). As discussed, the Order's three stated reasons for enactment all hinge on Susman's protected speech, and nothing in the Order or its accompanying fact sheet suggests that there is any other governmental interest that may be served if the Order is permitted to take effect. *See supra* Part III.B.1.a; ECF No. 51-7. The context in

---

[9] Even if *Umbehr*'s balancing test did apply, the government has not established any "legitimate interests" here that could possibly outweigh Susman's weighty free speech interests. *See infra* Part III.B.1.c.

which the Order was issued, as well as an examination of each section of the Order itself, makes clear that the adverse consequences of the Order are tied to Susman's First-Amendment-protected activity.

*Section 2.* The record indicates that the Order's command that the Attorney General, Director of National Intelligence, and other agency heads "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the national interest," Order § 2(a), is impermissibly tied to Susman's protected activity. First, based on the Order and Defendants' arguments, it is not clear what "national interest" is served by the revocation of Susman's employees' security clearances. Defendants gesture towards the Order's accusation that Susman "funds groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology," ECF No. 58, at 13-14 (quoting Order § 1), as a basis for the suspension of security clearances, but, as discussed, the only example they offer to substantiate this serious claim is a one-time donation to GLAD Law, an advocacy organization. Defendants offer absolutely no evidence to support their claim that this donation is a "dangerous effort[] to undermine the effectiveness of the United States military." Order § 2.

The presence of nearly identical clauses in several executive orders targeting other law firms[10] further confirms that the security-clearance provision is intended as a retaliatory measure. Perhaps most revealing is the fact that the Paul Weiss executive order included a nearly identical provision, *see* Exec. Order No. 14,237 § 2, 90 Fed. Reg. at 13039, that was walked back by the

---

[10] *See* Addressing Risks from WilmerHale, Exec. Order No. 14,250, 90 Fed. Reg. 14549 (Apr. 3, 2025); Addressing Risks from Jenner & Block, Exec. Order No. 14,246, 90 Fed. Reg. 13997 (Mar. 28, 2025); Addressing Risks from Perkins Coie LLP, Exec. Order No. 14,230, 90 Fed. Reg. 11781 (Mar. 11, 2025).

government as soon as Paul Weiss agreed to "adopt[] a policy of political neutrality with respect to client selection and attorney hiring; tak[e] on a wide range of pro bono matters representing the full political spectrum; commit[] to merit-based hiring, promotion, and retention . . . dedicat[e] the equivalent of $40 million in pro bono legal services during [President Trump's] term in office . . . ; and other similar initiatives." *Id.* § 1, 90 Fed. Reg. at 13685. No facet of this agreement touches on national security at all; instead, each provision addresses a policy disagreement that the Trump Administration had with Paul Weiss's work. Defendants' identical approach to the suspension of clearances in this case—which revokes any and all clearances held by Susman employees—further supports the court's conclusion that the government's action is retaliatory.

As Defendants themselves point out, "'[c]learance decisions involve an assessment of intangible qualities such as loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment.' And such decisions also 'involve predictive judgment about whether individuals are likely to divulge sensitive information under compulsion of circumstances or for other reasons, which is an inexact science at best.'" ECF No. 159, at 6 (citation omitted) (quoting *Lee*, 120 F.4th at 893). In other words, decisions regarding clearances are individual determinations that depend on a host of person-specific factors. The government's departure from the well-trodden path of individualized determination in favor of wholesale revocation—without even an ounce of supporting evidence for the court to evaluate—raises red flags and leads the court to believe that the only plausible motivation for Section 2 is retaliation.

*Section 3*. Section 3 states on its face that it is causally tied to several of Susman's activities. It explains that the government wishes to "prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, activities that are not aligned with American interests, including racial discrimination." Order § 3(a). But, as the court has laid

out, the activities that the Order contemplates—which include litigation concerning the 2020 election, a donation to GLAD Law, an academic prize that is not covered by Title VII, and general statements about diversity on Susman's website—are all plainly protected by the First Amendment. *See supra* Part III.B.1.a. Defendants cannot target Susman for those activities simply because it does not like them. And to the extent that Defendants argue that the Order is not intended as a punitive measure, but as a legitimate exercise of the government's discretion when it acts as a contractor, the court reiterates that the government is still required to comply with the Constitution when it acts as a contractor. *See supra* Part III.B.1.b.

*Section 4*. Defendants argue that Susman cannot show a causal link between the Order's threatened investigation by the Equal Employment Opportunity Commission and Susman's protected activity (1) because Susman has not yet received an inquiry letter from the Chair of the Commission; and (2) because the government had already been taking action—evinced by Executive Order 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("Ending Illegal Discrimination and Restoring Merit-Based Opportunity"), and publicly announced federal priorities—to "root[] out unlawful DEI-motivated race and sex discrimination." ECF No. 159, at 16 (quoting Press Release, Equal Employment Opportunity Commission, President Appoints Andrea R. Lucas EEOC Acting Chair (Jan. 21, 2025)).

Neither of these arguments holds water. While it is true that Susman has not yet received an inquiry from the Equal Employment Opportunity Commission, that is cold comfort given that the fact sheet accompanying the Order indicates that an investigation is forthcoming. *See* ECF No. 51-7 ("The practices of Susman *will be* reviewed under Title VII to ensure compliance with civil rights laws against racial bias." (emphasis added)). And Defendants' actions to legitimately address actual instances of race- and sex-based discrimination elsewhere do not help it *here*, where

it can point to no basis for an investigation into Susman except for lawful statements that the firm has made about diversity with which the government disagrees.  *See supra* Part III.B.1.a.

*Section 5*.   To defend Section 5's command that agency heads issue guidance limiting Susman employees' access to federal buildings (presumably including courts), instructing government employees not to "engag[e] with" Susman employees, and forbidding agency officials from hiring Susman employees absent a waiver from an agency head, Defendants rest only on a threadbare invocation of "the national security and other interests of the United States," Order § 5(a), and speculation that "[s]urely some [f]ederal facilities, contacts, and employment positions require tighter restrictions than others based on national security concerns."  ECF No. 159, at 17. But just as with earlier sections, Defendants offer no evidence to remotely support the idea that there is any interest (national-security-related or otherwise) that is implicated by Susman employees' entry into federal buildings, or federal employees' interaction with, or hiring of, Susman employees—much less one that requires intervention of the sort described in the Order.

Defendants protest that the text of Section 5 does not affirmatively place these restrictions on Susman employees, but rather, calls on agency heads to issue guidance to this effect.  ECF No. 159, at 17.  They contend that "scenarios such as *all* Susman attorneys being barred from courtroom practice is, currently, the stuff of imagination."  *Id.*  The court is unconvinced.  While the government argues that eventual guidance may not realize the full extent of the restrictions that the Order contemplates, the White House's fact sheet states outright that the "[f]ederal [g]overnment *will* . . . restrict [Susman] employees' access to government buildings" and "[f]ederal [a]gencies *will* also refrain from hiring Susman employees unless specifically authorized."  ECF No. 51-7 (emphases added).  Any reassurance that the Order's limitation on Susman employees' access to federal buildings only applies when "access would threaten the

national security of or otherwise be inconsistent with the interests of the United States" falls flat in the larger context of the Order—particularly Section 1, which makes findings that Susman "engage[s] in activities detrimental to critical American interests [and] should not have access to our Nation's secrets." Order § 1. And because Defendants have offered no plausible explanation for the extraordinary action contemplated by Section 5—which, on its face, could go as far as banning Susman lawyers from courtrooms, post offices, and military bases—the court determines that the record can only support the conclusion that Section 5 was motivated by retaliatory intent.[11]

*    *    *

The court concludes that the Order constitutes unlawful retaliation against Susman for activities that are protected by the First Amendment, including its representation of certain clients, its donations to certain causes, and its expression of its beliefs regarding diversity. Susman is therefore entitled to summary judgment on Counts I and II.

### 2.    First Amendment - Freedom of Association (Count III)

In Count III, Susman argues that Section 3's requirement that agencies require "[g]overnment contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract" and its directive to agency heads to review and "take appropriate steps to terminate" "all contracts with Susman or with entities that disclose doing business with Susman" is intended to chill Susman's clients' freedom of association. ECF No. 51-1, at 23. Defendants respond only that a "disclosure requirement limited to a subset of government contractors is far afield from core associational rights," ECF No. 159, at 14, especially given that the Order applies to a small number of government contractors, all of whom are already

---

[11] To the extent that Defendants' arguments regarding the lawfulness of Section 5 sound in ripeness, the court has dispensed with those concerns above. *See supra* Part III.A.5.

subject to substantial disclosure requirements as a condition of doing business with the Federal Government," ECF No. 58-1, at 23.  The court disagrees.

It has "long [been] understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  The Supreme Court has "noted that '[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action,'" and it has accordingly held that "the First Amendment prohibit[s] such compelled disclosure." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (first and second alterations in original) (quoting *NAACP*, 357 U.S. at 462).  The court therefore applies the "exacting scrutiny" standard to compelled-disclosure requirements, which requires that the government demonstrate "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Doe v. Reed*, 561 U.S. 186, 196 (2010) (quoting *Citizens United*, 558 U.S. at 366-67).  The weight of the governmental interest in question "must reflect the seriousness of the actual burden on First Amendment rights." *Id.*

Defendants cannot meet this burden.  As the court has already determined, Section 3 violates the First Amendment, and the government has no legitimate interest in retaliation and viewpoint discrimination.  *See supra* Part III.B.1.  In any event, the court would be hard-pressed to agree with Defendants that the compelled-disclosure requirement is "narrowly tailored to Section 3's stated goal."  ECF No. 58, at 23.  Section 3 does not tie the disclosure requirement to a particular kind of contract for certain goods and services.  Indeed, Section 3 requires the disclosure of "*any* business" that any government contractor does with Susman, even if that business has nothing to do with the firm.  Order § 3(a) (emphasis added).  Because Defendants

cannot demonstrate that they have an important interest that would be served by the compelled-disclosure requirement, and because the scope of the required disclosure is far too broad for it to be considered "narrowly tailored," Susman is entitled to summary judgment on Count III.

### 3.      First Amendment - Right to Petition (Count IV)

Susman argues that various sections of the Order violate the First Amendment "right of the people . . . to petition the Government for a redress of grievances." ECF No. 178 ¶ 142 (quoting U.S. Const. amend. I). In particular, Susman identifies "the Order's provisions punishing Susman for past petitioning activity and restricting Susman's ability to petition federal employees and appear before federal agencies on federal property," as well as in federal courts, as clearly violative of the First Amendment. ECF No. 51-1, at 22. The court agrees.

"[T]he Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). Ample Supreme Court precedent establishes that "[t]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Id.* (quoting *Sure-Tan, Inc. v. Nat'l Lab. Rels. Bd.*, 467 U.S. 883, 896-97 (1984)) (collecting cases). And "[l]aws that 'significant[ly] impair[]' this right must, like all substantial constitutional burdens, survive 'exacting scrutiny.'" *Patchak v. Jewell*, 109 F. Supp. 3d 152, 163 (D.D.C. 2015) (second and third alterations in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 362 (1976)), *aff'd*, 828 F.3d 995 (D.C. Cir. 2016), *aff'd sub nom.*, *Patchak v. Zinke*, 583 U.S. 244 (2018).

Defendants argue that properly evaluating the interest that Susman has at stake here requires the court to wait and see what guidance agency heads issue. ECF No. 58, at 29-30. But restrictions that prevent lawyers from entering federal buildings, interacting with agency officials,

and even entering courthouses plainly constitute a "significant impairment" of Susman's right to petition the government. *Elrod*, 427 U.S. at 362. That Defendants have not yet issued guidance to this end is irrelevant; the Order, fact sheet, and other statements made at the time of the Order's issuance makes clear that these restrictions are the government's goal. *See supra* Part III.B.1.c. And just like with the compelled-disclosure requirement in Section 3, Defendants fail to offer any evidence of a compelling governmental interest that would allow these restrictions, which heavily burden Susman's right to petition, to survive exacting scrutiny. *See id.* Because there is no legitimate governmental interest in abridging Susman's right to petition because it engages in disfavored speech, Susman is entitled to summary judgment on Count IV.

### 4.    Fifth Amendment - Procedural Due Process (Count VI)

The Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "'The fundamental requisite of due process of law is the opportunity to be heard' at 'a meaningful time and in a meaningful manner.'" *Alaska Commc'ns Sys. Holdings, Inc. v. Nat'l Lab. Rels. Bd.*, 6 F.4th 1291, 1298 (D.C. Cir. 2021) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)). When evaluating a procedural due process claim, the court must "first determine whether constitutional safeguards apply at all, i.e., whether a private party has a property or liberty interest that triggers Fifth Amendment due process protection." *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993). Then, the court evaluates whether the deprivation of interest occurred without process. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *see Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (explaining that process due is "flexible and calls for such procedural protections as the particular situation demands").

Susman contends in Count VI that the Order has deprived the firm of its constitutionally protected liberty and property interests without process. ECF No. 51-1, at 24-27. Specifically, Susman argues that, without any process whatever, the Order (1) interferes with the right of the firm and its attorneys to pursue their chosen profession; (2) harms the firm's reputation; and (3) deprives the firm of its protected property interest in contracts with its clients. The court holds that for each asserted liberty and property interest, Susman has shown that the Fifth Amendment's Due Process protections apply.

*Right to pursue chosen profession*. Susman attorneys have the right to pursue their chosen profession—law. *Schware v. Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 238-39 (1957) (holding that "[a] State cannot exclude a person from the practice of law" in contravention of the Due Process Clause). The Constitution safeguards an individual's "right to follow a chosen trade or profession" against governmental intrusions. *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895-96 (1961)). Governmental action that creates "a stigma or other disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment opportunities" is prohibited. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573-78 (1972). The stigma may either "formally or automatically exclude[] [the plaintiff] from work on some category of future . . . government employment opportunities" or have "the broad effect of largely precluding [the plaintiff] from pursuing her chosen career." *O'Donnell v. Barry*, 148 F.3d 1126, 1140-41 (D.C. Cir. 1998) (quoting *Kartseva*, 37 F.3d at 1528).

Here, the Order creates both sets of stigmas. First, the Order formally excludes the firm and its employees from being employed by the federal government or working on government contracts. *See* Order §§ 3, 5(b). Second, the Order has a preclusive effect on Susman's practice

of law.  The Order directs the government to terminate contracts with Susman's clients, pressuring clients to terminate their representation agreements with Susman and virtually shunning the firm as persona non grata.  *See* Order §§ 1, 3.  By banning Susman employees from government buildings and from engaging with government officials, the Order prevents the firm's attorneys from going to their place of work (the courts) and engaging in their daily business (discussing cases with the government).  Accordingly, the Order violates the right of Susman and its attorneys to pursue their chosen profession.

*Susman's reputation*.  Relatedly, Susman has a liberty and a property interest in its "good name, reputation, honor, [and] integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). This interest is particularly acute in the legal profession, where each state bar requires a showing of honor and integrity for certification.  Against this, the Order is especially pernicious.  The Order tarnishes, without process, Susman's reputation with salacious allegations of wrongdoing— references to "egregious" actions by Susman and a statement that the firm has "degrade[d] the quality of American elections"—and it brands Susman as unfit for government work, or even government interaction.  The government is required to provide process when it issues "findings of wrongdoing" that "could have an adverse impact on [an organization]'s reputation." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 567 U.S. 239, 256 (2012).  Thus, the Order violates Susman's interest in its reputation.

*Contracts with clients*.  Finally, the Order deprives Susman of its interest in contracting with clientele. *See Toxco Inc. v Chu*, 724 F. Supp. 2d 16, 27 (D.D.C. 2010) (holding that "contracts between private parties may give rise to property interests" for purposes of the Fifth Amendment). The Order attaches a penalty to Susman's representation: if a client chooses Susman under the

Order's regime, that client loses their government contract. *See supra* Part III.B.2. The Order therefore violates the firm's interest in being able to contract with clients.

*    *    *

The aforementioned liberty and property interests were all taken without any process. The Constitution demands more; specifically, that Susman has the "right to know the factual basis for the action" and have "the opportunity to rebut" it. *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014). Susman was afforded neither. The firm was not given prior notice of the Order, learned of it only when it was announced on live television, and was not provided the opportunity to clear its name. Susman is therefore entitled to summary judgment on Count VI.

### 5.    Fifth Amendment - Vagueness (Count VII)

The Due Process Clause of the Fifth Amendment prohibits "[v]ague laws." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see United States v. Williams*, 553 U.S. 285, 304 (2008) (explaining that the "[v]agueness doctrine is an outgrowth . . . of the Due Process Clause of the Fifth Amendment"). "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox Television*, 567 U.S. at 253. Moreover, "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* at 253. Under the Fifth Amendment, an enactment is void for vagueness if it fails to "give fair notice of conduct that is forbidden or required," *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (quoting *Fox Television*, 567 U.S. at 253), or "authorizes or even encourages arbitrary and discriminatory enforcement," *Hill v. Colorado*, 530 U.S. 703, 732 (2000). The law must "provide people of

ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill*, 530 U.S. at 732.

"[W]hen a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)); *see Sessions v. Dimaya*, 584 U.S. 148, 183 (2018) (Gorsuch, J., concurring) ("[A] 'stringent vagueness test' should apply to at least some civil laws—those abridging basic First Amendment freedoms."); *Fox Television*, 567 U.S. at 253-54 ("When speech is involved, rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech."); *Grayned*, 408 U.S. at 109 ("Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964))).

The parties dispute whether the Order is unconstitutionally vague. Susman maintains that the Order fails to provide it with "fair notice of what is prohibited and how the [f]irm can avoid sanctions in the future." ECF No. 178 ¶ 193. Susman continues that the Order "leverages that vagueness for its in terrorem effect," ECF No. 51-1, at 27; because it is "so standardless," "it gives agencies sweeping discretion to *further* restrict Susman's access over time," *id.* at 28. Defendants reject Susman's vagueness claim, asserting that the Order merely calls for agency heads to develop "guidance" and "[w]hat that guidance might consist of remains to be seen." ECF No. 159, at 17.

Susman has the better of the argument. Because the Order abridges the firm's basic First Amendment freedoms, a more stringent vagueness test applies. *See Fox Television*, 567 U.S. at 253-54. Against such a test, the Order simply does not pass muster.

The Order does little to provide the court, much less "a person of ordinary intelligence[,] fair notice of what is prohibited." *Williams*, 553 U.S. at 304. Section 1 states that Susman is a perpetrator of "activities inconsistent with the interests of the United States," Order § 1, and Section 5 directs agency heads to provide guidance limiting Susman employees from accessing federal government buildings "when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States," Order § 5(a). The court strains to understand the contours of that prohibition—conduct that is "inconsistent with the interests of the United States."

What is more plain to the court is the implication of such a vague prohibition. The Order promises only *discriminatory* enforcement by the Executive branch against such conduct and the threat of future retaliatory actions against the firm. *See supra* Part III.B.1. It chills Susman's speech advocating for clients whose interests are adverse to the government. Indeed, the Order hangs like the sword of Damocles over the firm. It "impermissibly delegates" matters to Defendants "for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108-09. Because the Order threatens penalties without sufficiently defining the conduct that triggers liability, it is unconstitutionally vague. Susman is therefore entitled to summary judgment on Count VII.

### 6.    Fifth Amendment - Equal Protection (Count VIII)

"The equal protection principles embodied in the Due Process Clause of the Fifth Amendment essentially direct 'that all persons similarly situated should be treated alike.'" *Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 650 (D.C. Cir. 1987) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To allege an equal protection violation, a plaintiff may either claim that "he or she received differential treatment by the government due to

membership in a protected class, such as one based on race, national origin, or gender," or that he

or she is in a "class of one." *Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 122

(D.D.C. 2012) (first citing *Jones v. Helms*, 452 U.S. 412, 424 n.3 (1981), then quoting *Vill. of

Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000)).  Here, Susman is pursuing a "class of one"

claim, arguing that it has been the subject of disparate treatment with no rational basis.  ECF

No. 51-1, at 28-29; *see 3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir.

2003).  Specifically, Susman contends that the Order intentionally treats it differently from

similarly situated law firms and that this differential treatment is "apparent on the face of the

Order."  ECF No. 51-1, at 29

Defendants first respond that "the class-of-one theory of equal protection is inapplicable in

the government employment context."  ECF No. 58-1, at 17 (citing *Enquist v. Or. Dep't of Agric.*,

553 U.S. 591, 609 (2008)).  But, as explained, Susman is not a government employee.  *See supra*

Part III.B.1.b.  It is also not fatal to Susman's class-of-one claim that a handful of other law firms

have been subjected to similar orders.  That is because "the number of individuals in a class is

immaterial for equal protection analysis."  *Olech*, 528 U.S. at 564 n.1.

Defendants further dispute whether Susman meets the elements of a class-of-one-claim.

They suggest that Susman is not similarly situated to "other potential government contractors who

do not engage in unlawful DEI practices."  ECF No. 58-1, at 17.  Defendants also claim that there

is a "plainly rational" basis for distinguishing between "potential contractors who 'engage in

blatant race-based and sex-based discrimination.'"  *Id.*  These arguments ring hollow for several

reasons.  First, as already explained, Susman is not a government contractor—it is a law firm that

has been singled out by the Order.  Next, Defendants have not established that Susman engages in

unlawful discrimination practices—indeed, Defendants admit that Susman was *not* included

among the twenty firms that received "letters from the [Equal Employment Opportunity Commission] Acting Chair" regarding employment discrimination. *Id.* at 25. Finally, Defendants have offered no other purportedly rational basis for their differential treatment of Susman, nor can the court readily discern one. Accordingly, the Order violates the Fifth Amendment's equal protection principle. Susman is therefore entitled to summary judgment on Count VIII.

### 7. Fifth Amendment - Right to Counsel (Count IX)

The Fifth Amendment protects "the right to the aid of counsel when desired and provided by the party asserting the right." *Powell v. Alabama*, 287 U.S. 45, 68 (1932). It guarantees due process by safeguarding the rights of individuals or entities to obtain legal representation. *See U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720-21 (1990); *see also Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 872-73 (D.C. Cir. 1984) ("[A]n individual or entity may in fact be denied the most fundamental elements of justice without prompt access to counsel."); *Muniz v. Meese*, 115 F.R.D. 63, 66 n.11 (D.D.C. 1987) ("[A] violation of civil liberties . . . is implied by a government intrusion into their right to select and to be represented by counsel of their choice."). Susman contends that the Order violates the Fifth Amendment right to counsel of the firm's clients by interfering with their ability to be represented by their chosen attorneys. The court agrees.

Section 5 of the Order restricts Susman's attorneys from "engaging with" government officials or "access[ing] . . . Federal Government buildings." Order § 5(a). In other words, the firm's clients would have "to go without their chosen counsel in upcoming meetings and hearings." ECF No. 51, at 30. Rather than being the "stuff of imagination," as Defendants claim, ECF No. 159, at 17, the Order directly interferes with Susman's clients by impermissibly restricting the firm's attorneys from entering federal courthouses or interacting with government officials. The Order cuts Susman off at the knees and effectively denies the firm's clients its counsel. Because

45

"governmental attempt[s] to deny counsel to a civil litigant" are invalid, *Am. Airways Charters*, 746 F.2d at 873 (collecting cases), the Order violates the Fifth Amendment right to counsel. Susman is therefore entitled to summary judgment on Count IX.

### 8.        Separation of Powers (Count X)

Finally, Susman argues that the Order violates separation-of-powers principles because it "tak[es] action for which the Executive Branch has no constitutional or statutory authority whatsoever," ECF No. 178 ¶¶ 21, 214, and because it unlawfully encroaches on the purview of the judiciary, *id.* ¶ 217.  The court agrees.

"The President's power, if any, to issue [an executive] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  While the Order proclaims that it has been made pursuant to the "authority vested in [Donald Trump] as President by the Constitution and the laws of the United States of America," Order, the court is not convinced that there is a statutory or constitutional basis for the actions taken therein.  Defendants do not point to any statutory authority that empowers the President to punish a law firm for its choice of clients, donations, or other speech, and the court is not aware of any law that would support such action.  Likewise, there is no constitutional authority that supports the action taken by the Order, and it cannot be sustained based on any of "the several constitutional provisions that grant executive power to the President." *Youngstown*, 343 U.S. at 587-88.  None of the President's many powers—not his power as commander-in-chief, nor his foreign policy powers, nor his power to appoint and remove government officials—can justify the targeting of a law firm for protected speech and actions.

This is especially so because, in addition to being outside the ambit of power granted to the President by the Constitution, the Order usurps responsibilities that have been constitutionally

delegated to the judiciary and therefore "threatens severe impairment of the judicial function."
*Velazquez*, 531 U.S. at 546. "Interpretation of the law and the Constitution is the primary mission
of the judiciary when it acts within the sphere of its authority to resolve a case or controversy,"
and a "informed, independent judiciary presumes an informed, independent bar." *Id.* at 545. When
the President attempts to limit who can present "the analysis of certain legal issues
and . . . truncate[s] presentation [of certain issues] to the courts," he restricts "speech and
expression upon which courts must depend for the proper exercise of the judicial power." *Id.* For
this reason, the power to "'fashion . . . appropriate sanction[s] for conduct which abuses the
judicial process'" is exclusively among the judiciary's "'inherent powers,' not conferred by rule
or statute"—and is a power that is not shared with any other branch of government. *Goodyear
Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (first quoting *Chambers v. NASCO, Inc.*,
501 U.S. 32, 44-45 (1991), then quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)).
Thus, to the extent that the Order sanctions attorneys—particularly in ways that prevent them from
appearing in court—it tramples on the province of the judiciary and violates the separation of
powers.

Rather than genuinely contest Susman's separation-of-powers arguments, Defendants
attempt to dodge them. Because Susman frames this claim as "*Ultra Vires* Presidential Action,"
ECF No. 178, at 116, Defendants cite *Federal Express Corp. v. U.S. Department of Commerce*,
39 F.4th 756 (D.C. Cir. 2022), for the proposition that *ultra vires* challenges are subject to a
"demanding standard" and are only available in limited circumstances, ECF No. 58, at 7. But
*Federal Express Corp.* is inapposite. In that case, the plaintiff challenged an agency interpretation
of a statute in circumstances where Congress had explicitly foreclosed judicial review. *Id.*
at 762-63. Because the plaintiff "[sought] the intervention of an equity court where Congress ha[d]

not authorized statutory judicial review," the D.C. Circuit determined that a "demanding standard [was] necessary." *Id.* at 765. The challenge mounted here lacks this key characteristic; it is a classic separation-of-powers claim in the vein of *Youngstown*, where the court was "asked to decide whether the President was acting within his constitutional power when he issued an [executive] order." 343 U.S. at 582.

Because the Order does not draw on an executive power that has been designated to the President by the Constitution or statute, and because it improperly seizes authority that the Constitution grants to the judiciary, the court will grant Susman's motion for summary judgment as to Count X.[12]

### C.    Susman is Entitled to a Permanent Injunction in Addition to Declaratory Relief

A plaintiff moving for a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

---

[12] Susman also argues that the Order "punishes [it] in the manner of an unconstitutional bill of attainder" and that this violates the separation of powers because "Presidents cannot seize judicial power unto themselves to 'pronounce[] upon the guilt of [Plaintiff] . . . in accordance [solely] with [their] own notions.'" ECF No. 178 ¶ 218 (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866)); ECF No. 158, at 39. Several amici raise similar arguments. *See* ECF Nos. 73, 145, 152. The extent to which the Constitution's prohibition on bills of attainder applies to executive action remains unclear. Because Susman does not raise a standalone bill-of-attainder claim, the court declines to reach this issue.

48

### 1.    Irreparable Harm and Adequate Remedy at Law

It is well established that "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod*, 427 U.S. at 373).  The court has determined that Susman and its clients have suffered constitutional violations.  *See supra* Part III.B.  Were it not for the court's temporary restraining order as to Sections 1, 3, and 5 of the Order, this harm would be ongoing.  And the court expects that, if the temporary restraining order were lifted, these harms would immediately resume.  Susman has also suffered reputational harms that are not monetarily reparable and that would continue if the court did not enter a permanent injunction.  *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103-04 (D.D.C. 2017).  Because these harms "cannot be fully compensated by later damages," *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 751 F. Supp. 218, 224 (D.D.C. 1990), they are irreparable.

In addition to constitutional and reputational harms, Susman would suffer significant monetary harm if the court's injunctive relief were curtailed.  To be sure, purely speculative monetary harm is not enough to justify a permanent injunction; instead, "[t]he injury complained of [must be] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (first alteration in original) (quoting *Ashland Oil, Inc. v. Fed. Trade Comm'n*, 409 F. Supp. 297, 307 (D.D.C. 1976)).  Although Susman does not yet allege that it has lost money because of the Order, it explains that clients have reached out to the firm to inquire about its effects, signaling that if it is permitted to go into effect, they may take their business elsewhere.  ECF No. 51-3 ¶ 70. The court shares that concern.  By its own terms, the Order appears to prevent Susman attorneys from interacting with federal agencies—before whom they currently have a substantial amount of business—and even from entering courthouses.  Order § 5.  Because over a third of Susman's

matters are in federal court or require interaction with the federal government, *see* ECF No. 51-3 ¶¶ 72-73, it is evident that the Order will cause Susman significant financial loss if it goes into effect.

In many instances, "economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. But where, as here, Defendants' sovereign immunity prevents a plaintiff from seeking monetary damages, courts have acknowledged that financial losses "can . . . constitute irreparable harm." *Xiaomi Corp. v. Dep't of Def.*, No. 21-CV-280, 2021 WL 950144, at *10 (D.D.C. Mar. 12, 2021). Accordingly, because Susman has no adequate remedy at law that would ameliorate its significant constitutional and financial injuries, it has suffered sufficient harm warranting permanent injunctive relief.

### 2.    Balance of Equities and Public Interest

The balance of the equities and the public interest squarely favor the issuance of an injunction. These factors "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting *Karem*, 960 F.3d at 668).

Evaluating these merged factors begins and ends with whether the Order is lawful. Susman has demonstrated that the Order is unconstitutional from beginning to end. *See supra* Part III.B. Because "enforcement of an unconstitutional law is always contrary to the public interest," *Karem*, 960 F.3d at 668 (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)), the Order serves no public interest. Defendants cannot, nor do they, argue anything different. *See generally* ECF No. 159; *see, e.g.*, *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (holding that "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required'" (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015))); *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021) (concluding that

when balancing the equities of unlawful governmental conduct, "any hardship" that the government might identify "is not legally relevant"); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (explaining that, although "[t]here is generally no public interest in the perpetuation of unlawful agency action[,] . . . there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (internal quotation marks and quoted source omitted)).

Here, the Order goes beyond violating the Constitution and the laws of the United States. The Order threatens the independence of the bar—a necessity for the rule of law. Accordingly, the court concludes that the balance of the equities and the public interest weigh overwhelmingly in favor of granting the permanent injunction.[13]

### 3.    Appropriate Defendants

Having determined that Susman is entitled to relief, the court must next consider whether each of the Defendants is properly named. Defendants argue that Susman's naming of the Executive Office of the President is improper because it "is an entity comprising a number of other entities, offices, and establishments," and because Susman "fails to specify in the Complaint whether it seeks to limit relief to any particular EOP entity and, if so, which one, and what Plaintiff's claims are against that entity and why relief against it is necessary." ECF No. 58, at 31-32. This argument is unconvincing and may be quickly disposed of: Defendants fail to cite any authority suggesting that the Executive Office of the President is not a proper defendant merely

---

[13] Because the court concludes that no section of the Order can stand, it need not assess severability. "[A]ssuming, arguendo, that the severability standard for statutes . . . also applies to Executive Orders," *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999), the court concludes that whether assessed on a section-by-section basis or as a whole, it cannot stand, *see id.* at 173.

because it has various constituent parts and offices—a fact that is true of federal agencies sued in federal court every day.  And, as Susman points out, the lone case that Defendants do cite, *Armstrong v. Executive Office of the President*, 90 F.3d 553 (D.C. Cir. 1996)—if only for the proposition that the Executive Office of the President has several component parts—itself features the Executive Office of the President as a defendant, *see* ECF No. 158, at 40-41.

Defendants further contend that the United States is not a properly named defendant because "[s]uits alleging unconstitutional action by the Government must be brought 'against officials,' not against the 'agenc[y]' or the 'State[]' writ large, 'which retain their immunity against all suits in federal court.'"  ECF No. 58, at 32 (second and third alterations in original) (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)).  This argument falls flat given the Administrative Procedure Act's express waiver of sovereign immunity in cases where the United States is named as a defendant.  5 U.S.C. § 702.  As Section 702 explains, "[t]he United States may be named as a defendant in any . . . action, and a judgment or decree may be entered against the United States," when the action is (1) "in a court of the United States," (2) "seeking relief other than money damages," and (3) "stat[es] a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."  *Id.*  This is plainly such a suit, and Susman has therefore properly named the United States as a defendant.[14]

---

[14] To be sure, Section 702 requires that an order granting injunctive relief against the United States "specify the Federal officer or officers . . . personally responsible for compliance," 5 U.S.C. § 702, and Susman's proposed order has done just that, ECF No. 181-1.

## IV.    CONCLUSION

For the foregoing reasons, the court will deny Defendants' Motion to Dismiss, ECF No. 180, grant Plaintiff's Motion for Summary Judgment, ECF No. 181, enter judgment for Plaintiff on Counts I through IV and VI through IX of the Amended Complaint, and grant declaratory and permanent injunctive relief.  A contemporaneous order will issue.

_____

LOREN L. ALIKHAN
United States District Judge

Date:    June 27, 2025

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SUSMAN GODFREY LLP, <br><br> *Plaintiff*, <br><br> v. <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *et al.*, <br><br> *Defendants*. | Civil Action No. 25 - 1107 (LLA) |

**<u>ORDER</u>**

Upon consideration of Defendants' Motion to Dismiss, ECF No. 180; Plaintiff's Motion for Summary Judgment, ECF No. 181; and the entire record herein; and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Defendants' Motion to Dismiss, ECF No. 180, is **DENIED**.  It is further

**ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 181, is **GRANTED**, and judgment is entered for Plaintiff on Counts I through IV and VI through IX of the Amended Complaint, ECF No. 178.  It is further

**DECLARED** that Executive Order No. 14,263, 90 Fed. Reg. 15615 (Apr. 15, 2025), entitled "Addressing Risks from Susman Godfrey," is unconstitutional and therefore null and void. It is further

**ORDERED** that:

(1)    Defendants, departments, agencies, and other entities subject to Executive Order 14,263, as well as their officers, agents, servants, employees, and attorneys, are **PERMANENTLY ENJOINED** from implementing, enforcing, or giving effect to Executive

Order 14,263 in any way;

(2)     Defendants, departments, agencies, and other entities subject to Executive Order 14,263, as well as their officers, agents, servants, employees, and attorneys, are **PERMANENTLY ENJOINED** from relying on or using in any way or for any purpose, or otherwise taking any action based upon, the statements laid out in Section 1 of Executive Order 14,263, including but not limited to in any interactions with Plaintiff, Plaintiff's clients, or government contractors; or with employees or other personnel of Plaintiff, Plaintiff's clients, or government contractors;

(3)     Defendants U.S. Department of Justice and Pamela Bondi, in her official capacity as U.S. Attorney General, are **DIRECTED** to:

(a)     provide a copy of this Order to all Defendants, departments, agencies, and other entities subject to Executive Order 14,263; any other departments, agencies, and entities that received Executive Order 14,263 or guidance related to Executive Order 14,263; and the respective officers, staff, employees, and independent contractors of any of the foregoing;

(b)     direct the recipients to comply with the terms of this Order;

(c)     notify all recipients that they are bound by the court's order, under penalty of contempt; and

(d)     provide counsel for Plaintiff with a copy of such communication(s);

(4)     Defendants, departments, agencies, and other entities subject to Executive Order 14,263, as well as their officers, agents, servants, employees, and attorneys, are **DIRECTED** to rescind all formal or informal guidance or other direction provided to officers, staff, employees, or contractors of the federal government to communicate, effectuate, implement,

or enforce Executive Order 14,263, including Sections 2 and 4 that were not subject to this court's Temporary Restraining Order, ECF No. 15;

(5)     Defendants, departments, agencies, and other entities subject to Executive Order 14,263, as well as their officers, agents, servants, employees, and attorneys, are **DIRECTED** to immediately notify all officers, staff, employees, and contractors subject to Executive Order 14,263 that Executive Order 14,263 is unlawful, null and void in its entirety and therefore should be disregarded, including all prior formal or informal advice, opinions, or direction previously received or communicated to effectuate, implement, or enforce Executive Order 14,263, and that all departments, agencies, officers, staff, employees, and contractors of the federal government should carry on with their ordinary course of business with Susman Godfrey LLP,[1] its personnel, its clients, and its clients' personnel known or believed by them to be associated with Susman Godfrey LLP, as if Executive Order 14,263 had not issued;

(6)     Defendants, departments, agencies, and other entities subject to Executive Order 14,263, as well as their officers, agents, servants, employees, and attorneys, are **DIRECTED** to immediately (a) communicate to every recipient of a formal or informal request for disclosure of any relationship with Susman Godfrey LLP or any person associated with the firm, made pursuant to Section 3(a) of Executive Order 14,263, that such request is permanently rescinded; and (b) cease making such requests for disclosure, pursuant to Section 3(a) of Executive Order 14,263;

(7)     Defendants, departments, agencies, and other entities subject to Executive Order 14,263, as well as their officers, agents, servants, employees, and attorneys, are

---

[1] For purposes of this Order, Susman Godfrey LLP includes any affiliates, predecessors, successors, assigns, directors, officers, partners, employees, and agents.

**DIRECTED** to cease any security clearance review, made pursuant to Sections 1 or 2(a) of Executive Order 14,263, and to reverse any suspension or revocation of any active security clearances, made pursuant to Sections 1 or 2(a) of Executive Order 14,263;

(8)     Defendants the Office of Management and Budget and Russell Vought, in his official capacity as director of the Office of Management and Budget, are **DIRECTED** to identify all government goods, property, material, and services, provided for the benefit of Susman Godfrey LLP, that were previously identified pursuant to Section 2(b) of Executive Order 14,263, and to immediately issue direction to the relevant heads of agencies and departments that they are to reverse any cessation of the provision of such material or services, if such cessation was done pursuant to Executive Order 14,263;

(9)     Defendants U.S. Department of Justice; Pamela Bondi in her official capacity as U.S. Attorney General; Equal Employment Opportunity Commission; and Andrea R. Lucas, in her official capacity as Acting Chair of the Equal Employment Opportunity Commission, are **DIRECTED** to immediately cease any investigation of Susman Godfrey LLP made pursuant to Section 4 of Executive Order 14,263, and to withdraw any requests for information from Susman Godfrey LLP or other investigative steps made pursuant to Section 4 of Executive Order 14,263;

(10)     Defendants, departments, agencies, and other entities subject to Executive Order 14,263, as well as their officers, agents, servants, employees, and attorneys, are **ORDERED** that they must act in good faith to take such other steps as are necessary to prevent the implementation or enforcement of Executive Order 14,263 and to reverse any implementation or enforcement of Executive Order 14,263 that has occurred or is occurring; and

(11)     Defendants are **ORDERED** to file a status report within two business days of this Order describing the steps taken to ensure compliance with this Order and certifying compliance

with its requirements; and it is further

(12)    **ORDERED** that this court shall retain jurisdiction to enforce or modify this Order.

This Order constitutes a final judgment of the court within the meaning of Rule 58(a) of the Federal Rules of Civil Procedure.  The Clerk of Court is directed to terminate the case.

**SO ORDERED.**

_____
LOREN L. ALIKHAN
United States District Judge

Date: June 27, 2025

| | | |
|---|---|---|
| | | CONELLY MANCHIN, LINDA MCMAHON, MARK M. MEADOR, BRYAN MERCIER, MICHAEL D. NEDD, REID NELSON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DAVID PALUMBO, JOHN PHELAN, Hestor PIERCE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STEWART, JENNIFER BASTRESS TAHMASEBI, SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF THE AIR FORCE, U.S. DEPARTMENT OF THE ARMY, U.S. DEPARTMENT OF THE NAVY, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES INTERNATIONAL TRADE COMMISSION, UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Attachments: # 1 Exhibit Notice)(Lawson, Richard) (Entered: 07/01/2025) |
| 07/29/2025 | 209 | Unopposed MOTION to Clarify re 207 Order on Motion for Summary Judgment,,, Order on Motion to Dismiss,,, Order on Motion for Declaratory Judgment,,, Order on Motion for Permanent Injunction,,,,,,,,,,,, 206 Memorandum & Opinion by ADMINISTRATION FOR CHILDREN AND FAMILIES, ADMINISTRATION FOR STRATEGIC PREPAREDNESS AND RESPONSE, ADVISORY COUNCIL ON HISTORIC PRESERVATION, ALL FEDERAL AGENCIES AND DEPARTMENTS AND HEADS OF FEDERAL AGENCIES AND DEPARTMENTS, AMERICORPS, APPALACHIAN REGIONAL COMMISSION, VIPIN ARORA, GARY A. ASHWORTH, PAUL S. ATKINS, SCOTT BESSENT, BIOMEDICAL ADVANCED RESEARCH AND DEVELOPMENT AUTHORITY, PAMELA J. BONDI, BONNEVILLE POWER ADMINISTRATION, BUREAU OF ECONOMIC ANALYSIS, BUREAU OF INDIAN AFFAIRS, BUREAU OF INDUSTRY AND SECURITY, BUREAU OF LAND MANAGEMENT, BUREAU OF OCEAN ENERGY MANAGEMENT, BUREAU OF RECLAMATION, BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT, DOUGLAS J. BURGUM, CENTRAL INTELLIGENCE AGENCY, LORI CHAVEZ−DEREMER, DOUG COLLINS, CAROLINE A. CRENSHAW, WALTER CRUICKSHANK, DEPARTMENT OF AGRICULTURE, DEPARTMENT OF COMMERCE, DEPARTMENT OF ENERGY, DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, DEPARTMENT OF LABOR, DEPARTMENT OF STATE, DEPARTMENT OF THE INTERIOR, DEPARTMENT OF THE TREASURY, DEPARTMENT OF TRANSPORTATION, GARY DISBROW, DANIEL P. DRISCOLL, SEAN DUFFY, ENVIRONMENTAL PROTECTION AGENCY, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, EXECUTIVE OFFICE OF THE PRESIDENT, FEDERAL TRADE COMMISSION, ANDREW N. FERGUSON, TULSI GABBARD, ANDREW GRADISON, JAMIESON GREER, JOHN HAIRSTON, PETER B. HEGSETH, MELISSA ANN HOLYOAK, DAVID JOHNSON, AMY A. KARPEL, JASON KEARNS, ROBERT F. KENNEDY, JR, JEFFREY KESSLER, JOHN KNOX, KELLY LOEFFLER, ANDREA R. LUCAS, HOWARD W. LUTNICK, GAYLE CONELLY MANCHIN, LINDA MCMAHON, MARK M. MEADOR, BRYAN MERCIER, MICHAEL D. NEDD, REID NELSON, KRISTI NOEM, OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DAVID PALUMBO, JOHN PHELAN, Hestor PIERCE, JOHN L. RATCLIFFE, BROOKE L. ROLLINS, MARCO RUBIO, SECURITIES AND EXCHANGE COMMISSION, SMALL BUSINESS ADMINISTRATION, COKE MORGAN STEWART, JENNIFER BASTRESS TAHMASEBI, SCOTT TURNER, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF EDUCATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF THE AIR FORCE, U.S. DEPARTMENT OF THE ARMY, U.S. DEPARTMENT OF THE NAVY, U.S. DEPARTMENT OF VETERANS AFFAIRS, UNITED STATES INTERNATIONAL TRADE COMMISSION, UNITED STATES OF AMERICA, UNITED STATES PATENT AND TRADEMARK OFFICE, MARK T. UYEDA, RUSSELL VOUGHT, CHRIS WRIGHT, LEE M. ZELDIN. (Lawson, Richard) (Entered: 07/29/2025) |

JA 3540

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

**333 Constitution Avenue, NW**
**Washington, DC 20001-2866**
**Phone: 202-216-7000 | Facsimile: 202-219-8530**

Plaintiff: **Susman Godfrey LLP**

vs.                                    Civil Action No. **25-1107**

Defendant: **Executive Office of the President**

## CIVIL NOTICE OF APPEAL

Notice is hereby given this  22  day of    August    20 25 , that

Defendants Executive Office of the President et al.

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from the

judgment of this court entered on the   27  day of    June   , 20 25 , in

favor of Plaintiff

against said Defendants

Attorney/Pro Se Party Signature:

Name:   Richard Lawson

Address:   950 Pennsylvania Ave NW

Washington DC

Telephone: ( 202 )  445-8042

(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil
action must be filed within 30 days after the date of entry of judgment or 60 days if the United
States or officer or agency is a party)

USCA Form 13
Rev. June 2017

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system.

*/s/   Abhishek Kambli*

ABHISHEK KAMBLI