**ORAL ARGUMENT SCHEDULED ON MAY 14, 2026**

**Nos. 25-5241, 25-5265, 25-5277, 25-5310**

# In the United States Court of Appeals for the District of Columbia Circuit

PERKINS COIE LLP,

PLAINTIFF-APPELLEE

*v.*

U.S. DEPARTMENT OF JUSTICE, ET AL.

DEFENDANTS-APPELLANTS

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA*

**BRIEF OF APPELLEE PERKINS COIE LLP**

DANE H. BUTSWINKAS
AMY MASON SAHARIA
MATTHEW B. NICHOLSON
CHARLES L. MCCLOUD
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
dbutswinkas@wc.com

*Counsel for Appellee Perkins Coie LLP*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rules 26.1 and 28(a)(1), Appellee provides the following information:

### A.    Parties and Amici

Except for amici America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Judicial Action Group, and Conservative Legal Defense and Education Fund who filed a brief in this court on March 13, 2026, all parties, intervenors, and amici before the district court and this court for *Perkins Coie LLP, et. al. v. U.S. Department of Justice, et. al.*, No. 25-5241 are listed by reference in the Brief for Appellants.

### B.    Rulings Under Review

References to the rulings at issue appear in the Brief for the Appellants.

### C.    Related Cases

This case has not previously been before this court. This Court has consolidated *Perkins Coie LLP v. U.S. Department of Justice et al.*, No. 25-5241, with three related appeals: (1) *Jenner & Block LLP v. U.S. Department of Justice, et al.*, No. 25-5265; (2) *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President, et al.*, No. 25-5277; and (3) *Susman Godfrey LLP v. Executive Office of the President, et al.*, No. 25-5310. It has also

i

ordered that these consolidated appeals be scheduled for oral argument on the same day and before the same panel as *Zaid v. Executive Office of the President, et al.*, No. 26-5009.

### D.     Rule 26.1 Disclosure

Appellee Perkins Coie LLP it is a limited liability partnership with no parent corporations.  No corporation owns 10% or greater ownership interest in Perkins Coie LLP.

Respectfully submitted,

/s/ *Dane H. Butswinkas*
DANE H. BUTSWINKAS
*Counsel for Appellee Perkins Coie LLP*

ii

# TABLE OF CONTENTS

Page

INTRODUCTION................................................................................................1

STATEMENT OF THE ISSUES ........................................................................3

CONSTITUTIONAL PROVISIONS AND EXECUTIVE ORDER ..............4

STATEMENT OF THE CASE ...........................................................................4

SUMMARY OF ARGUMENT.........................................................................11

STANDARD OF REVIEW ...............................................................................14

ARGUMENT .......................................................................................................14

I.  THE DISTRICT COURT CORRECTLY HELD THE ORDER VIOLATES THE FIRST AMENDMENT................................................14

    A.  The Order Retaliates Against Perkins for Protected First Amendment Activities .................................................................15

    B.  The Order Discriminates Based on Viewpoint .............................19

    C.  The Government's Section-by-Section Arguments Lack Merit..21

    D.  The Order Unconstitutionally Burdens the Right to Association .................................................................................35

II.  THE DISTRICT COURT CORRECTLY HELD THE ORDER VIOLATES PERKINS' DUE PROCESS RIGHTS ............................38

    A.  The Order Violates Procedural Due Process.............................38

    B.  The Order Is Vague and Fails To Provide Fair Notice................40

III.  THE DISTRICT COURT CORRECTLY HELD THE ORDER VIOLATES THE CONSTITUTIONAL RIGHTS TO COUNSEL ....41

IV.  THE DISTRICT COURT CORRECTLY HELD THE ORDER VIOLATES EQUAL PROTECTION.......................................................44

V.  SECTIONS 1, 3, AND 5 VIOLATE THE SEPARATION OF POWERS.........................................................................................46

CONCLUSION...................................................................................................47

iii

# TABLE OF AUTHORITIES[*]

Page

**CASES**

*Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865 (D.C. Cir. 1984)............43

*\*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) .......................36, 37

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016)......................................................15, 19

*BE & K Constr. Co. v. NLRB*, 536 U.S. 516 (2002).............................................38

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011)......................................16

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) .............38

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989)............41

*City of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ................29, 30

*Cohen v. Hurley*, 366 U.S. 117 (1961) .................................................................2

*Connection Distrib. Co. v. Holder*, 557 F.3d 321 (6th Cir. 2009) ....................28

*\*Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000)...............................................36

*Earthworks v. Dep't of the Interior*, 105 F.4th 449 (D.C. Cir. 2024) ..............14

*\*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009).....................................................16

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ...............................41

*Flynt v. Shimazu*, 940 F.3d 457 (9th Cir. 2019) .................................................28

*Franks v. Rubitschun*, 312 F. App'x 764 (6th Cir. 2009)...................................45

*Gen. Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995)......................................41

*Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024)....................43

*Hartman v. Moore*, 547 U.S. 250 (2006)..............................................................15

*\*Heffernan v. City of Paterson*, 578 U.S. 266 (2016)........................................15

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ...........................................29

*Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022)......................................33

*Iancu v. Brunetti*, 588 U.S. 388 (2019) ...............................................................29

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

Page

Cases—continued:

*In re Halkin*, 598 F.2d 176 (D.C. Cir. 1979),
   *overruled in part on other grounds by*
   *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984)......................................16

*Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550 (2005) ...................................22

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020)...............................................41

*Kimberlin v. Quinlan*, 199 F.3d 496 (D.C. Cir. 1999) .......................................30

*Lanier v. City of Woodburn*, 518 F.3d 1147 (9th Cir. 2008)..............................28

*Legal Servs. Corp. v. Velasquez*, 531 U.S. 533 (2001) ...................................2, 16

*Lozman v. Riviera Beach*, 585 U.S. 87 (2018)..............................................34, 38

*Luis v. United States*, 578 U.S. 5 (2016) ......................................................42, 43

*Media Matters for Am. v. FTC*,
   2025 WL 2988966 (D.C. Cir. Oct. 23, 2025)............................................34, 35

\*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025)..........33, 34

*Minnesota State Board for Community Colleges v. Knight*,
   465 U.S. 271 (1984)..........................................................................................39

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ...............................................29

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).........32

*NAACP v. DOE*, 779 F. Supp. 3d 53 (D.D.C. 2025)...........................................40

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
   417 F.3d 1272 (D.C. Cir. 2005)......................................................................27

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998).........................22

\*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024)...............1, 15, 20, 23, 26

*Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997).........................28

\*News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800 (D.C. Cir. 1988).................44, 45

*O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996)................21

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ....................................22

\*Powell v. Alabama*, 287 U.S. 45 (1932)..............................................................43

Page

Cases—continued:

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)......................................20

*\*Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819 (1995) ...........20

*Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977)................................38

*Strickland v. Washington*, 466 U.S. 668 (1984)...................................42

*Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984) .....................................38

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)...................26

*Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013)...................45

*Toolasprashad v. BOP*, 286 F.3d 576 (D.C. Cir. 2002) ......................30

*Trump v. Clinton*, 161 F.4th 671 (11th Cir. 2025)..................................7

*U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715 (1990) .......................41, 44

*\*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam)...............45

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015)..........................................................................22

*Wheat v. United States*, 486 U.S. 153 (1988) ......................................42

*\*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ................................................31

## CONSTITUTION

U.S. Const.
   amend. I .................. 2, 4, 10, 11, 13, 14, 15, 16, 18, 21, 29, 30, 33, 35, 36, 37, 38
   amend. V .................................................................2, 4, 10, 14, 41, 43, 44
   amend. VI .......................................................................2, 4, 10, 13, 41, 42

## OTHER AUTHORITIES

D.C. Bar Ethics Op. 383..............................................................................37

Josh Dawsey, *Trump Ordered Justice Department Reversal on Law
   Firm Sanctions*, WALL ST. J. (Mar. 11, 2026)................................11

Michael C. Dorf, *Facial Challenges to State and Federal Statutes*,
   46 Stan. L. Rev. 235, 279 (1994) ....................................................29

## INTRODUCTION

One year ago, the President did something no other president had done before: issue an executive order declaring a law firm whose clients and representations he dislikes "dishonest and dangerous" and deploying the levers of federal power to try to put the firm out of business. That was a perilous moment for appellee Perkins, the legal profession, and the rule of law. Nine law firms, cowed by the threat of firm-ending sanctions, "settled" with the President. But Perkins, followed by Jenner, WilmerHale, and Susman, sued to defend themselves and their clients. Four different district judges recognized the President's executive orders for what they are: shocking abuses of power that trample the constitutional rights of the law firms and their clients. This Court should recognize the same.

The government cannot "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). Yet here, the President did not hide his intent to punish Perkins for its expression and that of its clients. He openly declared that he targeted Perkins because it represented his "failed" opponent in the 2016 election, challenged election laws alongside so-called "activist donors," and brought

purportedly "partisan lawsuits," including "against the Trump Administration." The President designed the Order to do more than just damage Perkins; he intended to intimidate the bar into submission.

This Court must not allow that to happen. "An informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp. v. Velasquez*, 531 U.S. 533, 545 (2001). Lawyers must be free to respond to their highest calling—defending unpopular clients and causes—without fear of official retribution. Otherwise, lawyers would "become nothing more than parrots of the views of whatever group wields governmental power at the moment." *Cohen v. Hurley*, 366 U.S. 117, 138 (1961) (Black, J., dissenting). The First Amendment, together with the Due Process Clause, the Fifth and Sixth Amendment rights to counsel, the Fifth Amendment's equal-protection component, and separation-of-powers principles, forbid that result.

The Order is indefensible. No doubt, that is why the Department of Justice previously declined to defend it in this Court, moving to dismiss this appeal before abruptly reversing course at the President's direction. It is why the government closes its eyes to Perkins' overwhelming evidence of retaliatory intent—evidence the government neither disputed nor sought to contradict with counter-evidence. It is why the government insists Perkins' claims are

2

too "abstract," ignoring the unrebutted evidence that agencies began enforcing the Order against Perkins immediately after its issuance.

And it is why the government pretends the decision under review is something it is not. "Courts cannot tell the President what to say," the government protests (at 1). But no court told the President what to say. The President can use his bully pulpit to say whatever he likes. What he cannot do is employ the force of law to execute his "personal vendetta" against the Firm. JA182. The government further objects (at 1) that courts "cannot tell the President how to handle national security clearances." But no court told the President how to decide questions of national security. The court below merely ruled the President cannot categorically suspend the clearances of an entire group to retaliate against protected expression.

The district court correctly granted summary judgment to Perkins. This Court should affirm.

## STATEMENT OF THE ISSUES

1.      Whether the district court properly granted summary judgment on the grounds that the Order:

a. violates the First Amendment by retaliating for protected activity, discriminating based on viewpoint, and burdening the right to association;

b. deprives Perkins of due process and is impermissibly vague;

c. violates Perkins' clients' Fifth and Sixth Amendment rights to counsel; and

d. violates the Fifth Amendment's equal-protection component.

2.    Whether Perkins is entitled to summary judgment on the additional ground (raised but not reached below) that Sections 1, 3, and 5 violate the separation of powers.

## CONSTITUTIONAL PROVISIONS AND EXECUTIVE ORDER

Pertinent constitutional provisions and Executive Order 14230 are reproduced in the addendum.

## STATEMENT OF THE CASE

1. On March 6, 2025, President Trump targeted Perkins with Executive Order 14230, "Addressing Risks from Perkins Coie LLP." JA487-89. In Section 1, entitled "Purpose," the President finds the Firm engaged in allegedly "dishonest and dangerous activity." Perkins EO §1. For example, the Order points to the Firm's representation of "failed Presidential candidate Hillary

Clinton" in the 2016 election and its engagement of "Fusion GPS" in connection with that representation. *Id.* That language refers to work by former partner Marc Elias and members of the Firm's Political Law group, as well as cybersecurity work by former partner Michael Sussmann. JA266-67. Elias, Sussmann, and most of the Political Law Group left the Firm in 2021, and no attorney involved with Fusion GPS still works at the Firm. *Id.*

The Order also refers to the Firm's "work[] with activist donors including George Soros to judicially overturn" election laws. Perkins EO §1. That refers to lawsuits—most *successful*—challenging or defending election laws. JA267-68.

Based on these findings, the Order levels draconian sanctions on Perkins' lawyers, staff, and clients:

- Section 2 orders agencies "immediately" to "suspend any active security clearances" held by Perkins personnel and stop providing Perkins with "all Government goods, property, material, and services."

- Section 3 orders agencies to require federal contractors "to disclose any business they do with Perkins," regardless of "whether that business is related to the subject of the Government contract." Section 3 further directs agencies to "terminate any contract" for "which Perkins Coie has been hired to perform any service" and "assess[]" any contract "with entities that disclose doing business with Perkins" to "align" funding with the Administration's "goals and priorities."

- Section 4 orders the EEOC Chair to review, and the Attorney General to investigate, the employment practices of "large law firms."

- Section 5 orders agencies to provide guidance "limiting" Perkins employees from "access[ing]" federal buildings and "limiting" federal employees from "engaging" with Perkins employees.  Section 5 also bars agencies from hiring Perkins employees, absent a waiver from the agency head and OMB director.

The White House issued a so-called "Fact Sheet" accompanying the Order.  JA491.  The Fact Sheet touted the President's promise to "protect the nation from partisan actors"—citing Perkins' alleged "work[] with activist donors," litigation "to judicially overturn enacted election laws," and "lawsuits against the Trump Administration."  *Id.*

The Fact Sheet makes clear the Order will have "immediate[]" effects on Perkins and its clients:  all "security clearances held by [Perkins] employees *will* be immediately suspended"; the government "*will* halt all material and services" to Perkins and "*will* … restrict its employees' access to government buildings"; "the practices of [Perkins] *will* be reviewed under Title VII"; and the government "*will* prohibit funding contractors that use [Perkins]"

6

"[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States." *Id.*[2]

For nearly a decade, the President has been "preoccup[ied]" with Perkins' "election litigation and representation of Democratic political candidates" and harbored "grievances about [Perkins'] work in those client matters." JA1700. For example, during his first term, he attacked Elias and Sussmann for their involvement with the allegedly "discredited and Fake [Fusion GPS] Dossier" and "demand[ed] a full investigation." JA272. After the 2018 midterms, he accused Elias of being "shady," "finding votes," and committing "FRAUD." JA272-73. In 2022, he filed a personal lawsuit accusing Perkins of conspiring against him in the 2016 election based on the same allegations that appear in the Order. JA268, 1590, 1637. A district court dismissed that suit as having "no merit" and sanctioned Mr. Trump and his attorneys. JA268-69.[3] And in 2024, he threatened, "WHEN I WIN, those people that CHEATED will be prosecuted … Please beware [*sic*] that this legal exposure extends to Lawyers …." JA276.

---

[2] Unless otherwise noted, all emphases are added, and all internal quotation marks and citations are omitted.

[3] The Eleventh Circuit affirmed the dismissal and sanctions in relevant part. *Trump v. Clinton*, 161 F.4th 671 (11th Cir. 2025).

The Order makes good on the President's threats.  During the Order's signing ceremony, he declared, "What they've done is … it's just terrible.  It's weaponization … against a political opponent" (himself), and "it should never be allowed to happen again."  JA278.  And in an interview recorded that day, he confirmed he was "going after" law firms.  JA282-83.

The Order's impact on Perkins and its clients was immediate and severe.  Many of Perkins' largest clients or their affiliates have federal contracts or subcontracts.  JA284-85.  In many cases, these clients' relationships with Perkins are not public.  JA285.  In the days following the Order, however, clients began reporting that government officials were directing them to disclose their relationships with Perkins.  JA328.  Consequently, several long-time clients ended their relationships with the Firm or were considering doing so.  JA285-86.

Agencies also began implementing the Order by cancelling meetings with Perkins and refusing to discuss pending matters with the Firm.  JA285, 287.  As the district court found, "because the vast bulk of the [F]irm's practice requires [its] lawyers to engage with the federal government," the Order posed an "existential threat" to the Firm.  JA180.

8

Additionally, on March 17, 2025, the Acting EEOC Chair sent letters to Perkins and 19 other law firms, requesting extensive information about the firms' employment practices based on their "public statements and court filings." JA283, 506.

2. On March 11, 2025, Perkins filed this lawsuit and moved for a temporary restraining order against Sections 1, 3, and 5 because those sections posed the most immediate threat of irreparable harm to Perkins and its clients. Following a hearing, the district court granted a TRO. JA152-85. The court later clarified that its TRO required agencies to rescind any client-disclosure requests. JA20.

In response, the Attorney General and OMB Director issued a memorandum, deriding the court's ruling and continuing to describe the Firm as "dishonest and dangerous." JA230. The President was similarly undeterred. In a March 14, 2025 speech, he boasted about his actions against "the crooked law firms that aided" the "partisan persecutions" against him. JA298.

Later that day, the President issued a similar order against Paul Weiss. JA303, 948-50. The President revoked that order after Paul Weiss agreed to, *inter alia*, provide $40 million in free services to support the Administration's

9

initiatives.  JA303.  Soon thereafter, eight other law firms entered similar settlements.  JA305-06, 1248-55, 1390.

Meanwhile, the parties here agreed to extend the TRO and proceed directly to summary judgment.  JA213.  Perkins' summary-judgment motion was supported by an extensive "evidentiary record amounting to over 950 pages," and 22 amicus briefs from lawyers, law firms, legal organizations, professors, former judges, general counsel, former government officials, and others.  JA1653-54 & n.23.  The government offered no genuine dispute to the Firm's 260 statements of material fact.  JA1367-73.

The court granted Perkins' summary-judgment motion and denied the government's cross-motion to dismiss.  JA1628-29.  The court held the Order (1) violated the First Amendment by retaliating for expression, discriminating based on viewpoint, and burdening the right of association, (2) violated the Fifth Amendment's equal-protection component, (3) violated Perkins' clients' Fifth and Sixth Amendment rights to counsel, and (4) deprived Perkins of procedural due process and was impermissibly vague.  JA1677-1724.

The court permanently enjoined the Order, finding that Perkins had shown irreparable harm and that "the strong interests of the Firm, its employees, and clients, as well as the American legal system and the public more

broadly" supported "issuance of an injunction to protect the independence of counsel to represent their clients vigorously and zealously." JA1724-29.

3. The government appealed but moved to dismiss its appeal on March 2, 2026. The next day, the government moved to withdraw its dismissal motion. The White House Press Secretary confirmed the about-face was "'at the [P]resident's direction.'" Josh Dawsey, *Trump Ordered Justice Department Reversal on Law Firm Sanctions*, WALL ST. J. (Mar. 11, 2026).

## SUMMARY OF ARGUMENT

The Order brazenly assaults the constitutional rights of Perkins and its clients. The government's arguments—many of which are cursory at best—confirm it was correct in previously moving to dismiss this appeal.

I.    The court correctly held the Order violates the First Amendment several times over.

A.    The Order unconstitutionally retaliates against Perkins for its actual and perceived speech. JA1679-1704. The government does not dispute that Perkins engaged in protected speech. The causal link between Perkins' speech and the Order's retaliation is plain as day, and the government presented no counter-evidence of legitimate motive. Finally, the Order's draconian sanctions are designed to—and did—deter law firms of ordinary

firmness from engaging in protected speech.

B.    The Order also discriminates against Perkins based on its perceived viewpoints (*e.g.*, on the 2016 election, election laws, DEI). The government has not demonstrated that any legitimate (let alone compelling) interest justifies this discrimination or that the Order is narrowly tailored.

C.    The government's section-by-section defenses lack merit:

Section 1 is not merely "precatory" "government speech." As the government conceded below and the court found, Section 1 contains "findings" directing agencies how to implement the rest of the Order. JA1359, 1642-43.

Perkins' challenge to Section 2 is justiciable for the reasons stated by WilmerHale (at 33-37) and Jenner (at 34-43), which Perkins adopts. On the merits, the government offered no evidence of national-security concerns, and the evidence of pretext is overwhelming.

Perkins' challenges to Sections 3 and 5 are ripe. The record is sufficiently developed: the "reviews" and "guidance" directed by those sections are themselves retaliatory, and Section 1's findings preordain their outcome. Withholding review would only promote the sections' *in terrorem* purpose. On the merits, the government presented *no evidence* that Sections 3 and 5 were motivated by "unprotected conduct." In contrast, a mountain of undisputed

12

evidence confirms these sections are retaliatory.

Finally, regarding Section 4, the government does not dispute that the First Amendment prohibits retaliatory investigations. As the government conceded and the court found below, the Order specifically directs an investigation *of Perkins*. And the government did nothing below to rebut the evidence of retaliatory motive or show it would have investigated Perkins absent such motive. JA1695-97.

D.     The Order unconstitutionally burdens Perkins' and its clients' associational rights by compelling disclosure of their attorney-client relationships. JA1704-07. The government lacks any legitimate interest in such sensitive information, and the disclosure requirement is not narrowly tailored.

II.     The Order deprives Perkins of its protected liberty interest in petitioning the government. JA1716-19. And the government provided no process whatsoever before depriving Perkins of this interest. Additionally, the Order is unconstitutionally vague because it punishes Perkins based on amorphous standards—including "diversity, equity, and inclusion" and "national interest"—of which Perkins lacked fair notice. JA1720-24.

III.     The Order infringes Perkins' clients' Sixth Amendment rights to

13

effective assistance of counsel and counsel of choice in criminal cases by limiting Perkins' ability to access federal buildings or engage with government attorneys. JA1711-16. For the same reasons, the Order infringes Perkins' clients' Fifth Amendment right to counsel in civil litigation. *Id.*

IV.    The Order violates equal protection on a "class-of-one" (here, "class-of-four") theory. JA1707-11. The Order treats Perkins differently than similarly situated firms, and the obvious reason for the differential treatment—animus—is improper.

V.    The Court may affirm on an additional ground raised but not reached below: the Order violates separation-of-powers principles. Perkins incorporates WilmerHale's arguments (at 26-29) on this point.

## STANDARD OF REVIEW

This Court reviews a summary-judgment order *de novo*. *Earthworks v. Dep't of the Interior*, 105 F.4th 449, 454 (D.C. Cir. 2024).

## ARGUMENT

### I.    THE DISTRICT COURT CORRECTLY HELD THE ORDER VIOLATES THE FIRST AMENDMENT

Reading the government's brief, one would hardly guess this case presented, front and center, a *First Amendment* challenge. When the government finally gets around to discussing the First Amendment, it devotes

14

only a few pages to the subject. The government has nothing more to offer because the Order is "unconstitutional retaliation and viewpoint discrimination, plain and simple," JA1704, and clearly violates Perkins' and its clients' associational rights.

## A.    The Order Retaliates Against Perkins for Protected First Amendment Activities

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out," *Hartman v. Moore*, 547 U.S. 250, 256 (2006), and from "relying on the threat of invoking legal sanctions … to achieve the suppression of disfavored speech," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (cleaned up). This principle prohibits retaliation not only for actual speech, but also for *perceived* speech. *Heffernan v. City of Paterson*, 578 U.S. 266, 272-73 (2016).

To prove retaliation, a plaintiff must show "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link [exists] between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). As the district court held, "no

genuine dispute of material fact exists as to any of these three elements." JA1681.

First, the government did not dispute below, nor does it dispute here, that Perkins engaged in protected activity by representing clients and advocating on their behalf. "[A]dvocacy by [an] attorney to the courts" is protected "speech and expression." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-45 (2001). Interference with such advocacy "implicates the client's, as well as the attorney's, First Amendment interests," *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009), including the right to petition through litigation, *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011); *see infra* p.38.

Lawyers "retain their First Amendment rights even as participants in the judicial process" and may not be punished for taking positions the President dislikes. *In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979), *overruled in part on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 & n.18, 37 (1984). Indeed, "state action designed to retaliate against and chill an attorney's advocacy … strikes at the heart of the First Amendment." *Eng*, 552 F.3d at 1069 (cleaned up).

16

Regarding the second and third elements, the Order, Fact Sheet, and surrounding context all show the Order retaliates against Perkins because of its protected activities. JA1704.

Start with the Order. In Section 1, titled "Purpose," the Order declares that it targets Perkins because it "represent[ed] failed Presidential candidate Hillary Clinton"; hired "Fusion GPS" in connection with that representation; allegedly "worked with activist donors including George Soros" to bring lawsuits to "judicially overturn …. election laws"; and promoted diversity and inclusion. Perkins EO §1. As the district court recognized, the "retaliatory nature of [the Order] is clear from its face." JA156. The government, however, closes its eyes to all of this on appeal.

The government's see-no-evil approach extends to the Fact Sheet, which the government remarkably never mentions. That document is even more explicit about the Order's retaliatory purpose, declaring Perkins will face sanctions because of its allegedly "*partisan* lawsuits against the United States," including "lawsuits against the Trump Administration" itself. JA491.

The government also maintains studied silence about the surrounding context. As the undisputed evidence shows, the President spent nearly a decade attacking Perkins' (now former) lawyers for their representations and

17

promising to punish attorneys who represented his perceived enemies. JA272-76, 1637-41. The President also filed a sanction-worthy lawsuit against Perkins, leveling the same charges found in the Order. JA268-69; *see supra* p.7.

Nor does the government acknowledge the President followed through on his threat to "go[] after" law firms by issuing similar orders against Paul Weiss, Jenner, WilmerHale, and Susman. JA282-83, 302-05, 1242. When viewed in this context, the Order is part of a larger campaign of settling scores against the President's perceived opponents.

The government ignores two additional, undisputed indicia of retaliatory purpose. First, timing: The President issued the Order nearly four years after Elias and Sussmann left Perkins, and almost ten years after the initial complained-of conduct. JA266-67. The Order's draconian, forward-looking sanctions thus do not address any supposedly ongoing risk. Instead, they are payback for the Firm's past First Amendment activities and a shot across the bow to others.

Second, the Order's retaliatory nature is "clear from its stunning overbreadth." JA1697. Although the President attributed the Order to his concerns about a "specific" former Firm partner, JA1693, the Order (1) directs agencies to limit *all 2,500 Firm personnel* (*see* JA253) from accessing federal

18

buildings or engaging with federal officials, (2) presumptively bars *all* Firm personnel, including non-lawyers, from federal employment, and (3) threatens *all* of the Firm's government-contractor clients with contract termination. Only retaliation can explain such sweeping collective punishment.

The government also ignores that it failed to offer *any* counter-evidence of intent. None. It did not produce any declaration (even *in camera*) attesting to national-security concerns. Nor did it adduce any evidence that Perkins engages in employment discrimination, as the Order alleges. *See* JA1695 n.30. The evidence of retaliatory intent is undisputed.

Finally, the government does not dispute the Order was sufficiently chilling "to deter a person of ordinary firmness" from speaking. *Aref*, 833 F.3d at 258. The chilling effects of the Order and others like it were so severe that nine major firms capitulated and pledged hundreds of millions in free legal services to advance the President's initiatives, lest he brand them as *persona non grata* too. JA1390, 1687-89; *supra* pp.9-10.

### B.    The Order Discriminates Based on Viewpoint

The district court correctly concluded the Order not only retaliates against the Firm for protected activities, but also does so based on *viewpoint*. JA1680, 1704. "It is axiomatic that the government may not regulate speech

based on its substantive content or the message it conveys." *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 828 (1995). Discrimination based on "[v]iewpoint" is an "egregious form of content discrimination," *id.* at 829, and "uniquely harmful to a free and democratic society," *Vullo*, 602 U.S. at 187.

On its face, the Order discriminates against Perkins for perceived viewpoints regarding (i) the 2016 election, (ii) the constitutionality of certain election laws, and (iii) the values of diversity and inclusion. Perkins EO §§1-5. The Fact Sheet adds that the Order discriminates against Perkins for filing "lawsuits *against the Trump Administration*," JA491, specifically, a *pro bono* suit in which the Firm represents servicemembers challenging the Administration's policy excluding transgender military personnel, JA269-70. As the court observed, "[a]ll of this language makes perfectly clear that Perkins Coie and its employees were targeted for the firm accepting clients with perceived viewpoints that are unpopular with those in current political power." JA161.

Because the Order is viewpoint discriminatory, it is unconstitutional unless the government proves it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). The government, however, makes no attempt to satisfy that exacting

20

standard, nor could it do so.  The government has no legitimate (let alone compelling) interest in punishing lawyers for representing the President's opponents or advocating positions he dislikes.  And even if it did, the Order (which applies to the *entire* Firm) is far from narrowly tailored.  *Supra* p.18.

### C.    The Government's Section-by-Section Arguments Lack Merit

Rather than engaging with the points above, the government attempts to root each section of the Order in the Executive's general powers relating to government speech, security clearances, government contracts, and employment discrimination.  But whatever the scope of those general powers, the President may not wield them to *retaliate or discriminate based on viewpoint* for First Amendment activities.  *See, e.g.*, *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714-15 (1996).[4]

*Section 1*.  The government attempts (at 60) to downplay Section 1 as merely containing "precatory language."  As the government conceded below and the court held, however, the section sets forth presidential *findings* that

---

[4] The government's section-by-section arguments also fail because they presuppose the Order is severable.  As explained by WilmerHale (at 31-33) and Jenner (at 48), however, each Order is single, inseverable act of retaliation.

instruct agencies how to implement the sanctions in the sections that follow. JA1359, 1662-63.

Nor is the government correct (at 61) that Section 1 is merely "a textbook example of government speech." If that were true, one would expect the government to cite a textbook's worth of examples where courts have deemed orders making findings adverse to private parties and imposing punishments to be mere "government speech." But the government does not cite even one. That is because "[n]o American President has ever before issued executive orders like the one at issue in this lawsuit." JA1628.

The Order is nothing like the government-speech examples that the government does cite. To take a few, those cases involved a government policy of promoting beef, *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 554 (2005), a city's refusal to erect a particular monument in a park, *Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009), the National Endowment's decisions to approve or deny art grants, *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 572-73 (1998), or a State's refusal to put a Confederate flag on license plates, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200,

203 (2015). None involved an executive official (much less the President) making findings adverse to a private party and directing agencies to impose resulting punishments.

To be sure, government officials may "share [their] views freely and criticize particular beliefs … in the hopes of persuading others." *Vullo*, 602 U.S. at 188. But officials cannot "use the power of [the State] to punish or suppress disfavored expression." *Id.* This case concerns the latter, not the former. No one is telling the President "what not to say." *Contra* Gov't Br. 1. In fact, the court made clear "[Perkins] does not seek, nor would this [c]ourt grant, an injunction to prevent President Trump from sharing his views or criticizing particular beliefs." JA1663 (cleaned up). Perkins sought only to "enjoin the *use* of the Section 1 statements by executive branch actors to justify adverse actions toward [Perkins]." JA1662. This suit, therefore, challenges "the use of governmental power, not governmental speech." *Id.*

***Section 2****. Perkins' challenges to Section 2 are justiciable for the reasons stated by WilmerHale (at 33-37) and Jenner (at 34-43), which Perkins adopts.

On the merits, the government failed to offer any evidence that national-security concerns motivated Section 2(a). There is, therefore, zero evidence

for the government's assertion on appeal (at 20) that the President "personally adjudicated the merits of suspending these individuals' access to national security information."   In contrast, as the court held, Perkins presented undisputed evidence that the government's national-security rationale was merely a pretext for retaliation.  JA1691.

First, the Paul Weiss order contained a nearly identical Section 2(a).  JA303.  But the President withdrew that order after Paul Weiss agreed to, *inter alia*, provide millions in free legal services to support the President's agenda.  JA303.  That settlement had nothing to do with national security, nor did the other eight settlements—confirming that the national-security justification is a sham.  *See supra* pp.9-10; JA1688-90, 1693-94.

Second, Section 2(a) does not even reach the former Perkins lawyers involved in the Fusion GPS matter (the only purported connection to national security offered in the Order).  JA266-67.  Instead, Section 2(a) suspends clearances of 24 *current* lawyers and staff—none of whom had any involvement with that matter—based on nothing more than guilt by association.  JA270-71.

Third, the Order's timing belies any national-security motivation.  The Fusion GPS dossier dates to 2016, and the President has been describing it as

24

"Fake" since at least 2017.  JA272.  If the 2016 dossier did not cause the President or responsible officials to revoke the clearances of Perkins personnel during his first term, "it is impossible to understand how that nearly decade-old activity could now serve as a 'national security' justification for the immediate suspension of security clearances."  JA1232.

Finally, Section 2(a)'s text undermines the government's invocation of "national security."  Section 2(a) does not even mention "national security"; it instead refers to the "national interest."  As the court noted, the latter is a "far broader and more nebulous" concept that even the government could not define.  JA1668.  The government now tries to brush this aside, arguing (at 40) that the President need not use "the magic words 'national security.'"  But when combined with the lack of any evidence the President actually considered national security and the overwhelming evidence of retaliation, the generic reference to "national interest" gives the game away.

Regarding Section 2(b), the government offers no argument and thus forfeits any challenge to the district court's order relating to that section.

***Sections 3 and 5.***  The government argues (at 48-49) that, because these sections "contemplate future implementation," Perkins' challenges are not ripe.   The government raises only *prudential* ripeness, which asks

(1) "whether the factual record [is] sufficiently developed" to render an issue fit for decision and (2) "whether hardship to the parties would result" from withholding decision. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014). Even assuming that doctrine has "continuing vitality," *id.*, it is easily satisfied.

As to Section 3, the government contends (at 49) that agencies have yet (i) to require Perkins' government-contractor clients to disclose their relationships with the Firm or (ii) to review those clients' contracts for termination. Before the TRO, however, clients reported that government officials already were directing them to disclose business with Perkins. JA328. Regardless, the very "threat" of such forced disclosure and review is *itself* retaliation. *Vullo*, 602 U.S. at 180; *see* JA1670. And the constitutionality of that threat is a "purely legal" issue that "will not be clarified" by the outcome of the review. *Susan B. Anthony List*, 573 U.S. at 167.

In all events, Section 1's findings preordain the outcome of Section 3's review. The Fact Sheet makes this unmistakable: "To ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States, the Federal Government *will prohibit* funding contractors that use [Perkins]." JA491. Accordingly, there is "no reason here to wait for

26

[the Order] to be applied." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005).

The same is true for Section 5. The government notes (at 50) agencies have not yet issued "guidance" regarding Perkins' access to federal buildings or employees. But Section 5(a) makes clear that any agency guidance must "limit[]" Perkins' access. JA1676. The Fact Sheet confirms as much: "the Federal Government *will ... restrict* [Perkins'] employees' access to government buildings." JA491. Indeed, before the TRO, federal employees already started implementing Section 5 by cancelling meetings with Perkins' attorneys—without awaiting any "guidance." JA326-27. Furthermore, the government's wait-and-see argument does not apply to Section 5(b), which immediately imposes a presumptive ban on the federal hiring of Perkins employees. Perkins EO §5(b).

The hardship prong confirms this case is ripe. Before the TRO, the threats that government contracts would be terminated and that Perkins would be barred from accessing federal buildings or engaging with federal employees caused multiple clients to sever or consider severing their relationships with the Firm. JA285-86, 328-29. Moreover, through its *in terrorem* effect, Sections 3 and 5 caused immediate injury by chilling Perkins'

and its clients' rights to free speech and association. JA328-29, 1676; *cf. Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997).

The government fares no better in arguing (at 50) the court "fail[ed] to properly analyze [Perkins'] facial challenges" to Sections 3 and 5. In the government's view (at 51-52), the court should have compared the sections' purportedly "legitimate sweep" against "any unconstitutional applications." The government did not advance this "legitimate sweep" argument below and thus has forfeited it. *See Flynt v. Shimazu*, 940 F.3d 457, 464 (9th Cir. 2019).

Regardless, the government misapprehends both the Order's relevant sections and Perkins' claims. First, unlike laws typically at issue in facial challenges, Sections 3 and 5 are not "polic[ies] of general applicability." *Lanier v. City of Woodburn*, 518 F.3d 1147, 1150 (9th Cir. 2008). Instead, they apply *only* to Perkins, either directly or through its clients.[5]

Second, Perkins' claim is that, because Sections 3 and 5 have a retaliatory purpose, they cannot be validly applied to Perkins or its clients. Where a law is enacted for an "unconstitutional purpose," it is facially invalid. *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (citing cases). An

---

[5] The only section that applies more broadly is Section 4. But the court made clear it was enjoining that section "only" as to Perkins. JA34-35.

"invalid legislative purpose pervades all of the provision's applications," making it impossible to save the statute "by severing its unconstitutional applications."  Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 279 (1994).

The undisputed facts show that Section 3 and 5 retaliate against Perkins for First Amendment activities.  JA1694-95, 1697-1700.  That purpose infects *all* possible applications.  The sections therefore have *no* "legitimate sweep." *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

Furthermore, the government's reliance on the facial-overbreadth standard is particularly misplaced with respect to viewpoint discrimination. The Supreme Court "has never applied that kind of analysis to a viewpoint-discriminatory law"; instead, a "finding of viewpoint bias end[s] the matter." *Iancu v. Brunetti*, 588 U.S. 388, 398-99 (2019).

The government also cannot save Sections 3 and 5 by pointing (at 51) to clauses requiring agencies to implement the Order "consistent with applicable law."  Such "[s]avings clauses are read in their context" and "cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language."  *City of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018); *accord HIAS, Inc. v. Trump*, 985 F.3d 309, 325

29

(4th Cir. 2021). Here, the Order unambiguously commands agencies to take retaliatory and viewpoint-discriminatory actions against the Firm and its clients. The whole point of this suit is that those actions *cannot* be taken "consistent with applicable law." If a "consistent-with-applicable-law" clause precluded examining whether actions are, in fact, consistent with law, judicial review would be a "meaningless exercise." *San Francisco*, 897 F.3d at 1240.

On the merits of Sections 3 and 5, the government (at 4, 52) contends these sections are not retaliatory or viewpoint discriminatory because they are "expressly motivated" by "unprotected conduct," including (as relevant here) alleged "race-based employment practices" and "national security risks." But even when the government offers purportedly "valid" justifications, a court "still" must assess whether the government was "actually motivated by an illegitimate purpose." *Kimberlin v. Quinlan*, 199 F.3d 496, 502 (D.C. Cir. 1999). "An ordinarily permissible exercise of discretion may become a constitutional deprivation if performed in retaliation for the exercise of a First Amendment right." *Toolasprashad v. BOP*, 286 F.3d 576, 585 (D.C. Cir. 2002) (cleaned up).

Here, the undisputed facts show Sections 3 and 5 were motivated by retaliation for First Amendment speech and petitioning. *See supra* pp.6-7. The government contends (at 53) Section 3 merely uses "the procurement power

30

to combat racial discrimination." But that rationale disintegrates upon inspection. Below, the government conceded Perkins is "not a government contractor" and "offer[ed] no evidence" that Perkins engaged in employment discrimination. JA1694-95 & n.30. The government now contends (at 53) that all that matters is whether the President "honestly and reasonably believed" Perkins engaged in such discrimination. But the government adduced *no evidence* that the President genuinely or reasonably held that (mistaken) belief, much less evidence sufficient to rebut the evidence of retaliation. *Supra* p.19.

The government's rationale also makes no sense. If Section 3 genuinely were concerned with employment discrimination, one would expect it to order termination of government contractors who engage in discrimination. But Section 3 is indifferent to contractors' employment practices. It targets contractors only because they "do business with Perkins." Perkins EO §3. The Fact Sheet explains the Order does so "[t]o ensure that taxpayer dollars no longer go to contractors whose earnings *subsidize partisan lawsuits*." JA491. That is blatant retaliation and viewpoint discrimination.

Turning to Section 5, the government asserts (at 4) it is motivated by "national security risks." But "national security" is not a "talisman" that prevents further judicial inquiry. *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017). As

discussed, the government presented no evidence it genuinely believes the Firm endangers national security. And the "stunning overbreadth" of Section 5 confirms any such concern is a sham. JA1697; *see supra* pp.18-19.[6]

Finally, the government argues (at 55) that even if the President had retaliatory motives, it is "clear" he still would have issued the Order based on "unprotected conduct." But where a plaintiff shows that protected conduct was a "motivating factor," the burden shifts to the government to prove "it would have reached the same decision … even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). As noted, the government presented no such evidence, let alone evidence sufficient to overcome the overwhelming evidence of retaliation.

***Section 4.*** The government belittles (at 41) the four district judges for supposedly treating Section 4 as "mostly an afterthought." But the district judge here dedicated an entire section to this issue, carefully considering and

---

[6] Nor can the government (at 54) justify Section 5 based on the "litigation misconduct" alleged in Section 1. That language refers to a single incident in 2021 when three attorneys—who are no longer at the Firm—were sanctioned for filing a duplicative motion. JA334. That isolated episode has no plausible connection to Section 5's sweeping restrictions.

rejecting each of the government's arguments. JA1672-75. Nothing the government says undermines the court's conclusions.

As a threshold matter, the government does not dispute that a retaliatory investigation creates a cognizable injury. *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 579 (D.C. Cir. 2025) ("*Media Matters I*").

The government instead argues (at 46) that Perkins "lack[s] standing" to challenge Section 4 because the section itself does not name Perkins. But the Fact Sheet specifically declares that "[t]he practices of Perkins Coie LLP will be reviewed." JA491. The government thus conceded below that "Section 4 directs" DOJ and EEOC "to review whether *Perkins Coie* and like employers are violating the civil rights laws." Dkt. 43 at 2. And, as the court recognized, "the inclusion of this direction in an Order explicitly targeting [Perkins] speaks volumes." JA1673.

Next, the government (at 41-42) reprises (nearly verbatim) its argument below that Section 4 "merely" directs the EEOC, under "the usual EEOC process," to do what it "is already … supposed to be doing." But the First Amendment "prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Media Matters I*, 138 F.4th at 570 (quoting *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S.

33

468, 474 (2022)).  Even if the President could lawfully direct EEOC investigations, he cannot direct a *retaliatory* investigation—just like a state attorney general's authority to issue civil investigative demands does not permit retaliatory demands, *Media Matters I*, 138 F.4th at 585, or a city council's oversight over police does not allow retaliatory arrests, *Lozman v. Riviera Beach*, 585 U.S. 87, 99-100 (2018).

The government claims (at 46-48) Perkins cannot show causation, suggesting Section 4 would have issued, or the EEOC would have investigated Perkins, even absent retaliatory motive.  But the government's generic interest in "combat[ting] illegal private-sector DEI" (at 47) does not prove it would have investigated *Perkins* absent unlawful motive.  That assertion "elide[s] the compelling evidence of the campaign of retaliation." *Media Matters I*, 138 F.4th at 579.  Indeed, the President's own statements directly evidence retaliation.  *Supra* pp.6-7; *see Media Matters for Am. v. FTC*, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025) ("*Media Matters II*").

The circumstantial evidence, including timing, further undercuts the government's causation argument.  Just eleven days after the Order issued, the EEOC sent Perkins a sweeping demand for information.  *Supra* p.9.  Even

34

the government below thought there was an obvious connection between Section 4 and the investigation, acknowledging: "Well, certainly, the order called for it." JA1459.

Finally, as the court observed, the unprecedented nature of the EEOC investigation confirms its intent to punish (and chill) First Amendment-protected activity. JA1674-75. The government tries (at 45-46) to spin the EEOC's investigation—commenced publicly and without any initiating charge, *see* JA1674-75—as informal, voluntary information gathering. But it never made that argument below, which is why it backs this new argument (at 45) with only a vague reference to the EEOC's manual and a declaration filed in an *unrelated* case. Regardless, the district court correctly concluded that the EEOC's blatant abuse of the investigatory process betrayed its retaliatory purpose. JA1695-97; *see Media Matters II*, 2025 WL 2988966, at *7 (reasoning that "sweeping demand" issued without process evidenced retaliation).

### D.    The Order Unconstitutionally Burdens the Right to Association

The district court correctly concluded that Section 3 independently violates the First Amendment by burdening Perkins' and its clients' rights to

35

association.[7]  The section's transparent goal is to deter current and potential clients from associating with Perkins, a death knell for any law firm.  The government does not dispute that the First Amendment protects lawyer-client associations, as the district court concluded.  JA1704-06 (citing *e.g.*, *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000)).  On this point, the government offers (at 57) only the non sequitur that law firms do not engage in "expressive association when serving as government contractors or sub-contractors."  But Perkins serves in neither capacity, and the government offered no evidence that it does.

Government action compelling disclosure of protected associations must satisfy "exacting scrutiny."  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021).  The government must prove (1) "a substantial relation between the disclosure requirement and a sufficiently important governmental interest" and (2) that the disclosure requirement is "narrowly tailored to the government's asserted interest."  *Id.* at 606-08.  As the court found, the government made "zero effort" to prove either element.  JA1706.

---

[7] Perkins has standing to assert its clients' rights.  *Infra* p.41.

The government asserts (at 57), without elaboration, that Section 3 is "narrowly tailored" to ensure "federal funds are not flowing to entities that have engaged in racial discrimination."  That assertion yet again ignores the Fact Sheet, which declares that Section 3's purpose is "[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits"—a blatantly unconstitutional purpose.  JA491.  And even if Section 3 served a valid purpose, the government could not meet its heavy burden to show narrow tailoring.  As the court found and the government ignores, the Order "requires disclosure of '*any* business' that contractors do with [Perkins]—not merely business related to government contracts."  JA1707.

Finally, the government notes (at 57) that the mere existence of an attorney-client relationship is not privileged.  But the First Amendment more broadly protects against compelled disclosure of "sensitive" information that "might chill association."  *Bonta,* 594 U.S. at 615, 617.  Perkins' client relationships—many of which are confidential and which Perkins cannot ethically disclose, *see* JA258-59, 284; D.C. Bar Ethics Op. 383—easily satisfy that standard.

## II.   THE DISTRICT COURT CORRECTLY HELD THE ORDER VIO-LATES PERKINS' DUE PROCESS RIGHTS

### A.   The Order Violates Procedural Due Process

The district court correctly concluded Perkins satisfied both elements of its procedural due-process claim: (1) deprivation of a protected interest in life, liberty, or property (2) without due process of law.  JA1716.  It is undisputed that the government provided no process whatsoever.  JA282.

The only question is whether the Order infringed a protected interest. On that question, the court correctly held that the Order infringed Perkins' First Amendment interest in petitioning the government.  JA1716.  First Amendment interests "undoubtedly qualif[y]" as liberty interests protected by due process. *Sherrill v. Knight*, 569 F.2d 124, 130-31 (D.C. Cir. 1977).  And the petitioning right is among the "most precious of the liberties safeguarded by the Bill of Rights." *Lozman*, 585 U.S. at 101.  That right "plainly" includes "a right of access to the courts," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-97 (1984); *accord BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002), and executive agencies, *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972).  The Order directly interferes with that right by limiting Perkins from accessing federal buildings or engaging with federal employees. Perkins EO §5(a).

The government invokes (at 58-59) *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271, 283 (1984), for the proposition that "[t]he Constitution does not grant to members of the public generally a right to be heard by public bodies." But that case merely rejected the "novel constitutional claim" that individuals "have a right to force officers of the state … to listen to them in a particular formal setting." *Id.* at 282-83. Perkins is not asserting any such right to "force" federal officers to "listen" to it in any "particular" setting. Perkins simply is asserting its petitioning right to access buildings and engage with employees on the same terms as others.

It is no answer that Perkins remains free to "bring[] and pursu[e] lawsuits." Gov't Br. 59. Even assuming Perkins could still file a lawsuit, the Firm would be limited from entering federal courthouses (run by GSA) or negotiating with federal attorneys. JA106. Nor is it an answer that the Order's full effects are unclear. As discussed, Perkins challenges are ripe now, not least because the Fact Sheet makes clear that the government "*will* halt … [Perkins'] access to government buildings," JA491, and the government already began doing so, JA285, 287.

The government also contends (at 55-57) the Order does not infringe Perkins' protected interests in its client relationships, chosen profession, and

39

reputation.  But this Court, like the court below, need not address those additional interests, because the infringement of Perkins' petitioning interest is so clear.  *See* JA1716 n.34.  In any event, Perkins incorporates Susman's arguments (at 25-28) that the Order invades those interests as well.

### B.    The Order Is Vague and Fails To Provide Fair Notice

The court also correctly held the Order is unconstitutionally vague because it "direct[s] adverse agency actions against [Perkins]" based on supposedly discriminatory "diversity, equity, and inclusion policies."  JA1722-23 (cleaned up).  Those terms fail to provide fair notice because "[t]he terms diversity, equity, and inclusion, taken collectively or individually … could refer to a wide range of actions and programs, formal or informal, as well as basic thoughts and beliefs."  JA1723.  Accordingly, courts across the country have held similar anti-DEI laws void for vagueness.  *E.g.*, *NAACP v. DOE*, 779 F. Supp. 3d 53, 66-67 (D.D.C. 2025).  The Order also is shot through with other vague terms.  For example, it instructs agencies to act against Perkins to further "the interests of the United States."  Perkins EO §5(a); *see also id.* §3(b)(ii).  That sweeping standard gives no notice of what conduct is impermissible and invites discriminatory enforcement.  JA3524.

40

Finally, Perkins lacked fair notice of what constituted punishable conduct *at the time of the relevant acts.* *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020). Perkins did not know it could be subject to sweeping sanctions for representing Hillary Clinton, promoting industry-standard diversity initiatives, or (successfully) challenging election laws. No statute, regulation, or other source of law made those activities illegal then—or now.

In response, the government asserts (at 58) only that the Order does not "proscribe any conduct" or "impose any consequences for past conduct." But imposing retaliatory consequences for past conduct is the whole point of the Order. And fair notice is required where, as here, executive action imposes "drastic" sanctions. *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).

## III. THE DISTRICT COURT CORRECTLY HELD THE ORDER VIO-LATES THE CONSTITUTIONAL RIGHTS TO COUNSEL

The district court also correctly held the Order violates clients' Fifth and Sixth Amendment rights to counsel. The government does not dispute that Perkins has standing to raise its clients' rights to counsel. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989); *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990).

41

Start with the Sixth Amendment, which guarantees criminal defendants' rights to "effective assistance of counsel," *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (cleaned up), and "to choose one's own counsel," *Wheat v. United States*, 486 U.S. 153, 159 (1988).  The government does not, and cannot, dispute that the Order interferes with the right to *effective* counsel, as the court found.  JA1711-12.  The Order directs federal agencies, including the Department of Justice, to "limit[]" the Firm from accessing federal buildings or engaging with federal employees.  Perkins EO §5(a).  Unless specifically permitted, Firm attorneys could not negotiate with federal prosecutors, accompany clients to agency meetings, or even proceed past the Executive Branch officials guarding courthouse doors.  Indeed, before the TRO, the government had already begun imposing restrictions on the Firm.  JA285, 287.  The Order also cuts the Firm off from "all Government goods, property, material, and services," Perkins EO §2(b), including, for example, the postal service, PACER, or pay.gov.

The Order likewise interferes with clients' rights "to be represented by a qualified [Perkins] attorney whom [they] choose[] and can afford."  *Luis v. United States*, 578 U.S. 5, 12 (2016).  It is irrelevant that the Order does not

42

directly outlaw hiring Perkins. Constitutional rights "protect those closely related acts necessary to their exercise." *Id.* at 26 (Thomas, J., concurring). Accessing government buildings and engaging with government employees are "necessary to make meaningful" clients' right to choose the Firm. *Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024). Indeed, the rules of professional responsibility might *require* Perkins to withdraw from representing even willing clients because the Order would so severely handicap the Firm's ability to represent them. JA1198, 1713-14.

The government responds (at 59) that courts uphold "a wide range of incidental burdens based on neutral rules." But the Order is not "neutral," nor are its burdens "incidental." It *targets* Perkins with *crippling* sanctions.

For the same reasons, the Order "also unconstitutionally invades the right to counsel in the civil context." JA1715. The Fifth Amendment protects "the right to the aid of counsel when desired and provided by" a party in civil litigation. *Powell v. Alabama*, 287 U.S. 45, 68 (1932). "[A]rbitrarily" interfering with that right is a "denial … of due process." *Id.* at 69; *see Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 872-73 (D.C. Cir. 1984).

Quoting the *WilmerHale* decision, the government contends the law firms cannot prove a Fifth Amendment violation because they "cannot allege

that their 'clients are unable to obtain alternative qualified counsel.'"  Gov't Br. 59 (quoting JA2867).  But the *WilmerHale* court misunderstood the case on which it based this conclusion, *Triplett*, 494 U.S. 715.  The claim in *Triplett* was that a neutral statute governing attorney's fees in administrative proceedings "render[ed] qualified attorneys unavailable" *generally*.  *Id.* at 717.  The Court found that Congress had "an obvious and legitimate interest" in the statute and "anecdotal evidence" failed to show that lawyers generally were unavailable.  *Id.* at 722-24.  This case does not involve a neutral statute, any obvious or legitimate government interest, or a claim that lawyers *generally* are "unavailable."  Instead, the Firm's claim is that the Order unconstitutionally interferes with clients' rights to choose *Perkins* as their counsel.

## IV.  THE DISTRICT COURT CORRECTLY HELD THE ORDER VIOLATES EQUAL PROTECTION

The district court also correctly held the Order violates the Fifth Amendment's equal-protection component.  JA1707-11.  "Nowhere are the protections of [equal protection] more critical than when [the government] singles out one or a few for uniquely disfavored treatment."  *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 813 (D.C. Cir. 1988).  Such "class-of-one" claims require showing that (1) the plaintiff has "been intentionally treated differently from others similarly situated," and (2) "there is no rational basis for the

44

difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). These requirements are easily satisfied here: as the district court held, the Order "target[s]" Perkins "out of a crowd of similar law firms for punitive measures" based on "animus." JA1708-09.

The government's one-paragraph response is meritless. First, the government claims Perkins cannot prove a "class-of-one" claim because the President targeted "multiple" firms. Gov't Br. 58 (quoting JA2864). But it makes no difference "[w]hether the complaint alleges a class of one or of five"—or as here, of four—because "the number of individuals in a class is immaterial." *Olech*, 528 U.S. at 564 n.*. What matters is that the differential treatment is arbitrary or based on animus. *Franks v. Rubitschun*, 312 F. App'x 764, 765-66 (6th Cir. 2009).

Second, the government asserts the Firm "failed to plausibly allege a group of 'similarly situated' firms." Gov't Br. 58 (quoting JA2864). But there is no need to identify comparators where, as here, "animus is readily obvious." *Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013); *see also News Am. Publ'g*, 844 F.2d at 814. Regardless, as the court explained, the government itself identified two comparator groups: (1) the roughly 360 firms that

45

adopted the Mansfield Rule and (2) the dozens of firm participants in the Sponsors for Educational Opportunity program. JA1709. Although the government asserted (without evidence) that those programs were unlawful, it targeted only Perkins and a handful of others. JA1709-10. The government provided "no plausible explanation" for that differential treatment, nor does it dispute the court's conclusion that the "obvious" reason was unlawful retaliation. JA1710.

## V.   SECTIONS 1, 3, AND 5 VIOLATE THE SEPARATION OF POWERS

Perkins also is entitled to summary judgment regarding Sections 1, 3, and 5 on the ground, raised but not reached below, that those sections violate the separation of powers. *See* JA1633 n.5. Perkins incorporates the arguments stated in WilmerHale's brief (at 26-29).

**CONCLUSION**

The Court should affirm the judgment below.

Respectfully submitted,

/s/   *Dane H. Butswinkas*
DANE H. BUTSWINKAS
AMY MASON SAHARIA
MATTHEW B. NICHOLSON
CHARLES L. MCCLOUD
WILLIAMS & CONNOLLY LLP
 *680 Maine Avenue SW*
 *Washington, DC 20024*
 *(202) 434-5000*
 *dbutswinkas@wc.com*

*Counsel for Appellee Perkins Coie LLP*

MARCH 27, 2026

47

# CERTIFICATE OF COMPLIANCE
# WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Dane H. Butswinkas, counsel for appellee Perkins Coie LLP and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1), that the attached Brief of Appellee Perkins Coie LLP, is proportionately spaced, has a serif typeface of 14 points or more, and contains 8,994 words.

/s/ *Dane H. Butswinkas*
DANE H. BUTSWINKAS
*Counsel for Appellee Perkins Coie LLP*

MARCH 27, 2026

# CERTIFICATE OF SERVICE

I, Dane H. Butswinkas, counsel for appellee Perkins Coie LLP and a member of the Bar of this Court, certify that on March 27, 2026, a copy of the attached Brief for Appellee Perkins Coie LLP was filed with the Clerk through the Court's electronic filing system.  I further certify that all parties required to be served have been served.

/s/ *Dane H. Butswinkas*
DANE H. BUTSWINKAS
*Counsel for Appellee Perkins Coie LLP*

MARCH 27, 2026

**ADDENDUM**

## TABLE OF CONTENTS

Page

U.S. Const. amend. I......................................................................................1a

U.S. Const. amend. V.....................................................................................1a

U.S. Const. amend. VI....................................................................................1a

Executive Order 14230, Addressing Risks From Perkins Coie LLP,
   90 Fed. Reg. 11781 (Mar. 6, 2025)..........................................................1a

## U.S. Constitution Amendment I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## U.S. Constitution Amendment V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## U.S. Constitution Amendment VI

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

## Executive Order 14230, Addressing Risks From Perkins Coie LLP, 90 Fed. Reg. 11781 (Mar. 6, 2025)

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* The dishonest and dangerous activity of the law firm Perkins Coie LLP ("Perkins Coie") has affected this country for decades. Notably, in 2016 while representing failed Presidential candidate Hillary Clinton, Perkins Coie hired Fusion GPS, which then manufactured a false "dossier"

designed to steal an election. This egregious activity is part of a pattern. Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification. In one such case, a court was forced to sanction Perkins Coie attorneys for an unethical lack of candor before the court.

In addition to undermining democratic elections, the integrity of our courts, and honest law enforcement, Perkins Coie racially discriminates against its own attorneys and staff, and against applicants. Perkins Coie publicly announced percentage quotas in 2019 for hiring and promotion on the basis of race and other categories prohibited by civil rights laws. It proudly excluded applicants on the basis of race for its fellowships, and it maintained these discriminatory practices until applicants harmed by them finally sued to enforce change.

My Administration is committed to ending discrimination under "diversity, equity, and inclusion" policies and ensuring that Federal benefits support the laws and policies of the United States, including those laws and policies promoting our national security and respecting the democratic process. Those who engage in blatant race-based and sex-based discrimination, including quotas, but purposefully hide the nature of such discrimination through deceiving language, have engaged in a serious violation of the public trust. Their disrespect for the bedrock principle of equality represents good cause to conclude that they neither have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds.

**Sec. 2**. *Security Clearance Review.* (a) The Attorney General, the Director of National Intelligence, and all other relevant heads of executive departments and agencies (agencies) shall immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Perkins Coie, pending a review of whether such clearances are consistent with the national interest.

(b) The Office of Management and Budget shall identify all Government goods, property, material, and services, including Sensitive Compartmented Information Facilities, provided for the benefit of Perkins Coie. The heads of all agencies providing such material or services shall, to the extent permitted by law, expeditiously cease such provision.

**Sec. 3.** *Contracting.* (a) To prevent the transfer of taxpayer dollars to Federal contractors whose earnings subsidize, among other things, racial discrimination, falsified documents designed to weaponize the Government against candidates for office, and anti-democratic election changes that invite fraud and distrust, Government contracting agencies shall, to the extent permissible by law, require Government contractors to disclose any business they do with Perkins Coie and whether that business is related to the subject of the Government contract.

(b) The heads of all agencies shall review all contracts with Perkins Coie or with entities that disclose doing business with Perkins Coie under subsection (a) of this section. To the extent permitted by law, the heads of agencies shall:

(i) take appropriate steps to terminate any contract, to the maximum extent permitted by applicable law, including the Federal Acquisition Regulation, for which Perkins Coie has been hired to perform any service;

(ii) otherwise align their agency funding decisions with the interests of the citizens of the United States; with the goals and priorities of my Administration as expressed in executive actions, especially Executive Order 14147 of January 20, 2025 (Ending the Weaponization of the Federal Government); and as heads of agencies deem appropriate. Within 30 days of the date of this order, all agencies shall submit to the Director of the Office of Management and Budget an assessment of contracts with Perkins Coie or with entities that do business with Perkins Coie effective as of the date of this order and any actions taken with respect to those contracts in accordance with this order.

**Sec. 4.** *Racial Discrimination.* (a) The Chair of the Equal Employment Opportunity Commission shall review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964, including whether large law firms: reserve certain positions, such as summer associate spots, for individuals of preferred races; promote individuals on a discriminatory basis; permit client access on a discriminatory basis; or provide access to events, trainings, or travel on a discriminatory basis.

(b) The Attorney General, in coordination with the Chair of the Equal Employment Opportunity Commission and in consultation with State Attorneys General as appropriate, shall investigate the practices of large law firms as described in subsection (a) of this section who do business with Federal entities for compliance with race-based and sex-based non-discrimination laws and take any additional actions the Attorney General deems appropriate in light of the evidence uncovered.

**Sec. 5**. *Personnel.*  (a) The heads of all agencies shall, to the extent permitted by law, provide guidance limiting official access from Federal Government buildings to employees of Perkins Coie when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States. In addition, the heads of all agencies shall provide guidance limiting Government employees acting in their official capacity from engaging with Perkins Coie employees to ensure consistency with the national security and other interests of the United States.

(b) Agency officials shall, to the extent permitted by law, refrain from hiring employees of Perkins Coie, absent a waiver from the head of the agency, made in consultation with the Director of the Office of Personnel Management, that such hire will not threaten the national security of the United States.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

*Donald J. Trump*

THE WHITE HOUSE,
*March 6, 2025.*

4a
