(Oral Argument May 14, 2026)

Nos. 25-5241, 25-5265, 25-5277 & 25-5310

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Perkins Coie LLP v. United States Department of Justice

Jenner & Block LLP v. United States Department of Justice

Wilmer Cutler Pickering Hale & Dorr LLP, v. Executive Office of the President

Susman Godfrey LLP v. Executive Office of the President

---

On Appeal from the United States District Court
for the District of Columbia

---

**Amicus Brief of Prof. Aaron H. Caplan Regarding Attainder,
In Support of Plaintiffs-Appellees and Affirmance**

---

Stephen C. Leckar, D.C. Bar # 281691
Kalbian Hagerty, LLP
888-17th St., NW, Twelfth Floor
Washington, D.C. 20006
Telephone: (202) 223-5600
Facsimile: (202) 223-6625
sleckar@kalbianhagerty.com

Attorney for Amicus
Professor Aaron H. Caplan

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel certifies as follows:

### A.     Parties and *Amici*

All parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief of Defendants-Appellants. Pursuant to DC Circuit Rule 29(a), counsel knows of no other amici who intend to submit briefing to this Court on the arguments contained here.

### B.     Rulings Under Review

References to the rulings at issue appear in the Brief for Defendants-Appellants.

### C.     Related Cases

The Court has scheduled oral argument in these consolidated cases for the same day as *Zaid v. Executive Office of the President*, No. 26-5009.

/s/ *Stephen C. Leckar*

Counsel for Amicus

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

TABLE OF AUTHORITIES ................................................................................ iii

INTEREST OF AMICUS .................................................................................. 1

SUMMARY OF ARGUMENT ........................................................................ 1

ARGUMENT .................................................................................................... 2

    A.    The Attainder Clause Forbids Executive Actions that Specify Persons for Punishment Without Trial or Other Process. ............ 3

        1.    The Framers Knew and Loathed Bills of Attainder ........... 3

        2.    Attainder Clause Decisions Are Closely On Point. ........... 8

            a)    Decisions Finding Attainder Violations .................. 8

            b)    Decisions Analogous to Attainder Violations ......... 11

        3.    Attainders Threaten Bedrock Constitutional Values. ........ 14

            a)    Procedural Fairness ................................................. 14

            b)    Separation of Powers ............................................... 14

            c)    Political Persecution ................................................ 15

        4.    Like the Legislative Branch, the Executive Branch Has No Power to Impose Attainder. ........................................ 16

            a)    The Due Process Clause. .......................................... 17

            b)    The Take Care Clause ............................................... 19

            c)    The Fourteenth Amendment Privileges or Immunities Clause. ................................................. 21

    B.    The Record Establishes an Attainder Violation. .......................... 22

        1.    The Executive Orders Specify Who Will Be Affected ...... 23

2.    The Executive Orders Impose Punishment.......................... 23

C.    Attainder Theory Perfectly Matches the Facts and
Circumstances of These Cases. ..................................................... 26

CONCLUSION ...................................................................................... 29

CERTIFICATE OF COMPLIANCE ................................................... 30

CERTIFICATE OF SERVICE ............................................................ 30

# TABLE OF AUTHORITIES

\* Authorities on which *amicus* chiefly relies are marked with asterisks.

*Biden v. Knight First Amendment Institute*,
  141 S.Ct. 1220 (2021) ...............................................................................17

*Calder v. Bull*,
  3 U.S. 386 (1798) ......................................................................................27

*Campbell v. District of Columbia*,
  894 F.3d 281 (D.C. Cir. 2018) ..................................................................13

*Cohen v. Hurley*,
  366 U.S. 117 (1961) ..................................................................................18

*\*Cummings v. Missouri*,
  71 U.S. 277 (1866) ............................................................... 8, 9, 18, 19, 24

*Dent v. West Virginia,*
  129 U.S. 114 (1889)...........................................................................18, 19, 23

*\* Ex Parte Garland*,
  71 U.S. 333 (1866) ................................................................ 9, 18, 19, 24

*Ex Parte Wall*,
  107 U.S. 265 (1883)...................................................................................19

*Flemming v. Nestor*,
  363 U.S. 603 (1960) ..................................................................................23

*Fletcher v. Peck*,
  10 U.S. 87 (1810) ......................................................................................16

*Foretich v. United States*,
  351 F.3d 1198 (D.C. Cir. 2003) ................................................................22

*Hawker v. New York*,
  170 U.S. 189 (1898) .............................................................................19, 23

iii

*INS v. Chadha*,
   462 U.S. 919 (1983) ...................................................................15

*\*Jenkins v. McKeithen*,
   395 U.S. 411 (1969) ...............................................................25, 26

*Jones v. Brim,*
   165 U.S. 180 (1897)...................................................................19

*\*Joint Anti-Fascist Refugee Committee v. McGrath*,
   341 U.S. 123 (1951) .............................................................11, 12, 27

*Kennedy v. Mendoza-Martinez*,
   372 U.S. 144 (1963) ...................................................................23

*Little v. Barreme*,
   6 U.S. 170 (1804) .......................................................................19

*Lynce v. Mathis*,
   519 U.S. 433 (1997) ...................................................................22

*Nixon v. Administrator of General Services,*
   433 U.S. 425 (1977) ...............................................................23, 24

*Palko v. Connecticut*,
   302 U.S. 319 (1937)...................................................................18

*Perkins Coie LLP v. U.S. Department of Justice,*
   783 F. Supp. 3d 105 (D.D.C. 2025) ................................................. 3

*Peters v. Hobby*,
   349 U.S. 331 (1955) .............................................................12, 13, 27

*\* Pierce v. Carskadon*,
   83 U.S. 234 (1872) ...............................................................9, 18, 24

*The Slaughterhouse Cases*,
   83 U.S. 36 (1872)...................................................................22

iv

*Timbs v. Indiana*,
        586 U.S. 146 (2019)..........................................................................17

*Trump v. Hawai'i*,
        585 U.S. 667 (2018)..........................................................................17

*\*United States v. Brown*,
        381 U.S. 437 (1965) .......................................................7, 10, 15, 24, 27

*\*United States v. Lovett*,
        328 U.S. 303 (1946) ..............................................................9, 10, 24, 27

*United States ex rel. Heath v. AT&T*,
        791 F.3d 112 (D.C. Cir. 2015) ..............................................................2

*Wisconsin v. Constantineau,*
        400 U.S. 433 (1971) ...........................................................................13

*Youngstown Sheet & Tube Co. v. Sawyer*,
        343 U.S. 579 (1952) ......................................................................19, 20

*Zaid v. Executive Office of the President*,
        2025 WL 3724884 (D.D.C. Dec. 23, 2025) .............................................2

**Court Rules**

FRAP 29(f)..............................................................................................30

FRAP 29(a)(5)..........................................................................................30

**Constitutional Provisions**

Art. I, §3, cl. 1 (Impeachment Trial Clause)..................................................15

Art. I, §3, cl. 6 (Impeachment Trial Clause)..................................................15

Art. I, §9 (Federal Attainder Clause) ........................................................2, 20

Art. I, §9, cl. 3 (Federal Attainder Clause) .....................................................7

v

Art. I, §9, cl. 7 (Federal Attainder Clause) ........................................20

Art. I, §9, cl. 8 (Federal Attainder Clause) ........................................20

Art. I, §10, cl. 1 (State Attainder Clause) ............................................7

Art. II, §3 (Take Care Clause) ...........................................................19

Art. III, § 3, cl. 1 (Treason Clause) ..............................................6, 15

Art. III, § 3, cl. 2 (Attainder of Treason Clause) .................................6

Amendment 14, § 1 (Privileges or Immunities Clause) ...............15, 19, 21

## Other Authorities

William Blackstone, COMMENTARY ON THE LAWS OF ENGLAND 374 (1765)....3

* Aaron H. Caplan, *Nonattainder as a Liberty Interest*, 2010 Wis. L. Rev. 1203 ...................................................................1, 13, 15, 18, 23, 26

Zechariah Chafee, Jr., THREE HUMAN RIGHTS IN THE CONSTITUTION OF 1787 (1956) ...............................................................................................4

John Hart Ely, *A Suggested Approach to the Bill of Attainder Clause*, 72 Yale L.J. 330 (1962) ........................................................14

Christopher R. Green, *Justice Gorsuch and Moral Reality*, 70 Alabama L. Rev. 635 (2019) ....................................................21, 22

* Harold Hongju Koh et al., "No, The President Cannot Issue Bills of Attainder,"
JUST SECURITY (April 9, 2025), available at https://www.justsecurity.org/110109/president-cannot-issue-attainder-bills/, archived at https://perma.cc/2EWF-AFG5 ..............................5, 6, 7, 21

David Kairys, *The Bill of Attainder Clauses and Legislative and Administrative Suppression of "Subversives,"* 67 Colum. L. Rev. 1490 (1967) ..........17

Note, *Beyond Process: A Substantive Rationale for the Bill of Attainder Clause,* 70 Va. L. Rev. 475 (1984) ...................................................................27

Note, *The Supreme Court, 1964 Term,* 79 Harv. L. Rev. 105 (1965).............16

Platt Potter, "Of American Constitutional Power," in Fortunatus Dwarris, *A General Treatise on Statutes* (Platt Potter ed. 1871) ......................................19

Jacob Reynolds, *The Rule of Law and the Origins of the Bill of Attainder Clause,* 18 St. Thomas L. Rev. 177 (2005) ........................................................5

Matthew Steilen, *Bills of Attainder*, 53 Hous. L. Rev. 767 (2016) ...........16, 17

Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833) ...............................................................................................................8, 16

*The Federalist Papers* (1788) ................................................................5, 7, 28

Laurence Tribe, AMERICAN CONSTITUTIONAL LAW (2nd Ed. 1988).................16

## INTEREST OF AMICUS[1]

Amicus Aaron H. Caplan is a retired Professor of Law at LMU Loyola Law School in Los Angeles. He authored a casebook titled *An Integrated Approach to Constitutional Law* (Foundation Press 3rd Ed. 2023) and articles examining the interaction of due process and free speech principles. Of greatest relevance to this brief is his article explaining how executive branch blacklisting can violate due process by depriving the liberty to be free of acts of attainder. *Nonattainder as a Liberty Interest*, 2010 Wis. L. Rev. 1203 ("*Nonattainder*").

## SUMMARY OF ARGUMENT

In addition to other reasons for affirmance, the judgments below should be affirmed because the challenged Executive Orders violate the right not to be singled out for punishment without trial or other process – a right rooted in the Attainder Clauses.

Specifically: (a) The Attainder Clauses reflect a policy that applies to not only to "bills" of attainder passed by a legislature, but to equivalent actions by the executive. (b) The records establish violations of rights protected by the Attainder Clause. (c) The Attainder Clause precedents perfectly match the facts of these

---

[1] Pursuant to FRAP 29(a)(4), counsel for amicus certifies that no counsel for a party authored this brief in whole or in part, and that no person other than amicus or his counsel made a monetary contribution to the brief's preparation or submission.

cases. Their many similarities help explain why the Executive Orders are so alien to our traditions as a nation under law.

## ARGUMENT

The challenged Executive Orders specify law firms for politically-motivated punishment without trial or any other process. Four separate trial courts found that the Orders violated constitutional rights, including freedom of speech and the right to counsel. Because a court of appeals may affirm a judgment on any basis adequately supported by the record, *United States ex rel. Heath v. AT&T*, 791 F.3d 112, 123 (D.C. Cir. 2015), this Court may also affirm on grounds rooted in the Constitution's Art. I, § 9 ban on federal bills of attainder. On these facts, attainder is more than just a metaphor: it is an independent basis for judgment. Executive branch *acts* of attainder violate constitutional rights in the same manner, and for the same improper reasons, as legislative branch *bills* of attainder. Given the Administration's flood of punitive executive actions, this appeal would be an appropriate moment for the Court's guidance on the topic.

The attainder theory was recently upheld in a portion of *Zaid v. Executive Office of the President*, 2025 WL 3724884 (D.D.C. Dec. 23, 2025), that is not pending in that case's interlocutory appeal of a preliminary injunction. Denying a motion to dismiss, the district court found that the targeted attorney stated a claim of attainder violation when an executive order made it impossible to continue

2

representing much of his clientele. "It is hard to imagine," said the court, that "the Framers would have prohibited legislative bills of attainder while leaving the executive branch free to attaint whomever it likes." *Id.* at \*16. The theory also appeared in *Perkins Coie LLP v. U.S. Department of Justice*, 783 F. Supp. 3d 105, 173 n.36 (D.D.C. 2025) (Executive Order was "indistinguishable from a bill of attainder" in that it "targets plaintiff specifically, finds facts and declares plaintiff guilty [of misconduct], and imposes multiple forms of punitive adverse actions, without notice or other judicial process protections"). The parties' coordinated briefing refers to the Attainder Clause and cases applying it. WilmerHale Br. 1, 27.

**A.    The Attainder Clause Forbids Executive Actions that Specify Persons for Punishment Without Trial or Other Process.**

**1.    The Framers Knew and Loathed Bills of Attainder.**

Under the English law inherited by the newly independent States, "attainder" was an especially harsh form of punishment typically reserved for treason or other crimes against the state. Attainder went beyond the death penalty for the traitor, also preventing any inheritance of land or title by the traitor's descendants. 4 William Blackstone, COMMENTARY ON THE LAWS OF ENGLAND 374 (1765) ("the consequences of attainder are forfeiture, and corruption of blood").

In England, attainder could result from a successful criminal prosecution or from a non-judicial declaration of guilt by Parliament. *Id.* at 256. These "bills of attainder" – first used in the 1300s and last imposed in 1798 – were legislative acts

3

that would specify an individual (typically one suspected of disloyalty or unhealthy political ambition), declare that person guilty of some sort of wrongdoing, and decree the punishment to be imposed. Parliament also had the ability to pass a "bill of pains and penalties" to impose punishments less severe than attainder.

Famous bills of attainder, such as the one against the Earl of Strafford in 1641, were well known in the Founders' generation. Parliament disliked Strafford, a nobleman and military leader placed in high office by the (soon to be deposed) Charles I. Parliament attempted to impeach Strafford to remove him from power, but there was no proof of his committing any impeachable offenses. Undeterred, Parliament enacted a bill of attainder declaring Strafford guilty of treason and commanding his public execution. Unlike the quasi-judicial impeachment process, a bill of attainder required no weighing of evidence. See Zechariah Chafee, Jr., THREE HUMAN RIGHTS IN THE CONSTITUTION OF 1787, at 109–13 (1956) (describing the Strafford attainder and others known to the Framers).

During the Revolutionary War, several of the newly-independent American States enacted bills of attainder against British loyalists. In 1779, the New York legislature declared that 59 loyalists were guilty of the novel offense of having "voluntarily been adherent" to King George III. The attainted New Yorkers forfeited their property but were given the option of banishment in lieu of execution. John Jay wrote that "New York is disgraced by injustice too palpable to

4

admit even of palliation." *Id.* at 93. Thomas Jefferson had a role in enacting a Virginia bill of attainder against the Tory guerrilla warrior Josiah Phillips in 1778; by the time of Virginia's ratification debates in 1788 the state's leading figures, including then-governor Edmund Randolph and future Chief Justice John Marshall, recalled the incident with shame and regret. See Jacob Reynolds, *The Rule of Law and the Origins of the Bill of Attainder Clause*, 18 St. Thomas L. Rev. 177, 193-200 (2005). When discussing the need for attainder clauses in the new federal constitution, James Madison observed that although several state constitutions barred bills of attainder, "our own experience has taught us nevertheless, that additional fences against these dangers ought not to be omitted." *The Federalist* #44 (1788).

This quickly-regretted wave of State-law attainders often targeted attorneys who might represent the legislatures' perceived enemies.

> As Revolutionary fervor swept through the colonies, attorneys associated with loyalist interests found themselves particularly vulnerable. Everyone understood that the surest way to curtail loyalist power was to limit their access to legal representation. … Accordingly, New Jersey closed its courts to Loyalist attorneys. Pennsylvania extended bills of pains and penalties to lawyers and other professionals, effectively destroying their livelihoods without judicial process. New York suspended Tory lawyers' right to practice their profession.

Harold Hongju Koh et al., *No, The President Cannot Issue Bills of Attainder*, JUST SECURITY (April 9, 2025), available at

https://www.justsecurity.org/110109/president-cannot-issue-attainder-bills/,

archived at https://perma.cc/2EWF-AFG5 ("Koh").

After war fever subsided and the Articles of Confederation revealed their shortcomings, delegates gathered in Philadelphia in 1787 to draft our current Constitution. There was unanimous agreement that attainder was a vestige of tyranny that should have no place in the new nation. As ultimately ratified, the Constitution addressed attainder in the two locations necessary to close off the judicial and political paths by which attainder had been imposed under English and early American law.

For the judicial path, the Framers recognized that the accusation of treason had been misused for centuries. To ensure that unfounded or nebulous claims of disloyalty or national security risk did not become the basis for criminal charges, Art. III, §3, cl. 1 imposed substantive and procedural limits that would allow treason prosecutions only under narrow circumstances. Next, Art. III, § 3, cl. 2 specified that "no attainder of treason shall work corruption of blood, or [permanent] forfeiture" of property.

For the political path, the Framers understood that English and early American law did not allow the king or a state governor to unilaterally impose attainder. By the 1400s, "the law was settled: even where a bill of attainder was introduced on the king's behalf, the Executive could not issue the bill alone: the

6

consent of both branches of Parliament was requisite." Koh. Not even Henry VIII –

who sought attainder against hundreds of opponents – thought he could inflict this

punishment unilaterally, instead asking Parliament to pass bills. For the Framers,

this history meant that a purely executive attainder had never been allowed. Non-

judicial attainder required the legislature and executive to work together to pass

and sign a bill and then to enforce it. As a result, halting the legislative portion of

the process would be sufficient to remove the threat. As explained by Prof. Koh:

> The attainder was the king's instrument as much as Parliament's, and the Framers understood it as an abuse of governmental power broadly conceived, not merely a legislative excess. Thus, America's president, with powers much inferior to those of the British Crown, cannot claim a power even the king did not possess.

The language effectuating this ban was straightforward. At the federal level,

"No bill of attainder or ex post facto law shall be passed." Art. I, §9, cl. 3. The

same prohibition was repeated for the states. Art. I, §10, cl. 1 ("No State shall …

pass any bill of attainder [or] ex post facto law"). The linkage of bills of attainder

and ex post facto laws made sense, because the attainder power allows a legislature

to punish people for conduct that was not criminal at the time it was performed.

The Attainder Clauses were adopted unanimously and without debate.

*United States v. Brown*, 381 U.S. 437, 441 (1965). In *The Federalist* #44 (January

25, 1788), James Madison wrote that bills of attainder "are contrary to the first

principles of the social compact, and to every principle of sound legislation."

A few decades later, Joseph Story explained that when enacting bills of attainder, the legislature exercises "what may be properly deemed an irresponsible despotic discretion, being governed solely by what it deems political necessity or expediency, and too often under the influence of unreasonable fears, or unfounded suspicions. … The injustice and iniquity of such acts, in general, constitute an irresistible argument against the existence of the power." 3 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 678 at 484-85 (1833). The Constitution's ban on bills of attainder has consistently been interpreted to also ban "bills of pains and penalties" that impose punishment less severe than execution. *Cummings v. Missouri*, 71 U.S. 277, 323 (1866).

## 2.    Attainder Clause Decisions Are Closely On Point.

### a)    Decisions Finding Attainder Violations

The Supreme Court has invalidated laws under the Attainder Clauses on five occasions. Each involved enactments that singled out suspected political opponents for punishment during times of intense political polarization.

Several laws enacted in 1865, in the wake of the Civil War, were aimed at supporters of the vanquished Confederacy. These laws denied legal rights to people who could not swear an oath that they had not supported the Confederacy – a group that could be reduced to a finite list of named persons. The state law in *Cummings v. Missouri*, 71 U.S. 277 (1866) denied business and occupational

8

licenses to those who could not take the oath. (The challenger in *Cummings* was a member of the clergy, but the statute would also reach licensed attorneys.) The Court found that the Missouri law violated the Attainder Clause. It specified the persons to be affected as "a whole class," even if they were not identified by name, *id.* at 323; the denial of otherwise available business licenses constituted punishment, *id.* at 320; and there was no trial, *id.* at 329.

The federal law in the companion case of *Ex Parte Garland*, 71 U.S. 333 (1866), prohibited any person who could not take the oath from acting as an attorney in the federal courts. The Supreme Court also invalidated that measure, because it effectively specified which people would receive punishment for past disloyalty. *Id.* at 377. A few years later, *Pierce v. Carskadon*, 83 U.S. 234, 239 (1872), invalidated a West Virginia law that barred former Confederates from collecting debts in that state's courts. The law's unconstitutionality was so obvious that the Court resolved it in a two-sentence opinion citing *Cummings* and *Garland*.

The Supreme Court next encountered bills of attainder during the mid-twentieth century's politically fraught anti-Communist turmoil. *United States v. Lovett*, 328 U.S. 303 (1946), involved three federal employees who, along with a few dozen others, had been denounced on the floor of Congress by Rep. Martin Dies, chair of the House Committee on Un-American Activities. Dies called the employees "irresponsible, unrepresentative, crackpot, radical bureaucrats" and

9

affiliates of "communist front organizations." *Id.* at 308-09. The Committee then conducted hearings and determined that the three had engaged in "subversive activity" – a deliberately vague term not defined by statute but invented by the Committee for purposes of the investigation. *Id.* at 311-12 & n.3. Armed with this dubious finding, Congress included a proviso in an appropriations bill forbidding use of the funds "to pay any part of the salary, or other compensation for the personal services, of Goodwin B. Watson, William E. Dodd, Jr., and Robert Morss Lovett." *Id.* at 305 n.1. The Court held that Congress could not use its power of the purse to specify persons for punishment without trial. *Id.* at 316-17.

The federal statute in *United States v. Brown*, 381 U.S. at 461, was not as blatant as the *Lovett* statute in naming specific individuals, but it named a group with a finite and identifiable membership: the Communist Party. Specifically, the statute made it a crime for any Communist Party member to serve as a labor union officer or employee. *Brown* held that this was a specification of targeted individuals, *id.* at 461; that imposed punishment, *id.* at 457-58; and provided no trial. "The purpose of the statute before us is to purge the governing boards of labor unions of those whom Congress regards as guilty of subversive acts and associations." *Id.* at 460. The Court accordingly found the statute to be "void as a bill of attainder." *Id.* at 440.

10

**b)**     **Decisions Analogous to Attainder Violations**

Beyond the five cases described above, several other Supreme Court opinions invalidated blacklisting laws on various grounds – with one or more justices also relying on the Attainder Clause. *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951), involved President Truman's Executive Order 9835 of 1947, sometimes known as "The Loyalty Order." The Loyalty Order directed the U.S. Attorney General to make a list of organizations deemed "totalitarian, fascist, communist or subversive." The list would be given to the Loyalty Review Board of the Civil Service Commission, which in turn would encourage federal agencies to use the list to dismiss employees for disloyalty. When several organizations challenged their listing, five Justices issued five separate opinions explaining why the blacklisting was improper. Justice Burton (joined by Justice Douglas) held that the act was *ultra vires* because "patently arbitrary" decisions on whether an organization was subversive exceeded Executive Order's scope. *Id.* at 137-38. Justice Douglas's solo concurrence found a combination of due process violations, including vagueness, lack of notice, and lack of opportunity to be heard. *Id.* at 176. Justice Jackson found a due process violation in the lack of a hearing, *id.* at 187, while Justice Frankfurter's concurrence found a violation "when judged by our whole experience with the Due Process Clause," *id.* at 165. Justice Black argued that the blacklisting violated the Due Process Clause and the First Amendment – and the Attainder Clause.

11

> Officially prepared and proclaimed governmental blacklists possess almost every quality of bills of attainder, the use of which was from the beginning forbidden to both national and state governments. It is true that the classic bill of attainder was a condemnation by the legislature following investigation by that body, while in the present case the Attorney General performed the official tasks. But I cannot believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution.

*Id.* at 143-44 (Black, J., concurring).

The plaintiff in *Peters v. Hobby*, 349 U.S. 331 (1955), lost a federal position under the same Loyalty Order. He had been cleared of accusations by his own agency, but the Loyalty Review Board *sua sponte* reopened an investigation that led to his dismissal. Citing doctrines of constitutional avoidance, *id.* at 338, the majority decided the case on *ultra vires* grounds: the Executive Order empowered the Board to review dismissal recommendations, not to initiate them. *Id.* at 339-40. Concurring separately, Justice Douglas found it necessary to reach the constitutional questions, *id.* at 350, which included the right to confront accusers and the lack of even the "rudiments of a fair trial." *Id.* at 351. Justice Douglas also analogized the case to an executive branch act of attainder: "If [plaintiff] were condemned by Congress and made ineligible for government employment, he would suffer a bill of attainder, outlawed by the Constitution. An administrative agency – the creature of Congress – certainly cannot exercise powers that Congress

12

itself is barred from asserting." *Id.* at 352. Justice Black expressed agreement with the Douglas dissent. *Id.* at 349.

Finally, in *Wisconsin v. Constantineau,* 400 U.S. 433 (1971), a local police chief instructed taverns and liquor stores not to sell the plaintiff any alcohol. In an opinion that became the source of the due process "stigma-plus" doctrine, *see e.g.*, Jenner Br. 26; *Campbell v. District of Columbia*, 894 F.3d 281, 284 (D.C. Cir. 2018), the majority found that "when a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." 400 U.S. at 437. Justice Black, joined by Justice Blackmun, dissented on jurisdictional grounds, but he agreed that if state law authorized the blacklisting described in plaintiff's complaint, it would be unconstitutional. "The effect of such sweeping powers, if there is nothing else in the State's law to limit them, is practically the same as that of an old common-law bill of attainder. … And here the Wisconsin law purports on its face to place such arbitrary and tyrannical power in the hands of minor officers and others that these modern bills of attainder can be issued *ex parte*, without notice or hearing of any kind or character." *Id.* at 444. See *Nonattainder, 2010 Wis. L.Rev.* at 1215-27 & 1263-64 (examining *Constantineau*).

Significantly, no justice in these cases ever rejected the invocations of attainder principles by Justices Black, Douglas, and Blackmun.

13

### 3.    Attainders Threaten Bedrock Constitutional Values.

#### a)    Procedural Fairness

By insisting that punishment for wrongdoing be channeled into judicial forums, the attainder ban demands procedural fairness. Courts, after all, are governed by the many procedural protections arising from Article III and the Fifth and Sixth Amendments. In the political branches, by comparison, anything goes. Punishment could be imposed on the basis of hearsay evidence or no evidence at all. Punishment could be motivated by whim, jealousy, or cruelty. No method exists for the accused to mount a defense, because unlike courts, political actors are unconstrained by the adversarial system and not required to state reasons for their decisions. See *Nonattainder* at 1232-34.

#### b)    Separation of Powers

The Attainder Clause has a profound relationship to separation of powers. Prof. John Hart Ely's influential student note, *The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause*, 72 Yale L.J. 330 (1962), was among the first to examine the connection. For Ely, the Attainder Clause kept the legislature from invading the province of the judiciary, much as the Article III case or controversy requirement kept the judiciary from assuming the roles of the other branches. *Id.* at 343. The Attainder Clause prevents any single

14

branch of government from acting simultaneously as lawmaker, prosecutor, judge, jury, and executioner.

Ely's reasoning was endorsed in *Brown*, which confirmed that "the Bill of Attainder Clause was intended not as a narrow, technical (and soon to be outmoded) prohibition [on a specific form of legislation], but rather as an implementation of the separation of powers." 381 U.S. at 442. *See also INS v. Chadha*, 462 U.S. 919, 962 (1983) (Powell, J., concurring).

### c)    Political Persecution

The Attainder Clauses belong to a cluster of constitutional provisions designed to avoid political persecution. *Nonattainder* at 1236-37. These include a narrow definition of treason in Art. III, § 3, cl. 1, and an impeachment process that requires Senators to act "on oath or affirmation," Art. I, § 3, cl. 6, which requires Senators to mentally view themselves as judge and jury, rather than as purely political actors. Along the same lines, the founding generation understood that attainder was a symptom of, and a goad to, unchecked political passion and vindictiveness. Justice Story observed that "in the hands of a reigning faction, [the power of attainder] might be, and probably would be, abused to the ruin and death of the most virtuous citizens. Bills of this sort have been most usually passed in England in times of rebellion, or of gross subserviency to the crown, or of violent political excitements; periods, in which all nations are most liable (as well the free,

15

as the enslaved) to forget their duties, and to trample upon the rights and liberties of others." 3 Joseph Story, COMMENTARIES at 484-85 (1833). Chief Justice John Marshall observed that the ban on attainder helps avoid "the violent acts which might grow out of the feelings of the moment" and "those sudden and strong passions to which men are exposed." *Fletcher v. Peck*, 10 U.S. 87, 137-38 (1810).

### 4. Like the Legislative Branch, the Executive Branch Has No Power to Impose Attainder.

A legislative branch bill of attainder is tyranny of the majority in its purest form: on majority vote, a person is declared a wrongdoer and punished without trial. An act of attainder imposed through executive order is an even more concentrated form of tyranny. It imposes the same harms to the constitutional values described above as a legislative bill of attainder does.

Application of the Attainder Clauses to executive action has scholarly support. "It would make no sense to view the ban [on attainder] as less applicable to executive officers or administrative agencies than to legislative assemblies." Laurence Tribe, AMERICAN CONSTITUTIONAL LAW §10-6 at 661 (2nd Ed. 1988), citing Note, *The Supreme Court, 1964 Term,* 79 Harv. L. Rev. 105, 121 (1965) (the Attainder Clauses should be understood "not to prohibit trial by a particular *body* but rather to prohibit trial by legislative *method*, that is, to assure a defendant adequate judicial safeguards regardless of what body tries him") (emphasis added by Tribe). *See also* Matthew Steilen, *Bills of Attainder*, 53 Hous. L. Rev. 767, 891

16

(2016) ("the primary purpose of the Bill of Attainder Clauses was to prohibit a summary form of *proceeding,* rather than a proceeding in a certain *body*"); David Kairys, *The Bill of Attainder Clauses and Legislative and Administrative Suppression of "Subversives,"* 67 Colum. L. Rev. 1490, 1500-02 (1967) ("no principled distinction can be made, for the purposes of the bill of attainder clauses, between legislatures and administrative agencies").

The Constitution's text contains three paths that apply Art. I attainder principles to the executive branch.

### a)    The Due Process Clause.

The Due Process Clauses protect against wrongful deprivation of "liberty," a term that incorporates "fundamental" rights. *Timbs v. Indiana*, 586 U.S. 146, 150 (2019). And the Fifth Amendment Due Process Clause binds all branches of the federal government, the executive branch included. This type of incorporation across branches – which we might call "horizontal incorporation" – explains why the President must respect First Amendment rights, even though that Amendment is phrased in terms of the powers of "Congress." See, e.g., *Biden v. Knight First Amendment Institute*, 141 S.Ct. 1220 (2021) (Thomas, J., concurring) (assessing Presidential compliance with the Speech Clause); *Trump v. Hawai'i*, 585 U.S. 667 (2018) (assessing Presidential compliance with the Establishment Clause). Under any possible standard for determining whether a right is fundamental enough to be

17

incorporated, the Attainder Clause qualifies. Justice Black observed – in a case involving punishment of a lawyer for exercising constitutional rights – that the Art. I protections against attainder and ex post facto punishments are part of the "law of the land" enforced through the Due Process Clauses. *Cohen v. Hurley*, 366 U.S. 117, 141 (1961) (Black, J., dissenting). And given the horrors that flowed from English attainders, it is no exaggeration to say that "neither liberty nor justice would exist" if they were allowed. *Palko v. Connecticut*, 302 U.S. 319, 326 (1937).

Two cases from the late nineteenth century illustrate how the Supreme Court has treated freedom from attainder as a due process liberty interest.

The state law in *Dent v. West Virginia,* 129 U.S. 114 (1889), denied medical licenses to persons who had not attended medical school. The case was framed as a due process challenge. The word "attainder" appears nowhere in the opinion, but the result turned on Attainder Clause precedents. The opinion included a string cite to five cases for the proposition that the "great purpose" of the Due Process Clause "is to exclude everything that is arbitrary and capricious in legislation affecting the rights of the citizen." *Id.* at 124. But to resolve the case, the opinion gave close discussion of only three precedents: *Cummings*, *Garland*, and *Pierce*. *Id* at 125-28. The majority correctly concluded that these cases were distinguishable, and that the West Virginia law was not a forbidden attainder.

18

The law in *Hawker v. New York*, 170 U.S. 189 (1898), denied medical licenses to convicted felons. This time, the challenge was framed purely in terms of the Attainder Clause, and the defendant relied largely on *Cummings* and *Garland*. *Id.* at 198. In upholding the law, the Court relied extensively on the due process decision in *Dent*, while also citing other due process precedents like *Jones v. Brim,* 165 U.S. 180 (1897), and *Ex Parte Wall*, 107 U.S. 265 (1883). Together, *Dent* and *Hawker* show that freedom from attainder has long been viewed as a liberty protected by the Due Process Clauses.

### b)    The Take Care Clause.

From the founding until well after the Civil War, the dominant constitutional paradigm focused on Congress, not the other branches. Congress was to take the lead in initiating federal policy, and once Congress spoke, the President's role was to "take care that the laws be faithfully executed." Art. II, §3. Unless enumerated in Art. II, presidential action was impermissible absent Congressional authorization. *E.g., Little v. Barreme*, 6 U.S. 170 (1804) (invalidating an executive action not authorized by statute). *See also* Platt Potter, "Of American Constitutional Power," in Fortunatus Dwarris, *A General Treatise on Statutes* (Platt Potter ed. 1871) 340 ("the executive should do no legislative act").  Not until later in our history did it become accepted that a President might initiate governmental policy in the absence of legislation. *Youngstown Sheet & Tube Co. v.*

19

*Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) (describing a "zone of twilight" that might allow Presidential action where Congress is silent). The Framing-era understanding meant that if Congress lacked power to enact a type of law – such as a law abridging the freedom of speech – the executive necessarily lacked such power.

Against this backdrop, the Framers would have felt no need to specify in Art. II that the President could not independently impose attainders. Restricting Congress in Art. I was sufficient, because Presidents may only faithfully execute those laws that are allowed to exist. They may not undertake action forbidden to Congress by Art. I, § 9, be it attainder, ex post facto punishment, suspending habeas corpus in peacetime, granting titles of nobility,[2] or establishing preferences among ports of different states.

Even without reference to the Take Care clause, the history and structure of the Attainder Clause provide further evidence that the President is barred from imposing acts of attainder, even though the language accomplishing this result appears in Art. I rather than Art. II. Unless it were somehow enacted over a veto, a

---

[2] Art. I, § 9, cl. 8 includes both the Titles of Nobility clause and the Foreign Emoluments Clause. The latter bars Presidents from accepting gifts from foreign princes without Congressional approval, further demonstrating that Art. I, § 9 contains limits on executive action. The same can be said of Art. I, § 9, cl. 7, which prevents the President from withdrawing funds from the Treasury without a Congressional appropriation.

20

bill of attainder would become law only with the President's approval. As Prof. Koh asks: "How could a president alone have the authority to issue by executive order what would be unconstitutional if enacted with his signature and congressional approval?" Koh.

### c) The Fourteenth Amendment Privileges or Immunities Clause.

Section 1 of the Fourteenth Amendment directs that States may not "make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." No parallel language expressly states that the *federal* government may not make or enforce laws that abridge privileges or immunities of citizens of the United States, but it is a necessary inference. A privilege or immunity that the federal government is free to abridge could not possibly be a privilege or immunity of a citizen of the United States.

One purpose of the new language in the Fourteenth Amendment's Privileges or Immunities Clause was to ensure that the States could not do what the United States was already forbidden from doing. The words "make or enforce" in the new amendment reflected the existing understanding that the federal legislature could not "make," and the federal executive branch could not "enforce," any decree with the force of law that would abridge federal privileges or immunities. See Christopher R. Green, *Justice Gorsuch and Moral Reality*, 70 Alabama L. Rev.

635, 660 (2019) ("enforce" in the Privileges or Immunities Clause extends to executive and judicial action).

Admittedly, *The Slaughterhouse Cases*, 83 U.S. 36 (1872), defined "the privileges or immunities of citizens of the United States" very narrowly. But even under that decision, the protected privileges or immunities include those rights that "owe their existence to the Federal government, its national character, its Constitution, or its laws," *Id.* at 79. Freedom from federal-level attainder is undoubtedly a right that owes its existence to the federal government and its Constitution. Since it is a privilege or immunity of citizens of the United States, neither the States, nor Congress, nor the President can "make or enforce" edicts with the force of law that abridge it.

**B.    The Record Establishes an Attainder Violation.**

To identify Attainder Clause violations, courts ask if the government is "singling out disfavored persons and meting out summary punishment for past conduct." *Lynce v. Mathis*, 519 U.S. 433, 440 n.12 (1997). This Court distills the claim to two elements: "a law is prohibited under the bill of attainder clause if it (1) applies with specificity, and (2) imposes punishment." *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (internal citation and punctuation omitted). This same framework can be applied to executive branch attainders.

22

### 1.    The Executive Orders Specify Who Will Be Affected.

The Orders on their face specify by name which firms are affected.

### 2.    The Executive Orders Impose Punishment.

Several constitutional provisions are implicated by the presence of punishment, including the Attainder Clauses, the Ex Post Facto Clauses, the Double Jeopardy Clause, the Self-Incrimination Clause, and the Cruel and Unusual Punishment Clause. See *Nixon v. Administrator of General Services,* 433 U.S. 425, 475 (1977) (envisioning a "functional test of the existence of punishment"); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963) (listing factors that help identify punishment); *Flemming v. Nestor*, 363 U.S. 603, 616 (1960) ("Each case [defining punishment] has turned on its own highly particularized context"); *Nonattainder* at 1245-59 (under the Attainder Clauses, the essence of punishment is harsh retaliatory treatment imposed as a response to perceived wrongdoing). In some cases, it may be a debatable whether a governmental action is punishment, as opposed to an acceptable regulation of conduct. Indeed, the hybrid attainder and due process opinions in *Dent* and *Hawker* both used a "punishment v. regulation" framing. Here, the question is beyond dispute.

The draconian restrictions of the challenged Executive Orders are undoubtedly punishment. The Orders clearly state the perceived wrongdoing: representing clients the President dislikes, hiring attorneys the President dislikes, or following industry-wide diversity practices the President dislikes. The Orders

state on their face that the burdens are imposed because of the perceived wrongdoing. And the conditions are sufficiently harsh to constitute punishment for purposes of the Attainder Clause. "The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact." *Cummings* at 320.

Historical analogues are not prerequisites to finding punishment in Attainder Clause cases, where the Supreme Court "often has looked beyond mere historical experience" involving those forms of punishment "traditionally judged to be prohibited." *Nixon,* 433 U.S. at 475. But as it happens, the Executive Orders closely resemble their historical forbears. Thwarting a person's ability to pursue a trade or profession is a routine feature of American attainders, as seen in *Cummings*, *Garland*, *Lovett*, and *Brown*. "Disqualification from the pursuits of a lawful avocation, or from positions of trust, *or from the privilege of appearing in the courts*, or acting as an executor, administrator, or guardian, may also [be], and often has been, imposed as punishment." *Cummings*, 71 U.S. at 320 (emphasis added). The Civil War attainders all took aim at the ability of politically disfavored people from accessing the courts, from the licensure ban that would reach attorneys in *Cummings*, to the ban on practice in federal courts in *Garland*, to the banning of certain clients' claims in *Pierce*. And many of the State-level bills of attainder in

24

the 1770s targeted the lawyers of British loyalists as a way of disadvantaging their clients. Koh.

It is relevant that the Orders, along with the accompanying pejorative statements from the President and other officials, were deliberately crafted to stigmatize the law firms, sending a message to clients and potential clients that the firms were officially disfavored. *Jenkins v. McKeithen*, 395 U.S. 411 (1969), supports the notion that official pronouncements of wrongdoing (without more) can constitute punishment (although here the Orders involved more). Louisiana's Labor-Management Commission of Inquiry had no law enforcement power, but could hold one-sided hearings and formally find that named individuals had committed crimes during labor union activity. The plurality observed that the Commission "very clearly exercises an accusatory function" and that it "is used to find named individuals guilty of violating the criminal laws of Louisiana and the United States and to brand them as criminals in public." *Id.* at 427-28. Where such accusations are a government agency's sole function, the Due Process Clauses require it to provide trial-like procedures such as a right to call witnesses and confront accusers. Indeed, "the rigorous protections relevant to criminal prosecutions might well be the controlling starting point." *Id.* at 428 (internal citation omitted).

25

In his concurrence, Justice Black came close to analyzing *Jenkins* as an Attainder Clause case. For him, the law was "nothing more nor less than a scheme for a nonjudicial tribunal to charge, try, convict, and punish people without courts, without juries, without lawyers, without witnesses – in short, without any of the procedural protections that the Bill of Rights provides." *Id.* at 432-33. *See also Nonattainder* at 1214-27 & 1263-64 (examining the relationship between attainder and stigma-plus due process violations).

## C.    Attainder Theory Perfectly Matches the Facts and Circumstances of These Cases.

As exemplified by the splintered opinions in *McGrath*, government actions that raise attainder objections can implicate multiple legal theories. This is because attainders are so noxious that they inevitably offend numerous constitutional principles. Here, the lower courts held that the Orders violate the First Amendment rights of speech, association, and petition; the right to counsel; equal protection; and several varieties of due process. Freedom from attainder belongs on the list of liberties implicated by this case. By relying in part on the Attainder Clause to decide these cases, the Court can help convey to the public the gravity of the constitutional danger. To be sure, First Amendment and Due Process rights were violated here. But those theories do not fully convey how the President employed unilateral punishment without trial to acquire and preserve political power

unchecked by other branches – which is a threat to constitutional separation of powers.

The Orders against law firms fit within a larger pattern of executive actions limiting the freedom and the influence of the press and universities. These are not random targets: law, journalism, and academia are sectors of civil society that the Constitution protects in part because they are potential counterweights to concentrated political power. The Orders therefore resemble the blacklisting that occurred after WWII –which was viewed as contrary to the Attainder Clause in *Lovett* and *Brown* and the concurrences in *McGrath* and *Peters*. See Note, *Beyond Process: A Substantive Rationale for the Bill of Attainder Clause*, 70 Va. L. Rev. 475, 500–01 (1984) (attainders are especially dangerous when used to punish political activity protected by the First Amendment).

History shows that attainder is often used in times of intense political polarization as a tool to cement recently attained power. As Justice Iredell observed in *Calder v. Bull*, 3 U.S. 386, 399-400 (1798), "attainders, on the principle of retaliation and proscription, have marked all the vicissitudes of party triumph." Justice Black's concurrence in *McGrath* included a lengthy appendix describing the wave of attainders authorized by James II in the 1680s, after he had been deposed in Britain but was desperate to consolidate power in Ireland. 341 U.S. at 146. The American attainders of the 1770s were also products of newly-

installed governments. In *The Federalist* #44, Madison saw the attainders against Loyalists as a species of "fluctuating policy" that followed changes of government, while also noting that "the sober people of America" viewed "with regret and with indignation" such "sudden changes … in cases affecting personal rights." Madison knew that an early violation of rights by a new regime "is but the first link of a long chain of repetitions; every subsequent interference being naturally produced by the effects of the preceding."

Here, it is no surprise that a new administration elected narrowly over substantial public opposition might make quick recourse to nonjudicial punishment of political enemies – but that is one reason why executive punishment without judicial trial is forbidden.

## CONCLUSION

In addition to other grounds, this Court should also affirm because the

Executive Orders specified the law firms for punishment without trial.

Dated: March 30, 2026                    Respectfully submitted,

                                         KALBIAN HAGERTY, LLP

                                         By:    /s/ Stephen C. Leckar
                                                Stephen C. Leckar
                                                    (Bar No. 281691)
                                                888 17th Street, N.W.
                                                Suite 1200
                                                Washington, D.C. 20006
                                                Telephone: (202) 223-5600
                                                Facsimile: (202) 223-6625
                                                sleckar@kalbianhagerty.com

                                         Attorney for Professor Amicus
                                         Aaron H. Caplan

29

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief is prepared in Times New Roman 14-point font and that my word processing program, Microsoft Word, counted 6412 words in the brief – excluding the items exempted by Federal Rule of Appellate Procedure 32(f) – and that this complies with the word limit set forth in Federal Rule of Appellate Procedure 29(a)(5).

/s/ *Stephen C. Leckar*
Stephen C. Leckar

**CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2026, I electronically filed the foregoing brief in support of Plaintiff-Appellee with the Clerk of the Court of the U.S. Court of Appeals for the D.C. Circuit by using the Appellate CM/ECF system which will send notice to all counsel who are registered CM/ECF users.

/s/ *Stephen C. Leckar*
Stephen C. Leckar