[ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026]

**Nos. 25-5241, 25-5265, 25-5277, 25-5310**

_____

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

PERKINS COIE LLP,

*Plaintiff-Appellees,*

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court for the
District of Columbia, Nos. 25-cv-00716, 25-cv-00916, 25-cv-00917, 25-cv-01107

_____

## BRIEF OF AMICUS CURIAE LAWYERS DEFENDING AMERICAN DEMOCRACY IN SUPPORT OF PLAINTIFF-APPELLEES

_____

JOHN MCCOY
(Counsel of Record)
1717 N. St NW
Washington DC 20036
(202) 296-5600
mccoy@klimaskilaw.com

*Attorney for* amicus curiae *Lawyers Defending American Democracy*

### STATEMENT REGARDING CONSENT TO FILE
### AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for amicus curiae Lawyers Defending American Democracy states that counsel for all parties have consented to the filing of this brief. Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for amicus curiae states that a separate brief is necessary. Counsel for amicus curiae certifies that he has conferred with relevant counsel and determined that the contents of this brief are meaningfully different from the briefings submitted by Plaintiffs-Appellees and likely to be submitted by other amici curiae. Undersigned counsel for amicus certifies that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than amici and their counsel have contributed money for this brief.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus Lawyers Defending American Democracy has no parent corporation and no stock.

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

**A. Parties and Amici.** As of April 1, 2026, the date on which this amicus brief was filed, amicus is not aware of any other parties, intervenors, or amici who have entered an appearance in this Court, other than those listed in the briefs of Defendants-Appellants and Plaintiffs-Appellees or disclosed by other amici to date.

**B. Ruling Under Review.** Amicus curiae is aware of no rulings under review other than those listed in the briefs of Defendants-Appellants and Plaintiffs-Appellees or disclosed by other amici to date.

**C. Related Cases**. This case has not previously been before this Court. The Court has consolidated four related cases: Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President, No. 25-5277; Perkins Coie LLP v. United States Department of Justice, No. 25-5241; Jenner & Block LLP v. United States Department of Justice, No. 25-5265; and Susman Godfrey LLP v. Executive Office of the President, No. 25-5310. It has also ordered that these consolidated

appeals be scheduled for oral argument on the same day and before the same panel

as Zaid v. Executive Office of the President, No. 26-5009.

## TABLE OF CONTENTS

STATEMENT REGARDING CONSENT TO FILE……………………….…….ii

RULE 26.1 CORPORATE DISCLOSURE STATEMENT……………………...iii

CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES……...…iii-iv

TABLE OF AUTHORITIES…………………………………………………...v-vi

I. IDENTITY AND INTEREST OF AMICI CURIAE...............................................1

II. SUMMARY OF ARGUMENT.......................................................................2

III. ARGUMENT .......................................................................................3

    A. The Executive Actions Violate Separation-of-Powers and Basic Rule of Law Principles by Usurping Judicial Authority…………………………………..3

    B. The Orders Directly Interfere with the Professional Responsibilities of Lawyers……………………………………………………………………….16

CERTIFICATE OF COMPLIANCE……………………….……………...……27

CERTIFICATE OF SERVICE…………………….……………………...….28

# TABLE OF AUTHORITIES

**Cases**

*Ark. Properties v. Cameron*, 681 S.W.3d 133 (Ky. 2023) ...................................... 5

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ...................................... 4

*Consumers Beverages, Inc. v. Kavcon Dev. LLC*, 227 A.D.3d 1381 (N.Y. App. Div. 2024) ...................................... 22

*Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1867) ...................................... 3

*In re Austin*, 5 Rawle 191 (Pa. 1835) ...................................... 8

*In re Integration of Nebraska State Bar Ass'n*, 275 N.W. 265 (Neb. 1937) .......... 7

*Jenner & Block LLP v. U.S. Dep't of Justice*, No. 1:25-cv-00916, 2025 WL 1482021 (D.D.C. May 23, 2025) ...................................... 12

*Makesom v. Martin County*, 491 So.2d 1109 (Fla. 1986) ...................................... 16

*Perkins Coie LLP v. U.S. Dep't of Justice*, No. 1:25-cv-00716, 2025 WL 1276857 (D. D.C. May 2, 2025) ...................................... 12

*Plaut v. Spendthrift Farm, Inc.*, 501 U.S. 211 (1995) ...................................... 4

*Powell v. Alabama*, 287 U.S. 45 (1932) ...................................... 22

*Strickland v. Washington*, 466 U.S. 668 (1984) ...................................... 18

*Susman Godfrey LLP v. Exec. Office of the President*, No. 1:25-cv-01107, 2025 WL 1798294 (D. D.C. June 27, 2025) ...................................... 12

*Touche Ross & Co. v. SEC*, 609 F.2d 570 (2d Cir. 1979) ...................................... 5

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President,* No. 1:25-cv-00917, 2025 WL 1502329 (D. D.C. May 27, 2025) ...................................... 12

## Constitutional Provisions

U.S. Const. art. III, § 1 ............................................................................ 3

U.S. Const. arts. I–III ............................................................................. 3

## Statutes and Regulations

17 C.F.R. § 201.102(e) ........................................................................... 5

37 C.F.R. Part 11 ................................................................................... 5

## Secondary Authorities

American Bar Association, Report on the Evaluation of Disciplinary Enforcement (2018) ................................................................................... 4

American Bar Association, Model Rules of Professional Conduct………………6

Charles W. Wolfram, Toward a History of American Legal Ethics—I. Origins, 8 U. Chi. L. Sch. Roundtable 469 (2001) ............................................... 7

Dan Abrams & David Fisher, John Adams Under Fire (2020) .......................... 20

George M. Cohen, The Laws of Agency Lawyering, 84 Fordham L. Rev. 1963 (2016) ...................................................... 6

Roger D. Billings, Jr., Abraham Lincoln and the Duty of Zealous Representation, 14 Conn. Pub. Int. L.J. 179 (2015) ...................................................... 20

## Other Authorities

D.C. Rules of Professional Conduct R. 1.1 ................................................. 21

D.C. Rules of Professional Conduct R. 1.2 ................................................. 19

D.C. Rules of Professional Conduct R. 1.3 ........................................... 6, 9, 17

D.C. Rules of Professional Conduct R. 1.7 ................................................. 22

D.C. Rules of Professional Conduct R. 1.16 ............................................... 21

D.C. Rules of Professional Conduct R. 6.1.................................................... 24

D.C. Court of Appeals Rule XI .................................................... 10, 11

D.C. Court of Appeals, Attorney Discipline System .............................................. 9

**Executive Orders**

EO 14230, 90 Fed. Reg. 11781 (Mar. 11, 2025) ......................................... 2, 13, 14

EO 14246, 90 Fed. Reg. 13997 (Mar. 28, 2025) ....................................................... 2

EO 14250, 90 Fed. Reg. 14549 (Apr. 3, 2025) ....................................................... 2

EO 14263, 90 Fed. Reg. 15615 (Apr. 15, 2025) ....................................................... 4

## I.     IDENTITY AND INTEREST OF AMICUS CURIAE

Lawyers Defending American Democracy (LDAD) is a non-profit, non-partisan organization devoted to encouraging the legal profession to enforce and uphold principles of democracy and law, consistent with our obligations as lawyers; demanding accountability from lawyers and public officials; and identifying attacks on legal norms and prescribing redress for them. LDAD has a significant interest in this case because the Executive Orders at issue strike at the very heart of LDAD's mission by undermining basic principles of democracy, the rule of law and the practice of law.

LDAD submits this brief in support of Appellees Perkins Coie LLP, Wilmer Cutler Pickering Hale and Dorr LLP, Sussman Godfrey LLP, and Jenner & Block LLP ("Law Firms"). The appeals consolidated before this Court arise from executive actions targeting these Law Firms for their representation of clients and their advocacy in court proceedings. These actions represent an unprecedented attempt by the Executive Branch to penalize lawyers and law firms for engaging in constitutionally protected legal representation.

LDAD and its members have a direct institutional interest in ensuring that lawyers remain free to represent clients without fear of government retaliation. The

1

challenged executive actions threaten the independence of the legal profession and undermine foundational principles of the American legal system.

## II.     SUMMARY OF ARGUMENT

The executive actions challenged in these consolidated appeals represent a profound departure from constitutional norms governing the separation of powers and the independence of the legal profession.

First, the Executive Orders constitute an unlawful attempt by the Executive Branch to assume authority historically exercised by the judiciary: regulating the conduct of lawyers. EO 14230, Addressing Risks from Perkins Coie LLP, 90 Fed. Reg. 11781 (Mar. 11, 2025); EO 14246, Addressing Risks from Jenner & Block, 90 Fed. Reg. 13997 (Mar. 28, 2025); EO 14250, Addressing Risks from Wilmer Hale, 90 Fed. Reg. 14549 (Apr. 3, 2025); EO 14263, Addressing Risks from Susman Godfrey, 90 Fed. Reg. 15615 (Apr. 15, 2025) (collectively "Orders").

Courts—not the President—have the inherent authority to establish and enforce the rules governing the practice of law. The challenged actions violate the Constitution's separation of powers by intruding on the independence of the judiciary. If allowed to stand, the Orders will have a chilling effect across the legal profession: by targeting major law firms and signaling that others could face similar treatment, the Executive Branch deters attorneys from representing clients

2

who challenge government conduct or advance positions the President disfavors. In doing so, these measures would erode the judiciary's role as a check on executive power and, in turn, undermine the rule of law.

Furthermore, the Orders directly interfere with the professional responsibilities of lawyers. By imposing sanctions on firms based solely on their representation of particular clients or legal positions, the government seeks to coerce attorneys into abandoning their duty to zealously represent clients within the bounds of the law.

## III.    ARGUMENT

**A.    The Executive Actions Violate Separation-of-Powers and Basic Rule of Law Principles by Usurping Judicial Authority.**

The Constitution divides governmental authority among three coordinate branches. U.S. Const. arts. I–III. This separation of powers prevents the concentration of authority in any single branch. Article III vests "[t]he judicial Power of the United States" in the federal courts. U.S. Const. art. III, § 1. That power has long been understood to include the authority to regulate attorneys who practice before the courts. *See, e.g., Ex parte Garland*, 71 U.S. (4 Wall.) 333, 378–79 (1867) (holding that the admission and discipline of attorneys are matters entrusted to the judiciary because lawyers serve as officers of the courts);

3

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44 (1991) (finding that courts possess inherent authority to supervise the conduct of attorneys appearing before them). These decisions reflect a broader constitutional principle: the political branches may not intrude upon functions that are integral to the judiciary's operation. *See e.g., Plaut v. Spendthrift Farm, Inc.,* 501 U.S. 211, 218–19 (1995) (reinforcing the judiciary's independence from legislative oversight).

It is a well-settled principle in the United States that, with minor exceptions, primary responsibility for regulating lawyers' conduct rests with the judicial branch. As the 2018 American Bar Association Report on the Evaluation of Disciplinary Enforcement noted, "[e]xclusive judicial regulation of lawyers has developed since colonial times." *Am. Bar Ass'n, Report on the Evaluation of Disciplinary Enforcement* (2018). By the late 1800s, "state courts were asserting an exclusive right to regulate lawyers" based on "the constitutional doctrines of inherent power and separation of powers." *Id.* at 11. "Today," the Report observed, "judicial regulation of lawyers is a principle firmly established in every state." *Id.*

The highest court in each jurisdiction has the authority to establish and enforce rules of professional conduct for lawyers who are members of the bar in that jurisdiction, as well as for lawyers from other jurisdictions who participate in proceedings in the state. In addition to regulation by the highest court in each

4

jurisdiction, individual courts have the authority to discipline lawyers who appear before them for misconduct. Today there is also limited legislation in some states that regulates specific lawyer conduct. *See, e.g.,* N.Y. Judiciary Law §§ 90–499 (fraudulent legal practice); Florida Statutes Title XXXII, Chapter 454 (soliciting clients at accident scenes or hospitals). When courts are confronted with these legislative efforts, however, they typically consider whether to uphold them as a matter of comity. *See, e.g., Ark. Properties v. Cameron*, 681 S.W.3d 133, 140 (Ky. 2023)

Finally, there is very limited executive branch regulation of the conduct of lawyers. This involves rules established by several federal agencies governing the conduct of lawyers and others in agency proceedings and dealings with the agency. *See, e.g.,* 17 C.F.R. § 201.102I (Securities & Exchange Commission); 37 C.F.R. Part 11 (Patent & Trademark Office). Authority for such provisions is based on the need to enable agencies to perform their statutory functions. *See Touche Ross Co. v. SEC*, 609 F.2d 570, 582 (2d. Cir. 1979) (SEC Rule 2I "provides the Commission with the means to ensure that those professionals, on whom the Commission relies heavily in the performance of its statutory duties, perform their tasks diligently and with a reasonable degree of competence"). As one prominent scholar notes of these rules, "The vast majority of rules apply to lawyers practicing before an agency

acting in its judicial capacity." George M. Cohen, The Laws of Agency Lawyering, 84 Fordham L. Rev. 1963, 1978-79 (2016).

The Executive Orders challenged here violate this well-settled principle that the executive not intrude on the authority of the judiciary. Rather than invoking judicial disciplinary procedures, the Executive Branch has imposed sweeping sanctions on international law firms because of the litigation they undertake, and because the President does not like some of the clients who have hired these firms. Such unilateral punishment attempts to transform the regulation of lawyers into an instrument of executive power. The Constitution does not permit such interference with the judiciary's authority.

The central role of the judicial branch in regulating lawyer conduct reflects lawyers' distinctive role in the U.S. legal system. As the preamble to the American Bar Association Model Rules of Professional Conduct declares, "A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice." Lawyers have a special responsibility to sustain what the commentary to Rule 1.3 of the DC Rule of Professional Conduct calls "our government of laws and not of individuals."

This requires that lawyers be able to represent clients who seek to challenge the legality of executive or legislative action in order to affirm the principle that no one is above the law. In doing so, lawyers are required "honestly and ably to aid the courts in securing an efficient administration of justice." *In re Integration of Nebraska State Bar Association*, 275 N.W. 265, 268 (Neb. 1937). Thus, "[t]he practice of law is so intimately connected and bound up with the exercise of judicial power and the administration of justice that the right to define and regulate its practice naturally and logically belongs in the judicial department." *Id.*

Attempts by the executive branch, particularly the Office of the President, to engage in expansive regulation of lawyers' conduct poses the especially serious danger of punishing lawyers who represent clients seeking to hold the executive accountable under the law. This country's history illustrates the gravity of this risk. The Crown's colonial representatives resorted to disbarment "more than occasionally to punish or neutralize lawyers who were perceived as politically out-of-step or otherwise uncooperative." Charles W. Wolfram, Toward a History of American Legal Ethics-I. Origins, 8 Univ. of Chicago L. School Roundtable 469, 476 (2001). As with the Orders that are at issue in this case, such brazen political interference with lawyers' practice is fundamentally inconsistent with the rule of law.

The importance of preserving the independence of lawyers has on occasion resulted in striking down even the judicial exercise of authority over lawyers. In *In re Austin*, 5 Rawle 191 (Pa. 1835), most of the lawyers in a county in Pennsylvania were disbarred by the Court of Common Pleas for publishing criticism of the President of that court that the court regarded as disrespectful. The Pennsylvania Supreme Court, however, struck down this sanction. "[T]o subject the members of the profession to removal at the pleasure of the court," the Chief Justice said, "would leave them too small a share of the independence necessary to the duties they are called to perform to their clients and to the public. As a class, they are supposed to be, and in fact have always been, the vindicators of individual rights, and the fearless asserters of the principles of civil liberty; existing where alone they can exist, in a government not of parties or men, but of laws!" *Id.* at 203.

This authority of the judicial branch to regulate lawyer professional conduct helps ensure that the legal system and the lawyers who practice in it are protected as much as possible from political influence, especially from the executive because of the fear of concentrating power in that branch of government. The Executive Branch cannot "aggrandize" its powers at the expense of the Judiciary.[1]

---

[1] *See, e.g., United States v. James*, No. 2:25-cr-00122-JKW, slip op. at 18 (E.D. Va. Nov. 24, 2025) (invalidating a prosecution where the Interim U.S. Attorney's appointment exceeded statutory limits and violated the Appointments Clause, which serves as "a bulwark against one branch aggrandizing its power at the expense of another.").

Lawyers must be allowed to represent clients without fear of political persecution to ensure that "each member of our society is entitled to have such member's conduct judged and regulated in accordance with the law; to seek any lawful objective through legally permissible means; and to present for adjudication any lawful claim, issue, or defense." DC Rule of Professional Conduct 1.3, comment 2. The goal of the Orders to punish the Law Firms based simply on the personal preferences of the President is reflected in the complete absence of any of the procedural protections provided in judicial regulation of professional conduct that are integral to the rule of law.

The District of Columbia Court of Appeals, the highest court in that jurisdiction, is representative in its statement of the judiciary's regulatory authority: In the exercise of its inherent jurisdiction over members of the legal profession, the Court established the District of Columbia Bar and the Board on Professional Responsibility. The Court has the power to promulgate the rules regarding attorney discipline and to impose discipline upon attorneys. The Board on Professional Responsibility is the disciplinary arm of the Court, which administers the attorney discipline system and supports it in the adjudication of disciplinary cases. https://www.dccourts.gov/court-of-appeals/learn-more/attorney-discipline (last visited March 26, 2026).

9

Judicially established rules governing the conduct of the profession are adopted only after extensive opportunity for comment by lawyers, deliberation by the court, and notice of a final decision and the date on which a rule will be effective. *See, e.g.,* D.C. Court of Appeals, No. 287-24, Notice, December 10, 2024. Rules also include extensive comments that explain their rationales and clarify their application. Furthermore, lawyers are subject to sanctions for violation of judicially-established rules only after notice of an alleged violation, an opportunity to respond, and application of general rules to particular conduct that is accompanied by a statement of the reasons for a decision.

DC Court of Appeals Rule XI is an example of such procedural protections. It requires that in order to initiate disciplinary proceedings, disciplinary counsel must file a petition under oath and provide a copy to the attorney who is the subject of the proceedings. The petition must be "sufficiently clear and specific to inform the attorney of the alleged misconduct." Rule XI, Disciplinary Proceedings, Section 8: Investigation and Hearings, 8I. The attorney has 20 days to file a reply to the petition. Section 8(d). After a hearing is scheduled, the attorney must be given notice of the date and place of the hearing, which must be at least 15 days after the service of the notice. The notice "shall also advise the attorney that, at the hearing, the attorney shall have the right to be represented by counsel, to cross-

10

examine witnesses, and to present evidence in defense or mitigation of the charges." *Id.*

The Hearing Committee must submit a report to the Board on Professional Responsibility within 120 days with its findings and recommendations. Section 9. If the attorney files an exception to the report, the matter is scheduled for submission of briefs and oral argument before the Board. If the Board recommends disbarment or suspension, the attorney has 30 days to show cause why the Court should not enter an order of suspension pending final action on the Board's recommendation. In cases in which exceptions have been filed, the DC Court of Appeals schedules the matter for consideration.

In the instant case, the Executive Orders provide the perfect example of why the judiciary – not the executive - has the authority to regulate lawyers. The Orders' absence of any semblance of due process in establishing ostensible standards or determining that Law Firm lawyers have violated them, and the imposition of sanctions on the entirety of each Law Firm is a violation of due process, a point on which each of the four district court opinions below agree and elaborate. Beyond this, however, the Orders are antithetical to the rule of law because they reflect the exercise of executive power based purely on the President's desires unfettered by any legal standards.

The fact that the Orders are based on a standard template reflects the nature of the Orders as indiscriminate retaliation rather than particularized assessments of specific risks. All four of the Orders' operative provisions are the same, with each purporting to:

- Suspend or review security clearances for firm personnel;
- Restrict access to federal buildings and officials;
- Direct agencies to terminate or avoid contracts with each firm;
- Discourage or prohibit federal hiring of each firm's lawyers;
- Trigger investigations into DEI practices; and
- Frame each firm as a risk to national security or federal interests.

While each Order contained factual differences specific to each firm's clients and prior representations that the President disliked, the District Court in each case found that they were materially and legally the same: in all four District Court opinions, a single pattern of executive action was found, and each of the Orders was struck down on similar Constitutional grounds. *Perkins Coie LLP v. U.S. Dep't of Justice*, No. 1:25-cv-00716 (BAH), 2025 WL 1276857, at *47–50 (D. D.C. May 2, 2025) (granting summary judgment and permanently enjoining enforcement of executive order as unconstitutional); *Jenner & Block LLP v. U.S. Dep't of Justice*, No. 1:25-cv-00916 (JDB), 2025 WL 1482021, at *41–44 (D. D.C. May 23, 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President*, No. 1:25-cv-00917, 2025 WL 1502329, at *36–39 (D. D.C. May 27,

2025); *Susman Godfrey LLP v. Exec. Office of the President*, No. 1:25-cv-01107 (LLA), 2025 WL 1798294, at *52–56 (D. D.C. June 27, 2025).

The Executive Order targeting Perkins Coie is representative of the Orders issued against each firm. EO 14230, Addressing Risks from Perkins Coie LLP, 90 Fed. Reg. 11781 (Mar. 11, 2025) (the "Perkins Order"). The Perkins Order does not clearly state the standards that are the basis for sanctions, nor does it describe precisely the conduct that has allegedly violated them. Nonetheless, one can piece together portions of the Perkins Order and the Fact Sheet that accompanies it to infer a new category of improper conduct by lawyers that the Perkins Order purports to establish. It declares that lawyers at Perkins Coie have engaged in "dishonest and dangerous activity." Perkins Order §1. This consists first of representing clients who seek to "judicially overturn popular, necessary, and democratically enacted election laws, including those requiring voter identification." *Id.* Attempting to "judicially overturn" legislation, however, is an unremarkable activity in which any lawyer engages when the lawyer seeks judicial review of the lawfulness of legislation, especially on Constitutional grounds. The fact that such legislation may be "popular" is immaterial to its legality, as is the view of some parties that it is "necessary." Indeed, the firm's clients were successful in several election law cases relating to voting rights.

13

The second type of activity is representing clients with the goal of "undermining democratic elections, the integrity of our courts, and honest law enforcement." *Id.* What constitutes "undermining" these institutions is unclear. It is worth noting, for instance, that one activity in which Perkins Coie engaged was successfully defending numerous challenges to the outcome of the 2020 presidential election. Overwhelming rejection of these challenges by the courts suggests that, contrary to the contention in the Perkins Order, Perkins Coie lawyers were not engaged in attempting to undermine democratic elections but to vindicate them.

The third activity representing clients in "partisan lawsuits against the United States." Perkins Order Fact Sheet. Again, it is not clear what constitutes "partisan" lawsuits. The merits of the legal claims in these lawsuits seemingly is not the basis for this characterization. One must infer from the Perkins Order that the term "partisan" instead is based on the extent to which the President disfavors the clients whom Perkins Coie has represented and the claims that they have presented.

The Perkins Order also says that the firm has engaged in "unethical and discriminatory actions that threaten our elections, military strength, and national

14

security." *Id.* There is no description whatsoever of what the firm has done that warrants this conclusion.

These broad and vague descriptions of conduct provide no meaningful guide to what behavior complies with or violates the standards that the Perkins Order purports to announce, other than it involves representation of clients of whom the President disapproves, and presentation of arguments that he dislikes. This leaves a law firm completely at the mercy of the President's discretion. Furthermore, the putative standards were adopted with no notice that the standards were under consideration, no opportunity to comment on them, and no clear explanation of what they mean and the rationale for adopting them.

Next, in applying these standards to Perkins Coie, the Perkins Order gave no notice to the firm of the accusations against it and no opportunity to respond to them, call witnesses on its behalf, or contest the accusations in a hearing before a neutral decision maker. Nor has the firm received any explanation based on reasons and supporting evidence for the decision to penalize the firm. The basis for the sanctions is simply the President's dislike of the firm's activities without regard to their legality or compliance with the judiciary's rules of professional conduct governing lawyers.

Finally, it should be noted that the Perkins Order purports to penalize Perkins Coie for certain actions by persons no longer at the firm whose conduct has already been adjudicated by the legal system. They have all been exonerated, with one minor exception in which a minor sanction has already been imposed.

By violating basic principles of due process and impartiality, the Orders provide a vivid reminder of the critical importance of the rule of law in checking what otherwise would be unconstrained executive power. They are each a stark illustration of why the judicial branch, not the executive, has the primary responsibility for regulating the conduct of lawyers.

## B. The Orders Directly Interfere with the Professional Responsibilities of Lawyers.

The expert opinions in this case describe rules of professional conduct with which the Orders are at odds. This section therefore will not discuss these rules in detail, but will simply underscore their importance to the integrity of the legal system and the rule of law. Lawyers are required to follow judicially-established rules of professional conduct and face disciplinary sanctions for violating them. By purporting to establish standards of conduct at odds with the rules of professional conduct, the Orders attempt to coerce lawyers to violate the judiciary's rules of professional conduct. This directly interferes with lawyers' ability to provide adequate representation to clients. *See, e.g., Makesom v. Martin County*, 491 So.2d

16

1109 (Fla. 1986) (finding that a court had inherent authority to invalidate a legislative limit on attorney's fees in representing indigent criminal defendants, when limiting a fee to the statutory maximum would interfere with the Sixth Amendment right to effective assistance of counsel).

First, the Orders interfere with lawyers' duties to pursue a client's lawful goals through any means permitted by the law. As DC Rule of Professional Conduct Rule 1.3 provides:

> (a) A lawyer shall represent a client zealously and diligently within the bounds of the law.
>
> (b) A lawyer shall not intentionally: 1) Fail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules.
>
> Comment 1 to the Rule says, "This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor."

The Orders, however, effectively require that the Law Firms' lawyers' representation of clients be guided not by the law and the rules of professional conduct, but by concern about whether the claims they pursue and the positions they take will be deemed by the President to be objectionable.

17

This need for lawyers to ensure that they do not displease the President is fundamentally at odds with their professional responsibility to diligently represent clients within the bounds of the law rather than to be influenced by political considerations. By interfering with this responsibility of lawyers, the Orders risk concentrating the power of the executive by limiting the ability of the legal system to serve as a check on that power.

Lawyers' ability to exercise independent judgment in representing clients is especially crucial in criminal proceedings. The right to effective assistance of counsel in such proceedings "is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). The Court in *Strickland* said that the government violates this right "when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Id.* at 686. If the Orders stand, lawyers who fear executive retribution will be less likely to represent defendants in prosecutions brought by the administration, thus reducing the availability of experienced counsel in such proceedings. Those who are willing to do so will have an incentive to avoid presenting defenses with which the executive disagrees.

This is a profound threat to the rule of law because it enhances the executive's ability to use its formidable power of criminal prosecution against political opponents. This is not simply a theoretical possibility, since the President commonly characterizes many people with whom he disagrees as criminals. *See, e.g.*, Nnamdi Egwuonwu and Ryan J. Reilly, "Trump calls for jailing his perceived opponents in Justice Department speech," NBC News, March 14, 2025. And, as the Wall Street Journal has reported, "While every FBI director since J. Edgar Hoover has taken pains to keep the White House at arm's length, the new Trump administration has taken the opposite tack, working to bring the traditionally independent ethos of the FBI and Justice Department firmly within the president's grasp." "Trump Tightens Grip on FBI and Justice Department," Wall Street Journal, March 7, 2025. If the Orders are allowed to stand, every lawyer in America will have to weigh the very real risk of political persecution via criminal prosecution if he or she accepts a case or client that the President dislikes.

Related to this, the Orders are in direct conflict with the long-standing principle in our country that lawyers should provide representation on behalf of socially or politically unpopular people or causes. DC Rule of Professional Conduct 1.2(b), for instance, encourages this by providing, "A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social, or moral

19

views or activities." As comment 3 to that Rule says, "Legal representation should not be denied to people who are unable to afford legal services, or *whose cause is controversial or the subject of popular disapproval.*" (Emphasis added).

The rule of law insists that all persons are equal before the law and are entitled to present their claims regardless of popular opinion. This principle is exemplified by John Adams' decision to represent British soldiers accused of murder in the Boston Massacre in 1775. Adams did this knowing that his decision would elicit criticism. It did: "The patriots of Boston railed against [Adams and his co-counsel]. It was said that rocks had been thrown through the windows of Adams's home. The men were jeered in the streets. Clients were lost." Dan Abrams & David Fisher, *John Adams Under Fire: The Founding Father's Fight for Justice in the Boston Massacre Murder Trial* 35 (Hanover Square Press 2020). Adams nonetheless insisted that "every lawyer must hold himself not only to his country, but to the highest and most infallible of all tribunals for the part he should act…. Counsel ought to be the very last thing that an accused person would [lack] in a free country," Adams said. "The bar ought to be independent and impartial at all times and in every circumstance." *Id.* at 32.

Consistent with current rules of professional conduct, "Adams made sure to profess no sympathy for the accused officer, making it clear that he was not so

20

much defending the man as defending the law." *Id.* at 33. Abraham Lincoln felt – and acted – similarly. Roger D. Billings, Jr., *Abraham Lincoln and the Duty of Zealous Representation: The Matson Slave Case*, 14 Conn. Pub. Int. L.J. 179 (2015). While Lincoln's representation of a slave owner was clearly at odds with his personal anti-slavery sentiments and later political fight to end slavery, as a lawyer he too had the duty to defend the law, not the man.

By discouraging representation of clients who are disliked – or whose politics are disliked – by this particular President, the Orders will reduce the availability of lawyers who are willing to follow the examples of Lincoln and Adams in adhering to the duty of professional responsibility to represent clients.

The Orders also undermine the integrity of the legal system by interfering with lawyers' ability to competently represent their clients. DC Rule of Professional Conduct 1.1 states:

> a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.
>
> (b) A lawyer shall serve a client with skill and care commensurate with that generally afforded to clients by other lawyers in similar matters.
>
> Suspending Perkins Coie lawyers' security clearances, denying them access

to federal buildings, limiting government employees' interaction with them, and refusing to provide them with Sensitive Compartmented Information Facilities

could prevent them from competently and effectively representing clients in proceedings involving the government as required by the rules.

Under these circumstances, lawyers must assess whether these limitations compromise their ability to provide effective representation. If so, they may be forced to seek leave to withdraw, depriving clients of their chosen counsel. *See, e.g.,* DC Rule of Professional Conduct 1.16(a)(1).

This right is essential to effective representation. It requires a relationship of trust and confidence in which the client can disclose sensitive or embarrassing information and rely on counsel to act at all times in the client's best interests. Courts therefore give great weight to a client's choice of counsel. S*ee, e.g., Consumers Beverages, Inc. v. Kavcon Dev. LLC*, 227 A.D.3d 1381 (N.Y. App. Div. 4th Dept. 2024)("[W]e note the seriousness of a motion to disqualify a party's counsel of choice. Disqualification of a law firm during litigation implicates not only the ethics of the profession but also the substantive rights of the litigants.").

This right is especially crucial in criminal proceedings. As the Supreme Court stated in the landmark case of *Powell v. Alabama* recognizing the right to counsel in capital cases, "It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." 287 U.S. 45, 53 (1932).

22

Another way in which the Orders will undermine the professional responsibilities of lawyers in our democratic legal system is through the operation of attorney conflict of interest rules. DC Rule of Professional Conduct 1.7(b)(4), as do rules in other jurisdictions, provides that a lawyer shall not represent a client if "[t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by . . . the lawyer's own financial, business, property, or personal interests." Lawyers may reasonably fear that representation that displeases the President will result in public excoriation, denial of government contracts, loss of security clearance or access to federal buildings, and other potential disadvantages.

A lawyer whose representation of a client is influenced by the desire to avoid incurring these penalties would be violating their professional responsibility. In order to avoid this situation, lawyers are likely to represent clients who will not challenge the administration's actions, not bring claims against those whom the President regards as his supporters, and not advance legal arguments that the President finds threatening or with which he may disagree. The result will be to limit the number of firms that will undertake representation of clients who challenge actions by the executive. A predictable consequence as well is to reduce the number of parties who are willing to retain the Law Firms that are the target of the Orders. The Orders thus use the rules of professional conduct as an instrument

23

to interfere with clients' right to effective representation by counsel of their choice, and to prevent firms from holding the executive accountable under the law.

The Orders' interference with the ability of lawyers to practice in accordance with rules of professional conduct impairs potential clients' First Amendment right to petition the government for redress of grievances. Reliance on counsel can be crucial to enable the exercise of this right. Comment 1 to DC Rule of Professional Conduct 6.1 on pro bono service, for instance, notes, "The rule. . . recognizes that the rights and responsibilities of individuals and groups in the United States are increasingly defined in legal terms and that, as a consequence, legal assistance in coping with the web of statutes, rules, and regulations is imperative for persons of modest and limited means, as well as for the relatively well-to-do." The Orders attempt to preclude the Law Firms from assisting clients in seeking redress for certain types of grievances, thus interfering with this First Amendment right.

In sum, the Orders prevent lawyers from fulfilling professional responsibilities that are integral to the functioning of an impartial legal system. The Orders limit lawyers' ability to represent clients diligently within the bounds of the law by effectively requiring that they consider whether the President is likely to disapprove of their representation. This limits their ability to represent clients competently by threatening to deprive them of access to resources that they may

24

need to do so. The Orders discourage lawyers from representing clients who are unpopular with the President and his supporters and threaten, in particular, to interfere with providing effective assistance of counsel in criminal proceedings. A lawyer who reasonably fears being penalized by the Orders may not be able to fulfill the duty to represent a client without regard for the lawyer's own personal interest. If so, the lawyer must withdraw from or decline representation of clients. Lawyers are crucial in ensuring that the executive is constrained by the rule of law, and the Orders significantly impair their ability to do so.

Finally, it is important to emphasize that the Orders are not directed simply at individual lawyers. The Orders impose penalties on all lawyers in the Law Firms, regardless of their individual conduct. This makes clear that the Orders' concern is not with specific putative improper conduct. Rather, it is with the ability of the Law Firms to use their reputations, experience, and resources to represent clients and advance legal arguments that could challenge the legality of the administration's actions. That the goal is to hinder a significant portion of the legal profession from presenting such challenges is made clear by administration's actions targeting multiple law firms, and by the President's statement that he is planning similar measures against several other major law firms that are especially well equipped to provide such representation. As he has said, "We have a lot of law firms that we're going to be going after because they were very dishonest

25

people." Elvin Mulvaney & C. Ryan Barber, "Fear of Trump Has Elite Law Firms in Retreat," Wall Street Journal, March 7, 2025. This same article reports, "Advocacy groups and smaller law firms say it has been more difficult to recruit larger firms to help with cases against Trump."

The Administration thus seeks to sideline the very lawyers best positioned to hold it to account. That effort cannot be squared with the foundational principle that no one—least of all the Executive—is above the law.

CONCLUSION

For the foregoing reasons, the decisions of the District Court should be affirmed.

Respectfully submitted,

/s/John McCoy

JOHN MCCOY
(Counsel of Record)
1717 N. St NW
Washington DC 20036
(202) 296-5600
mccoy@klimaskilaw.com

MITT REGAN
600 New Jersey Avenue NW
Washington, D.C. 20001
(202) 662-9414
regan@georgetown.edu

Counsel for *amicus curiae* Lawyers Defending American Democracy

April 3, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,531 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/John McCoy

John McCoy
Counsel for *amici curiae* Lawyers Defending American Democracy

27

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit on April 1, 2026 by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. Pursuant to D.C. Circuit rules, hard copies of this amicus brief will also be timely filed.


/s/John McCoy

John McCoy
Counsel for *amici curiae* Lawyers Defending American Democracy