# In the United States Court of Appeals for the District of Columbia Circuit

—————————————————

PERKINS COIE LLP,

*Plaintiff-Appellee,*

*v.*

U.S. DEPARTMENT OF JUSTICE, et al.,

*Defendants-Appellants.*

—————————————————

On Appeal from the United States District Court
for the District of Columbia

—————————————————

**BRIEF FOR EUROPEAN BAR ASSOCIATIONS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

—————————————————

| | |
|---|---|
| John Muse-Fisher | Sally L. Pei |
| Brooke D'Amore Bradley | Peter L. Schmidt |
| Anthony Lindsey II | Ana S. Pirnia |
| ARNOLD & PORTER | Ernesto M. Hernández |
| KAYE SCHOLER LLP | ARNOLD & PORTER |
| Four Embarcadero Center | KAYE SCHOLER LLP |
| 14th Floor | 601 Massachusetts Ave., NW |
| San Francisco, CA 94111 | Washington, DC 20001 |
| (415) 471-3100 | (202) 942-5000 |
| | sally.pei@arnoldporter.com |

*Counsel for Amici Curiae*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), *amici curiae* submit this certificate as to parties, rulings, and related cases.

**A.      Parties and *Amici***

Except for *amici curiae* who are signatories to this brief, which are submitting this brief in support of Appellees, all parties and intervenors appearing before the district court and in this Court are listed in the parties' briefs.

**B.      Rulings under Review**

References to the rulings under review appear in the parties' briefs.

**C.      Related Cases**

These cases have not previously been before this Court.

These cases were previously before the U.S. District Court for the District of Columbia, captioned *Perkins Coie LLP v. U.S. Department of Justice*, No. 25-cv-716 (D.D.C.); *Jenner & Block LLP v. U.S. Department of Justice*, No. 25-cv-916 (D.D.C.); *Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of the President*, No. 25-cv-917 (D.D.C.); and *Susman Godfrey LLP v. Executive Office of the President*, No. 25-cv-1107 (D.D.C.).

/s/ *Sally L. Pei*
Sally L. Pei

i

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Circuit Rule 26.1, *amici curiae* state that no *amicus curiae* has outstanding shares or debt securities in the hands of the public, and none has a parent company. No publicly held company has a 10% or greater ownership interest in any *amicus curiae*.

/s/ *Sally L. Pei*
Sally L. Pei

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

All parties have consented to the filing of this *amicus* brief. Fed. R. App. P. 29; Cir. R. 29(b).

Pursuant to Circuit Rule 29(d), undersigned counsel for *amici curiae* certifies that a separate brief is necessary. *Amici* are European bar associations. They offer unique insights, informed by European and international law, as well as historical experiences in their respective countries, on the importance of the role of the legal profession to the rule of law. The comparative perspectives set out in this *amicus* brief are distinct from the arguments presented by the parties and may aid the Court's resolution of the issues presented.

/s/ *Sally L. Pei*
Sally L. Pei

## STATEMENT OF AUTHORSHIP AND
## FINANCIAL CONTRIBUTIONS

No counsel for a party authored this brief in whole or in part, and no person other than *amici curiae*, their members, or their counsel contributed money that was intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

/s/ *Sally L. Pei*
Sally L. Pei

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
  AND RELATED CASES ................................................................. i

RULE 26.1 DISCLOSURE STATEMENT ....................................... ii

STATEMENT REGARDING CONSENT TO FILE
  AND SEPARATE BRIEFING ...................................................... iii

STATEMENT OF AUTHORSHIP AND FINANCIAL
  CONTRIBUTIONS ...................................................................... iv

TABLE OF CONTENTS ................................................................... v

TABLE OF AUTHORITIES ........................................................... vii

GLOSSARY OF ABBREVIATIONS ................................................ xv

IDENTITY AND STATEMENT OF INTEREST OF *AMICI CURIAE* ..... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................... 4

ARGUMENT ..................................................................................... 6

I.  An independent legal profession is vital to the rule of law and a
    functioning democratic society ................................................. 6

    A.  Courts recognize professional independence as
        fundamental to the rule of law ......................................... 6

    B.  International and European legal instruments underscore
        the importance of an independent legal profession ......... 9

II. Attacks on the independence of the legal profession throughout
    history highlight its importance to the rule of law ................. 12

    A.  Germany, 1933 to 1945: The erosion of an independent
        legal profession and collapse of the rule of law ............. 13

    B.  Russia: Reprisals against lawyers representing dissidents
        and opposition figures ..................................................... 19

    C.  Poland: Systematic attacks on judicial independence and
        lawyers committed to protecting it .................................. 23

III. The Executive Orders threaten the independence of the legal profession and undermine the rule of law in the United States ............29

CONCLUSION..................................................................................34

CERTIFICATE OF COMPLIANCE ..................................................35

CERTIFICATE OF SERVICE ..........................................................36

# TABLE OF AUTHORITIES*

**Page(s)**

**U.S. Cases**

*Gideon v. Wainwright,*
  372 U.S. 335 (1963)................................................................................7

*Legal Servs. Corp. v. Velazquez,*
  531 U.S. 533 (2001)...............................................................................6

*Powell v. Alabama,*
  287 U.S. 45 (1932)................................................................................7

*Strickland v. Washington,*
  466 U.S. 668 (1984)...........................................................................6, 7

**Statutes and Rules**

Cir. R.
  26.1....................................................................................................ii
  28.......................................................................................................i
  29.................................................................................................... iii

Fed. R. App. P.
  26.1....................................................................................................ii
  29............................................................................................... iii, iv

**Treaties and International Agreements**

Charter of the International Military Tribunal art. 16(d)-(e), Aug. 8,
  1945, 82 U.N.T.S. 279 .......................................................................19

Convention for the Protection of Human Rights and Fundamental
  Freedoms, Nov. 4, 1950, 213 U.N.T.S. 222
  art. 6(1)........................................................................................ 11-12
  art. 6(3)(c) ................................................................................... 11-12

---

\* Authorities on which this brief chiefly relies are marked with an asterisk.

**Page(s)**

**Treaties and International Agreements—Continued**

*Eur. Consult. Ass., Convention for the Protection of the Profession of
Lawyer, C.E.T.S. No. 226 (2025) ............................................................... 32-33
    art. 1 ..........................................................................................................33
    art. 4 ..........................................................................................................33
    art. 5 ..........................................................................................................33
    art. 6 ..........................................................................................................33
    art. 7 ..........................................................................................................33
    art. 8 ..........................................................................................................33
    art. 9(4)(a) ..................................................................................................33
    art. 10 ........................................................................................................33
    pmbl. .........................................................................................................33

International Covenant on Civil and Political Rights art. 14, Dec. 16,
1966, 999 U.N.T.S. 171 .................................................................................9

**Foreign and International Cases**

Case C-432/23, *F SCS v. Administration des contributions directes*,
ECLI:EU:C:2024:791 (Sept. 26, 2024) ..........................................................7

Case C-550/07 P, *Akzo Nobel Chems. Ltd v. Eur. Comm'n*,
2010 E.C.R. I-8381 (Sept. 14, 2010) .............................................................7

Case C-694/20, *Orde van Vlaamse Balies v. Vlaamse Regering*,
ECLI:EU:C:2022:963 (Dec. 8, 2022) ..............................................................7

*Elçi v. Turkey*,
App. Nos. 23145/93 & 25091/94 (Mar. 24, 2004),
https://hudoc.echr.coe.int/eng?i=001-61442 .............................................7, 8

*José Alvear Restrepo Lawyers Collective v. Colombia*,
Preliminary Objections, Merits, Reparations and Costs, Judgment,
Inter-Am. Ct. H.R. (series C) No. 506 (Oct. 18, 2023) .............................. 8-9

*Kobaliya v. Russia*, Nos. 39446/16 (Oct. 22, 2024),
https://hudoc.echr.coe.int/en?i=001-237425 .................................................22

**Foreign and International Cases—Continued**

*Mesić v. Croatia*, App. No. 19362/18 (May 5, 2022),
https://hudoc.echr.coe.int/eng?i=001-217119 .................................................12

*Morice v. France*, App. No. 29369/10 (Apr. 23, 2015),
https://hudoc.echr.coe.int/en?i=001-154265 ...................................................8

*Rogalski v. Poland*, App. No. 5420/16 (Mar. 23, 2023),
https://hudoc.echr.coe.int/en?i=001-223656 ...................................................8

**Foreign Laws**

Bundesrechtsanwaltsordnung [Federal Lawyers Act], Aug. 1, 1959,
BGBl. I at 565, last amended by the Act of Dec. 22, 2025, BGBl. I at
349 (Ger.) .......................................................................................................18

Gesetz über die Zulassung zur Rechtsanwaltschaft [Law Regarding
Admission to the Bar], Apr. 7, 1933, § 2, 1933 RGBl. I at 188 (Ger.)..........14

Gesetz zur Behebung der Not von Volk und Reich [Law to Remedy the
Distress of People and Reich], Mar. 24, 1933, 1933 RGBl. I at 141
(Ger.) ...............................................................................................................13

Gesetz zur Wiederherstellung des Berufsbeamtentums [Law for
Restoration of the Professional Civil Service], Apr. 7, 1933, § 4, 1933
RGBl. I at 175 (Ger.) ................................................................................. 13-14

Loi du 26 juin 1941 réglementant la profession d'avocat et la discipline
du barreau [Law of June 26, 1941 Regulating the Legal Profession
and Bar Discipline], art. 23 (Fr.)...................................................................16

Verordnung des Reichspräsidenten über die Gewährung von
Straffreiheit [Decree of the Reich President on the Granting of
Immunity from Punishment], Mar. 21, 1933, § 1, 1933 RGBl. I at 134
(Ger.) ...............................................................................................................17

**Other Authorities**

*Adam Bodnar: adwokatom grozi tzw. "efekt mrożący" [Adam Bodnar: Lawyers face a risk of a chilling effect]*, Rzecznik Praw Obywatelskich (Aug. 5, 2020) ...............................................26

*Alexei Navalny, Russia's most outspoken Putin critic*, BBC (Feb. 16, 2024)......................................................................21

Beril Akman, *Turkey Arrests Jailed Erdogan Rival's Lawyer, Widening Crackdown*, Bloomberg (June 20, 2025) ......................................28

Hilde Benjamin, Fragen der Verteidigung und des Verteidigers, 5 Neue Justiz 51, 53 (1951) ................................................18

Dina M. Bernardelli, *Russia Rule-Ette: Using Khodorkovsky's Criminal Trial to Assess the State of Russia's Judiciary*, 31 B.C. Int'l & Comp. L. Rev. 85 (2008) .................................................20

Jasmine D. Cameron et al., *Attacks on U.S. Legal Profession Reflect Global Slide in Countries It Once Aided*, Just Security (Oct. 13, 2025) .........................................................................................21

Susan Carle et al., *The Reform of the Russian Legal Profession: Three Varying Perspectives*, 42 Fordham Int'l L.J. 271 (2018).............................19

Liberties Rule of Law Report 2024: Poland, Civ. Liberties Union for Eur. (2024) .................................................27

Hon. John C. Coughenour, *Reflections on Russia's Revival of Trial by Jury*, 26 Seattle U. L. Rev. 399 (2003) .........................................19

Eur. Comm'n, Reasoned Proposal, COM(2017) 835 final (2017)......................24

Eur. Comm'n for Democracy Through L. (Venice Comm'n), Opinion on the Act on the Public Prosecutor's Office as Amended, CDL-AD(2017)028 (Dec. 8-9, 2017) ........................................ 24-25

**Other Authorities—Continued**

*Cynthia Fountaine, *Complicity in the Perversion of Justice: The Role of Lawyers in Eroding the Rule of Law in the Third Reich*, 10 St. Mary's J. on Legal Malpractice & Ethics 198 (2020) .................13, 14, 15, 17

Hans Petter Graver, *Why Adolf Hitler Spared the Judges: Judicial Opposition Against the Nazi State*, 19 German L.J. 846 (2018)........... 17-18

Robert Grzeszczak & Ireneusz Pawel Karolewski, *The Rule of Law Crisis in Poland: A New Chapter*, VerfassungsBlog (Aug. 8, 2018)..........24

Amy Hawkins, *China's human rights lawyers speak out, 10 years after crackdown*, The Guardian (July 7, 2025)........................................................29

Kathryn Hendley, *Do Lawyers Matter in Russia?*, 2 Wis. L. Rev. 301 (2021)..................................................................19

Benjamin Carter Hett, Crossing Hitler: The Man Who Put the Nazis on the Witness Stand (2008)....................................................................16

Human Rights Comm., General Comment No. 32, U.N. Doc. CCPR/C/GC/32 (2007) .............................................................10

Russia: New Restrictions for 'Foreign Agents,' Human Rights Watch (Dec. 1, 2022) ..........................................................21

*Russian Federation: Authorities must end attacks on lawyers and abuse of foreign agents law*, ICJ (Apr. 19, 2023)........................................22

*Russian Federation: reinstate disbarred lawyer Aleksey Ladin and protect legal professionals from reprisals*, ICJ (Aug. 2, 2024) ...................22

Int'l Bar Ass'n, Standards for the Independence of the Legal Profession (1990)..................................................................11

Int'l Bar Ass'n's Hum. Rts. Inst. & Lawyers for Lawyers, *Oral Statement to the 52nd UN Human Rights Council,* 52d Sess. (Mar. 24, 27-28, 2023) ...................................................................24

**Other Authorities—Continued**

Mariana Katzarova (Special Rapporteur on the situation of human rights in the Russian Federation), *Situation of human rights in the Russian Federation*, U.N. Doc. A/HRC/54/54 (Sept. 18, 2023) ............ 22-23

Mariana Katzarova (Special Rapporteur on the situation of human rights in the Russian Federation), *Situation of human rights in the Russian Federation*, U.N. Doc. A/HRC/57/59 (Sept. 13, 2024) .................23

Wojciech Kość, *Poland tries to restore rule of law in the face of a hostile president*, Politico (Oct. 12, 2025) .......................................28

*Disbarment and reprisals against Hong Kong lawyer Kevin Yam amid a broader pattern of intimidation of lawyers defending the rule of law*, Lawyers for Lawyers (Sept. 3, 2025) .........................................29

Lawyers for Lawyers, Amsterdam Bar Ass'n & Int'l Comm'n of Jurists, *End Harassment of Michał Romanowski* (July 15, 2021) ............25

John Macy & Allyson K. Duncan, *The Collapse of Judicial Independence in Poland: A Cautionary Tale*, 104 Judicature 41 (2020) .....................................................................24

Ingo Müller, Hitler's Justice: The Courts of the Third Reich (1991) ..............14

Matthew Lippman, *They Shoot Lawyers Don't They?: Law in the Third Reich and the Global Threat to the Independence of the Judiciary*, 23 Cal W. Int'l L.J. 257 (1993) ...............................................14, 15

Karl Loewenstein, *Reconstruction of the Administration of Justice in American-Occupied Germany*, 61 Harv. L. Rev. 419 (1948) .....................15

Yves Ozanam, *Le barreau de Paris pendant la Seconde Guerre mondiale (1940-1945) [The Paris Bar during the Second World War (1940-1945)]*, 14 Histoire de la Justice 145 (2001) .......................... 15-16

Parliamentary Assembly of the Council of Eur., Recommendation 2121 (2018) The case for drafting a European Convention on the Profession of Lawyer (Jan. 24, 2018) ..........................................................32

**Other Authorities—Continued**

*PiS chce fuzji radców i adwokatów [PiS wants advocates' and legal advisors' fusion]*, Rzeczpospolita (Dec. 9, 2023) ...............................27

William E. Pomeranz, *The Magnitsky Case and the Limits of Russian Legal Reform*, 92 Russian Analytical Digest 12 (Feb. 22, 2011) .................20

Igor Slabykh, *Russia Attacks Lawyers, the Last Independent Institution*, Wilson Ctr. (Oct. 26, 2023).......................................20, 21

Statement of the Weimar Triangle of Lawyers (Nov. 10, 2023) ......................27

U.N. Off. of the High Comm'r for Hum. Rts., *Criminalisation of Istanbul Bar Association and dismissal of executive board, a chilling attack on the independence of lawyers: UN experts* (May 30, 2025) ...............................................28

U.N. Treaty Collection, *International Covenant on Civil and Political Rights*, Status of Treaties ................................................ 9-10

U.N. Basic Principles on the Role of Lawyers
pmbl.....................................................10
¶ 16(a) .................................................10
¶ 16(c) .................................................11
¶ 18.....................................................11
¶ 23.....................................................11

Vienna Declaration and Programme of Action, U.N. Doc. A/CONF.157/23 (July 12, 1993) .................................................10

Kenneth C.H. Willig, *The Bar in the Third Reich*, 20 Am. J. Legal Hist. 1 (1976) .......................13, 15, 16, 17

Anna Wójcik, *Poland's Rule-of-Law Repair: Trapped in Institutional Paralysis?*, German Marshall Fund (Dec. 5, 2025)......................................28

**Other Authorities—Continued**

*Zastępca Rzecznika Dyscyplinarnego Sędziów Radzik donosi na adwokata Mikołaja Pietrzaka, obrońcę Waldemara Żurka [Disciplinary counsel Przemysław Radzik reports Mikołaj Pietrzak, defense counsel of judge Waldemar Żurek]*, Monitor Konstytucyjny (Aug. 8, 2020) ................................................................25, 26

# GLOSSARY OF ABBREVIATIONS

EU      European Union
ICCPR     International Covenant on Civil and
       Political Rights
PiS      Prawo i Sprawiedliwość (Law and Justice
       Party) (Poland)
UN      United Nations

**IDENTITY AND STATEMENT OF INTEREST OF *AMICI CURIAE***

*Amici* are European bar associations whose mandates include advocating for the independence of the legal profession, access to justice, and the rule of law.

- **Deutscher Anwaltverein e.V.** (the German Bar Association) represents approximately 60,000 German and German-speaking lawyers.

- **Izba Adwokacka w Warszawie** (the Warsaw Bar Association) represents approximately 10,000 Polish and Polish-speaking advocates.

- The **Ordre des avocats à la Cour d'Appel de Paris – Barreau de Paris** (Paris Bar) represents more than 34,000 lawyers in Paris (France).

- The **Law Society of England and Wales** is the professional body for over 200,000 solicitors in England and Wales.

- **Suomen Asianajajat** (the Finnish Bar Association) is responsible for regulating and supervising over 2,400 attorneys in Finland.

- The **Council of Bars and Law Societies of Europe** (CCBE) represents the bars and law societies of 45 countries from the

European Union, the European Economic Area, and wider Europe. Through its membership, it represents more than 1 million European lawyers.

- The **Bar Council of England and Wales** is the professional body and approved regulator for 18,000 barristers in England and Wales.

- The **Bundesrechtsanwaltskammer** (the German Federal Bar) represents more than 166,000 lawyers in Germany.

- The **Conseil national des barreaux** (the French National Bar Council) represents approximately 79,000 lawyers in France.

- The **Consejo General de la Abogacía Española** (General Council of Spanish Lawyers) has more than 238,000 registered members, including more than 154,000 practicing lawyers.

- **Den Norske Advokatforeningen** (the Norwegian Bar Association) represents approximately 10,000 lawyers and associates in Norway.

- The **Law Society of Scotland** is the professional body for 14,000 solicitors in Scotland.

- **Lietuvos advokatūra** (the Bar Council of Lithuania) coordinates and regulates the activities of more than 2,300 Lithuanian practicing advocates.

- **Naczelna Rada Adwokacka** (the Polish Bar Council) is the national representative body of the Polish Bar, bringing together the regional bar associations and representing over 25,000 advocates and trainee advocates in Poland.

- The **Orde van Vlaamse Balies** (Order of Flemish Bar Associations) represents more than 11,500 Flemish lawyers in Belgium.

- The **Ordre des Avocats du Barreau de Luxembourg** (Luxembourg Bar) represents approximately 3,720 lawyers in Luxembourg.

- The **Ordre des avocats de Genève** (Geneva Bar Association) represents more than 2,300 lawyers in Geneva, Switzerland, including approximately 400 trainees.

- The **Ordre des Barreaux Francophones et Germanophone de Belgique** (AVOCATS.BE) unites bar associations in the French-speaking and German-speaking regions of Belgium. It represents approximately 8,600 lawyers.

- The **Ordre français des avocats du barreau de Bruxelles** (the French-speaking Bar of Brussels) has more than 4,400 members, including more than 900 trainees.

- **Sveriges advokatsamfund** (the Swedish Bar Association) has over

9,300 members, including approximately 6,700 advocates and more than 2,600 associate lawyers.

*Amici* have a substantial interest in protecting the independence of the legal profession as a cornerstone of the rule of law. The Executive Orders threaten that independence and thereby the rule of law. Drawing on historical experience in Europe and elsewhere, *amici* submit this brief to highlight how attacks on lawyers reflect and accelerate the decline of the rule of law, and to emphasize that preserving the profession's independence is critical to the integrity of the judicial system and the survival of democratic institutions.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The rule of law requires both independent courts and an independent legal profession that can freely provide reliable services to individuals and communities. As intermediaries between citizens and the judicial system, lawyers must be free to represent clients and exercise professional judgment without undue governmental interference. The Executive Orders purport to address concerns relating to national security and government contracting. Even if any genuine concerns were present, longstanding principles of the rule of law require careful scrutiny of measures that burden lawyers for their professional advocacy. Government action that burdens law firms based on the

clients they represent or the positions they advance raises serious concerns about the fair administration of justice and the rule of law.

History offers stark lessons. Over the past century, periods of democratic diminution in Europe and elsewhere have been marked by efforts to discipline, marginalize, and control the bar. In Nazi Germany, dismantling the independent bar was an early step in subordinating the legal system to the regime. More recently, a troubling pattern of interference with the profession has emerged in other regions. For instance, in Russia, Türkiye, China, and Hong Kong, as well as in European countries such as Poland, governmental pressure on lawyers representing politically sensitive clients has accompanied broader efforts to weaken judicial independence and limit effective legal challenge to state action.

*Amici* offer these examples not to equate the U.S. government with any other government, but to illustrate the importance of resisting attacks on the independence of the legal profession. History shows that suppression of the legal profession is both a symptom and an instrument of democratic decline. And while the destruction of democratic institutions is often swift, reestablishing the rule of law and rebuilding trust in the legal system is a long and fragile process.

The courts below correctly recognized and responded to the threat that the Executive Orders pose. By burdening law firms for their representations and advocacy, the Orders imperil the independence of the American legal profession, impede access to justice, and undermine the adversarial system. The judgments below should be affirmed.

## ARGUMENT

**I. An independent legal profession is vital to the rule of law and a functioning democratic society**

**A. Courts recognize professional independence as fundamental to the rule of law**

The independence of the legal profession is foundational to the rule of law. The fundamental right to counsel—enshrined in domestic and international law—presupposes that lawyers can represent clients and exercise professional judgment free from undue governmental interference. Courts across jurisdictions have affirmed that such independence is essential to lawyers' roles as facilitators of justice and safeguards against the arbitrary exercise of state power.

The U.S. Supreme Court has long recognized this principle. As the Court explained, "[a]n informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). U.S. courts have also affirmed the right to effective and independent counsel

as indispensable to fairness and the administration of justice. *See, e.g.,* *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (collecting cases); *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963); *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932). Interference with counsel's independent judgment undermines the adversarial process on which the rule of law depends. *See, e.g., Strickland*, 466 U.S. at 686.

European jurisprudence reflects the same understanding. The Court of Justice of the European Union has repeatedly recognized that "lawyers are assigned a fundamental role in a democratic society, that of defending litigants." *See, e.g.,* Case C-432/23, *F SCS v. Administration des contributions directes*, ECLI:EU:C:2024:791, ¶ 50 (Sept. 26, 2024); Case C-694/20, *Orde van Vlaamse Balies v. Vlaamse Regering*, ECLI:EU:C:2022:963, ¶ 28 (Dec. 8, 2022). The European legal tradition sees "the lawyer's role as collaborating in the administration of justice and as being required to provide, in full independence and in the overriding interests of that cause, such legal assistance as the client needs." Case C-550/07 P, *Akzo Nobel Chems. Ltd v. Eur. Comm'n*, 2010 E.C.R. I-8381, ¶ 42 (Sept. 14, 2010). In short, lawyers are charged with defending their clients and helping them to assert their rights.

The European Court of Human Rights concurs, affirming "the central

7

role of the legal profession in the administration of justice." *Elçi v. Turkey*, App. Nos. 23145/93 & 25091/94, ¶ 669 (Mar. 24, 2004), https://hudoc.echr.coe.int/eng?i=001-61442. "The freedom of lawyers to practise their profession without undue hindrance is an essential component of a democratic society." *Id.* Lawyers, as "intermediaries between the public and the courts," occupy "a central position in the administration of justice" and play a key role in protecting rights and ensuring public confidence in the legal system. *Rogalski v. Poland*, App. No. 5420/16, ¶ 39 (Mar. 23, 2023), https://hudoc.echr.coe.int/en?i=001-223656; *Morice v. France*, App. No. 29369/10, ¶ 132 (Apr. 23, 2015), https://hudoc.echr.coe.int/en?i=001-154265; *Elçi*, App. Nos. 23145/93 & 25091/94, ¶ 669. Accordingly, improper interference with the legal profession—including intimidation or punishment for representing unpopular clients or causes, or criticizing the authorities— poses a serious threat to the administration of justice.

The Inter-American Court of Human Rights has reached the same conclusion, emphasizing the essential role of lawyers—particularly those defending human rights—in representing victims and ensuring accountability, and the need to protect their ability to work independently and without retaliation. *José Alvear Restrepo Lawyers Collective v. Colombia*, Preliminary

Objections, Merits, Reparations and Costs, Judgment, Inter-Am. Ct. H.R. (series C) No. 506, ¶¶ 471-472 (Oct. 18, 2023).

In sum, courts across jurisdictions have converged on a common understanding: lawyers must be free from improper governmental interference to fulfill their role as guardians of justice. Compromising that independence not only threatens individual rights but also damages public confidence, undermines the legitimacy of democratic institutions, and jeopardizes the rule of law itself.

### B. International and European legal instruments underscore the importance of an independent legal profession

International legal instruments likewise highlight the centrality of an independent legal profession to the rule of law and the protection of fundamental rights. These international instruments reflect a widely shared understanding—consistent with longstanding U.S. constitutional principles— that the independence of lawyers is essential to the administration of justice.

Article 14 of the International Covenant on Civil and Political Rights ("ICCPR")—ratified by 175 countries, including the United States— guarantees the right to the legal counsel of one's choosing in criminal matters as part of the right to a fair trial. *See* International Covenant on Civil and Political Rights art. 14, Dec. 16, 1966, 999 U.N.T.S. 171; *see also* U.N. Treaty

Collection, *International Covenant on Civil and Political Rights*, Status of Treaties, http://bit.ly/4t1Ffoq. An interpretive comment to that Article explains that this guarantee requires that lawyers be able to represent their clients "without restrictions, influence, pressure or undue interference from any quarter." Human Rights Comm., General Comment No. 32, ¶ 34, U.N. Doc. CCPR/C/GC/32 (2007). The 1993 Vienna Declaration and Programme of Action on Human Rights, adopted by consensus by the United Nations, similarly affirms that the "administration of justice," in particular "an independent judiciary and legal profession … are essential to the full and non-discriminatory realization of human rights and indispensable to the processes of democracy and sustainable development." U.N. Doc. A/CONF.157/23, ¶ 27 (July 12, 1993).

To further these objectives, the United Nations adopted non-binding "Basic Principles on the Role of Lawyers" in 1990, a comprehensive set of authoritative norms aimed at safeguarding the independence of the legal profession. *See* U.N. Basic Principles on the Role of Lawyers pmbl. (1990). Among other things, they emphasize that lawyers must be able to perform all professional duties free from intimidation, interference, or harassment, *id.* ¶ 16(a), and must not be subjected to criminal or disciplinary action for conduct

performed in line with their professional obligations, ethical standards, or the law, *id.* ¶ 16(c). Lawyers must not be identified with their clients or their clients' causes simply because of their professional role, *id.* ¶ 18, and must retain the freedom to engage in public debate on legal matters, the administration of justice, and the protection of human rights without fear of professional sanction, *id.* ¶ 23.

The International Bar Association's "Standards for the Independence of the Legal Profession," adopted in conjunction with the U.N. Basic Principles, provide that lawyers must be able to "at all times act freely, diligently and fearlessly in accordance with the legitimate interest of the client and without any inhibition or pressure from the authorities or the public," and call on governments to ensure that lawyers do not face "penal, civil, administrative, economic or other sanctions or harassment by reason of his or her having legitimately advised or represented any client or client's cause." Int'l Bar Ass'n, Standards for the Independence of the Legal Profession arts. 6, 8 (1990), https://bit.ly/4c2sQK9.

European instruments echo these guarantees. The European Convention on Human Rights, like the ICCPR, guarantees the right to a fair trial and includes within that right the concomitant right to the counsel of one's

11

choosing. Convention for the Protection of Human Rights and Fundamental Freedoms arts. 6(1), 6(3)(c), Nov. 4, 1950, 213 U.N.T.S. 222. The European Court of Human Rights and the Court of Justice have affirmed the centrality of the independence of lawyers to protecting these rights and the rule of law more generally. *See, e.g.*, *Mesić v. Croatia*, App. No. 19362/18, ¶ 109 (May 5, 2022), https://hudoc.echr.coe.int/eng?i=001-217119 (governmental disparagement of lawyers would deter independent practice with "serious consequences for the rights of the accused and the right of access to a court").

## II. Attacks on the independence of the legal profession throughout history highlight its importance to the rule of law

Courts evaluating measures that affect lawyers' ability to represent clients have long considered the broader institutional role of the legal profession in the administration of justice. The rule of law rests, in part, on lawyers' ability to practice without undue governmental interference, regardless of the identity of their clients or the positions they advance. Comparative experience can illuminate why the independence of lawyers has traditionally been treated as a structural safeguard of the rule of law. The historical examples that follow are offered not to equate the U.S. government with the governments discussed, but to illustrate a recurring institutional pattern: attacks on the legal profession both reflect and accelerate the erosion

of democratic institutions. Once compromised, the rule of law can take generations to rebuild.

### A. Germany, 1933 to 1945: The erosion of an independent legal profession and collapse of the rule of law

Germany established an independent bar in 1878, designating the practice of law a "free profession[]" outside state control. Kenneth C.H. Willig, *The Bar in the Third Reich*, 20 Am. J. Legal Hist. 1, 2 (1976). The bar remained independent under the Weimar Republic. *Id.* But after Adolf Hitler became Chancellor on January 30, 1933, the regime moved rapidly to subordinate the legal profession to its political objectives. *See id.* at 1.

On March 24, 1933, a month after the Reichstag Fire, Hitler assumed broad authority to legislate by decree—even in conflict with the Constitution. *See* Gesetz zur Behebung der Not von Volk und Reich [Law to Remedy the Distress of People and Reich], Mar. 24, 1933, 1933 RGBl. I at 141 (Ger.); Cynthia Fountaine, *Complicity in the Perversion of Justice: The Role of Lawyers in Eroding the Rule of Law in the Third Reich*, 10 St. Mary's J. on Legal Malpractice & Ethics 198, 216-17 (2020). Attacks on the legal profession soon followed.

Two April 7, 1933 decrees marked the beginning of a purge from the legal profession of anyone the regime disfavored. The *Law for Restoration of*

*the Professional Civil Service* excluded, among others, individuals deemed "politically unreliable"—anyone "whose former political activity afford[ed] no guarantee that they w[ould] act in the interest of the national state at all times and without reservation"—from the Civil Service, which included judges, public prosecutors, and district attorneys. Gesetz zur Wiederherstellung des Berufsbeamtentums [Law for Restoration of the Professional Civil Service], Apr. 7, 1933, § 4, 1933 RGBl. I at 175 (Ger.); Fountaine, at 221. The *Law Regarding Admission to the Bar* disbarred and excluded from the profession individuals based on race and political affiliation. Gesetz über die Zulassung zur Rechtsanwaltschaft [Law Regarding Admission to the Bar], Apr. 7, 1933, § 2, 1933 RGBl. I at 188 (Ger.).

Ideological opponents were removed from public office, disbarred, or prohibited from becoming a lawyer or practicing in the profession. Fountaine, at 220-21. As one commentator later observed: "Justice as an ideal disappeared from Germany" following this purge. Ingo Müller, Hitler's Justice: The Courts of the Third Reich 296 (1991).

Resistance within the profession was minimal. *See id.*; Matthew Lippman, *They Shoot Lawyers Don't They?: Law in the Third Reich and the Global Threat to the Independence of the Judiciary*, 23 Cal W. Int'l L.J. 257,

269, 275 (1993). Many lawyers aligned themselves publicly with the regime. *See, e.g.*, Karl Loewenstein, *Reconstruction of the Administration of Justice in American-Occupied Germany*, 61 Harv. L. Rev. 419, 443 (1948). As one scholar explained, "[a]ttorneys who failed to demonstrate adherence to the principles of National Socialism found their careers stymied." Lippman, *supra*, at 276. Within weeks of the April decrees, the largest organization of German judges and prosecutors urged its members "'to enter the front line of Adolf Hitler's ranks,'" proclaiming that "'unconditional solidarity is a necessity for the success of our struggle.'" Fountaine, *supra*, at 222.

Subsequent legislation completed the transformation. In February 1934, the Reich Ministry of Justice assumed full control of the bar. *Id.* at 224. In 1936, the statute establishing an independent bar was rescinded and lawyers were required to comply with Nazi doctrine and swear personal loyalty to Hitler, shifting the lawyer's duty of loyalty from the client to the State. *See id.* at 206, 225; Willig, *supra*, at 1, 6-7, 14.[1]

---

[1] The Vichy government in France attempted similar measures during the German occupation. In February 1941, the Minister of Justice announced his intention to change the lawyers' oath to include an oath of allegiance to Philippe Pétain. The Paris Bar strongly objected, explaining that "any modification that would tend to transform the purely professional oath by

Hitler also targeted individual lawyers who attracted his personal rancor. For example, in a 1931 trial—before Hitler became Chancellor—Berlin lawyer Hans Litten represented workers injured by a Nazi stormtrooper assault on a dance hall. Benjamin Carter Hett, Crossing Hitler: The Man Who Put the Nazis on the Witness Stand 81-83 (2008). Litten called Hitler as a witness. *Id.* Hitler became enraged under Litten's examination, losing his composure on the witness stand. *Id.* at 113-14. Hitler did not forget: soon after becoming Chancellor, he ordered Litten into "protective custody" for representing workers with the wrong political leanings. *Id.* at 158-59. Litten was detained and tortured in prisons and concentration camps, and ultimately committed suicide after an "interrogation" at Dachau in 1938. *Id.* at 240-41.

Threats of disbarment, discipline, or worse made lawyers extremely

---

lawyers today into a political oath would be contrary to the principles [of the profession]." *See* Yves Ozanam, *Le barreau de Paris pendant la Seconde Guerre mondiale (1940-1945) [The Paris Bar during the Second World War (1940-1945)]*, 14 Histoire de la Justice 145, 152 (2001). Facing the Bar's opposition, the final version of the oath did not require swearing fealty to Pétain, but instead allegiance to "the justice system and the authorities of the French state." Loi du 26 juin 1941 réglementant la profession d'avocat et la discipline du barreau [Law of June 26, 1941 Regulating the Legal Profession and Bar Discipline], art. 23 (Fr.). The Paris Bar similarly refused demands to hang Pétain's portrait in its reception room or display his messages and speeches on its premises. Ozanam, *supra*, at 150-152.

hesitant to defend politically sensitive clients or issues. *See* Willig, *supra*, at 11; Fountaine, *supra*, at 227, 232-33. Some betrayed their own clients in favor of the Nazi regime. For example, when General Erich Hoepner was tried for alleged participation in a plot against Hitler, Hoepner's attorney asked the court to sentence Hoepner to death. Fountaine, *supra*, at 227.

Beyond formal pressure, the regime employed public intimidation to control the bar. It publicly reprimanded attorneys for perceived "errors." Willig, *supra*, at 12; *see* Fountaine, *supra*, at 223. Hitler himself disparaged lawyers, calling them "traitors," "idiots," "absolute cretins," "a disgrace," and "deficient by nature or else deformed by usage." *See* Willig, *supra*, at 1, 11; Fountaine, *supra*, at 205.

At the same time, the regime signaled that its adherents were above the law. For example, on March 21, 1933, partisans previously convicted or charged for "acts committed in the national revolution" were granted amnesty. Verordnung des Reichspräsidenten über die Gewährung von Straffreiheit [Decree of the Reich President on the Granting of Immunity from Punishment], Mar. 21, 1933, § 1, 1933 RGBl. I at 134 (Ger.).

When lawyers and judges nonetheless sought to hold Nazi officials responsible—despite the risks to themselves—their efforts were obstructed.

For example, in May 1933, Munich prosecutors investigated killings of inmates by S.S. personnel in the Dachau concentration camp. Hans Petter Graver, *Why Adolf Hitler Spared the Judges: Judicial Opposition Against the Nazi State*, 19 German L.J. 846, 854 (2018). Despite resistance by the S.S., the judge convicted S.S. guards and sentenced them to prison—only for Hitler to soon pardon them. *Id.*

Through these systematic attacks, and its own acquiescence, the German bar became powerless to defend the rule of law as Nazi barbarism intensified in the years after 1933.

The consequences endured long after the fall of the regime in May 1945. The bar regained its independence in West Germany more than a decade later in 1959. *See* Bundesrechtsanwaltsordnung [Federal Lawyers Act], Aug. 1, 1959, BGBl. I at 565, last amended by the Act of Dec. 22, 2025, BGBl. I at 349 (Ger.). The process took even longer in East Germany, where until reunification in 1990, lawyers remained expected to be committed to the political will of the new state in its entirety. *See, e.g.*, Hilde Benjamin, Fragen der Verteidigung und des Verteidigers, 5 Neue Justiz 51, 53 (1951).

*    *    *

An important postscript to the German story bears mentioning:

Notwithstanding their dismantling of the rule of law, obliteration of an independent legal profession, and commission of countless atrocities, Nazi leaders prosecuted at Nuremberg after World War II were guaranteed—by American and Allied forces—the right to conduct a defense with the aid of independent counsel. Charter of the International Military Tribunal art. 16(d)-(e), Aug. 8, 1945, 82 U.N.T.S. 279.

## B. Russia: Reprisals against lawyers representing dissidents and opposition figures

The experience of the legal profession in Russia reflects a similar pattern. The professional bar, first established in the 1860s, was abolished after the 1917 Revolution, and "at various times in the ensuing decades, it entirely disappeared as an institution independent from the state." Susan Carle et al., *The Reform of the Russian Legal Profession: Three Varying Perspectives,* 42 Fordham Int'l L.J. 271, 273-74 (2018); Hon. John C. Coughenour, *Reflections on Russia's Revival of Trial by Jury*, 26 Seattle U. L. Rev. 399, 405 (2003). The late twentieth century saw a brief revitalization, but under Vladimir Putin, legal practice in Russia has fallen into "familiar patterns in which politics trump[] law." Kathryn Hendley, *Do Lawyers Matter in Russia?*, 2 Wis. L. Rev. 301, 331 (2021).

Russia's increasing authoritarianism has been marked by escalating pressure on lawyers—particularly those representing political opponents or other clients adverse to the State. In 2005, Russian authorities deported a defense attorney during his representation of Mikhail Khodorkovsky—an oligarch imprisoned after opposing Putin and funding opposition parties after a trial widely regarded as politically motivated. Dina M. Bernardelli, *Russia Rule-Ette: Using Khodorkovsky's Criminal Trial to Assess the State of Russia's Judiciary*, 31 B.C. Int'l & Comp. L. Rev. 85, 97 (2008). In 2007, attorney Boris Kuznetsov fled Russia after facing prosecution for revealing evidence of illegal state wiretapping that he discovered while defending a politician accused of bribery. Igor Slabykh, *Russia Attacks Lawyers, the Last Independent Institution*, Wilson Ctr. (Oct. 26, 2023), https://bit.ly/4chbn2k. And in 2009, lawyer Sergei Magnitsky was arrested and charged with tax evasion after exposing fraud by state officials. William E. Pomeranz, *The Magnitsky Case and the Limits of Russian Legal Reform*, 92 Russian Analytical Digest 12, 13 (Feb. 22, 2011). Magnitsky died in prison. *See id.* at 12-13.

The State has continued to quash dissent by targeting attorneys representing clients adverse to the regime. That trend has intensified since

Russia's invasion of Ukraine in 2022. In 2023 alone, there were more than 150 documented cases of harassment against lawyers, including detentions, disbarments, and false charges. *See* Jasmine D. Cameron et al., *Attacks on U.S. Legal Profession Reflect Global Slide in Countries It Once Aided*, Just Security (Oct. 13, 2025), https://bit.ly/3Mo1dT4.

The case of Alexei Navalny illustrates the pattern. Navalny, a leading opposition figure, sued prison authorities while he was incarcerated. *Alexei Navalny, Russia's most outspoken Putin critic*, BBC (Feb. 16, 2024), https://bit.ly/4r8s6t8. Shortly before a scheduled hearing, three members of Navalny's legal team were arrested; two others fled to avoid detention. *See* Slabykh, *supra*. Those detained were later sentenced to prison terms for "extremism"—a charge often deployed against political opponents. *See* Cameron, *supra*.

Alongside targeted reprisals, the State has expanded legal mechanisms to undermine the bar's independence. In December 2022, invoking national security, Russia significantly expanded its "foreign agents" registration law, to cover any individual or entity who has received foreign support and/or is considered to be "under foreign influence" and engaged in activities that Russian authorities deem "political." *See* Russia: New Restrictions for

'Foreign Agents,' Human Rights Watch (Dec. 1, 2022), https://bit.ly/3M6c0RP. Several lawyers representing dissidents and opposition figures have since been labeled "foreign agents" and disbarred. *Russian Federation: Authorities must end attacks on lawyers and abuse of foreign agents law*, ICJ (Apr. 19, 2023), https://bit.ly/46HiJZc. In 2024, the European Court of Human Rights held that the law and its application were "arbitrary" and functioned as punishment and intimidation rather than legitimate national security measures. *Kobaliya v. Russia*, Nos. 39446/16, ¶¶ 94, 98 (Oct. 22, 2024), https://hudoc.echr.coe.int/en?i=001-237425.

Further legislative changes have tightened state control. In April 2024, amendments to the law governing the Russian bar empowered the Ministry of Justice to request disciplinary sanctions against lawyers and control qualification examinations. *See* ICJ, *Authorities must end attacks*, *supra*. Disbarments of lawyers representing dissidents and persecuted groups have followed. For example, in 2024, Aleksey Ladin was disbarred for representing Crimeans and Ukrainians "against politically motivated charges in Russian-occupied Crimea." *Russian Federation: reinstate disbarred lawyer Aleksey Ladin and protect legal professionals from reprisals*, ICJ (Aug. 2, 2024), https://bit.ly/4ktBBR7.

In sum, as the UN Special Rapporteur on the situation of human rights in the Russian Federation described it,

> lawyers who have voiced dissenting views and/or represented human rights defenders, journalists, opposition activists, anti-war protesters or victims of human rights violations in the Russian Federation have come under severe pressure themselves. This pressure includes disciplinary, administrative and criminal harassment and prosecution, and physical violence amounting to torture and ill-treatment.

Mariana Katzarova (Special Rapporteur on the situation of human rights in the Russian Federation), *Situation of human rights in the Russian Federation*, U.N. Doc. A/HRC/54/54, ¶¶ 94-95 (Sept. 18, 2023). The Special Rapporteur subsequently documented intensifying attacks on the legal profession, particularly in cases involving political persecution or national security. Mariana Katzarova (Special Rapporteur on the situation of human rights in the Russian Federation), *Situation of human rights in the Russian Federation*, U.N. Doc. A/HRC/57/59, ¶¶ 61-64 (Sept. 13, 2024).

## C. Poland: Systematic attacks on judicial independence and lawyers committed to protecting it

Poland illustrates how attacks on the legal profession can weaken the rule of law—even within an EU Member State formally committed to modern democratic standards and shared European values. Between 2015 and 2023, the then-governing Prawo i Sprawiedliwość (Law and Justice Party), known

as PiS, undertook a dramatic reshaping of Poland's judiciary, presented as "reforms" but widely criticized as severely undermining judicial independence. *See, e.g.*, Eur. Comm'n, Reasoned Proposal, COM(2017) 835 final, at 1 (2017); John Macy & Allyson K. Duncan, *The Collapse of Judicial Independence in Poland: A Cautionary Tale*, 104 Judicature 41, 41-43 (2020); Robert Grzeszczak & Ireneusz Pawel Karolewski, *The Rule of Law Crisis in Poland: A New Chapter*, VerfassungsBlog (Aug. 8, 2018), https://bit.ly/4rOcdZ3.

In tandem with the dismantling of protections for an independent judiciary, lawyers—particularly those handling rights-based or politically sensitive cases or resisting the erosion of Poland's judiciary—faced harassment and intimidation. *See, e.g.*, Int'l Bar Ass'n's Hum. Rts. Inst. & Lawyers for Lawyers, *Oral Statement to the 52nd UN Human Rights Council*, 52d Sess. (Mar. 24, 27-28, 2023), https://bit.ly/45U6vMM.

Polish lawyers reported that, during investigations, prosecutors questioned lawyers seeking disclosure of information squarely protected by attorney-client privilege. *Id.* This pressure coincided with structural changes to the prosecutorial service, which placed it under the direct authority of the Minister of Justice (who simultaneously served as Prosecutor General),

heightening concerns about politically motivated investigations. *See generally* Eur. Comm'n for Democracy Through L. (Venice Comm'n), Opinion on the Act on the Public Prosecutor's Office as Amended, CDL-AD(2017)028 (Dec. 8-9, 2017), https://bit.ly/4qNoc8p.

Lawyers representing judges and opposition figures faced targeted legal or disciplinary measures. For example, Professor Michał Romanowski was subject to criminal proceedings in connection with his representation of judges facing disciplinary and criminal proceedings for criticizing the PiS government's judicial "reforms" and questioning the legality of certain judicial appointments. Lawyers for Lawyers, Amsterdam Bar Ass'n & Int'l Comm'n of Jurists, *End Harassment of Michał Romanowski* (July 15, 2021), https://bit.ly/3ZtvYsQ. Observers expressed concern that the proceedings appeared retaliatory and designed to deter counsel from representing judges resisting unlawful disciplinary actions. *See id.* Proponents of the government's reforms, including members of the judiciary, filed complaints against Professor Romanowski (both at the Regional Council of Attorneys and the University), *id.*, but the disciplinary bodies declined to open proceedings.

Similarly, in 2020, lawyer Mikołaj Pietrzak (then serving as dean of the Warsaw Bar Association) faced disciplinary proceedings in connection with his

defense of Judge Waldemar Żurek, who was himself the target of disciplinary sanctions for resisting PiS's changes to the judicial system. *See Zastępca Rzecznika Dyscyplinarnego Sędziów Radzik donosi na adwokata Mikołaja Pietrzaka, obrońcę Waldemara Żurka [Disciplinary counsel Przemysław Radzik reports Mikołaj Pietrzak, defense counsel of judge Waldemar Żurek]*, Monitor Konstytucyjny (Aug. 8, 2020), https://bit.ly/40Ivrn9. Mr. Pietrzak had sought the recusal of Judge Przemysław Radzik, one of the disciplinary counsel presiding over Judge Żurek's case, after learning that certain disciplinary counsel, apparently including Judge Radzik, had made derogatory statements on Twitter about judges who opposed PiS's reforms. *Id.* In response, Judge Radzik filed a bar complaint against Mr. Pietrzak. *Id.* While the bar ultimately did not pursue proceedings against Mr. Pietrzak, observers noted that the mere threat would have a chilling effect, discouraging lawyers from making arguments in their clients' defense that might entail criticizing the courts or the government. *See Adam Bodnar: adwokatom grozi tzw. "efekt mrożący" [Adam Bodnar: Lawyers face a risk of a chilling effect]*, Rzecznik Praw Obywatelskich (Aug. 5, 2020), https://bit.ly/4blLRrM.

In the latter period of its governance, the PiS took further steps to undermine the structure and independence of Poland's bar associations. In

2022, a group of PiS members of Parliament challenged regulations requiring that bar membership be based on legal professionals' residential or professional addresses. Statement of the Weimar Triangle of Lawyers (Nov. 10, 2023), https://bit.ly/4bF5Roi (discussing case no. K 6/22). The case was seen as an attempt to interfere with the independence of the bar: Accepting the applicants' arguments would have dismantled the existing structure of independent bar associations and required creating a new organizational model—a process over which the PiS would have had significant influence. *See* Liberties Rule of Law Report 2024: Poland, Civ. Liberties Union for Eur., at 13-14 (2024), https://bit.ly/3OZWZ4R. Similarly, in its September 2023 election manifesto, PiS announced its intention to merge Poland's two historically distinct legal professions—advocates and legal advisors—and dissolve their respective self-governing bodies, a move likewise seen as a threat to the independence of the profession. *See PiS chce fuzji radców i adwokatów [PiS wants advocates' and legal advisors' fusion]*, Rzeczpospolita (Dec. 9, 2023), https://bit.ly/40KTi5I.

PiS lost power in the 2023 general elections, and its attempts to restructure the legal profession did not prevail. But three years on, Poland continues to grapple with the consequences of the erosion of the rule of law

during PiS's eight years in power. Given the polarization and politicization of Poland's legal system that PiS's reforms ushered in, the damage to Poland's judicial institutions is proving extremely difficult to repair. *See, e.g.*, Wojciech Kość, *Poland tries to restore rule of law in the face of a hostile president*, Politico (Oct. 12, 2025), https://bit.ly/4bNh6ge; Anna Wójcik, *Poland's Rule-of-Law Repair: Trapped in Institutional Paralysis?*, German Marshall Fund (Dec. 5, 2025), https://bit.ly/4aFRqB0.

*　　*　　*

Similar dynamics are unfolding elsewhere. In Türkiye—where the legal profession has long faced political pressure—lawyers and bar associations are facing retaliation (including criminal prosecution) for criticizing the government or representing opposition figures. *See* Beril Akman, *Turkey Arrests Jailed Erdogan Rival's Lawyer, Widening Crackdown*, Bloomberg (June 20, 2025), https://bit.ly/4aoVXq2. For example, in 2025, the Istanbul Bar Association's executive board was dismissed and charged with terrorism offenses after calling for an effective investigation into the deaths of two journalists reportedly killed by a Turkish drone strike in Syria. U.N. Off. of the High Comm'r for Hum. Rts., *Criminalisation of Istanbul Bar Association*

*and dismissal of executive board, a chilling attack on the independence of lawyers: UN experts* (May 30, 2025), https://bit.ly/4bMIMAb.

In China, the Chinese Communist Party has consolidated control over the bar, including by prosecuting and harassing lawyers and activists, revoking licenses of lawyers and firms working on cases the Party considers sensitive, and expanding State-sponsored legal aid provided by lawyers who are loyal to Party ideology. *See* Amy Hawkins, *China's human rights lawyers speak out, 10 years after crackdown*, The Guardian (July 7, 2025), https://bit.ly/4a8Volw. In Hong Kong, lawyers who have criticized the erosion of judicial independence and the rule of law have been placed on "wanted" lists, subjected to legal proceedings and asset freezes, and disbarred. *See Disbarment and reprisals against Hong Kong lawyer Kevin Yam amid a broader pattern of intimidation of lawyers defending the rule of law*, Lawyers for Lawyers (Sept. 3, 2025), https://bit.ly/4anliRl.

All of these developments illustrate how measures affecting lawyers because of their representation of controversial clients can have broader consequences for the functioning of legal and democratic institutions.

## III. The Executive Orders threaten the independence of the legal profession and undermine the rule of law in the United States

1. As illustrated above, authoritarian regimes and failing democracies

have often targeted the independence of the legal profession alongside broader efforts to undermine institutional checks. They have punished lawyers deemed insufficiently aligned with the government with exclusion from the profession, prosecution, or worse. They have frequently invoked "national security" to suppress dissent by curtailing the rights of political opponents and the lawyers who represent them. History shows that such measures often foreshadow a broader erosion of the rule of law.

*Amici* do not contend that the Orders here are equivalent to the measures adopted in the historical examples described above. But the Orders raise similar institutional concerns. Each singles out a firm associated with clients or causes the Administration considers undesirable. The WilmerHale Order targets the firm for taking on "partisan representations" supposedly adverse to the "interests of the United States," and for its association with former Special Counsel Robert Mueller, who led an investigation into alleged Russian interference in the 2016 presidential election. JA2332-2333. The Jenner & Block Order criticizes that firm for "condon[ing] partisan 'lawfare'" and engaging in "partisan representations." JA2012. The Perkins Coie Order singles out that firm for its representation of Hillary Clinton and its work on voting-rights cases. *See* JA487. The Susman Godfrey Order condemns that

firm's "efforts to weaponize the American legal system and degrade the quality of American elections," JA3150—apparently referring to the firm's work to defend the integrity of the 2020 presidential election.

The Orders interfere with the firms' ability to perform their professional duties by limiting tools they need to represent their clients effectively— security clearances, access to federal government buildings, the ability to engage with federal employees, and the use of federal government goods and services. *See, e.g.*, JA2714-2715; JA3146-3147. The Orders inflict economic injury by terminating government contracts with the firms, and pressuring the firms' government-contractor clients to sever ties.

The Orders invoke "public safety" and "national security." JA487-488; JA2012; JA2713; JA3147. But, as the courts below found, the Orders function as retaliation for disfavored advocacy rather than as genuine security measures. *See* JA1691-1694; JA2180-2181; JA2846; JA3512.

The Orders thus interfere with the independent performance of lawyers' professional duties, improperly conflate lawyers with their clients, and impose penalties for lawful advocacy. Such measures contravene fundamental international safeguards and erode the independence of the legal profession, a cornerstone of the rule of law. They also impede access to justice. Historical

31

experience shows that retaliation against lawyers for taking on clients, cases, or causes that the government disfavors dissuades lawyers from pursuing politically sensitive representations. This chilling effect deprives litigants of their right to retain counsel of their choosing, silences voices essential to ensuring public accountability and justice, and undermines the rule of law. Left to stand, the Orders here—which punish law firms for their advocacy— will likely have the same effect.

2.  If upheld, the Orders would render the United States a clear outlier among Western democracies. Recognizing the dangers of undermining the legal profession's independence, and in response to increasing pressure on lawyers and bar associations in parts of Europe, European states are taking steps to formalize and bolster international protections for the profession. *See* Parliamentary Assembly of the Council of Eur., Recommendation 2121 (2018) The case for drafting a European Convention on the Profession of Lawyer, ¶ 3 (Jan. 24, 2018), https://bit.ly/4ktuBUk.

In March 2025—at the same time the President was issuing executive orders against law firms—the Council of Europe adopted the Convention for the Protection of the Profession of Lawyer, the first binding international treaty dedicated to safeguarding lawyers and their professional associations.

To date, 29 States have signed the Convention. Eur. Consult. Ass., Convention for the Protection of the Profession of Lawyer, C.E.T.S. No. 226 (2025). It will enter into force upon ratification by eight states.

The Convention affirms "the fundamental role that lawyers and their professional associations play in upholding the rule of law, securing access to justice and ensuring the protection of human rights and fundamental freedoms." *Id.* pmbl. It obligates contracting parties to guarantee lawyers' right to practice independently and without intimidation, improper interference, or discrimination. *Id.* arts. 1, 5, 6. It also requires states to investigate attacks or threats against lawyers, *id.* art. 9(4)(a), and to protect the autonomy and self-governance of bar associations, *id.* art. 4. The Convention further protects lawyers' freedom of expression, *id.* art. 7, and ensures disciplinary due process, *id.* art. 8, and professional autonomy, *id.* art. 5, recognizing these as essential to democratic governance. Implementation will be monitored by an expert body and a Committee of the Parties, with mechanisms for investigation and public reporting. *Id.* art. 10.

The Convention's adoption underscores clear international recognition that lawyers' professional independence is not merely a privilege, but a structural safeguard of democratic governance. It reflects the signatory

states' shared commitment to protecting the independence of the legal profession and the rule of law.

The Executive Orders are an extraordinary step in the opposite direction, down a path that—if historical experience is any guide—risks subverting the rule of law and democratic institutions in ways that may take generations to repair.

**CONCLUSION**

The decisions below should be affirmed.

Dated: April 1, 2026                             Respectfully submitted,

                                                 /s/ *Sally L. Pei*

John Muse-Fisher                                 Sally L. Pei
Brooke D'Amore Bradley                           Peter L. Schmidt
Anthony Lindsey II                               Ana S. Pirnia
ARNOLD & PORTER                                  Ernesto M. Hernández
 KAYE SCHOLER LLP                                ARNOLD & PORTER
Four Embarcadero Center                           KAYE SCHOLER LLP
14th Floor                                       601 Massachusetts Ave., NW
San Francisco, CA 94111                          Washington, DC 20001
(415) 471-3100                                   (202) 942-5000
                                                 sally.pei@arnoldporter.com

*Counsel for Amici Curiae*

34

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because this brief contains 6,482 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using Microsoft Office 365 in 14-point Century Expanded BT font.

Dated: April 1, 2026

/s/ *Sally L. Pei*
Sally L. Pei

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  April 1, 2026 /s/ *Sally L. Pei*  
Sally L. Pei