ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026

Nos. 25-5241, 25-5265, 25-5277, 25-5310

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

Perkins Coie LLP,
*Plaintiff-Appellee*

v.

United States Department of Justice, et al.,
*Defendants-Appellants*

---

On Appeal from the United States District Court
for the District of Columbia

---

## BRIEF FOR *AMICUS CURIAE* AMERICAN BAR ASSOCIATION IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

Stephen B. Kinnaird
1701 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006
202-469-1691
skinnaird2000@icloud.com

James A. Feldman
5614 Connecticut Avenue NW
#380
Washington, D.C.  20015
(202) 780-6379
wexfeld@gmail.com

Michelle A. Behnke
President
American Bar Association
321 N. Clark Street
Chicago, Illinois 60654
(312) 988-5000
amicusbriefs@americanbar.org

*Counsel for* Amicus Curiae
*American Bar Association*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, *amicus curiae* American Bar Association (ABA) states that it is an Illinois not-for-profit corporation, has no parent corporation, and does not issue stock. The ABA is a national voluntary professional association comprising attorneys, law students, and related professionals. Its mission is to serve its members, improve the legal profession, eliminate bias and enhance diversity, and advance the rule of law.

## CERTIFICATE REGARDING PARTIES, RULINGS, AND RELATED CASES

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for the Appellants. References to rulings at issue and related cases also appear in the Brief for the Appellants.

## CERTIFICATE OF COUNSEL AS TO SEPARATE BRIEF

A separate brief by the ABA is necessary in this case, because the ABA has unique expertise and experience that may be of value to the court and cannot be duplicated by any other entity. The ABA is the

largest voluntary professional association of attorneys and legal professionals in the United States. Its members represent the full spectrum of public and private clients and practice every type of law. With respect to the issues of professional conduct and attorney discipline at the heart of this case, the ABA has been involved in the development of rules governing those areas since 1908, and its current model rules remain widely influential on U.S. jurisdictions. The ABA has long experience in considering the impact of government actions on the ability of lawyers to represent unpopular or disfavored clients—an issue that is also deeply implicated in these cases. Over many decades, the ABA has addressed a wide variety of threats to the profession and to our system of justice posed by efforts to limit lawyers' ability to represent disfavored clients and to make unpopular arguments.

/s/ James A. Feldman

/s/ Stephen B. Kinnaird
Counsel for Amicus Curiae

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

CERTIFICATE REGARDING PARTIES, RULINGS, AND RELATED CASES ..............................................................................................i

CERTIFICATE OF COUNSEL AS TO SEPARATE BRIEF ....................i

TABLE OF CONTENTS ...................................................................iii

TABLE OF AUTHORITIES ................................................................v

GLOSSARY OF ABBREVIATIONS ....................................................ix

STATEMENT OF INTEREST OF *AMICUS CURIAE*.............................1

SUMMARY OF ARGUMENT ..............................................................5

ARGUMENT .....................................................................................7

I.      The Executive Orders Violate the First Amendment in Three Independent Respects ....................................................7

        A.      Punishing Law Firms for Litigation Advocacy Is Impermissible Viewpoint Discrimination..............................8

                1.      The EOs Regulate Law Firms Based Upon Litigation Viewpoints..................................................8

                2.      The EOs Cannot Survive First Amendment Scrutiny ...................................................................12

                3.      The EOs Cannot Be Justified as Regulations of Non-Speech Conduct...........................................17

        B.      Retaliation for Taking Litigation Positions Adverse to the President Infringes the First Amendment ...........................19

C.     The Executive Orders Abridge Associational Rights ........... 20

D.     Interference with Lawyers' First Amendment Rights Harms Client Representation ....................................................... 23

II.    The Executive Orders Violate the Separation of Powers .............. 25

A.     The Judicial Branch Has Exclusive Authority to Sanction Lawyers for Misconduct, Especially in or Related to Judicial Proceedings ................................................................... 26

B.     The Executive Orders in These Cases Are Attempts to Sanction Lawyers for Alleged Misconduct in or Related to Judicial Proceedings ......................................................... 29

C.     The EOs Cannot Be Defended As Exercises of Legitimate Presidential Authority over Executive Branch Activities .... 31

CONCLUSION ..................................................................... 35

CERTIFICATE OF COMPLIANCE ......................................... 36

CERTIFICATE OF SERVICE ................................................ 36

# TABLE OF AUTHORITIES*

**Cases**

*Aref v. Lynch,*
   833 F.3d 242 (D.C. Cir. 2016) ........................................................ 20

*Ashcroft v. ACLU,*
   542 U.S. 656 (2004) .................................................................... 16

*Ams. for Prosperity Found. v. Bonta,*
   594 U.S. 595 (2021) .................................................................... 22

*Ateba v. Leavitt,*
   133 F.4th 114 (D.C. Cir. 2025) ..................................................... 8

*Bhd. of R.R. Trainmen v. Virginia,*
   377 U.S. 1 (1964) ....................................................................... 21

*Chi. & S. Air Lines v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) .................................................................... 30

*\*Chiles v. Salazar,*
   No. 24-539, 2026 WL 872307 (U.S. Mar. 31, 2026) ....... 8, 12-13, 17, 18

*Cohen v.* Hurley,
   366 U.S. 117 (1961) .................................................................... 28

*\*Ex Parte Garland,*
   71 U.S. (32 How.) 333 (1866) ....................................................... 26

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
   561 U.S. 477 (2010) .................................................................28-29

*Goodyear Tire & Rubber Co. v. Haeger,*
   581 U.S. 101 (2017) .................................................................... 26

[*] Authorities principally relied upon are marked by an asterisk.

*Hayburn's Case,*
   2 U.S. (2 Dall.) 409 (1792) ...................................................... 30

*Huggins v. Sch. Dist. of Manatee County,*
   151 F.4th 1268 (11th Cir. 2025) ............................................ 20

*\*Iancu v. Brunetti,*
   588 U. S. 388 (2019)............................................................... 17

*INS v. Chadha,*
   462 U.S. 919 (1983)............................................................... 25

*\*Legal Servs. Corp. v. Velazquez,*
   531 U.S. 533 (2001).................................................... 7, 27, 32

*Nat'l Rifle Ass'n v. Vullo,*
   602 U.S. 175 (2024)............................................................... 15

*\*Plaut v. Spendthrift Farms,*
   514 U.S. 211 (1995).................................................... 7, 30, 34

*Printz v. United States,*
   521 U.S. 898 (1997)........................................................29 n.14

*R.A.V. v. City of Saint Paul,*
   505 U. S. 377 (1992).............................................................. 16

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984)...........................................................20-21

*\*Rosenberger v. Rector of Univ. of Va.,*
   515 U.S. 819 (1995)............................................................ 8, 12

*Stern v. Marshall,*
   564 U.S. 462 (2011)............................................................... 30

*Strickland v. Washington,*
466 U.S. 668 (1984)............................................................27

*Suarez Corp. Indus. v. McGraw,*
202 F.3d 676 (4th Cir. 1999)............................................20

*\*TikTok Inc. v. Garland,*
604 U.S. 56 (2025)............................................................18

*\*Trump v. United States,*
603 U.S. 593 (2024)....................................................... 7, 33

*United States v. Cronic,*
466 U.S. 648 (1984)............................................................27

*United States v. Thorpe,*
148 F.4th 768 (D.C. Cir. 2026)............................................30

*United States v. Will,*
449 U.S. 200 (1980)............................................................28

*United Transp. Union v. State Bar of Mich.,*
401 U.S. 576 (1971)............................................................21

*\*Vidal v. Elster,*
602 U. S. 286 (2024)............................................................12

**Other Sources**

ABA Resolution 07M10C (Feb. 2007) ...........................4 n.8, 23

ABA Resolution 92M119 (Feb. 1992)................................2 n.3

ABA Resolution 25A509 (Aug. 2025) .......................3 n.6, 3 n.7

ABA Special Committee on Evaluation of Disciplinary Enforcement,
American Bar Ass'n, *Problems and Recommendations in Disciplinary Enforcement* (1970) ..................................................2 n.2

*Bar Organizations' Statement in Support of the Rule of Law*, American Bar Association (Mar. 26, 2025) ........................................................23

Bruce Green, *Whose Rules of Professional Conduct Should Govern Lawyers in Federal Court and How Should the Rules be Created?*, 64 Geo. Wash. L. Rev. 460 (1996)..................................................26 n.13

Cully Stimson, "An Apology to Detainees' Attorneys," *Washington Post*, Jan. 17, 2007........................................................32

Mike Spector, et al., *How Trump's Crackdown on Law Firms Is Undermining Legal Defenses for the Vulnerable*, Reuters, July 31, 2025 ..............................................................................................24-25

Model Rules for Lawyer Disciplinary Enforcement (2007) ................2 n.4

Model Rules of Prof'l Conduct (2002)..................3 n.5, 3 n.6, 4 n.9, 4 n.10

Neil A. Lewis, "Official Attacks Top Law Firms Over Detainees," *New York Times*, Jan. 13, 2007 ......................................................32

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ABA | American Bar Association |
| DEI | Diversity, Equity, and Inclusion |
| EO | Executive Order |
| JA | Joint Appendix |
| Jenner | Jenner & Block LLP |
| Perkins | Perkins Coie LLP |
| Susman | Susman Godfrey LLP |
| WilmerHale | Wilmer Cutler Pickering Hale and Dorr LLP |

**STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]**

The American Bar Association (ABA) is the nation's largest voluntary professional association for lawyers, judges, and law students, founded in 1878 to promote justice, professional excellence, and the rule of law. The obligations and rights of lawyers have been an essential part of the ABA's work almost since its inception. In 1908, the ABA adopted the first Canon of Professional Ethics, the predecessor of today's Model Rules of Professional Conduct that form the basis for every U.S. jurisdiction's enforceable rules of professional conduct.

---

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief.

No member of any appellee firm who is also a member of the ABA Standing Committee on Amicus Curiae Briefs or Board of Governors participated in preparation of this brief. Appellee Susman Godfrey LLP represents the ABA in the ABA's own lawsuit challenging the Executive Orders. The ABA engaged separate counsel to prepare this amicus brief, and, after separate counsel completed a draft, a Susman Godfrey LLP lawyer reviewed it solely to ensure that it took no positions inconsistent with those taken in the ABA's own lawsuit.

The ABA's work has long included not only substantive rules, but also enforcement procedures. In 1970, the ABA Special Committee on Evaluation of Disciplinary Enforcement identified significant underenforcement of legal ethics rules.[2] Thereafter, the ABA established the Standing Committee on Professional Discipline (now the Standing Committee on Professional Regulation). Over the years, the Standing Committee promulgated, and the ABA adopted, model rules to regulate lawyer conduct.

The ABA has recognized that "[r]egulation of the legal profession should remain under the authority of the judicial branch of government."[3] The preamble to the ABA Model Rules for Lawyer Disciplinary Enforcement provides that the highest court of a State "has *exclusive* responsibility within this state for the structure and administration of the lawyer discipline and disability system."[4] And the preamble to the

---

[2] See ABA Special Committee on Evaluation of Disciplinary Enforcement, American Bar Ass'n, *Problems and Recommendations in Disciplinary Enforcement* 1-2 (1970).

[3] ABA Resolution 92M119 (Feb. 1992).

[4] Model Rules for Lawyer Disciplinary Enforcement, Preamble (2007) (emphasis added).

Model Rules of Professional Conduct recognizes that "ultimate authority over the legal profession is vested largely in the courts."[5]

The ABA has a strong interest in ensuring that lawyers charged with misconduct face discipline in fair proceedings under the authority of the courts, rather than sanctions imposed by the Executive Branch, which has its own litigation interests.

The ABA has also taken a leading role defending and promoting the ability of lawyers to represent unpopular or disfavored clients. After the Executive Orders (EOs) in these cases, the ABA House of Delegates passed a resolution that "opposes any efforts by any government actor to punish or threaten to punish lawyers, law firms, or other organizations for representing or having represented any particular client or cause disfavored by the government."[6] That resolution reaffirmed the ABA's support for "the rights of lawyers and their clients to freedom of speech."[7] The ABA previously adopted a policy opposing any "governmental attack on the independence of the profession" that would "penalize lawyers for

---

[5] Model Rules of Prof'l Conduct, Preamble ¶ 10 (2002).
[6] ABA Resolution 25A509 (Aug. 2025).
[7] *Id.*

representing unpopular or controversial clients."[8] As ABA Model Rule of Professional Conduct 1.2(b) recognizes, "[a] lawyer's representation of a client … does not constitute an endorsement of the client's political, economic, social or moral views or activities."[9] Comment 5 to that Rule declares that "[l]egal representation should not be denied to people who are unable to afford legal services, or whose cause is controversial or the subject of popular disapproval."[10]

The ABA has filed its own lawsuit alleging that the "intimidation policy" embodied in these EOs is unconstitutional, for reasons similar to those urged by appellees. *Am. Bar Ass'n v. Executive Office of the President*, No. 1:25-cv-01888-AHA (D.D.C., filed June 16, 2025). The ABA also maintains that challenges to the EOs are fully ripe and justiciable. This brief, however, focuses on two substantive points: that the EOs violate the First Amendment and intrude on powers reserved to the judiciary under the Constitution.

---

[8] ABA Resolution 07M10C (Feb. 2007).
[9] Model Rules of Prof'l Conduct, R. 1.2(b).
[10] *Id*. cmt. 5.

4

## SUMMARY OF ARGUMENT

The ABA has a longstanding commitment to promoting the rule of law, the proper judicial discipline of attorneys, and the universal protection of zealous advocacy for all clients. The EOs jeopardize those principles by imposing starkly unconstitutional sanctions on firms (and their lawyers) that represent clients and positions adverse to the Administration.

The EOs abridge the First Amendment in three respects. First, the EOs punish the firms for the viewpoints they advocate. The Supreme Court has recently declared that the government must nearly always abstain from viewpoint-based regulation, which is subject to the most rigorous scrutiny. Here, the President, lacking authority to sanction lawyers generally, has no power to use his control of the Executive Branch to punish the firms and their lawyers for judicial advocacy. There is thus no compelling state interest advanced by the EOs, which are not narrowly tailored in any event. Regardless, the EOs reflect an attempt to suppress speech and cannot be sustained. Second, the EOs unconstitutionally retaliate against the firms for exercising First Amendment rights. Third, the EOs impair the rights of expressive

5

association by punishing firms (and their attorneys) for their advocacy. The EOs have chilled law firm advocacy against the Administration and undermine the ability of disfavored groups to retain counsel of their choice.

The EOs also violate core separation-of-powers principles. The power to sanction lawyers for conduct in or related to litigation is the power to control the adversarial process on which courts depend to carry out their constitutional function. That power is therefore reserved to the judiciary. Because the EOs impose sanctions on lawyers for litigation-related conduct, they intrude on the judiciary's reserved power. Giving one frequent litigant—the Executive Branch—authority to control the conduct of attorneys and firms would distort the judicial process, in violation of core separation-of-powers principles. Those risks manifest in the EOs' attempt to sanction attorneys' *successful* representation of clients in cases against the government, in violation of settled principles that prevent the Executive Branch from interfering with judgments of courts.

Contrary to the government's contention, it is doubtful that the EOs actually invoke accepted areas of presidential authority. But even if they

did, the President could not employ even valid authority to control and distort the judicial process by sanctioning attorneys and their firms for conduct in or relating to litigation. No branch may use even its accepted areas of authority to intrude upon core responsibilities of another. *See, e.g., Trump v. United States*, 603 U.S. 593, 614-15 (2024); *Legal Servs. Corp. v. Velazquez,* 531 U.S. 533, 545 (2001); *Plaut v. Spendthrift Farms*, 514 U.S. 211, 218-19 (1995).

## ARGUMENT

### I.    The Executive Orders Violate the First Amendment in Three Independent Respects

The EOs in these cases violate the First Amendment in at least three independent respects. First, the EOs punish litigation advocacy adverse to or disfavored by the President and thereby embody impermissible viewpoint discrimination. Second, the EOs unconstitutionally retaliate for protected speech. Third, the EOs infringe the right of expressive association. Those First Amendment violations seriously harm lawyers' ability to represent their clients. For any of these reasons, this Court should affirm the judgments invalidating the EOs.

### A. Punishing Law Firms for Litigation Advocacy Is Impermissible Viewpoint Discrimination

"Viewpoint discrimination is an 'egregious form of content discrimination,' which occurs when a government regulation 'targets not subject matter, but particular views taken by speakers on a subject." *Ateba v. Leavitt*, 133 F.4th 114, 124 (D.C. Cir. 2025) (quoting *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995)). The government must "nearly always," *Chiles v. Salazar*, No. 24-539, 2026 WL 872307, at *7 (U.S. Mar. 31, 2026), "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction," *Rosenberger*, 515 U.S. at 829.

### 1. The EOs Regulate Law Firms Based Upon Litigation Viewpoints

The government has singled out the four law firms and their lawyers for a series of adverse actions—revocation of security clearances, cessation of provision of government materials and services, imposition of disclosure obligations on federal contractor clients, denial of access to federal buildings and federal employees, and barring firm lawyers from future federal employment—based largely on the firm's advocacy in the

courts.[11] *See Perkins* EO, JA487-89; *Jenner* EO, JA2012-14; *WilmerHale* EO JA2331-35; *Susman EO*, JA3146-48. The EOs punish each firm—and its attorneys—for representing clients or advocating litigation positions adverse to or disfavored by the Administration. Such viewpoint discrimination starkly violates the First Amendment.

In *Jenner*, the EO premises its punishment on Jenner's "obvious partisan representations to achieve political ends." JA2012. As the *Jenner* district court noted, that is "another way of saying courtroom advocacy on behalf of [Jenner's] chosen causes." JA2168. The EO is also premised on Jenner's "support[ing] attacks against women and children based on a refusal to accept the biological reality of sex," and Jenner's "obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." JA2012. The district court held that "[i]n context," those references "refer[] to Jenner's ongoing challenges to two … executive orders issued by this administration," on behalf of transgender individuals and asylum-seekers. JA2159.

---

[11] The Administration extracted settlements from nine other law firms. *See, e.g.,* Govt. Br. 2 n.1.

In *WilmerHale*, the EO charges that the firm engages in "obvious partisan representations" and "abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." JA2713. The EO also charges that WilmerHale "supports efforts to discriminate on the basis of race" and "backs the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders." *Id.* As the district court found, the EO thus "explicitly targets WilmerHale at least in part for the litigation it has pursued, including election and immigration lawsuits." JA2844.

The Administration pursued Perkins for like reasons. The *Perkins* EO states that Perkins, "while representing failed Presidential candidate Hillary Clinton" in 2016, hired an opposition research firm that produced a dossier alleging cooperation between the Trump presidential campaign and Russia. JA487. As the district court noted, the *Perkins* EO "disparages [Perkins] as 'partisan' three separate times …, making explicit that those in power disagree with the political and litigation positions taken by clients of [Perkins]." JA1683-84. The Perkins EO also claims that "Perkins Coie has worked with activist donors including George Soros to judicially overturn popular, necessary, and

10

democratically enacted election laws, including those requiring voter identification." JA487. The district court noted that this refers to "lawsuits filed by [Perkins Coie] on behalf of its clients." JA1683.

In *Susman*, the EO accused the firm of "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections." JA3146. The government "did not dispute" that this "references Susman's representation of Dominion Voting Systems and state election officials in connection with litigation concerning the 2020 election." JA3485; *see also id.* at 3485 n.2 (recounting other Susman election litigation). The Susman EO further declares that Susman "funds groups" that engage in putatively "dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology." JA3485. Both parties agreed that that is a reference to Susman's donations to GLBTQ Legal Advocates and Defenders (GLAD), which had previously sued to enjoin a Department of Defense policy on grounds of gender discrimination. JA3485, 3507.

These EOs do not apply generally to law firms or even to any defined class of firms. Viewpoint is the touchstone. The Administration targeted specific firms for "partisan representations for political ends,"

11

but only those representing the President's political adversaries, and not firms representing the President's own party or serving its ends. The EOs do not penalize all firms litigating questions of racial or gender discrimination, election integrity, immigration, or voting restrictions, but only those that have taken positions disfavored by the Administration.

Because "the opinion or perspective of the speaker is the rationale for the restriction," *Rosenberger*, 515 U.S. at 829, the EOs constitute unconstitutional viewpoint discrimination.

### 2. The EOs Cannot Survive First Amendment Scrutiny

"[A] content-based regulation is presumptively unconstitutional and may be justified only if the government proves that it is narrowly tailored to serve compelling state interests.'" *Vidal v. Elster*, 602 U. S. 286, 293 (2024) (cleaned up). Viewpoint discrimination, "is also generally subject to heightened scrutiny, though viewpoint discrimination's violation of the First Amendment is more blatant." *Id.* (cleaned up). Because viewpoint regulation "represents an egregious form of content regulation, ... governments in this country must nearly always abstain from it." *Chiles*, 2026 WL 872307, at *7 (cleaned up). "A law drawing a line based on the ideology of the speaker . . . suggests an impermissible

motive–that the government is regulating speech because of its own hostility toward the targeted messages"—and this "risk of censorship … triggers [the] most rigorous review." *Id.* at *13 (Kagan, J., concurring) (cleaned up). Here, the government does not attempt to prove that the EOs are narrowly tailored to serve a compelling interest, much less meet the additional burden of showing that the EOs are free of hostility to the viewpoints the firms advocated.

a. The EOs do not advance any compelling state interest. There is no state interest in presidential regulation of firms for advocacy in federal and state courts. The President has no general power to regulate lawyers for litigation conduct, much less to use his control of the Executive Branch to sanction lawyers for pursuing disfavored claims or defenses of their clients in the courts. See pp. 25-31, *infra.*

The government asserts interests in controlling security clearances to protect federal classified information, in maintaining security in federal buildings, and in ensuring integrity in federal contracting and employment. But, as the district courts found, those interests are not served by the categorical exclusion of the targeted firms from these particular federal functions.

In *Jenner*, the district court noted that the EO's own justification "doesn't even feign at national security" and that the similar Paul Weiss EO, which was also assertedly based on national security interests, was withdrawn after a settlement that "had not even a glancing relationship to national security." JA2180-81.; *see* JA2183 (noting that Jenner is not a government contractor but is ordinarily "*adverse* to the government"), JA2198 (restriction on hiring and access "has no plausible legitimate rationale"). The same is true in *WilmerHale,* where the district court explained that the EO does not regulate particular programs, because its sanctions are "keyed to the *recipient* of federal funds, not to the particular contract funded," JA2842, and that the EO "is not substantially related to [any national security] interest," JA2846.

The district court in *Perkins* also concluded that the EOs' categorical exclusions and sanctions do not serve the asserted government interests. The court noted that relevant EO provisions invoked "national *interest*" and "never invoke[] national *security* as the reason, or even one of multiple reasons," for the suspension and review of security clearances of Perkins employees. JA1668 (emphasis added); *see also* JA1699 (noting that "[t]he government offers absolutely no

14

justification, let alone any legitimate government interest for … such a sweeping hiring ban"). The court in *Susman* made similar findings. *See* JA3515 ("Defendants offer no evidence to remotely support the idea that there is any interest (national-security-related or otherwise) that is implicated by Susman employees' entry into federal buildings, or federal employees' interaction with, or hiring of, Susman employees."); *see also* JA3515 (noting that the government "can point to no basis for [a discrimination] investigation into Susman except for lawful statements that the firm has made about diversity with which the government disagrees").

Despite the rhetoric in the EOs characterizing the firms as engaged in "dangerous" or "destructive" activity that "undermines critical American interests," the government has not shown that the firms present any threats to national security, federal buildings, federal contracting, or federal employment. While the Administration may use rhetoric castigating opposing positions as harmful or dangerous in the political arena, it cannot "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024).  The EOs' restrictions fail to advance any compelling government

interest. To the contrary, the freedom to advocate diverse and disfavored positions promotes the rule of law and the judiciary's fulfillment of its own constitutional functions. *See* pp. 25-31, *infra.*

b. Even if the EOs did somehow advance a compelling state interest, they are not narrowly tailored. "[T]he danger of censorship … requires that that weapon be employed only where it is *necessary* to serve the asserted compelling interest." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (cleaned up). The regulation must be the "least restrictive means" of accomplishing the objective. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

Here, it is unnecessary to deny security clearances to the lawyers and all other "individuals" at the firms, *see, e.g.,* Perkins EO, JA487, when normal individualized review would identify any threats to national security; to deny all access to federal buildings or federal employees when security risks can be individually assessed; to require federal contractors to disclose even unrelated firm retentions when such disclosures add nothing to existing contracting safeguards; and to deny all of the firm's lawyers and other employees future federal employment when the normal hiring process properly vets candidates.

c. Even if the government were belatedly to attempt to justify the EOs as narrowly tailored to a compelling state interest, it cannot show that they are free of hostility to the viewpoints advocated by the targeted firms. To the contrary, the EOs expressly justify the restrictions imposed because of the supposed dangers of the viewpoints advocated. *See* pp. 8-12, *supra.* The EOs violate "the bedrock First Amendment principle that the government cannot discriminate" based on viewpoint. *Iancu v. Brunetti*, 588 U. S. 388, 393 (2019) (cleaned up); *accord Chiles*, 2026 WL 872307, at *7.

### 3. The EOs Cannot Be Justified as Regulations of Non-Speech Conduct

Rather than address strict scrutiny, the government claims that the substantive restrictions are justified as regulations of conduct that are not protected speech (such as alleged racial discrimination through Diversity, Equity, and Inclusion (DEI) policies, and the affiliation of two firms with lawyers who investigated the President). Gov't Br. 4, 6-10, 52-54. The government does not deny that the EOs are based at least partly on the viewpoints the firms advocated in litigation but characterizes the non-speech conduct as content-neutral grounds.

The government's argument fails. "[A] law regulating the content of speech cannot avoid searching First Amendment review just because it mostly regulates non-expressive conduct," *Chiles*, 2026 WL 872307, at *7—and here the EOs primarily target speech. The government relies on *TikTok Inc. v. Garland,* 604 U.S. 56 (2025), but that case is inapposite. The Supreme Court there found that data collection by a social media platform subject to foreign coercion posed national security risks, the prevention of which provided a content-neutral justification supporting all the statutory restrictions. *Id.* at 78-80. Under intermediate scrutiny, the Court upheld the restrictions because they "further an important Government interest unrelated to the suppression of free expression and do not burden substantially more speech than necessary to further that interest." *Id.* at 73-75.

The same cannot be said of the EOs. The facts that the EOs target only four firms that engaged in disfavored advocacy (out of the many companies that have supported DEI at some time) and afford no process for determining whether the firms in fact practice unlawful racial discrimination belie the claim that racial discrimination could support the entirety of the EO restrictions. Moreover, as one district court

18

observed, no court has equated DEI with unlawful racial discrimination; the government acknowledges that not all DEI policies "cross the line into illegal discrimination." JA2188.

Furthermore, even if any racial discrimination were proven, that would not justify, for example, denial of access of the entire firm to federal buildings and the immediate cessation of all government services; disclosure requirements on firm clients; or the barring of all firm lawyers and employees (including ones who had nothing to do with the DEI policies) from security clearances or future federal employment. The punitive measures of the EOs are directed to suppressing speech and cannot in their entirety be justified by unproven racial discrimination allegations. Similarly, the former affiliation of two firms with attorneys who had investigated the President is not illegal and cannot justify the entirety of the EO restrictions (as underscored by the imposition of the same restrictions on the other two firms that had no such affiliation).

**B. Retaliation for Taking Litigation Positions Adverse to the President Infringes the First Amendment**

The law firms also proved unlawful retaliation under the First Amendment. To prevail under such a claim, each firm must show (1) that it "engaged in conduct protected under the First Amendment"; (2) "some

retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"; and (3) "a causal link" between the protected activity and "the adverse action taken against" the firm. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (citation omitted). Although viewpoint discrimination may serve as evidence of retaliatory animus, *see, e.g.*, *Huggins v. Sch. Dist. of Manatee County*, 151 F.4th 1268, 1279-83 (11th Cir. 2025), viewpoint discrimination and retaliation are independent First Amendment claims, *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 1999). The law firms in their briefs have amply demonstrated why the district courts properly found unconstitutional retaliation, and, in the interest of brevity, the ABA does not repeat that analysis here.

### C. The Executive Orders Abridge Associational Rights

The Supreme Court "has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment," including speech and petitioning for the redress of grievances. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). "According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity, and in shielding

dissident expression from suppression by the majority." *Id.* at 622. Infringements on expressive association may be tolerated only if the regulations "serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* at 623.

As a practical matter, clients generally associate with firms for more effective representation; punishing firms for the clients represented and the positions taken thus burdens associational rights. *See Bhd. of R.R. Trainmen v. Virginia,* 377 U.S. 1, 7 (1964) (states cannot "infringe in any way the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest," for "[l]aymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries"); *United Transp. Union v. State Bar of Mich.,* 401 U.S. 576, 585 (1971) ("[C]ollective activity undertaken to obtain meaningful access to the courts" is protected by the First Amendment.). These punitive measures cannot survive strict scrutiny under *Roberts*.

Here, the EOs trench upon not only the associational rights of the firms and their litigation clients, but also the rights of federal contractor

clients, who must disclose the retention of the disfavored firms and thereby risk jeopardizing their standing with the Administration. The Supreme Court has declared that "compelled disclosure of affiliation with groups engaged in advocacy may constitute … a restraint on freedom of association," and that a "vital relationship" exists "between freedom to associate and privacy in one's associations." *Ams. for Prosperity Found. v. Bonta,* 594 U.S. 595, 606 (2021) (cleaned up). Because of the potential benefits of disclosures, a lesser but still demanding standard of "exacting scrutiny" applies: "there must be a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 607 (plurality) (cleaned up).

The government has not attempted to meet this test. A disclosure that a federal contractor retained one of these respected firms, even for matters completely unrelated to the contract, bears no relationship to integrity in federal contracting. The government thus "has *no* legitimate interests in the disclosures compelled … much less a sufficiently important one to satisfy exacting scrutiny." JA1707. And these disclosure obligations, which apply to all types of federal contractors, and all types of client-firm representations even if unrelated to the federal contract at

issue, are not narrowly tailored to any such interest.  JA3517; JA2848-49.  The EOs violate the First Amendment on these grounds as well.

**D.    Interference with Lawyers' First Amendment Rights Harms Client Representation**

The rights of lawyers and clients to speak and associate freely are essential to preserving "the core values of the legal profession, including commitment to pro bono provision of legal services to those in need and the commitment to the independence of the profession." ABA Resolution 07M10C (Feb. 2007). Infringing those rights jeopardizes the ability of lawyers to represent clients and causes that may be disfavored by the government and clients' ability to freely choose counsel.  The ABA has long recognized that "if legal assistance is withheld from anyone because of the nature of the accusations made against them, or the unpopularity of their beliefs … all of us are at greater risk." *Id.*  More than 100 bar associations joined the ABA in opposing "the notion that the U.S. government can punish lawyers and law firms who represent certain clients" and "efforts to remake the legal profession into something that rewards those who agree with the government and punishes those who do not." *Bar Organizations' Statement in Support of the Rule of Law*, American Bar Association (Mar. 26, 2025).

The ABA filed its own lawsuit challenging the EOs' attempt to "intimidate and coerce law firms and lawyers." *Am. Bar Ass'n v. Executive Office of the President*, No. 1:25-cv-01888 (D.D.C.), Compl. ¶ 4 (ECF#1). The ABA's complaint details the "chilling effect" that law firms, lawyers, and clients have experienced from the EOs, *id.* ¶¶ 168-83, with declarations from ABA members whose firms changed their pro bono policies to avoid government retaliation, *id.* ¶¶ 185-88, experienced difficulties finding co-counsel in matters adverse to the government, ¶¶ 192-96, and diverted resources to defending their firms from potential retaliation, ¶¶ 189-91, 197-200.

After the ABA filed suit, a Reuters investigation concluded that the EOs "threaten lasting damage to America's tradition of mobilizing free lawyers to challenge government actions on behalf of the vulnerable." Mike Spector, et al., *How Trump's Crackdown on Law Firms Is Undermining Legal Defenses for the Vulnerable*, Reuters, July 31, 2025. Specifically, Reuters found that "[d]ozens of major law firms, wary of political retaliation, have scaled back pro bono work, diversity initiatives and litigation that could place them in conflict with the Trump administration." *Id.* Civil rights groups reported that "law firms they

24

count on to pursue legal challenges are hesitating to engage with them, keeping their representation secret or turning them down altogether." *Id.* Court dockets "show[ed] a sharp decline in major firms challenging government policies." *Id.* This "retreat from courtroom challenges comes as many of the same firms face a new pressure: to actively support the administration's legal agenda." *Id.* Reuters reported that firms had agreed to perform pro bono services in support of causes favored by the administration to avoid EOs and harm to client relationships. *Id.*

## II.     The Executive Orders Violate the Separation of Powers

The Constitution divided "powers of the new Federal Government into three defined categories, legislative, executive, and judicial." *INS v. Chadha*, 462 U.S. 919, 951 (1983). The separation of powers precludes any branch from intruding upon powers assigned exclusively to another. As the district courts held in *WilmerHale*, *see* JA2850-2854, and *Susman*, *see* JA3527-3529, the EOs constitute unprecedented intrusions by the Executive Branch on courts' exclusive power to sanction attorneys for conduct in or relating to litigation.[12] Even if the EOs were based on a

---

[12] Without formally ruling on the separation-of-powers claim, the *Jenner* court found the EO "seeks to chill legal representation the administration doesn't like, thereby insulating the Executive Branch from the judicial

legitimate and otherwise constitutional exercise of Executive Branch powers, their intrusion on a core Judicial Branch function would violate longstanding separation-of-powers principles.

### A. The Judicial Branch Has Exclusive Authority to Sanction Lawyers for Misconduct, Especially in or Related to Judicial Proceedings

1. "Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (cleaned up). That includes the exclusive authority to enforce standards of conduct for lawyers practicing before them. "The right" to "appear for suitors, and to argue causes, is … a right of which [an attorney] can only be deprived by the judgment of the court, for moral or professional delinquency." *Ex Parte Garland*, 71 U.S. (4 Wall.) 333, 379 (1866).[13]

---

check fundamental to the separation of powers." JA2158. The court in *Perkins* did not reach the separation-of-powers issue. *See* JA1633 n.5.

[13] Some federal administrative agencies regulate the conduct of attorneys who appear in quasi-judicial proceedings before them. *See generally* Bruce Green, *Whose Rules of Professional Conduct Should Govern Lawyers in Federal Court and How Should the Rules be Created?*, 64 Geo. Wash. L. Rev. 460, 465 n.22 (1996).

2. Courts' authority to police the conduct of attorneys must be exclusive because attorneys play "a role that is critical to the ability of the adversarial system to produce just results." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *United States v. Cronic*, 466 U.S. 648, 655 (1984) (cleaned up). Courts "depend for the proper exercise of the judicial power" on attorneys' "present[ing] all the reasonable and well-grounded arguments necessary for proper resolution of the case." *Legal Servs. Corp v. Velazquez*, 531 U.S. 533, 545 (2001). The power to sanction lawyers is the power to control how (and whether) cases are presented to courts. Courts therefore must have full and exclusive control over the administration of attorney sanctions.

3. Because the Executive Branch has its own interests as a frequent litigant, permitting it to punish lawyers for conduct in or relating to litigation would be a particular threat to judicial independence. As the district court put it in *Jenner*, "[w]hen the government draws legal scrutiny, its response must be to defend itself in

court, not to intimidate those who would force it to do so." JA2174. Given the critical role vigorous advocacy plays in the judicial system, allowing the Executive Branch to control attorney conduct in or relating to litigation would give it the ability to distort judicial outcomes. *Cf., e.g., Cohen v.* Hurley, 366 U.S. 117, 138 (1961) (Black, J., dissenting) (without independence, lawyers may "become nothing more than parrots of the views of whatever group wields governmental power at the moment"). That would violate core separation-of-powers principles. "A Judiciary free from control by the Executive and Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government." *United States v. Will*, 449 U.S. 200, 217-18 (1980).

4. The government has it exactly wrong when it states that "the judiciary *also*" — i.e., in addition to the Executive Branch — "has power to respond to abuses of judicial process." Gov't Br. 55. Just as the President must have exclusive authority to appoint officers to fulfill his constitutional duty to ensure that the laws are faithfully executed, *see, e.g., Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S.

477, 496 (2010), the judiciary must have exclusive authority over administering attorney sanctions to fulfill its constitutional duties.

**B.** **The Executive Orders in These Cases Are Attempts to Sanction Lawyers for Alleged Misconduct in or Related to Judicial Proceedings**

As the district courts in these cases held, the EO restrictions are premised on the conduct of attorneys in or related to judicial proceedings. *See* pp. 8-12, *supra*.[14] Indeed, these cases illustrate the threat to the judiciary, because the EOs are largely premised on cases in which the attorneys *succeeded* in court. *See, e.g.,* JA2159 (EO "refers to Jenner's ongoing challenges to two … executive orders … both of which have resulted in *favorable preliminary outcomes* for Jenner's clients") (emphasis added); JA2845 n.19 ("There can be no serious claim that WilmerHale's lawsuits were not brought in good faith; in fact many of the lawsuits were *successful.*") (emphasis added).

Susman too obtained favorable rulings and then a favorable settlement for its client in the Dominion Voting Systems litigation for

---

[14] Insofar as the EOs address state-court litigation, they violate federalism principles for the same reasons that they violate separation-of-powers principles. Cf. *Printz v. United States*, 521 U.S. 898, 921-22 (1997).

which it was sanctioned. See JA3158-64. And it is undisputed that Perkins was *successful* in representing clients in all but one of the 2020 election-related lawsuits addressed in its EO.  JA267 (¶ 77).

The separation of powers forbids the Executive Branch to alter judgments of Article III courts. *See, e.g., Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 114 (1948); *see also Plaut v. Spendthrift Farm*, 514 U.S. 211, 218-19 (1995); *Hayburn's Case*, 2 U.S. (2 Dall.) 408 (1792); *United States v. Thorpe*, 148 F.4th 768, 775-76 (D.C. Cir. 2026). Rather than directly revising or overturning a judgment, the EOs arrive indirectly at the same destination by punishing lawyers for winning judgments or otherwise successfully representing their clients.

The indirectness of the method does not alter the constitutional harm. *Stern v. Marshall*, 564 U.S. 462, 502-03 (2011), held that "[a] statute may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely." Similarly, the EOs here indirectly attack judgments reached by Article III courts. They exercise authority reserved to the judiciary to sanction lawyers for conduct in or relating to litigation.  They are therefore unconstitutional.

### C. The EOs Cannot Be Defended as Exercises of Legitimate Presidential Authority over Executive Branch Activities

It is no answer to contend, as the government does, that the district courts "simply ignored the discretion that the President retains in the areas addressed by the EO." Gov't Br. 54-55. Initially, each of the district courts, based on undisputed facts, casts doubt on the proposition that the unprecedented EOs in these cases actually invoke accepted presidential authority over federal property, federal contracts, the federal workplace, or even federal security clearances, or genuine government interests in those fields. *See* pp. 13-16, *supra.*

We are unaware of any prior occasion in the history of our Republic when the Executive Branch asserted authority to sanction or punish attorneys for litigation-related conduct. *See* JA1628 ("No American President has ever before issued executive orders like the one at issue in this lawsuit."). In the closest analogy we have found, a Department of Defense official in 2007 urged corporate CEOs to fire law firms that represented Guantanamo detainees. After a disavowal by the Department of Defense itself and widespread criticism (including from the ABA President) that the proposal offended fundamental principles of

our legal system, the official made clear he did not intend such a proposal and the matter was dropped. *See, e.g.,* Neil A. Lewis, "Official Attacks Top Law Firms Over Detainees," *New York Times*, Jan. 13, 2007; Cully Stimson, "An Apology to Detainees' Attorneys," *Washington Post*, Jan. 17, 2007, p. A9.

In any event, separation-of-powers principles preclude the President from using even valid areas of authority to control the judicial process by punishing attorneys for conduct in or relating to litigation. For example, *Velazquez* involved a law prohibiting government-funded legal services attorneys from representing welfare recipients in suits seeking "to amend or otherwise challenge existing law." 531 U.S. at 538. The Court did not question Congress's Spending Clause authority to decide which programs and activities to fund. But the Court held the law invalid, in part because "[b]y seeking to prohibit the analysis of certain legal issues and to truncate presentation to the courts, the enactment … prohibits speech and expression *upon which courts must depend for the proper exercise of the judicial power*." *Id*. at 545 (emphasis added). That restriction, the Court held, "threatens severe impairment of the judicial

function" and is "inconsistent with accepted separation-of-powers principles." *Id.* at 546.

*Trump v. United States*, 603 U.S. 593 (2024), recently applied the same principle. In *Trump*, the Court held that, "to ensure that the President's decisionmaking is not distorted by the threat of future litigation stemming from [the President's] actions," a former President generally has presumptive immunity from criminal prosecutions for his official acts within the outer perimeter of his duties (and absolute immunity when exercising his exclusive constitutional powers). *Id.* at 615. The Court cast no doubt on Congress's authority to enact the generally applicable criminal laws at issue or the authority of the courts to try individuals for violating those laws. But the courts nonetheless could not exercise the judicial power to try a President for violations of those laws if such trials would threaten the ability of a President to carry out critical Executive Branch functions. One branch (in *Trump*, the Judiciary) cannot exercise even its valid powers when doing so would critically intrude on powers reserved to another (in *Trump*, the Executive).

Similarly, in *Plaut*, the Court recognized that Congress has authority to enact legislation modifying the statute of limitations, even if it does so retroactively. 514 U.S. at 226. The Court acknowledged that Congress may use that very power to alter final judgments of non-Article III courts. *Id.* Permitting Congress to use that power to alter final judgments of Article III courts, however, would be "repugnant to the text, structure, and traditions of Article III" and was therefore unconstitutional. *Id.* at 218.

The same conclusion follows here. Even if the EOs were premised on otherwise legitimate exercises of presidential authority, they would violate the separation of powers by intruding deeply on an area—the sanctioning of attorneys for conduct in or relating to litigation—that is exclusively the province of the courts and critical to their constitutional duties.

## CONCLUSION

This Court should affirm the judgments in all four cases.

Respectfully submitted,

Michelle A. Behnke
President
American Bar Association
321 N. Clark Street
Chicago, Illinois 60654
(312) 988-5000
amicusbriefs@americanbar.org

s/ Stephen B. Kinnaird
Stephen B. Kinnaird
1701 Pennsylvania Avenue NW
Suite 200
Washington, DC 20006
202-469-1691
skinnaird2000@icloud.com

James A. Feldman
5614 Connecticut Avenue NW,
#380
Washington, D.C.  20015
(202) 780-6379
wexfeld@gmail.com

***Counsel for* Amicus Curiae**
***American Bar Association***

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(g), I certify that the foregoing brief complies with the type-volume limitation provided by Fed. R. App. P. 29(a)(5). This brief contains 6,483 words, as recorded by the word count of the Microsoft Word word-processing system used to prepare the brief. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font.

s/ Stephen B. Kinnaird
Stephen B. Kinnaird

## CERTIFICATE OF SERVICE

I certify that on April 2, 2026, I electronically filed the attached Brief for Amicus Curiae American Bar Association with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  I certify that, for all participants in the case who are registered CM/ECF users, service will be accomplished by the CM/ECF system.

s/ Stephen B. Kinnaird
Stephen B. Kinnaird