**ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026**

**Nos. 25-5241, 25-5265, 25-5277, 25-5310**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

PERKINS COIE LLP,

*Plaintiff-Appellee,*

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*

*Defendants-Appellants.*

———————————

On Appeal from the U.S. District Court
for the District of Columbia

———————————

**BRIEF FOR AMICI CURIAE FORMER PRESIDENTS OF THE
ENERGY BAR ASSOCIATION IN SUPPORT OF LAW FIRMS
ADVOCATING FOR AFFIRMANCE**

———————————

Michael P. Abate (D.C. Bar No. 1023343)
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main St., 4th Floor
Louisville, KY 40202
mabate@kaplanjohnsonlaw.com
(502) 540-8280

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................ii

TABLE OF AUTHORITIES................................................................... iii

GLOSSARY ....................................................................................... v

STATEMENT OF INTEREST OF *AMICI CURIAE*.................................. 1

FRAP 29(a)(4) STATEMENT.................................................................3

SUMMARY OF ARGUMENT ................................................................ 4

ARGUMENT........................................................................................ 7

    I.   Independent Counsel Are Essential to the Functioning of the Energy Industry. .........................................................................8

    II.  Energy Lawyers Practice Before an Unusually Wide Array of Federal Agencies and Bodies in Ways that are Affected by the Executive Orders........................................................................12

    III. A Well-Functioning Energy Industry Requires Attorneys Who Can Handle All Aspects of a Project, Transaction, or Matter Before the Many Different Interested Agencies or Bodies..........20

CONCLUSION .................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

APPENDIX LISTING *AMICI*

# TABLE OF AUTHORITIES

**Cases**

*Federal Power Commission v. Hope Natural Gas Co.,*
 320 U.S. 591 (1944) ...............................................................13

*Legal Servs. Corp. v. Velazquez,*
 531 U.S. 533 (2001) ...............................................................11

*New York v. Federal Energy Regulatory Commission,*
 535 U.S. 1 (2002) ...................................................................13

*West Virginia v. Environmental Protection Agency,*
 597 U.S. 697 (2022) ...............................................................13

**Statutes**

15 U.S.C. § 717c .......................................................................14

15 U.S.C. § 717c-1 ...................................................................14

15 U.S.C. § 717d .......................................................................14

15 U.S.C. § 717f(c) ...............................................................9, 14

15 U.S.C. § 18a ...........................................................................9

16 U.S.C. § 824b ...................................................................9, 13

16 U.S.C. § 824d ...................................................................14, 15

16 U.S.C. § 824e ...................................................................14, 15

16 U.S.C. § 824j .......................................................................14

16 U.S.C. § 824o ...................................................................14, 15

16 U.S.C. § 824v .......................................................................15

22 U.S.C. § 3201 .......................................................................17

42 U.S.C. § 10101 .....................................................................17

42 U.S.C. § 16513 ............................................................................. 16

42 U.S.C. § 2011 ............................................................................... 17

42 U.S.C. § 6291 ............................................................................... 16

5 U.S.C. § 555(b) ................................................................................. 8

7 U.S.C. § 2(a)(1)(A) ......................................................................... 18

7 U.S.C. § 9 ...................................................................................... 18

Dodd-Frank Wall Street Reform and Consumer Protection Act (2010),
   Pub. L. No. 111-203 ..................................................................... 18

**Other Authorities**

Exec. Order No. 14,230, 90 Fed. Reg. 11,781 (Mar. 6, 2025) ............... 3, 7

Exec. Order No. 14,246, 90 Fed. Reg. 13,997 (Mar. 25, 2025) ................ 3

Exec. Order No. 14,250, 90 Fed. Reg. 14,549 (Mar. 27, 2025) ................ 3

Exec. Order No. 14,263, 90 Fed. Reg. 15,615 (Apr. 9, 2025) .................. 3

**Rules**

Fed. R. App. P. 29(a)(4)(D) .................................................................. 3

Fed. R. App. P. 29(a)(4)(E) .................................................................. 3

# GLOSSARY

CFTC      Commodity Futures Trading Commission

DOE      Department of Energy

DOJ      Department of Justice

EBA      Energy Bar Association

FERC      Federal Energy Regulatory Commission

FCC      Federal Communications Commission

FPA      Federal Power Act

FTC      Federal Trade Commission

NGA      Natural Gas Act

NRC      Nuclear Regulatory Commission

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici curiae* are fourteen former Presidents of the Energy Bar Association ("EBA"), a voluntary bar association established in 1946 now with about 1,500 attorneys and energy professionals whose practices focus on the laws, regulations, and policies governing the production, development, conservation, transmission, transportation, distribution, and sale of energy in all its forms. The identities of each *amicus* and a description of their experience are shown in the Appendix to this brief. *Amici* submit this brief in their individual capacities; they do not speak for any law firm, client, or company with which they are or previously were associated. Nor do they speak for the EBA.

The former EBA Presidents who join this brief have served the organization across four decades. Their tenures as EBA President reflect the full arc of energy law history—from the era of natural gas curtailment and wellhead price controls and the early Federal Power Act ("FPA") open transmission access cases, to the deregulation and restructuring of the wholesale and retail natural gas and electricity industries in the 1980s -1990s, through the rise of organized wholesale

electricity markets, and into the era of renewable energy, the energy transition, and the large loads associated with AI and data centers.

Collectively, *amici* have experience across a wide range of energy and related industries, roles, executive and administrative agencies, and courts. *Amici* have worked on generation and transmission/transportation projects in the oil and gas, liquefied natural gas ("LNG"), coal, nuclear, hydroelectric, solar, wind, energy storage, and biofuels sectors, among others. They have worked for and with federal and state agencies and law judges, as in-house counsel, as industry executives, in academic roles, and as outside counsel. Their clients have included public utilities, public power and cooperative utilities, independent system operators and regional transmission organizations, tribal nations, universities, banks, private equity, infrastructure funds, government agencies (including state utility regulators, attorneys general, and consumer advocate offices), manufacturers, and non-profit entities, among numerous other types. And they have worked in, and represented clients before, myriad federal and state courts and agencies

potentially affected by the Law Firm Executive Orders,[1] including but not limited to the Department of Energy ("DOE"), the Federal Energy Regulatory Commission ("FERC"), the Commodity Futures Trading Commission ("CFTC"), the Nuclear Regulatory Commission ("NRC"), and the Environmental Protection Agency ("EPA").

In short, *amici* have a depth and breadth of experience that makes them uniquely positioned to explain to this Court how the Law Firm Executive Orders would affect a wide range of attorneys. Among many other potential harms, they threaten the ability of a broad community of lawyers to perform the important functions that make the energy industry work in the interests of market participants and consumers.

## FRAP 29(a)(4) STATEMENT

Pursuant to Fed. R. App. P. 29(a)(4)(D), *amici* certify that all parties have consented to the filing of this *amicus* brief.

Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* certify that no party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund the preparation or

---

[1] The term "Law Firm Executive Orders" or "Executive Orders," as used in this brief, refers to Executive Orders 14230 (Perkins Coie), 14246 (Jenner & Block), 14250 (Wilmer Hale), and 14263 (Susman Godfrey).

submission of this brief. No person other than the *amici* or their counsel contributed money to fund this brief.

## SUMMARY OF ARGUMENT

The Law Firm Executive Orders are not merely an attack on a few firms. In *amici*'s view, they represent an assault on a foundational premise underlying the rule of law: that energy companies, trade associations, public interest organizations, individuals, and others dealing with the federal government are entitled to be represented by counsel of their choosing, regardless of whether those attorneys' (or their firms') past or present representations have attracted the ire of the Executive Branch.

*Amici* submit this brief to explain, from their decades of accumulated experience, why the Law Firm Executive Orders pose a concrete and severe threat to the energy industry. There are at least three reasons why this is the case.

*First*, the energy legal, regulatory, and policy processes depend at every stage on the effective participation of independent counsel. Rulemaking and other proceedings that shape how electricity is generated, priced, and transmitted, adjudications and other proceedings

that determine whether gas pipelines and LNG facilities may be built, and enforcement investigations and proceedings that determine whether market manipulation has occurred in physical and financial energy markets are essential to the functioning of the energy industry. They require the participation of law firms with the requisite expertise to represent clients across the energy industry.

*Second*, the practice of energy law is inherently—and uniquely—multi-modal. Energy lawyers often must simultaneously practice before FERC and other federal departments, agencies, and bodies, participate in rulemaking proceedings, advise on all sorts of projects and transactions, negotiate contracts, and counsel clients on a range of critical matters such as mandatory electric reliability standards, cybersecurity, energy infrastructure development and permitting, and compliance and enforcement matters. The Executive Orders' threat to bar counsel from federal buildings and interacting with federal personnel would sever the integrated advisory relationship between energy lawyers and their clients.

*Third*, this is not just about the economic interests of energy lawyers or even their clients. Rather, the energy industry serves the

*public interest.* It is the foundation that underpins the delivery of goods and vital services in myriad other industries. When independent counsel are prevented from representing their clients in these industries, it harms the millions of Americans who depend on reliable, affordable energy on a daily basis.

*Amici* wish to stress that their opposition to the Executive Orders is not political. They have practiced energy law during various administrations and often have represented clients on cases that have spanned more than one Presidential administration. If every administration change raised the specter that certain firms or lawyers would be barred from interacting with the government based on the priorities of who was then in power, clients might be forced to change counsel midstream. As explained in more detail below, that would have a profoundly negative effect on the energy industry and everyone who relies on it—which is to say, all Americans.

# ARGUMENT

There are numerous aspects of the Law Firm Executive Orders that trouble *amici*, but this brief focuses primarily on the devastating impacts that Section 5 of the Orders would have upon the energy industry in the United States. Section 5(a) of the Orders, entitled "Personnel," states in relevant part:

> The heads of all agencies <u>shall</u>, to the extent permitted by law, provide guidance <u>limiting official access</u> from Federal <u>Government buildings</u> to employees of [Law Firm] when such access would threaten the national security of or otherwise be <u>inconsistent with the interests of the United States</u>. In addition, the heads of all agencies shall provide guidance <u>limiting Government employees acting</u> in their official capacity from <u>engaging with</u> [Law Firm] employees to ensure consistency with the national security and other interests of the United States.

*See, e.g.*, Exec. Order 14230, § 5(a) (Mar. 6, 2025) (emphasis added).

In essence, the Executive Orders allow the government to refuse to interact with certain lawyers or firms, or to deny them access to government buildings—including potentially courthouses—if an agency head appointed by the President determines that such a restriction is in the (undefined) "interests of the United States." As explained below, that restriction would have devastating consequences for energy law practitioners and, as a result, the energy industry in the United States.

7

## I. Independent Counsel Are Essential to the Functioning of the Energy Industry.

Our nation's energy system depends heavily on the availability of independent counsel who can advise and represent their clients on a wide range of issues, even if that requires taking positions adverse to those of government agencies at times.

Take rulemakings, for example. The FERC conducts a wide range of rulemakings on matters ranging from electric transmission, interconnection, and grid access, to rate-setting for electricity and natural gas pipelines, to pipeline capacity access, to authorizing natural gas and LNG projects, to licensing hydroelectric power projects, to rates for oil and product pipelines, and to mandatory electric reliability standards. And because energy and environmental issues are intertwined, the EPA conducts rulemakings impacting the energy industry on matters like power plant emissions standards, wastewater discharge standards, federal jurisdiction over wetlands and waterways, and renewable fuel standards. Under the Administrative Procedure Act, "[a] party is entitled to appear in person or by or with counsel or other duly qualified representative *in an agency proceeding.*" 5 U.S.C. § 555(b)

(emphasis added). That includes rulemakings and a broad range of other proceedings.

Counsel also is essential when seeking regulatory approval from federal agencies. The number and types of approvals needed in the energy industry defies easy cataloguing. By way of a few examples, however, certain mergers, acquisitions, and reorganizations of public utilities and holding companies require approvals from FERC under FPA § 203. Other transactions—including certain utility mergers and acquisitions, power plant acquisitions and dispositions, midstream and pipeline acquisitions, oil and gas company acquisitions, and renewable energy and related infrastructure acquisitions—require antitrust filings under the Hart-Scott-Rodino Act. *See* 15 U.S.C. § 18a. Market-based electric rate applications and tariff filings require federal approval by FERC. And applications for certificates of public convenience and necessity to build new gas pipelines must be approved by FERC under NGA § 7(c) and LNG facilities and exports of LNG must be approved by FERC and DOE. All of these applications are legally complex, requiring counsel with specialized knowledge able to assist their energy clients.

And, independent lawyers are essential for defending clients in enforcement investigations and proceedings brought by federal agencies in administrative and judicial tribunals. As explained in more detail below, numerous federal agencies have enforcement authority to investigate entities and individuals in the energy industry, ranging from FERC (market manipulation under the FPA and NGA, tariff violations, reliability standards violations, and other violations), to DOJ (civil and criminal antitrust matters, Clean Air Act and Clean Water Act cases), to the EPA, Securities and Exchange Commission, Federal Trade Commission ("FTC"), and the CFTC (energy derivatives and commodities manipulation).

*Amici* could go on and on with these lists, but the point is clear— access to independent expert counsel is essential to the functioning of orderly energy markets, be it at the rulemaking stage, the licensing, certification, and permitting stage, the ratemaking stage, or the enforcement stage. As the Supreme Court has long recognized, restricting "attorneys in advising their clients and in presenting arguments and analyses to the courts distorts the legal system by

altering the traditional role of the attorneys." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544 (2001).

Yet, if the Executive Orders are allowed to stand, the independence of counsel—the bedrock of the American legal system—would be called into question. Indeed, the Executive Orders seem uniquely designed to make lawyers trim their sails to avoid taking positions that might be antagonistic toward the government's "interests," whatever they may be at a particular time.

Nor are these harms theoretical. Based on *Amici*'s long experience and first-hand observations, the Executive Orders have real-world consequences. Some in-house counsel at energy companies are reticent to use preferred outside counsel out of concern that association with that firm or lawyer could affect on-going regulatory and governmental relationships. Likewise, the potential threat of executive retaliation is causing some firms to decline certain representations, or opt out of advocacy efforts, out of fear that their actions might be deemed antagonistic by the Executive Branch. That impacts clients, as they must either retain less-experienced attorneys that could prolong matters and increase costs, or hire experienced counsel with the

understanding that counsel may need to limit the scope of their representation. Firms also may decline to take on certain *pro bono* matters they would have taken in the past, or—in the case of the firms that made "deals" with the administration—have committed their *pro bono* resources to other causes chosen by the Executive Branch.

As explained in more detail below, the consequences of this chilling of attorney-client relationships, as applied to the energy sector, would be severe for the American economy.

## II. Energy Lawyers Practice Before an Unusually Wide Array of Federal Agencies and Bodies in Ways that are Affected by the Executive Orders

From their own personal experience, *amici* can attest that energy lawyers are often called upon to practice in more different fora than many of their counterparts in other legal specialties. This is due in large part to the ubiquity of energy concerns and their centrality to the United States' economy.

The U.S. Supreme Court regards energy production, regulation, and infrastructure as matters of major national significance, intertwining economic and energy security, environmental considerations, and federal-state jurisdictional issues. For example, in *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591

(1944), the Court held that under the NGA, pipeline rate regulation must ensure returns sufficient to maintain financial integrity and attract capital, and recognized the importance of natural gas sales and transportation  to the national economy. In *New York v. Federal Energy Regulatory Commission*, 535 U.S. 1 (2002), the Court upheld FERC's authority under the FPA to regulate broadly electricity transmission and recognized the national nature of the electricity grid. And in *West Virginia v. Environmental Protection Agency,* 597 U.S. 697 (2022), the Court acknowledged that environmental regulation of electricity generation is a matter of major economic and political significance and recognized that decisions about power generation affect the entire U.S.

The list below is nowhere near exhaustive, but is more than sufficient to apprise the Court of the breadth of federal agencies and courts with which energy lawyers regularly interact.

*FERC*. First, there is FERC. As noted above, that agency conducts a wide range of rulemakings and other proceedings on issues under the FPA including: mergers and acquisitions regulation for certain transactions involving public utilities and holding companies (FPA § 203), 16 U.S.C. § 824b; wholesale rate regulation and modification of

rates, (FPA §§ 205 and 206), *id.* § 824d and § 824e; interconnection and transmission rules (FPA § 211), *id.* § 824j; and mandatory reliability standards (FPA § 215), *id.* § 824o. It also conducts rulemakings and other proceedings under the NGA on issues like: pipeline rates and services (NGA §§ 4 and 5), 15 U.S.C. § 717c and § 717d; market manipulation (NGA §4A), *id.* § 717c-1; and pipeline certificates for new facilities, (NGA §7(c)), *id.* § 717f(c). Settlement discussions and other meetings on these issues typically take place at FERC; under the Executive Orders, counsel would be prevented from attending. All of these proceedings involve complex, multi-round proceedings in which the quality of legal advocacy materially affects outcomes that shape how electricity, gas, and other forms of energy are priced and made available for millions of Americans. Trade associations, public interest groups, state utility regulators, state attorneys general and individual market participants all depend on independent expert counsel to present their views effectively in these proceedings.

FERC conducts a wide range of permitting and contract-approval activities as well, under statutes like the NGA and the FPA. To give one concrete example, a developer or other entity seeking a Certificate of

14

Public Convenience and Necessity under the NGA must navigate multi-year proceedings involving environmental reviews, shipper commitments, cost allocation, and other issues and address challenges from intervenors. Experienced counsel are essential throughout, beginning with the initial prefiling process through potential rehearing and eventual appellate review. The loss of chosen counsel mid-proceeding could be extremely detrimental for project timelines and investor expectations.

FERC also has broad enforcement authority. Among other things, it enforces anti-manipulation provisions in electricity markets, 16 U.S.C. § 824v, tariff violations, *id.* §§ 824d–824e, and reliability standards violations, *id.* § 824o. It has similar enforcement authority in the natural gas industry. Investigations by FERC's Office of Enforcement and Regulatory Accounting into alleged market manipulation under the FPA and NGA are technically demanding and consequential, as they can result in millions of dollars in civil penalties. During these proceedings, counsel are essential in helping clients respond to orders to show cause, participate in investigative testimony,

conduct settlement negotiations, appear at agency hearings and, if necessary, litigate in federal court.

*Amici* know first-hand that such matters require highly specialized legal counsel. Subjects of such investigations have a critical need for experienced legal representation. Counsel who have developed expertise through prior representations are often uniquely positioned to defend clients in these investigations.

***DOE.*** The Department of Energy administers numerous laws that energy lawyers deal with on a regular basis. For example, DOE sets, and polices, national appliance and equipment energy efficiency standards under the Energy Policy and Conservation Act, 42 U.S.C. §§ 6291 *et seq*. It oversees four Power Marketing Administrations that market and transmit federally generated hydroelectric power. It also administers a loan guarantee program for innovative energy programs under the Energy Policy Act of 2005, *see* 42 U.S.C. § 16513. Again, each of these areas of authority—and many more like them—require legal assistance for energy market participants to help shape, utilize, and defend against agency actions.

*NRC*. Energy lawyers regularly deal with the Nuclear Regulatory Commission. That agency has rulemaking and enforcement authority under the Atomic Energy Act, 42 U.S.C. §§ 2011 *et seq.*, which means that attorneys helping clients build or apply for licenses to own and operate nuclear power plants must deal directly with the agency. The NRC also administers the Nuclear Waste Policy Act, *id.* §§ 10101 *et seq.,* and the Nuclear Non-Proliferation Act, 22 U.S.C. §§ 3201 *et seq.*, requiring attorneys that represent nuclear plant operators to frequently interact with these regulators. This specialized expertise in a highly regulated and dangerous area of the law could not be easily replaced if experienced attorneys and firms were suddenly banned from representing clients in the nuclear energy field.

Moreover, some of the most sensitive work related to nuclear energy and non-proliferation could require security clearances from attorneys as well as clients. To that extent, Section 2 of the Executive Orders, requiring a review of any existing clearances, could have an adverse impact on nuclear safety if applied to experienced energy attorneys with the expertise to handle these sensitive issues.

***CFTC***. Attorneys representing energy market participants regularly interact with the CFTC. Public utilities and other energy market participants frequently use derivatives regulated by CFTC, *see, e.g.*, 7 U.S.C. § 2(a)(1)(A), to hedge against changes in fuel and natural gas prices, as well as other costs. In addition, following passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act (2010), Pub. L. No. 111-203, CFTC adopted new rules related to these derivatives, and energy lawyers were heavily involved in representing their clients' interests during those rulemaking proceedings. Finally, CFTC has the authority under the Commodities Exchange Act to bring enforcement proceedings against entities and individuals seeking civil penalties, disgorgement, and other remedies. *See* 7 U.S.C. § 9. Legal representation during those investigations and proceedings is essential, as explained above.

***Other Federal Agencies***. It is not just energy-focused agencies that expert energy counsel deal with, either. Energy projects and transactions regularly require coordination with the Federal Communications Commission ("FCC") to ensure that repair crews have access to communications channels in an emergency, and to deal with

numerous issues regarding utility pole attachment rates, terms and conditions, and license transfers. Likewise, energy lawyers need to deal with the Department of Transportation's Pipeline and Hazardous Materials Safety Administration on issues related to pipeline safety regulations and the transportation of hazardous materials. And, if an energy infrastructure project crosses a river, federal lands, or tribal lands, energy attorneys must work with the Department of the Interior and its various bureaus (such as the Fish and Wildlife Service, Indian Affairs, Land Management, and National Park Service), the U.S. Army Corps of Engineers, and other agencies.

*Congress.* Because of their extensive experience, expert energy counsel are sought-after subject matter experts on a number of matters. For that reason, some of the *amici* have been invited to testify before Congress, meet with legislators, or otherwise participate in drafting key legislation with federal regulators or officials. That, too, could potentially be prohibited under the Executive Orders.

*Federal Courts*. Finally, energy lawyers regularly appear before federal trial and appellate courts on a wide range of issues. *Amici* themselves have decades of experience litigating high-stakes cases for

their clients in a range of federal courts, including this one. That vital experience would be lost to clients if the government is allowed to pick and choose the firms that can darken courthouse doors.

III. **A Well-Functioning Energy Industry Requires Attorneys Who Can Handle All Aspects of a Project, Transaction, or Matter Before the Many Different Interested Agencies or Bodies**

The agencies and courts noted above do not exist in silos. Rather, when energy attorneys represent their clients on an energy matter, they may have to appear before multiple agencies. A merger, for example, may require DOJ and FTC filings, as well as approvals from agencies like NRC and FERC. Likewise, projects or transactions such as acquisitions or dispositions of certain generation assets, project financings, power purchase agreements, and pipeline infrastructure contracts routinely require counsel to interact with FERC, DOE, and other federal agencies. Blacklisting a firm from federal interactions effectively disqualifies that firm and its lawyers from representing clients in major energy projects, transactions, and other matters.

Due to the unique nature of energy law practice, one-off representations are not the norm. Rather, it is common for clients to select a firm that best understands their business and the role it plays

in the energy industry; suits their needs and budget; and with whom they are comfortable. Building those relationships and expertise can take many years—especially in many of the specialized sub-areas of energy law practice.

That heightens the impact of the Executive Orders for counsel in fields like energy law. Given that multi-modal practice is the norm for many energy lawyers, a bar from appearing before one agency is tantamount to a bar to appearing before all of them. Typically it is not efficient or advisable to hire different attorneys to handle different agencies of a complex, interconnected, years-long project or transaction. Therefore, clients may need to uproot longstanding attorney-client relationships if an attorney (or their firm) is targeted by the Executive Branch. And some of those attorneys, who have acquired specialized knowledge and a unique skill set, will be at risk of losing their entire practice.

Thus, the likely outcome of the Executive Orders is that there would be fewer qualified attorneys able to handle complex energy matters impacting the public interest in a well-functioning energy industry. Clients would not necessarily be able to hire the counsel of

their first choice for large and complex projects or transactions. They would have to make do with less qualified counsel that they would then have to teach the particulars of their business, transactions, and projects. That, in turn, would drive up the cost and time required to handle complex legal matters, including vital energy infrastructure projects, and could impact the likelihood of success in the matter.

**CONCLUSION**

An energy industry in which law firms and their lawyers must assess whether their representations will displease the Executive Branch before agreeing to represent and advise clients before FERC, DOE, CFTC, NRC, other agencies and bodies, or federal courts is not an adversarial system at all and contravenes the rule of law in this country. It is a system in which the Executive Branch has already decided the outcome, and legal representation is permitted only on terms the Executive approves.

At the end of the day, it will be the American public—the consumer—that will pay the literal price for more chaotic, less efficient, less affordable, and less reliable energy markets where it is harder to complete new infrastructure and other projects that move the energy

industry and this nation forward. This Court should affirm the trial courts' rulings striking down the Executive Orders.

Dated: <u>April 2, 2026</u>    Respectfully Submitted,

<u>s/Michael P. Abate</u>
Michael P. Abate (D.C. Bar #1023343)
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main St., 4th Floor
Louisville, KY 40202
mabate@kaplanjohnsonlaw.com
(502) 540-8280

23

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with Fed. R. App. P. 29(a)(5) and 32(a)(5)(A) because it was prepared using Century Schoolbook 14-point type and contains 4,016 words.

*s/ Michael P. Abate*
Counsel for *Amici*

# CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2026, I filed the foregoing Brief with the Court and served it on opposing counsel by filing them through the Court's CM/ECF system. All counsel of record are registered ECF users.

*s/ Michael P. Abate*
Counsel for *Amici*

# APPENDIX LISTING *AMICI*

## Biographical Information of Former Presidents of the Energy Bar Association

**Donna M. Attanasio** (EBA President, 2008)

Donna Attanasio practiced energy regulatory and transactional law representing independent power producers, industrial electricity users, investor-owned utilities, and other energy sector clients before FERC and the federal courts; she subsequently moved to academia, where she has taught energy law, participated in DOE-funded grid modernization studies, led sustainability initiatives, and published research on the electric utility industry's transition to cleaner energy sources.

**Richard P. Bonnifield** (EBA President, 2009)

Richard Bonnifield's career has spanned every major segment of the energy sector: he began as an attorney-advisor and trial staff counsel at FERC, moved to private practice representing energy companies before the Commission, then served as General Counsel of a large public power utility and Vice President of Law at a major public utility before returning to private practice.

**David T. Doot** (EBA President, 2006)

David Doot has represented clients across the full spectrum of energy activities, including renewable and conventional generation, power transmission, and energy transactions, before federal and state regulators, and served as secretary and lead counsel for a large power pool, where he oversaw regulatory filings and the mediation of industry-wide proceedings.

**Robert S. Fleishman** (EBA President, 1999)

Robert Fleishman advised a broad range of clients for over 40 years on the regulatory, transactional, and enforcement aspects of energy market activities across electricity, natural gas, oil, LNG, pipelines, renewable energy, and energy storage, and defended energy and financial industry participants before FERC, the CFTC, and other regulatory bodies in market manipulation and enforcement matters. He worked at the FERC, for a major energy company, and for three major law firms, and served as Editor-in-Chief of the Energy Law Journal for about 15 years.

**Stephen A. Herman** (EBA President, 1992)

Stephen Herman built and led an energy law practice focused on competition and deregulation in natural gas and electric power industries, appearing before FERC, the U.S. Department of Energy, and state and federal courts, before transitioning to the private sector as a senior executive overseeing the development, financing, and operation of competitive electric power facilities.

**Stephen L. Huntoon** (EBA President, 2004)

Steve Huntoon has practiced energy regulatory law for more than 30 years representing major energy companies before FERC on matters including RTO/ISO markets, wind project development, and reliability standards, and also served in leadership roles at major public utilities launching retail energy marketing units, and personally developed the first coastal wind project in the eastern United States.

**Susan N. Kelly** (EBA President, 2010)

Susan Kelly has represented public power and cooperative electric utility interests throughout her career, both in private practice and as in-house counsel at two electric utility trade associations. She subsequently served as an electric utility trade association CEO, and more recently, as a Director for an organization that sets electric reliability standards.

**Michael J. Manning** (EBA President, 2007)

Over a 38-year career in energy law, Michael Manning represented major oil production companies, interstate and intrastate natural gas pipeline companies, oil pipeline companies, natural gas distribution companies,

electric utilities, and hydroelectric projects before FERC and other regulatory bodies.

**Mosby G. Perrow** (EBA President, 2021)

Mosby Perrow's career has encompassed government service as an attorney-advisor in FERC's Office of General Counsel, in-house counsel at a major natural gas interstate pipeline overseeing interstate natural gas pipeline regulatory matters, and private practice representing electric utilities, independent power producers, and pipeline companies.

**Matthew R. Rudolphi** (EBA President, 2018)

Matthew Rudolphi has advised electric cooperatives, municipal electric utilities, and pipeline companies on federal and state regulatory matters throughout his career, representing clients before FERC, state commissions, and the federal courts on issues ranging from wholesale power and transmission to natural gas and oil pipeline regulation.

**Jane E. Rueger** (EBA President, 2020)

Jane Rueger counsels a broad range of energy market participants, including public utilities, large industrial and commercial power consumers, and infrastructure developers, on FERC regulatory matters, RTO/ISO market participation, power purchase agreements, mergers and acquisitions, and energy policy at both the federal and state levels.

**Jennifer N. Waters** (EBA President, 1996)

Jennifer Waters devoted her career to energy law, specializing in natural gas regulation and litigation primarily on behalf of local gas distribution companies, and appeared in numerous proceedings before the U.S. Courts of Appeals and FERC over the course of her decades-long practice.

**Robert A. Weishaar, Jr.** (EBA President, 2017)

Robert Weishaar began his career as a judicial law clerk at FERC and subsequently spent 30 years in private practice representing manufacturers and other large industrial energy users in wholesale and retail electricity markets, and shippers in natural gas and petroleum products pipeline matters, before state commissions, FERC, and the federal courts of appeal including the U.S. Supreme Court.

**Joel F. Zipp** (EBA President, 2000)

Joel Zipp began his career in the Office of General Counsel at the Federal Power Commission (now FERC), and served as an Assistant Director of the FERC's Office of Enforcement. He practiced primarily in the oil and gas sector, serving as outside general counsel to developers of interstate and intrastate natural gas pipelines and LNG projects, managing federal and state regulatory approvals, project financing, and construction contracting, while also representing Native American tribes on oil and gas matters and a major Canadian power generator before FERC and regional grid operators.