**Nos. 25-5241, 25-5265, 25-5277, 25-5310**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Perkins Coie LLP,
                *Plaintiff-Appellee,*
            v.

United States Department of Justice, *et al.*
                *Defendants-Appellants;*

Consolidated on Appeal from the U.S. District Court for the District of Columbia
(Case Nos. 25-cv-716-BAH; 25-cv-916-JDB; 25-cv-917-RJL; 25-cv-1107-LLA)

**BRIEF OF FORTY-TWO MEDIA ORGANIZATIONS AND PRESS FREEDOM ADVOCATES AS *AMICI CURIAE* IN SUPPORT OF AFFIRMANCE OF SUMMARY JUDGMENT FOR EACH PLAINTIFF-APPELLEE**

Dated: April 2, 2026

Kendra K. Albert
Andrew F. Sellars
ALBERT SELLARS LLP
769 Centre St, Suite 199
Boston, MA 02130
(203) 424-0382
kendra@albertsellars.law

Counsel for *Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

*Amici* CalMatters; The Center for Investigative Reporting, Inc.; Defending Rights and Dissent; The First Amendment Coalition; The Forum for Constitutional Rights; Free Press; Freedom of the Press Foundation; Journalism Funding Partners; Media Alliance; National Press Photographers Association; The New England First Amendment Coalition; The Online News Association; The Project On Government Oversight; Public Knowledge; Reporters Without Borders, Inc.; The Signals Network, Inc.; and Zansberg Beylkin LLC each certify that they do not have a parent corporation, and no publicly-held corporation owns 10% or more of its stock.

The Press Freedom Defense Fund is a project of The Intercept Media, Inc. The Intercept Media, Inc. does not have a parent corporation, and no publicly-held corporation owns 10% or more of its stock.

Emmerich Newspapers, Inc. is owned by Emmerich Family Newspapers, LLC. Emmerich Family Newspapers, LLC does not have a parent corporation, and no publicly-held corporation owns 10% or more of its stock.

**CERTIFICATE AS TO PARTIES, RULINGS UNDER
REVIEW, AND RELATED CASES**

Pursuant to D.C. Circuit Rules 26.1 and 28(a)(1), and Fed. R. App. P. 26.1, the undersigned counsel certifies as follows:

### A.     Parties and *Amici*

To the best knowledge of *amici curiae*, the parties, intervenors, and *amici* appearing before the district court and in this Court are those listed in the Briefs for Appellants and each Appellee, along with Aaron H. Kaplan; Leadership Now Project; the Institute for the Rule of Law of the Union Internationale des Avocats (UIA-IROL); Lawyers Defending American Democracy; the European bar associations identified in document number 2166650; the American Bar Association; the International Bar Association of Human Rights Institute; the Commonwealth Lawyers Association; the Washington Legal Foundation; and the former presidents of the Energy Bar Association identified in document number 2166771.

### B.     Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants.

### C.     Related Cases

To the best knowledge of *amici curiae*, these cases have not previously been before this Court or another district court. These cases are scheduled for oral argument before this Court on the same day and before the same panel as *Zaid v. Executive Office of the President*, No. 26-5009 (D.C. Cir.).

Dated: April 2, 2026

/s/Kendra K. Albert

Kendra K. Albert
Albert Sellars LLP
769 Centre St, Suite 199
Boston, MA 02130
(203) 424-0382
kendra@albertsellars.law

Counsel for *Amicus Curiae*

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..................................................i

CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES ...........................................................................ii

TABLE OF CONTENTS ................................................................... iv

TABLE OF AUTHORITIES................................................................. v

GLOSSARY OF ABBREVIATIONS ...................................................... ix

STATUTES AND REGULATIONS....................................................... x

STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE................................................................ xi

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS............. xv

ARGUMENT ..............................................................................1

    I.    A Free Press Grants the Public a Check on the Government, But Requires Legal Support. ............................................. 5

    II.    The Role of the Press Will Not Function if the Court Allows These Executive Orders.............................................12

        a. The Government Will Inevitably Use This Authoritarian Power to Target the Press.......................................................12

        b. The Executive Order Will Chill Lawyers from Working With the Press. ................................................................15

        c. The Lawyers That Remain will be Unable to Do Their Jobs.........19

    III.    Without a Free Press, the Public will Lose a Key Vindicator of First Amendment Rights. .................................................21

CONCLUSION ......................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Abramowitz v. Lake*, --- F. Supp. 3d ---, 2026 WL 746989 (D.D.C. Mar. 17, 2026),
*appeal docketed* No. 26-5087 (D.C. Cir. Mar. 20, 2026) ................................................ 10

*Am. Assoc. Of Univ. Profs. v. Rubio*, --- F. Supp. 3d ---, 2026 WL 172733
(D. Mass. Jan. 22, 2026) .................................................................................... 8

*Am. Bar Ass'n v. Exec. Off. of the President*, No. 25-cv-1888, 2026 WL 890410
(D.D.C. Mar. 31, 2026) ...................................................................................... 4

*Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14 (D.D.C. 2025) ............................................ 7

*Assoc. Press v. Budowich*, 780 F. Supp. 3d 32 (D.D.C. 2025), *appeal docketed* No. 25-5109
(D.C. Cir. argued Nov. 24, 2025) ......................................................................... 8

*Assoc. Press v. Budowich*, No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) .. 13, 21

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ...................................................................... 8

*CBS, Inc. v. Davis*, 510 U.S. 1315 (1994) ................................................................... 10

*Citizens for Responsibility and Ethics in Wash. v. U.S. DOGE Serv.*,
769 F. Supp. 3d 8 (D.D.C. 2025) ........................................................................... 7

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) ............................................................. 6

*De Jonge v. Oregon*, 299 U.S. 353 (1937) .................................................................... 22

*Frederick Douglass Found. Inc. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) .... 3

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) ............................................................. 6

*In re Grand Jury Subpoenas*, --- F. Supp. 3d ---, 2026 WL 710202
(D.D.C. Mar. 13, 2026) ..................................................................................... 12

*In re Search of the Real Property Premises of Hannah Natanson*, No. 26-sw-54,
2026 WL 510727 (E.D. Va. Feb. 24, 2026) ......................................................... 9, 13

*Jenner & Block LLP v. Dep't of Justice*, 784 F. Supp. 3d 76 (D.D.C. 2025), *appeal docketed*,
No. 25-5265 (D.C. Cir. July 22, 2025) ....................................... 2, 12, 16, 17, 19, 20, 22

*L.A. Press Club v. Noem*, --- F.4th ---, 2026 WL 889142 (9th Cir. Apr. 1, 2026) ............. 9

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001) ........................................................21

*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) ...................................... 5

*Mills v. Alabama*, 384 U.S. 214 (1966) ..........................................................................5, 21

*N.Y. Times Co. v. Dep't of Defense*, --- F. Supp. 3d ---, 2026 WL 788689
   (D.D.C. Mar. 20, 2026) ...............................................................3, 8, 9, 14, 22

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ..............................................1, 5, 11, 14

*Nat'l Pub. Radio, Inc. v. Trump*, --- F. Supp. 3d ---, 2026 WL 877434
   (D.D.C. Mar. 31, 2026) ...........................................................................10, 15

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) .......................................................... 19

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ............................................................ 10

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ...........................................................17

*Perkins Coie LLP v. Dep't of Justice*, 783 F. Supp. 3d 105 (D.D.C. 2025), *appeal docketed*,
   No. 25-5241 (D.C. Cir. July 2, 2025) ..............................................2, 15, 16, 20

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) .........................................5, 8

*Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977) ............................................................... 6

*Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15 (D.D.C. 2025),
   *appeal docketed*, No. 25-5310 (D.C. Cir. Aug. 26, 2025) ..................................... 2, 15, 21

*Time, Inc. v. Hill*, 385 U.S. 374 (1967) ..............................................................................21

*Trump v. N.Y. Times Co.*, 800 F. Supp. 3d 1297 (M.D. Fla. 2025) ....................................15

*Trump v. Trump*, No. 453299/2021, 2024 WL 133846 (N.Y. Sup. Ct. Jan. 12, 2024)......15

*Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) ................... 4

*United States v. Torrens*, 560 F. Supp. 3d 283 (D.D.C. 2021) .............................................8

*Villarreal v. Alaniz*, 607 U.S. ---, 2026 WL 795532 (Mar. 23, 2026) ............................. 19

*Wessler v. Dep't of Justice*, 381 F. Supp. 3d 253 (S.D.N.Y. 2019) ........................................ 11

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President,*
    784 F. Supp. 3d 127 (D.D.C. 2025), *amended by* No. 25-cv-917,
    2025 WL 2104252 (D.D.C. June 26, 2025), *appeal docketed*, No. 25-5277
    (D.C. Cir. July 28, 2025) ............................................................... 2, 12, 15, 19

**Other Authorities**

Christina Koningisor, *The De Facto Reporter's Privilege,* 127 Yale L.J. 1176 (2018) ....... 18

D. Victoria Baranetsky, Simon Frankel & Thomas R. Burke, *International Charity
    Planet Aid Pays $1.925 Million to Settle Six-Year Libel Lawsuit,* Reveal (Oct. 20, 2022)
    ........................................................................................................... 17

David Enrich, Murder the Truth: Fear, The First amendment, And a Secret Campaign
    to Protect the Powerful (2025) ............................................................... 18

Erik Wemple, *A Call for Reporting Tips Rankles Pentagon Officials*, New York Times
    (Mar. 12, 2026) ............................................................................... 14

Floyd Abrams, *Richard S. Salant Lecture on Freedom of the Press* (2013) .......................... 3

Heidi Kitrosser, *Media Leak Prosecutions and the Biden-Harris Administration: What
    Lies Ahead?,* 2021 U. Ill. L. Rev. Online 121 (2021) ........................................ 18

Jon Brodkin, *Trump and His FCC Chair Demand More Positive News Coverage of Iran
    War*, Ars Technica (Mar. 16, 2026) ........................................................ 14

Jonas Heese, Gerardo Pérez-Cavazos & Caspar David Peter, *When the Local
    Newspaper Leaves Town: The Effects of Local Newspaper Closures on Corporate
    Misconduct*, 145 J. Fin. Econ. 445, 446 (2022) ............................................ 7

Juan Carlos Lara, *FCC Investigates SF Radio Station for ICE Reporting, Sparking Press
    Freedom Fears*, KQED (Feb. 6, 2025) ...................................................... 13

Kriston Capps, *The Hidden Costs of Losing Your City's Newspaper*, Bloomberg CityLab
    (Mar. 30, 2018) ............................................................................... 7

Lauren Russell, Chuck Tobin & Max Mishkin, *January 6, 2021: Saving the Truth From
    the Whitewash*, Media L. Resource Ctr. (Jan. 2026) ...................................... 11

*MLRC 2025 Report on Trials and Damages*, Media L. Resource Ctr. Bulletin (Mar.
    2025) ......................................................................................... 18

Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, PROPUBLICA (Aug. 6, 2025) ....................................................15

*National Press Club Awards Mississippi Today with its Highest Press Freedom Award,* MISSISSIPPI TODAY (Sep. 25, 2024) ..........................................................17

Oliver Darcy, *Trump and His Allies Are Threatening Retribution against the Press. Their Menacing Words Should Not Be Ignored*, CNN (2023) ...................................13

Penelope Muse Abernathy & Sarah Stonebely, *The State of Local News,* NW. MEDILL LOCAL NEWS INITIATIVE (Nov. 16, 2023) ......................................... 16

Pengjie Gao, Chang Lee & Dermot Murphy, *Financing Dies in Darkness? The Impact of Newspaper Closures on Public Finance*, 135 J. FIN. ECON. 445 (2020) ........................... 7

*Press Photographers Achieve Historic Settlement with New York City Police Department*, DAVIS WRIGHT TREMAINE (Sept. 5, 2023) ........................................ 10

*Prior Restraint*, U.S. PRESS FREEDOM TRACKER .................................. 10

Ryan Minnaugh, *Trump Blasts CNN and MSNBC, Calls Them "Gutless Cowards" Over Iran Strike Coverage*, ABC 4 NEWS (June 24, 2025) ........................................ 14

Scott Nover, *Pentagon Bars Reporters Over "Unflattering" Hegseth Photos*, WASHINGTON POST (Mar. 11, 2026) .............................................. 14

**GLOSSARY OF ABBREVIATIONS**

| | |
|---|---|
| FOIA | Freedom of Information Act |
| TRO | Temporary Restraining Order |
| USAGM | United States Agency For Global Media |

**STATUTES AND REGULATIONS**

Relevant statutes and regulations are reproduced in the Addendum that accompanies the Appellants' Opening Brief.

**STATEMENT OF IDENTITY, INTEREST IN CASE,
AND SOURCE OF AUTHORITY TO FILE**

This brief represents the views of forty-two media organizations and press freedom advocates, spearheaded by Press Freedom Defense Fund. *Amici* include newsrooms that publish information of public concern, associations that represent individual journalists and publications, organizations that advocate for press freedom, law firms that practice media law, and individual attorneys who collectively have more than five hundred years of practice experience on issues related to the First Amendment and press freedom.

The Press Freedom Defense Fund is a project of The Intercept Media, Inc., a nonprofit news organization that publishes *The Intercept*, an award-winning news website with a reputation for in-depth investigations.

CalMatters is an award-winning, nonpartisan, nonprofit news organization that covers California policy and politics.

The Center for Investigative Reporting, Inc. is the nation's oldest nonprofit investigative newsroom, and runs the news outlets *Mother Jones*, *Reveal*, and *CIR Studios*.

Defending Rights and Dissent is a national civil liberties organization that defends First Amendment rights through grassroots mobilization, policy expertise, and advocacy journalism.

Emmerich Newspapers, Inc. produces local news in twenty small markets in

Mississippi.

The First Amendment Coalition is a nonprofit, nonpartisan organization dedicated to defending free speech, a free press, and the people's right to know.

The Forum for Constitutional Rights conducts public education regarding constitutional rights and governmental power, and files amicus briefs in cases involving both.

Free Press is a non-partisan, nonprofit, nationwide media and technology advocacy organization founded in 2003 that seeks to change the media in order to transform democracy in furtherance of a just society.

Freedom of the Press Foundation is a nonprofit organization dedicated to protecting and defending press freedom and public interest journalism.

Journalism Funding Partners strengthens the depth, diversity and sustainability of local news by building and stewarding relationships between philanthropy and newsrooms to better serve communities.

Media Alliance is a Northern California democratic communications advocate, founded in 1976, which works for an accurate, accountable and representative media and communications system.

The National Press Photographers Association is a non-profit professional organization dedicated to the advancement of visual journalism, its creation, editing and distribution in all news media.

The New England First Amendment Coalition, a non-partisan and non-profit

organization, is the region's leading defender of First Amendment freedoms and open government.

The Online News Association is the world's largest association of digital journalists whose mission is to inspire innovation and excellence among journalists to better serve the public.

The Project On Government Oversight, founded in 1981, is a nonprofit, nonpartisan independent watchdog that includes an editorially independent newsroom and produces *Bad Watchdog*, an award-winning investigative podcast.

Public Knowledge is a nonprofit organization that promotes free expression, an open internet, and access to affordable communications tools and creative works.

Reporters Without Borders, Inc. is a US-based nonprofit that defends press freedom and everyone's right to information.

The Signals Network, Inc. is a nonpartisan, nonprofit organization that provides legal, psychological, security, communications, and advocacy support to individuals who have shared information of public interest.

Zansberg Beylkin LLC is a First Amendment, media, and intellectual property law firm committed to defending freedom of speech and of the press.

The individual *amici*[1] are Floyd Abrams, Seth D. Berlin, David J. Bodney, Chad R. Bowman, Jay Ward Brown, Matthew S.L. Cate, John C. Greiner, Lee Levine,

---

[1] The individuals here sign in their personal capacities only, and the views of this brief should not be ascribed to their clients, employers, or institutions.

Jennifer Ann Dukarski, Anna Kaul, Ashley Kissinger, Maxwell S. Mishkin, Lynn B. Oberlander, Lauren P. Russell, Isabella Salomão Nascimento, Jacquelyn N. Schell, David A. Schulz, Elizabeth Seidlin-Bernstein, Alia L. Smith, Michael D. Sullivan, Thomas Sullivan, Charles D. Tobin, and Saumya Vaishampayan. Together, these individuals represent about 575 years of practice engaged in First Amendment and press freedom. *Amici* have worked at major law firms, boutique media firms, in-house at media companies and press associations, and as academics and law school clinicians. Multiple *amici* have argued cases before the United States Supreme Court on First Amendment matters, as well as nearly every circuit court and state supreme court in the United States. They have authored leading books and treatises on media law, and appeared as experts before Congress and state legislators for their media-related work. As veteran media attorneys, they are well aware of the importance of a constructive and functional legal system that allows for the adjudication of press freedom rights with a fair consideration of competing governmental interests.

*Amici* file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) and Circuit Rule 29(b). Both Appellants and Appellees have consented to *amici* filing this brief.

## STATEMENT OF AUTHORSHIP AND
## FINANCIAL CONTRIBUTIONS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici curiae* certify that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money that was intended to fund the preparation or submission of this brief, and no party or person—other than the *amici curiae* or their counsel—contributed money that was intended to fund the preparation or submission of this brief.

**ARGUMENT**

A news organization receives documents from a government source. The documents concern an ongoing overseas conflict, and they could have profound consequences for national politics and international relations. But when the organization seeks to publish the document, it finds itself gagged by a temporary restraining order obtained by the Department of Justice from a district court.

This is the familiar story of the Pentagon Papers case, and its famous conclusion that a claim of national security, especially one that "does not even attempt to rely on any act of Congress," cannot overcome the right of the press to inform the public. *N.Y. Times Co. v. United States* (*Pentagon Papers*), 403 U.S. 713, 718 (1971) (per curiam) (Black, J., concurring).

But the story could have played out differently. Imagine that, despite the fact that the injunction is a prior restraint, the newspaper cannot find legal counsel to challenge the order. "The case is a slam dunk, but we can't take it," the lawyers say, quietly. "The partners don't want to get on the bad side of the current administration." The organization's in-house counsel goes to argue before the court, but hours after she files a notice of appearance, an executive order is issued. She is "dishonest" and her work is "dangerous." Her client is a threat to "national security", and as such, she is no longer able to enter a federal courthouse, nor confer with attorneys from the Department of Justice. The media organization cannot challenge the order, thus they do not publish. The courts are never given the chance to balance

1

competing constitutional interests. The documents remain hidden, and the public is never fully informed.

This is the logical result of the four Executive Orders at issue in these consolidated cases, and the equal parts dangerous and absurd outcome prevented by the opinions below. "No American President has ever before issued executive orders" like these. *Perkins Coie LLP v. Dep't of Justice*, 783 F. Supp. 3d 105, 118 (D.D.C. 2025), *appeal docketed*, No. 25-5241 (D.C. Cir. July 2, 2025). The orders are "unconstitutional from beginning to end," *Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15, 57 (D.D.C. 2025), *appeal docketed*, No. 25-5310 (D.C. Cir. Aug. 26, 2025), and it is "[l]ittle wonder that in the nearly 250 years since the Constitution was adopted no Executive Order has been issued challenging" the fundamental right to litigants to their chosen counsel, *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President (WilmerHale)*, 784 F. Supp. 3d 127, 135 (D.D.C. 2025), *amended by* No. 25-cv-917, 2025 WL 2105262 (D.D.C. June 26, 2025), *appeal docketed*, No. 25-5277 (D.C. Cir. July 28, 2025).

And "what the President does to the bar he can equally do to other pillars of our constitutional order," including "the press." *Jenner & Block LLP v. Dep't of Justice*, 784 F. Supp. 3d 76, 115 (D.D.C. 2025), *appeal docketed*, No. 25-5265 (D.C. Cir. July 22, 2025). But an executive order need not aim at the press directly, because to target counsel is to target freedom of speech. Lawyers help the press access government records and spaces, advise on how to handle sensitive sources and content, and

defend against threats stemming from publication. To publish the Pentagon Papers, the *New York Times* and *Washington Post* employed some of the most famous First Amendment lawyers in American history. These lawyers advocated for the newspapers' editorial right to publish what it chose to, and counseled the newspapers on what they may nevertheless wish to withhold from public view. *See* Floyd Abrams, *Richard S. Salant Lecture on Freedom of the Press* at 22 (2013) (describing such conversations with the *New York Times*).[2]

Today, the need for those very same outlets to diligently assert their rights through counsel is heightened, not lessened. *N.Y. Times Co. v. Dep't of Defense* (*Pentagon Press Credentials*), --- F. Supp. 3d ---, 2026 WL 788689 at *3 n.3 (D.D.C. Mar. 20, 2026) (describing, in the context of a successful suit for the reinstatement of press credentials, how actions to exclude journalists from the Pentagon were not taken even in response to the leak of the Pentagon Papers). If Executive Orders like these are allowed, the President could "permit one side to have a monopoly in expressing its views" by cutting off the lawyers for those who dissent, which is the "antithesis of constitutional guarantees." *Frederick Douglass Found. Inc. v. District of Columbia*, 82 F.4th 1122, 1131 (D.C. Cir. 2023) (quoting *City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp. Relations Comm'n*, 429 U.S. 167, 175–76 (1976)).

*Amici* are forty-two media organizations and press freedom advocates, who

---

[2] Available at https://shorensteincenter.org/wp-content/uploads/2013/10/Salant-2013-Transcript-web.pdf.

have dedicated their work in service of the understanding that "[f]reedom of the press holds an . . . exalted place in the First Amendment firmament," *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 375 (D.D.C. 2020), because the press plays a vital role in the maintenance of democratic governance. Each signatory's vantage point is different, but *amici* are united by their understanding that the zealous advocacy of media counsel is vital to the press's ability to inform the public and hold the government to account. If the Executive Order stands, many lawyers will be chilled from taking on work so directly in conflict with the President, out of fear for the harm it would cause to their greater practice. Lawyers who are not chilled will face the constant threat that a similar executive order aimed at them would throw their work into disarray and deny them access to the people and places necessary to advocate for their clients.

*Amici* urge this Court to affirm the decisions below. The object of this campaign could not be more obvious: the administration "want[s] to keep the threats of more executive orders on the table because they think it dissuades the best lawyers from representing critics of the administration." *Am. Bar Ass'n v. Exec. Off. of the President*, No. 25-cv-1888, 2026 WL 890410 at *4 (D.D.C. Mar. 31, 2026) (quoting Erin Mulvaney et al., *The Law Firms That Appeased Trump—and Angered Their Clients*, WALL ST. JOURNAL (June 1, 2025)[3]). "'[T]here is always a strong public interest in the exercise of free

---

[3] https://www.wsj.com/us-news/law/law-firms-trump-deals-clients-71b3616d

speech rights otherwise abridged by an unconstitutional' government action." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). Allowing a President to selectively punish law firms for representing clients who anger him—which would almost certainly include the news media—would "wipe out the First Amendment and destroy the fundamental liberty and security of the very people the Government hopes to make 'secure.'" *Pentagon Papers*, 403 U.S. at 719 (Black, J., concurring).

## I.   A Free Press Grants the Public a Check on the Government, But Requires Legal Support.

*Amici* represent a constituency who are, by constitutional design, routinely antagonistic to the government. "The dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression of embarrassing information." *Pentagon Papers*, 403 U.S. at 723–24 (Douglas, J., concurring). "Only a free and unrestrained press can effectively expose deception in government." *Id.* at 717 (Black, J. concurring). Against this threat of an overreaching government, "the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966).

In serving this role, the press acts as the public's proxy, obtaining the information needed for democratic deliberation. *Richmond Newspapers, Inc. v.*

*Virginia*, 448 U.S. 555, 572–73 (1980) (the public, "instead of acquiring information . . . by firsthand observation . . . now acquire it chiefly through the print and electronic media"); *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977) ("[T]he public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information."). The press sifts through the chaff to find the information most relevant to listeners, a more vital task than ever given today's information ecosystem. "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975). "The newspapers, magazines, and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936).

Threats to the press are therefore threats to the public, in concrete and practical terms. "When local newspapers shut their doors, communities lose out. People and their stories can't find coverage. Politicos take liberties when it's nobody's job to hold them accountable. What the public doesn't know winds up hurting them." Kriston

Capps, *The Hidden Costs of Losing Your City's Newspaper*, BLOOMBERG CITYLAB (Mar. 30, 2018).[4] These effects can be measured. Scholarship indicates that when local press closes, both corporate misconduct and government waste increase. *See* Jonas Heese, Gerardo Pérez-Cavazos & Caspar David Peter, *When the Local Newspaper Leaves Town: The Effects of Local Newspaper Closures on Corporate Misconduct*, 145 J. FIN. ECON. 445, 446 (2022); Pengjie Gao, Chang Lee & Dermot Murphy, *Financing Dies in Darkness? The Impact of Newspaper Closures on Public Finance*, 135 J. FIN. ECON. 445, 447 (2020).

To serve this role, the press requires access to government information. That access has always required lawyers, though recent events alone provide ample illustration. This is perhaps most obvious in the context of public records laws, like the Freedom of Information Act ("FOIA"). *See, e.g., Citizens for Responsibility and Ethics in Wash. v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8, 11 (D.D.C. 2025) (finding that "the public would be irreparably harmed by an indefinite delay" in processing information about that controversial "United States DOGE Service"). And when there are concerns that agencies may hide or destroy records, media lawyers work to ensure records are preserved. *See Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 20 (D.D.C. 2025) (discussing a brokered agreement that required the government to attempt to preserve the correspondence in the "Signalgate" scandal).

Beyond FOIA, the press and their lawyers often take the lead in ensuring the

---

[4] https://www.bloomberg.com/news/articles/2018-05-30/when-local-newspapers-close-city-financing-costs-rise

public preserves its common law and First Amendment rights to access the facilities of the government. *See Assoc. Press v. Budowich*, 780 F. Supp. 3d 32, 39 (D.D.C. 2025), *appeal docketed* No. 25-5109 (D.C. Cir. argued Nov. 24, 2025) (access to the White House press pool); *Pentagon Press Credentials*, 2026 WL 788689 at *11–12, 17 (access to the Pentagon). Lawyers representing the press also work directly with courts to ensure meaningful public access to court proceedings and records. *See, e.g., Am. Assoc. Of Univ. Profs. v. Rubio*, --- F. Supp. 3d --- 2026 WL 172733 at *2 (D. Mass. Jan. 22, 2026) (unsealing trial exhibits in the first major public trial related to the administration's retaliatory deportation of students for their speech); *United States v. Torrens*, 560 F. Supp. 3d 283, 292–93 (D.D.C. 2021) (discussing the Standing Order created with a coalition of press organizations for effectuating public access to video records in the Capitol Riot cases). The tests employed in adjudicating such access often involve balancing multiple constitutional interests and careful calculation around the scope of such rights to different records and proceedings. *See Torrens*, 560 F. Supp. 3d at 289–90. Such processes functionally require counsel.

Lawyers also work closely with members of the press when they handle sensitive information and sources. In recognition of "the special nature of a claim of a First Amendment right to gather information," *Richmond Newspapers, Inc.*, 448 U.S. at 586, the Supreme Court has long held that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need . . . of

the highest order." *Bartnicki v. Vopper*, 532 U.S. 514, 528 (2001) (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979)). But to realize that right, lawyers often advise on delicate matters related to how information is procured, handled, and disclosed, and interact with the government as a part of that. *See, e.g., In re Search of the Real Property Premises of Hannah Natanson*, No. 26-sw-54, 2026 WL 510727 at *3 (E.D. Va. Feb. 24, 2026) (after the government seized a reporter's property per a third-party leak investigation, the *Washington Post*'s lawyers "conferred multiple times with the government and proposed multiple frameworks" to address the First Amendment and attorney–client privilege issues in this seizure); *Pentagon Press Credentials*, 2026 WL 788689 at *11 (challenging a policy that would strip a journalist's press credentials "if the journalist happens to ask a question that results in the disclosure of unauthorized information by a Department [of Defense] employee").

Similarly, lawyers will advise clients who run into legal issues while engaged in constitutionally protected on-the-street newsgathering activity. *See, e.g., L.A. Press Club v. Noem*, --- F.4th ---, 2026 WL 889142 at *5 (9th Cir. Apr. 1, 2026) (media lawyers produced "extensive evidence that federal officers repeatedly targeted journalists . . . who stood far from any protesters or bad actors"). Sometimes, lawyers are involved in extended litigation and negotiation with law enforcement to form consent decrees that ensure reporters on the ground are not swept up in any enforcement actions. *See, e.g., Press Photographers Achieve Historic Settlement with New York City Police*

*Department*, DAVIS WRIGHT TREMAINE (Sept. 5, 2023).[5]

Lawyers are also necessary to advocate for media outlets who directly receive government funding. They ensure that the government's own press arm, the United States Agency for Global Media, operates at the level and scope set by Congress. *See Abramowitz v. Lake*, --- F. Supp. 3d ---, 2026 WL 746989 at *14 (D.D.C. Mar. 17, 2026), *appeal docketed* No. 26-5087 (D.C. Cir. Mar. 20, 2026) (granting summary judgment after USAGM official Kari Lake "repeatedly thumbed her nose" at those statutory requirements). And they work to ensure that funds allocated by Congress to support public media reach their intended recipients. *See Nat'l Pub. Radio, Inc. v. Trump*, No. 25-cv-1674, --- F. Supp. 3d ---, 2026 WL 877434 (D.D.C. Mar. 31, 2026).

Finally, when a court imposes an unlawful prior restraint on a media outlet, they turn to their lawyers to see that such orders are reversed. While a prior restraint has long been held as "the most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), the simple fact remains that courts will, all too frequently, allow a prior restraint to issue. *See Prior Restraint*, U.S. PRESS FREEDOM TRACKER.[6] In these circumstances it takes the rapid action of lawyers to overturn such unconstitutional orders. *See CBS, Inc. v. Davis*, 510 U.S. 1315, 1317–18 (1994) (Blackmun, J., in chambers) (granting a stay of a

---

[5] https://www.dwt.com/about/news/2023/09/press-photographers-achieve-settlement-with-nypd [https://perma.cc/UA3S-QM38]
[6] https://pressfreedomtracker.us/prior-restraint/ [https://perma.cc/R483-FEZX].

preliminary injunction enjoining network from broadcasting news program on grounds that delay would cause irreparable harm to the news media).

While this state of affairs often means that the press' lawyers and the government's lawyers spar, these battles serve a higher purpose. "Investigative reporting . . . far from impeding the public interest, actually enhances it." *Wessler v. Dep't of Justice,* 381 F. Supp. 3d 253, 260 (S.D.N.Y. 2019). And critically, the branch responsible for resolving such disputes is the Judiciary, whose responsibility cannot not be surrendered to the whims of the Executive. *See Sherrill v. Knight*, 569 F.2d 124, 128 n.14 (D.C. Cir. 1977) (in addressing a First Amendment challenge to the issuance of White House press credentials, "[w]e reject at the outset the contention . . . that this case is nonjusticiable" due to the claimed sole discretion of the Executive). This helps to ensure that the "essential role" served by the press is "to serve the governed, not the governors." *Pentagon Papers*, 403 U.S. at 717 (Black, J., concurring). And it serves a safeguard against any effort by the Executive to rewrite history by unilaterally undoing the work of media lawyers. *See* Lauren Russell, Chuck Tobin & Max Mishkin, *January 6, 2021: Saving the Truth From the Whitewash*, MEDIA L. RESOURCE CTR. (Jan. 2026) (describing the effort to preserve the videos in the Capitol Riot cases after the Department of Justice began to delete them).[7]

---

[7] https://medialaw.org/january-6-2021-saving-the-truth-from-the-whitewash/ [https://perma.cc/2HET-68YF]

## II. The Role of the Press Will Not Function if the Court Allows These Executive Orders.

The cases above establish a predictable playing field between the press and the Executive Branch, overseen by the Judicial Branch. The Executive cannot simultaneously be the defendant and "take it upon itself to sanction" the attorneys on the other side. *WilmerHale*, 784 F. Supp. 3d at 161. There may, of course, be countervailing equities and times where the press does not get its way, but it is a balance to be constructed thoughtfully through adversarial argument, not shortcutted via executive whim. "A First Amendment that disappears in the face of governmental interests would be both impotent and foreign to American jurisprudence." *Jenner & Block*, 784 F. Supp. 3d at 95 n.8. And given media's reliance on pro bono and low-cost counsel, the chill from these Executive Orders would be drastic. It would make it impossible for many press organizations to serve as the public's proxy.

### a. The Government Will Inevitably Use This Authoritarian Power to Target the Press.

"Being perceived as the President's adversary has become risky in recent years." *In re Grand Jury Subpoenas*, --- F. Supp. 3d ---, 2026 WL 710202 at *3 (D.D.C. Mar. 13, 2026). Perhaps no institution knows this better than the press. The President and some of his political allies have long displayed a distaste for the media. Even before his second term, the President has attacked outlets he viewed as insufficiently deferential, including saying they should "pay a big price." *See* Oliver Darcy, *Trump*

*and His Allies Are Threatening Retribution against the Press. Their Menacing Words Should Not Be Ignored*, CNN (2023).[8] Since taking office again, that payment has come in many forms. The Federal Communications Commission, no longer functioning as an agency independent of the White House, has launched spurious investigations against those who report critically on the administration's actions. *See, e.g.*, Juan Carlos Lara, *FCC Investigates SF Radio Station for ICE Reporting, Sparking Press Freedom Fears*, KQED (Feb. 6, 2025).[9] "[P]articipation in the Press Pool or the broader White House press corps has never been conditioned on the viewpoint expressed outside the Pool by any participating news organization—until now." *Assoc. Press v. Budowich*, No. 25-5109, 2025 WL 1649265 at *13 (D.C. Cir. June 6, 2025) (Pillard, J., dissenting). The Department of Justice has ignored the restraints on press investigations imposed by Congress. *See In re Search of the Real Property Premises of Hannah Natanson*, 2026 WL 510727 at *5 (noting the court's "significant concern" about failing to engage with the Privacy Protection Act of 1980, which limits searches of the press).

International conflict has been a focal point of this retaliation. The President threatened the press last year, when they suggested that the attack on Iran in June 2025 may not have been fully successful. Ryan Minnaugh, *Trump Blasts CNN and MSNBC, Calls Them "Gutless Cowards" Over Iran Strike Coverage*, ABC 4 NEWS (June 24,

---

[8] https://www.cnn.com/2023/12/07/media/trump-threatens-retribution-against-press/index.html [https://perma.cc/3X25-BE8A]
[9] https://www.kqed.org/news/12025977/fcc-investigates-sf-radio-station-for-ice-reporting-sparking-press-freedom-fears

2025).[10] He threatened them last month, when they questioned why a war with Iran was necessary if the prior year's attack was as successful as he claimed. *See* Jon Brodkin, *Trump and His FCC Chair Demand More Positive News Coverage of Iran War*, ARS TECHNICA (Mar. 16, 2026).[11]

"[P]aramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people and sending them off to distant lands to die of foreign fevers and foreign shot and shell." *Pentagon Papers*, 403 U.S. at 717 (Black, J., concurring). But rather than recognizing this duty, today we see an administration "whose leadership has been and continues to be openly hostile to the mainstream media whose reporting it views as unfavorable." *Pentagon Press Credentials*, 2026 WL 788689 at *13 (internal citations omitted). Their reasons for retaliation have ranged from troubling to petty. *See* Erik Wemple, *A Call for Reporting Tips Rankles Pentagon Officials*, NEW YORK TIMES (Mar. 12, 2026);[12] Scott Nover, *Pentagon Bars Reporters Over "Unflattering" Hegseth Photos*, WASHINGTON POST (Mar. 11, 2026).[13]

"The President may, of course, engage in his own expressive conduct, including criticizing the views, reporting, or programming of [any] news outlet with whom he

---

[10]   https://abcnews4.com/news/nation-world/trump-blasts-cnn-and-msnbc-calls-them-gutless-losers-over-iran-strike-coverage [https://perma.cc/QRS8-L84P]
[11] https://arstechnica.com/tech-policy/2026/03/trump-and-his-fcc-chair-demand-more-positive-news-coverage-of-iran-war/
[12] https://www.nytimes.com/2026/03/12/business/media/a-call-for-reporting-tips-rankles-pentagon-officials.html
[13] https://www.washingtonpost.com/business/2026/03/11/hegseth-press-briefings-photos-iran/

disagrees." *Nat'l Pub. Radio*, 2026 WL 877434 at *1. He can also use the court system under the procedures set forth for all private litigants if he has a cause of action. *See, e.g., Trump v. N.Y. Times Co.*, 800 F. Supp. 3d 1297 (M.D. Fla. 2025); *Trump v. Trump*, No. 453299/2021, 2024 WL 133846 (N.Y. Sup. Ct. Jan. 12, 2024). No matter how many times the government tries to say it, challenges to the Executive Orders are not about whether the President has the right to speak, and "[t]he government's attempt to reframe this case as about governmental speech is subterfuge." *Perkins Coie*, 783 F. Supp. 3d at 140. The issue is, "[w]hen the President attempts to limit who can present 'the analysis of certain legal issues and truncates presentation of certain issues to the courts,' he restricts 'speech and expression upon which courts must depend for the proper exercise of the judicial power.'" *Susman Godfrey*, 789 F. Supp. 3d at 55 (quoting *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 546 (2001)) (cleaned up). It is all but certain that, should these Executive Orders be allowed to stand, a similar version of them will soon be issued against law firms or legal organizations for their representation of the press. Even if that does not happen, firms that have represented outlets that Trump dislikes will take the hint and consider the consequences of doing so going forward.

   **b. The Executive Orders Would Chill Lawyers from Working With the Press.**

The records in these cases well establish the deterrence effect Executive Orders like these have on law firms to represent "unpopular, controversial, or disfavored"

clients. *WilmerHale*, 784 F. Supp. 3d at 151; *see* Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, PROPUBLICA (Aug. 6, 2025) (gathering extensive examples of major firms backing off of work in support of causes adverse to the current administration).[14] This fear is "further confirmed by the reaction of additional peer law firms that chose to negotiate deals with the Trump White House to avoid being targeted by similar Executive Orders." *Perkins Coie*, 783 F. Supp. 3d at 155. "Over the course," of this litigation, "several firms of (presumably) ordinary firmness have folded rather than face similar executive orders. Indeed, it appears to take extraordinary firmness to resist." *Jenner & Block*, 784 F. Supp. 3d at 95.

The press has another disadvantage: Independent media organizations and individual freelance journalists are rarely deep-pocketed clients. The past two decades have required journalism organizations to do more with significantly less. Advertising revenue is at a fraction of what it was, and the number of full-time journalists has fallen by tens of thousands. *See* Luke Morgan, *The Broken Branch: Capitalism, the Constitution, and the Press*, 125 PENN. STATE L. REV. 1, 7–20 (2020). Local, small, and non-profit media organizations are especially resource constrained— sometimes not even able to afford to pay their contributors, let alone counsel. *See* Penelope Muse Abernathy & Sarah Stonebely, *The State of Local News,* NW. MEDILL

---

[14] https://www.propublica.org/article/trump-law-firms-accountability-environment-police-lgbtq [https://perma.cc/9BTX-429Y]

LOCAL NEWS INITIATIVE (Nov. 16, 2023).[15]

Given these economic conditions, independent press relies upon the time and effort of lawyers working at free and reduced rates. *See, e.g.*, D. Victoria Baranetsky, Simon Frankel & Thomas R. Burke, *International Charity Planet Aid Pays $1.925 Million to Settle Six-Year Libel Lawsuit*, REVEAL (Oct. 20, 2022) (the Center for Investigative Reporting relied on a joint team from Covington & Burling and Davis Wright Tremaine to defend it pro bono);[16] *National Press Club Awards Mississippi Today with its Highest Press Freedom Award*, MISSISSIPPI TODAY (Sep. 25, 2024) (*Mississippi Today* relied on pro bono work by Gibson Dunn to defend itself from defamation litigation resulting from a Pulitzer Prize-winning investigation).[17]

As detailed in Section I above, representing the media very often is directly adverse to the government, and even when it is not, it is often disliked by those who would prefer not to be subject to the media's scrutiny. Generalist law firms will simply be less likely to take on pro bono or low bono work if it comes along with an existential threat to their broader practice. *See Jenner & Block*, 784 F. Supp. 3d at 115 ("The order's chilling effect is uniquely harmful for its focus on pro bono work.").

And this is an especially poor time to see the press undefended. The standards

---

[15] https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2023/ [https://perma.cc/P8MH-635A]
[16] http://revealnews.org/press/international-charity-planet-aid-pays-1-925-million-to-settle-six-year-libel-lawsuit/ [https://perma.cc/5AHH-5EPK ]
[17] https://mississippitoday.org/2024/09/25/national-press-club-award-freedom-mississippi-today/

articulated in *New York Times v. Sullivan*, 376 U.S. 254 (1964), and progeny find themselves under renewed and relentless attack. "[T]he fates of the current crop of lawsuits designed to kneecap the *Sullivan* precedent ... might not be known for years" but will likely include "a damper on investigative journalism," "[g]reater legal risks and higher insurance costs," and "[n]ew dangers for anyone who speaks up about wrongdoing by authority figures or big businesses." DAVID ENRICH, MURDER THE TRUTH: FEAR, THE FIRST AMENDMENT, AND A SECRET CAMPAIGN TO PROTECT THE POWERFUL 266–67 (2025). Even before the current administration, the federal government has substantially increased the prosecution of those who reveal information to the media. Heidi Kitrosser, *Media Leak Prosecutions and the Biden-Harris Administration: What Lies Ahead?,* 2021 U. ILL. L. REV. ONLINE 121, 123–24 (2021). There is evidence that judicial sanctions on reporters for refusing to reveal confidential sources are increasing. Christina Koningisor, *The De Facto Reporter's Privilege,* 127 YALE L.J. 1176, 1250 (2018). The median jury damage award against the press grew fivefold between the 1980s and mid 2010s. *MLRC 2025 Report on Trials and Damages*, MEDIA L. RESOURCE CTR. BULLETIN at 8–9 (Mar. 2025).[18]

These trends alone pose a risk to the press's core functions without pro bono counsel. But combine them with the attacks described in Section II(A), and the situation is catastrophic. All of these members of the media require counsel to defend

---

[18] Available at https://medialaw.org/wp-content/uploads/2025/03/2025-Bulletin-Issue-1-Trials-Damages.pdf.

themselves, counsel that could find themselves on the pointy end of an Executive Order. Some outlets may be able to pay for representation, but many cannot—and firms may be unwilling to represent even paying clients if it risks more lucrative representations. As the Supreme Court explained in *National Rifle Association of America v. Vullo*, "[t]he analogy…is to killing a person by cutting off his oxygen supply rather than by shooting him." 602 U.S. 175, 197 (2024) (quoting *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015)). "Tolerating retaliation against journalists, or efforts to criminalize routine reporting practices, threatens to silence 'one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free.'" *Villarreal v. Alaniz*, 607 U.S. ---, 2026 WL 795532 at *7 (Mar. 23, 2026) (Sotomayor, J., dissenting from denial of cert.) (quoting *Mills v. Alabama*, 384 U.S. 214, 219 (1966)).

### c. Lawyers That Still Work With the Press Would be Unable to Do Their Jobs.

The chilling effect on counsel is only one component of the risk to the press. Another is the actual constraints of these Executive Orders. The practice of media law requires access to government lawyers and facilities for "in-person attendance in federal buildings and face-to-face engagement with federal employees for depositions, in-court hearings, advocacy presentations, and more." *WilmerHale*, 784 F. Supp. 3d at 156 n.20. This "courtroom advocacy on behalf of [a firm's] chosen causes" is "the very core of the First Amendment's protection of 'litigation as a vehicle

for effective political expression and association.'" *Jenner & Block*, 784 F. Supp. 2d at 94 (quoting *In re Primus*, 436 U.S. 412, 431 (1978)). "Cancelled meetings and restricting plaintiff's access to government officials . . . threatens to undermine [these firms'] clients' vital right to effective assistance of counsel." *Perkins Coie*, 783 F. Supp. 3d at 169.

Even lawyers who are dedicated to representing the press in spite of potential threats would not be able to do so effectively if the actions of the administration are deemed constitutional. Under the government's theory of presidential power, there is no check on the limits of the executive to functionally disqualify attorneys. App't Br. at 58–59 (arguing that there is no infringement of "any" First Amendment right to petition or "any" Fifth or Sixth Amendment right to counsel by prohibiting lawyers from accessing to federal buildings). The government seems untroubled with the finding that these Orders would keep attorneys at targeted firms "out of federal buildings, away from federal employees, and forever off the federal payroll." *Jenner & Block*, 784 F. Supp. 3d at 111.

Media organizations cannot protect against these risks by moving lawyers in-house, as the same logic could apply to sanctioning in-house attorneys as to law firms.[19] Nor is there any limit offered by the government that would prevent the

---

[19] Further, in-house counsel cannot generally serve as a substitute for external lawyers, as they will not be admitted in every jurisdiction where a news organization may be haled into court.

President from taking action against every lawyer and law firm that represents a particular client that the president dislikes, over and over again. *See* App't Br. at 54–55.

To be an effective adjudicator for the rights of the press and the public, "[a]n informed, independent judiciary presumes an informed, independent bar" and any attempt by the Executive Branch to interfere with this "is inconsistent with the proposition that attorneys should present all reasonable and well-grounded arguments necessary for proper resolution of the case." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). "Thus, to the extent that the Order sanctions attorneys—particularly in ways that prevent them from appearing in court—it tramples on the province of the judiciary and violates the separation of powers." *Susman Godfrey*, 789 F. Supp. 3d at 55.

**III.   Without a Free Press, the Public will Lose a Key Vindicator of First Amendment Rights.**

This threat does not solely affect *amici*, as threats to a free press do not only affect the press. "Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free." *Mills v. Alabama*, 384 U.S. 214 (1966). The press holds a key place in our constitutional order, and "[a] broadly defined freedom of the press assures the maintenance of our political system

and an open society." *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967). "Public officials often and inevitably disagree with publicly expressed views of the journalists or news organizations that cover them." *Budowich*, 2025 WL 1649265 at *15 (D.C. Cir. June 6, 2025) (Pillard, J., dissenting). That is not a flaw; it is a signal that the press's checking function still works.

As the press is often the vehicle through which public rights are exercised, the First Amendment's balances depend upon a viable press ecosystem. "[E]specially in light of the . . . ongoing war with Iran, it is more important than ever that the public have access to information from a variety of perspectives about what its government is doing—so that the public can support government policies, if it wants to support them; protest, if it wants to protest; and decide based on full, complete, and open information who they are going to vote for in the next election." *Pentagon Press Credentials*, 2026 WL 788689 at *18. Conversely, to reinstate these Executive Orders would chill press freedom, limit government accountability, and deny the public this critical source of information. This should not stand.

After all, in the First Amendment "lies the security of the Republic, the very foundation of constitutional government." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). "[F]ew stars are as fixed as the principle that no official 'can prescribe what shall be orthodox in politics.' And in our constitutional order, few actors are as central to fixing that star as lawyers," especially those who work to defend the rights of the press and other speakers. *Jenner & Block*, 784 F. Supp. 3d at 86 (quoting *W. Va. State*

*Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

**CONCLUSION**

For the foregoing reasons, *amici* urge this Court to affirm the grants of summary judgment in the four cases below.

Dated: April 2, 2026

Respectfully submitted,

<u>/s/Kendra K. Albert</u>

Kendra K. Albert
Andrew F. Sellars
ALBERT SELLARS LLP
769 Centre St, Suite 199
Boston, MA 02130
(203) 424-0382
kendra@albertsellars.law

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure and the Circuit Rules. The document contains 6,372 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface and type style requirements of the Federal Rules. The document has been prepared in a proportionally spaced typeface using Microsoft Word, in the font Crimson Pro.

Dated: April 2, 2026

/s/Kendra K. Albert

Kendra K. Albert
ALBERT SELLARS LLP
769 Centre St, Suite 199
Boston, MA 02130
(203) 424-0382
kendra@albertsellars.law

Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2026, I caused the foregoing Brief of *Amici Curiae* to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all counsel of record.

Dated: April 2, 2026

/s/ Kendra K. Albert

Kendra K. Albert
ALBERT SELLARS LLP
769 Centre St, Suite 199
Boston, MA 02130
(203) 424-0382
kendra@albertsellars.law

Counsel for *Amici Curiae*