**ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026**

**Nos. 25-5241, 25-5265, 25-5277, 25-5310**

# United States Court of Appeals
## for the
## District of Columbia Circuit

PERKINS COIE LLP,
*Plaintiff-Appellee*,

v.

U.S. DEPARTMENT OF JUSTICE, *et al.*,
*Defendants-Appellants*

On Appeal from the United States District Court for the District of Columbia

Nos. 1:25-cv-00716 (BAH), 1:25-cv-00916 (JDB),
1:25-cv-00917 (RJL), 1:25-cv-01107 (LLA)

## Brief of Amicus Curiae General Counsels United
## in Support of Plaintiffs-Appellees and Affirmance

Julia Solomon-Strauss
ZIMMER, CITRON & CLARKE LLP
14 Ridge Square NW, Suite 328
Washington, DC 20016
Tel.: (202) 796-4540
jsolomonstrauss@zimmercitronclarke.com

David J. Zimmer
  *Counsel of Record*
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
Tel.: (617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Amicus Curiae General Counsels United*

April 3, 2026

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Cir. Rule 28(a)(1)(A), General Counsels United certifies:

**A. Parties and Amici**

Except for the following parties, the parties, intervenors, and amici appearing before the district court and in this Court appear in the government's opening brief and in the brief for appellee Jenner & Block LLP: America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Judicial Action Group, and Conservative Legal Defense and Education Fund, amici supporting appellants; and Washington Legal Foundation, Lawyers Defending American Democracy, Law Firms, Leadership Now Project, Law Professors, Prof. Aaron Caplan, United States Senators, Legal Ethics Scholars, Union Internationale des Avocats, Institute for the Rule of Law (UIA-IROL), European Bar Associations, American Bar Association, Institute for Justice, Lawyers' Committee for Civil Rights Under Law, Public Counsel, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Public Interest Law Center, Chicago Lawyers' Committee for Civil Rights Under Law, Mississippi Center for Justice, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, International Bar Association Human Rights Institute, Commonwealth Lawyers Association, Former and Current General Counsel, Lawyers for Lawyers, Former Judges, Former Presidents of the Energy Bar Association, American Non-Governmental Organizations, 1224 Law Students

and 50 Law Student Organizations, Forty-Two Media Organizations and Press Freedom Advocates, Members of Congress, Western Center on Law and Poverty, et al., National Security Counselors, Inc., Compass Rose Legal Group, PLLC, Law Office of Daniel L. Ellis, Pioneer New England Legal Foundation and Pacific Legal Foundation, and Washington State Bar Association, Oregon State Bar, and the State Bar of California, amici supporting appellees.[1]

**B. Rulings Under Review**

References to the rulings under review appear in the government's brief.

**C. Related Cases**

The related case to these consolidated appeals is listed in the government's brief. Counsel is not aware of any other related case.

Date: April 3, 2026          */s/ David J. Zimmer*
                                      David J. Zimmer

---

[1] This list includes all amici that had appeared when this brief was finalized.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 29(b), amicus curiae General Counsels United certifies that it is a collective of more than 800 general counsels.  It has no parent company and does not issue stock.

Date: April 3, 2026 *                    /s/ David J. Zimmer*
                                David J. Zimmer

**CERTIFICATE REGARDING SEPARATE BRIEFING**

Pursuant to D.C. Circuit Rule 29(d), counsel for amicus certifies that a separate brief is necessary.  General Counsels United's members are the general counsels of companies throughout the United States.  General Counsels United's brief addresses the concrete impact of the Executive Orders on their companies and their selection of outside counsel.  General Counsels United is uniquely suited to address these subjects because of the direct impact the Executive Orders have had on its members and their companies.

Date: April 3, 2026 *                    /s/ David J. Zimmer*
                                David J. Zimmer

# TABLE OF CONTENTS

STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE ........................................................................1

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ...............................................................................3

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................3

ARGUMENT .......................................................................................................7

    I.     If Allowed to Take Effect, the Executive Orders Would Make It Infeasible for Many Companies to Retain the Targeted Firms .......................................8

    II.    By Dividing Firms Between Those That Have Been or Might Be Targeted, and Those with Agreements with the Federal Government, the Executive Orders Create Complex Ethical and Strategic Concerns. ...........................15

    III.   The Executive Orders Have Deterred Both Law Firms and Companies from Challenging Government Action Out of Fear of Federal Retaliation..........20

CONCLUSION ..................................................................................................26

CERTIFICATE OF COMPLIANCE .................................................................27

CERTIFICATE OF SERVICE ..........................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ............................................................................. 10, 11

*Department of the Navy v. Egan*,
  484 U.S. 518 (1988) ................................................................................22

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001) ...................................................... 7, 20, 21, 25

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ..............................................................25


**Statutes**

42 U.S.C. § 2000e-5.................................................................................22


**Other Authorities**

D.C. Legal Ethics Op. 391 (2025) .........................................................18

Model Rules of Pro. Conduct (A.B.A. 2025) ............................... 2, 18, 19

Matthew Goldstein & Jessica Silver-Greenberg, *Some Giant Law Firms Shy Away from Pro Bono Immigration Cases*, N.Y. TIMES (May 6, 2025).........................23

**STATEMENT OF IDENTITY, INTEREST IN CASE,
AND SOURCE OF AUTHORITY TO FILE**

General Counsels United is a nationwide, non-partisan collective of more than 800 general counsels. Its members lead the legal departments of every type and stage of enterprise: public companies (including Fortune 100 companies), private companies (including venture-backed startups and private equity portfolio companies), and non-profit organizations. Their companies span virtually every industry—finance, healthcare, energy, manufacturing, logistics, real estate, retail, technology, education, media, and beyond.

Each day, General Counsels United's members help their organizations navigate a complex legal and regulatory landscape with evolving standards. They oversee litigation in federal and state court and must ensure compliance with statutes, agency rules, administrative requirements, and contractual obligations—all while protecting the interests of investors, customers, employees, and other stakeholders without regard to politics. The companies they serve create the products, deliver the services, and drive the innovation that defines the American economy.

The members of General Counsels United have a direct and substantial interest in the questions presented by this litigation. The Executive Orders penalize both the targeted law firms and the companies who work with those law firms. As the general counsels of companies who routinely hire outside counsel,

1

General Counsels United's members regularly confront the consequences of the Executive Orders. As the senior-most decisionmakers on outside counsel retention, they are the individuals who must translate the Executive Orders' coercive effects into concrete legal-services decisions, every day. As licensed attorneys, they bear non-waivable professional duties of competence and independent judgment under Model Rules 1.1 and 2.1 that govern how they select outside counsel—duties that are impaired, not merely inconvenienced, when political considerations are injected into that selection. *See* Model Rules of Pro. Conduct r. 1.1, 2.1 (A.B.A. 2025). And as corporate officers, they owe fiduciary duties of care and loyalty to their companies and shareholders that independently require competence-based outside-counsel decisions uncorrupted by government pressure. That combination of roles makes General Counsels United's perspective valuable for the Court in analyzing the constitutionality of the Executive Orders.

General Counsels United submits this amicus brief to ensure that the Court has the perspective of general counsels who have experienced firsthand the Executive Orders' impacts on their ability to hire or retain the targeted law firms, the willingness of other companies and law firms to challenge or defend against federal action, and the rule of law more generally. Current general counsels face a significant constraint that makes public commentary difficult: speaking publicly about the Orders' impact on their companies risks inviting the very federal

retaliation they are describing.  That is why the anonymous survey and town hall described below represent important perspectives concerning how the Orders are reshaping legal-services decisions.

All parties have consented to the filing of this amicus brief.

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person other than the amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

General Counsels United submits this brief to provide the Court with the unique perspective of its membership of more than 800 current and former general counsels, who have experienced firsthand the impact of the challenged Executive Orders.  As explained below, General Counsels United's anonymous survey and town hall show the concrete, present harm the Executive Orders are inflicting on outside-counsel selection, including ethical conflicts that even the most diligent general counsel cannot cure on their own.

The Executive Orders at issue in these appeals require federal agencies to take adverse action against specific law firms based on the legal positions those

firms have taken on behalf of their clients. The Orders have already distorted the lens through which general counsels must make outside-counsel decisions, even before any agency has implemented any part of those Orders. If allowed to take effect, the Orders would require federal government contractors to report every matter in which they have engaged a targeted law firm; require federal agencies to review all federal government contracts with companies that hired the targeted firms; limit all federal employees from "engaging" with employees of the targeted firms; bar every employee of the targeted firms from accessing "Federal Government buildings" (including, presumably, the federal courts) whenever an agency deems such access "inconsistent with the interests of the United States"; and suspend all security clearances for attorneys who work at those law firms. The Orders justify these extraordinary measures based almost entirely on the fact that the targeted firms have taken legal positions, on behalf of clients, that are disfavored by the current Administration.

Amicus General Counsels United submits this brief to highlight the specific harms the Executive Orders inflict on the relationship between companies and their counsel. As general counsels, amicus's members serve as the senior-most decisionmakers on outside-counsel selection, as licensed attorneys with independent professional and fiduciary obligations, and as corporate officers with

fiduciary duties to their companies and shareholders. The Orders undermine general counsels' ability to serve in these roles in three particular ways.

First, the Orders, if allowed to take effect, would make it nearly impossible for many general counsels to retain, or even maintain current engagements with, the targeted firms. Companies with government contracts, interactions with federal agencies, or appearances in federal court must consider the chance that any engagement with a targeted firm could mean their contracts could be terminated, their lawyers could be barred from speaking with government officials, or their litigation teams could be kept out of court. Those consequences are severe. If the injunctions were lifted, general counsels would in many instances need to change outside counsel even where doing so would be massively disruptive for a company—*e.g.*, in changing trial counsel at the last minute. The government characterizes these concerns as speculative—and the law firms' claims as unripe— because the government has not yet enforced these provisions. But amicus's members' experiences demonstrate that even the *risk* of being effectively cut off from federal contracts, federal employees, and federal courts has produced behavioral change that would be significantly exacerbated if the Orders were allowed to take effect.

Second, by dividing law firms into three groups—(1) those that have been targeted with an Executive Order, (2) those that have settled with the current

Administration to lift or avoid an Executive Order, and (3) those that could, in the future, be targeted and/or settle—the Executive Orders create an ethical and strategic minefield for general counsels. While hiring a firm that settled avoids the problems discussed above, it creates a host of potential conflict issues in any matter that involves the federal government. And in hiring a firm that has neither been targeted nor settled, general counsels must try to predict whether the firm will later be targeted and/or settle—a form of political due diligence that is nearly impossible to carry out and should have no role in the selection of outside counsel.

Third, by targeting law firms that have represented clients with positions adverse to the Administration, the Orders have a significant chilling effect on the willingness of law firms and companies to associate themselves with such positions. The expressive conduct that the Orders deter encompasses far more than offensive litigation against the government: companies are forgoing participation in rulemaking processes and engaging in anticipatory compliance with the Administration's policy objectives—adjusting conduct in advance of any government action, or acceding to government demands without contesting or defending against them, to reduce the risk of being targeted. Amicus's members also report that some firms have refused to represent their companies in litigation adverse to the federal government. And amicus's members have themselves shared concerns about recommending that their companies bring legal challenges,

resist federal government demands, or otherwise take public positions contrary to Administration policy or preference.

Amicus's experience with the Orders vindicates a principle that the Supreme Court has long recognized:  Because a lawyer's advocacy on behalf of a client is "constitutionally protected expression" under the First Amendment, the government cannot interfere with that advocacy to "insulate its own laws from legitimate judicial challenge." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001).  Yet that is exactly what the Orders seek to accomplish.  By sending the message that the federal government will target lawyers who take positions adverse to this Administration, the Orders suppress constitutionally protected speech, deprive companies of access to counsel of choice, and undermine the rule of law. General Counsels United urges this Court to affirm the decisions below.

## ARGUMENT

To help the Court understand the real-world impact of the Executive Orders, General Counsels United created and distributed an anonymous survey to its membership of more than 800 general counsels and hosted a town hall for members to discuss the impact of the Executive Orders.[2]  The survey and town hall

---

[2] The anonymous survey was distributed electronically to all members of General Counsels United's membership of current and former general counsels. Responses were anonymous and encrypted given General Counsels United's members' concern that public statements on this subject could invite government retaliation.  More than one hundred general counsels responded.  The town hall

discussion made several things clear.  First, the Executive Orders, if allowed to take effect, would make it infeasible for many companies to retain the targeted firms—a present harm that undermines the government's claim that the targeted firms' challenges are not ripe.  Second, by forcing law firms to either settle with the federal government or be threatened with an Executive Order, the Orders have put general counsels and their companies in a challenging bind as they consider who to retain as outside counsel, especially for matters involving the federal government.  Third, by targeting law firms because they represented clients that took positions adverse to the Administration's policy priorities, the Orders have deterred both law firms and companies from engaging with the legal system in ways that may displease the Administration out of fear of federal retaliation.

I.      **If Allowed to Take Effect, the Executive Orders Would Make It Infeasible for Many Companies to Retain the Targeted Firms.**

The most straightforward lesson from the survey and town hall is that, for many general counsels, it would not be viable to retain one of the targeted firms if the Executive Orders were allowed to take effect.  That conclusion is unsurprising given the Orders' substance; indeed, it is their intended effect.  Section 3 of the Executive Orders requires government contractors to disclose any business

---

was conducted to give general counsels an opportunity to discuss their experiences as a group.  Neither the survey nor the town hall was designed to elicit opinions about the Orders' legality.

relationship with a targeted firm, even on matters entirely unrelated to their government contracts. That section then further requires that federal agencies identify and review "all contracts" both with the targeted firms and with any company that has hired the targeted firms. JA 487-88 (Perkins Coie); JA 2012-13 (Jenner & Block); JA 2333-34 (WilmerHale); JA 3146-47 (Susman Godfrey). The "Fact Sheet" the White House released makes clear the government's plans for that review: "To ensure taxpayer dollars no longer go to contractors whose earnings subsidize partisan lawsuits against the United States, *the Federal Government will prohibit funding contractors that use Perkins Coie LLP*." JA 491 (emphasis added). Section 5 of the Executive Orders directs agency heads to issue guidance barring firm employees from accessing federal buildings when such access would "be inconsistent with the interests of the United States" and restricts government employees from engaging with firm employees in their official capacity "to ensure consistency with the national security and other interests of the United States." JA 488 (Perkins Coie); JA 2013 (Jenner & Block); JA 2334 (WilmerHale); JA 3147 (Susman Godfrey). And Section 2 requires the blanket suspension of all security clearances of attorneys that work at a targeted firm. JA 487 (Perkins Coie); JA 2012 (Jenner & Block); JA 2333 (WilmerHale); JA 3146 (Susman Godfrey).

The government's primary defense of Sections 3 and 5 is that plaintiffs' claims are not yet ripe. The prudential ripeness doctrine allows courts to avoid

9

"entangling themselves in abstract disagreements over administrative policies" before the "effects" of an administrative decision are "felt in a concrete way." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). To determine whether a case is ripe for adjudication, the Court considers "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149. The government focuses primarily on the "fitness" prong of *Abbott Laboratories*. Its discussion of hardship is largely limited to the ipse dixit claim that, because the government has not yet had the chance to implement Sections 3 and 5, it is "unclear" how the Executive Orders "will concretely impact Plaintiffs." Gov't Br. 50.

That is wrong. Results from the survey and the town hall show that the targeted firms are already experiencing hardship without any further action by the agencies because, absent the district courts' injunctions, the risk of being cut off from federal contracts, employees, and courts would immediately reshape how general counsels retain outside counsel. General counsels explained that, absent an injunction, they would have to consider redirecting work away from targeted firms and declining to retain firms they would otherwise have chosen. While many general counsels would prefer to retain firms that were targeted with an Executive Order, that would not be feasible for their companies given the risks those Orders

10

impose.  The Supreme Court recognized in *Abbott Laboratories* that, "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts …  must be permitted."  387 U.S. at 153.  Amicus's members can attest that the Executive Orders did require an immediate and significant change in their decisions regarding outside counsel, directly affecting the targeted firms and defeating the government's ripeness defense.

The Executive Orders' restrictions on government contracts, building access, and access to federal personnel had a significant impact on amicus's members. Starting with government contracts, the requirement that federal contractors disclose any retention of a targeted firm, even on matters entirely unrelated to the government contract and even where the very fact of the retention is confidential and privileged, creates an immediate harm of compelled disclosure and infringes on their associational rights.  And the subsequent review of all government contracts for companies that report retaining a targeted firm is even more threatening.  To take just one example, a general counsel for a company with significant federal contracts explained that even the risk of having the company's federal contracts terminated overwhelmed any preference that the attorney or their company might have to work with a targeted firm or its lawyers.

11

Another general counsel serves a company where the National Institutes of Health is a significant customer. Retaining a targeted firm would put that federal contract relationship at risk—not as a speculative future possibility, but as an immediate operational consequence of the outside-counsel selection decision the general counsel must make today. The calculation, as that general counsel explained, is straightforward and inescapable: Unless the Executive Orders are permanently enjoined, no general counsel at a company with a material federal contract relationship can retain a targeted firm without incurring an unreasonable risk contrary to the fiduciary duty to the company or its shareholders. If the Executive Orders were to take effect, the targeted firms would be effectively off limits—as the Administration presumably intended.

The threat that attorneys might be barred from federal buildings is equally chilling. A general counsel who oversees significant federal litigation explained that, if the Executive Orders were upheld, their company would have no choice but to replace litigation counsel from any of the targeted firms—even in cases that were close to trial. That general counsel explained that, if there was even a small risk that the firm's lawyers would be barred from entering the federal courthouse, the general counsel could not justify continuing to work with that firm.

The general counsel provided a concrete illustration of that disruption. Their company is party to a multi-patent infringement case. In this general counsel's

experience, cases like this one routinely require several years of trial preparation and generate litigation costs of well over $10 million even before trial begins.  As the general counsel explained, those costs are an "investment" in the litigation team's knowledge of the patent and its legal context, positions developed in briefing, relationships with retained technical experts, and trial strategy.  But that investment in a team from any targeted or potentially targeted firm would be lost if the Executive Orders are upheld and the attorneys are barred from the courthouse.  New counsel would need to quickly build the technical and strategic expertise from scratch; retained experts would need to be re-engaged (or, if there are conflicts, replaced entirely).  Every scheduling order would need to be renegotiated, from fact discovery deadlines, expert disclosure dates, and summary judgment briefing to the trial date.  Those disruptions could inconvenience the court as well as the parties.  These harms are traceable directly to Section 5 of the Executive Orders.

These harms can arise even more acutely for general counsels who work with outside counsel on regulatory processes.  General counsels whose companies are navigating multi-year federal approval processes depend on outside regulatory counsel in ways that differ fundamentally from other legal representation.  Using the example of a company seeking FDA approval for a new drug or biologic, a general counsel explained that the regulatory submission process can span five to ten years, involve thousands of pages of scientific and clinical data, and require

sustained engagement with specific FDA divisions.  Through that engagement, the company's outside counsel develops an understanding of that division's priorities, expectations, and informal practices with respect to that drug that cannot be reduced to a memorandum and handed off to a new firm.

Moreover, if the Executive Orders take effect, lawyers from a targeted firm would be barred from the very agency meetings that are the core of their value to the client.  A new firm would need years to rebuild that product specific expertise; familiarity with a given agency, while helpful, cannot substitute for counsel's accumulated understanding of the specific drug's regulatory history, the scientific arguments that have been made, and the FDA's particular concerns about that application.  For a company with a pending drug or biologic approval, delay means deferring patients' access to the drug, allowing generics or biosimilars to gain ground, and letting the commercial advantages of a new therapy dwindle.  So, as with general counsels who oversee federal litigation, general counsels who supervise regulatory approval processes would find it simply too risky to hire a targeted firm.

Paul, Weiss's decision to settle with the federal government to lift its Executive Order further reinforced the risks for general counsels in hiring the targeted firms.  By agreeing to lift the Paul, Weiss Executive Order in exchange for $40 million in pro bono commitments and ideological concessions unrelated to the

14

national security interests the Executive Orders purported to invoke, the Administration made clear to the American legal and business communities that the Executive Orders were, in reality, instruments of ideological leverage rather than genuine national security measures. To companies, that sent a clear message: Hiring one of the targeted firms risks a type of retaliation from the federal government like the retaliation in the Executive Orders. That confirmation made it even harder to hire one of the targeted firms, and made the harm to those firms even more immediate and concrete.

For all of these reasons, amicus and its members believe that if this Court were to uphold the Executive Orders and allow them to take effect, the harm to the targeted firms would be immediate and concrete—and more than sufficient to satisfy *Abbott Laboratories*.

## II. By Dividing Firms Between Those That Have Been or Might Be Targeted, and Those with Agreements with the Federal Government, the Executive Orders Create Complex Ethical and Strategic Concerns.

As the government repeatedly touts in its brief, *e.g.*, Gov't Br. 14, several law firms responded to the Executive Orders by entering arrangements with the Administration in which they agree to provide pro bono services to causes the Administration supports, among other concessions. In the case of Paul, Weiss, the government agreed to lift an existing Executive Order after the law firm made

substantial promises and concessions.  Other firms signed similar agreements to avoid an Executive Order.

The result of the Executive Orders, if allowed to take effect, would be to divide firms into three groups: (1) firms that have been targeted with an Executive Order; (2) firms that have entered an agreement with the Administration to lift or avoid an Executive Order; and (3) firms that have neither been targeted nor settled, but might be targeted or settle in the future.  Choosing a firm in any of these three groups raises significant concerns for general counsels in balancing their fiduciary obligations to their companies and ethical obligations to the bar.  In the survey of General Counsels United's members, ninety-four percent of respondents reported that they consider a firm's support for the rule of law when hiring outside counsel, even if that would not otherwise be a business need.  And among those with government-related matters, sixty-two percent reported factoring in whether a prospective firm might be targeted by the Executive Branch.  The Executive Orders thus force general counsels to undertake a form of political due diligence in selecting outside counsel that is both impossible to execute and fundamentally inconsistent with both the right to counsel of choice and the competence-based professional judgment that outside-counsel selection requires.

For the reasons discussed above, hiring one of the targeted law firms would not be viable for most general counsels if the Executive Orders were to take effect.

16

Even where a general counsel believes that one of those firms would otherwise be the best option, the risk of losing government contracts and having counsel barred from speaking with federal employees or appearing in a federal courthouse would make it difficult to justify hiring a targeted firm while acting consistently with the general counsel's fiduciary duty to their company.

Working with a firm that settled with the Administration avoids those problems but raises a host of other ethical and fiduciary issues. The fiduciary duty of loyalty demands that a general counsel retain outside counsel capable of providing undivided, conflict-free representation. General counsels expressed concern that, in any matter involving the federal government—whether litigating against the government, negotiating with the government for contracts or services, or participating in a regulatory proceeding—it is unclear whether a firm that entered into an agreement with the government could serve as a zealous advocate for the company. They also expressed concern about facing shareholder actions for alleged violations of fiduciary duties. And they observed that working with firms that settled could potentially conflict with their companies' anti-bribery and corruption policies. As a result, many general counsels expressed a disinclination to hire a firm that had settled with the Administration, especially in connection with matters involving the federal government.

Amicus's members' concerns are not merely hypothetical. The Model Rules require a general counsel hiring outside counsel to "reasonably believe that the other lawyers' services will contribute to the competent and ethical representation of the client." Model Rules of Pro. Conduct r. 1.1 cmt. 6 (A.B.A. 2025). But the District of Columbia Bar has issued an ethics opinion advising that law firms that entered into settlements with the government "must examine whether the arrangement would prevent the firm from providing conflict-free representation to clients—existing and new—who are adverse to the relevant government." D.C. Legal Ethics Op. 391 (2025).[3] The potential for ethical conflicts is heightened where companies are seeking representation in a policy area that the Executive Orders have targeted. As the District of Columbia Bar Ethics Committee emphasized, there is a "major" ethical concern about how a firm that settled "would deal with a current or proposed matter in which its client's position is directly adverse to a program or policy in which the government in question has a strong interest." *Id.*

Engaging a firm in the third group—*i.e.*, a firm that has not been targeted or settled, but might be targeted or settle in the future—trades these concrete problems for uncertainty. In choosing among firms, general counsels must weigh

---

[3] Available at https://www.dcbar.org/For-Lawyers/Legal-Ethics/Ethics-Opinions-210-Present/Ethics-Opinion-391 (last accessed Apr. 2, 2026).

the risk that a given firm may ultimately be targeted or settle, which could force the general counsel to terminate the representation or cause the firm to abandon its client. For instance, in engaging counsel for litigation adverse to the federal government (or where the federal government has some interest), the general counsel must try to calculate the risk that the firm might be targeted or settle during the litigation—either of which might force the company to replace outside counsel for the reasons explained above. That sort of political due diligence is next to impossible to undertake and is not an appropriate consideration in determining the most competent outside counsel for a particular company need.

The cumulative result is to improperly add a political consideration to a professional judgment that general counsels are legally and ethically obligated to make based on competence. Outside-counsel selection is not a procurement decision analogous to vendor selection. It is an exercise of professional judgment grounded in the general counsel's duty of competence under Model Rule 1.1 and the duty of independent professional judgment under Model Rule 2.1. *See* Model Rules of Pro. Conduct r. 1.1, 2.1 (A.B.A. 2025). In specialized practice areas— including complex federal litigation, regulatory proceedings before specific agencies, and high-stakes intellectual property matters—there may be only a small number of firms with the requisite expertise. The Executive Orders introduce a

19

threshold political veto into that assessment before any competence-based analysis can begin.

Companies have always selected law firms and lawyers based in part on their expertise in a particular area, which can include, to some extent, their familiarity with processes and personnel within a given federal agency.  But the political due diligence that the Executive Orders require—which focuses on a law firm's political reputation more generally, including its fealty to this Administration—is entirely new.  General counsels reported feeling the need to be cautious about hiring firms who have taken positions, in representing clients, that could attract government disfavor, regardless of the quality of their legal work.  And general counsels are at the same time wary of hiring firms that have entered into agreements with the Administration to avoid an Executive Order—or who might do so.  If this Court upholds the Executive Orders, the risk that a given firm might be targeted or settle must be weighed alongside—and, arguably, above—any other consideration in selecting counsel, causing harm to amicus's members and the companies they represent.

## III.    The Executive Orders Have Deterred Both Law Firms and Companies from Challenging Government Action Out of Fear of Federal Retaliation.

A quarter-century ago, in *Legal Services Corp. v. Velazquez*, the Supreme Court held that the federal government cannot "insulate its own laws from

legitimate judicial challenge" by seeking to restrict attorneys' ability to zealously advocate on behalf of their clients. 531 U.S. at 548. The Executive Orders seek to do just that, by targeting law firms that have taken legal positions with which the Administration disagrees. The settlements with Paul, Weiss and other firms only reinforce the government's efforts to insulate its views from judicial scrutiny. *See* JA 1688 ("The fact that Paul, Weiss quickly negotiated a deal, including an agreement to provide 'the equivalent of $40 million' in free legal work, rather than face the potential injuries of the similar Executive Order targeting that firm, *see* Paul, Weiss Revocation Order, 90 Fed. Reg. at 13685, demonstrates the coercive power of such targeting by the Trump Administration."). While the government's brief seeks to minimize these aspects of the Executive Orders, the Orders' message to attorneys is clear: The federal government will retaliate against those who take positions the Administration does not like.

Notably, this is true regardless of the form of retaliation—whether it be cutting off access to government buildings or personnel, reviewing or terminating government contracts, initiating retaliatory administrative proceedings, or across-the-board, non-individualized suspension of security clearances. Whether or not any particular form of retaliation is independently reviewable, it is the retaliation as a whole that produces the constitutional harm. For example, contrary to the government's brief, the law firms are not asking the Court to second-guess any

individual security-clearance suspension in violation of *Department of the Navy v. Egan*, 484 U.S. 518 (1988). The injury to the targeted firms (and their clients and potential clients) is the forced restructuring of outside-counsel relationships—an injury that is distinct from any individual clearance suspension. And the result of that injury is to insulate the Administration's policy priorities from judicial scrutiny.

The parts of the Executive Orders that target firms' diversity initiatives provide another good example of this. The Administration is free to accuse law firms, or any company, of violating federal civil rights laws by filing a lawsuit. *See* 42 U.S.C. § 2000e-5. That will allow the legality of the challenged practice to be decided in court. The Executive Orders, however, seek to circumvent the courts by threatening a range of retaliatory Executive action if a targeted firm seeks access to the court system—effectively forcing law firms to abandon their diversity programs without the opportunity to defend their legality. The Susman Godfrey Executive Order shows the importance of allowing discrimination claims to be adjudicated by courts not through Executive fiat: That Order targeted and sought to penalize Susman Godfrey for an award program that, as the government has now conceded, does not violate federal law. JA 3508.

Amicus's survey results and town hall discussion show that the message of these Executive Orders has not been lost on law firms. General counsels

confirmed what the targeted law firms' briefs argue:  The Executive Orders have "cast[] a chill over" and "intimidate[d]" the legal profession.  Jenner Br. 1; Susman Br. 2.  In both the survey and town hall, general counsels reported that law firms are worried about being targeted by the Administration and may be unwilling to represent clients in matters that could attract Administration disfavor, whether or not those matters involve direct litigation against the government.  General counsels also reported specific instances in which law firms have declined to take on cases adverse to the federal government.  While there has been significant reporting about the extent to which the Executive Orders have deterred law firms from taking on pro bono work adverse to the federal government, amicus's survey and town hall show that these concerns also extend to paid work on behalf of companies.[4]

This chilling effect has had a significant impact on general counsels' selection of outside counsel.  While outside counsel used to promote themselves by touting their track record of zealously advocating on behalf of their clients against the federal government, multiple general counsels noted that firms are now more inclined to highlight their connections within the Administration.  And a general

---

[4] *E.g.*, Matthew Goldstein & Jessica Silver-Greenberg, *Some Giant Law Firms Shy Away from Pro Bono Immigration Cases*, N.Y. TIMES (May 6, 2025), https://www.nytimes.com/2025/05/06/business/trump-law-firms-pro-bono-immigration.html.

counsel working at an organization that is vulnerable to adverse action by the federal government reported that whether a firm might abandon the organization mid-representation is now a "primary consideration" in selecting outside counsel— a consideration that did not exist before the Executive Orders.

The concerns about federal retaliation for taking disfavored positions extend not only to law firms but to companies themselves. Multiple general counsels reported that the Executive Orders caused their companies to refrain from taking positions contrary to the federal government, including not only in litigation but also submitting comments in proposed rulemaking. General counsels also reported that their companies are afraid to take public positions that may be contrary to Administration preferences or priorities. In these circumstances, the fear of federal retaliation akin to the Executive Orders outweighs any potential benefit from challenging federal government action or taking public positions with which the Administration may disagree. Indeed, companies not only have declined to confront the Administration but have also engaged in anticipatory compliance— adjusting their conduct, policies, and public positions to conform to the Administration's perceived preferences either in advance of or instead of defending against a federal enforcement action. The goal in making these adjustments is to reduce the risk of being targeted with retaliation, regardless of

whether the company's prior conduct, policies, and public positions were even arguably unlawful.

These harms fall not only on general counsels, law firms, and their companies, but on the judicial system itself. Article III courts interpret the law through party engagement in the judicial process. By creating a pervasive fear of Executive retaliation, the Executive Orders interfere with this foundational adversarial presentation and prevent the courts from fulfilling their "duty" to "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

The Administration may of course speak freely about the targeted firms and the positions they have taken in litigation—amicus's members themselves have a range of views on those issues. But the Administration may not "insulate" the Administration's policies "from legitimate judicial challenge" by retaliating against lawyers who represent clients with views the Administration does not like. *Velazquez*, 531 U.S. at 548. The First Amendment's guarantee of the right "to petition the Government for a redress of grievances"—and the rule of law itself—depend on lawyers' ability to challenge the government without fear of retribution. The experience of amicus's members shows that the Executive Orders, if allowed to take effect, would make even the most powerful law firms and companies hesitant or unwilling to express their own legal, professional, or business judgment.

25

**CONCLUSION**

General Counsels United respectfully urges this Court to affirm the decisions of the district courts.  The Executive Orders have already distorted the lens through which general counsels select outside counsel; created irresolvable conflicts in outside-counsel selection that no amount of due diligence can cure; and begun the process of insulating federal action from judicial challenge by making it professionally hazardous for lawyers to represent clients that take a position the Administration disfavors.

Date: April 3, 2026

Respectfully submitted,

*/s/ David J. Zimmer*
David J. Zimmer
  *Counsel of Record*
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
Tel.: (617) 676-9421
dzimmer@zimmercitronclarke.com

Julia Solomon-Strauss
ZIMMER, CITRON & CLARKE LLP
14 Ridge Square NW, Suite 328
Washington, DC 20016
Tel.: (202) 796-4540
jsolomonstrauss@zimmercitronclarke.com

*Counsel for Amicus Curiae*
*General Counsels United*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 29(a)(5), I hereby certify that the preceding brief complies with the type-volume limitation of the rules, containing 5,761 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). I further certify that the document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Times New Roman font.

Date: April 3, 2026          */s/ David J. Zimmer*
                                              David J. Zimmer

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2026, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

         */s/ David J. Zimmer*
         David J. Zimmer