**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

PERKINS COIE LLP,

Plaintiff–Appellee,

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,

Defendants–Appellants.

On Appeal from the United States District Court
for the District of Columbia
Nos. 1:25-cv-716, Hon. Beryl A. Howell

**BRIEF OF AMICI CURIAE FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY, SERVICE EMPLOYEES INTERNATIONAL UNION, AMERICAN FEDERATION OF TEACHERS, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, CENTER FOR CIVIL RIGHTS AND CRITICAL JUSTICE, RACE AND LAW CENTERS, AND CIVIL RIGHTS AND ADVOCACY ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Charlotte Garden
University of Minnesota Law
  School†
Walter F. Mondale Hall
229 S. 19th Ave.
Minneapolis, MN 55455

Jeremiah Chin
University of Washington
  School of Law†
William H. Gates Hall, Rm. 310
P.O. Box 353020
Seattle, WA 98195-3020

Additional counsel listed inside

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Robert S. Chang
Susan McMahon
FRED T. KOREMATSU CENTER FOR
  LAW AND EQUALITY
University of California–Irvine
401 E. Peltason Dr., Suite 1000
Irvine, CA 92697

Jessica Levin
Melissa Lee
CENTER FOR CIVIL RIGHTS
   AND CRITICAL JUSTICE
Ronald A. Peterson Law Clinic
Seattle University School of Law
901 12th Avenue
Seattle, WA 98122

† institutional affiliations listed
for identification purposes only

April 3, 2026

Counsel for Amici Curiae

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, amici curiae state that they are all not-for-profit organizations, have no parent corporations, and do not issue stock.

# CERTIFICATE REGARDING PARTIES, RULINGS, AND RELATED CASES

All Parties and Amici appearing before the District Court and in this Court are listed in the Brief for the Appellants. References to rulings at issue and related cases also appear in the Brief for the Appellants.

# CERTIFICATE OF COUNSEL AS TO SEPARATE BRIEF

Pursuant to Circuit Rule 29(d), counsel states that this separate brief is necessary because it presents a different perspective than other briefs. Amici share direct stories of prior executive branch attack on lawyers' ability to represent unpopular clients, and stories of law firms representing unpopular clients in the face of government pressure not to do so. Amici bring unique perspectives as centers on race and the law, unions, and other membership organizations. And this brief presents historical context and arguments not duplicated in the numerous other briefs filed in the District Court in the four matters on appeal here.

/s/ Jim Davy

Jim Davy

i

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ............................................................ i

Certificate Regarding Parties, Rulings, and Related Cases .................... i

Certificate of Counsel as to Separate Brief ............................................... i

Table of Authorities ............................................................................... iii

Introduction .............................................................................................. 2

Argument .................................................................................................. 5

I. The Supreme Court has repeatedly held that the Government may not obstruct lawyers to deter challenges to government conduct. .......................................................... 5

    A. Litigation is often expressive, and the First Amendment protects participants in litigation against government retaliation. .................................................................. 8

    B. The First Amendment protects against disclosure requirements aimed at deterring association. ........................... 12

II. The Court should not defer to the Administration's casual invocation of national security to justify the EOs. .......................... 14

    A. *Korematsu* and the Guantanamo cases offer a cautionary lesson about judicial deference to unsubstantiated claims of national security. ............................ 15

    B. Judicial deference is unwarranted where the Government has failed to articulate even a plausible national security rationale. .................................................... 21

Conclusion ............................................................................................... 23

Certificates ............................................................................................. 24

Appendix of Amici Curiae ....................................................................... 1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) ............................................................................ 13

*BE&K Constr. Co. v. NLRB,*
536 U.S. 516 (2002) ...................................................................... 11, 13

*Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar,*
377 U.S. 1 (1964) ............................................................................... 11

*Boumediene v. Bush,*
553 U.S. 723 (2008) ........................................................................... 19

*Boumediene v. Bush,*
579 F. Supp. 2d 191 (D.D.C. 2008) ............................................... 19, 20

*Brown v. Board of Education,*
347 U.S. 483 (1954) (*Brown I*) ............................................................ 5

*Brown v. Board of Education,*
349 U.S. 294 (1955) (*Brown II*) .......................................................... 5

*Gibson v. Fla. Legis. Investigation Comm.,*
372 U.S. 539 (1963) ........................................................................... 13

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006) ........................................................................... 18

*Hamdan v. United States,*
696 F.3d 1238 (D.C. Cir. 2012) .......................................................... 18

*Hirabayashi v. United States,*
828 F.2d 591 (9th Cir. 1987) .............................................................. 16

*In re Primus,*
436 U.S. 412 (1978) ........................................................................... 11

*Jenner & Block v. United States Department of Justice,*
784 F. Supp. 3d 76 (D.D.C. 2025) ........................................................ 8

*Korematsu v. United States,*
323 U.S. 214 (1944) ............................................................................. 3

*Korematsu v. United States,*
584 F. Supp. 1406 (N.D. Cal. 1984) ......................................... 3, 16, 17

*NAACP v. Alabama ex. rel Patterson,*
357 U.S. 449 (1958) .................................................................. 8, 12, 13

*NAACP v. Button,*
371 U.S. 415 (1963) ............................................................ 8, 9, 10, 12

*NAACP v. Patty,*
  159 F. Supp. 503 E.D. Va. 1958) ........................................ 6

*Nat'l Rifle Ass'n of Am. v. Vullo,*
  602 U.S. 175 (2024) ........................................................ 4

*Perkins Coie LLP v. United States Department of Justice,*
  783 F. Supp. 3d 105 (D.D.C. 2025) .................................. 8

*Scull v. Virginia ex rel. Comm. on Law Reform & Racial Activities,*
  359 U.S. 344 (1959) ........................................................ 6

*Susman Godfrey LLP v. Executive Office of the President,*
  789 F. Supp. 3d 15 (D.D.C. 2025) .................................... 8

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ........................................................ 3

*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n,*
  389 U.S. 217 (1967) ...................................................... 11

*United Transp. Union v. State Bar of Mich.,*
  401 U.S. 576 (1971) ...................................................... 10

*Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President,*
  784 F. Supp. 3d 127 (D.D.C. 2025) .................................. 8

**Other Authorities**

1956 Va. Extra Session Acts 29–42 (chs. 31–37) .......................... 6, 9, 12

ACLU Board Minutes (June 22, 1942) *microformed on* ACLU Microfilms, Reel 9 ............................................................ 2

Ben Protess, *More Than 500 Law Firms Back Perkins Coie in Fight with Trump*, N.Y. Times, Apr. 4, 2025 .................................... 7

Brian J. Daugherity, *Keep On Keeping On: The NAACP and the Implementation of Brown v. Board of Education in Virginia* (2006) ... 8

Brief for the United States, *Korematsu v. United States*, 323 U.S. 214 (1944) ............................................................................ 17

Carol Rosenberg, *They Were Guantánamo's First Detainees. Here's Where They Are Now*, N.Y. Times, May 18, 2021 .................... 18

Defendants' Memorandum in Support of Motion to Dismiss and for Expedited Judgment, *Perkins Coie LLP v. U.S. Department of Justice et al.*, No. 1:25-cv-716 (D.D.C.) .................................. 21

Eugene Cook, Ga. Att'y Gen, The Ugly Truth About the NAACP, Address Before the 55th Annual Convention of the Peace Officers Association of Georgia ................................................................ 6

Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) .................... 22

Executive Order 14230.................................................................. 4

Executive Order 14246.............................................................. 4, 9

Executive Order 14250.......................................................... 4, 9, 14

Executive Order 14263.............................................................. 4, 9

Katya Jestin, Co-Managing Partner, Jenner & Block LLP, Testimony Before U.S. Sen. Committee on the Judiciary, Closing Guantanamo: Ending Twenty Years of Injustice (Dec. 7, 2021) ............................... 20

Lorraine K. Bannai, *Enduring Conviction: Fred Korematsu and His Quest for Justice* (2015) ......................................................... 2, 3

Matthew Goldstein, Jessica Silver-Greenberg, & Ben Protess, *Paul Weiss Chair Says Deal with Trump Adheres to Firm's Principles*, N.Y. Times, Mar. 21, 2025 ................................................................ 7

*NAACP Suit Dismissal Is Sought*, Richmond News Leader, Mar. 16, 1957.................................................................................... 6

Peter Irons, *Justice at War: The Story of the Japanese American Internment Cases* (1993) ........................................................... 2

Press Release, Haw. Dep't of the Att'y Gen., Hawaii Concludes Travel Ban Case (Aug. 13, 2018)........................................................... 3

Robert S. Chang, Alice Hsu, Robert A. Johnson, Elizabeth C. Rosen & Sofie Syed, *Stop Repeating History: The Story of an Amicus Brief and Its Lessons for Engaging in Strategic Advocacy, Coalition Building, and Education*, 68 Case W. L. Rev. 1223 (2018) ................................ 4

Tr. of Oral Arg., *Boumediene v. Bush*, 553 U.S. 723 (2008) (No. 06-1195) .................................................................................. 19

# INTERESTS OF THE AMICI CURIAE[1]

Amici are Race and Law Centers from law schools across the country engaged in research, advocacy, and education regarding issues of race and the law; the Service Employees International Union (SEIU), which advances worker rights and has over 150 affiliates representing approximately two million members in healthcare, the public sector, and property services; the American Federation of Teachers (AFT), a union with more than 3,000 local affiliates nationwide and representing 1.8 million members who are America's educators, school and higher education staff, nurses, healthcare professionals, and public employees; the American Association of University Professors (AAUP), a membership association of faculty and academic professionals with chapters at colleges and universities throughout the country, which advances academic freedom and economic security of academic workers; and legal advocacy organizations dedicated to defending human and civil rights. Amici have a common interest in supporting the rule of law and upholding the Constitution and the liberties it protects.

---

[1] Amici file this brief with the consent of the Parties. No Party or counsel for a Party authored this brief in whole or in part, or contributed money to its preparation. Statements of interest for each signatory to this brief are set forth more fully below in the Appendix.

## INTRODUCTION

When Fred Korematsu stood in the San Francisco federal district court in 1942 to challenge the constitutionality of a criminal charge that he had violated an exclusion order issued pursuant to Executive Order 9066, he was represented by pro bono counsel funded by the San Francisco office of the American Civil Liberties Union (ACLU).[2] But just four days after Fred's attorneys filed a motion to dismiss his criminal charges, ACLU director Roger Baldwin—wanting to avoid angering President Roosevelt—conveyed the "national board's decision to prohibit test cases from challenging Roosevelt's authority to issue Executive Order 9066."[3] Instead, local ACLU affiliates could "only argue that [General] DeWitt's orders were arbitrary because they did not except individuals who were loyal, they covered too wide an area, and they unlawfully discriminated against Japanese Americans."[4] For cases already filed, the national board "advised defendants … 'to arrange, if they desire, for counsel who will be free to raise other constitutional issues.'"[5]

---

[2] Lorraine K. Bannai, *Enduring Conviction: Fred Korematsu and His Quest for Justice* 43 (2015).

[3] *Id.* at 59.

[4] *Id.* at 60.

[5] Peter Irons, *Justice at War: The Story of the Japanese American Internment Cases* 130 (1993) (citing ACLU Board Minutes (June 22, 1942) *microformed on* ACLU Microfilms, Reel 9).

In defiance of national ACLU's orders, Fred's pro bono counsel appealed his conviction, continuing to argue that the forced exclusion from their homes and incarceration of Japanese Americans in camps were unlawful exercises of executive power: "We undertook to defend Korematsu and we informed him before he accepted our help that in the event he was convicted, we would undertake an appeal, if necessary, because we regarded his as a test case."[6] Though the Supreme Court ruled against him in 1944, *Korematsu v. United States*, 323 U.S. 214 (1944), pro bono counsel again raised the failure of justice in his case in 1984—and this time, a federal court agreed, overturning Fred's wartime conviction, *Korematsu v. United States*, 584 F. Supp. 1406 (N.D. Cal. 1984). The Supreme Court finally recognized this failure of justice when Chief Justice Roberts, in *Trump v. Hawaii*, declared that *Korematsu* had been overruled in the court of history, and that the Government's treatment of Fred had been "gravely wrong." 585 U.S. 667, 710 (2018).

Like Fred, countless others have depended on pro bono counsel to defend their constitutional rights.[7] But President Trump's Executive

---

[6] Bannai*, supra,* at 68. National ACLU eventually supported Fred's challenge, including submitting an amicus brief at the Supreme Court. Charles Horsky, a partner with Covington, Burling, Rublee, Acheson & Shorb (now Covington & Burling) argued for the ACLU, sharing argument time with Fred's attorney, Wayne Collins.

[7] In *Trump v. Hawaii*, the State of Hawaii was represented by Neal Katyal and his firm, with most of their services provided pro bono. Press Release, Haw. Dep't of the Att'y Gen., Hawaii Concludes Travel Ban Case (Aug. 13, 2018), https://ag.hawaii.gov/wp-content/uploads/2018/08/News-

Orders targeting law firms, Executive Orders 14230 (the "Perkins EO"), 14246 (the "Jenner EO"), 14250 (the "WilmerHale EO"), and 14263 (the "Susman EO") (collectively, the "EOs"), aim to curtail firms' pro bono work when it conflicts with the Administration's policy goals. As the courts below found in their respective decisions, this violates the First Amendment rights of the firms and their clients. As the Supreme Court recently and unanimously held, "[a] government official can share her views freely and criticize particular beliefs . . . . What she cannot do, however, is use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).

---

Release-2018-47.pdf. The children of the three men—Fred Korematsu, Minoru Yasui, and Gordon Hirabayashi—who challenged Exclusion Order 9066 during WWII filed amicus briefs supporting challenges to each iteration of the executive order travel ban. They were represented by pro bono counsel. *See* Robert S. Chang, Alice Hsu, Robert A. Johnson, Elizabeth C. Rosen & Sofie Syed, *Stop Repeating History: The Story of an Amicus Brief and Its Lessons for Engaging in Strategic Advocacy, Coalition Building, and Education*, 68 Case W. L. Rev. 1223, 1226–28 (2018).

## ARGUMENT

Amici make two points. First, drawing on Southern states' massive resistance to school desegregation, they show that the EOs mirror earlier, unconstitutional attempts by governments to suppress disfavored legal arguments by targeting the lawyers who made them. Second, they sound a cautionary note about the Government's casual and unsupported invocation of national security to justify the substance of the executive orders, and they argue that the courts should not defer to the Executive branch without scrutinizing their claims.

## I. The Supreme Court has repeatedly held that the Government may not obstruct lawyers to deter challenges to government conduct.

The EOs take more than one page from the massive resistance playbook that Southern states developed to hamstring the efforts of civil-rights groups and lawyers in their fight for racial equality. This playbook, developed in Virginia and other states in response to the Supreme Court's 1954 and 1955 decisions in *Brown v. Board of Education*, 347 U.S. 483 (1954) (*Brown I*); 349 U.S. 294 (1955) (*Brown II*), involved labeling civil-rights groups as threats to public safety, targeting their operation under the guise of regulation of the legal profession, and undermining their funding through implied threats to their members.

In 1956, Virginia's General Assembly went into Extra Session to pass a set of bills to prevent school desegregation, which the Governor

characterized as "a clear and present danger." *NAACP v. Patty*, 159 F. Supp. 503, 514 (E.D. Va. 1958) (quoting Governor Stanley's address to the Assembly, opening the Extra Session).[8] Key to this effort were a set of bills designed to prevent the NAACP from filing new school desegregation cases in the state. These included two registration and disclosure measures, and several related measures on attorney licensing and the practice of law.[9] In the words of Delegate James M. Thomson—who later chaired the Assembly's Committee on Law Reform and Racial Activities—the "so-called NAACP laws"[10] would "bust that organization . . . wide open." *Scull v. Virginia ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 347 (1959) (quoting Thomson's testimony).

Much like Southern states aimed to interrupt school desegregation by targeting the lawyers and organizations bringing desegregation cases, the EOs state plainly that the named firms were targeted in part because

---

[8] Southern public officials often invoked broad public-safety concerns to justify their refusals to desegregate or their opposition to the NAACP. In another representative example, Georgia's Attorney General claimed that the NAACP "has allowed itself to become part and parcel of the Communist conspiracy to overthrow the democratic governments of this nation and its sovereign states." Eugene Cook, Ga. Att'y Gen., The Ugly Truth About the NAACP, Address Before the 55th Annual Convention of the Peace Officers Association of Georgia 10, https://egrove.olemiss.edu/citizens_pamph/79/.

[9] *See* 1956 Va. Extra Session Acts 29–42 (chs. 31–37), https://babel.hathitrust.org/cgi/pt?id=uc1.d0000507608&seq=39.

[10] *E.g.*, *NAACP Suit Dismissal Is Sought*, Richmond News Leader, Mar. 16, 1957, at 2 (referring to "the so-called NAACP laws").

the Government objects to their pro bono work, including civil rights litigation: WilmerHale's work in immigration and election cases; Perkins's advocacy against voter identification laws; and Jenner & Block's work on transgender rights and immigration.[11] The EOs purport to respond to problems with how the named firms operate—specifically, that the firms have used impermissible methods of diversifying their workforces—similar to how Virginia and other Southern states nominally focused on the NAACP's client-recruitment practices.[12] And the EOs impose disclosure requirements designed to deter current or potential clients from working with the named firms in the future,

---

[11] Moreover, recently announced settlements between the Trump administration and other firms have included terms requiring those firms to perform substantial amounts of pro bono work of which the administration approves. *See, e.g.*, Matthew Goldstein, Jessica Silver-Greenberg & Ben Protess, *Paul Weiss Chair Says Deal with Trump Adheres to Firm's Principles*, N.Y. Times, Mar. 21, 2025, at A14 (noting that "the firm agreed to do $40 million worth of pro bono work on causes supported by the Trump administration"); Ben Protess, *More Than 500 Law Firms Back Perkins Coie in Fight with Trump*, N.Y. Times, Apr. 4, 2025, at A20 (noting that Willkie Farr & Gallagher and Milbank "both cut deals promising to dedicate $100 million of pro bono work to causes Mr. Trump supports").

[12] Amici do not argue that individual litigants or the government would be barred from enforcing employment discrimination laws through the usual channels. Instead, like accusations of barratry, accusations of employment discrimination can be strategically deployed as a facially plausible justification for government retaliation.

echoing the Southern states' disclosure rules designed to deter NAACP membership, which was also the organization's main source of revenue.[13]

The courts below, drawing from the First Amendment jurisprudence that emerged from the challenges to Southern states' interference with the NAACP's advocacy, found that the EOs violate the speech and association rights of the firms and their clients. *See Perkins Coie LLP v. United States Department of Justice*, 783 F. Supp. 3d 105, 152 (D.D.C. 2025) (citing *NAACP v. Button*, 371 U.S. 415, 429 (1963), and *NAACP v. Alabama ex. rel. Patterson*, 357 U.S. 449, 460 (1958)); *Jenner & Block v. United States Department of Justice*, 784 F. Supp. 3d 76, 94 (D.D.C. 2025) (citing *Button*); *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*, 784 F. Supp. 3d 127, 151 (D.D.C. 2025) (citing *Button*); *Susman Godfrey LLP v. Executive Office of the President*, 789 F. Supp. 3d 15, 37, 48 (D.D.C. 2025) (citing *Patterson*).

### A. Litigation is often expressive, and the First Amendment protects participants in litigation against government retaliation.

In *NAACP v. Button*, the Court held that Chapter 33 of the 1956 Extra Session Acts of the General Assembly, which expanded Virginia's

---

[13] *See* Brian J. Daugherity, *Keep On Keeping On: The NAACP and the Implementation of Brown v. Board of Education in Virginia* 63–65 (2006) (recounting that these measures caused the Virginia NAACP chapter to lose thousands of members, depleted its coffers, and diverted lawyers from desegregation cases).

definition of "malpractice or any unlawful or dishonest or unworthy or corrupt or unprofessional conduct" to include "improper solicitation of any legal or professional business,"[14] could not be applied to the NAACP's efforts to solicit clients willing to pursue school desegregation efforts. 371 U.S. 415, 419, 437 (1963). The Court emphasized that the First Amendment protects "vigorous advocacy," including litigation, particularly (though not exclusively) when it is used as "a form of political expression." *Id.* at 429. This was true precisely because litigation can be counter-majoritarian—politically powerless groups and individuals have often turned to the courts to protect them when the political process failed to do so. *Id.*; *cf., e.g.*, WilmerHale EO § 1 (mischaracterizing WilmerHale's work as furthering "the degradation of the quality of American elections"); Jenner EO § 1 (mischaracterizing Jenner's pro bono work as supporting "attacks against women and children based on a refusal to accept the biological reality of sex"); Susman EO § 1 (mischaracterizing Susman's work as "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections"). The *Button* Court emphasized that even potential infringements of the NAACP's advocacy were enough to violate the First Amendment: "It makes no difference whether such prosecutions or proceedings would actually be commenced. It is enough that a vague and broad statute lends itself to

---

[14] 1956 Va. Extra Session Acts 34.

selective enforcement against unpopular causes." *Button*, 371 U.S. at 435.

Importantly, the Court also rejected Virginia's argument that Chapter 33's application to NAACP lawyers was justified as an ordinary regulation of the practice of law. Here, it emphasized that Virginia had failed to state a specific interest in regulating the NAACP's conduct. That is, before it could interfere with litigation protected under the First Amendment, Virginia would have to make a record of "substantive evils flowing from [the NAACP's] activities." *Id.* at 444.

The *Button* Court did not suggest that its analysis was limited to the NAACP itself, or to groups that operated in a similar fashion. To the contrary, it observed that "a State cannot foreclose the exercise of constitutional rights by mere labels." *Id.* at 429. Subsequent cases confirm that one can change any number of variables about the NAACP's approach to litigation and get the same result under the First Amendment. For example, the Supreme Court has repeatedly recognized that unions use a range of methods to connect workers who get hurt on the job with lawyers who will help them pursue their rights under workers' compensation or other statutes—and all are protected by the First Amendment as expressions of the unions' political and moral commitments to workers' rights. *See United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 581 (1971) (finding injunction restricting union's facilitation of litigation by members violated First Amendment because

it did not "relate specifically and exclusively to the pleadings and proof"); *id.* at 582–83, 584–85 (finding First Amendment protected union's right to recommend specific lawyers working on contingency basis to members pursuing claims under the Federal Employers Liability Act, and to transport members to and from lawyers' office); *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 218, 225 (1967) (finding First Amendment protected union's choice to retain attorney on salary basis to represent members in workers' compensation claims); *Bhd. of R.R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 8 (1964) (finding First Amendment protected union's practice of encouraging injured members to seek legal advice from specific counsel); *see also In re Primus*, 436 U.S. 412, 414, 439 (1978) (finding First Amendment protected client solicitation by lawyer working on behalf of ACLU). In other contexts, the Court has suggested that nearly *all* litigation may be protected under the First Amendment's petition clause, even if it does not have a political or ideological purpose. *See BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 531 (2002) (construing NLRA in light of First Amendment concerns and concluding that retaliatory litigation may be an unfair labor practice only if both brought for an unlawful purpose and objectively baseless).

This fundamental principle should control this case: the Government violates the First Amendment when it sanctions law firms because it objects to their choices about which causes to take up. The EOs rely on

11

scattershot grievances about the firms' decisions to take on clients and causes that the President dislikes; they are devoid of specific factual findings of wrongdoing, and therefore the sanctions they impose cannot be tailored to findings of wrongdoing. On this basis alone, this Court should conclude that the EOs violate the First Amendment.

**B.  The First Amendment protects against disclosure requirements aimed at deterring association.**

Southern states' attempts to force the NAACP to disclose sensitive information—particularly membership lists—met a similar fate to their attempts to regulate client recruitment.[15] In *NAACP v. Alabama ex rel. Patterson*, the Court concluded that Alabama's efforts to compel disclosure of the NAACP's membership roster was a "substantial restraint upon the exercise by petitioner's members of their right to freedom of association." 357 U.S. 449, 462 (1958). This was because the NAACP "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed these

---

[15] Although the *Button* Court did not rule on this basis, it observed that Virginia's anti-barratry law also imposed associational burdens by deterring others from working with or financially supporting NAACP lawyers. *See Button*, 371 U.S. at 434–36. Specifically, Chapter 33 declared it malpractice to accept "employment, retainer, compensation or costs" from anyone who had themselves violated Virginia's law on solicitation of professional employment. 1956 Va. Extra Session Acts 34. And Chapter 35 made it a misdemeanor to offer financial or other support to a "barrator"—that is, someone who "stirs up litigation." 1956 Va. Extra Session Acts 36.

members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.* That some of this retaliation came from "private community pressures" rather than state action did not matter: "The crucial factor is the interplay of governmental and private action, for it is only after the initial exertion of state power represented by the production order that private action takes hold." *Id.* at 463.

More recent decisions have clarified that compelled disclosures that burden the right of association should be "reviewed under exacting scrutiny." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021); *see also Patterson*, 357 U.S. at 460 ("state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny"); *see also Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 554–56 (1963) (finding Florida could not compel disclosure of NAACP membership records to investigate group's connection to communist activities absent plausible basis for belief that connection existed).

The law firm EOs cannot possibly survive this exacting standard. First, as discussed above, the law firms are engaged in association for the purpose of litigation, protected under the First Amendment's speech and petition clauses. And while the Supreme Court has suggested that nearly all litigation, undertaken for any purpose, may qualify for First Amendment coverage, *see BE&K*, 536 U.S. at 531, the pro bono and

political work named in the EOs is, at a minimum, plainly covered by the First Amendment. Second, the EOs require disclosure of "any business" that government contractors have with the named firms, as well as the nature of that business. *See, e.g.*, WilmerHale EO § 3. These compelled disclosure requirements are packaged with a threat of economic harm: agencies are directed to "terminate any contract, to the maximum extent permitted by applicable law" that is serviced by a named firm and to at least consider stopping *all* funding to entities that do *any* business with a named firm. *Id.* Third, there is very little on the Government's side of the ledger once one discounts the President's objections to the firms' and their clients' viewpoints—and what remains lacks the specific fact-finding that the Supreme Court has emphasized is necessary to justify an infringement of First Amendment rights. Accordingly, this Court should hold that the mandatory disclosure provisions of the EOs violate the First Amendment right of association.

## II. The Court should not defer to the Administration's casual invocation of national security to justify the EOs.

This Court should not defer to the administration's invocation of national security to justify the infringements of First Amendment rights. *See* Appellant's Opening Br. 29–30 (arguing that issue is non-justiciable). First, governments frequently offer unfounded national-security or public-safety justifications for their otherwise-unconstitutional actions; *Korematsu* shows the catastrophic harm that can result when courts

defer to those explanations without adequate basis. And, as *Korematsu* and the Guantanamo cases arising out of the "global war on terror" illustrate, lawyers—often acting pro bono—have been instrumental in revealing unjustified invocations of national security. Second, courts should not defer to facially implausible national security rationales. Here, the Government's assertions are belied by its own actions, including settlements it has reached with other firms in exchange for millions of dollars' worth of pro bono work on causes supported by the administration. This quid-pro-quo belies the administration's position in this litigation that the EOs are based on national security concerns.

A. ***Korematsu* and the Guantanamo cases offer a cautionary lesson about judicial deference to unsubstantiated claims of national security.**

Fred Korematsu was subject to relocation orders during WWII because of unfounded national security concerns. His conviction for violating those orders was upheld because courts—having been misled by DOJ attorneys—failed to discover the truth. This episode illustrates the dangers of blind deference to executive branch assertions that an individual or group constitutes a threat to national security.

We now know that the Department of Justice was not forthcoming in their *Korematsu* and *Hirabayashi* Supreme Court briefs. Initially, DOJ attorneys in *Hirabayashi* proposed alerting the Court that the basis for General DeWitt's decision to "evacuate," exclude, and incarcerate based

on exigent military necessity was refuted by information the Office of Naval Intelligence (ONI) had provided to DeWitt; in fact, ONI had concluded that mass incarceration was unnecessary, as "individual determinations could be made expeditiously," *Hirabayashi v. United States*, 828 F.2d 591, 602 n.11 (9th Cir. 1987) (emphasis omitted).[16] In *Korematsu*, DOJ attorneys—by then aware that the FBI and ONI did not support DeWitt's conclusions—initially drafted the following footnote for inclusion in their brief.

> The recital [in the General DeWitt Report] of the circumstances justifying the evacuation as a matter of military necessity … is in several respects, particularly with reference to the use of illegal radio transmitters and to shore-to-ship signaling by persons of Japanese ancestry, in conflict with information in possession of the Department of Justice. In view of the contrariety of the reports on this matter we do not ask the Court to take judicial notice of the recital of those facts contained in the [DeWitt] Report.

*Korematsu*, 584 F. Supp. at 1417 (quoting original footnote) (citation omitted).

But the DOJ attorneys were ordered to alter the footnote. The version that was submitted to the Court read:

> [The DeWitt Report] is relied on in this brief for statistics and other details concerning the actual evacuation and the events

---

[16] This proceeding, four decades after the U.S. Supreme Court upheld a curfew that singled out persons of Japanese ancestry, stemmed from an effort to reverse Gordon Hirabayashi's WWII criminal conviction based on DOJ attorneys withholding critical information from the Supreme Court.

> that took place subsequent thereto. We have specifically recited in this brief the facts relating to the justification for the evacuation, of which we ask the Court to take judicial notice, and we rely upon the Final Report only to the extent that it relates to such facts.

*Id.* at 1418 (quoting Brief for the United States at 11, *Korematsu v. United States*, 323 U.S. 214 (1944)).

This lack of candor contributed to federal courts' failure to safeguard constitutional rights, which they did not remedy until decades later. But the courts also could have pressed the issue by seeking more detail about the nature of the national security interest and questioning the Government about some of the obvious problems with its case. Why, for example, had DeWitt found it necessary to incarcerate tens of thousands of people living in the western U.S., when his counterpart in the eastern U.S. had not? Why treat Americans of Japanese descent worse than German or Italian citizens living in the U.S.? Why was individualized due process impossible?

In contrast, challenges to the indefinite detention of individuals held at Guantanamo Bay after the September 11, 2001, attacks show how courts can test invocations of national security. The Pentagon had claimed the men held at the U.S. Naval Station at Guantanamo Bay, detained in the months following the September 11 attacks, were "the worst of the worst"; the Chairman of the Joint Chiefs of Staff said they "would gnaw through hydraulic lines" of a cargo plane "to bring it

down."[17] In the years that followed, advocacy by lawyers from firms including WilmerHale, Perkins Coie, and Jenner & Block revealed the inadequacy of the procedures the Government used to justify the detention, the deficiencies in the evidence supporting its claims, and the abuse it inflicted upon the men in its custody.

Perkins Coie was part of the team representing Salim Ahmed Hamdan, the petitioner in *Hamdan v. Rumsfeld* who challenged the legality of the military commissions that were originally set up to try detainees. 548 U.S. 557 (2006). The rules of that tribunal barred the accused and his civilian counsel from attending (or even seeing the evidence presented) during closed proceedings. *Id.* at 614. The Supreme Court found that jettisoning so basic a protection—the right to be present—"particularly disturbing" and held that the commissions were deficient on that and other grounds. *Id.* at 624. When Mr. Hamdan's case was eventually adjudicated, he was acquitted of one of the two charges against him; this Court later vacated his conviction on the other charge. *Hamdan v. United States*, 696 F.3d 1238, 1244, 1253 (D.C. Cir. 2012).

While Perkins Coie's advocacy laid bare the dearth of procedural protections in the Government's preferred tribunals, WilmerHale's advocacy shone a light on the evidentiary infirmities in the cases against detainees. WilmerHale attorneys represented Lakhdar Boumediene, a

---

[17] Carol Rosenberg, *They Were Guantánamo's First Detainees. Here's Where They Are Now*, N.Y. Times, May 18, 2021, at A1.

Guantanamo detainee who was arrested in Bosnia along with five other men. *Boumediene v. Bush*, 579 F. Supp. 2d 191, 193 (D.D.C. 2008). Mr. Boumediene's case similarly reached the Supreme Court, where, during oral argument, WilmerHale attorney Seth Waxman illustrated the importance of testing government assertions. He explained that after one detainee's lawyer saw the name of the detainee's associate—alleged to have died as a suicide bomber—in the Government's filings, "[w]ithin 24 hours, his counsel had affidavits not only from the German prosecutor but from the supposedly deceased [suicide bomber], who is a resident of Dresden never involved in terrorism and fully getting on with his life."[18] The Supreme Court subsequently ordered that the detainees could invoke the protections of habeas corpus. *Boumediene v. Bush*, 553 U.S. 723, 798 (2008).

A few months later, after assessing the evidence underlying Mr. Boumediene's detention, the U.S. District Court for the District of Columbia granted his habeas petition. *Boumediene*, 579 F. Supp. 2d at 197–98. The court noted that the Government had rested its case on a single source, whose credibility could not be assessed; it provided no corroborating evidence supporting its claims that Mr. Boumediene had planned to travel from Bosnia to Afghanistan to fight against U.S. and allied forces. *Id.* at 197. "To rest this case on so *thin* a reed . . . would be

---

[18] Tr. of Oral Arg. 75–76, *Boumediene v. Bush*, 553 U.S. 723 (2008) (No. 06-1195).

inconsistent with this Court's obligation . . . to protect petitioners from the risk of erroneous detention." *Id.*

Not only did these firms' pro bono representations reveal weaknesses in the Government's evidence and process, but it also revealed details of the torture some detainees suffered at the hands of the Government. Jenner & Block represented Guantanamo detainee Majid Khan, who pled guilty to crimes associated with his work for Al Qaeda.[19] After his arrest, Mr. Khan was "beaten, starved, hung by his arms and sleep-deprived for days on end, waterboarded, and sexually assaulted."[20] His lawyers submitted Mr. Khan's detailed statement about his abuse to the jury deciding Mr. Khan's post-plea sentence.[21] That jury recommended clemency, calling his abuse "a stain on the moral fiber of America."[22] One of his Jenner & Block lawyers later testified to Congress about his "brutal [] torture," stating that "[t]hrough transparency, we can achieve some modicum of accountability, and move past this ugly chapter in our nation's history."[23]

---

[19] Katya Jestin, Co-Managing Partner, Jenner & Block LLP, Testimony Before U.S. Sen. Committee on the Judiciary, Closing Guantanamo: Ending Twenty Years of Injustice 2–3 (Dec. 7, 2021), https://www.judiciary.senate.gov/imo/media/doc/ Jestin%20Testimony.pdf.

[20] *Id.* at 2.

[21] *Id.*

[22] *Id.* at 7.

[23] *Id.* at 2, 7.

Counsel for these detainees fought for meaningful review of their clients' cases and transparency about their treatment at the Government's hands. In time, the evidence against many of the men was demonstrated to be far weaker than the Government initially asserted. As with *Korematsu*, the scrutiny for which these counsel fought—of the process, and of the evidence—revealed deficiencies that required correction.

Under the EOs at issue in this case, these law firms would have been barred from performing their critical pro bono advocacy because it could not be carried out without security clearances. Other firms may not have picked up the slack, for fear that they would become the subject of their own executive orders.

**B. Judicial deference is unwarranted where the Government has failed to articulate even a plausible national security rationale.**

In court filings, the Government has conflated its policy goals—the President's own view of what is in the best interests of the United States—with bona fide national security concerns. *See, e.g.*, Defendants' Memorandum in Support of Motion to Dismiss and for Expedited Judgment, *Perkins Coie LLP v. U.S. Department of Justice et al.*, No. 1:25-cv-716 (D.D.C.), Doc. 43, at 1, 14, 16, 28, 30, 31. Further, the Government has asserted that its national security determinations are owed special deference and are unreviewable. Appellant's Opening Br.

20, 30 (conflating individualized determinations with blanket suspensions).

This deference is particularly unwarranted here, where the Government's own actions show that it is not acting in good faith. First, the EOs tie the Government's national security rationale to each of the targeted law firms' employment practices. Whatever one might think of the connection between national security and employment discrimination in the abstract, that connection is impossible to square with the fact that the Government has also directed the Department of Labor's Office of Federal Contract Compliance Programs to stop most of its work auditing government contractors' compliance with non-discrimination mandates established by (now revoked) Executive Order 11246. *See* Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).

Moreover, the Government has also taken the position that the firm Paul, Weiss, Rifkind, Wharton & Garrison posed a threat to national security—up until they agreed to provide at least $40 million dollars in pro bono services to causes favored by the President. Likewise, other firms including Skadden, Arps, Slate, Meagher & Flom and Willkie Farr & Gallagher apparently avoided becoming the subjects of executive orders by making similar pledges. These agreements reveal the true purpose of the Executive Orders: securing the firms' compliance with achieving the Government's policy goals.

# CONCLUSION

For the foregoing reasons, this Court should uphold the respective grants of summary judgment.

Respectfully submitted,

/s/ Jim Davy

Charlotte Garden
University of Minnesota Law
  School†
Walter F. Mondale Hall
229 S. 19th Ave.
Minneapolis, MN 55455

Jeremiah Chin
University of Washington
  School of Law†
William H. Gates Hall, Rm. 310
P.O. Box 353020
Seattle, WA 98195-3020

Jessica Levin
Melissa Lee
CENTER FOR CIVIL RIGHTS AND
  CRITICAL JUSTICE
Ronald A. Peterson Law Clinic
Seattle University School of
  Law
901 12th Avenue
Seattle, WA 98122

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Robert S. Chang
Susan McMahon
Shaleen Shanbhag
THE FRED T. KOREMATSU CENTER
  FOR LAW AND EQUALITY
University of California–Irvine
401 E. Peltason Dr., Suite 1000
Irvine, CA 92697
(949) 824-3034
rchang@law.uci.edu

† institutional affiliations listed
for identification purposes only

Counsel for Amici Curiae

April 3, 2026

# CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this brief:

(i) complies with the type-volume limitation of Rule 29(a)(5) because the brief contains 6,500 words (5,198 words in the body of the brief; 1,302 in the Appendix), including footnotes and excluding the parts of the brief exempted by Rule; and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word, set in Century Schoolbook font in 14-point type.

<u>/s/ Jim Davy</u>
Jim Davy

## CERTIFICATE OF SERVICE

I certify that on April 3, 2026, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Jim Davy
Jim Davy

# APPENDIX

# APPENDIX OF AMICI CURIAE

## I. Statements of Interest of Amici

### A. Race and Law Centers[24]

The **Fred T. Korematsu Center for Law and Equality** ("Korematsu Center") is a non-profit organization based at the University of California, Irvine School of Law. Inspired by the legacy of Fred Korematsu, who defied military orders during World War II that ultimately led to the unlawful incarceration of over 120,000 Japanese Americans, the Korematsu Center works to advance social justice for all. In addition to having a deep commitment to the rule of law and ensuring that lawyers and law firms remain free to advocate for their clients without fear of retaliation by the government, the Korematsu Center has a special interest in ensuring that actions taken for national security reasons remain bounded by the constitution.

The **Center for Civil Rights and Critical Justice** ("CCRCJ") is based at Seattle University School of Law and works to achieve a legal system where both historical and present-day racism, oppression, and

---

[24] None of the Centers listed represents the official views of the universities of which they are a part.

marginalization no longer control outcomes or otherwise contribute to inequality. CCRCJ has a special interest in ensuring the rule of law and, given the pro bono work undertaken by CCRCJ's Civil Rights Clinic, in ensuring the freedom of advocates to represent their clients in politically charged matters without fear of reprisal.

The **Center for Racial and Economic Justice** is based at UC Law San Francisco. The mission of the Center for Racial and Economic Justice is to advance equity and justice through legal education, research and scholarship, and academic-community partnerships and collaborations.

The Duke University School of Law **Center on Law, Race & Policy** (the "Center") is a nonpartisan, nonprofit university-based center that supports research, public engagement, teaching, and programs related to race, law, policy, and people. The Center has an ongoing commitment to fostering racial equity by promoting material change in law and public policy, focusing on education, knowledge production, and community engagement. The Center joins this brief to ensure the fundamental freedom of advocates to represent their clients without fear of retaliation.

The **Center on Race, Inequality, and the Law** at New York University School of Law works to highlight and dismantle structures

and institutions that have been infected by racial bias and plagued by inequality. The Center fulfills its mission through public education, research, advocacy, and litigation focused on ensuring the fair administration of justice.

The **Community Equity Initiative** at New York University School of Law ("CEI") is dedicated to advancing legal and policy frameworks that confront embedded and systemic racial inequality and promote equitable access to opportunity, safety, and democratic participation. The CEI has a strong interest in ensuring that constitutional and statutory doctrines meaningfully constrain the exercise of executive power that is deployed to coerce, punish, or exclude institutions that serve as bulwarks of democratic accountability, especially communities that have historically depended on the legal profession to vindicate their rights.

### B. Unions and Associations

**Service Employees International Union** ("SEIU") represents approximately two million members in healthcare, the public sector, and property services. SEIU has over 150 affiliates across the United States, Puerto Rico, and Canada. SEIU members include long-term care workers, physicians and other healthcare workers, janitors, security

officers, airport workers, librarians, childcare workers, educators, fast food workers, employees who work for city, county, and federal governments, and many more. Our work is guided by our vision for a just society where all workers are valued and all people respected—no matter where we are from or the color of our skin, where all families and communities can thrive, and where we leave a better and more equitable world for generations to come. SEIU has significant familiarity with the critical need for zealous legal advocacy of issues that advance our members' interests, particularly when those interests are either not served by the government or, alternatively, under threat by the government.

The **American Federation of Teachers** ("AFT") was founded in 1916 and today represents 1.8 million members. AFT members include preK-12 educators, paraprofessionals, higher education faculty and administrative staff, nurses and health care workers, and public employees. The AFT's mission is to champion fairness, democracy, and economic opportunity in and through high-quality public education, as well as healthcare and public services for students, their families, and communities their members serve. The AFT does so by ensuring its

members receive fair pay and benefits for their crucial work, by fighting for safe working conditions that also benefit students, patients and all those who use public services, and by fighting for civil rights.

The **American Association of University Professors** ("AAUP") is a membership association of faculty and academic professionals with chapters at colleges and universities throughout the country. AAUP is committed to advancing academic freedom and shared governance, defining fundamental professional values and standards for higher education, promoting the economic security of academic workers, and ensuring higher education's contribution to the common good. AAUP often opposes US government policies as a plaintiff organization, *see Nat'l Ass'n of Diversity Officers in Higher Educ.et al v. Trump*, --- F. Supp. 3d ---, 2025 WL 573764, at \*29 (D. Md. Feb. 21, 2025); *American Sociological Association et al v. Chertoff*, 588 F. Supp. 2d 166 (D. Mass. 2008); and by submitting and joining amicus briefs. *See Barenblatt v. United States*, 360 U.S. 109 (1959); *Trump v. Hawaii*, 138 S. Ct. 2392 (2018).

C. Advocacy Organizations

The **Autistic Self Advocacy Network** is the largest and oldest advocacy organization run by and for the autistic community. We

promote the interests of autistic people and others with intellectual and developmental disabilities. Litigation has been integral to expanding the legal rights of Americans with disabilities. Permitting governmental pressure on legal organizations because they serve clients who may need to bring court challenges against the government would set a dangerous precedent for the people we serve. Any such development could severely curtail our constituents' ability to enforce their rights.

Since 1972, the **Judge David L. Bazelon Center for Mental Health Law** has advocated for the civil rights, full inclusion, and equality of adults and children with mental disabilities. We secured early legal precedents creating basic civil rights for people with mental disabilities—including the rights to a public education, receive services in community-based settings instead of institutions, and make decisions about one's own care. The Center played a key role in the historic case of *Olmstead v. L.C.* (1999), where the Supreme Court found that needless segregation of people with psychiatric disabilities violates federal law. None of this would have been possible without pro bono support from private law firms who co-counsel on our cases.

The **Center for Public Representation** ("CPR") is a national advocacy organization dedicated to enforcing and expanding the rights of people with disabilities and others who are in segregated settings. For more than 50 years, CPR has used legal strategies, advocacy, and policy to design and implement system reform initiatives that increase access to integrated community services for children and adults with disabilities. Through the support and pro-bono services of private firm partners, CPR has litigated systemic cases on behalf of people with disabilities in more than twenty jurisdictions.

**LatinoJustice PRLDEF** ("LatinoJustice"): Founded in 1972, LatinoJustice PRLDEF's mission is to use and challenge laws to create a more just and equitable society, transform harmful systems, empower Latino communities, fight for racial justice, and grow the next generation of leaders. For over five decades, LatinoJustice has litigated landmark civil rights cases and advanced policy reforms in a wide range of areas including racial justice, economic justice, immigrants' rights, policing and prison reform and voting rights.

**The Lawyering Project** is a nonprofit legal advocacy organization that blends traditional impact litigation with movement lawyering to

promote reproductive health, rights, and justice throughout the United States.