ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026

Nos. 25-5241, 25-5265, 25-5277 & 25-5310

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PERKINS COIE LLP,

*Plaintiff-Appellee,*

v.

U.S. DEPARTMENT OF JUSTICE*, et al.*,

*Defendants-Appellants.*

**On Appeal from the United States District Court
for the District of Columbia**

---

**BRIEF OF *AMICI CURIAE* UNIVERSITY PROFESSORS AND
SCHOLARS IN SUPPORT OF PLAINTIFFS-APPELLEES AND
AFFIRMANCE**

---

Maithreyi Ratakonda
STATES UNITED DEMOCRACY CENTER
45 Main Street, Suite 320
Brooklyn, NY 11201
(202) 999-9305
mai@statesunited.org

Christine P. Sun
STATES UNITED DEMOCRACY CENTER
95 Third Street, 2nd Floor
San Francisco, CA 94103
(202) 999-9305
christine@statesunited.org

Samantha Trepel
*Counsel of Record*
Marina Eisner
STATES UNITED DEMOCRACY CENTER
1101 17th St. NW, Suite 250
Washington, DC 20036
(202) 999-9305
sam@statesunited.org
marina@statesunited.org

*Counsel for* Amici Curiae *University Professors and Scholars*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### Parties and Amici

Except for any additional *amici* before this Court, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the briefs of the parties.

### Rulings Under Review

References to the ruling at issue appear in the briefs of the parties.

### Related Cases

Related cases are listed in the briefs of the parties.

/s/ Samantha Trepel
Samantha Trepel
*Counsel of Record*

i

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule Fed. R. App. P. 26.1, *amicus curiae* University Professors and Scholars state that no party to this amicus brief is a publicly held corporation, issues stock, or has a parent corporation.

*/s/ Samantha Trepel*
Samantha Trepel
*Counsel of Record*

ii

## CERTIFICATE OF SEPARATE BRIEF

Pursuant to D.C. Circuit Rule 29(d), Counsel states the following as to why a separate *amicus* brief for *amici* University Professors and Scholars is necessary.

*Amici curiae* are university professors and scholars with decades of experience studying the rule of law in the United States and other countries. Their views and perspective derive from their study of backsliding democracies and the rise of autocratic governments, including how autocratic leaders interfere with and target the legal profession to consolidate power, weaken political opposition, and stifle dissent.

*Amici curiae* have a unique perspective based on this experience. They have a special interest in this case because the improper and illegal targeting of the Appellee law firms poses a significant threat to the rule of law in the United States, a subject they have studied and written about for decades. *Amici's* views, and the weight they should be afforded given amici's expertise, do not overlap with legal perspectives that might be offered by other *amici* in this case, nor do they overlap with the views of persons or organizations that do not have a similar deep academic experience.

A separate *amicus* brief allows *amici* to present their views in as clear and concise a fashion as possible. As a result, *amici* believe that a separate brief is justified, and also serves the Court.

*/s/ Samantha Trepel*
Samantha Trepel
*Counsel of Record*

iv

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................vi

IDENTITY AND INTEREST OF AMICI CURIAE ...........................................1

INTRODUCTION AND SUMMARY OF ARGUMENT....................................2

ARGUMENT ...........................................................................................4

    I.    TARGETING OF THE LEGAL PROFESSION IS CHARACTERISTIC OF COUNTRIES EXHIBITING DEMOCRATIC BACKSLIDING. ...........................................4

        A.    Hungary ......................................................5

        B.    Venezuela ...................................................9

        C.    Turkey.......................................................12

    II.    THE ACTIONS TAKEN IN THE EXECUTIVE ORDERS BEAR STRIKING PARALLELS TO TARGETING OF LAWYERS IN BACKSLIDING DEMOCRACIES....................................16

    III.    TARGETING OF THE LEGAL PROFESSION UNDERMINES THE RULE OF LAW. .........................................20

    IV.    ADDITONAL TARGETING AND RETALIATION HAS OCCURRED UNDER THIS ADMINISTRATION. ........................23

    V.    AS TARGETING THE LEGAL PROFESSION DAMAGES THE RULE OF LAW, JUDICIAL REVIEW PROVIDES AN IMPORTANT CHECK.................................................27

CONCLUSION.........................................................................................28

ADDENDUM ...........................................................................................1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*European Commission v. Hungary*, Case C-821/19 (E.C.J. Nov. 16, 2021) ..........10

*Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76 (D.D.C. 2025) ....26, 27, 35

*Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105 (D.D.C. 2025) 25, 26, 27, 35

*Susman Godfrey LLP v. Exec. Office of the President*, 789 F. Supp. 3d 15 (D.D.C. 2025) ....................................................................................24, 26, 27, 36

Third Party Intervention by the Commissioner for Human Rights of the Council of Europe, *HHC v. Hungary*, App. No. 44253/19 (Aug. 30, 2024) ..................11

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President (WilmerHale)*, 784 F. Supp. 3d 127 (D.D.C. 2025) (No. 1:25-cv-00917)...23, 26, 27, 36

## Other Authorities

Acceso a la Justicia, *The Takeover of the Venezuelan Bar Associations 2000-2020* (2022) .........................................................................................................12

Ahmet T. Kuru, *Secularism, Islamism, and the Future of Turkey*, 36 J. of Democracy 92 (2025)...........................................................................................13

Anushka Patil, *Rocío San Miguel, Venezuelan Political Prisoner, Was Among Those Released*, N.Y. Times (Jan. 8, 2026)...................................................11

Attila Ágh, *Decline of Democracy in East-Central Europe: The Last Decade as the Lost Decade in the ECE Democratization*, 7 J. Comp. Pol. 4 (2014).............6

Berk Esen & Sebnem Gumuscu, *How to Fight Turkey's Authoritarian Turn*, 36 J. of Democracy 106 (2025) ..................................................................13, 15

Brian Z. Tamanaha, *On the Rule of Law: History, Politics, Theory* (Cambridge Univ. Press 2004)..................................................................................20

Daniel S. Nagin*, Deterrence in the Twenty-First Century*, 42 Crime & Just. 199 (Aug. 2013) ..................................................................................23

David M. Driesen, *The Specter of Dictatorship: Judicial Enabling of Presidential Power* (Stanford Univ. Press 2021) ................................................................13

*ECtHR Must Understand that Turkey's Gülen Trials are Vindictive, Jurist Says*, Turkish Minute (Jan. 24, 2024).........................................................................13

European Council on Refugees and Exiles, *Hungary: Hungarian Helsinki Committee and Open Society Foundation File Complaint Against Hungary Over Legislation That Criminalises Support for Refugees* (Sep. 28, 2018) ...8

Fernanda G. Nicola & Jasmine D. Cameron, *First Time as Tragedy, Second Time as Farce: The Chilling Effects of the Hungarian Law Protecting National Sovereignty,* Verfassungsblog (Sept. 5, 2024) .........................................6, 7

Freedom House, *Freedom in the World 2026: The Growing Shadow of Autocracy* (2026) ..................................................................................................................2

Gábor Halmai & Bojan Bugarič, *Resisting Autocratization: The Case of Hungary*, *in* Legal Resistance to Autocracy: The Global Fight to Save Democracy (Octávio Luiz Motta Ferraz et al. eds., Routledge 2026)...............................8

Gülçin Balamir Coşkun & Ertuğ Tombuş, *Criminalising the Legal Profession: The Case Against the Istanbul Bar Ass'n*, Verfassungsblog (Apr. 24, 2025)......15

Hum. Rights Watch, *Türkiye: Attacks on the Legal Profession Unacceptable* (Apr. 14, 2025) ...............................................................................................................15

Hum. Rts. Found., *The Collapse of the Rule of Law and Human Rights in Turkey: The Ineffectiveness of Domestic Remedies and the Failure of the ECtHR's Response* (Apr. 2019)................................................................................................13

Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, UN Doc. A/HRC/45/33 (Sept. 25, 2020) ...................................................................................................11

Independent Int'l Fact Finding Mission on the Bolivarian Republic of Venezuela, *Detailed Findings of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, UN Doc. A/HRC/45/CRP.11 (Sept. 15, 2020) ...........................................................................................10, 11, 12

Int'l Bar Ass'n & Laws. for Laws., *Joint Submission to the United Nations Universal Periodic Review: Hungary* (2021) ...........................................7, 8

Int'l Bar Ass'n Hum. Rights Inst. & The Arrested Lawyers Initiative, *A Profession on Trial: The Systematic Crackdown Against Lawyers in Turkey* (2024)....14

Int'l Comm'n of Jurists, *Lawyers Under Attack – Barriers to the Legal Profession in Venezuela* (May 2022).................................................9, 11, 12, 20, 22

János Kornai, *Hungary's U-Turn: Retreating from Democracy*, 26 J. of Democracy 34 (2015) ..................................................................................6

Javier Corrales, *Autocracy Rising: How Venezuela Transitioned to Authoritarianism* (Rowman & Littlefield Publishing 2022).......................4, 9

Javier Corrales, *Autocratic Legalism in Venezuela*, 26 J. of Democracy 37 (Apr. 2015) .................................................................................................4

Javier Corrales, *Trump Is Using the Legal System Like an Autocrat*, N.Y. Times (Mar. 5, 2020) ........................................................................................23

Justin Henry, *Trump Rescinds Paul Weiss Order as Firm Pledges $40 Million*, Bloomberg (Mar. 20, 2025) ..................................................................24

Kathryn Rubino, *Trump Sics EEOC On 20 Biglaw Firms*, Above the Law (Mar. 17, 2025) ...............................................................................................24

Kim Lane Scheppele, *Autocratic Legalism*, 85 U. Chi. L. Rev. 545 (2018).............4

Kim Lane Scheppele, *Hungary and the End of Politics*, The Nation (May 6, 2014)6

Maria Popova, *Putin-Style "Rule of Law" & the Prospects for Change*, 146 Daedalus 64 (2017) ....................................................................................4

Marina Nord et al., *Democracy Report 2026: Unraveling The Democratic Era?*, V-Dem Institute (2026) ...........................................................................2, 5

Md. Awal Hossain Mollah, *Modern Administrative Law in the 21st Century: Navigating the Challenges of Digital Governance* (Cambridge Scholars Publ'g 2024)..............................................................................................22

Memorandum on Preventing Abuses of the Legal System and the Federal Court, White House (Mar. 22, 2025) ...................................................................25

Memorandum on Suspension of Security Clearances and Evaluation of Government Contracts, White House (Feb. 25, 2025)................................24

Mike Spector et al., *How Trump's Crackdown on Law Firms Is Undermining Legal Defenses for the Vulnerable*, Reuters (Aug. 3, 2025) .........................26

Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, ProPublica (Aug. 6, 2025).................................................26

Ozan Varol, *Stealth Authoritarianism*, 100 Iowa L. Rev. 1673 (2015) .................13

Patrick Kingsley, *Hungary Criminalizes Aiding Illegal Immigrants*, N.Y. Times (June 20, 2018)...................................................................................7, 8

Paul Kirby, *Erdogan: Turkey's All-powerful Leader of 20 years*, BBC News (Mar. 24, 2023) ..............................................................................12, 13

Press Release, UN High Comm'r for Hum. Rts., *Venezuela: UN Expert Concerned by Reported Retaliation Against Lawyer Perkins Rocha* (Sept. 30, 2024)...10

Rémi Banet, *Lawyers Caught in Turkey's Crackdown on Opposition*, Al-Monitor (Sept. 8, 2025)........................................................................15

Sam Baker, *Law Firms Pledge Almost $1 Billion in Free Work to Trump,* Axios (Apr. 12, 2025)......................................................................24

Scott L. Cummings, *The Autocratic Legal Playbook,* UCLA L. Rev. (forthcoming) ...........................................................................7, 20, 21, 22

Shayna Jacobs, Clara Ence Morse & Mark Berman, *Nation's Biggest Law Firms Back Off From Challenging Trump Policies*, Wash. Post (Oct. 26, 2025)....3, 19

Steve Levitsky & Lucan A. Way, *Competitive Authoritarianism: Hybrid Regimes After the Cold War* (2010) .............................................................23

Steven Levitsky & Daniel Ziblatt, *How Democracies Die* (2018)...........................6

Steven Levitsky & Lucan Way, *The Rise of Competitive Authoritarianism*, 13 J. of Democracy 2 (April 2002) ..............................................................4

Susan C. Stokes, *The Backsliders: Why Leaders Undermine Their Own Democracies* (Princeton Univ. Press 2025) ...............................................27

The Arrested Lawyers Initiative, *Turkey's Post-Coup Crackdown: Nine Years On* (Jul. 17, 2025) .......................................................................14

The White House, *Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block* (Mar. 25, 2025) ...................................................17

The White House, *Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP* (Mar. 6, 2025)...................................................16

The White House, *Fact Sheet: President Donald J. Trump Addresses Risks from Susman Godfrey*, (Apr. 9, 2025) ....................................................17

The White House, *Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale* (Mar. 27, 2025)........................................................17

U.N. Secretary-General, *The Rule of Law and Transitional Justice in Conflict and Post-Conflict Societies*, U.N. Doc. S/2004/616 (Aug. 23, 2004)...................20

U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Turkey* .13, 14, 15, 22

Vanessa Buschschlüter, *Venezuelan Opposition Leader's Lawyer Detained*, BBC News (Aug. 28, 2024) ................................................................................10

Veronica Anghel & Erik Jones, *What Went Wrong in Hungary,* 35 J. of Democracy 52 (2024) .......................................................................................................6

World Justice Project, *What Is the Rule of Law?*, https://worldjusticeproject.org/about-us/overview/what-rule-law (last visited Mar. 31, 2026)......................................................................................................20

**Regulations**

Exec. Order No. 14230, 90 Fed. Reg. 11781 (Mar. 6, 2025)...........................16, 18

Exec. Order No. 14237, 90 Fed. Reg. 13039 (Mar. 14, 2025)...............................24

Exec. Order No. 14246, 90 Fed. Reg. 13997 (Mar. 25, 2025)........................16, 18

Exec. Order No. 14250, 90 Fed. Reg.14549 (Mar. 27, 2025)........................16, 18

Exec. Order No. 14263, 90 Fed. Reg. 15615 (Apr. 9, 2025) ..........................16, 18

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

*Amici curiae* are university professors and scholars with decades of experience studying and writing about the rule of law in the United States and other countries, and with substantial expertise in studying democracies that slide into authoritarianism and the rise of autocratic governments. They submit this brief to describe how rising autocratic leaders interfere with the independence of the legal profession to consolidate power, weaken political opposition, stifle dissent, and exact retribution on the perceived enemies of those in power. *Amici*'s expertise is relevant here, as it illuminates how the administration's targeting of law firms poses a threat to the rule of law in the United States and why it is essential for courts to carefully review these claims.

*Amici* are Michael Albertus, Nancy Bermeo, Javier Corrales, Scott L. Cummings, Larry Diamond, David M. Driesen, Francis Fukuyama, Tom Ginsburg, Gábor Halmai, Gretchen Helmke, Aziz Z. Huq, Sonia Mittal, Maria Popova, Stephen Richer, Dalibor Rohac, Kim Lane Scheppele, Susan Stokes, and Lucan Way. Biographies of each *amicus* are appended at the end of this brief.

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). As required by Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* provide this statement: no party's counsel authored this brief in whole or in part; and no person other than *amici* or their counsel made a monetary contribution to this brief's preparation or submission.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

We are university professors and scholars who have studied nations around the world experiencing autocratic consolidation and democratic backsliding—or the weakening of an existing democracy's democratic norms, processes, and institutions. This area of study is particularly salient today, as recent assessments show that democratic backsliding is occurring across the world.[2] Autocracies now outnumber democracies and many more countries, including the United States, are experiencing democratic decline than are democratizing.[3] Through our research, we recognize that one common way leaders with autocratic tendencies increase their authority is by asserting control over government and private institutions that have previously been insulated from political influence, including private lawyers and legal associations.

The Executive Orders targeting Appellee law firms mirror attacks on the independence of the legal profession in the countries we study. As we have seen in these backsliding democracies, targeting the legal profession can provide the

---

[2] *See generally* Freedom House, *Freedom in the World 2026: The Growing Shadow of Autocracy* (2026), https://freedomhouse.org/sites/default/files/2026-03/FIW2026_final_digital%20%281%29.pdf; Marina Nord et al., *Democracy Report 2026: Unraveling The Democratic Era?*, V-Dem Institute (2026), https://www.v-dem.net/documents/75/V-Dem_Institute_Democracy_Report_2026_lowres.pdf.

[3] Nord et al., *supra* note 2, at 4-5 (noting that the world has 92 autocracies and 87 democracies as of the end of 2025, and 44 countries are autocratizing while only 18 are democratizing).

autocratizing government with the means to weaken political adversaries by impairing their ability to access legal representation and to stifle dissent, undermining the rule of law and damaging democratic governance. The capture of legal organizations can also lead to rights violations and corruption by the administration going unchallenged. Yet because the targeting of lawyers and legal entities are supported by claims of legal authority, they may appear to be legitimate exercises of state power.

It is vital to recognize the dangers attacks on the legal profession pose to the fabric of democracy. Here, as four district courts held below, Appellee law firms were targeted based on the clients and causes they represent. Appellees were not the only law firms targeted by Executive Order and by other executive actions. While Appellee law firms challenged the actions taken against them, other affected firms have pulled back on representation of civil society organizations and causes perceived to be adverse to the Trump administration. This chilling effect continues to this day.[4] The Court should not ignore this broader context and the dangerous precedent these Executive Orders set and should affirm the decisions below.

---

[4] Shayna Jacobs, Clara Ence Morse & Mark Berman, *Nation's Biggest Law Firms Back Off From Challenging Trump Policies*, Wash. Post (Oct. 26, 2025), https://www.washingtonpost.com/national-security/2025/10/26/smaller-law-firms-struggle-trump-administration-initiatives/ (finding that large law firms represented plaintiffs in 15% of cases challenging executive orders during Trump's second term, compared with 75% of cases during a comparable period in Trump's first term).

3

## ARGUMENT

## I. TARGETING OF THE LEGAL PROFESSION IS CHARACTERISTIC OF COUNTRIES EXHIBITING DEMOCRATIC BACKSLIDING.

One key indicator of democratic backsliding is a government's reliance on "autocratic legalism,"—the use or abuse of the law, or the trappings of law, to attack governmental institutions and diminish their independence so as to consolidate power and remove checks on the executive.[5] As a governing leader gains power over previously independent institutions such as the judiciary and prosecutors, he is able to direct the force of law at his opponents, detaining, charging, and sometimes convicting them to remove political threats, silence or intimidate dissenting voices, and exact retribution.[6] Often, this control can extend

---

[5] Javier Corrales, *Autocratic Legalism in Venezuela*, 26 J. of Democracy 37, 38 (Apr. 2015); Kim Lane Scheppele, *Autocratic Legalism*, 85 U. Chi. L. Rev. 545, 547-49 (2018). Scholars generally characterize autocracies as systems of government where a ruler or small ruling group has captured state institutions, manipulated democratic procedures, and eroded checks and balances so that outcomes are predetermined. A façade of democracy may remain, but rulers are not accountable to the people. *See, e.g.*, Maria Popova, *Putin-Style "Rule of Law" & the Prospects for Change*, 146 Daedalus 64 (2017); Steven Levitsky & Lucan A. Way, *The Rise of Competitive Authoritarianism*, 13 J. of Democracy 51 (April 2002). That a leader governs as an autocrat says nothing about that leader's particular political ideology. Likewise, autocrats that rely on autocratic legalism to consolidate power are not limited to any one particular political ideology, and indeed, "[t]heir ideology is often flexible," or they may deny having one at all. Scheppele, at 574 & n. 102.

[6] *See* Scheppele, *supra* note 5, at 550; Javier Corrales, *Autocracy Rising: How Venezuela Transitioned to Authoritarianism* 2, 14-15 (Rowman & Littlefield Publ'g 2022).

beyond governmental institutions to private entities, including the legal profession. By controlling lawyers and legal associations, the autocratic leader can weaken those opposed to his administration and their defenders, stifling dissent and facilitating his and his successors' entrenchment in office. The way in which a government seizes control over the legal profession varies based on the structure and traditions of a country's justice system, but the resulting loss of independence invariably damages the rule of law.

Below, we discuss examples from three countries that experienced democratic backsliding over the last two and a half decades and are now considered electoral autocracies.[7] In Hungary, Venezuela, and Turkey, targeting of the legal profession enabled a leader to further consolidate power, weaken political opposition, and degrade civil society.

### A.    Hungary

Hungary was a functioning democracy around fifteen years ago and is now considered an electoral autocracy.[8] In 2010, Viktor Orbán became Prime Minister for the second time and immediately began consolidating power, including by taking control of previously independent institutions such as the Prosecution

---

[7] Nord et al., *supra* note 2, at 15. In an "electoral autocracy," there are multiparty elections for the executive, but "insufficient levels of fundamental requisites such as freedom of expression and association, and free and fair elections." *Id.* at 14.
[8] *Id*. at 14-15.

Service, Constitutional Court, the Supreme Court, other parts of the judiciary, and the State Audit Office.[9] Orbán's Fidesz party, which had taken over the legislature, altered labor laws so that civil servants could be fired without process or protections, leading to thousands of career government employees—most of whom opposed Orbán and his party—losing their jobs.[10]

Orbán also asserted authority over the private sector, including over bar associations and non-governmental organizations providing legal services that were perceived to be critical of or otherwise not aligned with his administration. He created new law enforcement agencies such as the Counter Terrorism Center and the Sovereignty Protection Office that were under his government's control and were given expansive authority to investigate individuals and entities, including in the private legal sector.[11] Entities that were investigated were not

---

[9] Steven Levitsky & Daniel Ziblatt, *How Democracies Die* 78 (2018); János Kornai, *Hungary's U-Turn: Retreating from Democracy*, 26 J. of Democracy 34, 35-36 (2015), https://www.kornai-janos.hu/media/konyvek_cikkek/KornaiJanosEletmuve_Cikkek_0774.pdf; Veronica Anghel & Erik Jones, *What Went Wrong in Hungary,* 35 J. of Democracy 52 (2024), https://dx.doi.org/10.1353/jod.2024.a922833.
[10] Kim Lane Scheppele, *Hungary and the End of Politics*, The Nation (May 6, 2014), https://www.thenation.com/article/archive/hungary-and-end-politics/.
[11] *See, e.g.*, Attila Ágh, *Decline of Democracy in East-Central Europe: The Last Decade as the Lost Decade in the ECE Democratization*, 7 J. Comp. Pol. 4 (2014); Fernanda G. Nicola & Jasmine D. Cameron, *First Time as Tragedy, Second Time as Farce: The Chilling Effects of the Hungarian Law Protecting National Sovereignty,* Verfassungsblog (Sept. 5, 2024), https://verfassungsblog.de/second-time-as-farce/.

entitled to basic due process protections or transparency in the investigative process and instead were intimidated, harassed, and "named and shamed" in an effort to silence dissenting voices.[12] For example, Orbán's government threatened the Hungary Bar Association so that it would not bring its own investigations against attorneys who abetted Orbán and Fidesz.[13]

In addition to conducting targeted investigations, the Orbán administration and media companies closely aligned with the administration publicly "target[ed], discredit[ed], and demonize[d] lawyers and judges that criticize[d] the government, and uph[e]ld human rights," labeling these lawyers as the "enemies of the Hungarian State and the Hungarian people."[14] Orbán, who campaigned on a nationalist, anti-immigrant platform, particularly went after non-governmental entities, such as the Hungarian Helsinki Committee and Open Society Foundation, which provide legal services to refugees and migrants.[15] His administration introduced "a raft of legislative measures and constitutional amendments" that

---

[12] *See, e.g.*, Nicola & Cameron, *supra* note 11; Int'l Bar Ass'n & Laws. for Laws., *Joint Submission to the United Nations Universal Periodic Review: Hungary* (2021), https://www.lawyersforlawyers.org/wp-content/uploads/2021/03/UPR-SUBMISSION-HUNGARY-2021_FINAL_IBAHRI_L4L.pdf.

[13] Scott L. Cummings, *The Autocratic Legal Playbook,* UCLA L. Rev. (forthcoming) (manuscript at 11), https://ssrn.com/abstract=5392409.

[14] Int'l Bar Ass'n & Laws. for Laws., *supra* note 12, at 5.

[15] Patrick Kingsley, *Hungary Criminalizes Aiding Illegal Immigrants*, N.Y. Times (June 20, 2018), https://www.nytimes.com/2018/06/20/world/europe/hungary-stop-soros-law.html [https://perma.cc/DR8G-P2YD].

impose criminal sanctions and heavy fines on individuals and entities that support these groups.[16] For instance, under a law passed after Orbán took power, helping a migrant legalize their status could result in a year of jail time.[17]

In light of the takeover and installation of loyalists in public sector legal and investigative agencies and threats and harassment of private sector legal entities that are not aligned with the Orbán administration, the International Bar Association and Lawyers for Lawyers concluded in a human rights report that "[t]he legal profession in Hungary is under a heavy pressure caused exclusively by the attempts of the government to crackdown on dissent."[18] The Council of Europe Commissioner for Human Rights contextualized the attacks on lawyers within the broader authoritarian regime in Hungary, which has moved "to restrict the rights to

---

[16] European Council on Refugees and Exiles, *Hungary: Hungarian Helsinki Committee and Open Society Foundation File Complaint Against Hungary Over Legislation That Criminalises Support for Refugees* (Sep. 28, 2018), https://ecre.org/hungary-hungarian-helsinki-committee-and-open-society-foundation-file-complaint-against-hungary-over-legislation-that-criminalises-support-for-refugees/. In 2021, the European Court of Justice found that this violated European Union law. *See European Commission v. Hungary*, Case C-821/19 (E.C.J. Nov. 16, 2021), https://www.courthousenews.com/wp-content/uploads/2021/11/ecj-hungary.pdf.

[17] Kingsley, *supra* note 15.

[18] Int'l Bar Ass'n & Laws. for Laws., *supra* note 12, at 5; *see also* Gábor Halmai & Bojan Bugarič, *Resisting Autocratization: The Case of Hungary*, *in* Legal Resistance to Autocracy: The Global Fight to Save Democracy (Octávio Luiz Motta Ferraz et al. eds., Routledge 2026).

freedom of expression and freedom of association, which have resulted in a shrinking of space for civil society organisations and human rights defenders."[19]

### B.    Venezuela

Venezuela also exemplifies this pattern. While President Hugo Chávez was in office from 1999 to 2013, he consolidated control over much of the Venezuelan government.[20] After Chávez's death, his successor President Nicolás Maduro faced increased political opposition and mass protests. Maduro leveraged the state institutions Chávez had already captured, including the Public Prosecutor's Office and elements of the judiciary, to stabilize his precarious position.[21] Maduro's control of the justice system extended beyond government institutions to non-governmental lawyers and legal organizations. These entities have faced significant obstacles, including the prosecution and other targeting of lawyers handling political cases and lawyers defending Maduro's opponents as well as the government's interference with the independence of legal associations.[22]

---

[19] Third Party Intervention by the Commissioner for Human Rights of the Council of Europe, *HHC v. Hungary*, App. No. 44253/19, at 2 (Aug. 30, 2024), https://rm.coe.int/third-party-intervention-in-the-case-of-hhc-v-hungary-by-michael-o-fla/1680b15985.

[20] Corrales, *supra* note 6, at 1-2.

[21] Corrales, *supra* note 6, at 119.

[22] Int'l Comm'n of Jurists, *Lawyers Under Attack – Barriers to the Legal Profession in Venezuela* (May 2022), https://www.icj.org/wp-content/uploads/2022/06/Venezuela-Lawyers-under-attack-publications-briefing-paper-2022-ENG.pdf.

A 2021 Human Rights Council report found that 57% of the 56 defense lawyers surveyed reported that they or their families had been subject to harassment and threats by the military, security forces, or intelligence officers.[23] The harassment included surveillance, threatening phone calls, and being blocked from certain tribunals.[24] As one example, in 2024, future Nobel Peace Prize winner and head of Venezuela's opposition party María Corina Machado's lawyer, Perkins Rocha, was detained following a crackdown on dissidents in the aftermath of the election in which Maduro was declared the winner.[25] Rocha was taken by hooded security forces and held at an undisclosed location, which a UN Special Rapporteur called part of a pattern of retaliation against political opponents and those who represent them.[26] Rocío San Miguel, a well-known attorney who headed a nonprofit that investigated deadly force used by Venezuelan state law enforcement,

---

[23] Independent Int'l Fact Finding Mission on the Bolivarian Republic of Venezuela, *Detailed Findings of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, UN Doc. A/HRC/45/CRP.11, ¶ 313 (Sept. 15, 2020), https://www.ohchr.org/sites/default/files/Documents/HRBodies/HRCouncil/FFMV/A_HRC_45_CRP.11.pdf.

[24] *Id.*

[25] Vanessa Buschschlüter, *Venezuelan Opposition Leader's Lawyer Detained*, BBC News (Aug. 28, 2024), https://www.bbc.com/news/articles/ceq5z15xglpo.

[26] Press Release, UN High Comm'r for Hum. Rts., *Venezuela: UN Expert Concerned by Reported Retaliation Against Lawyer Perkins Rocha* (Sept. 30, 2024), https://www.ohchr.org/en/press-releases/2024/09/venezuela-un-expert-concerned-reported-retaliation-against-lawyer-perkins.

was also taken as a political prisoner and held for almost two years, released only after Maduro was captured.[27]

The government, through the largely co-opted judiciary and other officials, has also interfered with the ability of political opponents to hire lawyers of their choice, particularly in times of increased opposition and unrest. Between 2014 and 2017, a period in which Venezuela faced large political protests across the country, detained protestors were often forced by courts to be represented by public defenders, even when they asked for private counsel.[28] Public defenders in Venezuela lack independence from judicial authorities and frequently advised their clients not to contest charges against them and failed to challenge the arbitrariness of arrests and raise human rights violations.[29] When private lawyers were able to represent protestors, they were often hindered by court and government authorities from providing an adequate defense, including through the withholding of relevant

---

[27] Anushka Patil, *Rocío San Miguel, Venezuelan Political Prisoner, Was Among Those Released*, N.Y. Times (Jan. 8, 2026), https://www.nytimes.com/2026/01/08/world/americas/san-miguel-venezuela-prisoner-released.html.

[28] Int'l Comm'n of Jurists, *supra* note 22, at 17; *see also* Human Rights Council, *Report of the Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela*, UN Doc. A/HRC/45/33, ¶¶ 74, 78, 128, 130 (Sept. 25, 2020), https://docs.un.org/en/A/HRC/45/33 (describing protests and arbitrary detentions).

[29] Int'l Comm'n of Jurists, *supra* note 22, at 17; *see also* Independent Int'l Fact Finding Mission on the Bolivarian Republic of Venezuela, *supra* note 23, ¶¶ 358-59.

documents, preventing lawyers from visiting clients, and failing to inform them of hearing dates.[30]

Bar associations have also lost their independence as a result of the authoritarian government, making it difficult for these organizations to defend and support the independence of Venezuelan lawyers. A provision of the 1999 Venezuelan Constitution provided the government with increased control over the electoral processes of civil society organizations, including bar associations.[31] Since then, through Constitutional provisions and supported by judicial decisions of the Supreme Court of Justice (TSJ), the government has essentially co-opted Venezuelan bar associations in a huge consolidation of power.[32]

### C.    Turkey

Turkey provides another example of an autocratic government's crackdown on lawyers and the legal profession as part of a larger attack on the rule of law and as a means of asserting political control. Recep Tayyip Erdoğan became Turkey's Prime Minister in 2003.[33] While Erdoğan initially implemented some democratic

---

[30] Independent Int'l Fact Finding Mission on the Bolivarian Republic of Venezuela, *supra* note 23, ¶ 359.

[31] Int'l Comm'n of Jurists, *supra* note 22, at 23-24; *see also* Acceso a la Justicia, *The Takeover of the Venezuelan Bar Associations 2000-2020,* at 2-3 (2022), https://accesoalajusticia.org/wp-content/uploads/2022/01/Executive-summary-The-takeover-of-the-Venezuelan-Bar-Associations.pdf.

[32] *Supra* note 31.

[33] Paul Kirby, *Erdogan: Turkey's All-powerful Leader of 20 years*, BBC News (Mar. 24, 2023), https://www.bbc.com/news/world-europe-13746679.

reforms,[34] by 2013, he became increasingly autocratic,[35] and after amending the

constitution to grant more power to the presidency, became President in 2014.[36] In

2016, rebel soldiers attempted a coup, nearly capturing Erdoğan.[37] Following the

failed coup attempt, Erdoğan assumed even greater authority over the military, law

enforcement, judiciary, and other government institutions,[38] purging close

to 100,000 public servants, based on their alleged connection with or support for

the coup.[39] Many of these former officials were then prosecuted, mainly for alleged

membership in a terrorist organization.[40] Erdoğan's government also attacked the

lawyers defending those the regime sought to prosecute, detaining more than 1,700

attorneys, and convicting more than 550 of them for terrorism-related offenses.[41]

---

[34] Ozan O. Varol, *Stealth Authoritarianism*, 100 Iowa L. Rev. 1673, 1715 (2015).

[35] Kirby, *supra* note 33.

[36] David M. Driesen, *The Specter of Dictatorship: Judicial Enabling of Presidential Power* 30 (Stanford Univ. Press 2021).

[37] Kirby, *supra* note 33.

[38] Berk Esen & Sebnem Gumuscu, *How to Fight Turkey's Authoritarian Turn*, 36 J. of Democracy 106, 106 (2025).

[39] Ahmet T. Kuru, *Secularism, Islamism, and the Future of Turkey*, 36 J. of Democracy 92, 100 (2025).

[40] Hum. Rts. Found., *The Collapse of the Rule of Law and Human Rights in Turkey: The Ineffectiveness of Domestic Remedies and the Failure of the ECtHR's Response* 19 (Apr. 2019), https://hrf.org/latest/the-collapse-of-the-rule-of-law-and-human-rights-in-turkey/; *ECtHR Must Understand that Turkey's Gülen Trials are Vindictive, Jurist Says*, Turkish Minute (Jan. 24, 2024), https://turkishminute.com/2024/01/24/ecthr-must-understand-that-turkey-gulen-trial-are-vindictive-jurist-say/ (Turk.).

[41] U.S. Dep't of State, *2022 Country Reports on Human Rights Practices: Turkey* 13, https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/turkey/; The Arrested Lawyers Initiative, *Turkey's Post-Coup*

Prosecutors frequently pointed to the lawyers' representation of clients accused of terrorism as proof of the attorneys' guilt by association,[42] causing some Turkish lawyers to decline to represent clients perceived to be political opponents of Erdoğan.[43]

When targeting lawyers, Erdoğan's government concentrated on curbing the influence and independence of leaders in the profession and legal organizations that publicly opposed Erdoğan's policies or documented the government's human rights abuses. For example, the government ordered the shuttering of more than 34 bar associations following the 2016 coup attempt and confiscated the associations' assets.[44] Of the attorneys arrested, at least 15 were active or former members of provincial bar associations.[45] The government also initiated five separate investigations against attorney Cihan Aydin, the former president of the Diyarbakir Bar Association, and members of the association's board of directors[46] after the

---

*Crackdown: Nine Years On* (Jul. 17, 2025), https://arrestedlawyers.org/2025/07/17/turkeys-post-coup-crackdown-nine-years-on/; Int'l Bar Ass'n Hum. Rights Inst. & The Arrested Lawyers Initiative, *A Profession on Trial: The Systematic Crackdown Against Lawyers in Turkey* 3 (2024), https://www.ibanet.org/document?id=IBAHRI-TALI-A-Profession-on-Trial-Turkey-report-2024.

[42] *Turkey's Post-Coup Crackdown: Nine Years On*, *supra* note 41.

[43] *2022 Country Reports on Human Rights Practices: Turkey*, *supra* note 41, at 13.

[44] *A Profession on Trial: The Systematic Crackdown Against Lawyers in Turkey, supra* note 41, at 13.

[45] *2022 Country Reports on Human Rights Practices: Turkey*, *supra* note 41, at 13.

[46] *Id.* at 14.

association issued a 2019 statement calling for an end to Turkey's military action in Syria.[47]

More recently, Turkish authorities detained hundreds of people for participating in protests against the March 2025 arrest of Istanbul Mayor Ekrem İmamoğlu, a high-profile political opponent of Erdoğan and opposition Republican People's Party presidential primary party frontrunner.[48] State security forces then detained many of the lawyers representing those arrested, including the former Chair of the İzmir Bar Association and İmamoğlu's own attorney.[49] The same month, a court in Istanbul ordered the removal of the elected leadership of the Istanbul Bar Association, and prosecutors criminally charged the bar association president and ten executive board members for making terrorist propaganda after the association issued a public statement calling for an independent investigation into the killing of two journalists in Syria.[50]

---

[47] *Id.*

[48] Esen & Gumuscu, *supra* note 38, at 106, 109.

[49] Rémi Banet, *Lawyers Caught in Turkey's Crackdown on Opposition*, Al-Monitor (Sept. 8, 2025), https://www.al-monitor.com/originals/2025/09/lawyers-caught-turkeys-crackdown-opposition; Hum. Rights Watch, *Türkiye: Attacks on the Legal Profession Unacceptable* (Apr. 14, 2025), https://www.hrw.org/news/2025/04/14/turkiye-attacks-legal-profession-unacceptable.

[50] Banet, *supra* note 49; Hum. Rights Watch, *supra* note 49; Gülçin Balamir Coşkun & Ertuğ Tombuş, *Criminalising the Legal Profession: The Case Against the Istanbul Bar Ass'n*, Verfassungsblog (Apr. 24, 2025), https://verfassungsblog.de/tuerkey_barassociation_ruleoflaw/.

## II.   THE ACTIONS TAKEN IN THE EXECUTIVE ORDERS BEAR STRIKING PARALLELS TO TARGETING OF LAWYERS IN BACKSLIDING DEMOCRACIES.

This case raises concerning parallels to the targeting of lawyers and legal organizations in the countries we have studied. Here, the President issued Executive Orders sanctioning the Appellee law firms in retaliation for their representation of, and association with, perceived political opponents and causes at ideological odds with the administration's position.[51] According to the "fact sheets" issued simultaneously with the Executive Orders, the Appellee law firms' perceived offenses include: (1) Perkins Coie's representation of Hillary Clinton's 2016 presidential campaign and other clients in "filing lawsuits against the Trump Administration;"[52] (2) Jenner and Block's association with Andrew Weissmann, a former partner at the firm who worked on the special counsel investigation, led by Robert Mueller, into alleged Russian interference in the 2016 presidential election;[53] (3) WilmerHale's employment of Robert Mueller and members of his

---

[51] *See* Exec. Order No. 14230, 90 Fed. Reg. 11781 (Mar. 6, 2025); Exec. Order No. 14246, 90 Fed. Reg. 13997 (Mar. 25, 2025); Exec. Order No. 14250, 90 Fed. Reg.14549 (Mar. 27, 2025); Exec. Order No. 14263, 90 Fed. Reg. 15615 (Apr. 9, 2025).

[52] The White House, *Fact Sheet: President Donald J. Trump Addresses Risks from Perkins Coie LLP* (Mar. 6, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-adresses-risks-from-perkins-coie-llp/.

[53] The White House, *Fact Sheet: President Donald J. Trump Addresses Risks from Jenner & Block* (Mar. 25, 2025), https://www.whitehouse.gov/fact-

former special counsel team and the firm's "partisan representations to achieve political ends,"[54] presumably including the firm's representation of the Biden and Harris presidential campaigns, *see* Compl. ¶ 85, *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President* (*WilmerHale*), 784 F. Supp. 3d 127 (D.D.C. 2025) (No. 1:25-cv-00917); and (4) Susman Godfrey's efforts to "degrade the quality of American elections,"[55] through its representation of Dominion Voting Systems and state election officials in lawsuits related to the integrity of the 2020 election. *See Susman Godfrey LLP v. Exec. Office of the President*, 789 F. Supp. 3d 15, 29-30 (D.D.C. 2025) (noting that the government did not dispute that the relevant Executive Order related to these activities).

The Executive Orders sought to punish the firms for the clients they represented and the attorneys they employed and to deter them from continuing these associations by imposing penalties designed to threaten their financial viability. The Executive Orders did so by requiring that the security clearances

---

sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-jenner-block/.

[54] The White House, *Fact Sheet: President Donald J. Trump Addresses Risks from WilmerHale* (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-addresses-risks-from-wilmerhale/.

[55] The White House, *Fact Sheet: President Donald J. Trump Addresses Risks from Susman Godfrey*, (Apr. 9, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-addresses-risks-from-susman-godfrey/.

held by individuals employed by the firms be suspended and ordering federal agencies to terminate contracts with the firms and with entities that do business with them.[56] The Executive Orders also instructed federal agencies to limit the law firms' employees from accessing federal buildings and to restrict government employees from "engaging" with the law firms' employees.[57]

The four district courts that reviewed the Executive Orders each concluded they were intended to punish the law firms for representing the administration's political opponents and for representing and otherwise supporting causes with which the President disagrees. *See, e.g.*, *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 163 (D.D.C. 2025) (holding that the Executive Order "was issued to seek retribution . . . for the [f]irm's representation of clients in political campaigns or litigation, about which President Trump expressed disapproval, dating back to 2017"); *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 88 (D.D.C. 2025) ("[T]his [Executive] [O]rder . . . makes no bones about why it chose its target: it picked Jenner because of the causes Jenner champions, the clients Jenner represents, and a lawyer Jenner once employed."); *WilmerHale*, 784

---

[56] *See* Exec. Order No. 14230, 90 Fed. Reg. 11781, §§ 2 & 3; Exec. Order No. 14246, 90 Fed. Reg. 13997, §§ 2 & 3; Exec. Order No. 14250, 90 Fed. Reg. 14549, §§ 2 & 3; Exec. Order No. 14263, 90 Fed. Reg. 15615, §§ 2 & 3.
[57] *See* Exec. Order No. 14230, 90 Fed. Reg. 11781, § 5; Exec. Order No. 14246, 90 Fed. Reg. 13997, § 5; Exec. Order No. 14250, 90 Fed. Reg. 14549, § 5; Exec. Order No. 14263, 90 Fed. Reg. 15615, § 5.

F. Supp. 3d at 151 (noting that "on its face" the Executive Order constitutes "retaliation" motivated by WilmerHale's work, including its "pro bono practice" and "its involvement in immigration and election litigation"); *Susman Godfrey*, 789 F. Supp. 3d at 48 (concluding that the Executive Order "constitutes unlawful retaliation against Susman for activities that are protected by the First Amendment, including its representation of certain clients, its donations to certain causes, and its expression of its beliefs regarding diversity."). The courts also held the orders had a chilling effect on the firms, *Perkins Coie*, 783 F. Supp. 3d at 155; *WilmerHale*, 784 F. Supp. 3d at 166; *Susman Godfrey*, 789 F. Supp. 3d at 52, and one court noted the chill extended "over the whole of the legal profession" and beyond, *Jenner & Block*, 784 F. Supp. 3d at 88, 115.[58] Each court found the orders violate the Constitution, and blocked them from taking effect. *See Perkins Coie*, 783 F. Supp. 3d at 180-81; *Jenner & Block*, 784 F. Supp. 3d at 118-19; *WilmerHale*, 784 F. Supp. 3d at 173-74*; Susman Godfrey*, 789 F. Supp. 3d at 58.

This targeting of law firms based on who they employ and the causes and clients they represent parallels developments in Hungary, Venezuela, and Turkey, where autocratizing leaders have subjected lawyers representing migrant populations, political opponents, and protestors to investigations, arbitrary arrest

---

[58] *See also* Jacobs et al., *supra* note 4 (documenting chilling effect).

and prosecution, and other penalties, and have disbanded or threatened bar associations for criticizing or questioning government loyalists or actions. *See supra*, Section I.

## III. TARGETING OF THE LEGAL PROFESSION UNDERMINES THE RULE OF LAW.

From our scholarship and research, we know that targeting the legal profession can have outsized effects on the rule of law and adherence to democratic principles. The rule of law requires both the government and its citizens to be bound by the law.[59] But that constraint is not self-enforcing. It depends on individuals and institutions capable of holding the government to account. And lawyers and legal associations are a vital part of that system.[60] By targeting lawyers and legal associations that speak out against their government, autocrats can further consolidate their power.

---

[59] Brian Z. Tamanaha, *On the Rule of Law: History, Politics, Theory* 114-15 (Cambridge Univ. Press 2004); World Justice Project, *What Is the Rule of Law?*, https://worldjusticeproject.org/about-us/overview/what-rule-law (last visited Mar. 31, 2026); U.N. Secretary-General, *The Rule of Law and Transitional Justice in Conflict and Post-Conflict Societies*, at 4, U.N. Doc. S/2004/616 (Aug. 23, 2004), https://digitallibrary.un.org/record/527647?v=pdf#files.

[60] *See* Scott L. Cummings, *The Autocratic Legal Playbook*, UCLA L. Rev. (forthcoming) (manuscript at 10), https://ssrn.com/abstract=5392409; Int'l Comm'n of Jurists, *Lawyers Under Attack: Barriers to the Legal Profession in Venezuela*, at 6-7 (May 2022), https://www.icj.org/wp-content/uploads/2022/06/Venezuela-Lawyers-under-attack-publications-briefing-paper-2022-ENG.pdf.

Most directly, pursuing lawyers who represent political opponents can prevent those opponents from receiving adequate representation, thus ensuring their silence or defeat. This also clears the way for autocrats to transform the legal system into a tool for the autocrat to retain power, as their most high-profile political rivals are silenced or incapacitated. The countries discussed above are instructive. In Venezuela, and Turkey, the government's attacks often focus on lawyers for the most well-known political opponents, such as Maria Machado's lawyer in Venezuela and Ekrem İmamoğlu's lawyer in Turkey. *See supra* Section I(B)-(C), at 10, 15. This underscores a tenet of the autocratic legalist's playbook that "*only the autocrat is entitled to zealous representation*" and any lawyers who "oppose him [are] singled out for retribution."[61]

Autocratizing governments also tend to attack lawyers representing disfavored groups and individuals—such as the attorneys representing migrants in Hungary, where simply assisting migrants in legalizing their status can result in an attorney receiving jail time—a significant deterrent. *See supra* Section I(A), at 7-8. And in Turkey, defense lawyers have similarly reported hesitancy to accept representation of public servants who were fired by Erdoğan and then charged in

---

[61] Cummings, *supra* note 60, at 34.

terrorism cases, for fear of reprisal, including the threat the attorneys themselves will be prosecuted.[62]

By taking aim at lawyers who represent disfavored individuals and groups, an autocratic government can exert a chilling effect well beyond those directly subject to retaliation, deterring lawyers from defending political opponents or targeted minorities or challenging the legality of the autocratic government's policies.[63] The lack of independence across Venezuela's judicial system, for example, has led to widespread fear among lawyers related to fulfilling their professional duties.[64] Lawyers fear that they will be persecuted, subject to disciplinary or criminal sanctions, or that they will be unable to effectively represent their clients.[65] By chilling or preventing attorneys from representing persons disfavored by the government or challenging the legality of government actions, the autocratic leader further undermines the rule of law, which requires processes that allow individuals to challenge unlawful government action[66] and enforce the fundamental rights of all persons. Without effective representation,

---

[62] *2022 Country Reports on Human Rights Practices: Turkey, supra* note 41, at 13.

[63] Cummings, *supra* note 60, at 34.

[64] Int'l Comm'n of Jurists, *supra* note 60, at 12-15.

[65] *Id.*

[66] Md. Awal Hossain Mollah, *Modern Administrative Law in the 21st Century: Navigating the Challenges of Digital Governance*, at 225 (Cambridge Scholars Publ'g 2024).

autocratic leaders are increasingly able to subjugate and silence their opponents and impose unlawful policies.

## IV. ADDITONAL TARGETING AND RETALIATION HAS OCCURRED UNDER THIS ADMINISTRATION.

Because autocratic legalists cloak their actions in the legitimacy of law and previously trusted institutions, the descent into autocracy can be hard to stop.[67] Yet the ability to recognize the risks posed by targeting lawyers is vital, especially as such actions are usually part of a pattern of similar acts of retaliation. Indeed, autocratic legalists tend to target opposition groups and individuals close in time because doing so increases their chilling effect, signals the government's strength, and exhausts the opposition.[68] This pattern is visible here: Appellees are four private law firms the administration targeted through Executive Orders within a short time. But they were not the only ones targeted. The attacks against a broad swath of the legal community have already had far-reaching effects.

The first public targeting of a large law firm came as a Presidential Action against Covington & Burling on February 25, 2025, ordering the Attorney General to suspend security clearances held by any employees who assisted Special

---

[67] *See* Javier Corrales, *Trump Is Using the Legal System Like an Autocrat*, N.Y. Times (Mar. 5, 2020), https://www.nytimes.com/2020/03/05/opinion/autocratic-legalism-trump.html.

[68] *See, e.g.*, Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199 (Aug. 2013); Steven Levitsky & Lucan A. Way, *Competitive Authoritarianism: Hybrid Regimes After the Cold War* 9 (2010).

Counsel Jack Smith, who had led investigations against President Trump.[69]

Executive Orders and Presidential Memoranda against other law firms and lawyers soon followed. Some large private law firms chose to make deals with the administration to avoid sanctions. After being targeted by an Executive Order,[70] a law firm ranked in the top 20 by American Lawyer became the first to strike a deal, which included agreeing to end certain diversity, equity, and inclusion ("DEI") policies within the firm and pledging $40 million of *pro bono* services in support of policies and goals supported by the administration.[71] After a letter from the Equal Employment Opportunity Commission was sent to other large law firms stating the agency would open investigations into their employment and DEI practices,[72] other prestigious firms soon followed suit, collectively pledging almost $1 billion of *pro bono* services to causes the administration supports in order to avoid sanctions and retribution.[73]

---

[69] Memorandum on Suspension of Security Clearances and Evaluation of Government Contracts, White House (Feb. 25, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/suspension-of-security-clearances-and-evaluation-of-government-contracts/.

[70] Exec. Order No. 14237, 90 Fed. Reg. 13039 (Mar. 14, 2025).

[71] Justin Henry, *Trump Rescinds Paul Weiss Order as Firm Pledges $40 Million*, Bloomberg (Mar. 20, 2025), https://news.bloombergtax.com/daily-tax-report-international/trump-rescinds-executive-order-that-targeted-paul-weiss-law-firm.

[72] Kathryn Rubino, *Trump Sics EEOC On 20 Biglaw Firms*, Above the Law (Mar. 17, 2025), https://abovethelaw.com/2025/03/trump-sics-eeoc-on-20-biglaw-firms/.

[73] Sam Baker, *Law Firms Pledge Almost $1 Billion in Free Work to Trump,* Axios (Apr. 12, 2025), https://www.axios.com/2025/04/12/big-law-pro-bono-legal-work-trump.

Meanwhile, the Trump administration has initiated attacks against other lawyers and law firms, including through a Presidential Memorandum directing the Attorney General and Secretary of Homeland Security to bring enforcement actions against attorneys exhibiting supposed "grossly unethical misconduct."[74] The Memorandum points to lawyers the administration perceives as enemies or that oppose its policy priorities, including Marc Elias, an attorney the Memorandum claims was involved in developing a "fraudulent basis" to "alter the outcome of the Presidential election," as well as "powerful Big Law pro bono practices."[75] It also specifically targets attorneys seeking to assist immigrants, reminiscent of Orbán's attacks against attorneys representing migrants in Hungary.[76] As with the Appellee law firms, these attacks are improper and unlawful attempts to punish and suppress disfavored viewpoints and entities. *See Perkins Coie*, 783 F. Supp. 3d at 120-21; *Jenner & Block*, 784 F. Supp. 3d at 88; *WilmerHale*, 784 F. Supp. 3d at 135, 155-53; *Susman Godfrey*, 789 F. Supp. 3d. at 28, 42.

The targeting of private law firms and lawyers has already had a large impact on civil society, just over a year into President Trump's second

---

[74] Memorandum on Preventing Abuses of the Legal System and the Federal Court, White House (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/.
[75] *Id.*
[76] *Id.*; *see supra* Section I(A), at 7-8.

administration. A number of the country's largest law firms, which have historically provided *pro bono* services to clients supporting causes such as environmental protections, LGBTQ+ rights, and police accountability, are now refusing to represent individuals and organizations that seek to challenge actions taken by the Trump administration on these and other issues, or are simply avoiding representation of clients that the President may perceive as his enemies.[77] This chilling effect has continued long after the administration stopped issuing Executive Orders targeting law firms, in April of 2025, and has affected the ability of civil society organizations to challenge actions taken by the administration due to a lack of paid and *pro bono* legal representation typically provided by large law firms.[78]

   Targeting and capture of lawyers and legal entities is typical of autocratic countries, not democratic ones. We see a concerning trend of stifling dissent and consolidating legal power through the targeting of private law firms perceived to be insufficiently aligned with the President and his administration.

---

[77] Molly Redden, *Trump's War on Big Law Means It's Harder to Challenge the Administration*, ProPublica (Aug. 6, 2025), https://www.propublica.org/article/trump-law-firms-accountability-environment-police-lgbtq; Mike Spector et al., *How Trump's Crackdown on Law Firms Is Undermining Legal Defenses for the Vulnerable*, Reuters (Aug. 3, 2025), https://www.reuters.com/investigations/trumps-war-big-law-leads-firms-retreat-pro-bono-work-underdogs-2025-07-31/.

[78] Redden, *supra* note 77; Spector et al., *supra* note 77.

## V.    AS TARGETING THE LEGAL PROFESSION DAMAGES THE RULE OF LAW, JUDICIAL REVIEW PROVIDES AN IMPORTANT CHECK.

As discussed in Section III, the targeting of lawyers and legal entities in autocratic and backsliding countries to secure the government's authority and injure the opposition damages the rule of law and public trust in governmental institutions. This context is important to consider when determining whether the Executive Orders targeting the law firms are lawful. It is essential that the Court carefully examine whether the orders violate the law firms' constitutional rights, given that there is strong evidence that the firms were singled out for retributive reasons, including perceived insufficient loyalty to the administration. Moreover, Appellees were not the only private law firms targeted by the administration, and these actions have already had widely-felt effects across civil society.

As the growing group of present-day autocracies has amply demonstrated, democracies require legal organizations and lawyers insulated from political pressure and a strong and independent judiciary to stand firm and faithfully apply the law, no matter the identity of the parties before it or how they are perceived by those in power.[79]

---

[79] *See* Susan C. Stokes, *The Backsliders: Why Leaders Undermine Their Own Democracies* 6 (2025).

**CONCLUSION**

*Amici* respectfully request that the Court consider the broader context in which these Executive Orders were issued and the danger to the rule of law they pose and affirm the decisions below.

Dated: April 3, 2026                      Respectfully submitted,

*/s/ Samantha Trepel*
Samantha Trepel (D.C. Bar # 992377)
Marina Eisner (D.C. Bar # 1005593)
STATES UNITED DEMOCRACY CENTER
1101 17th St. NW, Suite 250
Washington, DC 20036
(202) 999-9305
sam@statesunited.org
marina@statesunited.org

Maithreyi Ratakonda
STATES UNITED DEMOCRACY CENTER
45 Main Street, Suite 320
Brooklyn, NY 11201
(202) 999-9305
mai@statesunited.org

Christine P. Sun
STATES UNITED DEMOCRACY CENTER
95 Third Street, 2nd Floor
San Francisco, CA 94103
(202) 999-9305
christine@statesunited.org

*Counsel for Amici Curiae University Professors and Scholars*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it was prepared in 14-point Times New Roman, a proportionally spaced typeface, using Microsoft Word. *See* Fed. R. App. P. 32(g)(1). This brief complies with the type-volume limitation of Rule 29(a)(5) because it contains 6158 words, excluding the parts exempted by Rule 32(f).

Dated: April 3, 2026                    Respectfully submitted,

*/s/ Samantha Trepel*
Samantha Trepel

## CERTIFICATE OF SERVICE

I, Samantha Trepel, hereby certify that on April 3, 2026, I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. A true and correct copy of this Brief has been served via the Court's CM/ECF system on all counsel of record.

Dated: April 3, 2026                    Respectfully submitted,

                                        */s/ Samantha Trepel*
                                        Samantha Trepel

# ADDENDUM

- **Michael Albertus** is a professor of political science at the University of Chicago where he also serves as the Deputy Dean for Academic Affairs in the Division of Social Sciences. His research examines democracy and dictatorship, including why some countries are democratic and others aren't, and why some societies may fall into civil conflict.

- **Nancy Bermeo** is a Nuffield College Senior Research Fellow at Oxford University, an Emeritus Professor of Politics at Princeton University and a Fellow of the American Academy of Arts and Sciences. Her research focuses on regime change, democratic backsliding and popular resistance.

- **Javier Corrales** is a professor of political science at Amherst College. His research includes work on democratization and democratic backsliding with a focus on Latin America and the Caribbean. His latest book, *Autocracy Rising*, discusses the transition to authoritarianism in Venezuela since the 2010s.

- **Scott L. Cummings** is the Robert Henigson Professor of Legal Ethics at the UCLA School of Law, where he teaches and writes about the legal profession and legal ethics, and is the Founding Director of the Program in Legal Ethics and Democracy. He was awarded a 2023 Guggenheim Fellowship to study the role of lawyers in democratic backsliding.

- **Larry Diamond** is the William L. Clayton Senior Fellow at the Hoover Institution and the Mosbacher Senior Fellow in Global Democracy at the Freeman Spogli Institute for International Studies, at Stanford University. He co-founded and for 32 years co-edited the *Journal of Democracy* and is a past director of Stanford's Center on Democracy, Development and the Rule of Law.

- **David M. Driesen** is an emeritus professor of law at Syracuse University College of Law where his areas of academic interest include constitutional law and law and economics. His book, *The Spector of Dictatorship: Judicial Enabling of Presidential Power*, analyzes the chief executive's role in the democratic decline of Hungary, Poland, and Turkey.

- **Francis Fukuyama** is a senior fellow at FSI, and a faculty member of FSI's Center on Democracy, Development and the Rule of Law, and has written widely on issues in development and international politics. Earlier in his career, he was a member of the Political Science Department of the RAND Corporation, and a member of the Policy Planning Staff of the U.S. Department of State from 1981 to 1982.

- **Tom Ginsburg** is the Leo Spitz Distinguished Service Professor of International Law and a professor of political science at the University of Chicago, where his research focuses on comparative and international law. His most recent book is *Democracies and International Law*.

- **Gábor Halmai** is an emeritus professor of the Eötvös Loránd University (ELTE) in Hungary and the European University Institute in Florence, where he served as Chair of Comparative Law between 2016 and 2022. His research interests include the backsliding of liberal democracies within the European Union, with special focus on the development of constitutionalism and human rights in Hungary.

- **Gretchen Helmke** is a professor of political science at the University of Rochester, where she also serves as the Faculty Director for the University of Rochester's Democracy Center. A 2025 Guggenheim Fellow, Helmke's research focuses on political institutions, the rule of law, and democratic erosion in Latin America and the United States.

- **Aziz Z. Huq** is a professor of law at the University of Chicago Law School. He is a scholar of U.S. and comparative constitutional law and his recent work includes a focus on democratic backsliding. His award-winning scholarship is published in several books and in leading law, social science, and political science journals.

- **Sonia Mittal** is a Clinical Lecturer in Law and Associate Research Scholar in Law at Yale Law School. Her research in law and political science concerns constitutional failure in the United States and abroad.

- **Maria Popova** is the Hiram Mills Chair and associate professor of political science at McGill University. Her work explores the rule of law and democracy in Eastern Europe. Her book *Politicized Justice in Emerging Democracies* examines the weaponization of law to manipulate elections and control the media in Russia and Ukraine (1997-2004).

A-2

- **Stephen Richer** is the CEO of Republic Affairs, a consulting firm for democracy and the rule of law. He is also a Senior Practice Fellow in American Democracy at the Harvard Kennedy School's Ash Center for Democratic Governance and Innovation.

- **Dalibor Rohac** is a senior fellow at the American Enterprise Institute, where he studies European political and economic trends, U.S.-E.U. relations, and the post-Communist transitions and backsliding of countries in the former Soviet bloc. He is also a research associate at the Wilfried Martens Centre for European Studies in Brussels and previously was affiliated with the Cato Institute's Center for Global Liberty and Prosperity.

- **Kim Lane Scheppele** is the Rockefeller Professor of Sociology and International Affairs at Princeton. For more than 30 years, she has studied the rise and fall of constitutional government, living for extended periods in Russia and Hungary. Her book, *Destroying Democracy by Law*, is forthcoming from Harvard University Press.

- **Susan Stokes** is a professor of political science at the University of Chicago and the Faculty Director of the Chicago Center on Democracy. Her research and teaching interests include democratic theory and how democracy functions in developing societies. Her latest book, *The Backsliders: Why Leaders Undermine Their Own Democracies*, examines why democracies around the world are under assault by the leaders entrusted to preserve it.

- **Lucan Way** is a professor at the University of Toronto. His research focuses on global patterns of democracy and dictatorship. He has authored or co-authored several books on these topics, including *Revolution and Dictatorship: The Violent Origins of Durable Authoritarianism* and *Competitive Authoritarianism: Hybrid Regimes after the Cold War*.